IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

THEODORE ROOSEVELT                           )
CONSERVATION PARTNERSHIP                      )
555 Eleventh St. N.W., 6th Floor              )
Washington, DC 20004,                         )
                                              )
                Plaintiff,                    )
                                              )
        v.                                    )       CASE NO. 1:07-cv-01486-RJL
                                              )
DIRK KEMPTHORNE, in his official              )
capacity as the Secretary of the United States )
Department of the Interior                    )
1849 C Street, N.W.                           )
Washington, DC 20240,                         )
                                              )
        and                                   )
                                              )
UNITED STATES BUREAU OF LAND                  )
MANAGEMENT                                    )
1849 C Street, N.W., Room 406-LS              )
Washington, DC 20240,                         )
                                              )
                Defendants.                   )
_____)
                                              )
ANADARKO PETROLEUM CORPORATION,               )
P.O. Box 1330                                 )
Houston, TX 77251-1330,                       )
                                              )
WARREN RESOURCES, INC.,                       )
489 Fifth Avenue, 32nd Floor                  )
New York, NY 10017,                           )
                                              )
DOUBLE EAGLE PETROLEUM CO.,                   )
777 Overland Trail, Suite 208                 )
P.O. Box 766                                  )
Casper, WY 82602-0766,                        )
                                              )
                Movant-Intervenors.           )
_____)

**MOTION OF ANADARKO PETROLEUM CORPORATION, WARREN
RESOURCES, INC. AND DOUBLE EAGLE PETROLEUM CO. TO INTERVENE**

Pursuant to Rule 7(j) of the Local Rules of this Court and Rule 24 of the Federal Rules of Civil Procedure, Anadarko Petroleum Corporation ("Anadarko"), Warren Resources, Inc. ("Warren"), and Double Eagle Petroleum Co. ("Double Eagle") (collectively referred to as "Movants") respectfully move for leave to intervene as defendants in *Theodore Roosevelt Conservation Partnership v. Kempthorne, et al.*, Case Number 1:07-cv-01486-RJL.

In support of this motion, Movants state as follows:

1.    This action was initiated by Plaintiff Theodore Roosevelt Conservation Partnership ("Plaintiff") on August 17, 2007 against Dirk Kempthorne, in his official capacity as the Secretary of the Department of the Interior, and the United States Bureau of Land Management ("BLM") (collectively referred to as the "Federal Defendants") pursuant to the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4370f, the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. §§ 1701-1785, the Declaratory Judgment Act, 28 U.S.C. § 2201, and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706.  To date, no answer has been filed.  Under Federal Rule of Civil Procedure 12(a)(3), the Federal Defendants have 60 days from the date of service of the complaint to file a response and, thus, such answer would be due on or about October 16, 2007.

2.    Plaintiff brought this action to overturn a decision of the BLM that provides a management plan for the development of approximately 2,000 coalbed methane ("CBM") (also referred to as coalbed natural gas ("CBNG")) and conventional natural gas wells and associated infrastructure in the Atlantic Rim Project Area located in south central Wyoming.  The Atlantic Rim Project Area comprises approximately 270,080 acres, of which 173,672 acres are federal surface estate (64 percent), 14,060 acres are state surface estate (5 percent), and 82,348 acres are private surface estate (31 percent).  Beserra Decl. ¶ 4 (citing to Record of Decision, Environmental Impact Statement for the Atlantic Rim Natural Gas Field Development Project,

Carbon County, Wyoming ("ROD"), Mar. 2007, at 1). BLM's Rawlins Field Office manages more mineral estate than surface estate within the Area: 179,438 acres are federal mineral estate (66 percent), 12,384 acres are state mineral estate (5 percent), and 78,258 acres are private mineral estate (29 percent). *Id.* Under the ROD, the total surface area that would be disturbed by the development in the project area is a maximum of 7,600 acres, at any given time. *Id.* ¶ 6.

       3.      Anadarko is an independent oil and gas exploration and production company with extensive operations throughout Colorado, Utah and Wyoming, including CBM and natural gas operations. Beserra Decl. ¶ 2. Warren is an independent energy company engaged in the exploration and development of domestic onshore natural gas and oil reserves. Gobble Decl. ¶ 2. It is one of the leading developers of CBM in the Rocky Mountain region. *Id.* Double Eagle is an oil and gas exploration and development company with over thirty years of experience in the Rocky Mountain Basins of the western United States. Hollis Decl. ¶ 2. Anadarko, through Anadarko E&P Company LP, Warren, and Double Eagle are the proponents of the Atlantic Rim Natural Gas Field Development Project that is at issue in this case. Beserra Decl. ¶ 5; Gobble Decl. ¶ 5; Hollis Decl. ¶ 4. Anadarko, Warren and Double Eagle all have been granted oil and gas leaseholds throughout the Atlantic Rim Project Area. Beserra Decl. ¶ 3; Gobble Decl. ¶ 3; Hollis Decl. ¶ 3. As discussed more fully below, a decision in this case overturning the BLM action would significantly affect Anadarko's, Warren's and Double Eagle's rights in the Atlantic Rim Project Area.

       4.      In June of 2001, the Federal Defendants announced that an environmental impact statement ("EIS") for the Atlantic Rim Coalbed Methane Project (subsequently renamed Atlantic Rim Natural Gas Development Project) was to be prepared pursuant to NEPA. *See* 66 Fed. Reg. 33,975 (June 26, 2001). The EIS was to review the potential impacts of a proposed coalbed

methane field development project, which initially included up to 3,880 coalbed methane wells

with associated facilities, located within approximately 310,335 acres of Federal, State, and

private lands. *Id.* at 33,975. The anticipated life of the proposed project is approximately 20 to

30 years. *Id.*

5.    In December of 2005, BLM issued a draft EIS. In November of 2006, the final

EIS was completed. The FEIS analyzed various options for oil and gas recovery and resource

mitigation. BLM's Record of Decision, issued March 2007, outlined a management plan for the

development of the area, which would include approximately 2,000 gas wells within the Atlantic

Rim Project Area to recover energy resources, while limiting total new surface disturbance from

the drilling program (federal, state and fee minerals) to a maximum of 7,600 acres, at any given

time, and a 6.5-acre/well site short-term (less than 6 years) disturbance goal. Beserra Decl. ¶6

(citing ROD at 1). Additional environmental review will be undertaken as required by law with

respect to applications for permits to drill, right-of-way grants, sundry notices, or applications for

special use permits associated with the project. *Id.* (citing ROD at 3).

6.    On June 18, 2007, Plaintiff filed an appeal with the Interior Board of Land

Appeals (IBLA-2007-008). Compl. ¶ 59. With its notice of appeal, Plaintiff filed a petition for

stay. *Id.* Because of their strong interests in the administrative appeal, as proponents of the

project at issue, Anadarko, Warren and Double Eagle all sought, and obtained, participation as an

intervenor in the administrative proceeding (as well as three other administrative appeals).

Beserra Decl. ¶ 7; Gobble Decl. ¶ 6; Hollis Decl. ¶ 6. The petition for stay was denied on

September 5, 2007. Beserra Decl. ¶ 7. The Plaintiff filed a notice withdrawing the appeal on

September 11, 2007.  Hollis Decl. ¶ 6.  On September 12, 2007, the Interior Board of Land

Appeals dismissed the appeal.  *Id.*[1]

8.      The interests of Movants will be directly affected by the Court's action in this

case.  As noted above, Movants have oil and gas leases and operations in the Atlantic Rim

Project area and have plans for additional CBM development.  Movants' planned development is

the subject of this case.  Plaintiff's suit, if successful, would directly affect Movants' ability to

develop and utilize the rights that have been granted to them under their oil and gas leases, or

place additional restrictions on their proposed operations.  The action also could cause Movants

to incur additional costs and suffer further delays relating to the Atlantic Rim project.  In order to

protect these interests, therefore, Movants seeks to intervene in this action as a matter of right.

8.      The interests of Movants will not be adequately represented in the absence of

intervention.  Plaintiff is a non-governmental organization whose interests do not align with

those of Movants.  Plaintiff has opposed the proposed development of the Atlantic Rim Project

Area.  The Federal Defendants include a federal government official and an agency that are

responsible for the management of public lands and mineral rights pursuant to federal laws and

regulations.  These federal government parties cannot adequately represent the unique interests

of Movants, as the federal government must take into account numerous other public interests.

9.      This motion to intervene is being filed within the time the Federal Defendants are

required to file an answer, and is therefore timely.  Granting the motion to intervene in this

matter will not prejudice any party, nor will it delay the proceedings.  The motion is being filed

at the preliminary stages of the case, and Movants will comply with all scheduling orders

established by the Court for intervenor participation in this action.

---

[1]  The declarations for Messrs. Beserra and Gobble were executed prior to their receiving notice of the dismissal of the administrative appeal, and these declarations therefore do not reflect that dismissal.

10.     Movants, therefore, are entitled to intervene as a matter of right under Federal Rule of Civil Procedure 24(a) because:  (a) the motion is timely; (b) Movants have an interest in the subject matter of this case; (c) Movants' interests will be impaired absent intervention; and (d) Movants' interests will not be adequately represented by the existing parties in this case.

11.     In the alternative, Movants' should be granted intervention on a permissive basis under Federal Rule of Civil Procedure 24(b).  Any defenses raised by Movants will be based on common issues of fact and of law with those of the Federal Defendants.  Further, Movants' intervention will not unduly delay the proceedings or prejudice the original parties.

12.     Pursuant to Local Rule 7(m), Counsel for Movants contacted Counsel for Plaintiff and Counsel for the Federal Defendants.  Plaintiffs do not oppose this motion.  The Federal Defendants take no position on this motion.

13.     With the Motion to Intervene, Movants are submitting an Answer (attached hereto as "Exhibit A").

**WHEREFORE**, Anadarko Petroleum Corporation, Warren Resources, Inc., and Double Eagle Petroleum Co. respectfully request that this Court grant their Motion to Intervene and permit Movants to file the Answer.

Respectfully submitted,

_____/s/ Michael B. Wigmore_____
Michael B. Wigmore (DC Bar # 436114)
Bingham McCutchen LLP
2020 K Street, N.W.
Washington, D.C.  20006
(202) 373-6000
(202) 373-6001 (facsimile)

*Counsel for Anadarko Petroleum Corporation,
Warren Resources, Inc. and Double Eagle
Petroleum Co.*

*Of Counsel for Double Eagle Petroleum Co.*

Robert C. Mathes (DC Bar # 484255)
*(application for admission pending)*
Bjork Lindley Little PC
1600 Stout Street, Suite 1400
Denver, CO 80202
(303) 892-1400
(303) 892-1401 (facsimile)

Dated:  September 14, 2007

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

THEODORE ROOSEVELT                          )
CONSERVATION PARTNERSHIP                     )
555 Eleventh St. N.W., 6th Floor            )
Washington, DC 20004,                        )
                                             )
               Plaintiff,                    )
                                             )
        v.                                   )          CASE NO. 1:07-cv-01486-RJL
                                             )
DIRK KEMPTHORNE, in his official             )
capacity as the Secretary of the United States )
Department of the Interior                   )
1849 C Street, N.W.                          )
Washington, DC 20240,                        )
                                             )
     and                                     )
                                             )
UNITED STATES BUREAU OF LAND                 )
MANAGEMENT                                   )
1849 C Street, N.W., Room 406-LS             )
Washington, DC 20240,                        )
                                             )
        Defendants.                          )
_____)
                                             )
ANADARKO PETROLEUM CORPORATION,              )
P.O. Box 1330                                )
Houston, TX 77251-1330,                      )
                                             )
WARREN RESOURCES, INC.,                      )
489 Fifth Avenue, 32nd Floor                 )
New York, NY 10017,                          )
                                             )
DOUBLE EAGLE PETROLEUM CO.,                  )
777 Overland Trail, Suite 208                )
P.O. Box 766                                 )
Casper, WY 82602-0766,                       )
                                             )
        Movant-Intervenors.                  )
_____)

**MEMORANDUM IN SUPPORT OF THE MOTION OF
ANADARKO PETROLEUM CORPORATION, WARREN RESOURCES, INC. AND
<u>DOUBLE EAGLE PETROLEUM CO. TO INTERVENE</u>**

On August 17, 2007, Plaintiff Theodore Roosevelt Conservation Partnership ("Plaintiff") initiated an action against Dirk Kempthorne, in his official capacity as the Secretary of the United States Department of Interior, and the United States Bureau of Land Management ("BLM") (collectively referred to as the "Federal Defendants") pursuant to the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4370f, the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. §§ 1701-1785, the Declaratory Judgment Act, 28 U.S.C. § 2201, and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706.  In this case, Plaintiff seeks to set aside a Record of Decision ("ROD") and its accompanying environmental impact statement ("EIS") of the BLM that provides a management plan related to coalbed methane and natural gas development in the Atlantic Rim Project Area, and to enjoin BLM from taking any further action in reliance of the ROD and EIS.

Anadarko Petroleum Corporation ("Anadarko"), Warren Resources, Inc. ("Warren") and Double Eagle Petroleum Co. ("Double Eagle") (collectively referred to as "Movants") are independent oil and gas exploration and production companies with extensive operations throughout Colorado, Utah and Wyoming, including coalbed methane ("CBM") or coalbed natural gas ("CBNG") operations.  Movants have substantial oil and gas leaseholds in the project area, and are proponents of the operations that are the subject of the BLM's ROD and EIS at issue in this case.  These interests will be adversely impacted if the ROD and EIS are set aside.

Because of their substantial interests in the outcome of this case, Movants respectfully seek intervention as parties in the case.  Movants' intervention would not delay or complicate the case, nor would it otherwise increase the burden on the existing parties.  Intervention is essential to ensure that Movants rights are adequately protected.  Plaintiffs do not oppose this motion. The Federal Defendants take no position on this motion.

# ARGUMENT

## I.    MOVANTS ARE ENTITLED TO INTERVENE AS A MATTER OF RIGHT.

Movants are entitled to intervene as a matter of right in this case.  Movants have "an interest relating to the property or transaction which is the subject of the action and ... the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest."  Fed. R. Civ. P. 24(a)(2).  Moreover, Movants' interests are not "adequately represented by existing parties."  *Id.*  The premise of intervention is "the protection of third parties affected by pending litigation."  *Kleissler v. U.S. Forest Serv.*, 157 F.3d 964, 971 (3d Cir. 1998).  This Court and the D.C. Circuit have taken a liberal approach to intervention.  *See Wilderness Soc'y v. Babbitt*, 104 F. Supp. 2d 10, 12, 18 (D.D.C. 2000) (citing *Natural Res. Def. Council v. Costle*, 561 F.2d 904, 910-11 (D.C. Cir. 1977)).

When intervention is sought by an applicant to uphold an agency's action, intervention as a matter of right should be granted when the applicant (a) files a timely motion, (b) has standing, and (c) has an interest in the action that may be impaired by the outcome and is not adequately represented without intervention.  *See Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 731-32 (D.C. Cir. 2003); *County of San Miguel, Colo. v. MacDonald*, __ F. Supp. 2d ___, 2007 WL 2367759, at *6-10 (D.D.C. Aug. 21, 2007); *Am. Horse Prot. Ass'n, Inc. v. Veneman*, 200 F.R.D. 153, 156 (D.D.C. 2001).  Movants satisfy all of these requirements.

### A.    The Intervention Motion is Timely Filed.

The intervention motion is timely.  Movants' intervention will not prevent this case from an "efficient proceeding to a final resolution."  *Am. Horse Prot. Ass'n*, 200 F.R.D. at 157.  Also, the motion will not result in prejudice to the parties.  *See Foster v. Gueory*, 655 F.2d 1319, 1324 (D.C. Cir. 1981) ("Whether a motion to intervene is timely made is 'to be determined from all

the circumstances, including the purpose for which intervention is sought ... and the improbability of prejudice to those already in the case.'"). The instant motion is being filed within the time granted to the Federal Defendants to file an answer to the Plaintiff's Complaint under Federal Rule of Civil Procedure 12(a)(3), and less than one month since the complaint was filed. To date, only an initial case management order has been issued, but it provided no briefing scheduling, and no hearing or trial date has been set. *See, e.g., Utah Ass'n of Counties v. Clinton*, 255 F.3d 1246, 1250-51 (10th Cir. 2001) (finding motion to intervene timely because it was filed at early stage of litigation in which no scheduling order has been issued, no trial date set, and no cut-off date for motions set, and because parties would not be prejudiced by intervention).

### B.    Movants Have Standing to Intervene in this Case.

Movants have standing in this case. "It would follow that, when a party seeks to intervene as a defendant to uphold what the government has done, it would have to establish that it will be injured in fact by the setting aside of the government's action it seeks to defend, that this injury will have been caused by that invalidation, and the injury would be prevented if the government action is upheld." *Am. Horse Prot. Ass'n*, 200 F.R.D. at 156. Movants satisfy these requirements in this case.

Movants are oil and gas development companies that engage in CBM operations. Each has leaseholds in the Atlantic Rim Project Area, and Movants are the proponents of the project that is the subject of the EIS and the ROD at issue in this case. Beserra Decl. ¶¶ 3, 5; Gobble Decl. ¶¶ 3, 5; Hollis Decl. ¶¶ 3, 4. The ROD authorizes and provides a management plan for the proposed project and, thus, is a critical step in its development. Movants' ability to take advantage of their leaseholds are dependent on the ROD, which is being challenged by Plaintiff.

Thus, Movants will be injured in fact if the decision of the BLM is set aside, this injury would be caused by that invalidation, and the injury would be prevented if the agency action is upheld.

In *American Horse Protection Association, Inc. v. Veneman*, this Court found horse trainers had standing to intervene as defendants in a case seeking to set aside an operating plan that "regulates how they conduct the training of the horses they exhibit and how violations of that regulatory scheme will be detected and punished."  200 F.R.D. at 157.  The Court found the "invalidation of the Plan will render nugatory all the efforts the Fund's members have made to date in assisting its creation and will lead to a period of uncertainty during which a new regulatory scheme is created. …  Finally, there is a significant potential that the invalidation of the Operating Plan will lead to the promulgation of new regulations which will be more demanding of the Fund's members than the current Operating Plan."  *Id.*

Similarly here, Movants' have engaged in extended efforts to develop the project and prepare their operations in compliance with the ROD.  Beserra Decl. ¶ 9; Gobble Decl. ¶ 8; Hollis Decl. ¶¶ 8, 9.  Invalidation of the ROD may render these efforts nugatory.  At a minimum, the invalidation of the ROD will result in additional costs and delay, and Movants may be subject to more demanding requirements as a result.  All of these injuries are avoided if the ROD and EIS remain in place.  Movants, therefore, have standing to intervene in this case.

### C.    Movants Have Interests that May be Impaired by the Outcome of the Case, which are Not Adequately Represented by the Existing Parties.

Movants have significant, direct interests in the outcome of this case, which may be impaired and which are not adequately represented by the existing parties.  *See Am. Horse Prot. Ass'n*, 200 F.R.D. at 156.  First, Movants have sufficient interest in this litigation for intervention.  This Circuit determines whether a party has sufficient interest in the litigation to justify intervention "by the most pragmatic test possible":  the "interest test" is "primarily a

practical guide to disposing of lawsuits by involving as many apparently concerned persons as is compatible with efficiency and due process." *Id.* at 157 (citations omitted). Movants' interest in the validity of the ROD and EIS, in order to develop their leaseholds and proposed projects, meets this "liberal and forgiving standard." *Id.*

As described above, Movants are holders of oil and gas interests in the Atlantic Rim area and are the proponents of the CBM and natural gas project the Plaintiff seeks to enjoin, and thus have a direct interest in the outcome of this case. *See, e.g., Kleissler*, 157 F.3d at 971-72 (finding business interests tied to agency action sufficient to grant intervention to timber companies). Several courts, including this Court, have granted intervention as of right to parties that hold mineral leases in actions that could affect those leases. *See, e.g., N. Plains Res. Council v. BLM*, Nos. 03-69-BLG-RWA, 03-78-BLG-RWA, 2005 U.S. Dist. LEXIS 4678, at *12 n.4 (D. Mont. Feb. 25, 2005) (noting that several petroleum companies were permitted to intervene as defendants in a case where plaintiffs challenged BLM's Final Statewide Oil and Gas Environmental Impact Statement and proposed changes to the Resource Management Plans authorizing coalbed methane development); *S. Utah Wilderness Alliance v. Norton*, No. 01-2518, 2002 U.S. Dist. LEXIS 27414, at *17-18 (D.D.C. June 29, 2002) (recognizing a petroleum company's intervention of right as a defendant in an action challenging the BLM's decision to issue mineral leases to the company and others).

Moreover, because Movants have demonstrated the requisite standing in this case, the interest requirement for intervention is met. *See Fund for Animals*, 322 F.3d at 735 ("Our conclusion that the [Movant] has constitutional standing is alone sufficient to establish that [it] has 'an interest relating to the property or transaction which is the subject of the action.'"); *Am. Horse Prot. Ass'n*, 200 F.R.D. at 157 ("[I]t is impossible to conjure a case in which an intervenor

would have constitutional standing to intervene but not have a sufficient 'interest in the litigation' to justify intervention under Fed. R. Civ. P. 24(a)(2).").  As this Court has found, "the participation of the persons most directly affected by the [challenged agency action] is utterly consistent with the notice and opportunity to be heard concerns that lie at the heart of the due process clause." *Am. Horse Prot. Ass'n*, 200 F.R.D. at 158.

Second, Movants' interest could be impaired by the outcome of this lawsuit.  This Court looks to the "practical consequences" to the movant of denying intervention in determining whether the movant's interest will be impaired by an action.  *Am. Horse Prot. Ass'n*, 200 F.R.D. at 158 (citations omitted).  A judgment in this case overturning the BLM's decision approving a management plan for the development of CBM and natural gas in the Atlantic Rim Project Area will directly impair Movants' rights under their leaseholds.  *See S. Utah Wilderness Alliance*, 2002 U.S. Dist. LEXIS 27414, at *17 (finding mineral leaseholder met requirement to show impairment of interest for intervention in an action challenging BLM's decision to issue those and other mineral leases under NEPA, National Historic Preservation Act, and APA where, should plaintiffs prevail, company's lease interests would be "significantly impaired").  Movants should be afforded the ability to ensure their interests are protected, and without intervention their ability to protect their interests is substantially impaired.

Finally, Movants meet the minimal burden of showing that their interests are not adequately represented by the existing parties because their interests differ from those of the Plaintiff and the Federal Defendants.  "The Supreme Court has held that inadequacy of representation is satisfied 'if the applicant shows that representation of [its] interest 'may be' inadequate; and the burden of making that showing should be treated as minimal.'" *County of San Miguel, Colo.,* 2007 WL 2367759, at *10 (quoting *Trbovich v. United Mine Workers of Am.*,

404 U.S. 528, 538 n.10 (1972)). *See also Am. Horse Prot. Ass'n*, 200 F.R.D. at 159. Plaintiff's interests are divergent from Movants. Plaintiff is a public interest organization, representing the aesthetic, environmental, and other interests of its members and seeks to have Movants' operations prohibited or substantially limited.

The Federal Defendants also cannot adequately represent Movants because they cannot solely take into account the interests of the leaseholders and project proponents, but must consider the interests of the public as a whole. *See, e.g., County of San Miguel, Colo.,* 2007 WL 2367759, at \*10 ("[T]he [Fish and Wildlife Service's] obligation is to represent the interests of the general public…while the intervenor-applicants' interests are those of its members, which include, but are not limited to protecting their members' livelihoods and business operations…."); *Fund for Animals*, 322 F.3d at 736-37 ("[W]e have often concluded that governmental entities do not adequately represent the interests of aspiring intervenors… ."); *San Juan County, Utah v. United States*, 420 F.3d 1197, 1212 (10th Cir. 2005) (quoting *Utahns for Better Transp. v. U.S. Dep't of Transp.*, 295 F.3d 1111, 1117 (10th Cir. 2002)) ("We have repeatedly pointed out that in such a situation the government's prospective task of protecting not only the interest of the public but also the private interest of the petitioners in intervention is on its face impossible and creates the kind of conflict that satisfies the minimal burden of showing inadequacy of representation."); *Kleissler,* 157 F.3d at 973-74 ("[T]he government represents numerous complex and conflicting interests in matters of this nature. The straightforward business interests asserted by intervenors here may become lost in the thicket of sometimes inconsistent governmental policies."); *Sierra Club v. Espy*, 18 F.3d 1202, 1208 (5th Cir. 1994) (finding that the government did not adequately represent the timber industry because it "must represent the broad public interest, not just the economic concerns of the timber

industry"); *Castle*, 561 F.2d at 912 (finding EPA did not adequately represent interests of proposed industry intevenors that were "more narrow and focused than EPA's, being concerned primarily with the regulation that affects their industries"); *see also Sierra Club v. Glickman*, 82 F.3d 106, 110 (5th Cir. 1996); *Am. Horse Prot. Ass'n*, 200 F.R.D. at 159; *People for the Ethical Treatment of Animals v. Babbitt,* 151 F.R.D. 6, 8 (D.D.C. 1993). Neither party, therefore, adequately represents the interests of Movants in this case.

Because their motion is timely, they have standing, their interests could be impaired, and they are not adequately represented by the existing parties, Movants are entitled to intervene as a matter of right.

## II.    MOVANTS ARE ENTITLED TO PERMISSIVE INTERVENTION.

Alternatively, this Court should find that Movants are entitled to permissive intervention. Federal Rule of Civil Procedure 24(b) provides for permissive intervention, upon timely application, where the applicant's claim or defense and the main action have a question of law or fact in common. Fed. R. Civ. P. 24(b). In exercising its discretion, the Court also must consider whether the intervention will delay or prejudice the rights of the existing parties. *Id.*; *see also Appleton v. Food & Drug Admin.*, 310 F. Supp. 2d 194, 196 (D.D.C. 2004).

First, there is a common question of law and fact between Movants' defense and the main action. Plaintiff's action challenges approval of a management plan issued by BLM that regulates Movants' rights to CBM development in the Atlantic Rim Project Area. By intervention, Movants do not seek to raise any new claims, but to defend the decision in this case to allow CBM development. As such, Movants' defense and the main action have the same questions of law and fact. *See, e.g., Weinberg v. Barry*, 604 F. Supp. 390, 392 n.1 (D.D.C. 1985)

(finding "it is clear that common questions of law and fact exist" where the intervenor sought to defend the validity of its own landmark application against plaintiffs' challenges).

Second, as described above, this motion for intervention is timely, and will not delay the adjudication or prejudice the existing parties. As described above, the instant motion is timely because it is being filed early in the proceedings of the case. In addition, Movants will abide by any scheduling order issued by the Court. Intervention in this case, then, would not delay the proceedings or prejudice the parties to the case. This Court, therefore, should grant the motion to intervene in this case. *See, e.g., Huron Envtl. Activist League v. EPA*, 917 F. Supp. 34, 43 (D.D.C. 1996) (granting permissive intervention where movant's defenses to plaintiffs' claims had common questions of law and fact and would not unduly delay adjudication of rights of original parties).

## CONCLUSION

For the reasons stated above, Anadarko Petroleum Corporation, Warren Resources, Inc. and Double Eagle Petroleum Co. respectfully request that their motion to intervene be granted.

Respectfully submitted,


_____/s/ Michael B. Wigmore_____
Michael B. Wigmore (DC Bar # 436114)
Bingham McCutchen LLP
2020 K Street, N.W.
Washington, D.C.  20006
(202) 373-6000
(202) 373-6001 (facsimile)

*Counsel for Anadarko Petroleum Corporation,*
*Warren Resources, Inc. and Double Eagle*
*Petroleum Co.*

*Of Counsel for Double Eagle Petroleum Co.*

Robert C. Mathes (DC Bar # 484255)
*(application for admission pending)*
Bjork Lindley Little PC
1600 Stout Street, Suite 1400
Denver, CO 80202
(303) 892-1400
(303) 892-1401 (facsimile)

Dated:  September 14, 2007

Unreported Cases

Westlaw.

2007 WL 2367759                                                                Page 1

--- F.Supp.2d ----, 2007 WL 2367759 (D.D.C.)

**(Cite as: 2007 WL 2367759 (D.D.C.))**

Only the Westlaw citation is currently available.

United States District Court,
District of Columbia.
COUNTY OF SAN MIGUEL, COLORADO, et al.,
Plaintiffs,
v.
MacDONALD, et al., Defendants,
and
Colorado Cattlemen's Association, Partnership for the
West, and Western
Conservation Coalition, Intervenor-Applicants.
**Civil Action No. 06-1946 (RBW).**

Aug. 21, 2007.

Amy R. Atwood, Eugene, OR, Geoff Hickcox, Durango, CO, Rebekah S. King, Assistant Attorney for San Miguel County, Telluride, CO, for Plaintiffs.

Courtney O. Taylor, James A. Maysonett, U.S. Department of Justice, Washington, DC, for Defendants.

Anurag Varma, Conlon, Frantz, Phelan & Varma, LLP, Washington, DC, for Movants.

### *MEMORANDUM OPINION*
REGGIE B. WALTON, United States District Judge.

**\*1** On November 14, 2006, the plaintiffs, the County of San Miguel, Colorado and nine conservation, birding, and governmental-accountability organizations, mostly non-profit, filed a complaint pursuant to the Endangered Species Act ("ESA"), 16 U.S .C. § 1540(g)(1)(C) (2000) and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 702, 706 (2000), challenging the defendants' (Julie MacDonald, [FN1] Dick Kempthorne, [FN2] and H. Dale Hall [FN3]) determination that listing the Gunnison sage-grouse as "endangered" or "threatened" under the ESA is "not warranted." [FN4] ("Compl.") ¶ 1; *see generally* Final Listing Determination for the Gunnison Sage-Grouse as Endangered or Threatened, 71 Fed.Reg. 19954-01 (Apr. 18, 2006) (to be codified at 50 C.F.R. pt. 17) ("Final Determination"). The plaintiffs seek declaratory relief that sets aside the United States Fish and Wildlife Service's ("FWS") "not warranted" finding and requires the issuance of an emergency rule listing the Gunnison sage-grouse as

"endangered" under the ESA until normal listing procedures are completed pursuant to the citizen suit provision of the ESA, 16 U.S.C. § 1540(g)(1)(C), and the judicial review provisions of the APA, 5 U.S.C. §§ 702, 706. [FN5] Compl. ¶¶ 2-3 and C, E at 23.

> FN1. Julie MacDonald is being sued in her official capacity as Deputy Assistant Secretary for Fish & Wildlife and Parks Service in the United States Department of the Interior. Complaint ("Compl.") ¶ 22.

> FN2. Dick Kempthorne is being sued in his official capacity as Secretary of the Department of the Interior. *Id.* ¶ 23.

> FN3. H. Dale Hall is being sued in his official capacity as Director of the United States Fish and Wildlife Service, a component of the Department of the Interior. *Id.* ¶ 24.

> FN4. The nine conservation, birding, and government accountability organizations that have joined the County of San Miguel, Colorado in this action are Sagebrush Sea Campaign, Center for Native Ecosystems, Forest Guardians, The Larch Company, Sinapu, Center for Biological Diversity, Public Employees for Environmental Responsibility, Black Canyon Audubon Society, and Sheep Mountain Alliance. *See id.* ¶¶ 10-18. These organizations, *inter alia,* are committed to the conservation and recovery of the Gunnison sage-grouse. *See id.*

> FN5. Specifically, the plaintiffs request that the Court find that the FWS's determination that listing the Gunnison sage-grouse as threatened or endangered was "not warranted" (1) violates Section 4(b)(3)(A) of the ESA and (2) is arbitrary, capricious, an abuse of discretion, and constitutes agency action unlawfully withheld under Section 706 of the APA. Compl. ¶¶ C, E at 23; *see* 16 U.S.C. § 1533(b)(3)(A)(2000); 5 U.S.C. § 706.

Currently before this Court is a motion to intervene

--- F.Supp.2d ----, 2007 WL 2367759 (D.D.C.)

**(Cite as: 2007 WL 2367759 (D.D.C.))**

as defendants filed by intervenor-applicants Colorado Cattlemen's Association ("Cattlemen"), Partnership for the West ("Partnership"), and Western Conservation Coalition ("Western") pursuant to Federal Rule of Civil Procedure 24(a). [FN6] Intervenor-Applicants Colorado Cattlemen's Association, Partnership for the West, and Western Conservation Coalition's Motion for Leave to Intervene as Defendants ("Intervenor-Applicants' Mot."). [FN7] The motion is unopposed by the current defendants, Intervenor-Applicants' Mem. at 18, but is opposed by the plaintiffs, *see* Pls.' Opp'n.

> FN6. Alternatively, the intervenor-applicants request intervention under Rule 24(b), which allows permissive intervention "when an applicant's claim or defense and the main action have a question of law or fact in common." Fed.R.Civ.P. 24(b). However, "[i]n exercising its discretion the [C]ourt shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties." *Id.* Permissive intervention, therefore, may be granted if the prospective intervenor presents "(1) an independent ground for subject matter jurisdiction; (2) a timely motion; and (3) a claim or defense that has a question of law or fact in common with the main action." *Equal Employment Opportunity Comm'n v. Nat'l Children's Ctr., Inc.,* 146 F.3d 1042, 1046 (D.C.Cir.1998) (citation omitted). The Court enjoys considerable discretion in deciding whether intervention should be permitted. *Id.* at 1048. However, the Court need not analyze the intervenor-applicants' motion under this theory because it concludes that the intervenor-applicants may intervene as a matter of right. *See* Fund for Animals, Inc. v. Norton, 322 F.3d 728, 731 (D.C.Cir.2003) ("Because we conclude that the NRD is entitled to intervene as of right, we need not address the issue of permissive intervention.") (citation omitted).

> FN7. The following papers have been submitted in connection with this motion: (1) Memorandum of Points and Authorities in Support of Intervenor-Applicants Colorado Cattlemen's Association, Partnership for the West, and Western Conservation Coalition's Motion for Leave

to Intervene as Defendants ("Intervenor-Applicants' Mem."), (2) Plaintiffs' Memorandum in Opposition to Motion of Colorado Cattlemen, et al., to Intervene ("Pls.' Opp'n") and (3) Intervenor-Applicants Colorado Cattlemen's Association, Partnership for the West, and Western Conservation Coalition's Reply Memorandum in Support of Motion for Leave to Intervene as Defendants ("Intervenor-Applicants' Reply").

For the reasons set forth below, the intervenor-applicants' motion is granted.

## I. Factual Background
*A. The Endangered Species Act*

The ESA, 16 U.S.C. §§ 1531 et seq. (2000), is intended, *inter alia,* "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved [and] to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b). The Supreme Court has stated that "[t]he plain intent of Congress in enacting [the ESA] was to halt and reverse the trend toward species extinction, whatever the cost." *Tennessee Valley Auth. v. Hill,* 437 U.S. 153, 184 (1978).

The ESA protects species listed under the Act as "endangered" or "threatened" in several ways. The Act: (1) requires the FWS to develop and implement a recovery plan for listed species, 16 U.S.C. § 1533(f); (2) requires all federal agencies to carry out their programs for the conservation of the listed species and not jeopardize the continued existence of listed species, 16 U.S.C. § 1536(a)(1), (a)(2); and (3) forbids anyone from "taking" listed species by any means, except where authorized, 16 U.S.C. §§ 1538, 1539, 1532(19); 50 C.F.R. § 17.31.

*2 The ESA charges the Secretary of the United States Department of the Interior ("Secretary") with determining whether a species is "endangered" or "threatened," and when such a determination is made, to designate its "critical habitat." 16 U.S.C. § 1533. The Secretary has delegated the responsibility of these determinations to the FWS. 50 C.F.R. § 402.01(b).

Protection of a species does not commence under the ESA until the species is listed as either endangered or

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----, 2007 WL 2367759 (D.D.C.)
**(Cite as: 2007 WL 2367759 (D.D.C.))**

threatened. *See* 16 U.S.C. § 1533(f) (requiring the development of a recovery plan for listed species). Under the ESA, a species is endangered if it "is in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6). A species is threatened if it "is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id* . § 1532(20). Once one of these designations is made, the ESA requires all federal agencies to verify that any action they authorize, fund, or perform "is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary ... to be critical." 16 U.S.C. § 1536(a)(2).

A species may be classified as endangered or threatened by the Secretary's own initiative or by a petition to list a species submitted by the public to the Secretary. 16 U.S.C. § 1533(a) & (b). When the FWS receives a petition to list a species submitted by the public, within 90 days of receiving the petition, "to the maximum extent practicable," the FWS must determine "whether the petition presents substantial scientific or commercial information indicating that ... [a listing] may be warranted." 16 U.S.C. § 1533(b)(3)(A). If the FWS determines that listing based upon a petition "may be warranted," the FWS must start a review of the status of the species, *id.,* which must include (1) publication of the "may be warranted" determination in the Federal Register, *id.* § 1533(b)(3)(B)(ii), and (2) an opportunity for public review and comments on new or revised recovery plans [FN8], *id.* § 1533(f)(4). At the conclusion of the review period, the FWS must determine whether the petition for the listing of a species is (1) "not warranted," *id.* § 1533(b)(3)(B)(I), (2) "warranted," *id.* § 1533(b)(3)(B)(ii), or (3) "warranted ... but ... precluded" because of, *inter alia,* other "pending proposals to determine whether any species is an endangered or a threatened species ...." *id.* § 1533(b)(3)(B)(iii). If the listing is warranted, the FWS must (1) promptly publish a proposed regulation in the Federal Register, 16 U.S.C. § 1533(b)(3)(B)(ii), and (2) within one year publish a final regulation or withdraw the proposed regulation, *id.* § 1533(b)(6)(A)(I). The designation of the critical habitat of an endangered or threatened species must be made at the same time. [FN9] *Id.* § 1533(b)(6)(A)(ii). If the FWS determines that the listing is "not warranted," it must also publish that determination in the Federal Register *Id.* §

1533(b)(3)(B)(I). The FWS's "not warranted" determination is subject to judicial review. *Id.* § 1533(b)(3)(C)(ii).

> FN8. A recovery plan is a plan developed and implemented by the Secretary "for the conservation and survival of endangered species and threatened species listed pursuant to [16 U.S.C. § 1533]...." 16 U.S.C. § 1533(f)(1).

> FN9. The ESA defines "critical habitat" as a habitat that is "essential to the conservation of the species," 16 U.S.C. §§ 1532(5)(A)(I), (A)(ii), with "conservation" defined as the use of methods necessary "to bring any [listed species] to the point at which the measures provided pursuant to this chapter are no longer necessary," *id.* § 1532(3).

*B. The Gunnison Sage-grouse*

**\*3** "The sage-grouse is a brownish-gray bird known for its unique mating ritual and the colorful ... features on the male birds," Compl. ¶ 25, which is a "distinct species" from a bird with a smaller wing span known as the Gunnison sage-grouse, *id.* ¶ 26. This distinct sub-species of the Gunnison sage-grouse is currently found primarily in the Gunnison Basin in southwestern Colorado. *Id.* ¶¶ 26, 31. The Gunnison sage-grouse relies upon sagebrush habitats "throughout the year" for "food, shelter, and cover." *Id.* ¶¶ 28-29.

According to the FWS, "[t]he current range of [the] Gunnison sage-grouse is about 8.5 percent of its historic range." [FN10] *Id.* ¶ 30, *see id.* ¶ 68. In 2004, the Colorado Division of Wildlife "estimated that the rangewide Gunnison sage-grouse population declined between 42 and 90 percent over the last 50 years ." *Id.* ¶ 31. The plaintiffs represent that factors contributing to the decline of the species include "habitat loss, fragmentation, and degradation from numerous human activities" such as domestic livestock grazing. *Id.* ¶ 32. The National Audubon Society has identified the Gunnison sage-grouse as one of the country's ten most endangered birds. *Id.* ¶ 33.

> FN10. According to the plaintiffs, the "historic range of the Gunnison sage-grouse likely included southwestern Colorado, southwestern Kansas, northwestern

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----, 2007 WL 2367759 (D.D.C.)

**(Cite as: 2007 WL 2367759 (D.D.C.))**

Oklahoma, northern New Mexico, northern Arizona, and southeastern Utah." *Id.* ¶ 27.

*C. Listing of the Gunnison Sage-grouse*

On January 25, 2000, the plaintiffs submitted a petition to the Secretary to list the Gunnison sage-grouse as endangered under the ESA. *Id.* Approximately a month later, the plaintiffs received a written response from Ralph Morgenweck, Regional Director of the FWS Mountain-Prairie Region, stating that the FWS had internally designated the Gunnison sage-grouse as a candidate species a week before the FWS-Mountain Prairie Region received the petition "by relying on provisions in the agency's 'Petition Management Guidance' ("PMG") Policy." [FN11] *Id.* ¶¶ 46-47.

> FN11. The PMG Policy was subsequently declared invalid, and the defendants in an earlier action were enjoined by this Court from applying the policy. See June 2, 2004 Order at 6-7, *American Lands Alliance v. Norton* ("Norton I"), No. 00-2339 (D.D.C.2003) (RBW).

The defendants' review of the Gunnison sage-grouse's classification status has already been the subject of several court actions claiming that the FWS was not following the mandate of the ESA. [FN12] On November 14, 2005, in one of those actions, *Norton II,* "the parties filed a stipulated settlement agreement with the Court that required [the] defendants to publish a listing determination for [the] Gunnison sage-grouse on or before March 31, 2006." Compl. ¶ 63. However, the plaintiffs allege that "[i]n December 2005, after several drafts of a proposed rule had been prepared," the FWS "drastically reversed course and began to draft a 'not warranted' listing determination." Compl. ¶ 64.

> FN12. The Court will not discuss in detail the factual background of the prior litigation or the listings made by the FWS for the Gunnison sage-grouse because those facts are not directly relevant in resolving the current motion before the Court. Those prior cases are the following: *Norton I,* No. 00-2339 (D.D.C.2003) (RBW) (challenging the FWS's failure to issue a 90-day finding in response to a petition to list the Gunnison sage-grouse pursuant to the ESA), and *American Lands Alliance v. Norton* ("

*Norton* II"), No. 04-0434 (D.D.C.2005) (RBW) (challenging the "warranted but precluded" finding of the FWS for the Gunnison sage-grouse pursuant to the ESA and the APA).

On April 18, 2006, the defendants published the "not warranted" listing that is at issue in this case. *Id.* ¶ 66; see Final Determination at 19954. The plaintiffs contest this listing determination primarily on the grounds that the FWS did not "rely solely on the best scientific and commercial data available," as required by 16 U.S.C. § 1533(b)(1)(A). Compl. ¶¶ 72-73. As noted above, the plaintiffs seek relief in several forms, including a request that this Court set aside the FWS's final determination that listing the Gunnison sage-grouse as threatened or endangered under the ESA is "not warranted." *Id.* ¶ C at 23-24.

*D. The Intervenor-Applicants*

**\*4** Intervenor-applicant Cattlemen "is a non-profit trade organization representing the social, economic and educational interests of more than 12,000 beef producers throughout the State of Colorado." Intervenor-Applicants Mot., Declaration of Terry Fankhauser in Support of Motion to Intervene of Colorado Cattlemen's Association ("Fankhauser Decl.") ¶ 3. Members of Cattlemen are farmers and ranchers who depend upon farming and ranching for their livelihoods and who use land within the range of the Gunnison sage-grouse. *Id.* ¶¶ 3-4. Members use private lands, as well as federally-managed lands to conduct their businesses. *Id.* Cattlemen asserts that its members' interests will be impaired by withdrawal of the FWS determination and listing of the Gunnison sage-grouse as "not warranted" for several reasons. First, Cattlemen contends that a listing of the Gunnison sage-grouse as threatened or endangered under the ESA would negatively impact members by imposing restrictions on the use of their own land, thereby potentially limiting their ability to raise cattle and produce hay. Intervenor-Applicants' Mem. at 3, 4. Second, its members will purportedly be significantly impacted because "ESA compliance may restrict the ability to use water rights held by Cattlemen's members that originate on federal lands," thereby limiting their water supplies for irrigation, *Id.* at 3. Third, Cattlemen alleges that compliance with the ESA may "reduce the number of cattle that [the government] will permit to graze upon the national forests or federal lands or the amount of time that the cattle may graze." *Id.* Finally, the FWS's listing of the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2007 WL 2367759                                                                                    Page 5

--- F.Supp.2d ----, 2007 WL 2367759 (D.D.C.)

**(Cite as: 2007 WL 2367759 (D.D.C.))**

Gunnison sage-grouse as threatened or endangered will purportedly "reduce profitability and further lower profit margins and, ultimately, the financial viability of Cattlemen's members." *Id.* Therefore, Cattlemen contends that alternatives, other than setting aside the FWS's listing determination, "exist that satisfy the needs of [the] species without impacting land use and the rights of [its] members." Fankhauser Decl. ¶¶ 6, 8.

Intervenor-applicant Partnership "is a non-profit organization ... with more than 600 companies, associations, coalitions and individuals who collectively employ or represent more than one million citizens across America" in the following sectors: farming and ranching, coal, timber and wood products, utilities, hard rock mining, oil and gas, sportsmen and hunters, and small businesses. Intervenor-Applicants Mot. at 4 (quoting Declaration of Paul Poister in Support of Motion to Intervene of the Partnership of the West ("Poister Decl.") ¶ 3). The organization "seek[s] to restore a common sense balance between economic growth and environmental conservation." Poister Decl. ¶ 3. Many Partnership members, including but not limited to, members who operate mining, oil and gas, utility, agricultural and timber harvesting operations on public lands, hold or need federal permits and authorizations from federal agencies that manage land and mineral resources in the range of the Gunnison sage-grouse. *Id.* ¶ 4. The Partnership claims that an ESA listing of the Gunnison sage-grouse as threatened or endangered would negatively impact the Partnership by (1) "impairing existing conservation efforts, of which the Partnership's members are a part," *id.* ¶ 5, and (2) "increas[ing] regulatory restrictions on agriculture, oil and gas, utilities, mining, timber harvests, recreation, and other activities on federal lands," resulting in significant delays in processing permits to conduct business on private or public land due to regional consultations with the FWS over the needed permits, thereby, in turn, resulting in financial hardship on the Partnership's members, *id.* ¶ 6, and (3) requiring the amendment of federal management plans in ways that would restrict access to federal lands and impair the Partnership members' ability to conduct their businesses, *id.*

**\*5** Intervenor-applicant Western "is a non-profit organization dedicated to wildlife conservation through local and state conservation efforts while maintaining the highest scientific standards, private property rights, agriculture and a strong economy ."

Intervenor-Applicants Mot., Declaration of Pam Paris in Support of Motion to Intervene of the Western Conservation Coalition ("Paris Decl.") ¶ 3. Western's members include "landowners, realtors, agricultural producers, trade organizations, contractors, and other businesses in the southwestern Colorado range of the Gunnison sage[-]grouse." *Id.* ¶ 4. Western supports local and state conservation efforts for the Gunnison sage-grouse as opposed to seeking federal listing under the ESA. *See id.* ("Western believes a federal listing will hinder such local efforts as well as adversely impact the interests of Western's members."); *see also* Intervenor-Applicants' Mot., Letter to U.S. Rep. John Salazar and Letter to FWS Director Dale Hale (letters urging Congress and the FWS to support existing state and local conservation efforts rather than pursuing an unnecessarily restrictive federal listing of the Gunnison sage-grouse). According to Western, listing the Gunnison sage-grouse as threatened or endangered would result in additional regulatory requirements under the ESA, causing significant delays and hardship to its members, including, for example, construction project delays and additional costs to remove snow at construction sites due to reduced time during the summer months to conduct construction activities. Paris Decl. ¶ 4.

## II. Standard of Review

Federal Rule of Civil Procedure 24(a) sets forth the requirements for intervention as of right and provides that:

> [u]pon timely application anyone shall be permitted to intervene in an action ... when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

Fed.R.Civ.P. Rule 24(a)(2). In evaluating motions for intervention as of right, this Court must consider

> the following four factors: (1) the timeliness of the motion; (2) whether the applicant claims an interest relating to the property or transaction which is the subject of the action; (3) whether the applicant is as situated that the deposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest; and (4) whether the applicant's interest is adequately represented by the existing parties.

*Fund for Animals,* 322 F.3d at 731 (quoting *Mova Pharm. Corp. v. Shalala,* 140 F.3d 1060, 1074 (D.C.Cir.1998)) (internal quotation marks omitted); *see also SEC v. Prudential Sec., Inc.,* 136 F.3d 153, 156 (D.C.Cir.1998); *Environmental Defense v. Leavitt,* 329 F.Supp.2d 55, 65-66 (D.D.C.2004). Further, a prospective intervenor must demonstrate that it has Article III constitutional standing to intervene by showing "(1) injury-in-fact, (2) causation, and (3) redressability." *Fund for Animals,* 322 F.3d at 733 (citing *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61 (1992)) (additional citation omitted); *see also Environmental Defense,* 329 F.Supp.2d at 66.

## II. Legal Analysis

**\*6** As noted above, a party seeking to intervene as of right must demonstrate that it has standing under Article III of the United States Constitution. *See Military Toxics Project v. EPA,* 146 F.3d 948, 953 (D.C.Cir.1998); *Mova Pharm. Corp.,* 140 F.3d at 1074. "[B]ecause a Rule 24 intervenor seeks to participate on an equal footing with the original parties to the suit, [it] must satisfy the standing requirements imposed on those parties." Fund for Animals, 322 F.3d at 732 (quoting *City of Cleveland v. NRC,* 17 F.3d 1515, 1517 (D.C.Cir.1994)). Since a prospective intervenor's Article III standing presents a material question as to this Court's jurisdiction, *Sierra Club v. EPA,* 292 F.3d 895, 898 (D.C.Cir.2002), the Court must address the prospective intervenors' standing in this action before considering the factors for evaluating their intervention as of right. [FN13]

> FN13. As discussed in *Environmental Defense,* "the requirements for Rule 24(a) and [for Article III] standing are not co-extensive" in this Circuit. 329 F.Supp.2d at 66 n. 7. As the District of Columbia Circuit has stated, satisfying Rule 24(a) also satisfies Article III standing. *Roeder v. Islamic Republic of Iran,* 333 F.3d 228, 233 (D.C.Cir.2003). On the other hand, however, a person who has constitutional standing fulfills only the second of the four requirements for intervention as of right under Rule 24(a). *See Jones v. Prince George's Co., Md.,* 348 F.3d 1014, 1018-19 (D.C.Cir .2003) (assessing existence of impairment of interest and adequacy of representation after concluding that constitutional standing had been satisfied).

### A. Standing

The intervenor-applicants assert that they have standing as associations to intervene in this action because (1) their "members have standing to sue in their own right; (2) the interests at stake [in this litigation] are germane to the organizations' purposes; and (3) neither the claim asserted nor the relief sought requires [their] members to participate directly in [this] lawsuit." Intervenor-Applicants Mem. at 14. In opposition, the plaintiffs respond that the intervenor-applicants fail to satisfy Rule 24(a)'s Article III standing requirement of injury-in-fact, having failed to show that their "asserted injuries-- i.e., of 'significant delay' and 'financial hardship', ... are ... 'fairly traceable' to the 'not warranted' listing decision but rather to speculative events that will be caused in the future if at all, by yet-to-be-published regulations." Pls' Opp'n at 17. For the reasons set forth below, the Court finds that the intervenor-applicants have constitutional standing.

Under Article III of the United States Constitution,

> an association ... has standing to sue on behalf of its members only if (1) at least one of its members would have standing to sue in his own right, (2) the interests the association seeks to protect are germane to its purpose, and (3) neither the claim asserted nor the relief requested requires that an individual member of the association participate in the lawsuit.

*Sierra Club,* 292 F.3d at 898; *see Hunt v. Wash. State Apple Adver. Comm'n,* 432 U.S. 333, 342-43 (1977). And, "[t]he 'irreducible constitutional minimum of standing contains three elements': (1) injury-in-fact, (2) causation, and (3) redressablity." *Sierra Club,* 292 F.3d at 898 (quoting *Defenders of Wildlife,* 504 U.S. at 560). [FN14]

> FN14. The intervenor-applicants' argument that the *Defenders of Wildlife* requirements are irrelevant to this motion, *see* Intervenor-Applicants' Reply at 13 (claiming *Defenders of Wildlife* "does not relate to intervention at all"), is incorrect. As explained by the District of Columbia Circuit, "because a Rule 24 intervenor seeks to participate on an equal footing with the original parties to the suit, he must satisfy the standing requirements imposed on those parties." *Fund for Animals,* 322 F.3d at 732 (quoting *City of Cleveland v. NRC,* 17 F.3d 1515,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----, 2007 WL 2367759 (D.D.C.)

**(Cite as: 2007 WL 2367759 (D.D.C.))**

1517 (D.C.Cir.1994)). *Fund for Animals,* which the intervenor-applicants cite in their filing, *see* Intervenor-Applicants' Reply at 12, does in fact analyze the standing of the party seeking to intervene as a defendant under the *Defenders of Wildlife* requirements. *See Fund for Animals,* 322 F.3d at 732-33. And, this Court is bound by this Circuit precedent.

Despite the plaintiffs' challenge to the adequacy of the intervenor-applicants' injury-infact claims, the Court finds that the intervenor-applicants have satisfied the constitutional minimum requirements of standing. Their allegations of expected increase in regulatory restrictions on their members' use of public and private land, including their members' access to federal lands, impairment of their members' existing and future conservation efforts, and a reduction in the profitability of their members' business concerns, constitute concrete and imminent injuries. For standing purposes, the injury a party claims must be "distinct and palpable, ... and not abstract or conjectural or hypothetical." *Allen v. Wright,* 468 U.S. 737, 751 (1984) (internal quotation marks and citations omitted). "Although the fact that harm or injury may occur in the future is not necessarily fatal to a claim of standing[,] ... [such circumstances can] lessen the concreteness of the controversy and thus mitigate [sic] against a recognition of standing." *United Transp. Union v. I.C.C.,* 891 F.2d 908, 913 (D.C.Cir.1998) (quoting *Harrington v. Bush,* 553 F.2d 190, 208 (D .C.Cir.1977)) (internal quotation marks omitted). Thus, when a party alleges future injury alone, the party "must demonstrate a realistic danger of sustaining a direct injury...." *Id.* (quoting *Babbitt v. United Farm Workers Nat'l Union,* 442 U.S. 289, 298 (1979)) (citation omitted).

**\*7** Here, the intervenor-applicants have demonstrated that there is a real likelihood they will sustain a direct injury if the plaintiffs prevail in obtaining any of the relief they are requesting. The Gunnison sage-grouse is the subject of the conservatory regulations sought by the plaintiffs, and the intervenor-applicants benefit from the FWS's current "not warranted" determination because their land use is unfettered by regulations designed to protect the habitat of the Gunnison sage-grouse. Moreover, if the Court were to grant the relief the plaintiffs seek, the threat of greater regulation of the lands the intervenor-applicants' members use and rely upon would be imminent and result in concrete injury. As stated in *Sierra Club v. EPA,* "if the complainant is 'an object of the action (or forgone action) at issue'--as is the case usually in review of a rulemaking and nearly always in review of an adjudication--there should be 'little question that the action or inaction has caused him injury, and that a judgment preventing or requiring action will redress it." 292 F.3d at 900 (quoting *Defenders of Wildlife,* 504 U.S. at 561-62). While the intervenor-applicants are not themselves the topic of the challenged agency action, the Gunnison sage-grouse and its habitat are integral components of the environmental make-up of their members' property or the public property they utilize for their livelihoods and business operations. Intervenor-Applicants' Mem. at 2-3. The Circuit Court has found that it sees "no meaningful distinction between a regulation that directly regulates a party and one that directly regulates the disposition of a party's property." *Fund for Animals,* 322 F.3d at 734 (footnote omitted); *see Horsehead Res. Dev. Co. v. Browner,* 16 F.3d 1246, 1259 (D.C.Cir.1994) (finding that environmental organizations with members living in the affected areas "clearly do have standing"). Hence, the injuries-in-fact that the intervenor-applicants' members claim they will suffer are fairly traceable to the judicial intervention (setting aside the FWS's "not warranted" finding for listing the Gunnison sage-grouse as an endangered or threatened species) and the regulatory relief (the issuance of an emergency rule by the FWS listing the Gunnison sage-grouse as "endangered" or "threatened" under the ESA) that the plaintiffs seek in this action. Further, it is likely that a decision favorable to the intervenor-applicants would prevent their members from incurring the injuries they fear, including, but not limited to, increased regulatory restrictions, impairment to existing and future conservation efforts of their members, and a reduction in the profitability of their members' businesses.

This case is similar to *Fund for Animals.* There, the District of Columbia Circuit considered a similar set of circumstances when evaluating the District Court's denial of the National Resources Department of the Ministry of Nature and Environment of Mongolia's ("NRD") motion to intervene in an action alleging violations of the ESA and APA. *Fund for Animals,* 322 F.3d at 731. The plaintiffs, the Fund for Animals and other organizations dedicated to wildlife conservation, challenged the Secretary of the Interior and the Director of the FWS for "failing to list the

--- F.Supp.2d ----, 2007 WL 2367759 (D.D.C.)
**(Cite as: 2007 WL 2367759 (D.D.C.))**

argali sheep as an endangered species in Mongolia, Kyrgyzstan, and Tajikistan, and by issuing hundreds of permits for sport hunters to import killed argali into the United States as 'trophies.' " *Id.* at 730. In *Fund for Animals,* "[t]he plaintiffs asked the court, *inter* alia, to direct the defendants to list the argali as an endangered species in those countries, to declare unlawful all outstanding permits for the import of argali sheep, and to enjoin the defendants from issuing additional permits." *Id.* The NRD, an agency of the Mongolian government responsible for "implementing the policy and decision of the Government on rational utilization of natural resources, rehabilitation, and protection, including the country's 'tourist hunting program,' " *id.* at 731, sought intervention, asserting that it satisfied the requirements for standing under Article III "because fees paid by sport hunters are the primary source of funding for its argali conservation program," *id.* at 733. Therefore, the NRD argued that if the Court ruled in favor of the plaintiffs in that case and barred American hunters from bringing the argali sheep they killed home as trophies, "some hunters [would] not travel to Mongolia to hunt the argali, and the revenues that support the conservation program [would] decline." *Id.* In reversing the District Court, the Circuit found the NRD's argument persuasive and ruled that "[t]he threatened loss of tourist dollars, and the consequent reduction in funding for Mongolia's conservation program, constitute[d] a concrete and imminent injury ... [that] is fairly traceable to the regulatory action ... [and therefore, it was] likely that a decision favorable to the NRD would prevent that loss from occurring." *Id.* at 733.

**\*8** Here, as previously noted, like in *Fund for Animals,* the Gunnison sage-grouse is the subject of the sought-after regulation and the intervenor-applicants' members benefit from the FWS's current "not warranted" determination. If the Court grants the relief that the plaintiffs seek, the threat of greater regulation of the lands the intervenor-applicants' members use and rely upon for their livelihoods and business operations would be imminent and would result in concrete injury to their members. Hence, the intervenor-applicants' members' economic status would be threatened. Therefore, the Court finds that the record in this case at this point in the proceedings adequately demonstrates that the intervenor-applicants have constitutional standing. [FN15]

> FN15. The District of Columbia Circuit has explained that under the Supreme Court's

ruling in *Defenders of Wildlife,*
the burden of production a[n] [intervenor-applicant] must bear in order to show that it has standing ... varies with the procedural context of the case. At the pleading stage, [which is the current procedural posture of this case,] general factual allegations of injury resulting from the [relief the plaintiff is seeking] may suffice, and the [C]ourt [must] presum[e] that general allegations embrace the specific facts that are necessary to support the claim.

*Sierra Club,* 292 F.3d at 898 (quoting *Defenders of Wildlife,* 504 U.S. at 561); *see c.f. Fund for Animals,* 322 F.3d at 733-34 (concluding that identical standing analysis for "any party" equally applies to "prospective intervenor[s]," but declining to decide "whether ... [a] motion to intervene is closer to a motion for summary judgment or to a pleading" because the case involved a challenge to administrative action, and standing "in many if not most [such] cases[,] ... is self evident") (citation omitted).

B. Elements of Test for Intervention As of Right

(1) Timeliness

The intervenor-applicants timely filed their application for intervention on March 2, 2007, see Intervenor-Applicants' Mot. (Docket Entry No. 14), and the plaintiffs concede that the application was timely filed, Pls' Opp'n at 4. Therefore, timeliness of the intervenor-applicants' application for intervention is not at issue in this case.

*(2) Legally Protected Interests*

The intervenor-applicants claim an interest in the subject matter of this case because a listing or reversal of the "not warranted" determination "would subject [the applicants' members] to the requirements of the ESA including section 7 consultations with the FWS, reinitiation of consultation, increased restrictions on the use of public lands, potential denial of permit renewals, significant delays in the conduct of their businesses and financial hardship." Intervenor-Applicants Mem. at 11-12. In opposition, the plaintiffs respond that the intervenor-applicants' broadly asserted interests do not support intervention as of right because those "interests do not relate to *defendants'* liability under the ESA...." Pls' Opp'n at

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----, 2007 WL 2367759 (D.D.C.)
**(Cite as: 2007 WL 2367759 (D.D.C.))**

6. In their reply, the intervenor-applicants contend that their members' interests in the land that would be impacted by a decision to list the Gunnison sage-grouse, and the resulting economic consequences in an ESA case fall within the "zone of interests" test, making their intervention appropriate. Intervenor-Applicants' Reply at 8-10. For the reasons set forth below, the Court agrees with the intervenor-applicants.

The District of Columbia Circuit has held that by satisfying the requirements of standing a party can demonstrate that a legally protected interest exists. *See* *Jones,* 348 F.3d at 1018-19 (reasoning that "because [the intervenor-applicant] ha[d] suffered a cognizable injury sufficient to establish Article III standing, she also ha[d] the requisite interest under Rule 24(a)(2)") (citations omitted); *see also* *Mova Pharm.,* 140 F.3d at 1076 (explaining that the party seeking intervention "need not show anything more than that it has standing to sue in order to demonstrate the existence of a legally protected interest for purposes of Rule 24(a)") (citations omitted). This Court having determined already that the intervenor-applicants have constitutional standing, and the District of Columbia Circuit having found that standing alone is sufficient to establish that they have "an interest relating to the property or transaction which is the subject of th[is] action," Fed.R.Civ.P. 24(a)(2); *see* *Jones,* 348 F.3d at 1018-19; *Mova Pharm.,* 140 F.3d at 1076, the intervenor-applicants have satisfied the second requirement for intervention as of right. The property at issue in this case being public and private lands within the range of the Gunnison sage-grouse and this action being a challenge to the FWS's listing decision for the Gunnison sage-grouse as "not warranted" under the ESA clearly vest the intervenor-applicants with the requisite interest in this litigation for Rule 24(a) intervention. *See* *Foster v. Gueory,* 655 F.2d 1319, 1324 (D.C.Cir.1981) ("An intervenor's interest is obvious when he asserts a claim to property that is the subject matter of the suit ....") (citation omitted). Accordingly, the Court concludes that the intervenor-applicants have legally protected interests in the instant case.

*(3) Threat to Impair the Legally Protected Interests*

**\*9** The intervenor-applicants contend that their interests and the interests of their members will be adversely affected by the type of relief the plaintiffs are seeking because listing the Gunnison sage-grouse

as threatened or endangered would "impose section 7 consultation and section 9 take prohibitions." Intervenor-Applicants Mem. at 13-14. The intervenor-applicants further claim that success of the plaintiffs in having the Gunnison sage-grouse listed as they demand "could also reinitiate consultation on existing permits ... and other authorizations held by the [i]ntervenor-[a]pplicants." *Id.* at 14. In opposition, the plaintiffs argue that lawsuits such as this one do not result in an order compelling the defendants to actually list the subject species, Pls' Opp'n at 7, and any proposed rule would be followed by a 60-day public comment period during which the intervenor-applicants could participate, *id.* at 9-10. Further, the plaintiffs contend that "the chain of events that [the] applicants rely on here ... is attenuated and speculative, and cannot support intervention." *Id.* at 11. Replying to the plaintiffs' argument, the intervenor-applicants assert that "[e]ven if [the Court simply] revers[es] and remand[s] ... the FWS's determination," their members will still be harmed by the expenditure of "additional time and resources they would ordinarily devote to their businesses." Intervenor-Applicants' Reply at 7. The Court agrees with the intervenor-applicants.

The intervenor-applicants are "so situated that the disposition of the action may as a practical matter impair or impede [their] ability to protect [their] interest." Fed.R.Civ.P. 24(a)(2). Despite the plaintiffs' argument that the intervenor-applicants would have an opportunity to weigh in during the review period of a proposed rule to classify the Gunnison sage-grouse as either endangered or threatened or to file suit upon issuance of a new final adoption of a rule, it is clear that the process of regaining a "not warranted" determination, should the plaintiffs succeed in the instant case, would be "difficult and burdensome." *Fund for Animals,* 322 F.3d at 735 (citation omitted). For instance, if the FWS's determination is set aside and it has to conduct the year-long review period, including the 60-day public comment period, the intervenor-applicants would have to file a separate action if the FWS then concludes that listing the Gunnison sage-grouse as threatened or endangered is warranted. The positions of the parties, including those of the intervenor-applicants, in such a proceeding would likely be duplicative of their current positions. Moreover, "[i]t is not enough to deny intervention under [Rule] 24(a)(2) because the applicants may vindicate their interests in some later, albeit more burdensome, litigation." *Natural Res. Def. Council v. Costle,* 561

--- F.Supp.2d ----, 2007 WL 2367759 (D.D.C.)

**(Cite as: 2007 WL 2367759 (D.D.C.))**

F.2d 904, 910 (D.C.Cir.1977). Also, as the intervenor-applicants further argue, the imminent threat of lost earnings if this Court orders the FWS to issue an emergency rule listing immediately the Gunnison sage-grouse as "endangered," pending remand of the challenged determination, would immediately impair the intervenor-applicants' members economic interests. [FN16]

> FN16. In their opposition, the plaintiffs acknowledges that "lawsuits such as this one usually [do not] result in ... an Order compelling defendants to actually list the species in question" and cite many cases in which this jurisdiction has vacated and remanded an agency determination concerning various species. Pls.' Opp'n at 7. As the intervenor-applicants point out, however, the plaintiffs chose to seek relief in the form of an order requiring the FWS to issue an emergency listing of the Gunnison sage-grouse. Intervenor-Applicants' Reply at 4; *see* Compl. ¶ E at 24. The Court, therefore, must consider whether such a result would harm the interests of the intervenor-applicants.

*(4) Adequate Representation of the Applicants' Interests*

**\*10** The Court must finally determine whether the intervenor-applicants' interests are "adequately represented by existing parties." Fed.R.Civ.P. 24(a)(2). The intervenor-applicants assert that their interests are inadequately represented because (1) the plaintiffs seek the reversal of the FWS's "not warranted" determination and an emergency listing of the Gunnison sage-grouse under the ESA while the intervenor-applicants request that this Court uphold the FWS's "not warranted" determination and (2) the intervenor-applicants' interests consist of pursuing their economic livelihoods on private and public lands, whereas, the primary interests of the FWS are the protection and conservation of species, including the Gunnison sage-grouse, as mandated by the ESA. Intervenor-Applicants' Mem. at 16. Further, the intervenor-applicants note that they take views different than the FWS on what activities may impact the Gunnison sage-grouse or its habitat. *Id.* In opposition, the plaintiffs argue the intervenor-applicants fail to meet their burden of proving inadequate representation. Pls' Opp'n at 14. The plaintiffs claim that the intervenor-applicants have

proven no more than a "slight difference" in interests between them and the current defendants, especially considering that both parties have the same interest in upholding the "not warranted" determination. *Id.* at 14- 15. In their reply, the intervenor-applicants contend that the plaintiffs bear the burden of proving the adequacy of representation and allege that they have not done so. Reply at 11. Further, the intervenor-applicants argue that the FWS cannot adequately represent the intervenor-applicants' economic interests at the same time they also seek to represent the general public's interest. *Id.* For the following reasons, the Court finds that the intervenor-applicants have satisfied the final factor for intervention as of right.

The Supreme Court has held that inadequacy of representation is satisfied "if the applicant shows that representation of [its] interest 'may be' inadequate; and the burden of making that showing should be treated as minimal." *Trbovich v. United Mine Workers of Am.,* 404 U.S. 528, 538 n. 10 (1972) (citation omitted); *see Dimond v. District of Columbia,* 792 F.2d 179, 192 (D.C.Cir.1986) (stating that under *Trbovich* the requirement of showing inadequate representations "is not onerous"). The District of Columbia Circuit has "often concluded that government entities do not adequately represent the interests of aspiring intervenors." *Fund for Animals,* 322 F.3d at 736 (footnote omitted). The Circuit Court has reached this conclusion because government entities are usually charged with "represent[ing] the interests of the American people," whereas aspiring intervenors, like the intervenor-applicants here, are dedicated to representing their personal interests or the interests of their members or members' businesses. *Id.; see, e.g., Costle,* 561 F.2d at 912-13; *Smuck v. Hobson,* 408 F.2d 175, 181 (D.C.Cir.1969); *Friends of Animals v. Kempthorne,* 452 F.Supp.2d 64, 70 (D.D.C.2006). Clearly, both the defendants and the intervenor-applicants agree that the FWS's decision that a listing of the Gunnison sage-grouse as endangered or threatened is "not warranted" under the ESA should be upheld. However, the FWS's obligation is to represent the interests of the general public in protecting and conserving species covered by the ESA, while the intervenor-applicants' interests are those of its members, which include, but are not limited to, protecting their members' livelihoods and business operations, along with advancing local and state conservation measures. Thus, although the FWS and the intervenor-applicants share a common interest--

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----, 2007 WL 2367759 (D.D.C.)

**(Cite as: 2007 WL 2367759 (D.D.C.))**

upholding the FWS's listing determination--that shared interest does not guarantee adequate representation of the intervenor-applicants' interests and those of their members. As the Circuit Court has recognized, even "a shared general agreement does not necessarily ensure agreement in all particular respects." *Fund for Animals,* 322 F.3d at 737 (quoting *Natural Res. Def. Council,* 561 F.2d at 912) (internal quotation marks omitted). Considering the minimal showing that must be made to demonstrate inadequate representation, the Court concludes that the intervenor-applicants have satisfied the final requirement for intervention as of right under Federal Rule of Civil Procedure 24(a). [FN17]

> FN17. Although they oppose the motion to intervene, the plaintiffs request that if the Court should grant intervention to the intervenor-applicants that the Court limit the scope of the intervention in the following ways: (1) order the intervenors "not to assert claims outside the scope of the Complaint;" (2) prohibit the intervenors "from filing any motions independently, or in which the Secretary does not join;" (3) prohibit the intervenors "from seeking any discovery not sought by the Secretary;" (4) require the intervenors and the Secretary to each reduce by one-half the standard page limits authorized by the Local Rules for all Court filings; and (5) restrict "intervention to the remedial phase of this case." Pls' Opp'n at 20-22. In the intervenor-applicants' reply, they opposed such restrictions as arbitrary and contrary to the purpose of intervention, considering the applicants' "commitment" to follow scheduling orders issued by the Court, and the applicants' and defendants' varied interests. Intervenor-Applicants' Reply at 14. Further, the intervenor-applicants contend that they do not seek to alter dramatically the scope of the case as it exists in its current posture. *Id.* As noted in Advisory Committee Notes to the Federal Rules of Civil Procedure, intervention of right "may be subject to appropriate conditions or restrictions responsive among other things to the requirements of efficient conduct of the proceedings." Fed. R.Civ. P. 24 advisory committee's note; *see Smuck,* 408 F.2d at 180 (stating that after requirements for intervention are met, consideration of "the nature of [the

intervenor-applicant's] 'interest' may play a role in determining the sort of intervention which should be allowed") (footnote omitted). For reasons of judicial economy and the purpose for which intervention is being permitted, the Court agrees with the plaintiffs that intervention must be limited to claims within the scope of the Complaint. Otherwise, the Court declines to limit the applicants' intervention as requested by the plaintiffs.

**III. Conclusion**

**\*11** Based on the foregoing analysis, the intervenor-applicants' motion to intervene as defendants pursuant to Federal Rule of Civil Procedure 24(a) is **GRANTED.**

**SO ORDERED.** [FN18]

> FN18. An order consistent with this Court's Memorandum Opinion shall be filed contemporaneously herewith.

--- F.Supp.2d ----, 2007 WL 2367759 (D.D.C.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

LEXSEE 2005 U.S. DIST. LEXIS 4678



Cited
As of: Sep 13, 2007

### NORTHERN PLAINS RESOURCE COUNCIL, Plaintiff v. UNITED STATES BUREAU OF LAND MANAGEMENT; et al., Defendants, and MARATHON OIL COMPANY; et al., Intervenor Defendants; NORTHERN CHEYENNE TRIBE, a federally recognized Indian tribe, and NATIVE ACTION, a Montana non-profit corporation, Plaintiffs v. GALE NORTON, et al., Defendants and FIDELITY EXPLORATION & PRODUCTION COMPANY, et al., Intervenor defendants

### Cause No. CV 03-69-BLG-RWA, Cause No. CV 03-78-BLG-RWA

### UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MONTANA, BILLINGS DIVISION

### 2005 U.S. Dist. LEXIS 4678

### February 25, 2005, Decided
### February 25, 2005, Filed

**DISPOSITION:** Motions ruled upon.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiffs, a council and a tribe, filed a summary judgment motion in an action against defendant Bureau of Land Management (BLM) for violating the National Environmental Policy Act (NEPA), 42 U.S.C.S. § 4321 et seq., the Federal Land Policy Management Act (FLPMA), 43 U.S.C.S. § 1701 et seq., and the National Historic Preservation Act (NHPA), 16 U.S.C.S. § 470 et seq. BLM and intervenor companies filed motions for summary judgment and to strike.

**OVERVIEW:** The council and tribe challenged BLM's approval of a final statewide oil and gas environmental impact statement (FEIS) and proposed amendments to resource management plans (RMPs) authorizing full-field coal bed methane (CBM) development in a river basin. The council, tribe, BLM, and intervening companies sought summary judgment. The magistrate held that the FEIS was inadequate under NEPA because it did not consider a feasible phased development alternative that served the purpose of the FEIS, which was a programmatic plan to minimize the environmental effects of developing CBM resources. Therefore, an evidentiary hear-

ing was necessary to determine the extent of injunctive relief. However, BLM was entitled to summary judgment on other NEPA claims because its treatment of injection options was reasonable and its two separate studies of the area were justified by practical concerns of the timing of proposals and pace of development. The magistrate dismissed the generic challenges to the RMPs under FLPMA, which were not ripe, and granted the BLM and companies summary judgment on the NHPA claims because BLM properly conducted NHPA consultation with the tribe at the site-specific level.

**OUTCOME:** The magistrate denied the motions to strike as moot, granted the BLM and companies summary judgment on the NHPA claims, and dismissed the FLPMA claim. As for the NEPA claims, the magistrate remanded and ordered an evidentiary hearing, held that the BLM's creation of only a single FEIS was not arbitrary and capricious, and would not consider the other NEPA claims for procedural reasons.

**LexisNexis(R) Headnotes**

*Administrative Law > Judicial Review > Reviewability > Questions of Law*

Case 1:07-cv-01486-RJL    Document 5    Filed 09/14/2007    Page 32 of 55

Page 2
2005 U.S. Dist. LEXIS 4678, *

*Administrative Law > Judicial Review > Standards of Review > Arbitrary & Capricious Review*
*Environmental Law > Litigation & Administrative Proceedings > Judicial Review*
[HN1] Judicial review of agency action is governed by the Administrative Procedure Act, 5 U.S.C.S. § 701 et seq. Review is narrow. An agency's actions, findings, and conclusions will be set aside only if they are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C.S. § 706(2)(A).

*Administrative Law > Judicial Review > Standards of Review > Arbitrary & Capricious Review*
*Civil Procedure > Judgments > General Overview*
*Civil Procedure > Appeals > Standards of Review > Clearly Erroneous Review*
[HN2] In determining whether a decision is arbitrary and capricious, the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. The court must not substitute its judgment for that of the agency. Instead, in environmental actions, the court must simply ensure that the agency has adequately considered and disclosed the environmental impact of its actions.

*Environmental Law > National Environmental Policy Act > General Overview*
[HN3] See 40 C.F.R. § 1500.1(a).

*Environmental Law > National Environmental Policy Act > Environmental Impact Statements*
[HN4] A procedural statute, the National Environmental Policy Act mandates the preparation of an environmental impact statement (EIS) before an agency takes major federal actions significantly affecting the quality of the human environment. 42 U.S.C.S. § 4332(2)(C). An EIS must address both the cumulative impacts of a proposed action and reasonable alternatives thereto.

*Environmental Law > Litigation & Administrative Proceedings > Judicial Review*
*Environmental Law > National Environmental Policy Act > General Overview*
*Governments > Federal Government > Claims By & Against*
[HN5] The National Environmental Policy Act (NEPA) has twin aims. First, it places upon a federal agency the obligation to consider every significant aspect of the environmental impact of a proposed action. Second, it ensures that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process. NEPA does not contain substantive environmental standards. Rather, it exists to ensure a process, not particular substantive results. It establishes action-forcing procedures that require agencies to take a "hard look" at environmental consequences.

*Administrative Law > Judicial Review > General Overview*
*Environmental Law > Litigation & Administrative Proceedings > Judicial Review*
*Environmental Law > National Environmental Policy Act > General Overview*
[HN6] In evaluating the adequacy of an environmental impact statement (EIS), the United States Court of Appeals for the Ninth Circuit employs a rule of reason to determine whether the EIS contains a reasonably thorough discussion of the significant aspects of probable environmental consequences. This "rule of reason" analysis is essentially the same as an abuse of discretion standard. The court reviews an EIS to ensure that its form, content, and preparation fostered both informed decision-making and informed public participation. However, the court need not flyspeck the document. If the court is satisfied that the agency took a "hard look" at a proposed action's environmental consequences, judicial review is at an end.

*Environmental Law > National Environmental Policy Act > General Overview*
[HN7] In construing the National Environmental Policy Act (NEPA), the court gives substantial deference to implementing regulations issued by the Council on Environmental Quality (CEQ) found at 40 C.F.R. §§ 1500-1508. The procedures prescribed both in NEPA and the CEQ regulations are to be strictly interpreted to the fullest extent possible with the policies embodied in NEPA.

*Environmental Law > National Environmental Policy Act > Environmental Impact Statements*
[HN8] Under the National Environmental Policy Act, an environmental impact statement (EIS) must include a detailed statement of alternatives to the proposed action. 42 U.S.C.S. § 4332(2)(C)(iii). The alternatives analysis, which is the "heart" of an EIS, requires an agency to rigorously explore and objectively evaluate all reasonable alternatives, and to briefly discuss the reasons for eliminating other alternatives from detailed study. 40 C.F.R. § 1502.14(a).

*Environmental Law > National Environmental Policy Act > Environmental Impact Statements*

2005 U.S. Dist. LEXIS 4678, *

[HN9] The purpose and need statement of an environmental impact statement (EIS), which briefly specifies the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action, 40 C.F.R. §. 1502.13, defines the range of alternatives to be considered by the agency. The agency must look at every reasonable alternative within the range dictated by the nature and scope of the proposal. The existence of reasonable but unexamined alternatives renders an EIS inadequate.

*Environmental Law > National Environmental Policy Act > General Overview*

[HN10] An environmental impact statement need not consider an infinite range of alternatives, only reasonable or feasible ones. Thus, an agency need consider only those alternatives that achieve its stated purpose and goal. Alternatives that are remote, speculative, ineffective, or inconsistent with basic policy objectives need not be considered. When the purpose is to accomplish one thing, it makes no sense to consider the alternative ways by which another thing might be achieved.

*Environmental Law > National Environmental Policy Act > Environmental Impact Statements*
*Governments > Federal Government > Claims By & Against*

[HN11] Federal agencies are given considerable discretion to define the scope of the National Environmental Policy Act review. However, connected, cumulative, and similar actions must be considered together to prevent an agency from dividing a project into multiple "actions" each of which individually has an insignificant environmental impact, but which collectively have a substantial impact. Thus, 40 C.F.R. § 1508.25 requires that two or more agency actions must be discussed in the same impact statement where they are connected or cumulative actions. Where the proposed actions are similar, the agency may wish to assess them in the same document and should do so when a single document provides the best way to assess adequately the combined impacts of similar actions. 40 C.F.R. §. 1508.25(a)(3). Cumulative actions are those that when viewed with other proposed actions have cumulatively significant impacts. 40 C.F.R. § 1508.25(a)(2). Cumulative impacts are those that result from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time. 40 C.F.R. § 1508.7.

*Environmental Law > Litigation & Administrative Proceedings > Judicial Review*
*Environmental Law > National Environmental Policy Act > General Overview*

[HN12] Agencies may consider factors in addition to geographic area when determining whether to conduct one or more environmental analyses. Even if environmental interrelationships could be shown conclusively to extend across basins and drainage areas, practical considerations of feasibility might well necessitate restricting the scope of comprehensive statements. The key question is whether the record suggests that the agency intended to segment review to minimize cumulative impact analysis.

*Environmental Law > National Environmental Policy Act > Environmental Impact Statements*
*Governments > Public Lands > Forest Lands*

[HN13] An agency has more discretion to decide whether to complete a single document when "similar" actions are concerned than when "cumulative" actions are involved. The regulations simply provide that an agency "may wish" to analyze similar actions in the same impact statement. 40 C.F.R. § 1508.25(a)(3). The agency should do so when the best way to assess adequately the combined impacts of similar actions or reasonable alternatives to such actions is to treat them in a single impact statement. Where there are prior administrative boundaries, different patterns of ownership, disparate timetables, and separate supervisory personnel, the agency may reasonably conclude that two separate documents are the best way to assess adequately the combined impacts of the similar actions.

*Environmental Law > National Environmental Policy Act > General Overview*

[HN14] An environmental impact statement must be reviewed as a whole. However, where the final environmental impact statement is a large-scale, programmatic planning device, it need only provide sufficient detail to foster informed decision making, site specific impacts need not be fully evaluated until a critical decision has been made to act on site development.

*Environmental Law > National Environmental Policy Act > General Overview*

[HN15] Without a reasonably complete discussion of possible mitigation measures in an environmental impact statement, neither the agency nor the public can properly evaluate the severity of the adverse effects of the proposed action.

*Environmental Law > National Environmental Policy Act > General Overview*
[HN16] A cumulative impact analysis in an environmental impact statement must include a useful assessment of past, present, and reasonably foreseeable future projects.

*Civil Procedure > Justiciability > General Overview*
*Environmental Law > Natural Resources & Public Lands > Federal Land Management*
[HN17] Generic challenges to the sufficiency of a resource management plan are no longer justiciable. Unless a site-specific action is the focus of the complaint, a plaintiff can no longer use the Federal Lands Policy Management Act to challenge an agency's adoption of a programmatic plan.

*Governments > Federal Government > Claims By & Against*
*Governments > Federal Government > Property*
*Real Property Law > Zoning & Land Use > Historic Preservation*
[HN18] The National Historic Preservation Act requires federal agencies with jurisdiction over a proposed federal or federally assisted undertaking to take into account the effect of the undertaking on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register of Historic Places. 16 U.S.C.S. § 470f.

*Governments > Native Americans > Property Rights*
*Real Property Law > Zoning & Land Use > Historic Preservation*
[HN19] See 16 U.S.C.S. § 470a(d)(6)(A).

*Governments > Native Americans > Property Rights*
*Real Property Law > Zoning & Land Use > Historic Preservation*
[HN20] Prior to approving the expenditure of federal funds on the undertaking or issuing any license, federal agencies must consult with Indian tribes that attach religious or cultural significance to historic properties. 16 U.S.C.S. § 470a(6)(B). After consulting with and gathering information from an Indian tribe, the agency must make a reasonable and good faith effort to identify historic properties, determine the eligibility of the identified properties for listing in the National Register, assess any effects that an undertaking may have on an historic property, and, if the agency determines that the effects are

adverse, avoid or mitigate and such effects. 36 C.F.R. §§ 800.4(b)(1), 800.4(c), and 800.5.

*Civil Procedure > Remedies > Damages > Monetary Damages*
*Civil Procedure > Remedies > Injunctions > Elements > Irreparable Harm*
[HN21] An injunction may issue where plaintiffs prove irreparable injury and inadequacy of legal remedies. Even though environmental injury can rarely be remedied by money damages and is often long-lasting, the court must still balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.

**COUNSEL:** [*1] For NORTHERN PLAINS RESOURCE COUNCIL, Plaintiff: Jack R. Tuholske, TUHOLSKE LAW OFFICE, Missoula, MT; Michael Reisner, NORTHERN PLAINS RESOURCE COUNCIL, Billings, MT

For BUREAU OF LAND MANAGEMENT, Defendant: William W. Mercer, OFFICE OF THE U.S. ATTORNEY, Billings, MT; Lori Caramanian, U.S. DEPARTMENT OF JUSTICE, Denver, CO

For GALE NORTON, in her official capacity as the United States Secretary of Interior, Defendant: Lorraine D. Gallinger, William W. Mercer, OFFICE OF THE U.S. ATTORNEY, Billings, MT; Lori Caramanian, U.S. DEPARTMENT OF JUSTICE, Denver, CO; Thomas L. Sansonetti, U.S. DEPARTMENT OF JUSTICE - E.N.R.D. GENERAL LITIGATION, Washington, DC

For KATHLEEN CLARKE, in her official capacity as the Director of the Bureau of Land Management, Defendant: Lorraine D. Gallinger, William W. Mercer, OFFICE OF THE U.S. ATTORNEY, Billings, MT; Lori Caramanian, U.S. DEPARTMENT OF JUSTICE, Denver, CO; Thomas L. Sansonetti, U.S. DEPARTMENT OF JUSTICE - E.N.R.D. GENERAL LITIGATION, Washington, DC

For MARTIN OTT, in his official capacity as the Montana Director of the Bureau of Land Management, Defendant: Lorraine D. Gallinger, William W. Mercer, OFFICE OF THE U.S. ATTORNEY, [*2] Billings, MT; Lori Caramanian, U.S. DEPARTMENT OF JUSTICE, Denver, CO; Thomas L. Sansonetti, U.S. DEPARTMENT OF JUSTICE - E.N.R.D. GENERAL LITIGATION, Washington, DC

For MARATHON OIL COMPANY, intervenor defendant: Lawrence B. Cozzens, COZZENS HARMAN

WARREN HARRIS & ODEGARRD, Billings, MT; John C. Martin, Mary Beth Bosco, PATTON BOGGS, Washington, DC

For PENNACO ENERGY, INC., intervenor defendant: Lawrence B. Cozzens, COZZENS HARMAN WARREN HARRIS & ODEGARRD, Billings, MT; John C. Martin, Mary Beth Bosco, PATTON BOGGS, Washington, DC

For FIDELITY EXPLORATION AND PRODUCTION COMPANY, intervenor defendant: Jon Metropoulos, Dana L. Hupp, GOUGH SHANAHAN JOHNSON & WATERMAN, Helena, MT

For ANADARKO PETROLEUM, intervenor defendant: David J. Owens, Tearle W.T. Harlan, Glen C. Maynard, Lawrence B. Cozzens, COZZENS HARMAN WARREN HARRIS & ODEGARRD, Transwestern Plaza III Suite, Billings, MT; John C. Martin, Mary Beth Bosco, Amy B. Chasanov, PATTON BOGGS, Washington, DC

For DEVON ENERGY, intervenor defendant: David J. Owens, Tearle W.T. Harlan, Glen C. Maynard, Lawrence B. Cozzens, COZZENS HARMAN WARREN HARRIS & ODEGARRD, Transwestern Plaza III Suite, Billings, MT; John C. [*3] Martin, Mary Beth Bosco, Amy B. Chasanov, PATTON BOGGS, Washington, DC

For NORTHERN CHEYENNE TRIBE, THE, a federally recognized Indian tribe, Plaintiff: Steven H. Chestnut, John B. Arum, Brian C. Gruber, ZIONTZ CHESTNUT VARNELL BERLEY & SLONIM, Seattle, WA; Joe A. Rodriguez, RODRIGUEZ LAW OFFICE, Lame Deer, MT

For NATIVE ACTION, a Montana non-profit corporation, Plaintiff: Steven H. Chestnut, John B. Arum, Brian C. Gruber, ZIONTZ CHESTNUT VARNELL BERLEY & SLONIM, Seattle, WA; Joe A. Rodriguez, RODRIGUEZ LAW OFFICE, Lame Deer, MT

For GALE NORTON, Secretary of the Interior, Defendant: Lorraine D. Gallinger, William W. Mercer, OFFICE OF THE U.S. ATTORNEY, Billings, MT; Lori Caramanian, U.S. DEPARTMENT OF JUSTICE, Denver, CO; Thomas L. Sansonetti, U.S. DEPARTMENT OF JUSTICE - E.N.R.D. GENERAL LITIGATION, Washington, DC; Alan D. Greenberg, U S DEPARTMENT OF JUSTICE ENVIRONMENTAL DEFENSE SECTION, Denver, CO

For KATHLEEN CLARKE, Director, Bureau of Land Management, Defendant: Lorraine D. Gallinger, William W. Mercer, OFFICE OF THE U.S. ATTORNEY, Billings, MT; Lori Caramanian, U.S. DEPARTMENT OF

JUSTICE, Denver, CO; Thomas L. Sansonetti, U.S. DEPARTMENT OF JUSTICE - E. [*4] N.R.D. GENERAL LITIGATION, Washington, DC; Alan D. Greenberg, U S DEPARTMENT OF JUSTICE ENVIRONMENTAL DEFENSE SECTION, Denver, CO

For MARTIN OTT, Montana State Director, Bureau of Land Management, Defendant: Lorraine D. Gallinger, William W. Mercer, OFFICE OF THE U.S. ATTORNEY, Billings, MT; Lori Caramanian, U.S. DEPARTMENT OF JUSTICE, Denver, CO; Thomas L. Sansonetti, U.S. DEPARTMENT OF JUSTICE - E.N.R.D. GENERAL LITIGATION, Washington, DC; Alan D. Greenberg, U S DEPARTMENT OF JUSTICE ENVIRONMENTAL DEFENSE SECTION, Denver, CO

For FIDELITY EXPLORATION AND PRODUCTION COMPANY, intervenor defendant: Jon Metropoulos, Dana L. Hupp, GOUGH SHANAHAN JOHNSON & WATERMAN, Helena, MT

For MARATHON OIL COMPANY, intervenor defendant: Lawrence B. Cozzens, COZZENS HARMAN WARREN HARRIS & ODEGARRD, Billings, MT; Susan Brownlee Miller, MARATHON OIL COMPANY, Houston, TX; John C. Martin, Mary Beth Bosco, Amy B. Chasanov, PATTON BOGGS, Washington, DC; Edward A. Strenkowski, MARATHON OIL COMPANY, Houston, TX

For PENNACO ENERGY, INC., intervenor defendant: Lawrence B. Cozzens, COZZENS HARMAN WARREN HARRIS & ODEGARRD, Billings, MT; Susan Brownlee Miller, MARATHON OIL COMPANY, Houston, TX; [*5] John C. Martin, Mary Beth Bosco, Amy B. Chasanov, PATTON BOGGS, Washington, DC; Edward A. Strenkowski, MARATHON OIL COMPANY, Houston, TX

For ANADARKO PETROLEUM, Corporation, intervenor defendant: Lawrence B. Cozzens, COZZENS HARMAN WARREN HARRIS & ODEGARRD, Billings, MT

For DEVON ENERGY, Corporation, intervenor defendant: Lawrence B. Cozzens, COZZENS HARMAN WARREN HARRIS & ODEGARRD, Billings, MT

**JUDGES:** RICHARD W. ANDERSON, UNITED STATES MAGISTRATE JUDGE

**OPINION BY:** RICHARD W. ANDERSON

OPINION

ORDER

ORDER

Pending before the Court are the parties' cross-motions for summary judgment in this action for judicial review of agency action. Having considered the briefs of the parties, the administrative record, and the arguments advanced in open court on September 9, 2004, the Court is prepared to rule. [1]

> 1    Pursuant to 28 U.S.C. § 636(c) and the written consent of the parties, these cases were assigned to the undersigned United States Magistrate Judge for all proceedings, including trial and entry of judgment, by District Judge Richard F. Cebull in orders dated August 15, 2003, in Cause No. CV 03-69-BLG-RWA, and August 22, 2003, in Cause No. CV 03-78-BLG-RWA.

[*6] BACKGROUND

In these consolidated cases, plaintiff in Cause No. CV 03-69-BLG-RWA, Northern Plains Resource Council (NPRC), and plaintiffs in Cause No. CV 03-78-BLG-RWA, Northern Cheyenne Tribe and Native Action (collectively referred to as the Tribe), challenge the April 2003 decision by the Bureau of Land Management (BLM) to approve the Final Statewide Oil and Gas Environmental Impact Statement (FEIS) and proposed amendments to the Resource Management Plans (RMPs) authorizing full-field coal bed methane (CBM) development in the Powder River and Billings Resource Areas of Montana. Plaintiffs in both cases contend that BLM's decision violates the National Environmental Policy Act (NEPA) , 42 U.S.C. § 4321 et seq. In addition, the Tribe alleges that the decision violated the Federal Land Policy and Management Act (FLPMA), 43 U.S.C. § 1701 et seq., the National Historic Preservation Act (NHPA), 16 U.S.C. § 470 et seq., and constitutes a breach of the government's fiduciary duty to protect Tribal interests and resources.

The Powder River Basin of southeastern Montana and north central Wyoming is a sparsely populated, semi-arid [*7]  grassland. Most of the land is used for cattle ranching, fanning, and coal mining.

Domestic and livestock water supplies in the area are dependent upon groundwater, which provides "almost 100% of the domestic water for farmsteads" and "the largest percentage of dependable stock water." FEIS at 3-32. Both ground and surface waters provide irrigation for crops. In addition, the surface waters and the riparian habitat they support provide critical habitat for native fish and wildlife populations.

Vast quantities of CBM are generated by coal deposits underlying the Powder River Basin. The methane is trapped in the coal seams by the pressure of groundwater. Releasing the pressure of groundwater from the coal aquifers liberates the methane, allowing it to be produced and sold.

In the early 1990s, BLM analyzed conventional oil and gas development in the Billings and Powder River Resource Areas. In 1994, BLM adopted the analysis and amended the existing RMP. [2]

> 2    This previous RMP amendment will hereinafter be referred to as the 1994 Amendment.

[*8] Although CBM is considered to be part of the oil and gas estate, the 1994 Amendment only briefly addressed the environmental impacts of CBM development because, at that time, only low levels of CBM production were anticipated. After analyzing the impacts of limited production, BLM determined that small-scale development and exploratory drilling would not cause significant environmental impacts. BLM recognized, however, that further environmental analysis would be needed before commercial production would be allowed.

> The Reasonably Foreseeable Development projections can accommodate the drilling of test wells and initial small-scale development of coal bed methane . . . . This amendment does not contain either a hydrologic analysis of the RFD area or an environmental study of the impacts of building major pipeline systems. In order for full-field development to occur on Federal oil and gas lands, an additional environmental document tied to this amendment would be required.

A.R. § VI.D.45 at 18.

Between 1997 and 2001, BLM held 23 competitive oil and gas lease sales. By 2001, approximately 867,000 acres within six counties in the Billings and Powder River Resource [*9]  Management Areas, including 46% of the federal minerals in the Powder River Basin, had been leased. [3] None of the leases contained stipulations prohibiting CBM production.

> 3    Much of the federal minerals underlie lands owned by private parties. Under this "split estate" scheme of ownership, the rights of the mineral

owners predominate over those of the surface owners.

In 2000, BLM decided that the time had come to further analyze the impacts of CBM development. In July of that year,. BLM determined that Fidelity Exploration & Production Company's proposal to develop its Tongue River CBM Project would result in significant environmental impacts, requiring the preparation of an EIS. Shortly thereafter, in October 2000, at a meeting of the Coal Bed Methane Coordination Group, industry predicted that it would drill approximately 10,000 CBM wells in the Montana portion of the Powder River Basin over the next 10 years. Two months later, in December 2000, BLM published in the Federal Register a notice of intent to [*10] prepare a programmatic EIS to consider amendments to the 1994 Amendment.

The Montana BLM's decision to prepare an EIS came some six months after a similar decision by the Wyoming BLM. In June 2000, the Wyoming BLM had begun an EIS on the effects of CBM production on the Wyoming portion of the Powder River Basin.

The State of Montana acted as a co-lead agency in the development of Montana's 2003 FEIS. The Environmental Protection Agency (EPA), the Bureau of Indian Affairs (BIA), the Department of Energy (DOE), and the Crow Tribe of Indians all participated as cooperating agencies. Although it chose not to become a cooperating party, the Northern Cheyenne Tribe actively participated in the process and undertook two studies funded by BLM concerning several issues relevant to Tribal interests.

In preparing the draft EIS (DEIS), BLM held five public scoping meetings and six public hearings. It published the DEIS in the Federal Register on February 15, 2002. During the following 60-day public comment period, BLM held six public hearings throughout Montana and received more than 25,000 comments, both oral and written.

Some of the comments, including those of the EPA and the Fish and Wildlife [*11] Service, criticized BLM for failing to assess the cumulative environmental impacts of CBM production in the Montana and Wyoming portions of the Powder River Basin in a single EIS. In response, the Montana and Wyoming agencies worked together to prepare joint cumulative impact statements for air and surface water. These new analyses were included in the Montana FEIS.

The FEIS was published in the Federal Register on January 17, 2003. Pursuant to 43 C.F.R. § 1610.5-2(a), members of the public who participated in the planning process had an additional 30-day opportunity to review the FEIS and to protest BLM's proposed decision. None of the protests resulted in changes to the proposed FEIS,

and in April 2003, BLM issued its Record of Decision approving the FEIS and RMP amendments.

These suits were filed immediately thereafter. In its complaint, NPRC alleges that BLM violated NEPA by failing to combine the Montana and Wyoming studies in a single EIS. NPRC also alleges that BLM violated NEPA's comment and participation requirements by failing to prepare a supplement to the DEIS.

Both NPRC and the Tribe contend that the FEIS is inadequate because it fails to consider any alternatives [*12] to full-field development. They also contend that BLM failed to take a hard look at the impacts of CBM development on groundwater, surface water, air quality, wildlife, aquatic life, noise, and traffic. The Tribe additionally argues that BLM failed to take a hard look at the socioeconomic and cultural effects of CBM development on the Northern Cheyenne Tribe.

Finally, the Tribe claims that BLM failed to engage in formal consultation with the Tribe over the effects of these federal undertakings on the Tribe's cultural and historical resources.

All parties [4] have filed cross motions for summary judgment on these issues. The federal defendants and the intervenors have also moved to strike extra judicial material filed by plaintiffs in support of their summary judgment motions. These motions are the subject of the following discussion.

    4    Marathon Oil Company, Pennaco Energy, Inc., Anadarko Petroleum Corporation, Devon Energy Corporation, and Fidelity Exploration & Production Company have been allowed to intervene as defendants in both actions. Intervenors have filed a motion for summary judgment in each of the consolidated cases.

[*13] DISCUSSION

A. Statutory Framework

1. The Administrative Procedure Act

[HN1] Judicial review of agency action is governed by the Administrative Procedure Act (APA), 5 U.S.C. § 701 et seq. Review is narrow. Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416, 28 L. Ed. 2d 136, 91 S. Ct. 814 (1971). An agency's actions, findings, and conclusions will be set aside only if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A).

[HN2] In determining whether a decision is arbitrary and capricious, the Court "'must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judg-

Case 1:07-cv-01486-RJL    Document 5    Filed 09/14/2007    Page 38 of 55

Page 8
2005 U.S. Dist. LEXIS 4678, *

ment.'" *Hells Canyon Alliance v. United States Forest Service,* 227 F.3d 1170, 1177 (9th Cir. 2000). (quoting *Morongo Band of Mission Indians v. Federal Aviation Admin.,* 161 F.3d 569, 573 (9th Cir. 1998)). The Court must not substitute its judgment for that of the agency. *Id.* Instead, in environmental actions, the Court "must simply ensure that the agency has adequately considered [*14] and disclosed the environmental impact of its actions[.]" *Id.*

## 2. The National Environmental Policy Act

NEPA [HN3] "is our basic national charter for protection of the environment." *Klamath-Siskiyou Wildlands Ctr. v. BLM,* 387 F.3d 989, 993 (9th Cir. 2004) (quoting 40 C.F.R. § 1500.1(a)). [HN4] A procedural statute, NEPA mandates the preparation of an EIS before an agency takes "major Federal actions significantly affecting the quality of the human environment[.]" 42 U.S.C. § 4332(2)(C). An EIS must address both the cumulative impacts of a proposed action and reasonable alternatives thereto. *Muckleshoot Indian Tribe v. United States Forest Service,* 177 F.3d 800, 809 (9th Cir. 1999).

[HN5] NEPA has "twin aims. First, it places upon [a federal] agency the obligation to consider every significant aspect of the environmental impact of a proposed action. Second, it ensures that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process.'" *Kern v. United States BLM,* 284 F.3d 1062, 1066 (9th Cir. 2002) (quoting *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.,* 462 U.S. 87, 97, 76 L. Ed. 2d 437, 103 S. Ct. 2246 (1983)). [*15] "NEPA does not contain substantive environmental standards." *Id.* Rather, it "exists to ensure a process, not particular substantive results[.]" *Hells Canyon Alliance,* 227 F.3d at 1177. It "'establishes 'action-forcing' procedures that require agencies to take a 'hard look' at environmental consequences.'" *Kern,* 284 F.3d at 1066 (quoting *Metcalf v. Daley,* 214 F.3d 1135, 1141 (9th Cir. 2000)).

[HN6] In evaluating the adequacy of an EIS, the Ninth Circuit employs a "rule of reason to determine whether the EIS contains a 'reasonably thorough discussion of the significant aspects of probable environmental consequences.'" *Id.* at 1071 (quoting *Neighbors of Cuddy Mountain v. United States Forest Service,* 137 F.3d 1372, 1376 (9th Cir. 1998)). This "rule of reason" analysis is essentially the same as an abuse of discretion standard. *Id.* at 1072. The Court reviews an EIS to ensure that its "'form, content and preparation foster[ed] both informed decision-making and informed public participation.'" *Friends of Southeast's Future v. Morrison,* 153 F.3d 1059, 1062-63 (9th Cir. 1998) (quoting *Idaho Conservation League v. Mumma,* 956 F.2d 1508, 1519 (9th Cir. 1992)). [*16] However, the Court need not flyspeck

the document. *Id.* at 1063. If the Court is satisfied that the agency took a "hard look" at a proposed action's environmental consequences, judicial review is at an end. *Id.*

[HN7] In construing NEPA, the Court gives substantial deference to implementing regulations issued by the Council on Environmental Quality (CEQ) found at 40 C.F.R. §§ 1500-1508. *Center for Biological Diversity v. United States Forest Serv.,* 349 F.3d 1157, 1166 (9th Cir. 2003). The procedures prescribed both in NEPA and the CEQ regulations "are to be strictly interpreted 'to the fullest extent possible' with the policies embodied the Act." *Id.* (quoting 42 U.S.C. § 4332(1)).

## 3. Reasonable Range of Alternatives

[HN8] Under NEPA, an EIS must include a detailed statement of alternatives to the proposed action. 42 U.S.C. § 4332(2)(C)(iii). The alternatives analysis, which is the "heart" of an EIS, requires an agency to rigorously explore and objectively evaluate all reasonable alternatives, and to briefly discuss the reasons for eliminating other alternatives from detailed study. 40 C.F.R. § 1502.14(a).

[HN9] The [*17] purpose and need statement of an EIS, which briefly specifies "the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action[,]" 40 C.F.R. §. 1502.13, defines the range of alternatives to be considered by the agency. *City of Carmel-by-the-Sea v. United States Dept. of Transp.,* 123 F.3d 1142, 1155 (9th Cir. 1997). "The agency must look at every reasonable alternative within the range dictated by the nature and scope of the proposal. The existence of reasonable but unexamined alternatives renders an EIS inadequate." *Friends of Southeast's Future,* 153 F.3d at 1065 (internal quotation omitted).

[HN10] An EIS need not, however, "consider an infinite range of alternatives, only reasonable or feasible ones." *City of Carmel,* 123 F.3d at 1155. Thus, an agency need consider only those alternatives that achieve its stated purpose and goal. *The Island Range Chapter of the Montana Wilderness Ass'n v. United States Forest Serv.,* 45 F.Supp.2d 1006, 1009 (D. Mont. 1996), *aff'd* 117 F.3d 1425 (9th Cir. 1997). Alternatives that are remote, speculative, ineffective, [*18] or inconsistent with basic policy objectives need not be considered. *Headwaters, Inc. v. BLM, Medford Dist.,* 914 F.2d 1174, 1180 (9th Cir. 1990). "When the purpose is to accomplish one thing, it makes no sense to consider the alternative ways by which another thing might be achieved." *City of Angoon v. Hodel,* 803 F.2d 1016, 1021 (9th Cir. 1986).

## A. Phased Development

2005 U.S. Dist. LEXIS 4678, *

Turning to the present case, NPRC and the Tribe both argue that the EIS was inadequate because it failed to consider any lesser degree of development than full-field development. NPRC and the Tribe contend that BLM should have examined phased development as an alternative to full-field planning so that the environmental effects of CBM production could have been more accurately measured.

BLM examined five alternatives: Alternative A, the no-action alternative required by 40 C.F.R. 1502.14(d), which provided a basis for comparison with the proposed action; Alternative B. which emphasized environmental protection; Alternative C, which emphasized CBM development with minimal restrictions; Alternative D, which encouraged CBM development while maintaining existing land uses; and Alternative [*19] E, the preferred, and ultimately adopted alternative, which provided "management options to facilitate CBM exploration and development, while sustaining resource and social values, and existing land uses." FEIS at 2-13. BLM admits that all four of its action-based alternatives considered full-field development of CBM. It argues, however, that any lesser degree of development would not have achieved the objectives of the EIS.

To determine whether BLM's contention is correct, the Court looks to the Purpose and Need Statement, which provides in pertinent part:

> The purpose of the EIS is to analyze impacts from oil and gas activity, particularly from CBM exploration, production, development, and reclamation in the Billings and Powder River Resource RMP areas. This EIS is being used to analyze options for BLM to change its planning decisions by considering oil and gas management options including mitigating measures that will help minimize the environmental and social impacts related to CBM activities. The alternatives presented provide a range of management options for amending the RMPs . . . . The EIS will focus the analysis on the oil and gas development issues not covered in [*20] the current RMPs, such as water management from CBM production.

FEIS at 1-2.

The Purpose and Need Statement requires BLM to analyze options for managing the environmental effects of CBM "exploration, production, development, and reclamation . . . ." *Id.* Nothing in the Statement restricts those options to full-field development. Rather, the goal of the EIS is to determine what options, including mitigating measures, "will help minimize the environmental and societal impacts related to CBM activities." *Id.* Phased development, such as controlling the number of rigs operating in an area or developing one geographic area at a time, as suggested by plaintiffs, the EPA [5] and the Montana Department of Fish Wildlife and Parks (FWP), [6] would not hinder this goal. To the contrary, a phased development alternative would serve the stated purpose and need of the EIS by providing additional options for minimizing impacts related to CBM exploration, production, and development.

5   In its scoping comments, the EPA wrote:

> There may be significant impacts related to constructing oil and gas infrastructure due to the "boom and bust" nature of the coal-bed methane development. Therefore, we suggest that the range of alternatives include a phased development alternative. Just as determining where oil and gas development is appropriate, determining when development is appropriate is also a consideration of the RMP. An alternative that incorporates a phased development of coal-bed methane could help reduce the significance of impacts by spreading them out over a period of time. Preparing infrastructure for peak production during a boom results in environmental impacts that could have been minimized through a planned or phased approach to development. For example, a phased approach would reduce impacts from larger volumes of surface water discharges that would be encountered if drilling and production are allowed to proceed without timing restrictions.

AR § III, File A, Doc. 2 at 8.

[*21]

6   FWP commented on the DEIS as follows:

> FWP believes that an action alternative capable of reducing or minimizing negative impacts to fish and wildlife resources must

rely on phased development over time. A phased approach would allow the responsible agencies to evaluate the effects of development on existing land uses and natural and cultural resources and through a deliberative, adaptive management process, devise strategies to prevent or reduce the detrimental effects of future development found to be irreparable or unmitigable.

As such, FWP recommends that a phased development approach be added to the conditions of Alternative B. Timing and spacing of the phased approach needs to be determined, but it is suggested that a starting point would be to lease and permit 20-35% of the potential lands (depending on geology), with clustered development.

AR, § 4, File E, Doc. 2 at 2.

The comments go on to describe the benefits of this approach and to further suggest that phased development be incorporated into the Preferred Alternative.

A phased development alternative [*22] was within the range of reasonable alternatives set forth in the Purpose and Need Statement. A phased development alternative should therefore have been given detailed consideration, unless, as BLM argues, such a planning tool would not have been feasible under the circumstances.

In the FEIS, BLM acknowledged that it had been presented with several different ideas for phased development:

Staged or phased development was presented to BLM during scoping in several ways. First, the number of rigs operating in the emphasis area could be controlled and leases could be developed in stages. Second, companies would be allowed to develop production in one geographic area at a time and when complete, move to another. Lastly, corridors could be left undeveloped to allow for wildlife movement.

FIES 2-4. [7]

7   Considering this section of the EIS, the Court finds it somewhat disingenuous for BLM to now argue that it was not presented with any specific proposals for phased development.

The FEIS then stated [*23] the following reasons for rejecting these proposals:

BLM has a legal obligation to ensure that leased federal minerals are reasonably developed and that federal minerals are not drained by production that occurs on non-federal leases. The State of Montana and private parties own much of the minerals and surface in the emphasis area, resulting in a checkerboard pattern that could compromise the BLM's legal obligation to protect federal minerals.

This alternative is not reasonable in the case of oil and gas leases because each lessee has an investment-backed expectation that its applications for permits to drill will be considered in a timely manner and approved absent unacceptable site-specific impacts. See the Supreme Court decision in *Mobil Oil Exploration and Producing Southeast, Inc. v. United States,* 530 U.S. 604, 620, 147 L. Ed. 2d 528, 120 S. Ct. 2423 (2000), which found a breach of contract when the Minerals Management Service, pursuant to a later adopted statute, would not review and make a timely decision on development plans per the regulations. In addition the Mineral Leasing Act and 43 CFR 3100 require maximum ultimate recovery of oil and gas from leased lands. In light of the [*24] broad geographic distribution of leases in the Powder River Basin, phased development in any fashion would not allow compliance with the above requirements.

Although, BLM must balance these mandates with its responsibility to use multiple use principles to prevent unnecessary or undue degradation in managing the public lands pursuant to FLPMA. [8] This document does not support a finding that these competing responsibilities would be in conflict.

8    This sentence is correctly quoted from the FEIS. Even so, the Court has struggled to make sense of it.

*Id.*

According to this explanation, BLM's decision not to undertake a detailed study of a phased development alternative rested on two premises: its duty to prevent drainage of leased federal minerals and its concern that phased development would interfere with the rights of leaseholders. Both premises rest on the erroneous assumption that, having leased the mineral rights, BLM could not control the pace of production.

First, it may be true that [*25] BLM is legally required to maximize federal oil and gas resources and prevent drainage of federal minerals. Nevertheless, these duties do not obviate the need for NEPA analysis. While depletion of CBM may be a valid concern, that concern must be balanced against the environmental and societal impacts resulting from CBM production. It does not justify BLM's failure to consider a phased development alternative in detail, especially where, as here, the minerals were leased before the environmental impacts of CBM development had been analyzed and where a phased development alternative fell within the scope of alternatives established by the agency's stated purpose and need.

Second, the "investment-backed rights" of holders of oil and gas leases are not absolute. They are limited by previously established RMPs, in this case, the 1994 Amendment, which gave federal leaseholders of oil and gas interests in the Powder River Basin "only the right to undertake exploratory drilling and small-scale development of CBM resources." *N. Plains Res. Council v. United States BLM,* 298 F.Supp.2d 1017, 1024 (D.Mont. 2003), *aff'd on other grounds,* 107 Fed.Appx. 166 (9th Cir. 2004).

Unlike [*26] the case cited in the FEIS, *Mobil Oil Exploration and Producing SouthEast, Inc. v. United States,* 530 U.S. 604, 147 L. Ed. 2d 528, 120 S. Ct. 2423 (2000), where the United States sought to restrict the rights of the leaseholders, the purpose of the EIS in this case is to expand the rights of the lessees to allow them to develop CBM resources on a larger scale than permitted under the 1994 Amendment. *See* FEIS at 2-2 ("The purpose of this document, is to analyze levels of conventional oil and gas and CBM development that are greater than those analyzed in the [1994 Amendment.]") A management plan that permits development in stages, rather than all at once, is not inconsistent with this goal. Phased planning would allow development to proceed, *albeit* at a more controlled pace than the full-scale development alternatives studied in the FEIS. Phased development would not incorrectly restrict the rights of leaseholders whose only investment-backed expectations at the time they purchased their leases were that they would be allowed to conduct exploratory drilling and small-scale development of CBM. [9]

9    To find that the lessees obtained rights greater than this would mean that, when it issued the leases, BLM violated NEPA by making an irreverible and irretrievable commitment of CBM resources prior to undertaking the requisite environmental analysis. *Metcalf v. Daley,* 214 F.3d 1135, 1143 (9th Cir. 2000); *Conner v. Burford,* 848 F.2d 1441, 1446 (9th Cir. 1988). BLM's discretion to impose restrictions on CBM development could not lawfully have been limited by leasing decisions made under the 1994 Amendment because that document expressly declined to analyze the impacts of full-field CBM development. Because no analysis of full-scale CBM development preceded the issuance of leases under the 1994 Amendment, the leases created no legally enforceable leasehold rights or investment-backed expectations in full-field CBM development.

[*27] Nor is phased development the functional equivalent of a no-action alternative, as BLM argues. Pursuant to regulation. 40 C.F.R. § 1502.14(d), and in order to establish a baseline for comparison with the proposed project, the EIS included a no-action alternative (Alternative A). This alternative would have continued existing management, limiting CBM activity to exploration and limited development. Such an alternative clearly would not have promoted the purposes of the EIS, which was to change planning decisions to allow for increased CBM production. Phased development, *i.e.,* developing leases in stages or allowing production in one geographic area at a time allows for the production of CBM resources. It is not the functional equivalent of the no-action alternative.

*Pit River Tribe v. BLM,* 306 F.Supp.2d 929 (E.D.Cal. 2004), upon which BLM relies, is inapposite. In that case, BLM had approved a site-specific geothermal project after considering a no-action alternative and six alternatives that differed only in the placement of the project's power line. The Tribe argued that the FEIS was inadequate because it failed to consider anything other than geothermal technology. [*28] The court found that the alternatives suggested by the Tribe were unnecessary because they amounted to the functional equivalent of the no-action alternative.

In *Pit River,* unlike the pending cases, a programmatic FEIS approving the use of geothermal energy was

already in place. Because BLM had already decided in the earlier programmatic FEIS to develop geothermal power, the Tribe's challenges based on alternative sources of energy came too late. As the court noted, "The sorts of alternatives suggested by the plaintiffs are more appropriate to earlier NEPA documents, and, indeed, the programmatic EIS for the Geothermal Steam Act did consider alternative sources of energy . . . ." *Id.* at 940.

Here, unlike *Pit River,* the FEIS does not involve a site-specific project. Instead, the FEIS is a programmatic plan for the broad scope of development of CBM resources. Because no prior NEPA document has ever analyzed the environmental effects of CBM development in the area, this is precisely the place for BLM to consider alternatives varying the pace and geographical sites of development.

In sum, the Court finds that a phased development alternative is consistent with [*29] the purpose of the EIS, which was to analyze options for developing CBM resources in a manner that would minimize the societal and environmental impacts resulting from such development. [10] The reason offered by BLM for rejecting phased development alternatives premised on the assumption that BLM's prior issuance of oil and gas leases committed it to total and immediate full-field development is legally untrue. BLM's failure to analyze a phased development alternative renders the EIS inadequate.

> 10    Indeed, as FWP observed, a phased development alternative approach fits hand-in-hand with the adaptive management approach BLM subscribes to throughout the FEIS.

**B. Reinjection and other alternatives.**

Management of the wastewater produced by CBM drilling presents one of the greatest challenges associated with CBM production. NPRC contends that BLM failed to consider an alternative requiring the re-injection of produced water from CBM production into depleted coal seams. BLM responds that re-injection was rejected [*30] as an infeasible alternative because a coal seam must be depressurized in order to liberate methane. Re-injection of produced water would repressurize the seam, resulting in a decrease in methane production. As this dilemma was recognized by NPRC's own consultant, the Court cannot say that BLM unreasonably failed to give re-injection detailed consideration.

Although BLM did not consider re-injecting wastewater into producing coal seams to be a viable option, Alternative B examined the possibility of injecting produced water into non-productive seams that were geologically separated from producing CBM fields. Alternative E, the preferred alternative, also included injection

as an option for dealing with produced water, although it emphasized beneficial use as the preferred method for wastewater management.

Perhaps BLM did not consider every possible manner for wastewater management through injection or re-injection. However, the agency need not consider an endless range of possibilities. Nor need the agency adopt every method suggested by commentators and experts. The Court cannot find that BLM's treatment of injection options was unreasonable.

In two sentences, NPRC criticizes BLM [*31] for allegedly failing to adopt best available control technology for minimizing emissions from gas-fired compressors or for treatment of wastewater. Suffice it to say that the Court will not consider the merits of arguments that the parties have made no effort to develop in their briefs. NPRC's criticisms, regarding best available technologies are rejected.

**4. A Single EIS**

NPRC contends that BLM violated NEPA by completing two separate EISs for the Wyoming and Montana portions of the Powder River Basin. NPRC argues that the two EISs were both cumulative and similar actions that necessitated the preparation of a single EIS covering the entire Basin.

[HN11] Federal agencies are given considerable discretion to define the scope of NEPA review. *Native Ecosystems Council v. Dombeck,* 304 F.3d 886, 894 (9th Cir. 2002). However, "connected, cumulative, and similar actions must be considered together to prevent an agency from 'dividing a project into multiple 'actions' each of which individually has an insignificant environmental impact, but which collectively have a substantial impact.'" *Id.* (quoting *Thomas v. Peterson,* 753 F.2d 754, 758 (9th Cir. 1985)). [*32]  Thus, 40 C.F.R. § 1508.25. requires that "two or more agency actions must be discussed in the same impact statement where they are 'connected' or 'cumulative' actions." *Klamath-Siskiyou,* 387 F.3d at 999. "Where the proposed actions are "similar, ' the agency 'may wish' to assess them in the same document and 'should do so' when a single document provides the 'best way to assess adequately the combined impacts of similar actions . . . .'" *Id.* (quoting 40 C.F.R. § 1508.25(a)(3).

Cumulative actions are those that "when viewed with other proposed actions have cumulatively significant impacts . . . ." 40 C.F.R. § 1508.25(a)(2). Cumulative impacts are those that result from "the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions . . . . Cumulative impacts can result from individually minor but col-

lectively significant actions taking place over a period of time." 40 C.F.R. § 1508.7.

NPRC maintains that CBM development will have cumulative impacts on air quality, surface water quality, groundwater resources, and wildlife that will cut across the state lines dividing the Powder River Basin. According to NPRC, [*33] when two proposed actions will occur in a distinct geographic region such as the Powder River Basin, the impact analysis should be combined in a single EIS.

While NPRC's argument is facially attractive, [HN12] agencies may consider factors in addition to geographic area when determining whether to conduct one or more environmental analyses. As the Supreme Court has noted, "Even if environmental interrelationships could be shown conclusively to extend across basins and drainage areas, practical considerations of feasibility might well necessitate restricting the scope of comprehensive statements." *Kleppe v. Sierra Club,* 427 U.S. 390, 414, 49 L. Ed. 2d 576, 96 S. Ct. 2718 (1976). The key question is whether "the record suggests that the agency *intended* to segment review to minimize cumulative impact analysis." *Earth Island Inst. v. United States Forest Service,* 351 F.3d 1291, 1305 (9th Cir. 2003) (emphasis in original).

Here, sufficient practical considerations justified BLM's decision to conduct two separate studies of the area. First, the timing of the proposals, at least initially, differed by some six months. Next, the scope of the studies differed. Wyoming began its environmental [*34] process in response to a specific industry-project proposing to drill 39,000 CBM wells in the Wyoming portion of the Powder River Basin. The Wyoming EIS accordingly focused on that geographic area. The Montana process evolved initially from a site-specific analysis of a project proposed by Fidelity Exploration & Production. Company to develop the Tongue River Project and ultimately from an October 2000 meeting of the Coal Bed Methane Coordination Group at which industry predicted that it could drill up to 10,000 wells in the Montana portion of the Powder River Basin. Although the federal analysis centers around the Powder River Basin, the Montana EIS is a statewide planning device, encompassing areas and impacts beyond the Powder River Basin.

In addition, the pace of CBM development varied greatly between the two states. CBM exploration in the Wyoming portion of the Basin began in 1988. By June 2000, when the Wyoming BLM commenced its EIS process, 4,866 CBM wells had already been drilled. Of this number, 759 were federal wells. At the same time, the Montana CBM industry was in its infancy. Its first proposal for CBM development was received in 1998, with Fidelity's application to [*35] develop the Tongue

River Project. By June 2000, there were no producing federal CBM wells.

Many different agencies cooperated in the preparation of the EISs. In Wyoming, the U.S. Forest Service, Medicine Bow National Forest, and the State of Wyoming were cooperating agencies. Five conservation districts, four counties, and four state agencies also assisted in the preparation of the Wyoming FEIS. In Montana, the State of Montana was a co-lead agency, with EPA, DOE, BIA, and the Crow Tribe of Indians serving as cooperating agencies. With the involvement of all of these different agencies, it would have been extremely difficult for all parties to come together to prepare a single environmental document.

The Wyoming and Montana BLMs considered developing one EIS and rejected that option, concluding that "one document would be so broad and cumbersome than preparation of separate environmental documents is necessary to address the varied state and public concerns." A.R. § I.A.2 at 1. Nothing in the record suggests that BLM made this decision with the intent of obscuring the cumulative impacts of CBM development. To the contrary, the agencies recognized the need to analyze cumulative impacts [*36] in the Powder River Basin. For that reason, they collaborated throughout the process. They shared information, and, when inconsistencies between the two DEISs were noted, they coordinated their efforts to prepare joint cumulative impact assessments of surface water and air quality.

BLM could have prepared a single EIS for "cumulative actions" in the Powder River Basin. For practical reasons, it chose not to. That decision was not arbitrary and capricious.

NPRC also contends that the two EISs fell within the definition of "similar" actions and therefore should have been completed as a single analysis. Similar actions are those "which when viewed with other reasonably foreseeable or proposed agency actions, have similarities that provide a basis for evaluating this environmental consequences together, such as common timing or geography." 40 C.F.R. § 1508.25(a)(3).

The two EISs may very well be similar actions, to the extent they have the common geographic background of the Powder River Basin. [HN13] An agency, however, has even more discretion to decide whether to complete a single document when "similar" actions are concerned than when "cumulative" actions are involved. *Earth Island,* 351 F.3d at 1306. [*37] The regulations simply provide that an agency "may wish" to analyze similar actions in the same impact statement. 40 C.F.R. § 1508.25(a)(3). The agency "should do so when the best way to assess adequately the combined impacts of simi-

lar actions or reasonable alternatives to such actions is to treat them in a single impact statement." *Id.*

*Earth Island* is instructive. In that case, a large wildfire burned two adjacent national forests in two different states. When the supervisors of the two forests decided to implement separate restoration projects and timber sales for the two forests, the plaintiffs sued, arguing that a single EIS covering both forests should have been prepared. The Ninth Circuit did not agree. The appellate court held that where there were prior administrative boundaries, different patterns of ownership, disparate timetables and separate supervisory personnel, the agency may reasonably conclude that two separate documents are the best way to assess adequately the combined impacts of the similar actions.

The same circumstances exist in this case. First, the political boundaries between the states of Wyoming and Montana, as well as the administrative boundaries [*38] of the BLM State Offices predated the decision to undertake EISs in both states. Second, the Powder River Basin in each state has different patterns of ownership. In Wyoming, the land is owned by the federal government, the State of Wyoming, and private individuals. In Montana, the land belongs to the federal government, the Crow and Northern Cheyenne Tribes, the State of Montana, and private parties. Finally, as noted in the previous discussion, the environmental reviews were initiated at different times and conducted by different supervisory personnel. As in *Earth Island,* it was not arbitrary and capricious for BLM to determine that a single EIS was not the best to adequately assess the combined effects of the actions.

**5. Bard Look**

Plaintiffs contend that the FEIS failed to take a hard look at the impacts of CBM development on groundwater, surface water quality, air quality, aquatic life, wildlife, methane migration, noise, and traffic. The Tribe also contends that the FEIS failed to take a hard look at the socioeconomic and cultural effects of development on the Northern Cheyenne Reservation.

Having already determined that the FEIS failed to consider a phased development [*39] alternative, the Court need not examine plaintiffs' hard look arguments. Nevertheless, as an advisory opinion only, the Court observes that, as a whole, the FEIS adequately considered the impacts of CBM development in the Powder River Basin. *See National Parks & Conservation Ass'n v. United States Dept. of Transportation,* 222 F.3d 677, 682 (9th Cir. 2000) [HN14] (An EIS must be reviewed as a whole.). Indeed, the analysis may not be as detailed as plaintiffs would like. However, where, as here, the FEIS is a large-scale, programmatic planning device, it need

only provide "'sufficient detail to foster informed decision making, . . . site specific impacts need not be fully evaluated until a critical decision has been made to act on site development.'" *Friends of Yosemite Valley v. Norton,* 348 F.3d 789. 800 (9th Cir. 2003) (quoting *Northern Alaska Envtl. Ctr v. Lujan,* 961 F.2d 886, 890-91 (9th Cir. 1992)). Thus, the detailed analysis that plaintiffs desire may be deferred until BLM has been presented with a proposal for a site-specific plan of development. *Id.*

That said, for the guidance of BLM in its further analysis on remand, the Court [*40] notes the following areas of concern. The first involves private water well mitigation agreements. While the FEIS relies on these agreements to ameliorate the impacts of methane migration and the depletion of groundwater aquifers, it never clearly describes what the agreements entail nor does it evaluate their effectiveness. Without some additional discussion about how these private agreements will alleviate the impacts of CBM development on methane migration and groundwater drawdown, it is difficult to conclude that the FEIS fairly evaluated the consequences of CBM development in these two areas. *See Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 350-52, 104 L. Ed. 2d 351, 109 S. Ct. 1835 (1989) [HN15] (Without a reasonably complete discussion of possible mitigation measures, neither the agency nor the public can properly evaluate the severity of the adverse effects of the proposed action.).

The other area of concern involves the Tongue River Railroad. The DEIS included the railroad as a reasonably foreseeable future project. The FEIS, however, omitted the railroad. In briefing and at oral argument, BLM justified the omission by arguing that the railroad is a speculative project that may never [*41] occur. Since that time, the Surface Transportation Board has published its intent to undergo another environmental analysis of the railroad and, in recent environmental assessments (EAs) for CBM projects in the Powder River Basin, BLM has included the railroad in its discussion of reasonably foreseeable future projects. [11] Under these circumstances, and without deciding whether the omission of the railroad from the FEIS was error, the Court suggests that, on remand, BLM include the railroad in its cumulative impacts analysis. *See Klamath-Siskiyou,* 387 F.3d at 994 [HN16] (A cumulative impact analysis must include a useful assessment of past, present, and reasonably foreseeable future projects.).

11   The Court takes judicial notice of notice of availability of the draft supplemental EIS for the Tongue River Railroad construction project published in the Federal Register on October 22, 2004. The Court also takes judicial notice of the

EA for Fidelity's Tongue River-Dry Creek Plan of Development approved on December 16, 2004, and the EA for Fidelity's Tongue River-Coal Creek Plan of Development approved on January 19, 2005, despite the motions of BLM and Fidelity to strike the excerpted pages from these two EAs filed by NPRC. In the context in which these EAs are used by the Court, which is not to make a determination as to the merits of plaintiffs' claims, there is nothing inappropriate in taking judicial notice of the fact that the EAs do indeed include the Tongue River Railroad in their cumulative impact analyses.

[*42] **6. Supplemental DEIS**

NPRC argues that BLM violated the public comment and participation requirements of NEPA by failing to circulate a supplemental DEIS containing new air and surface water quality analyses that were included in the FEIS, but not the DEIS. Because the Court is remanding for other reasons, it need not discuss this issue.

### 7. Federal Lands Policy Management Act

The Tribe's challenges to the RMP under FLPMA are not ripe. *Norton v. Southern Utah Wilderness Alliance,* 542 U.S. 55, 159 L. Ed. 2d 137, 124 S. Ct. 2373 (2004); *Kern,* 284 F.3d at 1070; *Wilderness Soc'y v. Thomas,* 188 F.3d 1130, 1134 (9th Cir. 1999); *Ohio Forestry Ass'n, Inc. v. Sierra Club,* 523 U.S. 726, 140 L. Ed. 2d 921, 118 S. Ct. 1665 (1998). [HN17] "Generic challenges to the sufficiency of [an RMP] are no longer justiciable[.]" *Thomas,* 188 F.3d at 1134. Unless a site-specific action is the focus of the complaint, a plaintiff can no longer use FLPMA to challenge an agency's adoption of a programmatic plan. *Id.; Kern,* 284 F.3d at 1070. The Tribe's claim that BLM violated FLPMA must accordingly be dismissed without prejudice. [12] [*43]

> 12 NPRC has already withdrawn its arguments on this issue and has moved to dismiss its FLPMA claims from its complaint.

### 8. The National Historic Preservation Act

[*HN18*] NHPA requires federal agencies with jurisdiction over a proposed federal or federally assisted "undertaking" to "take into account the effect of the undertaking on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register [of Historic Places]." 16 U.S.C § 470f. [HN19] "Properties of traditional religious and cultural importance to an Indian tribe . . . may be determined to be eligible for inclusion in the National Register." 16 U.S.C. § 470a(d)(6)(A). Accordingly, [HN20] prior to approving the expenditure of federal funds on the undertaking or issuing any license, federal agencies must consult with Indian Tribes that attach religious or cultural significance to historic properties. 16 U.S.C. 470a(d)(6)(B). After consulting [*44] with and gathering information from an Indian tribe, the agency must make a reasonable and good faith effort to identify historic properties, determine the eligibility of the identified properties for listing in the National Register, assess any effects that an undertaking may have on an historic property, and, if the agency determines that the effects are adverse, avoid or mitigate and such effects. 36 C.F.R. §§ 800.4(b)(1), 800.4(c), and 800.5.

The Tribe claims that BLM failed in its NHPA obligations by failing to consult with it prior to issuing oil and gas leases pursuant to the 1994 Amendments and approving the 2003 RMP Amendments.

As to the issuance of the oil and gas leases, the Tribe fails to identify any single lease or leasing decision to support its claim. Instead, the Tribe appears to attack the entire leasing program undertaken by the BLM after approving the 1994 Amendments. In this sense, the Tribe's claims are akin to the challenges made to BLM's "land withdrawal review program" in *Lujan v. National Wildlife Fed'n.* 497 U.S. 871, 111 L. Ed. 2d 695, 110 S. Ct. 3177 (1990). In that case, the Supreme Court rejected the plaintiffs' claims for the reason that they failed to identify any particular [*45] "agency action" that caused them harm. Without final agency action, there is no right to judicial review under the APA. *Id.* So too, here, where the Tribe asserts a general attack against an entire program instead of challenging any specific leasing decision, this Court lacks the authority under the APA to review the Tribe's claim. [13]

> 13 The Tribe cannot challenge the 1994 Amendment itself because such an attack would be barred by the statute of limitations. *NPRC v. United States BLM,* 107 Fed.Appx. 166 (9th Cir. 2004).

As to the 2003 RMP Amendments, it appears that BLM did indeed consult with the Tribe to the extent required under NHPA. BLM's decision to conduct further NHPA consultation at the site-specific level was not in error. Where, as here, large land areas are involved, the agency may use a phased process to conduct NHPA identification and evaluation efforts. 36 C.F.R. § 800.4(b)(2). Furthermore, where the identification effort is part of a NEPA process, final identification and [*46] evaluation may be deferred until a site-specific project is proposed. *Id.*

### 9. BLM's Trust Responsibility to the Tribe

2005 U.S. Dist. LEXIS 4678, *

The Tribe alleges that by violating NEPA, FLPMA, and NHPA. BLM also violated its fiduciary obligations to the Tribe. As this contention offers nothing more than a rehash of previous arguments, the Court need not consider it.

### 10. Injunctive Relief

[HN21] An injunction may issue where plaintiffs prove irreparable injury and inadequacy of legal remedies. *Amoco Prod. Co. v. Vill. of Gambell,* 480 U.S. 531, 542, 94 L. Ed. 2d 542, 107 S. Ct. 1396 (1987). Even though environmental injury can rarely be remedied by money damages and is often longlasting, the court must still "balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Id.*

In this case, the NEPA violations found by the Court do not automatically lead to the conclusion that all development activities must cease pending further administrative review. From the record presently before it, the Court cannot determine to what extent, if at all, development should be suspending during the completion of a new environmental impact statement [*47] that includes a phased development alternative. Under these circumstances, the Court deems it prudent to hold an evidentiary hearing to determine the nature and extent of injunctive relief, if any, to be granted.

### MOTIONS TO STRIKE

BLM and the intervenors have filed several motions to strike affidavits and extra-record materials filed by plaintiffs. Because the Court did not review any of these materials in reaching its decision, the motions shall be denied as moot.

### ORDER

In accordance with the foregoing, **IT IS ORDERED:**

1. The Tribe's motion for summary judgment (docket no. 60 in Cause No. CV 03-69-BLG-RWA and docket no. 76 in Cause No. CV 03-78-BLG-RWA) is granted in part and denied in part in accordance with the discussion above.

2. NPRC's motion for summary judgment (docket no. 64 in Cause No. CV 03-69-BLG-RWA) is granted in part and denied in part in accordance with the discussion above.

3. BLM's motion for summary judgment against NPRC (docket no. 77 in Cause No. CV 03-69-BLG-RWA and docket no. 92 in Cause No. CV 03-78-BLG-RWA) is granted in part and denied in part in accordance with the discussion above.

4. BLM's motion for summary judgment against the [*48] Tribe (docket no. 80 in Cause No. CV 03-69-BLG-RWA and docket no. 93 in Cause No. CV 03-78-BLG-RWA) is granted in part and denied in part in accordance with the discussion above.

5. Defendant Intervenors' motion for summary judgment against NPRC (docket no. 73 in Cause No. CV 03-69-BLG-RWA and docket no. 88 in Cause No. CV 03-78-BLG-RWA) is granted in part and denied in part in accordance with the discussion above.

6. Defendant Intervenors' motion for summary judgment against the Tribe (docket no. 96 in Cause No. CV 03-78-BLG-RWA) is granted in part and denied in part in accordance with the discussion above.

7. Defendant Intervenor Fidelity's motion for summary judgment against NPRC (docket no. 83 in Cause No. CV 03-69-BLG-RWA) is granted in part and denied in part in accordance with the discussion above.

8. NPRC's motion to dismiss (docket no. 128-1 in Cause No. CV 03-69-BLG-RWA) is granted. Count Five of NPRC's complaint in Cause No. CV 03-69-BLG-RWA is hereby dismissed without prejudice.

9. The Fifth Cause of Action in the Tribe's complaint in Cause No. CV 03-78-BLG-RWA alleging claims under FLPMA is likewise dismissed without prejudice.

10. BLM's motion to strike NPRC's extra-record [*49] materials (docket no. 97-1 in Cause No. CV 03-69-BLG-RWA) is denied as moot.

11. Intervenor Defendant Fidelity's motion to strike (docket no. 110 in Cause No. CV 03-69-BLG-RWA and docket no. 111 in Cause No. CV 03-78-BLG-RWA) is denied as moot.

12. BLM's motion to strike NPRC's supplemental statement of facts (docket no. 112 in Cause No. CV 03-69-BLG-RWA and docket no. 113 in Cause No. CV 03-78-BLG-RWA) is denied as moot.

13. BLM's motion to strike exhibits filed in support of NPRC's combined response/reply brief (docket no. 114 in Cause No. CV 03-69-BLG-RWA and docket no. 115 in Cause No. CV 03-78-BLG-RWA) is denied as moot.

14. BLM's motion to strike excerpted pages from the Dry Creek and Coal Creek EAs (docket no. 134 in Cause No. CV 03-69-BLG-RWA and docket no. 125 in Cause No. CV 03-78-BLG-RWA) is denied.

15. Fidelity's motion to strike (docket no. 135 in Cause No. CV 03-69-BLG-RWA) is denied.

15. An evidentiary hearing on the appropriate scope of injunctive relief in this matter shall be held on March

29, 2005, from 9:30 a.m. to 12:00 p.m. Prior to the hearing, the parties shall decide among themselves how to divide the allotted time.

16. On or before March 23, 2005, [*50]  the parties shall file briefs, limited to 10 pages, on the appropriate scope of injunctive relief.

The Clerk of Court shall not enter judgment until further order of the Court.

The Clerk of Court shall notify counsel of record of the making of this order.

Done and dated this 25th day of Feb 2005.

RICHARD W. ANDERSON

UNITED STATES MAGISTRATE JUDGE

LEXSEE 2002 U.S. DIST. LEXIS 27414



Positive
As of: Sep 13, 2007

**SOUTHERN UTAH WILDERNESS ALLIANCE, et al., Plaintiffs, v. GALE NORTON, et al., Defendants.**

**Civil Action No. 01-2518 (CKK)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

**2002 U.S. Dist. LEXIS 27414**

**June 28, 2002, Decided**
**June 28, 2002, Filed**

**DISPOSITION:** [*1] Defendants' motion to transfer the action to the District Court of the District of Utah granted.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff environmentalists sued defendants, a federal official and a federal agency, for failing to comply with the National Environmental Policy Act, 42 U.S.C.S. § 4332 et seq., the National Historic Preservation Act, 16 U.S.C.S. § 470 et seq., and 5 U.S.C.S. § 706 of the Administrative Procedures Act. Defendants moved to transfer venue. Movant, a lessee, moved to intervene in the suit.

**OVERVIEW:** The environmentalists challenged the sale and issuance of oil and gas leases on 12 parcels of public land located in southern Utah. Defendants moved to transfer venue of the suit to Utah pursuant to 28 U.S.C.S. § 1404(a). The lessee moved to intervene in the suit pursuant to Fed. R. Civ. P. 24(a)(2) and declared its support of defendants' motion. The court granted both motions. Regarding the motion to transfer venue, the environmentalists failed to demonstrate that the District of Columbia had meaningful ties to the controversy, as the decisions to issue the leases were made in, and the leased land and administrative record were located in, Utah. Further, the public and private interest factors weighed in favor of transfer. Regarding the motion to intervene, the lessee demonstrated that it satisfied all four requirements for intervention under Fed. R. Civ. P. 24(a)(2). It moved to intervene only 60 days after the complaint was filed. As

the holder of two of the challenged leases, the lessee had a direct, substantial, and legally protectable interest in the subject matter of the litigation, and a decision in the environmentalists' favor would impair that interest.

**OUTCOME:** The court granted defendants' motion to transfer venue and the lessee's motion to intervene.

**LexisNexis(R) Headnotes**

*Environmental Law > National Environmental Policy Act > Environmental Impact Statements*
*Governments > Federal Government > Claims By & Against*
[HN1] National Environmental Policy Act, 42 U.S.C.S. § 4332 et seq., requires a federal agency to prepare an Environmental Impact Statement if the agency proposes to undertake a major federal action significantly affecting the quality of the human environment. 42 U.S.C.S. § 4332(2)(C).

*Governments > Federal Government > Property*
*Real Property Law > Zoning & Land Use > Historic Preservation*
[HN2] The National Historic Preservation Act, 16 U.S.C.S. § 470 et seq., directs federal agencies to consider historic resources in carrying out their discretionary activities.

2002 U.S. Dist. LEXIS 27414, *

*Civil Procedure > Venue > Federal Venue Transfers > General Overview*
[HN3] See 28 U.S.C.S. § 1404(a).

*Civil Procedure > Venue > Federal Venue Transfers > General Overview*
[HN4] A federal district court is afforded broad discretion to determine whether transfer from one jurisdiction to another is proper.

*Civil Procedure > Venue > Federal Venue Transfers > Convenience Transfers*
*Civil Procedure > Venue > Motions to Transfer > Choice of Forum*
[HN5] The decision to transfer venue under 28 U.S.C.S. § 1404(a) is made pursuant to an individualized, case by case consideration of convenience and fairness. In determining whether transfer is appropriate the court takes into consideration and balances a number of case specific factors relating to the private interests of the parties and the public interests of the courts. The private interest considerations include: (1) the plaintiffs' choice of forum, unless the balance of convenience is strongly in favor of the defendants; (2) the defendants' choice of forum; (3) whether the claim arose elsewhere; (4) the convenience of the parties; (5) the availability of witnesses; and (6) the ease of access to sources of proof. The public interest considerations include: (1) the degree to which the courts in both venues are familiar with the governing laws; (2) the relative congestion of the calendars of the potential transferee and transferor courts; and (3) the local interest in deciding local controversies at home.

*Civil Procedure > Venue > Federal Venue Transfers > Convenience Transfers*
[HN6] The party moving for transfer of venue bears the burden of demonstrating that the private and public interest factors weigh in favor of transfer pursuant to 28 U.S.C.S. § 1404(a).

*Civil Procedure > Venue > Federal Venue Transfers > Convenience Transfers*
[HN7] Regarding a motion to transfer venue pursuant to 28 U.S.C.S. § 1404(a), whether an action "might have been brought" in a particular jurisdiction is determined by the venue provisions contained in 28 U.S.C.S. § 1391.

*Civil Procedure > Venue > Multiparty Litigation*
[HN8] See 28 U.S.C.S. § 1391(e)(2).

*Civil Procedure > Venue > Federal Venue Transfers > General Overview*
*Civil Procedure > Venue > Motions to Transfer > Choice of Forum*
[HN9] The first of the private interest factors considered when deciding whether to transfer venue, the plaintiff's choice of forum, is due substantial deference and, unless the balance of convenience is strongly in favor of the defendants, should rarely be disturbed. A case should not be transferred from a plaintiff's chosen forum simply because another forum, in the court's view, may be superior to that chosen by the plaintiff. However, the deference afforded to a plaintiff's choice of forum is diminished where that forum has no meaningful ties to the controversy and no particular interest in the parties or subject matter.

*Civil Procedure > Venue > Federal Venue Transfers > General Overview*
[HN10] A plaintiff's choice of forum is entitled to less deference when there is "an insubstantial factual nexus with the plaintiff's choice.

*Civil Procedure > Venue > Federal Venue Transfers > General Overview*
[HN11] Regarding the public interest factors considered when deciding a motion to transfer venue, there is a local interest in having localized controversies decided at home.

*Civil Procedure > Parties > Intervention > Right to Intervene*
[HN12] The District of Columbia Circuit recognizes four requirements for intervention of right: (1) timeliness; (2) a cognizable interest; (3) impairment of that interest; and (4) lack of adequate representation by existing parties. The United States Court of Appeals for the District of Columbia Circuit has described the interest test under Fed. R. Civ. P. 24(a)(2) as primarily a practical guide to disposing of lawsuits by involving as many apparently concerned persons as is compatible with efficiency and due process.

*Civil Procedure > Parties > Intervention > Right to Intervene*
[HN13] See Fed. R. Civ. P. 24(a).

2002 U.S. Dist. LEXIS 27414, *

*Contracts Law > Types of Contracts > Lease Agreements > General Overview*
*Real Property Law > Landlord & Tenant > Lease Agreements > General Overview*
*Real Property Law > Oil & Gas*
[HN14] The requirement that an applicant demonstrate that its interests will not adequately be represented if it is not allowed to intervene requires only a "minimal" showing and is satisfied if the applicant shows that representation of his interest "may be" inadequate.

**COUNSEL:** For SOUTHERN UTAH WILDERNESS ALLIANCE, NATURAL RESOURCES DEFENSE COUNCIL, INC., Plaintiffs: Sharon Buccino, NATURAL RESOURCES DEFENSE COUNCIL, Washington, DC.

For GALE NORTON, Secretary of Interior, BUREAU OF LAND MANAGEMENT, Defendants: Ann D. Navaro, UNITED STATES DEPARTMENT OF JUSTICE, Environment and Natural Resources, Washington, DC.

For YATES PETROLEUM CORPORATION, Movant: William P. Horn, BIRCH, HORTON, BITTNER & CHEROT, Washington, DC.

**JUDGES:** COLLEEN KOLLAR-KOTELLY, United States District Judge.

**OPINION BY:** COLLEEN KOLLAR-KOTELLY

**OPINION**

**MEMORANDUM OPINION**

(June 28, 2002)

Presently before this Court is Defendants' Motion to Transfer Venue to the United States District Court for the District of Utah pursuant to 28 U.S.C. § 1404(a). Also pending before the Court is Yates Petroleum Corporation's ("Yates Petroleum") unopposed Motion to Intervene as a Defendant, and Notice of Support for Federal Defendants' Motion to Transfer Venue. Plaintiffs, the Southern Utah Wilderness Alliance ("SUWA") and the National Resources Defense Council ("NRDC") (collectively [*2] "Plaintiffs"), brought the present action in order to challenge the sale and issuance of mineral leases for twelve parcels of public land located in southern Utah. Defendants, Gale Norton, the United States Department of the Interior ("DOI"), and the Bureau of Land Management ("BLM") (collectively "Defendants") argue that the action is more appropriately brought in the District of Utah and, accordingly, request that the case be transferred pursuant to § 1404(a). Yates Petroleum is a

company that was awarded two of the challenged leases issued by the Utah BLM and joins in Defendants' request for transfer. Upon consideration of Defendants' motion to transfer venue, memorandum of law, Yates Petroleum's notice of support, Plaintiffs' Opposition thereto, Defendants' reply, and the relevant law, the Court shall grant Defendants' motion to transfer and shall grant Yates Petroleum's motion to intervene.

**I. BACKGROUND**

The facts of this case are set out briefly below. Plaintiffs filed the instant action to challenge the sale and issuance of certain oil and gas leases granted by the Utah Bureau of Land Management ("Utah BLM"). On September 6, 2001, the Utah BLM sold oil and gas leases [*3] for sixty-eight parcels of land located in southern Utah. Plaintiffs argue that, in allowing the sales related to twelve of those parcels, the Utah BLM failed to comply with the National Environmental Policy Act ("NEPA") [1], 42 U.S.C. §§ 4332, *et seq.* and the National Historic Preservation Act ("NHPA") [2], 16 U.S.C. §§ 470, *et seq.* Plaintiffs also allege that the sale and issuance of the challenged leases was arbitrary and capricious, in violation of § 706 of the Administrative Procedures Act ("APA"), 5 U.S.C. § 706. Plaintiffs seek a remedy of both declaratory and injunctive relief. *See generally* Plaintiffs' Complaint.

> 1    [HN1] NEPA requires a federal agency to prepare an Environmental Impact Statement if the agency proposes to undertake a "major federal action significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).

> 2    [HN2] NHPA directs federal agencies to consider historic resources in carrying out their discretionary activities. 16 U.S.C. §§ 470, *et seq*

[*4] The United States Bureau of Land Management ("BLM") delegates the authority to determine the propriety of all oil and gas lease sales in Utah to the Utah State Director of the Utah BLM. *See* Declaration of Robert Lopez ("Lopez Decl.") PP4-5, 9, dated January 16, 2002. Utah BLM offered the twelve parcels of public land at issue in this action as part of a quarterly oil and gas lease sale. *See* 30 U.S.C. § 226(b)(1) (requiring BLM state offices to conduct quarterly oil and gas lease sales of available public lands). On July 6, 2001, the Utah BLM posted a Notice of Competitive Lease Sale for sixty-eight parcels of public land, including the twelve at issue here. Utah BLM determined that the lease sales fell within the existing NEPA analyses and were proper under local land use plans. Def. Mem. at 4. SUWA objected to the proposed sales and filed a protest with Utah BLM on August 20, 2001. The lease sales occurred on

Case 1:07-cv-01486-RJL    Document 5    Filed 09/14/2007    Page 51 of 55

Page 4
2002 U.S. Dist. LEXIS 27414, *

September 6, 2001, and Utah BLM formally denied SUWA's protest on September 17, 2001. Lopez Decl. P7, Attachment A (September 17, 2001 Decision). Defendants assert that "the BLM Washington, D.C. Office did not assist BLM Utah in reviewing SUWA's [*5] protest of the September 6, 2001, lease sale, in deciding to deny SUWA's protest, or in conducting the lease sale and issuing the leases. These decisions were made and actions were taken entirely by the Utah BLM." *Id.* P9. The twelve parcels of land in question are administered by the Utah BLM's Price, Moab and Monticello Field Offices. *Id.* P6.

Defendants argue that transfer is appropriate in this action to the District Court for the District of Utah because 1) the specific lands at issue are located in Utah, 2) the leasing process at issue was undertaken solely in Utah, 3) leasing actions relating to land in Utah are of most direct interest to and most significantly affect the residents of that state, and 4) the convenience of the parties, counsel, and witnesses, should any be required, support transfer of the case. Def. Reply at 2. Plaintiffs contend that this Court should defer to their choice of forum because the issues related to the lands in Southern Utah are of "national interest," Pl. Opp'n at 2-3, and because the Washington, D.C. BLM headquarters "played a major role in determining the fate of Utah's public lands, including those at issue here . . . ." Pl. Opp'n at [*6] 5.

## II. DISCUSSION

28 U.S.C. § 1404(a) [HN3] states that "for the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a). [3] [HN4] The Court is afforded broad discretion to determine whether transfer from one jurisdiction to another is proper. *Securities & Exchange Commission v. Savoy Indus. Inc.,* 190 U.S. App. D.C. 252, 587 F.2d 1149, 1154 (D.C. Cir. 1978). [HN5] The decision to transfer is made pursuant to an "individualized, case by case consideration of convenience and fairness." *Stewart Organization v. Ricoh Corp.,* 487 U.S. 22, 29, 101 L. Ed. 2d 22, 108 S. Ct. 2239 (1988). In determining whether transfer is appropriate the Court takes into consideration and balances a number of case specific factors relating to the private interests of the parties and the public interests of the courts. *Id.* at 30. The private interest considerations include: (1) the plaintiffs' choice of forum, unless the balance of convenience is strongly in favor of the defendants; (2) the defendants' choice of forum; (3) whether the [*7] claim arose elsewhere; (4) the convenience of the parties; (5) the availability of witnesses; and (6) the ease of access to sources of proof. *See Trout Unlimited v. U.S. Dep't of Agric.,* 944 F. Supp. 13, 16 (D.D.C. 1996);

*see also Hawksbill Sea Turtle v. Federal Emergency Management Agency,* 939 F. Supp. 1, 3 (D.D.C. 1996). The public interest considerations include: (1) the degree to which the courts in both venues are familiar with the governing laws; (2) the relative congestion of the calendars of the potential transferee and transferor courts; and (3) the local interest in deciding local controversies at home. *Trout Unlimited,* 944 F. Supp. at 16. [HN6] The party moving for transfer of venue bears the burden of demonstrating that these factors weigh in favor of transfer pursuant to § 1404(a). *See Shapiro, Lifschitz & Schram, P.C. v. Hazard,* 24 F. Supp. 2d 66, 71 (D.D.C. 1998). The Court will consider each factor in turn.

> 3    [HN7] Whether an action "might have been brought" in a particular jurisdiction is determined by the venue provisions contained in 28 U.S.C. § 1391. It is undisputed that in this case venue is also proper in the United States District Court for the District of Utah pursuant to 28 U.S.C. § 1391(e)(2) because a substantial part of the events in dispute took place in that state and the property in question is located in that state. 28 U.S.C. § 1391(e)(2) [HN8] states in relevant part "[a] civil action in which a defendant is an officer or employee of the United States or any agency thereof . . . or an agency of the United States . . . may be brought in any judicial district in which . . . a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of the property that is the subject of the action is situated."

[*8]  A. Private Interest Factors

[HN9] The first of the private interest factors, the plaintiff's choice of forum, "is due substantial deference and, unless the balance of convenience is strongly in favor of the defendants, should rarely be disturbed" *International Brotherhood of Painters & Allied Trades Union v. Best Painting and Sandblasting Co., Inc.,* 621 F. Supp. 906, 907 (D.D.C. 1985). A case should not be transferred "from a plaintiff's chosen forum simply because another forum, in the court's view, may be superior to that chosen by the plaintiff." *Pain v. United Technologies Corp.,* 205 U.S. App. D.C. 229, 637 F.2d 775, 783 (D.C. Cir. 1980). However, the deference afforded to a plaintiff's choice of forum is diminished where "that forum has no meaningful ties to the controversy and no particular interest in the parties or subject matter." *Islamic Republic of Iran v. Boeing* Co., 477 F. Supp. 142, 144 (D.D.C. 1979); *see also Hawksbill Sea Turtle v. FEMA,* 939 F. Supp. 1, 3 (D.D.C. 1996) [HN10] (noting that a plaintiff's choice of forum is entitled to less deference when there is "an insubstantial factual nexus with the plaintiff's choice.").

In the [*9]  present case, Plaintiffs have failed to demonstrate a substantial link between their choice of forum, the District of Columbia, and the facts of the controversy. The relationship between the challenged agency action -- the sale and issuance of twelve oil and gas leases granted by the Utah Bureau of Land Management -- and this District is attenuated at best. In contrast, Utah has a substantial connection to the controversy. The authority to determine the propriety of such leases is vested in the Utah BLM State Director. The administrative decision of the Utah BLM to deny SUWA's protest was made without assistance from the BLM Washington, D.C. office and the lease sales took place at the direction of and under the auspices of the Utah BLM. Lopez Decl. P9. In addition, the land at issue in this action is located entirely within Southeast Utah and the twelve protested parcels of land are administered by the Utah BLM's Price, Moab and Monticello Field Offices. *Id.* P6. Moreover, any decision regarding the Utah lands will have an impact most directly on the citizens of Utah.

Plaintiffs attempt to argue that the fate of these parcels of land is of "national interest" and [*10]  that, therefore, there is a sufficient connection with this District. Plaintiffs further contend that the Washington, D.C. BLM office had a hand in influencing the decision of the Utah BLM. Plaintiffs rely primarily on *The Wilderness Soc'y v. Babbitt,* 104 F. Supp. 2d 10 (D.D.C. 2000), in which the court found that transfer was inappropriate. In *Wilderness Soc'y* the plaintiffs challenged the Department of Interior's Final Integrated Activity Plan/Environmental Impact Statement ("FEIS") and alleged that the DOI failed to properly address the environmental impact of oil and gas development in the National Petroleum Reserve Planning area in Alaska ("NPR-A"). *Wilderness Soc'y,* 104 F. Supp. 2d at 11. In concluding that transfer was inappropriate the court found that there was a sufficient connection between the challenged conduct and the District of Columbia. Specifically, the court noted that the DOI had held a public meeting in Washington, D.C. to solicit comments on the draft FEIS, that former Secretary Babbitt was substantially involved in the DOI's review of the impact of oil and gas leasing on the environment in the NPR-A, and that Secretary Babbitt [*11]  personally made the final challenged decision regarding the FEIS. *Id.* at 14; *see also Greater Yellowstone Coalition v. Bosworth,* 180 F. Supp. 2d 124 (D.D.C. 2001) (finding that where federal government officials in the District of Columbia were involved in the decision to issue grazing permits, the case had national significance and transfer was inappropriate). In addition, the *Wilderness Soc'y* court determined that the NPR-A related to the oil supply that would be used nationwide and therefore, impacted more than just the local residents of Alaska. No similar claim can be made here. Plaintiffs have not pointed to signifi-

cant action taken in Washington, D.C. such as the public hearing held in *Wilderness Soc'y* and has not demonstrated the type of substantial personalized involvement by a member of the Washington, D.C. BLM that supports a finding of "meaningful ties" to this District. Additionally, Robert Lopez, Chief, Branch of Minerals Adjudication, BLM Utah State Office affirmed that the "decisions [at issue] were made and actions were taken entirely by the Utah BLM." Lopez Decl. P9.

Turning to the second factor, the Court finds that the [*12]  Defendants and Yates Petroleum's preference for having this case heard in the District Court in Utah is justified and must be given some weight. The District of Columbia's connection to this case is limited at best. The decisionmaking process and the decision itself occurred entirely within Utah and the administrative record and agency decision-makers reside in Utah. The third factor to consider, whether the claim arose elsewhere, also weighs in favor of transfer. As discussed above, the complained of action, the lease sale of twelve parcels of public land, occurred in Utah and Plaintiffs have not pointed to actions arising in Washington, D.C. that support a finding that the claim arose in this District. The fourth factor, the convenience of the parties is balanced between the parties. Plaintiff, SUWA, is headquartered in Utah and cannot claim inconvenience. Plaintiff NRDC, maintains an office in San Francisco, California, as well as in Washington D.C. Yates Petroleum maintains that Utah is a more convenient location for it as its headquarters are located in Artesia, New Mexico. Yates Petroleum's Notice of Support at 9. Defendants' counsel is located in Washington, D.C., however, "any [*13]  inconvenience to [Defendants' counsel] is offset by the fact that they represent the party requesting transfer." *Northwest Forest Resource Council v. Babbitt,* 1994 WL 908586, *3 n.6 (D.D.C., April 13, 1994).

The fifth and sixth private interest factors to consider, the availability and convenience of witnesses, and the ease of access to sources of proof may be considered together. The parties agree that the agency's challenged action will likely require no witnesses and will therefore, be decided on the administrative record. *See* Pl. Opp'n at 13; Def. Mem. at 10. In a case such as this one, "the convenience of witnesses . . . has less relevance because this case involves judicial review of an administrative decision." *Trout Unlimited,* 944 F. Supp. at 17. Moreover, if witnesses are necessary it appears that any relevant witnesses regarding the agency's decision and actions reside in Utah. The administrative record in this case was generated by the Utah BLM and is currently maintained in "either BLM's Utah State Office or the relevant field offices." Lopez Decl. P10. Therefore, the Court finds that the availability and the convenience of the witnesses [*14]  do not weigh in favor of either party and that the

Case 1:07-cv-01486-RJL    Document 5    Filed 09/14/2007    Page 53 of 55

Page 6
2002 U.S. Dist. LEXIS 27414, *

ease of access to sources of proof weighs in favor of transfer.

2. Public Interest Factors

The Court now turns to the three public interest factors. The first two factors, the degree to which the courts in both venues are familiar with the governing laws and the relative congestion of the calendars of the potential transferee and transferor courts weigh in favor of neither Plaintiffs nor Defendants. Both the District of Columbia and Utah Federal Courts are equally capable of determining issues of compliance with federal law under the NEPA, NHPA and APA. It is not apparent that transfer to the District of Utah will lead to any unnecessary delay due to docket congestion. Transfer to Utah would not lead to delay as this Court has not dealt with any issue in this suit other than the ones present here and has not become familiar with the underlying merits of the case. *See Trout,* 944 F. Supp. at 19 (finding that where the case was "in its earliest stages," no delay would be associated with the transferee court's having to familiarize itself with the case).

The third, and arguably most important of the public interest [*15] factors, the local interest in deciding local controversies at home, weighs in favor of transfer. [HN11] It is undisputed that "there is a local interest in having localized controversies decided at home." *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 509, 91 L. Ed. 1055, 67 S. Ct. 839 (1947); *see also Hawksbill Sea Turtle* at 3 n.5 ("The Court also notes the importance of allowing local citizens to attend and observe the proceedings of the case" due to the local nature of the action). As the dispute in this instance will have the greatest impact on the citizens of Utah the Court finds that the third public interest factor weighs in favor of transfer.

*Yates Petroleum's Motion to Intervene*

Yates Petroleum proposes to intervene in this action as a defendant pursuant to Federal Rule of Civil Procedure 24(a)(2). [4] Neither Plaintiffs nor Defendants in this action oppose Yates Petroleum's intervention. [HN12] This Circuit recognizes four requirements for intervention of right: (1) timeliness; (2) a cognizable interest; (3) impairment of that interest; and (4) lack of adequate representation by existing parties. *See Williams & Humbert, Ltd. v. W & H. Trade Marks, Ltd.,* 268 U.S. App. D.C. 192, 840 F.2d 72, 74 (D.C. Cir. 1988); [*16] *see also Dimond v. District of Columbia,* 253 U.S. App. D.C. 111, 792 F.2d 179, 192 (D.C. Cir. 1986). The Court of Appeals has described the interest test under Rule 24(a)(2) as "primarily a practical guide to disposing of lawsuits by involving as many apparently concerned persons as is compatible with efficiency and due process." *Nuesse v. Camp,* 128 U.S. App. D.C. 172, 385 F.2d 694, 700 (D.C. Cir. 1967); *see also Huron Envtl. Activist League v. United States EPA,* 917 F. Supp. 34 (D.D.C. 1996). Applying this liberal approach to the case at bar this Court will grant Yates Petroleum's motion.

> 4 Federal Rule of Civil Procedure 24(a) [HN13] states in relevant part "upon timely application anyone shall be permitted to intervene in an action . . . (2) when an applicant claims an interest relating to the property or transaction which is the subject of the action and applicant is so situated that the disposition of the action may as a practical matter impede his ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

[*17] The first requirement of timeliness has been satisfied. Plaintiffs filed their Complaint on December 6, 2001. Yates Petroleum filed its motion to intervene sixty days after the Complaint on February 12, 2002. The Court finds that there has been no prejudicial delay in Yates Petroleum's filing of its motion. Yates Petroleum must also demonstrate a "cognizable interest" in the present action. Yates Petroleum, as the lessee of two of the challenged leases has a "direct, substantial, and legally protectable" interest in the subject matter of this litigation. *Stewart v. Rubin,* 948 F. Supp. 1077, 1105 (D.D.C. 1996). Should Plaintiffs prevail in this action Yates Petroleum's interest in the leases will be significantly impaired. Plaintiff requests injunctive relief requiring the recision of the twelve challenged leases until Defendants comply with the requirements of NEPA and NHPA. Thus, Yates Petroleum has demonstrated compliance with the third requirement necessary for intervention. Finally, Yates Petroleum [HN14] must demonstrate that its interests will not adequately be represented if it is not allowed to intervene. This requirement requires only a "minimal" showing and is [*18] satisfied if the applicant "shows that representation of his interest 'may be' inadequate." *Trbovich v. United Mine Workers of America,* 404 U.S. 528, 538 n.10, 30 L. Ed. 2d 686, 92 S. Ct. 630 (1972). Yates Petroleum contends that Defendants in this action are required to represent the "broad public interest as owners of the public lands and as lessors under the Leases." Yates Petroleum Mem. at 4. Yates Petroleum maintains that as a lessee, it has expended substantial funds in its pursuit of the leases and that Defendants "will not adequately represent the specific interests or economic concerns of Yates Petroleum, a private entity." *Id.* The Court finds that Yates Petroleum has met its minimal burden of demonstrating that its interests may not be satisfactorily represented by Defendants in this action. Accordingly, this Court will grant Yates Petroleum's motion to intervene.

**III. CONCLUSION**

Having consider the arguments of all parties for and against transfer, the Court finds that transfer in appropriate. Plaintiffs have failed to demonstrate that this District has meaningful ties to the controversy. The Court concludes that the public and private interest factors weigh in favor of transfer [*19] to the District of Utah. Accordingly, this Court will grant Defendants' motion to transfer the action to the District Court of the District of Utah. In addition, the Court shall grant Yates Petroleum's Motion to Intervene pursuant to Federal Rule of Procedure 24(a)(2). An appropriate Order accompanies this Memorandum Opinion.

Dated: June 28, 2002

COLLEEN KOLLAR-KOTELLY

United States District Judge

**ORDER**

For the reasons stated in the accompanying Memorandum Opinion, it is, this 28 day of June, 2002, hereby

**ORDERED** that Defendants' Motion to Transfer Venue to the United States District Court for the District of Utah [# 3] is GRANTED; and it is further

**ORDERED** that Proposed Intervenor-Defendant Yates Petroleum Corporation's Motion to Intervene [# 11] is GRANTED; and it is further

**ORDERED** that Proposed Intervenor-Defendant Yates Petroleum Corporation's Motion to Re-set the Briefing Schedule for the Motion to Transfer [# 12] is DENIED AS MOOT

**SO ORDERED.**

COLLEEN KOLLAR-KOTELLY

United States District Judge

CERTIFICATE OF SERVICE

The undersigned certifies that, on the 14th day of September, 2007, I caused a true and correct copy of the foregoing Motion of Anadarko Petroleum Corporation, Warren Resources, Inc., and Double Eagle Petroleum Co. to Intervene and accompanying papers to be sent by first-class mail, postage prepaid to:

>Steven M. Kupka
>Thomas R. Wilmoth
>Donald G. Blankenau
>BLACKWELL SANDERS LLP
>206 South 13th Street, Suite 1400
>Lincoln, NE 68508-2019
>*Counsel for Plaintiff*
>
>Donna Fitzgerald
>Environment and Natural Resources Division
>U.S. Department of Justice
>950 Pennsylvania Avenue, NW
>Washington, DC 20530-0001
>*Counsel for Defendants*

                              /s/ Michael B. Wigmore
                              Michael B. Wigmore

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| THEODORE ROOSEVELT<br>CONSERVATION PARTNERSHIP<br>555 Eleventh St. N.W., 6th Floor<br>Washington, DC 20004,<br><br>Plaintiff,<br><br>v.<br><br>DIRK KEMPTHORNE, in his official<br>capacity as the Secretary of the United States<br>Department of the Interior<br>1849 C Street, N.W.<br>Washington, DC 20240,<br><br>and<br><br>UNITED STATES BUREAU OF LAND<br>MANAGEMENT<br>1849 C Street, N.W., Room 406-LS<br>Washington, DC 20240,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CASE NO. 1:07-cv-01486-RJL<br><br><br><br><br>DECLARATION OF<br>TROY B. BESERRA |
| ANADARKO PETROLEUM CORPORATION,<br>P.O. Box 1330<br>Houston, TX 77251-1330,<br><br>WARREN RESOURCES, INC.,<br>489 Fifth Avenue, 32nd Floor<br>New York, NY 10017,<br><br>DOUBLE EAGLE PETROLEUM CO.,<br>777 Overland Trail, Suite 208<br>P.O. Box 766<br>Casper, WY 82602-0766,<br><br>Movant-Intervenors. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | |

I, Troy B. Beserra, swear and affirm under the penalties of perjury that I am over 18 years of age and otherwise competent to testify as to the matters herein, which are based on my personal knowledge.

1.     I am the Geological & Geophysics Manager responsible for coalbed methane operations in the Northern Rockies Region for Anadarko Petroleum Corporation ("Anadarko"). I am the team leader for Anadarko E & P Company LP's Atlantic Rim Natural Gas Field Development Project in Carbon County, Wyoming and as such am responsible for directing the overall operations for the Atlantic Rim Project. I am familiar with the Record of Decision ("ROD") and Environmental Impact Statement ("EIS") issued by the Bureau of Land Management ("BLM") that is at issue in this case.

2.     Anadarko is an independent oil and gas exploration and production company. Anadarko's operations include exploration, conventional and coalbed natural gas development, and enhanced oil recovery projects.

3.     Anadarko has oil and gas leases in the Atlantic Rim Project Area. It owns or controls either by itself or with its partner, Warren Resources, Inc. ("Warren"), approximately 64 percent of the lands within the Atlantic Rim Project.

4.     The Atlantic Rim Project Area comprises approximately 270,080 acres, of which 173,672 acres are federal surface estate (64 percent), 14,060 acres are state surface estate (5 percent), and 82,348 acres are private surface estate (31 percent). *See* ROD, Environmental Impact Statement for the Atlantic Rim Natural Gas Field Development Project, Carbon County, Wyoming, at 1. BLM's Rawlins Field Office manages the 179,438 acres of federal mineral estate (66 percent), 12,384 acres of state mineral estate (5 percent), and 78,258 of private mineral estates (29 percent). *Id.*

5.     Anadarko, through Anadarko E&P, and with Warren submitted a proposal for the Atlantic Rim Coalbed Methane Project (subsequently renamed Atlantic Rim Natural Gas Development Project). Overall, the proposed project included up to 3,880 coalbed methane wells, with associated facilities, located within approximately 310,335 acres of Federal, State, and private lands. *See* 66 Fed. Reg. 33,975 (June 26, 2001). The anticipated life of the proposed project is 20 to 30 years. *Id.* In June of 2001, BLM announced that an environmental impact statement ("EIS") for the proposed project would be completed. *Id.*

6.     In December of 2005, BLM issued a draft EIS. In December of 2006, the final EIS was completed. The FEIS analyzed various options for oil and gas recovery and resource mitigation. BLM's Record of Decision, issued March 2007, outlined a management plan for the development of the area. The ROD addressed a proposal for approximately 2,000 gas wells within the Atlantic Rim Project Area to recover energy resources, while limiting total new surface disturbance from the drilling program (federal, state and fee minerals) to a maximum of 7,600 acres, at any given time, and a 6.5-acre/well site short-term (less than 6 years) disturbance goal. *See* ROD at 1. Additional environmental review is anticipated with respect to applications for permits to drill, right-of-way grants, sundry notices, or applications for special use permits associated with the project. *See* ROD at 3.

7.     On June 18, 2007, Plaintiff filed an appeal and a request for a stay with the Interior Board of Land Appeals (Board) (IBLA-2007-008), challenging BLM's FEIS and ROD for the Atlantic Rim project. Because of its strong interests in the administrative appeal, Anadarko sought, and obtained, participation as an intervenor in the administrative proceeding. On September 5, 2007, the Board issued a decision denying Plaintiff's request for stay. The Board has yet to rule on the substantive issues raised in Plaintiff's appeal. Three other

administrative appeals were also filed—Environmental Preservation Foundation and Habitat for

Wildlife, IBLA 2007-226; Biodiversity Conservation Alliance, et al., IBLA 2007-210, and

National Wildlife Federation, IBLA No. 2007-277.

8.    Plaintiff seeks to have the EIS and ROD set aside and to enjoin any further action

based on the EIS or ROD. Anadarko's planned CBM development in the Atlantic Rim Project

Area will be affected if the EIS or ROD were set aside. Anadarko may not be able to utilize the

rights that have been granted under its oil and gas leases, or may be subject to additional

restrictions on its proposed operations.

9.    Anadarko has also incurred costs related to various efforts to develop its proposal

and prepare its operations in compliance with the FEIS and ROD. Anadarko has drilled

exploratory wells allowed during the interim drilling period. The FEIS includes best

management practices that may be required of Anadarko, which Anadarko has begun to analyze

for each of its proposed wells and include in its development plans. In total, Anadarko and

Warren have spent approximately $173,118,000 to drill wells and develop coalbed natural gas

resources on lands within the Atlantic Rim Project and have expended approximately

$38,400,000 to purchase, acquire and obtain federal, state and private leases within the Atlantic

Rim Project. To date, the EIS has cost Warren and Anadarko approximately $4,400,000.

10.    Because of the potential impacts on its operations and property interests,

Anadarko has a significant interest in upholding the BLM's EIS and ROD—the subject matter of

this case.

_____

# **ACKNOWLEDGEMENT**

STATE OF COLORADO     )
                              )ss.
COUNTY OF DENVER     )

I, **Gretchen M. Darnay**, a Notary Public in and for the County and State aforesaid, do hereby certify that, **Troy B. Beserra,** whose name is subscribed to the foregoing instrument appeared before me this day in person and acknowledged he executed said instrument as his free, voluntary act and deed as the free, voluntary act and deed of said corporation for the uses and purposes therein set forth.

**Given under my hand and Notarial Seal this  12th   day of    September  , 2006.**

My commission expires:
        9/11/2011

_____
Gretchen M. Darnay, Notary Public

GRETCHEN M DARNAY
Notary Public
State of Colorado

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| THEODORE ROOSEVELT | ) | |
| CONSERVATION PARTNERSHIP | ) | |
| 555 Eleventh St. N.W., 6th Floor | ) | |
| Washington, DC 20004, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 1:07-cv-01486-RJL |
| | ) | |
| DIRK KEMPTHORNE, in his official | ) | |
| capacity as the Secretary of the United States | ) | |
| Department of the Interior | ) | |
| 1849 C Street, N.W. | ) | |
| Washington, DC 20240, | ) | DECLARATION OF |
| | ) | KEN GOBBLE |
| and | ) | |
| | ) | |
| UNITED STATES BUREAU OF LAND | ) | |
| MANAGEMENT | ) | |
| 1849 C Street, N.W., Room 406-LS | ) | |
| Washington, DC 20240, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| ANADARKO PETROLEUM CORPORATION, | ) | |
| P.O. Box 1330 | ) | |
| Houston, TX 77251-1330, | ) | |
| | ) | |
| WARREN RESOURCES, INC., | ) | |
| 489 Fifth Avenue, 32nd Floor | ) | |
| New York, NY 10017, | ) | |
| | ) | |
| DOUBLE EAGLE PETROLEUM CO., | ) | |
| 777 Overland Trail, Suite 208 | ) | |
| P.O. Box 766 | ) | |
| Casper, WY 82602-0766, | ) | |
| | ) | |
| Movant-Intervenors. | ) | |
| | ) | |

I, Ken Gobble, swear and affirm under the penalties of perjury that I am over 18 years of age and otherwise competent to testify as to the matters herein, which are based on my personal knowledge.

1.      I am the President and Chief Operating Officer of Warren E&P, Inc. and the Senior Vice President - Exploration & Production of Warren Resources, Inc., the parent company of Warren E&P, Inc. (collectively "Warren"). As such, I am responsible for directing the overall operations for the Atlantic Rim Natural Gas Development Project in Carbon County, Wyoming ("Atlantic Rim Project") on behalf of Warren. As such, I am familiar with Warren's oil and gas operations and the proposed development in the Atlantic Rim Project Area. I am familiar with the Record of Decision ("ROD") and Environmental Impact Statement ("EIS") issued by the Bureau of Land Management ("BLM") that is at issue in this case.

2.      Warren is an independent energy company engaged in the exploration and development of domestic onshore natural gas and oil reserves. It is one of the leading developers of coalbed methane in the Rocky Mountain region.

3.      Warren has oil and gas leases in the Atlantic Rim Project Area. Warren owns or controls, either by itself or with Anadarko Petroleum Corporation, approximately 64 percent of the lands within the project area.

4.      The Atlantic Rim Project Area comprises approximately 270,080 acres of land located in Carbon County, Wyoming, which is covered by a combination of federal, state and private oil and gas leases.

5.      Warren, with Anadarko Petroleum Corporation, submitted a proposal for the Atlantic Rim Coalbed Methane Project (subsequently renamed Atlantic Rim Natural Gas Development Project). BLM's Record of Decision, issued March 2007, outlined a management

plan for the development of the Atlantic Rim Project Area. The ROD addresses a proposal for approximately 2,000 gas wells within the Atlantic Rim Project Area to recover energy resources, while limiting total new surface disturbance from the drilling program (federal, state and fee minerals) to a maximum of 7,600 acres, at any given time, and a 6.5-acre/well site short-term (less than 6 years) disturbance goal. *See* ROD at 1. Additional environmental review is anticipated with respect to applications for permits to drill, right-of-way grants, sundry notices, or applications for special use permits associated with the project. *See* ROD at 3.

6.    On June 18, 2007, Plaintiff filed an appeal with the Interior Board of Land Appeals (IBLA-2007-008), challenging BLM's ROD and the accompanying EIS. Because of its strong interests in the administrative appeal, Warren, through Anadarko, sought, and obtained, participation as an intervenor in the administrative proceeding, which remains pending. Three other administrative appeals were also filed—Environmental Preservation Foundation and Habitat for Wildlife, IBLA 2007-226; Biodiversity Conservation Alliance, et al., IBLA 2007-210, and National Wildlife Federation, IBLA No. 2007-277.

7.    Plaintiff seeks to have the EIS and ROD set aside and to enjoin any further action based on the EIS or ROD. Warren's planned CBM development in the Atlantic Rim Project Area will be affected if the EIS or ROD were set aside. Warren may not be able to utilize the rights that have been granted under its oil and gas leases, or may be subject to additional restrictions on its proposed operations.

8.    Warren has also incurred costs related to various efforts to develop its project and prepare its operations in compliance with the FEIS and ROD. Warren has drilled exploratory wells allowed during the interim drilling period. The FEIS includes best management practices that may be required of Warren, which Warren has begun to analyze for each of its proposed

wells and include in its development plans.  In total, Anadarko and Warren have spent

approximately $173,118,000.00 to drill wells and develop coalbed natural gas resources on lands

within the Atlantic Rim Project.

9.    Because of the potential impacts on its operations and property interests, Warren

has a significant interest in upholding the EIS and ROD—the subject matter of this case.


_____

Ken Gobble


Subscribed and sworn to before me

this 12 day of September, 2007

GRETCHEN M DARNAY
Notary Public
State of Colorado

My Commission Expires: 9/11/2011
In the County of Denver, in the State of Colorado

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

THEODORE ROOSEVELT                         )
CONSERVATION PARTNERSHIP                    )
555 Eleventh St. N.W., 6th Floor            )
Washington, DC 20004,                       )
                                            )
            Plaintiff,                       )
                                            )
        v.                                   )          CASE NO. 1:07-cv-01486-RJL
                                            )
DIRK KEMPTHORNE, in his official            )
capacity as the Secretary of the United States )
Department of the Interior                   )
1849 C Street, N.W.                          )
Washington, DC 20240,                        )          DECLARATION OF
                                            )          STEPHEN H. HOLLIS
        and                                  )
                                            )
UNITED STATES BUREAU OF LAND                 )
MANAGEMENT                                   )
1849 C Street, N.W., Room 406-LS             )
Washington, DC 20240,                        )
                                            )
        Defendants.                          )
_____)
                                            )
ANADARKO PETROLEUM CORPORATION,             )
P.O. Box 1330                                )
Houston, TX 77251-1330,                      )
                                            )
WARREN RESOURCES, INC.,                      )
489 Fifth Avenue, 32nd Floor                 )
New York, NY 10017,                          )
                                            )
DOUBLE EAGLE PETROLEUM CO.,                  )
777 Overland Trail, Suite 208                )
P.O. Box 766                                 )
Casper, WY 82602-0766,                       )
                                            )
        Movant-Intervenors.                  )
_____)

I, Stephen H. Hollis, swear and affirm under the penalties of perjury that I am over 18 years of age and otherwise competent to testify as to the matters herein, which are based on my personal knowledge.

1. I am the President of Double Eagle Petroleum Company ("Double Eagle") and as such am responsible for the direction and the overall operations for Double Eagle in the Atlantic Rim Natural Gas Development Project in Carbon County, Wyoming ("Atlantic Rim Project"). As such, I am familiar with Double Eagle's oil and gas operations and the proposed development in the Atlantic Rim Project Area. I am familiar with the Record of Decision ("ROD") and Environmental Impact Statement ("EIS") issued by the Bureau of Land Management ("BLM") that is at issue in this case.

2. Double Eagle is an oil and gas exploration and development company with over thirty years of experience in the Rocky Mountain Basins of the western United States. The company's two main producing/development projects are its core areas of Wyoming's Atlantic Rim Coal Bed Methane fairway and the tight sands of the Pinedale Anticline, both in the Greater Green River Basin.

3. Double Eagle has federal and state oil and gas leases in the Atlantic Rim Project Area.

4. The Atlantic Rim Project Area comprises approximately 270,080 acres of land located in Carbon County, Wyoming, which is covered by a combination of federal, state and private oil and gas leases. Double Eagle is a proponent of the Atlantic Rim Natural Gas Development Project.

5. BLM's Record of Decision, issued March 2007, outlined a management plan for the development of the Atlantic Rim Project Area. The ROD included approximately 2,000 gas

wells within the Atlantic Rim Project Area to recover energy resources, while limiting total new surface disturbance from the drilling program (federal, state and fee minerals) to a maximum of 7,600 acres, at any given time, and a 6.5-acre/well site short-term (less than 6 years) disturbance goal. *See* ROD at 1. Additional environmental review is anticipated with respect to applications for permits to drill, right-of-way grants, sundry notices, or applications for special use permits associated with the project. *See* ROD at 3.

6.     On June 18, 2007, Plaintiff filed an appeal with the Interior Board of Land Appeals (IBLA-2007-008), challenging BLM's ROD and the accompanying EIS. Because of its strong interests in the administrative appeal, Double Eagle sought, and obtained, participation as an intervenor in the administrative proceeding. On September 11, 2007, Plaintiff filed a Notice of Withdrawal of Appeal with the Interior Board of Land of Appeals, and the Interior Board of Land Appeals accordingly dismissed Plaintiff's administrative appeal on September 12, 2007. Three other administrative appeals were also filed and are presently pending—Environmental Preservation Foundation and Habitat for Wildlife, IBLA 2007-226; Biodiversity Conservation Alliance, et al., IBLA 2007-210, and National Wildlife Federation, IBLA No. 2007-277.

7.     Plaintiff seeks to have the EIS and ROD set aside and to enjoin any further action based on the EIS or ROD. Double Eagle's planned CBM development in the Atlantic Rim Project Area will be affected if the EIS or ROD were set aside. Double Eagle may not be able to utilize the rights that have been granted under its oil and gas leases, or may be subject to additional restrictions on its proposed operations.

8.     Double Eagle has also incurred costs related to various efforts to develop its proposal and to prepare its operations in compliance with the FEIS and ROD. Double Eagle has drilled exploratory wells and built associated facilities allowed during the interim drilling period.

The FEIS includes best management practices that may be required of Double Eagle, which Double Eagle has begun to analyze for each of its proposed wells and include in its development plans.

9.      Double Eagle has entered into contracts with an estimated value of $34 million for third-party services for the drilling and completion of 33 natural gas wells and associated facilities under the 2007 drilling plan.  This project commenced August 6, 2007, and is expected to be completed February, 2008.

10.     Because of the potential impacts on its operations and property interests, Double Eagle has a significant interest in upholding the EIS and ROD—the subject matter of this case.

_Stephen H. Hollis_

Stephen H. Hollis, President

## ACKNOWLEDGMENT

STATE OF WYOMING         §
                         §
COUNTY OF NATRONA        §

The foregoing instrument was acknowledged before me by Stephen H. Hollis, as President of Double Eagle Petroleum Company on this __13th__ day of September, 2007.

Witness my hand and official seal. _Carol A. Osborne_

Notary Public

My Commission Expires: __4/9/2009__

NOTARY PUBLIC
CAROL A. OSBORNE
STATE OF WYOMING
COUNTY OF NATRONA
My Commission Expires Apr 9, 2009

**EXHIBIT A**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

THEODORE ROOSEVELT                          )
CONSERVATION PARTNERSHIP                     )
555 Eleventh St. N.W., 6th Floor             )
Washington, DC 20004,                        )
                                             )
        Plaintiff,                     )
                                             )
    v.                                 )    CASE NO. 1:07-cv-01486-RJL
                                             )
DIRK KEMPTHORNE, in his official             )
capacity as the Secretary of the United States )
Department of the Interior                   )
1849 C Street, N.W.                          )
Washington, DC 20240,                        )
                                             )
    and                                )
                                             )
UNITED STATES BUREAU OF LAND                 )
MANAGEMENT                                   )
1849 C Street, N.W., Room 406-LS             )
Washington, DC 20240,                        )
                                             )
    Defendants.                        )
_____)
                                             )
ANADARKO PETROLEUM CORPORATION,              )
P.O. Box 1330                                )
Houston, TX 77251-1330,                      )
                                             )
WARREN RESOURCES, INC.,                      )
489 Fifth Avenue, 32nd Floor                 )
New York, NY 10017,                          )
                                             )
DOUBLE EAGLE PETROLEUM CO.,                  )
777 Overland Trail, Suite 208                )
P.O. Box 766                                 )
Casper, WY 82602-0766,                       )
                                             )
    Defendant-Intervenors.             )
_____)

**ANSWER OF ANADARKO PETROLEUM CORPORATION,
WARREN RESOURCES, INC. AND DOUBLE EAGLE PETROLEUM CO.**

Defendant-Intervenors Anadarko Petroleum Corporation ("Anadarko"), Warren

Resources, Inc. ("Warren") and Double Eagle Petroleum Co. ("Double Eagle") (collectively

referred to as "Defendant-Intervenors") for their Answer in response to the Complaint for

Declaratory and Injunctive Relief (the "Complaint") filed by Plaintiff Theodore Roosevelt

Conservation Partnership (the "Plaintiff") in this matter state as follows:

## INTRODUCTION AND OVERVIEW OF CLAIMS

1.      The allegations in the first sentence of Paragraph 1 of the Complaint consist of

Plaintiff's characterization of the nature of the case and require no response.  To the extent a

response is deemed required, Defendant-Intervenors deny the allegations.  Defendant-Intervenors

deny the allegations in the remainder of this paragraph.

2.      Defendant-Intervenors deny the allegations in Paragraph 2 of the Complaint.

3.      Defendant-Intervenors deny the allegations in Paragraph 3 of the Complaint.

4.      The allegations in Paragraph 4 of the Complaint consist of Plaintiff's

characterization of the nature of the case and require no response.  To the extent a response is

deemed required, Defendant-Intervenors deny the allegations.

## JURISDICTION AND VENUE

5.      Defendant-Intervenors admit that 28 U.S.C. § 1331 provides this Court with

subject matter jurisdiction over the claims set forth in the Complaint, in the absence of any other

jurisdictional defect.  The allegations in the last sentence of Paragraph 5 of the Complaint

constitute legal conclusions that require no response.  Defendant-Intervenors deny the remainder

of the allegations in Paragraph 5 of the Complaint.

6.      Defendant-Intervenors deny the allegations in Paragraph 6 of the Complaint.

7.    Defendant-Intervenors admit that venue is proper in this Court pursuant to 28 U.S.C. § 1391(e), because defendants are located in Washington, D.C.  Defendant-Intervenors do not have sufficient information or knowledge to form a belief as to the truth of the averments in the remainder of Paragraph 7 of the Complaint and therefore deny same.

### PARTIES

8.    Defendant-Intervenors do not have sufficient information or knowledge to form a belief as to the truth of the averments in Paragraph 8 of the Complaint.

9.    In response to the allegations in Paragraph 9 of the Complaint, Defendant-Intervenors specifically refer to the cited source in its entirety for its words, substance, meaning, content or context thereof, and, to the extent that these allegations require a response, they are denied.

10.    Defendant-Intervenors do not have sufficient information or knowledge to form a belief as to the truth of the averments in Paragraph 10 of the Complaint and therefore deny same.

11.    Defendant-Intervenors do not have sufficient information or knowledge to form a belief as to the truth of the averments in Paragraph 11 of the Complaint and therefore deny same.

12.    Defendant-Intervenors do not have sufficient information or knowledge to form a belief as to the truth of the averments in Paragraph 12 of the Complaint and therefore deny same.

13.    Defendant-Intervenors admit the allegations in Paragraph 13 of the Complaint.

14.    Defendant-Intervenors admit the allegations in Paragraph 14 of the Complaint.

### LEGAL BACKGROUND

15.    The allegations in Paragraph 15 of the Complaint constitute a characterization of law that requires no response.  Defendant-Intervenors specifically refer to the cited source in its

entirety for its words, substance, meaning, content or context thereof, and, to the extent that these allegations require a response, they are denied.

16.     The allegations in Paragraph 16 of the Complaint constitute a characterization of law that requires no response.  Defendant-Intervenors specifically refer to the cited source in its entirety for its words, substance, meaning, content or context thereof, and, to the extent that these allegations require a response, they are denied.

17.     The allegations in Paragraph 17 of the Complaint constitute a characterization of law that requires no response.  Defendant-Intervenors specifically refer to the cited source in its entirety for its words, substance, meaning, content or context thereof, and, to the extent that these allegations require a response, they are denied.

18.     The allegations in Paragraph 18 of the Complaint constitute a characterization of law that requires no response.  Defendant-Intervenors specifically refer to the cited source in its entirety for its words, substance, meaning, content or context thereof, and, to the extent that these allegations require a response, they are denied.

19.     The allegations in Paragraph 19 of the Complaint constitute a characterization of law that requires no response.  Defendant-Intervenors specifically refer to the cited source in its entirety for its words, substance, meaning, content or context thereof, and, to the extent that these allegations require a response, they are denied.

20.     The allegations in Paragraph 20 of the Complaint constitute a characterization of law that requires no response.  Defendant-Intervenors specifically refer to the cited source in its entirety for its words, substance, meaning, content or context thereof, and, to the extent that these allegations require a response, they are denied.

21.     The allegations in Paragraph 21 of the Complaint constitute a characterization of law that requires no response.  Defendant-Intervenors specifically refer to the cited source in its entirety for its words, substance, meaning, content or context thereof, and, to the extent that these allegations require a response, they are denied.

22.     The allegations in Paragraph 22 of the Complaint constitute a characterization of law that requires no response.  Defendant-Intervenors specifically refer to the cited source in its entirety for its words, substance, meaning, content or context thereof, and, to the extent that these allegations require a response, they are denied.

23.     The allegations in Paragraph 23 of the Complaint constitute a characterization of law that requires no response.  Defendant-Intervenors specifically refer to the cited source in its entirety for its words, substance, meaning, content or context thereof, and, to the extent that these allegations require a response, they are denied.

24.     The allegations in Paragraph 24 of the Complaint constitute a characterization of law that requires no response.  Defendant-Intervenors specifically refer to the cited source in its entirety for its words, substance, meaning, content or context thereof, and, to the extent that these allegations require a response, they are denied.

## FACTUAL BACKGROUND

25.     Defendant-Intervenors deny the allegations in the last sentence of Paragraph 25 of the Complaint.  The remainder of the allegations in Paragraph 25 of the Complaint constitute legal conclusions that requires no response.  Defendant-Intervenors specifically refer to the cited source in its entirety for its words, substance, meaning, content or context thereof, and, to the extent that these allegations require a response, they are denied.

26.     Defendant-Intervenors deny the allegations in the first sentence of Paragraph 26 of the Complaint.  In response to the remainder of the allegations in Paragraph 26, Defendant-Intervenors specifically refer to the cited source in its entirety for its words, substance, meaning, content or context thereof, and, to the extent that these allegations require a response, they are denied.

27.     In response to the allegations in Paragraph 27 of the Complaint, Defendant-Intervenors specifically refer to the cited source in its entirety for its words, substance, meaning, content or context thereof, and, to the extent that these allegations require a response, they are denied.

28.     In response to the allegations in Paragraph 28 of the Complaint, Defendant-Intervenors specifically refer to the cited source in its entirety for its words, substance, meaning, content or context thereof, and, to the extent that these allegations require a response, they are denied.

29.     In response to the allegations in Paragraph 29 of the Complaint, Defendant-Intervenors specifically refer to the cited source in its entirety for its words, substance, meaning, content or context thereof, and, to the extent that these allegations require a response, they are denied.

30.     Defendant-Intervenors deny the allegations in Paragraph 30 of the Complaint.

31.     Defendant-Intervenors deny the allegations in Paragraph 31 of the Complaint.

32.     The allegations in the first sentence of Paragraph 32 of the Complaint constitute a characterization of law that requires no response.  Defendant-Intervenors specifically refer to the cited source in its entirety for its words, substance, meaning, content or context thereof, and, to the extent that these allegations require a response, they are denied.  In response to the remainder

of the allegations in Paragraph 32 of the Complaint, Defendant-Intervenors specifically refer to the cited source in its entirety for its words, substance, meaning, content or context thereof, and, to the extent that these allegations require a response, they are denied.

33.     In response to the allegations in Paragraph 33 of the Complaint, Defendant-Intervenors specifically refer to the cited source in its entirety for its words, substance, meaning, content or context thereof, and, to the extent that these allegations require a response, they are denied.

34.     In response to the allegations in Paragraph 34 of the Complaint, Defendant-Intervenors specifically refer to the cited source in its entirety for its words, substance, meaning, content or context thereof, and, to the extent that these allegations require a response, they are denied.

35.     In response to the allegations in Paragraph 35 of the Complaint, Defendant-Intervenors specifically refer to the cited source in its entirety for its words, substance, meaning, content or context thereof, and, to the extent that these allegations require a response, they are denied.

36.     In response to the allegations in Paragraph 36 of the Complaint, Defendant-Intervenors specifically refer to the cited source in its entirety for its words, substance, meaning, content or context thereof, and, to the extent that these allegations require a response, they are denied.

37.     The allegations in Paragraph 37 of the Complaint constitute legal conclusions that require no response.  To the extent they require a response, Defendant-Intervenors specifically refer to the cited source in its entirety for its words, substance, meaning, content or context thereof, and they are denied.

38.     Defendant-Intervenors do not have sufficient information or knowledge to form a belief as to the truth of the averments in the first sentence of Paragraph 38 of the Complaint and therefore deny same.  In response to the remainder of the allegations in Paragraph 38, Defendant-Intervenors specifically refer to the cited source in its entirety for its words, substance, meaning, content or context thereof, and, to the extent that these allegations require a response, they are denied.

39.     Defendant-Intervenors deny the allegations in Paragraph 39 of the Complaint.

40.     Defendant-Intervenors admit that the proposed Atlantic Rim Natural Gas Field Development Project involves drilling approximately 2,000 coalbed methane wells within the Atlantic Rim Project Area and that total surface disturbance from the drilling program will be a maximum of 7,600 acres, at any given time.  In response to the remainder of the allegations in Paragraph 40 of the Complaint, Defendant-Intervenors specifically refer to the cited source in its entirety for its words, substance, meaning, content or context thereof, and, to the extent that these allegations require a response, they are denied.

41.     In response to the allegations in Paragraph 41 of the Complaint, Defendant-Intervenors specifically refer to the cited source in its entirety for its words, substance, meaning, content or context thereof, and, to the extent that these allegations require a response, they are denied.

42.     In response to the allegations in Paragraph 42 of the Complaint, Defendant-Intervenors specifically refer to the cited source in its entirety for its words, substance, meaning, content or context thereof, and, to the extent that these allegations require a response, they are denied.

43.     In response to the allegations in Paragraph 43 of the Complaint, Defendant-Intervenors specifically refer to the cited source in its entirety for its words, substance, meaning, content or context thereof, and, to the extent that these allegations require a response, they are denied.

44.     In response to the allegations in Paragraph 44 of the Complaint, Defendant-Intervenors specifically refer to the cited source in its entirety for its words, substance, meaning, content or context thereof, and, to the extent that these allegations require a response, they are denied.

45.     In response to the allegations in Paragraph 45 of the Complaint, Defendant-Intervenors specifically refer to the cited source in its entirety for its words, substance, meaning, content or context thereof, and, to the extent that these allegations require a response, they are denied.

46.     Defendant-Intervenors deny the allegations in the first sentence in Paragraph 46 of the Complaint.  In response to the remainder of the allegations in Paragraph 46, Defendant-Intervenors specifically refer to the cited source in its entirety for its words, substance, meaning, content or context thereof, and, to the extent that these allegations require a response, they are denied.

47.     Defendant-Intervenors deny the allegations in Paragraph 47 of the Complaint.

48.     In response to the allegations in the second sentence of Paragraph 48 of the Complaint, Defendant-Intervenors specifically refer to the cited source in its entirety for its words, substance, meaning, content or context thereof, and, to the extent that these allegations require a response, they are denied.  Defendant-Intervenors do not have sufficient information or

knowledge to form a belief as to the truth of the remaining averments in Paragraph 48 and therefore deny same.

49.     In response to the allegations in Paragraph 49 of the Complaint, Defendant-Intervenors specifically refer to the cited source in its entirety for its words, substance, meaning, content or context thereof, and, to the extent that these allegations require a response, they are denied.

50.     In response to the allegations in Paragraph 50 of the Complaint, Defendant-Intervenors specifically refer to the cited source in its entirety for its words, substance, meaning, content or context thereof, and, to the extent that these allegations require a response, they are denied.

51.     In response to the allegations in Paragraph 51 of the Complaint, Defendant-Intervenors specifically refer to the cited source in its entirety for its words, substance, meaning, content or context thereof, and, to the extent that these allegations require a response, they are denied.

52.     In response to the allegations in Paragraph 52 of the Complaint, Defendant-Intervenors specifically refer to the cited source in its entirety for its words, substance, meaning, content or context thereof, and, to the extent that these allegations require a response, they are denied.

53.     In response to the allegations in Paragraph 53 of the Complaint, Defendant-Intervenors specifically refer to the cited source in its entirety for its words, substance, meaning, content or context thereof, and, to the extent that these allegations require a response, they are denied.

54.    Defendant-Intervenors admit that a Final Report for the Atlantic Rim Mule Deer Study was completed in April of 2007.  In response to the remainder of the allegations in Paragraph 54 of the Complaint, Defendant-Intervenors specifically refer to the cited source in its entirety for its words, substance, meaning, content or context thereof, and, to the extent that these allegations require a response, they are denied.

55.    In response to the allegations in Paragraph 55 of the Complaint, Defendant-Intervenors specifically refer to the cited source in its entirety for its words, substance, meaning, content or context thereof, and, to the extent that these allegations require a response, they are denied.

56.    Defendant-Intervenors do not have sufficient information or knowledge to form a belief as to the truth of the averments in the first and last sentences of Paragraph 56 of the Complaint and therefore deny same.  In response to the remainder of the allegations in Paragraph 56, Defendant-Intervenors specifically refer to the cited source in its entirety for its words, substance, meaning, content or context thereof, and, to the extent that these allegations require a response, they are denied.

57.    Defendant-Intervenors deny the allegations in the first sentence of Paragraph 57 of the Complaint.  In response to the remainder of the allegations in Paragraph 57 of the Complaint, Defendant-Intervenors specifically refer to the cited source in its entirety for its words, substance, meaning, content or context thereof, and, to the extent that these allegations require a response, they are denied.

58.    Defendant-Intervenors do not have sufficient information or knowledge to form a belief as to the truth of the averments in Paragraph 58 of the Complaint and therefore deny same.

59.     Defendant-Intervenors admit that notice of the availability of the ROD for the Atlantic Rim Natural Gas Development Project was published in the Federal Register on May 21, 2007 at 72 Fed. Reg. 28,518.  Defendant-Intervenors also admit that at least four administrative appeals were filed with the Interior Board of Land Appeals related to the actions at issue in this case, including one filed by the Plaintiff and further states that each of the Defendant-Intervenors are also Intervenors in those cases.  Defendant-Intervenors admit that Plaintiff has filed a petition for a stay before the Interior Board of Land Appeals, which was denied on or about September 5, 2007.  Defendant-Intervenors further state, upon information and belief, that Plaintiff filed a notice withdrawing its appeal, and the Interior Board of Land Appeals dismissed the administrative appeal on September 12, 2007.  The remainder of the allegations in Paragraph 59 constitute legal conclusion that require no response, and, to the extent that these allegations require a response, they are denied.

60.     In response to the allegations in Paragraph 60 of the Complaint, Defendant-Intervenors specifically refer to the cited source in its entirety for its words, substance, meaning, content or context thereof, and, to the extent that these allegations require a response, they are denied.

61.     Defendant-Intervenors incorporate by reference their response to Paragraph 59 of the Complaint, and deny the remainder of the allegations of Paragraph 61 of the Complaint.

## CLAIMS FO RELIEF

### COUNT ONE

62.     Defendant-Intervenors restate and incorporate by reference their responses in Paragraphs 1 through 61 above as if fully set forth herein.

63.     Defendant-Intervenors deny the allegations in Paragraph 63 of the Complaint.

64.     Defendant-Intervenors deny the allegations in Paragraph 64 of the Complaint.

65.     Defendant-Intervenors deny the allegations in Paragraph 65 of the Complaint.

## COUNT TWO

66.     Defendant-Intervenors restate and incorporate by reference their responses in Paragraphs 1 through 65 above as if fully set forth herein.

67.     Defendant-Intervenors deny the allegations in Paragraph 67 of the Complaint.

68.     Defendant-Intervenors deny the allegations in Paragraph 68 of the Complaint.

69.     Defendant-Intervenors deny the allegations in Paragraph 69 of the Complaint.

## COUNT THREE

70.     Defendant-Intervenors restate and incorporate by reference their responses in Paragraphs 1 through 69 above as if fully set forth herein.

71.     The allegations in the first sentence of Paragraph 71 of the Complaint constitute legal conclusions that require no response.  Defendant-Intervenors specifically refer to the cited source in its entirety for its words, substance, meaning, content or context thereof, and, to the extent that these allegations require a response, they are denied.  Defendant-Intervenors deny the remainder of the allegations in Paragraph 71.

72.     Defendant-Intervenors deny the allegations in Paragraph 72 of the Complaint.

73.     Defendant-Intervenors deny the allegations in Paragraph 73 of the Complaint.

## COUNT FOUR

74.     Defendant-Intervenors restate and incorporate by reference their responses in Paragraphs 1 through 73 above as if fully set forth herein.

75.     Defendant-Intervenors admit that, upon information and belief, BLM is preparing a resource management plan referred to as the Rawlins Resource Management Plan ("RMP"),

and that a draft environmental impact statement for the Rawlins RMP has been prepared.

Defendant-Intervenors deny the remainder of the allegations in Paragraph 75 of the Complaint.

76.    Defendant-Intervenors deny the allegations in Paragraph 76 of the Complaint.

## COUNT FIVE

77.    Defendant-Intervenors restate and incorporate by reference their responses in Paragraphs 1 through 76 above as if fully set forth herein.

78.    Defendant-Intervenors deny the allegations in the first sentence of Paragraph 78 of the Complaint.  In response to the remainder of the allegations in Paragraph 78 of the Complaint, Defendant-Intervenors specifically refer to the cited source in its entirety for its words, substance, meaning, content or context thereof, and, to the extent that these allegations require a response, they are denied.

79.    Defendant-Intervenors deny the allegations in Paragraph 79 of the Complaint.

80.    Defendant-Intervenors deny the allegations in Paragraph 80 of the Complaint.

81.    Defendant-Intervenors deny the allegations in Paragraph 81 of the Complaint.

## COUNT SIX

82.    Defendant-Intervenors restate and incorporate by reference their responses in Paragraphs 1 through 81 above as if fully set forth herein.

83.    In response to the allegations in the third sentence of Paragraph 83 of the Complaint, Defendant-Intervenors specifically refer to the cited source in its entirety for its words, substance, meaning, content or context thereof, and, to the extent that these allegations require a response, they are denied.  Defendant-Intervenors deny the remainder of the allegations in Paragraph 83.

84.    Defendant-Intervenors deny the allegations in Paragraph 84 of the Complaint.

## COUNT SEVEN

85.     Defendant-Intervenors restate and incorporate by reference their responses in Paragraphs 1 through 84 above as if fully set forth herein.

86.     In response to the allegations in Paragraph 86 of the Complaint, Defendant-Intervenors specifically refer to the cited source in its entirety for its words, substance, meaning, content or context thereof, and, to the extent that these allegations require a response, they are denied.

87.     Defendant-Intervenors deny the allegations in the last sentence in Paragraph 87 of the Complaint.  In response to the remainder of the allegations in Paragraph 87 of the Complaint, Defendant-Intervenors specifically refer to the cited source in its entirety for its words, substance, meaning, content or context thereof, and, to the extent that these allegations require a response, they are denied.

88.     Defendant-Intervenors deny the first two sentences and the last sentence in Paragraph 88 of the Complaint.  In response to the remainder of the allegations in Paragraph 88, Defendant-Intervenors specifically refer to the cited source in its entirety for its words, substance, meaning, content or context thereof, and, to the extent that these allegations require a response, they are denied.

89.     Defendant-Intervenors deny the second and last sentences in Paragraph 89 of the Complaint.  In response to the remainder of the allegations in Paragraph 89, Defendant-Intervenors specifically refer to the cited source in its entirety for its words, substance, meaning, content or context thereof, and, to the extent that these allegations require a response, they are denied.

90.     In response to the allegations in Paragraph 90 of the Complaint, Defendant-Intervenors specifically refer to the cited source in its entirety for its words, substance, meaning, content or context thereof, and, to the extent that these allegations require a response, they are denied.

91.     In response to the allegations in Paragraph 91 of the Complaint, Defendant-Intervenors specifically refer to the cited source in its entirety for its words, substance, meaning, content or context thereof, and, to the extent that these allegations require a response, they are denied.

92.     In response to the allegations in Paragraph 92 of the Complaint, Defendant-Intervenors specifically refer to the cited source in its entirety for its words, substance, meaning, content or context thereof, and, to the extent that these allegations require a response, they are denied.

93.     In response to the allegations in Paragraph 93 of the Complaint, Defendant-Intervenors specifically refer to the cited source in its entirety for its words, substance, meaning, content or context thereof, and, to the extent that these allegations require a response, they are denied.

94.     Defendant-Intervenors deny the allegations in Paragraph 94 of the Complaint.

### COUNT EIGHT

95.     Defendant-Intervenors restate and incorporate by reference their responses in Paragraphs 1 through 94 above as if fully set forth herein.

96.     In response to the allegations in Paragraph 96 of the Complaint, Defendant-Intervenors specifically refer to the cited source in its entirety for its words, substance, meaning,

content or context thereof, and, to the extent that these allegations require a response, they are denied.

97.     In response to the allegations in Paragraph 97 of the Complaint, Defendant-Intervenors specifically refer to the cited source in its entirety for its words, substance, meaning, content or context thereof, and, to the extent that these allegations require a response, they are denied.

98.     The allegations in the first two sentence of Paragraph 98 of the Complaint consist of Plaintiff's characterization of the nature of the case and require no response.  Defendant-Intervenors specifically refer to the cited source in its entirety for its words, substance, meaning, content or context thereof, and, to the extent that these allegations require a response, they are denied.  Defendant-Intervenors deny the remainder of the allegations in Paragraph 98 of the Complaint.

## COUNT NINE

99.     Defendant-Intervenors restate and incorporate by reference their responses in Paragraphs 1 through 98 above as if fully set forth herein.

100.     In response to the allegations in Paragraph 100 of the Complaint, Defendant-Intervenors specifically refer to the cited source in its entirety for its words, substance, meaning, content or context thereof, and, to the extent that these allegations require a response, they are denied.

101.     Defendant-Intervenors deny the allegations in Paragraph 101 of the Complaint.

102.     Defendant-Intervenors deny each and every allegation of the Complaint not previously admitted, explained, qualified, or denied.

**FIRST AFFIRMATIVE DEFENSE**

The Complaint fails to state a claim upon which relief can be granted.

**SECOND AFFIRMATIVE DEFENSE**

The Complaint should be dismissed in whole or in part because Plaintiff failed to exhaust administrative remedies and/or on the grounds of primary jurisdiction.

**PRAYER FOR RELIEF**

WHEREFORE, Defendant-Intervenors Anadarko Petroleum Corporation, Warren Resources, Inc. and Double Eagle Petroleum Co. pray for judgment as follows:

1.     To the extent the Complaint seeks declaratory judgment that BLM's development of the EIS and approval of the ROD were arbitrary and capricious and in violation of NEPA and FLPMA, it is denied;

2.     To the extent the Complaint seeks an order requiring that the ROD and EIS be vacated, set aside and remanded for further consideration, it is denied;

3.     To the extent the Complaint seeks an order enjoining BLM from taking any further action in reliance on the ROD, including the authorization of any specific oil and gas operations, it is denied;

4.     To the extent the Complaint seeks an order enjoining BLM from taking any further action in reliance on the EIS, including the tiering of any future NEPA compliance document off of the EIS, it is denied;

5.     To the extent the Complaint seeks litigation expenses of the Plaintiff, it is denied;

6.     Judgment on the merits in favor of Defendants and against the Plaintiff; and

7.      For such other relief that this Court may deem just and proper.

Respectfully submitted,

      /s/ Michael B. Wigmore
Michael B. Wigmore (DC Bar # 436114)
Bingham McCutchen LLP
2020 K Street, N.W.
Washington, D.C.  20006
(202) 373-6000
(202) 373-6001 (facsimile)

*Counsel for Anadarko Petroleum Corporation, Warren Resources, Inc. and Double Eagle Petroleum Co.*

*Of Counsel for Double Eagle Petroleum Co.*

Robert C. Mathes (DC Bar # 484255)
*(application for admission pending)*
Bjork Lindley Little PC
1600 Stout Street, Suite 1400
Denver, CO 80202
(303) 892-1400
(303) 892-1401 (facsimile)

Dated:  September 14, 2007

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| THEODORE ROOSEVELT | ) | |
| CONSERVATION PARTNERSHIP | ) | |
| 555 Eleventh St. N.W., 6th Floor | ) | |
| Washington, DC 20004, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 1:07-cv-01486-RJL |
| | ) | |
| DIRK KEMPTHORNE, in his official | ) | |
| capacity as the Secretary of the United States | ) | |
| Department of the Interior | ) | |
| 1849 C Street, N.W. | ) | |
| Washington, DC 20240, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| UNITED STATES BUREAU OF LAND | ) | |
| MANAGEMENT | ) | |
| 1849 C Street, N.W., Room 406-LS | ) | |
| Washington, DC 20240, | ) | |
| | ) | |
| Defendants. | ) | |
| ———————————————— | ) | |
| | ) | |
| ANADARKO PETROLEUM CORPORATION, | ) | |
| P.O. Box 1330 | ) | |
| Houston, TX 77251-1330, | ) | |
| | ) | |
| WARREN RESOURCES, INC., | ) | |
| 489 Fifth Avenue, 32nd Floor | ) | |
| New York, NY 10017, | ) | |
| | ) | |
| DOUBLE EAGLE PETROLEUM CO., | ) | |
| 777 Overland Trail, Suite 208 | ) | |
| P.O. Box 766 | ) | |
| Casper, WY 82602-0766, | ) | |
| | ) | |
| Movants-Intervenors. | ) | |
| ———————————————— | ) | |

**CERTIFICATE REQUIRED BY LCvR 7.1 OF THE LOCAL RULES OF**
**THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

I, the undersigned, counsel of record for Anadarko Petroleum Corporation, Warren Resources, Inc. and Double Eagle Petroleum Co. certify that to the best of my knowledge and belief, the following are parent companies, subsidiaries or affiliates of each party which have any outstanding securities in the hands of the public:

Anadarko Petroleum Corporation

None.

Warren Resources, Inc.

None.

Double Eagle Petroleum Co.

None.

These representations are made in order that judges of this court may determine the need for recusal.

Attorney of Record for Anadarko Petroleum Corporation, Warren Resources, Inc. and Double Eagle Petroleum Co.


    /s/ Michael B. Wigmore
Michael B. Wigmore (DC Bar # 436114)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

THEODORE ROOSEVELT                          )
CONSERVATION PARTNERSHIP                     )
555 Eleventh St. N.W., 6th Floor             )
Washington, DC 20004,                        )
                                             )
        Plaintiff,                       )
                                             )
    v.                                   )    CASE NO. 1:07-cv-01486-RJL
                                             )
DIRK KEMPTHORNE, in his official             )
capacity as the Secretary of the United States    )    [PROPOSED] ORDER
Department of the Interior                   )
1849 C Street, N.W.                          )
Washington, DC 20240,                        )
                                             )
   and                                  )
                                             )
UNITED STATES BUREAU OF LAND                 )
MANAGEMENT                                   )
1849 C Street, N.W., Room 406-LS             )
Washington, DC 20240,                        )
                                             )
    Defendants.                      )
————————————————————————)
                                             )
ANADARKO PETROLEUM CORPORATION,              )
P.O. Box 1330                                )
Houston, TX 77251-1330,                      )
                                             )
WARREN RESOURCES, INC.,                      )
489 Fifth Avenue, 32nd Floor                 )
New York, NY 10017,                          )
                                             )
DOUBLE EAGLE PETROLEUM CO.,                  )
777 Overland Trail, Suite 208                )
P.O. Box 766                                 )
Casper, WY 82602-0766,                       )
                                             )
    Defendant-Intervenors.           )
————————————————————————)

UPON CONSIDERATION of the Motion of Anadarko Petroleum Corporation, Warren Resources, Inc. and Double Eagle Petroleum Co. to Intervene as defendants in this case pursuant to Federal Rule of Civil Procedure 24, and for good cause shown, it is hereby

ORDERED that the Motion of Anadarko Petroleum Corporation, Warren Resources, Inc. and Double Eagle Petroleum Co. to Intervene is GRANTED, and that Anadarko Petroleum Corporation, Warren Resources, Inc. and Double Eagle Petroleum Co. are hereby accorded party status as defendants in this case; and

ORDERED that the Answer of Anadarko Petroleum Corporation, Warren Resources, Inc. and Double Eagle Petroleum Co. be deemed filed.

Dated this ___ day of ____, 2007.


_____
United States District Court Judge