IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

THEODORE ROOSEVELT                          )
CONSERVATION PARTNERSHIP,                    )
                                             )
          Plaintiff,                         )
                                             )
     v.                                      )          CASE NO. 1:07-cv-1486-RJL
                                             )
DIRK KEMPTHORNE, in his official             )
capacity as the Secretary of the United States )
Department of the Interior, and UNITED STATES )
BUREAU OF LAND MANAGEMENT,                    )
                                             )
          Defendants.                        )
_____)
ANADARKO PETROLEUM CORPORATION,              )
WARREN RESOURCES, INC., and DOUBLE           )
EAGLE PETROLEUM CO.,                          )
and                                          )
STATE OF WYOMING,                             )
                                             )
          Defendant-Intervenors.             )
_____)
                                             )
NATURAL RESOURCES DEFENSE                     )
COUNCIL, *et al.*,                            )
                                             )
          Plaintiffs,                        )
                                             )
     v.                                      )          CASE NO. 1:07-cv-1709-RJL
                                             )
DIRK KEMPTHORNE, in his official             )
capacity as the Secretary of the United States )
Department of the Interior, and UNITED STATES )
BUREAU OF LAND MANAGEMENT,                    )
                                             )
          Defendants.                        )
_____)
ANADARKO PETROLEUM CORPORATION,              )
WARREN RESOURCES, INC., and DOUBLE           )
EAGLE PETROLEUM CO.,                          )
                                             )
          Defendant-Intervenors.             )
_____)

**INDUSTRY DEFENDANT-INTERVENORS MOTION TO CONSOLIDATE AND
MEMORANDUM IN SUPPORT THEREOF**

Pursuant to Federal Rules of Civil Procedure 7(b) and 42(a) and Local Rules 7 and 40.5 of this Court, Defendant-Intervenors Anadarko Petroleum Corporation, Warren Resources, Inc. and Double Eagle Petroleum Co. ("Defendant-Intervenors") respectfully move to consolidate for all purposes *Theodore Roosevelt Conservation Partnership v. Kempthorne,* No. 1:07-cv-1486-RJL, and *Natural Resources Defense Council, et al. v. Kempthorne,* No. 1:07-cv-1709-RJL.  The Honorable Ellen Segal Huvelle has already found that the two cases are related, because of common issues of law and fact.  Order, *Natural Res. Def. Council v. Kempthorne*, No. 1:07-cv-1709 (D.D.C. Sept. 28, 2007) ("Related Case Order") (attached as Exhibit 1).  The Court did so because both cases challenge decisions by the Bureau of Land Management ("BLM") to approve coalbed natural gas development in the Atlantic Rim area in Wyoming pursuant to the National Environmental Policy Act ("NEPA") and the Federal Land Policy and Management Act ("FLPMA").  The administrative record will be virtually the same for both cases, and consolidation of briefing, including joint briefs on all common issues by all non-governmental entities on each side, will save judicial and parties' resources.  Thus, judicial economy dictates that the cases be heard together.

In support of its motion, Defendant-Intervenors state as follows:

## FACTUAL BACKGROUND

1.        In December of 2006, BLM issued a Final Environmental Impact Statement ("FEIS") pursuant to NEPA for the Atlantic Rim Natural Gas Field Development Project ("Atlantic Rim Development Project" or "Project") in Carbon County, Wyoming.  71 Fed. Reg. 69,582 (Dec. 1, 2006).  In May of 2007, BLM issued a Record of Decision ("ROD"), providing a plan for future management of the federal surface and mineral estate in the Atlantic Rim Development Project area.  72 Fed. Reg. 28,518 (May 21, 2007).  Under the approved plan in the

ROD, BLM will allow drilling of approximately 2,000 gas wells to recover energy resources, while limiting total new surface disturbance from the drilling program across the Atlantic Rim Development Project area (federal, state and fee minerals) to a maximum of 7,600 acres, at any given time, and a 6.5-acre/well site short-term (less than 6 years) disturbance goal.  ROD at 1, *available at* http://www.blm.gov/wy/st/en/info/NEPA/rfodocs/atlantic_rim.html.

2.      The ROD is "not the final review or approval for actions associated with [the Project.]"  ROD at 3.  BLM is to review and consider each component of the project that involves federal lands or minerals on a site-specific basis, including Applications for Permit to Drill ("APDs").  *Id.*  Thus, individual well plans of development ("PODs") within the Project area require separate APDs from BLM prior to construction and operation.  In deciding whether to approve a specific POD in the Project area, BLM will conduct site-specific environmental reviews, which will be tiered to the review done in the FEIS for the entire Project.  *See id.* at 4.

3.      Since the issuance of the ROD, BLM has conducted site-specific environmental reviews and approved APDs for seven PODs located within the Atlantic Rim Development Project area:  (a) Catalina Unit PODs A and B, approved June 28, 2007 (Ex. 2); (b) Sun Dog Unit PODs A and B, approved August 16, 2007 (Ex. 3); (c) Sun Dog Unit POD C, approved October 23, 2007 (Ex. 4); and (d) Sun Dog Unit PODs D and E, approved October 23, 2007 (Ex. 5).  BLM conducted site-specific environmental assessments for these approved PODs, which incorporate the review undertaken in the FEIS.

4.      On August 17, 2007, Plaintiff Theodore Roosevelt Conservation Partnership ("TRCP") filed a Complaint in Case No. 07-1486 ("TRCP Compl."), alleging that BLM violated NEPA and FLPMA in authorizing the development of 2,000 coal bed methane wells and associated infrastructure in the Atlantic Rim Development Project area.  TRCP Compl. ¶1.  In its

Complaint, TRCP requests, among other things, that this Court "[e]njoin BLM from taking any further action in reliance on the unlawful ROD, *including the authorization of any specific oil and gas operations*" and "[e]njoin BLM from taking any further action in reliance on the unlawful EIS, *including the 'tiering' of any future NEPA compliance document (e.g., environmental assessment, determination of NEPA adequacy, or supplemental EIS) off of the EIS.*" *Id.* at 35 (emphasis added). Thus, TRCP seeks relief related to both the FEIS and to any additional site-specific determinations and approvals.

5.    On September 25, 2007, Plaintiffs Natural Resources Defense Council, Biodiversity Conservation Alliance, Wyoming Outdoor Council, Western Watersheds Project, and Wyoming Wilderness Association (collectively referred to as "NRDC") filed a Complaint in Case No. 07-1709 ("NRDC Compl."), alleging that BLM violated NEPA, FLPMA and the Clean Water Act in authorizing ground disturbance activities as part of the Atlantic Rim Development Project. NRDC Compl. ¶¶1, 7. In their Motion for Preliminary Injunction, which was filed on that same date, NRDC acknowledged that "[b]ecause of BLM's reliance on this previous FEIS in approving the [plans of development at issue here], the adequacy of the Atlantic Rim Development Project FEIS is relevant to the lawfulness of BLM's approval of the wells challenged' in this action." NRDC Mem. in Supp. of Mot. for Prelim. Inj., No. 07-1709, at 10-11 (filed Sept. 25, 2007) ("NRDC PI Mem."). On September 28, 2007, the Honorable Ellen S. Huvelle, to which the NRDC case was originally assigned, found that the NRDC case and the TRCP case were related cases as they "clearly involve common issues of law under NEPA and issues of fact, for, to a large degree, they grow out of the same event—BLM's promulgation of the Atlantic Rim EIS," and transferred the NRDC case to the Honorable Richard J. Leon. Related Case Order, at 2-3 (Ex. 1).

6.      On October 26, 2007, NRDC filed an Amended Complaint in Case No. 07-1709

("NRDC Am. Compl.").  In the Amended Complaint, NRDC challenges the site-specific

environmental assessments for the approved PODs, but also admits that NRDC, like TRCP, is

challenging BLM's actions "to approve the [EIS] and [ROD] for the Atlantic Rim Natural Gas

Field Development Project in Wyoming's Red Desert."  NRDC Am. Compl. ¶1.  As with TRCP,

NRDC requests "injunctive relief prohibiting defendants from approving any further applications

for permits to drill, or other ground-disturbing activity, tied to the Atlantic Rim Development

Project EIS…."  *Id.* at 25.

## POINTS AND AUTHORITIES

7.      Federal Rule of Civil Procedure 42(a) provides that "[w]hen actions involving a

common question of law or fact are pending before the court, it may order a joint hearing or trial

of any or all the matters in issue in the actions; it may order all the actions consolidated; and it

may make such orders concerning proceedings therein as may tend to avoid unnecessary costs or

delay."  Fed. R. Civ. P. 42(a).  In reference to Rule 42, among others, the U.S. Supreme Court

noted that "[u]nder the Rules, the impulse is toward entertaining the broadest possible scope of

action consistent with fairness to the parties; joinder of claims, parties and remedies is strongly

encouraged."  *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 724 (1966).  Because both

cases challenge the same underlying decision by BLM and have numerous common issues of law

and fact, judicial economy warrants consolidation.

**I.      Consolidation is Warranted Here Because Both Cases Involve Numerous Common Issues of Law and Fact.**

8.      As this Court has already found, the NRDC case and the TRCP case involves

common issues of law and fact.  *See* Related Case Order, at 2 (Ex. 1).

9. First, the underlying facts in both cases are largely identical. Both cases concern BLM's authorization of coal-bed methane drilling in the Atlantic Rim Development Project area of south-central Wyoming. TRCP's case involves a challenge to the FEIS issued by BLM for the Project. TRCP Compl. ¶1. NRDC also challenges the FEIS, as well as four individual, site-specific environmental assessments that are tiered to the FEIS. NRDC Am. Compl. ¶1. Both TRCP and NRDC seek to enjoin any further reliance on the FEIS. TRCP Compl. at 35; NRDC Am. Compl. at 25. Thus, both cases are challenging the same underlying decision by BLM— issuance of the FEIS—as it relates to subsequent decisions relying on that FEIS, including the ROD and site-specific approvals. As such, consolidation is warranted. *See, e.g., Biochem Pharma, Inc. v. Emory Univ.*, 148 F. Supp. 2d 11, 13 (D.D.C. 2001) ("Consolidation is appropriate where, as here, the two cases each involve review of the same underlying decision.") (citation omitted).

10. In its initial Complaint, NRDC attempted to distinguish its case from TRCP's case based on the fact that NRDC only challenges the site-specific environmental assessments that allowed specific groups of wells (or PODs) to be drilled. NRDC Compl. ¶¶1, 7. In its Amended Complaint, NRDC discarded this purported distinction and acknowledged that the environmental assessments are tiered to the FEIS being challenged by TRCP and, thus, the FEIS and the site-specific environmental assessments are inextricably intertwined.

11. Tiering allows environmental assessments to "summarize the issues discussed in the broader statement and incorporate discussions from the broader statement by reference" and "concentrate on the issues specific to the subsequent action." 40 C.F.R. § 1502.20. For example, NRDC challenges BLM's consideration of various environmental impacts and cumulative effects of other related projects. Third Cause of Action, NRDC Am. Compl. ¶¶100-

101.  Although NRDC may attempt to claim that it is challenging the analysis in each specific environmental assessment, that analysis is tiered to, and thus incorporates, the analysis in the FEIS.  The FEIS, which TRCP challenges, is part and parcel of the review of NRDC's claims.  *See, e.g., Ark. Wildlife Fed'n v. U.S. Army Corps of Eng'rs*, 431 F.3d 1096, 1100 (8th Cir. 2005) (An environmental assessment "will be ruled deficient only if it does not include a cumulative impact analysis or is not tiered to an EIS that contains such an analysis.").  *See also Sierra Club v. Robertson,* 784 F. Supp. 593, 606 (W.D. Ark. 1991) ("Upon reviewing both the FSFEIS and Oden EA, it appears to the court that the EIS and EA provide the information reasonably necessary to enable the decision-maker to consider environmental consequences and to make a reasoned decision."); *Nat'l Coal Ass'n v. Hodel*, 675 F. Supp. 1231, 1247-48 (D. Mont. 1987) (finding court must look at both environmental assessment and EIS to determine compliance with NEPA).  Thus, one cannot consider NRDC's claims regarding the site-specific environmental assessment without consideration of the FEIS, which NRDC acknowledges.  NRDC PI Mem. at 10-11.

12.     Likewise, certain of TRCP's claims may involve consideration of the site-specific environmental reviews.  For example, TRCP alleges that BLM's adaptive management program, which addresses mitigation measures, "violates NEPA's directive to take a hard look at mitigation prior to agency action."  TRCP Compl. ¶ 69.  To determine whether BLM adequately considered mitigation measures, the Court may consider not only the FEIS, but also the site-specific measures implemented in the environmental assessments.  Moreover, both NRDC and TRCP request an injunction preventing BLM from relying on the FEIS and from approving any additional wells in the Project area.  Both cases, therefore, involve the FEIS and individual environmental assessments.  Thus, there are substantial common issues of fact to support

consolidation.  *See, e.g., Mary Ellen Enters. v. Camex, Inc.*, 68 F.3d 1065, 1073 (8th Cir. 1995)

(granting consolidation because, "[a]lthough there was evidence of other transactions in the

diversity case, the copyright claim and the diversity claims were undeniably tied together by the

L'eggs transaction").

13.     Second, the legal grounds raised by both TRCP and NRDC under NEPA and

FLPMA are substantially the same.  Indeed, claims in four out of five of NRDC's Causes of

Action are subsumed within TRCP's Complaint.  NRDC's NEPA claims are largely addressed in

TRCP's Counts One through Five, while NRDC's FLPMA claim is addressed in TRCP's Counts

Six and Seven.

14.     Both Complaints present a number of common legal questions or issues under

NEPA.  NRDC and TRCP both allege that the "EIS fails to take the required 'hard look' at the

potential environmental consequences of the Project."  TRCP Compl. ¶2.  *Cf.* NRDC Am.

Compl. ¶2 (claiming "[t]he EIS BLM prepared violates [NEPA] because it fails to take a hard

look at the environmental effects of the 2,000 well Atlantic Rim project").  In particular, both

NRDC and TRCP largely focus on BLM's alleged failure to take a hard look at the potential

effects of the project on wildlife and habitats within the region.  For example, both parties allege

that BLM failed to consider a reasonable range of alternatives related to wildlife protections.

Second Cause of Action, NRDC Am. Compl. ¶¶84-97; Count One, TRCP Compl. ¶63.  While

NRDC focuses on mitigation measures related to the sage grouse, TRCP's claim addresses this

concern in alleging BLM's failure to consider alternatives that would have provided better

protections for wildlife in general.  Further, TRCP does make similar allegations as NRDC

specifically related to the sage grouse.  Count Five, TRCP Compl. ¶¶80-81.  Similarly, both

NRDC and TRCP take issue with BLM's consideration of cumulative effects. Third Cause of Action, NRDC Am. Compl. ¶101; Count Three, TRCP Compl. ¶¶71-73.

15.     In addition, both NRDC and TRCP raise public participation arguments under NEPA. NRDC takes issue with the alleged lack of public participation due to BLM's deferral of site-specific analysis. First Cause of Action, NRDC Am. Compl. ¶¶75-77. NRDC has claimed that an opportunity for public comment is needed on site-specific analysis to address mitigation measures. Pls.' Supplemental Br. in Supp. of Mot. for Prelim. Inj., No. 07-1709, at 4 (filed Oct. 29, 2007). TRCP similarly claims that the FEIS fails to involve the public in the adaptive management process, which is intended to analyze future mitigation measures that may be applied in site-specific implementation. Count Two, TRCP Compl. ¶¶66-68. Thus, this Court's consideration of NEPA's hard look and public participation requirements and BLM's compliance with those requirements are at issue in both cases.

16.     In addition to substantially similar NEPA claims, both NRDC and TRCP raise virtually identical claims under FLPMA. NRDC alleges that BLM's approval of the Atlantic Rim Development Project fails to comply with the applicable Resource Management Plan. Fourth Cause of Action, NRDC Am. Compl. ¶¶104-108. TRCP also alleges that BLM failed to comply with the Resource Management Plan. Counts Six and Seven, TRCP Compl. ¶¶82-94. In particular, both NRDC and TRCP allege that BLM's decisions are inconsistent with the wildlife management objectives of the Resource Management Plan. NRDC Am. Compl. ¶107; TRCP Compl. ¶94. Thus, both allege similar violations of FLPMA.

17.     The only substantively different claim is NRDC's claim that BLM violated Section 401 of the Clean Water Act.[1]  However, the common issues of law and fact that are in both cases far outweigh this single additional claim raised by NRDC.  Moreover, the Clean Water Act claim involves common issues of fact, including the same property, the Atlantic Rim Development Project area, and potential effects on surface waters in the Project area, which is also at issue in NRDC's NEPA claims.  "[T]he mere pursuit of a different legal theory or a different claim by one of the parties is insufficient to defeat a motion to consolidate."  *Tracinda Corp. v. DaimlerChrysler AG*, Nos. Civ. A. 00-984-JJF, 01-004-JJF, 00-993-JJF, 2001 WL 849736, at *2 (D. Del. July 26, 2001) (citations omitted).  *See also A.F.I.K. Holding SPRL v. Fass*, 216 F.R.D. 567, 570 (D. N.J. 2003) (noting that Rule 42 does not require "that pending suits be identical before they can be consolidated").

## II.     This Court Should Use its Broad Discretion to Consolidate These Actions in the Interests of Judicial Economy.

18.     Consolidation in this case would also promote judicial economy.  As this Court has found, "Federal Rule of Civil Procedure 42(a) gives the Court broad discretionary authority to consolidate cases.  Consolidation can help alleviate 'needless duplication of time, effort, and expense on the part of the parties and the Court.'"  *Horn v. Raines*, 227 F.R.D. 1, 2 (D.D.C. 2005) (quoting *Millman v. Brinkley*, Nos. 1:03-cv-3831, 1:03-cv-3832, 1:03-cv-0058, 2004 WL 2284505, at *3 (N.D. Ga. Oct. 1, 2004)).  Here, "[e]ach of the cases arises out of the same operative facts and raises similar legal issues.  Therefore, without consolidation there is a significant risk of duplicative efforts and expenses on the part of the parties."  *Id.* at 3.  Further,

---

[1]  As Defendant-Intervenors' noted in their opposition to NRDC's motion for a preliminary injunction, this Court lacks subject matter jurisdiction over NRDC's Section 401 Clean Water Act claim because NRDC failed to provide the required notice under 33 U.S.C. § 1365(b).

consolidation "relieves the parties and the Court of the burden of duplicative pleadings and Court orders." *New York v. Microsoft Corp.*, 209 F. Supp. 2d 132, 148 (D.D.C. 2002).

19.     Because there is substantial overlap between the NEPA and FLPMA claims raised by NRDC and TRCP, it would serve the interests of judicial economy for the Court to review all of the issues raised once. In other words, this Court should only be required to review the FEIS, ROD and individual environmental assessments once to determine compliance with NEPA and only consider once whether BLM's decision complies with FLPMA, rather than making the same decisions in a piecemeal fashion. Consolidation would allow this Court to have a complete picture of the case and consider all the relevant issues at the same time.

20.     Consolidation would conserve judicial and parties' resources. The administrative records in both cases will be virtually the same and can be compiled at the same time. In addition, Defendant-Intervenors request consolidated briefing on all common issues by non-governmental parties to reduce the filings before this Court, allowing the Defendants and Defendant-Intervenors to respond once to the same issues. Plaintiffs would similarly save resources by working collaboratively on the issues both have raised. Thus, consolidation would avoid having to compile (and review) two separate records and reviewing, responding to and arguing the same issues twice.

21.     Finally, consolidation would not prejudice any of the parties. There is little chance of confusion of the issues, as this case involves only questions of federal law and does not involve a jury trial. In addition, the parties retain their opportunity to have all of their issues heard. Further, both cases are in the early stages and, although NRDC has a pending motion for preliminary injunction, no schedules for briefing on the merits have been issued in either case.

22.    Pursuant to Local Rule 7(m), counsel for Defendant-Intervenors has conferred with counsel for all the parties regarding their position on the motion.  Plaintiffs TRCP and NRDC and the Federal Defendants oppose consolidation of these two cases.  Defendant-Intervenor State of Wyoming does not oppose consolidation.

## CONCLUSION

23.    TRCP and NRDC challenge the same underlying BLM decision, raise many of the same legal issues, and request the same relief.  Their cases are, in many ways, exactly the same.  In the interests of judicial economy, and because no party will be prejudiced, this Court should exercise its broad discretion and grant this motion to consolidate.  To reduce duplication and alleviate the burdens on the parties and this Court, consolidation should be for all purposes.

Respectfully submitted,

/s/ Michael B. Wigmore

Michael B. Wigmore (DC Bar # 436114)
Sandra P. Franco (DC Bar # 467091)
Bingham McCutchen LLP
2020 K St., NW
Washington, DC 20006-1806
202.373.6000
202.373.6001 (facsimile)

*Counsel for Anadarko Petroleum Corporation, Warren Resources, Inc., and Double Eagle Petroleum Co.*

Robert C. Mathes (DC Bar # 484255)
Bjork Lindley Little PC
1600 Stout Street, Suite 1400
Denver, CO 80202
303.892.1400
303.892.1401 (facsimile)

*Counsel for Double Eagle Petroleum Co.*

Dated:  November 15, 2007

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 15th day of November, 2007, I caused to be filed

Industry Defendant-Intervenors' Motion to Consolidate and Memorandum in Support Thereof

electronically through the CM/ECF system, which caused the following parties or counsel to be

served by electronic means, as more fully reflected on the Notice of Electronic Filing:

Steven Michael Kupka
BLACKWELL SANDERS LLP
206 South 13th Street
Suite 1400
Lincoln, NE 68508-2019
(402) 458-1500
(402) 458-1510 (fax)
nholland@blackwellsanders.com
*Attorney for Theodore Roosevelt Conservation Partnership*

Sharon Buccino
NATURAL RESOURCES DEFENSE COUNCIL
1200 New York Avenue, NW
Suite 400
Washington, DC 20005
(202) 289-6868
Fax: (202) 289-1060
Email: sbuccino@nrdc.org
*Attorney for Natural Resources Defense Council, et al.*

Lori Caramanian
U.S. DEPARTMENT OF JUSTICE
1961 Stout St.
8th Floor
Denver, CO 80294
(303) 312-7393
Fax: (303) 844-1499
Email: lori.caramanian@usdoj.gov
*Attorney for Defendants*

Kristen A. Dolan
WYOMING ATTORNEY GENERAL'S OFFICE
123 Capitol Avenue
Cheyenne, WY 82002
(307) 777-6946
kdolan@state.wy.us
*Counsel for Defendant-Intervenor State of Wyoming*


        /s/ Michael B. Wigmore
        Michael B. Wigmore

Unreported Case

Westlaw.

Not Reported in F.Supp.2d                                                                          Page 1
Not Reported in F.Supp.2d, 2001 WL 849736 (D.Del.)
**(Cite as: 2001 WL 849736 (D.Del.))**

**H**Only the Westlaw citation is currently available.

United States District Court, D. Delaware.
TRACINDA CORPORATION, a Nevada corporation,
Plaintiff,
v.
DAIMLERCHRYSLER AG, a Federal Republic of
Germany corporation; Daimler-Benz AG,
a Federal Republic of Germany corporation; Juergen
Schrempp, a citizen of the
Federal Republic of Germany; Manfred Gentz, a citizen
of the Federal Republic
of Germany; Hilmar Kopper, a citizen of the Federal
Republic of Germany,
Defendants;
GLICKENHAUS & CO., et al., Plaintiffs,
v.
DAIMLERCHRYSLER AG, et al., Defendants;
In re: DAIMLERCHRYSLER AG SECURITIES
LITIGATION.
**No. CIV. A. 00-984-JJF, CIV. A. 01-004-JJF, CIV. A.
00-993-JJF.**

July 26, 2001.

Joseph A. Rosenthal, Esquire, and Carmella P. Keener,
Esquire of Rosenthal, Monhait, Gross & Goddess, P.A.,
Wilmington, Delaware. Of Counsel: Lowey, Dannenberg,
Bemporad & Selinger, P.C., White Plains, New York.
Attorneys for Glickenhaus Plaintiffs.

A. Glichrist Sparks, III, Esquire, Alan J. Stone, Esquire,
and Jessica Zeldin, Esquire of Morris, Nichols, Arsht &
Tunnell, Wilmington, Delaware. Of Counsel: Terry
Christensen, Esquire, James S. Schreier, Esquire, Steven
J. Aaronoff, Esquire, and Eric P. Early, Esquire of
Christensen, Miller, Fink, Jacobs, Glaser, Weil &
Shapiro, LLP, Los Angeles, California. William G.
McGuinness, Esquire and Julie E. Kamps, Esquire of
Fried, Frank, Harris, Shriver & Jacobson, New York,
New York. Attorneys for Plaintiff Tracinda Corporation.

Jay W. Eisenhofer, Esquire, Abott A. Leban, Esquire, and
Richard M. Donaldson, Esquire of Grant & Eisenhofer,
P.A., Wilmington, Delaware. Of Counsel: Vincent R.
Cappucci, Esquire and Catherine Torell, Esquire,
Entwistle & Cappucci LLP, New York, New York.
Jeffrey A. Klafter, Esquire and Stacy E. Osborne, Esquire
of Bernstein Litowitz Berger & Grossmann LLP, New
York, New York. Jeffrey W. Golan, Esquire and Samuel

R. Simon, Esquire of Barrack Rodos & Bacine,
Philadelphia, Pennsylvania. Attorneys for Co-Lead
Plaintiffs, The Florida State Board of Administration,
Municipal Employees Annuity and Benefit Fund of
Chicago, Denver Employees Retirement Plan,
Policemen's Annuity and Benefit Fund of Chicago, and
Municipal Employees Annuity and Benefit Fund of
Chicago.

Thomas J. Allingham II, Esquire, Robert S. Saunders,
Esquire, KennethA. Polite, Jr., Esquire of Skadden, Arps,
Slate, Meagher & Flom LLP, Wilmington, Delaware. Of
Counsel: Jonathan J. Lerner, Esquire, J. Michael Schell,
Esquire, Joseph N. Sacca, Esquire and Jacob E. Hollinger,
Esquire of Skadden, Arps, Slate, Meagher & Flom LLP,
New York, New York. Attorneys for Defendants
DaimlerChryler AG, Daimler-Benz AG, Jürgen Schrempp
and Manfred Gentz.

Peter J. Walsh, Jr., Esquire of Potter Anderson & Corroon
LLP, Wilmington, Delaware. Of Counsel: Milbank,
Tweed, Hadley & McCloy LLP, New York, New York.
Attorneys for Defendant Hilmar Kopper.

MEMORANDUM OPINION

FARNAN, District J.

**\*1** Pending before the Court is a Motion To Consolidate
(D.I.33) [FN1] filed by Defendants, DaimlerChrysler
AG, Daimler-Benz AG, Juergen Schrempp, and Manfred
Gentz requesting the Court to consolidate twenty-two
class actions, and two related actions brought individually
by Tracinda Corporation and Glickenhaus & Co.,
respectively. Since the filing of Defendants' Motion, the
twenty-two class actions were consolidated by an
agreement among the parties (D .I. 30, 34, 35) and an
Amended Consolidated Class Action Complaint was filed
on behalf of the Class Plaintiffs (D.I.41). However,
Defendants maintain that the remaining two individual
actions should be consolidated with the consolidated class
action. In response to Defendants' Motion, Class
Plaintiffs, Tracinda Corporation and Glickenhaus & Co.
oppose any further consolidation of these actions. In the
alternative, Tracinda and Glickenhaus propose a "Plan of
Coordination" which would require the Court to enter an
"Order Of Coordination" aimed at establishing procedures
to be used by the parties during discovery. The Motion
has been fully briefed and is ripe for the Court's review.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

FN1. All Docket Item references are to the documents as filed in Civil Action No. 00-993-JJF.

DISCUSSION

In pertinent part, Rule 42 of the Federal Rules of Civil Procedure provides:

When actions involving a common question of law or fact are pending before the court, it may order a joint hearing or trial of any or all the matters in issue in the actions; it may order all the actions consolidated; and it may make such orders concerning proceedings therein as may tend to avoid unnecessary costs or delay.

Fed.R.Civ.P. 42(a). Although common issues are a prerequisite to consolidation, the Court must also consider such factors as the saving of money, time and effort and any prejudice to the rights of the parties as a result of consolidation. *See e.g. Rohm & Hass Co. v. Mobil Oil Corp.*, 525 F.Supp. 1298, 1309 (D.Del.1981).

After reviewing the briefs in opposition to consolidation filed by Class Plaintiffs, Tracinda and Glickenhaus, it appears to the Court that the primary concern among the parties is whether consolidation for trial is warranted in this action. For example, in their opposition brief, Lead Plaintiffs state that they "do not fundamentally oppose consolidation for pre-trial purposes." (D.I. 28 at 1). However, Lead Plaintiffs contend that it is too early to determine whether the action should be consolidated for trial, and if the actions are consolidated for discovery, they should not be consolidated in the manner proposed by Defendants which would limit all plaintiffs to serving one joint set of discovery requests and allow only one questioner at depositions.

Likewise, Tracinda and Glickenhaus acknowledge that there is "overlap" among the Complaints in these actions and that there are common factual and legal questions among the actions. (D.I. 29 at 21, D.I. 30 at 11). Nevertheless, Glickenhaus and Tracinda maintain that their actions contain separate common law claims based on alleged oral misrepresentations that are sufficient to defeat any request for consolidation.

**\*2** After reviewing the cases upon which Glickenhaus and Tracinda rely in the context of the Complaints in this case, the Court disagrees with the position advanced by Glickenhaus and Tracinda. The cases upon which Glickenhaus and Tracinda rely are cases involving the question of whether to certify a class under Rule 23 of the Federal Rules of Civil Procedure. *See e.g. Clark v.*

*Watchie*, 513 F.2d 994 (9th Cir.1975); *Groshek v. Covington County Bank*, [1979-1980 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 97,289 (N.D.Ala. Jan. 31, 1980); *Sanders v. Robinson Humphrey/Am. Express, Inc.*, [1986-1987 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 92,880, at 94,272 (N.D.Ga. July 8, 1986). The standard under Rule 23 is whether common issues predominate over individual questions, a standard which is different than the standard for consolidation under Rule 42(a). Further, it appears to the Court that many of the facts relied upon by Tracinda and Glickenhaus to support their common law claims are facts recited in the Class Action Complaint, suggesting that these facts may be relevant to the Class Plaintiffs' action as well. Where, as here, common questions of law and fact exist among the claims advanced, the mere pursuit of a different legal theory or a different claim by one of the parties is insufficient to defeat a motion to consolidate. *See Aronson v. McKesson HBOC, Inc.*, 79 F.Supp.2d 1146, 1151 (N.D.Cal.1999); *Discount Bank & Trust Co. v. Salomon Inc.*, 141 F.R.D. 42, 44 (S.D.N.Y.1992) (addition of a RICO claim by one plaintiff based on conduct alleged in earlier class action complaints is insufficient to warrant denial of consolidation); *Waldman v. Electrospace Corp.*, 68 F.R.D. 281, 284 (S.D.N.Y.1975) (holding that "[e]nough common and related issues exist with respect to all claims" to warrant consolidation even though some plaintiffs raised a claim which other plaintiffs did not raise). And, even if each and every fact is not relevant to each and every party's claims, the Court finds that enough common issues of law and fact exist among the parties' claims to satisfy the prerequisite of Rule 42(a).

Having concluded that the prerequisite for consolidation has been established, the Court must balance the benefits and detriments associated with consolidation. In this case, Glickenhaus and Tracinda make duplicative arguments that they will be prejudiced in this case, because they will "effectively be denied full-use of their counsel of choice," "be forced to accept counsel not of their choosing," or their counsel will be forced to represent the other plaintiffs. (D.I. 30 at 1, 3, 22; D.I. 29 at 23-24). In the Court's view, Tracinda and Glickenhaus's fear is overstated. As the United States Supreme Court has recognized, consolidation "does not merge the suits into a single cause, or change the rights of the parties, or make those who are parties in one suit parties in another." *Johnson v. Manhattan Ry. Co.*, 289 U.S. 479, 496-497 (1933); *Cella v. Togum Constructeur Ensemleier en Industrie Alimentaire*, 173 F.3d 909 (3d Cir.1999). Indeed, those courts considering similar arguments concerning the impact of consolidation on a party's choice of counsel or its procedural and substantive rights have

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                      Page 3
Not Reported in F.Supp.2d, 2001 WL 849736 (D.Del.)
**(Cite as: 2001 WL 849736 (D.Del.))**

relied on *Johnson* to conclude that no such prejudice will result from consolidation. *Primavera Familienstiftung v. Askin,* 1173 F.R.D. 115, 129- 130 (S.D.N.Y.1997); *Discount Bank,* 141 F.R.D. at 44. As in *Primavera* and *Discount Bank,* the collective Plaintiffs in this case will still be able to pursue any individual claims they have and will still be able to maintain their respective attorneys. Indeed, Glickenhaus and Tracinda do not oppose some form of coordination and cooperation in this case, and in the Court's view, consolidation will further those goals by requiring the parties to coordinate their efforts while simultaneously increasing the efficient handling of these cases and easing the administrative burdens on the Court.

**\*3** Moreover, to emphasize the Court's goals in consolidating these cases without prejudicing or curtailing the parties' rights, the Court will order consolidation at this juncture without entering any detailed discovery order. Discovery in this matter is currently stayed, and by delaying the entry of a more detailed order, the Court seeks to give the parties an opportunity to meaningfully discuss and coordinate a satisfactory approach to discovery. Further, the Court notes that it can revisit and amend its order of consolidation as circumstances require. *See e.g., In re Repetitive Stress Injury Litig.,* 11 F.3d 368, 372 (2d Cir.1993). Accordingly, the Court will only order consolidation for pre-trial and discovery purposes at this point, will reserve decision on the question of

consolidation for trial purposes, and will revisit its consolidation order during the course of this litigation as needed.

CONCLUSION

For the reasons discussed, Defendant's Motion For Consolidation will be granted.

An appropriate Order will be entered.

ORDER

At Wilmington, this 26 day of July 2001, for the reasons set forth in the Memorandum Opinion issued this date,

IT IS HEREBY ORDERED this 26 day of July 2001, that:

    1. Defendants' Motion To Consolidate (D.I. 33 in Civil Action No. 00-993) is GRANTED.

    2. Civil Action Nos. 00-984-JJF, 00-993-JJF and 01-004-JJF are CONSOLIDATED for pre-trial and discovery purposes.

    3. Civil Action No. 00-993 shall be the lead case. All documents filed in this consolidated action shall be placed in the file of Civil Action No. 00- 993-JJF.

    4. The caption henceforth shall be:

```
        IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

IN RE: DAIMLERCHRYSLER AG         :  Civil Action No. 00-993/00-984/01-004-JJF
SECURITIES LITIGATION.            :
                                  :
_____ :
                                  :  CONSOLIDATED ACTION
TRACINDA CORPORATION,             :
a Nevada Corporation,             :
                                  :
                                  :
            Plaintiff,            :
       v.                         :
                                  :
DAIMLERCHRYSLER AG, a Federal     :
Republic of Germany               :
corporation; DAIMLER-BENZ AG,     :
a Federal Republic of Germany     :
corporation; JUERGEN SCHREMPP,    :
a citizen of the Federal          :
Republic of Germany;              :
MANFRED GENTZ, a citizen of       :
the Federal Republic of           :
Germany; HILMAR KOPPER, a         :
citizen of the Federal            :
Republic of Germany,              :
                                  :
            Defendants.           :
```

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                Page 4
Not Reported in F.Supp.2d, 2001 WL 849736 (D.Del.)
**(Cite as: 2001 WL 849736 (D.Del.))**


```
_____   :
                                  :
GLICKENHAUS & CO., et al.,        :
                                  :
              Plaintiffs,         :
                                  :
         v.                       :
                                  :
DAIMLERCHRYSLER AG, et al.,       :
                                  :
              Defendants;         :
                                  :
```

 Not Reported in F.Supp.2d, 2001 WL 849736 (D.Del.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Exhibit 1 to Defendant-Intervenors
Motion To Consolidate and
Memorandum in Support Thereof
Order, Natural Res. Def. Council v. Kempthorne,
No. 1:07-cv-1709 (D.D.C. Sept. 28, 2007)
("Related Case Order")

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                          )
**NATURAL RESOURCES DEFENSE**             )
**COUNCIL, *et al.*,**                    )
                                          )
           **Plaintiffs,** )
                                          )
           **v.**   )      **Civil Action No. 07-1709 (ESH)**
                                          )
**DIRK A. KEMPTHORNE, *et al.*,**         )
                                          )
           **Defendants.** )
_____)

## <u>ORDER</u>

On September 25, 2007, plaintiffs filed the above-captioned case challenging actions

taken by the Department of the Interior and the Bureau of Land Management ("BLM") relating

to the Atlantic Rim Natural Gas Field Development Project in Wyoming.  Specifically, plaintiffs

challenge BLM's approval of ninety new natural gas wells in the project area under the public

participation provisions and other provisions of National Environmental Policy Act ("NEPA"),

the Federal Land Policy and Management Act ("FLPMA") and the Clean Water Act ("CWA").

(Compl. ¶ 7.)  Plaintiffs have simultaneously moved for a preliminary injunction, asking the

Court to enjoin any "further ground-disturbing activity" relating to the ninety newly approved

wells and prohibit BLM from approving any additional applications for drilling permits in the

Atlantic Rim area until the agency rectifies its alleged NEPA, FLPMA, and CWA violations.

(Pls.' Mot. at 3.)

The day after plaintiffs filed their complaint and motion for preliminary injunction,

defendants filed a notice of related case pursuant to Local Civil Rule 40.5.  Defendants contend

that this case is related to *Theodore Roosevelt Conservation Partnership v. Kempthorne*,

07cv1486, currently pending before Judge Richard Leon, which involves NEPA and FLPMA challenges to the Atlantic Rim Environmental Impact Statement ("Atlantic Rim EIS"). They argue that because the specific BLM decisions challenged in this action are "tiered" to the Atlantic Rim EIS -- meaning that they refer to it and adopt its reasoning -- both cases necessarily involve an examination of the adequacy of the BLM's analysis in the Atlantic Rim EIS, and therefore involve common issues of fact and law. Under the local rules, if the Court determines that the two cases are related, the above-captioned matter would be transferred to Judge Leon, who is presiding over the lower-numbered case. Plaintiffs object to such a transfer, arguing that the areas of overlap between the two cases are not substantial enough to warrant transfer, as the focus of their case is on the process relating to the two specific drilling decisions, and their case also raises several additional legal claims not currently encompassed by the case before Judge Leon.

Under Local Civil Rule 40.5, civil cases "are deemed related when the earliest is still pending on the merits in the District Court and they (i) relate to common property, or (ii) involve common issues of fact, or (iii) grow out of the same event or transaction . . . ." Here, plaintiffs themselves acknowledge that "[b]ecause of BLM's reliance on [the Atlantic Rim EIS] in approving the plans of development [at issue here], the adequacy of the Atlantic Rim Development Project FEIS is relevant to the lawfulness of BLM's approval of the wells challenged" in this action. (Pls.' Mot. at 10-11.) Therefore, the two cases clearly involve common issues of law under NEPA and issues of fact, for, to a large degree, they grow out of the same event -- BLM's promulgation of the Atlantic Rim EIS. Moreover, as admitted by the plaintiffs during a conference call held on September 27, 2007, the two cases also clearly involve

the same property -- the land area that is the subject of the Atlantic Rim EIS. The "considerations of judicial economy" that underlie this Court's related-case rule thus favor the transfer of this case to Judge Leon. *Tripp v. Executive Office of President*, 196 F.R.D. 201, 202 (D.D.C. 2000) (deeming two cases to be unrelated when they only involved "the overlap of discovery," and noting that "[i]t will often prove wasteful of time and resources for two judges to be handling cases that are so related that they involve common factual issues or grow out of the same event or transaction"). The fact that plaintiffs' complaint adds additional legal claims not currently before Judge Leon does not make transfer of this case any less judicially efficient.

Accordingly, because the Court finds that the two cases are related, it overrules plaintiffs' objections and transfers the case to Judge Leon under Local Civil Rule 40.5.

**SO ORDERED.**

_____/s/_____
ELLEN SEGAL HUVELLE
United States District Judge

Date: September 28, 2007

Exhibit 2 to Defendant-Intervenors
Motion To Consolidate and
Memorandum in Support Thereof
EA, Catalina Unit PODs A and B,
Approved June 28, 2007



U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT
RAWLINS FIELD OFFICE

JUNE 18, 2007

TIERED EA, FONSI, AND DR FORM



Tiered to & Referencing the Atlantic Rim Natural Gas Development Project Environmental Impact Statement

---

## ENVIRONMENTAL ASSESSMENT

**EA NUMBER:** <u>WY-030-07-EA-186</u>

**Lease Numbers:** <u>WYC-079940, WYC-0081348, WYC-081348A, WYW-02846, WYW-003569</u>

**Proposed Action:**

<u>Catalina A & B PODs: Natural Gas Wells, Water Reinjection Wells, Access Roads, Pipeline/Utility Corridors, Water Transfer Station, Central Delivery Point, and Appurtenant Infrastructure</u>

### Rawlins Field Office (RFO) Interdisciplinary Team (IDT)

| IDT Member | Title |
|---|---|
| John Ahlbrandt | Natural Resource Specialist (Catalina A POD) |
| Travis Bargsten | Natural Resource Specialist (Catalina B POD) |
| Andy Stone | Hydrologist |
| Patrick Lionberger | Fisheries Biologist |
| TJ Murry | Rangeland Management Specialist |
| Paul Rau | Recreation Planner |
| Frank Blomquist | Wildlife Biologist |
| Bonni Bruce | Archaeologist |
| Mark Newman | Geologist |
| Susan Foley | Soil Scientist |
| Hillaire Peck | Engineer |

Prepared By:

_____
Travis Bargsten, Natural Resource Specialist

06/25/2007
_____
Date

_____
John Ahlbrandt, Natural Resource Specialist

6/25/2007
_____
Date

**Location of Proposed Action (BLM-administered public lands):**

### Catalina Unit POD A

| Well # | T | R | Sec | Aliquot |
|--------|-----|-----|-----|---------|
| 44-11 | 16N | 92W | 11 | SESE |
| 24-12 | 16N | 92W | 12 | SESW |
| 13-12 | 16N | 92W | 12 | NWSW |
| 11-13 | 16N | 92W | 13 | NWNW |
| 42-13 | 16N | 92W | 13 | SENE |
| 31-13 | 16N | 92W | 13 | NWNE |
| 22-13 | 16N | 92W | 13 | SENW |
| 11-18 | 16N | 91W | 18 | NWNW |
| 22-18 | 16N | 91W | 18 | SENW |
| 31-18 | 16N | 91W | 18 | NWNE |
| 42-18 | 16N | 91W | 18 | SENE |
| 24-7 | 16N | 91W | 7 | SESW |
| 33-7 | 16N | 91W | 7 | NWSE |
| 44-7 | 16N | 91W | 7 | SESE |

### Catalina Unit POD B

| Well # | T | R | Sec | Aliquot |
|--------|-----|-----|-----|---------|
| 31-7 | 16N | 91W | 7 | NWNE |
| 42-7 | 16N | 91W | 7 | SENE |
| 13-31 | 17N | 91W | 31 | NWSW |
| 24-31 | 17N | 91W | 31 | SESW |
| 33-31 | 17N | 91W | 31 | NWSE |
| 44-31 | 17N | 91W | 31 | SESE |
| 13-32 | 17N | 91W | 32 | NWSW |
| 24-32 | 17N | 91W | 32 | SESW |
| 20-1 | 16N | 92W | 1 | Lot 11 |
| 22-1 | 16N | 92W | 1 | Lot 19 |
| 31-1 | 16N | 92W | 1 | Lot 15 |
| 33-1 | 16N | 92W | 1 | NWSE |
| 40-1 | 16N | 92W | 1 | Lot 9 |
| 42-1 | 16N | 92W | 1 | Lot 17 |
| 20-6 | 16N | 91W | 6 | NENW |
| 40-6 | 16N | 91W | 6 | NENE |
| 31-6 | 16N | 91W | 6 | SWNE |
| 11-6 | 16N | 91W | 6 | SWNW |
| 42-6 | 16N | 91W | 6 | Lot 22 |
| 22-6 | 16N | 91W | 6 | NESW |
| 33-6 | 16N | 91W | 6 | NWSE |
| 44-6 | 16N | 91W | 6 | SESE |
| 13-6 | 16N | 91W | 6 | NWSW |
| 1I | 16N | 92W | 1 | SESW |
| 31I | 17N | 91W | 31 | NWSW |
| 6I | 16N | 91W | 6 | SWNW |

See POD Master Surface Use Plan and project maps.

**Applicant/Proponent**: <u>Double Eagle Petroleum Company (Double Eagle)</u>

**<u>Conformance with Land Use Plan</u>**

This proposed action is in conformance with the Great Divide Resource Management Plan (RMP) that was approved on November 8, 1990. The RMP has been reviewed to determine if the proposed action conforms to the land use plan terms and conditions as required by 43 CFR 1610.5. Development of oil and gas reserves is in conformance with the RMP. On page 30, the RMP states "The entire planning area [Great Divide Resource Area] is open to oil and gas leasing".

The development of this project will not affect the achievement of the Wyoming Standards for Healthy Rangelands (August 1997).

Remarks:

The NOSs or APDs for the proposed action were posted for 30 days in the Rawlins Field Office Information Access Center (Public Room) for review. Notification of preparation of this EA was provided on the Wyoming BLM internet NEPA register (http://www.wy.blm.gov/nepa/search).

The Atlantic Rim Area Natural Gas Field Development Project Environmental Impact Statement (AREIS) was written to assess the potential foreseeable and cumulative effects of drilling operations and associated activities in the Project area. The Record of Decision (ROD) for this project was approved on March 23, 2007. The proposed action is in conformance with the AREIS.

The AREIS ROD provides for the drilling of natural gas wells and associated infrastructure, limiting total surface disturbance to 7,600 acres at any one time (not including surface disturbance that occurred prior to implementation of the Interim Drilling Policy). The ROD establishes a goal for per-well surface disturbance of 6.5 acres of short-term disturbance (less in "Category A" areas).

The surface disturbance cap is allocated to operators "...on a prorated mineral leasehold basis." (ROD at Page 2), and development is limited to no more than 8 well sites per 640-acre section. If, in the event an Operator reaches its surface disturbance cap allocation, than "...further disturbance on federal minerals will not be permitted." (ROD at Page 3). The RFO will monitor and track disturbance areas for future proposals, in order to ascertain whether the disturbance cap would be exceeded by future authorizations.

The APDs/Master Surface Use Plan/Master Drilling Plan/Water Management Plan (Master Plan Elements), with Conditions of Approval, contain a complete description of the proposed action. The Master Plan Elements, with Conditions of Approval, are considered an integral part of this Environmental Assessment and are incorporated by reference.

The project (both PODs A & B) is located entirely within a Federal Oil & Gas Unit. No additional rights-of-way are necessary for the proposed action.

## Purpose and Need for Proposed Action

Domestic natural gas production is an integral part of U.S. energy development and conservation plans due to its availability and the presence of existing market delivery infrastructure. Domestic production reduces immediate dependence upon foreign sources of energy, and maintains an adequate and stable supply of fuel to maintain economic well-being, industrial production, and national security. The environmental advantages of burning natural gas are emphasized in the Clean Air Act amendments of 1990.

In addition, the proposed action would allow Double Eagle, as leaseholder, to exercise lease rights to explore and develop oil & gas resources within the project lease areas.

For these particular wells, the production is primarily natural gas and produced water from the coal seams.

## Description of Proposed Action Alternative

The proposed action entails the construction and/or reconstruction of access roads and well pads for the purpose of drilling 37 CBNG wells (14 in POD A, 23 in POD B) and 3 produced water reinjection wells (all in POD B). In addition, the proposed action provides for the construction, use, and reclamation of appurtenant gas- & water-gathering pipelines and utility corridors, including such a corridor to a proposed well on State of Wyoming estate in Section 36 (T17N/R92W). Where feasible and appropriate, the pipeline/utility corridors were located adjacent and parallel to the proposed or existing access roads and existing pipeline disturbances. The maps and illustrations attached to the EA, APDs, and Master Surface Use Plan display the locations of the proposed wells, access roads, gas- & water-gathering pipelines, and utility (primarily electrical) corridors.

A fenced Central Delivery Point (CDP) facility is proposed in POD B. This 500' x 560' facility would contain the centrally-located facilities to pump & reinject produced water, compress gas, and provide storage and measurement components (see Figure 1).



Figure 1: Central Delivery Point (POD B)

The CDP for POD A wells is already constructed and in use, built during exploratory activities (2002). In order to transfer water across topographic rises, each POD will contain a single water transfer station, see Figures 2 and 3:



These stations will contain several components within their fenced areas, including water storage tanks, water pumping equipment, and an emergency pit for overflow. The pit would only be constructed and utilized should it be determined that the producing wells would flow water in the event power is lost and the well pumps cease pumping. The emergency pits will prevent the uncontrolled flow of water and subsequent surface release, should power be lost.

Water for drilling would be obtained from the pond located in NWSE of Section 12 (T16N/R92W), which collects flow from coalbed wells in the area under an approved WDEQ WYPDES permit. Water would be hauled by truck to each drill site over existing and proposed roads within the POD.

Onsite inspections of the PODs were conducted on February 22-23 and March 30, 2006. Potential impacts to resources were considered and alternate locations considered. As a result of this field inspection, several project components were moved to reduce potential impacts to soils, water resources, vegetation, and wildlife resources.

The location of the proposed development is approximately 28 miles northeast of Baggs, Wyoming, west of Highway 789. Access to the area will be from existing access roads off of 789. New roads will be constructed or reconstructed to access most well locations.

A discussion of the actions generally associated with drilling a well, including (1) a plan of operations, (2) construction of the access road and drilling pad, and (3) pipeline installation, can be located in the following portions of the AREIS or ROD:

- Chapter 2, *Proposed Action and Alternatives (AREIS)*
- Chapter 4, *Analysis of Environmental Consequences (AREIS)*
- Appendix A, *Project Reclamation Plan (ROD)*
- Appendix C, *Operator-Committed Practices (ROD)*

Mitigation and reclamation measures are described in Chapter 4 and Appendix B of the ROD (*Project Performance-Based Monitoring and Best Management Practices*). The following narratives summarize elements specific to the proposed action for this EA.

Construction

Disturbance estimates for POD B include the well pad and access road/utility/pipeline corridor for the #44-36, a State of Wyoming estate well located in Section 36 (T17N/R92W). Portions of the pads unnecessary for production operations will be reclaimed after the production facilities are constructed. The well sites and access roads will be entirely reclaimed after the wells are plugged and abandoned. For the purpose of assessing potential cumulative effects, oil and gas development may be considered long-term as transitory in nature.

| POD A | Short-Term Disturbance Areas | | | | | |
|---|---|---|---|---|---|---|
| Well Name | Well Pad-Acres* | Road-Feet | Road-Acres** | Corridor-Feet | Corridor-Acres*** | SUM-Acres |
| 44-11[1] | 2.1 | 2,020 | 2.3 | 0 | 0.0 | 4.4 |
| 24-12 | 2.1 | 0 | 0.0 | 0 | 0.0 | 2.1 |
| 13-12[1] | 2.1 | 1,430 | 1.6 | 1,470 | 1.7 | 5.4 |
| 11-13 | 2.1 | 1,620 | 3.0 | 1,990 | 2.3 | 7.4 |
| 42-13 | 2.1 | 2,230 | 4.1 | 0 | 0.0 | 6.2 |
| 31-13 | 2.1 | 180 | 0.3 | 0 | 0.0 | 2.4 |
| 22-13 | 2.1 | 480 | 0.9 | 0 | 0.0 | 3.0 |
| 11-18 | 2.1 | 2,090 | 3.8 | 0 | 0.0 | 5.9 |
| 22-18 | 2.1 | 3,190 | 5.9 | 0 | 0.0 | 8.0 |
| 31-18 | 2.1 | 370 | 0.7 | 0 | 0.0 | 2.8 |
| 42-18 | 2.1 | 1,450 | 2.7 | 0 | 0.0 | 4.8 |
| 24-7 | 2.1 | 4,380 | 8.0 | 0 | 0.0 | 10.1 |
| 33-7 | 2.1 | 2,360 | 4.3 | 0 | 0.0 | 6.4 |
| 44-7 | 2.1 | 910 | 1.7 | 0 | 0.0 | 3.8 |
| Xfer Station | 0.7 | 0 | 0.0 | 0 | 0.0 | 0.7 |
| Total: | 30.1 | 22,710 | 39.3 | 3,460 | 4.0 | 73.4 |

| POD B | Short-Term Disturbance Areas | | | | | |
|---|---|---|---|---|---|---|
| Well Name | Well Pad-Acres* | Road-Feet | Road-Acres** | Corridor-Feet | Corridor-Acres*** | SUM-Acres |
| 31-7[1] | 2.1 | 1,010 | 1.2 | 2,030 | 2.3 | 5.6 |
| 42-7 | 2.1 | 1,370 | 2.5 | 0 | 0.0 | 4.6 |
| 13-31[2] | 3.2 | 2,730 | 5.0 | 0 | 0.0 | 8.2 |
| 24-31 | 2.1 | 0 | 0.0 | 0 | 0.0 | 2.1 |
| 33-31 | 2.1 | 1,680 | 3.1 | 0 | 0.0 | 5.2 |
| 44-31 | 2.1 | 2,100 | 3.9 | 0 | 0.0 | 6.0 |
| 13-32 | 2.1 | 2,010 | 3.7 | 0 | 0.0 | 5.8 |
| 24-32 | 2.1 | 1,660 | 3.0 | 0 | 0.0 | 5.1 |
| 20-1 | 2.1 | 2,900 | 5.3 | 0 | 0.0 | 7.4 |
| 22-1 | 2.1 | 2,600 | 4.8 | 0 | 0.0 | 6.9 |
| 31-1 | 2.1 | 380 | 0.7 | 0 | 0.0 | 2.8 |
| 33-1 | 2.1 | 1,340 | 2.5 | 0 | 0.0 | 4.6 |
| 40-1 | 2.1 | 3,140 | 5.8 | 2,730 | 3.1 | 11.0 |
| 42-1 | 2.1 | 1,900 | 3.5 | 0 | 0.0 | 5.6 |
| 20-6 | 2.1 | 1,540 | 2.8 | 0 | 0.0 | 4.9 |
| 40-6 | 2.1 | 2,010 | 3.7 | 0 | 0.0 | 5.8 |
| 31-6 | 2.1 | 1,880 | 3.4 | 0 | 0.0 | 5.5 |
| 11-6[2] | 3.2 | 2,780 | 5.1 | 0 | 0.0 | 8.3 |
| 42-6 | 2.1 | 1,260 | 2.3 | 0 | 0.0 | 4.4 |
| 22-6 | 2.1 | 260 | 0.5 | 0 | 0.0 | 2.6 |
| 33-6 | 2.1 | 3,190 | 5.9 | 0 | 0.0 | 8.0 |
| 44-6 | 2.1 | 740 | 1.4 | 700 | 0.8 | 4.3 |
| 13-6[1] | 2.1 | 1,930 | 2.2 | 0 | 0.0 | 4.3 |
| 1I[1,3] | 0.0 | 1,390 | 1.6 | 1,820 | 2.1 | 3.7 |
| 31I[2] | 0.0 | 0 | 0.0 | 0 | 0.0 | 0.0 |
| 6I[2] | 0.0 | 0 | 0.0 | 0 | 0.0 | 0.0 |
| Xfer Station | 0.7 | 1,130 | 2.1 | 0 | 0.0 | 2.8 |
| CDP | 6.4 | 0 | 0.0 | 0 | 0.0 | 6.4 |
| 44-36 (WY) | 2.1 | 1,620 | 3.0 | 0 | 0.0 | 5.1 |
| Total: | 59.7 | 44,550 | 79.0 | 7,280 | 8.3 | 147.0 |

*Well pad disturbance areas are approximately equal to 300' x 300' (2.1 acres), including stockpiles and cut & fill slopes for all single-well locations. For wells co-located with injection wells (see [2], below), the disturbance areas are approximately equal to 400' x 350' (3.2 acres).
**Assumes new road disturbance and adjacent/parallel pipelines & utilities width equal to 80 feet, unless no adjacent pipeline is proposed (see [1], below).
***Assumes corridor disturbance width equal to 50 feet.
[1]No adjacent pipeline is proposed along this road segment, in which case the disturbance width is assumed to equal 50 feet
[2]Well is co-located with another proposed well (disturbance area accounted for in production wells, and so injection wells are assigned no additional disturbance)
[3]Well is located on an existing disturbed area

The proposed action will result in approximately 220.4 acres of short-term disturbance, comprised of new or reconstructed access roads and adjacent & parallel pipelines and utilities (118.3 acres), drill/well pads (82.0 acres), Central Delivery Point (6.4 acres), water transfer stations (1.4 acres), and non-adjacent pipeline/utility corridors (12.3 acres).

The average per-well disturbance for POD A is 5.2 acres (73.4 acres/14 CBM wells), and for POD B is 6.1 acres (147.0 acres/24 CBM wells). The proposed action is located outside of "Category A" area, and thus is subject to a "disturbance goal" of 6.5 acres per well. Both PODs, then, meet the disturbance goal provided in the AREIS ROD.

Access

The operator proposes to construct new access roads to access the well locations. The new roads will be constructed to BLM specifications for a "Resource Road", as specified in BLM Manual Section 9113.

Adequate drainage structures will be constructed or installed. The travelway will be at least 14 feet wide and will have an average right-of-way width of 50 feet (80 feet, including adjacent & parallel pipeline/utility corridors). The access roads would be reclaimed during production operations to the maintenance width, or to approximately 30 feet in width. Upon completion of the project, unnecessary access roads would be recontoured, ripped, seeded, and revegetated.

In order to construct the access road to POD B, an existing stock pond reservoir will be upgraded to serve as a channel crossing (west of the 11-6/6I location).

Well Site

Should the wells become productive, cut portions of the well site will be backfilled and the unused portions of the well site and soil stockpile sites will be stabilized and reseeded with native vegetation. The well size will be reduced to less than one-half acre for the duration of production operations. Reserve pits will be dried within 180 days. Upon completion of the project, the well pads would be recontoured, ripped, seeded, and revegetated.

Pipeline/Utility Corridors

The pipelines would be buried after construction and the disturbed area reclaimed as soon after construction as reasonable. Upon completion of the project, the pipelines would be evacuated and abandoned in-place. Several pipeline crossings of ephemeral or intermittent channels are proposed (see POD maps).

Produced Water Disposal

Produced water from the proposed action would be gathered to existing water injection facilities within the unitized area. Produced water would be disposed of into the Trout Creek, Cherokee Creek, Deep Creek and Nugget formations.

The existing Water Management Plan also indicates that "The pending water-treatment facility and WPDES permit will also provide an important water management option." This is referring to a proposal under consideration by the RFO ("Catalina Unit CBNG Produced Water Disposal Project EA", WY-030-07-EA-001), and being analyzed under separate NEPA analysis. The proposed action for this EA does not consider surface disposal of produced water under WYPDES #WY0054038. The only means of produced water disposal considered in this action would be by reinjection using disposal wells permitted by the BLM and State of Wyoming.

**No Action Alternative**

NEPA regulations require that alternative analyses in NEPA documents "include the alternative of no action" (40 CFR 1502.14(d)). For this analysis, "no action" means that the BLM would reject the proponent's proposal and "the proposed activity would not take place."

**Potential Environmental Impacts- Proposed Action Alternative**

| Critical Element | Affected Yes | No | Critical Element | Affected Yes | No |
|---|---|---|---|---|---|
| Air Quality | X | | T & E Species | | X |
| ACEC's | | X | Wastes, Hazardous/Solid | X | |
| Cultural Resources | X | | Water Quality | | X |
| Prime/Unique Farmlands | | X | Wetlands/Riparian Zones | X | |
| Floodplains | | X | Wild & Scenic Rivers | | X |
| Native Amer. Rel. Concerns | | X | Wilderness | | X |
| Environmental Justice | | X | Invasive, Nonnative Species | X | |

In addition to the critical elements referenced above, reviews of potential effects upon paleontological-, recreational-, soil-, vegetation-, visual-, and wildlife-resources were conducted. See maps in Figures 4 – 6.

The affected environment and analysis of environmental impacts are discussed in the AREIS to which this EA is tiered.

Air quality impacts are disclosed and analyzed in the AREIS.

Class III cultural resources inventory were conducted for the project areas. Archaeological resources identified will be avoided or, as necessary, a monitor will review construction to ensure no cultural artifacts are disturbed. Both PODs are located outside of the two-mile buffer to contributing segments of historic trails. As such, no additional SHPO consultation is necessary, nor is a visibility analysis required.

Halogeton and other noxious weeds are a significant concern for this project area. COAs have been added to control the spread, establishment, and plant community changes associated with weed infestation.

Portions of the proposed action are located within crucial winter range for mule deer, and within protection buffers of nesting raptors. Two sage grouse leks are known to exist within two miles of the project area. One of the APDs in POD B (#20-6) is located within the ¼-mile buffer of the lek perimeter, and can not be situated to adequately mitigate the potential effects to grouse at the adjacent lek. As a result, authorization of this APD will be deferred until additional mitigation measures have been developed to re-consider the proposal. No mountain plover habitat was identified as being affected within the project area. Seasonal restrictions have been added to the APD authorizations, as appropriate:

### Catalina Unit POD A Wildlife Stips

| Well Name | Raptor[1] | CWR[2] | Grouse[3] |
|---|---|---|---|
| 44-11 | X | X | X |
| 24-12 | X | X | X |
| 13-12 | X | X | X |
| 11-13 | X | X | X |
| 42-13 | X | | X |
| 31-13 | X | | X |
| 22-13 | X | | X |
| 11-18 | X | | X |
| 22-18 | X | | X |
| 31-18 | X | | X |
| 42-18 | X | | X |
| 24-7 | X | | X |
| 33-7 | X | | X |
| 44-7 | X | | |
| Xfer Station | X | | |

### Catalina Unit POD B Wildlife Stips

| Well Name | Raptor[1] | CWR[2] | Grouse[3] |
|---|---|---|---|
| 31-7 | X | | X |
| 42-7 | X | | X |
| 13-31/31I | X | X | X |
| 24-31 | X | X | X |
| 33-31 | X | | X |
| 44-31 | X | | X |
| 13-32 | X | | X |
| 24-32 | X | | X |
| 20-1 | X | X | X |
| 22-1 | X | X | X |
| 31-1 | X | X | X |
| 33-1 | X | X | X |
| 40-1 | X | | X |
| 42-1 | X | | X |
| 40-6 | X | | X |
| 31-6 | X | | X |
| 11-6/6I | X | | X |
| 42-6 | X | | X |
| 22-6 | X | | X |
| 33-6 | X | | X |
| 44-6 | X | | X |
| 13-6 | X | | X |
| 1I | X | X | X |
| Xfer Station | X | | X |
| CDP | X | | X |
| 44-36 (WY) | X | X | X |

[1] Construction, drilling and other activities potentially disruptive to nesting raptors are prohibited during the period of February 1 to July 31 for the protection of raptor nesting areas.

[2]Construction, drilling and other activities potentially disruptive to wintering wildlife are prohibited during the period of November 15 to April 30 for the protection of big game crucial winter habitat.

[3]Construction, drilling, reclamation and other potentially disruptive activities are prohibited during the period of March 1 to July 15 for the protection of sage grouse.

In some instances, the proponent may request consideration of a temporary exception to wildlife seasonal restrictions. Such an exception may be granted if a determination is made that the wildlife resource will not be adversely impacted.

Two pipeline crossings of an ephemeral/intermittent channel are proposed in POD B (from the #44-6 and #31-7 to the water transfer station). These crossings will comply with current BLM policies and mitigation measures appropriate to the crossings (see "Hydraulic Considerations for Pipelines Crossing Stream Channels," BLM Technical Note 423, April 2007).

Site-specific findings by the interdisciplinary review team are provided on the attached review documents.

Description of Impacts:

A discussion of the actions generally associated with drilling projects and their associated impacts may be found in the Atlantic Rim Environmental Impact Statement and Record of Decision.

Hazardous Materials

Double Eagle has indicated that some hazardous materials could be used during drilling, completion, and production of their proposed wells. The term "hazardous material" as used here means: 1) any substance, pollutant, or contaminant (regardless of quantity) listed as hazardous under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) of 1980, as amended, 42 U.S.C. 9601 et seq., and the regulations issued under CERCLA, 2) any hazardous waste as defined in the Resource Conservation and Recovery Act (RCRA) of 1976, as amended, and 3) any nuclear or nuclear byproduct as defined by the Atomic Energy Act of 1954, as amended, 42 U.S.C. 2011 et seq.

It is possible that wastes created or transported during implementation of the proposed action (i.e., waste motor oils, drilling/completion additives) could be accidentally released to the environment. The operator will be required to comply with the Hazardous Materials Management Plan provided in Appendix C of the AREIS. Numerous State and Federal rules and regulations also apply that govern the handling, storage, and disposal of hazardous substances.

Double Eagle or any contracted company working for Double Eagle will have Material Data Safety Sheets available for all chemicals, compounds, or substances which are used during the course of construction, drilling, completion, and production operations for this project. Additionally, all chemicals will be handled in an appropriate manner to minimize the potential for leaks or spills to the environment.

Impacts to soils, surface and groundwater resources, wildlife, vegetation, and human health could result from the accidental exposure of hazardous materials. However, since the project operations will strictly comply with all applicable federal and state laws concerning hazardous materials, the Hazardous Materials Management Plan for this project, and the operator's Spill Prevention Control and Countermeasure Plan, no significant impacts are anticipated.

Reclamation

Reclamation typically commences within 6 months of drilling completion. The drill pads will be reduced to a less than ½-acre production well site at each location. Total reclamation of all new disturbances will take place as the wells and facilities are no longer productive or needed and are plugged and abandoned. Appendix A of the ROD contains the reclamation success criteria by which the reclamation status will be judged. The approved Master Surface Use Plan and Conditions of Approval also contain reclamation measures pertaining to reclamation standards.

Description of Mitigation Measures and Residual Impacts:

Mitigation of potential effects is part of the proposed action, and specific mitigation details can be found in the Master Plan Elements including the Conditions of Approval. Residual impacts resulting from the proposed action would include permanent loss of oil and/or gas reserves should the wells become productive. In addition, the well pads, production equipment, and the access roads could remain in place for 30 years or more (until plugging and abandonment, final reclamation).

**Potential Environmental Impacts- No Action Alternative**

Under the No-Action Alternative, the proposed action would not be authorized.  The 40 wells would not be constructed or drilled, and gas production from the proponent's lease would not occur.  Existing development would continue to occupy the project area, along with impacts associated from the existing development.

**Residual Impacts/Cumulative Impacts:**

The potential residual and cumulative impacts are discussed in the AREIS, Chapter 5, *Cumulative Impacts Analysis*.  The proposed action entails the addition of 40 CBNG wells and appurtenant facilities.

Standard mitigation guidelines are addressed in the ROD's Appendix A, *Project Reclamation Plan*.  Additional mitigation measures are also provided in Appendix B, *Performance-Based Monitoring and Best Management Practices*, and Appendix C, *Operator-Committed Practices*.  All needed mitigation, for that portion of the proposed action on public land, is part of the proposed action.

The access roads and well/production pads may remain visible for a period of approximately 20 to 30 years after they are abandoned and reclaimed.  The oil and gas resource will be permanently lost.  All needed mitigation is part of the proposed action.

## FINDING OF NO SIGNIFICANT IMPACT/DECISION RECORD.

### Decision

I have reviewed this environmental assessment including the explanation and resolution of any potentially significant environmental impacts. I have selected the proposed action alternative with the mitigation measures described below for authorization and implementation. I have determined that the proposed project is in conformance with the approved land use plan. It is my decision to implement the project with the mitigation measures identified below.

### Finding of No Significant Impact

Based upon the analysis of potential environmental impacts contained in the EA, I have determined that the impacts are not expected to be significant, and that an EIS is not required.

### Rationale for Decision

Compared to the No Action Alternative, the Proposed Action Alternative best meets the Purpose & Need and guiding laws, regulations, and directives, including the Federal Land Policy and Management Act (FLPMA, 43 USC 35). The proposed action is in conformance with the Great Divide Resource Management Plan (RMP) and the Atlantic Rim Natural Gas Field Development Project EIS.

### Mitigation Measures/Remarks:

All needed mitigation is part of the proposed action and can be found in the Master Plan Elements and Conditions of Approval. The decision to authorize/deny the APD for the #20-6 (POD B) will be deferred until a new proposal to mitigate potential effects to sage grouse is submitted by the operator, the APD is moved to a satisfactory location, or withdrawn. A total of 39 APDs, then, are authorized under this decision, along with appurtenant access roads, pipelines, utility corridors, water transfer stations, a CDP, and access road/pipeline/utility corridor over BLM-administered public lands to the State well #44-36.

### Monitoring and Compliance

Designated BLM personnel will monitor operations under authorizations for the proposed action as needed to ensure compliance with the Master Plan Elements and Conditions of Approval.

Authorized Official:

_Mark Stuger_                                            **JUN 2 8 2007**

Field Manager                                             Date
Rawlins Field Office

### Appeal

Under BLM regulation this decision is subject to appeal. Under BLM regulation, this decision is subject to administrative review in accordance with 43 CFR 3165. Any request for administrative review of this decision must include information required under 43 CFR 3165.3(b) (State Director Review), including all supporting documentation. Such a request must be filed in writing with the State Director, Bureau of Land Management, P.O. Box 1828, Cheyenne, Wyoming 82003 within 20 business days of the date this Decision Record is received or considered to have been received.



**CatA & CatB**

Catalina POD B

Catalina POD A

**Legend**

| | |
|---|---|
| ○ | Proposed Well |
| ----- | Proposed Pipeline |

**WOGCC Well Data (03/2007)-CA**

| | |
|---|---|
| ⚒ | Injection Well |
| ⊗ | Plugged & Abandoned |
| ✳ | Producing Gas Well |
| ● | Producing Oil Well |
| ⊝ | Shut-In |
| ◇ | Spud |
| ■ | Water Transfer Station |
| ----- | Proposed Road |
| —— | Approved Road |
| ▇ | CDP |

Feet

0    2,000    4,000

1 inch equals 2,000 feet
1:24,000

Drafted By: TDB 06/19/2007

The BLM can not guarantee the accuracy of these data.

U.S. Department of the Interior
Bureau of Land Management
Rawlins, Wyoming





Exhibit 3 to Defendant-Intervenors
Motion To Consolidate and
Memorandum in Support Thereof
EA, Sun Dog Unit PODs A and B,
Approved August 16, 2007



U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT
RAWLINS FIELD OFFICE

AUGUST 13, 2007

**TIERED EA, FONSI, AND DR FORM**



Tiered to & Referencing the Atlantic Rim Natural Gas Development Project Environmental Impact Statement



---

**ENVIRONMENTAL ASSESSMENT**                      **EA NUMBER**: WY-030-07-EA-222

**Lease Numbers**: WYW-116679, WYW-126439, WYW-131778, WYW-141280, WYW-141281, WYW-WYW-147856, WYW-148482, ST-99-357 (State Wells on Federal Surface)

**Proposed Action**:

Sun Dog A & B PODs: Natural Gas Wells, Water Reinjection Wells, Access Roads, Pipeline/Utility Corridors, Water Transfer Station, and associated Infrastructure

**Rawlins Field Office (RFO) Interdisciplinary Team (IDT)**

| IDT Member | Title |
|---|---|
| John Ahlbrandt | Natural Resource Specialist |
| Andy Stone | Hydrologist |
| Patrick Lionberger | Fisheries Biologist |
| Andy Warren | Rangeland Management Specialist |
| Paul Rau | Recreation Planner |
| Frank Blomquist | Wildlife Biologist |
| Nina Trapp | Archaeologist |
| Mark Newman | Geologist |
| Susan Foley | Soil Scientist |
| Hilaire Peck | Civil Engineer |

Prepared By:

_John P. Ahlbrandt_                                        08/15/07

John Ahlbrandt, Natural Resource Specialist;                    Date
Pod ID Team Lead

**Location of Proposed Action (BLM-administered public lands):**

**Sun Dog Unit POD A**

| Well # * | T | R | Sec | Aliquot |
|---|---|---|---|---|
| 2-8 | 16N | 91W | 8 | NWNE |
| 4-8 | 16N | 91W | 8 | NWNW |
| 6-8 | 16N | 91W | 8 | SENW |
| 8-8 | 16N | 91W | 8 | SENE |
| 4-9 | 16N | 91W | 9 | NWNW |
| 12-9 | 16N | 91W | 9 | NWSW |
| 14-9 | 16N | 91W | 9 | SESW |
| 4-17 | 16N | 91W | 17 | NWNW |
| 12-17 | 16N | 91W | 17 | NWSW |
| 12-17I | 16N | 91W | 17 | NWSW |
| 2-19 | 16N | 91W | 19 | NWNE |
| 8-19 | 16N | 91W | 19 | SENE |
| 2-20 | 16N | 91W | 20 | NWNE |
| 14-18 | 16N | 91W | 18 | SESW |
| 4-19 | 16N | 91W | 19 | NWNW |
| 6-19 | 16N | 91W | 19 | SENW |
| 10-19 | 16N | 91W | 19 | NWSE |
| 12-19 | 16N | 91W | 19 | NWSW |
| 4-20 | 16N | 91W | 20 | NWNW |
| 6-20 | 16N | 91W | 20 | SENW |
| 14-20 | 16N | 91W | 20 | SESW |
| 14-20I | 16N | 91W | 20 | SESW |
| 4-21 | 16N | 91W | 21 | NWNW |
| 12-18 | 16N | 91W | 18 | NWSW |
| 10-18 | 16N | 91W | 18 | NWSE |
| 16-18 | 16N | 91W | 18 | SESE |
| (ST)6-16 | 16N | 91W | 16 | SENW |
| (ST)14-16 | 16N | 91W | 16 | SESW |

**Sun Dog Unit POD B**

| Well # * | T | R | Sec | Aliquot |
|---|---|---|---|---|
| 12-4 | 16N | 91W | 4 | NWSW |
| 12-4I | 16N | 91W | 4 | NWSW |
| 14-4 | 16N | 91W | 4 | SESW |
| 10-5 | 16N | 91W | 5 | NWSE |
| 14-5 | 16N | 91W | 5 | SESW |
| 16-5 | 16N | 91W | 5 | SESE |
| 2-9 | 16N | 91W | 9 | NWNE |
| 6-9 | 16N | 91W | 9 | SENE |
| 10-9 | 16N | 91W | 9 | NWSE |
| 16-9 | 16N | 91W | 9 | SESE |
| 8-20 | 16N | 91W | 20 | SENE |
| 10-20 | 16N | 91W | 20 | NWSE |
| 10-4 | 16N | 91W | 4 | NWSE |
| 12-5 | 16N | 91W | 5 | NWSW |
| 12-20 | 16N | 91W | 20 | NWSW |
| 2-21 | 16N | 91W | 21 | NWNE |
| 6-21 | 16N | 91W | 21 | SENW |
| 8-21 | 16N | 91W | 21 | SENE |
| 12-21 | 16N | 91W | 21 | NWSW |
| (ST)2-16 | 16N | 91W | 16 | NWNE |
| (ST)8-16 | 16N | 91W | 16 | SENE |
| (ST)10-16 | 16N | 91W | 16 | NWSE |
| (ST)16-16 | 16N | 91W | 16 | SESE |

* Wells are organized by Lease #

(ST) indicates a State well (State minerals) underlying Federal (BLM) Surface. However, these wells are within the Sun Dog Federal Unit, and therefore will be authorized with this POD package, and not as separate Right(s)-of-Way.

Also see POD Master Surface Use Plan and project maps.

**Applicant/Proponent**: Anadarko E & P Company  (Anadarko)

**Conformance with Land Use Plan**

This proposed action is in conformance with the Great Divide Resource Management Plan (RMP) that was approved on November 8, 1990.  The RMP has been reviewed to determine if the proposed action conforms to the land use plan terms and conditions as required by 43 CFR 1610.5.  Development of oil and gas reserves is in conformance with the RMP.  On page 30, the RMP states "The entire planning area [Great Divide Resource Area] is open to oil and gas leasing".

The development of this project will not affect the achievement of the Wyoming Standards for Healthy Rangelands (August 1997).

Remarks:

The NOSs or APDs for the proposed action were posted for 30 days in the Rawlins Field Office Information Access Center (Public Room) for review. Notification of preparation of this EA was provided on the Wyoming BLM internet NEPA register (http://www.wy.blm.gov/nepa/search).

The Atlantic Rim Area Natural Gas Field Development Project Environmental Impact Statement (AREIS) was written to assess the potential foreseeable and cumulative effects of drilling operations and associated activities in the Project area. The Record of Decision (ROD) for this project was approved on March 23, 2007. The proposed action is in conformance with the AREIS.

The AREIS ROD provides for the drilling of natural gas wells and associated infrastructure, limiting total surface disturbance to 7,600 acres at any one time (not including surface disturbance that occurred prior to implementation of the Interim Drilling Policy). The ROD establishes a goal for per-well surface disturbance of 6.5 acres of short-term disturbance (less in "Category A" areas).

The surface disturbance cap is allocated to operators "…on a prorated mineral leasehold basis." (ROD at Page 2), and development is limited to no more than 8 well sites per 640-acre section. If, in the event an Operator reaches its surface disturbance cap allocation, than "…further disturbance on federal minerals will not be permitted." (ROD at Page 3). The RFO will monitor and track disturbance areas for future proposals, in order to ascertain whether the disturbance cap would be exceeded by future authorizations.

The APDs/Master Surface Use Plan/Master Drilling Plan/Water Management Plan (Master Plan Elements), with Conditions of Approval, contain a complete description of the proposed action. The Master Plan Elements, with Conditions of Approval, are considered an integral part of this Environmental Assessment and are incorporated by reference.

The project (both PODs A & B) is located entirely within a Federal Oil & Gas Unit. No additional rights-of-way are necessary for the proposed action.

## Purpose and Need for Proposed Action

Domestic natural gas production is an integral part of U.S. energy development and conservation plans due to its availability and the presence of existing market delivery infrastructure. Domestic production reduces immediate dependence upon foreign sources of energy, and maintains an adequate and stable supply of fuel to maintain economic well-being, industrial production, and national security. The environmental advantages of burning natural gas are emphasized in the Clean Air Act amendments of 1990.

In addition, the proposed action would allow Anadarko, as leaseholder, to exercise lease rights to explore and develop oil & gas resources within the project lease areas.

For these particular wells, the production is primarily natural gas and produced water from the coal seams.

## Description of Proposed Action Alternative

The proposed action entails the construction and/or reconstruction of access roads and well pads for the purpose of drilling 48 CBNG wells (26 in POD A, 22 in POD B) and 3 produced water re-injection wells (2 in POD A, and 1 in POD B). In addition, the proposed action provides for the construction, use, and reclamation of appurtenant gas & water-gathering pipelines and utility corridors, including such corridors to 6 proposed State wells underlying federal (BLM administered) surface in Section 16 (T16N/R91W). Where feasible and appropriate (and in most cases), the pipeline/utility corridors were located adjacent and parallel to the proposed or existing access roads and existing pipeline disturbances. The maps and illustrations attached to the EA, APDs, and Master Surface Use Plan display the locations of the proposed wells, access roads, gas & water-gathering pipelines, and utility (primarily electrical) corridors.

The CDP (compressor) for POD A and Pod B wells is already constructed and in use, built during exploratory activities (2001). Likewise, no new water transfer facilities are proposed for these pods at this time. If additional water transfer stations are later determined to be necessary, they would be proposed and applied for via a Sundry Notice.

Water for drilling each well would be obtained from existing wells completed in the coal seams of the Mesa Verde Group within the Sun Dog Unit. Water would be hauled by truck to each drill site over existing and proposed roads within the POD. Any changes in the water source or method of transportation would first require written approval by the BLM. To protect any shallow, fresh water aquifers or sources, drilling of surface casing for each well would use either air drilling techniques, or use non-produced (fresh) water from a State permitted local source (Baggs Pond.)

Onsite inspections of the PODs were conducted on October 11-13 and December 15, 2006. Potential impacts to resources were considered and alternate locations considered. As a result of this field inspection, several project components were moved to reduce potential impacts to soils, water resources, vegetation, and wildlife resources.

The location of the proposed development is approximately 28 miles northeast of Baggs, Wyoming, west of Highway 789. Access to the area will be from existing access roads off of 789. New roads will be constructed or reconstructed to access most well locations.

A discussion of the actions generally associated with drilling a well, including (1) a plan of operations, (2) construction of the access road and drilling pad, and (3) pipeline installation, can be located in the following portions of the AREIS or ROD:

- Chapter 2, *Proposed Action and Alternatives (AREIS)*
- Chapter 4, *Analysis of Environmental Consequences (AREIS)*
- Appendix A, *Project Reclamation Plan (ROD)*
- Appendix C, *Operator-Committed Practices (ROD)*

Mitigation and reclamation measures are described in Chapter 4 and Appendix B of the ROD (*Project Performance-Based Monitoring and Best Management Practices*). The following narratives summarize elements specific to the proposed action for this EA.

Construction

Disturbance estimates include the well pad and access road/utility/pipeline corridors for 6 State of Wyoming estate wells located in Section 36 (T17N/R92W) which are located on federal (BLM administered) surface. Portions of the pads unnecessary for production operations will be reclaimed after the production facilities are constructed. The well sites and access roads will be entirely reclaimed after the wells are plugged and abandoned. For the purpose of assessing potential cumulative effects, oil and gas development may be considered long-term as transitory in nature.

POD A

| Well # | Well Pad-Acres* | Road-L. Feet | Road-Acres** | Corridor-Acres*** | SUM-Acres |
|--------|-----------------|--------------|--------------|-------------------|-----------|
| 2-8    | 2.2 | 2383 | 1.6 | 4.4 | 6.6 |
| 4-8    | 2.2 | 2948 | 2.0 | 5.4 | 7.6 |
| 6-8    | 2.2 | 151  | 0.1 | 0.3 | 2.5 |
| 8-8    | 2.2 | 1823 | 1.3 | 3.4 | 5.6 |
| 4-9    | 2.2 | 853  | 0.6 | 1.6 | 3.8 |
| 12-9   | 2.2 | 418  | 0.3 | 0.8 | 3.0 |
| 14-9   | 2.2 | 1270 | 0.9 | 2.3 | 4.5 |
| 4-17   | 2.2 | 2488 | 1.7 | 4.6 | 6.8 |
| 12-17  | 2.2 | 1502 | 1.0 | 2.8 | 5.0 |
| 12-17I | 0.0 | 0    | 0.0 | 0.0 | 0.0 |
| 2-19   | 2.2 | 56   | 0.0 | 0.1 | 2.3 |
| 8-19   | 2.2 | 0    | 0.0 | 0.0 | 0.0 |
| 2-20   | 2.2 | 395  | 0.3 | 0.7 | 2.9 |
| 14-18  | 2.2 | 994  | 0.7 | 1.8 | 4.0 |
| 4-19   | 2.2 | 1878 | 1.3 | 3.5 | 5.7 |
| 6-19   | 2.2 | 279  | 0.2 | 0.5 | 2.7 |
| 10-19  | 2.2 | 3882 | 2.7 | 7.1 | 9.3 |
| 12-19  | 2.2 | 4138 | 2.8 | 7.6 | 9.8 |
| 4-20   | 2.2 | 1324 | 0.9 | 2.4 | 4.6 |
| 6-20   | 2.2 | 178  | 0.1 | 0.3 | 2.5 |

| 14-20 | 2.2 | 742 | 0.5 | 1.4 | 3.6 |
|---|---|---|---|---|---|
| 14-20I | 0.0 | 0 | 0.0 | 0.0 | 0.0 |
| 4-21 | 2.2 | 1691 | 1.2 | 3.1 | 5.3 |
| 12-18 | 2.2 | 3371 | 2.3 | 6.2 | 8.4 |
| 10-18 | 2.2 | 1650 | 1.1 | 3.0 | 5.2 |
| 16-18 | 2.2 | 401 | 0.3 | 0.7 | 2.9 |
| (ST) 6-16 | 2.2 | 273 | 0.2 | 0.5 | 2.7 |
| (ST) 14-16 | 2.2 | 1060 | 0.7 | 2.0 | 4.2 |
| Total: | 52.0 | 36,148 | 24.8 | 66.5 | 118.5 |

*Average well pad disturbance areas are approximately equal to 300' x 320' (2.2 acres), including stockpiles and cut & fill slopes for all single-well locations. No additional disturbance is associated with injection wells, since they are co-located on the same pad with the respective producing well(s).
**Assumes 30' roadway disturbance.
***Assumes 80' overall corridor disturbance (road plus utilities) for all wells.

POD B

| Well # | Well Pad-Acres* | Road-L. Feet | Road-Acres** | Corridor-Acres*** | SUM-Acres |
|---|---|---|---|---|---|
| 12-4 | 2.2 | 542 | 0.4 | 1.0 | 3.2 |
| 12-4I | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| 14-4 | 2.2 | 1051 | 0.7 | 1.9 | 4.1 |
| 10-5 | 2.2 | 3928 | 2.7 | 7.2 | 9.4 |
| 14-5 | 2.2 | 2273 | 1.6 | 4.1 | 6.3 |
| 16-5 | 2.2 | 174 | 0.1 | 0.3 | 2.5 |
| 2-9 | 2.2 | 467 | 0.3 | 0.9 | 3.1 |
| 6-9 | 2.2 | 1744 | 1.2 | 3.2 | 5.4 |
| 10-9 | 2.2 | 676 | 0.5 | 1.2 | 3.4 |
| 16-9 | 2.2 | 663 | 0.5 | 1.2 | 3.4 |
| 8-20 | 2.2 | 1922 | 1.3 | 3.5 | 5.7 |
| 10-20 | 2.2 | 1418 | 1.0 | 2.6 | 4.8 |
| 10-4 | 2.2 | 4829 | 3.3 | 8.9 | 11.1 |
| 12-5 | 2.2 | 603 | 0.4 | 1.1 | 3.3 |
| 12-20 | 2.2 | 764 | 0.5 | 1.4 | 3.6 |
| 2-21 | 2.2 | 858 | 0.6 | 1.6 | 3.8 |
| 6-21 | 2.2 | 1973 | 1.4 | 3.6 | 5.8 |
| 8-21 | 2.2 | 19 | 0.0 | 0.0 | 2.2 |
| 12-21 | 2.2 | 1417 | 1.0 | 2.6 | 4.8 |
| (ST) 2-16 | 2.2 | 148 | 0.1 | 0.3 | 2.5 |
| (ST) 8-16 | 2.2 | 1839 | 1.3 | 3.4 | 5.6 |
| (ST) 10-16 | 2.2 | 219 | 0.2 | 0.4 | 2.6 |
| (ST) 16-16 | 2.2 | 697 | 0.5 | 1.3 | 3.5 |
| Total: | 48.4 | 28,224 | 19.6 | 51.7 | 100.1 |

*Average well pad disturbance areas are approximately equal to 300' x 320' (2.2 acres), including stockpiles and cut & fill slopes for all single-well locations. No additional disturbance is associated with injection wells, since they are co-located on the same pad with the respective producing well(s).
**Assumes 30' roadway disturbance.
***Assumes 80' overall corridor disturbance (road plus utilities) for all wells.

The proposed action (for both POD A and Pod B) will result in approximately 218.6 acres of short-term disturbance, comprised of new or reconstructed access roads and adjacent & parallel pipelines and utilities, as detailed above.

The average per-well disturbance for POD A is 4.2 acres (118.5 acres/28 CBM wells), and similarly, for POD B is 4.4 acres (100.1 acres/23 CBM wells). The proposed action is located outside of "Category A" area, and thus is subject to a "disturbance goal" of 6.5 acres per well. Both PODs, then, meet the disturbance goal provided in the AREIS ROD.

Access

The operator proposes to construct new access roads to access the well locations. The new roads will be constructed to BLM specifications for a "Resource Road", as specified in BLM Manual Section 9113. Adequate drainage structures will be constructed or installed. The travelway will be at least 14 feet wide and will have an average right-of-way width of 50 feet (80 feet, including adjacent & parallel pipeline/utility corridors). The access roads would be reclaimed during production operations to the maintenance width, or to approximately 30 feet in width. Upon completion of the project, unnecessary access roads would be recontoured, ripped, seeded, and revegetated.

Well Site

Should the wells become productive, cut portions of the well site will be backfilled and the unused portions of the well site and soil stockpile sites will be stabilized and reseeded with native vegetation. The well size will be reduced to less than one-half acre for the duration of production operations. Reserve pits will be dried within 180 days. Upon completion of the project, the well pads would be recontoured, ripped, seeded, and revegetated.

Pipeline/Utility Corridors

The pipelines would be buried after construction and the disturbed area reclaimed as soon after construction as reasonable. Upon completion of the project, the pipelines would be evacuated and abandoned in-place.

Produced Water Disposal

The only means of produced water disposal considered in this action would be by re-injection using disposal wells permitted by the BLM and State of Wyoming, and would be disposed of into the Haystack Mountain Formation of the Mesaverde Group.

Produced water from the proposed action would be gathered to existing and/or new water injection facilities within the unitized area.

At new injection facilities, it is anticipated that subsurface water sumps will be constructed in lie of above ground storage tanks. Any modifications to this proposal will be submitted via a Sundry Notice for review prior to approval.

Monitoring wells

As described and detailed in Appendix B of the Atlantic Rim ROD and the Sun Dog Water Management Plan, the Unit Operator shall be responsible for drilling, completing, and equipping one set of three shallow groundwater-monitoring wells completed in water-bearing sandstone units stratigraphically above the principle producing coal beds in the upper Mesaverde Group prior to production of any of the wells in the two PODs.

**No Action Alternative**

NEPA regulations require that alternative analyses in NEPA documents "include the alternative of no action" (40 CFR 1502.14(d)). For this analysis, "no action" means that the BLM would reject the proponent's proposal and "the proposed activity would not take place."

**Potential Environmental Impacts- Proposed Action Alternative**

| Critical Element | Affected Yes | No | Critical Element | Affected Yes | No |
|---|---|---|---|---|---|
| Air Quality | X | | T & E Species | | X |
| ACEC's | | X | Wastes, Hazardous/Solid | X | |
| Cultural Resources | X | | Water Quality | | X |
| Prime/Unique Farmlands | | X | Wetlands/Riparian Zones | X | |
| Floodplains | | X | Wild & Scenic Rivers | | X |
| Native Amer. Rel. Concerns | | X | Wilderness | | X |
| Environmental Justice | | X | Invasive, Nonnative Species | X | |

In addition to the critical elements referenced above, reviews of potential effects upon paleontological-, recreational-, soil-, vegetation-, visual-, and wildlife-resources were conducted.

The affected environment and analysis of environmental impacts are discussed in the AREIS to which this EA is tiered.

Air quality impacts are disclosed and analyzed in the AREIS.

Halogeton and other noxious weeds are a significant concern for this project area. COAs have been added to control the spread, establishment, and plant community changes associated with weed infestation.

Cultural:
Class III cultural resources inventory were conducted for the project areas. Archaeological resources identified will be avoided or, as necessary, a monitor will review construction to ensure no cultural artifacts are disturbed. Both PODs have wells and infrastructure located inside of the two-mile buffer of contributing segments of a historic trail ("Rawlins to Baggs Road"). As a result, SHPO consultation was necessary and a visibility analysis required on those well locations and related infrastructure. The AREIS also required a "Programmatic Agreement" or "Memorandum of Agreement" between the affected parties, i.e. landowner (BLM), operator and SHPO to address the necessary mitigation to minimize impact to the trail view-shed from these wells and associated disturbances. As a result, restrictions or stipulations in the form of COA were added to the MSUP APD authorizations as appropriate. Those stipulations are summarized below:

For all wells and associated infrastructure in POD A and B:
1) Standard cultural stip (under general permitting requirements)
2) All surface facilities will be painted a color compatible with the local environment.
3) The access road will be surfaced with material compatible with the local environment.
4) The Operator shall select and use a seed mix most applicable to each disturbed location, with the goal of restoring individual sites to closely resemble the pre-disturbance native plant communities, as provided in Appendix A of the ROD, "Project Reclamation Plan."

Additional mitigation measures are stipulated for individual wells and/or infrastructure within two-miles of the Rawlins-Baggs Road which have viewshed or visibility concerns, which include:
POD A wells: 2-8; 4-8; 4-9; 14-9; 14-16; 4-17; 16-18; 6-19; 8-19; 10-19; 12-19; 2-20; 4-20; 6-20; 14-20; 14-20I; 4-21
POD B wells: 10-4; 12-4; 12-4I; 16-5; 6-9; 10-9; 16-9; 2-16; 8-16; 10-16; 16-16; 8-20; 10-20; 12-20; 2-21; 6-21; 8-21; 12-21.

These additional mitigation measures include:
1) Unless otherwise authorized, the pipelines/utilities will be plowed or ripped into the un-bladed surface (using technology that does not require trenching). If such techniques are infeasible due to terrain or geology, the surface will be brush-hogged and the utilities will be placed no farther than the outside edge of the ditch slope.
2) No blading will be allowed outside the staked well location for placement or removal of the topsoil stockpile.

Other, site-specific Conditions of Approval (such as archaeological monitor, barrier fencing, etc.), are also applied, as applicable.

Wildlife:
Summarized in the tables below are the seasonal wildlife timing stipulations which will be applied to the subject wells.

**Sun Dog Unit POD A Wildlife Stipulations**

| Well # | Raptor[1] | Grouse[2] | Mt.Plover[3] | CWR[4] |
|--------|-----------|-----------|--------------|--------|
| 2-8    | X         | X         |              |        |
| 4-8    | X         | X         |              |        |
| 6-8    | X         | X         |              |        |
| 8-8    | X         | X         | X            |        |
| 4-9    | X         | X         | X            |        |
| 12-9   |           | X         | X            |        |
| 14-9   |           | X         | X            |        |
| 4-17   | X         |           |              |        |

| 12-17 | X | X | | |
| 12-17I | X | X | | |
| 2-19* | X | X | | |
| 8-19 | X | X | | |
| 2-20 | | X | | |
| 14-18 | X | X | | |
| 4-19 | X | X | | |
| 6-19 | X | X | | |
| 10-19 | X | X | | |
| 12-19 | X | X | | X |
| 4-20 | X | X | X | |
| 6-20 | X | X | | |
| 14-20 | X | X | | |
| 14-20I | X | X | | |
| 4-21 | | X | | |
| 12-18 | X | X | | |
| 10-18 | X | X | X | |
| 16-18 | X | X | | |
| 6-16* | | X | X | |
| 14-16 | | X | | |

### Sun Dog Unit POD B Wildlife Stipulations

| Well # | Raptor[1] | Grouse[2] | Mt.Plover[3] | CWR[4] |
|--------|-----------|-----------|--------------|--------|
| 12-4 | X | X | | |
| 12-4I | X | X | | |
| 14-4 | X | X | | |
| 10-5 | X | X | | |
| 14-5 | X | X | | |
| 16-5 | X | X | | |
| 2-9 | | X | | |
| 6-9 | | X | X | |
| 10-9 | | X | X | |
| 16-9 | | X | X | |
| 8-20 | | X | | |
| 10-20 | X | X | X | |
| 10-4 | X | X | | |
| 12-5 | X | X | | |
| 12-20 | X | X | X | |
| 2-21 | X | X | X | |
| 6-21 | | X | | |
| 8-21 | X | X | | |
| 12-21 | | X | X | |
| 2-16 | | X | X | |
| 8-16* | X | X | X | |
| 10-16 | X | X | | |
| 16-16 | X | X | X | |

* Black-footed ferret surveys were conducted for these locations and/or access roads.

[1] Construction, drilling and other activities potentially disruptive to nesting raptors are prohibited during the period of February 1 to July 31 for the protection of raptor nesting areas.

[2] Construction, drilling, reclamation and other potentially disruptive activities are prohibited during the period of March 1 to July 15 for the protection of sage grouse.

[3] Construction, drilling, and other activities are prohibited during the reproductive period of April 10 to July 10 for the protection of nesting plover.

[4] Construction, drilling and other activities potentially disruptive to wintering wildlife are prohibited during the period of November 15 to April 30 for the protection of big game crucial winter habitat.

In some instances, the proponent may request consideration of a temporary exception to wildlife seasonal restrictions. Such an exception may be granted if a determination is made that the wildlife resource will not be adversely impacted.

Black-footed ferret surveys were conducted for the 2-19, 6-16, and 8-16 locations and/or access roads. These individual sites fell within areas where white-tailed prairie dog towns (within the Dad BFF non-block cleared area) could not be avoided. The results of the BFF surveys were negative, and the USFWS has subsequently concurred with our "may affect, not likely to adversely affect" determination, thereby allowing the project to proceed as proposed.

Site-specific findings by the interdisciplinary review team are provided on the attached review documents, and are incorporated into Conditions of Approval, as applicable.

Description of Impacts:

A discussion of the actions generally associated with drilling projects and their associated impacts may be found in the Atlantic Rim Environmental Impact Statement and Record of Decision.

Hazardous Materials

Anadarko has indicated that some hazardous materials could be used during drilling, completion, and production of their proposed wells. The term "hazardous material" as used here means: 1) any substance, pollutant, or contaminant (regardless of quantity) listed as hazardous under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) of 1980, as amended, 42 U.S.C. 9601 et seq., and the regulations issued under CERCLA, 2) any hazardous waste as defined in the Resource Conservation and Recovery Act (RCRA) of 1976, as amended, and 3) any nuclear or nuclear byproduct as defined by the Atomic Energy Act of 1954, as amended, 42 U.S.C. 2011 et seq.

It is possible that wastes created or transported during implementation of the proposed action (i.e., waste motor oils, drilling/completion additives) could be accidentally released to the environment. The operator will be required to comply with the Hazardous Materials Management Plan provided in Appendix C of the AREIS. Numerous State and Federal rules and regulations also apply that govern the handling, storage, and disposal of hazardous substances.

Anadarko or any contracted company working for Anadarko will have Material Data Safety Sheets available for all chemicals, compounds, or substances which are used during the course of construction, drilling, completion, and production operations for this project. Additionally, all chemicals will be handled in an appropriate manner to minimize the potential for leaks or spills to the environment.

Impacts to soils, surface and groundwater resources, wildlife, vegetation, and human health could result from the accidental exposure of hazardous materials. However, since the project operations will strictly comply with all applicable federal and state laws concerning hazardous materials, the Hazardous Materials Management Plan for this project, and the operator's Spill Prevention Control and Countermeasure Plan, no significant impacts are anticipated.

Reclamation

Reclamation typically commences within 6 months of drilling completion. The drill pads will be reduced to a less than ½-acre production well site at each location. Total reclamation of all new disturbances will take place as the wells and facilities are no longer productive or needed and are plugged and abandoned. Appendix A of the ROD contains the reclamation success criteria by which the reclamation status will be judged. The approved Master Surface Use Plan and Conditions of Approval also contain reclamation measures pertaining to reclamation standards.

Description of Mitigation Measures and Residual Impacts:

Mitigation of potential effects is part of the proposed action, and specific mitigation details can be found in the Master Plan Elements including the Conditions of Approval. Residual impacts resulting from the proposed action would include permanent loss of oil and/or gas reserves should the wells become productive. In addition, the well pads, production equipment, and the access roads could remain in place for 30 years or more (until plugging and abandonment, final reclamation).

**Potential Environmental Impacts- No Action Alternative**

Under the No-Action Alternative, the proposed action would not be authorized. The 51 wells would not be constructed or drilled, and gas production from the proponent's lease would not occur. Existing development would continue to occupy the project area, along with impacts associated from the existing development.

**Residual Impacts/Cumulative Impacts:**

The potential residual and cumulative impacts are discussed in the AREIS, Chapter 5, *Cumulative Impacts Analysis*. The proposed action entails the addition of 51 CBNG wells (including 3 injection wells, and 6 State CBNG wells on Federal Surface) and appurtenant facilities.

Standard mitigation guidelines are addressed in the ROD's Appendix A, *Project Reclamation Plan*. Additional mitigation measures are also provided in Appendix B, *Performance-Based Monitoring and Best Management Practices,* and Appendix C, *Operator-Committed Practices*. All needed mitigation, for that portion of the proposed action on public land, is part of the proposed action.

The access roads and well/production pads may remain visible for a period of approximately 20 to 30 years after they are abandoned and reclaimed. The oil and gas resource will be permanently lost. All needed mitigation is part of the proposed action.

**FINDING OF NO SIGNIFICANT IMPACT/DECISION RECORD.**

**Decision**

I have reviewed this environmental assessment including the explanation and resolution of any potentially significant environmental impacts. I have selected the proposed action alternative with the mitigation measures described below for authorization and implementation. I have determined that the proposed project is in conformance with the approved land use plan. It is my decision to implement the project with the mitigation measures identified below.

**Finding of No Significant Impact**

Based upon the analysis of potential environmental impacts contained in the EA, I have determined that the impacts are not expected to be significant, and that an EIS is not required.

**Rationale for Decision**

Compared to the No Action Alternative, the Proposed Action Alternative best meets the Purpose & Need and guiding laws, regulations, and directives, including the Federal Land Policy and Management Act (FLPMA, 43 USC 35). The proposed action is in conformance with the Great Divide Resource Management Plan (RMP) and the Atlantic Rim Natural Gas Field Development Project EIS.

**Mitigation Measures/Remarks:**

All needed mitigation is part of the proposed action and can be found in the Master Plan Elements and Conditions of Approval. A total of 45 federal APDs/wells (including three injection wells), as well as 6 State wells underlying BLM- administered surface (all within the Sun Dog Federal Unit), are authorized under this decision, along with appurtenant access roads, pipelines, utility corridors, and other described infrastructure.

Approval of Sun Dog PODs A and B only authorizes the Sun Dog Water Management Plan (WMP) to the extent of, and as applicable to, the wells within these two PODs. It does not approve the WMP in its entirety for the remaining Sun Dog PODs (C, D, and E).

**Monitoring and Compliance**

Designated BLM personnel will monitor operations under authorizations for the proposed action as needed to ensure compliance with the Master Plan Elements and Conditions of Approval.

Authorized Official:

Deborah K. Johnson                     aug. 16, 2007

Acting Field Manager
Rawlins Field Office                          Date

**Appeal**

Under BLM regulation this decision is subject to appeal. Under BLM regulation, this decision is subject to administrative review in accordance with 43 CFR 3165. Any request for administrative review of this decision must include information required under 43 CFR 3165.3(b) (State Director Review), including all supporting documentation. Such a request must be filed in writing with the State Director, Bureau of Land Management, P.O. Box 1828, Cheyenne, Wyoming 82003 within 20 business days of the date this Decision Record is received or considered to have been received.

Exhibit 4 to Defendant-Intervenors
Motion To Consolidate and
Memorandum in Support Thereof
EA, Sun Dog Unit POD C,
Approved October 23, 2007



U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT
RAWLINS FIELD OFFICE



TIERED EA, FONSI, AND DR FORM

Tiered to and Referencing the Atlantic Rim Natural Gas Development Project Environmental Impact Statement

---

**ENVIRONMENTAL ASSESSMENT**                     **EA NUMBER**: WY-030-07-EA-231

**Lease Numbers**: WYW-128664, 131778, 133656, 141279, 141280, 141281, and 163348

**Proposed Action**:

Sun Dog Unit C Plan of Development (POD), which includes: 13 Coal Bed Methane Natural Gas Wells and 1 Water Re-injection Well with Access Roads, Pipeline/Utility Corridors, and related infrastructure.

**Applicant/Proponent**: Anadarko E & P Company

**BLM Rawlins Field Office (RFO) Interdisciplinary (Review) Team (IDT)**

| POD IDT Members | Title |
| --- | --- |
| Ben Toole | Wildlife Biologist |
| Pam Murdock | Archaeologist |
| Andy Stone | Hydrologist |
| Hillaire Peck | Civil Engineer |
| TJ Murry | Rangeland Management Specialist |
| Gary McDonald | Natural Resource Specialist |

Prepared By:

_Laura Gianakos for_

Gary McDonald, Sun Dog D/E POD IDT Lead

October 23, 2007
Date

**Location of Wells and Proposed Action (BLM-administered public lands)**:

**Sun Dog Unit POD "C"**

|   | Well # | Aliquot | Sec | T | R |
|---|--------|---------|-----|---|---|
| 1 | 4-15 | NWNW | 15 | 16N | 91W |
| 2 | 12-15 | NWSW | 15 | 16N | 91W |
| 3 | 16-19 | SESE | 19 | 16N | 91W |
| 4 | 16-20 | SESE | 20 | 16N | 91W |
| 5 | 10-21 | NWSE | 21 | 16N | 91W |
| 6 | 14-21 | SESW | 21 | 16N | 91W |
| 7 | 14-21i | SESW | 21 | 16N | 91W |
| 8 | 4-22 | NWNW | 22 | 16N | 91W |
| 9 | 12-22 | NWSW | 22 | 16N | 91W |
| 10 | 4-28 | NWNW | 28 | 16N | 91W |
| 11 | 2-29 | NENE | 29 | 16N | 91W |
| 12 | 4-29 | NWNW | 29 | 16N | 91W |
| 13 | 6-29 | SENW | 29 | 16N | 91W |
| 14 | 8-29 | SENE | 29 | 16N | 91W |

**Conformance with Land Use Plan**

This proposed action is in conformance with the Great Divide Resource Management Plan (RMP) that was approved on November 8, 1990. The RMP has been reviewed to determine if the proposed action conforms to the land use plan terms and conditions as required by 43 CFR 1610.5. Development of oil and gas reserves is in conformance with the RMP. On page 30, the RMP states "The entire planning area [Great Divide Resource Area] is open to oil and gas leasing".

The development of this project will not affect the achievement of the Wyoming Standards for Healthy Rangelands (August 1997).

Remarks:

The NOS or APD for the proposed action were posted for 30 days (beginning 04/06/2007) in the Rawlins Field Office Information Access Center (Public Room) for review. Notification of preparation of this EA was provided on the Wyoming BLM internet NEPA register (http://www.wy.blm.gov/nepa/search).

The Atlantic Rim Area Natural Gas Field Development Project Environmental Impact Statement (AREIS) was written to assess the potential foreseeable and cumulative effects of drilling operations and associated activities in the Project area. The Record of Decision (ROD) for this project was approved on March 23, 2007. The proposed action is in conformance with the AREIS.

The AREIS ROD provides for the drilling of natural gas wells and associated infrastructure, limiting total surface disturbance to 7,600 acres at any one time (not including surface disturbance that occurred prior to implementation of the Interim Drilling Policy). The ROD establishes a goal for per-well surface disturbance of 6.5 acres of short-term disturbance (less in "Category A" areas).

The surface disturbance cap is allocated to operators "…on a prorated mineral leasehold basis." (AR ROD, Page 2), and development is limited to no more than 8 well sites per 640-acre section. If in the event an Operator reaches the surface disturbance cap allocation, then "…further disturbance on federal minerals will not be permitted." (AR ROD, Page 3). The RFO will monitor and track disturbance areas for future proposals, in order to ascertain whether the disturbance cap would be exceeded by any future authorizations.

The APD's, Master Drilling Plan and Master Surface Use Plan with Water Management Plan and Conditions of Approval, contain a complete description of the proposed action. The Master Drilling and Surface Use Plans with associated documents and the Conditions of Approval are considered an integral part of this Environmental Assessment and are incorporated by reference.

Modifications, or alternatives, to the original proposal received from the operator were identified as the

result of the pre-approval onsite inspections. At the on-sites, all areas of proposed surface disturbance were inspected to ensure that potential impacts to resources would be reduced. In some cases, access roads were re-routed, and well locations, pipelines, and other water management control structures were moved, modified, or dropped from further consideration to alleviate or reduce environmental impacts. In addition, site specific mitigation and/or Conditions of Approval have been applied to alleviate or reduce environmental effects of the operator's proposal. Onsite changes, implementation of committed mitigation measures contained in the Master Surface Use Plan, Drilling Program and Water Management Plan, and site specific and Standard COAs are incorporated and analyzed in the Proposed Action Alternative.

All POD C wells are located entirely within a Federal Oil and Gas Unit, the Sun Dog Unit, and as result no additional rights-of-way are required as part of the proposed action.

**Purpose and Need for Proposed Action**

Domestic natural gas production is an integral part of U.S. energy development and conservation plans due to its availability and the presence of existing market delivery infrastructure. Domestic production reduces immediate dependence upon foreign sources of energy, and maintains an adequate and stable supply of fuel to maintain economic well-being, industrial production, and national security. The environmental advantages of burning natural gas are emphasized in the Clean Air Act amendments of 1990.

In addition, the proposed action would allow Anadarko, as leaseholder, to exercise lease rights to explore and develop oil and gas resources within the project lease areas.

For these particular wells, the production is primarily natural gas and produced water from coal seams.

**Development of Alternatives**

In reviewing the proponent's submitted proposal (APDs, Master Surface Use Plan, Master Drilling Plan, Water Management Plan, etc.), the BLM conducted onsite reviews and considered known and potentially-occurring resources and conditions in the project area. As a result of this review, project components were moved, added, or eliminated in order to reduce potential environmental impacts, and in accordance with BLM policy and accepted Best Management Practices (BMPs). This resulted in the alteration of the proponent's submitted proposal to yield the Proposed Action, which incorporates the changes from the onsite inspections, BLM review, and mandated BLM mitigations (Conditions of Approval). The Proposed Action, then, differs from the original proposal submitted by the proponent. Since the proponent has agreed, by re-submission of the applications and POD plans, to the changes agreed upon as a result of the onsite inspections and BLM review, the Proposed Action represents a *de facto* alternative to the original submittal.

The EIS considered several alternatives to development of the oil & gas resources in the project area (see DEIS, Pages S2-S3 and FEIS Page 1-20).

The BLM interdisciplinary team, in review of this Proposed Action (as modified during onsite inspections and subsequent review), identified no unresolved resource conflicts that would necessitate development of additional alternatives.

**Description of Proposed Action Alternative**

The proposed action includes the construction and/or reconstruction of access roads and the construction of well pads for the purpose of drilling 13 CBNG wells and 1 produced water re-injection well. In addition, the proposed action also includes the construction, operation and reclamation of associated underground gas gathering/sales pipelines, produced water-gathering pipelines and power-lines and utility corridors. The majority of pipeline/utility corridors are located adjacent and parallel to the proposed or existing access roads and existing pipeline disturbances, except where not feasible and appropriate and surface disturbance would be increased. The maps and illustrations attached to the APDs and Master Surface Use Plan display the locations of the proposed wells, access roads, gas and water-gathering pipelines, power-line (electrical) and other utility (gas and water) corridors.

Any additional facilities later determined to be necessary would be proposed and applied for via a Sundry Notice.

Water for drilling each well would be obtained from existing wells completed in the coal seams of the Mesa Verde Group within the Sun Dog Unit. Water would be hauled by truck to each drill site over existing and proposed roads within the POD. Any changes in the water source or method of transportation would first require written approval by the BLM. To protect any shallow, fresh water aquifers or sources, drilling of surface casing for each well would use either air drilling techniques, or use non-produced (fresh) water from a State permitted local source.

Onsite inspections of the POD wells, well pads, access roads and pipeline/utility corridors were conducted on May 1, 2, 3 and 23, 2007. Potential impacts to resources from the location of the well pads, access roads and corridors were reviewed and assessed. As a result, numerous pads, roads and corridors were relocated to reduce potential impacts to soils, vegetation, water, wildlife (including fisheries), cultural and recreational resources.

The location of the proposed development is approximately 22 miles north/northeast of Baggs, Wyoming, east of Highway 789. Access to the area will be from existing County Road 608 to the east off of Highway 789. Some existing roads will be reconstructed and new roads will be constructed to access well locations.

A discussion of the actions generally associated with drilling a well, including (1) a plan of operations, (2) construction of the access road and drilling pad, and (3) pipeline installation, can be located in the following portions of the AREIS or ROD:

- Chapter 2, Proposed Action and Alternatives (AREIS)
- Chapter 4, Analysis of Environmental Consequences (AREIS)
- Appendix A, Project Reclamation Plan (ROD)
- Appendix C, Operator-Committed Practices (ROD)

Mitigation and reclamation measures are described in Chapter 4 and Appendix B of the ROD (Project Performance-Based Monitoring and Best Management Practices). The following narratives summarize elements specific to the proposed action for this EA.

<u>Construction</u>

Well access roads, drill pads and pipeline/utility corridors must be constructed and or re-constructed in order to drill and complete operating and producing coal bed natural gas wells. This is considered a short-term disturbance. Upon completion of a well as a producer and placing into production (gas sales), portions of the well (drill) pad not needed for production operations will be reclaimed to a production pad. Upon the completion of installation of the pipelines/utilities the pipeline/utility corridors will be finally reclaimed. Upon the successful interim reclamation of the areas of the well pad and access/utility corridors not needed for production operations, the remaining surface disturbance is considered as long-term. The entire well pad, access road and pipeline/utility corridor will be totally reclaimed subsequent to well plugging and abandonment under final reclamation.

Surface disturbance estimates for C POD including the well pads and access road/utility/pipeline corridors and are presented in the Table below:

| Sun Dog C | Short Term Disturbance Areas | | | | |
|---|---|---|---|---|---|
| Well # | Well Pad-Acres* | Road-L. Feet | Corridor-Acres** | Road-Acres*** | SUM- Acres |
| 4-15 | 2.2 | 984 | 0.68 | 1.13 | 4.01 |
| 12-15 | 2.2 | 244 | 0.17 | 0.28 | 2.65 |
| 16-19 | 2.2 | 1219 | 0.84 | 1.40 | 4.44 |
| 16-20 | 2.2 | 1155 | 0.80 | 1.33 | 4.33 |
| 14-21i | 0 | 0 | 0.00 | 0.00 | 0.00 |
| 10-21 | 2.2 | 255 | 0.18 | 0.29 | 2.67 |
| 14-21 | 2.2 | 280 | 0.19 | 0.32 | 2.71 |
| 4-22 | 2.2 | 25 | 0.02 | 0.03 | 2.25 |

| | | | | | |
|---|---|---|---|---|---|
| 12-22 | 2.2 | 1376 | 0.95 | 1.58 | 4.73 |
| 4-28 | 2.2 | 318 | 0.22 | 0.37 | 2.79 |
| 2-29 | 2.2 | 1107 | 0.76 | 1.27 | 4.23 |
| 4-29 | 2.2 | 610 | 0.42 | 0.70 | 3.32 |
| 6-29 | 2.2 | 39 | 0.03 | 0.04 | 2.27 |
| 8-29 | 2.2 | 278 | 0.19 | 0.32 | 2.71 |
| Total | 28.6 | 7890 | 5.4 | 9.1 | 43.1 |

* Well pad surface disturbance areas are approximately 2.2 acres, including spoil piles and cut/fill slopes. Injection wells (i) are co-located on same pad with production wells representing no additional surface disturbance.
** This assumes a corridor surface disturbance with widths equal to 30 feet.
***.This assumes new road surface disturbance with widths equal to 50 feet.

The proposed action will result in approximately 43 acres of short-term disturbance, comprised of new or reconstructed access roads and adjacent and parallel pipelines and utilities, as detailed above.

The average short-term per-well disturbance for POD C is 3.5 acres  The proposed action is located outside of "Category A" area, and thus is subject to a "disturbance goal" of 6.5 acres per well.  This POD, then, meets the disturbance goal provided in the AREIS ROD.

Access

The operator proposes to construct new or reconstruct existing access roads to the proposed well locations. The new constructed or reconstructed roads will be constructed to meet BLM specifications for a "Resource Road", as specified in BLM Manual Section 9113.  Proper drainage structures will be constructed/installed along the access roads. The width of the access road travel-way (travel surface) will be a minimum of 14 feet within an average right-of-way width of 40 to 50 feet. Unless prohibited by terrain and or excessive surface disturbance or other such circumstances the access road right-of-way will be combined with the pipeline/utility right-of-way into a road/utility corridor that will be a total of 80 feet in width.  In addition, some local connector or collector roads between multiple well locations will be constructed to a minimum 16-20 feet wide travel width within the 80 feet wide corridor.

The access roads including utility corridors would be reclaimed during production operations to the maintenance width of approximately 30 to 40 feet. Utility corridors upon completion of pipeline/power-line installation along with any unneeded access road would be recontoured, ripped, seeded, and revegetated.

Well Sites

In order to drill and complete the wells an approximate 220 by 300 or 220 by 350 feet 1.8 or 2.0 acre drill pad will be constructed for each well location. Some well locations will also include an additional produced water injection well, identified by an "i" at the end of the well number. In the event the wells become producers, cut and fill portions of the well site will be brought back to grade and reclaimed along with any other unneeded portions of the well site. Soil stockpiles will be re-spread or stabilized, and reseeded with native vegetation. The well pad will be reduced to less than one-half acre for the duration of production operations.  Unless otherwise authorized and in conjunction with interim pad reclamation, the reserve pits will have been dried and backfilled within 180 days of well completion or plugging and abandonment.  The entire well pad will be recontoured, ripped, seeded, and revegetated during final reclamation upon final plugging and abandonment.

Pipeline/Utility Corridors

The produced water and gas sales and gathering pipelines and power-lines would be buried upon completion of construction and installation, and the surface disturbed areas reclaimed soon thereafter. Upon well plugging and abandonment and or pipeline/power-line abandonment, the pipelines/power-lines would be properly abandoned in accordance with BLM procedures for abandonment and the right-of-ways and corridors adequately reclaimed.  Major crossings of drainages have been engineered to insure design/construction adequacy and erosion protection. All channel crossings will comply with current BLM policies and mitigation

measures appropriate to the crossings (see "Hydraulic Considerations for Pipelines Crossing Stream Channels," BLM Technical Note 423, April 2007).

<u>Produced Water Disposal</u>

Produced water from the proposed wells would be gathered and transported via buried water pipelines to existing and proposed water re-injection wells within the POD and the Sun Dog Unit. Produced water collection, transport and disposal, is addressed in detail in the MSUP and appended Sun Dog Unit Water Management Plan (WMP).

The only method of produced water disposal considered and analyzed under the "proposed action" and this EA is subsurface re-injection using underground injection disposal wells permitted by the State of Wyoming and approved by BLM.

At new injection facilities, it is anticipated that subsurface water sumps will be constructed in lieu of above ground storage tanks.  Any modifications to this proposal will be submitted via a Sundry Notice for review prior to approval.

<u>Monitoring wells</u>

As described and detailed in Appendix B of the Atlantic Rim ROD and the Sun Dog Water Management Plan, the Unit Operator shall be responsible for drilling, completing, and equipping one set of three shallow groundwater-monitoring wells completed in water-bearing sandstone units stratigraphically above the principle producing coal beds in the upper Mesaverde Group prior to production of any of the wells in the two PODs.

**No Action Alternative**

NEPA regulations require that alternative analyses in NEPA documents "include the alternative of no action" (40 CFR 1502.14(d)). For this analysis, "no action" means that the BLM would reject the proponent's proposal and "the proposed activity would not take place."

**Potential Environmental Impacts of the "Proposed Action" Alternative**

| Critical Element | Affected | | Critical Element | Affected | |
|---|---|---|---|---|---|
| | Yes | No | | Yes | No |
| Air Quality | X | | T / E Species | | X |
| ACEC's | | X | Wastes, Hazardous/Solid | X | |
| Cultural Resources | X | | Water Quality | | X |
| Prime/Unique Farmlands | | X | Wetlands/Riparian Zones | X | |
| Floodplains | | X | Wild and Scenic Rivers | | X |
| Native Amer. Rel. Concerns | | X | Wilderness | | X |
| Environmental Justice | | X | Invasive, Nonnative Species | X | |

In addition to the critical elements referenced above, reviews of potential effects upon paleontological, visual and recreational, soil, vegetation, and wildlife resources were conducted.

The affected environment and analysis of environmental impacts are discussed in the AREIS to which this EA is tiered. Air quality impacts are also disclosed and analyzed in the AREIS.  A map showing the known wildlife resources in the project vicinity is attached.

Halogeton and other invasive and/or noxious weeds are a significant concern for this project area.  COAs have been added to control the spread, establishment, and plant community changes associated with weed infestation.

Cultural:

Class III cultural resources inventory were conducted for the project areas. Archaeological resources identified will be avoided or, as necessary, a monitor will review construction to ensure no cultural artifacts are disturbed. Both PODs have wells and infrastructure located inside of the two-mile buffer of contributing segments of a historic trail ("Rawlins to Baggs Road"). As a result, SHPO consultation was necessary and a visibility analysis required on those well locations and related infrastructure. The AREIS also required a "Programmatic Agreement" or "Memorandum of Agreement" between the affected parties, i.e. landowner (BLM), operator and SHPO to address the necessary mitigation to minimize impact to the trail view-shed from these wells and associated disturbances. As a result, restrictions or stipulations in the form of COAs were added to the MSUP APD authorizations as appropriate. Those stipulations are summarized below:

For all wells and associated infrastructure in POD C:
1) *Standard cultural stip (under general permitting requirements)*
2) *All surface facilities will be painted a color compatible with the local environment.*
3) *The access road will be surfaced with material compatible with the local environment.*
4) *The Operator shall select and use a seed mix most applicable to each disturbed location, with the goal of restoring individual sites to closely resemble the pre-disturbance native plant communities, as provided in Appendix A of the ROD, "Project Reclamation Plan."*

Additional mitigation measures are stipulated for individual wells and/or infrastructure within two-miles of the Rawlins-Baggs Road which have viewshed or visibility concerns, which include:

POD C wells: 4-15, 12-15, 16-19, 16-20, 10-21, 14-21, 4-22, 12-22, 4-28, 2-29, 6-29, 8-29

These additional mitigation measures include:

1) *Unless otherwise authorized, the pipelines/utilities will be plowed or ripped into the un-bladed surface (using technology that does not require trenching). If such techniques are infeasible due to terrain or geology, the surface will be brush-hogged and the utilities will be placed no farther than the outside edge of the ditch slope.*
2) *No blading will be allowed outside the staked well location for placement or removal of the topsoil stockpile.*

Other, site-specific Conditions of Approval (such as archaeological monitor, barrier fencing, etc.), are also applied, as applicable.

Portions of the proposed actions (wells, pads, access roads and pipeline/power-line right-of ways/corridors) are located within two mile (protective buffer) of sage grouse leks, within one mile (protective buffer) of nesting raptors (ferruginous hawks) and within crucial winter range for mule deer. Numerous well locations, roads and corridors were relocated outside these areas or buffer zones where practical, and several were relocated on the outside or edge of "No Surface Occupancy" (NSO) or "Controlled Surface Use" (CSU) areas or zones for these wildlife resources. The NSO or CSU is a one mile radius from the lek perimeter for sage-grouse and one-quarter mile from the nest for ferruginous hawks. Mountain plover habitat was identified for a few locations. As a result of the above, seasonal restrictions or stipulations in the form of COAs were added to the MSUP APD authorizations as appropriate. Those stipulations are summarized below:

### Sun Dog Unit POD "C" Wildlife Stipulations

| Well Name | Raptor[1] | Grouse[2] |
|-----------|-----------|-----------|
| 4-15 | 1 | 2 |
| 12-15 | 1 | 2 |
| 16-19 | 1 | 2 |
| 16-20 | NA | 2 |
| 10-21 | NA | 2 |
| 14-21 | NA | 2 |
| 14-21i | NA | 2 |
| 4-22 | 1 | 2 |
| 12-22 | 1 | 2 |
| 4-28 | NA | 2 |
| 2-29 | 1 | 2 |
| 4-29 | 1 | 2 |

| 6-29 | 1 | 2 |
|------|-----|---|
| 8-29 | NA | 2 |

1 <u>Raptor Stipulations</u>: Construction, drilling and other activities potentially disruptive to nesting raptors are prohibited during the period of February 1 to July 31 for the protection of raptor nesting areas.

2 <u>Grouse Stipulations</u>: Construction, drilling, reclamation and other potentially disruptive activities are prohibited during the period of March 1 to July 15 for the protection of sage grouse.

<u>Exceptions to Stipulations</u>: In some instances, the operator may request consideration of a temporary exception to wildlife seasonal restrictions or stipulations. Such exceptions may be granted on a limited individual case by case basis if a determination is made by a BLM wildlife biologist that the wildlife resource will not be adversely impacted.

The fisheries biologist attended onsite inspections and considered potential impacts to Muddy Creek's 6840 BLM Sensitive fish species and determined that no additional mitigation or monitoring requirements for the proposed action were necessary.

Other site-specific findings by the interdisciplinary review team are provided in the review documents that accompany the POD MSUP and well APD and this EA in the BLM RFO lease/well and POD/Unit files.

<u>Description of Impacts</u>:

A discussion of the actions generally associated with drilling projects and their associated impacts may be found in the Atlantic Rim Environmental Impact Statement and Record of Decision.

<u>Hazardous Materials</u>

Anadarko has indicated that some hazardous materials could be used during drilling, completion, and production of their proposed wells. The term "hazardous material" as used here means: 1) any substance, pollutant, or contaminant (regardless of quantity) listed as hazardous under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) of 1980, as amended, 42 U.S.C. 9601 et seq., and the regulations issued under CERCLA, 2) any hazardous waste as defined in the Resource Conservation and Recovery Act (RCRA) of 1976, as amended, and 3) any nuclear or nuclear byproduct as defined by the Atomic Energy Act of 1954, as amended, 42 U.S.C. 2011 et seq.

It is possible that wastes created or transported during implementation of the proposed action (i.e., waste motor oils, drilling/completion additives) could be accidentally released to the environment. The operator will be required to comply with the Hazardous Materials Management Plan provided in Appendix C of the AREIS. Numerous State and Federal rules and regulations also apply that govern the handling, storage, and disposal of hazardous substances.

Anadarko or any contracted company working for Anadarko will have Material Data Safety Sheets available for all chemicals, compounds, or substances which are used during the course of construction, drilling, completion, and production operations for this project. Additionally, all chemicals will be handled in an appropriate manner to minimize the potential for leaks or spills to the environment.

Impacts to soils, surface and groundwater resources, wildlife, vegetation, and human health could result from the accidental exposure of hazardous materials. However, since the project operations will strictly comply with all applicable federal and state laws concerning hazardous materials, the Hazardous Materials Management Plan for this project, and the operator's Spill Prevention Control and Countermeasure Plan, no significant impacts are anticipated.

<u>Reclamation</u>

Interim reclamation is typically initiated and completed within 6 months of drilling completion. The drill pads will be reduced to a less than one-half acre production well site at each location. Total reclamation of all new disturbances will take place as the wells and facilities are no longer productive or needed and are plugged and abandoned. Appendix A of the ROD contains the reclamation success criteria by which the reclamation status

will be judged. The approved Master Surface Use Plan and Conditions of Approval also contain reclamation measures pertaining to reclamation standards.

Description of Mitigation Measures and Residual Impacts:

Mitigation of potential effects is part of the proposed action, and specific mitigation details can be found in the Master Plan Elements including the Conditions of Approval. Residual impacts resulting from the proposed action would include permanent loss of oil and/or gas reserves should the wells become productive. In addition, the well pads, production equipment, and the access roads could remain in place for 30 years or more (until plugging and abandonment, final reclamation).

**Potential Environmental Impacts- No Action Alternative**

Under the No-Action Alternative, the proposed action would not be authorized. The 14 wells would not be constructed or drilled, and gas production from the proponent's lease would not occur. Existing development would continue to occupy the project area, along with impacts associated from the existing development and development on nearby private (fee) and or state leases.

**Residual Impacts/Cumulative Impacts:**

The potential residual and cumulative impacts are discussed in the AREIS, Chapter 5, and Cumulative Impacts Analysis. The proposed action entails the addition of 13 CBNG wells, 1 produced water re-injection well, and appurtenant facilities.

Standard mitigation guidelines are addressed in the ROD's Appendix A, Project Reclamation Plan. Additional mitigation measures are also provided in Appendix B, Performance-Based Monitoring and Best Management Practices, and Appendix C, Operator-Committed Practices. All needed mitigation, for that portion of the proposed action on public land, is part of the proposed action.

The access roads and well/production pads may remain visible for a period of approximately 20 to 30 years after they are abandoned and reclaimed. The oil and gas resource will be permanently lost. All needed mitigation is part of the proposed action.

Additional mitigation measures are addressed in the AREIS, under; Appendix A: Reclamation Plan; Appendix C Hazardous Materials, and; Appendix D Wildlife Protection Plan. All recommended mitigation for that portion of the proposed action on public land, is part of the proposed action and plan of operation found in the well POD MSUP with COA and APD.

**Persons/Agencies Contacted and or Consulted:**

| | | |
|---|---|---|
| Mary Mondragon | Regulatory Analyst | Anadarko E&P Company |
| Cathy Flansburg | Regulatory Analyst | Anadarko E&P Company |
| Gary Sundberg | Permitting Consultant | Anadarko E&P Company |
| Andy Stone | Hydrologist | BLM, Rawlins Field Office |
| Ben Toole | Wildlife Biologist | BLM, Rawlins Field Office |
| Hillaire Peck | Civil Engineer | BLM, Rawlins Field Office |
| Bonni Bruce/Nina Trapp | Archaeologist | BLM, Rawlins Field Office |
| Janelle Wrigley | Realty Specialist | BLM, Rawlins Field Office |
| TJ Murry | Rangeland Specialist | BLM, Rawlins Field Office |
| Mark Newman | Geologist | BLM, Rawlins Field Office |
| Jerry Dickinson | Petroleum Engineer | BLM, Rawlins Field Office |
| Patrick Lionberger | Fisheries Biologist | BLM, Rawlins Field Office |
| Paul Rau | Recreation Planner | BLM, Rawlins Field Office |
| Skip Stonesifer | Reclamation Specialist | BLM, Rawlins Field Office |
| Andy Warren | Rangeland Supervisor | BLM, Rawlins Field Office |
| Mary Read | Wildlife Biologist | BLM, Rawlins Field Office |



**Sun Dog C/D/E PODs**

SunDogE

SunDogD

SunDogC

T17N
T16N

R92W
R91W

### Legend

☐ GSG Lek Perimeter

**Raptor Nest**

▲ Active

⚠ Historical

◉ Sage Grouse Lek

▧ Pronghorn CWR

▨ Elk CWR

▨ Mule Deer CWR

☐ Atlantic Rim EIS Area

☐ Bureau of Land Management

☐ Private

☐ State

**WOGCC Well Data (06/2007)-CA**

• All Other

⚲ Injection Well

✳ Flowing Well

⚲ Plugged & Abandoned

✳ Producing Gas Well

● Producing Oil Well

⊶ Shut-In

◇ Spud

U.S. Department of the Interior
Bureau of Land Management
Rawlins, Wyoming

0    1    2    3    Miles

1 inch equals 5,000 feet
1:60,000

Drafted By: TDB 10/23/2007

The BLM can not guarantee the accuracy of these data.

## FINDING OF NO SIGNIFICANT IMPACT/DECISION RECORD.

### Decision

I have reviewed this environmental assessment including the explanation and resolution of any potentially significant environmental impacts, public comments, and errata to this EA (see Appendix A to this Decision Record, "Errata").  I have selected the proposed action alternative with the mitigation measures described below for authorization and implementation.  I have determined that the proposed project is in conformance with the approved land use plan.  It is my decision to implement the project with the mitigation measures identified below.

### Finding of No Significant Impact

Based upon the analysis of potential environmental impacts contained in the EA, I have determined that the impacts are not expected to be significant, and that an EIS is not required.

### Rationale for Decision

Compared to the No Action Alternative, the Proposed Action Alternative best meets the Purpose and Need and guiding laws, regulations, and directives, including the Federal Land Policy and Management Act (FLPMA, 43 USC 35).  The proposed action is in conformance with the Great Divide Resource Management Plan (RMP) and the Atlantic Rim Natural Gas Field Development Project EIS.

### Public Comments/BLM Responses

Appendix B to this Decision Record contains a summary of substantive public comments received for this action, and corresponding BLM responses.

### Mitigation Measures/Remarks:

All needed mitigation is a part of the proposed action and is found in the Master Surface Plan, and accompanying attachments and appendices, with the Conditions of Approval for the MSUP and APD's.  A total of 14 well APDs, unless specified otherwise in the COA, are authorized under this decision, along with associated well pads, access roads, pipelines, power-lines and utility corridors.

### Monitoring and Compliance

Designated BLM personnel will monitor operations under authorizations for the proposed action as needed to ensure compliance with the Master Surface Plan and Conditions of Approval.

Authorized Official:

_____                    October 23, 2007
Field Manager                                       Date
Rawlins Field Office

### Appeal

Under BLM regulation this decision is subject to appeal. Under BLM regulation, this decision is subject to administrative review in accordance with 43 CFR 3165. Any request for administrative review of this decision must include information required under 43 CFR 3165.3(b) (State Director Review), including all supporting documentation. Such a request must be filed in writing with the State Director, Bureau of Land Management, P.O. Box 1828, Cheyenne, Wyoming 82003 within 20 business days of the date this Decision Record is received or considered to have been received.

Appendix A to the Decision Record

ERRATA

Modifications and Corrections To The
Sun Dog Unit C Plan of Development (POD)
Environmental Assessment

To clarify the BLM consideration of alternatives for this project, additional discussion was added (Page 8):

### *Development of Alternatives*

*In reviewing the proponent's submitted proposal (APDs, Master Surface Use Plan, Master Drilling Plan, Water Management Plan, etc.), the BLM conducted onsite reviews and considered known and potentially-occurring resources and conditions in the project area.  As a result of this review, project components were moved, added, or eliminated in order to reduce potential environmental impacts, and in accordance with BLM policy and accepted Best Management Practices (BMPs).  This resulted in the alteration of the proponent's submitted proposal to yield the Proposed Action, which incorporates the changes from the onsite inspections, BLM review, and mandated BLM mitigations (Conditions of Approval). The Proposed Action, then, differs from the original proposal submitted by the proponent.  Since the proponent has agreed, by re-submission of the applications and POD plans, to the changes agreed upon as a result of the onsite inspections and BLM review, the Proposed Action represents a de facto alternative to the original submittal.*

*The EIS considered several alternatives to development of the oil & gas resources in the project area (see DEIS, Pages S2-S3 and FEIS Page 1-20).*

*The BLM interdisciplinary team, in review of this Proposed Action (as modified during onsite inspections and subsequent review), identified no unresolved resource conflicts that would necessitate development of additional alternatives.*

### Potential Environmental Impacts of the "Proposed Action" Alternative

A map was added to the EA to display known wildlife resources in the project vicinity.  Add map and:

*A map showing the known wildlife resources in the project vicinity is attached.*

Change:

*Numerous well locations, roads and corridors were relocated outside these areas or buffer zones where practical, and several were relocated on the outside or edge of "No Surface Occupancy" (NSO) or "Controlled Surface Use" (CSU) areas or zones for these wildlife resources. The NSO or CSU is a one mile radius from the lek perimeter for sage-grouse and one-quarter mile from the nest for ferruginous hawks. Mountain plover habitat was identified for a few locations. Mountain plover habitat was identified for a few locations.*

To:

*Numerous well locations, roads and corridors were relocated outside these areas or buffer zones where practical, and several were relocated on the outside or edge of "Controlled Surface Use" (CSU) areas or zones for these wildlife resources. The CSU is a one-quarter mile radius from the lek perimeter for sage-grouse and is variable depending upon raptor species.*

Add reference: *Sawyer, Hal.  2006.  Progress Report for the Atlantic Rim Mule Deer Study.*

*End Errata*

Appendix B to the Decision Record

Summary of EA Comments and BLM Responses

A total of two comment letters were received. The letters have been reviewed to determine whether the information they provided would warrant a determination other than a Finding of No Significant Impact (FONSI). Substantive comments are summarized below, with BLM responses to the comments in italics. The RFO would like to thank all who commented for taking the time to review the EA.

As noted in the EA (Page 2), information about the proposal was posted in the RFO public room for a 30-day period upon submittal by the proponent. In addition, the BLM online NEPA register provides notice of actions for which NEPA documentation is prepared, including the proposal considered under this EA.

In reviewing the comments received, there were some instances where substantial comments were made but we could find no project-specific comments or any description of (1) new information, (2) why or how the analysis is flawed, (3) evidence of flawed assumptions, (4) evidence of error in data presented, or (5) requests for clarification that bear on conclusions presented in the analysis. This was the standard used to identify substantive comments for the following responses.

**1.   Theodore Roosevelt Conservation Partnership**

a.   "The EAs and FONSIs are inconsistent with the EIS from which they allegedly tier. Neither the ROD, nor the EIS… contemplates an exclusion from seasonal drilling restrictions."

*As provided on page 1-9 of the Atlantic Rim FEIS, "the BLM's Great Divide RMP and its Record of Decision (ROD) (USDI-BLM 1990) directs management of the federal lands within the project area. The proposed project is in conformance with management objectives and actions provided for in the ROD..." The RMP provides direction applicable to BLM consideration of requests for exceptions to seasonal wildlife restrictions: "…Exception, waiver, or modification of this [wildlife] limitation in any year may be approved in writing, including documented supporting analysis, by the Authorized Officer"… (page 48-49, Appendix I, Great Divide Resource Area Record of Decision and Approved Resource Management Plan). As such, case-by-case consideration of exceptions to seasonal restrictions is in compliance with the decisions and analysis to which the EA is tiered.*

b.   "The EAs consider only two alternatives: "no action" and the proponent's proposed development. This is not the reasonable range of alternatives NEPA demands be analyzed."

*Modifications, or alternatives, to the original proposal received from the operator were identified as the result of the pre-approval onsite inspections. Clarification that the proposal was modified and subsequently analyzed as a de facto alternative has been added (see "Errata").*

**2.   Biodiversity Conservation Alliance**

a.   "…the EA makes no representations about the potential impacts of this POD on any other species, including BLM Sensitive Species. A full analysis of site-specific impacts to wildlife is needed."

*The BLMs analysis of the proposed action included site-specific review of potential impacts to sensitive species, using the experience and expertise of the BLM biologists as well as data and knowledge collected by the BLM, Wyoming Department of Game and Fish, U.S. Fish & Wildlife Service, and other organizations. This analysis is referred to in the EA on page 8 ("Other site specific findings by the interdisciplinary review team are provided in the review documents that accompany… …this EA in the BLM RFO lease/well and POD/Unit files."). Potential site-specific impacts to wildlife are addressed in the EA (see Pages 7-8).*

b. "Using lower-standard jeep trails for all access purposes could dramatically reduce these impacts, but does not appear to have been considered."

*As provided for in the fourth edition of the BLM Gold Book (containing BLM guidance for consideration of oil & gas activities on BLM-administered public lands), "The appropriateness of primitive roads or routes is both site-specific and use specific and is typically based on many factors…." Nonconstructed roads were not mandated for this POD due to a lack of unresolved resource conflicts. Should the BLM determine that alternate road designs are appropriate or necessary, the BLM could mandate the use of a reviewed and approved alternate design. In this instance, such a design was not determined to be necessary.*

c. "BLM needs to provide a site specific cumulative impacts analysis of the impacts of these operations on the affected migration corridors, their permeability to mule deer, and the ultimate impact on the population dynamics of the herd."

*In our review, we considered recently obtained data (Sawyer, 2006. Progress Report for the Atlantic Rim Mule Deer Study) regarding mule deer migration routes in the project area. At this time, no migration corridors have been identified within the POD boundaries. This Report has been added as a reference to the EA (see "Errata").*

d. "In Sun Dog C, nesting habitat for mountain plover (a BLM Sensitive Species) was identified at several well locations."

*There is no identified mountain plover habitat in this POD. This error has been corrected; see Errata, Appendix A to this Decision Record. Where potential mountain plover habitat has been identified (i.e., Sun Dog POD D), seasonal restrictions have been applied to protect mountain plover.*

e. "For raptor nests and sage grouse leks, BLM indicates that 'The NSO or CSU is a one mile radius from the lek perimeter for sage-grouse and one-quarter mile from the nest for ferruginous hawks'… Which is it[?]"

*The buffer descriptions and distances were in error and have been corrected; see Errata.*

f. "It has been definitively demonstrated that mere seasonal moratoria on construction and drilling activities is insufficient to prevent major [sage grouse] population declines."

*Potential impacts to sage grouse from activities such as those in the proposed action have been discussed in the programmatic EIS (see FEIS at Page 4-76). Site-specific mitigation measures have been applied to the proposed action (see Conditions of Approval and EA at Page 7) to reduce potential impacts to sage grouse as the result of the site-specific analysis. You provided no data or substantiation for your opinion that seasonal restrictions are insufficient, and so we can not judge your conclusion. The seasonal restrictions applied are supported by programmatic BLM decisions (such as the Great Divide RMP and Atlantic Rim ROD, among others), and are consistent with BLM policies developed in consultation with agencies such as the Wyoming Department of Game and Fish.*

g. "The EAs do not mention in any way the potential impacts of the projects on the [pygmy rabbit, Wyoming pocket gopher, & White-tailed prairie dogs]… BLM Sensitive Species."

*See above response to #2(a).*

h. "These viewsheds, which formerly were unimpaired by human intrusions… will be badly degraded by the cumulative impacts of these three new PODs if usual road and wellpad construction techniques are used."

*The EA acknowledges that the proposal would result in impacts to the visual setting of the project area (see EA at Page 9).  Mitigations to protect visual resources consistent with its Visual Resource Management (VRM) setting have been applied (see Conditions of Approval).  See also #2(b).*

i.  "We are concerned that the proposed activities, when occurring on highly saline, erodible, or unstable soils will contribute to significant impacts to the watershed, and in particular to downstream native fishes."

*The EA addresses BLM specialist conclusions regarding potential impacts to sensitive fisheries ("…no additional mitigation or monitoring requirements for the proposed action were necessary." EA at Page 8).  In addition, the mitigation measures voluntarily committed to by the proponent, compliance with other requirements including State water quality regulations, and mitigation applied by the BLM as Conditions of Approval, will reduce potential impacts from erosion and sedimentation.  No impacts to sensitive fisheries are anticipated.*

j.  "…BLM must require that the project proponents have acquired certifications (or a waiver of such certifications) [under Section 401 of the Clean Water Act] from the State of Wyoming…"

*The proponent has certified that they "will comply with all laws, standards, and criteria set forth by all appropriate Federal, State, and Local authorities…" (Master Surface Use Plan).  This is also a requirement of the BLM's Conditions of Approval.*

k.  "The Rawlins to Baggs Wagon Road is known to be affected by a number of wells in these PODs…"

*The impacts to cultural resources from the proposal are discussed on Pages 6-7 of the EA, including impacts to the Rawlins-Baggs Road.  Additional mitigation measures have been applied to reduce potential impacts to this feature.  No Section 106 consultation for this proposal was deemed necessary; the BLM has entered into a programmatic agreement with the State Historic Preservation Office (SHPO) regarding the protection of cultural resources.*

l.  "BLM's proposed methodology to allow the operators to report archaeological and paleontological resources passively if they happen to notice them is unacceptable."

*The BLM conducted a site-specific review of the potential for archaeological and paleontological resources.  In this review, it was determined that potential impacts to resources would be avoided or mitigated (cultural) or that impacts were unlikely due to absence of significant resources (paleontological).  Operator-reporting of potential archaeological or paleontological resources encountered is provided as a standard Condition of Approval by the BLM out of an abundance of caution.*

Exhibit 5 to Defendant-Intervenors
Motion To Consolidate and
Memorandum in Support Thereof
EA, Sun Dog Unit PODs D and E,
Approved October 23, 2007



**U.S. DEPARTMENT OF THE INTERIOR**
**BUREAU OF LAND MANAGEMENT**
**RAWLINS FIELD OFFICE**



**TIERED EA, FONSI, AND DR FORM**

Tiered to and Referencing the Atlantic Rim Natural Gas Development Project Environmental Impact Statement

---

**ENVIRONMENTAL ASSESSMENT**                    **EA NUMBER**: <u>WY-030-07-EA-232</u>

**Lease Numbers**: WYW-116679, 139142, 141278, 148482, 161909, 161910, and 161914

**Proposed Action**:

Sun Dog Unit D and E Plans of Development (PODs), which include; 30 Coalbed Natural Gas Wells and  4 Water Re-injection Wells,  Access Roads, Pipeline/Utility Corridors, and related infrastructure.

**Applicant/Proponent**: Anadarko E & P Company

**BLM Rawlins Field Office (RFO) Interdisciplinary (Review) Team (IDT)**

| POD IDT Members | Title |
|---|---|
| Ben Toole | Wildlife Biologist |
| Nina Trapp | Archaeologist |
| Andy Stone | Hydrologist |
| Hillaire Peck | Civil Engineer |
| TJ Murry | Rangeland Management Specialist |
| Gary McDonald | Natural Resource Specialist |

Prepared By

Laura Gianakos for

Gary McDonald, Sun Dog D/E POD IDT Lead

<u>October 23, 2007</u>
Date

**Location of Wells and Proposed Action (BLM-administered public lands)**:

### Sun Dog Unit POD "D"

|    | Well # | Aliquot | Sec | T | R |
|----|--------|---------|-----|---|---|
| 1  | 2-3    | NWNE    | 3   | 16N | 91W |
| 2  | 4-3    | NWNW    | 3   | 16N | 91W |
| 3  | 6-3    | SENW    | 3   | 16N | 91W |
| 4  | 10-3   | NWSE    | 3   | 16N | 91W |
| 5  | 10-3i  | NWSE    | 3   | 16N | 91W |
| 6  | 12-3   | NWSW    | 3   | 16N | 91W |
| 7  | 2-4    | NWNE    | 4   | 16N | 91W |
| 8  | 4-4    | NWNW    | 4   | 16N | 91W |
| 9  | 6-4    | SENW    | 4   | 16N | 91W |
| 10 | 8-4    | Not approved at this time |  |  |  |
| 11 | 16-4   | SESE    | 4   | 16N | 91W |
| 12 | 2-5    | NWNE    | 5   | 16N | 91W |
| 13 | 4-5    | NWNW    | 5   | 16N | 91W |
| 14 | 4-5i   | NWNW    | 5   | 16N | 91W |
| 15 | 6-5    | SENW    | 5   | 16N | 91W |
| 16 | 8-5    | SENE    | 5   | 16N | 91W |
| 17 | 8-9    | SENE    | 9   | 16N | 91W |
| 18 | 4-10   | NWNW    | 10  | 16N | 91W |
| 19 | 12-10  | NWSW    | 10  | 16N | 91W |
| 20 | 10-34  | NWSE    | 34  | 17N | 91W |
| 21 | 12-34  | NWSW    | 34  | 17N | 91W |
| 22 | 12-34i | NWSW    | 34  | 17N | 91W |
| 23 | 14-34  | SESW    | 34  | 17N | 91W |
| 24 | 16-34  | SESE    | 34  | 17  | 91W |

### Sun Dog Unit POD "E"

|    | Well # | Aliquot | Sec | T | R |
|----|--------|---------|-----|---|---|
| 1  | 12-26  | NWSW    | 26  | 17N | 91W |
| 2  | 14-26  | SESW    | 26  | 17N | 91W |
| 3  | 2-34   | NWNE    | 34  | 17N | 91W |
| 4  | 8-34   | SENE    | 34  | 17N | 91W |
| 5  | 2-35   | NWNE    | 35  | 17N | 91W |
| 6  | 4-35   | NWNW    | 35  | 17N | 91W |
| 7  | 6-35   | SENW    | 35  | 17N | 91W |
| 8  | 10-35  | NWSE    | 35  | 17N | 91W |
| 9  | 12-35  | NWSW    | 35  | 17N | 91W |
| 10 | 12-35i | NWSW    | 35  | 17N | 91W |
| 11 | 14-35  | SESW    | 35  | 17N | 91W |

## Conformance with Land Use Plan

This proposed action is in conformance with the Great Divide Resource Management Plan (RMP) that was approved on November 8, 1990. The RMP has been reviewed to determine if the proposed action conforms to the land use plan terms and conditions as required by 43 CFR 1610.5. Development of oil and gas reserves is in conformance with the RMP. On page 30, the RMP states "The entire planning area [Great Divide Resource Area] is open to oil and gas leasing".

The development of this project will not affect the achievement of the Wyoming Standards for Healthy Rangelands (August 1997).

Remarks:

The NOS or APD for the proposed action were posted for 30 days (beginning on 10/26/2006 for POD D and 11/03/2006 for POD E) in the Rawlins Field Office Information Access Center (Public Room) for review. Notification of preparation of this EA was provided on the Wyoming BLM internet NEPA register (http://www.wy.blm.gov/nepa/search).

The Atlantic Rim Area Natural Gas Field Development Project Environmental Impact Statement (AREIS) was written to assess the potential foreseeable and cumulative effects of drilling operations and associated activities in the Project area. The Record of Decision (ROD) for this project was approved on March 23, 2007. The proposed action is in conformance with the AREIS.

The AREIS ROD provides for the drilling of natural gas wells and associated infrastructure, limiting total surface disturbance to 7,600 acres at any one time (not including surface disturbance that occurred prior to implementation of the Interim Drilling Policy). The ROD establishes a goal for per-well surface disturbance of 6.5 acres of short-term disturbance (less in "Category A" areas).

The surface disturbance cap is allocated to operators "…on a prorated mineral leasehold basis." (AR ROD, Page 2), and development is limited to no more than 8 well sites per 640-acre section. In the event an Operator reaches the surface disturbance cap allocation, then "…further disturbance on federal minerals will not be permitted." (AR ROD, Page 3). The RFO will monitor and track disturbance areas for future proposals, in order to ascertain whether the disturbance cap would be exceeded by any future authorizations.

The APD's, Master Drilling Plan and Master Surface Use Plan with Water Management Plan and Conditions of Approval, contain a complete description of the proposed action. The Master Drilling and Surface Use Plans with associated documents and the Conditions of Approval are considered an integral part of this Environmental Assessment and are incorporated by reference.

Modifications, or alternatives, to the original proposal received from the operator were identified as the result of the pre-approval onsite inspections. At the on-sites, all areas of proposed surface disturbance were inspected to ensure that potential impacts to resources would be minimized. In some cases, access roads were re-routed, and well locations, pipelines, and other water management control structures were moved, modified, or dropped from further consideration to alleviate or minimize environmental impacts. In addition, site specific mitigation and/or Conditions of Approval have been applied to alleviate or reduce environmental effects of the operator's proposal. Onsite changes, implementation of committed mitigation measures contained in the Master Surface Use Plan, Drilling Program and Water Management Plan, and site specific and Standard COAs are incorporated and analyzed in the Proposed Action Alternative.

All D and E POD wells are located entirely within a Federal Oil and Gas Unit, the Sun Dog Unit, and as a result no additional rights-of-way are required as part of the proposed action.

## Purpose and Need for Proposed Action

Domestic natural gas production is an integral part of U.S. energy development and conservation plans due to its availability and the presence of existing market delivery infrastructure. Domestic production reduces immediate dependence upon foreign sources of energy, and maintains an adequate and stable supply of fuel to maintain economic well-being, industrial production, and national security. The environmental advantages of burning natural gas are emphasized in the Clean Air Act amendments of 1990.

In addition, the proposed action would allow Anadarko, as leaseholder, to exercise lease rights to explore and develop oil and gas resources within the project lease areas.

For these particular wells, the production is primarily natural gas and produced water from coal seams.

## Development of Alternatives

In reviewing the proponent's submitted proposal (APDs, Master Surface Use Plan, Master Drilling Plan, Water Management Plan, etc.), the BLM conducted onsite reviews and considered known and potentially-occurring resources and conditions in the project area. As a result of this review, project components were moved, added, or eliminated in order to reduce potential environmental impacts, and in accordance with BLM policy

and accepted Best Management Practices (BMPs). This resulted in the alteration of the proponent's submitted proposal to yield the Proposed Action, which incorporates the changes from the onsite inspections, BLM review, and mandated BLM mitigations (Conditions of Approval). The Proposed Action, then, differs from the original proposal submitted by the proponent. Since the proponent has agreed, by re-submission of the applications and POD plans, to the changes agreed upon as a result of the onsite inspections and BLM review, the Proposed Action represents a *de facto* alternative to the original submittal.

The EIS considered several alternatives to development of the oil & gas resources in the project area (see DEIS, Pages S2-S3 and FEIS Page 1-20).

The BLM interdisciplinary team, in review of this Proposed Action (as modified during onsite inspections and subsequent review), identified no unresolved resource conflicts that would necessitate development of additional alternatives.

## Description of Proposed Action Alternative

The proposed action includes the construction and/or reconstruction of access roads and the construction of well pads for the purpose of drilling 30 CBNG wells (20 in POD D and 10 in POD E) and 4 produced water re-injection wells (3 in POD D and 1 in POD E). An additional well, the 8-4, was originally proposed but is not being included in this analysis due to unresolved archaeological resource concerns. In addition, the proposed action also includes the construction, operation and reclamation of associated underground gas gathering/sales pipelines, produced water-gathering pipelines and power-lines and utility corridors. The majority of pipeline/utility corridors are located adjacent and parallel to the proposed or existing access roads and existing pipeline disturbances, except where not feasible and appropriate and surface disturbance would be increased. The maps and illustrations attached to the APDs and Master Surface Use Plan display the locations of the proposed wells, access roads, gas and water-gathering pipelines, power-line (electrical) and other utility (gas and water) corridors.

Any additional facilities later determined to be necessary would be proposed and applied for via a Sundry Notice.

Water for drilling each well would be obtained from existing wells completed in the coal seams of the Mesa Verde Group within the Sun Dog Unit. Water would be hauled by truck to each drill site over existing and proposed roads within the POD. Any changes in the water source or method of transportation would first require written approval by the BLM. To protect any shallow, fresh water aquifers or sources, drilling of surface casing for each well would use either air drilling techniques, or use non-produced (fresh) water from a State permitted local source.

Onsite inspections of the POD wells, well pads, access roads and pipeline/utility corridors were conducted on May 1, 2, 3 and 23, 2007. Potential impacts to resources from the location of the well pads, access roads and corridors were reviewed and assessed. As a result, numerous pads, roads and corridors were relocated to reduce potential impacts to soils, vegetation, water, wildlife (including fisheries), cultural and recreational resources.

The location of the proposed development is approximately 22 miles north/northeast of Baggs, Wyoming, east of Highway 789. Access to the area will be from existing County Road 608 to the east off of Highway 789. Some existing roads will be reconstructed and new roads will be constructed to access well locations.

A discussion of the actions generally associated with drilling a well, including (1) a plan of operations, (2) construction of the access road and drilling pad, and (3) pipeline installation, can be located in the following portions of the AREIS or ROD:

- Chapter 2, Proposed Action and Alternatives (AREIS)
- Chapter 4, Analysis of Environmental Consequences (AREIS)
- Appendix A, Project Reclamation Plan (ROD)
- Appendix C, Operator-Committed Practices (ROD)

Mitigation and reclamation measures are described in Chapter 4 and Appendix B of the ROD (Project Performance-Based Monitoring and Best Management Practices). The following narratives summarize elements specific to the proposed action for this EA.

Construction

Well access roads, drill pads and pipeline/utility corridors must be constructed and or re-constructed in order to drill and complete operating and producing coal bed natural gas wells. This is considered a short-term disturbance. Upon completion of a well as a producer and placing into production (gas sales), portions of the well (drill) pad not needed for production operations will be reclaimed to a production pad. Upon the completion of installation of the pipelines/utilities, the pipeline/utility corridors will be finally reclaimed. Upon the successful interim reclamation of the areas of the well pad and access/utility corridors not needed for production operations, the remaining surface disturbance is considered as long-term. The entire well pad, access road and pipeline/utility corridor will be totally reclaimed subsequent to well plugging and abandonment under final reclamation.

Surface disturbance estimates for POD D and E including the well pads and access road/utility/pipeline corridors and are presented in the Tables below:

| Sun Dog D | Short Term Disturbance Areas | | | | |
|---|---|---|---|---|---|
| Well # | Well Pad-Acres* | Road-L. Feet | Corridor-Acres** | Road-Acres*** | SUM-Acres |
| 8-9 | 2.2 | 3088 | 2.1 | 3.5 | 7.8 |
| 12-10 | 2.2 | 2565 | 1.8 | 2.9 | 6.9 |
| 2-3 | 2.2 | 102 | 0.1 | 0.1 | 2.4 |
| 10-3 | 2.2 | 355 | 0.2 | 0.4 | 2.8 |
| 10-3i | 0 | | 0 | 0 | 0 |
| 2-4 | 2.2 | 1471 | 1 | 1.7 | 4.9 |
| 2-5 | 2.2 | 170 | 0.1 | 0.2 | 2.5 |
| 4-3 | 2.2 | 2498 | 1.7 | 2.9 | 6.8 |
| 4-4 | 2.2 | 2235 | 1.5 | 2.6 | 6.3 |
| 4-5 | 2.2 | 2325 | 1.6 | 2.7 | 6.5 |
| 4-5i | 0 | | 0 | 0 | 0 |
| 6-3 | 2.2 | 505 | 0.3 | 0.6 | 3.1 |
| 6-4 | 2.2 | 2194 | 1.5 | 2.5 | 6.2 |
| 6-5 | 2.2 | 161 | 0.1 | 0.2 | 2.5 |
| 8-4 | Not approved at this time | | | | |
| 8-5 | 2.2 | 5393 | 3.7 | 6.2 | 12.1 |
| 12-3 | 2.2 | 167 | 0.1 | 0.2 | 2.5 |
| 16-4 | 2.2 | 0 | 0 | 0 | 2.2 |
| 4-10 | 2.2 | 5334 | 3.7 | 6.1 | 12 |
| 10-34 | 2.2 | 217 | 0.1 | 0.2 | 2.5 |
| 12-34 | 2.2 | 3534 | 2.4 | 4.1 | 8.7 |
| 12-34i | 0 | 0 | 0 | 0 | 0 |
| 14-34 | 2.2 | 408 | 0.3 | 0.5 | 3.0 |
| 16-34 | 2.2 | 258 | 0.2 | 0.3 | 2.7 |
| **Total** | **44** | **32980** | **22.5** | **37.9** | **104.5** |

| Sun Dog E | Short Term Disturbance Areas | | | | |
|---|---|---|---|---|---|
| Well # | Well Pad- Acres* | Road-L. Feet | Corridor-Acres** | Road-Acres*** | SUM-Acres |
| 12-26 | 2.2 | 111 | 0.1 | 0.1 | 2.4 |
| 14-26 | 2.2 | 116 | 0.1 | 0.1 | 2.4 |
| 2-34 | 2.2 | 3169 | 2.2 | 3.6 | 8 |
| 8-34 | 2.2 | 1186 | 0.8 | 1.4 | 4.4 |
| 2-35 | 2.2 | 3821 | 2.6 | 4.4 | 9.2 |
| 4-35 | 2.2 | 1065 | 0.7 | 1.2 | 4.1 |
| 6-35 | 2.2 | 138 | 0.1 | 0.2 | 2.5 |
| 10-35 | 2.2 | 991 | 0.7 | 1.1 | 4 |
| 12-35 | 2.2 | 189 | 0.1 | 0.2 | 2.5 |
| 14-35 | 2.2 | 337 | 0.2 | 0.4 | 2.8 |
| 12-35i | 0 | 0 | 0 | 0 | 0 |
| Total | 22 | 11123 | 7.6 | 12.7 | 42.3 |

* Well pad surface disturbance areas are approximately 2.2 acres, including spoil piles and cut/fill slopes. Injection wells (i) are co-located on same pad with production wells representing no additional surface disturbance.
** This assumes a corridor surface disturbance with widths equal to 30 feet. .
*** This assumes new road surface disturbance with widths equal to 50 feet.

The proposed action (for both POD D and Pod E) will result in approximately 147 acres of short-term disturbance, comprised of new or reconstructed access roads and adjacent & parallel pipelines and utilities, as detailed above.

The average short-term per-well disturbance for POD D is 5.2 acres for Sun Dog D (again, assuming no additional disturbance for the injection wells) and 4.2 acres for POD E.  The proposed action is located outside of "Category A" area, and thus is subject to a "disturbance goal" of 6.5 acres per well.  Both PODs, then, meet the disturbance goal provided in the AREIS ROD.

<u>Access</u>

The operator proposes to construct new or reconstruct existing access roads to the proposed well locations. The new constructed or reconstructed roads will be constructed to meet BLM specifications for a "Resource Road", as specified in BLM Manual Section 9113.  Proper drainage structures will be constructed/installed along the access roads.  The width of the access road travel-way (travel surface) will be a minimum of 14 feet within an average right-of-way width of 40 to 50 feet. Unless prohibited by terrain and or excessive surface disturbance or other such circumstances the access road right-of-way will be combined with the pipeline/utility right-of-way into a road/utility corridor that will be a total of 80 feet in width.  In addition, some local connector or collector roads between multiple well locations will be constructed to a minimum 16-20 feet wide travel width within the 80 feet wide corridor.

The access roads including utility corridors would be reclaimed during production operations to the maintenance width of approximately 30 to 40 feet. Utility corridors upon completion of pipeline/power-line installation along with any unneeded access road would be recontoured, ripped, seeded, and revegetated.

<u>Well Sites</u>

In order to drill and complete the wells an approximate 220 by 300 or 220 by 350 feet 1.8 or 2.0 acre drill pad will be constructed for each well location. Some well locations will also include an additional produced water injection well, identified by an "i" at the end of the well number. In the event the wells become producers, cut and fill portions of the well site will be brought back to grade and reclaimed along with any other unneeded portions of the well site. Soil stockpiles will be re-spread or stabilized, and reseeded with native vegetation.

The well pad will be reduced to less than one-half acre for the duration of production operations. Unless otherwise authorized and in conjunction with interim pad reclamation, the reserve pits will have been dried and backfilled within 180 days of well completion or plugging and abandonment. The entire well pad will be recontoured, ripped, seeded, and revegetated during final reclamation upon final plugging and abandonment.

Pipeline/Utility Corridors

The produced water and gas sales and gathering pipelines and power-lines would be buried upon completion of construction and installation, and the surface disturbed areas reclaimed soon thereafter. Upon well plugging and abandonment and or pipeline/power-line abandonment, the pipelines/power-lines would be properly abandoned in accordance with BLM procedures for abandonment and the right-of-ways and corridors adequately reclaimed. Major crossings of drainages have been engineered to insure design/construction adequacy and erosion protection. All channel crossings will comply with current BLM policies and mitigation measures appropriate to the crossings (see "Hydraulic Considerations for Pipelines Crossing Stream Channels," BLM Technical Note 423, April 2007).

Produced Water Disposal

Produced water from the proposed wells would be gathered and transported via buried water pipelines to existing and proposed water re-injection wells within the PODs and the Sun Dog Unit. Produced water collection, transport and disposal, is addressed in detail in the MSUP and appended Sun Dog Unit Water Management Plan (WMP).

The only method of produced water disposal considered and analyzed under the "proposed action" and this EA is subsurface re-injection using underground injection disposal wells permitted by the State of Wyoming and approved by BLM.

At new injection facilities, it is anticipated that subsurface water sumps will be constructed in lie of above ground storage tanks. Any modifications to this proposal will be submitted via a Sundry Notice for review prior to approval.

Monitoring wells

As described and detailed in Appendix B of the Atlantic Rim ROD and the Sun Dog Water Management Plan, the Unit Operator shall be responsible for drilling, completing, and equipping one set of three shallow groundwater-monitoring wells completed in water-bearing sandstone units stratigraphically above the principle producing coal beds in the upper Mesaverde Group prior to production of any of the wells in the two PODs.

**No Action Alternative**

NEPA regulations require that alternative analyses in NEPA documents "include the alternative of no action" (40 CFR 1502.14(d)). For this analysis, "no action" means that the BLM would reject the proponent's proposal and "the proposed activity would not take place."

**Potential Environmental Impacts of the "Proposed Action" Alternative**

| Critical Element | Affected | | Critical Element | Affected | |
|---|---|---|---|---|---|
| | Yes | No | | Yes | No |
| Air Quality | X | | T / E Species | | X |
| ACEC's | | X | Wastes, Hazardous/Solid | X | |
| Cultural Resources | X | | Water Quality | | X |
| Prime/Unique Farmlands | | X | Wetlands/Riparian Zones | X | |
| Floodplains | | X | Wild and Scenic Rivers | | X |
| Native Amer. Rel. Concerns | | X | Wilderness | | X |
| Environmental Justice | | X | Invasive, Nonnative Species | X | |

In addition to the critical elements referenced above, reviews of potential effects upon paleontological, visual and recreational, soil, vegetation, and wildlife resources were conducted.

The affected environment and analysis of environmental impacts are discussed in the AREIS to which this EA is tiered. Air quality impacts are also disclosed and analyzed in the AREIS. A map showing the known wildlife resources in the project vicinity is attached.

Halogeton and other invasive and/or noxious weeds are a significant concern for this project area. COAs have been added to control the spread, establishment, and plant community changes associated with weed infestation.

Cultural:

Class III cultural resources inventory were conducted for the project areas. Archaeological resources identified will be avoided or, as necessary, a monitor will review construction to ensure no cultural artifacts are disturbed. Both PODs have wells and infrastructure located inside of the two-mile buffer of contributing segments of a historic trail ("Rawlins to Baggs Road"). As a result, SHPO consultation was necessary and a visibility analysis required on those well locations and related infrastructure. The AREIS also required a "Programmatic Agreement" or "Memorandum of Agreement" between the affected parties, i.e. landowner (BLM), operator and SHPO to address the necessary mitigation to minimize impact to the trail view-shed from these wells and associated disturbances. As a result, restrictions or stipulations in the form of COA were added to the MSUP APD authorizations as appropriate. Those stipulations are summarized below:

For all wells and associated infrastructure in POD D and E:
*1) Standard cultural stip (under general permitting requirements)*
*2) All surface facilities will be painted a color compatible with the local environment.*
*3) The access road will be surfaced with material compatible with the local environment.*
*4) The Operator shall select and use a seed mix most applicable to each disturbed location, with the goal of restoring individual sites to closely resemble the pre-disturbance native plant communities, as provided in Appendix A of the ROD, "Project Reclamation Plan."*

Additional mitigation measures are stipulated for individual wells and/or infrastructure within two-miles of the Rawlins-Baggs Road which have viewshed or visibility concerns, which include:

POD E wells: 2-35, 10-35, 2-34, 8-34, 12-26, 4-35, 6-35, 12-35, and 14-35
POD D wells: 12-10 (1 only), 2-4, 4-3 (1 only), 6-4 (1 only), 12-3 (1 only), 10-34 (2 only), 12-34 and 12-34i (1 only), and 14-34

These additional mitigation measures include:

*1) Unless otherwise authorized, the pipelines/utilities will be plowed or ripped into the un-bladed surface (using technology that does not require trenching). If such techniques are infeasible due to terrain or geology, the surface will be brush-hogged and the utilities will be placed no farther than the outside edge of the ditch slope.*
*2) No blading will be allowed outside the staked well location for placement or removal of the topsoil stockpile.*

Other, site-specific Conditions of Approval (such as archaeological monitor, barrier fencing, etc.), are also applied, as applicable.

Portions of the proposed actions (wells, pads, access roads and pipeline/power-line right-of ways/corridors) are located within two mile (protective buffer) of sage grouse leks, within one mile (protective buffer) of nesting raptors (ferruginous hawks) and within crucial winter range for mule deer. Numerous well locations, roads and corridors were relocated outside these areas or buffer zones where practical, and several were relocated on the outside or edge of "No Surface Occupancy" (NSO) or "Controlled Surface Use" (CSU) areas or zones for these wildlife resources. The NSO or CSU is a one mile radius from the lek perimeter for sage-grouse and one-quarter mile from the nest for ferruginous hawks. Mountain plover habitat was identified for a few locations. As a result of the above, seasonal restrictions or stipulations in the form of COA were added to the MSUP APD authorizations as appropriate. Those stipulations are summarized below:

**Sun Dog Unit POD "D" Wildlife Stipulations**

| Well Name | Raptor[1] | Grouse[2] | Plover[3] |
|-----------|-----------|-----------|-----------|
| 2-3 | NA | 2 | NA |
| 4-3 | 1 | 2 | NA |
| 6-3 | NA | 2 | NA |
| 10-3 | NA | 2 | NA |
| 10-3i | NA | 2 | NA |
| 12-3 | NA | 2 | NA |
| 2-4 | 1 | 2 | NA |
| 4-4 | 1 | 2 | NA |
| 6-4 | 1 | 2 | NA |
| 16-4 | NA | 2 | NA |
| 2-5 | 1 | 2 | NA |
| 4-5 | 1 | 2 | NA |
| 4-5i | 1 | 2 | NA |
| 6-5 | 1 | 2 | NA |
| 8-5 | 1 | 2 | NA |
| 8-9 | NA | 2 | NA |
| 4-10 | NA | 2 | NA |
| 12-10 | NA | 2 | NA |
| 10-34 | 1 | 2 | NA |
| 12-34 | 1 | 2 | NA |
| 12-34i | 1 | 2 | NA |
| 14-34 | 1 | 2 | 3 |
| 16-34 | 1 | 2 | NA |

**Sun Dog Unit POD "E" Wildlife Stipulations**

| Well Name | Raptor[1] | Grouse[2] | Plover[3] |
|-----------|-----------|-----------|-----------|
| 12-26 | 1 | 2 | NA |
| 14-26 | NA | 2 | NA |
| 2-34 | 1 | 2 | NA |
| 8-34 | 1 | 2 | NA |
| 2-35 | NA | 2 | NA |
| 4-35 | 1 | 2 | NA |
| 6-35 | NA | 2 | NA |
| 10-35 | NA | 2 | NA |
| 12-35 | NA | 2 | NA |
| 12-35i | NA | 2 | NA |
| 14-35 | NA | 2 | NA |

1 <u>Raptor Stipulations</u>: Construction, drilling and other activities potentially disruptive to nesting raptors are prohibited during the period of February 1 to July 31 for the protection of raptor nesting areas.

2 <u>Grouse Stipulations</u>: Construction, drilling, reclamation and other potentially disruptive activities are prohibited during the period of March 1 to July 15 for the protection of sage grouse.

3 <u>Plover Stipulations</u>: Construction, drilling and other activities potentially disruptive to breeding and nesting plover are prohibited during the period of April 10 to July 10 for the protection of nesting plover/habitat.

<u>Exceptions to Stipulations</u>: In some instances, the operator may request consideration of a temporary exception to wildlife seasonal restrictions or stipulations. Such exceptions may be granted on a limited individual case by case basis if a determination is made by a BLM wildlife biologist that the wildlife resource will not be adversely impacted.

The fisheries biologist attended onsite inspections and considered potential impacts to Muddy Creek's 6840

BLM Sensitive fish species and determined that no additional mitigation or monitoring requirements for the proposed action were necessary.

Other site-specific findings by the interdisciplinary review team are provided in the review documents that accompany the POD MSUP and well APDs and this EA in the BLM RFO lease/well and POD/Unit files.

Description of Impacts:

A discussion of the actions generally associated with drilling projects and their associated impacts may be found in the Atlantic Rim Environmental Impact Statement and Record of Decision.

Hazardous Materials

Anadarko has indicated that some hazardous materials could be used during drilling, completion, and production of their proposed wells. The term "hazardous material" as used here means: 1) any substance, pollutant, or contaminant (regardless of quantity) listed as hazardous under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) of 1980, as amended, 42 U.S.C. 9601 et seq., and the regulations issued under CERCLA, 2) any hazardous waste as defined in the Resource Conservation and Recovery Act (RCRA) of 1976, as amended, and 3) any nuclear or nuclear byproduct as defined by the Atomic Energy Act of 1954, as amended, 42 U.S.C. 2011 et seq.

It is possible that wastes created or transported during implementation of the proposed action (i.e., waste motor oils, drilling/completion additives) could be accidentally released to the environment. The operator will be required to comply with the Hazardous Materials Management Plan provided in Appendix C of the AREIS. Numerous State and Federal rules and regulations also apply that govern the handling, storage, and disposal of hazardous substances.

Anadarko or any contracted company working for Anadarko will have Material Data Safety Sheets available for all chemicals, compounds, or substances which are used during the course of construction, drilling, completion, and production operations for this project. Additionally, all chemicals will be handled in an appropriate manner to minimize the potential for leaks or spills to the environment.

Impacts to soils, surface and groundwater resources, wildlife, vegetation, and human health could result from the accidental exposure of hazardous materials. However, since the project operations will strictly comply with all applicable federal and state laws concerning hazardous materials, the Hazardous Materials Management Plan for this project, and the operator's Spill Prevention Control and Countermeasure Plan, no significant impacts are anticipated.

Reclamation

Interim reclamation is typically initiated and completed within 6 months of drilling completion. The drill pads will be reduced to a less than one-half acre production well site at each location. Total reclamation of all new disturbances will take place as the wells and facilities are no longer productive or needed and are plugged and abandoned. Appendix A of the ROD contains the reclamation success criteria by which the reclamation status will be judged. The approved Master Surface Use Plan and Conditions of Approval also contain reclamation measures pertaining to reclamation standards.

Description of Mitigation Measures and Residual Impacts:

Mitigation of potential effects is part of the proposed action, and specific mitigation details can be found in the Master Plan Elements including the Conditions of Approval. Residual impacts resulting from the proposed action would include permanent loss of oil and/or gas reserves should the wells become productive. In addition, the well pads, production equipment, and the access roads could remain in place for 30 years or more (until plugging and abandonment, final reclamation).

**Potential Environmental Impacts- No Action Alternative**

Under the No-Action Alternative, the proposed action would not be authorized. The 35 wells would not be constructed or drilled, and gas production from the proponent's lease would not occur. Existing development

would continue to occupy the project area, along with impacts associated from the existing development and development on nearby private (fee) and or state leases.

**Residual Impacts/Cumulative Impacts:**

The potential residual and cumulative impacts are discussed in the AREIS, Chapter 5, and Cumulative Impacts Analysis.  The proposed action entails the addition of 30 CBNG wells (20 in POD D and 10 in POD E) and 4 produced water re-injection wells (3 in POD D and 1 in POD E).

Standard mitigation guidelines are addressed in the ROD's Appendix A, Project Reclamation Plan.  Additional mitigation measures are also provided in Appendix B, Performance-Based Monitoring and Best Management Practices, and Appendix C, Operator-Committed Practices.  All needed mitigation, for that portion of the proposed action on public land, is part of the proposed action.

The access roads and well/production pads may remain visible for a period of approximately 20 to 30 years after they are abandoned and reclaimed.  The oil and gas resource will be permanently lost.  All needed mitigation is part of the proposed action.

Additional mitigation measures are addressed in the AREIS, under; Appendix A: Reclamation Plan; Appendix C Hazardous Materials, and; Appendix D Wildlife Protection Plan. All recommended mitigation for that portion of the proposed action on public land, is part of the proposed action and plan of operation found in the well POD MSUP with COA and APDs.

**Persons/Agencies Contacted and or Consulted:**

| | | |
|---|---|---|
| Mary Mondragon | Regulatory Analyst | Anadarko E&P Company |
| Cathy Flansburg | Regulatory Analyst | Anadarko E&P Company |
| Gary Sundberg | Permitting Consultant | Anadarko E&P Company |
| Andy Stone | Hydrologist | BLM, Rawlins Field Office |
| Ben Toole | Wildlife Biologist | BLM, Rawlins Field Office |
| Hillaire Peck | Civil Engineer | BLM, Rawlins Field Office |
| Bonni Bruce/Nina Trapp | Archaeologist | BLM, Rawlins Field Office |
| Janelle Wrigley | Realty Specialist | BLM, Rawlins Field Office |
| TJ Murry | Rangeland Specialist | BLM, Rawlins Field Office |
| Mark Newman | Geologist | BLM, Rawlins Field Office |
| Jerry Dickinson | Petroleum Engineer | BLM, Rawlins Field Office |
| Patrick Lionberger | Fisheries Biologist | BLM, Rawlins Field Office |
| Paul Rau | Recreation Planner | BLM, Rawlins Field Office |
| Skip Stonesifer | Reclamation Specialist | BLM, Rawlins Field Office |
| Andy Warren | Rangeland Supervisor | BLM, Rawlins Field Office |
| Mary Read | Wildlife Biologist | BLM, Rawlins Field Office |



**Sun Dog C/D/E PODs**

SunDogE

SunDogD

SunDogC

T17N
T16N

R92W
R91W

**Legend**

*GSG Lek Perimeter*

**Raptor Nest**
- ▲ Active
- ⚠ Historical
- ◉ Sage Grouse Lek
- ▨ Pronghorn CWR
- ▨ Elk CWR
- ▨ Mule Deer CWR
- ▭ *Atlantic Rim EIS Area*
- ▭ *Bureau of Land Management*
- ▭ *Private*
- ▭ *State*

WOGCC Well Data (06/2007)-CA
- • *All Other*
- ⚲ *Injection Well*
- ☀ *Flowing Well*
- ⚻ *Plugged & Abandoned*
- ✳ *Producing Gas Well*
- ● *Producing Oil Well*
- –○– *Shut-In*
- ◊ *Spud*

U.S. Department of the Interior
Bureau of Land Management
Rawlins, Wyoming

0     1     2     3   Miles

1 inch equals 5,000 feet
1:60,000

Drafted By: TDB 10/23/2007

The BLM can not guarantee the accuracy of these data.

**FINDING OF NO SIGNIFICANT IMPACT/DECISION RECORD.**

**Decision**

I have reviewed this environmental assessment including the explanation and resolution of any potentially significant environmental impacts, public comments, and errata to this EA (see Appendix A to this Decision Record, "Errata").   I have selected the proposed action alternative with the mitigation measures described below for authorization and implementation.  I have determined that the proposed project is in conformance with the approved land use plan.  It is my decision to implement the project with the mitigation measures identified below.

**Finding of No Significant Impact**

Based upon the analysis of potential environmental impacts contained in the EA, I have determined that the impacts are not expected to be significant, and that an EIS is not required.

**Rationale for Decision**

Compared to the No Action Alternative, the Proposed Action Alternative best meets the Purpose and Need and guiding laws, regulations, and directives, including the Federal Land Policy and Management Act (FLPMA, 43 USC 35).  The proposed action is in conformance with the Great Divide Resource Management Plan (RMP) and the Atlantic Rim Natural Gas Field Development Project EIS.

**Public Comments/BLM Responses**

Appendix B to this Decision Record contains a summary of public comments received for this action, and corresponding BLM responses.

**Mitigation Measures/Remarks:**

All needed mitigation is a part of the proposed action and is found in the Master Surface Plan, and accompanying attachments and appendices, with the Conditions of Approval for the MSUP and APD's.  A total of 34 well APDs, unless specified otherwise in the COA, are authorized under this decision, along with associated well pads, access roads, pipelines, power-lines and utility corridors.  Please note: The Sun Dog D 8-4, due to unresolved archaeological issues, is not being approved at this time.

**Monitoring and Compliance**

Designated BLM personnel will monitor operations under authorizations for the proposed action as needed to ensure compliance with the Master Plan Elements and Conditions of Approval.

Authorized Official:

_____                         October 23, 2007_____

Field Manager                                                         Date
Rawlins Field Office

**Appeal**

Under BLM regulation this decision is subject to appeal. Under BLM regulation, this decision is subject to administrative review in accordance with 43 CFR 3165. Any request for administrative review of this decision must include information required under 43 CFR 3165.3(b) (State Director Review), including all supporting documentation. Such a request must be filed in writing with the State Director, Bureau of Land Management, P.O. Box 1828, Cheyenne, Wyoming 82003 within 20 business days of the date this Decision Record is received or considered to have been received.

Appendix A to the Decision Record

ERRATA

Modifications and Corrections To The
Sun Dog Unit D & E Plan of Development (POD)
Environmental Assessment

To clarify the BLM consideration of alternatives for this project, additional discussion was added (Page 3):

### *Development of Alternatives*

*In reviewing the proponent's submitted proposal (APDs, Master Surface Use Plan, Master Drilling Plan, Water Management Plan, etc.), the BLM conducted onsite reviews and considered known and potentially-occurring resources and conditions in the project area. As a result of this review, project components were moved, added, or eliminated in order to reduce potential environmental impacts, and in accordance with BLM policy and accepted Best Management Practices (BMPs). This resulted in the alteration of the proponent's submitted proposal to yield the Proposed Action, which incorporates the changes from the onsite inspections, BLM review, and mandated BLM mitigations (Conditions of Approval). The Proposed Action, then, differs from the original proposal submitted by the proponent. Since the proponent has agreed, by re-submission of the applications and POD plans, to the changes agreed upon as a result of the onsite inspections and BLM review, the Proposed Action represents a de facto alternative to the original submittal.*

*The EIS considered several alternatives to development of the oil & gas resources in the project area (see DEIS, Pages S2-S3 and FEIS Page 1-20).*

*The BLM interdisciplinary team, in review of this Proposed Action (as modified during onsite inspections and subsequent review), identified no unresolved resource conflicts that would necessitate development of additional alternatives.*

### Potential Environmental Impacts of the "Proposed Action" Alternative

A map was added to the EA to display known wildlife resources in the project vicinity. Add map and:

*A map showing the known wildlife resources in the project vicinity is attached.*

Change:

*Numerous well locations, roads and corridors were relocated outside these areas or buffer zones where practical, and several were relocated on the outside or edge of "No Surface Occupancy" (NSO) or "Controlled Surface Use" (CSU) areas or zones for these wildlife resources. The NSO or CSU is a one mile radius from the lek perimeter for sage-grouse and one-quarter mile from the nest for ferruginous hawks.*

To:

*Numerous well locations, roads and corridors were relocated outside these areas or buffer zones where practical, and several were relocated on the outside or edge of "Controlled Surface Use" (CSU) areas or zones for these wildlife resources. The CSU is a one-quarter mile radius from the lek perimeter for sage-grouse and is variable depending upon raptor species.*

Seasonal restrictions for raptors were mistakenly applied to several wells in the PODs. These have been corrected (see table, Page 9).

Add reference: *Sawyer, Hal. 2006. Progress Report for the Atlantic Rim Mule Deer Study.*

*End Errata*

Appendix B to the Decision Record

Summary of EA Comments and BLM Responses

A total of two comment letters were received.  The letters have been reviewed to determine whether the information they provided would warrant a determination other than a Finding of No Significant Impact (FONSI).  Substantive comments are summarized below, with BLM responses to the comments in italics.  The RFO would like to thank all who commented for taking the time to review the EA.

As noted in the EA (Page 3), information about the proposal was posted in the RFO public room for a 30-day period upon submittal by the proponent.  In addition, the BLM online NEPA register provides notice of actions for which NEPA documentation is prepared, including the proposal considered under this EA.

In reviewing the comments received, there were some instances where substantial comments were made but we could find no project-specific comments or any description of (1) new information, (2) why or how the analysis is flawed, (3) evidence of flawed assumptions, (4) evidence of error in data presented, or (5) requests for clarification that bear on conclusions presented in the analysis.  This was the standard used to identify substantive comments for the following responses.

1. **Theodore Roosevelt Conservation Partnership**

   a. "The EAs and FONSIs are inconsistent with the EIS from which they allegedly tier.  Neither the ROD, nor the EIS… contemplates an exclusion from seasonal drilling restrictions."

   *As provided on page 1-9 of the Atlantic Rim FEIS, "the BLM's Great Divide RMP and its Record of Decision (ROD) (USDI-BLM 1990) directs management of the federal lands within the project area.  The proposed project is in conformance with management objectives and actions provided for in the ROD..."  The RMP provides direction applicable to BLM consideration of requests for exceptions to seasonal wildlife restrictions: "…Exception, waiver, or modification of this [wildlife] limitation in any year may be approved in writing, including documented supporting analysis, by the Authorized Officer"… (page 48-49, Appendix I, Great Divide Resource Area Record of Decision and Approved Resource Management Plan).  As such, case-by-case consideration of exceptions to seasonal restrictions is in compliance with the decisions and analysis to which the EA is tiered.*

   b. "The EAs consider only two alternatives: "no action" and the proponent's proposed development.  This is not the reasonable range of alternatives NEPA demands be analyzed."

   *Modifications, or alternatives, to the original proposal received from the operator were identified as the result of the pre-approval onsite inspections.  Clarification that the proposal was modified and subsequently analyzed as a* de facto *alternative has been added (see "Errata").*

2. **Biodiversity Conservation Alliance**

   a. "…the EA makes no representations about the potential impacts of this POD on any other species, including BLM Sensitive Species. A full analysis of site-specific impacts to wildlife is needed."

   *The BLMs analysis of the proposed action included site-specific review of potential impacts to sensitive species, using the experience and expertise of the BLM biologists as well as data and knowledge collected by the BLM, Wyoming Department of Game and Fish, U.S. Fish & Wildlife Service, and other organizations. This analysis is referred to in the EA on page 8-9 ("Other site specific findings by the interdisciplinary review team are provided in the review documents that accompany… …this EA in the BLM RFO lease/well and POD/Unit files.").  Potential site-specific*

*impacts to wildlife are addressed in the EA (see Pages 8-9).*

b. "Using lower-standard jeep trails for all access purposes could dramatically reduce these impacts, but does not appear to have been considered."

*As provided for in the fourth edition of the BLM Gold Book (containing BLM guidance for consideration of oil & gas activities on BLM-administered public lands), "The appropriateness of primitive roads or routes is both site-specific and use specific and is typically based on many factors…." Nonconstructed roads were not mandated for this POD due to a lack of unresolved resource conflicts. Should the BLM determine that alternate road designs are appropriate or necessary, the BLM could mandate the use of a reviewed and approved alternate design. In this instance, such a design was not determined to be necessary.*

c. "BLM needs to provide a site specific cumulative impacts analysis of the impacts of these operations on the affected migration corridors, their permeability to mule deer, and the ultimate impact on the population dynamics of the herd."

*In our review, we considered recently obtained data (Sawyer, 2006. Progress Report for the Atlantic Rim Mule Deer Study) regarding mule deer migration routes in the project area. At this time, no migration corridors have been identified within the POD boundaries. This Report has been added as a reference to the EA (see "Errata").*

d. "In Sun Dog C, nesting habitat for mountain plover (a BLM Sensitive Species) was identified at several well locations."

*There is no identified mountain plover habitat in POD C. This error has been corrected; see Errata, Appendix A to this Decision Record. Where potential mountain plover habitat has been identified (i.e., Sun Dog POD D), seasonal restrictions have been applied to protect mountain plover.*

e. "For raptor nests and sage grouse leks, BLM indicates that 'The NSO or CSU is a one mile radius from the lek perimeter for sage-grouse and one-quarter mile from the nest for ferruginous hawks'… Which is it[?]"

*The buffer descriptions and distances were in error and have been corrected; see Errata.*

f. "It has been definitively demonstrated that mere seasonal moratoria on construction and drilling activities is insufficient to prevent major [sage grouse] population declines."

*Potential impacts to sage grouse from activities such as those in the proposed action have been discussed in the programmatic EIS (see FEIS at Page 4-76). Site-specific mitigation measures have been applied to the proposed action (see Conditions of Approval and EA at Page 8) to reduce potential impacts to sage grouse as the result of the site-specific analysis. You provided no data or substantiation for your opinion that seasonal restrictions are insufficient, and so we can not judge your conclusion. The seasonal restrictions applied are supported by programmatic BLM decisions (such as the Great Divide RMP and Atlantic Rim ROD, among others), and are consistent with BLM policies developed in consultation with agencies such as the Wyoming Department of Game and Fish.*

g. "The EAs do not mention in any way the potential impacts of the projects on the [pygmy rabbit, Wyoming pocket gopher, & White-tailed prairie dogs]… BLM Sensitive Species."

*See above response to #2(a).*

h. "These viewsheds, which formerly were unimpaired by human intrusions… will be badly degraded by the cumulative impacts of these three new PODs if usual road and wellpad construction techniques are used."

*The EA acknowledges that the proposal would result in impacts to the visual setting of the project area (see EA at Page 11). Mitigations to protect visual resources consistent with its Visual Resource Management (VRM) setting have been applied (see Conditions of Approval). See also #2(b).*

i.  "We are concerned that the proposed activities, when occurring on highly saline, erodible, or unstable soils will contribute to significant impacts to the watershed, and in particular to downstream native fishes."

*The EA addresses BLM specialist conclusions regarding potential impacts to sensitive fisheries ("…no additional mitigation or monitoring requirements for the proposed action were necessary." EA at Page 9). In addition, the mitigation measures voluntarily committed to by the proponent, compliance with other requirements including State water quality regulations, and mitigation applied by the BLM as Conditions of Approval, will reduce potential impacts from erosion and sedimentation. No impacts to sensitive fisheries are anticipated.*

j.  "…BLM must require that the project proponents have acquired certifications (or a waiver of such certifications) [under Section 401 of the Clean Water Act] from the State of Wyoming…"

*The proponent has certified that they "will comply with all laws, standards, and criteria set forth by all appropriate Federal, State, and Local authorities…" (Master Surface Use Plan). This is also a requirement of the BLM's Conditions of Approval.*

k.  "The Rawlins to Baggs Wagon Road is known to be affected by a number of wells in these PODs…"

*The impacts to cultural resources from the proposal are discussed on Pages 8 of the EA, including impacts to the Rawlins-Baggs Road. Additional mitigation measures have been applied to reduce potential impacts to this feature. No Section 106 consultation for this proposal was deemed necessary; the BLM has entered into a programmatic agreement with the State Historic Preservation Office (SHPO) regarding the protection of cultural resources.*

l.  "BLM's proposed methodology to allow the operators to report archaeological and paleontological resources passively if they happen to notice them is unacceptable."

*The BLM conducted a site-specific review of the potential for archaeological and paleontological resources. In this review, it was determined that potential impacts to resources would be avoided or mitigated (cultural) or that impacts were unlikely due to absence of significant resources (paleontological). Operator-reporting of potential archaeological or paleontological resources encountered is provided as a standard Condition of Approval by the BLM out of an abundance of caution.*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| THEODORE ROOSEVELT CONSERVATION PARTNERSHIP, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | CASE NO. 1:07-cv-1486-RJL |
| DIRK KEMPTHORNE, in his official capacity as the Secretary of the United States Department of the Interior, and UNITED STATES BUREAU OF LAND MANAGEMENT, | ) ) ) ) ) | |
| Defendants. | ) ) ) | |
| ANADARKO PETROLEUM CORPORATION, WARREN RESOURCES, INC., and DOUBLE EAGLE PETROLEUM CO., and STATE OF WYOMING, | ) ) ) ) ) | |
| Defendant-Intervenors. | ) ) ) | |
| NATURAL RESOURCES DEFENSE COUNCIL, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | CASE NO. 1:07-cv-1709-RJL |
| DIRK KEMPTHORNE, in his official capacity as the Secretary of the United States Department of the Interior, and UNITED STATES BUREAU OF LAND MANAGEMENT, | ) ) ) ) ) | |
| Defendants. | ) ) | |
| ANADARKO PETROLEUM CORPORATION, WARREN RESOURCES, INC., and DOUBLE EAGLE PETROLEUM CO., | ) ) ) ) | |
| Defendant-Intervenors. | ) ) ) | |

[PROPOSED] ORDER

UPON CONSIDERATION of the Motion of Defendant-Intervenors Anadarko Petroleum

Corporation, Warren Resources, Inc. and Double Eagle Petroleum Co. to Consolidate the above-

captioned cases pursuant to Federal Rule of Civil Procedure 42, memorandum in support thereof,

and for good cause shown, it is hereby

ORDERED that the Motion to Consolidate is GRANTED, and that *Theodore Roosevelt*

*Conservation Partnership v. Kempthorne*, No. 1:07-cv-1486-RJL, and *Natural Resources*

*Defense Council, et al. v. Kempthorne*, No. 1:07-cv-1709-RJL, be consolidated for all purposes.

Dated this_____ day of _____, 2007.

_____
United States District Court Judge