**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| THEODORE ROOSEVELT | ) | |
| CONSERVATION PARTNERSHIP | ) | |
| 555 Eleventh St. N.W., 6th Floor | ) | |
| Washington, DC 20004 | ) | |
| (202) 654-4600, | ) | |
| | ) | |
| Plaintiff, | ) | CASE NO. 1:07-cv-01486-RJL |
| | ) | |
| v. | ) | |
| | ) | |
| DIRK KEMPTHORNE, in his official | ) | |
| capacity as the Secretary of the United | ) | |
| States Department of the Interior | ) | |
| 1849 C Street, N.W. | ) | |
| Washington, DC 20240 | ) | |
| (202) 208-3100, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| UNITED STATES BUREAU OF LAND | ) | |
| MANAGEMENT | ) | |
| 1849 C Street, Room 406-LS | ) | |
| Washington, DC 20240 | ) | |
| (202) 452-5125, | ) | |
| | ) | |
| Defendants. | ) | |
| ——————————————— | ) | |
| | ) | |
| ANADARKO PETROLEUM | ) | |
| CORPORATION, WARREN | ) | |
| RESOURCES, INC., DOUBLE EAGLE | ) | |
| PETROLEUM CO., | ) | |
| | ) | |
| and | ) | |
| | ) | |
| STATE OF WYOMING | ) | |
| | ) | |
| Defendant-Intervenors | ) | |

**RESPONSE IN OPPOSITION TO INDUSTRY DEFENDANT-INTERVENORS'**
**MOTION TO CONSOLIDATE**

Plaintiff Theodore Roosevelt Conservation Partnership ("TRCP") responds in opposition to the Industry Defendant-Intervenors' motion to consolidate this case with *Natural Resources Defense Council v. Kempthorne*, Case No. 1:07-cv-1709-RJL (the "Motion") (Doc. No. 13). Plaintiffs in both cases oppose consolidation. Motion ¶ 22. The Federal Defendants in both cases oppose consolidation. *Id.* Consolidation is not appropriate because, while some overlap exists, the two cases differ in scope, involve different "final agency actions" and present distinct legal issues. Consolidation will confuse the issues, prejudice the respective plaintiffs and delay the instant case, which is prepared to proceed, but for the Motion. The Motion should be denied.

## MATERIAL FACTUAL BACKGROUND

1.     Plaintiff TRCP filed its complaint on August 17, 2007 ("TRCP Complaint"). (Doc. No. 1). The TRCP Complaint challenges the March 2007 Record of Decision ("ROD") approving the Atlantic Rim Natural Gas Field Development Project ("Project") and Final Environmental Impact Statement ("EIS") supporting the ROD. TRCP Complaint ¶ 1. The TRCP Complaint asserts violations of the National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq.* ("NEPA") and the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. §§ 1701 *et seq.*, in the development and adoption of the ROD and EIS.

2.     Plaintiff Natural Resources Defense Council *et al.*, (collectively "NRDC") filed its original complaint in *Natural Resources Defense Council v. Kempthorne* on September 25, 2007. *See Natural Resources Defense Council v. Kempthorne,* Doc. No. 1. That complaint referenced the ROD and EIS in the context of claims challenging certain development authorizations post-dating the ROD and EIS. Plaintiff NRDC, however, did not challenge the ROD or EIS directly.

3.     Unlike Plaintiff TRCP, Plaintiff NRDC sought preliminary injunctive relief that would preclude the specific development activities NRDC challenged in its original complaint,

and that motion is now pending before the Court in *Natural Resources Defense Council v. Kempthorne*.

4.      On September 28, 2007, Judge Huvelle transferred *Natural Resources Defense Council v. Kempthorne* to this Court for resolution pursuant to Local Rule 40.5. *See* Motion, Exhibit 1. While Judge Huvelle believed the cases were related enough to merit transfer, her decision does not resolve the consolidation question, which is left to the judge presiding over the earlier filed case. *See* Local Rule 40.5(d); *Baystate Health System v. Thompson*, 254 F. Supp. 2d 80 (D.D.C. 2003).[1]

5.      On October 26, 2007, Plaintiff NRDC amended its complaint to include a challenge to the ROD and EIS. *See Natural Resources Defense Council v. Kempthorne,* Doc. No. 17, ("NRDC Amended Complaint"). Yet, the NRDC Amended Complaint appears to focus still on the subsequent authorizations challenged in the original complaint. *See, e.g.,* NRDC Amended Complaint (First and Fifth Causes of Action and Prayer for Relief ¶ 2). In addition to NEPA and FLPMA claims, moreover, the NRDC Amended Complaint includes claims arising under the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251(a).

## ARGUMENT

### I.      STANDARD OF REVIEW.

"The decision whether to consolidate cases under Rule 42(a) is within the broad discretion of the trial court." *Stewart v. O'Neill*, 225 F. Supp. 2d 16, 20 (D.D.C. 2002). Two cases may be consolidated "when the cases share common issues of law or fact, consolidation would serve the interests of judicial economy, and the parties would not be prejudiced by

---

[1] The question of "relatedness" for transfer purposes does not implicate the factors that must be considered when determining whether consolidation is appropriate. *See Natural Resources Defense Council v. Norton*, 2007 WL 14283, *16 (Jan. 3, 2007 E.D. Cal.) ("… as Plaintiffs point out, that these factors favored a *transfer* does not necessarily indicate that *consolidation* of two cases already before the same district judge is necessary or appropriate.") (emphasis original).

consolidation." *Judicial Watch, Inc. v. United States Department of Energy*, 207 F.R.D. 8, 8 (D.D.C. 2002). When determining whether to consolidate cases, a court should "weigh considerations of convenience and economy against considerations of confusion and prejudice." *American Postal Workers Union v. United States Postal Service*, 422 F. Supp. 2d 240, 245 (D.D.C. 2006) citing *Chang v. United States*, 217 F.R.D. 262, 265 (D.D.C. 2003).

"The party moving for consolidation bears the burden of showing the commonality of factual and legal issues." *Sidari v. Orleans County*, 174 F.R.D. 275, 281 (W.D. N.Y. 1996) citing *In Re Repetitive Stress Injury Litigation*, 11 F.3d 368 (2d Cir. 1993). "The Court must examine the 'special underlying facts' with 'close attention' before ordering consolidation." *Id.* (internal citation omitted). Even where commonality is established, considerations of convenience and economy must yield to the overriding concerns of fairness and impartiality. *Id.* citing *In Re Repetitive Stress Injury Litigation* in turn citing *Johnson v. Celotex Corp.*, 899 F.2d 1281 (2d Cir.) *cert. denied*, 498 U.S. 920 (1990).

## II. THE TWO CASES INVOLVE DIFFERENT AGENCY ACTIONS, ARE BASED ON SEPARATE DECISION DOCUMENTS, AND PRESENT DISTINCT LEGAL ISSUES.

The Industry Defendant-Intervenors are correct that, generally speaking, both cases involve challenges to oil and gas development activities in the Project area, and both seek to preclude additional development based on the ROD and EIS. However, the cases remain factually and legally distinct.

Plaintiff TRCP challenges only the ROD and the EIS. Plaintiff NRDC has nominally challenged the ROD and EIS,[2] but its complaint originally was, and appears to remain,

---

[2] The mere fact that two cases involve challenges to the same underlying decision document does not necessarily dictate consolidation. *See generally Natural Resources Defense Council*, 2007 WL 14283 (denying motion to consolidate, despite the fact that two cases challenged same underlying biological opinion).

predominantly focused on individual well plans of development ("POD") being pursued by the Industry Defendant-Intervenors. These PODs are authorized under separate "Decision Notices." *See* Motion at 3, ¶¶ 2-3 (explaining the need for additional approvals beyond the ROD). A Decision Notice is issued upon completion of an Environmental Assessment / Finding of No Significant Impact ("EA/FONSI"). While the EA/FONSIs completed by BLM prior to approving the PODs challenged by Plaintiff NRDC "tier" from the EIS challenged by Plaintiff TRCP, the EA/FONSIs and the Decision Notices are separate and distinct documents produced by BLM, and constitute independent "final agency actions" for purposes of judicial review under the Administrative Procedure Act, 5 U.S.C. §§ 551 *et seq.*

In addition, the legal claims brought in the two cases bear little similarity, and "counsel have raised different allegations of error in their respective cases." *Barton v. Astrue*, 495 F. Supp. 2d 504, 505 (D. Md. 2007). For example, this case does not include any claims arising under the CWA. *Contrast* NRDC Amended Complaint (Fifth Cause of Action). While both plaintiffs bring claims under NEPA and FLPMA, "[c]onsolidation is not warranted merely because two separate plaintiffs allege distinct claims under the same general theory of law or statute." *Sidari*, 174 F.R.D. at 281. Under the NEPA rubric, Plaintiff TRCP specifically challenges BLM's so-called "adaptive management" mitigation plan, TRCP Complaint (Count Two), while Plaintiff NRDC appears to have no comparable claim. Plaintiff TRCP asserts BLM has unlawfully engaged in an irreversible and irretrievable commitment of resources in contravention of NEPA, TRCP Complaint (Count Four), while Plaintiff NRDC appears to have no comparable claim. Plaintiff NRDC alleges BLM violated certain public participation requirements of NEPA, NRDC Amended Complaint (First Cause of Action), but Plaintiff TRCP has no comparable claim. Plaintiff TRCP alleges specific violations of FLPMA's multiple use-

sustained yield mandate (Count Eight) and its prohibition on unnecessary and undue degradation (Count Nine), but Plaintiff NRDC's complaint appears to contain no such claim.

Even where claims appear to be facially similar, a close look reveals their disparities. For instance, while both plaintiffs assert BLM failed to consider a "reasonable range of alternatives" under NEPA, Plaintiff TRCP's challenge is based on a failure to evaluate a program of phased development. Plaintiff NRDC's claim appears to be limited to BLM's alleged failure to explore an alternative with mitigation requirements more protective of sage grouse. *Compare* TRCP Complaint (Count One) with NRDC Amended Complaint (Second Cause of Action). The only common claims between the two cases appear to be Plaintiff TRCP's Counts Six and Seven and Plaintiff NRDC's Fourth Cause of Action, each alleging a violation of FLPMA's requirement of consistency with the applicable Resource Management Plan. However, similarity of claims alone is not sufficient cause for consolidation. *Compare Oregon Natural Desert Association v. Shurford*, 2006 WL 2601073 (Sept. 8, 2006 D. Or.) (denying motion to consolidate, even where NEPA and FLPMA claims were similar, because records and factual underpinnings differed).

## III.    CONSOLIDATION WILL CONFUSE THE ISSUES, PREJUDICE THE RESPECTIVE PLAINTIFFS, AND DELAY THIS CASE.

More troubling to Plaintiff TRCP is the fact that, beyond simply seeking consolidation, the Industry Defendant-Intervenors want to force the plaintiffs in each case to file "joint briefs on all common issues[.]" Motion at 2. As explained above, the decisions and supporting documentation challenged by the respective plaintiffs are distinct. The challenges mounted by the respective plaintiffs are leveled against different agency actions, which are justified on the basis of different NEPA analyses and implicate distinct violations of law. If Plaintiff TRCP and Plaintiff NRDC are forced to brief jointly the issues presented by the ROD, the EIS, at least

seven separate Decision Notices and supporting EA/FONSIs, confusion of the issues will be unavoidable.

Consolidation also will serve to delay adjudication of the instant case. Plaintiff TRCP and the Federal Defendants already agreed upon and presented to this Court a proposed schedule for briefing and resolving this case. *See* Doc. No. 16 (Joint Conference Report and Proposed Schedule). That schedule would have the Federal Defendants file the administrative record as early as January 4, 2008 and calls for the completion of briefing by late spring. While the Industry Defendant-Intervenors argue for judicial economy and case efficiency, at this point, the only thing holding up this case is the Motion, itself.

Moreover, as noted above, Plaintiff NRDC filed a motion for preliminary injunction in *Natural Resources Defense Council v. Kempthorne*. The outcome of that decision may result in one or more appeals, sidetracking the instant litigation indefinitely. Plaintiff TRCP and the Federal Defendants are prepared to litigate TRCP's claims on the merits, and should not have to wait for proceedings in *Natural Resources Defense Council v. Kempthorne* to play out.

Any additional delay, of course, works in favor of the Industry Defendant-Intervenors. Since the challenged ROD and EIS were finalized, BLM has approved at least seven PODs being developed by Anadarko Petroleum Corporation (Sun Dog A through E) and Double Eagle Petroleum Co. (Catalina A and B). There is no reason to believe the Industry Defendant-Intervenors will pursue their development plans with less vigor in 2008 while the parties wrangle about a revised schedule and how quickly the consolidated cases should proceed. Neither Plaintiff TRCP nor the Atlantic Rim's wildlife resources should suffer the adverse effects of continued development during that time.

"If the parties at issue, the procedural posture and the allegations in each case are different, … consolidation is not appropriate." *Blasko v. Washington Metropolitan Area Transit Authority*, 243 F.R.D. 13, 15 (D.D.C. 2007) citing *Stewart*, 225 F. Supp. 2d at 21. Here, although there is some overlap among the parties and facts, the two cases involve different plaintiffs with different fundamental interests, making different allegations about different BLM decisions. Moreover, this case is ready to proceed to the merits, whereas *Natural Resources Defense Council v. Kempthorne* awaits further decision on a pending injunction motion and faces an uncertain path. Consolidation is not warranted.

## IV.    THERE IS A BETTER ALTERNATIVE TO CONSOLIDATION IF THE COURT BELIEVES EFFICIENCY WILL BE PROMOTED BY SIMULTANEOUS CONSIDERATION.

While Plaintiff TRCP opposes consolidation of its case with *Natural Resources Defense Council v. Kempthorne*, TRCP does not wish to stand in the way of judicial economy. To the extent the Court believes it would benefit from simultaneous consideration of the two cases, Plaintiff TRCP suggests the Court issue a common schedule for proceeding in the two cases based on that already developed and agreed upon by Plaintiff TRCP and the Federal Defendants. *Compare Superior Helicopter LLC v. U.S.*, 78 Fed. Cl. 181, n. 1 (Fed. Cl. 2007) ("In addition, at the request of the parties, the court did not consolidate the case brought by Superior and Ranier (No. 07-518C) with that brought by Erickson (No. 07-519C), but rather issued a common schedule for proceedings in the two cases.").

## CONCLUSION

For the foregoing reasons, the Motion should be denied. If the Court believes judicial economy is best served by simultaneous consideration of the cases, Plaintiff TRCP respectfully requests the Court simply place the cases on parallel tracks with each being resolved substantially on the schedule already developed by Plaintiff TRCP and the Federal Defendants.

Respectfully submitted this 26th day of November 2007.

/s/ *Donald G. Blankenau*
Donald G. Blankenau
D.C. Bar No. ND0003
Thomas R. Wilmoth
Nebraska Bar No. 22518
BLACKWELL SANDERS LLP
206 South 13th Street, Suite 1400
Lincoln, NE  68508
T: (402) 458-1500
F: (402) 458-1510
twilmoth@blackwellsanders.com
dblankenau@blackwellsanders.com

*Counsel for the Theodore Roosevelt*
*Conservation Partnership*

## CERTIFICATE OF SERVICE

I hereby certify that on November 26, 2007, I caused to be electronically filed the foregoing RESPONSE TO MOTION TO CONSOLIDATE with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

**Donald G. Blankenau**
dblankenau@blackwellsanders.com; smarburger@blackwellsanders.com

**Lori Caramanian**
lori.caramanian@usdoj.gov; susan.middagh@usdoj.gov; efile_nrs.enrd@usdoj.gov
lori.montano@usdoj.gov

**Kristen A. Dolan**
kdolan@state.wy.us

**Steven Michael Kupka**
nholland@blackwellsanders.com

**Robert Charles Mathes**
rmathes@bjorklindley.com; lvanderveer@bjorklindley.com

**Michael B. Wigmore**
michael.wigmore@bingham.com

/s/ *Donald G. Blankenau*
Donald G. Blankenau
D.C. Bar No. ND0003
Thomas R. Wilmoth
Nebraska Bar No. 22518
BLACKWELL SANDERS LLP
206 South 13th Street, Suite 1400
Lincoln, NE  68508
T: (402) 458-1500
F: (402) 458-1510
twilmoth@blackwellsanders.com
dblankenau@blackwellsanders.com

*Counsel for the Theodore Roosevelt
Conservation Partnership*

UNREPORTED

CASES

Westlaw.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2006 WL 2601073 (D.Or.)
**(Cite as: Not Reported in F.Supp.2d)**

**H**
Oregon Natural Desert Ass'n v. Shuford
D.Or.,2006.
Only the Westlaw citation is currently available.
United States District Court,D. Oregon.
OREGON NATURAL DESERT ASSOCIATION,
Plaintiff,
v.
Dana R. SHUFORD, Burns District Manager,
BLM, Karla Bird, Andrews Resource Area.Field
Manager, Joan M. Suther, Three Rivers Resource
Area Field Manager, Elaine M. Brong, State
Director, Oregon/Washington BLM, Gale A.
Norton, Secretary, United States Department of the
Interior, U.S. Bureau of Land Management, and
U.S. Department of the Interior, Defendants.
**No. CIV 06-242-AA.**

Sept. 8, 2006.

Peter M. Lacy, Kristin F. Ruther, Portland, Oregon,
Stephanie M. Parent, Portland, Oregon, for plaintiff.
Karin J. Immergut, United States Attorney, District
of Oregon, Stephen J. Odell, Assistant United States
Attorney, Portland, Oregon, Bradley Grenham,
Special Assistant U.S. Attorney, Office of the
Regional Solicitor, Portland, Oregon, for
defendants.
Ronald Yockim, Roseburg, Oregon, for proposed
defendant-intervenor Harney County.
Elizabeth E. Howard, Dunn Carney Allen Higgins
& Tongue LLP, Portland, Oregon, for proposed
defendant-intervenor Steens Mountain Landowner
Group, Inc.
Harold S. Shepherd, Center for Trial Water
Advocacy, Pendleton, Oregon, for proposed
plaintiff-intervenor Center for Tribal Water
Advocacy.

OPINION AND ORDER
AIKEN, J.
*1 The parties filed six motions for this court's
consideration. Oral argument on held on September

7, 2006. The motions are decided as follows:

(1) Harney County's Motion to
Intervene-GRANTED IN PART (denied as to
liability phase, but allowed intervention in remedial
phase, also allow participation in liability phase as
amicus curiae).

(2) Steens Mountain Landowner Group's Motion to
Intervene-GRANTED IN PART (denied as to
liability phase, but allowed intervention in remedial
phase, also allow participation in liability phase as
amicus curiae).

(3) Tribal Water Advocacy's Motion to
Intervene-GRANTED.

(4) Government's Motion to Stay-GRANTED.

(5) Plaintiff's Motion for Partial Summary
Judgment-STAYED.

(6) Plaintiff's Motion to Consolidate-DENIED.

*FACTUAL BACKGROUND*

In 2000, Congress enacted the Steens Mountain
Cooperative Management and Protection Act of
2000 ("Steens Act"), 16 U.S.C. §§ 460nnn-122, to
provide for conservation and management of Steens
Mountain. Steens Mountain is a nearly 10,000 foot
elevation mountain in the northern Great Basin in
southeast Oregon. The Act created the 170,000 acre
Steens Mountain Wilderness; added 29 miles to the
federal Wild and Scenic River System; withdrew
1.1 million acres from mining and geothermal
development; established a Wildlands Juniper
Management Area for experimentation, education,
interpretation and demonstration of juniper
management and restoration of native vegetation of
the Steen; and designated the nation's first Redband
Trout Reserve. *Id.*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2006 WL 2601073 (D.Or.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 2

The Act also established the Cooperative Management and Protection Area (CMPA or "the Area"), a 496,000 acre area managed by the BLM on the Steens. *Id.* The purpose of the CMPA "is to conserve, protect, and manage the long-term ecological integrity of Steens Mountain for future and present generations."16 U.S.C. § 460nnn-12(a).

On February 22, 2006, plaintiff Oregon Natural Desert Association (ONDA) filed the lawsuit at bar alleging that defendants Dana Shuford et al. ("BLM") violated federal environmental laws in a number of respects, in their adaption of the Andrews-Steens Resource Management Plan ("Andrews-Steens RMP ").*See* Complaint, ¶¶ 1-2. A resource management plan is a land use plan that establishes, for a particular area of public lands, allowable uses, land designations, goals for future condition of the land, program constraints and management practices, implementation requirements, intervals and standards for monitoring and evaluation of the plan, and specific next steps in management. *See*43 C.F.R. § 1601.0-5(k); 43 U.S.C. § 1712.

Plaintiff alleges that the BLM violated its duties under the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321-4361, the Federal Land Policy and Management Act (FLPMA), 43 U.S.C. § § 1701-1784, the Public Rangelands Improvement Act (PRIA), 43 U.S.C. §§ 1901-08, the Taylor Grazing Act of 1934, 43 U.S.C. §§ 315-315r, and the Steens Act, each actionable under the Administrative Procedure Act (APA), 5 U.S.C. §§ 701-706. Plaintiff's allegations specifically allege the BLM's failure to: (1) consider the environmental consequences of the proposed action on the wilderness resource; (2) engage in a proper multiple use balancing process as to the wilderness resource, relying upon up-to-date and accurate inventory information, and ensuring the proposed action will not cause "unnecessary or undue degradation" to the public lands; (3) analyze a reasonable range of alternatives with respect to lands allocated to, and authorized levels of, domestic livestock grazing, as well as lands designated as "closed" to off-highway vehicle use; (4) assess or determine the suitability of the public lands for grazing; (5) adopt a Transportation Plan within the time required by Congress in the Steens Act; and (6) complete the

Transportation Plan as an integral part of the Andrews-Steens RMP. Complaint, ¶¶ 1-3.

**\*2** Plaintiff challenges the BLM's grazing allocation and off-highway vehicle designation decisions as follows, the BLM failed to: (1) satisfy NEPA's range of alternatives and "hard look" requirements with respect to lands allocated to, and authorized levels of, livestock grazing, as well as lands designated "closed" to off-highway vehicle use; (2) assess or determine the suitability of the public lands for grazing, as required by FLPMA, the Public Rangelands Improvement Act, and the Taylor Grazing Act; and (3) properly balance competing uses of the public lands and their resources in a way that satisfied FLPMA's multiple-use requirements.

*DISCUSSION*

*MOTIONS TO INTERVENE*

*Standards Pursuant to Fed.R.Civ.P. 24(a), (b)*

Intervention of right pursuant to Rule 24(a) requires the satisfaction of a four-part test: (1) the applicant's motion must be timely; (2) the applicant must assert an interest relating to the property or transaction that is the subject of the action; (3) the applicant must be so situated that without intervention the disposition of the action may, as a practical matter, impair or impede the applicant's ability to protect that interest; and (4) the applicant's interest is not adequately represented by the other parties.*United States v. State of Oregon,* 839 F.2d 635, 637 (9ᵗʰ Cir.1988); and *Northwest Forest Resource Council v. Glickman,* 82 F.3d 825, 836 (9ᵗʰ Cir.1996). The burden is on the intervener to establish that the requirements for intervention are satisfied. *Petrol Stops Northwest v. Continental Oil Co.,* 647 F.2d 1005, 1010 n.5 (9ᵗʰ Cir.1981).

Permissive intervention pursuant to Rule 24(b)(2) requires that an applicant show the following: (1) its motion is timely; (2) it shares a common question of law or fact with the main action; and (3) the court

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2006 WL 2601073 (D.Or.)
**(Cite as: Not Reported in F.Supp.2d)**

has an independent basis for jurisdiction over the applicant's claims. *Donnelly v. Glickman,* 159 F.3d 405, 412 (9th Cir.1998)(internal citations omitted). The court has broad discretion in granting or denying permissive intervention.*Id.*

### (1) Harney County's Motion to Intervene

Harney County is a political subdivision of the State of Oregon. Pursuant to Fed.R.Civ.P. 24(a), (b), Harney County requests leave to intervene as a defendant-intervenor in this action because it has "a significant interest in the wise and proper implementation of the [Steens Act]" in lands within Harney County.

Defendant does not object to Harney County's intervention. Plaintiff objects to Harney County's intervention and requests that this court allow the County leave to intervene only as to the remedial phase of this litigation. I agree.

### (1) Timeliness

Applying the test outlined above, I find that Harney County's motion is timely. Under Rule 24(a), a court must consider: (1) the stage of the proceeding at the time intervention is sought; (2) the possible prejudice to the other parties from any delay in seeking intervention; and (3) the reasons for the length of any delay. *County of Orange v. Air California,* 799 F.2d 535, 537 (9th Cir.1986), *cert. denied,*480 U.S. 946 (1987). This case was filed on February 21, 2006. Harney County promptly held a public meeting under the Oregon Public Meetings Law wherein it debated whether to intervene, and subsequently drafted the motion to intervene. Further, the court notes Harney County's ability to comply with the court's discovery and pretrial scheduling order including motions, hearings and trial. Finally, I note that plaintiff does not contest the timeliness of Harney County's motion.

### (2) Interest in Subject Matter

**\*3** A party may intervene as a matter of right if it is

able to assert an interest in the property or transaction that is the subject of the action. Here, Harney County asserts an interest in the property within its boundaries, including the management of federal and private lands within the Andrews Management Unit and the Steens Mountain Cooperative Management and Protection Area.

Specifically, Harney County asserts that it has participated in the land management planning for these lands and has coordinated its own land use planning with these various plans at issue. Further the Steens Mountain Cooperative Management and Protection Area Plan is premised, in part, upon the County providing search and rescue, road management, and sheriff services on the lands within or abutting the Area. Finally, pursuant to the Oregon system of land use planning, the County is responsible for coordinating its local plans with the federal plans and to protect water quality, scenic features, wildlife, fisheries and wild and scenic rivers on lands within the county.

I find that the County fails to establish a "significant protectable interest" which would allow intervention in this lawsuit. The rule in the Ninth Circuit regarding intervention is clear: when, as here, the claims in an environmental case go only to the government's compliance or non-compliance with its legal duties, the federal government is the only proper defendant in the liability phase of the case. *See Kootenai Tribe of Idaho v. Veneman,* 313 F.3d 1094 (9th Cir.2002). There, the court considered whether the defendant-intervenors allowed by the district court were an appropriate party to defend an action by plaintiff against the federal government. The court held: "[a]s a general rule, the federal government is the only proper defendant in an action to compel compliance with NEPA."*Id.* at 1107-08.The rule is "based on the premise that private parties do not have a ' significantly protectable interest' in NEPA compliance actions."*Id.* at 1108.The court reasoned that NEPA and other environmental laws required action only by the government, and therefore only the government can be liable under those laws. *Id.* (internal quotation omitted).

Moreover, that rule has been applied by the Ninth

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2006 WL 2601073 (D.Or.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 4

Circuit to state, county and city governments seeking intervention. In *Forest Conservation Council v. U.S. Forest Service,* 66 F.3d 1489 (9th Cir.1995), the court reaffirmed that the state and county could not "claim any interest that relates to the issue of the Forest Service's liability under NEPA and NFMA."*Id.* at 1495, 1499 n.11. Similarly, in *Churchhill County v. Babbitt,* 150 F.3d 1072 (9th Cir.1998), the court again applied the rule to city and county governments, reasoning that "because NEPA requires action only by the [federal] government, only the government can be liable under NEPA" and the city and county " cannot comply" with NEPA, therefore [they] cannot be defendants in a NEPA compliance action." *Id.* at 1082.As here, the proposed Intervener in *Churchhill County* also argued at length that it had a "significantly protectable" interest in the underlying action. Despite those arguments, the court firmly held that the Intervener "does not have a 'significantly protectable' interest in federal government compliance or noncompliance with NEPA."*Id.*

**\*4** The court accepts the County's assertions that it has responsibilities under state law to protect water quality, fish and wildlife, and other nature resources, however, that fact is irrelevant to whether the BLM complied with NEPA and other federal laws when it adopted the Andrews-Steens RMP. Here, the statutory provisions that form the basis of plaintiff's claims-NEPA, FLMPA, PRIA, the Taylor Grazing Act, and the Steens Act-regulate only the actions of the federal government. The Acts listed above do not impose any duties, rights or obligations on private parties, including the County, nor do plaintiff's claims implicate state or private lands.

### (3),(4) *Adequate Representation of County's Interest*

The Ninth Circuit has held that in determining the adequacy of representation, the following factors should be considered: (1) whether the current party's interest is such that it will undoubtedly make all of the intervenor's arguments; (2) whether the current party is capable and willing to make such arguments; and (3) whether the Intervener would

offer any necessary elements to the proceeds that other parties would neglect. *People of the State of California v. Tahoe Regional Planning Agency,* 792 F.2d 775, 778 (9th Cir.1986).

The County argues that where the government is the representative, "the requirement of inadequacy of representation is satisfied if the applicant shows that representation of its interests 'may be' inadequate and ... the burden of making that showing is minimal."*United States v. Stringfellow,* 783 F.2d 821, 827 (9th Cir.1986), *vacated and remanded on other grounds,*107 S.Ct. 1177 (1987).

Here, the County asserts that the government cannot adequately represent its interests as its interests are broader than those of the federal defendants and cover the private lands as well as the federal lands within the external boundaries of the Area. Further, the federal defendants do not share in the County's dependency upon federal grazing receipts nor in the County's obligations to provide transportation, land use planning, search and rescue, or sheriff patrols in and abutting the areas covered by the various land management plans.

The County specifically refers to its duties and powers under the State of Oregon's comprehensive land use planning. These duties and powers are not shared by the BLM and are unique to the County. In managing the Area, the County argues that it is necessary to inquire into the manner in which the State of Oregon, and the County, regulate the private lands within the external boundaries of these Areas, a matter left exclusively to the states. These areas cannot be effectively managed by the BLM alone and requires cooperation between the BLM, private landowners and the County. Regulation of private lands with the Areas external boundaries is one of the responsibilities delegated to the County under the Oregon system of comprehensive planning. *See* Affidavit of Steven R. Grasty (duty and power to conserve and protect the natural resources of the County, improve and protect the quality of Oregon's air, water and land resources).

**\*5** The court has no quarrel with the County's assertions outlined above, however, I find that the BLM will adequately represent the County's

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                          Page 5

Not Reported in F.Supp.2d, 2006 WL 2601073 (D.Or.)
**(Cite as: Not Reported in F.Supp.2d)**

interests during the liability phase of this case. During the liability phase, the County has the same interest as the BLM and any other member of the public: an interest in assuring that the federal defendants have complied with all applicable federal laws. There is generally a presumption of adequate representation when the representative is a governmental body or officer charged by law with representing the interests of the public. *Forest Cons.Council,* 66 F.3d at 1499.

Moreover, I note that in its Proposed Answer, Harney County has not asserted any affirmative or other defenses, or cross-claims. The County's statement that its "interests are broader than those of the federal Defendants and cover private lands as well as federal lands[,] does not support a finding that the County's interests are not adequately protected. Harney County's Brief, p. 11. I agree, however, that during the remedial phase of this litigation there is a possibility that the interests of the BLM and the County may diverge.

Finally, I find that the County is not entitled to permissive intervention pursuant to Rule 24(b)(2). I find no independent basis for jurisdiction over the County's claims, nor has the County argued that the court has an independent basis for jurisdiction over its claims. *Donnelly,* 159 F.3d at 412 (internal citation omitted).

Regarding the requirement that there be a common question of law or fact, again, the only issue in the liability phase of this ligation is whether the BLM has complied with NEPA, FLPMA and other federal statutes. There is no dispute that only the BLM can be held liable under these federal laws, and only the BLM can be ordered to comply with the statutory provisions at issue. Harney County fails to demonstrate that any legal position it might advance concerning plaintiff's claims is any different than the position advanced by the BLM. *SeeKootenai Tribe,* 313 F.3d at 1111 (if "the would be intervenor's claim or defense contains no question of law or fact that is raised also by the main action, intervention under Rule 24(b)(2) must be denied.").

In conclusion, given the clear law of the Ninth

Circuit on this issue, Harney County's motion to intervene is granted in part. Harney County is granted intervention of right in the remedial phase of this lawsuit, and denied intervention in the liability phase of this lawsuit. Harney County's alternative Motion for permissive intervention is denied. Further, Harney County may file briefs and attend oral argument as amicus curiae during the liability phase of the lawsuit.

### (2) *Steens Mountain Landowner Group's Motion to Intervene*

Steens Mountain Landowner Group (SMLG) is a non-profit association formed under the laws of the State of Oregon, on behalf of private landowners within the Steens Mountain Cooperative Management and Protective Area. SMLG seeks to intervene in this lawsuit as a defendant-intervenor pursuant to Fed.R.Civ.P. 24 as a matter of right, and alternatively, move for permissive intervention. Defendants do not oppose this motion.

**\*6** SMLG is comprised of 23 property owners with land located inside or adjacent to the Area. Because their lands are intertwined with the Area lands, SMLG members access their private lands through the public lands in the Area. Members also utilize the lands in the Area in conjunction with their private lands in order to support commercial livestock and commercial recreational businesses. " SMLG members were key players in the cooperative process undertaken by Congressman Walden that led to the enactment of the Steens Act." SMLG's Memo in Support, p. 3. "For example, a number of privately-held ranches exchanged land with the BLM in order to effectuate its enactment. These compromises by private landowners are specifically recognized in the Act itself."*Id.* (internal citations omitted)."Since the enactment of the Steens Act, SMLG and its members have participated in, commented on and reviewed BLM's actions with respect to the Steens Act and the [Area]."*Id.*

SMLG argues that it must be granted full party status "not only to protect its economic interests but also to ensure that Plaintiff and BLM do not

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2006 WL 2601073 (D.Or.)
**(Cite as: Not Reported in F.Supp.2d)**

compromise the intent and goals of the Steens Act." *Id.* at p. 4.

The court refers to and relies on the standards section outlined above to determine whether to allow intervention. Plaintiff does not contest the timeliness of SMLG's motion and the court finds that it was timely filed.

Regarding SMLG's "significantly protectable" interests related to the subject matter of this litigation, SMLG asserts that its members' livestock grazing and commercial recreation businesses rely on access to privately held property across public lands. Further, SMLG argues that if that access is diminished, the value of SMLG members' property will be substantially diminished. SMLG's Memo, p. 10. Specifically, SMLG argues that if plaintiff prevails on its claims, "the practical outcome is that access to private land, grazing, and recreational uses would be restricted and constrained. Therefore, the resolution of these claims directly implicates SMLG's members' economic and real property interests, which were specifically protected by the Steens Act."SMLG's Memo, p. 13. Finally, the SMLG asserts that "any reduction in grazing rights, commercial recreational use, or access to private lands will have a negative impact on SMLG's members. A ruling dismissing Plaintiff's claims will allow SMLG's members to continue the current level of use of public lands for these purposes. Any concessions by the BLM to resolve this dispute will impact SMLG's members to the extent it lessens their use of public lands. Therefore, as a practical matter, SMLG's members will be substantially affected by the outcome in this case and are entitled to intervene."SMLG's Memo, p. 14.

SMLG fails to adequately discuss or distinguish any of the many Ninth Circuit cases that mandate this court's ruling when dealing with a private party requesting intervention in a NEPA or FLMPA lawsuit against the government. Instead, SMLG relies on a case brought under the Clean Water Act (CWA), *Sierra Club v. U.S. Environmental Protection Agency,* 995 F.2d 1478 (9th Cir.1993). There, the CWA established a scheme explicitly designed to permit and thereby regulate the discharge of sewage sludge into navigable waters of

the United States. *Id.* at 1485.This scheme protects the interests of persons who discharge sewage sludge pursuant to such permits. The proposed-intervenor (City of Phoenix) had such a permit, and therefore the court found the City had a "protectable interest" and allowed intervention. *Id.* SMLG asserts that the statutes at issue here also authorize permits for use of public lands, SMLG members hold or own such permits, and therefore SMLG has a "protectable interest" sufficient to obtain intervention of right.

*7 I disagree. *Sierra Club* specifically distinguished their facts precisely because the case was brought pursuant to the CWA. "The Clean Water Act does not principally regulate the EPA. It regulates private parties and state and local governments, such as the City of Phoenix."*Id.* at 1485.The court went on to note that it is "one thing to hold that only the government can be a defendant in a NEPA suit, where the statute regulates only government action, but quite another to exclude permit-holding property owners from a Clean Water Act suit, where the statute directly regulates their conduct."*Id.* Therefore, while the Ninth Circuit has allowed such intervention pursuant to the CWA, it has not allowed intervention pursuant to NEPA, FLMPA, and other similar federal Acts. As stated earlier, in challenges such as this which allege that the federal government has failed to comply with non-discretionary duties under federal statutes like NEPA and FLPMA, the Ninth Circuit has established a rule limiting intervention of right to " none but a federal defendant." *Kootenai Tribe,* 313 F .3d at 1108. *See also,Wetlands Action Network v. U.S. Army Corps of Engineers,* 222 F.3d 1105, 1114 (9th Cir.2000) ("Because a private party cannot violate NEPA, it cannot be a defendant in a NEPA compliance action.").

Further, I note that SMLG's economic interests based on its members' businesses and an interest in access to private property do not qualify as " significant protectable interests" under Ninth Circuit law. *SeeRanchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dept. of Agric.,* 143 Fed. Appx. 751, 753 (9th Cir.2005) (" pure economic expectancy is not a legally protected interest for purposes of intervention") (internal

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2006 WL 2601073 (D.Or.)
**(Cite as: Not Reported in F.Supp.2d)**

citations omitted). Specifically, because the decision to issue grazing permits is discretionary by the BLM, and because those federally-issued permits convey no "right, title, or interest, or estate in or to the public lands," SMLG's members' economic interests based on federally issued grazing permits are not a "significant protectable interest." 43 U.S.C. § 315b. This also applies to individuals holding various "special recreation permits" which allow them to conduct private commercial operations on public lands. This court has previously found that status as special use permit holders, operating tours and other commercial activities conducted in a wild and scenic river corridor did not establish a protectable interest in a NEPA action. *Riverhawks v. Zapeda,* CV 01-3035-AA (D.Or. Aug. 23, 2001) (citing *Wetlands Action Network,* 222 F.3d at 1114). Therefore, the SMLG's economic interest in ensuring its members' commercial operations relying on federally-permitted use of the public lands remains unchanged and that interest is not at issue unless and until this action reaches the remedial phase.

Finally, I find no basis for SMLG's contentions that if plaintiff prevails on its claims, "the practical outcome is that access to private land, grazing, and recreational uses would be restricted and constrained."None of the statutory provisions at issue in plaintiff's lawsuit or the relief requested by plaintiff affect the rights of private individuals to access their private lands. Complaint, ¶¶ 44-78.

**\*8** Alternatively, SMLG argues that it is entitled to permissive intervention pursuant to Rule 24(b)(2). Again, I disagree. As explained above, this court finds no independent basis for jurisdiction over SMLG's claims, with respect to the liability phase of the litigation. Moreover, SMLG has not attempted to argue that the court has an independent basis for jurisdiction over its claims. Further, regarding the necessity for a common question of law or fact, the only issue in the liability phase of this litigation is whether the BLM has complied with NEPA, FLPMA and other federal statutes. Only the BLM can be held liable under these federal laws, and only the BLM can be ordered to comply with the statutory provisions at issue.

Therefore, I find that SMLG fails to demonstrate that any legal position it might advance concerning plaintiff's claims is any different than that of the BLM's. Therefore, SMLG's alternative motion for permissive intervention is denied.

In conclusion, based on the case law cited at length above, SMLG's motion to intervene as a matter of right is denied as to the liability phase, however, it is granted as to the remedial phase. Further, SMLG may also participate in the liability phase of this lawsuit as amicus curiae by submitting briefs and attending oral argument.

### (3) *Center for Tribal Water Advocacy Motion to Intervene*

The Center for Tribal Water Advocacy (CTWA) moves to intervene as a plaintiff in this lawsuit. Plaintiff ONDA does not object to the motion. Defendants object to CTWA's intervention in this lawsuit.

CTWA is a non-profit Oregon public interest entity whose members use the Area and the lands covered by the Andrews RMP area for cultural, traditional, recreational, fishing, hunting and aesthetic pursuits. CTWA Motion to Intervene, p. 3. CTWA's approximately 100 members include Indian Tribe members located throughout the Pacific Northwest. CTWA is headquartered in Pendleton, Oregon. CTWA's mission is to "protect, defend, and restore forever, water right and water quality interests of Federally recognized Indian Tribes and their members."CTWA's Memo in Support, p. 9. CTWA asserts that "for the most part," its members are not members of plaintiff ONDA and "retain legal interest separate from the general public that are not representative of the ONDA membership."CTWA's Reply, p. 4.

CTWA's motion to intervene was timely filed. Defendants do not contend otherwise.

CTWA filed a 24-page proposed complaint in intervention. Defendants object to CTWA's intervention "on the present record," arguing first that CTWA "has offered absolutely no arguments or

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 8

Not Reported in F.Supp.2d, 2006 WL 2601073 (D.Or.)
**(Cite as: Not Reported in F.Supp.2d)**

rationales upon which it can even arguably demonstrate that it satisfies the criteria in [Rule 24].... CTWA simply recites the test of the rule, but nowhere, in its motion or otherwise, does it articulate any reasons that ostensibly serve to establish that it has met the rule's standards." Defendants' Response, p. 2.

**\*9** Second, defendants object to CTWA's motion because
virtually the only factual evidence that CTWA offers in support of its motion is a four-paragraph affidavit of its own counsel.... [Moreover,] [t]he allegations that CTWA sets forth in its proposed complaint are not significantly or sufficiently specific or satisfactory in this regard.... Even taken collectively, the largely conclusory and overly vague averments and allegations that CTWA proffers in its moving papers fall well short of establishing a sound factual predicate for the necessary findings that, among other things, litigation of the claims without its participation stands to impair its ability to protect one or more legally protectable interests and that the original plaintiff, [ONDA], cannot adequately represent any such interests.

Defendants' Response, p. 2-3.

CTWA replies that in compliance with Rule 24, it attached to and filed with its motion to intervene its Complaint in Intervention which fully and thoroughly describes the basis for CTWA's standing, rights in intervention and sets forth its claims for which intervention is sought. I agree that CTWA's proposed 24-page complaint in intervention adequately sets out each of the claims brought by CTWA against the defendant. CTWA's motion to intervene as a plaintiff in this action is granted.

### (4), (5) *Defendant's Motion to Stay and Plaintiff's Motion for Partial Summary Judgment*

Defendants move for a stay of plaintiff's motion for partial summary judgment on plaintiff's sixth claim for relief and request that plaintiff's motion be considered under the same dispositive motion

briefing schedule as previously set by this court.

This court retains "inherent power to control the disposition of the causes on its docket in a matter which will promote economy of time and effort for itself, for counsel, and for litigants. *CMAX, Inc. v. Hall,* 300 F.2d 265, 268 (9th Cir.1962). This discretion includes postponing summary judgment on plaintiff's sixth claim until all of the claims can be considered together.

As already stated on the record during the hearing on these motions, defendants' motion to stay consideration of plaintiff's motion for partial summary judgment is granted. Plaintiff's motion for partial summary judgment is stayed. Plaintiff's motion for partial summary judgment will be considered along with the other summary judgment motions due October 20, 2006, and subject to the briefing schedule set by the court.

### (6) *Plaintiff's Motion to Consolidate*

Plaintiff requests that the action at bar (*SHUFORD*) be consolidated with another pending action, *Oregon Natural Desert Association v. Gammon,* CV 06-523-HO (D. Or. filed April 21, 2006). Plaintiff-**intervenor**, CTWA, filed a "Reply in Support of **Motion** to **Consolidate**" joining in plaintiff's motion and brief.

In *Gammon,* both the Answer and Administrative Record have been filed, and dispositive motions are due November 7, 2006. Specifically, plaintiff requests that the court maintain separate schedules for briefing dispositive motions, but order that oral argument on cross-dispositive motions in both cases be consolidated into a single hearing.

**\*10** As stated earlier, *Shuford* involves plaintiff ONDA's assertion that BLM violated federal environmental laws in their adoption of the Andrews-Steens Resource Management Plan. The *Gammon* lawsuit, filed by ONDA along with co-plaintiffs Oregon Natural Resources Council Fund and Northwest Environmental Defense Center, alleges similar violations concerning the BLM's adoption of the Lakeview Resource

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                          Page 9

Not Reported in F.Supp.2d, 2006 WL 2601073 (D.Or.)
**(Cite as: Not Reported in F.Supp.2d)**

Management Plan and the Beaty Butte Allotment
Management Plan.

### STANDARDS

Fed.R.Civ.P. 42 provides:
When actions involving a common question of law
or fact are pending before the court, it may order a
joint hearing or trial of any or all of the matters in
issue in the actions; it may order all the actions
consolidated; and it may make such orders
concerning proceedings therein as may tend to
avoid unnecessary costs or delay.

*Id.*

District courts have broad discretion in deciding
whether to consolidate cases within the same
district. *Investors Research Co. v. U.S. Dist. Court,*
877 F.2d 777 (9th Cir.1989). Local Rule 42
provides that "[u]nless otherwise directed by the
court consolidation and case Management of
complex or related cases will usually be governed
by the principals set forth in The Manual for
Complex Litigation, Third."L.R. 42.1. The Manual
states that actions "involving common questions of
law or fact may be consolidated ... if it will avoid
unnecessary cost or delay."Manual § 21.631.

### DISCUSSION

Consolidation is only appropriate if there are
common questions of law or fact. Plaintiff argues
that each of these two actions allege that the BLM
violated a number of federal environmental laws in
adopting resource management plans (RMP) for
neighboring several million-acre areas of public
lands in southeast Oregon. A RMP is a land use
plan that establishes, for a particular area of the
public lands, allowable uses, land designations,
goals for future condition of the land, program
constraints and management practices,
implementation requirements, intervals and
standards for monitoring and evaluation of the plan,
and specific next steps in management. *See*43
C.F.R. §§ 1601.0-5(k), 1712. The *Gammon* case
also includes three claims directed at BLM's

decision adopting the Beaty Butte allotment
management plan (AMP). FLPMA provides that the
BLM may prepare AMPs which are activity-level
plans that "prescribe[ ] the manner in, and extent to
which livestock operations will be conducted in
order to meet multiple-use, sustained yield,
economic and other needs and objectives. 43 U.S.C.
§ 1702(k). AMPs are "tailored to the specific range
condition of the area: and are intended to "
improv[e] the range condition of [those] lands." 43
U .S.C. § 1752(d).

In both cases, plaintiff argues that it "targets several
core issues of concern," primarily under NEPA and
FLPMA. Plaintiff's Memo in Support, p. 4.
Plaintiff's primary complaint about the RMPs
concern BLM's alleged violation of its statutory
duties concerning management of public lands
containing outstanding wilderness values. This
concern gives rise to claims under two independent
and district statutory duties: NEPA requires the
BLM to take a "hard look" at the direct, indirect,
and cumulative impacts of its decision on the
wilderness resource; FLMPA establishes the BLM's
duty to affirmatively balance the wilderness
resource against the other valid "multiple uses" of
the public lands to ensure its selected course of
action will not cause "unnecessary or undue
degradation," and to achieve that purpose by
collecting and maintaining accurate, up-to-date
inventory information on wilderness and other
resources. 42 U.S.C. § 4332(2)©); 43 U.S.C. §§
1711(a),       1712©),       1732(a),(b).       Plaintiff
acknowledges that the underlying facts are different
in both cases-the public lands at issue versus the
timing       of       wilderness       inventories
conducted-however, plaintiff argues that both
actions raise the same legal questions.

**\*11** Plaintiff also asserts that both actions raise
identical legal questions concerning the BLM's
grazing allocation and off-highway vehicle
designation decisions. Specifically, plaintiff's claims
allege that the BLM: (1) failed to satisfy NEPA's
range of alternatives and "hard look" requirements
with respect to lands allocated to, and authorized
levels of, livestock grazing, as well as lands
designated "closed to off-highway vehicle use;" (2)
did not assess or determine the suitability of the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                  Page 10

Not Reported in F.Supp.2d, 2006 WL 2601073 (D.Or.)
**(Cite as: Not Reported in F.Supp.2d)**

public lands for grazing, as required by FLPMA, the Public Rangelands Improvement Act, and the Taylor Grazing Act; and (3) did not properly balance competing uses of the public lands and their resources in a way that satisfied FLPMA's multiple-use requirements.

Plaintiff acknowledges that both actions contain claims that are distinct from the other. *Shuford* contains two claims (six and seven) under the Transportation Plan provision under the Steens Mountain Act. In the *Gammon* case, there are three claims related to the BLM's decision adopting the Beaty Butte AMP.

The Manual for Complex Litigation states: " [w]hether consolidation is permissible or desirable will depend in large part on the extent to which the evidence in the cases is common."Manual at § 21.631. Unless common evidence predominates, consolidation may lead to confusion while failing to improve efficiency. *Id.* Plaintiff acknowledges that the challenged agency decisions in these two actions will rely upon separate administrative records, therefore, "common evidence does not predominate. " Plaintiff's Memo in Support, p. 6. Plaintiff then states the lack of common evidence between the two cases is the "main reason" why plaintiff recommends separate briefing schedules "with the possibility of a consolidated hearing following completion of briefing in both cases."*Id.* at 6-7.Finally, plaintiff notes that consolidating lodging of the administrative record and/or briefing on the merits in these two actions "would *not* be efficient due to the sheer magnitude of the record (estimated to be on the order of 20,000 pages in each action) and the briefing."*Id.* at p. 8, n.2 (emphasis in original).

Defendants object to consolidation, with the SMLG filing a separate brief in opposition. Defendants point to *Oregon Natural Desert Ass'n v. USFS,* 2004 WL 1293909 (D. Or. June 10, 2004), where the Forest Service filed a motion to consolidate a related case pending in the District of Oregon. Plaintiff ONDA opposed the motion. The court denied defendant Forest Service's motion to consolidate in part because ONDA's claims under the National Wild and Scenic Rivers Act (WSRA)

in the first case were not present in the second case. Further, ONDA's claims under the National Forest Management Act in the second case were not present in the first case. Although both cases contained similar claims under NEPA and the Rescissions Act, the court nonetheless determined that the plaintiff's allegations under the WSRA were central to the action, and denied the motion to consolidate. Defendants argue that is the situation at bar. Defendants assert that *Shuford* presents distinct legal issues under the Steens Act, other claims are highly fact-dependent, and the pure legal issue has already been litigated. Specifically, defendants argue that plaintiff's claims under the Steens Act are central to the *Shuford* case. The Steens Act is unique to the area at issue. These claims are not present in the *Gammon* case. Similarly, the *Gammon* case involves claims regarding the Beaty Butte AMP that are legally distinct from the claims in our case. In fact, plaintiff does not challenge any allotment management plans in *Shuford.*Like the WSRA claim in *ONDA v. USFS,* the Steens Act claims are central to *Shuford,* and the specific legal duties imposed by the WSRA in *ONDA v. USFS* are similar to those imposed on the BLM in the Steens Act with respect to the Steens Mountain Area. Therefore, defendants assert that because the Steens Act is unique to the area at issue in *Shuford* and that claim is central to the case, consolidation is not appropriate.

**\*12** While defendants acknowledge that plaintiff's NEPA and FLMPA claims in both cases are similar, defendants point out that resolution of those claims is highly fact dependent and will turn on specific facts contained in different Administrative Records.

Defendants also assert that consolidation is inappropriate because the legal question at issue in both cases has already been litigated and decided by Judge Jelderks. Plaintiff's fourth claim for relief in *Shuford* and fifth claim for relief in *Gammon* both assert that the BLM has violated the Taylor Grazing Act by failing to determine whether the public lands at issue are "chiefly valuable" for grazing. Judge Jelderks found that claim was nonjusticiable. *ONDA v. BLM,* CV 03-1017-JE, 2005 WL 711663 (D.Or. March 29, 2005) (determining that plaintiffs' claims under FLMPA and the Taylor Grazing Act were not

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                      Page 11

Not Reported in F.Supp.2d, 2006 WL 2601073 (D.Or.)
**(Cite as: Not Reported in F.Supp.2d)**

justiciable).

As noted above, the Manual counsels whether consolidation is permissible or desirable depends " in large part on the extent to which the evidence in the cases is common."Here, there is little common evidence between the two cases. The cases refer to completely different RMPs, different areas of land, and the areas are located in different BLM districts. Further, the administrative record in each of the cases is distinct because many of the determinations, such as the effects of grazing or off-highway vehicle use, are highly site-specific. Finally, relying on the precedent in *ONDA v. USFS,* cited above, evidence of BLM's compliance with Steens Act duties will not be relevant to the allegations made in *Gammon.*

Finally, consolidation will likely cause unnecessary cost and delay because the administrative record in each case is indisputably voluminous. The administrative record in our case, according to defendants, consists of "upwards of thirty thousand pages." Even plaintiff recognizes that the two cases are so distinct that separate administrative record filings, and separate briefing schedules on cross-motions for summary judgment would be necessary. The only portion that plaintiff believes should be consolidated is "possibly" the hearing on dispositive motions. Given the fact-dependent nature of the NEPA and FLMPA claims, it is unlikely that consolidation will lead to increased efficiency in reviewing the records.

Plaintiff's motion to consolidate is denied.

### CONCLUSION

The motions at bar are ruled on as follows:

Harney County's and SMLG's motions to intervene (docs.28,33) are denied as to the liability phase, but granted as to the remedial phase. These parties are also allowed to participate in the liability phase as amicus curiae.

The Center for Tribal Water Advocacy's motion to intervene (doc. 67) is granted.

The government's motion to stay (doc. 77) is granted. Plaintiff's motion for partial summary judgment (doc. 17) is stayed and will be considered with other dispositive motions filed pursuant to the briefing schedule set by this court.

**\*13** Finally, plaintiff's motion to consolidate (doc. 51) is denied.

IT IS SO ORDERED.

D.Or.,2006.
Oregon Natural Desert Ass'n v. Shuford
Not Reported in F.Supp.2d, 2006 WL 2601073 (D.Or.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Westlaw.

Not Reported in F.Supp.2d                                                                                     Page 1

Not Reported in F.Supp.2d, 2007 WL 14283 (E.D.Cal.), 64 ERC 1718
**(Cite as: Not Reported in F.Supp.2d)**

**H**
Natural Resources Defense Council v. Norton
E.D.Cal.,2007.

United States District Court,E.D. California.
NATURAL RESOURCES DEFENSE COUNCIL,
et al., Plaintiffs,
v.
Gale A. NORTON, in her official capacity as
Secretary of the Interior, et al., Defendants,
v.
San Luis & Delta-Mendota Water Authority, et al.,
Defendant-Intervenors.
Pacific Coast Federation of Fishermen's
Associations, et al., Plaintiffs,
v.
Carlos M. Gutierrez, in his official capacity as
Secretary of Commerce, et al., Defendants,
v.
San Luis & Delta-Mendota Water Authority, et al.,
Defendant-Intervenors.
**No. 1:05-CV-01207 OWW LJO.**

Jan. 3, 2007.

## ORDER DENYING MOTIONS TO DISMISS, REMAND, AND STAY.

OLIVER W. WANGER, United States District
Judge.

### I. INTRODUCTION

*1 Before the court for decision are a number of
procedural motions in two parallel cases: *NRDC v.
Kempthorne ("NRDC"),* 1:05-cv-01207, which
concerns the impact of the 2004 Operations and
Criteria Plan ("OCAP") [FN1] on the endangered
Delta smelt; and *Pacific Coast Federation of
Fishermen's Associations v. Gutierrez ("PCFFA"),*
1:06-cv-00246, which concerns the impact of the
OCAP on several endangered and threatened
species of salmonids.

FN1. The OCAP governs the coordinated
operation of the federal Central Valley
Project ("CVP") and the State Water
Project.

In both cases, Plaintiffs challenge biological
opinions ("BiOps") issued under the ESA by the
United States Fish and Wildlife Service ("USFWS"
) (for the Delta smelt case) and the National Marine
Fisheries Service ("NMFS") (for the salmonid
case), which address whether the OCAP will
jeopardize the respective listed species. Among
other things, the lawsuits allege that the BiOps fail
to consider the best available science and rely upon
uncertain (and allegedly inadequate) adaptive
management processes to monitor and mitigate the
potential impacts of the OCAP.

In mid-2006, USFWS and NMFS announced that
they would reinitiate consultation, respectively, on
the challenged biological opinions. It is anticipated
that new BiOps will be issued within 18 months.
For several months during the fall of 2006, the
parties attempted to reach a settlement as to the
management of the SWP and CVP during the
interim period. These negotiations failed to resolve
the parties' remaining disputes. Among others,
dispute continue over: (1) the fact that the Federal
and State Defendants plan to continue to implement
the OCAP in accordance with the challenged BiOps
and (2) that the federal defendants have not
promised to maintain the pre-2004 status quo,
although the exact actions they plan to take are
unclear.

In both *NRDC* and *PCFFA,* the federal defendants
now move: (1) to dismiss on prudential mootness
grounds; (2) for a voluntary remand without
vacatur; or (3) for a stay pending the completion of
renewed consultation based on the doctrine of
primary jurisdiction. In addition, federal defendants
move to consolidate *NRDC* and *PCFFA* for the
purposes of deciding the above motions and for the
purpose of deciding how the CVP and SWP should

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 2

Not Reported in F.Supp.2d, 2007 WL 14283 (E.D.Cal.), 64 ERC 1718
**(Cite as: Not Reported in F.Supp.2d)**

be operated during the interim period, should any such decision be necessary.

Plaintiffs oppose dismissing, remanding, staying, or consolidating these cases. Rather, Plaintiffs request a prompt hearing on the merits in the *NRDC* case. If they prevail, Plaintiffs anticipate asking the court to impose some form of interim relief.

Defendant-Intervenors and the Sederal Defendants support the issuance of a stay in this case, rather than dismissal, remand, or a hearing on the merits. Relative to a hearing on the merits, which Defendant-Intervenors suggest would be a waste of judicial resources, Defendant-Intervenors suggest that Plaintiffs always have the option of appealing to the court for injunctive relief, should any of the management activities threaten the species.

## II. *BACKGROUND*

**\*2** Both the Delta smelt (*NRDC* ) and salmonid ( *PCFFA* ) cases concern the coordinated operation of the federally-managed Central Valley Project (" CVP") and the State of California's State Water Project ("SWP"). Both projects divert large volumes of water from the California Bay Delta (" Delta") and use the Delta to store water.

The Delta is home to a number of endangered and threatened species, including the endangered Delta smelt (*Hypomesus transpacificus),* a small, slender-bodied fish endemic to the Delta. Historically, the Delta smelt could be found throughout the Delta, but the population has declined significantly in recent years. The Delta and its tributaries are also home to various endangered salmonid species, including the endangered Sacramento River winter-run Chinook salmon; the threatened Central Valley spring-run Chinook salmon; the threatened Central Valley steelhead; the threatened Southern Oregon/Northern California coho salmon; and the threatened California Coast steelhead. Plaintiffs concede that the population of one of these species, the winter-run Chinook, has increased somewhat in recent years, but the administrative record reveals that their population remains small and vulnerable. All of the other

salmonid species are alleged to remain low in abundance and face threats from limited habitat, low stream flows, higher than ideal water temperatures, and entrainment in CVP/SWP facilities.

### A. *Coordinated Operations and the ESA.*

The state and federal agencies charged with management of the CVP and SWP share certain facilities and coordinate operations with one another pursuant to a Coordinated Operating Agreement ("COA"). The COA, which originated in 1986, has evolved over time to reflect, among other things, changing facilities, delivery requirements, and regulatory restrictions. The most recent document concerning coordinated management is the Operating Criteria and Plan (OCAP). The OCAP proposes a number of changes to the coordinated operation of the CVP and SWP, some of which are discussed in greater detail below.

Because various endangered and/or threatened species reside in the area affected by the CVP and SWP, the OCAP must comply with various provisions of the ESA.[FN2]In this case, the Bureau of Reclamation entered into formal and early consultation with both the USFWS and NMFS concerning the OCAP's impact on the various species under each agency's jurisdiction.

> FN2. Specifically, prior to authorizing, funding, or carrying out any action, a federal agency must first consult with USFWS and/or NMFS" to "insure that [the] action ... is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined ... to be critical...."16 U.S.C. § 1536(a)(2) [ESA § 7(a)(2) ]. (This form of consultation is called "formal consultation. " 50 C .F.R. § 402.02.) In addition, an independent consultation obligation arises under § 1536(a)(3) where the federal agency "has reason to believe that an

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                     Page 3

Not Reported in F.Supp.2d, 2007 WL 14283 (E.D.Cal.), 64 ERC 1718
**(Cite as: Not Reported in F.Supp.2d)**

endangered species or a threatened species may be present in the area affected by this project and that implementation of such action will likely affect such species."(This form of consultation is called "early consultation." 50 C.F.R. § 402.02.)

**B. *The Development of the 2005 USFWS OCAP BiOp.***

Prior to 2004, the OCAP operated under Biological Opinions issued in 1993 and 1995. (The age of these prior BiOps is potentially important, as Plaintiffs seek to vacate the more recent documents. Although there is little information about the 1993/1995 BiOps in this record, USFWS asserts that the information contained within them is now seriously outdated.)

On June 30, 2004, USFWS issued a Biological Opinion (the "2004 USFWS OCAP BiOp"), addressing the impact of the OCAP on the Delta smelt.[FN3] On February 16, 2005, USFWS issued an amended BiOp (the "2005 USFWS OCAP BiOp"), which superceded the 2004 USFWS OCAP BiOp.

> FN3. On August 4, 2005, the Ninth Circuit decided *Gifford Pinchot Task Force v. United States Fish & Wildlife Serv.,* 378 F.3d 1059, 1069 (9th Cir.2004), which held that the USFWS's definition of " adverse modification" to critical habitat is an impermissible interpretation of the ESA because it focuses on whether critical habitat modifications would impact the *survival* of a species, effectively ignoring the statutorily-mandated goal of *"recovery.* "In November 4, 2004, presumably in response to this ruling, the Bureau requested reinitiation of formal consultation to address critical habitat issues.
> Plaintiffs, a coalition of non-profit conservation organizations, filed suit on February 15, 2005, alleging that the 2004 USFWS OCAP BiOp was legally inadequate in light of *Gifford Pinchot* and should be invalidated. (Doc. 1.) Plaintiffs

named as defendants the Department of the Interior and the USFWS. (*Id.*)

**\*3** The 2005 USFWS OCAP BiOp addresses the operation of the CVP and SWP as well as several future actions. These future actions, some of which are discussed in greater detail below, are: (1) increasing flows in the Trinity River; (2) "8500 Banks"; (3) operating permanent barriers in the South Delta; (4) operating an intertie between the California Aqueduct and the Delta-Mendota Canal; (5) a long-term Environmental Water Account (" EWA"); (6) delivery of CVP water to the Freeport Regional Water Project ("FRWP"); and (7) various other operational changes, including changes to a monitoring program at the North Bay Aqueduct. (2005 USFWS OCAP BiOp at 10, 76-77.)

The 2005 USFWS OCAP BiOp concludes that the coordinated operation of the SWP and CVP, including the proposed future actions, will not jeopardize the Delta smelt's continued existence. (2005 USFWS OCAP BiOp at 223.) Although the 2005 USFWS OCAP BiOp recognizes that *existing* protective measures may be inadequate, the USFWS concluded that certain *proposed* protective measures, including the EWA and a proposed " adaptive management" protocol would provide adequate protection. The proposed adaptive management protocol is known as the Delta Smelt Risk Assessment Matrix ("DSRAM"). The DSRAM utilizes a list of trigger criteria monitored on a monthly basis from December to July. (*Id.* at 98-103.)If any trigger criteria is met or exceeded, a Delta Smelt Working Group ("DSWG") is convened. The DSWG consists of representatives from USFWS, the California Department of Fish and Game, DWR, the United States Environmental Protection Agency, the Bureau, and the California Bay-Delta Authority. The DSWG then recommends corrective actions to a Water Operations Management Team ("WOMT"). The 2005 USFWS OCAP BiOp identifies four specific actions that the DSWG and WOMT must consider: (1) export reductions at one or both of the projects; (2) changes in the south Delta barrier operations; (3) changes in San Joaquin River flows; and (4) changes in the operation of the Delta cross channel. FN4

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2007 WL 14283 (E.D.Cal.), 64 ERC 1718
**(Cite as: Not Reported in F.Supp.2d)**

FN4. The 2005 USFWS OCAP BiOp also includes an incidental take statement that insulates operations implemented according to the OCAP from liability for taking Delta smelt. (2005 USFWS OCAP BiOp at 223.)

The federal government now acknowledges that shortly before the 2005 USFWS OCAP BiOP was completed, a fall midwater trawl survey of Delta smelt revealed a "substantial decline in the population index for the species."At the time the BiOp was issued, the government asserts that " limited analysis of this data existed, and the Service relied on the raw data, and its own professional judgments, as the best scientific and commercial data available."However, since the issuance of the BiOp, the CALFED agencies have analyzed the new trawl data. In part as a result of their analyses, the Service and Bureau "have concluded that substantial new information indicates that the agencies should revisit the [2005 USFWS OCAP BiOp], including the jeopardy and adverse modification analysis, and incidental take statement. "(Doc. 240 at 4-5.) [FN5]

FN5.50 C.F.R. § 402.16(b) calls for the reinitiation of formal consultation "[i]f new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered."

Scientists from CALFED Bay-Delta Program participant agencies recently developed a document based upon the new data: the Interagency Ecological Program Synthesis of 2005 Work to Evaluate the Pelagic Organism Decline (POD) in the Upper San Francisco Estuary (the "IEP POD Synthesis"). This document led the federal defendants to conclude that the OCAP for the CVP and SWP may affect Delta smelt in a manner or to an extent not previously considered. (IEP POD Synthesis, Doc. 240, Attachment 1.)

**\*4** In addition, other new information recently became available, including information concerning changes to the operation of project elements and

new studies on the impact of climate change. The Federal Defendants submit that this new information may affect the 2005 USFWS OCAP Biop in several ways:

First, the environmental baseline and jeopardy analysis will be revisited, because whether or not the OCAP implementation will appreciably reduce the likelihood of survival and recovery of the Delta smelt must be evaluated against what may likely be a new baseline, potentially with a lower species population than was previously understood to exist. Second, the critical habitat analysis will be revisited, because data on salinity concentrations, declining population recruitment activity from downstream areas, and invasion of the exotic clam species, potamocorbula amurensis, require further analysis of whether the implementation of the OCAP adversely modifies critical habitat, in terms of both survival and recovery of the species. Third, and finally, the existing incidental take statement may need to be revised to take into account recent Delta smelt populations changes.

(Doc. 242 at 6.)

On July 6, 2006, the Bureau of Reclamation (the " Bureau") requested that the USFWS re-initiate consultation concerning the impact of the OCAP on the Delta smelt. (Doc. 240.) In a July 6, 2006 letter from the Bureau to the USFWS, the Bureau acknowledged that "emerging data indicates an apparent substantial decline in the Delta smelt population index."(Doc. 240-2.)

### C. The NMFS OCAP BiOp.

In the *PCFFA* case, a parallel consultation process resulted in the issuance by NMFS of a Biological Opinion ("BiOp") on October 21, 2004, (the "2004 NMFS OCAP BiOp"), which addressed the impact of the OCAP on the salmonid species. The 2004 NMFS OCAP BiOp concludes that the salmonid species may be adversely affected by the CVP and SWP. For example the systems' dams and other water management structures have altered some salmonid species' habitat and limited the habitat available for spawning and rearing. In addition the salmonid species may be adversely affected by

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2007 WL 14283 (E.D.Cal.), 64 ERC 1718
**(Cite as: Not Reported in F.Supp.2d)**

project operations. The storage and release of water will affect river flows and temperatures, and the diversion of water may result in entrainment at fish screens and pumps.

Subsequent to the issuance of the 2004 NMFS OCAP BiOp, NOAA listed the green sturgeon population segment as threatened and designated critical habitat for numerous salmonid and steelhead species. The Bureau acknowledges that this is "new information" requiring the reinitiation of ESA § 7 consultation on the 2004 NMFS OCAP BiOp. In addition, the federal defendants acknowledge that independent peer-reviews and an audit "provided important feedback" on the 2004 NMFS OCAP BiOp. (Doc. 81 at 7.) Accordingly, the Bureau and NMFS are revisiting the 2004 NMFS OCAP BiOp, including "the potential effects of ongoing CVP and SWP operations to the newly listed species and newly designated critical habitat, the jeopardy and adverse modification, analysis and the incidental take statement."(*Id.*)

### III. *EVIDENTIARY DISPUTES*

#### A. *Plaintiffs' Requests for Judicial Notice.*

**\*5** In opposition to the federal defendants motion to dismiss, remand and or stay in the Delta smelt case, Plaintiffs request that the district court take judicial notice of a number of documents. One of the documents is an unpublished court decision in *Rock Creek Alliance v. U.S. Fish & Wildlife Serv.,* No. CV 01-152-M-DWM (D.Mont. Mar. 19, 2002) (Docket No. 24). This is a judicially noticeable court record. No party objects to the court taking judicial notice of another court document, consisting of excerpts from the CALFED Programmatic Record of Decision, issued August 8, 2000, and obtained from the CALFED website.

The remaining documents appear to post-date the issuance of the challenged biological opinions. Federal defendants object to the court taking judicial notice of these documents on the ground that the scope of review in this case should be limited to the administrative record. (*NRDC* Doc.

283; *PCFFA* Doc. 88.) Section 706 of the Administrative Procedure Act (APA), 5 U.S.C. § 706, provides for judicial review of federal administrative actions based upon "the whole record or those parts of it cited by the party."In general, review should be of "the full administrative record that was before the [agency decisionmaker] at the time he made his decision."*Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 420 (1971). For example, post-decisional documents are not ordinarily included in the administrative record. *See Rock Creek Alliance v. United States Fish and Wildlife Serv.,* 390 F. Supp 2d 993, 998 (D.Mont.2005) (refusing to consider post-decisional information not available to the agency in that particular form at the time of the decision). The Ninth Circuit recognizes several exceptions to this general rule, however. District courts are permitted to admit extra-record evidence:
(1) if admission is necessary to determine whether the agency has considered all relevant factors and has explained its decision,
(2) if the agency has relied on documents not in the record,
(3) when supplementing the record is necessary to explain technical terms or complex subject matter, or
(4) when plaintiffs make a showing of agency bad faith.

*Lands Council v. Powell,* 395 F.3d 1019, 1030 (9th Cir.2004)."These limited exceptions operated to identify and plug holes in the administrative record .. . [and] are narrowly construed and applied."*Id.*The scope of these exceptions permitted by our precedent is constrained, so that the exception does not undermine the general rule. Were the federal courts routinely or liberally to admit new evidence when reviewing agency decisions, it would be obvious that federal courts would be proceeding, in effect, de novo, rather than with the proper deference to agency process, expertise, and decision-making.

*Id.*

Plaintiffs make no effort to provide legal authority to support supplementation of the administrative record with these post-decisional documents, nor do

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 6

Not Reported in F.Supp.2d, 2007 WL 14283 (E.D.Cal.), 64 ERC 1718
**(Cite as: Not Reported in F.Supp.2d)**

they suggest why the record of this case should not be limited to the administrative record. Although post-decisional information might be relevant in the context of a motion for interim injunctive relief, Plaintiffs do not explain why these documents should be considered as part of their continued challenge to the merits of the challenged BiOps. The request for judicial notice is **DENIED WITHOUT PREJUDICE,** except with respect to the unpublished decision from *Rock Creek Alliance* and the excerpts from the 2000 CALFED Programmatic Record of Decision of which judicial notice has been taken.

### B. *Defendant-Intervenors' Requests for Judicial Notice.*

*6 In both cases, Defendant-Intervenors request that the district court take judicial notice of:
The August 15, 2002 order of The Honorable Robert E. Coyle, United States District Judge for the Eastern District of California in Association of California in *Water Agencies v. Evans,* E.D. Cal. Case No. CV-F-00-6148 REC/DLB.

This is a judicially noticeable public record. *Schweitzer v. Scott,* 469 F.Supp. 1017, 1020 (C.D.Cal.1979) ("Although each case must be viewed on its merits, the Court is empowered to and does take judicial notice of court files and records." ).

In addition, in the *NRDC* case, Defendant-Intervenors request that the court take judicial notice of:
The October 27, 2006 Memorandum to the Administrative Record from Deputy Assistant Secretary, Fish and Wildlife and Parks explaining the contents of an email sent by Deputy Assistant Secretary Julie MacDonald to Steve Thompson, et al., on April 1, 2004, regarding the Fish and Wildlife Service's five-year status review for the Delta smelt. This document was previously made part of the administrative record in *San Luis & Delta-Mendota Water Authority v. United States Department of the Interior* (E.D.Cal., Oct. 27, 2006) F-02-6461-OWW-DLB.

This document is capable of being judicially notice, because a court can take judicial notice of its own files and records in other cases. *Wible v. Aetna Life Ins. Co.,* 375 F.Supp.2d 956, 965-66 (C.D.Cal.2005) ; *Del Puerto Water Dist. v. United States Bureau of Reclamation,* 271 F.Supp.2d 1224, 1233 (E.D.Cal.2003) (holding that a federal court "may take notice of proceedings in other courts ... if those proceedings have a direct relation to the matters at issue.").

Defendant-Intervenors' request for judicial notice is **GRANTED.**

### C. *Objections to Declaration of Christina Swanson, Submitted by Plaintiffs.*

Plaintiffs present the declaration of a Dr. Christina Swanson, PhD, an experienced fisheries biologist. ( *NRDC* Doc. 280.) In her declaration Dr. Swanson summarizes recent referenced literature and an oral presentation from a recent conference. Defendant-Intervenors object to substantial portions of Dr. Swanson's declaration on the grounds of hearsay. They also argue that certain portions constitute inadmissible opinion testimony. (*NRDC* Doc. 294) As a threshold matter, however, the district court need not address these evidentiary objections because Plaintiffs have not demonstrated why Dr. Swanson's declaration should be considered by the district court at this time. Her opinions are based at least in part on post-decision evidence and are essentially irrelevant to the pending motions.

### IV. *ANALYSIS*

#### A. *Overview.*

In both *NRDC* and *PCFFA,* the federal defendants move (1) to dismiss on prudential mootness grounds; (2) to remand the case to the agency; or (3) for a stay pending the completion of renewed consultation based on the doctrine of primary jurisdiction. Defendant Intervenors oppose dismissal or remand, but support the issuance of a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2007 WL 14283 (E.D.Cal.), 64 ERC 1718
**(Cite as: Not Reported in F.Supp.2d)**

stay. Plaintiffs oppose dismissing, remanding, or staying the case. Instead, *emphasizing the fact that Defendants continue to rely on the challenged BiOps,* Plaintiffs advocate proceeding with a decision on the merits (i.e., they seek a determination as to whether the BiOps violate the ESA). If they prevail, Plaintiffs intend to seek interim remedial relief.

**\*7** The federal defendants have also moved to consolidate *NRDC* and *PCFFA* for all purposes. The Defendant-**Intervenors** have all joined the **motion** to **consolidate**. Plaintiffs oppose consolidation.

### B. *Motion to Dismiss on Prudential Mootness Grounds.*

The federal defendants argue that both cases should be dismissed based on the doctrine of prudential mootness. The doctrine of prudential mootness permits a court, in its discretion, to dismiss a case when

a controversy, though not moot in the strict Article III sense, is so attenuated that considerations of prudence and comity for coordinate branches of government counsel the court to stay its hand, and to withhold relief it has the power to grant ... Under both Article III and prudential mootness doctrines, the central inquiry is essentially the same: have circumstances changed since the beginning of the litigation that forestall any occasion for meaningful relief.

*Sierra Club v. Babbitt,* 69 F.Supp.2d 1202, 1244 (E.D.Cal.1999)."[T]he doctrine of prudential mootness ... has particular applicability in cases ... where the relief sought is an injunction against the government."*Southern Utah Wilderness Alliance v. Smith,* 110 F.3d 724, 727 (10th Cir.1997). A court should decline to grant declaratory or injunctive relief where the government "has already changed or is in the process of changing is policies or where it appears that any repeat of the actions in question is otherwise highly unlikely."*Building and Const. Dept. v. Rockwell Intern. Corp.,* 7 F.3d 1487, 1492 (10th Cir.1993).

Here, Federal Defendants assert that the reinitiation of formal consultation is a change in circumstance that forestalls any possibility of meaningful relief in this court. Federal Defendants also assert that Plaintiffs' claims will be considered through the reinitiated consultation process. (*NRDC* Doc. 242-1 at 8.) Federal Defendants cite an unpublished district court case that considered the applicability of prudential mootness after a federal agency defendant reinitiated ESA § 7 consultation. *See, e.g. Or. Natural Res. Council v. Keys,* 2004 WL 1048168 (D.Or. May 7, 2004) (applying doctrine of prudential mootness where agency was in the process of reinitiating consultation and "plaintiffs' concerns [would] be fully addressed in the new consultation").

But, Plaintiffs correctly point out that courts have refused to dismiss on prudential mootness grounds where the action agency did not indicate an intent to change its operations. *See Am. Rivers, Inc. v. NOAA Fisheries,* No. CV-04-0061, 2004 WL 2075032 at *3 (D.Or. Sept. 14, 2004). In that case, the district court refused to dismiss on prudential mootness grounds despite reinitiation of consultation because the agencies involved did not intend to change their opinion or alter their operations significantly.

Here, the Defendants have volunteered to change their operations to a certain extent. For example, DWR has promised that it will NOT increase pumping above pre-2004 levels. The Federal Defendants have made a less firm commitment to maintain pumping from the Tracy Pumping Plant at "recent historic" levels. In addition, Federal Defendants have promised that, during the interim period, they will

**\*8** • not execute long-term water service contracts for CVP water deliveries; and

• not further implement new construction activities or long term projects in the Sacramento Delta without necessary ESA consultation;

Apart from these promises, however, the Federal Defendants continue to maintain that the challenged BiOps are valid and lawful, continue to implement at least some portions of the measures set forth therein, and continue to operate under the protection of the incidental take statements included

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                              Page 8

Not Reported in F.Supp.2d, 2007 WL 14283 (E.D.Cal.), 64 ERC 1718
**(Cite as: Not Reported in F.Supp.2d)**

in the BiOps.

Plaintiffs point to some specific examples of actions the Federal Defendants plan to take in reliance on the challenged BiOps. In the salmonid case, the Federal Defendants want to alter the the pre-2004 temperature compliance point at Bend Bridge [FN6] and refuse to promise compliance with the pre-2004 requirement that 1.9 million acre feet ("MAF") be held behind Shasta Dam as a cold water carryover. [FN7] Plaintiffs maintain that the corrective measures (such as the EWA) set forth in the BiOps are insufficient to protect the species against such changes.

> FN6. This temperature compliance point is the geographical point at which the temperature must be maintained at or below a certain level, to protect the salmonids' ability to successfully spawn and ensure that their offspring can survive downstream migration. The Federal Defendants advocate allowing this compliance point to move geographically upstream during non-critical times of the year, because this will conserve cold water resources for more critical times of the year.

> FN7. The 1.9 MAF coldwater carryover refers to an amount of cold water that is to be held behind Shasta Dam for the purpose of maintaining the appropriate coldwater compliance point.

Plaintiffs' concerns have not been fully addressed by the reinitiation of consultation. Federal Defendants are relying in part on the challenged BiOps in operating the CVP and intend to continue to do so. The controversy over whether the BiOps and OCAP should have continued viability is real and substantial. and this court could provide relief, in the form of a decision invalidating the BiOps followed by hearings on interim remedies. [FN8] Under these circumstances, it is not appropriate to deem this case prudentially moot. [FN9]

> FN8. The Defendants and Defendant-Intervenors suggest in the alternative that the court should forgo a decision on the merits, opting instead to stay the case while allowing Plaintiffs the opportunity to move at any time for interim injunctive relief. This option is discussed in greater detail below.

> FN9. The parties also engage in a detailed debate over issues that essentially go to the merits of the complaint or are relevant to the issuance of an interim remedy. For example, Plaintiffs maintain that the record indicates that USFWS and NMFS relied upon flawed science and analyses in reaching the "no-jeopardy" conclusions contained in the BiOps. Plaintiffs also point to evidence that calls into question the Federal Defendants prediction that interim operation of the CVP and SWP under the OCAP will not have any "long-term" impacts on the species. Essentially, Plaintiffs argue that the Federal Defendants have no way of knowing whether any long term impacts will result because their analyses have been based on flawed information. Defendants strenuously dispute these assertions, maintaining that the BiOps were lawfully promulgated given the state of the record at the time. For the purposes of deciding the instant procedural motions, these fact-specific disputes are largely irrelevant. So long as there is a live controversy and Plaintiffs can obtain meaningful relief from the district court, dismissal on mootness grounds is inappropriate.

Federal Defendants' motion to dismiss on prudential mootness grounds is **DENIED.**

### C. *Motion for Voluntary Remand Without Vacatur.*

Alternatively, Federal Defendants move in both cases for voluntary remand without vacatur. (Doc.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2007 WL 14283 (E.D.Cal.), 64 ERC 1718
**(Cite as: Not Reported in F.Supp.2d)**

242)
Voluntary remand is consistent with the principle that "administrative agencies have an inherent authority to reconsider their own decisions, since the power to decide in the first instance carries with it the power to reconsider."*Trujillo v. General Electric Co.,* 621 F.2d 1084, 1086 (10th Cir.1980). Voluntary remand also promotes judicial economy by allowing the relevant agency to reconsider and rectify an erroneous decision without further expenditure of judicial resources. *See, e.g., Ethyl Corp. v. Browner,* 989 F.2d 522, 524 (D.C.Cir.1993) (granting EPA's opposed motion for voluntary remand) ("We commonly grant such motions [for voluntary remand], preferring to allow agencies to cure their own mistakes rather than wasting the courts' and the parties' resources reviewing a record that both sides acknowledge to be incorrect or incomplete."); *id.* at 524 n. 3 (collecting cases); *cf. Marathon Oil v. EPA,* 564 F.2d 1253, 1268-69 (9th Cir.1977) (discussing motion for voluntary remand).

*NRDC v. United States Dept. of the Interior,* 275 F.Supp.2d 1136, 1141 (C.D.Cal.2002) (citations edited). The district court in *NRDC v. United States Department of the Interior* also held that a voluntary remand need not lead to the vacatur of the agency action being remanded:*9 The test for whether to remand an arbitrary and capricious rule without vacating depends in part on "the *seriousness of the order's deficiencies* (and thus the extent of doubt whether the agency chose correctly) and the *disruptive consequences of an interim change that may itself be changed."*

*Id.* at 1143 (emphasis added).

Applying this general framework is difficult here, because the alleged deficiencies in the challenged BiOps have not yet been fully litigated. In fact, Federal Defendants continue to maintain that the BiOps were, in whole or part, validly promulgated. Federal Defendants do suggest that a change to the status quo "would have huge ramifications for regional water users and agriculture (a point on which Federal Defendants defer to Intervenors)." (Doc. 242 at 12 .) But, the water user Defendant-Intervenors do not support a voluntary

remand without vacatur, nor have they yet presented any evidence or argument regarding the nature of the prejudice they might suffer if the BiOps were invalidated.

Federal Defendants suggest that the district court's vacatur analysis should also consider whether continued operation of the CVP and SWP under the challenged biological opinions would constitute an irreversible or irretrievable commitment of resources, invoking the language of ESA § 7(d). [FN10] Federal Defendants point to the 2001 unpublished opinion in *Southwest Center for Biological Diversity v. United States Forest Service,* 2001 U.S. Dist. LEXIS 25027 (D.Ariz. Mar. 30, 2001), which applied the "irreversible or irretrievable commitment of resources" test under somewhat similar circumstances. *In Southwest Center,* the agency sought a voluntary remand of a biological opinion to evaluate impacts of new grazing allotments on endangered species. The plaintiffs sought an injunction against implementation of the existing biological opinion. The *Southwest Center* court denied the injunction, applying a hybrid injunctive relief standard that incorporated the standard set forth in ESA § 7(d). The *Southwest Center* court reasoned:

> FN10. ESA § 7(d), 16 U.S.C. § 1536(d), provides:
> Limitation on commitment of resources
> After initiation of consultation required under subsection (a) (2) of this section, the Federal agency and the permit or license applicant shall not make any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures which would not violate subsection (a)(2) of this section.

Although the Supreme Court has made clear that in balancing the hardships of the parties, threatened and endangered species are to be given the highest priority, under the circumstances of this case, where the Forest Service and the FWS are committed to complying with the ESA, the economic hardship to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2007 WL 14283 (E.D.Cal.), 64 ERC 1718
**(Cite as: Not Reported in F.Supp.2d)**

ranchers in issuing an injunction should be considered. Because there has been an insufficient showing that continued grazing on these allotments would result in irreparable harm to the loach minnow and spikedace while Defendants are consulting, Plaintiff's request for injunctive relief is denied ...

* * *

The record demonstrates that despite allowing cattle grazing to continue, conditions on these allotments are improving. The Forest Service has excluded livestock from directly accessing key watersheds in the national forests, in particular, watersheds containing loach minnow and/ or spikedace habitat. This exclusion has contributed to improved watershed conditions and has minimized the adverse effects of livestock grazing to the loach minnow and the spikedace. *Therefore, there is no evidence that maintenance of the current status quo, which allows grazing, would result in an irreversible and irretrievable commitment of resources foreclosing the implementation of future alternatives, especially when as here the Forest Service can prevent any irreversible or irretrievable commitment of resources by moving the livestock to other pastures or removing the livestock from national forest lands.*

**\*10** *Southwest Center,* 2001 U.S. Dist. LEXIS 25027, 121-123 (emphasis added).*See also Washington Toxics Coalition v. EPA,* 413 F.3d 1024, 1035 (9th Cir.2005), (under ESA § 7(d) " non-jeopardizing agency actions [may] continue during the consultation process.").

Federal Defendants maintain that, like in *Southwest Center,* maintenance of the status quo will not present an irreversible or irretrievable commitment of resources. In support of this assertion, Federal Defendants argue that there are various provisions in the existing OCAP BiOps designed to protect the Delta smelt and the salmonid populations.

With respect to the Delta smelt, the Federal Defendants note that the 2005 USFWS OCAP BiOp could require cessation of CVP operations in some circumstances. In addition, the Federal Defendants emphasize that numerous other rules, regulations,

subgroups, and teams exist to protect the Delta smelt, including those teams and processes which make up the Delta Smelt Risk Assessment Matrix (DSRAM), which is designed to recognize when take limits are being exceeded and then take action to address such problems. The problem with relying upon these protective measures to justify voluntary remand without vacatur is that Plaintiffs allege that the adaptive management structures relied upon in the 2005 USFWS OCAP BiOp's no jeopardy finding are inadequate and unlawful. The government preemptively responded to this objection by offering to somewhat strengthen DSRAM.
Despite Plaintiffs' claims that the DSRAM process is entirely voluntary, *Pl. Memo* at 13, there is a significant record of actions taken to benefit the smelt in response to recommendations made by the Delta Smelt Working Group to the WOMT ... However, in light of recent data on the Delta smelt, and to ensure the adequacy of actions taken to protect the Delta smelt by the WOMT during the pendency of the reinitiation of the § 7 consultation process, the Service will require the Delta Smelt Working Group to adequately document the technical reasons for its recommendations to the WOMT. If the WOMT does not accept the recommendations by the Delta Smelt Working Group, then the WOMT will need to document the technical justification for why the actions they are proposing for implementation will be sufficiently protective of the smelt. This finding will need to be transmitted to the Sacramento Fish and Wildlife Office of the Service, who will determine if the WOMT is correct in its determination, thereby finding that the operations of the facilities remain within the project description, or in the alternative, find that the action is inadequate to conserve the smelt.

(*NRDC* Doc. 242 at 19-20.) But this does not definitively answer the question of whether USFWS lawfully concluded that the DSRAM process is adequate to protect the Delta smelt from harm caused by implementation of other aspects of the OCAP.[FN11]

        FN11. Similarly, the Federal Defendants

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 11

Not Reported in F.Supp.2d, 2007 WL 14283 (E.D.Cal.), 64 ERC 1718
(Cite as: Not Reported in F.Supp.2d)

point to the EWA and to CVPIA(b)(2) water deliveries as protective measures that will ensure no harm comes to the smelt in the interim period. Again, Plaintiffs assert in this lawsuit that these mechanisms are inadequate.

With respect to the salmonid species, the Federal Defendants similarly maintain that the 2004 NMFS OCAP BiOp contains sufficient measures designed to protect salmonid species:

*11 According to the National Marine Fisheries Service, the measures being undertaken by Reclamation to manage salmonid species concerns have, in the recent past, led to increases in salmonid populations, and decreases in salmonid species entrainment at the CVP and SWP project pumps. Declaration of Michael E. Aceituno, Attachment 3, ¶ 5 (also discussing charts accompanying the declaration.) Reclamation's ongoing measures, including properly timed cold water releases and dam operations along the Sacramento River, are expected to continue to provide a measure of protection for the salmonid species. *Id.* at ¶ 13 (discussing temperature control device at Shasta Dam, gate operations at the Red Bluff Diversion Dam, and continued real time management by the Interagency Sacramento River Temperature Control Task Force.) In addition, no expected long-term effects on listed salmonids are expected within the interim period of consultation because of above normal hydrology (i.e., full reservoirs and banked water available for fish protection) and because short-term effects (less than 18 months) are unlikely to have any effect on migratory salmon species that take 36 months to return as adults. *Id.* Accordingly, ongoing operation of the CVP and SWP in this case will not result in any irreversible or irretrievable commitment of resources which have the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures.

(*PCFFA,* Doc. 81 at 16-17.)

Plaintiffs respond to each assertion by Federal Defendants that the challenged BiOps will benefit or at least not harm the salmonids. For example, with respect to the alteration of the temperature compliance point, Plaintiffs rejoin that "[t]he

Federal Defendants fail to explain how the dim inution of cold water spawning habitat in the Sacramento River as well as the Feather and American Rivers as a result of interim operations is consistent with ESA requirements."

As discussed above, the 2004 Salmonid BO found that operations under the 2004 OCAP would have numerous, serious adverse impacts to salmonid spawning habitat due to moving the Sacramento River temperature compliance point 19 miles upstream, elimination of the Shasta Reservoir cold water carryover storage requirement, and reduced stream flows. According to NMFS's own analysis, which independent science reviewers suggested underestimated adverse impacts, the temperature and carryover "targets" identified in the 2004 BO are inadequate to maintain suitable spawning habitat. The 2004 Salmonid BO found, for example, that the change in the Sacramento River compliance point would eliminate over 40 percent of winter-run Chinook critical habitat, decrease spawning success, and effectively limit the population size due to restricted availability of suitable spawning habitat. NMFS AR 5844, 5920, 5939. Such adverse effects could easily reverse the rebound the winter-run population experienced after these temperature controls were put in place....

*12 (*PCFFA,* Doc. 85 at 12.)

At the very least, there are factual disputes as to the effectiveness of the various protective measures relied upon by the challenged BiOps. This makes it impossible to undertake a proper § 7(d) analysis on the pleadings at this stage of the case. More critically, it is not entirely clear that the § 7(d) analysis is relevant to deciding whether a remand without vacatur is appropriate. Although § 7(d) was taken into consideration in *Southwest Center,* the instant case is in a very different procedural posture than was *Southwest Center.* In *Southwest Center,* the court had already ruled in favor of the plaintiffs on the merits of their ESA claim. The district court subsequently denied plaintiffs' request for a preliminary injunction that would have vacated the BiOp, applying a test that incorporated a detailed examination of the § 7(d) standard. Here, in contrast, the Federal Defendants request that the case be remanded without vacatur *prior* to any

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                   Page 12

Not Reported in F.Supp.2d, 2007 WL 14283 (E.D.Cal.), 64 ERC 1718
**(Cite as: Not Reported in F.Supp.2d)**

decision on the merits.

Plaintiffs argue that the Federal Defendants should not be permitted to "have it both ways," by being permitted to operate under the challenged BiOps while maintaining that all litigation regarding those BiOps should cease. In support of this argument, Plaintiffs cite *Rock Creek Alliance v. U.S. Fish & Wildlife Serv.,* No. CV 01-152-M-DWM, Order (D.Mont. Mar. 19, 2002), in which the district court refused to authorize a voluntary remand where the agency refused to withdraw its BiOp. Federal Defendants attempt to distinguish *Rock Creek,* arguing:

In *Rock Creek,* a voluntary remand without vacatur was rejected because the agency sought to continue the construction and operation of a copper and silver mine in Montana. In contrast, here, Federal Defendants have explained that any future construction actions require further ESA § 7 review. Declaration of Kirk Rodgers (Oct. 18, 2006) at paragraph 4 and footnote 1. Instead, this Court is asked only not to vacate the current, ongoing operation of the nation's largest federal water project, to which additional limitations were adopted for the specific purposes of protecting Delta smelt and salmonid species.

(*PCFFA,* Doc. 92 at 22.)

Federal Defendants' argument begs the question, however, of what potentially detrimental aspects of the OCAP they intend to implement during the interim period. The mere presence in the challenged BiOps of programs that might potentially benefit the fish does not distinguish this case from *Rock Creek* if Defendants intend to implement significant detrimental water management actions (above and beyond those in place prior to the issuance of the challenged BiOps).[FN12]

> FN12. Plaintiffs also cite *Greenpeace v. Nat'l Marine Fisheries Serv.,* 80 F.Supp.2d at 1151 (W.D.Wash.2000), in which the district court rejected the agency's attempts to rely on a BiOp to defend against a motion for summary judgment while at the same time arguing the BiOp has been

withdrawn and plaintiffs' claims should be dismissed on Article III mootness grounds. The Greenpeace court reasoned that the agency "cannot have it both ways." Federal Defendants correctly point out that this case is less relevant because it involved Article III mootness.

Again, the Ninth Circuit's general standard for vacatur is as follows:
The test for whether to remand an arbitrary and capricious rule without vacating depends on " the *seriousness of the order's deficiencies* (and thus the extent of doubt whether the agency chose correctly) and the *disruptive consequences of an interim change that may itself be changed."*

*\*13 NRDC,* 275 F.Supp.2d at 1143. Similarly, in *Modesto Irrigation District v. Evans et. al.,* Case No. 1:02-cv-06553-OWW-DLB (May 12, 2004), Doc. 79 at 48, this district court considered whether to vacate the listing of a salmonid species and articulated seven factors to be evaluated in determining whether or not to set aside a rule when it was subjected to an APA based challenge and remand:(1) the purposes of the substantive statute under which the agency was acting;
(2) the magnitude of the administrative error and how extensive, substantive and serious it was;
(3) the possibility the agency will be able to substantiate its decision given an opportunity to do so;
(4) the likelihood that the errors can be mended and that such changes can be made without altering the order;
(5) equity and public interest considerations;
(6) the potential prejudice to those who will be affected by maintaining the status quo; and
(7) the disruptive consequences of an interim change, which could include invalidating or enjoining the agency action.

Here, there are significant factual disputes concerning most if not all of the factors noted above. Federal Defendants continue to maintain that no administrative errors occurred in the promulgation of the challenged BiOps. Moreover, Defendants continue to rely, at least to some extent,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 13

Not Reported in F.Supp.2d, 2007 WL 14283 (E.D.Cal.), 64 ERC 1718
(Cite as: Not Reported in F.Supp.2d)

on the challenged BiOps, effectively adopting portions of the OCAP as of 2004 as the status quo. Plaintiffs' lawsuits assert that the OCAP was never properly evaluated for its impacts on the Delta smelt and salmonids and impliedly assert that a different status quo should serve as the baseline. Perhaps most critically, Federal Defendants deferred to the water users, who arguably would be the parties most disrupted by returning to the pre-2004 status quo, to make such a showing. However, the water users do not support a voluntary remand without vacatur, nor have they presented any evidence or argument regarding the nature of the prejudice they might suffer.

Under all these circumstances it is not possible to conclude that remand without vacatur is appropriate here. This motion is **DENIED** .

### D. *Motion for Stay Pending Completion of Re-Consultation (Based on Doctrine of Primary Jurisdiction).*

Federal Defendants, along with all Defendant-Intervenors invoke the doctrine of primary jurisdiction to support the imposition of stays in both cases pending the completion of re-consultation. Federal Defendants and Defendant Intervenors suggest, however, that the stay should include an exception that would permit Plaintiffs to bring a motion for injunctive relief under ESA § 7(d). Plaintiffs oppose this approach, and instead request that the cases be heard on their merits.

Whether to grant a stay lies within the sound discretion of the district court:

[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants. How this can best be done calls for the exercise of judgment, which must weigh competing interests and maintain an even balance ...

**\*14** *Landis v. N. Am. Co.,* 299 U.S. 248, 255 (1936).

In cases which "contain some issue within the special competence of an administrative agency," a

court may issue a stay to permit the administrative agency an opportunity to apply its special expertise. *Davel Communs., Inc. v. Qwest Corp., 460 F.3d 1075, 1080* (9th Cir.2006). The Ninth Circuit has considered a number of factors when deciding whether a stay based on primary jurisdiction is appropriate The doctrine has been applied where there is "(1) the need to resolve an issue that (2) has been placed by Congress within the jurisdiction of an administrative body having regulatory authority (3) pursuant to a statute that subjects an industry or activity to a comprehensive regulatory scheme that (4) requires expertise or uniformity in administration."*Id.* at 1087.

In determining whether to grant a stay based on primary jurisdiction, the Court must "weigh the benefits of obtaining the agency's aid against the need to resolve the litigation expeditiously."*Wagner & Brown v. ANR Pipeline Co.,* 837 F.2d 199, 201 (5th Cir.1988). In addition, a court should take into consideration "the possible damage which may result from the granting of a stay, the hardship or inequity which a party may suffer in being required to go forward, and the orderly course of justice measured in terms of the simplifying or complicating of issues, proof, and questions of law which could be expected to result from a stay." *CMAX, Inc. v. Hall,* 300 F.2d 265, 268 (9th Cir.1962).*"[A party seeking] a stay must make out a clear case of hardship or inequity in being required to go forward, if there is even a fair possibility that the stay for which he prays will work damage to someone else."Lockyer v. Mirant Corp.,* 398 F.3d 1098, 1109 (9th Cir.2005) (emphasis added). In *Lockyer,* the plaintiff demonstrated the possibility of harm to its interests from a stay and the defendant failed to make out a clear case of hardship or inequity. *Id.* at 1112-13.The Ninth Circuit held that "being required to defend a suit, without more, does not constitute a 'clear case of hardship or inequity'..."*Id.*

The Federal Defendants contend that this case is one in which there is a need for judicial consideration of the expert and specialized knowledge of the agencies. *Forest Guardians v. United States Forest Serv.,* 329 F.3d 1089, 1099 (9th Cir.2003) ("When the agency is making

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                    Page 14

Not Reported in F.Supp.2d, 2007 WL 14283 (E.D.Cal.), 64 ERC 1718
(Cite as: Not Reported in F.Supp.2d)

predictions, within its special expertise, at the frontiers of science, we must be at our most deferential."). Applying the four-part analytical approach from *Davel,* 460 F.3d at 1086-1087, the federal government argues that a stay is appropriate here because there is a need to resolve an issue-whether the operation of the CVP and SWP jeopardizes the continued existence of Delta smelt-that is of a type that was placed by Congress within the jurisdiction of an administrative agency.

Plaintiffs respond that a stay here would harm their interests because it would permit the defendants to implement the challenged BiOps without observing the requirements of the ESA, until at least April 2008. In theory, this would permit the defendants to operate the CVP and SWP pursuant to the 2004 OCAP (which calls for increased pumping and other types of potentially detrimental changes). Plaintiffs maintain that the challenged BiOps provide inadequate protection for the Delta smelt and salmonids. Plaintiffs submit that allowing the continued implementation of aspects of the OCAP under the admittedly flawed BiOps would likely result in harm to the species.

**\*15** Federal Defendants and Defendant-Intervenors rejoin that, under the framework they propose, Plaintiffs' would have ample opportunity to protect their interests by moving for injunctive relief under the standard set forth in ESA § 7(d). But, Plaintiffs would be at a disadvantage if they were required to proceed directly to a § 7(d) proceeding. Without a ruling that the challenged BiOps were unlawful, Defendants start from a position of legal validity, with two "lawful" BiOps. In contrast, if the BiOps are first declared unlawful, there is some authority suggesting that the government would then assume the burden to prove that its actions were non-jeopardizing. For example, in *Washington Toxics Coalition v. EPA,* 413 F.3d 1024, 1035 (9th Cir.2005), a case relied upon by Federal Defendants, the EPA attempted to register a number of pesticides that plaintiffs feared might harm endangered fish species. In approving the pesticides, EPA complied with the registration requirements of the Federal Insecticide, Fungicide and Rodenticide Act ("FIFRA"), 7 U.S.C. §§ 136 et seq., but did not consult with NMFS pursuant to the

ESA. The district court ruled that EPA must comply with the ESA as well as with FIFRA and ordered EPA to initiate and complete § 7 consultation according to a prescribed schedule. Having already ruled in favor of plaintiffs on the merits, the district court entertained a motion for interim injunctive relief under § 7(d). The Ninth Circuit affirmed the district court's decision to place the burden under § 7(d) of "showing that its actions were non jeopardizing to endangered or threatened species" on the action agency.

....We have not [previously] expressly stated who bears the burden of showing that the action is non-jeopardizing, *but the burden should be on the agency, the entity that has violated its statutory duty.*
*Placing the burden on the acting agency to prove the action is non-jeopardizing is consistent with the purpose of the ESA and what we have termed its " institutionalized caution mandate[ ]." Sierra Club v. Marsh,* 816 F.2d at 1389. We said as much in *Thomas v. Peterson,* where the defendant, the U.S. Forest Service, urged the district court to conclude that absent proof by the plaintiffs to the contrary, a proposed project was not likely to affect an endangered or threatened species. 753 F.2d at 765. We held that this was an inappropriate finding for the district court to make. *Id.*"It is not the responsibility of the plaintiffs to prove, nor the function of the courts to judge, the effect of a proposed action on an endangered species when proper procedures have not been followed."*Id. The district court correctly assigned EPA the burden of proving that its actions were non-jeopardizing.*
The district court was not required to balance interests in protecting endangered species against the costs of the injunction when crafting its scope. *Congress has decided that under the ESA, the balance of hardships always tips sharply in favor of the endangered or threatened species. See Marbled Murrelet v. Babbitt,* 83 F.3d 1068, 1073 (9th Cir.1996).

**\*16** *Id.* at 1035 (emphasis added). But, this ruling is premised on the fact that the agency was found to have been in violation of a statutory duty. Without such a finding, there would be little support for the application of this burden-shifting approach. Even under         Federal         Defendants'         and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2007 WL 14283 (E.D.Cal.), 64 ERC 1718
**(Cite as: Not Reported in F.Supp.2d)**

Page 15

defendant-intervenors' proposal that Plaintiffs would remain free to seek provisional relief pending re-consultation, such relief will require the parties to litigate on the merits the validity of the BiOps.

Plaintiffs are entitled to have their complaint decided on the merits, particularly given the fact that Defendants continue to rely on the challenged BiOps as if they were lawfully enacted. The motion for a stay is **DENIED**.

### E. *Motion to Consolidate.*

The Federal Defendants move to consolidate *NRDC* with *PCFFA* for all purposes. Rule 42(a) of the Federal Rules of Civil Procedure provides:
When actions involving a common question of law or fact are pending before the court, it may order a joint hearing or trial of any or all the matters in issues in the actions; it may order all the actions consolidated; and it may make such orders concerning proceedings therein as may tend to avoid unnecessary costs or delay.

A district court has broad discretion to decide whether consolidation is appropriate. *In re Consol. Parlodel Litig.,* 182 F.R.D. 441, 444 (D.N.J.1998). A court "must balance the interest of judicial convenience against the potential for delay, confusion and prejudice that may result from such consolidation." *Bank of Montreal v. Eagle Assoc.,* 117 F.R.D. 530, 532 (S.D.N.Y.1987) Factors such as differing trial dates or stages of discovery usually weigh against consolidation. 9 Wright & Miller, Federal Practice and Procedure § 2383 (2006).

The Federal Defendants first point out that the *PCFFA* case was transferred to this Court because it was found to be related to the *NRDC* case:
These two cases have (1) overlapping facts and legal issues and (2) arise out of the same agency action. In light of the danger of inconsistent relief, these two cases should be decided by the same court.

(*PCFFA,* Doc. 13.) But, as Plaintiffs point out, that these factors favored a *transfer* does not necessarily indicate that *consolidation* of two cases already

before the same district judge is necessary or appropriate.

Federal Defendants maintain that consolidation is appropriate here because, although there may have been factual distinctions when these cases were first filed, any factual distinctions between the two cases vanished when the agencies reinitiated consultation. This argument, which is related to Federal Defendants' contention that the cases are prudentially moot on the merits, has been rejected. The factually distinct merits claims are still live.

Federal Defendants also point out that both *NRDC* and *PCFFA* involve disputes over federal and state government management of the same regional water resources and the Bureau's regional water management obligations under the CVPIA. From a practical perspective, the Bureau is required to manage the water resources for both species. Accordingly, Federal Defendants maintain, consolidation would facilitate the interim management of the CVP and SWP in a manner that would benefit both species. According to the Federal Defendants, allowing the cases to proceed independently risks inconsistent judgments. While true in theory, if Plaintiffs prevail on the merits and the Delta smelt case proceeds to a remedies phase, Reclamation will be afforded an opportunity to explain not only how various remedies would impact the Delta smelt, but how any altered management action would impact the salmonids and/or any other legally protected interests.

*\*17* Finally, Federal Defendants note that all of the *NRDC* plaintiffs are also plaintiffs in *PCFFA* and the same counsel are assigned to both cases for these organizations. Federal Defendants maintain that consolidated briefing could help avoid duplicative proceedings and redundancies. But any efficiencies gained by consolidation would be countered (or more likely outweighed) by the additional confusion for the district court of dealing with two independent sets of scientific facts, not to mention separate administrative records. For example, with regard to Delta smelt, the district court may have to examine whether the adaptive management system upon which FWS based its original no jeopardy conclusion is adequate to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                          Page 16

Not Reported in F.Supp.2d, 2007 WL 14283 (E.D.Cal.), 64 ERC 1718
**(Cite as: Not Reported in F.Supp.2d)**

protect Delta smelt during interim operations. In contrast, in the salmonids case, the court may need to examine whether the weakening of temperature controls on the upper Sacramento River will destroy critical habitat and cause serious harm to the salmon and steelhead species during the interim period.

Finally, Plaintiffs argue that consolidation of the two cases would substantially delay resolution of the Delta smelt case, prejudicing Plaintiffs' interests. The *NRDC* and *PCFFA* are at significantly different stages of development. *NRDC* will be ready for a merits-type hearing almost immediately, while *PCFFA* is at a much earlier stage. Plaintiffs emphasize that time is of the essence in the Delta smelt case because of the species' precarious state.

Under the totality of the circumstances, consolidation is not appropriate at this time. The sole factor weighing in favor of consolidation is the possibility that a remedy in the Delta smelt case might adversely impact the salmonid species. However, should Plaintiffs prevail in the Delta smelt case, the district court can consider evidence of any such potential adverse impacts at that time. Moreover, any potential benefits of consolidation are far outweighed by the benefits of allowing these cases to proceed separately, namely (1) avoiding the confusion that would be caused by litigating cases with independent factual backgrounds and administrative records; and (2) avoiding further delay to the Delta smelt case.

### F. *Miscellaneous Issues.*

Federal Defendants also assert, in the context of their motion to dismiss/stay in the salmonid case, that "whatever legal mechanism this Court uses to allow Federal Defendants to complete a new biological opinion, Plaintiffs' future attorney's fees claims should be denied. Here, Federal Defendants are asking for an advisory opinion on an issue that has not yet been presented to the court for review. The court declines to rule on the issue of attorney's fees at this time.

### V. *CONCLUSION*

For the reasons set forth above,
(1) Federal Defendants' motion for Dismissal on prudential mootness grounds is **DENIED;**
(2) Federal Defendants' motion for Voluntary remand without vacatur is **DENIED;**
**\*18** (3) All Defendants' and Defendant-Intervenors' motion for a stay is **DENIED.**

All Defendants shall have 20 days from the entry of this order to answer the complaints in both the *NRDC* and *PCFFA* cases.

**IT IS SO ORDERED.**

E.D.Cal.,2007.
Natural Resources Defense Council v. Norton
Not Reported in F.Supp.2d, 2007 WL 14283 (E.D.Cal.), 64 ERC 1718

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

THEODORE ROOSEVELT CONSERVATION
PARTNERSHIP,

        Plaintiff,

        v.

DIRK KEMPTHORNE, in his official capacity as
the Secretary of the United States Department of
the Interior, and UNITED STATES BUREAU OF
LAND MANAGEMENT,

        Defendants.

CASE NO. 1:07-cv-1486-RJL

———————————————————

ANADARKO PETROLEUM CORPORATION,
WARREN RESOURCES, INC., and DOUBLE
EAGLE PETROLEUM CO.,

and

STATE OF WYOMING

        Defendant-Intervenors.

———————————————————

NATURAL RESOURCES DEFENSE COUNCIL,
*et al.*,

        Plaintiff,

        v.

DIRK KEMPTHORNE, in his official capacity as
the Secretary of the United States Department of
the Interior, and UNITED STATES BUREAU OF
LAND MANAGEMENT,

        Defendants.

CASE NO. 1:07-cv-1709-RJL

———————————————————

ANADARKO PETROLEUM CORPORATION,
WARREN RESOURCES, INC., and DOUBLE
EAGLE PETROLEUM CO.,

        Defendant-Intervenors.

## [PROPOSED] ORDER

UPON CONSIDERATION of the Motion of Defendant-Intervenors Anadarko Petroleum Corporation, Warren Resources, Inc. and Double Eagle Petroleum Co. to Consolidate the above-captioned cases pursuant to Federal Rule of Civil Procedure 42, and memoranda in support of and in opposition thereto:

IT IS HEREBY ORDERED that the Motion to Consolidate is DENIED.


Dated this _____ day of _____, 2007.


_____
United State District Court Judge