## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THEODORE ROOSEVELT<br>CONSERVATION PARTNERSHIP<br>555 Eleventh St. N.W., 6th Floor<br>Washington, DC 20004<br>(202) 654-4600,<br><br>        Plaintiff,<br><br>   v.<br><br>DIRK KEMPTHORNE, in his official<br>capacity as the Secretary of the United States<br>Department of the Interior<br>1849 C Street, N.W.<br>Washington, DC 20240<br>(202) 208-3100,<br><br>     and<br><br>UNITED STATES BUREAU OF LAND<br>MANAGEMENT<br>1849 C Street, Room 406-LS<br>Washington, DC 20240<br>(202) 452-5125,<br><br>        Defendants.<br><br>_____<br><br>ANADARKO PETROLEUM<br>CORPORATION, WARREN RESOURCES,<br>INC., DOUBLE EAGLE PETROLEUM<br>CO.,<br><br>     and<br><br>STATE OF WYOMING,<br><br>        Defendant-Intervenors.<br><br>_____ | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## UNOPPOSED MOTION FOR LEAVE TO FILE FIRST AMENDED AND
## SUPPLEMENTED COMPLAINT

Plaintiff Theodore Roosevelt Conservation Partnership ("TRCP"), hereby files this unopposed motion for leave to file its First Amended and Supplemented Complaint.  In support of this motion, TRCP states as follows:

1.     Rule 15(a) of the Federal Rules of Civil Procedure allows for liberal amendment of pleadings, "when justice so requires." FED. R. CIV. P. 15(a).  *See, e.g., Steinbuch v. Cutler*, 463 F.Supp. 2d 1, 3 (D.D.C. 2006) *citing Davis v. Liberty Mutual Insurance Co*., 871 F.2d 1134, 1136-37 (D.C. Cir. 1989) ("It is common ground that Rule 15 embodies a generally favorable policy toward amendments") (citations omitted). "The presumption runs in the plaintiff's favor that he may amend his complaint '[i]n the absence of any apparent or declared reason-such as undue delay, bad faith or dilatory motive on the part of the [plaintiff], repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of the amendment, etc.'" *Id. citing Foman v. Davis*, 371 U.S. 178, 182 (1962).

2.     Notwithstanding the subtle distinction between amendment and supplementation,[1] "the same liberal interpretation generally applies to motions to supplement pleadings pursuant to FED .R. CIV. P. 15(d)." *Grace v. Rosenstock*, 169 F.R.D. 473 (1996) *citing Kahn v. General Motors Corp*., 865 F. Supp. 210, 215 (S.D.N.Y. 1994); *Music Deli & Groceries, Inc. v. Internal Revenue Service, Dist. of Manhattan*, 781 F. Supp. 992, 997 (S.D.N.Y. 1991).  "An application for leave to file a supplemental pleading … should be freely granted where such supplementation will promote the economic and speedy disposition of the controversy between the parties, will

---

[1] Rule 15(d) is used to set forth new facts that update the original pleading or provide the basis for additional relief; to put forward new claims based on events that took place after the original complaint was filed; or to include new parties where subsequent events have made it necessary to do so.  Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1504 (1990).

not cause undue delay or trial inconvenience, and will not prejudice the rights of any other party." *Bornholdt v. Brady*, 869 F.2d 57, 68 (2d Cir. 1989) (citations omitted).

3.      As explicated in paragraphs 68 through 79 of the First Amended and Supplemented Complaint, TRCP submits amendment and supplementation is necessitated by the Bureau of Land Management's apparent decision to stay administrative review of development approvals (including the Sun Dog A and B Plans of Development) within the Atlantic Rim Project Area pending resolution of this and related litigation, which decision was upheld on appeal by the Interior Board of Land Appeals on February 19, 2008.  A copy of the Board's Order is attached as Exhibit D to the First Amended and Supplemented Complaint.

4.      Unless the Court grants this motion, TRCP will be unable to timely challenge the merits of development actions (including the Sun Dog A and B Plans of Development) in the Atlantic Rim Project Area.

5.      Pursuant to Local Rule 7(m), TRCP has conferred with counsel for all Parties, including the Defendant-Intervenors, and has been authorized to represent that no Party objects to TRCP's filing of the First Amended and Supplemented Complaint.

6.      In addition, counsel for all Parties have worked collegially to ensure this action will not unduly delay this litigation.  The Parties have agreed upon a schedule that diverges little from the existing Amended Scheduling Order (i.e. by only a matter of days).   Counsel for TRCP, with consent of opposing counsel, have filed concurrently herewith a proposed Second Amended Scheduling Order reflecting the Parties' agreement and asking the Court to enter an Order approving the Second Amended Scheduling Order.

7.      Pursuant to Local Rules 7(i) and 15.1, this motion is accompanied by an original of the proposed First Amended and Supplemented Complaint.  *See* Exhibit 1.

WHEREFORE, TRCP respectfully requests that this Court enter an Order granting TRCP leave to file its First Amended and Supplemented Complaint. A proposed Order granting TRCP's motion is attached as Exhibit 2.

Respectfully submitted this 3rd day of April, 2008.

/s/ **Donald G. Blankenau**

Donald D. Blankenau
D.C. Bar No. ND0003
Thomas R. Wilmoth
Nebraska Bar No. 22518
HUSCH BLACKWELL SANDERS LLP
206 South 13th Street, Suite 1400
Lincoln, NE 68508
T: (402) 458-1500
F: (402) 458-1510
don.blankenau@huschblackwell.com
tom.wilmoth@huschblackwell.com

*Counsel for the Theodore Roosevelt
Conservation Partnership*

## CERTIFICATE OF SERVICE

I hereby certify that on April 3, 2008, I caused to be electronically filed the foregoing UNOPPOSED MOTION FOR LEAVE TO FILE FIRST AMENDED COMPLAINT with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

**Donald G. Blankenau**
don.blankenau@huschblackwell.com; sharon.marburger@huschblackwell.com

**John Scudder Burbridge**
jburb1@state.wy.us

**Lori Caramanian**
lori.caramanian@usdoj.gov; susan.middagh@usdoj.gov; efile_nrs.enrd@usdoj.gov; lori.montano@usdoj.gov

**Kristen A. Dolan**
kdolan@state.wy.us; cschep@state.wy.us

**Jay A. Jerde**
jjerde@state.wy.us

**Steven Michael Kupka**
nancilee.holland@huschblackwell.com

**Robert Charles Mathes**
rmathes@bjorklindley.com; lvanderveer@bjorklindley.com

**Teresa Rachel Nelson**
tnelso@state.wy.us

**Michael B. Wigmore**
michael.wigmore@bingham.com; s.franco@bingham.com

**Thomas R. Wilmoth**
tom.wilmoth@huschblackwell.com; sharon.marburger@huschblackwell.com

/s/ *Donald G. Blankenau*
Donald D. Blankenau
D.C. Bar No. ND0003
Thomas R. Wilmoth
Nebraska Bar No. 22518
HUSCH BLACKWELL SANDERS LLP
206 South 13th Street, Suite 1400
Lincoln, NE  68508
T: (402) 458-1500
F: (402) 458-1510
don.blankenau@huschblackwell.com
tom.wilmoth@huschblackwell.com

*Counsel for the Theodore Roosevelt
Conservation Partnership*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| THEODORE ROOSEVELT<br>CONSERVATION PARTNERSHIP<br>555 Eleventh St. N.W., 6th Floor<br>Washington, DC 20004<br>(202) 654-4600, | )<br>)<br>)<br>)<br>)<br>) |
| Plaintiff, | )<br>) |
| v. | )<br>) |
| DIRK KEMPTHORNE, in his official<br>capacity as the Secretary of the United States<br>Department of the Interior<br>1849 C Street, N.W.<br>Washington, DC 20240<br>(202) 208-3100, | )<br>)<br>)<br>)<br>)<br>)<br>) |
| and | )<br>) |
| UNITED STATES BUREAU OF LAND<br>MANAGEMENT<br>1849 C Street, Room 406-LS<br>Washington, DC 20240<br>(202) 452-5125, | )<br>)<br>)<br>)<br>)<br>) |
| Defendants. | )<br>) |
| ANADARKO PETROLEUM<br>CORPORATION, WARREN RESOURCES,<br>INC., DOUBLE EAGLE PETROLEUM<br>CO., | )<br>)<br>)<br>)<br>) |
| and | )<br>) |
| STATE OF WYOMING, | )<br>)<br>) |
| Defendant-Intervenors. | )<br>) |

**FIRST AMENDED AND SUPPLEMENTED COMPLAINT**

Plaintiff Theodore Roosevelt Conservation Partnership ("TRCP"), pursuant to FED. R. CIV. P. 15(a) and (d), states its First Amended and Supplemented Complaint and prays for relief as follows.

## INTRODUCTION AND OVERVIEW OF CLAIMS

1.      This action challenges a Record of Decision ("ROD") documenting the Bureau of Land Management's ("BLM") adoption of the preferred alternative (the "Project") described in the ATLANTIC RIM NATURAL GAS FIELD DEVELOPMENT PROJECT FINAL ENVIRONMENTAL IMPACT STATEMENT ("EIS"), as well as certain actions undertaken by BLM to implement the ROD.  The ROD authorizes immediate development of 2,000 coal bed methane ("CBM") wells and associated infrastructure in the Atlantic Rim Project Area ("ARPA") located in south central Wyoming.  BLM violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. 4321 *et seq.*, and the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. 1701 *et seq.*, when developing the EIS and the ROD and, ultimately, approving the Project.

2.      The EIS fails to take the required "hard look" at the potential environmental consequences of the Project, considering all matters of environmental concern.  42 U.S.C. § 4332(2)(C).  The EIS violates NEPA because it:  1) fails to evaluate a reasonable range of alternatives to the Project; 2) relies on an amorphous "adaptive management" process that does not articulate the alternative management techniques that might be employed if planned mitigation measures fail and precludes the public from involvement in that process; 3) fails to analyze cumulative impacts of the Project in context with other similar development efforts and impacts; 4) irreversibly and irretrievably commits resources within the ARPA to CBM development prior to completion of an ongoing environmental analysis supporting revision of the applicable Resource Management Plan ("RMP"), which will govern activities in the ARPA and surrounding area; and 5) ignores the best available data concerning management requirements

for both mule deer and sage grouse, two species providing significant hunting opportunities in the ARPA.

3.      In addition, BLM has violated the multiple-use mandate of FLPMA § 302(a), 43 U.S.C. § 1732(a), by failing to engage in a reasoned and informed decision making process and failing to balance competing resource values in the ARPA to best meet the present and future needs of the ARPA. BLM has failed further to ensure against unnecessary or undue degradation of wildlife and habitats within the ARPA, 43 U.S.C. § 1732(b), and has committed its resources to a single use – CBM development.

4.      TRCP's First Amended and Supplemented Complaint also challenges: a) BLM's August 16, 2007 Finding of No Significant Impact ("FONSI") and Decision Record ("DR") authorizing land disturbing activities within that portion of the ARPA being developed by Intervenor Anadarko Petroleum Corporation ("Anadarko") as the "Sun Dog POD"; and b) BLM's June 28, 2007 FONSI and DR authorizing land disturbing activities within that portion of the ARPA being developed by Intervenor Double Eagle Petroleum Co. ("Double Eagle") as the "Catalina POD." The Sun Dog FONSI and DR were based on an Environmental Assessment ("EA") dated August 15, 2007. The Catalina FONSI and DR were based on an EA dated June 18, 2007. In addition to suffering independent flaws, identified below, the Sun Dog and Catalina EAs, FONSIs and DRs (collectively the "POD Decisions") purport to be "tiered" from the unlawful EIS.

5.      The Project will eliminate hunting and related recreational opportunities for multiple generations and result in permanent "industrialization" of the ARPA. EIS 4-102. Plaintiff TRCP seeks judicial review of BLM's violations pursuant to the Administrative Procedure Act ("APA"), which allows this Court to hold unlawful and set aside final agency

action it finds to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;" 5 U.S.C. § 706(2)(a), or that is "without observance of procedure required by law;" 5 U.S.C. § 706(2)(d).

## JURISDICTION AND VENUE

6.     This Court has jurisdiction over this action pursuant NEPA, 42 U.S.C. §§ 4321 *et seq.* and its implementing regulations, FLPMA, 43 U.S.C. §§ 1701 *et seq.* and its implementing regulations, the Declaratory Judgment Act, 28 U.S.C. § 2201, 28 U.S.C. § 1331 (federal question), and the APA, 5 U.S.C. §§ 551 *et seq.*  The ROD, the EIS and the POD Decisions each constitute "final agency action" for purposes of APA review.

7.     Injunctive relief is authorized by Rule 65 of the Federal Rules of Civil Procedure.

8.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because Defendant Kempthorne, as the Secretary of the United States Department of the Interior ("Department"), and Defendant BLM, both are headquartered in Washington, D.C.  Plaintiff maintains its corporate office in Washington, D.C.  Moreover, oil and gas development on public lands, including CBM development, is being dictated by federal policies formulated and directed by the Department's Washington-based officials, including Defendant Kempthorne.  On information and belief, much of the decision-making regarding CBM development, including the Project, is being made by those officials.  Finally, the manner in which oil and gas development, including CBM development, is carried out on public lands throughout the western United States constitutes a matter of national concern that is not confined to the geographic area in which development occurs.

## PARTIES

9.     Plaintiff TRCP is a 501(c)(3) nonprofit corporation, representing a coalition of leading hunting, fishing and conservation organizations, labor unions and individual grassroots

4

partners working together to preserve the traditions of hunting and fishing by: 1) expanding access to places to hunt and fish; 2) conserving fish and wildlife and the habitats necessary to sustain them; and 3) increasing funding for conservation and management. TRCP is supported by a nationwide network of over 90,000 sportsmen and women and more than 1,400 local and state-level clubs and organizations, that themselves represent nine million Americans. TRCP's members utilize the ARPA, and more particularly, various hunting grounds within the ARPA on which well development is contemplated under the Project. Those lands support various species of large game, fish and birds that offer hunting and fishing opportunities to TRCP's members. *See generally* declarations of Steven R. Belinda and Rollin D. Sparrowe.[1]

10.    BLM's decision documents supporting Project approval explain:

- "Implementation of the [Project] would have adverse impact to suitable habitat for many wildlife species … . Habitat loss was attributed to direct loss through surface disturbance, indirect loss through animal avoidance of areas near developments, and habitat fragmentation when habitat is no longer suitable for species dependent on intact habitat patches larger than what would be remaining if the project were constructed." ROD 9.

- "[I]mpacts to the predominant recreation activities in the ARPA – hunting, pleasure driving, and wildlife viewing – would be significant. The [Project] would diminish the wildlife presence, degrade scenery, and introduce traffic and noise. ***The natural setting would be converted to an industrialized setting by development of the [Project].*** These effects would likely make recreating in the project area significantly less desirable." EIS 4-102 (emphasis supplied).

11.    TRCP's members historically have hunted, fished, and observed wildlife and fish species, currently hunt, fish and observe wildlife and fish species, and plan to continue to hunt, fish and observe wildlife and fish species, in areas within the ARPA that will be adversely

---

[1] The declarations of Steven R. Belinda and Rollin D. Sparrowe were filed with the Interior Board of Land Appeals on July 27, 2007, and true and correct copies of those declarations are attached as Exhibits "A" and "B", respectively.

impacted by the ARPA's overall industrialization, as well as individual operations contemplated under the ROD and the POD Decisions.

12.    In addition to the interests of its members directly impacted by actions within the ARPA, TRCP has an interest at the organizational level in receiving and disseminating current and accurate information about federal activities that impact the hunting and fishing resources on which TRCP members depend throughout the Nation.  TRCP's governing Board of Directors specifically relies on such information when determining and recommending to its members appropriate responses to proposed land use activities on public lands in one or more western states, including Wyoming, Utah, Colorado, Montana and New Mexico.

13.    A favorable decision from this Court vacating BLM's ROD, EIS and the POD Decisions and remanding them to the agency for further consideration in light of the best available science will redress TRCP's injury.

14.    Defendant Dirk Kempthorne is sued in his official capacity as the Secretary of the Department.  In that capacity, he is responsible for ensuring the Department and the agencies within the Department, including BLM, comply with all applicable laws and regulations, including NEPA and FLPMA.

15.    Defendant BLM, an agency within the Department, is responsible for managing the public lands for a variety of competing resources, including oil and gas development, as well as for the protection of the natural and human environment.  BLM is required to comply with NEPA and FLPMA, and to evaluate, analyze, and disclose the impacts of federal undertakings to the public.  BLM, through its Wyoming State Office, is specifically responsible for production of the ROD and the EIS that are the subject of this action.

16.     Defendant Intervenors Anadarko Petroleum Corporation, Warren Resources, Inc., and Double Eagle Petroleum Co. each is engaged in oil and gas development within the State of Wyoming, including the ARPA, and have submitted to the jurisdiction of this Court.

17.     Defendant Intervenor State of Wyoming holds sovereign interests in oil and gas and wildlife species within the State of Wyoming, and has submitted itself to the jurisdiction of this Court.

## LEGAL BACKGROUND

### The National Environmental Policy Act

18.     NEPA, 42 U.S.C. § 4321 *et seq*., was enacted in recognition of "the profound impact of man's activity on the interrelations of all components of the natural environment, [and] ... the critical importance of restoring and maintaining environmental quality to the overall welfare ... of man … ." 42 U.S.C. § 4331.  NEPA "prescribes the necessary process by which federal agencies must take a 'hard look' at the environmental consequences of [their] proposed courses of action." *Pennaco Energy, Inc. v. U.S. Dept. of Interior*, 377 F.3d 1147, 1150 (10th Cir. 2004) (internal quotations omitted); *see also Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989).

19.     NEPA is intended to focus the attention of the government and the public on the likely environmental consequences of a proposed agency action. *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 371 (1989).  It "places upon an agency the obligation to consider every significant aspect of the environmental impact of the proposed action" and "ensures that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process." *Baltimore Gas & Electric Co. v. Natural Resources Defense Council, Inc.*, 462 U.S. 87, 97 (1983) (citations omitted).

20.     NEPA required BLM to prepare an environmental impact statement ("EIS") for the Project because it constituted a "major Federal action significantly affecting the quality of the human environment ... ."   42 U.S.C. § 4332(2)(C).   The EIS requirement "insure[s] a fully informed and well-considered decision" when a proposed activity may "significantly affect[ ] the quality of the human environment … ."   *Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council*, 435 U.S. 519, 558 (1978); 42 U.S.C. § 4332(2)(C).

21.     BLM must "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources."   42 U.S.C. § 4332(2)(E).   The consideration of alternatives to a proposed action is "the heart of the EIS."   40 C.F.R. § 1502.14.   BLM must consider a reasonably full range of alternatives to its proposed action.   *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 813 (9th Cir. 1999).   An agency's failure to analyze a viable alternative that is consistent with the objectives of its proposed action can render a NEPA document inadequate.   *See Muckleshoot Indian Tribe*, 177 F.3d at 814.

22.     NEPA further requires that an EIS contain "a reasonably complete discussion of possible mitigation measures."   *Methow Valley*, 490 U.S. at 352.   The mitigation must "be discussed in sufficient detail to ensure that environmental consequences have been fairly evaluated."   *City of Carmel-By-The-Sea v. U.S. Dept. of Transp.*, 123 F.3d at 1142, 1154 (9th Cir. 1997).   In other words, an EIS must include "[m]eans to mitigate adverse environmental impacts."   40 C.F.R. § 1502.16(h).   To the extent an agency relies on mitigation measures to reduce impacts, those measures must be reasonably well articulated and certain to occur.   *See, e.g., Natural Resources Defense Council, Inc. v. U.S. Army Corps of Engineers*, 457 F. Supp. 2d 198 (S.D.N.Y. 2006).

8

23.    An EIS must also analyze: "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions."  40 C.F.R. § 1508.7.  These so-called "cumulative impacts" may "result from individually minor but collectively significant actions taking place over a period of time."  *Id.*  "[T]he general rule under NEPA is that, in assessing cumulative effects, the [EIS] must give a sufficiently detailed catalogue of past, present, and future projects, and provide adequate analysis about how these projects, and differences between the projects, are thought to have impacted the environment."  *The Lands Council v. Powell*, 395 F.3d 1019, 1028 (9th Cir. 2005).

24.    CEQ regulation 40 C.F.R. § 1506.1 (Limitations on actions during NEPA process) in part provides:  "(a) Until an agency issues a record of decision as provided in § 1505.2 (except as provided in paragraph (c) of this section), no action concerning the proposal shall be taken which would: … (2) Limit the choice of reasonable alternatives."  Stated alternatively, once the NEPA process has commenced on a proposal, an agency may not take another action that would have an adverse environmental impact or limit the choice of reasonable alternatives concerning the proposal until a final decision has been made regarding the proposal. 40 C.F.R. § 1506.1(a)(1)-(2).

25.    When determining whether to prepare an EIS for a particular project, a federal agency may initially prepare a shorter environmental document known as an "environmental assessment."  40 C.F.R. §§ 1501.3, 1501.4, and 1508.9.  If the EA concludes that the proposed project will have no significant impact on the human environment, the agency may issue a finding of no significant impact, and proceed with the proposed action.  If the agency concludes that there may be significant impacts, then it must prepare an EIS.  40 C.F.R. § 1501.4.

26.     As with an EIS, an EA must consider a reasonable range of alternatives and appropriate mitigation measures. *Environmental Protection Information Center v. United States*, 2007 WL 1417163 (9th Cir., May 9, 2007); *Western Land Exchange Project v. U.S. Bureau of Land Management*, 315 F. Supp. 2d 1068 (D. Nev. 2004).  Regardless of whether it results from an EA or an EIS, the NEPA process must produce evidence that the agency has taken a "hard look" at the environmental consequences of its proposed action.  *TOMAC, Taxpayers of Michigan Against Casinos v. Norton*, 433 F.3d 852 (D.C. Cir. 2006); *Town of Cave Creek, Arizona v. F.A.A.*, 325 F.3d 320 (D.C. Cir. 2003).

27.     Subsequent environmental analyses compelled by NEPA may be conducted in an abbreviated manner by incorporating or referencing analyses conducted in a prior EIS.  This process, known as "tiering," is sanctioned by CEQ in appropriate cases.  *See* 40 C.F.R. §§ 1500.4(i), 1502.20 and 1508.28.  The purpose of tiering "from statements of broad scope to those of narrower scope, [is] to eliminate repetitive discussions of the same issues … ."  C.F.R. §§ 1500.4(i).  In this case, the POD Decisions were "tiered" from the EIS.

### The Federal Land Policy and Management Act

28.     FLPMA directs the Secretary and BLM to manage public lands "under principles of multiple use and sustained yield."  43 U.S.C. § 1732(a); *see also* 43 U.S.C. § 1701(a)(8) (listing purposes and values that should be considered in the management of public lands). FLMPA further requires that "[i]n managing the public lands the Secretary shall, by regulation or otherwise, take any action necessary to prevent unnecessary or undue degradation of the lands." 43 U.S.C. § 1732(b).

29.     To assist in the management of public lands, FLPMA requires BLM to "develop, maintain, and, when appropriate, revise land use plans."  43 U.S.C. § 1712(a).  These land use plans (RMPs) project both the present and future use of the land. 43 U.S.C. § 1701(a)(2).

FLPMA prohibits BLM from taking actions inconsistent with the provisions of its RMPs.  *See Norton v. Southern Utah Wilderness Alliance* ("*SUWA*"), 542 U.S. 55, 69 (2004); 43 U.S.C. § 1732(a) ("The Secretary shall manage the public lands ... in accordance with the land use plans developed by him … ."); 43 C.F.R. § 1610.5-3 ("All future resource management authorizations and actions ... shall conform to the approved plan.").

30.    When necessary, RMPs may be amended. 43 C.F.R. § 1610.5-5.  To do so, BLM must prepare appropriate NEPA documentation, and submit the proposed amendment to public notice and comment in the same way as when the plan was originally being prepared.  43 C.F.R. § 1610.2.

## FACTUAL BACKGROUND

### Increasing Federal Pressure to Develop Oil and Gas on the Public Lands

31.    BLM is required to manage approximately 261 million acres of public lands "in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values; that, where appropriate, will preserve and protect certain public lands in their natural condition; that will provide food and habitat for fish and wildlife and domestic animals; and that will provide for outdoor recreation and human occupancy and use." 43 U.S.C. § 1701(a)(8).  Consistent with this obligation, the public lands must be managed in a manner that "recognizes the Nation's need for domestic sources of minerals … ." 43 U.S.C. § 1701(a)(12).  However, in recent years it has become Department and BLM policy in certain parts of the western United States to facilitate the extraction of available federal oil and gas resources to the virtual exclusion of all other resource values, including fish and wildlife, and the hunting and angling opportunities they support.

32.    Recent BLM policies and directives have moved away from balanced management and reflect an unrelenting push toward managing the public lands primarily to

11

support oil and gas development.  For example, in 2003, BLM issued Instruction Memoranda Nos. 2003-233, INTEGRATION OF THE ENERGY POLICY AND CONSERVATION ACT (EPCA) INVENTORY RESULTS INTO THE LAND USE PLANNING PROCESS (EXPIRED), and 2003-234, INTEGRATION OF THE ENERGY POLICY AND CONSERVATION ACT (EPCA) INVENTORY RESULTS INTO OIL AND GAS EXPLORATION AND DEVELOPMENT USE AUTHORIZATIONS (EXPIRED), for the stated purposes of reaffirming BLM's "commitment to not unduly restrict access to the public lands for energy exploration and development" and of implementing the Administration's goal for federal agencies to "expedite their review of permits or take other actions necessary to accelerate the completion of [energy-related projects]" including through reassessment and modification of so-called "constraints" to federal oil and gas leasing.  Instruction Memorandum 2003-234 required a review of all existing lease stipulations to determine if they were still "necessary and effective" and to direct that, if "lease stipulations are no longer necessary or effective, the BLM must consider granting waivers, exceptions, or modifications."

33.    BLM issued Instruction Memorandum 2004-110, FLUID MINERAL LEASING AND RELATED PLANNING AND NATIONAL ENVIRONMENTAL POLICY ACT (NEPA) PROCESSES (EXPIRED), to direct land managers to proceed with leasing even while applicable land use plans were being revised, even if those plans were considering protecting the natural values of the same lands, and to require that any deferrals of leasing be supported by detailed explanations and documentation, submitted to the state and national directors of the BLM.

34.    Instruction Memorandum 2005-247, NATIONAL ENVIRONMENTAL POLICY ACT (NEPA) COMPLIANCE FOR OIL, GAS, AND GEOTHERMAL DEVELOPMENT (EXPIRED), was issued in the wake of the Energy Policy Act of 2005 ("EPAct"), Pub. L. No. 109-58, 119 Stat. 594 (2005), to address "NEPA compliance" in light of the new leasing priorities.  It recommends BLM

develop a NEPA alternative of higher well density and development beyond that actually proposed by an operator and provides direction as to how to make the maximum number of projects fit into categorical exclusions to avoid NEPA altogether.

35.    The Government Accountability Office ("GAO") issued a report in June 2005 entitled OIL AND GAS DEVELOPMENT - INCREASED PERMITTING ACTIVITY HAS LESSENED BLM'S ABILITY TO MEET ITS ENVIRONMENTAL PROTECTION RESPONSIBILITIES (GAO-05-418).    The GAO found that the increased volume of Applications for Permit to Drill ("APD"), and mandates to promptly process them, resulted in more BLM staff resources being devoted to issuing permits and less to monitoring and enforcing compliance with environmental standards.    According to the GAO, the total number of oil and gas drilling permits approved by BLM more than tripled, from 1,803 to 6,399, during fiscal years 1999 - 2004.    GAO 17.    The GAO explains succinctly that this "dramatic increase in oil and gas development on federal lands over the past 6 years has lessened BLM's ability to meet its environmental protection responsibilities."    GAO 5.    For example, the field offices visited by GAO investigators reported meeting annual environmental monitoring requirements "only about half of the time" during the 6 year period. GAO 22.

36.    In Section 366 of the EPAct, moreover, Congress imposed a 30-day timeframe for the approval of APDs based on arguments by industry representatives that BLM was too slow approving APDs.    Congress also provided a series of mandatory "categorical exclusions" from NEPA compliance for certain activities in Section 390 of the EPAct.    These exclusions allow BLM to completely avoid analyzing and disclosing the environmental impacts of certain activities related to oil and gas development (e.g., drilling new wells in an already "developed field").

37.    The Project represents yet another in a long line of efforts by Washington officials, and Defendants Kempthorne and BLM, in particular, to facilitate oil and gas development, particularly CBM development, at the expense of the Nation's fish and wildlife resources without adequate review of the environmental impacts of such development.

**The Governing Resource Management Plan for the ARPA**

38.    BLM's 1990 "Great Divide RMP" generally directs management of the federal lands within the ARPA.  *See, generally*, 43 C.F.R. Part 1600.  The Great Divide RMP deemed all public lands within its scope suitable for oil and gas leasing and development, subject to certain stipulations.

39.    The Wildlife Management Objectives of the Great Divide RMP are as follows:

    a)    To provide habitat quality (food, cover, space, and water) adequate to support a natural diversity of wildlife and fisheries, including big game, upland game, waterfowl, non-game species, game fish, sensitive, threatened, and endangered species, species of special management interest in Wyoming, as well as to assist in meeting goals of recovery plans.

    b)    To maintain or improve vegetation condition and/or avoid long-term disturbance in high priority standard habitat sites and fisheries areas.

    c)    To maintain or improve overall ecological quality, thus providing good wildlife habitat, within the constraints of multiple-use management in moderate and low priority standard habitat sites … .

40.    The Great Divide RMP also provides:  "Crucial winter ranges for all big game species will be protected.  Surface disturbance will be mitigated to restore or replace habitat.  In addition, previously depleted habitat in crucial big game winter ranges will be reclaimed to the extent possible."  Great Divide RMP 45.

41.    The Great Divide RMP's, recreation management objective is:  "To ensure the continued availability of outdoor recreational opportunities, to meet legal requirements for the

health and safety of visitors and to mitigate conflicts with other resource uses." Great Divide RMP 33.

42.    The Great Divide RMP, now 17 years old, needs to be modified because of new data, changing resource conditions, changing uses of BLM lands, and a staggering increase in mineral development activity. EIS 3-118. The Great Divide RMP, therefore, is currently undergoing revision as the "Rawlins RMP." EIS 1-9.

43.    The Rawlins RMP will provide future direction for managing 3.5 million acres of BLM administered public land and 4.5 million acres of BLM administered federal mineral estate in various Wyoming counties, including within the ARPA. Until the Rawlins RMP is updated, however, all activities authorized in association with the Project still must comply with the Great Divide RMP. 43 U.S.C. § 1732(a). Once the Rawlins RMP is completed, all activities must comply with that RMP. *Id.*; EIS 2-1.

44.    BLM currently is developing an EIS for the Rawlins RMP. The Purpose and Need Statement of the draft EIS for the Rawlins RMP states:

> Issue 1: Development of Energy Resources and Minerals-Related Issues.
>
> Special attention is needed to address energy resource development (i.e., oil and gas, coal, solar, and wind energy) and related transportation network conflicts with other land and resource uses and values. Principal considerations include disruptive activities and human presence in big game (i.e., elk, deer, antelope, moose, and bighorn sheep) habitat, big game crucial habitat (crucial winter range and birthing areas), and other important wildlife species habitats (i.e., Greater sage-grouse, plovers, raptors, and fish) and the effects of disruptive activities on recreation values, forage uses, air quality, sensitive vegetation types, and sensitive watersheds. Areas need to be identified where surface disturbing and other disruptive activities (e.g., mineral exploration and development activities, rights-of-way construction activities) are suitable or should be restricted or avoided.

Rawlins RMP Draft EIS 1-9. *See also id.* 3-35 ("… there is sufficient confidence in the coalbed reservoirs' economic viability for major proposals to have been made. These proposals currently are being evaluated by means of EISs (for example, an EIS is being prepared for the collective proposals in the Atlantic Rim).").

46.    Thus, the very issues resolved by the ROD are being evaluated in the parallel Rawlins RMP NEPA process.

### The Project, the ROD and the EIS

46.    The Project involves drilling approximately 2,000 CBM wells within the ARPA. Total new surface disturbance from the drilling program across the ARPA will be 7,600 acres, at any given time, subject to a rolling reclamation program allowing additional disturbance to occur as lands are reclaimed.  However, the estimated number of gas wells "is not a cap or limitation, but an approximation to help establish the surface disturbance limit." ROD 1-2.  The 7,600-acre disturbance cap will be allocated to operators on a prorated basis.  During the life of the Project (30–50 years), total disturbance from gas development activities in the ARPA is estimated to be 13,600 acres, when one accounts for disturbance from infrastructure supporting the proposed activities.  ROD 2-3.

47.    According to the ROD, "[d]rilling development and reclamation activities in the ARPA will be managed through a performance-based, adaptive management process."  As part of this, "[a] monitoring and mitigation process will be required, and its development will begin within 30 days of the effective date of the ROD."  ROD 3.  This will be developed by a "Review Team (BLM, cooperating and interested agencies, and Operators) and will provide quantifiable criteria to identify trends associated with the Performance Goals."  *Id.*  The process will "include the types of mitigation responses that will be considered in the event that monitoring data indicate a downward trend relative to the Performance Goals."  *Id.*  "Throughout the life of the

project, monitoring data will be reviewed to determine if mitigation measures are effective and leading to the achievement of reclamation and Performance Goals." *Id.* If Performance Goals are not being met, "best management practices (BMPs), conditions of approval (COAs), protective measures, reclamation criteria, and mitigation measures may be modified, as appropriate, based on the monitoring results." *Id.*

48.     The ROD "is not the final review or approval for actions associated with [Project] development." ROD 3. Additional site-specific reviews will be conducted. "Other reviews or decision points include, but are not limited to, the review of annual or multi-year development plans (including transportation plans), Applications for Permit to Drill (APD), right-of-way (ROW) grants, Sundry Notices, or applications for Special Use Permits." ROD 3. BLM assures that "[t]he appropriate level of environmental review would be conducted prior to authorizing any of these applications or permits." ROD 4. This could range from a categorical exclusion from further NEPA analysis (perhaps by virtue of the EPAct) to an EIS.

49.     The draft EIS for the Project included a "phased development" alternative ("Alternative B") that would have staggered development of CBM wells in the ARPA. The EIS describes Alternative B as follows:

> Alternative B proposed that natural gas development activities would be restricted to one of three zones within the ARPA boundary at any one time. Each zone would be open to construction and development of natural gas removal and processing facilities for 7 years at which time construction and development activities would cease. Gas extraction and processing would continue (i.e., operational activities), while construction and development activities would move to another zone. The intent of the alternative was to focus disturbance activities into a smaller area while the remainder of the project area would be less disturbed and less impacted than under the proposed action. EIS 2-12.

50. Alternative B was rejected principally due to concerns expressed by oil and gas industry representatives about possible delays in realizing development of leaseholdings. EIS 2-12. ("Comments received from the companies objected to the extended delay to their ability to develop their leases in those areas not open to development activities for 7 to 14 years.").

51. In abandoning Alternative B's phased logic and adopting the Project, the ROD relies heavily on a "monitoring and adaptive management process to ensure reclamation and mitigation measures are effective and initiate corrective action when it is not." ROD 8. Appendix B of the ROD elaborates on the approach:

> Adaptive Management
>
> The BLM will implement a performance-based, adaptive management process for the ARPA whereby incremental adjustments will be made to mitigation and management restrictions based upon how the environment responds to future development and performance requirements. …
>
> …     …     …
>
> As information is gained about how area resources are reacting to reclamation activities and mitigations, the adaptive management process allows for changes in management ***without further NEPA analysis***, unless development thresholds, such as the number of wells and disturbance limits, are reached. The process enables managers to rapidly adjust mitigation and management restrictions for unanticipated impacts or reclamation successes.

ROD B-2 – 3 (emphasis supplied).

52. During development of the EIS, BLM evaded questions about the specifics of its future mitigation plans and ignored invitations from sister agencies to assist in the process. When the Environmental Protection Agency ("EPA"), for example, called for substantive actions to be established as part of the future process, BLM responded simply that it "intends to conduct site-specific evaluation of annual development plans along with the appropriate level of NEPA analysis prior to approval of actual development activities." EIS O-145. When EPA further

"recommend[ed] that BLM provide public disclosure of each phase review" and "extend[ed] an offer to assist BLM in the evaluation of the future specific engineering/development plans for this project," BLM responded simply: "Thank you for your comment." *Id.*

53.    Notably, when BLM has tried to incorporate a more detailed adaptive management approach into its decision-making process, the agency has not lived up to its obligations. *See generally* Sparrowe Declaration (Exhibit B). For example, BLM has simply ignored multiple monitoring and review requirements that are part of an "adaptive management" process relied on to justify opening Wyoming's Pinedale Anticline to oil and gas development. *Id.* Given BLM's failings in the Pinedale Anticline, there is no basis on which to presume a less rigorous plan will be anything other than an abject failure.

## Status of Wildlife, Habitats and Recreational Hunting in the ARPA

54.    The big game species that occur within the ARPA include pronghorn antelope, mule deer, and elk. Big game populations are managed by the Wyoming Game & Fish Department ("WGFD") within areas designated as herd units. EIS 3-85. There are several areas of overlapping big game crucial winter range located in the ARPA. The combinations of overlapping big game crucial winter ranges include the following: elk/mule deer 3,038 acres; mule deer/antelope 22,637 acres. Areas of overlapping crucial winter range are important because they provide crucial habitat for more than one species of big game.

55.    Most of the ARPA is located within the western portion of the Sierra Madre [Elk] Herd Unit. EIS 3-91. The majority of the ARPA is identified as winter range for elk, with crucial winter range identified along the eastern and southern borders. The crucial winter range occurs at lower elevations where less snow accumulates, and on steep, south and west-facing slopes that commonly blow free of snow or melt off during winter months. There are 40,840 acres of elk crucial winter range. *Id.* Several elk migration routes transverse the ARPA. Elk in

the ARPA are hunted, with a 54% success rate, by 3,532 hunters (11% of which are non-residents) each year. These hunters are supported by at least 15 local outfitters. EIS 3-116.

56.    The ARPA is located mostly within the 1,394-mile Baggs Herd [Antelope] Unit ("BHU"). The project area covers 480 miles or 34% of the BHU. EIS 3-86. There are approximately 42,900 acres of antelope crucial winter range. *Id.* Pronghorn in the ARPA are hunted, with a 99% success rate, by 2,784 hunters (21% of which are non-residents) each year. These hunters are supported by at least 13 local outfitters. EIS 3-116.

57.    Mule deer herds in the Atlantic Rim region are among the largest in the Intermountain West and have been known to migrate up to 60 miles between seasonal ranges. Western Ecosystems Technology, FINAL REPORT FOR THE ATLANTIC RIM MULE DEER STUDY (April 2007) ("Mule Deer Study") (attached as Exhibit C)  2. The ARPA is located in the eastern portion of the BHU, which includes three hunt areas. *Id.*  3. "Since the 1980's the BHU has supported one of Wyoming's largest deer herds and provided exceptional recreational opportunities to both resident and nonresident sportsmen." *Id.*  Mule deer hunting in the BHU provides more than 14,000 recreation days each year. *Id.* 24. In addition to those members of the BHU, migratory mule deer from regions outside the ARPA migrate through or occupy portions of the ARPA during spring, summer, and fall periods. *Id.*  Most, if not all, of this herd's transition range is located within the ARPA. Over 50% of the BHU's crucial winter range likely lies within one or more of several oil and gas project boundaries. Mule Deer in the ARPA are hunted, with a 54% success rate, by 2,784 hunters (40% of which are non-residents) each year. These hunters are supported by at least 18 local outfitters. EIS 3-116.

58.     The EIS specifically recognized the need for additional information on mule deer migration routes and habitat and the possibility of adverse impacts to those areas if development were to proceed in the face of the information deficit.  EIS 5-17.

59.     As part of the Project, BLM, WGFD, and Project proponents from the oil and gas industry implemented a cooperative study intended to "provide the necessary information to mitigate potential impacts and ensure development plans are environmentally sensitive to mule deer."  Mule Deer Study 2.  The study was designed to have two phases:  Phase I was intended "to identify seasonal ranges, document migration routes, and estimate survival rates prior to development of the proposed 2,000 natural gas wells."  *Id.*  If conducted, Phase II was envisioned as a long-term study that would "occur during or after development to determine if impacts to mule deer from natural gas development occur, including changes in migration routes, habitat use patterns, and survival."  *Id.*

60.     The Mule Deer Study addressing Phase I was completed in April 2007 – one month after the ROD was approved by BLM's Wyoming District Office, but one month before the ROD became effective.  The Mule Deer Study explains:  "Impacts [of CBM development] include direct and indirect habitat losses that can potentially result in reduced population performance (Sawyer et al. 2006a).  Direct habitat loss occurs when native vegetation is converted to access roads, well pads, pipelines, and other project features.  Indirect habitat losses occur when wildlife are displaced or avoid areas near infrastructure because of increased levels of human disturbances (e.g., traffic, noise, pollution, human presence)."  *Id.*  The study concludes:

> Sustaining migratory mule deer populations in the BHU will require that suitable seasonal ranges (i.e., winter, transition, summer) be maintained and migration routes remain functional. The 116,494 GPS locations we collected from 47 different mule

deer provide a baseline data set that objectively and accurately identifies seasonal ranges and migration routes of mule deer in the ARPA prior to full-scale gas development.    We encourage agencies and industry to consider and incorporate this information in development plans and management strategies associated with the ARPA.

*Id.* 26.

61.    The Mule Deer Study concludes:  "Until recently, conserving migration routes has not been a top management concern for agencies because there have been no large-scale habitat alterations in the ARPA or BHU and the landscape has remained relatively unchanged. However, the recent BLM approval to develop 2,000 gas wells at a spacing of 8 per section and improve or construct approximately 1,000 miles of road and pipeline (BLM 2006) will result in large-scale habitat changes that could potentially impact the effectiveness of migration routes."

62.    Greater sage grouse also occupy the ARPA, which provides a uniquely well defined and contiguous block of sage brush and related habitats on which sage grouse rely. "Wyoming is one of the last strongholds for greater sage-grouse in the western United States, and contains more grouse than all other states combined.  Greater sage-grouse are common throughout Wyoming because their habitat remains relatively intact compared to other states." EIS 3-94.  There are 88 leks (i.e., mating grounds) located in and within 2 miles of the ARPA. Leks are often in grassy areas or in more open canopy sagebrush/grass habitat.  "Greater sage-grouse are dependent on sagebrush environments for their year-round survival … ."  *Id.*  Sage grouse in the ARPA are hunted by up to 509 hunters each year.  EIS 3-116.  It is unclear how many outfitters currently support these hunters.

63.    The best available data concerning the impact of oil and gas development on grouse and their habitats demonstrates dramatic adverse impacts.  *See* Walker, et al., Greater Sage-grouse Population Response to Energy Development and Habitat Loss ("Grouse

22

Study"). *See also* Naugle et al., SAGE-GROUSE POPULATION RESPONSE TO COAL-BED NATURAL GAS DEVELOPMENT IN THE POWDER RIVER BASIN: INTERIM PROGRESS REPORT ON REGION-WIDE LEK-COUNT ANALYSES (May 26, 2006) ("Interim Study").  For example, the Interim Study reports:

> [L]eks with extensive CBNG development (>40% developed within 3.2 km) showed substantially lower population trends than leks with minimal CBNG or no development, even after controlling for known impacts of West Nile virus. Leks in areas adjacent to CBNG fields (10-40% developed within 3.2 km) also showed higher population trends than leks further away, suggesting that sage-grouse may be avoiding developed areas and moving into adjacent undeveloped habitat.

The Grouse Study states:

> [T]he number of males observed on leks in CBNG fields declined more rapidly than leks outside of CBNG. Of leks active in 1997 or later, only 38% of 26 leks in CBNG fields remained active by 2004-2005, compared to 84% of 250 leks outside CBNG fields. By 2005, leks in CBNG fields had 46% fewer males per active lek than leks outside of CBNG.

Grouse Study 1.  Persistence of leks was positively correlated to the proportion of sagebrush habitat within 6.4 km of the lek.  *Id.* 1-2.

## Procedural History Regarding TRCP's Challenge to the ROD and EIS

64.    TRCP provided BLM with comments in January 2007, during BLM's NEPA process, expressing TRCP's concerns about the Project and highlighting various shortcomings of the EIS.  BLM did not take TRCP's comments into account in the ROD, which BLM adopted in March 2007.

65.    The ROD became effective when it was announced in the Federal Register on May 21, 2007.  72 Fed. Reg. 28,518 (May 21, 2007).  By virtue of 43 C.F.R. § 3165.4(c), the ROD was immediately effective and constituted a final agency action.  Though not required to do so, TRCP, attempting to resolve the issue administratively, timely appealed the ROD to the

Interior Board of Land Appeals ("IBLA") on June 18, 2007, where it raised the concerns identified in this Complaint. Concurrently with its notice of appeal, TRCP filed with the IBLA a Petition for Stay.

66.     On September 5, 2007, the IBLA, after first holding that TRCP had standing to appeal the ROD, denied TRCP's Petition for Stay. Having received no immediate relief from the IBLA, and under no legal obligation to exhaust that appeal, TRCP withdrew its IBLA appeal on September 10, 2007 in favor of this litigation.

67.     Certain of the oil and gas operators with leases in the ARPA, Anadarko, Double Eagle Petroleum and Warren Resources, have commenced operations authorized under the ROD.

### The POD Decisions and TRCP's Attempt to Obtain Administrative Review

68.     The Sun Dog Decision authorizes the construction or reconstruction of access roads and well pads for the drilling of 48 CBM wells and 3 produced water re-injection wells, along with the construction, use and reclamation of appurtenant gas and water gathering pipelines and utility corridors in the Sun Dog POD ("Plan of Development") within the ARPA. The Sun Dog Decision relies on the standard mitigation measures identified in the EIS and ROD to address wildlife related concerns.

69.     Neither the ROD, nor the EIS (App. E, Wildlife Monitoring & Protection Plan), contemplates or analyzes the impact of exclusions from seasonal wildlife management restrictions established therein. Yet, the EA provides, with respect to wildlife: "In some instances, the proponent may request consideration of a temporary exception to wildlife seasonal restrictions. Such an exception may be granted if a determination is made that the wildlife resource will not be adversely impacted." EA at 9. It appears this "determination" will be made without any further NEPA review.

70.     The EA considers only two alternatives: "no action" and the proponent's proposed development.

71.     TRCP learned of the Sun Dog Decision on September 13, 2007. On September 14, 2007, TRCP timely sought the Wyoming State Director's review of the Sun Dog Decision pursuant to 43 C.F.R. § 3165.3(b).

72.     On October 31, 2007, the Deputy State Director refused to perform a review under BLM's regulations citing this litigation, as well as litigation brought by the Natural Resources Defense Council (Cause No. 07-1709), challenging the ROD, the EIS and the Sun Dog Decision.

73.     TRCP timely appealed to the IBLA the Deputy State Director's refusal to conduct a State Director Review as contemplated by 43 C.F.R. § 3165.3(b). Before answering, BLM moved to stay TRCP's appeal.

74.     On February 19, 2008, the IBLA issued an Order explaining it would not review TRCP's administrative appeal, stating: "[G]iven that the legality of BLM's approval of the PODs, including the adequacy, under section 102(2)(C) of NEPA, of its assessment of likely environmental impacts in the EA and FEIS, is already pending before the court in the lawsuits, we grant BLM's request to suspend consideration of TRCP's appeal and defer final dispositive action in the pending appeal." *See* Exhibit D attached.

75.     Given IBLA's determination, and the apparent suspension by BLM of the administrative review requirements contained in 43 C.F.R. § 3165.3(b) insofar as development within the ARPA is concerned; TRCP has withdrawn its IBLA appeal in favor of this amended complaint. A copy of the Order dismissing the appeal is attached as Exhibit E.

76.    The Catalina Decision authorizes construction of access roads and pads for the drilling of 36 CBM wells and 3 produced water reinjection wells, as well as a central delivery point facility.  The Catalina Decision relies on the standard mitigation measures identified in the EIS and ROD to address wildlife related concerns.

77.    As with the Sun Dog Decision, the Catalina EA notes that exceptions to applicable wildlife stipulations may be granted, but the Catalina EA does not analyze the impact of granting such exceptions.

78.    As with the Sun Dog Decision, the Catalina EA considers only two alternatives: the proposed action and a "no action" alternative.

79.    In light of the IBLA's February 19, 2008 Order, TRCP cannot obtain administrative relief from the POD Decisions, and apparently will be unable to obtain administrative relief from any future POD approval while this litigation is pending.

## CLAIMS FOR RELIEF

### COUNT ONE

*NEPA Violation - The EIS Does Not Consider a Reasonable Range of Alternatives*

80.    TRCP incorporates each and every of the foregoing paragraphs.

81.    BLM summarily dropped "Alternative B" from consideration in the EIS based on concerns raised by oil and gas industry representatives about temporary delays in oil and gas development.  Rather than opening the ARPA to the development of 2,000 wells at once, Alternative B would have provided for phased implementation.  By doing so, Alternative B would have been less detrimental to wildlife in the short-term by providing a greater opportunity for wildlife to avoid disturbed areas.

82.    Alternative B also would have fit much better into BLM's so-called "adaptive management" program because it would have allowed lessons learned in those portions of the

ARPA opened to development to be applied to other areas as they were opened.  Under the Project, data gathering and analysis will occur simultaneously with damage, thereby limiting opportunities to change course and minimize adverse impacts.  Instead of closely examining Alternative B, BLM adopted a "build-now, mitigate-later" approach that opens the entire ARPA to construction without a firm mitigation proposal.

83.     While "an agency need not analyze the environmental consequences of alternatives it has in good faith rejected as too remote, speculative, impractical or ineffective," *Utah Environmental Congress v. Bosworth*, 439 F.3d 1184 (10th Cir. 2006), there is no indication in the EIS that Alternative B was any of these things.  Alternative B was fully consistent with the stated Purpose and Need for the Project, and BLM's refusal to meaningfully analyze Alternative B beyond the draft EIS phase was arbitrary and capricious and violated NEPA.

## COUNT TWO

### *NEPA Violation - The EIS Does Not Adequately Identify Mitigation Measures*

84.     TRCP incorporates each and every of the foregoing paragraphs.

85.     BLM's "adaptive management" approach is long on process and short on substance.  The ROD and EIS fail to provide meaningful information regarding the predicted outcome of initial mitigation measures, possible mitigation alternatives that the Review Team will consider in the event monitoring data indicates a downward trend, or BLM's basis for choosing and/or disregarding potential future mitigation alternatives.   BLM's adaptive management program instead simply provides that the Review Team will meet to review monitoring data, make recommendations, and adjust mitigation at a later date if necessary.  ROD 3 and B-2 – 3.  All of this would occur without further NEPA analysis.  ROD B-2 – 3.

86.     The process apparently will exclude the voices of stakeholders like TRCP.  Only BLM, state agencies and the oil and gas operators will be allowed to participate in future data analyses and alternative formulation.  Only if those analyses demonstrate a need for further NEPA review will the public be offered a chance to become involved.

87.     BLM's adaptive management program violates NEPA's directive to take a hard look at mitigation prior to agency action.  *See* 40 C.F.R. § 1500.1(b) ("NEPA procedures must insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken.").  Indeed, development of the monitoring and mitigation plan did not even begin until 30 days after the ROD was issued.  ROD 3.  By failing to provide a meaningful analysis of mitigation measures prior to agency action, BLM arbitrarily and capriciously failed to disclose mandated information and shielded the Project from adequate scrutiny in contravention of NEPA.

## COUNT THREE

### *NEPA Violation - BLM Failed to Analyze Cumulative Effects of Other Related Projects and to Identify All Reasonably Foreseeable Impacts*

88.     TRCP incorporates each and every of the foregoing paragraphs.

89.     An EIS must analyze "cumulative impacts" that may "result from individually minor but collectively significant actions taking place over a period of time."  EIS 5-1.  The EIS describes various projects in the vicinity of the ARPA, but fails to analyze meaningfully the nature and extent of the combined impacts of those activities and the Project on wildlife and habitats within the ARPA.  The discussion of cumulative effects offered by BLM is merely a catalogue of activities.  The assessment of actual species-specific impacts is offered, where at all, only at a most conclusory level.  EIS 5-14, 5-15.

90.     Moreover, the cumulative impact analysis ignores certain key elements impacting the ARPA, including its fire history, grazing management and the sprawling impact of temporary work camps.

91.     Ignoring these landscape-shaping forces and the incremental adverse impact the Project will add, was arbitrary, capricious and a violation of NEPA's requirement to evaluate cumulative impacts.

## COUNT FOUR

### NEPA Violation - BLM Has Irreversibly and Irretrievably Committed Resources in a Manner that Precludes Appropriate Consideration of Alternatives in the Rawlins RMP

92.     TRCP incorporates each and every of the foregoing paragraphs.

93.     As noted above, the Rawlins RMP still is being developed.  That document will supplant the existing Great Divide RMP and govern all land management throughout a large portion of south central Wyoming, including the ARPA.  All future actions will need to be in compliance with the Rawlins RMP when complete.  The NEPA process supporting development of the Rawlins RMP is well underway, and a draft EIS has been prepared.

94.     By finalizing the ROD before the Rawlins RMP, BLM has effectively precluded any alternative uses for the ARPA that might otherwise have been considered as part of the Rawlins RMP NEPA process.  BLM has violated NEPA's requirement that all reasonable alternatives be left open during the Rawlins RMP NEPA process.  Stated alternatively, BLM has improperly made an irreversible or irretrievable commitment of resources by virtue of the ROD.  42 U.S.C. § 4332(2)(C)(v).  *See Scientists' Institute for Public Information v. Atomic Energy Comm'n*, 481 F.2d 1079 (D.C. Cir. 1973).  BLM's actions were arbitrary and capricious and without observance of procedure required by NEPA.

## COUNT FIVE

### *NEPA Violation - BLM's Failure to Employ the Best Available Data was Unreasonable and Prevented BLM from Taking the Requisite "Hard Look"*

95.    TRCP incorporates each and every of the foregoing paragraphs.

96.    Rather than waiting for the Mule Deer Study to be completed, BLM charged ahead to finalize the ROD without regard to its likely conclusions.  The authors of the report, who were working, in part, for BLM itself, explained "[i]nformation from Phase I provides the baseline information necessary to develop energy resources such that important migration routes and seasonal ranges can be protected or minimally impacted. Additionally, Phase I provides the pre-development information needed, should Phase II of the study materialize."  Mule Deer Report 2.  The study "provides the baseline data necessary to accurately identify seasonal ranges and migration routes, both of which will be key components for successful mule deer management and mitigation as energy resources are developed in the ARPA."  *Id.* at 24.

97.    Rather than waiting on the results of a study:  1) that BLM, in part, initiated; and 2) that was designed to provide the proper baseline from which to develop necessary mitigation measures, the agency ramrodded home the Project before the necessary analysis could be completed.  Not surprisingly, the ROD runs contrary to the biological considerations evaluated and the conservation recommendations made in the Mule Deer Study.  By failing to utilize (and wait for) the best available data concerning mule deer mitigation needs, BLM has failed to take the hard look NEPA requires.[2]

---

[2]  Additional relevant literature concerning mule deer available to the BLM but apparently ignored includes, but is not limited to, the following: (1) Brown, C.B. 1992.  Movement and Migration Patterns of Mule Deer in Southeastern Idaho.  Journal of Wildlife Management 56:246-253.  (2) Freddy, D.J., W.M. Bronaugh, and M.C. Fowler. 1986.  Responses of Mule Deer to Disturbance by Persons Afoot and Snowmobiles.  Wildlife Society Bulletin 14:63-68.  (3) Hobbs, N.T. 1989.  Linking Energy Balance to Survival in Mule Deer:  Development and Test of a Simulation Model.  Wildlife Monographs 101.  (4) Johnson, B.K., J.W. Kern, M.J.

98.     Similarly, despite the well documented impacts of CBM development on sage grouse, BLM adheres to mitigation measures proven to be inadequate for sage grouse protection. The Grouse Study - another report for which BLM could not wait - specifically explains the inadequacy of the very management restrictions adopted as mitigation for the Project:

> Current lease stipulations that prohibit development within 0.4 km of sage-grouse leks on federal lands are inadequate to ensure lek persistence and may result in impacts to breeding populations over larger areas. Seasonal restrictions on drilling and construction do not address impacts caused by loss of sagebrush and incursion of infrastructure that can affect populations over long periods of time. Regulatory agencies may need to increase spatial restrictions on development, industry may need to rapidly implement more effective mitigation measures, or both, to reduce impacts of CBNG development on sage-grouse populations in the [Powder River Basin].

Grouse Study 2.[3]  Similarly, the United States Fish and Wildlife Service recommended greater sage grouse protections and noted scientific research demonstrating "stipulations placed on oil

---

Wisdom, S.L. Findholt, and J.G. Kie. 2000.  Resource Selection and Spatial Separation of Mule Deer and Elk During Spring.  Journal of Wildlife Management 64:685-697.  (5) Merrill, E.H., T.P. Hemker, K.P. Woodruff, and L. Kuck.  Impacts of Mining Facilities on Fall Migration of Mule Deer.  Wildlife Society Bulletin 22:68-73.   (6) Rost, G.R., and J.A. Bailey. 1979. Distribution of Mule Deer and Elk in Relation to Roads.  Journal of Wildlife Management 43:634-641. and (7) Yarmaloy, C., M. Bayer, and V. Geist.  1988.  Behavior Responses and Reproduction of Mule Deer Does Following Experimental Harassment with All-terrain Vehicle. Canadian Field-Naturalist 102:425-429.

[3] Additional relevant literature concerning sage grouse available to the BLM but apparently ignored include, but is not limited to the following:  (1) Beck, T.D.I. 1977. Sage Grouse Flock Characteristics and Habitat Selection During Winter.  Journal of Wildlife Management 41:18-26. (2) Braun, C.E., T. Britt, and R.O. Wallestad. 1977.  Guidelines For Maintenance Of Sage Grouse Habitats.  Wildlife Society Bulletin 5:99-106.  (3) Braun, C.E., O.O. Oedekoven, and C.L. Aldridge. 2002.  Oil and Gas Development In Western North America: Effects On Sagebrush Steppe Avifauna With Particular Emphasis On Sage-Grouse.  Transactions of the North American Wildlife and Natural Resources Conference 67:337-349. (4) Connelly, J.W., S.T. Knick, M.A. Schroeder, and S.J. Stiver. 2004.  Conservation Assessment Of Greater Sage-Grouse And Sagebrush Habitats. Western Association of Fish and Wildlife Agencies, Cheyenne, Wyoming, USA.  (5) Lyon, A.G. 2000. The Potential Effects Of Natural Gas Development On Sage Grouse (Centrocercus urophasianus) near Pinedale, Wyoming. Thesis. University of

and gas development in the Pinedale Anticline, which are identical to those proposed for the Atlantic Rim development, were insufficient to maintain sage-grouse breeding populations in natural gas fields." EIS, Appx. N (Comment No. 384).

99. BLM's failure to wait for its own experts to inform it of the consequences of its actions, and BLM's staunch insistence on employing failed mitigation techniques that fly in the face of the best available scientific data, constitutes arbitrary and capricious decision-making and violates NEPA's hard-look mandate.

## COUNT SIX

### *NEPA Violation – The POD Decisions "Tier" from an Unlawful EIS*

100. TRCP incorporates each and every of the foregoing paragraphs.

101. The POD Decisions are "tiered" from the EIS, purportedly in accordance with 40 C.F.R. §§ 1500.4(i), 1502.20 and 1508.28. However, the EIS and ROD are arbitrary and capricious for the reasons set forth herein. BLM's attempt to tier the POD Decisions from an EIS that is arbitrary and capricious renders the tiered POD Decisions arbitrary and capricious.

## COUNT SEVEN

### *NEPA Violation – The POD Decision EAs Fail to Examine a Reasonable Range of Alternatives*

102. TRCP incorporates each and every of the foregoing paragraphs.

103. NEPA demands that a reasonable range of alternatives be analyzed. The POD Decision EAs, however, contain only two alternatives – "no action" and the operators' proposed action.

---

Wyoming, Laramie, USA. (6) Walters, C.J. 1986. Adaptive Management Of Renewable Resources. McGraw Hill Book Co., New York, USA.

104.    BLM's failure to consider additional alternatives, such as those involving fewer wells and less disturbance or those that would avoid "exceptions" to the seasonal wildlife restrictions in the EIS and ROD, was arbitrary and capricious.

## COUNT EIGHT

### NEPA Violation - The POD Decision EAs are Inconsistent with the EIS and Fail to Take the Required "Hard Look" at the Impact of Granting Exceptions to Wildlife Management Restrictions

105.    TRCP incorporates each and every of the foregoing paragraphs.

106.    The POD Decisions are inconsistent with the EIS from which they allegedly tier. Tiering is designed to avoid repetitious discussion of the "same issues."  However, neither the ROD nor the EIS contemplates or analyzes the impact of exceptions from wildlife management restrictions as contemplated in the POD Decisions.  No further discussion or analysis appears in the EAs regarding the impacts of such exceptions.  BLM has, therefore, failed to take the required "hard look" at the impacts of granting exceptions to the wildlife management restrictions contemplated in the ROD and EIS, and BLM's approval of the POD Decisions was arbitrary and capricious.

## COUNT NINE

### FLPMA Violation - The ROD is not Consistent with the Great Divide RMP's Reasonably Foreseeable Development Numbers

107.    TRCP incorporates each and every of the foregoing paragraphs.

108.    The Great Divide RMP projected 1,440 wells being drilled between about 1987 and 2007.  The Project alone exceeds that number by over 25%.  Moreover, as noted in the EIS, there are a number of additional development projects within the Great Divide planning area. All in all, the total new projects being planned in the Great Divide planning area could lead to

the drilling of 12,190 wells – nearly 1,000% more than authorized under the Great Divide RMP.[4]

This series of projects is being pursued without the benefit of an updated BLM land-use plan to

guide development and ensure there is a "big picture" perspective on the explosive CBM boom

that is occurring in south central Wyoming, and indeed, the western United States.

109.    BLM recognized the problem in its *Notice of Intent To Prepare an Environmental*

*Impact Statement and Conduct Scoping for the Atlantic Rim Coalbed Methane Project, Carbon*

*County, Wyoming; and To Amend the Great Divide Resource Management Plan*, 66 Fed. Reg.

123, 33,975 (June 26, 2001):

> Concurrently with the preparation of the project EIS, the planning
> requirements for amending the Great Divide Resource
> Management Plan (RMP) will also be conducted because the level
> of oil and gas development under this project proposal is **likely to
> exceed the reasonably foreseeable development level analyzed in
> the EIS for the Great Divide RMP**. Any needed changes in the
> reasonably foreseeable development scenario will be identified and
> the Great Divide RMP will be amended as necessary.

(Emphasis supplied).  However, the Rawlins RMP remains in draft form, and the Great Divide

RMP still governs.  By exceeding the reasonably foreseeable development levels authorized in

the Great Divide RMP, BLM has violated FLPMA's basic requirement that all project level

actions remain consistent with the governing RMP.  43 U.S.C. § 1732(a).

## COUNT TEN

### *FLPMA Violation - The Project and the POD Decisions are Not Consistent with the Great Divide RMP's Wildlife Management Objectives*

110.    TRCP incorporates each and every of the foregoing paragraphs.

---

[4] Since 2005, BLM (Rawlins Field Office) has approved or is slated to approve the 2,000-well Atlantic Rim project, the 1,240-well Seminoe Road project, and the 8,950-well Continental Divide Creston project.  *See* PUBLIC SCOPING NOTICE CONTINENTAL DIVIDE – CRESTON NATURAL GAS DEVELOPMENT PROJECT ENVIRONMENTAL IMPACT STATEMENT (April 2006).

111.     As noted above, the Great Divide RMP requires that fish and wildlife, as well as

the hunting opportunities they support be protected and maintained.  The EIS explains the

tumbling effect of habitat losses on big game and game bird species under all of the action

alternatives:

> Direct habitat loss from construction would equal approximately 6
> percent of the project area. In addition, dust would directly and
> indirectly impact 15–30 percent more acreage (section 4.5.3.1).
> These impacts would include habitat avoidance.  Indirectly, this
> may increase inter- and intraspecies competition for forage and
> thermal cover.  In areas already fully occupied, density-dependant
> species would be further displaced, possibly outside of the project
> area.  This may force animals to use lower quality habitats, which
> may lead to a reduction in reproduction rates or an increase in
> predation.  The long-term loss/reduced usability of shrub habitat
> would lead to an increase in use on remaining shrub habitats.  This
> increase of use would then lead to long-term reduction of shrub
> habitats outside the immediate project disturbances.  A further
> reduction of shrub habitat from die-off caused by overuse would
> further reduce the habitat quantity and quality available in the long
> term, resulting in a significant impact.  EIS 4-70.

112.     Under the Project:  "Development would alter or remove approximately 15,800

acres of wildlife habitat over the next 20 years."  EIS 4-78.  Even after reclamation, 6,240 acres

would remain unusable.  *Id.*  It is virtually impossible, even at a most general level, to square

these stark conclusions with the Great Divide RMP's objectives to maintain and improve habitat

quality within the planning area.

113.     The only expressly stated protective measure for mule deer crucial winter range is

a seasonal limitation on drilling.  There is no limitation within crucial winter range on such

activities at other times, and there is no limitation at all during the operations phase.  The EIS

explains that the Project's "level of development within big game crucial winter and transition

ranges, compounded by the current condition of these ranges, would exceed the significance

criteria (criterion number 3)."  EIS 4-84.   This means that the Project will "result in substantial disruption or irreplaceable loss of vital and high value habitats … ."  EIS 4-69.

114.    The ROD similarly employs seasonal restrictions on drilling on crucial elk winter ranges between November 15 and April 30.  EIS 4-72.  However, there are no meaningful restrictions on operations at any time of year.  "During operations, mitigation measures such as remote monitoring and telemetry would be used to reduce, but not completely eliminate, impacts to big game."  *Id.*  The EIS concludes:  "there would be an 'extreme' impact to elk based on the actual number of pads (eight pads per section) (WGFD 2004c).  With this level of development, impacts to elk crucial winter range would exceed the significance criteria (criterion number 3)."  EIS 4-79.  Again, this spells a "substantial disruption or irreplaceable loss of vital and high value habitats."

115.    Similarly, with regard to pronghorn antelope, the EIS explains:  "Standard mitigations prohibiting construction, drilling, and other activities potentially disruptive to pronghorn within crucial winter range from November 15 to April 30 would reduce the probability of displacement during this critical time of the year."  EIS 4-73.  However "[d]uring the production phase, there is no equivalent mitigation and animals may be displaced up to 0.25 miles from the source."  *Id.*  "This would lead to increased stress/decreased condition or reproductive rates of the animals as they travel farther and may have to use lower-quality range."  EIS 4-73.  BLM hypothesizes that some pronghorn may become accustomed to tolerating increased human activity, but offer only "perception" as the basis of that conclusion.  *Id.*[5]

116.    The EIS explains that "Greater sage-grouse are abundant within the ARPA, due to the high amount and diversity of suitable habitat, lack of habitat fragmentation, and the close

---

[5] A virtually identical discussion appears with regard to mule deer.  EIS 4-74.

proximity of upland and riparian habitats." EIS 4-75. Yet, it also explains that due to construction of ancillary facilities, the Project will fragment the habitat on which sage grouse rely. EIS 76 ("Construction of facilities and roads creates a long-term loss of greater sage-grouse habitat, increases fragmentation of remaining habitat."). "Of greater concern is the indirect loss of habitat resulting in bird displacement and fragmentation of nesting and early brood-rearing habitat." EIS 76. "Wintering areas (as they are mapped) would be protected from surface disturbing activities from November 15 to March 14." EIS 4-77. The EIS candidly acknowledges: "The timing stipulation prevents winter disturbance to greater sage-grouse, but does not prevent the direct loss of wintering areas outside of this time period. Loss of this habitat would lead to lower productivity and long-term decline in the population of these species." EIS 4-79.

117.   Ultimately, the EIS concludes: "the long-term loss of shrubs combined with the indirect impacts on the habitat, such as dust, noise, and continued human presence during the drilling and production phase, would result in habitat loss and disturbance levels exceeding the significance criteria (criterion number 4)." EIS 4-79. This means that sage grouse will suffer a "[s]ubstantial loss of habitat function or disruption of life history requirements … that would preclude improvement of their status." EIS 4-69.[6]

118.   Overall, the EIS concludes that greater sage-grouse will experience:

> [L]oss of nesting or early brood-rearing habitat, decreased population productivity caused by loss of nesting or early brood-rearing habitat, reduced utilization of suitable habitats due to indirect disturbance, loss of winter habitat, increased predation due to increased roosting sites for raptors on power poles and other

---

[6] In this context: "Habitat function means the arrangement of habitat features and the capability of those features to sustain species, populations, and diversity of wildlife over time (WGFD 2004c)." EIS 4-69.

structures, and displacement of birds into lower quality habitats.
EIS 4-75.

119.    BLM's treatment of critical wildlife habitats, including those for grouse, under the

Project and as reflected in the POD Decisions simply does not comport with the Great Divide

RMP's wildlife management or recreation goals and objectives.   BLM's ROD and the POD

Decisions, therefore, violate FLPMA's mandate that implementing actions be consistent with the

terms of governing RMPs.   43 U.S.C. § 1732(a).

## COUNT ELEVEN

### *FLPMA Violation - BLM Has Failed to Comply with FLPMA's Multiple Use-Sustained Yield Mandate*

120.    TRCP incorporates each and every of the foregoing paragraphs.

121.    "The health and abundance of wildlife populations directly affect the quality of

hunting in the ARPA.   When wildlife populations fluctuate, so do wildlife-based recreational

opportunities."  EIS 4-98.    The Project will have both direct and indirect impacts to recreation.

"Direct impacts to recreation resources occur because of the physical disturbance and removal of

vegetation from the construction of facilities; the visual impacts of facilities and activities; and

from the noise, traffic, and visual distraction of human activity."   EIS 4-99.   "The principal

recreation impact likely to be associated with the Proposed Action and alternatives is the change

in big game hunting opportunities because of habitat loss and wildlife displacement."  EIS 4-99-

100.   "The impact would be borne primarily by local and regional hunters, especially local

hunters for whom the benefits of the ARPA would be diminished as a convenient and

economical place to hunt."  EIS 4-100.

122.    "The duration of the effects would be for the life of the project—which may affect

more than one generation of recreation user."  EIS 4-101.  The EIS ultimately concludes:

> [T]he impacts to the predominant recreation activities in the ARPA—hunting, pleasure driving, and wildlife viewing—would be significant. The Proposed Action would diminish the wildlife presence, degrade scenery, and introduce traffic and noise. ***The natural setting would be converted to an industrialized setting by development of the [Project].***

*Id.* (Emphasis supplied).

123.    Wildlife stipulations and related mitigation measures contained in the ROD and EIS are insufficient to protect against a dramatic loss of wildlife habitat and the wildlife it sustains.  The POD Decisions contain and apply those same stipulations.  The POD Decisions, moreover, contemplate exceptions from those stipulations.  Neither the ROD nor the POD Decisions will adequately protect big game and sage grouse from the adverse impacts of development within the ARPA and the Sun Dog and Catalina PODs.  By failing to protect sage grouse and big game within the ARPA and the hunting opportunities they afford, and particularly the Sun Dog and Catalina POD, BLM has converted the ARPA into a single use area – CBM development.

124.    Multiple use management means "striking a balance among the many competing uses to which land can be put ... ."  *Southern Utah Wilderness Alliance*, 542 U.S. at 58 (citing 43 U.S.C. § 1702(c)).  The phrase "sustained yield" refers to the BLM's duty "to control depleting uses over time, so as to ensure a high level of valuable uses in the future."  *Id.* (citing 43 U.S.C. § 1702(h)).  Transformation of the natural setting to an industrialized landscape during the lifetimes of multiple generations is not consistent with FLPMA's multiple use-sustained yield mandate.  Because development under the ROD, as demonstrated by the POD Decisions, will not protect hunting and wildlife within the ARPA, BLM has violated FLPMA's multiple use and sustained yield requirement.

**COUNT TWELVE**

***FLPMA Violation - BLM Has Failed to Comply with FLPMA's Rule
Against Unnecessary or Undue Degradation***

125.    TRCP incorporates each and every of the foregoing paragraphs.

126.    As noted above, FLPMA mandates that "[i]n managing the public lands the [BLM] shall, by regulation or otherwise, take any action necessary to prevent unnecessary or undue degradation of the lands."  43 U.S.C. § 1732(b).

127.    The Project and POD Decisions will: 1) destroy vital wildlife habitats throughout the ARPA; 2) displace big game and sage grouse from key habitats; 3) rely solely on protective measures, either demonstrated by the best available data to be deficient, or that are yet to be developed through an ambiguous adaptive management process; and 4) "industrialize" the ARPA for multiple generations.  There are alternative means (e.g., Alternative B) by which the Project's purpose and need can be satisfied while minimizing these adverse impacts.  By failing to utilize the best available data and fully exploring these alternatives, BLM has authorized an activity that will result in unnecessary and undue degradation of the public lands within the ARPA.  BLM's actions in this regard were arbitrary, capricious and not in accordance with FLPMA.

**PRAYER FOR RELIEF**

For the foregoing reasons, BLM's approval of the ROD and POD Decisions should be reversed and the matter remanded to the agency for further consideration in light of BLM's obligations under NEPA and FLPMA.  Specifically, TRCP prays that the Court:

A)    Adjudge and declare that BLM's development of the EIS and approval of the ROD were arbitrary and capricious and in violation of NEPA and FLPMA;

B)    Vacate and set aside the ROD and EIS;

C)      Remand the ROD and EIS to BLM for further consideration in light of its obligations under NEPA and FLPMA;

D)      Adjudge and declare that BLM acted arbitrarily and capriciously when attempting to "tier" the POD Decisions from the EIS and that the POD Decisions violate NEPA and FLPMA;

E)      Vacate and set aside the POD Decisions (i.e., the EAs, FONSIs and DRs);

F)      Enjoin BLM from taking any further action in reliance on the unlawful ROD, including the authorization of any specific oil and gas operations;

G)      Enjoin BLM from taking any further action in reliance on the unlawful EIS, including the "tiering" of any future NEPA compliance document (e.g., environmental assessment, determination of NEPA adequacy, or supplemental EIS) off of the EIS;

H)      Award Plaintiff TRCP its reasonable costs and attorneys' fees, including as applicable, under the Equal Access to Justice Act, 28 U.S.C. § 2412(d); and

I)      Order such other relief as the Court may deem necessary, just or proper.

Respectfully submitted this 3rd day of April, 2008.

/s/ *Donald G. Blankenau*
Donald D. Blankenau
D.C. Bar No. ND0003
Thomas R. Wilmoth
Nebraska Bar No. 22518
HUSCH BLACKWELL SANDERS LLP
206 South 13th Street, Suite 1400
Lincoln, NE 68508
T: (402) 458-1500
F: (402) 458-1510
don.blankenau@huschblackwell.com
tom.wilmoth@huschblackwell.com

*Counsel for the Theodore Roosevelt*
*Conservation Partnership*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| THEODORE ROOSEVELT | ) |
| CONSERVATION PARTNERSHIP | ) |
| 555 Eleventh St. N.W., 6th Floor | ) |
| Washington, DC 20004 | ) |
| (202) 654-4600, | ) |
|  | ) |
| Plaintiff, | ) |
|  | ) |
| v. | ) |
|  | ) |
| DIRK KEMPTHORNE, in his official capacity | ) |
| as the Secretary of the United States | ) |
| Department of the Interior | ) |
| 1849 C Street, N.W. | ) |
| Washington, DC 20240 | ) |
| (202) 208-3100, | ) |
|  | ) |
| and | ) |
|  | ) |
| UNITED STATES BUREAU OF LAND | ) |
| MANAGEMENT | ) |
| 1849 C Street, Room 406-LS | ) |
| Washington, DC 20240 | ) |
| (202) 452-5125, | ) |
|  | ) |
| Defendants. | ) |
|  | ) |
| ANADARKO PETROLEUM | ) |
| CORPORATION, WARREN RESOURCES, | ) |
| INC., DOUBLE EAGLE PETROLEUM CO., | ) |
|  | ) |
| and | ) |
|  | ) |
| STATE OF WYOMING, | ) |
|  | ) |
| Defendant-Intervenors. | ) |
|  | ) |

## CORPORATE DISCLOSURE STATEMENT

Pursuant to LCvR 7.1 I, the undersigned, counsel of record for Plaintiff Theodore

Roosevelt Conservation Partnership, certify that to the best of my knowledge and belief, Plaintiff

has no parent companies, subsidiaries or affiliates which have any outstanding securities in the hands of the public.

These representations are made in order that judges of this court may determine the need for recusal.

Attorney of Record for Theodore Roosevelt Conservation Partnership.


/s/ **_Donald G. Blankenau_**

Donald D. Blankenau
D.C. Bar No. ND0003
Thomas R. Wilmoth
Nebraska Bar No. 22518
HUSCH BLACKWELL SANDERS LLP
206 South 13th Street, Suite 1400
Lincoln, NE 68508
T: (402) 458-1500
F: (402) 458-1510
don.blankenau@huschblackwell.com
tom.wilmoth@huschblackwell.com

*Counsel for the Theodore Roosevelt*
*Conservation Partnership*

## <u>CERTIFICATE OF SERVICE</u>

       I hereby certify that on April 3, 2008, I caused to be electronically filed the foregoing FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

**Donald G. Blankenau**
don.blankenau@huschblackwell.com; sharon.marburger@huschblackwell.com

**John Scudder Burbridge**
jburb1@state.wy.us

**Lori Caramanian**
lori.caramanian@usdoj.gov; susan.middagh@usdoj.gov; efile_nrs.enrd@usdoj.gov;
lori.montano@usdoj.gov

**Kristen A. Dolan**
kdolan@state.wy.us; cschep@state.wy.us

**Jay A. Jerde**
jjerde@state.wy.us

**Steven Michael Kupka**
nancilee.holland@huschblackwell.com

**Robert Charles Mathes**
rmathes@bjorklindley.com; lvanderveer@bjorklindley.com

**Teresa Rachel Nelson**
tnelso@state.wy.us

**Michael B. Wigmore**
michael.wigmore@bingham.com; s.franco@bingham.com

**Thomas R. Wilmoth**
tom.wilmoth@huschblackwell.com; sharon.marburger@huschblackwell.com

/s/ *__Donald G. Blankenau__*

Donald D. Blankenau
D.C. Bar No. ND0003
Thomas R. Wilmoth
Nebraska Bar No. 22518
HUSCH BLACKWELL SANDERS LLP
206 South 13th Street, Suite 1400
Lincoln, NE  68508
T: (402) 458-1500
F: (402) 458-1510
don.blankenau@huschblackwell.com
tom.wilmoth@huschblackwell.com

*Counsel for the Theodore Roosevelt
Conservation Partnership*

Exhibit A

**UNITED STATES DEPARTMENT OF THE INTERIOR**
**OFFICE OF HEARINGS AND APPEALS**
**INTERIOR BOARD OF LAND APPEALS**

| | | |
|---|---|---|
| THEODORE ROOSEVELT | ) | Appeal from Record of Decision |
| CONSERVATION PARTNERSHIP, | ) | by the Wyoming State Director, BLM, |
| | ) | Atlantic Rim Natural Gas Field |
| Appellant. | ) | Development Project, |
| | ) | March 23, 2007 |
| | ) | |
| | ) | IBLA 2007-208 |
| | ) | |

---

## DECLARATION OF STEVEN R. BELINDA

---

I, Steven R. Belinda, declare under penalty of perjury that:

1.    I am a resident of the State of Wyoming, over eighteen (18) years of age, with personal knowledge of the facts set forth herein.

2.    I am employed by the Theodore Roosevelt Conservation Partnership ("TRCP") as an Energy Policy Initiative Manager. I have held this position at all times relevant hereto. In addition to being employed by the TRCP, I am also a member of that organization.

3.    The TRCP is a non-profit organization supported by a nationwide network of over 90,000 individual sportsmen and women and more than 1,400 affiliated clubs and organizations dedicated to the pursuit of hunting, fishing and outdoor recreation. These 1,400 affiliated clubs and organizations themselves represent some 9,000,000 American outdoor enthusiasts. Species observed and/or hunted by TRCP members include, but are not limited to, mule deer, pronghorn, Rocky Mountain elk, and sage grouse.

4.     The mission of the TRCP is to preserve the traditions of hunting and fishing by: A) Expanding access to places to hunt and fish; B) conserving fish and wildlife and the habitats necessary to sustain them; and C) increasing funding for conservation and management.

5.     The Atlantic Rim area in Wyoming is the location of a proposed development that will include 2,000 natural gas wells, including 1,800 to coal beds and 200 to other geologic formations. The area within which this proposed development will occur is called the Atlantic Rim Natural Gas Field Development Project Area ("ARPA"). The appeal taken by the TRCP concerns the proposed development and its impacts to TRCP's interests within the ARPA.

6.     TRCP members are frequent visitors to the ARPA where they enjoy wildlife viewing, hunting and fishing. Among the species TRCP members enjoy viewing and/or hunting are elk, mule deer and pronghorn. There are some 42,900 pronghorn that utilize the ARPA as crucial winter habitat. In addition to pronghorn, there are an estimated 21,000 mule deer in the ARPA. The region also provides critical winter range for elk with over 40,840 acres of habitat within the ARPA. Annually, over 2,500 hunters, many of whom are TRCP members, pursue these species within the ARPA.

7.     I personally have engaged, and continue to engage, in hunting mule deer, elk and sage grouse in the ARPA.

8.     On behalf of the TRCP, and consistent with its stated mission, I have provided numerous comments to the United States Bureau of Land Management ("BLM") with respect to the impacts to TRCP's interests resulting from the proposed development within the ARPA. Consistent with the comments provided by the TRCP, the Final Environmental Impact Statement ("EIS") associated with the ARPA concluded:

> [T]he impacts to the predominant recreation activities in the ARPA – hunting, pleasure driving, and wildlife viewing – would be significant. The Proposed

Action would diminish the wildlife presence, degrade scenery, and introduce traffic and noise. The natural setting would be converted to an industrialized setting by development of the Proposed Action.

Page 4-102, Final EIS for ARPA. In short, habitat for mule deer, elk, pronghorn, sage grouse and other species will be significantly reduced and adversely impacted as a result of the proposed project. This impact will in turn, result in fewer hunting and wildlife viewing opportunities for TRCP's members, precisely what the TRCP was created to protect.

9.       The TRCP, its individual members, the affiliated clubs and organizations and their members, believe there are important cultural and aesthetic values associated with the careful management of the ARPA. These cultural and aesthetic values will be adversely affected by the reduced if the proposed project moves forward in the ARPA.. The diminished recreational opportunities resulting from the proposed project, like hunting and wildlife viewing, are likely to continue for several decades, further magnifying the impacts to existing and future members of the TRCP. Proceeding with the project is in direct conflict with the goals, objectives and mission of the TRCP and its members.

I declare under perjury that the foregoing is true and correct.

_7-18-07_____

Date

_____

Steven R. Belinda

State of Wyoming          )

                         ) S.S.

County of Sublette        )

Subscribed and sworn to before me this __18__ day of July, 2007, by Steven R. Belinda

DISNEY BRUNETTE = NOTARY PUBLIC

COUNTY OF
SUBLETTE

STATE OF
WYOMING

My Commission Expires 10/17/2010

Notary Public
My Commission expires: _____ 10/17/10

Exhibit B

UNITED STATES DEPARTMENT OF THE INTERIOR
OFFICE OF HEARINGS AND APPEALS
INTERIOR BOARD OF LAND APPEALS

| | | |
|---|---|---|
| THEODORE ROOSEVELT CONSERVATION PARTNERSHIP,<br><br>Appellant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Appeal from Record of Decision by the Wyoming State Director, BLM, Atlantic Rim Natural Gas Field Development Project, March 23, 2007<br><br>IBLA 2007-208 |

## DECLARATION OF ROLLIN D. SPARROWE

I, Rollin D. Sparrowe, declare under penalty of perjury that:

1.     I am a resident of the State of Wyoming, over eighteen (18) years of age, with personal knowledge of the facts set forth herein.

2.     I am employed by the Theodore Roosevelt Conservation Partnership ("TRCP") as an Energy Policy consultant.  I am also a Founding Board Member of the TRCP. I have held these positions at all times relevant hereto.  My *curriculum vitae* is contained herein as Attachment A.

3.     The TRCP is a non-profit organization supported by a nationwide network of over 90,000 individual sportsmen and women and more than 1,400 affiliated clubs and organizations dedicated to the pursuit of hunting, fishing and outdoor recreation.  These 1,400 affiliated clubs and organizations themselves represent some 9,000,000 American outdoor enthusiasts.  Species observed and/or hunted by TRCP members include, but are not limited to, mule deer, pronghorn, Rocky Mountain elk, and sage grouse.

4.     The mission of the TRCP is to preserve the traditions of hunting and fishing by: A) Expanding access to places to hunt and fish; B) conserving fish and wildlife and the habitats necessary to sustain them; and C) increasing funding for conservation and management.

5.     The Atlantic Rim area in Wyoming is the location of a proposed development that will include 2,000 natural gas wells, including 1,800 to coal beds and 200 to other geologic formations. The area within which this proposed development will occur is called the Atlantic Rim Natural Gas Field Development Project Area ("ARPA"). The appeal taken by the TRCP concerns the proposed development and its impacts to TRCP's interests within the ARPA.

6.     TRCP members are frequent visitors to the ARPA where they enjoy wildlife viewing, hunting and fishing. Among the species TRCP members enjoy viewing and/or hunting are elk, mule deer and pronghorn. There are some 42,900 pronghorn that utilize the ARPA as crucial winter habitat. In addition to pronghorn, there are an estimated 21,000 mule deer in the ARPA. The region also provides critical winter range for elk with over 40,840 acres of habitat within the ARPA. Annually, over 2,500 hunters, many of whom are TRCP members, pursue these species within the ARPA.

7.     I personally have hunted sage grouse in the ARPA.

8.     On behalf of the TRCP, and consistent with its stated mission, I have helped develop numerous comments to the United States Bureau of Land Management ("BLM") with respect to the impacts to TRCP's interests resulting from the proposed development within the ARPA. Consistent with the comments provided by the TRCP, the Final Environmental Impact Statement ("EIS") associated with the ARPA concluded:

> [T]he impacts to the predominant recreation activities in the ARPA – hunting, pleasure driving, and wildlife viewing – would be significant. The Proposed Action would diminish the wildlife presence, degrade scenery, and introduce

traffic and noise. The natural setting would be converted to an industrialized setting by development of the Proposed Action.

Page 4-102, Final EIS for ARPA. In short, habitat for mule deer, elk, pronghorn, sage grouse and other species will be significantly reduced and adversely impacted as a result of the proposed project. This impact will in turn result in fewer hunting and wildlife viewing opportunities for TRCP's members, precisely what the TRCP was created to protect.

9.    The TRCP, its individual members, the affiliated clubs and organizations and their members, believe there are important cultural and aesthetic values associated with the careful management of the ARPA. These cultural and aesthetic values will be adversely affected if the proposed project moves forward in the ARPA. The diminished recreational opportunities resulting from the proposed project, like hunting and wildlife viewing, are likely to continue for several decades, further magnifying the impacts to existing and future members of the TRCP. Proceeding with the project is in direct conflict with the goals, objectives and mission of the TRCP and its members.

10.    The Record of Decision ("ROD") concerning the ARPA contains vague, non-specific commitments to monitor species, consider future mitigation measures and engage in adaptive management. The lack of specificity regarding these commitments renders them effectively meaningless and far below the level of detail and specificity contained in other environmental impact statements and records of decision for similar projects in Wyoming.

11.    I have extensive experience in adaptive management programs. For over a decade I worked with the Department of the Interior and the 50 state wildlife agencies to develop and implement a comprehensive waterfowl management adaptive management program. That program included the rigorous use of extensive scientific data and the application of predictive

modeling tools.   This adaptive management program served as a template for other similar species/habitat management programs.

12.    Given my experience with species/habitat management programs, I participated in the Pinedale Anticline Working Group ("PAWG") which acts as an advisory committee to implement the Pinedale Anticline EIS (2000) and Rod concerning an energy development effort, similar to the ARPA development.   As chair of the Wildlife Monitoring Task Group of PAWG, I am very familiar with the Pinedale Anticline EIS and ROD.   The Pinedale Anticline EIS and ROD contain commitments to monitor species and develop mitigation programs that are much more detailed than those contained in the ARPA Final EIS and ROD.   The Pinedale Anticline ROD specifically explained the implementation of an adaptive management process that would be implemented to adjust well-field operations if adverse impacts to species/habitats occurred. Yet despite the greater degree of specificity contained in the Pinedale EIS and ROD, species and their habitats have experienced significant negative impacts resulting from the development. This failure is the direct result of an adaptive management program that lacks the necessary institutional structure and detail to adjust operations to the needs of the biological resources.

13.    Given the failure of the process created by the more detailed Pinedale Anticline EIS and ROD, the vague structure and language of the ARPA Final EIS and ROD virtually ensure that negative impacts on species/habitat within the ARPA will occur.   In short, based on my experience as a member of PAWG and my experience in adaptive management programs, I conclude that there has been no serious consideration made by the BLM with regard to the impacts of the ARPA development on species/habitats important to the interests of  the TRCP and its members.

I declare under perjury that the foregoing is true and correct.

_____ July 20, 2007 _____          _____ Rollin D. Sparrowe _____
Date                                Rollin D. Sparrowe


State of Wyoming              )
                             ) S.S.
County of   SUBLETTE         )


Subscribed and sworn to before me this __20TH__ day of July, 2007, by Rollin D. Sparrowe

SUE M. WILSON      NOTARY PUBLIC
COUNTY OF          STATE OF
SUBLETTE           WYOMING
MY COMMISSION EXPIRES DECEMBER 22, 2009

_____ Sue M. Wilson _____
Notary Public
My Commission expires:  12/22/09

November, 2005

**ROLLIN D. SPARROWE**
10 Nighthawk Lane
P.O. Box 415
Daniel, Wyoming 83115
307-859-8606

## PERSONAL BACKGROUND

Born January 12, 1941, in Oakland, California.  Married.

## EDUCATION

B.S. in Game Management, 1964, Humboldt State University.  Coursework emphasis: wildlife management with range management option.

M.S. in Wildlife Management, 1966, South Dakota State University.  Coursework emphasis: zoology, wildlife management.  Thesis title: Population distribution and mobility of deer in eastern South Dakota.

Ph.D. in Wildlife Ecology, 1969, Michigan State University.  Coursework emphasis: animal behavior, ornithology, quantitative biology, physiology.  Thesis title: Prey-catching behavior in the American kestrel (Falco sparverius).

## AWARDS RECEIVED

Graduate Research Fellowship at South Dakota Cooperative Wildlife Research Unit, February 1964-1966.  Graduate Research Assistantship at Fisheries and Wildlife Department, Michigan State University, September 1966-June 1969.  National Wildlife Federation Fellowship in Conservation Education, 19681969.  Society of Sigma Xi Grant-in-aid of Research, 1969.

Received the Award for Outstanding Professional Contribution to the Wildlife Field, 1972, from the University of Missouri Wildlife Club.

Received a Quality Performance Award with merit pay increase from Fish and Wildlife Service, 1975.

Received the Superior Service Award from the Department of the Interior, 1978.

Received Distinguished Alumnus Award in 1981 from the Department of Wildlife and Fisheries Sciences, South Dakota State University.

Received Distinguished Alumnus Award in 1985 from the College of Natural Resources, Humboldt State University. Recognized a second time as Distinguished Alumnus in 2003 by the Humboldt State University Alumni Club.

Received Outstanding Performance Ratings from Fish and Wildlife Service in 1981, 1982, 1983, 1986, 1988, 1989, and 1990.

Received a Quality Performance Award with pay bonus as Outstanding Manager from Fish and Wildlife Service in 1988.

Meritorious Service Award from Secretary of the Interior, June, 1991.

Received the Aldo Leopold Memorial Award from The Wildlife Society for 2002, the most prestigious award granted in the wildlife profession, for leadership in the translation of science into policy in wildlife management.

Received 2003 Award for Public Policy Accomplishment for leadership of a diverse coalition over eight years to improve funding for National Wildlife Refuges, from The Natural Resources Council of America, composed of groups representing membership of 23 million.

Received the 2003 Outdoor Life Conservation Award for leadership on the North American Waterfowl Management Plan and in waterfowl conservation, which "has given new stature to wildlife professionals by translating science into policy".

**PROFESSIONAL EXPERIENCE:**

1991-2004  WILDLIFE MANAGEMENT INSTITUTE.   President.   A private, nonprofit, scientific and educational organization dedicated to the restoration, sound management and wise use of wildlife and their Present habitats in North America.  The Institute was supported by the American sporting arms and ammunition industry and private donors.  Its mission is to work alone, or with other organizations, to improve state and federal wildlife management programs, and provide public information and education services to promote effective wildlife management.

Activities include the biweekly Outdoor News Bulletin, the annual North American Wildlife and Natural Resources Conference, publishing pamphlets and scholarly books on wildlife and its management, and a wide array of supportive actions to enhance budgets and programs which benefit wildlife.  Administrative reviews of state, provincial, and federal wildlife agencies are done to help strengthen programs that benefit wildlife.  Work on research, legislation, and implementation of public programs are primary modes of operation.

1989 - 1991  FISH AND WILDLIFE SERVICE.  Deputy Assistant Director - Refuges and Wildlife.  Responsible to for Divisions and Offices as follows: Division of Refuges, Office of Migratory Bird Management, Division of Law Enforcement, Division of Realty, Duck Stamp Office.

Responsible for daily oversight and guidance of staff functions with the Assistant Director for Refuges and Wildlife in support of the Director, and in the conduct of operational programs in some law enforcement programs, duck stamp sales, and migratory bird surveys, analysis, and establishing hunting regulations.  Developed and recommended national policy for management of national wildlife refuges, migratory bird management, land acquisition, and law enforcement.

Had a lead role in implementation of the North American Waterfowl Management Plan and the North American Wetlands Conservation Act.  Also involved extensively in development of a national plan (EIS) for management of National Wildlife Refuges, review of law enforcement

functions, development of a strong nongame migratory bird leadership role for the Service, regular contact with Canada and Mexico concerning migratory bird and wetland management, and development of a broader duck stamp program to benefit wetland conservation. Concentrated on budget development in support of Service operational programs and future initiatives.

1984 - 1989 FISH AND WILDLIFE SERVICE. Chief, Office of Migratory Bird Management. Responsible for to management of migratory birds under the Migratory Bird Treaty Act and other basic authorities of the Service. Conducted operational activities nationally and internationally.

Developed policies, set population objectives, developed and managed species plans, provided leadership in habitat and population management for migratory birds in the Service, and conducted major operational programs to gather basic data on migratory birds. Had primary responsibility for cooperative work with Canada and states and provinces in conduct of waterfowl and migratory upland gamebird population, habitat, and harvest surveys used annually to set harvest regulations at the National level in Canada and the U.S. Ultimately responsible for annual Federal migratory bird hunting regulations. Office budget of $6.1 million and 120 employees. Programs also included North American Bird Banding Laboratory, and development of Service strategies for management of nongame migratory birds. Had a major role in writing and implementing the North American Waterfowl Management Plan in cooperation with Canada.

Other accomplishments included completion and publication of a major study of waterfowl harvest in cooperation with Canada; major revisions in Federal policy toward harvest regulations; completed programmatic EIS's on Use of Lead Shot for Hunting Migratory Birds and Establishing Migratory Bird Hunting Regulations; implemented the use of steel shot for waterfowl hunting nationwide; developed strong public outreach to explain the plight of waterfowl and shrinking habitats to the public through verbal, written, and video mechanisms; presented a series of policy papers at conferences to support regulatory policies.

1983 - 1984 FISH AND WILDLIFE SERVICE. Chief, Division of Wildlife Research. Line manager of wildlife research programs, including supervision of Directors of Patuxent, Denver, and Northern Prairie Wildlife Research Centers and National Wildlife Health Research Center.

Responsible for oversight of laboratories with a budget of $18 million and almost 400 employees. Developed budgets, tracked progress, evaluated research output of the laboratories. Led development of Research Review Panel to evaluate performance of agency research scientists for promotion. Provided coordination with agency functional programs and Regional Office to assure relevance of research activities to agency needs.

Major research program areas supervised included endangered species, animal damage control, environmental contaminants, and migratory birds.

Accomplishments included revision of Divisional structure and solving acute personnel problems; continued strong role in developing methods and procedures to evaluate research

laboratories and scientists; developed improved relationship with Endangered Species Program staff and managers. I was in this position one year and three months.

1979 - 1983 FISH AND WILDLIFE SERVICE. <u>Chief, Division of Cooperative Research Units</u>. Responsible for both programmatic, budgetary and line functions of Wildlife, Fishery, and Fish and Wildlife Research Units. Provided direction, coordination, leadership for 20 Wildlife Units, 25 Fishery Units, and 4 Fish and Wildlife Units. Identified goals, outputs, and strategies to achieve them, promoted broad joint research efforts oriented to expressed needs of cooperating agencies. Interpreted, developed guidelines and policies to enable functioning of Cooperative Units in the Department of the Interior, and also within the framework of the cooperating universities and state agencies.

The primary contact between the cooperating staffs of 31 universities, state agencies, and other cooperators. Participated in more than 100 Unit Coordinating Meetings at both Wildlife and Fishery Units. Responsible for evaluating programs at all 49 Units, and held accountable for organizational accomplishments of the Units on behalf of the Fish and Wildlife Service and the other cooperators. Annual budgets were approximately $4.4 million in federal funds, $2.5 million in university and state agency support, and $7.0 million handled through research at the individual Units. Position had responsibility to maintain, through the cooperating universities, high quality academic training to provide qualified resource managers who go to work in state and federal conservation agencies.

During the period 1981-83 the Units were not in the Administration's budget. I provided leadership to Unit scientists to increase quantitative measures of output as the strongest response to the uncertain situation. Developed a computer-based tracking system, and a major new approach to contracting which gave the agency access to university cooperating faculty to conduct needed studies. Developed and marketed combined cooperative fish and wildlife units which served as the current model for the program. Played a strong personal role in development of research-wide procedures for evaluating laboratory programs and research output of scientists. Made several specific EEO advances in training individuals who have gone on to successful careers.

1976 - 1979 FISH AND WILDLIFE SERVICE. Supervisor, Cooperative Wildlife Research Units. Responsible for administration and supervision of 20 Cooperative Wildlife Research Units.

Served as official representative of the U.S. Fish and Wildlife Service at each Unit Coordinating Committee meeting, requiring extensive travel. Often represented the Service at these same meetings for the Cooperative Fishery Research Units. Responsible for supervision of Cooperative Wildlife Research Unit Leaders and reviewing their supervision of the Assistant Unit Leaders. Coordinated seeking out and evaluating qualified applicants for vacant or new Unit positions, and negotiating with cooperators during final selection. Responsible for evaluation of research and training activities of all the Units, annual budgets, contracting for research, and reporting on accomplishments of the program. Also carried out extensive staff assignments from the Directorate or Research Division of FWS.

Special projects with the Unit Program Included development of guidelines for evaluation of each Unit's program (in conjunction with other staff from Units), and negotiation and development of now Units. Assumed fisheries supervision and ran both sets of units during a transition to a new office.

1969 - 1976 FISH AND WILDLIFE SERVICE. Assistant Leader, Missouri Cooperative Wildlife Research Unit. Primary duties included wildlife research and training of graduate students, teaching graduate wildlife courses, and cooperative work with state and federal agencies regarding wildlife in the State of Missouri. Teaching experience at the University of Missouri as Assistant Professor included Wildlife Ecology, General Ecology, and Basic Environmental Studies. Research interests included population dynamics, behavior, effects of land-use practices on wildlife, and biological and socioeconomic aspects of water resource projects.

Acting Leader, Missouri Cooperative Wildlife Research Unit, March through June 1973. Above duties plus administration of all Unit programs.

1966 - 1969 MICHIGAN STATE UNIVERSITY. Research Assistant assigned to prey-catching behavior of sparrow hawks. Included field observations, trapping, and training experimental animals, testing behavior in controlled laboratory system. Assisted in teaching laboratory courses.

5/66 - 9/66 NATIONAL PARK SERVICE, Yellowstone, Wyoming. Ranger-Naturalist. Primary job interpretation of park features for the public. Half time spent giving talks in visitor center. Half time spent on trails contacting public. One 45-minute illustrated talk on wildlife ecology each week. Spoke to groups of more than 600 people.

1964 - 1966 SOUTH DAKOTA COOPERATIVE WILDLIFE RESEARCH UNIT, Brookings. Research Assistant. Field study of white-tailed deer movements included trapping, color marking, and observation of deer; also construction and use of radio-transmitters. Considerable time spent assisting on raccoon telemetry study, banding waterfowl, and other projects.

2/63 - 6/63 CALIFORNIA FISH AND GAME. Sacramento. Seasonal Aide-Experimental. Conducted experiment on seed persistence of selected waterfowl foods. Written final report. Worked about 10 hours per week.

6/62 - 9/62 CALIFORNIA FISH AND GAME. Seasonal Aide. Worked on joint project with Game Department and U.S. Soil Conservation Service on developing waterfowl food plants. Included farming, recording growth data on plantings.

6/61 - 9/61 CALIFORNIA FISH AND GAME, Sacramento. Seasonal Aide. Same as the above.

**SPECIAL ASSIGNMENTS**

1972 - 1974 Detailed part-time to the Office of Endangered Species to construct a priority system for decision-making in the Endangered Species Program.

1972 - 1974 Assigned to work on appraisal of potentials for coordinated research on water resource problems through the Cooperative Fishery and Wildlife Research Units.

1973 - 1974 Detailed in 1973 to work in the Office of the Assistant Secretary for Fish, Wildlife and Parks to assist in planning research in the Atchafalaya River Basin, Louisiana. Assigned by the Associate Director for Environment and Research to review progress of the Atchafalaya Basin Land and Water Management Study.

1974 - 1979 Maintained continuing liaison between Research in FWS and Ecological Services Program in to developing methodologies (HEP) for evaluating habitats. Participated in evaluating emerging methodologies, planned and initiated cooperative research programs through the Cooperative Units and other Research entities in FWS.

1976 - 1979 Served as Team Leader on interagency team cooperating with the Government of Spain in to planning for the Coto Donana National Park. Included three trips to Spain to work in the field, with university and other scientists, and with the major natural resources agency.

1977 Member of Task Force assigned to evaluate procedures for conducting endangered species research in the FWS.

1979 Member of Task Force assigned to evaluate the scientific validity, implementation, needs for development, and other potential applications of the Habitat Evaluation Procedures (HEP) being developed for evaluating effects of water resource projects.

1980 - 1981 Alternate delegate for Interior Department to the CITES Commission, which reviewed international trade in endangered species.

1982 Member of Merit Pay Task Force assigned to evaluate the first year performance of Merit Pay in the Service, and recommend improvements.

1979 - 1984 Provided leadership in development and implementation of review process for FWS Research Laboratories and scientists.

1984 - 1986 Served on writing team to draft the North American Waterfowl Management Plan, signed by the U.S. and Canada in May 1986. Provided primary biological input from Office of Migratory Bird Management for the Service.

1987 Dec. Lead biologist in U.S. delegation to Soviet Union to review accomplishments under US-USSR Convention on Migratory Birds.

1985 - 1988 Lead responsibility for two programmatic EIS for the Service on Lead Shot for Hunting Migratory Birds (1986), and Sport Hunting of Migratory Birds (1988).

1986 - 1989 Served as Coordinator for the U.S. Section of the North American Waterfowl Management Plan to Committee, providing staff support regarding waterfowl population biology in relation to implementation of the Plan.

1989 Participated in major migratory bird symposium in Soviet Union as a U.S. delegate to the International Waterfowl and Wetlands Research Bureau.

1989 - 1991 One of two members of North American Waterfowl Management Plan Committee representing to the Service in implementing the Plan.

1990 - 1991 Served in a lead role for FWS participation in the "Partners in Flight" program for research and to management of Neotropical Migratory Birds.

1991-1997 Chaired the U.S. Implementation Board for the North American Waterfowl Management Plan (20 member organization).

1993 Appointed to National Research Council's Committee on Scientific issues in the Endangered Species Act.

1994 Appointed to the National Research Council's Committee on a Biological Survey for the Nation.

1995 Served on a Fish and Wildlife Service Director's Task Force to recommend how to implement Adaptive Harvest Management for U.S. duck harvest management.

1996 Lead organization of the Cooperative Alliance for Refuge Enhancement , resulting in formation of an alliance of 21 member groups that ranged from environmental groups to hunting groups, and worked with Congress to add over $250 million to the permanent budget to operate and maintain the National Wildlife Refuges.

1999 Initiated and Chaired an international task force to consider how to respond to overpopulation of midcontinent snow geese to ameliorate their adverse impact on northern coastal habitats.

2000 Lead organization with the help of the Boone and Crockett Club, of the 37 member American Wildlife Conservation Partners, a partnership of hunter/conservationists dedicated to ensuring the continued success of wildlife management in America-at a time of unprecedented polarization over management of land and wildlife.

## MISCELLANEOUS EXPERIENCE

1960 - 1966 Taught field ecology in Science Camp (part-time). Worked one summer in redwood mill, one to summer in redwood logging. Earned 50 percent of living expenses as pizza cook while an undergraduate. Five months as mail clerk for engineering firm.

1979 - 2004 Game Manager. Served as game manager, Island Creek Gun Club, Centerville, Maryland. Responsible for regulation of hunting, trapping, and habitat management on a privately owned 200-acre marshland. (Co-owner of Club).

## PUBLICATIONS

Sparrowe, R.D. and R.C. Drewien. 1966. Nesting and production of the mourning dove in eastern South Dakota, 1965. South Dakota Bird Notes 18(2): 33-44.

Sparrowe, R.D. 1968. Sexual behavior of grizzly bears. American Midland Naturalist 80(2):570-572.

Sparrowe, R.D. and P.F. Springer. 1970. Seasonal activity patterns in white-tailed deer in Eastern South Dakota. Journal of Wildlife Management 34(2): 420-431.

Sparrowe, R.D. 1972. Prey-catching behavior in the sparrow hawk. Journal of Wildlife Management 36(2):297308.

Sparrowe, R.D. and H.M. Wight. 1975. A priority system for decision-making in the endangered species program. Trans. North American Wildlife and Natural Resources Conference 40:140-154.

Sparrowe, R. D. 1977. Harry S. Truman Dam and Reservoir - a case history of problems in fish and wildlife coordination. Trans. North American Wildlife and Natural Resources Conference 42:42-55.

Flood, B.S., M.E. Sangster, R.D. Sparrowe and T.S. Baskett. 1977. A handbook for Habitat Evaluation Procedures. USDI-Fish and Wildlife Service, Resource Publication 132. 77 pages.

Wollard, L.L., R.D. Sparrowe and G.D. Chambers. 1977. Evaluation of a Korean Pheasant Introduction in Missouri. Journal of Wildlife Management 41(4): 616-623.

Drobney, R.D. and R.D. Sparrowe. 1977. Land-use relationships and management of Greater Prairie Chickens in Missouri. Trans. Missouri Academy of Sciences, Volumes 10 and 11: 146-160.

Sparrowe, R.D. and B.F. Sparrowe. 1978. Use of critical parameters for evaluating wildlife habitat Pages 385405 in Classification, inventory and analysis of fish and wildlife habitat: the proceedings of a national symposium, 1977, Phoenix, Arizona. The Fish and Wildlife Service, Office of Biological Services, Washington, D.C. 604 pages.

Sanderson, R.C., E.D. Able, R.D. Sparrowe, J.G. Grieb, L.D. Harris, and A.N. Moen. 1979. Research needs in wildlife. Trans. North American Wildlife and Natural Resources Conference 44:166-175.

Zwank, P.J., R.D. Sparrowe, W.R. Porath, and 0. Torgerson. 1979. Utilization of threatened bottomland habitats by white-tailed deer. Wildlife Society Bulletin 7(4):226-232.

Griffin, C.R., T.S. Baskett, and R.D. Sparrowe. 1980. Bald eagles and the management program at Swan Lake National Wildlife Refuge. Trans. North American Wildlife and Natural Resources Conference 45:252-262.

Griffin, C.R., T.S. Baskett, and R.D. Sparrowe. 1982. Ecology of bald eagles wintering near a waterfowl concentration. USDI-Fish and Wildlife Service, Special Scientific Report - Wildlife No. 247.12 pages.

Sparrowe, R.D. 1982. Influence of cooperative wildlife and fishery units on graduate education and professional employment. Trans. North American Wildlife and Natural Resources Conference 47:219-230.

Sparrowe, R.D. Threats to paddlefish habitat. In: The Paddlefish: Status, Management and Propagation. North-Central Section, American Fisheries Society, Special Publication No. 7:36-45.

Sparrowe_ R.D. and J.H. Patterson. 1987. Conclusions and recommendations from stabilized duck hunting regulations: management implications and future directions. Trans. North American Wildlife and Natural Resources Conference 52:320-326.

Sparrowe, R.D., T.J. Dwyer, P.G. Poulos, L.R. Jahn, D.M. Smith and R.J. Misso. 1989. Biopolitical strategies for waterfowl habitat preservation and enhancement. Pages 531-560 in L.M. Smith, P.L .Pederson, and R.M. Kaminski, Eds. Habitat Management for Migratory and Wintering Waterfowl in North America, Texas Tech. University Press. 560 pages.

Sparrowe, R.D. 1989. Developing harvest regulations strategies for wood ducks. Pages 256-258 in L.H. Frederickson, G.V. Burger, S.P. Havera, D.A. Graber, R.E. King, and T.S. Taylor, Eds. Proceedings, 1988 North American Wood Duck Symposium, St. Louis, Missouri.

Sparrowe, R.D. and K.M. Babcock. 1989. A turning point for duck harvest management. Trans. North American Wildlife and Natural Resources Conference 54: 493-495.

Sparrowe, R.D. and K.M. Babcock. 1989. Balancing expectations with reality in duck harvest management. Trans. North American Wildlife and Natural Resources Conference 54: 594-599.

Sparrowe, R.D. 1989. Future directions for reducing illegal waterfowl harvest. Trans. Sixth International Waterfowl Symposium. Ducks Unlimited: pages 261-265.

Sparrowe, R.D. 1990. Cooperative approaches to managing hunting of waterfowl in North America. Pages 155158 in G.V.T. Matthews, Ed. managing waterfowl populations. Proceedings of an IWRB Symposium, 2-5 October 1989, Astrakhan, USSR. IWRB Special Publication No. 12, 1990.

Sparrowe, R.D. 1991. Responses of migratory waterfowl to harvest in North America. Gibier Faune Sauvage 8:319-333.

1992 - 2005. Wrote Capitol Comments, a quarterly article analyzing national wildlife and land management issues in Fair Chase, the magazine of the Boone and Crockett Club.

## PROFESSIONAL ACTIVITIES

### Society Memberships

Certified Wildlife Biologist. The Wildlife Society. Actively support numerous conservation organizations. Life Member of Izaak Walton League of America, Rocky Mountain Elk Foundation, National Wild Turkey Federation, National Rifle Association of America, Mule Deer Foundation, and Ducks Unlimited. An active Professional Member of the Boone and Crockett Club, co-chair of the policy committee.

### Activities

Active in the North-Central Section of The Wildlife Society from 1979-76. Secretary (1971), Vice President (1972), President (1973), Missouri Chapter of The Wildlife Society. Served three terms as Chairman, Environmental Affairs Committee, The Wildlife Society. Chairman, Resolutions and Public Statements Committee, National Capitol Chapter of The Wildlife Society, 1982. Member of Future Directions Committee, The Wildlife Society, 1983-1988. Elected Vice President, The Wildlife Society and swerved on Council 1993-1996. In 1995 served as President.

Have organized and participated in numerous state, regional and national conferences on wildlife and natural resources. Extensive public speaking experience to varied groups. Have chaired sessions and presented papers on wildlife management topics and on water resources at local, regional, and national meetings.

Served 2 years (1971-72) as Chairman, Chancellor's Faculty-Student Committee on Environment, University of Missouri-Columbia. Was active as an advisor to student groups on campus, and pursued regular contact with the public through presentations on wildlife and assorted topics. Regular speaker before agriculture groups at the state and regional level in Missouri.

Extensive experience in the development of environmental impact assessments under the National Environmental Policy Act during 1970-75. Reviewed EIS's for The Wildlife Society, both the Missouri Chapter and parent society, and for the Kansas City Area Office of the Fish and Wildlife Service. Had significant input into EIS on the Harry S. Truman Dam and Reservoir Project, through interaction with the Environmental Defense Fund.

Served on 6-person steering committee 1974-75, for the initiative petition drive by the Citizens Committee for Conservation in Missouri to enact Amendment 1 to the Missouri Constitution which implemented the Design for Conservation. This action more than doubled the funding base of the Missouri Department of Conservation and lead to the most comprehensive wildlife conservation program in America.

### At The Wildlife Management Institute

Since 1991, assuming the position of President of the Wildlife Management Institute, extensively worked to build active coalitions to address resource management issues. Examples include the Wildlife Partners Network, a group of 10 wildlife organizations that track legislation and agency

rulemakings, and leads to action on issues by the organizations alone or in groups. The Cooperative Alliance for Refuge Enhancement, more than 20 diverse organizations working to improve funding and staffing for the National Wildlife Refuges. The American Wildlife Conservation Partners, 37 hunter/conservation organizations working together to strengthen modern, proactive management of wildlife and habitats on both public and private lands.

Legislative involvement has included the National Wildlife Refuge Improvement Act of 1997, the 1996 and 2002 Farm Bills, North American Wetlands Act, and a wide variety of other bills affecting wildlife. Served on the negotiating team that successfully amended the Migratory Bird Treaty with Canada to allow managed harvest by native people in the U.S. and Canada.

### Since Retirement in 2004

Founding Board Member, Theodore Roosevelt Conservation Partnership-and Currently Chair of the TRCP Policy Council.

Board Member, North American Grouse Partnership.

Chair, Wildlife Monitoring Task Group, under the Pinedale Anticline Working Group-FACA Chartered by Secretary of Interior Gale Norton.

Member, Tom Thorne Sage Grouse Fund Advisory Committee, Wyoming Community Foundation.

Member. International Association of Wildlife Agencies Task Group on Implementation of Adaptive Harvest Management.

Exhibit C

# Final Report for the
# Atlantic Rim Mule Deer Study

*Prepared For:*

**Anardarko Petroleum Company**
Houston Corporate Office
1201 Lake Robbins Drive
The Woodlands, TX 77380

**Bureau of Land Management**
Rawlins Field Office
1300 N. Third
PO Box 2407
Rawlins, WY 82301

**Warren E& P, Inc.**
123 West 1st St., Suite 505
Casper, WY 82601

**Wyoming Game and Fish Department**
5400 Bishop Blvd.
Cheyenne, WY 82006

*Prepared By:*

Hall Sawyer
Western Ecosystems Technology, Inc.
2003 Central Avenue
Cheyenne, WY 82001

**April 2007**

*Atlantic Rim Deer Study*                                                      *WEST,Inc.*

**ACKNOWLEDGMENTS**

Anadarko Petroleum Company (APC) and Warren E & P provided funding for this project. The Wyoming Game and Fish Department (WGFD) and Rawlins Field Office of the Bureau of Land Management (BLM) provided in-kind donations and study direction. We thank Joy Rector (APC), Cathy Flansburg (APC), David Applegate (APC), Scott Hedlund (Warren E & P), Frank Blomquist (BLM), Mary Read (BLM), Heath Cline (BLM), Bill Rudd (WGFD), Tim Woolley (WGFD), and Greg Hiatt (WGFD) for office and logistical support. Dwight France (France Flying Service) conducted all the relocation flights and Jim Pope (Leading Edge Aviation) provided the helicopter capture service. We appreciate Jack Cobb, John Espy, Mike Sheehan, Chuck Sanger, and Three Forks Ranch for allowing us to access their lands.

**TABLE OF CONTENTS**

Page

1.0    Introduction…………………………………………………………………    2

2.0    Study Area……………………………………………………………….    3

3.0    Objectives………………………………………………………………...    6

4.0    Methods………………………………………………………………...    6

5.0    Results………………………………………………………………..    7

        5.1    Capture………………………………………………………...    7

        5.2    GPS collars…………………………….……………….………    8

        5.3    Adult survival and mortality…………………..……………….    8

        5.4    Seasonal distribution, migration and movement rates………….    9

6.0    Discussion…………………………………………………………    24

7.0    Management Implications…………………………………………    26

8.0    Literature Cited…………………………………………………..    27

# 1.0     INTRODUCTION

Increased levels of energy development across southwest Wyoming have created a variety of concerns for fish, wildlife and the habitats they occupy (Bureau of Land Management [BLM] 1998). Impacts include direct and indirect habitat losses that can potentially result in reduced population performance (Sawyer et al. 2006*a*). Direct habitat loss occurs when native vegetation is converted to access roads, well pads, pipelines, and other project features. Indirect habitat losses occur when wildlife are displaced or avoid areas near infrastructure because of increased levels of human disturbances (e.g., traffic, noise, pollution, human presence). The draft environmental impact statement (DEIS) for the Atlantic Rim Project Area (ARPA) proposes the development of 2,000 natural gas wells, including 1,800 to coal beds and 200 to other formations, at a spacing of up to 80 acres per well (BLM 2005). Mule deer herds in the Atlantic Rim region are among the largest in the Intermountain West and known to migrate up to 60 miles between seasonal ranges (Porter 1999). Maintaining healthy mule deer populations and functional migration routes is a top priority for agencies and the public. In response to the proposed Atlantic Rim Natural Gas Development Project, the BLM, the Wyoming Game and Fish Department (WGFD), Anadarko Petroleum Company (APC), and Warren E & P, Inc. implemented a cooperative study intended to provide the necessary information to mitigate potential impacts and ensure development plans are environmentally sensitive to mule deer.

This study was designed to have two phases. The first phase of the study was intended to identify seasonal ranges, document migration routes, and estimate survival rates prior to development of the proposed 2,000 natural gas wells. There were approximately 116 natural gas wells completed to coal formations under an exploratory interim drilling program (BLM 2005) in the ARPA during Phase I. Full-scale development was not expected until the summer of 2007, following the Record of Decision on the Final Environmental Impact Statement (BLM 2006). Phase I of the study was expected to last approximately two years (2005 through 2006). Once Phase I was completed, study cooperators were to determine if Phase II was warranted. If conducted, Phase II was envisioned as a long-term (> 3 years) study that would occur during or after development to determine if impacts to mule deer from natural gas development occur, including changes in migration routes, habitat use patterns, and survival.

This study was not implemented as a compliance measure; rather it was a cooperative effort among agencies and industry to better understand mule deer ecology in the ARPA. Information from Phase I provides the baseline information necessary to develop energy resources such that important migration routes and seasonal ranges can be protected or minimally impacted. Additionally, Phase I provides the pre-development information needed, should Phase II of the study materialize. This report summarizes work completed in Phase I.

## 2.0     STUDY AREA

The ARPA is located in southern Carbon County (Figure 1) and encompasses 422 mi$^2$ south of I-80, east of WY 789, and north of WY 70 (Figure 2). The ARPA extends approximately 48 miles between Rawlins and Baggs, and contains 64% (271 mi$^2$) federal, 5% (22 mi$^2$) state, and 31% (129 mi$^2$) private lands (BLM 2005). The ARPA is located in the eastern portion of the Baggs herd unit which includes 3 hunt areas (82, 84, 100; Figures 1 and 2). The WGFD manages the Baggs herd unit for a post-hunting season population of 18,700 deer, but the estimated herd size has ranged from 20,200 in 2001 to 22,300 in 2005 (Woolley 2005). At the time of this study (2006) there were approximately 116 natural gas wells completed in the ARPA and the DEIS proposed development of up to 2,000 (BLM 2005). The ARPA supports a variety of vegetation types, but is generally characterized by rolling topography, prominent ridges, and dry canyons dominated by sagebrush (*Artemisia sp.*), black greasewood (*Sacrobatus vermiculatus*), Utah juniper (*Juniperus osteosperma*), and other mixed-shrub (*Purshia tridentata, Prunus virginiana, Amelanchier alnifolia, Chrysothamnus sp., Cercocarpus sp.*) (Photos 1 and 2). Elevations range from 6,300 to 8,300 feet. The ARPA contains 21 livestock allotments totaling 30,462 permitted animal unit months (AUM; BLM 2005). Refer to BLM (2005) for detailed description of study area.



Figure 1. Location of the Baggs Herd Unit and Hunt Areas 82, 84, 85, and 100 relative to the Atlantic Rim Project Area (ARPA) in south-central Wyoming.



Figure 2. Location of crucial mule deer winter ranges, mule deer hunt areas, and plans of development (POD) in the Atlantic Rim Project Area (ARPA) in south-central Wyoming.

*Atlantic Rim Deer Study*                                                    *WEST, Inc.*



Photo 1. Cow Creek area, view north.



Photo 2. Sand Hills and Doty Mountain, view northwest.

## 3.0    OBJECTIVES

The objectives of Phase I included:

➢ Identify seasonal ranges of mule deer in the ARPA portion of the Baggs herd unit.

➢ Identify migration routes of mule deer in the ARPA portion of the Baggs herd unit.

➢ Estimate survival rates of mule deer in the ARPA portion of the Baggs herd unit.

## 4.0    METHODS

We used helicopter net-gunning (Leading Edge Aviation, Lewiston, Idaho) techniques to capture adult female mule deer across winter ranges located in or adjacent to the ARPA. We attempted to sample deer in proportion to their numbers across the ARPA, as determined by pre-capture fixed-wing flight and ground surveys. Captured deer were fitted with standard very high frequency (VHF) radio-collars (Advanced Telemetry Systems, Isanti, Minnesota) or global positioning system (GPS) radio-collars (Telonics, Mesa, Arizona) programmed to collect 1 location every 2.5 hours October 1 through June 15, and 1 location every 25 hours June 16 through September 30. This GPS fix schedule was designed to intensify data collection during fall migration, winter, and spring migration while continuing to obtain daily locations during the summer period. All radio-collars were equipped with mortality sensors that changed pulse rate if they remained stationary > 8 hours. All GPS radio-collars were duty-cycled on 12-hour intervals (8:00 am – 8:00 pm) to maximize battery life. Half of the GPS radio-collars were equipped with remote-release mechanisms programmed to release on November 15, 2005 and the other half were programmed for November 15, 2006. Collars that were released in 2005 or recovered from deer that died were put on a new sample of deer in 2006. Fixed-wing flights (France Flying Service, Rawlins, Wyoming) were conducted approximately once a month to monitor general animal movement and locate mortality signals. Annual adult survival rates were calculated from telemetry records (Kaplan and Meier 1985). The sample of VHF-collared deer was intended to supplement the GPS-collars so that more precise survival estimates could be made.

Data collected from GPS-collars were downloaded and mapped in ArcView® (Environmental Systems Research Institute, Redlands, California) to identify seasonal distribution patterns and migration routes. Seasonal distribution patterns were identified by mapping locations of GPS-collared deer during 4 time periods; winter (December 1 – March 30), summer (June 1 – September 30), parturition (June 1- 14), and transition (April 15 – May 15 and October 1 – November 15). Migration routes were identified using 4 basic steps. First, we mapped the movement routes of all GPS-collared deer by simply drawing straight lines between successive locations of each deer. Second, we calculated the rate of movement or velocity of each line segment and created a map of movement routes that had velocities of 0.40 mi/hr or higher. The 0.40 mi/hr cut-off was intended to reflect the movement rates that occur in migration corridors and exclude those in summer and winter ranges. Third, we then digitized common migration routes that reflected areas where multiple high-velocity movements occurred. And finally we buffered the common migration routes by 0.25 mi.

To help visualize and identify the timing of seasonal migrations we calculated and plotted average daily movement rates for GPS-collared deer. Daily movement rates were

calculated by averaging the straight-line distances between successive locations during a 3-day moving window. The average daily movement rates were then averaged across deer and plotted for those time periods where GPS locations were collected multiple times per day (October 1 – June 15).

## 5.0    RESULTS

### 5.1    Capture

We captured 41 adult female deer across winter ranges located in or adjacent to the ARPA on February 8, 2005.  Of the 41 deer, 10 were fitted with standard VHF radio-collars and 31 were equipped with GPS radio-collars (Table 1). We captured an additional 22 adult female deer on December 10, 2005. Of these, 4 were fitted with VHF radio-collars and 18 with GPS radio-collars (Table 1). The 18 GPS collars included 7 from deer that had died; 4 of which were programmed to drop off in November 2005 and 3 in November 2006.

Table 1. List of 63 radiomarked deer in the Atlantic Rim Project Area (ARPA).

| Deer ID | Frequency | Collar Type | Capture Date | | Deer ID | Frequency | Collar Type | Capture Date |
|---|---|---|---|---|---|---|---|---|
| 1 | 150.101 | GPS | 2/9/2005 | | 33 | 149.221 | VHF | 2/9/2005 |
| 2 | 150.111 | GPS | 2/9/2005 | | 34 | 149.302 | VHF | 2/9/2005 |
| 3 | 150.121 | GPS | 2/9/2005 | | 35 | 149.333 | VHF | 2/9/2005 |
| 4 | 150.130 | GPS | 2/9/2005 | | 36 | 149.342 | VHF | 2/9/2005 |
| 5 | 150.140 | GPS | 2/9/2005 | | 37 | 149.371 | VHF | 2/9/2005 |
| 6 | 150.150 | GPS | 2/9/2005 | | 38 | 149.412 | VHF | 2/9/2005 |
| 7 | 150.161 | GPS | 2/9/2005 | | 39 | 149.442 | VHF | 2/9/2005 |
| 8 | 150.170 | GPS | 2/9/2005 | | 40 | 149.700 | VHF | 2/9/2005 |
| 9 | 150.180 | GPS | 2/9/2005 | | 41 | 149.762 | VHF | 2/9/2005 |
| 10 | 150.190 | GPS | 2/9/2005 | | 42 | 148.392 | VHF | 12/10/2005 |
| 11 | 150.200 | GPS | 2/9/2005 | | 43 | 148.413 | VHF | 12/10/2005 |
| 12 | 150.211 | GPS | 2/9/2005 | | 44 | 148.443 | VHF | 12/10/2005 |
| 13 | 150.221 | GPS | 2/9/2005 | | 45 | 148.772 | VHF | 12/10/2005 |
| 14 | 150.230 | GPS | 2/9/2005 | | 46 | 150.101 | GPS | 12/10/2005 |
| 15 | 150.240 | GPS | 2/9/2005 | | 47 | 150.111 | GPS | 12/10/2005 |
| 16 | 150.251 | GPS | 2/9/2005 | | 48 | 150.121 | GPS | 12/10/2005 |
| 17 | 150.261 | GPS | 2/9/2005 | | 49 | 150.130 | GPS | 12/10/2005 |
| 18 | 150.271 | GPS | 2/9/2005 | | 50 | 150.140 | GPS | 12/10/2005 |
| 19 | 150.281 | GPS | 2/9/2005 | | 51 | 150.150 | GPS | 12/10/2005 |
| 20 | 150.290 | GPS | 2/9/2005 | | 52 | 150.161 | GPS | 12/10/2005 |
| 21 | 150.301 | GPS | 2/9/2005 | | 53 | 150.170 | GPS | 12/10/2005 |
| 22 | 150.310 | GPS | 2/9/2005 | | 54 | 150.180 | GPS | 12/10/2005 |
| 23 | 150.320 | GPS | 2/9/2005 | | 55 | 150.190 | GPS | 12/10/2005 |
| 24 | 150.331 | GPS | 2/9/2005 | | 56 | 150.200 | GPS | 12/10/2005 |
| 25 | 150.340 | GPS | 2/9/2005 | | 57 | 150.211 | GPS | 12/10/2005 |
| 26 | 150.351 | GPS | 2/9/2005 | | 58 | 150.221 | GPS | 12/10/2005 |
| 27 | 150.360 | GPS | 2/9/2005 | | 59 | 150.230 | GPS | 12/10/2005 |
| 28 | 150.371 | GPS | 2/9/2005 | | 60 | 150.240 | GPS | 12/10/2005 |
| 29 | 150.381 | GPS | 2/9/2005 | | 61 | 150.271 | GPS | 12/10/2005 |
| 30 | 150.390 | GPS | 2/9/2005 | | 62 | 150.331 | GPS | 12/10/2005 |
| 31 | 150.411 | GPS | 2/9/2005 | | 63 | 150.371 | GPS | 12/10/2005 |
| 32 | 149.174 | VHF | 2/9/2005 | | | | | |

*Atlantic Rim Deer Study*                                                                    *WEST,Inc.*

## 5.2    GPS Collars

We recovered 47 of 49 GPS collars. Collars #29 and #50 could not be located. The remote-release mechanisms (Photo 3) and GPS collections functioned properly for the 47 collars we retrieved. We collected 116,494 GPS locations from 47 deer between 10 February 2005 and 15 November 2006. Fix rate success (99%) and accuracy (85% of the locations were 3-dimensional) was high (i.e., <20 meter error; Di Orio et al. 2003).



Photo 3. Released GPS-collar.

## 5.3    Adult Survival and Mortality

Twelve radiomarked deer died between February 2005 and 15 November 2006 (Table 2). Cause of death could not be determined for 7 of the 12. Estimated annual (01 June 2005 – 31 May 2006) survival was 0.80 (SE=0.06), with a 90% confidence interval of 0.73-0.87. Winter (01 December 2005 – 30 April 2006) survival was not estimated because no deaths occurred during that time period.

Table 2.  List of radiomarked deer that died between February 2005 and November 2006.

| ID | Frequency | Estimated Death | Location | Cause of Death |
|----|-----------|-----------------|----------|----------------|
| 12 | 150.211 | 4-28-05 | Sand Hills | Unknown: carcass present, deteriorated |
| 10 | 150.190 | 7-20-05 | Dexter Peak | Predation: cougar |
| 1 | 150.101 | 9-21-05 | Sand Hills | Unknown: carcass scavenged |
| 28 | 150.371 | 10-1-05 | Adams Reservoir | Unknown: carcass present, deteriorated |
| 24 | 150.331 | 10-6-05 | Spring Creek | Rifle harvest |
| 7 | 150.161 | 10-24-05 | Coal Gulch | Wounding loss |
| 18 | 150.271 | 11-11-05 | Sand Hills | Unknown: carcass present, scavenged |
| 21 | 150.301 | 5-08-06 | Upper Muddy Creek | No carcass found, only collar |
| 56 | 150.200 | 5-08-06 | Coal Gulch | Unknown: old carcass |
| 48 | 150.121 | 5-23-06 | South McCarty Canyon | Likely predation: carcass scavenged |
| 25 | 150.340 | 11-13-06 | Wild Horse Basin | Natural causes, fresh carcass |
| 17 | 150.261 | 11-15-06 | Muddy Creek Canyon | Unknown: carcass in ice |

**5.4    Seasonal Distribution, Migration, and Movement Rates**

To help visualize and interpret the 116,494 GPS locations, we generated specific maps for winter (December 1 – March 30; Figure 3), summer (June 1 – September 30; Figure 4), transition (April 15 – May 15 and October 1 – November 15; Figure 5), and parturition (June 1- 14; Figure 6) periods. Mule deer spent all or part of the winter in three winter ranges, the Dad-Juniper, Wild Horse, and Sand Hills winter ranges. Most mule deer in the ARPA wintered in either on the Dad-Juniper Winter Range or the Wild Horse Winter Range (Figure 3). The Dad-Juniper Winter Range encompassed approximately 25 mi$^2$ in the west-central portion of the ARPA and extended northerly from Dad to Doty Mountain along a sagebrush – juniper ridge immediately southeast of Muddy Creek. The Wild Horse Winter Range encompassed approximately 70 mi$^2$ in the southwest portion of the ARPA. This range began near the confluence Wild Cow and Muddy Creek, and extended south approximately 10 miles across Cherokee Creek, Wild Horse Draw, and Muddy Mountain. Mule deer from both the Dad-Juniper and Wild Horse winter ranges also utilized the Sand Hills Winter Range (Figure 3) during early winter (November, December and early-January). The Sand Hills Winter Range generally refers to 20-25 mi$^2$ along the west-facing slopes between Muddy Creek Canyon and Cow Creek, however additional winter and transition range occurred from Cow Creek to Deep Creek and Wild Cow Creek.

Of the 45,945 GPS locations collected during the winter (December 1 – March 30), 93% (n=42,851) occurred in areas designated as Crucial Winter – Yearlong Range by the WGFD (Figure 3). However, there were isolated clusters of winter locations (n=3,094) that occurred outside designated winter ranges, including: 1) the area immediately east of Deep Creek Rim along a portion of Deep Creek and 2) the base of Deep Gulch along Cow Creek and south to Wild Cow Creek (Figure 3).

Of the 47 GPS-marked deer, 46 were considered migratory and utilized distinct seasonal ranges (Table 3). The average migration distance between winter and summer ranges was 26.5 miles (n=46, SE = 1.35) and ranged from 5 to 48 miles (Table 3). Spring migrations usually occurred in early-April through mid-May, while fall migrations occurred October through December (Table 3). All summer ranges occurred east or northeast of winter ranges and approximately 87% (n=40) of GPS-collared deer occupied summer ranges outside of the ARPA (Table 3; Figure 4). GPS-collared deer congregated on transition ranges during the spring and fall periods (Figure 5). The east-central portion of the project area, generally from Muddy Creek Canyon and the Sand Hills south to Wild Cow Creek, provided important transition ranges for a large segment of the mule deer population and year-around range for a smaller segment (Figures 5 and 6).

Straight-line distances between GPS locations were useful for illustrating movement patterns across the ARPA (Figure 7). However, to specifically delineate migration routes, rather than day to day non-migratory movements, we identified movement paths where deer were moving at least 0.40 mi/hr (Figure 8). We assumed the high-velocity movement paths in Figure 8 represented spring and fall migration routes and generally excluded the lower-velocity movements of summer and winter ranges. These high-velocity movement paths were then used to digitize common migration routes in areas where multiple high-velocity movement paths occurred (Figure 9). We applied a 0.25-mi buffer on the common migration routes (Figure 10) such that most high-velocity movement paths were contained within the buffered regions. We recognize that the width of migration routes may vary across the

landscape and that the 0.25 buffer may be too large in some areas and too small in others. But, until a more quantitative technique is available (e.g., Horne et al. 2007), assigning a buffer width that encompasses most high-velocity movement paths can be used to illustrate and identify the approximate area of common migration routes. Migration routes were often well-defined and consistently used by multiple animals across both spring and fall migrations. For example, deer wintering in the Dad area migrated along the Muddy Creek corridor to Muddy Creek Canyon (Figure 11) before moving to summer ranges on Atlantic Rim or Miller Hill. And, deer wintering in the Wild Horse/Muddy Mountain area consistently used migration routes through the Brown Cow POD and north to transition ranges in the Sandhills and/or the Wild Cow/Deep Gulch areas (Figure 12).

Average daily movement rates for GPS-collared deer ranged from 0.6 miles/day in June of 2005 to 4.6 miles/day in December of 2005 (Figure 13). The average daily movement rate during the winter months was 1.25 miles/day. Movement rates were not calculated for the summer period (June 15 – September 30) because GPS locations were collected only once per day. During spring and fall migrations, daily movement rates increased to 1.5 – 3.0 miles/day and occasionally increased to 3.5 or 4.0 miles/day. Daily movement rates were also elevated (1.5 – 2.25 miles/day) during the rifle hunting season. Fall migration to transition ranges and elevated movement rates corresponded with the rifle hunting season in early October. This was followed by a period of lower daily movement before deer continued on to their respective winter ranges. Plots of daily movement rates (Figure 13) appeared to be a useful tool for identifying the timing of spring and fall migrations.

Deer distribution in relation to proposed POD locations varied from north to south (Figure 14). No GPS-collared deer locations occurred in many of the northern PODs, including Red Rim, Jolly Roger Alpha, Jolly Roger Beta, Sun Dog, and Blue Sky. The Doty Mountain and Cow Creek PODs received limited use. The extreme northern and southern edges of the Doty Mountain POD were used as mule deer migration routes, and a small portion (~80 acres) along the western edge of the Cow Creek POD was used as mule deer winter range. However, the two southern PODs, Brown Cow and Muddy Mountain, received substantial amounts of both winter and transition use by GPS-collared deer. Additionally, most GPS-collared deer migrated through portions of the Brown Cow or Muddy Mountain PODs to reach their respective summer ranges.

Relative to WGFD hunt areas (HA), 75% (n=35) of GPS-collared deer spent the majority of the winter in HA 82 (Table 3; Figure 14), occasionally crossing WY 789 and moving into HA 100 near Fivemile Point. The other 25% (n=12) spent the majority of winter in HA 100. During the summer 91% (n=43) of GPS-collared deer occupied ranges in HA 84 (n=18) and HA 82 (n=25), while 9% (n=4) deer (#24) summered in HA 80 (Table 3).

We organized all 116,494 GPS locations into a GIS database (ArcView shapefile with metadata) that study cooperators can easily access and map with ArcView software. The database includes the date, time, satellite precision, latitude, longitude, UTM coordinates, animal ID, herd unit, hunt area, seasonal range, and land ownership for each GPS location.

Table 3. Summary of radiomarked deer distribution and migration.

| ID | Winter Hunt Area | Summer Hunt Area | Summer IN or OUT of ARPA | Migration Distance (mi) | Timing of Migrations | | | |
|----|------|------|------|----------|-----------|-----------|-----------|-----------|
| | | | | | Spring 05 | Fall 05 | Spring 06 | Fall 06 |
| 1 | 100 | 82 | IN | 21.1 | April | >Nov.15 | n/a | n/a |
| 2 | 82 | 84 | OUT | 22.0 | May | October | n/a | n/a |
| 3 | 82 | 82 | IN | 14.8 | April | >Nov.15 | n/a | n/a |
| 4 | 82 | 84 | OUT | 21.2 | April-May | Oct-Dec | n/a | n/a |
| 5 | 82 | 84 | OUT | 29.8 | April | >Nov.15 | n/a | n/a |
| 6 | 82 | 84 | OUT | 35.1 | April-May | Oct-Dec | n/a | n/a |
| 7 | 82 | 82 | OUT | 16.1 | April | >Nov.15 | n/a | n/a |
| 8 | 82 | 82 | OUT | 32.4 | April-May | Oct-Dec | n/a | n/a |
| 9 | 82 | 84 | OUT | 29.9 | April | Oct-Dec | n/a | n/a |
| 10 | 82 | 82 | OUT | 31.0 | April-May | n/a | n/a | n/a |
| 11 | 82 | 82 | OUT | 31.4 | April-May | Oct-Dec | n/a | n/a |
| 12 | 82 | 82 | OUT | 27.8 | April | n/a | n/a | n/a |
| 13 | 82 | 82 | IN | 5.0 | SDM | SDM | n/a | n/a |
| 14 | 82 | 82 | OUT | 15.4 | April | October | n/a | n/a |
| 15 | 100 | 82 | OUT | 26.4 | April | >Nov.15 | n/a | n/a |
| 16 | 82 | 82 | OUT | 17.9 | April | December | April | n/a |
| 17 | 82 | 84 | OUT | 26.2 | April | November | April | November |
| 18 | 82 | 84 | OUT | 31.3 | April-May | Oct-Dec | n/a | n/a |
| 19 | 82 | 84 | OUT | 27.6 | April-May | Oct-Dec | April | Oct-Nov |
| 20 | 100 | 82 | IN | 17.6 | April | January | April | November |
| 21 | 100 | 80 | OUT | 47.1 | April-May | Oct-Dec | April-May | n/a |
| 22 | 82 | 82 | OUT | 20.1 | April | December | April | >Nov.15 |
| 23 | 82 | 82 | OUT | 36.6 | April-May | Oct-Dec | April-May | Oct-Nov |
| 24 | 82 | 80 | OUT | 47.9 | April-May | n/a | n/a | n/a |
| 25 | 82 | 82 | OUT | 22.2 | April-May | October | April-May | October |
| 26 | 82 | 82 | OUT | 36.0 | April-May | Oct-Dec | April-May | Oct-Nov |
| 27 | 82 | 82 | IN | 13.2 | April | December | April | >Nov.15 |
| 28 | 82 | 84 | OUT | 40.5 | April-May | n/a | n/a | n/a |
| 30 | 100 | 82 | OUT | 26.2 | April | October | April | October |
| 31 | 100 | 80 | OUT | 43.5 | April-May | Oct-Dec | April-May | October |
| 46 | 82 | 84 | OUT | 22.7 | n/a | December | April-May | Oct-Nov |
| 47 | 82 | 82 | IN | RESIDENT | n/a | n/a | n/a | n/a |
| 48 | 82 | 82 | OUT | 21.7 | April | n/a | n/a | n/a |
| 49 | 100 | 82 | OUT | 24.9 | n/a | n/a | April | October |
| 51 | 100 | 84 | OUT | 35.8 | n/a | December | April-May | Oct-Nov |
| 52 | 82 | 84 | OUT | 22.9 | n/a | n/a | April | October |
| 53 | 82 | 84 | OUT | 26.5 | n/a | n/a | April | October |
| 54 | 82 | 82 | OUT | 27.9 | n/a | December | April | >Nov.15 |
| 55 | 100 | 82 | IN | 35.8 | n/a | n/a | April | >Nov.15 |
| 56 | 100 | 82 | OUT | 19.1 | n/a | n/a | April | n/a |
| 57 | 82 | 84 | OUT | 16.7 | n/a | n/a | April | >Nov.15 |
| 58 | 82 | 84 | OUT | 18.6 | n/a | December | April | Oct-Nov |
| 59 | 82 | 84 | OUT | 15.3 | n/a | December | April | Oct-Nov |
| 60 | 82 | 84 | OUT | 27.8 | n/a | n/a | April | Oct-Nov |
| 61 | 82 | 80 | OUT | 36.4 | n/a | n/a | April-May | October |
| 62 | 100 | 84 | OUT | 31.9 | n/a | n/a | April | October |
| 63 | 100 | 82 | OUT | 24.7 | n/a | n/a | April | October |

*Atlantic Rim Deer Study*                                                    *WEST, Inc.*



Figure 3. Winter locations (n=45,945) of 47 GPS-marked deer in the Atlantic Rim Project Area (ARPA), February 10 – March 31, 2005 and December 1 – March 31, 2006.

*Atlantic Rim Deer Study*                                                                 *WEST, Inc.*



Figure 4. Summer locations (n=12,567) of 45 GPS-marked deer in the Atlantic Rim Project Area (ARPA), June 1 through September 20, 2005 – 2006.

*Atlantic Rim Deer Study*                                          *WEST, Inc.*



Figure 5. Transition locations (n=39,767) of 47 GPS-marked deer in the Atlantic Rim Project Area (ARPA) during the spring (April 15 – May 15) and fall (October 1 – November 15) of 2005 and 2006.

*Atlantic Rim Deer Study*                                    *WEST, Inc.*



Figure 6. Parturition locations (n=7,162) of 45 GPS-marked deer in the Atlantic Rim Project Area (ARPA), June 1 – 14, 2005 – 2006.

*Atlantic Rim Deer Study*                                                                              *WEST,Inc.*



Figure 7. Movement routes collected from of 47 GPS-collared mule deer between February 10, 2005 and November 15, 2006 in the Atlantic Rim Project Area (ARPA).

*Atlantic Rim Deer Study*                                                                                    *WEST, Inc.*



Figure 8. High-velocity (0.40 mi/hr) movement routes collected from of 47 GPS-collared mule deer between February 10, 2005 and November 15, 2006 in the Atlantic Rim Project Area (ARPA).

*Atlantic Rim Deer Study*                                                    *WEST, Inc.*



Figure 9. Common migration routes digitized from the high-velocity movement routes of 47 GPS-collared mule deer, February 10, 2005 – November 15, 2006 in the Atlantic Rim Project Area (ARPA).

Figure 10. Common migration routes with 0.25 mi buffer estimated from of 47 GPS-collared mule deer between February 10, 2005 and November 15, 2006 in the Atlantic Rim Project Area (ARPA).

*Atlantic Rim Deer Study*     *WEST, Inc.*



Figure 11. Migration routes of GPS-collared deer to and from the Dad-Juniper Winter Range, along the Muddy Creek corridor to Muddy Creek Canyon and the Sand Hills, February 10, 2005 – November 15, 2006 in the Atlantic Rim Project Area (ARPA).



Figure 12. Migration routes of GPS-collared deer to and from the Wild Horse Winter Range and their proximity to the Brown Cow POD, February 10, 2005 – November 15, 2006 in the Atlantic Rim Project Area (ARPA).

*Atlantic Rim Deer Study*                                                                                      *WEST,Inc.*



Figure 13. Average daily movement rates (miles/day) of 47 GPS-collared mule deer in the Atlantic Rim Project Area, February 5 – June 15, 2005, October 1, 2005 – June 15, 2006, and October 1, 2006 – November 15, 2006.

*Atlantic Rim Deer Study*                                                                                      *WEST,Inc.*



Figure 14. Locations and movement routes of 47-GPS collared deer relative to crucial mule deer winter ranges, mule deer hunt areas, and plans of development (POD) in the Atlantic Rim Project Area (ARPA) in south-central Wyoming, February 10, 2005 – November 15, 2006.

## 6.0    DISCUSSION

Since the 1980's the Baggs Herd Unit (BHU) has supported one of Wyoming's largest deer herds and provided exceptional recreational opportunities to both resident and non-resident sportsmen. Mule deer hunting in the BHU is known for plentiful deer numbers, an abundance of public land, above-average success rates, and liberal license allocations. Mule deer hunting in the BHU consistently provides more than 14,000 recreation days each year (Woolley 2005). Despite long-term drought conditions, range degradation (Nelson et al. 1994), and relatively low recruitment rates (<60 fawns per 100 does), the BHU 5-year population average of 21,480 has remained well above the WGFD objective of 18,700 animals (Woolley 2005). The number of mature bucks has declined in recent years, but the overall BHU mule deer population appears to be stable (Woolley 2005). However, the estimated annual survival rates of female mule deer observed during this study ($\hat{s} = 0.80$) were slightly lower than those reported in Colorado ($\hat{s} = 0.83$; White et al. 1996), Idaho, and Montana $\hat{s} = (0.85$; Unsworth et al. 1999). Sustaining the BHU population at objective levels is a top priority for the WGFD and will require that functional seasonal ranges and migration routes be maintained. Our study provides the baseline data necessary to accurately identify seasonal ranges and migration routes, both of which will be key components for successful mule deer management and mitigation as energy resources are developed in the ARPA.

Our data collection was limited to adult females because they represent the reproductive segment and are therefore considered the most biologically important component of the population. Spatial segregation of the sexes occurs in a variety of ungulates outside of the breeding season, including mule deer (King and Smith 1980, Bowyer 1984, Main and Coblentz 1996), so we recognize that the habitat selection patterns of adult males may differ from females and young. However, because the spatial segregation of the sexes occurs at a relatively fine scale (Bowyer et al. 1996), we assume that inference(s) made from GPS-collared females to the entire mule deer population is appropriate for assessing seasonal ranges and migration routes in the ARPA. Additionally, our data only reflect the movement and distribution patterns of mule deer that winter in the ARPA. However, we recognize that migratory mule deer from regions outside the ARPA (e.g., Little Snake River, Savery, Powder Wash, Poison Basin) migrate through or occupy portions of the ARPA during spring, summer, and fall periods (Nelson et al. 1994, Porter 1999).

Our data suggest that mule deer rely on several important seasonal ranges in the ARPA, including winter ranges located in the west-central (Dad Juniper Winter Range) and southwest (Wild Horse Winter Range) portions of the study area, and a transition range situated around the Sand Hills in the east-central portion of the ARPA. The importance of the Sand Hills transition range is highlighted by the fact that mule deer from both winter ranges utilized the area during both fall and spring migrations, and often for parturition. Additionally, Porter (1999) reported that the Wild Horse Winter Range and Sand Hills were also important transition areas for mule deer migrating to and from the Powder Rim Winter Range located approximately 30 miles west of Baggs. Transition ranges generally provide mule deer with better foraging opportunities than those available on winter ranges, allowing them to recover body condition earlier in the spring and maintain body condition later in the fall, before entering winter (Short 1981). Effective transition ranges alleviate foraging pressure on winter ranges and minimize the amount of time deer must spend on winter range (Short 1981). Managers should not overlook the importance of all seasonal ranges for maintaining healthy

and productive mule deer populations (Short 1981, Clements and Young 1997). Summer, transition, and winter ranges are equally important components of mule deer ranges in Wyoming and, while the relative importance of each may change annually, the loss or degradation of one will not be compensated for by the others (Sawyer et al. 2005).

The potential impacts of gas development in the ARPA (BLM 2006) include direct habitat losses that occur when native vegetation is converted to infrastructure, and indirect habitat losses that occur if mule deer are displaced or avoid areas near infrastructure. Indirect habitat losses can be substantially larger than direct habitat losses. For example, following 3 years of gas development in western Wyoming, 41% of areas classified as high deer use prior to development changed to medium-low or low-use areas (Sawyer et al. 2006*a*). This change in distribution occurred with only 2% direct habitat loss (Sawyer et al. 2006*b*). Indirect habitat losses can likely be minimized by reducing the amount of human activity (i.e., traffic). However, this may require approaches or mitigation measures that limit the level of human activity during both production (e.g., fluid collection systems) and development phases of wells. Relatively small amounts of direct habitat loss can affect winter distribution patterns of mule deer (Sawyer et al. 2006*a*) and the effects of direct habitat loss may be long term for species like mule deer that rely on native shrubs (i.e., sagebrush) because reclamation of native shrubs in arid environments is difficult and has rarely been accomplished in southwest Wyoming.

Mule deer preference for sagebrush species as winter forage is well-documented (Sheehy and Winward 1981, Wambolt 2001) and their use of sagebrush in the BHU winter ranges is no exception. Nelson et al. (1994) found approximately 74% of winter mule deer diets in the BHU consisted of Wyoming big sagebrush, and Debolt (2000) found Wyoming big sagebrush made up >70% of diets on winter ranges west of WY789. Because of the importance of sagebrush to mule deer, the winter and transition ranges identified in the ARPA may be used as target areas for specific management prescriptions (e.g., habitat improvements), mitigation (e.g., minimize direct loss of native shrubs), or reclamation practices (e.g., shrub establishment) intended to benefit mule deer. It is worth noting that winter conditions during this study were considered mild to average, and the deer distributions we observed reflect those conditions. Because most winters (e.g., 8 or 9 out of 10 years) are not considered severe, distribution patterns documented in this study should apply during most years. However, during more severe winters we would expect mule deer distribution patterns to shift to lower elevations and south-facing slopes. Nelson et al. (1994) and other observational WGFD data (T. Woolley, Wyoming Game and Fish Department, unpublished data) suggest that many mule deer from the ARPA migrate further west into the Poison Basin area during harsh winters. During the severe winter of 1983, mule deer numbers increased more than 300% in Poison Basin (Nelson et al. 1994).

Migrations between summer and winter ranges generally follow traditional routes that are learned and passed on from mother to young (McCullough 1985). Without migratory routes, many of the seasonal ranges in the BHU would be inaccessible to mule deer, and it is unlikely current populations could be maintained. Given that 98% of GPS-collared deer in the ARPA were migratory, identifying and conserving migration routes to and from seasonal ranges will be a key component to successful mule deer management in the BHU. The GPS data collected in this study accurately identified the location of migration routes across the ARPA, prior to gas development proposed in BLM (2006). Until recently, conserving migration routes has not been a top management concern for agencies because there have

been no large-scale habitat alterations in the ARPA or BHU and the landscape has remained relatively unchanged. However, the recent BLM approval to develop 2,000 gas wells at a spacing of 8 per section and improve or construct approximately 1,000 miles of road and pipeline (BLM 2006) will result in large-scale habitat changes that could potentially impact the effectiveness of migration routes. While disturbances associated with gas development may alter habitat selection and distribution patterns of wintering mule deer (Sawyer et al. 2006*a*), it is unclear how or if gas development affects migration routes and migratory behavior. Nonetheless, accurately delineating migration routes prior to gas development in the ARPA provide the necessary tools to develop proactive measures to protect routes or minimize impacts to routes and/or study the potential effects of proposed development on routes.

The GPS data collected in this study also provided accurate information on the timing of migrations. Similar to Porter (1999), spring migrations occurred in April and May, with most movement taking place mid-April through early-May. Fall migrations were variable, but occurred from October through December, with most movement occurring in November and early-December. Timing of fall migrations was consistent with Porter (1999) who reported most deer returned to winter ranges west of WY789 between October 11 and December 15. Calculating average daily movement rates of GPS-collared deer was useful for identifying migratory time periods and suggests that migrations generally occur when movement rates exceed 1.5 miles/day.

## 7.0    MANAGEMENT IMPLICATIONS

Sustaining migratory mule deer populations in the BHU will require that suitable seasonal ranges (i.e., winter, transition, summer) be maintained and migration routes remain functional. The 116,494 GPS locations we collected from 47 different mule deer provide a baseline data set that objectively and accurately identifies seasonal ranges and migration routes of mule deer in the ARPA prior to full-scale gas development. We encourage agencies and industry to consider and incorporate this information in development plans and management strategies associated with the ARPA.

The mapping options available with 116,494 deer locations are unlimited, and as such, we only included the most relevant maps in this report. However, we strongly encourage agencies and industry to utilize the GPS/GIS database for mapping projects that may assist them with site specific development plans (e.g., transportation plans, pipelines, well pad placement) and management prescriptions (e.g., habitat improvement projects, conservation easements, fencing modifications, highway crossings) in the ARPA. The database allows for easy mapping and evaluation of an assortment of attribute data for each GPS location, including date, time, latitude, longitude, UTM coordinates, animal ID, herd unit, hunt area, seasonal range, and land ownership. Additionally, the GPS database provides an excellent source of pre-development information, should any development-phase monitoring programs be implemented to assess potential impacts to mule deer distribution or movement patterns.

*Atlantic Rim Deer Study* WEST,Inc.

## 8.0    LITERATURE CITED

Bowyer, R. T. 1984. Sexual segregation in southern mule deer. Journal of Mammalogy 65:410–417.

Bowyer, R. T., J. G. Kie, and V. Van Ballenberghe. 1996. Sexual segregation in black-tailed deer: effects of scale. Journal of Wildlife Management 60:10–17.

Bureau of Land Management. 1998. Southwest Wyoming Resource Evaluation Report and Recommendations. USDI-BLM, Wyoming State Office, Cheyenne, Wyoming.

Bureau of Land Management. 2005.Draft Environmental Impact Statement Atlantic Rim Natural Gas Field Development Project. Rawlins Field Office, Rawlins, Wyoming.

Bureau of Land Management. 2006. Final Environmental Impact Statement Atlantic Rim Natural Gas Field Development Project. Rawlins Field Office, Rawlins, Wyoming.

Clements, C. D. and J. A. Young. 1997. A viewpoint: Rangeland health and mule deer habitat. Journal of Range Management 50:129–138.

DeBolt, B. L. 2000. Habitat use and diet selection of sympatric mule deer and elk in south-central Wyoming. M. S. Thesis, University of Wyoming, Laramie, Wyoming.

Di Orio, A. P., R. Callas, and R. J. Schaefer. 2003. Performance of two GPS telemetry collars under different habitat conditions. Wildlife Society Bulletin 31:372–379.

Horne, J. S., E. O. Garton, S. M. Krone, and J. S. Lewis. 2007. Analyzing animal movements using Brownian Bridges. Ecology, *In Press*.

Kaplan, E. L. and P. Meier. 1985. Nonparametric estimation from incomplete observations. Journal of American Statistical Association 53:457–581.

King, M. M. and H. D. Smith. 1980. Differential habitat utilization by the sexes of mule deer. Great Basin Naturalist 40:273–281.

McCullough, D. R. 1985. Long range movements of large terrestrial animals. Contributions in Marine Science Supplement 27: 444–465.

Main, M. B. and B. E. Coblentz. 1996. Sexual segregation in Rocky Mountain mule deer. Journal of Wildlife Management 60:497–507.

Nelson, R., G. Stout, L. Myers, and R. Straw. 1994. Baggs mule deer crucial winter range analysis. Wyoming Game and Fish Department, Cheyenne, Wyoming.

Porter, M. A. 1999.  Spatial relationships between sympatric mule deer and elk in south-central Wyoming.  M. S. Thesis, University of Wyoming, Laramie, Wyoming.

Sawyer, H., F. Lindzey, and D. McWhirter. 2005. Mule deer and pronghorn migration in western Wyoming. Wildlife Society Bulletin 33:1266–1273.

Sawyer, H., R. Nielson, F. Lindzey, and L. McDonald. 2006*a*. Winter habitat selection of mule deer before and during development of a natural gas field. Journal of Wildlife Management 70:396–403.

Sawyer, H., R. Nielson, D. Strickland, and L. McDonald. 2006*b*. 2006 Annual Report. Sublette Mule Deer Study (Phase II): Long-term monitoring plan to assess potential impacts of energy development on mule deer in the Pinedale Anticline Project Area. Western Ecosystems Technology, Inc., Cheyenne, Wyoming.

Sheehy, D. P. and A. H. Winward. 1981. Relative palatability of seven Artemisia taxa to mule deer and sheep. Journal of Range Management 34:397–399.

Short, H.L. 1981. Nutrition and Metabolism. Pages 99–127 *In* O.C. Wallmo, editor, Mule and Black-tailed Deer of North America. University of Nebraska Press, Lincoln, Nebraska.

Unsworth, J. W., D. F. Pac, G. C. White, R. M. Bartmann. 1999. Mule deer survival in Colorado, Idaho, and Montana. Journal of Wildlife Management 63:315–326.

Wambolt, C. L. 1996. Mule deer and elk foraging preference for 4 sagebrush taxa. Journal of Range Management 49:499-503.

White, G. C., R. A. Garrott, R. M. Bartmann, L. H. Carpenter, and A. W. Alldredge. 1987. Survival of mule deer in northwest Colorado. Journal of Wildlife Management 51:852–589.

White, G. C., A. F. Reeve, F. G. Lindzey, and K. P. Burnham. 1996. Estimation of mule deer winter mortality from age ratios. Journal of Wildlife Management 60:37–44.

Woolley, T. 2005. 2005 Job Completion Report for the Baggs Mule Deer Herd Unit. Wyoming Game and Fish Department, Cheyenne, Wyoming.

Exhibit D



# United States Department of the Interior

OFFICE OF HEARINGS AND APPEALS
Interior Board of Land Appeals
801 N. Quincy St.  Suite 300
Arlington, VA  22203

703 235 3750                                703 235 8349 (fax)

February 19, 2008

| | | |
|---|---|---|
| IBLA 2008-36 | ) | SDR WY-2008-01 |
| | ) | |
| THEODORE ROOSEVELT | ) | Coalbed Natural Gas Plans of |
| CONSERVATION PARTNERSHIP | ) | Development |
| | ) | |
| | ) | Motion to Intervene Granted; |
| | ) | Requests to Suspend Consideration |
| | ) | of Petition for Stay Denied; |
| | ) | Petition for Stay Denied; |
| | ) | Request to Suspend Consideration of |
| | ) | Appeal Granted |

### ORDER

The Theodore Roosevelt Conservation Partnership (TRCP) has appealed from and petitioned for a stay of the effect of an October 31, 2007, decision of the Deputy State Director, Minerals and Lands, Wyoming, Bureau of Land Management (BLM), denying its request for State Director Review (SDR) of an August 16, 2007, Finding of No Significant Impact/Decision Record (FONSI/DR) of the Acting Field Manager, Rawlins (Wyoming) Field Office, BLM.  In her FONSI/DR, the Acting Field Manager approved Plans of Development (PODs) for the "Sun Dog A" and "Sun Dog B" coalbed natural gas (CBNG) projects within the Atlantic Rim Natural Gas Field Development Project (Atlantic Rim Project) located in south-central Wyoming.[1]

TRCP cannot show immediate and irreparable harm from denial of its petition for stay.  Therefore, in this order we decline to suspend consideration of the petition for stay and deny it.  We also grant BLM's request to suspend consideration of the appeal.

---

[1]  Anadarko E&P Company LP, on behalf of itself (Anadarko), as the operator of the Sun Dog A and B PODs, and its working interest partner (Warren Resources, Inc. (Warren)) have moved to intervene in this appeal.  That motion is granted.

IBLA 2008-36

*Background*

On March 23, 2007, the Wyoming State Director, BLM, signed a Record of Decision (ROD) approving the Atlantic Rim Project, which will involve the drilling and development of a total of 1,800 CBNG wells and 200 conventional oil and gas wells in the Atlantic Rim Field in Carbon County, Wyoming. The State Director based the ROD on a December 1, 2006, Final Environmental Impact Statement (FEIS).

On June 20, 2007, TRCP filed a timely appeal and petitioned for a stay of the effect of the ROD (IBLA 2007-208). TRCP also filed a lawsuit in Federal District Court (*TRCP v. Kempthorne*, No. 07-1486 (RJL) (D.D.C.)), seeking to overturn the ROD on the basis, *inter alia*, that the FEIS failed to comply with section 102(2)(C) of the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. § 4332(2)(C) (2000). By order dated September 5, 2007, the Board denied TRCP's petition for stay. Thereafter, TRCP withdrew its appeal, and, by order dated September 12, 2007, the Board dismissed the appeal.[2]

On August 16, 2007, the Acting Field Manager issued her FONSI/DR approving the Sun Dog A and B PODs, which was based on BLM's August 15, 2007, Environmental Assessment (EA) (WY-030-07-EA-222). BLM tiered the EA to the FEIS.

On September 15, 2007, TRCP filed a request for SDR of the FONSI/DR, alleging that BLM had failed to comply with section 102(2)(C) of NEPA because of inadequacies in the EA and the FEIS.

In his October 2007 decision, the Deputy State Director denied the SDR request because of the pendency of a lawsuit challenging the FONSI/DR and seeking to enjoin it.[3] He stated: "As a result of the subject NRDC complaint and motion for preliminary injunction, we believe it would be inappropriate to respond to your

_____

[2] The Board presently has three appeals pending challenging the ROD, IBLA 2007-210, filed by Biodiversity Conservation Alliance, Wyoming Outdoor Council, Center for Native Ecosystems, Western Watersheds Project, Colorado Environmental Coalition, The Wilderness Society, and Wyoming Wilderness Association; IBLA 2007-226, filed by Environmental Preservation Foundation and Habitat for Wildlife; and IBLA 2007-227, filed by National Wildlife Federation and Wyoming Wildlife Federation.

[3] That lawsuit, filed on Sept. 28, 2007, by the Natural Resources Defense Council (NRDC), Biodiversity Conservation Alliance, Wyoming Outdoor Council, Western Watershed Projects, and Wyoming Wilderness Association is captioned *NRDC v. Kempthorne*, No. 07-1709 (RJL) (D.D.C.).

request for a[n] SDR challenging the sufficiency of the Sun Dog A and B POD FONSI and DR." Decision at 2.

TRCP appealed that decision. It also petitioned for a stay of that decision and the underlying FONSI/DR. TRCP did not, however, "contest the merits of the [FONSI/]Decision Record. Rather, TRCP contests only BLM's blatant refusal to consider the merits of TRCP's concerns with the [FONSI/]Decision Record and denial of TRCP's right to a[n] SDR." Petition for Stay at 5. It argues that "[g]ranting a Stay until the requested SDR is performed will ensure that wildlife in the Sun Dog A and B PODs receive the procedural and substantive protection to which it is entitled as a matter of law." *Id.* at 10.

On November 30, 2007, the District Court denied NRDC's motion for preliminary injunction in *NRDC v. Kempthorne*, No. 07-1709 (RJL) (D.D.C.), finding that NRDC had failed to demonstrate that it was likely to succeed on the merits of its lawsuit challenging the FONSI/DR and failed to satisfy the other criteria for equitable relief (which are comparable to those necessary to justify a stay).

In December 2007, the intervenors requested that the Board suspend consideration of TRCP's petition for stay until the District Court resolves the challenges to the ROD and the FONSI/DR. BLM made a similar request, although it seeks suspension of consideration of not only the petition for stay, but also the underlying appeal from the Deputy State Director's decision. BLM argues that a decision in the two pending court cases will affect the Department's resolution of the appeal and the underlying SDR request by TRCP, and, therefore, the Board should suspend consideration in order to avoid duplicative or inconsistent judgments. Both intervenors and BLM request an extension of time to respond to TRCP's petition for stay in the event we deny the suspension requests. TRCP opposes any suspension.

*The Petition for Stay*

We find no reason to defer consideration of the petition for stay. Accordingly, the requests to suspend consideration of the petition are denied, as are the requests for extensions of time to respond to the petition.

The regulation at 43 C.F.R. § 3165.4(c) provides that a decision of a BLM State Director concerning onshore oil and gas operations "shall remain effective pending appeal" unless the Board determines otherwise, and that an appellant, who petitions for a stay of the effect of such a BLM decision, pending a determination by the Board of the merits of its appeal, bears the burden of demonstrating sufficient justification for the stay, based on each of the following four criteria: (1) the relative harm to the parties if the stay is granted or denied, (2) the likelihood of the

appellant's success on the merits, (3) the likelihood of irreparable harm to the appellant or resources if the stay is not granted, and (4) whether the public interest favors granting the stay.

TRCP's position is that the granting of a stay of the Deputy State Director's decision and the underlying FONSI/DR "until the requested SDR is performed will ensure that wildlife in the Sun Dog A and B PODs receive the procedural and substantive protection to which it is entitled as a matter of law." Petition for Stay at 10. The only decision under appeal, however, is the Deputy State Director's decision not to undertake SDR. Granting a stay of that decision would not compel BLM to adjudicate TRCP's SDR request, but only stay BLM's denial of the request. Thus, denial of TRCP's petition for stay will not result in immediate and irreparable harm to TRCP or its interests, and we need not consider whether TRCP has satisfied the other criteria for a stay of the Deputy Director's decision.

Since TRCP has not met its burden of demonstrating that a stay of that decision is warranted, the petition for stay is denied. Although TRCP also requests a stay of the underlying FONSI/DR, that determination is not before the Board on appeal and, therefore, cannot be the subject of a petition for stay.

### Request to Suspend Consideration of the Appeal

We turn to BLM's request to suspend consideration of TRCP's appeal. While we recognize that the court in *NRDC v. Kempthorne* has declined to enjoin the FONSI/DR approving the Sun Dog A and B PODs, NRDC's challenge to the FONSI/DR remains pending before the court. Moreover, the court also has been asked by TRCP in *TRCP v. Kempthorne* to overturn the ROD.

We do not agree with BLM that suspension is necessary to avoid duplicative or inconsistent rulings, since, even were the Board to overturn the Deputy State Director's decision, that would not directly result in a final adjudication of the legality of BLM's approval of the Sun Dog A and B PODs. It would merely return the matter to the Deputy State Director for adjudication. However, given that the legality of BLM's approval of the PODs, including the adequacy, under section 102(2)(C) of NEPA, of its assessment of likely environmental impacts in the EA and the FEIS, is already pending before the court in the lawsuits, we grant BLM's request to suspend consideration of TRCP's appeal and defer final dispositive action in the pending appeal.[4]

---

[4]  As we said in *Gregory Lumber Co., Inc.*, 54 IBLA 309, 320D (1981), on reconsideration:

(continued...)

IBLA 2008-36

Therefore, pursuant to the authority delegated to the Board of Land Appeals by the Secretary of the Interior, 43 C.F.R. § 4.1, the motion to intervene is granted. The requests to suspend consideration of TRCP's petition for a stay are denied. TRCP's petition for stay is denied.  BLM's request to suspend consideration of TRCP's appeal is granted.  Within 20 days of a final ruling by the District Court in *TRCP v. Kempthorne*, No. 07-1486 (RJL) and/or *NRDC v. Kempthorne*, No. 07-1709 (RJL), BLM shall provide the Board with a copy of the court's ruling and brief the Board on the impact of that ruling on the present appeal.  Following receipt of that brief, the Board may direct further briefing by the parties.

Bruce R. Harris
Deputy Chief Administrative Judge

APPEARANCES:

Thomas R. Wilmoth, Esq.          **FAX:  402-458-1510**
Donald G. Blankenau, Esq.
Blackwell Sanders LLP
206 South 13th Street, Suite 1400
Lincoln, NE 68508-2019
For Theodore Roosevelt Conservation Partnership

Natalie Eades, Esq.              **FAX:  832-636-8002**
Anadarko Petroleum Corporation
P.O. Box 1330
Houston, TX 77251-1330
For Anadarko E&P Company LP and Warren Resources, Inc.

---

[4] (...continued)
As a practical matter, where parties to an appeal inform the Board that the matter is simultaneously pending before the Federal judiciary, this Board will normally defer to the court and suspend consideration of such an appeal.  This action, however, is not based on a view that the Board is without jurisdiction to act further; rather, it is based both on concepts of comity and the realization that the judicial action may preclude the necessity for any action by this Board.

IBLA 2008-36

Arthur R. Kleven, Esq.                          **FAX:  303-231-5363**
Office of the Regional Solicitor
U.S. Department of the Interior
755 Parfet Street, Suite 151
Lakewood, CO 80215
For the Bureau of Land Management

Exhibit E



# United States Department of the Interior

OFFICE OF HEARINGS AND APPEALS
Interior Board of Land Appeals
801 N. Quincy St. Suite 300
Arlington, VA  22203

703.235 3750                              703 235 8349 (fax)

April 2, 2008

| | | |
|---|---|---|
| IBLA 2008-36 | ) | SDR WY-2008-01 |
| | ) | |
| THEODORE ROOSEVELT | ) | Coalbed Natural Gas Plans of |
| CONSERVATION PARTNERSHIP | ) | Development |
| | ) | |
| | ) | Appeal Dismissed |

## ORDER

On April 1, 2008, the Theodore Roosevelt Conservation Partnership notified the Board that it was voluntarily dismissing the above-captioned appeal.

Accordingly, pursuant to the authority delegated to the Board of Land Appeals by the Secretary of the Interior, 43 C.F.R. § 4.1, the appeal is dismissed.

_____
Bruce R. Harris
Deputy Chief Administrative Judge

I concur:

_____
H. Barry Holt
Chief Administrative Judge

APPEARANCES:

Thomas R. Wilmoth, Esq.              **FAX:  402-458-1510**
Donald G. Blankenau, Esq.
Husch Blackwell Sanders LLP
206 South 13th Street, Suite 1400
Lincoln, NE 68508-2019
For Theodore Roosevelt Conservation Partnership

IBLA 2008-36

Natalie Eades, Esq.                    **FAX: 832-636-8002**
Anadarko Petroleum Corporation
P.O. Box 1330
Houston, TX 77251-1330
For Anadarko E&P Company LP and Warren Resources, Inc.

Arthur R. Kleven, Esq.                 **FAX: 303-231-5363**
Office of the Regional Solicitor
U.S. Department of the Interior
755 Parfet Street, Suite 151
Lakewood, CO 80215
For the Bureau of Land Management

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| THEODORE ROOSEVELT | ) |
| CONSERVATION PARTNERSHIP | ) |
| 555 Eleventh St. N.W., 6th Floor | ) |
| Washington, DC 20004 | ) |
| (202) 654-4600, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| DIRK KEMPTHORNE, in his official | ) |
| capacity as the Secretary of the United States | ) |
| Department of the Interior | ) |
| 1849 C Street, N.W. | ) |
| Washington, DC 20240 | ) |
| (202) 208-3100, | ) |
| | ) |
| and | ) |
| | ) |
| UNITED STATES BUREAU OF LAND | ) |
| MANAGEMENT | ) |
| 1849 C Street, Room 406-LS | ) |
| Washington, DC 20240 | ) |
| (202) 452-5125, | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |
| ANADARKO PETROLEUM | ) |
| CORPORATION, WARREN RESOURCES, | ) |
| INC., DOUBLE EAGLE PETROLEUM | ) |
| CO., | ) |
| | ) |
| and | ) |
| | ) |
| STATE OF WYOMING, | ) |
| | ) |
| Defendant-Intervenors. | ) |
| | ) |

**[PROPOSED] ORDER**

UPON CONSIDERATION of the Motion of Plaintiff Theodore Roosevelt Conservation Partnership for leave to file its amended Complaint:

IT IS HEREBY ORDERED that the Motion for Leave to File First Amended and Supplemented Complaint is GRANTED.


Dated this _____ day of _____, 2008.


_____
The Honorable Richard J. Leon
U.S. District Court Judge