**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| THEODORE ROOSEVELT<br>CONSERVATION PARTNERSHIP<br>555 Eleventh St. N.W., 6th Floor<br>Washington, DC 20004<br>(202) 654-4600,<br><br>                     Plaintiff,<br><br>    v.<br><br>DIRK KEMPTHORNE, in his official<br>capacity as the Secretary of the United<br>States Department of the Interior<br>1849 C Street, N.W.<br>Washington, DC 20240<br>(202) 208-3100,<br><br>    and<br><br>UNITED STATES BUREAU OF LAND<br>MANAGEMENT<br>1849 C Street, Room 406-LS<br>Washington, DC 20240<br>(202) 452-5125,<br><br>    Defendants.<br>_____<br><br>ANADARKO PETROLEUM<br>CORPORATION, WARREN<br>RESOURCES, INC., DOUBLE EAGLE<br>PETROLEUM CO.,<br><br>    and<br><br>STATE OF WYOMING<br><br>    Defendant-Intervenors<br>_____ | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   CASE NO. 1:07-cv-01486-RJL |

**MOTION FOR SUMMARY JUDGMENT AND SUPPORTING MEMORANDUM OF**
**POINTS AND AUTHORITIES**

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................................... iii

MOTION FOR SUMMARY JUDGMENT.................................................................. 1

MEMORANDUM OF POINTS AND AUTHORITIES .............................................. 1

SUMMARY OF TRCP'S ARGUMENT ON SUMMARY JUDGMENT .................... 1

SUMMARY OF MATERIAL FACTS........................................................................ 3

I.      THE ARPA'S RESIDENT WILDLIFE. ......................................................... 3

II.     EVOLUTION OF THE PROJECT.................................................................. 5

III.    THE FINAL PROJECT AND ITS IMPACTS. ............................................... 6

IV.     TRCP'S INTERESTS IN THE ARPA, ITS WILDLIFE, AND BLM'S
        MANAGEMENT DECISIONS........................................................................ 8

ARGUMENT ............................................................................................................ 8

I.      STANDARD OF REVIEW. ............................................................................ 8

II.     BLM's EIS and EAs VIOLATED NEPA......................................................... 9

   A.   BLM's EIS and Subsequent EAs Fail to Consider a Reasonable Range of
        Alternatives. .............................................................................................. 11

        1.   BLM's Elimination of the Phased Development Alternative was Arbitrary
             and Capricious. ................................................................................... 12

        2.   The EAs Were Unreasonably Limited to the Operators' Proposal and a
             "No Action" Alternative. .................................................................... 16

   B.   BLM's "Adaptive Management" Plan Fails to Identify Required Monitoring
        and Mitigation Measures and Unreasonably Forecloses Public Involvement. ................. 17

   C.   BLM Failed to Analyze Cumulative Impacts on Wildlife Resulting from CBM
        and Wind Power Development in the ARPA. ................................................ 22

   D.   BLM Irreversibly and Irretrievably Committed Resources in the ARPA in a
        Manner that Precluded Appropriate Consideration of Alternatives in the
        Rawlins RMP............................................................................................... 24

   E.   BLM's Failure to Await Baseline Data on Mule Deer Prevented BLM from
        Taking the Requisite "Hard Look". .............................................................. 26

   F.   BLM Improperly Tiered the EAs from an Unlawful EIS that Does Not Analyze
        Issues Presented by Development of the Sun Dog and Catalina PODs........................... 29

III.    BLM VIOLATED FLPMA. .......................................................................... 30

   A.   BLM Failed to Comply with FLPMA's Multiple Use and Sustained Yield
        Mandates by Approving a Project that Will Eradicate Sage Grouse, Severely

Displace Big Game and Effectively Eliminate Hunting and Recreation from the ARPA for Multiple Generations. ...................................................................31

1. The Meaning of "Multiple Use" and "Sustained Yield." ............................................31

2. The Project will Eliminate Sage Grouse and Substantially Reduce, if not Eliminate Big Game from the ARPA. ...................................................................32

    a. Impacts on Sage Grouse in the ARPA .................................................................. 33

    b. Impacts on Big Game in the ARPA ...................................................................... 37

    c. BLM's Failure to Implement Stricter Protections in the POD Decisions............. 40

B. The Project is Not Consistent with the Great Divide RMP. ...............................................41

1. Development Under The ROD So Exceeds the RFD Scenario as to Render the Project Inconsistent with the RMP. ...................................................................41

2. The Project is Not Consistent with the Great Divide RMP's Wildlife or Recreation Management Objectives. ...........................................................................42

3. BLM's Consistency Determination was Arbitrary and Capricious *Per Se* Since the Monitoring and Mitigation (*i.e.*, Adaptive Management) Plan was Not Defined at the Time the ROD was Adopted.................................................43

CONCLUSION AND RELIEF REQUESTED ...........................................................................44

CERTIFICATE OF SERVICE ......................................................................................................45

# TABLE OF AUTHORITIES

**Page**

**Federal Cases**

*Baltimore Gas & Electric Co. v. Natural Resources Defense Council, Inc.*,
  462 U.S. 87 (1983) ......................................................................................... 10

*Basel Action Network v. Maritime Administration*,
  370 F. Supp. 2d 57 (D.D.C. 2005) .................................................................. 10

*Citizens Against Burlington, Inc. v. Busey*,
  938 F.2d 190 (D.C. Cir. 1991) ........................................................................ 14

*Citizens' Comm. to Save Our Canyons v. U.S. Forest Serv.*,
  297 F.3d 1012 (10th Cir. 2002) ...................................................................... 13

*City of Alexandria, Va. v. Slater*,
  46 F. Supp. 2d 35 (D.D.C. 1999), reversed on other grounds by
  198 F.3d 862 (D.C. Cir. 1999) ........................................................................ 26

*City of Carmel-By-The-Sea v. United States Dept. of Transp.*,
  123 F.3d 1142 (9th Cir. 1997) ........................................................................ 14

*City of Willcox v. Federal Power Commission*,
  567 F.2d 394 (D.C. Cir. 1977) ........................................................................ 11

*Coalition on Sensible Transportation v. Dole*,
  826 F.2d 60 (D.C. Cir. 1987) .......................................................................... 23

*Curry v. U.S. Forest Service*,
  988 F. Supp. 541 (W.D. Pa. 1997) .................................................................. 16

*\*Defenders of Wildlife v. Babbitt*,
  130 F. Supp. 2d 121 (D.D.C. 2001) ................................................................ 24

*DIRECTV, Inc. v. FCC*,
  110 F.3d 816 (D.C. Cir. 1997) .......................................................................... 9

*Dubois v. United States Dept. of Agriculture*,
  102 F.3d 1273 (1st Cir. 1996) ........................................................................ 22

*Earth Island Institute v. U.S. Forest Service*,
  351 F.3d 1291 (9th Cir. 2003) ........................................................................ 24

*\*Environmental Protection Information Center v. USFS*,
  234 Fed. Appx. 440 (9th Cir. May 9, 2007) .............................................. 11, 16

*Foundation for North American Wild Sheep v. U.S.D.A.*,
  681 F.2d 1172 (9th Cir. 1982) ........................................................................ 20

*Friends of Southeast's Future v. Morrison*,
  153 F.3d 1059 (9th Cir. 1998) ........................................................................ 11

*Friends of Yosemite Valley v. Kempthorne*,
  520 F.3d 1024 (9th Cir. 2008) ........................................................................ 15

*Fund for Animals v. Babbitt*,
  903 F. Supp. 96 (D.D.C. 1995) ......................................................................... 9

*Grand Canyon Trust v. FAA*,
  290 F.3d 339 (D.C. Cir. 2002) ........................................................................ 10

*Greenpeace v. Nat'l Marine Fisheries Serv.*,
  80 F. Supp. 2d 1137 (W.D. Wash. 2000) .......................................................... 9

*Half Moon Bay Fishermans' Mktg. Ass'n v. Carlucci,*
  857 F.2d 505 (9th Cir. 1988) ............................................................ 27
*Hammond v. Norton,*
  370 F. Supp. 2d 226 (D.D.C. 2005) ............................................... 9, 10
*Humane Society v. Johanns,*
  520 F. Supp. 2d 8 (D.D.C. 2007) ...................................................... 10
*Marsh v. Oregon Natural Resources Council,*
  490 U.S. 360 (1989) ......................................................................... 10
*Marsh v. Oregon Natural Resources Council,*
  490 U.S. 360 (1989) ......................................................................... 17
*Morongo Band of Mission Indians v. Fed. Aviation Admin.,*
  161 F.3d 569 (9th Cir. 1998) ............................................................ 12
*Motor Vehicle Mfrs Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983) .............................................................................. 9
*Mount Royal Joint Venture v. Kempthorne,*
  477 F.3d 745 (D.C. Cir. 2007) ..................................................... 32, 40
*Mountaineers v. U.S. Forest Serv.,*
  445 F. Supp. 2d 1235 (W.D. Wash. 2006) ....................................... 21
*Muckleshoot Indian Tribe v. U.S. Forest Service,*
  177 F.3d 800 (9th Cir. 1999) ............................................................ 11
*Natural Resources Defense Council v. Hodel,*
  865 F.2d 288 (D.C. Cir. 1988) .......................................................... 24
*Natural Resources Defense Council v. Kempthorne,*
  506 F.Supp.2d 322 (E.D. Cal. 2007) ................................................ 21
*Northern Alaska Environmental Center v. Kempthorne,*
  457 F.3d 969 (9th Cir. 2006) ............................................................ 11
*Northern Cheyenne Tribe v. Norton,*
  503 F.3d 836 (9th Cir. 2007) ............................................................ 13
*Northern Plains Resource Council v. United States Bureau of Land Management,*
  2005 U.S. Dist. LEXIS 4678 (D. Mont. February 25, 2005) ............... 13, 14, 15
*Northwest Ecosystem Alliance v. Rey,*
  380 F. Supp. 2d 1175 (W.D. Wash 2005) ......................................... 14
*Norton v. Southern Utah Wilderness Alliance,*
  542 U.S. 55 (2004) ..................................................................... 30, 31, 40
*ONRC Action v. Bureau of Land Management,*
  150 F.3d 1132 (9th Cir. 1998) .......................................................... 25
*Or. Natural Res. Council v. Lowe,*
  109 F.3d 521 (9th Cir. 1992) .............................................................. 9
*Oregon Natural Desert Ass'n v. Shuford,*
  2007 WL 1695162 (D. Or. 2007) ........................................................ 9
*Oregon Natural Resources Council v. Marsh,*
  832 F.2d 1489 (9th Cir. 1987) .......................................................... 17
*Robertson v. Methow Valley Citizens Council,*
  490 U.S. 332 (1990) .......................................................................... 17
*Scientists' Institute for Public Information v. AEC,*
  481 F.2d 1079 (D.C. Cir. 1973) ........................................................ 25

iv

*Southern Utah Wilderness Alliance v. Norton,*
    237 F. Supp. 2d 48 (D.D.C. 2002) .................................................................. 11, 14
*The Lands Council v. Powell,*
    395 F.3d 1019 (9th Cir. 2005) ......................................................................... 9, 22
*Utah Environmental Congress v. Bosworth,*
    439 F.3d 1184 (10th Cir. 2006) ............................................................................ 12
*West Branch Valley Flood Protection Ass'n v. Stone,*
    820 F. Supp. 1 (D.D.C. 1993) ............................................................................... 17
*Western Watersheds Project v. Bennett,*
    392 F.Supp.2d 1217 (D. Idaho 2005) .................................................................... 43
*Western Watersheds Project v. Fish & Wildlife Service,*
    535 F. Supp. 2d 1173 (D. Idaho 2007) ................................................. 4, 35, 36, 37
*Western Watersheds Project v. U.S. Forest Service,*
    2006 WL 292010 (D. Idaho Feb. 7, 2006) ..................................................... 21, 43
*Wyoming Audubon et al.,*
    151 IBLA 42, 49 (Oct. 22, 1999) .......................................................................... 34
*Young v. General Services Administration,*
    99 F. Supp. 2d 59 (D.D.C. 2000) .......................................................................... 26

**Federal Rules**
Fed. R. Civ. P. 56(c) ..................................................................................................... 8

**Federal Regulations**
16 U.S.C. § 1531 ............................................................................................................ 4
28 U.S.C. § 2412(d) ..................................................................................................... 45
40 C.F.R. § 1500.1 ........................................................................................... 10, 22, 33
40 C.F.R. § 1500.1(b) .................................................................................................. 20
40 C.F.R. § 1500.2(d) .................................................................................................. 22
40 C.F.R. § 1500.2(e) ................................................................................................... 11
40 C.F.R. § 1502.14 ................................................................................................ 11, 12
40 C.F.R. § 1502.14(b) ................................................................................................. 11
40 C.F.R. § 1502.14(c) ................................................................................................. 11
40 C.F.R. § 1502.14(f) .................................................................................................. 17
40 C.F.R. § 1502.16(h) ................................................................................................. 17
40 C.F.R. § 1502.2(f) ................................................................................................... 25
40 C.F.R. § 1502.20 ..................................................................................................... 29
40 C.F.R. § 1502.24 ................................................................................................ 10, 34
40 C.F.R. § 1505.2(c) ................................................................................................... 18
40 C.F.R. § 1505.3 ....................................................................................................... 18
40 C.F.R. § 1506.1 ............................................................................................. 24, 25, 26
40 C.F.R. § 1506.1(a)(1)-(2) ........................................................................................ 25
40 C.F.R. § 1506.1(c) .............................................................................................. 24, 25
40 C.F.R. § 1508.20 ..................................................................................................... 17
40 C.F.R. § 1508.28 ..................................................................................................... 29
40 C.F.R. § 1508.7 ....................................................................................................... 22
42 U.S.C. § 4321 ............................................................................................................ 1
42 U.S.C. § 4331 .......................................................................................................... 10
42 U.S.C. § 4332(2)(C) ................................................................................................ 10

42 U.S.C. § 4332(2)(C)(iii)............................................................................... 11

42 U.S.C. § 4332(2)(C)(v)............................................................................... 25

42 U.S.C. § 4332(2)(E) ................................................................................... 11

43 C.F.R. § 1601.0-5(b) ................................................................................. 31

43 C.F.R. § 1610.5-3 ...................................................................................... 31

43 C.F.R. § 3101.1-2....................................................................................... 30

43 C.F.R. § 3162.1(a)...................................................................................... 30

43 C.F.R. Part 1600 ........................................................................................ 25

43 U.S.C. § 1701 .............................................................................................. 1

43 U.S.C. § 1701(a)(2).................................................................................... 30

43 U.S.C. § 1701(a)(8).................................................................................... 30

43 U.S.C. § 1702(c) ................................................................................ 31, 40

43 U.S.C. § 1702(h) ........................................................................................ 32

43 U.S.C. § 1712(a) ........................................................................................ 30

43 U.S.C. § 1732(a) .............................................................................. 2, 30, 43

43 U.S.C. § 1732(b) ........................................................................................ 30

5 U.S.C. § 706(2)(A)......................................................................................... 9

## Other Authorities

*Council on Environmental Quality*,
  Considering Cumulative Effects under the National Environmental Policy Act, Ch. 4, p. 41
  (copy available at http://www.nepa.gov/nepa/ccenepa/ccenepa.htm
  (visited April 21, 2008).............................................................................. 27

G. C. Coggins and Robert L. Glicksman,
  *Public Natural Resources Law* (2nd ed. 2007).......................................... 31, 32, 40

*Initiation of Status Review for the Greater Sage Grouse (Centrocercus Urophasianus) as
  Threatened or Endangered*, 73 Fed. Reg. 10, 218 (Feb. 26, 2008) ............................ 4

Julie Thrower, *Adaptive Management and NEPA: How a Nonequilibrium View of Ecosystems
  Mandates Flexible Regulations*, 33 Ecology L.Q. 871, 894 (2006) ........................ 20

## MOTION FOR SUMMARY JUDGMENT

Plaintiff, Theodore Roosevelt Conservation Partnership ("TRCP") respectfully moves this Court for an Order granting summary judgment in favor of TRCP and against the Federal Defendants, the Honorable Dirk Kempthorne and the U.S. Bureau of Land Management ("BLM"), and Defendant-Intervenors Anadarko Petroleum Corporation, Warren Resources, Inc., Double Eagle Petroleum Co. (collectively the "Operators"), and the State Of Wyoming. Pursuant to LCvR 7(a) – (c), LCvR 7(h) and LCvR 56.1, TRCP's Motion is supported by the following Memorandum of Points and Authorities and by TRCP's Statement of Material Facts in Support of Motion for Summary Judgment ("SOF"), concurrently filed herewith. A proposed Order also is lodged herewith for the Court's convenience.

## MEMORANDUM OF POINTS AND AUTHORITIES

### SUMMARY OF TRCP'S ARGUMENT ON SUMMARY JUDGMENT

This suit challenges BLM's Atlantic Rim Natural Gas Field Development Project (the "Project") as approved in the Project's Record of Decision ("ROD"). The ROD provides a plan for future management of the federal surface and mineral estate in the Atlantic Rim Project Area ("ARPA"), an area roughly seven times larger than the District of Columbia. A map and photographs of the ARPA are located at Exhibit D hereto and page iv of TRCP's SOF, respectively. The ROD is based on the ATLANTIC RIM NATURAL GAS FIELD DEVELOPMENT PROJECT FINAL ENVIRONMENTAL IMPACT STATEMENT ("EIS"). As described herein, BLM violated fundamental tenets of both the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, and the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. § 1701 *et seq.* when developing the EIS, adopting the ROD and, ultimately, approving the Project.

BLM violated NEPA because its EIS:  1) failed to evaluate a reasonable range of alternatives (arbitrarily, omitting phased development from detailed analysis); 2) relied for its

mitigation element on a defective "adaptive management" process that failed to specify applicable monitoring requirements and mitigation techniques and excluded the public from future NEPA processes; 3) failed to analyze cumulative impacts to wildlife resulting from the Project and other reasonably foreseeable activities in the ARPA, including extensive wind energy development identified in a contemporaneous NEPA process; 4) irreversibly and irretrievably committed resources within the ARPA to coal bed methane ("CBM") gas development prior to completion of an ongoing NEPA analysis for the Resource Management Plan ("RMP") that would otherwise govern land uses in and around the ARPA; and 5) failed to identify an environmental "baseline" needed to assist in the management and mitigation of impacts to wildlife, and particularly mule deer in the ARPA.

BLM violated FLPMA's multiple-use mandate, 43 U.S.C. § 1732(a), by authorizing a level and method of CBM development that will eradicate sage grouse from the ARPA, drastically reduce big game populations, and displace hunting and recreational activities for multiple generations. Far from ensuring multiple use, BLM committed the ARPA to a single use – CBM development – and has relegated one of Wyoming's best hunting grounds to permanent "industrialization." BLM violated FLPMA's "consistency" requirement, 43 U.S.C. § 1732(a), by approving a project that: 1) Greatly exceeds the Reasonable Foreseeable Development ("RFD") scenario in the governing RMP; 2) is contrary to the RMP's wildlife and recreation objectives; and 3) was so ill defined as to preclude a legitimate consistency determination.

BLM further violated NEPA and FLPMA when approving: 1) The August 15, 2007 Environmental Assessment ("EA") and August 16, 2007 Finding of No Significant Impact ("FONSI") and Decision Record ("DR") authorizing development by Defendant-Intervenor Anadarko Petroleum Corporation of "Sun Dog PODS A and B"; and 2) the June 18, 2007 EA and

June 28, 2007 FONSI and DR authorizing development by Defendant-Intervenor Double Eagle Petroleum Co. of the "Catalina PODs A and B" (collectively the "POD Decisions"). First, BLM improperly "tiered" the EAs from an unlawful EIS. Second, by evaluating only the Operators' proposed action and a "no action" alternative, BLM failed to consider a reasonable range of alternatives when approving the POD Decisions. Finally, by implementing development proscriptions based on unsound science, the POD Decisions fail to protect wildlife species in the face of overwhelming and uncontradicted scientific evidence that greater protections are needed to ensure persistence of wildlife and hunting opportunities in the ARPA.

## SUMMARY OF MATERIAL FACTS[1]

This action is directed at CBM development within the ARPA. However, the ARPA is best described by reference to the remarkable wildlife resources and recreational uses for which the ARPA has long been revered.

## I.    THE ARPA'S RESIDENT WILDLIFE.

Multiple big game species occupy the ARPA, including mule deer, pronghorn antelope, and elk. *See* SOF ¶ 2 and page v (photographs). Big game populations are managed by the Wyoming Game & Fish Department ("WGFD") as herd units. SOF ¶ 2. Of particular significance are mule deer herds, which are among the largest in the intermountain West. SOF ¶ 4. The ARPA is located in the eastern portion of the Baggs herd unit ("BHU"). SOF ¶ 4. "Since the 1980's the BHU has supported one of Wyoming's largest deer herds and provided exceptional recreational opportunities to both resident and nonresident sportsmen." SOF ¶ 5. In addition to those members of the BHU, migratory mule deer from regions outside the ARPA occupy portions of the ARPA during spring, summer, and fall periods. SOF ¶ 5.

---

[1] The facts material to disposition of TRCP's claims are more thoroughly set forth in TRCP's Statement of Material Facts in Support of Motion for Summary Judgment.

The ARPA supports a dense population of Greater sage grouse because it provides a uniquely well defined and contiguous block of sage brush and related habitats on which sage grouse rely. SOF ¶¶ 3; 17; and page v (photograph). Wyoming is one of the last strongholds for greater sage grouse in the western United States, and the ARPA provides some of the "finest sage grouse habitat in the world.". SOF ¶ 15; 97. There are 88 leks (courtship and display locations) located in and within 2 miles of the ARPA. SOF ¶ 15; Exhibit I hereto. Habitat maintenance is critical to the long-term viability of sage grouse. *See* Declaration of Clait E. Braun, PhD. ("Braun Decl.")[2] ¶ 13; SOF ¶¶ 18-19; 22-29. Without adequate protective measures, lek persistence decreases dramatically in and around oil and gas fields. Braun Decl. ¶¶ 18-21; SOF ¶¶ 18-19; 25-31.

Notably, the U.S. District Court for the District of Idaho recently invalidated and remanded the U.S. Fish and Wildlife Service's ("USFWS") determination that sage grouse did not qualify for listing as "threatened" or "endangered" under the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 *et seq. Western Watersheds Project v. Fish & Wildlife Service,* 535 F. Supp. 2d 1173 (D. Idaho 2007). The species' status is currently under review by USFWS, which will determine whether it should be federally protected. *Initiation of Status Review for the Greater Sage Grouse (Centrocercus Urophasianus) as Threatened or Endangered*, 73 Fed. Reg. 10, 218 (Feb. 26, 2008). WGFD listed sage grouse as a "Status 2 Species of Special Concern" in Wyoming, which means "[p]opulations are declining "and experiencing "[o]n-going significant loss of habitat." SOF ¶ 20. BLM has listed sage grouse as a "sensitive species" under its management authorities. SOF ¶ 16.

---

[2] Dr. Braun's declaration is attached as Exhibit A.

These species, along with elk and pronghorn antelope, provide extraordinary hunting opportunities in the ARPA. Mule Deer in the ARPA are hunted, with a 54% success rate, by 2,784 hunters (40% of which are non-residents) each year. These hunters are supported by at least 18 local outfitters. SOF ¶ 5. Mule deer hunting in the BHU provides more than 14,000 recreation days each year. SOF ¶ 5. Sage grouse in the ARPA are hunted by up to 509 hunters each year. SOF ¶ 17. Pronghorn antelope hunters enjoy an incredible 99% success rate. SOF ¶ 13.

## II.    EVOLUTION OF THE PROJECT.

The Project began as a modest proposal to drill a handful of wells in the ARPA for exploratory purposes. SOF ¶ 43. Even this small project sparked concerns about CBM impacts to wildlife, particularly sage grouse. SOF ¶¶ 48; 51; 52. Despite concerns expressed by the U.S. Environmental Protection Agency ("USEPA"), the U.S. Forest Service, and the State of Wyoming, BLM believed a cursory environmental review would suffice, SOF ¶¶ 45-49, until the Project escalated to as many as 3,880 wells. SOF ¶ 53. In light of the Project's expansion, BLM staff recognized repeatedly the RMP would need to be updated to accommodate the Project. SOF ¶¶ 55-59; 67-69; 79; 88. Accordingly, BLM assured the public that a comprehensive update of the governing "Great Divide" RMP (1990) (and corresponding NEPA analysis) would occur in conjunction with the Project. SOF ¶ 66. In the meantime, BLM authorized certain limited "interim drilling," ostensibly to gain information to aid environmental analyses for the Project. SOF ¶¶ 62-63. That drilling was conducted without the benefit of a comprehensive analysis of its cumulative impacts, SOF ¶ 85, and in some cases in direct violation of conditions designed to protect sage grouse. SOF ¶¶ 64-65.

As concern mounted over the scale of the Project and its impacts on wildlife, SOF ¶¶ 75-77, vital habitats and other key resources, BLM staff in Wyoming developed two alternatives

5

designed to mitigate impacts and address the public's concerns.[3]  SOF ¶ 90; 92-94; 103.  Those were a so-called "Temporal" (a.k.a. "Phased") alternative and a "Spatial" alternative.  *Id.*  Both were designed to protect wildlife and key habitats, the first by requiring development be conducted in three distinct phases; the second by placing key wildlife habitats off-limits.  *Id.*  These alternatives were incorporated into a draft EIS for the Project and promoted by BLM staff as more protective of the ARPA's non-energy resources.  *Id.  See also* 110-112.

When the Operators excoriated BLM for including the Phased and Spatial alternatives in the draft EIS, BLM officials in Washington, D.C. intervened.  SOF ¶¶ 106-109.  Shortly thereafter, BLM and the Operators entered into a Memorandum of Understanding ("MOU") placing revision of the draft EIS and development of the final EIS squarely back in the hands of the Operators' consultants.  SOF ¶ 114.  The Phased and Spatial development alternatives were summarily dropped from further analysis and not carried forward in the EIS.  SOF ¶¶ 114; 118-119.  That decision was based solely on the Operators' assertions of infeasibility, which BLM never tested for accuracy.

## III.    THE FINAL PROJECT AND ITS IMPACTS.

In the wake of the Operators' re-write, the EIS identified a preferred alternative that allows nearly two-thirds of the Project to be developed at once and includes outdated, scientifically unsupportable protections for wildlife and the habitats on which they depend.  SOF ¶¶ 126; 129-131; 134-135; 139-141; 151-153; Braun Decl. ¶¶ 12-21.  The Service and WGFD, along with other members of the public, including TRCP, called for more stringent measures and more specific management controls.  SOF ¶¶ 125-135; 157; 161-167; 196.  However, following a political compromise with the Wyoming Governor's Office, SOF ¶¶ 172 – 173, BLM adopted in

---

[3] BLM staff apparently rejected and extensively revised an early version of the draft EIS prepared by the Operators' NEPA contractor.  SOF ¶ 102.

the ROD what can only be described as an "act now – analyze later" approach based on ambiguous management goals BLM is not even committed to achieve. SOF ¶¶ 142-146. BLM attempts to defend its backward management style by labeling it, in the vernacular of wildlife biologists, "Adaptive Management." BLM's distorted view of Adaptive Management has no substance and shields subsequent controversial analyses from public view. Declaration of Rollin D. Sparrowe ("Sparrowe Decl.")[4] ¶¶ 20-28.

At base, the ROD's monitoring and mitigation elements explain simply BLM might impose some unidentified set of additional restrictions on future site-specific development if – in the opinion of BLM and the Operators – conditions warrant. SOF ¶¶ 142-150; 158-168. BLM's assurances of future protective measures offer the coldest comfort. The Operators early on indicated they could not comply with BLM's monitoring goals. SOF ¶¶ 169-171. Moreover, when BLM had an opportunity to impose additional protective measures, BLM refused to do so. Specifically, when approving the POD Decisions, BLM deferred to the same discredited wildlife management techniques it identified in the ROD. SOF ¶¶ 225; 233. As explained herein, these techniques were unsound when adopted decades ago and ignore modern, uncontroverted scientific analyses demonstrating their utter inadequacy. SOF ¶¶ 18-31; Braun Decl. ¶¶ 12-21.

The upshot is simple: over one quarter-million acres of prime wildlife habitat and related hunting and recreation grounds will be "converted to an industrialized setting" by development of the Project. SOF ¶ 208. Wildlife populations, including mule deer and sage grouse – a State listed species of special concern and once more a candidate for the Endangered Species List – will be decimated. Braun Decl. ¶ 21; SOF ¶ 29. Recreational and hunting opportunities will be displaced from the ARPA for multiple generations even under the best case scenario. In reality,

---

[4] Dr. Sparrowe's declaration is attached as Exhibit B.

it is more likely that wildlife, particularly sage grouse, and the recreational and hunting opportunities they afford will be forever lost from the ARPA.  SOF ¶¶ 127; 132; 193; 208.  One of Wyoming's most famous and formerly desirable hunting grounds is now being managed solely for the extraction and sale of CBM gas.

## IV.    TRCP'S INTERESTS IN THE ARPA, ITS WILDLIFE, AND BLM'S MANAGEMENT DECISIONS.

TRCP is a 501(c)(3) nonprofit corporation, representing a coalition of leading hunting, fishing and conservation organizations, labor unions and individual grassroots partners working together to preserve the traditions of hunting and fishing by: 1) expanding access to places to hunt and fish; 2) conserving fish and wildlife and the habitats necessary to sustain them; and 3) increasing funding for conservation and management.  Declaration of Steven R. Belinda ("Belinda Decl.")[5] ¶¶ 4-5.  TRCP's members utilize the ARPA, and more particularly, various hunting grounds within the ARPA on which CBM development is authorized under the Project.  Sparrowe Decl. ¶ 19; Belinda Decl. ¶¶ 6-8.  TRCP's members have hunted and observed, and will continue to hunt and observe, wildlife in areas within the ARPA that will be adversely impacted by the ARPA's industrialization, as well as individual operations contemplated under the ROD and the POD Decisions.  Id.  Dr. Sparrowe, Mr. Belinda and TRCP each participated in the public process leading to approval of the Project.  SOF ¶¶ 52, 157.

## ARGUMENT

## I.    STANDARD OF REVIEW.

Summary judgment is normally appropriate when the pleadings, materials on file, and affidavits show there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c).  This action has been brought pursuant to the

---

[5] A copy of Mr. Belinda's declaration is attached as Exhibit C.

judicial review provisions of the Administrative Procedure Act ("APA").[6]  Under the APA, a reviewing court should set aside agency actions, findings, or conclusions that are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A); *Hammond v. Norton*, 370 F. Supp. 2d 226, 238 (D.D.C. 2005).  An agency action is arbitrary and capricious if the agency has "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42-43 (1983); *The Lands Council v. Powell*, 395 F.3d 1019, 1026 (9th Cir. 2005); *DIRECTV, Inc. v. FCC*, 110 F.3d 816, 826 (D.C. Cir. 1997) (quoting *State Farm*, 463 U.S. at 43).

Although a Court's review under this standard is deferential, the agency must nonetheless "articulate a rational connection between the facts found and the conclusions made."  *Or. Natural Res. Council v. Lowe*, 109 F.3d 521, 526 (9th Cir. 1992).  Even when heightened deference may be warranted to an agency's "scientific" or "technical" conclusions, the "presumption of agency expertise may be rebutted if the decisions, even though based on scientific expertise, are not reasoned."  *Oregon Natural Desert Ass'n v. Shuford*, 2007 WL 1695162, *3 (D. Or. June 8, 2007) *citing Greenpeace v. Nat'l Marine Fisheries Serv.*, 80 F. Supp. 2d 1137, 1147 (W.D. Wash. 2000).

## II.    BLM's EIS and EAs VIOLATED NEPA.

NEPA was enacted in recognition of "the profound impact of man's activity on the interrelations of all components of the natural environment, [and] … the critical importance of

---

[6] Summary judgment is appropriate for resolving a challenge to a federal agency's administrative decision when review is based on an administrative record.  *Fund for Animals v. Babbitt*, 903 F. Supp. 96, 105 (D.D.C. 1995).

restoring and maintaining environmental quality to the overall welfare . . . of man." 42 U.S.C. § 4331. NEPA prescribes the necessary process by which federal agencies must take a "hard look" at the environmental consequences of their proposed courses of action. *See Hammond v. Norton*, 370 F. Supp. 2d 226, 239 (D.D.C. 2005); *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 371 (1989); *Grand Canyon Trust v. FAA*, 290 F.3d 339, 340 (D.C. Cir. 2002). NEPA "places on the agency the obligation to consider every significant aspect of the environmental impact of the proposed action" and "ensures that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process." *Baltimore Gas & Electric Co. v. Natural Resources Defense Council, Inc.*, 462 U.S. 87, 97 (1983) (citations omitted).

NEPA required BLM to prepare an EIS for the Project because it constituted a "major Federal action significantly affecting the quality of the human environment…." 42 U.S.C. § 4332(2)(C). *See also Grand Canyon Trust*, 290 F.3d at 340; *The Humane Society v. Johanns*, 520 F. Supp. 2d 8, 16 (D.D.C. 2007). The EIS requirement is designed to "insure a fully informed and well-considered decision" is made by the agency. *Base1 Action Network v. Maritime Administration*, 370 F. Supp. 2d 57, 63 (D.D.C. 2005) (citations omitted); 42 U.S.C. § 4332(2)(C). "Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA." 40 C.F.R. § 1500.1. For these reasons, agencies are under an affirmative obligation to "insure the professional integrity, including scientific integrity, of the discussions and analyses in environmental impact statements[,] identify any methodologies used and . . . make explicit reference by footnote to the scientific and other sources relied upon for conclusions[.]" 40 C.F.R. § 1502.24.

A.    **BLM's EIS and Subsequent EAs Fail to Consider a Reasonable Range of Alternatives.**

NEPA requires federal agencies to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources."  42 U.S.C. § 4332(2)(E).  *See also City of Willcox v. Federal Power Commission*, 567 F.2d 394, 415 (D.C. Cir. 1977); *Southern Utah Wilderness Alliance v. Norton*, 237 F. Supp. 2d 48, 52-53 (D.D.C. 2002).  An EIS, therefore, must include a detailed statement of alternatives to a proposed action.   42 U.S.C. § 4332(2)(C)(iii).  In this case, BLM was required to "[u]se the NEPA process to identify and assess the reasonable alternatives to [the Project] that [would] avoid or minimize adverse effects of these actions upon the quality of the human environment."  40 C.F.R. § 1500.2(e).  The consideration of alternatives to a proposed action is described as "the heart of the EIS."  40 C.F.R. § 1502.14.

An agency need not consider an infinite number of alternatives, but must rigorously explore and objectively evaluate all reasonable alternatives.  40 C.F.R. § 1502.14(a) – (c).  "The agency must look at every reasonable alternative within the range dictated by the nature and scope of the proposal." *Friends of Southeast's Future v. Morrison*, 153 F.3d 1059, 1065 (9th Cir. 1998); *see also Northern Alaska Environmental Center v. Kempthorne*, 457 F.3d 969 (9th Cir. 2006).  The existence of reasonable but unexamined alternatives renders an EIS inadequate. *Friends of Southeast's Future*, 153 F.3d at 1065; *see also Environmental Protection Information Center v. USFS*, 234 Fed. Appx. 440, *1 (9th Cir. May 9, 2007) ("A cursory dismissal of a proposed alternative, unsupported by agency analysis, does not help an agency satisfy its NEPA duty to consider a reasonable range of alternatives"); *Muckleshoot Indian Tribe v. U.S. Forest Service*, 177 F.3d 800, 814 (9th Cir. 1999) (Failure to analyze a viable alternative that is

11

consistent with the objectives of a proposed action renders a NEPA document inadequate); *Morongo Band of Mission Indians v. Fed. Aviation Admin*., 161 F.3d 569, 575 (9th Cir. 1998). In the final analysis, an agency must explain its reasons for eliminating an alternative from additional study. 40 C.F.R. § 1502.14.

### 1.    BLM's Elimination of the Phased Development Alternative was Arbitrary and Capricious.

The Phased Development Alternative ("PDA") would have accommodated CBM development while protecting wildlife by allowing three, successive seven-year phases of development activity, each phase impacting only one-third of the ARPA and leaving two-thirds undamaged. SOF ¶ 177. BLM staff closest to the Project developed the PDA and explained it would focus and concentrate activities in certain areas within the ARPA while creating a safe haven for wildlife in undeveloped areas. SOF ¶ 92. BLM staff identified several biological benefits of the PDA, including promotion of big game and greater sage grouse movement throughout the entire ARPA. SOF ¶ 94. BLM staff also noted the PDA would better allow for recreational hunting opportunities by temporarily delaying development on two thirds of the ARPA at any one time. SOF ¶ 94.

BLM staff also recognized a direct relationship between the Project's Adaptive Management program (which ultimately became the heart of the Project mitigation plan) and the PDA. SOF ¶ 93. Specifically, phasing would have provided an opportunity to study reclamation efforts over one-third of the ARPA and to make adjustments to development methods prior to implementation of subsequent phases. SOF ¶ 94. This would have accommodated better monitoring of wildlife and analysis of the Project's effects. SOF ¶ 94.

While an agency need not analyze the environmental consequences of alternatives it has in good faith rejected as too remote, speculative, impractical or ineffective, *Utah Environmental*

12

*Congress v. Bosworth*, 439 F.3d 1184, 1195 (10th Cir. 2006), there is no credible evidence in the record showing the PDA was any of these things.  Contrary to Defendant-Intervenor Anadarko's assertion, SOF ¶¶ 106; 107, the PDA was not inconsistent with the stated "purpose and need" for the Project, which contains no timetable for development:  "The purpose of, and need for, this proposed natural gas development is to develop, produce, and market natural gas products." SOF ¶ 139.  *Cf. Citizens' Comm. to Save Our Canyons v. U.S. Forest Serv.*, 297 F.3d 1012, 1030 (10th Cir. 2002) (In deciding whether an agency has adequately considered reasonable alternatives, "courts look closely at the objectives identified in an EIS's purpose and need statement.").

As other courts have held on similar facts, BLM's refusal to analyze the PDA was unreasonable and violated NEPA.  *Northern Cheyenne Tribe v. Norton,* 503 F.3d 836 (9th Cir. 2007) ("… [BLM] violated NEPA when it drafted an [EIS] considering several alternatives for large scale exploration and development of CBM mining in the Powder River Basin, but did not consider an alternative that would have phased exploration and development on a more gradual basis.  … [T]he district court correctly ordered the agency to comply with NEPA by preparing a supplemental [EIS] that studied this 'phased development' alternative.") (C.J. Schroeder dissenting); *Northern Plains Resource Council v. United States Bureau of Land Management*, 2005 U.S. Dist. LEXIS 4678 (D. Mont. February 25, 2005).

In *Northern Plains*, the court observed:

> The Purpose and Need Statement requires BLM to analyze options for managing the environmental effects of CBM 'exploration, production, development, and reclamation … .' *Id.*  Nothing in the Statement restricts those options to full-field development.  Rather, the goal of the EIS is to determine what options, including mitigating measures, "will help minimize the environmental and societal impacts related to CMB activities." *Id.*  Phased development, such as controlling the number of rigs operating in an area or developing one geographic area at a time, as suggested by plaintiffs, the EPA and the Montana Department of Fish and

13

Wildlife and Parks (FWP) would not hinder this goal.  To the contrary, a phased development alternative would serve the stated purpose and need of the EIS by providing additional options for minimizing impacts related to CBM exploration, production, and development.

*Id.* at *20.[7]

The only reason the Spatial and Phased alternatives were eliminated from study is because the Operators did not appreciate the delay and restrictions accompanying them. SOF ¶¶ 106-108; 113-114.   Despite several benefits of the PDA identified by BLM staff, the administrative record reflects no independent analysis by BLM of the Operator's criticisms of the PDA.  SOF ¶¶ 106; 114. As this Court has explained:  "An agency is obligated to take the needs and goals of the project applicant in mind when considering alternatives, *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 196 (D.C. Cir. 1991), but that obligation does not limit the scope of the agency's analysis to what the applicant says it needs." *Southern Utah Wilderness Alliance v. Norton*, 237 F. Supp. 2d 48, 52-53 (D.D.C. 2002).  Moreover, the *Northern Plains* court rejected the very same justifications BLM has offered in this case for rejecting the PDA:

> … BLM's decision not to undertake a detailed study of a phased development alternative rested on two premises: its duty to prevent drainage of leased federal

---

[7] Granted, the purpose and need statement in *Northern Plains* specifically included protection of the environment as an objective.  However, the mere fact this objective was not included in the Project ROD does not relieve BLM of its obligations to manage for multiple use and sustained yield under FLPMA.  Nor may BLM (or, more specifically, the Operators' contractor, ¶¶ 78; 106; 139) articulate a purpose and need in terms so narrow that only one type of alternative will meet its requirements.  *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 196 (D.C. Cir. 1991) ("[A]n agency may not define the objectives of its action in terms so unreasonably narrow that only one alternative from among the environmentally benign ones in the agency's power would accomplish the goals of the agency's action, and the EIS would become a foreordained formality."); *City of Carmel-By-The-Sea v. United States Dept. of Transp*., 123 F.3d 1142, 1155 (9th Cir. 1997) ("The stated goal of a project necessarily dictates the range of 'reasonable' alternatives and an agency cannot define its objectives in unreasonably narrow terms."); *Northwest Ecosystem Alliance v. Rey*, 380 F. Supp. 2d 1175, 1187-88 (W.D. Wash 2005) ("A statement of purpose and need is evaluated under a 'reasonableness standard.'  Under this standard, an agency may not define the purpose in unreasonably narrow terms.")  (citation omitted).

> minerals and its concern that phased development would interfere with the rights of leaseholders. Both premises rest on the erroneous legal assumption that, having leased the mineral rights, BLM could not control the pace of production.
>
> …
>
> … Phased planning would allow development to proceed, *albeit* at a more controlled pace than full-scale development alternatives studied in the FEIS. Phased development would not incorrectly restrict the rights of leaseholders whose only investment-backed expectations at the time they purchased their leases were that they would be allowed to conduct exploratory drilling and small-scale development of CBM.

*Id.* at *25-26; *see* SOF ¶¶ 118-119 (articulating same grounds for rejecting the PDA). As in *Northern Plains Resources Council*, "BLM's failure to analyze a phased development alternative renders the EIS inadequate." *Id.* at *29.

Finally, BLM's dismissal of the Phased and Spatial alternatives left three virtually identical development plans to be explored in the EIS. All three of those provide for the drilling of approximately the same number of wells (2000). All have virtually the same overall impact on lands within the ARPA. SOF ¶ 180. The different plans analyzed in the EIS are so similar that they do not constitute alternatives at all. *Compare Friends of Yosemite Valley v. Kempthorne*, 520 F.3d 1024, 1038 (9th Cir. 2008). ("Applying the "rule of reason" standard, we find that the range of action alternatives is unreasonably narrow because the alternatives are virtually indistinguishable from each other."); *see also id.* ("the action alternatives were not varied enough to allow for a real, informed choice.").

BLM's failure to analyze the PDA in the final EIS was arbitrary and capricious given that the PDA was: 1) designed by BLM staff expressly to facilitate the Adaptive Management scheme BLM incorporated into the ROD; 2) consistent with any reasonable interpretation of the purpose and need for the Project; 3) rejected solely on the basis of allegations by the Operators, which

BLM never bothered to study or validate; and 4) left remaining alternatives so similar as to constitute the same fundamental proposal.

> ### 2.    The EAs Were Unreasonably Limited to the Operators' Proposal and a "No Action" Alternative.

The Court's scrutiny must be particularly exacting when an agency analyzes only an applicant's proposed action and a "no-action" alternative.    In *Environmental Protection Information Center v. U.S. Forest Service*, 234 Fed.Appx. 440 (9th Cir. 2007), the court explained, although NEPA sets no numerical limit on the number of alternatives that must be explored, consideration only of an applicant's proposal and a "no-action" alternative should be rejected where the agency fails to develop even one alternative of its own and defines the purpose and need of the proposed action so narrowly that "the proposed project [is] the only alternative that would serve those objectives."  *Id.*  at 443.  *Compare Curry v. U.S. Forest Service*, 988 F. Supp. 541, 553-54 (W.D. Pa. 1997) ("the failure of the Forest Service to consider more than two alternatives … was arbitrary and capricious.").

In this case, BLM considered in the Sun Dog and Catalina POD EAs only the Operators' proposals and a "no action" alternative, which, of course, could not meet the articulated "purpose and need" - CBM development.  SOF ¶¶ 227; 235.  BLM's failure even to attempt development of an agency-based alternative is wholly unreasonably in light of the controversy surrounding the impact of development on wildlife resources in the ARPA and the quality and quantity of science demonstrating the inadequacy of protective stipulations and conditions imposed by BLM under the POD Decisions.  (*See* Section III.A.2 *infra*).  Under the circumstances presented, NEPA required BLM to evaluate at least one alternative that included more protective measures or lower intensity development.

**B.      BLM's "Adaptive Management" Plan Fails to Identify Required Monitoring and Mitigation Measures and Unreasonably Forecloses Public Involvement.**

An EIS must contain "a reasonably complete discussion of possible mitigation measures" which must "be discussed in sufficient detail to ensure that environmental consequences have been fairly evaluated." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 352 (1990).[8] *See also id.* at 351 ("A reasonably complete discussion of mitigation measures is implicitly required by NEPA."); 40 C.F.R. § 1502.14(f); § 1502.16(h) (EIS must include a discussion of possible "[m]eans to mitigate adverse environmental impact."); *West Branch Valley Flood Protection Ass'n v. Stone*, 820 F. Supp. 1 (D.D.C. 1993) (mitigation must be discussed in sufficient detail to demonstrate the agency took a "hard look" at the impact of its proposed action).

The importance of the mitigation plan in an EIS cannot be overstated.   It is a determinative factor in evaluating the adequacy of an EIS. *Oregon Natural Resources Council v. Marsh*, 832 F.2d 1489, 1493-94 (9th Cir. 1987), overruled on other grounds by *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360 (1989).   To ensure mitigation is effective, the CEQ's NEPA regulations make clear that, in issuing any ROD for which an EIS is required: "A monitoring and enforcement program shall be adopted and summarized where applicable for any

---

[8]    The Council on Environmental Quality ("CEQ") has explained mitigation means:

(a) Avoiding the impact altogether by not taking a certain action or parts of an action.
(b) Minimizing impacts by limiting the degree or magnitude of the action and its implementation.
(c) Rectifying the impact by repairing, rehabilitating, or restoring the affected environment.
(d) Reducing or eliminating the impact over time by preservation and maintenance operations during the life of the action.
(e) Compensating for the impact by replacing or providing substitute resources or environments.

40 C.F.R. 1508.20.   Notably, mitigation does not include subsequent *planning* for future mitigation.

mitigation." 40 C.F.R. § 1505.2(c). *See also* 40 C.F.R. 1505.3 ("Agencies may provide for monitoring to assure that their decisions are carried out and should do so in important cases. Mitigation (§1505.2(c)) and other conditions established in the [EIS] or during its review and committed as part of the decision shall be implemented by the lead agency or other appropriate consenting agency.").

Indicative of the indecipherably vague language used to articulate its monitoring and mitigation plan, the ROD explains: "BLM will implement a performance-based, adaptive management process for the ARPA whereby incremental adjustments will be made to mitigation and management restrictions based upon how the environment responds to future development and performance requirements." SOF ¶ 160. The Adaptive Management plan is silent when it comes to substantive requirements that might be imposed if monitoring shows existing measures to be ineffective. SOF ¶¶ 158-167. Some set of unidentified protection measures may be included, eliminated, or modified "in any given year as allowable and deemed appropriate by BLM in consultation with other agencies, Operators, interested parties." SOF ¶ 151. All of this may occur without further NEPA analysis. SOF ¶ 143-144; 149; 154. BLM's Adaptive Management plan in this case is so amorphous and ill-defined as to violate NEPA's requirements concerning monitoring and mitigation plans. It is simply impossible to tell what monitoring and/or mitigation BLM has required (or might require) of the Operators in this case. Indeed, some of those requirements already have been rejected by the Operators. SOF ¶ 171 (explaining why annual planning requirements are infeasible).

TRCP was not the only entity concerned with the vagaries of BLM's concept of Adaptive Management. Shortly before the ROD was signed, WGFD objected to "squishy language" concerning monitoring and mitigation requirements and warned that all parties would "remain in

sort of a limbo about how the plan will work." SOF ¶¶ 163; 164. WGFD also expressed concern about the substantive value of mitigation measures it could discern, observing:

> Neither the Proposed Action nor the BLM Preferred Alternative has any proposed mitigation measures beyond the standard protections. This is inadequate as there will always be unavoidable impacts associated with natural gas development, and in this plan, significant impacts are acknowledged in the FEIS. Some specific mitigation measures are foreseeable and are listed, and these should be disclosed in the ROD as first measures to be considered. Additional measures may be needed, as noted, if monitoring indicates that impacts have become more severe.

SOF ¶ 166. WGFD also proposed a series of specific "desired conditions" including maintenance of grouse "habitat and distribution similar to pre-development." SOF ¶ 165; *see also* SOF ¶¶ 166-168. WGFD demanded more to mitigate wildlife impacts, noting the absence of protections for wildlife after drilling has been completed and production begun. SOF ¶ 129. The Wyoming Governor's office called for BLM to identify in the ROD "specific desired resource conditions" and "potential mitigation options in case the desired conditions are not achievable." SOF ¶ 172. Ultimately, however, BLM officials prevailed upon the Governor's Office, however, not to insist on specific impact thresholds and mitigation responses that were "too specific." SOF ¶ 173. In exchange, BLM explained that a mitigation plan would be adopted *after* the ROD was signed. SOF ¶¶ 146; 173.

TRCP does not object to Adaptive Management which, when properly implemented with appropriate stakeholder involvement, can be an effective management tool. However, in this case BLM misapplied Adaptive Management[9] to defer hard choices or evade them altogether by relegating them to some uncertain point in the future. Sparrowe Decl. ¶¶ 20-28. For example, there is no identified wildlife management threshold (e.g., allowable population decline) beyond

---

[9] In fact, the Administrative Record in this case contains no relevant literature discussing Adaptive Management. Sparrowe Decl. ¶ 3. BLM's decision to design an Adaptive Management program without considering such information is itself arbitrary and capricious.

which development will be modified, reduced or curtailed. The only meaningful restriction on development is a surface disturbance limit that functions without regard to wildlife impacts. SOF ¶ 160. As one scholar has noted:

> Adaptive management should not be thought of as a substitute for a proper ex ante environmental impact analysis. *Agencies should not, for example, use the guise of adaptive management to evade their NEPA obligations* by claiming that scientific uncertainty precludes environmental assessment prior to the agency's decision. … *Adaptive management must start from the premise that some plan is already in place*. The purpose of adaptive management is to evaluate the impact and effectiveness of an action, and then refine the action to minimize adverse environmental consequences in light of the new analytical information. Integration of adaptive management with the front-end requirements of NEPA, rather than replacing the EIS preserves both the opportunity for public participation in the decision-making process and the benefits to the agency of gathering information regarding likely consequences to the environment of a proposed action in advance of its final decision.

Julie Thrower, *Adaptive Management and NEPA: How a Nonequilibrium View of Ecosystems Mandates Flexible Regulations*, 33 Ecology L.Q. 871, 894 (2006) (emphasis supplied).

Through its misapplication of Adaptive Management, BLM (and the public) were unable to take a "hard look" at the environmental consequences of the Project when the ROD was adopted and will continue to be in the dark until it is too late. *See* 40 C.F.R. § 1500.1(b) ("NEPA procedures must insure that environmental information is available to public officials and citizens *before decisions are made* and before actions are taken.") (emphasis supplied). Development of the monitoring and mitigation program required as part of Adaptive Management did not even commence until *30 days after the ROD was signed*. SOF ¶¶ 146; 173. "In most cases monitoring must occur for several years to detect trends and establish that successful mitigation has occurred." SOF ¶ 159. In every case, the disturbance occurs first, with evaluation of its impact addressed after the fact. SOF ¶ 158. *Compare Foundation for North American Wild Sheep v. U.S.D.A.*, 681 F.2d 1172, 1181 (9th Cir. 1982) ("NEPA expresses a Congressional determination that procrastination on environmental concerns is no longer

acceptable . . . . [A]n agency decision to act now and deal with environmental consequences later

. . . is plainly inconsistent with the broad mandate of NEPA.").

The court in *Mountaineers v. U.S. Forest Serv.*, 445 F. Supp. 2d 1235, 1250 (W.D. Wash.

2006), when faced with a similar scenario, explained the nature of the problem presented:

> The report takes the Court--and the public--to a general level of analysis, and then
> stops, proposing further study. As plaintiffs point out, however, the Forest Service
> does not incorporate any mandates for actual, system-wide wildlife studies into
> the Mad River decision. Rather, the agency proposes to construct the Mad River
> Trail Project, as well as the Goose-Maverick ORV Tie-Trail project and then, at
> most, apply the "adaptive management strategies," put forward by the Gaines
> Report. … These strategies amount, when applied to the Mad River Trail Project,
> to a "build-first, study later" approach to resource management. This backward-
> looking decision making is not what NEPA contemplates.

*Cf. Natural Resources Defense Council v. Kempthorne*, 506 F.Supp.2d 322, 356 (E.D. Cal.

2007). ("Here, the adaptive management process has no quantified objectives or required

mitigation measures. Although the *process* must be implemented by holding meetings and

making recommendations, nothing requires that any *actions* ever be taken.")  (Emphasis in

original); *see also, Western Watersheds Project v. U.S. Forest Service*, 2006 WL 292010 (D.

Idaho Feb. 7, 2006).

BLM's use of Adaptive Management in this case is particularly unreasonable in light of

failed adaptive management programs in other energy fields in Wyoming.  For example, BLM

and various operators failed to live up to Adaptive Management obligations imposed in a

2000 Record of Decision approving development in the Pinedale Anticline.   Sparrowe Decl.

¶¶ 4; 29-55; SOF ¶ 176.  Moreover, in June 2005, the General Accounting Office ("GAO") found

the "dramatic increase in oil and gas development on federal lands over the past 6 years has

lessened BLM's ability to meet its environmental protection responsibilities."  SOF ¶ 175.  Of

particular relevance to this case, GAO concluded annual monitoring requirements were met

"only about half of the time."  *Id.*  Such issues are extremely relevant to selecting management strategies, Sparrowe Decl. ¶ 4, and BLM's failure to consider them was arbitrary and capricious.

Finally, the Adaptive Management process will exclude the voices of stakeholders like TRCP.  SOF ¶¶ 151; 154.  "[P]ublic scrutiny [is] essential to implementing NEPA." 40 C.F.R. 1500.1.  BLM is directed to "[e]ncourage and facilitate public involvement in decisions which affect the quality of the human environment."  40 C.F.R. 1500.2(d).  Nevertheless, future oil and gas development decisions will be made solely among the Defendants in this case.  SOF ¶ 144. Such a scheme is contrary to NEPA's most fundamental tenet of ensuring public understanding of agencies' management decisions.  BLM's Adaptive Management plan fails to disclose required information and shields the Project from adequate public scrutiny in contravention of NEPA.

### C.    BLM Failed to Analyze Cumulative Impacts on Wildlife Resulting from CBM and Wind Power Development in the ARPA.

An EIS must analyze "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions."  40 C.F.R. § 1508.7.  An impact is reasonably foreseeable if it "is sufficiently likely to occur that a person of ordinary prudence would take it into account."  *Dubois v. United States Dept. of Agriculture,* 102 F.3d 1273, 1286 (1st Cir. 1996) (citation omitted).  Concerns about cumulative impacts arising from the Project were expressed by multiple agencies (e.g., USEPA, WGFD), and the public, since the Project was first proposed.  SOF ¶¶ 48; 76-77; 133.

These "cumulative impacts" may "result from individually minor but collectively significant actions taking place over a period of time."  40 C.F.R. § 1508.7.  In *The Lands Council v. Powell*, 395 F.3d 1019, 1028 (9th Cir. 2005), the Court explained: "the general rule

under NEPA is that, in assessing cumulative effects, the [EIS] must give a sufficiently detailed catalogue of past, present, and future projects, and provide an adequate analysis about how these projects, and differences between the projects, are thought to have impacted the environment." The point of the cumulative impact analysis in an EA is to provide "sufficient [information] to alert interested members of the public to any arguable cumulative impacts involving [] other projects." *Coalition on Sensible Transportation v. Dole*, 826 F.2d 60, 71 (D.C. Cir. 1987).

The discussion of cumulative impacts offered by BLM with regard to the Project fails to identify one extraordinarily important cumulative impact. BLM recently completed its FINAL ENVIRONMENTAL IMPACT STATEMENT ON WIND ENERGY DEVELOPMENT ON BUREAU OF LAND MANAGEMENT–ADMINISTERED LANDS IN THE WESTERN UNITED STATES ("Wind Energy EIS"). SOF ¶ 219 and Exhibits K-M. BLM therein proposed to implement a "comprehensive program to address wind energy development on BLM-administered lands." BLM identified "wind power estimates" for various locations throughout the Rawlins Field Office area, including specifically the ARPA. That analysis indicated the ARPA's "wind resource level" was among the highest in the State of Wyoming. *Id.* The potential of wind energy development to adversely impact sage grouse was specifically identified in the Wind Energy EIS. *Id.* So too was wind energy's potential to disrupt migratory behavior of big game animals like mule deer, elk and pronghorn antelope. *Id.*

Notably, when commenting on the impact of wind energy development, Defendant-Intervenor Anadarko whole-heartedly agreed with TRCP that the cumulative impact of wind development should be evaluated in connection with other impacts on the ARPA. SOF ¶ 220 and Exhibit M. It stated:

> [Anadarko] does not believe that the probable interaction of wind energy projects
> and mineral development (e.g. oil and gas) is clearly described and analyzed. The

> document's discussion of potential impacts to mineral development is limited to statements that defer analysis of cumulative impacts until site specific information is available … . Furthermore, the possible negative impacts from a wind energy project may have on the ability to develop leasable minerals is all but dismissed … .

These comments followed Anadarko's earlier call for the Wind Energy EIS to address "Cumulative impacts (visual, wildlife, etc.) from wind farm projects and the potential impact on the ability to develop resources on adjacent lands." *Id.*

The EIS unlawfully fails to analyze the nature and extent of the combined impacts of reasonably foreseeable wind energy development and the Project on wildlife and habitats within the ARPA. *See Defenders of Wildlife v. Babbitt*, 130 F. Supp. 2d 121, 138 (D.D.C. 2001). *See also Natural Resources Defense Council v. Hodel*, 865 F.2d 288, 299 (D.C. Cir. 1988) *Earth Island Institute v. U.S. Forest Service*, 351 F.3d 1291, 1306-07 (9th Cir. 2003) (cumulative impact analysis violated NEPA when final EIS ignored foreseeable future impacts on remaining suitable spotted owl habitat in a nearby home range core area within close proximity to proposed project); *NRDC v. Hodel*, 865 F.2d 288 (D.C. Cir. 1988) (failure to analyze interregional cumulative impact of simultaneous development on species, particularly whales and salmon, that migrate through different planning areas).

### D. BLM Irreversibly and Irretrievably Committed Resources in the ARPA in a Manner that Precluded Appropriate Consideration of Alternatives in the Rawlins RMP.

CEQ regulation 40 C.F.R. § 1506.1 (Limitations on actions during NEPA process) in part provides: "(a) Until an agency issues a record of decision …, no action concerning the proposal shall be taken which would: … (2) Limit the choice of reasonable alternatives."[10] Once the

---

[10] TRCP recognizes that 40 C.F.R. § 1506.1(c) excludes from this prohibition actions "covered by an existing program statement" that are themselves "accompanied by an adequate environmental impact statement" and that "[w]ill not prejudice the ultimate decision on the

NEPA process has begun on a proposal, therefore, an agency may not take any action that would limit the choice of reasonable alternatives concerning that proposal before a final decision has been made regarding the proposal. 40 C.F.R. § 1506.1(a)(1)-(2) *compare* 40 C.F.R. § 1502.2(f) (Agencies also may not "commit resources prejudicing the selection of alternatives before making a final decision.").

When BLM issued the ROD, the Great Divide RMP governed management of federal lands within the ARPA. *See, generally*, 43 C.F.R. Part 1600; SOF ¶ 32. BLM staff repeatedly recognized that the RMP could not accommodate the Project, and that the Project could not proceed, without a new RMP and corresponding NEPA analysis. SOF ¶¶ 39-41; 57-58; 62; 67-71; 73-74; 79. BLM initiated a revision of the RMP six years ago. SOF ¶ 66. The Rawlins RMP will provide management direction for 3.5 million acres of BLM administered public land and 4.5 million acres of BLM administered federal mineral estate in various Wyoming Counties, including within the ARPA. SOF ¶ 39.

Simply put, 40 C.F.R. 1506.1 required BLM to finalize its EIS on the ongoing Rawlins RMP prior to irreversibly committing to CBM development lands within the ARPA, which would be subject to management under the Rawlins RMP. 42 U.S.C. § 4332(2)(C)(v). *See Scientists' Institute for Public Information v. AEC*, 481 F.2d 1079 (D.C. Cir. 1973). BLM staff was keenly aware of this regulation. SOF ¶¶ 62; 74. Thus, as of March 2002, BLM's plan was

---

program [*i.e.,* the Rawlins RMP]." *See also ONRC Action v. Bureau of Land Management*, 150 F.3d 1132 (9th Cir. 1998). However, this exclusion is inapplicable in the instant case because the Project is not covered by the Great Divide RMP as discussed at length herein. Even if the Court were to find the Project within the ambit of the Great Divide RMP, the exclusion applies only if the Project also "[i]s itself accompanied by an adequate environmental impact statement" and "[w]ill not prejudice the ultimate decision on the program [i.e., the Rawlins RMP]." As established throughout this memorandum, the EIS is utterly inadequate, and the ROD irrevocably and irretrievably commits the ARPA to CMB development. Thus, 40 C.F.R. § 1506.1(c) is inapplicable.

to coordinate the release of the Project EIS with the Rawlins RMP and its EIS.  SOF ¶ 67.  BLM specifically intended to "wait until [the] Rawlins RMP review/revision currently underway is complete" before authorizing the Project.  SOF ¶ 68.  BLM repeatedly acknowledged the limitation of 40 C.F.R. § 1506.1 in response to Operator efforts to increase the pace of the NEPA process, SOF ¶ 62, as well as on other occasions.  SOF ¶¶ 68-70; 79; 88.

BLM then inexplicably finalized the ROD before the Rawlins RMP and its supporting EIS were complete.  By doing so, BLM precluded any alternative uses for the ARPA that might otherwise have been considered as part of the Rawlins RMP NEPA process and irreversibly and irretrievably committed resources within ARPA to CBM development.[11]  NEPA prohibited BLM from predetermining the outcome of the ongoing NEPA process for the Rawlins RMP by hardwiring CBM development on the ARPA into the Rawlins RMP.  To the extent there is any doubt about the ROD's infringement on the Rawlins RMP NEPA process, one need only review the "purpose and need" of the draft EIS for the Rawlins RMP to see the overlapping issues prematurely resolved by the ROD.    SOF ¶ 40 (principle considerations include energy development, big game and sage grouse protection.)

**E.    BLM's Failure to Await Baseline Data on Mule Deer Prevented BLM from Taking the Requisite "Hard Look".**

To satisfy its "hard look" requirement, BLM must consider the environmental effects of its actions "'to the fullest extent possible.'"  *Young v. General Services Administration*, 99 F. Supp. 2d 59, 75 (D.D.C. 2000) *quoting City of Alexandria, Va. v. Slater*, 46 F. Supp. 2d 35, 43 (D.D.C. 1999), *reversed on other grounds by* 198 F.3d 862 (D.C. Cir. 1999).  To effectuate this hard look, it was critical that the agency collect and maintain baseline data prior to initiation of

---

[11] This assumes that such alternatives were not already precluded by authorization of the interim drilling program, which according to one BLM official did not "leave a whole lot of options" for alternative development methods.  SOF ¶ 72.

the Project. "Without establishing ... baseline conditions ... there is simply no way to determine what effect [an action] will have on the environment and, consequently, no way to comply with NEPA." *Half Moon Bay Fishermans' Mktg. Ass'n v. Carlucci*, 857 F.2d 505, 510 (9th Cir. 1988); *see also Council on Environmental Quality*, Considering Cumulative Effects under the National Environmental Policy Act, Ch. 4, p. 41 (copy available at http://www.nepa.gov/nepa/ccenepa/ccenepa.htm (visited April 21, 2008) ("The critical element … is defining an appropriate baseline or threshold condition of the resource, ecosystem, and human community beyond which adverse or beneficial change would cause significant degradation or enhancement of the resource, respectively."). *See also* Sparrowe Decl. ¶ 24.

BLM and various commenting groups identified a need to develop and maintain baseline data to assist in analyzing the Project's overall impacts. SOF ¶¶ 48; 50; 60; 61; 83; 84; 87. All parties recognized that such data needed to be collected before development under the Project was initiated. *See, e.g.,* SOF ¶ 61. The interim drilling program was authorized purportedly as a means to develop such data. SOF ¶ 61-63. Notwithstanding these plans, it does not appear any meaningful wildlife data were developed, either as part of the interim drilling program or otherwise, prior to approval of the Project. SOF ¶ 101. As a result, baseline data will be collected as the Project progresses and its impacts are felt. SOF ¶ 147.

BLM, WGFD, and the Operators did implement a cooperative study intended to "provide the necessary information to mitigate potential impacts and ensure development plans are environmentally sensitive to mule deer." SOF ¶ 186; *see also* SOF ¶¶120-121. The study would have two phases: Phase I would "identify seasonal ranges, document migration routes, and estimate survival rates prior to development of the proposed 2,000 natural gas wells." *Id.* As completed, the study identifies mule deer migration corridors based on 116,494 GPS locations

collected from 47 different mule deer. The study "provides the baseline data *necessary to accurately identify seasonal ranges and migration routes*, both of which will be *key components* for successful mule deer management and mitigation as energy resources are developed in the ARPA." SOF ¶ 186 (emphasis supplied).

The problem with the Mule Deer Study is that it was completed in April 2007 – *four months after the EIS was finished and one month after the ROD was signed*. The study concludes: "Sustaining migratory mule deer populations in the BHU will require that suitable seasonal ranges (i.e., winter, transition, summer) be maintained and migration routes remain functional." SOF ¶ 187. Yet, because BLM did not wait for that conclusion, BLM's EIS and ROD do not account for it or its management implications. The magnitude of the problem presented by BLM's refusal to await collection of baseline data, is best demonstrated by comparing a map of mule migration routes as depicted in the EIS (December 2006) with a map of mule deer migration routes as depicted in the Mule Deer Study (April 2007). The latter demonstrates the information used in the EIS to determine mule deer needs is flat wrong. *Compare* Exhibit F with Exhibit J.

Rather than waiting on the result of a study that: 1) BLM and the Operators initiated; and 2) was designed to provide "necessary" baseline data from which to develop mitigation measures, the agency ramrodded home the Project before the analysis could be completed. The findings in BLM's EIS are contrary to the biological considerations evaluated and the conservation recommendations made in the Mule Deer Study. SOF ¶ 187. By failing to wait for the required baseline data, BLM failed to take the "hard look" NEPA requires, and is now left to "collect resource data to form a baseline" concurrently with CBM development. SOF ¶¶ 147; 149; 150. *Contrast* Sparrowe Decl. ¶ 24 (explaining importance of pre-project data).

28

**F.   BLM Improperly Tiered the EAs from an Unlawful EIS that Does Not Analyze Issues Presented by Development of the Sun Dog and Catalina PODs.**

"Tiering refers to the coverage of general matters in broader [EISs] with subsequent narrower statements or environmental analyses (such as … site-specific statements) incorporating by reference the general discussions and concentrating solely on the issues specific to the statement subsequently prepared."  40 C.F.R. 1508.28.  Tiering, of course, assumes the underlying EIS from which the narrower analysis is directed is lawful.  For the foregoing reasons, BLM's EIS was unlawful.  Accordingly, BLM improperly tiered the EAs from that EIS. *Kern v. U.S. Bureau of Land Management*, 284 F.3d 1062, 1074 (9th Cir. 2002) ("The revised EA is therefore inadequate to the extent that it attempts to tier to the EIS.").

Assuming *arguendo* the EIS were valid, CEQ regulations encourage agencies to engage in tiering to "eliminate repetitive discussions *of the same issues*  … ." 40 C.F.R. 1502.20 (emphasis supplied).  As CEQ explains, "the subsequent statement or [EA] need only summarize *the issues discussed in the broader statement* … ."  *Id.*  (Emphasis supplied).  In other words, if certain issues have not been addressed in the earlier EIS, they must be addressed in the EA approving the subsequent, site-specific action.  Otherwise those issues would escape NEPA analysis altogether.

In this case, the POD Decisions explain the Operators may request exemptions and waivers from even the modest wildlife proscriptions imposed by BLM when approving POD development.  SOF ¶¶ 226; 234.  There is no consideration in the EIS of the individual or cumulative impact of granting such waivers and exemptions.  Because the EIS did not address those impacts, BLM's cursory EAs cannot be interpreted as having eliminated discussion of the "same issues" or summarizing "issues discussed in a broader statement" as contemplated by the NEPA tiering regulations.  Accordingly, BLM was required to analyze in the EAs both the

individual and cumulative impacts of granting waivers and exemptions on request from the Operators. Failure to do so violated NEPA's "hard look" requirement.

## III.   BLM VIOLATED FLPMA.

FLPMA directs BLM to manage the public lands "under principles of multiple use and sustained yield." 43 U.S.C. § 1732(a). Land use management decisions must further the purposes of FLPMA, which includes a mandate that:

> the public lands be managed in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values; that, where appropriate, will preserve and protect certain public lands in their natural condition; that will provide food and habitat for fish and wildlife and domestic animals; and that will provide for outdoor recreation and human occupancy and use.

43 U.S.C. § 1701(a)(8). Further underscoring BLM's duty to protect the ARPA's non-energy resources is FLPMA's requirement that "[i]n managing the public lands the Secretary shall, by regulation or otherwise, take any action necessary to prevent unnecessary or undue degradation of the lands." 43 U.S.C. § 1732(b).[12]

To assist in the management of public lands, FLPMA requires BLM to "develop, maintain, and, when appropriate, revise land use plans." 43 U.S.C. § 1712(a). These land use plans (*i.e.*, RMPs) generally dictate both the present and future use of the land within a particular planning area (*e.g.*, the Rawlins Field Office). 43 U.S.C. § 1701(a)(2). FLPMA, prohibits BLM from taking actions inconsistent with the provisions of its RMPs. *See Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 69 (2004); 43 U.S.C. § 1732(a) ("The Secretary shall manage the public lands ... in accordance with the land use plans developed by him … ."). "All future

---

[12] In addition, the regulatory provisions at 43 C.F.R. 3162.1(a) and 43 C.F.R. 3101.1-2 vest BLM with adequate authority to protect recreational and wildlife values - even for older leases like those within the ARPA. It is not clear from the Administrative Record whether BLM appreciated the extent to which it could control the Operators' development. SOF ¶ 59.

resource management authorizations and actions ... shall conform to the approved plan." 43 C.F.R. § 1610.5-3. "Conformity" in this context means "a resource management action shall be specifically provided for in the [RMP], or if not specifically mentioned, shall be clearly consistent with the terms, conditions, and decisions of the [RMP]." 43 C.F.R. § 1601.0-5(b).

In this case, BLM violated FLPMA by: 1) Ignoring its multiple use and sustained yield mandates by managing the public lands within the ARPA for the sole purpose of CBM extraction and to the exclusion of other uses identified in FLPMA, specifically wildlife, recreation and hunting; and 2) authorizing a project that fails in multiple respects to conform with the Great Divide RMP.

> **A.    BLM Failed to Comply with FLPMA's Multiple Use and Sustained Yield Mandates by Approving a Project that Will Eradicate Sage Grouse, Severely Displace Big Game and Effectively Eliminate Hunting and Recreation from the ARPA for Multiple Generations.**

> **1.    The Meaning of "Multiple Use" and "Sustained Yield."**

Multiple use "is a deceptively simple term that describes the enormously complicated task of striking a balance among the many competing uses to which land can be put ... ." *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 58 (2004) (citing 43 U.S.C. § 1702(c)). The concept may be explained as "resource allocation for the greatest good for the greatest number over the long run." G. C. Coggins and Robert L. Glicksman, *Public Natural Resources Law* § 30:1 (2nd ed. 2007). Multiple use requires the balancing of competing uses including, but not limited to, "recreation, range, timber, minerals, watershed, wildlife and fish, and [uses serving] natural scenic, scientific and historical values." *Id.*; 43 U.S.C. § 1702(c). While BLM possesses discretion in managing for multiple use, three "concrete guidelines" apply: 1) "Congress rejected

economic optimality as the governing criterion,"[13] 2) multiple use management cannot "permanently impair land productivity," and 3) BLM must ensure a mix of uses. Coggins and Glicksman, *supra*, § 30:3.

"Sustained yield" refers to BLM's duty "to control depleting uses over time, so as to ensure a high level of valuable uses in the future," *Mount Royal Joint Venture v. Kempthorne*, 477 F.3d 745, 757 (D.C. Cir. 2007) (citations omitted); 43 U.S.C. § 1702(h). "BLM apparently has long ignored sustained yield entirely." Coggins and Glicksman, *supra*, § 30:4.

As explained below, the Project will result in long-term displacement from the ARPA of wildlife and the hunting opportunities they afford. The best available scientific data indicates sage grouse will effectively be extirpated from the ARPA. Braun Decl. ¶ 21; *see also* SOF ¶¶ 24; 28-29; 204. Similar development in Wyoming's Pinedale Anticline has substantially reduced big game occupation in and around energy fields. SOF ¶ 11. BLM itself has acknowledged that hunting and related wildlife-based recreation will be severely impacted by the Project for multiple generations. SOF ¶¶ 207-208. Over one-quarter million acres in south central Wyoming will be "industrialized" by development of the Project. SOF ¶ 208. Such action constitutes neither multiple use nor sustained yield.

> **2.    The Project will Eliminate Sage Grouse and Substantially Reduce, if not Eliminate Big Game from the ARPA.**

The EIS explains the principal wildlife impacts of the Project will include: "(1) direct and indirect loss of wildlife habitats, (2) displacement of some wildlife species from increased human access and activity, (3) an increase in the potential for collisions between wildlife and motor vehicles, (4) an increase in stress to wildlife, and (5) disruption of life history

---

[13] Contrast BLM's reason for rejecting 160-acre well spacing. SOF ¶ 141 ("drilling on 160-acre spacing would not achieve maximum recovery of natural gas resources ... ."); SOF ¶ 128 (expressing BLM's goal to "optimize" CBM recovery).

requirements of a species or population segment." SOF ¶ 181. "Displacement is unavoidable in the short term under all action alternatives, and this displacement has the potential to have the most significant effect on wildlife." SOF ¶ 182. Moreover, one cannot assume displaced wildlife will simply relocate, thrive and support hunting and recreation opportunities elsewhere in Wyoming:

> Displacement [will] result in local reductions in wildlife populations if adjacent, undisturbed habitats are at carrying capacity. In this situation animals are either forced into less optimal habitats or they compete with other animals that already occupy unaffected habitats. Possible consequences of such displacement are lower survival, lower reproductive success, lower recruitment, and ultimately lower carrying capacity and reduced populations.

SOF ¶ 182.

### a.    Impacts on Sage Grouse in the ARPA

USFWS explained that "Project impacts to greater sage grouse and other sagebrush obligate species may be significant and *possibly irreversible*, especially in landscape where these species currently thrive. Proposed development may alter the future size, distribution and existence of local populations." SOF ¶ 196 (emphasis supplied); 40 C.F.R. § 1500.1 (noting "expert agency comments … are essential to implementing NEPA."). "Of greater concern is the indirect loss of habitat resulting in bird displacement and fragmentation of nesting and early brood-rearing habitat." SOF ¶ 198. USFWS recommended greater sage grouse protections for the Project and noted scientific research demonstrating "stipulations placed on oil and gas development in the Pinedale Anticline, *which are identical to those proposed for the Atlantic Rim* development, were insufficient to maintain sage grouse breeding populations in natural gas fields." SOF ¶ 105. In sum, the Nation's primary wildlife management agency (USFWS) concluded that protective buffers BLM intends to employ in the ARPA will not maintain sage grouse breeding populations. *Compare* Braun Decl. ¶ 21.

In so concluding, USFWS referred to stipulations developed in the 1980s, which are inconsistent with the state of available science. Braun Decl. ¶¶ 12-21. Indeed, BLM's ¼ mile lek buffer was not based on science at all. *Wyoming Audubon et al.,* 151 IBLA 42, 49 (Oct. 22, 1999) (explaining unknown origin of ¼ mile buffer). *Contrast*, 40 C.F.R. § 1502.24 (requiring BLM to "insure`'" the scientific integrity of its EIS). BLM was fully aware of the latest research on sage grouse. SOF ¶¶ 97; 132; 200. Nevertheless, BLM continues to adhere to ineffective stipulations in the face of mounting scientific evidence that they are totally ineffective at mitigating the impact of oil and gas development on sage grouse.[14] SOF ¶ 152. As noted by USFWS, and more recently the Western Association of Fish and Wildlife Agencies when such stipulations have been employed in other developed fields, they have resulted in up to a ***95% lek abandonment rate***. Braun Decl. ¶ 20; SOF ¶ 29.

Simply put, the available science indicates that sage grouse will be effectively eradicated from the ARPA as a result of the Project. Braun Decl. ¶ 21. Even BLM admits that greater sage grouse will experience:

> [L]oss of nesting or early brood-rearing habitat, decreased population productivity caused by loss of nesting or early brood-rearing habitat, reduced utilization of suitable habitats due to indirect disturbance, loss of winter habitat, increased predation due to increased roosting sites for raptors on power poles and other structures, and displacement of birds into lower quality habitats.

SOF ¶ 205. *See also* SOF ¶¶ 191 (predicting "lower productivity and long-term decline in the [grouse] population"); 196 (noting "long-term effects" on grouse); and 197 (projecting long-term

---

[14] BLM also relies on a seasonal timing stipulation, SOF ¶ 152, but acknowledges it "does not prevent the direct loss of wintering areas outside of this time period." SOF ¶ 191. Moreover, BLM acknowledges that less than one-half the nests in the ARPA actually will be afforded these protections. SOF ¶ 198. Similarly, though BLM required grouse inventories be taken, BLM rejected WGFD's call for annual inventories, instead requiring them only every fifth year. SOF ¶¶ 130-131; 150.

loss of nesting habitat).  Moreover:  "the long-term loss of shrubs combined with the indirect impacts on the habitat … would result in habitat loss and disturbance levels exceeding the significance criteria (criterion number 4)."  SOF ¶ 198.  This means that sage grouse will suffer a "*[s]ubstantial loss of habitat function or disruption of life history requirements … that would preclude improvement of their status*."  SOF ¶ 204  (emphasis supplied).[15]

The Project, therefore, is not consistent with Section 6840.06.D of the BLM Manual (Special Status Species Management), which provides: "BLM shall carry out management for the conservation of State listed plants and animals."  In this context, the term "conservation" means "the use of all methods and procedures which are necessary to improve the condition of special status species and their habitats to a point where their special status recognition is no longer warranted."  BLM Manual Section 6840.01.  The Manual further directs "[a]ctions authorized by BLM shall further the conservation of federally listed species and other special status species and *shall not contribute to the need to list any special status species under provisions of the ESA*, or designate additional sensitive species under provisions of this policy." Section 6840.12 (emphasis supplied).

BLM's unwillingness to impose stricter protections for sage grouse is particularly troubling in light of the court's conclusions in *Western Watersheds Project, supra*.  That court

---

[15] This all assumes the Operators will comply with the restrictions imposed and that BLM will enforce them in the face of clear evidence they have been violated.  The record, however, reflects that the Operators did not comply with even BLM's modest requirements during the interim drilling stage.  SOF ¶ 64.  In at least one instance, an Operator simply informed BLM it would not be able to meet the ¼ mile lek buffer restriction.  SOF ¶ 64.  There is no indication in the record that this violation was ever addressed by BLM.  To the contrary, additional information suggests that at least one Operator moved wells without any oversight by the Rawlins Field Office.  SOF ¶ 65.

explained the perilous condition of the sage grouse and the impact suffered by its habitats to

date:

> … the sage grouse's habitat is being subjected to accelerating threats from invasive weeds, fires, *energy development*, and livestock grazing. About one-half of the original area occupied by the sage grouse is no longer capable of supporting sage grouse on a year-round basis.

*Id.* at 1175 (emphasis supplied).   Further elaborating on the current state of grouse habitat

according to the experts, the court noted:  "Nowhere is sage grouse habitat described as stable.

By all accounts, it is deteriorating, and that deterioration is caused by factors that are on the

increase."  *Id.* at 1186.

The court specifically focused on the impact of oil and gas development on grouse habitat

as identified by an independent expert team:

> Additional long-term problems were expected to be caused by increased oil and gas development. Existing development "influenced 28% of the sagebrush habitats within the [Assessment] study area," and caused a "direct loss of habitat."  *Id*. at 7-40, 7-42. Increases in demand for oil and gas have led to increased demand for drilling permits. For example, in the Powder River Basin (extending through sage grouse range in Montana and Wyoming), while 15,811 wells have been approved, an additional 65,635 "are being considered . . . ." *Id*. at 7-42; Fig. 7-30. This was no isolated instance: "[T]he [BLM] anticipates receiving large numbers of applications for permits to drill." *Id*. at 13-7. The [conservation assessment] noted that because 96% of all drilling permit applications are approved, "the frequency and extent of oil and gas development on sagebrush ecosystems are likely to increase . . . ." *Id*.

*Id*. at 1179.  Quoting from an independent conservation assessment, the court noted:

> In summary, "the western landscape has been subjected to a new suite of intense, frequent, or continuous disturbances." *Id*. at p. 13-6. It is the "cumulative impacts of the disturbances, rather than any single source, [that] may be the most significant influence on the trajectory of sagebrush ecosystems." *Id*. at p. 13-8. And that

36

"trajectory," in the opinion of the experts who drafted the
Assessment, is headed in a negative direction … .

*Id.*

In summary, BLM's plan for sage grouse management sounds the death knell for this
species throughout the ARPA.  BLM ignored the best available science before it, as well as its
obligation to protect State and federally designated "sensitive species."  Indeed, as USFWS
concluded, BLM's ROD has pushed the sage grouse further toward inclusion on the federal
Endangered Species List.  BLM's actions were arbitrary and capricious.

### b.    Impacts on Big Game in the ARPA

Impacts on big game species may include:  "(1) the removal and modification of habitat,
(2) displacement due to increased human activities, (3) increased potential for vehicular
collisions due to increased traffic levels on existing highways and (4) increased potential harvest
success due to easier access."  SOF ¶ 185.  As previously noted, because BLM did not wait for
the results of the mule deer study before issuing the ROD, the Project "could alter or block mule
deer movements along existing migration routes."  SOF ¶ 188.

Although the Mule Deer Study recommended maintenance of "suitable seasonal ranges
(i.e., winter, transition, summer)" and migration routes, SOF ¶ 187, the only habitat protected is
crucial winter range, and the only measure designed to protect winter range is a seasonal
limitation on drilling.  SOF ¶ 153.  There is no limitation within crucial winter range on such
activities at other times, and there is no limitation at all during the operations phase.  Beyond
preempting the Mule Deer Study, BLM ignored key lessons learned from other energy
development activities in Sublette County, (Pinedale) Wyoming. SOF ¶¶ 11; 98; 188 (noting a
near 50% reduction in mule deer use of crucial winter range in the Pinedale field, and suggesting
indirect impacts may lead to "reduced mule deer numbers and die-offs").  The Project's "level of

development within big game crucial winter and transition ranges, compounded by the current condition of these ranges, would exceed the significance criteria (criterion number 3)." SOF ¶ 189. This means the Project will "result in ***substantial disruption or irreplaceable loss of vital and high value habitats*** … ." *Id*. (Emphasis supplied).

BLM similarly employs only seasonal restrictions on drilling in crucial elk winter ranges. SOF ¶ 153. However, there are no restrictions on operations or on drilling at any other time of year. SOF 190-191. This is true notwithstanding BLM's acknowledgement that "elk rarely adjust to continued human presence required during the production phase." SOF ¶ 190. The EIS concludes: "there would be an 'extreme' impact to elk based on the actual number of pads (eight pads per section) (WGFD 2004c). With this level of development, impacts to elk crucial winter range would exceed the significance criteria (criterion number 3)." SOF ¶ 191. Again, this spells a "***substantial disruption or irreplaceable loss*** of vital and high value habitats." *Id*. (Emphasis supplied).

> Likewise, with regard to pronghorn, the EIS explains:
>
> The acreage disturbance and the actual number of pads per section would fall under a high impact post-reclamation. The direct loss/reduced usability of Wyoming big sagebrush would increase use on remaining shrubs, resulting in continued shrub health decline outside the immediate project disturbances. This would have the greatest impact to antelope due to their extreme reliance upon sagebrush (96 percent of their diet) during winter. This level of development within pronghorn crucial winter range, compounded by the current condition of the crucial winter habitat, would exceed the significance criteria (criterion number 3).

SOF ¶ 194. Again, this means pronghorn antelope will suffer a "***substantial disruption or irreplaceable loss*** of vital and high value habitats." *Id*. (Emphasis supplied).

BLM asserts "[s]tandard mitigations prohibiting construction, drilling, and other activities potentially disruptive to pronghorn within crucial winter range … would reduce the probability of displacement during this critical time of the year." SOF ¶ 195. However during

the production phase, there is no equivalent mitigation. *Id.* Pronghorn will suffer increased stress and decreased reproductive rates as they travel farther and use lower-quality range. *Id.* BLM hypothesizes that some pronghorn may become accustomed to tolerating increased human activity, but offers only "perception" as the basis of that conclusion. *Id. Compare* SOF ¶ 188 (suggesting mule deer will acclimate to disturbance but recognizing recent studies "found no evidence of acclimation behavior.") Other wildlife managers, including WGFD specifically challenged that conclusion and found no basis on which to conclude pronghorn (or presumably other displaced wildlife) would ever acclimate to the new setting. SOF ¶ 127. *See also* SOF ¶ 193 ("herd sizes are significantly smaller in impacted areas.")

"The health and abundance of wildlife populations directly affect the quality of hunting in the ARPA." SOF ¶ 207. Thus, the significant decrease in wildlife populations projected for the Atlantic Rim area will translate to a direct loss of hunting and recreational opportunities. SOF ¶¶ 155; 207-208. "The principal recreation impact likely to be associated with the [Project] is the change in big game hunting opportunities because of habitat loss and wildlife displacement." SOF ¶¶ 207-208. The impact would be borne primarily by local and regional hunters, especially local hunters for whom the benefits of the ARPA would be diminished as a convenient and economical place to hunt. SOF ¶ 207. Significantly, the duration of the effects would be for the life of the project (30 – 50 years), which may affect more than one generation of recreation user. SOF ¶ 208. BLM concedes that conflicts between recreation and the Project as configured simply cannot be "mitigated away." SOF ¶ 89.

In sum, BLM's actions cannot be squared with FLPMA's multiple use or sustained yield mandates. BLM has authorized a singular use for the ARPA, which will displace for multiple generations (if not permanently) the current primary uses of those lands (wildlife, hunting and

recreation).  BLM has not struck a "balance" among CBM development and other uses of the ARPA as required by 43 U.S.C. § 1702(c).  *Norton*, 542 U.S. at 58.  Nor has BLM "ensure[d] a high level" of wildlife and recreational hunting in the future.  *Mount Royal*, 477 F.3d at 757; *see also* Coggins and Glicksman, *supra*, § 30:4 (under sustained yield principles, "management of renewable resources should be aimed at achieving a long-term equilibrium in which each of the resources will be a prominent part or contributor.").  Accordingly, BLM has violated FLPMA's substantive mandates.

### c.    BLM's Failure to Implement Stricter Protections in the POD Decisions.

When presented with specific opportunities to impose additional protections for sage grouse and mule deer, BLM failed to do so, instead falling back on the same toothless stipulations and conditions referenced in the EIS and ROD.  When approving development of the Catalina and Sun Dog PODs, BLM again refused to acknowledge the need for additional controls on surface use beyond the standard ¼ mile buffer identified in the ROD.  SOF ¶¶ 225; 233.  Over 50 wells were permitted to locate within 2 miles or less of one or more active sage grouse leks and some wells were located less than 0.5 miles from those leks.  SOF ¶ 236.  As established by the best available science, such development is likely to result in declines in lek persistence ranging from 72% to 96%.  Braun Decl. ¶ 20.  Such a reduction is the functional equivalent of extirpation from the affected area.  Braun Decl. ¶ 21.

Similarly, although the western half of the Catalina B POD and the western third of the Catalina A POD constitutes mule deer crucial winter range, BLM authorized the drilling of 13 wells in that area.  SOF ¶ 236.  BLM imposed only a timing limitation on drilling, but no restrictions on operations or related work (i.e., transportation, etc...) during the rest of the year.  SOF ¶¶ 225; 233.    BLM held true to its ineffective timing stipulation in the face of clear

evidence that such stipulations do not work in comparable fields. SOF ¶ 11. As a result of its failure to impose additional restrictions on development to protect sage grouse mule deer in the Sun Dog and Catalina PODs, BLM has doomed grouse in that area and will likely displace mule deer for the duration of the Operators' production phase. BLM's POD Decisions are contrary to the best available science concerning species needs and CBM impacts on wildlife and are, therefore, arbitrary and capricious.

**B.    The Project is Not Consistent with the Great Divide RMP.**

**1.    Development Under The ROD So Exceeds the RFD Scenario as to Render the Project Inconsistent with the RMP.**

The Great Divide RMP projected 1,440 wells being drilled between approximately 1987 and 2007. SOF ¶ 38. However, the Project alone exceeds that number by over 25%. SOF ¶ 139. Moreover, there are a number of additional development projects within the Great Divide planning area. Since the RMP was issued BLM has approved, or is slated to approve, at least 6,000, and up to as many as 14,000, wells. SOF ¶ 38. All in all, the total new projects being planned in the Great Divide planning area could lead to the drilling of more than ten times the number of wells authorized under the Great Divide RMP. *Id*. Considered alone or in association with other developments, the Project greatly exceeds the RFD scenario included in the Great Divide RMP.

BLM staff repeatedly recognized the Project was not consistent with the RMP. SOF ¶¶ 55-58; 68. The Operators also knew the RMP would need to be updated to maintain consistency between the Project and the RMP. SOF ¶¶ 70; 73. Over and over again, BLM reminded the Operators and the public that it could not exceed the level of development identified in the Great Divide RMP. SOF ¶ 79 ("BLM *will not authorize* oil and gas

development actions … that exceed current RFD disturbance estimates prior to the [RMP] review and possible amendment.") (emphasis supplied).

Regardless of whether RFD scenarios represent a "hard" cap on development or mere planning guides, one thing is abundantly clear: Exceeding an RFD scenario by 25% with a single project (and by as much as 1000% when projects are viewed cumulatively), is so far beyond the RFD projection as to render BLM in violation of FLPMA's basic requirement that all project level actions remain consistent with the governing RMP.

**2.     The Project is Not Consistent with the Great Divide RMP's Wildlife or Recreation Management Objectives.**

In light of the impacts discussed in Section III.A.2, the Project cannot be squared with the Great Divide RMP's wildlife management objectives. Those objectives are:

(1)  To provide habitat quality (food, cover, space, and water) adequate to support a natural diversity of wildlife and fisheries, including big game, upland game, waterfowl, non-game species, game fish, sensitive, threatened, and endangered species, species of special management interest in Wyoming, as well as to assist in meeting goals of recovery plans;

(2)  To maintain or improve vegetation condition and/or avoid long-term disturbance in high priority standard habitat sites and fisheries areas; and

(3) To maintain or improve overall ecological quality, thus providing good wildlife habitat, within the constraints of multiple-use management in moderate and low priority standard habitat sites.

SOF ¶ 34; *see also* SOF ¶¶ 35-36. Far from "supporting," "maintaining" or "improving" habitat quality, all big game under the effects of the Project will suffer a "substantial disruption *or* irreplaceable loss of vital and high value habitats." SOF ¶ 189; 191; 194. Sage grouse will suffer a "[s]ubstantial loss of habitat function or disruption of life history requirements … that would preclude improvement of their status." SOF ¶ 204.

Nor is the Project consistent with the Great Divide RMP's recreation management objective: "To ensure the continued availability of outdoor recreational opportunities, to meet

legal requirements for the health and safety of visitors and to mitigate conflicts with other resource uses." SOF ¶ 37. Displacement of hunting and related recreation for multiple generations, SOF ¶¶ 207-208, is not consistent with this objective. Frankly, the Project is not even consistent with the Great Divide RMP's oil and gas management objective: "To provide for leasing, exploration and development of oil and gas *while protecting other resource values*." SOF ¶ 33 (emphasis supplied). Because the ROD is inconsistent with the Great Divide RMP's wildlife and recreation objectives, the ROD violates the consistency requirement of 43 U.S.C. § 1732(a); *Western Watersheds Project v. Bennett*, 392 F.Supp.2d 1217 (D. Idaho 2005).

### 3. BLM's Consistency Determination was Arbitrary and Capricious *Per Se* Since the Monitoring and Mitigation (*i.e.*, Adaptive Management) Plan was Not Defined at the Time the ROD was Adopted.

As discussed above, the Adaptive Management program in this case was the centerpiece of the Project's mitigation effort. However, the monitoring and mitigation aspects of the Adaptive Management scheme were not set forth in the ROD with requisite specificity to allow BLM to determine whether the Project was consistent with the Great Divide RMP in the first instance. Indeed, development of the monitoring and mitigation components did not even commence until after the ROD was adopted. SOF ¶ 146.

The court in *Western Watersheds Project v. U.S. Forest Service*, 2006 WL 292010 (D. Idaho Feb. 7, 2006) explained in an analogous case, arising under the National Forest Management Act, that the Forest Service could not possibly have ensured consistency between its planning document and its proposed action:

> Despite the importance placed on the adaptive management strategy to meet SNF Forest Plan standards and objectives, the strategy itself was not explained in the NSEIS. The keystone of the strategy is monitoring, yet the Forest Service stated in response to public comments on the NSEIS that a monitoring plan "will be developed and implemented through an iterative process if the Proposed Action is selected."

> … In the NSEIS, the Forest Service was relying heavily on the strategy to comply with Plan standards and objectives. Therefore, a full explanation of the strategy and its protocols is crucial to determining whether the NSEIS is consistent with the Plan, as required by NFMA. Without that explanation, the Court "cannot tell from the administrative record whether or not the Forest Service complied with the [Plan] standard[s]." *Native Ecosystems*, 418 F.3d at 963. As *Native Ecosystems* made clear, that lack of explanation constitutes a violation of NFMA and is arbitrary and capricious under the APA.

The same is true here. BLM's approval of the ROD was arbitrary and capricious *per se* because BLM's development of the monitoring and mitigation plan on which the ROD's approval was based had not even commenced at the time the ROD issued. SOF ¶¶ 146; 173. When the ROD was signed, BLM *could not have* ensured the Project was consistent with the Great Divide RMP as required by FLPMA.

## CONCLUSION AND RELIEF REQUESTED

For the reasons set forth herein, TRCP respectfully requests that the Court grant its Motion for Summary Judgment and enter an Order:

A)    Adjudging and declaring that BLM's EIS and the ROD were arbitrary and capricious and violate NEPA and FLPMA;

B)    Vacating and setting aside the ROD and EIS; and remanding the ROD and EIS to BLM for further consideration in light of its obligations under NEPA and FLPMA;

C)    Enjoining BLM from taking any further action in reliance on the ROD, including authorization of oil and gas operations; and enjoining BLM from taking further action in reliance on the EIS, including "tiering" of any future NEPA compliance document (e.g., environmental assessment, determination of NEPA adequacy, or supplemental EIS) from the EIS;

D)    Adjudging and declaring that BLM acted arbitrarily and capriciously when attempting to "tier" the POD Decisions from the unlawful EIS; and that the POD Decisions otherwise violate NEPA and FLPMA;

E)    Vacating and setting aside the POD Decisions; and remanding the POD Decisions to BLM for further consideration in light of its obligations under NEPA and FLPMA;

F)    Awarding Plaintiff TRCP its reasonable costs and attorneys' fees, including as applicable, under the Equal Access to Justice Act, 28 U.S.C. § 2412(d); and

G)    Ordering such other relief as the Court may deem necessary, just or proper.

Respectfully submitted this 6th day of May, 2008.

/s/ *Donald G. Blankenau*
D.C. Bar No. ND0003
Thomas R. Wilmoth
Nebraska Bar No. 22518
HUSCH BLACKWELL SANDERS LLP
206 South 13th Street, Suite 1400
Lincoln, NE  68508-2019
T: (402) 458-1500
F: (402) 458-1510
don.blankenau@huschblackwell.com
tom.wilmoth@huschblackwell.com

*Counsel for Theodore Roosevelt*
   *Conservation Partnership*

## CERTIFICATE OF SERVICE

I hereby certify that on May 6, 2008, I caused to be electronically filed the foregoing MOTION FOR SUMMARY JUDGMENT AND SUPPORTING MEMORANDUM OF POINTS AND AUTHORITIES with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

**Donald G. Blankenau**
don.blankenau@huschblackwell.com; sharon.marburger@huschblackwell.com

**John Scudder Burbridge**
jburb1@state.wy.us

**Lori Caramanian**
lori.caramanian@usdoj.gov; susan.middagh@usdoj.gov; efile_nrs.enrd@usdoj.gov;
lori.montano@usdoj.gov

**Jay A. Jerde**
jjerde@state.wy.us

**Steven Michael Kupka**
nancilee.holland@huschblackwell.com

**Robert Charles Mathes**
rmathes@bjorklindley.com; lvanderveer@bjorklindley.com

**Teresa Rachel Nelson**
tnelso@state.wy.us; cjohns1@state.wy.us

**Michael B. Wigmore**
michael.wigmore@bingham.com; s.franco@bingham.com

**Thomas R. Wilmoth**
tom.wilmoth@huschblackwell.com; sharon.marburger@huschblackwell.com


/s/ **_Donald G. Blankenau_**
D.C. Bar No. ND0003
Thomas R. Wilmoth
Nebraska Bar No. 22518
HUSCH BLACKWELL SANDERS LLP
206 South 13th Street, Suite 1400
Lincoln, NE  68508-2019
T: (402) 458-1500
F: (402) 458-1510
don.blankenau@huschblackwell.com
tom.wilmoth@huschblackwell.com

*Counsel for Theodore Roosevelt*
*Conservation Partnership*

46

# Plaintiff's Statement of Material Facts In Support of Motion for Summary Judgment

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| THEODORE ROOSEVELT<br>CONSERVATION PARTNERSHIP<br>555 Eleventh St. N.W., 6th Floor<br>Washington, DC 20004<br>(202) 654-4600,<br><br>                Plaintiff,<br><br>    v.<br><br>DIRK KEMPTHORNE, in his official<br>capacity as the Secretary of the United<br>States Department of the Interior<br>1849 C Street, N.W.<br>Washington, DC 20240<br>(202) 208-3100,<br><br>      and<br><br>UNITED STATES BUREAU OF LAND<br>MANAGEMENT<br>1849 C Street, Room 406-LS<br>Washington, DC 20240<br>(202) 452-5125,<br><br>    Defendants.<br>_____<br><br>ANADARKO PETROLEUM<br>CORPORATION, WARREN<br>RESOURCES, INC., DOUBLE EAGLE<br>PETROLEUM CO.,<br><br>      and<br><br>STATE OF WYOMING<br><br>    Defendant-Intervenors<br>_____ | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CASE NO. 1:07-cv-01486-RJL |

## PLAINTIFF'S STATEMENT OF MATERIAL FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Pursuant to FED. R. CIV. P. 56 and LCvR 56.1, Plaintiff Theodore Roosevelt Conservation Partnership ("TRCP") hereby submits the following statement of material facts in support of its motion for summary judgment, which has been filed concurrently herewith in the above referenced matter.  Each statement below is supported by reference to the Administrative Record lodged by the Federal Defendants or other supporting material.

References to the Administrative Record are noted as "AR" followed by the Bates Number where support for the referenced statement can be found within the Administrative Record.  In addition, TRCP requests the Court take judicial notice of official government publications referenced herein.  *See Canales Martinez v. Dow Chemical Co.* 219 F. Supp. 2d 719 (E.D. La. 2002); *Austracan (U.S.A.) Inc. v. Neptune Orient Lines, Ltd.*, 612 F. Supp. 578 (S.D. N.Y. 1985) (Government-published shipper's guide); *Nehus v. Alaska Marine Towing, Inc.*, 519 F. Supp. 328 (W.D. Wash. 1981) (United States Pilot publication); *Asg Industries, Inc. v. U.S.*, 467 F. Supp. 1187 (Cust. Ct. 1979) (United States Department of Commerce report).

**TABLE OF CONTENTS**

TABLE OF CONTENTS................................................................................................... ii

TABLE OF ACRONYMS................................................................................................ iii

PHOTOGRAPHS OF THE ATLANTIC RIM, WYOMING....................................... iv

PHOTOGRAPHS OF THE SPECIES OF CONCERN................................................... v

BACKGROUND ON THE ATLANTIC RIM, WYOMING .........................................1

    I.    MULE DEER AND OTHER BIG GAME..............................................1

    II.   GREATER SAGE GROUSE ...................................................................5

THE GREAT DIVIDE RESOURCE MANAGEMENT PLAN (1990) AND BLM
    EFFORTS TO UPDATE IT AS THE "RAWLINS RMP" .................................8

EVOLUTION OF THE PROJECT..............................................................................11

    I.    EARLY PROJECT CONFIGURATIONS..............................................11

    II.   INTERIM "EXPLORATORY" DRILLING..............................................16

    III.  DEVELOPMENT OF THE DRAFT EIS.................................................21

    IV.  THE DRAFT EIS AND THE INITIAL ALTERNATIVES .......................24

    V.   OPERATOR CONCERNS AND REVISION OF THE PROJECT
         ALTERNATIVES. ................................................................................28

    VI.  THE "PRELIMINARY FINAL" ENVIRONMENTAL IMPACT
         STATEMENT ......................................................................................34

THE FINAL ATLANTIC RIM PROJECT....................................................................38

    I.    SUMMARY OF THE PROJECT AS APPROVED .......................................38

    II.   ADAPTIVE MANAGEMENT .................................................................43

    III.  ALTERNATIVES .................................................................................48

    IV.  WILDLIFE AND RECREATION IMPACTS ...........................................49

         A.   Mule Deer and Other Big Game ...........................................................50

         B.   Sage Grouse.........................................................................................55

         C.   Overall Impact on Hunting and Other Recreational Endeavors ...............58

    V.   METHANE SEEPS .................................................................................59

    VI.  CUMULATIVE IMPACTS ANALYSIS..................................................61

PROCEDURAL HISTORY OF TRCP'S CHALLENGE .............................................62

THE POD DECISIONS AND TRCP'S ATTEMPT TO OBTAIN REVIEW .............62

**TABLE OF ACRONYMS**

APD – Application for Permit to Drill

ARPA – Atlantic Rim Project Area

BHU – Baggs Herd Unit

BLM – Bureau of Land Management

CBM or CBNG – Coalbed Methane Gas

CX – Categorical Exclusion

DEIS – Draft Environmental Impact Statement

EA – Environmental Assessment

EIS – Environmental Impact Statement

IDP – Interim Drilling Plan

IDTeam – Interdisciplinary Team

MOU – Memorandum of Understanding

NEPA – National Environmental Policy Act

NSO – No Surface Occupancy

POD – Plan of Development

RFD – Reasonable Foreseeable Development

RFO – Rawlins Field Office, BLM, Wyoming

RMG – Resource Management Group, BLM, Wyoming

RMP – Resource Management Plan

ROD – Record of Decision

USEPA – United States Environmental Protection Agency

USFS – United States Forest Service

USFWS – United States Fish and Wildlife Service

WGFD – Wyoming Game & Fish Department

## <u>PHOTOGRAPHS OF THE ATLANTIC RIM, WYOMING</u>

(August 2007)






Photos courtesy of Tom Wilmoth

## <u>PHOTOGRAPHS OF THE SPECIES OF CONCERN</u>

### Greater Sage Grouse
(Photo courtesy of Rob Bennet)



### Mule Deer
(Photo courtesy of Encyclopedia Britannica)



### Pronghorn Antelope
(Photo courtesy of Fredy Argir)



### Elk
(Photo courtesy of U.S. Forest Service)



v

## BACKGROUND ON THE ATLANTIC RIM, WYOMING

1.       The Atlantic Rim is located in south-central Wyoming.  AR 4797 (map).  The ARPA comprises approximately 270,080 surface acres, of which 173,672 acres are federal surface estate (64% of the ARPA).  BLM's RFO manages 179,438 acres of federal mineral estate (66%) within the ARPA.  AR 4796.

2.       Multiple big game species occur within the ARPA, including mule deer, pronghorn antelope and elk.  Big game populations are managed by WGFD within areas designated as herd units.  AR 2249.

3.       Greater sage grouse, a popular game bird, also occupy the ARPA, which provides a uniquely well-defined and contiguous block of sage brush and related habitats on which sage grouse rely.  Approximately, 85% of the ARPA is covered in sagebrush environments.  AR 8831.  The vast majority of lands in the ARPA are within 2 miles of an active sage grouse lek, *id*., and 92% of the area is sage grouse nesting habitat.  *Id.  See also* Exhibit I attached to TRCP's Motion for Summary Judgment and Supporting Memorandum of Points and Authority ("TRCP's MSJ").

## I.       MULE DEER AND OTHER BIG GAME

4.       Mule deer herds in the ARPA are among the largest in the Intermountain West and have been known to migrate up to 60 miles between seasonal ranges.  AR 7423.  The ARPA is located in the eastern portion of the BHU which includes three hunt areas.  AR 7424.  WGFD manages the BHU for a post-hunting season population of 18,700 deer.  *Id.*

5.       "Since the 1980's the BHU has supported one of Wyoming's largest deer herds and provided exceptional recreational opportunities to both resident and nonresident sportsmen."  AR 7445.  Mule deer hunting in the BHU provides more than 14,000 recreation days each year.  *Id.*  In addition to those members of the BHU, migratory mule deer from regions outside the

ARPA migrate through or occupy portions of the ARPA during spring, summer, and fall periods. *Id.* Most, if not all, of this herd's transition range is located within the ARPA. Mule Deer in the ARPA are hunted, with a 54% success rate, by 2,784 hunters (40% of which are non-residents) each year. These hunters are supported by at least 18 local outfitters. AR 2280.

6.      Mule deer in the Atlantic Rim area are migratory, traveling from a few miles to well over 100 miles between winter and summer ranges. Migration allows mule deer to select and use geographically separate habitats and their food and other resources seasonally for breeding, fawning, and wintering activities. All these are critical to survival and production to sustain populations. Garrott, R.A., G.C. White, R.M. Bartmann, L.H. Carpenter, and A.W. Alldredge. 1987. Movements of female mule deer in Northwest Colorado. Journal Wildlife Management: 51(3):640; Sawyer, H., F. Lindzey, and D. McWhirter. 2005. Mule deer and pronghorn migration in western Wyoming. Wildlife Society Bulletin: 33(4):1269-70. Migration corridors are behaviorally fixed in geographical location and are essential as clear avenues to seasonal habitats. *Id.; see also* AR 6477. In arid areas with extremes of seasonal weather, no single habitat can sustain all their needs, so each habitat including those that support migration itself is essential for mule deer survival.

7.      Mule deer rely heavily on historic movement patterns and corridors, and show very high site fidelity to fawning and wintering areas. Does often return to the same aspen patch to fawn. If alteration occurs to their habitats, they do not easily adapt to new sites, which can result in lowered survival rates. AR 6477 and Garrott, R.A., G.C. White, R.M. Bartmann, L.H. Carpenter, and A. W. Alldredge. 1987. Movements of female mule deer in Northwest Colorado. Journal Wildlife Management: 51(3):638-639.

8.     Mule deer require a diverse mixture of forbs, buds, stems and other vegetation on all seasonal ranges.  Mule deer does add nutrients and fat during summer, raise and fatten their young on summer range, and use transitional ranges as they migrate to winter ranges where they breed.  deVohs, Jr., J.D., M.R. Conover, and N Headrick. 2003.  Mule deer conservation: issues and management strategies.  Western Association of Fish and Wildlife Management Agencies and Berryman Institute Press, Utah State University, Logan, pp. 104-110.  Does gain weight on early spring transition ranges to allow them to fawn successfully and then fatten up with their fawns before returning to winter ranges in fall.  *Id.*

9.     Winter ranges are delineated as "crucial" and widely protected from human activity because of their importance to winter survival.  Winter ranges provide not only nutritional needs but also places mule deer can minimize energy losses to low temperatures and winds.  Mule deer cannot survive in harsh conditions unless they are able to move to nearby protected habitats. Disturbance on winter ranges must be controlled to avoid flight behavior leading to loss of limited body fat needed for survival.  AR 7421 and Garrott, R.A., G.C. White, R.M. Bartmann, L.H. Carpenter, and A.W. Alldredge.  1987.  Movements of female mule deer in Northwest Colorado.  Journal Wildlife Management: 51(3):634, 640-641.

10.     Equally important are transitional ranges that support spring and fall migration and staging of herds, which is vital to successful production and maintenance of deer populations.  Sawyer, H., F. Lindzey, and D. McWhirter.  2005.  Mule deer and pronghorn migration in western Wyoming. Wildlife Society Bulletin: 33(4):1269-70.  Mule deer does exist on winter range based on fat reserves built up on summer and fall transitional ranges, and feed on often limited quality winter browse.  Whether they survive to produce fawns depends on their prior condition coming onto winter range, and how well they have sustained their body weight at

the end of winter.  Does and young fawns are especially vulnerable to late winter or early spring snow that covers food plants and slows migration, preventing use of food resources off the depleted winter ranges.  Garrott, R.A., G.C. White, R.M. Bartmann, L.H. Carpenter, and A.W. Alldredge.  1987.  Movements of female mule deer in Northwest Colorado. Journal Wildlife Management: 51(3):640-642.

11.    Sustaining migratory mule deer herds requires maintaining sufficient amounts of functional seasonal ranges for winter, summer and transitional and migration habitats that link them.  AR 7421.  Experience at Pinedale, Wyoming suggests that disruption of these ranges will disrupt the ability of herds to be sustained.  AR 6477.

12.    Mule deer are not the only big game animals that occupy the ARPA.  Most of the ARPA is located within the western portion of the Sierra Madre Elk Herd Unit.  AR 2251–59.  Much of the ARPA is identified as winter range for elk, with crucial winter range identified along the eastern and southern borders.  *See* TRCP's MSJ Exhibit E.  The crucial winter range occurs at lower elevations where less snow accumulates, and on steep, south and west-facing slopes that commonly blow free of snow or melt off during winter months.  Several elk migration routes transverse the ARPA.  Elk in the ARPA are hunted, with a 54% success rate, by 3,532 hunters (11% of which are non-residents) each year.  These hunters are supported by at least 15 local outfitters.  AR 2280.

13.    The ARPA is located mostly within the 1,394-mile BHU for antelope.  The project area covers 480 miles or 34% of the BHU.  AR 2250.  Pronghorn in the ARPA are hunted, with a 99% success rate, by 2,784 hunters (21% of which are non-residents) each year.  These hunters are supported by at least 13 local outfitters.  AR 2280.

14.     Crucial winter range for all big game species is depicted on the map attached as Exhibit E to TRCP's MSJ.  In addition, there are several areas of overlapping big game crucial winter range located in the ARPA.  AR 2252.  The combinations of overlapping big game crucial winter ranges include the following:  elk/mule deer 3,038 acres and mule deer/antelope 22,637 acres.  Forty-percent is on private and state lands where there are no protections against disturbance of animals during critical time periods.  AR 2255.  Areas of overlapping crucial winter range are important because they provide crucial habitat for more than one species of big game.

## II.     GREATER SAGE GROUSE

15.     Wyoming is one of the last strongholds for greater sage grouse in the western United States.  Greater sage grouse are common throughout Wyoming because their habitat remains relatively intact compared to other states.  AR 2258.  There are 88 leks located in and within 2 miles of the ARPA.  Leks are often in grassy areas or in more open canopy sagebrush/grass habitat.  Greater sage grouse are dependent on sagebrush environments for their year-round survival.  *Id.*

16.     The BLM has listed the sage grouse as a "Sensitive Species."  AR 4405.

17.      "Greater sage-grouse are abundant within the ARPA, due to the high amount and diversity of suitable habitat, lack of habitat fragmentation, and the close proximity of upland and riparian habitats."  AR 2394.  Sage grouse in the ARPA are hunted by up to 509 hunters each year.  AR 2280.

18.     Oil and gas development adversely impacts grouse and their habitats.  *See* Walker, et al., GREATER SAGE-GROUSE POPULATION RESPONSE TO ENERGY DEVELOPMENT AND HABITAT LOSS ("Grouse Study").  *See also* AR 7357.  For example:

> [L]eks with extensive CBNG development (>40% developed within 3.2 km) showed substantially lower population trends than leks with minimal CBNG or no development, even after controlling for known impacts of West Nile virus. Leks in areas adjacent to CBNG fields (10-40% developed within 3.2 km) also showed higher population trends than leks further away, suggesting that sage-grouse may be avoiding developed areas and moving into adjacent undeveloped habitat.

*Id.*

19.    The Grouse Study states:

> [T]he number of males observed on leks in CBNG fields declined more rapidly than leks outside of CBNG. Of leks active in 1997 or later, only 38% of 26 leks in CBNG fields remained active by 2004-2005, compared to 84% of 250 leks outside CBNG fields. By 2005, leks in CBNG fields had 46% fewer males per active lek than leks outside of CBNG.

Grouse Study 1.  Persistence of leks was positively correlated to the proportion of sagebrush habitat within 6.4 km of the lek.  *Id.* 1-2.

20.    Sage grouse is listed as a "Status 2 Species of Special Concern" in Wyoming, which means "[p]opulations are declining" and experiencing "[o]n-going significant loss of habitat."  http://gf.state.wy.us/wildlife/nongame/SpeciesofSpecialConcern/index.asp.

21.    Much of the present distribution of sage-grouse is on publicly owned lands administered by the BLM.  AR 9989.

22.    Development of energy resources in sagebrush steppe habitats has negatively affected sage-grouse.  AR 6240–41; AR 9990.

23.    While earlier studies identified basic sage grouse needs, substantial additional information has been developed since 2000 regarding the needs of sage-grouse in southwest Wyoming relative to oil and gas development.  *See, e.g.,* AR 7063–171.

24.    The Western Association of Fish and Wildlife Agencies ("WAFWA") has concluded that because breeding, summer, and winter habitats are essential to sage grouse populations, developments within these areas should be avoided.  *See Western Association of*

*Fish and Wildlife Agencies Memorandum* ("WAFWA Memorandum"), (January 29, 2008) at 2. A copy of the WAFWA Memorandum is attached as Exhibit N to TRCP's MSJ.

25.     Studies of sage grouse movements and nesting started in the mid-1960s and demonstrated that most activities of males during the breeding season were within 2 miles of leks.  A large proportion of the females were also documented to nest within 2 miles of leks. Guidelines were published in the peer-reviewed literature in 1977 recommending that no sagebrush control be permitted within 2 miles of a lek.  AR 5736–37.

26.     This guideline has been promoted as a minimum for areas undergoing energy development.  *See, e.g.,* AR 6542–729.

27.     BLM has declined to increase the NSO area restriction around leks beyond ¼ mile and a 1/4 mile buffer is employed in the Atlantic Rim Oil and Gas Development Project (the "Project ROD").  *See, e.g.,* AR 4850.

28.     WAFWA have concluded that 1/4 mile NSO stipulations are insufficient to protect sage grouse from the impacts of oil and gas development.  *See* WAFWA Memorandum at p. 3.  The USFWS also rejects BLM's ¼ mile buffer as insufficient to protect sage grouse leks. AR 3256.

29.     Among other things, WAFWA noted that full field energy development "appears to have severe negative impacts on sage-grouse populations under current lease stipulations (Lyon and Anderson 2003, Holloran 2005 [AR 7063], Kaiser 2006, Holloran et al. 2007, Aldridge and Boyce 2007), Walker 2007, Doherty et al. 2008)."  *See* WAFWA Memorandum at p. 2.  WAFWA reviewed available literature from 2003–2008 and identified a 96% loss of 6k persistence associated with ¼ mile buffers.  Even at 2 miles, lek persistence is a mere 28%.  *See*

WAFWA Memorandum at p. 4-5. Lek persistence increases exponentially (to the approximate

norm of 85%) as NSO buffer size approaches 4 miles. *Id.*

30.     Recommendations offered to BLM to mitigate the Project's impacts included:

NSO within 5.5 km of all active sage-grouse leks. AR 9995. These recommendations were

offered by one of the foremost authorities on sage grouse behavior.

31.     In its January 26, 2006 letter, the USFWS stated that it "does not support a 0.25

mile protective buffer around sage-grouse leks as a mitigation measure, nor do [they] support a

2-mile [seasonal] buffer to protect nesting habitat." However, USFWS "strongly recommend[]

minimum protection measures as described by Connelly et al. (2000)." AR 3256. Those include

precluding surface disturbance within two miles of an active lek. Connelly et al., *Guidelines to*

*Manage Sage Grouse Population and Their Habitats,* Wildlife Society Bulletin 2000, 28(4):

967-985.

## THE GREAT DIVIDE RESOURCE MANAGEMENT PLAN (1990) AND BLM EFFORTS TO UPDATE IT AS THE "RAWLINS RMP"

32.     The Bureau's Great Divide Resource Management Plan ("Great Divide RMP")

generally directed management of the federal lands within the ARPA when the ROD was signed.

The Great Divide RMP was adopted in November 1990. The Great Divide RMP deemed all

public lands within its scope suitable for oil and gas leasing and development, subject to certain

stipulations. AR 679.

33.     The Great Divide RMP states its oil and gas "management objective" as: "To

provide for leasing exploration, and development of oil and gas while protecting other resource

values." AR 679.

34.     The Wildlife Management Objectives of the Great Divide RMP are as follows:

a)      To provide habitat quality (food, cover, space, and water) adequate to
support a natural diversity of wildlife and fisheries, including big game, upland

game, waterfowl, non-game species, game fish, sensitive, threatened, and endangered species, species of special management interest in Wyoming, as well as to assist in meeting goals of recovery plans.

b)    To maintain or improve vegetation condition and/or avoid long-term disturbance in high priority standard habitat sites and fisheries areas.

c)    To maintain or improve overall ecological quality, thus providing good wildlife habitat, within the constraints of multiple-use management in moderate and low priority standard habitat sites … .

AR 690.

35.    The Great Divide RMP states:  "Surface-disturbing activities will be restricted and intensively managed to maintain important resource values in the … Baggs Elk Crucial Winter Range, and in overlapping crucial winter ranges for the various big game species." AR 679.  The Great Divide RMP also provides:  "Crucial winter ranges for all big game species will be protected.  Surface disturbance will be mitigated to restore or replace habitat.  In addition, previously depleted habitat in crucial big game winter ranges will be reclaimed to the extent possible."  AR 694.

36.    The Great Divide RMP states the following objective with regard to Baggs Crucial Elk Winter Range:

**Management Objectives** The objectives for the Baggs Crucial Elk Winter Range are to maintain the integrity of crucial winter habitat for elk to allow development of oil and gas and coal and to seek the cooperation of owners of adjacent property in management of the habitat … .

**Management Actions** Surface-disturbing activities will be intensively managed to prevent loss of significant elk winter habitat.

AR 692.

37.    The Great Divide RMP's, recreation management objective is:  "To ensure the continued availability of outdoor recreational opportunities, to meet legal requirements for the health and safety of visitors and to mitigate conflicts with other resource uses."  AR 682.

38.    The Great Divide RMP projected 1,440 wells being drilled between about 1987 and 2007.  AR 4666.  Since that time, BLM's RFO has approved *at least* the following: the 2,000-well Atlantic Rim project, the 385-well Desolation Flats project, the 750-well Greater Wamsutter Area II project, the 3,000 well Continental Divide/Wamsutter II project, the 275 well Creston/Blue Gap project, and various other projects all identified in the EIS.  AR 2485.  In addition, BLM's RFO was evaluating another massive expansion of CBM development when it issued the ROD.  *See* PUBLIC SCOPING NOTICE CONTINENTAL DIVIDE – CRESTON NATURAL GAS DEVELOPMENT PROJECT ENVIRONMENTAL IMPACT STATEMENT (April 2006) describing the 8,950-well Continental Divide / Creston project.

39.    BLM explained the Great Divide RMP, now 18 years old, needed to be modified because of new data, changing resource conditions, changing uses of BLM lands, and increased mineral development activity.  AR 2282.  The Great Divide RMP is being revised as the "Rawlins RMP."  AR 2136.  The Rawlins RMP will provide future direction for managing 3.5 million acres of BLM administered public land and 4.5 million acres of BLM administered federal mineral estate in various Wyoming counties, including within the ARPA.  *Notice of Availability of the Rawlins Proposed Resource Management Plan and Final Environmental Impact Statement, Wyoming*, 73 Fed. Reg. 881 (Jan. 4, 2008).

40.    BLM developed an EIS for the Rawlins RMP.  The Purpose and Need Statement of the DEIS for the Rawlins RMP stated:

Issue 1:  Development of Energy Resources and Minerals-Related Issues.

Special attention is needed to address energy resource development (i.e., oil and gas, coal, solar, and wind energy) and related transportation network conflicts with other land and resource uses and values. Principal considerations include disruptive activities and human presence in big game (i.e., elk, deer, antelope, moose, and bighorn sheep) habitat, big game crucial habitat (crucial winter range and birthing areas), and other important wildlife species habitats (i.e., Greater sage-grouse, plovers, raptors, and fish) and the effects of disruptive activities on

recreation values, forage uses, air quality, sensitive vegetation types, and sensitive watersheds. Areas need to be identified where surface disturbing and other disruptive activities (e.g., mineral exploration and development activities, rights-of-way construction activities) are suitable or should be restricted or avoided.

AR 748.

41.    The Rawlins RMP DEIS explained: "BLM completed an evaluation of the Great Divide RMP on July 5, 2001. The BLM determined that the RMP was deficient in the following areas as a result of changing conditions and demands on the area's resources … Fluid mineral development levels are approaching Reasonable Foreseeable Development (RFD) scenarios established for analysis purposes in the existing RMP." AR 747.

42.    Notably, in the development of the Rawlins RMP, an alternative that would have limited oil and gas development to that analyzed in the Great Divide RMP was rejected:

> … [F]ollowing further analysis and discussion this alternative was considered to be unrealistic and unreasonable because reasonably foreseeable exploration levels established in 1986 in the Great Divide RMP have almost been achieved. The Rawlins Field Office RFO evaluation of the Great Divide RMP in 2001 identified the fluid mineral reasonable foreseeable development RFD at an analysis level that would be exceeded in the near future. This alternative would have effectively limited oil and gas exploration and development to that which has already been approved. In addition public comments received during scoping and issue identification indicated general acceptance of continued mineral development provided it is properly managed.

AR 756.

## EVOLUTION OF THE PROJECT

### I.    EARLY PROJECT CONFIGURATIONS

43.    The original Atlantic Rim project, to be developed by Stone & Wolf, was less than one tenth the size of the Project approved by BLM in 2007. It was "scoped" pursuant to NEPA in 2000-2001. AR 7451; 7461. The initial exploratory POD program consisted of drilling completing, and producing approximately 32 wells located in three PODs for evaluation. The three PODS would contain approximately 96 wells. AR 7452.

44.     At that time, "[p]otential impacts to wildlife habitats within the analysis area, including big game, sage grouse, and raptors" were all identified as key resource concerns. AR 7454.  The total project was approximately 8,000 acres in size.  *Id.*

45.     USEPA immediately expressed concerns that an EA would be inadequate to evaluate the impact of this original proposal and urged BLM to conduct extensive analyses of the cumulative impacts of the project along with related CBM development.  AR 7484.  USEPA suggested that development be limited to areas outside crucial winter range for elk until additional studies could be conducted.  AR 7485.

46.     The State of Wyoming also urged production of an EIS to evaluate the original project's impact.  AR 7486.

47.     BLM rejected these requests and commenced development of an EA for the Stone & Wolf project.  An internal October 2000 BLM memorandum authored by the Project Lead indicates BLM's preference to "to avoid cumulative impacts" and to "avoid [a] large document" when analyzing the revised proposal.  AR 7866.

48.     WGFD documented known wildlife in the area, AR 7494, and urged consideration of the impact of roads, powerlines and pipelines on the species of concern, including elk, mule deer and sage grouse.  AR 7495.  WGFD also reiterated EPA's concerns regarding the cumulative impact of oil and gas development on wildlife species:

> Since coalbed methane wells can be drilled and completed in few days and can quickly overrun the current environmental documentation, this will help serve to adequately address the potential impacts before they occur.  The cumulative analysis should include previous shrub treatment projects conducted by the BLM, as well as potential impacts to wildlife populations and important habitats from the proposed gas development.  If data gaps exist, baseline information should be collected to support the necessary analyses, and significant wildlife or habitat losses should be addressed through mitigation.  Since impacts from methane development are not well understood, it may be necessary to do additional wildlife monitoring or specific studies.

AR 7496.

49.    USFS echoed the call for an extensive cumulative effects analysis.  AR 7567.  It sought to have BLM review the proposed Atlantic Rim project in light of the impacts of the planned Continental Divide / Wamsutter II, South Baggs and Pinedale Anticline projects.  *Id.*

50.    Defendant-Intervenor Double Eagle supported the proposed project explaining "drilling of these pods should be approved if only to gain the scientific data needed to make further decisions."  AR 7584.

51.    The local public expressed concerns about the impact of the project on sage grouse, with one commenter stating:

> Sage Grouse--this area is also within the range of this species of grouse.  While relatively numerous in parts of Wyoming, its population is declining rapidly and it too, is under consideration for listing as a threatened species.  I have witnessed the devastating effect habitat destruction and manmade structures have had on this bird.  In the Northern regions of the Great Divide Basin I have watched as lek after lek has disappeared as the direct result of pipeline construction, compressor station construction and operation, road construction, and the construction of high voltage power lines.

AR 7588 (comment of David Lieb, B.S. Zoology/Chemistry, M.Ed. Science Education).

52.    The Wildlife Management Institute, for whom TRCP member Dr. Rollin Sparrowe worked at the time, provided extensive comments on the initial proposal, raising many of the concerns expressed in TRCP's Complaint.  AR 7617.

53.    During the preparation of the environmental assessment for its CBM exploration program, Stone & Wolf sold its operating rights to Petroleum Development Corporation ("PEDCO").  AR 7632.  PEDCO notified BLM in May 2001, that it wished to withdraw its application for the 96 well project.  In a letter dated May 24, 2001, PEDCO submitted its new proposal to BLM for CBM exploration and development.  By June 2001, the project had

ballooned to 3,880 wells and encompassed over 310,000 acres (nearly 200,000 of which were BLM lands). *Id*. The expanded PEDCO project is referred to herein as the "3880 Project."

54.     In response to the revised project, USEPA specifically questioned BLM's implied assessment that the 3880 Project was within the scope of the Great Divide RMP and called for additional information demonstrating compliance with the Great Divide RMP. AR 7681. There is no evidence in the Administrative Record that such demonstration was made.

55.     BLM determined the increase in CBM drilling and development activity could result in significant impacts and that an EIS would be necessary. AR 7632. In its initial scoping notice for that EIS, BLM stated:

> Relationship to Existing Plans and Documents. Resource Management Plan - The document that directs management of BLM-administered lands within the analysis area is the Great Divide Resource Management Plan (RMP, November 8, 1990). … Since the levels of oil and gas development under this proposal will likely exceed the levels of development analyzed in the RMP, it is anticipated that an RMP review will be conducted concurrently with the preparation of the Atlantic Rim CBM EIS.

AR 7635.

56.     In April 2001, BLM informed Congress as follows:

> Concurrently with the preparation of the Atlantic Rim Coalbed Methane EIS, it is likely a land use plan review will be conducted. The plan review will examine the need to increase the amount of oil and gas well development allowed from that shown under the Reasonable Foreseeable Development (RFD) scenario documented in the Great Divide Resource Area Resource Management Plan EIS.

AR 7923.

57.     In May 2001, some in BLM believed it would be impossible to finalize the RMP ROD before the 3880 Project ROD and planned to incorporate a RFD review directly into the 3880 Project ROD:

> We are fairly certain that well numbers and surface disturbance estimates for the project will exceed the RFD assumptions developed for analysis purposes in the [Great Divide] RMP EIS. As you both are aware we are also in the beginning

> stages of a field office wide plan review. It is our belief that the plan review will likely extend beyond the time required to complete the CBM EIS and we would therefore like to schedule time to meet to discuss the approach necessary to incorporate an oil and gas RFD review into the CBM EIS to assure that when the CBM EIS is complete we will be able to issue ROD for the project in timely manner.

AR 8951.

58.    In June 2001, BLM published a federal register notice announcing its intent to develop an EIS for the 3880 Project. It read, in part, as follows:

> Concurrently with the preparation of the project EIS, the planning requirements for amending the Great Divide Resource Management Plan (RMP) will also be conducted because the level of oil and gas development under this project proposal is likely to exceed the reasonably foreseeable development level analyzed in the EIS for the Great Divide RMP. Any needed changes in the reasonably foreseeable development scenario will be identified and the Great Divide RMP will be amended as necessary.

AR 9478.

59.    In scoping the 3880 Project EIS, and in holding public meetings, BLM made clear its view that it could not deny approval of the project proposed by PEDCO, AR 7649, and that its regulatory options were limited to controls on the rate and timing of development, well location and mitigation. AR 7651.

60.    As early as August 2001, BLM contractors identified a need for additional information and data concerning sage grouse winter habitat and big game migration corridors. AR 7975. BLM acknowledged in September 2001, that "[BLM] have no exact figures on the amount of sage grouse habitat available within the Atlantic Rim Project Area … ." AR 7986.

61.    The importance of developing baseline data was later emphasized by one BLM reviewer concerned with groundwater impacts:  "There is a need for a comprehensive groundwater-monitoring plan to collect baseline data and evaluate potential impacts in the future.

This will be difficult to achieve with concurrent development of the field, and therefore timing in [*sic*] critical." AR 9193.

## II.    **INTERIM "EXPLORATORY" DRILLING**

62.    BLM authorized the drilling of up to 200 wells during development of the 3880 Project EIS.  AR 7637.  Citing 40 C.F.R. § 1506.1, however, BLM acknowledged that its ability to authorize drilling pending completion of the NEPA process on the Atlantic Rim project was limited.  AR 7643; 7655; 7931.  An internal March 2002 email explains BLM's thinking about the relationship between the interim drilling and final approval of the 3880 Project:

> The Council on Environmental Quality (CEQ) regulations found at 40 CFR 1506.1, discusses limitations on actions allowed during the NEPA process.  The citation we generally refer to is found at 40 CFR 1506.1 and reads as follows:
>
> > (a)    *Until an agency issues a record of decision as provided in para. 1505.2 (except as provided in paragraph (c) of this section), no action concerning the proposal shall be taken that would:*
> >
> > > (1)    *Have an adverse environmental impact; or*
> > >
> > > (2)    *Limit the choice of reasonable alternatives.*
>
> The proponent asked BLM to begin the EIS process aware of the time it takes to complete a large project EIS, but they were also aware (as were we) that they were data poor and requested that some sort of exploration drilling program be allowed.  In the past, BLM in Rawlins has allowed interim activities while EIS's were being completed (i.e., Continental Divide and Desolation Flats) with the restrictions noted in the CEQ regulations.  The Buffalo Field Office has also allowed interim drilling activities outside of the Wyodak EIS area while the Powder River Basin Oil and Gas EIS was in progress.
>
> Enough information must be available to develop the proposed action and alternatives, and to analyze potential impacts and to allow the manager to make a reasoned decision.  All activities must conform with the CEQ regulations stated above and none of the activities will be allowed until NEPA is completed and a Finding of No Significant Impact is made.

AR 9095.

63.     BLM explained during scoping meetings that authorizing limited interim drilling during preparation of the EIS would allow BLM to collect vital information "necessary for completion of [the] EIS." AR 7656.  Interim drilling was authorized only outside of recognized sensitive areas.  AR 7657.  BLM's interim drilling policy prohibited drilling or disturbance in "critical winter habitat for sage grouse" and in "overlapping crucial winter ranges" of big game ungulates.  AR 7661; *see also* AR 7936.  Sensitive protected areas included crucial big game winter range, big game migration corridors, and a two-mile buffer around sage grouse leks. AR 7663; *see also* AR 7936.  BLM reiterated at the scoping meetings that review of the Great Divide RMP would occur concurrently with the EIS preparation.  AR 7664.

64.     Anadarko Petroleum Corporation ("Anadarko") apparently did not always comply with certain protective requirements during the interim drilling phase.  An email from an Anadarko representative to BLM explained:

> Before I address the EIS process, I wanted to let Frank Blomquist know that Anadarko has asked surveyors to reposition the AR Fee 2089 SE 29 well in the Red Rim Pod which we just did an EA on.  Because of Frank's request, we are going to try to move that well west a reasonable distance to separate the well from a designated sage grouse lek, and also try to stay within location allowances. Although we won't be able to meet Frank's requested 1/4-mile, we're going to see how far west we can move it.  We'll keep you posted, Frank.

AR 9238.

65.     In some cases, interim drilling activities were undertaken (e.g., PODs relocated) without any involvement from the RFO:  "The location of POD 9 was moved by the RMG / Anadarko without RFO involvement from an area we could have drilled to a site where crucial winter range is an issue."  AR 9283.

66.     On February 25, 2002, BLM announced its plans to update the Great Divide RMP (as the Rawlins RMP).  AR 8014.  BLM listed as the first issue to be addressed during the update: "Potential Conflicts Between Mineral Exploration and Development Activities and Other

17

Land and Resource Uses and Values." AR 8015. BLM requested public information on this topic explaining the purposes of this request were "to assure that the planning effort has sufficient information and data to consider the fullest possible range of public land and resource uses, management options and alternatives … ." *Id*.

 67. As of March 2002, BLM's plan was to coordinate release of the Project EIS with the revised RMP. BLM employees informed their NEPA contractor:

> After some discussion with John, the first thing we need to find out is what your predicted schedule for completing the Atlantic Rim EIS - so once you've completed the Prep Plan we can see where the document preparation would fall with regard to our current [resource management] plan review. The revised RMP is scheduled to be completed no later than October 1, 2004. If the Atlantic Rim EIS completion date falls near this date, although we may have some brief language regarding the GDRA RFD's, we will not require a planning effort in this document.
>
> Also, John mentioned because not everything will be drilled by 2004, we could likely approve some of the wells in Atlantic Rim under the existing document, should it be completed prior to the 10-04 date.
>
> So in other words, we may not even have to look at doing any planning exercise for the Atlantic Rim document - when the document will be completed will be key - so let me know the timeframe we are looking at - then we'll try to come up with the approach we need to take.

AR 9101.

 68. An internal BLM email from 2002, elaborated on the need to update the Great Divide RMP and BLM's plan to do so:

> Although, we originally thought we might have to include a planning exercise in the Atlantic Rim document, we have since changed our minds and will wait until Rawlins RMP review/revision currently underway is complete.
>
> The current RMP - RFD will only accommodate the exploratory drilling proposed under the Interim Drilling Plan (i.e., 200 wells in the Atlantic Rim project area), and a few other projects (one of them being Desolation Flats). Any large development after that (i.e., full field development in the Atlantic Rim area) would have to wait until the planning document is completed, currently slated for completion in late 2004.

> … [W]e will be identifying those areas with cbm potential, which will be different than our current [Great Divide] RMP, and we have to focus on what the magnitude of development might be. In the PRB [Powder River Basin] it appears to me, it is not that the impacts from cbm development are so different from 'conventional' gas development - but rather it is the magnitude of the development makes the impact discussions in the land use plans inadequate (i.e., do you think we would be having these concerns about cbm if total PRB development was limited to 100 wells?)

AR 9220.

69.    As development under the interim program approached its cap, BLM again acknowledged the limitation of 40 CFR 1506.1:

> We have completed the exploratory drilling phase of the project, so the rest of the 200 wells projected under the original exploratory drilling program just weren't necessary for exploration, they were able to figure things out with the ones they used. Any further wells would be development wells, which are constrained under the CEQ regulations as possibly prejudicing the decision(s) to be made under the EIS. The Field Office has been quite consistent with this message to the operators over the past couple of years in my experience.

> While originally it appeared we were completely constrained by the RMP revision (LTDisturbance), today we are recognizing that there is still some LTD acres available under the Great Divide RMP and that we can approve some limited development under the GD RMP pending the Rawlins RMP decision, thus making the EISs we've been working on the limiting factor instead of the RMP revision.

AR 9283.

70.    Double Eagle representatives knew that the RFD limitation contained in the Great Divide RMP presented a problem and informed BLM as much. AR 8137. In response, Double Eagle was informed by a BLM official in the RFO that the RMP update would be complete by December 2004, that it would be unappealable, and that it would "be whatever the Field Office decided it would be, period." *Id.* In light of BLM's instructions, the Double Eagle official explained he was comfortable with proceeding to analyze a project that included a number of wells that exceeded the RFD scenario contained in the Great Divide RMP. *Id.*

71.    Despite these concerns, the RMP EIS/ROD was still scheduled to be finalized ahead of the Project EIS/ROD. AR 9244. The Project EIS was supposed to be tiered from the updated Rawlins RMP. AR 8148. A June 2004, Briefing Paper explains that the Project will exceed the long-term disturbance level analyzed in the Great Divide RMP:

> The ARPA scoping Notice stated that since the levels of oil and gas development approved under the Great Divide RMP (GD RMP) (November 1990) would likely exceed the levels of long term disturbance (LTD) analyzed in the RMP. It was anticipated that an RMP review would be conducted concurrently with the preparation of the ARPA project, and that approval of the ARPA EIS would exceed the remaining GD RMP LTD level. An analysis performed for the Desolation Flats final EIS in the spring of 2004 estimates about 3,700 acres of long term disturbance as yet unallocated under the Great Divide RMP. This is a conservative estimate derived from BLM records for representative sample of long term disturbance for exploratory drilling for the Desolation Flats natural gas project, the most recent oil and gas play within the Field Office area. Any other method of estimating disturbance is expected to yield smaller per well figure and hence larger available acreage for development. There are about 3000 active wells in the Field Office at this time.

AR 8141.

72.    By January 2005, BLM acknowledged that interim drilling likely had already prejudiced the Project alternatives:

> As for Atlantic Rim- Pulling together an environ. doc. for this area/project has been difficult; there have been so many POD EAs (Blue Sky, Brown Cow, sun Dog etc. and authorized "interim drilling" that there is little left in the project area (geographically) for development/anlaysis. This doesn't leave a whole lot of options- The EIS does need to focus on the cumulative impacts.

AR 9266.

73.    In April 2005, Double Eagle expressed concern that its operation might be stalled since the RMP update and Project EIS had been delayed, remarking:

> As you requested, attached is a well list of the wells drilled or permitted in the Atlantic Rim EIS Area. As you can see, there are a total of 109 wells that have been drilled to date. In the summer 2005, Anadarko will drill 29 more bringing the total to 136 wells. The Interim Drilling Plan developed in 2001 allowed the drilling of 200 wells in the approved Pod Area while the EIS was being prepared.

All parties concerned, including BLM felt this EIS process would conclude sooner than has happened.

Double Eagle drilled 14 wells in the Cow Creek Pod. Double Eagle activity was idle and could not drill any wells in 2004 and it look like 2005 will be the same situation. With the delays that are possible with the RMP and EIS, our activity in 2006 could possibly now be greatly in question.

AR 9280.

74.    In response to Operator efforts to increase the pace of NEPA processing, BLM

staff reiterated the legal limitations it faced when approving interim drilling activities: "Any

activity allowed during preparation of an EIS must meet the provisions of 40 CFR 1506.1, which

basically states that no action can be taken that would have an adverse environmental impact or

limit the choice of reasonable alternatives during preparation of an EIS." AR 9288.

## III.    DEVELOPMENT OF THE DRAFT EIS

75.    During development of the DEIS for the 3880 Project, WGFD raised numerous

concerns about the impact of the project on mule deer, elk, and sage grouse. AR 7686.

76.    USFS reiterated its concerns about cumulative impacts. AR 7799.

77.    USFWS expressed grave concerns about the impact of the project on sage grouse:

Sage grouse are declining throughout their range, and concern for this species has led us to believe we will receive a petition for listing sage grouse pursuant to the Act in the near future. The cause of sage grouse decline is not known, and may be a combination of several factors which affect habitat and reproductive abilities. However, anecdotal information, from several sources in Wyoming, suggests that sage grouse populations are negatively affected by the activities associated with oil and gas development, even when mitigative measures are implemented.

. . .    . . .    . . .

Impacts to wildlife would be considered significant if this development would contribute to causes that warrant an unlisted species to be proposed for listing under the [Endangered Species] Act. We encourage the Bureau to take all necessary measures allowable to protect the sage grouse and Columbian sharp-tailed grouse in the project area to ensure this project does not exacerbate factors contributing to these species' declines and thus give support to a listing petition.

AR 7813.

78.     BLM narrowly identified the "purpose and need" of the project:  "The purpose of, and need for, the proposed natural gas development is to exercise the lease holders' rights within the Atlantic Rim project area to drill for, extract, remove, and market gas products."  AR 8020.

79.     The EIS Preparation Plan explained the relevance of the Great Divide RMP and its RFD scenarios:

> Conformance with Great Divide Resource Area RMP.  The Great Divide Resource Area RMP projected a planning period of 20 years, with data used for RMP analyses for oil and gas development compiled through 1985.  Monitoring and tracking of well development since the completion of the RMP will continue by the BLM.  BLM initiation of RMP land use plan review and possible amendment will occur, as provided for in existing BLM planning guidance, prior to reaching the RFD disturbance estimates made in the current RMP.  Since the levels of oil and gas development under this proposal will likely exceed the levels of development analyzed in the RMP, it is anticipated that an RMP review will be conducted concurrently with the preparation of the Atlantic Rim CBM EIS.  BLM will not authorize oil and gas development actions such as APDs and ROWs that exceed current RFD disturbance estimates prior to the plan review and possible amendment.

AR 8022.

80.     BLM established an IDTeam to assist in developing the DEIS.  As of July 2002, the IDTeam identified various concerns regarding impacts to wildlife, including:   1) the fragmentation of wildlife habitat; 2) noise impacts to wildlife; 3) displacement of big game from traditional winter range; and 4) long-term ecosystem health impacts.  AR 8056.

81.      BLM invited EPA's participation as a "cooperating agency" under CEQ's NEPA regulations.  AR 8063.  The State of Wyoming became a "cooperating agency" for purposes of the Project.  AR 8080.

82.     In May 2003, Anadarko and BLM signed an MOU whereby Anadarko agreed to take the lead in contracting with a consulting firm for EIS preparation.  AR 8096.  BLM was responsible for overseeing the contractor.  AR 8097.  BLM also was required to "ensure that the

Contractor considers existing data and environmental analyses available from AEPC, the BLM, and other sources … ."  AR 8098.

83.    BLM contacted USGS with a proposal to assist in the collection of baseline data related to water quality and quantity impacts.  AR 8127.  BLM explained the relevance of baseline data as follows:

> Data collected after field development is often questioned due to lack of good and comparable baseline data for water quality and stream gaging.  This often leads to data collection, modeling, and planning efforts designed to answer environmental questions that could be easily answered by well-designed data collection effort before, during, and after oil or gas field development.

AR 8127.

84.    In June 2004, BLM and the operators had planned to "incorporate information derived from the wildlife ground studies that were conducted" and to "use this data to guide the way."  AR 9244.  There is no indication in the record that such data was gathered or relied on.

85.    As of September 2004, BLM was not certain whether cumulative impacts from the IDP ever had been analyzed.  AR 8148.  The Project EIS planned to assess cumulative impacts, but would "absorb" the earlier EA's on individual PODs.  *Id*.  As of July 2005, BLM recognized it had never analyzed the cumulative impact of the IDP.  AR 8240.

86.    As of September 2004, BLM explained that it still lacked reliable data on the impact of noise on sage grouse.  AR 8149.

87.    In September 2004, the Industry representatives suggested conducting additional biological studies to help inform BLM decision-makers as to where protective stipulations would be required.  AR 8149.  The only such study reflected in the Administrative Record is the Mule Deer Study.

88.    In February 2005, BLM staff recognized that the 3880 Project proposal before it was unrealistic and uninformed by information learned during the IDP.  AR 8183.  BLM staff

also recognized that the "[n]ew RMP needs to be signed first" before the Project ROD could be finalized.  AR 8186.  Staff admonished that the "EIS/Decision should be proactive versus reactive in addressing impacts" and that such an approach would "save us time at the APD stage if impacts are addressed specifically and cumulatively and earlier than later."  *Id.*

89.    As of February 2005, the BLM Project Lead noted:  "… the only resource conflicts we will not be able to mitigate away is … recreation at Atlantic Rim."  AR 9274.

## IV.    THE DRAFT EIS AND THE INITIAL ALTERNATIVES

90.    In May 2005, BLM staff began developing two alternatives for inclusion in the DEIS.  AR 8196.  The first was described as the "Spatial Alternative" and protected crucial wildlife areas, such as "prime sage grouse habitat," with NSO stipulations.  AR 8198.  The second was an "Alternative Based on Timing of Development."[1]  BLM described this as follows:

> A temporal alternative that preserves less developed areas for a portion of the project life to allow wildlife and recreation use.  This will still allow for keeping leases and gathering additional information to see ideal spacing, while at the same time allow for the extraction of the resources, existing pods could continue.

AR 8198.  Ancillary benefits were identified as including allowing vegetation time to establish itself for reclamation purposes.  *Id.*

91.    The RFO asked the RMG a list of detailed questions concerning the economic feasibility of various development methods.  AR 8203.  The Administrative Record contains no evidence RFO ever asked RMG to evaluate the economic feasibility of a Phased Development Alternative.

92.    In July 2005, BLM staff internally elaborated on the "Temporal" Alternative, explaining it would "focus and concentrate activities in certain areas[,]" and would "create[] [a] safe haven for wildlife[.]"  AR 8241.

---

[1] Throughout the Administrative Record, this alternative is known variously as the "Temporal," "Sequential," and "Phased Development" alternative.

93.     BLM staff specifically recognized the relationship between "adaptive management" and a Phased Development alternative by explaining the latter:  "Ties into adaptive management … if we're not happy w/ phase 1, can go back and reevaluate for phase 2." AR 8242.  BLM made clear that the purpose of the Phased Development Alternative was "not to exclude drilling, but the [*sic*] reveal impacts in an area," *id*. and that the Project area would "still have production activity."  *Id.*

94.     The IDTeam identified the following benefits of the Phased Development Alternative:

Benefits of the Sequential Alternative for the Atlantic Rim EIS

1) Reduces disruption to big game and greater sage-grouse movement through out the entire EIS area.

   a) EIS area approximately 48 to 50 miles in length containing antelope, mule deer and elk crucial winter range, winter range, migration corridors, and transition range.

   b) Greater sage-grouse breeding, nesting, brood rearing and wintering habitat.  (large percentage of leks in the field office occur here)

   c) Minimizes disruptive noise and activity to animals to a third of the project area at a time.

2) Better allows for recreation hunting opportunities to two thirds of the area at any one time.

   a) Helps to minimize the industrialization feeling hunter may get in the area from field development and may improve the esthetic values of the area (assuming complete and successful reclamation).

   b) Reduces conflicts between recreational uses and field development.

   c) May allow for greater hunter success in the area.

3) Allows for an opportunity to study reclamation efforts over a third of the area and to make adjustments prior to moving into new areas.

   a) Require industry to meet identified reclamation standards prior to moving into another phase of the project.  (Part of **Reclamation Appendix**)

b) Weed control would be focused in one third of the project area rather than thought-out the entire EIS area.

c) Better transportation planning on one third of the project rather than thought-out the entire EIS area.

4) Allows for better monitoring.

a) Allows for monitoring of wildlife (especially big game & greater sagegrouse) and the effects of development have over one third of the EIS area. This in turn may allow for adjustment over the other two third of the EIS area if monitoring shows negative impacts.

b) Through monitoring of one third of the project area adjustments may be made over the other two thirds of the project area to improve ways of doing business, (adaptive management).

c) Allow for better vegetation, soil erosion and weed monitoring on a third of the project area, allowing for modifications if needed on the other two phases.

AR 8255-56.

95. In identifying impacts from road travel, BLM identified the following impacts on sage grouse: "Effects on sagegrouse: 10-20 trips, no impact; 20-40 trips, some impacts; 40 plus lose the sagegrouse." AR 8243.

96. BLM also recognized that during alternative development it was important to "Define corridors for migration of animals up and down [the] corridor." AR 8243.

97. The IDTeam understood the conclusions of Matthew Holloran, a leading grouse researcher, when preparing the draft EIS. "Look at latest photog in relation to lek data; any place w/in 3 miles is prime nesting area. New literature says +2 wells per section there is impact on the sage grouse. (Matt Halloran)." At that time, BLM explained, "Impacts to minerals - may be in a situation where can't recover the full public resource. Context is that this is the finest sage grouse habitat in the world." AR 8247.

98.    The IDTeam explained:  "Big game disturbance after more than 4 locations per section."  The IDTeam explained that this:  "Ties to Sublette study ... game gets pushed into other habitat."  The IDTeam desired "No wells in overlapping [crucial winter range]" and "4 or less wells in migration corridors and big game transition areas."  AR 8247.

99.    At an August 2005 IDTeam meeting, the participants recognized the importance of using the best available mule deer information.  AR 8267.  The IDTEam wanted to "use the Anadarko cooperative mule deer study data as it is developed" and identified the following goals:  "Protecting migration corridors - make as wide as possible - we have to know where they are, especially pinch points - protect habitat/allow development will quantify NSO?"  *Id.*

100.    In August 2005, the IDTeam identified the following mitigation measures, among others, for sensitive wildlife species:

- Avoiding or limiting disturbance to less than 20 acres per section in greater sage grouse habitats affecting nesting and brood rearing.  AR 8281.
- Avoiding severe winter grouse habitat.  *Id.*
- Limiting total disturbance to less than 20 acres per section in big game crucial winter range.  AR 8282.
- Avoiding or "severely limit[ing]" development to 15 acres per section in overlapping crucial winter range.  *Id.*
- Avoidance or imposition of NSO in big game migration corridors.  *Id.*

101.    BLM explained in a Q&A document as follows:

Q4.  What information has been gathered from the pilot phase of this project?

Q [*sic*] 4. Information sought for the interim exploration phase of the project includes gas content and productivity of the coal formations targeted, well density needed to develop natural gas resources feasibility of re-injection of produced water into underground formations, water quality and connectivity to surface water, which drilling techniques can be effectively used, and economic feasibility of the proposal.

AR 8374-75.  Apparently, no information was gathered during the IDP regarding the impact of drilling on wildlife.

102.    Immediately before its release, BLM staff determined that the version of the draft EIS produced by the Operators' NEPA contractor was inadequate.   BLM field staff explained:

Using information from interim drilling, BLM and cooperating agencies developed three alternatives and the No Action Alternative for analysis in the EIS. Contractor work on the NEPA document was completely revised by the BLM's Interdisciplinary Team's concerted effort, expending some 1200 workhours in a two-week period to complete the draft document.

AR 8419; *see also* AR 8474.

103.    When the DEIS was published, BLM explained:

BLM worked closely with cooperators - which includes the State of Wyoming, Carbon County Commissioners, Saratoga-Encampment-Rawlins Conservation District, and the Little Snake River Conservation District--to analyze the effects of the proposed action in the Atlantic Rim area, and then develop protection measures under Alternatives B [Phased Development] and C [Spatial Alternative] which would help safeguard resources from serious damage.

AR 8385.  BLM issued the DEIS in December 2005.  AR 1436.

## V.    OPERATOR CONCERNS AND REVISION OF THE PROJECT ALTERNATIVES.

104.    Congress enacted the Energy Policy Act of 2005 ("EPAct"), Pub. L. No. 109-58, 119 Stat. 594 (2005).   BLM later began explaining:   "This project is consistent with and supportive of the Energy Policy Act of 2005 and Departmental Policy in regards to oil and gas development."  AR 9539.

105.    In a January 26, 2006 comment to BLM, USFWS explained it "does not support a 0.25 mile protectve buffer around sage-grouse leks as a mitigation measure, nor do[es] [the agency] support a 2-mile buffer to protect nesting habitat."  AR 3256.  USFWS also explained that "stipulations placed on oil and gas development in the Pinedale Anticline, which are identical to those proposed for the Atlantic Rim development, were insufficient to maintain sage-grouse breeding populations in natural gas fields."  *Id.*

106.    Upon publication of the DEIS, Anadarko excoriated BLM for developing the Phased Alternative (B) and the Spatial Alternative (C), alleging they were based on an "unfounded bias against development of the CBNG resources."  AR 8388.  Citing the "purpose and need" for the project as "to drill for, remove and sell natural gas resources."  Anadarko asserted Alternatives B and C would not achieve that purpose.  AR 8389.  More specifically, Anadarko contended:

> Alternative B would phase the drilling of the wells contemplated by the proposal by dividing the project area into three sections thereby severely restricting Anadarko's ability to maximize the recovery of CBNG resources in direct opposition to policies set forth in the Energy Policy Act of 2005.

AR 8389.  The Administrative Record does not reflect any independent analysis by BLM of the economic viability of a Phased Development Alternative.

107.    Anadarko also criticized the Spatial Alternative explaining:

> Alternative C completely fails to meet the purpose and need because, Anadarko would be unable to develop the CBNG resources were all of the provisions set out in Alternative C applied by BLM, which as currently drafted appears to be BLM's intention.

*Id*.

108.    Anadarko broadly criticized BLM's use of data concerning wildlife impacts, stating:

> Those sections are characterized by analyses of impacts that are often general in nature; do not sufficiently integrate the effectiveness of engineering designs and operating practices and procedures; do not fully integrate existing information on environmental conditions into the analysis and are severely lacking in qualitative analyses despite the ready availability of such tools (e.g. soil loss models) or are based on dated information.

AR 8390.

109.    BLM's Washington officials promptly met with Anadarko to assuage Anadarko's concerns.  AR 8391.  However, there is no record of that meeting.

110.    In a briefing paper for the Director of BLM, the field staff defended the

alternatives they generated against Anadarko's criticisms:

> We developed alternatives for the Draft Atlantic Rim Environmental Impact
> Statement (EIS) after weighing issues and concerns identified in the scoping
> process.  The BLM project team developed range of alternatives that met the need
> to produce domestic energy resources while considering various levels of resource
> protection and mitigation.  We coordinated the alternatives with stakeholder
> groups, the State of Wyoming, and BLM staffs, including the Washington Office.
> The project area abounds in sensitive resources such as big game crucial winter
> range, sage grouse habitat, and difficult reclamation issues.  BLM is seeking a
> NEPA analysis that will help us arrive at the best decision to allow
> environmentally responsible natural gas development.

AR 8394.

111.    With respect to the Phased Development Alternative, BLM field staff explained:

> Phased development was included based on Washington Office advice, a result of
> the Montana case.  Alternative B seeks to reduce adverse impacts on wildlife by
> concentrating development activity in three distinct phases, working out from the
> center of the project area.  This alternative provides relief areas, where sensitive
> wildlife resources will encounter less disturbance and human presence.

AR 8395.

112.    With respect to the Spatial Alternative, BLM field staff explained:

> Alternative C was developed to seek ways to reduce significant adverse impacts
> to sensitive wildlife species and their habitat resulting from the intensity of the
> proposed development (8 wells pads/section) and multiple overlapping sensitive
> resources.

AR 8394.

113.    Warren also urged rejection of Alternatives B and C, arguing that 80-acre well

spacing was necessary, and that 160-acre well spacing was uneconomical.  AR 8397.  However,

nothing in Alternatives B or C required 160-acre spacing.  AR 8394.  BLM's field staff

explained to the Director:

> Alternatives B and C attempt to balance surface resource conflicts with impacts
> from oil and gas development.  These effects vary, depending on site-specific
> proposals received from industry.  Anadarko's concern about 160 acre spacing in

> Alternative C is their interpretation.  The alternative does not require or impose any spacing standard.  Alternative C was developed to mitigate potential development impacts to surface resources.

AR 8395.

114.   Shortly thereafter, BLM and the Operators entered into a revised MOU, which effectively eliminated Alternatives B and C, indicating that new alternatives to the Operators' proposed action would be developed by the NEPA contractor selected and approved by the Operators.  AR 8401-2.

115.   BLM began looking at other oil and gas fields for an example of how management should be conducted.  AR 8443.  At the heart of that effort was a plan to defer NEPA analysis to the APD stage.  The State of Wyoming encouraged this approach.  *Id*.  As Wyoming representatives explained:

> Performance-based planning is taking the place of subsequent analysis with worst-case scenarios outlining each level of development.  This would allow for one EIS.  Preplanning for multiple analyses is a desired condition which is reaching for that no matter what level development is at.

AR 8443.

116.   The NEPA contractor elaborated on the concept:  "Performance-based monitoring assumes setting performance standards in NEPA standards.  There is an association of different levels of impacts with NEPA standards."  AR 8444.

117.   The following exchange then ensued between BLM and WGFD:

> BLM (Clare Miller)  What if you can't achieve standard?  For example, what if the sage grouse are annihilated?  Then what?

> STATE (Vern S. - WY Game Fish)  With performance-based monitoring there is a level of impact that everyone agrees to and this is set by the ability to mitigate impact.  You wouldn't reach that level [annihilation] because the limit on impact would stop you before that happens, such as a set acreage or distribution of sage grouse for a population.

> …

31

> STATE (Vern S. - WY Game Fish)  We would need to establish an outside number of impacts and flexibility for level of development because we have a threshold limit to establish.  Development would go forth based on limitations of any given resource.

AR 8444.

118.    In a June 2006 memorandum to the Director of BLM, BLM field staff explained

that none of the Alternatives in the DEIS was "well received."  AR 8473.  Accordingly:

> BLM and cooperating agencies are formulating a preferred alternative for the Final EIS.  The goal of the preferred alternative is to optimize natural gas recovery while minimizing surface disturbance and other impacts.  The EIS discloses that in order to optimize natural gas recovery there will be significant impacts to some resources.

*Id.*

119.    As of June 2006, BLM's Project leader explained:

> Janet- fyi we are going to drop alternative "B" from the Atlantic Rim analysis and move it into "Alternatives Considered and Eliminated from Detailed Study" in the final.  Based on comments received it is legally questionable and places too much time setback for those who have leases/mineral rights into the no action zones.

AR 9336.

120.    BLM, WGFD and the Operators established an "Atlantic Rim Mule Deer Steering

Committee" in 2006.  AR 8509.  The MOU explained the purpose of the study as follows:

> Maintaining healthy mule deer populations and functional migration routes is a top priority for agencies and the public.  Increased levels of energy development have created concerns for wildlife and the habitats they occupy. … In response to proposed natural gas development in the Rawlins Field Office, Anadarko Petroleum Corporation, Warren Resources, Inc., the BLM, the WGFC, and WEST propose to implement a long-term study intended to determine if impacts are occurring, and if so, how best to mitigate them and ensure development plans are environmentally sensitive to mule deer.

AR 8510.

121.    The MOU explained that the study would have two phases:

> The first phase of the study is intended to identify seasonal ranges, determine migration   routes,   document   habitat   use   patterns,   and   estimate

32

> survival/reproductive rates prior to full-field CBNG development.  … The objectives of Phase I are to identify and clarify seasonal ranges, determine migration routes, describe habitat use patterns, and estimate survival/reproductive rates of mule deer prior to development of the Atlantic Rim Coal Bed Natural Gas Project (ARCBNGP).

AR 8510.  The MOU described Phase II as follows:

> Phase II proposes to monitor potential changes in mule deer habitat use patterns and population characteristics (i.e., e.g., survival, reproduction, density) during development of the ARCBNGP.  Habitat use in relation to development features (i.e., roads and well pads) and population performance will be measured through time to evaluate potential impacts to mule deer.  Assuming Phase II is implemented, the results of the study will be subject to peer review and published in a peer-reviewed scientific journal.

AR 8511.

122.     An internal August 2006 BLM meeting summary, further explains the elimination of the Phased Development Alternative (Alternative B):

> Based on comments received on Alternative B, long-term adverse impacts on some leaseholders, and BLMs obligation to grant reasonable access to private lands across federal lands, this alternative has been moved into the category of "Alternatives Considered but Eliminated from Detailed Study."

AR 8636.  The memorandum explains the preferred alternative has been modified from a combination of Phased and Spatial Development to "Alternative D."  AR 8636.

123.     The elimination of these alternatives resulted in the remaining alternatives being substantially similar.  All action alternatives analyzed in the FEIS assume the construction of up to 2,000 wells, AR 2341, and the disturbance level and mineral resource recovery is essentially the same for the Proposed Action and for Alternatives C and D.  AR 4800.  Their similarity is further demonstrated by a review of Chapter 4 of the FEIS, in which the BLM, among other things, sets forth its analysis of the environmental consequences of each alternative.  The FEIS continually refers to the similarity of impacts and outcomes across the alternatives and, even

when it does distinguish between alternatives, the distinguishing features are not subtle and of little substance worth.  AR 2320 - 481.

## VI.    THE "PRELIMINARY FINAL" ENVIRONMENTAL IMPACT STATEMENT

124.    Sometime in mid-2006, BLM began formulating a "Preliminary Final EIS" for review only by the cooperating entities (*i.e.*, without public input).

125.    In May 2006, WGFD expressed concern that the monitoring requirements in the Preliminary EIS were unclear.  They stated:  "We would propose that methodologies/protocols used in monitoring would be thought through before the EIS is finalized.  We would like to 'beef up' monitoring strategies."  AR 8444.

126.    In August 2006, internal reviewers expressed concern about the effectiveness of the surface disturbance cap being discussed:

> The phrase "*no more than 3.5% of the project area*" allows for heavy disturbance in one part of the project area to be averaged with little or no disturbance in other areas.  This is probably not your intent?  I assume that the goal is no more than 3.5% disturbance on any given leasehold or unit boundary.  If this is the case, you might consider adding some narrative to indicate the intent is not just to average heavy disturbance with no disturbance, but the goal is 3.5% disturbance on the leaseholds themselves.

AR 9617.

127.    In August 2006, WGFD submitted comments to BLM on the "Preliminary FEIS" stating among other things:

> Seasonal stipulations do not mitigate lost habitat, i.e., crucial winter range; they only temporarily mitigate (reduce) animal disturbance during initial field development.

AR 9646.  WGFD also explained:

> We disagree that pronghorn will "likely habituate to activities along roads and continue using habitats in those areas."  Individual pronghorn have varying tolerances to human disturbance, but it is incorrect to make this blanket statement.

*Id.*  WGFD also explained:

> There is a fifth major impact to wildlife that is likely to be associated with this project: 5) Disruption of essential life (i.e., reproductive) processes. (Or "disruption of life history requirements" as mentioned on line 2447.) This would include abandonment of young (e.g., raptors, big game and other species of concern, nest abandonment by many avian species, as well as interference in reproductive and breeding behaviors, particularly for lekking species like sage-grouse and sharp-tailed grouse). Animals are not necessarily displaced; their habitats may be intact, and these direct population losses are not necessarily a result of physiological stress, but reproduction is still lost. It is minimizing losses due to these types of impacts that many of the mitigation measures and BMPs are designed to address.

AR 9651.

128.   An October 2006 briefing paper to the BLM Director, explains that BLM's preferred alternative (D) has effectively shifted the timing of when protective measures would be implemented to the site-specific phase:

> The BLM preferred Alternative D minimizes surface disturbance while optimizing natural gas recovery (1.35 TCF). The BLM would work with the operators at a site-specific level to minimize surface disturbance by applying the appropriate lease stipulations, conditions of approval, best management practices, and any other measures deemed necessary to minimize surface disturbance and still allow for the recovery of natural gas.

AR 8682.

129.   In October 2006, WGFD provided comments voicing serious concerns remaining with the Preliminary FEIS. AR 9793. Among other things, WGFD questioned why more was not being done to mitigate wildlife impacts:

> We agree that seasonal stipulations "reduces the displacement and disturbance of big game during the most critical season", but what protections are they afforded after drilling has been completed and production begins? Additional mitigation, mentioned for mountain plover for example, is missing for all other species, including big game.
>
> For all big game species, sage grouse, and sharp-tail grouse, the preferred alternative level of development will either place the disturbance level at a high impact or exceed the significance category. This conclusion/disclosure implies that mitigation levels should be increased to compensate for this level of impact, but the document states "there are no additional measures proposed for the …

Alternative D [preferred alternative]" (Page 4-83, Line 3133).  Why is there additional protections provided to mountain plover, but not these species?

It is acknowledged that big game, sage grouse and sharp-tail grouse habitat will be "significantly" impacted.  What additional mitigation measures are specifically proposed?

The impact of over 74 mi$^2$ of lost mule deer habitat, 19 mi$^2$ of pronghorn habitat, and 11 mi$^2$ of elk habitat is significant impact.  Why is there little to no protection or mitigation?  (From Table 5-2)

*See also* AR 9757-73.

130.    WGFD also emphasized the importance of developing a protocol to address and detect population trends "before drilling begins."  AR 9793.  Specifically, with regard to grouse, WGFD explained that inventories needed to be conducted every year (rather than every 5 years as BLM proposed in the Preliminary FEIS).  AR 9794.

131.    WGFD staff explained:

In general, we are very disappointed to see so few alterations made to this document, after considerable consultation and recommendations from our biologists.  There appears to be no changes at all to the Appendices, and very few made to the general text of the document itself.  Of particular concern is the wildlife monitoring plan.  For example, we have repeatedly requested that sage grouse surveys be conducted annually, in accordance with our sampling protocol to allow trend analysis.  Also, our big game flights are not collecting trend data, as is referenced in the DFEIS.  Please respond to these comments as the wildlife monitoring plan is a critical component of the overall EIS, and as currently written, provides little in the way of assurances that the resources we are charged to protect, will be retained.

AR 9757.

132.    Regarding sage grouse, WGFD comments stated:

In light of Naugle's research, we suggest changing the first sentence of the paragraph to this: "While Braun's 1998 study inferred that sage grouse may repopulate an area following energy development, recent research by Naugle (2006) indicates sage grouse do not re-populate energy fields following the drilling phase.  Once the older birds die, the leks disappear because juvenile birds disperse to edge habitat until they are driven from there or die."

AR 9761-62.

133.    WGFD also expressed its concern that cumulative impacts were not being fully accounted for:

> The effects of proposed wells for Creston Blue Gap project (9,000+) and Hiawatha (4,000+) should be included in the cumulative impact since the price of natural gas is at profitable levels and the likelihood is high that additional wells will be drilled in the reasonably foreseeable future.

AR 9762-63; *see also* AR 9818.

134.    The Wyoming Department of Agriculture expressed concerns about the 7,600 acre disturbance limit, stating:

> We are concerned that about the generous limitation of 7,600 acres for disturbance and unsuccessful reclamation.  As noted in the same paragraph, the short-term disturbance goal is 6.5 acres/wellpad.  Dividing 7,600 by 6.5 shows that operators can develop 65 percent of their intended well pads before they reach the 7,600-acre limit.  This provides little incentive for operators to ensure successful reclamation and weed control, especially since the bulk of the well development will occur within six to eight years.

AR 9782.

135.    Elaborating, one Wyoming Department of Agriculture employee explained:

> On one hand, I am glad to see you impose a limit on development tied to successful reclamation.  On the other hand, I fear that the limit may be too generous.  As I note in my comments, given an average 6.5 acre short-term disturbance area for the development of each well pad, the 7,500-acre limit equals 65% of the development area.  Thus, the operators can develop 65% of the Atlantic Rim area, before successful reclamation of disturbed lands needs to occur.

AR 9747.  The Wyoming Department of Agriculture later argued, "Mitigation needs to be strengthened in the ROD."  AR 9816.

136.    Internal BLM reviewers also commented on the Preliminary FEIS.  One comment noted a need to be candid that many of the subsequent approvals needed for development would be granted under Categorical Exclusions authorized under the Energy Policy Act of 2005.  AR 9831; 9833.  Another comment explained:

> There may be opportunity to approve some ARPA drilling under Section 390 of the Energy Policy Act, which would not require NEPA documentation. While it is likely new areas of drilling and facilities construction would be approved after further NEPA analysis. However, infill drilling would, in most instances, would meet the criteria of Section 390 of the EPAct. The fact that some actions may be authorized under this act should be noted.

AR 9683.

137.    An internal BLM reviewer also observed "smaller operational footprints may or may not equal reduction in habitat fragmentation (that is if you have 28 wells in the pod with associated roads, the habitat is probably just as fragmented if the well pad has 1 or 2 acres)." AR 9831.

138.    BLM released the FEIS in December 2006. AR 2080.

## THE FINAL ATLANTIC RIM PROJECT

## I.    SUMMARY OF THE PROJECT AS APPROVED

139.    As finally approved, the Project involves drilling approximately 2,000 wells within the ARPA. Total new surface disturbance from the drilling program across the ARPA will be limited to 7,600 acres at any given time, subject to a rolling reclamation program allowing additional disturbance to occur as lands are reclaimed. A 6.5-acre per well site short-term disturbance goal also will apply. AR 4796. "The purpose of, and need for, this proposed natural gas development is to develop, produce, and market natural gas products." AR 2136.

140.    The estimated number of gas wells "is not a cap or limitation, but an approximation to help establish the surface disturbance limit." AR 4796. The 7,600-acre disturbance cap will be allocated to operators on a prorated basis. During the life of the Project (30–50 years), total disturbance from gas development activities in the ARPA is estimated to be 13,600 acres, when one accounts for disturbance from infrastructure supporting the proposed activities. AR 4796.

141.    The ROD approves 80-acre well spacing (8 well-sites per 640 acre section) because "drilling on 160-acre spacing would not achieve maximum recovery of natural gas resources, was likely not economically feasible, and was likely an inefficient recovery of the natural gas resource in the ARPA."  AR 4805.

142.    The ROD, however, "is not the final review or approval for actions associated with [Project] development."  AR 4798.  Additional site-specific reviews will be conducted. BLM assures the reader that "[t]he appropriate level of environmental review would be conducted" at that time.  *Id.*

143.    In January 2007, however, BLM reviewers explained that within the ROD "there should be mention of the option/potential for APD approvals via 39OCXs … .  I think we could still legally use them anyway (where applicable/appropriate), but it might save some further/later explanation to clearly reveal this up-front."  AR 9375.  Another commenter noted:  "Maybe there was a reason for not including it.  However, there needs to include be a statement in the ROD addressing that not all action would result in additional NEPA documentation prior to approval." AR 9375-76.

144.    The ROD contemplates an annual review process whereby the Operators, BLM and cooperating entities confer to review the Operators' site-specific development plans.  AR 4812-13.  To the extent a proposal must be modified, such modifications will be made based on site-specific conditions.  AR 4813.  The Review Team does not include the public.

145.    The ROD identifies the following amorphous "Performance Goals":

- "maintain functional migration routes through or around development areas"
- "provide an adequate amount of suitable undisturbed crucial winter range for big game animals"
- "provide well-dispersed sage-grouse breeding, nesting, brood rearing and winter habitat"

AR 4814.  However, the ROD does not commit BLM to achieving these goals.  Rather, the ROD explains "BLM will attempt to achieve" the performance goals.  *Id.*  Nor does the ROD explain what will be done if the Performance Goals are not met.

146.    The ROD explains the "monitoring, reporting and adaptive management processes made part of this decision are its key components."  AR 4815.  However, it also states development of the "monitoring and mitigation process ... will begin within 30 days of the effective date of the ROD."  *Id.*

147.    Baseline data are to be collected as part of the Project, rather than beforehand.  The ROD explains: "Early efforts are to be made to consolidate or collect resource data to form a baseline against which future monitoring efforts and data would be compared to indicate trends."  AR 4798.

148.    Appendix B outlines BLM's vision of the performance based approach.  It "lists the requirements that will be imposed as appropriate by the [BLM] on all oil and gas development actions approved on federal lands and minerals within the [ARPA]."  AR 4835.

149.    With regard to wildlife, Appendix B explains: "The Review Team … or BLM will identify the level of effort required for performance-based monitoring and develop wildlife monitoring and protection plan … for development in the ARPA."  AR 4847.

150.    With regard to inventory and monitoring requirements, Appendix B explains: "Inventory and monitoring for wildlife and plant species within the ARPA will be conducted at frequency dependent upon the level of development activity with increased frequency generally associated with increased levels of development."  AR 4848.  Contrary to WGFD's recommendation of annual monitoring, Appendix B requires sage grouse monitoring only once

every 5 years. AR 4848. Data on big game crucial winter range will be collected annually. AR 4849.

151.    Appendix B also includes "wildlife protection measures" that may be included, eliminated, or modified "in any given year as allowable and deemed appropriate by BLM in consultation with other agencies, Operators and interested parties [but not the public]." AR 4849.

152.    With regard to Greater sage grouse, these measures are as follows:

- Surface disturbance or occupancy will be prohibited within one-quarter mile of the perimeter of occupied leks;
- Human activity will be avoided between 600 p.m. and 900 a.m. from March to May 20 within one-quarter mile of the perimeter of occupied leks;
- Surface disturbance and other actions that create permanent and high-profile structures such as buildings storage tanks and overhead power lines will not be constructed within 0.25 to 1.0 mile of the perimeter of leks as determined on case-by-case basis;
- Surface disturbing and disruptive activities will not be allowed within two miles of an occupied greater sage-grouse lek or in nesting and early brood-rearing habitat associated with individual leks when identified and delineated from March to July 15; and
- Surface disturbing and disruptive activities will not be allowed between November 15 and March 14 in delineated winter concentration areas. In order to minimize noise disturbances to strutting or dancing grouse compressor stations and generators will be muffled with hospital-style mufflers.

AR 4850.

153.    With regard to Big Game species, the wildlife protection measures are:

- No construction activities or prolonged maintenance actions will be conducted within big game crucial winter range during the crucial winter periods of November 15-April 30.
- If ROW fencing is required it will be kept to minimum and the fences will meet BLM/WGFD approval for facilitating wildlife movement Wildlife-proof fencing will be used only to enclose areas that are potentially hazardous to wildlife species or reclaimed areas where it is determined that wildlife species are impeding successful vegetation establishment.
- Snow fences if used will be limited to segments of one-quarter mile or less In addition escape openings will be provided along roads in big game crucial winter ranges as designated by the BLM to facilitate exit of big game animals from snowplowed roads.

41

AR 4851.

154.    In answering concerns about the lack of public input in the monitoring and adaptive management process, BLM explained:  "As noted in the ROD the annual review and planning process will include cooperating agencies as well as the BLM.  …  Public input will be provided through the NEPA evaluation process for site specific proposals, unless Categorical Exclusions (pursuant to Section 390 of the Energy Policy Act of 2005) are used, if appropriate, for the approval of site-specific development activities."  AR 4872.

155.    The Project will have both direct and indirect impacts to recreation.  "Direct impacts to recreation resources occur because of the physical disturbance and removal of vegetation from the construction of facilities; the visual impacts of facilities and activities; and from the noise, traffic, and visual distraction of human activity."  AR 2418.

156.    BLM explains, "Applicant voluntarily committed measures (appendix K) and the BMPs (appendix H) would be implemented under all alternatives."  AR 2388.  Moreover:

> Standard mitigations prohibiting construction, drilling, and other activities potentially disruptive to pronghorn within crucial winter range from November 15 to April 30 would reduce the probability of displacement during this critical time of the year.  During the production phase, there is no equivalent mitigation and animals may be displaced up to 0.25 miles from the source (USDI-BLM 2004c). This would lead to increased stress/decreased condition or reproductive rates of the animals as they travel farther and may have to use lower-quality range.

AR 2392.

157.    TRCP submitted comments on the FEIS on January 4, 2007.  AR 10262.  TRCP highlighted, among other things, the following concerns with the FEIS:  1) that the Atlantic Rim Project would foreclose alternatives under consideration in the RMP update process; 2) that the Project was not in keeping with FLPMA's mandates; 3) that wildlife impacts had not been

properly documented and mitigation requirements were insufficient; and 4) that cumulative impacts had not been analyzed sufficiently.  *Id.*

## II.    <u>ADAPTIVE MANAGEMENT</u>

158.    The ROD summarizes the adaptive management process as follows:

- Disturbance Action
- monitoring for trend and effectiveness
- identification of areas requiring modification
- implementation of adapted techniques and/or mitigation
- repeat process

AR 4815.   Thus, in every case, the disturbance occurs first, with evaluation of its impact addressed after the fact.

159.    Moreover, BLM candidly acknowledges:  "In most cases monitoring must occur for several years to detect trends and establish that successful mitigation has occurred." AR 4815.   The ROD explains, "If additional mitigation measures do not produce the desired effects or conditions continued monitoring and data collection may be used to further identify or clarify the problem.  As result further adaptation of mitigation techniques would be tested and monitored for success."  AR 4815.

160.    Appendix B of the ROD further elaborates on the approach:

The BLM will implement a performance-based, adaptive management process for the ARPA whereby incremental adjustments will be made to mitigation and management restrictions based upon how the environment responds to future development and performance requirements. …

…        …        …

As information is gained about how area resources are reacting to reclamation activities and mitigations, the adaptive management process allows for changes in management without further NEPA analysis, unless development thresholds, such as the number of wells and disturbance limits, are reached. The process enables managers to rapidly adjust mitigation and management restrictions for unanticipated impacts or reclamation successes.

AR 4836-37.

161.    USEPA expressed concern with the vague allocation of mitigation responsibility: "It is important to designate what entity is in charge of which mitigation measure implementation and maintenance, and that there is a paper trail of monitoring, inspection, and maintenance activities."  AR 9812.

162.    Both USEPA and USFWS recognized that the new Preferred Alternative would have a greater adverse impact on the environment than the alternative identified as preferred in the Preliminary EIS.  AR 9815.  USEPA specifically asked that phased development be imposed in the BLM block acreage.  *Id.*

163.    BLM developed its adaptive management approach based on the advice of WGFD.  AR 8809.  However, WGFD objected to some of the "squishy language" contained in the FEIS concerning monitoring and mitigation requirements.  AR 8818.

164.    WGFD had earlier submitted comments on the FEIS.  AR 10322.  The comments provided "WGFD's idea of what needs to be included in the ROD[.]"  *Id.*  "[WGFD's comment] includes what would seem to be necessary, in addition to the FEIS, for the performance-based plan to function.  Without these items, we (and probably the operators) will remain in sort of a limbo about how the plan will work."  AR 10322.  WGFD explained:

> The plan is performance-based, which cannot be implemented properly or effectively without a description of:
>
> a.    Desired conditions that must be maintained during development,
>
> b.    Performance standards that help assure the desired conditions are being met,
>
> c.    Monitoring to indicate achievement of the performance standards, and
>
> d.    Potential mitigation options to deal with unavoidable impacts.

AR 10323.

165.    WGFD elaborated on each of the foregoing.  For example, it described "Desired Conditions" as "key landscape functions to be maintained during development and production." AR 10323.  As an example of one such desired condition, WGFD cited "Maintain landscape-scale sage or sharp-tailed grouse habitat and distribution similar to pre-development" levels.  *Id*. WGFD then explained "Performance Standards" are designed to "assure Desired Conditions are being met."  AR 10324.  As an example, it cited "Provide key sage-grouse and sharp-tailed grouse breeding, nesting, brood rearing, and winter habitat well dispersed over the project area." *Id*.  WGFD then explained "Monitoring" is designed to "demonstrate Performance Standards are achieved."  *Id*.  As an example, WGFD cited: "annual lek counts and lek searches … ."  *Id*.

166.    Finally WGFD explained its concerns with the mitigation component of the FEIS:

Mitigation - Neither the Proposed Action nor the BLM Preferred Alternative has any proposed mitigation measures beyond the standard protections.  This is inadequate as there will always be unavoidable impacts associated with natural gas development, and in this plan, significant impacts are acknowledged in the FEIS.  Some specific mitigation measures are foreseeable and are listed, and these should be disclosed in the ROD as first measures to be considered.  Additional measures may be needed, as noted, if monitoring indicates that impacts have become more severe.

AR 10325.

167.    As an example, WGFD cited:

Big Game Migration Routes--Plan for avoidance of heavy disturbance along narrow migration corridors if monitoring shows significant avoidance or declines in animal use; implement habitat enhancements for adjacent undisturbed sites to provide alternate routes.  For more severe impacts, may need to stage future development so that migrating animals always have a functional portion of the migration pathway remaining.

AR 10325.

168.    WGFD also noted:  "BLM needs to incorporate current data from the Baggs Mule Deer project into the ROD to protect or mitigate important habitats and migration corridors." AR 9810.

45

169.    In contrast, Double Eagle's comments on the FEIS sought to soften management prescriptions, arguing, for example, for the revision of prescriptive language to allow more flexibility in reclamation requirements.  AR 10044.  Yates also called for flexibility in the 7,600-acre disturbance cap employed by BLM, arguing BLM had provided no justification for its adoption.  AR 9929.  *See also* AR 9921 (Warren's comments) and 9864 (Anadarko's comments).

170.    Yates rejected the notion of mandatory wildlife surveys, except under conditions favorable to Yates:  "Yates resists the notion that they may be required to monitor and survey wildlife.  However, it becomes more palatable if survey results lead to less restrictions or requirements."  AR 9932.

171.    By May 2007, annual planning was being called the "key component" of the Preferred Alternative.  AR 8854.  However, Yates Petroleum's comments on the FEIS, rejected the annual planning contemplated in the adaptive management component of the Project.  AR 9929.  Yates explained:  "the dynamic process that is coalbed natural gas development may not allow for 'annual planning.'  Yates is willing to submit an 'annual plan,' but the BLM should allow Yates and other operators an opportunity to amend their 'annual plans' if necessary."  *Id*.  Yates later elaborated:

> On its face "annual planning" appears to be good idea and one would assume "annual planning" could be implemented by coalbed natural gas operators.  However, it is not that simple.  Coalbed natural gas development is dependent on the act of dewatering coal seams.  This is a very dynamic process that does not lend itself to "annual planning".  Operators must have the ability to freely move around within the Project Area on moments notice to take advantage of the dewatering process and optimize natural gas production.  "Annual planning" would prevent this flexibility.  Yates is willing to try "annual planning," but it should not be required.

AR 9930.

172.    In reviewing the FEIS, the Wyoming Governor's Office, while supporting

adaptive management in concept, noted that certain Wyoming agencies felt the concept was too

vaguely worded in the FEIS.  AR 1005.  The Governor's Office explained:

> To achieve the needed level of detail for a successful performance-based document, the following components should be included in the ROD:  Obtainable and quantifiable performance measures which outline specific desired resource conditions during development and after production, monitoring to make sure that the performance measures are being achieved and potential mitigation options in case the desired conditions are not achievable.

AR 10052.

173.    Ultimately the concerns of WGFD were solved by political compromise as

captured in a March 2007 letter from WGFD to BLM:

> We appreciate very much your collaboration in working with our issues in fashioning the Atlantic Rim ROD.  …  At our previous meetings, we avoided providing some of the specific language on impact thresholds and mitigation responses because you advised that language could possibly be too specific.

> With the acceptance of our current language, and considering Mr Allred's recent conversation with Governor Freudenthal, we feel it would be beneficial for all parties if a process for those specifics were at least outlined in the ROD.  Thus, we ask that the following paragraph be added to the ROD:

> "A Mitigation Plan will be required, and its development will begin immediately upon signing of the ROD.  This plan will be developed in concert with State Cooperators and will provide specific quantifiable impact thresholds associated with the Performance Goals.  The plan will identify the types of mitigation responses that will be considered in the event that annual monitoring indicates those thresholds are being surpassed."

AR 8824.

174.    In May 2007, BLM State Director Bennett explained to the BLM Director that

Wyoming's concerns had been resolved.  AR 8847.  This is true despite the fact that the

"squishy" language of which WGFD complained earlier had not changed (e.g., "The BLM will

attempt to achieve the following Performance Goals… .").  *Id*.  *See also* AR 4814.

175.    The Government Accountability Office ("GAO") issued a report in June 2005 entitled *Oil and Gas Development - Increased Permitting Activity Has Lessened BLM's Ability to Meet Its Environmental Protection Responsibilities* AR 6791–860.  The GAO found that the increased volume of APDs, and mandates to promptly process them, resulted in more BLM staff resources being devoted to issuing permits and less to monitoring and enforcing compliance with environmental standards.  According to the GAO, the total number of oil and gas drilling permits approved by BLM more than tripled, from 1,803 to 6,399, during fiscal years 1999-2004. AR 6811. The GAO explains succinctly that this "dramatic increase in oil and gas development on federal lands over the past 6 years has lessened BLM's ability to meet its environmental protection responsibilities."   AR 6799.   For example, the field offices visited by GAO investigators reported meeting annual environmental monitoring requirements "only about half of the time" during the 6 year period.  AR 6816.

176.    The GAO's findings have borne out in another area of Wyoming – the "Pinedale Anticline."   When BLM has tried to incorporate an adaptive management approach into its decision-making process, the agency did not live up to its obligations.  *See* Declaration of Rollin D. Sparrowe (attached as Exhibit B to TRCP's MSJ) ¶¶ 4: 29-55.  For example, BLM has simply ignored multiple monitoring and review requirements that are part of an "adaptive management" process relied on to justify opening Wyoming's Pinedale Anticline to oil and gas development. *Id.*  BLM's Pinedale Anticline Working Group website contains minutes from the last Wildlife Task Group meeting – dated November 2005.   *See* http://www.blm.gov/wy/st/en/field_offices/Pinedale/pawg/minutes.html.

## III.    ALTERNATIVES

177.    The FEIS describes rejected Alternative B (Phased Development) as follows:

Alternative B proposed that natural gas development activities would be restricted to one of three zones within the ARPA boundary at any one time. Each zone would be open to construction and development of natural gas removal and processing facilities for 7 years at which time construction and development activities would cease. Gas extraction and processing would continue (i.e., operational activities), while construction and development activities would move to another zone. The intent of the alternative was to focus disturbance activities into a smaller area while the remainder of the project area would be less disturbed and less impacted than under the proposed action.

AR 2160.

178.    All the Operators applauded elimination of the Phased Development Alternative. *See*, e.g., AR 9921 (Warren's Comments) ("Warren is pleased that Alternative B was considered and eliminated from detailed study in the FEIS because this alternative did not sufficiently address or provide for the purpose and need of the project.").

179.    In a PowerPoint presentation dated April 2007, BLM explained that one of the "key points" of the Preferred Alternative adopted in the ROD was to "optimize[] gas recovery." AR 8839.

180.    A comparison of the alternatives adopted in the FEIS demonstrates that they all are nearly identical in terms of overall surface disturbance and well numbers.  AR 8836.

## IV.    **WILDLIFE AND RECREATION IMPACTS**

181.    The FEIS explains:

The principal wildlife impacts likely to be associated with the Proposed Action or action alternatives include (1) direct and indirect loss of wildlife habitats, (2) displacement of some wildlife species from increased human access and activity, (3) an increase in the potential for collisions between wildlife and motor vehicles, (4) an increase in stress to wildlife and (5) disruption of life history requirements of a species or population segment.

AR 2387.

182.    The FEIS further explains:

Wildlife habitats directly affected by the proposed project include areas that are physically disturbed by the construction of pads, roads, pipelines, and production

facilities; wildlife habitats indirectly disturbed include areas surrounding directly impacted habitats. Disturbance during construction and production, such as human presence, dust, and noise may displace or preclude wildlife use of disturbed areas.

Prohibiting construction, drilling, and other activities potentially disruptive to wildlife during sensitive time periods (i.e., winter, brood-rearing) would minimize the probability of displacement, nest abandonment, or reproductive failure during these critical times of the year. … However, habitat loss would still occur outside of this time period, as development would be allowed. In addition, it does not address the displacement of animals/loss of critical habitat due to the presence and operation of wells, facilities, and roads after construction is complete.

Displacement is unavoidable in the short term under all action alternatives, and this displacement has the potential to have the most significant effect on wildlife.

AR 2388. It continues:

Displacement would result in local reductions in wildlife populations if adjacent, undisturbed habitats are at carrying capacity. In this situation animals are either forced into less optimal habitats or they compete with other animals that already occupy unaffected habitats. Possible consequences of such displacement are lower survival, lower reproductive success, lower recruitment, and ultimately lower carrying capacity and reduced populations (WGFD 1004d).

AR 2389. However, "The extent of wildlife displacement is impossible to predict for most species … ." *Id.*

183. Moreover, the FEIS states: "Direct habitat loss from construction would equal approximately 6 percent of the project area. In addition, dust would directly and indirectly impact 15-30 percent more acreage (section 4.5.3.1). These impacts would include habitat avoidance." AR 2389.

184. The FEIS acknowledges that "Habitat fragmentation and isolation are difficult to determine and vary species to species, but they could occur as a result of gas field developments, … ." AR 2390.

A. **Mule Deer and Other Big Game**

185.    "Impacts to big game species may include (1) the removal and modification of habitat, (2) displacement due to increased human activities, (3) increased potential for vehicular collisions due to increased traffic levels on existing highways, and (4) increased potential harvest success due to easier access."  AR 2391.  The FEIS explains the importance of crucial winter range:

> The WGFD classifies big game crucial winter range as vital habitats and recommends that habitat function be maintained so that the location, essential features, and species supported by the habitat are unchanged (WGFD 2004c). The application of BLM seasonal restrictions to prevent drilling on crucial winter range between November 15 and April 30 reduces the displacement and disturbance of big game during the most critical season.  During operations, mitigation measures such as remote monitoring and telemetry would be used to reduce, but not completely eliminate, impacts to big game.

*Id.*

186.    The Mule Deer Study addressing Phase I was completed in April 2007 – one month after the AR ROD was approved.  The authors of the report, who were working, in part, for BLM itself, explained "[i]nformation from Phase I provides the baseline information necessary to develop energy resources such that important migration routes and seasonal ranges can be protected or minimally impacted.  Additionally, Phase I provides the pre-development information needed, should Phase II of the study materialize."  AR 7423.  The study "provides the baseline data necessary to accurately identify seasonal ranges and migration routes, both of which will be key components for successful mule deer management and mitigation as energy resources are developed in the ARPA."  AR 7445.

187.    The Mule Deer Study contains the following conclusions vital to analysis of the Project's impacts and to formulation of a mitigation plan:

- Mule deer rely on several important seasonal ranges in the ARPA, including winter and transition ranges, which generally provide mule deer with better foraging opportunities.

- Managers should not overlook the importance of all seasonal ranges for maintaining healthy and productive mule deer populations. Summer, transition, and winter ranges are equally important; loss or degradation of one will not be compensated for by the others.
- Migrations between summer and winter ranges generally follow traditional routes that are learned and passed on from mother to young. Without migratory routes, many of the seasonal ranges in the BHU would be inaccessible to mule deer, and it is unlikely current populations could be maintained.
- Given that 98% of GPS-collared deer in the ARPA were migratory, identifying and conserving migration routes to and from seasonal ranges will be a key component to successful mule deer management in the BHU.
- The Project will result in large-scale habitat changes that could potentially impact the effectiveness of migration routes. "Sustaining migratory mule deer populations in the BHU will require that suitable seasonal ranges (i.e., winter, transition, summer) be maintained and migration routes remain functional.

*See generally* AR 7421.

188.    The FEIS explains:

Several mule deer migration routes transverse the ARPA. A research project initiated by the BLM and WGFD in February 2005, funded by two of the operators, should help delineate the migration routes used by mule deer on the ARPA. When information is available from this research, additional mitigation would be placed on development for the protection of mule deer migration corridors. Meanwhile, this project could alter or block mule deer movements along existing migration routes.

In addition to the direct removal of habitat due to the development of pads and associated ancillary facilities, disturbances from drilling activities and traffic would affect the use of the habitat immediately adjacent to these areas. Mule deer, however, are adaptable … However, the Sublette Mule Deer Study, which used Global Positioning System (GPS) collars, found that winter mule deer habitat selection and distribution patterns have been affected by development, specifically road networks and well pads. Sawyer found no evidence of acclimation behavior. During 3 years of study, mule deer had higher probability of use in areas farther away from well pads as development progressed. Predictive maps also suggest that some habitats considered "high probability of use" areas prior to development, changed to "low probability of use" areas as development progressed, and visa versa.

AR 2393. It continues:

This suggests that within the ARPA, indirect impacts such as displacement from activities, dust from roads, and competition for forage within the already poor condition crucial winter range habitat may lead to reduced mule deer numbers and

die-offs from animals going onto crucial winter range in poorer health with reduced body reserves.

AR 2393-94.

189.     The EIS explains that the Project's "level of development within big game crucial winter and transition ranges, compounded by the current condition of these ranges, would exceed the significance criteria (criterion number 3)."  AR 2403.   This means that the Project will "result in substantial disruption or irreplaceable loss of vital and high value habitats … ."  AR 2388.

190.     With regard to elk, the FEIS notes:

Construction activities remove crucial winter range vegetation and increase noise and human activity levels which displace animals.  However, … the amount of vegetation disturbed is not as important as the noise and activity levels that would still occur and result in displacement of elk.  In addition to the direct removal of habitat due to the development of pads and associated transportation facilities, disturbances from drilling activities and traffic would affect use of the habitat adjacent to these areas (Powell 2003).  Elk are more sensitive to human activities than pronghorn or mule deer, and they may be displaced in construction areas from 0.6 to 1.2 miles for elk depending upon the season (Powell 2003).  …  Elk would likely habituate to the physical presence of gas wells.  However, elk rarely adjust to continued human presence required during the production phase of the project (Thomas and Toweill 1982).  With the increase in roads and potential recreational access to the area, displacement of elk is extremely likely during all phases of development.  During the production phase, there is no equivalent mitigation and animals may be displaced up to 1 mile from the source (USDI-BLM 2004c).  This would lead to increased stress/decreased condition or reproductive rates of the animals as they travel farther and may have to use lower-quality range.

AR 2394.

191.     As with mule deer, the ROD employs seasonal restrictions on drilling on crucial elk winter ranges between November 15 and April 30.  AR 2391.  However, there are no meaningful restrictions on operations at any time of year.  "During operations, mitigation measures such as remote monitoring and telemetry would be used to reduce, but not completely eliminate, impacts to big game."  *Id.*  The EIS concludes:  "there would be an 'extreme' impact

to elk based on the actual number of pads (eight pads per section) (WGFD 2004c). With this level of development, impacts to elk crucial winter range would exceed the significance criteria (criterion number 3)." AR 2398. This means a "substantial disruption or irreplaceable loss of vital and high value habitats." AR 2388.

192.    "Several general pronghorn migration routes transverse the ARPA; it is unknown how critical these routes are. [The] [P]roject could alter or block pronghorn movements along existing migration routes." AR 2392.

193.    BLM opines "… pronghorn have been found to habituate to increased traffic …" and "… they would likely habituate to activities along roads and continue using habitats in those areas …" AR 2392. But BLM later states:

> However, this is true for only certain individuals within a population. Other individuals may exhibit a lower tolerance to human-related activity. Therefore, … BLM RFO biologists have noted anecdotally that antelope herd sizes are significantly smaller in impacted areas than in relatively pristine areas. Those animals that potentially acclimate seem to do so only in smaller herd sizes.

*Id.*

194.    Likewise, with regard to pronghorn, the EIS explains:

> The acreage disturbance and the actual number of pads per section would fall under a high impact post-reclamation. The direct loss/reduced usability of Wyoming big sagebrush would increase use on remaining shrubs, resulting in continued shrub health decline outside the immediate project disturbances. This would have the greatest impact to antelope due to their extreme reliance upon sagebrush (96 percent of their diet) during winter. This level of development within pronghorn crucial winter range, compounded by the current condition of the crucial winter habitat, would exceed the significance criteria (criterion number 3).

AR 2419. This equals a "substantial disruption or irreplaceable loss of vital and high value habitats." AR 2388.

195.    With regard to pronghorn antelope, the EIS explains: "Standard mitigations prohibiting construction, drilling, and other activities potentially disruptive to pronghorn within

crucial winter range from November 15 to April 30 would reduce the probability of displacement during this critical time of the year."  AR 2392.  However "[d]uring the production phase, there is no equivalent mitigation and animals may be displaced up to 0.25 miles from the source."  *Id.* "This would lead to increased stress/decreased condition or reproductive rates of the animals as they travel farther and may have to use lower-quality range."  *Id.*  BLM hypothesizes some pronghorn may become accustomed to tolerating increased human activity, but offer only "perception" as the basis of that conclusion.  *Id.*

### B.    Sage Grouse

196.    The USFWS in January 2007 again expressed concern with the Project as analyzed in the FEIS.  AR 10134.  That agency explained:

> Most importantly, the Service continues to be concerned with the potential for significant impacts this project may have on fish and wildlife resources within the Project area.  We remain concerned that Project impacts to greater sage-grouse and other sagebrush obligate species may be significant and possibly irreversible, especially in landscape where these species currently thrive.  Proposed development may alter the future size, distribution and existence of local populations.  The Service reiterates its recommendation that the Bureau not authorize an action that may exacerbate the decline of fish and wildlife species and possibly result in listing under the [Endangered Species] Act.

AR 10134–35.  The USFWS further explained:  "regardless of the limits to disturbance in the Project area, habitat fragmentation will occur, which may have widespread and long-term effects on species present."  AR 10135.

197.    The FEIS explains:  "Potential greater sage-grouse nesting habitat covers 92 percent of the ARPA.  In the long-term, recovery of shrubs to pre-disturbance levels would not occur during the life of the project.  Therefore, there would be a long-term loss of nesting habitat."  AR 2395.  BLM estimates a "… direct loss of 8.1 percent of the available nesting habitat …" AR 2402.

198.    "Of greater concern is the indirect loss of habitat resulting from bird displacement
and fragmentation of nesting and early brood-rearing habitat."  AR 2402.  BLM opines:

> The application of avoidance and mitigation measures would help reduce the loss
> of habitat and stress to greater sage-grouse in proximity to leks on public lands.
> Based on research conducted in Wyoming, only 45 percent of nests would be
> afforded seasonal protection as they are within the 2-mile buffer of leks.  Of the
> suitable nesting habitat, 21 percent is outside the 2-mile buffer and would be
> afforded no seasonal protection.  Habitat loss would continue outside the quarter-
> mile-protected buffer around leks.   However, the long-term loss of shrubs
> combined with the indirect impacts on the habitat, such as dust, noise, and
> continued human presence during the drilling and production phase, would result
> in habitat loss and disturbance levels exceeding the significance criteria (criterion
> number 4).

*Id.*

199.    BLM argues, "Sage-grouse may repopulate an area following energy
development, but may not attain population levels that occurred before development (Braun
1998).  Most nests abandoned are directly or indirectly related to human activity. "  AR 2395.

200.    Though it does not follow Naugle's recommendations, BLM acknowledges the
work of Naugle:

> Naugle et al. (2006) found that leks along the edge of CBNG development had
> higher lek attendance than leks within the developed area.  They hypothesis that
> sage-grouse avoid developed areas is supported by the finding that active leks and
> leks with moderate to large numbers of males were often found adjacent to CBNG
> fields but rarely within CBNG. …  One of the most striking patterns discovered
> was that, of leks counted in either 2004 or 2005, no medium or large-sized leks
> occurred within CBNG development; all remaining leks in CBNG have 20 or
> fewer males.  … active leks typically are twice as far from wells, … have less
> development (wells and power lines) within 3.2 kilometers (km) of the lek
> complex.  In addition, a significantly higher proportion of lek complexes are
> inactive in CBNG areas compared to areas on the edge of or outside CBNG … .

AR 2395.

201.    As for sage grouse protection, BLM explains "Wintering areas (as they are
mapped) would be protected from surface disturbing activities from November 15 to March 14.
Activities would be allowed outside this timing period and habitat could be removed.  This

would result in habitat loss as well as potential displacement of wintering birds." AR 2396.

BLM explains:

> The application of the winter timing stipulation would only protect grouse during this critical time period. This does not prevent the direct loss of wintering areas for grouse outside of this time period.

AR 2404.

202. The FEIS explains that due to construction of ancillary facilities, the Project will fragment the habitat on which sage grouse rely. AR 2395 ("Construction of facilities and roads creates a long-term loss of greater sage-grouse habitat, increases fragmentation of remaining habitat.").

203. The FEIS candidly acknowledges: "The timing stipulation prevents winter disturbance to greater sage-grouse, but does not prevent the direct loss of wintering areas outside of this time period. Loss of this habitat would lead to lower productivity and long-term decline in the population of these species." AR 2398

204. Ultimately, the AR FEIS concludes: "the long-term loss of shrubs combined with the indirect impacts on the habitat, such as dust, noise, and continued human presence during the drilling and production phase, would result in habitat loss and disturbance levels exceeding the significance criteria (criterion number 4)." AR 2398. This means that sage grouse will suffer a "[s]ubstantial loss of habitat function or disruption of life history requirements … that would preclude improvement of their status." AR 2388.

205. Overall, the AR FEIS concludes that greater sage grouse will experience:

> [L]oss of nesting or early brood-rearing habitat, decreased population productivity caused by loss of nesting or early brood-rearing habitat, reduced utilization of suitable habitats due to indirect disturbance, loss of winter habitat, increased predation due to increased roosting sites for raptors on power poles and other structures, and displacement of birds into lower quality habitats.

AR 2394.

206.    In the Sun Dog and Catalina PODs, wells were constructed within both the 1/4-mile radius and the 2-mile radius of sage grouse leks.  AR 78630, AR 78545, AR 78564, AR 78738.  *See also*  Declaration of Frank Blomquist, filed in *N.R.D.C. v. Kempthorne,* Case No. 07-CV-1709 (Oct. 5, 2007).

### C.     Overall Impact on Hunting and Other Recreational Endeavors

207.    "The health and abundance of wildlife populations directly affect the quality of hunting in the ARPA.  When wildlife populations fluctuate, so do wildlife-based recreational opportunities."  AR 2417.    The Project will have both direct and indirect impacts to recreation.  "Direct impacts to recreation resources occur because of the physical disturbance and removal of vegetation from the construction of facilities; the visual impacts of facilities and activities; and from the noise, traffic, and visual distraction of human activity."  AR 2418.  "The principal recreation impact likely to be associated with the Proposed Action and alternatives is the change in big game hunting opportunities because of habitat loss and wildlife displacement."  AR 2418-19.  "The impact would be borne primarily by local and regional hunters, especially local hunters for whom the benefits of the ARPA would be diminished as a convenient and economical place to hunt."  AR 2419.

208.    "The duration of the effects would be for the life of the project—which may affect more than one generation of recreation user."  AR 2420.  The EIS ultimately concludes:

> [T]he impacts to the predominant recreation activities in the ARPA—hunting, pleasure driving, and wildlife viewing—would be significant. The Proposed Action would diminish the wildlife presence, degrade scenery, and introduce traffic and noise. The natural setting would be converted to an industrialized setting by development of the Proposed Action.

*Id.* (Emphasis supplied).  "The impacts to hunting and to the recreation setting are similar under both the Proposed Action and the [Project] … ."  AR 2423.

## V.    <u>METHANE SEEPS</u>

209.    A document authored 2 months after the FEIS and one month before the ROD was signed analyzing the impact of methane seeps and augmented methane gas release due to CBM development describes the following concerns:

> Other concerns that precipitate from the likely increase gas seep emissions are:
>
> - Potential damage to the atmosphere by elevated emission of coal bed gases.  All of the constituents of the coal bed gases are considered to be greenhouse gases and incompatible with the well being of the earth's atmosphere.
> - Potential danger to human and animal safety:
>   - o  Accidental ignition by an unaware tourist/hunter could result in someone being seriously burned. Natural ignition via lightening or spontaneous combustion of exposed coal bed could cause wild fires that would be a danger to human life, wildlife and vegetation.
>   - o  Some of the potential constituents of coal gases like hydrogen sulfide and carbon dioxide are poisonous to humans and wildlife.  They are also heavier than air and can settle in low lying basin areas and can create potential traps for the unknowing and unwary.
> - Potential danger to vegetation.
>   - o  Some of the coal gas constituents like methane and hydrogen sulfide are incompatible with plant life and can result in vegetation die off in the adjacent vicinity of the seeps.  In the San Juan Basin of Colorado there have been extensive vegetation kills adjacent to gas seeps associated with the coal bed outcrops that are being developed for CBNG.

AR 8803.

210.    Among the conclusions of the analysis is:

> As previously discussed, there exist some fairly severe safety and environmental concerns and potential liability concerns for the federal government that are associated with the gas seeps in the ARPA.  At this point in time there is no scientific data available to prove or disprove CBNG development within the ARPA has caused or will cause increased gas flux from the known gas seeps. However, it is likely that future CBNG development may cause increased quantities of gas to be emitted from the known seeps.  It is also possible that there exist other seeps within the ARPA that are yet to be discovered.

AR 8805.

211.    BLM was expressly put on notice of its obligations to investigate and disclose the impacts identified in the memorandum.  AR 8840.  One commenter requested expressly that the ROD be deferred until after the issues could be addressed.  AR 8841.

212.    As late as May 2007, the State Director was still not fully disclosing to the Director the potential impact of methane seeps.  AR 8854.

213.    While some BLM materials attempted to argue that the mud pots had existed for decades, other information contradicted that conclusion.  AR 9432.

214.    On May 4, 2007, BLM staff informed the State Director that methane seeps had not been adequately considered:  "In light of the high level of interest in the Atlantic Rim project and the pending release of a Record of Decision dated Marchxx2007, new information and a concern about potential consequences of mud pot changes may not have been adequately addressed in the FEIS."  AR 9467.

215.    The memorandum was later criticized by other BLM employees:

> I asked Bob L. to put this together last night for today's discussion.  It should help as a reference that we (the BLM) has addressed methane springs in the FEIS and the letter from [Wyoming Outdoor Council] is NOT new information.  The briefing paper is NOT an accurate description of th *(sic)* issue.  I advise we do not use it … .

AR 9460.

216.    In response, another BLM employee explained:   "This was the kind of documentation that I was hoping we had in the administrative record which until the ROD is released to the public is still open for this kind of information.  Once the Record is released, the administrative record for the ARim project NEPA/decision making process closes."  AR 9452.

217.    By late May 2007, BLM was developing a list of "talking points" downplaying the significance of the methane seep issue.  AR 8862.

218.    Photos of the methane seeps are at AR 9432-37.

## VI.    <u>CUMULATIVE IMPACTS ANALYSIS</u>

219.    Prior to the issuance of the ROD and EIS, the BLM completed its *Final Environmental Impact Statement on Wind Energy Development on Bureau of Land Management – Administered Lands in the Western United States* ("Wind Energy EIS").    *See* http://windeis.anl.gov/ and Exhibits K-M of TRCP's MSJ.  The scope of the Wind Energy EIS includes the ARPA and indicates that the ARPA's "wind resource level" was among the highest in the Rawlins planning area.  The potential of wind energy development to adversely impact sage grouse was specifically identified in the Wind Energy EIS.    *See* http://windeis.anl.gov/documents/fpeis/maintext/Vol1/Vol1Ch5.pdf.  So too was the potential for wind energy development to disrupt migratory behavior of big game animals like mule deer, elk and pronghorn antelope.  *Id.*

220.    In response to the Wind Energy EIS cumulative impacts analysis, Anadarko stated it "does not believe that the probable interaction of wind energy projects and mineral development (e.g. oil and gas) is clearly described and analyzed.  Exhibit M to TRCP's MSJ. The document's discussion of potential impacts to mineral development is limited to statements that defer analysis of cumulative impacts until site specific information is available … Furthermore, the possible negative impacts from a wind energy project may have on the ability to develop leasable minerals is all but dismissed."

221.    This response followed Anadarko's earlier call for the Wind Energy EIS to address, "Cumulative impacts (visual, wildlife, etc.) from wind farm projects and the potential impact on the ability to develop resources on adjacent lands."  Exhibit M to TRCP's MSJ.

## PROCEDURAL HISTORY OF TRCP'S CHALLENGE

222.    TRCP provided BLM with comments in January 2007, during BLM's NEPA process, expressing TRCP's concerns about the Project and highlighting various shortcomings of the EIS.  AR 10262.

223.    The ROD became effective when it was announced in the Federal Register on May 21, 2007.  72 Fed. Reg. 28,518 (May 21, 2007).  By virtue of 43 C.F.R. § 3165.4(c), the ROD was immediately effective and constituted a final agency action.  Though not required to do so, TRCP, attempting to resolve the issue administratively, timely appealed the ROD to the Interior Board of Land Appeals ("IBLA") on June 18, 2007, where it raised the concerns identified in this Complaint.  Concurrently with its notice of appeal, TRCP filed with the IBLA a Petition for Stay.  *See generally TRCP*, IBLA No. 2007-208.

224.    On September 5, 2007, by Order of the same date, the IBLA, after first holding that TRCP had standing to appeal the ROD, denied TRCP's Petition for Stay.  Having received no immediate relief from the IBLA, and under no legal obligation to exhaust that appeal, TRCP withdrew its IBLA appeal on September 10, 2007 in favor of this litigation.

## THE POD DECISIONS AND TRCP'S ATTEMPT TO OBTAIN REVIEW

225.    The Sun Dog Decision authorizes the construction or reconstruction of access roads and well pads for the drilling of 48 CBM wells and 3 produced water re-injection wells, along with the construction, use and reclamation of appurtenant gas and water gathering pipelines and utility corridors in the Sun Dog POD (Plan of Development) within the ARPA.  The Sun Dog Decision relies on the standard mitigation measures identified in the EIS and ROD to address wildlife related concerns.  AR 74065.

226.    Neither the ROD, nor the EIS, contemplates or analyzes the impact of exclusions from seasonal wildlife management restrictions established therein.  Yet, the EA provides, with

respect to wildlife: "In some instances, the proponent may request consideration of a temporary exception to wildlife seasonal restrictions.  Such an exception may be granted if a determination is made that the wildlife resource will not be adversely impacted."  AR 74071.  It appears this "determination" will be made without any further NEPA review.

227.    The EA considers only two alternatives: "no action" and the proponent's proposed development.  AR 74063.

228.    TRCP learned of the Sun Dog Decision on September 13, 2007.  On September 14, 2007, TRCP timely sought the Wyoming State Director's review of the Sun Dog Decision pursuant to 43 C.F.R. § 3165.3(b).

229.    On October 31, 2007, the Deputy State Director refused to perform a review under BLM's regulations citing this litigation, as well as litigation brought by the Natural Resources Defense Council (Cause No. 07-1709), challenging the ROD, the EIS and the Sun Dog Decision.

230.    TRCP timely appealed to the IBLA the Deputy State Director's refusal to conduct a State Director Review as contemplated by 43 C.F.R. § 3165.3(b).  *See* TRCP, IBLA No. 2008-36.  Before answering, BLM moved to stay TRCP's appeal.

231.    On February 19, 2008, the IBLA issued an Order explaining it would not review TRCP's administrative appeal, stating: "[G]iven that the legality of BLM's approval of the PODs, including the adequacy, under section 102(2)(C) of NEPA, of its assessment of likely environmental  impacts in the EA and FEIS, is already pending before the court in the lawsuits, we grant BLM's request to suspend consideration of TRCP's appeal and defer final dispositive action in the pending appeal."

232.    Given IBLA's determination, and the apparent suspension by BLM of the administrative review requirements contained in 43 C.F.R. § 3165.3(b) insofar as development within the ARPA is concerned, TRCP withdrew its IBLA appeal in favor of this amended complaint.

233.    The Catalina Decision authorizes construction of access roads and pads for the drilling of 36 CBM wells and 3 produced water reinjection wells, and a central delivery point facility. AR 73494.  The Catalina Decision relies on the standard mitigation measures identified in the EIS and ROD to address wildlife related concerns. AR 73496-501.

234.    As with the Sun Dog Decision, the Catalina EA notes that exceptions to applicable wildlife stipulations may be granted, but the Catalina EA does not analyze the impact of granting such exceptions.  AR 73492–501.

235.    As with the Sun Dog Decision, the Catalina EA considers only two alternatives: the proposed action and a "no action" alternative.  AR 73492–501.

236.    In approving the Sun Dog and Catalina A and B PODs, BLM approved well locations within big game crucial winter range and within 0.5 miles of sage grouse leks.  *See* Declaration of Frank Blomquist, filed in *N.R.D.C. v. Kempthorne*, Case No. 07-CV-1709 (Oct. 5, 2007).

Respectfully submitted this 6th day of May, 2008.

/s/ *Donald G. Blankenau*

D.C. Bar No. ND0003
Thomas R. Wilmoth
Nebraska Bar No. 22518
HUSCH BLACKWELL SANDERS LLP
206 South 13th Street, Suite 1400
Lincoln, NE  68508-2019
T: (402) 458-1500
F: (402) 458-1510

64

don.blankenau@huschblackwell.com
tom.wilmoth@huschblackwell.com

*Counsel for Theodore Roosevelt*
*Conservation Partnership*

Exhibit A – Part 1

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THEODORE ROOSEVELT<br>CONSERVATION PARTNERSHIP<br>555 Eleventh St. N.W., 6th Floor<br>Washington, DC 20004<br>(202) 654-4600,<br><br>Plaintiff,<br><br>v.<br><br>DIRK KEMPTHORNE, in his official<br>capacity as the Secretary of the United States<br>Department of the Interior<br>1849 C Street, N.W.<br>Washington, DC 20240<br>(202) 208-3100,<br><br>and<br><br>UNITED STATES BUREAU OF LAND<br>MANAGEMENT<br>1849 C Street, Room 406-LS<br>Washington, DC 20240<br>(202) 452-5125,<br><br>Defendants.<br>_____<br><br>ANADARKO PETROLEUM<br>CORPORATION, WARREN RESOURCES,<br>INC., DOUBLE EAGLE PETROLEUM<br>CO.,<br><br>and<br><br>STATE OF WYOMING,<br><br>Defendant-Intervenors.<br>_____ | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## DECLARATION OF CLAIT E. BRAUN, Ph.D.

I, Clait E. Braun, do hereby state as follows:

1.      I am a resident of Tucson, Arizona, over eighteen years of age, with personal knowledge of facts and professional judgments contained herein.    The purpose of this Declaration is to summarize existing scientific knowledge concerning the biological requirements of Greater Sage-grouse and management decisions that affect its status.    In my professional view, it is not possible to understand those requirements from a single reference source.    Sound management requires review and synthesis of the cumulative body of scientific literature concerning the needs of this species.    This includes voluminous scientific materials, including published papers, peer-reviewed materials, theses and dissertations, and accounts of Sage-grouse behavior and response to threats.

## PROFESSIONAL BACKGROUND

2.      I hold a B.S. in Technical Agronomy from Kansas State University, a M.S. in Wildlife Management from the University of Montana, and a Ph.D. in Wildlife Biology from Colorado State University.    In addition, I have attended numerous short courses, workshops, technical sessions, etc., to remain current in my professional work and am a Certified Wildlife Biologist. My *curriculum vitae* is attached hereto as Exhibit A.

3.      I was a Research Wildlife Scientist, Wildlife Research Leader, and Avian Research Program Manager for the Colorado Division of Wildlife during 1969-99. In addition, I taught as an Instructor at the University of Montana (1963-65) and Colorado State University (1966-69), and have been an invited lecturer at more than 20 U.S. and Canadian universities. I also worked as a Soil Scientist in Kansas (1961) and Montana (1964) for the U.S.D.A., Soil

Conservation Service, and as a Research Technician with the Montana Department of Fish and Game (1965).

4. My field research was primarily on different species of birds, but especially grouse (1965-2007). I specifically conducted and directed research on Sage-grouse throughout Colorado from 1973 through mid-1999. My research on Sage-grouse has caused me to review sagebrush steppe ecosystems (plants and animals) throughout all western states and provinces. This research has led to more than 290 scientific publications, mostly in peer-reviewed journals. I am lead author or co-author on more than 65 articles on Sage-grouse (including Greater Sage-grouse and Gunnison Sage-grouse) and more than 50 technical abstracts on Sage-grouse in scientific publications.

5. I am closely familiar with research and scientific literature that addresses the habitat needs and biological requirements of Sage-grouse, and on the factors that cause or contribute to Sage-grouse population losses or declines (including from habitat loss). I have also spent innumerable hours in the field studying Sage-grouse populations and habitats over the last four decades, which I have used in my own publications addressing the relationships between Sage-grouse and their habitats, as well as the management implications of these relationships (including from gas and oil development).

6. Papers that I have authored or co-authored over the last three decades on sage-grouse habitat requirements and management implications include the following: Braun, C. E., T. Britt, and R. O. Wallestad. 1977. Guidelines for maintenance of Sage Grouse habitats. Wildlife Society Bulletin 5:99-106; Remington, T. E. and C. E. Braun. 1985. Sage Grouse food selection in winter, North Park, CO. Journal of Wildlife Management 49:1055-1061; Connelly, J. W. and C. E. Braun. 1997. Long-term changes in Sage Grouse *Centrocercus urophasianus*

populations in western North America. Wildlife Biology 3:123-128; Connelly, J. W., M. A. Schroeder, A. R. Sands, and C. E. Braun. 2000. Guidelines for management of Sage Grouse populations and habitats. Wildlife Society Bulletin 28:967-985; Braun, C. E., O. O. Oedekoven, and C. L. Aldridge, 2002. Oil and gas development in western North America: effects on sagebrush steppe avifauna with particular emphasis on Sage Grouse. Transactions of the North American Wildlife and Natural Resources Conference 67:337-349; Connelly, J. W. and C. E. Braun. 2007. Measuring success of Sage-grouse conservation plans. Grouse News 33: 4-6.

7.      I currently am a principal in Grouse Inc., a consulting firm.  I have been retained by the Theodore Roosevelt Conservation Partnership to provide my professional views in this declaration, based on my 35 years of scientific expertise, knowledge, and personal experience studying the biological requirements of Sage-grouse.

8.      As research has developed and the factors that affect Sage-grouse populations and habitats become increasingly well-recognized and understood, I have similarly refined my own professional views and management recommendations, as reflected in these papers.  In 2006, I updated my analysis of Sage-grouse habitat requirements and management recommendations through a paper entitled "Blueprint for Sage-grouse Conservation and Recovery," a copy of which is attached hereto as Exhibit 2.

## SAGE-GROUSE NEEDS AND MANAGEMENT IMPLICATIONS

9.      Much of the present distribution of Sage-grouse is on publicly owned lands administered by the USDI, Bureau of Land Management (BLM).  I have observed BLM manage public lands for various uses include recreation, watershed, wildlife production and harvest, livestock production, and mineral exploration and development (including oil and gas).

4

10.    One of the principal threats to Sage-grouse is habitat destruction and fragmentation associated with oil and gas development on public lands.  However, this threat is not new (Braun et al. 2002), as exploration and development of typical sources such as coal, oil, and, gas date to the 1880's.

11.    Many areas proposed for oil and/or gas production in the western United States, including Wyoming's Atlantic Rim, have been among the most productive for sagebrush-dependent wildlife, especially Sage-grouse. Development of energy resources in sagebrush steppe habitats has negatively affected Sage-grouse, and will continue to do so unless proper safeguards are taken that reflect the biological needs of the species, as clearly reflected in the relevant scientific literature cited herein.

12.    While earlier studies identified basic Sage-grouse needs, substantial additional information has been developed since 2000 regarding the needs of Sage-grouse in southwest Wyoming relative to oil and gas development (Holloran 1999, 2005, and resulting peer-reviewed publications; Lyon 2000). The scientific community now possesses solid knowledge (Lyon 2000, Holloran 2005, Walker et al. 2007) about Sage-grouse habitat use outside of lek (i.e., courtship and display) locations, and the negative impacts of gas and oil development on Sage-grouse populations. These data are sufficiently precise to allow professional biologists to draw meaningful conclusions about the needs of Sage-grouse, especially for spring nesting, and brood rearing habitat, and to formulate management strategies to properly protect those habitats.

13.    The most important areas are those used in winter, for nesting, and for brood use. Emphasis has been placed on breeding areas (lek locations) as these sites are relatively easy to locate. However, the number of active leks is dependent on winter survival and recruitment of yearlings produced in the previous year. Recruitment of yearlings is driven by nest success.

Thus, the overall quality of all components of Sage-grouse habitat is key to maintaining populations over time (Connelly et al. 2000). Focus on breeding areas tends to ignore the other important components of Sage-grouse habitats that are probably even more important to sustaining overall distribution and population size.

14.     Management and research on Sage-grouse has focused on location and counts of males on leks in spring as these sites can be located and males can be counted even though how these counts relate to population size is not completely known. The fidelity of males to leks, and the affinity of females to be associated with leks for breeding, has led to studies of distances that both males and females will disperse from these sites.

15.     Studies of Sage-grouse movements and nesting started in the mid-1960s and demonstrated that most activities of males during the breeding season were within 2 miles of leks. A large proportion of the females were also documented to nest within 2 miles of leks. Guidelines were published in the peer-reviewed literature in 1977 (Braun et al.) recommending that no sagebrush control be permitted within 2 miles of a lek.

16.     Large-scale industrialization of the sagebrush steppe was not a factor at that time and the BLM accepted the 2-mile guideline. By 1982, this guideline had been promoted for areas undergoing energy development (Autenreith et al. 1982). These guidelines were expanded in a peer-reviewed publication based on new and updated knowledge (Connelly et al. 2000).

17.     The BLM, starting in Wyoming, declined to accept the 2-mile restriction for no surface disturbance around Sage-grouse display sites during the early to mid 1980s. I was informed by BLM staff that BLM considered then existing data insufficient to demonstrate that Sage-grouse populations would be negatively affected by surface disturbance beyond ¼ mile of active leks, initially for coal development but then also for oil and gas development.

Notwithstanding the significant volume of scientific information developed since the 1980s, BLM has declined to increase the area restriction for no surface occupancy (NSO) around leks from ¼ mile.

18.    This current scientific evidence, particularly from studies in Wyoming, funded in part by BLM, clearly demonstrates that Sage-grouse populations experience a dramatic reduction in breeding male Sage-grouse when NSO stipulations protect only the ¼ mile area around a lek.

19.    This conclusion was recently echoed by Western Association of Fish and Wildlife Agencies biologists, who also concluded that ¼ mile NSO stipulations are insufficient to protect Sage-grouse from the impacts of oil and gas development.    A copy of the WAFWA Memorandum is attached as Exhibit C.  The WAFWA biologists implored the Wyoming Game and Fish Department to adopt its conclusions as "the correct interpretation of the recently published sage-grouse research[.]"

20.    Among other things, WAFWA noted that full field energy development "appears to have severe negative impacts on sage-grouse populations under current lease stipulations (Lyon and Anderson 2003, Holloran 2005, Kaiser 2006, Holloran et al. 2007, Aldridge and Boyce 2007, Walker 2007, Doherty et al. 2008)."  WAFWA reviewed available literature from 2003 – 2008 and identified the following persistence levels resulting from the application of different NSO buffer sizes:

| NSO Buffer Size | Lek Persistence | Lek Loss |
|:---:|:---:|:---:|
| 0.25 mi | 4% | 96% |
| 0.5 mi | 5% | 95% |
| 1.0 mi | 10% | 90% |
| 2.0 mi | 28% | 72% |

Lek persistence increases exponentially (to the approximate norm of 85%) as NSO buffer size approaches 4 miles.

21.    In my professional judgment, lek abandonment on the order of 72% or more would spell disaster for any Sage-grouse population.    Specifically, I do not believe a viable population of Sage-grouse can be sustained in the Atlantic Rim unless the NSO requirement is extended to at least 2, and preferably 4, miles from each active lek, or significant geographic areas within the Atlantic Rim containing Sage-grouse leks are protected from development while development proceeds elsewhere.    As a result, land uses that rely on the existence of Sage-grouse (e.g., hunting and recreational wildlife viewing) would be eliminated.

I declare, under penalty of perjury, that the foregoing is true and correct.

Executed this ___1st___ day of May, 2008

_Clait E. Braun_

Clait E. Braun

# REFERENCES

Autenrieth, R., W. Molini, and C. Braun. 1982. Sage Grouse management practices. Technical Bulletin 1. Western States Sage Grouse Committee, Twin Falls, Idaho, USA.

Beck, T. D. I. 1977. Sage Grouse flock characteristics and habitat selection during winter. Journal of Wildlife Management 41: 18-26.

Braun, C. E. 1986. Changes in Sage Grouse lek counts with advent of surface coal mining. Proceedings, Issues and Technology in the Management of Impacted Western Wildlife 2: 227-231.

Braun, C. E. 1987. Current issues in Sage Grouse management. Proceedings of the Western Association of Fish and Wildlife Agencies 67: 134-144.

Braun, C. E. 1998. Sage Grouse declines in western North America: what are the problems? Proceedings of the Western Association of State Fish and Wildlife Agencies 78: 139-156.

Braun, C. E., T. Britt, and R. O. Wallestad. 1977. Guidelines for maintenance of Sage Grouse habitats. Wildlife Society Bulletin 5: 99-106.

Braun, C. E., O. O. Oedekoven, and C. L. Aldridge. 2002. Oil and gas development in western North America: effects on sagebrush steppe avifauna with particular emphasis on Sage Grouse. Transactions of the North American Wildlife and Natural Resources Conference 67: 337-349.

Connelly, J. W. and C. E. Braun. 1997. Long-term changes in Sage Grouse *Centrocercus urophasianus* populations in western North America. Wildlife Biology 3: 123-128.

Connelly, J. W., M. A. Schroeder, A. R. Sands, and C. E. Braun. 2000. Guidelines to manage Sage Grouse populations and their habitats. Wildlife Society Bulletin 28: 967-985.

Connelly, J. W., S. T. Knick, M. A. Schroeder, and S. J. Stiver. 2004. Conservation assessment of Greater Sage-grouse and sagebrush habitats. Western Association of Fish and Wildlife Agencies, Cheyenne, Wyoming, USA.

Cote, I. M. and W. J. Sutherland. 1997. The effectiveness of removing predators to protect bird populations. Conservation Biology 11: 395-405.

Doherty, K. E., D. E. Naugle, B. L. Walker, and J. M. Graham. 2008. Greater Sage-

grouse winter habitat selection and energy development. Journal of Wildlife Management 72: 187-195.

Franklin, I. R. 1980. Evolutionary changes in small populations. Pages 135-140 *in* M. E. Soule and B. A. Wilcox, editors. Conservation biology: an evolutionary-ecological perspective. Sinauer Associates, Sunderland, Massachusetts, USA.

Heath, B. J., R. Straw, S. H. Anderson, and J. Lawson. 1997. Sage Grouse productivity, survival, and seasonal habitat use near Farson, Wyoming. Completion Report. Wyoming Game and Fish Department, Cheyenne, USA.

Holloran, M. J. 2005. Greater Sage-grouse (*Centrocercus urophasianus*) population response to natural gas field development in western Wyoming. Dissertation. University of Wyoming, Laramie, USA.

Holloran, M. J. and S. H. Anderson. 2004. Sage-grouse response to natural gas field field development in northwestern Wyoming. Western Agencies Sage and Columbian Sharp-tailed Grouse Technical Committee 24: 32.

Holloran, M. J. and S. H. Anderson. 2005a. Greater Sage-grouse response to natural gas field developments in western Wyoming: are regional populations affected by relatively localized disturbances? Transactions of the 70th North American Wildlife and Natural Resources Conference.

Holloran, M. J. and S. H. Anderson. 2005b. Spatial distribution of Greater Sage-grouse nests in relatively contiguous sagebrush habitats. Condor 107: 742-752.

Holloran, M. J., B. J. Heath, A. G. Lyon, S. J. Slater, J. L. Kuipers, and S. H. Anderson. 2005. Greater Sage-grouse nesting habitat selection and success in Wyoming. Journal of Wildlife Management 69: 638-649.

Hupp, J. W. and C. E. Braun. 1989. Topographic distribution of Sage Grouse foraging in winter. Journal of Wildlife Management 53: 823-829.

Lyon, A. G. 2000. The potential effects of natural gas development on Sage Grouse (*Centrocercus urophasianus*) near Pinedale, Wyoming. Thesis. University of Wyoming, Laramie, USA.

Patterson, R. L. 1952. The Sage Grouse in Wyoming. Sage Books, Denver, Colorado, USA.

Remington, T. E. and C. E. Braun. 1991. How surface coal mining affects sage grouse, North Park, Colorado. Proceedings, Issues and Technology in the Management of Impacted Western Wildlife 5: 128-132.

Rowland, M. M. 2004. Effects of management practices on grassland birds: Greater Sage-grouse. U.S. Department of the Interior, Geological Survey, Northern Prairie Wildlife Research Center, Jamestown, North Dakota, USA.

Schroeder, M. A., J. R. Young, and C. E. Braun. 1999. Sage Grouse (*Centrocercus urophasianus*). No. 425 *in* A. Poole and F. Gill, editors. The Birds of North America. The Birds of North America, Inc., Philadelphia, Pennsylvania, USA.

Schroeder, M. A., C. L. Aldridge, A. D. Apa, J. R. Bohne, C. E. Braun, S. D. Bunnell, J. W. Connelly, P. A. Deibert, S. C. Gardner, M. A. Hilliard, G. D. Kobriger, S. M. McAdam, C. W. McCarthy, J. J. McCarthy, D. L. Mitchell, E. V. Rickerson, and S. J. Stiver. 2004. Distribution of Sage-grouse in North America. Condor 106: 363-376.

Soule, M. E. 1980. Thresholds for survival: maintaining fitness and evolutionary potential. Pages 151-170 *in* M. E. Soule and B. A. Wilcox, editors. Conservation biology: an evolutionary perspective. Sinauer Associates, Sunderland, Massachusetts, USA.

Thompson, K. M., M. J. Holloran, S. J. Slater, J. L. Kuipers, and S. H. Anderson. 2006. Early brood-rearing habitat use and productivity of Greater Sage-grouse in Wyoming. Western North American Naturalist 66: 332-342.

Walters, C. J. 1986. Adaptive management of renewable resources. McGraw Hill Book Co., New York, USA.

Walker, B. L., D. E. Naugle, and K. E. Doherty. 2007. Greater Sage-grouse population response to energy development and habitat loss. Journal of Wildlife Management 71: 26444-2654.

Exhibit A

**BIOGRAPHICAL SKETCH**

Clait E. Braun, Grouse Inc., 5572 N.Ventana Vista Road, Tucson, AZ 85750
E-mail: sg-wtp@juno.com
Phone/Fax 520-529-0365

Born: 4 October 1939, Kansas City, Missouri, USA

**Academic Training**
B.S.1962. Technical Agronomy, Kansas State University, Manhattan
M.S. 1965. Wildlife Management, University of Montana, Missoula
Ph.D. 1969. Wildlife Biology, Colorado State University, Fort Collins

**Experience**
Director, Grouse Inc., Tucson, AZ (2000-Present)
Avian Research Program Manager, Colorado Division of Wildlife
Wildlife Research Leader-Avian, Colorado Division of Wildlife
Wildlife Research Leader-NonGame, Colorado Division of Wildlife
Wildlife Researcher-Avian, Colorado Division of Wildlife
Soil Scientist, Soil Conservation Service, USDA, Kansas and Montana
Research Technician, Montana Game and Fish Department
Invited Lecturer and Instructor, 20+ Different Universities/Colleges
Faculty Affiliate, 6+ Different Universities
Research Advisor, 35+ M.S. and Ph.D. Students

**Memberships/Honors**
The Wildlife Society
Editor (*Journal of Wildlife Management*) (1981-83)
CMPS Council Representative,
Vice President, President, Past President
Charter Member of Colorado and Montana Chapters
Editor, Sixth Edition, The 'Techniques Manual' (2005)

The Wilson Ornithological Society
Elected Board Member, Vice President, President,
Life Member
Editorial Board
Editor (*Wilson Journal of Ornithology*) (2007-2008)

Colorado-Wyoming Academy of Science
Elected Board Member, Treasurer, President, Life Member

American Ornithologist's Union
Elected Member, Life Member

1

Cooper Ornithological Society
    Life Member

American Society of Mammalogists
    Life Member

Great Plains Natural Science Society
    Life Member

American Association for the Advancement of Science (1969-2008)

American Men and Women of Science

Who's Who in the West

Personalities of the West and Midwest

Dictionary of International Biography

Professional Achievement Awards
    Colorado State University
    Colorado-Wyoming Academy of Science
    The Wildlife Society (Chapter, Section, National)
    U.S. Department of Agriculture (SCS)

**Publications**
    Over 300 Technical Articles on Birds, (especially on Sage-grouse and other species of grouse) (Several on Mammals) Published in Peer-reviewed and Non Peer-reviewed Journals, Symposia, Proceedings (List Available upon Request)

**Referee**
    Peer Reviewer for 20+ National/International Journals

**Consultant**
    State (Nevada, New Mexico, Oregon, Utah, Wyoming), Federal (USFWS), Provincial (Alberta) Governments, and Private Entities

**Professional Interests**
    Birds (Especially Grouse and Columbids), Habitat Management, Alpine Ecology, Sagebrush-steppe, Population Dynamics

**National Advisory Committee, Wildlife Services**
    1999-2005, Vice Chair and Chair

Exhibit B

# A Blueprint for Sage-grouse Conservation and Recovery

Prepared by

Clait E. Braun, Ph.D.

Grouse Inc.
Tucson, Arizona

**May 2006**

## TABLE OF CONTENTS

| | Page |
|---|---|
| **Abstract** | **3** |
| **Introduction** | **3** |
| **Statement of Problem** | **3** |
| **Goals** | **4** |
| **Habitat Needs Overview** | **4** |
| **Management of Development** | **5** |
| Noise | **5** |
| Physical Disturbance | **5** |
| **Management of Fire** | **6** |
| Prescribed Fire | **6** |
| Wild Fire | **6** |
| **Management of Grazing** | **7** |
| Livestock | **7** |
| Wildlife | **8** |
| **Management of Habitat Fragmentation** | **8** |
| **Management of Invasive Species** | **9** |
| Cheatgrass | **9** |
| Pinyon/Juniper | **9** |
| **Management of Rangeland Seedings** | **9** |
| **Management of Roads** | **10** |
| **Management of Structures** | **11** |
| **Management of Vegetation** | **12** |
| **Management of Water** | **13** |
| **Where Should Management Focus Be Placed?** | **13** |
| **How Should Success Be Measured?** | **14** |
| **Conclusions** | **14** |
| **Recommendations** | **15** |
| **Literature Cited** | **16** |
| **About the Author** | **20** |
| **Appendix** | **21** |

***Abstract:*** The distribution of greater sage-grouse (*Centrocercus urophasianus*) has declined by at least 44% while overall abundance has decreased by up to 93% from presumed historic levels. These decreases are the result of habitat loss, fragmentation, and degradation. Federal and state public land management agencies currently are responsible for about 70% of the remaining sagebrush (*Artemisia* spp.) steppe, with the Bureau of Land Management and U.S. Forest Service managing most of these lands for multiple uses. The goals of strategies outlined here are to improve sagebrush habitats to increase greater sage-grouse abundance by at least 33% by 2015, and overall distribution of greater sage-grouse by at least 20% by 2030. The abundance goal is achievable following recommendations presented in this document while the distribution goal will be more difficult to obtain. Federal land management agencies are key to achieving both goals, as they are responsible for managing public lands, which support most of the remaining populations of greater sage-grouse. Improved vegetation management to restore degraded habitat (from domestic livestock grazing and development, such as from mining and gas/oil extraction) followed by reduction of habitat fragmentation has the greatest potential for maintaining and enhancing viable populations of greater sage-grouse. While the habitat management strategies and recommendations in this report focus on greater sage-grouse, they are also applicable to Gunnison sage-grouse (*Centrocercus minimus*).

## Introduction

Sage-grouse (*Centrocercus urophasianus, C. minimus)* are dependent upon sagebrush (*Artemisia* spp.) and were historically widespread and at least locally abundant (Patterson 1952, Schroeder et al. 2004). Concern about the decrease in the abundance of sage-grouse is not only recent (Connelly and Braun 1997, Braun 1998, Connelly et al. 2004) but also long-term (Hornaday 1916, Patterson 1952). Sagebrush was also historically widely distributed in western North America (Küchler 1964, Vale 1975, Miller and Eddleman 2001, Schroeder et al. 2004). In the United States, about 70% of the remaining sagebrush steppe and distribution of sage-grouse is on public land, with most (~50% of all publicly owned sagebrush steppe) managed by the U. S. Department of Interior, Bureau of Land Management (BLM) (Connelly et al. 2004). Thus, the BLM and the U.S. Forest Service (USFS) (U.S. Department of Agriculture) have the greatest potential to positively impact sage-grouse abundance and distribution provided effective policies and conservation actions are implemented that will benefit sagebrush steppe habitats. Overall, the "responsibility for maintaining sagebrush habitats and [sage-grouse] populations rests squarely on public land management agencies because most [of the] species' [home] range [is] owned publicly and managed by state or federal agencies" (Knick et al. 2003:627, Connelly et al. 2004).

## Statement of Problem

The abundance and distribution of greater sage-grouse (*Centrocercus urophasianus*) have declined. Sage-grouse historically occupied at least 1,247,004 km² in western North America of which at least 1,200,483 km² were occupied by greater sage-grouse (Schroeder et al. 2004). Greater sage-grouse now occupy about 668,412 km² of

their estimated historical distribution and have been extirpated from 1 state (Nebraska) and 1 Canadian province (British Columbia) (Braun 1998). There are no data on historical numbers (pre-European settlement) but estimates range from at least 2 to 10 million birds (C. E. Braun, illustrated presentation to the Western Association of Fish and Wildlife Agencies, Jackson Hole, Wyoming, July 1998). Braun (1998) further presented estimated breeding population levels by state and province based on counts of male sage-grouse in spring 1998 as reported by state and provincial biologists. The total was presented as ~142,000 sage grouse (Braun 1998:141). This suggests a decrease of ~93% in overall abundance if the minimum historical estimate of 2 million sage grouse is used. Braun (1998) generally classified reasons for the apparent decrease in sage-grouse abundance as the result of habitat loss, habitat fragmentation, and habitat degradation. More recently, Connelly et al. (2004:13-4) indicated that of 41 populations defined for their analysis, 5 populations have been extirpated or have numbers too small to monitor, and 14 additional populations face a high risk of extinction. The vast majority of remaining sage-grouse are in only 8 populations. Additionally, Connelly et al. (2004: 6-67) reported that an examination of all trend data from the 1940s to 2003 "suggest a substantial decline in the overall sage-grouse population in North America." Sage-grouse populations declined at an overall rate of 2.0% per year from 1965 to 2003 (Connelly et al. 2004). These authors (2004:6-71) concluded, "Continued loss and degradation of habitat and other factors…do not provide causes for optimism."

## Goals

With respect to conservation of sage-grouse and the species' habitats as well as other sagebrush obligate species, the overall goal of management of public lands should be to (1) maintain the present abundance and distribution of greater sage-grouse and (2) enhance the population viability of the species through habitat management that results in increased abundance and distribution. While it is necessary to understand past changes in abundance and distribution of greater sage-grouse, it is also important to understand the present status of the species and to work towards a goal of no net loss of sagebrush steppe presently or potentially useful to sage-grouse, no further loss of populations or subpopulations, and enhancement of sage-grouse numbers by one-third (33%) and overall distribution by one-fifth (20%) (from ~668,412 km² to 835,000 km²). The abundance goal can likely be achieved by 2015 while the enhanced distribution goal is longer term (2030). Both desired increases (33% in abundance, 20% in distribution) were selected (by C. E. Braun) because they should be achievable, detectable, and measurable using current technology. A 20% increase in distribution was selected, as it should be detectable. Smaller increases in distribution are not likely to be detectable or measurable.

## Habitat Needs Overview

The habitat needs of greater sage-grouse are reasonably well understood based on knowledge of what has been described as "used" by sage-grouse (extensive literature summarized in Braun et al. 1977, Connelly et al. 2000b, Braun et al. 2005). The basic seasonal periods relating to sage-grouse habitat needs have been described as winter (early to mid-December to early to mid-March), spring (early to mid-March to early to

mid-June), summer (early to mid-June to late September), and fall (late September to early to mid-December) depending upon elevation and weather conditions (Braun et al. 2005). A summary (Braun et al. 2005) of the existing literature is attached as an appendix.

## Management of Development

Development of sagebrush steppe could include agricultural uses (usually permanent loss), which includes converting sagebrush habitats to cropland, placement of ranch/farm buildings, or the replacement of native sagebrush habitats with seeded pasture lands. Development may also refer to permanent conversion of sagebrush habitats to urban, suburban, and exurban uses (housing), and related infrastructure. "Development" as used in this section refers primarily to energy development, which includes mining (coal, gold, trona, and other mineral deposits) and extraction of natural gas (including coal bed methane) and oil. The following are minimum recommendations for development in sage-grouse habitats as it has been documented that some populations of greater sage-grouse require larger areas for breeding, brood-rearing, winter-use, and security depending upon whether they are migratory or non-migratory (Connelly et al. 2000b).

### Noise

Sage-grouse are known to select display sites (leks) that are highly visible and which have good acoustic properties (Patterson 1952, Connelly et al. 2000b, Lyon 2000, Braun et al. 2002). Sage-grouse numbers on leks within 1.6 km (1 mile) of coal bed methane (CBM) compressor stations in Campbell County, Wyoming, were consistently lower than on leks not affected by this disturbance (Braun et al. 2002). Holloran and Anderson (2005) reported that lek activity by sage-grouse decreased downwind of drilling activities, suggesting that noise had measurable negative impacts on sage-grouse. Roads also generate noise and Connelly et al. (2004) indicated there were no active sage-grouse leks within 2 km of Interstate 80 (I-80) across southern Wyoming and only 9 leks were known to occur between 2 and 4 km of I-80. Lyon and Anderson (2003) reported that oil and gas development influenced the rate of nest initiation of sage-grouse in excess of 3 km of construction activities. Clearly, the amount and (likely) frequency of noise associated with development has major negative effects on greater sage-grouse.

Consequently, all drilling activities for gas and oil development should be prohibited within 5.5 km (3.3 miles) of active leks and their associated nesting areas (Holloran 2005). Further, all existing and new compressor stations should add noise abatement devices (mufflers) to reduce audible noise within 5.5 km of active leks. The actual level of noise (measured in decibels) that would not negatively affect greater sage-grouse breeding and nesting activities is presently unknown.

### Physical Disturbance

Greater sage-grouse are known to be negatively impacted by activities associated with mining, and oil and gas development (Remington and Braun 1991, Aldridge 1998, Lyon and Anderson 2003, Holloran and Anderson 2005). Besides the actual physical disturbance to the landscape caused by mining and oil and gas development activities, the

impacts of roads are also negative for sage-grouse (Connelly et al. 2004). There are numerous examples of active leks being abandoned once road use associated with mining and gas/oil development increased in close proximity (< 1 km) to leks and nesting habitat (Braun 1986).

All surface activity should be prohibited within 5.5 km (Holloran and Anderson 2004, 2005) of active sage-grouse leks. No surface occupancy is preferred to simply limiting use of areas to specific periods, as the latter does not appear to benefit sage-grouse. Roads should not be placed within 5.5 km (3.3 miles) of active leks. If roads are present, they should be seasonally closed during the sage-grouse breeding season from 1 March to 20 June.

## Management of Fire

### Prescribed Fire

Fire has been demonstrated to be negative for greater sage-grouse (Hulet 1983; Connelly et al. 2000*a, b*; Nelle et al. 2000) as it destroys winter and nesting habitats. Use of fire has been promoted by public land management agencies (both BLM and USFS) to reduce sagebrush cover and increase forbs. However, the only presumed value of this practice is to improve brood-use areas or remove encroaching conifers. The problems with use of prescribed fire relate to control of the fire (escapement is frequent), what is actually burned versus what was desired to be burned, and size of the planned burn. Too often, what is burned is nesting or winter-use areas and burned areas are too large (> 20 ha).

Prescribed fire should not be used in areas where invasion of cheatgrass (*Bromus tectorum*) or other exotic species is likely. Burned areas should be smaller than 20 ha in size and no more than 20% of the landscape (128 ac per section [640 ac]) should be burned over a 30-year interval in taller sagebrush types. Burning should not be permitted in low sagebrush habitat types (i.e., *Artemisia arbuscula, A. longiloba, A. nova*). Burning that benefits sage-grouse will most likely be that which affects brood habitat. There should be a demonstrated need for additional brood habitat before use of prescribed fire is considered. The goal is to not exceed 20% fire coverage (128 ac per section [640 ac]) over a 30-year period regardless of the total area planned to be burned. Reseeding should not be necessary for prescribed burns, as areas should be sufficiently small so that surrounding sagebrush habitat can reseed the areas naturally.

### Wild Fire

All wild fires should be vigorously suppressed except in areas where juniper (*Juniperus* spp.) or pinyon pine (*Pinus edulis*) has invaded (>20 trees/ha). Most wild fires are negative for sage-grouse in the short-term. If wild fires occur, grazing by domestic livestock should be immediately suspended and should not be reinstated for a minimum of 3 years. The present 2-year rest period from grazing that is often prescribed on public lands following wild fires is not based on data. Replicated studies are needed across the gradient of moisture regimes and habitat types to learn if 3 years or more are adequate for ecosystem renewal following wild fire. Most areas burned by wild fire do not require reseeding, as disking and other forms of site preparation can be harmful to site restoration. These are practices that promote livestock grazing, not habitat restoration. If

reseeding must be done to reduce soil erosion, it should occur in linear strips perpendicular to the prevailing wind except on steeper (>30%) slopes. Strips should be planted with dryland alfalfa, biennial sweet clover, native bunch grasses, and sagebrush seed in a ratio of 1 strip (10 m width) per 50 m. Areas closest to a potential fire source (roads or railroads) should be planted with a 20-m wide strip of fire resistant vegetation.

## Management of Grazing

Sound grazing management in sagebrush steppe should promote light use of herbaceous forage while having a neutral or positive impact on plant vigor. Further, proper livestock grazing should maintain or enhance desirable plant communities, improve vegetation palatability, increase native plant diversity, and promote residual vegetative cover. Extreme caution should be exercised in grazing sagebrush steppe until scientific evidence is obtained through replicated studies that demonstrate grazing improves, restores, or maintains the ecosystem. It is questionable if grazing of sagebrush-dominated rangelands that produce less than 448 kg per ha (400 lbs/ac) per year of herbaceous forage should be permitted. Domestic livestock grazing should not be permitted of any sagebrush steppe habitats that produce less than 224 kg per ha (200 lbs/ac) of herbaceous vegetation per year if successful sage-grouse nesting and brood rearing is an objective. Unfortunately, there are no replicated long-term studies of the effects of stocking rates for cattle in sagebrush grasslands (Holechek et al. 1999:12).

### Livestock

Grazing by domestic cattle can negatively impact nesting success of ground-nesting birds (Walsberg 2005). Several studies have demonstrated that greater sage-grouse nest success is higher where grass height and density is greater than at random sites (Wakkinen 1990, Gregg 1991). Thus, livestock grazing that reduces herbaceous cover in sagebrush steppe may negatively affect nest success of sage-grouse. Sites used by sage-grouse broods are characterized by higher plant species richness (Dunn and Braun 1986, Klott and Lindzey 1990, and others) with strong grass and forb components (Sveum et al. 1998). Excessive livestock use may damage these important areas.

Livestock stocking rates are most important in affecting forage use and residual herbaceous cover followed by timing of grazing and length of the grazing season. The most common prescription used by public land management agencies on public lands is that of 'moderate use'. Holechek et al. (1999:12) equated 'moderate use' to removal of an average of 43% (their Table 2) of the primary forage species. These authors found that moderate use resulted in rangeland deterioration in semi-arid grasslands. Holechek et al. (1999:15) recommended that no more than 30-35% use of annual herbaceous production would be necessary for improvement in rangeland vegetation versus the common recommendation of 50% use by the Natural Resources Conservation Service.

My recommendation, if livestock grazing is permitted on public rangelands, is to not exceed 25-30% utilization of herbaceous forage each year. Grazing should not be allowed until after 20 June and all livestock should be removed by 1 August with a goal of leaving at least 70% of the herbaceous production each year to form residual cover to benefit sage-grouse nesting the following spring. Twice-over grazing systems, where livestock pass through an area twice in a grazing season, should be avoided, and full

rotation of each subdivision of an allotment or at least on a pasture basis should occur once every 4 years. Winter grazing is generally less negative for herbaceous vegetation and sage-grouse than grazing during the growing season. Care should be used in calculating stocking rates to ensure that no more than 25-30% forage utilization is achieved. Winter grazing should not be initiated until plant growth has ceased for the year and should generally occur in the 15 November to 1 March interval. Larger pastures with fewer fences are better than smaller pastures. Water and salt should be placed near fences or fence corners, as these areas (fences and fence corners) tend to 'naturally' attract livestock. The goal should be to reduce livestock impacts in the centers of pastures or allotments. Because fences are generally negative for sage-grouse (Connelly et al. 2004), placement of water and salt near fences can be used to concentrate livestock impacts in areas removed from the more valuable habitats for sage-grouse.

**Wildlife**

Native wildlife, primarily elk (*Cervus elaphus*), but also deer (*Odocoileus* spp.), pronghorn (*Antilocapra americana*), and hares (*Lepus* spp.), graze sagebrush steppe. Except in limited situations, such as within fenced pastures (to benefit domestic sheep which may prevent pronghorn movement), severe winter conditions, or unique situations (especially with hares), grazing by native wildlife species of particular sites is non-repetitive (unlike with domestic livestock). Hunting regulations by state and provincial agencies should keep populations of game animals within herd objectives. Management of elk can be difficult in achieving adequate harvests. State and provincial wildlife agencies should rigorously seek to manage elk within stated herd objectives or to reduce their numbers when sage-grouse habitat objectives are at risk. In areas where herd objectives cannot be met through legal hunting, reintroduction of native large predators should be considered.

'Wild' horses and burros also occupy some public lands and can cause habitat deterioration in areas important to sage-grouse. Efforts should be made to reduce or eliminate undocumented or permitted horses and burros on public lands important to sage-grouse where habitat deterioration is occurring.

## Management of Habitat Fragmentation

Fragmentation of habitats useful for greater sage-grouse is not of recent origin, but only recently has it been accorded proper recognition (Braun 1998, Connelly et al. 2004). There are many factors that can fragment habitats from conversion of habitat type (agriculture adjacent to sagebrush steppe), to fences, power lines, roads, reservoirs, wild fire, and prescribed burns. Essentially, any land use, development, or treatment that subdivides blocks of intact sagebrush steppe causes fragmentation. Management of sagebrush steppe should focus on maintaining large (>1 cadastral section [2.59 km² or 1 mi²]) blocks of sagebrush steppe and preferably in excess of 20 cadastral sections [51.8 km² or 20 mi²] in size. These blocks should conserve habitat at the landscape scale with at least 1 large block per Township (36 cadastral sections [93.2 km² or 36 mi²]) throughout the sagebrush steppe. This recommendation is based on personal observations as well on published literature (Toepfer et al. 1990).

Continuity among habitat patches is desirable. Dispersal corridors should be preserved between and among blocks of habitats useful to greater sage-grouse. These corridors should be at least 1.6 km (1 mi) in width to reduce predator concentrations. Corridors should not contain roads, power lines, oil and gas developments, fences, or buildings.

## Management of Invasive Plant Species

Invasive plant species are becoming more widespread throughout public lands as a result of disturbance from livestock grazing, livestock feeding operations, roads, development, and other land uses. While there are numerous invasive species that may occur across the sagebrush steppe, those most important over large areas include cheatgrass, juniper and pinyon pine (both native species), as well as other exotic species. Control or elimination of exotic species should have the highest priority.

### Cheatgrass

Livestock management practices, fire, plowing/chaining, various types of development, and other practices have facilitated the spread of cheatgrass. Cheatgrass is palatable to livestock for only a short period during early growth in spring. It is a highly proficient seed producer and cannot be easily controlled by disking, plowing, grazing, or herbicides during the growing period or when mature. However, several pre-emergent herbicides have been demonstrated to reduce germination of cheatgrass (Connelly et al. 2000*b*). Reseeding cheatgrass-dominated areas with dryland alfalfa and native bunch grasses in strips (20 m width with every other strip being alfalfa/bunch grasses/biennial sweet clover/sagebrush) would appear to be effective in reducing cheatgrass abundance and may be more economical than use of herbicides.

### Pinyon/Juniper

Management of pinyon pine or juniper invasion can be achieved through cutting and burning (either or both) individual trees as well as use of prescribed fire over larger landscapes. Treatment of individual trees is most effective (but more expensive), as the live sagebrush and grass/forb understory is not burned (Commons et al. 1999).

## Management of Rangeland Seedings

Hundreds of thousands of hectares of former sagebrush steppe have been seeded with non-native forage species following plowing (to benefit livestock) or wild fire. Much of this area was reseeded with crested wheatgrass (*Agropyron cristatum*). Unfortunately, crested wheatgrass is of little use to sage-grouse as it provides poor cover and no food value. Sage-grouse seasonally consume forbs, insects, and sagebrush and do not eat grass seeds or leaves. Further, crested wheatgrass is a prolific seed producer with the ability to remain dominant on the landscape for periods exceeding 40 years. Crested wheatgrass is preferred forage for livestock and wild ungulates, especially during the growing period. It is capable of withstanding substantial grazing pressure and, once established, crested wheatgrass is difficult to replace with native bunchgrasses and sagebrush (due to competition and lack of seed sources).

Benign neglect has allowed portions (primarily the edges) of many seedings on public lands to revert in part to sage-grouse habitat. This is the result of sagebrush regeneration from seeds of live sagebrush in adjacent areas. Sage-grouse use these areas as density of sagebrush seedlings and canopy cover increases. Unfortunately, forb abundance in most crested wheatgrass seedings is very low (<3-5% cover) and sage-grouse use is mostly confined to foraging on young sagebrush plants. Crested wheatgrass seedings with less than 5% sagebrush canopy cover should be disked and reseeded in strips perpendicular to the prevailing wind to aid restoration of native habitats. Strips should be no more than 20 m in width in a ratio of 1 strip every 100 m. Strips should be planted with a mixture of dryland alfalfa, biennial sweet clover, native bunch grasses, and taller sagebrush (either mountain big sagebrush [*Artemisia tridentata vaseyana*] or Wyoming big sagebrush [*A. t. wyomingensis*] depending upon the site).

Biological control of crested wheatgrass seedings through manipulation of grazing intensity is possible but is negative to overall rangeland health as it results in severe overgrazing of all areas including adjacent native sagebrush steppe. This practice should not be promoted, as it will fail to control or eliminate crested wheatgrass. Chemical control of crested wheatgrass seedings also has little chance of success because of the abundant but dormant seed in the upper levels of the soil profile that are not affected by herbicides. Mechanical control through plowing or disking of the entire seeding followed by reseeding with desirable plant species also has little merit as it is expensive and exposes large expanses to wind erosion and exotic weeds. Plowing or disking (with or without reseeding) also has little chance of success because of the abundant amount of crested wheatgrass seed in the upper soil profile. Thus, the best scenario is to disk strips into crested wheatgrass seedings horizontal to the prevailing wind and replant desired vegetation (in strips) while protecting all larger sagebrush plants that may be present to serve as seed sources. Additional strips should be disked and reseeded at 3-5 year intervals depending upon site and results from the initial strips (adaptive management).

## Management of Roads

Roads are known to reduce the value of potential breeding habitats for greater sage-grouse (Connelly et al. 2004), cause lek abandonment (Braun 1986), and lead to death (from collisions). Road densities are increasing within occupied sage-grouse habitats. A recent study in the Upper Green River Valley, Wyoming found that all remaining greater sage-grouse leks were within 5 km (3.1 miles) of a road and that 95% of the Jonah gas field had road densities greater than 3.2 km per 2.59 km² (2 miles/mile²) (Thomson et al. 2005). Distinction should be made among primary roads (usually paved), secondary roads (mostly gravel), and trails (usually dirt, commonly expressed as 2-tracks). Primary roads are most negative for greater sage-grouse because of vehicle frequency, speed, and noise. Secondary roads can also be very negative depending again upon vehicle frequency, speed, and noise. Generally, trails are used seasonally and receive light vehicle use. Consequently, they are least problematic for sage-grouse.

Public land management agencies should have transportation plans for each forest, district, and resource area. Both permanent and seasonal road/trail closures are appropriate to reduce disturbance to sage-grouse during breeding activities and winter.

Most trails within occupied sage-grouse habitat should be closed during the breeding period and winter. Some secondary roads within 5 km of active leks should be closed during the 1 March-20 June period as well as during winter (December-February). All secondary roads and trails that traverse important sage-grouse areas should be reviewed and considered for permanent closure and revegetation.

Off-road vehicles (ORVs) should be prohibited except on designated trails and roads where sage-grouse use does not occur.

## Management of Structures

Greater sage-grouse did not evolve with structures. Sage-grouse commonly collide with fences, and power lines have been demonstrated to be negative as they may result in collisions resulting in injury to or death of birds (Connelly et al. 2004). Structures can also provide perch locations for raptors, especially golden eagles (*Aquila chrysaetos*), which prey upon sage-grouse during all seasons of the year, and corvids that prey on nests. Prior to the advent of human-made structures, raptors and corvids in sagebrush steppe used elevated natural sites from which to hunt. The addition of power line poles, fences, hay equipment and stacks, and abandoned buildings have greatly expanded the number of suitable perches for raptors in a landscape that is mostly devoid of trees (Connelly et al. 2004). Historically, there were large expanses of suitable habitat for sage-grouse with few elevated perch sites.

Utility companies should be required to fit all potential perch sites (poles, towers) for golden eagles with devices to deter perching (including power poles associated with oil and gas development). All unused power poles (and towers) should be removed and consideration should be given to elimination (and removal) of unnecessary power lines that traverse sage-grouse habitats. Existing power lines should be placed in corridors that follow road systems, especially those that are paved, to minimize impacts on the landscape. First priority for fitting power poles with raptor guards and or for removal of power lines should be given to areas within 5.5 km (3.3 miles) of active leks (at least line of sight). Second priority should be given to known sage-grouse winter-use areas, especially along windswept ridges and near large expanses of sagebrush that are not typically covered by snow in winter. Raptor predation during summer and early fall is usually a local problem and more a product of habitat quality (i.e., sage-grouse are limited to few areas of suitable habitat) than at other times of the year.

Metal fence posts are preferable to wooden posts for fencing as the former better discourage raptors from using them as perches. Fencing within 2 km of active leks should be discouraged as sage-grouse are more likely to collide with them as they fly to and from leks, frequently at low levels and in low light. Fences designed to prevent domestic sheep from escaping pastures should be eliminated as walking sage-grouse frequently will follow and not readily fly over them. Fences in sage-grouse areas should be of no more than 3-strands of wire with both the top and bottom wires being barbless. All unnecessary fences should be removed (wire and posts). If fences known to result in sage-grouse mortality cannot be removed, the top wire should be marked with permanent visual flagging.

## Management of Vegetation

Native sagebrush steppe vegetation should be given highest priority for management. Management should revolve around proper livestock grazing practices and not use of chemical or mechanical treatments. Grazing should be managed to ensure that sagebrush-dominated rangelands have the opportunity to recover from past management practices. The goal is to have healthy, self-sustaining native vegetation in which sagebrush comprises 10 to 25% of the vegetative canopy cover, grasses comprise 30-40%, and forbs comprise 15 to 20% of the ground cover. Holechek et al. (1999:15) indicate that livestock grazing, if the intent is to improve rangeland vegetative condition, should remove no more than 30-35% of the annual herbaceous growth. Some areas may require complete removal of livestock grazing for 3-5 years before grazing at lower stocking rates can resume. Improved management of grazing is the least expensive practice to restore degraded sagebrush steppe and should have the highest priority.

Chemicals such as 2,4-D and tebuthiuron have been widely used in attempts to eliminate or reduce sagebrush to increase livestock forage on public rangelands (Braun 1987, 1998). Use of 2,4-D has mostly been phased out for a variety of human health and environmental reasons (Braun 1998). Tebuthiuron is now favored for controlling sagebrush, especially to 'thin' sagebrush stands. Unfortunately, the effectiveness of this chemical is site dependent and is greatly affected by soil characteristics (Braun 1998) and continued livestock grazing. Application rates are critical and use of high rates or any chemical use on inappropriate soils can lead to total kill of sagebrush and forbs. For this reason, use of chemicals to 'thin' or control sagebrush is usually inappropriate for winter and breeding habitat.

Mechanical methods to manage sagebrush date to the 1930's and have involved brush beating, disking, chaining, and railing (Pechanic et al. 1954). These methods are relatively expensive and have mostly been used on small scales. They have the advantage of being able to be tailored to specific sites and will not 'escape' or 'drift' when compared to fire or use of chemicals. Of the available mechanical methods, use of brush beating is most appropriate as the desired results in terms of vegetation can reasonably be predicted. Brush beating or any other type of mechanical method to manage sagebrush should only be considered for 'better' range sites where vegetation response can be expected. These are normally areas where sagebrush canopy cover is >30%. Brush beating should be done in strips (usually 10-20 m in width) not to exceed one-quarter (25%) of the width of untreated strips. Strips should conform to the terrain and should not be straight lines but should be perpendicular to the prevailing wind. The design should result in a mosaic of sagebrush types with no more than 20-30% of the area being treated every 10-15 years (depending upon site). The goal is to set back sagebrush height (causing resprouting) and not death of all sagebrush plants. This can be accomplished by adjustment of the height of the mower blades. More recent advances such as the 'Dixie Harrow' and 'Lawson Aerator' may have merit but more scientific analysis of the results of using these devices is needed. Management of livestock grazing (reduction in or elimination of use for at least 2 years) is normally needed following brush beating or any mechanical treatment.

Use of fire to manage sagebrush steppe vegetation is usually inappropriate as it is difficult to control and frequently burns primarily winter and nesting habitats (Connelly et al. 2000*a*). Fire should generally be avoided or, at the least, restricted to small (<20 ha) sites where a lack of brood habitat has been documented to limit increases in sage-grouse populations.

## Management of Water

Greater sage-grouse have been documented to use open water, especially during dry seasons. They readily eat snow in winter and forage during summer and fall on succulent vegetation in mesic sites. This vegetation may be adjacent to agricultural areas, riparian habitats, or where water is allowed to flow over land at springs and ponds. The need for so-called wildlife "guzzlers" is questionable, as studies have failed to demonstrate increases in sage-grouse density in areas with guzzlers (Connelly and Doughty 1989). Surface water flow in summer is important as it promotes growth of succulent forbs, which are attractive to greater sage-grouse. Pipes and tanks (for livestock) have no value for sage-grouse unless water is available at ground level or is allowed to spill onto the ground. There should be no emphasis placed on improving water distribution for livestock as this negatively affects sage-grouse habitats in most cases outside of ponds. All seeps and springs, and associated mesic sites should be fenced to exclude large grazing animals including domestic sheep, cattle, horses, and burros.

Livestock grazing has also impacted water tables by increasing sagebrush density and increasing soil erosion by reducing surface litter that slows runoff. Techniques useful to increasing water table levels include reduction of livestock grazing, sagebrush mowing, filling eroded drainages with (certified weed-free) straw bales, and creating check dams. These techniques are also useful in creating brood habitat for sage-grouse.

## Where Should Management Focus Be Placed?

Areas with existing sage-grouse populations should have the highest priority for conservation. The best scenario for improved sage-grouse abundance and distribution is to conserve habitats with existing populations and then work outward from those core areas to improve habitats in more peripheral areas. GIS (Geographic Information Systems) derived maps of present vegetation and soil potential should be used with overlays of past and planned treatments to prevent too much area from being treated in a 10-15+ year period. The goal should be to increase sage-grouse abundance and distribution. Increases in abundance will be easier to achieve.

Areas contiguous to existing populations which do not presently have sage-grouse or which have very small populations (100-300 birds) should have second priority for management. Review of GIS maps of vegetation and soil potential will frequently identify factors that are depressing sage-grouse populations when compared to similar maps where sage-grouse still persist in some number. Treatments to improve abundance and distribution of populations will vary from area to area. Grazing practices and development are the most obvious factors depressing sage-grouse populations followed by fragmentation caused by vegetation treatments, including fire.

## How Should Success Be Measured?

Changes in abundance of greater sage-grouse are best measured by monitoring the number of active leks in a discrete area (leks/10 km²) over a 3-5 year period. Total number of males counted in a given area over a 3-5 year period can also be used. Changes in estimated nest success and percent young based on wing surveys of hunter-harvested birds (where appropriate) may also provide useful data (Autenrieth et al. 1982, Connelly et al. 2003). Changes in the proportion of young to adult (and yearling) hens in the harvest can also be used to detect improvement in sage-grouse production.

Changes in distribution of greater sage-grouse can be derived from intensive searches for active leks in areas (based on GIS derived maps of potential habitat) where sage-grouse were not present in the previous 3-5 years. Random transects to assess seasonal changes in distribution of sage-grouse fecal pellets can also be used to assess changes in distribution. Even presence or absence line transect counts of either sage-grouse or their sign (pellets) can be useful. These surveys should be made at 3-5 year intervals.

Changes in vegetation such as % bare ground, % forb coverage, % grass coverage, % sagebrush cover, as well as height of residual herbaceous material can be used to assess changes in vegetative composition and quality of habitats. However, vegetation surveys are labor intensive, costly, and may be affected by weather conditions, rodents, insects, and grazing animals. It is highly unlikely that short-term changes can be detected without standardized plots, which are marked and uniformly evaluated. This is not likely to be done on a consistent basis over large areas of western North America. It will be difficult to measure success in vegetation improvement except over time in very localized sites.

## Conclusions

Habitat conservation strategies to improve the abundance and distribution of greater sage-grouse have not been scientifically tested because of the reluctance of public land management agencies to invest in replicated management experiments over sufficiently large areas to be able to detect responses. However, sufficient information is available to make management recommendations given that negative responses of sage-grouse (decreases in abundance and distribution) are measurable. Habitat loss is certainly measurable as are fragmentation and degradation of habitats. The most notable changes in the sagebrush steppe since European settlement are associated with repetitive grazing by domestic livestock and developments (no matter how 'development' is defined). It is logical to expect improvement in sage-grouse abundance, at the least, with changes in policies, regulations, and practices involving grazing of domestic livestock and development. Both of these factors are managed by the key public land management agencies (BLM and USFS) that together control in excess of 60% of the remaining sagebrush steppe occupied by greater sage-grouse. Improvement in distribution will be more difficult as is restoration of useful sagebrush habitats in areas that have been burned or plowed and seeded to exotic grasses will be exceedingly slow.

Management practices that significantly reduce wild fire, reduce grazing intensity and forage utilization, and reduce or eliminate the spread of introduced annuals have the

best chance to positively impact abundance of greater sage-grouse. They will be the least expensive to implement. Development practices such as gas and oil exploration and production including surface infrastructure, which are obviously negatively affecting sage-grouse abundance and distribution, will be more expensive to change, but collectively changes in these practices could equal the gains expected to result from changes in livestock grazing practices.

Sufficient knowledge is available to begin implementing recommended practices that will positively affect greater sage-grouse. The key is to develop public support and the resolve within federal agencies to make the necessary changes.

### Recommendations

- First priority for habitat management should be areas where larger sage-grouse populations are still present. Management practices chosen should maintain the present abundance and distribution of sage-grouse.
- The second priority for habitat management is for areas where sage-grouse populations are small (<300 birds or 100 males counted on a 3-year moving average). Management practices should enhance sage-grouse abundance and distribution.
- A third priority should be to improve habitats in areas adjacent to existing populations.
- Sagebrush steppe management should focus on maintaining large (>1 cadastral section and preferably >20 cadastral sections in size) blocks of sagebrush habitat per Township (36 cadastral sections).
- No surface occupancy should be allowed within 5.5 km of all active sage-grouse leks.
- No roads should be constructed within 5.5 km of active sage-grouse leks.
- Existing roads within 5.5 km of active sage-grouse leks should have seasonal closures (1 March-20 June).
- Prescribed fires should be no larger than 20 ha with no more that 40% of each cadastral section being burned over a 15-year period.
- Wild fires in sagebrush steppe should be vigorously suppressed except in areas with >20 invasive conifer trees per ha.
- Livestock grazing should be deferred for 3 years following fires for recovery of herbaceous native vegetation.
- Livestock grazing should not remove more than 25-30% of the annual growth of herbaceous vegetation with grazing delayed until after 20 June. True rest rotation systems should be used and winter grazing is preferred.
- Where wildlife (deer and elk) herd objectives cannot be achieved through legal hunting, reintroduction and expansion of populations of large predators should be encouraged.
- Rangeland seedings of exotic grasses should be converted using reseeded strips of native bunchgrasses, adapted subspecies or species of sagebrush, and dryland alfalfa.

-Power lines should be placed only into existing road/utility corridors.
-Power poles and other existing human structures should either be
    removed, if not used, or fitted with raptor-deterrence devices.
-Fences in sage-grouse use areas should be no more than 3 strands with the
    top and bottom wires being barbless. Unused fences should be
    removed.
-Use of chemicals to 'manage' sagebrush should not be permitted. If
    sagebrush is to be managed to reduce density or to enhance vigor,
    mechanical methods are preferred.
-Sage-grouse have not been shown to need open water. However, water
    should be allowed to flow (seep) over the ground to encourage
    growth of succulent forbs.
-Active leks per unit of area and total number of male sage-grouse counted at
    proscribed (4 counts per breeding period spaced at 7-10 day intervals)
    should be used as the measure of success of management treatments
    followed by changes in % bare ground, % forb coverage, % grass
    cover, % sagebrush canopy cover, and height of residual herbaceous
    vegetation.
-Sage-grouse pellet transects should be used to measure expansion of birds
    into vacant or former habitat.

### Literature Cited

Aldridge, C. L. 1998. Status of the sage grouse (*Centrocercus urophasianus urophasianus*) in Alberta. Wildlife Status Report 13. Wildlife Management Division, Alberta Environmental Protection and Alberta Conservation Association, Edmonton, Canada.

Autenrieth, R. E., W. Molini, and C. E. Braun 1982. Sage grouse management practices. Technical Bulletin 1. Western States Sage Grouse Committee, Twin Falls, Idaho, USA.

Braun. C. E. 1986. Changes in sage grouse lek counts with advent of surface coal mining. Thorne Ecological Institute. Proceedings, Issues and Technology in The Management of Impacted Western Wildlife 2:227-231.

Braun, C. E. 1987. Current issues in sage grouse management. Proceedings of the Western Association of Fish and Wildlife Agencies 67:134-144.

Braun, C. E. 1998. Sage grouse declines in western North America: what are the problems. Proceedings of the Western Association of Fish and Wildlife Agencies 78:139-156.

Braun, C. E., T. Britt, and R. O. Wallestad. 1977. Guidelines for maintenance of sage grouse habitats. Wildlife Society Bulletin 5:99-106.

Braun, C. E., O. O. Oedekoven, and C. L. Aldridge, 2002. Oil and gas development in western North America: effects on sagebrush steppe avifauna with particular emphasis on sage grouse. Transactions of the North American Wildlife and Natural Resources Conference 67:337-349.

Braun, C. E., J. W. Connelly, and M. A. Schroeder. 2005.  Seasonal habitat requirements for sage-grouse: spring, summer, fall, and winter. Pages 38-42 *in* N. L. Shaw, M. Pellant, and S. B. Monsen, compilers. Sage-grouse habitat restoration symposium proceedings, 4-7 June 2001, Boise, Idaho, USA. U. S. Department of Agriculture, Forest Service, RMRS-P-38.

Commons, M.L., R. K. Baydack, and C. E. Braun. 1999. Sage grouse response to pinyon-juniper management. Pages 238-239 *in* S. B. Monsen and R. Stevens, compilers. Proceedings: ecology and management of pinyon-juniper communities within the Interior West. U. S. Department of Agriculture, Forest Service, RMRS-P-9.

Connelly, J. W., and C. E. Braun. 1997. Long-term changes in sage grouse *Centrocercus urophasianus* populations in western North America. Wildlife Biology 3:229-234.

Connelly, J. W., and L. A. Doughty. 1989. Sage grouse use of wildlife water developments in southeastern Idaho. Pages 167-173 *in* S. Stiver and G. Tsukomoto, editors. Symposium on wildlife water developments. Nevada Department of Fish and Game, Reno, USA.

Connelly, J. W., K. P. Reese, and M. A. Schroeder. 2003. Monitoring of greater sage-grouse habitats and populations. College of Natural Resources Experiment Station Bulletin 80. University of Idaho, Moscow, USA.

Connelly, J. W., K. P. Reese, R. A. Fischer, and W. L. Wakkinen. 2000*a*. Response of a sage grouse breeding population to fire in southeastern Idaho. Wildlife Society Bulletin 28:90-96.

Connelly, J. W., M. A. Schroeder, A. R. Sands, and C. E. Braun. 2000*b*. Guidelines to manage sage grouse populations and their habitats. Wildlife Society Bulletin 28:967-985.

Connelly, J. W., S. T. Knick, M. A. Schroeder, and S. J. Stiver. 2004. Conservation assessment of greater sage-grouse and sagebrush habitats. Unpublished Report. Western Association of Fish and Wildlife Agencies, Cheyenne, Wyoming, USA.

Dunn, P. O., and C. E. Braun. 1986. Summer habitat use by adult female and juvenile sage grouse. Journal of Wildlife Management 50:228-235.

Gregg, M. A. 1991. Use and selection of nesting habitat by sage grouse in Oregon. Thesis. Oregon State University, Corvallis, USA.

Holechek, J. L., H. Gomez, F. Molinar, and D. Galt. 1999. Grazing studies: what we've learned. Rangelands 21(2): 12-16.

Holloran, M. J. 2005. Greater sage-grouse (*Centrocercus urophasianus*) population response to natural gas field development in western Wyoming. Dissertation. University of Wyoming, Laramie, USA.

Holloran, M. J., and S. H. Anderson. 2004. Sage-grouse response to natural gas field development in northwestern Wyoming. Proceedings of the Western Agencies Sage and Columbian sharp-tailed grouse Technical Committee 24:16.

Holloran, M. J., and S. H. Anderson. 2005. Greater sage-grouse population response to natural gas field development in western Wyoming: are regional populations affected by relatively localized disturbance? Transactions of the North American Wildlife and Natural Resources Conference 70:In Press.

Hornaday, W. T. 1916. Save the sage grouse from extinction, a demand from civilization to the western states. New York Zoological Park Bulletin 5:179-219.

Hulet, B. V. 1983. Selected responses of sage grouse to prescribed fire, predation, and grazing by domestic sheep in southeastern Idaho. Thesis. Brigham Young University, Provo, Utah, USA.

Klott, J. H., and F. G. Lindzey. 1990. Brood habitats of sympatric sage grouse and Columbian sharp-tailed grouse in Wyoming. Journal of Wildlife Management 54:84-88.

Knick, S. T., D. S. Dobkin, J. T. Rotenberry, M. A. Schroeder, W. M. Vander Haegen, and C. van Riper III. 2003. Teetering on the edge or too late? Conservation and research issues for avifauna of sagebrush habitats. Condor 105:611-634.

Küchler, A. W. 1964. Potential natural vegetation of the conterminous United States (map and manual). Special Publication 36. American Geographical Society, New York, USA.

Lyon, A. G. 2000. The potential effects of natural gas development on sage grouse (*Centrocercus urophasianus*) near Pinedale, Wyoming. Thesis. University of Wyoming, Laramie, USA.

Lyon, A. G., and S. H. Anderson. 2003. Potential gas development impacts on sage-

grouse nest initiation and movement. Wildlife Society Bulletin 31:486-491.

Miller, R. F., and L. E. Eddleman. 2001. Spatial and temporal changes of sage grouse habitat in the sagebrush biome. Agricultural Experiment Station Technical Bulletin 151. Oregon State University, Corvallis, USA.

Nelle, P. J., K. P. Reese, and J. W. Connelly. 2000. The long-term effect of fire on sage grouse nesting and brood-rearing habitats on the Upper Snake River Plain. Journal of Range Management 53:586-591.

Patterson, R. L. 1952. The sage grouse in Wyoming. Sage Books, Denver, Colorado, USA.

Pechanic, J. F., G. Stewart, A. P. Plummer, J. H. Roberson, and A. C. Hull. 1954. Controlling sagebrush on rangelands. Farmer's Bulletin 2072. U. S. Department of Agriculture, Washington, D.C., USA.

Remington, T. E., and C. E. Braun. 1991. How surface coal mining affects sage grouse, North Park, Colorado. Thorne Ecological Institute. Proceedings, Issues and Technology in the Management of Impacted Western Wildlife 5: 128-132.

Schroeder, M. A., C. L. Aldridge, A. D. Apa, J. R. Bohne, C. E. Braun, S. D. Bunnell, J. W. Connelly, P. A. Deibert, S. C. Gardner, M. A. Hilliard, G. D. Kobriger, S. M. McAdam, C. W. McCarthy, J. J. McCarthy, D. L. Mitchell, E. V. Rickerson, and S. J. Stiver. 2004. Distribution of sage-grouse in North America. Condor 106:363-376.

Sveum, C. M., J. A. Crawford, and W. D. Edge. 1998. Use and selection of brood-rearing habitat by sage grouse in south-central Washington. Great Basin Naturalist 58:344-351.

Thomson, J. L., T. S. Schaub, N. W. Culver, and P. C. Aengst. 2005. Wildlife at a crossroads: energy development in western Wyoming. Effects of roads on habitat in the Upper Green River Valley. The Wilderness Society, Washington, D.C., USA.

Toepfer, J. E., R. L. Eng, and R. K. Anderson. 1990. Translocating prairie grouse: what have we learned? Transactions of the North American Wildlife and Natural Resources Conference 55:569-579.

Vale, T. R. 1975. Presettlement vegetation in the sagebrush grass area of the Intermountain West. Journal of Range Management 28: 32-36.

Wakkinen, W. L. 1990. Nest site characteristics and spring-summer movements of migratory sage grouse in southeastern Idaho. Thesis. University of Idaho,

Moscow, USA.

Walsberg, G. E. 2005. Cattle grazing in a national forest greatly reduces nesting
    success in a ground-nesting sparrow. Condor 107:714-716.

---

About The Author

Clait E. Braun has worked with sage-grouse as a researcher (1973-99) and
consultant (2000-06), and has been a leader in publishing research and management
articles on sage-grouse. Dr. Braun is a Certified Wildlife Biologist and has either worked
in or extensively visited all states and provinces with current populations of sage-grouse.
He retired from the Colorado Division of Wildlife where he was responsible for sage-
grouse research from 1973 into 1999 and now operates Grouse Inc. providing
professional guidance and reviews on sage-grouse and their habitats. This 'Blueprint'
represents his professional experience and selected literature based on 30+ years of work
with sage-grouse.

Exhibit A – Part 2

**Appendix**

Seasonal Habitat Requirements for Sage-grouse:

Spring, Summer, Fall, and Winter[1]

(Citation: Braun, C. E., J. W. Connelly, and M. A. Schroeder. 2005. Pages 38-42 *in* N. L. Shaw, M. Pellant, and S. B. Monsen, compilers. Sage-grouse habitat restoration symposium proceedings, 4-7 June 2001, Boise, Idaho, USA. U. S. Department of Agriculture, Forest Service, RMRS-P-38.)

[1]The contents of this 'Blueprint' document have not been reviewed or approved by either of the 2 coauthors of the published paper referenced in the Appendix.

# Seasonal Habitat Requirements for Sage-Grouse: Spring, Summer, Fall, and Winter

**Clait E. Braun**
**John W. Connelly**
**Michael A. Schroeder**

**Abstract**—Sage-grouse (*Centrocercus minimus, C. urophasianus*) are dependent upon live sagebrush (*Artemisia* spp.) for all life processes across their entire range. This paper describes habitats used by sage-grouse as documented in the scientific literature. The leaves of sagebrush are eaten by sage-grouse throughout the entire year and comprise 99 percent of their winter diets. Spring (late March through May) habitats are those with intermixed areas of taller (40 to 80 cm) sagebrush with canopy cover of 15 to 25 percent and taller (>18 cm) grass/forb cover of at least 15 percent. Sites used for display have shorter vegetation, frequently few or only short sagebrush plants, but with taller, more robust sagebrush within 100 to 200 m that is used for escape cover. Nesting cover mimics that used overall during spring but with clumps of tall (>50 cm), dense (about 25 percent) live sagebrush and abundant forbs (>10 to 12 percent cover). Early brood rearing areas are those within 200 m (initial 3 to 7 days posthatch) to 1 km (up to 3 to 4 weeks posthatch) of nest sites. Forbs and taller (>18 cm) grasses are important for broods; forbs provide succulent foods, grasses provide hiding cover, and the grass/forb mixture supports insects used by chicks. Summer use areas are those with abundant succulent forbs with live, taller (>40 cm), and robust (10 to 25 percent canopy cover) sagebrush useful for cover. These areas continue to be used into fall when sage-grouse move to higher benches/ridges where they forage on remaining succulent forbs such as buckwheat (*Eriogonum* spp.) and switch to more use of sagebrush leaves. Winter (early December to mid-March) use areas are often on windswept ridges, and south to southwest aspect slopes as well as draws with tall, robust live sagebrush. Height (25 to 35 cm) of sagebrush above the surface of the snow in areas used in winter is important, as is canopy cover (10 to 30 percent). Management of habitats used by sage-grouse should initially focus on maintaining all present use areas. Practices to enhance sagebrush habitats to benefit sage-grouse are reviewed, as is the need to annually monitor sage-grouse numbers along with systematic monitoring of the health of sagebrush ecosystems.

Clait E. Braun is retired from the Colorado Division of Wildlife and operates Grouse, Inc., 5572 North Ventana Vista Road, Tucson, AZ 85750 U.S.A., FAX: (520) 529-0365; e-mail: sg-wtp@juno.com. John W. Connelly is Research Biologist, Idaho Department of Fish and Game, 1345 Barton Road, Pocatello, ID 83204 U.S.A.; e-mail: JCsagegrouse@aol.com. Michael A. Schroeder is Upland Bird Research Biologist, Washington Department of Fish and Wildlife, P.O. Box 1077, Bridgeport, WA 98813 U.S.A.; e-mail: schromas@dfw.wa.gov

In: Shaw, Nancy L.; Pellant, Mike; Monsen, Stephen B., comps. 2005. Sage-grouse habitat restoration symposium proceedings; 2001 June 4–7; Boise, ID. Proceedings RMRS-P-38. Fort Collins, CO: U.S. Department of Agriculture, Forest Service, Rocky Mountain Research Station.

## Introduction

Sage-grouse (*Centrocercus minimus, C. urophasianus*) historically occurred in at least 16 States and three Canadian Provinces (Aldrich 1963; American Ornithologists' Union 1957; Johnsgard 1973). They have been extirpated in five States and one Canadian Province (Braun 1998; Connelly and Braun 1997) and their overall distribution has become discontinuous (fig. 1). The changes in sage-grouse distribution have been attributed to loss, fragmentation, and degradation of habitats (Braun 1995, 1998; Connelly and Braun 1997), and it is probable that at least one-half of the original occupied area can no longer support sage-grouse (Braun 1998). Because of the reduced amount of available habitat, sage-grouse abundance has also markedly decreased with reported declines of 10 to 51 percent (Connelly and Braun 1997) and as much as 45 to 82 percent since 1980 (Braun 1998). The known decreases in distribution and abundance have led to concern about stability of sage-grouse populations and the health of sagebrush ecosystems upon which they depend. Petitions to list sage-grouse under the Federal Endangered Species Act have been filed for northern sage-grouse (*C. urophasianus*) and for Gunnison sage-grouse (*C. minimus*).

Sage-grouse are dependent upon ecosystems with vast and relatively continuous expanses of live, robust, taller sagebrushes (*Artemisia* spp.) with a strong grass and forb component. This dependency upon sagebrush, especially the subspecies of big sagebrush (*A. tridentata vaseyana, A. t. wyomingensis, A. t. tridentata*), low sagebrush (*A. arbuscula*), black sagebrush (*A. nova*), silver sagebrush (*A. cana*), and three-tip sagebrush (*A. tripartita*), as well as a variety of less apparent and abundant species, has been well documented (Patterson 1952; reviews by Braun and others 1977 and Connelly and others 2000a). Since the early 1960s, the sage-grouse/sagebrush relationship has focused attention by Western States and Provinces on the need to maintain healthy sagebrush-steppe communities over large expanses. Guidelines for maintenance of sage-grouse habitats were developed from the scientific literature (Braun and others 1977, completely revised by Connelly and others 2000a) and promoted by the Western States Sage-Grouse Technical Committee. The purpose of this paper is to present an overview of the habitat needs of sage-grouse based on the scientific literature, identify the issues that affect maintainance of useful habitats for sage-grouse, and discuss management strategies to maintain, enhance, and restore habitats



**Figure 1**—Historic and current distribution of sage-grouse (map prepared by M. A. Schroeder).

for sage-grouse. This paper draws extensively on the published *Guidelines to Manage Sage Grouse Populations and Their Habitats* (Connelly and others 2000a).

## Habitat Overview

### Spring

Timing of spring breeding activities of sage-grouse is dependent on elevation and amount of persistent snow cover. Attendance at leks may start in early to mid-March or, at higher elevations, in early April. Males may attend and display at leks until late May but most display and mating activities are greatly reduced by mid-May. Amount and depth of snow cover greatly influence sage-grouse breeding activities; thus, snow-free areas are important components of spring habitat. Habitats used by sage-grouse during the breeding period are those associated with foraging, leks, escape, and nesting. Depending upon moisture regimes, height of sagebrush in used habitats varies from 30 to 80 cm with canopy cover from 15 to 25 percent (Connelly and others 2000a). Lek sites typically have low amounts of sagebrush and appear relatively bare, but they may have extensive cover of low grasses and forbs. Taller, robust live sagebrush used as escape cover is normally within 100 to 200 m of active leks. The average distance from a nest to the nearest lek varies from 1.1 to 6.2 km, and the actual size of the breeding habitat appears largely dependent on the migratory characteristics of the sage-grouse population as well as distribution of sagebrush cover with respect to lek location (Connelly and others 2000a). Habitats selected for nesting are those with abundant (15 to 30 percent canopy cover) live, taller (30 to 80 cm) sagebrush plants within a community with >15 percent ground cover of taller (40 to 80 cm) grasses and forbs (Connelly and others 2000a). Early brood-rearing habitats (fig. 2) are normally those within 100 m to 1 km of nesting sites, especially areas with high plant species richness, moisture, and taller grasses and forbs (Connelly and others 2000a). Adult sage-grouse, while still foraging extensively on leaves of live sagebrush, eat leaves and flower parts of forbs during spring, as do chicks (Apa 1998; Drut and others 1994; Dunn and Braun 1986; Klott and Lindzey 1990).

### Summer

Habitats used by sage-grouse in summer (early to mid-June to mid to late September) are those that provide

Braun, Connelly, and Schroeder                                      Seasonal Habitat Requirements for Sage-Grouse: Spring, Summer, Fall, and Winter



Figure 2—Sage-grouse brood hen in good quality Wyoming big sagebrush habitat, North Park, Colorado (photograph by C. E. Braun).

adequate forage, especially succulent forbs, and cover useful for escape. These habitats may include those used for agriculture, especially for native and cultivated hay production, edges of bean and potato fields, as well as more typical sagebrush uplands and moist drainages. Taller (>40 cm) and robust (10 to 25 percent canopy cover) sagebrush is needed for loafing and escape cover as well as a source of food. Grass and forb ground cover can exceed 60 percent (hayfields). Provided moisture is available through water catchments or from succulent foliage, sage-grouse may be widely dispersed over a variety of habitats during this period (Connelly and others 2000a). As late summer approaches, there is movement from lower sites to benches and ridges (fig. 3) where sage-grouse forage extensively on leaves of sagebrush.

## Fall

Fall (late September into early December) is a time of change for sage-grouse from being in groups of hens with chicks or males and unsuccessful brood hens to separation into larger flocks frequently segregated by gender. Some birds may continue to use lower riparian or hayfield habitats, but there is movement onto higher, frequently north-aspect slopes where succulent native forbs, such as buckwheats, provide green forage. Use of sagebrush leaves for food becomes more common as does use of extensive stands (>20 percent canopy cover) of taller (>25 cm), live sagebrush (Connelly and others 2000a). Movements can be slow but there is a general shift toward traditional winter use areas (Connelly and others 1988).

## Winter

Flocks of sage-grouse are somewhat nomadic in early winter but may remain within chosen areas for periods of several weeks or more depending upon extent of snow cover and depth (Beck 1977; Hupp and Braun 1989b). Sagebrush height (>20 cm, but usually >30 cm, above the surface of the snow) is important as is the robust (>10 to 30 percent canopy cover) structure of live sagebrush (Connelly and others 2000a). Sage-grouse use a variety of sites in winter including windswept ridges with open (10 to 20 percent canopy cover) (fig. 4) stands of sagebrush to draws with dense (>25 percent canopy cover) stands. Quality of the snow can be important because sage-grouse are known to use snow roosts and burrows (Back and others 1987). Aspect is also important with south and southwest slopes most used in hilly terrain (Hupp and Braun 1989b). Leaves of live, vigorous sagebrush plants provide >99 percent of the foods eaten during the winter period (early December until early to mid-March) (Patterson 1952; Remington and Braun 1985; Wallestad and others 1975). Generally, winter is a time of body mass gain (Beck and Braun 1978), although severe winter conditions over prolonged intervals can reduce the amount of area available for foraging and cover (Beck 1977) and thus affect body condition (Hupp and Braun 1989a). Overall movement during winter may be extensive and home ranges can be large (Connelly and others 2000a). As winter wanes, flocks of sage-grouse move toward breeding areas that may be immediately adjacent to or far distant from winter use areas (Connelly and others 2000a).



Figure 3—Radio-tracking sage-grouse in high-elevation summer range with a stand of mountain big sagebrush in the background (photograph by J. W. Connelly).



Figure 4—Sage-grouse winter range in Wyoming big sagebrush habitat in North Park, Colorado (photograph by C. E. Braun).

## Issues

Decreases in distribution and abundance of sage-grouse have been ascribed to a complexity of factors (Braun 1987, 1998; Connelly and Braun 1997). The three major causes, (1) habitat loss (mostly permanent), (2) fragmentation (frequently permanent but reversible at times), and (3) degradation (usually can be corrected), are generally accepted but the latter two are poorly recognized and understood. Examples of permanent habitat loss include conversion of sagebrush rangelands to agricultural crops, town and subdivision developments, placement of power plants or surface mines, and reservoir construction. Fragmentation of habitats occurs with power lines, paved and other high-speed road development (including maintenance and improvement of farm roads), habitat-type conversion projects, fire, or any permanent development that reduces the size of existing habitat patches. Less understood are the impacts of fences, seasonal use trails, oil and gas wells with surface pipelines, noise, and so on. Some of these impacts can be resolved and sage-grouse will reoccupy some formerly disturbed areas (Braun 1987).

Distribution of habitat types useful to sage-grouse is also important, as these species are habitat specialists using a variety of areas within a larger landscape mosaic. Thus, not only is the quantity of sagebrush habitats important, but also the juxtaposition and quality of those habitats. All sagebrush habitats are not equal in their acceptability to sage-grouse, and location of areas used may affect sage-grouse distribution. Size of habitat patches is important and larger (>30 km$^2$) is better than smaller, although the spatial relationships of habitats for sage-grouse are not well understood. Sage-grouse use a mosaic of habitats that is normally present in sagebrush-steppe because of differences in soils, moisture, topography, aspect, insect defoliation, wildfires, and other factors. Sagebrush naturally regenerates as overmature plants die and seedlings become established. Use of the term "decadent" for sagebrush is generally inappropriate because it implies that sagebrush communities are not dynamic with a variety of age classes from seedlings to overmature. Since most sagebrush communities are resilient and represent a continuum of age classes within a mosaic of habitats, creation of "edge" to benefit sage-grouse is rarely needed. Because of human activities, the presence of too much edge (especially in straight lines) is more common than too little edge and results in degradation of sage-grouse habitats.

Sagebrush ecosystems have been managed through a variety of treatments from domestic livestock grazing, mechanical and chemical clearing or thinning, to use of prescribed fire (Braun 1998). Fire was a natural event in more mesic sagebrush communities but was infrequent as demonstrated by the lack of resprouting of big sagebrush, black sagebrush, and low sagebrush. Fire was more common in areas with three-tip sagebrush and silver sagebrush because both species resprout. Recent research suggests there is little gain in forage production of grasses and forbs after fire, because it can take longer than 30 years to return to preburn conditions (Wambolt and others 2001).

Treatments of sagebrush communities have primarily been conducted to benefit another treatment (livestock grazing). Use of some treatments has led to plantings of exotic grasses, invasion of areas by exotic plants, conifer invasion of sagebrush habitats, and increased fire frequency. Many, if not most, of these treatments have been applied to improve rangelands for domestic livestock but have had negative impacts on sagebrush communities and animals dependent on them (Braun and others 1976). Further, successive treatments have been applied to landscapes with little understanding of the cumulative effects that may impact both sagebrush-dependent animals, such as sage-grouse, and the overall health of the plant community. The impacts of natural events such as periodic drought are further exacerbated by human treatments of sagebrush communities. All of these issues emphasize the need for active protection of habitats presently used by sage-grouse as well as restoration of habitats that formerly supported sage-grouse populations.

## Sage-Grouse Habitat Management Strategies

The objectives of habitat management to benefit sage-grouse, in order of importance, should be (1) to protect and maintain existing occupied habitats, (2) enhance existing occupied habitats, (3) restore degraded habitats that still receive some sage-grouse use, and (4) rehabilitate significantly altered habitats that no longer support sage-grouse. Strategies to accomplish these objectives should include:

- Vigorous suppression of wildfire.
- Reconsideration of any use of prescribed fire.
- Proper livestock management (including reconsideration of time of grazing, stocking rates, season of use, and frequency of use).
- Use of nitrogen fertilizer, except in areas infested by annual weeds.
- Mechanical chopping of sagebrush.
- Fence type and placement.
- Water management.
- Rehabilitation and restoration techniques discussed in these proceedings.

At times, manipulation of some occupied sage-grouse habitat may be necessary to enhance the overall quality of a seasonal range. An example would be removing or reducing some sagebrush canopy cover in known breeding habitat to enhance a depleted understory. Removal of 57 percent of sagebrush cover resulted in a significant decline in a sage-grouse breeding population (Connelly and others 2000b) and degradation of early brood-rearing habitat (Fischer and others 1996). More recently, a wildfire that removed about 30 percent of the sagebrush cover in a breeding habitat resulted in a 60 percent decline in sage-grouse nest success (Connelly, unpublished data, 1998). Because of this information and the fact that wildfires, drought, and insect infestations cannot be predicted, any sagebrush removal efforts should affect a relatively small portion of the occupied habitat. Connelly and others (2000a) suggested that >80 percent of breeding and winter habitat with vegetative characteristics necessary for productive sage-grouse habitat should remain intact to adequately provide for the needs of sage-grouse. However, an even greater percentage should be protected if sage-grouse populations are declining or the population status is unknown. All proposed habitat

manipulations should carefully consider the current condition of habitat, status of the sage-grouse population, and likely outcome of the vegetation treatment, including recovery time necessary for the area to again provide adequate habitat for sage-grouse nesting and early brood rearing.

## Acknowledgments

We thank S. B. Monsen for inviting our participation in the symposium that led to these proceedings. We further thank all managers and researchers who have contributed to the scientific literature and our understanding of sage-grouse and their use of habitats. Much of our knowledge was gained through research supported through Colorado (CEB), Idaho (JWC), and Washington (MAS) Federal Aid to Wildlife Restoration Projects. This is a contribution from the Western States/Provinces Sage and Columbian Sharp-Tailed Grouse Technical Committee.

## References

Aldrich, J. W. 1963. Geographic orientation of American Tetraonidae. Journal of Wildlife Management. 27: 529–545.

American Ornithologists' Union. 1957. Check-list of North American birds. 5th ed. Baltimore, MD: Lord Baltimore Press. 691 p.

Apa, A. D. 1998. Habitat use and movements of sympatric sage and Columbian sharp-tailed grouse in southeastern Idaho. Moscow, ID: University of Idaho. 199 p. Dissertation.

Back, G. N.; Barrington, M. R.; McAdoo, J. K. 1987. Sage grouse use of snowburrows in northeastern Nevada. Wilson Bulletin. 99: 488–490.

Beck, T. D. I. 1977. Sage grouse flock characteristics and habitat selection in winter. Journal of Wildlife Management. 41: 18–26.

Beck, T. D. I.; Braun, C. E. 1978. Weights of Colorado sage grouse. Condor. 80: 241–243.

Braun, C. E. 1987. Current issues in sage grouse management. Proceedings of the Western Association of State Fish and Wildlife Agencies. 67: 134–144.

Braun, C. E. 1995. Distribution and status of sage grouse in Colorado. Prairie Naturalist. 27: 1–9.

Braun, C. E. 1998. Sage grouse declines in western North America: what are the problems? Proceedings of the Western Association of State Fish and Wildlife Agencies. 78: 139–156.

Braun, C. E.; Baker, M. F.; Eng, R. L.; Gashwiler, J. S.; Schroeder, M. H. 1976. Conservation Committee report on the effects of alteration of sagebrush communities on the associated avifauna. Wilson Bulletin. 88: 165–171.

Braun, C. E.; Britt, T.; Wallestad, R. O. 1977. Guidelines for maintenance of sage grouse habitats. Wildlife Society Bulletin. 5: 99–106.

Connelly, J. W. 1998. Unpublished data on file at: Idaho Department of Fish and Game, Pocatello, ID.

Connelly, J. W.; Braun, C. E. 1997. Long-term changes in sage grouse Centrocercus urophasianus populations in western North America. Wildlife Biology. 3: 229–234.

Connelly, J. W.; Browers, H. W.; Gates, R. J. 1988. Seasonal movements of sage grouse in southeastern Idaho. Journal of Wildlife Management. 52: 116–122.

Connelly, J. W.; Reese, K. P.; Fischer, R. A.; Wakkinen, W. L. 2000b. Response of a sage grouse breeding population to fire in southeastern Idaho. Wildlife Society Bulletin. 28: 90–96.

Connelly, J. W.; Schroeder, M. A.; Sands, A. R.; Braun C. E. 2000a. Guidelines to manage sage grouse populations and their habitats. Wildlife Society Bulletin. 28: 967–985.

Drut, M. S.; Crawford, J. A.; Gregg, M. A. 1994. Brood habitat use by sage grouse in Oregon. Great Basin Naturalist. 54: 170–176.

Dunn, P. O.; Braun, C. E. 1986. Summer habitat use by adult female and juvenile sage grouse. Journal of Wildlife Management. 50: 228–235.

Fischer, R. A.; Reese, K. P.; Connelly, J. W. 1996. An investigation on fire effects within xeric sage grouse brood habitat. Journal of Range Management. 49: 194–198.

Hupp, J. W.; Braun, C. E. 1989a. Endogenous reserves of adult male sage grouse during courtship. Condor. 91: 266–271.

Hupp, J. W.; Braun, C. E. 1989b. Topographic distribution of sage grouse foraging in winter. Journal of Wildlife Management. 53: 823–829.

Johnsgard, P. A. 1973. Grouse and quails of North America. Lincoln, NE: University of Nebraska Press. 553 p.

Klott, J. H.; Lindzey, F. G. 1990. Brood habitats of sympatric sage and sharp-tailed grouse in Wyoming. Journal of Wildlife Management. 54: 84–88.

Patterson, R. L. 1952. The sage grouse in Wyoming. Denver, CO: Sage Books, Inc. 341 p.

Remington, T. E.; Braun, C. E. 1985. Sage grouse food selection in winter, North Park, Colorado. Journal of Wildlife Management. 49: 1055–1061.

Wallestad, R. O.; Peterson, J. G.; Eng, R. L. 1975. Foods of adult sage grouse in central Montana. Journal of Wildlife Management. 39: 628–630.

Wambolt, C. L.; Walhof, K. S.; Frisina, M. R. 2001. Recovery of big sagebrush communities after burning in south-western Montana. Journal of Environmental Management. 61: 243–252.



*Fernleaf biscuitroot*

Exhibit C



**WYOMING GAME AND FISH DEPARTMENT**

5400 Bishop Blvd. Cheyenne, WY 82006

Phone: (307) 777-4600 Fax: (307) 777-4610

Web site: http://gf.state.wy.us

GOVERNOR
DAVE FREUDENTHAL

DIRECTOR
TERRY CLEVELAND

COMMISSIONERS
BILL WILLIAMS, DVM – President
JERRY GALLES – Vice President
CLARK ALLAN
CLIFFORD KIRK
FRED LINDZEY
RON LOVERCHECK
ED MIGNERY

January 29, 2008

<u>MEMORANDUM</u>

TO:         Terry Cleveland and John Emmerich

FROM:       Tom Christiansen and Joe Bohne

COPY TO:    Jay Lawson, Bill Rudd, Reg Rothwell, Bob Oakleaf

SUBJECT:    Multi-State Sage-Grouse Coordination and Research-based
            Recommendations

As assigned by Assistant Director Emmerich, we have been working with other state fish and wildlife agencies in WAFWA Sage-Grouse Management Zones 1 and 2 (MT, CO, UT, SD, ND, WY) in order to coordinate interpretation of recent sage-grouse research related to oil and gas development.

Attached for your review, please find the latest and final document capturing the multi-state interpretation of the recent science related to sage-grouse conservation and oil and gas development. It has been well scrutinized by staff from MT, WY, CO, ND and UT and there is consensus on the content by the participants. South Dakota was unable to attend the initial meeting in Salt Lake City on January 8-9, but they have been provided with meeting notes and the resulting document.

It is our recommendation that WGFD acknowledge this document as the correct interpretation of the recently published sage-grouse research and use this information to update and augment department documents and policies. It should be used in the forthcoming discussions with the BLM regarding their update to their sage-grouse Instruction Memorandum. In addition, we suggest that in order for this document to serve the broadest purpose for sage-grouse conservation four additional actions are needed. First, the document should be shared with Governor Freudenthal's staff. Second, we recommend that the Director's Office enter into discussions with MT FWP Director Jeff Hagener to ensure consistency in the application of these recommendations between our border states, and especially with the WY and MT BLM State Field Offices. Third, we recommend the document be submitted to WAFWA's Sage-Grouse Technical Committee as well as the WAFWA Executive Committee for their consideration and use. Finally, we recommend this document be included with other materials sent to the USFWS for consideration in their review of the status of sage-grouse and measures in place to conserve those populations.

We look forward to your direction on how to proceed.

*"Conserving Wildlife - Serving People"*

**Using the Best Available Science to Coordinate Conservation Actions that Benefit Greater Sage-Grouse Across States Affected by Oil & Gas Development in Management Zones I-II (Colorado, Montana, North Dakota, South Dakota, Utah, and Wyoming)**

## Background

Greater Sage-grouse are widely considered in scientific and public policy arenas to be a species of significant conservation concern. Loss, degradation and fragmentation of important sagebrush grassland habitats have negatively impacted sage-grouse populations. Much of this loss of habitat function is occurring in Sage-grouse Management Zones (MZ) 1 and 2 (Stiver et al. 2006) in Colorado, Montana, North Dakota, South Dakota, Utah, and Wyoming as a result of oil and gas development (Connelly et al. 2004). Oil and gas development is rapidly increasing within these areas. In response to those concerns, states and provinces are in various stages of completing or updating management plans in order to provide for long-term sage-grouse conservation. Special emphasis is being placed on oil and gas development as it rapidly spreads across much of the eastern range of sage-grouse.

The recent decision by B. Lynn Winmill, Chief U.S. District Judge (2007), which remands the original 2005 not warranted decision back to the USFWS for reconsideration, has highlighted the need for States to coordinate their application of best available science. Representatives from the state agencies with authority for managing fish and wildlife from the major sage-grouse and energy producing states comprising MZ 1 and 2 and sage-grouse researchers who have published new findings, met on January 8 and 9, 2008 in Salt Lake City. The objectives of the meeting were to better understand the application of most recent peer-reviewed science within the context of oil and gas development and coordinate and compare implementation of conservation actions utilizing that information.

## Review Process

The participants at this meeting represented technical science and management advisors from each of the states. Researchers having the most recently peer reviewed and published articles concerning sage grouse and oil and gas development were invited to present their findings and answer questions. State agency participants agreed that the goal was not to establish state or regional policy or to determine the management actions that will be implemented in any or all states within MZ 1 or 2. Rather, the goal was to reach agreement on the conservation concepts and strategies related to oil and gas development that are supported by current published peer-reviewed and unpublished literature. If implemented, these concepts and strategies likely will not eliminate impacts to sage-grouse populations that result from energy development. However, when used in combination with other conservation measures, these actions may enhance the likelihood that sage-grouse populations will persist at levels that allow historical uses such as grazing and agriculture and maintain their current distribution and abundance, thereby avoiding the need to list sage-grouse under the federal Endangered Species Act.

1

Each researcher was invited to present their findings and to answer questions posed by the states. Following this, each state provided an overview of their review of the science and their resulting management actions and recommendations. The group then collectively reviewed, debated and agreed on the concepts and strategies supported by that science. The focus of the meeting was on five key issues: core areas, no-surface-occupancy zones, phased development, timing stipulations, well-pad densities, and restoration. Scientific data are available to inform many other issues related to sage-grouse management and conservation that were not reviewed (e.g., BMPs).

## Core Areas

Identification and protection of core areas, sometimes also referred to as crucial areas, will help maintain or achieve target goals for populations including distribution and abundance.

Full field energy development appears to have severe negative impacts on sage-grouse populations under current lease stipulations (Lyon and Anderson 2003, Holloran 2005, Kaiser 2006, Holloran et al. 2007, Aldridge and Boyce 2007, Walker et al 2007, Doherty et al. 2008). Much of greater sage-grouse habitat in MZ 1 and 2 has already been leased for oil and gas development. These leases carry stipulations that have been shown to be inadequate for protecting breeding and wintering sage-grouse populations during full field development. (Holloran 2005, Walker et. al. 2007, Doherty et al. 2008)  New leases continue to be issued utilizing these same stipulations. To ensure long-term persistence of populations and meet goals set by the states for sage-grouse, identifying and implementing greater protection within core areas from impacts of oil and gas development is a high priority.

In order to conserve core areas it is essential that they be identified and delineated. Sage-grouse populations occur over large landscapes comprising a series of leks and lek complexes with associated seasonal habitats. Therefore, core areas should capture the range required by a defined population to maintain itself. This concept is consistent with Crucial Wildlife Habitats recently endorsed by the Western Governor's Association (2007). Criteria that could be used to identify and map core areas include, but are not limited to: (1) lek densities, (2) displaying male densities, (3) sagebrush patch sizes, (4) seasonal habitats (breeding, summering, wintering areas), (5) seasonal linkages, or (6) appropriate buffers around important seasonal habitats.

Research indicates that oil or gas development exceeding approximately 1 well pad per square mile with the associated infrastructure, results in calculable impacts on breeding populations, as measured by the number of male sage-grouse attending leks (Holloran 2005, Naugle et al. 2006). Because breeding, summer, and winter habitats are essential to populations, development within these areas should be avoided. If development cannot be avoided within core areas, infrastructure should be minimized and the area should be managed in a manner that effectively conserves sagebrush habitats within that area.

2

**No Surface Occupancy (NSO)**

At the scale that NSOs are established, they alone will not conserve sage-grouse populations without being used in combination with core areas. The intent of NSOs is to maintain sage-grouse distribution and a semblance of habitat integrity as an area is developed.

*Breeding Habitat - Leks*

Research in Montana and Wyoming in coal-bed methane natural gas (CBNG) and deep-well fields suggests that impacts to leks from energy development are discernable out to a minimum of 4 miles, and that some leks within this radius have been extirpated as a direct result of energy development (Holloran 2005, Walker et al. 2007). Walker et al. (2007) indicates that the current 0.25-mile buffer lease stipulation is insufficient to adequately conserve breeding sage-grouse populations in areas having full CBNG development. A 0.25-mi. buffer leaves 98% of the landscape within 2 miles open to full-scale energy development. In a typical landscape in the Powder River Basin, 98% CBNG development within 2 miles of leks is projected to reduce the average probability of lek persistence from 87% to 5% (Walker et al. 2007). Only 38% of 26 leks inside of CBNG development remained active compared to 84% of 250 leks outside of development (Walker et al. 2007). Of leks that persisted, the numbers of attending males were reduced by approximately 50% when compared to those outside of CBNG development (Walker et al. 2007).

The impact analyses provided in Walker et al. (2007) are based on a 7-year dataset where probability of lek persistence is strongly related to extent of sagebrush habitat and the extent of energy development within 4 miles of the lek and the extent of agricultural tillage in the surrounding landscape. The estimated probabilities of lek persistence are only reliable for the length of the dataset, and it is not understood how other stressors (e.g., West Nile virus [Naugle et al. 2004], invasive weeds [Bergquist et al. 2007]) will cumulatively impact sage-grouse over longer time periods. While increased NSO buffers alone are unlikely to conserve sage-grouse populations, results from Walker et al. 2007 suggest they will increase the likelihood of maintaining the distribution and abundance of grouse and should increase the likelihood of successful restoration following energy development.

Additional information provided in Walker et al. (2007) allows managers and policy makers to estimate trade-offs associated with allowing development within a range of different distances from leks (Figures 1a and 1b). These probabilities will also need to be applied over larger landscapes in future analyses to better understand projected region- and state-wide population impacts under current and future development scenarios. Walker et al. (2007) studied lek persistence from 1997-2005 in relation to coal bed natural gas (CBNG) development in the Powder River Basin. These models are based on projected impacts of full-field development within (a) 2 miles and (b) 4 miles of the lek. We present results from these models (rather than models with impacts at smaller scales)

3

because development within 2 and 4 miles of leks are known to decrease breeding populations as measured by the number of displaying males (Holloran et al. 2005, Walker et al. 2007), and 52% and 74-80% of hens are known to nest within 2 and 4 miles of leks, respectively (Holloran and Anderson 2005, Colorado Greater Sage-Grouse Conservation Plan Steering Committee 2008). Sizes of NSO buffers required to protect breeding populations may be underestimated because leks in CBNG fields have fewer males per lek and a time lag occurs (avg. 3-4 years) between development and when leks go inactive. As a result, it is expected that not only will lek persistence decline, the number of males per lek will also decline. In contrast, sizes may be overestimated where high lek densities cause buffers from adjacent leks to overlap. Additional time is required to develop models demonstrating the probabilities of lek persistence at well-pad densities less than full development.



Figure 1a. Estimated probability of lek persistence (dashed lines represent 95% CIs) in fully-developed[1] coal-bed natural gas fields within an average landscape in the Powder River Basin (74% sagebrush habitat, 26% other habitats types) with different sizes of no-surface-occupancy (NSO) buffers around leks, assuming that only CBNG within 2 miles of the lek affects persistence. Buffer sizes of 0.25 mi., 0.5 mi., 0.6 mi., and 1.0 mi. result in estimated lek persistence of 5%, 11%, 14%, and 30%. Lek persistence in the absence of CBNG averages ~85%.

---

[1] Defined as entire area outside the NSO buffer, but within 2 miles, being within 350 meters of a well.



Figure 1b.  Estimated probability of lek persistence (dashed lines represent 95% CIs) in fully-developed[2] coal-bed natural-gas fields within an average landscape in the Powder River Basin (74% sagebrush habitat, 26% other habitats types) with different sizes of no-surface-occupancy (NSO) buffers around leks, assuming that only CBNG within 4 miles of the lek affects persistence.  Buffer sizes of 0.25 mi., 0.5 mi., 0.6 mi., 1.0 mi., and 2.0 mi. result in estimated lek persistence of 4%, 5%, 6%, 10%, and 28%. Lek persistence in the absence of CBNG averages ~85%.

Figures 1a and 1b provide an illustration of the trade-offs between differing NSO buffers in relation to lek persistence in developing CBNG fields.  The group does not offer a specific NSO recommendation but provides these graphs to guide decision-making.

*Breeding Habitat - Nesting and Early Brood-rearing*

Yearling female greater sage-grouse avoid nesting in areas within 0.6 miles of producing well pads (Holloran et al. 2007), and brood-rearing females avoid areas within 0.6 miles of producing wells (Aldridge and Boyce 2007).  This suggests a 0.6-mile NSO around all suitable nesting and brood-rearing habitats is required to minimize impacts to females during these seasonal periods.  In areas where nesting habitats have not been delineated, research suggests that greater sage-grouse nests are not randomly distributed. Rather, they are spatially associated with lek location within 3.1 miles in Wyoming (Holloran and Anderson 2005).  However, a 4-mile buffer is needed to encompass 74-80% (Moynahan

---

[2]  Defined as entire area outside the NSO buffer, but within 4 miles, being within 350 meters of a well.

2004, Holloran and Anderson 2005, Colorado Greater Sage-Grouse Conservation Plan Steering Committee 2008). These suggest that all areas within at least 4-miles of a lek should be considered nesting and brood-rearing habitats in the absence of mapping.

*Winter Habitat*

NSO or other protections may also need to be considered for crucial winter range. Survival of juvenile, yearling, and adult females are the three most important vital rates that drive population growth in greater sage-grouse (Holloran 2005, Colorado Greater Sage-Grouse Conservation Plan Steering Committee 2008). Although overwinter survival in sage-grouse is typically high, severe winter conditions can decrease hen survival (Moynahan et al 2006). Crucial wintering habitats can constitute a small part of the overall landscape (Beck 1977, Hupp and Braun 1989). Doherty et al. (2008) demonstrated that sage-grouse avoided otherwise suitable wintering habitats once they have been developed for energy production, even after timing and lek buffer stipulations had been applied (Doherty et al. 2008). For this reason, increased levels of protection may need to be considered in crucial winter habitats.

## Phased Development

Population-level impacts and avoidance associated with energy development have been documented (Braun et al. 2002, Lyon and Anderson 2003, Holloran 2005, Kaiser 2006, Holloran et al. 2007, Aldridge and Boyce 2007, Walker et al 2007, Doherty et al. 2008). Phased development maximizes the amount of area within a landscape that is not being impacted by development at any one time, and can occur at multiple spatial scales (e.g., phased development of separate fields in a landscape, phased development of infrastructure within a single unit or field, or phased development within a single lease). Unitization, clustering, and geographically staggered development are all forms of phased development. As a tool to minimize impacts to sage-grouse, developing oil and gas resources by employing one of these phased methods may help maintain large, functional blocks of sage-grouse habitat.

## Timing Stipulations

As with NSOs, at the scale that timing stipulations are established, they alone will not conserve sage-grouse populations without being used in combination with core areas. The intent of timing stipulations is to help maintain sage-grouse distribution and a semblance of habitat integrity as an area is developed. Timing stipulations are of lesser value at the scale of full-field development.

*Breeding Habitat - Leks*

Traffic during the strutting period when males are on a lek results in declines in male attendance when road-related disturbance is within 0.8 miles (Holloran 2005). The distance traveled by males from the lek during the breeding season has been reported in varying ways but generally averages 0.6 miles from a lek (Colorado Greater Sage-Grouse

Conservation Plan Steering Committee 2008 - see Appendix B). Additionally, females breeding on leks within 1.9 miles of natural gas development had lower nest initiation rates and nested farther from the lek compared to non-impacted individuals (Lyon and Anderson 2003), suggesting disturbance to leks influence females as well. Local variations may influence the application of specific dates, which are typically within a window of March 1 and May 31.

*Breeding Habitat - Nesting and Early Brood-rearing*

Often, timing stipulations (periods where no activity that creates disturbance are allowed) for breeding habitat have been applied using a radius around a lek. However, nesting and brood-rearing habitat is not uniformly distributed around the lek. Mapping of habitat would allow for more accurate application of this stipulation. Research on the distribution of nests relative to leks and on the timing of nesting indicates that timing stipulations to protect nesting hens and their habitat should be in place from March through June in mapped breeding habitat or (when nesting habitat has not been mapped) within 4 miles of active lek sites (Moynahan 2004, Holloran et al. 2005, Colorado Greater Sage-Grouse Conservation Plan Steering Committee 2008).

*Winter Habitat*

Research suggests that no surface occupancy should also be applied to important wintering habitats (Doherty et al. 2008), but if development occurs, impacts would be reduced if development activities were avoided between December 1 and March 15.

**Well-Pad Densities**

Leks tend to remain active when well-pad densities within 1.9 miles of leks are less than 1 pad per square mile (Holloran 2005) but leks tend to go inactive at higher pad densities (Holloran 2005, Naugle et al. 2006).

**Restoration**

The purpose of restoration in sage-grouse habitat should be the removal of infrastructure associated with energy development from the land surface and subsequent re-establishment of native grasses, forbs, and shrubs, including sagebrush, to promote natural ecological function. Restoration should reestablish functionality of seasonal habitats for sage-grouse. Thus a field should not be considered restored until sagebrush-grassland habitats have been reestablished.

**Future Needs**

Time did not allow for a detailed discussion of specific Best Management Practices for oil and gas development and restoration, seasonal habitat mapping, or future research. These topics are all recognized as needing action in the immediate future.

## Literature Cited

Aldridge, C. L., and M. S. Boyce. 2007. Linking occurrence and fitness to persistence: a habitat-based approach for endangered greater sage-grouse. Ecological Applications 17:508-526.

Beck, T. D. I. 1977. Sage grouse flock characteristics and habitat selection during winter. Journal of Wildlife Management 41:18-26.

Bergquist, E., P. Evangelista, T. J. Stohlgren, and N. Alley. 2007. Invasive species and coal bed methane development in the Powder River Basin, Wyoming. Environmental Monitoring and Assessment. 128:381-394.

Braun, C. E., O. O. Oedekoven, and C. L. Aldridge. 2002. Oil and gas development in western North America: effects on sagebrush steppe avifauna with particular emphasis on sage grouse. Transactions North American Wildlife and Natural Resources Conference 67:337-349.

Colorado Greater Sage-Grouse Conservation Plan Steering Committee. 2008. The Colorado Greater Sage-Grouse Conservation Plan. Colorado Division of Wildlife. Denver, CO. Unpublished Report.

Connelly, J. W., S. T. Knick, M. A. Schroeder, and S. J. Stiver. 2004. Conservation assessment of greater sage-grouse and sagebrush habitats. Western Association of Fish and Wildlife Agencies, Cheyenne, Wyoming, USA.

Doherty, K.E., D.E. Naugle, B.L. Walker, J.M. Graham. 2008. Greater sage-grouse winter habitat selection and energy development. Journal of Wildlife Management *In Press*.

Holloran, M. J. 2005. Greater sage-grouse (*Centrocercus urophasianus*) population response to natural gas field development in western Wyoming. Dissertation. University of Wyoming, Laramie, USA.

Holloran, M. J. and S. H. Anderson. 2005. Spatial distribution of greater sage-grouse nests in relatively contiguous sagebrush habitats. Condor 107:742-752.

Holloran, M. J., B. J. Heath, A. G. Lyon, S. J. Slater, J. L. Kuipers, and S. H. Anderson. 2005. Greater sage-grouse nesting habitat selection and success in Wyoming. Journal of Wildlife Management 69: 638-649.

Holloran, M. J., R. C. Kaiser, and W. A. Hubert. 2007. Population response of yearling greater sage-grouse to the infrastructure of natural gas fields in southwestern Wyoming. Completion report. Wyoming Cooperative Fish and Wildlife Research Unit, Laramie, WY, USA.

Exhibit A – Part 3

Hupp, J. W. and C. E. Braun. 1989. Topographic distribution of sage grouse foraging in winter. Journal of Wildlife Management 53: 823-829.

Kaiser, R. C. 2006. Recruitment by greater sage-grouse in association with natural gas development in western Wyoming. Thesis. University of Wyoming. Laramie, USA.

Lyon, A. G. and S. H. Anderson. 2003. Potential gas development impacts on sage grouse nest initiation and movement. Wildlife Society Bulletin 31:486-491.

Moynahan B. J. 2004. Landscape-scale factors affecting population dynamics of greater sage-grouse *(Centrocercus urophasianus)* in northcentral Montana, 2001–2004. Dissertation, The University of Montana. Missoula, USA.

Moynahan, B.J., M.S. Lindberg, and J.W. Thomas. 2006. Factors contributing to process variance in annual survival of female greater sage-grouse in north-central Montana. Ecological Applications 16:1529-1538.

Naugle, D. E., C. L. Aldridge, B. L. walker, T. E. Cornish, B. J. Moynahan, M. J. Holloran, K. Brown, G. D. Johnson, E. T. Schmidtmann, R.T. Mayer, C. Y. Kato, M. R. Matchett, T. J. Christiansen, W. E. Cook, T. Creekmore, R. D. Falise, E. T. Rinkes, and M. S. Boyce. 2004. West Nile virus: pending crisis for greater sage-grouse. Ecology Letters 7:704-713.

Naugle, D. E., B. L. Walker, and K. E. Doherty. 2006. Sage-grouse population response to coal-bed natural gas development in the Powder River Basin: interim progress report on region-wide lek-count analyses. Unpublished Report, University of Montana, Missoula, USA.

Stiver, S.J., A.D. Apa, J.R. Bohne, S.D. Bunnell, P.A. Deibert, S.C. Gardner, M.A. Hilliard, C.W. McCarthy, and M.A. Schroeder. 2006. Greater sage-grouse comprehensive conservation strategy. Western Association of Fish and Wildlife Agencies. Unpublished report. Cheyenne, Wyoming.

Walker, B.L., D. E. Naugle, and K.E. Doherty. 2007. Greater sage-grouse population response to energy development and habitat loss. Journal of Wildlife Management 71:2644-2654.

Western Governor's Association. 2007. Wildlife corridors initiative oil and gas working group report. http://www.westgov.org/wga/publicat/OilGas07.pdf. Accessed 15 January 2007.

Appendix 1.

**Participants (Alphabetical)**

Dr. Tony Apa, Colorado Division of Wildlife
Mr. Joe Bohne, Wyoming Game and Fish Department
Mr. Tom Christiansen, Wyoming Game and Fish Department
Mr. Jeff Herbert, Montana Department of Fish, Wildlife and Parks
Mr. Bill James, Utah Division of Wildlife Resources
Mr. Rick Northrup, Montana Department of Fish, Wildlife and Parks
Mr. Dave Olsen, Utah Division of Wildlife Resources
Mr. Aaron Robinson, North Dakota Game and Fish
Ms. Pam Schnurr, Colorado Division of Wildlife
Mr. T.O. Smith, Montana Department of Fish, Wildlife and Parks
Mr. Brett Walker, Colorado Division of Wildlife

**Invited Guests**

Dr. Matt Holloran, Wyoming Wildlife Consultants, LLC
Dr. David Naugle, University of Montana

Exhibit B – Part 1

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| THEODORE ROOSEVELT<br>CONSERVATION PARTNERSHIP<br>555 Eleventh St. N.W., 6th Floor<br>Washington, DC 20004<br>(202) 654-4600, | ) ) ) ) ) ) | |
| Plaintiff, | ) ) | CASE NO. 1:07-cv-01486-RJL |
| v. | ) ) | |
| DIRK KEMPTHORNE, in his official<br>capacity as the Secretary of the United<br>States Department of the Interior<br>1849 C Street, N.W.<br>Washington, DC 20240<br>(202) 208-3100, | ) ) ) ) ) ) ) | |
| and | ) ) | |
| UNITED STATES BUREAU OF LAND<br>MANAGEMENT<br>1849 C Street, Room 406-LS<br>Washington, DC 20240<br>(202) 452-5125, | ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |
| ANADARKO PETROLEUM<br>CORPORATION, WARREN<br>RESOURCES, INC., DOUBLE EAGLE<br>PETROLEUM CO., | ) ) ) ) ) | |
| and | ) ) | |
| STATE OF WYOMING | ) ) | |
| Defendant-Intervenors | ) ) | |

## DECLARATION OF DR. ROLLIN D. SPARROWE

I, Dr. Rollin D. Sparrowe, state and declare as follows:

1.      I am a resident of Daniel, Wyoming, over eighteen years of age, with personal knowledge of the facts set forth herein.

2.      I am employed by the Theodore Roosevelt Conservation Partnership ("TRCP" or the "Partnership") as an Energy Policy consultant and serve on TRCP's Fish, Wildlife and Energy Working Group, which is dedicated to ensuring that energy development is conducted in a responsible manner that minimizes adverse impacts on fish, wildlife and the hunting opportunities they afford.   I also am a founding board member of TRCP and former Chair of TRCP's Policy Council.  I also, of course, am a member of the organization.

3.      The purpose of my declaration is twofold.  First, I will identify and summarize the foundational principles of a concept known as "adaptive environmental management" or simply "adaptive management."   I have reviewed the Administrative Record lodged by the Federal Defendants in the case and, although the Record of Decision ("ROD") approving the Atlantic Rim Oil and Gas Development Project ("Atlantic Rim Project") relies heavily on the concept of adaptive management as a tool for managing wildlife resources in the Atlantic Rim Project Area ("ARPA"), I could locate in the Administrative Record no published or peer-reviewed reference explaining how to design or implement a successful adaptive management program in the ARPA or anywhere else.

4.      Second, I will explain my personal experience with an adaptive management program implemented by the Bureau of Land Management ("BLM") at the Pinedale Anticline Oil and Gas Development Project ("Pinedale Project") in Pinedale, Wyoming.  As a biologist and wildlife manager, I would have considered the outright collapse of that process to be relevant to my decision to implement a comparable program as part of the Atlantic Rim Project.  Again,

however, I could locate no real discussion of the failure of the Pinedale Anticline adaptive management program in the Administrative Record in this case.

## PERSONAL AND PROFESSIONAL BACKGROUND

5.    I possess more than 40 years of professional experience with state and federal wildlife management in North America.  My *curriculum vitae* is attached hereto as Exhibit A.

6.    I hold three degrees in wildlife biology and management:  A Bachelor's of Science in Game Management from Humboldt State University; a Master's Degree in Wildlife Management from South Dakota State University; and a Ph.D. in Wildlife Ecology from Michigan State University.  I also am a Certified Wildlife Biologist through The Wildlife Society, the international professional society for wildlife biologists.

7.    I spent approximately 22 years working for the United States Fish and Wildlife Service ("FWS").  While with FWS, I supervised the Cooperative Fish and Wildlife Research Unit Program at more than 40 state land grant universities from 1969 into 1983.   During 1983 and into 1984, I was the national Chief of the Division of Wildlife Research overseeing research programs and laboratories with a budget exceeding $18 million and a staff of approximately 400 employees.

8.    From the latter part of 1984 and into 1989, I was the Chief of the FWS Office of Migratory Bird Management, where I was principally responsible for the management of migratory birds under the Migratory Bird Treaty Act.  From 1989 and into 1991, I was the Deputy Assistant Director for Refuges and Wildlife where I oversaw FWS' Division of Refuges, Office of Migratory Bird Management, Division of Law Enforcement, Division of Realty and Duck Stamp Office.

9.    I received the Superior Service Award from the Department of the Interior in 1978, and in June 1991, I received the Department's Meritorious Service Award.

10.    In late 1991, I left federal employment and became the President of The Wildlife Management Institute, a non-profit organization dedicated to sound management and wise use of wildlife and their habitats in North America. I held that position through 2004.

11.    While at The Wildlife Management Institute, I served on various National Research Council committees, including the Committee on Scientific Issues in the Endangered Species Act (1993) and the Committee on a Biological Survey for the Nation (1994).

12.    In 2002, I received the Aldo Leopold Memorial Award from The Wildlife Society for my 35-year record of distinguished federal and nongovernmental service to wildlife conservation.

13.    As reflected in my curriculum vitae, I have published scientific papers on a variety of wildlife topics, including species-specific biology, species-habitat relationships and the impact of various land-use practices on species and their habitats.

14.    Throughout my career I gained extensive and varied field experience. I served on a team negotiating the North American Waterfowl Management Plan with Canada and was involved in implementation of the North American Wetlands Conservation Act. From 1972 through 1974, I was specially detailed to serve in the Office of Endangered Species to assist in constructing a priority system for decision-making under the Endangered Species Act. In addition to my work in Canada, my international experience extends to Spain and the Soviet Union. I also helped initiate Partners in Flight, a cooperative effort among local, state and federal wildlife management agencies, professional organizations, philanthropic foundations, industry, the academic community and private individuals dedicating to combining resources to conserve bird populations throughout the western hemisphere.

15.    I have been directly involved at various levels in the planning and design of research objectives related to mule deer, sage grouse, and pronghorn antelope through the Wyoming Cooperative Fish and Wildlife Research Unit, a cooperative research and training program, located at the University of Wyoming, among the university, state wildlife agency, Department of the Interior, and the Wildlife Management Institute.  One purpose of that effort was to establish pre-development baseline data on habitat use by wildlife to improve our ability to predict actual responses of wildlife to future development.  These studies, published in peer-reviewed journals, provided strong insights into what we might expect in the way of wildlife impacts, especially under intensive energy development in the Intermountain West.

16.    I also have extensive experience designing and implementing adaptive management programs.  I assisted in negotiating amendments to the Migratory Bird Treaty with Canada, and implementing the Adaptive Harvest Management ("AHM") program for setting waterfowl seasons.

17.    From 1995 into 1996, I served on two working groups established by the Director of the FWS (1995 – 2000) and the International Association of Fish and Wildlife Agencies (2001 – 2006) to supplement and periodically evaluate AHM, a science-based adaptive management process for regulating hunting seasons and harvests of ducks.  As many as 14 million American hunters in all 50 states, Canada, and U.S. Territories spent over $16/year on duck hunting.  The public process in the past has been controversial because of varying interpretations of the science of managing duck populations and their harvests, sometimes leading to political intervention on the season-setting process.  Much of the controversy has been reduced by application of adaptive management through joint evaluation of long-term duck population data, the effects of past

seasons, establishment of population goals, and identification of alternative management responses that depend directly on whether established goals are met.

18.     In 2006, I participated in a half-day symposium on the Status of Duck Harvest Management that was published in the Proceedings of the 70th North American Wildlife and Natural Resources Conference.  The experience and outcomes of a decade of use of adaptive management were documented to guide the next steps in the program.

19.     In addition to this general experience, I have a personal interest in preserving the wildlife species in the ARPA, where I have enjoyed wildlife viewing and hunting.  I personally have hunted sage grouse and mule deer in the ARPA and intend to do so in the future, if the species remains viable there.  I also am an avid big game hunter and have hunted throughout most of the State of Wyoming, mainly taking pronghorn antelope, elk and mule deer.  I intend to hunt big game in the ARPA, provided the Wyoming Game & Fish Department continues to allow such hunting.

## PRINCIPLES OF ADAPTIVE MANAGEMENT

20.     Adaptive management is increasingly being used by state and federal agencies to plan and manage projects that adversely impact biological resources.  In its simplest form the concept may be defined as management, in the face of uncertainty, using available information, to: (a) Estimate possible outcomes; (b) set measurable objectives for project performance; (c) monitor the biological effects of project implementation; (d) evaluate those monitoring results; and (e) adjust project management based on the results of monitoring to ensure compliance with pre-set goals and objectives.  (Lancia et al. 1996. p 436-437; Boswell 2000 pp 1-3.).

21.     Resource managers from diverse fields are recognizing the value of adaptive management as a process, a strategy or a framework of sequential management steps.  Adaptive management is not a single step or technique, and it cannot be partially or incrementally adopted

apart from the overall framework identified in the foregoing paragraph. (Boswell, 2000 p.9; Johnson and Case, 2000 pp 96- 97).

22.     Especially in complex and controversial cases, a critical component of the adaptive management process is the unambiguous specification of management goals and objectives.  Loose references to "adaptive management," such as those in the Atlantic Rim Project ROD, falsely imply a myth that management goals can be based only on broad, qualitative statements about desirable management outcomes. (Johnson and Case, 2000 pp. 4-5). Goals and objectives can be specific (e.g., no greater than X% reduction in habitat or reduction in population number).  Only by identifying clear goals and objectives can one measure the success (or failure) of management techniques. (Williams, et al. 1996. p 431; Johnson and Case, 2000. p 94, 96).

23.     Management in the absence of well-defined goals and objectives is like embarking on a journey without knowing one's destination.  While adaptive management may be used to choose alternative paths, adaptive management cannot be employed effectively without knowing the initial objective sought to be achieved.

24.     Of equal importance is establishment of an "environmental baseline" from which project impacts can be measured.  This must be done before a project is underway, or else there will be no empirical information or data against which to measure the project's impacts.

25.     It also is critical to identify with some measure of specificity the alternative management actions that might be taken if specified negative outcomes occur.   Unless these alternative management actions are identified initially as part of an adaptive management program, resource managers do not know how to adjust project management to alleviate negative impacts.  Moreover, in my experience, up-front specification of alternatives reduces controversy

and helps avoid political intervention after adverse impacts occur, but before project plans are modified. (Johnson and Case, 2000. pp 94-96, 101-103.).

26.    Attempting to manage without first identifying alternative courses to be taken in the face of adversity is like coming upon a closed highway and selecting an alternative route without a road map. While one might end up at the chosen destination, it is equally likely that one will become sidetracked, derailed, or lost for good.

27.    Finally, the key to successful adaptive management is ensuring managers actually employ alternative techniques when faced with monitoring data that indicate that a goal or objective is not being met. If knowledge gained from monitoring and evaluation is not used to modify project implementation, then adaptive management has not occurred (Boswell, 2000, p 1-2, 9).

28.    I have reviewed the adaptive management component of the Atlantic Rim Project ROD and can only conclude that BLM has violated virtually all of the fundamental principles of true adaptive management. First, BLM has failed to articulate anything but the most amorphous goals and objectives. Second, BLM has failed to develop any real data concerning the environmental baseline in the ARPA (i.e., BLM has just now begun to develop key data regarding mule deer migration routes). Third, BLM has not specified any alternative management actions that might be taken in the future if the Atlantic Rim Project adversely impacts wildlife beyond what BLM apparently expects. Finally, BLM has not meaningfully explained how it will implement changes to the Atlantic Rim Project in the event wildlife are significantly impacted by the Atlantic Rim Project. Rather, the reader is simply informed that BLM, the oil and gas operators and the cooperating agencies will ultimately determine the best course. This approach does not qualify as adaptive management.

### FAILURE OF THE PINEDALE ANTICLINE ADAPTIVE ENVIRONMENTAL MANAGEMENT PROCESS

29.     An example of the problem presented by loose interpretations of adaptive management is the languishing program implemented in Pinedale, Wyoming.  From 2004 until early 2007, I served as the Chair of the Wildlife Monitoring Task Group operating under the Pinedale Anticline Working Group ("PAWG").  The PAWG was created by BLM to monitor and evaluate, and suggest additional mitigation as necessary to offset, the impact of development activities under the Pinedale Project approved by BLM in 2000.  The PAWG has not performed its intended function and, as a result, oil and gas development in the Pinedale Anticline Project Area ("PAPA") is continuing to evolve without the monitoring, evaluation, or mitigation contemplated by BLM when it approved the Pinedale Anticline Project.

30.     By way of background, the PAPA comprises 197,345 acres of Federal, state and private land in western Wyoming.  BLM's Record of Decision approving the Project ("PAPA ROD") authorizes the development of 700 oil and gas wells over 10 to 15 years as proposed and currently being conducted by various industry representatives, including Questar Exploration and Production, Ultra Resources, Inc. and Yates Petroleum Corporation (collectively, the "Industry Applicants").

31.     In developing the PAPA ROD and its supporting environmental documentation under the National Environmental Policy Act ("NEPA"), BLM committed itself and the Industry Applicants to a process of Adaptive Environmental Management ("AEM"), which BLM concluded was both necessary and fundamental to development of the PAPA in an environmentally sensitive manner that complied with BLM's obligations under NEPA, the Federal Land Policy and Management Act ("FLPMA") and related oil and gas operations authorities.

32.    The PAPA ROD included AEM as an innovative public process that would monitor and evaluate the impact of oil and gas development on water, air, wildlife, and other resources in the PAPA. This innovative process was needed for mainly two reasons: First there was great uncertainty about how development would affect other resources in the PAPA; and second BLM desired more local support from stakeholders.

33.    The PAPA ROD identified the PAWG as the entity that would implement the AEM process by receiving input directly from a series of topical Task Groups (e.g., wildlife, transportation, air) focused on key resources.

34.    During the PAWG's first year, it was challenged by Yates Petroleum Corporation – one of the primary proponents of oil and gas development in the PAPA – as violating the Federal Advisory Committee Act ("FACA"). In response, BLM shut down the PAWG until it could be chartered under the FACA and reconvened.

35.    Intensive drilling and development continued for the next 2-1/2 years while the Department of the Interior reconstructed the PAWG under a FACA charter from the Secretary of the Interior. Internal vetting and approval of the 10 new members of the PAWG took an additional year to complete.

36.    Finally, in August 2004, the PAWG had its first meeting – four years after the drilling began. I was asked and agreed to chair the Wildlife Monitoring Task Group at that time.

37.    In the meantime, drilling was ongoing. *See* FINDING OF NO SIGNIFICANT IMPACT, DECISION RECORD AND ENVIRONMENTAL ASSESSMENT FOR THE QUESTAR YEAR-ROUND DRILLING PROPOSAL, SUBLETTE COUNTY, WYOMING (November 2004) ("Questar Plan"), copy attached as Exhibit B. One of the key operators in the PAPA, Questar, had proposed in early 2004 to conduct year-round drilling in mule deer crucial winter range and greater sage-grouse

breeding, nesting, and wintering habitats and to construct a 107-mile long, 6-inch diameter pipeline in Sweetwater County. The PAPA ROD and related environmental impact statement ("PAPA EIS") had not evaluated impacts to mule deer or greater sage-grouse from year-round drilling on winter ranges or in breeding, nesting, and winter habitats. Nor did the PAPA ROD or PAPA EIS evaluate the pipeline. Research and monitoring data on mule deer and sage grouse had documented significant negative impacts (Holloran on sage grouse, Sawyer on mule deer). I attended and sponsored several public presentations and discussions of these research findings from 2003 through 2005.

38.    Despite the fact that the PAWG had not functioned for four years, BLM explained in August 2004 that its NEPA documentation for the Questar Plan would be "tiered" off of the PAPA ROD and PAPA EIS and that the impacts of the Questar Plan would be subjected to PAWG review and analysis. The problem with this approach, of course, was that due to Yates Petroleum Corporation's litigation and the consequent suspension of the PAWG, no baseline data had been collected or reviewed during the prior four years of development. Thus, the newly chartered PAWG had no information against which to compare and identify the impact of the Questar Plan.

39.    Nevertheless, over 75 individuals from a wide array of backgrounds in business, biology, sociology, agriculture, environmental and hunting interests and certain of the Industry Applicants, volunteered to serve on seven different task groups under the newly chartered PAWG, including the Wildlife Monitoring Task Group. The task groups conducted analytical work and made recommendations to the PAWG, who decided what to pass along to BLM. These task groups began by evaluating the EIS and PAPA ROD requirements for managing

development, including mitigation and monitoring for wildlife. In general, the task groups found that key provisions of the PAPA EIS and PAPA ROD had never been implemented.

40.     Foremost among the neglected requirements of the PAPA ROD and EIS was the AEM process itself, by which BLM was to review wildlife data on impacts of development, and to make changes in field operations as necessary to lessen those impacts. No AEM had been implemented during the first four years of oil and gas development under the PAPA ROD, even though several high level officials at the Department of the Interior all spoke about it in various public appearances as if it were in practice and a model on how adaptive management should be performed.

41.     Accordingly, one of the first tasks I undertook as Chair of the Wildlife Monitoring Task Group was to recommend that BLM outline the parameters of a functional AEM project. That effort, dated February 18, 2005, is attached hereto as Exhibit C. Unfortunately, as earlier noted, the Wildlife Monitoring Task Group (and the PAWG more generally) had no meaningful opportunity from 2000 through 2004 to conduct baseline inventories to which results of monitoring might be compared. Further, BLM had required contract monitoring paid for by the developing companies for four years, yet had not analyzed the data. Consequently, a wildlife monitoring plan could not be cleanly realized. Since development and comparison of baseline data is absolutely critical to successful AEM, the program already was severely compromised.

42.     Nevertheless, the Wildlife Monitoring Task Group identified several tasks in significant detail that BLM could immediately perform to help reinvigorate the AEM process. Six other task groups made similar recommendations. Unfortunately, BLM felt that these recommendations were simply too detailed and constraining. Thus, BLM reformatted the

Wildlife Monitoring Task Group's recommendations (and all the others') in April 2005. A copy of those reformatted recommendations is attached hereto as Exhibit D.

43.    Finally, in July 2005, BLM responded to the Wildlife Monitoring Task Group's recommendations indicating what BLM would and would not require of the operators within the PAPA. A copy of that response is attached as Exhibit E.    Many of our recommendations were simply discarded.

44.    Overall, I chaired the Wildlife Monitoring Task Group for over two years, evaluating on-going monitoring and research and making a variety of recommendations for changes in development to lessen impacts to wildlife from drilling activity as originally contemplated by the PAPA ROD and PAPA EIS.    Most were ignored.

45.    The dialog between the PAWG, its Task Groups and BLM grew extremely strained during 2005 over the PAWG's identification of a severe lack of process, which was inhibiting our ability to work with BLM and obtain orderly responses on PAWG recommendations.    BLM called a special meeting at which the Field Manager reinterpreted the PAWG's charge, narrowing it to only "post-decisional issues" and clarifying that each participant could exercise its right to comment through NEPA processes prior to site-specific project decisions.

46.    Because many PAWG members felt BLM's newfound interpretation of the PAWG's role was not consistent with the PAPA ROD or PAPA EIS, many members of the task groups ceased participating.    Meetings of both the task groups and the PAWG became increasingly infrequent.

47.    In November 2005, however, the Wildlife Monitoring Task Group transmitted through the PAWG to BLM eleven very specific recommendations regarding mule deer management in the PAPA.    A copy of those recommendations is attached as Exhibit F.    The

recommendations included: "Goals suggested by this [Task Group] to PAWG for mule deer are: a) maintain current numbers – specifically, no further decline in wintering deer numbers, and b) maintain current remaining, undisturbed habitats useful to deer in winter."

48.     Notably, if the AEM program had been functioning properly from the beginning, this recommendation would have been inconsistent with the Questar Plan.   Because the AEM program was so dysfunctional, this key recommendation could not be made until after BLM had approved the Questar Plan, which in retrospect appears extremely detrimental to mule deer.

49.     Approximately 6 months later, BLM responded to the Wildlife Monitoring Task Group's eleven recommendations by indicating simply that BLM would work with industry and the State of Wyoming to address the recommendations.   A copy of that response is attached hereto as Exhibit G.  No plan, however, was put in place at that time, and I do not believe that these recommendations have been acted upon to this date.

50.     In the spring of 2006, the appointments of the PAWG members were allowed to expire without notice and without any guidance as to PAWG management in the interim.   A period of several months followed during which the PAWG again fell dormant while drilling continued without any AEM program in place.

51.     In response to complaints by the PAWG that monitoring data were being ignored and the AEM process was broken, BLM hired an independent consultant to review its monitoring data and AEM program.  BLM's consultant, Environment Resources Group, evaluated the AEM monitoring program and analyzed the limited data gathered from 2000 – 2004.  Notably, BLM's consultant arrived at many of the same conclusions the Wildlife Monitoring Task Group had – virtually no data evaluation had occurred and no management recommendations had been made

during the life of the Project.   A copy of Environment Resources Group's report (August 2006) is attached as Exhibit H.

52.     The PAWG was reconvened for a third time under a new charter in the Fall of 2006. However, as the Chair of the Wildlife Monitoring Task Group, I informed the PAWG in early 2007 that the Wildlife Monitoring Task Group was no longer functional due to a lack of participation by its members.  I terminated my service as the Chair of the Wildlife Monitoring Task Group in March 2007.  Local biologists have met recently to try to initiate discussion of wildlife issues but do not have broad participation as specifically required by the original FACA Charter.

53.     In sum, the mechanism by which BLM intended to meet the obligations of the AEM process established by the PAPA ROD has collapsed.  The PAWG is not functioning.  BLM is not monitoring, evaluating and revising operations as foreseen and, in fact, promised by the PAPA ROD.   Oil and gas development is proceeding in a manner that specifically ignores the best available science and data concerning wildlife needs.

54.     For example, mule deer populations using the Pinedale Mesa on the PAPA have decreased by 46% since 2000.   Yet, BLM approved the Questar Plan specifically allowing year-round drilling in mule deer winter crucial winter range.  Not surprisingly, in the wake of that approval, all the Industry Applicants now want a similar deal and BLM is poised to authorize additional development to the detriment of mule deer habitats.

55.     A few of the task groups have met in recent months but often without a quorum. Several PAWG slots have remained vacant.   The PAWG Charter expired in March so all appointments must be renewed.  A target for renewal and reappointment is Fall of 2008.

I declare under penalty of perjury that the foregoing is true and correct.

_May 4, 2008_
Date

_Rollin D. Sparrowe_
Rollin D. Sparrowe

**Exhibit A**

AM-LITERATURE CITED

1) Boswell, M. 2000. Adaptive management planning for regional ecosystems: shifting the knowledge-action link from "planning" to "learning". Presented at American Collegiate Schools of Planning 2000 Annual Conference. November 2000. 24 pp.

2) Johnson, F.A., and D.J. Case. 2000. Adaptive regulation of waterfowl harvest-lessons learned and prospects for the future. Transactions 65th North American Wildlife and Natural Resources Conference. pp 94-108.

3) Williams, B.K. and F.A. Johnson. 1995. Adaptive management and the regulation of waterfowl harvests. Wildlife Society Bulletin: 23; 430-436.

4) Lancia, R.A., C.E. Braun, M.W. Collopy, R.D. Dueser, J.G. Kie, C. J. Martinka, T. D. Nudds, W. P. Porath, N.G. Tilghman. 1996. ARM! For the future: adaptive resource management in the wildlife profession. Wildlife Society Bulletin: 24 pp. 436-442.

5) Williams, B.K., F.S. Johnson, and K. Wilkins. 1996. Uncertainty and the management of waterfowl harvests. Journal of Wildlife Management: 60(2): 223-232.

# Exhibit A

November, 2005

**ROLLIN D. SPARROWE**
10 Nighthawk Lane
P.O. Box 415
Daniel, Wyoming 83115
307-859-8606

## PERSONAL BACKGROUND

Born January 12, 1941, in Oakland, California.  Married.

## EDUCATION

B.S. in Game Management, 1964, Humboldt State University.  Coursework emphasis: wildlife management with range management option.

M.S. in Wildlife Management, 1966, South Dakota State University.  Coursework emphasis: zoology, wildlife management.  Thesis title: Population distribution and mobility of deer in eastern South Dakota.

Ph.D. in Wildlife Ecology, 1969, Michigan State University.  Coursework emphasis: animal behavior, ornithology, quantitative biology, physiology.  Thesis title: Prey-catching behavior in the American kestrel (Falco sparverius).

## AWARDS RECEIVED

Graduate Research Fellowship at South Dakota Cooperative Wildlife Research Unit, February 1964-1966.  Graduate Research Assistantship at Fisheries and Wildlife Department, Michigan State University, September 1966-June 1969.  National Wildlife Federation Fellowship in Conservation Education, 1968-1969.  Society of Sigma Xi Grant-in-aid of Research, 1969.

Received the Award for Outstanding Professional Contribution to the Wildlife Field, 1972, from the University of Missouri Wildlife Club.

Received a Quality Performance Award with merit pay increase from Fish and Wildlife Service, 1975.

Received the Superior Service Award from the Department of the Interior, 1978.

Received Distinguished Alumnus Award in 1981 from the Department of Wildlife and Fisheries Sciences, South Dakota State University.

Received Distinguished Alumnus Award in 1985 from the College of Natural Resources, Humboldt State University. Recognized a second time as Distinguished Alumnus in 2003 by the Humboldt State University Alumni Club.

Received Outstanding Performance Ratings from Fish and Wildlife Service in 1981, 1982, 1983, 1986, 1988, 1989, and 1990.

Received a Quality Performance Award with pay bonus as Outstanding Manager from Fish and Wildlife Service in 1988.

Meritorious Service Award from Secretary of the Interior, June, 1991.

Received the Aldo Leopold Memorial Award from The Wildlife Society for 2002, the most prestigious award granted in the wildlife profession, for leadership in the translation of science into policy in wildlife management.

Received 2003 Award for Public Policy Accomplishment for leadership of a diverse coalition over eight years to improve funding for National Wildlife Refuges, from The Natural Resources Council of America, composed of groups representing membership of 23 million.

Received the 2003 Outdoor Life Conservation Award for leadership on the North American Waterfowl Management Plan and in waterfowl conservation, which "has given new stature to wildlife professionals by translating science into policy".

## PROFESSIONAL EXPERIENCE:

1991-2004 WILDLIFE MANAGEMENT INSTITUTE.    President.    A private, nonprofit, scientific and educational organization dedicated to the restoration, sound management and wise use of wildlife and their Present habitats in North America.  The Institute was supported by the American sporting arms and ammunition industry and private donors.  Its mission is to work alone, or with other organizations, to improve state and federal wildlife management programs, and provide public information and education services to promote effective wildlife management.

Activities include the biweekly Outdoor News Bulletin, the annual North American Wildlife and Natural Resources Conference, publishing pamphlets and scholarly books on wildlife and its management, and a wide array of supportive actions to enhance budgets and programs which benefit wildlife.  Administrative reviews of state, provincial, and federal wildlife agencies are done to help strengthen programs that benefit wildlife.  Work on research, legislation, and implementation of public programs are primary modes of operation.

1989 - 1991 FISH AND WILDLIFE SERVICE. Deputy Assistant Director - Refuges and Wildlife.  Responsible to for Divisions and Offices as follows: Division of Refuges, Office of Migratory Bird Management, Division of Law Enforcement, Division of Realty, Duck Stamp Office.

Responsible for daily oversight and guidance of staff functions with the Assistant Director for Refuges and Wildlife in support of the Director, and in the conduct of operational programs in some law enforcement programs, duck stamp sales, and migratory bird surveys, analysis, and establishing hunting regulations.  Developed and recommended national policy for management of national wildlife refuges, migratory bird management, land acquisition, and law enforcement.

Had a lead role in implementation of the North American Waterfowl Management Plan and the North American Wetlands Conservation Act.  Also involved extensively in development of a national plan (EIS) for management of National Wildlife Refuges, review of law enforcement

2

functions, development of a strong nongame migratory bird leadership role for the Service, regular contact with Canada and Mexico concerning migratory bird and wetland management, and development of a broader duck stamp program to benefit wetland conservation. Concentrated on budget development in support of Service operational programs and future initiatives.

1984 - 1989 FISH AND WILDLIFE SERVICE.  Chief, Office of Migratory Bird Management . Responsible for to management of migratory birds under the Migratory Bird Treaty Act and other basic authorities of the Service.    Conducted operational activities nationally and internationally.

Developed policies, set population objectives, developed and managed species plans, provided leadership in habitat and population management for migratory birds in the Service, and conducted major operational programs to gather basic data on migratory birds. Had primary responsibility for cooperative work with Canada and states and provinces in conduct of waterfowl and migratory upland gamebird population, habitat, and harvest surveys used annually to set harvest regulations at the National level in Canada and the U.S. Ultimately responsible for annual Federal migratory bird hunting regulations.  Office budget of $6.1 million and 120 employees. Programs also included North American Bird Banding Laboratory, and development of Service strategies for management of nongame migratory birds. Had a major role in writing and implementing the North American Waterfowl Management Plan in cooperation with Canada.

Other accomplishments included completion and publication of a major study of waterfowl harvest in cooperation with Canada; major revisions in Federal policy toward harvest regulations; completed programmatic EIS's on Use of Lead Shot for Hunting Migratory Birds and Establishing Migratory Bird Hunting Regulations; implemented the use of steel shot for waterfowl hunting nationwide; developed strong public outreach to explain the plight of waterfowl and shrinking habitats to the public through verbal, written, and video mechanisms; presented a series of policy papers at conferences to support regulatory policies.

1983 - 1984 FISH AND WILDLIFE SERVICE. Chief, Division of Wildlife Research. Line manager of wildlife research programs, including supervision of Directors of Patuxent, Denver, and Northern Prairie Wildlife Research Centers and National Wildlife Health Research Center.

Responsible for oversight of laboratories with a budget of $18 million and almost 400 employees. Developed budgets, tracked progress, evaluated research output of the laboratories. Led development of Research Review Panel to evaluate performance of agency research scientists for promotion. Provided coordination with agency functional programs and Regional Office to assure relevance of research activities to agency needs.

Major research program areas supervised included endangered species, animal damage control, environmental contaminants, and migratory birds.

Accomplishments included revision of Divisional structure and solving acute personnel problems; continued strong role in developing methods and procedures to evaluate research

laboratories and scientists; developed improved relationship with Endangered Species Program staff and managers. I was in this position one year and three months.

1979 - 1983 FISH AND WILDLIFE SERVICE.  Chief, Division of Cooperative Research Units. Responsible for both programmatic, budgetary and line functions of Wildlife, Fishery, and Fish and Wildlife Research Units.  Provided direction, coordination, leadership for 20 Wildlife Units, 25 Fishery Units, and 4 Fish and Wildlife Units.  Identified goals, outputs, and strategies to achieve them, promoted broad joint research efforts oriented to expressed needs of cooperating agencies.  Interpreted, developed guidelines and policies to enable functioning of Cooperative Units in the Department of the Interior, and also within the framework of the cooperating universities and state agencies.

The primary contact between the cooperating staffs of 31 universities, state agencies, and other cooperators.  Participated in more than 100 Unit Coordinating Meetings at both Wildlife and Fishery Units.  Responsible for evaluating programs at all 49 Units, and held accountable for organizational accomplishments of the Units on behalf of the Fish and Wildlife Service and the other cooperators.  Annual budgets were approximately $4.4 million in federal funds, $2.5 million in university and state agency support, and $7.0 million handled through research at the individual Units.  Position had responsibility to maintain, through the cooperating universities, high quality academic training to provide qualified resource managers who go to work in state and federal conservation agencies.

During the period 1981-83 the Units were not in the Administration's budget.  I provided leadership to Unit scientists to increase quantitative measures of output as the strongest response to the uncertain situation.  Developed a computer-based tracking system, and a major new approach to contracting which gave the agency access to university cooperating faculty to conduct needed studies.  Developed and marketed combined cooperative fish and wildlife units which served as the current model for the program. Played a strong personal role in development of research-wide procedures for evaluating laboratory programs and research output of scientists. Made several specific EEO advances in training individuals who have gone on to successful careers.

1976 - 1979 FISH AND WILDLIFE SERVICE. Supervisor, Cooperative Wildlife Research Units. Responsible for administration and supervision of 20 Cooperative Wildlife Research Units.

Served as official representative of the U.S. Fish and Wildlife Service at each Unit Coordinating Committee meeting, requiring extensive travel. Often represented the Service at these same meetings for the Cooperative Fishery Research Units. Responsible for supervision of Cooperative Wildlife Research Unit Leaders and reviewing their supervision of the Assistant Unit Leaders. Coordinated seeking out and evaluating qualified applicants for vacant or new Unit positions, and negotiating with cooperators during final selection. Responsible for evaluation of research and training activities of all the Units, annual budgets, contracting for research, and reporting on accomplishments of the program. Also carried out extensive staff assignments from the Directorate or Research Division of FWS.

Special projects with the Unit Program Included development of guidelines for evaluation of each Unit's program (in conjunction with other staff from Units), and negotiation and development of now Units. Assumed fisheries supervision and ran both sets of units during a transition to a new office.

1969 - 1976 FISH AND WILDLIFE SERVICE. <u>Assistant Leader, Missouri Cooperative Wildlife Research Unit</u>. Primary duties included wildlife research and training of graduate students, teaching graduate wildlife courses, and cooperative work with state and federal agencies regarding wildlife in the State of Missouri. Teaching experience at the University of Missouri as Assistant Professor included Wildlife Ecology, General Ecology, and Basic Environmental Studies. Research interests included population dynamics, behavior, effects of land-use practices on wildlife, and biological and socioeconomic aspects of water resource projects.

Acting Leader, Missouri Cooperative Wildlife Research Unit, March through June 1973. Above duties plus administration of all Unit programs.

1966 - 1969 MICHIGAN STATE UNIVERSITY. <u>Research Assistant</u> assigned to prey-catching behavior of sparrow hawks. Included field observations, trapping, and training experimental animals, testing behavior in controlled laboratory system. Assisted in teaching laboratory courses.

5/66 - 9/66 NATIONAL PARK SERVICE, Yellowstone, Wyoming. <u>Ranger-Naturalist</u>. Primary job interpretation of park features for the public. Half time spent giving talks in visitor center. Half time spent on trails contacting public. One 45-minute illustrated talk on wildlife ecology each week. Spoke to groups of more than 600 people.

1964 - 1966 SOUTH DAKOTA COOPERATIVE WILDLIFE RESEARCH UNIT, Brookings. <u>Research Assistant</u>. Field study of white-tailed deer movements included trapping, color marking, and observation of deer; also construction and use of radio-transmitters. Considerable time spent assisting on raccoon telemetry study, banding waterfowl, and other projects.

2/63 - 6/63 CALIFORNIA FISH AND GAME. Sacramento. Seasonal <u>Aide-Experimental</u>. Conducted experiment on seed persistence of selected waterfowl foods. Written final report. Worked about 10 hours per week.

6/62 - 9/62 CALIFORNIA FISH AND GAME. <u>Seasonal Aide</u>. Worked on joint project with Game Department and U.S. Soil Conservation Service on developing waterfowl food plants. Included farming, recording growth data on plantings.

6/61 - 9/61 CALIFORNIA FISH AND GAME, Sacramento. <u>Seasonal Aide</u>. Same as the above.

**SPECIAL ASSIGNMENTS**

1972 - 1974 Detailed part-time to the Office of Endangered Species to construct a priority system for decision-making in the Endangered Species Program.

1972 - 1974 Assigned to work on appraisal of potentials for coordinated research on water resource problems through the Cooperative Fishery and Wildlife Research Units.

1973 - 1974 Detailed in 1973 to work in the Office of the Assistant Secretary for Fish, Wildlife and Parks to assist in planning research in the Atchafalaya River Basin, Louisiana. Assigned by the Associate Director for Environment and Research to review progress of the Atchafalaya Basin Land and Water Management Study.

1974 - 1979 Maintained continuing liaison between Research in FWS and Ecological Services Program in to developing methodologies (HEP) for evaluating habitats. Participated in evaluating emerging methodologies, planned and initiated cooperative research programs through the Cooperative Units and other Research entities in FWS.

1976 - 1979 Served as Team Leader on interagency team cooperating with the Government of Spain in to planning for the Coto Donana National Park. Included three trips to Spain to work in the field, with university and other scientists, and with the major natural resources agency.

1977 Member of Task Force assigned to evaluate procedures for conducting endangered species research in the FWS.

1979 Member of Task Force assigned to evaluate the scientific validity, implementation, needs for development, and other potential applications of the Habitat Evaluation Procedures (HEP) being developed for evaluating effects of water resource projects.

1980 - 1981 Alternate delegate for Interior Department to the CITES Commission, which reviewed international trade in endangered species.

1982 Member of Merit Pay Task Force assigned to evaluate the first year performance of Merit Pay in the Service, and recommend improvements.

1979 - 1984 Provided leadership in development and implementation of review process for FWS Research Laboratories and scientists.

1984 - 1986 Served on writing team to draft the North American Waterfowl Management Plan, signed by the U.S. and Canada in May 1986. Provided primary biological input from Office of Migratory Bird Management for the Service.

1987 Dec. Lead biologist in U.S. delegation to Soviet Union to review accomplishments under US-USSR Convention on Migratory Birds.

1985 - 1988 Lead responsibility for two programmatic EIS for the Service on Lead Shot for Hunting Migratory Birds (1986), and Sport Hunting of Migratory Birds (1988).

1986 - 1989 Served as Coordinator for the U.S. Section of the North American Waterfowl Management Plan to Committee, providing staff support regarding waterfowl population biology in relation to implementation of the Plan.

6

1989 Participated in major migratory bird symposium in Soviet Union as a U.S. delegate to the International Waterfowl and Wetlands Research Bureau.

1989 - 1991 One of two members of North American Waterfowl Management Plan Committee representing to the Service in implementing the Plan.

1990 - 1991 Served in a lead role for FWS participation in the "Partners in Flight" program for research and to management of Neotropical Migratory Birds.

1991-1997 Chaired the U.S. Implementation Board for the North American Waterfowl Management Plan (20 member organization).

1993 Appointed to National Research Council's Committee on Scientific issues in the Endangered Species Act.

1994 Appointed to the National Research Council's Committee on a Biological Survey for the Nation.

1995 Served on a Fish and Wildlife Service Director's Task Force to recommend how to implement Adaptive Harvest Management for U.S. duck harvest management.

1996 Lead organization of the Cooperative Alliance for Refuge Enhancement , resulting in formation of an alliance of 21 member groups that ranged from environmental groups to hunting groups, and worked with Congress to add over $250 million to the permanent budget to operate and maintain the National Wildlife Refuges.

1999 Initiated and Chaired an international task force to consider how to respond to overpopulation of midcontinent snow geese to ameliorate their adverse impact on northern coastal habitats.

2000 Lead organization with the help of the Boone and Crockett Club, of the 37 member American Wildlife Conservation Partners, a partnership of hunter/conservationists dedicated to ensuring the continued success of wildlife management in America-at a time of unprecedented polarization over management of land and wildlife.

**MISCELLANEOUS EXPERIENCE**

1960 - 1966 Taught field ecology in Science Camp (part-time). Worked one summer in redwood mill, one to summer in redwood logging. Earned 50 percent of living expenses as pizza cook while an undergraduate. Five months as mail clerk for engineering firm.

1979 - 2004 Game Manager. Served as game manager, Island Creek Gun Club, Centerville, Maryland. Responsible for regulation of hunting, trapping, and habitat management on a privately owned 200-acre marshland. (Co-owner of Club).

## PUBLICATIONS

Sparrowe, R.D. and R.C. Drewien. 1966. Nesting and production of the mourning dove in eastern South Dakota, 1965. South Dakota Bird Notes 18(2): 33-44.

Sparrowe, R.D. 1968. Sexual behavior of grizzly bears. American Midland Naturalist 80(2):570-572.

Sparrowe, R.D. and P.F. Springer. 1970. Seasonal activity patterns in white-tailed deer in Eastern South Dakota. Journal of Wildlife Management 34(2): 420-431.

Sparrowe, R.D. 1972. Prey-catching behavior in the sparrow hawk. Journal of Wildlife Management 36(2):297308.

Sparrowe, R.D. and H.M. Wight. 1975. A priority system for decision-making in the endangered species program. Trans. North American Wildlife and Natural Resources Conference 40:140-154.

Sparrowe, R. D. 1977. Harry S. Truman Dam and Reservoir - a case history of problems in fish and wildlife coordination. Trans. North American Wildlife and Natural Resources Conference 42:42-55.

Flood, B.S., M.E. Sangster, R.D. Sparrowe and T.S. Baskett. 1977. A handbook for Habitat Evaluation Procedures. USDI-Fish and Wildlife Service, Resource Publication 132. 77 pages.

Wollard, L.L., R.D. Sparrowe and G.D. Chambers. 1977. Evaluation of a Korean Pheasant Introduction in Missouri. Journal of Wildlife Management 41(4): 616-623.

Drobney, R.D. and R.D. Sparrowe. 1977. Land-use relationships and management of Greater Prairie Chickens in Missouri. Trans. Missouri Academy of Sciences, Volumes 10 and 11: 146-160.

Sparrowe, R.D. and B.F. Sparrowe. 1978. Use of critical parameters for evaluating wildlife habitat Pages 385405 in Classification, inventory and analysis of fish and wildlife habitat: the proceedings of a national symposium, 1977, Phoenix, Arizona. The Fish and Wildlife Service, Office of Biological Services, Washington, D.C. 604 pages.

Sanderson, R.C., E.D. Able, R.D. Sparrowe, J.G. Grieb, L.D. Harris, and A.N. Moen. 1979. Research needs in wildlife. Trans. North American Wildlife and Natural Resources Conference 44:166-175.

Zwank, P.J., R.D. Sparrowe, W.R. Porath, and 0. Torgerson. 1979. Utilization of threatened bottomland habitats by white-tailed deer. Wildlife Society Bulletin 7(4):226-232.

Griffin, C.R., T.S. Baskett, and R.D. Sparrowe. 1980. Bald eagles and the management program at Swan Lake National Wildlife Refuge. Trans. North American Wildlife and Natural Resources Conference 45:252-262.

Griffin, C.R., T.S. Baskett, and R.D. Sparrowe. 1982. Ecology of bald eagles wintering near a waterfowl concentration. USDI-Fish and Wildlife Service, Special Scientific Report - Wildlife No. 247.12 pages.

Sparrowe, R.D. 1982. Influence of cooperative wildlife and fishery units on graduate education and professional employment. Trans. North American Wildlife and Natural Resources Conference 47:219-230.

Sparrowe, R.D. Threats to paddlefish habitat. In: The Paddlefish: Status, Management and Propagation. North-Central Section, American Fisheries Society, Special Publication No. 7:36-45.

Sparrowe_ R.D. and J.H. Patterson. 1987. Conclusions and recommendations from stabilized duck hunting regulations: management implications and future directions. Trans. North American Wildlife and Natural Resources Conference 52:320-326.

Sparrowe, R.D., T.J. Dwyer, P.G. Poulos, L.R. Jahn, D.M. Smith and R.J. Misso. 1989. Biopolitical strategies for waterfowl habitat preservation and enhancement. Pages 531-560 in L.M. Smith, P.L .Pederson, and R.M. Kaminski, Eds. Habitat Management for Migratory and Wintering Waterfowl in North America, Texas Tech. University Press. 560 pages.

Sparrowe, R.D. 1989. Developing harvest regulations strategies for wood ducks. Pages 256-258 in L.H. Frederickson, G.V. Burger, S.P. Havera, D.A. Graber, R.E. King, and T.S. Taylor, Eds. Proceedings, 1988 North American Wood Duck Symposium, St. Louis, Missouri.

Sparrowe, R.D. and K.M. Babcock. 1989. A turning point for duck harvest management. Trans. North American Wildlife and Natural Resources Conference 54: 493-495.

Sparrowe, R.D. and K.M. Babcock. 1989. Balancing expectations with reality in duck harvest management. Trans. North American Wildlife and Natural Resources Conference 54: 594-599.

Sparrowe, R.D. 1989. Future directions for reducing illegal waterfowl harvest. Trans. Sixth International Waterfowl Symposium. Ducks Unlimited: pages 261-265.

Sparrowe, R.D. 1990. Cooperative approaches to managing hunting of waterfowl in North America. Pages 155158 in G.V.T. Matthews, Ed. managing waterfowl populations. Proceedings of an IWRB Symposium, 2-5 October 1989, Astrakhan, USSR. IWRB Special Publication No. 12, 1990.

Sparrowe, R.D. 1991. Responses of migratory waterfowl to harvest in North America. Gibier Faune Sauvage 8:319-333.

1992 - 2005. Wrote Capitol Comments, a quarterly article analyzing national wildlife and land management issues in Fair Chase, the magazine of the Boone and Crockett Club.

## PROFESSIONAL ACTIVITIES

### Society Memberships

Certified Wildlife Biologist. The Wildlife Society. Actively support numerous conservation organizations. Life Member of Izaak Walton League of America, Rocky Mountain Elk Foundation, National Wild Turkey Federation, National Rifle Association of America, Mule Deer Foundation, and Ducks Unlimited. An active Professional Member of the Boone and Crockett Club, co-chair of the policy committee.

### Activities

Active in the North-Central Section of The Wildlife Society from 1979-76. Secretary (1971), Vice President (1972), President (1973), Missouri Chapter of The Wildlife Society. Served three terms as Chairman, Environmental Affairs Committee, The Wildlife Society. Chairman, Resolutions and Public Statements Committee, National Capitol Chapter of The Wildlife Society, 1982. Member of Future Directions Committee, The Wildlife Society, 1983-1988. Elected Vice President, The Wildlife Society and swerved on Council 1993-1996. In 1995 served as President.

Have organized and participated in numerous state, regional and national conferences on wildlife and natural resources. Extensive public speaking experience to varied groups. Have chaired sessions and presented papers on wildlife management topics and on water resources at local, regional, and national meetings.

Served 2 years (1971-72) as Chairman, Chancellor's Faculty-Student Committee on Environment, University of Missouri-Columbia. Was active as an advisor to student groups on campus, and pursued regular contact with the public through presentations on wildlife and assorted topics. Regular speaker before agriculture groups at the state and regional level in Missouri.

Extensive experience in the development of environmental impact assessments under the National Environmental Policy Act during 1970-75. Reviewed EIS's for The Wildlife Society, both the Missouri Chapter and parent society, and for the Kansas City Area Office of the Fish and Wildlife Service. Had significant input into EIS on the Harry S. Truman Dam and Reservoir Project, through interaction with the Environmental Defense Fund.

Served on 6-person steering committee 1974-75, for the initiative petition drive by the Citizens Committee for Conservation in Missouri to enact Amendment 1 to the Missouri Constitution which implemented the Design for Conservation. This action more than doubled the funding base of the Missouri Department of Conservation and lead to the most comprehensive wildlife conservation program in America.

### At The Wildlife Management Institute

Since 1991, assuming the position of President of the Wildlife Management Institute, extensively worked to build active coalitions to address resource management issues. Examples include the Wildlife Partners Network, a group of 10 wildlife organizations that track legislation and agency

rulemakings, and leads to action on issues by the organizations alone or in groups. The Cooperative Alliance for Refuge Enhancement, more than 20 diverse organizations working to improve funding and staffing for the National Wildlife Refuges. The American Wildlife Conservation Partners, 37 hunter/conservation organizations working together to strengthen modern, proactive management of wildlife and habitats on both public and private lands.

Legislative involvement has included the National Wildlife Refuge Improvement Act of 1997, the 1996 and 2002 Farm Bills, North American Wetlands Act, and a wide variety of other bills affecting wildlife. Served on the negotiating team that successfully amended the Migratory Bird Treaty with Canada to allow managed harvest by native people in the U.S. and Canada.

### Since Retirement in 2004

Founding Board Member, Theodore Roosevelt Conservation Partnership-and Currently Chair of the TRCP Policy Council.

Board Member, North American Grouse Partnership.

Chair, Wildlife Monitoring Task Group, under the Pinedale Anticline Working Group-FACA Chartered by Secretary of Interior Gale Norton.

Member, Tom Thorne Sage Grouse Fund Advisory Committee, Wyoming Community Foundation.

Member. International Association of Wildlife Agencies Task Group on Implementation of Adaptive Harvest Management.

Exhibit B

# Exhibit B – Part 2



## U.S. Department of the Interior

Bureau of Land Management
Pinedale Field Office

November 2004



# Finding of No Significant Impact, Decision Record and Environmental Assessment for the Questar Year-Round Drilling Proposal, Sublette County, Wyoming



**MISSION STATEMENT**

It is the mission of the Bureau of Land Management to sustain the health, diversity, and productivity of the public lands for the use and enjoyment of present and future generations.

**WY-100-EA05-034**

**ERRATA –** The appeal period is 20 business days rather than 30 business days

**APPEAL**

This decision is subject to appeal.  Under BLM regulation, this decision is subject to administrative review in accordance with 43 *Code of Federal Regulation (C.F.R.)* 3165.  Any request for administrative review of this decision must include the information required under 43 C.F.R. 3165.3(b)(State Director Review), including all supporting documentation.  Such request must be filed in writing with the State Director, Bureau of Land Management, P.O. Box 1828, Cheyenne, WY, 82003, within 20 business days of the date such notice of decision was received or considered to have been received.



# United States Department of the Interior

BUREAU OF LAND MANAGEMENT
Pinedale Field Office
P.O. Box 768
Pinedale, Wyoming 82941-0768

In Reply Refer To:
1792 (100)
WY-100-EA05-034

November 3, 2004

Dear Reader:

This Environmental Assessment (EA), Finding of No Significant Impact (FONSI), and Decision Record (DR) on the proposed Questar Year-round Drilling Proposal (QYDP) are furnished for your information. The DR identifies the BLM decision, explains the rationale for reaching the decision, and identifies measures to protect the environment. The QYDP decision was based on the analysis in the EA, public concerns and comments, and other multiple-use resource objectives or programs that apply to the project.

The EA was prepared pursuant to the National Environmental Policy Act (NEPA) and other regulations and statutes, to fully disclose potential impacts of the proposal and alternative actions to resources in the area of Questar's leasehold on the northern end of the Mesa in the Pinedale Anticline Natural Gas Field. Per NEPA regulations, the No Action is included as a baseline for comparison.

The BLM appreciates the individuals, organizations, and Federal, State, and Local Governments who participated in the process. Your input is essential in assuring that all issues important to you were considered.

Sincerely,

Priscilla E. Mecham
Pinedale Field Manager

**FINDING OF NO SIGNIFICANT IMPACT(FONSI) and DECISION RECORD (DR)
FOR
QUESTAR YEAR-ROUND DRILLING PROPOSAL
EA #WY-100-EA05-034**

## SUMMARY OF THE DEVELOPMENT PROPOSAL

Questar Exploration and Development Company (Questar) proposes to modify their current drilling program, approved in the July, 2000, Record of Decision (ROD) (BLM 2000b) for the Pinedale Anticline Project Area (PAPA). The ROD for the PAPA approved drilling, completion, testing, production, and reclamation of 700 new natural gas well locations in the 197,345-acre project area. Questar's Federal lease area encompasses approximately 14,160 acres in the northern portion of the PAPA. Maximum average well pad density approved in the ROD for Questar's leasehold area ranges from 0 to 4 well pads per square mile, depending on Management Area.

Questar proposes to conduct year-round drilling in mule deer crucial winter range and greater sage-grouse breeding, nesting, and wintering habitats in Management Areas 4 and 5. Questar also proposes to construct a 107-mile long, 6-inch diameter pipeline to transport condensate from the PAPA to sales facilities in Sweetwater County. Currently, condensate is trucked from each well pad in the PAPA. The PAPA EIS did not evaluate impacts to mule deer or greater sage-grouse from year-round drilling on winter ranges or in breeding, nesting, and winter habitats. Neither did the PAPA EIS evaluate a condensate pipeline.

Questar proposes to construct 9 additional well pads and drill multiple wells from each of these additional pads. Some of the existing 52 well pads would be re-entered to drill additional wells. Up to 150 well pads could have been authorized to Questar under the PAPA ROD. Questar proposes to begin year-round drilling under this proposal in 2004. Year-round drilling may shorten the time required to develop their lease area, provide for more economic drill rig utilization, and result in fewer wells on their lease acreage than analyzed in the EIS. The condensate pipeline, in conjunction with the previously-approved produced water gathering system, would eliminate approximately 25,000 tank truck trips annually from Questar's lease area during peak production.

## DECISION

It is my decision to approve Alternative A. Approval allows the following:

    1) Construction of the 107-mile long, 6-inch diameter condensate pipeline using the alignment shown in Appendix B of the EA. Approval of drilling operations between November 15, 2005, and April 30, 2006, is contingent upon this pipeline and the produced water pipeline being operational by that date; if the pipelines are not operational by November 15, 2005, Questar may not winter-drill after that date unless an exception is granted. That exception will be considered on its own merits.

*Decision Record, Questar Year-Round Drilling Proposal*

2) Up to two rigs drilling on one well pad between November 15, 2004 and April 30, 2005. Pad location will be selected in coordination with BLM and Wyoming Game and Fish Department (WGFD).

3) All mitigation described in Section 2.5 of the EA will be in place and operational by November 15, 2005, including initiation of habitat enhancement projects within Questar's leasehold in 2005, except for full implementation of EPA Tier II compliant or alternate fuel drilling rigs.

4) As committed to by Questar, by January 1, 2007, all drilling rigs operating in Questar's leasehold will be either EPA Tier II compliant or will utilize alternate fuels engines whose emissions are equivalent to Tier II engines.

5) Beginning in the winter of 2005-2006, Questar will implement an expanded mule deer research study to determine impacts of winter drilling on mule deer populations. Questar will provide a proposed expanded research design to BLM by July 1, 2005; BLM will submit that proposed design to the Pinedale Anticline Working Group (PAWG) and to the WGFD for review and recommendation. The PAWG and WGFD will make their recommendations to BLM by September 1, 2005; and BLM will approve the proposed or modified research design before November 1, 2005. Questar must implement that research by November 15, 2005.

6) Over a nine year period beginning November 15, 2005, through the winter of 2013-2014, Questar will be allowed to utilize up to six rigs (two rigs per well pad) drilling on up to three well pads between November 15 and April 30 each year. Between May 1 and November 15 of any year under this proposal, Questar can drill with as many rigs from as many of the 61 total well pads as is feasible, with appropriate authorization.

7) Questar can construct and begin drilling from the winter-long well pads before November 15 of any year; however, continuation of activity on those pads after November 15 will be contingent upon all appropriate mitigation being in place and/or operational.

8) This Decision Record authorizes a maximum of 61 well pads (52 currently existing and 9 new well pads) within Questar's leasehold.

9) Leasehold development and production will be based on performance objectives (see Appendix A) to allow Questar maximum flexibility to utilize innovation to maximize gas recovery while providing optimal short- and long-term protection for other resources in their leasehold.

My decision is conditioned upon and subject to the following requirements:

- Questar will fully implement the applicant-committed mitigation measures described in Section 2.5 of the EA and the original ROD for the PAPA EIS, except as modified by this decision, by November 15, 2005. Habitat enhancement activities may begin prior to November 15, at the discretion of BLM and WGFD;

- Questar will be required to fully implement the performance-based development and production objectives, Conditions of Approval, mitigation, monitoring, and Best Management Practices listed in Appendix A of this Decision Record;

- The Pinedale Anticline Working Group advisory committee will review and evaluate the above-referenced requirements and make recommendations to BLM on an annual basis regarding continuation, cessation, or addition to those requirements; and

- The BLM Pinedale Field Manager or designee is the Authorized Officer (AO) for this project. Mitigation and monitoring measures may be modified. Mitigation and monitoring requirements will be determined annually by the AO after receiving the results of on-site inspections, recommendations from the Pinedale Anticline Working Group (PAWG), and stakeholder consultations. BLM may require field studies or documentation in addition to those listed in Appendix A to ensure that reclamation and other resource protection goals are met.

## FINDING OF NO SIGNIFICANT IMPACTS

As discussed in the EA, the direct and indirect incremental change to the environment introduced by implementation of Alternative A result in no significant environmental impacts that have not been analyzed. BLM and the cooperating agency (State of Wyoming) believe the adverse impacts have been mitigated such that the net change in cumulative impacts introduced by the project – in combination with past mitigation, present actions, adjustments proposed by Questar, and future monitoring and assessment – are not expected to be significant. Steps to mitigate, assess, and monitor air emissions will be taken in conjunction with Wyoming DEQ. NOx emissions are expected to be reduced over time on these leases with the use of improved diesel engines, elimination of flaring at well completion, and a near elimination of vehicle emissions traveling to the wells to recover condensate. NOx emissions from oil and gas operations are less than half of total emissions from sources such as power plants, traffic, etc. Potential impacts to $NO_2$ National Ambient Air Quality Standard, Wyoming Ambient Air Quality Standards, and Prevention of Significant Deterioration are unlikely to be significant. Therefore, a new or supplemental EIS is not required.

## RATIONALE FOR DECISION and MANAGEMENT CONSIDERATIONS

The decision to approve Alternative A is based on the following factors:

1) **Consistency with Land Use and Resource Management Plans.** The decision to approve Alternative A is in conformance with the overall planning direction for the area. The Pinedale RMP states that public land in the area of the proposal is "open to consideration for exploration, leasing, and development for all leaseable minerals." Standard and special protective measures, identified and incorporated into Alternative A, including the mitigation measures committed to by Questar (which will reduce traffic and surface disturbance), will help meet other resource objectives in the RMP.

2) **Finding of No Significant Impact.** As discussed in the EA, the direct and indirect incremental change to the environment introduced by implementation of Alternative A result in no significant environmental impacts that have not been analyzed. BLM

*Decision Record, Questar Year-Round Drilling Proposal*

and the cooperating agency (State of Wyoming) believe the adverse impacts have been mitigated such that the net change in cumulative impacts introduced by the project – in combination with past mitigation, present actions, adjustments proposed by Questar, and future monitoring and assessment – are not  expected to be significant.

3) **Relevant Resource and Economic Considerations.**  Environmental impacts identified in the EA are within the scope of the PAPA EIS.  It is anticipated that implementation of Alternative A will reduce impacts for most resources to levels below those analyzed in the PAPA EIS.  The economic benefit of allowing the project is important, especially to Questar, the local community, and local and federal governments.

4) **Agency Statutory Requirements.**  All pertinent statutory requirements applicable to this proposal were considered.  These include consultation with the U.S. Fish and Wildlife Service regarding threatened and endangered species; and coordination with state agencies regarding air quality, wildlife, cultural resources, and oil and gas conservation.

5) **National Policy.**  Exploration and development of Federal oil and gas leases is an integral part of the BLM oil and gas leasing program under authority of the *Mineral Leasing Act of 1920* and the *Federal Land Policy and Management Act of 1976*, and the *National Energy Policy*.  The United States continues to rely heavily on foreign energy sources.  Oil and gas leasing is needed to encourage development of domestic oil and gas reserves to reduce the United States's dependence on foreign energy supplies.  Therefore, the decision is consistent with national policy.

6) **Measures to Avoid or Minimize Environmental Harm.**  The adoption of the performance-based development and production objectives, Conditions of Approval, mitigation, monitoring, and Best Management Practices in Appendix A represent practical and effective means to avoid or minimize environmental harm.  Alternative A will reduce current environmental impacts for most resources within the Questar project area and lessen socio-economic impacts for the surrounding communities.

7) **Public Comments.**  Eighty four comment letters were received on the scope of the EA during the 45-day scoping period that ended August 20, 2004.  These letters are summarized in Section 2.2 of the EA.

The decision to approve Alternative A takes into account important management consideration, Federal agency missions, and the public's need for oil and gas.  The decision balances these considerations with the degree of adverse impact to the environment and Alternative A's benefits.  The development effort will help meet public needs for oil and gas while at the same time allowing humans to coexist with nature in a way that allows the least degree of irreversible, irretrievable commitment of resources.  The long-term productivity of the area would neither be lost nor substantially reduced as a result of approving the Questar's proposal.  Implementation of

the mitigation measures listed in Section 2.5 of the EA will result in a reduction of impacts currently occurring to most resources from development within Questar's lease area.

## COMPLIANCE AND MONITORING

Qualified personnel from Questar and BLM will be available during and following construction to ensure compliance with construction, reclamation, and other requirements and provisions of this Decision Record. Questar will be required to conduct monitoring of the project in coordination with BLM and other State and Federal agencies in accordance with Appendix A of this Decision Record. Appropriate remedial action will be required by the BLM or the State of Wyoming in the event unacceptable impacts are identified.

## ALTERNATIVES CONSIDERED INCLUDING THE PROPOSED ACTION

Four development alternatives (Proposed Action, No Action, Alternative A, and Alternative B) were considered and analyzed in detail in the EA.

**Proposed Action**. The proposed development would involve:

1) Construction of a 107-mile long condensate pipeline between two existing pipeline plants (the Rocky Mountain Pipeline Facility in Section 5, T. 18 N., R. 112 W. in Sweetwater County and the Blacks Fork Plant in Section 10, T. 18 N., R. 112 W. in Uinta County), and the Pinedale No. 4 well site in the PAPA in Section 34, T. 32 N., R. 109 W. (Sublette County); and

2) Year-round drilling from three well pads each winter in Questar's lease area using two rigs on each well pad beginning in the winter of 2004-2005.

**No Action**. Under this alternative BLM would deny permits necessary for construction of the condensate pipeline and prohibit year-round drilling in Questar's lease area. Current land and resource uses would continue as approved by the ROD for the PAPA EIS. That is, an average of up to four well pads would be allowed per section throughout most of Questar's lease area. Drilling could continue for up to 18 years. Some reduction in tanker truck traffic would occur because of the previously-approved produced water gathering system.

**Alternative A.** This alternative is the same as the Proposed Action except that Questar would be allowed to drill from only one well pad with up to two rigs between November 15 and April 30 until the condensate pipeline is constructed and operational and the environmental benefits of the pipeline and other applicant-committed mitigation are initiated or operational to offset impacts from year-round drilling.

**Alternative B.** Under this alternative Questar would be denied the ability to drill year-round but would be required to implement the mitigation measures listed in Section 2.5 of the EA.

*Decision Record, Questar Year-Round Drilling Proposal*

## ALTERNATIVES CONSIDERED BUT NOT ANALYZED IN DETAIL

Five additional alternatives were considered in this EA but not analyzed in detail for the reasons stated below:

**Alternative 1**.  This alternative includes all project components of the Proposed Action but would allocate year-round drilling pads between Questar and other operators in the PAPA.  This alternative is beyond the scope of this EA because BLM does not have year-round drilling proposals from other lease operators.

**Alternative 2**.  This alternative includes all project components of the Proposed Action but would not allow new disturbance (well pads) until existing pads are drilled out.  BLM determined it was not necessary to analyze this alternative in detail because Questar has voluntarily committed to coordinating siting of all new and winter drilling pads with BLM and WGFD.  Therefore BLM, in consultation with WGFD, already has the ability to select only existing pads for year-round drilling.

**Alternative 3**.  This alternative includes all project components of the Proposed Action but would allow no development in big game migration corridors.  BLM determined that it was not necessary to analyze this alternative in detail because Questar has already committed to allowing BLM and WGFD to identify the locations of year-round drilling pads.  Therefore BLM, in consultation with WGFD, already has the ability to select only pads located outside big game migration corridors.

**Alternative 4**.  This alternative includes all project components of the Proposed Action but would prohibit drilling in sage grouse breeding and nesting habitat and deer crucial winter range during periods specified in the PAPA ROD.  BLM determined that this alternative is essentially the same as Alternative B, which was considered in detail.

**Alternative 5**.  Scoping comments suggested that BLM analyze year-round drilling throughout the PAPA instead of just for Questar's lease area.  BLM has not received applications or proposal for year-round drilling from PAPA operators other than Questar.  Consequently, BLM has no specific field-wide proposals for analysis.


## APPEAL

This decision is subject to appeal.  Under BLM regulation, this decision is subject to administrative review in accordance with 43 *Code of Federal Regulation (C.F.R.)* 3165.  Any request for administrative review of this decision must include the information required under 43 C.F.R. 3165.3(b)(State Director Review), including all supporting documentation.  Such request must be filed in writing with the State Director, Bureau of Land Management, P.O. Box 1828, Cheyenne, WY, 82003, within 30 business days of the date such notice of decision was received or considered to have been received.

*Decision Record, Questar Year-Round Drilling Proposal*

**SIGNATURE**

Priscilla C. Mecham                    11/09/04

**Priscilla Mecham, Pinedale Field Manager**        Date

*Decision Record, Questar Year-Round Drilling Proposal*

---

## Appendix A

# Performance-based Development and Production Objectives, Conditions of Approval, Mitigation, Monitoring, and Best Management Practices

### *Development and production performance-based objectives for existing and future activities within Questar's leasehold:*

- Maintain airborne emissions at or below levels sufficient to avoid:

    1. Near-field or far-field concentrations exceeding Wyoming or National Ambient Air Quality Standards (WAAQS or NAAQS );

    2. Cumulative near-field concentrations greater than Prevention of Significant Deterioration (PSD) Class II increments;

    3. Cumulative far-field concentrations in regional Class I wilderness areas and parks greater than PSD Class I increments;

    4. Decreases in visibility in regional parks and wilderness areas greater than Federal Land Managers' Air Quality Related Values Workgroup (FLAG), Forest Service (USFS), and/or National Park Service (NPS) thresholds.

    5. Decreases in Acid Neutralizing Capacity (ANC) in sensitive regional lakes greater than USFS  levels of acceptable change (LAC);

    6. Increases in total acid deposition in sensitive regional lakes greater than deposition analysis thresholds (DAT); and

    7. Cumulative deposition total loadings greater than USFS levels of concern (LOC).

- Maintain sediment erosion (salt and silt discharge rates) at WDEQ and BLM acceptable levels;

- Establish 50 percent of original cover and plant composition on reclaimed areas within two years of disturbance; establish 80 percent of original cover and plant composition on reclaimed areas within five years of disturbance;

- Plan interim and final reclamation to increase habitat patch sizes and reduce habitat fragmentation for sagebrush-obligate species;

- Limit increase in *production activity* noise levels to 10-decibels or less above background noise levels, measured at noise-sensitive resource locations;

---

*Decision Record, Questar Year-Round Drilling Proposal*

- Maintain or improve the integrity of sagebrush habitat to sustain or increase the number of male sage-grouse on leks and numbers of sagebrush-obligate listed and sensitive species;

- Maintain or improve currently active big game migration routes;

- Reduce human activity impacts in the leasehold below current levels during both the development and production phases;

- Prevent contamination of all surface and ground water;

- Utilize state-of-the-art technologies to avoid, minimize, or mitigate impacts; and

- Encourage Questar to participate in and support peer-reviewed research that evaluates impacts from development and applied mitigation;

## *General Conditions of Approval and Best Management Practices*

BLM will impose the following General Conditions of Approval (COAs) and Best Management Practices (BMPs) on all existing and future authorizations within Questar's leasehold:

- This decision is tiered to the PAPA EIS. Absent specific revision in this Decision Record, Questar will comply with the PAPA ROD management objectives, conditions of approval, standard stipulations and mitigation measures in the PAPA EIS and ROD;

- Questar will utilize flareless completions for all wells within their leasehold unless proven on a case-by-case basis that flareless completions would be unsafe;

- Questar will install remote telemetry at all wells to minimize well monitoring trips;

- Questar will pipe produced water and condensate from all wells in the leasehold beginning no later than November 15, 2005; this would supercede previous decisions related to method of condensate disposal;

- Well pads will be designed and constructed to achieve zero sediment discharge runoff for a 25-year storm or snowmelt event; Questar will modify all existing well pads to achieve zero sediment discharge within 1 year of this Decision Record;

- All hydraulic structures will be appropriately sized, utilizing hydraulic runoff modeling software to insure that structures are stable and erosion is minimized throughout the anticipated life of the project;

- Motor vehicle traffic in Questar's leasehold will be limited to BLM-approved roads and trails;

- Questar will cement or grout water wells as required by WSEO to protect fresh water aquifers;

*Decision Record, Questar Year-Round Drilling Proposal*

---

- Questar will utilize closed drilling systems (no reserve pits) for all wells unless proven on a case-by-case basis that to do so would be technologically or economically unfeasible. If reserve pits are approved, Questar will remove/vacuum fluids from reserve pits within 60 days of all wells on a pad being placed into production, to accelerate pit closure and reclamation;

- Compressor sites will be located away from noise-sensitive resources or muffled appropriately to minimum noise standards;

- Topsoil piles will not exceed 3 feet in height; exceptions may be granted for research and testing of new technology; reseeding of topsoil piles will be required if topsoil storage exceeds 3 months;

- Well pads, access roads, and other above-ground facilities will not be located within 825 feet of an active raptor nest, within 1,000 feet of an active ferruginous hawk nest, and within 2,640 feet of a bald eagle nest;

- The following seasonal restrictions for activities near active raptor nests/roosting sites/foraging areas will be imposed:

  1. February 1 through July 31, within ½ mile of all active raptor nests

  2. February 1 through July 31, within 1 mile of all active ferruginous hawk nests

  3. February 1 through August 15, within 1 mile of all active bald eagle nests

  4. November 1 through April 1, within 1 mile of active bald eagle communal winter roosts

  5. November 15 through April 1, within 2 ½ miles of bald eagle winter foraging areas

- Surface disturbing and disruptive activities in sage-grouse winter habitat from November 15 through March 14 will be avoided;

- Surface disturbing and disruptive activities in sage-grouse nesting and early brood-rearing habitat within 2 miles of an occupied lek, or in identified sage-grouse nesting and early brood-rearing habitat outside the 2-mile buffer, will be prohibited from March 15 through July 15;

- Surface disturbance and occupancy will be prohibited within ¼ mile of the perimeter of sage-grouse leks, and human activity will be avoided between 8 p.m. and 8 a.m. from March 1st to May 15th;

- Questar will submit to BLM for approval a reclamation plan (interim and long-term) for the leasehold area 1 year from the date of this Decision Record;

- Questar will avoid vehicle travel during saturated soil conditions to avoid impacts from rutting;

*Decision Record, Questar Year-Round Drilling Proposal*

- Questar will, in conjunction with other PAPA operators, fund a WDEQ mobile emissions inspector for five years to assist in determining further methods that could reduce overall emissions from development activities;

- Well completions within MA 5 will be prohibited between November 15 and April 30;

- Questar will inventory all roads/trails in the leasehold not already inventoried by BLM within 1 year of the date of this Decision Record; GIS data will be provided to BLM, WGFD and PAWG with FDGC-compliant metadata;

- Questar will inventory greater sage-grouse seasonal habitats within the leasehold not already inventoried by BLM or WGFD within 1 year of the date of this Decision Record; GIS data will be provided to BLM, WGFD and PAWG with FDGC-compliant metadata;

- Questar will maximize centralization of development and production facilities;

- Questar will continue innovation and planning to minimize well pad, road, pipeline, and ancillary facilities footprints;

- Questar will comply with all appropriate federal, state, and local laws and regulations. All appropriate permits from the appropriate regulatory agencies will be obtained before proceeding; and

- Seasonal closure of Mesa roads (as specified by BLM) to non-essential traffic from November 15th to April 30th.

## *Programmatic Mitigation/Conditions of Approval*

On a site-specific basis the BLM may impose the following Conditions of Approval:

- Conversion of resource roads to 2-tracks on a site specific basis during interim reclamation;

- Nighttime lighting restrictions may be imposed on a case-by-case basis (including but not limited to directional lighting, hooded lights, colored lights);

- Questar will use tanks for mud storage rather than pits for Horizontal Directional Drilling (HDD) crossings of the rivers;

- If Questar determines it is necessary to use additives for HDDs, Questar will consult with the WDEQ, WGFD and BLM to determine measures necessary to protect aquatic life at the river crossings;

- Prior to disturbance, Questar will prepare site-specific HDD monitoring and contingency plans for each river crossing for BLM, WDEQ and WGFD, Army Corp of Engineers review and approval;

*Decision Record, Questar Year-Round Drilling Proposal*

- Spoil piles will be contoured to approximate the surrounding topography, and contemporaneously reclaimed;

- Questar will develop a plan for BLM review and approval to bore or HDD beneath the crossings of the Slate Creek Cutoff/Baker Davis Road and the East Bank Kinney Cutoff trails;

- Interim (production phase) well pad reclamation (reclaim up to the wellhead, or up to the wellhead and dehydrators and separators on those well pads with central production facilities) may be required;

- Implement additional air quality mitigation measures such as: use of selective or non-selective catalytic reduction on compressors; increased diameter of sales pipelines; increased water or magnesium chloride applications or other treatments (gravel, paving) on all surface disturbances including resource roads and well pads;

- Hold storm water and snowmelt water in the project area for as long as possible to allow for infiltration, reduce runoff energy and associated sediment loads, using geofabrics, jute netting, spreader dikes, retention ponds, additional armoring of existing water courses, or other techniques;

- Construction of Livestock/wildlife water developments, or strategic supplementation of natural precipitation may be required to improve livestock distribution and forage utilization;

- Utilize hospital-grade mufflers or equivalent technology on all drilling rig engines and equivalent muffling of compressors and pump stations, to meet the noise limitation objective;

- Accelerate reclamation of disturbed areas – using innovative native seed mixtures and application techniques, supplementing natural precipitation with sprinkler irrigation at key times, and other practices as approved by BLM; and

- All engineering for construction authorized by this Decision Record will be planned to minimize or mitigate cumulative impacts and to minimize sedimentation at the lease boundary.

## Resource Monitoring

The following monitoring activities are being considered by the PAWG and may be applied throughout the PAPA. If resource monitoring is not prescribed PAPA–wide at the time of approval, monitoring activities such as those specified below may be required throughout the Questar leasehold. BLM will consider PAWG recommendations to adjust COAs, monitoring, mitigation, and BMPs to meet field development and production objectives.

- Questar will monitor reclamation success until development and interim (production phase) reclamation is completed;

Exhibit B – Part 3

*Decision Record, Questar Year-Round Drilling Proposal*

- Questar may be required to conduct site specific surveys of soils and vegetation types throughout the leasehold in coordination with BLM, and provide survey results to BLM within 1 year of this Decision Record;

- Questar may be required to conduct 6th-level watershed modeling throughout the leasehold (including identification of current sediment discharge rates), and provide the results to BLM and WDEQ, contingent on availability of data;

- Questar will prepare and implement a Sensitive Species Survey and Monitoring Plan for BLM and WGFD approval that will determine the presence, distribution and population trends of all Federally-listed, proposed, candidate, and BLM sensitive species throughout the leasehold. Monitoring will be conducted annually for the life of the project or until BLM determines that additional monitoring in not required. Questar will prepare an annual report for BLM, PAWG, and WGFD. Survey results will be provided annually to the Wyoming Natural Diversity Database (WNDD) with GIS FDGC-compliant metadata;

- Questar may be required to monitor 'first flush' total suspended solids (TSS), in coordination with WDEQ and BLM and other agencies;

- Questar may be required to assist BLM and WGFD in monitoring sage-grouse movements to determine if populations are migratory;

- BLM may recommend that Questar establish new, or financially support current, air quality monitoring in the Pinedale Field Office;

- In coordination with BLM, Questar will monitor forage utilization and reclamation success on reclaimed areas throughout leasehold development and into the full production phase;

- Questar may be required to monitor traffic volume on collector roads;

- Questar may be required to monitor the number of visits to well pads as required by BLM;

- Questar may be required to monitor noise near noise-sensitive resources;

- In coordination with BLM and WGFD, Questar will monitor winter pronghorn movement within the leasehold;

- Questar may be required to monitor raptor/ferruginous/bald eagle/burrowing owl nesting activity, sage-grouse lek attendance, and other sagebrush-obligate species;

- Questar may be required to make payment to the Colorado River Endangered Fish Recovery Program to compensate for water withdrawals from the Colorado River System; and

- Questar will evaluate, in coordination with BLM and WDEQ, the necessity of installing vapor recovery systems on pump stations, storage, and processing equipment located Gobblers Knob.

Exhibit C

Pinedale Anticline Working Group
Wildlife Monitoring Task Group
Proposed Monitoring Plan, February 18, 2005

**Introduction**

The Record of Decision (ROD) for the Pinedale Anticline Oil and Gas Exploration and Development Project published by the Bureau of Land Management (BLM) on July 27, 2000 incorporated Adaptive Environmental Management (AEM). The AEM process was included in Appendix F of the Draft Environmental Impact Statement (DEIS) for the Pinedale Anticline Oil and Gas Exploration and Development Project because the extent, location, and pace of natural gas development on the Pinedale Anticline Project Area (PAPA) could not be predicted at the time. Because of those uncertainties, predictions of impacts to various resources on the PAPA were based on multiple assumptions that may or may not have been correct. In addition, the AEM process was directed to evaluating and modifying, if necessary, mitigation measures contained in the ROD. The process of implementing AEM planning on the PAPA was included as Appendix C in the ROD and calls for monitoring plans to be prepared for several resources, including wildlife.

The purpose of monitoring is to detect change in some attribute of a resource over time (Morrison 2002). In general, monitoring efforts are preceded by a baseline inventory (Green 1979, Jones 1986). A baseline wildlife inventory assesses the status of the resource (and attributes such as abundance, distribution, and diversity of species and habitats) at one point in time and in a specific location(s). In impact analysis, monitoring is used to detect impact as a departure from the resources' status determined during the baseline inventory process and assumes that no impact occurred prior to the inventory and the location and time of the impact are unknown (Green 1979). An impact study-design decision scheme, representing the 5 major categories or main sequences of impact studies, is reproduced from Green (1979) in Figure 1, below.

**Figure 1. General scheme of environmental impact study designs (Green 1979) that provide a framework for the Draft Wildlife Monitoring Plan.**



Since the PAPA ROD was approved in 2000, natural gas development has progressed over the past 4 years. With the exception of research projects initiated before 2001, there is now no or limited opportunity to conduct baseline inventories to which results of monitoring can be compared. Consequently, a wildlife monitoring plan, in the strict sense of measuring wildlife attributes over time for comparison to those attributes measured during an inventory before development began, may not be possible. In addition to natural gas developments, wildlife and habitats on the PAPA and vicinity were, and have continued to be, exposed to various human-related effects as well as environmental changes (for example, climate variation) for many years.

When the study-design decision scheme in Figure1 is applied to present and past natural gas development on the PAPA, distinctions between the categories of impact study become blurred. An answer to the first question, "Has the impact already occurred?" cannot be answered definitively "Yes" or "No" for all wildlife species. Certainly potential sources of impact to wildlife are present (surface disturbance, roads with traffic, drilling and production activities) but there are limited, definitive data available to state that impacts to the various wildlife species that inhabit the PAPA have occurred.

If one accepts that the process of development has impacted wildlife, then answering second question "Is 'when and where' known?" is problematic. The answer to "where" may be the full extent of the PAPA or may be restricted to sites of development per se. That range in impact location will likely vary for different wildlife species. Similarly, there is no answer available as to "when" impact occurred - if it has already occurred or when, in the future, it will occur.

Answering such questions about the effectiveness of specific mitigation measures to wildlife might be easier in cases where implementation of specific mitigation measures at specific locations is known or can be planned (vegetation restoration or enhancement measures, road closures, are examples). Inventories at those locations can be conducted prior to implementation, then monitored over time to detect changes in the wildlife species' attributes inventoried and monitored; a positive change or maintaining the current status of those attributes would be assumed if the mitigation measure is effective. In those situations, control areas on the PAPA – sites where mitigation has not been not applied - could be defined so that an optimal study design (category 1 in Figure 1, above) can be developed.

With other types of mitigation measures that are or have been applied across the PAPA (seasonal stipulations, spatial buffers are examples), monitoring the success or failure of those measures presents problems similar to monitoring for detection of impact. Further, restrictions on BLM's authority to require using off-PAPA sites as control areas limits the level of reliable information that can be obtained by repetitive observations only conducted within the PAPA.

There may be future opportunities to implement optimal study designs, the goals of which will be to advance understanding of some aspects of impact and mitigation to wildlife. However, the Wildlife Task Group recognizes that a monitoring plan, in the strict sense, cannot be implemented to achieve similar goals since there is no baseline inventory to which monitoring results can be compared. Instead, monitoring to determine trends in wildlife species' attributes must be conducted over sufficient time and the entire PAPA so that impact and mitigation success can be inferred from changes over time (category 2 in Figure 1) and/or from spatial changes within the PAPA (category 4 in Figure 1). Most likely, detection of positive or negative changes will only be useful as evidence that something may be occurring and will prompt rapid development and implementation of a specific study designed to provide cause-and-effect understanding of the observed change in trends.

**Impact and Mitigation**

Impact assessment, in its simplest form, is an estimate of the future state of a resource or system without a perturbing development compared to the expected future state as a result of that development. The difference between the two future scenarios is the estimate of effect (Baskerville 1986), an impact if the effect is negative; a benefit if the effect is positive. The focus of impact assessment for wildlife resources is on populations; whether populations can be sustained under specific management actions and/or with implementation of various proposed developments. Impacts to wildlife populations imply some negative effect to birth rate and/or survival rate (and to a lesser extent on immigration and emigration rates) that causes populations to decline.

Impact to wildlife may be direct or indirect. The Council on Environmental Quality (CEQ 1978, Section 1508.8) describes direct effects as those "caused by the action and occur at the same time and place." Mechanisms of direct effect (impact) to wildlife are relatively straightforward to understand. They may involve directly increasing mortality (vehicle collisions, increased energy expense during escape from disturbances or harassment, electrocutions, entrapment in open pits, are some examples) and/or directly decreasing births and recruitment of young to the population (as examples, disrupting reproductive behavior, causing nest abandonment, causing stress-related reproductive failure such as fetal adsorption, abortion, or neonatal abandonment).

On the other hand, CEQ (1978) describes indirect effects as those "which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." Indirect impacts are related to but removed from an action by an intermediate step or process. For wildlife, indirect impacts are often associated with habitat alteration, elimination, or degradation. In terms of the Wyoming Game and Fish Commission Mitigation Policy (1998), such effects to habitats can diminish "habitat function" which is the "arrangement of habitat features, and the capability of those features, to sustain

species, populations, and diversity of wildlife over time" (Wyoming Game and Fish Department (WGFD) 2004). Habitats may provide a variety of functions including wildlife survival during winter, nesting or birthing, foraging, shelter, but if the effectiveness of those habitats becomes compromised, wildlife may not continue using that habitat area for the specific function it formerly provided (WGFD 2004). To be sure, habitat loss or alteration is a driving force in species' population declines as is, for example, the case in 85% of species listed as threatened or endangered under the Endangered Species Act (Boyce 2002).

Direct and indirect impacts may be short-term or long-term. Short-term effects, for example, would be activities (traffic, machinery, visual and auditory stimuli) associated with the well-drilling process. While drilling might last for one or several months, surface disturbances caused by the well pad, pipelines, and roads will persist over the long-term until successfully revegetated. Too, human presence on roads and well pads will last as long as a well produces gas and generate direct and indirect impact to wildlife over the long-term.

Cumulative impacts are the additive, synergistic, or countervailing interactions of various direct and indirect impacts expected to result from a proposed action (CEQ 1997) and the incremental impacts of "other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time" (CEQ 1978). For example, an individual well site might not cause detectable impact to wildlife but full-field natural gas development could. And, full-field natural gas development, and multiple field development in the region, along with other resource uses and human developments that can affect wildlife contribute to cumulative impacts.

Mitigation measures, alternatively, are implemented to limit or reverse the effects of direct, indirect, and cumulative impacts. CEQ (1978, Section 1508.20) includes the following approaches to mitigation:

" (a) Avoiding the impact altogether by not taking a certain action or parts of an action.
(b) Minimizing impacts by limiting the degree or magnitude of the action and its implementation.
(c) Rectifying the impact by repairing, rehabilitating, or restoring the affected environment.
(d) Reducing or eliminating the impact over time by preservation and maintenance operations during the life of the action.
(e) Compensating for the impact by replacing or providing substitute resources or environments."

In the PAPA ROD, BLM required a variety of mitigation measures to offset predicted impacts to wildlife. Many of those are standard stipulations applied by BLM (see Table 1). Determining whether those impacts have or will occur and whether those mitigation measures (including standard stipulations) have been or will be successful, are objectives of the AEM process.

## Existing Information and Monitoring Projects

There are numerous existing and proposed wildlife investigations that have or will provide information about wildlife on the PAPA and vicinity. Some, principally conducted by the WGFD, focus on geographic areas that may include the PAPA but generally extend to a larger region but have been ongoing for many years. Others have been conducted on the PAPA with the goal of detecting impact to wildlife by natural gas developments. Still others include the PAPA but have not been designed to specifically detect impact.

Long-term wildlife data have been collected within the region that surrounds the PAPA. The various sources and general characteristics of those data, extent over space and time, use of the data by agencies are provided in Table 2. For the most part, those data provide past trends of population demographic parameters and/or indices of species' population abundance, but only within the region for which data have been compiled. Much of the data noted in Table 2 are expected to be collected as agencies' on-going responsibilities. Collection of these data was not designed for use in impact analyses or for addressing mitigation effectiveness. Rather, analyses of data trends can provide indications that impacts may be occurring but sources of those impacts cannot be identified. Consequently, relevance of data in Table 2 for use in the AEM process will most likely serve to alert wildlife managers, the Wildlife Task Group, and the PAWG that cumulative impacts may be occurring and that design and implementation of specific studies are warranted.

Alternatively, there have been and continue to be wildlife investigations that focus on natural gas developments on the PAPA. Those studies, included in Table 3, were specifically designed to assess direct and indirect impacts by those

developments to the target species. Indeed, some of the studies have been designed as optimal impact studies (category 1 in Figure 1, above) wherein data were collected before and after (also during) initiation of developments on the impact site as well as non-impacted control sites. There are other studies that have been proposed though are not included in Table 3.

**Table 1. Summary of standard wildlife stipulations applied to leases on the PAPA by BLM.**

| Species or Group | Habitat Component | Stipulation | Applicable Area | Applicable Period |
|---|---|---|---|---|
| Big Game | Winter Range | No surface disturbance | Identified winter ranges | Nov 15 – Apr 30 |
| | Parturition Area | No surface disturbance | Identified parturition areas | May 1 – Jun 30 |
| Raptors | Nests | No surface disturbance | 0.5 mile radius of active nest | Feb 1 – Jul 31 |
| | Nests | No surface occupancy | 825 feet from active nests | Year-round |
| Ferruginous Hawk | Nests | No surface disturbance | 1.0 mile radius of active nest | Feb 1 – Jul 31 |
| | Nests | No surface occupancy | 1,000 feet from active nests | Year round |
| Bald Eagle | Nests | No surface disturbance or human activities | 1.0 mile radius of active nest | Feb 15 – Aug 15 |
| | Nests | No surface occupancy | 2,600 feet from active nests | Year round |
| | Winter Use areas | No surface disturbance or human activities | 1.0 mile radius of winter use area | Nov 15 – Mar 15 |
| | Foraging Areas | Habitat alteration restriction | 2.5 miles of BE foraging area | Year round |
| Sage Grouse | Lek | No surface disturbance | 0.25 mile of occupied lek | Year round |
| | Lek | No surface occupancy | 0.25 mile of occupied lek | Year round |
| | Lek | Restricted surface use | 0.25 mile of active lek | 8am to 8 pm Mar 1 – May 15 |
| | Nesting/Early Brood rearing | Restricted surface use | 2.0 miles or more of occupied leks | Mar 15 – Jul 15 |
| | Winter Concentration Areas | No surface disturbance or activity | Identified winter concentration areas | Nov 15 – Mar 14 |
| Mountain Plover | Breeding habitat | Survey requirement | Identified breeding habitat | Apr 10 – Jul 10 |
| Black-footed Ferret | Prairie dog town | Block clearance or survey requirement | Prairie dog towns that meet criteria | Year round |
| Pygmy Rabbit | Potential habitat | Survey required | Potential PR habitat | Year-round |
| Prairie Dogs | PD towns | Avoidance or reduction of impact | Identified PD towns | Year round |

There are additional wildlife studies included in Table 3 that do not have a rigorous impact study design. Some studies (pygmy rabbits, for example) are being implemented to assess the species' presence and basic ecology in the area. Other investigations have been focused on the PAPA and conducted annually (raptor nest surveys, for example), but the data collected, if examined alone, cannot be used to determine if impact has occurred or if mitigation is successful. Such data must be used in combination with temporal and spatial surface development actions on the PAPA to determine if impact can be detected by spatial relationships (proximity of raptor nests to development sites) and/or if impact can be inferred from species' trends on the PAPA over time. As with the data compiled in Table 2, such inferences about possible impact based on spatial and/or temporal data trends may require a study specifically designed and implemented to provide an unambiguous understanding of the cause-and-effect that had been detected or inferred.

Table 2. Summary of long-term wildlife information collected in the greater region surrounding the PAPA by various agencies.

| Species or Group | Responsible Agency | Data Collection Method | Data Collected | Area Extent of Data | Time Extent of Data | Use of Data by Agency | Use of Data In AEM Process |
|---|---|---|---|---|---|---|---|
| Mule Deer | WGFD | Harvest estimates based on field-checks and mail-in survey questionnaires | Number, sex, and age of animals harvested | Hunt Areas 138, 139 including the PAPA, other hunt areas in herd unit | Many years past and ongoing | Population model for Herd Unit | Temporal change may indicate socioeconomic impact |
| | | Aerial flights conducted post-harvest to classify sex and age categories | Number of fawns, yearling males, adult males, females | Hunt Areas 138, 139 including the PAPA, other hunt areas in herd unit | At least since 1978 and ongoing | Population model for Herd Unit, fawn production | Temporal change may indicate cumulative impact w/ need for study |
| | | Ground surveys conducted post-winter to classify age categories | Number of juveniles and adults surviving to post-winter | Hunt Areas 138, 139 including the PAPA, other hunt areas in herd unit | 1992–1993 and ongoing | Estimate winter mortality of fawns relative to adults | See below |
| | | Ground surveys for carcasses conducted post-winter to classify sex and age categories | Number of juvenile and adult carcasses | Core winter ranges including the PAPA | 1992–1993 and ongoing | Estimate over-winter mortality rates of fawns and adults | Temporal change may indicate cumulative impact w/ need for study |
| Pronghorn | WGFD | Harvest estimates based on field-checks and mail-in survey questionnaires | Number, sex, and age of animals harvested | Hunt Areas 87, 90 including the PAPA, other hunt areas in herd unit | Many years past and ongoing | Population model for Herd Unit | Temporal change may indicate socioeconomic impact |
| | | Aerial flights conducted pre-harvest to classify sex and age categories | Number of fawns, yearling males, adult males, females | Hunt Areas 87, 90 including the PAPA, other hunt areas in herd unit | At least since 1978 and ongoing | Population model for Herd Unit, fawn production | See below |
| | | Line transect aerial surveys stratified by habitat conducted pre-fawning | Number of animals by distance from transect | Sampling sub-units within herd unit | Since 1994 and ongoing | Population estimate | Temporal change may indicate cumulative impact w/ need for study |

5

Table 2. (continued).

| Species or Group | Responsible Agency | Data Collection Method | Data Collected | Area Extent of Data | Time Extent of Data | Use of Data by Agency | Use of Data In AEM Process |
|---|---|---|---|---|---|---|---|
| Sage Grouse | WGFD | Harvest estimates based on field-checks, mail-in survey questionnaires, wing-barrels | Number, sex, age harvested, hunters, hunter-days | SUGMA 3, 7 including the PAPA | Since 1982 and ongoing | Harvest, population, reproduction trends* | Temporal change may indicate socioeconomic impact |
| | | Low level aerial survey, ground observations during winter | Winter distribution of sage grouse | | Aerial surveys since 2004 and ongoing | Seasonal use maps | Spatial/temporal change may indicate impact |
| | | Monitor leks | Lek activity status and peak counts of males attending | WGFD District 1 including the PAPA | Years past with occasional lapses and ongoing | Trends in lek attendance, population trends | Spatial/temporal change may indicate impact |
| | | Brood count routes | Counts of chicks and hens | One permanent route in Upper GRB | | Reproduction trends | |
| Other Upland, Small Game | WGFD | Harvest estimates based on field-checks, mail-in survey questionnaires | Number harvested, hunters, hunter-days | SUGMA 3, 7 including the PAPA | Since 1982 and ongoing | Harvest, population trends | Temporal change may indicate cumulative impact |
| Bald Eagle | WGFD | Aerial surveys of nests during April, June | Number of active nests and young produced, fledged | | | Reproduction and population trends | Spatial/temporal change may indicate impact |
| Vegetation | WGFD BLM | Vegetation transects | Sagebrush production, age class, condition | 3 transects on north end of PAPA | 1994 compared with 2004 | Plant species list, sagebrush trends | Comparison by decade |
| Breeding Birds | NBS volunteer observers | Breeding Bird Surveys during May, June on fixed routes and at fixed intervals | Number and species of birds observed during breeding | Several BBS routes in Upper GRB | Early 1980's and ongoing | Bird population trends in region (count/route) | Temporal change may indicate cumulative impact |
| Big Game | WDOT | Big game highway mortality | Species, sex and location of mortality | Area main highways | | | Temporal change may indicate cumulative impact |
| All Wildlife | WGFD | Wildlife observations recorded on Wildlife Observation System | Species, numbers, behavior, locations by opportunistic sightings | WGFD District 1 including the PAPA | Years past with and ongoing | Species distributions | |

* recent late hunting season timing reduces the ability to detect reproductive performance

6

**Table 3. Summary of recent wildlife investigations that focus on natural gas developments within the PAPA.**

| Species Or Group | Study Cooperators | Funding Source | Study | Period of Study | Data Collected | Relevance to Study Design | Use of Data In AEM Process |
|---|---|---|---|---|---|---|---|
| Mule Deer | West, Inc. WGFD University of Wyoming | WGFD BLM NWF PAPA Operators | Sublette Mule Deer Study- Phase I | 1998 - 2000 | -Seasonal ranges -Migration route/time -Herd Unit boundary -Adult survival rates | Baseline for optimal impact study | Establish pre-impact patterns on impact and control sites |
| | | | Sublette Mule Deer Study- Phase II | 2001 - 2006 | -Surface development -Animal distribution as a function of development -Survival-productivity rates | Optimal impact study use impact/control- before/after design | Detection of indirect impact by analysis before/after and on impact/control sites |
| | | | Sublette Mule Deer Study- Phase III | 2005 - ? | -Animal distribution as a function of winter drilling -Winter activity levels | Pilot work in 2005 leading to full study design | Detection of mitigation success or failure |
| Antelope | Wildlife Conservation Society WGFD Utah State University | WCS GTNP Shell | Effects of energy development on Jackson Hole pronghorn | 2002 - 2005 | -Seasonal ranges -Survival-productivity rates in relation to predation | Control and experimental treatment areas | Detection of indirect impact by analysis before/after and on impact/control sites |
| | | | Competition between wolves and coyotes | 2002 – 2005 | -Fawn survival rates -Predation rates on fawns | | |
| | | | Landscape-level change effect on pronghorn habitat use | 2002 - 2009 | -Surface development -Animal distribution as a function of development -Snow depth | Control and experimental treatment areas | Detection of indirect impact by analysis before/after and on impact/control sites |
| | | | Human disturbance and over-winter survival | 2002 - 2006 | -Bioenergetics and population change as a function of gas field disturbance and abiotic factors | Long term data sets, modeling, empirical data | |
| | | | Migration routes, bottlenecks, corridors | 2003 - 2009 | -Animal movement to winter ranges | Empirical-descriptive | |
| Sage Grouse | University of Wyoming WGFD | Ultra Petroleum BLM DOE YTY Encana | Potential impacts of natural gas development- Phase I | 1998 - 2000 | -Disturbance to lek related to nesting success -Habitat selection by hens -Disturbance to lek related to cock attendance | Baseline for optimal impact study | Establish pre-impact patterns on impact and control sites |

7

**Table 3. (continued).**

| Species Or Group | Study Cooperators | Funding Source | Study | Period of Study | Data Collected | Relevance to Study Design | Use of Data In AEM Process |
|---|---|---|---|---|---|---|---|
| Sage Grouse | University of Wyoming WGFD | Ultra Petroleum BLM DOE YTY Encana | Potential impacts of natural gas development-Phase II | 2000 - 2004 | -Disturbance to lek related to sage grouse behavior -Road-related disturbance | Optimal impact study use impact/control-before/after design | Detection of indirect impact by analysis before/after and on impact/control sites |
|  |  | BLM DOE WGFD | Potential impacts of natural gas development-Phase III | 2004 - 2006 | -Disturbance to yearling males and effects on lek selection/attendance | Same as above | Assess mitigation effectiveness |
| Pygmy Rabbit | University of Wyoming | BLM WGFD University of Wyoming | Pygmy rabbit research | 2004 – 2005 | -Distribution -Habitat characteristics at occupied sites -Reproductive rates, juvenile survival rates | Baseline inventory and species ecology | Assess data for additional study needs |
|  | Wyoming Wildlife Consultants | PAPA Operators | Pygmy rabbit observations | 2004 – 2005 | Pygmy rabbit observations | Baseline inventory |  |
| Migratory Sagebrush-obligate Birds | University of Wyoming | USFWS WGFD Audubon | Effects of natural gas development on sagebrush steppe passerines | 1999 - 2000 | -Road effects on nesting bird densities by species -Distribution and habitat use by breeding birds | Baseline study of effects prior to start of development on PAPA | Establish pre-impact patterns on PAPA |
|  | Point Reyes Consultants | USFWS WGFD BLM | Demographic monitoring of shrub-steppe songbirds western Wyoming | 2002 – 2006 | -Population trends, recruitment, survival -Effect of habitat fragmentation | Comparative study in and out of energy development areas | Spatial/temporal change may indicate impact |
| Raptors | TRC-Mariah | PAPA Operators | Annual nesting surveys | 2001 and ongoing | -Nest locations -Nest activity by species | Could be analyzed with disturbances over time and space | Spatial/temporal change may indicate impact |
| Sage Grouse | TRC-Mariah | PAPA Operators | Annual lek surveys | 2001 and ongoing | -Lek locations -Lek activity | Could be analyzed with disturbances over time and space | Spatial/temporal change may indicate impact |
| Prairie Dog Colonies, Associated species | TRC-Mariah Wyoming Wildlife Consultants | PAPA Operators | Surveys for prairie dog associates: -black-footed ferrets -mountain plovers -burrowing owls | 2001 and ongoing | Number, locations of species observed | Species present |  |

**Monitoring and Related Requirements – PAPA ROD**

At several meetings with PAWG Task Group Leaders and BLM, the ROD for the Pinedale Anticline has been identified as the principle guidance document for 1) identifying monitoring needs; 2) evaluating implementation of ROD-related mitigation; and 3) recommending changes in mitigation or operations as a result of monitoring results. Therefore, a review of the status of actions taken to monitor and ensure compliance with the ROD is presented as Table 4. This table identifies subject, where in the ROD it is identified, responsible entity, and whether or not the action has been accomplished. This table is based on information known to the Task Group and may not reflect all actions that have been taken.  Several apparent key gaps in implementation of ROD requirements affecting monitoring and mitigation are reflected in Task Group recommendations to PAWG as a part of this document.

**Table 4. Monitoring and Related Requirements in PAPA ROD**

| Monitoring Subject | Where In Rod (Pages) | Responsibility | Has It Been Accomplished? |
|---|---|---|---|
| Develop and Implement Adaptive Environmental Management Process | 1, 14, 15, C-1, C-4, A-33 | BLM and PAWG | Not developed |
| Annual AEM Review Report to Public on Results | C-4, 40, A-33 | BLM, PAWG and Cooperating Agencies | Not developed |
| Monitor Species Identified in ROD | C-2 | Operators, BLM, other agencies | By contractor, no analysis |
| Develop Monitoring Plans Through "Technical Agency Groups" | 15 | BLM | Not consistently done |
| GIS Mapping of Wildlife Habitat Data | A-33, C-2 | BLM | Not completed, work now underway |
| Maintenance of Species Impact Models to Track Habitat Values | A-33, C-2 | BLM | Species' research in progress |
| Traffic Monitoring of Well-field Access Roads, Manage Access | A-32, A-33, B-9 | BLM, Operators, WYDOT, WGFD, Other Agencies | Not completed, access management plan needed |
| Funding of all Monitoring (except NOx emissions) Will be From Operators and Agencies | 15, A-33, C-4, C-5 | Operators, other agencies | Accomplished on per project basis |
| Monitor Level of Development to Assure Wildlife Impacts Within Scope of EIS | A-33, 46, A-41, C-2 | BLM | Need to address cumulative impact assessment |
| Environmental Compliance Coordinators Reporting for Each Company | 23 | BLM, Operators | Ongoing by operators but not coordinated |
| Allowable Well Pad Density by Management Area – Environmental Analysis | 26 | BLM | Ongoing and goals currently met |

**Monitoring Recommendations**

Given the short timeframe, wide array of complex topics, and relatively large amount of ongoing wildlife monitoring on PAPA, the Task Group has focused primarily on clarifying the following in developing its recommendations:

1) Existing and recent past studies on PAPA wildlife;
2) The applicability of those studies and their results to needs of the AEM process;
3) Ability to conduct a science-based monitoring program, versus apply science to areas already under development with lesser power to discern cause and effect;
4) Which PAPA ROD requirements have been accomplished, including implementation of processes such as AEM, specific monitoring proscribed in the ROD; regular reporting of monitoring results, analysis and use of monitoring data supplied by PAPA operators; and immediate monitoring needs either required by the ROD and not accomplished or considered important as gaps in knowledge.

The Task Group recognizes that the continued pace and scope of development will present monitoring challenges as it proceeds. Significant issues, such as the Questar exception to winter drilling restrictions, will develop over time and performance dates and needs for monitoring in the ROD are months or years away. On the other hand, important monitoring or related tasks need prompt implementation to lessen wildlife impacts. It appears to the Task Group that the following may be more important to effective wildlife stewardship than newly-funded biological studies at this time:

1) Using monitoring data currently available for BLM decisions about ongoing or needed mitigation and future monitoring;
2) Implementing monitoring called for in the ROD, but not yet under way;
3) Clarifying resource impact questions that may or may not be addressed by existing or expanding studies; and
4) Fully implementing the AEM process with a BLM-led role as described in the ROD, including engaging PAWG agencies, operators, and other partners with schedules for action.

The ROD (page 15, 1st paragraph) states clearly that "The AEM process will involve the participation of technical agency personnel (for example., U.S. Fish and Wildlife Service, USDA-Forest Service, Wyoming Game and Fish Department) and goes on to list several more state and federal agencies, the public, operators, environmental groups, etc. Then the ROD continues "The technical agency group will draft the various monitoring plans and other management documents. The public group will review the plans for adequacy and recommend where additional monitoring may be necessary before any of the plans are implemented."  We see our task primarily as identifying monitoring needs and providing a rationale for the need rather than designing monitoring itself. That seems the intended and appropriate role for the technical personnel from the cooperating agencies.

## RECOMMENDATION PRIORITY 1 - Need for prompt analysis of PAPA monitoring data required under ROD

BLM has required energy companies to monitor raptors, sage grouse, and other resources under the Pinedale Anticline ROD. A large amount of data exists for the first four years that has not been generally available for public review as called for in the ROD. No formal analysis has been done of the implications of these data for management decisions in the AEM Process.

The charge to our Task Group is to evaluate the need for, and recommend new or continued, monitoring as needed. To facilitate the AEM process and allow new monitoring considerations, an appraisal of these data is needed as soon as possible. Since these data are the result of a BLM regulatory requirement, BLM should be responsible for regular analysis of submitted data. Given the high workload and limited staff at the Pinedale BLM office, the Task Group recommends that BLM contract with a third party to conduct the analysis.

Monitoring data have been contracted for by operators for four years under a 2001 Monitoring Plan. The ROD (Appendix C) suggests that such a plan be constructed annually. An annual monitoring plan should be written after a review by BLM and PAWG of 1) analysis and evaluation of past monitoring results; 2) an annual drilling/operator briefing by operators as proscribed in the ROD; 3) evaluation of resource protection and mitigation effectiveness; and 4) consideration of resource concerns and adequacy of monitoring and mitigation under the level of development that has occurred on the PAPA (Appendix C, C-1, C-2).

The charge to the third party reviewer should include the above concepts, stated here as questions.

1) Does analysis of monitoring data show trends in monitored resources that reflect change?
2) What do the data indicate about effectiveness of mitigation requirements?
3) Does the level of development that has occurred change monitoring needs or the approach to mitigation?
4) Should monitoring or mitigation be changed to assure achieving a resource management objective?

A report deadline of September 30 should be required.

## RECOMMENDATION PRIORITY 2 – Support for Ongoing Monitoring and Studies

The Task Group strongly recommends that agency and operator investments in ongoing wildlife studies be continued for 2005. Some require commitment beyond 2005 to be effective. Further, agency-monitoring data, such as WGFD population composition surveys, must be maintained to facilitate detection of species' trends over time and the region surrounding the PAPA. This endorsement covers:

1) Mule deer;
2) Pronghorn;
3) Sage grouse;
4) Songbirds; and
5) Miscellaneous observations for species distribution.

The finding of more pygmy rabbits than expected on parts of the PAPA suggest the value of expanding surveys of distribution, abundance, and habitat use of pygmy rabbits as a basis for future impact studies.

A separate recommendation is included in this report dealing with operator-funded data collection on raptors and other species.

We did not identify additional data needs for prairie dogs or associated birds or mammals. Those needs may periodically be influenced by regulatory considerations, but appear to be covered at this time.

## RECOMMENDATION PRIORITY 3 – Implementation of AEM Process

For various reasons, including, but not limited to legal challenge, BLM has not implemented the AEM process. Four years of development on PAPA have proceeded at a pace and scale larger than anticipated in the PAPA EIS and ROD; the AEM process was identified in the ROD (pages 1, 14, 15, C-1, C-4, and A-33) as the approach that would be used to consciously adjust to the uncertainties of actual development on PAPA. A significant adjustment in a major part of operational development has been made by BLM in the winter drilling exception.

Monitoring data required during the four years of development have not been fully analyzed or fully used in management decisions presumably because there was no visible process to incorporate findings into management decisions. We have provided a recommendation for the analysis, but there should also be a visible process for the use of that analysis.

For these reasons, full implementation of an AEM process is vital for orderly and systematic monitoring of wildlife, evaluation of impacts of development, and consideration by BLM of changes in mitigation or operations to lessen those impacts. Data management is essential to these processes as is environmental compliance by operators as called for in the ROD.

We recommend that PAWG request that BLM clarify the AEM process and identify and reaffirm actions, meetings, evaluations, responsible entities, data management, and decision points on an annual calendar, as clearly intended in the description of the AEM process in the ROD (Appendix C). That would engender open discussion of issues of timing, expectations, and responsibility for management action. Without a clear statement of the AEM process with action dates and identified responsibilities, it is not clear, for example, that monitoring results have a clear pathway to be used in operational decisions.

**RECOMMENDATION PRIORITY 4 – Habitat Quality Assessment**

Sagebrush habitat quality is an important measure of the ability of the habitat to support wildlife. This includes understory, known to be essential to sage grouse reproductive success, songbirds and other wildlife . Not all sagebrush habitat is equal in value to specific wildlife, so spatial analysis of habitat quality can partition habitat based on its value to wildlife, and thus provide priority for protection or mitigation. The WGFD (WGFD 2004) goal of sustaining "habitat function" is a useful benchmark for evaluating change. An assessment of habitat quality would support that goal.

The Task Group recommends that an assessment of habitat quality be done on PAPA and associated sagebrush habitats. Adjacent areas are important to the wildlife using the PAPA and may factor in mitigation actions. Such a project should first construct a set of measures of habitat quality to aid in systematic characterization of habitats, and second provide GIS maps that delineate habitat differences.

The Task Group suggests that the need extends beyond the PAPA if wildlife values are to be anticipated and adaptively managed as development expands. It would provide a heretofore-unavailable baseline of habitat values useful to BLM, operators, WGFD, and others involved in the AEM process. A collaborative approach between agencies and operators, led by BLM, should be established to plan and prioritize assessment activites.

**RECOMMENDATION PRIORITY 5 - Activity Levels on PAPA Given Scale of Development**

The ROD (page 46, A-44, A-41, C-2) suggests that the level of development (and associated activity) be monitored regarding wildlife impacts. Further, it suggests (A-33) that traffic monitoring be done and remedial action taken if needed to protect wildlife resource values. Currently there is increased activity on public lands and roads on PAPA, confusion among local authorities about closures and enforcement, enforcement problems with habitat closures for mule deer, and significant winter operations changes by Quester. All of this will likely increase. Of particular concern are the extent of project-related traffic and activities compared to extent due to other sources.

The Task Group recommends that PAWG request that BLM coordinate monitoring of activity, especially on the Mesa and any other critical winter wildlife habitats in PAPA. Such monitoring should be coordinated with BLM and involve WYDOT, Sublette County law enforcement, WGFD, and operators. Operators can logically provide data on activity levels on roads and lands under lease to each company. To monitor effectively and provide usable data on which to decide controversial topics like road closure, contact with people will be needed to evaluate reasons for travel and other activity on PAPA. These data would provide a basis for mitigation or change in operations policies to be enforced by operators and local law enforcement authorities.

**RECOMMENDATION PRIORITY 6  – Monitoring Impact of Winter Drilling Activity**

The recent decision to allow Questar to change its operations to include winter drilling activity is accompanied by its own Decision Record (DR) with requirements that will be implemented gradually as winter activity is increased (Questar DR, pages 1-3). The new DR incorporates all of the previous PAPA ROD requirements for monitoring and mitigation, except those specifically changed by the new DR. Since this project is a significant exception to one of the strongest wildlife protection measures, appropriate attention is essential to monitoring, mitigation, and determining resource impact, if it occurs.

Many mitigation measures must be implemented by November 15, 2005. Unspecified habitat improvement in non-producing areas of Questar leases will occur. Well-siting consultation with BLM and WGFD will occur and was a key reason Alternative 3 that would protect Big game mitigation routes was not considered by BLM. A pipeline will be constructed to transport condensate off the PAPA, resulting in a major reduction in vehicle traffic. Questar will have compliance monitoring and reporting requirements.

PAWG and its Task Groups are expected to review and recommend to BLM on specific issues, such as expanded mule deer research, applicant-committed mitigation, all requirements in the original PAPA ROD and all the various conditions set in Appendix A for as requirements for the winter drilling project to proceed (Questar DR, pages 2-3). There are also requirements for Questar to monitor and report on compliance with these DR requirements. All of this applies to the AEM process.

We recommend that PAWG request that BLM include a PAWG representative in discussions between BLM and Questar about how to proceed. If PAWG and its Task Groups are to be responsible for the monitoring and evaluation tasks outlined in the PAPA ROD, we should be a part of those discussions for the AEM process to work.

The Task Group suggests that one of the key questions to be answered by monitoring the winter drilling program is "Does the "lesser foot print" of the Questar approach result in better wildlife habitat than would have occurred with winter activity restrictions?" The concept of "retaining habitat function" for key wildlife advanced by WGFD, is a useful goal. A second key question to be answered by long-term studies is "What has happened to Sage Grouse and other wildlife displaced by past, and now increased, levels of development activity?" This must be answered in terms of reproduction, survival, and recruitment within the affected populations. The expanded mule deer studies by West, Inc. that Questar has agreed to support is an important step toward long-term study to answer that question for displaced mule deer. Ongoing sage grouse research through the Wyoming Cooperative Fish and Wildlife Research Unit and expanded pronghorn research by the Wildlife Conservation Society will provide useful data. Details are not available on all these studies and they may need to be modified or added to as they evolve in order to address the two direct questions above.

The Task Group and PAWG should track these studies, obtain firm information on their design, and identify gaps in data or project approach necessary to answer the questions of resource impact.

The Task Group notes that several other recommendations can help ensure that some of the monitoring and reporting requirements in the Questar DR are met, such as traffic and human activity issues that affect wildlife.

**RECOMMENDATION PRIORITY 7 – Making Studies Useful for Cause-and-Effect Determination**

Decisions about direction and expansion of several high profile studies, such as pronghorn and mule deer, are being made independent of the AEM process. As noted in our assessment of ongoing studies, it is not clear that even the expanded studies will allow determination of population impacts. Such determinations will be key to evaluating management effectiveness of conditions of approval or application of standard stipulations.

With population impact a strong focus of monitoring development impacts on wildlife, the Task Group suggests this topic as a project for PAWG in cooperation with BLM, WGFD, operators, and other interested parties. As with the review of operator-funded monitoring data, this task should be completed before the 2006-round of operational decisions on the PAPA.

Convening one or more work sessions to be coordinated by this Task Group to focus sharply on findings and conclusions to date, study design, and applicability of data to answering cause and effect questions would clear the air on expectations and help focus future investment on answering real management questions. A Research Guidance Committee would be one product in addition to a better approach to research design.

**RECOMMENDATION PRIORITY 8 - Predator Management**

Predation as a potential influence on PAPA wildlife may complicate detecting whether managers are meeting resource objectives as development proceeds. Current mule deer, pronghorn, and sage grouse studies encounter predation and evaluate it as a part of their studies, but it is not a main focus. Predators could influence prey distributions on the PAPA. Also, road plowing in winter could make access to the PAPA easier for predator access and prey that might be displaced by development could become more vulnerable to predation. Research in Alaska is demonstrating that oil and gas infrastructure and human food wastes have increased Raven use of harsh climates. Ravens are a significant presence on the PAPA and are nest predators of sage grouse.

An additional dimension of predation could be greater predation pressure on wildlife displaced from favored habitats, including to areas off the PAPA. Such indirect effects warrant consideration as development proceeds. The Task Group recommends that predation issues be:

1) Tracked as development and monitoring proceeds;
2) Routinely included in other wildlife studies;
3) Considered as roads and access are managed; and

4) If predators increase as development proceeds, detailed studies would be conducted to determine solutions, including possible direct control. Initial tracking should be done by BLM and WGFD with information from operators in the field.

**Conclusions**

This is a consensus report from the Task Group. In the short time available, the Task Group has focused on review of ongoing monitoring activities and studies, evaluation of ROD requirements, and what has or has not been implemented. Important concepts needing further work include: 1) assuring that monitoring studies are conducted in a scientifically sound manner, 2) that expectations of the applicability of results are realistic, 3) that monitoring is systematically planned and reviewed annually for its focus on supporting management decisions, 4) that results are reviewed annually and evaluated for demonstration of need for changes in management of development. We propose to develop further the need for issues such as habitat quality assessment, predation, and the need for research planning to address long-term impact questions. An index of habitat quality, for example, can be as important to have before development as species baseline data so that measures of change can occur through monitoring during development.

We believe that implementing AEM and other specific ROD requirements should be high priority as we have recommended. Much remains to be done in evaluating four years of monitoring data and study results for mule deer, sage grouse, and antelope. While results have been prepared each year and presented in various briefings, no direct management action has been taken by BLM to change monitoring, mitigation or operations in response to monitoring data. Implementation of AEM will provide the process to enable use of monitoring data to adjust activities to help wildlife.

Procedurally, with implementation of AEM should come actions, reports, and consultations on a regular basis. For example, since mule deer studies already reported to PAWG and its members appear to demonstrate displacement of deer from favored habitats as development has proceeded, and sage grouse studies on the PAPA and in the adjacent Jonah Field have revealed a steady reduction in use of leks, particularly leks near roads and drilling activity, the AEM process calls for action in response. Under AEM, PAWG, BLM, and operators should consult on the meaning of these results, make a judgment on whether current mitigation is working, and consider appropriate actions. The AEM process would suggest that this should be done before all the operational plans are approved for the coming year.

This is the kind of regular consultation envisioned in the AEM process and should occur regularly (at least annually) to guide annual decisions about monitoring, mitigation effectiveness, and possible changes in operations to reduce impacts.

The Task Group will watch the decisions by PAWG and BLM with interest. We anticipate further discussion of the future role of the Task Group in implementation of the various recommendations, and especially the AEM process.

**Wildlife Monitoring Task Group**

      Task Group Members
            Dean Clause – WGFD, Pinedale
            Aimee Davison – Shell
            Mike Deland – Hoback Junction
            Kathleen Erwin – U.S. Fish and Wildlife Service
            Tony Gosar – Pinedale
            Ron Hogan – Questar
            Michelle Hosler – Pinedale
            Jim Jensen – rancher, Boulder
            Dan Lamoreux – Theodore Roosevelt Conservation Partnership, Jackson
            Archie Reeve – Laramie
            Rollin Sparrowe – Chair, Daniel

      BLM Liaison
            Steve Belinda – Pinedale

      Correspondents (communicated by e-mail)
            Kenny Becker – Pinedale

Lynda Earley – Cheyenne
Jeremy Johnston – Powell
Craig Thompson – Rock Springs
Harold Asire - Pinedale

Typing
Bettina Sparrowe - Daniel

## References

Baskerville, G. 1986.  Some scientific issues in cumulative environmental impact assessment.  Pages 9-14 in Proceeding of the workshop on cumulative environmental effects: a binational perspective.  The Canadian Environmental Assessment Research Council, Ottawa, Ontario and The United States National Research Council, Washington, D.C.

Boyce, M.S. 2002. Reconciling the small-population and declining-population paradigms. Pages 41-49 in S.R. Beissinger and D.R. McCullough (editors). Population Viability Analysis.  The University of Chicago Press, Chicago, IL.

Council on Environmental Quality. 1978. Regulations for implementing the Procedural Provisions of the National Environmental Quality Act.  Executive Office of the President, Washington, D.C.

Council on Environmental Quality. 1997. Considering cumulative effects under the National Environmental Quality Act. Executive Office of the President, Washington, D.C.

Green, R.H. 1979.  Sampling design and statistical methods for environmental biologists. John Wiley and Sons, New York.

Jones, K.B.  1986. The inventory and monitoring process. Pages 1–10 in A.Y. Cooperrider, R.J. Boyd, and H.R. Stuart (editors). Inventory and monitoring of wildlife habitat.  USDI-Bureau of Land Management Service Center, Denver, Colorado.

Morrison, M.L. 2002. Wildlife restoration: techniques for habitat analysis and animal monitoring. Island Press, Washington, D.C.

Sawyer, H. 2004. 2004 Annual Report, Sublette Mule Deer Study (Phase III): Long-term monitoring plan to assess potential impacts of energy development on mule deer in the Pinedale Anticline Project Area. Western Ecosystems Technology, Inc. Cheyenne, Wyoming.

U.S. Bureau of Land Management. May 2000. Final Environmental Impact Statement for the Pinedale Anticline Oil and Gas Exploration and Development Project, Sublette County, Wyoming.

U.S. Bureau of Land Management. July 2000. Record of Decision for the Pinedale Anticline Oil and Gas Exploration and Development Project Environmental Impact Statement, Sublette County, Wyoming.

U.S. Bureau of Land Management. November 2004. Finding of No Significant Impact, Decision Record and Environmental Assessment  for the Questar Year-Round Drilling Proposal, Sublette County, Wyoming.

Wyoming Game and Fish Commission. 1998. Mitigation Policy. Pages E3-E13 in Policy Manual. Wyoming Game and Fish Department, Cheyenne, WY.

Wyoming Game and Fish Department. 2004. Minimum recommendations for development of oil and gas resources within crucial and important wildlife habitats on BLM lands. Wyoming Game and Fish Department, Cheyenne, WY.

Exhibit D

Wildlife Monitoring Task Group Report to PAWG (due April 12, 2005)

(Reformatted monitoring recommendations from Task Group Report of February 18, 2005, limited to table format and not including all information concerning monitoring needs.)

Wildlife Monitoring Task Group Members:
    Task Group Members
        Dean Clause – WGFD, Pinedale
        Aimee Davison – Shell
        Mike Deland – Hoback Junction
        Kathleen Erwin – U.S. Fish and Wildlife Service
        Tony Gosar – Pinedale
        Ron Hogan – Questar
        Michelle Hosler – Pinedale
        Jim Jensen – rancher, Boulder
        Dan Lamoreux – Theodore Roosevelt Conservation Partnership, Jackson
        Archie Reeve – Laramie
        Rollin Sparrowe – Chair, Daniel

    BLM Liaison
        Steve Belinda – Pinedale

    Correspondents (communicated by e-mail)
        Kenny Becker – Pinedale
        Lynda Earley – Cheyenne
        Jeremy Johnston – Powell
        Craig Thompson – Rock Springs
        Harold Asire - Pinedale

    Typing
        Bettina Sparrowe – Daniel

| MONITORING ELEMENT | PRIORITY | PARTNERS | PURPOSE & NEED | MONITORING TECHNIQUE |
|---|---|---|---|---|
| **2.0 WILDLIFE** | | | | |
| 2.1 Analysis of Operator-Supported Monitoring Data | High | BLM Operators | Formal analysis of four years of contractor-provided monitoring data on raptors, T & E, sage grouse, other monitored resources that indicate need for changes in monitoring or mitigation. | Analysis should pose the following questions: 1) Does analysis of monitoring data show trends in monitored resources that reflect change? 2) What do the data indicate about effectiveness of mitigation requirements? 3) Does the level of development that has occurred change monitoring needs or the approach to mitigation? 4) Should monitoring or mitigation be changed to assure achieving a resource management objective? Report deadline of September 30, 2005. |
| 2.2 Continue Support for Ongoing Monitoring and Studies | High | Multiple as listed on following Tables 2 and 3 from the Task Group February 18, 2005, report. | Both long-term population monitoring conducted for other reasons, but useful to monitoring the development process – such as Wyoming Game and Fish surveys, and intensive monitoring and surveys focused primarily on development impacts form the core of wildlife monitoring on the PAPA and should continue. Tables 2 and 3 from the Task Group February 18, 2005, report follow this table. | *Pygmy Rabbit (new) The Task Group recommends development of pygmy rabbit surveys after completion of initial distribution and habitat surveys continuing in 2005 with operator funding and a University of Wyoming graduate study. |
| 2.3 Implementation of AEM Process. | High | BLM PAWG | Adaptive Environmental Management Process is identified in the PAPA ROD to systematically use monitoring data to evaluate mitigation, monitor effects of development on wildlife, and use these data to adjust operations where appropriate. It is also key to adjusting monitoring itself. A clear pathway for activities should be articulated to provide for monitoring plans and performance schedules, responsive entities, data management, meetings and consultations, and necessary management actions. | BLM and PAWG should jointly draft an annual schedule of activities with action points to implement a visible process for AEM. Table 4, Monitoring and Related Requirements in PAPA ROD, is attached as a road map for monitoring topics and schedules as a basis for implementing ROD requirements for monitoring, evaluation, and use of data and results. |

## 2.0 WILDLIFE

| | | | | |
|---|---|---|---|---|
| 2.4 Habitat Quality Assessment | High | BLM Operators WG&F PAWG | Sagebrush habitat quality is an important measure of the ability of the habitat to support wildlife. This includes understory forbs, grasses and other native plants, known to be essential to sage grouse reproductive success, songbirds and other wildlife. Not all sagebrush habitat is equal in value to specific wildlife, and so spatial analysis of habitat quality can partition habitat based on its value to wildlife, and thus provide priority for protection or mitigation. Existing vegetative mapping of sage habitats is not intensive enough, nor supported with filed data to support the difficult tradeoffs in offsite mitigation which seems likely in the future.<br><br>The WGFD (WGFD 2004) goal of sustaining "habitat function" is a useful benchmark for evaluating change and a clear goal for restoration. Local capability to restore native habitats will be enhanced by experimentation with field trials in separate projects. An assessment of habitat quality would support the goal of applying restoration skills so gained.<br><br>Various mapping and GIS projects are underway in the Rock Springs District and in Pinedale. GIS mapping was required in the PAPA ROD and is only recently underway. It is apparent that the nature of development on Jonah and PAPA (infill expected) will lead to off-site mitigation. A consolidated effort not limited to PAPA should be undertaken.<br><br>Mapping the wide differences in sage habitats can yield a tool of significant importance to weighing habitat management and mitigation needs and opportunities. Mapping products can be used to develop habitat conservation strategies for important wildlife, enhancing ability to work effectively with all stakeholders. | Conduct an inventory of Upper Green River Basin sagebrush habitats and develop a set of measures of habitat quality. Collect field data to increase the accuracy of mapping products. Other habitats within the sage may be appropriately included. Resources going to the several GIS mapping projects by BLM, and cooperation with similar projects through Wyoming Game and Fish may be incorporated for efficiency of product. GIS maps that delineate habitat differences are the end product.<br><br>Implementation is expected to take two summer field seasons for data collection, six months for compilation, GIS analysis, and mapping. Approximate costs are $100k/year for two years, $50k for the last year of data analysis and mapping.<br><br>Partners include BLM, energy companies, Wyoming Game and Fish Department, matching grants, local consultants, and conservation organizations. |
| 2.5 Activity Levels on PAPA | High | BLM WG&F Operators Sublette County DOT | This recommendation overlaps one from the Transportation Task Group.<br>The ROD (page 46, A-44, A-41, C-2) suggests that the level of development (and associated activity) be monitored regarding wildlife impacts. Further, it suggests (A-33) that traffic monitoring be done and remedial action taken if needed to protect wildlife resource values. Currently there is increased activity on public lands and roads on PAPA, confusion among local authorities about closures and enforcement, enforcement problems with habitat closures for mule deer, and significant winter operations changes by Questar. All of this will likely increase. Of particular | The Task Group has seen a draft of the Transportation Task Group monitoring recommendation. It focuses mainly on specific main roads. The Task Group recommends that PAWG request that BLM coordinate monitoring of activity, especially on the Mesa and any other critical winter wildlife habitats in PAPA. Such monitoring should be coordinated with BLM and involve WYDOT, Sublette County law enforcement, WGFD, and operators. Operators can logically provide data on activity levels on roads and lands under lease to each company. To monitor effectively and provide usable data on which to decide controversial topics like road closure, contact with people will be needed to evaluate reasons for travel and other activity on PAPA. These data |

| MONITORING ELEMENT | PRIORITY | PARTNERS | PURPOSE & NEED | MONITORING TECHNIQUE |
|---|---|---|---|---|
| **2.0 WILDLIFE** | | | | |
| 2.6 Monitor the Impact of Winter Drilling Activity | Medium | BLM PAWG Wyoming Game & FishNGO's | The recent decision to allow Questar to change its operations to include winter drilling activity is accompanied by its own Decision Record (DR) with requirements that will be implemented gradually as winter activity is increased (Questar DR, pages 1-3). The new DR incorporates all of the previous PAPA ROD requirements for monitoring and mitigation, except those specifically changed by the new DR. Since this project is a significant exception to one of the strongest wildlife protection measures, appropriate attention is essential to monitoring, mitigation, and determining resource impact, if it occurs.

Many mitigation measures must be implemented by November 15, 2005. Unspecified habitat improvement in non-producing areas of Questar leases will occur. Well-siting consultation with BLM and WGFD will occur and was a key reason Alternative 3 that would protect Big game mitigation routes was not considered by BLM. A pipeline will be constructed to transport condensate off the PAPA, resulting in a major reduction in vehicle traffic. Questar will have compliance monitoring and reporting requirements.

PAWG and its Task Groups are expected to review and recommend to BLM on specific issues, such as expanded mule deer research, applicant-committed mitigation, all requirements in the original PAPA ROD and all the various conditions set in Appendix A for as requirements for the winter drilling project to proceed (Questar DR, pages 2-3). There are also requirements for Questar to monitor and report on compliance with these DR requirements. All of this applies to the AEM process. | We recommend that PAWG request that BLM include a PAWG representative in discussions between BLM and Questar about how to proceed. If PAWG and its Task Groups are to be responsible for the monitoring and evaluation tasks outlined in the PAPA ROD, we should be a part of those discussions for the AEM process to work.

The Task Group suggests that one of the key questions to be answered by monitoring the winter drilling program is "Does the "lesser foot print" of the Questar approach result in better wildlife habitat than would have occurred with winter activity restrictions?" The concept of "retaining habitat function" for key wildlife advanced by WGFD, is a useful goal. A second key question to be answered by long-term studies is "What has happened to Sage Grouse and other wildlife displaced by past, and now increased, levels of development activity?" This must be answered in terms of reproduction, survival, and recruitment within the affected populations. The expanded mule deer studies by West, Inc. that Questar has agreed to support is an important step toward long-term study to answer that question for displaced mule deer. Ongoing sage grouse research through the Wyoming Cooperative Fish and Wildlife Research Unit and expanded pronghorn research by the Wildlife Conservation Society will provide useful data. Details are not available on all these studies and they may need to be modified or added to as they evolve in order to address the two direct questions above.

The Task Group and PAWG should track these studies, obtain firm information on their design, and identify gaps in data or project approach necessary to answer the questions of resource impact.

The Task Group notes that several other recommendations can help ensure that some of the monitoring and reporting requirements in the Questar DR are met, such as traffic and human activity issues that affect wildlife. Questar has already worked with BLM to fence their entrance roads to control activity. |

| MONITORING ELEMENT | PRIORITY | PARTNERS | PURPOSE & NEED | MONITORING TECHNIQUE |
|---|---|---|---|---|
| **2.0 WILDLIFE** | | | | |
| 2.7 Making Studies Useful for Cause and Effect Determinations | Medium | BLM WG&F Operators NGO's | Decisions about direction and expansion of several high profile studies, such as pronghorn and mule deer, are being made independent of the AEM process. As noted in our assessment of ongoing studies, it is not clear that even the expanded studies will allow determination of population impacts. Such determinations will be key to evaluating management effectiveness of conditions of approval or application of standard stipulations. | With population impact a strong focus of monitoring development impacts on wildlife, the Task Group suggests this topic as a project for PAWG in cooperation with BLM, WGFD, operators, and other interested parties. As with the review of operator-funded monitoring data, this task should be completed before the 2006-round of operational decisions on the PAPA. Convening one or more work sessions to be coordinated by this Task Group to focus sharply on findings and conclusions to date, study design, and applicability of data to answering cause and effect questions would clear the air on expectations and help focus future investment on answering real management questions. A Research Guidance Committee would be one product in addition to a better approach to research design. |
| 2.8 Predator Management | Low | BLM WG&F Operators Researchers | Predation as a potential influence on PAPA wildlife may complicate detecting whether managers are meeting resource objectives as development proceeds. Current mule deer, pronghorn, and sage grouse studies encounter predation and evaluate it as a part of their studies, but it is not a main focus. Predators could influence prey distributions on the PAPA. Also, road plowing in winter could make access to the PAPA easier for predator access and prey that might be displaced by development could become more vulnerable to predation. Research in Alaska is demonstrating that oil and gas infrastructure and human food wastes have increased Raven use of harsh climates. Ravens are a significant presence on the PAPA and are nest predators of sage grouse. | The Task Group recommends that predation issues be: <br> 1) Tracked as development and monitoring proceeds; <br> 2) Routinely included in other wildlife studies; <br> 3) Considered as roads and access are managed; and <br> If predators increase as development proceeds, detailed studies would be conducted to determine solutions, including possible direct control. Initial tracking should be done by BLM and WGFD with information from operators in the field. |

6

Additional Recommendations Concerning Mitigation Effectiveness

Mule Deer – Four years of studies measured against documentation before development show that mule deer on significant parts of PAPA have moved from previously-favored habitats to less-favored habitats on the Mesa, likely in response to development activity. The 2004 Annual Report, Sublette Mule Deer Study (Phase III), lays out the evidence of this change. PAWG, BLM, Operators, and the public have been briefed on these results and can access the report at www.West-Inc.com or can obtain a copy from the Task Group Chair.  These results show impacts on PAPA mule deer and review of mitigation of these effects appears warranted.

**Recommendation:** The Task Group recommends that PAWG meet with BLM, Operators, and principal investigators and discuss the implications of these results to current and future mitigation. We have been told informally that an Infill proposal is likely which may significantly increase the level of disturbance to PAPA mule deer. The Task Group notes that its Recommendation 5 and a recommendation from the Transportation Task Group might address some issues of activity level control. Monitoring strategies and research directions should be reconsidered to seek further options.

Sage Grouse – Four years of monitoring lek attendance by male sage grouse compared to data before development has shown a steady decline in use of leks associated with energy development. There has been a long-standing controversy over effective distance from leks required to buffer sage grouse behavioral responses. Experience on the Jonah field and parts of adjacent PAPA suggest that the half-mile buffer being used is not mitigating effects on sage grouse. There are other parts of two studies yet to be fully analyzed concerning effects on sage grouse nesting and reproduction, which are longer-term questions not addressed here. Operators, BLM, the Task Group Chair and other members of the TG were briefed on these results on February 18, 2005. A recently presented paper on the topic is attached.

**Recommendation:** With the high profile of the sage grouse and the recent decision not to list it under the Endangered Species Act, the Task Group concludes that BLM, Operators, and PAWG should review these results and consider possible changes in mitigation as warranted. With an Infill and more dense development activity likely on PAPA, the reported results suggest that a new mitigation strategy should be developed. If, as has been noted, developed areas like Jonah and other parts of the PAPA already exceed the appropriate density, more overt attention to off-site mitigation may offer options. Given the U.S. Fish and Wildlife Service explanation of why it chose not to list the sage grouse at this time, continued use of a failed mitigation requirement does not seem good business for anyone. Monitoring strategies and research directions should be reconsidered to seek further options.

OTHER ISSUES: The Task Group suggests that its Report of February 18 contains background information and specific recommendations that can accomplish conservation of wildlife that do not carry a specific price tag as a new monitoring activity, and should be a part of the discussion with BLM of action priorities.

Table 2 (from February 18, 2005 Wildlife Task Group Report to PAWG). Summary of long-term wildlife information collected in the greater region surrounding the PAPA by various agencies.

| Species or Group | Responsible Agency | Data Collection Method | Data Collected | Area Extent of Data | Time Extent of Data | Use of Data by Agency | Use of Data In AEM Process |
|---|---|---|---|---|---|---|---|
| Mule Deer | WGFD | Harvest estimates based on field-checks and mail-in survey questionnaires | Number, sex, and age of animals harvested | Hunt Areas 138, 139 including the PAPA, other hunt areas in herd unit | Many years past and ongoing | Population model for Herd Unit | Temporal change may indicate socioeconomic impact |
| | | Aerial flights conducted post-harvest to classify sex and age categories | Number of fawns, yearling males, adult males, females | Hunt Areas 138, 139 including the PAPA, other hunt areas in herd unit | At least since 1978 and ongoing | Population model for Herd Unit, fawn production | Temporal change may indicate cumulative impact w/ need for study |
| | | Ground surveys conducted post-winter to classify age categories | Number of juveniles and adults surviving to post-winter | Hunt Areas 138, 139 including the PAPA, other hunt areas in herd unit | 1992-1993 and ongoing | Estimate winter mortality of fawns relative to adults | See below |
| | | Ground surveys for carcasses conducted post-winter to classify sex and age categories | Number of juvenile and adult carcasses | Core winter ranges including the PAPA | 1992-1993 and ongoing | Estimate over-winter mortality rates of fawns and adults | Temporal change may indicate cumulative impact |
| Pronghorn | WGFD | Harvest estimates based on field-checks and mail-in survey questionnaires | Number, sex, and age of animals harvested | Hunt Areas 87, 90 including the PAPA, other hunt areas in herd unit | Many years past and ongoing | Population model for Herd Unit | Temporal change may indicate socioeconomic impact |
| | | Aerial flights conducted pre-harvest to classify sex and age categories | Number of fawns, yearling males, adult males, females | Hunt Areas 87, 90 including the PAPA, other hunt areas in herd unit | At least since 1978 and ongoing | Population model for Herd Unit, fawn production | See below |
| | | Line transect aerial surveys stratified by habitat conducted pre-fawning | Number of animals by distance from transect | Sampling sub-units within herd unit | Since 1994 and ongoing | Population estimate | Temporal change may indicate cumulative impact w/ need for study |

8

Table 2. (continued).

| Species Or Group | Responsible Agency | Data Collection Method | Data Collected | Area Extent of Data | Time Extent of Data | Use of Data by Agency | Use of Data In AEM Process |
|---|---|---|---|---|---|---|---|
| Sage Grouse | WGFD | Harvest estimates based on field-checks, mail-in survey questionnaires, wing-barrels | Number, sex, age harvested, hunters, hunter-days | SUGMA 3, 7 including the PAPA | Since 1982 and ongoing | Harvest, population, reproduction trends* | Temporal change may indicate socioeconomic impact |
| | | Low level aerial survey, ground observations during winter | Winter distribution of sage grouse | | Aerial surveys since 2004 and ongoing | Seasonal use maps | Spatial/temporal change may indicate impact |
| | | Monitor leks | Lek activity status and peak counts of males attending | WGFD District 1 including the PAPA | Years past with occasional lapses and ongoing | Trends in lek attendance, population trends | Spatial/temporal change may indicate impact |
| | | Brood count routes | Counts of chicks and hens | One permanent route in Upper GRB | | Reproduction trends | |
| Other Upland, Small Game | WGFD | Harvest estimates based on field-checks, mail-in survey questionnaires | Number harvested, hunters, hunter-days | SUGMA 3, 7 including the PAPA | Since 1982 and ongoing | Harvest, population trends | Temporal change may indicate cumulative impact |
| Bald Eagle | WGFD | Aerial surveys of nests during April, June | Number of active nests and young produced, fledged | | | Reproduction and population trends | Spatial/temporal change may indicate inpact |
| Vegetation | WGFD BLM | Vegetation transects | Sagebrush production, age class, condition | 3 transects on north end of PAPA | 1994 compared with 2004 | Plant species list, sagebrush trends | Comparison by decade |
| Breeding Birds | NBS volunteer observers | Breeding Bird Surveys during May, June on fixed routes and at fixed intervals | Number and species of birds observed during breeding | Several BBS routes in Upper GRB | Early 1980's and ongoing | Bird population trends in region (count/route) | Temporal change may indicate cumulative impact |
| Big Game | WDOT | Big game highway mortality | Species, sex and location of mortality | Area main highways | | | Temporal change may indicate cumulative impact |
| All Wildlife | WGFD | Wildlife observations recorded on Wildlife Observation System | Species, numbers, behavior, locations by opportunistic sightings | WGFD District 1 including the PAPA | Years past with and ongoing | Species distributions | |

* recent late hunting season timing reduces the ability to detect reproductive performance

9

Exhibit B – Part 4

Table 3 (from February 18, 2005 Wildlife Task Group Report to PAWG).  Summary of recent wildlife investigations that focus on natural gas developments within the PAPA.

| Species Or Group | Study Cooperators | Funding Source | Study | Period of Study | Data Collected | Relevance to Study Design | Use of Data In AEM Process |
|---|---|---|---|---|---|---|---|
| Mule Deer | West, Inc. WGFD University of Wyoming | WGFD BLM NWF PAPA Operators | Sublette Mule Deer Study- Phase I | 1998 - 2000 | -Seasonal ranges -Migration route/time -Herd Unit boundary -Adult survival rates | Baseline for optimal impact study | Establish pre-impact patterns on impact and control sites |
| | | | Sublette Mule Deer Study- Phase II | 2001 - 2006 | -Surface development -Animal distribution as a function of development -Survival-productivity rates | Optimal impact study use impact/control-before/after design | Detection of indirect impact by analysis before/after and on impact/control sites |
| | | | Sublette Mule Deer Study- Phase III | 2005 - ? | -Animal distribution as a function of winter drilling -Winter activity levels | Pilot work in 2005 leading to full study design | Detection of mitigation success or failure |
| Antelope | Wildlife Conservation Society WGFD Utah State University | WCS GTNP Shell | Effects of energy development on Jackson Hole pronghorn | 2002 - 2005 | -Seasonal ranges -Survival-productivity rates in relation to predation | Control and experimental treatment areas | Detection of indirect impact by analysis before/after and on impact/control sites |
| | | | Competition between wolves and coyotes | 2002 - 2005 | -Fawn survival rates -Predation rates on fawns | | |
| | | | Landscape-level change effect on pronghorn habitat use | 2002 - 2009 | -Surface development -Animal distribution as a function of development -Snow depth | Control and experimental treatment areas | Detection of indirect impact by analysis before/after and on impact/control sites |
| | | | Human disturbance and over-winter survival | 2002 - 2006 | -Bioenergetics and population change as a function of gas field disturbance and abiotic factors | Long term data sets, modeling, empirical data | |
| | | | Migration routes, bottlenecks, corridors | 2003 - 2009 | -Animal movement to winter ranges | Empirical-descriptive | |
| Sage Grouse | University of Wyoming WGFD | Ultra Petroleum BLM DOE YTY Encana | Potential impacts of natural gas development- Phase I | 1998 - 2000 | -Disturbance to lek related to nesting success -Habitat selection by hens -Disturbance to lek related to cock attendance | Baseline for optimal impact study | Establish pre-impact patterns on impact and control sites |

10

Table 3. (continued).

| Species Or Group | Study Cooperators | Funding Source | Study | Period of Study | Data Collected | Relevance to Study Design | Use of Data In AEM Process |
|---|---|---|---|---|---|---|---|
| Sage Grouse | University of Wyoming WGFD | Ultra Petroleum BLM DOE YTY Encana | Potential impacts of natural gas development- Phase II | 2000 - 2004 | -Disturbance to lek related to sage grouse behavior -Road-related disturbance | Optimal impact study use impact/control-before/after design | Detection of indirect impact by analysis before/after and on impact/control sites |
| | University of Wyoming WGFD | BLM DOE WGFD | Potential impacts of natural gas development- Phase III | 2004 - 2006 | -Disturbance to yearling males and effects on lek selection/attendance | Same as above | Assess mitigation effectiveness |
| Pygmy Rabbit | University of Wyoming | BLM WGFD University of Wyoming | Pygmy rabbit research | 2004 – 2005 | -Distribution -Habitat characteristics at occupied sites -Reproductive rates, juvenile survival rates | Baseline inventory and species ecology | Assess data for additional study needs |
| | Wyoming Wildlife Consultants | PAPA Operators | Pygmy rabbit observations | 2004 - 2005 | Pygmy rabbit observations | Baseline inventory | |
| Migratory Sagebrush-obligate Birds | University of Wyoming | USFWS WGFD Audubon | Effects of natural gas development on sagebrush steppe passerines | 1999 - 2000 | -Road effects on nesting bird densities by species -Distribution and habitat use by breeding birds | Baseline study of effects prior to start of development on PAPA | Establish pre-impact patterns on PAPA |
| | Point Reyes Consultants | USFWS WGFD BLM | Demographic monitoring of shrub-steppe songbirds western Wyoming | 2002 – 2006 | -Population trends, recruitment, survival -Effect of habitat fragmentation | Comparative study in and out of energy development areas | Spatial/temporal change may indicate impact |
| Raptors | TRC-Mariah | PAPA Operators | Annual nesting surveys | 2001 and ongoing | -Nest locations -Nest activity by species | Could be analyzed with disturbances over time and space | Spatial/temporal change may indicate impact |
| Sage Grouse | TRC-Mariah | PAPA Operators | Annual lek surveys | 2001 and ongoing | -Lek locations -Lek activity | Could be analyzed with disturbances over time and space | Spatial/temporal change may indicate impact |
| Prairie Dog Colonies, Associated species | TRC-Mariah Wyoming Wildlife Consultants | PAPA Operators | Surveys for prairie dog associates: -black-footed ferrets -mountain plovers -burrowing owls | 2001 and ongoing | Number, locations of species observed | Species present | |

11

Table 4 (from February 18, 2005 Wildlife Task Group Report to PAWG), Monitoring and Related Requirements in PAPA ROD

| Monitoring Subject | Where In Rod (Pages) | Responsibility | Has It Been Accomplished? |
|---|---|---|---|
| Develop and Implement Adaptive Environmental Management Process | 1, 14, 15, C-1, C-4, A-33 | BLM and PAWG | Not developed |
| Annual AEM Review Report to Public on Results | C-4, 40, A-33 | BLM, PAWG and Cooperating Agencies | Not developed |
| Monitor Species Identified in ROD | C-2 | Operators, BLM, other agencies | By contractor, no analysis done |
| Develop Monitoring Plans Through "Technical Agency Groups" | 15 | BLM | Not consistently done |
| GIS Mapping of Wildlife Habitat Data | A-33, C-2 | BLM | Not completed, work now underway |
| Maintenance of Species Impact Models to Track Habitat Values | A-33, C-2 | BLM | Species' research in progress |
| Traffic Monitoring of Well-field Access Roads, Manage Access | A-32, A-33, B-9 | BLM, Operators, WYDOT, WGFD, Other Agencies | Not completed, access management plan needed |
| Funding of all Monitoring (except NOx emissions) Will be From Operators and Agencies | 15, A-33, C-4, C-5 | Operators, other agencies | Accomplished on per project basis |
| Monitor Level of Development to Assure Wildlife Impacts Within Scope of EIS | A-33, 46, A-41, C-2 | BLM | Need to address cumulative impact assessment |
| Environmental Compliance Coordinators Reporting for Each Company | 23 | BLM, Operators | Ongoing by operators but not coordinated |
| Allowable Well Pad Density by Management Area – Environmental Analysis | 26 | BLM | Ongoing and goals currently met |

Exhibit E

BLM (PFO) Monitoring Proposals

As of: 7/8/2005

| ID # | Proposal | BPS # | Est. Cost | PFO Priority | BLM Funding | Other Funding | Cooperators | Remarks |
|---|---|---|---|---|---|---|---|---|
| | **High Priority Proposals** | | | | | | | |
| | **Cultural-Historic Task Group** | | | | | | | |
| 1 | Monitoring important archeological and historical sites | 036296 | $ 2,000 | 8 | $ 2,000 | | BLM, SHPO, OCTA, Sublette Co. | |
| 2 | Lander Trail viewshed monitoring | 036314 | $ 18,000 | 8 | $ 18,000 | | BLM, SHPO, OCTA | |
| 3 | Geomorphology and soil studies | 036295 | $ 100,000 | 1 | $ 100,000 | | BLM, NRCS, O&Gops | |
| 4 | Database analysis | | | | | | BLM, O&Gops | |
| 5 | Public education and awareness and artifact collecting rules | 036298 | $ 21,000 | 4 | $ 21,000 | | BLM, SHPO, BOCES, O&Gops | |
| 6 | Appendix E Programmatic Agreement | | | | | | BLM, SHPO, O&Gops | |
| | **Socio-Economic Task Group** | | | | | | | |
| 7 | Full-time socio-economic coordinator position in Sublette Co. | | | | | | BLM, St of WY, Sublette Co, towns, O&Gops | |
| | **Wildlife Task Group** | | | | | | | |
| 8 | Analysis of operator-supported (existing) monitoring data | 036308 | $ 25,000 | 3 | $ 25,000 | | BLM, O&Gops | |
| 9 | Continue support for ongoing monitoring & studies | 036312 | $ 20,000 | 5 | $ 20,000 | | BLM, PAWG | |
| 10 | Implementation of AM process | | | | | | BLM, O&Gops, WGFD | |
| 11 | Habitat quality assessment | see #2.15 | | | | | BLM, WGFD, O&Gops, Sublette Co Road & Bridge | |
| 12 | Monitor activity levels on PAPA | see #11 | | 7 | | | | |
| | **Air Quality Task Group** | | | | | | | |
| 13 | South Pass NADP site - share costs to continue for FY06 | | | | | | BLM, FS, O&Gops | |
| 14 | Pinedale NADP site - continue existing funding (BLM) | | | | | | BLM, FS, O&Gops | |
| 15 | Gypsum Creek NADP site - share costs to continue for FY06 | | | | | | BLM, FS, O&Gops | |
| 16 | Bulk deposition sampling - share costs to continue for FY06 | | | | | | BLM, FS, O&Gops | |
| 17 | IMPROVE transmissometer - share costs to continue for FY06 | | | | | | BLM, FS, O&Gops | |
| 18 | IMPROVE aerosol monitor - continue existing funding (FS) | | | | | | | |
| 19 | Long-term lake sampling in B-T/Shoshone NFs -continue funding (FS) | | | | | | | |

# BLM (PFO) Monitoring Proposals

As of: 7/8/2005

| ID # | Proposal | BPS # | Est. Cost | PFO Priority | BLM Funding | Other Funding | Cooperators | Remarks |
|---|---|---|---|---|---|---|---|---|
| 20 | Public health - Jonah monitoring - continue funding by EnCana | | | | | | | |
| 21 | Public health - Boulder monitoring - continue funding by Shell | | | | | | | |
| 22 | Public health - Daniel monitoring - continue funding by WyDEQ | | | | | | | |
| 23 | PM2.5 monitoring in Pinedale - continue VyDEQ funding | | | | | | | |
| 24 | WARMS monitoring - continue BLM funding | | | | | | | |
| 25 | CASTNet monitoring - continue EPA funding | | | | | | | |
| 26 | NOx tracking report | | | | | | | |
| 27 | Initiate activity tracking program | | | | | | | |
| 28 | Resolve funding issues | | | | | | | |
| **Transportation Task Group** | | | | | | | | |
| 29 | Monitor road traffic (1 test site of eventual proposed 7 sites) | 036301 | $ 17,000 | 7 | $ 17,000 | | WGFD | |
| 30 | Road and pipeline mapping/naming/signing | 036304, #3, #15 | $ 2,500 | 2 | $ 2,500 | | BLM, WyDOT, O&Gops, Sublette Co | |
| **Water Resources Task Group** | | | | | | | | |
| 31 | Continue existing surface water monitoring | | | | | | O&Gops | |
| 32 | Continue existing ground water monitoring | | | | | | O&Gops | |
| **Reclamation Task Group** | | | | | | | | |
| 33 | Inventory and evaluate producing sites per APD/ROD/DR | 036292 | $ 60,000 | 2 | $ 60,000 | | BLM, WGFD, NRCS, WyDEQ, O&Gops | |
| 34 | Monitor use of weed-free materials, seed mix/methods, invasive weed mapping/monitoring, establish transects | 036293, #15 | $ 10,000 | 6 | $ 10,000 | | BLM, O&Gops, Sublette Co Weed & Pest | |
| 35 | Soil/vegetation/habitat evaluation on undisturbed sites | see #2 | | 1 | | | BLM, WGFD, NRCS, Gov Wldlf Fund, O&Gops | |
| **Recreation/Visual Resources** | | | | | | | | |
| 36 | Monitoring of Key Observation Points (KOPs) | see #2 | | | | | No Task Group(s) considered recreation/visual resource monitoring | |

As of: 7/8/2005

# BLM (PFO) Monitoring Proposals

## Medium and Low Priority Subgroup Recommendations

| ID # | Proposal | BPS # | Est. Cost | PFO Priority | BLM Funding | Other Funding | Cooperators | Remarks |
|---|---|---|---|---|---|---|---|---|
| | **Cultural Resources Subgroup** | | | | | | | |
| 1 | Lander Trail Monitoring (annual 1/4 mile photo points) | | | | | | SHPO, BLM | |
| 2 | Analyze existing archaeological data (Class II) | | | | | | | |
| 3 | Complete Programmatic Agreement for Pinedale Anticline Project | | | | | | SHPO, BLM | |
| 4 | Enhance awareness about artifact collecting rules | | | | | | | |
| 5 | Encourage scientific investigation of identified archaeological sites (Promote scientific use of identified cultural sites) | | | | | | | |
| 6 | Increase heavy equipment operator awareness of cultural resource sites | | | | | | | |
| | **SocioEconomic Resources Subgroup** | | | | | | | |
| | None | | | | | | | |
| | **Wildlife Resouces Subgroup** | | | | | | | |
| 7 | Support ongoing Monitoring Projects | | | | | | | |
| 7a | Mule deer population model and mortality data | | | | | | WGFD | |
| 7b | Pronghorn population model data | | | | | | WGFD | |
| 7c | Sage Grouse population, reproduction, and use data | | | | | | WGFD | |
| 7d | Upland game harvest and population data | | | | | | WGFD | |
| 7e | Bald Eagle reproduction and population data | | | | | | WGFD | |
| 7f | Sagebrush vegetation transects (production, age class, and condition) | | | | | | WGFD, BLM | |
| 7g | Breeding bird population surveys | | | | | | NBS volunteers | |
| 7h | Wildlife Observation System | | | | | | WGFD | |
| 7i | Sublette Mule Deer Study Phase III | | | | | | All | |
| 7j | USU/WCS/WGFD Antelope Study | | | | | | | |
| 7k | UW Sage Grouse energy development impact study | | | | | | WGFD | |
| 7l | UW Pygmy Rabbit baseline inventory | | | | | | WGFD, BLM | |
| 7m | UW Sagebrush-obligate birds baseline inventory and energy development effects | | | | | | USFWS, WGFD | |

## BLM (PFO) Monitoring Proposals

As of: 7/8/2005

| ID # | Proposal | BPS # | Est. Cost | PFO Priority | BLM Funding | Other Funding | Cooperators | Remarks |
|---|---|---|---|---|---|---|---|---|
| 7n | Raptor nesting surveys | | | | | | operators | |
| 7o | Sage Grouse lek surveys | | | | | | operators | |
| 7p | Prairie Dog Colony surveys | | | | | | operators | |
| 8 | Implement AEM Process (items identified on Table 4) | | | | | | BLM | |
| 9 | Traffic monitoring | | | | | | | Overlaps with Transportation #30 |
| 10 | Monitor winter drilling activity | | | | | | | |
| 11 | Coordination of Wildlife Monitoring studies | | | | | | | |
| 12 | Monitor Predator (mammals and birds) Populations | | | | | | All WGFD, BLM | |
| **Air Resources SubGroup** | | | | | | | | |
| 13 | Continue funding for Pinedale NAPD Site | | | | | | BLM | |
| 14 | Continue funding for IMPROVE Aerosol Monitor at White Pine Ski Area | | | | | | FS | |
| 15 | Continue funding for lake chemistry sampling in Bridger-Teton and Shoshone NFs | | | | | | FS | |
| 16 | Fund visibility camera in Bridger Wilderness | | | | | | FS, BLM | |
| 17 | Continue funding for Jonah Ambient Air Quality Monitor | | | | | | WDEQ | |
| 18 | Continue funding for Boulder Ambient Air Quality Monitor | | | | | | WDEQ | |
| 19 | Fund Daniel Ambient Air Quality Monitor | | | | | | WDEQ | |
| 20 | Fund PM2.5 Pinedale Monitor | | | | | | WDEQ | |
| 21 | Fund $SO_2$ Monitor | | | | | | WDEQ | |
| 22 | Continue funding WARMS Station | | | | | | BLM | |
| 23 | Continue funding CASTNet Station | | | | | | EPA | |
| 24 | Fund BP Meterological Station | | | | | | operator | |
| 25 | Update NOx tracking data | | | | | | BLM | |
| 26 | Realease Annual Air Quality Report | | | | | | BLM, WDEQ, EPA | |
| 27 | Track emission activity | | | | | | BLM, WDEQ | |

BLM (PFO) Monitoring Proposals

As of: 7/8/2005

| ID # | Proposal | BPS # | Est. Cost | PFO Priority | BLM Funding | Other Funding | Cooperators | Remarks |
|------|----------|-------|-----------|--------------|-------------|---------------|-------------|---------|
| **Transportation Resources Subgroup** | | | | | | | | |
| 28 | Establish Road identifier system | | | | | | DOTs | |
| 29 | Sign major roads and errect speed signs | | | | | | BLM, DOTs | |
| 30 | Traffic monitoring (determine non-energy traffic component | | | | | | | Overlaps with wildlife #9 |
| **Water Resources Subgroup** | | | | | | | | |
| 31 | Monitor leakage from pits | | | | | | WDEQ, WOGCC, BLM | |
| 32 | Monitor sedimentation in New Fork River | | | | | | WDEQ, BLM | |
| 33 | Monitor water and condensate pipeline controls | | | | | | WDEQ | |
| **Reclamation Subgroup** | | | | | | | | |
| 34 | Evaluate effectiveness of seed mixes and seeding methods | | | | | | BLM | |
| 35 | Accelerate reclamation at abandoned sites | | | | | | BLM | |
| 36 | Monitor adequately reclamed sites for long term success | | | | | | BLM | |
| **Total Request** | | | $ 275,500 | | $275,500 | | | |

Exhibit F

Wildlife Monitoring Task Group Minutes and Report to PAWG
Meeting at BLM – Pinedale
November 10, 2005

Attendees:
Tony Gosar – citizen
Craig Cling – TRC
Ron Hogan – Questar
Aimee Davison – Shell
Steve Belinda – BLM
Rollin Sparrowe –Task Group Chair
Michelle Hosler – citizen

Rollin Sparrowe summarized the October 25, 2005 meeting of the Pinedale Anticline Working
Group (PAWG). In discussing the need for measurable thresholds in response to declines in mule deer
and other wildlife, PAWG requested the Wildlife Monitoring Task Group (TG) meet as soon as possible
to develop recommendations for what to do about these issues. This meeting is for that purpose.

Steve Belinda thanked Aimee Davison and Shell for aggressive work to implement the TG's
recommendations for signage, public outreach, and gates to control access to the Mesa. Further work on
outreach has involved the Transportation TG, signs and posters, and a press release targeting January 15,
2006, road closures.

The contract to review the backlog of operator-sponsored monitoring data has been let and BLM has met
with contractors and is refining a scope of work. Since the contractors will have 180 days to perform their
review, it will not be available in time to plan the revised Monitoring Work Plan for 2006. BLM will
revise that plan. The TG will have input into the main questions to be discussed.

The TG discussed a wide array of ongoing and potential mitigation actions. One of the new issues is the
possibility of winter completions and their impact on wildlife. The TG has supported expanded mule deer
research, access management on the Mesa, public outreach, and continuing the sage grouse monitoring
under way as part of research. Operationally, it is our conclusion that neither the TG nor PAWG are
active players in mitigation negotiations and that there is no comprehensive plan to mitigate effects on
wildlife. .

Thresholds of wildlife impact requiring management response was discussed. This was a wide-ranging
discussion that referred back to the TG recommendations in February that documented EIS and ROD
statements about intent to change operations if wildlife impacts were demonstrated. These actions were
not taken even though wildlife data have shown impacts to mule deer and sage grouse.

A main conclusion of the TG was that thresholds, such as a selected percent decline in populations or in
the amount of undisturbed habitat needed to sustain a certain population, should have been set before
development started. Such thresholds are not very useful after declines have been seen. For example,
declines in mule deer of 15% would have likely been a starting threshold for a high profile herd with high
cultural and economic values..

The TG generally agreed that:
   1) Thresholds are hard to apply after changes have already exceeded them, and are not useful
      without commitment to management actions in response to reaching the threshold.

2)  Given the actual situation where ownership rights have been transferred by BLM to lessees and that extremely rich gas deposits have been proven, many value judgments come into any numerical threshold.

3)  While no thresholds were set in the past, the TG and PAWG itself have expressed concern over significant, impacts documented for both mule deer and sage grouse. Research reports have been available to all participants.

4)  Energy impacts are not the only contributor to the 46% decline of mule deer on the Mesa; other impacts are either not under any control (climate) or are not being addressed (housing development).

5)  The real issue for mule deer is whether the herd can rebound this time given the new knowledge about the impacts of disturbance on their limited winter range. Other declines such as from severe winter weather have occurred in the past and they have recovered, but the disturbance was absent.

6)  A new issue of concern is timing. This unique deer herd comes to the Mesa to winter in a unique behavioral tradition. Each step that increases the length of time for development disturbance, such as additional downhole density, casts doubt on whether the behavioral tradition will continue.

7)  All agree that conserving target wildlife populations will require expansion of attention beyond the crest of the Anticline, such as to other winter and summer ranges now heading toward development and to the effects of changes like housing growth.

8)  Among the long-term issues not being dealt with are BLM management of habitats through various treatments for other resources, such as grazing, water resources, etc.

9)  Goals suggested by this TG to PAWG for mule deer are: a) maintain current numbers – specifically, no further decline in wintering deer numbers, and b) maintain current remaining, undisturbed habitats useful to deer in winter. If such goals are recommended by PAWG and accepted by BLM, an implementation plan can address the "how to do it" question. Concepts such as retaining as undisturbed winter habitat in all undeveloped parts of the Mesa off the Anticline Crest and tighter management of future development of critical winter range off the Anticline would be possible tools.

10) Once more is known about development scenarios and in order to restore wildlife populations as gas fields mature, a recovery sequence must address remaining habitat quality, activity levels, and population objectives wherever they affect the resource in question.

11) This TG recommended a GIS-based Habitat Quality Assessment as a baseline for a broader attempt to manage wildlife in the face of development. We are here suggesting that turning the declines around will be complicated and must be part of a larger planning and implementation effort than the PAWG has itself shown interest in, and certainly broader than BLM has shown a willingness to lead.

Note: While this discussion occurred, BLM and several companies were moving toward decisions to allow additional winter drilling with winter completions. The BLM decision document said it would likely result in further decline of mule deer. This may change the assessment of monitoring, research, and mitigation needs. Such a moving target provides a strong argument for a broader GIS-based plan for the Upper Green and for more open exchange of information.

Submitted by Rollin Sparrowe, Chair

11/18/05

Exhibit G



# United States Department of the Interior



BUREAU OF LAND MANAGEMENT
Pinedale Field Office
P.O. Box 768
Pinedale, Wyoming 82941-0768

In Reply Refer
1784 (100)

May 3, 2006

Linda Baker
Pinedale Anticline Working Group Chair
PO Box 994
Pinedale, WY 82941

Re: Please find enclosed my response to the PAWG's recommendation for mule deer on the Mesa.

## PAWG's Recommendation:

"PAWG recommends to BLM the development of an implementation plan to achieve the following goals on the PAPA, especially the Mesa:
a) Maintain current numbers - specifically, no further decline in wintering deer numbers, and
b) Maintain current remaining, undisturbed habitats useful to deer in winter."

## BLM's Response

1.) BLM will work with the oil and gas industry and the Wyoming Game and Fish Department to maintain and enhance winter habitat for mule deer populations to help foster a viable mule deer herd unit.

2.) BLM will work with the oil and gas industry and the Wyoming Game and Fish Department to promote sustainable and functional big game migration corridors within the Pinedale Anticline Project Area (PAPA).

3.) BLM will work with the oil and gas industry and the Wyoming Game and Fish Department to manage existing, functional winter habitat for mule deer on the PAPA through an appropriate program of habitat management and mitigation (i.e., avoidance, on-site, and off-site [compensation]).

Thank you for participation on the PAWG as a member and as the Chair.

Sincerely,

Dennis Stenger
Field Manager

Cc:     Nylla Kunard
        Paul Hagenstein
        Susan Kramer
        Bob Barrett
        Betty Fear
        Steve Duerr
        Rollin Sparowe
        Bill Wichers
        Vern Stelter
        Dave Roberts
        Jeff Edlestein
        Mary Flandurka
        Robin Smith

Exhibit C

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

THEODORE ROOSEVELT                )
CONSERVATION PARTNERSHIP           )
555 Eleventh St. N.W., 6th Floor   )
Washington, DC 20004               )
(202) 654-4600,                    )
                                   )
                    Plaintiff,     )          CASE NO. 1:07-cv-01486-RJL
                                   )
        v.                         )
                                   )
DIRK KEMPTHORNE, in his official   )
capacity as the Secretary of the United )
States Department of the Interior  )
1849 C Street, N.W.                )
Washington, DC 20240               )
(202) 208-3100,                    )
                                   )
        and                        )
                                   )
UNITED STATES BUREAU OF LAND       )
MANAGEMENT                         )
1849 C Street, Room 406-LS         )
Washington, DC 20240               )
(202) 452-5125,                    )
                                   )
        Defendants.                )
                                   )
_____   )
                                   )
ANADARKO PETROLEUM                 )
CORPORATION, WARREN                )
RESOURCES, INC., DOUBLE EAGLE      )
PETROLEUM CO.,                     )
                                   )
        and                        )
                                   )
STATE OF WYOMING                   )
                                   )
        Defendant-Intervenors      )
_____

## DECLARATION OF STEVEN R. BELINDA

I, Steven R. Belinda, declare under penalty of perjury that:

1.    I am a resident of the State of Wyoming, over eighteen (18) years of age, with personal knowledge of the facts set forth herein.

2.    I am employed by the Theodore Roosevelt Conservation Partnership ("TRCP") as an Energy Policy Initiative Manager. I have held this position at all times relevant hereto. In addition to being employed by TRCP, I am also a member of that organization.

3.    The purpose of my declaration is to explain the interests of TRCP and its members, in the Atlantic Rim Project Area ("ARPA") and the resources located there impacted by the Bureau of Land Management's ("BLM") decisions.

4.    TRCP is a non-profit organization supported by a nationwide network of over 90,000 individual sportsmen and women and more than 1,400 affiliated clubs and organizations dedicated to the pursuit of hunting, fishing and outdoor recreation. These 1,400 affiliated clubs and organizations themselves represent some 9,000,000 American outdoor enthusiasts. Species observed and/or hunted by TRCP members include, but are not limited to, mule deer, pronghorn, Rocky Mountain elk, and sage grouse.

5.    The mission of TRCP is to preserve the traditions of hunting and fishing by: A) Expanding access to places to hunt and fish; B) conserving fish and wildlife and the habitats necessary to sustain them; and C) increasing funding for conservation and management.

6.    TRCP members are frequent visitors to the ARPA where they enjoy wildlife viewing, hunting and fishing. Among the species TRCP members enjoy viewing and/or hunting are sage grouse, elk, mule deer and pronghorn. I personally have

engaged, and continue to engage, in hunting mule deer, elk and sage grouse in the ARPA. I intend to continue to do so, provided the ARPA continues to support these species.

7.    On behalf of TRCP, and consistent with its stated mission, I have provided numerous comments to BLM with respect to the impacts to TRCP's interests resulting from the proposed oil and gas development within the ARPA, including the Atlantic Rim Natural Gas Field Development Project ("Project") approved by BLM in 2007. In short, habitat for mule deer, elk, pronghorn, sage grouse and other species will be significantly reduced and adversely impacted as a result of the Project. This impact will in turn, result in fewer hunting and wildlife viewing opportunities for TRCP's members, precisely what TRCP was created to guard against.

8.    TRCP and its members believe there are important cultural and aesthetic values associated with the careful management of the ARPA.    These cultural and aesthetic values will be adversely affected by the Project.    According to BLM, diminished recreational opportunities resulting from the Project, like hunting and wildlife viewing, are likely to continue for several decades, further magnifying the impacts to existing and future members of TRCP.  Proceeding with the project is in direct conflict with the goals, objectives and mission of TRCP and its members.

I declare under penalty of perjury that the foregoing is true and correct.

_____May 2, 2008_____
Dated

_____Steven R. Belinda_____
Steven R. Belinda

Exhibit D

# RECORD OF DECISION

**Figure 1.  Atlantic Rim Project Location, Carbon County, Wyoming, 2006.**



the surface disturbance limit.  The 7,600-acre disturbance cap will be allocated to Operators on a prorated mineral leasehold basis.  Natural gas development is limited to eight well sites per 640-acre section, which includes coalbed natural gas (CBNG), conventional, and injection wells. Operators may install multiple wellbores (e.g., CBNG, conventional, or injection) on a well site.

Exhibit E

## CHAPTER 3.  AFFECTED ENVIRONMENT

**Map M-22.**    **Big Game Crucial Winter Ranges.**



**002252**

Exhibit F

# CHAPTER 3.  AFFECTED ENVIRONMENT

**Map M-23.     Seasonal Mule Deer Ranges and Migrations Routes.**



Exhibit G

## CHAPTER 3.  AFFECTED ENVIRONMENT

**Map M-24.    Seasonal Elk Ranges and Migrations Routes.**



# Exhibit H

## CHAPTER 3. AFFECTED ENVIRONMENT

**Map M-21.    Seasonal Pronghorn Ranges and Migrations Routes.**



# Exhibit I

## CHAPTER 3. AFFECTED ENVIRONMENT

**Map M-26.     Greater Sage-Grouse Leks.**



No Warranty is made by the Bureau of Land Management for use of the data for purposes not intended by the BLM.

002259

# Exhibit J

*Atlantic Rim Deer Study* *WEST,Inc.*



Figure 7. Movement routes collected from of 47 GPS-collared mule deer between February 10, 2005 and November 15, 2006 in the Atlantic Rim Project Area (ARPA).

Exhibit K



# United States Department of the Interior

BUREAU OF LAND MANAGEMENT
Washington, D.C. 20240
http://www.blm.gov

Dear Reader:

Enclosed is the Final Programmatic Environmental Impact Statement (PEIS) on Wind Energy
Development on Bureau of Land Management (BLM)-Administered Lands in the Western
United States, including proposed amendments to selected land use plans. The Final PEIS
analyzes three alternatives for managing wind energy development on BLM-administered lands.
The alternatives are: 1) the proposed action, which would implement a Wind Energy
Development Program, establish policies and best management practices (BMPs) for wind
energy right-of-way (ROW) authorizations, and amend 52 BLM land use plans; 2) the no action
alternative, which would allow continued wind energy development under the terms and
conditions of the BLM Interim Wind Energy Development Policy, and 3) a limited wind energy
development alternative, which would allow wind energy development only in selected
locations.

As stated above, the proposed action would establish a comprehensive program to address wind
energy development on BLM-administered lands. The policies and BMPs developed under the
proposed Wind Energy Development Program would establish minimum requirements for
management of individual wind energy projects. The proposed policies identify management
objectives and address the administration of wind energy development activities. The proposed
BMPs identify required mitigation measures that would need to be incorporated into project-
specific plans and stipulations. In addition, the proposed action would amend 52 BLM land use
plans which are listed in Appendix C of the Final PEIS. The proposed plan amendments include
the (1) adoption of programmatic policies and BMPs where wind energy development would be
considered and (2) identification of specific areas where wind energy development would not be
allowed. The purpose of the proposed plan amendments is to facilitate preparation and
consideration of potential wind energy development ROW applications on BLM-administered
lands, but not to eliminate the need for site-specific analysis of individual development
proposals.

The Draft Programmatic Environmental Impact Statement on Wind Energy Development on
BLM-Administered Lands in the Western United States was made available for public review
and comment from September 10, 2004 to December 10, 2004. The Draft PEIS was posted on
the project Web site at http://windeis.anl.gov and provided on request as a CD or printed
document. More than 120 individuals and organizations participated in the public comment
process, including more than 60 recognized organizations (public and private). About 77% of
the documents were received via the project Web-site and 23% were received via regular mail.
On the basis of comment categorization, approximately 718 individual comments were
identified.

2

Volume 3 of the Final PEIS contains the public comments on the Draft PEIS and the BLM's responses. Public comments addressed a broad range of issues. About 31% of the comments were categorized as addressing ecological issues, including monitoring and mitigation; 21% addressed policy issues; 17% addressed avian issues; 10% addressed bat issues; 8% addressed issues related to the scope of the PEIS and the alternatives evaluated; 6% addressed sage-grouse issues; 6% addressed transmission issues; and 4% of the comments addressed land use issues. The remainder of the issues were divided across a number of topics (each comprising less than 3% of the total), including engineering, cumulative impacts, cultural resources, economics, visual impacts, wind resource modeling approach, noise, regulatory issues, water, waste, air quality, geology, and transportation issues. (The percentages total more than 100% because many of the comments can be categorized under more than one key issue). Public comments on the Draft PEIS, including the proposed plan amendments, and internal BLM review comments were incorporated into the Final PEIS. Public comments resulted in the addition of clarifying text, but did not significantly change the proposed action or proposed land use plan amendments.

Copies of the Final Programmatic Environmental Impact Statement on Wind Energy Development on BLM-Administered Lands in the Western United States, including the proposed plan amendments (Appendix C), have been sent to the Environmental Protection Agency, DOI Office of Environmental Policy and Compliance, DOI Library, and the governors' office in each of the 11 western states. Copies of the Final PEIS, including the proposed plan amendments, are available at the BLM State Offices in the 11 western states and the BLM Washington Office, Public Affairs Office. Interested persons may also review the Final PEIS and proposed plan amendments on the Internet at http://windeis.anl.gov.

Instructions for filing a protest regarding the proposed plan amendments may be found at 43 CFR 1610.5. A protest may only raise those issues which were submitted for the record during the NEPA/planning process. E-mail and faxed protests will not be accepted as valid protests unless the protesting party also provides the original letter by either regular or overnight mail postmarked by the close of the protest period. Under these conditions, the e-mail or faxed protest will be considered as an advance copy and it will receive full consideration. If you wish to provide such advance notification, please direct faxed protests to the attention of the BLM protest coordinator at 202-452-5112, and emails to Brenda_Hudgens-Williams@blm.gov.

Please direct the follow-up letter to the appropriate address provided below.

The protest must contain:
    a. The name, mailing address, telephone number, and interest of the person filing the protest.
    b. A statement of the specific plan(s) by name and the amendment(s) being protested.
    c. A copy of all documents addressing the issue(s) that the protesting party submitted during the NEPA/planning process or a statement of the date they were discussed for the record.
    d. A concise statement explaining why the protestor believes the proposed land use plan amendment(s) is wrong.

3

All protests must be in writing and mailed to the following address:

| | |
|---|---|
| Regular Mail: | Overnight Mail: |
| Bureau of Land Management | Bureau of Land Management |
| Director (210) | Director (210) |
| Attention: Brenda Williams | Attention: Brenda Williams |
| P.O. Box 66538 | 1620 L Street, N.W., Suite 1075 |
| Washington, D.C. 20035 | Washington, D.C. 20036 |

Individual respondents may request confidentiality. If you wish to withhold your name or street address from public review or from disclosure under the Freedom of Information Act, you must state this prominently at the beginning of your written comment. Such requests will be honored to the extent allowed by law. All submissions from organizations and businesses, and from individuals identifying themselves as representatives or officials of organizations or businesses, will be available for public inspection in their entirety.

A decision shall be rendered promptly on the protest. The decision will be in writing and will be sent to the protesting party by certified mail, return receipt requested.

Following the resolution of any protests and completion of the consistency reviews by the governors of states affected by land use plan amendments, approval of the Program for Wind Energy Development on BLM-Administered Lands in the Western United States and amendment of selected land use plans will be documented in a Record of Decision that will be made available to the public and provided on request to interested parties. For additional information, you may contact Lee Otteni, Bureau of Land Management, Farmington Field Office, 1235 La Plata Highway, Suite A, Farmington, NM 87401, (505) 599-8911 or visit the Wind Energy Development Programmatic EIS Web site at windeis.anl.gov.

Sincerely,

Ray Brady
Group Manager, Lands and Realty

Exhibit L



Exhibit M

**Document 00016**

ANADARKO PETROLEUM CORPORATION                    P.O. BOX 50648 • CASPER, WYOMING 8260..



November 23, 2004

BLM Wind Energy Programmatic EIS
Argonne National Laboratory, EAD/900
9700 S. Cass Avenue
Argonne, IL 60439

RE: Wind Energy Development Draft Programmatic EIS

Dear BLM Manager:

Anadarko Petroleum Corporation (APC) appreciates the opportunity to comment on the referenced document.  APC and its subsidiaries have considerable interests – both as a landowner and as a lessee of federal minerals - in the proposed analysis area that may be affected by the outcome of this planning effort.  APC's interests as a landowner stem from its merger in 2000 with Union Pacific Resources.  As a result of that merger, APC owns what is commonly referred to as the "land grant strip," which is almost 700 miles long and 40 miles wide. The strip passes through southern Wyoming and portions of Northeast Colorado and Utah.  This land has the potential to be developed both for its mineral resources and its wind energy.  Further, APC owns a large number of federal leases in the states that will be covered by this EIS.

The development of the Programmatic EIS, whether or not it results in amendments to individual land use plans, has the potential to affect APC's interests in these states.  Therefore APC provided comments during the scoping process and will continue to actively participate in the EIS process.

In our December 19, 2003, letter APC requested that the DEIS address:

- *Management of mineral lease development on lands underlying wind farms that have been or may be permitted under a right of way.*
- *The interplay between issuance of competitive lease for wind energy and either existing or future leases for mineral resources*
- *Cumulative impacts (visual, wildlife etc.) from wind farm projects and the potential impact on the ability to develop resources on adjacent lands.*

16-1

APC does not believe that the probable interaction of wind energy projects and mineral development (e.g. oil and gas) is clearly described and analyzed.  The document's discussion of potential impacts to mineral development is limited to statements that defer analysis of cumulative impacts until site specific information is available (DEIS at 6.4.1.13).  Furthermore, the possible negative impacts from a wind energy project may have on the ability to develop leasable minerals is all but dismissed (". . . the relatively

small amount of land required for wind energy projects and their typically isolated location means that the cumulative impact on other commercial uses of BLM-administered lands would likely be small." (DEIS at 6.4.1.13). For instance, it appears that the Bureau of Land Management blindly assumed that owners of valid leases for minerals would be able to fully enjoy their vested rights if a wind energy project were to precede mineral development. This is not necessarily true given siting and access issues. The document fails to address the potential conflict between prior existing mineral leases and subsequent wind energy right-of-way requests.

In stark contrast, BLM recognized the potential conflict between wind energy development and hard rock mineral development. BLM provides for the protection of valid existing rights of mineral claimants by restricting wind energy development to the degree that it does not "materially interfere with the claimant's right to mine, remove, or sell the minerals". APC believes that similar protections should be provided for other mineral development. The language on page 2-7 of the DEIS is not sufficient to address this issue. There, the BLM provides that:

> To the extent possible, wind energy projects will be developed in a manner that will not prevent other land uses, including fluid minerals extraction, grazing, recreation use, and other ROW uses.

DEIS at 2-7.

16-1
(cont.)

It appears from statements made in the DEIS at 1-1 that BLM intends to continue granting access to federal lands for wind energy development pursuant to its existing right of way regulations, except in certain areas where BLM has determined that it will issue competitive leases. The DEIS lacks an analysis regarding the potential impacts of this decision. For example, the right-of-way regulations do not contain any provision authorizing BLM to require the payment of royalties. Presumably, private landowners will require payment of a royalty. Therefore, it is possible that wind energy development would be concentrated on public lands potentially causing a greater impact to public lands.

16-2

Sincerely,

Tom Clayson
Environmental Affairs Coordinator

Exhibit N



WYOMING GAME AND FISH DEPARTMENT

5400 Bishop Blvd. Cheyenne, WY 82006
Phone: (307) 777-4600  Fax (307) 777-4610
Web site: http://gf.state. wy.us

GOVERNOR
DAVE FREUDENTHAL

DIRECTOR
TERRY CLEVELAND

COMMISSIONERS
BILL WILLIAMS, DVM – President
JERRY GALLES – Vice President
CLARK ALLAN
CLIFFORD KIRK
FRED LINDZEY
RON LOVERCHECK
ED MIGNERY

January 29, 2008

MEMORANDUM

TO:        Terry Cleveland and John Emmerich

FROM:    Tom Christiansen and Joe Bohne

COPY TO:  Jay Lawson, Bill Rudd, Reg Rothwell, Bob Oakleaf

SUBJECT:  Multi-State Sage-Grouse Coordination and Research-based
          Recommendations

As assigned by Assistant Director Emmerich, we have been working with other state fish and
wildlife agencies in WAFWA Sage-Grouse Management Zones 1 and 2 (MT, CO, UT, SD, ND,
WY) in order to coordinate interpretation of recent sage-grouse research related to oil and gas
development.

Attached for your review, please find the latest and final document capturing the multi-state
interpretation of the recent science related to sage-grouse conservation and oil and gas
development. It has been well scrutinized by staff from MT, WY, CO, ND and UT and there is
consensus on the content by the participants. South Dakota was unable to attend the initial
meeting in Salt Lake City on January 8-9, but they have been provided with meeting notes and
the resulting document.

It is our recommendation that WGFD acknowledge this document as the correct interpretation of
the recently published sage-grouse research and use this information to update and augment
department documents and policies. It should be used in the forthcoming discussions with the
BLM regarding their update to their sage-grouse Instruction Memorandum. In addition, we
suggest that in order for this document to serve the broadest purpose for sage-grouse
conservation four additional actions are needed. First, the document should be shared with
Governor Freudenthal's staff. Second, we recommend that the Director's Office enter into
discussions with MT FWP Director Jeff Hagener to ensure consistency in the application of these
recommendations between our border states, and especially with the WY and MT BLM State
Field Offices. Third, we recommend the document be submitted to WAFWA's Sage-Grouse
Technical Committee as well as the WAFWA Executive Committee for their consideration and
use. Finally, we recommend this document be included with other materials sent to the USFWS
for consideration in their review of the status of sage-grouse and measures in place to conserve
those populations.

We look forward to your direction on how to proceed.

*"Conserving Wildlife - Serving People"*

**Using the Best Available Science to Coordinate Conservation Actions that Benefit Greater Sage-Grouse Across States Affected by Oil & Gas Development in Management Zones I-II (Colorado, Montana, North Dakota, South Dakota, Utah, and Wyoming)**

## Background

Greater Sage-grouse are widely considered in scientific and public policy arenas to be a species of significant conservation concern. Loss, degradation and fragmentation of important sagebrush grassland habitats have negatively impacted sage-grouse populations. Much of this loss of habitat function is occurring in Sage-grouse Management Zones (MZ) 1 and 2 (Stiver et al. 2006) in Colorado, Montana, North Dakota, South Dakota, Utah, and Wyoming as a result of oil and gas development (Connelly et al. 2004). Oil and gas development is rapidly increasing within these areas. In response to those concerns, states and provinces are in various stages of completing or updating management plans in order to provide for long-term sage-grouse conservation. Special emphasis is being placed on oil and gas development as it rapidly spreads across much of the eastern range of sage-grouse.

The recent decision by B. Lynn Winmill, Chief U.S. District Judge (2007), which remands the original 2005 not warranted decision back to the USFWS for reconsideration, has highlighted the need for States to coordinate their application of best available science. Representatives from the state agencies with authority for managing fish and wildlife from the major sage-grouse and energy producing states comprising MZ 1 and 2 and sage-grouse researchers who have published new findings, met on January 8 and 9, 2008 in Salt Lake City. The objectives of the meeting were to better understand the application of most recent peer-reviewed science within the context of oil and gas development and coordinate and compare implementation of conservation actions utilizing that information.

## Review Process

The participants at this meeting represented technical science and management advisors from each of the states. Researchers having the most recently peer reviewed and published articles concerning sage grouse and oil and gas development were invited to present their findings and answer questions. State agency participants agreed that the goal was not to establish state or regional policy or to determine the management actions that will be implemented in any or all states within MZ 1 or 2. Rather, the goal was to reach agreement on the conservation concepts and strategies related to oil and gas development that are supported by current published peer-reviewed and unpublished literature. If implemented, these concepts and strategies likely will not eliminate impacts to sage-grouse populations that result from energy development. However, when used in combination with other conservation measures, these actions may enhance the likelihood that sage-grouse populations will persist at levels that allow historical uses such as grazing and agriculture and maintain their current distribution and abundance, thereby avoiding the need to list sage-grouse under the federal Endangered Species Act.

1

Each researcher was invited to present their findings and to answer questions posed by the states. Following this, each state provided an overview of their review of the science and their resulting management actions and recommendations. The group then collectively reviewed, debated and agreed on the concepts and strategies supported by that science. The focus of the meeting was on five key issues: core areas, no-surface-occupancy zones, phased development, timing stipulations, well-pad densities, and restoration. Scientific data are available to inform many other issues related to sage-grouse management and conservation that were not reviewed (e.g., BMPs).

**Core Areas**

Identification and protection of core areas, sometimes also referred to as crucial areas, will help maintain or achieve target goals for populations including distribution and abundance.

Full field energy development appears to have severe negative impacts on sage-grouse populations under current lease stipulations (Lyon and Anderson 2003, Holloran 2005, Kaiser 2006, Holloran et al. 2007, Aldridge and Boyce 2007, Walker et al 2007, Doherty et al. 2008). Much of greater sage-grouse habitat in MZ 1 and 2 has already been leased for oil and gas development. These leases carry stipulations that have been shown to be inadequate for protecting breeding and wintering sage-grouse populations during full field development. (Holloran 2005, Walker et. al. 2007, Doherty et al. 2008) New leases continue to be issued utilizing these same stipulations. To ensure long-term persistence of populations and meet goals set by the states for sage-grouse, identifying and implementing greater protection within core areas from impacts of oil and gas development is a high priority.

In order to conserve core areas it is essential that they be identified and delineated. Sage-grouse populations occur over large landscapes comprising a series of leks and lek complexes with associated seasonal habitats. Therefore, core areas should capture the range required by a defined population to maintain itself. This concept is consistent with Crucial Wildlife Habitats recently endorsed by the Western Governor's Association (2007). Criteria that could be used to identify and map core areas include, but are not limited to: (1) lek densities, (2) displaying male densities, (3) sagebrush patch sizes, (4) seasonal habitats (breeding, summering, wintering areas), (5) seasonal linkages, or (6) appropriate buffers around important seasonal habitats.

Research indicates that oil or gas development exceeding approximately 1 well pad per square mile with the associated infrastructure, results in calculable impacts on breeding populations, as measured by the number of male sage-grouse attending leks (Holloran 2005, Naugle et al. 2006). Because breeding, summer, and winter habitats are essential to populations, development within these areas should be avoided. If development cannot be avoided within core areas, infrastructure should be minimized and the area should be managed in a manner that effectively conserves sagebrush habitats within that area.

2

**No Surface Occupancy (NSO)**

At the scale that NSOs are established, they alone will not conserve sage-grouse populations without being used in combination with core areas. The intent of NSOs is to maintain sage-grouse distribution and a semblance of habitat integrity as an area is developed.

*Breeding Habitat - Leks*

Research in Montana and Wyoming in coal-bed methane natural gas (CBNG) and deep-well fields suggests that impacts to leks from energy development are discernable out to a minimum of 4 miles, and that some leks within this radius have been extirpated as a direct result of energy development (Holloran 2005, Walker et al. 2007). Walker et al. (2007) indicates that the current 0.25-mile buffer lease stipulation is insufficient to adequately conserve breeding sage-grouse populations in areas having full CBNG development. A 0.25-mi. buffer leaves 98% of the landscape within 2 miles open to full-scale energy development. In a typical landscape in the Powder River Basin, 98% CBNG development within 2 miles of leks is projected to reduce the average probability of lek persistence from 87% to 5% (Walker et al. 2007). Only 38% of 26 leks inside of CBNG development remained active compared to 84% of 250 leks outside of development (Walker et al. 2007). Of leks that persisted, the numbers of attending males were reduced by approximately 50% when compared to those outside of CBNG development (Walker et al. 2007).

The impact analyses provided in Walker et al. (2007) are based on a 7-year dataset where probability of lek persistence is strongly related to extent of sagebrush habitat and the extent of energy development within 4 miles of the lek and the extent of agricultural tillage in the surrounding landscape. The estimated probabilities of lek persistence are only reliable for the length of the dataset, and it is not understood how other stressors (e.g., West Nile virus [Naugle et al. 2004], invasive weeds [Bergquist et al. 2007]) will cumulatively impact sage-grouse over longer time periods. While increased NSO buffers alone are unlikely to conserve sage-grouse populations, results from Walker et al. 2007 suggest they will increase the likelihood of maintaining the distribution and abundance of grouse and should increase the likelihood of successful restoration following energy development.

Additional information provided in Walker et al. (2007) allows managers and policy makers to estimate trade-offs associated with allowing development within a range of different distances from leks (Figures 1a and 1b). These probabilities will also need to be applied over larger landscapes in future analyses to better understand projected region- and state-wide population impacts under current and future development scenarios. Walker et al. (2007) studied lek persistence from 1997-2005 in relation to coal bed natural gas (CBNG) development in the Powder River Basin. These models are based on projected impacts of full-field development within (a) 2 miles and (b) 4 miles of the lek. We present results from these models (rather than models with impacts at smaller scales)

3

because development within 2 and 4 miles of leks are known to decrease breeding populations as measured by the number of displaying males (Holloran et al. 2005, Walker et al. 2007), and 52% and 74-80% of hens are known to nest within 2 and 4 miles of leks, respectively (Holloran and Anderson 2005, Colorado Greater Sage-Grouse Conservation Plan Steering Committee 2008). Sizes of NSO buffers required to protect breeding populations may be underestimated because leks in CBNG fields have fewer males per lek and a time lag occurs (avg. 3-4 years) between development and when leks go inactive. As a result, it is expected that not only will lek persistence decline, the number of males per lek will also decline. In contrast, sizes may be overestimated where high lek densities cause buffers from adjacent leks to overlap. Additional time is required to develop models demonstrating the probabilities of lek persistence at well-pad densities less than full development.



Figure 1a. Estimated probability of lek persistence (dashed lines represent 95% CIs) in fully-developed[1] coal-bed natural gas fields within an average landscape in the Powder River Basin (74% sagebrush habitat, 26% other habitats types) with different sizes of no-surface-occupancy (NSO) buffers around leks, assuming that only CBNG within 2 miles of the lek affects persistence. Buffer sizes of 0.25 mi., 0.5 mi., 0.6 mi., and 1.0 mi. result in estimated lek persistence of 5%, 11%, 14%, and 30%. Lek persistence in the absence of CBNG averages ~85%.

---

[1] Defined as entire area outside the NSO buffer, but within 2 miles, being within 350 meters of a well.



Figure 1b. Estimated probability of lek persistence (dashed lines represent 95% CIs) in fully-developed[2] coal-bed natural gas fields within an average landscape in the Powder River Basin (74% sagebrush habitat, 26% other habitats types) with different sizes of no-surface-occupancy (NSO) buffers around leks, assuming that only CBNG within 4 miles of the lek affects persistence. Buffer sizes of 0.25 mi., 0.5 mi., 0.6 mi., 1.0 mi., and 2.0 mi. result in estimated lek persistence of 4%, 5%, 6%, 10%, and 28%. Lek persistence in the absence of CBNG averages ~85%.

Figures 1a and 1b provide an illustration of the trade-offs between differing NSO buffers in relation to lek persistence in developing CBNG fields. The group does not offer a specific NSO recommendation but provides these graphs to guide decision-making.

*Breeding Habitat - Nesting and Early Brood-rearing*

Yearling female greater sage-grouse avoid nesting in areas within 0.6 miles of producing well pads (Holloran et al. 2007), and brood-rearing females avoid areas within 0.6 miles of producing wells (Aldridge and Boyce 2007). This suggests a 0.6-mile NSO around all suitable nesting and brood-rearing habitats is required to minimize impacts to females during these seasonal periods. In areas where nesting habitats have not been delineated, research suggests that greater sage-grouse nests are not randomly distributed. Rather, they are spatially associated with lek location within 3.1 miles in Wyoming (Holloran and Anderson 2005). However, a 4-mile buffer is needed to encompass 74-80% (Moynahan

---

[2] Defined as entire area outside the NSO buffer, but within 4 miles, being within 350 meters of a well.

2004, Holloran and Anderson 2005, Colorado Greater Sage-Grouse Conservation Plan Steering Committee 2008). These suggest that all areas within at least 4-miles of a lek should be considered nesting and brood-rearing habitats in the absence of mapping.

*Winter Habitat*

NSO or other protections may also need to be considered for crucial winter range. Survival of juvenile, yearling, and adult females are the three most important vital rates that drive population growth in greater sage-grouse (Holloran 2005, Colorado Greater Sage-Grouse Conservation Plan Steering Committee 2008). Although overwinter survival in sage-grouse is typically high, severe winter conditions can decrease hen survival (Moynahan et al 2006). Crucial wintering habitats can constitute a small part of the overall landscape (Beck 1977, Hupp and Braun 1989). Doherty et al. (2008) demonstrated that sage-grouse avoided otherwise suitable wintering habitats once they have been developed for energy production, even after timing and lek buffer stipulations had been applied (Doherty et al. 2008). For this reason, increased levels of protection may need to be considered in crucial winter habitats.

**Phased Development**

Population-level impacts and avoidance associated with energy development have been documented (Braun et al. 2002, Lyon and Anderson 2003, Holloran 2005, Kaiser 2006, Holloran et al. 2007, Aldridge and Boyce 2007, Walker et al 2007, Doherty et al. 2008). Phased development maximizes the amount of area within a landscape that is not being impacted by development at any one time, and can occur at multiple spatial scales (e.g., phased development of separate fields in a landscape, phased development of infrastructure within a single unit or field, or phased development within a single lease). Unitization, clustering, and geographically staggered development are all forms of phased development. As a tool to minimize impacts to sage-grouse, developing oil and gas resources by employing one of these phased methods may help maintain large, functional blocks of sage-grouse habitat.

**Timing Stipulations**

As with NSOs, at the scale that timing stipulations are established, they alone will not conserve sage-grouse populations without being used in combination with core areas. The intent of timing stipulations is to help maintain sage-grouse distribution and a semblance of habitat integrity as an area is developed. Timing stipulations are of lesser value at the scale of full-field development.

*Breeding Habitat - Leks*

Traffic during the strutting period when males are on a lek results in declines in male attendance when road-related disturbance is within 0.8 miles (Holloran 2005). The distance traveled by males from the lek during the breeding season has been reported in varying ways but generally averages 0.6 miles from a lek (Colorado Greater Sage-Grouse

6

Conservation Plan Steering Committee 2008 - see Appendix B). Additionally, females breeding on leks within 1.9 miles of natural gas development had lower nest initiation rates and nested farther from the lek compared to non-impacted individuals (Lyon and Anderson 2003), suggesting disturbance to leks influence females as well. Local variations may influence the application of specific dates, which are typically within a window of March 1 and May 31.

*Breeding Habitat - Nesting and Early Brood-rearing*

Often, timing stipulations (periods where no activity that creates disturbance are allowed) for breeding habitat have been applied using a radius around a lek. However, nesting and brood-rearing habitat is not uniformly distributed around the lek. Mapping of habitat would allow for more accurate application of this stipulation. Research on the distribution of nests relative to leks and on the timing of nesting indicates that timing stipulations to protect nesting hens and their habitat should be in place from March through June in mapped breeding habitat or (when nesting habitat has not been mapped) within 4 miles of active lek sites (Moynahan 2004, Holloran et al. 2005, Colorado Greater Sage-Grouse Conservation Plan Steering Committee 2008).

*Winter Habitat*

Research suggests that no surface occupancy should also be applied to important wintering habitats (Doherty et al. 2008), but if development occurs, impacts would be reduced if development activities were avoided between December 1 and March 15.

**Well-Pad Densities**

Leks tend to remain active when well-pad densities within 1.9 miles of leks are less than 1 pad per square mile (Holloran 2005) but leks tend to go inactive at higher pad densities (Holloran 2005, Naugle et al. 2006).

**Restoration**

The purpose of restoration in sage-grouse habitat should be the removal of infrastructure associated with energy development from the land surface and subsequent re-establishment of native grasses, forbs, and shrubs, including sagebrush, to promote natural ecological function. Restoration should reestablish functionality of seasonal habitats for sage-grouse. Thus a field should not be considered restored until sagebrush-grassland habitats have been reestablished.

**Future Needs**

Time did not allow for a detailed discussion of specific Best Management Practices for oil and gas development and restoration, seasonal habitat mapping, or future research. These topics are all recognized as needing action in the immediate future.

7

## Literature Cited

Aldridge, C. L., and M. S. Boyce. 2007. Linking occurrence and fitness to persistence: a habitat-based approach for endangered greater sage-grouse. Ecological Applications 17:508-526.

Beck, T. D. I. 1977. Sage grouse flock characteristics and habitat selection during winter. Journal of Wildlife Management 41:18-26.

Bergquist, E., P. Evangelista, T. J. Stohlgren, and N. Alley. 2007. Invasive species and coal bed methane development in the Powder River Basin, Wyoming. Environmental Monitoring and Assessment. 128:381-394.

Braun, C. E., O. O. Oedekoven, and C. L. Aldridge. 2002. Oil and gas development in western North America: effects on sagebrush steppe avifauna with particular emphasis on sage grouse. Transactions North American Wildlife and Natural Resources Conference 67:337-349.

Colorado Greater Sage-Grouse Conservation Plan Steering Committee. 2008. The Colorado Greater Sage-Grouse Conservation Plan. Colorado Division of Wildlife. Denver, CO. Unpublished Report.

Connelly, J. W., S. T. Knick, M. A. Schroeder, and S. J. Stiver. 2004. Conservation assessment of greater sage-grouse and sagebrush habitats. Western Association of Fish and Wildlife Agencies, Cheyenne, Wyoming, USA.

Doherty, K.E., D.E. Naugle, B.L. Walker, J.M. Graham. 2008. Greater sage-grouse winter habitat selection and energy development. Journal of Wildlife Management *In Press.*

Holloran, M. J. 2005. Greater sage-grouse (*Centrocercus urophasianus*) population response to natural gas field development in western Wyoming. Dissertation. University of Wyoming, Laramie, USA.

Holloran, M. J. and S. H. Anderson. 2005. Spatial distribution of greater sage-grouse nests in relatively contiguous sagebrush habitats. Condor 107:742-752.

Holloran, M. J., B. J. Heath, A. G. Lyon, S. J. Slater, J. L. Kuipers, and S. H. Anderson. 2005. Greater sage-grouse nesting habitat selection and success in Wyoming. Journal of Wildlife Management 69: 638-649.

Holloran, M. J., R. C. Kaiser, and W. A. Hubert. 2007. Population response of yearling greater sage-grouse to the infrastructure of natural gas fields in southwestern Wyoming. Completion report. Wyoming Cooperative Fish and Wildlife Research Unit, Laramie, WY, USA.

Hupp, J. W. and C. E. Braun. 1989. Topographic distribution of sage grouse
  foraging in winter. Journal of Wildlife Management 53: 823-829.

Kaiser, R. C. 2006. Recruitment by greater sage-grouse in association with natural gas
  development in western Wyoming. Thesis. University of Wyoming. Laramie,
  USA.

Lyon, A. G. and S. H. Anderson. 2003. Potential gas development impacts on sage
  grouse nest initiation and movement. Wildlife Society Bulletin 31:486-491.

Moynahan B. J. 2004. Landscape-scale factors affecting population dynamics of greater
  sage-grouse *(Centrocercus urophasianus)* in northcentral Montana, 2001–2004.
  Dissertation, The University of Montana. Missoula, USA.

Moynahan, B.J., M.S. Lindberg, and J.W. Thomas. 2006. Factors contributing to
  process variance in annual survival of female greater sage-grouse in north-central
  Montana. Ecological Applications 16:1529-1538.

Naugle, D. E., C. L. Aldridge, B. L. walker, T. E. Cornish, B. J. Moynahan, M. J.
  Holloran, K. Brown, G. D. Johnson, E. T. Schmidtmann, R.T. Mayer, C. Y. Kato,
  M. R. Matchett, T. J. Christiansen, W. E. Cook, T. Creekmore, R. D. Falise, E. T.
  Rinkes, and M. S. Boyce. 2004. West Nile virus: pending crisis for greater sage-
  grouse. Ecology Letters 7:704-713.

Naugle, D. E., B. L. Walker, and K. E. Doherty. 2006. Sage-grouse population response
  to coal-bed natural gas development in the Powder River Basin: interim progress
  report on region-wide lek-count analyses. Unpublished Report, University of
  Montana, Missoula, USA.

Stiver, S.J., A.D. Apa, J.R. Bohne, S.D. Bunnell, P.A. Deibert, S.C. Gardner, M.A.
  Hilliard, C.W. McCarthy, and M.A. Schroeder. 2006. Greater sage-grouse
  comprehensive conservation strategy. Western Association of Fish and Wildlife
  Agencies. Unpublished report. Cheyenne, Wyoming.

Walker, B.L., D. E. Naugle, and K.E. Doherty. 2007. Greater sage-grouse population
  response to energy development and habitat loss. Journal of Wildlife
  Management 71:2644-2654.

Western Governor's Association. 2007. Wildlife corridors initiative oil and gas working
  group report. http://www.westgov.org/wga/publicat/OilGas07.pdf. Accessed 15
  January 2007.

Appendix 1.

**Participants (Alphabetical)**

Dr. Tony Apa, Colorado Division of Wildlife
Mr. Joe Bohne, Wyoming Game and Fish Department
Mr. Tom Christiansen, Wyoming Game and Fish Department
Mr. Jeff Herbert, Montana Department of Fish, Wildlife and Parks
Mr. Bill James, Utah Division of Wildlife Resources
Mr. Rick Northrup, Montana Department of Fish, Wildlife and Parks
Mr. Dave Olsen, Utah Division of Wildlife Resources
Mr. Aaron Robinson, North Dakota Game and Fish
Ms. Pam Schnurr, Colorado Division of Wildlife
Mr. T.O. Smith, Montana Department of Fish, Wildlife and Parks
Mr. Brett Walker, Colorado Division of Wildlife

**Invited Guests**

Dr. Matt Holloran, Wyoming Wildlife Consultants, LLC
Dr. David Naugle, University of Montana

Proposed Order

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| THEODORE ROOSEVELT CONSERVATION PARTNERSHIP 555 Eleventh St. N.W., 6th Floor Washington, DC 20004 (202) 654-4600, | ) ) ) ) ) ) | |
| Plaintiff, | ) ) | CASE NO. 1:07-cv-01486-RJL |
| v. | ) ) | |
| DIRK KEMPTHORNE, in his official capacity as the Secretary of the United States Department of the Interior 1849 C Street, N.W. Washington, DC 20240 (202) 208-3100, | ) ) ) ) ) ) ) | |
| and | ) ) | |
| UNITED STATES BUREAU OF LAND MANAGEMENT 1849 C Street, Room 406-LS Washington, DC 20240 (202) 452-5125, | ) ) ) ) ) ) | |
| Defendants. | ) ) | |
| ANADARKO PETROLEUM CORPORATION, WARREN RESOURCES, INC., DOUBLE EAGLE PETROLEUM CO., | ) ) ) ) ) | |
| and | ) ) | |
| STATE OF WYOMING | ) ) | |
| Defendant-Intervenors | ) | |

## [PROPOSED] ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Upon consideration of the Plaintiff's Motion for Summary Judgment (Docket No. ___), and for good cause shown:

IT IS HEREBY ORDERED:  The Plaintiff's Motion for Summary Judgment is granted.

THE COURT HEREBY DECLARES:

A)    The Bureau of Land Management's ("BLM") Atlantic Rim Natural Gas Field Development Project Record of Decision ("ROD") and supporting Environmental Impact Statement ("EIS") are arbitrary and capricious and violate the National Environmental Policy Act and the Federal Land Policy and Management Act and applicable regulations;

THE COURT FURTHER ORDERS:

B)    The ROD and EIS are hereby vacated and set aside; and are remanded to BLM for further consideration in light of its obligations under NEPA and FLPMA;

C)    BLM is hereby enjoined from taking any further action in reliance on the ROD, including authorization of oil and gas operations; and from taking further action in reliance on the EIS, including "tiering" of any future NEPA compliance document (e.g., environmental assessment, determination of NEPA adequacy, or supplemental EIS) from the EIS until such time as BLM complies with NEPA and FLPMA;

THE COURT FURTHER DECLARES:

D)    That BLM acted arbitrarily and capriciously and in violation of NEPA and FLPMA when approving the Sun Dog A & B and Catalina A & B PODs (the "POD Decisions");

IT IS FURTHER ORDERED:

E)    The POD Decisions are hereby vacated and set aside; and are remanded to BLM for further consideration in light of its obligations under NEPA and FLPMA;

THE COURT FURTHER DECLARES AND ORDERS:

2

F)     The Court shall retain jurisdiction over this matter to ensure compliance with this

Order and address additional ancillary matters.

Dated this _____ day of _____, 2008.

_____
The Honorable Richard J. Leon
U.S. District Court Judge