UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| THEODORE ROOSEVELT CONSERVATION PARTNERSHIP, Plaintiff, | ) ) ) ) ) |
| v. | ) CASE NO. 07-cv-01486-RJL |
| DIRK KEMPTHORNE, in his official Capacity as the Secretary of the United States Department of the Interior, and UNITED STATES BUREAU OF LAND MANAGEMENT | ) ) ) ) ) ) ) |
| Defendants, | ) ) ) |
| STATE OF WYOMING, ANADARKO PETROLEUM CORPORATION, WARREN RESOURCES, INC., and DOUBLE EAGLE PETROLEUM CO., | ) ) ) ) ) |
| Defendant-Intervenors. | ) ) |

**DEFENDANT-INTERVENOR STATE OF WYOMING'S
RESPONSE TO PLAINTIFF'S STATEMENT OF MATERIAL FACTS**

Pursuant to LCvR 7(h), Defendant-Intervenor State of Wyoming ("Wyoming") hereby responds to PLAINTIFF'S STATEMENT OF MATERIAL FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT (hereinafter "Pl.'s Stmt. of Facts").

**A.    Objection to Extra-Record Documents and Citations**

Plaintiff impermissibly seeks to submit new evidence to this Court that was not in front of the agency at the time of its decision.  In Pl.'s Stmt. of Facts ¶¶ 6, 7, 8-10, 19-20,

24, 28-29, 176, 206, 219-221, 235, Plaintiff does not cite any portion of the administrative record to support the alleged facts. Plaintiff instead cites to material outside the administrative record, which improperly expands the administrative record. *See Bismullah v. Gates*, 514 F.3d 1291, 1300 (D.C. Cir. 2008) (stating that in an administrative review case, the Supreme Court of the United States "has made clear that [Courts] have no license to 'create' a record consisting of more than the agency itself had before it"); *Walter O. Boswell Mem'l Hosp. v. Heckler*, 749 F.2d 788, 793 (D.C. Cir. 1984) (finding that the record is limited "to that information before the Secretary *at the time of his decision* . . . thus excluding *ex post* supplementation of the record by either side," and further stipulating that "[i]f the parties wish to contest the merits of the case by referring or submitting to the District Court any material that does not appear in the . . . administrative record, they may do so only by joint stipulation").

Plaintiff has not moved this Court to supplement the record, and beyond a request asking that the Court take "judicial notice of official government publications referenced herein" (Pl.s' Stmt. of Facts, at i), has not offered any explanation or support as to why this Court should consider its extra-record documents in the challenged action. *See IMS, P.C. v. Alvarez*, 129 F.3d 618, 624 (D.C. Cir. 1997) (stating that the Court can only consider information that falls outside the administrative record when Plaintiffs demonstrate that "the agency failed to examine all relevant factors or to adequately explain its grounds for decision, or that the agency acted in bad faith or engaged in improper behavior in reaching its decision"). Wyoming thus objects to and denies the alleged facts in Pl.'s Stmt. of Facts ¶¶ 6, 7, 8-10, 19-20, 24, 28-29, 176, 206, 219-221, 235.

**B.     Wyoming's Response to Plaintiff's Statement of Facts**

**1.  Plaintiff's Alleged Material Fact:**  The Atlantic Rim is located in south-central Wyoming. AR 4797 (map). The ARPA comprises approximately 270,080 surface acres, of which 173,672 acres are federal surface estate (64% of the ARPA). BLM's RFO manages 179,438 acres of federal mineral estate (66%) within the ARPA. AR 4796.

> **Response:**  Admitted.

**2.  Plaintiff's Alleged Material Fact:**  Multiple big game species occur within the ARPA, including mule deer, pronghorn antelope and elk. Big game populations are managed by WGFD within areas designated as herd units. AR 2249.

> **Response:**  Admitted.

**3.  Plaintiff's Alleged Material Fact:**  Greater sage grouse, a popular game bird, also occupy the ARPA, which provides a uniquely well-defined and contiguous block of sage brush and related habitats on which sage grouse rely. Approximately, 85% of the ARPA is covered in sagebrush environments. AR 8831. The vast majority of lands in the ARPA are within 2 miles of an active sage grouse lek, *id.*, and 92% of the area is sage grouse nesting habitat. *Id. See also* Exhibit I attached to TRCP's Motion for Summary Judgment and Supporting Memorandum of Points and Authority ("TRCP's MSJ").

> **Response:**  Admitted in part.  Denied in part.  Wyoming admits that the Bureau
>
> of Land Management ("BLM") stated in the Atlantic Rim final environmental
>
> impact statement ("EIS") that the greater sage-grouse are known to occur in the
>
> Atlantic Rim Project Area ("ARPA").  (AR 2258).  "Wyoming is one of the last
>
> strongholds for greater sage-grouse in the western United States, and contains
>
> more grouse than all other states combined.  Greater sage-grouse are common
>
> throughout Wyoming because their habitat remains relatively intact compared to
>
> other states."  (*Id.*).  There are 88 greater sage-grouse leks located in and within
>
> two miles of the ARPA.  (AR 2258-59).  Wyoming also admits that
>
> approximately 85 percent of the ARPA is covered in sagebrush environments and
>
> 92 percent of the ARPA is sage-grouse nesting habitat.  (AR 8831).  To the extent

that Plaintiff has paraphrased and misrepresented the record to which it cites, the

alleged material facts are denied.

**4. Plaintiff's Alleged Material Fact:** Mule deer herds in the ARPA are among the largest in the Intermountain West and have been known to migrate up to 60 miles between seasonal ranges. AR 7423. The ARPA is located in the eastern portion of the BHU which includes three hunt areas. AR 7424. WGFD manages the BHU for a post-hunting season population of 18,700 deer. *Id.*

> **Response:** Admitted.

**5. Plaintiff's Alleged Material Fact:** "Since the 1980's the BHU has supported one of Wyoming's largest deer herds and provided exceptional recreational opportunities to both resident and nonresident sportsmen." AR 7445. Mule deer hunting in the BHU provides more than 14,000 recreation days each year. *Id.* In addition to those members of the BHU, migratory mule deer from regions outside the ARPA migrate through or occupy portions of the ARPA during spring, summer, and fall periods. *Id.* Most, if not all, of this herd's transition range is located within the ARPA. Mule Deer in the ARPA are hunted, with a 54% success rate, by 2,784 hunters (40% of which are non-residents) each year. These hunters are supported by at least 18 local outfitters. AR 2280.

> **Response:** Admitted in part. Denied in part. Wyoming denies Plaintiff's alleged
>
> fact that "[m]ost, if not all, of [the Baggs Herd Unit ("BHU")] transition range is
>
> located within the ARPA" as unsupported by the record. The *Final Report for the*
>
> *Atlantic Rim Mule Deer Study* ("Atlantic Rim Mule Deer Study"), which Plaintiff
>
> cites to, states that "mule deer rely on several important seasonal ranges in the
>
> ARPA, including winter ranges located in the west-central (Dad Juniper Winter
>
> Range) and southwest (Wild Horse Winter Range) portions of the study area, and
>
> a transition range situated around the Sand Hills in the east-central portion of the
>
> ARPA." (AR 7445). Wyoming admits the remaining facts in Pl.'s Stmt. of Facts
>
> ¶ 5.

**6. Plaintiff's Alleged Material Fact:** Mule deer in the Atlantic Rim area are migratory, traveling from a few miles to well over 100 miles between winter and summer ranges. Migration allows mule deer to select and use geographically separate habitats and their food and other resources seasonally for breeding, fawning, and wintering activities. All

these are critical to survival and production to sustain populations. Garrott, R.A., G.C. White, R.M. Bartmann, L.H. Carpenter, and A.W. Alldredge. 1987. Movements of female mule deer in Northwest Colorado. Journal Wildlife Management: 51(3):640; Sawyer, H., F. Lindzey, and D. McWhirter. 2005. Mule deer and pronghorn migration in western Wyoming. Wildlife Society Bulletin: 33(4):1269-70. Migration corridors are behaviorally fixed in geographical location and are essential as clear avenues to seasonal habitats. *Id.; see also* AR 6477. In arid areas with extremes of seasonal weather, no single habitat can sustain all their needs, so each habitat including those that support migration itself is essential for mule deer survival.

> **Response:**   Denied.   The portion of the record that Plaintiff cites is a 65-page
>
> study entitled *Sublette Mule Deer Study (Phase II):  Long-term monitoring plan to*
>
> *assess potential impacts of energy development on mule deer in the Pinedale*
>
> *Anticline Project Area* ("Sublette Mule Deer Study").  (AR 6477-6541).  Plaintiff,
>
> however, fails to reference the specific part of the study relied on to support the
>
> alleged facts.  Additionally, Plaintiff cites to material outside the administrative
>
> record, which improperly expands the administrative record.  *See* Section A of
>
> this Response.  No response is thus required.  To the extent that a response is
>
> required, Wyoming denies the alleged facts.

**7.  Plaintiff's Alleged Material Fact:**  Mule deer rely heavily on historic movement patterns and corridors, and show very high site fidelity to fawning and wintering areas. Does often return to the same aspen patch to fawn. If alteration occurs to their habitats, they do not easily adapt to new sites, which can result in lowered survival rates. AR 6477 and Garrott, R.A., G.C. White, R.M. Bartmann, L.H. Carpenter, and A. W. Alldredge. 1987. Movements of female mule deer in Northwest Colorado.  Journal Wildlife Management: 51(3):638-639.

> **Response:**   Denied.   The portion of the record that Plaintiff cites is the 65-page
>
> Sublette Mule Deer Study.  (AR 6477-6541).  Plaintiff, however, fails to reference
>
> the specific part of the study relied on to support the alleged facts.  Additionally,
>
> Plaintiff cites to material outside the administrative record, which improperly
>
> expands the administrative record.  *See* Section A of this Response.  No response

is thus required.  To the extent that a response is required, Wyoming denies the

alleged facts.

**8.  Plaintiff's Alleged Material Fact:**  Mule deer require a diverse mixture of forbs, buds, stems and other vegetation on all seasonal ranges. Mule deer does add nutrients and fat during summer, raise and fatten their young on summer range, and use transitional ranges as they migrate to winter ranges where they breed. deVohs, Jr., J.D., M.R. Conover, and N Headrick. 2003. Mule deer conservation: issues and management strategies. Western Association of Fish and Wildlife Management Agencies and Berryman Institute Press, Utah State University, Logan, pp. 104-110. Does gain weight on early spring transition ranges to allow them to fawn successfully and then fatten up with their fawns before returning to winter ranges in fall. *Id.*

> **Response:**  Denied.  Plaintiff does not cite any portion of the administrative
>
> record to support the facts in Pl.'s Stmt. of Facts ¶ 8.  Plaintiff instead cites to
>
> material outside the administrative record, which improperly expands the
>
> administrative record.  *See* Section A of this Response.  No response is thus
>
> required.  To the extent that a response is required, Wyoming denies the alleged
>
> facts.

**9.  Plaintiff's Alleged Material Fact:**  Winter ranges are delineated as "crucial" and widely protected from human activity because of their importance to winter survival. Winter ranges provide not only nutritional needs but also places mule deer can minimize energy losses to low temperatures and winds. Mule deer cannot survive in harsh conditions unless they are able to move to nearby protected habitats. Disturbance on winter ranges must be controlled to avoid flight behavior leading to loss of limited body fat needed for survival. AR 7421 and Garrott, R.A., G.C. White, R.M. Bartmann, L.H. Carpenter, and A.W. Alldredge. 1987. Movements of female mule deer in Northwest Colorado. Journal Wildlife Management: 51(3):634, 640-641.

> **Response:**  Denied.  Plaintiff does not cite any portion of the administrative
>
> record to support the facts in Pl.'s Stmt. of Facts ¶ 9.  Plaintiff instead cites to
>
> material outside the administrative record, which improperly expands the
>
> administrative record.  *See* Section A of this Response.  No response is thus

required.  To the extent that a response is required, Wyoming denies the alleged

facts.

**10.  Plaintiff's Alleged Material Fact:**  Equally important are transitional ranges that support spring and fall migration and staging of herds, which is vital to successful production and maintenance of deer populations. Sawyer, H., F. Lindzey, and D. McWhirter. 2005. Mule deer and pronghorn migration in western Wyoming. Wildlife Society Bulletin: 33(4):1269-70. Mule deer does exist on winter range based on fat reserves built up on summer and fall transitional ranges, and feed on often limited quality winter browse. Whether they survive to produce fawns depends on their prior condition coming onto winter range, and how well they have sustained their body weight at the end of winter. Does and young fawns are especially vulnerable to late winter or early spring snow that covers food plants and slows migration, preventing use of food resources off the depleted winter ranges. Garrott, R.A., G.C. White, R.M. Bartmann, L.H. Carpenter, and A.W. Alldredge. 1987. Movements of female mule deer in Northwest Colorado. Journal Wildlife Management: 51(3):640-642.

> **Response:**  Denied.  Plaintiff does not cite any portion of the administrative
>
> record to support the facts in Pl.'s Stmt. of Facts ¶ 10.  Plaintiff instead cites to
>
> material outside the administrative record, which improperly expands the
>
> administrative record.  *See* Section A of this Response.  No response is thus
>
> required.  To the extent that a response is required, Wyoming denies the alleged
>
> facts.

**11.  Plaintiff's Alleged Material Fact:**  Sustaining migratory mule deer herds requires maintaining sufficient amounts of functional seasonal ranges for winter, summer and transitional and migration habitats that link them. AR 7421. Experience at Pinedale, Wyoming suggests that disruption of these ranges will disrupt the ability of herds to be sustained. AR 6477.

> **Response:**  Denied.  The portion of the record that Plaintiff cites includes the 65-
>
> page Sublette Mule Deer Study and the 29-page Atlantic Rim Mule Deer Study
>
> (AR 6477-6541, 7421-7449).  Plaintiff, however, fails to reference the specific
>
> part of the studies relied on to support the alleged facts.  Therefore, Wyoming
>
> denies the alleged facts in Pl.'s Stmt. of Facts ¶ 11 as unsupported by the record.

**12.  Plaintiff's Alleged Material Fact:**  Mule deer are not the only big game animals that occupy the ARPA. Most of the ARPA is located within the western portion of the Sierra Madre Elk Herd Unit. AR 2251–59.  Much of the ARPA is identified as winter range for elk, with crucial winter range identified along the eastern and southern borders. *See* TRCP's MSJ Exhibit E. The crucial winter range occurs at lower elevations where less snow accumulates, and on steep, south and west-facing slopes that commonly blow free of snow or melt off during winter months. Several elk migration routes transverse the ARPA. Elk in the ARPA are hunted, with a 54% success rate, by 3,532 hunters (11% of which are non-residents) each year. These hunters are supported by at least 15 local outfitters. AR 2280.

> **Response:**  Admitted in part.  Denied in part.  Wyoming admits that elk in the
>
> ARPA were hunted with a 45 percent success rate in 2002.  (AR 2280).  To the
>
> extent that Plaintiff has paraphrased and misrepresented the record to which it
>
> cites, the alleged material fact is denied.  Wyoming admits the remaining facts in
>
> Pl.'s Stmt. of Facts ¶ 12.

**13.  Plaintiff's Alleged Material Fact:**  The ARPA is located mostly within the 1,394-mile BHU for antelope. The project area covers 480 miles or 34% of the BHU. AR 2250. Pronghorn in the ARPA are hunted, with a 99% success rate, by 2,784 hunters (21% of which are non-residents) each year.  These hunters are supported by at least 13 local outfitters. AR 2280.

> **Response:**  Admitted in part.  Denied in part.  Wyoming admits that antelope
>
> were hunted by 377 hunters in 2002.  (AR 2280).  To the extent that Plaintiff has
>
> paraphrased and misrepresented the record to which it cites, the alleged material
>
> fact is denied.  Wyoming admits the remaining facts in Pl.'s Stmt. of Facts ¶ 13.

**14.  Plaintiff's Alleged Material Fact:** Crucial winter range for all big game species is depicted on the map attached as Exhibit E to TRCP's MSJ. In addition, there are several areas of overlapping big game crucial winter range located in the ARPA. AR 2252. The combinations of overlapping big game crucial winter ranges include the following: elk/mule deer 3,038 acres and mule deer/antelope 22,637 acres. Forty-percent is on private and state lands where there are no protections against disturbance of animals during critical time periods. AR 2255. Areas of overlapping crucial winter range are important because they provide crucial habitat for more than one species of big game.

> **Response:**  Admitted.

8

**15.  Plaintiff's Alleged Material Fact:** Wyoming is one of the last strongholds for greater sage grouse in the western United States. Greater sage grouse are common throughout Wyoming because their habitat remains relatively intact compared to other states. AR 2258. There are 88 leks located in and within 2 miles of the ARPA. Leks are often in grassy areas or in more open canopy sagebrush/grass habitat. Greater sage grouse are dependent on sagebrush environments for their year-round survival. *Id.*

> **Response:**  Admitted.

**16.  Plaintiff's Alleged Material Fact:** The BLM has listed the sage grouse as a "Sensitive Species." AR 4405.

> **Response:**  Admitted.

**17.  Plaintiff's Alleged Material Fact:** "Greater sage-grouse are abundant within the ARPA, due to the high amount and diversity of suitable habitat, lack of habitat fragmentation, and the close proximity of upland and riparian habitats." AR 2394. Sage grouse in the ARPA are hunted by up to 509 hunters each year. AR 2280.

> **Response:**  Admitted in part.  Denied in part.  Wyoming admits that "[g]reater sage-grouse are abundant within the ARPA, due to the high amount and diversity of suitable habitat, lack of habitat fragmentation, and the close proximity of upland and riparian habitats."  (AR 2394).  Wyoming denies that sage-grouse in the ARPA are hunted by up to 509 hunters each year as unsupported by the record.  (AR 2280).  Birds and small game (consisting of 51 percent sage-grouse, 47 percent cottontail rabbit, and two percent doves) were hunted by up to 509 hunters in 2002.  (*Id.*).

**18.  Plaintiff's Alleged Material Fact:**  Oil and gas development adversely impacts grouse and their habitats. *See* Walker, et al., GREATER SAGE-GROUSE POPULATION RESPONSE TO ENERGY DEVELOPMENT AND HABITAT LOSS ("Grouse Study"). *See also* AR 7357. For example:

> [L]eks with extensive CBNG development (>40% developed within 3.2 km) showed substantially lower population trends than leks with minimal CBNG or no development, even after controlling for known impacts of West Nile virus. Leks in areas adjacent to CBNG fields (10-40% developed within 3.2 km) also showed higher population trends than leks

further away, suggesting that sage-grouse may be avoiding developed areas and moving into adjacent undeveloped habitat.

*Id.*

**Response:** Admitted in part. Denied in part. Wyoming denies that oil and gas development adversely impacts grouse and their habitats as unsupported by the record. In a 2006 document entitled *Sage-grouse Population Response to Coal-bed Natural Gas Development in the Powder River Basin: Interim Progress Report on Region-wide Lek-count Analyses*, individuals at the University of Montana stated that "[l]arge-scale modification of sagebrush habitats associated with energy development *may* have important impacts on habitat use or vital rates of sagebrush-dependent wildlife species . . . ." (AR 7357) (emphasis added). Wyoming admits the remaining facts in Pl.'s Stmt. of Facts ¶ 18.

**19. Plaintiff's Alleged Material Fact:** The Grouse Study states:

[T]he number of males observed on leks in CBNG fields declined more rapidly than leks outside of CBNG. Of leks active in 1997 or later, only 38% of 26 leks in CBNG fields remained active by 2004-2005, compared to 84% of 250 leks outside CBNG fields. By 2005, leks in CBNG fields had 46% fewer males per active lek than leks outside of CBNG.

Grouse Study 1. Persistence of leks was positively correlated to the proportion of sagebrush habitat within 6.4 km of the lek. *Id.* 1-2.

**Response:** Denied. Plaintiff does not cite any portion of the administrative record to support the facts in Pl.'s Stmt. of Facts ¶ 19. Plaintiff instead cites to material outside the administrative record, which improperly expands the administrative record. *See* Section A of this Response. No response is thus required. To the extent that a response is required, Wyoming denies the alleged facts.

**20. Plaintiff's Alleged Material Fact:** Sage grouse is listed as a "Status 2 Species of Special Concern" in Wyoming, which means "[p]opulations are declining" and experiencing "[o]n-going significant loss of habitat." http://gf.state.wy.us/wildlife/nongame/SpeciesofSpecialConcern/index.asp.

>   **Response:** Denied. Plaintiff does not cite any portion of the administrative record to support the facts in Pl.'s Stmt. of Facts ¶ 20. Plaintiff instead cites to material outside the administrative record, which improperly expands the administrative record. *See* Section A of this Response. No response is thus required. To the extent that a response is required, Wyoming denies the alleged facts.

**21. Plaintiff's Alleged Material Fact:** Much of the present distribution of sage-grouse is on publicly owned lands administered by the BLM. AR 9989.

>   **Response:** Admitted.

**22. Plaintiff's Alleged Material Fact:** Development of energy resources in sagebrush steppe habitats has negatively affected sage-grouse. AR 6240–41; AR 9990.

>   **Response:** Admitted in part. Denied in part. Wyoming admits that the greater sage-grouse "are known to be negatively impacted by activities associated with mining, and oil and gas development." (AR 9990). However, Wyoming notes that the document Plaintiff cites also states that the "magnitude of the impacts of [development of mines and energy resources] on sage grouse and their habitat is largely unknown. . . . It is reasonable to conclude that as oil/gas developments mature and disturbed areas are reclaimed, similar to mined areas, sage grouse will repopulate the area." (AR 6240-41). To the extent that Plaintiff has paraphrased and misrepresented the record to which it cites, the alleged material fact is denied.

**23. Plaintiff's Alleged Material Fact:** While earlier studies identified basic sage grouse needs, substantial additional information has been developed since 2000 regarding the

needs of sage-grouse in southwest Wyoming relative to oil and gas development. *See, e.g.,* AR 7063–171.

> **Response:** Denied.  The portion of the record that Plaintiff cites includes a 116-page document entitled *Greater Sage-grouse Population Response to Natural Gas Field Development in Western Wyoming* prepared by Matthew J. Holloran in December 2005.  (AR 7063-7171).  Plaintiff, however, fails to reference the specific part of the document relied on to support the alleged facts.  Therefore, Wyoming denies the alleged facts in Pl.'s Stmt. of Facts ¶ 23 as unsupported by the record.

**24. Plaintiff's Alleged Material Fact:** The Western Association of Fish and Wildlife Agencies ("WAFWA") has concluded that because breeding, summer, and winter habitats are essential to sage grouse populations, developments within these areas should be avoided. *See Western Association of Fish and Wildlife Agencies Memorandum* ("WAFWA Memorandum"), (January 29, 2008) at 2. A copy of the WAFWA Memorandum is attached as Exhibit N to TRCP's MSJ.

> **Response:** Denied.  Plaintiff does not cite any portion of the administrative record to support the facts in Pl.'s Stmt. of Facts ¶ 24.  Plaintiff instead cites to material outside the administrative record, which improperly expands the administrative record.  *See* Section A of this Response.  No response is thus required.  To the extent that a response is required, Wyoming denies the alleged facts.

**25. Plaintiff's Alleged Material Fact:** Studies of sage grouse movements and nesting started in the mid-1960s and demonstrated that most activities of males during the breeding season were within 2 miles of leks. A large proportion of the females were also documented to nest within 2 miles of leks.  Guidelines were published in the peer-reviewed literature in 1977 recommending that no sagebrush control be permitted within 2 miles of a lek. AR 5736–37.

> **Response:** Admitted in part.  Denied in part.  Wyoming admits that a document entitled *Guidelines for Maintenance of Sage Grouse Habitats* was published in

1977 recommending that no sagebrush control be permitted within two miles of a lek. (AR 5737). These guidelines were prepared by individuals who served on the guidelines subcommittee since the mid-1960s. (AR5732-33). The document was "critically evaluated" by two individuals. (AR 5733). Additionally, Wyoming admits that the guidelines noted that studies found that "76 percent of [male] movements during the breeding period occurred within 1 km of leks" and that "68 percent of all nests occurred within 2.4 km of the lek." (*Id.*). To the extent that Plaintiff has paraphrased and misrepresented the record to which it cites, the alleged material facts are denied.

**26. Plaintiff's Alleged Material Fact:** This guideline has been promoted as a minimum for areas undergoing energy development. *See, e.g.,* AR 6542–729.

Response: Denied. The portion of the record that Plaintiff cites includes a 188-page document entitled *Recommendations for Development of Oil and Gas Resources within Crucial and Important Wildlife Habitats* prepared by the Wyoming Game and Fish Department ("WGFD") in December 2004. (AR 7063-7171). Plaintiff, however, fails to reference the specific part of the document relied on to support the alleged facts. Therefore, Wyoming denies the alleged facts in Pl.'s Stmt. of Facts ¶ 26 as unsupported by the record.

**27. Plaintiff's Alleged Material Fact:** BLM has declined to increase the NSO area restriction around leks beyond ¼ mile and a 1/4 mile buffer is employed in the Atlantic Rim Oil and Gas Development Project (the "Project ROD"). *See, e.g.,* AR 4850.

Response: Admitted in part. Denied in part. Wyoming admits that "[s]urface disturbance or occupancy will be prohibited within one-quarter mile of the perimeter of occupied leks." (AR 4850). However, "[s]urface disturbing and disruptive activities will not be allowed within *two* miles of an occupied greater

sage-grouse lek or in nesting and early brood-rearing habitat associated with individual leks (when identified and delineated) from March 1 to July 15," and "[s]urface disturbing and disruptive activities will not be allowed between November 15 and March 15 in delineated winter concentration areas." (*Id.*) (emphasis added). To the extent that Plaintiff has paraphrased and misrepresented the record to which it cites, the alleged material facts are denied.

**28. Plaintiff's Alleged Material Fact:** WAFWA have concluded that 1/4 mile NSO stipulations are insufficient to protect sage grouse from the impacts of oil and gas development. *See* WAFWA Memorandum at p. 3. The USFWS also rejects BLM's ¼ mile buffer as insufficient to protect sage grouse leks. AR 3256.

> **Response:** Admitted in part. Denied in part. Wyoming admits that the United States Fish and Wildlife Service ("FWS") "does not support a 0.25-mile protective buffer around sage-grouse leks as a mitigation measure." (AR 3256). However, Plaintiff does not cite any portion of the administrative record to support the remaining alleged facts in Pl.'s Stmt. of Facts ¶ 28. Plaintiff instead cites to material outside the administrative record, which improperly expands the administrative record. *See* Section A of this Response. No response is thus required. To the extent that a response is required, Wyoming denies the remaining alleged facts.

**29. Plaintiff's Alleged Material Fact:** Among other things, WAFWA noted that full field energy development "appears to have severe negative impacts on sage-grouse populations under current lease stipulations (Lyon and Anderson 2003, Holloran 2005 [AR 7063], Kaiser 2006, Holloran et al. 2007, Aldridge and Boyce 2007), Walker 2007, Doherty et al. 2008)." *See* WAFWA Memorandum at p. 2. WAFWA reviewed available literature from 2003–2008 and identified a 96% loss of 6k persistence associated with ¼ mile buffers. Even at 2 miles, lek persistence is a mere 28%. *See* WAFWA Memorandum at p. 4-5. Lek persistence increases exponentially (to the approximate norm of 85%) as NSO buffer size approaches 4 miles. *Id.*

**Response:** Denied. Plaintiff does not cite any portion of the administrative record to support the facts in Pl.'s Stmt. of Facts ¶ 29. Plaintiff instead cites to material outside the administrative record, which improperly expands the administrative record. *See* Section A of this Response. No response is thus required. To the extent that a response is required, Wyoming denies the alleged facts.

**30. Plaintiff's Alleged Material Fact:** Recommendations offered to BLM to mitigate the Project's impacts included: NSO within 5.5 km of all active sage-grouse leks. AR 9995. These recommendations were offered by one of the foremost authorities on sage grouse behavior.

**Response:** Admitted in part. Denied in part. Wyoming admits that Clait E. Braun, Ph.D., of Grouse Inc. in Tucson, Arizona recommended that no surface occupancy should be allowed within 5.5 km of all active sage-grouse leks. (AR 9988, 9995). To the extent that Plaintiff has paraphrased and misrepresented the record to which it cites, the alleged material facts are denied.

**31. Plaintiff's Alleged Material Fact:** In its January 26, 2006 letter, the USFWS stated that it "does not support a 0.25 mile protective buffer around sage-grouse leks as a mitigation measure, nor do [they] support a 2-mile [seasonal] buffer to protect nesting habitat." However, USFWS "strongly recommend[] minimum protection measures as described by Connelly et al. (2000)." AR 3256. Those include precluding surface disturbance within two miles of an active lek. Connelly et al., *Guidelines to Manage Sage Grouse Population and Their Habitats,* Wildlife Society Bulletin 2000, 28(4): 967-985.

**Response:** Admitted in part. Denied in part. Wyoming admits that the Connelly Guidelines recommend that during *sage-grouse breeding activities*, energy-related facilities should be located two miles from active leks whenever possible. (AR 86,094). To the extent that Plaintiff has paraphrased and misrepresented the record to which it cites, the alleged material fact is denied. Wyoming admits the remaining facts in Pl.'s Stmt. of Facts ¶ 31.

**32.    Plaintiff's Alleged Material Fact:** The Bureau's Great Divide Resource Management Plan ("Great Divide RMP") generally directed management of the federal lands within the ARPA when the ROD was signed. The Great Divide RMP was adopted in November 1990. The Great Divide RMP deemed all public lands within its scope suitable for oil and gas leasing and development, subject to certain stipulations. AR 679.

      **Response:** Admitted

**33.    Plaintiff's Alleged Material Fact:** The Great Divide RMP states its oil and gas "management objective" as: "To provide for leasing exploration, and development of oil and gas while protecting other resource values." AR 679.

      **Response:** Admitted.

**34.    Plaintiff's Alleged Material Fact:** The Wildlife Management Objectives of the Great Divide RMP are as follows:

> a)  To provide habitat quality (food, cover, space, and water) adequate to support a natural diversity of wildlife and fisheries, including big game, upland game, waterfowl, non-game species, game fish, sensitive, threatened, and endangered species, species of special management interest in Wyoming, as well as to assist in meeting goals of recovery plans.
> b)  To maintain or improve vegetation condition and/or avoid long-term disturbance in high priority standard habitat sites and fisheries areas.
> c)  To maintain or improve overall ecological quality, thus providing good wildlife habitat, within the constraints of multiple-use management in moderate and low priority standard habitat sites … .

AR 690.

      **Response:** Admitted.

**35.    Plaintiff's Alleged Material Fact:** The Great Divide RMP states: "Surface-disturbing activities will be restricted and intensively managed to maintain important resource values in the … Baggs Elk Crucial Winter Range, and in overlapping crucial winter ranges for the various big game species."  AR 679. The Great Divide RMP also provides: "Crucial winter ranges for all big game species will be protected. Surface disturbance will be mitigated to restore or replace habitat. In addition, previously depleted habitat in crucial big game winter ranges will be reclaimed to the extent possible." AR 694.

      **Response:** Admitted.

**36.  Plaintiff's Alleged Material Fact:** The Great Divide RMP states the following objective with regard to Baggs Crucial Elk Winter Range:

>**Management Objectives** The objectives for the Baggs Crucial Elk Winter
>Range are to maintain the integrity of crucial winter habitat for elk to
>allow development of oil and gas and coal and to seek the cooperation of
>owners of adjacent property in management of the habitat … .

>**Management Actions** Surface-disturbing activities will be intensively
>managed to prevent loss of significant elk winter habitat.

AR 692.

>**Response:** Admitted.

**37.    Plaintiff's Alleged Material Fact:** The Great Divide RMP's, recreation
management objective is: "To ensure the continued availability of outdoor recreational
opportunities, to meet legal requirements for the health and safety of visitors and to
mitigate conflicts with other resource uses." AR 682.

>**Response:** Admitted.

**38.    Plaintiff's Alleged Material Fact:** The Great Divide RMP projected 1,440 wells
being drilled between about 1987 and 2007. AR 4666. Since that time, BLM's RFO has
approved *at least* the following: the 2,000-well Atlantic Rim project, the 385-well
Desolation Flats project, the 750-well Greater Wamsutter Area II project, the 3,000 well
Continental Divide/Wamsutter II project, the 275 well Creston/Blue Gap project, and
various other projects all identified in the EIS. AR 2485. In addition, BLM's RFO was
evaluating another massive expansion of CBM development when it issued the ROD. *See*
PUBLIC SCOPING NOTICE CONTINENTAL DIVIDE – CRESTON NATURAL GAS
DEVELOPMENT PROJECT ENVIRONMENTAL IMPACT STATEMENT (April
2006) describing the 8,950-well Continental Divide / Creston project.

>**Response:**    Admitted in part.    Denied in part.    Wyoming denies that the Great
>
>Divide Resource Management Plan ("RMP") projected 1,440 wells being drilled
>
>between 1987 and 2007 as unsupported by the record.    The record cite that
>
>Plaintiff refers to is a comment by Michael A. Saul, National Wildlife Federation,
>
>on the final EIS which *alleges* that the "BLM planned in the RMP for 1,440 new
>
>wells to be drilled in the Great Divide planning area."    (AR 4393, 4666).
>
>Wyoming admits the remaining facts in Pl.'s Stmt. of Facts ¶ 38.

**39.  Plaintiff's Alleged Material Fact:** BLM explained the Great Divide RMP, now 18 years old, needed to be modified because of new data, changing resource conditions, changing uses of BLM lands, and increased mineral development activity. AR 2282. The Great Divide RMP is being revised as the "Rawlins RMP." AR 2136. The Rawlins RMP will provide future direction for managing 3.5 million acres of BLM administered public land and 4.5 million acres of BLM administered federal mineral estate in various Wyoming counties, including within the ARPA. *Notice of Availability of the Rawlins Proposed Resource Management Plan and Final Environmental Impact Statement, Wyoming*, 73 Fed. Reg. 881 (Jan. 4, 2008).

      **Response:**  Admitted.

**40.  Plaintiff's Alleged Material Fact:** BLM developed an EIS for the Rawlins RMP. The Purpose and Need Statement of the DEIS for the Rawlins RMP stated:

> Issue 1: Development of Energy Resources and Minerals-Related Issues. Special attention is needed to address energy resource development (i.e., oil and gas, coal, solar, and wind energy) and related transportation network conflicts with other land and resource uses and values. Principal considerations include disruptive activities and human presence in big game (i.e., elk, deer, antelope, moose, and bighorn sheep) habitat, big game crucial habitat (crucial winter range and birthing areas), and other important wildlife species habitats (i.e., Greater sage-grouse, plovers, raptors, and fish) and the effects of disruptive activities on recreation values, forage uses, air quality, sensitive vegetation types, and sensitive watersheds. Areas need to be identified where surface disturbing and other disruptive activities (e.g., mineral exploration and development activities, rights-of-way construction activities) are suitable or should be restricted or avoided.

AR 748.

      **Response:**  Admitted.

**41.  Plaintiff's Alleged Material Fact:** The Rawlins RMP DEIS explained: "BLM completed an evaluation of the Great Divide RMP on July 5, 2001. The BLM determined that the RMP was deficient in the following areas as a result of changing conditions and demands on the area's resources … Fluid mineral development levels are approaching Reasonable Foreseeable Development (RFD) scenarios established for analysis purposes in the existing RMP." AR 747.

      **Response:**  Admitted.

**42.  Plaintiff's Alleged Material Fact:** Notably, in the development of the Rawlins RMP, an alternative that would have limited oil and gas development to that analyzed in the Great Divide RMP was rejected:

> … [F]ollowing further analysis and discussion this alternative was
> considered to be unrealistic and unreasonable because reasonably
> foreseeable exploration levels established in 1986 in the Great Divide
> RMP have almost been achieved. The Rawlins Field Office RFO
> evaluation of the Great Divide RMP in 2001 identified the fluid mineral
> reasonable foreseeable development RFD at an analysis level that would
> be exceeded in the near future. This alternative would have effectively
> limited oil and gas exploration and development to that which has already
> been approved. In addition public comments received during scoping and
> issue identification indicated general acceptance of continued mineral
> development provided it is properly managed.

AR 756.

> **Response:**  Admitted.

**43.  Plaintiff's Alleged Material Fact:** The original Atlantic Rim project, to be
developed by Stone & Wolf, was less than one tenth the size of the Project approved by
BLM in 2007. It was "scoped" pursuant to NEPA in 2000-2001. AR 7451; 7461. The
initial exploratory POD program consisted of drilling completing, and producing
approximately 32 wells located in three PODs for evaluation.  The three PODS would
contain approximately 96 wells. AR 7452.

> **Response:**  Admitted.

**44.  Plaintiff's Alleged Material Fact:** At that time, "[p]otential impacts to wildlife
habitats within the analysis area, including big game, sage grouse, and raptors" were all
identified as key resource concerns.  AR 7454. The total project was approximately 8,000
acres in size. *Id.*

> **Response:**  Admitted.

**45.  Plaintiff's Alleged Material Fact:** USEPA immediately expressed concerns that an
EA would be inadequate to evaluate the impact of this original proposal and urged BLM
to conduct extensive analyses of the cumulative impacts of the project along with related
CBM development. AR 7484. USEPA suggested that development be limited to areas
outside crucial winter range for elk until additional studies could be conducted. AR 7485.

> **Response:**  Admitted in part.  Denied in part.  Wyoming admits that in response
>
> to the Scoping Notice for the Atlantic Rim Coalbed Methane Project, the
>
> Environmental Protection Agency ("EPA") stated the following:

> EPA is concerned about the segmented nature of this project. Although, the project is deemed exploratory in nature it also includes an initial production phase. Since it has been demonstrated that incremental evaluation of oil, gas and coalbed methane projects using the increment EA [environmental assessment] process have not been adequate, EPA suggests that the evaluation of the reasonable foreseeable production phases for coalbed methane be evaluated with the other existing and future projects for the regions.

(AR 7484). The EPA further stated that "[u]ntil further evaluation of impacts to the elk range can be completed, it would be appropriate to limit interim drilling activities in the Deep Creek pod to the area outside the crucial winter range for elk." (AR 7485). To the extent that Plaintiff has paraphrased and misrepresented the record to which it cites, the alleged material facts are denied.

**46. Plaintiff's Alleged Material Fact:** The State of Wyoming also urged production of an EIS to evaluate the original project's impact. AR 7486.

**Response:** Admitted.

**47. Plaintiff's Alleged Material Fact:** BLM rejected these requests and commenced development of an EA for the Stone & Wolf project. An internal October 2000 BLM memorandum authored by the Project Lead indicates BLM's preference to "to avoid cumulative impacts" and to "avoid [a] large document" when analyzing the revised proposal. AR 7866.

**Response:** Denied. Wyoming denies the alleged facts in Pl.'s Stmt. of Facts ¶ 47 as unsupported by the record. The October 2006 "Meeting Notes & Attendance Sheet" that Plaintiff refers to only lists the following with regard to the "Contact Team": (1) "to avoid cumulative impacts"; (2) "avoid large document"; and (3) "no significant impacts." (AR 7866). The "Meeting Notes," which are described by the BLM in the Administrative Record Index as "Meeting Notes Regarding Planned Project Expansion by Petroleum Development Corporation (PEDCO) in the Atlantic Rim Project Area – initial meeting," in no way state that the "BLM

rejected the requests and commenced development of an EA for the Stone & Wolf

project." (*See* Administrative R. Index, at 14; AR 7865-67).

**48. Plaintiff's Alleged Material Fact:** WGFD documented known wildlife in the area, AR 7494, and urged consideration of the impact of roads, powerlines and pipelines on the species of concern, including elk, mule deer and sage grouse. AR 7495. WGFD also reiterated EPA's concerns regarding the cumulative impact of oil and gas development on wildlife species:

> Since coalbed methane wells can be drilled and completed in few days and can quickly overrun the current environmental documentation, this will help serve to adequately address the potential impacts before they occur. The cumulative analysis should include previous shrub treatment projects conducted by the BLM, as well as potential impacts to wildlife populations and important habitats from the proposed gas development. If data gaps exist, baseline information should be collected to support the necessary analyses, and significant wildlife or habitat losses should be addressed through mitigation. Since impacts from methane development are not well understood, it may be necessary to do additional wildlife monitoring or specific studies.

AR 7496.

> **Response:** Admitted in part. Denied in part. Wyoming admits that the WGFD stated that the "effects of pipelines and power lines should be disclosed, and underground placement along roads should be considered as a means of decreasing habitat impacts." (AR 7495). To the extent that Plaintiff has paraphrased and misrepresented the record to which it cites, the alleged material fact is denied. Wyoming admits the remaining facts in Pl.'s Stmt. of Facts ¶ 48.

**49. Plaintiff's Alleged Material Fact:** USFS echoed the call for an extensive cumulative effects analysis. AR 7567. It sought to have BLM review the proposed Atlantic Rim project in light of the impacts of the planned Continental Divide / Wamsutter II, South Baggs and Pinedale Anticline projects. *Id.*

> **Response:** Admitted.

**50. Plaintiff's Alleged Material Fact:** Defendant-Intervenor Double Eagle supported the proposed project explaining "drilling of these pods should be approved if only to gain the scientific data needed to make further decisions." AR 7584.

**Response:** Admitted.

**51. Plaintiff's Alleged Material Fact:** The local public expressed concerns about the impact of the project on sage grouse, with one commenter stating:

> Sage Grouse--this area is also within the range of this species of grouse. While relatively numerous in parts of Wyoming, its population is declining rapidly and it too, is under consideration for listing as a threatened species. I have witnessed the devastating effect habitat destruction and manmade structures have had on this bird. In the Northern regions of the Great Divide Basin I have watched as lek after lek has disappeared as the direct result of pipeline construction, compressor station construction and operation, road construction, and the construction of high voltage power lines.

AR 7588 (comment of David Lieb, B.S. Zoology/Chemistry, M.Ed. Science Education).

**Response:** Admitted.

**52. Plaintiff's Alleged Material Fact:** The Wildlife Management Institute, for whom TRCP member Dr. Rollin Sparrowe worked at the time, provided extensive comments on the initial proposal, raising many of the concerns expressed in TRCP's Complaint. AR 7617.

**Response:** Denied. The portion of the record that Plaintiff cites includes a comment letter from the Wildlife Management Institute and Plaintiff's own 41-page complaint. (AR 7617-18; *see* Pl.'s First Am. and Supplemented Compl., at 1-41). Plaintiff, however, fails to reference the specific part of the documents relied on to support the alleged facts. Therefore, Wyoming denies the alleged facts in Pl.'s Stmt. of Facts ¶ 52 as vague and unsupported by the record.

**53. Plaintiff's Alleged Material Fact:** During the preparation of the environmental assessment for its CBM exploration program, Stone & Wolf sold its operating rights to Petroleum Development Corporation ("PEDCO"). AR 7632. PEDCO notified BLM in May 2001, that it wished to withdraw its application for the 96 well project. In a letter dated May 24, 2001, PEDCO submitted its new proposal to BLM for CBM exploration and development. By June 2001, the project had ballooned to 3,880 wells and encompassed over 310,000 acres (nearly 200,000 of which were BLM lands). *Id*. The expanded PEDCO project is referred to herein as the "3880 Project."

**Response:** Admitted.

**54. Plaintiff's Alleged Material Fact:** In response to the revised project, USEPA specifically questioned BLM's implied assessment that the 3880 Project was within the scope of the Great Divide RMP and called for additional information demonstrating compliance with the Great Divide RMP. AR 7681. There is no evidence in the Administrative Record that such demonstration was made.

**Response:** Denied. Wyoming denies the alleged facts in Pl.'s Stmt. of Facts ¶ 54 as unsupported by the record. The EPA provided scoping comments on the Atlantic Rim Coal Bed Methane project, stating that "coal bed methane production can be considerably different from conventional oil and gas operations. As a result the Great Divide Resource Management Plan may not have anticipated those differences. If BLM continues to state that the project is in conformance with the RMP, there should be statements that provide additional information that show that the differences are minimal." (AR 7681). The EPA did not "specifically question[] BLM's implied assessment that the 3880 Project was within the scope for the Great Divide RMP" as Plaintiff suggests. (AR 7681-82). Additionally, Wyoming denies Plaintiff's alleged fact that there is no evidence in the record that demonstrates the Atlantic Rim project is in compliance with the Great Divide RMP. The Great Divide RMP in no way caps the amount of oil and gas development in the Great Divide Resource Area or the ARPA. (*See* AR 5311-12). A reasonably foreseeable development ("RFD") scenario was recently defined in an Instruction Memorandum from the director of the BLM in Washington D.C. to all state BLM directors as "a long-term projection (scenario) of oil and gas exploration, development, production, and reclamation activity." (AR 5311). The memorandum also discussed the effect of an RFD scenario:

> The fact that the total number of wells in an area may exceed the total number of wells projected in the selected alternative does not

23

automatically mean that a supplement to the NEPA document or a
revision or amendment to the RMP is necessary. It is possible that
exceeding the number of wells projected in the selected alternative
may not result in exceeding the predicted level of environmental
effects.

(AR 5312).

**55. Plaintiff's Alleged Material Fact:** BLM determined the increase in CBM drilling
and development activity could result in significant impacts and that an EIS would be
necessary. AR 7632. In its initial scoping notice for that EIS, BLM stated:

Relationship to Existing Plans and Documents. Resource Management
Plan – The document that directs management of BLM-administered lands
within the analysis area is the Great Divide Resource Management Plan
(RMP, November 8, 1990). … Since the levels of oil and gas development
under this proposal will likely exceed the levels of development analyzed
in the RMP, it is anticipated that an RMP review will be conducted
concurrently with the preparation of the Atlantic Rim CBM EIS.

AR 7635.

**Response:** Admitted in part. Denied in part. Wyoming admits that the BLM

stated the above-quoted language. (AR 7635). However, Wyoming notes that the

BLM also stated in its scoping notice for the Atlantic Rim EIS that the

"development of coalbed methane within the Atlantic Rim project area is in

conformance with the [Great Divide] RMP." (AR 7635). To the extent that

Plaintiff has paraphrased and misrepresented the record to which it cites, the

alleged material facts are denied.

**56. Plaintiff's Alleged Material Fact:** In April 2001, BLM informed Congress as
follows:

Concurrently with the preparation of the Atlantic Rim Coalbed Methane
EIS, it is likely a land use plan review will be conducted. The plan
review will examine the need to increase the amount of oil and gas well
development allowed from that shown under the Reasonable
Foreseeable Development (RFD) scenario documented in the Great
Divide Resource Area Resource Management Plan EIS.

AR 7923.

    **Response:**  Admitted.

**57.  Plaintiff's Alleged Material Fact:** In May 2001, some in BLM believed it would be impossible to finalize the RMP ROD before the 3880 Project ROD and planned to incorporate a RFD review directly into the 3880 Project ROD:

> We are fairly certain that well numbers and surface disturbance estimates for the project will exceed the RFD assumptions developed for analysis purposes in the [Great Divide] RMP EIS. As you both are aware we are also in the beginning stages of a field office wide plan review. It is our belief that the plan review will likely extend beyond the time required to complete the CBM EIS and we would therefore like to schedule time to meet to discuss the approach necessary to incorporate an oil and gas RFD review into the CBM EIS to assure that when the CBM EIS is complete we will be able to issue ROD for the project in timely manner.

AR 8951.

    **Response:**  Admitted.

**58.  Plaintiff's Alleged Material Fact:** In June 2001, BLM published a federal register notice announcing its intent to develop an EIS for the 3880 Project. It read, in part, as follows:

> Concurrently with the preparation of the project EIS, the planning requirements for amending the Great Divide Resource Management Plan (RMP) will also be conducted because the level of oil and gas development under this project proposal is likely to exceed the reasonably foreseeable development level analyzed in the EIS for the Great Divide RMP. Any needed changes in the reasonably foreseeable development scenario will be identified and the Great Divide RMP will be amended as necessary.

AR 9478.

    **Response:**  Admitted.

**59.  Plaintiff's Alleged Material Fact:** In scoping the 3880 Project EIS, and in holding public meetings, BLM made clear its view that it could not deny approval of the project proposed by PEDCO, AR 7649, and that its regulatory options were limited to controls on the rate and timing of development, well location and mitigation. AR 7651.

**Response:** Admitted in part. Denied in part. At an Atlantic Rim Coalbed Methane Project scoping meeting on July 10-11, 2001, the BLM stated that it can not deny the project because: (1) "Oil and gas leasing is consistent with our land use plan, and (2) "Oil and gas leases are a contract between the mineral owner (the federal government) and the oil and gas." (AR 7645, 7649). The BLM also noted what they can do: (1) "Control the rate of oil and gas development"; (2) "Time the activities"; (3) "Modify siting of wells and facilities"; and (4) "Enforce reasonable mitigation measures." (AR 7651). To the extent that Plaintiff has paraphrased and misrepresented the record to which it cites, the alleged material facts are denied.

**60. Plaintiff's Alleged Material Fact:** As early as August 2001, BLM contractors identified a need for additional information and data concerning sage grouse winter habitat and big game migration corridors. AR 7975. BLM acknowledged in September 2001, that "[BLM] have no exact figures on the amount of sage grouse habitat available within the Atlantic Rim Project Area … ." AR 7986.

**Response:** Admitted in part. Denied in part. Wyoming admits that in the "Meeting Notes & Attendance Sheet" of the Atlantic Rim Coalbed Methane ("CBM") Project Wildlife Meeting in August 2001, it was noted that additional information was needed on "winter greater sage grouse info/big game migration information/protection/fisheries." (AR 7975). Wyoming also admits that in September 2001, the BLM Reservoir Management Group noted that "[w]e have no exact figures on the amount of sage grouse habitat available within the Atlantic Rim Project Area." (AR 797985-86). To the extent that Plaintiff has paraphrased and misrepresented the record to which it cites, the alleged material facts are denied.

**61. Plaintiff's Alleged Material Fact:** The importance of developing baseline data was later emphasized by one BLM reviewer concerned with groundwater impacts: "There is a need for a comprehensive groundwater-monitoring plan to collect baseline data and evaluate potential impacts in the future. This will be difficult to achieve with concurrent development of the field, and therefore timing in [*sic*] critical." AR 9193.

      **Response:** Admitted.

**62. Plaintiff's Alleged Material Fact:** BLM authorized the drilling of up to 200 wells during development of the 3880 Project EIS. AR 7637. Citing 40 C.F.R. § 1506.1, however, BLM acknowledged that its ability to authorize drilling pending completion of the NEPA process on the Atlantic Rim project was limited. AR 7643; 7655; 7931. An internal March 2002 email explains BLM's thinking about the relationship between the interim drilling and final approval of the 3880 Project:

> The Council on Environmental Quality (CEQ) regulations found at 40 CFR 1506.1, discusses limitations on actions allowed during the NEPA process. The citation we generally refer to is found at 40 CFR 1506.1 and reads as follows:
>
> *(a)    Until an agency issues a record of decision as provided in para. 1505.2 (except as provided in paragraph (c) of this section), no action concerning the proposal shall be taken that would:*
>
> > *(1)    Have an adverse environmental impact; or*
> >
> > *(2)    Limit the choice of reasonable alternatives.*
>
> The proponent asked BLM to begin the EIS process aware of the time it takes to complete a large project EIS, but they were also aware (as were we) that they were data poor and requested that some sort of exploration drilling program be allowed. In the past, BLM in Rawlins has allowed interim activities while EIS's were being completed (i.e., Continental Divide and Desolation Flats) with the restrictions noted in the CEQ regulations. The Buffalo Field Office has also allowed interim drilling activities outside of the Wyodak EIS area while the Powder River Basin Oil and Gas EIS was in progress.
>
> Enough information must be available to develop the proposed action and alternatives, and to analyze potential impacts and to allow the manager to make a reasoned decision. All activities must conform with the CEQ regulations stated above and none of the activities will be allowed until NEPA is completed and a Finding of No Significant Impact is made.

AR 9095.

      **Response:** Admitted.

**63.  Plaintiff's Alleged Material Fact:** BLM explained during scoping meetings that authorizing limited interim drilling during preparation of the EIS would allow BLM to collect vital information "necessary for completion of [the] EIS." AR 7656. Interim drilling was authorized only outside of recognized sensitive areas. AR 7657. BLM's interim drilling policy prohibited drilling or disturbance in "critical winter habitat for sage grouse" and in "overlapping crucial winter ranges" of big game ungulates. AR 7661; *see also* AR 7936. Sensitive protected areas included crucial big game winter range, big game migration corridors, and a two-mile buffer around sage grouse leks.  AR 7663; *see also* AR 7936. BLM reiterated at the scoping meetings that review of the Great Divide RMP would occur concurrently with the EIS preparation. AR 7664.

> **Response:**  Admitted.

**64.  Plaintiff's Alleged Material Fact:** Anadarko Petroleum Corporation ("Anadarko") apparently did not always comply with certain protective requirements during the interim drilling phase. An email from an Anadarko representative to BLM explained:

> Before I address the EIS process, I wanted to let Frank Blomquist know that Anadarko has asked surveyors to reposition the AR Fee 2089 SE 29 well in the Red Rim Pod which we just did an EA on. Because of Frank's request, we are going to try to move that well west a reasonable distance to separate the well from a designated sage grouse lek, and also try to stay within location allowances.  Although we won't be able to meet Frank's requested 1/4-mile, we're going to see how far west we can move it. We'll keep you posted, Frank.

AR 9238.

> **Response:**  Admitted in part.  Denied in part.  Wyoming denies that Anadarko Petroleum Corporation ("Anadarko") "apparently did not always comply with certain protective requirements during the interim drilling phase" as unsupported by the record.  (AR 9238).  The portion of the record Plaintiff refers to does not reflect or contain this statement.  Wyoming admits the remaining facts in Pl.'s Stmt. of Facts ¶ 64.

**65.  Plaintiff's Alleged Material Fact:** In some cases, interim drilling activities were undertaken (e.g., PODs relocated) without any involvement from the RFO: "The location of POD 9 was moved by the RMG Anadarko without RFO involvement from an area we could have drilled to a site where crucial winter range is an issue." AR 9283.

**Response:** Denied. Wyoming denies the alleged facts in Pl.'s Stmt. of Facts ¶ 65

as unsupported by the record. The portion of the record that Plaintiff refers to

does not contain the above-quoted langauge. (AR 9238).

**66. Plaintiff's Alleged Material Fact:** On February 25, 2002, BLM announced its plans to update the Great Divide RMP (as the Rawlins RMP). AR 8014. BLM listed as the first issue to be addressed during the update: "Potential Conflicts Between Mineral Exploration and Development Activities and Other Land and Resource Uses and Values." AR 8015. BLM requested public information on this topic explaining the purposes of this request were "to assure that the planning effort has sufficient information and data to consider the fullest possible range of public land and resource uses, management options and alternatives … ." *Id*.

**Response:** Admitted.

**67. Plaintiff's Alleged Material Fact:** As of March 2002, BLM's plan was to coordinate release of the Project EIS with the revised RMP. BLM employees informed their NEPA contractor:

> After some discussion with John, the first thing we need to find out is what your predicted schedule for completing the Atlantic Rim EIS - so once you've completed the Prep Plan we can see where the document preparation would fall with regard to our current [resource management] plan review. The revised RMP is scheduled to be completed no later than October 1, 2004. If the Atlantic Rim EIS completion date falls near this date, although we may have some brief language regarding the GDRA RFD's, we will not require a planning effort in this document.

> Also, John mentioned because not everything will be drilled by 2004, we could likely approve some of the wells in Atlantic Rim under the existing document, should it be completed prior to the 10-04 date.

> So in other words, we may not even have to look at doing any planning exercise for the Atlantic Rim document - when the document will be completed will be key - so let me know the timeframe we are looking at - then we'll try to come up with the approach we need to take.

AR 9101.

**Response:** Admitted in part. Denied in part. Wyoming denies that the

"BLM's plan was to coordinate release of the Project EIS with the revised

RMP." The email Plaintiff refers to does not reflect or contain this

statement.  (AR 9101).  Wyoming admits the remaining facts in Pl.'s Stmt.

of Facts ¶ 67.

**68.  Plaintiff's Alleged Material Fact:**  An internal BLM email from 2002, elaborated on the need to update the Great Divide RMP and BLM's plan to do so:

> Although, we originally thought we might have to include a planning exercise in the Atlantic Rim document, we have since changed our minds and will wait until Rawlins RMP review/revision currently underway is complete.

> The current RMP - RFD will only accommodate the exploratory drilling proposed under the Interim Drilling Plan (i.e., 200 wells in the Atlantic Rim project area), and a few other projects (one of them being Desolation Flats). Any large development after that (i.e., full field development in the Atlantic Rim area) would have to wait until the planning document is completed, currently slated for completion in late 2004.

> … [W]e will be identifying those areas with cbm potential, which will be different than our current [Great Divide] RMP, and we have to focus on what the magnitude of development might be. In the PRB [Powder River Basin] it appears to me, it is not that the impacts from cbm development are so different from 'conventional' gas development - but rather it is the magnitude of the development makes the impact discussions in the land use plans inadequate (i.e., do you think we would be having these concerns about cbm if total PRB development was limited to 100 wells?)

AR 9220.

> **Response:**  Admitted.

**69.  Plaintiff's Alleged Material Fact:**  As development under the interim program approached its cap, BLM again acknowledged the limitation of 40 CFR 1506.1:

> We have completed the exploratory drilling phase of the project, so the rest of the 200 wells projected under the original exploratory drilling program just weren't necessary for exploration, they were able to figure things out with the ones they used. Any further wells would be development wells, which are constrained under the CEQ regulations as possibly prejudicing the decision(s) to be made under the EIS. The Field Office has been quite consistent with this message to the operators over the past couple of years in my experience.

> While originally it appeared we were completely constrained by the RMP revision (LTDisturbance), today we are recognizing that there is still some LTD acres available under the Great Divide RMP and that we can approve some limited development under the GD RMP pending the Rawlins RMP

decision, thus making the EISs we've been working on the limiting factor instead of the RMP revision.

AR 9283.

**Response:** Admitted.

**70. Plaintiff's Alleged Material Fact:** Double Eagle representatives knew that the RFD limitation contained in the Great Divide RMP presented a problem and informed BLM as much. AR 8137. In response, Double Eagle was informed by a BLM official in the RFO that the RMP update would be complete by December 2004, that it would be unappealable, and that it would "be whatever the Field Office decided it would be, period." *Id.* In light of BLM's instructions, the Double Eagle official explained he was comfortable with proceeding to analyze a project that included a number of wells that exceeded the RFD scenario contained in the Great Divide RMP. *Id.*

**Response:** Denied. Wyoming denies the alleged facts in Pl.'s Stmt. of Facts ¶ 70

as unsupported by the record. The Memorandum from Steve Degenfelder,

Double Eagle Petroleum & Mining, to Thomas Marranzino and John Stroud,

Merit energy, states the following:

> To follow-up with our conversation last night concerning what the proposed action for the Atlantic Rim EIS should be (especially in relation to the RMP and specifically the number of wells), I just wanted to forward some feedback I received today while visiting with Clare Miller at the Rawlins BLM.
>
> Clare told me the current RMP only has about 300-400 wells left on it. He also said the new RMP will not be an appealable document so environmental groups can't delayed [sic] things by appeals, etc. He said the document would be whatever the Field Office decided it would be, period. When I commented the RMP should have the office's greatest priority, he said they had been told by Washington "they would have it done by December".
>
> Clare also suggested we go ahead and submit the number of wells we want along with some conventional wells, maybe 100, so they don't have to come back and do this again. With the foregoing in mind, I take back my comments about proposing a smaller number of wells and would be comfortable with a greater number originally talked about.

(AR 8137).

**71. Plaintiff's Alleged Material Fact:** Despite these concerns, the RMP EIS/ROD was still scheduled to be finalized ahead of the Project EIS/ROD. AR 9244. The Project EIS was supposed to be tiered from the updated Rawlins RMP. AR 8148. A June 2004, Briefing Paper explains that the Project will exceed the long-term disturbance level analyzed in the Great Divide RMP:

> The ARPA scoping Notice stated that since the levels of oil and gas development approved under the Great Divide RMP (GD RMP) (November 1990) would likely exceed the levels of long term disturbance (LTD) analyzed in the RMP. It was anticipated that an RMP review would be conducted concurrently with the preparation of the ARPA project, and that approval of the ARPA EIS would exceed the remaining GD RMP LTD level. An analysis performed for the Desolation Flats final EIS in the spring of 2004 estimates about 3,700 acres of long term disturbance as yet unallocated under the Great Divide RMP. This is a conservative estimate derived from BLM records for representative sample of long term disturbance for exploratory drilling for the Desolation Flats natural gas project, the most recent oil and gas play within the Field Office area. Any other method of estimating disturbance is expected to yield smaller per well figure and hence larger available acreage for development. There are about 3000 active wells in the Field Office at this time.

AR 8141.

> **Response:** Admitted in part. Denied in part. Wyoming admits that in a June 2004 email from Joy Rector, Anadarko, to various individuals at the BLM, Anadarko stated that the purpose of the June 11, 2004, meeting was to discuss the proposed timelines as follows: (1) "Discussions related to the timeline for the ROD approving the RMP (Target date of 6/10/2005)", and (2) "Discussions related to the Atlantic Rim EIS Completion Date of 11/1/2005." (AR 9244). Additionally, the BLM Rawlins Field Office ("RFO") stated in a September 22, 2004, mitigation meeting that the "EIS is tiered to the RMP." (AR 8148). The meeting notes did not state whether the RMP referenced by Plaintiff was the Great Divide RMP or the Rawlins RMP. (*Id*.). Moreover, the June 2004 Briefing Paper stated that "the levels of oil and gas development approved under the Great Divide RMP (GD RMP) (November 1990) would *likely* exceed the levels of long

32

term disturbance (LTD) analyzed in the RMP," and not that the Atlantic Rim

Project *will* exceed the long-term disturbance level.  (AR 8141) (emphasis added).

Wyoming admits the remaining facts in Pl.'s Stmt. of Facts ¶ 71.

**72.  Plaintiff's Alleged Material Fact:** By January 2005, BLM acknowledged that interim drilling likely had already prejudiced the Project alternatives:

> As for Atlantic Rim- Pulling together an environ. doc. for this area/project has been difficult; there have been so many POD EAs (Blue Sky, Brown Cow, sun Dog etc. and authorized "interim drilling" that there is little left in the project area (geographically) for development/anlaysis. This doesn't leave a whole lot of options- The EIS does need to focus on the cumulative impacts.

AR 9266.

> **Response:** Admitted in part.  Denied in part.  Wyoming denies that by January
>
> 2005, the BLM acknowledged that interim drilling likely had already prejudiced
>
> the Project alternatives.  The email Plaintiff refers to does not reflect or contain
>
> this statement.  (AR 9266).  Wyoming admits the remaining facts in Pl.'s Stmt. of
>
> Facts ¶ 72.

**73.  Plaintiff's Alleged Material Fact:** In April 2005, Double Eagle expressed concern that its operation might be stalled since the RMP update and Project EIS had been delayed, remarking:

> As you requested, attached is a well list of the wells drilled or permitted in the Atlantic Rim EIS Area. As you can see, there are a total of 109 wells that have been drilled to date. In the summer 2005, Anadarko will drill 29 more bringing the total to 136 wells. The Interim Drilling Plan developed in 2001 allowed the drilling of 200 wells in the approved Pod Area while the EIS was being prepared.  All parties concerned, including BLM felt this EIS process would conclude sooner than has happened. Double Eagle drilled 14 wells in the Cow Creek Pod. Double Eagle activity was idle and could not drill any wells in 2004 and it look like 2005 will be the same situation. With the delays that are possible with the RMP and EIS, our activity in 2006 could possibly now be greatly in question.

AR 9280.

**Response:** Admitted.

**74. Plaintiff's Alleged Material Fact:** In response to Operator efforts to increase the pace of NEPA processing, BLM staff reiterated the legal limitations it faced when approving interim drilling activities: "Any activity allowed during preparation of an EIS must meet the provisions of 40 CFR 1506.1, which basically states that no action can be taken that would have an adverse environmental impact or limit the choice of reasonable alternatives during preparation of an EIS." AR 9288.

> **Response:** Admitted in part. Denied in part. Wyoming denies that in response to
>
> Operator efforts to increase the pace of NEPA processing, BLM staff reiterated
>
> the legal limitations they faced when approving interim drilling activities. The
>
> "Development of an Interim Drilling Plan for the Atlantic Rim CBNG [coalbed
>
> natural gas] Project Area" document Plaintiff refers to does not reflect or contain
>
> this statement. (AR 9288-89). Wyoming admits the remaining facts in Pl.'s Stmt.
>
> of Facts ¶ 74.

**75. Plaintiff's Alleged Material Fact:** During development of the DEIS for the 3880 Project, WGFD raised numerous concerns about the impact of the project on mule deer, elk, and sage grouse. AR 7686.

> **Response:** Admitted.

**76. Plaintiff's Alleged Material Fact:** USFS reiterated its concerns about cumulative impacts. AR 7799.

> **Response:** Admitted in part. Denied in part. Wyoming admits that in response
>
> to the BLM's scoping notice for the Atlantic Rim Coalbed Methane Project, the
>
> United States Forest Service stated in July 2001 that the BLM should evaluate the
>
> cumulative impacts on air quality. (AR 7686). To the extent that Plaintiff has
>
> paraphrased and misrepresented the record to which it cites, the alleged material
>
> fact is denied.

**77. Plaintiff's Alleged Material Fact:** USFWS expressed grave concerns about the impact of the project on sage grouse:

> Sage grouse are declining throughout their range, and concern for this species has led us to believe we will receive a petition for listing sage grouse pursuant to the Act in the near future. The cause of sage grouse decline is not known, and may be a combination of several factors which affect habitat and reproductive abilities. However, anecdotal information, from several sources in Wyoming, suggests that sage grouse populations are negatively affected by the activities associated with oil and gas development, even when mitigative measures are implemented.
> . . . . . . . . .
> Impacts to wildlife would be considered significant if this development would contribute to causes that warrant an unlisted species to be proposed for listing under the [Endangered Species] Act. We encourage the Bureau to take all necessary measures allowable to protect the sage grouse and Columbian sharptailed grouse in the project area to ensure this project does not exacerbate factors contributing to these species' declines and thus give support to a listing petition.

AR 7813.

> **Response:** Admitted in part. Denied in part. Wyoming denies that the FWS
>
> expressed "grave" concerns about the impact of the Atlantic Rim Project on the
>
> greater sage-grouse. The portion of the record that Plaintiff refers to does not
>
> reflect or contain this statement. (AR 7686). Wyoming admits the remaining
>
> facts in Pl.'s Stmt. of Facts ¶ 77.

**78. Plaintiff's Alleged Material Fact:** BLM narrowly identified the "purpose and need" of the project: "The purpose of, and need for, the proposed natural gas development is to exercise the lease holders' rights within the Atlantic Rim project area to drill for, extract, remove, and market gas products." AR 8020.

> **Response:** Admitted in part. Denied in part. Wyoming admits that in the
>
> Atlantic Rim Coalbed Methane Project Environmental Impact Statement
>
> Preparation Plan, the BLM stated that the "purpose of, and need for, the proposed
>
> natural gas development is to exercise the lease holders' rights within the Atlantic
>
> Rim project area to drill for, extract, remove, and market gas products." (AR

8020, 8022). To the extent that Plaintiff has paraphrased and misrepresented the

record to which it cites, the alleged material fact is denied.

**79. Plaintiff's Alleged Material Fact:** The EIS Preparation Plan explained the relevance of the Great Divide RMP and its RFD scenarios:

> Conformance with Great Divide Resource Area RMP. The Great Divide Resource Area RMP projected a planning period of 20 years, with data used for RMP analyses for oil and gas development compiled through 1985. Monitoring and tracking of well development since the completion of the RMP will continue by the BLM. BLM initiation of RMP land use plan review and possible amendment will occur, as provided for in existing BLM planning guidance, prior to reaching the RFD disturbance estimates made in the current RMP. Since the levels of oil and gas development under this proposal will likely exceed the levels of development analyzed in the RMP, it is anticipated that an RMP review will be conducted concurrently with the preparation of the Atlantic Rim CBM EIS. BLM will not authorize oil and gas development actions such as APDs and ROWs that exceed current RFD disturbance estimates prior to the plan review and possible amendment.

AR 8022.

**Response:** Admitted.

**80. Plaintiff's Alleged Material Fact:** BLM established an IDTeam to assist in developing the DEIS. As of July 2002, the IDTeam identified various concerns regarding impacts to wildlife, including: 1) the fragmentation of wildlife habitat; 2) noise impacts to wildlife; 3) displacement of big game from traditional winter range; and 4) long-term ecosystem health impacts. AR 8056.

**Response:** Admitted in part. Denied in part. Wyoming admits that at an

Interdisciplinary Team Meeting in July 2002, common issues that were identified

during scoping of the Atlantic Rim Project were listed, including, *inter alia*, (1)

the fragmentation of wildlife habitat; (2) impacts to wildlife from compressor and

construction noise; (3) displacement of big game from traditional winter ranges;

and (4) impacts to long-term health of ecosystem. (AR 8056-58). To the extent

that Plaintiff has paraphrased and misrepresented the record to which it cites, the

alleged material fact is denied.

**81. Plaintiff's Alleged Material Fact:** BLM invited EPA's participation as a "cooperating agency" under CEQ's NEPA regulations. AR 8063. The State of Wyoming became a "cooperating agency" for purposes of the Project. AR 8080.

**Response:** Admitted.

**82. Plaintiff's Alleged Material Fact:** In May 2003, Anadarko and BLM signed an MOU whereby Anadarko agreed to take the lead in contracting with a consulting firm for EIS preparation. AR 8096. BLM was responsible for overseeing the contractor. AR 8097. BLM also was required to "ensure that the Contractor considers existing data and environmental analyses available from AEPC, the BLM, and other sources . . . ." AR 8098.

**Response:** Admitted.

**83. Plaintiff's Alleged Material Fact:** BLM contacted USGS with a proposal to assist in the collection of baseline data related to water quality and quantity impacts. AR 8127. BLM explained the relevance of baseline data as follows:

> Data collected after field development is often questioned due to lack of good and comparable baseline data for water quality and stream gaging. This often leads to data collection, modeling, and planning efforts designed to answer environmental questions that could be easily answered by well-designed data collection effort before, during, and after oil or gas field development.

AR 8127.

**Response:** Admitted in part. Denied in part. Wyoming admits that in a BLM document entitled *Research to Enhance Oil and Gas Operations and Associate Environmental Protection Opportunities on the Public Lands*, the BLM stated that the objective of this research was to "[c]ollect baseline data using USGS [United States Geological Survey] Stream gages downstream of project areas preparing Environmental Impact Statements (EISs) for the production of natural gas from coal seams." (AR 8127). To the extent that Plaintiff has paraphrased and misrepresented the record to which it cites, the alleged material fact is denied. Wyoming admits the remaining facts in Pl.'s Stmt. of Facts ¶ 83.

**84. Plaintiff's Alleged Material Fact:** In June 2004, BLM and the operators had planned to "incorporate information derived from the wildlife ground studies that were conducted" and to "use this data to guide the way." AR 9244. There is no indication in the record that such data was gathered or relied on.

> **Response:** Admitted in part. Denied in part. Wyoming admits that in a June 2004 email from Joy Rector, Anadarko, to various individuals at the BLM, Joy stated that the purpose of the June 11, 2004, meeting was to discuss "timelines for projects Anadrako wishes to discuss with the BLM Management." (AR 9244). The list provided included the following statement: "Strive to eliminate non-essential data from future EA's. . . . Incorporate information derived from the wildlife ground studies that were conducted. Use this data to guide the way." (*Id*.). Plaintiff, however, fails to reference the specific part of the record relied on to support its statement that there is no indication in the record that "such data was gathered or relied on." Therefore, Wyoming denies the remaining alleged facts in Pl.'s Stmt. of Facts ¶ 84 as vague and unsupported by the record.

**85. Plaintiff's Alleged Material Fact:** As of September 2004, BLM was not certain whether cumulative impacts from the IDP ever had been analyzed. AR 8148. The Project EIS planned to assess cumulative impacts, but would "absorb" the earlier EA's on individual PODs. *Id*. As of July 2005, BLM recognized it had never analyzed the cumulative impact of the IDP. AR 8240.

> **Response:** Denied. Wyoming denies the alleged facts in Pl.'s Stmt. of Facts ¶ 85 as unsupported by the record. In a September 22, 2004, mitigation meeting, the BLM RFO listed as a "Flipchart Note" the following: "On Individual POD EAs, were cumulative effects considered? – holistic effects of the entire interim drilling." (AR 8148). The BLM also noted that "Cumulative impacts are considered in the EIS for all 2,200 wells," and that "EIS 'absorbs' previous EAs." (*Id*.). Wyoming objects to Plaintiff's characterization of these statements.

Additionally, Wyoming denies that as of July 2005, the BLM recognized it had

never analyzed the cumulative impact of the individual POD EAs.  The portion of

the record Plaintiff refers to does not reflect or contain this statement.  (AR 8240).

**86.  Plaintiff's Alleged Material Fact:**  As of September 2004, BLM explained that it still lacked reliable data on the impact of noise on sage grouse. AR 8149.

> **Response:**  Admitted.

**87.  Plaintiff's Alleged Material Fact:**  In September 2004, the Industry representatives suggested conducting additional biological studies to help inform BLM decision-makers as to where protective stipulations would be required. AR 8149. The only such study reflected in the Administrative Record is the Mule Deer Study.

> **Response:**    Admitted in part.    Denied in part.    Wyoming admits that in a
>
> September 22, 2004, mitigation meeting, the BLM RFO stated that "[i]ndustry
>
> suggest conducting biology studies with the Master Use Plan up front, to know
>
> where exceptions to stip[ulations] will not be allowed; operator does the studies
>
> (including actions and timing) to avoid conflicts and impacts."   (AR 8250).
>
> Plaintiff, however, fails to reference the specific part of the record relied on to
>
> support its statement that the "only such study reflected in the Administrative
>
> Record is the Mule Deer Study."    Therefore, Wyoming denies the remaining
>
> alleged facts in Pl.'s Stmt. of Facts ¶ 87 as vague and unsupported by the record.

**88.  Plaintiff's Alleged Material Fact:**  In February 2005, BLM staff recognized that the 3880 Project proposal before it was unrealistic and uninformed by information learned during the IDP. AR 8183. BLM staff also recognized that the "[n]ew RMP needs to be signed first" before the Project ROD could be finalized. AR 8186. Staff admonished that the "EIS/Decision should be proactive versus reactive in addressing impacts" and that such an approach would "save us time at the APD stage if impacts are addressed specifically and cumulatively and earlier than later." *Id*.

> **Response:**  Denied.  Wyoming denies the alleged facts in Pl.'s Stmt. of Facts ¶ 88
>
> as unsupported by the record.  The portion of the record that Plaintiff cites is a

February 2005 presentation on the ARPA by an unknown entity.  (AR 8183-89).

The record does not reflect that BLM staff made any of the statements referenced

above.  (*Id*.).

**89.  Plaintiff's Alleged Material Fact:**  As of February 2005, the BLM Project Lead noted: "… the only resource conflicts we will not be able to mitigate away is … recreation at Atlantic Rim." AR 9274.

> **Response:**  Denied.  Wyoming denies the alleged facts in Pl.'s Stmt. of Facts ¶ 89
>
> as unsupported by the record.    The document Plaintiff refers to is an
>
> "[a[lternatives discussion for the Washington Office" sent in an email from David
>
> Simons to several individuals in the BLM RFO.  (AR 9273-74).  The document
>
> states the following:  "With these EISs probably the only resource conflicts we
>
> will not be able to mitigate away is . . . *possibly* recreation at Atlantic Rim."  (AR
>
> 9274) (emphasis added).

**90.  Plaintiff's Alleged Material Fact:**  In May 2005, BLM staff began developing two alternatives for inclusion in the DEIS. AR 8196. The first was described as the "Spatial Alternative" and protected crucial wildlife areas, such as "prime sage grouse habitat," with NSO stipulations. AR 8198. The second was an "Alternative Based on Timing of Development."  BLM described this as follows:

> A temporal alternative that preserves less developed areas for a portion of
> the project life to allow wildlife and recreation use. This will still allow for
> keeping leases and gathering additional information to see ideal spacing,
> while at the same time allow for the extraction of the resources, existing
> pods could continue.

AR 8198. Ancillary benefits were identified as including allowing vegetation time to establish itself for reclamation purposes. *Id*.

> **Response:**  Admitted in part.  Denied in part.  Wyoming admits that the "Spatial
>
> Alternative" that Plaintiff refers to included the following:  "No pad locations on
>
> BLM lands in the following wildlife areas identified by our wildlife staff showing
>
> the best of the best: . . . Prime sage grouse habitat identified by consultants with

our wildlife staff now and refined on an annual basis with protocols." (AR 8197-98). Wyoming also admits that the BLM described another alternative as an "Alternative Based on Timing of Development." (AR 8198). However, Wyoming denies Plaintiff's statement that "[a]ncillary benefits were identified as including allowing vegetation time to establish itself for reclamation purposes." The portion of the record Plaintiff cites does not contain or reflect this statement. (AR 8198).

**91. Plaintiff's Alleged Material Fact:** The RFO asked the RMG a list of detailed questions concerning the economic feasibility of various development methods. AR 8203. The Administrative Record contains no evidence RFO ever asked RMG to evaluate the economic feasibility of a Phased Development Alternative.

**Response:** Admitted in part. Denied in part. Wyoming admits that the BLM RFO asked the Reservoir Management Group ("RMG") to answer the following questions: (1) "Can the coalbed natural gas (CBNG) resources in the modified study area be economically developed with 160-acre spacing?" and (2) "If the project area requires 80-acre spacing, can the project be developing economically utilizing directional drilling techniques?" Plaintiff, however, fails to reference the specific part of the record relied on to support its statement that the "Administrative Record contains no evidence RFO ever asked RMG to evaluate the economic feasibility of a Phased Development Alternative." Therefore, Wyoming denies the remaining alleged facts in Pl.'s Stmt. of Facts ¶ 91 as vague and unsupported by the record.

**92. Plaintiff's Alleged Material Fact:** In July 2005, BLM staff internally elaborated on the "Temporal" Alternative, explaining it would "focus and concentrate activities in certain areas[,]" and would "create[] [a] safe haven for wildlife[.]" AR 8241.

**Response:**  Admitted in part.  Denied in part.  Wyoming admits that in July 2005, meeting notes from an "Atlantic Rim Project EIS ID [interdisciplinary] Team Meeting" state the following with regard to "ALTERNATIVE C TEMPORAL ANALYSIS":  (1) "focus and concentrate activities in certain areas," and (2) "creates safe haven for wildlife."  (AR 8240-41).  To the extent that Plaintiff has paraphrased and misrepresented the record to which it cites, the alleged material fact is denied.

**93.  Plaintiff's Alleged Material Fact:**   BLM staff specifically recognized the relationship between "adaptive management" and a Phased Development alternative by explaining the latter: "Ties into adaptive management … if we're not happy w/ phase 1, can go back and reevaluate for phase 2."  AR 8242. BLM made clear that the purpose of the Phased Development Alternative was "not to exclude drilling, but the [*sic*] reveal impacts in an area," *id*. and that the Project area would "still have production activity." *Id.*

**Response:**  Admitted.

**94.  Plaintiff's Alleged Material Fact:**  The IDTeam identified the following benefits of the Phased Development Alternative:

Benefits of the Sequential Alternative for the Atlantic Rim EIS

1)  Reduces disruption to big game and greater sage-grouse movement through out the entire EIS area.

a) EIS area approximately 48 to 50 miles in length containing antelope, mule deer and elk crucial winter range, winter range, migration corridors, and transition range.

b) Greater sage-grouse breeding, nesting, brood rearing and wintering habitat. (large percentage of leks in the field office occur here)

c) Minimizes disruptive noise and activity to animals to a third of the project area at a time.

2)  Better allows for recreation hunting opportunities to two thirds of the area at any one time.

a) Helps to minimize the industrialization feeling hunter may get in the area from field development and may improve the esthetic values of the area (assuming complete and successful reclamation).

b) Reduces conflicts between recreational uses and field development.

c) May allow for greater hunter success in the area.

3)    Allows for an opportunity to study reclamation efforts over a third of the area and to make adjustments prior to moving into new areas.

a) Require industry to meet identified reclamation standards prior to moving into another phase of the project. (Part of **Reclamation Appendix**)

b) Weed control would be focused in one third of the project area rather than thought-out the entire EIS area.

c) Better transportation planning on one third of the project rather than thought-out the entire EIS area.

4)    Allows for better monitoring.

a) Allows for monitoring of wildlife (especially big game & greater sagegrouse) and the effects of development have over one third of the EIS area. This in turn may allow for adjustment over the other two third of the EIS area if monitoring shows negative impacts.

b) Through monitoring of one third of the project area adjustments may be made over the other two thirds of the project area to improve ways of doing business, (adaptive management).

c) Allow for better vegetation, soil erosion and weed monitoring on a third of the project area, allowing for modifications if needed on the other two phases.

AR 8255-56.

**Response:** Admitted.

**95. Plaintiff's Alleged Material Fact:** In identifying impacts from road travel, BLM identified the following impacts on sage grouse: "Effects on sagegrouse: 10-20 trips, no impact; 20-40 trips, some impacts; 40 plus lose the sagegrouse." AR 8243.

**Response:** Admitted.

**96.  Plaintiff's Alleged Material Fact:** BLM also recognized that during alternative development it was important to "Define corridors for migration of animals up and down [the] corridor." AR 8243.

> **Response:**  Admitted in part.  Denied in part.  Wyoming admits that in July 2005,
>
> meeting notes from an "Atlantic Rim Project EIS ID Team Meeting" state the
>
> following with regard to "ALTERNATIVE C TEMPORAL ANALYSIS":
>
> "Define corridors for migration of animals up and down corridor."  (AR 8241,
>
> 8243).  To the extent that Plaintiff has paraphrased and misrepresented the record
>
> to which it cites, the alleged material fact is denied.

**97.  Plaintiff's Alleged Material Fact:** The IDTeam understood the conclusions of Matthew Holloran, a leading grouse researcher, when preparing the draft EIS. "Look at latest photog in relation to lek data; any place w/in 3 miles is prime nesting area. New literature says +2 wells per section there is impact on the sage grouse. (Matt Halloran)." At that time, BLM explained, "Impacts to minerals - may be in a situation where can't recover the full public resource. Context is that this is the finest sage grouse habitat in the world." AR 8247.

> **Response:**  Admitted in part.  Denied in part.  Wyoming admits that in July 2005,
>
> meeting notes from an "Atlantic Rim Project EIS ID Team Meeting" state the
>
> following with regard to "ALTERNATIVE E SPATIAL ALTNERATIVE":
>
> "Look at photog in relation to lek data; any place w/in 3 miles is prime nesting
>
> area.  New literature says +2 wells per section there is impact on the sage grouse.
>
> (Matt Halloran)"  (AR 8244, 8247).   Wyoming denies that the "IDTeam
>
> understood the conclusions of Mathhew Holloran, a leading grouse researcher,
>
> when preparing the draft EIS."  The portion of the record Plaintiff cites does not
>
> contain or reflect this statement.  (AR 8247).  Wyoming admits the remaining
>
> facts in Pl.'s Stmt. of Facts ¶ 97.

**98.  Plaintiff's Alleged Material Fact:** The IDTeam explained: "Big game disturbance after more than 4 locations per section." The IDTeam explained that this: "Ties to

44

Sublette study ... game gets pushed into other habitat." The IDTeam desired "No wells in overlapping [crucial winter range]" and "4 or less wells in migration corridors and big game transition areas." AR 8247.

      **Response:** Admitted.

**99.** **Plaintiff's Alleged Material Fact:** At an August 2005 IDTeam meeting, the participants recognized the importance of using the best available mule deer information. AR 8267. The IDTeam wanted to "use the Anadarko cooperative mule deer study data as it is developed" and identified the following goals: "Protecting migration corridors - make as wide as possible - we have to know where they are, especially pinch points - protect habitat/allow development will quantify NSO?" *Id.*

      **Response:** Admitted in part. Denied in part. Wyoming admits that in August 2005, meeting notes from an "Atlantic Rim Alternatives meeting" state the following with regard to "Severe Winter Relief": (1) "AR Muledeer [sic] . . . use the Anadarko cooperative mule deer study data as it is developed" and (2) "Protecting migration corridors – make as wide as possible – we have to know where they are, especially pinch points – protect habitat/allow development will quantify NSO?" (AR 8267). Wyoming denies that "the participants recognized the importance of using the best available mule deer information." The portion of the record Plaintiff cites does not contain or reflect this statement. (*Id.*).

**100.** **Plaintiff's Alleged Material Fact:** In August 2005, the IDTeam identified the following mitigation measures, among others, for sensitive wildlife species:

- Avoiding or limiting disturbance to less than 20 acres per section in greater sage grouse habitats affecting nesting and brood rearing. AR 8281
- Avoiding severe winter grouse habitat. *Id.*
- Limiting total disturbance to less than 20 acres per section in big game crucial winter range. AR 8282
- Avoiding or "severely limit[ing]" development to 15 acres per section in overlapping crucial winter range. *Id.*
- Avoidance or imposition of NSO in big game migration corridors. *Id.*

      **Response:** Admitted.

**101.  Plaintiff's Alleged Material Fact:** BLM explained in a Q&A document as follows:

> Q4. What information has been gathered from the pilot phase of this project?

> Q [*sic*] 4. Information sought for the interim exploration phase of the project includes gas content and productivity of the coal formations targeted, well density needed to develop natural gas resources feasibility of re-injection of produced water into underground formations, water quality and connectivity to surface water, which drilling techniques can be effectively used, and economic feasibility of the proposal.

AR 8374-75. Apparently, no information was gathered during the IDP regarding the impact of drilling on wildlife.

> **Response:**  Admitted in part.  Denied in part.  Wyoming admits that the BLM responded in a Question and Answer Document that "Information sought for the interim exploration phase of the project includes gas content and productivity of the coal formations targeted, well density needed to develop natural gas resources, feasibility of re-injection of produced water into underground formation, water quality and connectivity to surface water, which drilling techniques can be effectively used, and economic feasibility of the proposal."   (AR 8374-75). Plaintiff, however, fails to reference the specific part of the record relied on to support its statement that "[a]pparently, no information was gathered during the IDP regarding the impact on wildlife."  Therefore, Wyoming denies the remaining alleged facts in Pl.'s Stmt. of Facts ¶ 101 as vague and unsupported by the record.

**102.  Plaintiff's Alleged Material Fact:** Immediately before its release, BLM staff determined that the version of the draft EIS produced by the Operators' NEPA contractor was inadequate. BLM field staff explained:

> Using information from interim drilling, BLM and cooperating agencies developed three alternatives and the No Action Alternative for analysis in the EIS.  Contractor work on the NEPA document was completely revised by the BLM's Interdisciplinary Team's concerted effort, expending some 1200 workhours in a two-week period to complete the draft document.

AR 8419; *see also* AR 8474.

> **Response:**   Admitted in part.   Denied in part.   Wyoming admits that in March 2006, a Briefing Paper by the BLM stated the following in regard to the Atlantic Rim Project:   "Using information from interim drilling, BLM and cooperating agencies developed three alternatives and the No Action Alternative for analysis in the EIS.   Contractor work on the NEPA document was completely revised by the BLM's Interdisciplinary Team's concerted effort, expending some 1200 workhours in a two-week period to complete the draft document."   (AR 8419). Wyoming denies Plaintiff's statement that "[i]mmediately before its release, BLM staff determined that the version of the draft EIS produced by the Operators' NEPA contractor was inadequate."   The portion of the record Plaintiff cites does not contain or reflect this statement.   (AR 8419, 8474).

**103.   Plaintiff's Alleged Material Fact:** When the DEIS was published, BLM explained:

> BLM worked closely with cooperators - which includes the State of Wyoming, Carbon County Commissioners, Saratoga-Encampment-Rawlins Conservation District, and the Little Snake River Conservation District--to analyze the effects of the proposed action in the Atlantic Rim area, and then develop protection measures under Alternatives B [Phased Development] and C [Spatial Alternative] which would help safeguard resources from serious damage.

AR 8385. BLM issued the DEIS in December 2005. AR 1436.

> **Response:**   Admitted.

**104.   Plaintiff's Alleged Material Fact:** Congress enacted the Energy Policy Act of 2005 ("EPAct"), Pub. L. No. 109-58, 119 Stat. 594 (2005). BLM later began explaining: "This project is consistent with and supportive of the Energy Policy Act of 2005 and Departmental Policy in regards to oil and gas development." AR 9539.

> **Response:**   Admitted.

**105.   Plaintiff's Alleged Material Fact:** In a January 26, 2006 comment to BLM, USFWS explained it "does not support a 0.25 mile protectve buffer around sage-grouse

leks as a mitigation measure, nor do[es] [the agency] support a 2-mile buffer to protect nesting habitat." AR 3256. USFWS also explained that "stipulations placed on oil and gas development in the Pinedale Anticline, which are identical to those proposed for the Atlantic Rim development, were insufficient to maintain sagegrouse breeding populations in natural gas fields." *Id.*

> **Response:** Admitted.

**106. Plaintiff's Alleged Material Fact:** Upon publication of the DEIS, Anadarko excoriated BLM for developing the Phased Alternative (B) and the Spatial Alternative (C), alleging they were based on an "unfounded bias against development of the CBNG resources." AR 8388. Citing the "purpose and need" for the project as "to drill for, remove and sell natural gas resources." Anadarko asserted Alternatives B and C would not achieve that purpose. AR 8389. More specifically, Anadarko contended:

> Alternative B would phase the drilling of the wells contemplated by the proposal by dividing the project area into three sections thereby severely restricting Anadarko's ability to maximize the recovery of CBNG resources in direct opposition to policies set forth in the Energy Policy Act of 2005.

AR 8389. The Administrative Record does not reflect any independent analysis by BLM of the economic viability of a Phased Development Alternative.

> **Response:** Admitted in part. Denied in part. Wyoming denies Plaintiff's
>
> statement that the "Administrative Record does not reflect any independent
>
> analysis by BLM of the economic viability of a Phased Development Alternative"
>
> as unsupported by the record. The BLM eliminated Alternative B from the final
>
> EIS "based on comments received on the Draft EIS, the effects of long delays on
>
> allowable oil and gas development to leaseholders and mineral rights, and the
>
> policy that BLM will allow reasonable access across federal lands for mineral
>
> development on private and state lands." (AR 2161). Wyoming admits the
>
> remaining facts in Pl.'s Stmt. of Facts ¶ 106.

**107. Plaintiff's Alleged Material Fact:** Anadarko also criticized the Spatial Alternative explaining:

> Alternative C completely fails to meet the purpose and need because, Anadarko would be unable to develop the CBNG resources were all of the

provisions set out in Alternative C applied by BLM, which as currently drafted appears to be BLM's intention.

*Id*.

**Response:** Admitted.

**108. Plaintiff's Alleged Material Fact:** Anadarko broadly criticized BLM's use of data concerning wildlife impacts, stating:

Those sections are characterized by analyses of impacts that are often general in nature; do not sufficiently integrate the effectiveness of engineering designs and operating practices and procedures; do not fully integrate existing information on environmental conditions into the analysis and are severely lacking in qualitative analyses despite the ready availability of such tools (e.g. soil loss models) or are based on dated information.

AR 8390.

**Response:** Admitted.

**109. Plaintiff's Alleged Material Fact:** BLM's Washington officials promptly met with Anadarko to assuage Anadarko's concerns. AR 8391. However, there is no record of that meeting.

**Response:** Denied. Wyoming denies the alleged facts in Pl.'s Stmt. of Facts ¶ 109 as unsupported by the record. The portion of the record that Plaintiff cites is a letter from the State Director of the BLM to Anadarko. (AR 8391). The letter does not support the statement that a meeting between Washington officials and Anadarko took place. (*Id.*).

**110. Plaintiff's Alleged Material Fact:** In a briefing paper for the Director of BLM, the field staff defended the alternatives they generated against Anadarko's criticisms:

We developed alternatives for the Draft Atlantic Rim Environmental Impact Statement (EIS) after weighing issues and concerns identified in the scoping process. The BLM project team developed range of alternatives that met the need to produce domestic energy resources while considering various levels of resource protection and mitigation. We coordinated the alternatives with stakeholder groups, the State of Wyoming, and BLM staffs, including the Washington Office. The project area abounds in sensitive resources such as big game crucial

winter range, sage grouse habitat, and difficult reclamation issues. BLM
is seeking a NEPA analysis that will help us arrive at the best decision to
allow environmentally responsible natural gas development.

AR 8394.

**Response:** Admitted.

**111. Plaintiff's Alleged Material Fact:** With respect to the Phased Development
Alternative, BLM field staff explained:

Phased development was included based on Washington Office advice, a
result of the Montana case. Alternative B seeks to reduce adverse impacts
on wildlife by concentrating development activity in three distinct phases,
working out from the center of the project area. This alternative provides
relief areas, where sensitive wildlife resources will encounter less
disturbance and human presence.

AR 8395.

**Response:** Admitted.

**112. Plaintiff's Alleged Material Fact:** With respect to the Spatial Alternative, BLM
field staff explained:

Alternative C was developed to seek ways to reduce significant adverse
impacts to sensitive wildlife species and their habitat resulting from the
intensity of the proposed development (8 wells pads/section) and multiple
overlapping sensitive resources.

AR 8394.

**Response:** Admitted.

**113. Plaintiff's Alleged Material Fact:** Warren also urged rejection of Alternatives B
and C, arguing that 80-acre well spacing was necessary, and that 160-acre well spacing
was uneconomical. AR 8397. However, nothing in Alternatives B or C required 160-acre
spacing. AR 8394. BLM's field staff explained to the Director:

Alternatives B and C attempt to balance surface resource conflicts with
impacts from oil and gas development. These effects vary, depending on
site-specific proposals received from industry. Anadarko's concern about
160 acre spacing in Alternative C is their interpretation. The alternative
does not require or impose any spacing standard. Alternative C was
developed to mitigate potential development impacts to surface
resources.

AR 8395.

**Response:** Admitted.

**114. Plaintiff's Alleged Material Fact:** Shortly thereafter, BLM and the Operators entered into a revised MOU, which effectively eliminated Alternatives B and C, indicating that new alternatives to the Operators' proposed action would be developed by the NEPA contractor selected and approved by the Operators. AR 8401-2.

> **Response:** Admitted in part. Denied in part. Wyoming admits that in August 2006 the BLM and Anadarko entered into a revised Memorandum of Understanding ("MOU"). (AR 8401-18). Wyoming denies, however, that the MOU "effectively" eliminated Alternatives B and C. The MOU stated that the "project components" that were to be analyzed in the final EIS included the following: (1) the operators' proposed action; (2) the no action alternative; and (3) "a reasonable range of alternatives to the proposed action." (AR 8401-02). The MOU did not mention Alternatives B or C. (AR 8401-18).

**115. Plaintiff's Alleged Material Fact:** BLM began looking at other oil and gas fields for an example of how management should be conducted. AR 8443. At the heart of that effort was a plan to defer NEPA analysis to the APD stage. The State of Wyoming encouraged this approach. *Id*. As Wyoming representatives explained:

> Performance-based planning is taking the place of subsequent analysis with worst-case scenarios outlining each level of development. This would allow for one EIS. Preplanning for multiple analyses is a desired condition which is reaching for that no matter what level development is at.

AR 8443.

> **Response:** Admitted in part. Denied in part. Wyoming admits that during a Cooperator Status Meeting on the Atlantic Rim EIS in May 2006, a discussion about performance-based monitoring took place. (AR 8443). The BLM stated that it was "focused on looking at successful/recent ideas, especially the Jonah ROD." (*Id*.). A representative from the WGFD then stated the above-quoted language. (*Id*.). Wyoming denies the remaining alleged facts in Pl.'s Stmt. of

Facts ¶ 115 as unsupported by the record.  The meeting notes referred to do not reflect or support Plaintiff's contentions that the BLM began looking at other oil and gas fields for an example of how management should be conducted, and that at the heart of that effort was a plan to defer NEPA analysis to the Application for Permit to Drill ("APD") stage.  (*Id*.).

**116.  Plaintiff's Alleged Material Fact:** The NEPA contractor elaborated on the concept: "Performance-based monitoring assumes setting performance standards in NEPA standards. There is an association of different levels of impacts with NEPA standards." AR 8444.

**Response:**  Admitted in part.  Denied in part.  Wyoming admits that during a Cooperator Status Meeting on the Atlantic Rim EIS in May 2006, a third party contractor stated that "[p]erformance-based monitoring assumes setting performance standards in NEPA standards.  There is an association of different levels of impacts with NEPA standards."  (AR 8444).  To the extent that Plaintiff has paraphrased and misrepresented the record to which it cites, the alleged material fact is denied.

**117.  Plaintiff's Alleged Material Fact:** The following exchange then ensued between BLM and WGFD:

BLM (Clare Miller) What if you can't achieve standard? For example, what if the sage grouse are annihilated? Then what?

STATE (Vern S. - WY Game Fish) With performance-based monitoring there is a level of impact that everyone agrees to and this is set by the ability to mitigate impact. You wouldn't reach that level [annihilation] because the limit on impact would stop you before that happens, such as a set acreage or distribution of sage grouse for a population.

…

STATE (Vern S. - WY Game Fish) We would need to establish an outside number of impacts and flexibility for level of development because we have a threshold limit to establish. Development would go forth based on limitations of any given resource.

AR 8444.

    **Response:** Admitted.

**118. Plaintiff's Alleged Material Fact:** In a June 2006 memorandum to the Director of BLM, BLM field staff explained that none of the Alternatives in the DEIS was "well received." AR 8473. Accordingly:

> BLM and cooperating agencies are formulating a preferred alternative for the Final EIS. The goal of the preferred alternative is to optimize natural gas recovery while minimizing surface disturbance and other impacts. The EIS discloses that in order to optimize natural gas recovery there will be significant impacts to some resources.

*Id.*

    **Response:** Admitted.

**119. Plaintiff's Alleged Material Fact:** As of June 2006, BLM's Project leader explained:

> Janet- fyi we are going to drop alternative "B" from the Atlantic Rim analysis and move it into "Alternatives Considered and Eliminated from Detailed Study" in the final. Based on comments received it is legally questionable and places too much time setback for those who have leases/mineral rights into the no action zones.

AR 9336.

    **Response:** Admitted.

**120. Plaintiff's Alleged Material Fact:** BLM, WGFD and the Operators established an "Atlantic Rim Mule Deer Steering Committee" in 2006. AR 8509. The MOU explained the purpose of the study as follows:

> Maintaining healthy mule deer populations and functional migration routes is a top priority for agencies and the public. Increased levels of energy development have created concerns for wildlife and the habitats they occupy. … In response to proposed natural gas development in the Rawlins Field Office, Anadarko Petroleum Corporation, Warren Resources, Inc., the BLM, the WGFC, and WEST propose to implement a long-term study intended to determine if impacts are occurring, and if so, how best to mitigate them and ensure development plans are environmentally sensitive to mule deer.

AR 8510.

    **Response:** Admitted.

**121. Plaintiff's Alleged Material Fact:** The MOU explained that the study would have two phases:

> The first phase of the study is intended to identify seasonal ranges, determine migration routes, document habitat use patterns, and estimate survival/reproductive rates prior to full-field CBNG development. … The objectives of Phase I are to identify and clarify seasonal ranges, determine migration routes, describe habitat use patterns, and estimate survival/reproductive rates of mule deer prior to development of the Atlantic Rim Coal Bed Natural Gas Project (ARCBNGP).

AR 8510. The MOU described Phase II as follows:

> Phase II proposes to monitor potential changes in mule deer habitat use patterns and population characteristics (i.e., e.g., survival, reproduction, density) during development of the ARCBNGP. Habitat use in relation to development features (i.e., roads and well pads) and population performance will be measured through time to evaluate potential impacts to mule deer. Assuming Phase II is implemented, the results of the study will be subject to peer review and published in a peer-reviewed scientific journal.

AR 8511.

> **Response:** Admitted.

**122. Plaintiff's Alleged Material Fact:** An internal August 2006 BLM meeting summary, further explains the elimination of the Phased Development Alternative (Alternative B):

> Based on comments received on Alternative B, long-term adverse impacts on some leaseholders, and BLMs obligation to grant reasonable access to private lands across federal lands, this alternative has been moved into the category of "Alternatives Considered but Eliminated from Detailed Study."

AR 8636. The memorandum explains the preferred alternative has been modified from a combination of Phased and Spatial Development to "Alternative D." AR 8636.

> **Response:** Admitted.

**123. Plaintiff's Alleged Material Fact:** The elimination of these alternatives resulted in the remaining alternatives being substantially similar. All action alternatives analyzed in the FEIS assume the construction of up to 2,000 wells, AR 2341, and the disturbance level and mineral resource recovery is essentially the same for the Proposed Action and for Alternatives C and D. AR 4800. Their similarity is further demonstrated by a review of Chapter 4 of the FEIS, in which the BLM, among other things, sets forth its analysis of the environmental consequences of each alternative. The FEIS continually refers to the similarity of impacts and outcomes across the alternatives and, even when it does

distinguish between alternatives, the distinguishing features are not subtle and of little substance worth. AR 2320 - 481.

>   **Response:** Denied. Wyoming denies the alleged facts in Pl.'s Stmt. of Facts ¶
>
>   123 as unsupported by the record. The final EIS articulates three different
>
>   alternatives: a no action alternative, which would result in no drilling or
>
>   development; Alternative C, which would allow for 2,000 wells to be drilled, but
>
>   includes heightened constraints for wildlife and sensitive resources; and
>
>   Alternative D, which drastically reduces surface disturbance and includes an
>
>   adaptive management system. (AR 2149-63).

**124.  Plaintiff's Alleged Material Fact:** Sometime in mid-2006, BLM began formulating a "Preliminary Final EIS" for review only by the cooperating entities (*i.e.*, without public input).

>   **Response:** Denied. Plaintiff fails to reference the specific part of the record
>
>   relied on to support the alleged facts. No response is thus required. To the extent
>
>   that a response is required, Wyoming denies the alleged facts in Pl.'s Stmt. of
>
>   Facts ¶ 124.

**125.  Plaintiff's Alleged Material Fact:** In May 2006, WGFD expressed concern that the monitoring requirements in the Preliminary EIS were unclear. They stated: "We would propose that methodologies/protocols used in monitoring would be thought through before the EIS is finalized. We would like to 'beef up' monitoring strategies." AR 8444.

>   **Response:** Admitted in part. Denied in part. Wyoming admits that during a
>
>   Cooperator Status Meeting on the Atlantic Rim EIS in May 2006, a representative
>
>   of the WGFD stated that "[w]e would propose that methodologies/protocols used
>
>   in monitoring would be thought through before the EIS is finalized. We would
>
>   like to 'beef up' monitoring strategies." (AR 8444). Wyoming denies that the
>
>   WGFD expressed concern that the monitoring requirements in the preliminary

EIS were unclear.  The portion of the record Plaintiff refers to does not reflect or

contain this statement.  (*Id*.).

**126.  Plaintiff's Alleged Material Fact:** In August 2006, internal reviewers expressed concern about the effectiveness of the surface disturbance cap being discussed:

> The phrase "*no more than 3.5% of the **project area***" allows for heavy disturbance in one part of the project area to be averaged with little or no disturbance in other areas. This is probably not your intent? I assume that the goal is no more than 3.5% disturbance on any given leasehold or unit boundary. If this is the case, you might consider adding some narrative to indicate the intent is not just to average heavy disturbance with no disturbance, but the goal is 3.5% disturbance on the leaseholds themselves.

AR 9617.

> **Response:**  Admitted in part.  Denied in part.  Wyoming admits that in August
>
> 2006, internal reviewers from the BLM commented on the preliminary final EIS
>
> and stated the above-quoted language.  (AR 9617).  Wyoming denies that these
>
> reviewers expressed concern about the effectiveness of the surface disturbance
>
> cap.  The portion of the record Plaintiff refers to does not reflect or contain this
>
> statement.  (*Id*.).  Moreover, along with the above-quoted language, the reviewers
>
> also stated that "[w]e support the 3.5/2.5% disturbance concept, when **coupled**
>
> with all technically feasible BMPs."  (*Id*.).

**127.  Plaintiff's Alleged Material Fact:** In August 2006, WGFD submitted comments to BLM on the "Preliminary FEIS" stating among other things:

> Seasonal stipulations do not mitigate lost habitat, i.e., crucial winter range; they only temporarily mitigate (reduce) animal disturbance during initial field development.

AR 9646. WGFD also explained:

> We disagree that pronghorn will "likely habituate to activities along roads and continue using habitats in those areas." Individual pronghorn have varying tolerances to human disturbance, but it is incorrect to make this blanket statement.

*Id.* WGFD also explained:

> There is a fifth major impact to wildlife that is likely to be associated with this project: 5) Disruption of essential life (i.e., reproductive) processes. (Or "disruption of life history requirements" as mentioned on line 2447.) This would include abandonment of young (e.g., raptors, big game and other species of concern, nest abandonment by many avian species, as well as interference in reproductive and breeding behaviors, particularly for lekking species like sagegrouse and sharp-tailed grouse). Animals are not necessarily displaced; their habitats may be intact, and these direct population losses are not necessarily a result of physiological stress, but reproduction is still lost. It is minimizing losses due to these types of impacts that many of the mitigation measures and BMPs are designed to address.

AR 9651.

> **Response:** Admitted.

**128. Plaintiff's Alleged Material Fact:** An October 2006 briefing paper to the BLM Director, explains that BLM's preferred alternative (D) has effectively shifted the timing of when protective measures would be implemented to the site-specific phase:

> The BLM preferred Alternative D minimizes surface disturbance while optimizing natural gas recovery (1.35 TCF). The BLM would work with the operators at a site-specific level to minimize surface disturbance by applying the appropriate lease stipulations, conditions of approval, best management practices, and any other measures deemed necessary to minimize surface disturbance and still allow for the recovery of natural gas.

AR 8682.

> **Response:** Admitted in part. Denied in part. Wyoming admits that an October 2006 Information Memorandum to the Director of the BLM contains the above-quoted language. (AR 8682). Wyoming denies that the preferred alternative has effectively shifted the timing of when protective measures would be implemented to a site-specific phase. Even though development of site-specific mitigation plans will take place after the record of decision ("ROD") is issued, the criteria for the plans and the specific mitigation measures that the BLM will require are

discussed in detail in both the final EIS and ROD.  (AR 3081-96, AR 3149-62, 4799-4800, 4813, 4835-55).

**129.  Plaintiff's Alleged Material Fact:** In October 2006, WGFD provided comments voicing serious concerns remaining with the Preliminary FEIS. AR 9793. Among other things, WGFD questioned why more was not being done to mitigate wildlife impacts:

> We agree that seasonal stipulations "reduces the displacement and disturbance of big game during the most critical season", but what protections are they afforded after drilling has been completed and production begins? Additional mitigation, mentioned for mountain plover for example, is missing for all other species, including big game.

> For all big game species, sage grouse, and sharp-tail grouse, the preferred alternative level of development will either place the disturbance level at a high impact or exceed the significance category.  This conclusion/disclosure implies that mitigation levels should be increased to compensate for this level of impact, but the document states "there are no additional measures proposed for the … Alternative D [preferred alternative]" (Page 4-83, Line 3133). Why is there additional protections provided to mountain plover, but not these species?

> It is acknowledged that big game, sage grouse and sharp-tail grouse habitat will be "significantly" impacted.  What additional mitigation measures are specifically proposed?

> The impact of over 74 mi$^2$ of lost mule deer habitat, 19 mi$^2$ of pronghorn habitat, and 11 mi$^2$ of elk habitat is significant impact. Why is there little to no protection or mitigation? (From Table 5-2)

*See also* AR 9757-73.

> **Response:**  Admitted.

**130.  Plaintiff's Alleged Material Fact:** WGFD also emphasized the importance of developing a protocol to address and detect population trends "before drilling begins." AR 9793. Specifically, with regard to grouse, WGFD explained that inventories needed to be conducted every year (rather than every 5 years as BLM proposed in the Preliminary FEIS). AR 9794.

> **Response:**  Admitted.

**131.  Plaintiff's Alleged Material Fact:** WGFD staff explained:

> In general, we are very disappointed to see so few alterations made to this document, after considerable consultation and recommendations from our biologists. There appears to be no changes at all to the Appendices, and

> very few made to the general text of the document itself. Of particular concern is the wildlife monitoring plan. For example, we have repeatedly requested that sage grouse surveys be conducted annually, in accordance with our sampling protocol to allow trend analysis. Also, our big game flights are not collecting trend data, as is referenced in the DFEIS. Please respond to these comments as the wildlife monitoring plan is a critical component of the overall EIS, and as currently written, provides little in the way of assurances that the resources we are charged to protect, will be retained.

AR 9757.

> **Response:** Admitted.

**132. Plaintiff's Alleged Material Fact:** Regarding sage grouse, WGFD comments stated:

> In light of Naugle's research, we suggest changing the first sentence of the paragraph to this: "While Braun's 1998 study inferred that sage grouse may repopulate an area following energy development, recent research by Naugle (2006) indicates sage grouse do not re-populate energy fields following the drilling phase. Once the older birds die, the leks disappear because juvenile birds disperse to edge habitat until they are driven from there or die."

AR 9761-62.

> **Response:** Admitted.

**133. Plaintiff's Alleged Material Fact:** WGFD also expressed its concern that cumulative impacts were not being fully accounted for:

> The effects of proposed wells for Creston Blue Gap project (9,000+) and Hiawatha (4,000+) should be included in the cumulative impact since the price of natural gas is at profitable levels and the likelihood is high that additional wells will be drilled in the reasonably foreseeable future.

AR 9762-63; *see also* AR 9818.

> **Response:** Admitted.

**134. Plaintiff's Alleged Material Fact:** The Wyoming Department of Agriculture expressed concerns about the 7,600 acre disturbance limit, stating:

> We are concerned that about the generous limitation of 7,600 acres for disturbance and unsuccessful reclamation. As noted in the same paragraph, the short-term disturbance goal is 6.5 acres/wellpad. Dividing 7,600 by 6.5 shows that operators can develop 65 percent of their intended

well pads before they reach the 7,600-acre limit. This provides little incentive for operators to ensure successful reclamation and weed control, especially since the bulk of the well development will occur within six to eight years.

AR 9782.

**Response:** Admitted.

**135.  Plaintiff's Alleged Material Fact:** Elaborating, one Wyoming Department of Agriculture employee explained:

On one hand, I am glad to see you impose a limit on development tied to successful reclamation. On the other hand, I fear that the limit may be too generous. As I note in my comments, given an average 6.5 acre short-term disturbance area for the development of each well pad, the 7,500-acre limit equals 65% of the development area. Thus, the operators can develop 65% of the Atlantic Rim area, before successful reclamation of disturbed lands needs to occur.

AR 9747. The Wyoming Department of Agriculture later argued, "Mitigation needs to be strengthened in the ROD." AR 9816.

**Response:** Admitted.

**136.  Plaintiff's Alleged Material Fact:** Internal BLM reviewers also commented on the Preliminary FEIS. One comment noted a need to be candid that many of the subsequent approvals needed for development would be granted under Categorical Exclusions authorized under the Energy Policy Act of 2005. AR 9831; 9833. Another comment explained:

There may be opportunity to approve some ARPA drilling under Section 390 of the Energy Policy Act, which would not require NEPA documentation. While it is likely new areas of drilling and facilities construction would be approved after further NEPA analysis. However, infill drilling would, in most instances, meet the criteria of Section 390 of the EPAct. The fact that some actions may be authorized under this act should be noted.

AR 9683.

**Response:**  Admitted in part.  Denied in part.  Wyoming admits that on a State Office Preliminary Final EIS Comment Form, Brenda Vosika Neuman from the BLM Wyoming State Office stated the above-quoted language.  (AR 9683). Wyoming also admits that she stated the following:  (1) "This is not entirely true.

Much of this project may be subject to a NEPA exemption as allowed by Section 390 of the Energy Policy Act of 2005" and (2) "To be perfectly clear, acknowledge these as being categorical exclusions as pursuant to Section 390 of the Energy Policy Act of 2005 (i.e., not be confused with categorical exclusions described in the CEQ regulations)." (AR 9831, 9833). To the extent that Plaintiff has paraphrased and misrepresented the record to which it cites, the alleged material facts are denied.

**137. Plaintiff's Alleged Material Fact:** An internal BLM reviewer also observed "smaller operational footprints may or may not equal reduction in habitat fragmentation (that is if you have 28 wells in the pod with associated roads, the habitat is probably just as fragmented if the well pad has 1 or 2 acres)." AR 9831.

**Response:** Admitted.

**138. Plaintiff's Alleged Material Fact:** BLM released the FEIS in December 2006. AR 2080.

**Response:** Admitted.

**139. Plaintiff's Alleged Material Fact:** As finally approved, the Project involves drilling approximately 2,000 wells within the ARPA. Total new surface disturbance from the drilling program across the ARPA will be limited to 7,600 acres at any given time, subject to a rolling reclamation program allowing additional disturbance to occur as lands are reclaimed. A 6.5-acre per well site shortterm disturbance goal also will apply. AR 4796. "The purpose of, and need for, this proposed natural gas development is to develop, produce, and market natural gas products." AR 2136.

**Response:** Admitted.

**140. Plaintiff's Alleged Material Fact:** The estimated number of gas wells "is not a cap or limitation, but an approximation to help establish the surface disturbance limit." AR 4796. The 7,600-acre disturbance cap will be allocated to operators on a prorated basis. During the life of the Project (30–50 years), total disturbance from gas development activities in the ARPA is estimated to be 13,600 acres, when one accounts for disturbance from infrastructure supporting the proposed activities. AR 4796.

**Response:** Admitted.

**141. Plaintiff's Alleged Material Fact:** The ROD approves 80-acre well spacing (8 well-sites per 640 acre section) because "drilling on 160-acre spacing would not achieve

maximum recovery of natural gas resources, was likely not economically feasible, and was likely an inefficient recovery of the natural gas resource in the ARPA." AR 4805.

      **Response:** Admitted.

**142. Plaintiff's Alleged Material Fact:** The ROD, however, "is not the final review or approval for actions associated with [Project] development." AR 4798. Additional site-specific reviews will be conducted. BLM assures the reader that "[t]he appropriate level of environmental review would be conducted" at that time. *Id.*

      **Response:** Admitted.

**143. Plaintiff's Alleged Material Fact:** In January 2007, however, BLM reviewers explained that within the ROD "there should be mention of the option/potential for APD approvals via 39OCXs … . I think we could still legally use them anyway (where applicable/appropriate), but it might save some further/later explanation to clearly reveal this up-front." AR 9375. Another commenter noted: "Maybe there was a reason for not including it. However, there needs to include be a statement in the ROD addressing that not all action would result in additional NEPA documentation prior to approval." AR 9375-76.
      **Response:** Admitted.

**144. Plaintiff's Alleged Material Fact:** The ROD contemplates an annual review process whereby the Operators, BLM and cooperating entities confer to review the Operators' site-specific development plans. AR 4812-13. To the extent a proposal must be modified, such modifications will be made based on site-specific conditions. AR 4813. The Review Team does not include the public.

      **Response:** Admitted in part. Denied in part. Wyoming denies that the Review

      Team does not include the public. The review team consists of the "BLM

      (including interdisciplinary team members), cooperating and *interested agencies*,

      and the Operators." (AR 4811) (emphasis added). Wyoming admits the

      remaining facts in Pl.'s Stmt. of Facts ¶ 144.

**145. Plaintiff's Alleged Material Fact:** The ROD identifies the following amorphous "Performance Goals":

- "maintain functional migration routes through or around development areas"
- "provide an adequate amount of suitable undisturbed crucial winter range for big game animals"

- "provide well-dispersed sage-grouse breeding, nesting, brood rearing and winter habitat"

AR 4814. However, the ROD does not commit BLM to achieving these goals. Rather, the ROD explains "BLM will attempt to achieve" the performance goals. *Id.* Nor does the ROD explain what will be done if the Performance Goals are not met.

> **Response:** Admitted in part. Denied in part. Wyoming admits that the ROD states that the BLM "will attempt to achieve the following Performance Goals": (1) "maintain functional migration routes through or around development areas"; (2) provide an adequate amount of suitable, undisturbed crucial winter range for big game animals"; and (3) provide well-dispersed sage-grouse breeding, nesting, brood rearing, and winter habitat." (AR 4814). Wyoming denies the remaining alleged facts in Pl.'s Stmt. of Facts ¶ 145 as unsupported by the record. The ROD requires that operators "are responsible for demonstrating successful achievement of Performance Goals. Early efforts are to be made to collect or consolidate resource data to form a baseline against which future monitoring efforts and data would be compared to indicate trends. In the absence of sufficient data illustrating Operator achievement of Performance Goals, the BLM will use a conservative approach when considering additional approvals." (*Id.*). Importantly, the BLM will monitor all the mitigation measures, including the ones already set out in the ROD and the ones that will be required depending on the specifics of the development area, though an operating plan that the operators must submit annually to the BLM. (AR 4798).

**146. Plaintiff's Alleged Material Fact:** The ROD explains the "monitoring, reporting and adaptive management processes made part of this decision are its key components." AR 4815. However, it also states development of the "monitoring and mitigation process ... will begin within 30 days of the effective date of the ROD." *Id.*

**Response:**  Admitted.

**147. Plaintiff's Alleged Material Fact:** Baseline data are to be collected as part of the Project, rather than beforehand. The ROD explains: "Early efforts are to be made to consolidate or collect resource data to form a baseline against which future monitoring efforts and data would be compared to indicate trends." AR 4798.

**Response:**  Admitted.

**148. Plaintiff's Alleged Material Fact:** Appendix B outlines BLM's vision of the performance based approach. It "lists the requirements that will be imposed as appropriate by the [BLM] on all oil and gas development actions approved on federal lands and minerals within the [ARPA]." AR 4835.

**Response:**  Admitted.

**149. Plaintiff's Alleged Material Fact:** With regard to wildlife, Appendix B explains: "The Review Team … or BLM will identify the level of effort required for performance-based monitoring and develop wildlife monitoring and protection plan … for development in the ARPA." AR 4847.

**Response:**  Admitted.

**150. Plaintiff's Alleged Material Fact:** With regard to inventory and monitoring requirements, Appendix B explains:  "Inventory and monitoring for wildlife and plant species within the ARPA will be conducted at frequency dependent upon the level of development activity with increased frequency generally associated with increased levels of development." AR 4848. Contrary to WGFD's recommendation of annual monitoring, Appendix B requires sage grouse monitoring only once every 5 years. AR 4848. Data on big game crucial winter range will be collected annually. AR 4849.

**Response:**  Admitted in part.  Denied in part.  Wyoming denies Plaintiff's alleged

fact that contrary to the WGFD's recommendation of annual monitoring,

Appendix B requires greater sage-grouse monitoring only once every five years.

Appendix B states that "Greater sage-grouse/Columbian sharp-tailed grouse lek

inventories will be conducted by the BLM and Wyoming Game and Fish

Department (WGFD) or by a BLM-approved operator-financed biologist on the

project area and a two mile/one mile buffer to determine lek locations every 5

years, *or as deemed appropriate by the BLM*." (AR 4848) (emphasis added).

Wyoming admits the remaining facts in Pl.'s Stmt. of Facts ¶ 150.

**151. Plaintiff's Alleged Material Fact:** Appendix B also includes "wildlife protection measures" that may be included, eliminated, or modified "in any given year as allowable and deemed appropriate by BLM in consultation with other agencies, Operators and interested parties [but not the public]." AR 4849.

> **Response:** Denied. Wyoming denies the alleged facts in Pl.'s Stmt. of Facts ¶
>
> 151 as unsupported by the record. Appendix B states that additional measures
>
> may be *included* or existing measures may be *modified* "in any given year as
>
> allowable and as deemed appropriate by BLM in consultation with other agencies,
>
> Operators, and interested parties." (AR 4849) (emphasis added). The portion of
>
> the record Plaintiff refers to does not state that the wildlife protection measures
>
> may be eliminated or that the consultation does not include the public. (AR
>
> 4849).

**152. Plaintiff's Alleged Material Fact:** With regard to Greater sage grouse, these measures are as follows:

- Surface disturbance or occupancy will be prohibited within one-quarter mile of the perimeter of occupied leks;
- Human activity will be avoided between 600 p.m. and 900 a.m. from March to May 20 within one-quarter mile of the perimeter of occupied leks;
- Surface disturbance and other actions that create permanent and high-profile structures such as buildings storage tanks and overhead power lines will not be constructed within 0.25 to 1.0 mile of the perimeter of leks as determined on caseby- case basis;
- Surface disturbing and disruptive activities will not be allowed within two miles of an occupied greater sage-grouse lek or in nesting and early brood-rearing habitat associated with individual leks when identified and delineated from March to July 15; and
- Surface disturbing and disruptive activities will not be allowed between November 15 and March 14 in delineated winter concentration areas. In order to minimize noise disturbances to strutting or dancing grouse compressor stations and generators will be muffled with hospital-style mufflers.

AR 4850.

     **Response:** Admitted.

**153.  Plaintiff's Alleged Material Fact:** With regard to Big Game species, the wildlife protection measures are:

- No construction activities or prolonged maintenance actions will be conducted within big game crucial winter range during the crucial winter periods of November 15-April 30.
- If ROW fencing is required it will be kept to minimum and the fences will meet BLM/WGFD approval for facilitating wildlife movement Wildlife-proof fencing will be used only to enclose areas that are potentially hazardous to wildlife species or reclaimed areas where it is determined that wildlife species are impeding successful vegetation establishment.
- Snow fences if used will be limited to segments of one-quarter mile or less In addition escape openings will be provided along roads in big game crucial winter ranges as designated by the BLM to facilitate exit of big game animals from snowplowed roads.

AR 4851.

     **Response:** Admitted.

**154.  Plaintiff's Alleged Material Fact:** In answering concerns about the lack of public input in the monitoring and adaptive management process, BLM explained: "As noted in the ROD the annual review and planning process will include cooperating agencies as well as the BLM. … Public input will be provided through the NEPA evaluation process for site specific proposals, unless Categorical Exclusions (pursuant to Section 390 of the Energy Policy Act of 2005) are used, if appropriate, for the approval of site-specific development activities." AR 4872.

     **Response:** Admitted.

**155.  Plaintiff's Alleged Material Fact:** The Project will have both direct and indirect impacts to recreation. "Direct impacts to recreation resources occur because of the physical disturbance and removal of vegetation from the construction of facilities; the visual impacts of facilities and activities; and from the noise, traffic, and visual distraction of human activity." AR 2418.

     **Response:** Admitted in part.  Denied in part.  Wyoming denies that the project

*will* have both direct and indirect impacts to reaction.  The ROD states that the

"Proposed Action and alternatives would *potentially* have both direct and indirect

impacts to reaction." (AR 2418) (emphasis added). Wyoming admits the

remaining facts in Pl.'s Stmt. of Facts ¶ 155.

**156.    Plaintiff's Alleged Material Fact:** BLM explains, "Applicant voluntarily committed measures (appendix K) and the BMPs (appendix H) would be implemented under all alternatives." AR 2388. Moreover:

> Standard mitigations prohibiting construction, drilling, and other activities potentially disruptive to pronghorn within crucial winter range from November 15 to April 30 would reduce the probability of displacement during this critical time of the year. During the production phase, there is no equivalent mitigation and animals may be displaced up to 0.25 miles from the source (USDI-BLM 2004c). This would lead to increased stress/decreased condition or reproductive rates of the animals as they travel farther and may have to use lower-quality range.

AR 2392.

> **Response:** Admitted.

**157.    Plaintiff's Alleged Material Fact:** TRCP submitted comments on the FEIS on January 4, 2007. AR 10262. TRCP highlighted, among other things, the following concerns with the FEIS: 1) that the Atlantic Rim Project would foreclose alternatives under consideration in the RMP update process; 2) that the Project was not in keeping with FLPMA's mandates; 3) that wildlife impacts had not been properly documented and mitigation requirements were insufficient; and 4) that cumulative impacts had not been analyzed sufficiently. *Id.*

> **Response:** Admitted.

**158.    Plaintiff's Alleged Material Fact:** The ROD summarizes the adaptive management process as follows:

- Disturbance Action
- monitoring for trend and effectiveness
- identification of areas requiring modification
- implementation of adapted techniques and/or mitigation
- repeat process

AR 4815. Thus, in every case, the disturbance occurs first, with evaluation of its impact addressed after the fact.

> **Response:** Admitted in part. Denied in part. Wyoming admits that the BLM

summarized in the ROD the adaptive management process:

- Disturbance Action
  - o Monitoring for trend and effectiveness
  - o Identification of areas requiring modification
  - o Implementation of adapted techniques and/or mitigation
  - o Repeat process

(AR 4815).  To the extent that Plaintiff has paraphrased and misrepresented the

record to which it cites, the alleged material fact is denied.

**159.  Plaintiff's Alleged Material Fact:** Moreover, BLM candidly acknowledges: "In most cases monitoring must occur for several years to detect trends and establish that successful mitigation has occurred." AR 4815. The ROD explains, "If additional mitigation measures do not produce the desired effects or conditions continued monitoring and data collection may be used to further identify or clarify the problem. As result further adaptation of mitigation techniques would be tested and monitored for success." AR 4815.

**Response:** Admitted in part.  Denied in part.  Wyoming admits that the BLM

stated the following in the ROD:  "In most cases, monitoring must occur for

several years to detect trends and establish that successful mitigation has

occurred. . . . If additional mitigation measures do not produce the desired effects

or conditions, continued monitoring and data collection may be used to further

identify or clarify the problem.  As a result, further adaptation of mitigation

techniques would be tested and monitored for success."  (AR 4815).  To the

extent that Plaintiff has paraphrased and misrepresented the record to which it

cites, the alleged material fact is denied.

**160.  Plaintiff's Alleged Material Fact:** Appendix B of the ROD further elaborates on the approach:

The BLM will implement a performance-based, adaptive management process for the ARPA whereby incremental adjustments will be made to mitigation and management restrictions based upon how the environment responds to future development and performance requirements. …

… … …

> As information is gained about how area resources are reacting to reclamation activities and mitigations, the adaptive management process allows for changes in management without further NEPA analysis, unless development thresholds, such as the number of wells and disturbance limits, are reached. The process enables managers to rapidly adjust mitigation and management restrictions for unanticipated impacts or reclamation successes.

AR 4836-37.

    **Response:** Admitted.

**161.  Plaintiff's Alleged Material Fact:** USEPA expressed concern with the vague allocation of mitigation responsibility:  "It is important to designate what entity is in charge of which mitigation measure implementation and maintenance, and that there is a paper trail of monitoring, inspection, and maintenance activities." AR 9812.

    **Response:**  Admitted in part.  Denied in part.  Wyoming admits that in an Atlantic Rim FEIS Comment Summary document, the EPA's comment was summarized as follows: "It is important to designate what entity is in charge of which mitigation measure implementation and maintenance, and that there is a paper trail of monitoring, inspection and maintenance activities."  (AR 9812).  To the extent that Plaintiff has paraphrased and misrepresented the record to which it cites, the alleged material fact is denied.

**162.  Plaintiff's Alleged Material Fact:** Both USEPA and USFWS recognized that the new Preferred Alternative would have a greater adverse impact on the environment than the alternative identified as preferred in the Preliminary EIS. AR 9815. USEPA specifically asked that phased development be imposed in the BLM block acreage. *Id.*

    **Response:**  Admitted in part.  Denied in part.  Wyoming admits that in an Atlantic Rim EIS Comment Summary document, the BLM summarized EPA's comment as follows:  "The new preferred alternative has more significant impact than the DEIS preferred alternative (combo Alt B and C) rated by EPA, and more than Alternative C analyzed in the FEIS.  USEPA recommends the following:  - Impose phased development in the BLM block acreage . . . ."  (AR 9815).

Wyoming also admits that in the Atlantic Rim FEIS Comment Summary document, the BLM summarized the FWS's comment as follows: "The USFWS believes Alternative C may provide enhanced protection for fish and wildlife resources. Recommends incorporation of as many protective measures outlined in Appendix L as practical into the final action." (*Id.*). To the extent that Plaintiff has paraphrased and misrepresented the record to which it cites, the alleged material facts are denied.

**163.** **Plaintiff's Alleged Material Fact:** BLM developed its adaptive management approach based on the advice of WGFD. AR 8809. However, WGFD objected to some of the "squishy language" contained in the FEIS concerning monitoring and mitigation requirements. AR 8818.

**Response:** Denied. The WGFD submitted a document entitled "Generic Language for a Performance-based management Approach" to the BLM in February 2007. (AR 8809). The WGFD also stated in comments in February 2007 that "the draft generic language for performance-based management looks very good, in general. We would obviously like to see the wording tightened up . . . . The squishy language of 'attempt' and 'if possible' provide wiggle room that will be constantly challenged and argued once the ROD is signed." (AR 8818). However, the WGFD followed up that comment with a request that the following paragraph be added to the ROD: "A Mitigation Plan will be required, and its development will begin immediately upon signing of the ROD. This plan will be developed in concert with State Cooperators and will provide specific quantifiable impact thresholds associated with the Performance Goals. The plan will identify the types of mitigation responses that will be considered in the event that annual monitoring indicates those thresholds are being surpassed." (AR

8824).   The BLM added the language requested by WGFD to the ROD: "A monitoring and mitigation process will be required, and its development will begin within 30 days of the effective date of the ROD.   This process will be developed by the Review Team (BLM, cooperating and interested agencies, and Operators) and will provide quantifiable criteria to identify trends associated with the Performance Goals.   The process will include the types of mitigation responses that will be considered in the event that monitoring data indicate a downward trend relative to the Performance Goals . . . ."  (AR 4798).

**164.  Plaintiff's Alleged Material Fact:** WGFD had earlier submitted comments on the FEIS. AR 10322. The comments provided "WGFD's idea of what needs to be included in the ROD[.]" *Id*. "[WGFD's comment] includes what would seem to be necessary, in addition to the FEIS, for the performance-based plan to function. Without these items, we (and probably the operators) will remain in sort of a limbo about how the plan will work." AR 10322. WGFD explained:

> The plan is performance-based, which cannot be implemented properly or effectively without a description of:
>
> > a. Desired conditions that must be maintained during development,
> >
> > b. Performance standards that help assure the desired conditions are being met,
> >
> > c. Monitoring to indicate achievement of the performance standards, and
> >
> > d. Potential mitigation options to deal with unavoidable impacts.

AR 10323.

> **Response:**  Admitted.

**165.  Plaintiff's Alleged Material Fact:**  WGFD elaborated on each of the foregoing. For example, it described "Desired Conditions" as "key landscape functions to be maintained during development and production."  AR 10323. As an example of one such desired condition, WGFD cited "Maintain landscapescale sage or sharp-tailed grouse habitat and distribution similar to pre-development" levels. *Id*.  WGFD then explained "Performance Standards" are designed to "assure Desired Conditions are being met." AR 10324. As an example, it cited "Provide key sage-grouse and sharp-tailed grouse breeding, nesting, brood rearing, and winter habitat well dispersed over the project area."

*Id.* WGFD then explained "Monitoring" is designed to "demonstrate Performance Standards are achieved." *Id.* As an example, WGFD cited: "annual lek counts and lek searches … ." *Id.*

> **Response:** Admitted.

**166. Plaintiff's Alleged Material Fact:** Finally WGFD explained its concerns with the mitigation component of the FEIS:

> Mitigation - Neither the Proposed Action nor the BLM Preferred Alternative has any proposed mitigation measures beyond the standard protections. This is inadequate as there will always be unavoidable impacts associated with natural gas development, and in this plan, significant impacts are acknowledged in the FEIS. Some specific mitigation measures are foreseeable and are listed, and these should be disclosed in the ROD as first measures to be considered. Additional measures may be needed, as noted, if monitoring indicates that impacts have become more severe.

AR 10325.

> **Response:** Admitted.

**167. Plaintiff's Alleged Material Fact:** As an example, WGFD cited:

> Big Game Migration Routes--Plan for avoidance of heavy disturbance along narrow migration corridors if monitoring shows significant avoidance or declines in animal use; implement habitat enhancements for adjacent undisturbed sites to provide alternate routes. For more severe impacts, may need to stage future development so that migrating animals always have a functional portion of the migration pathway remaining.

AR 10325.

> **Response:** Admitted.

**168. Plaintiff's Alleged Material Fact:** WGFD also noted: "BLM needs to incorporate current data from the Baggs Mule Deer project into the ROD to protect or mitigate important habitats and migration corridors." AR 9810.

> **Response:** Admitted in part. Denied in part. Wyoming admits that in an Atlantic Rim FEIS Comment Summary document, the BLM summarized the WGFD's comment as follows: "BLM needs to incorporate current data from the Baggs Mule Deer project into the ROD to protect or mitigate important habitats

and migration corridors." (AR 9810). To the extent that Plaintiff has paraphrased and misrepresented the record to which it cites, the alleged material fact is denied.

**169. Plaintiff's Alleged Material Fact:** In contrast, Double Eagle's comments on the FEIS sought to soften management prescriptions, arguing, for example, for the revision of prescriptive language to allow more flexibility in reclamation requirements. AR 10044. Yates also called for flexibility in the 7,600- acre disturbance cap employed by BLM, arguing BLM had provided no justification for its adoption. AR 9929. *See also* AR 9921 (Warren's comments) and 9864 (Anadarko's comments).

> **Response:** Admitted in part. Denied in part. Wyoming admits that Yates Petroleum Corporation ("Yates") submitted the following comment on the final EIS in January 2007: "First, the BLM does not provide any justification for the 7600 acre surface disturbace [sic] cap and the agency does not provide any flexibility if operators reach the cap. Rather than conducting further analysis, Yates recommends the BLM allow flexibility in the 7600 acre surface disturbance cap." (AR 9929). To the extent that Plaintiff has paraphrased and misrepresented the record to which it cites regarding Yates' comment, the alleged material fact is denied. Wyoming also denies that Double Eagle Petroleum and Mining Company's comments on the final EIS "sought to soften management prescriptions, arguing, for example, for the revision of prescriptive language to allow more flexibility in reclamation requirements." The letter Plaintiff refers to does not reflect or contain these alleged facts. (AR 10044).

**170. Plaintiff's Alleged Material Fact:** Yates rejected the notion of mandatory wildlife surveys, except under conditions favorable to Yates: "Yates resists the notion that they may be required to monitor and survey wildlife. However, it becomes more palatable if survey results lead to less restrictions or requirements." AR 9932.

> **Response:** Admitted in part. Denied in part. Wyoming admits that Yates submitted the following comment on the final EIS in January 2007: "Yates resists

the notion that they may be required to monitor and survey wildlife. However, it becomes more palatable if survey results lead to less restrictions or requirements." (AR 9932). To the extent that the Plaintiff has paraphrased and misrepresented the record to which it cites, the alleged material fact is denied.

**171. Plaintiff's Alleged Material Fact:** By May 2007, annual planning was being called the "key component" of the Preferred Alternative. AR 8854. However, Yates Petroleum's comments on the FEIS, rejected the annual planning contemplated in the adaptive management component of the Project. AR 9929. Yates explained: "the dynamic process that is coalbed natural gas development may not allow for 'annual planning.' Yates is willing to submit an 'annual plan,' but the BLM should allow Yates and other operators an opportunity to amend their 'annual plans' if necessary." *Id*.

Yates later elaborated:

On its face "annual planning" appears to be good idea and one would assume "annual planning" could be implemented by coalbed natural gas operators. However, it is not that simple. Coalbed natural gas development is dependent on the act of dewatering coal seams. This is a very dynamic process that does not lend itself to "annual planning". Operators must have the ability to freely move around within the Project Area on moments notice to take advantage of the dewatering process and optimize natural gas production. "Annual planning" would prevent this flexibility. Yates is willing to try "annual planning," but it should not be required.

AR 9930.

**Response:** Admitted in part. Denied in part. Wyoming admits that a May 2, 2007, Information Memorandum for the Secretary from the Wyoming BLM State Director stated that the "key component of [the BLM's preferred alternative in the final EIS] is its dependence on annual planning and coordination between the operators, cooperating agencies and BLM prior to operating season." (AR 8854). Wyoming also admits that Yates submitted the following comment on the final EIS in January 2007: "[T]he dynamic process that is coalbed natural gas development may not allow for 'annual planning.' Yates is willing to submit an 'annual plan,' but the BLM should allow Yates and other operators an opportunity

to amend their 'annual plans' if necessary."  (AR 9929).  Yates also submitted the

following comment:

> On its face "annual planning" appears to be a good idea and one
> would assume "annual planning" could be implemented by coalbed
> natural gas operators.  However, it is not that simple.  Coalbed
> natural gas development is dependent on the act of dewatering coal
> seams.  This is a very dynamic process that does not lend itself to
> "annual planning."  Operators must have the ability to freely move
> around within the Project Area on a moments notice to take
> advantage of the dewatering process and optimize natural gas
> production.   "Annual planning" would prevent this flexibility.
> Yates is willing to try "annual planning," but it should not be
> required.

(AR 9930).  To the extent that Plaintiff has paraphrased and misrepresented the

record to which it cites, the alleged material facts are denied.

**172.  Plaintiff's Alleged Material Fact:**    In reviewing the FEIS, the Wyoming
Governor's Office, while supporting adaptive management in concept, noted that certain
Wyoming agencies felt the concept was too vaguely worded in the FEIS. AR 1005. The
Governor's Office explained:

> To achieve the needed level of detail for a successful performance-based
> document, the following components should be included in the ROD:
> Obtainable and quantifiable performance measures which outline specific
> desired resource conditions during development and after production,
> monitoring to make sure that the performance measures are being
> achieved and potential mitigation options in case the desired conditions
> are not achievable.

AR 10052.

> **Response:** Admitted in part.  Denied in part.  Wyoming admits that in its January
>
> 2007 comments on the Atlantic Rim final EIS, the Wyoming Office of the
>
> Governor stated that "I appreciate the Rawlins Field Office's willingness to
>
> explore a performance-based development management design for the Atlantic
>
> Rim Project."  (AR 10051).  The Governor's Office also stated the following:
>
> > Several agencies are concerned that specific performance
> > objectives were too vague . . . . To achieve the needed level of

detail for a successful performance-based document, the following components should be included in the ROD: Obtainable and quantifiable performance measures which outline specific desired resource conditions during development and after production, monitoring to make sure that the performance measures are being achieved and potential mitigation options in case the desired conditions are not achievable.

(AR 10052).   To the extent that Plaintiff has paraphrased and misrepresented the record to which it cites, the alleged material facts are denied.

**173.  Plaintiff's Alleged Material Fact:** Ultimately the concerns of WGFD were solved by political compromise as captured in a March 2007 letter from WGFD to BLM:

We appreciate very much your collaboration in working with our issues in fashioning the Atlantic Rim ROD. … At our previous meetings, we avoided providing some of the specific language on impact thresholds and mitigation responses because you advised that language could possibly be too specific.

With the acceptance of our current language, and considering Mr Allred's recent conversation with Governor Freudenthal, we feel it would be beneficial for all parties if a process for those specifics were at least outlined in the ROD. Thus, we ask that the following paragraph be added to the ROD:

"A Mitigation Plan will be required, and its development will begin immediately upon signing of the ROD. This plan will be developed in concert with State Cooperators and will provide specific quantifiable impact thresholds associated with the Performance Goals. The plan will identify the types of mitigation responses that will be considered in the event that annual monitoring indicates those thresholds are being surpassed."

AR 8824.

**Response:** Admitted in part.  Denied in part.  Wyoming admits that the above-quoted language was stated in a Memorandum from the WGFD to the BLM in March 2007.  (AR 8824).  To the extent that Plaintiff has paraphrased and misrepresented the record to which it cites, the alleged material facts are denied.

**174.  Plaintiff's Alleged Material Fact:** In May 2007, BLM State Director Bennett explained to the BLM Director that Wyoming's concerns had been resolved. AR 8847. This is true despite the fact that the "squishy" language of which WGFD complained

earlier had not changed (e.g., "The BLM will attempt to achieve the following Performance Goals… ."). *Id. See also* AR 481.

> **Response:** Denied.  Wyoming denies the alleged facts in Pl.'s Stmt. of Facts ¶
>
> 174 as unsupported by the record.  The WGFD stated in comments in February
>
> 2007 that "the draft generic language for performance-based management looks
>
> very good, in general.  We would obviously like to see the wording tightened up
>
> . . . .  The squishy language of 'attempt' and 'if possible' provide wiggle room
>
> that will be constantly challenged and argued once the ROD is signed."  (AR
>
> 8818).  The WGFD followed up that comment with a request that the following
>
> paragraph be added to the ROD:  "A Mitigation Plan will be required, and its
>
> development will begin immediately upon signing of the ROD.  This plan will be
>
> developed in concert with State Cooperators and will provide specific quantifiable
>
> impact thresholds associated with the Performance Goals.  The plan will identify
>
> the types of mitigation responses that will be considered in the event that annual
>
> monitoring indicates those thresholds are being surpassed."  (AR 8824).  The
>
> BLM added the language requested by WGFD to the ROD: "A monitoring and
>
> mitigation process will be required, and its development will begin within 30 days
>
> of the effective date of the ROD.  This process will be developed by the Review
>
> Team (BLM, cooperating and interested agencies, and Operators) and will
>
> provide quantifiable criteria to identify trends associated with the Performance
>
> Goals.  The process will include the types of mitigation responses that will be
>
> considered in the event that monitoring data indicate a downward trend relative to
>
> the Performance Goals . . . ."  (AR 4798).

**175.    Plaintiff's Alleged Material Fact:** The Government Accountability Office ("GAO") issued a report in June 2005 entitled *Oil and Gas Development - Increased*

*Permitting Activity Has Lessened BLM's Ability to Meet Its Environmental Protection Responsibilities* AR 6791–860. The GAO found that the increased volume of APDs, and mandates to promptly process them, resulted in more BLM staff resources being devoted to issuing permits and less to monitoring and enforcing compliance with environmental standards. According to the GAO, the total number of oil and gas drilling permits approved by BLM more than tripled, from 1,803 to 6,399, during fiscal years 1999-2004. AR 6811. The GAO explains succinctly that this "dramatic increase in oil and gas development on federal lands over the past 6 years has lessened BLM's ability to meet its environmental protection responsibilities." AR 6799. For example, the field offices visited by GAO investigators reported meeting annual environmental monitoring requirements "only about half of the time" during the 6 year period. AR 6816.

> **Response:** Admitted in part. Denied in part. Wyoming admits that a Government Accountability Office ("GAO") report in June 2005 stated the following:
>
>> Oil and gas development on BLM-managed lands has increased dramatically over the past 6 years, resulting in staff spending more time processing drilling permits and less time mitigating the environmental impacts of the development. Nationwide, the total number of oil and gas drilling permits approved by BLM more than tripled, from 1,803 to 6,399 for fiscal years 1999 through 2004. Much of the increased oil and gas activity was concentrated in five intermountain states–Colorado, Montana, New Mexico, Utah, and Wyoming.
>
> (AR 6811). The GAO report also stated that a "dramatic increase in oil and gas development on federal lands over the past 6 years has lessened BLM's ability to meet its environmental protection responsibilities" (AR 6799), and that "*[t]aken as a whole*, the eight BLM field offices we visited met their annual environmental inspection goals only about half of the time during the past 6 years." (AR 9816) (emphasis added). To the extent that Plaintiff has paraphrased and misrepresented the record to which it cites, the alleged material facts are denied.

**176. Plaintiff's Alleged Material Fact:** The GAO's findings have borne out in another area of Wyoming – the "Pinedale Anticline." When BLM has tried to incorporate an adaptive management approach into its decision-making process, the agency did not live up to its obligations. *See* Declaration of Rollin D. Sparrowe (attached as Exhibit B to

TRCP's MSJ) ¶¶ 4: 29-55. For example, BLM has simply ignored multiple monitoring and review requirements that are part of an "adaptive management" process relied on to justify opening Wyoming's Pinedale Anticline to oil and gas development. *Id.* BLM's Pinedale Anticline Working Group website contains minutes from the last Wildlife Task Group meeting – dated November 2005. *See* http://www.blm.gov/wy/st/en/field_offices/Pinedale/pawg/minutes.html.

> **Response:** Denied. Plaintiff does not cite any portion of the administrative record to support the facts in Pl.'s Stmt. of Facts ¶ 176. Plaintiff instead cites to material outside the administrative record, which improperly expands the administrative record. *See* Section A of this Response. No response is thus required. To the extent that a response is required, Wyoming denies the alleged facts.

**177. Plaintiff's Alleged Material Fact:** The FEIS describes rejected Alternative B (Phased Development) as follows:

> Alternative B proposed that natural gas development activities would be restricted to one of three zones within the ARPA boundary at any one time. Each zone would be open to construction and development of natural gas removal and processing facilities for 7 years at which time construction and development activities would cease. Gas extraction and processing would continue (i.e., operational activities), while construction and development activities would move to another zone. The intent of the alternative was to focus disturbance activities into a smaller area while the remainder of the project area would be less disturbed and less impacted than under the proposed action.

AR 2160.

> **Response:** Admitted in part. Denied in part. Wyoming admits that the BLM discussed Alternative B in the final EIS:

> > Alternative B proposed that natural gas development activities would be restricted to one of three zones within the ARPA boundary at any one time. Each zone would be open to construction and development of natural gas removal and processing facilities for 7 years at which time construction and development activities would cease. Gas extraction and processing would continue (i.e., operational activities), while construction and

development activities would move to another zone. The intent of the alternative was to focus disturbance activities into a smaller area while the remainder of the project area would be less disturbed and less impacted than under the proposed action.

(AR 2160).   To the extent that Plaintiff has paraphrased and misrepresented the record to which it cites, the alleged material facts are denied.

**178. Plaintiff's Alleged Material Fact:** All the Operators applauded elimination of the Phased Development Alternative. *See*, e.g., AR 9921 (Warren's Comments) ("Warren is pleased that Alternative B was considered and eliminated from detailed study in the FEIS because this alternative did not sufficiently address or provide for the purpose and need of the project.").

**Response:** Admitted in part.   Denied in part.   Wyoming admits that Warren E&P, Inc. stated in a December 2006 letter to the BLM that it "is pleased that Alternative B was considered and eliminated from detailed study in the FEIS because this alternative did not sufficiently address or provide for the purpose and need of the project." (AR 9921).   Plaintiff, however, fails to reference the specific part of the record relied on to support the alleged fact that all the operators "applauded elimination of the Phased Development Alternative."   No response is thus required.   To the extent that a response is required, Wyoming denies the remaining alleged facts in Pl.'s Stmt. of Facts ¶ 178.

**179. Plaintiff's Alleged Material Fact:** In a PowerPoint presentation dated April 2007, BLM explained that one of the "key points" of the Preferred Alternative adopted in the ROD was to "optimize[] gas recovery." AR 8839.

**Response:** Denied.   Wyoming denies the alleged facts in Pl.'s Stmt. of Facts ¶ 179 as unsupported by the record.   The BLM stated in an April 2007 presentation entitled "Atlantic Rim Natural Gas Field Development Project" that the key points of the preferred alternative included the following:   (1) emphasizes reclamation; (2) optimizes gas recovery; (3) mitigates impacts to wildlife; and (4)

"encourages cooperation with landowners/livestock operators/companies/other agencies." (AR 8839).

**180.  Plaintiff's Alleged Material Fact:** A comparison of the alternatives adopted in the FEIS demonstrates that they all are nearly identical in terms of overall surface disturbance and well numbers. AR 8836.

> **Response:** Denied. Wyoming denies the alleged facts in Pl.'s Stmt. of Facts ¶ 180 as unsupported by the record. Alternative A is the "no action" alternative, where the BLM would reject the operators' proposal and the proposed drilling and development would not take place. (AR 2151). Conversely, the proposed action would consist of drilling and developing approximately 2,000 new natural gas wells in addition to the 116 exploration wells currently in place. (AR 2149-50). The well spacing would be eight wells per section (80 acre spacing) but spacing could be reduced to four wells per section (160 acre spacing) depending on geology. (*Id*.). Development and drilling would continue for 20 years, with a life-of-project of 30 to 50 years. (*Id*.). Roads, pipelines, water wells, disposal wells, compressor stations, and gas processing facilities would also be constructed. (*Id*.). Total new initial, short-term disturbance would be about 15,800 acres, while long-term disturbance after reclamation would be 6,241 acres. (*Id*.).

> Alternative C would be similar to the proposed action but would require development protection measures in those areas with sensitive or crucial resource values, including sensitive wildlife and fish habitat, and areas with sensitive soils. (AR 2151-55). Constraints would consist of surface disturbance limits, limited operating periods, modification of drilling and construction practices, and no

surface occupancy where necessary. (*Id*.). Specific protection measures would be implemented in several resource areas, including water and soil management, vegetation resources, range resources, wildlife resource management, visual resources, hunting areas, and historic trails. (*Id*.). For wildlife resource management, the focus would be on grouse brood rearing or nesting habitat and big game crucial winter range. (*Id*.). In these sensitive wildlife areas, surface disturbance would be limited to less than 20 acres, with four well locations per section (as opposed to eight). (*Id*.). Additionally, no surface disturbance would be allowed in severe winter relief habitats for greater sage-grouse and wintering areas for Columbian sharp-tailed grouse. (*Id*.).

Alternative D would still involve drilling approximately 2,000 gas wells within the APPA, but no more than 7,600 acres or 2.8 percent of the ARPA would be disturbed and unreclaimed at any given time. (AR 2156). Management areas with sensitive fish populations, and crucial wildlife habitats, including elk crucial winter range and silver sage and bitterbrush communities, would be managed more intensely to reduce the extent of disturbance. (*Id*.). Additionally, reclamation would be reviewed annually and an adaptive management system using best management practices would be implemented. (*Id*.). Therefore, the final EIS articulates at three different alternatives: a no action alternative, which would result in no drilling or development; Alternative C, which would allow for 2,000 wells to be drilled, but includes heightened constraints for wildlife and sensitive resources; and Alternative D, which drastically reduces surface disturbance and includes an adaptive management system.

**181.  Plaintiff's Alleged Material Fact:** The FEIS explains:

> The principal wildlife impacts likely to be associated with the Proposed
> Action or action alternatives include (1) direct and indirect loss of wildlife
> habitats, (2) displacement of some wildlife species from increased human
> access and activity, (3) an increase in the potential for collisions between
> wildlife and motor vehicles, (4) an increase in stress to wildlife and (5)
> disruption of life history requirements of a species or population segment.

AR 2387.

> **Response:**  Admitted.

**182.  Plaintiff's Alleged Material Fact:** The FEIS further explains:

> Wildlife habitats directly affected by the proposed project include areas
> that are physically disturbed by the construction of pads, roads, pipelines,
> and production facilities; wildlife habitats indirectly disturbed include
> areas surrounding directly impacted habitats. Disturbance during
> construction and production, such as human presence, dust, and noise may
> displace or preclude wildlife use of disturbed areas.

> Prohibiting construction, drilling, and other activities potentially
> disruptive to wildlife during sensitive time periods (i.e., winter, brood-
> rearing) would minimize the probability of displacement, nest
> abandonment, or reproductive failure during these critical times of the
> year. … However, habitat loss would still occur outside of this time
> period, as development would be allowed. In addition, it does not address
> the displacement of animals/loss of critical habitat due to the presence and
> operation of wells, facilities, and roads after construction is complete.

> Displacement is unavoidable in the short term under all action alternatives,
> and this displacement has the potential to have the most significant effect
> on wildlife.

AR 2388. It continues:

> Displacement would result in local reductions in wildlife populations if
> adjacent, undisturbed habitats are at carrying capacity. In this situation
> animals are either forced into less optimal habitats or they compete with
> other animals that already occupy unaffected habitats. Possible
> consequences of such displacement are lower survival, lower reproductive
> success, lower recruitment, and ultimately lower carrying capacity and
> reduced populations (WGFD 1004d).

AR 2389. However, "The extent of wildlife displacement is impossible to predict

for most species … ." *Id.*

**Response:** Admitted in part. Denied in part. Wyoming admits that in the final EIS the BLM stated the above-quoted language. (AR 2388-89). However, Plaintiff conveniently left out that the BLM *also* stated that "[t]o reduce human presence, remote monitoring of project facilities, gating of roads, and noise reduction techniques should be used to the greatest extent possible during the production phase." (AR 2388). The BLM further stated that "[a]fter initial avoidance, some wildlife species (usually certain birds and rodents and to a lesser extent deer and pronghorn) may acclimate to the activity and begin to reinvade areas previously avoided." (AR 2389). To the extent that Plaintiff has paraphrased and misrepresented the record to which it cites, the alleged material facts are denied.

**183. Plaintiff's Alleged Material Fact:** Moreover, the FEIS states: "Direct habitat loss from construction would equal approximately 6 percent of the project area. In addition, dust would directly and indirectly impact 15-30 percent more acreage (section 4.5.3.1). These impacts would include habitat avoidance." AR 2389.

**Response:** Admitted.

**184. Plaintiff's Alleged Material Fact:** The FEIS acknowledges that "Habitat fragmentation and isolation are difficult to determine and vary species to species, but they could occur as a result of gas field developments, … ." AR 2390.

**Response:** Admitted.

**185. Plaintiff's Alleged Material Fact:** "Impacts to big game species may include (1) the removal and modification of habitat, (2) displacement due to increased human activities, (3) increased potential for vehicular collisions due to increased traffic levels on existing highways, and (4) increased potential harvest success due to easier access." AR 2391. The FEIS explains the importance of crucial winter range:

The WGFD classifies big game crucial winter range as vital habitats and recommends that habitat function be maintained so that the location, essential features, and species supported by the habitat are unchanged (WGFD 2004c). The application of BLM seasonal restrictions to prevent drilling on crucial winter range between November 15 and April 30

reduces the displacement and disturbance of big game during the most critical season. During operations, mitigation measures such as remote monitoring and telemetry would be used to reduce, but not completely eliminate, impacts to big game.

*Id.*

**Response:** Admitted.

**186. Plaintiff's Alleged Material Fact:** The Mule Deer Study addressing Phase I was completed in April 2007 – one month after the AR ROD was approved. The authors of the report, who were working, in part, for BLM itself, explained "[i]nformation from Phase I provides the baseline information necessary to develop energy resources such that important migration routes and seasonal ranges can be protected or minimally impacted. Additionally, Phase I provides the pre-development information needed, should Phase II of the study materialize." AR 7423. The study "provides the baseline data necessary to accurately identify seasonal ranges and migration routes, both of which will be key components for successful mule deer management and mitigation as energy resources are developed in the ARPA." AR 7445.

> **Response:** Admitted in part. Denied in part. Wyoming admits that the Final
>
> Report for the Atlantic Rim Mule Deer Study stated the following: "Information
>
> from Phase I provides the baseline information necessary to develop energy
>
> resources such that important migration routes and seasonal ranges can be
>
> protected or minimally impacted. Additionally, Phase I provides the pre-
>
> development information needed should Phase II of the study materialize." (AR
>
> 7423). However, Wyoming denies that the Mule Deer Study was completed after
>
> the Atlantic Rim ROD was approved. The BLM included the Mule Deer Study in
>
> the administrative record, and notes that the study, which was released in April
>
> 2007, was in front of the agency *before* the ROD was officially made available to
>
> the public in May 2007. (AR 7421-49, 9574-75). Importantly, the BLM stated
>
> that it will use this Mule Deer Study to mitigate development in mule deer
>
> migration corridors within the ARPA. (*See* AR 2393 (stating that additional

mitigation will be placed on development for the protection of mule deer

migration corridors based on information available from the Mule Deer Study);

AR 3094 (requiring that operators avoid surface disturbance within migration

corridors identified in the Mule Deer Study)).

**187. Plaintiff's Alleged Material Fact:** The Mule Deer Study contains the following conclusions vital to analysis of the Project's impacts and to formulation of a mitigation plan:

- Mule deer rely on several important seasonal ranges in the ARPA, including winter and transition ranges, which generally provide mule deer with better foraging opportunities.
- Managers should not overlook the importance of all seasonal ranges for maintaining healthy and productive mule deer populations. Summer, transition, and winter ranges are equally important; loss or degradation of one will not be compensated for by the others.
- Migrations between summer and winter ranges generally follow traditional routes that are learned and passed on from mother to young. Without migratory routes, many of the seasonal ranges in the BHU would be inaccessible to mule deer, and it is unlikely current populations could be maintained.
- Given that 98% of GPS-collared deer in the ARPA were migratory, identifying and conserving migration routes to and from seasonal ranges will be a key component to successful mule deer management in the BHU.
- The Project will result in large-scale habitat changes that could potentially impact the effectiveness of migration routes. "Sustaining migratory mule deer populations in the BHU will require that suitable seasonal ranges (i.e., winter, transition, summer) be maintained and migration routes remain functional. *See generally*

AR 7421.

**Response:** Denied. The portion of the record that Plaintiff cites is a 29-page

document entitled Final Report for the Atlantic Rim Mule Deer Study. (AR 6477-

6541). Plaintiff, however, fails to reference the specific part of the study relied on

to support the alleged facts. Therefore, Wyoming denies the alleged facts in Pl.'s

Stmt. of Facts ¶ 52 as vague and unsupported by the record.

**188. Plaintiff's Alleged Material Fact:** The FEIS explains:

> Several mule deer migration routes transverse the ARPA. A research project initiated by the BLM and WGFD in February 2005, funded by two of the operators, should help delineate the migration routes used by mule deer on the ARPA. When information is available from this research, additional mitigation would be placed on development for the protection of mule deer migration corridors. Meanwhile, this project could alter or block mule deer movements along existing migration routes.

> In addition to the direct removal of habitat due to the development of pads and associated ancillary facilities, disturbances from drilling activities and traffic would affect the use of the habitat immediately adjacent to these areas. Mule deer, however, are adaptable … However, the Sublette Mule Deer Study, which used Global Positioning System (GPS) collars, found that winter mule deer habitat selection and distribution patterns have been affected by development, specifically road networks and well pads. Sawyer found no evidence of acclimation behavior. During 3 years of study, mule deer had higher probability of use in areas farther away from well pads as development progressed. Predictive maps also suggest that some habitats considered "high probability of use" areas prior to development, changed to "low probability of use" areas as development progressed, and visa versa.

AR 2393. It continues:

> This suggests that within the ARPA, indirect impacts such as displacement from activities, dust from roads, and competition for forage within the already poor condition crucial winter range habitat may lead to reduced mule deer numbers and die-offs from animals going onto crucial winter range in poorer health with reduced body reserves.

AR 2393-94.

**Response:** Admitted.

**189. Plaintiff's Alleged Material Fact:** The EIS explains that the Project's "level of development within big game crucial winter and transition ranges, compounded by the current condition of these ranges, would exceed the significance criteria (criterion number 3)." AR 2403. This means that the Project will "result in substantial disruption or irreplaceable loss of vital and high value habitats … ." AR 2388.

**Response:** Admitted in part. Denied in part. Wyoming admits that in the final EIS, the BLM stated that the "following criteria were considered in the assessment of impacts associated with the Proposed Action and alternatives and are the same as those contained in the Draft Rawlins RMP DEIS (USDI-BLM 2004c): . . . 3. Management actions that result in substantial disruption or irreplaceable loss of vital and high value habitats as defined in the WGFD (2004c) Mitigation Policy." (AR 2387-88). Wyoming also admits that the BLM stated that the "level of development within big game crucial winter and transition ranges, compounded by the current condition of these ranges, would exceed the significance criteria (criterion number 3)." (AR 2403). To the extent that Plaintiff has paraphrased and misrepresented the record to which it cites, the alleged material facts are denied.

**190. Plaintiff's Alleged Material Fact:** With regard to elk, the FEIS notes:

> Construction activities remove crucial winter range vegetation and increase noise and human activity levels which displace animals. However, … the amount of vegetation disturbed is not as important as the noise and activity levels that would still occur and result in displacement of elk. In addition to the direct removal of habitat due to the development of pads and associated transportation facilities, disturbances from drilling activities and traffic would affect use of the habitat adjacent to these areas (Powell 2003). Elk are more sensitive to human activities than pronghorn or mule deer, and they may be displaced in construction areas from 0.6 to 1.2 miles for elk depending upon the season (Powell 2003). … Elk would likely habituate to the physical presence of gas wells. However, elk rarely adjust to continued human presence required during the production phase of the project (Thomas and Toweill 1982). With the increase in roads and potential recreational access to the area, displacement of elk is extremely likely during all phases of development. During the production phase, there is no equivalent mitigation and animals may be displaced up to 1 mile from the source (USDIBLM 2004c). This would lead to increased stress/decreased condition or reproductive rates of the animals as they travel farther and may have to use lower quality range.

AR 2394.

**Response:** Admitted in part. Denied in part. Wyoming admits that in the final EIS the BLM stated the above-quoted language. (AR 2394). However, Plaintiff conveniently left out that the BLM *also* stated with regard to elk that (1) "much of the crucial winter range is on steeper south- and west-facing slopes that would be avoided during development"; (2) "[d]isplacement would be reduced in areas with topographic barriers," and (3) "[t]o reduce human presence, remote monitoring of project facilities would be used to the greatest extent possible during the production phase." (*Id.*). To the extent that Plaintiff has paraphrased and misrepresented the record to which it cites, the alleged material facts are denied.

**191. Plaintiff's Alleged Material Fact:** As with mule deer, the ROD employs seasonal restrictions on drilling on crucial elk winter ranges between November 15 and April 30. AR 2391. However, there are no meaningful restrictions on operations at any time of year. "During operations, mitigation measures such as remote monitoring and telemetry would be used to reduce, but not completely eliminate, impacts to big game." *Id.* The EIS concludes: "there would be an 'extreme' impact to elk based on the actual number of pads (eight pads per section) (WGFD 2004c). With this level of development, impacts to elk crucial winter range would exceed the significance criteria (criterion number 3)." AR 2398. This means a "substantial disruption or irreplaceable loss of vital and high value habitats." AR 2388.

**Response:** Admitted in part. Denied in part. Wyoming admits that in the final EIS, the BLM stated that the "following criteria were considered in the assessment of impacts associated with the Proposed Action and alternatives and are the same as those contained in the Draft Rawlins RMP DEIS (USDI-BLM 2004c): . . . 3. Management actions that result in substantial disruption or irreplaceable loss of vital and high value habitats as defined in the WGFD (2004c) Mitigation Policy." (AR 2387-88). Wyoming also admits that the BLM stated with regard to elk that "[a]lthough actual acreage disturbance would fall under a 'high' impact post-reclamation, there would be an 'extreme' impact to elk based

on the actual number of pads (eight pads per section) (WGFD 2004c).  With this level of development, impacts to elk crucial winter range would exceed the significance criteria (criterion number 3)."  (AR 2398)

Wyoming denies, however, Plaintiff's alleged fact that there are no meaningful restrictions on operations at any time of the year for crucial winter range for elk.  The Great Divide RMP was prepared under the Federal Land Policy and Management Act ("FLPMA") and manages approximately four million acres of public land surface and five million acres of federal mineral estate administered by the BLM in the Great Divide Resource Area in Wyoming. (AR 650).  The RMP covers management of federal lands within the ARPA and is therefore the governing RMP.  (AR 2136).  The RMP indicates that to protect important big game winter habitat, "activities or surface use will not be allowed from November 15 to April 30."  (AR 697).  The final EIS requires this same protection measure, stating that "[n]o construction activities or prolonged maintenance actions will be conducted within big game crucial winter range during the crucial winter periods of November 15-April 30."  (AR 2628).

Additionally, the final EIS and ROD discuss several adverse effects of drilling and developing in the ARPA on big game crucial winter range.  The BLM recognized these adverse effects in the final EIS and in response implemented in the ROD a "performance-based, adaptive management process."  (AR 4798). This process includes the use of performance goals for migration routes and big game crucial winter range.  (AR 4835-38).  Therefore, in addition to the mitigation measures already required by the ROD, drilling and development and

reclamation activities in the ARPA will be managed through this adaptive management process to "avoid and/or minimize adverse impacts to wildlife by monitoring wildlife population trend and developing mitigation during the course of project development and operation." (AR 4847).

Moreover, if the development area proposed by the operator is in big game crucial winter range, the BLM will require the operators to implement the following mitigation measures: (1) directional drilling; (2) drilling multiple wells from a single pad; (3) remote well monitoring; (4) transportation planning to reduce road density and traffic volumes; (5) cluster development; (6) compensation mitigation; and (7) seasonal restriction of public vehicular access. (AR 3093). Importantly, the BLM stated in the final EIS that "[d]ata on big game use of crucial winter ranges on the project area and an adjacent one mile buffer will be requested annually by the BLM from the WGFD, as deemed necessary by the BLM. This information will be used to assess the effectiveness of protection measures implemented for the project. In the event that BLM, in consultation with WGFD and other interested parties, determines that additional data should be collected on big game, these issues will be discussed at the annual meeting . . . and monitoring plans modified as agreed to by the parties. (AR 2625).

**192. Plaintiff's Alleged Material Fact:** "Several general pronghorn migration routes transverse the ARPA; it is unknown how critical these routes are. [The] [P]roject could alter or block pronghorn movements along existing migration routes." AR 2392.

**Response:** Admitted. Wyoming admits that the BLM stated in the final EIS the above-quoted language. (AR 2392).

**193. Plaintiff's Alleged Material Fact:** BLM opines "… pronghorn have been found to habituate to increased traffic …" and "… they would likely habituate to activities along roads and continue using habitats in those areas …" AR 2392. But BLM later states:

> However, this is true for only certain individuals within a population. Other individuals may exhibit a lower tolerance to human-related activity. Therefore, … BLM RFO biologists have noted anecdotally that antelope herd sizes are significantly smaller in impacted areas than in relatively pristine areas. Those animals that potentially acclimate seem to do so only in smaller herd sizes. *Id.*

**Response:** Denied. Wyoming denies the alleged facts in Pl.'s Stmt. of Facts ¶ 193 as unsupported by the record. In the final EIS, the BLM stated the following with regard to the direct and indirect impacts to pronghorn antelope:

> In addition to the direct removal of habitat due to the development of pads and associated ancillary facilities, disturbances from drilling activities and traffic would affect use of the habitat adjacent to these areas. However, pronghorn have been found to habituate to increased traffic volumes and heavy machinery as long as the machines move in a predictable manner. Well development operations and deviation from ordinary activities may cause antelope displacement of up to 0.625 miles, *but they would likely habituate to activities along roads and continue using habitats in those areas. The magnitude of displacement would decrease over time as (1) the animals have more time to adjust to the circumstance and (2) the extent of the most intensive activities such as drilling and road building diminishes and more wells are put into production. By the time the field is under full production, construction activities would have ceased, and traffic and human activities should be reduced.*

> The perception of pronghorn use in and near oil and gas development projects is that some individuals may habituate to project construction and operational activities in both the short and long term. Over time, some individuals may habituate to certain disturbances, depending on the spatial relationship (i.e., distance) between these areas of disturbance to available forage, water, and thermal cover. However, this is true for only certain individuals within a population. Other individuals may exhibit a lower tolerance to human-related activity. Therefore, animals within a population may respond differently to construction and operational activity. BLM RFO biologists have noted anecdotally that antelope herd sizes are significantly smaller in impacted areas than in relatively pristine areas. Those animals that potentially

acclimate seem to do so only in smaller herd sizes. In undisturbed areas, the herds are much large and show flight responses at much greater distances than in disturbed zones. *Minimizing human presence at well sites after they have been put into production and timely reclamation of well pads, pipelines, and ROWs [right-of-ways] would help reduce displacement of pronghorn from the well field.*

(AR 2392) (emphasis added) (internal citations omitted).

**194. Plaintiff's Alleged Material Fact:** Likewise, with regard to pronghorn, the EIS explains:

The acreage disturbance and the actual number of pads per section would fall under a high impact post-reclamation. The direct loss/reduced usability of Wyoming big sagebrush would increase use on remaining shrubs, resulting in continued shrub health decline outside the immediate project disturbances. This would have the greatest impact to antelope due to their extreme reliance upon sagebrush (96 percent of their diet) during winter. This level of development within pronghorn crucial winter range, compounded by the current condition of the crucial winter habitat, would exceed the significance criteria (criterion number 3).

AR 2419. This equals a "substantial disruption or irreplaceable loss of vital and high value habitats." AR 2388.

**Response:** Admitted in part. Denied in part. Wyoming admits that in the final EIS, the BLM stated that the "following criteria were considered in the assessment of impacts associated with the Proposed Action and alternatives and are the same as those contained in the Draft Rawlins RMP DEIS (USDI-BLM 2004c): . . . 3. Management actions that result in substantial disruption or irreplaceable loss of vital and high value habitats as defined in the WGFD (2004c) Mitigation Policy." (AR 2387-88). However, the portion of the record that Plaintiff refers to (AR 2419) does not contain the above-quoted material. Therefore, Wyoming denies the remaining alleged facts Pl.'s Stmt. of Facts ¶ 194 as unsupported by the record.

**195. Plaintiff's Alleged Material Fact:** With regard to pronghorn antelope, the EIS explains: "Standard mitigations prohibiting construction, drilling, and other activities potentially disruptive to pronghorn within crucial winter range from November 15 to April 30 would reduce the probability of displacement during this critical time of the year." AR 2392. However "[d]uring the production phase, there is no equivalent mitigation and animals may be displaced up to 0.25 miles from the source." *Id.* "This would lead to increased stress/decreased condition or reproductive rates of the animals as they travel farther and may have to use lower-quality range." *Id.* BLM hypothesizes some pronghorn may become accustomed to tolerating increased human activity, but offer only "perception" as the basis of that conclusion. *Id.*

> **Response:** Admitted in part. Denied in part. Wyoming admits that in the final EIS, the BLM stated the following with regard to the direct and indirect impacts to pronghorn antelope:
>
> > Standard mitigations prohibiting construction, drilling, and other activities potentially disruptive to pronghorn within crucial winter range from November 15 to April 30 would reduce the probability of displacement during this critical time of the year. During the production phase, there is no equivalent mitigation and animals may be displace up to 0.25 miles from the source (USDI-BLM 2003c). This would lead to increased stress/decreased condition or reproductive rates of the animals as they travel father and may have to use lower-quality range. *To reduce human presence, remote monitoring of project facilities would be used to the greatest extent possible during the production phase.*
>
> (AR 2392) (emphasis added). Additionally, if the development area proposed by the operator is in big game crucial winter range, the BLM will require the operators to implement the following mitigation measures: (1) directional drilling; (2) drilling multiple wells from a single pad; (3) remote well monitoring; (4) transportation planning to reduce road density and traffic volumes; (5) cluster development; (6) compensation mitigation; and (7) seasonal restriction of public vehicular access. (AR 3093). Importantly, the BLM stated the following in the final EIS:

> Data on big game use of crucial winter ranges on the project area
> and an adjacent one mile buffer will be requested annually by the
> BLM from the WGFD, as deemed necessary by the BLM.  This
> information will be used to assess the effectiveness of protection
> measures implemented for the project.  In the event that BLM, in
> consultation with WGFD and other interested parties, determines
> that additional data should be collected on big game, these issues
> will be discussed at the annual meeting . . . and monitoring plans
> modified as agreed to by the parties.

(AR 2625).

Wyoming denies Plaintiff's alleged fact that the "BLM hypothesizes some pronghorn may become accustomed to tolerating increased human activity, but offer only 'perception' as the basis of that conclusion."  The BLM noted in the final EIS the following:

> Pronghorn have been found to habituate to increased traffic
> volumes and heavy machinery as long as the machines move in a
> predictable manner (Reeve 1984).  Well development operations
> and deviation from ordinary activities may cause antelope
> displacement of up to 0.625 miles (Easterly et al. 1991), but they
> would likely habituate to activities along roads and continue using
> habitats in those areas (Reeve 1984).  The magnitude of
> displacement would decrease over time as (1) the animals have
> more time to adjust to the circumstance and (2) the extent of the
> most intensive activities such as drilling and road building
> diminishes and more wells are put into production.  By the time the
> field is under full production, construction activities would have
> ceased, and traffic and human activities should be reduced.

(AR 2392).  This alleged "perception" is based on two references included in the final EIS:  (1) Easterly, T., A. Wood, and T. Litchfield 1991.  *Responses of Pronghorn and Mule Deer to Petroleum Development on Crucial Winter Range in the Rattlesnake Hills*.  Unpublished Completion Report.  67 pp.; and (2) Reeve, A. F.  1984.  *Environmental Influences on Male Pronghorn Home Range and*

*Pronghorn Behavior.*  Laramie, Wyoming: PhD.  Dissertation, University of Wyoming.  172 pp.  (AR 2392, 2521, 2531).

**196. Plaintiff's Alleged Material Fact:**  The USFWS in January 2007 again expressed concern with the Project as analyzed in the FEIS. AR 10134. That agency explained:

> Most importantly, the Service continues to be concerned with the potential for significant impacts this project may have on fish and wildlife resources within the Project area. We remain concerned that Project impacts to greater sage-grouse and other sagebrush obligate species may be significant and possibly irreversible, especially in landscape where these species currently thrive. Proposed development may alter the future size, distribution and existence of local populations. The Service reiterates its recommendation that the Bureau not authorize an action that may exacerbate the decline of fish and wildlife species and possibly result in listing under the [Endangered Species] Act.

AR 10134–35. The USFWS further explained: "regardless of the limits to disturbance in the Project area, habitat fragmentation will occur, which may have widespread and long-term effects on species present." AR 10135.

> **Response:**  Admitted in part.  Denied in part.  Wyoming admits that the FWS's comments on the Atlantic Rim final EIS in January 2007 stated that above-quoted language.  To the extent that Plaintiff has paraphrased and misrepresented the record to which it cites, the alleged material facts are denied.

**197. Plaintiff's Alleged Material Fact:**  The FEIS explains: "Potential greater sage-grouse nesting habitat covers 92 percent of the ARPA. In the long-term, recovery of shrubs to pre-disturbance levels would not occur during the life of the project. Therefore, there would be a long-term loss of nesting habitat." AR 2395. BLM estimates a "… direct loss of 8.1 percent of the available nesting habitat …" AR 2402.

> **Response:**  Admitted in part.  Denied in part.  Wyoming admits that under Alternative D, "habitat disturbances would equate to a maximum direct loss of 8.1 percent of the available [greater sage-grouse] nesting habitat (eight locations per section with associate roads and facilities)."  (AR 2402).  However, Plaintiff conveniently left out that the BLM *also* stated that "[u]nder this alternative there is a goal of 20 percent reduction of such habitat disturbance." (*Id.*).  To the extent

that Plaintiff has paraphrased and misrepresented the record to which it cites, the alleged material fact is denied. Wyoming admits the remaining facts in Pl.'s Stmt. of Facts ¶ 197.

**198. Plaintiff's Alleged Material Fact:** "Of greater concern is the indirect loss of habitat resulting from bird displacement and fragmentation of nesting and early brood-rearing habitat." AR 2402. BLM opines:

> The application of avoidance and mitigation measures would help reduce the loss of habitat and stress to greater sage-grouse in proximity to leks on public lands. Based on research conducted in Wyoming, only 45 percent of nests would be afforded seasonal protection as they are within the 2-mile buffer of leks. Of the suitable nesting habitat, 21 percent is outside the 2-mile buffer and would be afforded no seasonal protection. Habitat loss would continue outside the quartermile- protected buffer around leks. However, the long-term loss of shrubs combined with the indirect impacts on the habitat, such as dust, noise, and continued human presence during the drilling and production phase, would result in habitat loss and disturbance levels exceeding the significance criteria (criterion number 4). *Id.*

> **Response:** Admitted. Wyoming admits that in the final EIS the BLM stated the above-quoted language. (AR 2402).

**199. Plaintiff's Alleged Material Fact:** BLM argues, "Sage-grouse may repopulate an area following energy development, but may not attain population levels that occurred before development (Braun 1998). Most nests abandoned are directly or indirectly related to human activity. " AR 2395.

> **Response:** Denied. In the final EIS, the BLM stated that "[s]age-grouse may repopulate an area following energy development, but may not attain population levels that occurred before development (Braun 1998). Most nests abandoned are directly or indirectly related to human activity. Likelihood of abandonment is higher when nests are disturbed early in the incubation period (Remington and Braun 1991)." (AR 2395). This alleged "argument" is based on two references included in the final EIS: (1) Braun, C. E. 1998. "Sage Grouse Declines in Western North America: What are the Problems?" *Proceedings of the Western*

*Association of State Fish and Wildlife Agencies* 78:139-156; and (2) Remington,

T. E., and C. E. Braun 1991. "How Surface Coal Mining Affects Sage Grouse,

North Park, Colorado." *Proceedings, Issues and Technology in the Management*

*of Impacted Western Wildlife*. Thorne Ecological Institute 5:128-132. (AR 2395,

2518, 2532).

**200. Plaintiff's Alleged Material Fact:**   Though it does not follow Naugle's
recommendations, BLM acknowledges the work of Naugle:

> Naugle et al. (2006) found that leks along the edge of CBNG development
> had higher lek attendance than leks within the developed area. They
> hypothesis that sage-grouse avoid developed areas is supported by the
> finding that active leks and leks with moderate to large numbers of males
> were often found adjacent to CBNG fields but rarely within CBNG. …
> One of the most striking patterns discovered was that, of leks counted in
> either 2004 or 2005, no medium or large-sized leks occurred within
> CBNG development; all remaining leks in CBNG have 20 or fewer males.
> … active leks typically are twice as far from wells, … have less
> development (wells and power lines) within 3.2 kilometers (km) of the lek
> complex. In addition, a significantly higher proportion of lek complexes
> are inactive in CBNG areas compared to areas on the edge of or outside
> CBNG … .

AR 2395.

> **Response:**   Admitted in part.   Denied in part.   Wyoming admits that in the final
>
> EIS, the BLM stated the above-quoted language.   (AR 2395).   Plaintiff, however,
>
> fails to reference the specific part of the record relied on to support the alleged
>
> fact that the BLM does not "follow Naugle's recommendations."   No response is
>
> thus required.   To the extent that a response is required, Wyoming denies the
>
> alleged fact.

**201. Plaintiff's Alleged Material Fact:**   As for sage grouse protection, BLM explains
"Wintering areas (as they are mapped) would be protected from surface disturbing
activities from November 15 to March 14. Activities would be allowed outside this
timing period and habitat could be removed. This would result in habitat loss as well as
potential displacement of wintering birds." AR 2396.  BLM explains:

> The application of the winter timing stipulation would only protect grouse during this critical time period. This does not prevent the direct loss of wintering areas for grouse outside of this time period.

AR 2404.

> **Response:** Admitted.

**202. Plaintiff's Alleged Material Fact:** The FEIS explains that due to construction of ancillary facilities, the Project will fragment the habitat on which sage grouse rely. AR 2395 ("Construction of facilities and roads creates a long-term loss of greater sage-grouse habitat, increases fragmentation of remaining habitat.").

> **Response:** Admitted in part. Denied in part. Wyoming admits that in the final EIS, the BLM stated that "[c]onstruction of facilities and roads creates a long-term loss of greater sage-grouse habitat, increases [sic] fragmentation of remaining habitat." (AR 2395). To the extent that Plaintiff has paraphrased and misrepresented the record to which it cites, the alleged material fact is denied.

**203. Plaintiff's Alleged Material Fact:** The FEIS candidly acknowledges: "The timing stipulation prevents winter disturbance to greater sage-grouse, but does not prevent the direct loss of wintering areas outside of this time period. Loss of this habitat would lead to lower productivity and long-term decline in the population of these species." AR 2398

> **Response:** Denied. Wyoming denies the alleged facts in Pl.'s Stmt. of Facts ¶ 203 as unsupported by the record. In the final EIS, the BLM stated *in regard to the proposed action* (and not the preferred alternative) that the "timing stipulation prevents winter disturbance to greater sage-grouse, but does not prevent the direct loss of wintering areas outside of this time period." (AR 2398).

**204. Plaintiff's Alleged Material Fact:** Ultimately, the AR FEIS concludes: "the long-term loss of shrubs combined with the indirect impacts on the habitat, such as dust, noise, and continued human presence during the drilling and production phase, would result in habitat loss and disturbance levels exceeding the significance criteria (criterion number 4)." AR 2398. This means that sage grouse will suffer a "[s]ubstantial loss of habitat function or disruption of life history requirements … that would preclude improvement of their status." AR 2388.

**Response:** Denied.  Wyoming denies the alleged facts in Pl.'s Stmt. of Facts ¶ 204 as unsupported by the record.  In the final EIS, the BLM stated *in regard to the proposed action* (and not the preferred alternative) that "the long-term loss of shrubs combined with the indirect impacts on the habitat, such as dust, noise, and continued human presence during the drilling and production phase, would result in habitat loss and disturbance levels exceeding the significance criteria (criterion number 4).  (AR 2398).

**205.  Plaintiff's Alleged Material Fact:**  Overall, the AR FEIS concludes that greater sage grouse will experience:

> [L]oss of nesting or early brood-rearing habitat, decreased population productivity caused by loss of nesting or early brood-rearing habitat, reduced utilization of suitable habitats due to indirect disturbance, loss of winter habitat, increased predation due to increased roosting sites for raptors on power poles and other structures, and displacement of birds into lower quality habitats.

AR 2394.

**Response:** Denied.  Wyoming denies the alleged facts in Pl.'s Stmt. of Facts ¶ 205 as unsupported by the record.  The BLM stated in the final EIS that *potential* impacts to the greater sage-grouse include "loss of nesting or early brood-rearing habitat, decreased population productivity caused by loss of nesting or early brood-rearing habitat, reduced utilization of suitable habitats due to indirect disturbance, loss of winter habitat, increased predation due to increased roosting sites for raptors on power poles and other structures, and displacement of birds into lower quality habitats."  (AR 2395).

**206.  Plaintiff's Alleged Material Fact:**  In the Sun Dog and Catalina PODs, wells were constructed within both the 1/4- mile radius and the 2-mile radius of sage grouse leks. AR

78630, AR 78545, AR 78564, AR 78738. *See also* Declaration of Frank Blomquist, filed in *N.R.D.C. v. Kempthorne,* Case No. 07- CV-1709 (Oct. 5, 2007).

> **Response:** Denied. Wyoming denies the alleged facts in Pl.'s Stmt. of Facts ¶ 206 as unsupported by the record. On September 26, 2006, Double Eagle Petroleum Company ("Double Eagle") submitted an APD in the Catalina Unit Plan of Development ("POD") B. (AR 78630). On February 23, 2006, the BLM conducted a pre-ROD onsite inspection for this APD. (*Id*.). The inspection presented a conflict with an adjacent sage-grouse lek. (*Id*.). The BLM stated in a letter to Double Eagle that "we were unable to move this proposed well to a location both suitable to us and you . . . . We are returning this APD *unapproved* for this reason." (*Id*.) (emphasis added). Therefore, contrary to Plaintiff's alleged fact, the BLM rejected the APD for the well that was situated within the one-fourth-mile radius of a greater sage-grouse lek. (*Id*.) Additionally, Plaintiff cites to material outside the administrative record, which improperly expands the administrative record. *See* Section A of this Response. Therefore, Wyoming also denies the alleged facts in Pl.'s Stmt. of Facts ¶ 206 to the extent they are based on extra-record material.

**207. Plaintiff's Alleged Material Fact:** "The health and abundance of wildlife populations directly affect the quality of hunting in the ARPA. When wildlife populations fluctuate, so do wildlife-based recreational opportunities." AR 2417. The Project will have both direct and indirect impacts to recreation. "Direct impacts to recreation resources occur because of the physical disturbance and removal of vegetation from the construction of facilities; the visual impacts of facilities and activities; and from the noise, traffic, and visual distraction of human activity." AR 2418. "The principal recreation impact likely to be associated with the Proposed Action and alternatives is the change in big game hunting opportunities because of habitat loss and wildlife displacement." AR 2418-19. "The impact would be borne primarily by local and regional hunters, especially local hunters for whom the benefits of the ARPA would be diminished as a convenient and economical place to hunt." AR 2419.

**Response:** Admitted in part. Denied in part. Wyoming admits that in the final EIS, the BLM stated the above-quoted language. (AR 2418-19). Wyoming denies Plaintiff's alleged fact that the Project will have both direct and indirect impacts to recreation. The BLM stated in the final EIS that the "Proposed Action and alternatives would *potentially* have both direct and indirect impacts to recreation." (AR 2418).

208. **Plaintiff's Alleged Material Fact:** "The duration of the effects would be for the life of the project—which may affect more than one generation of recreation user." AR 2420. The EIS ultimately concludes:

> [T]he impacts to the predominant recreation activities in the ARPA— hunting, pleasure driving, and wildlife viewing—would be significant. The Proposed Action would diminish the wildlife presence, degrade scenery, and introduce traffic and noise. The natural setting would be converted to an industrialized setting by development of the Proposed Action. *Id.* (Emphasis supplied). "The impacts to hunting and to the recreation setting are similar under both the Proposed Action and the [Project] … ."

AR 2423.

**Response:** Denied. Wyoming denies the alleged facts in Pl.'s Stmt. of Facts ¶ 208 as unsupported by the record. In the final EIS, the BLM stated the following *in regard to the proposed action* (and not the preferred alternative):

> The duration of the effects would be for the life of the project— which may affect more than one generation of recreation user—but the intensity of the effects would be lower after drilling and construction ends. . . . In conclusion, the impacts to the predominant recreation activities in the ARPA—hunting, pleasure driving, and wildlife viewing—would be significant. The *Proposed Action* would diminish the wildlife presence, degrade scenery, and introduce traffic and noise. The natural setting would be converted to an industrialized setting by development of the *Proposed Action*.

(AR 2420) (emphasis added). The BLM also stated the following:

Impacts to hunting and to the recreation setting under Alternative D [the agency's preferred alternative] would be similar to, *but of a lesser magnitude than the impacts described under the Proposed Action* (section 4.9.3.1 above). The acreage of the project area that would be disturbed at any one time under Alternative D (goal of 6.5 acres average disturbance per well site) would be approximately 20 percent *less* than the acreage anticipated under the Proposed Action 7.9 acres per well site).

(AR 2423) (emphasis added).

**209. Plaintiff's Alleged Material Fact:** A document authored 2 months after the FEIS and one month before the ROD was signed analyzing the impact of methane seeps and augmented methane gas release due to CBM development describes the following concerns:

- Other concerns that precipitate from the likely increase gas seep emissions are:
- Potential damage to the atmosphere by elevated emission of coal bed gases. All of the constituents of the coal bed gases are considered to be greenhouse gases andincompatible with the well being of the earth's atmosphere.
- Potential danger to human and animal safety:
    - Accidental ignition by an unaware tourist/hunter could result in someone being seriously burned. Natural ignition via lightening or spontaneous combustion of exposed coal bed could cause wild fires that would be a danger to human life, wildlife and vegetation.
    - Some of the potential constituents of coal gases like hydrogen sulfide and carbon dioxide are poisonous to humans and wildlife. They are also heavier than air and can settle in low lying basin areas and can create potential traps for the unknowing and unwary.
- Potential danger to vegetation.
    - Some of the coal gas constituents like methane and hydrogen sulfide are incompatible with plant life and can result in vegetation die off in the adjacent vicinity of the seeps. In the San Juan Basin of Colorado there have been extensive vegetation kills adjacent to gas seeps associated with the coal bed outcrops that are being developed for CBNG.

AR 8803.

**Response:** Admitted in part. Denied in part. Wyoming admits that the document Plaintiff refers to is a *draft* report written by Jon N. Dull entitled *Documentation and Appraisal of Known Gas Seeps within the Atlantic Rim Coal Bed Natural Gas Development Area Carbon County, Wyoming* dated February 6, 2007. (AR 8799-8808). Wyoming acknowledges that the final EIS was released to the public and a notice of availability ("NOA") was published in the Federal Register on December 1, 2006 (AR 9564-65), and that the ROD was released to the public and a NOA was published in the Federal Register on May 21, 2007. (AR 9574-75). Wyoming also admits that in his draft report, Mr. Dull stated the above-quoted language. (AR 8805). However, to the extent that the Plaintiff has paraphrased and misrepresented the record to which it cites, the alleged material fact is denied. Additionally, Wyoming notes that Mr. Dull stated in that document that "[a]t this point in time there is no scientific data available to prove or disprove that CBNG development within the ARPA has caused or will cause increased gas flux from the known gas seeps." (*Id.*).

**210. Plaintiff's Alleged Material Fact:** Among the conclusions of the analysis is:

> As previously discussed, there exist some fairly severe safety and environmental concerns and potential liability concerns for the federal government that are associated with the gas seeps in the ARPA. At this point in time there is no scientific data available to prove or disprove CBNG development within the ARPA has caused or will cause increased gas flux from the known gas seeps. However, it is likely that future CBNG development may cause increased quantities of gas to be emitted from the known seeps. It is also possible that there exist other seeps within the ARPA that are yet to be discovered.

AR 8805.

**Response:** Admitted in part. Denied in part. Wyoming admits that Mr. Dull stated in his draft report the above-quoted language. (AR 8805). To the extent that Plaintiff has paraphrased and misrepresented the record to which it cites, the alleged material facts are denied.

**211. Plaintiff's Alleged Material Fact:** BLM was expressly put on notice of its obligations to investigate and disclose the impacts identified in the memorandum. AR 8840. One commenter requested expressly that the ROD be deferred until after the issues could be addressed. AR 8841.

**Response:** Denied. Wyoming denies the alleged facts in Pl.'s Stmt. of Facts ¶ 211 as unsupported by the record. Wyoming Outdoor Council sent a letter to the BLM dated April 25, 2007. (AR 8840-41). This letter stated that "there has been increasing concern about reports that new and unexplained mud pots have been occurring in the Atlantic Rim area." (AR 8840). The letter also states that the possibility of methane seeps "merits further investigation and analysis before the BLM can go forward with its Atlantic Rim proposal." (AR 8841). The letter does *not* mention Mr. Dull's draft report nor does it "expressly put [the BLM] on notice of its obligations to investigate and disclose the impacts identified in the [Mr. Dull's report]." (AR 8840-41). Moreover, in response to public comments, and based on Mr. Dull's report, the BLM implemented additional "performance-based monitoring and best management practices" in the ROD to address methane seeps. (AR 4844-45). One of the additional requirements includes "drilling, completing, and equipping one set of three shallow groundwater-monitoring wells completed in water-bearing sandstone units stratigraphically above the principle producing coal beds in the upper Mesaverde Group." (AR 4844). The BLM also responded directly to comments in the ROD, stating that the "BLM is looking into

reports of mud pots and geysers and how they may be related to current operations.  Given that produced water is injected into geologic formations below the coal seams being dewatered, BLM currently speculates that the mud pots and geysers are not likely related to injection of produced water."  (AR 4870).

**212.  Plaintiff's Alleged Material Fact:**  As late as May 2007, the State Director was still not fully disclosing to the Director the potential impact of methane seeps. AR 8854.

> **Response:**  Denied.  Wyoming denies the alleged facts in Pl.'s Stmt. of Facts ¶ 212 as unsupported by the record.  In a May 2007 Information Memorandum for the Secretary, the BLM Wyoming State Director stated the following regarding methane seeps:  "About a dozen historic springs in the Atlantic Rim area south of Rawlins are drawing attention because they appear to be more active than in the historic past.  These springs have been around for 30-50 years and are a naturally occurring geologic feature when there is sand over coal seams."  (AR 8854).  This statement is wholly in line with the information in Mr. Dull's report that the gas seeps within the ARPA are *naturally* occurring—Mr. Dull stated that the "seeps have been found in association with natural occurring water springs."  (AR 8799).  Additionally, the report ultimately concluded that "there is no scientific data available to prove or disprove that CBNG development within the ARPA has caused or will cause increased gas flux from the known gas seeps."  (AR 8805).

**213.  Plaintiff's Alleged Material Fact:**  While some BLM materials attempted to argue that the mud pots had existed for decades, other information contradicted that conclusion. AR 9432.

> **Response:**  Denied.  Wyoming denies the alleged facts in Pl.'s Stmt. of Facts ¶ 213 as unsupported by the record.  The "other information" that Plaintiff refers to is a March 2007 email from Sharon O'Toole to the BLM stating the following:

"Here are some photos of mudpots on the Atlantic Rim.  The second and third

photos are the same mudpot—the first on 2/28 and the second on 3/4/07.  Duck

Well is the old artesian with the developed wetland.  We spoke today with

Veneble Barclay, a geologist who has done a lot of work in this area.  He

confirmed that this is new activity.  Sharon & Pat[.]"  (AR 9432).  Contrary to

Plaintiff's alleged fact, the email does not contradict that mud pots have existed

naturally for decades nor does it even state whether the "new activity" is naturally

occurring or not.  (*Id*.).

**214. Plaintiff's Alleged Material Fact:**  On May 4, 2007, BLM staff informed the State
Director that methane seeps had not been adequately considered: "In light of the high
level of interest in the Atlantic Rim project and the pending release of a Record of
Decision dated Marchxx2007, new information and a concern about potential
consequences of mud pot changes may not have been adequately addressed in the FEIS."
AR 9467.

**Response:**  Admitted in part.  Denied in part.  Wyoming admits that in a May 4,

2007, Decision Memorandum for the BLM State Director, Marty Griffith stated

the following:  "In light of the high level of interest in the Atlantic Rim project

and the pending release of a Record of Decision dated Marchxx2007, new

information and a concern about potential consequences of mud pot changes *may*

*not* have been adequately addressed in the FEIS.  There is a 3 day window of

opportunity to address the information in the ROD before its Notice of

[A]vailability is published in the Fedreal Register."  (AR 9467) (emphasis added).

However, Wyoming denies that the BLM stated that methane seeps had not been

adequately considered as the letter merely states that concern about methane seeps

"may not" have been adequately addressed in the final EIS.  (*Id*.).  Moreover, the

BLM received comments from public entities expressing concerns with methane

springs in the ARPA.  (*See* AR 8840-42, 9447, 79100-105).  In response to these comments, and based on Mr. Dull's report, the BLM implemented additional "performance-based monitoring and best management practices" in the ROD to address methane seeps.  (AR 4844-45).  One of the additional requirements includes "drilling, completing, and equipping one set of three shallow groundwater-monitoring wells completed in water-bearing sandstone units stratigraphically above the principle producing coal beds in the upper Mesaverde Group."  (AR 4844).  The BLM also responded directly to comments in the ROD, stating that the "BLM is looking into reports of mud pots and geysers and how they may be related to current operations.  Given that produced water is injected into geologic formations below the coal seams being dewatered, BLM currently speculates that the mud pots and geysers are not likely related to injection of produced water."  (AR 4870).

**215.  Plaintiff's Alleged Material Fact:**  The memorandum was later criticized by other BLM employees:

> I asked Bob L. to put this together last night for today's discussion. It should help as a reference that we (the BLM) has addressed methane springs in the FEIS and the letter from [Wyoming Outdoor Council] is NOT new information. The briefing paper is NOT an accurate description of th *(sic)* issue. I advise we do not use it … .

AR 9460.

> **Response:**  Denied.  Wyoming denies the alleged facts in Pl.'s Stmt. of Facts ¶ 215 as unsupported by the record.  The "memorandum" that Plaintiff refers to is not the subject of the email Plaintiff cites.  Debbie Johnson, a BLM employee, forwarded a document entitled "Summary of Groundwater Issues Covered in the Atlantic Rim EIS.doc" to several other BLM employees.  (AR 9460).  Debbie

stated that "I asked Bob L. to put this together last night for today's discussion. It should help as a reference that we (the BLM) has addressed methane springs in the FEIS and the letter from [Wyoming Outdoor Council] is NOT new information. The Briefing paper is NOT an accurate description of th[e] issue. I advise we do not use it this morning for our discussion with Don and Bob." (*Id*.). In other words, Plaintiff's record cite does not support it's alleged fact that the May 4, 2007, Decision Memorandum for the BLM State Director was later criticized by other BLM employees. (*Id*.).

**216. Plaintiff's Alleged Material Fact:** In response, another BLM employee explained: "This was the kind of documentation that I was hoping we had in the administrative record which until the ROD is released to the public is still open for this kind of information. Once the Record is released, the administrative record for the ARim project NEPA/decision making process closes." AR 9452.

**Response:** Denied. Wyoming denies the alleged facts in Pl.'s Stmt. of Facts ¶ 216 as unsupported by the record. Plaintiff's record cite does not support it's alleged fact that a BLM employee responded to the May 4, 2007, Decision Memorandum for the BLM State Director with the above-quoted language. (*Id*.). Debbie Johnson, a BLM employee, forwarded a document entitled "Atlantic_Rim_Update_2007_April_26.doc" to several other BLM employees. (AR 9452-54). In response, Janet Kurman, Environmental Protection Specialist, BLM Wyoming State Office, stated "thanks for passing this along. This was the kind of documentation that I was hoping we had in the administrative record which until the ROD is released to the public is still open for this kind of information. Once the Record is released, the administrative record for the ARim project NEPA/decision making process closes." (AR 9452).

**217. Plaintiff's Alleged Material Fact:** By late May 2007, BLM was developing a list of "talking points" downplaying the significance of the methane seep issue. AR 8862.

**Response:** Denied.    Wyoming denies the alleged facts in Pl.'s Stmt. of Facts ¶ 217 as unsupported by the record.   In a May 21, 2007, document entitled "Methane seeps talking points," Debbie Johnson, a BLM employee, did not "downplay" the significance of the "methane seep issue."  Rather, she thoroughly discussed methane seeps in relation to the ARPA:

- Most of these features are **not new.**
- Many of the methane springs have been **in existence since before the interim drilling** occurred in the Atlantic Rim area.
- **Fluctuation in the amount of gas** coming from the methane springs has also varied over the years, including prior to drilling.
- The methane springs do not appear to be associated with the **re-injection of produced water.**
- They are most likely the result of **natural seepage of methane gas** from near surface coals via subsurface faulting, and/or through the soil surface, and/or through abandoned wells that penetrate through the coals.
- The number and location of these seeps is **impossible to predict**, therefore **monitoring** would be established to evaluate this impact.
- Currently, the BLM is working with the **University of Wyoming and the Wyoming State Geological Survey** on collecting and evaluating the isotopic data and completing a water conductivity study.
- The BLM is also working with the **Wyoming Oil and Gas Conservation Commission** on locating all methane springs and surface water resources, conducting an **inventory of abandoned wells** and plugged coal cores, conducting a **field reconnaissance of fault traces**, and collecting and analyzing **water samples from springs**, methane springs, water wells, CBNG (coal bed natural gas) wells, and perennial drainages located in the Atlantic Rim project area . . . .
- The EIS disclosed that there would be **significant impacts** to these resources.
  - Further discussion in the EIS, specifically on page 4-32, states: "Methane seeps **could possibly develop** in the outcrop region of the Mesaverde Groups as a result of this project.["]
  - These seeps could **contaminate shallow groundwater** sources and may also cause death of vegetation in limited areas.
  - As part of the monitoring described in the EIS (page 4-49), "**Isotopic data would be collected** project wide by the BLM to evaluate groundwater resources and **additional monitoring wells** in the upper Mesaverde Group would be established to a BLM

    o   There are also several other references in the EIS with regard to impacts to **surface water hydrology and groundwater resources**, including methane springs.  As the EIS states, **there will be impacts** from gas development in the Atlantic Rim area.

    o   **Samples will be collected** from springs, methane springs, water wells, CBNG (coal bed natural gas) wells, and perennial drainages located in the Atlantic Rim project area.

(AR 8862).

**218.  Plaintiff's Alleged Material Fact:** Photos of the methane seeps are at AR 9432-37.

    **Response:** Admitted

**219.  Plaintiff's Alleged Material Fact:** Prior to the issuance of the ROD and EIS, the BLM completed its *Final Environmental Impact Statement on Wind Energy Development on Bureau of Land Management – Administered Lands in the Western United States* ("Wind Energy EIS"). *See* http://windeis.anl.gov/ and Exhibits K-M of TRCP's MSJ. The scope of the Wind Energy EIS includes the ARPA and indicates that the ARPA's "wind resource level" was among the highest in the Rawlins planning area. The potential of wind energy development to adversely impact sage grouse was specifically identified in the Wind Energy EIS. *See* http://windeis.anl.gov/documents/fpeis/maintext/Vol1/Vol1Ch5.pdf. So too was the potential for wind energy development to disrupt migratory behavior of big game animals like mule deer, elk and pronghorn antelope. *Id.*

    **Response:**  Denied.  Plaintiff does not cite any portion of the administrative record to support the facts in Pl.'s Stmt. of Facts ¶ 219.  Plaintiff instead cites to material outside the administrative record, which improperly expands the administrative record.  *See* Section A of this Response.  No response is thus required.  To the extent that a response is required, Wyoming denies the alleged facts.

**220.  Plaintiff's Alleged Material Fact:** In response to the Wind Energy EIS cumulative impacts analysis, Anadarko stated it "does not believe that the probable interaction of wind energy projects and mineral development (e.g. oil and gas) is clearly described and analyzed. Exhibit M to TRCP's MSJ.  The document's discussion of potential impacts to mineral development is limited to statements that defer analysis of cumulative impacts until site specific information is available … Furthermore, the possible negative impacts

from a wind energy project may have on the ability to develop leasable minerals is all but dismissed."

> **Response:** Denied. Plaintiff does not cite any portion of the administrative record to support the facts in Pl.'s Stmt. of Facts ¶ 220. Plaintiff instead cites to material outside the administrative record, which improperly expands the administrative record. *See* Section A of this Response. No response is thus required. To the extent that a response is required, Wyoming denies the alleged facts.

**221. Plaintiff's Alleged Material Fact:** This response followed Anadarko's earlier call for the Wind Energy EIS to address, "Cumulative impacts (visual, wildlife, etc.) from wind farm projects and the potential impact on the ability to develop resources on adjacent lands." Exhibit M to TRCP's MSJ.

> **Response:** Denied. Plaintiff does not cite any portion of the administrative record to support the facts in Pl.'s Stmt. of Facts ¶ 221. Plaintiff instead cites to material outside the administrative record, which improperly expands the administrative record. *See* Section A of this Response. No response is thus required. To the extent that a response is required, Wyoming denies the alleged facts.

**222. Plaintiff's Alleged Material Fact:** TRCP provided BLM with comments in January 2007, during BLM's NEPA process, expressing TRCP's concerns about the Project and highlighting various shortcomings of the EIS. AR 10262.

> **Response:** Admitted in part. Denied in part. Wyoming admits that on January 4, 2007, Plaintiff Theodore Roosevelt Conservation Partnership ("TRCP") provided BLM with comments on the Atlantic Rim Gas Project. (AR 10262-67). To the extent that the Plaintiff has paraphrased and misrepresented the record to which it cites, the alleged material facts are denied.

**223.  Plaintiff's Alleged Material Fact:** The ROD became effective when it was announced in the Federal Register on May 21, 2007. 72 Fed. Reg. 28,518 (May 21, 2007). By virtue of 43 C.F.R. § 3165.4(c), the ROD was immediately effective and constituted a final agency action. Though not required to do so, TRCP, attempting to resolve the issue administratively, timely appealed the ROD to the Interior Board of Land Appeals ("IBLA") on June 18, 2007, where it raised the concerns identified in this Complaint. Concurrently with its notice of appeal, TRCP filed with the IBLA a Petition for Stay. *See generally TRCP*, IBLA No. 2007-208.

> **Response:**  Admitted in part.  Denied in part.  Wyoming admits that the Atlantic Rim ROD was released to the public and a NOA was published in the Federal Register on May 21, 2007.  (AR 9574-75).  Wyoming also admits that on June 20, 2007, Plaintiff TRCP filed a timely appeal and petitioned for a stay of the effect of the ROD with the United States Department of the Interior, Interior Board of Land Appeals ("IBLA").  *See* Theodore Roosevelt Conservation Partnership, I.B.L.A. No. 2008-36, at 2 (Feb. 19, 2008); __ I.B.L.A. __ (2008).  To the extent that Plaintiff has paraphrased and misrepresented the record to which it cites, the alleged material facts are denied.  Wyoming also denies Plaintiff's alleged fact that by virtue of 43 C.F.R. § 3165.4(c), the ROD was immediately effective and constituted a final agency action.   43 C.F.R. § 3165.4(c) provides the following:

>> Effect of an appeal on an approval/decision by a State Director or Administrative Law Judge. All decisions and approvals of a State Director or Administrator Law Judge under this part shall remain effective pending appeal unless the Interior Board of Land Appeals determines otherwise upon consideration of the standards stated in this paragraph. The provisions of 43 CFR 4.21(a) shall not apply to any decision or approval of a State Director or Administrative Law Judge under this part. A petition for a stay of a decision or approval of a State Director or Administrative Law Judge shall be filed with the Interior Board of Land Appeals, Office of Hearings and Appeals, Department of the Interior, and shall show sufficient justification based on the following standards:

(1) The relative harm to the parties if the stay is granted or denied,

(2) The likelihood of the appellant's success on the merits,

(3) The likelihood of irreparable harm to the appellant or resources if the stay is not granted, and

(4) Whether the public interest favors granting the stay.

Nothing in this paragraph shall diminish the discretionary authority of a State Director or Administrative Law Judge to stay the effectiveness of a decision subject to appeal pursuant to paragraph (a) or (b) of this section upon a request by an adversely affected party or on the State Director's or Administrative Law Judge's own initiative. If a State Director or Administrative Law Judge denies such a request, the requester can petition for a stay of the denial decision by filing a petition with the Interior Board of Land Appeals that addresses the standards described above in this paragraph.

**224.  Plaintiff's Alleged Material Fact:** On September 5, 2007, by Order of the same date, the IBLA, after first holding that TRCP had standing to appeal the ROD, denied TRCP's Petition for Stay. Having received no immediate relief from the IBLA, and under no legal obligation to exhaust that appeal, TRCP withdrew its IBLA appeal on September 10, 2007 in favor of this litigation.

**Response:**    Admitted in part.   Denied in part.   Wyoming admits that on September 5, 2007, the IBLA denied Plaintiff TRCP's petition for stay. *See Theodore Roosevelt Conservation Partnership,* I.B.L.A. No. 2008-36, at 2 (Feb. 19, 2008); __ I.B.L.A. __ (2008).   Wyoming also admits that Plaintiff TRCP thereafter withdrew its appeal, and on September 12, 2007, the IBLA dismissed the appeal.  (*Id.*).  To the extent that Plaintiff has paraphrased and misrepresented the record to which it cites, the alleged material facts are denied.

**225.  Plaintiff's Alleged Material Fact:** The Sun Dog Decision authorizes the construction or reconstruction of access roads and well pads for the drilling of 48 CBM wells and 3 produced water re-injection wells, along with the construction, use and reclamation of appurtenant gas and water gathering pipelines and utility corridors in the

Sun Dog POD (Plan of Development) within the ARPA. The Sun Dog Decision relies on the standard mitigation measures identified in the EIS and ROD to address wildlife related concerns. AR 74065.

> **Response:**  Admitted in part.  Denied in part.  Wyoming admits that the EA for
>
> the Sun Dog A & B PODs authorizes the construction or reconstruction of access
>
> roads and well pads for the drilling of 48 coalbed natural gas wells and three
>
> produced water re-injection wells, along with the construction, use and
>
> reclamation of appurtenant gas and water gathering pipelines and utility corridors
>
> within the ARPA.  (AR 74065).  Wyoming denies that the Sun Dog EA relies
>
> solely on the standard mitigation measures identified in the EIS and ROD to
>
> address wildlife related concerns.  The EA and finding of no significant impact
>
> ("FONSI") for the Sun Dog PODs are tiered to the final EIS.  (AR 74063).
>
> However, the Sun Dog EA also lays out seasonal wildlife timing stipulations
>
> which will be applied to the subject wells.  (AR 74069-70).  Additionally, site-
>
> specific findings by the review team are incorporated into the Conditions of
>
> Approval for the Sun Dog A & B PODs.  (AR 74071, 74081).  These site-specific
>
> findings in the Conditions of Approval provide wildlife protection measures and
>
> seasonal restrictions that apply to specific well locations (as well as access road,
>
> gas-gathering pipeline, water-gathering pipeline, and utility corridor segments) in
>
> the Sun Dog A & B PODs.  (74082-83).  These restrictions apply to raptor nesting
>
> areas, greater sage-grouse habitat, plover nesting areas, and big game crucial
>
> winter habitat specifically in the Sun Dog PODs.  (*Id.*).  Moreover, the Conditions
>
> of Approval state the following:  "[R]equests for exceptions to wildlife
>
> stipulations will only be considered in the event of extraordinary and unavoidable

occurrences over which the company has little or no control. Additionally, wells must be spud in a time frame which would allow for reasonably normal drilling and completion of the well prior to the beginning date of wildlife protection stipulations." (AR 74083).

**226. Plaintiff's Alleged Material Fact:** Neither the ROD, nor the EIS, contemplates or analyzes the impact of exclusions from seasonal wildlife management restrictions established therein. Yet, the EA provides, with respect to wildlife: "In some instances, the proponent may request consideration of a temporary exception to wildlife seasonal restrictions. Such an exception may be granted if a determination is made that the wildlife resource will not be adversely impacted." AR 74071. It appears this "determination" will be made without any further NEPA review.

> **Response:** Denied. Wyoming denies the alleged facts in Pl.'s Stmt. of Facts ¶ 226 as unsupported by the record. The Sun Dog EA indicates that "[i]n some instances, the proponent may request consideration of a temporary exception to wildlife seasonal restrictions. Such an exception may be granted *if a determination is made that the wildlife resource will not be adversely impacted.*" (AR 74071) (emphasis added). This statement comports with the BLM's "performance-based, adaptive management" process. (AR 4798). The adaptive management process includes the development of mitigation measures by a review team consisting of the BLM, cooperating and interested agencies, and the operators, and will include modifying an operator's development and drilling proposal based on site-specific factors such as greater sage-grouse lek locations, raptor nests, and crucial winter range. (AR 4798, 4813). In other words, the adaptive management process involves modifying an operator's development proposal based on whether or not certain resources exist in the specific area that is being developed.

For example, if the development area proposed by the operator is in big game crucial winter range, the BLM will require the operators to implement the following mitigation measures: (1) directional drilling; (2) drilling multiple wells from a single pad; (3) remote well monitoring; (4) transportation planning to reduce road density and traffic volumes; (5) cluster development; (6) compensation mitigation; and (7) seasonal restriction of public vehicular access. (AR 3093). Similarly, if the development area is not in big game crucial winter range or would not adversely affect crucial winter range, it seems obvious that the BLM could grant an exemption or waiver from certain mitigation measures. Importantly, the BLM will monitor all these mitigation measures, or the grant of exemptions or waivers, though an operating plan that the operators must submit annually to the BLM. (AR 4798). Therefore, the BLM's "performance-based, adaptive management" process, which is described in detail in the ROD, contemplates modifying an operator's development proposal based on whether or not certain resources exist in the specific area that is being developed.

**227. Plaintiff's Alleged Material Fact:** The EA considers only two alternatives: "no action" and the proponent's proposed development. AR 74063.

**Response:** Denied. Wyoming denies the alleged facts in Pl.'s Stmt. of Facts ¶ 227 as unsupported by the record. The EA and FONSI for the Sun Dog PODs are tiered to the final EIS. (AR 74063). The final EIS articulates at least three different alternatives: a no action alternative, which would result in no drilling or development; Alternative C, which would allow for 2,000 wells to be drilled, but includes heightened constraints for wildlife and sensitive resources; and Alternative D, which drastically reduces surface disturbance and includes an

adaptive management system. (AR 2149-63). Because the EA is tiered to the

final EIS, and the BLM considered a reasonable range of alternatives in the final

EIS, the BLM also considered a reasonable range of alternatives for the site-

specific PODs.

**228. Plaintiff's Alleged Material Fact:** TRCP learned of the Sun Dog Decision on September 13, 2007. On September 14, 2007, TRCP timely sought the Wyoming State Director's review of the Sun Dog Decision pursuant to 43 C.F.R. § 3165.3(b).

**Response:** Admitted in part. Denied in part. Wyoming admits that on

September 15, 2007, Plaintiff TRCP filed a request with the IBLA for State

Director Review of the FONSI and Decision Record ("DR") for the Sun Dog A &

B PODs. *See* Theodore Roosevelt Conservation Partnership, I.B.L.A. No. 2008-

36, at 2 (Feb. 19, 2008); __ I.B.L.A. __ (2008). To the extent that Plaintiff has

paraphrased and misrepresented the record to which it cites, the alleged material

facts are denied.

**229. Plaintiff's Alleged Material Fact:** On October 31, 2007, the Deputy State Director refused to perform a review under BLM's regulations citing this litigation, as well as litigation brought by the Natural Resources Defense Council (Cause No. 07-1709), challenging the ROD, the EIS and the Sun Dog Decision.

**Response:** Admitted in part. Denied in part. Wyoming admits that on October

21, 2007, the Deputy State Director denied Plaintiff TRCP's request for State

Director Review because of the pendency of a lawsuit filed on September 28,

2007, by Natural Resources Defense Council ("NRDC"), Biodiversity

Conservation Alliance, Wyoming Outdoor Council, Western Watershed Projects

and Wyoming Wilderness Association, *NRDC v. Kempthorne*, No. 07-1709 (RJL)

(D.D.C.), challenging the Sun Dog A & B FONSI/DR. *See* Theodore Roosevelt

Conservation Partnership, I.B.L.A. No. 2008-36, at 2 (Feb. 19, 2008); __ I.B.L.A.

__ (2008).  To the extent that Plaintiff has paraphrased and misrepresented the record to which it cites, the alleged material facts are denied.

**230.  Plaintiff's Alleged Material Fact:** TRCP timely appealed to the IBLA the Deputy State Director's refusal to conduct a State Director Review as contemplated by 43 C.F.R. § 3165.3(b).  *See* TRCP, IBLA No. 2008- 36. Before answering, BLM moved to stay TRCP's appeal.

> **Response:**  Admitted in part.  Denied in part.  Wyoming admits that Plaintiff TRCP appealed the October 21, 2007, Deputy State Director's denial of its request for a State Director Review.  *See* Theodore Roosevelt Conservation Partnership, I.B.L.A. No. 2008-36, at 3 (Feb. 19, 2008); __ I.B.L.A. __ (2008). TRCP also petitioned for a stay of that decision and the underlying FONSI/DR. (*Id.*).  In December 2007, the BLM requested that the IBLA suspend consideration of TRCP's petition for stay and underlying appeal until the United States District Court for the District of Columbia ("D.C. District Court") resolved NRDC's lawsuit challenging the Atlantic Rim ROD and the FONSI/DR for the Sun Dog PODs.  (*Id.*).  To the extent that Plaintiff has paraphrased and misrepresented the record to which it cites, the alleged material facts are denied.

**231.  Plaintiff's Alleged Material Fact:** On February 19, 2008, the IBLA issued an Order explaining it would not review TRCP's administrative appeal, stating: "[G]iven that the legality of BLM's approval of the PODs, including the adequacy, under section 102(2)(C) of NEPA, of its assessment of likely environmental impacts in the EA and FEIS, is already pending before the court in the lawsuits, we grant BLM's request to suspend consideration of TRCP's appeal and defer final dispositive action in the pending appeal."

> **Response:**  Admitted.  *See* Theodore Roosevelt Conservation Partnership, I.B.L.A. No. 2008-36, at 4 (Feb. 19, 2008); __ I.B.L.A. __ (2008).

**232.  Plaintiff's Alleged Material Fact:** Given IBLA's determination, and the apparent suspension by BLM of the administrative review requirements contained in 43 C.F.R. § 3165.3(b) insofar as development within the ARPA is concerned, TRCP withdrew its IBLA appeal in favor of this amended complaint.

> **Response:** Admitted in part.  Denied in part.  Wyoming admits that Plaintiff filed
>
> a First Amended and Supplemented Complaint with this Court on April 3, 2008,
>
> adding a challenge to the EAs and FONSIs for the Sun Dog A & B PODs and the
>
> Catalina A & B PODs.  (Pl.'s First Am. and Supplemented Compl., at 3).
>
> Plaintiff, however, fails to provide record cites to support the remaining alleged
>
> facts in Pl.'s Stmt. of Facts ¶ 232.  Therefore, Wyoming denies the remaining
>
> alleged facts as unsupported by the record.

**233.  Plaintiff's Alleged Material Fact:** The Catalina Decision authorizes construction of access roads and pads for the drilling of 36 CBM wells and 3 produced water reinjection wells, and a central delivery point facility. AR 73494. The Catalina Decision relies on the standard mitigation measures identified in the EIS and ROD to address wildlife related concerns. AR 73496-501.

> **Response:**  Admitted in part.  Denied in part.  Wyoming admits that the EA for
>
> the Catalina A & B PODs authorizes the construction or reconstruction of access
>
> roads and well pads for the drilling of 36 coalbed natural gas wells and three
>
> produced water re-injection wells, along with the construction, use and
>
> reclamation of appurtenant gas and water gathering pipelines and utility corridors
>
> within the ARPA.  (AR 73494).  Wyoming denies that the Catalina EA relies
>
> solely on the standard mitigation measures identified in the EIS and ROD to
>
> address wildlife related concerns.  The EA and FONSI for the Catalina PODs are
>
> tiered to the final EIS.  (AR 74063).  However, the Catalina EA also lays out
>
> specific restrictions regarding wildlife:

> Portions of the proposed action are located within crucial winter range for mule deer, and within protection buffers of nesting raptors. Two sage grouse leks are known to exist within two miles of the project area. One of the APDs in POD B (#20-6) is located within the ¼-mile buffer of the lek perimeter, and can not be situated to adequately mitigate the potential effects to grouse at the adjacent lek. As a result, authorization of this APD will be deferred until additional mitigation measures have been developed to reconsider the proposal. No mountain plover habitat was identified as being affected within the project area.

(AR 73499). Additionally, site-specific findings by the review team are incorporated into the Conditions of Approval for the Catalina A & B PODs. (AR 73500, 73510). These site-specific findings in the Conditions of Approval provide wildlife protection measures and seasonal restrictions that apply to specific well locations (as well as access road, gas-gathering pipeline, water-gathering pipeline, and utility corridor segments) in the Catalina A & B PODs. (73511-12). These restrictions apply to raptor nesting areas, greater sage-grouse habitat, and big game crucial winter habitat specifically in the Catalina PODs. (*Id.*). Moreover, the Conditions of Approval state the following: "[R]equests for exceptions to wildlife stipulations will only be considered in the event of extraordinary and unavoidable occurrences over which the company has little or no control. Additionally, wells must be spud in a time frame which would allow for reasonably normal drilling and completion of the well prior to the beginning date of wildlife protection stipulations." (AR 73511).

**234. Plaintiff's Alleged Material Fact:** As with the Sun Dog Decision, the Catalina EA notes that exceptions to applicable wildlife stipulations may be granted, but the Catalina EA does not analyze the impact of granting such exceptions. AR 73492–501.

**Response:** Denied. Wyoming denies the alleged facts in Pl.'s Stmt. of Facts ¶ 234 as unsupported by the record. The Catalina EA indicates that "[i]n some

instances, the proponent may request consideration of a temporary exception to wildlife seasonal restrictions. Such an exception may be granted *if a determination is made that the wildlife resource will not be adversely impacted.*" (AR 73500) (emphasis added). This statement comports with the BLM's "performance-based, adaptive management" process. (AR 4798). The adaptive management process includes the development of mitigation measures by a review team consisting of the BLM, cooperating and interested agencies, and the operators, and will include modifying an operator's development and drilling proposal based on site-specific factors such as greater sage-grouse lek locations, raptor nests, and crucial winter range. (AR 4798, 4813). In other words, the adaptive management process involves modifying an operator's development proposal based on whether or not certain resources exist in the specific area that is being developed.

　　For example, if the development area proposed by the operator is in big game crucial winter range, the BLM will require the operators to implement the following mitigation measures: (1) directional drilling; (2) drilling multiple wells from a single pad; (3) remote well monitoring; (4) transportation planning to reduce road density and traffic volumes; (5) cluster development; (6) compensation mitigation; and (7) seasonal restriction of public vehicular access. (AR 3093). Similarly, if the development area is not in big game crucial winter range or would not adversely affect crucial winter range, it seems obvious that the BLM could grant an exemption or waiver from certain mitigation measures. Importantly, the BLM will monitor all these mitigation measures, or the grant of

exemptions or waivers, though an operating plan that the operators must submit annually to the BLM. (AR 4798). Therefore, the BLM's "performance-based, adaptive management" process, which is described in detail in the ROD, contemplates modifying an operator's development proposal based on whether or not certain resources exist in the specific area that is being developed.

**235. Plaintiff's Alleged Material Fact:** As with the Sun Dog Decision, the Catalina EA considers only two alternatives: the proposed action and a "no action" alternative. AR 73492–501.

> **Response:** Denied. Wyoming denies the alleged facts in Pl.'s Stmt. of Facts ¶ 235 as unsupported by the record. The EA and FONSI for the Catalina PODs are tiered to the final EIS. (AR 73492). The final EIS articulates at least three different alternatives: a no action alternative, which would result in no drilling or development; Alternative C, which would allow for 2,000 wells to be drilled, but includes heightened constraints for wildlife and sensitive resources; and Alternative D, which drastically reduces surface disturbance and includes an adaptive management system. (AR 2149-63). Because the EA is tiered to the final EIS, and the BLM considered a reasonable range of alternatives in the final EIS, the BLM also considered a reasonable range of alternatives for the site-specific PODs.

**236. Plaintiff's Alleged Material Fact:** In approving the Sun Dog and Catalina A and B PODs, BLM approved well locations within big game crucial winter range and within 0.5 miles of sage grouse leks. *See* Declaration of Frank Blomquist, filed in *N.R.D.C. v. Kempthorne*, Case No. 07-CV-1709 (Oct. 5, 2007).

> **Response:** Denied. Plaintiff does not cite any portion of the administrative record to support the facts in Pl.'s Stmt. of Facts ¶ 236. Plaintiff instead cites to material outside the administrative record, which improperly expands the

administrative record.  *See* Section A of this Response.  No response is thus required.  To the extent that a response is required, Wyoming denies the alleged facts.

DATED the 11th day of June, 2008.

DEFENDANT-INTERVENOR,
STATE OF WYOMING


 /s/ Teresa R. Nelson
Teresa R. Nelson
Assistant Attorney General

Jay A. Jerde
Deputy Attorney General
Wyoming Attorney General's Office
123 Capitol Building
Cheyenne, WY  82002
(307) 777-6946
(307) 777-3542 – Facsimile
jjerde@state.wy.us

## CERTIFICATE OF SERVICE

I hereby certify that on this 11th day of June, 2008, the foregoing DEFENDANT-INTERVENOR STATE OF WYOMING'S RESPONSE TO PLAINTIFF'S STATEMENT OF MATERIAL FACTS was electronically filed through the CM/ECF system, which caused the following parties to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

Steven M. Kupka
Thomas R. Wilmoth
Donald G. Blankenau
Husch Blackwell Sanders LLP
206 South 13th Street, Suite 1400
Lincoln, NE 68508-2019
email: nancilee.holland@huschblackwell.com
email: tom.wilmoth@huschblackwell.com
email: don.blankenau@huschblackwell.com
*Counsel for Plaintiff*

Michael B. Wigmore
Sandra P. Franco
Bingham McCutchen LLP
2020 K Street, NW
Washington, D.C. 20006-1806
email: michael.wigmore@bingham.com
email: s.franco@bingham.com
*Counsel for Defendant-Intervenors Anadarko Petroleum Corporation, Warren Resources, Inc.,  and Double Eagle Petroleum Co.*

Lori Caramanian
United States Department of Justice
Environment & Natural Resources
Division
1961 Stout Street, 8th Floor
Denver, CO 80294
email: lori.caramanian@usdoj.gov
*Counsel for Federal Defendants*

Robert C. Mathes
Bjork Lindley Little PC
1600 Stout Street, Suite 1400
Denver, CO 80202
email: rmathes@bjorklindley.com
*Counsel for Defendant-Intervenor Double Eagle Petroleum Co.*

　　　/s/ Teresa R. Nelson　　　　　　
Office of the Attorney General