UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ————————————— ) | |
| THEODORE ROOSEVELT CONSERVATION ) | |
| PARTNERSHIP, ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CASE NO. 07-cv-01486-RJL |
| ) | |
| DIRK KEMPTHORNE, in his official Capacity ) | |
| as the Secretary of the United States Department ) | |
| of the Interior, and UNITED STATES BUREAU ) | |
| OF LAND MANAGEMENT ) | |
| ) | |
| Defendants, ) | |
| ) | |
| ————————————— ) | |
| ) | |
| STATE OF WYOMING, ANADARKO ) | |
| PETROLEUM CORPORATION, WARREN ) | |
| RESOURCES, INC., and DOUBLE EAGLE ) | |
| PETROLEUM CO., ) | |
| ) | |
| Defendant-Intervenors. ) | |
| ————————————— ) | |

---

**DEFENDANT-INTERVENOR STATE OF WYOMING'S
CROSS-MOTION FOR SUMMARY JUDGMENT**

---

Pursuant to Fed. R. Civ. P. 56 and LCvR 7(h), Defendant-Intervenor State of Wyoming

hereby respectfully moves this Court to enter an order granting summary judgment in favor of

Defendant-Intervenor State of Wyoming and against Plaintiff as to all claims. Because there are

no material facts in dispute, Defendant-Intervenor is entitled to judgment as a matter of law.  The grounds for this motion are set forth more fully in the accompanying DEFENDANT-INTERVENOR STATE OF WYOMING'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT which is filed herewith and incorporated by reference.

DATED the 11th day of June, 2008.

DEFENDANT-INTERVENOR, STATE OF WYOMING

/s/ Teresa R. Nelson
Teresa R. Nelson
Assistant Attorney General

Jay A. Jerde
Deputy Attorney General
Wyoming Attorney General's Office
123 Capitol Building
Cheyenne, WY  82002
(307) 777-6946
(307) 777-3542 - Facsimile
jjerde@state.wy.us

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THEODORE ROOSEVELT CONSERVATION PARTNERSHIP, Plaintiff, | ) ) ) ) ) |
| v. | ) CASE NO. 07-cv-01486-RJL ) |
| DIRK KEMPTHORNE, in his official Capacity as the Secretary of the United States Department of the Interior, and UNITED STATES BUREAU OF LAND MANAGEMENT | ) ) ) ) ) ) |
| Defendants, | ) ) |
| STATE OF WYOMING, ANADARKO PETROLEUM CORPORATION, WARREN RESOURCES, INC., and DOUBLE EAGLE PETROLEUM CO., | ) ) ) ) ) |
| Defendant-Intervenors. | ) ) |

**DEFENDANT-INTERVENOR STATE OF WYOMING'S
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS
CROSS-MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

TABLE OF ACRONYMS ...................................................................................................v

INTRODUCTION ...........................................................................................................1

FACTUAL AND LEGAL BACKGROUND .................................................................2

STANDARD OF REVIEW .............................................................................................6

ARGUMENT ...................................................................................................................8

    I.      The BLM took the required "hard look" at environmental consequences
           under NEPA. ......................................................................................................8

           A.      The BLM considered a reasonable range of alternatives. ................9

           B.      The BLM adequately identified mitigation measures....................16

           C.      The BLM analyzed cumulative impacts of reasonably foreseeable
                    future actions....................................................................................19

           D.      NEPA does not require that the BLM refrain from making an
                    irreversible or irretrievable commitment of resources. .................21

           E.      The BLM sought out and relied on reasonable information
                    regarding mule deer. .......................................................................22

            F.      The POD decisions tier from a lawful EIS. ...................................26

    II.      The BLM did not violate FLPMA. ..........................................................28

           A.      The BLM complied with FLPMA's multiple use and sustained
                      yield provision. ...............................................................................28

           B.      The BLM complied with FLPMA's mandate that the final EIS and
                    ROD conform to the governing RMP...........................................31

CONCLUSION................................................................................................................39

i

## **TABLE OF AUTHORITIES**

### Cases

*Airport Impact Relief, Inc. v. Wykle*, 192 F.3d 197 (1st Cir. 1999) ...................................21

\* *Alaska v. Andrus*, 580 F.2d 465 (D.C. Cir. 1978)....................................................22, 23, 25

*Ark. Wildlife Fed'n v. U.S. Army Corps of Eng'rs*, 431 F.3d 1096 (8th Cir. 2005) ..........20

\* *Baltimore Gas & Elec. Co. v. NRDC*, 462 U.S. 87 (1983).............................................8, 9

*Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190 (D.C. Cir. 1991) ................16, 21

*City of Olmsted Falls, OH v. FAA*, 292 F.3d 261  (D.C. Cir. 2002)................................7, 8

*Great Basin Mine Watch v. Hankins*, 456 F.3d 955 (9th Cir. 2006) ...................................7

*Gulf Restoration Network v. U.S. Dep't of Transp.*, 452 F.3d 362 (5th Cir. 2006)...........21

\* *Izaak Walton League of Am. v. Marsh*, 655 F.2d 346 (D.C. Cir. 1981) .........................8, 9

*Klamath-Siskiyou Wildlands Ctr. v. Medford Dist. of the BLM*, 400 F. Supp. 2d
1234 (D. Or. 2005).........................................................................................32, 34

\* *Kleppe v. Sierra Club*, 427 U.S. 390 (1976)..............................................................19, 21

\* *Lomak Petroleum, Inc. v. FERC*, 206 F.3d 1193 (D.C. Cir. 2000)...................................6, 7

*Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871 (1990) ........................................................29

\* *Mineral Policy Ctr. v. Norton*, 292 F. Supp. 2d 30 (D.D.C. 2003) ...............................6, 29

*Mo. Pub. Serv. Comm'n v. FERC*, 215 F.3d 1 (D.C. Cir. 2000)........................................7

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463
U.S. 29 (1983)......................................................................................................7

*N. Plains Res. Council, Inc. v. U.S. BLM*, 298 F. Supp. 2d 1017 (D. Mont. 2003)...........34

*Nat'l Wildlife Fed'n v. Burford*, 835 F.2d 305 (D.C. Cir. 1987) .......................................28

\* *Natural Res. Def. Council, Inc. v. Hodel*, 865 F.2d 288 (D.C. Cir. 1988)..................20, 21

\* *Natural Res. Def. Council, Inc. v. Morton*, 458 F.2d 827 (D.C. Cir. 1972) .................9, 14

\* *Nevada v. Dep't of Energy*, 457 F.3d 78 (D.C. Cir. 2006) ...........................7, 9, 12, 15, 26

\* *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55 (2004).................................29, 31, 32

*Pennaco Energy, Inc. v. U.S. Dep't of the Interior*, 377 F.3d 1147 (10th Cir. 2004)........31

\* *Pub. Lands Council v. Babbitt*, 167 F.3d 1287 (10th Cir. 1999).......................................30

*Pub. Utils. Comm'n of the State of Cal. v. FERC*, 900 F.2d 269 (D.C. Cir. 1990) ...........20

\*    *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332 (1989)................8, 16, 19, 25

\*    *Rocky Mountain Oil and Gas Ass'n v. Watt*, 696 F.2d 734 (10th Cir. 1982) ..................30

*Shell Oil Co. v. FERC*, 47 F.3d 1186 (D.C. Cir. 1995) ........................................................7

*Thomas v. Peterson*, 753 F.2d 754 (9th Cir. 1985)............................................................20

*TOMAC, Taxpayers of Mich. Against Casinos v. Norton*, 433 F.3d 852 (D.C. Cir. 2006) .....................................................................................................................20

*Utah v. Andrus*, 486 F. Supp. 995 (D. Utah 1979) ..........................................................30

*Vill. of Bensenville v. FAA*, 457 F.3d 52 (D.C. Cir. 2006)...............................................25

\*    *Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519 (1978)..................................................................................................10, 14, 15

*Wis. Valley Improvement v. FERC*, 236 F.3d 738 (D.C. Cir. 2001)....................................7

\*    *Wyo. Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43 (D.C. Cir. 1999) .....................22

**Federal Rules**

Fᴇᴅ. R. Cɪᴠ. P. 56...............................................................................................................6

Fᴇᴅ. R. Cɪᴠ. P. 56(c) .......................................................................................................39

**Federal Statutes**

5 U.S.C. § 706(2)(A).........................................................................................................7

42 U.S.C. § 1701(a) .........................................................................................................28

42 U.S.C. § 4332(2)(C)(i)-(iii)...........................................................................................9

42 U.S.C. § 4332(2)(C)(v) ...............................................................................................22

43 U.S.C. § 1701(a)(2).....................................................................................................32

43 U.S.C. § 1702(c) .........................................................................................................29

43 U.S.C. § 1702(h) .........................................................................................................29

43 U.S.C. § 1712(c)(1)......................................................................................................29

43 U.S.C. § 1732(a) ....................................................................................................29, 31

iii

**Federal Regulations**

40 C.F.R. § 1502.14 ................................................................................................9

40 C.F.R. § 1502.20 ........................................................................................15, 26

40 C.F.R. § 1508.7 .........................................................................................19, 20

40 C.F.R. § 1508.28 ............................................................................................. 26

43 C.F.R. § 1610.5-3(a) ....................................................................................... 31

**Other Authorities**

Record of Decision, *Implementation of a Wind Energy Development Program and
        Associated Land Use Plan Amendments* (December 2005), available at
        http://windeis.anl.gov/documents/docs/WindPEIS ROD.pdf ..............................20

# TABLE OF ACRONYMS

APA ................................................................Administrative Procedure Act

APD ...............................................................Application for Permit to Drill

ARPA ..............................................................Atlantic Rim Project Area

BLM ...............................................................Bureau of Land Management

BMP ...............................................................Best Management Practice

CBM...............................................................Coalbed Methane

CBNG .............................................................Coalbed Natural Gas

EA .................................................................Environmental Assessment

EIS ................................................................Environmental Impact Statement

FLPMA ...........................................................Federal Land Policy and Management Act

FONSI............................................................Finding of No Significant Impact

NEPA .............................................................National Environmental Policy Act

NOA ..............................................................Notice of Availability

NOI ...............................................................Notice of Intent

POD ..............................................................Plan of Development

RFO ...............................................................Rawlins Field Office

RMP ..............................................................Resource Management Plan

ROD ..............................................................Record of Decision

**INTRODUCTION**

The Atlantic Rim Natural Gas Field Development Project in Carbon County, Wyoming involves drilling approximately 2,000 natural gas wells within the 270,000-acre Atlantic Rim Project Area ("ARPA") to recover energy resources.  This project is consistent with the President's National Energy Policy and the Energy Policy Act of 2005 as it will increase domestic energy supply and help to reduce the country's dependence on foreign sources of oil and gas.  The proposed project will produce nearly 1,350 billion cubic feet of natural gas, which will provide enough gas to heat 19.3 million homes for one year and will generate approximately $958 million in total taxes and royalties.  The Wyoming State Director approved the Bureau of Land Management's ("BLM") preferred alternative, which emphasizes limiting surface disturbance and performing interim reclamation, cooperative air quality monitoring with the State of Wyoming, and continued resource monitoring and consultation with federal and state agencies.

The BLM determined after analyzing various options for oil and gas recovery and resource mitigation that limiting surface disturbance to a maximum of 7,600 acres or 2.8 percent of the ARPA at any given time will minimize surface disturbance while optimizing natural gas recovery.  Natural gas development will be limited to eight well sites per 640-acre section, and drilling, development, and reclamation activities will be managed through a "performance-based, adaptive management" process.

Yet, despite the resource mitigation and reclamation that will be required, Plaintiff brings this action in an attempt to prohibit the Federal Defendants from implementing a project that will result in production of nationally significant natural gas

1

resources. More importantly to the State of Wyoming, Plaintiff's unfounded action interferes with Wyoming's right to protect its sovereign and economic interests.

The administrative record clearly demonstrates that the Federal Defendants did not act arbitrarily or capriciously in adopting the Atlantic Rim environmental impact statement ("EIS") and record of decision ("ROD") and the Catalina and Sun Dog environmental assessments ("EAs") and findings of no significant impact ("FONSIs"). The Federal Defendants conformed to the National Environmental Policy Act ("NEPA") by taking a "hard look" at the environmental consequences of its actions and abided by the Federal Land Policy and Management Act ("FLPMA") by complying with its multiple use and sustained yield mandate and the governing Resource Management Plan ("RMP"). Accordingly, this Court should uphold the actions of the Federal Defendants and grant summary judgment in favor of Defendant-Intervenor State of Wyoming.

## FACTUAL AND LEGAL BACKGROUND

On May 24, 2001, the Petroleum Development Corporation and Warren Resources Incorporated notified the BLM Rawlins Field Office ("RFO") in Wyoming that they intended "to explore for and potentially develop coalbed methane wells in south-central Wyoming." (AR 2128, 9484). The operators initially proposed to drill a maximum of 3,880 coalbed methane wells, which involved the construction of associated facilities, roads, well pads, pipelines, and compressor stations. (AR 9484).

In response to this notification, the BLM published a Notice of Intent ("NOI") to prepare an EIS and to conduct scoping for the Atlantic Rim Coalbed Methane Project, later renamed the Atlantic Rim Natural Gas Development Project. (AR 9483). The draft EIS was released in December 2005. (AR 1438). The BLM defined the ARPA as

including 270,000 acres of federal, state, and private surface ownership, noting that within the ARPA there were already 116 natural gas wells completed to coal formations. (*Id*.). The BLM analyzed four alternatives in the draft EIS and articulated a proposed action, which consisted of drilling up to 2,000 additional natural gas wells with a spacing of 80 acres per well. (*Id*.). The development included pipelines, roads, and ancillary facilities, and water produced from coalbed natural gas ("CBNG") wells would be re-injected below the land surface. (*Id*.). Under Alternative A, the "no action" alternative, the BLM would reject the project proposed by the operators but would allow all existing wells to continue to operate. (AR 1439). Under Alternatives B and C, the BLM would allow the same number and types of wells as the proposed action. However, construction activities under Alternative B would be concentrated into one of three zones within the ARPA at a time, and the use of special protection measures under Alternative C would limit surface disturbance for sensitive resources. (*Id*.).

The BLM opened up a 60-day comment period for the draft EIS, resulting in over 59,400 individual comments from state, federal, and local agencies; environmental advocacy groups; landowners; leaseholders; oil and gas companies; and the general public. (AR 4816). The final EIS was released to the public and a notice of availability ("NOA") was published in the Federal Register on December 1, 2006. (AR 9564-65). Based on responses received during the comment period, the BLM developed Alternative D as its preferred alternative. (AR 4796, 4816). The goal of Alternative D is to minimize surface disturbance while optimizing natural gas recovery. (AR 2089). Alternative D involves drilling approximately 2,000 gas wells within the ARPA but limits "total new surface disturbance from the drilling program across the ARPA (federal, state and fee

minerals) to a maximum of 7,600 acres, at any given time, and a 6.5-acre/well site short-term (less than 6 years) disturbance goal." (AR 2090, 4796). Additionally, areas with sensitive fish populations, crucial wildlife habitats, and unique vegetation communities (about 72,200 acres) would have a short-term disturbance goal of *less* than 6.5 acres per well pad. (AR 2090).

The BLM received approximately 85 comments on the final EIS, to which it responded in the ROD. (AR 4817). The ROD was released to the public and a NOA was published in the Federal Register on May 21, 2007. (AR 9574-75). In the ROD, the BLM selected Alternative D as its preferred alternative with modifications based on comments received, stating that "[w]hile the development is expected to adversely impact certain resource values and limit opportunities for other uses in the short-term, the long-term goal is to return these lands to a condition approximate to that which existed before developments proposed in Alternative D were implemented." (AR 4799). The modifications include the requirement that operators use performance goals and the option to consider additional protective measures that are not in conflict with the ROD. (AR 4796). The BLM estimates that the total disturbance from natural gas development activities in the ARPA, including disturbance from existing wells and infrastructure, will be 13,600 acres during the 30 to 50 year life of the project. (AR 4798).

The BLM will manage drilling development and reclamation activities in the ARPA through a "performance-based, adaptive management process," which includes a requirement that the operators submit an annual operating plan to the BLM RFO. (*Id*.). Reclamation will be required after completion of the drilling activities and before the next growing season, which will reduce impacts to 5,000 acres or 1.5 percent of the

4

ARPA by the end of the development phase of the project. (*Id*.). Adaptive management techniques will be used to modify reclamation criteria as necessary, and a mitigation process will be developed to provide quantifiable criteria to review performance goals. (AR 3069, 4798). Additionally, the BLM will review each component of the project involving federal lands or minerals on a site-specific basis, including review of annual or multi-year development plans, applications for permits to drill ("APDs"), right-of-way grants, Sundry Notices, and applications for special use permits. (AR 4798).

In June 2007, the BLM released an EA and FONSI for the Catalina A & B plans of development ("PODs"), which are tiered to the Atlantic Rim EIS. (AR 73492-505). In the APDs, Double Eagle Petroleum Company ("Double Eagle") proposed to drill 37 CBNG wells and three produced water re-injection wells. (AR 73494). The BLM stated in the FONSI that the potential environmental impacts contained in the EA are "not expected to be significant, and that an EIS is not required." (AR 73502). The BLM authorized a total of 39 APDs, denying the APD for one well because of potential effects to sage grouse. (*Id*.). In August 2007, the BLM released a tiered EA and FONSI for the Sun Dog A & B PODs. (AR 74063-74). In the APDs, Anadarko E & P Company ("Anadarko") proposed to drill 48 CBNG wells and three produced water re-injection wells. (AR 74064-65). Similarly, the BLM found that an EIS was not required and authorized all 51 APDs proposed by Anadarko. (AR 74073).

Subsequent to the release of these EAs and FONSIs, Theodore Roosevelt Conservation Partnership ("Plaintiff") filed its Complaint on August 17, 2007, stating that Dirk Kempthorne, in his official capacity as Secretary of the United States Department of the Interior, and the United States BLM (collectively "Federal

Defendants") violated NEPA and FLPMA "when developing the EIS and ROD, and ultimately, approving the project." (Pl.'s Compl., at 2). Plaintiff amended its complaint on April 3, 2008, to include review of the tiered EAs and FONSIs related to the Catalina A & B and Sun Dog A & B PODs. (Pl.'s First Am. and Supplemented Compl., at 2).

Plaintiff asks this Court to: (1) "adjudge and declare that BLM's development of the EIS and approval of the ROD were arbitrary and capricious and in violation of NEPA and FLPMA"; (2) "vacate and set aside the ROD and EIS"; and (3) "remand the ROD and EIS to BLM for further consideration in light of its obligations under NEPA and FLPMA." (Pl.'s First Am. and Supplemented Compl., at 40-41). Plaintiff further asks the Court to enjoin the BLM from taking any action in reliance on the ROD and EIS. (*Id.* at 41).

## STANDARD OF REVIEW

This case consists of the parties' submissions of motions and cross-motions for summary judgment based on the administrative record. "Summary judgment, pursuant to Federal Rule of Civil Procedure 56, shall be granted if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Because this court's review is based upon the administrative record, summary judgment is especially appropriate." *Mineral Policy Ctr. v. Norton*, 292 F. Supp. 2d 30, 36 (D.D.C. 2003), *citing* FED. R. CIV. P. 56.

Plaintiffs allege that the Federal Defendants acted arbitrarily and capriciously by adopting the final EIS and ROD and the Catalina and Sun Dog EAs and FONSIs. As the party challenging agency action, Plaintiffs bear the burden of proving that these NEPA documents are arbitrary and capricious. *Lomak Petroleum, Inc. v. FERC*, 206 F.3d 1193,

6

1198 (D.C. Cir. 2000). Section 706 of the Administrative Procedure Act ("APA")

governs judicial review of a final agency action. *Shell Oil Co. v. FERC*, 47 F.3d 1186,

1197 (D.C. Cir. 1995). The standard of review under the APA is whether an agency

decision is " 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance

with law.' " *Shell Oil Co.*, 47 F.3d at 1197, *quoting* 5 U.S.C. § 706(2)(A). In order to

satisfy this standard, the agency must " 'consider the relevant factors and draw a rational

connection between the facts found and the choice made.' " *Wis. Valley Improvement v.

FERC*, 236 F.3d 738, 748 (D.C. Cir. 2001), *quoting Mo. Pub. Serv. Comm'n v. FERC*,

215 F.3d 1, 3 (D.C. Cir. 2000). According to the Supreme Court of the United States,

> [A]n agency rule would be arbitrary and capricious if the agency has relied
> on factors which Congress has not intended it to consider, entirely failed
> to consider an important aspect of the problem, offered an explanation for
> its decision that runs counter to the evidence before the agency, or is so
> implausible that it could not be ascribed to a difference in view or the
> product of agency expertise.

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43

(1983).

The APA also governs judicial review of agency decisions under NEPA and

FLPMA. *See Nevada v. Dep't of Energy*, 457 F.3d 78, 87 (D.C. Cir. 2006) ("[W]e apply

the APA's arbitrary and capricious standard to a NEPA challenge."); *City of Olmsted

Falls, OH v. FAA*, 292 F.3d 261, 269 (D.C. Cir. 2002) (stating that the arbitrary and

capricious standard is applied to review compliance with NEPA and to determine the

adequacy of an EIS); *Great Basin Mine Watch v. Hankins*, 456 F.3d 955, 961 (9th Cir.

2006) (stating that judicial review of agency decisions under both NEPA and FLPMA "is

governed by the APA, which dictates that an agency action may be overturned only

where it was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' ").

Under NEPA, the " 'role of the courts is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious.' " *City of Olmsted Falls*, 292 F.3d at 269, *quoting Baltimore Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 97-98 (1983). "In making these determinations the courts must be governed by a 'rule of reason.' They should not substitute their judgment for that of the agency. In particular, they should not attempt to resolve conflicting scientific opinions. So long as the agency's conclusions have a substantial basis in fact, the mandate of NEPA has been satisfied." *Izaak Walton League of Am. v. Marsh*, 655 F.2d 346, 371-72 (D.C. Cir. 1981) (internal citations omitted). Moreover, "[i]f the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs. . . . NEPA merely prohibits uninformed—rather than unwise—agency action." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350-51 (1989).

## ARGUMENT

### I.    The BLM took the required "hard look" at environmental consequences under NEPA.

The Supreme Court of the United States has established an agency's requirements under NEPA:

> NEPA has twin aims. First, it "places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action." Second, it ensures that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process. Congress in enacting NEPA, however, did not

> require agencies to elevate environmental concerns over other appropriate considerations.  Rather, it required only that the agency take a "hard look" at the environmental consequences before taking a major action.

*Baltimore Gas & Elec.*, 462 U.S. at 97 (internal citations omitted).  In order for an agency to comply with its "procedural" obligations under NEPA, the agency must prepare a " 'detailed statement . . . [on] the environmental impact of the proposed action, any adverse environmental effects which cannot be avoided should the proposal be implemented, [and] alternatives to the proposed action.' "  *Nevada*, 457 F.3d at 87, *quoting* 42 U.S.C. § 4332(2)(C)(i)-(iii).  The EIS must "contain[] sufficient discussion of the relevant issues and opposing viewpoints to enable the decisionmaker to take a 'hard look' at environmental factors, and to make a reasoned decision."  *Izaak Walton League of Am.*, 655 F.2d at 371.

## A.    The BLM considered a reasonable range of alternatives.

 "At the 'heart of the environmental impact statement' is the requirement that an agency 'rigorously explore and objectively evaluate' the projected environmental impacts of all 'reasonable alternatives' to the proposed action."  *Nevada*, 457 F.3d at 87, *quoting* 40 C.F.R. § 1502.14; *see also* 42 U.S.C. § 4332(2)(C)(iii).  "[T]he discussion of environmental effects of alternatives need not be exhaustive.  What is required is information sufficient to permit a reasoned choice of alternatives so far as environmental aspects are concerned."  *Natural Res. Def. Council, Inc. v. Morton*, 458 F.2d 827, 836 (D.C. Cir. 1972).  In *Natural Resources Defense Council, Inc. v. Morton*, the Court focused on the Nation's energy resources when further defining the scope of NEPA:

> [T]he requirement in NEPA of discussion as to reasonable alternatives does not require "crystal ball" inquiry. . . . The statute must be construed in the light of reason if it is not to demand what is, fairly speaking, not

> meaningfully possible, given the obvious, that the resources of energy and research—and time—available to meet the Nation's needs are not infinite.

*Id.* at 837.

" [T]he concept of alternatives must be bounded by some notion of feasibility." *Vt. Yankee Nuclear Power Corp. v Natural Res. Def. Council, Inc.*, 435 U.S. 519, 551 (1978). " [T]he concept of 'alternatives' is an evolving one, requiring the agency to explore more or fewer alternatives as they become better known and understood." *Id.* at 552-53.

The draft EIS identified four alternatives: the "no action" alternative, the proposed action, and two additional "action" alternatives. (AR 1488). Alternative A is the "no action" alternative, where the BLM would reject the operators' proposal and the proposed drilling and development would not take place. (AR 1489). Conversely, the proposed action would consist of drilling and developing approximately 2,000 new natural gas wells in addition to the 116 exploration wells currently in place. (AR 1488). The well spacing would be eight wells per section (80 acre spacing) but spacing could be reduced to four wells per section (160 acre spacing) depending on geology. (*Id.*). Development and drilling would continue for 20 years, with a life-of-project of 30 to 50 years. (AR 1488-89). Roads, pipelines, water wells, disposal wells, compressor stations, and gas processing facilities would also be constructed. (AR 1489). Total new initial, short-term disturbance would be about 15,800 acres, while long-term disturbance after reclamation would be 6,241 acres. (*Id.*).

Alternative B involved phased drilling and development. (*Id.*). This alternative would have the same number and spacing of wells as the proposed action. However, the drilling and development would occur in three phases, each lasting six to seven years

10

including completion of interim reclamation. (AR 1489-90). When a zone was considered inactive, no additional development would occur—BLM would suspend all operations and production for leases within the no-activity areas. (AR 1490). The unique provision of this alternative, therefore, is that development within the ARPA would occur in three distinct phases, with construction activities limited to one of the areas at a time. (AR 1494).

Alternative C would be similar to the proposed action but would require development protection measures in those areas with sensitive or crucial resource values, including sensitive wildlife and fish habitat, and areas with sensitive soils. (AR 1491). Constraints would consist of surface disturbance limits, limited operating periods, modification of drilling and construction practices, and no surface occupancy where necessary. (*Id*.). Specific protection measures would be implemented in several resource areas, including water and soil management, vegetation resources, range resources, wildlife resource management, visual resources, hunting areas, and historic trails. (AR 1491-92). For wildlife resource management, the focus would be on grouse brood rearing or nesting habitat and big game crucial winter range. (AR 1491). In these sensitive wildlife areas, surface disturbance would be limited to less than 20 acres, with four well locations per section (as opposed to eight). (*Id*.). Additionally, no surface disturbance would be allowed in severe winter relief habitats for greater sage-grouse and wintering areas for Columbian sharp-tailed grouse. (*Id*.).

The BLM modified these alternatives in the final EIS, dropping Alternative B and proposing Alternative D as its preferred alternative. (AR 2149-63). The BLM eliminated Alternative B from the final EIS "based on comments received on the Draft EIS, the

effects of long delays on allowable oil and gas development to leaseholders and mineral rights, and the policy that BLM will allow reasonable access across federal lands for mineral development on private and state lands." (AR 2161). The new alternative would still involve drilling approximately 2,000 gas wells within the ARPA, but no more than 7,600 acres or 2.8 percent of the ARPA would be disturbed and unreclaimed at any given time. (AR 2156). Management areas with sensitive fish populations, and crucial wildlife habitats, including elk crucial winter range and silver sage and bitterbrush communities, would be managed more intensely to reduce the extent of disturbance. (*Id*.). Additionally, reclamation would be reviewed annually and an adaptive management system using best management practices ("BMPs")[1] would be implemented. (*Id*.). Therefore, the final EIS articulates three different alternatives: a no action alternative, which would result in no drilling or development; Alternative C, which would allow for 2,000 wells to be drilled, but includes heightened constraints for wildlife and sensitive resources; and Alternative D, which drastically reduces surface disturbance and includes an adaptive management system.

Even though the BLM dropped Alternative B from the final EIS and ROD, the BLM objectively evaluated Alternative B after receiving new information, and found that phased development was not reasonable or feasible. *See Nevada*, 457 F.3d at 87 (stating that an agency must " 'rigorously explore and objectively evaluate' the projected environmental impacts of all 'reasonable alternatives' to the proposed action"). Several independent operators commented on Alternative B in the draft EIS. Warren Resources Incorporated ("Warren") is an independent energy company that explores and develops

---

[1]    BMPs are specific protection measures that will be applied where proposals conflict with identified resources. (AR 3081-96, 4835-55).

domestic onshore natural gas and oil reserves.  (AR 8397).  In 1999, Warren acquired a majority of the acreage covering the ARPA and was one of the original proponents of drilling and developing in the ARPA.  (*Id*.).  In its draft EIS comments to the BLM in February 2006, Warren noted that it had already drilled 137 wells throughout the ARPA, and stated that the ARPA, if properly developed, "constitutes one contiguous gas reservoir . . . with a potential to produce multiple trillions of CBM [coalbed methane] natural gas."  (AR 8398).  Warren then commented on Alternative B:

> For efficient and effective development to maximize production, it will be necessary to develop the project in a manner that best draws down the formation pressure throughout the entire Atlantic Rim CBM gas reservoir. Contemporaneous development will allow operators to efficiently dewater the coals to achieve optimum production results.  A staged development approach would inhibit achieving this goal.

(*Id*.).

Additionally, Anadarko, who took over as proponent of the Atlantic Rim project, also commented on Alternative B:

> Alternative B would phase the drilling of the wells contemplated by the proposal by dividing the project area into three sections thereby severely restricting Anadarko's ability to maximize the recovery of CBNG resources in direct opposition to policies set forth in the Energy Policy Act of 2005.[2]  Drilling would be allowed in only one area at a time, and drilling would not be allowed in any other area until interim reclamation had been completed in the previous area.  A few of the more egregious lapse [sic] in the analysis for this alternative are:  1) BLM has failed to address whether this proposal is technologically or economically viable; 2) BLM has failed to account for the economic impact on lessees both from the perspective that some of the subject leases could be suspended for over fourteen years and that those with interest in the second and third phases will be deprived of revenues for seven to fourteen years; 3) BLM has failed to address the potential economic impact to the federal government

---

[2]  The Energy Policy Acts of 2001 and 2005 and the President's National Energy Policy emphasize the development of domestic natural gas reserves for supply and economic stability and to reduce the country's dependence on foreign sources of oil and gas.  (AR 2135-36, 4796).

both from the perspective of a loss of revenues, drainage, and from potential liability for takings claims; 4) BLM has failed to define what constitutes "interim reclamation" thereby failing to fully analyze both the environmental and economic impacts of phasing drilling in this fashion.

(AR 8389).

These comments from the operators identified feasibility problems with Alternative B. Therefore, in light of NEPA's mandate of reasonableness and the notion that "the resources of energy and research—and time—available to meet the Nation's needs are not infinite," the BLM's decision to drop the alternative from the final EIS was not arbitrary and capricious. *Natural Res. Def. Council, Inc.*, 458 F.2d at 837; *see also Vt. Yankee Nuclear Power Corp.*, 435 U.S. at 552-53 ("[T]he concept of 'alternatives' is an evolving one, requiring the agency to explore more or fewer alternatives as they become better known and understood.").

Moreover, the provisions of Alternative B effectively were incorporated into Alternatives C and D in the final EIS and the preferred alternative in the ROD. The BLM stated during the draft EIS process that the benefits of Alternative B included reducing disruption to big game and greater sage-grouse movement in the ARPA, minimizing disruptive noise and activity to animals, and allowing for "better" monitoring of wildlife. (AR 8254-55). Alternatives C and D encompass these provisions. Alternative C requires additional protective measures for sensitive wildlife areas: "In grouse brood-rearing or nesting habitat and big game crucial winter range, the BLM would approve at the site-specific review level limited surface disturbance . . . . No surface disturbance would be allowed in severe winter relief habitats for greater sage grouse." (AR 2153). Additionally, the modified Alternative D in the ROD dictates that drilling development and reclamation activities will be managed through a "performance-based, adaptive

management process." (AR 4798). The BLM then describes in detail what this process entails. (AR 4798, 4835-55).

The BLM's decision to drop Alternative B from the final EIS and ROD was based on information that implementing a phased development of energy resources in the ARPA is not reasonable or feasible. *See Nevada*, 457 F.3d at 87 (stating that under NEPA, an EIS must objectively evaluate the projected environmental impacts of all *reasonable* alternatives to the proposed action); *Vt. Yankee Nuclear Power Corp.*, 435 U.S. at 551 (finding that "the concept of alternatives must be bounded by some notion of *feasibility*") (emphasis added). By fully developing other alternatives which address the benefits of Alternative B, and taking into account feasibility, the BLM considered a reasonable range of alternatives and took the required "hard look" that is required under NEPA. Therefore, the BLM's decision to eliminate Alternative B was not arbitrary and capricious.

Additionally, the EAs and FONSIs for the Catalina and Sun Dog PODs are tiered to the final EIS. (AR 73492, 74063). Because these EAs are tiered to the final EIS, and the BLM considered a reasonable range of alternatives in the final EIS as discussed above, the BLM also considered a reasonable range of alternatives for the site-specific PODs. *See Nevada v. Dep't of Energy*, 457 F.3d 78, 91 n.9 (D.C. Cir. 2006) (noting that tiering is appropriate for certain proposed actions, including "when the sequence of statements or analyses" is from an EIS to a site-specific statement or analysis); *see also* 40 C.F.R. § 1502.20 (providing that when tiering is used, "the subsequent statement or environmental assessment need only summarize the issues discussed in the broader statement and incorporate discussions from the broader statement by reference").

15

**B.      The BLM adequately identified mitigation measures.**

"[O]ne important ingredient of an EIS is the discussion of steps that can be taken

to mitigate adverse environmental consequences."     *Robertson*, 490 U.S. at 351.

"[O]mission of a reasonably complete discussion of possible mitigation measures would

undermine the 'action-forcing' function of NEPA."  *Id*. at 352.  However,

> There is a fundamental distinction . . . between a requirement that
> mitigation be discussed in sufficient detail to ensure that environmental
> consequences have been fairly evaluated, on the one hand, and a
> substantive requirement that a complete mitigation plan be actually
> formulated and adopted, on the other. . . . Even more significantly, it
> would be inconsistent with NEPA's reliance on procedural mechanisms—
> as opposed to substantive, result-based standards—to demand the presence
> of a fully developed plan that will mitigate environmental harm before an
> agency can act.

*Id*. at 352-53.   An EIS does not need to contain " 'a detailed explanation of specific

measures which *will* be employed to mitigate the adverse impacts of a proposed action.' "

*Id*. at 353 (citations omitted).  "NEPA not only does *not* require agencies to discuss any

particular mitigation plans that they might put in place, it does *not* require agencies—or

third parties—to effect any.' "  *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190,

206 (D.C. Cir. 1991) (emphasis added).

The ROD has specific mitigation measures built into the BLM's preferred

alternative where the BLM not only explains the mitigation process but describes how

each mitigation measure will minimize the associated environmental impact.  In other

words, the BLM describes the *substance* of the mitigation measure.  For example, the

BLM acknowledges that surface disturbance associated with further development of the

ARPA affects many resources, including soils, vegetation, wildlife, wildlife habitat, and

cultural resources.  (AR 4799).  Because of the effects of this disturbance, the BLM chose

16

Alternative D, which reduces the amount of initial and long-term disturbance by approximately 18 percent from the proposed action. (AR 4799-4800). This reduction is done through limiting the number of roads by transportation planning, requiring smaller operational footprints, and using accelerated reclamation efforts, which the BLM describes as "the most practical alternative for mitigating environmental impacts while maximizing natural gas recovery." (AR 4800).

The BLM also acknowledged in the final EIS that wildlife habitat impacts will be significant due to development in the ARPA and therefore set out a mitigation strategy in Alternative D that includes limiting the allowable surface disturbance, accelerating reclamation by the operators, using remote monitoring, and enforcing timing stipulations. (AR 4804). These mitigation measures will effectively "reduce direct disturbance to wildlife" and facilitate the long-term return of habitat function. (*Id*.). Additionally, to mitigate effects of development on sensitive resources, specific areas in Alternative D are designated as "Category A" areas where the short-term disturbance goal is required to be *less* than 6.5 acres per well pad. (AR 4807). These sensitive resources include sensitive fish populations, crucial wildlife habitats, and unique vegetation communities. (*Id*.). More importantly, these areas equal about 27 percent of the ARPA and are already mapped out in the ROD. (AR 4807-08).

In addition to the mitigation measures already required by the ROD, drilling and development and reclamation activities in the ARPA will be managed through a "performance-based, adaptive management" process. (AR 4798). This process includes the development of additional mitigation measures by a review team consisting of the BLM, cooperating and interested agencies, and the operators, and will include modifying

an operator's development and drilling proposal based on site-specific factors such as greater sage-grouse lek locations, raptor nests, and crucial winter range. (AR 4798, 4813). Furthermore, in Appendix B in the final EIS, the BLM lists the requirements that will be imposed on the operators in order to mitigate effects of development. (AR 4835-55). These requirements dictate what the operators have to do in regard to land use and surface disturbance; paleontological values; air quality and dust; soils and water; reclamation; livestock grazing and range management; wildlife; inventory and monitoring; wildlife protection measures; visual resource management; cultural and historic resources protection; socioeconomics; transportation; and noise. (*Id*.).

Additionally, in Appendix H, the BLM lists specific resource concerns that could occur in a development area (*e.g.*, big game crucial winter range, greater sage-grouse leks, mule deer migration corridors) and requires that a specific mitigation measure take place to remedy the concern. (AR 3081-96). For example, if the development area proposed by the operator is in big game crucial winter range, the BLM will require the operators to implement the following mitigation measures: (1) directional drilling; (2) drilling multiple wells from a single pad; (3) remote well monitoring; (4) transportation planning to reduce road density and traffic volumes; (5) cluster development; (6) compensation mitigation; and (7) seasonal restriction of public vehicular access. (AR 3093).

Moreover, in Appendix L, the BLM lists over 30 additional resource concerns above and beyond the ones listed in Appendix H, which are accompanied by the specific mitigation measure that the BLM would require the operator to implement. (AR 3149-62). Importantly, the BLM will monitor all these mitigation measures, including the ones

18

already set out in the ROD and the ones that will be required depending on the specifics of the development area, through an operating plan that the operators must submit annually to the BLM.  (AR 4798).

The record demonstrates that not only did the BLM include a "reasonably complete discussion of possible mitigation measures" in the EIS and ROD, it actually set out "a detailed explanation of specific measures which *will* be employed to mitigate the adverse impacts of a proposed action," an action which the Supreme Court has found is not required under NEPA.  *Robertson*, 490 U.S. at 352-53.  Therefore, the BLM took the required "hard look" at mitigation measures and its decision is not arbitrary and capricious.

**C.    The BLM analyzed cumulative impacts of reasonably foreseeable future actions.**

NEPA's implementing regulations require that an EIS evaluate any cumulative impacts of agency action.  40 C.F.R. § 1508.7.  A cumulative impact is defined as "the impact on the environment which results from the incremental impact of the action when added to other past, present and reasonably foreseeable future actions regardless of what agency . . . undertakes such other actions."  *Id.*  "[W]hen several proposals . . . that will have cumulative or synergistic environmental impact upon a region are pending concurrently before an agency, their environmental consequences must be considered together.  Only through comprehensive consideration of pending proposals can the agency evaluate different courses of action."  *Kleppe v. Sierra Club*, 427 U.S. 390, 410 (1976).

The purpose of a cumulative impacts requirement "is to prevent agencies from dividing one project into multiple individual actions 'each of which individually has an

insignificant environmental impact, but which collectively have a substantial impact.' " *Natural Res. Def. Council, Inc. v. Hodel*, 865 F.2d 288, 297-98 (D.C. Cir. 1988), *quoting Thomas v. Peterson*, 753 F.2d 754, 758 (9th Cir. 1985). NEPA's implementing regulations refer to those cumulative impacts as those "*outside* of the project in question; it is a measurement of the effect of the current project along with any other past, present or likely future actions in the same geographic area." *TOMAC, Taxpayers of Mich. Against Casinos v. Norton*, 433 F.3d 852, 864 (D.C. Cir. 2006). The point of a cumulative impacts analysis is to "equip a decisionmaker to make an informed decision about alternative courses of action." *Natural Res. Def. Council*, 865 F.2d at 298.

However, an agency only needs to include cumulative impacts of "reasonably foreseeable future actions." 40 C.F.R. § 1508.7. "An impact is reasonably foreseeable if it 'is sufficiently likely to occur that a person of ordinary prudence would take it into account.' " *Ark. Wildlife Fed'n v. U.S. Army Corps of Eng'rs*, 431 F.3d 1096, 1102 (8th Cir. 2005). There is "no need to consider the cumulative impacts" of an action if it is not reasonably foreseeable. *Pub. Utils. Comm'n of the State of Cal. v. FERC*, 900 F.2d 269, 283 (D.C. Cir. 1990).

The BLM's cumulative impacts analysis included seven natural gas development areas surrounding the ARPA, all of which had a completed final EIS or EA. (AR 2484-85). The BLM, however, did not include a Wind Energy Development Program which establishes a number of policies and BMPs regarding the development of wind energy resources on BLM-administered public lands. *See* Record of Decision*, Implementation of a Wind Energy Development Program and Associated Land Use Plan Amendments* (December 2005), available at http://windeis.anl.gov/documents/docs/WindPEIS

20

ROD.pdf.  The final EIS for this program does not involve any actual applications for wind energy development on lands in Wyoming or the ARPA.  It merely describes the practices that will be instituted if and when an application for wind energy development occurs.  Even though the NEPA process is completed for the Wind Energy Development Program, the implementation of the program is contingent on operators actually applying for wind development projects, which may or may not occur and could be several years out.  Therefore, the BLM was not required to include the program in its cumulative impacts analysis.  *See Gulf Restoration Network v. U.S. Dep't of Transp.*, 452 F.3d 362, 370 (5th Cir. 2006) (deferring to the agency's decision that an action was not reasonably foreseeable because "the occurrence of any one of a number of contingencies could cause the plans to build the ports to be cancelled or drastically altered"); *Airport Impact Relief, Inc. v. Wykle*, 192 F.3d 197, 206 (1st Cir. 1999) (finding that an airport expansion was not reasonably foreseeable because it was "contingent on several events that may or may not occur over an eight-year span").

The BLM carried out the NEPA-mandated "comprehensive consideration of pending proposals," and its analysis "equip[ed] a decisionmaker to make an informed decision about alternative courses of action."  *Kleppe*, 427 U.S. at 410; *Natural Res. Def. Council*, 865 F.2d at 298.  Therefore, the BLM took the required "hard look" at the cumulative impacts, and its decision is not arbitrary or capricious.

D.    **NEPA does not require that the BLM refrain from making an irreversible or irretrievable commitment of resources.**

NEPA requires that an EIS discuss "any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.'"  *Citizens Against Burlington, Inc.*, 938 F.2d at 194 n.2, *quoting* 42 U.S.C.

§ 4332(2)(C)(v).    "[T]he law does not require an agency to prepare an EIS until it reaches the critical stage of a decision which will result in 'irreversible and irretrievable commitments of resources' to an action that will affect the environment." *Wyo. Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43, 49 (D.C. Cir. 1999).    Therefore, the threshold question of whether or not the agency made an "irreversible or irretrievable" commitment of resources relates directly to whether an EIS is required, and not whether the agency violated NEPA by making such a commitment.

In the instant case, the BLM prepared a detailed EIS, which is currently governed by the Great Divide RMP. (AR 2136).    However, the Rawlins RMP, which is in the process of being drafted, will replace the Great Divide RMP.  (AR 2136).    The BLM, therefore, released the ROD before the Rawlins RMP was finalized.  Nevertheless, even if the BLM did make an irreversible or irretrievable commitment of resources by finalizing the ROD before the Rawlins RMP was finished,[3] the BLM did not violate NEPA by doing so.  Because the BLM took the required "hard look" at the environmental consequences of its decision, it did not violate NEPA and its decision was not arbitrary and capricious.

**E.      The BLM sought out and relied on reasonable information regarding mule deer.**

In *Alaska v. Andrus*, the D.C. Circuit described in detail the scope of the obligation that an agency is required to seek out information concerning environmental consequences:

As a preliminary matter, we note that NEPA does, unquestionably, impose on agencies an affirmative obligation to seek out information concerning

---

[3]    The State does not concede that the BLM did in fact make an irreversible or irretrievable commitment of resources in relation to the Rawlins RMP.

the environmental consequences of proposed federal actions. Indeed, this is one of NEPA's most important functions. . . . The question in each case is, "How much information is enough?" And that is not a question to which NEPA provides a clear, firm answer. Certainly, NEPA cannot be read as a requirement that complete information concerning the environmental impact of a project must be obtained before action may be taken. If we were to impose a requirement that an impact statement can never be prepared until all relevant environmental effects were known, it is doubtful that any project could ever be initiated. . . . NEPA simply does not specify the quantum of information that must be in the hands of a decisionmaker before that decisionmaker may decide to proceed with a given project.

*Alaska v. Andrus*, 580 F.2d 465, 473 (D.C. Cir. 1978), *vacated in part on other grounds*, 439 U.S. 922 (1978) (internal citations omitted). Environmental agencies are not "empowered to substitute their judgment for that of the responsible agency official," and more importantly, "the courts may not substitute their judgment for that of the decisionmaker and insist that the project be delayed while more information is sought." *Id*. at 474 n.40, 473-74.

In the instant case, a study entitled *Final Report for the Atlantic Rim Mule Deer Study* ("Mule Deer Study") came out in April 2007 after the final EIS had been released to the public. Nevertheless, the BLM was not required to "wait for" the results of the Mule Deer Study before issuing the ROD. *See Alaska*, 580 F.2d at 474 (holding that the agency was not required to wait for the results of ongoing studies before proceeding with agency action). Additionally, many of the same predictions and hardships that the Mule Deer Study identifies are already incorporated in the final EIS. *E.g., compare* (AR 7423 ("The Mule Deer Study explains: 'Impacts [of CBM development] include direct and indirect habitat losses that can potentially result in reduced population performance. Direct habitat loss occurs when native vegetation is converted to access roads, well pads, pipelines, and other project features. Indirect habitat losses occur when wildlife are

23

displaced . . . .' ") *with* AR 2393 (finding in the final EIS that loss of mule deer crucial winter range is likely during the life of the project as "[c]onstruction activities remove crucial winter range vegetation and increase noise and human activity levels which displaces animals")).

Moreover, the BLM included the Mule Deer Study in the administrative record, and notes that the study, which was released in April 2007, was in front of the agency *before* the ROD was officially made available to the public in May 2007.  (AR 7421-49, 9574-75).  Importantly, the BLM stated that it will use this Mule Deer Study to mitigate development in mule deer migration corridors within the ARPA.  (*See* AR 2393 (stating that additional mitigation will be placed on development for the protection of mule deer migration corridors based on information available from the Mule Deer Study); AR 3094 (requiring that operators avoid surface disturbance within migration corridors identified in the Mule Deer Study)).

Additionally, the BLM relied on and cited to several references concerning mule deer in the final EIS.  These references include reports by Shell Oil Company, the Wyoming Game and Fish Department ("WGFD"), Colorado's Thorne Ecological Institute, the Universities of Idaho and Wyoming, and Wyoming's Western EcoSystems Technology, Incorporated.  (AR 2516-44, 6130-6215, 6254-6338, 6477-6541).  These reports discuss the effect of oil and gas development on mule deer distribution and crucial winter range.  Specifically, the BLM relied on the document entitled *Sublette Mule Deer Study (Phase II): Long-term monitoring plan to assess potential impacts of energy development on mule deer in the Pinedale Anticline Project Area*, which was prepared by Western EcoSystems Technology, Incorporated in Cheyenne, Wyoming.  (AR 6477-

6541).  This report details the effect of natural gas production in western Wyoming on

mule deer populations.  (*Id.*)  The report focused on the Pinedale Anticline Project Area,

which is northwest of the ARPA, is home to 4,000-6,000 mule deer, and includes the

construction and drilling of up to 900 well pads.  (AR 6484, 6488).  The BLM relied on

this report when analyzing the environmental consequences of oil and gas development in

the ARPA:

> [T]he Sublette Mule Deer Study . . . found that winter mule deer habitat
> section and distribution patterns have been affected by development,
> specifically road networks and well pads. . . . Reduction in winter range
> size and quality of available habitat may decrease the carrying capacity of
> the overall winter range.  This suggests that within the ARPA, indirect
> impacts such as displacement from activities, dust from roads, and
> competition for forage within the already poor condition crucial winter
> range habitat may lead to reduced mule deer numbers and die-offs from
> animals going onto crucial winter range in poorer health with reduced
> body reserves.

(AR 2393-94).  The BLM also relied on several other EISs and EAs which analyzed the

effects of oil and gas development on mule deer populations in Sweetwater and Carbon

counties in Wyoming (where the ARPA is located) and numerous WGFD assessments

detailing mule deer unit reports and statistics.  (AR 2249, 2391, 2393, 2484-85, 2498-99,

2536-38, 2541-42).

  The BLM used the information it had available to it at the time, and this Court

may not "substitute [its] judgment for that of the decisionmaker and insist that the project

be delayed while more information is sought."  *Alaska*, 580 F.2d at 473-74; *see also Vill.*

*of Bensenville v. FAA*, 457 F.3d 52, 71 (D.C. Cir. 2006) (holding that the agency's

method of using the best information available at the time of its analysis was reasonable);

*Robertson*, 490 U.S. at 351 ("NEPA merely prohibits uninformed—rather than unwise—

agency action.").  The BLM complied with NEPA by taking the requisite "hard look" at

the environmental consequences of its actions on mule deer, and its decision was not arbitrary and capricious.

**F.    The POD decisions tier from a lawful EIS.**

NEPA's implementing regulations state that agencies are encouraged to tier their environmental impact statements and indicate that a subsequent environmental assessment "need only summarize the issues discussed in the broader statement."  40 C.F.R. § 1502.20.  Tiering is appropriate for certain proposed actions, including "when the sequence of statements or analyses is" from an EIS to a site-specific statement or analysis.  *Nevada*, 457 F.3d at 91 n.9.  Specifically, if the agency action "involves many separate sub-projects and will take many years," the agency can evaluate "each sub-project as it becomes ready and that evaluation can be done with 'subsequent narrower statements or environmental analyses.' "  *Id.* at 91, *quoting* 40 C.F.R. § 1508.28.

In the instant case, the EAs and FONSIs for the Catalina and Sun Dog PODs are tiered to the final EIS.  (AR 73492, 74063).  Because these EAs are tiered to the final EIS, and the BLM took the required "hard look" at the environmental consequences of its actions, the BLM also took a "hard look" for the site-specific PODs.  *See Nevada*, 457 F.3d at 91 n.9 (noting that tiering is appropriate for certain proposed actions, including "when the sequence of statements or analyses" is from an EIS to a site-specific statement or analysis); *see also* 40 C.F.R. § 1502.20 (providing that when tiering is used, "the subsequent statement or environmental assessment need only summarize the issues discussed in the broader statement and incorporate discussions from the broader statement by reference").

However, with regard to wildlife, the POD EAs indicate that "[i]n some instances, the proponent may request consideration of a temporary exception to wildlife seasonal restrictions. Such an exception may be granted *if a determination is made that the wildlife resource will not be adversely impacted*." (AR 74071) (emphasis added). Nevertheless, this statement comports with the BLM's "performance-based, adaptive management" process articulated in the ROD. (AR 4798). The adaptive management process includes the development of mitigation measures by a review team consisting of the BLM, cooperating and interested agencies, and the operators, and will include modifying an operator's development and drilling proposal based on site-specific factors such as greater sage-grouse lek locations, raptor nests, and crucial winter range. (AR 4798, 4813). In other words, the adaptive management process involves modifying an operator's development proposal based on whether or not certain resources exist in the specific area that is being developed.

For example, if the development area proposed by the operator is in big game crucial winter range, the BLM will require the operators to implement the following mitigation measures: (1) directional drilling; (2) drilling multiple wells from a single pad; (3) remote well monitoring; (4) transportation planning to reduce road density and traffic volumes; (5) cluster development; (6) compensation mitigation; and (7) seasonal restriction of public vehicular access. (AR 3093). Similarly, if the development area is not in big game crucial winter range or would not adversely affect crucial winter range, it seems obvious that the BLM could grant an exemption or waiver from certain mitigation measures. Importantly, the BLM will monitor all these mitigation measures, or the grant

of exemptions or waivers, through an operating plan that the operators must submit annually to the BLM.  (AR 4798).

The BLM's "performance-based, adaptive management" process, which is described in detail in the ROD, contemplates modifying an operator's development proposal based on whether or not certain resources exist in the specific area that is being developed.  Therefore, the BLM took the required "hard look" at the environmental consequences of its actions, both in the final EIS and ROD and the Catalina and Sun Dog EAs, and its decision is not arbitrary and capricious.

**II.     The BLM did not violate FLPMA.**

The D.C. Circuit has discussed the purpose and mandate of FLPMA, stating that the Act provides procedures and policy guidelines for land use planning under the BLM's jurisdiction:

> First, Congress directed that "management be on the basis of multiple use and sustained yield unless otherwise specified by law."  Second, the public lands [must] be managed in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values; that, where appropriate, will preserve and protect certain public lands in their natural condition; that will provide food and habitat for fish and wildlife and domestic animals; and that will provide for outdoor recreation and human occupancy and use.  Finally, the Act directs BLM to manage the lands in a manner which recognizes the country's need for natural resources.

*Nat'l Wildlife Fed'n v. Burford*, 835 F.2d 305, 308 (D.C. Cir. 1987), *quoting* 42 U.S.C. § 1701(a).

**A.     The BLM complied with FLPMA's multiple use and sustained yield provision.**

"FLPMA's 'multiple use and sustained yield' provision provides as follows:  The Secretary shall manage the public lands under principles of multiple use and sustained

28

yield, in accordance with the land use plans developed by him . . . when they are

available." *Mineral Policy Ctr. v. Norton*, 292 F. Supp. 2d 30, 49 (D.D.C. 2003), *quoting*

43 U.S.C. § 1732(a); *see also* 43 U.S.C. § 1712(c)(1) ("[T]he Secretary shall . . . use and

observe the principles of multiple use and sustained yield set forth in this and other

applicable law.").

FLPMA " 'established a policy in favor of retaining public lands for multiple use

management.' " *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 58 (2004), *quoting*

*Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 877 (1990). "Multiple use management"

means "a deceptively simple term that describes the enormously complicated task of

striking a balance among the many competing uses to which land can be put, 'including,

but not limited to, recreation, range, timber, minerals, watershed, wildlife and fish, and

[uses serving] natural scenic, scientific and historical values.' " *S. Utah Wilderness*

*Alliance*, 542 U.S. at 58, *quoting* 43 U.S.C. § 1702(c). Another management goal of

FLPMA is "sustained yield," which "requires BLM to control depleting uses over time,

so as to ensure a high level of valuable uses in the future." *S. Utah Wilderness Alliance*,

542 U.S. at 58, *citing* 43 U.S.C. § 1702(h)

However, not all land uses are compatible—the BLM "faces a classic land use

dilemma of sharply inconsistent uses, in a context of scarce resources." *S. Utah*

*Wilderness Alliance*, 542 U.S. at 58, 60. The Tenth Circuit has discussed this

incompatibility:

> The FLPMA requires [the BLM] to recognize competing values. To
> accomplish this legislative directive within a finite land base, it is
> necessary to realize that [FLPMA] provides a comprehensive statement of
> congressional policies. It represents an attempt by Congress to balance the
> use of the public lands by interests as diverse as the lands themselves.
> Accordingly, Congress provides that the BLM should manage the public

29

> lands by using [FLPMA's] procedures in a dynamic, evolving manner to accommodate these competing demands.  Congress directed the BLM to manage the public lands on a "multiple use" basis, "making the most judicious use of the land *for some or all* of [the public land] resources" and using "some land for *less than all* of the resources," where appropriate.  Thus, under [FLPMA], the BLM need not permit all resource uses on a given parcel of land.

*Rocky Mountain Oil and Gas Ass'n v. Watt*, 696 F.2d 734, 738 (10th Cir. 1982) (internal citations omitted).  The Tenth Circuit further noted the reach of FLPMA's "multiple use" provision:

> If all the competing demands reflected in FLMPA were focused on one particular piece of public land, in many instances only one set of demands could be satisfied.  A parcel of land cannot both be preserved in its natural character and mined.  Thus, it would be impossible for BLM to carry out the purposes of [FLPMA] if each particular management decision were evaluated separately.  It is only by looking at the overall use of the public lands that one can accurately assess whether or not BLM is carrying out the broad purposes of the statute.

*Id*. at 738 n.4, *citing Utah v. Andrus*, 486 F. Supp. 995, 1003 (D. Utah 1979).  Therefore, in order to manage the lands in accordance with the principles of multiple use and sustained yield, FLPMA requires land use planning:  "The Secretary shall, with public involvement and consistent with the terms and conditions of [FLPMA], develop, maintain, and, when appropriate, revise land use plans which provide by tracts or areas for the use of the public lands."  *Pub. Lands Council v. Babbitt*, 167 F.3d 1287, 1290 (10th Cir. 1999).

In other words, the BLM must satisfy FLPMA's "multiple use" provision by looking at the overall use of the public lands, not one particular piece of land.  *See Rocky Mountain Oil and Gas Ass'n*, 696 F.2d at 738 n.4.  The ARPA is a small part of a much broader "public lands" picture—the BLM's management of federal lands in accordance with the Great Divide RMP.  (AR 650, 2136).  The RMP presents a comprehensive

management framework for approximately nine million acres of BLM-administered public land and federal mineral estate and discusses thirteen categories of resource management including preservation of cultural resources; paleontological resources; fire suppression; health and productivity of forests; public lands; livestock grazing; mineral extraction; recreation; sensitive plants; soil, water, and air quality; visual resources; wild horses; and wildlife habitat and fisheries.  (AR 643-720); *see S. Utah Wilderness Alliance*, 542 U.S. at 70-71.  Furthermore, the BLM noted that the RMP's EIS considered in detail four alternatives, which were all "multiple-use oriented," and stated that the RMP "represents a selection of management actions which resolve the planning issues and provide for sustained multiple use management of the public lands and resources." (AR 650, 652).  Therefore, the BLM fully complied with FLPMA's land use planning and multiple use policies, and its decision is not arbitrary and capricious.

**B.    The BLM complied with FLPMA's mandate that the final EIS and ROD conform to the governing RMP.**

FLPMA requires that the Secretary of the Interior ("Secretary") "shall manage the public lands . . . in accordance with the land use plans" and states that "[a]ll future resource management authorizations and actions . . . and subsequent more detailed or specific planning, shall conform to the approved plan."  43 U.S.C. § 1732(a); 43 C.F.R. § 1610.5-3(a).  This requirement prevents BLM from taking actions inconsistent with the provisions of a land use plan.  *S. Utah Wilderness Alliance*, 542 U.S. at 69.  "Unless and until the plan is amended, such actions can be set aside as contrary to law pursuant to [the APA]."  *Id.*; *see also Pennaco Energy, Inc. v. U.S. Dep't of the Interior*, 377 F.3d 1147, 1151 (10th Cir. 2004) ("In the context of oil and gas development, the BLM is initially charged with determining whether the issuance of a particular oil and gas lease is

31

consistent with the RMP."); *Klamath-Siskiyou Wildlands Ctr. v. Medford Dist. of the BLM*, 400 F. Supp. 2d 1234, 1241 (D. Or. 2005) ("Failure of a project to comply with the requirements of the RMP is a violation of FLPMA and its implementing regulations."). Land use plans are "tools by which 'present and future use is *projected*.' The implementing regulations make clear that land use plans are a preliminary step in the overall process of managing public lands." *S. Utah Wilderness Alliance*, 542 U.S. at 69, *quoting* 43 U.S.C. § 1701(a)(2).

The Great Divide RMP was prepared under FLPMA and manages approximately four million acres of public land surface and five million acres of federal mineral estate administered by the BLM in the Great Divide Resource Area in Wyoming.  (AR 650).  The RMP covers management of federal lands within the ARPA and is therefore the governing RMP.  (AR 2136).  The Great Divide RMP states that with regard to oil and gas, the management objective is to "provide opportunity for leasing, exploration, and development of oil and gas while protecting other resource values."  (AR 679).  The RMP also indicates that the "entire planning area is open to oil and gas leasing.  Leases will be issued with needed restrictions to protect resources" such as sage grouse leks, high priority wildlife habitat, raptor concentration areas, crucial winter range for elk, and overlapping big game crucial winter range.  (AR 679, 681).  The final EIS for the Great Divide RMP further states that oil and gas leasing in the Great Divide Resource Area "is consistent with national policy that energy resources should be available for development and with the principle of multiple-use management of the public lands."  (AR 451).

In the instant case, the ROD is consistent with the Great Divide RMP's reasonably foreseeable development ("RFD") scenario.  The Great Divide RMP in no

way caps the amount of oil and gas development in the Great Divide Resource Area or

the ARPA.  A RFD scenario was recently defined in an Instruction Memorandum from

the director of the BLM in Washington D.C. to all state BLM directors as "a long-term

projection (scenario) of oil and gas exploration, development, production, and

reclamation activity."  (AR 5311).  The memorandum also discussed the effect of an RFD

scenario:

> The fact that the total number of wells in an area may exceed the total
> number of wells projected in the selected alternative does not
> automatically mean that a supplement to the NEPA document or a revision
> or amendment to the RMP is necessary.  It is possible that exceeding the
> number of wells projected in the selected alternative may not result in
> exceeding the predicted level of environmental effects.

(AR 5312).  Therefore, even if the ROD does exceed the RFD scenario outlined in the

Great Divide RMP, it does not signify that the ROD is not in conformance with the RMP.

Moreover, the Great Divide RMP specifically states that the entire Great Divide

Resource Area is open to oil and gas leasing subject to certain restrictions for sage grouse

leks, high priority wildlife habitat, raptor concentration areas, crucial winter range for elk,

and overlapping big game crucial winter range.  (AR 679, 681).  The final EIS and ROD

address extensively these exact restrictions.  The BLM states that it will require operators

to use BMPs such as protection measures for big game crucial winter range, greater sage-

grouse habitat, wildlife habitat, potential hazards to wildlife, disruption of mule deer

migration corridors, and disturbance of severe winter relief habitat for greater sage-

grouse.  (AR 3093-94).  Additionally, the BLM lays out in Appendix E a comprehensive

wildlife monitoring and protection plan for the ARPA and addresses in Appendix L

resource concerns and associated protection measures that the BLM can implement above

and beyond the BMPs already required.  (AR 2618-32, 3149-62).

The final EIS and ROD for the ARPA therefore conform to the Great Divide RMP's objective to allow oil and gas leasing subject to certain resource restrictions. *See*, *e.g.*, *Klamath-Siskiyou Wildlands Ctr*, 400 F. Supp. 2d at 1245-47 (finding that the BLM demonstrated compliance with the RMP's mitigation requirements based on the extensive study and analysis supporting those measures in the final EIS); *N. Plains Res. Council, Inc. v. U.S. BLM*, 298 F. Supp. 2d 1017, 1024 (D. Mont. 2003) (finding that the RMP permitted the level of coal bed methane activity approved by the BLM because the RMP's "reasonably foreseeable development scenario" included the drilling of test wells and a limited amount of coal bed methane production). Accordingly, the BLM's decision to allow drilling and development in the ARPA as laid out in the final EIS and ROD did not violate FLPMA.

The final EIS and ROD are also consistent with the Great Divide RMP's wildlife and recreation management objectives. The Great Divide RMP lists the following general management objectives for wildlife habitat management decisions:

> To provide habitat quality (food, cover, space, and water) adequate to support a natural diversity of wildlife and fisheries, including big game, upland game, waterfowl, non-game species, game fish, sensitive, threatened, and endangered species, species of special management interest in Wyoming, as well as to assist in meeting goals of recovery plans.
>
> To maintain or improve vegetation condition and/or to avoid long-term disturbance in high priority standard habitat sites and fisheries areas.
>
> To maintain or improve overall ecological quality, thus providing good wildlife habitat, within the constraints of multiple-use management in moderate and low priority standard habitat sites.

(AR 690). The RMP also discusses management objectives in regard to specific resources. For the Baggs crucial elk winter range, the objectives are "to maintain the

integrity of crucial winter habitat for elk, to allow development of oil and gas and coal, and to seek the cooperation of owners of adjacent property in management of the habitat." (AR 692). These objectives will be ascertained by a "case-by-case" examination of proposals to determine potential adverse effects and appropriate mitigation measures. (*Id*.). Furthermore, "[c]ertain times of the year and certain areas will be avoided by spatial and temporal management of development, facilities, and uses." (AR 692, 694). The RMP also states that "[c]rucial winter ranges for all big game species will be protected" through mitigation and reclamation and "[s]age grouse and sharp-tailed grouse strutting/dancing grounds and nesting habitat will be protected." (AR 694).

Similarly, the BLM's preferred alternative for the ARPA discusses management objectives for wildlife. The final EIS and ROD discuss several adverse effects of drilling and developing in the ARPA on big game crucial winter range and the greater sage-grouse. The BLM recognized these adverse effects in the final EIS and in response implemented in the ROD a "performance-based, adaptive management process." (AR 4798). This process includes the use of performance goals for migration routes, big game crucial winter range, and the greater sage-grouse. (AR 4835-38). Therefore, in addition to the mitigation measures already required by the ROD, drilling and development and reclamation activities in the ARPA will be managed through this adaptive management process to "avoid and/or minimize adverse impacts to wildlife by monitoring wildlife population trend and developing mitigation during the course of project development and operation." (AR 4847). In other words, the BLM did just what the RMP directed—it performed an examination of drilling and development in the ARPA, described the

35

adverse effects, and determined appropriate mitigation measures. Furthermore, the BLM will perform the RMP's required "case-by-case" examination for approval of individual APDs and apply the appropriate mitigation measures on a site-specific basis. (AR 4835).

More importantly, the final EIS and ROD use substantially the same mitigation measures laid out as "guidelines" in the Great Divide RMP for big game winter habitat and greater sage-grouse nesting and breeding habitat. (AR 696-98). The RMP indicates that to protect important big game winter habitat, "activities or surface use will not be allowed from November 15 to April 30." (AR 697). The final EIS requires this same protection measure, stating that "[n]o construction activities or prolonged maintenance actions will be conducted within big game crucial winter range during the crucial winter periods of November 15-April 30." (AR 2628). For the greater sage-grouse, the RMP notes that "activities or surface use" will not be allowed from February 1 to July 31 in nesting habitat areas and from November 15 to April 30 for game bird winter concentration areas. (AR 697). Similarly, the final EIS does not allow surface disturbing and disruptive activities "within two miles of an occupied greater sage-grouse lek or in nesting and early brood-rearing habitat associated with individual leks . . . from March 1 to July 15" and "between November 15 and March 15 in delineated winter concentration areas." (AR 2626). Therefore, not only do the final EIS and ROD for the ARPA conform to the Great Divide RMP's management objectives for wildlife, the BLM abides by the exact mitigation guidelines in the RMP for big game crucial winter habitat and the greater sage-grouse nesting and breeding habitats.

Similarly, the final EIS and ROD conform to the Great Divide RMP's management objectives for recreation. The Great Divide RMP lists the following general

management objectives for recreation management decisions: "To ensure the continued availability of outdoor recreational opportunities, to meet legal requirements for the health and safety of visitors and to mitigate conflicts with other resource uses." (AR 682). Even though development in the ARPA would "make recreating in the project area significantly less desirable," it would not preclude altogether recreation activities like hunting, pleasure driving, and wildlife viewing from taking place. (AR 2421; *see* AR at 2445 ("[S]ome hunters and other recreation visitors to the ARPA may be *temporarily* displaced from the area by drilling, field development activity, land disturbance, and reductions in game. A lesser number of hunters and recreation visitors may be displaced in the long term because of the loss of undisturbed landscapes and solitude.") (emphasis added)). Additionally, the BLM is planning to expand the Sand Hills Area of Critical Environmental Concern ("ACEC") in the ARPA to include the JO Ranch Lands (1,234 acres), which are used for recreational uses such as pronghorn antelope, mule deer, elk, and sage-grouse hunting; back country camping and hiking; rockhounding; wildlife observation; off-road vehicle use; outdoor photography; and scenic touring. (AR 2282-83). Therefore, the EIS and ROD conform to the Great Divide RMP's management objectives for recreation and its decision is not arbitrary and capricious.

Additionally, even though development of site-specific mitigation plans will take place after the ROD is issued, the criteria for the plans and the specific mitigation measures that the BLM will require are discussed in detail in both the final EIS and ROD. The BLM's adaptive management process includes the development of mitigation measures by a review team consisting of the BLM, cooperating and interested agencies, and the operators, and will include modifying an operator's development and drilling

proposal based on site-specific factors such as greater sage-grouse lek locations, raptor nests, and crucial winter range.  (AR 4798, 4813).  In Appendix B in the final EIS, the BLM lists the requirements that will be imposed on the operators in order to mitigate effects of development.  (AR 4835-55).  In Appendix H, the BLM lists specific resource concerns that could occur in a development area (*e.g.*, big game crucial winter range, greater sage-grouse leks, mule deer migration corridors) and requires that a specific mitigation measure take place to remedy the concern.  (AR 3081-96).  Moreover, in Appendix L, the BLM lists over 30 additional resource concerns above and beyond the ones listed in Appendix H, which are accompanied by the specific mitigation measure that the BLM would require the operator to implement.  (AR 3149-62).  Importantly, the BLM will monitor all these mitigation measures, including the ones already set out in the ROD and the ones that will be required depending on the specifics of the development area, through an operating plan that the operators must submit annually to the BLM.  (AR 4798).

Therefore, the BLM adequately identified mitigation measures, which were available to the public *before* the decision was made, and the BLM's decision does not violate FLPMA's mandate that the final EIS and ROD conform to the governing RMP.

//

//

//

//

//

//

38

**CONCLUSION**

For the foregoing reasons, the Federal Defendants did not act arbitrarily or capriciously in adopting the Atlantic Rim final EIS and ROD and the Catalina and Sun Dog EAs and FONSIs.  In accordance with FED. R. CIV. P. 56(c) this Court should grant Defendant-Intervenor State of Wyoming's Cross-Motion for Summary Judgment on all claims.

DATED the 11th day of June, 2008.

DEFENDANT-INTERVENOR,
STATE OF WYOMING

  /s/ Teresa R. Nelson
Teresa R. Nelson
Assistant Attorney General

Jay A. Jerde
Deputy Attorney General
Wyoming Attorney General's Office
123 Capitol Building
Cheyenne, WY  82002
(307) 777-6946
(307) 777-3542 – Facsimile
jjerde@state.wy.us

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THEODORE ROOSEVELT CONSERVATION PARTNERSHIP, Plaintiff, v. DIRK KEMPTHORNE, in his official Capacity as the Secretary of the United States Department of the Interior, and UNITED STATES BUREAU OF LAND MANAGEMENT Defendants, STATE OF WYOMING, ANADARKO PETROLEUM CORPORATION, WARREN RESOURCES, INC., and DOUBLE EAGLE PETROLEUM CO., Defendant-Intervenors. | CASE NO. 07-cv-01486-RJL |

**DEFENDANT-INTERVENOR STATE OF WYOMING'S
STATEMENT OF MATERIAL FACTS
AS TO WHICH THERE IS NO GENUINE ISSUE**

Pursuant to LCvR 7(h), Defendant-Intervenor State of Wyoming submits the following statement of material facts as to which it contends there is no genuine issue:

1.    On September 26, 2001, the Bureau of Land Management ("BLM") published a Notice of Intent ("NOI") to prepare an environmental impact statement ("EIS") and to conduct scoping for the Atlantic Rim Coalbed Methane Project, later renamed the Atlantic Rim Natural Gas Development Project. (AR 9483).

2.    The draft EIS was released in December 2005.  (AR 1438).

3.    On December 1, 2006, the BLM published in the Federal Register a Notice of Availability ("NOA") of the final EIS.  (AR 9564-65).

4.    On May 21, 2007, the BLM published a NOA of the record of decision ("ROD").  (AR 9574-75).

5.    In the ROD, the BLM selected Alternative D as its preferred alternative with modifications based on comments received, including the requirement that operators use performance goals and the option to consider additional protective measures that are not in conflict with the ROD.  (AR 4796, 4799).

6.    The BLM estimates that the total disturbance from natural gas development activities in the Atlantic Rim Project Area ("ARPA"), including disturbance from existing wells and infrastructure, will be 13,600 acres during the 30 to 50 year life of the project.  (AR 4798).

7.    The BLM will manage drilling development and reclamation activities in the ARPA through a "performance-based, adaptive management process," which includes a requirement that the operators submit an annual operating plan to the BLM Rawlins Field Office ("RFO").  (AR 4798).

8.   Reclamation will be required after completion of the drilling activities and before the next growing season, which will reduce impacts to 5,000 acres or 1.5 percent of the ARPA by the end of the development phase of the project. (AR 4798).

9.   Adaptive management techniques will be used to modify reclamation criteria as necessary, and a mitigation process will be developed to provide quantifiable criteria to review performance goals.  (AR 3069, 4798).

10.   The BLM will review each component of the project involving federal lands or minerals on a site-specific basis, including review of annual or multi-year development plans, applications for permits to drill ("APDs"), right-of-way grants, Sundry Notices, and applications for special use permits.  (AR 4798).

11.   In June 2007, the BLM released an environmental assessment ("EA") and finding of no significant impact ("FONSI") for site-specific plans of development ("PODs") in the ARPA entitled Catalina A & B PODs.  (AR 73492-505).

12.   In August 2007, the BLM released an EA and FONSI for the Sundog A & B PODs.  (AR 74063-74).

13.   The EAs and FONSIs for the Catalina and Sun Dog PODs are tiered to the final EIS.  (AR 73492, 74063).

**ALTERNATIVES**

14.   The draft EIS identified four alternatives: the "no action" alternative, the proposed action, and two additional "action" alternatives.  (AR 1488).

3

15.  Alternative A is the "no action" alternative, where the BLM would reject the operators' proposal and the proposed drilling and development would not take place.  (AR 1489).

16.  The proposed action would consist of drilling and developing approximately 2,000 new natural gas wells in addition to the 116 exploration wells currently in place.  (AR 1488).

17.  Under the proposed action, the well spacing would be eight wells per section (80 acre spacing) but spacing could be reduced to four wells per section (160 acre spacing) depending on geology, and development and drilling would continue for 20 years, with a life-of-project of 30 to 50 years.  (AR 1488-89).

18.  Roads, pipelines, water wells, disposal wells, compressor stations, and gas processing facilities would also be constructed under the proposed action, and total new initial, short-term disturbance would be about 15,800 acres, while long-term disturbance after reclamation would be 6,241 acres.  (AR 1489).

19.  Alternative B would have the same number and spacing of wells as the proposed action but the drilling and development would occur in three phases, each lasting six to seven years including completion of interim reclamation. (AR 1489-90).

20.  Alternative C would require development protection measures in those areas with sensitive or crucial resource values, including sensitive wildlife and fish habitat, and areas with sensitive soils.  (AR 1491).

21.    Under Alternative C, constraints would consist of surface disturbance limits, limited operating periods, modification of drilling and construction practices, and no surface occupancy where necessary.  (AR 1491).

22.    For Alternative C, wildlife resource management would focus on grouse brood rearing or nesting habitat and big game crucial winter range.  (AR 1491).

23.    In the sensitive wildlife areas under Alternative C, surface disturbance would be limited to less than 20 acres, with four well locations per section (as opposed to eight).  (AR 1491).

24.    The BLM modified the alternatives in the final EIS, dropping Alternative B and proposing Alternative D as its preferred alternative.  (AR 2149-63).

25.    The BLM eliminated Alternative B from the final EIS "based on comments received on the Draft EIS, the effects of long delays on allowable oil and gas development to leaseholders and mineral rights, and the policy that BLM will allow reasonable access across federal lands for mineral development on private and state lands."  (AR 2161).

26.    Alternative D involves drilling approximately 2,000 gas wells within the ARPA, but no more than 7,600 acres or 2.8 percent of the ARPA would be disturbed and unreclaimed at any given time.  (AR 2156).

27.    Under Alternative D, management areas with sensitive fish populations, and crucial wildlife habitats, including elk crucial winter range and silver sage and bitterbrush communities, would be managed more intensely to reduce the extent of disturbance; reclamation would be reviewed annually; and an

adaptive management system using best management practices would be implemented.  (AR 2156).

28.    Warren Resources Incorporated commented on Alternative B in its draft EIS comments to the BLM:  "For efficient and effective development to maximize production, it will be necessary to develop the project in a manner that best draws down the formation pressure throughout the entire Atlantic Rim CBM gas reservoir.    Contemporaneous development will allow operators to efficiently dewater the coals to achieve optimum production results.  A staged development approach would inhibit achieving this goal."  (AR 8398).

29.    Anadarko also commented on Alternative B in its draft EIS comments to the BLM:

> Alternative B would phase the drilling of the wells contemplated by the proposal by dividing the project area into three sections thereby severely restricting Anadarko's ability to maximize the recovery of CBNG resources in direct opposition to policies set forth in the Energy Policy Act of 2005.  Drilling would be allowed in only one area at a time, and drilling would not be allowed in any other area until interim reclamation had been completed in the previous area.  A few of the more egregious lapse [sic] in the analysis for this alternative are:  1) BLM has failed to address whether this proposal is technologically or economically viable; 2) BLM has failed to account for the economic impact on lessees both from the perspective that some of the subject leases could be suspended for over fourteen years and that those with interest in the second and third phases will be deprived of revenues for seven to fourteen years; 3) BLM has failed to address the potential economic impact to the federal government both from the perspective of a loss of revenues, drainage, and from potential liability for takings claims; 4) BLM has failed to define what constitutes "interim reclamation" thereby failing to fully analyze both the environmental and economic impacts of phasing drilling in this fashion.  (AR 8389).

**MITIGATION MEASURES**

30. Alternative D reduces the amount of initial and long-term disturbance by approximately 18 percent from the proposed action, which is done through limiting the number of roads by transportation planning, requiring smaller operational footprints, and using accelerated reclamation efforts. (AR 4799-4800).

31. The BLM set out a mitigation strategy in Alternative D that includes limiting the allowable surface disturbance, accelerating reclamation by the operators, using remote monitoring, and enforcing timing stipulations, which will effectively "reduce direct disturbance to wildlife" and facilitate the long-term return of habitat function. (AR 4804).

32. To mitigate effects of development on sensitive resources, specific areas in Alternative D are designated as "Category A" areas where the short-term disturbance goal is required to be less than 6.5 acres per well pad. (AR 4807).

33. Drilling and development and reclamation activities in the ARPA will be managed through a "performance-based, adaptive management" process. (AR 4798).

34. The adaptive managment process includes the development of additional mitigation measures by a review team consisting of the BLM, cooperating and interested agencies, and the operators, and will include modifying an operator's development and drilling proposal based on site-specific factors such as greater sage-grouse lek locations, raptor nests, and crucial winter range. (AR 4798, 4813).

35.     In Appendix B in the final EIS, the BLM lists the requirements that will be imposed on the operators in order to mitigate effects of development, including what the operators have to do in regard to land use and surface disturbance; paleontological values; air quality and dust; soils and water; reclamation; livestock grazing and range management; wildlife; inventory and monitoring; wildlife protection measures; visual resource management; cultural and historic resources protection; socioeconomics; transportation; and noise.  (AR 4835-55)

36.     In Appendix H in the final EIS, the BLM lists specific resource concerns that could occur in a development area and requires that a specific mitigation measure take place to remedy the concern.  (AR 3081-96).

37.     In Appendix L in the final EIS, the BLM lists over 30 additional resource concerns which are accompanied by the specific mitigation measure that the BLM would require the operator to implement.  (AR 3149-62).

38.     The BLM will monitor mitigation measures through an operating plan that the operators must submit annually to the BLM.  (AR 4798).

39.     In February 2007, approximately three months before the ROD was published, the Wyoming Game and Fish Department ("WGFD") commented on the BLM's performance-based management process, stating that the "draft generic language for performance-based management looks very good, in general."   (AR 8818).

40.     The BLM requested that the BLM add the following paragraph to the ROD: "A Mitigation Plan will be required, and its development will begin

immediately upon signing of the ROD.  This plan will be developed in concert with State Cooperators and will provide specific quantifiable impact thresholds associated with the Performance Goals.  The plan will identify the types of mitigation responses that will be considered in the event that annual monitoring indicates those thresholds are being surpassed."  (AR 8824).

41.    The BLM added the following paragraph to the ROD:  "A monitoring and mitigation process will be required, and its development will begin within 30 days of the effective date of the ROD.  This process will be developed by the Review Team (BLM, cooperating and interested agencies, and Operators) and will provide quantifiable criteria to identify trends associated with the Performance Goals.   The process will include the types of mitigation responses that will be considered in the event that monitoring data indicate a downward trend relative to the Performance Goals . . . ."  (AR 4798).

### CUMULATIVE IMPACTS

42.    The BLM's cumulative impacts analysis includes seven natural gas development areas surrounding the ARPA.  (AR 2484-85).

43.    The BLM did not include in the cumulative impacts analysis a Wind Energy Development Program which establishes a number of policies and BMPs regarding the development of wind energy resources on BLM-administered public lands.  *See* Record of Decision, *Implementation of a Wind Energy Development Program and Associated Land Use Plan Amendments* (December 2005), available at http://windeis.anl.gov/documents/docs/ WindPEISROD.pdf.

44.    The final EIS for the Wind Energy Development Program does not involve any actual applications for wind energy development on lands in Wyoming or the ARPA.  *See* Record of Decision*, Implementation of a Wind Energy Development Program and Associated Land Use Plan Amendments* (December 2005), available at http://windeis.anl.gov/documents/docs/WindPEISROD.pdf.

### MULE DEER

45.    A study entitled *Final Report for the Atlantic Rim Mule Deer Study* ("Mule Deer Study") was puslished in April 2007 after the final EIS had been released to the public.  (AR 7421-49, 9564-65).

46.    Many of the same predictions and hardships that the Mule Deer Study identifies are already incorporated in the final EIS.  (AR 2393, 7423)

47.    The BLM included the Mule Deer Study in the administrative record, and noted that the study, which was released in April 2007, was in front of the agency before the ROD was officially made available to the public in May 2007.  (AR 7421-49, 9574-75).

48.    The BLM stated that it will use the Mule Deer Study to mitigate development in mule deer migration corridors within the ARPA.  (AR 2393, 3094).

49.    The BLM relied on and cited to several references concerning mule deer in the final EIS, including reports by Shell Oil Company, the WGFD, Colorado's Thorne Ecological Institute, the Universities of Idaho and Wyoming, and Wyoming's Western EcoSystems Technology, Incorporated.  (AR 2516-44, 6130-6215, 6254-6338, 6477-6541).

50.   In the final EIS, the BLM relied on a document entitled the *Sublette Mule Deer Study (Phase II): Long-term monitoring plan to assess potential impacts of energy development on mule deer in the Pinedale Anticline Project Area* ("Sublette Mule Deer Study"), which was prepared by Western EcoSystems Technology, Incorporated in Cheyenne, Wyoming.   (AR 2393-94, 6477-6541).

51.   The Sublette Mule Deer Study details the effect of natural gas production in western Wyoming on mule deer populations.  (AR 6477-6541).

52.   The BLM relied on several other EISs and EAs which analyzed the effects of oil and gas development on mule deer populations in Sweetwater and Carbon counties in Wyoming (where the ARPA is located) and numerous WGFD assessments detailing mule deer unit reports and statistics.  (AR 2249, 2391, 2393, 2484-85, 2498-99, 2536-38, 2541-42).

## FEDERAL LAND POLICY MANAGEMENT ACT

53.   The Great Divide Resource Management Plan ("RMP") was prepared under the Federal Land Policy and Management Act ("FLPMA") and manages approximately four million acres of public land surface and five million acres of federal mineral estate administered by the BLM in the Great Divide Resource Area in Wyoming.  (AR 650).

54.   The RMP covers management of federal lands within the ARPA and is therefore the governing RMP.  (AR 2136).

55.     The ARPA is a small part of a much broader "public lands" picture—the BLM's management of federal lands in accordance with the Great Divide RMP.  (AR 650, 2136).

56.     The RMP discusses thirteen categories of resource management including preservation of cultural resources; paleontological resources; fire suppression; health and productivity of forests; public lands; livestock grazing; mineral extraction; recreation; sensitive plants; soil, water, and air quality; visual resources; wild horses; and wildlife habitat and fisheries.  (AR 643-720).

57.     The BLM noted that the RMP's EIS considered in detail four alternatives, which were all "multiple-use oriented," and stated that the RMP "represents a selection of management actions which resolve the planning issues and provide for sustained multiple use management of the public lands and resources."  (AR 650, 652).

58.     The Great Divide RMP states that with regard to oil and gas, the management objective is to "provide opportunity for leasing, exploration, and development of oil and gas while protecting other resource values."  (AR 679).

59.     The RMP also indicates that the "entire planning area is open to oil and gas leasing.  Leases will be issued with needed restrictions to protect resources" such as sage grouse leks, high priority wildlife habitat, raptor concentration areas, crucial winter range for elk, and overlapping big game crucial winter range.  (AR 679, 681).

60.     The final EIS for the Great Divide RMP further states that oil and gas leasing in the Great Divide Resource Area "is consistent with national policy that

energy resources should be available for development and with the principle of multiple-use management of the public lands." (AR 451).

61. A reasonably foreseeable development ("RFD") scenario was recently defined in an Instruction Memorandum from the director of the BLM in Washington D.C. to all state BLM directors as "a long-term projection (scenario) of oil and gas exploration, development, production, and reclamation activity." (AR 5311).

62. The Instruction Memorandum stated that "[t]he fact that the total number of wells in an area may exceed the total number of wells projected in the selected alternative does not automatically mean that a supplement to the NEPA document or a revision or amendment to the RMP is necessary. It is possible that exceeding the number of wells projected in the selected alternative may not result in exceeding the predicted level of environmental effects. (AR 5312).

63. The Great Divide RMP lists general management objectives for wildlife habitat management decisions. (AR 690).

64. The BLM's preferred alternative for the ARPA discusses management objectives for wildlife. (AR 4835-38).

65. The RMP indicates that to protect important big game winter habitat, "activities or surface use will not be allowed from November 15 to April 30." (AR 697).

66.    The final EIS requires that "[n]o construction activities or prolonged maintenance actions will be conducted within big game crucial winter range during the crucial winter periods of November 15-April 30." (AR 2628).

67.    For the greater sage-grouse, the RMP notes that "activities or surface use" will not be allowed from February 1 to July 31 in nesting habitat areas and from November 15 to April 30 for game bird winter concentration areas. (AR 697).

68.    The final EIS does not allow surface disturbing and disruptive activities "within two miles of an occupied greater sage-grouse lek or in nesting and early brood-rearing habitat associated with individual leks . . . from March 1 to July 15" and "between November 15 and March 15 in delineated winter concentration areas." (AR 2626).

69.    The Great Divide RMP lists the following general management objectives for recreation management decisions:  "To ensure the continued availability of outdoor recreational opportunities, to meet legal requirements for the health and safety of visitors and to mitigate conflicts with other resource uses." (AR 682).

70.    Development in the ARPA will not preclude altogether recreation activities like hunting, pleasure driving, and wildlife viewing from taking place. (AR 2421, 2445).

71.    The BLM is planning to expand the Sand Hills Area of Critical Environmental Concern ("ACEC") in the ARPA to include the JO Ranch Lands (1,234 acres), which are used for recreational uses such as pronghorn antelope, mule deer, elk, and sage-grouse hunting; back country camping and hiking;

rockhounding; wildlife observation; off-road vehicle use; outdoor photography; and scenic touring. (AR 2282-83).

DATED this 11th day of June, 2008.

DEFENDANT-INTERVENOR, STATE OF WYOMING


 /s/ Teresa R. Nelson
Teresa R. Nelson
Assistant Attorney General

Jay A. Jerde
Deputy Attorney General
Wyoming Attorney General's Office
123 Capitol Building
Cheyenne, WY  82002
(307) 777-6946
(307) 777-3542 - Facsimile
jjerde@state.wy.us

## CERTIFICATE OF SERVICE

I hereby certify that on this 11th day of June, 2008, the foregoing DEFENDANT-INTERVENOR STATE OF WYOMING'S CROSS-MOTION FOR SUMMARY JUDGMENT, DEFENDANT-INTERVENOR STATE OF WYOMING'S MEMORANDUM IN SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT and DEFENDANT-INTERVENOR STATE OF WYOMING'S STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE were electronically filed through the CM/ECF system, which caused the following parties to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

Steven M. Kupka
Thomas R. Wilmoth
Donald G. Blankenau
Husch Blackwell Sanders LLP
206 South 13th Street, Suite 1400
Lincoln, NE 68508-2019
email: nancilee.holland@huschblackwell.com
email: tom.wilmoth@huschblackwell.com
email: don.blankenau@huschblackwell.com
*Counsel for Plaintiff*

Michael B. Wigmore
Sandra P. Franco
Bingham McCutchen LLP
2020 K Street, NW
Washington, D.C. 20006-1806
email: michael.wigmore@bingham.com
email: s.franco@bingham.com
*Counsel for Defendant-Intervenors Anadarko Petroleum Corporation, Warren Resources, Inc., and Double Eagle Petroleum Co.*

Lori Caramanian
United States Department of Justice
Environment & Natural Resources Division
1961 Stout Street, 8th Floor
Denver, CO 80294
email: lori.caramanian@usdoj.gov
*Counsel for Federal Defendants*

Robert C. Mathes
Bjork Lindley Little PC
1600 Stout Street, Suite 1400
Denver, CO 80202
email: rmathes@bjorklindley.com
*Counsel for Defendant-Intervenor Double Eagle Petroleum Co.*

  /s/ Teresa R. Nelson
Office of the Attorney General

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THEODORE ROOSEVELT CONSERVATION PARTNERSHIP, <br><br> Plaintiff, <br><br> v. <br><br> DIRK KEMPTHORNE, in his official Capacity as the Secretary of the United States Department of the Interior, and UNITED STATES BUREAU OF LAND MANAGEMENT <br><br> Defendants, <br><br><br> STATE OF WYOMING, ANADARKO PETROLEUM CORPORATION, WARREN RESOURCES, INC., and DOUBLE EAGLE PETROLEUM CO., <br><br> Defendant-Intervenors. | ) <br> ) <br> ) <br> ) <br> ) <br> ) CASE NO. 07-cv-01486-RJL <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

**[Proposed]**
**ORDER GRANTING DEFENDANT-INTERVENOR STATE OF WYOMING'S
CROSS-MOTION FOR SUMMARY JUDGMENT**

Defendant-Intervenor State of Wyoming has filed a cross-motion pursuant to Fed. R. Civ. P. 56 seeking summary judgment in its favor. The Court, having reviewed the record and having considered all pleadings and arguments of the parties, and being otherwise fully advised, finds that Federal Defendants have not acted arbitrary or capriciously in violation of the Administrative Procedure Act, and hereby:

**ORDERS** that Defendant-Intervenor State of Wyoming's cross-motion for summary judgment is **GRANTED.**

**DATE:** _____    _____
**UNITED STATED DISTRICT JUDGE**