# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THEODORE ROOSEVELT CONSERVATION PARTNERSHIP, )<br><br>Plaintiffs, )<br><br>v. )<br><br>DIRK KEMPTHORNE, in his official capacity as the Secretary of the United States Department of the Interior, and UNITED STATES BUREAU OF LAND MANAGEMENT, )<br><br>Defendants. )<br><br>ANADARKO PETROLEUM CORPORATION, WARREN RESOURCES, INC., and DOUBLE EAGLE PETROLEUM CO., and STATE OF WYOMING, )<br><br>Defendant-Intervenors. ) | Civil No. 1:07-cv-01486-RJL |

**FEDERAL DEFENDANTS' MEMORANDUM OF
POINTS AND AUTHORITIES IN SUPPORT OF COMBINED
CROSS MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

I.      INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

III.    LEGAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        A.      Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        B.      The Federal Land Policy and Management Act . . . . . . . . . . . . . . . . . . . . . . . . . 6

        C.      The National Environmental Policy Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

IV.     ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        A.      BLM Complied With NEPA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

                1.      BLM Considered a Range of Reasonable Alternatives . . . . . . . . . . . . . . . 8

                2.      BLM Properly Defined the Purpose and Need and
                        Evaluated in Detail a Range of Reasonable Alternatives . . . . . . . . . . . . 11

                3.      BLM Considered the Phased Development Alternative
                        in Detail in the DEIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

                4.      BLM Adequately Examined Alternatives in the EAs . . . . . . . . . . . . . . . 17

                5.      The FEIS Contains a Reasonably Complete Discussion
                        of Mitigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

                6.      The FEIS Took a Hard Look at the Reasonably
                        Foreseeable Impacts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

                7.      BLM Is Not Required to Consider the Cumulative Impacts
                        of Wind Development Projects That Do Not Exist . . . . . . . . . . . . . . . . . 27

                8.      BLM Adequately Discussed Baseline Information for
                        Mule Deer and Took a Hard Look at the Potential
                        Impacts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

                9.      BLM Did Not Violate NEPA by Irretrievably
                        Committing Resources Prior to Finalizing the
                        Rawlins RMP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

i

10.    BLM Took a Hard Look at the Impacts of
Site-Specific Approvals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

B.    BLM Complied With FLPMA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

1.    The Protections for Sage-Grouse Imposed by the
Atlantic Rim Project ROD are Consistent with the
Great Divide RMP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

2.    BLM Did Not Violate Plan Requirements for Big Game  . . . . . . . . . . . 41

3.    Plaintiff's Claim that the Action Violates RMP Objectives
Is Non-Justiciable  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

4.    The catalina and Sun Dog Plans Comply with the RMP . . . . . . . . . . . . 45

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

# TABLE OF AUTHORITIES

## CASES

Baltimore Gas & Elec. Co. v. NRDC, 462 U.S. 87 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Biodiversity Conservation Alliance v. BLM,  404 F. Supp. 2d 212 (D.D.C. 2005) . . . . 17, 18, 26

Citizens Against Burlington, Inc. v. Busey, 938 F.2d 190 (D.C. Cir. 1991) . . . . . . . . . . . . passim

City of Grapevine v. Dep't of Transp., 17 F.3d 1502 (D.C. Cir. 1994) . . . . . . . . . . . . . . . 13, 14

City of Williams v. Dombeck, 151 F. Supp. 2d 9 (D.D.C. 2001) . . . . . . . . . . . . . . . . . . . . . . . 26

Davis v. Latschar, 202 F.3d 359 (D.C. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 10, 15

Deukmejian v. Nuclear Regulatory Comm'n, 751 F.2d 1287 (D.C. Cir.1984) . . . . . . . . . . . . . 28

Dep't of Transp. v. Public Citizen, 541 U.S. 752 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 17

El Conejo Americano of Texas, Inc. v. DOT, 278 F.3d 17
(D.C. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Envtl. Prot. Info. Center v. U.S. Forest Service, 234 Fed. Appx. 440
(9th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Fund for Animals, Inc. v. BLM, 460 F.3d 13 (D.C. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . 37

Half Moon Bay Fisherman's Mktg. Ass'n v. Carlucci, 857 F.2d 505
(9th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 30

Hammond v. Norton, 370 F. Supp. 2d 226 (D.D.C. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

J.A. Jones Mgmt. Servs. v. FAA, 225 F.3d 761(D.C. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . 6

Karst Envtl. Educ. & Protection, Inc. v. EPA, 475 F.3d 1291(D.C. Cir. 2007) . . . . . . . . . . . . . 5

Lujan v. National Wildlife Federation, 497 U.S. 871 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Marsh v. Oregon Natural Res. Council, 490 U.S. 360 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Milk Indus. Found. v. Glickman, 132 F.3d 1467 (D.C. Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . 6

Motor Vehicle Mfs. Ass'n v. State Farm Mut. Auto. Ins., 463 U.S. 29  (1983) . . . . . . . . . . . . . 6

Nevada v. Dep't of Energy, 457 F.3d 78 (D.C. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Northern Alaska Envtl. Ctr. v. Kempthorne, 457 F.3d 969 (9th Cir. 2006) . . . . . . . . . . . . . . . 20

Northern Cheyenne Tribe v. Norton, 503 F.3d 836 (9th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . 16

Northern Plains Resource Council, Inc. v. BLM, 298 F. Supp. 2d 1017
(D. Mont. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Northern Plains Resource Council, Inc. v. BLM, 2005 U.S. Dist. LEXIS 4678
(D. Mont. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 16, 17

Norton v. Southern Utah Wilderness Alliance (SUWA), 542 U.S. 55 (2004) . . . . . . . . . . passim

NRDC v. Kempthorne, 525 F. Supp. 2d 115 (D.D.C. 2007) . . . . . . . . . . . . . . . . . . . . . . . . passim

Ocean Conservancy v. Gutierrez, 394 F. Supp. 2d 147 (D.D.C. 2005) . . . . . . . . . . . . . . . passim

Okanogan Highlands Alliance v. Williams, 236 F.3d 468
(9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21, 22

ONRC Action v. BLM, 150 F.3d 1132 (9th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 33

Potomac Alliance v. U. S. Nuclear Regulatory Comm'n, 682 F.2d 1030
(D.C. Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Pub. Lands Council v. Babbitt, 167 F.3d 1287 (10th Cir.1999) . . . . . . . . . . . . . . . . . . . . . . . . 36

Reed v. Avis Rent-A-Car, 29 F. Supp. 2d 1121 (N.D. Cal. 1998) . . . . . . . . . . . . . . . . . . . . . . 40

River Road Alliance, Inc. v. Corps of Eng'rs, 764 F.2d 445 (7th Cir. 1985) . . . . . . . . . . . . . . 14

Robertson v. Methow Valley Citizens Council, 490 U.S. 332 (1989) . . . . . . . . . . . . . . . . . . 7, 20

Rocky Mountain Oil and Gas Ass'n v. Watt, 696 F.2d 734 (10th Cir. 1982) . . . . . . . . . . . . 35, 36

Schweiker v. Hansen, 450 U.S. 785 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Sierra Club v. Adams, 578 F.2d 389 (D.C. Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Sierra Club v. Peterson, 717 F.2d 1409 (D.C. Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Sierra Club v. U.S. Dept. Of Transp., 753 F.2d 120 (D.C. Cir. 1985) . . . . . . . . . . . . . . . . . . . 41

TOMAC v. Norton, 433 F.3d 852 (D.C. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Vermont Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519 (1978) . . . . . . . . . . . . . . . . 9, 24

Voyaguers Nat'l Park Ass'n v. Norton, 381 F.3d 759 (8th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . 30

Western Watershed Project v. Fish and Wildlife Serv.,
535 F. Supp. 2d 1173 (D. Idaho 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Western Watersheds Project v. U.S. Forest Service, 2006 WL 292010
(D. Idaho 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

## STATUTES

5 U.S.C. § 551 et seq. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

5 U.S.C. § 706 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

42 U.S.C. § 16372 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

42 U.S.C. § 15927 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

42 U.S.C. § 4321 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

42 U.S.C. § 4332 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

43 U.S.C. § 1701 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

43 U.S.C. § 1702 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

43 U.S.C. § 1712 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 36

43 U.S.C. § 1732) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Energy Policy Act of 2005, Pub. L. No. 109-58, 119 Stat. 604 (2005) . . . . . . . . . . . . . . . . . . . . 12

## REGULATIONS

40 C.F.R. § 1501.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

40 C.F.R. § 1502.9 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

40 C.F.R. § 1502.15 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

40 C.F.R. § 1506.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 32

40 C.F.R. § 1506.3(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

40 C.F.R. § 1508.7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

40 C.F.R. §§ 1508.9 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

40 C.F.R. § 1508.28 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

43 C.F.R. 1601.0-5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

43 C.F.R. § 1610.5-3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 37

# I.  INTRODUCTION

Plaintiff challenges the Record of Decision and Final Environmental Impact Statement (FEIS) for the Atlantic Rim Natural Gas Development Project and two site-specific Plans of Development (POD) that tier to its analysis.  Natural gas is an essential component of the Nation's energy strategy, and is among the resources the Bureau of Land Management (BLM) is required to balance in its management of the public lands pursuant to the Federal Land Policy and Management Act (FLPMA).  In a six-year process that included substantial involvement by the public, the Environmental Protection Agency (EPA), the Fish and Wildlife Service (FWS) and the State of Wyoming, BLM developed an FEIS that employed a high level of scientific rigor and conservatism in analyzing the impacts of a proposal by oil and gas developers to drill approximately 2,000 coalbed natural gas wells in the Atlantic Rim project area in Wyoming.  Plaintiff generally concedes that BLM took the requisite "hard look" at the impacts of its decision that NEPA requires, and objects only to its description of the baseline information for mule deer.  Plaintiff raises a spurious objection based on its newly manufactured claim that BLM did not consider the cumulative impacts of wind energy, which the Court should not consider.  Plaintiff argues that BLM failed to consider a reasonable range of alternatives, but the record shows that BLM five alternatives in detail, including the phased development alternative Plaintiff preferred.  Plaintiff also argues that BLM violated FLPMA's multiple use and sustained yield mandates, but the record shows that BLM complied with the Great Divide Resource Management Plan (RMP or Plan), pursuant to which BLM carries out its responsibilities under FLPMA.  The Court should grant summary judgment for BLM.

## II.  FACTUAL BACKGROUND

BLM manages oil and gas resources on federal public lands, and, following appropriate environmental analysis, it issues permits to develop those resources, thereby reducing U.S.

1

dependence on foreign energy sources. We adopt by reference this Court's November 2007 decision denying the motion for a preliminary injunction in <u>NRDC v. Kempthorne</u> (<u>NRDC I</u>), 525 F. Supp. 2d 115, 117-18 (D.D.C. 2007) because it addresses many of the relevant facts. The Atlantic Rim Coalbed Methane FEIS analyzes the impacts of developing up to 2,000 coalbed natural gas (CBNG) wells in south-central Wyoming. FEIS at ES-1 (AR 2088).[1] The project area is approximately 270,080 acres, including 173,672 acres of federal surface estate and 179,438 acres of federal mineral estate. ROD at 1 (AR 4796). The remaining lands and minerals are held by the State of Wyoming or are privately owned. <u>Id.</u> The project area is in the Great Divide Resource area, which encompasses four million acres of public surface land and five million acres of federal mineral estate. AR 652. BLM manages the lands pursuant to direction contained in the Great Divide Resource RMP.[2] <u>Id.</u> The Record of Decision (ROD) for the Atlantic Rim Project sets forth the plan for future management of federally minerals and surface in the Project area. ROD at 1.

In its statement of facts, and improperly relying on extra-record declarations which we have separately moved to strike, Plaintiff attempts to cast aspersions on the process by arguing that BLM caved to the will of developers and elevated political considerations over sound science. Plfs. Br. at 5-6. The record shows otherwise. BLM studied the proposal for six years before arriving at a decision, beginning with scoping of the project in 2001 and ending with the State Director making the decision in March 2007. ROD at 22 (AR 4819). The decision was made after detailed study and coordination with other agencies' experts, including the FWS and WGFD. FEIS at 6-2 (AR 2511).

Plaintiff's efforts to characterize the action as transforming "prime wildlife habitat" into an

---

[1]Contrary to Plaintiff's assertion that the project "escalated" from a small exploratory project to a proposal to develop 3,880 wells, what actually happened was that a different project was pending and the proposal to develop it was subsequently withdrawn. AR 7633.

[2] The Great Divide RMP is undergoing revision as the Rawlins RMP. FEIS at 1-9 (AR 2136).

"industrialized setting" exaggerate BLM's conclusions in the FEIS. Plfs. Br. at 7. The project is located in an area that historically has been an important source of oil and gas. FEIS at 3-12, 4-139, 5-2-5-5 (AR 2176, 2458, 2484-85). The project area and surrounding region also provide habitat of varying importance for numerous species of animals. FEIS at 3-84 (AR 2248). Therefore, BLM identified impacts on wildlife, including impacts on big game and sensitive species, as a key issue and concern during the scoping period, and it tailored its decisionmaking accordingly. FEIS at 1-18 (AR 2145). The FEIS analyzed four alternatives in detail, including the action preferred by the oil and gas proponents, the no action alternative, and Alternative C (special protections).[3] FEIS at 2-3 to 2-11 (AR 2151-59). In the draft EIS BLM also considered in detail a phased development alternative that proposed restricting development to one of three zones at any one time, with a seven-year construction and development window for each zone. ROD at 14 (AR 4809). BLM dropped the alternative from the FEIS because it was infeasible. Id.

In the FEIS, BLM developed Alternative D, in part to address concerns raised by federal agencies and others about impacts on wildlife. It is intended to minimize surface disturbance while optimizing natural gas recovery. Id. at 2-7, 1-20 (AR 2155, 2147). Operators are required to initiate reclamation after completion of drilling activities and before the next growing season. ROD at 3 (AR 4798). Surface disturbance from development activities is limited to a maximum of 7,600 acres (approximately 3% of project area) at any given time, with an expected total surface disturbance limited to 13,600 acres (approximately 5%). Id. at 2-3 (AR 4797-98). Disturbance is limited to an

---

[3] Plaintiff insinuates that there is something untoward about the fact that the EIS was prepared by a contractor, Plfs. Br. at 6, but NEPA's regulations specifically allow for preparation of an EIS "by a contractor selected by the lead agency." 40 C.F.R. § 1506.5(c). The contractor that prepared the EIS was selected by BLM and worked under the agency's direct guidance. The companies' role was limited to recommending the contractor and to paying the bill. AR 8401. BLM's NEPA Handbook provides guidance for third-party contracts, and addresses the potential for conflicts by directing BLM to establish a strict division between a project proponent and the contractor through a memorandum of understanding. AR 5019-20. The MOU does that. AR 8403-05.

average of 6.5 acres per well.  Id. at 4 (AR 4199).  The expected life of the project is 30–50 years.
Id. at 12 (AR4807).  If the disturbance cap is reached during development, further disturbance
activities would be halted pending successful reclamation. FEIS at 2-8 (AR 2156).  BLM will
manage approximately 72,200 acres (27% of the project area) as Category A mitigation areas.  Id.
at 2-8--2-9; ROD at 12 (AR 2156-57, 4807).  Category A areas have sensitive fish populations and
crucial wildlife habitats, such as crucial elk winter range.  Id. at 2-8; ROD at 12 (AR 2156, 4807).
BLM required reduced disturbance below 6.5 acres per well in Category A areas.  Id.

The project has significant benefits, including providing enough clean-burning natural gas
to heat 19.3 million homes for a year.  ROD at 1; FEIS at 1-8  (AR 4796; 2135).  Developing
domestic sources of natural gas also reduces U.S. reliance on foreign energy sources.  ROD at 1,
FEIS at 1-8 (AR 4796, 2135).  The project will also benefit the State of Wyoming, including its
schools, by adding 1,500 jobs at the peak of production and generating five million dollars annually
in taxes and royalties.  FEIS at ES-6, 4-130, 4-137 (AR 2093, 2449).

Plaintiff objects to the BLM's adaptive management process as a "backward management
style," based on its contention that BLM is actually seeking to shield subsequent decisonmaking
from public view.  Plfs. Br. at 7.   In fact, BLM's adaptive management plan will be transparent.
Operators will submit annual operating plans to the BLM.  Id.  After submission of annual operating
plans, site-specific monitoring and mitigation processes will be developed by a Review Team
(including but not limited to BLM, cooperating agencies, and interested agencies).  ROD at 3, 12
(AR 4798, 4807); see also id. at App. B (AR 4836-55).  Monitoring data will be evaluated at least
annually to determine if mitigation is effective and meeting performance goals.  Id.  Based on those
results, mitigation measures, conditions of approval, best management practices, reclamation
criteria, and other protective measures may be modified.  ROD at 3 (AR 4798); see also ROD at E-1

(planning process allows for more frequent meetings if necessary). Additional protective measures may be applied to site-specific proposals. ROD at 21 (AR 4816).

Further, the ROD is not the final review or approval of development activities within the Project area. Site-specific approvals, including appropriate environmental analysis, are required for such actions as Applications for Permit to Drill (APDs), right-of-way grants, and applications for Special Use Permits. ROD at 3-4 (AR 4798-99). In the ROD, BLM emphasized that monitoring, reporting and adaptive management are key components of the decision. ROD at 20 (AR 4815). That means BLM will continue to monitor trends and the effectiveness of reclamation efforts and mitigation, that it will identify areas requiring modification, and that it will implement adapted techniques, including additional mitigation, to resolve problems observed during monitoring. Id. BLM's long-term goal is to return the lands to approximately the same condition they were in before development. ROD at 4 (AR 4799). BLM approved Findings of No Significant Impact (FONSI) for the challenged environmental assessments (EA) in 2007. The Catalina A and B POD FONSI was issued on June 28, 2007, with a supporting EA. AR 73502, 73492. BLM issued the FONSI for the Sun Dog A and B POD on August 15, 2007, also supported by an EA. AR 74063, 74073.

## III.  LEGAL BACKGROUND

### A.    Standard of Review

"Since neither the FLPMA nor NEPA provides a private right of action," a challenge to agency action must be brought pursuant to the Administrative Procedure Act, 5 U.S.C. § 551 et seq., which requires 'final agency action for which there is no other adequate remedy in a court.'" Lujan v. National Wildlife Federation, 497 U.S. 871, 872 (1990); Karst Envtl. Educ. & Protection, Inc. v. EPA, 475 F.3d 1291, 1295 (D.C. Cir. 2007) (citation omitted). This Court's review is governed by the "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" standard

of the Administrative Procedure Act (APA). See 5 U.S.C. § 706(2)(A). This standard is "narrow and a court is not to substitute its judgment for that of the agency." Motor Vehicle Mfs. Ass'n v. State Farm Mut. Auto. Ins., 463 U.S. 29, 43 (1983). This Court should uphold BLM's decision if it finds "adequate support in the record." J.A. Jones Mgmt. Servs. v. FAA, 225 F.3d 761, 765 (D.C. Cir. 2000); see also El Conejo Americano of Texas, Inc. v. DOT, 278 F.3d 17, 20 (D.C. Cir. 2002). Under "familiar and well-established principles," no agency decision is arbitrary and capricious "as long as [the agency] 'examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a "rational connection between the facts found and the choice made."'" Milk Indus. Found. v. Glickman, 132 F.3d 1467, 1476 (D.C. Cir. 1998) (citations omitted).

## B.    The Federal Land Policy and Management Act

BLM manages the public lands under FLPMA using a multi-step planning and decision process. BLM first develops a RMP for an area that sets forth long-term goals and objectives for management of resources on BLM-administered lands. 43 U.S.C. § 1712(a). The RMP generally establishes, among other things, lands to be opened or closed to leasing of federal oil and gas resources, and the conditions under which development of each resource should occur within a particular resource planning area. 43 C.F.R. 1601.0-5(n); see also Norton v. Southern Utah Wilderness Alliance (SUWA), 542 U.S. 55, 71 (2004). Generally, an RMP does not constitute a decision to undertake any particular site-specific action. 43 C.F.R. 1601.0-5. At the second tier of decisionmaking, BLM implements the RMP through project-specific decisions, which must conform to the RMP. See 43 U.S.C. § 1712(e); 43 C.F.R. § 1610.5-3.

## C.    The National Environmental Policy Act

The purpose and intent of NEPA is to focus the attention of the federal government and the public on a proposed action so that its potential consequences can be studied before a decision is

made. 42 U.S.C. § 4321; 40 C.F.R. § 1501.1(c); <u>Marsh v. Oregon Natural Res. Council</u>, 490 U.S. 360, 371 (1989). NEPA requires the preparation of an EIS for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). In contrast to an EIS, an EA need only include brief discussions of the need for a proposal, alternatives, and of the environmental impacts of the proposed action and alternatives. 40 C.F.R. § 1508.9(b). <u>See also</u> 40 C.F.R. §§ 1508.9(a), (a)(1) (An environmental assessment is a "concise public document" that "[b]riefly provides sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact."). NEPA mandates the procedures for agencies to consider the environmental impacts of their actions, but does not dictate substantive results. <u>Robertson v. Methow Valley Citizens Council</u>, 490 U.S. 332, 350 (1989). ("NEPA merely prohibits uninformed-rather than unwise-agency action.").

A narrow, deferential standard also applies to judicial review of agency NEPA compliance. <u>Marsh</u>, 490 U.S. at 375. The "role of the courts is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious." <u>Baltimore Gas & Elec. Co. v. NRDC</u>, 462 U.S. 87, 97-98 (1983). In a case like this, where an agency is "making predictions within its area of special expertise" as "opposed to simple findings of fact," a "reviewing court must generally be at its most deferential." <u>Id.</u> at 103. "When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." <u>Marsh</u>, 490 U.S. at 378.

## IV.  ARGUMENT

Over a six-year process, BLM developed a decision that took a hard look at the environmental impacts of the proposal to develop 2,000 natural gas wells in the project area, as

NEPA requires. The project complies with the Great Divide RMP, and is therefore consistent with FLPMA's multiple use and sustained yield mandates. Plaintiff's arguments founder because Plaintiff relies on inapplicable law, in large part ignoring precedent from this Circuit, including this Court's decision in NRDC I. Plaintiff also misconstrues the administrative record, "cherry-picking" information to present a misleading picture. At bottom, Plaintiff's objection is simply that it would prefer that BLM favor hunting and recreation over oil and gas development.

**A.    BLM Complied With NEPA**

**1.    BLM Considered a Range of Reasonable Alternatives**

Plaintiff argues that BLM violated NEPA by failing to consider in detail a phased development alternative. Plfs. Br. at 11-15. Plaintiff also makes a cursory argument that BLM violated NEPA because the three action alternatives it considered are "virtually identical" and do not provide a reasoned basis for choice. Id. As support for their argument that BLM's alleged "refusal to analyze the [phased development alternative] was unreasonable and violated NEPA," Plaintiff cobbles together an argument based on several cases from the Ninth Circuit, including an unreported district court case, Northern Plains Resource Council v. BLM (NRPC), 2005 U.S. Dist. LEXIS 4678 (D. Mont. 2005). Plfs. Br. at 11-15. Plaintiff's arguments are without merit.

One, Plaintiff's reliance on Ninth Circuit case law is misplaced, because two cases from the D.C. Circuit are on point and controlling: Citizens Against Burlington, Inc. v. Busey, 938 F.2d 190 (D.C. Cir. 1991) and Davis v. Latschar, 202 F.3d 359 (D.C. Cir. 2000). Two, Plaintiff wrongly argues that BLM's analysis of the same number of wells for each of the action alternatives resulted in substantially the same impacts to resources and therefore an improperly narrow range of alternatives. The volume of development is only one of many factors influencing environmental impacts. The manner in which development proceeds can be of greater relevance to the agency's

consideration of the environmental impacts.  Three, contrary to Plaintiff's assertion and dispositive of its argument, BLM did analyze the phased development alternative in detail in the draft EIS.

In contrast to its lengthy string cite and discussion of Ninth Circuit case law, Plaintiff only briefly mentions Citizens Against Burlington.  Plaintiff's failure to address this case in any detail is unsurprising, because it compels dismissal of their claim.  In Citizens Against Burlington, the D.C. Circuit court discussed the agency's duty to consider alternatives pursuant to NEPA, and specifically considered the scope of the agency's duty to consider alternatives when the action is proposed by a private applicant.  The court explained that the agency's discussion of alternatives "must be moored to 'some notion of feasibility.'" 938 F.2d at 195, quoting Vermont Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519, 551 (1978) ("Common sense also teaches us that the 'detailed statement of alternatives' cannot be found wanting simply because the agency failed to include every device and thought conceivable by the mind of man.").  Thus, the court stated, "[t]he goals of an action delimit the universe of the action's reasonable alternatives."  938 F.2d at 195.

The Court of Appeals further explained that an agency's obligation when it considers an action proposed by a private actor is different than when it acts as the sponsor of a project.  Id. at 196.  In the latter case, "[w]hen an agency is asked to sanction a specific plan, see 40 C.F.R. § 1508.18(b)(4), the agency should take into account the needs and goals of the parties involved in the application."  Id.  In addition, the agency should also consider whether Congress has expressed a view.  Id.  The purpose and need for the project at issue was defined as "helping to launch a new cargo hub in Toledo and thereby helping to fuel the Toledo economy."  Id. at 198.   The EIS described five alternatives, including approving the proposed action, expansion of Toledo Express Airport, approving other airport configurations, no action, and approving plans for a hub at other airports in the Toledo metropolitan area.  Id. at 197.  The agency considered only the proposed

9

action and the no action alternatives in detail, and the court found that the agency's "reasoning fully supports its decision" to consider only two alternatives. Id. The court found that different geometric configurations of the airport "would mean technological problems and extravagant costs," and would not reasonably accomplish the goal of constructing a hub at Toledo Express. Id. at 198.

The plaintiffs in Citizens Against Burlington had argued that the consideration of alternatives under NEPA "is to be an evaluation of alternative means to accomplish the *general* goal of an action; it is not an evaluation of the alternative means by which a particular applicant can reach his goals." Id. (emphasis original). In plaintiffs' view, the general goal was to build a cargo hub, and that goal could have been accomplished by building a hub at some other air field. Id. at 198-99. Plaintiffs therefore argued that the agency erred because it failed to consider in detail building a hub at another airport. Id. at 199. The court rejected plaintiffs' argument, finding that "Congress did expect agencies to consider an applicant's wants when the agency formulates the goals of its own proposed action. Congress did not expect agencies to determine for the applicant what the goals of the applicant's proposal should be." Id. at 199. The court concluded: "We are forbidden from taking sides in the debate over the merits of developing the Toledo Express Airport. . . . Events may someday vindicate [plaintiffs'] belief that the [agency's] judgment was unwise. . . . All this court decides today is that the judgment was not uninformed." Id.

Davis v. Latschar is also on point. In that case, the plaintiffs challenged a National Park Service (NPS) decision to employ marksmen to cull deer in Gettysburg National Military Park that were threatening historic resources. 202 F.3d at 359. The court rejected plaintiffs' assertion that NPS improperly narrowed the objective for its deer management program to eliminate reasonable alternatives, finding that "[i]n its draft EIS and its final EIS, the Park Service initially considered and rejected a wide range of non-lethal alternatives. Id. at 368. In the FEIS, the NPS "proceeded

10

to evaluate in more detail the five alternatives it considered most viable." Id. Therefore, the court concluded, "[i]t is apparent from a review of both the draft EIS and the final EIS that the Park Service weighed all the reasonable alternatives and came to a fully-informed decision. This is all that NEPA requires." Id. Read together, the two cases make clear that (1) it was appropriate for BLM to give substantial weight to the private applicants' goals in defining the purpose and need for the proposed action, and in turn the range of reasonable alternatives; and (2) it was appropriate for BLM to consider the phased development alternative in detail in the draft EIS and to evaluate the most viable alternatives in the FEIS. It was also appropriate for BLM to consider Congress' intent, expressed in the 2005 Energy Policy Act, as to the strategic importance of developing domestic sources of supply, such as CBNG. BLM's consideration of alternatives was fully informed.

### 2.    BLM Properly Defined the Purpose and Need and Evaluated in Detail a Range of Reasonable Alternatives

Plaintiff makes a cursory, one-paragraph, argument--again relying on a Ninth Circuit case-- that BLM violated NEPA because it only analyzed "three virtually identical development plans" having "virtually the same overall impact" in the FEIS. Plfs. Br. at 15. It is unsurprising that Plaintiff fails to support this claim with anything other than a citation to a powerpoint presentation included in the administrative record. Id. Here, as the FEIS' purpose and need statement explains, pursuant to its statutory authorities, BLM has already leased the federal minerals within the project area. FEIS at 1-8 (AR 2135). Several oil and gas operators have submitted a proposal to develop their leases by exploring and potentially developing approximately 1,800 CBNG wells in the Atlantic Rim project area. FEIS at 1-7 (AR 2134). BLM encourages development of domestic oil and gas reserves as part of its oil and gas leasing program. In particular, development of natural gas is environmentally preferable because it is a clean burning fuel. Id. at 1-8 (AR 2135). BLM also explained that development of natural gas reserves are important "for supply and economic

11

stability." Id. Development of nonconventional sources of supply, such as CBNG from the Atlantic Rim project, will help develop domestic sources to meet growing demand (demand of natural gas is expected to increase from a 2002 level of 18 trillion cubic feet to 21 trillion cubic feet in 2025). Id. at 1-9 (AR 2136). In the Energy Policy Act of 2005, Pub. L. No. 109-58, 119 Stat. 604 (2005) (codified as amended at 42 U.S.C. §§ 15801, et seq.), Congress stated that "it is the policy of the United States that--(1) United States oil shale, tar sands, and other unconventional fuels are strategically important domestic resources that should be developed to reduce the growing dependence of the United States on politically and economically unstable sources of foreign oil imports."[4] 42 U.S.C. § 15927 (b)(1). Therefore, consistent with the Energy Policy Act of 2005, the "purpose of, and need for, this proposed natural gas development is to develop, produce, and market natural gas products . . . to meet the national domestic energy demand." FEIS at 1-9 (AR 2136).

    With that purpose and need in mind, and given that the operators proposed development of 2000 wells, BLM considered five alternatives in detail in the draft and final EISs. Contrary to Plaintiff's assertion, the alternatives that BLM examined were not "identical;" each of the alternatives has a different purpose and a different impact. BLM considered in detail in the DEIS and the FEIS a range of reasonable alternatives to the oil and gas companies' proposal to develop 2,000 wells in the Atlantic Rim project area, including the proposed action (as proposed by the oil and gas companies), no action alternative, a phased or temporal development alternative (Alternative B), an alternative that provided enhanced protection for water, soils, wildlife and other resources (Alternative C), and Alternative D, BLM's preferred alternative, which was ultimately adopted in the ROD. FEIS at 2-1--2-10 (AR 2149-58); AR 1499. In addition to phased development, BLM

_____

[4] Elsewhere in the statute, referencing a program to fund research, Congress referred to "unconventional resources" as "coalbed methane, deep drilling, natural gas production from tight sands, natural gas production from gas shales, [and] stranded gas. . ." 42 U.S.C. 16372(d)(7)(B).

also considered three other alternatives that it eliminated from detailed study, including the operators' original plan to develop an estimated 3,880 wells. FEIS at 2-11 (AR 2159).

Alternative D also adds additional protections for sensitive fish populations and crucial wildlife habitats, such as crucial elk winter range. Id. at 2-8; ROD at 12 (AR 2156, 4807). BLM will manage approximately 72,200 acres (27% of the project area) as Category A mitigation areas and will require reduced disturbance below the threshold level of 6.5 acres per well. Id. at 2-8--2-9; ROD at 12 (AR 2156-57, 4807). As compared to the operators' proposal to limit total surface disturbance at any one time to 15,800 acres, Alternative D also reduces the total allowable new disturbance at any one time to 7,600 acres (2.8% of the project area). FEIS at 2-14-2-15 (AR 2162-63). And, as this Court observed in NRDC I, 525 F. Supp. 2d at 121, the protections afforded to sage grouse under the various alternatives ranged from "little to no protection for the grouse population" under the intervenors' original plan, to no action, and included a limited development plan with stricter protections for sage grouse, and BLM's preferred alternative, which includes various mitigation measures to minimize impacts. Id. BLM examined a range of alternatives that provided a "clear basis for choice."

Plaintiff's argument that BLM improperly excluded an alternative with a lesser scale of development because the purpose and need is generally defined as developing natural gas resources, Plfs. Br. at 13, fixates on a single sentence in the purpose and need statement and disregards that the proposed action is to developed approximately 2,000 wells. Moreover, it is foreclosed by Citizens Against Burlington. In that case, as here, the agency properly took into account the oil and gas operators' goals when it defined a range of alternatives. 938 F.2d at 196. It also appropriately factored in Congress' expressed intent as to the importance of developing CBNG, and the need to expedite development in order to meet rapidly grown demand. Id.; see also City of Grapevine v.

13

Department of Transp., 17 F.3d 1502, 1506 (D.C. Cir. 1994) (agency limited its consideration of alternatives to different runway configurations, and rejected alternatives that would result in undue delay; court held it was entirely proper for the agency, in defining the purposes of the project, "to consider the economic goals of the project's sponsor."); see also River Road Alliance, Inc. v. Corps of Eng'rs, 764 F.2d 445, 453 (7th Cir. 1985) (agency "is not a business consulting firm [and] is in no position to conduct a feasibility study of alternative sites. . ., a study that would have to [] evaluate [applicant's] business needs..."). Likewise, here, BLM properly examined different configurations for development of the 2,000 wells proposal.

Plaintiff admits that it was entirely appropriate for BLM to take the operators' concerns into account. Plfs. Br. at 14. But, contrary to its allegation, that does not mean that BLM simply bowed to the desires of the applicants. Several oil and gas companies commented that Alternative D was too restrictive. See AR 9864 (Anadarko complained: "Due to the limitations imposed via the acreage cap and the reclamation requirements there is likelihood that only half of the proposed wells could be drilled under this alternative."); AR 10193 (Devon Energy objected that restrictive reclamation requirements would unduly limit development); AR 9922 (Warren E&P, also objecting to restrictive reclamation requirements); AR 10044 (Double Eagle, same). Rather than simply falling back on the alternative proposed by developers, BLM developed a compromise alternative, Alternative D, that sought to address the concerns raised by all the stakeholders, not just the oil and gas companies. BLM reasonably eliminated alternatives that did not meet the purpose and need.

### 3.    BLM Considered the Phased Development Alternative in Detail in the DEIS

Again relying heavily on Ninth Circuit caselaw, Plaintiff argues at length that BLM violated NEPA because it eliminated Alternative B, phased or temporal development, from detailed consideration in the FEIS, even though it was considered in detail in the DEIS. But, Plaintiff did

not raise this issue in its comments on the FEIS, and it therefore forfeited any objection on that basis. See DOT v. Public Citizen, 541 U.S. 752, 764-65 (2004) (respondents "forfeited any objection" where they failed to identify issues the agency should have considered). Even if Plaintiff had preserved a challenge on the merits, Plaintiff sets up a straw man with its argument that the agency should have considered the phased development alternative because it was not "remote, speculative impractical or ineffective." Plfs. Br. at 12-13. BLM *did* consider the phased (temporal) development alternative in detail as Alternative B in the draft EIS. The DEIS explains that the alternative proposes the same number of wells as the proposed action, but the project would be developed over the course of 20 years, to proceed in three phases, each lasting 6-7 years. AR 1489, 1491. The direct, indirect and cumulative impacts of Alternative B were examined in detail. See AR 1497-1510 (table summarizing impacts of each alternative); 1640 (geology); 1651 (air); 1654-55 (soils); 1657, 1660-73, 1676-77, 1680 (water); 1681-83, 1686, 1687-88 (vegetation); 1688-90, 1691-93 (rangeland resources); 1694-1702, 1704-06, 1709, 1711 (wildlife); 1711-12, 1721-22, 1725, 1727 (special status plant, wildlife and fish species); 1731-32 (recreation); 1739, 1740 (visual resources); 1745, 1747 (cultural resources); 1748-72, 1773, 1774-76, 1778-79 (socioeconomics); 1784 (transportation); 1786-88 (health and safety); 1789-90 (noise); 1793, 1799, 1800-14 (cumulative impacts). It was appropriate for BLM to evaluate the alternative in detail in the draft EIS and to carry forward only the "most viable" alternatives in the FEIS. Davis v. Latschar, 202 F.3d at 368. The Court need look no further to find that BLM is entitled to summary judgment on this issue.

Plaintiff's problem is that there is no legal basis for its argument that BLM was required to carry forward the detailed DEIS analysis to the FEIS. Therefore, while it may object to BLM's rationale for omitting phased development from further examination in the FEIS, its complaints are

irrelevant.[5]  Plfs. Br. at 14.  And, as we have explained in detail herein, it was entirely appropriate

for BLM to take into account the oil and gas operators' concerns about delay when it identified the

"most viable" alternatives for consideration in the FEIS.[6]  See also ROD at 14 (AR 4809).  As some

of the operators commented, phased development would have put some of their leases off limits to

development for 7 to 14 years.  FEIS at 2-2 (AR 2150); ROD at 14.  BLM concluded that such long

delays made the phased development alternative infeasible.  ROD at 14.  Finally, although we need

not address it in exhaustive detail, even if the Court were to ignore Plaintiff's waiver of its claim as

to phased development and the D.C. Circuit's controlling precedent, which compels a finding on the

merits in favor of BLM, Plaintiff's reliance on the unpublished district court decision in NPRC, is

unavailing.[7]    Most importantly, in NPRC, the agency excluded phased development from

---

[5] Drawing from interdisciplinary team meeting notes discussing alternatives during preparation of the *draft* EIS, Plaintiff cites the fact that BLM staff identified various benefits of the phased development alternative in support of its argument that phased development should have been considered in detail, a fact which we do not dispute.  Plfs. Br. at 12 (relying on AR 8241).  Indeed, the notes show that, as NEPA intends, BLM explored a variety of alternatives and identified the plusses and minuses of each.  AR 8239-8250.  Moreover, BLM carried forward some of the important concepts from the phased development alternative that Plaintiff cites, Plfs. Br. at 12, such as adaptive management and the emphasis on reclamation, into Alternative D in the final EIS.

[6] Plaintiff's arguments betray a limited understanding of patterns of land ownership in the West.  Forty-three percent of the project area (AR 8474), is located in a so-called "checkerboard ownership pattern" where federal and private/state lands alternate.  ROD at 4809.  Thus, leases are spread throughout the project area on federal, state and private lands.  Moreover, BLM has an obligation to grant rights-of-way to owners of non-federal lands surrounded by public lands.  AR 2160-61.  Thus, even if BLM required phased development on federal lands, development could occur throughout the project on state and private lands.  AR 4445, 4809.

[7] Plaintiff also quotes Northern Cheyenne Tribe v. Norton, 503 F.3d 836 (9th Cir. 2007) for the proposition that BLM violated NEPA where it did not consider phased development.  Plfs. Br. at 13.  While the case is wholly inapposite, because BLM did consider phased development here, the Ninth Circuit did *not* find that BLM violated NEPA by failing to consider phased development.  Plaintiff's quote is excerpted from the *dissent*, and, notwithstanding the dissenting judge's broad language, the merits of the lower court's decision were not before the Ninth Circuit.  Id. at 846.

consideration at the outset.  Here, the agency considered the alternative in detail in the DEIS.  That

fact alone distinguishes this decision from NRPC.[8/]

### 4.    BLM Adequately Examined Alternatives in the EAs

Plaintiff argues that BLM violated NEPA when it approved the Sun Dog and Catalina PODs

because it considered only the applicants' proposal and the no action alternative.  Plfs. Br. at 16.

Plaintiff argues that BLM erred because it supposedly failed "even to attempt development of an

agency-based alternative."  Plf. Br. at 16.  Plaintiff's argument fails at the outset because it

submitted no comments on the Sun Dog or Catalina proposals, and it therefore waived this

argument.  Public Citizen, 541 U.S. at 764; see also Biodiversity Conservation Alliance v. BLM

(BCA) 404 F. Supp. 2d 212, 219 n.6 (D.D.C. 2005).  But, even if it could maintain the challenge,

Plaintiff is again wrong on the law and wrong on the facts.

As support for its argument that BLM violated NEPA because it only considered two

alternatives, Plaintiff again needlessly reaches outside the D.C. Circuit.  As we explained above, in

Citizens Against Busey, the Court of Appeals concluded that the agency's analysis was not arbitrary

or capricious where it examined only two alternatives in detail in an EIS.  938 F.2d at 197.  An

---

[8/] Also significant, in NRPC, BLM was evaluating a proposal by the *agency* "to analyze options for
BLM to change its planning decisions by considering oil and gas management options including
mitigating measures that will help minimize the environmental and social impacts related to [CBNG]
activities." 2005 U.S. Dist. LEXIS 4678 at *19. As we have explained, the D.C. Circuit has
established a different standard for evaluating the range of alternatives to be considered when the
proponent is a private applicant as opposed to when the agency acts as a sponsor for the project.
Finally, the court's conclusion that BLM improperly excluded phased development from detailed
consideration turned on its finding that BLM had eliminated it based on "the assumption that BLM's
prior issuance of oil and gas leases committed it to total and immediate full-field development,"
which the court concluded "is legally untrue." Id. at *29. While we disagree with the court's
characterization of BLM's position, the facts here are different. Contrary to Plaintiff's assertion that
BLM offered the "very same justifications" in this case as in NRPC, Plfs. Br. at 14, citing their SOF
at ¶¶ 118-119 (AR 8473, 9336), in this case, unlike NRPC, the record shows that, in part due to the
checkerboard nature of the lease holds, lessees could face an "extended delay" of 7 to 14 years to
develop their leases.  FEIS at 2-12--2-13 (AR 2160-61).

agency's analysis in an EA is expected to be "less detailed" than that in an EIS.  TOMAC v. Norton,

433 F.3d 852, 857 (D.C. Cir. 2006).  As this Court has explained, an EA must include "brief

discussions" of the alternatives to be considered, and its consideration of alternatives is examined

under the "rule of reason."  BCA, 404 F. Supp. 2d at 218.  Therefore, in BCA, the court found that

BLM's analysis of three alternatives was reasonable.  Id.  Plaintiff relies on Envtl. Prot. Info. Center

v. U.S. Forest Service, 234 Fed. Appx. 440, 442 (9th Cir. 2007), Plfs. Br. at 16, which the Ninth

Circuit stated is not suitable for publication and may not be relied on as precedent.  More telling,

Plaintiff's selective quotation of the decision ignores that the court specifically recognized that the

established precedent in the Ninth Circuit holds that consideration of only the action and no action

alternatives is acceptable.  "[I]n some cases, an agency's consideration of a no-action alternative and

the agency's preferred alternative can satisfy NEPA."  Id. at 443, citing Native Ecosystems Council

v. Forest Service, 428 F.3d 1233, 1249 (9th Cir. 2005).

        Plaintiff's allegation that BLM failed to develop an agency-based alternative also disregards

the record, which demonstrates that BLM *did* develop an agency-based alternative. The record

shows that BLM's proposed alternative substantially modified the applicants' original proposals.

BLM conducted site-specific review of the on-the-ground locations identified for development by

the proponents, and worked with the proponents to modify their proposals.  For example, as the EA

for the Catalina A and B POD explains, "[o]nsite inspections of the PODs were conducted. . .

Potential impacts to resources were considered and alternate locations considered.  As result of this

field inspection, several project components were moved to reduce potential impacts to soils, water,

resources, vegetation, and wildlife resources."  AR 73496.

        The Catalina A and B PODs were originally submitted having a very different arrangement

and footprint (see map used during onsite inspections for these PODs, AR 78734) than what was

finally approved as the "Proposed Action." AR 75577, 75763. Through on-site inspections (AR 78554, AR 78557, AR 78703-733) and BLM-operator communication, the proponent agreed to substantially modify the proposed action in order to resolve resource conflicts that the BLM had identified. See AR 78560; 78577-78 (noting well sites relocated after on-site inspections); AR 78564; 78580; 78743 (discussing moving project facilities to minimize sage grouse conflicts); AR 78576 (projects moved to resolve conflicts with prairie dogs); AR 78591-592 (identifying need for changes to address potential impacts to archaeological resources); AR 78619 (road changes made per archaeological study); AR 78787 (moving site to avoid potential hydrological impacts). BLM added conditions of approval to the proposed action, including seasonal restrictions on development to protect wildlife (AR 73511-12), cultural/archaeological monitors during construction (AR 73512-13), the addition of culverts and drainage control structures (AR 73519) and the modification of engineering designs. AR 73513. In essence, although BLM did not state it directly, it dropped the proponent's proposed alternative from detailed consideration, and examined in detail the agency developed-modified alternative that mitigated and minimized impacts. Plaintiff's argument that BLM failed to consider a reasonable range of alternatives should be rejected.

### 5.    The FEIS Contains a Reasonably Complete Discussion of Mitigation

Plaintiff argues that BLM violated NEPA because it supposedly failed to discuss its mitigation plan in adequate detail and because it improperly deferred analysis by adopting an adaptive management plan. Plfs. Br. at 17-22. Plaintiff argues that "[d]evelopment of the monitoring and mitigation program required as part of Adaptive Management did not even commence until *30 days after the ROD was signed*." Plfs. Br. at 20 (Plaintiff's emphasis). Tellingly, Plaintiff does not identify any particular flaw in the mitigation or adaptive management plan other than its supposedly vague language. Perhaps unsurprisingly, because it is dispositive of

19

their argument, Plaintiff again cites a 1987 decision from the Ninth Circuit and ignores case law

from this Circuit.  It even fails to address this Court's decision in NRDC I, which is directly on point

because the Court evaluated and rejected the same claim by NRDC and concluded that BLM's

mitigation plan was adequate.  NRDC I, 525 F. Supp. 2d at 121-22.

Plaintiff's use of italics does not save its otherwise unsupported argument, because NEPA

does not require BLM to complete a mitigation plan prior to finalizing the ROD.  As this Court also

concluded in NRDC I:

> [A]s our Circuit has observed, "NEPA . . . does not require agencies to discuss any particular
> mitigation plans that they may put in place" not does it "require agencies--or third parties--to
> effect any."  Citizens Against Burlington, Inc. v. Busey, 938 F.2d 190, 206 (D.C. Cir 1991);
> Southern Utah Wilderness Alliance v. Norton, 237 F. Supp. 2d 48, 54 (D.D.C. 2002)
> ("NEPA does not require agencies to mitigate the adverse effects and does not require a
> detailed explanation of the mitigation measures that will actually be employed.").

NRDC I, 525 F. Supp. 2d at 121.  Contrary to Plaintiff's assertion, the rule in the Ninth Circuit is

much the same.  See Northern Alaska Envtl. Ctr. v. Kempthorne, 457 F.3d 969, 979 (9th Cir. 2006),

citing Methow Valley, 490 U.S. at 352 ("NEPA does not require an agency to formulate and adopt

a complete mitigation plan.").  Indeed, the Ninth Circuit's decision in Okanogan Highlands Alliance

v. Williams, 236 F.3d 468, 476 (9th Cir. 2000) is instructive here because it disposes of the exact

argument Plaintiff makes.  In that case, the court upheld the agency's decision even though it

concluded that "[i]t is true that the mitigating measures are described in general terms and rely on

general processes, not on specific substantive requirements."  Id. at 477.  In essence, although the

agency's plan for addressing impacts was not described as adaptive management, that is exactly

what it was.  As the court explained, "[t]he exact environmental problems that will have to be

mitigated are not yet known because the Project does not exist," but the agency has a procedure in

place that will allow it to address impacts identified through monitoring.  Id. at 476-77.  Thus, it

concluded the agency had complied with NEPA.  Id. at 477.

20

Plaintiff objects to the ROD's explanation that "BLM will implement a performance-based adaptive management process for the ARPA whereby incremental adjustments will be made to mitigation and management restrictions based upon how the environment responds to future development and performance requirements," Plfs. Br. at 18, quoting ROD at B-2-B-3, as "indecipherably vague." Plaintiff includes a lengthy quote from an article on adaptive management written by Julie Thrower and through italicization of the quoted language, attempts to bolster its assertion that BLM is improperly evading its NEPA obligations by deferring its analysis.[9] Plfs. Br. at 19-20, quoting 33 Ecology L.Q. 871, 894 (2006). Plaintiff's use of italics no more helps its argument here than it did its unsupported and incorrect claim that the mitigation plan was required to be complete prior to finalization of the ROD. BLM's approach here is exactly the same approach the Ninth Circuit upheld in Okonagan Highlands, where the agency thorough evaluated the impacts in the EIS and committed to continued monitoring to mitigate unanticipated impacts. Moreover, the

---

[9] Plaintiff also relies on a declaration from Rollin Sparrowe for the proposition that BLM supposedly improperly deferred its analysis. Plfs. Br. at 19. The court should not consider the declaration, as we have explained in our separate motion to strike. Moreover, Plaintiff has waived whatever objections it might have had based on Sparrowe's complaints, by failing to raise them to the agency during the administrative process, as explained above. Sparrowe is employed by TRCP, and, as one of its founding board members, has an obvious bias. In addition, his most recent experience actually conducting research was 1991, which was also the year he published his last research article. See Sparrowe Decl. at ¶¶ 2, 7, 8 and Ex. A at 8-9. But, assuming _arguendo_ that those hurdles could be overcome, he offers little more then general statements about adaptive management, and then simply concludes that BLM's "approach does not qualify as adaptive management." Id. at ¶ 28. Relying on Sparrowe, ¶ 3, Plaintiff also contends that the record "contains no relevant literature discussing Adaptive Management." Plfs. Br. at 19 n.9. In fact, the record includes BLM guidance explaining how to implement adaptive management according to the same concepts outlined in Sparrowe's declaration, which he wrongly alleges BLM failed to consider. See AR 5333 (defining adaptive management as a system of management practices based on "clearly identified outcomes," with monitoring to ensure those outcomes are met, and a plan to facilitate changes and adjust management based on the monitoring. Compare Sparrowe at ¶¶ 20-28 (identifying same concepts). See also National Sage Grouse Policy addressing adaptive management. AR 5547-49, 5561. Ultimately, while he may disagree with BLM's experts, the Court should defer to BLM's conclusions. Ocean Conservancy v. Gutierrez, 394 F. Supp. 2d 147, 162 (D.D.C. 2005) ("Deference is particularly warranted in cases such as this involving complex scientific or technical matters where the agency's expertise is clear.").

adaptive management plan as set forth in the FEIS and ROD here is far more detailed than the "general processes" upheld in <u>Okonagan Highlands</u> and unlike that case, includes specific substantive requirements. It is the same approach suggested in the article Plaintiff cites. <u>See</u> Plfs. Br. at 20.

Plaintiff's selective reading of the ROD ignores that the BLM explained in detail how the process will work. Development and reclamation activities will be evaluated through a "performance-based management approach" that describes performance goals; performance requirements (including best management practices, conditions of approval and other protective measures); performance-based monitoring to measure the degrees of success; and adaptive management through additional mitigation or adaptive techniques to achieve the performance goals. ROD at 19 (AR 4814). Plaintiff asserts that "[i]t is simply impossible to tell what monitoring and/or mitigation BLM has required (or might require) of the Operators in this case," Plfs. Br. at 18, but it need only have read Appendices B and C to the ROD to discern the answer. Appendix B "lists the requirements that will be imposed, as appropriate," on all site-specific approvals. ROD at B-1 (AR 1835); <u>see also</u> B-4-B-20 (AR 4838-54) (identifying specific best management practices and monitoring). Appendix C identifies additional mitigation committed to by the operators and made requirements through approval of the ROD. ROD at C-1-C-7 AR 4857-63). The ROD also specifies that monitoring data will be evaluated "at least annually," and the management may be revised based on the results. ROD at 3 (AR 4798).

Plaintiff argues that WGFD objected to BLM's adaptive management plan and that a March 2007 letter shows that WGFD's concerns were solved by "political compromise." Plfs. Br. at 6, 19, SOF at ¶ 173. Plaintiff also claims that Wyoming objected to "squishy language" in the ROD describing performance management goals. Plaintiff's selective quotation fails to tell the whole

22

story, which is that BLM's experts worked with WGFD's experts to address their concerns.  AR 8824.  BLM included the performance goals in the ROD in the first place as a result of discussions with WGFD.  See AR 8734.[10]

Although a WGFD representative commented about the "squishy language," what Plaintiff fails to explain is that his concern was that it would be "constantly challenged and argued once the ROD is signed."  AR 8818.  He summed up, "[t]hanks for your efforts on this; it is a quantum leap forward."  Id.  And, while the performance goals contain language that properly affords BLM discretion in its management of the public lands, the ROD also contains performance requirements to achieve those goals, makes operators responsible for demonstrating achievement, and explains that there will be consequences if an operator fails to demonstrate compliance.  ROD at 19-20 (AR 4814-15) ("In the absence of sufficient data illustrating Operator achievement of Performance Goals, the BLM will use a conservative approach when considering additional approvals.").  Likewise, while Plaintiff claims that Wyoming's concerns were addressed through political compromise, Plfs. Br. at 18-19, the documents actually show that the issues of concern were being thoroughly vetted in order to ensure that BLM made the best decision.  See AR 8824, AR 8847.  Plaintiff argues that Wyoming's concerns were not addressed, but in AR 8824, WGFD identified its only remaining concern as ensuring that the mitigation plan would be mandatory, and that it would begin immediately upon of the ROD.  AR 8824.  While the ROD did not incorporate the exact language WGFD proposed, it did adopt that concept, stating that "a monitoring and mitigation process will

---

[10] WGFD recommending "Performance Objectives" for "Migration Routes--Maintain functional migration routes through or around development areas;" "Crucial Winter Ranges--Provide an adequate amount of suitable undisturbed crucial winter range to maintain big game distribution;" "Sage and Sharp-tailed Grouse--Provide key sage-grouse and sharp-tailed grouse breeding nesting brood-rearing and winter habitat well dispersed over the project area;" and recommendations for language addressing other resources, such as Muddy Creek sensitive fish, shrub dependent birds, and riparian resources; and see ROD at 19 (AR 4814) (adopting substantially same language).

23

be required, and its development will begin within 30 days of the effective date of the ROD." ROD at 20 (AR 4815). The May 1, 2007 memorandum also specifically explains how the ROD was modified to address Wyoming's concerns. AR 8847-48.

Plaintiff also asserts that the adaptive management process is flawed because "[i]n every case, the disturbance occurs first, with evaluation of its impact addressed after the fact." Plf. Br. at 18, citing SOF at 158. This argument, however, wholly disregards the two-volume FEIS and ROD, and thousands of pages of supporting documentation, which thoroughly examines and discloses the impacts. In essence, Plaintiff is asking this Court to require BLM to "foresee the unforeseeable," which NEPA does not require. Potomac Alliance v. U. S. Nuclear Regulatory Comm'n, 682 F.2d 1030, 1036 (D.C. Cir. 1982) ("agency cannot be asked to engage in a 'crystal ball' inquiry or to 'foresee the unforeseeable'") (citation omitted); see also Vermont Yankee, 435 U.S. at 534 (same).

Again relying on Sparrowe, Plaintiff argues that the Court should find that BLM's decision here is arbitrary because in Sparrow's opinion, BLM has failed to live up to its adaptive management obligations elsewhere in Wyoming. Sparrowe's opinion is irrelevant because this Court's review is limited to the administrative record before it. Nor does he support his allegations with any shred of evidence. See Sparrowe at ¶¶ 4, 29-55. Plaintiff also cites a 2005 Report by the General Accounting Office as support for this claim. Plfs. Br. at 21-22. In essence, Plaintiff's argument is that the Court should conclude that BLM cannot be trusted to carry out its statutory and regulatory responsibilities. But, as this Court stated in NRDC I, "[i]n the final analysis, however, an agency action is 'entitled to a presumption of regularity.'" 525 F. Supp. 2d at 120, quoting Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 415–16 (1971).

Next, Plaintiff asserts that "future oil and gas development decisions will be made solely among the Defendants in this case," Plfs. Br. at 22, but the record shows that allegation is patently

false.  Moreover, the allegation also serves to highlight the fact that BLM *is* carrying out its responsibilities.  As we have explained herein, and as Plaintiff is well aware, the ROD does not approve site-specific development.  ROD at 3 (AR 4798).  Rather, approval of an APD, for example, is a separate decision point, and requires appropriate environmental review prior to approval.  Id. at 3-4.  As BLM stated in response to comments on the FEIS, "[p]ublic input will be provided through the NEPA evaluations process for site specific proposals . . ."[11]  ROD at E-4 (AR 4872). The approvals of the Catalina A and B POD show that BLM is executing its responsibilities by conditioning site-specific development to be as protective as possible of potentially affected resources, including wildlife.  The ROD contains a number of monitoring requirements, ROD Appx. B (AR 4834-4855), all of which are required under the site-specific POD approvals (AR 73510, AR74081), including the drilling of groundwater monitoring wells in Sun Dog A and B POD.  AR 74082.  In addition, BLM's guidance on adaptive management provides that BLM should provide for continued public participation, including maintaining "open channels of information," "transparency," and for public review and input of adaptive management processes.  AR 5334. Finally, Plaintiff's unsupported objection that adaptive management will occur without further NEPA analysis, Plfs. Br. at 18, is without merit because NEPA contains no such requirement. NEPA requires supplemental analysis only if "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1)(ii).  Plaintiff makes no allegation that is the case here.

**6.    The FEIS Took a Hard Look at the Reasonably Foreseeable Impacts**

In examining the adequacy of the FEIS, this Court's only role is to "to determine whether the EIS was compiled with objective good faith and whether the resulting statement would permit

---

[11] That is precisely what occurred here.  Plaintiff requested an opportunity to comment on the Sun Dog C, D, and E PODs, which they do not challenge here, and it was provided.

a decisionmaker to fully consider and balance the environmental factors." Sierra Club v. Adams, 578 F.2d 389, 393 (D.C. Cir. 1978) (quotation marks and citation omitted) ("full, fair, bona fide compliance with NEPA" does not authorize the courts to "fly speck" the EIS nor substitute its judgment for the agency's) (citations omitted); see also City of Williams v. Dombeck, 151 F. Supp. 2d 9, 23 (D.D.C. 2001) (same). Plaintiff concedes the overall adequacy of the FEIS' analysis of impacts. Its claims that BLM failed to take a hard look at the impacts of the action are limited to its objections to the mule deer analysis, and a claim that is raised for the first time in its summary judgment brief, that BLM supposedly failed to consider the cumulative impacts of wind development on wildlife. Plfs. Br. at 22-24, 26-28. Significantly, it does not contend that BLM failed to take a hard look at the potential impacts of the proposed action on sage grouse. Plaintiff also admits that BLM's analysis of the impacts on other big game animals, such as elk and pronghorn antelope, is adequate. Thus, Plaintiff does not quarrel with the majority of BLM's conclusions.

BLM analyzed in detail impacts on geology, mineral and paleontology resources, air quality, soils, water resources, vegetation and wetlands, wildlife, including special status plant, wildlife and fish species, rangeland, recreation, visual resources, cultural resources, socioeconomics, transportation, health and safety, noise, wild horses, and on special management areas. FEIS at 4-2--4-162 (AR 2321-2481). BLM also analyzed cumulative impacts on each of these resources. FEIS at 5-1--5-26 (AR 2483-2508). "[T]o satisfy their obligations under NEPA, the BLM must only provide a 'realistic evaluation of the total impacts.'" BCA, 404 F. Supp. 2d at 218, quoting Grand Canyon Trust v. FAA, 290 F.3d 339, 342 (D.C. Cir. 2002). The two-volume EIS satisfies that standard.

7.    **BLM Is Not Required to Consider the Cumulative Impacts of Wind Development Projects That Do Not Exist**

Based entirely on inadmissable extra-record evidence, Plaintiff argues that BLM violated NEPA because BLM ignored the "extraordinarily important cumulative impact" on wildlife arising out of wind development.  Plfs. Br. at 22-23.  Plaintiff never explains, however, why it failed to mention this supposedly "extraordinarily important" issue in its comments.  AR 10262-66.  Nor did it allege in its First Amended Complaint that BLM's analysis of the cumulative impacts was deficient because it did not consider wind energy.  The Court should therefore bar Plaintiff from raising this issue now.  Even if it were to reach the merits, Plaintiff cannot prevail.

NEPA defines cumulative impact as the impact on the environment of the proposed action added to the incremental impact of other "past, present, and reasonably foreseeable future actions." 40 C.F.R. § 1508.7.   There are no past, present or reasonably foreseeable wind projects in the project area.  Plaintiff's claim that Andarko "whole-heartedly agreed with TRPC that the cumulative impact of wind development" was required to be assessed in the Atlantic Rim EIS, Plfs. Br. at 23-24, is a complete fabrication because neither Anadarko nor TRCP ever commented on the need to address wind energy as part of the Atlantic Rim cumulative impacts analysis.  Plfs. Br. at 23. Plaintiff attaches to its brief Exhibit M, which is a November 23, 2004 letter from Anadarko to BLM regarding the wind energy development programmatic EIS, and, contrary to Plaintiff's assertion, says nothing about the Atlantic Rim project or its assessment of cumulative impacts.  Plfs. Ex. M. It is also telling that Plaintiff fails to identify any supposed project that should have been analyzed or what these supposedly important impacts might be.

The Wind Energy EIS to which it refers is a programmatic EIS that examines a proposal to establish a program to address wind energy development on BLM lands throughout the entire Western U.S.  Plfs. Ex. K.  Its purpose is to facilitate consideration of site-specific development

when and if such proposals arise.  Id.  During the development of the Atlantic Rim project EIS, there were no wind power proposals to be analyzed in the cumulative impacts analysis, which is why Plaintiff identifies none.  NEPA does not require agencies to address "remote and highly speculative consequences," and that should be particularly true where Plaintiff never raised the issue during the administrative process.  Deukmejian v. Nuclear Regulatory Comm'n, 751 F.2d 1287, 1300 & n.63 (D.C. Cir.1984) (EIS need not address "remote and highly speculative consequences"); see also Hammond v. Norton, 370 F. Supp. 2d 226, 246 (D.D.C. 2005) (same).  Applying the "rule of reason" as set out in this Court's decision in Ocean Conservancy, 394 F. Supp. 2d at 164, the Court should reject Plaintiff's claim that BLM was required to analyze the cumulative impacts of proposals that do not exist.

### 8.  BLM Adequately Discussed Baseline Information for Mule Deer and Took a Hard Look at the Potential Impacts

Next, Plaintiff claims that BLM failed to examine the impacts on mule deer because it did not have the necessary baseline data to assess such impacts.  Plfs. Br. at 26-28.  This argument is based entirely on Plaintiff's contention that BLM did not wait for the results of the Mule Deer Study, which was funded by industry, prepared by a third-party, Hall Sawyer of Western Ecosystems Technology, and finalized after the decision was made.  AR 7421.  Plaintiff's argument is without merit.  One, BLM did set forth baseline information sufficient to evaluate potential impacts on mule deer in the FEIS.  Two, BLM was aware of the study and accounted for it in its analysis.  Three, BLM was not required to wait for the study to be finalized before it signed the record of decision.

As an initial matter, Plaintiff's overly burdensome interpretation of NEPA finds no support in the regulations.  NEPA does not require an agency to exhaustively detail baseline information.  Rather, the regulations direct an agency to "succinctly describe the environment of the area(s) to be affected or created by the alternatives under consideration.  The descriptions shall be no longer than

is necessary to understand the effects of the alternative." 40 C.F.R. § 1502.15. Chapter 3 of the FEIS sets forth the baseline information on mule deer. BLM explained that the project area is located in the eastern portion of the 3,440 square mile-range of the Baggs Herd. Post-hunt data for mule deer estimated the population at 21,000. FEIS at 3-86 (AR 2250). The FEIS explains that the southern and western portions of the project area contain crucial winter range for mule deer. FEIS at 3-90 and map at 3-89 (AR 2254, 2253). Relevant to Plaintiff's claim, it also explains that mule deer migrate from the eastern portion of the Baggs Herd Unit to lower elevation crucial winter ranges that are located in the southern and central portions of the project area. In addition, the FEIS explains that the crucial winter range south and west of Muddy Mountain is of particular importance. Id. at 3-90. Plaintiff's claim that BLM lacked baseline data is founded on its interpretation of two maps: the FEIS map of mule deer migration routes and a map in the 2007 Mule Deer Study. Comparing the two maps, Plaintiff somehow arrives at the conclusion that the baseline information contained in the FEIS "is flat wrong." Plfs. Br. at 28. But, what the 2007 Study bears out is that BLM got it right. Figure 7 (Plf. Ex. J) in the 2007 Mule Deer Study represents tracking of 47 deer, and it shows generally that those deer are moving from the east to lower elevation winter ranges in the south and central portions of the project area. AR 7437. Likewise, Figure 3 in the 2007 Mule Deer Study bears out BLM's conclusion that the area south and west of Muddy Mountain is important habitat. AR 7433; see also AR 7430 (describing seasonal distribution).

Plaintiff's reliance on Half Moon Bay Fisherman's Mktg. Ass'n v. Carlucci, 857 F.2d 505 (9th Cir. 1988) is misplaced. Plfs. Br. at 27. There, analyzing the adequacy of a site-specific analysis, the court found the Army Corps of Engineers' analysis was flawed because it failed "to set forth any baseline conditions" existing in the project area. 857 F.2d at 510. However, the court did not find a NEPA violation because, subsequent to the final decision, the Corps had developed a

monitoring program to compare the impact of the proposed action to baseline conditions. Id. at 511. While the case may stand for the obvious proposition that an EIS must include some baseline information, it cuts against Plaintiff's arguments that the agency is required to provide exhaustive background information, particularly where the challenged document is a programmatic EIS.

Plaintiff's claim that BLM "ramrodded home" a decision after six years of analysis merely because it declined to await the outcome of the Mule Deer Study also rings hollow. Plfs. Br. at 28. Importantly, BLM incorporated the available information in its analysis of the impacts on mule deer, explaining that the 2007 Mule Deer Study would help pinpoint the migration routes used by mule deer on the project area. BLM recognized that there was a potential for the project to alter or block mule deer movements along existing migration routes and that the study would help it address those issues. FEIS at 4-74; 5-17 (AR 2393, 2499). In addition, BLM required best management practices to be applied as conditions of approval to site-specific decisions, and cited the Mule Deer Study for the need to prevent impediments to mule deer migration and require that surface disturbance be avoided in migration corridors. See FEIS, App. H, H-14 (AR 3094); also compare map at AR 78001 (showing current and future planned PODs) with Mule Deer Study map at AR 7440 (clearly showing that the Catalina A and B and Sun Dog A and B PODs are not in the identified routes). One best management practice provides that a no-surface occupancy narrow migration corridor would be determined following data collection and analysis from the study. Id.

Also important, in response to comments, BLM specifically evaluated whether the 2007 Mule Deer Study represented new information that should be incorporated into the decision, and it reasonably concluded that the data could be factored into its wildlife monitoring and mitigation process. ROD at E-2 (AR 4870). Finally, BLM was not required to await the final study prior to making its decision. See Voyaguers Nat'l Park Ass'n v. Norton, 381 F.3d 759, 765 (agency's

reliance on draft study to support conclusions was not arbitrary or capricious).  As NEPA requires,
it relied on the best information before it at the time, including established baseline information as
to the size of the herd, FEIS at 3-86, its seasonal ranges, id. at 3-89, and the available information
from the draft Mule Deer Study.  FEIS at 5-17 ("Completion of the first phase of the study has
provide BLM and WGFD better information on migration routes").  It therefore had ample
information before it in order to assess the impacts on mule deer.

### 9.  BLM Did Not Violate NEPA by Irretrievably Committing Resources Prior to Finalizing the Rawlins RMP

Plaintiff argues that BLM was required "to finalize its EIS on the ongoing Rawlins RMP
prior to irreversibly committing to [CBNG] development lands" within the Project area.  Plfs. Br.
at 25.  According to Plaintiff, BLM's actions violate 40 C.F.R. § 1506.1, which constrains an
agency's ability to take actions that would have an adverse environmental impact or would limit the
choice of reasonable alternative in advance of a record of decision.  At the outset, Plaintiff
apparently does not understand how BLM manages lands.  BLM decided in the Great Divide RMP
that "[t]he entire planning area is open to oil and gas leasing."  AR 679.  Here, the irretrievable
commitment of resources occurred when BLM issued the leases.  Sierra Club v. Peterson, 717 F.2d
1409, 1415 (D.C. Cir. 1983).  Consistent with the RMP, and its supporting EIS, BLM has already
leased all the federal minerals within the project area.[12]  FEIS at 1-8 (AR 2135).  Plaintiff does not

---

[12] BLM explained in a detailed response to comments on the draft EIS that:

> The RMP states that the entire planning area is open to oil and gas leasing and does not make distinction as to whether oil and gas development is conventional or otherwise. . . . CBNG related activity is not unanticipated just because the RMP does not use the specific words coalbed methane.  Methane and natural gas are used interchangeably regardless of the source. No specific formation bed or seam was identified in the RMP as being suitable or unsuitable for oil and gas development.  Natural gas production operations are very similar and CBNG development is no exception. . . . Therefore even if coal bed methane has not been specifically mentioned the activity is clearly consistent with the terms conditions and decisions of the approved plan. 43 C.F.R. § 1610.0-5b.

AR 4668.

challenge the leasing decisions. The Court need go no further to conclude that Plaintiff's claim is meritless. BLM's actions comport with 40 C.F.R. § 1506.1(c) because they are covered by an existing EIS.

Northern Plains Resource Council, Inc. v. BLM, 298 F. Supp. 2d 1017 (D. Mont. 2003) provides useful instruction. As the court explained in that case, "BLM treats [CBNG] as part of the oil and gas estate. It does not issue [CBNG] leases separate and apart from conventional oil and gas leases." Id. at 1020. Plaintiffs there challenged BLM's decision to issue oil and gas leases and approve APDs for CBNG development without preparing a supplemental EIS and amending the existing RMP. Id. In the existing RMP, BLM had only analyzed the effects of exploration and limited CBNG development. As the court observed, "[o]nce it recognized that full-field [CBNG] development was a genuine possibility, it commenced a statewide EIS. While undergoing that EIS, it was not required to halt lease sales, as long as they were in conformance with the existing plan." Id. at 1021 citing ONRC Action v. BLM, 150 F.3d 1132, 1137 (9th Cir. 1998).

While Plaintiff attempts to relegate ONRC Action v. BLM to a footnote, Plfs. Br. at 25, n.10, the decision squarely addresses this issue. Section 1506.1(c) of the CEQ regulations provides:

> While work on a required program environmental impact statement is in progress and the action *is not covered by an existing program statement*, agencies shall not undertake in the interim any major Federal Action covered by the program ...

40 C.F.R. § 1506.1(c) (emphasis added). The plaintiffs in ONRC Action argued that when there was a pending EIS, NEPA required the agency to halt action that would adversely affect the environment or prejudice the agency's ability to choose between alternatives. 150 F.3d at 1137. The plaintiffs also argued that BLM's land use plans were outdated and that FLPMA required BLM to base its land management activities on up-to-date plans. BLM pointed out that 40 C.F.R. § 1506.1(c) provided an exception to the requirement that an agency comply with NEPA prior to approving an

32

action where the action is covered by an existing EIS, and the Ninth Circuit agreed, concluding that an RMP is the existing program statement that "currently cover[s]" action on BLM lands. Id. at 1138. Indeed, even though the Ninth Circuit observed that it was "likely" that new information being developed in an EIS would lead to revision of the RMP, the Ninth Circuit rejected as "unfounded" plaintiffs' argument that an "outdated" RMP could not serve as the "existing program plans" under NEPA. Id. at 1140. The same is true here. BLM's earlier decisions to lease lands in the Atlantic Rim project area are consistent with the existing Great Divide RMP. AR 679. BLM properly limited development of those leases under the RMP pending completion of the FEIS at issue here, which analyzes the impacts of full-field CBNG development. Therefore, because the existing RMP supports BLM's decision to issue leases, BLM was not required to complete a plan revision and a separate EIS prior to finalizing the decision here.

Plaintiff's argument is based primarily on early discussions BLM had about whether a plan amendment would be necessary prior to completing the Atlantic Rim EIS because the level of development would likely exceed the reasonably foreseeable development (RFD) level analyzed in the EIS for the Great Divide RMP. Plfs. Br. at 25, citing SOF ¶¶ 39-41; 57-58; 62;67-71; 73-74; 79. But, Plaintiff ignores the fact that in 2004, BLM issued a new policy that better defined how BLM should take the RFD into account. It stated that the RFD is a technical report used in the RMP process to evaluate existing management direction and not a planning decision. AR 5311, 5313. It also made clear that the fact the total number of wells in an area may exceed the total number of project wells does not automatically mean that a revision or amendment to the RMP is necessary. Id. at 5312. Rather, the important consideration is whether the proposed action will substantially exceed the predicted impacts analyzed in the original plan EIS. Id. In June 2003, BLM had assembled an interdisciplinary team of specialists to evaluate whether exploration and development

of CBNG was "within the broad impacts predicted from the development of oil and gas resources described in the current land use plan." AR 8102, 8118. The team considered several criteria, including whether the action was consistent with the plan and its existing range of alternatives, whether the analysis continued to be valid in light of new information, and whether the direct, indirect, and cumulative impacts were consistent with the analysis in the Great Divide RMP EIS. ROD at 4. (AR 4799; see also 8104-8118). BLM concluded that exploration and development of CBNG was in conformance with the Great Divide RMP. AR 8103, 8118. Finally, NEPA regulations state that an agency may appropriately rely on information contained in a draft EIS. 40 C.F.R. § 1506.3(a). Here, BLM took into "consideration consistency with the significance criteria found in the Rawlins RMP Draft EIS." FEIS at 4-1; 4-68-69 (AR 2320; 2387-88).

### 10. BLM Took A Hard Look at the Impacts of Site-Specific Approvals

Plaintiff's last NEPA argument claims that BLM violated NEPA because the Sun Dog and Catalina EAs tier to an inadequate EIS. Plfs. Br. at 29. Plaintiff admits that "tiering," which allows an agency to cover issues in a broad, programmatic EIS, with narrower environmental analysis in a site-specific statement that incorporates by reference general discussions and focuses on issues specific to the proposal, is generally acceptable. Plfs. Br. at 29. See 40 C.F.R. § 1508.28; see also Nevada v. Dep't of Energy, 457 F.3d 78, 91 (D.C. Cir. 2006). As explained above, its complaints about the adequacy of the FEIS are without merit. Plaintiff's only objection to the analysis in the actual EAs is a cursory--two sentence--argument that BLM failed to consider the cumulative impact of granting waivers and exemptions from wildlife proscriptions. Plfs. Br. at 29.

This argument is wholly without merit. First, as we explained above, BLM added conditions of approval to the proposed action, including *more restrictive* conditions on development to protect wildlife. AR 73511-12. Second, Plaintiff again misleadingly excerpts the record. BLM did not

approve any modification of wildlife restrictions in the EAs or Decision Records; it said it may grant a "temporary exception," but only if a determination is made that the wildlife resource will not be adversely impacted." AR 73500; see also 74071 (same). Accordingly, given the condition of no impact, a temporary exception--which may or may not even be requested--is within BLM's finding of no significant impact.

## B.    BLM Complied With FLPMA

Plaintiff argues that BLM violated FLPMA by ignoring "multiple use and sustained yield mandates" because it supposedly decided to manage lands in the project area "for the sole purpose of [CBNG] extraction" and to the exclusion of other uses, such as recreation and hunting. Plfs. Br. at 31. Cherry-picking information from the record, and improperly relying on extra-record declarations, Plaintiff conjures up a scenario pursuant to which it concludes that sage grouse and big game will be eliminated from the Project area. Plfs. Br. at 32. As we explain in more detail below, these claims are wrong. But, to illustrate the lack of merit to Plaintiff's allegations, it is worthwhile to address one of the more exaggerated claims that forms the basis for its arguments at the outset. Plaintiff asserts that "[o]ver one-quarter million acres on south-central Wyoming will be 'industrialized' by development of the project." Plfs. Br. at 32, citing FEIS at 4-102 (AR 2421). The FEIS did observe that the natural character of the area would be "industrialized," but actual development of natural gas activities will disturb an estimated total of 13,600 acres within the 270,080 acre project area, not a quarter-million. ROD at 3 (AR 4798). While there will be limitations on uses of some resources, BLM's decision to emphasize oil and gas development was not arbitrary or capricious. The multiple-use and sustained-yield standard allows BLM to exercise discretion in determining the appropriate mix of resource use and protection. As the Tenth Circuit explained in Rocky Mountain Oil and Gas Ass'n v. Watt, 696 F.2d 734, 738 (10th Cir. 1982),

multiple use management means that "BLM need not permit all resource uses on a given parcel of land." Relevant to the decision here, the court further observed that "a parcel of land cannot both be preserved in its natural character and mined. . . . It is only by looking at the overall use of the public lands that one can accurately assess whether or not BLM is carrying out the broad purposes of the statute." Id. at 738-39, n.4, quoting Utah v. Andrus, 486 F. Supp. 995, 1003 (D. Utah 1979). The record shows BLM's actions comply with FLPMA.

As an initial matter, Plaintiff sets forth the wrong standard for this Court to evaluate BLM's compliance with FLPMA by referring to the principles of "multiple use" and "sustained yield" as though they were stand-alone requirements for evaluating agency action. They are not. FLPMA establishes requirements for land use planning on land administered by the Secretary of the Interior, including lands managed by BLM. FLPMA provides that "goals and objectives be established by law as guidelines for public land use planning, and that management be on the basis of multiple use and sustained yield . . ." 43 U.S.C. § 1701(a)(7). The Secretary implements this multiple-use management policy by developing, maintaining, and when appropriate, revising land use plans in accordance with the principles of multiple use and sustained yield. Id. §§ 1712(a), (c)(1). Multiple use means the management of public lands "so that they are utilized in the combination that will best meet the present and future needs of the American people." Id. § 1702(c). Sustained yield "means the achievement and maintenance in perpetuity of a high-level annual or regular periodic output of the various renewable resources of the public lands consistent with multiple use." Id. at 1702(h). These principles afford BLM broad discretion in its management of public lands. See, e.g., Pub. Lands Council v. Babbitt, 167 F.3d 1287, 1305 (10th Cir.1999) (multiple-use sustained-yield policy allows BLM "considerable administrative flexibility").

Once a plan is developed, the Secretary manages the public lands under principles of multiple use in accordance with that plan, here the Great Divide RMP, by ensuring that management actions conform to the plan. See 43 U.S.C. § 1732(a); 43 C.F.R. § 1610.5-3. See also SUWA, 542 U.S. at 59-60 ("[u]nder FLPMA, '[t]he Secretary shall manage the public lands under principles of multiple use and sustained yield, in accordance with the land use plans . . .'"), quoting 43 U.S.C. § 1732(a). In its affirmance of this Court's decision, and interpreting SUWA in Fund for Animals, Inc. v. BLM, 460 F.3d 13, 21 (D.C. Cir. 2006), the D.C. Circuit explained that "the plans themselves are generally unreviewable; it is only specific actions implementing the plans that are subject to judicial scrutiny." Likewise, as the Interior Board of Land Appeals (IBLA) explained in Southern Utah Wilderness Alliance, 122 IBLA 165, 172–73 (1992), "[m]ultiple use is generally considered in the context of BLM's land-use planning. In fact, alternate uses of the land were considered when adopting the [RMP at issue]. They need not be considered anew each time BLM decides to lease the land or grant leave to undertake an activity." IBLA concluded that the appellants could only object to the manner in which the RMP had been implemented (i.e., demonstrate that an implementation action violated the terms of the RMP). Id. (stating that, in the RMP, BLM "considered the impact of the proposed action on all of the resources appellants seek to protect, and the fact that appellants would prefer other exclusionary uses of the land does not establish error.").

BLM struck the appropriate balance pursuant to FLPMA in the existing Great Divide RMP, where it selected "management actions which resolve the planning issues and provide for sustained multiple use management of the public lands and resources." AR 652. In that plan, BLM determined that the entire planning area would be open to oil and gas development. AR 679. Plaintiff does not--and could not--argue that the Great Divide RMP violates FLPMA. Thus, in order to prevail, Plaintiff must show that the Atlantic Rim ROD and the decisions to approve the Sun Dog

and Catalina PODs violate FLPMA because they do not comport with specific management requirements contained in the RMP. It makes no attempt to satisfy that standard. Nor could it. While the Atlantic Rim project will impact a variety of resources, BLM properly exercised its discretion as it carried out "the enormously complicated task of striking a balance among the many competing uses to which land can be put . . ." SUWA, 542 U.S. at 58. That does not mean it ignored its obligation to balance oil and gas development with other resources. To the contrary, as it explained in the ROD, it selected Alternative D because it provides a "good balance between oil and gas recovery and resource protection and provides for long-term reclamation and re-establishment of native vegetation and wildlife communities." ROD at 10 (AR 4805).

### 1. The Protections for Sage-Grouse Imposed by the Atlantic Rim Project ROD are Consistent with the Great Divide RMP

Pursuant to the Great Divide RMP all of the public lands within the RFO management area, including those within the project area, are open to oil and gas leasing and development. AR 679. The Great Divide RMP's general management objective for wildlife is to provide "habitat quality . . . adequate to support a natural diversity of wildlife and fisheries." Id. at 690. The only specific guidance included in the Great Divide RMP for sage grouse provides that "[s]age grouse and sharp-tailed grouse strutting/dancing grounds and nesting habitat will be protected." AR 694. Contrary to Plaintiff's assertion, sage-grouse strutting/dancing grounds (leks) and nesting habitat *are* protected under the Atlantic Rim Project ROD. The ROD imposes mitigation requirements specific to sage-grouse. ROD at B-14, B-16 (AR 4848, 4850). A no surface-occupancy restriction extending 1/4 mile from occupied leks, and seasonal restrictions prohibiting surface-disturbing activities within two miles of occupied sage-grouse leks during strutting season, are required. Id. at B-16. The seasonal restriction prohibits surface disturbing activities within 2 miles of delineated nesting or brood-rearing habitat associated with individual leks from March 1-July 15. See id. Also

38

mandated are limitations against disruptive activities, high-profile structures, and disturbance in delineated winter concentration areas. Id. Inventory and monitoring requirements are included. Id. at B-14. BLM will also consider additional protective measures on a site-specific basis. Id. at 1, 21 (AR 4796, 4816).

Consistent with the RMP's general objective of maintaining habitat adequate to support a diversity of species, the ROD establishes a goal of providing "well-dispersed sage-grouse breeding, nesting, brood rearing, and winter habitat." ROD at 19 (AR 4814). And, while Plaintiff argues that these stipulations were developed in the 1980s and are inconsistent with current science, in fact the mitigation and reclamation requirements included in the ROD are consistent with WGFD's "Recommendations for Development of Oil and Gas Resources in Crucial and Important Wildlife Habitats," a 2004 Study. ROD at 8 (AR 4803) (BLM considered 2004 WGFD Recommendations during preparation of the FEIS and ROD); AR 6557, 6563-64, 6566 (suggesting seasonal use restrictions and avoidance of surface disturbance within 1/4-mile of the perimeter of occupied leks).

As Plaintiff observes, in its comments on the FEIS, the FWS expressed its preference for an alternative with fewer impacts on wildlife and stated that it remained concerned that there was the potential for significant impacts. But, FWS did not identify any flaws in BLM's analysis.[13] AR 10134-35. It simply observed that "[p]roposed development may alter the future size, distribution and existence of local populations." Id. The FEIS explains that noise levels, disruptive human activities, construction and roads can all result in lower productivity and decline of the species.

---

[13] Plaintiff also cites FWS' DEIS comments, which in turn relied on Holloran 2005 (doctoral dissertation), and where FWS stated the stipulations oil and gas development in the Pinedale project are "identical to mitigation proposed for the Atlantic Rim" project. Plfs. Br. at 33, citing AR 3256. Contrary to Plaintiff's and FWS' assertion, the record shows that there are important distinctions between the mitigation adopted for Pinedale and the mitigation here, including larger buffers and longer timeframes prohibiting surface disturbing activities. Compare AR 4042 (Holloran descriptions of Pinedale mitigation) and AR 2626 (Atlantic Rim requirements).

Relying in part on Clait Braun, Plaintiff's declarant, BLM also discloses that, while sage grouse may repopulate an area following development, they may not attain the same population levels as prior to development. FEIS at 4-76 (AR 2395). BLM recognized that there would be significant impacts on the sage grouse and acknowledged that 10 percent of the grouse's habitat could be lost. FEIS at 4-79 (AR 2398). Plaintiff also omits that in its FEIS comments, the FWS "commend[ed] BLM for requiring interim reclamation as this may reduce some of the impacts that will occur across the Project area." AR 10135. FWS also stated that it "believes that the reclamation criteria in Appendix B form a reasonable basis for measuring reclamation success." Id. Ultimately, BLM concluded that "there is no way to fully develop the oil and gas resources within the project area without these effects, although site-specific review at the annual work planning stage would allow for the use of best management practices to reduce adverse effects." AR 4404.

Relying on a declaration prepared by Clait Braun, which we have moved to strike, Plaintiff concludes that sage grouse will be eradicated from the project area as a result of the project. Plfs. Br. at 34. Ultimately, while Plaintiff and its experts may object to BLM's conclusions, those conclusions are supported in the record. The Court should reject Plaintiff's attempts to foment a "battle of the experts." Ocean Conservancy, 394 F. Supp. 2d at 162. BLM recognized the potential for a "long-term decline in the population of this species," FEIS at 4-76 (AR 2395), but it did not find there would be a "substantial loss of habitat function or disruption of life history requirements" that would make the sage grouse eligible for listing under the ESA.[14] Id. at 4-69 (AR 2388). Rather,

[14] Plaintiff also claims that the Project is inconsistent with the BLM Manual because it does not comply with the Manual's directive that BLM actions shall not contribute to the need to list any special status species. Plfs. Br. at 35. That conclusion is wrong, but the Court is without jurisdiction to consider it in the first place because the BLM Manual is merely a statement of policy. Schweiker v. Hansen, 450 U.S. 785, 789 (1981) (agency manuals do not have force and effect of law and are not binding on the agency); Reed v. Avis Rent-A-Car, 29 F. Supp.2d 1121, 1126 (N.D. Cal. 1998) (BLM Manual does not have force of law). Finally, although Plaintiff quotes heavily from dicta in Western Watershed Project v. Fish and Wildlife Service, 535 F. Supp. 2d 1173 (D. Idaho 2007), the

the agency found that the impacts were significant under criteria 4, FEIS at 4-83 (AR 2042), which states that substantial loss of habitat function "would preclude improvement of their status." FEIS at 4-69 (AR 2388). The Court should defer to its decision. Ocean Conservancy, 394 F. Supp. 2d at 157, citing Sierra Club v. DOT, 753 F.2d 120, 129 (D.C. Cir. 1985).

BLM recognized its obligation to protect the sage grouse as a sensitive species, stating that "no actions that might jeopardize the future existence or viability of this species may occur." AR 4405. Plaintiff simply has not shown that the Project, which includes substantial mitigation and gives BLM the tools to continue to adapt its management in order to respond to changing circumstances, will result in a violation of the Great Divide RMP's directive to protect sage-grouse leks and nesting habitat. Therefore, "although the plaintiff[ is] dissatisfied with the level of protection provided under the current mitigation plan, the record clearly reflects that BLM analyzed and considered various alternatives" and adopted a "more stringent" plan to protect sage grouse. NRDC I, 525 F. Supp. 2d at 122. Plaintiff has not established a violation of FLPMA.

### 2. BLM Did Not Violate Plan Requirements for Big Game

Plaintiff claims that the Project violates FLPMA because it displaces wildlife and will impact hunting. Plfs. Br. at 39-40. It ignores RMP provisions applicable to BLM's management of big game, which show that BLM's actions are in conformance with the plan, and therefore with FLPMA. The same general objective to support habitat quality adequate to support a diversity of species which applies to sage grouse also applies to big game. AR 690. The Plan's specific requirement for management of big game states: "[t]o protect important big game winter habitat activities or surface use will not be allowed from November 15 to April 30 within certain areas encompassed by the authorization," and the project incorporates that requirement. See AR 697,

_____

case is irrelevant to this Court's decision. The court's limited finding was the process the FWS followed in denying the petition to list sage grouse was fatally flawed. Id. at 1188.

FEIS at 4-72 (AR 2391). The project will also incorporate additional mitigation measures that will reduce impacts to big game, although it will not completely eliminate them. FEIS at 4-72. As explained above, BLM developed Alternative D in order to strike a balance between oil and gas development and protection of wildlife communities. ROD at 10 (AR 4805). All habitats in the project area are protected and many protection measures are put in place, from reducing disturbance through a cap, ROD at 1 (AR 4796), to enhanced and hastened reclamation measures to replace forage for big game. ROD at 3 (AR 4798). While Plaintiff may object to the balance BLM struck, at bottom, its complaint is simply that it would prefer that BLM manage the project area for its preferred use, hunting.

Further, Plaintiff's hyperbolic assertion that BLM has approved a plan that will "eliminate" big game from the project area, Plfs. Br. at 32, simply has no foundation. Except for the Bitter Creek herd of pronghorn antelope, big game animals in the project area are all at or above optimal populations levels. FEIS at 3-90 (AR 2254). There are nearly 20,000 antelope, 21,000 mule deer, and 11,500 elk in the area. Id. BLM disclosed that there would be impacts on big game, including reduced numbers, primarily from indirect impacts to habitat. FEIS at 4-72--4-75 (AR 2391-92). Ultimately, BLM concluded that the impacts to big game would result in substantial disruption or irreplaceable loss of high value habitats, not that there would be a loss of habitat to the extent that big game populations would be extirpated. FEIS at 4-82-83 (stating effects would exceed criterion number 3) and FEIS at 4-69 (defining significance criteria) (AR 2401-02, 2388). Its decision is consistent with the RMP.

### 3.    Plaintiff's Claim that the Action Violates RMP Objectives Is Non-Justiciable

In yet another argument never raised in its comments on the final EIS (AR 1062-66), and which the Court should not consider, Plaintiff contends that the Project violates FLPMA because

it is inconsistent with the RFD scenario set forth in the Plan and with Plan objectives for wildlife and recreation. Plfs. Br. at 41-42. Plaintiff also claims that BLM's alleged failure to fully define its mitigation and monitoring plan was arbitrary and capricious because it supposedly prevented BLM from assessing whether the project was consistent with the RMP. These claims are non-justiciable under SUWA, where the Supreme Court explained in the context of a claim brought pursuant to § 706(1) of the APA regarding BLM's alleged failure to act, that general statements in a plan, such as "'will do' projections of agency action . . . are not a legal binding commitment. . ." SUWA, 542 U.S. at 71. Action in a plan may be compelled only "when language in the plan itself creates a commitment binding on the agency." Id. The Court held that to conclude that "general enforcement of plan terms would lead to pervasive interference with BLM's own ordering priorities," and "would ultimately operate to the detriment of sound environmental management." Id. at 72.

As IBLA recently explained in Biodiversity Conservation Alliance, 174 IBLA 1 (2008), "RFD scenarios do not constitute fixed or maximum limits on development in RMPs under FLPMA such that exceeding them constitutes a violation of that statute. Rather, they spring from the NEPA review process, deriving from the Council on Environmental Quality (CEQ) regulations requiring analysis of reasonably foreseeable events, and permit NEPA analysis of impacts of projected development." Id. at *11. Thus, interpreting SUWA, IBLA determined that the RFD scenario was not enforceable under FLPMA. Id. at *12. Likewise, BLM's "management objectives" for wildlife and recreation set forth no binding commitment, although as we explain above, the project is consistent with Plain objectives to provide habitat sufficient to support a diversity of wildlife. Id.

Contrary to Plaintiff's assertion, the project is also consistent with the objective of ensuring continued availability of outdoor recreational opportunities. Plaintiff objects that the decrease in

wildlife populations will result in a loss of hunting and recreational opportunities.  Plfs. Br. at 39,

43.  BLM acknowledged the potential for impacts on hunting and recreation in the FEIS, and

acknowledged that they would be "significant."  FEIS at 4-100-102.  But, that does not compel the

conclusion that its actions--which are in conformance with the Plan--violate FLPMA. While hunters

may have a "reduced quality hunting experience," the project includes protection measures for the

most heavily hunted areas that will "help retain the quality of hunting, wildlife viewing, and

recreation experiences" in the project area."  FEIS at 4-104.  In addition, Plaintiff also ignores that

the 270,080 acre project area, ROD at 1 (AR 4796), is a small fraction of the 4 million acre area

managed by BLM under the Great Divide RMP.  AR 652.  The actual disturbance footprint is an

even smaller fraction,7,600 acres at any given time, and 13,600 acres over the life of the Project.

ROD at 1, 3 (AR 4796, 4798).  Thus, there will still be ample opportunities for Plaintiff's members

to hunt and recreate throughout the planning area, including in the project area.

Plaintiff's reliance on an unreported case from Idaho, Western Watersheds Project v. U.S.

Forest Service, 2006 WL 292010 (D. Idaho) is also misplaced.  There, the Forest Service had relied

on its adaptive management strategy to meet plan standards and objectives, but it did not explain the

strategy in the EIS.  In particular, the "keystone of the strategy" was monitoring, but the Forest

Service had deferred development of a monitoring plan. Id. at *10.  The court found that the lack

of an explanation prevented it from evaluating whether the agency action complied with the plan.

Id.  Here, BLM is not relying on adaptive management to meet plan requirements; as addressed

herein, the proposed action independently complies with the Plan.  In addition, its adaptive

management plan, including monitoring, is explained in the ROD.  ROD at B-2--B-13 (AR 4836-

47).  The Atlantic Rim Project complies with the Plan and with FLPMA.

### 4.    The Catalina and Sun Dog Plans Comply with the RMP

Finally, Plaintiff argues that BLM violated FLPMA because it did not adopt additional protections for sage grouse and mule deer beyond what the Plan requires when it approved the Sun Dog and Catalina PODs.  Plfs. Br. at 40.  Plaintiff cannot prevail on this claim because there is no requirement in the RMP or in FLPMA that BLM impose additional requirements, and BLM is therefore entitled to summary judgment.  Adopting the Plaintiff's recommendation to extend the no surface occupancy restriction "to at least 2, and preferably 4, miles from each active lek," Braun Decl. at ¶ 21, would essentially shut down development in the Atlantic Rim project area.  See, e.g., FEIS at 3-95 (map).  Moreover, contrary to its assertion that BLM failed to impose additional restrictions on development, the record shows that numerous well locations were moved or consolidated to reduce disturbance, visual impacts, and impacts on sage grouse.  AR 78554, 78560, 78564, 78576, 78577-78, 78580, 78583,  78703-33, 78743, 78748, 78787, 78819.  Plaintiff is also simply incorrect in stating that the restrictions the BLM placed upon wells located in mule deer crucial winter range are "only a timing limitation on drilling," not a restriction on operations.  Plfs. Br. at 40. The record shows the seasonal restrictions that the BLM applied to the Catalina A and B PODs are broader than just drilling operations.  See AR 73511-512 ("*Construction,* drilling, and *other activities potentially disruptive* to wintering wildlife are prohibited during the period of November 15 to April 30 for the protection of big game crucial winter habitat.") (emphasis added). BLM's approvals of the Sun Dog and Catalina PODs complied with the RMP, and therefore satisfied its obligations under FLPMA.

### CONCLUSION

For the foregoing reasons, the Court should granted summary judgment in favor of Federal Defendants.

Respectfully submitted this 12th day of June, 2008.


RONALD J. TENPAS
Acting Assistant Attorney General
United States Department of Justice
Environment & Natural Resources Division


   s/ Lori Caramanian
Lori Caramanian
United States Department of Justice
Environment and Natural Resources Division
Environment & Natural Resources Division
1961 Stout Street, 8th Floor
Denver, CO 80294
Phone: (303) 844-1499
Fax: (303) 844-1350

Attorneys for Federal Defendants

Arthur R. Kleven
Attorney-Advisor
U.S. Department of the Interior
Office of the Solicitor, Rocky Mtn. Region