IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

THEODORE ROOSEVELT CONSERVATION PARTNERSHIP
555 Eleventh St. N.W., 6th Floor
Washington, DC 20004,

Plaintiff,

v.

DIRK KEMPTHORNE, in his official capacity as the Secretary of the United States Department of the Interior
1849 C Street, N.W.
Washington, DC 20240,

and

UNITED STATES BUREAU OF LAND MANAGEMENT
1849 C Street, N.W., Room 406-LS
Washington, DC 20240,

Defendants.

ANADARKO PETROLEUM CORPORATION,
P.O. Box 1330
Houston, TX 77251-1330,

WARREN RESOURCES, INC.,
489 Fifth Avenue, 32nd Floor
New York, NY 10017,

DOUBLE EAGLE PETROLEUM CO.,
777 Overland Trail, Suite 208
P.O. Box 766
Casper, WY 82602-0766,

Defendant-Intervenors.

CASE NO. 1:07-cv-01486-RJL

STATE OF WYOMING )
123 Capitol Building )
Cheyenne, WY 82002 )

Defendant-Intervenor. )

**DEFENDANT-INTERVENORS ANADARKO PETROLEUM CORPORATION, WARREN RESOURCES, INC., AND DOUBLE EAGLE PETROLEUM CO.'S CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1, Defendant-Intervenors Anadarko Petroleum Company, Warren Resources, Inc. and Double Eagle Petroleum Co. (collectively, "Defendant-Intervenors") respectfully move this Court for summary judgment on claims asserted by Plaintiff Theodore Roosevelt Conservation Partnership ("TRCP") in its First Amended and Supplemented Complaint dated April 7, 2008. Defendant-Intervenors also oppose TRCP's Motion for Summary Judgment, which was filed on May 6, 2008.

As shown in the accompanying Memorandum in Opposition to Plaintiff's Motion for Summary Judgment and in Support of Defendant-Intervenors' Cross-Motion for Summary Judgment, TRCP's claims have no merit. Defendant-Intervenors should be allowed to continue work under their already-issued permits to drill, to submit new applications for permits to drill, and to conduct other surface-disturbing activities in the Atlantic Rim Project Area, because the Bureau of Land Management (a) took a "hard look" at environmental impacts under the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4370f, and complied with NEPA's

requirements and (b) complied with its land management obligations under the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. §§ 1707-1785.[1]

Defendant-Intervenors respectfully request oral argument under Local Rule 7(f).

Respectfully submitted,

/s/ Michael B. Wigmore

Michael B. Wigmore (DC Bar #436114)
Bingham McCutchen LLP
2020 K Street, NW
Washington, DC 20006-1806
(202) 373-6000 (tel)
(202) 373-6001 (fac)

*Counsel for Anadarko Petroleum Corporation Warren Resources, Inc., and Double Eagle Petroleum Co.*

Robert C. Mathes (DC Bar #484255)
Bjork Lindley Little PC
1600 Stout Street, Suite 1400
Denver, CO 80202
(303) 892-1400 (tel)
(303) 892-1401 (fac)

*Counsel for Double Eagle Petroleum Co.*

Dated: June 12, 2008

A/72561862.1

[1] In conjunction with this cross-motion, Defendant-Intervenors are also filing a motion to strike materials that TRCP submitted in support of its motion for summary judgment that are outside the administrative record in this case, as well as references to extra-record documents that are found throughout its statement of facts and memorandum.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

THEODORE ROOSEVELT CONSERVATION PARTNERSHIP
555 Eleventh St. N.W., 6th Floor
Washington, DC 20004,

Plaintiff,

v.

DIRK KEMPTHORNE, in his official capacity as the Secretary of the United States Department of the Interior
1849 C Street, N.W.
Washington, DC 20240,

and

UNITED STATES BUREAU OF LAND MANAGEMENT
1849 C Street, N.W., Room 406-LS
Washington, DC 20240,

Defendants.

---

ANADARKO PETROLEUM CORPORATION,
P.O. Box 1330
Houston, TX 77251-1330,

WARREN RESOURCES, INC.,
489 Fifth Avenue, 32nd Floor
New York, NY 10017,

DOUBLE EAGLE PETROLEUM CO.,
777 Overland Trail, Suite 208
P.O. Box 766
Casper, WY 82602-0766,

Defendant-Intervenors.

---

CASE NO. 1:07-cv-01486-RJL

STATE OF WYOMING )
123 Capitol Building )
Cheyenne, WY 82002 )

Defendant-Intervenor. )

**MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF DEFENDANT-INTERVENOR ANADARKO PETROLEUM CORPORATION, WARREN RESOURCES, INC. AND DOUBLE EAGLE PETROLEUM CO.'S CROSS-MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

LIST OF EXHIBITS ..... iii

TABLE OF AUTHORITIES ..... iv

GLOSSARY OF ACRONYMS AND ABBREVIATIONS ..... ix

INTRODUCTION ..... 1

FACTUAL BACKGROUND ..... 3

1. The Great Divide Resource Area Resource Management Plan ..... 3

2. The Atlantic Rim Project and the History of the NEPA Process ..... 4

3. Procedural History - Administrative Appeal ..... 9

ARGUMENT ..... 10

I. Standard of Review ..... 10

II. BLM's Atlantic Rim EIS and Specific POD EAs Satisfy the Requirements of NEPA ..... 11

A. BLM Took a "Hard Look" at the Environmental Impacts of the Atlantic Rim Project and Individual PODs ..... 11

B. BLM Considered a Reasonable Range of Alternatives ..... 13

1. BLM appropriately defined the alternatives based on the purpose and need of the Proposed Action and on its own policies ..... 14

2. BLM analyzed spatial and phased alternatives ..... 15

3. The EAs properly tiered to the EIS regarding alternatives ..... 19

C. BLM Appropriately Analyzed Potential Impacts to Wildlife Species ..... 20

1. BLM adequately analyzed the potential cumulative impacts of the Atlantic Rim Project in relation to other projects ..... 21

2. BLM appropriately analyzed the potential impacts to Mule Deer ....................24

D. The EIS Includes Adequate Mitigation and Monitoring....................27

1. BLM's adaptive management plan is consistent with the purposes of NEPA....................28

2. Reference to possible exemptions does not render the extensive analysis of mitigation measures in the EIS inadequate ....................32

E. BLM was Not Required to Wait for the Completion of the Rawlins RMP Before Issuing the Atlantic Rim ROD ....................33

III. BLM's Approval of the Atlantic Rim Project Complies with FLPMA ....................34

A. BLM Complied With FLPMA's Multiple Use and Sustained Yield Requirements....................36

1. FLPMA's multiple use and sustained yield mandates do not require all resources be available in all areas....................36

2. BLM provided mitigation measures to reduce the Project's impacts with respect to the sage grouse and big game....................38

B. The Atlantic Rim Project Conforms with the Great Divide Resource Management Plan....................40

1. TRCP mischaracterizes the Reasonably Foreseeable Development scenario....................41

2. The Atlantic Rim Project is consistent with the Great Divide RMP's wildlife and recreation objectives ....................43

CONCLUSION....................44

**LIST OF EXHIBITS**

| | |
|---|---|
| Exhibit 1 | *Theodore Roosevelt Conservation P'ship, et al.*, No. IBLA 2007-208, *et al*. (Sept. 5, 2007) |
| Exhibit 2 | BLM, Record of Decision: Implementation of a Wind Energy Development Program and Associated Land Use Plan Amendments, December 2005 |
| Exhibit 3 | Excerpts from BLM, Final Environmental Impact Statement on Wind Energy Development on Bureau of Land Management-Administered Lands in the Western United States, June 2005 |
| Exhibit 4 | Mem., Office of the Solicitor, June 7, 2002 |

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Ad Hoc Metals Coal. v. Whitman*, 227 F. Supp. 2d 134 (D.D.C. 2002) ............................10

*Ark. Wildlife Federation v. U.S. Army Corps of Eng'rs*, 431 F.3d 1096 (8th Cir. 2005) ............................13

*Biodiversity Associates v. U.S. Forest Serv.*, 226 F. Supp. 2d 1270 (D. Wyo. 2002) ............................33

**Camp v. Pitts*, 411 U.S. 138 (1973) ............................10

*Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190 (D.C. Cir. 1991) ................15, 27

*Citizens' Committee to Save Our Canyons v. U.S. Forest Serv.*, 297 F.3d 1012 (10th Cir. 2002) ............................15

*Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971) ............................10

*City of Williams v. Dombeck*, 151 F. Supp. 2d 9 (D.D.C. 2001) ............................32

*Colo. Environmental Coal. v. Dombeck*, 185 F.3d 1162 (10th Cir. 1999) ............................25

*Cronin v. USDA*, 919 F.2d 439 (7th Cir. 1990) ............................13

*Curry v. U.S. Forest Serv.*, 988 F. Supp. 541 (W.D. Pa. 1997) ............................20

*Envtl. Prot. Info. Ctr. v. U.S. Forest Serv.*, 234 Fed. Appx. 440 (9th Cir. 2007) ..............20

*Foundation for North American Wild Sheep v. USDA*, 681 F.2d 1172 (9th Cir. 1982) ............................30

*Fund for Animals v. Hall*, 448 F. Supp. 2d 127 (D.D.C. 2006) ............................12

*Half Moon Bay Fishermans' Marketing Association v. Carlucci*, 857 F.2d 505 (9th Cir. 1988) ............................25

*Headwaters, Inc. v. BLM*, 684 F. Supp. 1053 (D. Or. 1988) ............................35

*Hells Canyon Alliance v. U.S. Forest Serv.*, 227 F.3d 1170 (9th Cir. 2000) ...............17, 19

**Kleppe v. Sierra Club*, 427 U.S. 390 (1976) ............................23

*Marsh v. Or. Natural Resources Council*, 490 U.S. 360 (1989) ............................39

*Mo. Mining, Inc. v. I.C.C.*, 33 F.3d 980 (8th Cir. 1994)....................................................20

*Mobil Oil Exploration & Producing SE, Inc. v. United States*, 530 U.S. 604 (2000)....................................................................................................................14

*Mountaineers v. U.S. Forest Service*, 445 F. Supp. 2d 1235 (W.D. Wash. 2006).............30

*N. Alaska Environmental Ctr. v. Kempthorne*, 457 F.3d 969 (9th Cir. 2006) .............13, 31

*N. Plains Resources Council v. Lujan*, 874 F.2d 661 (9th Cir. 1989) ...............................13

*NRDC v. EPA*, --- F.3d ----, 2008 WL 2310951 (D.C. Cir. 2008)....................................10

*NRDC v. Kempthorne*, 506 F. Supp. 2d 322 (E.D. Cal. 2007) ..........................................30

*NRDC v. Kempthorne*, 525 F. Supp. 2d 115 (D.D.C. 2007)........................6, 11, 12, 13, 38

*N. Slope Borough v. Andrus*, 642 F.2d 589 (D.C. Cir. 1980) ...........................................11

**National Association of Home Builders v. Defenders of Wildlife*, 127 S. Ct. 2518 (2007)...............................................................................................................3, 11

*National Wildlife Federation v. FERC*, 912 F.2d 1471 (D.C. Cir. 1990)....................23, 33

*Nevada v. Department of Energy*, 457 F.3d 78 (D.C. Cir. 2006) ..........................13, 22, 32

*Northern Cheyenne Tribe v. Norton*, 503 F.3d 836 (9th Cir. 2007) .................................16

**Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55 (2004)...........................................37

*Nw. Ecosystem Alliance v. Rey*, 380 F. Supp. 2d 1175 (W.D. Wash. 2005) .....................14

*ONRC Action v. BLM*, 150 F.3d 1132 (9th Cir. 1998)................................................16, 33

*Pennaco Energy, Inc. v. U.S. Department of Interior*, 377 F.3d 1147 (10th Cir. 2004)...........................................................................................................35

**Robertson v. Methow Valley Citizens Council*, 490 U.S. 332 (1989)..................27, 28, 43

*Rocky Mountain Oil & Gas Association v. Watt*, 696 F.2d 734 (10th Cir. 1983) .............37

*S. Utah Wilderness Alliance v. Norton*, 237 F. Supp. 2d 48 (D.D.C. 2002)................11, 27

*S. Utah Wilderness Alliance v. Norton*, 326 F. Supp. 2d 102 (D.D.C. 2004)....................25

*Scientists' Institute for Public Information v. AEC*, 481 F.2d 1079 (D.C. Cir. 1973) ....................33

*Sierra Club v. U.S. Department of Transport*, 753 F.2d 120 (D.C. Cir. 1985) ....................10

*St. John's United Church of Christ v. City of Chicago*, 502 F.3d 616 (7th Cir. 2007)....................33

*Trout Unlimited v. U.S. Department of Agriculture*, 320 F. Supp. 2d 1090 (D. Colo. 2004) ....................25

*Twp. of Lower Alloways Creek v. Public Serv. Electric & Gas Co.*, 687 F.2d 732 (3rd Cir. 1982) ....................11

*Utah v. Andrus*, 486 F. Supp. 995 (D. Utah 1979) ....................37, 38

**Vt. Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519 (1978)....................11, 21, 22

*Western Watersheds Project v. Fish & Wildlife Serv.*, 535 F. Supp. 2d 1173 (D. Idaho 2007), *appeal docketed*, Nos. 08-35352, 08-35353, 08-35409, 08-35414 (9th Cir. 2008)....................39

*Western Watersheds Project v. Bennett*, 392 F. Supp. 2d 1217 (D. Idaho 2005)....................44

**DOCKETED CASES**

*Northern Plains Resource Council v. BLM*, Nos. 03-69 & 03-78, 2005 U.S. Dist. LEXIS 4678 (D. Mont. Feb. 25, 2005)....................15, 16, 17

*Western Watersheds Project v. U.S. Forest Service*, No. 05 189, 2006 WL 292010 (D. Idaho Feb. 7, 2006)....................30

**FEDERAL STATUTES**

5 U.S.C. § 706(2) ....................10

30 U.S.C. § 182....................1

*30 U.S.C. § 21a ....................1

30 U.S.C. § 226(f)....................29

42 U.S.C. § 15942....................29

*43 U.S.C. § 1701(a)(12)....................1, 35, 40

*43 U.S.C. § 1702(c) ....................................................................................37

*43 U.S.C. § 1702(h) ....................................................................................37

*43 U.S.C. § 1702(l) ....................................................................................1, 35, 40

43 U.S.C. § 1712 ....................................................................................39

*43 U.S.C. § 1732 ....................................................................................35, 39

**FEDERAL REGULATIONS**

40 C.F.R. § 1500.1(b) ....................................................................................32

40 C.F.R. § 1500.3 ....................................................................................34

40 C.F.R. § 1502.14 ....................................................................................16

*40 C.F.R. § 1502.20 ....................................................................................8, 13

40 C.F.R. § 1502.22 ....................................................................................25, 26, 29

40 C.F.R. § 1505.2(c) ....................................................................................29

40 C.F.R. § 1505.3 ....................................................................................29

40 C.F.R. § 1506.1 ....................................................................................16, 33

40 C.F.R. § 1506.5(c) ....................................................................................5

40 C.F.R. § 1508.7 ....................................................................................20, 21, 41

40 C.F.R. § 1508.25 ....................................................................................41

43 C.F.R. § 1610.4-6 ....................................................................................41

43 C.F.R. § 1610.5-3(a) ....................................................................................35

43 C.F.R. § 1610.8(a) ....................................................................................34

43 C.F.R. § 3101.1-2 ....................................................................................34

43 C.F.R. §§ 3162.3-1(a), 3162.5-1(a) ....................................................................................29

**ADMINISTRATIVE MATERIALS**

70 Fed. Reg. 2244, 2267 (Jan. 12, 2005) ....................39

*Biodiversity Conservation Alliance*, 174 IBLA 1 (2008) ....................38, 42

*Biodiversity Conservation Alliance*, No. IBLA 2004-316 (Oct. 26, 2004) ....................42, 43

*Nat'l Wildlife Fed'n*, 150 IBLA 385 (1999) ....................14

*Nat'l Wildlife Fed'n*, 170 IBLA 240 (2006) ....................42

*Reichman*, 173 IBLA 149 (2007) ....................42

*S. Utah Wilderness Alliance*, 159 IBLA 220 (2003) ....................42

*Theodore Roosevelt Conservation P'ship, et al.*, No. IBLA 2007-208, *et al*. (Sept. 5, 2007) ....................9, 29, 42

*Wyo. Audubon*, 151 IBLA 42 (1999) ....................39

*Wyoming Outdoor Council*, 164 IBLA 84 (2004) ....................42

*Wyoming Outdoor Council*, *et al.*, No. IBLA 2006-155 (June 28, 2006) ....................42

**GLOSSARY OF ACRONYMS AND ABBREVIATIONS**

| | |
|---|---|
| APA | Administrative Procedure Act |
| APD | Applications for a Permit to Drill |
| AR | Administrative Record |
| ARPA | Atlantic Rim Project Area |
| Atlantic Rim Project or Project | Atlantic Rim Natural Gas Field Development Project |
| BLM | Bureau of Land Management |
| BMP | Best Management Practice |
| CBM | Coalbed Methane |
| CBNG | Coalbed Natural Gas |
| CEQ | Council on Environmental Quality |
| CIA | Cumulative Impact Analysis |
| COA | Condition of Approval |
| CWR | Crucial Winter Range |
| DEIS | Draft Environmental Impact Statement |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| EPA | Environmental Protection Agency |
| FEIS | Final Environmental Impact Statement |
| FLPMA | Federal Land Policy and Management Act |
| FWS | U.S. Fish and Wildlife Service |
| GDRA | Great Divide Resource Area |

| | |
|---|---|
| Great Divide RMP | Record of Decision and Approved Resource Management Plan for the Great Divide Resource Area |
| IBLA | Interior Board of Land Appeals |
| NEPA | National Environmental Policy Act |
| NRDC | Natural Resources Defense Council |
| NOI | Notice of Intent |
| NSD | No Surface Disturbance |
| NSO | No Surface Occupancy |
| PEDCO | Petroleum Development Corporation |
| PEIS | Programmatic Environmental Impact Statement |
| POD | Plan of Development |
| RFD | Reasonably Foreseeable Development |
| RFFA | Reasonably Foreseeable Future Activity |
| RFO | Rawlins Field Office, BLM |
| RMG | BLM Wyoming State Office Reservoir Management Group |
| RMP | Resource Management Plan |
| ROD | Record of Decision |
| ROW | Right of Way |
| TRCP | Theodore Roosevelt Conservation Partnership |
| WGFD | Wyoming Game and Fish Department |
| Wind EIS | Final Environmental Impact Statement on Wind Energy Development on Bureau of Land Management-Administered Lands in the Western United States |

## INTRODUCTION

This case involves a challenge to a decision by the Bureau of Land Management ("BLM") to authorize the Atlantic Rim Natural Gas Development Project ("Atlantic Rim Project" or "Project"), which would develop coalbed natural gas ("CBNG") (also referred to as coalbed methane ("CBM")) in an area of Wyoming known as the Atlantic Rim Project Area ("ARPA"). Plaintiff Theodore Roosevelt Conservation Partnership ("TRCP") challenges this decision under the National Environmental Policy Act ("NEPA") and the Federal Land Policy and Management Act ("FLPMA").

BLM is responsible for managing approximately 258 million acres of federal surface estate and 700 million acres of federal subsurface mineral estate pursuant to its authority under FLPMA, among other statutes. Congress has declared development of domestic minerals, including natural gas, to be a continuing policy of the United States. 30 U.S.C. § 21a. FLPMA and the Mineral Leasing Act of 1920 promote mineral exploration and production, including natural gas development, as principal uses of the federal public lands. 30 U.S.C. § 182; 43 U.S.C §§ 1701(a)(12), 1702(l). Development of domestic oil and gas resources is consistent with this country's energy policy to reduce our dependence on foreign sources of oil and gas.

BLM's Rawlins Field Office ("RFO") manages an area within Wyoming known as the Great Divide Resource Area ("GDRA"). The GDRA consists of approximately 4 million acres of federal surface estate and 5 million acres of federal mineral estate. The ARPA, which falls within the GDRA, consists of approximately 270,080 total surface acres (federal, state, and private), of which 173,672 acres is federal surface estate and 179,438 is federal mineral estate.

The federal lands within the ARPA fall under the Resource Management Plan ("RMP") for the GDRA. Consistent with the RMP, BLM issued oil and gas leases throughout the ARPA.[1]

In 2001, various leaseholders proposed development of CBNG in the ARPA, which proposal ultimately became the Atlantic Rim Project. BLM's analysis pursuant to NEPA of the potential environmental impacts of the Atlantic Rim Project took over six years to complete and provided numerous opportunities for public participation. This effort culminated in a March 23, 2007 Record of Decision ("ROD"), which authorized a project with substantially reduced development and environmental impacts when compared to the proposed action. The ROD imposed numerous requirements on the Project to limit potential impacts to the extent possible, including a surface disturbance cap, mitigation measures and adaptive management to monitor environmental impacts, and ongoing interim reclamation of the areas disturbed. BLM will continue to conduct site-specific environmental reviews for specific plans of development ("PODs") prior to any surface disturbing operations.

TRCP's challenges of these decisions are reviewed under the Administrative Procedure Act ("APA") and are based on the whole record before the agency at the time it made the decision. TRCP, however, attempts to rely on selective statements and partial excerpts from the record, often taken out of context, in its effort to have this Court find BLM's actions arbitrary and capricious.[2] Such attempts were recently rejected by the Supreme Court, which reaffirmed that selectively highlighting potentially inconsistent discrete statements in the record is

---

[1] The ARPA contains approximately 0.067% of the surface estate and 0.026% of the mineral estate under BLM's jurisdiction.

[2] TRCP's 65-page statement of facts and 45-page brief also include numerous citations to extra-record evidence. In conjunction with their cross-motion and opposition to TRCP's motion for summary judgment, Defendant-Intervenors Anadarko Petroleum Corporation ("Anadarko"), Warren Resources, Inc. ("Warren"), and Double Eagle Petroleum Co. ("Double Eagle") have submitted a motion to strike the extra-record evidence relied on by TRCP, and the discussions and arguments based on that evidence.

insufficient to render an agency's decision arbitrary and capricious. *See Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 127 S. Ct. 2518, 2530 (2007).

TRCP's NEPA and FLPMA challenges merely reflect its disagreement with BLM's decision to allow CBNG development in the ARPA. NEPA, however, does not dictate any particular outcome, but only requires BLM to consider a proposed action's potential environmental impacts. The record in this case, compiled over a six-year period, amply demonstrates BLM's compliance with its NEPA obligations. Further, BLM's approval of the Atlantic Rim Project was consistent with BLM's FLPMA obligations and the Great Divide RMP.

## FACTUAL BACKGROUND

### 1.    The Great Divide Resource Area Resource Management Plan

In November 1990, BLM issued the Record of Decision and Approved Resource Management Plan for the GDRA ("Great Divide RMP"). AR645. The Great Divide RMP provides for the "sustained multiple use management" of approximately 4 million acres of public land surface and 5 million acres of federal mineral estate administered by BLM in the GDRA. AR651-AR652 (*Id.* at 2-3). The Great Divide RMP opened the entire planning area within the GDRA to oil and gas leasing, subject to protections for various resources, including sage grouse leks and big game crucial winter range ("CWR"). AR679-AR681 (*Id.* at 30-32). Pursuant to its authority under the RMP, BLM leased federal minerals within the entire ARPA. AR2135, AR2174 (FEIS at 1-8, 3-10).

In 2000, Stone & Wolf made a proposal to BLM for a CBNG exploration project to evaluate the feasibility of producing CBNG in the ARPA. AR7461 (BLM Press Release). BLM did not plan a "cursory environmental review" of the project (TRCP Mem. in Support of Mot. for Summ. J. ("TRCP Mem.") at 5), but intended to prepare an environmental assessment ("EA"), which "may be advanced to the environmental impact statement (EIS) level." AR7461. BLM

also noted that: "If the exploratory project is deemed successful, any development plans beyond the scope of the EA would require additional environmental analysis." *Id.* Stone & Wolf then sold its operating rights, and the new owners, including Petroleum Development Corp. ("PEDCO"), withdrew this proposal. AR7633 (Scoping Statement at 1); AR2128 (FEIS at 1-1).

On July 5, 2001, BLM determined that the Great Divide RMP needed revisions. AR747 (Rawlins DEIS at 1-7). On February 25, 2002, BLM published a notice of intent ("NOI") to revise the Great Divide RMP. AR745 (Rawlins DEIS at 1-3). In the NOI, BLM noted that the "existing Great Divide RMP will continue to guide management actions and decisions for the Rawlins Field Office until the RMP revision is completed."[3] AR8015 (67 Fed. Reg. 8701, 8701 (Feb. 25, 2002)). *See also* AR747 (Rawlins DEIS at 1-6).

**2. The Atlantic Rim Project and the History of the NEPA Process**

PEDCO, which acquired lease holdings in addition to those of Stone & Wolf, and other operators approached BLM regarding CBNG operations in the ARPA. AR7865 (Meeting Notes); AR7633 (Scoping Statement at 1). On May 24, 2001, the operators, which now include Anadarko, Warren and Double Eagle, submitted a proposal to BLM to explore and develop CBNG resources located in the ARPA under their lease holdings, which became the Atlantic Rim Project. AR2128 (FEIS at 1-1). A maximum of 3,880 CBNG wells -- developed within approximately 310,335 acres of federal, state and private lands using 80-acre spacing -- was proposed in order to efficiently recover the natural gas resources. *Id.*; AR9483 (66 Fed. Reg. 33,975 (June 26, 2001)). In June of 2001, BLM initiated its environmental review of the Atlantic

[3] As BLM has explained: "The Great Divide Resource Management Plan was signed in 1990, and the data and analysis on which the decisions were based are approximately 15 years old. Many decisions are still valid and are not expected to change; however, the environmental impact statement (EIS) analysis on which the decisions are based is in need of update." AR7923 (Congressional briefing).

Rim Project pursuant to NEPA, and provided notice to the public that it was going to prepare an EIS.[4]  AR7632 (Dear Reader Letter);  AR9483-AR9484 (66 Fed. Reg. 33,975-76).

While the EIS was being prepared for the proposed project, BLM developed an interim drilling policy to allow the operators to conduct exploratory drilling to obtain geologic information needed for the Atlantic Rim EIS.  AR2131-AR2132 (FEIS at 1-4 to 1-5).  Extensive EAs were completed for this drilling activity.  AR2132 (FEIS at 1-5).  Based on the interim drilling, the proposed project was reduced from 3880 wells to 2000 wells (1800 CBNG and 200 conventional natural gas) (the "Proposed Action").  AR8141 (Draft Briefing Paper, 6/7/2004).  In February of 2005, the boundary of the ARPA was redrawn, reducing the size of the project area by approximately 40,000 acres.  AR2132 (FEIS at 1-5).

Over four years after announcing its intent to prepare an EIS for the Atlantic Rim Project, BLM released a Draft EIS in December of 2005.  AR2141 (FEIS at 1-14).  The Draft EIS noted the purpose of the project was to drill for, remove and sell natural gas resources, recognizing the importance of developing domestic energy sources.  AR1443, AR1478 (DEIS at S-1, 1-5).

The Draft EIS considered four alternatives in detail, including (1) the Proposed Action, (2) the No Action Alternative (Alternative A), (3) Alternative B, which would have the same number and spacing of wells as in the Proposed Action, but would be developed in three phases occurring over 6-7 years each ("Phased Development"), and (4) Alternative C, which would condition the Proposed Action on the application of required development protection measures, resulting in fewer acres of disturbance and reduced road density ("Spatial Development").[5]

---

[4]  Throughout its brief, TRCP refers to the EIS as being prepared by the Operators' "consultant" or Operators' "contractor."  As TRCP should know, Council on Environmental Quality ("CEQ") regulations clearly require that the NEPA EIS contractor be chosen by and be under the direction of the federal agency.  40 C.F.R. § 1506.5(c). The record reflects this was done here.  AR8097.

[5]  During development of alternatives for consideration in the Draft EIS, BLM identified four alternatives -- the Proposed Action, No Action, the Sequential or Phased Alternative, and the Spatial Alternative.  AR8275 (meeting notes).  In the EIS, the "Phased Alternative" (also referred to as "temporal") became Alternative B while the

AR1444-AR1445; AR1489-AR1493 (DEIS at S-3 to S-4, 2-2 to 2-6). The Draft EIS considered the potential impacts of each alternative. *See, e.g.*, AR1446-AR1449; AR1497-AR1510 (DEIS at S-4 to S-7, 2-10 to 2-23). BLM's preferred alternative in the Draft EIS was a combination of Alternatives B and C, although BLM noted the Final EIS may include a different preferred alternative "to provide the best mix of operational requirements and mitigation best management practices to reduce environmental harm." AR1449-AR1450 (DEIS at S-7 to S-8).

The Final FEIS was noticed in the Federal Register on December 1, 2006. AR9564 (71 Fed. Reg. 69,582 (Dec. 1, 2006)). The Final EIS again identified the purpose of and need for the project "to develop, produce, and market natural gas products" consistent with the Nation's energy policy. AR2136 (FEIS at 1-9). The Final EIS reviewed potential impacts to geology/minerals/paleontology, air quality, soils, surface water resources, groundwater, range and other land uses, vegetation (*e.g.*, erosion and runoff, long-term loss of shrubs), wildlife, recreation, visual resources, cultural resources, socioeconomics, transportation, health and safety, and noise. *See generally* AR2090-AR2094, AR2165 (FEIS at ES-3 to ES-7, 3-1). BLM also analyzed cumulative impacts on these resources, considering the Atlantic Rim Project with current and reasonably foreseeable projects. AR2482-AR2508 (FEIS, Ch. 5).

In the Final EIS, BLM identified "a range of alternatives based on issues, concerns, and opportunities raised in public comments to project scoping and the Draft EIS, interdisciplinary interaction between resource professionals, and collaboration with cooperating and interested agencies." AR2149 (FEIS at 2-1). BLM also reviewed numerous mitigation measures. *See, e.g.*, *NRDC v. Kempthorne*, 525 F. Supp. 2d 115, 121 (D.D.C. 2007); AR2617-AR2632,

---

"Spatial Alternative" (also referred to as "special protection of sensitive resources") became Alternative C. AR4439, AR4778 (FEIS at O-43, O-383). Alternative C, in the Draft EIS and the Final EIS, included spacing requirements as development protection measures, including generally limiting spacing to 4 wells per section (160-acre spacing). AR1491-AR1493 (DEIS at 2-4 to 2-6); AR2151-AR2155 (FEIS at 2-3 to 2-7).

AR3081-AR3096, AR3097-AR3108, AR3109-AR3121, AR3122-AR3147, AR3148-AR3162 (FEIS, App. E, H, I, J, K, L).

The Final EIS retained the alternatives reviewed in detail in the Draft EIS, including Alternative C, placed Alternative B (despite its in-depth consideration in the Draft EIS) in the section of Alternatives Considered and Eliminated from Detailed Study, and added Alternative D, which would minimize surface disturbance while optimizing natural gas recovery.  AR2089, AR2149-AR2161 (FEIS at ES-2, 2-1 to 2-13).  BLM noted that "[s]ignificant effects were expected under [Alternative B] upon several resources, including wildlife, soils and range."[6] AR2160 (FEIS at 2-12); AR4809 (ROD at 14).  BLM eliminated Alternative B "from further detailed study in the Final EIS based on comments received on the Draft EIS, the effects of long delays on allowable oil and gas development to leaseholders and mineral rights, and the policy that BLM will allow reasonable access across federal lands for mineral development on private and state lands."  AR2161 (FEIS at 2-13).  BLM identified Alternative D as the Preferred Alternative following public comment and in response to issues identified in the scoping process. AR2147 (FEIS at 1-20).

On March 23, 2007, BLM signed the Atlantic Rim ROD, authorizing Alternative D, which limited total new surface disturbance from the drilling program across the ARPA to a maximum of 7,600 acres at any given time.  AR4796, AR4817 (ROD at 1, 22).  The Atlantic Rim Project is expected to produce nearly 1,350 billion cubic feet of natural gas, providing enough natural gas to heat 19.3 million homes for one year.  AR4796 (ROD at 1).

---

[6] In the Draft EIS, BLM found that the Proposed Action and Alternative B (the Phased Development Alternative) would have similar impacts:  "Surface disturbance amounts, both long term and short term, are envisioned to be similar under the Proposed Action and Alternative B.  Reclamation timing and amounts, including short term, interim, and long term would also be similar for both alternatives."  AR1494 (DEIS at 2-7).

The ROD provides for the application of site-specific mitigation measures to minimize surface disturbance through appropriate conditions of approval ("COAs"), best management practices ("BMPs"), and other measures deemed necessary. AR4807, A4816, AR4835-AR4855, AR4859-AR4863 (ROD at 12, 21, App. B, App. C). BLM also required annual planning between BLM and the operators. AR4807 (ROD at 12). Operators further must engage in monitoring "to measure the degree of success the performance requirements have in achieving Performance Goals." AR4863 (ROD at B-2). Operators must also adopt additional mitigation or adaptive management techniques to achieve the Performance Goals where needed. *Id.* The ROD also included a Reclamation Plan that outlines criteria for reclamation of the disturbed areas. AR4822-AR4833 (ROD, App. A).

Because the ROD itself does not authorize drilling, operators are required to submit applications for permit to drill ("APDs"), prior to beginning any on-the-ground activities. AR4798 (ROD at 3). APDs for individual wells are often submitted in groups, or PODs. *See, e.g.*, AR73493-AR73494 (Catalina A&B EA at 2-3). BLM has approved PODs located in the Catalina and Sun Dog Units. AR73502 (Catalina A&B EA/DR); AR74073 (Sun Dog A&B EA/DR). For each POD, BLM prepared an EA, which was tiered to the Atlantic Rim EIS. AR73492 (Catalina A&B EA); AR74063 (Sun Dog A&B EA); 40 C.F.R. § 1502.20. Based on site inspections, the EAs for the PODs identify and implement the mitigation measures deemed necessary, which are also incorporated into COAs. AR73496, AR73499-AR73500 (Catalina A&B EA at 5, 8-9); AR74066, AR74069-AR74071 (Sun Dog A&B EA at 4, 7-9); AR74074-AR74091 (Sun Dog A&B); AR73506-AR73517 (Catalina A&B). The EAs concluded "the impacts are not expected to be significant, and that an EIS is not required." AR73502 (Catalina A&B EA/DR at 11); AR74073 (Sun Dog A&B EA/DR at 11).

**3. Procedural History - Administrative Appeal**

Following release of the ROD, TRCP sought an administrative appeal of the Atlantic Rim ROD before the Interior Board of Land Appeals ("IBLA"). *Theodore Roosevelt Conservation P'ship, et al.*, No. IBLA 2007-208, *et al*. (Sept. 5, 2007), at 1 ("IBLA Decision") (Ex. 1). TRCP also sought a stay of any actions under the ROD, which was denied by the IBLA on September 5, 2007. *Id.* at 2. The IBLA found that TRCP "failed to justify staying the effect of the ROD because [it has] failed to show a likelihood of success on the merits of [its] arguments that BLM erred in issuing the ROD." *Id.* at 11.

In particular, the IBLA found that TRCP was not likely to succeed in establishing that BLM failed to give adequate consideration to the likely cumulative impacts of the Project or that BLM failed to give adequate consideration to mitigation measures. *Id.* at 15, 21. The IBLA also rejected TRCP's claim that BLM erred in dropping Alternative B from detailed study in the Final EIS, finding that "delay in lease development for 7 to 14 years, which was contemplated under Alternative B, conflicts with the purpose of the Proposed Action to permit such development." *Id.* at 19. The IBLA found no violation of the multiple-use mandate under FLPMA, concluding that "[s]election of one use of the public lands over another competing use, even when the selected use will adversely affect a competing use, is not a violation of BLM's FLPMA multiple-use mandate." *Id.* at 22. Finally, the IBLA found no violation of FLPMA's land use plan conformance requirement, noting that, while exceeding the Reasonably Foreseeable Development ("RFD") scenario in an RMP may require further environmental analysis, such analysis was completed in the Draft EIS and Final EIS. *Id.* TRCP subsequently withdrew its appeal.

TRCP also sought administrative appeals of the EA for Sun Dog PODs A&B, which were denied based on litigation pending before this Court (Case No. 07-1709). Pl.'s Statement

of Material Facts in Support of Mot. for Summ. J. ("TRCP SOF") ¶¶228-231. On April 7, 2008, TRCP amended its complaint to include claims related to the EAs for Sun Dog PODs A&B and Catalina PODs A&B. Docket No. 36.

**ARGUMENT**

**I. Standard of Review**

Judicial review of agency actions under NEPA and FLPMA is governed by the APA. Under the APA, an agency's decision will not be set aside unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see also Sierra Club v. U.S. Dep't of Transp.*, 753 F.2d 120, 126 (D.C. Cir. 1985). As the D.C. Circuit recently reiterated, the arbitrary and capricious standard grants the agency substantial deference:

> "[An agency] typically has wide latitude in determining the extent of data-gathering necessary to solve a problem. We generally defer to an agency's decision to proceed on the basis of imperfect scientific information, rather than to invest the resources to conduct the perfect study." . . . In other words, the sole question before us is whether [the agency] has acted reasonably, not whether it has acted flawlessly.

*NRDC v. EPA*, --- F.3d ----, 2008 WL 2310951, at *8 (D.C. Cir. 2008) (citation omitted).

Under the APA, "[r]eview of agency action 'is to be based on the full administrative record that was before the [agency] at the time [it] made [its] decision." *Ad Hoc Metals Coal. v. Whitman*, 227 F. Supp. 2d 134, 136 (D.D.C. 2002) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971)) (alterations in original). Limiting judicial review to the record comports with the well-established rule that the court should not substitute its judgment for that of the agency. *Citizens to Preserve Overton Park*, 401 U.S. at 416. *See also Camp v. Pitts*, 411 U.S. 138, 142 (1973) ("[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing

court."). Consistent with a reviewing court's obligation to consider the whole record, the U.S. Supreme Court has made clear that preliminary statements by agency staff are irrelevant:

> With regard to the various statements made by the involved agencies' regional offices during the early stages of consideration, the only "inconsistency" respondents can point to is the fact that the agencies changed their minds -- something that, as long as the proper procedures were followed, they were fully entitled to do. The federal courts ordinarily are empowered to review only an agency's *final* action, see 5 U.S.C. § 704, and the fact that a preliminary determination by a local agency representative is later overruled at a higher level within the agency does not render the decisionmaking process arbitrary and capricious.

*Nat'l Ass'n of Home Builders*, 127 S. Ct. at 2530 (emphasis in original).

Moreover, a plaintiff cannot merely "baldly assert[], without supporting proof or evidence, that significant effects will accompany a proposed action -- particularly when such assertion is made without even addressing or confronting the detailed and comprehensive analyses and studies compiled by the agency which arrive at the contrary conclusion." *Twp. of Lower Alloways Creek v. Pub. Serv. Elec. & Gas Co.*, 687 F.2d 732, 747 (3rd Cir. 1982). *See also Vt. Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 553-54 (1978).

## II. BLM's Atlantic Rim EIS and Specific POD EAs Satisfy the Requirements of NEPA.

### A. BLM Took a "Hard Look" at the Environmental Impacts of the Atlantic Rim Project and Individual PODs.

NEPA's requirements are "essentially procedural": "As long as the agency's decision is 'fully informed' and 'well-considered,' it is entitled to judicial deference, and a court must not substitute its own policy judgment for that of the agency." *S. Utah Wilderness Alliance v. Norton*, 237 F. Supp. 2d 48, 52 (D.D.C. 2002) (quoting *N. Slope Borough v. Andrus*, 642 F.2d 589, 599 (D.C. Cir. 1980)). "The NEPA process 'involves an almost endless series of judgment calls' and the line-drawing decisions 'are vested in the agencies, not the courts.'" *NRDC*, 525 F.

Supp. 2d at 123 (quoting *Coal. on Sensible Transp., Inc. v. Dole*, 826 F.2d 60, 66 (D.C. Cir. 1987)). *See also Fund for Animals v. Hall*, 448 F. Supp. 2d 127, 132 (D.D.C. 2006). BLM's consideration of the potential environmental consequences of the Atlantic Rim Project complied with NEPA. Pursuant to NEPA, BLM prepared an EIS that fully explored the potential environmental issues pertaining to the project as a whole, but left to individual permit decisions (and EAs prepared in connection with those decisions) consideration of the site-specific issues.

In the Atlantic Rim EIS, BLM identified the critical environmental elements and then analyzed whether they would be potentially affected by the proposed project. *See generally* AR2165 (FEIS at 3-1). BLM reviewed these effects in light of each proposed alternative, which were developed based on public comments, interdisciplinary interaction between resource professionals, and collaboration with cooperating and interested agencies. AR2149 (FEIS at 2-1). *See generally* AR2090-AR2094 (FEIS at ES-3 to ES-7). BLM also considered cumulative impacts of the Proposed Action with past, existing, and Reasonably Foreseeable Future Activity ("RFFA") on the identified environmental resources. AR2482-AR2508 (FEIS, Ch. 5). Finally, BLM considered numerous mitigation measures in an attempt to minimize these impacts in the context of the alternatives reviewed. *See NRDC*, 525 F. Supp. 2d at 121-22.

In the end, BLM selected Alternative D -- an alternative designed to reduce the potential environmental impacts to the extent practicable, while still allowing energy development. Thus, BLM took the required "hard look" and adequately considered the environmental impacts of the project. BLM recognized that the project required "surface-disturbing activities that are likely to result in major adverse impacts to certain resource values, as outlined in the FEIS." AR4799 (ROD at 4). Nonetheless, BLM concluded its decision "will result in production of nationally

significant natural gas resources consistent with the National Energy Policy (May 2001) and the National Energy Policy Act of 2005." *Id.* NEPA requires no more.

For each specific POD that has been proposed, BLM tiered its environmental review to the Atlantic Rim EIS. Consistent with the "tiering" approach, BLM left some decisions concerning site-specific environmental issues to the individual POD determinations and EAs. BLM's approach reflects the CEQ regulations that encourage agencies to adopt a "tiering" approach, under which an EIS is prepared for a broad project and the subsequent EAs for particular actions taken as part of the project "concentrate on the issues specific to the subsequent action." 40 C.F.R. § 1502.20. Numerous judicial decisions have approved this "tiering" approach.[7] For NEPA purposes, the entire environmental review, including the EIS and EAs are to be considered. *N. Plains Res. Council v. Lujan*, 874 F.2d 661, 666 (9th Cir. 1989) ("The EA analyzing the exchange must be read together with the . . . draft and final EIS reports, and all supporting documentation taken as a whole.").

B. BLM Considered a Reasonable Range of Alternatives.

Setting aside for the moment TRCP's mischaracterization of BLM's consideration of alternatives in this case, its argument can be summarized as a simple disagreement over BLM's selected alternative. TRCP, in essence, asserts that BLM should have picked Alternative B, rather than Alternative D. This Court must defer, however, to BLM's reasoned decision, which balanced environmental considerations with energy needs consistent with BLM policy. In

[7] *Nevada v. Dep't of Energy*, 457 F.3d 78, 91-92 (D.C. Cir. 2006) ("The decision whether to prepare a programmatic EIS is committed to the agency's discretion."); *N. Alaska Envtl. Ctr. v. Kempthorne*, 457 F.3d 969, 979 (9th Cir. 2006) (approving this approach where BLM approved a plan to offer long-term oil and gas leases in a portion of northwest Alaska, concluding that "BLM development of more specific mitigating measures cannot be required at this stage"); *Ark. Wildlife Fed'n v. U.S. Army Corps of Eng'rs*, 431 F.3d 1096, 1101-02 (8th Cir. 2005) ("tiering" approach was adequate to consider cumulative impacts); *Cronin v. USDA*, 919 F.2d 439, 447 (7th Cir. 1990) (once an EIS has been issued for a Forest Plan, Forest Service generally is not required to prepare additional EISs for every site-specific project authorized under Forest Plan).

addition, BLM considered a reasonable range of alternatives with respect to the EAs, which are tiered to the EIS.

1. BLM appropriately defined the alternatives based on the purpose and need of the Proposed Action and on its own policies.

BLM developed the alternatives in the EIS based on the purpose of and need for the Project: "The purpose of, and need for, this proposed natural gas development is to develop, produce, and market natural gas products. This natural gas is needed to meet the national domestic energy demand." AR2136 (FEIS at 1-9). TRCP does not dispute BLM's stated purpose and need of the project.[8]

With respect to natural gas development in the ARPA, BLM recognized:

> Exploration and development of federal oil and gas leases by private industry are an integral part of the BLM's oil and gas leasing program under authority of the Mineral Leasing Act of 1920 as amended, the Mining and Minerals Policy Act of 1970, the Federal Land Policy and Management Act of 1976 (FLPMA), the National Materials and Minerals Policy, Research and Development Act of 1980, and the Federal Onshore Oil and Gas Leasing Reform Act of 1987.

AR2135 (FEIS at 1-8). The IBLA has concluded that, once a lease has been issued, "absent a nondiscretionary statutory prohibition against drilling, BLM cannot now deny the right to drill and develop the leasehold. . . . In such cases, BLM is required to fashion mitigation strategies and methods to reduce or eliminate adverse impacts." *Nat'l Wildlife Fed'n*, 150 IBLA 385, 403 (1999). *See also Mobil Oil Exploration & Producing SE, Inc. v. United States*, 530 U.S. 604, 620 (2000) (recognizing contractual rights under oil and gas lease).

BLM developed its alternatives with these policies in mind. While NEPA requires agencies to consider a reasonable range of alternatives, those alternatives are defined by the

[8] Cases cited by TRCP similarly upheld the agency's definition of the purpose and scope. *See, e.g.*, *Nw. Ecosystem Alliance v. Rey*, 380 F. Supp. 2d 1175, 1186-87 (W.D. Wash. 2005).

project's purpose and need, paying particular attention to the objectives of the party making the proposal. *See, e.g.*, *Citizens' Comm. to Save Our Canyons v. U.S. Forest Serv.*, 297 F.3d 1012, 1030 (10th Cir. 2002) ("In determining whether an agency considered reasonable alternatives, courts look closely at the objectives identified in an EIS's purpose and needs statement. . . . Where the action subject to NEPA review is triggered by a proposal or application from a private party, it is appropriate for the agency to give substantial weight to the goals and objectives of that private actor.") (citations omitted); *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 196 (D.C. Cir. 1991) ("An agency is obligated to take the needs and goals of the project applicant in mind when considering alternatives.").

2. BLM analyzed spatial and phased alternatives.

TRCP claims that the EIS is inadequate because the "Spatial" and "Phased" alternatives were "eliminated from study." TRCP Mem. at 14. TRCP's argument is factually wrong, and ignores the analysis of alternatives in the Draft EIS and Final EIS. The record demonstrates BLM analyzed both a spatial alternative and a phased alternative advocated by TRCP. First, contrary to TRCP's claims, Alternative C, also referred to as the spatial alternative, was analyzed in detail in *both* the Draft EIS *and* the Final EIS. *See, e.g.*, AR1491-AR1493 (DEIS at 2-4 to 2-6); AR2151-AR2155 (FEIS at 2-3 to 2-7). And while the Final EIS eliminated the phased alternative (Alternative B) from detailed study, the Draft EIS fully considered Alternative B and its potential environmental impacts. *See, e.g.,* AR1489-AR1491 (DEIS at 2-3 to 2-4); AR4439, AR4790 (FEIS at O-43, O-395). As such, the case here is contrary to *Northern Plains Resource Council v. BLM*, Nos. 03-69 & 03-78, 2005 U.S. Dist. LEXIS 4678 (D. Mont. Feb. 25, 2005), relied on by TRCP, where the plaintiffs challenged the approval of the Final Statewide Oil and Gas EIS and proposed amendments to the RMPs that authorized full-field CBNG development in the Powder River and Billings Resource Areas of Montana. *Id.* at *6. In that case, BLM

asserted that full-field development was required by the leases issued. *Id.* at *29. The district court rejected that reasoning, finding that the leases at issue only provided for exploratory drilling and small-scale development of CBNG and the purpose of the EIS was to "expand the rights of the lessees to allow them to develop CBM resources on a larger scale than permitted under the 1994 [RMP] Amendment." *Id.* at *25-26. Hence, the district court found in that case, under the facts presented there, that a phased development was consistent with the purpose and need of the EIS.[9] *Id.* at 28-29.

Here, the proposal at issue was for a specific development of up to 2,000 wells pursuant to *existing leases* issued by BLM. And, while BLM considered a "phased" alternative (Alternative B) in detail in the Draft EIS, BLM determined that this alternative did not meet the purpose and need of the project. AR2160-AR2161 (FEIS at 2-12 to 2-13); AR4809 (ROD at 14). Thus, Alternative B was "eliminated from *further* detailed study in the Final EIS," AR2161 (FEIS at 2-13) (emphasis added).

CEQ regulations do not require that BLM retain all alternatives from the Draft EIS, but only that an agency "briefly discuss" its reasons for eliminating an alternative from additional study. 40 C.F.R. § 1502.14. BLM did so here:

> Comments received from the companies objected to the extended delay to their ability to develop their leases in those areas not open to development activities for 7 to 14 years. In addition comments pointed out the implication that BLM would not approve rights-of-way proposals for the development of private and state oil and gas development within the closed areas conflicts with BLM policy (BLM Manual, Part 2800.06 'Policy' (D)) to allow owners of non-federal lands surrounded by public lands managed under FLPMA

[9] In *Northern Cheyenne Tribe v. Norton*, 503 F.3d 836 (9th Cir. 2007), the U.S. Court of Appeals for the Ninth Circuit affirmed the injunctive relief granted by the district court, which, despite finding BLM failed to consider a phased alternative, did not prohibit all actions pending NEPA compliance. TRCP cites to the dissenting opinion in that case, which would have preserved the status quo based on 40 C.F.R. § 1506.1, even though the majority rejected the dissenting judge's rationale, noting that the NEPA limitation on actions "is not without qualification" where 40 C.F.R. § 1506.1 "expressly *allows* even 'major Federal action' where criteria are satisfied." *Id.* at 844 n.30 (quoting 40 C.F.R. § 1506.1(c) and *ONRC Action v. BLM*, 150 F.3d 1132, 1138 (9th Cir. 1998)) (emphasis in original).

> that would provide for the reasonable use and enjoyment of the non-federal land. A large portion of the project area is located in so-called "checkerboard" ownership pattern of alternating federal and private / state lands where access to such lands requires federal rights-of-way approval for access.

AR2160-AR2161 (FEIS at 2-12 to 2-13). Thus, BLM determined Alternative B was not consistent with BLM policy and, thus, was not reasonable. *Id.*; AR4789 (FEIS at O-394) ("Alternative B . . . would limit development to about 33 percent of the Atlantic Rim Project Area at any one time."). *See, e.g., Hells Canyon Alliance v. U.S. Forest Serv.*, 227 F.3d 1170, 1181 (9th Cir. 2000) (finding agency "had no obligation to consider an alternative unlikely to be implemented and inconsistent with basic policy objectives for managing the area"); *N. Plains Res. Council*, 2005 U.S. Dist. LEXIS 4678, at *17-18 ("Alternatives that are remote, speculative, ineffective, *or inconsistent with basic policy objectives need not be considered.*") (citation omitted) (emphasis added). TRCP cites to no evidence or authority to dispute BLM's findings.[10]

Second, TRCP inaccurately asserts that the "only reason the Spatial and Phased alternatives were eliminated from study is because the Operators did not appreciate the delay and restrictions accompanying them." TRCP Mem. at 14. Again, the spatial alternative (Alternative C) was not eliminated from study, but remained in the Final EIS. Moreover, BLM explained its justifications for not continuing its detailed analysis of the phased alternative (Alternative B):

> Alternative B was eliminated from further detailed study in the Final EIS based on comments received on the Draft EIS, the effects of long delays on allowable oil and gas development to leaseholders and mineral rights, and the policy that BLM will allow reasonable access across federal lands for mineral development on private and state lands.

[10] TRCP references a Memorandum of Understanding between BLM and the Operators for preparation of the EIS, noting it "effectively eliminated Alternatives B and C." TRCP SOF ¶114. The document cited in SOF ¶114, however, is a draft and, moreover, requires that the NEPA analysis include a "reasonable range of alternatives." AR8401-AR8402. Thus, TRCP provides no support for its argument that the Operators restricted BLM's consideration of alternatives.

AR2161 (FEIS at 2-13). Thus, TRCP's unsupported allegations that the phased alternative was eliminated solely at the Operators' behest is belied by record evidence to the contrary. BLM clearly explained its reasons for not carrying Alternative B through in the Final EIS.

In any event, the effects of Alternative B were found to be largely the same as the Proposed Action. AR1497-AR1510 (DEIS at 2-10 to 2-23). While early discussions on alternatives noted that Alternative B may provide a "safe haven for wildlife," TRCP SOF ¶92, BLM's detailed analysis in the Draft EIS subsequently determined that such safe havens were speculative:

> [T]his phased approach would potentially provide "safe-haven" areas in two thirds of the project area during the development phases of the ARPA. However, this does not take into account that those areas would be already occupied, may be of lower quality or not be suitable, or may not be available due to migration distances or potential barriers. They may not provide enough habitat for the areas lost.

AR1704-AR1705 (DEIS at 4-69 to 4-70). BLM also found that "[s]ignificant effects were expected under [Alternative B] upon several resources including wildlife, soils and range." AR2160 (FEIS at 2-12). In particular, BLM found that impacts on hunting, sage grouse and the pronghorn would be significant under all the action alternatives reviewed in the Draft EIS. AR1731-AR1732; AR1705; AR4576. Thus, eliminating Alternative B from detailed study in the Final EIS did not result in an uninformed decision by BLM.

With respect to BLM's decision not to select Alternative C, evidence in the record shows that Alternative C would not have met the purpose and need because it would have effectively limited development in many areas to 160-acre well spacing. *See, e.g.*, AR4442, AR4712 (FEIS at O-46, O-317). Interim drilling results, consultation with the project proponents, and analysis from the Reservoir Management Group ("RMG"), an office within BLM, indicated that 80-well

spacing would generally be required to develop oil and gas in the ARPA efficiently, and that 160-acre well spacing would result in less recovery. *See, e.g.*, AR4564-AR4566, AR4431, AR4407 (FEIS at O-168-O-170, O-35, O-11). The RMG's analysis concluded that: "160-acre well spacing for CBNG development in the Atlantic Rim Area (AR Area) is possible only under very special geologic conditions. As a general rule, existing production data suggests that 80-acre well spacing is the best standard well spacing. It is the local geologic setting that must be considered." AR8204 (RMG 2005 Report at 1). *See also* AR8206 (*Id.* at 3) ("A well-spacing area of 160 acres may be too large and may compromise the full exploitation of the CBNG resources the AR Area."); AR8525 (RMG 2006 Report) ("The AR wells should be spaced at 80 acres (or less) to permit economic operations and conservation of the CBNG resources."). Hence, the record supports BLM's rejection of Alternative C.

Finally, BLM justified its decision to select Alternative D, which balanced energy needs with environmental considerations by limiting "the amount of surface disturbance which can occur in the ARPA at a given time providing an incentive to achieve successful interim reclamation." AR4404 (FEIS at O-8); AR4799-AR4801 (ROD at 4-6). Alternative D was developed in response to public comments and the analysis developed by RMG. AR4432, AR4443, AR4408 (FEIS at O-36, O-47, O-12). Cooperating agencies also were consulted and reviewed the revisions. AR4652 (FEIS at O-257). Thus, BLM's choice of Alternative D is reasonable and is supported by the evidence in the record.

3. The EAs properly tiered to the EIS regarding alternatives.

TRCP also claims that the EAs were unreasonably limited to two alternatives -- the proposed POD and no action. TRCP ignores, however, that the EAs were tiered to the Atlantic Rim EIS. *See Hells Canyon Alliance*, 227 F.3d at 1185 (finding "'range of alternatives' jurisprudence" not applicable to case challenging alternatives considered in EA where agency

"included an appropriate range of alternatives in the FEIS"). *Compare Envtl. Prot. Info. Ctr. v. U.S. Forest Serv.*, 234 Fed. Appx. 440 (9th Cir. 2007) (finding, in case where no EIS was conducted, no action and preferred action alternatives discussion in EA insufficient); *Curry v. U.S. Forest Serv.*, 988 F. Supp. 541 (W.D. Pa. 1997) (same), *with Mo. Mining, Inc. v. I.C.C.*, 33 F.3d 980, 984 (8th Cir. 1994) ("Because the EA concluded that the proposed rail line would have a minimal environmental effect, the range of alternatives that the Commission needed to consider was narrow."). As described above, the EIS considered several alternatives, based on the results of the interim drilling and comments received. The EAs similarly expressed the purpose and need of the proposed PODs to be producing natural gas, consistent with U.S. energy policy to increase domestic sources of energy, promoting the environmental advantages of burning natural gas as emphasized in the Clean Air Act amendments of 1990, and allowing the leaseholder to exercise lease rights to explore and develop oil gas resources within the project lease areas. AR73494 (Catalina A & B at 3); AR74065 (Sun Dog A & B at 3). While TRCP attacks BLM's range of alternatives, it suggests no specific additional alternative that BLM should have considered for any particular POD, which would meet the purpose and need of the PODs. Given BLM's careful consideration of alternatives in the EIS, BLM was not unreasonable to focus on two alternatives in the EA.

C. BLM Appropriately Analyzed Potential Impacts to Wildlife Species.

BLM analyzed the potential cumulative impacts of oil and gas operations in the ARPA. Cumulative impacts are "impact[s] on the environment which result[s] from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions." 40 C.F.R. § 1508.7. In Chapter 5 of the EIS, BLM specifically identified the potential cumulative impacts of operations to a variety of resources including: geology and paleontology; climate and air quality; soils; water resources; vegetation and wetlands; range resources; wildlife

and fish; recreation resources; visual resources; cultural resource; socioeconomics; transportations; health and safety; and noise. AR1792-AR1814, AR2483-AR2508. These potential impacts considered past, existing, and reasonably foreseeable future actions, as required by 40 C.F.R. § 1508.7, including those located in (a) the ARPA, (b) the Southeastern Sweetwater County/Southwestern Carbon County cumulative impact analysis ("CIA") area, (c) the Watershed CIA area, and (d) the Regional CIA area. AR2483.

In particular, the Atlantic Rim EIS contains a discussion of how the Atlantic Rim Project relates to and interacts with other oil and gas projects in the region. AR2138, AR2484-AR2485 (FEIS, at M-5 (map of other projects in vicinity of ARPA), 5-2 to 5-3). BLM's cumulative impact analysis was more than adequate to allow an informed decision.

        1.     BLM adequately analyzed the potential cumulative impacts of the Atlantic Rim Project in relation to other projects.

TRCP asserts that BLM failed to consider the potential cumulative impacts of the Atlantic Rim Project with those of theoretical wind development projects in the general vicinity, and bases this argument solely on the Final Environmental Impact Statement on Wind Energy Development on Bureau of Land Management-Administered Lands in the Western United States ("Wind EIS"), which is extra-record evidence. Regardless, TRCP's argument fails.

First, TRCP has not shown this issue was sufficiently raised before BLM. TRCP's comment letter on the Atlantic Rim Final EIS -- TRCP did not submit comments on the Draft EIS -- does not mention wind projects or the potential impacts associated with wind projects. AR10262. The Supreme Court has recognized, in the NEPA context, that it is "incumbent upon intervenors who wish to participate to structure their participation so that it is meaningful, so that it alerts the agency to the intervenors' position and contentions." *Vt. Yankee Nuclear Power Corp.*, 435 U.S. at 553.

> Indeed, administrative proceedings should not be a game or a forum to engage in unjustified obstructionism by making cryptic and obscure reference to matters that "ought to be" considered and then, after failing to do more to bring the matter to the agency's attention, seeking to have the agency determination vacated on the ground that the agency failed to consider matters "forcefully presented."

*Id.* at 553-54. *See also Nevada*, 457 F.3d at 88 (holding that claims are waived if not raised in agency proceeding below). Because TRCP did not "forcefully present" potential impacts with respect to wind projects to the BLM in this case, the Court need not address the issue now.

Second, TRCP ignores that the Wind EIS is a programmatic document designed to develop general policies and BMPs for future wind energy development activities; it neither analyzes nor approves specific wind development projects. "Site specific concerns, and the development of additional mitigation measures, will be addressed in project-level reviews, including NEPA analyses, as required." Ex. 2 (Wind EIS ROD), at 2; Ex. 3 (Wind EIS), at ES-3, 1-3 ("As a programmatic evaluation, this PEIS does not evaluate site-specific issues associated with individual wind energy development projects."), and at ES-4, 2-8 (noting that site-specific NEPA analysis will be performed in conjunction with actual wind energy development proposals).[11] Also, although the Wind EIS and ROD amended several resource management plans to accommodate future wind energy projects, the Great Divide RMP was not among them. *See* Ex. 2 (Wind EIS ROD), at Table B-1, B-12 to B-13.

Hence, any such wind projects are purely speculative at this time. Although the Wind EIS identified portions of Wyoming as having high potential for future wind energy projects, at the time the Atlantic Rim Project was proposed, analyzed, and approved by BLM, no wind development projects in the vicinity of the ARPA had even been proposed. BLM could not have

[11] The ROD is attached as Exhibit 2 and excerpts of the Wind EIS are attached as Exhibit 3. The Wind EIS is available at http://windeis.anl.gov/documents/fpeis/index.cfm.

reasonably anticipated potential cumulative impacts from yet un-proposed wind development projects and the Atlantic Rim Project. As the Supreme Court has found:

> The statute [NEPA], however, speaks solely in terms of Proposed actions; it does not require an agency to consider the possible environmental impacts of less imminent actions when preparing the impact statement on proposed actions. Should contemplated actions later reach the stage of actual proposals, impact statements on them will take into account the effect of their approval upon the existing environment; and the condition of that environment presumably will reflect earlier proposed actions and their effects.

*Kleppe v. Sierra Club*, 427 U.S. 390, 410 n. 20 (1976). "*Kleppe* thus clearly establishes that an EIS need not delve into the possible effects of a hypothetical project, but need only focus on the impact of the particular proposal at issue and other pending or recently approved proposals that might be connected to or act cumulatively with the proposal at issue." *Nat'l Wildlife Fed'n v. FERC*, 912 F.2d 1471, 1478 (D.C. Cir. 1990). Thus, BLM was not required to analyze the potential cumulative impacts of projects not yet proposed.

Third, the Atlantic Rim EIS acknowledges the potential for future wind development projects:

> Other potential developments are also possible, such as coal mining, *wind power development*, and hydropower. Such activities have not been proposed and therefore are not reasonably foreseeable. If these factors change and additional proposals are submitted, assessment under NEPA would likely be required.

AR2483 (emphasis added).

Finally, TRCP falsely states that Anadarko criticized the BLM's analysis in the Wind EIS for failing to consider potential impacts associated with development in the ARPA. TRCP Mem. at 23-24. Anadarko's comments never mention the Atlantic Rim Project or any specific oil and gas or wind projects, but simply ask BLM to consider potential impacts of wind energy projects

on oil and gas activities. BLM's response to Anadarko's comments indicated that such impacts will be analyzed if and when specific wind energy projects are proposed:

> As required by the Wind Development Program proposed policies and BMPs, site-specific analyses will be conducted for any proposed project on BLM-administered lands. . . . Management and development of mineral resources, including conflicts with the proposed wind development project, will be among the issues assessed at the project-specific level.

Ex. 3 (Wind EIS) Vol. III, at 82. Anadarko's comments cannot reasonably be construed as criticizing the BLM's cumulative impacts analysis in the Atlantic Rim EIS.

2. BLM appropriately analyzed the potential impacts to Mule Deer.

TRCP's suggestion that BLM did not prepare and disclose information regarding the existing conditions of mule deer in the ARPA is baseless. In Chapter 3 of the Atlantic Rim EIS, BLM discloses the environmental, social, and economic factors "as they currently exist within the ARPA." AR2165.[12] BLM's analysis includes detailed information regarding the existing condition of mule deer in the ARPA and the potential impacts to mule deer resulting from the approval of the Atlantic Rim Project. AR1581-AR1582, AR1693-AR1700, AR1703, AR1705, AR1707, AR1805-AR1807, AR2248-AR2255, AR2257, AR2387-AR2394, AR2397-AR2402, AR2496-AR2499. This includes information regarding baseline conditions of mule deer, including population numbers, AR2250, AR2254, migration routes, AR2253, and CWR, AR2252, AR2255. The Atlantic Rim EIS also contains information regarding existing habitat concerns with mule deer winter range and the distribution of mule deer range on public and private lands within the vicinity of the ARPA, AR2254, and information regarding overlapping mule deer crucial range and crucial winter range for other species, AR2255, AR2257.

[12] The Atlantic Rim EIS discloses the existing or baseline conditions for a variety of resources including: climate and air quality; soils; water resources; vegetation; range resources; fish and wildlife; special status species; recreation resources; visual resources; cultural resources; socioeconomics; transportation; health and safety; noise; wild horses; and special management areas. AR2165-AR2318.

Hence, the present case is clearly distinguishable from the case cited by TRCP, *Half Moon Bay Fishermans' Mktg. Ass'n v. Carlucci*, 857 F.2d 505, 510 (9th Cir. 1988), in which the Army Corps of Engineers failed to prepare information regarding the physical or biological conditions impacted by the planned dredging and dumping operations. In this case, the BLM prepared detailed information regarding the existing conditions in the ARPA prior to the project approval. Simply because plaintiffs "would have done more" does not render BLM's reasoned analysis arbitrary. *S. Utah Wilderness Alliance v. Norton*, 326 F. Supp. 2d 102, 117 (D.D.C. 2004).

Notwithstanding this baseline analysis, TRCP argues, without support, that BLM also had to consider a recently released, operator-funded study regarding mule deer titled "*Final Report for the Atlantic Rim Mule Deer Study*" prepared by Hall Sawyer. This study was released in April of 2007, after the ROD for the Atlantic Rim EIS was signed (March 23, 2007), but before the ROD was made publicly available (May 21, 2007). AR4817; AR9574; AR7421. The study was funded by two of the operators in the ARPA as "a cooperative effort among agencies and industry to better understand mule deer ecology in the ARPA." AR7423.

To demonstrate a violation of NEPA for inadequate or missing information, however, TRCP must demonstrate (1) the missing information was essential to a reasoned decision between the alternatives, and (2) that the public was unaware of the limitations of the data relied upon by the BLM. *Trout Unlimited v. U.S. Dep't of Agric.*, 320 F. Supp. 2d 1090, 1111 (D. Colo. 2004) (citing *Colo. Envtl. Coal. v. Dombeck*, 185 F.3d 1162, 1172-73 (10th Cir. 1999)); *see also* 40 C.F.R. § 1502.22 (noting the information must be essential to a reasoned decision). TRCP cannot possibly satisfy this burden. Here, BLM engaged in an extensive analysis of baseline mule deer conditions. Moreover, the public was made aware of the ongoing

study, and BLM specifically created a mechanism to incorporate its findings into future operations in the ARPA. As such, TRCP cannot demonstrate essential information was missing, or that the public was unaware.

Although the study was released after the Final EIS was completed and the ROD was signed, BLM was aware of the ongoing mule deer study by Hall Sawyer and incorporated available data from the study into the Atlantic Rim EIS. AR2499 ("Currently, an industry sponsored mule deer study is ongoing. Completion of the first phase of the study has provided BLM and WGFD [(Wyoming Game and Fish Department)] with better information on migration routes."); AR4870 (noting that information from mule deer study will be evaluated and incorporated into wildlife monitoring and mitigation process). BLM also properly disclosed that the final report was not yet available, as required by CEQ regulations, 40 C.F.R. § 1502.22. AR2393, AR2499.

Moreover, the Atlantic Rim ROD expressly provides for the protection of wildlife migration routes in the ARPA. The first Performance Goal adopted in the ROD requires BLM and operators to "maintain functional migration routes through or around development areas." AR4814, AR4836. The second Performance Goal similarly requires BLM and operators to "provide an adequate amount of suitable, undisturbed crucial winter range for big game animals." AR4814. The operators are responsible for demonstrating successful achievement of the Performance Goals in order to have future operations approved. AR4814-AR4816.

BLM further noted that additional mitigation measures may be imposed based on any new information from the mule deer study:

> A research project initiated by the BLM and WGFD in February 2005, funded by two of the operators, should help delineate the migration routes used by mule deer on the ARPA. When information is available from this research, additional mitigation

> will be placed on development for the protection of mule deer migration corridors.

AR2393; AR4870. TRCP ignores that information gained during development operations, including the Sawyer Study, will be utilized and incorporated into BLM's adaptive management for the Atlantic Rim Project. AR4811-AR4816, AR4847-AR4848 (describing procedures for annual review meetings of wildlife specialists to discuss yearly wildlife reports and other studies). In the Atlantic Rim ROD, BLM imposed an annual planning, review, and approval process whereby the operators, BLM, and other cooperating agencies, such as the WGFD, meet annually to discuss proposed operations in the ARPA and design appropriate additional mitigation measures and BMPs for proposed operations based on the most current information regarding habitat conditions, wildlife populations, and reclamation success. AR4811-AR4816. By utilizing this ongoing adaptive management approach, BLM and the operators will be in the best position to protect wildlife and mule deer migration corridors based on continually updated information.

D. The EIS Includes Adequate Mitigation and Monitoring.

TRCP disputes the extensive mitigation measures considered and imposed by BLM for the Atlantic Rim Project. NEPA, however, does not require agencies to mitigate adverse effects and does not require a detailed explanation of the mitigation measures that will actually be employed. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 353 (1989). *See also Citizens Against Burlington, Inc.*, 938 F.2d at 206; *S. Utah Wilderness Alliance*, 237 F. Supp. 2d at 54-55. Given the many mitigation measures analyzed in the EIS, which are implemented through the EAs and COAs, BLM complied with NEPA.

      1. BLM's adaptive management plan is consistent with the purposes of NEPA.

Despite the numerous specific mitigation measures addressed in the EIS and imposed in the ROD, TRCP argues that BLM's use of an adaptive management program to 1) monitor the success of the required mitigation and 2) evaluate and develop additional measures somehow violates NEPA. TRCP also claims that such adaptive management measures "may occur without further NEPA analysis" and would exclude public participation. TRCP Mem. at 18, 22. These arguments are meritless.

As TRCP recognizes, an EIS must contain a "reasonably complete discussion of possible mitigation measures." TRCP Mem. at 17 (quoting *Robertson*, 490 U.S. at 352). But NEPA does not mandate *any* specific mitigation be imposed. *Robertson*, 490 U.S. at 353. BLM outlined and considered numerous mitigation measures in the EIS.[13] Here, BLM went beyond the requirements of NEPA and imposed numerous mitigation requirements. *See, e.g.,* AR4835-AR4855 (ROD, App. B). For example, BLM developed mandatory BMPs where the Proposed Action conflicted with identified resources. AR3081-AR3096 (FEIS, App. H). Further, additional mitigation measures may be required at specific PODs as necessary based on site-specific conditions. The ROD makes clear that it is not the final decision document for operations in the ARPA, and that the Authorized Officer for BLM will review, consider, and evaluate each component of future development on federal lands on a site-specific basis. AR4798. Individual APDs are subject to additional NEPA analysis and review. *See* 43 C.F.R.

[13] Among the measures considered were: (a) voluntary measures proposed by the project proponents to mitigate surface disturbance and environmental impacts under the Proposed Action (AR3122-AR3147, FEIS, App. K); (b) a Wildlife Monitoring and Protection Plan, which outlines proposed inventory, monitoring and protection measures (AR2617-AR2632, FEIS, App. E); (c) a program to inventory, evaluate, and manage cultural resources (AR3097-AR3108, FEIS, App. I); (d) BMPs for reducing non-point source pollution (AR3109-AR3121, FEIS, App. J); and (e) protection measures proposed for Alternative C (AR3148-AR3162, FEIS, App. L).

§§ 3162.3-1(a), 3162.5-1(a).[14] Operations will only be approved after on-site visits and the application of appropriate BMPs. AR4813-AR4814; AR5683.

BLM's approach complies with NEPA. First, BLM identified when it had incomplete or unavailable information, as required by 40 C.F.R. § 1502.22, requiring monitoring and adaptation in management as found necessary. As the IBLA found:

> [I]n "cases involving unknown future impacts of a proposed action," . . . section 102(2)(C) of NEPA permits adoption of a mitigation plan "in which BLM identified the type of mitigation but rendered implementation contingent on assessment of whether and to what extent that mitigation was warranted, given the uncertain results of possible future activity."

IBLA Decision at 20 (quoting *Colo. Envtl. Coal.*, 169 IBLA 137, 143 (2006)). "When the impacts that will be mitigated are uncertain, and will only become known by monitoring the effects of the Project, the particular mitigation to be applied will necessarily be uncertain." *Id*. The IBLA concluded the "adaptive management" approach adopted by the BLM for the Atlantic Rim Project is a reasonable method to address this uncertainty and comports with NEPA. *Id*.

Second, Section 1505.2(c) of CEQ regulations provides: "A monitoring and enforcement program shall be adopted and summarized where applicable for any mitigation." 40 C.F.R. § 1505.2 (c). Contrary to TRCP's characterization, the adaptive management plan is just such a monitoring program, which is designed to ensure the effectiveness of the mitigation measures imposed and to ensure that unexpected or unknown environmental impacts are identified.

Finally, the mitigation measures identified are to be included as appropriate conditions in issuing APDs, consistent with 40 C.F.R. § 1505.3. As such, contrary to TRCP's allegations, any subsequent mitigation will be available for public participation. Proposed mitigation measures

[14] Section 390 of the Energy Policy Act of 2005 provides a "rebuttable presumption" that a categorical exclusion from NEPA review would apply to certain limited activities relating to oil and gas projects. 42 U.S.C. § 15942. Even if categorical exclusions are utilized for individual APDs, consistent with this new law, the APDs will still be publicly posted and subject to comment as required by Section 17 of the Mineral Leasing Act. 30 U.S.C. § 226(f).

would be included in the EAs, which are noticed on BLM's website, and incorporated in COAs. In sum, NEPA does not require identifying each and every possible mitigation measure that could be employed, and does not mandate that any such measures be imposed. NEPA solely requires a "hard look" at the environmental impacts. Here, BLM went above and beyond the requirements of NEPA.

The cases cited by TRCP are inapposite. In *Foundation for North American Wild Sheep v. USDA*, 681 F.2d 1172, 1181 (9th Cir. 1982), the agency prepared only an EA and attempted to rely on monitoring and repopulation provisions to demonstrate that the project would have no significant impacts. Similarly, in *Mountaineers v. U.S. Forest Service*, 445 F. Supp. 2d 1235, 1250 (W.D. Wash. 2006), the court found that deferring consideration of cumulative effects of a project at the EA stage was insufficient to find the project, an off-road vehicle trail, would not have significant effects. Here, conversely, BLM did not avoid or defer consideration of any identifiable environmental impacts, *it prepared an EIS* disclosing the potential significant impacts of CBNG development in the ARPA.[15]

In an attempt to bolster its arguments, TRCP relies on mischaracterizations of the record and extra-record evidence. For example, TRCP asserts that "[i]t is simply impossible to tell what monitoring and/or mitigation BLM has required." TRCP Mem. at 18. The Final EIS, however, outlines the monitoring required, including air quality monitoring (AR2334-AR2335), groundwater monitoring (AR2368), wildlife monitoring (AR2621-AR2625), and reclamation

[15] TRCP also cites to *NRDC v. Kempthorne*, 506 F. Supp. 2d 322 (E.D. Cal. 2007), and *Western Watersheds Project v. U.S. Forest Service*, No. 05 189, 2006 WL 292010 (D. Idaho Feb. 7, 2006). However, these cases were brought not under NEPA, but pursuant to *substantive* statutes that imposed specific requirements on the agency to ensure protection of species. *See NRDC*, 506 F. Supp. 2d at 356-57 (finding agency did not provide reasonable explanation showing adaptive management proposal "will satisfy [Endangered Species Act] requirements to assure survival and recovery of the Delta smelt"); *W. Watersheds Project*, 2006 WL 292010, at *1, *10 (finding violation of National Forest Management Act's requirement to manage uses "so long as that utilization did not 'substantially impair' the SNRA's [Sawtooth National Recreation Area] primary values" where "adaptive management strategy was likewise crucial to the Forest Service's finding that grazing would not substantially impair the SNRA primary values [and] . . . that strategy was to be filled out later").

monitoring (AR2580-AR2581). On top of these specific monitoring requirements, the ROD also requires a monitoring and adaptive management plan. AR4815-AR4816 (ROD at 20-21). Monitoring will "measure the degree of success the performance requirements have in achieving Performance Goals." AR4836 (ROD at B-2). Operators must then adopt additional mitigation or adaptive techniques to achieve the Performance Goals where needed. *Id.*

The ROD also includes numerous measures to minimize environmental impacts. It limits total new surface disturbance from the drilling program across the ARPA to a maximum of 7,600 acres at any given time and imposes a 6.5-acre/well site short-term (less than 6 years) disturbance goal. AR4796 (ROD at 1). In more sensitive areas, identified as "Category A" areas (management areas with sensitive fish populations and crucial wildlife habitats), the 6.5-acre short-term disturbance would be further minimized. AR4807 (ROD at 12). Appendix C of the ROD includes at least 38 mandatory requirements for all permit holders, such as prohibition of off-road vehicle activity; location of buried pipelines close to roads to minimize area of disturbance; and requirements for run-off and erosion control. AR4816, AR4859-AR4863 (ROD at 21, C-3 to C-7). Appendix B of the ROD includes 17 pages of required BMPs, based on site-specific conditions. AR4838-AR4854 (ROD at B-4 to B-20).[16]

TRCP also cites to the "failed adaptive management" at the Pinedale Anticline project in an attempt to establish that adaptive management is improper here. TRCP Mem. at 21. TRCP's cited evidence, however, is both extra-record and irrelevant as it involves an unrelated project and a very different process. In any event, NEPA does not require that an agency establish that its mitigation measures be effective. *N. Alaska Envtl. Ctr.*, 457 F.3d at 979. Moreover, TRCP's

---

[16] As one example of TRCP's many red herrings, TRCP also claims that the operators have already rejected some of the requirements, citing to comments on the Final EIS requesting that BLM not impose annual planning requirements. TRCP Mem. at 18. Notwithstanding such requests in comments, the ROD requires annual planning between BLM and the operators. AR4807 (ROD at 12).

use of extra-record evidence is particularly troubling here, because its comments on the EIS did not reference BLM's adaptive management plan. AR10262-AR10266. Having failed to provide comments during consideration of the EIS, TRCP's arguments have been waived. *See, e.g., Nevada*, 457 F.3d at 88 (holding that claims are waived if not raised in agency proceeding below).

2. Reference to possible exemptions does not render the extensive analysis of mitigation measures in the EIS inadequate.

TRCP complains that the EAs are unlawful because the EIS did not consider the potential for exemptions and waivers from the wildlife mitigation measures imposed in the EAs. TRCP Mem. at 29. Again, TRCP mischaracterizes BLM's analysis and the record.

The EAs cited by TRCP do not discuss broad waivers or exemptions from the numerous mitigation measures that BLM has addressed. The pages referenced by TRCP state: "In some instances, the proponent may request consideration of a *temporary exception to wildlife seasonal restrictions.* Such an exception may be granted if a determination is made that the wildlife resource *will not be adversely impacted*." AR74071 (Sun Dog A&B EA) (emphasis added); AR73500 (Catalina A&B EA). These exemptions, by definition, will not result in adverse impacts,[17] and TRCP is asking BLM to speculate as to possible requests, which it need not do.[18] Moreover, any waiver or exemption would be a federal action and BLM would be required to determine whether or not further NEPA review is necessary.

---

[17] 40 C.F.R. § 1500.1(b) ("Most important, NEPA documents must concentrate on the issues that are truly significant to the action in question, rather than amassing needless detail."). *See also City of Williams v. Dombeck*, 151 F. Supp. 2d 9, 23 (D.D.C. 2001) (NEPA "does not authorize the courts to 'fly speck' the EIS").

[18] For example, the COA for Sun Dog A&B notes that "due to limits on the available time of qualified personnel, the unpredictability of wildlife, and future weather conditions, requests for exceptions to wildlife stipulations *will only be considered in the event of extraordinary and unavoidable occurrences over which the company has little or no control*." AR74083 (Sun Dog A&B COA at 10) (emphasis added).

E. BLM was Not Required to Wait for the Completion of the Rawlins RMP Before Issuing the Atlantic Rim ROD.

Citing to 40 C.F.R. § 1506.1, TRCP contends that BLM was required to wait to finalize its EIS on the Rawlins RMP prior to "irreversibly committing to CBM development lands within the ARPA." TRCP Mem. at 25. This argument is baseless. "The regulation to which Plaintiffs refer prohibits action in the absence of an agency's issuance of a ROD. Here, though, the ROD and the accompanying EIS have been issued." *St. John's United Church of Christ v. City of Chicago*, 502 F.3d 616, 630 (7th Cir. 2007). In this case, before any actions by the project proponents could be done under their proposal to develop CBNG in the ARPA, BLM conducted an EIS, issued a ROD, and then APDs and EAs were issued for actual PODs.

That BLM decided to update its land management plan during consideration of the Atlantic Rim EIS has no bearing on whether BLM met NEPA's requirements in this case. Indeed, TRCP cites not a single case supporting this argument.[19] Instead, TRCP posits a tortured reading of the CEQ regulations to assert that BLM is required to forego lawful management decisions until a new RMP has been adopted.[20] However, "there is no provision in NEPA or regulations promulgated under NEPA requiring that the existing statements not be subject to change." *ONRC Action*, 150 F.3d at 1138. *See also Biodiversity Assocs. v. U.S. Forest Serv.*, 226 F. Supp. 2d 1270, 1308 (D. Wyo. 2002) (finding actions under Forest Plan could continue pending its revision).

[19] The only case TRCP cites, *Scientists' Institute for Public Information v. AEC*, 481 F.2d 1079 (D.C. Cir. 1973), is inapposite. In that case, the agency declined to conduct *any* analysis at the proposal stage for research of technological developments, but proposed to do so once the technology was deemed feasible, after considerable resources were invested. Moreover, the D.C. Circuit subsequently noted that it "seriously doubt[ed] that the relevant reasoning in *Scientists' Institute* survives the Supreme Court's *Kleppe* decision." *Nat'l Wildlife Fed'n v. F.E.R.C.*, 912 F.2d 1471, 1478 (D.C. Cir. 1990). In *Kleppe*, the Supreme Court found that an agency must prepare an EIS concerning an action at "the time at which it makes a recommendation or report on a *proposal* for federal action." *Id.* at 1477 (quoting *Kleppe*, 427 U.S. at 406) (emphasis in original).

[20] BLM did note in the Atlantic RIM EIS that the Great Divide RMP was undergoing revision. AR2149, AR2282 (FEIS at 2-1, 3-118). Where possible, BLM considered consistency with the Draft Rawlins RMP EIS in the Atlantic Rim EIS. AR2320 (FEIS at 4-1).

BLM policy is consistent with this case law. The Great Divide RMP, which remains currently in place, allowed oil and gas development throughout the covered area. AR650; AR679 (Great Divide RMP at 1, 30). CBNG was reasonably foreseeable under this RMP. AR4666 (FEIS at O-271). The Rawlins RMP simply updates the information in the Great Divide RMP; it "will not reverse" the decision to open up the entire area covered by the RMP to oil and gas leasing. *Id.* BLM's Land Use Planning Manual (2005) provides that, "if current land use plans have designated lands open for a particular use, they remain open for that use." AR5390 (BLM Manual H-1601-1, at 47). Neither the Manual nor BLM regulations restricts BLM from approving projects during revision of a current RMP. *Id.* *See also* 43 C.F.R. § 1610.8(a).[21] To hold otherwise would paralyze BLM's ability to manage the public lands.[22] Under TRCP's view, any time BLM commenced a periodic revision of a management plan, a process that takes several years, it apparently would have to suspend all management decisions pending completion of the plan revision.

## III. BLM's Approval of the Atlantic Rim Project Complies With FLPMA.

FLPMA recognizes that public lands should be managed, among other things, to provide for wildlife habitat and for recreational uses, but also "in a manner which recognizes the Nation's

---

[21] In June of 2002, the Department of Interior's Solicitor's Office, in addressing a prior version of the BLM manual, concluded that "while postponement to preserve alternatives may be desirable in some cases, NEPA does not compel an agency to postpone taking implementation actions which are not inconsistent with the existing land use plan and supported by adequate NEPA documentation." Mem., Office of the Solicitor, June 7, 2002, at 1 (Ex. 4). Moreover, BLM subsequently determined in April of 2005 that approval of limited development under the Great Divide RMP was not constrained by the revisions to the Rawlins RMP. AR9283 (Simons E-mail).

[22] Indeed, such a result goes against BLM's authority under other statutes, such as the Minerals Leasing Act. AR2135-AR2136 (FEIS at 1-8 to 1-9). CEQ regulations are binding "except where compliance would be inconsistent with other statutory requirements." 40 C.F.R. § 1500.3. Prior to the issuance of the Atlantic Rim EIS or ROD, BLM recognized "[a]ctions taken under the Great Divide RMP created land use patterns and valid existing rights that influence options for future management. For example, many of the oil and gas resources in the planning area have been leased. The presence of these valid existing rights will affect the management choices available for BLM to consider in developing the Rawlins RMP." AR727 (Rawlins DEIS at E-2). *See also* 43 C.F.R. § 3101.1-2 ("A lessee shall have the right to use so much of the leased lands as is necessary to explore for, drill for, mine, extract, remove and dispose of all the leased resource in a leasehold subject to" stipulations, statutes and "such reasonable measures" to minimize impacts to other resources.).

need for domestic sources of *minerals*, food, timber, and fiber from the public lands." 43 U.S.C § 1701(a)(12) (emphasis added). FLPMA promotes mineral exploration and production as principal uses of the federal public lands. 43 U.S.C § 1702(l).

Pursuant to FLPMA, BLM "manages the use of federal oil and gas resources through a three-phase decision-making process." *Pennaco Energy, Inc. v. U.S. Dep't of Interior*, 377 F.3d 1147, 1151 (10th Cir. 2004). First, BLM develops land use plans, or RMPs, which outline management goals based on principles of multiple use and sustained yield. *Id. See also* 43 U.S.C. § 1732(a). Then, once an RMP is issued, "subsequent more detailed or specific planning, shall conform to the [RMP]." 43 C.F.R. § 1610.5-3(a). *See also Headwaters, Inc. v. BLM*, 684 F. Supp. 1053, 1055 (D. Or. 1988) ("Site-specific or parcel-by-parcel multiple use analyses are not necessary in the EA if the MFP [(Management Framework Plan)] considered multiple uses adequately."). "In the context of oil and gas development, the BLM is initially charged with determining whether issuance of a particular oil and gas lease is consistent with the RMP." *Pennaco Energy, Inc.*, 377 F.3d at 1151. Finally, the lessee obtains BLM approval of an APD before commencing any "drilling operations" or "surface disturbance preliminary thereto." *Id.* at 1151-1152 (quoting 43 C.F.R. § 3162.3-1(c)).

The Great Divide RMP covers approximately 4 million acres of public land surface and 5 million acres of federal mineral estate in the GDRA. AR650 (Great Divide RMP at 1). BLM found that the Great Divide RMP, which opened the entire planning area to oil and gas leasing, "represents the best mix of management actions that provide for sustained multiple use management and environmental protection, while allowing reasonable levels of commodity use." AR651, AR679 (Great Divide RMP at 2, 30). The ARPA comprises approximately 270,080 acres of federal, state and privately owned lands. AR4796 (BLM ROD at 1), or approximately

4.3% of the federal lands in the GDRA.  Total surface disturbances authorized at any one time

under the Atlantic Rim ROD -- 7,600 acres -- is 2.8% of the ARPA and 0.19% of the GDRA.

Pursuant to FLPMA, BLM issued leases throughout the ARPA for the development of minerals,

and then authorized the Atlantic Rim Project to allow development of CBNG under those leases.

BLM specifically found that the project was consistent with the Great Divide RMP.  AR2136,

AR2174 (FEIS at 1-9, 3-10).

TRCP argues, however, largely based on extra-record evidence, that allowing CBNG

development in the ARPA violates FLPMA because it would limit other uses and would exceed

the RMP's "reasonably foreseeable development scenario."  TRCP's claims are without merit.

A.     BLM Complied With FLPMA's Multiple Use and Sustained Yield Requirements.

TRCP contends that, because the Atlantic Rim Project may result in displacement of sage

grouse and big game, BLM has violated the multiple use requirement, and because the Atlantic

Rim Project may result in reduced hunting in the ARPA, BLM has violated the sustained yield

requirement.  TRCP is wrong on both counts, because FLPMA does not mandate the availability

of all uses and resources in any particular area.  Hence, even if the dire results TRCP speculates

should occur, and there is no record evidence supporting this proposition, it would not result in a

violation of FLPMA's multiple use and sustained yield goals.  In any event, as discussed above,

BLM imposed mitigation measures for the protection of sage grouse and big game designed to

ensure continued hunting in the ARPA.

1.     FLPMA's multiple use and sustained yield mandates do not require all
       resources be available in all areas.

TRCP's asserted FLPMA violations focus on the alleged "displacement" of sage grouse

and big game and, thereby, hunting.  But FLPMA does not require use of all resources in any

particular area.  "'Multiple use management' is a deceptively simple term that describes the

enormously complicated task of striking a balance among the many competing uses to which land can be put." *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 58 (2004) (citing 43 U.S.C. § 1702(c)). "Of course not all uses are compatible." *Id.* While Congress directed BLM to manage the public lands on a "multiple use" basis, the multiple use requirement includes "making the most judicious use of the land for some or all of [the public land] resources" and using "some land for less than all of the resources," where appropriate. 43 U.S.C. § 1702(c). In short, FLPMA's multiple use standard does not require that BLM permit all resource uses on a given parcel of land. *Rocky Mountain Oil & Gas Ass'n v. Watt*, 696 F.2d 734, 738 (10th Cir. 1983). *See also Utah v. Andrus*, 486 F. Supp. 995, 1003 (D. Utah 1979) ("It is only by looking at the overall use of the public lands that one can accurately assess whether or not BLM is carrying out the broad purposes of the statute."). Thus, TRCP's assertion that BLM was required, under 43 U.S.C. § 1702(c), to balance uses "of the ARPA," TRCP Mem. at 40, is misplaced; the multiple use mandate applies to BLM's management of "public lands."

Similarly, FLPMA defines "sustained yield" as "the achievement and maintenance in perpetuity of a high-level annual or regular periodic output of the various renewable resources of the public lands *consistent with multiple use*." 43 U.S.C. § 1702(h) (emphasis added). As with the multiple use requirement, the sustained yield requirement does not impose a duty on BLM to protect all resources or uses in any particular area, rather than its management of public lands as a whole. *See Utah*, 486 F. Supp. at 1003.

In essence, TRCP's complaint is that allowing CBNG development in the ARPA may reduce hunting opportunities there. Even if this is the case, it would not constitute a violation of

FLPMA's multiple use requirement. *See id.*, at 1003 ("BLM is not obliged to, and indeed cannot, reflect all the purposes of FLPMA in each management action.").[23]

2. BLM provided mitigation measures to reduce the Project's impacts with respect to the sage grouse and big game.

TRCP also contends erroneously that BLM violated FLPMA's multiple use requirement because the 1/4-mile no surface occupancy ("NSO") from sage grouse leks is inadequate. Again, TRCP largely relies on extra-record evidence in the form of the Braun Declaration and a January 2008 memorandum (cited in TRCP SOF ¶¶24, 28, 29), neither of which was before BLM at the time it made its decision. TRCP attempts to rely on this same extra-record evidence to argue that BLM failed to revise its mitigation measures in the EAs for PODs A&B of the Sun Dog and Catalina Units. TRCP Mem. at 40. While TRCP's reliance on such evidence should not be countenanced, this evidence is irrelevant in any event.

Disputes over the proper mitigation measures for the sage grouse do not render BLM's decision arbitrary and capricious. Evidence in the record supports BLM's choice of mitigation measures. "Literature reviews show that requirements for no surface disturbance (NSD) from lek generally run in the quarter-mile to 2-mile range. The quarter-mile NSD mitigation is generally minimum distance."[24] AR4405. BLM also explained that the 1/4-mile NSO was

[23] TRCP also asserts that BLM's duty to protect the ARPA's non-energy resources is "[f]urther underscore[ed]" by FLPMA's requirement that BLM shall take any action necessary to prevent unnecessary or undue degradation. TRCP Mem. at 30. As the IBLA has explained, BLM "has issued no regulation defining what might constitute 'unnecessary or undue degradation' in the context of onshore oil and gas development, an activity where some level of environmental degradation is to be expected," and Congress "recognized that the mere act of approving oil and gas development does not constitute unnecessary or undue degradation under FLPMA, and that something more than the usual effects anticipated from such development, subject to appropriate mitigation, must occur for degradation to be 'unnecessary or undue.'" *Biodiversity Conservation Alliance*, 174 IBLA 1, 5-6 (2008) (citations omitted). In that case, the IBLA rejected the contention that failure to impose more stringent mitigation measures recommended by the plaintiffs constituted unnecessary and undue degradation. *Id.* at 8.

[24] TRCP's focus on the 1/4 NSO ignores the numerous other mitigation measures considered for the sage grouse, which have been recognized by this Court. *NRDC*, 525 F. Supp. 2d at 121-22; AR2623, AR2626 (FEIS at E-4, E-7).

consistent with the RMP and with the Wyoming Greater Sage-Grouse Conservation Plan.[25] AR4678. "When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989).[26]

TRCP also ignores that BLM required reclamation of areas disturbed. The FWS "commend[ed] the Bureau for requiring interim reclamation as this may reduce some of the impacts that will occur across the Project area." AR10135. Evidence in the record shows that sage grouse adapt to changes. *See, e.g.,* AR5972 ("The high degree of motility and extensive knowledge of regional habitat exhibited by the sage grouse during the 2-year study are strong indicators of their versatility and their considerable capacity for responding quickly and effectively to changing environmental conditions. Since reclamation of the [site] will proceed concurrently with mining the duration and magnitude of any impacts will be substantially reduced."). Evidence also shows that sage grouse return to areas disturbed by energy development, although not to predisturbance levels. AR6240-AR6241. *See also* TRCP

[25] TRCP asserts that "BLM's 1/4 mile lek NSO "was not based on science at all," citing to *Wyo. Audubon*, 151 IBLA 42 (1999). TRCP Mem. at 34. In that case, however, the IBLA upheld the 1/4-mile NSO based on BLM's explanation as to its use. *Wyo. Audubon*, 151 IBLA at 49-50. TRCP also refers to the "best available science," TRCP Mem. at 40, but cites to no such requirement under FLPMA. *See* 43 U.S.C. §§ 1712, 1732.

[26] TRCP also references "the perilous condition of the sage grouse," TRCP Mem. at 36, and a recent decision by the U.S. District Court for the District of Idaho, which remanded the U.S. Fish & Wildlife Service's ("FWS") determination that listing of the greater sage grouse under the Endangered Species Act was not warranted. *W. Watersheds Project v. Fish & Wildlife Serv.*, 535 F. Supp. 2d 1173 (D. Idaho 2007), *appeal docketed*, Nos. 08-35352, 08-35353, 08-35409, 08-35414 (9th Cir. 2008). While hunting is now regulated by the State, in that rulemaking FWS identified hunting as one of the major causes of the initial decline of the sage grouse populations -- "Historically, the greater sage-grouse was heavily exploited by commercial and sport hunting in the late 1800s and early 1900s (Patterson 1952; Autenrieth 1981). Hornaday (1916) and others alerted the public to the risk of extinction to the species as a result of this overharvest." 70 Fed. Reg. 2244, 2267 (Jan. 12, 2005). It was also noted that increased human presence resulting from oil and gas development can also impact sage-grouse through "increased hunting and poaching pressure." *Id.* at 2263. Further, if the FWS does in fact list the greater sage-grouse under the Endangered Species Act, its hunting would be prohibited. TRCP's arguments on this point ring hollow.

SOF ¶199 (citing AR2395). Thus, there is ample evidence supporting BLM's decision in this case, even in light of disagreements over the "best" choice of mitigation measures.[27]

Likewise, BLM also imposed mitigation measures to protect big game in the ARPA. In addition to the surface disturbance limits noted above, BLM imposed restrictions to prevent drilling on CWR between November 15 and April 30. AR2391 (FEIS at 4-72). BLM found that the restrictions imposed would reduce "the displacement and disturbance of big game during the most critical season." AR2391 (FEIS at 4-72). BLM further noted that the extent of this displacement "is impossible to predict." AR2419 (FEIS at 4-100).

BLM additionally imposed measures designed to mitigate potential indirect impacts to hunting, which would make recreation in the ARPA "significantly less desirable." AR2421 (FEIS at 4-102); AR4839-AR4840 (ROD at B-5 to B-6) (imposing measures to limit fugitive dust); AR4849-AR4852 (ROD at B-15 to B-18) (imposing wildlife protection measures); AR4852-AR4853 (ROD at B-18 to B-19) (imposing measures to manage visual resources); AR4854 (ROD at B-20) (imposing measures to address transportation and noise impacts).

B.     The Atlantic Rim Project Conforms with the Great Divide Resource Management Plan.

The Atlantic Rim Project is consistent with the Great Divide RMP. Development of oil and gas resources from public lands is a critical part of the BLM's responsibilities. *See, e.g.,* 43 U.S.C. §§ 1701(a)(12) (recognizing that public lands must be managed in a manner recognizing the Nation's need for domestic minerals), 1702(l) (defining mineral exploration and development as a principal or major use of public lands).

---

[27] TRCP falsely states that the operators would not abide by the mitigation measures required by BLM, which are imposed through the EAs and COAs for each POD, by highlighting activities relating to a specific well. TRCP Mem. at 35 n.15. The well referenced in footnote 15 of TRCP's brief, AR Fee 2089 SE29, was a well located on private land with private mineral rights. AR72448. As such, the activities are not subject to BLM jurisdiction. Notwithstanding, the record reflects that Anadarko was, in fact, making efforts to apply BLM mitigation measures even for wells not subject to BLM jurisdiction.

     1. TRCP mischaracterizes the Reasonably Foreseeable Development scenario.

TRCP claims that BLM has authorized drilling of wells in exceedance of the RFD scenario analyzed in the Great Divide RMP.[28] TRCP Mem. at 41. This is incorrect. The life of the Atlantic Rim Project is expected to be 30-50 years, and the ROD itself does not authorize actual drilling of wells, which must be approved through APDs. AR4798 (ROD at 3). BLM recognized this in the reference cited by TRCP in its SOF ¶ 79 (cited on page 41-42). Despite TRCP's omissions in its brief, the reference actually states that BLM "will not authorize oil and gas development actions *such as APDs and ROWs [(rights of way)]*." TRCP SOF ¶79 (quoting AR8022) (emphasis added).

Moreover, contrary to TRCP's assertion, the RFD scenario in the Great Divide RMP is not a limitation on activities -- it is simply a tool for NEPA compliance. The RFD scenario is not expressly required by FLPMA, NEPA, or BLM's planning regulations. The concept arises from NEPA's general requirement to consider cumulative impacts when conducting NEPA analysis. *See* 40 C.F.R. §§ 1508.7, 1508.25(c). BLM adopted this requirement into its planning regulations by requiring RMPs to estimate the physical, biological, economic, and social effects of each alternative considered. 43 C.F.R. § 1610.4-6. The regulations specifically note that this estimate may be stated in terms of probable ranges where effects cannot be precisely determined. *Id.* BLM's Fluid Mineral Planning Handbook is the original source of the term "RFD." The Handbook provides that the cumulative impacts of reasonably foreseeable development is one of three factors for analysis that should be considered when making fluid mineral determinations in RMPs or plan amendments. AR5076. "To ensure NEPA compliance, a minimum level of

[28] Although BLM initially discussed and considered an RMP review during the initial stages of preparing the Atlantic Rim EIS, AR7923, AR7635, it was under no obligation to do so.

exploration and development activities should be projected." AR5082. Thus, the RFD serves as a tool assisting in NEPA compliance.

Further, several years ago, BLM's Washington Office transmitted a policy directive, known as an Instruction Memorandum, to clarify the RFD scenario. AR5311-AR5319.[29] Instruction Memorandum 2004-089 clarifies that the RFD is "neither a planning decision nor the 'No Action Alternative' in the NEPA document." AR5311. The RFD is not intended as a limit to future development, but is instead a baseline scenario to provide the "mechanism to analyze the effects that discretionary management decisions have on oil and gas activity." AR5311. The IBLA has repeatedly confirmed this purpose of the RFD scenario. *Wyoming Outdoor Council*, 164 IBLA 84, 102 (2004) ("We see no proper basis for accepting a characterization of the RFD scenario that requires us to jettison, in its entirety, BLM's expertise and view of the proper scope and role of an RFD scenario, as expressed in IM 2004-089."). Indeed, the IBLA has held in eight separate decisions, including several involving the Great Divide RMP and one in TRCP's administrative appeal of the Atlantic Rim EIS, that the RFD scenario is not a planning decision, nor a limit on future development.[30]

[29] The heading on Instruction Memorandum 2004-089 indicates that it "expires" on September 30, 2005. The document, however, indicates that the policy "remains in effect until cancelled or amended." AR5309.

[30] IBLA Decision, at 22 (holding with respect to Atlantic Rim EIS that RFD Scenario in Great Divide RMP is not a limitation on future development); *Biodiversity Conservation Alliance*, 174 IBLA at 11 ("While an important tool in the land use planning process, RFD scenarios do not constitute fixed or maximum limits on development in RMPs under FLPMA such that exceeding them constitutes a violation of that statute."); *Reichman*, 173 IBLA 149, 158 (2007) ("The RFD Scenario does not establish a point beyond which further oil and gas exploration and development are prohibited."); *Nat'l Wildlife Fed'n*, 170 IBLA 240, 249 (2006) (holding with respect to Great Divide RMP that RFD Scenario is not a limitation on development); *Wyoming Outdoor Council*, 164 IBLA at 99 (holding with respect to Pinedale RMP that RFD Scenario does not establish "a point past which further exploration and development is prohibited"); *S. Utah Wilderness Alliance*, 159 IBLA 220, 234 (2003) (holding that Book Cliffs RMP did not establish a well limit); *Wyoming Outdoor Council, et al.*, No. IBLA 2006-155 (June 28, 2006), at *26 - 27 (determining RFD scenario for Pinedale RMP is not a limitation on future development); *Biodiversity Conservation Alliance*, No. IBLA 2004-316 (Oct. 26, 2004), at *7 (holding with respect to Great Divide RMP that "RFD scenario cannot be considered to establish a limit on the number of oil and gas wells that can be drilled in a resource area.") (citing *S. Utah Wilderness Alliance*, 159 IBLA at 234).

Finally, to the extent any additional NEPA analysis was required, the Atlantic Rim EIS itself constitutes that analysis. *See Biodiversity Conservation Alliance*, No. IBLA 2004-316 (Oct. 6, 2004), at *7. The Atlantic Rim EIS analyzes the potential impacts of drilling and developing additional natural gas wells within the ARPA in light of past, present, and reasonably foreseeable development within the GDRA. No other analysis is required.

2. The Atlantic Rim Project is consistent with the Great Divide RMP's wildlife and recreation objectives.

The Great Divide RMP identified oil and gas leasing and development as one of BLM's primary management objectives, and opened the entire planning area in the GDRA for this purpose. AR679-AR681. The Great Divide RMP's general notation that sage grouse strutting grounds will be protected does not conflict with approval of the Atlantic Rim ROD, particularly when BLM imposed specific mitigation measures, performance goals, and monitoring requirements to protect sage grouse and sage grouse strutting areas or leks. AR694, AR4814, AR4836, AR4847-AR4852, AR2623, AR2626. Similarly, the Great Divide RMP's general comments regarding recreation and big game habitat do not conflict with the approval of the Atlantic Rim Project, which again contained appropriate mitigation measures for big game species. AR4802-AR4805, AR4814-AR4816, AR4851-AR4852, AR4862.

The disclosure of potentially significant environmental impacts to wildlife species or recreation resources in the Atlantic Rim EIS does not demonstrate the BLM failed to comply with FLPMA. Indeed, the very purpose of an EIS is to identify and disclose potential environmental impacts. *Robertson*, 490 U.S. at 350-51. TRCP's arguments to the contrary would lead to the absurd result that every time BLM discloses potentially significant impacts in a

NEPA document, the agency has somehow violated its FLPMA obligations or its obligations under a governing RMP.[31]

Finally, the case cited by TRCP in support of its position, *Western Watersheds Project v. Bennett*, 392 F. Supp. 2d 1217 (D. Idaho 2005), is inapplicable here. In that case, the court determined the BLM had not complied with the terms of the applicable RMP by approving additional livestock grazing permits on lands where the RMP specifically elevated wildlife goals and watershed needs over increases in livestock use. *See id.* at 1227-28. That situation is not presented here, because the Great Divide RMP explicitly authorized oil and gas development throughout the ARPA. Thus, BLM's decision, which sought to balance oil and gas development and habitat protection to the extent feasible, was in conformance with the Great Divide RMP.

**CONCLUSION**

For the foregoing reasons, this Court should deny Plaintiff's Motion for Summary Judgment and grant summary judgment in favor of defendants.

Respectfully submitted,

/s/ Michael B. Wigmore

Michael B. Wigmore (DC Bar # 436114)
Bingham McCutchen LLP
2020 K St., NW
Washington, DC 20006-1806
202.373.6000
202.373.6001 (facsimile)

*Counsel for Anadarko Petroleum Corporation, Warren Resources, Inc., and Double Eagle Petroleum Co.*

[31] The IBLA recognized that finding a species to be significantly impacted for purposes of developing an EIS is not a violation of BLM's sensitive species policy and, while noting that the FWS and WGFD "caution" BLM, the IBLA found that BLM is complying with its sensitive species policy in requiring management plans (*i.e.*, mitigation) to minimize those effects. *See* IBLA Decision at 22-23.

Robert C. Mathes (DC Bar # 484255)
Bjork Lindley Little PC
1600 Stout Street, Suite 1400
Denver, CO 80202
303.892.1400
303.892.1401 (facsimile)

*Counsel for Double Eagle Petroleum Co.*

Dated:  June 12, 2008

A/72562383.3

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

THEODORE ROOSEVELT CONSERVATION PARTNERSHIP
555 Eleventh St. N.W., 6th Floor
Washington, DC 20004,

Plaintiff,

v.

DIRK KEMPTHORNE, in his official capacity as the Secretary of the United States Department of the Interior
1849 C Street, N.W.
Washington, DC 20240,

and

UNITED STATES BUREAU OF LAND MANAGEMENT
1849 C Street, N.W., Room 406-LS
Washington, DC 20240,

Defendants.

ANADARKO PETROLEUM CORPORATION,
P.O. Box 1330
Houston, TX 77251-1330,

WARREN RESOURCES, INC.,
489 Fifth Avenue, 32nd Floor
New York, NY 10017,

DOUBLE EAGLE PETROLEUM CO.,
777 Overland Trail, Suite 208
P.O. Box 766
Casper, WY 82602-0766,

Defendant-Intervenors.

CASE NO. 1:07-cv-01486-RJL

STATE OF WYOMING )
123 Capitol Building )
Cheyenne, WY 82002 )
)
Defendant-Intervenor. )
)

**STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF DEFENDANT-INTERVENOR ANADARKO PETROLEUM CORPORATION, WARREN RESOURCES, INC. AND DOUBLE EAGLE PETROLEUM CO.'S CROSS-MOTION FOR SUMMARY JUDGMENT**

Pursuant to Local Rule 7(h), Defendant-Intervenors Anadarko Petroleum Corporation ("Anadarko"), Warren Resources, Inc. ("Warren"), and Double Eagle Petroleum Corporation ("Double Eagle") submit the following statement of material facts as to which there is no genuine issue in support of its cross-motion for summary judgment.

**I. Great Divide Resource Management Plan**

1. In the Mining and Minerals Policy Act of 1970, Congress declared that it is the continuing policy of the Federal Government to foster and encourage private development of domestic minerals, including gas. 30 U.S.C. § 21a. The Mineral Leasing Act of 1920 encourages and authorizes mineral development, including oil and gas development, on federal lands. 30 U.S.C. § 182.

2. The United States Bureau of Land Management ("BLM") manages resources on public lands in the United States pursuant to the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. §§ 1731, 1732, among other statutes. FLPMA provides that public lands should be managed "in a manner which recognizes the Nation's need for domestic sources of minerals, food, timber, and fiber from the public lands including implementation of the Mining and Minerals Policy Act of 1970 (84 Stat. 1876, 30 U.S.C. 21a) as it pertains to public lands."

43 U.S.C § 1701(a)(12).  FLPMA identifies mineral exploration and production as a "principal or major use[]" of the federal public lands.  *Id.* at § 1702(l).

3.      BLM has found that "[e]xploration and development of federal oil and gas leases by private industry are an integral part of the BLM's oil and gas leasing program under authority of the Mineral Leasing Act of 1920 as amended, the Mining and Minerals Policy Act of 1970, the Federal Land Policy and Management Act of 1976 (FLPMA), the National Materials and Minerals Policy, Research and Development Act of 1980, and the Federal Onshore Oil and Gas Leasing Reform Act of 1987."  AR2135 (FEIS at 1-8).

4.      The Rawlins Field Office of the BLM manages public lands in Wyoming known as the Great Divide Resource Area, which includes approximately 12.5 million acres of federal, state and privately owned lands within its general administrative boundary.  AR652 (Great Divide RMP at 3).  The Great Divide Resource Area consists of approximately 4 million acres of federal surface estate and 5 million acres of federal mineral estate.  AR650 (Great Divide RMP at 1).

5.      In November of 1990, BLM issued the Record of Decision and Approved Resource Management Plan for the Great Divide Resource Area ("Great Divide RMP").  AR645 (Great Divide RMP).  The RMP was prepared under the regulations implementing FLPMA.  AR650 (Great Divide RMP at 1).  An environmental impact statement ("EIS") was prepared for the RMP in compliance with the National Environmental Policy Act of 1969 ("NEPA"), *id.*, and consistent with BLM regulations at 43 C.F.R. § 1601.0-6.

6.      BLM found that the Great Divide RMP "represents the best mix of management actions that provide for sustained multiple use management and environmental protection, while allowing reasonable levels of commodity use."  AR651 (Great Divide RMP at 2).

7.     The Great Divide RMP opened the entire planning area within the Great Divide

Resource Area to oil and gas leasing.  AR679 (Great Divide RMP at 30).  Leasing in the Great

Divide Resource Area would be subject to stipulations to protect various resources, including

habitat for the greater sage-grouse, elk, and various other big game species.  AR679-AR681

(Great Divide RMP at 30-32).  BLM also may include restrictions as reasonable measures or

conditions of approval ("COAs") in authorizing applications for permits to drill ("APDs") or

plans of development ("PODs").  AR679 (Great Divide RMP at 30).

8.     On July 5, 2001, BLM evaluated the Great Divide RMP and determined that it

needed revisions.  AR747 (Rawlins DEIS at 1-7).  BLM's Land Use Planning Manual (2005)

provides that, "if current land use plans have designated lands open for a particular use, they

remain open for that use."  AR5390 (BLM Manual H-1601-1, at 47).  BLM has the discretion to

approve, defer or modify a specific proposal during revision of a current RMP.  *Id.*; 43 U.S.C. §

1610.8(a).

9.     BLM explained:  "The Great Divide Resource Management Plan was signed in

1990, and the data and analysis on which the decisions were based are approximately 15 years

old.  Many decisions are still valid and are not expected to change; however, the environmental

impact statement (EIS) analysis on which the decisions are based is in need of update."  AR7923

(Congressional briefing).

10.     On February 25, 2002, BLM published a notice of intent to revise the Great

Divide RMP, which will be renamed the Rawlins RMP.  AR745 (Rawlins DEIS at 1-3).  In that

notice, BLM noted that the "existing Great Divide RMP will continue to guide management

actions and decisions for the Rawlins Field Office until the RMP revision is completed."

AR8015 (67 Fed. Reg. 8701, 8701 (Feb. 25, 2002)).  *See also* AR747 (Rawlins DEIS at 1-6).

## II. The Atlantic Rim Project

A. The Atlantic Rim Project Area

11. The Atlantic Rim Project Area ("ARPA") is located in southwestern Carbon County, Wyoming, within the Great Divide Resource Area. AR2088, AR2136 (FEIS at ES-1, 1-9). The ARPA comprises approximately 270,080 acres, of which 173,672 acres are federal surface estate (64 percent), 14,060 acres are state surface estate (5 percent), and 82,348 acres are private surface estate (31 percent). AR4796 (ROD at 1). The ARPA contains approximately 2.2 percent of total lands within the boundary of the Great Divide Resource Area and 4.3 percent of the federal lands in the Great Divide Resource Area.

12. The BLM Rawlins Field Office manages more mineral estate than surface estate within the ARPA -- 179,438 acres federal mineral estate (66 percent), 12,384 acres state mineral estate (5 percent), and 78,258 acres private mineral estates (29 percent). AR4796 (ROD at 1). Pursuant to its authority, and consistent with the Great Divide RMP, BLM leased federal minerals within the entire ARPA. AR2135, AR2174 (FEIS at 1-8, 3-10).

13. In 2000, Stone & Wolf, which had obtained some development rights in the ARPA, made a proposal to BLM for a coalbed natural gas ("CBNG") (also referred to as coalbed methane ("CBM")) exploration project. AR7461 (BLM Press Release). The proposal involved exploratory drilling of three PODs of approximately 32 wells each within the ARPA. *Id.* Stone & Wolf anticipated that these PODs would assist in evaluating the feasibility of producing CBNG in the ARPA. *Id.*

14. BLM noticed its plan to prepare an environmental assessment ("EA"), which BLM indicated "may be advanced to the environmental impact statement (EIS) level based on public scoping or if the EA concludes that significant issues or impacts are present." AR7461 (BLM Press Release). BLM also noted: "If the exploratory project is deemed successful, any

development plans beyond the scope of the EA would require additional environmental analysis." *Id.*

15. During preparation of the EA, Stone & Wolf sold its operating rights. AR7633 (Scoping Statement at 1). The new owners, including Petroleum Development Corporation ("PEDCO") and Warren, withdrew this proposal. AR7633 (Scoping Statement at 1); AR2128 (FEIS at 1-1). PEDCO had acquired lease holdings in addition to those of Stone & Wolf. AR7633 (Scoping Statement at 1).

16. In October of 2000, PEDCO and other operators approached BLM regarding an expansion of the proposed drilling in the ARPA. AR7865 (Initial Meeting Notes). This proposed drilling would include interim drilling for exploration purposes. *Id.* BLM sought information from its Wyoming State Office Reservoir Management Group ("RMG") regarding recommendations for interim drilling. AR7897 (Conversation Record); AR7915 (RMG 2001 Mem. at 1).

17. On May 24, 2001, PEDCO and other operators,[1] submitted a proposal to BLM for the Atlantic Rim Natural Gas Development Project ("Atlantic Rim Project") to explore and develop CBNG resources located in the ARPA. AR2128 (FEIS at 1-1). The project would include a maximum of 3,880 CBNG wells using 80-acre spacing, which the project proponents believed was necessary for efficient development of natural gas in the ARPA. *Id.* The proposed project would have been developed within approximately 310,335 acres of federal, state and private lands during the 20-30 year life of the project. AR9483 (66 Fed. Reg. 33,975 (June 26, 2001)).

[1] The project proponents now include Anadarko, Warren and Double Eagle.

B. The NEPA Process

18. On June 14, 2001, BLM issued a scoping statement for the environmental review of the Atlantic Rim Project. AR7632 (Dear Reader Letter). The scoping statement noted that: "The development of coalbed methane within the Atlantic Rim project area is in conformance with the RMP. The environmental analysis that will be prepared on the PEDCO proposal will incorporate appropriate decisions, terms, and conditions of use described in the RMP." AR7635 (Scoping Statement at 3).

19. On June 26, 2001, BLM issued a Notice of Intent to prepare an EIS for the Atlantic Rim Project pursuant to NEPA. AR9483-AR9484 (66 Fed. Reg. at 33,975-33,976). BLM also indicated that it was initiating the planning process to review the reasonably foreseeable development level analyzed in the EIS for the Great Divide RMP and to determine if an amendment to the RMP was necessary. *Id.*

*1. Interim Drilling*

20. BLM developed an interim drilling policy to allow the project proponents to conduct exploratory drilling in a systematic manner to obtain additional information that would be used to support the geologic information needed for the Atlantic Rim EIS. AR2131-AR2132, AR2565-AR2573 (FEIS at 1-4 to 1-5, App. A). Under this policy, a maximum of 200 exploratory CBNG wells in nine proposed POD locations could be drilled -- each POD could include development of up to 24 wells. AR2132 (FEIS at 1-5). An EA for each proposed POD was prepared and a decision record issued and implemented, although not all of the nine initial estimated PODs were developed. *Id.* Approximately 137 CBNG wells were approved under the interim drilling policy. AR2135 (FEIS at 1-8).

21. Based on this interim drilling, the overall size of the proposed project was reduced from 3880 wells to 2000 wells (1800 CBNG and 200 conventional natural gas) (the "Proposed

Action"). AR8141 (Draft Briefing Paper, June 7, 2004). In February of 2005, the boundary of the ARPA was redrawn, reducing the size of the project area by approximately 40,000 acres from the initial 310,335 acres to 270,080 acres. AR2132 (FEIS at 1-5).

22. Interim drilling results, consultation with Anadarko, and BLM's RMG independent technical analysis indicated that 80-well spacing would generally be required to efficiently develop oil and gas in the ARPA, and that 160-acre well spacing would result in less recovery. AR4564-AR4566, AR4431, AR4407 (FEIS at O-168 to O-170, O-35, O-11).

23. RMG's analysis of available data confirmed the need for 80-acre spacing. *See* AR8206 (RMG 2005 Report at 3) ("A well spacing area of 160-acres may be too large and may compromise the full exploitation of the CBNG resources the AR Area."); AR8525 (RMG 2006 Report) ("The AR wells should be spaced at 80 acres (or less) to permit economic operations and conservation of the CBNG resources.").

24. RMG found that 160-acre well spacing for CBNG in the ARPA would be possible only under very special geologic conditions, and that the data suggests 80-acre well spacing is the best standard well spacing. AR8204 (RMG 2005 Report at 1).

*2. The Draft Environmental Impact Statement*

25. BLM released a Draft EIS for the Atlantic Rim Project in December of 2005. AR2141 (FEIS at 1-14). The Draft EIS noted the purpose of the project was to drill for, remove and sell natural gas resources. AR1443 (DEIS at S-1). BLM found: "As America's need for energy continues, natural gas has emerged as an important industrial and domestic fuel source. Development of domestic natural gas reserves reduces the country's dependence on foreign sources of energy and maintains supply of fuel for domestic consumption, industrial production, power generation and national security." *Id.* *See also* AR1478 (DEIS at 1-5).

26.    In the Draft EIS, BLM found that the Atlantic Rim Project conformed with the management objectives and actions provided for in the Great Divide RMP, and noted the RMP was undergoing revision.  AR1478-AR1479 (DEIS at 1-5 to 1-6).  Earlier in 2005, BLM determined that the pending RMP revision did not constrain approval of limited development under the Great Divide RMP.  AR9283 (Simons E-mail) ("While originally it appeared we were completely constrained by the RMP revision (LTDisturbance), today we are recognizing that there is still some LTD acres available under the Great Divide RMP and that we can approve some limited development under the GD RMP pending the Rawlins RMP decision, thus making the EISs we've been working on the limiting factor instead of the RMP revision.").  BLM policy further recognized that the Reasonably Foreseeable Development Scenario used for development of an RMP is simply a tool for NEPA compliance.  AR5311 (Instruction Mem. 2004-089).

27.    The Draft EIS identified fourteen issues of concern raised during the scoping process, including potential impacts to wildlife habitat and potential conflicts between mineral development activities and recreational opportunities.  AR1443-AR1444 (DEIS at S-1 to S-2).

28.    The Draft EIS considered four alternatives in detail, including (1) the Proposed Action, (2) the No Action Alternative (Alternative A), (3) Alternative B, and (4) Alternative C.  AR1444-AR1445 (DEIS at S-2 to S-3).

29.    Alternative B, also referred to as "Phased" or "Temporal" alternative, would have the same number and spacing of wells as in the Proposed Action, but would be developed in three phases each occurring over 6 to 7 years.  AR4439, AR4778 (FEIS at O-43, O-383); AR1489-AR1491 (DEIS at 2-2 to 2-4).  The Draft EIS found that "Surface disturbance amounts, both long term and short term, are envisioned to be similar under the Proposed Action and

Alternative B. Reclamation timing and amounts, including short term, interim, and long term would also be similar for both alternatives." AR1494 (DEIS at 2-7).

30. Alternative C, also referred to as the "Spatial" alternative, would condition the Proposed Action on the application of required development protection measures, resulting in fewer acres of disturbance and reduced road density. AR4439, AR4778 (FEIS at O-43, O-383). AR1491-AR1493 (DEIS at 2-4 to 2-6). Alternative C would generally provide for 160-acre spacing. AR2153, AR2159, AR4442, AR4712 (FEIS at 2-5, 2-11, O-46, O-317).

31. The Draft EIS considered the environmental impacts of each alternative, including impacts on wildlife and recreation. *See, e.g.*, AR1446-AR1449 (DEIS at S-4 to S-7).

32. A comparison of the potential impacts under each alternative reflected generally similar impacts between the Proposed Action and Alternative B. AR1497-AR1510 (DEIS at 2-10 to 2-23). With respect to big game (elk, pronghorn and mule deer), BLM found that, under Alternative B and "[s]imilar to the proposed action," development "within transitional ranges and CWR [(crucial winter ranges)] compounded by the current poor condition of the crucial winter habitat would exceed the significance criteria." AR1705 (DEIS at 4-70). For the sage grouse, while the Draft EIS found that Alternative B would benefit greater sage-grouse "in the short-term by concentrating development within one third of the project area over the first five to six years, . . . [i]n the long-term, however, the decline in health of CWR and transitional ranges for big game would further reduce habitat quality and quantity for grouse, potentially leading to a decline in population numbers." *Id.* The Draft EIS, while recognizing that Alternative B reduced the "level of simultaneous development" that would allow hunters and recreationists some "limited, but continued opportunities to use portions of the ARPA," found that "[s]hort term impacts to recreation occurring under Alternative B would be qualitatively the same as

under the Proposed Action" and "[l]ong-term impacts to recreation would be the same under Alternative B as under the Proposed Action." AR1731-AR1732 (FEIS at 4-96 to 4-97).

33. BLM's preferred alternative in the Draft EIS was a combination of Alternatives B and C. AR1449 (DEIS at S-7). BLM noted, however, that the Final EIS may include a different preferred alternative "to provide the best mix of operational requirements and mitigation best management practices to reduce environmental harm." AR1449-AR1450 (DEIS at S-7 to S-8).

*3. The Final Environmental Impact Statement*

34. The Final EIS was noticed in the Federal Register on December 1, 2006. AR9564 (71 Fed. Reg. 69,582 (Dec. 1, 2006)). The Final EIS again identified the purpose of and need for the project "to develop, produce, and market natural gas products": "This natural gas is needed to meet the national domestic energy demand. This proposal is consistent with the National Energy Act of 2005 and the National Energy Policy (President's Plan)." AR2136 (FEIS at 1-9).

35. The Final EIS reiterated that the project conformed with the Great Divide RMP's management objectives and actions. AR2136 (FEIS at 1-9). While again noting that the Great Divide RMP was being revised, BLM also indicated that any activities authorized after its revision must conform with the revised RMP. AR2149 (FEIS at 2-1).

*a) Review of Environmental Impacts*

36. The Final EIS reviewed potential impacts to numerous resources, including geology/minerals/paleontology, air quality, soils, water resources (impacts to Muddy Creek, salinity loading, etc.), groundwater (impacts to wells, seeps, and springs emanating from upper Mesaverde Group, etc.), range and other land uses, vegetation (impacts from erosion and runoff, long-term loss of shrubs, etc.), wildlife (impacts to greater sage-grouse, big game, threatened and endangered fishes, etc.), recreation, visual resources, cultural resources, socioeconomics,

transportation, health and safety, and noise. *See generally* AR2090-AR2094, AR2165 (FEIS at ES-3 to ES-7, 3-1).

37.    Chapter 3 of the Atlantic Rim EIS describes the existing environmental conditions in the ARPA for these resources, such as:  climate and air quality; soils; water resources; vegetation; range resources; fish and wildlife; special status species; recreation resources; visual resources; cultural resources; socioeconomics; transportation; health and safety; noise; wild horses; and special management areas.  AR2165-AR2318 (FEIS at Ch. 3).

38.    BLM's analysis in the Atlantic Rim EIS includes information regarding baseline conditions of mule deer including:  population numbers, AR2250, AR2254 (FEIS at 3-86, 3-90); migration routes, AR2253 (FEIS at 3-89); and crucial winter range ("CWR"), AR2252, AR2255 (FEIS at 3-88, 3-91).  The Atlantic Rim EIS also contains information regarding existing habitat concerns with mule deer winter range and the distribution of mule deer range on public and private lands within the vicinity of the ARPA, AR2254 (FEIS at 3-90), and information regarding overlapping mule deer crucial range and crucial winter range for other species, AR2255, AR2257 (FEIS at 3-91, 3-93).

39.    The FEIS noted that a mule deer study was ongoing and that the first phase of that study provided BLM and the Wyoming Game and Fish Department information on migration routes.  AR2499 (FEIS at 5-17).  Additional information from the study would be evaluated and incorporated into the wildlife monitoring and mitigation process.  AR4870 (ROD at E-2).

40.    BLM considered past, existing, and reasonably foreseeable future activity located in (a) the ARPA, (b) the Southeastern Sweetwater County/Southwestern Carbon County cumulative impact analysis ("CIA") area, (c) the Watershed CIA area, and (d) the Regional CIA area.  AR2483 (FEIS at 5-1).

41.     Other oil and gas projects in the region were included in this analysis, including the Desolation Flats Natural Gas Field Development Project, the Greater Wamsutter Area II Natural Gas Development Project, the Continental Divide/Wamsutter II Natural Gas Development Project, the Creston/Blue Gap Natural Gas Project, the Hay Reservoir Unit Natural Gas Infill Development Project, the South Baggs Area Natural Gas Development Project, and the Vermillion Basin Natural Gas Exploration and Development Project.  AR2138, AR2484-AR2485 (FEIS at M-5 (map of other development projects in vicinity of ARPA), 5-2 to 5-3). BLM found these projects were reasonably foreseeable.  AR2483-AR2484 (FEIS at 5-1 to 5-2).

42.     Recognizing more information may be needed, the Final EIS outlines various monitoring requirements, including:  air quality monitoring, AR2334-AR2335 (FEIS at 4-15 to 4-16); groundwater monitoring, AR2368 (FEIS at 4-49); wildlife monitoring, AR2621-AR2625 (FEIS at E-2 to E-6); and reclamation monitoring, AR2580-AR2581 (FEIS at B-5 to B-6).

43.     The Final EIS also reviewed numerous mitigation measures, including: (a) voluntary measures proposed by the project proponents to mitigate surface disturbance and environmental impacts under the Proposed Action (AR3122-AR3147, FEIS, App. K); (b) a Wildlife Monitoring and Protection Plan, which outlines proposed inventory, monitoring and protection measures (AR2617-AR2632, FEIS, App. E); (c) a program to inventory, evaluate, and manage cultural resources (AR3097-AR3108, FEIS, App. I); (d) best management practices ("BMPs") for reducing non-point source pollution (AR3109-AR3121, FEIS, App. J); and (e) protection measures proposed for Alternative C (AR3148-AR3162, FEIS, App. L).  BLM developed mandatory BMPs where the Proposed Action conflicted with identified resources, including, but not limited to, vegetation resources, visual resources, water and soil management, and wildlife.  AR3081-AR3096 (FEIS, App. H).

44. Mitigation measures were considered with each alternative consistent with the management objectives identified as part of the significance criteria. AR2320-AR2321 (FEIS at 4-1 to 4-2). For wildlife, the Final EIS provides that the Great Divide RMP and state land use plans prescribe the following management objectives associated with wildlife resources: (1) to provide habitat quality (food, cover, space, and water) adequate to support natural diversity of wildlife and fisheries including big game; upland game; waterfowl; non-game species; game fish; sensitive, threatened, and endangered species; and species of special management interest in Wyoming, as well as to assist in meeting goals of recovery plans; (2) to maintain or improve vegetation condition or avoid long-term disturbance in high priority standard habitat sites and fisheries areas; and (3) to maintain or improve overall ecological quality, thus providing good wildlife habitat, within the constraints of multiple-use management in moderate and low priority standard habitat sites. AR2387 (FEIS at 4-68).

45. With respect to big game, BLM noted the impacts on CWR for big game exceeded the significance criteria for big game. AR2401-AR2402 (FEIS at 4-82 to 4-83). BLM imposed restrictions to prevent drilling in CWR between November 15 and April 30. AR2391 (FEIS at 4-72). BLM found that the restrictions imposed would reduce "the displacement and disturbance of big game during the most critical season." AR2391 (FEIS at 4-72). BLM further noted that the extent of this displacement "is impossible to predict." AR2419 (FEIS at 4-100). The potential impacts to hunting and recreation under Alternative D would be of a lesser magnitude than the impacts of the Proposed Action. AR2423 (FEIS at 4-104).

46. With respect to sage grouse, BLM identified loss of habitat as exceeding the significance criteria. AR2402 (FEIS at 4-83). BLM imposed numerous mitigation measures for the sage grouse, including (a) limiting surface disturbances within 1/4 mile of "the perimeter of

occupied leks"; (b) providing a two-mile buffer around occupied leks and nesting and early brood-rearing habitat from March 1 to July 15; (c) prohibiting *any human activity* within 1/4 mile of occupied leks from 6 p.m. to 9 a.m. from March 1 to May 20; (d) limiting construction of permanent and high-profile structures within 0.25 to 1 mile of the perimeter of leks; (e) prohibiting surface disturbances between November 15 and March 14 in delineated winter concentration areas; (f) requiring noise reduction techniques, including using hospital-style mufflers on compressor stations and generators; and (g) requiring annual inventory and monitoring for the sage-grouse. AR2623, AR2626 (FEIS at E-4, E-7). BLM found that the application of avoidance and mitigation measures would help reduce the loss of habitat and stress to greater sage-grouse in proximity to leks on public lands. AR 2402 (FEIS at 4-83).

*b) Range of Alternatives*

47. BLM identified "a range of alternatives based on issues, concerns, and opportunities raised in public comments to project scoping and the Draft EIS, interdisciplinary interaction between resource professionals, and collaboration with cooperating and interested agencies." AR2149 (FEIS at 2-1).

48. In addition to the Proposed Action, the Final EIS retained Alternatives A and C that were reviewed in detail in the Draft EIS. AR2089, AR2149-AR2155 (FEIS at ES-2, 2-1 to 2-7).

49. The Final EIS placed Alternative B (the "Phased" or "Temporal" alternative), which was considered in depth in the Draft EIS, in the section of Alternatives Considered and Eliminated from Detailed Study. AR2089, AR2159-AR2161 (FEIS at ES-2, 2-11 to 2-13). BLM noted that "[s]ignificant effects were expected under [Alternative B] upon several resources, including wildlife, soils and range." AR2160 (FEIS at 2-12).

50.    Alternative B would limit development to about 33 percent of the ARPA at any one time.  AR4789 (FEIS at O-394).  BLM eliminated Alternative B "from further detailed study in the Final EIS based on comments received on the Draft EIS, the effects of long delays on allowable oil and gas development to leaseholders and mineral rights, and the policy that BLM will allow reasonable access across federal lands for mineral development on private and state lands."  AR2161 (FEIS at 2-13); AR4809 (ROD at 14).

51.    BLM found that, under Alternative C (the "Spacial" alternative), development would be limited to four well locations per section (160-acre spacing) in up to 95 percent of the federal lands within ARPA.  AR2159 (FEIS at 2-11); AR4811 (ROD at 16).  BLM further stated that comments on the Draft EIS and from internal BLM sources, including the RMG, indicates that this limited amount of development might render the project unfeasible.  AR2159 (FEIS at 2-11); AR4811 (ROD at 16).

52.    The Final EIS revised the Preferred Alternative in the Draft EIS, which was designated as Alternative D.  AR4404 (FEIS at O-8).  Alternative D was developed to address the well-spacing issue with input from RMG and Anadarko.  AR4432, AR4443, AR4408 (FEIS at O-36, O-47, O-12).

53.    Alternative D would minimize surface disturbance while optimizing natural gas recovery.  AR2089, AR2155-AR2157 (FEIS at ES-2, 2-7 to 2-9).  Cooperating agencies also were consulted and reviewed the revisions.  AR4652 (FEIS at O-257).

54.    BLM considered each alternative's potential environmental impacts based on significance criteria used to gauge the magnitude of an impact on the human environment. AR2320 (FEIS at 4-1).  The applicable management objectives from the Great Divide RMP were

included as significance criteria. *Id.* BLM also took into consideration consistency with the significance criteria found in the Rawlins RMP Draft EIS. *Id.*

55. BLM chose Alternative D as the Preferred Alternative in the Final EIS following public comment and in response to nine of the fifteen key issues identified by BLM during the scoping process. AR2147 (FEIS at 1-20).

*4. The Record of Decision*

56. On March 23, 2007, BLM signed the Record of Decision ("ROD"), authorizing the Atlantic Rim Project, but limiting total new surface disturbance from the drilling program across the ARPA to a maximum of 7,600 acres at any given time and a 6.5-acre/well site short-term (less than 6 years) disturbance goal. AR4796, AR4817 (ROD at 1, 22). In more sensitive areas -- about 72,200 acres identified as "Category A" areas (management areas with sensitive fish populations and crucial wildlife habitats) -- the 6.5 acre short-term disturbance would be further minimized. AR4807 (ROD at 12). A notice of availability of the ROD was published in the Federal Register on May 21, 2007. AR9574 (72 Fed. Reg. 28,518 (May 21, 2007)).

57. Appendix C of the ROD includes at least 38 specific "mandatory requirements" for all permit holders, such as prohibition of off-road vehicle activity, location of buried pipelines close to roads to minimize areas of disturbance, and non-reflective paint for all structures to blend with landscape (except where OSHA requires safety coloration). AR4816, AR4859-AR4863 (ROD at 21, C-3 to C-7). In addition to these operator-committed measures, BLM required annual planning between BLM and the operators. AR4807 (ROD at 12).

58. The ROD provides for the application of site-specific mitigation measures to minimize surface disturbance by means of appropriate COAs, BMPs, and other measures deemed necessary. AR4807 (ROD at 12). Appendix B includes 17 pages of BMPs that are or could be required. AR4838-AR4854 (ROD at B-4 to B-20).

59. Operators must engage in monitoring "to measure the degree of success the performance requirements have in achieving Performance Goals." AR4836 (ROD at B-2). Operators must also adopt additional mitigation or adaptive techniques to achieve the Performance Goals where needed. *Id.*

60. The ROD also included a Reclamation Plan that outlines criteria for reclamation of the disturbed areas. AR4822-AR4833 (ROD, App. A). Once a site has been disturbed, it stays within the 7,600 acre disturbance cap until it has been successfully reclaimed. AR4798, AR4813 (ROD at 3, 18). Successful reclamation is defined as having achieved 80 percent of predisturbance ground cover, with 90 percent dominant species. AR4827 (ROD at A-6).

61. Although BLM recognized surface-disturbing activities associated with the Atlantic Rim Project may result in major adverse impacts to certain resource values, BLM concluded that its decision "will result in production of nationally significant natural gas resources consistent with The National Energy Policy (May 2001) and the National Energy Policy Act of 2005." AR4799 (ROD at 4). The Atlantic Rim project is expected to produce nearly 1,350 billion cubic feet of natural gas, providing enough natural gas to heat 19.3 million homes for one year. AR4796 (ROD at 1).

C. Plans of Development

62. Prior to any drilling or other surface-disturbing activity, operators are required to submit an Application for Permit to Drill ("APD"). AR4798 (ROD at 3). Operations are approved only after on-site visits and the application of appropriate BMPs. AR4813 (ROD at 18); AR5683 (Onshore Order No. 1, 72 Fed. Reg. 10,308, 10,329 (Mar. 7, 2007)).

63. Notices of the APDs are posted for 30 days in the Rawlins Field Office Information Access Center (Public Room) for review. AR73494 (Catalina A&B EA at 3); AR74065 (Sun Dog A&B EA at 3).

64.    On June 28, 2007, BLM approved Catalina PODs A&B for 39 new wells (36 development wells and 3 produced water injection wells) and associated infrastructure. AR73502 (Catalina A&B DR).  BLM prepared an EA for these PODs, which was tiered to the Atlantic Rim EIS.  AR73492 (Catalina A&B EA).  Notification of preparation of the EA was provided on the Wyoming BLM internet NEPA register.  AR73494 (Catalina A&B EA at 3).

65.    During consideration of the Catalina PODs A&B, BLM determined that one of the proposed wells was to be located within the 1/4-mile buffer zone for a sage grouse lek (breeding area) and that the well "can not be situated to adequately mitigate the potential effects to grouse at the adjacent lek."  AR73499 (Catalina A&B EA at 8).  "As a result," BLM stated that "authorization of this APD will be deferred until additional mitigation measures have been developed to reconsider the proposal."  *Id.*

66.    On August 16, 2007, BLM approved Sun Dog PODs A&B for 51 new wells (48 development wells and 3 injection wells) and associated infrastructure.  AR74073 (Sun Dog A&B DR).  BLM prepared an EA for these PODs, which was tiered to the Atlantic Rim EIS. AR74063 (Sun Dog A&B EA).  Notification of preparation of the EA was provided on the Wyoming BLM internet NEPA register.  AR74065 (Sun Dog A&B EA at 3).

67.    The average short-term disturbances for these projects ranged from 4.2 and 4.4 acres for Sun Dog PODs A&B and 5.2 and 6.1 acres for Catalina PODs A & B.  AR73497 (Catalina A&B EA at 6); AR74067 (Sun Dog A&B EA at 5).  The 90 approved wells in these PODs involve a total of only 439 disturbed acres.  AR73496-AR73497 (Catalina EA at 5-6); AR74067 (Sun Dog EA at 5).  This amounts to approximately 0.16 percent of the total area in the ARPA, and 0.011 percent of the federal lands in the Great Divide Resource Area.

68.    BLM conducted on-site inspections for each POD.  AR73496 (Catalina A&B EA at 5); AR74066 (Sun Dog A&B EA at 4).  Based on these inspections, the EAs for the PODs identify and implement the mitigation measures deemed necessary.  AR73499-AR73500 (Catalina A&B EA at 8-9); AR74069-AR74071 (Sun Dog A&B EA at 7-9).  These measures include restrictions to protect sage grouse, big game, and other wildlife outlined in the EIS. AR4807, AR4813 (ROD at 12, 18).

69.    The mitigation measures outlined in the EAs are also incorporated into the COAs for each POD.  AR74074-AR74091 (Sun Dog A&B); AR73506-AR73517 (Catalina A&B).

70.    For each POD, the EAs concluded "the impacts are not expected to be significant, and that an EIS is not required."  AR73502 (Catalina A&B EA/DR at 11); AR74073 (Sun Dog A&B EA/DR at 11).

71.    The EAs outlined the purpose and need of the PODs as production of natural gas, which was found (a) to be consistent with U.S. energy policy to increase domestic sources of energy, (b) would promote the environmental advantages of burning natural gas as emphasized in the Clean Air Act amendments of 1990, and (c) would allow the leaseholder to exercise lease rights to explore and develop oil gas resources within the project lease areas.  AR73494 (Catalina A&B at 3); AR74065 (Sun Dog A&B at 3).

Respectfully submitted,

/s/ Michael B. Wigmore

Michael B. Wigmore (DC Bar # 436114)
Bingham McCutchen LLP
2020 K St., NW
Washington, DC 20006-1806
202.373.6000
202.373.6001 (facsimile)

*Counsel for Anadarko Petroleum Corporation, Warren Resources, Inc., and Double Eagle Petroleum Co.*

Robert C. Mathes (DC Bar # 484255)
Bjork Lindley Little PC
1600 Stout Street, Suite 1400
Denver, CO 80202
303.892.1400
303.892.1401 (facsimile)

*Counsel for Double Eagle Petroleum Co.*

Dated: June 12, 2008

A/72563817.1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

THEODORE ROOSEVELT CONSERVATION PARTNERSHIP
555 Eleventh St. N.W., 6th Floor
Washington, DC 20004,

Plaintiff,

v.

DIRK KEMPTHORNE, in his official capacity as the Secretary of the United States Department of the Interior
1849 C Street, N.W.
Washington, DC 20240,

and

UNITED STATES BUREAU OF LAND MANAGEMENT
1849 C Street, N.W., Room 406-LS
Washington, DC 20240,

Defendants.

---

ANADARKO PETROLEUM CORPORATION,
P.O. Box 1330
Houston, TX 77251-1330,

WARREN RESOURCES, INC.,
489 Fifth Avenue, 32nd Floor
New York, NY 10017,

DOUBLE EAGLE PETROLEUM CO.,
777 Overland Trail, Suite 208
P.O. Box 766
Casper, WY 82602-0766,

Defendant-Intervenors.

CASE NO. 1:07-cv-01486-RJL

STATE OF WYOMING )
123 Capitol Building )
Cheyenne, WY 82002 )
)
Defendant-Intervenor. )
)

**RESPONSE OF ANADARKO PETROLEUM CORPORATION, WARREN RESOURCES, INC. AND DOUBLE EAGLE PETROLEUM CO. TO PLAINTIFF'S STATEMENT OF MATERIAL FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1, Defendant-Intervenors Anadarko Petroleum Corporation ("Anadarko"), Warren Resources, Inc. ("Warren") and Double Eagle Petroleum Co. ("Double Eagle") (collectively referred to as "Defendant-Intervenors") submit the following response to Plaintiff Theodore Roosevelt Conservation Partnership's Statement of Material Facts in Support of Motion for Summary Judgment.

**GENERAL OBJECTIONS**

1. Defendant-Intervenors object to any and all statements of fact proffered by Plaintiff that are allegedly supported by documents, declarations, or other evidence that is not included in the administrative record ("AR") for this case. By offering such statements that are not supported by evidence in the AR, Plaintiff impermissibly seeks to submit new evidence to this Court that was not before the Bureau of Land Management ("BLM") at the time the agency was deliberating the administrative decisions at issue in this case.

Review of an agency's decision based on alleged violations of the National Environmental Policy Act ("NEPA") and the Federal Land Policy and Management Act ("FLPMA"), as in this case, may only be made through the Administrative Procedure Act ("APA"). The APA provides that a court shall review agency action based on a review of the "whole record." 5 U.S.C. § 706. The court's review is limited to "the full administrative record

before the agency at the time the decision was made." *Envtl. Def. Fund, Inc. v. Costle*, 657 F.2d 275, 284 (D.C. Cir. 1981). Despite this rule, many of the Plaintiff's statements of material fact rely, in whole or in part, on information contained in documents, declarations, or other evidence that is not part of the administrative record for this case.

To the extent that a response is required to any statements of fact that are supported by references to evidence not contained in the administrative record, such statements are denied as they are not material to this record-review case.[1]

2. Defendant-Intervenors object to any and all statements of fact proffered by Plaintiff that consist of opinions and characterizations. Such statements are not statements of material fact, and are therefore denied.

3. Defendant-Intervenors object to any and all statements of fact proffered by Plaintiff that are not cited in Plaintiff's Motion for Summary Judgment and Supporting Memorandum of Points and Authorities. Such statements are not material to Plaintiff's motion, and are therefore denied.

**RESPONSES TO PLAINTIFF'S STATEMENTS OF MATERIAL FACT**

Defendant-Intervenors respond to Plaintiff's proffered statements of material fact as follows:

1. Admitted.

2. Admitted.

3. Defendant-Intervenors object to the phrase "uniquely well-defined and contiguous block of sage brush" as vague and ambiguous and not supported by any citation to the record,

[1] Defendant-Intervenors have submitted a motion to strike the extra-record evidence relied on by Plaintiff and the discussions and arguments based on that evidence. Defendant-Intervenors' motion also requests that the Court strike any and all statements of fact proffered by Plaintiff that are not cited in Plaintiff's Motion for Summary Judgment and Supporting Memorandum of Points and Authorities. *See* General Objection No. 3 herein.

and therefore, deny the first sentence in this proffered Statement of Fact ("SOF"). Defendant-Intervenors admit the second sentence in this SOF. Defendant-Intervenors object to the phrase "vast majority" in the third sentence in this SOF as vague and ambiguous. Without waiving this objection, Defendant-Intervenors admit the remainder of the third sentence in this SOF.

4. Admitted. Defendant-Intervenors note, however, that with regard to the last sentence in this SOF, the cited source states that "[t]he WGFD manages the Baggs herd unit for a post-hunting season population of 18,700 deer, but the estimated herd size has ranged from 20,200 in 2001 to 22,300 in 2005. (Woolley 2005)." AR 007424. Also, hunt areas appear to be largely outside of the ARPA. *Id.* *See also* AR 002280.

5. Defendant-Intervenors admit the first three sentences in this SOF. Defendant-Intervenors deny the fourth sentence in this SOF, as it is not supported by any reference to the administrative record. Moreover, it appears from the maps located at AR 007433, AR 007435, and AR 007437, that much of the Baggs herd's transition range is located outside of the ARPA. Defendant-Intervenors deny the fifth sentence in this SOF, as it identifies the statistics presented as being representative of hunting in the ARPA "each year." The statistics presented on AR 002280 are identified therein as coming from a single year, 2002, and represent data from hunt areas that are not entirely within the ARPA. Defendant-Intervenors admit the last sentence in this SOF.

6. Denied. Defendant-Intervenors hereby reference and incorporate General Objection No. 1 with regard to the first four sentences in this SOF. Defendant-Intervenors deny the last sentence in this SOF, as it cites to no support in the administrative record. Without waiving any objections, Defendant-Intervenors admit that mule deer may demonstrate affinity for certain migration routes. *See* AR 006528.

7.    Denied.  Defendant-Intervenors hereby reference and incorporate General Objection No. 1 with regard to each sentence in this SOF and further note that the single record document cited does not support this SOF.  The one study cited in this SOF that is contained in the administrative record notes: "While results from our resource selection analyses suggest natural gas development in the [Pinedale Anticline Project Area] has affected mule deer habitat use, no statistically significant changes in survival or reproduction have been detected."  AR 006531.

8.    Denied.  Defendant-Intervenors hereby reference and incorporate General Objection No. 1 with regard to each sentence in this SOF.

9.    Denied.  Defendant-Intervenors hereby reference and incorporate General Objection No. 1 with regard to each sentence in this SOF.  In addition, this SOF is not supported by the lone record document cited (AR 007421).

10.    Denied.  Defendant-Intervenors hereby reference and incorporate General Objection No. 1 with regard to each sentence in this SOF.

11.    Defendant-Intervenors admit the first sentence in this SOF.  Defendant-Intervenors deny the second sentence in this SOF, and note that Plaintiffs have clearly mischaracterized the record document cited.  As the study cited in this SOF notes, "[w]hile results from our resource selection analyses suggest natural gas development in the [Pinedale Anticline Project Area] has affected mule deer habitat use, no statistically significant changes in survival or reproduction have been detected."  AR 006531.

12.    Defendant-Intervenors admit each sentence in this SOF, with the exception of the second-to-last sentence.  Defendant-Intervenors deny the second-to-last sentence in this SOF, as it identifies the statistics presented as being representative of hunting in the ARPA "each year."

The statistics presented on AR 002280 are identified therein as coming from a single year, 2002, and represent data from hunt areas that are not entirely within the ARPA. In addition, according to the statistics presented on AR 002280, elk were hunted with a 45% success rate, not 54%, in 2002.

13.     Defendant-Intervenors admit each sentence in this SOF, with the exception of the third sentence. Defendant-Intervenors deny the third sentence in this SOF, as it identifies the statistics presented as being representative of hunting in the ARPA "each year." The statistics presented on AR 002280 are identified therein as coming from a single year, 2002, and represent data from hunt areas that are not entirely within the ARPA. In addition, according to the statistics presented on AR 002280, pronghorn antelope were hunted by 377 hunters, not 2,784 hunters, in 2002.

14.     Admitted.

15.     Admitted.

16.     Admitted in part. The BLM State Office in Cheyenne, Wyoming identified the greater-sage grouse as a BLM Wyoming Sensitive Species.

17.     Defendant-Intervenors admit that the first sentence in this SOF is an accurate quote from the document cited, and that AR 002258 is in the administrative record and speaks for itself. Defendant-Intervenors deny the second sentence in this SOF, as it identifies the statistics presented as being representative of hunting in the ARPA "each year." The statistics presented on AR 002280 are identified therein as coming from a single year, 2002, and represent data from hunt areas that are not entirely within the ARPA. In addition, according to the statistics presented on AR 002280, 509 hunters hunted "Birds & Small Game," a category which includes only "[a]bout 51% sage-grouse hunting."

18.     Defendant-Intervenors hereby reference and incorporate General Objection No. 1 with regard to the first sentence in this SOF.  Defendant-Intervenors admit that the block quote from AR 007357 is an accurate quote and that AR 007357, as part of the administrative record, speaks for itself.

19.     Defendant-Intervenors hereby reference and incorporate General Objection No. 1, and therefore deny this SOF.

20.     Defendant-Intervenors hereby reference and incorporate General Objection No. 1, and therefore deny this SOF.

21.     Admitted.

22.     Denied.  The impacts of energy development are not well understood. Nonetheless, Defendant-Intervenors admit that one of the documents cited notes that "[g]reater sage-grouse are known to be negatively impacted by activities associated with mining, and oil and gas development."  AR 009990.  However, another cited document also states:  several studies "concluded that sage grouse were displaced by coal mining activities but returned to fluctuating predisturbance levels once mine activity ceased," and one study "reported similar findings for sage grouse in areas impacted by oil development."  AR 006240.

23.     Defendant-Intervenors object to the phrases "identified basic sage grouse needs" and "substantial additional information" as vague and ambiguous.  Defendant-Intervenors hereby reference and incorporate General Objection No. 2 with regard to this SOF.  To the extent a response is required and without waiving any objections, Defendant-Intervenors deny this SOF.

24.     Defendant-Intervenors hereby reference and incorporate General Objection No. 1, and therefore deny this SOF.

25.    Denied.  With regard to the first two sentences in this SOF, Plaintiff fails to cite to any support in the administrative record.  Defendant-Intervenors note that references listed in the document cited in the last sentence date as early as 1937.  AR 005738.  With regard to the last sentence in this SOF, Defendant-Intervenors object to the relevance of this statement.  Although Defendant-Intervenors admit that "Recommended Guidelines" were published in the Wildlife Society Bulletin in 1977 that recommended that no sagebrush control be permitted within 3 km of a lek,  AR 005736-37, sagebrush control is unrelated to this case as it involves the treatment of sagebrush by burning, spraying, plowing, disking, chaining, cutting, and beating in attempts to convert these ranges to grasslands.  AR 005732.

26.    Denied.  In support of this purported SOF, Plaintiff references the entire document titled Recommendations for Development of Oil and Gas Resources within Crucial and Important Wildlife Habitats, issued by the Wyoming Game and Fish Department ("WGFD"), and mischaracterizes its content.  The standard mitigation measures outlined in this document include no surface occupancy within 0.25 miles of the perimeter of occupied sage grouse leks.  AR 006564.  The WGFD also includes as standard mitigation measures the avoidance of surface disturbing activities and geophysical surveys in suitable nesting and early brood-rearing habitat within 2 miles of an occupied sage grouse lek, and within identified sage grouse nesting and early brood-rearing habitat outside the 2-mile buffer, from 15 March through 15 July.  AR 006565.  These are measures BLM considered for the Atlantic Rim Project Area. AR 004850 (ROD at B-16).  Additional sage grouse mitigation measures include:  (a) prohibiting *any human activity* within 0.25 mile of occupied leks from 6 p.m. to 9 a.m. from March 1 to May 20; (b) limiting construction of permanent and high-profile structures within 0.25 to 1 mile of the perimeter of leks; (c) prohibiting surface disturbances between November 15 and March 14 in

delineated winter concentration areas; (d) requiring noise reduction techniques, including using hospital-style mufflers on compressor stations and generators; and (e) requiring annual inventory and monitoring for the sage-grouse.  *Id.*; AR 002623, AR002626 (FEIS at E-4, E-7).

27.     Denied.  As the Record of Decision ("ROD") notes, "[s]urface disturbance and other actions that create permanent and high-profile structures . . . will not be constructed within 0.25 to 1.0 mile of the perimeter of leks, as determined on a case-by-case basis."  AR 004850.  In addition, the ROD places several seasonal timing restrictions upon activities near leks.  *See id.* *See also* Response to SOF No. 26.

28.     Defendant-Intervenors hereby reference and incorporate General Objection No. 1 with regard to the first sentence of this SOF, and therefore deny same.  Defendant-Intervenors deny the second sentence of this SOF.  However, without waiving any objection, Defendant-Intervenors admit that the letter cited from the U.S. Fish & Wildlife Service ("USFWS") states that it "does not support a 0.25-mile protective buffer around sage-grouse leks as a mitigation measure . . . ."  AR 003256.  The USFWS recommended minimum mitigation measures recommended by Connelly, *et al.* (2000).  AR 003256.  *See also* Response to SOF No. 30.

29.     Defendant-Intervenors hereby reference and incorporate General Objection No. 1, and therefore deny this SOF.

30.     Defendant-Intervenors admit that comments submitted by Biodiversity Conservation Alliance on the EIS referenced a 5.5 km buffer around sage grouse leks.  BLM's literature review, however, found "that requirements for no surface disturbance (NSD) from a lek generally run in the quarter-mile to 2-mile range.  The quarter-mile NSD mitigation is generally a minimum distance."  AR 004405.  BLM also noted in response to similar comments that the 1/4-mile NSO was consistent with the Resource Management Plan and with the Wyoming

Greater Sage Grouse Conservation Plan. AR 004678. Defendant-Intervenors hereby reference and incorporate General Objection No. 2 with regard to the second sentence of this SOF, and therefore deny same.

31. Defendant-Intervenors admit that the quotations contained in the first two sentences of this SOF are accurate quotations from AR 003256. Defendant-Intervenors note that the January 26, 2006 letter from the USFWS is contained in the administrative record and speaks for itself. Defendant-Intervenors hereby reference and incorporate General Objection No. 1 with regard to the last sentence in this SOF, and therefore deny same. To the extent a response is required to this last sentence, Defendant-Intervenors note that Connelly *et al*. (2000), does not suggest strict adherence to a 2-mile NSO area, and instead recommends:

> Adjust timing of energy exploration, development, and construction activity to minimize disturbance of sage grouse breeding activities. Energy-related facilities should be located >3.2 km [(2 miles)] from active leks *whenever possible*. Human activities within view of or <0.5 km from leks should be minimized during the early morning and late evening when birds are near or on leks.
>
> Wildlife Society Bulletin 2000, 28(4) at 978 (emphasis added).

32. Admitted.

33. Defendant-Intervenors admit that the quotation contained in this SOF is an accurate quotation, with the exception of a minor punctuation error (an omitted comma). Defendant-Intervenors note that the Great Divide Resource Management Plan ("Great Divide RMP") is contained in the administrative record and speaks for itself.

34. Defendant-Intervenors admit that the "Wildlife Management Objectives" listed in this SOF are accurately excerpted from the Great Divide RMP. Defendant-Intervenors note that the Great Divide RMP is contained in the administrative record and speaks for itself.

35.    Defendant-Intervenors admit that the quotations contained in this SOF are accurate quotations.  Defendant-Intervenors note that the Great Divide RMP is contained in the administrative record and speaks for itself.

36.    Defendant-Intervenors admit that the quotation from the Great Divide RMP contained in this SOF is an accurate quotation.  However, Defendant-Intervenors also note that Plaintiff has omitted the remainder of the paragraph entitled "**Management Actions**," and the paragraph thereafter, which are relevant to the issues presented.  The first two paragraphs under "**Management Actions**" state:

> **Management Actions**  Surface-disturbing activities will be intensively managed to prevent loss of significant elk winter habitat.  *This will entail case-by-case examination of proposals to determine potential adverse effects and appropriate mitigation to minimize those effects.  Certain times of the year and certain areas will be avoided by spatial and temporal management of development, facilities, and uses.*
> *Oil and gas leasing will be allowed with application of surface protection measures described above.*
>
> AR 000692-94 (italicized emphasis added).

37.    Defendant-Intervenors admit that the quotations contained in this SOF are accurate quotations.  Defendant-Intervenors note that the Great Divide RMP is contained in the administrative record and speaks for itself.

38.    Denied.  Defendant-Intervenors deny the first sentence in this SOF because the reference cited does not support the proposition that the Great Divide RMP "projected 1,440 wells being drilled between 1987 and 2007."  Instead, the cited reference consists of a random comment contained in the public comments section of the Atlantic Rim Final Environmental Impact Statement to which BLM responded.  *See* AR 004666; AR 004654.  The Great Divide RMP does not contain a "projected" number of wells.  *See* AR 000643-721.  In addition, even if

a "projected" number of wells were included within the reasonable foreseeable development ("RFD") analysis in the Great Divide RMP, such an RFD analysis does not establish a limit on the number of wells that can be drilled in that resource area. *See* AR 004654; AR 005309. "Rather it is a reasonable estimate of drilling activity for environmental review purposes." *Id.*; *see also* AR 005309. With regard to the second sentence in this SOF, Defendant-Intervenors deny that the number of wells listed were actually drilled for each project. The number of wells listed for each project generally are the "maximum" number of wells analyzed in the NEPA documents for those projects, and Plaintiff cites no record evidence that these projects actually drilled the amounts stated. With regard to the final sentence in this SOF, Defendant-Intervenors hereby reference and incorporate General Objection No. 1, and therefore deny same.

39.　　Admitted. BLM evaluated the Great Divide RMP and determined that it needed updating. Until the Rawlins RMP is finalized, however, the Great Divide RMP governs land use management within the ARPA. AR 002136; AR 008015.

40.　　Defendant-Intervenors admit that the block quotation contained in this SOF is an accurate quotation. Defendant-Intervenors note that the Draft Environmental Impact Statement ("DEIS") for the Rawlins RMP is contained in the administrative record and speaks for itself.

41.　　Defendant-Intervenors admit that the quotations contained in this SOF are accurate quotations. Defendant-Intervenors note that the DEIS for the Rawlins RMP is contained in the administrative record and speaks for itself. Defendant-Intervenors note, however, that the RFD scenario is used to estimate impacts for purposes of environmental review, not as a limitation on development. AR 005309. Defendant-Intervenors hereby reference and incorporate their response to SOF No. 38.

42.      Defendant-Intervenors admit that the block quotation contained in this SOF is an accurate quotation, with the exception of numerous punctuation errors. Defendant-Intervenors note that the DEIS for the Rawlins RMP is contained in the administrative record and speaks for itself.

43.      Defendant-Intervenors deny the first sentence in this SOF. In 2000, Stone & Wolf proposed an exploratory project to utilize its limited rights in the ARPA. AR 007452. Stone & Wolf sold its interests to Petroleum Development Corporation ("PEDCO") and Warren Resources, Inc. ("Warren"), who subsequently withdrew this proposal. AR 002128; AR 007633. The Stone & Wolf proposal was an exploratory project and was substantively different that the Atlantic Rim Project approved by BLM in 2007. AR 007452.   Defendant-Intervenors admit the remaining sentences in this SOF.

44.      Defendant-Intervenors deny the first sentence in this SOF. Defendant-Intervenors admit that "[p]otential impacts to wildlife habitats within the analysis area, including big game, sage grouse, and raptors," was identified as an issue or concern in the scoping phase, but there is no indication that this was a "key resource concern." AR 007454. Defendant-Intervenors admit the second sentence in this SOF.

45.      Defendant-Intervenors object to this SOF in its entirety as it is irrelevant. Without waiving their objections, Defendant-Intervenors deny the first sentence in this SOF, as it is not supported by the cited reference, and to the extent it refers to the Stone & Wolf proposal as the "original proposal." Defendant-Intervenors admit that the United States Environmental Protection Agency ("USEPA") "suggest[ed] that the evaluation of the reasonable foreseeable production phases for coalbed methane be evaluated with the other existing and future projects for the region." AR 007484. Defendant-Intervenors admit the second sentence in this SOF.

46.      Defendant-Intervenors object to this SOF in its entirety as it is irrelevant.  Without waiving their objections, Defendant-Intervenors deny this SOF to the extent it refers to the Stone & Wolf proposal as the "original project."  Defendant-Intervenors admit that "[i]n this initial information-gathering stage of scoping," the State of Wyoming "encourag[ed] [BLM] to proceed with an environmental impact statement" with respect to the Stone & Wolf proposal.  AR 007486.

47.      Defendant-Intervenors object to this SOF in its entirety as it is irrelevant.  Without waiving their objection, Defendant-Intervenors deny this SOF in its entirety.  Defendant-Intervenors deny the first sentence in this SOF, as Plaintiff fails to cite to any support in the administrative record.  Defendant-Intervenors deny the second sentence in this SOF because the "internal October 2000 BLM memorandum" consists of random notes, and cannot be considered a "memorandum" or any other type of official statement by BLM or one of its employees.  AR 007866.  There is no evidence at this document "indicates BLM's preference" on any issue.  *See id*.  Further, BLM noted that the environmental assessment ("EA") "may be advanced to the environmental impact statement (EIS) level based on public scoping or if the EA concludes that significant issues or impacts are present."  AR 007461 (BLM 2/25/2000 Press Release).  BLM also noted that:  "If the exploratory project is deemed successful, any development plans beyond the scope of the EA would require additional environmental analysis."  *Id.*  However, Stone & Wolf sold its operating rights, and the new owner, PEDCO, withdrew this proposal.  AR 007633 (Scoping Statement at 1).

48.      Defendant-Intervenors deny the first sentence in this SOF, as it is not supported by the cited reference.  Defendant-Intervenors admit that WGFD identified certain concerns and suggested that certain impacts on wildlife from roads, powerlines, and pipelines be analyzed.

*See* AR 007495.  Defendant-Intervenors admit that the block quote after the second sentence of this SOF is an accurate quotation.

49.     Denied.  Defendant-Intervenors admit that the U.S. Forest Service requested that the BLM evaluate the Stone & Wolf project, as proposed in 2000, for "[c]umulative impacts on air quality from this project, Continental Divide/Wamsutter II, South Baggs and Pinedale Anticline projects to nearby Class I wilderness areas."  AR 007567.

50.     Denied.  Defendant-Intervenors admit that Double Eagle supported the Stone & Wolf proposal and that the quotation is accurate.

51.     Defendant-Intervenors admit that the block quotation contained in this SOF is an accurate quotation.  However, Defendant-Intervenors deny that the "local public" expressed concerns about the impact of the project on sage grouse.  Plaintiff cites to statements of only one member of the "local public."

52.     Defendant-Intervenors deny this SOF, to the extent it uses the terms "initial proposal."   Defendant-Intervenors admit that the Wildlife Management Institute submitted comments to BLM concerning the Stone & Wolf proposal on March 3, 2000, and deny the remainder of this SOF.

53.     Defendant-Intervenors admit the first three sentences of this SOF.  Defendant-Intervenors deny the fourth sentence in this SOF.  The project proposed to BLM in May 2001 was proposed by PEDCO and other operators within the ARPA.  AR 007865; AR 007633; AR 002128.  The proposal indicated that a "maximum" of 3,880 wells may be drilled in the 310,335 acres encompassing the total project area, which was estimated to be the number needed to effectively develop CBNG in the ARPA.  AR 007633.  Subsequently, the proposed project was

reduced to up to 2,000 wells (1800 CBNG and 200 conventional wells).  AR 008141.  The last sentence in this SOF requires no response.

54.    Denied.  Plaintiff's characterizations of EPA's actions are not supported by the cited material.  In a July 26, 2001 letter, cited in this SOF, EPA stated that "[i]f BLM continues to state that the project is in conformance with the [Great Divide] RMP, there should be statements that provide additional information that show that the differences are minimal."  AR 007681.  Defendant-Intervenors further note that the Great Divide RMP opened up the entire planning area within the Great Divide Resource Area to oil and gas leases.  AR 000679.  BLM issued leases for oil and gas throughout the ARPA, consistent with the Great Divide RMP.  AR 002135.

55.    Defendant-Intervenors admit the first sentence in this SOF.  Defendant-Intervenors admit that the partial block quote after the second sentence of this SOF is an accurate quotation.  Defendant-Intervenors note, however, that Plaintiff selectively omits the following sentences from the middle of the block quote, which are relevant to this SOF: "The development of coalbed methane within the Atlantic Rim project area is in conformance with the RMP.  The environmental analysis that will be prepared on the PEDCO proposal will incorporate appropriate decisions, terms, and conditions of use described in the RMP."  AR 007635.

56.    Defendant-Intervenors admit that the block quote contained in this SOF is an accurate quotation from AR 007923, and note that the document speaks for itself.  The quotation omits, however, the last sentence in the paragraph, which states: "No time line has yet been established for the completion of these documents."  AR 007923.

57.    Defendant-Intervenors hereby reference and incorporate General Objection No. 2 with regard to the first clause in this SOF, and therefore deny Plaintiff's characterization of

BLM's actions. Without waiving any objection, Defendant-Intervenors admit that the block quote contained in this SOF is an accurate quotation from AR 008951, and note that the document speaks for itself.

58. Defendant-Intervenors admit the first sentence in this SOF. Defendant-Intervenors admit that the block quote contained in this SOF is an accurate quotation from AR 009478-79, and note that the document speaks for itself.

59. Denied. Because BLM had already issued leases for mineral development throughout the ARPA, BLM indicated in a presentation for one of the scoping meetings that oil and gas leasing is consistent with BLM's land use plan and oil and gas leases are a contract between the mineral owner (the federal government) and the oil and gas operator. AR 007649. BLM also cited its national mineral leasing policies and regulations, which recognize the statutory right of leaseholders to develop mineral resources to meet the continuing national needs and economic demands as long as undue environmental degradation is not incurred. AR 007650. BLM noted that it had the authority to: (1) "[c]ontrol the rate of oil and gas development," (2) "[t]ime the activities," (3) "[m]odify siting of wells and facilities," and (4) "[e]nforce reasonable mitigation measures." AR 007651.

60. Denied. With regard to the first sentence in this SOF, there is no indication on the document cited, AR 007975, who the author of the document is. With regard to the second sentence in this SOF, there is no support in the cited document, AR 007986, for the statement that "BLM acknowledged" the statements made within the document. In addition, the paragraph states in its entirety: "We have no exact figures on the amount of sage grouse habitat available with the Atlantic Rim Project Area, but the RMP identifies the area as lying within the area [sic] the Baggs Habitat Management Plan was prepared. Within this larger area, 160,500 acres of

sage grouse habitat was identified." AR 007986. BLM later mapped sage brush habitat and sage grouse habitat in the Atlantic Rim EIS. AR 002232-33; AR 002258-59.

61. Defendant-Intervenors hereby reference and incorporate General Objection No. 2 with regard to the first clause in this SOF, and therefore deny same. Without waiving any objection, Defendant-Intervenors admit that the quotation contained in this SOF is an accurate quotation from AR 009193, and note that the document speaks for itself. The Atlantic Rim EIS discloses the existing or baseline conditions for a variety of resources including: climate and air quality; soils; water resources; vegetation; range resources; fish and wildlife; special status species; recreation resources; visual resources; cultural resources; socioeconomics; transportation; health and safety; noise; wild horses; and special management areas. AR 002165-2318.

62. Denied. During preparation of the EIS for the Atlantic Rim Project, BLM issued an interim drilling policy that would allow up to 200 exploration wells. AR 002132. The purpose of allowing "the drilling of a maximum of 200 exploration wells" was "specifically for the acquisition of data necessary for the completion of the EIS proposed analysis area." AR 007637. Operators had only submitted for approval applications for six PODs. AR 002132. BLM conducted an extensive Environmental Assessment ("EA") prior to approving any of these specific PODs. *Id.* Defendant-Intervenors deny the third sentence in this SOF, as there is no indication in the internal email cited that its contents "explain[] BLM's thinking." Defendant-Intervenors admit that the block quote in the third sentence of this SOF is an accurate quotation from AR 009095, and note that the document speaks for itself.

63. Defendant-Intervenors admit the first sentence in this SOF, with the exception of the characterization "vital information." Defendant-Intervenors admit that the interim drilling

allowed "for acquisition of *additional data necessary* for completion of [the] EIS." AR 007656

(emphasis added). Defendant-Intervenors admit the remaining sentences in this SOF.

64.    Denied. Defendant-Intervenors deny the first sentence in this SOF, and note there

is no support for this statement in the administrative record. Defendant-Intervenors further deny

that the email cited in the second sentence supports this SOF. The well referenced in the e-mail,

AR Fee 2089 SE29 was a well that was not subject to BLM jurisdiction. AR 072448. Thus, the

cited email reflects Anadarko's efforts to utilize BLM mitigation measures even for wells not

subject to BLM authorization.

65.    Denied. The cited references provide no support for Plaintiff's purported SOF.

The cited document references POD 9, which was the Muddy Mountain POD. AR 002135. This

proposal was never submitted to BLM and, thus, not undertaken. AR 002132. As the FEIS

notes, it was "on hold." AR 002135. Further, the document also references RMG, which is

BLM's Wyoming State Office Reservoir Management Group. *See* AR 002131. Therefore, any

proposed movement of locations was not done without BLM involvement.

66.    Defendant-Intervenors admit the first sentence in this SOF. BLM is required

under FLPMA to update its land management plans, "when appropriate." 43 U.S.C. § 1712(a).

BLM determined that the environmental analysis conducted for the Great Divide RMP, last

revised in 1990, needed updating, but that the decisions regarding opening up the entire area to

oil and gas leasing, would not be affected. AR 004666. Defendant-Intervenors admit the second

sentence in this SOF. Defendant-Intervenors note, however, that the issue quoted is one of eight

issues listed on AR 008015, and there is no indication that the order of the issues listed has any

significance. Defendant-Intervenors deny the last sentence in this SOF. The request for

information in AR 008015 is not limited to the topic listed by Plaintiff in this SOF. Defendant-

Intervenors admit that the quotation in the last sentence of this SOF is an accurate quotation from AR 008015, and note that the document speaks for itself.

67. Defendant-Intervenors deny the first sentence in this SOF, as Plaintiff fails to cite any evidence in support of this first sentence. Defendant-Intervenors admit that the block quote in the second sentence of this SOF is an accurate quotation from AR 009101, and note that the document speaks for itself. Defendant-Intervenors also note that AR 009101 is an email from one BLM employee, and not from multiple BLM employees. Moreover, in 2004, BLM's Washington Office transmitted a policy directive, known as an Instruction Memorandum, to clarify the purpose and effect of the RFD scenario. AR 005311-19. The Washington Office Instruction Memorandum 2004-089 clarifies that the RFD is "neither a planning decision nor the 'No Action Alternative' in the NEPA document." AR 005311. The Instruction Memorandum clarifies that the RFD is not intended as a limit to future development, but is instead a baseline scenario to provide the "mechanism to analyze the effects that discretionary management decisions have on oil and gas activity." *Id.*; *see also* AR 004666; AR 004654.

68. Denied. Defendant-Intervenors hereby reference and incorporate their response to SOF No. 67. The interim program was developed specifically to allow for exploratory drilling and collect information for the EIS on the overall project. While the interim policy was in use, BLM was developing the EIS. In addition, Defendant-Intervenors note that Plaintiff selectively omits the following paragraph from the block quotation in this SOF:

> Despite what the environmental groups state, so much of the cbm drilling currently underway in the RFO area contains the same components and utilizes the same methodology as those described in the oil and gas appendix to the RMP. The only difference is - we don't say cbm!!! I would expect there will be some changes to the narrative, but they may only be minor. The RMP already states that water is produced with oil and gas development, the RMP recognizes the need to dispose of the water, it recognizes the oil

> and gas industry as a large user of groundwater resources, etc., etc., etc.
>
> AR 009220.

69. Defendant-Intervenors hereby reference and incorporate their response to SOF Nos. 67 and 68 Defendant-Intervenors admit that the block quote in this SOF is an accurate quotation from AR 009283, and note that the document speaks for itself.

70. Defendant-Intervenors deny the first sentence in this SOF, and further note that this characterization finds no support in the Administrative Record, nor in the document specifically cited by Plaintiff. Nowhere in AR 008137 does it state that Double Eagle representatives believed that the "RFD limitation contained in the Great Divide RMP presented a problem." Defendant-Intervenors admit the second sentence in this SOF. Defendant-Intervenors deny the third sentence in this SOF as, again, it is not supported by the document cited. Mr. Degenfelder states that he "would be comfortable with a greater number [of wells than] originally talked about," but there is no indication that Mr. Degenfelder proposed a project that specifically "exceeded the RFD scenario contained in the Great Divide RMP." AR 008137.

71. Defendant-Intervenors deny the first sentence in this SOF, and note again that it is not supported by the document cited. Defendant-Intervenors admit that the cited document, an email dated June 1, 2004, indicates a June 10, 2005 "Target date" for approval of the Record of Decision for the RMP. AR 009244. Defendant-Intervenors deny the second sentence in this SOF, as it is not supported by the document cited. Defendant-Intervenors admit that the cited document contains certain meeting notes that state: "EIS is tiered to the RMP." AR 008148. There is no indication in this document, however, that the EIS "was supposed to be tiered" from the updated Rawlins RMP. Defendant-Intervenors admit that the block quote in the last sentence of this SOF is an accurate quotation from AR 008141, and note that the document speaks for

itself, but also note that the cited document is a "DRAFT" briefing paper.  *See* AR 008141.

Defendant-Intervenors hereby reference and incorporate their response to SOF No. 67.

72.    Denied.  While Defendant-Intervenors admit that the block quote in this SOF is an

accurate quotation from AR 009266, this document does not represent the position or opinion of

BLM, but rather records the statements of one BLM employee.  In addition, the excerpted

quotation does not reference alternatives in the EIS and, thus, does not support the assertion that

"interim drilling likely had already prejudiced the Project alternatives."  Moreover, a subsequent

e-mail from BLM states:  "We have completed the exploratory drilling phase of the project, so

the rest of the 200 wells projected under the original exploratory drilling program just weren't

necessary for exploration, they were able to figure things out with the ones they used.  Any

*further* wells would be development wells, which are constrained under the CEQ regulations as

possibly prejudicing the decision(s) to be made under the EIS."  AR 009283 (emphasis added).

73.    Defendant-Intervenors hereby reference and incorporate General Objection No. 2

with regard to the first clause in this SOF, and therefore deny same.  Without waiving any

objection, Defendant-Intervenors admit that the block quote contained in this SOF is an accurate

quotation from AR 009280, and note that the document speaks for itself.

74.    Denied.  While Defendant-Intervenors admit that the quotation in this SOF is an

accurate quotation from AR 009288, there is absolutely no support in that document for

Plaintiff's characterization that it was created "[i]n response to Operator efforts to increase the

pace of NEPA processing."  In fact, BLM completed an EIS for the entire Atlantic Rim Project,

which was a six-year process that began when the notice of intent was filed in 2001 and

culminated in the Final EIS in 2006 and the ROD in 2007.

75.     Denied.  Defendant-Intervenors admit that WGFD raised "wildlife issues and concerns" during the scoping process for the DEIS.  AR 007686.  The scoping process is the means by which members of the public assist the agency in identifying the potential issues to be considered in the NEPA review process.

76.     Denied.  Defendant-Intervenors admit that the U.S. Forest Service requested that BLM address possible cumulative affects to air quality in a letter responding to BLM's scoping notice for the project.  AR 007799.

77.     Defendant-Intervenors hereby reference and incorporate General Objection No. 2 with regard to the first clause in this SOF, and therefore deny same.  Nowhere in AR 007813 does the USFWS characterize its concerns as "grave."  Without waiving any objection, Defendant-Intervenors admit that the block quote contained in this SOF is an accurate quotation from AR 007813, and note that the document speaks for itself.

78.     Defendant-Intervenors hereby reference and incorporate General Objection No. 2 with regard to the first clause in this SOF, and therefore deny same.  Without waiving any objection, Defendant-Intervenors deny that BLM "narrowly" identified the purpose and need of the project.  Defendant-Intervenors also deny this statement based on the fact that Plaintiff is quoting a 2002 "Preparation Plan." AR 008020.  The FEIS states the purpose and need of the project.  Nonetheless, Defendant-Intervenors admit that the purpose of the project was to develop natural gas in the ARPA, and further note that BLM had previously issued leases for such development.

79.     Defendant-Intervenors admit that the quotation contained in this SOF is an accurate quotation from AR 008022, and note that the document speaks for itself.  Defendant-Intervenors hereby reference and incorporate their response to SOF No. 67.

80.    Defendant-Intervenors admit the first sentence in this SOF.  The ID Team was made up of numerous experts, such as experts in hydrology, biology, cultural resources, and air quality.  AR 002512-14.  Defendant-Intervenors deny the second sentence in so far as it states that the "ID Team identified various concerns" in document AR 008056-58.  As part of the NEPA process, the ID Team listed "Common Issues Identified During Scoping" for the "Atlantic Rim Coalbed Methane Project" in AR 008056-58.  Defendant-Intervenors admit the remainder of the second sentence.

81.    Admitted.

82.    Denied.  Defendant-Intervenors note that the Memorandum of Understanding ("MOU") is contained in the Administrative Record and speaks for itself.  AR 008096-8101. Defendant-Intervenors also note that the MOU requires BLM to oversee the contractor in accordance with the procedures found in 40 C.F.R. § 6.604(g)(3) and 40 C.F.R. § 1506.5(c).

83.    Defendant-Intervenors object to this SOF in its entirety as it is irrelevant.  Without waving their objection, Defendant-Intervenors deny the first sentence in this SOF.  The cited document, AR 008127-32, does not support the assertion that BLM contacted USGS concerning the proposal described therein.  Defendant-Intervenors admit that the quotation contained in the second sentence of this SOF is an accurate quotation from AR 008127, and note that the document speaks for itself.

84.    Denied.  The cited document, AR 009244, does not support the assertion that BLM and the Operators "planned" to "incorporate information derived" from wildlife "ground studies."  AR 009244 only lists topics for discussion at a meeting between BLM and Anadarko. BLM did authorize studies on wildlife.  *See, e.g.,* AR 007383 (Vegetation and Habitat Analysis of Critical Wintering Areas for Greater Sage-Grouse).

85.     Denied.  Defendant-Intervenors deny this SOF because the cited documents, AR 008148 and AR 008240, consist of meeting notes and there is no indication that these notes represent the position of BLM, or just the recollections of one BLM employee.  Further, AR 008240 does not state what is represented by Plaintiff to be a fact in the last sentence of this SOF.

86.     Denied.  Defendant-Intervenors deny this SOF because the cited document, AR 008149, consists of meeting notes and there is no indication that these notes represent the position of BLM, or just the recollections of one BLM employee.  Moreover, the notes appear to be in reference to the monitoring and adaptive management plans.

87.     Denied.  Defendant-Intervenors admit, however, that the notes contained on AR 008150, not AR 008149, state: "Industry suggests conducting biology studies with the Master Use Plan up front, to know where exceptions to stips will not be allowed; operator does the studies (including actions and timing) to avoid conflicts and impacts."  AR 008150 does not explain what "biology studies" are being referred to.

88.     Denied.  Defendant-Intervenors deny this SOF because the cited document, AR 008183-89, consists of printouts from a powerpoint presentation and there is no indication that these powerpoint slides represent the statements of BLM, BLM staff, or just one BLM employee.  Moreover, the cited document does not reference the 3880 proposal or it being "unrealistic and uniformed," and therefore fails to support Plaintiff's purported statement of fact.  The Atlantic Rim Project had been reduced to up to 2000 wells.

89.     Denied.  Defendant-Intervenors admit that the BLM Project Lead noted in February 2005 that "probably" one of the only resource conflicts "we will not be able to mitigate away" is "*possibly* recreation at Atlantic Rim."  AR 009274 (emphasis added).

90.    Defendant-Intervenors deny the first sentence in this SOF.  Defendant-Intervenors admit, however, that one BLM employee, Bob Lange, outlined two alternatives for inclusion in the DEIS on AR 008197-98.  Defendant-Intervenors admit the second and third sentences of this SOF, as they refer to the alternatives outlined in Mr. Lange's proposal, AR 008197-98.  Defendant-Intervenors admit that the block quote contained in the fourth sentence of this SOF is an accurate quotation from AR 008197-98, and note that the document speaks for itself.  Defendant-Intervenors deny that this quotation reflects BLM's proposed alternatives.  Defendant-Intervenors also note that Plaintiff has selectively omitted the last sentence of the quoted paragraph, which states: "The total time for the project life would be increased by 20 years."  AR 008198.  Defendant-Intervenors admit the last sentence in this SOF.

91.    Denied.  Defendant-Intervenors admit that the RFO asked the RMG two specific questions concerning the economic feasibility of certain well-spacing and directional drilling techniques.  *See* AR 008204.  With regard to the second sentence in this SOF, Defendant-Intervenors note that the documents contained in the administrative record speak for themselves.

92.    Denied.  Defendant-Intervenors admit that notes from a meeting of BLM staff in July 2005 contain a heading stating "Alternative C Temporal Analysis" and underneath that heading are, inter alia, "focus and concentrate activities in certain areas," and "creates safe haven for wildlife."  BLM's detailed analysis in the DEIS subsequently determined that such safe havens were speculative:

> [T]his phased approach would potentially provide "safe-haven" areas in two thirds of the project area during the development phases of the ARPA.  However, this does not take into account that those areas would be already occupied, may be of lower quality or not be suitable, or may not be available due to migration distances or potential barriers.  They may not provide enough habitat for the areas lost.

AR 001704-05.  BLM also found that "[s]ignificant effects were expected under [the phased alternative] upon several resources including wildlife, soils and range."  AR 002160.

93.    Denied.  Defendant-Intervenors deny this SOF because the cited document, AR 008242, consists of meeting notes and there is no indication that these notes represent the positions of BLM, BLM staff, or just one BLM employee.  Defendant-Intervenors admit that the quotations contained in this SOF are accurate quotations from AR 008242, and note that the document speaks for itself.  Defendant-Intervenors hereby reference and incorporate their response to SOF No. 92.

94.    Denied.  Defendant-Intervenors deny this SOF because the cited document, AR 008255-56, consists of random notes and there is no indication that these notes represent the positions of the ID Team, BLM, BLM staff, or just one BLM employee.  Defendant-Intervenors admit that the quotations contained in this SOF are accurate quotations from AR 008255-56, and note that the document speaks for itself.  Defendant-Intervenors hereby reference and incorporate their response to SOF No. 92.

95.    Denied.  Defendant-Intervenors deny this SOF because the cited document, AR 008243, consists of meeting notes and there is no indication that these notes represent the positions of BLM, BLM staff, or just one BLM employee.  Defendant-Intervenors admit that the quotations contained in this SOF are accurate quotations from AR 008243, and note that the document speaks for itself.

96.    Denied.  Defendant-Intervenors deny this SOF because the cited document, AR 008243, consists of meeting notes and there is no indication that these notes represent the positions of BLM, BLM staff, or just one BLM employee.  Defendant-Intervenors admit that the quotations contained in this SOF are accurate quotations from AR 008243, and note that the

document speaks for itself.  BLM identified migration corridors in the Atlantic Rim EIS.  AR 002253; AR 002256.

97.    Denied.  Defendant-Intervenors object to the unsupported assertion that Matthew Holloran is a "leading grouse researcher."  The Holloran study is a PhD dissertation.  Defendant-Intervenors deny this SOF because the cited document, AR 008247, consists of meeting notes and there is no indication that these notes represent the positions of the ID Team, BLM, BLM staff, or just one BLM employee.  Defendant-Intervenors admit that the quotations contained in this SOF are accurate quotations from AR 008247, and note that the document speaks for itself.

98.    Denied.  Defendant-Intervenors deny this SOF because the cited document, AR 008247, consists of meeting notes and there is no indication that these notes represent the positions of the ID Team, BLM, BLM staff, or just one BLM employee.  Defendant-Intervenors admit that the quotations contained in this SOF are accurate quotations from AR 008247, and note that the document speaks for itself.

99.    Denied.  Defendant-Intervenors hereby reference and incorporate General Objection No. 2 with regard to the first sentence in this SOF.  Defendant-Intervenors deny this SOF because the cited document, AR 008267, consists of draft meeting notes and it appears from the notes that the quoted statements may be those of certain individual BLM employees, "(DJ)" and "(FB)."  Defendant-Intervenors admit that the quotations contained in this SOF are accurate quotations from AR 008267, and note that the document speaks for itself.

100.    Denied.  Defendant-Intervenors deny this SOF because the cited document, AR 008281-82, consists of a chart contained within meeting notes and there is no indication that this chart represents the positions of the ID Team, BLM, BLM staff, or just one BLM employee.

Defendant-Intervenors admit that the "mitigation measures" listed in this SOF are contained in the chart on AR 008281-82.

101.    Defendant-Intervenors admit that the block quote contained in the first sentence of this SOF is an accurate quotation from AR 008374-75, and note that the document speaks for itself.  Defendant-Intervenors deny the last sentence in this SOF.  According to the document cited in this SOF, "[i]nformation obtained during the interim drilling enabled the companies to more accurately determine the number of wells needed to effectively develop the natural gas resources in the Atlantic Rim area.  This in turn enables BLM to more accurately assess potential impacts of the proposed development."  AR 008371.

102.    Defendant-Intervenors object to this SOF in its entirety as it is irrelevant. Without waiving their objection, Defendant-Intervenors deny the first sentence in this SOF.  While Defendant-Intervenors admit that BLM staff revised the Draft EIS before publication, there is no statement in the cited document that the Draft EIS produced by the contractor was "inadequate." Defendant-Intervenors admit that the block quote contained in the second sentence of this SOF is an accurate quotation from AR 008419, and note that the document speaks for itself.

103.    Defendant-Intervenors admit that the block quote contained in the first sentence of this SOF is an accurate quotation from AR 008387, with the addition of the words in brackets, and note that the document speaks for itself.  Defendant-Intervenors admit the second sentence in this SOF.

104.    Defendant-Intervenors admit the first sentence in this SOF.  Defendant-Intervenors deny the second sentence.  Although Defendant-Intervenors admit that the quotation contained in the second sentence of this SOF is an accurate quotation from AR 009539, and note that the document speaks for itself, BLM consistently had stated that the project and

development of natural gas was consistent with BLM policy. Plaintiff fails to cite any evidence that BLM has ever taken the position that the project or the development of natural gas was inconsistent with BLM policy.

105. Defendant-Intervenors admit that the quotations contained in this SOF are accurate quotations from AR 003256, and note that the document speaks for itself. The mitigation measures at issue in the Holloran study, however, which was referenced by USFWS, differ from those in the Atlantic Rim Project. AR 007131. For example, there were restrictions on human activity within 1/2 mile of an active lek from March to May, but only from midnight to 9 a.m. in the Pinedale Anticline Project Area ("PAPA"), rather than from 6 p.m. to 9 a.m. AR 007131. Mitigation measures for the ARPA also include sound muffling and seasonal restrictions for winter concentration areas. *Compare* AR 004850 *with* AR 007131-32. More significantly, the surface disturbance and well-spacing limitations for the ARPA are more restrictive -- 8 well sites per 640 acres (80-acre spacing), AR 004805, compared to 16 wells per section in the PAPA. AR 007082.

106. Defendant-Intervenors hereby reference and incorporate General Objection No. 2 with regard to the first sentence of this SOF, and therefore deny same. Defendant-Intervenors admit that the quotations contained in the first, second, and fourth sentences of this SOF are accurate quotations from AR 008388-89, and note that the document speaks for itself. Defendant-Intervenors object to the last sentence in this SOF as it is irrelevant. With respect to determining the reasonableness of Alternative B, BLM also considered comments received on the DEIS, the effects of long delays on allowable oil and gas development to leaseholders and mineral rights, and the policy that BLM will allow reasonable access across federal lands for mineral development on private and state lands. AR 002161.

107.    Defendant-Intervenors admit that the block quote contained in this SOF is an accurate quotation from AR 008389, with the exception of a minor punctuation error (misplaced comma), and note that the document speaks for itself. Alternative C would have effectively limited development in many areas to 160-acre well spacing. *See, e.g.,* AR 004442, AR 004712, AR 004730. Interim drilling results and consultation with Anadarko and RMG indicated that 80-well spacing would generally be required to efficiently develop oil and gas in the ARPA and 160-acre well spacing would result in less recovery. *See, e.g.,* AR 004564-66, AR 004431, AR 004407. RMG confirmed Anadarko's analysis: "160-acre well spacing for CBNG development in the Atlantic Rim Area (AR Area) is possible only under very special geologic conditions. As a general rule, existing production data suggests that 80-acre well spacing is the best standard well spacing. It is the local geologic setting that must be considered." AR 008204. *See also* AR 008206, AR 008525.

108.    Defendant-Intervenors object to this SOF in its entirety as it is irrelevant to the arguments Plaintiff raises in its Motion for Summary Judgment. Without waiving their objection, Defendant-Intervenors deny the first clause of this SOF, as the quoted language from AR 008390 that follows addresses "[t]he analyses for potential impacts to air, soil, water and wildlife," not just "data concerning wildlife impacts." Defendant-Intervenors admit that the block quote contained in this SOF is an accurate quotation from AR 008390, and note that the document speaks for itself.

109.    Defendant-Intervenors object to this SOF in its entirety as it is irrelevant to the arguments Plaintiff raises in its Motion for Summary Judgment. Without waiving their objection, Defendant-Intervenors deny this SOF, and note again that Plaintiff has clearly mischaracterized the document cited. The cited document, AR 008391, does not support the

proposition that "BLM's Washington officials promptly met with Anadarko to assuage Anadarko's concerns"; in fact, it does not reflect any such meeting ever being held.

110.    Defendant-Intervenors hereby reference and incorporate General Objection No. 2 with regard to the first clause of this SOF, and therefore deny same.  Defendant-Intervenors admit that the block quote contained in this SOF is an accurate quotation from AR 008394, and note that the document speaks for itself.

111.    Defendant-Intervenors admit that the block quote contained in this SOF is an accurate quotation from AR 008395, and note that the document speaks for itself.  Defendant-Intervenors hereby reference and incorporate their response to SOF No. 92.

112.    Defendant-Intervenors admit that the block quote contained in this SOF is an accurate quotation from AR 008394, and note that the document speaks for itself.

113.    Defendant-Intervenors admit the first sentence of this SOF.  However, Defendant-Intervenors note Warren Resources, Inc. also explained in its letter, providing comments on the draft EIS:

> Additionally, after drilling a total of 137 wells throughout the entire Atlantic Rim Project Area, we have established that the shallow Almond coals blanket the entire project area. Consequently, we believe the Atlantic Rim CBM Project area constitutes one contiguous gas reservoir with a preferential drilling fairway that runs 60 miles north to south and 3 to 8 miles wide with a potential to produce multiple trillions of CBM natural gas, if properly developed.  For efficient and effective development to maximize production, it will be necessary to develop the project in a manner that best draws down the formation pressure throughout the entire Atlantic Rim CBM gas reservoir.  Contemporaneous development will allow operators to efficiently dewater the coals to achieve optimum production results.  A staged development approach would inhibit achieving this goal.

AR 008398.  Defendant-Intervenors deny the second sentence in this SOF.  As Anadarko noted, Alternative C "would effectively impose 160 acre spacing across ninety-five percent (95%) of

the project area."  AR 008389 (citing DEIS at 4-51).  *See also* AR 004442, AR 004712, AR

004730.  Defendant-Intervenors admit that the block quote contained in the third sentence in this

SOF is an accurate quotation from AR 008395, and note that the document speaks for itself.

114.    Denied.  The MOU cited by Plaintiff does not address any specific alternatives

and only states that the EIS will contain "[a] reasonable range of development alternatives to the

proposed action."  AR 008402.  Moreover, Defendant-Intervenors deny that the NEPA

contractor was "selected and approved by the Operators."  In fact, the MOU requires that BLM

select the contractor.  AR 008412 (¶2).

115.    Denied.  BLM conducted an EIS that fully explored the environmental impacts of

the project and then left certain site-specific considerations to the APD stage.  In addition,

Defendant-Intervenors deny the first sentence in this SOF, as the cited document, AR 008443,

does not support the assertion in first sentence.  AR 008443 consists of meeting notes which state

that a BLM employee, "Dave S.," noted that the "Jonah ROD has some new monitoring

language that BLM may use" and that the "Jonah ROD uses performance-based

monitoring/planning."  Defendant-Intervenors deny the second and third sentences in this SOF,

as again Plaintiff cites no support in the administrative record for these assertions.  Nowhere in

AR 008443 does it state that the "plan" was "to defer NEPA analysis to the APD stage."

Defendant-Intervenors admit that the block quote contained in the last sentence of this

SOF is an accurate quotation from AR 008443, and note that the document speaks for itself.

However, because AR 008443 consists of transcribed meeting notes, Defendant-Intervenors deny

that these notes reflect the precise words used by those in attendance.  Indeed, at the beginning of

these notes are the following disclaiming statements: "These notes are not an exact transcript of

the discussion held during this meeting. They merely capture the essence of the discussion to serve as a reference for the team." AR 008440.

116. Defendant-Intervenors object to the term "concept" as vague and ambiguous. Without waiving this objection, Defendant-Intervenors admit that the quotation contained in this SOF is an accurate quotation from AR 008444, and note that the document speaks for itself. However, because AR 008444 consists of transcribed meeting notes, Defendant-Intervenors deny that these notes reflect the precise words used by those in attendance. Indeed, at the beginning of these notes are the following disclaiming statements: "These notes are not an exact transcript of the discussion held during this meeting. They merely capture the essence of the discussion to serve as a reference for the team." AR 008440.

117. Defendant-Intervenors admit that the block quote contained in this SOF is an accurate quotation from AR 008444, and note that the document speaks for itself. However, because AR 008444 consists of transcribed meeting notes, Defendant-Intervenors deny that these notes reflect the precise words used by those in attendance. Indeed, at the beginning of these notes are the following disclaiming statements: "These notes are not an exact transcript of the discussion held during this meeting. They merely capture the essence of the discussion to serve as a reference for the team." AR 008440.

118. Defendant-Intervenors admit the first sentence of this SOF, with the exception that AR 008473 consists of a memorandum from the Wyoming State Director to the Director of BLM. Defendant-Intervenors admit that the block quote contained in the second sentence of this SOF is an accurate quotation from AR 008473, and note that the document speaks for itself. Defendant-Intervenors also note that the preceding paragraph on AR 008473 states:

> The Draft EIS presented four alternatives including the No Action. In addition to the Proposed Action, a third alternative analyzed

> phased development and the fourth alternative employed special protective measures to protect sensitive resources. None of the alternative [sic] received support during the public comment period.

The Preferred Alternative in the DEIS was a combination of Alternatives B and C. AR 001449. The FEIS included a "revised Preferred Alternative which limits the amount of surface disturbance which can occur in the ARPA at a given time providing an incentive to achieve successful interim reclamation." AR 004404. Alternative D was developed to address the well-spacing issue identified by Operators and confirmed by RMG. AR 004432, AR 004443, AR 004408. Cooperating agencies were consulted and also reviewed the revisions. AR 004652.

119. Defendant-Intervenors admit that the quotation contained in this SOF is an accurate quotation from AR 009336, and note that the document speaks for itself. Alternative B was fully considered in the DEIS. BLM removed Alternative B "from *further* detailed study in the Final EIS based on comments received on the Draft EIS, the effects of long delays on allowable oil and gas development to leaseholders and mineral rights, and the policy that BLM will allow reasonable access across federal lands for mineral development on private and state lands." AR 002161 (emphasis added).

120. Defendant-Intervenors admit the first sentence in this SOF. Defendant-Intervenors admit that the block quote contained in the second sentence of this SOF is an accurate quotation from AR 008510, and note that the document speaks for itself. However, this block quote selectively omits several sentences from the quoted paragraph on AR 008510. One of the omitted sentences states: "The potential impacts coal-bed natural gas (CBNG) development may have on mule deer are generally unknown (Sawyer and Lindzey 2004)." AR 008510.

121.    Defendant-Intervenors admit that the block quotes contained in this SOF are accurate quotations from AR 008510-11, and note that the document speaks for itself. However, these block quotes omit the immediately preceding paragraph which states, in part: "Phase II [of the study] is envisioned as a long-term (≥5 years) study that would examine the potential impacts of CBNG development on mule deer." AR 008510.

122.    Defendant-Intervenors admit that the block quote contained in the first sentence of this SOF is an accurate quotation from AR 008636, and note that the document speaks for itself. Defendant-Intervenors admit the last sentence in this SOF. Defendant-Intervenors hereby reference and incorporate their responses to SOF Nos. 118 and 119.

123.    Denied. Defendant-Intervenors hereby reference and incorporate General Objection No. 2 with regard to this SOF in its entirety, and therefore deny same. Defendant-Intervenors also note that the differences between the alternatives examined in the FEIS are discussed and outlined in the FEIS itself and in the ROD. *See* AR 002148-63, AR 004806-07. For example, with regard to total acres of surface disturbance allowed at any one time, the alternatives range from 16,400 acres (Proposed Action), to 13,886 (Alternative C), to 7,600 (Alternative D -- the agency preferred alternative). AR 004800.

On the other hand, the DEIS found similar impacts between Alternative B and the Proposed Action. AR 001497-510. With respect to big game (elk, pronghorn and mule deer), BLM found that, under Alternative B and "[s]imilar to the proposed action," development within transitional ranges and crucial winter ranges "compounded by the current poor condition of the crucial winter habitat would exceed the significance criteria." AR 001705. For the sage grouse, while the DEIS found that Alternative B would benefit greater sage-grouse "in the short-term by concentrating development within one third of the project area over the first five to six years, …

[i]n the long-term, however, the decline in health of CWR and transitional ranges for big game would further reduce habitat quality and quantity for grouse, potentially leading to a decline in population numbers." *Id.* The DEIS, while recognizing that Alternative B reduced the "level of simultaneous development" that would allow hunters and recreationists some "limited, but continued opportunities to use portions of the ARPA," found that "[s]hort term impacts to recreation occurring under Alternative B would be qualitatively the same as under the Proposed Action" and "[l]ong-term impacts to recreation would be the same under Alternative B as under the Proposed Action." AR 001731-32.

124.    Defendant-Intervenors object to this SOF in its entirety as it is irrelevant to the arguments Plaintiff raises in its Motion for Summary Judgment. Without waiving their objection, Defendant-Intervenors deny this SOF. According to meeting notes from May and August 2006, the preliminary FEIS was reviewed by the BLM State office, the BLM Washington office, and Wyoming State agencies (Wyoming Game and Fish Department, Wyoming Department of Agriculture, and the Governor's Planning Office). *See* AR 008440, AR 008636-38. Defendant-Intervenors note that 40 C.F.R. § 1501.6 emphasizes agency cooperation early in the NEPA process.

125.    Defendant-Intervenors object to this SOF in its entirety as it is irrelevant to the arguments Plaintiff raises in its Motion for Summary Judgment. Without waiving their objection, Defendant-Intervenors deny the first sentence of this SOF, as the cited document does not support the assertion stated. Defendant-Intervenors admit that the quotation contained in the second sentence of this SOF is an accurate quotation from AR 008444, and note that the document speaks for itself.

126.    Defendant-Intervenors object to this SOF in its entirety as it is irrelevant to the arguments Plaintiff raises in its Motion for Summary Judgment.  Defendant-Intervenors hereby reference and incorporate General Objection No. 2 with regard to the first clause in this SOF, and therefore deny same.  Without waiving their objections, Defendant-Intervenors admit that the block quote contained in this SOF is an accurate quotation from AR 009617, and note that the document speaks for itself.  Defendant-Intervenors also note that the sentence immediately preceding the block quote states: "We support the 3.5/2.5% disturbance concept, when **coupled** with all technically feasible BMPs."  (Emphasis in original).

127.    Defendant-Intervenors admit that the block quotes contained in this SOF are accurate quotations from AR 009646 and AR 9651, and note that the documents speaks for themselves.

128.    Defendant-Intervenors hereby reference and incorporate General Objection No. 2 with regard to the first sentence in this SOF, and therefore deny same.  Without waiving their objections, Defendant-Intervenors admit that the block quote contained in this SOF is an accurate quotation from AR 008682, and note that the document speaks for itself.

129.    Defendant-Intervenors hereby reference and incorporate General Objection No. 2 with regard to  the first two sentences of this SOF, and therefore deny same.  Without waiving their objections, Defendant-Intervenors admit that the block quotes contained in this SOF are accurate quotations from AR 009793, and note that the document speaks for itself.

130.    Defendant-Intervenors hereby reference and incorporate General Objection No. 2 with regard to the first sentence in this SOF, and therefore deny same.  Without waiving their objections, Defendant-Intervenors admit the second sentence in this SOF.

131.    Defendant-Intervenors admit that the block quote contained in this SOF is an accurate quotation from AR 009757, and note that the document speaks for itself.

132.    Defendant-Intervenors admit that the block quote contained in this SOF is an accurate quotation from AR 009761-62, and note that the document speaks for itself.

133.    Defendant-Intervenors hereby reference and incorporate General Objection No. 2 with regard to the first clause in this SOF, and therefore deny same.  Without waiving their objections, Defendant-Intervenors admit that the block quote contained in this SOF is an accurate quotation from AR 009762-63, and note that the document speaks for itself.

134.    Defendant-Intervenors admit that the block quote contained in this SOF is an accurate quotation from AR 009782, and note that the document speaks for itself.

135.    Without waiving their objection, Defendant-Intervenors admit that the block quote contained in this SOF is an accurate quotation from AR 009747, and note that the document speaks for itself.  Defendant-Intervenors admit that the quotation contained in the last sentence of this SOF is an accurate quotation from AR 009816, and note that the document speaks for itself.  Defendant-Intervenors note that the sentences preceding and following the quotation from AR 009816 focus on reclamation and weed control.

136.    Defendant-Intervenors admit the first sentence of this SOF.  Defendant-Intervenors deny the second sentence of this SOF.  The comments cited by Plaintiff in the second sentence of this SOF, from AR 009831 and AR 009833, are from comments on the Preliminary Record of Decision, not the Preliminary FEIS.  In addition, one of the comments states that "[m]uch of this project *may be* subject to a NEPA exemption as allowed by Section 390 of the Energy Policy Act of 2005." AR 009831 (emphasis added).  Defendant-Intervenors admit that the block quote contained in the last sentence of this SOF is an accurate quotation from AR

009683, and note that the document speaks for itself.  Section 390 of the Energy Policy Act of

2005 provides a "rebuttable presumption" that a categorical exclusion would apply to certain

limited activities, including:  (1) individual surface disturbances of less than 5 acres so long as

the total surface disturbance on the lease is not greater than 150 acres and site-specific analysis in

a document prepared pursuant to NEPA has been previously completed; (2) drilling an oil or gas

well at a location or well pad site at which drilling has occurred previously within 5 years prior

to the date of spudding the well; (3) drilling an oil or gas well within a developed field for which

an approved land use plan or any environmental document prepared pursuant to NEPA analyzed

such drilling as a reasonably foreseeable activity, so long as such plan or document was

approved within 5 years prior to the date of spudding the well; (4) placement of a pipeline in an

approved right-of-way corridor, so long as the corridor was approved within 5 years prior to the

date of placement of the pipeline; and (5) maintenance of a minor activity, other than any

construction or major renovation or a building or facility.  42 U.S.C. § 15942.  To date, each

proposed POD has had its own EA prepared.

137.    Defendant-Intervenors admit that the quotation contained in this SOF is an

accurate quotation from AR 009831, and note that the document speaks for itself.

138.    Denied.  According to the introductory letter to the FEIS, BLM released the FEIS

on November 27, 2006.  AR 002082.

139.    Admitted.

140.    Admitted.

141.    Admitted.  Defendant-Intervenors note that the full quotation cited states: "Public

comments received on the DEIS, results of interim exploration, and technical evaluations by the

BLM Reservoir Management Group all indicated drilling on 160-acre spacing would not achieve

maximum recovery of natural gas resources, was likely not economically feasible, and was likely an inefficient recovery of the natural gas resource in the ARPA." AR 4806.

142. Admitted.

143. Defendant-Intervenors hereby reference and incorporate General Objection No. 2 with regard to the first clause in this SOF, and therefore deny same. Defendant-Intervenors admit that the quotations contained in this SOF are accurate quotations from AR 009375-76, and note that the document speaks for itself. Defendant-Intervenors also note that the ROD directly discusses the process for determining "whether a categorical exclusion pursuant to Section 390 of the Energy Policy Act of 2005 applies" to the proposed drilling at a specific site. AR 004814. Defendant-Intervenors hereby reference and incorporate their response to SOF No. 136.

144. Admitted. Defendant-Intervenors note the while the ROD describes an annual planning process, "this concept is adaptive and open for modification and improvement, including more frequent planning meetings if necessary." AR 004811. In addition, the Review Team will include "BLM (including interdisciplinary team members), cooperating and interested agencies, and the Operators." *Id.* Subsequent mitigation measures required in EAs will be available to the public for comment, as BLM provides public notice of EAs on its website.

145. Defendant-Intervenors hereby reference and incorporate General Objection No. 2 with regard to the first clause in this SOF, and therefore deny same. Defendant-Intervenors admit that the three quoted Performance Goals are contained in the list of fourteen (14) Performance Goals listed on AR 004814-15. Defendant-Intervenors deny the remainder of this SOF. The ROD states that "Operators are responsible for demonstrating successful achievement of Performance Goals." AR 004815. In addition, "[i]n the absence of sufficient data illustrating Operator achievement of Performance Goals, the BLM will use a conservative approach when

considering additional approvals." *Id*. Moreover, the ROD includes "an extensive array of BMPs [Best Management Practices], COAs [Conditions of Approval], and protective measures used to help achieve the Performance Goals." AR 004814. *See* ROD Appendix B, AR 004835-4855.

146. Defendant-Intervenors admit that the quotations contained in this SOF are accurate quotations from AR 004815, and note that the document speaks for itself. Defendant-Intervenors also note that the complete sentence from the second quotation states: "As part of the annual planning process, a monitoring and mitigation process will be required, and its development will begin within 30 days of the effective date of the ROD." AR 004815. Such requirements are in addition to the monitoring and mitigation measures already addressed in the ROD.

147. Denied. As the quoted sentence states, "[e]arly efforts are to be made to collect or consolidate resource data to form a baseline . . . ." AR 004798. Therefore, data that already exists should be "consolidate[d]" to form a baseline when possible.

148. Defendant-Intervenors admit the first sentence of this SOF. Defendant-Intervenors admit that the quotation contained in the second sentence of this SOF is an accurate quotation from AR 004815, and note that the document speaks for itself.

149. Defendant-Intervenors admit that the quotation contained in this SOF is an accurate quotation from AR 004847, and note that the document speaks for itself. However, Defendant-Intervenors also note that Plaintiff selectively omits the reference to the Wildlife Monitoring and Protection Plan previously developed and included in the FEIS as Appendix E. *See* AR 004847 and AR 002617-32.

150.    Defendant-Intervenors admit that the quotation contained in the first sentence of this SOF is an accurate quotations from AR 004848, and note that the document speaks for itself. Defendant-Intervenors deny the second and third sentences in this SOF.  With regard to the second sentence of this SOF, Appendix B of the ROD states that sage grouse inventories will be performed once every five years "or as deemed appropriate by the BLM."  AR 004848.  With regard to the third sentence of this SOF, Appendix B of the ROD states that "[d]ata on big game use of crucial winter ranges on the project area and an adjacent one-mile buffer will be requested annually by the BLM from the WGFD, as deemed necessary by the BLM."  AR 004849.

151.    Denied.  Appendix B includes various "Wildlife Protection Measures" and notes that "[a]dditional measures may be included and/or existing measures may be modified in any given year as allowable and as deemed appropriate by BLM in consultation with other agencies, Operators, and interested parties (FEIS appendix E)."  AR 004849.

152.    Defendant-Intervenors admit that the block quote contained in this SOF is an accurate quotation from AR 004850, with the following exceptions.  First, the block quote omits several punctuation marks (commas, colons, parentheses).  Second, the block quote omits the number "1" after "March" in the second and fourth bullet-points.  Defendant-Intervenors note that the quoted document speaks for itself.

153.    Defendant-Intervenors admit that the block quote contained in this SOF is an accurate quotation from AR 004851, with the exception of the omission of several punctuation marks (commas, periods).  Defendant-Intervenors note that the quoted document speaks for itself.

154.    Defendant-Intervenors hereby reference and incorporate General Objection No. 2 with regard to the first clause in this SOF, and therefore deny same.  Defendant-Intervenors

admit that the quotation contained in this SOF is an accurate quotation from AR 004872, and note that the document speaks for itself. Defendant-Intervenors note, however, that the remainder of the quoted paragraph states: "APDs will be posted in the RFO and available for public review. This ROD gives BLM authority to make decisions that limit surface disturbance in the ARPA." AR 004872. Defendant-Intervenors hereby reference and incorporate their response to SOF No. 136.

155. Defendant-Intervenors admit that the Atlantic Rim project will "potentially" have both direct and indirect impacts to recreation. AR 002418. Defendant-Intervenors admit that the quotation contained in the second sentence of this SOF is an accurate quotation from AR 002418, and note that the document speaks for itself.

156. Defendant-Intervenors admit that the quotation contained in the first sentence of this SOF is an accurate quotation from the FEIS at AR 002388, and note that the document speaks for itself. Defendant-Intervenors admit that the block quote contained in the second sentence of this SOF is an accurate quotation from AR 002392, and note that the document speaks for itself. However, Defendant-Intervenors also note that the Plaintiff selectively omitted the last sentence in the quoted paragraph, which states: "To reduce human presence, remote monitoring of project facilities would be used to the greatest extent possible during the production phase." AR 002392.

157. Defendant-Intervenors admit the first sentence in this SOF. Defendant-Intervenors deny parts 1, 2, and 4, and admit part 3 of the second sentence of this SOF. In its January 4, 2007 letter, TRCP warned BLM of the possibility that the analysis of the Atlantic Rim Project could "foreclose" alternatives under consideration in the RMP update process, but TRCP never stated that the Atlantic Rim analysis "would foreclose" alternatives under consideration in

the RMP update process. AR 010262. In addition, TRCP's letter discusses the multiple use mandate contained in the Federal Land Policy and Management Act, but does not state that the Atlantic Rim project "was not in keeping" with this mandate. AR 010263. Lastly, TRCP notes that it is concerned with the cumulative impacts from the Atlantic Rim project, but it does not state in its letter that it believes the cumulative impacts had not been analyzed sufficiently. *Id.*

158. Defendant-Intervenors admit the first sentence of this SOF. Defendant-Intervenors deny the second sentence in this SOF. BLM considered the potential impacts of the proposed project, and surface disturbances, in the EIS. BLM then addresses site-specific conditions in the EAs for a particular POD. As the ROD states, "[t]he BLM will implement a performance-based, adaptive management process for the ARPA whereby incremental adjustments will be made to mitigation and management restrictions based upon how the environment responds to future development and performance requirements." AR 004836-37. Therefore, on-going mitigation measures already will be in place before each new site-specific surface-disturbing action.

159. Defendant-Intervenors hereby reference and incorporate General Objection No. 2 with regard to the first clause in this SOF, and therefore deny same. Defendant-Intervenors admit that the quotations contained in this SOF are accurate quotations from AR 004815, and note that the document speaks for itself. Defendant-Intervenors also note that CEQ regulations for implementing NEPA state that, with regard to the creation of a ROD, "[a] monitoring and enforcement program shall be adopted and summarized where applicable for any mitigation." 40 C.F.R. §1505.2.

160. Defendant-Intervenors admit that the block quotes contained in this SOF are accurate quotations from AR 004836-37, and note that the document speaks for itself.

Defendant-Intervenors note, however, that Plaintiff has selectively omitted certain paragraphs between the two block quotes. These paragraphs state:

> . . . The potential value of adaptive management to the National Environmental Policy Act (NEPA) process is discussed by Carpenter (1997) and is strongly supported by a number of agencies at the national level, including BLM, United States Environmental Protection Agency (USEPA), and United States Department of Agriculture-Forest Service (USDA-FS). Carpenter summarized, "It is increasingly recognized that human interventions into natural systems seldom proceed as originally planned. Scientific uncertainties prevent environmental impacts from being reliably or precisely predicted. Thus, the style of management must provide for monitoring to guide mid-course corrections in adapting to inevitable surprises." Council on Environmental Quality (CEQ) NEPA regulations require continual monitoring.
>
> Throughout the life of the project, monitoring data will be reviewed to determine if mitigation is leading to the achievement of reclamation and performance goals. The adaptive management process will use this data to enable the development of management changes. Following submission of development plans (APDs, Sundry notices, etc.) specific COAs, BMPs, and other mitigations will be determined and applied for each specific site during on-site reviews. These on-the-ground reviews offer BLM resource specialists the opportunity to anticipate the potential effects of development and apply those measures judged necessary to reduce the adverse effects of development at the site. The specific measures (COAs, BMPs, etc.) that are best suited for reducing adverse effects will vary by site, based on conditions found at the specific site, such as the presence of sensitive soils, wildlife issues, aspect, slope, nature of the specific action proposed, and many other factors.
>
> While the activities planned for the ARPA, including most mitigation measures, are common and their effects generally well known, variations in site and climatic conditions, unknown conditions, and other factors can result in variations in reclamation success. Therefore, new techniques and technology *to reduce* oil and gas development impacts can and will be implemented as they become available. For those sites where known mitigations are not as effective as desired, monitoring and application of adaptive management will be used to change the mitigation approach using

> different or new techniques that provide the BLM with a mechanism to increase the success of reclamation in the ARPA.
>
> AR 004837 (emphasis added).

161. Defendant-Intervenors hereby reference and incorporate General Objection No. 2 with regard to the first clause in this SOF, and therefore deny same. Defendant-Intervenors admit that the quotation contained in this SOF is an accurate quotation from AR 009812, and note that the document speaks for itself.

162. Denied. Defendant-Intervenors admit that USEPA stated its position that the preferred alternative in the FEIS "has more significant impact than the DEIS preferred alternative . . . ." AR 009815. Defendant-Intervenors admit that USEPA recommended that phased development be imposed in the BLM block acreage. *Id.* Defendant-Intervenors hereby reference and incorporate their response to SOF No. 118.

163. Denied. The cited reference for the first sentence in this SOF does not support the assertion therein. *See* AR 008809. Defendant-Intervenors admit that a document entitled "Generic Language for a Performance-based Management Approach" has a notation at the top that states "from WG&F." *Id.* Defendant-Intervenors admit that a document that indicates it was "Received from Vern Stelter with WGFD" referred to some of the language contained in the FEIS as "squishy." AR 008818. Defendant-Intervenors note that AR 008818 states that the "draft generic language for performance-based management looks very good, in general," and only requests that certain wording be "tightened up."

164. Defendant-Intervenors admit the first sentence in this SOF. Defendant-Intervenors admit that the quotations contained in this SOF are accurate quotations from AR 010322-23, and note that the document speaks for itself. Defendant-Intervenors note that BLM addressed the points (a. through d.) outlined by WGFD on AR 010323 in the ROD, by discussing

the performance "goals" and "requirements," as well as monitoring and possible mitigation measures to be applied to the project on a site-specific basis. *See, e.g.*, AR 004814-16, 004835-55 (Appendix B).

165. Defendant-Intervenors admit that the quotations contained in this SOF are accurate quotations from AR 010323-24, and note that the document speaks for itself.

166. Defendant-Intervenors admit that the block quote contained in this SOF is an accurate quotation from AR 010325, with the exception of a minor punctuation error (missing comma), and note that the document speaks for itself.

167. Defendant-Intervenors admit that the block quote contained in this SOF is an accurate quotation from AR 010325, and note that the document speaks for itself.

168. Defendant-Intervenors admit that the quotation contained in this SOF is an accurate quotation from AR 009810, and note that the document speaks for itself. BLM incorporated data from the study into the Atlantic Rim EIS and provided for further evaluation based on the final results. AR 002499 ("Currently, an industry sponsored mule deer study is ongoing. Completion of the first phase of the study provided BLM and WGFD with better information on migration routes."); AR 004870 (noting that information from mule deer study will be evaluated and incorporated into wildlife monitoring and mitigation process).

169. Defendant-Intervenors object to this SOF in its entirety as it is irrelevant to the arguments Plaintiff raises in its Motion for Summary Judgment. Defendant-Intervenors hereby reference and incorporate General Objection No. 2 with regard to the first sentence in this SOF, and therefore deny same. Without waiving their objections, Defendant-Intervenors admit that Double Eagle "encourage[d]" BLM to "exercise flexibility in reclamation to achieve the most

successful outcome." AR 010044-45. Defendant-Intervenors admit the second sentence in this SOF.

170.    Defendant-Intervenors object to this SOF in its entirety as it is irrelevant to the arguments Plaintiff raises in its Motion for Summary Judgment. Defendant-Intervenors hereby reference and incorporate General Objection No. 2 with regard to the first sentence in this SOF, and therefore deny same. Without waiving their objections, Defendant-Intervenors admit that the quotation contained in this SOF is an accurate quotation from AR 009932, and note that the document speaks for itself.

171.    Defendant-Intervenors object to this SOF in its entirety as it is irrelevant to the arguments Plaintiff raises in its Motion for Summary Judgment. Without waiving their objections, Defendant-Intervenors admit the first sentence of this SOF. Defendant-Intervenors deny the second sentence in this SOF. Defendant-Intervenors admit that in its January 3, 2007 letter, Yates Petroleum Corporation ("Yates") stated that "the dynamic process that is coalbed natural gas development may not allow for 'annual planning,'" but Yates did not reject the annual planning requirement. AR 009929. In fact, Yates noted that it was "willing to try 'annual planning.'" AR 009930. Defendant-Intervenors admit that the quotations contained in the remainder of this SOF are accurate quotations from AR 009929-30, with the exception of an omitted "a" in the third-to-last quoted sentence, and note that the document speaks for itself.

172.    Defendant-Intervenors deny the first sentence in this SOF. According to the Wyoming Governor's Office, several state agencies were "concerned that specific performance objectives were too vague and would leave too much discretion to future interpretation while some objectives were too prescriptive and would not afford options as to how the performance objectives would be obtained." AR 010052. Defendant-Intervenors admit that the block quote

contained in the second sentence of this SOF is an accurate quotation from AR 010052, and note that the document speaks for itself.

173.    Defendant-Intervenors hereby reference and incorporate General Objection No. 2 with regard to the first clause in this SOF, and therefore deny same.  Defendant-Intervenors admit that the block quote contained in this SOF is an accurate quotation from AR 008824, and note that the document speaks for itself.  Defendant-Intervenors further note that Plaintiff selectively omitted the following sentence from the block quote: "It is my understanding that the general components we asked to be included in the ROD have been favorably considered by your D.C. office."  AR 008824.

174.    Defendant-Intervenors admit the first sentence of this SOF.  Defendant-Intervenors hereby reference and incorporate General Objection No. 2 with regard to the second sentence in this SOF, and therefore deny same.

175.    Defendant-Intervenors object to this SOF in its entirety as it is irrelevant to the arguments Plaintiff raises in its Motion for Summary Judgment.  Without waiving their objections, Defendant-Intervenors admit the first, second, and third sentences in this SOF.  Defendant-Intervenors admit that the quotation contained in the fourth sentence of this SOF is an accurate quotation from AR 006799, and note that the document speaks for itself.  Defendant-Intervenors deny the last sentence in this SOF.  Defendant-Intervenors admit that, "[t]aken as a whole, the eight BLM field offices [the GAO] visited met their annual environmental inspection goals only about half of the time during the past 6 years (from fiscal years 1999 through 2004), due in part to staff spending an increasing amount of time processing drilling permits."  AR 006816-17.

176.    Defendant-Intervenors object to this SOF in its entirety as it is irrelevant. Defendant-Intervenors hereby reference and incorporate General Objection No. 1 with regard to this SOF, and therefore deny same.

177.    Defendant-Intervenors hereby reference and incorporate General Objection No. 2 with regard to the first clause in this SOF, and therefore deny same. Defendant-Intervenors admit that the block quote contained in this SOF is an accurate quotation from AR 002160, and note that the document speaks for itself. Defendant-Intervenors hereby reference and incorporate their response to SOF Nos. 92, 106, 119, and 123.

178.    Denied. Defendant-Intervenors admit that BLM considered and decided to eliminate Alternative B "from detailed study in the FEIS because [Alternative B] did not sufficiently address or provide for the purpose and need of the project." AR 009921. BLM eliminated Alternative B "from further detailed study in the Final EIS based on comments received on the Draft EIS, the effects of long delays on allowable oil and gas development to leaseholders and mineral rights, and the policy that BLM will allow reasonable access across federal lands for mineral development on private and state lands." AR 002161. Defendant-Intervenors hereby reference and incorporate their response to SOF Nos. 92, 106, 119, and 123.

179.    Admitted. Defendant-Intervenors note that the April 2007 BLM powerpoint presentation listed the following additional "Key Points" with regard to the Preferred Alternative: (1) "emphasizes reclamation", (2) "mitigates impacts to wildlife", and (3) "encourages cooperation with landowners/livestock operators/companies/other agencies." AR 008839.

180. Defendant-Intervenors hereby reference and incorporate General Objection No. 2 with regard to this SOF, and therefore deny same. Defendant-Intervenors also hereby reference and incorporate their response to SOF No. 123, *supra*.

181. Defendant-Intervenors admit that the block quote contained in this SOF is an accurate quotation from AR 002387, and note that the document speaks for itself.

182. Defendant-Intervenors admit that the block quotes contained in this SOF are accurate quotations from AR 002388-89, with the exception of an omitted sentence at the end of the first paragraph. The omitted sentence states: "Wildlife sensitivity to these impacts varies considerably with each animal species." AR 002388. Defendant-Intervenors also note that the quoted document speaks for itself. With regard to the last sentence in this SOF, Defendant-Intervenors note that Plaintiff selectively omits the latter half of the sentence. The entire paragraph states:

> The extent of wildlife displacement is impossible to predict for most species since the response severity varies from species to species and can even vary between different individuals of the same species. After initial avoidance, some wildlife species (usually certain birds and rodents and to a lesser extent deer and pronghorn) may acclimate to the activity and begin to reinvade areas previously avoided. This acclimation and reoccupation would be expected to occur following construction and drilling when the project moves into the production phases where less noise and human activity would take place.
>
> AR 002389.

183. Defendant-Intervenors admit that the quotation contained in this SOF is an accurate quotation from AR 002389, and note that the document speaks for itself.

184. Defendant-Intervenors admit that the quotation contained in this SOF is an accurate quotation from AR 002390, and note that the document speaks for itself.

185. Defendant-Intervenors admit that the quotations contained in this SOF are accurate quotations from AR 002391, and note that the document speaks for itself.

186. Defendant-Intervenors admit the first sentence of this SOF. Defendant-Intervenors admit that the quotations contained in the remainder of this SOF are accurate quotations from AR 007423 and AR 007445, and note that the document speaks for itself.

187. Defendant-Intervenors hereby reference and incorporate General Objection No. 2 with regard to the first clause of this SOF, and therefore deny same. Defendant-Intervenors admit that the statements and conclusions listed in the bullet points in this SOF are generally included in AR 007445-47, but deny that the information is "vital." BLM considered impacts on mule deer based on information it had before it.

188. Defendant-Intervenors admit that the block quotes contained in this SOF are accurate quotations from AR 002393-94, with the exception of Plaintiff's selective omission of the second half of one sentence in this two-paragraph block quote. The complete sentence in the quoted paragraph states: "Mule deer, however, are adaptable *and may adjust to non-threatening, predictable human activity (Irby et al. 1988 and Gusey 1986)*." AR 002393 (emphasis added). Defendant-Intervenors also note that the document speaks for itself.

189. Defendant-Intervenors admit that the quotations contained in this SOF are accurate quotations from AR 002404 and AR 002388, and note that the document speaks for itself.

190. Defendant-Intervenors deny that the block quotation contained in this SOF is an accurate quotation from AR 002394. Plaintiff has removed three key sentences from the quoted paragraph, which results in the partial quotation being misleading and substantively inaccurate overall. The first omitted sentence (see the first ellipses) states: "However, much of the crucial

winter range is on steeper south- and west-facing slopes that would be avoided during development."  The second omitted sentence (see the second ellipses) states:  "Displacement would be reduced in areas with topographic barriers (Edge and Marcum 1991)."  Lastly, the final sentence of the paragraph is omitted: "To reduce human presence, remote monitoring of project facilities would be used to the greatest extent possible during the production phase."  AR 002394.

191.    Defendant-Intervenors admit the first sentence of this SOF.  Defendant-Intervenors deny the second sentence of this SOF, as it is not supported by any citation to the record.  Defendant-Intervenors also reference and incorporate General Objection No. 2 with regard to the second sentence of this SOF, and therefore deny same.  Defendant-Intervenors admit that the quotations contained in the remainder of this SOF are accurate quotations from AR 002391, AR 002398 and AR 002388, and note that the document speaks for itself.

192.    Defendant-Intervenors admit that the quotation contained in this SOF is an accurate quotation from AR 002392, and note that the document speaks for itself.

193.    Defendant-Intervenors admit that the quotations contained in the first sentence of this SOF are accurate quotation from AR 002392, although, the two complete sentences state: "However, pronghorn have been found to habituate to increased traffic volumes and heavy machinery as long as the machines move in a predictable manner (Reeve 1984).  Well development operations and deviation from ordinary activities may cause antelope displacement of up to 0.625 miles (Easterly et al. 1991), but they would likely habituate to activities along roads and continue using habitats in those areas (reeve 1984)."  AR 002392.  Defendant-Intervenors admit that the block quotation contained in this SOF is an accurate quotation from AR 002392.  Defendant-Intervenors also note that the document speaks for itself.

194.    Defendant-Intervenors admit that the quotations contained in this SOF are accurate quotations from AR 002401-02 (not AR 2419), and AR 002388, and note that the document speaks for itself.

195.    Defendant-Intervenors admit that the quotations contained in the first three sentences of this SOF are accurate quotations from AR 002392, and note that the document speaks for itself.  Defendant-Intervenors deny the last sentence in this SOF.  BLM cites to a specific study, cited as "Reeve 1984," to support its statements that pronghorn "have been found to habituate" to increased human activity.  AR 002392.

196.    Defendant-Intervenors admit the first sentence of this SOF.  Defendant-Intervenors admit that the block quote contained in the second sentence of this SOF is an accurate quotation from AR 010134-35, with the exception of an omitted "a" before "landscape," and note that the document speaks for itself.  Defendant-Intervenors admit that the quotation contained in the third sentence of this SOF is an accurate quotation from AR 010135, and note that the quoted document speaks for itself.  Defendant-Intervenors also note the cited letter from USFWS states that "[i]n regard to Alternative D, the Service commends the [BLM] for requiring interim reclamation as this may reduce some of the impacts that will occur across the Project Area."  AR 010135.

197.    Defendant-Intervenors admit that the quotations contained in the first three sentences in this SOF are accurate quotations from AR 002395, and note that the document speaks for itself.  Defendant-Intervenors deny the last sentence in this SOF and note that BLM estimates a "*maximum* direct loss of 8.1 percent of the available nesting habitat . . . ."  AR 002402 (emphasis added).  This reflects an approximate 20 percent reduction from the estimated

"maximum direct loss of 10 percent of the available nesting habitat" under the Proposed Action. AR 002398, 002402.

198.    Defendant-Intervenors admit that the quotations contained in this SOF are accurate quotations from AR 002402, and note that the document speaks for itself.

199.    Defendant-Intervenors admit that the quotation contained in this SOF is an accurate quotation from AR 002395, and note that the document speaks for itself.

200.    Defendant-Intervenors admit, as illustrated by this SOF, BLM considered the Naugle study.  Defendant-Intervenors deny this SOF to the extent that it states that BLM "does not follow Naugle's recommendations," as Plaintiff does not explain what "recommendations" it is referring to.  Defendant-Intervenors admit that the block quote contained in this SOF is an accurate quotation from AR 002395, with the exception that in the cited source, the word "they" in the second sentence of the quotation appears as "the."  Defendant-Intervenors also note that the document speaks for itself.

201.    Defendant-Intervenors admit that the quotations contained in this SOF are accurate quotations from AR 002396 and AR 002404, and note that the document speaks for itself.

202.    Denied.  Defendant-Intervenors hereby reference and incorporate General Objection No. 2 with regard to this SOF, and therefore deny same.  Defendant-Intervenors also note that the cited document is in the administrative record and speaks for itself.  Defendant-Intervenors deny this SOF as the FEIS explains that construction of facilities and roads "increases fragmentation" of sage grouse habitat.  The FEIS does not state that construction of facilities and roads "will fragment" habitat.

203.    Defendant-Intervenors admit that the quotation in this SOF is an accurate quotation from AR 002398.  Defendant-Intervenors note, however, that this language appears in the "Proposed Action" section, not under the section describing the Preferred Alternative chosen by BLM.  AR 002398.  Similar language does not appear in the discussion of Alternative D, the alternative selected in the ROD.  *See* AR 002402.

204.    Defendant-Intervenors admit that the quotation in the first sentence of this SOF is an accurate quotation from AR 002398.  Defendant-Intervenors note, however, that this language appears in the "Proposed Action" section, not under the section describing the Preferred Alternative chosen by BLM.  AR 002398.  Defendant-Intervenors note that the same language appears with regard to Alternative D, the alternative selected in the ROD.  AR 002402.  Defendant-Intervenors hereby reference and incorporate General Objection No. 2 with regard to the second sentence in this SOF, and therefore deny same.  Without waiving this objection, Defendant-Intervenors admit that the quotation in the second sentence is an accurate quotation from AR 002388, and note that the document speaks for itself.

205.    Denied.  Defendant-Intervenors hereby reference and incorporate General Objection No. 2, and therefore deny same.  Without waiving this objection, Defendant-Intervenors deny this SOF as unsupported by the cited authority.  The quoted language is accurate, but the FEIS states that the impacts listed in the quoted language are "[p]otential impacts to greater sage-grouse," not that the greater sage-grouse "will experience" such impacts.  AR 002394-95.

206.    Defendant-Intervenors deny this SOF to the extent that it states that wells were constructed within the 1/4-mile radius of sage grouse leks because it is unsupported by the cited sources.  The cited July 11, 2007 letter from BLM to Double Eagle states that BLM did *not*

approve well #20-6 in Catalina POD B because it was situated within the 1/4-mile No Surface Occupancy area around a sage grouse lek. AR 078630. The cited February 22, 2006 e-mail from Travis Bargsten to Steven Degenfelder and attached documents discuss proposed well locations that conflicted with wildlife buffers and does not support Plaintiffs' allegation that wells "were constructed" within those buffers. AR 078545-51. Similarly, the cited April 7, 2006 email from Steven Degenfelder to Travis Bargsten only discusses proposed well locations and does not indicate whether those proposed wells were later moved. AR 078564-65. Lastly, the cited March 16, 2006 email from Travis Bargsten to Mark Storzer and others simply proposes a meeting to discuss the conflict between the 1/4-mile No Surface Disturbance Zone and "recovery of significant gas reserves." AR 078738. With regard to Plaintiff's citation to the Declaration of Frank Blomquist, Defendant-Intervenors hereby reference and incorporate General Objection No. 1, and therefore deny same. Without waiving this objection, Defendant-Intervenors note that the cited sources state that, of the only two wells that were proposed to be located in the 1/4-mile No Surface Disturbance Zone, one was "moved to edge of 1/4 mile Controlled Surface Use greater sage-grouse buffer," and the other was "cancelled as proposed." Exh. A to Exh. 13 to BLM's Opp. to Pl.'s Mot. for Preliminary Injunction in *Natural Resources Defense Council v. Kempthorne*, Case No. 1:07-cv-01709-RJL, Docket No. 9-20. *See also* SOF No. 64 and Response to SOF No. 64. Defendant-Intervenors admit that wells were constructed within the 2-mile radius of sage grouse leks, subject to seasonal limitations and other mitigation measures. *Id.*

207. Defendant-Intervenors admit that the quotations in this SOF are accurate quotations from AR 002417-19, and note that the document speaks for itself. Defendant-Intervenors deny the third sentence of this SOF. The FEIS states that "[t]he Proposed Action and

alternatives would *potentially* have both direct and indirect impacts to recreation." AR 002418 (emphasis added). Defendant-Intervenors note that the quoted language in the last sentence of this SOF is from the discussion of the Proposed Action, and not the Preferred Alternative chosen by BLM. AR 002419. The discussion of Alternative D, the alternative selected in the ROD, notes that "[i]mpacts to hunting and to the recreation setting under Alternative D would be similar to, but of a lesser magnitude than the impacts described under the Proposed Action." AR 002423.

208. Defendant-Intervenors admit that the quotation in the first sentence of this SOF is an accurate quotation from AR002420, but note that the quoted language is followed by the caveat: "-- but the intensity of the effects would be lower after drilling and construction ends." AR 002420. Defendant-Intervenors admit that the block quote in this SOF is an accurate quotation from AR 002420, but note that the quoted language is from the discussion of the Proposed Action, not Alternative D, the alternative selected in the ROD. AR 002420. In the discussion of Alternative D, the alternative selected in the ROD, the FEIS explains that impacts to hunting and recreation "would be similar to, but of a lesser magnitude than the impacts described under the Proposed Action." AR 002423. Defendant-Intervenors admit that the quotation in the last sentence of this SOF is an accurate quotation from AR 002423. However, Defendant-Intervenors refer to the preceding sentence herein.

209. Defendant-Intervenors hereby reference and incorporate General Objection No. 3 with regard this SOF, and therefore deny same. Without waiving this objection, Defendant-Intervenors deny the first sentence in this SOF as unsupported by the cited source to the extent that it states that the cited document analyzes the impacts of methane seeps and augmented gas release "due to CBM development." To the contrary, the cited source states that "there is no

scientific data available to prove or disprove that CBNG development within the ARPA has caused or will cause increased gas flux from the known gas seeps." AR 008805. Defendant-Intervenors also note that the cited document is in draft form. Defendant-Intervenors admit that the block quote contained in this SOF is an accurate quotation from AR 008803, and note that the document speaks for itself.

210.   Defendant-Intervenors hereby reference and incorporate General Objection No. 3 with regard to this SOF, and therefore deny same. Without waiving this objection, Defendant-Intervenors admit that the block quote contained in this SOF is an accurate quotation from AR 008805, and note that the document speaks for itself. Defendant-Intervenors also note that the cited document is in draft form.

211.   Defendant-Intervenors hereby reference and incorporate General Objection No. 3 with regard this SOF, and therefore deny same. Without waiving this objection, Defendant-Intervenors deny the first sentence in this SOF to the extent that it states that BLM was put on notice of "its obligations to investigate and disclose the impacts identified in the memorandum." Plaintiff does not identify the "obligations" to which it is referring. Defendant-Intervenors admit that in its April 25, 2007 letter to BLM, Wyoming Outdoor Council stated that the impacts of methane seeps "need to be addressed as part of your Environmental Impact Statement before you issue a Record of Decision." AR 008841. BLM considered the potential impacts of methane seeps in the ARPA, based on the information it had before it. AR 002351; AR 002368-69 (FEIS at 4-32, 4-49 to 4-50); AR 001682 (DEIS at 4-47). Moreover, BLM is actively addressing the situation by requiring monitoring and adaptive management. AR 009452-54. *See also* AR 009455-57 (draft memorandum describing WDEQ actions).

212.    Defendant-Intervenors hereby reference and incorporate General Objection No. 3 with regard to this SOF, and therefore deny same.  Without waiving this objection, Defendant-Intervenors deny this SOF.  Defendant-Intervenors note that the cited memorandum states that "[a]bout a dozen historic springs in the Atlantic Rim area south of Rawlins are drawing attention because they appear to be more active than in the historic past."  AR 008854.  The memorandum explains that "[t]hese springs have been around for 30-50 years and are a naturally occurring geologic feature when there is sand over coal seams."  *Id.*  Defendant-Intervenors hereby reference and incorporate their response to SOF No. 211.

213.    Defendant-Intervenors hereby reference and incorporate General Objection No. 3 with regard to this SOF, and therefore deny same.  Without waiving this objection, Defendant-Intervenors deny this SOF because it is not supported by the cited document.  Defendant-Intervenors note that the cited e-mail states that there was "new activity" at a mud pot in the Atlantic Rim between February and March of 2007, but does not tie that activity to the Atlantic Rim Project and does not support Plaintiffs' contention that the mud pots had not existed for decades.  AR 009432.  BLM also has found the activity has fluctuated on and off even prior to interim drilling.  AR 009453.

214.    Defendant-Intervenors hereby reference and incorporate General Objection No. 3 with regard to this SOF, and therefore deny same.  Defendant-Intervenors hereby reference and incorporate General Objection No. 2 to the extent that this SOF characterizes the cited reference as stating that methane seeps "had not been adequately considered," and therefore deny same.  Without waiving these objections, Defendant-Intervenors deny that the cited document informed the State Director that methane seeps "had not been adequately considered."  BLM determined that this was not new information.  AR 009460.

215.    Defendant-Intervenors hereby reference and incorporate General Objection No. 3 with regard to each sentence in this SOF, and therefore deny same.  Without waiving this objection, Defendant-Intervenors  admit that the quotation contained in this SOF is an accurate quotation from AR009460.

216.    Defendant-Intervenors hereby reference and incorporate General Objection No. 3 with regard to each sentence in this SOF, and therefore deny same.  Without waiving this objection, Defendant-Intervenors deny this SOF.  Defendant-Intervenors admit that the quotation contained in this SOF is an accurate quotation from AR009452.  Defendant-Intervenors note, however, that the quoted language does not refer to the memorandum cited in SOF No. 214.  Rather, the quoted language refers to the information contained in the cited email and in the memorandum attached to the cited e-mail, entitled "Atlantic Rim Methane Springs Update."  *See* AR 009452-57.  BLM determined that this was not new information.  AR 009460.

217.    Defendant-Intervenors hereby reference and incorporate General Objection Nos. 2 and 3 with regard to this SOF, and therefore deny same.  Without waiving these objections, Defendant-Intervenors deny this SOF because it is unsupported by the cited source.  There is no indication that the cited source was developed by BLM.  AR 008862.  Moreover, the cited talking points do not downplay the significance of the methane seep issue.  *Id.*

218.    Defendant-Intervenors hereby reference and incorporate General Objection No. 3 with regard to this SOF, and therefore deny same.  Without waiving their objection, Defendant-Intervenors deny this SOF. There is no authentication of where these photographs were taken or their relation to the project.

219.    Defendant-Intervenors hereby reference and incorporate General Objection No. 1 with regard to each sentence in this SOF, and therefore deny same.  Defendant-Intervenors also

object to this SOF in its entirety as it is irrelevant.  TRCP did not specifically raise the issue of wind projects within the ARPA in its comments to BLM.  Without waiving their objections, Defendant-Intervenors deny the second sentence in this SOF and note that the cited Wind Energy EIS indicates that the wind resource level is "high" only in certain parts of the ARPA.  Exh. L to TRCP's MSJ.

220.    Defendant-Intervenors hereby reference and incorporate General Objection No. 1 with regard to each sentence in this SOF, and therefore deny same.  Defendant-Intervenors object to this SOF in its entirety as it is irrelevant.  Without waiving their objections, Defendant-Intervenors admit that the quotations in this SOF are accurate quotations from Anadarko's November 23, 2004 comments on BLM's Wind Energy Programmatic EIS, and note that the document speaks for itself.  Exh. M to TRCP's MSJ.

221.    Defendant-Intervenors hereby reference and incorporate General Objection No. 1 with regard to this SOF, and therefore deny same.  Defendant-Intervenors object to this SOF in its entirety as it is irrelevant.   Without waiving their objections, Defendant-Intervenors admit that the quotations in this SOF are accurate quotations from Anadarko's November 23, 2004 comments on BLM's Wind Energy Programmatic EIS, and note that the document speaks for itself.  Exh. M to TRCP's MSJ.

222.    Admitted in part and denied in part.  Defendant-Intervenors admit that on January 4, 2007, TRCP provided BLM with comments on the FEIS.  AR 010262.  TRCP provided no comments on the DEIS.

223.    Defendant-Intervenors deny the first sentence in this SOF.  As the ROD notes, "this decision will be in full force and effect commencing with the date it is signed by the [Authorized Officer]."  AR 004799.  Defendant-Intervenors object to the second sentence in this

SOF on the grounds that it is a legal conclusion, not a statement of fact, and therefore, no response is required.  With regard to the third sentence in this SOF, Defendant-Intervenors admit that on June 18, 2007, TRCP appealed the ROD to the Interior Board of Land Appeals ("IBLA"), where it raised some of the same alleged concerns contained in its complaint in the current action.  *See generally* TRCP, IBLA No. 2007-208.  Defendant-Intervenors, however, have insufficient information to admit or deny the remainder of the third sentence of this SOF, and therefore deny same.  Defendant-Intervenors admit the last sentence in this SOF.

224.    Defendant-Intervenors object to the statement in the second sentence of this SOF that TRCP was "under no obligation to exhaust [its] appeal" to the IBLA, as it calls for a legal conclusion.  Defendant-Intervenors admit the remainder of this SOF.

225.    Defendant-Intervenors admit the first sentence in this SOF.  Defendant-Intervenors object to the phrase "standard mitigation measures" as vague and ambiguous.  To the extent that a response is required, Defendant-Intervenors admit that mitigation measures considered in the Atlantic Rim EIS and ROD were imposed as part of the approval of the PODs, and deny the remainder of the second sentence in this SOF.

226.    Denied.  The FEIS contemplated limited mitigation measures, including those identified in the Proposed Action.  Defendant-Intervenors also note that no further review of impacts is required for an exception from the wildlife seasonal restrictions because such an exception "may be" granted, but only "if a determination is made that the wildlife resource will not be adversely impacted."  AR 074071.

227.    Denied.  Defendant-Intervenors note that the EA is tiered to the Atlantic Rim FEIS, which considered the proposed action, the no action alternative, and two action alternatives, Alternatives C and D.  *See, e.g.,* AR 002089-90.

228. Plaintiff fails to cite to any support in the administrated record for this SOF, and Defendant-Intervenors have insufficient information to admit or deny this SOF, and therefore deny same.

229. Admitted.

230. To the extent it does not call for a legal conclusion, Defendant-Intervenors admit this SOF.

231. Admitted.

232. Denied. Plaintiff fails to cite to any support for its assertion of an "apparent suspension by BLM of the administrative review requirements in 43 C.F.R. § 3165.3(b) insofar as development within the ARPA is concerned."

233. Defendant-Intervenors admit the first sentence in this SOF, and note that the approval of one additional well was deferred. AR 073494. Defendant-Intervenors object to the second sentence in this SOF on the grounds that "standard mitigation measures" is undefined, vague and ambiguous. To the extent that a response is required, Defendant-Intervenors deny the second sentence in this SOF and hereby reference and incorporate their response to SOF No. 225

234. Denied. The FEIS contemplated limited mitigation measures, including those identified in the Proposed Action. Defendant-Intervenors also note that no further review of impacts is required for an exception from the wildlife seasonal restrictions because such exceptions "may be" granted, but only "if a determination is made that the wildlife resource will not be adversely impacted." AR 073500.

235. Denied. Defendant-Intervenors note that the EA is tiered to the Atlantic Rim FEIS, which considered the proposed action, the no action alternative, and two action alternatives, Alternatives C and D. *See, e.g.,* AR 002089-90.

236. Defendant-Intervenors hereby reference and incorporate General Objection No. 1 with regard to this SOF, and therefore deny same. Without waiving this objection, Defendant-Intervenors note that the exhibits to the Declaration of Frank Blomquist show that no well locations were approved within a 1/4-mile radius of sage grouse leks and do not delineate a 1/2-mile radius from sage grouse leks. Exh. A to Exh. 13 to BLM's Opp. to Pl.'s Mot. for a Preliminary Injunction in *Natural Resources Defense Council v. Kempthorne,* Case No. 1:07-cv-1709-RJL, Docket No. 9-20. Defendant-Intervenors admit that 12 well locations were approved within Mule Deer or Pronghorn crucial winter range, subject to mitigation measures. Exh. B to Exh. 13 to BLM's Opp. to Pl.'s Mot. for a Preliminary Injunction in *Natural Resources Defense Council v. Kempthorne*, Case No. 1:07-cv-01709-RJL, Docket No. 9-20.

Respectfully submitted,

/s/ Michael B. Wigmore
Michael B. Wigmore (DC Bar # 436114)
Bingham McCutchen LLP
2020 K Street, N.W.
Washington, D.C. 20006
(202) 373-6000
(202) 373-6001 (facsimile)

*Counsel for Anadarko Petroleum Corporation, Warren Resources, Inc. and Double Eagle Petroleum Co.*

Robert C. Mathes (DC Bar # 484255)
Bjork Lindley Little PC
1600 Stout Street, Suite 1400
Denver, CO 80202
(303) 892-1400
(303) 892-1401 (facsimile)

*Counsel for Double Eagle Petroleum Co.*

Dated:  June 12, 2008

A/72538366.6

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

THEODORE ROOSEVELT CONSERVATION PARTNERSHIP
555 Eleventh St. N.W., 6th Floor
Washington, DC 20004,

Plaintiff,

v.

DIRK KEMPTHORNE, in his official capacity as the Secretary of the United States Department of the Interior
1849 C Street, N.W.
Washington, DC 20240,

and

UNITED STATES BUREAU OF LAND MANAGEMENT
1849 C Street, N.W., Room 406-LS
Washington, DC 20240,

Defendants.

ANADARKO PETROLEUM CORPORATION,
P.O. Box 1330
Houston, TX 77251-1330,

WARREN RESOURCES, INC.,
489 Fifth Avenue, 32nd Floor
New York, NY 10017,

DOUBLE EAGLE PETROLEUM CO.,
777 Overland Trail, Suite 208
P.O. Box 766
Casper, WY 82602-0766,

Defendant-Intervenors.

CASE NO. 1:07-cv-01486-RJL

| | |
|---|---|
| | ) |
| STATE OF WYOMING | ) |
| 123 Capitol Building | ) |
| Cheyenne, WY 82002 | ) |
| | ) |
| Defendant-Intervenor. | ) |
| | ) |

## CERTIFICATE OF SERVICE

I hereby certify that on this 12th day of June, 2008, the foregoing Cross-Motion for Summary Judgment, Memorandum in Opposition to Plaintiff's Motion for Summary Judgment and in Support of Defendant-Intervenor Anadarko Petroleum Corporation, Warren Resources, Inc., and Double Eagle Petroleum Co.'s Cross-Motion for Summary Judgment, Statement of Undisputed Material Facts in Support of Cross-Motion for Summary Judgment, Response to Plaintiff's Statement of Material Facts as to Which There is no Genuine Issue, and Proposed Order were electronically filed through the CM/ECF system, which caused the following to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

Donald G. Blankenau
Thomas R. Wilmoth
Steven Michael Kupka
Husch Blackwell Sanders LLP
206 South 13th Street
Suite 1400
Lincoln, NE 68508
don.blankenau@huschblackwell.com,
sharon.marburger@huschblackwell.com,
tom.wilmoth@huschblackwell.com,
nancilee.holland@huschblackwell.com

Lori Caramanian
U.S. Department of Justice
1961 Stout Street, 8th Floor
Denver, CO 80294
lori.caramanian@usdoj.gov

Jay A. Jerde
Teresa R. Nelson
John S. Burbridge
Deputy Attorney General
Wyoming Attorney General's Office
123 Capitol Building
Cheyenne, WY 82002
jjerde@state.wy.us
tnelso@state.wy.us
jburb1@state.wy.us


            /s/ Michael B. Wigmore
            Michael B. Wigmore


A/72561934.1

**Exhibits in Support of Memorandum In Opposition To Plaintiff's Motion For Summary Judgment And In Support Of Defendant-Intervenor Anadarko Petroleum Corporation, Warren Resources, Inc. And Double Eagle Petroleum Co.'s Cross-Motion For Summary Judgment**

Exhibit 1 — *Theodore Roosevelt Conservation P'ship, et al.*, No. IBLA 2007-208, *et al*. (Sept. 5, 2007)

Exhibit 2 — BLM, Record of Decision: Implementation of a Wind Energy Development Program and Associated Land Use Plan Amendments, December 2005

Exhibit 3 — Excerpts from BLM, Final Environmental Impact Statement on Wind Energy Development on Bureau of Land Management-Administered Lands in the Western United States, June 2005

Exhibit 4 — Mem., Office of the Solicitor, June 7, 2002

Exhibit 1

*Theodore Roosevelt Conservation P'ship*, *et al.*, No. IBLA 2007-208, *et al*. (Sept. 5, 2007)



# United States Department of the Interior

OFFICE OF HEARINGS AND APPEALS
Interior Board of Land Appeals
801 N. Quincy St. Suite 300
Arlington, VA 22203

703 235 3750 703 235 8349 (fax)

September 5, 2007

| | | |
|---|---|---|
| IBLA 2007-208, *et al.* | ) | BLM/WY/PL-07/011+1310 |
| | ) | |
| THEODORE ROOSEVELT CONSERVATION PARTNERSHIP, *ET AL.* | ) | Atlantic Rim Natural Gas Field Development Project |
| | ) | |
| | ) | Motions to Intervene Granted; Motions to Dismiss IBLA 2007-208 For Lack of Standing Denied; Motions to Dismiss IBLA 2007-226 For Lack of Standing Granted in Part; Motion to Dismiss IBLA 2007-226 as Untimely Denied; Petitions for Stay Denied |

## ORDER

The Theodore Roosevelt Conservation Partnership (TRCP) and others have appealed from a March 23, 2007, Record of Decision (ROD) of the Wyoming State Director, Bureau of Land Management (BLM), approving the Atlantic Rim Natural Gas Field Development Project (ARP or Project). BLM published notice of the availability of the ROD in the *Federal Register* on May 21, 2007 (72 Fed. Reg. 28518).[1]

Four appeals were filed from the ROD, and docketed as follows: IBLA 2007-208 (TRCP); IBLA 2007-210 (Biodiversity Conservation Alliance, Wyoming Outdoor Council, Center for Native Ecosystems, Western Watersheds

---

[1] In December 2006, BLM offered to the public for comment the ARP Final Environmental Impact Statement (FEIS), which had been prepared in accordance with section 102(2)(C) of the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. § 4332(2)(C) (2000), to analyze the potential significant environmental impacts of oil and gas drilling and associated activity in the Project area, under the proposed action and alternatives thereto.

Project, Colorado Environmental Coalition, The Wilderness Society, and Wyoming Wilderness Association (collectively, BCA)); IBLA 2007-226 (Environmental Preservation Foundation (Foundation) and Habitat for Wildlife (HFW) (collectively, EPF)); and IBLA 2007-227 (National Wildlife Federation and Wyoming Wildlife Federation (collectively, NWF)).[2]

The Project currently authorizes the drilling of 2,000 natural gas wells, including 1,800 coalbed methane (CBM) and 200 conventional gas wells, within the Atlantic Rim Project Area (ARPA or Project area). The Project area encompasses 270,080-acres of Federal, State, and private lands in Ts. 18 through 20 N., R. 89 W., Ts. 13 through 20 N., R. 90 W., Ts. 13 through 19, R. 91 W., and Ts. 15 through 17, R. 92 W., Sixth Principal Meridian, Carbon County, Wyoming.[3] All of the public lands in the Project area are subject to existing Federal oil and gas leases, within the administrative jurisdiction of BLM's Rawlins Field Office. All of the wells will be drilled at 80-acre spacing, or a maximum of 8 wells per 640-acre section. The CBM wells will be drilled in the Mesaverde Group, which consists of the Almond, Ericson, Rock Springs, and Blair formations, and the conventional gas wells will generally be drilled in deeper formations.

No more than 7,600 acres of Federal, State, and private lands will be disturbed at any one time, and the total cumulative surface disturbance will not exceed 13,600 acres over the life of the Project. Short-term disturbance will be limited to 6.5 acres per well site. Wastewater produced by CBM extraction will be reinjected into subsurface formations. Reclamation of disturbed areas will begin after the completion of drilling activities, and conclude once the well sites are no longer needed for any operations or production. New access roads and natural gas

---

[2] By three orders dated June 28, and July 26, 2007, we granted motions by the following proponents of the Project to intervene in the respective pending appeals: Anadarko E&P Company LP and Warren Resources, Inc. (collectively, Anadarko) (IBLA 2007-208, 2007-210, and 2007-227); and Double Eagle Petroleum Co. (Double Eagle) (IBLA 2007-208 and 2007-210). We hereby grant their motions to intervene in the remaining pending appeals: Anadarko (IBLA 2007-226); and Double Eagle (IBLA 2007-226 and 2007-227). In addition, by order dated July 18, 2007, we granted motions by the State of Wyoming to intervene in all four appeals.

[3] Under a 2001 Interim Drilling Policy (IDP), BLM approved, following the completion of environmental assessments and issuance of decision records/findings of no significant impact, the drilling of CBM wells and related activity in several Plan of Development (POD) areas within the ARPA in order to test the feasibility of development therein and to gather data for further environmental analysis. A total of 132 CBM wells had been drilled under the IDP at the time of issuance of the ARP FEIS.

pipelines, each totaling close to 1,000 miles, as well as compressors and other facilities, will be constructed in connection with the drilling and development activities. The overall life of the Project is expected to be from 30 to 50 years, although most drilling and related roadbuilding and facility construction will occur in the first 6 to 8 years.

TRCP and BCA each petitioned the Board to stay the effect of the ROD during the pendency of their appeals. The stay petitions are opposed by BLM and all of the intervenors. No stay petition was filed by EPF or NWF, although EPF filed a document styled "Concurrence and Joinder in Petition for Stay," stating that it was joining in the petition for stay earlier filed by BCA.

In this order, we first address motions to dismiss. We deny the motions to dismiss IBLA 2007-208 for lack of standing to appeal and grant the motions to dismiss IBLA 2007-226 for lack of standing to appeal only as to HFW. BLM's motion to dismiss IBLA 2007-226 as untimely is denied.

*I. Standing to Appeal in IBLA 2007-208 (TRCP) and IBLA 2007-226 (EPF)*

Anadarko, Double Eagle, the State, and BLM move to dismiss IBLA 2007-208 and IBLA 2007-226, alleging that none of the appellants has demonstrated standing to appeal, in accordance with 43 C.F.R. § 4.410(a).

In order to have standing under 43 C.F.R. § 4.410(a) to appeal from a BLM decision, an appellant must demonstrate that it is both a "party to a case" and "adversely affected" by the decision within the meaning of 43 C.F.R. § 4.410(b) and (d). As we said in *Southern Utah Wilderness Alliance*, 140 IBLA 341, 346 (1997) (*quoting Mark S. Altman*, 93 IBLA 265, 266 (1986)): "If either element is lacking, an appeal must be dismissed." Further, it is the responsibility of the appellant to demonstrate the requisite elements of standing. *Colorado Open Space Council*, 109 IBLA 274, 280 (1989).

First, under 43 C.F.R. § 4.410(b), an appellant is considered to be a "party to a case," when it is "one who has taken action that is the subject of the decision on appeal, is the object of that decision, or has otherwise participated in the process leading to the decision under appeal, *e.g.*, . . . by commenting on an environmental document, or by filing a protest to a proposed action." *See The Coalition of Concerned National Park [Service] Retirees*, 165 IBLA 79, 81-82 (2005), and cases cited.

Second, under 43 C.F.R. § 4.410(d), a party to a case is "adversely affected" by a BLM decision, "when that party has a legally cognizable interest, and the decision on appeal has caused or is substantially likely to cause injury to that

interest." *See The Coalition of Concerned National Park [Service] Retirees*, 165 IBLA at 81-82, and cases cited. When an appellant is a membership organization, it must demonstrate that one or more of its members has a legally cognizable interest, which is germane to the purposes of the organization as a whole, and which is or may be adversely affected by the decision being appealed. *Id.* at 86.

*A. IBLA 2007-208*

Anadarko, Double Eagle, the State, and BLM do not question whether TRCP is a "party to a case;" rather they assert that TRCP is not "adversely affected" by the ROD. Initially, although TRCP claimed that its members visited Project area lands for aesthetic and recreational pursuits, lived and worked in neighboring communities, enjoyed the wildlife found there, and/or made their living on public lands in the vicinity of Project area lands, TRCP did not identify any such members or provide any declarations or other statements of any members attesting to such activities or the likely effect of the Project on such activities.

In response to the motions to dismiss, TRCP filed affidavits of two members, Steven R. Belinda and Rollin D. Sparrowe, who attest to the fact that TRCP is "a non-profit organization representing outdoor enthusiasts who engage in hunting, fishing and outdoor recreation;" that its "mission is to preserve hunting and fishing by conserving fish and wildlife and the habitats necessary to sustain them for its members and for the public;" that they personally have hunted elk, mule deer, and/or sage grouse within the Project area; and that, given the negative impacts to such species, such activity would be harmed by allowing the Project to go forward. TRCP Consolidated Response to Motions to Dismiss at 4 (citing attached Ex. A (Affidavit of Belinda, dated July 18, 2007) and Ex. B (Affidavit of Sparrowe, dated July 20, 2007)).

Based on the affidavits of TRCP's members, we conclude that TRCP has offered specific facts demonstrating that its members have a legally cognizable interest in the Project area, which is germane to the purposes of the organization, and which may be adversely affected by BLM's decision to go forward with drilling and development in the Project area. Therefore, we deny the motions to dismiss TRCP's appeal (IBLA 2007-208) for lack of standing to appeal.

*B. IBLA 2007-226*

Turning to the motions to dismiss EPF's appeal, we note that HFW has not taken action that is the subject of the decision on appeal, and HFW is not the object of that decision. While the Foundation participated in the public scoping and comment process, HFW did not. *See* ROD, Appendix E, at E-11 to E-13;

FEIS, Appendix N (Draft EIS Comment Letters), at N-12 to N-15. In a consolidated response to the motions to dismiss, EPF asserts at page 1 that "[t]he intent was that comments were to represent both" the Foundation and HFW. While in hindsight that may have been the intent, there is no independent evidence in the record that HFW participated, at any point, in the NEPA review or decisionmaking process that led to the ROD. We conclude that HFW cannot be considered a "party to a case," and, for this reason alone, lacks standing to appeal. *See Edwin H. Marston*, 103 IBLA 40, 42 (1988).

Although both the Foundation and HFW claim that their members, who recreate, observe wildlife, and hunt in the Project area, will be negatively impacted by drilling and development, only the Foundation provides the declaration of a member in support of those assertions, the August 9, 2007, declaration of Asa S. Nielson, the Chairman of the Foundation. Through that declaration the Foundation has offered specific facts establishing that Nielson has a legally cognizable interest in the Project area, which is germane to the purposes of the Foundation, and which may be adversely affected by BLM's approval of the Project. Thus, the Foundation has established that it has standing to appeal the ROD.

Accordingly, we grant the motions to dismiss IBLA 2007-226 for lack of standing to appeal only as to HFW.[4]

*II. Timeliness of Appeal in IBLA 2007-226*

BLM requests that the Board dismiss EPF's appeal as untimely. It states that EPF made two attempts at filing a notice of appeal, one filed initially with the Field Office and forwarded to the State Office, and the other filed directly with the State Office. BLM asserts that neither notice of appeal satisfies the filing requirements of 43 C.F.R. § 4.411(a), or can take advantage of the waiver provision of 43 C.F.R. § 4.401(a).

Both assertions hinge on the fact that a notice of appeal had to be filed, as provided by 43 C.F.R. § 4.411(a), 30 days after the May 21, 2007, date of publication of notice of the availability of the ROD in the *Federal Register*, *i.e.*, on or before June 20, 2007, "in the office of the officer who made the decision."

EPF initially filed a notice of appeal with the Rawlins Field Office on June 20, 2007, the deadline for filing. However, BLM correctly notes that the filing did not comport with 43 C.F.R. § 4.411(a), because it was not filed "in the office of the

---

4 Hereinafter, references to EPF will be solely to the Environmental Preservation Foundation and not to that organization and HFW collectively.

officer who made the decision," within the 30-day appeal period. In the present case, that "office" was the Wyoming State Office of the Wyoming State Director, who issued the ROD.[5] Filing with the Rawlins Field Office did not satisfy the regulation. *See William R. Smith*, 149 IBLA 358, 362 (1999).

BLM also correctly observes that this notice of appeal was forwarded to the Wyoming State Office, and received there on June 26, 2007. Therefore, the proper BLM office received the notice of appeal within the 10-day grace period provided by 43 C.F.R. § 4.401(a). That regulation states that a failure to file a document in the proper office within the required time period

> will be waived if the document is filed not later than 10 days after it was required to be filed *and* it is determined that the document was transmitted or probably transmitted to the office in which the filing is required before the end of the period in which it was required to be filed. [Emphasis added.]

*See, e.g., Southern California Sunbelt Developers, Inc.*, 154 IBLA 115, 116-17 (2001).[6]

BLM argues that, although the notice of appeal was transmitted to BLM on June 19, 2007, before the filing deadline, and was received by the proper BLM office on June 26, 2007, within the 10-day grace period, it was not "transmitted or probably transmitted to the office in which the filing is required" before the end of the 30-day appeal period, since the office to which it was initially transmitted was not the proper BLM office. It concludes that EPF's failure to comply with 43 C.F.R. § 4.411(a) cannot be waived under 43 C.F.R. § 4.401(a).

We have long held that, if a notice of appeal is misdirected to the incorrect BLM office, and then forwarded to the correct BLM office, the notice will be considered, for purposes of 43 C.F.R. § 4.401(a), to have been "transmitted or probably transmitted to the office in which the filing is required" on the date the notice was forwarded to the correct BLM office. *Ida Mae Rose*, 73 IBLA 97, 99 (1983). In the present case, while we know that the original notice of appeal was

---

[5] The ROD expressly stated at page 22: "If an appeal is filed, your notice of appeal must be filed in this office (Bureau of Land Management, State Director, P.O. Box 1828, Cheyenne, Wyoming 82003) within 30 days of the date BLM publishes its notice of decision in the *Federal Register*."

[6] The copy of the notice of appeal filed directly with the Wyoming State Office is untimely. It was transmitted on June 29, 2007, after the expiration of the appeal period, and received on July 2, 2007. The waiver provision of 43 C.F.R. § 4.401(a) does not apply to that filing.

received by the State Office on June 26, 2007, we do not know when it was forwarded to that office, but it is possible that it was forwarded on June 20, 2007, before the end of the 30-day appeal period.[7] Therefore, we must conclude that the requirements for invoking the waiver provision of 43 C.F.R. § 4.401(a) were satisfied, and we consider the appeal to have been timely filed. BLM's motion to dismiss IBLA 2007-226 as untimely is denied.

*III. Factual Background*

BLM based its ROD on a December 12, 2005, Draft EIS (DEIS) and the FEIS, which were prepared to address the proposed action and alternatives thereto.[8] BLM tiered those documents to the June 1988 Medicine Bow-Divide EIS prepared in conjunction with promulgation of the applicable land use plan, the November 1990 Great Divide Resource Management Plan (RMP). BLM incorporated in the DEIS and the FEIS a Draft Air Quality Technical Support Document (AQTSD) and a Final AQTSD (FEIS, Appendix F). BLM also consulted with the Fish and Wildlife Service (FWS), U.S. Department of the Interior, concerning the potential adverse effects of the proposed Project to listed and candidate threatened and endangered (T&E) species, protected by the Endangered Species Act of 1973 (ESA), *as amended*, 16 U.S.C. §§ 1531-1543 (2000).

In the DEIS, BLM considered the Proposed Action,[9] a No Action Alternative (Alternative A), a Phased Development Alternative (Alternative B), and a Special Protection for Crucial or Sensitive Resources Alternative (Alternative C). Alternative B was eliminated from further study in the FEIS due to comments received on the

---

[7] While the case record contains a copy of a fax transmission from the Rawlins Field Office to the Wyoming State Office, dated June 22, 2007, showing that a copy of the notice of appeal was transmitted to the State Office on that date, there is no evidence in the case record of the date on which the Rawlins Field Office transmitted the original notice of appeal.

[8] The FEIS is a 2-volume document, consisting of the FEIS itself (Volume 1) and 15 appendices (Volume 2). Since the FEIS and each of the appendices contains distinctive pagination, citations will use the title of the basic document and the relevant page.

[9] Under the Proposed Action, 2,000 (1,800 CBM and 200 conventional) gas wells would be drilled at 80-acre spacing (but potentially 160-acre spacing, if suitable for the recovery of natural gas). No limit was placed on surface disturbance, but it was expected to be a total of 16,400 acres (or 7.9 acres per well) in the short term, falling to a total of 6,200 acres, after interim reclamation, for the remainder of the life of the Project.

DEIS. In its FEIS, BLM also considered a Natural Gas Development with Surface Disturbance Limitations Alternative (Alternative D), which was BLM's preferred alternative: "The objective of this alternative is to minimize surface disturbance while optimizing natural gas recovery."[10] FEIS at 2-7.

In his ROD, the State Director approved a modified preferred alternative (Alternative D) for the Project, subject to a performance-based, adaptive management process, and "the option to consider protective measures described in Alternative C that are not in conflict with this Decision."[11] ROD at 1; *see id.* at 19. He concluded that the approved drilling and development conformed with BLM's applicable land use plan, which had opened public lands in the Rawlins Resource Area to oil and gas leasing and development, and also adequately protected other resources: "Alternative D [with modifications] provides a good balance between oil and gas recovery and resource protection and provides for long-term reclamation and re-establishment of native vegetation and wildlife communities." ROD at 10.

BLM's approval of the Project did not authorize drilling or other surface-disturbing activity. ROD at 3-4. A Review Team, composed of representatives of BLM, other Federal and State agencies, and the operators, will evaluate annual and site-specific development proposals and establish required best management practices (BMPs), conditions of approval (COAs), or other protective measures to mitigate potential environmental impacts. *Id.* at 16.

---

[10] Alternative D limited total surface disturbance at any one time to 7,600 acres, with a cumulative limit of 13,600 acres ("2,000 wells x 6.5 acres/well, plus approximately 600 acres existing disturbance under the Interim Drilling Policy"): "If the disturbance limit [applicable during the Project] should be reached, further disturbance activities would be halted pending successful reclamation." FEIS at 2-8. In addition, BLM would designate "Category 'A' Mitigation Areas," containing a total of approximately 72,200 acres, which "would be managed more intensely . . . to reduce the extent of disturbance below an average of 6.5 acres/well." *Id.* at 2-8, 2-9. Such areas would include areas "with sensitive fish populations, and crucial wildlife habitats, including areas of critical environmental concern, special management areas (SMA), elk crucial winter range and silver sage/bitterbrush communities." *Id.* at 2-8.

[11] Alternative C encompassed the same number of wells as the Proposed Action, but imposed additional measures outlined in Appendix L (Resource Concerns and Associated Protection Measures Proposed under Alternative C), to protect crucial or sensitive resources: "Generally, constraints would focus on surface disturbance limits, limited operating periods, modification of drilling and construction practices, and, in some cases, no surface occupancy." DEIS at 2-4.

BLM recognized that Project approval would convert the "natural setting" of the Project area "to an industrialized setting," significantly impacting the environment by degrading the scenery, introducing traffic and noise, and otherwise adversely affecting wildlife and wildlife habitat, and associated recreational use, in the form of hunting and sightseeing. FEIS at 4-102. However, despite surface-disturbing activities that were likely to result in major adverse impacts to certain resource values in the short term, BLM's long-term goal is to return Project area lands to a condition approximate to that which existed before developments proposed in Alternative D were implemented. ROD at 4.

In approving a modified Alternative D, BLM adopted various measures, set forth in Appendix B (Performance-Based Monitoring and Best Management Practices) and Appendix C (Operator-Committed Practices) of the ROD. Appendix C practices became "mandatory requirements" upon issuance of the ROD. ROD at 21. On the other hand, Appendix B requirements "will be considered during site-specific, environmental review." *Id.*

In Appendix B, at B-2, BLM described the "performance-based, adaptive management process" as consisting of four primary elements: (1) the Project would proceed subject to an extensive list of BMPs, COAs, and protective measures (termed "Performance Requirements"); (2) the environmental effects of the Project would be monitored (termed "Performance-Based Monitoring"); (3) monitoring results would be assessed to determine whether resource management objectives (termed "Performance Goals") were being met; and (4) where necessary, "additional" mitigation measures or techniques (termed "Adaptive Management") would be adopted, in conjunction with the approval of specific surface-disturbing activity to ensure achievement of the Performance Goals.[12] BLM stated that "Operators are responsible for demonstrating successful achievement of Performance Goals," which would bear on BLM's approval of future Project activities. ROD at 20.

For wildlife, BLM expected that Project activities would significantly adversely affect big game, such as pronghorn antelope, elk, and mule deer, and upland game birds, such as Greater sage-grouse, and Columbian sharp-tailed grouse, by displacing them and eliminating and fragmenting their habitat, particularly big game crucial winter range and grouse nesting and brood-rearing habitat. ROD at 7, 9; FEIS at 4-69 to 4-77, 4-82 to 4-83, 4-85. BLM provided for implementing "four strategies" for minimizing significant adverse impacts:

---

12 "The specific measures . . . that are best suited for reducing adverse effects will vary by site, based on conditions found at the specific site, such as the presence of sensitive soils, wildlife issues, aspect, slope, nature of the specific action proposed, and many other factors." *Id.* at B-3.

(1) reduce the initial disturbance footprint as much as possible,
(2) restore habitat function in the shortest time possible,
(3) perform timely site reclamation and limit unreclaimed surface disturbance, and
(4) institute a monitoring and adaptive management process to ensure reclamation and mitigation measures are effective and initiate corrective action when it is not.

ROD at 8.

In addition to limiting surface disturbance and providing for interim reclamation, BLM provided for adopting a Wildlife Monitoring and Protection Plan, as outlined at Appendix E of the FEIS, the goal of which is to avoid and/or minimize adverse impacts to wildlife by monitoring wildlife population trends and developing appropriate mitigation during the course of Project development and operation. ROD, Appendix B, at B-13. Under the plan, BLM and/or the Wyoming Game and Fish Department (WGFD) would monitor the impacts of Project activities on Greater sage-grouse and Columbian sharp-tailed grouse leks, big game crucial winter range, and other important wildlife areas, and specified mitigation measures would be adopted in connection with the approval of applications for permit to drill (APDs), rights-of-way (ROWs), and other land-use authorizations. ROD, Appendix B, at B-14, B-15; FEIS, Appendix E, at E-4, E-6, E-12. These measures include spatial and/or temporal restrictions on drilling and other activity. ROD, Appendix B, at B-16, B-17; FEIS, Appendix E, at E-7, E-9 to E-10. BLM stated that "these measures may be modified on a site-specific basis as deemed appropriate by the BLM after completion of APD and ROW application field reviews." FEIS, Appendix E, at E-6.

BLM also provided for assessing the need for additional mitigation measures or techniques, based on the success in achieving Performance Goals related to wildlife. These Goals include providing an adequate amount of suitable undisturbed crucial winter range and maintaining functional migration routes for big game through the Project area, and providing well-dispersed breeding, nesting, brood-rearing, and winter habitat for upland game birds. ROD at 19; ROD, Appendix B, at B-2.

For air quality, BLM expected that Project emissions would not exceed National Ambient Air Quality Standards (NAAQS) or Wyoming Ambient Air Quality Standards (WAAQS), or violate Prevention of Significant Deterioration (PSD) requirements. ROD at 7; FEIS at 4-12 to 4-15. BLM also noted that, before undertaking any Project activities, the operators were required to obtain the appropriate air quality permits for drilling and other activity from the applicable State agency (Wyoming Department of Environmental Quality (WDEQ)), and thereafter comply with all Federal and State air quality laws. FEIS at 1-12 to 1-13, 3-19, 4-6.

BLM stated that air quality would be monitored following Project approval, and appropriate regulatory action would be taken by WDEQ to resolve any subsequent violations of air quality standards by Project activities. ROD at 7; FEIS at 4-6, 4-15; FEIS, Appendix B, at B-5. The impacts of Project emissions on air quality, specifically concentrations of nitrogen dioxide ($NO_2$), carbon monoxide, (CO), ozone ($O_3$), sulfur dioxide ($SO_2$), and particulate matter less than 2.5 and 10 micrograms in diameter ($PM_{2.5}$ and $PM_{10}$), in the Project and surrounding areas would be monitored by the operators, as well as BLM, WDEQ, and the Environmental Protection Agency (EPA).

*IV. Petitions for Stay in IBLA 2007-208 and IBLA 2007-210*

The regulation at 43 C.F.R. § 3165.4(c) provides that a decision of a BLM State Director concerning onshore oil and gas operations shall remain effective pending appeal, unless the Board determines otherwise, and that an appellant who petitions for a stay of the effect of such a BLM decision pending a determination by the Board of the merits of its appeal bears the burden of demonstrating sufficient justification for the stay, based on the following four standards: (1) the relative harm to the parties if the stay is granted or denied; (2) the likelihood of the appellant's success on the merits; (3) the likelihood of irreparable harm to the appellant or resources if the stay is not granted; and (4) whether the public interest favors granting the stay. *See Colorado Environmental Coalition*, 135 IBLA 356, 357-58 (1996), *aff'd*, *Colorado Environmental Coalition v. BLM*, 932 F. Supp. 1247 (D. Colo. 1996).

TRCP and BCA contend that they are likely to succeed on the merits of their appeals and satisfy the other requirements for a stay.[13]

Based on a preliminary review of the case record, the petitions for stay filed by TRCP and BCA, and their subsequent pleadings, as well as the responsive pleadings of BLM, Anadarko, Double Eagle, and the State, we conclude that TRCP and BCA have failed to justify staying the effect of the ROD because they have failed to show a likelihood of success on the merits of their arguments that BLM erred in issuing the ROD. For the following reasons, the Board denies their petitions for stay.

---

[13] TRCP's arguments that it is likely to succeed on the merits of its appeal are set forth on less than two pages of its NA/Petition. More importantly, such arguments are conclusory in nature, and fail to carry its burden to demonstrate a likelihood of success. Nevertheless, TRCP has since filed a statement of reasons (SOR), which we consider in determining whether it has carried that burden. BCA filed a 107-page NA/Petition, adopting the 89-page discussion regarding their likelihood of success as their SOR.

*A. Analysis*

TRCP and BCA contend that the ROD is violative of the environmental review requirements of section 102(2)(C) of NEPA and the multiple-use management and land use plan conformance requirements of section 302(a) of the Federal Land Policy and Management Act of 1976 (FLPMA), 43 U.S.C. § 1732(a) (2000). We turn first to their arguments that BLM violated section 102(2)(C) of NEPA.

*1. National Environmental Policy Act of 1969*

When BLM considers the likely environmental impacts of approving large-scale natural gas drilling and related activity in an EIS, the adequacy of the EIS, under section 102(2)(C) of NEPA, must be judged by whether it constituted a detailed statement, which took a hard look at all of the potential significant environmental consequences of the proposed action and reasonable alternatives thereto, considering all relevant matters of environmental concern. *Center for Biological Diversity*, 162 IBLA 268, 275 (2004), and cases cited. In deciding whether an EIS promotes informed decisionmaking, we have held that a "rule of reason" will be employed. *Forest Guardians*, 170 IBLA 80, 95 (2006); *see, e.g.*, *Utahns for Better Transportation v. U.S. Department of Transportation*, 305 F.3d 1152, 1163 (10th Cir. 2002) ("We apply a rule of reason standard . . . in deciding whether claimed deficiencies in a[n] FEIS are merely flyspecks, or are significant enough to defeat the goals of informed decisionmaking and informed public comment"). Thus, an EIS will be upheld when it has set forth sufficient information to allow the decision maker to consider fully the environmental effects involved and to make a reasoned choice among alternatives after balancing the risks of harm to the environment against the benefits of the proposed action. *County of Suffolk v. Secretary of Interior*, 562 F.2d 1368, 1375 (2d Cir. 1977), *cert. denied*, 434 U.S. 1064 (1978).

"[W]hether BLM is able to know and quantify precisely the 'ultimate effects' of development . . . is a very different question from whether BLM adequately considered and made a reasoned assessment of environmental impacts." *National Wildlife Federation*, 150 IBLA 385, 396 (1999).

An appellant challenging a BLM decision to approve oil and gas development, following preparation of an EIS, must carry its burden to demonstrate by a preponderance of the evidence, with objective proof, that BLM failed to give adequate consideration to a substantial environmental question of material significance to the proposed action, or otherwise failed to abide by section 102(2)(C) of NEPA. *Colorado Environmental Coalition*, 142 IBLA 49, 52 (1997). "If the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the

environmental costs," in deciding to go forward with the proposed action. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989).[14] Section 102(2)(C) of NEPA does not require BLM to take any particular action in a given set of circumstances, and it does not prohibit action when environmental degradation will inevitably result. "Rather, it merely mandates that whatever action BLM decides upon be initiated only after a full consideration of the environmental impact of such action." *Oregon Natural Resources Council*, 116 IBLA 355, 361 n.6 (1990).

In assessing significant impacts, when BLM relies on the professional opinion of its technical experts concerning matters within the realm of their expertise, and that reliance is reasonable and supported by record evidence, an appellant challenging such reliance must demonstrate, by a preponderance of the evidence, error in the data, methodology, analysis, or conclusion of the expert. *Salinas Ramblers Motorcycle Club*, 171 IBLA 396, 400 (2007); *Fred E. Payne*, 159 IBLA 69, 77-78 (2003). A mere difference of opinion, even of expert opinion, will not suffice to show that BLM failed to fully comprehend the nature or scope of the significant impacts. 170 IBLA at 400; 159 IBLA at 78.

*a. Failure to Identify Site-Specific Impacts*

BCA contends that BLM failed to consider the likely impacts of the Project because it did not specify the situs of the wells, roads, and pipelines, asserting that the location of impacts is the key determinant of their impact. NA/Petition at 58.

BLM may properly defer consideration of the site-specific impacts of such development until it has concrete proposals for APDs, ROWs, and other land use authorizations. *See Biodiversity Conservation Alliance*, 171 IBLA 218, 231-32 (2007); *Fred E. Payne*, 159 IBLA at 81. BLM is unable to evaluate impacts at specific well sites because the operators have not yet identified specific well locations. According to BLM, specific impacts will be evaluated based on site-specific proposals before any drilling is approved. FEIS at 1-1; *see also* ROD at 3-4; FEIS, Appendix O, at O-165, O-174.

---

[14] An EIS should contain "a reasonably complete discussion of possible mitigation measures," which means that such measures must be "discussed in sufficient detail to ensure that environmental consequences have been fairly evaluated[.]" *Robertson v. Methow Valley Citizens Council*, 490 U.S. at 352. However, "NEPA imposes no substantive requirement that mitigation measures actually be taken," or that they be completely "formulated and adopted[.]" *Id.* at 352, 353 n.16.

Such a system of evaluation is not violative of section 102(2)(C) of NEPA, because the project-level of environmental analysis is entirely commensurate with the nature of the activity that is being considered for approval. *See Blue Mountains Biodiversity Project*, 139 IBLA 258, 266 (1997); *Southern Utah Wilderness Alliance*, 123 IBLA 302, 305-07 (1992). There is no impermissible irreversible or irretrievable commitment of resources at this project-level stage, since the basic decision to permit drilling and development was made, consistent with the Great Divide RMP, at the time of lease issuance. Further, no surface-disturbing activity will occur at all until a decision is made to authorize that activity, after required site-specific environmental review, at which time BLM has "the authority to impose reasonable measures to minimize adverse impacts on other resource values," including restricting "the siting or timing of lease activities." *National Wildlife Federation*, 169 IBLA 146, 164 (2006).

While BCA believes that BLM will give "short shrift" to site-specific impacts when, or if, it undertakes environmental review of proposals for specific wells, roads, and pipelines (NA/Petition at 58), such a concern is speculative at this point and does not support BCA's argument that site-specific impacts must be considered in the FEIS.[15]

BCA has failed to show that it has a likelihood of success in prevailing on the merits of its argument regarding site-specific impacts.

*b. Failure to Give Adequate Consideration to the Likely Cumulative Impacts to Fish and Wildlife*

TRCP and BCA argue that BLM failed to consider the likely cumulative impacts of the Project on resident native populations of Bluehead sucker, Flannelmouth sucker, and Roundtail chub in Muddy Creek and/or on elk, mule deer, and pronghorn antelope throughout the Project and surrounding areas. TRCP SOR at

---

[15] BCA notes that BLM stated that "'[m]any of the subsequent actions in the ARPA . . . may be eligible for categorical exclusion [CX] under [section 390 of] the Energy Policy Act of 2005,'" 42 U.S.C.A. § 15942 (Supp. 2007), which, BCA asserts, would mean the absence of any site-specific environmental analysis at the APD, ROW, or other specific land-use authorization stage. NA/Petition at 62-63 (*quoting* ROD, Appendix E, at E-7). However, the next sentence in Appendix E, at E-7, after that quoted by BCA is: "In all cases, the action will be subject to onsite investigation, cultural reviews, T&E consultation and environmental reviews." Moreover, a CX is only applicable where there is no need for site-specific environmental analysis. 40 C.F.R. § 1508.4; *Vulcan Power Co.*, 143 IBLA 10, 18 (1998). Further, "site-specific approvals and review" are still required, as a matter of BLM policy, for APDs. BLM Opposition (IBLA 2007-210) at 22.

18-19; BCA NA/Petition at 74-82. They refer to the cumulative impacts likely to be associated with several approved or pending major oil and gas projects, particularly the Continental Divide/Creston (8,950 wells) and Hiawatha (4,207 wells), which are currently undergoing NEPA review, and the Continental Divide/Wamsutter II (2,130 wells), South Baggs (50 wells), and Desolation Flats (385 wells), which are already approved. BCA NA/Petition at 78, 80.

BLM considered the cumulative impacts of the Project and other oil and gas development projects in the region, including the Continental Divide/Wamsutter II, Creston/Blue Gap, South Baggs, and Desolation Flats, to soils, vegetation, water resources, fish, and big game wildlife. FEIS at 5-2 to 5-4, 5-9 to 5-19; BLM Opposition (IBLA 2007-210) at 31. It recognized the existence of other projects, including the Continental Divide/Creston, which was an outgrowth of the Continental Divide/Wamsutter II and Creston/Blue Gap. *See* FEIS at 1-10, 1-11 (Map M-5 (Mineral Development Projects in the Vicinity)). BLM's decision not to include the proposed Continental Divide/Creston and Hiawatha projects is properly explained by the fact that they were not approved or fully defined, and were still undergoing NEPA review, which will take into account the cumulative impacts of those projects, as well as the ARP. *See Wyoming Outdoor Council*, 151 IBLA 260, 270 (1999); BLM Opposition (IBLA 2007-210) at 31-32.

In order to demonstrate a deficiency in BLM's cumulative impacts analysis, "it is not sufficient merely to note the existence of other gas fields and gas development projects . . . without concretely identifying the adverse impacts caused by such other fields and projects to which the action being scrutinized will add." *National Wildlife Federation*, 150 IBLA at 399. Nor is it sufficient to merely refer to geographic proximity or some other factor likely to give rise to a cumulative impact. *Wyoming Outdoor Council*, 159 IBLA 388, 406-07 (2003). Therefore, BCA cannot simply state that the Project area and other project areas cover parts of the same watershed or are traversed by the same big game wildlife herds. *See* BCA NA/Petition at 79-81; BCA Reply at 24-26.

TRCP and BCA have failed to show that they are likely to succeed in establishing that BLM failed to give adequate consideration to the likely cumulative impacts of the Project.[16]

---

[16] The EIS contains baseline information regarding the water quality of representative perennial, intermittent, and ephemeral surface waters (FEIS at 3-48 to 3-52), mule deer (*id.* at 3-86, 3-89 to 3-90), Greater sage-grouse and Columbian sharp-tailed grouse (*id.* at 3-94 to 3-97, 3-99), raptors (*id.* at 3-97 to 3-98, 3-100), sensitive wildlife species (*id.* at 3-110 to 3-112), and roads (*id.* at 3-58, 3-146
(continued...)

*c. Failure to Give Adequate Consideration to the Likely Impacts to Air Quality*

BCA argues that BLM failed to give adequate consideration to the likelihood that Project emissions will cause ozone concentrations in the Project area, which are already at 147$\mu g/m^3$, averaged over an 8-hour period, to exceed the NAAQS of 157$\mu g/m^3$, averaged over an 8-hour period.[17] It asserts that BLM has misjudged the background levels of ozone and used the "scientifically discredited 'Scheffe method'" to assess the effects of Project emissions on future ozone levels in the Project area.[18] NA/Petition at 68.

Arguments similar to those raised by BCA were advanced by several organizations in support of their petition to stay the effect of a March 14, 2006, ROD of the Wyoming State Director, approving the Jonah Infill Drilling Project in southwestern Wyoming. We considered these arguments in the June 28, 2006, order in *Wyoming Outdoor Council*, IBLA 2006-155, denying the stay petition, and a March 30, 2007, order, denying reconsideration of that order. We concluded that the appellants had failed to show a likelihood of success on their arguments. *See* Order, dated June 28, 2006, at 17-21, 23-24; Order, dated Mar. 30, 2007, at 2-7. We find no reason to deviate from that conclusion at this stage of review in this case, especially since the circumstances are essentially the same regarding the ARP and the Jonah Infill Drilling Project.[19] *See* BCA Reply at 15-19. Moreover, BLM developed

---

[16] (...continued)
to 3-148). Additional information is being or will be gathered, and will be incorporated in the design and analysis of specific proposed surface-disturbing activities. *See* FEIS at 4-74 (mule deer migration patterns); ROD, Appendix B, at B-14 to B-15 (upland game bird, raptor, and sensitive wildlife species inventories).

[17] NAAQS are violated only when the 3-year average of the fourth highest maximum daily concentration of ozone exceeds the NAAQS 8-hour standard for ozone. *See* 40 C.F.R. § 50.10(b); 40 C.F.R. Part 50, Appendix I, 2.3.

[18] As we stated at page 17, n.18, of our June 28, 2006, order in *Wyoming Outdoor Council*, IBLA 2006-155, "the Scheffe method was developed by an EPA employee (Richard D. Scheffe), and was published by EPA in a September 1988 document entitled "VOC/$NO_x$ Point Source Screening Tables" (Scheffe Paper)[.]" The method "utilizes $NO_x$ and VOC emissions ratios to estimate $O_3$ concentrations," since ozone is formed as a result of a chemical reaction in the atmosphere between the two emissions, triggered by sunlight. FEIS, Appendix F, at 43; *see* FEIS at 4-9.

[19] While BLM determined in the December 2006 Draft Supplemental EIS for the Pinedale Anticline Oil and Gas Exploration and Development Project at 4-62 that the
(continued...)

and implemented a mitigation and monitoring program for ozone in the ARPA, and the operators have agreed to operate additional air quality monitoring in the area, including ozone monitoring. *See* Double Eagle Opposition, Ex. 1; ROD, Appendix B, at B-5. If the air quality monitoring were to show elevated ozone concentrations that are attributable at least in part to Project activities, agencies will confer to determine the propriety of additional mitigation measures, and, if necessary, enforcement action will be taken. *See* BLM Opposition (IBLA 2007-210) at 29; State Opposition (IBLA 2007-210) at 21; Double Eagle Opposition (IBLA 2007-210) at 42.

BCA has failed to show a likelihood of success on the merits of its argument that BLM failed to give adequate consideration to air quality impacts of approval of the Project.

*d. Failure to Give Adequate Consideration to Likely Impacts Related to Methane Seeps*

BCA argues that BLM failed to give adequate consideration to the likelihood that coalbed dewatering associated with the drilling of CBM wells would exacerbate dangerous seeps of methane gas, which can kill plants, wildlife, and even people visiting the Project area, and that new information regarding the likely increase in the number and severity of methane seeps requires BLM to now supplement the EIS.[20] It asserts that, when new circumstances present a seriously different picture of a

[19] (...continued)
CALGRID model, rather than the Scheffe method, was the most appropriate method for estimating ozone impact for that project, Double Eagle states that such a determination does not demonstrate that the methodology used for the ARPA was inappropriate because the Atlantic Rim and Pinedale Anticline Projects are "very different." Opposition (IBLA 2007-210) at 38. It states that the Pinedale Anticline Project involves more wells (4,399 wells), all directionally drilled, much denser spacing (10-acre spacing), far deeper (14,000 feet) formations, and longer drilling periods (50 days per well) as opposed to 2,000 wells vertically drilled for 7 to 10 days per well at 80-acre spacing to shallower (6,000 feet) formations, resulting in "greater air quality impacts" for the Pinedale Anticline Project. *Id.* at 39.

[20] BCA offers a June 19, 2007, Declaration of Walter R. Merschat (Attachment 5 to NA/Petition), a private geochemist working for the oil and gas industry, who visited a total of eight methane seeps along Cow Creek, Deep Gulch, and Wild Cow Creek, within the Project area, on Mar. 27, 2007. Merschat Declaration at 1, ¶5. In Merschat's opinion these seeps are "likely the result" of nearby CBM wells, which were approved as part of the interim drilling effort in the Project area, and that increased CBM activity will likely result in increased volume from existing methane seeps and creation of new ones. Merschat Declaration at 2, ¶¶8, 14.

proposed action than originally envisioned, a supplemental EIS must be prepared. NA/Petition at 15, 67.

The Merschat Declaration presents an opinion that is not shared by WDEQ. According to WDEQ, methane seeps are a natural phenomenon that predates oil and gas development in the region and the seeps are not geologically connected to the producing CBM formations or to the formations into which produced water is being disposed. Double Eagle Opposition, IBLA 2007-210, Ex. 6. Nevertheless, in the FEIS, BLM acknowledged that methane seeps could possibly develop in the outcrop region of the Mesaverde Group as a result of the Project, and that those seeps could potentially contaminate shallow groundwater sources and could cause the death of vegetation in limited areas. FEIS at 4-32. BLM noted that the number and location of such seeps was impossible to predict, but that operators would be required to monitor for methane seep detection purposes. *Id.* at 4-32, 4-49; ROD, Appendix B, at B-10 to B-11. In addition, BLM is working in cooperation with the University of Wyoming, the Wyoming State Geological Survey, and the Wyoming Oil and Gas Conservation Commission to inventory and model methane seeps.

BCA has failed to show a likelihood of success on its argument that BLM failed to give adequate consideration to likely impacts related to methane seeps or that new information on methane seeps requires completion of a supplemental EIS.

*e. Failure to Consider a Full Range of Reasonable Alternatives*

BCA argues that BLM violated section 102(2)(C) of NEPA because it failed to consider a full range of reasonable alternatives to the proposed Project, noting that, since all of the action alternatives provided for drilling a total of 2,000 wells in the Project area, BLM did not consider any alternatives which would limit or reduce the environmental consequences of the proposed Project. NA/Petition at 3. BCA asserts that BLM should have considered "a true phased development alternative," under which one section of the Project area would be drilled, produced, and reclaimed before drilling in the next section could be initiated, and an alternative that provides for natural gas development across a smaller area. *Id.* at 24.

TRCP challenges BLM's consideration of reasonable alternatives solely on the basis that BLM improperly rejected Alternative B because of the operators' concerns that it would delay lease development.

BLM is required by section 102(2)(C) of NEPA and its implementing regulations to rigorously explore and objectively evaluate, in an EIS, all *reasonable* alternatives to the proposed action, which will accomplish its intended purpose, are

technically and economically feasible, and yet have a lesser or no impact.[21]  42 U.S.C.
§ 4332(2)(C) (2000); 40 C.F.R. §§ 1500.2, 1501.2, 1502.1, and 1502.14; *City of
Carmel-by-the-Sea v. U.S. Department of Transportation*, 123 F.3d 1142, 1155
(9th Cir. 1997); *Dubois v. U.S. Department of Agriculture*, 102 F.3d 1273, 1286-87
(1st Cir. 1996), *cert. denied*, 521 U.S. 1119 (1997); *Southern Utah Wilderness
Alliance*, 163 IBLA 142, 159 (2004). Consideration of all reasonable alternatives
ensures that the decisionmaker "has before him and takes into proper account all
possible approaches to a particular project." *Calvert Cliffs' Coordinating Committee,
Inc. v. United States Atomic Energy Commission*, 449 F.2d 1109, 1114 (D.C. Cir.
1971).

BLM declined to afford Alternative B detailed study because it would not
accomplish the purpose of the Proposed Action, which was to permit the operators
and the United States to realize the benefit of existing Federal leases, by developing,
producing, and marketing natural gas. *See* FEIS at 1-8 to 1-9, 2-12 to 2-13; ROD
at 14; BLM Opposition (IBLA 2007-210) at 9. While TRCP finds nothing in
Alternative B contrary to that purpose, delay in lease development for 7 to 14 years,
which was contemplated under Alternative B, conflicts with the purpose of the
Proposed Action to permit such development. *See Northern Alaska Environmental
Center v. Kempthorne*, 457 F.3d 969, 978 (9th Cir. 2006) ("An agency need not . . .
discuss . . . alternatives which are 'infeasible, ineffective, or inconsistent with the
basic policy objectives for the management of the area,'" *quoting Headwaters, Inc. v.
BLM*, 914 F.2d 1174, 1180-81 (9th Cir. 1990)).

The "true phased development alternative" offered by BCA does not satisfy the
purpose of the proposed Project, which is to promote lease development. *See* FEIS
at 1-8 to 1-9. Indeed, it would prevent development of a substantial part of the
Project area for a considerable portion, perhaps even all, of the 30- to 50-year life of
the Project.

BCA also argues that BLM should have considered an alternative providing for
less natural gas development. NA/Petition at 27, 28. BLM responds that it
considered an alternative (Alternative C) which provided for less surface disturbance
at any one time than the Proposed Action, but that alternative provided for drilling at
160-acre spacing, which was determined by BLM's Reservoir Management Group,
based on the results of the exploratory drilling, not to promote the maximum
recovery of natural gas from the Project area, and, as such, it would not serve the

---

[21]  Alternatives that fail to accomplish the purpose of an action are not reasonable
and need not be studied in detail by the agency. *Citizens' Comm. to Save Our
Canyons v. United States Forest Service*, 297 F.3d 1012, 1030 (10th Cir. 2002);
*Northern Alaska Environmental Center*, 153 IBLA 253, 256 (2000).

purpose of the Proposed Action. Opposition (IBLA 2007-210) at 11 (citing ROD at 16). BLM concludes that any alternative which provides for less natural gas development, based on comparable or greater well spacing, would not serve the purpose of the Proposed Action.

BCA and TRCP have failed to show a likelihood of succeeding on the merits of their arguments that BLM failed to consider a full range of reasonable alternatives to the proposed Project.

*f. Failure to Give Adequate Consideration to Mitigation Measures*

In conjunction with its basic argument that BLM failed to consider a full range of reasonable alternatives, BCA repeatedly asserts that BLM failed to consider reasonable alternatives to mitigate or avoid significant impacts. TRCP challenges BLM's use of adaptive management as a mitigation measure, arguing that such mitigation is, by its nature, violative of section 102(2)(C) of NEPA, because it is not discussed in sufficient detail to ensure that environmental consequences have been fairly evaluated.

BLM considered a panoply of mitigation measures in connection with the proposed Project and alternatives thereto, in an effort to avoid or mitigate the significant impacts of the Project. It was not required, however, to adopt particular measures in order to avoid or minimize significant impacts. *See Western Exploration Inc.*, 169 IBLA 388, 398-99 (2006). As we said in *Legal & Safety Employer Research Inc.*, 154 IBLA 167, 185 (2001): "The fact that Appellant . . . prefers that BLM take another course of action does not establish that BLM violated the procedural requirements of NEPA. *See San Juan Citizens Alliance*, 129 IBLA 1, 14 (1994)." BLM considered the prospect of mitigating significant adverse impacts in sufficient detail to ensure that it fairly evaluated the environmental consequences of the Project.

We have long held, in "cases involving unknown future impacts of a proposed action," that section 102(2)(C) of NEPA permits adoption of a mitigation plan "in which BLM identified the type of mitigation but rendered implementation contingent on assessment of whether and to what extent that mitigation was warranted, given the uncertain results of possible future activity." *Colorado Environmental Coalition*, 169 IBLA 137, 143 (2006); *see Great Basin Mine Watch*, 159 IBLA 324, 354 (2003); *Powder River Basin Resource Council*, 144 IBLA 319, 323-24 (1998). Adaptive management is consistent with that approach. When the impacts that will be mitigated are uncertain, and will only become known by monitoring the effects of the Project, the particular mitigation to be applied will necessarily be uncertain. Such a process comports with section 102(2)(C) of NEPA. *See Northern Alaska*

*Environmental Center v. Kempthorne*, 457 F.3d at 979; *Biodiversity Conservation Alliance*, 169 IBLA 321, 341-43 (2006).

BCA and TRCP have failed to show a likelihood of success on their argument that BLM did not give adequate consideration to mitigation measures.

We next turn to TRCP's and BCA's arguments that BLM violated section 302(a) of FLPMA, 43 U.S.C. § 1732(a) (2000).

2. *Section 302(a) of the Federal Land Policy and Management Act of 1976*

a. *Failure to Comply with the Multiple-Use Mandate*

TRCP argues that BLM's approval of the Project violates the multiple-use mandate of section 302(a) of FLPMA, because BLM failed to engage in a reasoned and informed decision making process, which balanced competing resource values in the ARPA to best meet the present and future needs of the American people. SOR at 2 (citing *National Wildlife Federation v. BLM*, 140 IBLA 85, 101 (1997)). It asserts that BLM's decision to convert the natural setting of the Project area to an industrialized setting, which results in significant adverse impacts to hunting, sightseeing, and other recreational use of the Project area for more than one generation of recreational users, by diminishing the presence of wildlife, degrading scenery, and introducing traffic and noise, violates FLPMA's multiple-use mandate. SOR at 35.

In managing the public lands, BLM must strike a balance among the many competing uses to which the land may be put. *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 58 (2004). BLM analyzes appropriate uses of the public lands during its land use planning process and makes decisions thereon. In this case, BLM determined in the Great Divide RMP to allow oil and gas leasing in the entire Rawlins Resource Area, thereby providing the opportunity for oil and gas exploration and development "while protecting other resource values." FEIS at 1-9 (*quoting* ROD and Approved RMP for the Great Divide Resource Area, dated Nov. 8, 1990 (RMP ROD), at 30). BLM required the protection of specified resources, including sage grouse leks and big game crucial winter range, recognizing that its authority was unlimited in the case of new leases, but limited in the case of existing leases: "These restrictions or requirements may only be included as reasonable measures or as conditions of approval (COA) in authorizing applications for permit to drill (APD), sundry notices, or plans of development." RMP ROD at 30. BLM was also permitted to authorize exploration and development, subject to whatever restrictions BLM deemed appropriate to render such activity compatible with recreation and other competing uses of the public lands.

Selection of one use of the public lands over another competing use, even when the selected use will adversely affect a competing use, is not a violation of BLM's FLPMA mutiple-use mandate. *See Native Ecosystems Council*, 139 IBLA 209, 212 (1997); *Friends of the Bow*, 139 IBLA 141, 143-44 (1997).

TRCP has not shown a likelihood of success on its argument that BLM violated the multiple-use mandate of section 302(a) of FLPMA.

*b. Failure to Conform to the Reasonably Foreseeable Development Scenario of the RMP*

TRCP and BCA argue that BLM's approval of the Project violates the land use plan conformance requirement of section 302(a) of FLPMA by authorizing the drilling and development of wells and related surface disturbance, which together with activity already approved, greatly exceeds the Reasonably Foreseeable Development (RFD) scenario set forth in the Great Divide RMP.

In *Wyoming Outdoor Council*, 164 IBLA 84, 99 (2004), we disagreed with the argument that the RFD scenario establishes a point past which further exploration and development is prohibited. *See Southern Utah Wilderness Alliance*, 159 IBLA 220, 234 (2003). The RFD scenario is utilized for identifying the potential direct, indirect, and cumulative impacts of oil and gas development. *Id.* In this case, BLM does not deny that the RFD scenario will be exceeded by the Project activities approved in the ROD. However, BLM states that the fact that the total number of wells projected in an RFD scenario may be exceeded "does not automatically mean that . . . a revision or amendment to the RMP is necessary." BLM Opposition (IBLA 2007-210) at 38 (citing Instruction Memorandum (IM) No. 2004-089, dated Jan. 16, 2004).

We have stated that the question, which must be addressed on a case-by-case basis, is "whether . . . [the] exceeded RFD scenario demonstrates that further environmental analysis is required[.]" *Wyoming Outdoor Council*, 164 IBLA at 102. In this case, further environmental analysis was completed in the DEIS and FEIS.

TRCP and BCA have failed to show a likelihood of success on their argument that BLM's approval of the Project violates the land use plan conformance requirement of section 302(a) of FLPMA.

*3. BLM Policy*

a. *Failure to Adhere to Sensitive Species Management Policy*

BCA argues that BLM's decision to approve the Project violates the policy directive, set forth in BLM Manual § 6840.06 (Rel. 6-121 (1/19/01)), that actions

approved by BLM not contribute to the need to designate a sensitive species as a T&E species under the ESA. NA/Petition at 92-93. It refers to the Greater sage-grouse, Columbian sharp-tailed grouse, Bluehead sucker, Flannelmouth sucker, and Roundtail chub as such species.

While not binding on the Board, since it does not have the force and effect of law, the Board has stated that it will nevertheless consider whether BLM abided by its own Manual. *Native Ecosystems Council*, 139 IBLA at 219. It is true that BLM concluded that the Project is likely to significantly impact the Greater sage-grouse and Columbian sharp-tailed grouse and the Bluehead sucker, Flannelmouth sucker, and Roundtail chub. FEIS at 4-83, 4-85, 4-94, 4-96, 4-97. BLM attributed the significant impacts to the substantial loss of habitat function or disruption of life history requirements that would *preclude improvement* of the status of the special status species. *Id.* at 4-69, 4-86. Such a significant impact does not necessarily mean that any of the upland game birds and sensitive fish species is likely to be designated as a T&E species, or that BLM has otherwise failed in its duty to avoid contributing to the need to designate a species as a T&E species. As Double Eagle points out: "Such a position would necessarily lead to the absurd result that every time the BLM determines to prepare an EIS . . ., the BLM is violating its Manual." Double Eagle Opposition (IBLA 2007-210) at 57.

While BCA cites statements from FWS and WGFD in support of its argument that the Project is likely to contribute to the need to list a species as a T&E species (*see* BCA NA/Petition at 92-99; BCA Reply at 27-300), those statements merely caution that BLM should not authorize activity that might exacerbate the decline of a species. BLM states that, through consultation, it considered concerns expressed by FWS and WGFD, including their "preference" for BLM's adoption of Alternative C, as well as the incorporation of protective measures from Appendix L of the FEIS, and decided that it would consider adopting protective measures taken from Appendix L at the time of approval of APDs, ROWs, and other surface-disturbing activity. Opposition (IBLA 2007-210) at 39.

BLM also states that it adopted a Wildlife Monitoring and Protection Plan, which will be implemented, with the assistance of FWS and WGFD, "with the specific goal of avoiding or minimizing potential impacts to wildlife." Opposition (IBLA 2007-210) at 39; *see* FEIS, Appendix E, at E-1 to E-3, E-12, E-13; FEIS, Appendix O, at O-14; ROD, Appendix B, at B-13 to B-15.

BCA has failed to show a likelihood of success on the merits of its argument that Project approval violates BLM's sensitive species management policy.

To the extent TRCP and BCA raise other substantive arguments, they have failed to show a likelihood of success on the merits of those arguments, and therefore, those arguments do not support granting a stay.

Accordingly, pursuant to the authority delegated to the Board of Land Appeals by the Secretary of the Interior, 43 C.F.R. § 4.1, motions to intervene are granted as discussed *supra.* Anadarko's, Double Eagle's, the State's, and BLM's motions to dismiss IBLA 2007-208 for lack of standing to appeal are denied. Anadarko's, Double Eagle's, the State's, and BLM's motions to dismiss IBLA 2007-226 are granted in part as to HFW. BLM's motion to dismiss IBLA 2007-226 as untimely is denied. TRCP's and BCA's stay petitions are denied.

Bruce R. Harris
Deputy Chief Administrative Judge

APPEARANCES:

Thomas R. Wilmoth, Esq. **FAX: 402-458-1510**
Donald G. Blankenau, Esq.
Theresa D. Koller, Esq.
Blackwell Sanders LLP
206 South 13th Street, Suite 1400
Lincoln, NE 68508-2019
For Theodore Roosevelt Conservation Partnership

Suzanne H. Lewis, Esq. **FAX: 307-742-7989**
Biodiversity Conservation Alliance
P.O. Box 1512
Laramie, WY 82073
For Biodiversity Conservation Alliance, *et al.*

E. Craig Smay, Esq. **FAX: 801-539-8544**
E. Craig Smay, P.C.
174 East South Temple
Salt Lake City, UT 84111-1102
For Environmental Preservation Foundation and Habitat for Wildlife

Michael A. Saul, Esq. **FAX: 303-786-8911**
National Wildlife Federation
Rocky Mountain Natural Resource Center
2260 Baseline Road, Suite 100
Boulder, CO 80302
For National Wildlife Federation and Wyoming Wildlife Federation

Laura Lindley, Esq. **FAX: 303-892-1401**
Robert C. Mathes, Esq.
Kathleen S. Corr, Esq.
Bjork Lindley Little PC
1600 Stout Street, Suite 1400
Denver, CO 80202-3110
For Double Eagle Petroleum Co.

Natalie Eades, Esq. **FAX: 832-636-8034**
Anadarko Petroleum Corporation
P.O. Box 1330
Houston, TX 77251-1330
For Anadarko E&P Company LP and Warren Resources, Inc.

Patrick J. Crank, Esq. **FAX: 307-777-3542**
Jay Jerde, Esq.
Ursula P. Schultz, Esq.
Office of the Attorney General
123 State Capitol
Cheyenne, WY 82002
For the State of Wyoming

Arthur R. Kleven, Esq. **FAX: 303-231-5363**
Office of the Regional Solicitor
U.S. Department of the Interior
755 Parfet Street, Suite 151
Lakewood, CO 80215
For the Bureau of Land Management

Exhibit 2

BLM, Record of Decision:  Implementation of a Wind
Energy Development Program and Associated Land Use
Plan Amendments, December 2005

# RECORD OF DECISION

## Implementation of a Wind Energy Development Program and Associated Land Use Plan Amendments

**DECEMBER 2005**

**U.S. Department of the Interior**
**Bureau of Land Management**
**Washington, D.C.**

Tom Lonnie
Assistant Director, Minerals, Realty and Resource Protection

DEC 15 2005
Date

Ed Shepard
Assistant Director, Renewable Resources and Planning

DEC 15 20[illegible]
Date

**RECORD OF DECISION**

**Implementation of a Wind Energy Development Program and Associated Land Use Plan Amendments**

## 1 INTRODUCTION

The U.S. Department of the Interior (DOI), Bureau of Land Management (BLM), is responsible for the development of wind energy resources on BLM-administered public lands. Currently, about 500 megawatts (MW) of installed wind capacity occurs under right-of-way (ROW) authorizations administered by the BLM in accordance with the requirements of the Federal Land Policy and Management Act of 1976 (FLPMA).

This document records the decision that the BLM reached to implement a comprehensive Wind Energy Development Program in 11 western states, excluding Alaska, and to amend 52 BLM land use plans to adopt the new program. The elements of the Wind Energy Development Program and the associated land use plan amendments were evaluated through the preparation of the *Final Programmatic Environmental Impact Statement on Wind Energy Development on BLM-Administered Lands in the Western United States* (BLM 2005a). This Programmatic Environmental Impact Statement (PEIS) was prepared in accordance with the National Environmental Policy Act of 1969 (NEPA) and the FLPMA. The U.S. Department of Energy (DOE) cooperated in the preparation of the PEIS in support of the BLM's proposed action.

The BLM prepared a Programmatic Biological Assessment (BA) evaluating the potential effects of wind energy development that could occur on BLM-administered public lands as a result of the proposed land use plan amendments (BLM 2005b). Specifically, the Programmatic BA considered the potential effects to federally listed threatened and endangered species and candidate species, and to their critical habitats, that have the potential to be present at locations where wind energy projects may be developed within the planning areas affected by the proposed land use plan amendments. The BLM submitted the Programmatic BA to the U.S. Fish and Wildlife Service (USFWS) on July 27, 2005, for formal consultation. The USFWS issued a Biological Opinion (BO) on November 30, 2005, (USFWS 2005). For each of the nine species listed as likely to be adversely affected in the Programmatic BA, the USFWS concluded that the program is not likely to jeopardize the species or destroy or adversely modify any federally listed threatened and endangered species critical habitat. The USFWS further recommended that the BLM coordinate with the appropriate USFWS field office prior to planning the construction of any site-specific wind energy project to obtain the most current information on the distribution of listed species in the site-specific area.

## 2 DECISION

The decision is hereby made to implement a comprehensive Wind Energy Development Program to administer the development of wind energy resources on BLM-administered public

lands in 11 western states: Arizona, California, Colorado, Idaho, Montana, Nevada, New Mexico, Oregon, Utah, Washington, and Wyoming. The decision establishes policies and best management practices (BMPs) for the administration of wind energy development activities and establishes minimum requirements for mitigation measures. The policies and BMPs were evaluated in the Final Wind Energy PEIS (BLM 2005a) and are included in Attachment A. With the decision to implement the Wind Energy Development Program, the BLM Interim Wind Energy Policy (BLM 2002) will be replaced by a new policy that incorporates the programmatic policies and BMPs evaluated in the PEIS. Elements of the Interim Policy addressing applications, authorizations, competitive interests, and due diligence will not be changed by the new program requirements.

In addition, this decision amends 52 BLM land use plans in 9 of the states in the study area: Colorado, Idaho, Montana, Nevada, New Mexico, Oregon, Utah, Washington, and Wyoming. The land use plan amendments, identified in Attachment B, include the adoption of the Wind Energy Development Program policies and BMPs and, in a few instances, the identification of specific areas where wind energy development will be excluded.

## 3  ALTERNATIVES, INCLUDING THE PROPOSED ACTION

The Final Wind Energy PEIS (BLM 2005a) analyzed three alternatives. It analyzed the potential impacts associated with the BLM's proposed action to implement a Wind Energy Development Program. It also assessed potential impacts associated with two alternatives to the proposed action, which present different management options for wind energy development on BLM-administered public lands. The alternatives were defined as follows:

- *Proposed action: implement a Wind Energy Development Program.* Under this alternative, the BLM proposed to implement a comprehensive program to address issues associated with wind energy development on BLM-administered public lands under a maximum potential development scenario (MPDS). The program will establish policies and BMPs to address the administration of wind energy development activities and identify minimum requirements for mitigation measures. These programmatic policies and BMPs will be applicable to all wind energy development projects on BLM-administered public lands. Site-specific concerns, and the development of additional mitigation measures, will be addressed in project-level reviews, including NEPA analyses, as required. To the extent appropriate, future project-specific analyses will tier from the analyses conducted in the PEIS and the decisions in this Record of Decision (ROD) to allow project-specific analyses to focus just on the critical, site-specific issues of concern. In addition, under this alternative, a number of BLM land use plans will be amended to address wind energy development, including adoption of the programmatic policies and BMPs and identification of exclusion areas.

- *No action alternative*. Under this alternative, the BLM would continue administering wind energy development ROW authorizations in accordance

with the terms and conditions of the Interim Wind Energy Development Policy (BLM 2002). Analysis and review of wind energy development, including NEPA analyses and development of required mitigation measures, would be conducted on a project-by-project basis. Individual land use plan amendments would occur on a plan-by-plan basis without the benefit of the overarching, comprehensive analysis provided by the PEIS.

- *Limited wind energy development alternative*. Under this alternative, additional wind energy development on BLM-administered public lands would occur only in areas where it currently exists, is under review, or was approved for development prior publication of this ROD . For the purposes of establishing an upper bound on the potential impacts of this alternative, it was assumed that all proposed wind energy projects on BLM-administered public lands under review during preparation of the PEIS would be approved for development by the time this ROD was published. Future expansion of wind energy development would be allowed at existing project areas; however, no additional BLM-administered public lands would be made available for development. Under these restrictions, development would be limited to locations where development currently exists: Palm Springs, California; Ridgecrest, California; and Arlington, Wyoming; and locations where it is currently being reviewed: the Table Mountain Wind Generating Facility, Nevada; Cotterel Mountain Wind Farm Project, Idaho; and Walker Ridge, California.

Potential adverse impacts to natural and cultural resources could occur during each phase of wind energy development (i.e., site monitoring and testing, construction, operation, and decommissioning) if effective mitigation measures are not implemented. The nature and magnitude of these impacts would vary by phase and would be determined by the project location and size. Potential direct impacts would include use of geologic and water resources; creation or increase of geologic hazards or soil erosion; water quality degradation; localized generation of airborne dust; generation of noise; alteration or degradation of wildlife habitat or sensitive or unique habitat; interference with resident or migratory fish or wildlife species, including protected species; alteration or degradation of plant communities, including the occurrence of invasive vegetation; land use changes; alteration of visual resources; release of hazardous materials or wastes; increased traffic; increased human health and safety hazards; and destruction or loss of paleontological or cultural resources. More limited, potential indirect impacts also could occur to cultural and ecological resources.

Effective mitigation measures can be implemented to address many of the direct and indirect adverse impacts that could occur. For some resources, minimum requirements can be established that would effectively mitigate impacts at all potential development sites. For other resources, however, such as ecological and visual resources, mitigation will be better defined at the project level to address site-specific concerns.

The potential impacts of wind energy development on local and regional economies will be largely beneficial, depending upon the size of the project and the resultant wind power capacity.

The proposed action and its alternatives present options for the management of wind energy development on BLM-administered public lands. The proposed action, implementing the Wind Energy Development Program, was determined through the Final Wind Energy PEIS (BLM 2005a) to be the "environmentally preferable" alternative because it will establish a comprehensive set of policies and BMPs. The policies will identify specific lands on which wind energy development will not be allowed; establish requirements for public involvement, consultation with other federal and state agencies, and government-to-government consultation; define the need for project-level environmental review; establish requirements for the scope and content of the site-specific project Plan of Development (POD); and incorporate adaptive management strategies. The BMPs will establish environmentally sound and economically feasible mechanisms to protect and enhance natural and cultural resources. They identify the issues and concerns that must be addressed by project-specific plans, programs, and stipulations during each phase of development. Mitigation measures protecting these resources will be required to be incorporated into project PODs; this will include incorporation of specific programmatic BMPs as well as the incorporation of additional mitigation measures contained in other, existing and relevant BLM guidance, or developed to address site-specific or species-specific concerns. The no action and limited development alternatives do not provide the same level of assurance that comprehensive mitigation measures will be implemented across the 11 states.

In addition, in terms of facilitating wind energy development, implementation of the proposed action is expected to minimize some of the delays that currently occur for wind energy development projects, ensure consistency in the ROW application and authorization process, and reduce costs. These benefits will be realized as a result of the emphasis on site-specific concerns during the project-level environmental analyses, the amendment of numerous land use plans to address wind energy development, and the opportunity to tier future NEPA analyses from the Final Wind Energy PEIS (BLM 2005a) and decisions in this ROD. The no action and limited development alternatives do not provide these benefits in terms of facilitating wind energy development.

## 4 MANAGEMENT CONSIDERATIONS

On May 18, 2001, the President issued Executive Order (E.O.) 13212, "Actions to Expedite Energy-Related Projects," which established a policy that federal agencies should take appropriate actions, to the extent consistent with applicable law, to expedite projects to increase the production, transmission, or conservation of energy. In that same month, the President's National Energy Policy Development Group (NEPDG) recommended to the President, as part of the National Energy Policy, that the Departments of the Interior, Energy, Agriculture, and Defense work together to increase renewable energy production (NEPDG 2001). In July 2001, the Departments created an interagency task force to address the issues associated with increasing renewable energy production on federal lands (DOE and DOI 2002). The task force

developed a Memorandum of Understanding (MOU) among the U.S. Department of Energy (DOE), U.S. Department of the Interior (DOI), U.S. Department of Agriculture (USDA), U.S. Environmental Protection Agency (EPA), Council on Environmental Quality (CEQ), and the members of the Western Governors' Association to establish a framework for cooperation between western states and the federal government to address energy problems facing the West and to facilitate renewable energy production.

To address increased interest in wind energy development and to implement the National Energy Policy recommendation to increase renewable energy production, the BLM undertook efforts to evaluate wind energy potential on public lands and establish a wind energy policy. In 2002, the BLM issued an Interim Wind Energy Development Policy (BLM 2002) that establishes requirements for processing applications for wind energy site testing and monitoring and commercial wind energy development projects. To further support wind energy development on public lands and also to minimize potential environmental and sociocultural impacts, the BLM decided to build on the interim policy and establish a comprehensive Wind Energy Development Program. The BLM initiated preparation of the PEIS in October 2003 and published the PEIS in June 2005. On August 8, 2005, the President signed into law the Energy Policy Act of 2005 (P.L. 109-58). Section 211 of the Act states, "It is the sense of the Congress that the Secretary of the Interior should, before the end of the 10-year period beginning on the date of enactment of this Act, seek to have approved non-hydropower renewable energy projects located on the public lands with a generation capacity of at least 10,000 megawatts of electricity."

The Wind Energy Development Program and the amendment of multiple land use plans to adopt the program will effectively support the directives of E.O. 13212, the recommendations of the National Energy Policy, and congressional direction provided in the Energy Policy Act of 2005 regarding renewable energy development on public lands. On the basis of the impact analyses presented in the Final Wind Energy PEIS (BLM 2005a), it appears that the proposed action will present the best approach for managing wind energy development on BLM-administered public lands. The Wind Energy Development Program is likely to result in the greatest amount of wind energy development over the next 20 years, at the lowest potential cost to industry. Simultaneously, the proposed action will provide the most comprehensive approach for ensuring that potential adverse impacts are minimized to the greatest extent possible. And, finally, the proposed action is likely to provide the greatest economic benefits to local communities and the region as a whole.

## 5  MITIGATION AND MONITORING

A primary purpose of the Wind Energy Development Program is the establishment of policies and BMPs to ensure that potential adverse impacts associated with the development of wind energy resources on BLM-administered public lands are minimized to the greatest extent possible. The policies and BMPs, included in Attachment A, address all identified issues associated with the administration of wind energy development and mitigation of potential impacts; these issues are either addressed directly in the policies and BMPs, or through requirements that they will be addressed as needed during site-specific reviews.

The program will establish specific monitoring requirements that must be met throughout all phases of development. The requirement for the BLM and operators of wind energy projects on BLM-administered public lands to adopt adaptive management strategies will further ensure that potential environmental impacts will be kept to a minimum. This includes requirements for periodic review and revision of programmatic policies and BMPs; comprehensive site monitoring programs, including metrics for measuring impacts; and protocols for incorporating monitoring observations and new mitigation measures into standard operating procedures and project-specific stipulations.

The amendment of 52 BLM land use plans to adopt the program ensures that the program will have a maximum effect. Additional land use plan amendments and revisions are expected to follow the issuance of this ROD in those remaining areas with potentially developable wind energy resources through ongoing and future land use planning efforts.

## 6 PUBLIC INVOLVEMENT

The "Notice of Intent to Prepare a Programmatic Environmental Impact Statement (EIS) to Evaluate Wind Energy Development on Western Public Lands Administered by the BLM" (the NOI) was published in Volume 68, page 201, of the *Federal Register* (68 FR 201) on October 17, 2003. This initiated the public scoping period, which lasted from October 17 to December 19, 2003. During that period, the BLM invited the public and interested groups to provide information and guidance on the scope of the PEIS and alternatives to the proposed action, suggest issues that should be examined, and express their concerns and opinions on resources in the western United States that wind energy development might impact. Public scoping meetings were held in Sacramento, California; Salt Lake City, Utah; Cheyenne, Wyoming; Las Vegas, Nevada; and Boise, Idaho.

An estimated 5,000 people participated in the scoping process by attending public meetings, providing comments, requesting information, or visiting the Wind Energy Development PEIS Web site (http://windeis.anl.gov). All comments received equal consideration in developing the alternatives and analytical issues evaluated in the PEIS. The results of the scoping process were documented in a report issued in January 2004 (BLM 2004) that summarizes and categorizes the major themes, issues, and concerns of the written and verbal comments. The scoping summary report and copies of the individual letters, facsimiles, and comments received electronically during scoping are available on the Wind Energy Development PEIS Web site.

In addition to public scoping, government-to-government consultation was initiated with all Tribal entities with a potential interest in wind energy development on BLM-administered public lands.

The Notice of Availability (NOA) of the Draft PEIS was published on September 10, 2004, (69 FR 175). This began a 90-day public comment period on the Draft PEIS, which lasted from September 10 to December 10, 2004. During this period, the BLM invited the public and interested groups to comment on the content of the Draft PEIS.

The Draft PEIS was posted in its entirety on the Wind Energy Development PEIS Web site. Printed copies of the document and CDs containing the electronic files comprising the document were mailed upon request. More than 120 people and organizations participated in the public comment process by providing Internet-based comments or postal letters. Approximately 718 individual comments were received. The BLM reviewed all comments and made changes to the PEIS, as appropriate. Responses to comments are provided in Volume 3 of the Final Wind Energy PEIS (BLM 2005a). The 30-day public protest period resulted in no protests.

In addition, on June 24, 2005, the BLM initiated a 90-day Governors Consistency Review of the PEIS in accordance with BLM planning regulations. The results of the review were favorable in that none of the Governors objected to the proposed plan amendments.

## 7 REFERENCES

BLM 2002, "Instruction Memorandum No. 2003-020, Interim Wind Energy Development Policy," issued by the Director of the BLM, Washington, D.C., Oct. 16.

BLM, 2004, *Summary Report of Scoping Comments Received on the BLM Wind Energy Development Programmatic Environmental Impact Statement*, prepared by Argonne National Laboratory, Argonne, Ill., for the BLM, Lands and Realty Group, Washington, D.C., Jan.

BLM, 2005a, *Final Programmatic Environmental Impact Statement on Wind Energy Development on BLM-Administered Lands in the Western United States*, prepared by Argonne National Laboratory for BLM, Washington, D.C., June.

BLM, 2005b, *Programmatic Biological Assessment for the BLM's Proposed Land Use Plan Amendments to Adopt the Proposed Wind Energy Development Program*, BLM, Washington, D.C., July.

DOE and DOI (U.S. Department of Energy and U.S. Department of the Interior), 2002, *White House Report in Response to the National Energy Policy Recommendations to Increase Renewable Energy Production on Federal Lands*, Washington, D.C., Aug.

NEPDG (National Energy Policy Development Group), 2001, *National Energy Policy, Reliable, Affordable, and Environmentally Sound Energy for America's Future*, Washington, D.C., May.

USFWS (U.S. Fish and Wildlife Service), 2005, *Biological Opinion for BLM Wind Energy Program*, Washington, D.C.,Nov.

**ATTACHMENT A**

**BLM WIND ENERGY DEVELOPMENT PROGRAM**
**POLICIES AND BEST MANAGEMENT PRACTICES (BMPS)**

## ATTACHMENT A

## BLM WIND ENERGY DEVELOPMENT PROGRAM POLICIES AND BEST MANAGEMENT PRACTICES (BMPS)

The BLM's Wind Energy Development Program will establish a number of policies and BMPs, provided below, regarding the development of wind energy resources on BLM-administered public lands. The policies and BMPs will be applicable to all wind energy development projects on BLM-administered public lands. The policies address the administration of wind energy development activities, and the BMPs identify required mitigation measures that would need to be incorporated into project-specific Plans of Development (PODs) and right-of-way (ROW) authorization stipulations. Additional mitigation measures will be applied to individual projects, in the form of stipulations in the ROW authorization as appropriate, to address site-specific and species-specific issues.

These policies and BMPs were formulated through preparation of the Final Wind Energy PEIS (BLM 2005). The PEIS included detailed, comprehensive analysis of the potential impacts of wind energy development and relevant mitigation measures; reviews of existing, relevant mitigation guidance; and reviews of comments received during scoping and public review of the Draft PEIS.

### A.1 Policies

- The BLM will not issue ROW authorizations for wind energy development on lands on which wind energy development is incompatible with specific resource values. Lands that will be excluded from wind energy site monitoring and testing and development include designated areas that are part of the National Landscape Conservation System (NLCS) (e.g., Wilderness Areas, Wilderness Study Areas, National Monuments, NCAs,[1] Wild and Scenic Rivers, and National Historic and Scenic Trails) and Areas of Critical Environmental Concern (ACECs).[2] Additional areas of land may be excluded from wind energy development on the basis of findings of resource impacts that cannot be mitigated and/or conflict with existing and planned multiple-use activities or land use plans.

- To the extent possible, wind energy projects shall be developed in a manner that will not prevent other land uses, including minerals extraction, livestock grazing, recreational use, and other ROW uses.

---

1 Wind energy development is permitted in one NCA, the California Desert Conservation Area (CDCA), in accordance with the provisions of the *California Desert Conservation Area Plan 1980, as Amended* (BLM 1999).

2 Although the MPDS developed for this PEIS (Section 2.2.1 and Appendix B) did not exclude all of these lands at the screening level, they will be excluded from wind energy development.

- Entities seeking to develop a wind energy project on BLM-administered lands shall consult with appropriate federal, state, and local agencies regarding specific projects as early in the planning process as appropriate to ensure that all potential construction, operation, and decommissioning issues and concerns are identified and adequately addressed.

- The BLM will initiate government-to-government consultation with Indian Tribal governments whose interests might be directly and substantially affected by activities on BLM-administered lands as early in the planning process as appropriate to ensure that construction, operation, and decommissioning issues and concerns are identified and adequately addressed.

- Entities seeking to develop a wind energy project on BLM-administered lands, in conjunction with BLM Washington Office (WO) and Field Office (FO) staff, shall consult with the U.S. Department of Defense (DoD) regarding the location of wind power projects and turbine siting as early in the planning process as appropriate. This consultation shall occur concurrently at both the installation/field level and the Pentagon/BLM WO level. An interagency protocol agreement is being developed to establish a consultation process and to identify the scope of issues for consultation. Lands withdrawn for military purposes are under the administrative jurisdiction of the DoD or a military service and are not available for issuance of wind energy authorizations by the BLM.

- The BLM will consult with the U.S. Fish and Wildlife Service (USFWS) as required by Section 7 of the Endangered Species Act of 1973 (ESA). The specific consultation requirements will be determined on a project-by-project basis.

- The BLM will consult with the State Historic Preservation Office (SHPO) as required by Section 106 of the National Historic Preservation Act of 1966 (NHPA). The specific consultation requirements will be determined on a project-by-project basis. If programmatic Section 106 consultations have been conducted and are adequate to cover a proposed project, additional consultation may not be needed.

- Existing land use plans will be amended, as appropriate, to (1) adopt provisions of the BLM's Wind Energy Development Program, (2) identify land considered to be available for wind energy development, and (3) identify land that will not be available for wind energy development.

- The level of environmental analysis to be required under NEPA for individual wind power projects will be determined at the FO level. For many projects, it may be determined that a tiered environmental assessment (EA) is appropriate in lieu of an EIS. To the extent that the PEIS addresses anticipated issues and

concerns associated with an individual project, including potential cumulative impacts, the BLM will tier off of the decisions embedded in the PEIS and limit the scope of additional project-specific NEPA analyses. The site-specific NEPA analyses will include analyses of project site configuration and micrositing considerations, monitoring program requirements, and appropriate mitigation measures. In particular, the mitigation measures discussed in Chapter 5 of the PEIS may be consulted in determining site-specific requirements. Public involvement will be incorporated into all wind energy development projects to ensure that all concerns and issues are identified and adequately addressed. In general, the scope of the NEPA analyses will be limited to the proposed action on BLM-administered public lands; however, if access to proposed development on adjacent non-BLM-administered lands is entirely dependent on obtaining ROW access across BLM-administered public lands and there are no alternatives to that access, the NEPA analysis for the proposed ROW may need to assess the environmental effects from that proposed development. The BLM's analyses of ROW access projects may tier off of the PEIS to the extent that the proposed project falls within the scope of the PEIS analyses.

- Site-specific environmental analyses will tier from the PEIS and identify and assess any cumulative impacts that are beyond the scope of the cumulative impacts addressed in the PEIS.

- The Categorical Exclusion (CX) applicable to the issuance of short-term ROWs or land use authorizations may be applicable to some site monitoring and testing activities. The relevant CX, established for the BLM in the DOI Departmental Manual 516, Chapter 11, Sec. 11.5, E(19) (DOI 2004), encompasses "issuance of short-term (3 years or less) rights-of-way or land use authorizations for such uses as storage sites, apiary sites, and construction sites where the proposal includes rehabilitation to restore the land to its natural or original condition."

- The BLM will require financial bonds for all wind energy development projects on BLM-administered public lands to ensure compliance with the terms and conditions of the rights-of-way authorization and the requirements of applicable regulatory requirements, including reclamation costs. The amount of the required bond will be determined during the rights-of-way authorization process on the basis of site-specific and project-specific factors. The BLM may also require financial bonds for site monitoring and testing authorizations.

- Entities seeking to develop a wind energy project on BLM-administered public lands shall develop a project-specific Plan of Development (POD) that incorporates all BMPs and, as appropriate, the requirements of other existing and relevant BLM mitigation guidance, including the BLM's interim off-site mitigation guidance (BLM 2005a). Additional mitigation measures will be

incorporated into the POD and into the ROW authorization as project stipulations, as needed, to address site-specific and species-specific issues. The POD will include a site plan showing the locations of turbines, roads, power lines, other infrastructure, and other areas of short- and long-term disturbance.

- The BLM will incorporate management goals and objectives specific to habitat conservation for species of concern (e.g., sage-grouse), as appropriate, into the POD for proposed wind energy projects.

- The BLM will consider the visual resource values of the public lands involved in proposed wind energy development projects, consistent with BLM Visual Resource Management (VRM) policies and guidance. The BLM will work with the ROW applicant to incorporate visual design considerations into the planning and design of the project to minimize potential visual impacts of the proposal and to meet the VRM objectives of the area.

- Operators of wind power facilities on BLM-administered public lands shall consult with the BLM and other appropriate federal, state, and local agencies regarding any planned upgrades or changes to the wind facility design or operation. Proposed changes of this nature may require additional environmental analysis and/or revision of the POD.

- The BLM's Wind Energy Development Program will incorporate adaptive management strategies to ensure that potential adverse impacts of wind energy development are avoided (if possible), minimized, or mitigated to acceptable levels. The programmatic policies and BMPs will be updated and revised as new data regarding the impacts of wind power projects become available. At the project-level, operators will be required to develop monitoring programs to evaluate the environmental conditions at the site through all phases of development, to establish metrics against which monitoring observations can be measured, to identify potential mitigation measures, and to establish protocols for incorporating monitoring observations and additional mitigation measures into standard operating procedures and project-specific stipulations.

## A.2 Best Management Practices (BMPs)

The BMPs will be adopted as required elements of project-specific PODs and/or as ROW authorization stipulations. They are categorized by development activity: site monitoring and testing, development of the POD, construction, operation, and decommissioning. The BMPs for development of the POD identify required elements of the POD needed to address potential impacts associated with subsequent phases of development.

### A.2.1 Site Monitoring and Testing

- The area disturbed by installation of meteorological towers (i.e., footprint) shall be kept to a minimum.
- Existing roads shall be used to the maximum extent feasible. If new roads are necessary, they shall be designed and constructed to the appropriate standard.
- Meteorological towers shall not be located in sensitive habitats or in areas where ecological resources known to be sensitive to human activities (e.g., prairie grouse) are present. Installation of towers shall be scheduled to avoid disruption of wildlife reproductive activities or other important behaviors.
- Meteorological towers installed for site monitoring and testing shall be inspected periodically for structural integrity.

### A.2.2 Plan of Development Preparation

***General***

- The BLM and operators shall contact appropriate agencies, property owners, and other stakeholders early in the planning process to identify potentially sensitive land uses and issues, rules that govern wind energy development locally, and land use concerns specific to the region.
- Available information describing the environmental and sociocultural conditions in the vicinity of the proposed project shall be collected and reviewed as needed to predict potential impacts of the project.
- The Federal Aviation Administration (FAA)-required notice of proposed construction shall be made as early as possible to identify any air safety measures that would be required.
- To plan for efficient use of the land, necessary infrastructure requirements shall be consolidated wherever possible, and current transmission and market access shall be evaluated carefully.
- The project shall be planned to utilize existing roads and utility corridors to the maximum extent feasible, and to minimize the number and length/size of new roads, lay-down areas, and borrow areas.
- A monitoring program shall be developed to ensure that environmental conditions are monitored during the construction, operation, and

decommissioning phases. The monitoring program requirements, including adaptive management strategies, shall be established at the project level to ensure that potential adverse impacts of wind energy development are mitigated. The monitoring program shall identify the monitoring requirements for each environmental resource present at the site, establish metrics against which monitoring observations can be measured, identify potential mitigation measures, and establish protocols for incorporating monitoring observations and additional mitigation measures into standard operating procedures and BMPs.

- "Good housekeeping" procedures shall be developed to ensure that during operation the site will be kept clean of debris, garbage, fugitive trash or waste, and graffiti; to prohibit scrap heaps and dumps; and to minimize storage yards.

***Wildlife and Other Ecological Resources***

- Operators shall review existing information on species and habitats in the vicinity of the project area to identify potential concerns.

- Operators shall conduct surveys for federal and/or state-protected species and other species of concern (including special status plant and animal species) within the project area and design the project to avoid (if possible), minimize, or mitigate impacts to these resources.

- Operators shall identify important, sensitive, or unique habitats in the vicinity of the project and design the project to avoid (if possible), minimize, or mitigate impacts to these habitats (e.g., locate the turbines, roads, and ancillary facilities in the least environmentally sensitive areas; i.e., away from riparian habitats, streams, wetlands, drainages, or critical wildlife habitats).

- The BLM will prohibit the disturbance of any population of federal listed plant species.

- Operators shall evaluate avian and bat use of the project area and design the project to minimize or mitigate the potential for bird and bat strikes (e.g., development shall not occur in riparian habitats and wetlands). Scientifically rigorous avian and bat use surveys shall be conducted; the amount and extent of ecological baseline data required shall be determined on a project basis.

- Turbines shall be configured to avoid landscape features known to attract raptors, if site studies show that placing turbines there would pose a significant risk to raptors.

- Operators shall determine the presence of bat colonies and avoid placing turbines near known bat hibernation, breeding, and maternity/nursery colonies; in known migration corridors; or in known flight paths between colonies and feeding areas.

- Operators shall determine the presence of active raptor nests (i.e., raptor nests used during the breeding season). Measures to reduce raptor use at a project site (e.g., minimize road cuts, maintain either no vegetation or nonattractive plant species around the turbines) shall be considered.

- A habitat restoration plan shall be developed to avoid (if possible), minimize, or mitigate negative impacts on vulnerable wildlife while maintaining or enhancing habitat values for other species. The plan shall identify revegetation, soil stabilization, and erosion reduction measures that shall be implemented to ensure that all temporary use areas are restored. The plan shall require that restoration occur as soon as possible after completion of activities to reduce the amount of habitat converted at any one time and to speed up the recovery to natural habitats.

- Procedures shall be developed to mitigate potential impacts to special status species. Such measures could include avoidance, relocation of project facilities or lay-down areas, and/or relocation of biota.

- Facilities shall be designed to discourage their use as perching or nesting substrates by birds. For example, power lines and poles shall be configured to minimize raptor electrocutions and discourage raptor and raven nesting and perching.

***Visual Resources***

- The public shall be involved and informed about the visual site design elements of the proposed wind energy facilities. Possible approaches include conducting public forums for disseminating information, offering organized tours of operating wind developments, and using computer simulation and visualization techniques in public presentations.

- Turbine arrays and turbine design shall be integrated with the surrounding landscape. Design elements to be addressed include visual uniformity, use of tubular towers, proportion and color of turbines, nonreflective paints, and prohibition of commercial messages on turbines.

- Other site design elements shall be integrated with the surrounding landscape. Elements to address include minimizing the profile of the ancillary structures, burial of cables, prohibition of commercial symbols, and lighting. Regarding

lighting, efforts shall be made to minimize the need for and amount of lighting on ancillary structures.

***Roads***

- An access road siting and management plan shall be prepared incorporating existing BLM standards regarding road design, construction, and maintenance such as those described in the BLM 9113 Manual (BLM 1985) and the *Surface Operating Standards for Oil and Gas Exploration and Development* (RMRCC 1989) (i.e., the Gold Book).

***Ground Transportation***

- A transportation plan shall be developed, particularly for the transport of turbine components, main assembly cranes, and other large pieces of equipment. The plan shall consider specific object sizes, weights, origin, destination, and unique handling requirements and shall evaluate alternative transportation approaches. In addition, the process to be used to comply with unique state requirements and to obtain all necessary permits shall be clearly identified.

- A traffic management plan shall be prepared for the site access roads to ensure that no hazards would result from the increased truck traffic and that traffic flow would not be adversely impacted. This plan shall incorporate measures such as informational signs, flaggers when equipment may result in blocked throughways, and traffic cones to identify any necessary changes in temporary lane configuration.

***Noise***

- Proponents of a wind energy development project shall take measurements to assess the existing background noise levels at a given site and compare them with the anticipated noise levels associated with the proposed project.

***Noxious Weeds and Pesticides***

- Operators shall develop a plan for control of noxious weeds and invasive species, which could occur as a result of new surface disturbance activities at the site. The plan shall address monitoring, education of personnel on weed identification, the manner in which weeds spread, and methods for treating infestations. The use of certified weed-free mulching shall be required. If trucks and construction equipment are arriving from locations with known

invasive vegetation problems, a controlled inspection and cleaning area shall be established to visually inspect construction equipment arriving at the project area and to remove and collect seeds that may be adhering to tires and other equipment surfaces.

- If pesticides are used on the site, an integrated pest management plan shall be developed to ensure that applications would be conducted within the framework of BLM and DOI policies and entail only the use of EPA-registered pesticides. Pesticide use shall be limited to nonpersistent, immobile pesticides and shall only be applied in accordance with label and application permit directions and stipulations for terrestrial and aquatic applications.

***Cultural/Historic Resources***

- The BLM will consult with Indian Tribal governments early in the planning process to identify issues regarding the proposed wind energy development, including issues related to the presence of cultural properties, access rights, disruption to traditional cultural practices, and impacts to visual resources important to the Tribe(s).

- The presence of archaeological sites and historic properties in the area of potential effect shall be determined on the basis of a records search of recorded sites and properties in the area and/or, depending on the extent and reliability of existing information, an archaeological survey. Archaeological sites and historic properties present in the area of potential effect shall be reviewed to determine whether they meet the criteria of eligibility for listing on the *National Register of Historic Places* (NRHP).

- When any rights-of-way application includes remnants of a National Historic Trail, is located within the viewshed of a National Historic Trail's designated centerline, or includes or is within the viewshed of a trail eligible for listing on the NRHP, the operator shall evaluate the potential visual impacts to the trail associated with the proposed project and identify appropriate mitigation measures for inclusion as stipulations in the POD.

- If cultural resources are present at the site, or if areas with a high potential to contain cultural material have been identified, a cultural resources management plan (CRMP) shall be developed. This plan shall address mitigation activities to be taken for cultural resources found at the site. Avoidance of the area is always the preferred mitigation option. Other mitigation options include archaeological survey and excavation (as warranted) and monitoring. If an area exhibits a high potential, but no artifacts were observed during an archaeological survey, monitoring by a qualified archaeologist could be required during all excavation and

earthmoving in the high-potential area. A report shall be prepared documenting these activities. The CRMP also shall (1) establish a monitoring program, (2) identify measures to prevent potential looting/vandalism or erosion impacts, and (3) address the education of workers and the public to make them aware of the consequences of unauthorized collection of artifacts and destruction of property on public land.

***Paleontological Resources***

- Operators shall determine whether paleontological resources exist in a project area on the basis of the sedimentary context of the area, a records search for past paleontological finds in the area, and/or, depending on the extent of existing information, a paleontological survey.

- If paleontological resources are present at the site, or if areas with a high potential to contain paleontological material have been identified, a paleontological resources management plan shall be developed. This plan shall include a mitigation plan for collection of the fossils; mitigation could include avoidance, removal of fossils, or monitoring. If an area exhibits a high potential but no fossils were observed during survey, monitoring by a qualified paleontologist could be required during all excavation and earthmoving in the sensitive area. A report shall be prepared documenting these activities. The paleontological resources management plan also shall (1) establish a monitoring program, (2) identify measures to prevent potential looting/vandalism or erosion impacts, and (3) address the education of workers and the public to make them aware of the consequences of unauthorized collection of fossils on public land.

***Hazardous Materials and Waste Management***

- Operators shall develop a hazardous materials management plan addressing storage, use, transportation, and disposal of each hazardous material anticipated to be used at the site. The plan shall identify all hazardous materials that would be used, stored, or transported at the site. It shall establish inspection procedures, storage requirements, storage quantity limits, inventory control, nonhazardous product substitutes, and disposition of excess materials. The plan shall also identify requirements for notices to federal and local emergency response authorities and include emergency response plans.

- Operators shall develop a waste management plan identifying the waste streams that are expected to be generated at the site and addressing hazardous waste determination procedures, waste storage locations, waste-specific management and disposal requirements, inspection procedures, and waste

minimization procedures. This plan shall address all solid and liquid wastes that may be generated at the site.

- Operators shall develop a spill prevention and response plan identifying where hazardous materials and wastes are stored on site, spill prevention measures to be implemented, training requirements, appropriate spill response actions for each material or waste, the locations of spill response kits on site, a procedure for ensuring that the spill response kits are adequately stocked at all times, and procedures for making timely notifications to authorities.

***Storm Water***

- Operators shall develop a storm water management plan for the site to ensure compliance with applicable regulations and prevent off-site migration of contaminated storm water or increased soil erosion.

***Human Health and Safety***

- A safety assessment shall be conducted to describe potential safety issues and the means that would be taken to mitigate them, including issues such as site access, construction, safe work practices, security, heavy equipment transportation, traffic management, emergency procedures, and fire control.

- A health and safety program shall be developed to protect both workers and the general public during construction, operation, and decommissioning of a wind energy project. Regarding occupational health and safety, the program shall identify all applicable federal and state occupational safety standards; establish safe work practices for each task (e.g., requirements for personal protective equipment and safety harnesses; Occupational Safety and Health Administration [OSHA] standard practices for safe use of explosives and blasting agents; and measures for reducing occupational electric and magnetic fields [EMF] exposures); establish fire safety evacuation procedures; and define safety performance standards (e.g., electrical system standards and lightning protection standards). The program shall include a training program to identify hazard training requirements for workers for each task and establish procedures for providing required training to all workers. Documentation of training and a mechanism for reporting serious accidents to appropriate agencies shall be established.

- Regarding public health and safety, the health and safety program shall establish a safety zone or setback for wind turbine generators from residences and occupied buildings, roads, rights-of-ways, and other public access areas that is sufficient to prevent accidents resulting from the operation of wind turbine generators. It shall identify requirements for temporary fencing

around staging areas, storage yards, and excavations during construction or decommissioning activities. It shall also identify measures to be taken during the operation phase to limit public access to hazardous facilities (e.g., permanent fencing would be installed only around electrical substations, and turbine tower access doors would be locked).

- Operators shall consult with local planning authorities regarding increased traffic during the construction phase, including an assessment of the number of vehicles per day, their size, and type. Specific issues of concern (e.g., location of school bus routes and stops) shall be identified and addressed in the traffic management plan.

- If operation of the wind turbines is expected to cause significant adverse impacts to nearby residences and occupied buildings from shadow flicker, low-frequency sound, or EMF, site-specific recommendations for addressing these concerns shall be incorporated into the project design (e.g., establishing a sufficient setback from turbines).

- The project shall be planned to minimize electromagnetic interference (EMI) (e.g., impacts to radar, microwave, television, and radio transmissions) and comply with Federal Communications Commission [FCC] regulations. Signal strength studies shall be conducted when proposed locations have the potential to impact transmissions. Potential interference with public safety communication systems (e.g., radio traffic related to emergency activities) shall be avoided.

- The project shall be planned to comply with FAA regulations, including lighting regulations, and to avoid potential safety issues associated with proximity to airports, military bases or training areas, or landing strips.

- Operators shall develop a fire management strategy to implement measures to minimize the potential for a human-caused fire.

### A.2.3 Construction

#### *General*

- All control and mitigation measures established for the project in the POD and the resource-specific management plans that are part of the POD shall be maintained and implemented throughout the construction phase, as appropriate.

- The area disturbed by construction and operation of a wind energy development project (i.e., footprint) shall be kept to a minimum.

- The number and size/length of roads, temporary fences, lay-down areas, and borrow areas shall be minimized.

- Topsoil from all excavations and construction activities shall be salvaged and reapplied during reclamation.

- All areas of disturbed soil shall be reclaimed using weed-free native grasses, forbs, and shrubs. Reclamation activities shall be undertaken as early as possible on disturbed areas.

- All electrical collector lines shall be buried in a manner that minimizes additional surface disturbance (e.g., along roads or other paths of surface disturbance). Overhead lines may be used in cases where burial of lines would result in further habitat disturbance.

- Operators shall identify unstable slopes and local factors that can induce slope instability (such as groundwater conditions, precipitation, earthquake activities, slope angles, and the dip angles of geologic strata). Operators also shall avoid creating excessive slopes during excavation and blasting operations. Special construction techniques shall be used where applicable in areas of steep slopes, erodible soil, and stream channel crossings.

- Erosion controls that comply with county, state, and federal standards shall be applied. Practices such as jute netting, silt fences, and check dams shall be applied near disturbed areas.

***Wildlife***

- Guy wires on permanent meteorological towers shall be avoided, however, may be necessary on temporary meteorological towers installed during site monitoring and testing.

- In accordance with the habitat restoration plan, restoration shall be undertaken as soon as possible after completion of construction activities to reduce the amount of habitat converted at any one time and to speed up the recovery to natural habitats.

- All construction employees shall be instructed to avoid harassment and disturbance of wildlife, especially during reproductive (e.g., courtship and nesting) seasons. In addition, pets shall not be permitted on site during construction.

***Visual Resources***

- Operators shall reduce visual impacts during construction by minimizing areas of surface disturbance, controlling erosion, using dust suppression techniques, and restoring exposed soils as closely as possible to their original contour and vegetation.

***Roads***

- Existing roads shall be used, but only if in safe and environmentally sound locations. If new roads are necessary, they shall be designed and constructed to the appropriate standard and be no higher than necessary to accommodate their intended functions (e.g., traffic volume and weight of vehicles). Excessive grades on roads, road embankments, ditches, and drainages shall be avoided, especially in areas with erodible soils. Special construction techniques shall be used, where applicable. Abandoned roads and roads that are no longer needed shall be recontoured and revegetated.

- Access roads and on-site roads shall be surfaced with aggregate materials, wherever appropriate.

- Access roads shall be located to follow natural contours and minimize side hill cuts.

- Roads shall be located away from drainage bottoms and avoid wetlands, if practicable.

- Roads shall be designed so that changes to surface water runoff are avoided and erosion is not initiated.

- Access roads shall be located to minimize stream crossings. All structures crossing streams shall be located and constructed so that they do not decrease channel stability or increase water velocity. Operators shall obtain all applicable federal and state permits.

- Existing drainage systems shall not be altered, especially in sensitive areas such as erodible soils or steep slopes. Potential soil erosion shall be controlled at culvert outlets with appropriate structures. Catch basins, roadway ditches, and culverts shall be cleaned and maintained regularly.

***Ground Transportation***

- Project personnel and contractors shall be instructed and required to adhere to speed limits commensurate with road types, traffic volumes, vehicle types,

and site-specific conditions, to ensure safe and efficient traffic flow and to reduce wildlife collisions and disturbance and airborne dust.

- Traffic shall be restricted to the roads developed for the project. Use of other unimproved roads shall be restricted to emergency situations.

- Signs shall be placed along construction roads to identify speed limits, travel restrictions, and other standard traffic control information. To minimize impacts on local commuters, consideration shall be given to limiting construction vehicles traveling on public roadways during the morning and late afternoon commute time.

***Air Emissions***

- Dust abatement techniques shall be used on unpaved, unvegetated surfaces to minimize airborne dust.

- Speed limits (e.g., 25 mph [40 km/h]) shall be posted and enforced to reduce airborne fugitive dust.

- Construction materials and stockpiled soils shall be covered if they are a source of fugitive dust.

- Dust abatement techniques shall be used before and during surface clearing, excavation, or blasting activities.

***Excavation and Blasting Activities***

- Operators shall gain a clear understanding of the local hydrogeology. Areas of groundwater discharge and recharge and their potential relationships with surface water bodies shall be identified.

- Operators shall avoid creating hydrologic conduits between two aquifers during foundation excavation and other activities.

- Foundations and trenches shall be backfilled with originally excavated material as much as possible. Excess excavation materials shall be disposed of only in approved areas or, if suitable, stockpiled for use in reclamation activities.

- Borrow material shall be obtained only from authorized and permitted sites. Existing sites shall be used in preference to new sites.

- Explosives shall be used only within specified times and at specified distances from sensitive wildlife or streams and lakes, as established by the BLM or other federal and state agencies.

***Noise***

- Noisy construction activities (including blasting) shall be limited to the least noise-sensitive times of day (i.e., daytime only between 7 a.m. and 10 p.m.) and weekdays.

- All equipment shall have sound-control devices no less effective than those provided on the original equipment. All construction equipment used shall be adequately muffled and maintained.

- All stationary construction equipment (i.e., compressors and generators) shall be located as far as practicable from nearby residences.

- If blasting or other noisy activities are required during the construction period, nearby residents shall be notified in advance.

***Cultural and Paleontological Resources***

- Unexpected discovery of cultural or paleontological resources during construction shall be brought to the attention of the responsible BLM authorized officer immediately. Work shall be halted in the vicinity of the find to avoid further disturbance to the resources while they are being evaluated and appropriate mitigation measures are being developed.

***Hazardous Materials and Waste Management***

- Secondary containment shall be provided for all on-site hazardous materials and waste storage, including fuel. In particular, fuel storage (for construction vehicles and equipment) shall be a temporary activity occurring only for as long as is needed to support construction activities.

- Wastes shall be properly containerized and removed periodically for disposal at appropriate off-site permitted disposal facilities.

- In the event of an accidental release to the environment, the operator shall document the event, including a root cause analysis, appropriate corrective actions taken, and a characterization of the resulting environmental or health and safety impacts. Documentation of the event shall be provided to the BLM authorized officer and other federal and state agencies, as required.

- Any wastewater generated in association with temporary, portable sanitary facilities shall be periodically removed by a licensed hauler and introduced into an existing municipal sewage treatment facility. Temporary, portable sanitary facilities provided for construction crews shall be adequate to support expected on-site personnel and shall be removed at completion of construction activities.

***Public Health and Safety***

- Temporary fencing shall be installed around staging areas, storage yards, and excavations during construction to limit public access.

### A.2.4 Operation

***General***

- All control and mitigation measures established for the project in the POD and the resource-specific management plans that are part of the POD shall be maintained and implemented throughout the operational phase, as appropriate. These control and mitigation measures shall be reviewed and revised, as needed, to address changing conditions or requirements at the site, throughout the operational phase. This adaptive management approach would help ensure that impacts from operations are kept to a minimum.

- Inoperative turbines shall be repaired, replaced, or removed in a timely manner. Requirements to do so shall be incorporated into the due diligence provisions of the rights-of-way authorization. Operators will be required to demonstrate due diligence in the repair, replacement, or removal of turbines; failure to do so could result in termination of the rights-of-way authorization.

***Wildlife***

- Employees, contractors, and site visitors shall be instructed to avoid harassment and disturbance of wildlife, especially during reproductive (e.g., courtship and nesting) seasons. In addition, any pets shall be controlled to avoid harassment and disturbance of wildlife.

- Observations of potential wildlife problems, including wildlife mortality, shall be reported to the BLM authorized officer immediately.

***Ground Transportation***

- Ongoing ground transportation planning shall be conducted to evaluate road use, minimize traffic volume, and ensure that roads are maintained adequately to minimize associated impacts.

***Monitoring Program***

- Site monitoring protocols defined in the POD shall be implemented. These will incorporate monitoring program observations and additional mitigation measures into standard operating procedures and BMPs to minimize future environmental impacts.

- Results of monitoring program efforts shall be provided to the BLM authorized officer.

***Public Health and Safety***

- Permanent fencing shall be installed and maintained around electrical substations, and turbine tower access doors shall be locked to limit public access.

- In the event an installed wind energy development project results in EMI, the operator shall work with the owner of the impacted communications system to resolve the problem. Additional warning information may also need to be conveyed to aircraft with onboard radar systems so that echoes from wind turbines can be quickly recognized.

### A.2.5 Decommissioning

***General***

- Prior to the termination of the rights-of-way authorization, a decommissioning plan shall be developed and approved by the BLM. The decommissioning plan shall include a site reclamation plan and monitoring program.

- All management plans, BMPs, and stipulations developed for the construction phase shall be applied to similar activities during the decommissioning phase.

- All turbines and ancillary structures shall be removed from the site.

- Topsoil from all decommissioning activities shall be salvaged and reapplied during final reclamation.

- All areas of disturbed soil shall be reclaimed using weed-free native shrubs, grasses, and forbs.

- The vegetation cover, composition, and diversity shall be restored to values commensurate with the ecological setting.

## ATTACHMENT B

## BLM LAND USE PLAN AMENDMENTS TO ADOPT THE WIND ENERGY DEVELOPMENT PROGRAM

**ATTACHMENT B**

**BLM LAND USE PLAN AMENDMENTS TO ADOPT THE WIND ENERGY DEVELOPMENT PROGRAM**

The Final Wind PEIS (BLM 2005) evaluated all BLM land use plans within the 11-state study area. The decision has been made to amend 52 land use plans in 9 of those states: Colorado, Idaho, Montana, Nevada, New Mexico, Oregon, Utah, Washington, and Wyoming. The amendments include (1) adoption of the Wind Energy Development Program policies and best management practices (BMPs), and (2) identification of specific areas where wind energy development will not be allowed.

Some plans within the 11-state study area were excluded from amendment in this Record of Decision (ROD) for a variety of reasons, including (1) if developable wind resources are not present in the planning area, (2) if the plan was previously amended or revised to adequately address wind energy development, (3) if the plan currently is being amended or revised in a separate National Environmental Policy Act of 1969 (NEPA) review and that amendment or revision will address wind energy development, or (4) if some other reason(s) exist(s) to exclude the plan from amendment under the PEIS (e.g., a plan revision is scheduled in the foreseeable future).

None of the land use plans in Arizona or California are included for amendment in this ROD. Ongoing and upcoming land use plan amendments being conducted will address wind energy development in these states for areas where developable wind resources are present.

Table B-1 provides information describing the amendment change for each land use plan that is amended in this ROD. The rationale for the change also is provided.

**TABLE B-1  Changes and Rationales for Land Use Plan Amendments[a]**

| Plan/Field Office | Change | Rationale |
|---|---|---|
| *Colorado* | | |
| Royal Gorge RMP, Royal Gorge Field Office | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The current RMP does not address wind energy development, and the Field Office has received two recent inquiries about wind energy development. The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |
| San Luis RMP, includes La Jara, Saguache, and Del Norte Field Offices and the San Luis Valley Public Lands Center | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The current RMP does not address wind energy development, and the Field Office has received two recent inquiries about wind energy development. The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in the planning area. |
| *Idaho* | | |
| Cascade RMP, Four Rivers Field Office | Wind energy development will be restricted from wildlife habitat where adverse effects could not be mitigated. | Restricted areas are not appropriate for wind energy development because of resource management conflicts. |
| | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The BMPs are appropriate for wind energy development in this planning area. |
| Challis RMP, Challis Field Office | Wind energy development will be restricted from wildlife habitat where adverse effects could not be mitigated. | Restricted areas are not appropriate for wind energy development because of resource management conflicts. |
| | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The BMPs are appropriate for wind energy development in this planning area. |

**TABLE B-1  (Cont.)**

| Plan/Field Office | Change | Rationale |
| --- | --- | --- |
| Jarbidge RMP, Jarbidge Field Office | Wind energy development will be restricted from wildlife habitat where adverse effects could not be mitigated. | Restricted areas are not appropriate for wind energy development because of resource management conflicts. |
| | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The BMPs are appropriate for wind energy development in this planning area. |
| Kuna MFP, Four Rivers Field Office | Wind energy development will be restricted from wildlife habitat where adverse effects could not be mitigated. | Restricted areas are not appropriate for wind energy development because of resource management conflicts. |
| | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The BMPs are appropriate for wind energy development in this planning area. |
| Lemhi RMP, Salmon Field Office | Wind energy development will be restricted from wildlife habitat where adverse effects could not be mitigated. | Restricted areas are not appropriate for wind energy development because of resource management conflicts. |
| | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The BMPs are appropriate for wind energy development in this planning area. |
| Owyhee RMP, Owyhee Field Office | Wind energy development will be restricted from wildlife habitat where adverse effects could not be mitigated. | Restricted areas are not appropriate for wind energy development because of resource management conflicts. |
| | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The BMPs are appropriate for wind energy development in this planning area. |
| Twin Falls MFP, Burley Field Office | Wind energy development will be restricted from wildlife habitat where adverse effects could not be mitigated. | Restricted areas are not appropriate for wind energy development because of resource management conflicts. |
| | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |

**TABLE B-1  (Cont.)**

| Plan/Field Office | Change | Rationale |
|---|---|---|
| *Montana* | | |
| Billings RMP, Billings Field Office | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted with restrictions as indicated in the PEIS. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area.  The Billings RMP is scheduled for revision in 2007; however, Billings also has an active wind testing and monitoring permit (MTM92391) with an effective date of September 28, 2003. If this potential project goes to full field development, it is doubtful that the RMP revision would be completed in time to address wind energy development on public lands.  The current RMP does not address wind energy development. |
| Garnet RMP, Missoula Field Office | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |
| | RMP MA 9 will be identified as an exclusion area where wind energy and its associated development will be prohibited. | Wind energy development would be inconsistent with the BLM's management decisions and objectives. |
| | RMP MAs 1, 4, 10, and 11 will be identified as avoidance areas where wind energy and its associated development will be discouraged. | These areas contain important riparian areas; threatened and endangered species habitat; big game winter range; and/or recreation, and historic and cultural sites where wind energy development would be inconsistent with the BLM's management decisions and objectives. |
| Headwaters RMP, Butte Field Office | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |
| Judith-Valley-Phillips RMP, Lewistown Field Office | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |

**TABLE B-1 (Cont.)**

| Plan/Field Office | Change | Rationale |
|---|---|---|
| Judith-Valley-Phillips RMP, Malta Field Office | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |
| | Wind energy development will be excluded from large reservoirs/waterfowl complexes. | Development will be restricted within 2 mi (3 km) of these sites because of the potential for bird/tower strikes. |
| | Wind energy development will be excluded from Montana Air National Guard Training sites. | This area is in S. Phillips County and within the Hays Military Operations Area. Wind energy development would conflict with training missions. |
| | Wind energy development will be excluded from developed recreation sites. | Development within viewsheds will be restricted within 1 mi (2 km) unless topography can screen the project. |
| | Wind energy development will be excluded from backcountry byways. | Development should not be seen within the viewshed of the byway. |
| West Hi Line RMP, Lewiston FO | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |
| *New Mexico* | | |
| Carlsbad RMP, Carlsbad FO | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate in some areas for wind energy development activities in this planning area. |
| | Wind energy development will be restricted in those areas along the face of the Guadalupe Mountains located in the western portion of the planning area and grassland areas in the northwestern portion of the planning area. | This area provides critical habitat for Kuenzlers cactus and Aplamado falcon. Wind energy development in this area would be inconsistent with the BLM's management decisions and objectives for the critical habitat. |

**TABLE B-1 (Cont.)**

| Plan/Field Office | Change | Rationale |
|---|---|---|
| Carlsbad RMP, Carlsbad FO (Cont.) | Wind energy development will be restricted in those areas within the viewshed of Carlsbad Caverns National Park. | Carlsbad Caverns National Park receives heavy tourist traffic throughout the year. Because of the significance of the park, wind energy development in the viewshed for the park would be inconsistent with the BLM's management decisions and objectives as well as those of the National Park Service. |
| | Wind energy development will be restricted in those areas that are within known cave/karst areas within the planning area. | Much of the known cave/karst areas have been designated as "high wind resource levels"; however, wind energy development in this area would have to be restricted because of the numerous cave/karst features in the area. |
| | Wind energy development will be restricted in those areas that are within the Guadalupe National Backcountry Byway and the Guadalupe Escarpment Scenic Area. | Any wind development in these areas would have a negative impact on the VRM ratings for these areas, which would be inconsistent with current BLM management decisions and objectives. |
| | Wind energy development will be restricted in designated Special Management Areas. | Wind development in these areas would be inconsistent with BLM management decisions and objectives. |
| Mimbres RMP, Las Cruces FO | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |
| Roswell RMP, Roswell FO | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |
| White Sands RMP, Las Cruces FO | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |

**TABLE B-1 (Cont.)**

| Plan/Field Office | Change | Rationale |
|---|---|---|
| *Nevada* | | |
| Elko RMP, Elko FO | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |
| Las Vegas RMP, Las Vegas FO | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |
| Paradise-Denio MFP, Winnemucca FO | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |
| Shoshone-Eureka RMP, Battle Mountain FO | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |
| Sonoma-Gerlach MFP, Winnemucca FO | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |
| Tonopah RMP, Battle Mountain FO, Tonopah Field Station | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |
| Wells RMP, Elko FO | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |

**TABLE B-1  (Cont.)**

| Plan/Field Office | Change | Rationale |
|---|---|---|
| *Oregon* | | |
| Andrews/Steens RMP, Andrews/Steens FO | Wind energy development will be restricted from ROW, realty use, and renewable energy avoidance and exclusion zones as identified in the RMP and the portion of the Steens Mountain CMPA in the planning area. | Wind energy development would be incompatible with the purposes and objectives of the special designations (ACECs, WSAs, RNAs, and ONAs) that were identified as avoidance and exclusion areas in the RMP.  Although the RMP does not designate the portion of the Steens Mountain CMPA in the planning area as an avoidance/ exclusion zone, the restrictions on facility development contained in the language of the Steens Mountain CMPA exclude wind energy development in this area. |
| Brothers/LaPine RMP, Deschutes and Central Oregon FO | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |
| Coos Bay RMP, Coos Bay FO | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |
| Eugene RMP, Eugene FO | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |
| John Day RMP, Central Oregon FO | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |
| Medford RMP, Medford FO | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |
| Salem RMP, Salem FO | BMPs and automatic avoidance/exclusion zones included in the Wind Energy Development Program will be adopted. | The BMPs and automatic avoidance/exclusions zones included in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |

**TABLE B-1  (Cont.)**

| Plan/Field Office | Change | Rationale |
|---|---|---|
| Southeast Oregon RMP, Malheur and Jordan Resource Areas | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |
| Three Rivers RMP, Three Rivers FO's | It will be clarified that wind energy development is allowable on a case-by-case basis in areas outside rights-of--way and land use authorization avoidance and exclusion zones. | The RMP does not contain any explicit discussion on wind energy development, although the plan designates avoidance and exclusion areas for rights-of-way and land use authorizations. |
| | Wind energy development will be restricted from rights-of-way and land use authorization avoidance and exclusion zones identified in the RMP and the portion of the Steens Mountain CMPA in the planning area. | Wind energy development would be incompatible with the purposes and objectives of the special designations (ACECs, WSAs, RNA, and ONAs) that were identified as avoidance and exclusion areas in the RMP. Although the RMP does not designate the portion of the Steens Mountain CMPA in the planning area as an avoidance/exclusion zone, the restrictions on facility development contained in the language of the Steens Mountain CMPA exclude wind energy development in this area. |
| | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |
| Two Rivers RMP, Deschutes and Central Oregon Field Offices | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |
| Upper Deschutes RMP, Deschutes FO | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |

**TABLE B-1  (Cont.)**

| Plan/Field Office | Change | Rationale |
|---|---|---|
| *Utah* | | |
| Cedar-Beaver-Garfield-Antimony RMP, Cedar City FO | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |
| Escalante MFP, Kanab FO | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |
| Paria MFP, Kanab FO | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |
| Pinyon MFP, Cedar City FO | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |
| Randolph MFP, Salt Lake FO | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |
| St. George RMP, St. George FO | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |
| Vermillion MFP, Kanab FO | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |
| Zion MFP, Kanab FO | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |

**TABLE B-1 (Cont.)**

| Plan/Field Office | Change | Rationale |
|---|---|---|
| *Washington* | | |
| Spokane RMP, Wenatchee and Border Field Offices | BMPs and automatic avoidance/exclusion zones included in the Wind Energy Development Program will be adopted. | The BMPs and automatic avoidance/exclusion zones included in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |
| *Wyoming* | | |
| Buffalo RMP, Buffalo FO | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |
| Cody RMP, Cody FO | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |
| Grass Creek RMP, Worland FO | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |
| Green River RMP, Rock Springs FO | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |
| Lander RMP, Lander FO | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |
| Newcastle RMP, Newcastle FO | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |

**TABLE B-1  (Cont.)**

| Plan/Field Office | Change | Rationale |
|---|---|---|
| Washakie RMP, Worland FO | Programmatic policies and BMPs in the Wind Energy Development Program will be adopted. | The programmatic policies and BMPs in the Wind Energy Development Program are appropriate for wind energy development activities in this planning area. |

[a]  Abbreviations: ACEC = Area of Critical Environmental Concern; BMP = best management practice; CMPA = (Steens Mountain) Cooperative Management and Protection Area; MA = management area; MFP = Management Framework Plan; ONA = Outstanding National Area; RMP = Resource Management Plan; RNA = Research Natural Area; ROW = right-of-way; VRM = Visual Resource Management; WSA = Wilderness Study Area.

[b]  The Andrews/Steens RMP is currently being revised; upon completion, it will replace the Andrews MFP and revise part of the Three Rivers RMP. The amendments listed in this table will be applied to whatever plans are in existence at the time the Record of Decision (ROD) is issued.

[c]  The Upper Deschutes RMP is currently being revised; upon completion, it will replace a portion of the Brothers/LaPine RMP. The amendments listed in this table will be applied to whatever plans are in existence at the time the ROD is issued.

Exhibit 3

Excerpts from BLM, Final Environmental Impact
Statement on Wind Energy Development on Bureau of
Land Management-Administered Lands in the Western
United States, June 2005

FES 05-11

# Final Programmatic Environmental Impact Statement on Wind Energy Development on BLM-Administered Lands in the Western United States

*Volume 1: Main Text*

U.S. Department of the Interior
Bureau of Land Management

June 2005




## ES.4  SCOPE OF THE ANALYSIS

The scope of the PEIS analysis includes an assessment of the positive and negative environmental, social, and economic impacts; discussion of relevant mitigation measures to address these impacts; and identification of appropriate, programmatic policies and best management practices (BMPs) to be included in the proposed Wind Energy Development Program. The scope includes all BLM-administered lands in the western United States, excluding Alaska. They are located in 11 states: Arizona, California, Colorado, Idaho, Montana, Nevada, New Mexico, Oregon, Utah, Washington, and Wyoming. A maximum potential development scenario (MPDS) was developed to help define the potential magnitude of future wind energy development activities on BLM-administered lands within these states. Additional modeling was conducted to consider the impact of various economic factors affecting wind energy development and to define how much wind power might be generated over the next 20 years in the 11-state study area.

The PEIS also assesses the proposed amendment of 52 BLM land use plans. The proposed amendments include (1) adoption of the proposed programmatic policies and BMPs, and (2) identification of specific areas where wind energy development would not be allowed. None of the proposed amendments address designation of lands for competitive ROW bidding processes, although this was identified as a possibility in the NOI. Interest in competitive bidding processes currently is limited to two areas and would be addressed in local BLM land use planning efforts.

The analysis is based on current, available, and credible scientific data. Programmatic policies and BMPs incorporated into the BLM's proposed Wind Energy Development Program are based on an interpretation of these scientific data and decisions on relevant mitigation requirements. Direct and indirect impacts of wind energy development on the environment, social systems, and the economy, as discussed at the programmatic level, have been evaluated. Cumulative impacts associated with the proposed action have also been evaluated.

As a programmatic evaluation, this PEIS does not evaluate site-specific issues associated with individual wind energy development projects. A variety of location-specific factors (e.g., soil type, watershed, habitat, vegetation, viewshed, public sentiment, the presence of threatened and endangered species, and the presence of cultural resources) will vary considerably from site to site, especially over an 11-state region. In addition, the variations in project size and design will greatly determine the magnitude of the impacts from given projects. The combined effects of these location-specific and project-specific factors cannot be fully anticipated or addressed in a programmatic analysis; such effects must be evaluated at the project level.

## ES.5  ALTERNATIVES

This PEIS analyzes three alternatives. It analyzes the potential impacts associated with the BLM's proposed action to implement a Wind Energy Development Program. It also assesses potential impacts associated with two alternatives to the proposed action, which present different

management options for wind energy development on BLM-administered land. The alternatives are defined as follows:

- *Proposed action: implement a Wind Energy Development Program.* Under this alternative, the BLM proposes to implement a comprehensive program to address issues associated with wind energy development on BLM-administered lands under the MPDS. The proposed program would establish policies and BMPs to address the administration of wind energy development activities and identify minimum requirements for mitigation measures. These programmatic policies and BMPs would be applicable to all wind energy development projects on BLM-administered lands. Site-specific and species-specific concerns, and the development of additional mitigation measures, would be addressed in project-level reviews, including NEPA analyses, as required. To the extent appropriate, future project-specific analyses would tier off of the analyses conducted in this PEIS and the decisions in the resultant Record of Decision (ROD) to allow project-specific analyses to focus just on the critical, site-specific issues of concern. In addition, under this alternative, a number of BLM land use plans would be amended to address wind energy development, including adoption of the programmatic policies and BMPs and identification of exclusion areas. Upon final approval of the proposed Wind Energy Development Program, the Interim Wind Energy Policy (BLM 2002) will be replaced by a new policy that incorporates the programmatic policies and BMPs evaluated in this PEIS. Elements of the interim policy addressing applications, authorizations, competitive interests, and due diligence will not be changed by the proposed program requirements.

- *No action alternative*. Under this alternative, the BLM would continue administering wind energy development ROW authorizations in accordance with the terms and conditions of the Interim Wind Energy Development Policy (BLM 2002). Analysis and review of wind energy development, including NEPA analyses and development of required mitigation measures, would be conducted on a project-by-project basis. Individual land use plan amendments would occur on a plan-by-plan basis without the benefit of the overarching, comprehensive analysis provided by this PEIS.

- *Limited wind energy development alternative*. Under this alternative, additional wind energy development on BLM-administered land would occur only in areas where it currently exists, is under review, or has been approved for development at the time the ROD for this PEIS is published. For the purposes of establishing an upper bound on the potential impacts of this alternative, it was assumed that all proposed wind energy projects on BLM-administered land currently under review would be approved for development by the time the ROD is published (anticipated for July 2005). Future expansion of wind energy development would be allowed at existing project areas; however, no additional BLM-administered land would be made

programmatic policies and BMPs to be included in the proposed Wind Energy Development Program. The scope includes all BLM-administered lands in the western United States, excluding Alaska. They are located in 11 states: Arizona, California, Colorado, Idaho, Montana, Nevada, New Mexico, Oregon, Utah, Washington, and Wyoming. A maximum potential development scenario (MPDS) has been developed to help define the potential magnitude of future wind energy development activities on BLM-administered lands within these states (Section 2.2.1).

Also as stated in the NOI, potential land use plan amendments have been assessed (Section 2.2.4). The proposed amendments include (1) adoption of the proposed programmatic policies and BMPs and (2) identification of specific areas where wind energy development would not be allowed. None of the proposed amendments address designation of lands for competitive ROW bidding processes, although this was identified as a possibility in the NOI. Interest in competitive bidding processes currently is limited to two areas in California — the Palm Springs-South Coast Field Office and Ridgecrest Field Office — and will be addressed in local BLM land use planning efforts.

The analysis conducted in preparation of this PEIS was based on current, available, and credible scientific data. Programmatic policies and BMPs incorporated into the BLM's proposed Wind Energy Development Program are based on an interpretation of these scientific data and decisions on relevant mitigation requirements. Direct and indirect impacts of wind energy development on the environment, social systems, and the economy, as discussed at the programmatic level, have been evaluated. Cumulative impacts associated with the proposed action have also been evaluated.

As a programmatic evaluation, this PEIS does not evaluate site-specific issues associated with individual wind energy development projects. A variety of location-specific factors (e.g., soil type, watershed, habitat, vegetation, viewshed, public sentiment, the presence of threatened and endangered species, and the presence of cultural resources) will vary considerably from site to site, especially over an 11-state region. In addition, the variations in project size and design will greatly determine the magnitude of the impacts from given projects. The combined effects of these location-specific and project-specific factors cannot be fully anticipated or addressed in a programmatic analysis; such effects must be evaluated at the project level. Thus, this PEIS identifies the range of potential impacts and identifies relevant mitigation measures. The proposed program establishes policies and BMPs to mitigate impacts that will apply to all wind energy development projects on BLM-administered lands. These proposed policies and BMPs are general in nature and do not address site-specific and species-specific issues and concerns. Site-specific and species-specific issues will be addressed during individual project reviews. Individual project analyses, review, and approval may tier off of the PEIS but will not be supplanted by it.

- The BLM will consult with the State Historic Preservation Office (SHPO) as required by Section 106 of the National Historic Preservation Act of 1966 (NHPA). The specific consultation requirements will be determined on a project-by-project basis. If programmatic Section 106 consultations have been conducted and are adequate to cover a proposed project, additional consultation may not be needed.

- Existing land use plans will be amended, as appropriate, to (1) adopt provisions of the BLM's proposed Wind Energy Development Program, (2) identify land considered to be available for wind energy development, and (3) identify land that will not be available for wind energy development.

- The level of environmental analysis to be required under NEPA for individual wind power projects will be determined at the Field Office level. In certain instances, it may be determined that a tiered environmental assessment (EA) is appropriate in lieu of an EIS. To the extent that this PEIS addresses anticipated issues and concerns associated with an individual project, including potential cumulative impacts, the BLM will tier off of the decisions embedded in this PEIS and limit the scope of additional project-specific NEPA analyses. The site-specific NEPA analyses will include analyses of project site configuration and micrositing considerations, monitoring program requirements, and appropriate mitigation measures. In particular, the mitigation measures discussed in Chapter 5 may be consulted in determining site-specific requirements. Public involvement will be incorporated into all wind energy development projects to ensure that all concerns and issues are identified and adequately addressed. In general, the scope of the NEPA analyses will be limited to the proposed action on BLM-administered lands; however, if access to proposed development on adjacent non-BLM-administered lands is entirely dependent on obtaining ROW access across BLM-administered lands and there are no alternatives to that access, the NEPA analysis for the proposed ROW may need to assess the environmental effects from that proposed development. The BLM's analyses of ROW access projects may tier off of this PEIS to the extent that the proposed project falls within the scope of the PEIS analyses.

- Site-specific environmental analyses will tier from the PEIS and identify and assess any cumulative impacts that are beyond the scope of the cumulative impacts addressed in the PEIS.

- The existing Categorical Exclusion (CX) applicable to the issuance of short-term ROWs or land use authorizations may be applicable to some site monitoring and testing activities. The relevant CX, established for the BLM in the DOI Departmental Manual 516, Chapter 11, Sec. 11.5, E(19) (DOI 2004), encompasses "issuance of short-term (3 years or less) rights-of-way or land use authorizations for such uses as storage sites, apiary sites, and construction

BLM

June 2005

FES 05-11

# Final Programmatic Environmental Impact Statement on WIND ENERGY DEVELOPMENT on BLM-Administered Lands in the Western United States

*Volume 3: Comments and Responses (printed from CD)*

U.S. Department of the Interior
Bureau of Land Management

**COMMENTS AND RESPONSES**

**Responses for Document 00016**

**00016-001:** As required by the Wind Development Program proposed policies and BMPs, site-specific analyses will be conducted for any proposed project on BLM-administered lands. The scope and approach for site-specific analyses will be determined on a project-by-project basis in conjunction with input from other federal, state, and local agencies, and stakeholders. Management and development of mineral resources, including conflicts with the proposed wind development project, will be among the issues assessed at the project-specific level.

The 2nd bullet in Section 2.2.3.1, Proposed Policies, has been revised. The specification "fluid" minerals has been deleted so that all mineral extraction activities are included.

**00016-002:** As stated in Sections 1.2 and 2.2.4, none of the alternatives in the PEIS include amendment of land use plans to provide for competitive right-of-way bidding, in part because interest in this approach was limited to two areas in California (the Palm Spring-South Coast Field Office and the Ridgecrest Field Office). If competitive bidding is conducted, it will be addressed on a case-by-case basis in local BLM land use planning efforts. The ROW authorization for wind energy development on BLM-administered lands will require the payment of rent rather than royalties. However, the formula used to calculate minimum rent payments incorporates a 3% royalty as part of the calculation (see Appendix A, BLM's Interim Wind Energy Development Policy). We agree that the proposed Wind Energy Development Program may increase use of BLM-administered land for wind energy projects. The potential impacts associated with that increased use are the primary subject of the PEIS. The proposed program will establish mitigation requirements to ensure that potential adverse impacts are minimized to the greatest extent possible. Development on non-BLM-administered lands would potentially be subject to less federal environmental oversight.

Exhibit 4

Mem., Office of the Solicitor, June 7, 2002



ATTACHMENT

# United States Department of the Interior

OFFICE OF THE SOLICITOR
Washington, D.C. 20240

1849-1999

IN REPLY REFER TO:

JUN - 7 2002

Memorandum

To: Henri Bisson, Assistant Director, Renewable Resources and Planning, BLM
Pete Culp, Assistant Director, Minerals, Realty and Resource Protection, BLM

From: Robert D. Comer, Associate Solicitor, Division of Land and Water Resources
Fred E. Ferguson, Associate Solicitor, Division of Mineral Resources

Subject: Implementation Actions During Land Use Planning

**Issue**

You have asked if the National Environmental Policy Act (NEPA) regulations promulgated by the Council on Environmental Quality (CEQ )at 40 CFR §1506.1 require BLM to defer or deny a proposed action, which is not inconsistent with an existing land use plan, during a plan amendment or revision process when the action will not preserve all of the alternatives BLM is considering in the plan amendment and accompanying EIS. This question arises from the situation described in the Land Use Planning Handbook, BLM Handbook H-1601-1 (Nov. 22, 2000), paragraph VII. E. The relevant provision reads:

> E. Status of existing decisions during the amendment or revision process.
>
> * * *
>
> During the amendment or revision process, the BLM should review all proposed implementation actions [under the existing plan] through the NEPA process to determine whether approval... would harm resource values so as to limit the choice of reasonable alternative actions relative to the land use plan decisions being reexamined . . . . Subject to valid existing rights, proposed actions that cannot be modified to preserve opportunities for selection of any of the reasonable alternatives should be postponed or denied. (See 40 CFR 1506.1)

We conclude that, while postponement to preserve alternatives may be desirable in some cases, NEPA does not compel an agency to postpone taking implementation actions which are not inconsistent with the existing land use plan and supported by adequate NEPA documentation. We reach the same conclusion whether we analyze plan EISs as outside the scope of 40 CFR §1506.1(c), which is concerned only with actions during preparation of "program statements," or whether we rely on the exception in that regulation for "actions covered by an existing" EIS of such breadth. In fact, section 302(a) of the Federal Land Policy and Management Act (FLPMA), requires that BLM manage the public lands "in accordance with the land use plans developed by [it]." 43 U.S.C. 1732(a).

**Discussion**

The Land Use Planning Handbook, quoted above, refers to 40 CFR §1506.1 ("Limitations on actions during the NEPA process"). The only provisions of §1506.1 that could bear on this question are subsections (a) and (c).

Subsection (a) of 40 CFR §1506.1 addresses implementation of elements of an action under analysis in an EIS.[1] Subsection (a) prohibits an agency from taking any action that would adversely impact the environment before the NEPA analysis and record of decision covering the proposed action is final and formally adopted. We are examining a different question. It involves BLM's discretion to take an action that implements an existing land use plan (such as a resource management plan or "RMP") during the planning and NEPA processes that may amend or revise the existing land use plan based on the analysis in a new or supplemental plan EIS.

Subsection (c) of 40 CFR §1506.1 addresses an agency's ability to take actions when the agency is working on a "required program environmental impact statement." Subsection (c) provides:

> While work on a required program environmental impact statement is in progress and the action is not covered by an existing program statement, agencies shall not undertake in the interim any major Federal action covered by the program which may significantly affect the quality of the human environment unless such action:
>
> (1) Is justified independently of the program;
>
> (2) Is itself accompanied by an adequate environmental impact statement; and
>
> (3) Will not prejudice the ultimate decision on the program. Interim action prejudices the ultimate decision on the program when it tends to determine subsequent development or limit alternatives.

It is unclear whether an RMP/EIS is a program statement within the scope of this regulation. This prohibition only applies where a "program statement" is "required." Several provisions of the CEQ regulations indicate that program statements are but one of several types of environmental impact statements. In addition to project-specific actions, statements may be

---

[1] 40 CFR 1506.1(a) provides:

Until an agency issues a record of decision as provided in §1505.2 (except as provided in paragraph (c) of this section), no action concerning the proposal shall be taken which would

(1) Have an adverse environmental impact; or
(2) Limit the choice of reasonable alternatives. (emphasis added)

required for several types of broad proposals or actions: program, policy, and plan. See 40 CFR §1508.18(b). See also 40 CFR §§1500.4 and 1508.28. According to the regulations, a federal action will tend to fall into one of these categories. The regulations describe a program action as the "[a]doption of programs, such as a group of concerted actions to implement a specific policy or plan; systematic and connected agency decisions allocating agency resources to implement a specific statutory program or executive directive." 40 CFR §1508.18(b)(3). The Secretarial Decision for the federal coal program, pursuant to the Federal Coal Leasing Amendments Act and the Surface Mining Coal Reclamation Act, was a program action. In contrast to a program action, a planning action involves "[a]doption of formal plans, such as official documents prepared or approved by federal agencies which guide or prescribe alternative uses of federal resources, upon which future agency actions will be based." 40 CFR §1508.18(b)(2). A program statement thus would be one addressing the implementation of a specific plan or policy, such as a statute or executive directive, while plans provide for the coordination of many resource use programs within a specific agency or (in the case of land use plans) geographic areas. Since subsection (c) only applies to "program statements," one could argue that it does not apply to an RMP/EIS, if an RMP action is seen as a planning action rather than the implementation of a program.

However, one reaches the same conclusion if one treats §1506.1 as applicable to a plan EIS, blurring any distinction between "program statements" and environmental impact statements for formal plans (such as land use plans) or agency policies (such as regulations). By its own terms, subsection (c) does not limit agency decisionmaking with respect to actions "covered by an existing program statement." Subsection (c) permits an agency to take implementation actions covered by an existing programmatic EIS during work on a new programmatic EIS, even if the action would limit the range of alternatives in the new "program statement."

In ONRC Action v. Bureau of Land Management, 150 F.3d 1132 (9th Cir. 1998), plaintiffs requested that BLM impose a moratorium on certain actions during preparation of the "Eastside Management Plan," which would result in the revision of three existing RMPs. BLM responded that it would continue to take actions under existing program statements in reliance on the exception in 40 CFR §1506.1(c) for "existing program statements." The United States Court of Appeals for the Ninth Circuit upheld the BLM position, stating that plaintiffs failed to show any clear duty under NEPA or FLPMA with which BLM must comply. The court dismissed as unfounded the argument that an outdated RMP/EIS cannot serve as the "existing program statement" referenced in §1506.1(c), stating that "it is reasonable to conclude that the RMPs are existing program statements for purposes of NEPA. The fact that revisions of the RMPs are not necessarily current does not change this result." 50 F.3d at 1140. The court also concluded there was no provision in FLPMA or its regulations "that would require BLM to cease actions during the revision process." Id.

In Western Land Exchange Project v. Dombeck, 47 F. Supp.2d 1196 (D. Ore. 1999), plaintiffs contended the CEQ regulations prohibited the Forest Service from proceeding with a land exchange pending completion of the Eastside and Upper Columbia River Basin EIS. Relying on the analysis in ONRC Action, the court upheld the land exchange, reasoning that: "[T]he land

exchange in the case before us is being conducted pursuant to the Forest Plans of the three National Forests involved in the proposed exchange. Each of these three National Forests has its 'existing program statement'. . . . The exception in 40 CFR 1506.1(c) applies to the facts in this case." 47 F. Supp.2d at 1213. In addition, the court noted the land exchange itself was accompanied by an adequate EIS. See also In re Bryant Eagle Timber Sale, 133 IBLA 25 (1995) (denied claim that BLM violated 40 CFR §1506.1(a) and (c)). Thus, even if a plan EIS is treated as if it were a "program statement" covered by §1506.1(c), implementation actions under existing plans would not be limited by that regulation because of the exception for actions "covered by an existing program statement," inasmuch as all actions authorized by such plans have been covered by previous programmatic EISs.

It is important to recognize that the limited applicability of section 1506.1 does not relieve BLM from the need to evaluate and document plan conformity and the adequacy of NEPA analysis in support of the proposed action. For example, in Upper Floras Timber Sale, the decision to approve a timber sale was vacated pending the preparation of a supplemental EIS and plan amendment, where the "plan being implemented can no longer be fairly said to encompass the same plan described in the EIS," and "the increase in the acreage designated for clearcutting" goes beyond what might be treated as "merely a fine-tuning adjustment" to the program envisaged by the original EIS. 86 IBLA 296 (1985). See 40 CFR §1502.9 concerning the circumstances in which additional NEPA work may be required. Provided that the action conforms to the RMP, BLM may choose to carry out any necessary NEPA supplementation of the existing plan EIS as BLM performs NEPA analysis of the site-specific proposal.

**Conclusion**

Nothing in the CEQ NEPA regulations require postponing or denying a proposed action covered by the EIS for the existing land use plan to preserve alternatives during the course of preparing a new land use plan and EIS. Of course, BLM must undertake appropriate NEPA analysis of the site specific action being proposed under the existing land use plan.

**DOCKETED CASES**

1. *Northern Plains Resource Council v. BLM*, Nos. 03-69 & 03-78, 2005 U.S. Dist. LEXIS 4678 (D. Mont. Feb. 25, 2005)

2. *Western Watersheds Project v. U.S. Forest Service*, No. 05 189, 2006 WL 292010 (D. Idaho Feb. 7, 2006)

**ADMINISTRATIVE DECISIONS**

3. *Biodiversity Conservation Alliance*, 174 IBLA 1 (2008)

4. *Biodiversity Conservation Alliance*, No. IBLA 2004-316 (Oct. 26, 2004)

5. *Nat'l Wildlife Fed'n*, 150 IBLA 385 (1999)

6. *Nat'l Wildlife Fed'n*, 170 IBLA 240 (2006)

7. *Reichman*, 173 IBLA 149 (2007)

8. *S. Utah Wilderness Alliance*, 159 IBLA 220 (2003)

9. *Wyoming Audubon*, 151 IBLA 42 (1999)

10. *Wyoming Outdoor Council*, 164 IBLA 84 (2004)

11. *Wyoming Outdoor Council, et al.*, No. IBLA 2006-155 (June 28, 2006)

LEXSEE 2005 U.S. DIST. LEXIS 4678

Cited
As of: Jun 12, 2008

**NORTHERN PLAINS RESOURCE COUNCIL, Plaintiff v. UNITED STATES BUREAU OF LAND MANAGEMENT; et al., Defendants, and MARATHON OIL COMPANY; et al., Intervenor Defendants; NORTHERN CHEYENNE TRIBE, a federally recognized Indian tribe, and NATIVE ACTION, a Montana non-profit corporation, Plaintiffs v. GALE NORTON, et al., Defendants and FIDELITY EXPLORATION & PRODUCTION COMPANY, et al., Intervenor defendants**

**Cause No. CV 03-69-BLG-RWA, Cause No. CV 03-78-BLG-RWA**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MONTANA, BILLINGS DIVISION**

***2005 U.S. Dist. LEXIS 4678***

**February 25, 2005, Decided**
**February 25, 2005, Filed**

**DISPOSITION:** Motions ruled upon.

**COUNSEL:** [*1] For NORTHERN PLAINS RESOURCE COUNCIL, Plaintiff: Jack R. Tuholske, TUHOLSKE LAW OFFICE, Missoula, MT; Michael Reisner, NORTHERN PLAINS RESOURCE COUNCIL, Billings, MT

For BUREAU OF LAND MANAGEMENT, Defendant: William W. Mercer, OFFICE OF THE U.S. ATTORNEY, Billings, MT; Lori Caramanian, U.S. DEPARTMENT OF JUSTICE, Denver, CO

For GALE NORTON, in her official capacity as the United States Secretary of Interior, Defendant: Lorraine D. Gallinger, William W. Mercer, OFFICE OF THE U.S. ATTORNEY, Billings, MT; Lori Caramanian, U.S. DEPARTMENT OF JUSTICE, Denver, CO; Thomas L. Sansonetti, U.S. DEPARTMENT OF JUSTICE - E.N.R.D. GENERAL LITIGATION, Washington, DC

For KATHLEEN CLARKE, in her official capacity as the Director of the Bureau of Land Management, Defendant: Lorraine D. Gallinger, William W. Mercer, OFFICE OF THE U.S. ATTORNEY, Billings, MT; Lori Caramanian, U.S. DEPARTMENT OF JUSTICE, Denver, CO; Thomas L. Sansonetti, U.S. DEPARTMENT OF JUSTICE - E.N.R.D. GENERAL LITIGATION, Washington, DC

For MARTIN OTT, in his official capacity as the Montana Director of the Bureau of Land Management, Defendant: Lorraine D. Gallinger, William W. Mercer, OFFICE OF THE U.S. ATTORNEY, [*2] Billings, MT; Lori Caramanian, U.S. DEPARTMENT OF JUSTICE, Denver, CO; Thomas L. Sansonetti, U.S. DEPARTMENT OF JUSTICE - E.N.R.D. GENERAL LITIGATION, Washington, DC

For MARATHON OIL COMPANY, intervenor defendant: Lawrence B. Cozzens, COZZENS HARMAN WARREN HARRIS & ODEGARRD, Billings, MT; John C. Martin, Mary Beth Bosco, PATTON BOGGS, Washington, DC

For PENNACO ENERGY, INC., intervenor defendant: Lawrence B. Cozzens, COZZENS HARMAN WARREN

HARRIS & ODEGARRD, Billings, MT; John C. Martin, Mary Beth Bosco, PATTON BOGGS, Washington, DC

For FIDELITY EXPLORATION AND PRODUCTION COMPANY, intervenor defendant: Jon Metropoulos, Dana L. Hupp, GOUGH SHANAHAN JOHNSON & WATERMAN, Helena, MT

For ANADARKO PETROLEUM, intervenor defendant: David J. Owens, Tearle W.T. Harlan, Glen C. Maynard, Lawrence B. Cozzens, COZZENS HARMAN WARREN HARRIS & ODEGARRD, Transwestern Plaza III Suite, Billings, MT; John C. Martin, Mary Beth Bosco, Amy B. Chasanov, PATTON BOGGS, Washington, DC

For DEVON ENERGY, intervenor defendant: David J. Owens, Tearle W.T. Harlan, Glen C. Maynard, Lawrence B. Cozzens, COZZENS HARMAN WARREN HARRIS & ODEGARRD, Transwestern Plaza III Suite, Billings, MT; John C. [*3] Martin, Mary Beth Bosco, Amy B. Chasanov, PATTON BOGGS, Washington, DC

For NORTHERN CHEYENNE TRIBE, THE, a federally recognized Indian tribe, Plaintiff: Steven H. Chestnut, John B. Arum, Brian C. Gruber, ZIONTZ CHESTNUT VARNELL BERLEY & SLONIM, Seattle, WA; Joe A. Rodriguez, RODRIGUEZ LAW OFFICE, Lame Deer, MT

For NATIVE ACTION, a Montana non-profit corporation, Plaintiff: Steven H. Chestnut, John B. Arum, Brian C. Gruber, ZIONTZ CHESTNUT VARNELL BERLEY & SLONIM, Seattle, WA; Joe A. Rodriguez, RODRIGUEZ LAW OFFICE, Lame Deer, MT

For GALE NORTON, Secretary of the Interior, Defendant: Lorraine D. Gallinger, William W. Mercer, OFFICE OF THE U.S. ATTORNEY, Billings, MT; Lori Caramanian, U.S. DEPARTMENT OF JUSTICE, Denver, CO; Thomas L. Sansonetti, U.S. DEPARTMENT OF JUSTICE - E.N.R.D. GENERAL LITIGATION, Washington, DC; Alan D. Greenberg, U S DEPARTMENT OF JUSTICE ENVIRONMENTAL DEFENSE SECTION, Denver, CO

For KATHLEEN CLARKE, Director, Bureau of Land Management, Defendant: Lorraine D. Gallinger, William W. Mercer, OFFICE OF THE U.S. ATTORNEY, Billings, MT; Lori Caramanian, U.S. DEPARTMENT OF JUSTICE, Denver, CO; Thomas L. Sansonetti, U.S. DEPARTMENT OF JUSTICE - E. [*4] N.R.D.

GENERAL LITIGATION, Washington, DC; Alan D. Greenberg, U S DEPARTMENT OF JUSTICE ENVIRONMENTAL DEFENSE SECTION, Denver, CO

For MARTIN OTT, Montana State Director, Bureau of Land Management, Defendant: Lorraine D. Gallinger, William W. Mercer, OFFICE OF THE U.S. ATTORNEY, Billings, MT; Lori Caramanian, U.S. DEPARTMENT OF JUSTICE, Denver, CO; Thomas L. Sansonetti, U.S. DEPARTMENT OF JUSTICE - E.N.R.D. GENERAL LITIGATION, Washington, DC; Alan D. Greenberg, U S DEPARTMENT OF JUSTICE ENVIRONMENTAL DEFENSE SECTION, Denver, CO

For FIDELITY EXPLORATION AND PRODUCTION COMPANY, intervenor defendant: Jon Metropoulos, Dana L. Hupp, GOUGH SHANAHAN JOHNSON & WATERMAN, Helena, MT

For MARATHON OIL COMPANY, intervenor defendant: Lawrence B. Cozzens, COZZENS HARMAN WARREN HARRIS & ODEGARRD, Billings, MT; Susan Brownlee Miller, MARATHON OIL COMPANY, Houston, TX; John C. Martin, Mary Beth Bosco, Amy B. Chasanov, PATTON BOGGS, Washington, DC; Edward A. Strenkowski, MARATHON OIL COMPANY, Houston, TX

For PENNACO ENERGY, INC., intervenor defendant: Lawrence B. Cozzens, COZZENS HARMAN WARREN HARRIS & ODEGARRD, Billings, MT; Susan Brownlee Miller, MARATHON OIL COMPANY, Houston, TX; [*5] John C. Martin, Mary Beth Bosco, Amy B. Chasanov, PATTON BOGGS, Washington, DC; Edward A. Strenkowski, MARATHON OIL COMPANY, Houston, TX

For ANADARKO PETROLEUM, Corporation, intervenor defendant: Lawrence B. Cozzens, COZZENS HARMAN WARREN HARRIS & ODEGARRD, Billings, MT

For DEVON ENERGY, Corporation, intervenor defendant: Lawrence B. Cozzens, COZZENS HARMAN WARREN HARRIS & ODEGARRD, Billings, MT

**JUDGES:** RICHARD W. ANDERSON, UNITED STATES MAGISTRATE JUDGE

**OPINION BY:** RICHARD W. ANDERSON

**OPINION**

**ORDER**

**ORDER**

Pending before the Court are the parties' cross-motions for summary judgment in this action for judicial review of agency action. Having considered the briefs of the parties, the administrative record, and the arguments advanced in open court on September 9, 2004, the Court is prepared to rule. [1]

1 Pursuant to *28 U.S.C. § 636(c)* and the written consent of the parties, these cases were assigned to the undersigned United States Magistrate Judge for all proceedings, including trial and entry of judgment, by District Judge Richard F. Cebull in orders dated August 15, 2003, in Cause No. CV 03-69-BLG-RWA, and August 22, 2003, in Cause No. CV 03-78-BLG-RWA.

[*6] **BACKGROUND**

In these consolidated cases, plaintiff in Cause No. CV 03-69-BLG-RWA, Northern Plains Resource Council (NPRC), and plaintiffs in Cause No. CV 03-78-BLG-RWA, Northern Cheyenne Tribe and Native Action (collectively referred to as the Tribe), challenge the April 2003 decision by the Bureau of Land Management (BLM) to approve the Final Statewide Oil and Gas Environmental Impact Statement (FEIS) and proposed amendments to the Resource Management Plans (RMPs) authorizing full-field coal bed methane (CBM) development in the Powder River and Billings Resource Areas of Montana. Plaintiffs in both cases contend that BLM's decision violates the National Environmental Policy Act (NEPA) , *42 U.S.C. § 4321 et seq.* In addition, the Tribe alleges that the decision violated the Federal Land Policy and Management Act (FLPMA), *43 U.S.C. § 1701 et seq.*, the National Historic Preservation Act (NHPA), *16 U.S.C. § 470 et seq.*, and constitutes a breach of the government's fiduciary duty to protect Tribal interests and resources.

The Powder River Basin of southeastern Montana and north central Wyoming is a sparsely populated, semi-arid [*7] grassland. Most of the land is used for cattle ranching, fanning, and coal mining.

Domestic and livestock water supplies in the area are dependent upon groundwater, which provides "almost 100% of the domestic water for farmsteads" and "the largest percentage of dependable stock water." FEIS at 3-32. Both ground and surface waters provide irrigation for crops. In addition, the surface waters and the riparian habitat they support provide critical habitat for native fish and wildlife populations.

Vast quantities of CBM are generated by coal deposits underlying the Powder River Basin. The methane is trapped in the coal seams by the pressure of groundwater. Releasing the pressure of groundwater from the coal aquifers liberates the methane, allowing it to be produced and sold.

In the early 1990s, BLM analyzed conventional oil and gas development in the Billings and Powder River Resource Areas. In 1994, BLM adopted the analysis and amended the existing RMP. [2]

2 This previous RMP amendment will hereinafter be referred to as the 1994 Amendment.

[*8] Although CBM is considered to be part of the oil and gas estate, the 1994 Amendment only briefly addressed the environmental impacts of CBM development because, at that time, only low levels of CBM production were anticipated. After analyzing the impacts of limited production, BLM determined that small-scale development and exploratory drilling would not cause significant environmental impacts. BLM recognized, however, that further environmental analysis would be needed before commercial production would be allowed.

> The Reasonably Foreseeable Development projections can accommodate the drilling of test wells and initial small-scale development of coal bed methane . . . . This amendment does not contain either a hydrologic analysis of the RFD area or an environmental study of the impacts of building major pipeline systems. In order for full-field development to occur on Federal oil and gas lands, an additional environmental document tied to this amendment would be required.

A.R. § VI.D.45 at 18.

Between 1997 and 2001, BLM held 23 competitive oil and gas lease sales. By 2001, approximately 867,000 acres within six counties in the Billings and Powder River Resource [*9] Management Areas, including 46% of the federal minerals in the Powder River Basin, had been leased. [3] None of the leases contained stipulations prohibiting CBM production.

3 Much of the federal minerals underlie lands owned by private parties. Under this "split estate" scheme of ownership, the rights of the mineral owners predominate over those of the surface owners.

In 2000, BLM decided that the time had come to further analyze the impacts of CBM development. In July of that year,. BLM determined that Fidelity Exploration & Production Company's proposal to develop its Tongue River CBM Project would result in significant environmental impacts, requiring the preparation of an EIS. Shortly thereafter, in October 2000, at a meeting of the Coal Bed Methane Coordination Group, industry predicted that it would drill approximately 10,000 CBM wells in the Montana portion of the Powder River Basin over the next 10 years. Two months later, in December 2000, BLM published in the Federal Register a notice of intent to [*10] prepare a programmatic EIS to consider amendments to the 1994 Amendment.

The Montana BLM's decision to prepare an EIS came some six months after a similar decision by the Wyoming BLM. In June 2000, the Wyoming BLM had begun an EIS on the effects of CBM production on the Wyoming portion of the Powder River Basin.

The State of Montana acted as a co-lead agency in the development of Montana's 2003 FEIS. The Environmental Protection Agency (EPA), the Bureau of Indian Affairs (BIA), the Department of Energy (DOE), and the Crow Tribe of Indians all participated as cooperating agencies. Although it chose not to become a cooperating party, the Northern Cheyenne Tribe actively participated in the process and undertook two studies funded by BLM concerning several issues relevant to Tribal interests.

In preparing the draft EIS (DEIS), BLM held five public scoping meetings and six public hearings. It published the DEIS in the Federal Register on February 15, 2002. During the following 60-day public comment period, BLM held six public hearings throughout Montana and received more than 25,000 comments, both oral and written.

Some of the comments, including those of the EPA and the Fish and Wildlife [*11] Service, criticized BLM for failing to assess the cumulative environmental impacts of CBM production in the Montana and Wyoming portions of the Powder River Basin in a single EIS. In response, the Montana and Wyoming agencies worked together to prepare joint cumulative impact statements for air and surface water. These new analyses were included in the Montana FEIS.

The FEIS was published in the Federal Register on January 17, 2003. Pursuant to *43 C.F.R. § 1610.5-2(a)*, members of the public who participated in the planning process had an additional 30-day opportunity to review the FEIS and to protest BLM's proposed decision. None of the protests resulted in changes to the proposed FEIS, and in April 2003, BLM issued its Record of Decision approving the FEIS and RMP amendments.

These suits were filed immediately thereafter. In its complaint, NPRC alleges that BLM violated NEPA by failing to combine the Montana and Wyoming studies in a single EIS. NPRC also alleges that BLM violated NEPA's comment and participation requirements by failing to prepare a supplement to the DEIS.

Both NPRC and the Tribe contend that the FEIS is inadequate because it fails to consider any alternatives [*12] to full-field development. They also contend that BLM failed to take a hard look at the impacts of CBM development on groundwater, surface water, air quality, wildlife, aquatic life, noise, and traffic. The Tribe additionally argues that BLM failed to take a hard look at the socioeconomic and cultural effects of CBM development on the Northern Cheyenne Tribe.

Finally, the Tribe claims that BLM failed to engage in formal consultation with the Tribe over the effects of these federal undertakings on the Tribe's cultural and historical resources.

All parties [4] have filed cross motions for summary judgment on these issues. The federal defendants and the intervenors have also moved to strike extra judicial material filed by plaintiffs in support of their summary judgment motions. These motions are the subject of the following discussion.

4 Marathon Oil Company, Pennaco Energy, Inc., Anadarko Petroleum Corporation, Devon Energy Corporation, and Fidelity Exploration & Production Company have been allowed to intervene as defendants in both actions. Intervenors have filed a motion for summary judgment in each of the consolidated cases.

[*13] **DISCUSSION**

**A. Statutory Framework**

**1. The *Administrative Procedure Act***

Judicial review of agency action is governed by the Administrative Procedure Act (APA), *5 U.S.C. § 701 et seq.* Review is narrow. *Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416, 28 L. Ed. 2d 136, 91 S. Ct. 814 (1971)*. An agency's actions, findings, and conclusions will be set aside only if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" *5 U.S.C. § 706(2)(A)*.

In determining whether a decision is arbitrary and capricious, the Court "'must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" *Hells Canyon Alliance v. United States Forest Service, 227 F.3d 1170, 1177 (9th Cir. 2000)*. (quoting *Morongo Band of Mission Indians v. Federal Aviation Admin., 161 F.3d 569, 573 (9th Cir. 1998))*. The Court must not substitute its judgment for that of the agency. *Id.* Instead, in environmental actions, the Court "must simply ensure that the agency has adequately considered [*14] and disclosed the environmental impact of its actions[.]" *Id.*

**2. The National Environmental Policy Act**

NEPA "is our basic national charter for protection of the environment." *Klamath-Siskiyou Wildlands Ctr. v. BLM, 387 F.3d 989, 993 (9th Cir. 2004)* (quoting *40 C.F.R. § 1500.1(a)*). A procedural statute, NEPA mandates the preparation of an EIS before an agency takes "major Federal actions significantly affecting the quality of the human environment[.]" *42 U.S.C. § 4332(2)(C)*. An EIS must address both the cumulative impacts of a proposed action and reasonable alternatives thereto. *Muckleshoot Indian Tribe v. United States Forest Service, 177 F.3d 800, 809 (9th Cir. 1999)*.

NEPA has "'twin aims. First, it places upon [a federal] agency the obligation to consider every significant aspect of the environmental impact of a proposed action. Second, it ensures that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process.'" *Kern v. United States BLM, 284 F.3d 1062, 1066 (9th Cir. 2002)* (quoting *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc., 462 U.S. 87, 97, 76 L. Ed. 2d 437, 103 S. Ct. 2246 (1983))*. [*15] "NEPA does not contain substantive environmental standards." *Id.* Rather, it "exists to ensure a process, not particular substantive results[.]" *Hells Canyon Alliance, 227 F.3d at 1177*. It "'establishes 'action-forcing' procedures that require agencies to take a 'hard look' at environmental consequences.'" *Kern, 284 F.3d at 1066* (quoting *Metcalf v. Daley, 214 F.3d 1135, 1141 (9th Cir. 2000))*.

In evaluating the adequacy of an EIS, the Ninth Circuit employs a "rule of reason to determine whether the EIS contains a 'reasonably thorough discussion of the significant aspects of probable environmental consequences.'" *Id. at 1071* (quoting *Neighbors of Cuddy Mountain v. United States Forest Service, 137 F.3d 1372, 1376 (9th Cir. 1998))*. This "rule of reason" analysis is essentially the same as an abuse of discretion standard. *Id. at 1072*. The Court reviews an EIS to ensure that its "'form, content and preparation foster[ed] both informed decision-making and informed public participation.'" *Friends of Southeast's Future v. Morrison, 153 F.3d 1059, 1062-63 (9th Cir. 1998)* (quoting *Idaho Conservation League v. Mumma, 956 F.2d 1508, 1519 (9th Cir. 1992))*. [*16] However, the Court need not flyspeck the document. *Id. at 1063*. If the Court is satisfied that the agency took a "hard look" at a proposed action's environmental consequences, judicial review is at an end. *Id.*

In construing NEPA, the Court gives substantial deference to implementing regulations issued by the Council on Environmental Quality (CEQ) found at 40 C.F.R. §§ 1500-1508. *Center for Biological Diversity v. United States Forest Serv., 349 F.3d 1157, 1166 (9th Cir. 2003)*. The procedures prescribed both in NEPA and the CEQ regulations "are to be strictly interpreted 'to the fullest extent possible' with the policies embodied the Act." *Id.* (quoting *42 U.S.C. § 4332(1)*).

**3. Reasonable Range of Alternatives**

Under NEPA, an EIS must include a detailed

statement of alternatives to the proposed action. *42 U.S.C. § 4332(2)(C)(iii)*. The alternatives analysis, which is the "heart" of an EIS, requires an agency to rigorously explore and objectively evaluate all reasonable alternatives, and to briefly discuss the reasons for eliminating other alternatives from detailed study. *40 C.F.R. § 1502.14(a)*.

The [*17] purpose and need statement of an EIS, which briefly specifies "the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action[,]" *40 C.F.R. §. 1502.13*, defines the range of alternatives to be considered by the agency. *City of Carmel-by-the-Sea v. United States Dept. of Transp., 123 F.3d 1142, 1155 (9th Cir. 1997)*. "The agency must look at every reasonable alternative within the range dictated by the nature and scope of the proposal. The existence of reasonable but unexamined alternatives renders an EIS inadequate." *Friends of Southeast's Future, 153 F.3d at 1065* (internal quotation omitted).

An EIS need not, however, "consider an infinite range of alternatives, only reasonable or feasible ones." *City of Carmel, 123 F.3d at 1155*. Thus, an agency need consider only those alternatives that achieve its stated purpose and goal. *The Island Range Chapter of the Montana Wilderness Ass'n v. United States Forest Serv., 45 F.Supp 2d 1006, 1009 (D. Mont. 1996), aff'd 117 F.3d 1425 (9th Cir. 1997)*. Alternatives that are remote, speculative, ineffective, [*18] or inconsistent with basic policy objectives need not be considered. *Headwaters, Inc. v. BLM, Medford Dist., 914 F.2d 1174, 1180 (9th Cir. 1990)*. "When the purpose is to accomplish one thing, it makes no sense to consider the alternative ways by which another thing might be achieved." *City of Angoon v. Hodel, 803 F.2d 1016, 1021 (9th Cir. 1986)*.

**A. Phased Development**

Turning to the present case, NPRC and the Tribe both argue that the EIS was inadequate because it failed to consider any lesser degree of development than full-field development. NPRC and the Tribe contend that BLM should have examined phased development as an alternative to full-field planning so that the environmental effects of CBM production could have been more accurately measured.

BLM examined five alternatives: Alternative A, the no-action alternative required by *40 C.F.R. 1502.14(d)*,

which provided a basis for comparison with the proposed action; Alternative B. which emphasized environmental protection; Alternative C, which emphasized CBM development with minimal restrictions; Alternative D, which encouraged CBM development while maintaining existing land uses; and Alternative [*19] E, the preferred, and ultimately adopted alternative, which provided "management options to facilitate CBM exploration and development, while sustaining resource and social values, and existing land uses." FEIS at 2-13. BLM admits that all four of its action-based alternatives considered full-field development of CBM. It argues, however, that any lesser degree of development would not have achieved the objectives of the EIS.

To determine whether BLM's contention is correct, the Court looks to the Purpose and Need Statement, which provides in pertinent part:

> The purpose of the EIS is to analyze impacts from oil and gas activity, particularly from CBM exploration, production, development, and reclamation in the Billings and Powder River Resource RMP areas. This EIS is being used to analyze options for BLM to change its planning decisions by considering oil and gas management options including mitigating measures that will help minimize the environmental and social impacts related to CBM activities. The alternatives presented provide a range of management options for amending the RMPs . . . . The EIS will focus the analysis on the oil and gas development issues not covered in [*20] the current RMPs, such as water management from CBM production.

FEIS at 1-2.

The Purpose and Need Statement requires BLM to analyze options for managing the environmental effects of CBM "exploration, production, development, and reclamation . . . ." *Id.* Nothing in the Statement restricts those options to full-field development. Rather, the goal of the EIS is to determine what options, including mitigating measures, "will help minimize the environmental and societal impacts related to CBM activities." *Id.* Phased development, such as controlling

the number of rigs operating in an area or developing one geographic area at a time, as suggested by plaintiffs, the EPA [5] and the Montana Department of Fish Wildlife and Parks (FWP), [6] would not hinder this goal. To the contrary, a phased development alternative would serve the stated purpose and need of the EIS by providing additional options for minimizing impacts related to CBM exploration, production, and development.

5 In its scoping comments, the EPA wrote:

> There may be significant impacts related to constructing oil and gas infrastructure due to the "boom and bust" nature of the coal-bed methane development. Therefore, we suggest that the range of alternatives include a phased development alternative. Just as determining where oil and gas development is appropriate, determining when development is appropriate is also a consideration of the RMP. An alternative that incorporates a phased development of coal-bed methane could help reduce the significance of impacts by spreading them out over a period of time. Preparing infrastructure for peak production during a boom results in environmental impacts that could have been minimized through a planned or phased approach to development. For example, a phased approach would reduce impacts from larger volumes of surface water discharges that would be encountered if drilling and production are allowed to proceed without timing restrictions.

AR § III, File A, Doc. 2 at 8.

[*21]

6 FWP commented on the DEIS as follows:

> FWP believes that an action alternative capable of reducing or minimizing negative impacts to fish and wildlife resources must rely on phased development over time. A phased approach would allow the responsible agencies to evaluate the effects of development on existing land uses and natural and cultural resources and through a deliberative, adaptive management process, devise strategies to prevent or reduce the detrimental effects of future development found to be irreparable or unmitigatable.
>
> As such, FWP recommends that a phased development approach be added to the conditions of Alternative B. Timing and spacing of the phased approach needs to be determined, but it is suggested that a starting point would be to lease and permit 20-35% of the potential lands (depending on geology), with clustered development.

AR, § 4, File E, Doc. 2 at 2.

The comments go on to describe the benefits of this approach and to further suggest that phased development be incorporated into the Preferred Alternative.

A phased development alternative [*22] was within the range of reasonable alternatives set forth in the Purpose and Need Statement. A phased development alternative should therefore have been given detailed consideration, unless, as BLM argues, such a planning tool would not have been feasible under the circumstances.

In the FEIS, BLM acknowledged that it had been presented with several different ideas for phased development:

> Staged or phased development was presented to BLM during scoping in several ways. First, the number of rigs operating in the emphasis area could be controlled and leases could be developed in stages. Second, companies would be

allowed to develop production in one geographic area at a time and when complete, move to another. Lastly, corridors could be left undeveloped to allow for wildlife movement.

FIES 2-4. [7]

7 Considering this section of the EIS, the Court finds it somewhat disingenuous for BLM to now argue that it was not presented with any specific proposals for phased development.

The FEIS then stated [*23] the following reasons for rejecting these proposals:

BLM has a legal obligation to ensure that leased federal minerals are reasonably developed and that federal minerals are not drained by production that occurs on non-federal leases. The State of Montana and private parties own much of the minerals and surface in the emphasis area, resulting in a checkerboard pattern that could compromise the BLM's legal obligation to protect federal minerals.

This alternative is not reasonable in the case of oil and gas leases because each lessee has an investment-backed expectation that its applications for permits to drill will be considered in a timely manner and approved absent unacceptable site-specific impacts. See the Supreme Court decision in *Mobil Oil Exploration and Producing Southeast, Inc. v. United States, 530 U.S. 604, 620, 147 L. Ed. 2d 528, 120 S. Ct. 2423 (2000)*, which found a breach of contract when the Minerals Management Service, pursuant to a later adopted statute, would not review and make a timely decision on development plans per the regulations. In addition the *Mineral Leasing Act* and 43 CFR 3100 require maximum ultimate recovery of oil and gas from leased lands. In light of the [*24] broad geographic distribution of leases in the Powder River Basin, phased development in any fashion would not allow compliance with the above requirements.

Although, BLM must balance these mandates with its responsibility to use multiple use principles to prevent unnecessary or undue degradation in managing the public lands pursuant to FLPMA. [8] This document does not support a finding that these competing responsibilities would be in conflict.

8 This sentence is correctly quoted from the FEIS. Even so, the Court has struggled to make sense of it.

*Id.*

According to this explanation, BLM's decision not to undertake a detailed study of a phased development alternative rested on two premises: its duty to prevent drainage of leased federal minerals and its concern that phased development would interfere with the rights of leaseholders. Both premises rest on the erroneous assumption that, having leased the mineral rights, BLM could not control the pace of production.

First, it may be true that [*25] BLM is legally required to maximize federal oil and gas resources and prevent drainage of federal minerals. Nevertheless, these duties do not obviate the need for NEPA analysis. While depletion of CBM may be a valid concern, that concern must be balanced against the environmental and societal impacts resulting from CBM production. It does not justify BLM's failure to consider a phased development alternative in detail, especially where, as here, the minerals were leased before the environmental impacts of CBM development had been analyzed and where a phased development alternative fell within the scope of alternatives established by the agency's stated purpose and need.

Second, the "investment-backed rights" of holders of oil and gas leases are not absolute. They are limited by previously established RMPs, in this case, the 1994 Amendment, which gave federal leaseholders of oil and gas interests in the Powder River Basin "only the right to undertake exploratory drilling and small-scale development of CBM resources." *N. Plains Res. Council v. United States BLM, 298 F.Supp.2d 1017, 1024*

*(D.Mont. 2003), aff'd on other grounds, 107 Fed.Appx. 166 (9th Cir. 2004).*

Unlike [*26] the case cited in the FEIS, *Mobil Oil Exploration and Producing SouthEast, Inc. v. United States, 530 U.S. 604, 147 L. Ed. 2d 528, 120 S. Ct. 2423 (2000)*, where the United States sought to restrict the rights of the leaseholders, the purpose of the EIS in this case is to expand the rights of the lessees to allow them to develop CBM resources on a larger scale than permitted under the 1994 Amendment. *See* FEIS at 2-2 ("The purpose of this document, is to analyze levels of conventional oil and gas and CBM development that are greater than those analyzed in the [1994 Amendment.]") A management plan that permits development in stages, rather than all at once, is not inconsistent with this goal. Phased planning would allow development to proceed, *albeit* at a more controlled pace than the full-scale development alternatives studied in the FEIS. Phased development would not incorrectly restrict the rights of leaseholders whose only investment-backed expectations at the time they purchased their leases were that they would be allowed to conduct exploratory drilling and small-scale development of CBM. [9]

9 To find that the lessees obtained rights greater than this would mean that, when it issued the leases, BLM violated NEPA by making an irreverible and irretrievable commitment of CBM resources prior to undertaking the requisite environmental analysis. *Metcalf v. Daley, 214 F.3d 1135, 1143 (9th Cir. 2000)*; *Conner v. Burford, 848 F.2d 1441, 1446 (9th Cir. 1988)*. BLM's discretion to impose restrictions on CBM development could not lawfully have been limited by leasing decisions made under the 1994 Amendment because that document expressly declined to analyze the impacts of full-field CBM development. Because no analysis of full-scale CBM development preceded the issuance of leases under the 1994 Amendment, the leases created no legally enforceable leasehold rights or investment-backed expectations in full-field CBM development.

[*27] Nor is phased development the functional equivalent of a no-action alternative, as BLM argues. Pursuant to regulation. *40 C.F.R. § 1502.14(d)*, and in order to establish a baseline for comparison with the proposed project, the EIS included a no-action alternative (Alternative A). This alternative would have continued existing management, limiting CBM activity to exploration and limited development. Such an alternative clearly would not have promoted the purposes of the EIS, which was to change planning decisions to allow for increased CBM production. Phased development, *i.e.*, developing leases in stages or allowing production in one geographic area at a time allows for the production of CBM resources. It is not the functional equivalent of the no-action alternative.

*Pit River Tribe v. BLM, 306 F.Supp.2d 929 (E.D.Cal. 2004)*, upon which BLM relies, is inapposite. In that case, BLM had approved a site-specific geothermal project after considering a no-action alternative and six alternatives that differed only in the placement of the project's power line. The Tribe argued that the FEIS was inadequate because it failed to consider anything other than geothermal technology. [*28] The court found that the alternatives suggested by the Tribe were unnecessary because they amounted to the functional equivalent of the no-action alternative.

In *Pit River*, unlike the pending cases, a programmatic FEIS approving the use of geothermal energy was already in place. Because BLM had already decided in the earlier programmatic FEIS to develop geothermal power, the Tribe's challenges based on alternative sources of energy came too late. As the court noted, "The sorts of alternatives suggested by the plaintiffs are more appropriate to earlier NEPA documents, and, indeed, the programmatic EIS for the *Geothermal Steam Act* did consider alternative sources of energy . . . ." *Id. at 940*.

Here, unlike *Pit River*, the FEIS does not involve a site-specific project. Instead, the FEIS is a programmatic plan for the broad scope of development of CBM resources. Because no prior NEPA document has ever analyzed the environmental effects of CBM development in the area, this is precisely the place for BLM to consider alternatives varying the pace and geographical sites of development.

In sum, the Court finds that a phased development alternative is consistent with [*29] the purpose of the EIS, which was to analyze options for developing CBM resources in a manner that would minimize the societal and environmental impacts resulting from such development. [10] The reason offered by BLM for rejecting phased development alternatives premised on the

assumption that BLM's prior issuance of oil and gas leases committed it to total and immediate full-field development is legally untrue. BLM's failure to analyze a phased development alternative renders the EIS inadequate.

10 Indeed, as FWP observed, a phased development alternative approach fits hand-in-hand with the adaptive management approach BLM subscribes to throughout the FEIS.

**B. Reinjection and other alternatives.**

Management of the wastewater produced by CBM drilling presents one of the greatest challenges associated with CBM production. NPRC contends that BLM failed to consider an alternative requiring the re-injection of produced water from CBM production into depleted coal seams. BLM responds that re-injection was rejected [*30] as an infeasible alternative because a coal seam must be depressurized in order to liberate methane. Re-injection of produced water would repressurize the seam, resulting in a decrease in methane production. As this dilemma was recognized by NPRC's own consultant, the Court cannot say that BLM unreasonably failed to give re-injection detailed consideration.

Although BLM did not consider re-injecting wastewater into producing coal seams to be a viable option, Alternative B examined the possibility of injecting produced water into non-productive seams that were geologically separated from producing CBM fields. Alternative E, the preferred alternative, also included injection as an option for dealing with produced water, although it emphasized beneficial use as the preferred method for wastewater management.

Perhaps BLM did not consider every possible manner for wastewater management through injection or re-injection. However, the agency need not consider an endless range of possibilities. Nor need the agency adopt every method suggested by commentators and experts. The Court cannot find that BLM's treatment of injection options was unreasonable.

In two sentences, NPRC criticizes BLM [*31] for allegedly failing to adopt best available control technology for minimizing emissions from gas-fired compressors or for treatment of wastewater. Suffice it to say that the Court will not consider the merits of arguments that the parties have made no effort to develop in their briefs. NPRC's criticisms, regarding best available technologies are rejected.

**4. A Single EIS**

NPRC contends that BLM violated NEPA by completing two separate EISs for the Wyoming and Montana portions of the Powder River Basin. NPRC argues that the two EISs were both cumulative and similar actions that necessitated the preparation of a single EIS covering the entire Basin.

Federal agencies are given considerable discretion to define the scope of NEPA review. *Native Ecosystems Council v. Dombeck, 304 F.3d 886, 894 (9th Cir. 2002)*. However, "connected, cumulative, and similar actions must be considered together to prevent an agency from 'dividing a project into multiple 'actions' each of which individually has an insignificant environmental impact, but which collectively have a substantial impact.'" *Id.* (quoting *Thomas v. Peterson, 753 F.2d 754, 758 (9th Cir. 1985))*. [*32] Thus, *40 C.F.R. § 1508.25*. requires that "two or more agency actions must be discussed in the same impact statement where they are 'connected' or 'cumulative' actions." *Klamath-Siskiyou, 387 F.3d at 999*. "Where the proposed actions are "similar, ' the agency 'may wish' to assess them in the same document and 'should do so' when a single document provides the 'best way to assess adequately the combined impacts of similar actions . . . .'" *Id.* (quoting *40 C.F.R. § 1508.25(a)(3)*.

Cumulative actions are those that "when viewed with other proposed actions have cumulatively significant impacts . . . ." *40 C.F.R. § 1508.25(a)(2)*. Cumulative impacts are those that result from "the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions . . . . Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." *40 C.F.R. § 1508.7*.

NPRC maintains that CBM development will have cumulative impacts on air quality, surface water quality, groundwater resources, and wildlife that will cut across the state lines dividing the Powder River Basin. According to NPRC, [*33] when two proposed actions will occur in a distinct geographic region such as the Powder River Basin, the impact analysis should be combined in a single EIS.

While NPRC's argument is facially attractive,

agencies may consider factors in addition to geographic area when determining whether to conduct one or more environmental analyses. As the Supreme Court has noted, "Even if environmental interrelationships could be shown conclusively to extend across basins and drainage areas, practical considerations of feasibility might well necessitate restricting the scope of comprehensive statements." *Kleppe v. Sierra Club, 427 U.S. 390, 414, 49 L. Ed. 2d 576, 96 S. Ct. 2718 (1976)*. The key question is whether "the record suggests that the agency *intended* to segment review to minimize cumulative impact analysis." *Earth Island Inst. v. United States Forest Service, 351 F.3d 1291, 1305 (9th Cir. 2003)* (emphasis in original).

Here, sufficient practical considerations justified BLM's decision to conduct two separate studies of the area. First, the timing of the proposals, at least initially, differed by some six months. Next, the scope of the studies differed. Wyoming began its environmental [*34] process in response to a specific industry-project proposing to drill 39,000 CBM wells in the Wyoming portion of the Powder River Basin. The Wyoming EIS accordingly focused on that geographic area. The Montana process evolved initially from a site-specific analysis of a project proposed by Fidelity Exploration & Production. Company to develop the Tongue River Project and ultimately from an October 2000 meeting of the Coal Bed Methane Coordination Group at which industry predicted that it could drill up to 10,000 wells in the Montana portion of the Powder River Basin. Although the federal analysis centers around the Powder River Basin, the Montana EIS is a statewide planning device, encompassing areas and impacts beyond the Powder River Basin.

In addition, the pace of CBM development varied greatly between the two states. CBM exploration in the Wyoming portion of the Basin began in 1988. By June 2000, when the Wyoming BLM commenced its EIS process, 4,866 CBM wells had already been drilled. Of this number, 759 were federal wells. At the same time, the Montana CBM industry was in its infancy. Its first proposal for CBM development was received in 1998, with Fidelity's application to [*35] develop the Tongue River Project. By June 2000, there were no producing federal CBM wells.

Many different agencies cooperated in the preparation of the EISs. In Wyoming, the U.S. Forest Service, Medicine Bow National Forest, and the State of Wyoming were cooperating agencies. Five conservation districts, four counties, and four state agencies also assisted in the preparation of the Wyoming FEIS. In Montana, the State of Montana was a co-lead agency, with EPA, DOE, BIA, and the Crow Tribe of Indians serving as cooperating agencies. With the involvement of all of these different agencies, it would have been extremely difficult for all parties to come together to prepare a single environmental document.

The Wyoming and Montana BLMs considered developing one EIS and rejected that option, concluding that "one document would be so broad and cumbersome than preparation of separate environmental documents is necessary to address the varied state and public concerns." A.R. § I.A.2 at 1. Nothing in the record suggests that BLM made this decision with the intent of obscuring the cumulative impacts of CBM development. To the contrary, the agencies recognized the need to analyze cumulative impacts [*36] in the Powder River Basin. For that reason, they collaborated throughout the process. They shared information, and, when inconsistencies between the two DEISs were noted, they coordinated their efforts to prepare joint cumulative impact assessments of surface water and air quality.

BLM could have prepared a single EIS for "cumulative actions" in the Powder River Basin. For practical reasons, it chose not to. That decision was not arbitrary and capricious.

NPRC also contends that the two EISs fell within the definition of "similar" actions and therefore should have been completed as a single analysis. Similar actions are those "which when viewed with other reasonably foreseeable or proposed agency actions, have similarities that provide a basis for evaluating this environmental consequences together, such as common timing or geography." *40 C.F.R. § 1508.25(a)(3)*.

The two EISs may very well be similar actions, to the extent they have the common geographic background of the Powder River Basin. An agency, however, has even more discretion to decide whether to complete a single document when "similar" actions are concerned than when "cumulative" actions are involved. *Earth Island, 351 F.3d at 1306.* [*37] The regulations simply provide that an agency "may wish" to analyze similar actions in the same impact statement. *40 C.F.R. § 1508.25(a)(3)*. The agency "should do so when the best way to assess adequately the combined impacts of similar

actions or reasonable alternatives to such actions is to treat them in a single impact statement." *Id.*

*Earth Island* is instructive. In that case, a large wildfire burned two adjacent national forests in two different states. When the supervisors of the two forests decided to implement separate restoration projects and timber sales for the two forests, the plaintiffs sued, arguing that a single EIS covering both forests should have been prepared. The Ninth Circuit did not agree. The appellate court held that where there were prior administrative boundaries, different patterns of ownership, disparate timetables and separate supervisory personnel, the agency may reasonably conclude that two separate documents are the best way to assess adequately the combined impacts of the similar actions.

The same circumstances exist in this case. First, the political boundaries between the states of Wyoming and Montana, as well as the administrative boundaries [*38] of the BLM State Offices predated the decision to undertake EISs in both states. Second, the Powder River Basin in each state has different patterns of ownership. In Wyoming, the land is owned by the federal government, the State of Wyoming, and private individuals. In Montana, the land belongs to the federal government, the Crow and Northern Cheyenne Tribes, the State of Montana, and private parties. Finally, as noted in the previous discussion, the environmental reviews were initiated at different times and conducted by different supervisory personnel. As in *Earth Island,* it was not arbitrary and capricious for BLM to determine that a single EIS was not the best to adequately assess the combined effects of the actions.

**5. Bard Look**

Plaintiffs contend that the FEIS failed to take a hard look at the impacts of CBM development on groundwater, surface water quality, air quality, aquatic life, wildlife, methane migration, noise, and traffic. The Tribe also contends that the FEIS failed to take a hard look at the socioeconomic and cultural effects of development on the Northern Cheyenne Reservation.

Having already determined that the FEIS failed to consider a phased development [*39] alternative, the Court need not examine plaintiffs' hard look arguments. Nevertheless, as an advisory opinion only, the Court observes that, as a whole, the FEIS adequately considered the impacts of CBM development in the Powder River Basin. *See National Parks & Conservation Ass'n v. United States Dept. of Transportation, 222 F.3d 677, 682 (9th Cir. 2000)* (An EIS must be reviewed as a whole.). Indeed, the analysis may not be as detailed as plaintiffs would like. However, where, as here, the FEIS is a large-scale, programmatic planning device, it need only provide "'sufficient detail to foster informed decision making, . . . site specific impacts need not be fully evaluated until a critical decision has been made to act on site development.'" *Friends of Yosemite Valley v. Norton, 348 F.3d 789. 800 (9th Cir. 2003)* (quoting *Northern Alaska Envtl. Ctr v. Lujan, 961 F.2d 886, 890-91 (9th Cir. 1992))*. Thus, the detailed analysis that plaintiffs desire may be deferred until BLM has been presented with a proposal for a site-specific plan of development. *Id.*

That said, for the guidance of BLM in its further analysis on remand, the Court [*40] notes the following areas of concern. The first involves private water well mitigation agreements. While the FEIS relies on these agreements to ameliorate the impacts of methane migration and the depletion of groundwater aquifers, it never clearly describes what the agreements entail nor does it evaluate their effectiveness. Without some additional discussion about how these private agreements will alleviate the impacts of CBM development on methane migration and groundwater drawdown, it is difficult to conclude that the FEIS fairly evaluated the consequences of CBM development in these two areas. *See Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 350-52, 104 L. Ed. 2d 351, 109 S. Ct. 1835 (1989)* (Without a reasonably complete discussion of possible mitigation measures, neither the agency nor the public can properly evaluate the severity of the adverse effects of the proposed action.).

The other area of concern involves the Tongue River Railroad. The DEIS included the railroad as a reasonably foreseeable future project. The FEIS, however, omitted the railroad. In briefing and at oral argument, BLM justified the omission by arguing that the railroad is a speculative project that may never [*41] occur. Since that time, the Surface Transportation Board has published its intent to undergo another environmental analysis of the railroad and, in recent environmental assessments (EAs) for CBM projects in the Powder River Basin, BLM has included the railroad in its discussion of reasonably foreseeable future projects. [11] Under these circumstances, and without deciding whether the omission of the railroad

from the FEIS was error, the Court suggests that, on remand, BLM include the railroad in its cumulative impacts analysis. *See Klamath-Siskiyou, 387 F.3d at 994* (A cumulative impact analysis must include a useful assessment of past, present, and reasonably foreseeable future projects.).

11 The Court takes judicial notice of notice of availability of the draft supplemental EIS for the Tongue River Railroad construction project published in the Federal Register on October 22, 2004. The Court also takes judicial notice of the EA for Fidelity's Tongue River-Dry Creek Plan of Development approved on December 16, 2004, and the EA for Fidelity's Tongue River-Coal Creek Plan of Development approved on January 19, 2005, despite the motions of BLM and Fidelity to strike the excerpted pages from these two EAs filed by NPRC. In the context in which these EAs are used by the Court, which is not to make a determination as to the merits of plaintiffs' claims, there is nothing inappropriate in taking judicial notice of the fact that the EAs do indeed include the Tongue River Railroad in their cumulative impact analyses.

[*42] **6. Supplemental DEIS**

NPRC argues that BLM violated the public comment and participation requirements of NEPA by failing to circulate a supplemental DEIS containing new air and surface water quality analyses that were included in the FEIS, but not the DEIS. Because the Court is remanding for other reasons, it need not discuss this issue.

**7. Federal Lands Policy Management Act**

The Tribe's challenges to the RMP under FLPMA are not ripe. *Norton v. Southern Utah Wilderness Alliance, 542 U.S. 55, 159 L. Ed. 2d 137, 124 S. Ct. 2373 (2004)*; *Kern, 284 F.3d at 1070*; *Wilderness Soc'y v. Thomas, 188 F.3d 1130, 1134 (9th Cir. 1999)*; *Ohio Forestry Ass'n, Inc. v. Sierra Club, 523 U.S. 726, 140 L. Ed. 2d 921, 118 S. Ct. 1665 (1998)*. "Generic challenges to the sufficiency of [an RMP] are no longer justiciable[.]" *Thomas, 188 F.3d at 1134*. Unless a site-specific action is the focus of the complaint, a plaintiff can no longer use FLPMA to challenge an agency's adoption of a programmatic plan. *Id.; Kern, 284 F.3d at 1070*. The Tribe's claim that BLM violated FLPMA must accordingly be dismissed without prejudice. [12] [*43]

12 NPRC has already withdrawn its arguments on this issue and has moved to dismiss its FLPMA claims from its complaint.

**8. The National Historic Preservation Act**

NHPA requires federal agencies with jurisdiction over a proposed federal or federally assisted "undertaking" to "take into account the effect of the undertaking on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register [of Historic Places]." *16 U.S.C § 470f*. "Properties of traditional religious and cultural importance to an Indian tribe . . . may be determined to be eligible for inclusion in the National Register." *16 U.S.C. § 470a(d)(6)(A)*. Accordingly, prior to approving the expenditure of federal funds on the undertaking or issuing any license, federal agencies must consult with Indian Tribes that attach religious or cultural significance to historic properties. *16 U.S.C. 470a(d)(6)(B)*. After consulting [*44] with and gathering information from an Indian tribe, the agency must make a reasonable and good faith effort to identify historic properties, determine the eligibility of the identified properties for listing in the National Register, assess any effects that an undertaking may have on an historic property, and, if the agency determines that the effects are adverse, avoid or mitigate and such effects. *36 C.F.R. §§ 800.4(b)(1)*, *800.4(c)*, and *800.5*.

The Tribe claims that BLM failed in its NHPA obligations by failing to consult with it prior to issuing oil and gas leases pursuant to the 1994 Amendments and approving the 2003 RMP Amendments.

As to the issuance of the oil and gas leases, the Tribe fails to identify any single lease or leasing decision to support its claim. Instead, the Tribe appears to attack the entire leasing program undertaken by the BLM after approving the 1994 Amendments. In this sense, the Tribe's claims are akin to the challenges made to BLM's "land withdrawal review program" in *Lujan v. National Wildlife Fed'n. 497 U.S. 871, 111 L. Ed. 2d 695, 110 S. Ct. 3177 (1990)*. In that case, the Supreme Court rejected the plaintiffs' claims for the reason that they failed to identify any particular [*45] "agency action" that caused them harm. Without final agency action, there is no right to judicial review under the APA. *Id.* So too, here, where the Tribe asserts a general attack against an entire

program instead of challenging any specific leasing decision, this Court lacks the authority under the APA to review the Tribe's claim. [13]

13 The Tribe cannot challenge the 1994 Amendment itself because such an attack would be barred by the statute of limitations. *NPRC v. United States BLM, 107 Fed.Appx. 166 (9th Cir. 2004).*

As to the 2003 RMP Amendments, it appears that BLM did indeed consult with the Tribe to the extent required under NHPA. BLM's decision to conduct further NHPA consultation at the site-specific level was not in error. Where, as here, large land areas are involved, the agency may use a phased process to conduct NHPA identification and evaluation efforts. *36 C.F.R. § 800.4(b)(2).* Furthermore, where the identification effort is part of a NEPA process, final identification and [*46] evaluation may be deferred until a site-specific project is proposed. *Id.*

**9. BLM's Trust Responsibility to the Tribe**

The Tribe alleges that by violating NEPA, FLPMA, and NHPA. BLM also violated its fiduciary obligations to the Tribe. As this contention offers nothing more than a rehash of previous arguments, the Court need not consider it.

**10. Injunctive Relief**

An injunction may issue where plaintiffs prove irreparable injury and inadequacy of legal remedies. *Amoco Prod. Co. v. Vill. of Gambell, 480 U.S. 531, 542, 94 L. Ed. 2d 542, 107 S. Ct. 1396 (1987).* Even though environmental injury can rarely be remedied by money damages and is often longlasting, the court must still "balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Id.*

In this case, the NEPA violations found by the Court do not automatically lead to the conclusion that all development activities must cease pending further administrative review. From the record presently before it, the Court cannot determine to what extent, if at all, development should be suspending during the completion of a new environmental impact statement [*47] that includes a phased development alternative. Under these circumstances, the Court deems it prudent to hold an evidentiary hearing to determine the nature and extent of injunctive relief, if any, to be granted.

**MOTIONS TO STRIKE**

BLM and the intervenors have filed several motions to strike affidavits and extra-record materials filed by plaintiffs. Because the Court did not review any of these materials in reaching its decision, the motions shall be denied as moot.

**ORDER**

In accordance with the foregoing, **IT IS ORDERED:**

1. The Tribe's motion for summary judgment (docket no. 60 in Cause No. CV 03-69-BLG-RWA and docket no. 76 in Cause No. CV 03-78-BLG-RWA) is granted in part and denied in part in accordance with the discussion above.

2. NPRC's motion for summary judgment (docket no. 64 in Cause No. CV 03-69-BLG-RWA) is granted in part and denied in part in accordance with the discussion above.

3. BLM's motion for summary judgment against NPRC (docket no. 77 in Cause No. CV 03-69-BLG-RWA and docket no. 92 in Cause No. CV 03-78-BLG-RWA) is granted in part and denied in part in accordance with the discussion above.

4. BLM's motion for summary judgment against the [*48] Tribe (docket no. 80 in Cause No. CV 03-69-BLG-RWA and docket no. 93 in Cause No. CV 03-78-BLG-RWA) is granted in part and denied in part in accordance with the discussion above.

5. Defendant Intervenors' motion for summary judgment against NPRC (docket no. 73 in Cause No. CV 03-69-BLG-RWA and docket no. 88 in Cause No. CV 03-78-BLG-RWA) is granted in part and denied in part in accordance with the discussion above.

6. Defendant Intervenors' motion for summary judgment against the Tribe (docket no. 96 in Cause No. CV 03-78-BLG-RWA) is granted in part and denied in part in accordance with the discussion above.

7. Defendant Intervenor Fidelity's motion for summary judgment against NPRC (docket no. 83 in

Cause No. CV 03-69-BLG-RWA) is granted in part and denied in part in accordance with the discussion above.

8. NPRC's motion to dismiss (docket no. 128-1 in Cause No. CV 03-69-BLG-RWA) is granted. Count Five of NPRC's complaint in Cause No. CV 03-69-BLG-RWA is hereby dismissed without prejudice.

9. The Fifth Cause of Action in the Tribe's complaint in Cause No. CV 03-78-BLG-RWA alleging claims under FLPMA is likewise dismissed without prejudice.

10. BLM's motion to strike NPRC's extra-record [*49] materials (docket no. 97-1 in Cause No. CV 03-69-BLG-RWA) is denied as moot.

11. Intervenor Defendant Fidelity's motion to strike (docket no. 110 in Cause No. CV 03-69-BLG-RWA and docket no. 111 in Cause No. CV 03-78-BLG-RWA) is denied as moot.

12. BLM's motion to strike NPRC's supplemental statement of facts (docket no. 112 in Cause No. CV 03-69-BLG-RWA and docket no. 113 in Cause No. CV 03-78-BLG-RWA) is denied as moot.

13. BLM's motion to strike exhibits filed in support of NPRC's combined response/reply brief (docket no. 114 in Cause No. CV 03-69-BLG-RWA and docket no. 115 in Cause No. CV 03-78-BLG-RWA) is denied as moot.

14. BLM's motion to strike excerpted pages from the Dry Creek and Coal Creek EAs (docket no. 134 in Cause No. CV 03-69-BLG-RWA and docket no. 125 in Cause No. CV 03-78-BLG-RWA) is denied.

15. Fidelity's motion to strike (docket no. 135 in Cause No. CV 03-69-BLG-RWA) is denied.

15. An evidentiary hearing on the appropriate scope of injunctive relief in this matter shall be held on March 29, 2005, from 9:30 a.m. to 12:00 p.m. Prior to the hearing, the parties shall decide among themselves how to divide the allotted time.

16. On or before March 23, 2005, [*50] the parties shall file briefs, limited to 10 pages, on the appropriate scope of injunctive relief.

The Clerk of Court shall not enter judgment until further order of the Court.

The Clerk of Court shall notify counsel of record of the making of this order.

Done and dated this 25th day of Feb 2005.

RICHARD W. ANDERSON

UNITED STATES MAGISTRATE JUDGE



Page 1 of 10

Not Reported in F.Supp.2d Page 1
Not Reported in F.Supp.2d, 2006 WL 292010 (D.Idaho), 62 ERC 1142
**(Cite as: 2006 WL 292010 (D.Idaho))**

H

United States District Court,
D. Idaho.
WESTERN WATERSHEDS PROJECT and
Randall Hermann, Md., Plaintiffs,
v.
UNITED STATES FOREST SERVICE, Defendant.
**No. CV 05 189 E BLW.**

Feb. 7, 2006.

Lauren M. Rule, Advocates for The West, Laurence J. Lucas, Law Office of Laurence J. Lucas, Boise, ID, for Plaintiffs.

Deborah A. Ferguson, US Attorney's Office, Boise, ID, Elizabeth Crocker Rozek, United States Department of Justice, Washington, DC, for Defendant.

MEMORANDUM DECISION AND ORDER

WINMILL, Chief J.

INTRODUCTION

***1** The Court has before it cross-motions for summary judgment and a motion to strike. The Court heard oral argument on January 23, 2006, and took the motions under advisement. For the reasons expressed below, the Court will deny the motion to strike, and grant in part and deny in part the cross-motions.

BACKGROUND

Plaintiff WWP asserts that the Forest Service has failed to do a proper environmental analysis of the impacts of grazing on four allotments within the Sawtooth National Forest (SNF) and the Sawtooth National Recreation Area (SNRA). [FN1]

FN1. Two of the allotments are entirely within the SNRA while the other two are partly within its boundaries.

Congress created the SNRA in 1972 in the Organic Act, 16 U.S.C. § 460aa, *et. seq.*, and charged the Secretary of the Agriculture, and thereby the Forest Service, with the duty of managing the lands. Congress listed certain "primary" values that it wanted conserved and developed, including scenic, historic, and wildlife values. *See* 16 U.S.C. § 460aa-1(a). Congress also directed the Forest Service to manage the utilization of timber, grazing, and mineral resources, so long as that utilization did not "substantially impair" the SNRA's primary values. *Id.*

For management purposes, the Forest Service has divided the SNF and SNRA into allotments, on which about 4,470 sheep currently graze. This grazing is conducted pursuant to permits issued by the Forest Service, typically for 10- year periods. The permits are accompanied by Allotment Management Plans (AMPs) that set forth the terms and conditions governing the grazing. The AMPs are fine-tuned on an annual basis with Annual Operating Instructions (AOIs).

The AMPs and AOIs must be consistent with the SNF Forest Plan, which governs the overall management of the Forest Service lands within the SNF, including the SNRA. The Forest Plan sets broad programmatic guidelines, while the AMPs and AOIs set the site-specific guidelines.

In the mid-1990s, Congress found that the Forest Service was not proceeding quickly enough to conduct environmental analyses of the impacts of grazing on the National Forest lands. As a remedy, Congress passed the Rescissions Act in 1995 to compel the Forest Service to set up a schedule to conduct a NEPA analysis on each grazing allotment in the National Forest System. The Forest Service submitted a schedule in 1995.

The Forest Service did not fully comply with its schedule, however. In *WWP v. Sawtooth National*

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

http://print.westlaw.com/delivery.html?dest=atp&dataid=B0055800000100060004934902C... 6/6/2008

Page 2 of 10

Not Reported in F.Supp.2d Page 2

Not Reported in F.Supp.2d, 2006 WL 292010 (D.Idaho), 62 ERC 1142

**(Cite as: 2006 WL 292010 (D.Idaho))**

*Forest*, CV-01-389-E-BLW (June 13, 2002), the Court found that the Forest Service had failed to complete the NEPA analysis on 7 allotments within the SNRA by the dates specified on that schedule. The Court went on to set new deadlines for NEPA analysis, and held that the analysis must include a review under the Organic Act of whether grazing was "substantially impairing" wildlife values. *Id.* at p. 7.

In 2003, the Forest Service revised the SNF Forest Plan. Using that Plan, the Forest Service then issued in September of 2004, the North Sheep Environmental Impact Statement (NSEIS) to study the impacts of sheep and goat grazing on four allotments: (1) Fisher Creek, (2) Smiley Creek, (3) North Fork-Boulder, and (4) Baker Creek.

***2** Based on a review of the NSEIS, the Forest Service issued two Records of Decision (RODs) on September 30, 2004--one for the North Fork-Boulder and Baker Creek allotments, and another for the Fisher Creek and Smiley Creek allotments. The RODs authorized no reduction of grazing in the Fisher Creek and North Fork-Boulder allotments. Reductions were ordered in the Smiley Creek allotment, from 3,877 to 3,628 head-months, and in the Baker Creek allotment from 6,530 to 5,159 head-months.

The reductions in Smiley Creek and Baker Creek resulted from the closure of certain high-elevation areas, and the closure of the Adams Gulch area in the Baker Creek allotment. The RODs also moved two sheep corrals and planned mitigation measures including (1) restricting grazing along Smiley Creek, (2) restricting sheep crossings on certain streams, (3) prohibiting sheep bedding in riparian areas or noxious weed infestation areas, (4) posting signs to warn recreationists of sheep and guard dogs, (5) prohibiting fall use of two areas of the "sheep driveway," and (6) coordinating with the Idaho Department of Fish and Game if Bighorn Sheep are sighted in the allotments. *See NSEIS* at pp. 2- 14 to -15.

The RODs also implemented a strategy for future management known as "adaptive management." The Forest Service defined this as "a strategy based on three principles: (1) achievement of realistic, clearly defined objectives, (2) ongoing monitoring to assess progress toward those objectives, and (3) the flexibility to alter management when adequate progress is not being achieved." *See NSEIS* at p. 2-2. This strategy is similar to the Fundamentals of Rangeland Health, used by the BLM to manage grazing on the lands under its stewardship. *See AR* 02232 (Forest Service memo suggesting adoption of approach similar to that used by BLM).

The Forest Service did not define the protocols it would use or describe the monitoring that is the heart of the strategy. In a response to public comment, contained in the NSEIS, the Forest Service explained that a monitoring plan "will be developed and implemented through an iterative process if the Proposed Action is selected." *See NSEIS* at p. F-31.

WWP responded by filing this lawsuit, claiming that the Forest Plan and the NSEIS violate NFMA and NEPA. The Court will consider each argument raised by WWP after setting forth the standard of review.

## ANALYSIS

1. *Standard of Review*

The Court's review of NFMA challenges is governed by the Administrative Procedures Act (APA) because NFMA contains no express provision for judicial review. *See Native Ecosystems Council v. United States*, 418 F.3d 953, 961 (9th Cir.2005). Under the APA, the Court may set aside agency action only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Although this standard is a "narrow one," the Court is required to "engage in a substantial inquiry [,] ... a thorough, probing, in-depth review." *Native Ecosystems*, 418 F.3d at 961. To have not acted in an arbitrary and capricious manner, the agency must present a "rational connection between the facts found and the conclusions made." *Id.*

***3** Agencies are entitled to deference to their

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

http://print.westlaw.com/delivery.html?dest=atp&dataid=B0055800000100060004934902C... 6/6/2008

Page 3 of 10

Not Reported in F.Supp.2d Page 3
Not Reported in F.Supp.2d, 2006 WL 292010 (D.Idaho), 62 ERC 1142
**(Cite as: 2006 WL 292010 (D.Idaho))**

interpretation of their own regulations, including Forest Plans. *Id.* However, an agency's interpretation "does not control where ... it is plainly inconsistent with the regulation at issue." *Id.* Moreover, an agency's position "that is contrary to the clear language of a Forest Plan is not entitled to deference." *Id.* at 962.

The Court's review of NEPA challenges is also governed by the APA. In reviewing the adequacy of an Environmental Impact Statement (EIS) under NEPA, the Court applies the "rule of reason" standard, which "requires a pragmatic judgment whether the EIS's form, content, and preparation foster both informed decision-making and informed public participation." *Id.* at 961. The Court must ensure that the agency has taken a "hard look" at the potential environmental consequences of the proposed action. *Id.*

2. *Capability & Suitability*

WWP claims that the Forest Service violated NFMA and NEPA by failing to apply the Forest Plan findings on "capability" to the NSEIS. There is no dispute that NFMA compels the Forest Service to determine, in the Forest Plan, the capability and suitability of SNF lands for grazing. There is also no dispute that the Forest Service did so. WWP's claim is that the Forest Service ignored those determinations in the NSEIS. This means, according to WWP, that the NSEIS cannot be consistent with the SNF Forest Plan, as required by NFMA, and that the Forest Service cannot be deemed to have taken a "hard look" at environmental impacts, as required by NEPA.

NFMA requires that site-specific projects and their environmental analysis must be "consistent" with the Forest Plan. *See* 16 U.S.C. § 1604(I); *Neighbors of Cuddy Mountain v. Alexander,* 303 F.3d 1059, 1062 (9th Cir.2002). The Forest Service regulations implementing NFMA require that forest plans determine "the suitability and potential capability of National Forest System lands for producing forage for grazing animals and for providing habitat for management indicator species...." 36 C.F.R. § 219.20. The term "capability" refers to the potential of land under study to "produce resources," *i.e.,* sustain grazing. *See* 36 C.F.R. § 219.3.

In drafting the SNF Forest Plan, the Forest Service completed a capability determination pursuant to these regulations. According to the Forest Service counsel's description at oral argument, the capability determination process is akin to a series of filters or screens. The land at issue is sifted through these filters, or, in other words, is evaluated according to a uniform set of predetermined criteria. The criteria filter out (or exclude) lands not capable of sustaining grazing. Whatever lands do not fall within these criteria are deemed capable.

The five capability "filters" or criteria exclude lands that (1) are inaccessible to livestock, (2) will not produce at least 200 pounds of forage per acre, (3) are not within 1.2 miles of water, (4) have unstable, highly erodible soils, or (5) are on steep slopes. *See AR--P001922.* These are uniform criteria used by the Forest Service. *Id.*

***4** To determine whether these criteria exist, the Forest Service used satellite imagery because on-the-ground studies would be too expensive and time-consuming given the SNF's rugged terrain. *See Diem Declaration* at ¶ 5. These images were often not detailed enough, however, to pick out some of the five capability criteria. *Id.* For example, the images did not reveal whether 200 pounds of forage per acre existed in the lands portrayed. *Id.*

To work around these limitations, the Forest Service developed a model that estimated the presence of the five criteria using what could be seen on the satellite images. *Id.* Because rock outcroppings and lakes could be seen on the images, and typically contained little forage, the model excluded those areas. *Id.* The satellite images could also detect vegetation, giving the model a basis to forecast the forage. in those areas. *Id.*

The modeling data was in digital form, and has been referred to as Geographic Information Systems (GIS) data. The Forest Service used the GIS data to produce maps that depicted the location of capable and incapable lands. *See Declaration of Diem* at ¶

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

http://print.westlaw.com/delivery.html?dest=atp&dataid=B0055800000100060004934902C... 6/6/2008

Page 4 of 10

Not Reported in F.Supp.2d Page 4
Not Reported in F.Supp.2d, 2006 WL 292010 (D.Idaho), 62 ERC 1142
**(Cite as: 2006 WL 292010 (D.Idaho))**

6. The Forest Service used these maps to "determine if the model provided an appropriate depiction of capability at a forest-wide and management area scale." *Id.* Once the Forest Service validated its model, "the maps were not retained." *Id.*

The result of this process was a finding that only 25% of the SNF was considered "capable." *See SNF Forest Plan* at p. 3-669. The SNF Forest Plan simply presents this 25% figure in a table, and provides no supporting details. While the five capability criteria are identified in an accompanying Technical Report, *see AR* P001922, neither the Plan nor any referenced document discusses how the Forest Service used the five criteria in this particular case to calculate the 25% figure. Although the Forest Service used the GIS data to create maps identifying the capable and incapable lands for its internal use, it did not share the GIS data and maps in the Plan.

When this GIS data is examined for the four allotments at issue here, the capable land drops below 25% for three of the allotments. Only 12% of the Baker Creek allotment contains capable land, and the Smiley Creek and North Fork-Boulder allotments contain only 13% and 15% capable land, respectively. *See Mitchell Declaration* at ¶ 8.

The Forest Service does not quarrel with the accuracy of these allotment-specific percentages, but argues instead that they are not part of the administrative record and hence cannot be considered. While it is true that the allotment-specific percentages are not part of the administrative record, they were calculated using the Forest Service's own GIS data. This is not information that was unavailable to the agency, or that arose only after the agency made its decisions--it is the agency's own data, relied upon by the agency in making the decisions under review here. As such, the information falls within the extra-record exception discussed in *Southwest Center for Biological Diversity v. U.S. Forest Service*, 100 F.3d 1443, 1450 (9th Cir.1996).

***5** The Forest Service responds that even if the figures are considered, their alarming appearance is exaggerated because they are imprecise and subject to substantial modification by on-the-ground studies. For these reasons, the Forest Service argues that the figures are inappropriate for use in site-specific studies like the NSEIS.

To support this argument, the Forest Service filed the affidavit of Michael O'Farrell, a Rangeland Management Specialist with personal knowledge of the actual conditions in these allotments. He details instances where the GIS data was simply wrong, in some instances overestimating capable lands, and in other instances underestimating them. *See O'Farrell Declaration* at ¶ 6, pp. 3-5.

Because of these inaccuracies, the Forest Service argues, "the fact that a forest-level capability analysis may find land to be only partly capable does not mean that the Forest Service should issue a decision disallowing grazing on that land, as [WWP] contends." *See Forest Service Reply Brief* at p. 5. The Forest Service insists that it did site-specific studies that supported grazing and provided more reliable data than the capability determination, and that those studies were fully discussed in the NSEIS at the following pages: (1) NS06888 (forage production and capacity); NS06898 (table of land group, type and soil characteristics by allotment/unit which specifically shows soil productivity, fertility, etc.): NS06897-6904 (effects from sheep grazing on soils); NS06999 (soil productivity); NS07002-7005 (analysis by alternative on soil productivity). *See Forest Service Reply Brief* at p. 6.

Site-specific studies done after the capability determination could reveal that actual conditions on the allotments are much different than were portrayed by the model based on satellite images. In that case, the Forest Service may rely more heavily on the site-specific studies than the capability figures in setting grazing levels for specific allotments. That would be the appropriate result here if the citations listed above represented site-specific studies-- done after the capability figures were calculated--showing that actual conditions varied from those depicted in the model

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

http://print.westlaw.com/delivery.html?dest=atp&dataid=B0055800000100060004934902C... 6/6/2008

Page 5 of 10

Not Reported in F.Supp.2d Page 5
Not Reported in F.Supp.2d, 2006 WL 292010 (D.Idaho), 62 ERC 1142
**(Cite as: 2006 WL 292010 (D.Idaho))**

based on satellite images.

That is not the case, however. Here, the capability figure of 25% is contained in a Technical Report dated July 15, 2003. *See AR NS02240.* The citations listed above rely almost entirely on data pre-dating July 15, 2003. The NSEIS makes no attempt to show that the capability figure is inaccurate. There is no comparison of that figure with site-specific studies showing actual conditions in the allotments.

The Forest Service concedes as much in the NSEIS. In a section of the NSEIS labeled "Issues Dropped From Detailed Analysis," the Forest Service states as follows:

> One commentator questioned whether the [SNF Forest Plan's] assessments of capability and suitability for grazing are accurate given the site-specific characteristics of these allotments. This issue was not analyzed in detail because, based on the [SNF Forest Plan], it is outside the scope of this EIS.

***6** *See NSEIS* at p. 1-11. [FN2]

> FN2. The Forest Service goes on to explain in the NSEIS that it did address suitability by closing some areas, and may close some areas in the future "on the basis of adaptive management." *See NSEIS* at p. 1-11. However, as explained above, the Forest Service never compared the 25% capability figure with actual conditions of the allotments, and provided no discussion of that 25% figure in the NSEIS.

The Forest Service treats the capability determination mandated by NFMA as confined to the Forest Plan. As the Forest Service prepared the NSEIS focusing on four allotments, it made no attempt to determine if the GIS data it used to make the capability determination accurately depicted the actual conditions in the four allotments. This violates NFMA and NEPA, according to WWP.

As discussed earlier, NFMA requires (1) that suitability and capability determinations be done at the forest plan level, and that (2) all subsequent site-specific management be "consistent" with the forest plan. *See* 16 U.S.C. § 1604(I). In its own Technical Paper explaining the criteria for making suitability and capability determinations, the Forest Service concludes that these determinations made at the forest plan level will "provide prescriptive management direction for project-level analysis and subsequent NEPA decisions...." *See NS02233.*

This agency position comes from its own regulations implementing NFMA, which state that "[l]ands so identified [in the forest plan's capability determination] shall be managed in accordance with direction established in forest plans...." *See* 36 C.F.R. § 219.20. The "lands so identified" are the lands designated capable and incapable in the Forest Service's GIS data. These "lands so identified" are to be "managed" according to the forest plan, meaning that the capable/incapable designations play a continuing role and cannot be discarded once the forest plan is completed.

The NEPA "hard look" doctrine arrives at the same result. NEPA imposes procedures designed to force agencies to take a "hard look" at the environmental consequences of a proposed action. *Earth Island Institute v. United States,* 351 F.3d 1291, 1300 (9th Cir.2003). The agency must reveal in the EIS how it conducted its "hard look"--including the crucial data it relied upon and how it analyzed that data--so that the public can make an informed comparison of the alternatives. *Ecology Center, Inc. v. Austin,* 430 F.3d 1057, 1067 (9th Cir.2005).

Here, the Forest Service had GIS data showing that only 15% of the North Fork-Boulder allotment contained capable ground, yet that figure was never evaluated in the NSEIS despite the fact that the Proposed Action sought to graze 30% of the allotment. *See NS07005.* Likewise, the Forest Service GIS data showing that only 13% of the Smiley Creek allotment contained capable ground was never discussed even though the Proposed Action sought to graze 29% of that allotment. *Id.*

This process violated NEPA in three ways. First, the Forest Service never explained in the SNF Forest Plan or the NSEIS how it used its five capability criteria to calculate the 25% capability

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

http://print.westlaw.com/delivery.html?dest=atp&dataid=B0055800000100060004934902C... 6/6/2008

Page 6 of 10

Not Reported in F.Supp.2d Page 6
Not Reported in F.Supp.2d, 2006 WL 292010 (D.Idaho), 62 ERC 1142
**(Cite as: 2006 WL 292010 (D.Idaho))**

figure. Second, the Forest Service had GIS data that could be used to show allotment-by-allotment capability but never shared that information in any NFMA or NEPA document. Third, the Forest Service ignored the capability figures in the NSEIS. By not revealing crucial data, and then ignoring it in the NSEIS, the Forest Service violated its duty under NEPA to prepare an EIS that would "foster both informed decision-making and informed public participation." *Native Ecosystems*, 418 F.3d at 960.

***7** While the Court finds violations of NFMA and NEPA, the Court is not holding that the capability figures are determinative. For example, lands identified as incapable are not forever off-limits to grazing. Neither NFMA nor NEPA would compel such a result.

Instead, the figures are a baseline. *See AR P014325* (Forest Service Regional Office memo stating that capability and suitability determinations will provide baseline information for project level review of allotment groups). A baseline is a comparison point, not a mandate. If land is found incapable at the forest plan level, it may still be grazed if site-specific studies show actual conditions support grazing. Conversely, land found capable may become off-limits if warranted by later site-specific studies.

A baseline is a management tool, acting as a starting point to evaluate site-specific proposals. In this baseline role, the capability figures can no more be ignored than the starting line in a 100-yard dash. This is especially true here where so much land was found incapable, and where that finding was made so close in time to the site-specific NSEIS. Even here, however, these figures did not compel a halt to grazing--they did, however, compel consideration.

If the figures were computed inaccurately, the EIS must explain why. If actual conditions differ, the EIS must explain how. With those explanations, the NSEIS would comply with NFMA's "consistency" command and NEPA's "hard look" requirement. The absence of such explanations here constitutes a violation of both statutes. The Forest Service's contrary interpretation is a misreading of the law and hence entitled to no deference.

3. *Capability & Suitability for MIS*

Management Indicator Species (MIS) for the SNF include the sage grouse, pileated woodpecker and bull trout. *See FEIS ROD* at p. 8. The Forest Service's NFMA regulations require it to conduct for MIS the same suitability and capability determination it conducts for grazing. *See* 36 C.F.R. § 219.20. This regulation also requires that "[l]ands in less than satisfactory condition shall be identified and appropriate action planned for their restoration." *Id.*

The SNF Forest Plan and accompanying FEIS do not make any formal capability and suitability analysis for any of the three MIS species. The documents do discuss habitat, but at different levels of detail depending on the species.

For example, with regard to sage grouse, the FEIS discusses the drop in sage grouse population, and the concurrent diminishment of habitat. *See FEIS SNF* at p. 3-279. The FEIS then includes a table, based on satellite imagery, showing the amount of sagebrush canopy cover--important sage grouse habitat--in 15 of the 20 SNF Management Areas. *Id.* at 3-280. On the basis of that table, the FEIS identifies four Management Areas that have less than 10% canopy cover. For those four areas, the FEIS states that "no other management-controlled reduction [in canopy cover] should take place in the near term in these areas. *Id.* at p. 3-281.

***8** It is not entirely clear from this discussion whether all SNF lands have been evaluated for sage grouse habitat capability. Five of the SNF Management Areas are not addressed in the table cited above. There is no discussion whether sage brush canopy is going to be used as the single proxy for capable habitat. On a broader scale, there is no discussion of a model for capability, as was done for grazing. Because of these insufficiencies, the Forest Service has failed to comply with its regulatory duty to determine capability and suitability for sage grouse habitat.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

http://print.westlaw.com/delivery.html?dest=atp&dataid=B0055800000100060004934902C... 6/6/2008

With regard to the pileated woodpecker, the FEIS discusses its habitat requirements generally, and includes a table showing expected habitat trends across all the acres of the three National Forests in the Ecosystem Group (Boise, Payette, and SNF). There is no more detailed analysis of pileated woodpecker habitat within the SNF, and thus the Plan and FEIS also fail to satisfy the regulation with regard to this species.

The discussion of bull trout habitat is much more detailed. The bull trout is a Threatened Species under the Endangered Species Act. *See FEIS SNF* at p. 3- 123. The Forest Service has also designated the bull trout as an MIS "because of extensive past habitat reduction, and the potential for additional habitat modification in the future." *Id.* at 3-129.

The FEIS exhibits an extensive study of bull trout habitat. For example, Table SW-8 details the conditions on numerous sections of rivers, rating factors such as water quality, watershed conditions, and flow/hydrology, among others. The findings summarized in the Table are then explained at length.

The FEIS also contains a viability analysis, evaluating how bull trout "may respond to restoration, conservation, and other management actions" for each of the Forest Plan alternatives. *Id.* at 3-172. Over the next 58 pages, the FEIS identifies deficiencies in bull trout habitat and discusses improvement strategies. *Id.* at pp 3-172 to -230.

In this extensive discussion, the FEIS uses terms such as "functioning appropriately" or "functioning at risk" to describe the bull trout's habitat conditions. While the FEIS does not use the terms capable or suitable, the terms that it does use essentially describe the same thing. The FEIS also contains an extensive discussion of necessary habitat improvements.

"An agency's actions [under NFMA] need not be perfect; we may only set aside decisions that have no basis in fact, and not those with which we disagree." *Forest Guardians v. United States,* 329 F.3d 1089, 1099 (9th Cir.2003). While the FEIS does not use the terms capable and suitable, it does contain a detailed analysis of bull trout habitat and improvement strategies. That is precisely the result intended by the capability regulation, 36 C.F.R. § 219.20. The Court therefore finds that the Forest Service has complied with NFMA with regard to bull trout habitat.

In sum, 36 C.F.R. § 219.20 requires the Forest Service to conduct a capability and suitability determination for MIS species and, for lands in less than satisfactory condition, to identify those lands and plan appropriate action for their restoration. The SNF Forest Plan and FEIS do not satisfy this duty for the sage grouse and pileated woodpecker but do satisfy it for the bull trout.

4. *Consistency Between NSEIS and SNF Forest Plan*

***9** WWP argues that past grazing levels on the SNF violated SNF Forest Plan standards, yet the NSEIS and RODs authorized grazing at essentially those same levels. The NSEIS is therefore not consistent with the Forest Plan, WWP asserts. The Forest Service responds that the NSEIS and RODs did make important changes to grazing management, including the addition of the adaptive management strategy, that will lead to improved range conditions.

There is no doubt that past grazing caused serious problems in the SNF. The NSEIS found that "the existing grazing system does not comply with the management direction provided" in the SNF Forest Plan. *See AR NS06825*. The ROD for the Fisher Creek and Smiley Creek allotments stated that the current condition of the two allotments fail to meet Forest Plan standards, "indicating a need for change in current livestock management practices." *AR NS07206.*

The NSEIS concluded that if no action was taken to reduce grazing impacts, soil conditions would continue to degrade in sensitive areas, stream sediment levels would increase, and fish habitat would be reduced, among other detrimental effects.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

The effects of taking no action would result in the violation of SNF Forest Plan standards: "Continuation of the current grazing management ... would fail to comply with the following standards: SWEST01 [requiring management actions to restore water quality], SWST04 [requiring that management actions will not degrade or retard soil, water, riparian, and aquatic desired conditions], and may not be consistent with [three listed Plan Objectives]." *AR NS06879.*

Despite the recognition that change is needed, the RODs made no changes to grazing levels for Fisher Creek and North Fork-Boulder, and approved only a very minor reduction in grazing for the Smiley Creek allotment. The RODs closed no areas to grazing in Fisher Creek and only small areas in Smiley Creek and North Fork-Boulder. *See AR NS06867 to NS06870* (maps of closed areas). Grazing levels in the Baker Creek allotment were more significantly reduced, largely due to the closure of the Adam's Gulch area.

The NSEIS listed four changes that distinguished the Proposed Action from the No Action alternative: (1) implementation of the adaptive management strategy; (2) the closure of Adam's Gulch; (3) the closure of select high-elevation areas; and (4) the use of temporary corrals in two allotments. *AR NS07021.*

At first glance, the latter three changes appear of minor significance. The closure of Adam's Gulch only affects one allotment, and the high-elevation closures affect only a very small amount of land. *See NS06867--6870* (maps depicting closed areas). Similarly, the use of temporary corrals has only a limited impact.

This means that the first listed change--the adoption of the adaptive management strategy--is the core change implemented by the Forest Service to improve range conditions. And that is precisely what the Forest Service itself said in the NSEIS:

> ***10** How effectively the adaptive management strategy could be implemented would be the key to correcting these impacts [to water quality, stream channel morphology, hydrology, riparian soils, vegetation, and fish and invertebrate diversity] and approaching desired conditions. Closure of select, high-elevation terrain and erection of temporary corrals would reduce impacts in specific areas. However, in drainages open to grazing, the impacts outlined above would continue to some degree, dependent on the efficacy of adaptive management.

*AR NS07022.*

Despite the importance placed on the adaptive management strategy to meet SNF Forest Plan standards and objectives, the strategy itself was not explained in the NSEIS. The keystone of the strategy is monitoring, yet the Forest Service stated in response to public comments on the NSEIS that a monitoring plan "will be developed and implemented through an iterative process if the Proposed Action is selected." *See NSEIS* at p. F-31.

The failure to explain the strategy and its protocols in the NSEIS violated NFMA. In the NSEIS, the Forest Service was relying heavily on the strategy to comply with Plan standards and objectives. Therefore, a full explanation of the strategy and its protocols is crucial to determining whether the NSEIS is consistent with the Plan, as required by NFMA. Without that explanation, the Court "cannot tell from the administrative record whether or not the Forest Service complied with the [Plan] standard[s]." *Native Ecosystems*, 418 F.3d at 963. As *Native Ecosystems* made clear, that lack of explanation constitutes a violation of NFMA and is arbitrary and capricious under the APA.

The adaptive management strategy was likewise crucial to the Forest Service's finding that grazing would not substantially impair the SNRA primary values. *See AR NS07219.* That finding is also arbitrary and capricious given that the strategy was to be filled out later.

5. *Bighorn Sheep*

WWP argues that the NSEIS fails to ensure a viable Bighorn Sheep population in violation of NFMA. Their concern is that sheep transmit diseases to Bighorn Sheep.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Page 9 of 10

Not Reported in F.Supp.2d Page 9
Not Reported in F.Supp.2d, 2006 WL 292010 (D.Idaho), 62 ERC 1142
**(Cite as: 2006 WL 292010 (D.Idaho))**

As the NSEIS noted, a dramatic decline in Bighorn Sheep in 1991 was "presumed ... [due to] contact with domestic sheep which resulted in transmission of the *Pasteurella* bacteria." *See AR NS06982*. The NSEIS states that the disease kills adults quickly and leads to low disease resistence in new lambs. *See AR NS07070.*

The Forest Service found that Bighorn Sheep do not use the four allotments, but have a summer range adjacent to the Fisher Creek allotment, and have used range adjacent to the North Fork-Boulder allotment. *See AR NS06982*. To determine the likelihood of contact, the Forest Service studied its own maps of herd ranges, and others provided by the Idaho Department of Fish and Game, to determine if contacts were possible. *See AR NS07053*. Ultimately, the Forest Service concluded that "[t]he likelihood of contact between these two species in the noted allotments is low, given the lack of overlapping current and historic range." *See AR NS07071*.

***11** The lethal nature of this disease, and the dramatic die-offs in the past, warrant--and were in fact given--close attention by the Forest Service. After study, it concluded that sheep/Bighorn Sheep contact, and hence disease transmission, was unlikely. That decision is entitled to deference and the Court can find nothing in the record that renders it arbitrary and capricious.

6. *Sheep Driveway & Q Fever*

The Court concludes that the Forest Service did treat the Sheep Driveway as a cumulative issue and has complied with NEPA. With regard to Q Fever, the NSEIS concludes that "continued sheep grazing on the allotments would not pose a significant risk to public health." *See AR NS07156-7159*. That decision is entitled to deference, and the Court can find nothing in the record warranting setting it aside. The Court will therefore deny WWP's challenges on these two issues.

7. *Conclusion*

To summarize:

(1) The failure of the NSEIS to discuss the capability and suitability determinations violated NFMA and NEPA.
(2) The failure of the NSEIS to discuss the capability and suitability of the MIS sage grouse and pileated woodpecker violated NFMA.
(3) The failure of the NSEIS to fully explain the adaptive management strategy and its protocols violated NFMA.
(4) The Forest Service satisfied NFMA and NEPA in its discussion of Bighorn Sheep, the Sheep Driveway, and Q Fever.

Both sides have filed motions for summary judgment. The Court will grant in part and deny in part each motion, as set forth above. For the issues on which WWP prevailed, the appropriate remedies will have to await further briefing-- the motions did not cover remedy issues as the parties decided to raise those issues only after resolution of the present motions. For that reason, this decision does not finally resolve the case. The Court will direct counsel to stipulate to a briefing schedule on the remaining issues, and submit the schedule to the Court for approval within twenty days from the date of this decision.

ORDER

In accordance with the Memorandum Decision set forth above,

NOW THEREFORE IT IS HEREBY ORDERED, that the defendant's motion for summary judgment (Docket No. 25) is GRANTED IN PART AND DENIED IN PART. It is granted to the extent it seeks a finding that the Forest Service properly resolved issues relating to Bighorn Sheep, the Sheep Driveway, and Q Fever. It is denied in all other respects.

IT IS FURTHER ORDERED, that the plaintiffs' motion for summary judgment (Docket No. 35) is GRANTED IN PART AND DENIED IN PART. It is granted to the extent that it seeks a ruling that: (1) The failure of the NSEIS to discuss the capability and suitability determinations violated NFMA and NEPA; (2) The failure of the NSEIS to discuss the capability and suitability of the MIS sage grouse

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

http://print.westlaw.com/delivery.html?dest=atp&dataid=B0055800000100060004934902C... 6/6/2008

Page 10 of 10

Not Reported in F.Supp.2d Page 10
Not Reported in F.Supp.2d, 2006 WL 292010 (D.Idaho), 62 ERC 1142
**(Cite as: 2006 WL 292010 (D.Idaho))**

and pileated woodpecker violated NFMA; and (3) The failure of the NSEIS to fully explain the adaptive management strategy and its protocols violated NFMA. It is denied in all other respects.

***12** IT IS FURTHER ORDERED, that the motion to strike (Docket No. 34) is DENIED.

IT IS FURTHER ORDERED, that counsel shall stipulate to a schedule for remaining briefing and submit the stipulation to the Court for approval within twenty days from the date of this decision.

Not Reported in F.Supp.2d, 2006 WL 292010 (D.Idaho), 62 ERC 1142

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

http://print.westlaw.com/delivery.html?dest=atp&dataid=B0055800000100060004934902C... 6/6/2008





BIODIVERSITY CONSERVATION ALLIANCE, *ET AL.*

174 IBLA 1                                    Decided March 3, 2008


# United States Department of the Interior

## Office of Hearings and Appeals

Interior Board of Land Appeals
801 N. Quincy St., Suite 300
Arlington, VA 22203

BIODIVERSITY CONSERVATION ALLIANCE, *ET AL.*

IBLA 2004-316, 2005-3 Decided March 3, 2008

Appeals from a Record of Decision of the Wyoming State Director, Bureau of Land Management, authorizing the Desolation Flats Natural Gas Field Development Project. BLM/WY/PL-04/029+1310.

Affirmed in part; affirmed as modified in part.

1. Federal Land Policy and Management Act of 1976: Generally--Oil and Gas Leases: Generally--Oil and Gas Leases: Stipulations

   When BLM issues a Record of Decision to approve an oil and gas development project, BLM's decision will not be found to constitute unnecessary or undue degradation of the public lands if its conclusions have a rational basis in the record, even if it does not (1) adopt appellants' proffered alternative to make specific decisions regarding directional drilling or co-locating wells; (2) delay drilling until after consideration of citizens' proposals to change the designation of land open to oil and gas leasing to wilderness or areas of critical environmental concern; or (3) adopt appellants' positions regarding mitigation to protect sage grouse leks and big game winter range,.

2. Federal Land Policy and Management Act of 1976: Generally--Federal Land Policy and Management Act of 1976: Land Use

   Where BLM establishes a reasonably foreseeable development scenario for purposes of land use planning and environmental review, that scenario is not a land use decision establishing a binding maximum to which BLM must conform. A subsequent decision to exceed such a scenario does not violate the land use plan, FLPMA, or the rules at 43 C.F.R. Subpart 1610.

3.    Environmental Policy Act--Environmental Quality:
Environmental Statements--National Environmental
Policy Act of 1969: Generally

BLM may prepare a programmatic or project-level
environmental impact statement for exploration and
development of an oil and gas field, deferring site-specific
environmental analysis of individual well sites until
applications for permits to drill wells are submitted.

APPEARANCES:  Mike Chiropolos, Esq., Boulder, Colorado, for Biodiversity
Conservation Alliance, *et al.*; Johanna H. Wald, Esq., San Francisco, California, for
Natural Resources Defense Council; Michael Saul, Esq., Boulder, Colorado, for
National and Wyoming Wildlife Federations; Terri L. Debin, Esq., Office of the
Regional Solicitor, U.S. Department of the Interior, Lakewood, Colorado, for the
Bureau of Land Management; and Laura Lindley, Esq., and Robert C. Mathes, Esq.,
Denver, Colorado, for Cabot Oil & Gas Corp., EOG Resources, Inc., and Sampson
Resources Company.

OPINION BY ADMINISTRATIVE JUDGE HEMMER

On July 27, 2004, the Wyoming State Director, Bureau of Land Management
(BLM), issued a Record of Decision (ROD) authorizing the "Desolation Flats Natural
Gas Field Development Project" (Project) on leased Federal lands in Ts. 13-16 N.,
Rs. 93-96 W., Sixth Principal Meridian, Sweetwater and Carbon Counties, Wyoming
(Project Area).  Two groups of environmental associations appealed the decision,
arguing that it violates sections 202 and 302 of the Federal Land Policy and
Management Act of 1976 (FLPMA), 43 U.S.C. §§ 1712 and 1732 (2000), and
section 102(2)(C) and (E) of the National Environmental Policy Act of 1969 (NEPA),
42 U.S.C. § 4332(2)(C) and (E) (2000).

Biodiversity Conservation Alliance, Wyoming Outdoor Council, Center for
Native Ecosystems, The Wilderness Society, and Wyoming Wilderness Association
(collectively, BCA) appealed and petitioned for a stay of the decision in an appeal
docketed as IBLA 2004-316, alleging numerous violations of FLPMA and NEPA.  We
denied BCA's petition for a stay by order dated October 26, 2004.  In that order, and
in an order dated September 20, 2004, we granted requests to intervene filed by
Cabot Oil & Gas Corporation (Cabot), EOG Resources, Inc. (EOG), proponents of the
Project, and Samson Resources Company (Samson), a successor-in-interest to a
proponent of the Project (collectively, Intervenors).

Natural Resources Defense Council, National Wildlife Federation, and
Wyoming Wildlife Federation (collectively, NRDC) filed an appeal, IBLA 2005-3, in

which they allege similar violations of NEPA and FLPMA. By order dated November 22, 2004, we granted requests from Intervenors to intervene in this appeal as well. We consolidate the appeals to consider the merits.

*Background – The Desolation Flats Project*

In 1999, several operators, including Cabot, EOG, and Sampson's predecessor-in-interest, submitted to BLM a proposal for an exploratory drilling and development project involving 592 gas wells to be drilled over a 20-year period on leased Federal lands in the Desolation Flats area of Wyoming. ROD at 1. Over 93% of this area is subject to Federal oil and gas leases. BLM Response to Petition for Stay, IBLA 2004-316, at 4; BCA Reply at 1. The operators later modified the proposal to reduce to 385 the number of potential gas wells to concentrate exploration and development in the most economically and technically feasible parts of the Project Area. *Id.* The area encompasses approximately 233,542 acres, 224,434 of which are Federally-owned. Final Environmental Impact Statement for the Desolation Flats Natural Gas Field Development Project, May 2004 (FEIS) at 1-1. Approximately 94% of the Project Area is within the administrative jurisdiction of BLM's Rawlins Field Office, governed by the November 1990 Great Divide Resource Management Plan (RMP)[1]; the remainder (6%) is managed by BLM's Rock Springs Field Office under the August 1997 Green River RMP. ROD at 1.

On May 18, 2000, BLM published a notice of intent to prepare an EIS for the Project. ROD at 4. It completed the Draft EIS (DEIS) in April 2003, analyzing three alternatives in detail: the Proposed Action, described below; Alternative A, which involved expanding the project to 592 wells in the event the economic environment changed to make drilling in additional locations feasible; and the No-Action Alternative. In this case, because the subject land is generally subject to oil and gas leases which give lessees the right to exploit oil and gas, the no-action alternative was not a "no development" alternative. Rather, taking "no action" (that is, *not* undertaking to consider development of the Project under a single EIS) would reject the operators' proposal but would nonetheless result in consideration of individual Applications for Permits to Drill (APDs) submitted by lessees or operators on a case-by-case basis. DEIS at S-2 and S-3.

The Proposed Action included 385 wells to be drilled at 361 locations. FEIS at 1-2. Assuming a forecasted success rate of 65%, the project would encompass 250 producing wells at 235 well sites, supplementing 89 wells already existing in the Project Area. *Id.* (Of the wells predicted to be successful, 237 would be located in the Rawlins Resource Area; 13 would be in the area managed by the Rock Springs

---

[1] The Great Divide RMP is currently being revised and updated, and also renamed the Rawlins RMP.

Field Office.) Development was scheduled to begin in 2004 and continue for 20 years. The total projected life of the Project was 30 to 50 years. *Id.* BLM estimated that the new, short-term surface disturbance caused by the Project would be 4,923 acres: 1,444 acres for wells, 2,624 acres for new road construction or road upgrades, 758 acres for new pipelines, and 97 acres for ancillary facilities (4 compressor stations, one gas processing plant, three water evaporation ponds, two disposal wells, and ten water wells). *Id.* In total, approximately 2.1% of the Project Area would be disturbed in the short term. *Id.* BLM forecasted that total long-term surface disturbance, after rehabilitation, would be reduced to 2,139 acres, or 0.92% of the Project Area: 336 acres for wells (235 well sites with an average of 1.43 acres of long-term disturbance per site); 1,706 acres for roads (assuming reclamation of roads leading to unsuccessful well sites); and 97 acres for ancillary facilities. *Id.*

The DEIS describes two alternatives considered but rejected from detailed study: the Expanded Wilderness Alternative and the Directional Drilling Alternative, both proposed by BCA. DEIS at 2-42 to 2-43; ROD at 6. After receiving and considering public comment, BLM issued the FEIS in May 2004. Both the FEIS and the DEIS were tiered to the EISs prepared in connection with BLM's land use planning documents governing the Project Area; these are the November 1990 Great Divide RMP for the Rawlins Field Office and the August 1997 Green River RMP for the Rock Springs Field Office. DEIS at S-1; FEIS at 1-1. The applicable NEPA documents for the Great Divide RMP are the April 1987 Medicine Bow-Divide (Great Divide Resource Area) Draft Environmental Impact Statement (1987 Great Divide DEIS) and a 1990 Final EIS (together the Great Divide RMP/EIS).

On July 27, 2004, the Wyoming State Director issued an ROD adopting the Proposed Action, thereby authorizing up to 385 gas wells to be drilled on up to 361 drill sites, and construction or improvement of 542 miles of roads, 361 miles of natural gas pipelines, four compressor stations, and one natural gas processing plant over 20 years. ROD at 5. The ROD did not approve specific sites for the 385 wells, or provide site-specific analysis of potential well sites. BLM deferred that level of detailed analysis to NEPA documentation to be prepared in association with APDs submitted by the project proponents. ROD at 2 ("Prior to issuing any permit or authorization to implement these activities on the BLM-administered lands, the BLM must analyze each component of the Proposed Action on a site-specific basis and subject to NEPA."); FEIS at 3-4, 5-38 to 5-41; DEIS at 2-4, 2-6 to 2-7.

*Analysis*

*I. FLPMA.*

Appellants' allegations that the ROD violates FLPMA fall into two general categories. They argue that the ROD (i) fails to avoid unnecessary or undue

degradation to the environment, and (ii) impermissibly authorizes development in excess of the Reasonably Foreseeable Development scenario (RFD) established in the Great Divide RMP/EIS.

*A. Unnecessary or Undue Degradation*

Section 302(b) of FLPMA, 43 U.S.C. § 1732(b) (2000), extends protection to the administration of the public lands: "In managing the public lands the Secretary shall, by regulation or otherwise, take any action necessary to prevent unnecessary or undue degradation of the lands." The Department has issued no regulation defining what might constitute "unnecessary or undue degradation" in the context of onshore oil and gas development, an activity where some level of environmental degradation is to be expected. As we recently explained:

> As the Board has noted, "[n]either FLPMA nor implementing regulations defines the term 'undue or unnecessary degradation.'" *Colorado Environmental Coalition*, 165 IBLA 221, 229 (2005); *see* 43 U.S.C. § 1702 (2000). In other contexts, BLM has promulgated regulations defining the term. *See, e.g.*, . . . 43 C.F.R. § 3809.5 (surface management). No similar definition appears in the onshore oil and gas regulations. *Compare* 43 C.F.R. § 3100.0-5 (definitions for Onshore Oil and Gas Leasing: General) and 3160.0-5 (definitions for Onshore Oil and Gas Operations). However, those [latter] regulations provide that the right of a lessee to
>
> > explore for, drill for, mine, extract, remove and dispose of all the leased resource in a leasehold [is] subject to: Stipulations attached to the lease, restrictions deriving from specific, nondiscretionary statutes, and such reasonable measures as may be required by the authorized officer to minimize adverse impacts to other resource values, land uses or users not addressed in the lease stipulations at the time operations are proposed.

*Wyoming Outdoor Council*, 171 IBLA 108, 121 (2007), *quoting* 43 C.F.R. § 3101.1-2.

Nonetheless, FLPMA coexists with mineral leasing statutes and recognizes the need for multiple use management, which includes taking into account the nation's need for nonrenewable resources such as minerals, 43 U.S.C. § 1702(c) (2000), and "domestic sources of minerals . . . from the public lands," 43 U.S.C. § 1701(a)(12) (2000). Congress thus recognized that the mere act of approving oil and gas development does not constitute unnecessary or undue degradation under FLPMA, and that something more than the usual effects anticipated from such development,

subject to appropriate mitigation, must occur for degradation to be "unnecessary or undue." *See also* BCA Ex. CC, Instruction Memorandum No. (IM) 92-67 at 2 (Dec. 3, 1991) (standard "implies that there is also *necessary and due degradation*").

BCA argues that BLM has failed to meet its duty to avoid unnecessary or undue degradation on public lands because BLM did not adopt BCA's suggestions of "specific ways to avoid altogether or lessen the environmental impacts associated with additional development of the [Project Area], such as employing directional drilling, locating multiple wells per pad, . . . and implementing more stringent and scientifically supportable protections for sage grouse leks and winter-range." BCA Petition for Stay (BCA PS) at 32. We disagree with BCA that BLM's choice not to adopt BCA's mitigation recommendations constitutes, by law or rule, unnecessary or undue degradation.

[1] The question remaining is whether BLM's decision was, as BCA argues, without rational foundation because BLM failed to minimize adverse impacts where possible, and, if so, whether that failure logically would constitute unnecessary or undue degradation. *See* BCA PS at 32.[2] BLM responded to BCA's comment letter with 59 pages of explanation, addressing each suggestion and explaining why BLM chose not to adopt it. *See* FEIS at 5-43, 5-53 (directional drilling, multiple wells per pad); 5-43 to 5-44, 5-61 (sage grouse); 5-51 to 5-52, 5-55 to 5-58 (winter range). With respect to BCA's specific allegations of failures amounting to unnecessary or undue degradation, the record shows as follows:

1. *BCA's complaints that BLM did not adopt BCA's suggestions for employing directional drilling or locating multiple wells per pad.* BCA suggested that BLM consider an alternative of "directional drilling only." DEIS at 2-43. BLM responded in considerable detail, (a) explaining that BLM anticipated that such drilling methods *would be considered* at the APD phase; (b) describing problems encountered by Union Pacific Resources Company in attempting to drill 17 diagonal wells at the nearby Wamsutter Field, which showed that a hard and fast rule was not technically feasible; and (c) discussing the economic and mechanical limits associated with standard drilling equipment that make diagonal drilling impossible at some sites. *Id.* at 2-43 to 2-44. BLM noted this answer in responding to BCA's comments. FEIS at 5-43. We find no error in BLM's explanation, let alone a lack of rational basis that could compel

[2] BCA argues that BLM's decisions were "arbitrary, capricious, and an abuse of discretion." BCA PS at 32. This standard derives from the Administrative Procedure Act (APA) which provides that Federal courts must set aside actions of an agency found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (2000). As an administrative tribunal, we review a BLM decision to determine whether it is supportable on a rational basis. *Southern Utah Wilderness Alliance,* 160 IBLA 225, 233 (2003).

a finding of unnecessary or undue degradation.  BCA's position is, ultimately, that "BLM failed to recognize that protecting other resources might sometimes *require* conditioning drilling approvals on such technologies."  BCA Reply at 8 (emphasis BCA's).  Nothing BLM has done precludes such a requirement at the stage when BLM considers an APD, and BLM has reasonably explained why it will not adopt such requirements at the stage of preparing the FEIS for the development project.

2.  *BCA's complaints that BLM did not adopt BCA's proposals to delay drilling to protect wilderness character or proposed ACECs to be addressed in the revision of the Great Divide RMP.*  At the time of the ROD, at most, BLM had stated its intention to update the Great Divide RMP; the Rawlins Draft RMP had not been completed at that time.  BCA proposed that various portions of the Desolation Flats Project Area be designated as wilderness in a 2001 Citizen's Wilderness Proposal.  DEIS at 2-42.  BCA also proposed that some portions be designated as ACECs.  BLM considered the possibility of an Expanded Wilderness Alternative, but rejected it.  *Id.*  BLM explained that it would consider relevant citizens' proposals through appropriate NEPA documentation, and that, to the extent "proposed development activities were found to impair wilderness values, [an APD] would be denied until completion of the Great Divide RMP revision."  *Id.* at 2-43.  We find BLM's conclusion to be founded in logic.

Further, BLM has already issued oil and gas leases for the vast majority of the Project Area.  We have refused to reverse BLM land use decisions on grounds that appellants have asked BLM to change prior land use commitments.  In *Biodiversity Conservation Alliance*, 171 IBLA 313, 318 (2007), we stated:

> We have repeatedly rejected the notion that BLM must manage the public lands in light of proposals by the public to designate lands as wilderness.  *Colorado Environmental Coalition*, 162 IBLA 293, 301-02 (2004), *Colorado Environmental Coalition*, 161 IBLA 386, 393-94 (2004); *Colorado Environmental Coalition*, 149 IBLA 154, 156 (1999); *Colorado Environmental Coalition*, 142 IBLA 49, 53-54 (1997); *see also Southern Utah Wilderness Alliance*, 163 IBLA 14, 25-27 (2004).  We have applied similar principals in the context of ACECs.  *E.g., Southern Utah Wilderness Alliance*, 141 IBLA 85, 90 (1997).

*See also Colorado Environmental Coalition,* 171 IBLA 256, 268 (2007); *Southern Utah Wilderness Alliance*, 160 IBLA 225, 230-32 (2003), and cases cited.  Given this precedent, we are unable to find BLM's decision to go forward with the Desolation Flats Project an action that causes unnecessary or undue degradation.

3.  *BCA's complaints that BLM did not adopt BCA's proposals to implement "more stringent and scientifically supportable protections for sage grouse leks and winter-range."*  BCA PS at 32.  In comments, BCA challenged BLM for setting a ¼-mile buffer

around sage grouse leks. In response, BLM acknowledged that scientific literature shows that no-surface-disturbance requirements for the sage grouse "generally run in the .25 to 2 mile range"; that therefore the ROD had established ¼ mile as a minimum distance; and that BLM reserved the right to increase the no-surface-disturbance buffer. FEIS at 5-44.[3] BLM also responded in considerable detail to BCA's complaints that BLM's protections of the winter range for various species were inadequate. In particular, BLM explained the difference between stipulations attached to leases that had already been issued, as opposed to conditions of approval (COAs) attaching to APD decisions, and detailed situations in which exceptions could be granted on site-specific bases, noting that exception requests result in interdisciplinary review and consultation with the Wyoming Game and Fish Department. FEIS at 5-52. BLM explained, in response to BCA's complaints that waivers are "almost always approved on request," that the reason for this is that operators generally discuss such requests informally to determine if such a waiver is possible, and do not submit formal requests if BLM advises that a waiver cannot be approved. *Id.* at 5-51 to 5-52; *see also id.* at 5-53, 5-54. We find that BLM's conclusions have a rational basis, and do not violate FLPMA's unnecessary or undue degradation standard. *Cf. Wyoming Outdoor Council*, 171 IBLA at 121-22 (failure to incorporate Wyoming Fish and Game policy for winter range not unnecessary or undue degradation under FLPMA).

We reject BCA's FLPMA argument. We will not disturb BLM's discretion to balance the competing uses mandated by FLPMA where BLM has provided a reasoned explanation for its decision.

*B. Development Beyond the RFD Scenario*

BCA and NRDC argue that the BLM has exceeded the RFD scenario for the Great Divide Resource Area, both in number of wells drilled and in number of acres disturbed. BCA PS at 32-36; NRDC SOR at 5-20. They base this conclusion on the Great Divide RMP/EIS and DEIS, which considered an RFD scenario for oil and gas in the 20-year planning period projecting 1,440 wells. Great Divide RMP/DEIS at 220.

BLM points out that the Great Divide RFD scenario envisioned that the anticipated 1,440 wells would disturb "approximately 34,355 acres" in the 20-year planning period, at the end of which an estimated 18,263 acres would be reclaimed, leaving a total estimated long-term disturbance of 16,092 acres. Great Divide RMP/DEIS at 220. BLM explains that the 40 acres of disturbance anticipated per well in 1987 exceeds subsequent gains in drilling efficiency. BLM analyzed 26 wells drilled under an interim drilling program at Desolation Flats, and concluded that the

[3] As explained in addressing NEPA below, we affirm the ROD as modified to incorporate the sage grouse policy set forth in IM 2004-057 (Aug. 16, 2004).

"long-term disturbance has averaged 6.3 acres/well." FEIS at 2-2. BLM concluded that, at the time of the ROD, existing long-term disturbance in the Rawlins Resource Area amounted to 10,767 acres for existing or authorized wells. At a 65% success rate for the 385 wells in the Proposed Alternative, and accounting for wells in the Rawlins Resource Area (totaling 237 out of 250 successful wells), BLM projected long-term impacts of approved and successful wells (237 x 6.5 (rounding up)) at 1,541 acres, a total falling reasonably within the RFD disturbance scenario in the Great Divide RMP/EIS (10,767 + 1,541 < 16,092). *See* FEIS at 2-2 through 2-4.

Appellants object to this approach and argue that BLM may permit no more than the number of wells projected for the RFD scenario in 1987. They claim that BLM's experience with 26 wells in the Desolation Flats interim program, leading to disturbance of 6.3 acres/well, is unworthy of consideration, and that BLM should be compelled to follow the previous projection of 9 acres of disturbance per well employed in the 2000 EIS for the Continental Divide/Wamsutter II Natural Gas Project. NRDC SOR at 16-17 and n.6. They dispute BLM's calculation based on a 65% well success rate, stating that "[n]o data is provided to support this assumption." *Id.* at 19 n.11.[4] They dispute the calculated disturbance of 10,767 acres for existing or authorized wells; they argue that BLM should have increased projections of disturbed acreage per future wells and that BLM improperly discounted the number of wells authorized for other projects. They complain that, whether counted in numbers of wells or acres to be disturbed, by approving the ROD, BLM has authorized wells in the Rawlins Resource Area vastly in excess of the RFD scenario considered in the Great Divide RMP/EIS.

[2] We have already rejected these arguments in other appeals involving appellants represented in the cases before us, including a case involving the Great Divide RFD scenario. We find no reason to reconsider outcomes already reached.

In *Wyoming Outdoor Council*, 164 IBLA 84, 96-97 (2004), appellants contended that BLM had violated FLPMA by approving development of wells in excess of the number of wells anticipated in the RFD scenario for the Pinedale RMP.[5] BLM conceded in that case that the RFD scenario had been exceeded. Nonetheless, we rejected appellants' characterization of the RFD as a "point past which further exploration and development is prohibited." *Id.* at 99. We adopted the characterization of the RFD found in BLM's IM No. 2004-89 (Jan. 16, 2004), as merely a "tool prepared by an interdisciplinary group of technical and scientific

---

[4] In fact, the Great Divide RMP discusses the history of oil and gas wells in the Rawlins Resource Area. Between 1911 and 1985, 3,671 wells were drilled; 1,896 (more than 50%) were dry and abandoned. Great Divide RMP/DEIS at 220.

[5] Wyoming Outdoor Council, Wyoming Wildlife Federation, The Wilderness Society, and NRDC, all appellants in the cases before us, participated in the case.

specialists," which "serves as an analytical baseline for identifying and quantifying direct, indirect, and cumulative impacts, which provide the premise for formulating alternatives to a proposed action and strategies for mitigating adverse impacts." *Id.*

Subsequently, in *National Wildlife Federation*, 170 IBLA 240 (2006), BLM argued that the RFD for the Great Divide RMP had not been exceeded because, despite the number of wells anticipated in the RFD scenario, the number of acres of long-term disturbance envisioned in the RFD had not been exceeded.[6] We explained:

> On the question of whether the RFD scenario has been exceeded, NWF takes a different tack than that argued in *WOC*, 164 IBLA 84. In *WOC*, appellants argued that the number of authorized and drilled wells was greater than that projected in the RFD and, therefore, that BLM was required to amend or revise the RMP before further leasing occurred. *Id.* at 101-102. Here, NWF objects to BLM's method of determining the status of the RFD scenario, specifically the fact that BLM has altered its calculation method.

*National Wildlife Federation*, 170 IBLA at 249. We rejected the argument that BLM's method for calculating the status of the RFD scenario was flawed:

> [W]e perceive no fault in a calculus that presumes that the number of wells that can be drilled in an RFD scenario is properly a function of reduced surface disturbance resulting from achievements in increased efficiencies, better management practices and techniques, technological advances, reclamation, and so on . . . . [A]lthough it plainly objects to the impact on the RFD scenario to the extent it leads to more development . . . , NWF challenges the propriety of revising the method at all. We find nothing in FLPMA or NEPA, or implementing regulations, that plausibly requires us to hold that BLM cannot revise its method of calculating the number of wells remaining to be drilled under an RFD scenario based upon, among other things, the degree of short- and long-term surface disturbance resulting from oil and gas activities. Even if we believed that there was a different or better approach to quantifying the degree of development remaining under an RFD scenario, however, as an appellate tribunal, the Board of Land Appeals does not exercise supervisory authority over BLM, outside the context of deciding an appeal over which the Board has jurisdiction.

170 IBLA at 250-51 (footnotes and citations omitted).

[6] The four appellants in *National Wildlife Federation*, National Wildlife Federation, BCA, Wyoming Outdoor Council, and Wyoming Wildlife Federation, appear here.

Appellants here similarly fail to make the showing that was absent in *National Wildlife Federation*. Although they plainly disagree with BLM, the many claims appellants (in particular, NRDC) make with respect to the types of wells BLM should or should not have included in its consideration, or the types of acres of disturbance properly or improperly considered, these arguments are not probative of appellants' contention that BLM has exceeded *its* discretion with respect to assessing and interpreting the RFD scenario it previously established.[7] The many permutations raised by appellants as options for calculating the RFD scenario and determining whether it has been exceeded only verify that there are different ways to consider the degree and impact of surface disturbance attributable to oil and gas development in the Rawlins Resource Area; they do not compel us to reject BLM's approach and choose one of appellants' options for calculating wells or acreage. BLM established the RFD scenario in the first place; we will defer to BLM in interpreting its meaning.

But even if we were to parse through NRDC's averments regarding the wells and acreage BLM properly should have considered in calculating whether the 1987 Great Divide RFD scenario has been exceeded, we still would not find a violation of FLMPA. We thus address, at NRDC's invitation, the issue we declined to reach definitively in *Wyoming Outdoor Council* – whether the RFD "can or should be deemed to constitute a land use plan decision within the meaning of" BLM's regulations at 43 C.F.R. Subpart 1610. NRDC Reply at 6-7, *quoting Wyoming Outdoor Council*, 164 IBLA at 102. To the extent NRDC's query is whether an RFD scenario is a land use decision constituting a binding maximum to which BLM must "conform," we find that it is not.

BLM has the delegated authority of the Secretary under section 202(a) of FLPMA, 43 U.S.C. § 1712(a) (2000), to establish land use plans. Under 43 C.F.R. § 1610.5-3(a), all subsequent decisions "shall conform to the approved plan." *See Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 69 (2004). While an important tool in the land use planning process, RFD scenarios do not constitute fixed or maximum limits on development in RMPs under FLPMA such that exceeding them constitutes a violation of that statute. Rather, they spring from the NEPA review process, deriving from the Council on Environmental Quality (CEQ) regulations requiring analysis of reasonably foreseeable events, and permit NEPA analysis of impacts of projected development. As we explained in *Wyoming Outdoor Council*, 164 IBLA at 91 n.11:

---

[7] Though appellants argue various conclusions regarding the number of wells authorized, depending on whether the wells are productive, dry holes, or reclaimed, NRDC settles on 2,227 as the number of wells BLM will have authorized in the Rawlins Resource Area with the Desolation Flats Project. NRDC SOR at 12. Without agreement on parameters, a precise number is evidently not possible to verify.

> The phrase appears in CEQ regulations at 40 C.F.R. §§ 1501.2, 1502.16, and 1502.22, and in the CEQ's definitions of *cumulative impact*, 40 C.F.R. § 1508.7; *effects*, 40 C.F.R. § 1508.8(b); *scope*, 40 C.F.R. § 1508.25(a)(3); and *significantly*, 40 C.F.R. § 1508.27(b)(7). The concept of projecting reasonably foreseeable future actions or impacts, or, as it is more popularly termed, "reasonably foreseeable development," originates in two regulations. The CEQ defines the scope of an EIS as consisting of the "range of actions, alternatives, and impacts to be considered," 40 C.F.R. § 1508.25, and these include direct, indirect, and cumulative effects, 40 C.F.R. § 1508.25(c).

Thus, the RFD scenario is a tool used to define and consider the significant impacts on the environment as required by NEPA, when undertaking to establish an RMP, which by law and rule requires accompanying NEPA review. BLM's goals for operating within the confines of an RFD scenario in an EIS for an RMP derive from NEPA's strictures.

The Great Divide RMP explicitly opened the entire planning area to oil and gas leasing with appropriate restrictions to protect listed resources; it states with respect to oil and gas that "[a]ll lands open to oil and gas leasing" are open to exploration and development. Great Divide RMP at 17. Even assuming that it has been exceeded, we do not find that use of the RFD scenario for analysis in the underlying EIS led to a violation of the RMP, FLPMA, or the rules at 43 C.F.R. Subpart 1610.

We find confirmation of our view in Supreme Court analysis of FLPMA RMPs:

> Quite unlike a specific statutory command requiring an agency to promulgate regulations by a certain date, a land use plan is generally a statement of priorities; it guides and constrains actions, but does not (at least in the usual case) prescribe them. It would be unreasonable to think that either Congress or the agency intended otherwise . . . .
>
> Of course, an action called for in a plan may be compelled when the plan merely reiterates duties the agency is already obligated to perform, or perhaps when language in the plan itself creates a commitment binding on the agency. But allowing general enforcement of plan terms would lead to pervasive interference with BLM's own ordering of priorities.

*Norton v. Southern Utah Wilderness Alliance*, 542 U.S. at 71.

We find no evidence in the RMP of "language in the plan [which] creates a commitment binding on the agency" limiting the number of oil and gas wells to

1,440, or long-term disturbance due to oil and gas development to 16,092 acres in the 20-year planning period, let alone in the subsequent decades covered by the Desolation Flats Project. BLM established an RFD scenario for purposes of considering effects on the environment of its projected planning under NEPA.

The parties present a wealth of information regarding the planning process in making their arguments, including the *BLM Manual*, Planning for Fluid Mineral Resources, H-1624-1, May 7, 1990; BLM reports to Congress; and IM 2004-89 (Jan. 16, 2004), which set a "Policy for [RFD] Scenario for Oil and Gas." BLM undoubtedly employs RFD scenarios as a planning tool incorporated into the BLM land use planning handbook, which merges FLPMA and NEPA obligations. "The baseline RFD scenario provides the mechanism to analyze the effects that discretionary management decisions have on oil and gas activity. The RFD also provides basic information that is analyzed in the [NEPA] document under various alternatives." Intervenors' Ex 9, IM 2004-89, Attachment 1-1. That BLM has coordinated its planning and evaluation responsibilities for multiple use management is both laudable and obligatory. But it also understands that the RFD is not "a planning decision." *Id.* However BLM has intertwined the RFD scenario in accomplishing its statutory goals, on review we do not see it as a maximum limitation on development for purposes of considering conformance with the RMP under 43 C.F.R. § 1610.5-3(a). Were we to find that BLM authorized development in excess of the RFD scenario, this would constitute an issue of compliance with NEPA, not FLPMA.[8] And so, we turn to NEPA.

*II. NEPA*

NEPA is a procedural statute designed to "insure a fully informed and well-considered decision." *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 558 (1978). NEPA does not bar actions which affect the environment, even adversely. Rather, the process assures that

[8] This view is consistent with materials attached as Document 6 to NRDC's SOR. BLM, *Budget Justifications and Annual Performance Plan, Fiscal Year 2001*, "Report to the Congress: Land Use Planning for Sustainable Resource Decisions – Oil and Gas." In that report, BLM explained that many of its RMPs were insufficient to meet today's needs, and were "in varying stages of decline and will continue to degenerate in usability as they continue to age." *Id.* at last page, Strategy to Address Identified Planning and NEPA Deficiencies. With respect to oil and gas, BLM explained that demand exceeded many RFD scenarios, and thus that environmental analysis may be out-of-date. "This means that [land use plans] in many areas of high industry interest for leasing and development no longer *adequately analyze the full effects of such projected activities on the environment and socio-economic conditions.*" *Id.* at III-99, Justification of 2001 Program Changes (emphasis added).

decisionmakers are fully apprised of likely effects of alternative courses of action so that selection of an action represents a fully informed decision. *In re Bryant Eagle Timber Sale*, 133 IBLA 25, 29 (1995). When BLM has satisfied the procedural requirements of section 102(2)(C) of NEPA, it will be deemed to have complied with NEPA, regardless of whether a different substantive outcome would be reached by appellants, this Board, or a reviewing court. *National Wildlife Federation*, 169 IBLA 146, 155 (2006).

An EIS is judged by whether it constitutes a "detailed statement" that takes a "hard look" at the potentially significant environmental consequences of the proposed Federal action and reasonable alternatives thereto, considering all relevant matters of environmental concern. *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976); *Western Exploration Inc.*, 169 IBLA 388, 399 (2006); *Southwest Center for Biological Diversity*, 154 IBLA 231, 236 (2001); *see* 40 C.F.R. § 1502.2(a). We are guided by a "rule of reason." *IMC Chemical, Inc.*, 155 IBLA 173, 195 (2001). The EIS must contain a "reasonably thorough discussion of the significant aspects of the probable environmental consequences" of the proposed action and alternatives. *California v. Block*, 690 F.2d 753, 761 (9th Cir. 1982), *quoting Trout Unlimited, Inc. v. Morton*, 509 F.2d 1276, 1283 (9th Cir. 1974). Significant impacts are expected when an agency prepares an EIS. *Western Exploration Inc.*, 169 IBLA at 399, *citing* 40 C.F.R. § 1502.16 (EIS must include discussion of "adverse environmental effects which cannot be avoided"); 42 U.S.C. § 4332(2)(C) (2000) (EIS required when significant impacts are found).[9]

Excluding their arguments that fall into the category of challenging a FONSI, appellants' attacks on the sufficiency of the EIS supporting the ROD generally fall into four categories. They allege that the FEIS (i) does not constitute the requisite hard look, because BLM did not choose locations of potential wells and therefore did not consider site-specific impacts; (ii) fails adequately to consider the cumulative impacts of the Project combined with other oil and gas development in the region; (iii) does not address the many opposing views set forth in appellants' comments regarding

---

[9]  Appellants claim that BLM erred for failing to acknowledge that impacts of the project would be significant or to reduce such impacts to insignificance with mitigation. *E.g.*, BCA Statement of Reasons (BCA SOR) at 3; NRDC SOR at 2. These are challenges to a finding of no significant impact (FONSI) based on an environmental assessment (EA). An EA allows an agency, *inter alia*, to determine whether impacts of a proposed action warrant a FONSI or instead are significant enough that an EIS is required. *Wilderness Watch*, 168 IBLA 16, 35 (2006). A FONSI is upheld on the basis of an EA if the record justifies such a finding or a conclusion that required mitigation measures will reduce effects to insignificance. Appellants' claims that the Project will cause impacts that are significant or that BLM's mitigation will be ineffective to permit what is in effect a FONSI are not redressible here.

habitat fragmentation or the efficacy of proposed mitigation; and (iv) does not adequately consider alternatives.

1. *The FEIS's Failure To Undertake Site-Specific Analysis*

[3] BCA argues that BLM failed to take the "hard look" mandated by NEPA because BLM did not undertake site-specific analysis of each potential well location. BCA SOR at 2-3; BCA PS at 14-16. BCA thus challenges the scope of the EIS as insufficient. BLM and Intervenors contend that the specificity demanded by BCA not only is unnecessary at this point, but also would be counterproductive and result in overstating environmental impacts by projecting events unlikely to occur. They explain that, like all oil and gas developers, the project proponents reasonably should be permitted to employ geological and natural gas reservoir knowledge gained from early wells to more strategically site future wells. Intervenors Answer to SOR, IBLA 2004-316, at 7-11; BLM Answer to SOR, IBLA 2004-316, at 2-5.

In the ROD, BLM explained that it chose to defer well-site selection and the accompanying analysis as follows:

> At this time the location of all future well sites and other disturbance cannot be determined with 100% accuracy by any process the proponents or BLM are aware of. "Setting in stone" well locations in the EIS would require predicting well locations with information in hand, and ignoring the fact that each well provides additional information that is utilized to help determine future actions, including the number of wells and well site locations. Currently, generalized areas of interest are being explored through the interim drilling process to further develop our knowledge of the geology and potential of the [Project Area]. Adaptive management of oil and gas resource development is very much a reality in that utilization of new information from drilling produces more effective drilling programs with correspondingly reduced effects upon the environment. The number of wells, well locations, timing of drilling, and construction is controlled in part by the location of gas and oil resources as they are found and developed . . . .

ROD at Errata 1, BLM Response to Comments from Ken Kreckle.

We disagree with BCA that, by choosing to consider in an EIS impacts of the oil and gas development project proposed here, BLM bore the obligation to expand the scope of the Project to include final decisions on site location, particularly when such decisions would be predictably inaccurate. Such specificity is not compelled by the requirement that BLM properly identify the scope of the project, lest we define

"scope" in a way that requires agencies to conduct environmental analysis they know will not be relevant. While it is true that when "an agency has an obligation to prepare an EIS, the scope of its analysis of environmental consequences in that EIS must be appropriate to the action in question," *Kern v. BLM*, 284 F.3d 1062, 1072 (9th Cir. 2002), it is also true that scope cannot be expanded so as to defeat the meaningfulness of review altogether. The Supreme Court described this problem in *New York v. Kleppe*: "EIS is required to furnish only such information as appears to be reasonably necessary under the circumstances for evaluation of the project rather than to be so all-encompassing in scope that the task of preparing it would become either fruitless or well nigh impossible." 429 U.S. 1307, 1311 (1976), *quoting Natural Resources Defense Council v. Callaway*, 524 F.2d 79, 88 (2d Cir. 1975).

Moreover, BCA errs in presuming that an EIS supporting a large-scale action must be as site-specific as an EIS or an EA to support the site-specific action. The Ninth Circuit has stated with regard to a programmatic EIS that the issue is not *whether* but *when* site-specific analysis is required:

> The critical inquiry in considering the adequacy of an EIS prepared for a large scale, multi-step project is not whether the project's site-specific impact should be evaluated in detail, but when such detailed evaluation should occur. NEPA requires that the evaluation of a project's environmental consequences take place at an early stage in the project's planning process. This requirement is . . . *tempered by the preference to defer detailed analysis until a concrete development proposal crystallizes the dimensions of a project's probable environmental consequences. When a programmatic EIS has already been prepared, we have held that site-specific impacts need not be fully evaluated until a "critical decision" has been made to act on site development*.

*'Ilio'ulaokalani Coalition v. Rumsfeld*, 464 F.3d 1083, 1095-96 (2006), *quoting California v. Block*, 690 F.2d 753 (9th Cir. 1982) (emphasis added); *see also Friends of Yosemite Valley v. Norton*, 348 F.3d 789, 800 (9th Cir. 2003); *Northern Alaska Environmental Center v. Lujan*, 961 F.2d 886, 890-91 (9th Cir. 1992).

Similarly, this Board has approved NEPA documents for reviewing large-scale projects the implementation of which will be subject to further critical decisionmaking. *See Fred E. Payne*, 159 IBLA 69, 81 (2003) ("exact position of the [353] wells and related facilities will be determined by BLM, only upon submission by the lessee/operator of an APD and further decisionmaking by BLM, following site-specific environmental review"); *William E. Love*, 151 IBLA 309, 320 (2000) ("further analysis will fix the exact location of [601 coal-bed methane] wells, compressors, pipelines, powerlines, and other facilities in the project area").

Although the Project Area lands are for the most part already leased, and thereby committed to oil and gas development, the particular location of each well has not been decided. Thus, the threshold at which site-specific analysis is required has not been reached. Well locations will be decided at the time BLM considers APDs for wells. *See* IM 2003-152 (comprehensive drilling planning). We will not reverse BLM for preparing an EIS at this point in the process, as a matter of pure practicality. The consequence of agreement with BCA's position with respect to this EIS would be that BLM would be obligated to choose the "no action" alternative and conduct environmental review on a case-by-case basis as APDs are submitted. This could subject BLM to the claim of improper segmentation antithetical to NEPA. *See Stewart Park & Reserve Coalition v. Slater*, 352 F.3d 545, 559 (2d Cir. 2003).

Finally, federal regulations and our case law establish that BLM may "tier" subsequent, site-specific NEPA analysis to earlier, broad, programmatic NEPA analysis. 40 C.F.R. § 1502.20; *see, e.g.*, *Klamath Siskiyou Wildlands Center*, 157 IBLA 322, 331 (2002); *Blue Mountains Biodiversity Project*, 139 IBLA 258, 266 (1997). BLM explains its expectation that necessary NEPA review of specific APDs will be tiered to the Desolation Flats FEIS. Tiering is a permissible method of conducting NEPA review and we will not reverse BLM for announcing its intention to employ it.

Having established that BLM may defer site-specific analysis at the broad project or programmatic level, we find that it did so appropriately in this case. BLM's explanation fully justifies the conclusion that later location of well sites is in order.

This conclusion, even if undermined, is not ultimately undone by BLM's subsequent approvals of APDs in the Desolation Flats Project Area pursuant to the ROD. In its SOR and in its later submitted Supplemental Information, BCA submits EAs and Statements of Categorical Exclusion prepared for those APDs.[10] BCA SOR Exs. R-W; Supplemental Information Exs. C1-C10. BLM and the Intervenors object to these submissions on grounds that they impermissibly expand the scope the appeal. Intervenors' Answer, IBLA 2004-316, at 11-13; BLM Answer, IBLA 2004-316, at 5-10. But BCA clarifies its position:

> *Appellants are not asking this Board to invalidate the APDs, as suggested by BLM*. Rather, Appellants submitted the APDs are relevant probative evidence to support Appellants' contention that the [Project] would be used to violate NEPA by excluding the public from site-specific decision-making—notwithstanding the empty assurances in the FEIS that BLM

[10] For three of the APDs cited by BCA, BLM relied on statutory categorical exclusions created by section 390 of the Energy Policy Act of 2005, Pub. L. No. 109-58, 119 Stat. 594, foregoing further NEPA analysis before approving the APDs. 42 U.S.C. § 15942 (West Supp. 2007).

> would meet its legal obligation to allow public comment on such decisions. This Board should consider the APDs to establish BLM's course of conduct as it proceeds with the site-specific stage of the [Project]—exposing a fundamental legal deficiency of the FEIS.

BCA Reply to BLM and Operators' Responses to SOR at 8 (emphasis added).

We acknowledge BCA's concern that BLM could avoid site-specific analysis altogether if it refuses to address drill sites in the FEIS, defers consideration until the APD phase, and then refuses to conduct appropriate review at that time on the basis of the recent categorical exclusions authorized by the 2005 Energy Policy Act enacted after the ROD. We agree that subsequent BLM actions could be problematic or rise to the level of legal error. But the deficiency, if one exists, is not with the FEIS. To the extent BCA's information is probative, it relates to BLM action subsequent to the ROD, which is neither before us in this appeal nor does it constitute evidence of BLM expectations when it prepared the ROD.

In any event, BCA's critique that BLM's assurances that it would allow public comment when approving the APDs have proven to be "empty" is based on its claim that there has been no opportunity for comment prior to approval of the APDs. BCA's Exhibits C2, C3, and C4 (to its Supplemental Information), however, include EAs with responses to BCA's comments on the proposed APDs. BLM denies a lack of opportunity with respect to other EAs cited by BCA, noting that notice of all APDs it considers is posted in BLM field offices 30 days before approval. 30 U.S.C. § 226(f) (2000); 43 C.F.R. § 3162.3-1(g) (2005). BCA does not allege that BLM violated this statutory responsibility when it approved the APDs for which BCA provided documentation. Regardless of whether BCA had an opportunity to comment on any particular APD, however, if there is a violation to be found, it arises from BLM's actions with respect to a particular APD, not the FEIS.

BCA does not seek reversal of any decision to grant a particular APD. Whatever BCA's strategy may be with respect to the FEIS, we nonetheless note that we may not resolve *sua sponte* alleged deficiencies in BLM's NEPA procedures for approving an APD because this appeal from the ROD and FEIS is not the appropriate forum for doing so. Any party adversely affected by BLM's decision to grant an APD may request State Director Review of that decision and ultimately appeal to this Board pursuant to 43 C.F.R. §§ 3165.3 and 3165.4. *Southern Utah Wilderness Alliance,* 144 IBLA 70, 81 (1998); *Wyoming Wildlife Federation*, 123 IBLA 392, 393 (1992).[11] BCA did not avail itself of such administrative relief.

---

[11] In any event, we find deficiencies in BCA's particular allegations. BCA complains that BLM conducted site-specific analysis supporting particular EAs before BLM (continued...)

*2. Cumulative Impacts*

NRDC argues that BLM's cumulative impacts analysis is flawed because the baseline environmental information used to prepare it was incorrectly calculated. NRDC argues that BLM incorrectly calculated the number of existing wells and the number of acres already disturbed. This flawed baseline, NRDC argues, undermines BLM's entire cumulative impacts analysis and will prevent BLM from accurately monitoring ongoing impacts. NRDC SOR at 21-26. As NRDC states: "Both of these flaws flow directly from BLM's machinations regarding the RFD." *Id.* at 23.

As we concluded above, if an agency exceeds the RFD scenario, a NEPA issue is presented and the question is whether the agency has authorized a Proposed Action without fully considering its effects in violation of NEPA section 102(2)(C). The remedy for that violation is to direct the agency to prepare or supplement an EIS considering those impacts. BLM prepared an EIS here. Therefore, the question for us is ultimately whether NRDC has shown that BLM failed properly to consider the baseline RFD scenario, and thus failed adequately to address cumulative impacts as required by NEPA.

As described above, NRDC has presented a number of options for interpreting the baseline that it believes BLM should have considered in terms of wells drilled and acreage disturbed, the effects of which were analyzed in the Great Divide RMP/EIS. While NRDC contends that these various options show that BLM's baseline was in error, in fact, they demonstrate to us NRDC's failure to meet its burden of showing error. Faced with a few sentences in the 1987 Great Divide DEIS, at page 220, projecting development at 1,440 wells, presuming 40 acres disturbance/well, NRDC contends that the meaning of this language decades later is such that we must find BLM's analysis of that baseline in the Desolation Flats FEIS to lack rational foundation. The certainty that NRDC demands of us, however, is undermined by its own arguments acknowledging that by 2000 the Wamsutter EIS recognized that

[11] (...continued)
approved the ROD. We do not see the violation of NEPA BCA finds in this allegation. BCA argues that BLM failed to prepare site surveys of BLM sensitive species before approving particular APDs. But BLM responded to BCA's comments to EAs on this point explaining what surveys had been conducted for several species. *See, e.g.*, Supplemental Information, Exs. C2, C3, C4, "Determination of Need for T&E Conference/Consultation and Biological Evaluation on Other Wildlife Species," prepared for each EA (including information on endangered, threatened, and sensitive species). Finally, BCA argues that the EAs do not contain site-specific additions to the mitigation and cumulative impacts addressed in the FEIS. BCA fails, however, to show that any site has a unique character that would prevent BLM from tiering to the FEIS for its analysis of these issues.

updated information from drilling showed disturbance per well to be reduced by more than 75%, to 9 acres/well.  Elsewhere, NRDC acknowledges that "[a]t best, BLM's new projection of 6.5 acres per well can be applied only to forecast the disturbance resulting from the 385 wells authorized in this EIS."  NRDC SOR at 18.  NRDC's NEPA/RFD argument does nothing more than criticize BLM for the same lack of certainty seemingly recognized by NRDC.  NRDC SOR at 25, *see also* at 24.  While NRDC presents statistical options to substitute for BLM's, we will not undertake the supervisory role of deciding the RFD's meaning in 1987, when it is obviously ephemeral on today's data.

We therefore turn to BCA's cumulative impacts arguments.  BLM is required by NEPA section 102(2)(C) to consider potential cumulative impacts of a proposed action, together with any other past, present, and reasonably foreseeable future actions.  40 C.F.R. § 1508.7; *see Park County Resource Council, Inc. v. United States Department of Agriculture*, 817 F.2d 609, 623 (10th Cir. 1987); *Forest Guardians*, 170 IBLA 80, 97 (2006); *Howard B. Keck, Jr.*, 124 IBLA 44, 53 (1992), *aff'd, Keck v. Hastey*, No. Civ. S-92-1670-WBS-PAN (E.D. Cal. Oct. 4, 1993); Forty Most Asked Questions Concerning CEQ's NEPA Regulations, 46 Fed. Reg. 18026 (Mar. 23, 1981).  BCA bears the burden of showing that BLM's cumulative impacts analysis, tiered to analysis performed for RMPs governing the Project Area, does not constitute "a reasonably thorough discussion of . . . significant aspects of the probable environmental consequences" of the proposed action.  *Trout Unlimited v. Morton*, 509 F.2d 1276, 1283 (9th Cir. 1974); *Biodiversity Conservation Alliance*, 169 IBLA 321, 333 (2006).

BCA challenges BLM's cumulative impacts analysis because the FEIS allegedly did not consider impacts on wildlife resources, all of the potential development BCA believes should have been addressed, or cumulative impacts within the region.  Such arguments are unsubstantiated.  In a fairly extensive cumulative impacts analysis in the FEIS and DEIS, BLM conducted a thorough review, weighing impacts of the Project with those from other projects over four "Cumulative Impact Areas" (CIAs), the Project Area, the watersheds that contain the Project Area, southeastern Sweetwater County and southwestern Carbon County, and southwest Wyoming and northwest Colorado.  The CIAs studied, and thus the sources of impacts, vary, as appropriate, by the resources affected, including, *inter alia*, air quality, water quality, and wildlife.  Not surprisingly, the projects potentially impacting a watershed were different from those potentially affecting an air region, or habitat, and so on.  In considering these CIAs, BLM analyzed impacts from two preexisting oil and gas projects within the Project Area and seven adjacent projects for which NEPA analysis was available.  Moreover, the NEPA documents were tiered to EISs prepared for the Great Divide RMP and the Green River RMP, which analyzed overall impacts of oil and gas leasing in the jurisdictions of the Rawlins and Rock Springs Field Offices before opening the regions to oil and gas development.

BCA's argument that BLM did not consider cumulative impacts on wildlife in the FEIS is unwarranted. The DEIS contains extensive analysis in Chapter 5 of cumulative impacts on range resources; wildlife; big game (including pronghorn, mule deer, and elk); wild horses; greater sage grouse; raptors (broken down by nesting and foraging habitats); and special status plant, wildlife, and fish species (including threatened, endangered, and sensitive species of plants and animals). DEIS at 5-15 to 5-25. BCA's complaint appears to be that this extensive analysis was not duplicated in the FEIS document, an argument we will not consider further.

BCA presents a list of projects BLM allegedly should have considered in its cumulative impacts analysis. BCA PS at 29-30; *see also* BCA Ex. P (map). BCA's complaint is that BLM did not consider four of seven projects raised by BCA. One of these, the Bitter Creek coalbed methane project, was proposed for scoping several months after the challenged ROD. BLM noted in the FEIS that several projects, including two of the projects raised by BCA that were not included in the analysis, had been proposed but not yet analyzed, and thus could not be included in the numerical well count. FEIS 2-69. It is unclear whether BCA's argument is that BLM was compelled by 40 C.F.R. § 1508.7 to halt consideration of development, and ultimate approval of the activity, until plans for other development had coalesced into numerical quantification. We do not read the rule this way. BLM acknowledged the cumulative impacts from accelerated development occurring in the region as a result of world events and national demand and recognized that new projects will be developed in the future; BLM acknowledged that cumulative impacts of this Project with others could be significant. FEIS at 1-16 to 1-17.[12] Ultimately, it is not a failure of consideration that BCA sustains, but rather a result BCA objects to. We do not grant relief for that.

*3. Opposing Views*

BCA argues that BLM failed adequately to respond to opposing scientific views. BCA SOR at 5-10. In *Biodiversity Conservation Alliance*, we held that, "[t]he fact that BCA cites experts who agree with its position is not dispositive." 169 IBLA at 343, citing *Colorado Environmental Coalition v. Dombeck*, 185 F.3d 1162, 1176 (10th Cir. 1999). In making its argument, BCA has provided a bibliography of scientific studies it claims oppose BLM's position, and, based on this list, BCA demands that BLM respond to each study. BCA SOR at 8-9. We do not believe the burden placed on BLM to respond to opposing views is so broad. Nor do we believe it is our burden or

[12] BLM estimated that the potential cumulative impacts of these future projects to "visibility and atmospheric deposition may exceed significance criteria, although violations of Wyoming or federal pollutant concentrations standards are unlikely." FEIS at 2-69 to 2-70.

within our authority to oversee BLM's function by absorbing the substance of material represented by that bibliography and deciding ourselves what science is "right." To be successful on its arguments, BCA must establish that BLM committed a "clear error of law or demonstrable error of fact, or that the analysis failed to consider a substantial environmental question of material significance to the proposed action." *Missouri Coalition for the Environment,* 172 IBLA 226, 239 (2007); *see also Southern Utah Wilderness Alliance*, 164 IBLA 33, 36 (2004).  BLM responded to the two issues BCA raises as examples of BLM's failure to respond to opposing views:  protections for the sage grouse and big game.  We thus examine the record to determine whether BLM committed a "demonstrable error of fact" or failed to consider a substantial environmental question of material significance in reaching its conclusions.

*Sage grouse.*  The record shows both that BCA and NRDC are correct to say that the scientific community is moving in a different direction on the issue of sage grouse protections and also that BLM has recognized this in a new policy with respect to sage grouse in IM 2004-057.  Thus, as explained below we affirm BLM's decision in the ROD and FEIS, as modified by that policy.

BCA and NRDC both recommended that BLM adopt a 3-mile buffer of no-surface activity around active sage grouse leks, on the advice of Dr. Clait Braun.  BCA SOR at 6-7; NRDC SOR at 29-30; *see* NRDC Ex. 10 (Braun report).  NRDC argues that BLM has not presented a scientific study to establish the efficacy of the ¼-mile buffer. NRDC SOR at 29-32; NRDC Reply at 13-15.  As noted above, BLM responded, FEIS at 5-44 and 5-61, that the ¼-mile buffer it established for the Project "is generally a minimum distance," and acknowledged that BLM may be compelled to increase the buffer in areas of "quality nesting habitat."  FEIS at 5-44, 5-62.  BLM anticipated using site-specific review and targeted COAs at the APD stage to review the status of the leks identified in the Project Area in the FEIS and DEIS.  *Id.* at 4-65.  BCA and NRDC correctly noted that BLM's sister agency, U.S. Fish and Wildlife Service (FWS), expressed concern about the drifting state of science about sage grouse protection and questioned BLM's adherence to the notion of a ¼-mile buffer.  FEIS at 4-96.

After completing the FEIS, however, BLM issued IM 2004-057, "Statement of Policy Regarding Sage-Grouse Management Definitions, and Use of Protective Stipulations and Conditions of Approval (COAs)" (Aug. 16, 2004).  BLM Response, IBLA 2004-316, Att. 2.  This IM catalogs the history of scientific thought regarding protections for sage grouse habitat, leks, and nesting areas from the 1970s to the present.  It acknowledges a severe decline in population, public calls for listing the species under the Endangered Species Act, and the possibility that 1970s-era protections and mitigation measures might not serve intended purposes.  The IM requires BLM to coordinate with the State of Wyoming to map existing sage grouse leks and to undertake analysis to determine which populations are migratory, a factor that may make areal radiuses around leks either obsolete or inaccurate on a case-by-

case basis. The IM pursues a site-specific policy for sage grouse management which maintains minimum requirements for buffers, a 2-mile radius as a "flagging device" for stipulations and COAs, diurnal timing limitations, and seasonal restrictions. *Id.* at 5. But, it also imposes a policy of case-by-case mapping of sage grouse habitat, including nesting habitat, to better protect nests that are beyond a 2 mile radius "regardless of distance from leks" while allowing disturbance in areas within such a radius that do not provide suitable habitat. *Id.* at 5.

NEPA requires BLM to "consider and respond to the comments . . . , not to agree with them." *Utahns for Better Transportation v. U.S. Department of Transportation*, 305 F.3d 1152, 1174-75 (10th Cir. 2002). Nonetheless, the record shows a general agreement in the relevant community of experts that sage grouse science is changing and in need of development and supplementation. BLM must and is evidently attempting to adapt to available data and derive new data. This is not inconsistent with Dr. Braun's contentions regarding data "too limited to conclusively demonstrate the health of the sage-grouse population(s) and trends" in the Great Divide Resource Area, and the need for long-term monitoring efforts and research studies. NRDC Ex. 10, "Sage-Grouse Scoping Issues for Revision of the BLM's Great Divide [RMP]," Clait E. Braun, at 4-5. The IM which BLM has committed to adopt for the Desolation Flats Project reflects BLM's acceptance that its data was outdated, and we therefore affirm as modified to incorporate the IM into the ROD. NRDC objects to the IM as "exactly the same inadequate protection that experts have criticized in the Desolation Flats Project." NRDC Reply at 14. Nonetheless, as we have described above, we see it as a sufficient departure that both moots the argument that BLM did not respond to comments on sage grouse and also prohibits us from finding that BLM is not attempting to protect the grouse. NRDC is free to challenge specific decisions if it perceives that decisions made on APDs are devoid of the kind of site-specific consideration envisioned in the policy.

*Big game winter range.* BCA and NRDC complain that BLM did not accurately consider their comments about big game winter range within the Desolation Flats Project Area.[13] We have examined the material in the record on this topic, one which has proven in a number of cases before us to be scientifically controversial within the State of Wyoming. *E.g., Biodiversity Conservation Alliance*, 171 IBLA 218 (2007); *Wyoming Outdoor Council*, 171 IBLA 108; *National Wildlife Federation*, 169 IBLA 146 (2006). These cases generally address the sufficiency of mitigation measures BLM has imposed on oil and gas leasing or development to protect the winter range.

[13] NRDC contends that BLM did not adequately consider the impacts of habitat fragmentation on the sage grouse and other wildlife, citing the FWS comment letter to the DEIS which critiqued BLM's analysis of indirect impacts on the sage grouse. NRDC SOR at 28-29, citing FEIS at 4-96. As we have responded regarding the sage grouse by modifying the ROD, we address this argument no further.

In this case, however, the import of BCA's argument is that BLM erred by incorporating various mitigation techniques for development on the big game winter range at all, *see* DEIS at 4-59 to 4-64, because "winter range areas should be withdrawn from the surface disturbance associated with oil and gas development." BCA comment letter at 28 (FEIS at 4-116). We have not overstated BCA's comments; in its SOR BCA explains that seasonal timing restrictions would be insufficient, and that "disturbance on winter ranges should be avoided at all costs," and "oil and gas production facilities and access roads must never be sited on crucial winter ranges." BCA SOR at 12. As explanation for this contention, BCA reiterates in its SOR the contention repeated in its comments that BLM has not sufficiently analyzed the effectiveness of its mitigation measures. *Id.* at 13. We presume BCA's view is that the Board's alternatives are to (a) set aside and direct BLM to complete analyses of mitigation measures to BCA's satisfaction before the ROD is issued; or (b) reverse and direct BLM to establish that no oil and gas activity can occur on winter range.

BLM acknowledged that allowing development during non-winter months and limited traffic and recreation year-round would have impacts on big game, but concluded that such impacts would not be significant. FEIS at 5-55. BLM analyzed the impacts development would have on pronghorn antelope, deer, and elk. DEIS at Chapter 4. BLM concluded that the pronghorns and deer would adapt to some disruption, and anticipated that elk would adapt less easily, but, with appropriate mitigation, would not be significantly affected. *Id.*; *see also* at 4-72 (additional mitigation measures). BLM responded to BCA's comments regarding winter range, habitat fragmentation, and particular species. FEIS at 5-50 through 5-58.

The record shows that the majority of the Desolation Flats Project Area is classified as winter/yearlong range for big game species. *See* DEIS at 4-60 (219,930 acres of "DFPA" in pronghorn winter/yearlong range); *id.* at 4-58 (Figure 4-7). We have examined the DEIS, FEIS, BCA's comments, and BLM's analysis and response, as well as our recent precedent on this topic. We find that the BCA's arguments are premised on its position that BLM has not sufficiently analyzed the impacts of oil and gas development on winter range for particular species and must do so before proceeding. We do not find such arguments sufficient to demonstrate error in BLM's failure to acquiesce in BCA's contention, effectively, that BLM "withdraw" the Desolation Flats area from oil and gas development.

*4. Alternatives*

BCA claims that BLM failed to consider adequate alternatives to the proposed action because BLM did not consider BCA's suggested "directional drilling, multiple wells per pad and closed loop drilling alternatives," as alluded to above. BCA PS at 21. BCA argues that BLM's failure to address such alternatives constitutes a violation of NEPA section 102(2)(E), 42 U.S.C. § 4332(2)(E) (2000), and CEQ regulations at

40 C.F.R. § 1502.14. BLM is obligated to consider reasonable alternatives which accomplish the intended purpose of a proposed action, are technically and economically feasible, and have a lesser impact. 40 C.F.R. § 1500.2(e); *Headwaters, Inc. v. BLM*, 914 F.2d 1174, 1180-81 (9th Cir. 1990); *Western Exploration Inc.*, 169 IBLA at 406; *see also* 43 C.F.R. §§ 1501.2, 1502.14, 1508.9. To show a failure to consider sufficient alternatives, an appellant must posit an alternative that would meet the test described above. *Great Basin Mine Watch*, 159 IBLA 324, 354 (2003).

BCA has not met its burden. As described above in addressing FLPMA, BLM has explained that it is not possible to make the particular decisions BCA would demand of it in adopting an alternative that addresses some method of co-locating wells. BLM explained why: certain locations present technical, feasibility, and economic problems which would make such options impossible, and certainly impossible to choose at this time; and the technical and geophysical data gathered with early wells will necessarily define subsequent well placement decisions. Thus, while BLM concedes the value of the kind of drilling options BCA demands, it did not choose to consider them as an alternative because it was technically not feasible to do so for the overall Project, and because optimal well configurations will be determined as Project action progresses. BCA has appended IM 2003-152 (Apr. 14, 2003), by which the BLM Director established a policy for BLM field offices to work with oil and gas operators to engage in comprehensive drilling planning. BCA Ex. BB. This IM, however, establishes this policy for "APD process improvements." We do not find that BLM has impeded its ability to follow that policy by failing to consider a directional drilling alternative in the FEIS. BCA has failed to show error in that conclusion, or to proffer a sensible proffered alternative that is technologically feasible or environmentally preferable to BLM's decision to defer siting until the APD phase, implemented in a manner consistent with IM 2003-152.

Therefore, pursuant to the authority delegated to the Board of Land Appeals by the Secretary of the Interior, 43 C.F.R. § 4.1, the decision appealed from is affirmed in part, and affirmed and modified in part as identified herein.

/s/
Lisa Hemmer
Administrative Judge

I concur:

/s/
James F. Roberts
Administrative Judge

# United States Department of the Interior

OFFICE OF HEARINGS AND APPEALS
Interior Board of Land Appeals
801 N. Quincy St. Suite 300
Arlington, VA 22203

703 235 3750 703 235 8349 (fax)

October 26, 2004

| | | |
|---|---|---|
| IBLA 2004-316 | : | BLM/WY/PL-04/029+1310 |
| | : | |
| BIODIVERSITY CONSERVATION ALLIANCE, ET AL. | : | Natural Gas Development |
| | : | |
| | : | Motions to Intervene Granted; Petition for Stay Denied |

ORDER

Biodiversity Conservation Alliance (BCA), Wyoming Outdoor Council, Center for Native Ecosystems, The Wilderness Society, and Wyoming Wilderness Association (collectively, appellants) have filed an appeal from and petitioned for a stay of the Record of Decision (ROD) of the Wyoming State Director, Bureau of Land Management (BLM), dated July 27, 2004, authorizing the "Desolation Flats Natural Gas Field Development Project" (Project), on Federally-leased lands situated in Ts. 13-16 N., Rs. 93-96 W., Sixth Principal Meridian, Sweetwater and Carbon Counties, Wyoming.

By order dated September 20, 2004, we granted the request to intervene filed by Cabot Oil & Gas Corporation (Cabot). Two other project proponents, or successors thereto, have also moved to intervene in this appeal, Samson Resources Company (Samson) and EOG Resources, Inc. (EOG). Those requests are granted.

In 1999 several operators submitted to BLM a proposal for an exploratory drilling and development project involving up to 592 gas wells to be drilled over a 20-year period in the Desolation Flats area of Wyoming. The operators later modified the proposal to reduce the number of potential gas wells to 385. The Project area encompasses approximately 233,542 acres, of which 224,434 acres are under Federal ownership (212,611 acres of Federal surface/mineral and 11,823 of Federal surface only), and is within the administrative jurisdiction of the BLM Rawlins and Rock Springs Field Offices. 1/

On May 18, 2000, BLM issued a notice of intent to prepare an environmental impact statement (EIS) for the Project and, thereafter, prepared an April 2003

---

1/ Approximately 94 percent of the Project area is administered by the Rawlins Field Office under the guidance of the Great Divide Resource Management Plan (RMP).

Draft EIS (DEIS) and a May 2004 Final EIS (FEIS), which it tiered to the EIS's prepared in connection with BLM's land use planning for the area (November 1990 Great Divide RMP and August 1997 Green River RMP). Under the proposed action, up to 385 gas wells would be drilled on 361 drill sites, along with the construction or improvement of 542 miles of roads, 361 miles of natural gas pipelines, four compressor stations, and one natural gas processing plant.

Departmental regulation 43 CFR 3165.4(c) provides that an appellant, who petitions for a stay of the effect of a BLM decision concerning onshore oil and gas operations, pending a determination by the Board of the merits of its appeal, bears the burden of demonstrating sufficient justification for the stay, based on the following four standards:

(1) The relative harm to the parties if the stay is granted or denied,
(2) The likelihood of the appellant's success on the merits,
(3) The likelihood of irreparable harm to the appellant or resources if the stay is not granted, and
(4) Whether the public interest favors granting the stay.

See Colorado Environmental Coalition, 135 IBLA 356, 357-58 (1996), aff'd, Colorado Environmental Coalition v. BLM, 932 F. Supp. 1247 (D. Colo. 1996).

Appellants seek to stay the effect of the ROD, and any proposed gas drilling in the Project area which has been or may be approved, pending the Board's resolution of their appeal. They assert that they are likely to succeed on the merits of the appeal and that they satisfy the other prerequisites for a stay. Intervenors and BLM oppose the granting of a stay.

Appellants challenge the ROD on the basis that BLM failed to comply with the environmental review requirements of section 102(2)(C) of the National Environmental Policy Act of 1969 (NEPA), as amended, 42 U.S.C. § 4332(2)(C) (2000), and the land use plan conformance requirement of section 302(a) of the Federal Land Policy and Management Act of 1976 (FLPMA), 43 U.S.C. § 1732(a) (2000). They assert that BLM did not adequately consider the significant individual and cumulative environmental impacts of full-field development in the Project area, because it deferred any site-specific environmental analysis until the Project proponents submit applications for permits to drill (APDs) for the approved wells and applications for rights-of-way (ROWs) for the approved roads, pipelines, and other facilities. They contend that the FEIS does not provide an adequate analysis of the impacts from actual development authorized by the disputed decision. They further assert that BLM did not consider all the cumulative impacts likely to result from the proposed development under the Project, in conjunction with several other existing

or reasonably foreseeable "oil and gas projects pending in the Washakie Basin of the southern Red Desert." [2/] (Petition for Stay at 29.)

Appellants also argue that BLM failed to address reasonable alternatives to the proposed development that, they assert, would minimize detrimental environmental impacts, particularly directional drilling, multiple wells per pad (cluster drilling), and closed loop or pitless drilling to protect resource values. They further argue that BLM failed to address reasonable alternatives that take into account environmentally protective management alternatives that BLM may be considering in conjunction with its ongoing revision of the Great Divide RMP. They assert that such management alternatives include a citizens' proposal to add approximately 50,000 acres to the Adobe Town Wilderness Study Area (WSA) and proposals by BCA and others to create Areas of Critical Environmental Concern (ACEC) to protect white-tailed prairie dog complexes, mountain plover concentrated nesting areas, and a large and important juniper scrub woodland.

Further, appellants contend that BLM's decision to approve the authorization of 385 wells does not conform to the current Great Divide RMP, since it exceeds the Reasonably Foreseeable Development (RFD) scenario approved in that plan. They assert that BLM must first consider exceeding the RFD scenario in a proposed revision of the RMP, analyze the environmental consequences of doing so in a supplemental EIS, and then approve a revised RMP, before natural gas development may exceed that adopted in the existing RMP. Appellants also contend that BLM should defer any approval of further natural gas development in the Project area until BLM completes its revision of the Great Divide RMP. Such a revision will, they contend, comprehensively address the development of energy resources and any restrictions or prohibitions on such development necessary to protect wilderness characteristics and other Federal-land resources. Approval of the Project prior to such revision, they argue, improperly limits and potentially forecloses decisions that can be considered and made in the revised RMP.

Based on a preliminary review of the record and pleadings submitted by appellants, BLM, and intervenors, we conclude that appellants have failed to satisfy their burden of demonstrating sufficient justification for the granting of a stay. They have not demonstrated a likelihood of succeeding on the merits of their appeal.

We find no basis for concluding that BLM was required by section 102(2)(C) of NEPA to address the site-specific impacts of the proposed natural gas development in the EIS for the Project. The EIS in question is a programmatic EIS and is tiered to

---

[2/] In addition to the Project, appellants list a total of seven other gas projects involving the drilling and potential development of a total of 6,386 wells.

the relevant land use planning EIS's. As such, BLM may address the overall environmental impacts of the Project, based on the general location of wells and associated facilities in the Project area. Consistent with its regulations, once APD's and other applications for ROWs, roads, or other facilities are submitted, BLM will conduct more site-specific analysis of potential environmental impacts, tiered to the Project-level EIS. See 43 CFR 3162.3-1(a) and 3162.5-1(a); Fred E. Payne, 159 IBLA 69, 81 (2003); DEIS at 2-4, 2-6 to 2-7; FEIS at 3-4 ("Site-specific impacts will be thoroughly reviewed under the NEPA regulations by tiering site specific environmental analysis to the Desolation Flats Record of Decision"), 5-38 to 5-41; ROD at 2 ("Prior to issuing any permit or authorization to implement these activities on the BLM-administered lands, the BLM must analyze each component of the Proposed Action on a site-specific basis and subject to NEPA").

Such a process permits BLM first to consider the impacts of an overall plan of development based on general expectations of the nature and extent of underlying natural gas reserves, but later to focus on more likely impacts, once the plan proceeds and actual development confirms or dispels such expectations. See DEIS at 2-1 ("The precise number of additional wells, locations of the wells, and timing of drilling associated with the proposed natural gas development project would be directed by the success of development drilling and production technology and economic considerations"); FEIS at 3-4 ("The number of wells, well locations, timing of drilling, and construction is controlled in part by the location of gas and oil resources as they are found and developed"). Most importantly, under this process potential environmental impacts of specific surface-disturbing activities can be considered and mitigated "before actions are taken," as required by NEPA and its implementing regulations. See 40 CFR 1500.1(b). Appellants have failed to show a likelihood of success on this argument. [3/]

Likewise, they have not shown a likelihood of success on their argument that BLM's cumulative impacts analysis was deficient because it failed to address the potential cumulative impacts of the proposed development under the Project, together with other present or reasonably foreseeable projects in the Washakie Basin of the southern Red Desert. In its "Cumulative Impacts Analysis" (DEIS, Chapter 5), BLM considered the likely cumulative impacts of the Project in conjunction with some, but not all, of the gas projects identified by appellants. See DEIS at 5-1 to 5-4.

---

[3/] Appellants argue, in their statement of reasons for appeal at page 3, that BLM's subsequent processing of specific APD's confirms its assertion that "the analysis 'deferred' in the FEIS is not being conducted prior to issuance of Applications for Permits to Drill," and thus should have been addressed at the Project level. Neither BLM's decision to approve a specific APD nor the adequacy of its environmental analysis in support thereof is the subject of the present appeal.

Although appellants assert that all these projects are likely to result in significant cumulative impacts affecting wildlife, water quality, air quality, and other aspect of the environment, the only evidence offered in support of such assertion is two maps (Ex. P attached to Petition for Stay), each titled "The Red Desert," one depicting only the relative location of the various projects and the other showing the locations of those same projects, as well as the corresponding locations for "Big Game Crucial Habitat and Birthing Grounds," "Big Game Migration Routes," and "Sage Grouse Leks." Such evidence is not sufficient, by itself, to establish that appellants have a likelihood of success on this argument. "[In order to demonstrate the deficiency of BLM's cumulative impacts analysis,] it is not sufficient merely to note the existence of other gas fields and gas development projects in Wyoming." National Wildlife Federation, 150 IBLA 385, 399 (1999); see, e.g., Wyoming Outdoor Council, 159 IBLA 388, 406-07 (2003); Wyoming Outdoor Council, 147 IBLA 105, 109 (1998).

Further, appellants have provided no basis for concluding that they have a likelihood of success on their argument that BLM was required in the EIS to address in detail various alternatives proposed by appellants. Two such alternatives, the expanded wilderness alternative for the Adobe Town WSA and directional drilling, were discussed in the DEIS at 2-42 through 2-44 and, for the reasons set forth therein, eliminated from detailed study. The reasons offered by BLM support such action.

Moreover, examination of the record shows multiple discussions by BLM relating to drilling methodologies for which appellants complain there was "insufficient analysis." [4] (Petition at 21.) While such discussions might be

---

[4] See DEIS at 2-12, 2-14 ("Some surface locations within the [Project area] may not be feasible to occupy, either for economical (e.g., high road construction costs), physical (e.g., steep terrain), or other environmental reasons (e.g., sage-grouse lek). A drilling method the Operators may use to access bottom-hole locations in these areas is directional drilling from a single-well pad (multi-well, directional drilling)."), 2-17, 2-43 ("[C]ircumstances [that might result in directional drilling] would arise at the APD stage, and economic evaluation for those particular instances would be conducted at that time to determine whether or not a directional well would be utilized"); FEIS at 5-82 to 5-83, 5-87 to 5-89; ROD at 6 ("The Proposed Action * * * provide[s] for directional drilling when practical * * *. There is no limit to the number of directional/multi-pad wells that may be drilled, but mandating that every well regardless of geologic or surface conditions must be drilled directionally is not reasonable"); BLM Response to Petition for Stay at 26 ("Further mitigative measures may be developed after considering site-specific conditions, and will be addressed in

(continued...)

considered insufficient, if those methodologies should have been addressed, either collectively or individually, as reasonable alternatives to the proposed action, appellants have not provided any persuasive evidence that they should have been. In fact, it is clear that those methodologies relate to possible future actions that might be authorized by BLM. Upon the filing of an APD, BLM has the authority to consider alternative means for drilling the particular wells, in connection with its site-specific environmental review. The citations to the record, noted above, clearly show BLM's intent to consider such methodologies at the APD approval stage.

At the APD approval stage, BLM may properly address changing the location of proposed drill sites, providing for directionally drilling multiple wells from a single pad, or making other adjustments in the timing or manner of drilling and related activity in order to protect sage grouse and sage grouse habitat, crucial big game winter range, other wildlife resources, wilderness characteristics, or other sensitive aspects of the environment. See, e.g., ROD at 3. Further, BLM could take into account any ACEC designations or other resource protective actions which have, at that time, been taken through promulgation of a revised RMP.

The fact that BLM is in the process of revising the Great Divide RMP does not require BLM to halt all resource management decisions pending the finalization of such a revision. Such a position has been rejected by the courts (ONRC Action v. Bureau of Land Management, 150 F.3d 1132, 1139-41 (9th Cir. 1998)) and this Board, most recently in Southern Utah Wilderness Alliance, 163 IBLA 14, 27-28 (2004), and cases cited therein. 5/

Appellants also have failed to show a likelihood of success on their assertion that BLM failed to abide by the land use plan conformance requirement of section 302(a) of FLPMA, because the proposed development would exceed that already considered and approved under the RFD scenario in the Great Divide RMP.

---

4/ (...continued)
the EA prepared to authorize subsequent APDs and ROWs and included as conditions of approval").

5/ Intervenors provide, as Ex. 4 to their opposition to appellants' petition for stay, a copy of BLM Instruction Memorandum (IM) No. 2004-100, dated Feb. 23, 2004, titled "Fluid Mineral Leasing and Related Planning and National Environmental Policy Act (NEPA) Processes," which states at page 2 that "nothing in the CEQ [Council on Environmental Quality] NEPA regulations requires postponing or denying a proposed action that is covered by the Environmental Impact Statement (EIS) for the existing land use plan to preserve alternatives during the course of preparing a new land use plan and EIS (see 40 CFR 1506.1(c)(2))."

The Board has endorsed BLM's conclusion that the RFD scenario is not a management prescription, but an assumption established as a reasonable estimate of activities for NEPA evaluation. Southern Utah Wilderness Alliance, 159 IBLA 220, 234 (2003). Thus, the RFD scenario cannot be considered to establish a limit on the number of oil and gas wells that can be drilled in a resource area. Rather, it is a reasonable estimate of drilling activity for environmental review purposes. Following issuance of the Board's decision, BLM issued IM No. 2004-089, dated January 16, 2004, titled "Policy for Reasonably Foreseeable Development (RFD) Scenario for Oil and Gas." Intervenors provided a copy of that IM to the Board as Ex. 9 to their opposition to the petition for stay. Therein, BLM stated in Attachment 1-1 that the RFD scenario is "neither a planning decision nor the 'No Action Alternative' in the NEPA document" and that it "provides the mechanism to analyze the effects that discretionary management decisions have on an oil and gas activity." BLM further explained at Attachment 1-2 that

> [t]he fact that the total number of wells in an area may exceed the total number of wells projected in the selected alternative does not automatically mean that a supplement to the NEPA document or revision or amendment to the RMP is necessary. It is possible that exceeding the number of wells projected in the selected alternative may not result in exceeding the predicted level of environmental effects. Mitigation of environmental effects through successful reclamation, clustering wells on shared well locations, and minimizing pad and road construction can prevent the level of impacts from substantially exceeding the impacts analyzed in the original RMP/EIS or other NEPA documentation.

Moreover, to the extent that additional environmental analysis is required for the present proposed development, it is contained in the Project FEIS.

Accordingly, pursuant to the authority delegated to the Board of Land Appeals by the Secretary of the Interior, 43 CFR 4.1, the motions by Samson and EOG to intervene in the present proceeding are granted, and appellants' petition to stay the effect of the ROD is denied because they failed to demonstrate that they are likely to succeed on the merits of their appeal.

Bruce R. Harris
Deputy Chief Administrative Judge

APPEARANCES:

Michael L. Chiropolos, Esq.
Lands Program Director
Western Resource Advocates
2260 Baseline Road, Suite 200
Boulder, CO 80302

**FAX: 303-786-8054**

Terri L. Debin, Esq.
Office of the Regional Solicitor
U.S. Department of the Interior
755 Parfet Street, Suite 151
Lakewood, CO 80215

**FAX: 303-231-5360**

Laura Lindley, Esq.
Robert C. Mathes, Esq.
Bjork Lindley Little PC
1600 Stout Street, Suite 1400
Denver, CO 80202

**FAX: 303-892-1401**



GFS(O&G) 37(1999), 150 IBLA 385

**(Cite as: 150 IBLA 385)**

United States Department of the Interior
Office of Hearings and Appeals
Interior Board of Land Appeals

NATIONAL WILDLIFE FEDERATION

WYOMING OUTDOOR COUNCIL

WYOMING WILDLIFE FEDERATION

IBLA 96-59

Decided October 8, 1999

INDEX CODE:

40 CFR 1502.20

42 CFR 4321 - 4370c

43 CFR 1601.0-5(k)(2)

43 CFR 1601.0-6

43 CFR 1610.2

43 CFR 1610.3

***385** Appeal from a decision to approve Texaco USA's Stagecoach Draw Unit natural gas field development program in the Green River Resource Area, issued by the Wyoming State Director, Bureau of Land Management. WY 1793 (420).

Affirmed.

1. Environmental Quality: Environmental Statements--National Environmental Policy Act of 1969: Environmental Statements

NEPA does not require a particular result or course of action. The statute requires a fully informed, well-considered decision supported by reasonable forecasting and speculation. While an agency is required to take a hard look at the environmental consequences of a proposed action, a rule of reason is applied to determine whether an environmental statement contains a reasonably thorough discussion of the significant aspects of probable environmental consequences.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

2. National Environmental Policy Act of 1969: Environmental Statements

In considering the adequacy of an environmental impact statement, the Board will examine the mitigation plan, which must be complete and must contain a reasonably thorough discussion which explains the effectiveness of the specific mitigation measures.

3. Environmental Quality: Environmental Statements--National Environmental Policy Act of 1969: Environmental Statements--Oil and Gas Leases

In alleging a failure to consider the cumulative impacts of a natural gas development project, it is not sufficient merely to note the existence of other gas fields and gas development projects in Wyoming without concretely identifying the adverse impacts caused by such other fields and projects ***386** to which the action being scrutinized will add. Where appellants have adduced nothing which negates or controverts the determination that air quality remains excellent and that applicable air quality standards have not been exceeded in the cumulative impact analysis area, they have failed to demonstrate a cumulative or synergistic impact on air quality which would give rise to an obligation to consider the environmental consequences of the project with those of any then-pending proposals.

4. Environmental Quality: Environmental Statements--National Environmental Policy Act of 1969: Environmental Statements--Oil and Gas Leases

Where the decision to allow mineral leasing on certain public lands was considered in the development of a Management Framework Plan with public comment and participation, and where BLM thereafter analyzed the significant environmental consequences of continued oil and gas leasing in a regional Environmental Assessment before any unit leases were sold, no site-specific Environmental Impact Statement is required prior to issuing individual oil and gas leases.

5. Environmental Quality: Environmental Statements--National Environmental Policy Act of 1969: Environmental Statements--Oil and Gas Leases

Once oil and gas leases are issued without surface occupancy restrictions, BLM cannot completely deny the right to drill and develop the leasehold, but it is required to fashion mitigation strategies and measures designed to reduce or eliminate adverse environmental impacts.

APPEARANCES: Susan Morath Horner, Esq., and Thomas D. Lustig, Esq., Boulder, Colorado, for Appellants; John F. Shepherd, Esq., Jane L. Montgomery, Esq., and Nanette J. Crawford, Esq., Denver, Colorado, for Intervenor Texaco Exploration and Production, Inc.; Andrea Gelfuso, Esq., Office of the Regional Solicitor, Denver, Colorado, for Bureau of Land Management.

OPINION BY ADMINISTRATIVE JUDGE PRICE

The National Wildlife Federation (NWF), the Wyoming Outdoor Council (WOC), and

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

the Wyoming Wildlife Federation (WWF) [FN1] have appealed the ***387** September 27, 1995, Record of Decision (ROD) of the Wyoming State Director, Bureau of Land Management (BLM), approving Texaco USA's (Texaco) natural gas field development program for the Stagecoach Draw Unit (Unit). [FN2] The ROD approved Texaco's proposal to drill 72 wells on 320-acre spacing over the next 10 years. In addition, however, the ROD explicitly stated:

This decision does not authorize drilling on a 160-acre spacing or up to 144 wells. BLM recognizes that the Almond Formation has low porosity and permeability at Stagecoach Draw, and that to attain maximum ultimate economic recovery of the natural gas resource with minimum waste, in accordance with Federal Regulation (43 CFR 3162(a)), infill drilling on a well spacing of 160 acres may be necessary. [FN3] Authorization for further infill drilling will be contingent upon additional site-specific environmental analysis, including detailed geologic and reservoir engineering analysis demonstrating that a closer spacing is needed to avoid unnecessary waste of the natural gas resource.
(ROD at 1.)

On November 6, 1995, Appellants submitted a two-volume pleading containing their Notice of Appeal, Statement of Reasons (SOR), and Petition for Stay. [FN4] In their SOR, [FN5] Appellants allege that the ROD is premised upon legal and factual errors, and that it failed to consider substantial environmental questions. More particularly, it is contended that the ROD failed to consider "a host" of direct and cumulative impacts on wildlife ***388** and on air quality in the region, and that BLM postponed analysis of such impacts indefinitely while nonetheless authorizing development. (SOR at 8.) Appellants further argue that compliance with the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. §§ 4321-4370c (1994), is flawed in that BLM issued the Stagecoach Draw oil and gas leases without first conducting a NEPA analysis; that BLM's assertion that development cannot be postponed without impairing Texaco's contractual and Constitutional rights pending compliance with NEPA is in error; and that BLM's interpretation of the regulations requiring maximum development of gas reserves as a limitation on its ability to comply with environmental statutes, including mitigation of environmental impacts, also is incorrect. (SOR at 8.)

In support of the argument that BLM ignored cumulative impacts of the Decision, Appellants argue that "there is significant mineral development in almost every direction" around the "relatively pristine area" of Stagecoach Draw, and that this development must be included in any assessment of cumulative impacts. (SOR at 4.) Thus, it is noted that the Fontanelle gas field contains 1,070 producing wells and an additional 1,317 are under review; McMurry Jonah Prospect, where 20 wells are proposed, is 20 miles north; and Moxa Arch field is south of Fontanelle and contains 957 active wells and 1,325 new wells are under review. The Enron Burly field, the HS Resources exploratory development, the BTA/Bravo field, the Amoco Continental Divide Project, the Hay Reservoir Unit, the Greater Wamsutta II field and the Creston/Blue Gap field are also identified as development which must be considered in analyzing cumulative impacts. (SOR at 4-5.) Accordingly, NWF and WOC contend that "an agency may not segment the project from other similar or related

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

projects, which, when added to the proposal under review, will have a cumulatively adverse effect on the environment." (SOR at 9.)

Appellants argue that BLM failed to adequately consider the impacts on wildlife, and on the Sublette pronghorn antelope herd in particular. The Sublette herd is the largest migrating herd of big game animals in the United States south of the Canadian border (¶ 8, Ex. 2 to SOR), and the Unit area contains crucial winter/yearlong range for the herd. (DEIS at 59; ¶ 8, Ex. 2 to SOR.) Appellants criticize the ROD for evaluating impacts to pronghorn and other large animals "primarily in terms of the direct forage lost through the construction of well pads and associated roads and pipelines." (SOR at 11.) BLM calculated a loss of 570 acres of crucial habitat. (DEIS at 95.) Although they do not attack BLM's acreage calculation, NWF and WOC allege that "[c]ursory attention is given to the indirect loss of habitat; the effect of disturbance on the utilization of habitat." They claim, moreover, that the only discussion of the utilization of habitat is a single sentence in the DEIS at 96. (SOR at 11.)

As further support for the contention that BLM failed to consider utilization of habitat, Appellants have provided exhibits in which it is concluded that displacement from customary habitat affects the pronghorns' metabolism; that energy expended by the animals in flight and avoidance and seeking alternative forage can exceed the animals' energy budget; and that increased energy expenditures can cause lower body weight and compromise ***389** reproductive success. Appellants acknowledge the extent of such impacts depends upon the sensitivity of the species affected, the nature of the disruption, the characteristics and importance of the affected habitat, and the availability and condition of alternative habitat. (SOR at 11-12, citing Ex. 17, the U.S. Forest Service's (USFS) General Technical Report INT-191, Wildlife Management Implications of Petroleum Exploration and Development in Wildland Environments, by Marianne Bromley (1985), and Ex. 18, Ecosystem Wide Habitat Fragmentation by the Oil and Gas Industry in Southwest Alberta [Canada], by Brian L. Horejsi (1994).) Other impacts noted include harassment by petroleum workers, the existence of secondary roads, the availability of shelter, topography, poaching, vehicle collisions, habituation to human activity which makes the animals less wary and more vulnerable to poaching and collisions, and the effects of severe weather. (SOR at 12-15, citing Ex. 2, Affidavit of Dr. Stephen C. Torbit.)

Appellants further attack the Decision on the ground that BLM acknowledged that a number of threatened and endangered species potentially could exist in the Stagecoach Draw project area, but did not survey most of these species. NWF and WOC contend that it is BLM's position that where a species is not known to exist, it does not exist in the project area, and that on this basis BLM incorrectly concluded that impacts are negligible. The long-billed curlew and silky pocket mouse, discussed in the DEIS at 94, are cited as examples of this flawed analysis. (SOR at 16-17.) Appellants allege a failure to evaluate surrounding habitat and to analyze the migratory route of the Sublette antelope herd, and thus challenge the lack of a cumulative impact analysis of all the oil and gas development activity in the region. (SOR at 19.) In the same vein, it is argued that BLM cannot

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

rationally admit that it lacks necessary data regarding the availability and carrying capacity of habitat and yet conclude that various mitigation strategies will minimize impacts. (SOR at 20-21.) Appellants argue that when it is difficult to obtain adequate data, BLM is obligated to "prepare a summary of existing and credible scientific evidence and an evaluation of impacts based upon generally accepted scientific approaches and research methods. [Citation omitted.]" (SOR at 21- 22.) NWF and WOC therefore conclude that BLM's evaluation of impacts on wildlife is not entitled to this Board's deference. (SOR at 22-23.)

Appellants next contend that BLM incorrectly claims that air emissions from the Stagecoach Draw project cannot be quantified, and further contend that BLM failed to analyze the direct and cumulative effects on air quality. More specifically, Appellants argue that BLM's unsupported conclusion that no significant impacts will result from drilling activities on the Unit is belied by the experience at the Moxa Arch project, where emissions were at least generally quantified in the DEIS prepared for that project, an excerpt of which Appellants have provided as Exhibit 5. (SOR at 23-24.) They argue, moreover, that BLM failed to quantify and evaluate emissions associated with production activities, and that these will exist for the life of the project. (SOR at 24- 25.) In sum, NWF and WOC argue that until BLM considers all the oil and gas and industrial development in the region as a whole, all of which is reasonably foreseeable, it has failed to rationally and thoroughly evaluate the cumulative impacts on ***390** air quality. (SOR at 25-28.) Appellants thus conclude that BLM cannot lawfully authorize the project and yet postpone impact analysis and the development of mitigation strategies. (SOR at 28-29.)

With respect to alleged errors of law, Appellants believe that BLM is required to halt drilling until it has fully complied with NEPA, and that BLM's contrary conclusion that doing so would constitute a taking of Texaco's lease rights in violation of the Constitution is wrong. (SOR at 30-33.) In addition, they argue that NEPA required BLM to conduct a site-specific environmental analysis before issuing the Unit leases (SOR at 33-36), and that BLM abandoned its obligation to fully consider a no-action alternative when it issued the Unit leases and thereby irretrievably committed resources to the project. (SOR at 37-38.)

Appellants' final arguments are that BLM cannot tier the ROD to the Big Sandy Management Framework Plan (MFP), which they characterize as an outdated "collection of individual decisions, really more in the nature of objectives" (SOR at 39), or to the Big Sandy/Salt Wells Oil and Gas Leasing Environmental Assessment (Leasing EA), which by its terms projected oil and gas development activity only through 1991 and has been proven wrong in one of its assumptions. (SOR at 40.) These documents are an inadequate basis for the ROD because, according to NWF and WOC, "neither document was intended to make, nor did it make, any site-specific leasing or development decisions." (SOR at 40.) Appellants concede that the Leasing EA is more detailed than the MFP, but they argue that it "makes no effort to tie in its summary of possible impacts to specific lease areas, or to foreseeable development of any particular lease or leases." (SOR at 41.)

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

In its Answer, [FN6] Texaco responds to Appellants by observing that compliance with NEPA is a means of achieving better decision-making, which is governed by a rule of reason. (Answer at 8.) Texaco contradicts Appellants' assertion that BLM's consideration of the impacts on antelope is cursory by citing relevant pages of the DEIS [FN7] where the analysis is to be found, including citations offered to show, on a point-by-point basis, that BLM did not ignore or fail to consider the impacts discussed by Bromley (Ex. 17 to SOR), Torbit (Ex. 2 to SOR), and Horejsi (Ex. 18 to SOR). (Answer at 10-14.)

With respect to threatened and endangered species, Texaco cogently makes the point that Appellants' arguments fail to address the question of whether the Unit area contains the features required to provide suitable habitat for the species. Thus, citing the DEIS at 68-73, Texaco argues:

***391** Bald eagles require cliffs, large trees associated with concentrated food sources, or sheltered canyons for nesting or roosting areas. [DEIS] at 68. Although there are some cliffs along the Big Sandy River, [DEIS] at 62, there is no habitat in the Stagecoach Draw Unit suitable for nesting or roosting. [[[DEIS] at 68. Similarly, peregrine falcons nest on tall cliffs, which do not exist in the project area. Id. And the scattered prairie dog burrows in the project area are not of sufficient size or density to constitute black footed ferret habitat. Id. (Answer at 14-15.) Texaco therefore contends that conducting site-specific inventories for certain species makes little sense when there is no suitable habitat for most threatened and endangered species, and operations in some parts of the Unit area are years away or may never occur. According to Texaco, the more important point is that before it can initiate any on-the-ground activities, the necessary surveys will be completed, and if any threatened and endangered species are found, BLM will consult with the appropriate agencies and determine what activities are to be allowed under what conditions and subject to what mitigation measures. (Answer at 15.)

As to Appellants' challenges to the sufficiency of the DEIS with regard to air quality, Texaco responds that the Wyoming Department of Environmental Quality-Air Quality Division (WDEQ-AQD), the agency which regulates air quality for oil and gas activities, advised BLM that no air quality modeling would be required as part of its permitting process. Additionally, Texaco notes that the United States Environmental Protection Agency (EPA) formally stated its agreement that no modeling is necessary. Texaco's final point is that BLM reasonably could conclude that the project would not exceed applicable State and Federal air quality standards, based upon its considerable experience with oil and gas leasing in Wyoming. (Answer at 16-17.)

Texaco refutes Appellants' contention that an EIS should have been prepared before the Unit leases were issued by noting that neither NWF nor WOC commented on the Big Sandy/Salt Wells Oil and Gas Leasing EA when it was released for comment, and because neither protested or appealed the issuance of the leases to Texaco, a challenge is untimely. (Answer at 21-22.) Texaco distinguishes cases requiring the preparation of an EIS before an oil and gas lease is issued on the ground that

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

they involved leasing in mountainous national forests having wilderness characteristics. (Answer at 22.)

Finally, Texaco dismisses Appellants' contentions regarding whether BLM can halt the Stagecoach Draw Unit project until a regional EIS is completed without unconstitutionally taking Texaco's lease rights as "over-blown," emphasizing that there is no "valid" reason to halt the project. (Answer at 24.)

We begin with Appellants' factual contentions. It is first argued that BLM failed to consider a number of cumulative impacts on wildlife and ***392** threatened and endangered species, and on the Sublette antelope herd in particular. Specifically, Appellants fault BLM for analyzing only loss of habitat, and not indirect loss of habitat and utilization of habitat (SOR at 11), and as noted, they have submitted Exhibits 2, 17, and 18 to support their position. We do not believe that it fairly can be argued that BLM failed to consider the impacts described by Appellants and their expert sources. The EIS shows otherwise, as Texaco in its Answer notes, and while the EIS did not engage in the technical and more detailed discussion that appears in Appellants' exhibits, it was not necessary to do so to demonstrate that BLM has taken the requisite hard look at the environmental consequences of the action. In addition to Texaco's citations to the EIS, NWF's and WOC's allegation is further refuted by the extensive list of individuals, organizations, State and local governmental entities, and expert authorities BLM consulted or relied upon to reach its decision (EIS at 139-48), and by the discussion in the Leasing EA at 49-52, submitted as Appellants' Exhibit 22.

With respect to threatened and endangered species, NWF and WOC claim that BLM has taken the position that if a species is not known to exist in the project area, then it does not exist in the project area. (SOR at 16-17.) They assert that BLM has admitted that it lacks key data regarding antelope habitat, but nonetheless concludes that mitigation measures will be effective. We do not agree with Appellants' characterization of the portions of the DEIS and FEIS on which they rely. It is correct that BLM acknowledged that it had not surveyed some threatened and endangered and special status species and that there may be a loss of potential habitat. BLM also noted the reasons why it had concluded that the habitat was not likely to prove suitable for certain species, a point Appellants have not disputed.

In addition, however, BLM generally described the mitigation measures required for each threatened and endangered and special status species (DEIS at 99-100), which include applicant-committed practices under the Preferred Alternative, more fully described in section 2.1.12 (DEIS at 26-28) and 5.0 (DEIS at 129-38); a buffer zone for certain species; and the prohibition against on-the-ground activity until surveys are completed as part of processing an application for permit to drill, right-of-way application, or other authorization. If threatened and endangered or special status species are found in the area, then BLM, the U.S. Fish and Wildlife Service (USFWS), and Texaco must reach agreement regarding what activities are to be allowed and what conditions will govern such activities. (DEIS at 135-36.) Appellants do not address the specifics of these mitigation

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

strategies and ongoing monitoring, or the impact they will have in reducing expected impacts.

Appellants' further argue that the absence of data does not justify assuming that impacts to wildlife will be minimal. They rely upon two examples. Specifically, NWF and WOC point to BLM's statement relating to the Sublette antelope herd by which BLM generally acknowledged that it lacked good scientific data with respect to the availability and capacity of habitat. (DEIS at 95.) In addition, Appellants rely upon BLM's response to the Wyoming Game and Fish Department's (WGFD's) letter dated ***393** April 1, 1995, commenting on the DEIS. WGFD's Comment 1, which BLM designated 8.1 in the FEIS in its point-by-point responses to comments, advised BLM that in 1993 the State had revised its Sublette antelope herd management objective from 30,000 head to 40,000 head. Thus, WGFD's comment was that it was incorrect to speak of the objective as a proposal when in fact it had been adopted by the State, and that BLM should use the higher population objective for certain calculations related to impacts appearing on pages 95, 98, and 122 of the DEIS. BLM's response was as follows:

Comment: 8.1.--BLM has not concurred in an increased Sublette antelope herd population objective (from 30,000 to 40,000 animals) for habitat management reasons. BLM cannot concur because any increase must be based on the availability and capability of the habitat on public lands to support higher numbers. This habitat information is not available.

As a multiple use management agency, BLM must manage public lands not only to meet reasonable big game population objectives, but also to meet the nation[']s burgeoning demands for minerals, water, grazing, recreation, etc. All these needs must be taken into consideration in conjunction with any proposal for increasing population objective levels. In accordance with the Memorandum of Understanding between BLM and WGFD, BLM will cooperatively work towards the determination of appropriate population objectives based upon the availability of habitat and its capability to handle present or increased numbers in conjunction with other demands.

However, to make it clear that WGFD has increased its population objective, the second sentence under Pronghorn on page 59 has been modified to read as follows: ***.

(FEIS at 14.) BLM's position is further illuminated by the brief discussion of the mission of WGFD as compared to that of BLM. According to BLM,

WGFD manages big game species on a "herd unit" concept. This management strategy is designed to maintain a desired population objective in order to provide a desired harvest, success rate, and quantity of recreation days. Objectives are determined according to both political and biological realities. *** WGFD herd unit objectives are not typically set at a number that strictly reflects biological carrying capacity of the habitat. In most cases, objectives for big game populations are somewhat lower than what the range could support, and carrying capacity varies considerably from year to year, depending especially upon

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

weather.
(DEIS at 121-22.) It is thus clear that WGFD's comment pertained to a related but entirely different point from the one for which it was offered by Appellants, and on that basis, we reject the argument.

***394** Appellants' second example likewise requires us to provide the complete context of the sentence quoted. The DEIS acknowledges that all of the proposed Stagecoach Draw development would be within crucial winter/yearlong antelope habitat. The project area is 23,575 acres of 799,123 of the crucial winter and winter/yearlong range for the Sublette herd, or approximately 3 percent. (DEIS at 59.) BLM believes that the direct loss of habitat would be 570 acres of such habitat, 270 acres (47 percent) of which would be for the life of the project; 108 acres (19 percent) would be reclaimed during the first appropriate season after initial disturbance and would not become available for forage for some years; and the remaining 192 acres (34 percent) would be lost as a result of construction of the pipeline gathering system, with grasses and forbs quickly revegetating the area for spring/summer/fall forage, but the shrubs necessary for winter forage would be years in returning. BLM concluded:

The 570 acres of crucial winter and crucial winter/yearlong habitat that would be lost for some period of time represents 0.07% of the crucial winter and crucial winter/yearlong habitat in the Sublette antelope herd area. Good scientific data regarding the carrying capacity of crucial winter and crucial winter/yearlong habitats in the Sublette antelope herd are not available on which to base an estimate of the reduction in carrying capacity that this 570 acres loss would represent. If, however, it is assumed that the 799,123 acres of crucial winter and crucial winter/yearlong habitat in the Sublette herd area has a carrying capacity of 30,000 antelope, then each antelope would require 27 acres of such range, and crucial winter and crucial winter/yearlong habitats could support 24 antelope/mi2. The loss of 570 acres *** would reduce the carrying capacity by approximately 21 antelope. This loss assumes that the carrying capacity of the crucial winter and crucial winter/yearlong habitat is 30,000 animals. It also assumes that antelope numbers are directly related to the extent of crucial winter habitats. It is impossible to accurately quantify the number of animals that could be lost due to the Stagecoach Draw project. It could be greater or less than 21 animals.
(DEIS at 95; Compare DEIS at 121-22.)

Rather than demonstrating how and why BLM's assumptions or reasoning are unsound, Appellants allude to "a body of well-defined scientific thought concerning negative impacts on wildlife" which BLM "completely ignored" (SOR at 22), and suggest that BLM's conclusions lack any scientific support whatsoever. However, apart from assertions that more surveys, studies or modeling should have been undertaken before the project could be approved, no contrary scientific evidence, data and findings are offered which would vitiate BLM's reasoned conclusions, nor have Appellants articulated exactly what they believe is necessary to achieve "an understanding of the ultimate effects this development will have on wildlife ***395** populations." (SOR at 22.) As noted, Appellants have submitted three exhibits which discuss the nature of the impacts that antelope and elk may experience in

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

varying degrees in response to various disturbances, displacement, and conditions. Contrary to NWF's and WOC's assertion, these were considered by BLM. See DEIS at 95-96, 121-123, 135. They nonetheless cite Methow Valley Citizens Council v. Regional Forester (Methow Valley), 833 F.2d 810 (9th Cir.1987), rev'd on other grounds sub nom. Robertson v. Methow Valley Citizens Council, 490 U.S. 332 (1989), as an illustration of "the irrationality of reaching conclusions on wildlife impacts in the face of nonexistent data." (SOR at 21.) The case is distinguishable on its facts.

In Methow Valley, USFS granted a special use permit to a developer for the purpose of providing "a winter sports opportunity." The developer intended to construct a year-round destination ski resort at Sandy Butte, Washington, even though the permit itself was not tied to any specific parcel of land, prompting the court to question why USFS was "wedded exclusively to the development of Sandy Butte." Methow Valley, supra at 815. The court faulted USFS for failing to consider the permanent residential and commercial development that would follow development of the resort and the impact it would have on a variety of natural resources, including impacts on a mule deer herd, and for failing to consider other locations or the possibility of expanding existing facilities. The court had concluded that the proposed project would "cut off the deer herd's migration route, usurp fawning and staging areas and eliminate winter range--all of which are vital to the herd's survival." Methow Valley, supra at 817. Thus, it rejected USFS' assertion that the impacts to mule deer would be minor as a result of mitigation, which the court found was described in "very general terms, lacking both a detailed description of required or possible mitigation measures, and any analysis as to the effectiveness of these measures," because "not only ha[d] the effectiveness of these mitigation measures not yet been assessed, but the mitigation measures themselves ha[d] yet to be developed." Methow Valley, supra at 817, 819. Moreover, USFS' own witness testified at trial that the agency's data in support of this conclusion was inadequate, and this was borne out by the fact that USFS was then engaged in preparing a comprehensive study of the herd. Accordingly, the court concluded that "just as the subsequent preparation of mitigation measures will not cure a deficient EIS, neither will a subsequent study providing information essential to assessment of the environmental impacts of a proposed action and its alternatives." Methow Valley, supra at 817.

Unlike Methow Valley, however, BLM has considered reasonable alternatives to the proposed action, considered obvious and more subtle impacts to wildlife, and prepared and explained a number of mitigation measures, all in advance of approving the action. Since the record provides little to buttress Appellants' factual assertions regarding BLM's consideration of impacts to wildlife, what remains of the argument is an inference that BLM cannot have considered available data and literature, because had BLM done so, it would have reached different conclusions as to the degree of impact, that is, the same conclusions as Appellants.

***396** [1] Appellants' argument fails to recognize that NEPA does not compel a particular result or course of action, mandating only a fully informed and

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

well-considered decision. 40 C.F.R. § 1500.1(b); Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc., 435 U.S. 519, 558 (1978); National Wildlife Federation, 145 IBLA 348, 359 (1998) [FNa]. Second, NEPA does not demand the certain knowledge that Appellants would insist upon as a condition precedent to approving the Texaco project. Only reasonable forecasting and speculation is required by NEPA. City of Davis v. Coleman, 521 F.2d 661, 676 (9th Cir.1975), citing Scientists' Institute for Public Information v. A.E.C., 481 F.2d 1079, 1092 (D.C.Cir.1973). Thus, whether BLM is able to know and qua ntify precisely the "ultimate effects" of development-- in this case, how many more or fewer than 21 animals will be lost as result of the project--is a very different question from whether BLM adequately considered and made a reasoned assessment of environmental impacts. NEPA requires an agency to take a hard look at environmental consequences, and this BLM has done. National Wildlife Federation, supra. In deciding whether an EIS meets the purposes of NEPA, a rule of reason is applied to determine whether the EIS contains a "reasonably thorough discussion of the significant aspects of the probable environmental consequences" of the proposed action. National Wildlife Federation, supra, citing Natural Resources Defense Council v. Hodel, 819 F.2d 927, 929 (9th Cir.1987). We are satisfied that the EIS presented a reasonably thorough discussion of environmental consequences of the Stagecoach Draw project, including the points raised by Appellants' submissions.

[2] Further, Appellants' argument fails to take into account the mitigation goals and strategies which are expected to reduce or minimize overall impacts. "The importance of the mitigation plan cannot be overestimated. It is a determinative factor in evaluating the adequacy of an environmental impact statement. Without a complete mitigation plan, the decisionmaker is unable to make an informed judgment as to the environmental impact of the project--one of the main purposes of an environmental impact statement." Oregon Natural Resources Council v. Marsh, 820 F.2d 1051, 1055 (9th Cir.1987). More than simply listing mitigation measures, an EIS must contain a reasonably thorough discussion of such strategies which explains the effectiveness of the measures. Oregon Natural Resources Council v. Marsh, supra. The DEIS and FEIS include specific mitigation measures, such as seasonal restrictions, buffer zones, and prohibitions against certain structures and activity, for example; monitoring; local site assessments of environmental impacts in connection with specific authorizations, which way include imposition of further conditions, restrictions, or prohibitions as appropriate; numerous stipulations governing surface disturbance, reclamation, and drilling; and the imposition of additional restrictions if information obtained from other, larger projects warrants it. Appellants do not directly challenge the mitigation plan in general, and certainly do not address the impact of specific measures on their concerns or on BLM's conclusions that overall direct and indirect impacts to wildlife are negligible. (DEIS at 127.)

***397** Appellants' final point in this line of argument is that the ROD and underlying EIS are not entitled to deference for three reasons: BLM ignored "well-defined scientific thought;" it admitted that it does not understand the "ultimate effects" of the project on wildlife; and USFWS has challenged the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

accuracy of BLM's assertion in the DEIS that wildlife impacts are negligible, as demonstrated by a paragraph from page 4 of USFWS' comments dated March 24, 1995. Having addressed the first two assertions in the discussion above, we will consider the third. USFWS' comments, designated as Comment 11-8 for purposes of BLM's response, were as follows:

Page 95, 4.11 Wildlife and Fisheries, page 121, 4.25.2.11 and Table 4.6--The environmental consequences of the proposed action focus on the direct effects of acreage of habitat lost. I concur, that from a landscape perspective, the proposed project will affect a relatively small amount of land. However, indirect impacts associated with wildlife displacement and disruption probably have substantially more impact. The draft EIS suggests that for most species there is some unquantifiable amount of indirect impact, but discounts these impacts as negligible. If these impacts are truly unquantifiable, then how can the Bureau determine the "negligible" level of impact. [Sic] As written, the draft EIS is misleading and presumes the proposed action will have negligible impacts, when in fact the impacts for most species are not known.

BLM responded as follows:

Comment: 11.8--Within the Stagecoach Draw Unit indirect impacts are acknowledged and would occur at their highest levels during construction and drilling. Although indirect impacts are unquantifiable, through professional judgment, we can deduce that--(1) given the behavioral characteristics of antelope and other wildlife and (2) given the implementation of the identified mitigation measures--the impacts from the proposed project should be negligible within the Stagecoach Draw Unit (Section 4.11.2.1 Big Game/Other Animals, page 96). However, when considered cumulatively with other present and reasonably foreseeable development, we can deduce that anticipated impacts would be moderately adverse during the development stage, becoming negligible as development activity slows (Section 4.25.2.11 Wildlife and Fisheries, page 121). Nevertheless, studies are needed to document the precise indirect effects of this human activity.

(FEIS at 18-19.) To admit that BLM does not possess precise knowledge--whether 17 or 71 animals will perish as a result of low birth weight attributable to harassment by project workers, for example--is not tantamount to an admission that BLM lacks sufficient information or experience to reach a reasoned conclusion regarding likely overall impacts based upon the knowledge and data that are available. A more objective ***398** consideration of the comment and response, read against the background of the discussions at DEIS at 95-96, 121- 23, 135, Tables 4.6 and 4.7, and Appendix G to FEIS, convinces us that it merely urged a further clarification to avoid the appearance of an inconsistency or misleading impression. That interpretation appears to be borne out by the absence of any further comment on the point in USFWS' August 22, 1995, comments on the FEIS. (ROD for EIS, Appendix E.) Thus, we are not persuaded that the cited exchange between USFWS and BLM supports Appellants' contentions.

Appellants' second factual argument concerns air quality. Specifically, four points are asserted. First, error is alleged in the failure to analyze direct

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

impacts and to quantify emissions from drilling and production activities by appropriate computer modeling. (SOR at 23-25.) Second, it is alleged that the finding of no significant impact on air quality is undermined by the quantification in general terms of the potential emission rates for various air pollutants at the Moxa Arch project. (SOR at 24, citing Ex. 5 to SOR.) The final arguments are that BLM failed to consider the cumulative impacts of all other mineral and oil and gas projects on air quality, and that BLM cannot properly postpone a cumulative analysis or development of mitigation measures. (SOR at 28-29.) The DEIS states that the project is a Class II air quality area, a classification which allows development and limited increases in certain pollutants, provided such increases do not exceed the National Ambient Air Quality Standards (NAAQS). The DEIS further states that the principal ambient air pollutant in the project area is particulate matter, attributable to a variety of natural and industrial sources, including natural gas development activities. However, the DEIS also states that there are no known violations of Class II air quality standards (DEIS at 37), and this is not disputed by NWF and WOC.

Moreover, while BLM acknowledged growing concern regarding the potential for increases in certain emissions on the part of the WDEQ-ADQ, "[t]here are no known or suspected exceedances of NAAQS's or Class 2 Prevention of Significant Deterioration (PSD) increments for NOx [oxides of nitrogen] in the county at this time ***." (DEIS at 38.) BLM also acknowledged temporary increases in unquantifiable amounts of certain pollutants at some locations as a result of various development activities, but noted that impacts on air quality are not considered significant until they violate Federal or State air quality standards, and that it is WDEQ-ADQ which would issue air quality permits for the construction, testing, and operation of equipment and facilities, as appropriate. (DEIS at 87-88.) WDEQ-ADQ apparently does not anticipate air quality modeling in connection with the permitting process, because no significant impacts are anticipated. (DEIS at 88.) Again, none of these points are directly disputed by Appellants, although they question BLM's representation that no modeling will be required in the course of WDEQ's air quality permitting process.

Regardless of whether BLM should have been more specific in identifying the source of the representation, the fact is that WDEQ formally commented on the DEIS, and it did not voice any concern about impacts to ***399** air quality as a result of the project. (FEIS at 11.) We therefore cannot say that BLM's inference that impacts are not significant is plainly wrong. The EPA agrees with BLM's inference. (FEIS at 16.) As a result, it was neither unreasonable nor reversible error to determine not to require air quality modeling at this time. This conclusion accordingly disposes of Appellants' contentions with respect to emissions from production activities, as distinct from drilling and completion activities. As to the air quality modeling to be performed in connection with Moxa Arch, we agree with Texaco and BLM that the experience at that project does not necessarily undermine the reasoning of the Stagecoach Draw ROD or DEIS/FEIS. Moxa Arch is a much larger project with 35 times the number of wells proposed for the Stagecoach Draw project, yet it appears that no Federal nor State air quality standard has been exceeded (Answer at 17), assertions not contested by Appellants.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

The third leg of NWF's and WOC's claims regarding air quality is that BLM failed to consider the "thousands of additional wells" that are to be drilled in southwest Wyoming over the next 20 years. Appellants contend that these wells "will result in significant air pollutant emissions, which will cumulate over time." They further note that development of trona, uranium, coal, and coalbed methane also will increase in the same period and contribute air pollutants. (SOR at 26.) Thus, it is alleged that the ROD and DEIS/FEIS have "failed completely" to address the cumulative effects of all such industrial activity. (SOR at 27.) This is not supported by the record. See DEIS at 30, 37-38, 87-88, 112, 119, 131.

[3] The cumulative impact analysis area comprises 1,004,080 acres, and for the most part extends well beyond the Unit boundaries and includes several other units and fields, including some of those identified by Appellants. (DEIS at 111-15, 119.) It also includes the basin-wide airshed and the Class I airshed for the Bridger and Fitzpatrick Wilderness Areas. As noted, it is uncontested that "[e]xisting air quality in the area is generally excellent." (DEIS at 119.) Appellants instead generally argue that the potential air pollution from all other sources can severely impact air quality. [FN8] However, it is not sufficient merely to note the existence of other gas fields and gas development projects in Wyoming without concretely identifying the adverse impacts caused by such other fields and projects to which the action being scrutinized will add. Wyoming Outdoor Council, 147 IBLA 105, 109 (1998) [FNb]. Here, the incremental ***400** impact of the Stagecoach Draw Unit project is not expected to be significant, and although a moderately adverse short-term increase in oxides of nitrogen and particulates is anticipated, these will decline to negligible impact as construction activities decline, and in any event such emissions will be subject to Class 2 PSD increments. (DEIS at 38, 119.) Moreover, should the Fontanelle and Moxa Arch EIS' identify any further measures to mitigate cumulative impacts on air quality, or should WDEQ-ADQ require additional measures, they also will be imposed on Texaco. (ROD at 13.) [FN9] Appellants have adduced nothing which negates or controverts the determination that air quality remains "generally excellent" (DEIS at 37) in the cumulative impact analysis area, and that applicable air quality standards have not been exceeded (DEIS at 37-38). In the absence of such evidence, Appellants have failed to demonstrate a cumulative or synergistic impact on air quality which would give rise to an obligation to consider the environmental consequences of the Stagecoach Draw project with those of any other proposed project pending before the agency. Sierra Club v. Kleppe, 427 U.S. 390, 410 (1976) ; Southwest Resource Council, 96 IBLA 105, 121, 94 I.D. 56, 65 (1987) [FNc] .

NWF and WOC also raise an argument regarding improper segmenting and the obligation to complete a regional EIS before authorizing Texaco to proceed. The present case is not, because of the fact of other natural gas development in Wyoming, like the "segments of a proposed highway, which must be considered as part of one major federal development program [citation omitted]." Natural Resources Defense Council v. Calloway, 524 F.2d 79, 87-88 (2d Cir.1975). It cannot fairly be said that all the existing and proposed projects and fields in southwestern Wyoming are so interdependent that it would be irrational or unwise to undertake one project if the other projects were not also undertaken. Cf.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Concerned Citizens for Responsible Mining (On Reconsideration), 131 IBLA 257, 265-66 (1994) [FNd], citing Thomas v. Peterson, 753 F.2d 754, 758-59 (9th Cir.1985) .

With respect to their legal arguments, NWF and WOC contend that "there is no authority for the proposition that postponement of drilling activity to comply with NEPA would give rise to a taking." (SOR at 31.) They further argue that BLM should have conducted an environmental analysis before issuing the leases involved in the Unit, and that BLM failed to consider a no-action alternative, having "relinquished" the ability to do so by issuing the leases. (SOR at 33-38.) In advancing this contention, Appellants challenge BLM's reliance on the Big Sandy MFP and the Big Sandy oil and gas leasing EA, arguing that neither furnishes an adequate basis for the ROD. (SOR at 38-41.) To buttress their contentions, they have submitted excerpts from both documents as exhibits in Volume II of their pleadings. As a preliminary matter, we observe that tiering is not only permitted, it is encouraged "to eliminate repetitive discussions of the ***401** same issues and to focus on the actual issues ripe for decision at each level of environmental review." 40 C.F.R. § 1502.20; Southern Utah Wilderness Alliance (SUWA), 124 IBLA 162, 167-68 (1992) [FNe] . The issue therefore is whether the MFP and the Leasing EA contain any data, analysis or findings that are relevant to the Stagecoach Draw FEIS, such that tiering was appropriate.

Appellants dismiss the MFP on the ground that it lacks site-specific leasing decisions. This argument misses the mark. The Resource Management Plan (RMP) is the successor of the MFP, 43 C.F.R. § 1610.8, and it is considered a major Federal action significantly affecting the quality of the human environment, the approval of which therefore requires the preparation of an EIS. 43 C.F.R. § 1601.0-6. Both are land use plans in which, among other things, "[a]llowable resource uses (either singly or in combination) and related levels of production or use to be maintained" are designated, including a decision whether and to what extent mineral leasing is to be allowed. An MFP or RMP is not, however, "a final implementation decision on actions which require further specific plans, process steps, or decisions under specific provisions of law and regulations." 43 C.F.R. § 1601.0-5(k)(2), final paragraph. Thus, an MFP or RMP is not the document in which any site-specific or individual leasing decisions would be made.

An MFP properly may serve as the basis for decision-making until it is superceded by an RMP, provided it is consistent with the principles of multiple use and sustained yield, and was developed with public participation and Government coordination, even if the public participation and coordination did not occur in the manner prescribed in 43 C.F.R. §§ 1610.2 and 1610.3 relative to RMP's. As initial environmental reviews for the leasing, exploration and proposed development of mineral resources were conducted during the land use planning process with public participation, and conformity with the principles of multiple use and sustained yield has not been called into question (ROD for EIS at 12), this claim is rejected.

As to the Leasing EA, NWF's and WOC's chief complaint is that it projected oil

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

and gas activity only through 1991, and that it wrongly anticipated a decline in oil and gas in the area after 1987 because of increased interest in coal and sodium. As they did with respect to the MFP, Appellants perceive error in the lack of "effort to tie its summary of possible impacts to specific lease areas, or to foreseeable development of any particular lease or leases." (SOR at 41.) However, the purpose of the Leasing EA was to describe and analyze the present and probable future cumulative impacts of oil and gas exploration, development, and production in the Big Sandy and Salt Wells Resource Areas, a region comprising approximately 5 million acres in 5 counties in southwestern Wyoming. Tentative land use decisions pertaining to continued oil and gas leasing had been made earlier in 1987, and the Leasing EA was designed to provide the analysis to be used in making final decisions. The document was programmatic in nature and expressly "[did] not analyze specific well sites or other specific practices," the stated primary purpose being "to identify overall and cumulative impacts of an assumed rate and type of development." (Leasing EA at 1, Ex. 22 to SOR.)

***402** Regardless of whether BLM was able to accurately foresee the turns in the tide of mineral development in southwestern Wyoming or not, the important question is whether the basic data, analysis, or reasoning of the EA retains any validity for any purpose useful to the Stagecoach Draw EIS. Appellants bear the burden of demonstrating the particulars of why the Leasing EA is obsolete, and to do so requires more than noting that its projections were not intended to go beyond 1991. Indeed, NWF and WOC have not articulated or provided anything that would lead us to find that the cumulative impact analysis contained in the Leasing EA has lost its legitimacy. Accordingly, it was entirely appropriate for BLM to tier to the documents in which the appropriateness of continued oil and gas leasing and the circumstances under which it would continue were considered and analyzed with public comment and participation. SUWA, supra.

Appellants' concern regarding the need to examine the cumulative impacts from all mineral and industrial activity over the coming decades is well-taken, and it is a concern shared by the State and by BLM. Indeed, BLM has undertaken a regional assessment in the form of the Southwest Wyoming Resource Evaluation, which, among other things, will examine unanticipated or unpredictable effects, including off-site impacts; determine the effectiveness of mitigation measures; determine the status of established threshold levels; and evaluate what is necessary to achieve or maintain consistency with the plans or programs of State and local government and Native American tribes. (FEIS at 17.) The Southwest Wyoming Resource Evaluation seeks information that ultimately may shed light on conclusions or expectations set forth in the EIS, but it is not, and does not purport to be, a substitute for project- and site-specific environmental analysis, and it does not negate the land use planning and programmatic analyses performed in connection with the MFP and Leasing EA.

Appellants nonetheless argue that BLM should have conducted an environmental analysis before issuing the Stagecoach Draw Unit leases to ensure that a no-action alternative could be considered. (SOR at 33-38.) Sierra Club v. Peterson, 717 F.2d 1409, 1410, 1414 (D.C.Cir.1983); Conner v. Burford, 836 F.2d 1521, 1526, 1530-31

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

(9th Cir.1988); and Bob Marshall Alliance v. Hodel, 852 F.2d 1223, 1227 (9th Cir.1988), are cited in support of the contention that an EIS was required before the Unit leases could be sold. These cases stand for the proposition that an environmental analysis must be conducted before a competitive oil and gas lease is issued, unless the Government retains the authority to preclude all surface-disturbing development.

[4] In the present case, however, BLM analyzed the environmental consequences of continued mineral leasing before it issued the Unit leases. The initial determination regarding which public lands were to be open to mineral leasing was made in the MFP, and this was subject to public comment. Stagecoach Draw was among the lands designated for leasing, with various protective conditions and stipulations. Thereafter, the Leasing EA served as the mechanism by which environmental consequences and cumulative impacts of oil and gas leasing in the area were analyzed and additional protective measures to ensure minimal impacts were developed, and ***403** that analysis was completed before any Unit lease was issued to Texaco. (ROD for EIS at 12, Appendix E at 4-5, 6-7; Answer at 21- 22.) Where BLM has previously analyzed the significant environmental consequences of mineral leasing, no site-specific EIS is required prior to issuing an oil and gas lease. Colorado Environmental Coalition, 142 IBLA 49, 52-53 (1997) [FNf]. Moreover, Appellants evidently neither commented on the Leasing EA nor protested issuance of Texaco's leases, and thus the time for contesting issuance of the leases has long since passed. Southern Utah Wilderness Alliance, 122 IBLA 165, 172 (1992) [FNg].

[5] Since the leases have been issued, absent a nondiscretionary statutory prohibition against drilling, BLM cannot now deny the right to drill and develop the leasehold. Only Congress can completely prohibit development activities. Western Colorado Congress, 130 IBLA 244, 248 (1994) [FNh], citing Union Oil Co. of California v. Morton, 512 F.2d 743, 750-51 (9th Cir.1975). In such cases, BLM is required to fashio n mitigation strategies and methods to reduce or eliminate adverse impacts. Western Colorado Congress, supra at 248; see also DEIS at 28. In these circumstances, a no-action alternative is not a viable alternative, although it may be included in the environmental analysis for comparative purposes. Consequently, there was no "relinquishment" of the obligation to consider no action in the sense urged by Appellants.

To the extent not stated herein, other arguments have been considered and rejected.

Accordingly, pursuant to the authority delegated to the Board of Land Appeals by the Secretary of the Interior, 43 C.F.R. § 4.1, the Decision appealed from is affirmed.

T. Britt Price

Administrative Judge

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

I concur:
James P. Terry
Administrative Judge

FN1 On Nov. 20, 1995, Texaco filed a Motion to Dismiss the appeal on the ground of lack of standing to appeal. By Order dated Nov. 25, 1996, this Board denied the Motion to Dismiss, but concluded that WWF lacked standing.

FN2 The Unit comprises 23,575 acres situated in Sweetwater County, Wyoming, in T. 22, 23, and 24 N., R. 107 and 108 W. (Texaco's Stagecoach Draw Unit Draft Environmental Impact Statement released in March 1995 (DEIS).) The United States owns 98 percent of the surface and mineral estates, while the State of Wyoming owns the remaining 2 percent. (DEIS at i, 82.) Texaco formed the Unit in 1993 and is the operator. (Answer at 2.)

FN3 We note that on Dec. 12, 1998, Texaco filed a pleading styled Motion to Allow BLM to Process An Application for In-fill Drilling While Appeal Is Pending Or, In the Alternative, For Expedited Consideration. Based upon information obtained from earlier wells, Texaco has concluded that to properly develop the reservoir, wells should be drilled on 160-acre spacing, and intends to submit an application to do so. By Order dated Mar. 16, 1999, the Board granted the request for expedited consideration, but denied the request to proceed with the application for infill drilling.

FN4 The Petition for Stay was granted on a temporary basis by Order dated Dec. 14, 1995. It was extended by Orders dated Mar. 7, 1996, and Apr. 4, 1996. On Apr. 25, 1996, the Petition for Stay was denied.

FN5 The Notice of Appeal is the unnumbered first page of the submission, the SOR is pages 1-47, and the Petition for Stay is pages 48-54.

FN6 In its Answer filed with the Board on Feb. 2, 1996, BLM formally joined in Texaco's Answer.

FN7 In its Answer, Texaco referred to the DEIS. Although the FEIS identifies relatively minor changes as a result of comments received, these did not affect the overall quality of the environmental analysis or reasoning employed in the DEIS. Thus, for present purposes, citations to the DEIS and FEIS are interchangeable.

FNa) GFS(MIN) 105(1998)

FN8 They also contend that BLM omitted mention of two pending pipeline proposals. As Appellants' own Exhibit 16 shows, one of those proposals is to be subjected to its own environmental analysis, and in the absence of any specific allegation or evidence relating to the nature and extent of potential emissions associated with the other proposed pipeline to counter the conclusion that no Federal or State air quality standard has been exceeded at Moxa Arch or any other natural gas field or

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

unit within the cumulative impact analysis area, we find no error in BLM's failure to mention the pipeline.

FNb) GFS(O&G) 6(1999)

FN9 The FEIS' for the Moxa Arch and Fontanelle will include the Stagecoach Draw Proposed Alternative and Alternative A, and will also include impacts on the Bridger, Fitzpatrick, and Popo Agie Wildernesses. (ROD at 13.)

FNc) GFS(MIN) 27(1987)

FNd) GFS(MIN) 2(1995)

FNe) GFS(O&G) 38(1992)

FNf) GFS(O&G) 5(1998)

FNg) GFS(O&G) 14(1992)

FNh) GFS(O&G) 24(1994)

GFS(O&G) 37(1999), 150 IBLA 385

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

GFS(O&G) 15(2006), 170 IBLA 240

**(Cite as: 170 IBLA 240)**

United States Department of the Interior
Office of Hearings and Appeals
Interior Board of Land Appeals

NATIONAL WILDLIFE FEDERATION

BIODIVERSITY CONSERVATION ALLIANCE

WYOMING OUTDOOR COUNCIL

WYOMING WILDLIFE FEDERATION

IBLA 2004-133, 2004-289, 2005-109

Decided September 29, 2006

INDEX CODE:

40 CFR 1506.1

***240** Appeal from decisions of the Acting Deputy State Director, Wyoming State Office, Bureau of Land Management, affirming the Decision Record/Finding of No Significant Impact approving the Brown Cow Pod Environmental Assessment, WY-030-04-EA-067; the Decision Record/Finding of No Significant Impact approving the Red Rim Pod Environmental Assessment, WY-030-04-EA-055; and the Decision Record/Finding of No Significant Impact approving the Jolly Roger Pod Environmental Assessment, WY-030-04-EA-390. SDR No. WY-2004-05; SDR No. WY-2004-22; and SDR No. WY-2005-09.

Affirmed.

1. National Environmental Policy Act of 1969: Finding of No Significant Impact

When an agency issues a Decision Record and Finding of No Significant Impact based on an Environmental Assessment, that decision will be deemed to comply with the National Environmental Policy Act if the record demonstrates that the agency has considered all relevant matters of environmental concern, taken a hard look at potential environmental impacts, and made a convincing case that any potentially significant impact will be reduced to insignificance by imposing appropriate mitigation measures.

***241** 2. Administrative Practice--Administrative Review: Generally-- Appeals: Generally

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

GFS(O&G) 15(2006), 170 IBLA 240

**(Cite as: 170 IBLA 240)**

When the Board has previously considered and rejected the same arguments urged in the present appeal, and an appellant does not file supplemental briefing to address the impact of that earlier decision, appellant has not shown that the arguments expressly considered and rejected in the previous decision remain viable in these cases. In such circumstances, the Board properly concludes that the earlier decision is dispositive.

3. Federal Land Policy and Management Act of 1976: Generally--Federal Land Policy and Management Act of 1976: Land Use National Environmental Policy Act of 1969: Generally

Nothing in the Federal Land Policy and Management Act or the National Environmental Policy Act, or their implementing regulations, requires the Board to conclude that BLM cannot revise its method of calculating the number of wells remaining to be drilled under a Reasonably Foreseeable Development (RFD) scenario, or that the degree of short-and long-term surface disturbance resulting from oil and gas activities is an improper reference point in ascertaining the present status of the RFD scenario.

Appearances: Thomas D. Lustig, Esq., and Michael A. Saul, Esq., for the National Wildlife Federation, Biodiversity Conservation Alliance, Wyoming Outdoor Council, and Wyoming Wildlife Federation; Craig Carver, Esq., and Christopher M. Kamper, Esq., Denver, Colorado, for Merit Energy Company; Jack D. Palma II, Esq., P.C., and Jenifer E. Scoggin, Esq., Cheyenne, Wyoming, Sandra Snodgrass, Esq., Denver, Colorado, and Natalie Eades, Esq., Houston, Texas, for Anardarko E&P Company and Warren Resources, Inc.; Lyle K. Rising, Esq., Office of the Regional Solicitor, U.S. Department of the Interior, Lakewood, Colorado, for the Bureau of Land Management.

OPINION BY ADMINISTRATIVE JUDGE PRICE

The National Wildlife Federation, Biodiversity Conservation Alliance, Wyoming Outdoor Council, and the Wyoming Wildlife Federation (collectively, NWF) have appealed decisions of the Deputy State Director or Acting Deputy State Director, Wyoming State Office, Bureau of Land Management (BLM), affirming on State ***242** Director Review (SDR) Decision Records and Findings of No Significant Impact (DR/FONSIs) issued by the Rawlins (Wyoming) Field Office (RFO) approving three coalbed methane (CBM) exploratory drilling Pods (plans of development and/or operational segments). Merit Energy Company (Merit) appears in IBLA 2004-133 as owner and operator of the Brown Cow Pod. Anardarko E&P Company LP (Anardarko) and Warren Resources, Inc. (Warren) appear as the parties who proposed the exploratory drilling for the Red Rim and Jolly Roger Pods.

The Brown Cow, Red Rim, and Jolly Roger Pods represent three of nine exploratory CBM projects within the Atlantic Rim CBM Project (ARP) area in southwestern Wyoming in Carbon County. The activities in the ARP area are governed by the 1990 Great Divide Resource Management Plan (Great Divide RMP) and its underlying environmental impact statement (EIS) (collectively, the RMP/EIS). See Notice of

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Intent to Prepare an [EIS] and Conduct Scoping for the [ARP], Carbon County, Wyoming; and to Amend the Great Divide [RMP], 66 FR 33975, 33976 (June 26, 2001). The ARP area encompasses 310,335 acres of Federal, State, and private lands, in which up to 3,880 CBM wells with related facilities and improvements could be drilled. Id. An RMP amendment and accompanying EIS are proposed because the development pursuant to the ARP is likely to exceed the reasonably foreseeable development analyzed in the 1990 RMP/EIS. Id. at 33975-76. Exploratory drilling has been authorized to gather information "to define the coal structures in the area, to determine if the coal can be dewatered to allow for economic development of gas, and to support conclusions reached to be contained in the ARP EIS." Id.

The three Pods are part of a nine-Pod exploratory project to be undertaken pursuant to BLM's 2001 Interim Drilling Policy, Conditions and Criteria Under Which Development Activities May Occur Concurrent with EIS Preparation for the Atlantic Rim Coalbed Methane Project (IDP), which allows the drilling of a maximum of 200 wells (a maximum of 24 wells per Pod) in the ARP area while the development of the EIS for the ARP proceeds, subject to a variety of terms and conditions designed to ensure that drilling activity remains within the level of activity permitted pursuant to Council on Environmental Quality (CEQ) regulation 40 CFR 1506.1. [FN1] See IDP, Appendix A ***243** to Environmental Assessment (EAs). While operators will be able to produce any wells that prove successful in the course of Pod operations, a primary objective is to obtain information and data needed for the Atlantic Rim EIS. (DR/FONSIs at 1.)

In December 2003, the RFO issued EA No. WY-030-04-EA-067 for the Brown Cow Pod (BCEA), pursuant to which Merit proposed to drill 12 CBM wells and convert 2 existing shut-in wells to water injection wells, and construct related access roads and facilities. [FN2] The proposal was approved by issuance of the DR/FONSI on December 12, 2003 (IBLA 2004-133).

In the Red Rim Pod, Anardarko and Warren proposed to drill 9 exploratory CBM wells and up to 2 water injection wells, operate 7 existing wells, and construct 2 water conditioning facilities, 3 surface discharge outfalls, a compressor station, and associated access roads and infrastructure, for which EA No. WY-030-04-EA-055 (RREA) was prepared in November 2003. [FN3] A DR/FONSI was issued on April 23, 2004 (IBLA 2004-289).

In the Jolly Roger Pod, Anardarko and Warren proposed to drill 16 exploratory CBM wells and 2 deep injection wells, operate 8 existing wells and 1 existing deep injection well, and construct access roads and related facilities. The RFO prepared ***244** EA No. WY-030-04-EA-390 (JREA) for that Pod in September 2004 and issued the DR/FONSI approving the project on December 14, 2004 (2005-189). [FN4]

NWF protested the three DR/FONSIs, resulting in the SDR decisions here appealed. Because of the common legal and factual issues, we have consolidated these appeals on our own motion.

[1] When an agency issues a DR/FONSI, based on an EA, concluding that it is not

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

necessary to prepare an EIS before undertaking the proposed action, that decision will be deemed to comply with section 102(2)(C) of National Environmental Policy Act (NEPA), 42 U.S.C. § 4332(2)(c) (2000), if the record demonstrates that the agency has considered all relevant matters of environmental concern, taken a "hard look" at potential environmental impacts, and made a convincing case that any potentially significant impact will be reduced to insignificance by imposing appropriate mitigation measures. Cabinet Mountain Wilderness v. Peterson, 685 F.2d 678, 681-82 (D.C. Cir. 1982).

An appellant seeking to overcome a FONSI bears the burden of demonstrating, with objective proof, that BLM has failed to adequately consider an environmental question of significance to the proposed action, or otherwise failed to abide by section 102(2)(C) of NEPA. Frederic L. Fleetwood, 159 IBLA 375, 382 (2003); [FNa] Defenders of Wildlife, 169 IBLA 117, 132 (2006); [FNb] Southern Utah Wilderness Alliance, 127 IBLA 331, 350, 100 I.D. 370, 380 (1993). [FNc] That an appellant has a different opinion about the likelihood or significance of environmental impacts or prefers that BLM take another course of action does not establish that BLM violated the procedural requirements of NEPA. San Juan Citizens Alliance, 129 IBLA 1, 14 (1994). [FNd] When BLM has completed the procedural requirements of section 102(2)(C) of NEPA by taking a hard look at the potential environmental impacts of a proposed action, it will be deemed to have complied with the statute, regardless of whether a different substantive decision would have been reached by an appellant, this Board, or a court (in the event of judicial review). Stryker's Bay Neighborhood Council v. Karlen, 444 U.S. 223, 227-28 (1980); Natural Resources Defense Council v. Morton, 458 F.2d 827, 838 (D.C. Cir. 1972). When deciding whether BLM has taken a hard look, this Board is guided by the "rule of reason." Don't Ruin Our Park v. Stone, 802 F. Supp. 1239, 1247- 48 (M.D. Pa. 1992); Armando Fernandez, 165 IBLA 41, 50 (2005). [FNe]

***245** This Board recently decided NWF's appeal involving two other Pods in the ARP area. In National Wildlife Federation, 169 IBLA 146 (2006), [FNf] we considered the Cow Creek and Blue Sky Pods, with respect to which NWF advanced a number of the same issues. Thus, in those protests, NWF argued that (1) the Cow Creek and Blue Sky Pod EAs violated NEPA, 42 U.S.C. § 4332(2)(c) (2000), because they relied on the IDP, which makes numerous decisions that result in environmental impacts that should have been analyzed under NEPA; (2) the EAs failed to consider connected, similar, and cumulative impacts adequately, as required by NEPA; (3) the EAs violated the Federal Land Policy and Management Act of 1976 (FLPMA) because authorizing drilling for CBM does not conform to the RMP, as required by 43 U.S.C. § 1732(a) (2000); (4) the EAs failed to disclose likely environmental impacts that would occur during the production phase; and (5) the EAs failed to consider a reasonable range of alternatives. National Wildlife Federation, 169 IBLA at 150.

In the appeals of the SDR decisions denying the protests of the Cow Creek and Blue Sky DR/FONSIs to this Board, NWF attacked BLM's decisions on three main fronts. First, NWF argued that those EAs did not comply with NEPA because they were predicated on the IDP, which was never analyzed under NEPA. More

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

specifically, citing Kern v. U.S. Bureau of Land Management, 284 F.3d 1062 (9th Cir. 2002), NWF contended that, when the IDP was incorporated into site-specific proposals, independent of the analyses of the impacts of Pod activities, BLM was required to analyze the IDP under NEPA. Second, NWF argued that the approval of the projects for CBM development violates FLPMA because CBM development does not conform to the 1990 Great Divide RMP in that CBM impacts "are substantially different" in magnitude and nature from impacts contemplated in the RMP/EIS for conventional oil and gas production. Third, appellants asserted that BLM cannot mitigate impacts to wildlife during the production phase of Pod activities because lease provisions preclude the imposition of timing limitations once the projects are past the exploration and development phases, and thus they contended that those EAs failed to disclose "likely" impacts that will materialize "during the production phase." National Wildlife Federation, 169 IBLA at 150-51.

Those arguments and points in support of them are again raised in these appeals, in virtually identical form. Accordingly, most are controlled by the analysis and holdings in National Wildlife Federation, 169 IBLA at 152-165. We rejected NWF's contentions regarding the import of the IDP or the obligation to subject it to NEPA review, finding that "[t]he conditions and criteria in the IDP do not constitute agency action within the meaning of NEPA, as it proposes no agency action." Id. at 156. We concluded that

the IDP merely establishes the boundaries within which a surface-disturbing pod action, when it is proposed, must fit. The IDP is therefore not itself independently subject to NEPA's requirements, so ***246** long as, when and to the extent it is incorporated into a specific proposed agency action, full NEPA review and analysis of the effects of that action is undertaken.
Id. at 156-57.

With respect to the alleged FLPMA violation, it is established that CBM is a fluid mineral subject to the land use planning decisions applicable to such minerals, regardless of whether it is identified by name or not. Therefore, a land use planning decision that opens the planning area to oil and gas leasing opens it to CBM exploration and development as well.
Id. at 153 and cases cited.

As to NWF's allegations regarding the kind and magnitude of CBM-related impacts and conformance with the Great Divide RMP, we first explained that, in a post-leasing context,

the real issue presented by CBM activity in these appeals is not whether it conforms to the Great Divide RMP land use decision authorizing oil and gas activity, but whether there are any environmental impacts associated with CBM activity on the leased parcels beyond those resulting from conventional oil and gas activity, hence rendering them "unique" impacts or impacts never addressed in the EIS. To the extent truly unique CBM impacts demonstrably exist or are likely to materialize, it is not FLPMA's land use planning provisions that are triggered, but those of * * * NEPA * * *, which requires an agency to analyze such impacts

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

before undertaking an action.
Id. at 154. We concluded that NWF's arguments regarding the applicability of the decisions in Wyoming Outdoor Council, 158 IBLA 384 (2003), [FNg] and Wyoming Outdoor Council, 160 IBLA 387 (2004), [FNh] were misplaced because the Cow Creek and Blue Sky Pods, like those presently before us, constitute post-leasing proposed actions that must stand or fall on the quality and completeness of the analyses contained in the EAs. We therefore examined those environmental analyses and went on to detail the reasons why we could not agree that BLM had failed to adequately consider an environmental question of significance to the proposed action or otherwise failed to comply with section 102(2)(C) of NEPA and, on that basis, concluded that the DR/FONSIs were properly sustained.

As we have said, in the present appeals, NWF largely repeats the same arguments. We have scrutinized each of the EAs in these appeals in light of NWF's ***247** arguments, however, paying particular attention to impacts that can be significant in the CBM context, and we conclude that the reasoning and analysis in National Wildlife Federation is dispositive.

These three EAs, like those previously considered in National Wildlife Federation, summarize the potential issues and concerns posed by the proposed exploration activity, including potential effects on surface water and groundwater, air, soils, and wildlife. (BCEA at 1-5 to 1-6; RREA at 1-6 to 1-9; JREA at 1-4 to 1-5.) Each EA prescribes detailed project-wide mitigation measures and best-management practices (BMPs), which include both BLM-imposed and applicant-committed measures, to govern preconstruction planning, design, and compliance measures, as well as resource-specific requirements. (BCEA at 2- 13 to 2-20; RREA at 2-9; JREA at 2-14 to 2-22.) See also Appendices to BCEA (Master Surface Use Plan, Master Drilling Program, and Water Management Plan), and to JREA (Master Surface Use Plan, Master Drilling Program); and Appendices C and D to RREA DR/FONSI (Master Surface Use Plan, Master Drilling Plan, Conditions of Approval). Operators must comply with all permitting requirements imposed under Federal or State law, including those that govern water quality, air quality, and wildlife. See Appendix B to BCEA and JREA (Federal, State, and County Permits, Approvals, and Authorizing Actions). [FN5]

With respect to impacts on particular resources, air quality, for example, none of the subject Pods is expected to have any significant impact on ambient air quality in large part because of the small number of wells proposed, but also because emissions from methane that is "nearly 100 percent methane" are negligible and no new compressor engines are proposed (BCEA at 4- 4), and compressor emissions "would contain minimal amounts of sulphur dioxide and particulate matter (JREA at 4-2); because air quality impacts from all the wells that would be drilled pursuant to the IDP were analyzed under the air quality model developed for the Continental Divide/Wamsutter II (CD/WII) and South Baggs Natural Gas Development Project EISs (RREA at 4-35) or the Desolation Flats Natural Gas Field Development Project (BCEA at 4-4; JREA at 4- 2 to 4-3); and because construction emissions are temporary and would occur in isolation (BCEA at 4-3; RREA at 4-35; JREA at 4-2).

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Regarding water resources, typically one of the impact areas of greatest concern in CBM extraction and development, it is clear that these EAs have ***248** undertaken the requisite hard look at impacts. Most existing groundwater wells and the proposed CBM wells would penetrate Mesaverde aquifers. (BCEA at 3-28; RREA at 3-16; JREA at 3-12.) Mesaverde groundwater is suitable for livestock use, but is not suitable for domestic supplies or irrigation without treatment or dilution. (BCEA at 3-28; RREA at 3-17; JREA at 3-12.) The other land uses within the Pod project areas consist of "[a]griculture (primarily cattle and sheep grazing), wildlife habitat, oil and natural gas exploration, development, and transmission, and dispersed outdoor recreation (primarily hunting in the fall)." (BCEA at 3-32; RREA at 3-24; JREA at 3-20.) There will be no surface discharge of produced water on Federal lands within the project areas, and produced water will be injected. (BCEA at 2-8 to 2-9; RREA at 2-27; JREA at 2-8.) The water is to be injected below the coal seams in the Cherokee or Deep Creek Sands at 3,000' to 5,000' (BCEA at 2-6); 5,965' to 6,335' (RREA at 2-8); and 3,800' to 4,600' (JREA at 2-6). Shallow groundwater would be unaffected, given the depths of the injection targets, and injected produced water would not migrate or infiltrate into overlying fresh water zones. (BCEA at 4-6; RREA at 4-9; see JREA at 4-22.) Within the Red Rim project area on private land, some produced water will be discharged to emphemeral drainages, subject to mitigation and to a National Pollutant Discharge Elimination System permit issued by the Wyoming Department of Environmental Quality. (RREA at 4-10 to 4-11.) Some of the produced water will be used for livestock. Therefore, surface water quality is expected to be good. (BCEA at 4-6; RREA at 4-10; JREA at 4-22.) All the EAs specify a number of mitigation measures and BMPs to further protect water quality and quantity.

As the Appendices show, access to the Pods will be obtained by existing highways, main roads, and two-track roads, and all equipment and vehicles will be confined to those travel corridors when practical. Construction of some access roads is envisioned, and these will be spurs from existing roads and will be 16 feet wide and subject to a number of requirements regarding their construction and maintenance. (Appendix to C to BCEA, Surface Use Plan.) See also DR/FONSI for JREA, Summary of Comments on Appendix B (Surface Use); DR/FONSI for RREA, Summary of Comments on Appendix B (Surface Use). [FN6]

[2] We could continue in this vein, but we think it unnecessary to do so because our review of the EAs convinces us that BLM has taken the requisite hard look at the impacts of these Pod activities. If there are any particular facts or circumstances about the Brown Cow, Red Rim, or Jolly Roger projects that compel different reasoning or a different outcome than that reached in National Wildlife Federation, NWF has not filed supplemental briefing to address the impact of that decision. It did not do so, presumably because there are no such distinguishing facts or circumstances regarding these Pod activities. We therefore decline to shoulder the ***249** burden of a more exhaustive discussion of these EAs when, with one possible exception, NWF has not shown why the arguments expressly considered and rejected in the previous decision remain viable in these cases.

NWF has raised one argument in its challenge to the Brown Cow and Red Rim

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

projects that was not expressly raised or implicated in the prior appeal. NWF contends that these two projects exceed the reasonably foreseeable development scenario (the RFD or RFD scenario) established in the 1990 RMP/EIS. In support, NWF argues that BLM has authorized more than the 1,440 wells projected in the RFD for the RMP/EIS (BCEA at 44); that BLM is required to count all wells drilled in the planning area rather than only active wells (BCEA at 45; RREA at 43); that BLM's reliance on long-term disturbance to measure conformance with the RFD scenario is not justified (BCEA at 46-47; RREA at 44-45); and that BLM improperly assumes that previously disturbed acreage has been reclaimed (BCEA at 47-48; RREA at 45-46). In essence, these are further contentions in support of the arguments that the wells to be drilled in each Pod do not conform to the RMP, as required by FLPMA.

In Wyoming Outdoor Council (WOC), 164 IBLA 84 (2004), [FNi] we considered an allegation that the RFD scenario analyzed in the Pinedale RMP/EIS had been exceeded. Noting that an RFD scenario is an analytical tool, we expressly rejected both the idea that it "establishes a point past which further exploration and development is prohibited, and the assumption that the underlying environmental analysis has no validity beyond the RFD scenario." WOC, 164 IBLA at 99. In rejecting that assertion, we implicitly agreed with BLM that an RFD scenario "is neither a planning decision nor the 'No Action Alternative' in the NEPA document." Id. at 100. We stated that "[t]he better question is whether in any given case an exceeded RFD scenario demonstrates that further environmental analysis is required, a question that must be determined on a case-by-case basis," specifically declining to decide whether the need for further environmental review also required a land use plan amendment or revision. Id. at 102 n.22.

On the question of whether the RFD scenario has been exceeded, NWF takes a different tack than that argued in WOC, 164 IBLA 84. In WOC, appellants argued that the number of authorized and drilled wells was greater than that projected in the RFD and, therefore, that BLM was required to amend or revise the RMP before further leasing occurred. Id. at 101-102. Here, NWF objects to BLM's method of determining the status of the RFD scenario, specifically the fact that BLM has altered its calculation method. As explained in the SDR decision pertaining to the Brown Cow Pod:

The Great Divide analysis is based on 40 acres of surface disturbance for each gas well brought into production (this figure includes well pads, pipelines and roads). Since the Great Divide RMP was released, ***250** technology has changed and the assumptions for which the RFD was made have also changed (each gas well and associated facilities disturbs [sic] significantly less that 40 acres).

Estimated surface disturbance for the Brown Cow project is a short-term disturbance of 3.23 acres/well (12 wells and ancillary facilities requiring 38.82 acres) and a long-term disturbance of .063 acres/well. According to the response prepared by the RFO to comments received for the BCPEA, there are still approximately 7000 acres available for future oil and gas projects before the amount of RFD surface-disturbance would be exceeded (DR/FONSI at 16).

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

As indicated above, the number of wells permitted is one RFD reference point. The number of surface acres disturbed is another reference point. Surpassing one of these reference points does not necessarily mean the RFD has been exceeded and does not mean that additional development cannot occur. Should the number of wells and the level of surface disturbance exceed those analyzed in the Great Divide RMP, BLM would re-examine the Great Divide RMP assumptions and compare them to actual on-the-ground impacts and at that point will determine if the authorization of further oil and gas exploration and development is an appropriate action. (Brown Cow SDR Decision at 8.) On the basis of the foregoing, the Acting Deputy State Director concluded that the RFD had not been exceeded. He reached the same conclusion, following the same reasoning, in deciding NWF's protest of the Red Rim project decision. (Red Rim SDR Decision at 13.)

[3] NWF obviously would prefer that no more wells be drilled in the planning area and, to that end, it moves the Board to invalidate BLM's methodology for ascertaining the number of wells that remain to be drilled pursuant to the RFD. As a general matter, we perceive no fault in a calculus that presumes that the number of wells that can be drilled in an RFD scenario is properly a function of reduced surface disturbance resulting from achievements in increased efficiencies, better management practices and techniques, technological advances, reclamation, and so on. Nor has NWF shown that such logic is flawed, although it plainly objects to the impact on the RFD scenario to the extent it leads to more development. Instead, NWF challenges the propriety of revising the method at all. We find nothing in FLPMA or NEPA, or implementing regulations, that plausibly requires us to hold that BLM cannot revise its method of calculating the number of wells remaining to be drilled under an RFD scenario based upon, among other things, the degree of short-and long-term surface ***251** disturbance resulting from oil and gas activities. [FN7] Even if we believed that there was a different or better approach to quantifying the degree of development remaining under an RFD scenario, however, as an appellate tribunal, the Board of Land Appeals does not exercise supervisory authority over BLM, outside the context of deciding an appeal over which the Board has jurisdiction. Defenders of Wildlife, 169 IBLA 117, 127 (2006); [FNj] Benton Cavin, 166 IBLA 78, 83 (2005); [FNk] Nevada Outdoor Recreation Center, 158 IBLA 207, 210 (2003). [FNl] Therefore, in the absence of a showing by appellant of a violation of applicable law or regulations, we have no general authority to substitute our judgment for BLM's with regard to a method of calculating the number of wells that remain under an RFD scenario. [FN8]

NWF also asserts that, in determining the number of wells remaining to be drilled under the RFD scenario, BLM was required to count every well that has ever been drilled in the planning area within the planning period, not just active wells. We cannot agree. We have found nothing in the RMP/EIS or its ROD, or in FLPMA or NEPA, that supports or compels this conclusion. To buttress its contention, NWF further alleges that BLM has failed to ensure that well sites have been properly reclaimed. Such an allegation could conceivably fortify a challenge to the method of calculating the status of the RFD scenario, and thus NWF attacks BLM's failure to "provide any evidence to back its unsupported assumption that all inactive wells have already been fully and successfully reclaimed." (Brown Cow SOR at 50;

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Red Rim SOR at 48.) It is NWF's burden to affirmatively demonstrate error in the decision appealed, however, not BLM's. Great Basin Mine Watch, 159 IBLA 325, 353 (2003); [FNm] Southern Utah Wilderness Alliance, 158 IBLA 212, 219-20 (2003); [FNn] The Ecology Center, 140 IBLA 269, 271 (1997). [FNo] In this case, NWF has failed to support its charge that BLM is improperly excluding wells from the calculation of RFD by deeming them inactive, fully reclaimed wells; NWF fails even to identify a single instance of an improperly designated well, and it certainly has not demonstrated a general failure to ***252** require full reclamation when wells and their attendant facilities are taken out of service.

Under the circumstances, we reach the same conclusion we reached in National Wildlife Federation with respect to the Cow Creek and Blue Sky Pods:

Appellants have demonstrated their conviction that BLM should have imposed more stringent restrictions on interim exploratory activities and more intense mitigation measures. While NWF's arguments clearly reveal a difference of opinion, they do not demonstrate an error of law or fact, or show that the EAs failed to consider a substantial environmental problem of material significance. The Fund for Animals, Inc., 163 IBLA 172, 179 (2004); [FNp] Rocky Mountain Trials Association, 156 IBLA 64, 71 (2001). [FNq] Moreover, as we observed in Oregon Natural Resources Council, 116 IBLA 355, 361 n.6 (1980); [FNr] NEPA is a procedural statute. It does not direct that BLM take any particular action and it specifically does not prohibit action even where environmental degradation is inevitable. The statute only mandates a full consideration of the environmental impact of a proposed action before undertaking it. The records in these cases clearly and convincingly show that BLM fulfilled its obligations under NEPA. National Wildlife Federation, 169 IBLA at 165.

Therefore, pursuant to the authority delegated to the Board of Land Appeals by the Secretary of the Interior, 43 CFR 4.1, the decisions appealed from are affirmed.

T. Britt Price

Administrative Judge

I concur:
Lisa Hemmer
Administrative Judge

FN1. CEQ regulation 40 CFR 1506.1, Limitations on actions during NEPA process, in part provides as follows:

(a) Until an agency issues a record of decision as provided in § 1505.2 (except as provided in paragraph (c) of this section), no action concerning the proposal shall be taken which would:

(1) Have an adverse environmental impact; or

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

(2) Limit the choice of reasonable alternatives.

* * * * *

(c) While work on a required program environmental impact statement is in progress and the action is not covered by an existing program statement, agencies shall not undertake in the interim any major Federal action covered by the program which may significantly affect the quality of the human environment unless such action:

(1) Is justified independently of the program;

(2) Is itself accompanied by an adequate environmental impact statement; and

(3) Will not prejudice the ultimate decision on the program. Interim action prejudices the ultimate decision on the program when it tends to determine subsequent development or limit alternatives. * * *

FN2. The Brown Cow Pod project area is 1,600 acres of Federal land, and is within existing development of the Browning Field in Carbon County. (BCEA at 1-1 and 2-1.)

FN3. The Red Rim Pod project area is 3,200 acres. (DR/FONSI at 1.) Of the wells to be drilled, 5 will be on BLM land, 1 will be on State land, and the remaining wells will be on private land. (RREA at 2-1.)

FN4. The Jolly Roger Pod project area consists of 3,926.77 acres. (JREA at 1- 1.) Of the 24 proposed well locations, 10 would be on BLM lands, and the remaining 14 would be on private lands, as would the compressor station and new injection wells. The existing injection well is also on private land. (JREA at 2-1.)

FN5. BLM did not furnish a copy of the RREA, and NWF provided only incomplete copies without all the Appendices with which we have become familiar as a result of reviewing appeals involving the ARP. Given the topic and the references to such Appendices in the Red Rim DR/FONSI, however, we are confident that the Red Rim Pod, like all that we have reviewed to date, also has an Appendix that deals with Federal, State, and County Permits, Approvals, and Authorizing Actions.

FN6. See n.5 ante.

FN7. In so stating, we do not mean to suggest that the number of wells and facilities would never be the most compelling parameter in ascertaining the current status of the RFD scenario. Air quality, for example, on a long-term basis might be more forcibly driven by the number of wells and compressors, rather than the degree of surface disturbance associated with each.

FN8. While NWF mistrusts the timing of this change in methodology, we note that the approach was presented at least as early as 1999. See Draft EIS for the CD/WII Natural Gas Project at 4-6 to 4-7. Noting that the RMP/EIS assumed long-term

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

surface disturbance of 11.2 acres per well, the CD/WII Draft EIS stated that experience had shown that the long-term disturbance is 9 acres per well, but even that revised figure was deemed to be an "overestimation." (CD/WII Draft EIS at 1-8.)

FNa. GFS(MISC) 23(2003)

FNb. GFS(O&G) 4(2006)

FNc. GFS(O&G) 26(1993)

FNd. GFS(O&G) 9(1994)

FNe. GFS(MISC) 14(2005)

FNf. GFS(O&G) 6(2006)

FNg. GFS(O&G) 5(2003)

FNh. GFS(O&G) 2(2004)

FNi. GFS(O&G) 3(2005)

FNj. GFS(O&G) 4(2006)

FNk. GFS(MISC) 31(2005)

FNl. GFS(MISC) 7(2003)

FNm. GFS(MIN) 23(2003)

FNn. GFS(MIN) 7(2003)

FNo. GFS(MISC) 63(1997)

FNp. GFS(MISC) 27(2004)

FNq. GFS(MISC) 5(2002)

FNr. GFS(MISC) 83(1990)

GFS(O&G) 15(2006), 170 IBLA 240

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.



GFS(O&G) 2(2008), 173 IBLA 149

**(Cite as: 173 IBLA 149)**

United States Department of the Interior
Office of Hearings and Appeals
Interior Board of Land Appeals

DEBORAH REICHMAN

IBLA 2007-43

Decided December 13, 2007

INDEX CODE:

40 CFR 1502.9(c)(ii)

40 CFR 1506.3(a), (c)

43 CFR 2.28 - 2.33

43 CFR 4.1(b)(3)

43 CFR 3101.7-1

***149** Appeal from a decision of the Acting Deputy State Director, Division of Resources, Montana State Office, Bureau of Land Management, dismissing a protest of the inclusion of a parcel in a competitive oil and gas lease sale. NDM 95807 (Parcel 05-06-35).

Affirmed.

1. Environmental Quality: Environmental Statements--National Environmental Policy Act: Environmental Statements--Oil and Gas Leases: Competitive Leases

The "reasonably foreseeable development" (RFD) scenario for oil and gas is a long-term projection of oil and gas exploration, development, production, and reclamation activity in a defined area for a specified period of time. The RFD scenario serves as an analytical baseline for identifying and quantifying direct, indirect, and cumulative impacts of oil and gas activity, under standard lease terms and conditions, on all potentially productive areas open to oil and gas leasing, and forms the foundation for the analysis of the effects of oil and gas management decisions in planning and environmental documents. When an appellant contends that new information undermines the validity of the RFD scenario underlying the environmental analysis supporting the decision to include a parcel in a competitive oil and gas lease sale, but the number of wells projected in the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

GFS(O&G) 2(2008), 173 IBLA 149

**(Cite as: 173 IBLA 149)**

RFD scenario has not yet been exceeded and the appellant has not shown that the impacts of leasing the parcel at issue will surpass or significantly differ from those analyzed in the applicable documents, BLM need not prepare a supplemental environmental document before leasing the parcel.

***150** 2. National Historic Preservation Act: Generally--National Historic Preservation Act: Applicability--Oil and Gas Leases: Stipulations

In issuing Federal oil and gas leases, BLM may adopt a phased approach to compliance with section 106 of the National Historic Preservation Act, as amended, 16 U.S.C. § 470(f) (2000), as long as no surface disturbing activity will occur until after the section 106 process is complete.

3. Environmental Quality: Environmental Statements--National Environmental Policy Act: Environmental Statements--Oil and Gas Leases: Stipulations

A challenge to the sufficiency of lease terms and stipulations to protect topographical and wildlife resources on the basis that the terms and stipulations were not derived from on-the-ground observations of those resources will be rejected where BLM will conduct onsite inspections at the application for permit to drill stage and will analyze the impacts of any site specific proposal and mitigate those impacts with site-specific resource protection measures developed in consultation with the private surface owner.

Appearances: Tom W. Stonecipher, Esq., Bozeman, Montana, for appellant; Karan L. Dunnigan, Esq., Field Solicitor, U.S. Department of the Interior, Billings, Montana, for the Bureau of Land Management.

OPINION BY ADMINISTRATIVE JUDGE GREENBERG

Deborah Reichman has appealed the October 25, 2006, decision of the Acting Deputy State Director, Division of Resources, Montana State Office, Bureau of Land Management (BLM), dismissing her protest of the inclusion of Parcel 05-06- 35 (NDM 95807) in the May 31, 2006, competitive oil and gas lease sale of Federal lands in Montana, North Dakota, and South Dakota. Reichman has not shown that significant new information undermines the current validity of the reasonably foreseeable development (RFD) scenario underlying the environmental analysis upon which the sale was based or that the impacts of leasing the affected parcel will surpass or differ significantly from the analyzed impacts. She also has not demonstrated that cultural, topographical, and wildlife resources will not be adequately protected by the imposed lease stipulations, as supplemented by additional resource protection measures developed during subsequent evaluations of ***151** any proposed site-specific surface activities. We therefore reject her appeal and affirm BLM's decision dismissing her protest.

BACKGROUND

Parcel 05-06-35 encompasses 1,879.04 acres of land described as all of sec. 20,

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

lots 1, 2, 3, and 4, the E 1/2 , and the E 1/2 W 1/2 sec. 30, and all of sec. 32, T. 146 N., R. 103 W., Fifth Principal Meridian, McKenzie County, North Dakota, within the Little Missouri National Grasslands (LMNG). [FN1] The lands within sec. 20 fall within the jurisdiction of the McKenzie Ranger District, FS; the lands in sees. 30 and 32 are split estate lands (non-Federal surface, Federal minerals) managed by BLM. Reichman owns the surface of sees. 30 and 32 as well as land adjacent to sec. 20.

Before including Parcel 05-06-35 in the May 31, 2006, competitive oil and gas lease sale, BLM sought FS's consent to the leasing of sec. 20 as required by 43 C.F.R. § 3101.7-1. See 30 U.S.C. § 352 (2000); see also 30 U.S.C. § 226(h) (2000). FS evaluated the parcel and, prepared a "Dakota Prairie Grasslands Decision Verification" (Decision Verification), finalized on February 14, 2006, which concluded that the inclusion of the parcel conformed to the July 2002 DPG Final Environmental Impact Statement (FEIS) and Land and Resource Management Plan (LRMP) Record of Decision (ROD) and the June 2003 DPG/Montana State Office Oil and Gas Leasing ROD (O&G Leasing ROD) [FN2] and that no new information or changed circumstances existed. FS consented to the leasing of the parcel with various specified stipulations.

BLM offered Parcel 05-06-35 for competitive bidding in the May 31, 2006, oil and gas lease sale, with the FS stipulations as well as its own notices and stipulations. One of the notices and stipulations applicable to the parcel was a notice for split estate lands explaining BLM's role in placing necessary lease stipulations and conditions of approval (COAs) on permitted activities, in cooperation with the surface owner, to minimize adverse impacts from Federally-authorized mineral lease activities as required by the Endangered Species Act (ESA), 16 U.S.C. §§ 1531-***152**1544 (2000), the National Historic Preservation Act (NHPA), 16 U.S.C. § 470f (2000), and the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. § 4332 (2000), and explaining BLM's responsibility for processing and approving applications for permit to drill (APDs). Additional notices and stipulations included (1) an ESA section 7 consultation stipulation authorizing BLM to modify or disapprove activities likely to jeopardize the continued existence of a proposed or listed threatened or endangered species or destroy or adversely modify designated or proposed critical habitat; (2) a notice for lands under FS jurisdiction identifying FS's obligation to ensure the protection of cultural, paleontological, and riparian resources; (3) no surface occupancy (NSO) restrictions on slopes greater than 40 percent and within one-half mile of golden eagle, merlin, and ferruginous hawk nests; (4) timing limitations for sharp-tailed grouse display grounds; (5) controlled surface use (CSU) constraints for water, wetlands, woody draws, and riparian areas, and areas containing paleontological resources; and (6) a threatened, endangered, and sensitive (TES) plant or animal species lease notice authorizing additional restrictions or prohibitions to protect TES species or their habitats.

On May 16, 2006, Reichman filed a protest of the inclusion Parcel 05-06- 35 in the May 31, 2006, competitive oil and gas lease sale. [FN3] She supplemented her protest on September 27, 2006, and met with both BLM and FS representatives on

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

that date to present additional information related to her concerns. Her protest, as augmented, raised five main issues. First, she argued that, in light of new information indicating the existence of significantly increased recoverable oil reserves in the Bakken Formation and unforeseen dramatic increases in oil prices, the DPG FEIS/LRMP and the O&G Leasing ROD, and the May 31, 2001, RFD scenario upon which they were based, [FN4] grossly underestimated the level of development likely in the LMNG. Accordingly, she asserted that those documents were inadequate to assess the impacts of that heightened development and had to be augmented with supplemental environmental analyses in order to support offering the parcel for leasing. Second, she alleged that the stipulations attached to sees. 30 and 32 did not sufficiently address the topographical and wildlife values of those lands because those stipulations were based on less detailed and less accurate computer-generated maps and models developed in 2002, rather than on hand-drawn representations created in 1991 from direct visual inspection of the land. Third, she complained that, as the owner of the surface estate, she did not receive adequate notice of the inclusion of ***153** the parcel in the oil and gas lease sale. Fourth, she contended that a cultural resources inventory should have been performed and appropriate cultural resources stipulations imposed before the parcel was offered for competitive bidding. Finally, she averred that the pertinent documents failed to assess the impacts of oil and gas leasing on the use and availability of water, including the effects of salt water disposal from oil exploration and production.

PROTEST DECISION

In his decision dismissing the protest, the Acting Deputy State Director responded to each of the issues raised. He rejected Reichman's claim that the DPG FEIS and LRMP and the O&G Leasing ROD were inadequate to assess the true impacts of oil development within the LMNG. He explained that the 10-year 660 well (405 Federal well) RFD scenario for the DPG FEIS and the O&G Leasing ROD was based on historical drilling data and incorporated the scenarios prepared for the 1991 Northern LMNG Oil and Gas Leasing EIS (NLMNG EIS) (50 conventional wells per year on lands north of T. 139 N. based on the historic rate from 1951-1988) and the 1995 Southern Little Missouri and Cedar River National Grasslands Oil and Gas Leasing EIS (SLM & CRNG EIS) (9 conventional wells on lands south of T. 139 N. based on the historic rate from 1955-1992). He noted that the historical periods used for both predictions included the boom period of 1979 through 1985, as well as low points in drilling activity, and that the RFD scenario foresaw another boom period such as might come from the Bakken Formation. He further pointed out that the RFD scenario briefly addressed the potential of horizontal drilling on the LMNG into the Bakken and other possible producing formations and observed that, in addition to the 60 conventional wells per year, the RFD scenario assumed that a total of 60 coal bed natural gas wells in all ownership categories would be drilled during the life of the plan. Protest Decision at 2.

The Acting Deputy State Director determined that the RFD scenario was still reasonable and did not underestimate the level of activity on the LMNG. He based this determination on data provided by the DPG indicating that a total of 58

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Federal wells were drilled on the area covered by the RFD scenario from 2003 through July 2006, which was well within the projected count in the scenario; that during the first 3 years after adoption of the O&G Leasing ROD, approximately 15 percent of the total forecast Federal conventional wells had been drilled; and that from the 2001 completion of the RFD scenario through July 2006, a total of 75 Federal wells or approximately 20 percent of the forecast number of wells had been drilled in the planning area. He also stated that, as drilling came closer to reaching the levels predicted in the RFD scenario, BLM would evaluate the need for an amendment or a new plan. Protest Decision at 2-3.

***154** As to the adequacy of the wildlife and topography lease stipulations, the Acting Deputy State Director noted that the lease terms were based on the O&G Leasing ROD, which relied on the analyses in the DPG FEIS and the earlier NLMNG and SLM & CRNG EISs. He explained that when nominations for oil and gas leasing within the LMNG were submitted, BLM provided those nominations to FS for its review, which, by agreement, included review of split estate lands as well as FS-administered lands within the boundary of the Grasslands, to determine, among other things, whether information available since issuance of the O&G Leasing ROD warranted changing the lease stipulations specified in the ROD. He informed Reichman that, in response to her request that FS re-examine the stipulations applicable to her land, FS had updated its maps of slopes greater than 40 percent, which were encumbered with NSO stipulations, on February 3, 2006, and had revised its delineations of golden eagle, merlin, and ferruginous hawk nests, sharp-tailed grouse display grounds, and prairie falcon and burrowing owl nests, which were subject to NSO and timing limitation stipulations, on February 14, 2006. Protest Decision at 4.

The Acting Deputy State Director pointed out that section 6 of the lease provided for resource protection by requiring the lessee to conduct operations in a manner that minimized adverse impacts to the land, air, water, cultural, biological, visual, and other resources and to other land uses or users and by specifying various actions the lessee might be required to take to fulfill that requirement. He explained that, before approving an APD, BLM would conduct an onsite inspection and that the surface owner of split estate lands would be invited to participate in the inspection and to provide input into the development of site-specific COAs to be placed on the APD to protect surface and subsurface resources. He advised Reichman that the information she had presented at the September 27, 2006, meeting would be used to develop the site-specific COAs for any APD for the parcel in addition to those identified in the O&G Leasing ROD and analyzed in the DPG FEIS and LRMP. He further informed Reichman that for surface disturbing activity to occur on leased split estate lands, the lease operator had to provide a statement in any APD or sundry notice indicating that it had obtained one of the following: (1) a surface owner agreement for access to enter the leased lands; (2) a waiver from the surface owner for access to the leased lands; (3) an agreement regarding compensation to the surface owner for damages for loss of crops and tangible improvements; or (4) in lieu thereof, an adequate bond to secure payment for such damages. [FN5] Protest Decision at 4-5.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

***155** Finally, the Acting Deputy State Director addressed Reichman's complaint that cultural resource values were not properly surveyed or protected with specific lease stipulations. [FN6] He acknowledged that the lands in Parcel 05-06-35 were subject to the NHPA and that BLM and FS were obligated to ensure enforcement of that statute and its implementing regulations through appropriate lease terms and stipulations. He pointed out that the lands administered by FS were covered by a lease notice specifying both FS duties under the applicable cultural resource protection statutes and regulations and lessee actions necessary to meet the requirements imposed pursuant to those responsibilities. As to split estate lands, he stated that BLM would enforce the NHPA through lease terms advising the lessee that the rights granted were subject to existing laws, regulations, and policies, and through lease stipulations and notices, adding that before any APD was approved, the proposed disturbed area would be surveyed and appropriate mitigation measures would be imposed. He also noted that Summitt, the high bidder for the parcel, had signed a lease stipulation covering cultural resources protection on the split-estate portion of the parcel that explicitly reserved BLM's authority to modify or even disapprove proposed surface-disturbing lease activities that did not comply with applicable laws and executive orders. [FN7] Protest Decision at 6- 7.

DISCUSSION

Reichman raises three issues on appeal. First she contends that new information, including the unanticipated three-fold increase in the price of crude oil, the discovery of tremendously greater oil reserves in the area, and the consequent. increase in state-wide drilling activity, undermine the validity of the environmental analyses supporting the leasing decision and mandate the suspension of oil and gas leasing until BLM and FS evaluate the environmental impacts of oil and gas leasing in light of this new information and determine whether a supplemental EIS is required. Second, she objects to FS's failure to produce existing cultural resource information related to sec. 30 and to the lack of specific, rather than generic, cultural resource lease stipulations for this potentially cultural-resource rich parcel. Finally, she maintains that the maps used to generate the topographical and wildlife stipulations ***156** for sees. 30 and 32 were inaccurate and did not represent the best available information, and that those stipulations are therefore inadequate to protect topographical and wildlife values. We find none of these arguments persuasive and affirm the Acting Deputy State Director's decision dismissing her protest.

1. New Information

Reichman contends that significant new information undermines the basis for the projected environmental effects of oil and gas leasing in the LMNG and must be considered before additional oil and gas leases issue. According to Reichman, this new information includes the recent steep rise in oil prices, the increased amount of oil reserves projected for the LMNG, and the rising number of requests for drilling permits, all of which, she submits, render the RFD scenario underlying the environmental analyses supporting the O&G Leasing ROD grossly inaccurate.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Specifically, she avers that the RFD scenario anticipated that the world oil price in 2020 would be no more than $23.51 per barrel in 1999 dollars (SOR Ex. 1, RFD Scenario, at 10, Table RFDS-T2), while the actual price has reached as high as $77 per barrel and, as of May 30, 2007, was $63.15 per barrel. [FN8] See SOR at 6-8. She further avers that the amount of recoverable reserves projected for the Bakken Formation underlying the LMNG has jumped from some unspecified millions of barrels at the time the RFD scenario was issued to the current estimated reserves of over 200 to 300 billion barrels, including 550 million barrels of proved developed oil reserves, 660 million barrels of probable reserves, and 1.6 billion barrels of possible oil reserves in the State of North Dakota. See SOR at 10 and Ex. 7. [FN9] Finally, she maintains that the unprecedented rise in oil prices has lead to an unanticipated significant increase in the number of wells permitted and completed in North Dakota, with 1,002 wells completed and 332 APDs for Federal wells approved within the state since 2001. She maintains that these numbers exceed the 660 wells projected in the RFD scenario. See SOR at 8-9 and Exs. 3A, 6.

Reichman insists that the high oil prices, the new recoverable reserve estimates, and the resultant increase in drilling activity render the RFD scenario grossly inadequate to serve as the basis for analyzing the environmental impacts of current oil and gas leasing decisions. She asserts that BLM and FS must take a hard look at this significant new information and determine whether supplemental environmental documentation is necessary to accurately assess the impacts of continued oil and gas leasing before they issue additional leases in the LMNG. See SOR at 16-17.

***157** In response, BLM contends that drilling within the LMNG planning area is well below the RFD scenario predictions, averring that 100 Federal wells have been drilled in the planning area since 2001, including 58 Federal wells in the 3-year period since the adoption of the O&G Leasing ROD (July 2003-July 2006), which is well under the predicted 6-year total of 240 Federal wells (i.e., 60 percent of the 405 Federal wells forecast for the 10-year period) and the projected 120 Federal wells for the 3-year period. BLM discounts Reichman's reliance on state-wide drilling statistics, asserting that state-wide data, including the number of Federal APDs approved for the whole state, have no relevance to leasing decisions for the LMNG, since that planning area is not coextensive with the entire state. BLM similarly maintains that oil prices and oil reserve estimates are not pertinent to the question of whether oil and gas development and production impacts were properly analyzed and relied upon in the planning and decision documents. BLM submits that, unless drilling activity in the LMNG comes closer to the levels forecast in the RFD scenario, the current NEPA documents are adequate to evaluate leasing proposals. BLM Answer at 4-5.

In reply, Reichman questions the accuracy of BLM's statement that only 100 wells have been completed in the LMNG since 2001, citing an August 30, 2007, e-mail message from the Assistant Field Manager, Minerals, BLM North Dakota Field Office (Reply Ex. 1), which indicates a total of 134 wells drilled for Federal minerals, including 90 wells on FS surface/Federal minerals and 44 wells on non-FS surface/Federal minerals. [FN10] According to Reichman, this and other available

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

data lead irrefutably to the conclusion that significant drilling is occurring in the LMNG and is increasing rapidly in response to the unanticipated tripling of crude oil prices, so much so that the number of wells to be drilled in the area by 2011 will "far exceed" those predicted in the RFD scenario. Reply at 2. Reichman also maintains that state-wide data directly relates to drilling activity on the LMNG and can be used to extrapolate future drilling activity on these grasslands. Id. at 2-4. Reichman adds that proven and probable oil reserves in western North Dakota have been estimated at 550 million and 660 million barrels, respectively, that the available rig count has increased in response to the rise in oil price and reserve estimates, and that the North Dakota legislature has enacted tax breaks for oil and gas production, all of which will boost drilling in the LMNG. Id. at 5-6. We find Reichman's arguments to be unpersuasive.

[1] The RFD scenario for oil and gas is a long-term projection of oil and gas exploration, development, production, and reclamation activity in a defined area for a specified period of time. The RFD scenario serves as an analytical baseline for identifying and quantifying direct, indirect, and cumulative impacts of oil and gas ***158** activity, under standard lease terms and conditions, on all potentially productive areas open to oil and gas leasing, and forms the foundation for the analysis of the effects of oil and gas management decisions in planning and environmental documents. Wyoming Outdoor Council, 164 IBLA 84, 99-100 (2004). [FNb] The RFD scenario does not establish a point beyond which further oil and gas exploration and development are prohibited. Nor does the underlying environmental analysis lose its validity beyond the RFD scenario. Id.; see also National Wildlife Federation, 170 IBLA 240, 249 (2006). [FNc] The critical question when an RFD scenario has been exceeded is whether the case-specific facts demonstrate that further environmental analysis is warranted. Wyoming Outdoor Council, 164 IBLA at 102; see also National Wildlife Federation, 170 IBLA at 249. As the party challenging BLM's decision, Reichman has the burden of affirmatively demonstrating error in that decision. National Wildlife Federation, 170 IBLA at 251, and cases cited. She has failed to meet that burden here.

The RFD scenario has not yet been exceeded in this case. For the 10-year period 2001-2011, the RFD scenario forecast that 660 wells would be drilled in the grasslands, including 405 wells on Federal mineral interests. SOR Ex. 1, RFD scenario at 19. According to page 2 of BLM's October 25, 2006, decision, as of July 1, 2006, 75 wells had been drilled on Federal mineral interests in the grasslands - only 18.5 percent of the projected total of 405 wells, with more than 50 percent of the period having elapsed. Further, assuming, arguendo, that the BLM e-mail of August 30, 2007 (Reply Ex. 1) gives the number of wells drilled beginning in 2001 to the date of the e-mail, 134 wells have been drilled on Federal mineral interests in the grasslands during that period - 33 percent of the total, with more than 66 percent of the period elapsed. Additionally, the fact that, according to SOR Exhibit 6, 173 wells were completed state-wide on minerals of all ownership during 2005, and 648 wells were completed in the entire state over the 5-year period 2001 through 2005, for an average of 130 wells per year, does not demonstrate that the RFD scenario's projection of an average of 40.5 wells drilled annually on Federal mineral interests in the LMNG has been exceeded.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Reichman nevertheless contends that the new evidence she presents demonstrates the inevitability of exceeding that scenario before the end of the 10-year period it covers and that supplemental environmental analysis must therefore now be undertaken before BLM issues a lease for Parcel 05-06-35. We disagree.

The regulations implementing section 102(2)(C) of NEPA, 42 U.S.C. § 4332(2)(C) (2000), direct an agency to prepare a supplemental EIS if "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(ii). In developing its 10-year projection of 660 wells, consisting of 405 Federal wells (including 24 coal bed methane (CBM) wells) and 255 non-Federal wells (including ***159** 36 CBM wells) (SOR Ex. 1, RFD Scenario, at 19, Table RFDS-T6), the RFD scenario considered economic trends such as oil and gas prices, national growth, and supply and demand; technology and equipment trends including technological advances and equipment supply; and past drilling activity. Id. at 10. In so doing, it acknowledged that oil and gas activity varies with the price of crude oil and that pricing is one of the most important factors affecting U.S. oil production. Id. at 10-11. It also recognized the potentially high productivity of the Bakken Formation and the advances in horizontal drilling technology and exploration theories affecting the petroleum potential of the LMNG. Id. at 6, 8, 12. Finally, it relied on historic drilling trends between 1951 and 1999, a time frame that included both boom and slow periods. Id. at 12.

BLM does not deny that the recent unprecedented rise in oil prices may affect the amount the oil and gas activity in the LMNG. Even the rise in price, however, does not demonstrate that the RFD scenario will soon be exceeded or that the scenario and consequent environmental analyses are inadequate to support BLM's decision to offer Parcel 05-06-35 for competitive bidding. [FN11] Reichman's reliance on well drilling and completion statistics for the entire State of North Dakota, including state-wide BLM APD approvals, is similarly misplaced. Those numbers do not show the number of wells permitted or completed in the LMNG and thus cannot be used to prove that the RFD scenario, which only projected oil and gas activity in that planning area, has already been or will soon be exceeded.

In addition, the varying estimates of the amount of recoverable oil reserves in the entire Bakken Formation, some of which are more speculative than others, [FN12] do not establish that the RFD scenario for the limited planning area will be exceeded before the end of the 10-year planning period. Given the lack of any existing or imminent surpassing of the RFD scenario or any evidence showing that the specific impacts of leasing Parcel 05-06-35 will exceed or significantly differ from those assessed in the RFD scenario and supporting environmental analyses, Reichman's conclusory allegations of error do not show the existence of significant new ***160** information establishing that leasing Parcel 05-06-35 will affect the quality of the human environment in a significant manner or to a significant extent not already considered. See Forest Guardians, 170 IBLA 253, 267 (2006); [FNd] Forest Guardians, 170 IBLA 80, 96 (2006); [FNe] see also Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 374 (1989); Colorado Environmental Coalition, 171 IBLA 256, 267 (2007) [FNf] We, therefore, reject her. contention

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

that supplemental environmental analyses were necessary prior to leasing that parcel. [FN13] See Southern Utah Wilderness Alliance, 163 IBLA 14, 28 (2004). [FNg]

2. Cultural Resources

Reichman also attacks the adequacy of the cultural resource protection stipulations attached to the parcel. She first complains that FS has failed to respond to her requests under the Freedom of Information Act (FOIA), 5 U.S.C. § 552 (2000), for information about cultural resources discovered on the parcel and that this failure has prevented her from assessing the sufficiency of the cultural resources stipulations. The Board's jurisdiction is limited to reviewing decisions rendered by Department of the Interior officials related to, among other things, the use and disposition of public lands and their resources. See 43 C.F.R. § 4.1 (b)(3); see also 43 C.F.R. §§ 2.28-2.33 (setting out specific procedures for Departmental FOIA appeals). The Board, therefore, is not the proper forum for considering Reichman's FOIA issues and these issues will not be addressed further. [FN14]

Reichman also questions the adequacy of the cultural resources stipulation attached to the lease issued for the parcel, contending that the stipulation provides no meaningful guidance and protections. SOR at 18. Reichman asserts that more particularized stipulations should especially be developed for sec. 30 because that section contains more than half of Flat Rock Butte, a large table of rock atop the Butte, which contains inscriptions, initials, names, and other evidence of visitation by settlers arriving after the Native Americans, including some markings over a century old. SOR at 21.

***161** In response, BLM explains that it uses a phased approach to ensure that cultural resources are adequately identified and considered at each stage of the oil and gas leasing and development decision-making process. In conformance with that approach, BLM notes that it added the cultural resources stipulation quoted above to sec. 30 to protect cultural resources on the private surface. It asserts that it will complete its NHPA review at the APD stage and will modify or disapprove activities if necessary to protect cultural resources. BLM therefore submits that the lease stipulation provides adequate protection for cultural resources at this point. Answer at 6-7.

[2] The NHPA is essentially a procedural statute designed to ensure that an agency identifies and considers significant cultural resources in its decision-making process. The Mandan, Hidatsa, and Arikara Nation (Mandan), 164 IBLA 343, 347 (2005), [FNh] and cases cited. Section 106 of the NHPA, 16 U.S.C. § 470(f) (2000), requires the head of any Federal agency having authority to license any undertaking to take into account the effects of the undertaking on any property eligible for inclusion in the National Register of Historic Places. See Mandan, 164 IBLA at 348. Both the Board and the Federal courts have endorsed BLM's use of a phased approach to section 106 compliance as long as no surface-disturbing activity will occur until the section 106 process is complete. Mandan, 164 IBLA at 354, and cases cited.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

The phased approach does not allow BLM to defer all NHPA analysis until the site-specific APD stage; rather, the record must show that BLM conducted appropriate NHPA identification and protection activities at the land use planning and lease sale stages, as well. See Montana Wilderness Association v. Fry, 310 F. Supp. 2d 1127, 1152 (D. Mont. 2004); Mandan, 164 IBLA at 348- 51; Southern Utah Wilderness Alliance, 164 IBLA 1, 22-24. [FNi] Reichman concedes that the parcel was inventoried for cultural resources before the challenged decision to offer the parcel for leasing was made. See SOR at 17; Sept. 26, 2007, Supplementation to Protest at 8. The stipulations attached to the parcel reflect the results of this inventory. We therefore conclude that BLM and FS undertook the requisite appropriate NHPA evaluation at the pre-leasing stage. See Mandan, 164 IBLA at 355.

The cultural resources stipulation attached to the parcel provides:

Cultural Resources Lease Stipulation

This lease may be found to contain historic properties and/or resources protected under the [NHPA], American Indian Religious Freedom Act, the Native American Graves Protection and Repatriation Act, [Executive Order] 13007, or other statutes and executive orders. The BLM will not approve any ground disturbing activities that may affect such properties or resources until it completes its obligations under applicable requirements of the NHPA and other authorities. The BLM may require ***162** modification to exploration or development proposals to protect such properties, or disapprove any activity that is likely to result in adverse effects that cannot be successfully avoided, minimized or mitigated.

This stipulation notifies the lessee that the parcel might contain historic or cultural resources requiring protection under the NHPA and other authorities, that BLM will not approve any ground-disturbing activities until BLM completes its obligations under those authorities, and that BLM reserves the authority to modify or disapprove activities to protect cultural resources. Although Reichman asserts that these protections are insufficient, we disagree. BLM's preservation of the right to prohibit contemplated surface-disturbing activities that would harm cultural resources suffices at this stage to protect those resources. Reichman's concerns about Flat Rock Butte are more properly addressed at the APD stage when the lessee has presented site-specific surface-disturbing activities. We therefore reject Reichman's challenge to the adequacy of the cultural resource stipulation attached to the lease. [FN15]

3. Topographical and Wildlife Values

Finally, Reichman avers that FS used inadequate information to generate lease stipulations addressing the topographical and wildlife values associated with secs. 30 and 32. She asserts that, although FS admittedly possessed hand drawings, created in 1991 from direct observation, depicting the topographical and wildlife features of the parcel, it nevertheless used less accurate computer-generated maps of the topographical features derived from overflights of the area beginning in 2000 to develop the stipulations attached to the parcel. Reichman insists that FS

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

and BLM should be required to use the earlier, allegedly more accurate, maps to formulate appropriate topographical and wildlife stipulations for the parcel. SOR at 22-23; Reply at 7-8; see SOR Ex. 8 (Reichman Affidavit submitted in IBLA 2006-58).

BLM denies that the topographical and wildlife stipulations for the parcel are inadequate. According to BLM, in addition to standard lease terms, FS updated the stipulations for the parcel based on additional review performed in February 2006 and added NSO stipulations for slopes greater than 40 percent and for golden eagle, merlin, and ferruginous hawk nests, as well as a timing limitation based on the presence of sharp-tailed grouse nests. Answer at 8. BLM also notes that Onshore Oil and Gas Order No. 1, Sec. III., C. 48 Fed. Reg. 48915, 48922-23 (Oct. 21, 1983), ***163** requires an onsite inspection prior to approval of an APD and an invitation to the surface owner of split estate lands to participate in the inspection and provide input on site-specific COAs for the APD. BLM adds that an operator is required obtain a surface owner's agreement for access or waiver thereof and an agreement regarding compensation for surface damages or a bond before operations commence. Answer at 8. BLM submits that, given the lack of any evidence or documentation supporting her claims that the NEPA analysis relied upon to make the leasing decision is flawed or that the imposed stipulations are inadequate to protect wildlife values, Reichman's complaint that aerial topographical maps rather than on the ground maps were used in the planning and decision-making process does not suffice to overturn the decision to offer the parcel for leasing. Id. at 8-9.

As BLM points out, the parcel and the subsequently issued lease contain various stipulations precluding or limiting surface disturbing activities affecting various topographical and wildlife values. These stipulations include (1) an Endangered Species Act Section 7 Consultation Stipulation reserving BLM's right to require modification or to disapprove proposed activity that is likely to result in jeopardy to the continued existence of a proposed or listed threatened or endangered species or result in the destruction or adverse modification of designated or proposed critical habitat; (2) FS NSO stipulations precluding surface use or occupancy on slopes greater than 40 percent and within .5 miles of golden eagle, merlin, and ferruginous hawk nests (R1-FS-2820-14 (1/90)); (3) a FS timing limitation stipulation prohibiting surface use from March 1 through June 15 within 1 mile of active sharp-tailed grouse display grounds (R1-FS-2820-15 (1/90)); (4) a FS CSU stipulation directing activities and facilities away from riparian areas, woody draws, wetlands, and floodplains (R1-FS-2820-16 (1/90)); and (5) a FS Threatened, Endangered, and Sensitive Plant or Animal Species Lease Notice advising the lessee that the lease area might contain TES species or critical habitat protected under the ESA and that a biological evaluation and mitigation measures, including the disallowance of the use, might be necessary to comply with the ESA, other statutes, and applicable regulations (R1-FS-2820-18a (5/02)).

Reichman has not shown that these stipulations and notices are inadequate to protect the topographical and wildlife values of the parcel. To the extent she

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

challenges these stipulations on the ground that the areas specifically identified in the NSO, timing limitation, and CSU stipulations were not based on accurate information, she ignores the fact that FS reviewed the parcel in February 2006 and specifically added portions of the NE 1/4 SW 1/4 sec. 32 to the CSU for woody draws and portions of the E 1/2 , SE 1/4 , NW 1/4 , and E 1/2 SW 1/4 sec. 20, of the NE 1/4 NE 1/4 , NE 1/4 NW 1/4 , SE 1/4 SW 1/4 , SE 1/4 , and Lot 2, sec. 30, and of the N 1/2 , W 1/2 SW 1/4 NE 1/4 SW 1/4 , W 1/2 SE 1/4 , and SE 1/4 SE 1/4 sec. 32 to the NSO for 40 percent slopes. See Decision Verification at unnumbered p. 2. Additionally, BLM will have the further opportunity to analyze impacts of any site-specific proposal at the APD stage and mitigate those impacts with ***164** site-specific resource protection measures, and Reichman will be invited to participate in pre-APD approval inspections. See Onshore Oil and Gas Order No. 1, Sec. III. C, 48 Fed. Reg. 48915, 48922-23 (Oct. 21, 1983). As part of that process, BLM notes that Reichman will be given the opportunity to provide input into the development of appropriate COAs for any APDs. Reichman has not shown that the lease terms and stipulations and BLM's preservation of the authority to supplement those terms and stipulations at the APD stage do not adequately protect topographical and wildlife resources. Accordingly, we uphold the dismissal of her protest of the inclusion of Parcel 05-06-35 in the May 31, 2006, competitive oil and gas lease sale.

Therefore, pursuant to the authority delegated to the Board of Land Appeals by the Secretary of the Interior, 43 C.F.R. § 4.1, the decision appealed from is affirmed.

Sara B. Greenberg

Administrative Judge

I concur:
Geoffrey Heath
Administrative Judge

FN1. The LMNG is part of the Dakota Prairie Grasslands (DPG) and is administered by the United States Forest Service (FS), U.S. Department of Agriculture.

FN2. The O&G Leasing ROD contains both BLM and FS oil and gas leasing decisions and includes BLM's express adoption, as a cooperating agency, of the DPG FEIS, LRMP, and supporting documents and analysis as its environmental analyses for offering lands for competitive bidding and issuing leases within the project area, subject to the specified stipulations, and for offering split estate lands within the boundaries of the LMNG for competitive bidding and issuing leases for the mineral estate of those lands. O&G Leasing ROD at 20-21; see 40 C.F.R. § 1506.3(a) , (c).

FN3. BLM chose not to withdraw the parcel from the sale after receiving the protest, and Summitt Resources Inc. (Summitt) was the high bidder for the parcel. BLM issued lease NDM 95807 to Summitt on Nov. 30, 2006.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

FN4. The RFD scenario, a copy of which was attached to Reichman's Statement of Reasons (SOR) as Ex.1, forecast that 660 wells of all ownership, including 405 Federal wells, would be drilled over the ensuing 10 years.

FN5. These requirements were derived from the Stock Raising Homestead Act, 43 U.S.C. § 299(a) (2000), and have been adopted by BLM as applicable to all split estate lands. See Deganawidah-Quetzalcoatle University, 164 IBLA 155, 163 n.11 (2004). [FNa]

FNa. GFS(O&G) 7(2005)

End of Footnote(s).

FN6. The Acting Deputy State Director also rejected Reichman's water-related challenges, finding that these concerns had been adequately addressed in the NLMNG EIS, and her inadequate notice contention, determining that she had been sufficiently notified of the impending sale. Reichman does not pursue these issues on appeal and we will not address them further.

FN7. The cultural resources lease stipulation attached to the Notice of Competitive Lease Sale for the May 31, 2006, sale inexplicably did not identify Parcel 05-06-35 as one of the parcels subject to the stipulation. This omission was corrected by Summitt's subsequent signing of the stipulation.

FN8. The record does not indicate what these prices would be in 1999 dollars.

FN9. Reichman does not identify the author, source, or date of Ex. 7, nor does the exhibit itself contain that information.

FN10. We note, however, that, although Reichman represents it to be a "summary report of wells drilled on federal minerals since 2001" (Reply at 2), this exhibit does not state the time period during which enumerated wells were drilled.

FN11. The relationship between higher prices and the number of wells drilled is not mathematically linear. Consistently higher prices should make some oil economically recoverable that was not economically recoverable at lower price levels. But variances in price levels do not change the underlying geology.

FN12. Reichman's own SOR Ex. 7 recognizes that the much higher estimates of reserves in the Bakken Formation are the subject of some dispute and controversy. But even assuming, arguendo, that the estimated reserves in the Bakken Formation (which in addition to the LMNG encompasses parts of North Dakota, Montana, and Canada) are of the magnitude Reichman asserts, it is still unknown how much will be recoverable or what the impacts of recovery will be.

FN13. Reichman herself apparently realizes that supplementation is not mandatory at this point. See SOR at 6-7 (suggesting that relevant authority does not prohibit the Board from "enjoining leasing decisions at this point" and averring

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

that the prudent, cautious, and appropriate way to address the developments would be to suspend leasing now until suitable action can be taken in light of the new information).

FN14. We note, however, as BLM points out, that the Archaeological Resources Protection Act of 1979, 16 U.S.C. § 470hh(a) (2000), prohibits the disclosure of site specific cultural resource information under certain circumstances.

FN15. We note that, in addition to BLM's cultural resource stipulation, the notices and stipulations attached to the parcel and the subsequently issued lease (NDM 95807) include the FS cultural resources and vertebrate paleontology notice (R1-FS-2820-13d (01/01)) and the FS.CSU stipulation to protect paleontological resources (R1-FS-2820-16 (1/90)), the latter of which explicitly applies to lands within sees. 30 and 32.

FNb. GFS(O&G) 3(2005)

FNc. GFS(O&G) 15(2006)

FNd. GFS(O&G) 16(2006)

FNe. GFS(O&G) 13(2006)

FNf. GFS(O&G) 5(2007)

FNg. GFS(O&G) 13(2004)

FNh. GFS(O&G) 12(2005)

FNi. GFS(O&G) 1(2005)

GFS(O&G) 2(2008), 173 IBLA 149

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.



GFS(O&G) 9(2003), 159 IBLA 220

**(Cite as: 159 IBLA 220)**

United States Department of the Interior
Office of Hearings and Appeals
Interior Board of Land Appeals

SOUTHERN UTAH WILDERNESS ALLIANCE

IBLA 2000-358

Decided June 16, 2003

INDEX CODE:

40 CFR 1500.2(e)

40 CFR 1502.14(a)

40 CFR 1508.7

40 CFR 1508.8(b)

40 CFR 1508.9(b)

40 CFR 1508.25(a)(1)

40 CFR 1508.28

43 CFR 4.410(a)

43 CFR 1601.0-5(b)

43 CFR 1610.5-3(a)

43 CFR 2800.0-7

43 CFR 2802.4(d)(1)

43 CFR Subpt. 2880

43 CFR 3101.1-2

43 CFR 3101.1-3

***220** Appeal from a decision of the Deputy State Director, Utah State Office,

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

GFS(O&G) 9(2003), 159 IBLA 220

**(Cite as: 159 IBLA 220)**

Bureau of Land Management, affirming on State Director Review a Decision Record/Finding of No Significant Impact issued by BLM's Vernal District Office. SDR UT 00-5, UTU-76912, UTU-77673.

Affirmed.

1. Appeals: Generally--Rules of Practice: Appeals: Standing to Appeal Under 43 CFR 4.410(a), a party to a case who is adversely affected by a BLM decision has a right of appeal to the Board. Where an organization commented on an environmental assessment and protested a finding of no significant impact, and submitted affidavits of members showing that they would be adversely affected by a BLM decision, the Board will not dismiss the appeal for lack of standing.

2. Administrative Practice--Environmental Quality: Generally--Federal Land Policy and Management Act of 1976: Land Use Planning--Oil and Gas Leases: Drilling Where an analysis of a resource management plan (RMP) indicates that the location of a proposed well is within an area open to oil and gas leasing without special stipulations, and the RMP identifies an anticipated range of annual well approvals, the Board will not find that the projected number is a mandatory maximum which is violated by approval of a particular well.

3. Environmental Policy Act--Environmental Quality: Environmental Statements--Oil and Gas Leases: Drilling When making a determination whether a proposed action will have a significant effect on the human environment, the ***221** cumulative effect of the proposed action and other actions not connected with the proposed action must be taken into consideration. A cumulative impact is one which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions and can result from individually minor but collectively significant actions taking place over time. The Board may affirm BLM's conclusion that the possible cumulative impact of a future action need not be considered significant when the reasonably foreseeable future action is speculative.

4. Environmental Policy Act--Environmental Quality: Environmental Statements--Oil and Gas Leases: Drilling Connected actions are closely related and should be discussed in the same environmental impact statement if they include those which: (i) automatically trigger other actions which may require an EIS; (ii) cannot or will not proceed unless other actions are undertaken previously or simultaneously; or (iii) are interdependent parts of a larger action and depend on the larger action for their justification.

5. Environmental Quality: Environmental Statements--National Environmental Policy Act of 1969: Environmental Statements Section 102(2)(E) of NEPA, 42 U.S.C. § 4332 (2)(E) (2000), requires consideration of "appropriate alternatives" to a proposed action, including the no action alternative. In deciding whether BLM need not consider the "no action" alternative in an EA considering an application for permit to drill a well on a Federal oil and gas lease, the appropriate inquiry for BLM is whether the lease was issued after full environmental review and the no

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

action alternative was already considered in a document to which the EA is tiered. The Board may affirm a finding of no significant impact where the no action alternative was considered.

6. Federal Land Policy and Management Act of 1976: Wilderness Act--Oil and Gas Leases: Drilling Where BLM prepares an environmental assessment regarding the environmental impact of a proposed well to be drilled on a Federal oil and gas lease in an area inventoried for wilderness ***222** suitability but not designated as a wilderness study area, BLM is not required to re-inventory the land for wilderness characteristics. The Federal Land Policy and Management Act, 43 U.S.C. § 1711(a) (2000), not the National Environmental Policy Act, controls the Secretary's wilderness inventory authority, and the Board has no supervisory authority over BLM to compel a reinventory.

7. Federal Land Policy and Management Act of 1976: Land Use Planning--Rights-of-Way: Oil and Gas Pipelines Where BLM approves a right-of-way for a pipeline based on an environmental assessment which discusses impacts from the pipeline on a case-by-case basis in conjunction with its consideration of associated road development, the decision to approve the pipeline right-of-way may be affirmed.

Appearances: W. Herbert McHarg, Esq., Moab, Utah, for appellants; James E. Karkut, Office of the Field Solicitor, U.S. Department of the Interior, Salt Lake City, Utah, for the Bureau of Land Management; Joe Glennon, Billings, Montana, for intervenor Retamco Operating Inc.

OPINION BY ADMINISTRATIVE JUDGE HEMMER

Southern Utah Wilderness Alliance (SUWA) appeals from an August 25, 2000, decision of the Deputy State Director (DSD), Utah State Office, Bureau of Land Management (BLM), affirming a July 3, 2000, Decision Record/Finding of No Significant Impact (DR/FONSI) issued by BLM's Vernal District Office. The decision approved an application for permit to drill (APD) the Rockhouse 11-31 well, with a right-of-way (ROW) for an access road to the well (UTU-76912), and an ROW for a pipeline (UTU-77673) on the basis of Environmental Assessment (EA) UT-080-1999-69.

Background and Statement of Relevant Facts

Based upon a February 24, 1997, competitive lease bid, on March 14, 1997, BLM issued oil and gas lease UTU-76281 to Retamco Operating, Inc., effective April 1, 1997. The lease covers 429.2 acres of land in lots 1-4, sec. 30, and the E1/2 W1/2 lots 1-4, sec. 31, in T. 10 S., R. 23 E., Salt Lake Meridian, in Uintah County, Utah. (Lease UTU-76281, submitted as attachment to Nov. 14, 2001, letter from BLM to IBLA.) The lease granted the "exclusive right to drill for, mine, extract, remove and dispose of all the oil and gas" on the leased lands "together with the right ***223** to build and maintain necessary improvements thereupon." Id. The lease did not contain a stipulation prohibiting surface occupancy (a "no surface occupancy" (NSO) stipulation). See 43 CFR 3101.1-3. On October 19, 1998, Retamco

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

submitted an APD for the Rockhouse 11-31 well in the NE1/4 SW1/4 sec. 31, dated September 15, 1998. [FN1] The APD stated that a "10 Point Drilling Program" and "13 Point Surface Use Plan" were attached. [FN2]

In March 1999, BLM announced its intention to prepare a statewide environmental impact statement (EIS) and multiple resource management plan amendments for a possible wilderness study area (WSA) designation of up to 136 wilderness inventory units on approximately 2.6 million acres of public lands within Utah. This acreage included an area identified as the White River Wilderness Re-Inventory Unit (WRU). See 64 FR 13439 (Mar. 18, 1999). [FN3] The White River WRU comprises 15,800 acres in eastern Uintah County, approximately 30 miles south of Vernal, Utah. (EA at 10.) The Rockhouse well was proposed on lands located within the WRU.

On April 15, 1999, the Solicitor of the Department of the Interior sent a memorandum to the Utah State Director, BLM, with regard to the 1999 wilderness inventory lands:

While the planning process is being completed on lands found to have wilderness characteristics in the 1999 Wilderness Inventory, the management prescriptions of existing land management plans do not change. For example, if current land management plans have designated lands open for mineral leasing, they remain open for leasing. Management prescriptions may be changed only through amendment of the land management plans, following the procedures of section 202 of FLMPA and implementing regulations at 43 CFR Subpart 1610.

* * * * * * *

***224** In completing its Environmental Assessment (EA) or Environmental Impact Statement (EIS) on any proposed action within inventory areas, the BLM should address whether the approval of the proposed action would harm existing wildlife characteristics so as to negate the eligibility of the lands for wilderness designation in the future. * * * If BLM determines that the proposed action would harm wilderness characteristics so as to negate the eligibility of the lands for wilderness designation, the BLM must consider among its alternatives in its EA or EIS the no action alternative, which would preserve the land's eligibility for wilderness designation.

On August 31, 1999, Retamco submitted an amended "13 Point Surface Use Plan" for the Rockhouse well. This plan described the need for road and pipeline ROWs. A handwritten note in red ink on a copy of the lease attached to this Plan, noted that "[w]hen this APD was filed, it did not include a request for the pipeline. 9-14-99."

In November 1999, BLM halted its statewide Utah wilderness inventory review and shifted its focus to a regional approach, beginning with approximately 815,000 acres in the southeast portion of the State. See 64 FR 59787 (Nov. 3, 1999). This notice indicated that the White River WRU was one of four regional groupings deferred for future study. Id. at 59788.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

GFS(O&G) 9(2003), 159 IBLA 220

**(Cite as: 159 IBLA 220)**

In 2000, BLM prepared draft and final EAs for the APD for the Rockhouse 11-31 well, with necessary ROWs for an access road and a pipeline on lease UTU-72681. The proposed action included the Rockhouse well, and called for a four-inch surface steel pipeline of 11,000 feet in length and a road or road improvements 9,204 feet in length. The access road and pipeline would travel south from the well-site and the lease into secs. 5, 8, and 9 of T. 11 S., R. 23 E., Salt Lake Meridian. Approximately two thousand feet of the access road lie within the proposed White River WRU, in the above-described secs. 31 and 5. (EA at 10.) The pipeline location is depicted in Map A as lying along or within the same corridor as the access road. (EA at 3).

The EA considered the impact of the proposed well and road development on the White River WRU. The EA stated that during the consideration of the wilderness inventory, Departmental

> policy is that while the planning process is being completed, the management prescriptions of existing land management plans still apply to these units, but the BLM will pay careful and particular attention to development proposals that could limit Congress' ability to ***225** designate the units as wilderness. Therefore, BLM considers actions proposed in the inventory units on a case-by-case basis to determine the potential impacts on wilderness characteristics.

(EA at 11.)

The EA identified impacts to the WRU from the road and well as follows:

> The proposal would directly disturb 5.8 acres or 0.0004 percent of the [WRU]. * * * The proposed well and road would be noticeable for the life of the project or an estimated 30 years and for 15 to 20 years after the well is abandoned when the pinyon and juniper trees would reach sufficient size to blend into the existing landscape. Considering the topographic and vegetative screening of the disturbed areas by pinyon and juniper trees, the estimated indirect or offsite effect on naturalness is that the road and well pad intrusions would be noticeable on about one acre or 0.00006 percent of the inventory unit.
>
> Noise from equipment and traffic on the access road would reduce the quality of the opportunity for solitude in a small portion of the inventory unit during the construction and drilling phases of the proposed action. However, this effect would be temporary and last only 44 days.
>
> Over all, the drilling and production of the single proposed well would introduce intrusions on the natural appearance of the area as viewed from less than 1 percent of the 15,800-acre wilderness inventory unit. As a whole, the intrusions in the unit would remain substantially unnoticeable * * * therefore the proposed action would not affect Congress's ability to designate the remainder of the inventory unit as a wilderness area.

(EA at 13.) The EA proposed by way of mitigation the use of noise muffling equipment and that drilling and other work take place outside of a 6 week period between May 1 and June 15, when recreation levels were high. Id.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

The land on which the Rockhouse well would be sited is located within the Book Cliffs Resource Area (BCRA) governed by a 1985 RMP for the BCRA. The EA discussed the conformance of the proposed well and road with the RMP for the BCRA, stating that the "proposed action would be in conformance with the Book Cliffs Resource Management Plan (BCRMP) (1985) and the terms of the lease." (EA at 2.) The BCRMP is composed of a Book Cliffs Final Environmental Impact Statement (FEIS) and the Record of Decision (ROD) for the RMP. Those documents ***226** addressed mineral resource development within the BCRA and assumed the drilling of up to 80 new oil and gas wells per year. (FEIS at 145.) The BCRMP indicated that both the existing management of the area in which the well and road would be located, and management chosen under the "balanced use" alternative, permitted oil and gas mineral development with standard conditions and no special restrictions. E.g., FEIS at 17, 36-37, 65-67.

The EA evaluated the environmental impacts of the proposed action and reasonable alternatives, including the "no action alternative," and analyzed unavoidable adverse impacts of the proposed action and the no action alternative, as well as reasonably foreseeable future development scenarios and cumulative impacts on wilderness characteristics. With respect to the "no action alternative," the EA stated:

Under the No Action Alternative, the APD would be denied and no ROW authorization would be issued. The constraint under this alternative is that a lease has already been issued which is contractual in nature. The applicant has been granted the right to drill somewhere on the lease, otherwise a "taking" would be created. The BLM does not have the authority to create a taking. Only Congress can create and resolve a taking situation.

(EA at 6-7.) Nonetheless, BLM evaluated the impacts a "no action" decision would have on the White River WRU, recreation, soil and watershed, and vegetation. The EA recognized that wilderness values of naturalness, primitive and unconfined recreation and solitude would continue as a result of the no action decision on the APD, but stated that these same values could be diminished in any event by existing land uses and uses authorized by the BCRMP. (EA at 17.) The EA identified impacts expected from current uses, even in the absence of the proposed well. Id. at 17-18.

The EA compared unavoidable adverse impacts of granting the APD and of the no action alternative.

Proposed Action

1. The wilderness characteristics would be degraded on 5.8 acres or 0.0004% of the White River [WRU] for the life of the well and for 15 to 20 years after rehabilitation occurs.

2. The Goblin City Viewshed would be degraded during the 44 day period when the well site is being constructed, drilled and completed. Increase[d] noise levels during this time could further degrade recreational experiences from Goblin City

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

***227** overlook and the White River north of the proposed well location. [FN4]

3. Should the proposed well become a producing well, workover operations could degrade recreational experiences from Goblin City overlook and the White River north of the well location for 20 days once every 10 years.

4. Should the proposed well become a producing well, the expectation of naturalness and quiet that many people seek would diminish by approximately 10% for the one year during drilling * * *.

5. An additional 6.3 tons per year of sediment, 205 tons over the life of the project, would be added to the White River.

6. Approximately 500 juniper trees and associated vegetation would be lost for the life of the well and for another 15 to 20 years after reclamation takes place.

No Action Alternative

1. Wilderness values could be diminished by current, on-going public land uses including recreational activities such as float boating, hiking, camping, sightseeing, off highway vehicle (OHV) use, as well as grazing, mineral development, and other oil and gas actions.

2. The scenic views from the Goblin City overlook could gradually be degraded by the existing, ongoing public land uses mentioned above.

3. Sediment yields could gradually increase as other existing public land uses continue.

4. With the continuation of the public land uses mentioned above, the [pinyon pine and juniper] community would gradually ***228** decline and the opportunity for noxious weed invasion would increase.
(EA at 18-19.)

The EA also considered the "lease exchange" alternative, but did not analyze this alternative in detail because the agency found, inter alia, that the alternative would be difficult to implement because Federal law requires that exchanged assets must be of equal value. BLM reasoned that because the proposed action was for an exploration well, the agency would be unable to establish a value for the lease in order to orchestrate an equal value exchange. Id. at 7-8. [FN5] The EA considered closure of the White River area to future leasing but noted that closure of the area to future leasing would require amendment to existing land use planning documents that would not affect pre-existing rights granted in the Retamco lease. Id. at 8; see also FEIS at 65, 67.

The EA addressed reasonably foreseeable future development and cumulative impacts. [FN6] The EA identified an EA prepared for a Wexpro Company Island Unit in Uintah County (Wexpro EA UT-080 1997-51), which "contains scenarios for

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

expected development within Duchesne and Uintah Counties, Utah, and resultant cumulative impacts." (EA at 19.) The EA for the Rockhouse well also identified two wells proposed by Lone Mountain Production on State sections within the WRU. (EA at 20.) BLM noted that "should the proposed or any other well on State lands in the area be successful," up to an additional 50 gas wells could be drilled on existing State and Federal leases within the White River WRU. Id. The EA listed this potential among the cumulative impacts on wilderness resources. Id. [FN7]

In considering cumulative impacts as a result of a productive well on the State or Federal leases, the EA stated that surface disturbance caused by such potential development would comprise roughly 35 percent of the unit, and encircle an additional 5 percent, which could limit Congress' ability to designate a total of ***229** 40 percent of the White River WRU as wilderness. Id. The EA also noted that the effect of such surface disturbance was also a potential consequence of the "no action" alternative because they could occur "with or without approval of the APD." According to the EA, such oil and gas exploration and development on existing leases is expected and has the same potential irrespective of drilling on the Retamco lease. "Over time, these [wilderness] values could be expected to be degraded or lost." Id.

The Final EA was released on July 3, 2000. On that same date, the Field Manager for the Vernal District Office, BLM, approved the APD for the Rockhouse well. The DR/FONSI was entitled "Application for Permit to Drill (APD) Rockhouse 11-31 Well." Nonetheless, it approved the APD "with necessary rights-of-way (ROWs) for access and a pipeline, subject to provisions of the lease and Conditions of Approval (COAs)" in the DR/FONSI. As the rationale for the decision, the DR/FONSI states

BLM must meet its responsibility to protect resource values and uses on the public lands while recognizing valid existing rights (VERs) that it must respect.

* * * Only 5.8 acres of surface disturbance are anticipated as a result of this decision. Impacts on wilderness character, and recreation and visual resources would be less than significant. Wilderness character of the White River Wilderness Inventory Unit will not be substantially degraded because naturalness will be degraded on less than 1 percent of the unit. Congress' ability to designate the area as wilderness would not be compromised * * *. The well pad and access road would not be visible from any major view points when mitigating measures are applied. Current recreational use of the Goblin City Overlook would be diminished by only about 12 visitors per year. None of the disturbed areas will be visible from the White River.
(DR/FONSI at 2.)

The DR/FONSI concluded that "[t]he APD is in conformance with the existing BLM land use plans for the area." Recognizing the concern over potential major cumulative impacts of up to an additional 50 wells in the vicinity of the proposed well, the DR/FONSI stated:

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Concern was expressed over potential major cumulative impacts of up to an additional 50 wells in the vicinity of the proposed well because the EA that was released for public comment erroneously described these impacts as unavoidable. This error has been corrected. Significant cumulative impacts are not likely to occur as a result of this ***230** decision because the proposed well is exploratory and the potential for production is uncertain; there are no additional proposals for drilling on the other Federal leases adjacent to the proposed drilling site, and * * * approval of this well does not automatically authorize any future drilling that would create cumulative impacts. BLM will progressively analyze past, present and future actions for cumulative impacts and monitor the level of significance of potential impacts based on the results of the individual drilling proposals. Should production and the potential for field development be established, and cumulative impacts are likely to occur, BLM will prepare an appropriate level of NEPA analysis and documentation for field development prior to approving additional APDs.
(DR/FONSI at 3, referring to the National Environmental Policy Act of 1969, 42 U.S.C. § 4332(2)(C) (2000) (NEPA) (emphasis added).)

On July 17, 2000, SUWA petitioned for State Director Review (SDR) and a stay of the DR/FONSI approving the APD and ROWs. On July 27, 2000, BLM notified SUWA that its request for stay would not be addressed, as the Vernal District Office would take no action until the petition for SDR was decided. On August 25, 2000, the DSD affirmed the DR/FONSI permitting drilling and the ROWs for the road and pipeline. (SDR UT-00-5.) In response to SUWA's argument that the well and ROWs will have significant impacts that must be analyzed in an EIS, the DSD stated

[e]ffects of the projected development scenario, if this exploratory well should become a producer, were erroneously presented in the second version of the EA as direct, indirect and unavoidable impacts. The scope of the analysis for this EA is for a single well. Projections for development are analyzed as potential cumulative impacts rather than unavoidable impacts. Development is not proposed and analysis of direct, indirect and unavoidable impacts from foreseeable actions is not required, since approval of the proposed action does not automatically approve future proposals.
(SDR Decision at 3.)

In response to SUWA's claim that the proposed well violated the BCRMP because it constituted an approval in excess of 80 wells permitted in that RMP, the DSD responded

[t]he 80 wells per year figure of the [BCRMP] is not a management prescription. The figure is an assumption established as a reasonable estimate of activities for NEPA evaluation. The Record of Decision ***231** (ROD) for the RMP EIS did not establish the figure as a "threshold" * * *. The ROD also states that future oil and gas activities will continue to be subject to further environmental review.
(SDR Decision at 4.)

Concerning SUWA's claim that the EA failed to adequately consider reasonable

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

alternatives, specifically the no action alternative, the DSD wrote: "Federal leases carry certain rights which cannot be completely denied. In this case, the No Action alternative considers denial of the proposed applications and is included for comparative purposes." Id.

On August 29, 2000, the Vernal District Office issued ROW's UTU-76912 and UTU-77673 for the road and pipeline, respectively. On September 13, 2000, SUWA appealed to this Board and sought a stay of the SDR decision.

On December 6, 2000, we entered a stay on the grounds that SUWA had shown a likelihood of success on the merits with respect to two issues: (1) whether BLM had failed to adequately consider the "no action" alternative, and (2) whether the DR/FONSI was predicated on denying the existence of the cumulative impacts discussed in the draft EA, rather than considering the potential significance of those impacts. Based upon SUWA's uncontradicted representations, issuance of the stay order was premised on the understanding that all activities leading to and including drilling the well had commenced and were completed in early October 1999. Accordingly, the order stayed only pipeline development.

The parties subsequently filed a number of motions. SUWA filed a motion for reconsideration to expand the scope of the stay order. BLM countered with a motion for reconsideration. Retamco filed a motion to intervene, for reconsideration, to dissolve the stay and to dismiss for lack of standing. By order dated August 2, 2001, we granted the motions to reconsider and to intervene, denied the motions to amend the stay, and took Retamco's motion to dismiss under advisement. We granted various parties' requests for more briefing, and ordered SUWA to respond with respect to standing. [FN8] In considering the likelihood of success on the merits, we did not further address the issue of the "no action" alterative, but continued to express ***232** concern for BLM's consideration of "unavoidable" impacts, and whether cumulative affects were properly considered.

In a brief filed September 4, 2001, SUWA responded to Retamco's motion to dismiss which alleged that SUWA had failed sufficiently to allege standing. On November 14, 2001, BLM submitted lease records and documents for the case and provided a Response to our August 2, 2001, order. BLM submitted the BCRMP documents by computer diskette. On November 15, 2001, Retamco's counsel withdrew from the case, and the next day, Retamco waived any further pleadings authorized by this Board's order of August 2, 2001. SUWA filed a "Reply to BLM's Response to the Board's Order" on December 3, 2001.

Analysis

[1] We deny Retamco's motion to dismiss for lack of standing. SUWA correctly cites 43 CFR 4.410(a) as the source of the requirement that an appellant have standing to appeal to the Board. (Nov. 14, 2001, SUWA Response to Retamco's Motion to Dismiss.) The appellant must be "a party to the case who is adversely affected by a decision" of BLM. 43 CFR 4.410(a). SUWA is correct that it was a party to this matter by virtue of its comments on the EA and its protest. (Nov. 14, 2001,

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

SUWA Response to Retamco's Motion to Dismiss at 4.) Likewise, SUWA supports its assertion that the interests of its members would be "adversely affected" by the decision, by submitting affidavits of individual SUWA members verifying, inter alia, that they were involved in a 1986 proposal to establish the White River Canyon as a wilderness area, that they use lands affected by the activities authorized by the DR/FONSI and that they personally inventoried lands within the project area. Id., Exhibits A and B, Affidavits of Dr. Durant, and Chad Hamblin. Audubon Society of Portland, 128 IBLA 370, 373-74 (1994). [FNa]

[2] In reviewing the merits, we begin with SUWA's challenges to the BLM decision as inconsistent with the BCRMP. SUWA alleges that BLM violated section 302(a) of FLPMA, 43 U.S.C. § 1732(a) (2000), in approving the APD and ROWs because the well and ROWs do not conform to the BCRMP approved in 1985. FLPMA section 302(a) requires the Secretary, in managing the public lands, to do so in accordance with applicable land use plans which the Secretary must establish under section 202, 43 U.S.C. § 1712 (2000). Likewise, 43 CFR 1610.5-3(a) requires that all future resource management authorizations and actions conform to approved plans. "Conformity or conformance" is defined in the regulations at 43 CFR 1601.0-5(b) to mean that "a resource management action shall be specifically provided for in the plan, or if not specifically mentioned, shall be clearly consistent with the terms, conditions, and decisions of the approved plan or plan amendment."

***233** Our review of the BCRMP gives little support to SUWA's allegation that the Rockhouse well is inconsistent with BLM's land use plan for the BCRA. The BCRMP demonstrates that BLM exhaustively reviewed the area in which the well is located. The Book Cliffs FEIS considered four management alternatives: current management, resource protection, commodity production, and balanced use. (FEIS at 15.) The ROD chose the balanced use alternative for the BCRA. For each alternative, however, BLM considered a management objective, utilizing its oil and gas category system, which consists of four management categories (1-4) for oil and gas exploration and development. (FEIS, Appendix 1.)

For all of the FEIS alternatives, BLM identified the site of the proposed Rockhouse well as available for oil and gas development under the least restrictive category, meaning that the location is open to exploration and development subject to standard stipulations only. (FEIS at 37, 46, 57, 67.) [FN9] While areas adjacent to the proposed site of the Rockhouse well are, under both the resource protection alternative and balanced use alternative, subject to a more restrictive category 2, requiring special lease stipulations, the lease is nonetheless located in category 1 area which BLM considered in all alternatives to be open to oil and gas development subject to standard stipulations. [FN10]

The RMP further discounts SUWA's allegations of a conflict with regard to visual resources and road development. The FEIS's analysis of visual resources does not identify concerns for the area in question. (FEIS at 31, 54, 65, Appendix 7; ROD at 7, 57.) The project location is not identified as containing a "scenic travel corridor" or an "overlook." (FEIS at 122; ROD at 57, 59.) In all cases, the area where the well and road are located are in areas open to off-highway vehicle (OHV)

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

use. (FEIS at 53, 74; ROD at 58.) In no case did BLM identify a wilderness conflict for the area in question, or treat the project area as a wilderness location. Id.; FEIS at 82.

BLM correctly analyzed the "no action" alternative within the Book Cliffs FEIS as the "current management" alternative, thus considering "no action" for the land management plan as "no change" from existing use for oil and gas development. See 46 FR 18026, 18027 (Mar. 23, 1981) (Council on Environmental Quality's (CEQ's) ***234** Forty Most Asked Questions Concerning CEQ's [NEPA] Regulations, Question 3.) [FN11] As the Solicitor noted correctly in the April 15, 1999, Solicitor Memorandum to the Utah State Director, BLM, "if current land management plans have designated lands open for mineral leasing, they remain open for leasing. Management prescriptions may be changed only through amendment of the land management plans * * *." Thus, considering the Book Cliffs FEIS and ROD for the BCRMP, we find the application for the well to be consistent with the management plan. [FN12]

SUWA asserts that the inconsistency between the RMP and the APD derives from the fact that the EA announced that approving the Rockhouse well would exceed 80 wells for the BCRA within the year and that this violates the terms of the RMP restricting the number of wells allowed. This assertion misstates both the RMP and the significance of the EA's comments on the issue. It is true that the BCRMP assumes that "[r]egardless of the alternative selected, approximately 40 to 80 wells would be drilled within the BCRA annually * * *." (FEIS at 145.) By contrast, the EA states "more than 80 wells are being drilled on a yearly basis within the Vernal District Office boundaries." (EA at 2).

Nonetheless, having reviewed the RMP extensively, we agree with BLM that nothing within it establishes a limit on the number of wells within the BCRA, let alone the Vernal District Office boundaries. Rather, the general reference to the number of wells that might be anticipated or assumed annually in the BCRA does not constitute a term, condition or substantive limit on the number of wells BLM may authorize.

We agree with SUWA that the EA is not helpful on this issue. It states that "the drilling of wells which are covered under a field development EA are not counted under the 80 wells figure. The impacts of wells drilled under field development EAs are analyzed separately from the BCRMP within each document." (EA at 2.) But the DSD correctly concluded that "[t]he 80 wells per year figure of the [BCRMP] is not a management prescription. The figure is an assumption established as a reasonable estimate of activities for NEPA evaluation." (SDR Decision at 4.) We find no inconsistency between this conclusion and the BCRMP.

[3] Turning to SUWA's specific challenges to the EA, it is worth beginning with a recitation of precedent governing our review of EAs. In preparing an EA to assess whether an EIS is required under section 102(2)(C) of NEPA, ***235**42 U.S.C. § 4332(2)(C) (2000), an agency must take a "hard look" at the proposal being addressed, identifying relevant areas of environmental concern, so that it can

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

make an informed determination as to whether the environmental impact is insignificant or impacts will be reduced to insignificance by mitigation measures. See Colorado Environmental Commission, 142 IBLA 49, 52 (1997); [FNb] Utah Wilderness Association, 80 IBLA 64, 78, 91 I.D. 165, 174 (1987). [FNc] The Board will affirm a FONSI if the record establishes that BLM has engaged in a careful review of environmental consequences, all relevant environmental concerns have been identified, and the final determination is reasonable. Owen Severance, 118 IBLA 381, 392 (1991); [FNd] Utah Wilderness Association, 80 IBLA at 78, 91 I.D. at 174.

A party challenging a FONSI must show that it was premised on a clear error of law or demonstrable error of fact or that the analysis failed to consider a substantial environmental question of material significance to the action for which the analysis was prepared. Southern Utah Wilderness Alliance, 122 IBLA 6, 12 (1991); [FNe] G. Jon & Katherine M. Roush, 112 IBLA 293, 297 (1990); [FNf] Glacier-Two Medicine Alliance, 88 IBLA 133, 141 (1985); [FNg] Utah Wilderness Association, 80 IBLA at 78, 91 I.D. at 174. "The ultimate burden of proof is on the challenging party and such burden must be satisfied by objective proof. Mere differences of opinion provide no basis for reversal." Rocky Mountain Trails Association, 156 IBLA 64, 71 (2001), [FNh] citing Larry Thompson, 151 IBLA 208, 217 (1999). [FNi]

SUWA argues that BLM erred in its analysis of the potential cumulative impacts of drilling the exploratory well because it failed to consider the cumulative impact of drilling the well and of reasonably foreseeable additional oil and gas wells that might be drilled in the future should the well be successful. SUWA objects to BLM's failure to maintain its view, as expressed in the draft EA, that such impacts were "unavoidable."

In our previous orders, the Board was particularly concerned with changes from the draft EA to the final EA, DR/FONSI, and the SDR decision, in which the description of potential impacts from a successful well was converted from "unavoidable" to "cumulative," which the SDR found to be so uncertain that they failed to rise to the level of "significance" within the meaning of NEPA. Our earlier orders queried whether BLM had incorrectly described the likelihood of significant cumulative impacts by changing this description. Noting that "[n]othing in the CEQ regulations or in common parlance suggests that 'reasonably foreseeable' equates to 'unavoidable'," we provided BLM an opportunity to further brief the sequence of events that led to changes in language. (Aug. 2, 2001, Order at 14.)

BLM has provided an extensive discussion of the chronology of events leading to these changing characterizations. (Nov. 14, 2001, Response to August 2, 2001, Order at 4-7.) As BLM explains it, the Vernal District Office issued three different EAs ***236** in which it considered the Rockhouse well. In each draft of the EA, in the DR/FONSI, and in the DSD Decision, the discussion of impacts changed under the headings "unavoidable adverse impacts" and "reasonably foreseeable future impacts." Only in the second draft did BLM describe the 50-well scenario as

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

unavoidable. The final EA transferred that possible result to the "reasonably foreseeable" heading, due to the facts that the potential for production was unclear and that the 50-well scenario was likely to occur as a result of drilling elsewhere than on Retamco's lease. The DR/FONSI explained:

Concern was expressed over potential major cumulative impacts of up to an additional 50 wells in the vicinity of the proposed well because the EA that was released for public comment erroneously described these impacts as unavoidable. This error has been corrected. Significant cumulative impacts are not likely to occur as a result of this decision because the proposed well is exploratory and the potential for production is uncertain; there are no additional proposals for drilling on the other Federal leases adjacent to the proposed drilling site, and * * * approval of this well does not automatically authorize any future drilling that would create cumulative impacts.
(DR/FONSI at 3.)

While it is clear that the characterization of the impacts changed throughout the NEPA documentation process, BLM's brief adequately explains its logic. In our initial review, we found the changed description of impacts confusing. Nonetheless, BLM's job in developing multiple drafts and taking comments on environmental documents is to correct errors or misinformation within them, and to otherwise respond to comments and reconsider conclusions. Accordingly, this Board will not criticize BLM for the existence of such changes alone. Thus, the only issue is whether the decision documents comply with NEPA under the above-described precedent and the CEQ regulations implementing NEPA at 40 CFR Part 1500.

CEQ rule 40 CFR 1508.9(b) requires EAs to include brief statements of "environmental impacts" of a proposed action. "Effects and impacts as used in these regulations are synonymous" and include "direct," "indirect," and "cumulative" effects. 40 CFR 1508.8. "Indirect effects * * * may include growth inducing effects and other effects related to induced changes in the pattern of land use * * *." 40 CFR 1508.8(b). A cumulative impact is

the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency or person undertakes such other actions. Cumulative impacts can result from ***237** individually minor but collectively significant actions taking place over time.
40 CFR 1508.7; see Southern Utah Wilderness Alliance, 122 IBLA 165, 169- 70 (1992). [FNj]

Considering this definition, we find that BLM correctly identified the cumulative "impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions," and correctly identified the potential construction of 50 new wells as a reasonably foreseeable future action. Further, BLM adequately concluded that the impact from the Rockhouse well was not so "significant" as to require an EIS at this juncture until more is known about its production potential, given that more information

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

also would be derived from drilling nearby wells and that a further EIS would be undertaken should drilling justify broader development in the area.

SUWA takes issue with the final EA's conclusion that the development of 50 new wells should be identified as "a reasonably foreseeable future action" from which cumulative impacts should be determined, rather than being described as an "unavoidable" consequence of the drilling of the Rockhouse well alone. SUWA contends that the possibility of 50 new wells as a direct result of drilling the Rockhouse well is "significant" and should compel the development of an EIS.

Having reviewed the BCRMP, we agree with BLM and, ultimately, the DSD, that the numbers and locations of future wells in the BCRA are dependent upon the uncertain nature of further exploration and development in the field. First, the fact that large areas of the BCRA are open and leased to oil and gas development supports the EA's assertion that the potential for development in the vicinity derives from these factors and exists independent of the Rockhouse well, not as an unavoidable result of it. (EA at 19.) Two wells on State sections within the White River WRU might be drilled productively. (EA at 20.) The granting or denial of the Rockhouse well APD does not affect this potential. While the effect of the Rockhouse well's drilling is appropriately considered within the cumulative impacts analysis, the fact that State and Federal lands are open to oil and gas leasing and development, and the existence of development plans identified in the Wexpro EA and for State lands, lend credence to BLM's conclusion that the 50-well development scenario is not an "unavoidable" result of the approval of the APD for the Rockhouse well, but rather depends on development potential in nearby leased areas. At a minimum, SUWA has not provided evidence that this conclusion is wrong. [FN13]

***238** Second, we are persuaded by the BCRMP's analysis of the likelihood of oil and gas development in the vicinity of the proposed well that BLM correctly concluded that the potential for development was uncertain and therefore the cumulative impacts did not rise to the level of "significance" at this time. The BCRMP sought to quantitatively assess the potential for future oil and gas development throughout the BCRA in terms of two factors, favorability and certainty. (FEIS at 374, Appendix 4.) Figure 3-1 of the FEIS is a map that depicts these factors for oil and gas in the BCRA. Id. at 95. In the vicinity of the proposed well, favorability is rated as "2", while the certainty is "4".

The FEIS describes the category rating of "Favorability 2 (f2)":

The geologic environment of an area rated at the "f2" level for oil and gas is considered to have a potential only for small, widely scattered oil and gas pools. The size of recoverable hydrocarbon accumulations in such an environment would be anticipated to be less than 10 million barrels of oil, or, if gas, no more than 60 billion cubic feet. The cumulative thickness of sedimentary rocks in the "f2" geologic environment will generally be less than a few thousand feet thick. Such relatively thin stratigraphic sequence generally limits the volume of both favorable source and reservoir rocks; hence the expected small size and low frequency of oil and gas pools.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Id. at 374-375.

The certainty categories reflect the "degree of certainty of oil and gas occurrence * * * based on the proximity of direct evidence that either supports or refutes the existence of the resource in the immediate environment of the area." (FEIS at 376.) "Certainty factor 4 (c4)" is the "highest level of oil and gas certainty" that minerals will or will not be found. Id. at 379. By way of example, the FEIS ***239** described a category of c4, combined with a favorability category of f1: "the dual rating indicates with a high-degree of certainty that commercial quantities of oil and gas do not occur in or near the area." Id. It follows that, here, where a "c4" certainty category is used with an "f2" favorability, the dual rating indicates with a high-degree of certainty that very small commercial quantities of oil and gas occur in or near the area.

The RMP and FEIS thus support the DSD's conclusion that future development in geographic proximity to the proposed well was not certain. Further, the DSD explained that:

> BLM will progressively analyze past, present and future actions for cumulative impacts and monitor the level of significance of potential impacts based on the results of the individual drilling proposals. Should production and the potential for field development be established, and cumulative impacts are likely to occur, BLM will prepare an appropriate level of NEPA analysis and documentation for field development prior to approving additional APDs.

(DR/FONSI at 3.) This assurance of further NEPA review resolves any questions as to what will happen when the "certainty" of the 50-well scenario ripens as a result of production from the Rockhouse or another well.

In a similar case before this Board brought by SUWA alleging shortcomings in cumulative impact and foreseeable development analysis, we rejected SUWA's contentions and stated:

> [A]t best, the amount and location of additional road building is dependent on the highly uncertain nature of further exploration and development in the Kane Creek Field, which in turn will depend on undetermined geology and the variable economic forces and fortunes of oil and gas operators in the area.

Southern Utah Wilderness Alliance, 127 IBLA 282, 289 (1993). [FNk] Given the categories analyzed for the Rockhouse well site in the RMP, SUWA has not shown by objective proof error in BLM's cumulative impacts analysis sufficient to warrant reversal of the DSD's decision.

[4] SUWA objects to the EA's conclusion that the RDG proposal to drill over 400 gas wells and construct several hundred miles of road is a related action, rather than a "connected action" requiring preparation of an EIS. CEQ regulations state that the scope of an EIS is determined by considering three types of actions including ***240** "connected actions." 40 CFR 1508.25(a)(1). That rule defines "connected actions" as meaning

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

that they are closely related and therefore should be discussed in the same impact statement. Actions are connected if they:

(i) Automatically trigger other actions which may require environmental impact statements.

(ii) Cannot or will not proceed unless other actions are taken previously or simultaneously.

(iii) Are interdependent parts of a larger action and depend on the larger action for their justification.

Id. In Glacier-Two Medicine Alliance, 88 IBLA at 145, we considered this definition to conclude that "the road and the associated development which are the subject of the APD [and] have no independent utility in the absence of production from any commercially feasible discovery on the land" are connected actions that must be included within the scope of the EA. SUWA does not show that the RDG proposal meets this definition or is interdependent with the APD for the Rockhouse well.

[5] SUWA also argues that BLM failed to consider reasonable alternatives to the proposed action, including the "no action" alternative. SUWA asserts as well that this alleged failure to address the no action alternative violated the Solicitor's 1999 memorandum, because that memorandum stated that BLM must consider the no action alternative when analyzing actions that would potentially negate the eligibility of certain lands for wilderness designation. See Memorandum from Solicitor to Utah State Director, BLM (Apr. 15, 1999).

The obligation of Federal agencies to consider "no action" alternatives in NEPA documents other than an EIS derives from section 102(2)(E) of NEPA. That statutory provision requires agencies to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(E) (2000). CEQ regulations provide that Federal agencies shall, to the fullest extent possible, "[u]se the NEPA process to identify and assess the reasonable alternatives to proposed actions that will avoid or minimize adverse effects of these actions upon the quality of the human environment." 40 CFR 1500.2(e); 1502.14(a); 1508.9(b).

In Bob Marshall Alliance v. Hodel, 852 F.2d 1223 (9th Cir. 1988), cert. denied, 489 U.S. 1066 (1989), the United States Court of Appeals for the Ninth Circuit concluded that the obligation in section 102(2)(E) is "both independent of, and ***241** broader than, the EIS requirement." Id. at 1229. The court concluded that agencies bear the obligation to consider the no action alternative in preparing EAs. Id. at 1228-29. In Southern Utah Wilderness Alliance, 122 IBLA 334, 338-39 (1992), [FNl]this Board held:

An EA must include a brief discussion of alternatives as mandated by section 102(2)(E) of NEPA, 42 U.S.C. § 4332(2)(E) (1988). See 40 CFR 1508.9(b); 516 DM

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

3.4(A). See also Oregon Natural Resources Council, 115 IBLA 179, 186 (1990), [FNm] In re Long Missouri Timber Sale, 106 IBLA 83, 87 (1988). [FNn] * * * Among the alternatives which must be considered pursuant to this mandate is the no-action alternative. Bob Marshall Alliance v. Hodel, 852 F.2d at 1228.

Turning to the record, we find that SUWA errs in claiming that BLM failed to consider the alternative of "no action," or, in this case, denying the APD. While what concerned us in our initial review of the record on the petition for stay was the seeming refusal to consider the "no action" option because of perceived concerns about a Fifth Amendment "taking," in fact, the EA went on to address the alternative. (EA at 6-7.) As the DSD noted, that alternative analysis was "included for comparative purposes." (SDR Decision at 4.) BLM concluded that a "no action" decision would avoid impacts from the development of the Rockhouse well on recreation, soils, watersheds, and vegetation. The EA also went on to consider the effects of the proposed action and the no action alternative on wilderness values. Id. at 17-18. The EA noted that the effect of taking no action on, or denying, the APD was not significantly different from granting the APD, given available land use and planned wells on State lands. Id. We find that this analysis is sufficient to meet BLM's obligation to include a "brief" discussion of alternatives. See, e.g., Robert P. Muckle, 143 IBLA 328, 335 (1998); [FNo] In re Blackeye Timber Sale, 98 IBLA 108, 111 (1987). [FNp]

The discussion of the ability to consider the no action alternative in the DR/FONSI and EA has a genesis in the NEPA process and BLM regulations. BLM regulations, the courts and our precedent proceed under the notion that the issuance of a lease without an NSO stipulation conveys to the lessee an interest and a right so secure that full NEPA review must be conducted prior to the decision to lease. The courts have held that the Department must prepare an EIS before it may decide to issue such "non-NSO" oil and gas leases. The reason, according to the Ninth Circuit, is that a "non-NSO" lease "does not reserve to the government the absolute right to prevent all surface disturbing activities" and thus its issuance constitutes "an irretrievable commitment of resources" under section 102 of NEPA. Friends of Southeast's Future v. Morrison, 153 F.3d 1059, 1063 (9th Cir. 1998), quoting Conner v. Burford, 848 F.2d 1441, 1448-51 (9th Cir. 1988). This commitment is reflected as well in BLM regulations:

***242** A lessee shall have the right to use so much of the leased lands as is necessary to explore for, drill for, mine, extract, remove, and dispose of all the leased resource subject to: Stipulations attached to the lease; restrictions deriving from specific, nondiscretionary statutes; and such reasonable measures as may be required by the authorized officer to minimize adverse impacts to other resource values, land uses or users not addressed in the lease stipulations at the time operations are proposed. To the extent consistent with lease rights granted, such reasonable measures may include, but are not limited to, modification to siting or design of facilities, timing of operations, and specification of interim and final reclamation measures. * * *

43 CFR 3101.1-2. The Board discussed this process most recently in Wyoming Outdoor Council, 157 IBLA 259, 264-65, 272-73 (2002) [FNq](Burski, J.,

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

concurring), rev'd on other grounds, Pennaco Energy, Inc. v. State of Wyoming, Case No. 02-CV-116-B (June 2, 2003). [FN14]

Consistent with the above-stated precedent and 43 CFR 3101.1-2, we have held that an EA which is tiered to a final EIS need not restate the cumulative impacts analysis or a no action alternative that was already considered in the document to which the EA is tiered. Blue Mountains Biodiversity Project, 139 IBLA 258, 267 (1997); [FNr] Oregon Natural Resources Council, 115 IBLA 179, 186 (1990); [FNs] In re Long Missouri Timber Sale, 106 IBLA 83, 87 (1988), [FNt] reconsideration denied (1989); In re Upper Floras Timber Sale, 86 IBLA 296, 311 (1985); [FNu] see also Southern Utah Wilderness Alliance, 158 IBLA 212 (2003), [FNv] and citations therein. Tiering is defined in the CEQ regulations as "coverage of general matters in broader [EISs] * * * with subsequent narrower statements or environmental analyses * * * incorporating by reference the general discussions and concentrating solely on the issues specific to the statement subsequently prepared." 40 CFR 1508.28 (emphasis added). Conversely, where BLM has adopted a lease stipulation barring particular surface activity, this Board has permitted BLM to defer NEPA analysis of such impacts because BLM had the legal authority to prohibit them. In Glacier Two-Medicine Alliance, we stated:

> This Board has previously recognized that environmental analysis is required prior to an irreversible commitment of resources to an action which will affect the environment. ***243**Sierra Club Legal Defense Fund, Inc., 84 IBLA 311, 92 I.D. 37 (1985). [FNw] Hence, deferral of assessment of specific surface disturbing activities pending submission of a site specific plan of operations has been permitted where the Department has retained the authority to bar such activities if the impacts, even with mitigating measures, are unacceptable.

88 IBLA at 146.

This is not to say that BLM may evade its NEPA obligation and fail to identify cumulative impacts or the no action alternative in an EA. Southern Utah Wilderness Alliance, 122 IBLA at 339-40 ("cavalier" failure to address no action alternative requires reversal of DR/FONSI); Wyoming Outdoor Council, 147 IBLA 105, 115 (1998) [FNx](even though BLM's authority to curtail oil and gas activity in a "non-NSO" lease was limited, it nonetheless considered the no action alternative). Rather, the tiering concept provides that, for alternatives and impacts already considered and answered with a conclusion to commit resources, BLM need not reconsider what amounts to a pre-existing decision. In the leasing context, this is particularly true because after a lease is issued, resources have been committed to a particular authorized land use, presumably after the agency considered and rejected the alternative of taking no action to lease.

The DSD's analysis regarding "takings" does not adequately or correctly state the applicability of NEPA, BLM and CEQ regulations and precedent, and is not accurate shorthand for it. However, the DSD's statement appears to have derived from the concepts and logic described above. Once the lease was issued, alternatives such as prohibiting surface occupancy by way of a no action alternative effectively have been considered and rejected prior to lease issuance.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

The difficulty on this record, however, is determining how to apply such concepts here. According to the EA the lease was issued to Retamco not as a result of an EIS but rather based on an "administrative determination of NEPA adequacy [(DNA)] and plan conformance document." (EA at 1.) No further information is provided regarding the allegedly adequate documents to which such a DNA related. We affirm here because BLM adequately, if briefly, considered the no action alternative in this EA. By contrast, SUWA has not shown effects of the "no action" alternative BLM should have considered and did not.

We must likewise reject SUWA's argument that BLM violated the terms of the Solicitor's memorandum dated April 15, 1999. That memorandum states: "If BLM determines that the proposed action would harm wilderness characteristics so as to negate the eligibility of the lands for wilderness designation, the BLM must consider among its alternatives in its EA or EIS the no action alternative, which would preserve the land's eligibility for wilderness designation." BLM did consider such an ***244** alternative. Moreover, implicit in SUWA's suggestion is the notion that the memorandum meant to change existing law. Yet, the memorandum is not inconsistent with the laws and precedent discussed above, and acknowledged that "if current land management plans have designated lands open for mineral leasing, they remain open for leasing."

We note also that the EA, and DR/FONSI did consider the impacts on wilderness values from granting the APD. The EA concluded that "the road and well pad intrusions would be noticeable on about one acre or 0.00006 percent of the inventory unit," the "effect [of noise and equipment] would be temporary and last only 44 days," "drilling and production of the single proposed well would introduce intrusions on the natural appearance of the area as viewed from less than 1 percent of the 15,800-acre wilderness inventory unit," and "intrusions in the unit would remain substantially unnoticeable." (EA at 13.) Accordingly, BLM considered the effects on wilderness in the manner required by the Solicitor's memorandum.

[6] To the extent SUWA argues that the existence of the 1999 wilderness reinventory unit required BLM to alter existing land use authorizations under the RMP, this construction is inconsistent with the governing law and regulations, Board precedent construing it, and the Solicitor's memorandum. In 2003, we rejected a similar argument by SUWA that BLM was required either to inventory lands for wilderness characteristics or treat re-inventoried lands as wilderness before undertaking a land use decision authorized by the current RMP. Southern Utah Wilderness Alliance, 158 IBLA at 215, 216-17. [FN15] There the Board noted that section 201(a) of FLPMA, 43 U.S.C. § 1711(a) (2000), not NEPA, controls the Secretary's wilderness inventory authority, and that the Board has no supervisory authority over BLM to compel a reinventory. The Solicitor's memorandum of April 15, 1999, is consistent, explicitly stating: "Management prescriptions may be changed only through amendment of the land management plans * * *." Thus, we will not construe the Solicitor's memorandum to have added obligations in law that it expressly rejected.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[7] Our prior orders in this case implemented a stay of pipeline development. Thus, we turn to the issue of the pipeline.

***245** The original APD form did not mention a pipeline, but it referred to the attached "10 Point Drilling Program" and "13 Point Surface Use Plan," required by 43 CFR Subpart 3100. See also FEIS at 366. Retamco amended the latter on August 31, 1999, to include the pipeline, which is described as a surface line. A Serial Register Page within UTU-77673 shows that NEPA analysis was initiated for the pipeline in 1999.

The EA contains a brief discussion and description of the road (EA at 3, "Access") and pipeline (EA at 6, "If the Well Becomes a Producer"), but otherwise merges the description of the pipeline and road, as does the DR/FONSI. The extent of the EA's separate analysis of the proposed pipeline appears at 6, where it states:

If the proposed well were to be capable of production, approximately 11,000 feet (2000 feet on lease and 9000 feet off lease) of 4" outside diameter surface steel natural gas pipeline would be laid adjacent to the access road as described above to a point in the SE NW of Sec. 8, T11S, R23E where the pipeline would join an existing surface natural gas transportation pipeline (see map A). The pipeline would be laid within six (6) months after the well is drilled and would take approximately 2 days to install. The pipe would be stored and welded together on the well location and dragged into place using a dozer or backhoe. All the equipment used to install the pipe would use the access road as a working surface. No wash crossings or road crossings would be necessary. The off-lease portion of the pipeline (9000 feet) would require a ROW. A temporary ROW width of 30 feet would be needed for installation of the pipeline. A permanent ROW width of 15 feet would then be required for maintenance over a period of 30 years.
(EA at 6 (emphasis added).) The EA adds that when the well is abandoned, the pipeline would be removed. Id. Map A shows the pipeline crossing sec. 5, T. 11 S., R. 23 E.

As the language emphasized above reveals, the EA appears to have anticipated a subsequent ROW. (EA at 6.) The same is true in other document records. A July 20, 2000, letter from BLM to Retamco states that the "proposed natural gas pipeline will require a right-of-way (R/W) grant. The APD will be used as the R/W application which we have assigned serial number UTU-77673. Any future correspondence regarding this R/W should reference this serial number."

Under the balanced use alternative in the BCRMP, BLM chose 235 miles, or 93,000 acres, to be designated as ROW corridors. (FEIS at 21.) The RMP noted that pipelines could be located within a corridor, but that, in any event, ROWs for ***246** pipelines required individual environmental review. Id. at 77, 158; ROD at iv. The ROD explains the objective of the RMP with respect to ROWs:

[ROWs] will be encouraged within identified corridors while protecting or mitigating other resource values. Additional corridors could be established if

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

compatible with other resource uses.
(ROD at 28.) It is clear that the pipeline at issue here does not appear within one of the established corridors. Id. at 30. Thus, the RMP permitted ROWs outside of the corridors, subject to NEPA review on a case-by-case basis.

Applications for [ROWs] and corridors outside of designated corridors and exclusion areas will be considered individually.

* * * * * * * *

The issuance of ROWs will require district administrative and review support on a regular basis. Compliance with [NEPA] * * * and other appropriate legislation will be included in this support. Some [ROWs] may require an amendment to this [RMP].
(ROD at 28.) [FN16]

While the separate analysis of the pipeline in this record was minimal, it appears that BLM complied with NEPA, the RMP, and its regulations in granting ROW UTU-77673. The EA indicates that BLM intended the road access analysis to cover the pipeline access and, significantly, the public understood the project in those terms. Two public comments and BLM's responses mentioning the pipeline support this conclusion. See EA at 26 (BLM responds to comment that pipeline visibility would be limited by vegetative and topographic screening); 27 (comment regarding visibility of pipeline); 35 (comment that EA governs development of pipelines). Most importantly, SUWA does not meet its burden of showing that BLM failed to consider a substantial environmental question of material significance with particular regard to the pipeline. Southern Utah Wilderness Alliance, 122 IBLA at 12. Accordingly, we affirm BLM's decision granting the pipeline ROW and dissolve the stay as to that portion of the proposed project.

***247** Conclusion

To the extent that SUWA raises other arguments that are not explicitly addressed above, these arguments were considered but rejected. The decision of the DSD, SDR UT 00-5, is affirmed with respect to the authorization of the permit to drill the Rockhouse 11-31 well, ROW UTU-76912 for associated road development, and ROW UTU-77673 for associated pipeline development. SUWA fails to meet its burden of establishing that the decision was premised upon a clear error of law or demonstrable error of fact such that the analysis failed to consider a substantial environmental question of material significance.

Accordingly, pursuant to the authority delegated to the Board of Land Appeals by the Secretary of the Interior, 43 CFR 4.1, Retamco's motion to dismiss is denied, and the decision appealed from is affirmed.

Lisa Hemmer

Administrative Judge

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

I concur:
T. Britt Price
Administrative Judge

FN1. Ultimately, Retamco transferred an 80% or 100% share of its working interest in the lease, or the entire lease, to Texacoma Oil and Gas Corporation of Dallas, Texas. (Retamco Brief at 2, 65; c.f., Dec. 28, 1999, Letter of Texacoma to BLM (Purchase Contract for Lease, Mar. 1999).)

FN2. A copy of the APD without the referenced attachments was placed in the case file for UTU-77673, for the surface pipeline ROW.

FN3. Section 201(a) of the Federal Land Policy and Management Act of 1976 (FLPMA), 43 U.S.C. § 1711(a) (2000), requires the Secretary of the Interior to maintain an inventory of all public lands and their resource values.

FN4. "Goblin City" is a "series of stacked ridges, towers, and spires" 1.7 miles northeast of the proposed well. The "overlook" provides a 360 degree view of the landscape. (EA at 11.) The EA indicated that views and noise levels at the overlook would be impaired during a 44-day construction period. Id. at 17.

FN5. The EA analyzed the "lease suspension" alternative, but found that this option would have the same effect as the "no action alternative." See EA at 7.

FN6. The EA also noted that proposed access routes for the drilling pad and pipeline crossed lands on which a proposal had been submitted to BLM by the Resource Development Group (RDG), a consortium of private interests holding Federal, state, and private oil and gas leases for development of natural gas within Uintah County, Utah. (EA at 2-3.) BLM identified this as a "related action" and stated that an EIS is being initiated for the proposed development.

FN7. The EA further described cumulative impacts on recreation, visual resources, and soils and vegetation. Id. at 21-22.

FN8. In its entirety, the order ruled as follows: Motions to Reconsider Stay Granted; Motion to Dismiss Taken Under Advisement; Motion to Intervene Granted; Motion of Retamco Operation Inc. for Additional Time Granted; Appellant's Requests for Immediate Review Denied; Appellant's Request for Opportunity to Respond Granted; Motion to Expand Scope of Stay Denied; Motion to Dissolve Stay Denied; Motion to Vacate Stay Denied; Intervenor's Request for Immediate Review Denied as Moot; Order to Appellant to Plead Standing; Briefing Ordered.

FN9. According to the FEIS, for category 1 areas, consistent with 43 CFR Subpart 3100, lessees must prepare a 13 point surface use plan for purposes of environmental assessment, like the one presented by Retamco here. (FEIS at 366.)

FN10. BLM set forth special stipulations in the final 1985 ROD for the BCRMP for category 2 areas. (ROD at 18, 19, 22, 24, 25.) Categories 3 and 4 require NSO

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

lease stipulations and prohibit leasing, respectively.

FN11. CEQ stated that considering the "no action" alternative in the case of land management plans to mean stopping existing authorized action is a "useless academic exercise." Id.

FN12. We address the pipeline issue separately below.

FN13. SUWA provides a letter from the United States Environmental Protection Agency (EPA), to the Vernal District Office, BLM, stating the EPA's concern that BLM was approving incremental project development for pipelines and wells. (Nov. 16, 2001, SUWA Response, Exhibit E, June 20, 2001, EPA letter to Vernal District Office.) While this letter surely provides a basis for general concern with the Vernal District Office's environmental compliance, it followed the challenged DR/FONSI and DSD decision by a year. Further, as BLM mentions in its pleadings, the Vernal District Office and the Utah State Office will be engaging in the development of a new RMP encompassing, inter alia, the BCRA, and also preparing an EIS for oil and gas development in the Uintah Basin, consistent with BLM's stated commitment in the EA to conduct an EIS for the basin. The EPA letter focuses on this process, and an upcoming meeting among EPA, the Vernal District Office, BLM, and the United States Fish and Wildlife Service.

FN14. As we stated at 264, "[w]hile the scope of the examination of * * * impacts in a pre-leasing NEPA document will necessarily differ from that required in a site-specific NEPA analysis prepared for a proposed development project, NEPA mandates that those impacts must nevertheless be acknowledged and appropriately considered before the leasing decision is made."

FN15. Though the issue has not been raised in this appeal, we note that in 2003 the Secretary entered into an agreement with the State of Utah in settlement of a dispute over the 1999 Utah Wilderness Inventory Report. State of Utah, et al v. Norton, et al, No. 2:96CV0870 B, Stipulation and Joint Motion to Enter Order Approving Settlement and To Dismiss the Third Amended and Supplemented Complaint, filed Apr. 11, 2003.

FN16. The RMP presumes that all ROWs issued within the BCRA will be issued under general FLPMA regulations at 43 CFR Part 2800. These regulations require NEPA review before granting a pipeline ROW. 43 CFR 2802.4(d)(1); see also 43 CFR 2800.0-7 (pipelines within scope of regulations). The pipeline in this case was also issued pursuant to 43 CFR Subpart 2880.

FNa. GFS(MISC) 13(1994)

FNb. GFS(O&G) 5(1998)

FNc. GFS(O&G) 99(1984)

FNd. GFS(MISC) 29(1991)

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

FNe. GFS(O&G) 7(1992)

FNf. GFS(MISC) 4(1990)

FNg. GFS(O&G) 108(1985)

FNh. GFS(MISC) 5(2002)

FNi. GFS(MIN) 5(2000)

FNj. GFS(O&G) 14(1992)

FNk. GFS(O&G) 24(1993)

FNl. GFS(O&G) 23(1992)

FNm. GFS(MISC) 52(1990)

FNn. GFS(MISC) 11(1989)

FNo. GFS(MISC) 52(1998)

FNp. GFS(MISC) 54(1987)

FNq. GFS(O&G) 13(2002)

FNr. GFS(MISC) 47(1997)

FNs. GFS(MISC) 52(1990)

FNt. GFS(MISC) 11(1989)

FNu. GFS(MISC) 51(1985)

FNv. GFS(MIN) 7(2003)

FNw. GFS(O&G) 22(1985)

FNx. GFS(O&G) 6(1999)

GFS(O&G) 9(2003), 159 IBLA 220

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.



GFS(O&G) 2(2000), 151 IBLA 42

**(Cite as: 151 IBLA 42)**

United States Department of the Interior
Office of Hearings and Appeals
Interior Board of Land Appeals

WYOMING AUDUBON ET AL.

IBLA 98-337

Decided October 22, 1999

INDEX CODES:

40 CFR 1500.1(b) & (c)

40 CFR 1502.24

***42** Appeal from a decision of the Wyoming State Director, Bureau of Land Management, approving a Record of Decision and Final Environmental Impact Statement for the Jonah II Natural Gas Development Project. WY 1793 (930).

Affirmed; stay request denied as moot.

1. Environmental Policy Act--Environmental Quality: Environmental Statements--National Environmental Policy Act of 1969: Environmental Statements

BLM did not err in not adopting a 2 mile buffer zone for sage grouse leks or strutting grounds in the ROD/FEIS where authorities relied on in support of a 2 mile buffer zone and addressed widespread sagebrush eradication rather than the more limited impacts associated with oil and gas operations, and no scientific evidence was offered showing that a 2 mile buffer zone was necessary to protect sage grouse leks or strutting grounds.

2. Environmental Policy Act--Environmental Quality: Environmental Statements--National Environmental Policy Act of 1969: Environmental Statements

BLM did not violate seasonal sage grouse restrictions identified in the RMP where the RMP also provided for modification of the restrictions if necessary based upon environmental analysis of specific proposal and site specific mitigation, and BLM prepared an environmental impact statement modifying the seasonal restriction based on post-RMP research more clearly defining sage grouse breeding and nesting activity and required site-specific mitigation which protects nests and chicks identified through required surveys.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

3. Environmental Policy Act--Environmental Quality: Environmental Statements--National Environmental Policy Act of 1969: Environmental Statements

Where the scientific data relied on by BLM and appellants indicate that a 1/2 mile buffer zone ***43** is preferable but not essential to protect sage grouse leks, and there is no scientific evidence or studies indicating a 1/4 mile buffer zone with appropriate mitigation measures is insufficient to protect sage grouse leks, BLM's conclusion that a 1/4 mile buffer zone with additional mitigation is sufficient to lessen the impact on sage grouse due to oil and gas development will be affirmed.

APPEARANCES: Barb Gorges, President, Wyoming Audubon, for appellant Wyoming Audubon; Linda B. Rawlins, pro se; Andrea S.V. Gelfuso, Esq., U.S. Department of the Interior, Office of the Regional Solicitor, Rocky Mountain Region, Denver, Colorado, for the Bureau of Land Management; John F. Shepherd, Esq., Denver, Colorado, for Intervenors McMurry Oil Company and Amoco Production Company.

OPINION BY ADMINISTRATIVE JUDGE FRAZIER

Wyoming Audubon and Linda B. Rawlins have appealed and requested a stay of an April 27, 1998, decision of the Wyoming State Director, Bureau of Land Management (BLM or the Bureau), approving a Record of Decision and Final Environmental Impact Statement (ROD/FEIS) for the Jonah II Natural Gas Development Project. On June 25, 1998, the Board granted the Bureau an extension of time within which to file an answer to appellants' Statement of Reasons (SOR) and took appellants' request for a stay under advisement. On September 3, 1998, we granted McMurry Oil Company and Amoco Production Company's joint Motion to Intervene and granted Intervenors' request for an extension to and including September 28, 1998, within which to file an answer to appellants' SOR and to respond to appellants' request for a stay. Appellants were granted 30 days from receipt of BLM's Answer to file a response and to respond to the answer filed by McMurry and Amoco. Appellants seek a "stay that affects only those [natural gas] wells that are to be drilled within two miles of an identified sage grouse lek." (SOR and Request for Stay at 13.) Because we reach the merits of this appeal and affirm BLM, appellants' stay request is denied as moot. [FN1]

The EIS for the project analyzes the Proposed Action; Alternative A, a sensitive resource protection alternative development strategy; Alternative B, a maximum density alternative development strategy; and a No Action. Alternative. Other alternatives requiring higher or lower well densities were considered or rejected for environmental, economic and/or legal reasons. BLM's preferred alternative for the project is the Proposed Action with selected mitigation measures, as described in the Draft Environmental ***44** Impact Statement (DEIS) and FEIS, which would further reduce environmental impacts. (FEIS, Executive Summary at v.) On appeal, appellants challenge the adequacy of two mitigation measures contained in the ROD/EIS: the 0.25 mile buffer zone around sage grouse leks or strutting grounds that will remain free from surface disturbance and the March 1 to June 30 seasonal restriction on construction designed to avoid displacing sage grouse from nesting

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

habitat.

The ROD states with respect to sage grouse:

The sage grouse is the predominant and most important game bird in the analysis area. Data from the WGFD [Wyoming Game Fish Department] indicate that State-wide numbers of sage grouse declined between 1987 and 1992.

The entire analyses area is generally considered year-round habitat for sage grouse. Important areas for these birds are strutting grounds (leks), brood-rearing areas, and wintering areas.

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

Lek Protection--to avoid displacing sage grouse from strutting, surface disturbance within 0.25 miles of a sage grouse lek (strutting ground) will be avoided. Also to avoid enhancing raptor predation on strutting sage grouse, permanent, high profile structures such as buildings, storage tanks overhead power lines, etc., will not be allowed within 0.25 miles of lek (the area may be enlarged, if justified on a case by case basis).

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

Nesting Protection--To avoid displacing sage grouse from nesting habitat, construction activities within a two-mile radius of active leks will be avoided from March 1 through June 30, or as designated by the BLM AO. [Bureau of Land Management Authorized Officer].

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

Wintering Areas--Tall sage brush *** will be avoided except to cross the drainages at right angles. This will be done to minimize disturbance of tall sage brush which is important sage grouse wintering habitat.
(ROD at 21-22.)

***45** With respect to the 0.25 mile buffer zone provided for lek protection, appellants contend BLM erred in not requiring a 2 mile, or alternatively, a 0.5 mile buffer zone as provided in Alternative A to provide "additional protection of sage grouse leks." (FEIS Executive Summary at viii.)

Regarding nesting protection, appellants argue that, "without reasonable explanation, BLM Resource Management Plan-approved seasonal restrictions have been shortened by two months in the [ROD]." (SOR at 2.) They argue that "[s] easonal restrictions to protect sage grouse nesting and brood-rearing areas in the Pinedale Resource Area RMP are set from Feb. 1-July 31 (USDI BLM, RMP FEIS, 1987, 4; RMP ROD, 1988, 59)," while the ROD at 22 provides for a March 1 to June 30 seasonal restriction. (SOR at 4.) Appellants conclude that there is no "basis to change a legally-binding decision made in an existing BLM [RMP] EIS." Id. at 6.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

While appellants acknowledge that the Jonah II FEIS appears to comply with the guidelines of the RMP with respect requiring field evaluations for sage grouse leks between February 1 and March 15, and for sage grouse nesting between April 1 and July 1, they complain that the seasonal restriction directly contradicts the (Pinedale) RMP guidelines. Id. at 7.

In response, the Bureau states that appellants rely on a Table contained in the RMP, but "ignore language elsewhere" in the RMP which allows for modification of the dates of sage grouse seasonal restrictions. (BLM Answer to Request for Stay and SOR (BLM Answer) at 2.) The RMP at 8 states that "use restrictions (e.g., dates, distances) may be made more or less stringent depending upon the need of specific situations," and at 59, provides that "[m] odifications to this limitation in any year may be approved in writing by the Authorized Officer." (Intervenors' Answer and Response to Stay Request, Exhibit (Ex.) A.) BLM maintains that modifications were authorized by the subject ROD/FEIS based on scientific research more clearly defining sage grouse breeding and nesting activity. The WGFD, an agency cited by appellants as having expertise in this area, BLM notes, "concurred with the BLM's seasonal restrictions in their comments on the FEIS." (BLM Answer at 4.)

Richard Wallestad in a BLM article entitled "Life History and Habitat Requirements of Sage Grouse in Central Montana" (1975), observed that "the strutting display of sage grouse has been described in detail [citations omitted]. Cocks establish territories on traditional strutting grounds in early March, assembling on grounds an hour or so before dawn and strutting until approximately one hour after sunrise." (BLM Answer, Ex. C, Breeding Activities, at 1.)

Thus, BLM denies that there is a need to restrict activities around a sage grouse lek in February when the males do not use the leks until March:

Breeding then occurs in early April, but some hens may return to the lek into May to breed. See Agency Exhibit D, Environmental Assessment for the Big Piney LaBarge Coordinated Activity Plan, USDI-BLM 1990, p. 37. Nesting occurs from mid-April ***46** through mid-June. See Agency Exhibit E, BLM Technical Note "Habitat Requirements and Management Recommendations for Sage Grouse" pp. 15- 16. Chicks hatch approximately 37 days after breeding.

(BLM Answer at 3.) BLM reasons that "if a hen returned to the lek for breeding for the last time on May 10, which is considered late in the breeding cycle, the eggs should hatch 37 days later, i.e., June 23. Id. Thus, BLM concludes that "even late-hatching chicks would have a week to leave the nest area before any activity would begin." Id. at 3. BLM denies that there is any reason to restrict use in order to protect nest sites when the young have left the nests, which normally peaks by mid-June. See BLM Answer, Ex. M at 8, "Draft Pinedale/Jackson Region Sage Grouse Job Completion Report 1990-1996" prepared by Doug McWhirter, Wildlife Biologist, WGFD, Pinedale, Wyoming. The ROD, BLM submits, ensures that any sage grouse that did use the area in February and July would be protected because the ROD requires that "field evaluations for sage grouse leks will be conducted by a qualified biologist prior to the start of the activities in sage grouse habitat."

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

(BLM Answer at 3-4.) BLM insists that it preserved its ability to provide protection to active nesting sites in the ROD (Appendix C, at 14) by delaying actions until nesting is completed. Thus, BLM states that "[i]f an occupied nest is found in July, activity would not be allowed to proceed until the chicks have left the nest, regardless of the date." (BLM Answer at 4.)

Next, appellants contend that "BLM has not provided sufficient scientific evidence to support quarter-mile (0.25 mile) buffer zones around sage grouse leks or strutting grounds that will remain free from surface disturbance." (SOR at 2.) Appellants acknowledge, however, that the ROD protects leks by stipulating that "surface disturbance within 0.25 miles of a sage grouse lek (strutting ground) will be avoided." (SOR at 4.) They nonetheless criticize BLM for failing to consult with, or obtain recommendations from, the U.S. Fish and Wildlife Service (USFWS) on the buffer zones. (SOR at 5.)

Also, appellants allege that "WGFD found the BLM's lek buffer zones to be inadequate in size, as stated in response to the Jonah II [DEIS] (BLM Jonah II FEIS, 1998, 7-107)." They note that WGFD's views regarding the inadequacy of BLM's lek buffer zone were contained in a completion report dated December 1997, captioned "Sage Grouse Productivity, Survival and Seasonal Habitat Use Near Farson, Wyoming, July 1 1993 to December 30 1996," which recommends "no vegetation control within 3 km [2.2 miles] of leks (WGFD, 1997, 50)." (SOR at 5; Ex. 4.) BLM's own experts, appellants contend, concurred in WGFD's assessment, citing a 1979 BLM Technical Note, Management Recommendations (BLM, 1979, 29). (SOR at 6 and Ex. 5.) Referencing Exhibit 6 to its SOR, "Guidelines for Maintenance of Sage Grouse Habitats," by Clait E. Braun, Colorado Division of Wildlife, Wildlife Research Center, Tom Britt, WGFD, and Richard O. Wallenstad, Montana Fish and Game Department, appellants state that the Colorado Division of Wildlife (CDW), another agency with expertise, has also specified a 3 km buffer ***47** zone around leks. Id. at 6. While appellants concede that BLM included a list of citations to justify its decision to limit the size of lek buffer zones to 0.25 mile, they deny that the cited scientific studies support BLM's decision. Indeed, appellants claim that "many of these studies directly contradict BLM's conclusions." (SOR at 10.) The Bureau's conclusions, appellants maintain, are a "plain violation of BLM's responsibility under 40 C.F.R. § 1502.24 'to insure the professional integrity, including scientific integrity, of the discussions and the analyses in environmental impact statements'." (SOR at 10.)

Appellants further contend that BLM ignored the special expertise of WGFD, CDW, and its own experts. (SOR at 10.) They maintain that WGFD recommended the "0.5 mile surface disturbance buffer surrounding sage grouse leks as defined in Alternative A. This would provide additional protection from predation, as high profile structures would not be constructed within this buffer zone." In its Answer, BLM makes the statement that it believes that "impacts to sage grouse using the 1/4 mile buffer are insignificant," but acknowledges that "there are potential impacts including noise impacts, that may reduce breeding success." (BLM Answer at 11.) In addressing BLM's statement, appellants point to WGFD's comments on the DEIS where it observed that "[t]his impact does not appear to be

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

insignificant and seems to provide more support for increased protection of areas surrounding grouse leks. We disagree that the proposed development will have insignificant impacts to sage grouse." (SOR at 10-11, citing BLM Jonah II FEIS, 1998, 7-107, 108.) Appellants agree. (SOR at 9-11.) In response to WGFD's observation, BLM stated that it may require a 0.5 mile seasonal avoidance buffer from March 1 through May 30 to further protect leks from noise disturbance as an additional potential mitigation measure to be added to the ROD. (FEIS Comment Response 9 at 7-110; FEIS 4.2.2.5 at 42.) This mitigation measure was not selected for implementation. (ROD at 15.) Instead, BLM required that engines and compressor exhaust stacks are to be properly muffled according to manufactures' specifications to reduce noise. (ROD at 9.)

Citing a 1998 WGFD document not submitted for the record, appellants assert that WGFD has determined that "chick survival has been the predominant factor contributing to sage grouse population decline." (SOR at 10.) Appellants reason that sage grouse populations can be expected to decline "if chicks are not afforded seasonal adequate protection during the first weeks of life, total sage grouse population can be expected to decline." Id.

BLM, while not specifically disputing the importance of chick survival, disputes the implication that oil and gas operations are responsible for increases in sage grouse chick mortality. To the contrary, BLM points out that in the 1997 Completion Report relied on by appellants, WGFD specifically stated that it did not know why the chicks died. BLM argues that WGFD reached a similar conclusion in a second Draft Report captioned the ***48** "Pinedale/Jackson Region Sage Grouse Completion Report 1990-1996," not mentioned by appellants, which specifically analyzed sage grouse population in the Jonah II Field. Id.; BLM Answer, Ex. M. The Pinedale/Jackson Report states:

> Factors responsible for recent declines continue to be debated. Suspected and proven causative agents include sagebrush eradication, overgrazing, drought, pesticides, off[-]road vehicle use, and noise from oil & gas operations. There is also a continuing debate on whether or not sage grouse experience cyclic population variations. Regardless of the reason, sage grouse are currently experiencing a region[-]wide population decline.

Id. at 1.

The 0.25-mile buffer, BLM relates, resulted from BLM's attempt to protect the integrity of leks during the era of radical sagebrush treatment projects based on guidelines established by biologists in the 1960's. Noting that appellants advocate a buffer zone of 3 km or 2 miles, BLM denies that appellants can point to any specific scientific basis supporting their contention. (Answer at 5.)

Moreover, to the extent that appellants imply that had BLM consulted USFWS, a 2 mile buffer zone would have been adopted, BLM denies that USFWS requires a 2 mile buffer zone. Specifically, BLM explains that consultation with USFWS was not required because consultation is only required for Federally listed threatened and endangered species. Further, BLM notes that, although USFWS was involved in the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

preparation of the Wildlife Monitoring/Protection Plan which considered "Wyoming Species of Concern," including sage grouse, USFWS did not comment on the proposed 0.25 buffer zone. BLM also notes that WGFD did not state that a 2 mile buffer zone "was required" in comments submitted on the draft or final EIS. Id.

BLM argues that appellants' reliance on "Guidelines for Maintenance of Sage Grouse Habitats" by Clait E. Braun (Ex. 6 to SOR) and the BLM article "Habitat Requirements and Management Recommendations for Sage Grouse," by Mayo W. Call, Avian Biologist, Denver Service Center (Ex. 5 to SOR), is misplaced because neither provides a scientific basis for a 2 mile buffer zone. BLM asserts that the limited disturbance associated with oil and gas operations cannot be compared with sagebrush eradication over thousands of acres, and to illustrate the point, cites to the former article's description of sagebrush eradication: "over the past 35 years an estimated 2 to 2.5 million acres of sagebrush range have been treated by burning, spraying, plowing, disking, chaining, cutting and beating in attempts to convert these ranges to grasslands" for livestock grazing. (SOR, Ex. 6 at 99.)

In contrast, BLM adds, the surface disturbance associated with oil and gas operations is small areas. The Jonah II project encompasses about 60,000 acres, and the maximum limit of sagebrush to be treated at any one ***49** time within a 2-mile radius of a lek is 20 percent. BLM urges that the Jonah II project provides for 450 wells resulting in 3,250 acres of surface disturbance at most, or 7.2 acres of disturbance per well. At eight wells per section, 7.2 acres of disturbance per well would result in a total of 57.6 acres of disturbance per section (which contains 160 acres), scattered throughout the section. (BLM Answer at 7.) The WGFD 1997 Completion Report cited by appellants in support of the 2 mile buffer zone (SOR at 9), BLM states, involved widespread sagebrush eradication as well.

BLM urges that its adoption of the 1/4 mile buffer zone was based on consultation between wildlife biologists based on scientifically sound considerations, and that appellants have cited no scientific studies to the contrary. In his affidavit, BLM Biologist David A. Roberts admits that he has no personal knowledge of the basis for establishing the 1/4-mile buffer, and that he was able to locate only one draft edition of sagebrush management guidelines from about 1965 which contained the 1/4-mile limit. The limit was omitted from the final guidelines, however. His consultations with biologists in neighboring states revealed nothing further regarding the 1/4-mile limit. (BLM Answer at 9; BLM Answer, Ex. N at 2.) Roberts surmises that the 1/4-mile standard evolved initially because in the 1959's and 1960's BLM and the Forest Service were engaged in sagebrush eradication as a form of range impoundment, a practice of recognized as "quite detrimental" to sage grouse. See BLM Answer at 10 and Ex. N at 2. Addressing more recent studies however, Roberts states:

While there is very little or no empirical, scientific data out there to either support or refute the 1/4 mile no surface disturbance standard, there does seem to be an increasingly large "pile" of anecdotal data accumulating to suggest a 1/4 mile may not be adequate. Some more recent (within the last 5-8 years) studies and

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

anecdotal observations would suggest that a greater distance (possibly 1/2 mile) would be a more appropriate protective offer around sage grouse leks. Even these more recent studies, however, have not really been designed to empirically ascertain an appropriate setback distance.

(BLM Answer at 10, Ex. N at 3.) BLM in the ROD considered whether current knowledge required that the buffer be changed and concluded:

BLM has only somewhat recently been requiring the 1/4 mile buffer. While there are some with concerns that the current 1/4 mile buffer is not enough, there is no evidence that the 1/4 mile buffer is not sufficient, nor are there any studies to support the need for a .05 mile buffer.

(ROD at 28.) The 1/4 mile buffer zone, BLM and Intervenors note, was included in several recent environmental documents, including the Green River Resource Area Plan approved in 1997 (Agency Ex. 0), and the Fontenelle and Stagecoach Draw Natural Gas Project approved in 1995 and ***50** 1996 (BLM Answer, Exs. P & Q). Acknowledging that "there may exist a legitimate difference of opinion among biologists as to what is an appropriate buffer zone for sage grouse protection," the National Environmental Policy Act of 1969 (NEPA), BLM insists, "does not require a court to resolve disagreements between scientific methodologies." (BLM Answer at 10-11.)

[1] Recently, in National Wildlife Federation, 145 IBLA 348, 378 (1998) [FNa] , we recognized that

NEPA is primarily a procedural statute designed "to insure a fully informed and well-considered decision." Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc., 435 U.S. 519, 558 (1978). It requires that an agency take a "hard look" at the environmental effects of any major Federal action. Kleppe v. Sierra Club, 427 U.S. 390, 410 n. 21 (1976).

In Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 350-51 (1989), the Court stated:

[I]t is now well settled that NEPA does not mandate particular results, but simply prescribes the necessary process. *** If the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs. *** Other statutes may impose substantive environmental obligations on federal agencies, but NEPA merely prohibits uninformed--rather than unwise--agency action.

An EIS must fulfill the primary mission of NEPA, which is to ensure that a Federal agency, in exercising the substantive discretion afforded it to approve or disapprove a project, is fully informed regarding the environmental consequences of such action. See 40 C.F.R. § 1500.1(b) and (c); Natural Resources Defense Council v. Hodel, 819 F.2d 927, 929 (9th Cir.1987).

Considering the foregoing, appellants' arguments, BLM's and the Intervenors'

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

responses, and the record, we decline to find that BLM erred in failing to adopt a 2 mile buffer zone in the ROD\FEIS. The authorities relied on by appellants pertain to the effects of widespread sagebrush eradication, rather than the more limited impacts associated with oil and gas operations. Moreover, BLM recognizes the importance of tall sagebrush to the quality of sage grouse habitat and intends to limit disturbance of tall sagebrush in critical areas. (ROD/FEIS at 22.)

***51** [2] Appellants have also not shown that the seasonal restriction identified in the ROD/FEIS violated the Pinedale RMP. Appendix A-1 of the 1988 Pinedale Resource Area RMP at 59 identifies the February 1 to July 31 seasonal restriction and states that modification of this limitation in any year may be approved in writing by the Authorized Officer. More importantly here, Appendix A-1 provides at that same page that "modification of requirements, developed from this guidance must be based upon environmental analysis of proposals (e.g., plans of development, plans of operation, Applications for Permit to Drill) and, if necessary, must allow for other mitigation to be applied on a site specific basis." (Pinedale ROD/RMP, Appendix A-1 at 59, Ex. A to Intervenors' Answer and Response to Stay Request.) BLM prepared an EIS in this case modifying the seasonal restriction based on post-RMP research which more clearly defines sage grouse breeding and nesting activity. It included other mitigation to be applied on a site specific basis, including restrictions in the ROD/FEIS insuring that sage grouse nests identified through required surveys would be protected, regardless of when chicks left the nest, thus providing in some cases a broader seasonal restriction than that identified in the Pinedale RMP relied on by appellants. See BLM Answer at 3-4.

[3] We further find that BLM has provided sufficient rationale for adopting a 1/4-mile surface avoidance area. The record shows that there is no concrete scientific evidence in the record which proves or disproves the adequacy of a 0.25 mile buffer zone. At best, the record suggests that a 0.50 mile buffer zone as urged by appellants may be preferable. In the absence of more definitive scientific evidence or conclusions, however, we find that the annual surveys of leks and triennial monitoring to determine lek attendance, and the resulting collection of data, coupled with BLM's representations that additional mitigation measures may be required as necessary before any surface-disturbing activity is permitted, demonstrates that BLM took the requisite hard look at the environmental consequences of the proposed action and that the decision reflects a reasoned analysis. King's Meadow Ranches, 126 IBLA 339, 342 (1993) [FNb].

Moreover, as BLM and Intervenors point out, NEPA does not require the courts or this Board to decide whether an EIS or environmental assessment is based on the best scientific methodology available or require us to resolve disagreements among various scientists as to methodology. See Greenpeace Action v. Franklin, 14 F.3d 1324, 1333 (9th Cir.1992); Friends of Endangered Species, Inc. v. Jantzen, 760 F.2d 976, 986 (9th Cir.1985). Nor does NEPA compel a particular result or course of action, mandating only a fully informed decision and well considered decision. 40 C.F.R. § 1500.1(b); National Wildlife Federation, 145 IBLA at 359. Although the need for additional research to better ascertain appropriate sage grouse setbacks

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

in the specific case of oil gas operations cannot be gainsaid, BLM's analysis of the available data was reasonable and provides an adequate basis for its decision.

***52** Therefore, pursuant to the authority delegated to the Board of Land Appeals by Secretary of the Interior, 43 C.F.R. § 4.1, BLM's decision approving the ROD/FEIS is affirmed and appellants' request for a stay is denied as moot.

Gail M. Frazier

Administrative Judge

I concur:
T. Britt Price
Administrative Judge

FN1 On Apr. 12, 1999, Intervenors filed a "Motion to Allow BLM to Process an Application For In-Fill Drilling while Appeal is Pending or, In The Alternative for Expedited Consideration." Considering our disposition of this appeal, this motion is also denied as moot.

FNa) GFS(MIN) 105(1998)

FNb) GFS(MISC) 47(1993)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.



GFS(O&G) 3(2005), 164 IBLA 84

**(Cite as: 164 IBLA 84)**

United States Department of the Interior
Office of Hearings and Appeals
Interior Board of Land Appeals

WYOMING OUTDOOR COUNCIL, ET AL.

IBLA 2002-126, 2002-303

Decided November 30, 2004

INDEX CODE:

40 CFR 1501.2

40 CFR 1502.16

40 CFR 1502.22

40 CFR 1506.1(c)

40 CFR 1508.7

40 CFR 1508.8

40 CFR 1508.25(a)(3)

40 CFR 1508.25(c)

43 CFR 4.21(b)

43 CFR 1610.5-3(a) - .5-6

43 CFR 3162.3-1

***84** Consolidated appeals from decisions of the Deputy State Director, Minerals and Lands, Wyoming State Office, Bureau of Land Management, dismissing two protests of the inclusion of 27 parcels in an August 7, 2001, competitive lease sale, and inclusion of 35 parcels in a February 12, 2002, sale. WY-0108- 167 through-221; WY-0202-140 through-179, respectively.

Decision in IBLA 2002-126 affirmed; appeal in IBLA 2002-303 dismissed to the extent it pertained to conventional oil and gas activities and otherwise reversed and remanded.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

1. National Environmental Policy Act: Environmental Assessments--National Environmental Policy Act: Environmental Impact Statements--Oil and Gas Leases: Competitive Leases

The "reasonably foreseeable development" scenario (RFD scenario) for oil and gas is a long-term projection of oil and gas exploration, development, production, and reclamation activity in a defined area for a specified period of time. The RFD scenario projects a baseline scenario of activity assuming all potentially productive areas can be open under standard lease terms and conditions, except those areas designated as closed to leasing by law, regulation or executive order. The baseline RFD scenario provides the mechanism to analyze the effects that discretionary management decisions have on oil and gas activity, and it also provides basic information that is analyzed in environmental documents under various alternatives.

2. National Environmental Policy Act: Environmental Assessments--National Environmental Policy Act: Environmental Impact ***85** Statements--Oil and Gas Leases: Competitive Leases--Oil and Gas Leases: Competitive Leases

Whether an RMP's exceeded RFD scenario demonstrates an inadequate analysis of environmental impacts to the extent of such exceedance is a question that must be determined on a case-by-case basis. Where the RMP is being revised pursuant to 43 CFR 1610.5-6, the Board will not further consider appellants' arguments regarding the RFD scenario in support of that outcome.

3. Appeals: Burden of Proof--National Environmental Policy Act: Environmental Assessments--National Environmental Policy Act: Environmental Impact Statements--Oil and Gas Leases: Competitive Leases

The appropriate time for considering the potential impacts of oil and gas exploration and development is when BLM proposes to lease public lands for oil and gas purposes because leasing, at least without no surface occupancy stipulations, constitutes an irreversible and irretrievable commitment to permit surface-disturbing activity, in some form and to some extent. Where the environmental assessment (EA) of each parcel at issue shows that there is no serious promise of CBM development, the burden falls upon the appellant to come forward with objective, countering evidence showing error in the EA's conclusions, to demonstrate that BLM could not properly rely on the RMP/EIS's environmental analysis to support the decision to offer these parcels for sale. In light of the absence of any serious potential for CBM development on the parcels, BLM could rely on the impacts analysis contained in the RMP to fulfill its pre-leasing NEPA obligation.

4. National Environmental Policy Act: Environmental Assessments-- National Environmental Policy Act: Environmental Impact Statements--Oil and Gas Leases: Competitive Leases

Where appellants' allegations regarding the potential for CBM extraction and

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

development on the parcels at issue and the unique impacts associated therewith were not refuted by the record or by BLM on appeal, and where it is also undisputed that ***86** the RMP/EIS did not analyze CBM extraction and development or the unique impacts that might be occasioned by such activities, existing environmental NEPA documents did not provide the required pre-leasing NEPA analysis for the sale of those parcels. BLM's decision dismissing a protest on the basis of a contrary conclusion is properly reversed and the case remanded for further action.

Appearances: Susan Daggett, Esq., Denver, Colorado, and Thomas F. Darin, Esq., Washington, D.C., for Appellants; Lyle K. Rising, Esq., Office of the Regional Solicitor, U.S. Department of the Interior, Lakewood, Colorado, for the Bureau of Land Management; and Jerrold A. Long, Esq., Cheyenne, Wyoming, for Intervenor, Burlington Resources, Inc.

OPINION BY ADMINISTRATIVE JUDGE PRICE

In IBLA 2002-126, Wyoming Outdoor Council, Greater Yellowstone Coalition, and Wyoming Wildlife Federation (collectively referred to as WOC), have appealed from the October 12, 2001, decision of the Deputy State Director, Minerals and Lands, Wyoming State Office, Bureau of Land Management (BLM), dismissing their protest to the inclusion of 27 parcels located in the Pinedale Resource Area in the competitive oil and gas lease sale held on August 7, 2001. [FN1] The protest was received by BLM on August 3, 2001. WOC also sought a stay of the decision.

In IBLA 2002-303, Wyoming Outdoor Council, Greater Yellowstone Coalition, Wyoming Wildlife Federation, Sierra Club, Defenders of Wildlife, The Wilderness Society, and Natural Resources Defense Council (also collectively referred to as WOC), have appealed from the March 29, 2002, decision of the Deputy State Director, Minerals and Lands, Wyoming State Office, BLM, dismissing their protest of the offering of 35 parcels located in the Pinedale Resource Area in the competitive oil and gas lease sale held on February 12, 2002. [FN2] Appellants state that their protest ***87** was filed on February 8, 2002, and that it incorporated the protest dated August 2, 2001, which involves the 27 parcels docketed as IBLA 2002-126. [FN3]

In both protests, WOC argued that inclusion of the parcels in the lease sales violated the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. § 4332(2) (2000), and the Federal Land Policy and Management Act of 1976 (FLPMA), 43 U.S.C. § 1732 (2000). Specifically, WOC contended that the parcels could not lawfully be leased until the "amendment" of the Pinedale Resource Management Plan (RMP) had been completed; that leasing the parcels violated NEPA's prohibition against interim actions; that BLM's Land Use Planning Handbook prohibits new leasing until the RMP is amended; and that the leasing was improper because the "reasonably foreseeable development" (RFD) scenario projected in the environmental impact statement (EIS) for the RMP (collectively RMP/EIS) had been surpassed. WOC further alleged that allowing coalbed methane (CBM) development on the parcels violated NEPA and FLPMA because none of the existing environmental documents addressed the severe and unique impacts of CBM development and because CBM development did not

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

conform to the existing RMP.

Although there are differences, we have sua sponte determined to consolidate the two appeals for decision: the lead appellants are the same and there are some common appellants as well, the subject matter and circumstances are the same, and the arguments appellants advance on appeal are essentially the same.

Procedural Background

IBLA 2002-126:

In an Information Notice dated August 6, 2001, BLM acknowledged that WOC had filed a protest and announced the Wyoming State Director's determination to delete 19 of the protested parcels from the sale, [FN4] not because of the protest, but because the Pinedale Field Office (PFO) had advised the Wyoming State Office that it ***88** was actively processing three land use applications in the area where the land contained in those parcels was located. It was decided that the eight remaining parcels would be offered at the sale while the merits of the protest were being considered.

In his October 12, 2001, decision dismissing WOC's protest, the Deputy State Director concluded that Board precedent and BLM internal policies and guidance supported BLM's authority to offer the parcels for oil and gas leasing in conformance with the existing RMP while that plan was undergoing amendment. He found that BLM's leasing determination did not violate NEPA's prohibition against interim actions, because the decisions necessary to authorize leasing had previously been issued. Lastly, he responded that the RFD scenario had not been exceeded, because it had been updated through project-related environmental analyses. [FN5]

On November 23, 2001, WOC filed the Notice of Appeal and Request for Stay (NA/Petition) with the Board. On December 20, 2001, appellants "adopt[ed] their Petition for Stay, pages 1-28 and all referenced exhibits, [FN6] filed on or about November 6, 2001, subject to further supplement on motion to leave [sic] to file response/reply pleadings in this case" as their statement of reasons for appeal (SOR). [FN7] (SOR at 1.)

On December 21, 2001, BLM moved to dismiss the appeal, asserting that WOC had failed to provide any acceptable affidavits establishing its standing with respect to any of the parcels sold in the August 2001 lease sale. (BLM Motion to Dismiss at 1.) In response, on January 25, 2002, WOC filed its opposition to the BLM Motion to Dismiss (Opposition), submitting affidavits from members of one or more of the appellants, attesting to their use of one or more of the 27 parcels identified in its protest. Acknowledging that 19 parcels had not been offered for sale and that its appeal was moot as to those parcels, WOC nonetheless urged in its Opposition that its appeal should remain viable as to those parcels, because of the likelihood that they would be included in future sales. (Opposition at 3.) In Wyoming Outdoor Council, 156 IBLA 377 (2002), [FNa] the Board rejected that

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

argument and request, holding that WOC was not adversely affected by the decision on its protest because BLM had ***89** excluded those parcels from the sale. The Board therefore dismissed WOC's appeal for lack of standing as to those 19 parcels. Wyoming Outdoor Council, 156 IBLA at 379-380.

BLM also moved to dismiss WOC's petition for a stay on the ground of lack of jurisdiction. [FN8] That motion was denied as well, as was WOC's request for a stay, and service on the purchasers of the eight parcels with respect to which WOC had demonstrated standing was directed. [FN9] Wyoming Outdoor Council, 156 IBLA at 385.

IBLA 2002-303:

WOC's protest arguments formed the basis for appellants' request for a stay, and the stay petition was incorporated as part of appellants' notice of appeal (NA/Petition) filed on May 8, 2002.

On June 6, 2002, Burlington Resources, Inc. (BRI), a successful bidder on 16 of the 35 parcels, moved to intervene, and on June 13, 2002, opposed the stay petition. On July 11, 2002, EOG Resources, Inc. (EOG), the successful bidder on one of the 35 parcels, also moved to intervene. On July 15, 2002, the Solicitor's Office filed notice that it concurred with BRI's arguments. On July 31, 2002, the Board granted BRI's motion to intervene.

Also on July 31, 2002, the petition for stay was granted in part, to the extent WOC sought a stay of CBM exploration and development activity in the Pinedale Resource Area, and denied in part to the extent appellants sought to stay all oil and gas activity. In so ruling, the Board determined that neither the Pinedale RMP nor the Environmental Assessment (EA) for the February 12, 2002, sale, discussed below, analyzed CBM activity, "the impacts of which differ significantly from those related to conventional oil and gas drilling." [Citations omitted.] We concluded that, in the context of a request for a stay, WOC had raised "substantial questions regarding BLM's compliance with NEPA and FLPMA that would require careful consideration and an opportunity to resolve them in a deliberative manner." On that basis, we granted a partial stay.

On August 13, 2002, WOC filed a Motion for Leave to File a Consolidated Reply (to EOG's and BRI's submissions). Among other things, ¶ 9 stated that "Appellants do not intend to file a separate [SOR] in this case and are relying on their ***90** Request for Stay to serve as their opening brief." (Motion for Leave at 2.) On September 10, 2002, EOG moved to withdraw its motion to intervene.

Also on September 10, 2002, BRI filed its answer to WOC's NA/Petition and its Motion to Dismiss on the basis of the procedural argument that WOC had not timely filed an SOR, and its view that BLM had not violated NEPA or FLPMA in proceeding with the lease sale. By order dated October 17, 2002, the Board granted EOG's motion to withdraw, and on October 22, 2002, granted WOC's request to file a consolidated reply. On November 4, 2002, WOC opposed BRI's Motion to Dismiss, and

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

also moved for a partial dismissal of its appeal: "Having been denied a stay of these leases for conventional oil and gas development, [WOC] hereby provides notice that it is voluntarily dismissing this aspect of its administrative appeal and does not seek a further ruling on the merits regrading whether these leases satisfy NEPA and FLPMA with respect to conventional oil and gas development." (Notice of Partial Voluntary Dismissal at 2.)

On October 6, 2004, the Board issued WOC an order to show cause why the appeal in IBLA 2002-303 should not be dismissed for lack of standing. [FN10] The Board received a telefaxed courtesy copy of WOC's response on October 29, 2004, in which the affidavit of Linda F. Baker was submitted. That affidavit established WOC's standing as to six parcels: WY-0202-147, -150, -160, -161, - 162, and -166. Accordingly, WOC's appeal as it pertains to the remaining 29 parcels in the February 12, 2002, lease sale is herewith dismissed for lack of standing.

Factual Background

IBLA 2002-126:

We begin with the 1988 Pinedale RMP and its associated EIS (collectively RMP/EIS), which authorizes oil and gas exploration and development, among other things, in the Pinedale Resource Area. That land use decision was based on an RFD scenario that authorized the drilling of 45 wells per year, up to 900 wells in the Pinedale Resource Area. [FN11]

***91** More specifically, Table 39 of the draft RMP/EIS projected the drilling of 450 wells from 1985 through 1995, and the drilling of another 450 wells from 1985 through 2005 for the purpose of estimating short-and long-term cumulative impacts. (RMP/EIS at 190-91.)

BLM prepared EA No. WY100-EA2001-144, dated April 13, 2001 (April EA), to analyze the environmental impacts of offering the parcels in IBLA 2002-126 at the August 2001 lease sale. The April EA was tiered to the Pinedale RMP/EIS. [FN12] The Decision Record and Finding of No Significant Impact (DR/FONSI) was issued on April 18, 2001.

IBLA 2002-303:

BLM prepared EA No. WY100-EA2001-055, dated November 19, 2001 (November EA), to analyze the environmental impacts of offering the parcels in IBLA 2002-303 at the February 2002 lease sale. (Intervenor's Ex. 2.) The November EA also was tiered to the Pinedale RMP/EIS. In addition, however, it incorporated by reference large portions of EA No. WY100-EA2001-022 (EA-022), a copy of which was appended to the November EA. EA-022 was prepared for the February 2002 ***92** lease sale, for certain other parcels. [FN13] (Intervenor's Ex. 2, App. 1.) The DR/FONSI for the November EA was issued on November 20, 2001.

In November 1999, BLM, acting for the Department of the Interior as lead agency

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

in a cooperative effort, released a draft environmental impact statement (DEIS) for the Pinedale Anticline Oil and Gas Exploration and Development Project (PAP/DEIS) in Sublette County. [FN14] The cooperating agencies were the U.S. Forest Service, Department of Agriculture; the U.S. Army Corps of Engineers; and the State of Wyoming. The final EIS (PAP/FEIS) was issued in May 2000, and the Record of Decision (PAP/ROD) was issued in July 2000. The purpose of the PAP/EIS was to analyze the proposal of a number of Pinedale Anticline operators to "provide for the continued exploration for natural gas and, where discoveries occur, the development of the gas resource by drilling up to 900 new wells to achieve 700 producing locations over the next 10 to 15 years." (PAP/DEIS Abstract, unnumbered p. 1.) In addition, the DEIS stated:

***93** To date, 725 of the 900 additional wells have been drilled and are producing or have been obligated to a specific area (e.g., the Jonah II Field). Therefore, in addition to analyzing impacts from future exploration and development activities in the PAPA and construction and operation of gathering and sales pipelines, this EIS also provides analysis of a revised oil and gas reasonably foreseeable scenario for the Pinedale RMP as part of the cumulative impact analysis (see Chapter 5). The EIS looked at three scenarios: no action, project-wide development, and development only along the Anticline crest. (PAP/DEIS, Fig. 1-1 at 1-3; emphasis added.) In both appeals, WOC points to the PAP as evidence of rapid growth in the Pinedale Resource Area (see NA/Petition in IBLA 2002-303 at 15-16) and as an admission that the RFD scenario has been exceeded in the Pinedale Resource Area, thus furnishing the predicate for WOC's NEPA and FLPMA arguments (NA/Petition at 16-24.)

The Parties' Arguments on Appeal

As stated, WOC has adopted most of its stay petitions in lieu of submitting separate SORs. In the request for a stay in IBLA 2002-126, WOC contended that all oil and gas development on the parcels must be stayed. It argued a likelihood of success on the merits because the RFD scenario utilized in the RMP/EIS has been exceeded, thus rendering continued oil and gas development on the challenged parcels violative of both NEPA and FLPMA. (NA/Petition in IBLA 2002-126 at 11-20.) Further, WOC contended that, since BLM had begun the process of "amending" the RMP, leasing the parcels while that process and the related NEPA analysis unfolded violates NEPA's constraints on interim actions set forth in 40 CFR 1506.1(a), as well as BLM policy enunciated in its Handbook. (NA/Petition in IBLA 2002-126 at 21-22.) Although WOC acknowledged that under Instruction Memorandum (IM) No. 2001-191, issued on August 6, 2001 (NA/Petition in IBLA 2002-126, Ex. 29), leasing during the RMP amendment process is allowed, WOC nonetheless contended that BLM had failed to first determine that continued leasing in the interim would not constrain the choice of reasonable alternatives under consideration, as IM No. 2001-191 requires. (NA/Petition in IBLA 2002-126 at 22-23.)

Alternatively, WOC argued that it had a likelihood of success on the merits relative to CBM extraction and development, even if its arguments are not sustained as to all oil and gas leasing. Specifically, WOC argued that CBM

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

extraction and development will violate NEPA and FLPMA because such activity does not conform to the RMP, and that its unique environmental effects have never been adequately analyzed. (NA/Petition in IBLA 2002-126 at 24-26.)

***94** In IBLA 2002-303, in their Motion for Leave to File a Consolidated Reply, in which appellants adopted the stay request as their SOR, WOC did not specifically exclude any portion of its stay as it did in IBLA 2002-126. Nonetheless, the arguments are virtually identical, and we will not repeat them.

Also in IBLA 2002-303, in its Motion to Dismiss and Answer, BRI argued that WOC's notice that it was adopting its stay petition in lieu of filing an SOR was untimely, having waited over three months to give notice without obtaining an extension of time. (BRI Motion to Dismiss at 5.) BRI further contends that, as WOC had not offered any arguments or information regarding conventional oil and gas leasing not raised when the Board considered WOC's stay petition, the Board should deny the appeal to the extent of conventional oil and gas leasing. (BRI Motion to Dismiss at 6.) BRI's third argument is a reiteration of its view that the EA in IBLA 2002-303 complies with NEPA. Specifically, BRI states that WOC has "identified no environmental impacts associated with conventional oil-and-gas development that have not been analyzed in a NEPA document. Neither has WOC demonstrated that the BLM committed a clear error of law." (BRI Motion to Dismiss at 7-8.) BRI disputes WOC's assertion that all oil and gas leasing must cease until the RMP is amended (BRI Motion to Dismiss at 8-9), as it disputes WOC's conclusions regarding the significance of the RFD (BRI Motion to Dismiss at 9-10).

WOC responds by noting that BRI had intervened with respect to conventional oil and gas leasing only, and had explicitly stated that it advocated no position regarding CBM activity; that the arguments articulated in the Motion to Dismiss appear to relate only to conventional oil and gas leasing; and that WOC's stay request served as its SOR, a practice the Board has accepted in the past.

## Analysis

We first address BRI's Motion to Dismiss the appeal in IBLA 2002-303. Despite the technical merits of BRI's arguments regarding the sufficiency and timeliness of WOC's determination to adopt the petition for stay as their SOR, we decline to dismiss WOC's appeal on this basis. To constitute an acceptable SOR, a notice of appeal must affirmatively point out error in the decision challenged. Burton A. McGregor, 119 IBLA 95, 98 (1991). [FNb] This does not mean that the appellant must persuasively establish that BLM actually committed error in its decision. Instead, the appellant must offer reasons in support of his contention that BLM erred, and thus articulate some basis for the Board to review the propriety of the challenged decision. It must do more than simply assert, in a conclusory fashion, that error was committed. See United States v. Fisher, 92 IBLA 226, 227 (1986). [FNc] If the Board can fairly discern the reasons an individual has appealed a BLM decision, it typically will decline to dismiss the appeal. See, e.g., Eric E. Wieler, 160 IBLA 284, 286 n. 4 (2004); [FNd] MSVR Equipment Rentals, 160 IBLA 95, 97-98 (2003); [FNe] Bruce M. Lewis, ***95** 156 IBLA 287, 293 (2002); [FNf] J.W. Weaver, 124 IBLA

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

29, 31 (1992); [FNg] Robert A. Erkins, 121 IBLA 61, 63 (1991). [FNh] In this case, the stay petition in IBLA 2002-303 more than adequately articulated the reasons for appealing the BLM decision. Although WOC obviously should have declared its intention within the period when an SOR must be filed, or any extension thereof, BRI is not prejudiced by the tardiness of WOC's action. BRI's motion to dismiss on this basis is therefore denied.

We similarly are not persuaded to grant the motion on BRI's substantive grounds, which BRI incorporates in its opposition to the stay petition. In that pleading, BRI unambiguously states that it had no position with respect to appellants' arguments regarding CBM (Opposition to Stay at 3), because BRI

> currently has no plans to develop any gas reserves similar to the coal bed methane development occurring in the Powder River Basin, i.e., BR has no plans to dewater coal formations nor to dispose of produced water on the surface. [Citation omitted.] In fact, encountering water would substantially decrease or eliminate the development potential of BR's wells. The only development that will take place in the foreseeable future on these parcels is conventional oil and gas development of the kind identified, analyzed and evaluated in the Pinedale RMP and its associated NEPA documents and again in the Lease EA.

(Opposition to Stay at 4.) As WOC notes, the arguments in BRI's Opposition relate exclusively to conventional oil and gas leasing. Moreover, appellants explicitly withdrew their appeal to the extent that it pertained to conventional oil and gas leasing, so that the only issues that remain before us concern CBM. Accordingly, BRI's Motion to Dismiss is denied, and, as BRI has averred that it has no position on the topic of CBM, we will not consider its arguments further. We now turn to the merits of WOC's CBM arguments under FLPMA and NEPA.

To reiterate, WOC questions whether CBM extraction and development conform to the Pinedale RMP/EIS, either because current projections of oil and gas development have exceeded that projected in the RMP/EIS, so that it logically must follow that BLM could not have adequately analyzed CBM impacts, or because CBM is so unique that the impacts thereof are beyond those associated with conventional oil and gas exploration and development. WOC further contends that no CBM activity should be allowed to go forward until the RMP is amended. Whether CBM activity conforms to the RMP is a land use issue that arises under FLPMA. Though couched in FLPMA terms and designed to demonstrate the inadequacy of the RMP/EIS so as to mandate a halt of all CBM activity until the RMP is revised, WOC's contentions with respect to the effect of exceeding the RFD scenario projected in the ***96** RMP/EIS and the uniqueness of CBM impacts in fact are NEPA issues. We will approach our task accordingly.

The 1988 RMP/EIS and ROD clearly determined that the Pinedale Resource Area was generally to be "open for consideration for exploration, leasing, and development for all leasable minerals, which include oil, gas, coal, oil shale, and geothermal steam, in accord with all applicable prohibitions (e.g., restrictions, prohibitions)." (RMP/ROD at 15.) In fact, the RMP refers to gas production in the form of $CO_2$, methane, $H_2S$, nitrogen, and helium gases. (Draft RMP/EIS at 186.) CBM

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

extraction and development activity is a type of oil and gas leasing activity, and to that extent, is in conformity with that general land use decision. 43 CFR 1610.5-3(a); see also Southern Utah Wilderness Association, 159 IBLA 220, 234 (2003); [FNi] Southern Utah Wilderness Association, 158 IBLA 215, 216-17 (2003); [FNj] [FNa1] Marathon Oil Co., 139 IBLA 347, 356 (1997); [FNk] Sierra Club Legal Defense Fund, Inc., 124 IBLA 130, 140 (1992); [FNl] High Plains Petroleum Corp., 125 IBLA 24, 26 (1992). [FNm] Since the choice of whether to allow oil and gas leasing in the Pinedale Resource Area was made in 1988, [FN15] no violation of FLPMA is established by reason of the interest in exploring for and developing CBM gas resources in the Pinedale Resource Area.

Notwithstanding that the Pinedale RMP permits oil and gas exploration and development, WOC argues that CBM extraction and development does not conform to the RMP, either because current projections of oil and gas development have exceeded that projected in the RMP/EIS's RFD scenario, or because CBM extraction and development generates unique impacts beyond those associated with conventional oil and gas exploration and development. According to WOC, it must logically follow that BLM could not have adequately analyzed CBM impacts, fundamentally NEPA issues that require a "plan amendment" (see, e.g., NA/Petition at 12-13) pursuant to 43 CFR 1610.5-5, a FLPMA issue.

As stated, under the RMP, 450 wells per decade, or up to 900 wells for the life of the RMP were projected in 1988. In their stay petitions, appellants stated that, with the issuance of the PAP/ROD, up to 900 additional well locations have been approved, resulting in a revised RFD scenario for the RMP/EIS of 1,944 oil and gas wells for the Pinedale Resource Area. WOC characterizes the Pinedale ***97** Resource Area as one "which has been relatively undisturbed by development for natural gas." (NA/Petition in both appeals at 3-4.) WOC further argues that Wyoming bears a disproportionate share of onshore leasing with approximately 20 of approximately 41 million acres of public land leased (NA/Petition in both appeals at 5); it notes that leasing is occurring at a "feverish pace" (NA/Petition in both appeals at 5); and argues that southwestern Wyoming and the Greater Green River Basin, which includes the Pinedale Resource Area, is "at risk for CBM extraction" (NA/Petition in IBLA 2002-126 at 6; in IBLA 2002-303 at 7), as demonstrated by the authorization of the Riley Ridge project and another that, according to BLM, was then "in the works" (May 2001 Energy Development and Natural Resource Management published by BLM, Ex. 17 to NA/Petition in IBLA 2002-126 at 6; in IBLA 2002-303 at 7-8.) Additionally, in IBLA 2002-303, WOC states that of 1.2 million acres of public lands in the Pinedale Resource Area, 1.14 million are under lease or closed to leasing, so that only 60,000 acres remain that have not been leased, and of those acres open to leasing, only 10,000 acres remain to be leased. (NA/Petition in IBLA 2002-303 at 6.)

With those factual assertions as background, WOC maintains that "[w]hen an RFD scenario has been exceeded, all oil and gas operations (and particularly leasing) must stop because the impacts of the new wells implicated by new leases have not been addressed in a resource area[-]wide NEPA document, usually the EIS accompanying the RMP." (NA/Petition in IBLA 2002-126 at 11; IBLA 2002- 303 at 15.)

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[FN16] WOC argues that even assuming that issuance of the PAP/ROD properly revises the RFD scenario projected in the RMP/EIS, the revised RFD scenario of 1,944 wells resulting from the PAP/EIS was exceeded in 1999. WOC derived this figure by adding the numbers of wells allowed under the RFD scenarios for the "Hoback Basin (MA 21), Upper Green River (MA 72), Soda Unit, Castle Creek Unit, Riley Ridge, CAP [Coordinated Activity Plan], Jonah II, Burley, Bird Canyon, and PAP," which, "when added to the approved wells for the Anticline," [FN17] totaled 3,151 wells within the Pinedale resource area. See Exhibit ***98** 24 at 5-3." [FN18] (NA/Petition in IBLA 2002-126 at 14-15; in IBLA 2002-303 at 18.) WOC questions whether an RFD scenario properly can be updated, and whether the need to update an RFD scenario necessarily vitiates the environmental analysis to which it is connected. (NA/Petition in IBLA 2002- 126 at 12-14; in IBLA 2002-303 at 16-18.)

As an initial matter, we are puzzled by WOC's figure of a total of 3,151 wells, which presumably was derived from Table 5-1. As we see it, the ROD's for the ten projects identified by WOC (and this includes the PAP/ROD) allow up to 2,071 wells, of which 1,762 remained that could be drilled as of November 1999. For its argument, WOC uses the higher total of 900 wells for the PAP, but as the PAP/ROD states, BLM

> recognizes that in order to develop 700 productive well pads in the PAPA, as many as 900 well pads may need to be constructed and drilled and that as many as 200 of these well pads may be plugged, abandoned and reclaimed because the wells would be dry holes or uneconomical to produce. The ROD also recognizes that not all of the well pads will be located on Federal lands/minerals. Therefore, monitoring for project consistency with the scope of the EIS analysis will be based on the total of 700 producing well pads.

(PAP/ROD at 1.) We note, moreover, that the State of Wyoming Oil and Gas Conservation Commission, the Office of State Lands and Investments, BLM, and some PAP operators "believe that drilling results to date suggest a more likely level ***99** of development in the PAPA of 300 to 350 producing well pads." (PAP/DEIS at 2-2.) BLM opted to analyze the higher projection of 500 to 700 producing well pads to ensure adequate disclosure of impacts. Thus, it is not at all clear that the RFD scenario, whether viewed in terms of anticipated but not yet drilled wells, or more concretely as numbers of wells drilled to date, has actually been exceeded in the Pinedale Resource Area, and if the scenario has been exceeded, when it might have occurred, because what is before us is data as of November 1999, when the PAP/DEIS was prepared.

[1] Putting aside the unanswered question of whether the RFD scenario has actually been exceeded, however, implicit in WOC's argument is the conviction that the RFD scenario establishes a point past which further exploration and development is prohibited, and the assumption that the underlying environmental analysis has no validity beyond the RFD scenario. We do not agree. A tool prepared by an interdisciplinary group of technical and scientific specialists, the RFD scenario serves as an analytical baseline for identifying and quantifying direct, indirect, and cumulative impacts, which provides the premise for formulating alternatives to a proposed action and strategies for mitigating adverse impacts.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Recently, in IM No. 2004-89 (January 16, 2004), [FN19] BLM explained the RFD scenario:

A "Reasonably Foreseeable Development Scenario" (RFD) for oil and gas is a long-term projection (scenario) of oil and gas exploration, development, production, and reclamation activity. The RFD covers oil and gas activity in a defined area for a specified period of time. The RFD projects a baseline scenario of activity assuming all potentially productive areas can be open under standard lease terms and conditions, except those areas designated as closed to leasing by law, regulation or executive order. The baseline RFD scenario provides the mechanism to analyze the effects that discretionary management decisions have on oil and gas activity. The RFD also provides basic information that is analyzed in the National ***100** Environmental Policy Act (NEPA) document under various alternatives.

The RFD is a technical report typically referenced in the NEPA document. * * *

The RFD is neither a planning decision nor the "No Action Alternative" in the NEPA document. In the NEPA document, the RFD baseline scenario is adjusted under each alternative to reflect varying levels of administrative designations, management practices, and mitigation measures. Under each alternative, the new adjusted level of projected oil and gas activity then leads to an analysis of related environmental effects in the "Environmental Consequences" section of the NEPA document * * *.

(Attachment 1-1 to IM No. 2004-089 at 1-1.) More specifically, an RFD scenario is

based on a review of geological factors that control the potential for oil and gas resource occurrence and past and present technological factors that control the type and level of oil and gas activity. The RFD also considers petroleum engineering principles and practices and economics associated with discovering and producing oil and gas. The RFD projection can range from speculative estimates in unexplored frontier areas to estimates with higher levels of confidence in maturely developed producing areas.

Because the potential for oil and gas occurrence and development is rarely the same from one planning area to the next, the level of detail and type of information included in an RFD is determined on a case-by-case basis.

(Attachment 1-1 at 1-3, which also individually lists functions of the oil and gas RFD scenario.) [FN20]

***101** WOC concedes that the impacts of various projects have been analyzed on a project-specific basis, but insists that the RMP's RFD scenario has been exceeded by the cumulative number of wells projected for various projects, that there has been no meaningful analysis of cumulative impacts on a Resource Area-wide basis, and that all CBM activity must be halted until the RMP is amended. BLM responded to that argument by denying that the RFD scenario had been exceeded, on the theory that it was "updated" by the analysis contained in the PAP/EIS and elsewhere. See Decision in IBLA 2002-126 at 2. WOC challenges BLM's assertion that the PAP/EIS

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

can lawfully "update" the RMP/EIS, arguing that, pursuant to FLPMA and implementing regulation 43 CFR 1610.4, changes in RFD scenarios can be achieved only by an RMP amendment that analyzes the entire resource area. [FN21] (NA/Petition in IBLA 2002-126 at 12-14; in IBLA 2002-303 at 15-17.) BLM denies that it has attempted to amend or modify the RMP: "The analysis documented in the Pinedale Anticline EIS updates the oil and gas reasonably foreseeable development scenario and the air quality cumulative impact analysis of the EIS for the Pinedale RMP." (PAP/ROD at 34; Decision at 2.) WOC advances the related argument that the number of additional wells authorized by the PAP/EIS does not ***102** conform to the RMP, and therefore the RMP must be changed before leasing can proceed.

[2] We see no proper basis for accepting a characterization of the RFD scenario that requires us to jettison, in its entirety, BLM's expertise and view of the proper scope and role of an RFD scenario, as expressed in IM 2004- 089. Nor are we persuaded that we must here decide the implied question of whether the RFD scenario can or should be deemed to constitute a land use decision within the meaning of the 43 CFR Subpart 1610. The better question is whether in any given case an exceeded RFD scenario demonstrates that further environmental analysis is required, a question that must be determined on a case-by-case basis. [FN22]

WOC is correct that RMP's are to be changed only in accordance with the provisions of 43 CFR Subpart 1610. It is also true that the term "update" does not appear in the relevant regulations, 43 CFR 1610.5-4 (maintenance of RMP's), 1610.5-5 (amendments of RMP's), or 1610.5-6 (revision of RMP's) in describing either the process or the result. The RFD scenario admittedly plays a vital role in land use planning and impacts analysis, but it is not an RMP. To come directly to the point, however, as WOC acknowledges, the RMP is being revised in accordance with 43 CFR Subpart 1610, [FN23] and that plan revision was prompted by the recognition that "multiple issues, including oil & gas, coalbed methane, [and] urban interface," must be addressed in the Pinedale Resource Area. (IM No. 2002-081 (February 4, 2002)). [FN24] As the RMP is in the process of being revised, we find ***103** it unnecessary to further consider or to decide the merits of WOC's contentions in support of that outcome. WOC's other FLPMA arguments regarding notice in the Federal Register and public comment accordingly are moot. We now turn to WOC's second line of argument.

[3] We begin by acknowledging that

> [t]he appropriate time for considering the potential impacts of oil and gas exploration and development is when BLM proposes to lease public lands for oil and gas purposes because leasing, at least without NSO [no surface occupancy] stipulations, constitutes an irreversible and irretrievable commitment to permit surface-disturbing activity, in some form and to some extent.

Western Slope Environmental Resource Council, 163 IBLA 262, 285 (2004) [FNq] citing Wyoming Outdoor Council, 156 IBLA at 379; Colorado Environmental Coalition, 149 IBLA 154, 156 (1999), [FNr] and cases cited; see also Sierra Club v. Peterson, 717 F.2d 1409, 1414-15 (D.C. Cir. 1983).

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

WOC contends that CBM exploration and development results in impacts so unique they require separate consideration and analysis. In its pleadings, WOC enumerates these impacts. [FN25] WOC concludes that since there is no pre-leasing NEPA analysis that covers these unique impacts, no lease can be sold that could be ***104** developed for CBM. (NA/Stay Petition in IBLA 2002-126 at 28.) More than a general recitation of possible CBM-related impacts is necessary to discharge the burden of proof on appeal. The Board will look for objective indications of the potential for CBM on the specific parcels at issue. Assuming that a parcel may contain CBM, the Board will not simply further assume that any such potential ipso facto will result in development or that any development will necessarily occur in circumstances rivaling those found in the Powder River Basin or a comparably productive basin.

In IBLA 2002-126, the April EA characterized conditions on the eight parcels as follows:

Geology/Minerals: The geology will vary from parcel to parcel. Parcels 167, 177, 178, 188, 200, 201, 205 and 207 lie in the tight-gas sand play of the Lance and Mesaverda formations (like the Pinedale Anticline and Jonah Fields). Depths would typically be greater than 8000 feet. The rest of the parcels are located within the Wyoming Range Overthrust Belt. The most probable mineral (oil/gas) target for these overthrust parcels is natural gas from subthrust Frontier or deeper formations (Nugget & Madison). Mark Strahn of Hanson and Strahn, Lease Brokers, stated that target formations for the South LaBarge parcels was the Hilliard, Frontier, Nugget, and Madison.

Coal bed methane development is not anticipated on PFO-August parcels. Based on current sub-surface geological information the coal beds are either too deep, the seams too thin, or in the case of the South LaBarge parcels 212-221 and 226-235 the coal-bearing Cretaceous Formations are typically eroded and absent.

Parcels 167, 177, and 178 would be located in the vicinity of existing oil and gas development, i.e., producing wells in the Jonah Field and on the Mesa portion of the Pinedale Anticline. The rest of the parcels would be several miles or more from the nearest producing well.
(EA at unnumbered page 15; emphasis added.)

It thus appears that none of the eight parcels in IBLA 2002-126 shows any serious promise of CBM development. Given the individualized assessment of CBM potential, the burden falls upon WOC to come forward with objective, countering evidence to show, as to each parcel, that BLM erroneously relied on the RMP/EIS's environmental analyses to support the decision to offer these parcels for sale. When BLM has identified the specific factors that support its conclusion that ***105** existing impacts analysis encompasses the leasing decision, appellants' burden is not discharged by referring to the interest that industry has shown in the PAPA or by pointing to the number of wells that might be drilled pursuant to the PAP/ROD, because these parcels are not in the PAPA, and the three that are "in the vicinity of existing oil and gas development" are near conventional gas operations. In

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

light of the apparent absence of any serious potential for CBM development, BLM properly relied on the RMP/EIS analysis contained in the RMP to fulfill its pre-leasing NEPA obligation. [FN26]

[4] In IBLA 2002-303, neither the November EA nor EA-022 contains an assessment of CBM potential on the 35 leases offered in the February 12, 2002, lease sale: EA-022 provided only that "[l]easing, where determined to be appropriate, would allow parcels to potentially be explored and/or developed for the production of any underlying hydrocarbon resources to meet national needs." (EA-022 at unnumbered page 3.) None of the descriptions of conditions on the individual parcels mentioned CBM, and only one of the six leases remaining in contention is subject to an NSO stipulation, because it is in the bed of the Green River. (EA-022 at unnumbered page 6.) As we have noted, neither the Pinedale RMP nor its EIS, to which EA-022 is tiered, specifically discussed CBM, the impacts of which can significantly differ from those associated with conventional oil and gas. However, appellants allege that the six parcels are likely to be developed for the CBM resources they contain, and that the unique impacts like those associated with CBM development in the Powder River Basin, for example, are likely to materialize.

***106** Neither BLM nor BRI, on whose pleadings BLM relied as its response to WOC's SOR, has disputed that critical assertion. Indeed, BRI -- and thus BLM -- expressly confined its concerns to conventional oil and gas development, and BLM has submitted nothing further on appeal that might illuminate matters differently. WOC's contention therefore stands unrefuted, circumstantially buttressed by the fact that the RMP is presently being revised to address, among other things, CBM development in the Pinedale Resource Area, and by BLM's admissions and actions in other contexts. [FN27] We must conclude that the RMP did not provide the preleasing analysis for the sale of those parcels that NEPA requires. Pennaco Energy, Inc. v. U.S. Department of the Interior, 377 F.3d 1147, (10th Cir. 2004); Western Slope Environmental Resource Council, 163 IBLA at 285, and cases cited; Wyoming Outdoor Council, 156 IBLA 347, 357 (2002). [FNu] BLM's decision dismissing WOC's protest on the basis of a conclusion to the contrary therefore is reversed and the case will be remanded for further action.

Therefore, pursuant to the authority delegated to the Board of Land Appeals by the Secretary of the Interior, 43 CFR 4.1, the decision in IBLA 2002-126 is affirmed; the appeal in IBLA 2002-303 is dismissed to the extent it pertained to conventional oil and gas activity, and is otherwise reversed and remanded for further action.

T. Britt Price

Administrative Judge

I concur:
James F. Roberts
Administrative Judge

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

FN1. Those parcels are WY-0108-167, WY-0108-177, WY-0108-178, WY-0108-188, WY-0108-197 and -198, and WY-0108-201 through-221.

In that decision, the Deputy State Director simultaneously dismissed WOC's separate protest of the sale of 159 parcels in other Field Offices that were also part of the Aug. 7, 2001, sale. That portion of the decision is not before us in these appeals.

FN2. Those parcels are WY-0202-140 through WY-0202-163; WY-0202-165 through WY-0202-169; WY-0202-173, and WY-0202-175 through WY-0202-179.

In that decision, the Deputy State Director simultaneously dismissed WOC's separate protest of the offering of 123 parcels in other Field Offices that were part of the Feb. 8, 2002, sale. That portion of the decision is not before us in these appeals.

FN3. The Deputy State Director's decision responded by incorporating prior decisions to earlier WOC protests, but the decision dismissing the Aug. 2, 2001, protest was not among those listed. Copies of those decisions were not provided, and if they were separately appealed to this Board, no docket numbers or other identifying information was provided that would enable us to easily retrieve them. Given that WOC referenced only the Aug. 2, 2001, protest, however, we rely on the Deputy State Director's decision in IBLA 2002-126 to resolve these appeals.

FN4. The parcels that were deleted were WY-0108-203 through-221.

FN5. The Deputy State Director did not identify those project-related analyses, but like WOC, we assume that these analyses include the EIS for the Pinedale Anticline Project (collectively PAP/EIS), a CBM project discussed infra.

FN6. By identifying pages 1-28 of the stay request, WOC omits its arguments pertaining to irreparable harm.

FN7. Accordingly, in discussing appellants' reasons for appeal, we will cite the NA/Petition. It should be noted that WOC filed no motion for leave to supplement the NA/Petition in IBLA 2002-126 or to file a further response.

FN8. Apart from those two motions to dismiss, counsel for BLM has filed nothing further in IBLA 2002-126.

FN9. Those parcels are WY-0108-167, WY-0108-177, WY-0108-178, WY-0108-188, WY-0108-197, WY-0108-198, WY-0108-201, and WY-0108-202.

FN10. In the past, the Board has issued orders to show cause, but it is not required to do so. Appellants are cautioned that, in the future, the Board will not hesitate to dismiss an appeal for lack of standing when the record contains no proper evidence of standing as of the date the Board first considers any aspect of the appeal for any purpose.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

FN11. The draft RMP/EIS did not employ the term "RFD scenario," although it is plain that the 900-well projection served much the same purpose as the RFD scenario.

BLM's more recent NEPA documentation often refers to the RFD scenario as "reasonable foreseeable development." The correct phrase is "reasonably foreseeable." See 40 CFR Part 1508. The phrase describes the obligation to analyze all impacts that reasonably can be foreseen at the time of the analysis. The phrase appears in CEQ regulations at 40 CFR 1501.2, 1502.16, and 1502.22, and in the CEQ's definitions of cumulative impact, 40 CFR 1508.7; effects, 40 CFR 1508.8(b); scope, 40 CFR 1508.25(a)(3); and significantly, 40 CFR 1508.27(b)(7). The concept of projecting reasonably foreseeable future actions or impacts, or, as it is more popularly termed, "reasonably foreseeable development," originates in two regulations. The CEQ defines the scope of an EIS as consisting of the "range of actions, alternatives, and impacts to be considered," 40 CFR 1508.25, and these include direct, indirect, and cumulative effects, 40 CFR 1508.25(c). A separate CEQ regulation requires agencies to consider the environmental consequences of a proposed action by examining direct and indirect effects. 40 CFR 1502.16.

FN12. Parcels and portions of parcels that were identified in the PAP as not available for leasing, described below, were deleted from the sale. (April EA at 1; see also n.13, infra.)

FN13. EA-022 was prepared for parcels WY-0202-141 through-164, WY-0202-174, and WY-0202-176 through-181 "at the February 2001" lease sale, apparently a typographical error. As recited in the November EA, EA-022 analyzed four alternatives. The DR/FONSI selected Alternative 2 for implementation. Parcels WY-0202-179, -180, and -181 were deleted under Alternatives 1 and 2 "due to a pending land exchange in the vicinity." (November EA at 1.) Later, it was determined that these parcels were more than two miles away from the closest portion of the land exchange, and, consequently, that leasing those parcels would have no effect on the exchange and should not have been eliminated from consideration in EA-022: "Environmental Assessment WY100-2001-022 did not include an alternative that addressed leasing these parcels and still applied the additional mitigation for parcels 141-147 and 157 that were [sic] implemented through Alternative 2. This EA [the November EA] is being developed to analyze an [sic] this alternative." (November EA at 1.)

FN14. The Pinedale Anticline Project Area (PAPA) is located in west-central Wyoming between Ts. 29 through 33 N., Rs. 107 through 110 W., 6th Principal Meridian and lies on a northwest-southeast strike, roughly between the Town of Pinedale and the Jonah II Field, 30 to 35 miles away. The PAPA includes almost 200,000 acres consisting of primarily Federal land (80 percent), but it also includes State (5 percent) and private lands (15 per cent). (PAP/DEIS at 1; Fig. 1-3; DEIS "Dear Reviewer" letter dated Oct. 28, 1999.) All but approximately 7 (PAP/DEIS at 2-2) to 7.4 square miles of the PAPA have been leased. (PAP/DEIS Executive Summary at 1.) Some of the leases were issued in the 1950's and "few" of those contain no surface occupancy (NSO) stipulations or restrictions. (PAP/DEIS

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

at 2-2.)

FN15. To the extent that WOC challenges that decision to allow oil and gas exploration and development, the time for appeal has long since passed. Even were it a viable argument at this point in time, however, approval and amendment of land use planning determinations, i.e., resource management plans, are not actions appealable to this Board. Rio Grande Rapid Transit, 161 IBLA 225, 227 (2004); [FNn] Friends of the River, 146 IBLA 157, 163-64 (1998); [FNo] Wilderness Society, 90 IBLA 221, 224 (1986). [FNp] See 43 CFR 1610.5-2.

FN16. In considering this line of argument to rule on the stay petition, the Board noted its assumption that BLM would address WOC's concern at the appropriate time, that is, if and when development activities are proposed on leases issued for the challenged parcels. In the limited context of a request for a stay, where a party's showing must address a number of elements to persuade the Board that a stay should be granted, see 43 CFR 4.21(b), that conclusion sufficed.

FN17. Contrary to the suggestion that might be implied by WOC's phrasing, the projection of well numbers for purposes of developing an RFD scenario does not constitute a blanket approval to drill. Actual drilling is authorized only by approval of an Application for Permit to Drill. 43 CFR 3162.3-1.

FN18. Ex. 24 in IBLA 2002-126 is Table 5-1 from the PAP/DEIS at 5-3. That Table was provided as Ex. 28 in IBLA 2002-303. Table 5-1 lists every oil and gas development project in the Pinedale Resource Area, including CBM projects; the date each project ROD was signed; the number of existing wells as of the date of each project EIS; the number of wells anticipated in each project ROD; the number of wells drilled since each ROD; the number of dry hole, depleted, or plugged and abandoned wells for each project; the number of completed but not producing wells for each project; the number of producing wells for each; and the number of remaining wells that can still be drilled under each project RFD scenario.

The number of wells that could be drilled under each project RFD scenario is equal to the number of existing wells as of the date each project EIS was written added to the number of wells projected under each project ROD, less the number of producing wells. In other words, dry, depleted, or plugged wells are not counted in the number of projected wells remaining to be drilled under an RFD scenario. More to the point, Table 5-1 shows that as of November 1999 when the PAP/DEIS was prepared, 7,711 out of a total of 8,791 wells estimated for all the project RFD scenarios in southwestern Wyoming remained to be drilled.

FN19. IM No. 2004-089 expires on Sept. 30, 2005. It replaced BLM Manual Section 1624 and the related Handbook, H-1624-1, Planning for Fluid Mineral Resources (Rel. 1-1583 (May 7, 1990)), which was deleted with the issuance of IM No. 96-147 (July 26, 1996): "The BLM Handbook H-1624-1, Planning for Fluid Mineral Resources[,] was reviewed to determine areas in need of replacement or revision, and recommendations were made for an action plan to accomplish those changes. As a result of those recommendations, the decision was made to update and clarify

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Chapter III of Manual H-1624-1. The revised technical policy for developing, reporting and using an RFD scenario is here provided (Attachment 1)." (IM No. 2004-089 at 1.)

FN20. We note, moreover, that this policy is consistent with broader action to articulate the nature and uses of RFD scenarios. See, e.g., the Final Draft of the Interagency Reference Guide, "Reasonably Foreseeable Development Scenarios and Cumulative Effects Analysis For Oil and Gas Activities On Federal Lands In the Greater Rocky Mountain Region" (Aug. 30, 2002), authored by the Rocky Mountain Federal Leadership Forum (IRG). That Forum consisted of representatives from BLM, the U.S. Environmental Protection Agency, the U.S. Fish & Wildlife Service, the National Park Service, and the U.S. Department of Agriculture, Forest Service. Noting that an "RFD describes net disturbances, not just numbers of wells" (IRG at 10), the IRG states:

An RFD is a vital and necessary tool for

. Determining to what extent a management plan might need to be updated or revised[;]

. Providing technical information for analyzing direct, indirect, and cumulative effects from oil and gas activity that reasonably could be expected as a result of a leasing decision;

. Serving as a context for more localized site-specific decisions on proposed exploration or development projects; and

. Making informed planning (leasing) decisions on management of oil and gas resources balanced with management of other resources.
(IRG at 12.)

FN21. We agree that the RFD scenario utilized in the PAP/EIS technically cannot "update" the RFD scenario utilized in the RMP/EIS, in the sense that the regulations admittedly do not address or recognize "updates" of RFD scenarios by means of the environmental analysis that authorizes expansion of the very activity that causes the RFD scenario to be exceeded. Although WOC does not acknowledge it, the PAP/EIS examined the environmental consequences of drilling up to 900 additional wells in the Pinedale Resource Area, and, as part of that analysis, considered the incremental effects of the proposed PAP added to the effects of all other projects in the Resource Area. See Chapter 5 of the PAP/EIS.

FN22. We express no opinion at this time regarding whether a need for further environmental analysis also compels a plan amendment or revision.

FN23. The Pinedale RMP was among a number of RMP's BLM identified in IM 2002- 081 (Feb. 4, 2002) as time-sensitive and a "top priority" for initiation, revision, amendment, or assessment. The Pinedale RMP was to be "revised" pursuant to 43 CFR 1610.5-6 rather than "amended" pursuant to 43 CFR 1610.5-5, with a target

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

completion date in October 2004. By its terms, IM 2002- 081 expired on Sept. 30, 2003. The present status of the Pinedale RMP amendment does not appear from the record before us.

FN24. We note also that BLM has imposed a moratorium with respect to other future actions. The PAP/ROD states:

Future Pinedale RMP Updates: The Wyoming State Director has placed a moratorium on Federal mineral leasing and associated and similar activities (e.g., rights-of-way) on all Federal lands and minerals that are unleased and/or that have expired leases in the Hoback Basin, southern foothills of the Gros Ventre Range, and the Wind River Front (see Figure 9). The moratorium will remain in effect until the impacts of leasing these lands for mineral development can be addressed in a planning review and update to the 1988 Pinedale RMP and the Bridger-Teton Leasing EIS has been completed (see DEIS Chapter 5). The RMP planning review for the identified areas will address any needed update of the analysis for Federal mineral leasing in these areas to reflect present day information and public input on air quality values, protection of the mountain range scenic values, protection of the new and/or more densely populated rural subdivisions occurring on private surface underlain by Federal minerals, and other resource concerns. Pending budget allocations, the planning review and update process is expected to be conducted from the fall of 2000 through 2005.
(PAP/ROD at 34.)

FN25. The Board is well aware of the significant environmental consequences that can be associated with CBM extraction and development. These may include high volumes of produced water and related disposal issues, depletion of aquifers, impeded water rechargeability, high sodium adsorption rate in soils, increases in total dissolved solids, the suitability of produced water for irrigation and human consumption, erosion, and the possibility of underground fires.

FN26. WOC's argument to the contrary notwithstanding, nothing in 43 CFR Part 1610 or in CEQ regulations requires BLM to suspend leasing until a plan revision is concluded:

In Sierra Club Legal Defense Fund, Inc., 124 IBLA 130, 140 (1992), [FNs] the Board rejected the argument that BLM must suspend action in conformance with an existing land use plan when it decides to prepare a new plan. The Board has also held that 40 CFR 1506.1(c) does not apply where the proposed action is covered by an existing environmental statement, thus repudiating the contention that ongoing environmental studies bar BLM from acting until such studies have been completed. In Re Bryant Eagle Timber Sale, 133 IBLA 25, 29 (1995). [FNt] This precedent undermines WOC's contention that BLM violated NEPA and FLPMA by offering the parcels for leasing during the amendment process for the existing RMP. See also ONRC Action v. BLM, 150 F.3d 1132, 1140 (9th Cir. 1998) ("because the RMPs are outdated, they cannot be existing program plans as stated in NEPA").
Wyoming Outdoor Council, 156 IBLA at 384-85.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

FN27. In a report to Congress, BLM acknowledged the inadequacy of its planning documents, particularly as they relate to interest in CBM. Projecting 8,600 new applications to drill CBM wells between 1999 and 2003, BLM stated that revised or amended land use planning and NEPA compliance to meet this need was essential. (See NA/Petition in IBLA 2002-303, Ex. 31, Report to Congress, Land Use Planning for Sustainable Resource Decisions, Executive Summary at unnumbered pages 6, 7 (February 2000).) See also nn. 22 and 23, supra.

FNa. GFS(O&G) 8(2002)

FNb. GFS(MISC) 35(1991)

FNc. GFS(MIN) 40(1986)

FNd. GFS(MIN) 5(2004)

FNe. GFS(MIN) 28(2003)

FNf. GFS(MIN) 11(2002)

FNg. GFS(MISC) 41(1992)

FNh. GFS(MISC) 75(1991)

FNi. GFS(O&G) 9(2003)

FNj. GFS(MIN) 7(2003)

FNa1. GFS EDITOR'S NOTE: Apparent error. Cite should be 158 IBLA 212.

FNk. GFS(O&G) 23(1997)

FNl. GFS(MISC) 47(1992)

FNm. GFS(O&G) 1(1993)

FNn. GFS(O&G) 1(2004)

FNo. GFS(MISC) 93(1998)

FNp. GFS(MISC) 7(1986)

FNq. GFS(O&G) 17(2004)

FNr. GFS(O&G) 22(1999)

FNs. GFS(MISC) 47(1992)

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Page 22 of 22

GFS(O&G) 3(2005) Page 22
GFS(O&G) 3(2005), 164 IBLA 84
**(Cite as: 164 IBLA 84)**

FNt. GFS(MISC) 31(1995)

FNu. GFS(O&G) 6(2002)

GFS(O&G) 3(2005), 164 IBLA 84

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

http://print.westlaw.com/delivery.html?dest=atp&dataid=A0055800000021190004934902C... 6/6/2008

FAXED

# United States Department of the Interior

OFFICE OF HEARINGS AND APPEALS
Interior Board of Land Appeals
801 N. Quincy St. Suite 300
Arlington, VA 22203

703 235 3750 703 235 8349 (fax)

RECEIVED
JUL - 5 2006
BJORK LINDLEY LITTLE PC

June 28, 2006

| | | |
|---|---|---|
| IBLA 2006-155 | : | EIS WY/PL-06/006-1310 |
| | : | |
| WYOMING OUTDOOR COUNCIL, ET AL. | : | |
| | : | Jonah Infill Drilling Project |
| IBLA 2006-157 | : | |
| | : | |
| BIODIVERSITY CONSERVATION ALLIANCE & CENTER FOR NATIVE ECOSYSTEMS | : | |
| | : | |
| | : | Appeals Consolidated; Petitions for Stay Denied |

ORDER

Wyoming Outdoor Council, Upper Green River Valley Coalition, The Wilderness Society, and Greater Yellowstone Coalition (hereinafter, WOC) and Biodiversity Conservation Alliance and Center for Native Ecosystems (hereinafter, BCA) have separately appealed from and petitioned for a stay of the effect of a March 14, 2006, Record of Decision (ROD) of the Wyoming State Director, Bureau of Land Management (BLM), approving the Jonah Infill Drilling Project (JIDP or Project). The Board granted intervention requests in each of the two pending appeals to EnCana Oil & Gas (USA) Inc. (EnCana) and BP America Production Company (BP America), both proponents of the Project and holders and/or operators of Federal oil and gas leases in the Project area, and the State of Wyoming (State).

The Project, as approved, provides for the year-round drilling of an additional 3,100 oil and gas wells within the Jonah Field, an existing oil and gas development in southwestern Wyoming. The Jonah Field or Project area encompasses a 30,500-acre area of Federal, State, and private lands in Ts. 28 and 29 N., Rs. 107, 108 and 109 W., Sixth Principal Meridian, Sublette County, Wyoming, within the Upper Green River Valley, which is situated south of Yellowstone and Grand Teton National Parks (Parks). [1] It is described as "one of the most * * * highly productive sweet natural

---

[1] The majority of the land in the Project area is Federally-owned surface and mineral
(continued...)

gas fields in North America," estimated to contain approximately 12.8 trillion cubic feet of natural gas. (January 2006 Final Environmental Impact Statement (FEIS) at 1-1.) Virtually all of the public lands in the Project area are administered by BLM's Pinedale Field Office, with the remainder (320 acres) subject to the jurisdiction of its Rock Springs Field Office.

Because they arise from the same facts and raise related factual and legal issues, we hereby consolidate the two appeals for purposes of resolution of the stay petitions and, ultimately, a decision on the merits of the appeals.

Prior to Project approval, BLM had authorized the drilling of 533 wells in the Project area resulting in a surface disturbance of a total of 4,209 acres of public land. The ROD authorizes the drilling of an additional 3,100 wells in that area. For the purposes of analysis, BLM assumed drilling would occur at a rate of 250 wells per year. Each well pads would disturb 3.8 acres during drilling with 0.9 acres disturbed over the life of the Project. New access roads, pipelines, and other facilities will be constructed in connection with the drilling of the wells. Reclamation of disturbed areas will begin as soon as they are no longer needed for drilling activities and conclude once the sites are no longer needed for production activities. No more than 14,030 acres will be disturbed at any one time, and the total cumulative surface disturbance over the life of the Project cannot exceed 20,334 acres (including 16,125 acres of new and 4,209 acres of existing disturbance) in the Project area. For the purposes of analysis, BLM assumed an overall life of the Project of 76 years, with roadbuilding, facility construction, and drilling anticipated to last 13 years.

BLM based the ROD on a February 2005 Draft Environmental Impact Statement (DEIS) and the January 2006 FEIS, as well as a November 2004 Draft Air Quality Technical Support Document (TSD), a January 2005 Draft Socioeconomic Analysis TSD, an August 2005 DEIS Air Quality Impact Analysis (DAQIA) Supplement, an August 2005 Draft Air Quality TSD Supplement, a January 2006 Final Air Quality TSD, a January 2006 Final Socioeconomic Analysis TSD, and a January 2006 Public Comment Analysis Report. [2/] All of these documents, which were subject to public comment, were prepared pursuant to section 102(2)(C) of the National Environmental Policy Act of 1969 (NEPA), as amended, 42 U.S.C.

---

[1/] (...continued)
estate (28,580 acres), with the remainder being State-owned surface and mineral estate (1,280 acres) and private surface/Federal mineral estate (640 acres).

[2/] The FEIS, DEIS, and some of the other environmental analysis documents upon which BLM relied in issuing its ROD are multi-volume documents. However, since each volume contains distinctive pagination, we will cite to each of these documents, using the title of the basic document and the particular page at issue.

§ 4332(2)(C) (2000), in order to address the potential significant environmental impacts of the proposed action and alternatives thereto. [3]

Under BLM's Preferred Alternative, the drilling of 3,100 wells in the Project area would be allowed at a rate of 250 wells per year, but air pollutant emissions would be reduced by 80 percent from the level of such pollutants that would be emitted through unmitigated Project development. See Letter to U.S. Environmental Protection Agency (EPA) from BLM, dated Oct. 5, 2005; FEIS at 4-19. [4] BLM's preference for this alternative was reinforced by EPA's opinion, expressed in its October 7, 2005, letter to BLM at page 2 that any alternative that would result in greater emissions was considered to be "Environmentally Unsatisfactory," given the anticipated effect on visibility in nearby Class I areas, which, under the Clean Air Act (CAA), as amended, 42 U.S.C. § 7472(a) (2000), include national wilderness areas and national parks larger than 5,000 acres and 6,000 acres, respectively, that were in existence on August 7, 1977. [5]

---

[3] In September 2002, EnCana proposed the drilling of 1,250 additional wells in the Project area. This was increased to 3,100 wells "at the request of the BLM, and in order to avoid the potential waste of the natural gas resource in the JIDP." (EnCana Opposition to Petition for Stay (Opposition) (IBLA 2006-155) at 4; see FEIS at 2-14 ("Operator reservoir modeling shows that 3,100 new wells would be necessary to adequately recover the natural gas resource present in the area").) This became the Proposed Action. In the DEIS, BLM also considered the No Action Alternative, under which drilling would continue as already approved in the Jonah Field, Alternative A ("Maximize Mineral Resource Recovery"), which curtailed environmental restrictions on drilling, and Alternative B ("Minimize Surface Disturbance"), which would authorize only directional drilling from existing well pads. BLM also considered Alternative C, limiting development to 1,250 wells and well pads, Alternative D, increasing the number of wells and well pads to 2,200, Alternative E, allowing only 16 well pads per section, Alternative F, increasing well pad density to 32 well pads per section, Alternative G, increasing well pad density to 64 well pads per section, and BLM's Preferred Alternative, which was substantially revised between the DEIS and FEIS based on public comment and agency analysis.

[4] BLM explained in the FEIS at 4-19 that "[i]mpacts [to air quality] from the Preferred Alternative as described herein are those potentially occurring from the high emissions scenario (i.e., 250 wells developed per year, 50% directionally drilled wells, 80% Tier 0 * * * and 20% Tier 1 drilling rig emission levels) with an 80% reduction in emissions levels."

[5] An EPA rating of "Environmentally Unsatisfactory" means that EPA review "has identified adverse environmental impacts that are of sufficient magnitude that they

(continued...)

In commenting on the DEIS, EPA commended BLM for adopting the 80-percent emissions reduction, noting that there remained an anticipated visibility impact to a Class I area which caused it "Environmental Concerns." [6] Id. at 2-3. It stated that development at an annual rate less than 250 wells was advisable, absent the adoption of measures to reduce drilling rig emissions:

> EPA supports this alternative which provides a slower pace of development for the Jonah Field (fewer wells allowed per year) unless the operator secures new and clean diesel engine technology for well drilling operations. If emissions are reduced, the operator would be allowed to drill more natural gas wells and energy development could proceed with assurance that air resources within Wyoming are being protected. [Emphasis added.]

Id. at 3.

The matter causing EPA concern was the fact that BLM had reported that, even with an 80-percent emissions reduction, modeling disclosed that there would be a significant adverse impact to visibility in the Bridger Wilderness Area, which is the closest Class I area to the Project area. See FEIS at 3-7 (Map 3.1). BLM thereafter adopted measures to further reduce emissions, which would involve the use of "new and clean diesel engine technology," thereby eliminating all significant adverse impacts to visibility in Class I areas. See ROD at 5, 14; ROD, Appendix A, at A-3 to A-4. Following issuance of the FEIS, EPA determined that BLM had "properly analyzed and disclosed to the public the potential environmental impacts of the project," concluding that, "[t]hrough innovative approaches and cooperation with the operators, we have been able to find solutions allowing continued field development, while implementing pollution control technologies which will eliminate the visibility impacts from the Jonah field development on the nearby Bridger/Fitzpatrick Wilderness areas." (Letter to BLM, dated Feb. 10, 2006, at 1.)

In the March 2006 ROD, BLM approved a revised Preferred Alternative for the Project, concluding that the approved drilling conformed to its applicable land-use

---

[5] (...continued)
are unsatisfactory from the standpoint of public health or welfare or environmental quality." (U.S. Environmental Protection Agency Rating System for Draft Environmental Impact Statements (Rating System) (attached to Letter to BLM from EPA, dated Oct. 7, 2005).)

[6] Under the Rating System, an EPA rating of "Environmental Concerns" means that EPA review "has identified environmental impacts that should be avoided in order to fully protect the environment."

plans (Pinedale Resource Management Plan (RMP) and Green River RMP): "The revised Preferred Alternative, and its associated outcome-based performance objectives, mitigation, and Best Management Practices (BMPs), would achieve high levels of natural gas recovery * * * while minimizing impacts related to the key issues," including questions of surface disturbance, air quality, and wildlife and wildlife habitat. (ROD at 13; see id. at 3-8.) BLM's approval of the Project did not authorize drilling or other surface-disturbing activity:

> The [BLM] Authorized Officer will review and authorize each component of the project that involves disturbance of [F]ederal lands on a site-specific basis. The methods used to evaluate and authorize each surface-disturbing activity include, but are not limited to, an Application for Permit to Drill (APD), right-of-way (ROW) grant, Sundry Notice, or Special Use Permit with the supporting environmental review.

Id. at 3.

In approving the Preferred Alternative, BLM adopted various measures, set forth in Appendix A (Administrative Requirements, Conditions of Approval, and Mitigation) and Appendix B (Operator-Committed Practices) of the ROD, which are intended to mitigate significant environmental impacts. The measures identified in Appendix A are to be applied when BLM approves specific drilling or other surface-disturbing activity "when supported by site-specific environmental review," and those identified in Appendix B became "mandatory requirements" upon issuance of the ROD. (ROD at 8.) BLM concluded:

> Although the proposed development requires intensive surface-disturbing activities that will result in significant impacts to resource values, including displacement and/or local extirpation of wildlife resources, long-term reestablishment of habitat value and function will occur through the proposed reclamation practices and monitoring efforts. While the intensive development will limit opportunities for other uses for many years, the long-term outcome will be full reclamation and the return of these lands to near prior existing conditions for other use opportunities in the future.

Id. at 3.

BLM provided that sites eligible for inclusion in the National Register of Historic Places, areas of Native American concern, and other recognized sensitive areas would be avoided as much as practical or impacts would be mitigated through

approved methods, that Class III cultural resource inventories, in all cases, and paleontological resource surveys, when necessary, would be conducted before approving surface-disturbing activity, and, if such resources were discovered during drilling and other surface-disturbing activity, operations would be suspended and efforts approved by BLM to protect or conserve those resources would be undertaken. (ROD at 4; ROD, Appendix A, at A-6, A-8; ROD, Appendix B, at B-2, B-4, B-12.)

BLM provided for mitigating cumulative adverse impacts to wildlife in the Project area, using three strategies:

> 1) return field habitat function in the shortest time possible, 2) perform on-site mitigation to the extent practicable and employ compensatory (off-site) mitigation (CM) when complete on-site mitigation is not effective in the short[]term, and 3) institute an adaptive management process to ensure monitoring and both on- and off-site mitigation are effective.

(ROD at 5.) It stated that habitat function would be restored as soon as possible by "rapid on-site interim and final reclamation." Id. BLM placed spatial and seasonal restrictions on drilling and other surface-disturbing activity in order to protect raptors and greater sage-grouse during nesting, breeding, and other sensitive time periods during their life cycles. (ROD, Appendix A, at A-5; ROD, Appendix B, at B-10, B-11.) It also provided that Project operators would undertake pre-disturbance surveys and monitor BLM Wyoming Sensitive wildlife species and their habitat in the Project area, avoiding or mitigating adverse impacts, subject to oversight by BLM, the Wyoming Department of Game and Fish, and the U.S. Fish and Wildlife Service. (ROD, Appendix A, at A-4, A-5; ROD, Appendix B, at B-2, B-9 through B-11.) BLM recognized that, despite on-site mitigation, the Project would render the Project area no longer suitable habitat for many wildlife species, noting that off-site mitigation "should result in significant improvements to existing habitats and/or development of additional suitable habitats used by the affected species" outside the Project area. (ROD at 6.)

BLM also provided that before undertaking any Project activities the operators were required to obtain the appropriate air quality permits for drilling and other activity from the applicable State agency (Wyoming Department of Environmental Quality (WDEQ)), and thereafter comply with all Federal and State air quality laws. (ROD, Appendix B, at B-2, B-3, B-16.) In order to limit air quality impacts, it also required that, "Tier II or equivalent diesel engine emission technologies will be required for all drill rigs at the earliest possible date." (ROD, Appendix A, at A-3.) It stated that EnCana had committed to 15 additional air quality measures, including reducing average drilling rig emissions to Tier II standards or better by January 1,

2007, and to Tier III standards or better by January 1, 2009, and, through flareless completion techniques, to capture an average of 90 percent of the hydrocarbon and other emissions which would have ordinarily occurred with flaring. (ROD, Appendix B, at B-16.) [7/]

BLM expected that Project emissions would not exceed National Ambient Air Quality Standards (NAAQS) or Wyoming Ambient Air Quality Standards (WAAQS), or violate Prevention of Significant Deterioration (PSD) requirements. It did acknowledge that modeling indicated "potential significant adverse visibility impacts" in various Class I areas, which it addressed through jointly developed (BLM, WDEQ, EPA, and United States Forest Service (USFS)) performance-based mitigation measures. (ROD at 5; ROD, Appendix A, at A-3 to A-4.)

In the ROD, BLM required a 12-month Demonstration Project, during which Project operators will test new drilling engine technologies, as defined in a plan to be developed by the operators and WDEQ. (ROD, Appendix A, at A-3.) WDEQ will then consider the emissions testing data to determine the appropriate Best Available Technology (BAT) for the engines associated with all drilling operations. The Implementation Period will follow the Demonstration Period. During implementation, all operators will comply with WDEQ established BAT or

> submit annual operating plans that report the emissions from all emitting units in order to demonstrate that the potential visibility impact from the proposed project will be less than the potential visibility impact levels of the 80% emission reduction scenario * * *, at a minimum, and to demonstrate that any potential visibility impact decreases as soon as possible to no days with an impact greater than or equal to 1 deciview (dv). [[8/]]

(ROD, Appendix A, at A-4.) BLM noted that WDEQ is the regulatory authority to maintain and monitor compliance with State and Federal air quality standards and

---

[7/] While BLM also stated at B-16 of Appendix B that none of the other operators in the Project area had yet agreed to the additional air quality measures, as noted above, the operator-committed practices of Appendix B became mandatory requirements upon issuance of the ROD. See ROD at 8.

[8/] WOC states that BLM failed to specify "whether emissions actually will be reduced below the 80% emissions reduction threshold, * * * and what, if anything, will happen in the event the operators fail to make the necessary 'demonstrations' of emissions reductions." (Petition at 11.) The ROD provision places the burden on the operators to reduce emissions, failing which adjustments in authorized activities would be necessary.

that BLM would work with WDEQ, EPA, and USFS to monitor air quality for public health, including ozone monitoring.  (ROD at 5; ROD, Appendix A, at A-3, A-4; ROD, Appendix B, at B-3, B-16.)

The ROD also established an off-site or compensatory mitigation (CM) fund proposed by EnCana.  Under the Preferred Alternative, "EnCana, and potentially other Operators, committed to fund varying levels of CM depending on the amount of new surface disturbance authorized in this decision."  (ROD at 9; ROD, Appendix C ("Adaptive Management in the Jonah Infill Drilling Project Area").)  Based on the permitted surface disturbance in the ROD, a total commitment of $24.5 million would be required, $16.5 million for "Offsite Wildlife Habitat Improvement Projects" and $8 million for "Other Monitoring, Inspection, and Enforcement Activities." [9]  Id. The fund would be administered by a new entity established by the ROD, known as the Jonah Interagency Mitigation and Reclamation Office (JIO), staffed by full-time or contract employees from BLM, WDEQ, Wyoming Department of Agriculture, and Wyoming Department of Game and Fish. [10]  One of the purposes of the JIO is to implement the adaptive management process in the Project area, as well as select and manage all off-site mitigation projects. [11]  JIO will evaluate the effectiveness of guidelines, mitigation, BMPs, and monitoring and make recommendations to BLM on modifications based on those evaluations.  BLM will use those recommendations in consultation with appropriate Federal and State agencies to adapt management decisions.  (ROD at 3.)

---

[9]  The ROD stated that funds would be provided "annually in increments not to exceed 20% of the total CM fund," and that:  "In the event CM proffered funds are withheld, further surface disturbance allowed under this decision would not be authorized."  (ROD at 9.)

[10]  The JIO is also referred to as the Jonah Interagency Monitoring and Mitigation Office at page 3 of the ROD.  However, it is denoted as the Jonah Interagency Mitigation and Reclamation Office in Appendix C of the ROD, which includes the office's "Charter," signed by the "Charter Members," representatives of BLM, Wyoming Department of Agriculture, Wyoming Department of Game and Fish, and WDEQ, on Feb. 14, and 27, 2006.

[11]  "Uncertainty regarding the accuracy of the predictive assumptions and models used in the impact analysis, and uncertainty regarding how the environment will react to future development in the JIDPA using current and future untested development and mitigation technologies and untried restrictions, creates a need for a mechanism through which BLM can make incremental adjustments to field management over time, as information is gained about how area resources are reacting to new technologies and/or restrictions.  That mechanism is adaptive management."  (ROD, Appendix C, at C-1.)

On appeal, WOC expresses concern that the Project threatens to dramatically increase emissions and resulting concentrations of air pollutants, including ozone and small particulate matter, posing significant health risks to the people who live and work in the Project area and surrounding communities and obscuring views in the Parks and surrounding wilderness lands, in violation of the air quality requirements of the CAA, as amended, 42 U.S.C. §§ 7401-7671q (2000). (Petition at 1-2.) [12/] It notes that air quality in the Upper Green River Valley is already impacted by existing oil and gas development, noting the presence of a total of 2,530 wells in the area managed by BLM's Pinedale Field Office alone. Id. at 3.

BCA's concern is that the construction, noise, pollution, and traffic in the Project area during the 76-year life of the Project will drive off most of the BLM Wyoming Sensitive wildlife species remaining in the area, specifically greater sage-grouse, pygmy rabbit, sage thrasher, Brewer's sparrow, and sage sparrow: "Two of every three acres of the JIDPA will be bulldozed. When the Jonah Field is fully developed, 99.98% of wildlife habitat will be within a quarter mile (three city blocks) of oil and gas development; 99.2% within an eight[h] of a mile." (Petition at 5.) BCA concludes that habitat loss and fragmentation caused by converting 67 percent of the Project area to roads or well pads over the life of the Project will render the Jonah Field uninhabitable. Id. at 10. It acknowledges that the Project area will be subject to ongoing reclamation, with no more than 14,030 acres of land disturbed at any one time, but states that "the actual amount of habitat elimination is likely to reach the full 20,334-acre figure due to the long period of time that will elapse between interim reclamation activities and recovery of the sagebrush habitat to a state of maturity that will support sagebrush obligate wildlife." Id. at 58. BCA asserts that wildlife impacts will be compounded by the fact that 95 percent of public lands administered by BLM's Pinedale Field Office are leased for oil and gas purposes, and the Pinedale Anticline, South Piney, and other oil and gas development projects are pending or ongoing on lands surrounding the Project area.

In their stay petitions, appellants both state that they do not seek to halt all development activities associated with the Project during the pendency of the appeals. Instead, WOC states that it seeks a limited stay to prohibit BLM from approving any activities associated with the Jonah Infill project that would violate health-based standards for $PM_{2.5}$ (particulate matter less than 2.5 microns in diameter), $NO_2$ (nitrogen dioxide), and $O_3$ (ozone) emissions under the CAA. [13/] See

---

[12/] WOC filed a corrected version of its Petition with the Board on Apr. 17, 2006. Citations will be to that document, identified as "Petition." BCA's petition for stay will also be identified as "Petition."

[13/] Expected emissions of volatile organic compounds (VOC) and $NO_x$ (oxides of (continued...)

Petition at 2, 68-69. WOC requests, inter alia, that the Board set maximum concentrations of $PM_{2.5}$ and $NO_2$ that can result from Project activities while the appeal is pending; [14/] direct BLM to provide a proposal concerning the activities which may proceed consistent with the limitations; offer WOC an opportunity to comment on the proposal; and issue a final stay order specifying the extent to which the Project may go forward.

BCA also requests a limited stay of all drilling activities for new well pads, including construction of new roads, facilities, and pipelines. (Petition at 62.) BCA maintains that such a stay will allow oil and gas development to continue in the Project area, but will protect valuable wildlife, wildlife habitat, and cultural and paleontological resources.

Departmental regulation 43 CFR 3165.4(c) provides that a decision of a BLM State Director concerning onshore oil and gas operations "shall remain effective pending appeal" unless the Board determines otherwise, and that an appellant, who petitions for a stay of the effect of such a BLM decision, pending a determination by the Board of the merits of its appeal, bears the burden of demonstrating sufficient justification for the stay, based on the following four standards:

(1) The relative harm to the parties if the stay is granted or denied,
(2) The likelihood of the appellant's success on the merits,
(3) The likelihood of irreparable harm to the appellant or resources if the stay is not granted, and
(4) Whether the public interest favors granting the stay.

See Colorado Environmental Coalition, 135 IBLA 356, 357-58 (1996), aff'd, Colorado Environmental Coalition v. BLM, 932 F. Supp. 1247 (D. Colo. 1996).

Appellants contend that they are likely to succeed on the merits of their appeals and satisfy the other requirements for a stay. Based on a preliminary review of the record, as well as all the pleadings filed by the parties, we conclude that appellants have failed to provide sufficient justification for the requested limited stays of the ROD. They have not shown a likelihood of success on the merits of their arguments.

---

[13/] (...continued)
nitrogen) by the Project contribute to the formation of ozone, when subjected to a chemical reaction in the atmosphere triggered by sunlight. See FEIS at 4-6.

[14/] WOC asserts that it is not possible to set air quality impact limitations for ozone, and it asks the Board to adopt "alternative means" for ensuring that air quality standards are not exceeded during the pendency of the appeal. (Petition at 69.)

When BLM considers the likely environmental impacts of approving large-scale oil and gas drilling and related activity in an EIS, the adequacy of the EIS under section 102(2)(C) of NEPA must be judged by whether it constituted a "'detailed statement,'" which took a "'hard look'" at all of the potential significant environmental consequences of the proposed action and reasonable alternatives thereto, considering all relevant matters of environmental concern. Center for Biological Diversity, 162 IBLA 268, 275 (2004) (quoting 42 U.S.C. § 4332(2)(C) (2000), and Kleppe v. Sierra Club, 427 U.S. 390, 410 n.21 (1976)), and cases cited. In deciding whether an EIS promotes informed decisionmaking, a rule of reason will be employed. Wyoming Outdoor Council, 151 IBLA 260, 263 (1999), and cases cited therein. As we stated in National Wildlife Federation, 150 IBLA 385, 396 (1999), "whether BLM is able to know and quantify precisely the 'ultimate effects' of development * * * is a very different question from whether BLM adequately considered and made a reasoned assessment of environmental impacts."

An appellant challenging a BLM decision to authorize an oil and gas development project following preparation of an EIS must carry its burden to demonstrate by a preponderance of the evidence, with objective proof, that BLM failed to adequately consider a substantial environmental question of material significance to the proposed action, or otherwise failed to abide by section 102(2)(C) of NEPA. See Colorado Environmental Coalition, 142 IBLA 49, 52 (1997).

Where, in assessing significant impacts, BLM properly relies on the professional opinion of its technical experts concerning matters within the realm of their expertise and that opinion is reasonable and supported by record evidence, an appellant challenging such reliance must demonstrate, by a preponderance of the evidence, error in the data, methodology, analysis, or conclusion of the expert. Fred E. Payne, 159 IBLA 69, 77-78 (2003). A mere difference of opinion, even of expert opinion, will not suffice to show that BLM failed to fully comprehend the nature or scope of the significant impacts. Id. at 78.

## WOC Arguments on Likelihood of Success

WOC contends that the ROD violates section 102(2)(C) of NEPA because BLM failed to adequately consider the impacts of the Project and other past, present, and reasonably foreseeable future oil and gas development in the area on air quality in the Upper Green River Valley and nearby Parks and other Class I areas. [15/]

---

[15/] WOC also argues that BLM has a duty under the Federal Land Policy and Management Act of 1976 (FLPMA), as amended, 43 U.S.C. §§ 1701-1785 (2000), to "ensure that its approval of the Jonah Infill project complies with all applicable air (continued...)

Regulation of air quality is governed by the CAA and its implementing regulations, and their State counterparts. See generally Alabama Power Co. v. Costle, 636 F.2d 323, 346-52, 361-62 (D.C. Cir. 1979). In Wyoming, ensuring compliance with Federal and State air quality standards, setting maximum allowable limits (NAAQS and WAAQS) for six criteria pollutants (CO (carbon monoxide), $SO_2$ (sulfur dioxide), $NO_2$, ozone, and particulate matter ($PM_{10}$ and $PM_{2.5}$)), and setting maximum allowable increases (PSD increments) above legal baseline concentrations for three of these pollutants ($SO_2$, $NO_2$, and $PM_{10}$) in Class I and Class II areas is the responsibility of WDEQ, subject to EPA oversight.

WDEQ is required to submit a state implementation plan (SIP) to EPA detailing what emission reductions and other control measures it will use to attain the NAAQS. If EPA approves the SIP, it is codified and is enforceable as Federal law.

EnCana asserts, and WOC does not dispute, that

> Wyoming's [F]ederally approved SIPs include a permitting program that addresses both major and minor sources. Wyoming's permitting program exceeds the [F]ederal program by requiring construction permits for any source that may emit any air contaminant in any form, including minor sources from oil and gas operations. *See* WYO. STAT. ANN. §§ 35-11-201 [to] [35-11]-203 (LexisNexis 2005); *see also* WAQSR [Wyoming Air Quality Stds. & Regs.] Ch. 6 § 2(a)(i) (pg. 6-1). Wyoming requires that all sources, including minor sources from oil and gas operations, implement best available control technology ("BACT") to reduce or eliminate emissions. *See* WAQSR Ch. 6 § 2(c)(v) (pg. 6-3); *see also* EnCana Ex. 20, WDEQ Regulations for Oil and Gas Operations. As part of the permitting process, WDEQ requires applicants for both major and minor sources to demonstrate that the proposed facility "will not prevent the attainment or maintenance of any ambient air quality standard" or "cause significant deterioration of existing ambient air quality" before an air quality permit will issue. WAQSR Ch. 6 § 2(c)(ii), (iii) (pg. 6-3). [Emphasis added.]

---

15/ (...continued)
quality standards." (Petition at 26, 27; see WOC Reply at 7-9.) BLM, EnCana, BP America, and the State of Wyoming all argue that the duty to ensure compliance with the CAA rests with the State regulatory authority (WDEQ), subject to oversight by EPA, and that to invest such authority in BLM is not supported by any Federal statute or regulation. WOC has not shown a likelihood of success on this issue.

(EnCana Opposition (IBLA 2006-155) at 26.) Permits to drill oil and gas wells must be accompanied by State air quality permits because such wells are considered to be minor sources of regulated emissions, and such permits will only be issued when the applicant can demonstrate compliance with Federal and State air quality standards. See, e.g., State Opposition (IBLA 2006-155) at 11-13. Therefore, in approving the Project, BLM properly assumed that emissions would be regulated and, if necessary, controlled so as to satisfy Federal and State air quality standards. See, e.g., ROD at 5; ROD, Appendix A, at A-3; ROD, Appendix B, at B-3, B-16; FEIS at 4-3.

Nevertheless, BLM was required by section 102(2)(C) of NEPA to consider the potential significant impacts to air quality in the Project area and surrounding areas from approval of the Project.

The Project area is designated an "attainment" area for each of the criteria pollutants at issue, $PM_{2.5}$, $NO_2$, and ozone, which means that the NAAQS for each pollutant is currently being met. (FEIS at 3-6.) BLM was well aware of the nature and scope of pollutant emissions likely to occur as a consequence of approving the Project. It modeled the air quality impacts of the Project in the Project area and surrounding areas, using expected emissions by drilling and other Project activities, and other past, present, and reasonably foreseeable future oil and gas development in the Cumulative Impact Assessment Area (CIAA):

> Direct, indirect, and cumulative air quality analyses were performed to predict maximum near-field (surrounding the JIDPA) and far-field (sensitive Class I and Class II areas) ambient air pollutant concentrations, as well as maximum impacts to visibility (regional haze) and atmospheric deposition, including "acid rain." Analyses were also performed to predict maximum mid-field (regional communities of Big Piney, Big Sandy, Boulder, Daniel, Farson, LaBarge, Merna, and Pinedale * * *) visibility impacts and maximum in-field (within the JIDPA) concentrations.

(FEIS at 4-3.) BLM concluded that the Project activities, alone or together with other oil and gas development, would not exceed NAAQS, WAAQS, or PSD increment limitations. (ROD at 5; FEIS at 4-19 through 4-24, 5-3.)

WOC challenges BLM's adoption of the 80-percent reduction of air pollutant emissions under the Preferred Alternative on the basis that, even if it can be achieved, it will result in air quality impacts which are still violative of the CAA: "[E]ven under this 80-percent reduction alternative, the Jonah Infill project remains a severe threat to air quality." (Petition at 9.) WOC also asserts that EPA stated in commenting on the DEIS that BLM had predicated achievement of the 80-percent reduction in

emissions on a rate of development of 50 to 75 wells per year, noting that BLM had failed to demonstrate how that reduction could be achieved when drilling is proceeding at the rate of 250 wells per year, as approved by BLM in the ROD. Id. at 9, n.5.

BLM's modeling of the air quality impacts of the Preferred Alternative was based on the assumption of a rate of development of 250 wells per year, with an 80-percent reduction in emissions. (ROD at 14; FEIS at 4-19; Final Air Quality TSD at 6.) However, BLM admitted in the ROD that "the actual pace of development may be limited by air quality impact restrictions and associated mitigation, which creates the potential to increase the duration of the field development phase." (ROD at 14.)

WOC further argues that BLM has yet to specify how it would, in fact, achieve an 80-percent reduction in emissions. WOC notes that BLM focuses on the use of Tier II diesel engines on drilling rigs, since they emit less pollutants than standard engines, but failed to appreciate that such engines are "not widely available at this time," and drilling is not being deferred until such engines are available and, in general, failed to identify any of the "additional mitigation" which is necessary to achieve an overall 80-percent emissions reduction. (Petition at 9.)

BLM's air quality impact modeling for the Preferred Alternative did not rely on the use of Tier II or equivalent diesel engines on all drilling rigs in the Project area during any given year, but assumed that 200 wells would have Tier 0 engines, and 50 wells would have Tier I engines. (FEIS at 4-19; Final Air Quality TSD at 14, n.5.) BLM provided for the exclusive use of Tier II or equivalent diesel engines at the earliest possible time, and EnCana and the other operators are committed to do so by January 1, 2007. (ROD, Appendix A, at A-3; ROD, Appendix B, at B-16.) It was not assumed that the 80-percent emissions reduction depended on the availability of Tier II diesel engines for drilling rigs. Rather, such reduction may be achieved by other means. EPA has stated that it "believes that the 80 percent reduction scenario is a reasonable and attainable approach," noting "recent developments," in addition to Tier II diesel engines:

> EPA Tier II diesel engines standards go into effect on January 1, 2006. These cleaner engines will reduce $NO_x$ emissions by approximately 75 percent from uncontrolled diesel engines. While the immediate availability of these new engines will be uncertain, there are other developments in southwestern Wyoming which demonstrate the potential for reducing drilling rig emissions in the short term. Some gas operators have successfully demonstrated the retrofit of existing engines to perform at or below emission rates of the Tier II (or Tier III) standards. The use of dual fuels (combination of natural gas and diesel

> fuel) shows promise, as well as selective catalytic reduction applied to new or existing engines. In addition, EnCana has acquired a natural gas fired drilling rig and is currently using this low emitting unit in the Jonah field. We further understand that EnCana is evaluating the feasibility of providing electrical service to the Jonah field to power drilling rigs with direct electrical power. This option could reduce emissions from the Jonah field to negligible amounts.

(Letter to BLM, dated Oct. 7, 2005, at 3; see Letter to EPA from BLM, dated Oct. 5, 2005 ("[The 80-percent reduction] can be accomplished by a variety of actions on the companies' part such as the use of tier technology, natural gas powered drill rigs, electric powered drill rigs, and additional emission control").)

If it is not possible to achieve the 80-percent emissions reduction through technological means, BLM has acknowledged that the rate of development may be reduced below 250 wells per year: "[T]he actual pace of development may be limited by air quality impact restrictions and associated mitigation[.]" (ROD at 14; see Letter to BLM from EPA, dated Oct. 7, 2005, at 3 ("In addition to technological solutions, there are many options for either BLM or the Wyoming DEQ to control the rate of well development to correspond with the availability and use of cleaner drilling rigs beginning with the early project development phase").) WOC has not shown a likelihood of success on these arguments related to the 80-percent emissions reduction.

BLM specifically concluded that Project activities will not result in $NO_2$ concentrations in the Project area and other Class II areas that exceed CAA limits, since Project activities will result in a total increase in the $NO_2$ concentration of 18.9 $\mu g/m^3$ (micrograms per cubic meter), below the maximum allowable annual average ambient $NO_2$ concentration increment (25 $\mu g/m^{3)}$) available under the PSD program. (FEIS at 4-19; FEIS, Appendix J, at J-1 (Table J-1).) WOC argues that BLM's analysis is flawed because it relied on data regarding the existing air quality of the Project area dating from 2001 and collected at a site (Green River, Wyoming) 60 miles from the Project area, rather than "far more recent and relevant" data generated by the WDEQ which dates from 2004 and was collected in the Project area. For that reason, WOC asserts, BLM failed to account for much of the existing pollution in the Project area, which has already consumed much of the maximum allowable 25 $\mu g/m^3$ increase. (Petition at 32, 34.) WOC asserts that BLM's data does not reflect the "extensive energy development" that has occurred in southwestern Wyoming since 2001, and was collected in an area which is not representative of the Project area because it is not downwind of the Project area. Id. at 35.

WOC concludes: "Had BLM used [WDEQ's] data to calculate [background] $NO_2$ concentrations, it would have found that added emissions from the Jonah Infill project will consume more than the $NO_2$ PSD increment in violation of the Clean Air Act." Id. at 30. WOC explains that WDEQ had determined that as of 2004 the existing $NO_2$ concentration was 11.5 $\mu g/m^3$ (rather than BLM's 3.4 $\mu g/m^3$), which meant that, with the addition of BLM's anticipated 18.9 $\mu g/m^3$ increase, the concentration would reach 30.4 $\mu g/m^3$ (rather than BLM's 22.3 $\mu g/m^3$), more than the maximum allowable 25 $\mu g/m^3$ incremental increase. 16/

BP America asserts that WOC fundamentally errs in its criticism of BLM's analysis of the effects of the Project on the $NO_2$ concentration in the Project area and surrounding lands, noting that BLM's anticipated increase of 18.9 $\mu g/m^3$ takes into account WDEQ's reported 11.5 $\mu g/m^3$ background level, since it incorporates the continuing impact of many non-Project sources: "Because Scenario 2 [Cumulative Sources] is a cumulative modeling exercise, to add the 18.9 $\mu g/m^3$ cumulative estimate to the WDEQ's 2004 cumulative estimate would result in double counting many sources, thereby egregiously overstating actual increment consumption." (BP America Opposition (IBLA 2006-155) at 11.) As set forth in Table 3.5 of the Final Air Quality TSD at 31, the maximum modeled annual $NO_2$ concentrations for Scenario 2 are 18.9 $\mu g/m^3$. Scenario 2 included "projected compression expansions proposed within the Jonah and Pinedale Anticline fields, well site heater emissions from 198 wells developed in the JIDPA since January 2002, well site emissions from 3,100 proposed wells and an inventory of existing regional compressor station emissions." Id. at 29; see Summary Report, Southwest Wyoming $NO_2$ PSD Increment Consumption Modeling: Results for Sublette County, dated Sept. 15, 2005 (Ex. 25 attached to EnCana Opposition (IBLA 2006-155)), at SR-24 ("[11.5 $\mu g/m^3$ reflects] $NO_2$ PSD increment consumption due to emissions from all sources in Sublette County and the Bridger and Naughton power plants as of 2004").)

The existence of double counting is not disputed by WOC. See WOC Reply at 15 ("It is true that the methodology BLM used to derive th[e] [18.9 $\mu g/m^3$] figure swept in existing Jonah field wells developed since 2002 and certain existing compressor stations"). WOC makes no effort to quantify the extent of double counting, but merely states that it is "impossible" to determine the extent of double

16/ WOC recognizes that BLM does not add its existing $NO_2$ concentration to its anticipated $NO_2$ increase to determine whether the $NO_2$ PSD increment has been exceeded, but states: "For purposes of this argument, appellants will assume that BLM meant to treat the 3.4[]$\mu g/m^3$ Green River background $NO_2$ concentration as a measure of existing increment consumption, because otherwise BLM made no attempt to consider the Jonah Infill's modeled $NO_2$ impact in light of the existing increment consumption." (Petition at 34 n.14.)

counting and to calculate the increase in the $NO_2$ concentration that is likely to occur as a result of Project activities. Id. Most importantly, it provides no evidence to establish that relying on WDEQ's 2004 existing $NO_2$ concentration is likely to result in an increase greater than the maximum allowable 25 $\mu g/m^3$, after taking into account the matter of double counting. Additionally, as EnCana states at page 6 of its Sur-Reply in Opposition to the Petition, "[t]he WDEQ will continue to monitor all increment consuming sources to determine if emissions threaten the $NO_2$ increment and WDEQ has the ability to force emission reductions on any source, including JIDP operations, to protect air quality." WOC has failed to show a likelihood of success on the merits of these arguments.

Next, WOC argues that Project emissions will contribute to the formation of ozone, which will result in exceeding the NAAQS standard of an average concentration of 157 $\mu g/m^3$ over an 8-hour period. 17/ It asserts that BLM concluded that the ozone standard will not be exceeded by Project emissions of VOC and $NO_x$ using a "discredited methodology," known as the Scheffe method, which was developed nearly twenty years ago, and is "not recognized by EPA," because "it does not have the capacity to reliably predict conditions in the real world of the Jonah Infill project area." 18/ (Petition at 39, 40.)

WOC states that EPA issued its "Guideline on Air Quality Models" (Guideline), pursuant to a Congressional directive in section 165(e)(3)(D) of the CAA, as amended, 42 U.S.C. § 7475(e)(3)(D) (2000). 19/ Under the Guideline, it asserts, the recommended model for multi-source emissions, such as the Project, is the "Community Multi-scale Air Quality" (CMAQ) model, which was not used by BLM. (Petition at 42.) WOC notes that, although alternative models can be used so long as they are shown to EPA's satisfaction to perform as well or better than the preferred method, BLM has provided no such justification for the Scheffe method. WOC asserts

---

17/ The NAAQS is considered to be violated only when the 3-year average of the 4th highest maximum daily concentration of ozone exceeds the NAAQS standard for ozone. See 40 CFR 50.10(b); 40 CFR Part 50, Appendix I, 2.3.

18/ EnCana states that the Scheffe method was developed by an EPA employee (Richard D. Scheffe), and was published by EPA in a September 1988 document entitled "VOC/$NO_x$ Point Source Screening Tables" (Scheffe Paper), which is contained in the record (Final Air Quality TSD, Appendix A, Sub-appendix A). (Opposition (IBLA 2006-155) at 38.)

19/ The Guideline is contained in Appendix W of EPA's 40 CFR Part 51 regulations. The Guideline in the 2005 version of the CFR has since been amended, effective Dec. 9, 2005. See 70 FR 68218 (Nov. 9, 2005).

that BLM's failure to use EPA's preferred model for evaluating the impacts of Project emissions on ozone levels precludes BLM from finding compliance with the CAA.

WOC argues that, in any event, BLM's decision to rely on the Scheffe method is arbitrary because BLM has failed to demonstrate that that methodology is capable of accurately predicting the effects of Project emissions on ozone levels. (Petition at 45.) In support of its position, it offers an April 8, 2006, technical report, entitled "Ozone Modeling in the Jonah Infill Development Project Final Environmental Impact Statement," prepared by Dr. Jana B. Milford (Milford Report) (Ex. 10c attached to Petition), which details the alleged deficiencies in the Scheffe method in predicting such effects:

> Dr. Milford identifies several factors that undermine the Scheffe method's ability to provide a reliable replication of ozone formation in the Jonah [Infill Project] context including the method's failure to account for: (1) the variation in ozone precursor concentrations that will be transported into the Jonah region from other source regions; (2) the chemistry of the atmosphere caused by local sources of precursor emissions; and (3) the effects of continuing ozone formation as emissions from the field are transported downwind from the Jonah Field. [[20]]

(Petition at 46.)

---

[20] WOC also notes that deficiencies in the Scheffe method are proven by the fact that it failed to predict ozone exceedances which have already occurred in 2005 in the Project area. See Petition at 51, n.24. EnCana asserts, based on a study of the February 2005 exceedances (Opposition (IBLA 2006-155), Ex. 26, CH2M Hill letter to WDEQ, dated Aug. 2, 2005 (CH2M Hill Report)), that these exceedances were the result of stratospheric intrusion or other natural events, such as long range urban plume transport. (Opposition (IBLA 2006-155) at 37, n.25; see BLM Response (IBLA 2006-155) at 20.) WOC counters that the exceedances were not due to intrusion of ozone from the stratosphere, offering a copy of a Powerpoint presentation titled "Supplemental Information for the Oil and Gas Stakeholder Meeting #2," dated June 8, 2006, which it represents was prepared by two individuals in the Air Pollution Control Division of the Colorado Department of Public Health and Environment. (Notice of Supplementary Information in Support of Petition at 2.) The conclusion of the Supplemental Information regarding ozone exceedances in the Pinedale Anticline-Jonah oil and gas region is that exceedances were not caused by stratospheric intrusions, but by oil and gas activities and favorable meteorological conditions, such as winter basin inversions, clear skies, snow cover, and mild temperatures.

EnCana argues that BLM's use of a particular air quality model to assess the effects of Project emissions of VOC and $NO_x$ on ozone formation was not subject to EPA approval because the provisions of the CAA relied on by WOC do not apply to the Project, which is not a major stationary source of such pollutants and, therefore, not subject to the PSD program. Moreover, EnCana adds that, while WOC asserts that the CAA does not authorize agencies to make determinations of PSD program compliance required by 42 U.S.C. Chapter 85, Subchapter I, Part C by using models not approved by EPA, the CAA does not authorize BLM to make such determinations; those determinations, EnCana asserts, are made by WDEQ. EnCana contends that "[t]he analyses the BLM conducted are not intended to be determinations of PSD program compliance required by Part C–instead, the BLM conducts analyses under NEPA to understand the potential environmental impacts associated with the JIDP." (EnCana Opposition (IBLA 2006-155) at 38.)

We note that the Guideline does not mandate the use of the CMAQ model, rather, under the heading "*Recommendations,*" it states that "[c]ontrol agencies with jurisdiction over areas with ozone problems are encouraged to use photochemical grid models, such as the Models-3/Community Multi-scale Air Quality (CMAQ) modeling system,[] to evaluate the relationship between precursor species and ozone." (Guideline, 5.2.1 (70 FR at 68235), emphasis added.) In addition, even assuming it were mandated, at this stage WOC has not offered evidence that BLM is a control agency.

Further, EnCana argues that the Scheffe method, a screening model, is a well-accepted and widely-used approach to estimate ozone concentrations, which conservatively estimated the impact of ozone from the Project. BLM asserts that the Scheffe method was implemented with review and input from EPA, as well as the WDEQ.

The Scheffe Paper states at page 3 that "[t]he ozone increment estimates produced from this analysis should be interpreted as conservative predictions which would exceed ozon[e] formation produced by actual episodic events." It also explains that "[t]he tables presented herein are intended to serve as a means for screening effects on ozone from individual point sources so that subsequent, more refined analyses can be focused on sources where it is warranted." Id. at 4. We note that EPA recognized the use of screening techniques in its Guideline:

> There are two levels of sophistication of models [screening and refined]. The first level consists of relatively simple estimation techniques that generally use preset, worst-case meteorological conditions to provide conservative estimates of the air quality impact of a specific source, or source category. * * * The purpose of such

> techniques is to eliminate the need of more detailed modeling for those sources that clearly will not cause or contribute to ambient concentrations in excess of either the National Ambient Air Quality Standards (NAAQS)[] or the allowable prevention of significant deterioration (PSD) concentration increments.[] [Emphasis added.]

(Milford Report at 12, n.39 (quoting Guideline, 2.2 (70 FR at 68230)).) BP America states that "EPA raised no objection to the screening model for ozone that BLM used for this project." 21/ (Opposition (IBLA 2006-155) at 14.) WOC has failed to show a likelihood of succeeding on the merits of its argument that the Scheffe method was not an appropriate model for use in this case.

WOC further argues that, even relying on the Scheffe method, BLM failed to properly evaluate the Project's ozone impacts by minimizing the existing ozone concentration in the Project area and the expected level of ozone caused by Project activities.

First, it asserts that BLM relied upon its own assessment of the existing 8-hour average concentration of 75.2 $\mu g/m^3$, rather than WDEQ's assessment of 147 $\mu g/m^3$, and that, when added to the expected generation of 54.7 $\mu g/m^3$ over an 8-hour period, the 8-hour NAAQS for ozone of 157 $\mu g/m^3$ is exceeded utilizing WDEQ's, but not BLM's, baseline concentration. WOC states that WDEQ's baseline concentration would yield a total 8-hour concentration of 201.7 $\mu g/m^3$, posing "a significant threat to human health and the environment from the Jonah Infill project." (Petition at 49.)

It argues that BLM achieved compliance with the CAA by improperly relying on "a background long-term [ozone] concentration based on 1-hour measurements" (75.2 $\mu g/m^3$), rather than the "background 8-hour ozone concentration" (147 $\mu g/m^3$). Id. It states that, instead of properly taking the average over an eight-hour period, in order to compare it to the 8-hour NAAQS after adding the expected 8-hour level attributable to Project emissions, BLM averaged a series of 1-hour measurements of ozone concentration: "This was directly at odds with BLM's announced approach of combining '[b]ackground air quality concentrations [* * *] with modeled Project-related emissions for the same averaging time periods so

---

21/ EnCana also states that use of the CMAQ model, a refined model, was not necessary, since, apart from its high cost and time demands, the model would "provide little additional understanding of the potential impacts from ozone." (Opposition (IBLA 2006-155) at 44; see id. at 39 ("The [CMAQ] model is based on reactive plume modeling; however, the use of this complex regional * * * model is not needed here because the Scheffe approach is based on the same reactive plume chemistry prediction techniques").)

that total predicted pollutant concentrations can be compared to applicable air quality standards.'" Id. at 50 (quoting DEIS at 3-4).

EnCana states that BLM explained that its use of the monitored 1-hour ozone average background ozone concentration to assess ozone impacts of the Project was an overly conservative approach, which was endorsed by WDEQ and EPA. BP America adds:

> The highest monitored [8-hour] concentrations [of 147 $\mu g/m^3$] "were not added to the [8-hour] concentrations estimated with the Scheffe method since it is overly conservative to add a maximum concentration to a screening level estimated concentration." * * * It would be inappropriate to base the Jonah ROD on overly conservative information that does not reasonably reflect reality.

(Opposition (IBLA 2006-155) at 15 (quoting Final Air Quality TSD at 33 (referring to Final Air Quality TSD at 22 (Table 3.1))); see BLM Response (IBLA 2006-155) at 20.) WOC has failed to show a likelihood of success on this argument in light of approval by EPA and WDEQ of the methodology.

Second, WOC challenges BLM's calculation of the expected level of ozone caused by Project activities because in applying the Scheffe method, BLM utilized the table for predicting ozone levels in rural, rather than urban, areas. WOC argues that BLM's use of the rural table was improper because it was to be employed where the emissions source and downwind area were rural areas, but also only where ozone exceedances have never been reported. [22/] (Petition at 53.) WOC states that use of the rural table was inappropriate given "several recent exceedances of the ozone 8-hour standard in and very near the Jonah Field." (Petition at 53.) It notes that "[e]ither the urban table should have been used or at a minimum the highest value obtained from applying both tables should have been used," resulting in an 8-hour average concentration of 111.9 $\mu g/m^3$, rather than BLM's 54.7 $\mu g/m^3$. [23/] Id. at 54. WOC points out that, when the expected 8-hour average concentration of ozone generated by Project activities is added to BLM's (75 $\mu g/m^3$) or WDEQ's (147 $\mu g/m^3$)

---

22/ The Scheffe Paper states at 6 that "[i]f the source location and downwind impact area can be described as rural and where ozone exceedances have never been reported, choose the rural area table."

23/ The Scheffe Paper provides at page 6 that "[u]se of the urban area table is for areas in which the source location and downwind impact area are of urban characte[r]." In addition, applying the "highest value obtained from applying both tables" is applicable "[i]f the urban based source potentially can impact a downwind rural area, or a rural based source can potentially impact a downwind urban area."

baseline concentration, the total 8-hour NAAQS of 157 $\mu g/m^3$ for ozone would be exceeded.

EnCana argues that BLM properly used rural, not urban, tables for calculating anticipated ozone levels, since the Project area and affected downwind areas are rural: "Pinedale, with a population of about 1,500 people, is the largest town near the JIDP and it is more than 32 miles away." (Opposition (IBLA 2006-155) at 40.) BP America further notes that meteorological conditions in rural southwest Wyoming are not typical of conditions in urban areas, and the models available for estimating ozone formation in urban areas, where high temperature, summertime, stagnant conditions can persist and are conducive to ozone formation, are not appropriate.

EnCana also asserts that the few ozone exceedances in 2005 do not call for use of the urban tables, stating: "Isolated occurrences of elevated ozone levels which are caused by stratospheric intrusion or other natural events do not convert the JIDP into an urban environment." (Opposition (IBLA 2006-155) at 40.) The CH2M Hill Report discounted the role of oil and gas development activities in the February 2005 ozone exceedances:

> If we were to see ozone formed from local sources, we should see the elevated ozone events more often in summer. These emissions of $NO_x$ and VOC's are higher in the summer from increased seasonal drilling activity, and atmospheric temperatures and available sunlight are also higher in the summer. If local sources were the cause of the observed ozone, both factors should lead to increased ozone formation in the summer. However[,] the measurements are just the opposite. We have elevated ozone measurements in the winter but not in the summer at the Jonah site. These are further indications that the ozone is not being formed locally but is coming from another source.

(Encana Opposition (IBLA 2006-155), Ex. 26 at 3.)

In a June 6, 2006, addendum to that report, CH2M Hill reached a similar conclusion after analysis of Jonah ozone data for 2005 and 2006. It stated: "It remains our position that the elevated ozone readings in the Pinedale area in February 2005 and 2006 are not attributable to photochemical processes involving local industrial sources of air pollution. Rather, the elevated readings were caused by natural transport to the ground of ozone from the lower levels of the ozone-rich stratosphere." (EnCana Sur-Reply in Opposition, Ex. 33 at 2.) CH2M Hill also stated that "[t]he Jonah ozone data do not currently demonstrate a violation of the EPA 8-hour ozone standard since we only have two years of data and the fourth highest

measured 8[-]hour concentration is less than 85 ppb [part per billion] in both 2005 and 2006." Id.

BP America explains:

> There have been no measured ozone levels that may properly be considered an exceedance in the area. The "exceedances" in February 2005 and 2006 are anomalies that appear to be caused by natural events in the atmosphere and not from any emissions sources. * * * Furthermore, under EPA's regulations, there is no violation of the ozone standard until the fourth highest annual eight-hour concentration, averaged over three years, exceeds 80 parts per billion. 40 C.F.R. § 50.10; Part 50 App. I, § 2.3. The anomalous "exceedances" in February 2005 and 2006 do not constitute a violation of the ozone standard under EPA's regulations.

(Opposition (IBLA 2006-155) at 16.) Thus, BP America's position is that there have never been any reported "exceedances" which would preclude use of the rural table. [24/] EnCana also points out that BLM was aware of these exceedances, and adopted measures in its ROD to respond appropriately to any future events. (Opposition (IBLA 2006-155) at 41, n.27 (citing FEIS at 5-3, and ROD, Appendix A, at A-4).)

EnCana concludes that BLM's estimate of an 8-hour concentration of 54.7 $\mu g/m^3$ in the expected ozone level attributable to Project emissions was "highly conservative," and, when added to the long-term monitoring existing ozone concentration of 75.2 $\mu g/m^3$, results in a cumulative ozone concentration of 129.9 $\mu g/m^3$, below the 8-hour NAAQS of 157 $\mu g/m^3$. (Opposition (IBLA 2006-155) at 41; see BP America Opposition (IBLA 2006-155) at 15 ("[T]he Scheffe modeled result is very conservative and greatly overstates what actual ozone impacts are likely to be").)

Although WOC has raised a number of arguments related to asserted deficiencies in the Scheffe model and its application by BLM, particularly the projected levels of ozone, the record fails to show objections by EPA or WDEQ to its

---

[24/] "Based on the data, the science of ground level ozone formation, an analysis of the data and an analysis of causation, these February 2005 events were caused either by stratospheric ozone intrusion or other natural events, and therefore can be excluded or adjusted by the Regional Administrator to accurately reflect the state of ozone in Wyoming. 40 C.F.R. Part 50, Appendix I." (EnCana Opposition (IBLA 2006-155), Ex. 26 at 4.)

use or application. As noted in the Final Air Quality TSD at 34, "Adding $NO_x$ and VOC emissions to the ambient air, where some amount of $O_3$ has already formed, is not necessarily an indication that the potential for ozone formation has increased. In fact, it could decrease, since the ambient background conditions that caused $O_3$ formation have changed, and the new mixture of chemical species in the atmosphere may not be conducive to $O_3$ formation." Moreover, as noted above, BLM has taken steps in the ROD to ensure achievement of air quality goals. WOC has failed to show a likelihood of success on the arguments related to the Scheffe model and its application.

WOC also argues that BLM failed to consider the cumulative impacts of Project activities and other facilities affecting air quality in the region, in terms of the impact of VOC emissions on the ozone concentration in "western Wyoming." (Petition at 61.) While the record shows that BLM, in fact, considered the cumulative effect of Project emissions when added to background levels on the ozone concentration in the Project area (see FEIS at 4-19; FEIS, Appendix J, at J-3 (Table J-6)), BLM admits that it did not incorporate VOC emissions and background VOC concentrations in its assessment of the cumulative impacts of the Project outside the Project area. (Response (IBLA 2006-155) at 24.)

BLM explains that it expects "maximum ozone impacts * * * to occur within or  immediately adjacent to the Jonah Infill Project Area," and that its analysis "concluded that the maximum predicted quantity of ozone that could be formed from the Jonah Infill Project in combination with other existing projects and potential future developments is less than the NAAQS." Id. at 24, n.9 (citing Final Air Quality TSD at 57 and FEIS at 4-6). BLM determined that, while VOC emissions play a role in the formation of ozone, it is difficult, if not impossible, to model the relationship between an individual source of VOC emissions and the formation of ozone. For that reason, it determined that a regional VOC inventory would not provide additional useful information for its NEPA analysis.

While WOC speculates that local communities and nearby Class I national parks and wilderness areas might have greater concentrations of ozone than occur in the Jonah Field, it does not offer any objective evidence that BLM's determination not to inventory regional VOC emissions was inappropriate. BLM's position is supported by the fact that EPA stated in its February 10, 2006, comment letter on the FEIS that "the new air quality modeling performed in the supplemental analysis forms an excellent foundation for an improved understanding of air quality for other projects in the region." WOC has not shown a likelihood of success on the merits of its argument.

Next, WOC argues that BLM failed to properly evaluate the potential negative effects on human health associated with Project emissions of $PM_{2.5}$. It states that BLM's modeling of air quality impacts indicates that, during the early stages of the Project, Project activities are likely to cause total 24-hour $PM_{2.5}$ concentrations in the Project area to reach 49.2 $\mu g/m^3$, with a cumulative total of 62.4 $\mu g/m^3$ given other regional sources. (Petition at 57.) It further states that Project activities will result in a total 24-hour concentration of 44.0 $\mu g/m^3$, given the baseline concentration and expected emissions. (Petition at 57 (citing FEIS, Appendix J, at J-3 (Table J-5)).) It notes that EPA set the NAAQS for $PM_{2.5}$ at a concentration of 65 $\mu g/m^3$ over a 24-hour period in 1997, but that studies since that time have revealed that a standard of 35 $\mu g/m^3$ is more appropriate to protect public health, that EPA proposed that standard on January 17, 2006, and that EPA must finalize its new standard by September 27, 2006, pursuant to a court-ordered consent decree: "'[T]he current primary [24-hour and annual] $PM_{2.5}$ standards, taken together, are not requisite to protect public health with an adequate margin of safety[.]'" (Petition at 57 (quoting 71 FR 2620, 2643 (Jan. 17, 2006), and citing 71 FR at 2624).)

WOC recognizes that the new 24-hour $PM_{2.5}$ standard has yet to be adopted, but argues that BLM must consider the effects on human health of the $PM_{2.5}$ emissions allowed by the Project, given the "large body of compelling scientific evidence" that such emissions will cause significant adverse health effects:

> Judged against EPA's currently pending 24-hour standard of 35 $\mu g/m^3$, which stands as a surrogate for the massive body of health effects research published in the last nine years, the Jonah Infill project will create hazardous levels of $PM_{2.5}$ pollution that can be expected to cause increased mortality, hospitalizations and other serious adverse health effects.

(Petition at 57, 58.) WOC argues that, given the current state of knowledge about the health effects of $PM_{2.5}$ emissions, it is not sufficient for BLM to "assume that $PM_{2.5}$ emissions will be harmless to human health" because those emissions will be below 65 $\mu g/m^3$. (Petition at 58 (citing FEIS at 4-19).)

EnCana asserts that Project emissions need not comply with an NAAQS which is "not currently in effect, and may not be in effect until 2007 or beyond." (Opposition (IBLA 2006-155) at 42.) Likewise, it contends BLM cannot be held to have violated NEPA by failing to rely on a proposed EPA $PM_{2.5}$ standard as a baseline which may or may not become an NAAQS standard. BP America points out, citing 71 FR 2620 (Jan. 17, 2006), that EPA solicited comments on alternative levels of a 24-hour $PM_{2.5}$ standard ranging from 25 $\mu g/m^3$ to 65 $\mu g/m^3$. See Opposition (IBLA 2006-155) at 17-18.

WOC has not shown a likelihood of succeeding on the merits of its argument that BLM failed properly to evaluate potential negative effects on human health associated with Project emissions of $PM_{2.5}$ because it failed to utilize a standard presently incorporated in proposed rulemaking. At this point, the final standard can only be a matter of speculation. See Edwardsen v. U.S. Department of the Interior, 268 F.3d 781, 789 (9th Cir. 2001). Moreover, assuming EPA were to reduce the standard, it would be applicable to the Project area. [25/]

In addition to its NEPA challenges, WOC also alleges that BLM's approval of the Project violates the land-use plan conformance requirement of section 302(a) of FLPMA, 43 U.S.C. § 1732(a) (2000), since it authorizes the drilling of 3,100 wells in an area where the Pinedale RMP "allows no more than 900 wells[.]" [26/] (Petition at 16 (citing Norton v. Southern Utah Wilderness Alliance, 542 U.S. 55, 69 (2004)).)

We find no restriction in the RMP on the number of wells that can be drilled within the Pinedale Resource Area. BLM assumed for purposes of its NEPA analysis at the time of preparation of the RMP EIS in 1987 that drilling would not exceed 900 wells. (Pinedale RMP ROD at 15; FEIS at 1-10.) This is termed the "Reasonably Foreseeable Development" (RFD) scenario. See FEIS at 1-10. BLM was not, however, precluded by the RMP from later approving drilling in excess of 900 wells. As we stated in Wyoming Outdoor Council, 164 IBLA 84, 99 (2004), "implicit in WOC's argument is the conviction that the RFD scenario establishes a point past which further exploration and development is prohibited * * *. We do not agree." See Southern Utah Wilderness Alliance, 159 IBLA 220, 234 (2003). We further stated that "[t]he better question is whether in any given case an exceeded RFD scenario demonstrates that further environmental analysis is required, a question that must be determined on a case-by-case basis." Id. at 102.

BLM simply could not rely on the RMP EIS to satisfy its NEPA obligation to address the likely environmental impacts of approving more drilling. BLM was required to separately comply with section 102(2)(C) of NEPA. Therefore, when BLM prepares additional NEPA analysis for proposed oil and gas development, as it

---

[25/] EnCana states that should a new 24-hour $PM_{2.5}$ standard be promulgated after Project approval, WDEQ will ensure compliance by addressing the standard in its SIP and implementing appropriate measures to protect any new $PM_{2.5}$ NAAQS standard.

[26/] The 3,100 wells would be drilled across two areas, one subject to the Pinedale RMP and the other to the Green River RMP. WOC does not assert that the number of wells drilled in the latter area would violate the Green River RMP. We note that oil and gas leasing and development were generally authorized in the portion of the Project area covered by the Green River RMP. (Green River RMP at 12, Map 13 ("No Lease Areas").)

has done in this case, the RFD scenario does not serve as a limitation on further exploration and development. WOC has failed to show a likelihood of prevailing on the merits of its argument that BLM's approval of the Project is violative of the land use plan conformance requirement of section 302(a) of FLPMA.

BCA Arguments on Likelihood of Success

BCA contends that BLM's rejection of the directional drilling alternative, which it alleges "was initially considered as Alternative E in the DEIS, but was dropped from further consideration in the FEIS," is unreasonable and unsupported by the record. [27/] (Petition at 24.) BCA claims that directional drilling of Project wells "is feasible from both the technical and economic perspective, and would produce the gas reserves of the Jonah Field as fully as the use of 3,100 vertical wells." Id. It notes that EnCana has drilled directional wells in the Project area for years, and currently has 160 such wells, thereby establishing that such drilling is both feasible and economic. [28/] It also notes that BLM has acknowledged that the costs to directionally drill a group of wells at one well pad may be the "'same or less'" than the costs of well pad construction and vertical drilling at separate well pads for the same number of wells. (Petition at 29 (quoting Best Management Practices for Fluid Minerals, Wildlife Management, BLM (Ex. R attached to Petition), at unpaginated 9).) BCA states that directional drilling would reduce production by four percent (or less with "remediation") compared to vertical drilling: "In a field estimated to contain 10.5 **trillion** cubic feet of natural gas reserves, the difference of 4% is quite negligible[.]" (Petition at 28 (citing Declaration of Kenneth Kreckel, [29/] dated Apr. 10, 2006 (Ex. J attached to Petition)).) [30/]

---

[27/] Despite this claim by BCA, Alternative B of the DEIS, which was carried through to the FEIS, required that all new wells be drilled from existing expanded well pads, clearly a directional drilling alternative. Under that alternative, there would be 3,081 acres of new disturbance from expanding 497 existing well pads. (FEIS at 2-16; see FEIS at iv.) Alternative E provided that "[a]ll new wells would be drilled from the 497 existing and 266 new well pads," resulting in 5,742 acres of new initial surface disturbance. (DEIS at 2-16.) Thus, Alternative E would result in substantially greater surface disturbance than Alternative B.

[28/] EnCana states that, although directional drilling is "technically difficult in the JIDP, and results in significant lost reserves," it has undertaken such drilling in the past "[i]n order to comply with surface disturbance limitations imposed in previous [BLM approval] documents." (Opposition (IBLA 2006-155) at 9 n.5.)

[29/] In its petition, BCA refers to Kreckel as "Dr. Kreckel." E.g., Petition at 28. While Kreckel has considerable oil and gas experience, having worked for major oil

(continued...)

BCA complains that BLM's estimate of unrecovered oil and gas reserves "is based entirely on use of present-day technology and prices. It does not take into account the fact that over time technology will improve, experience will lead to more efficient drilling techniques, and the price of gas is predicted to rise indefinitely into the future." (BCA Reply at 4.)

In the ROD, BLM acknowledged that a directional drilling alternative (Alternative B) would benefit wildlife and other resources. However, it rejected that alternative because it found that Alternative B would result in the non-recovery of approximately 1.8 trillion cubic feet of natural gas and 18 million barrels of oil and, thereby, would fail to achieve fully the aims of the proposed action. (ROD at 13; FEIS at 4-28 to 4-29.) In addition, BLM determined that Alternative B could have a greater cumulative impact on air quality resources due to extending drilling times per well for directional drilling.

EnCana notes that BLM relied on a report prepared for EnCana by Resource Management Services, Inc. (RMS), entitled "Jonah Infill Drilling Project Evaluation of Directional Drilling," dated July 16, 2004 (Ex. 15 attached to EnCana Opposition (IBLA 2006-157)), which discusses in detail the unique geological conditions of the Jonah Field and the difficulties associated with directional drilling in that field, based on EnCana's experience. (Opposition (IBLA 2006-157) at 18.) EnCana explained that, in addition to increased costs of approximately $240,000 per well, "directional drilling leads to differential sticking (when the drill pipe becomes attached to the borehole wall), stuck casing (the inability to circulate casing at the bottom of the well during completion which potentially strands reserves), and casing set off-bottom

---

29/ (...continued)
companies from 1974 through 2000, he lists his education as including only a Bachelor of Science degree in Geology. (Ex. J (attached to Petition (IBLA 2006-157)), Attachment A, "Comments on Various Analyses of Drilling Alternatives for Jonah Field," at 20.) We note that in the section of his Comments containing recommendations, Kreckel states at page 14 that "[t]he BLM should always fully evaluate alternatives utilizing directional drilling such as Alternative E. It is disturbing that Alternative E was not included in the final EIS." Kreckel does not mention the fact that BLM considered Alternative B, a directional drilling alternative, in the FEIS.

30/ EnCana argues that the Board should not consider Kreckel's Declaration and Comments because they were offered for the first time on appeal. It cites Board precedent to the effect that the Board will consider on appeal only those issues raised by the party in its prior participation. BCA raised the issue of directional drilling in its comments on the DEIS. See Public Comment Analysis Report at 229-30. Kreckel's submissions are appropriate for consideration on appeal.

(when casing does not reach the total depth of the well bore, stranding reserves)." [31/] Id. EnCana asserts that, based on its experience drilling 140 directional wells in the Jonah Field, it found that "casing in directional wells is stuck 86% of the time, and that the casing in directional wells is stuck off bottom 28% of the time, resulting in significant lost reserves." Id.; FEIS, Appendix B ("Jonah Infill Drilling Project Development Procedures Technical Support Document"), at 10 ("[D]irectional wells have a greater risk of total failure, require additional time and costs to develop, may be uneconomic in some cases, and may result in unrecovered reserves").)

Further, EnCana states that directional drilling will have "significantly (20%) greater air emissions" than vertical drilling, owing to the "longer drilling times, increased load factors on drilling rig engines, and increased traffic required." (Opposition (IBLA 2006-157) at 10; see ROD at 13.) BCA responds in its reply at 3 that operators would be free to drill as many wells as they deem appropriate from the existing wellpads, although they might have "to proceed at a slower pace due to * * * the potential for greater air emissions." Nevertheless, as RMS points out, while directional drilling may help control the surface footprint of development of the field, the impact of the Project includes not only the size of the disturbed area but also the length of time the development footprint impacts the surface. (Ex. 15 attached to EnCana Opposition (IBLA 2006-157) at 23.)

Despite BCA's concerns with and objections to BLM's rejection of a directional drilling alternative, it has failed to show a likelihood of success in showing that BLM did not have a rational basis for rejecting a directional drilling alternative as the preferred alternative in the ROD.

Next, BCA contends that BLM's approval of the Project violates the requirement of section 302(b) of FLPMA, 43 U.S.C. § 1732(b) (2000), that, in managing the public lands, BLM "take any action necessary to prevent unnecessary or undue degradation of the lands." (Petition at 20.) It also contends that BLM violated NEPA, arguing that "BLM must demonstrate that it has complied with the 'unnecessary or undue degradation' standard," that it must do so in the EIS, and that, having failed to do so, BLM violated NEPA:

> BLM's UUD [unnecessary or undue degradation] responsibilities are intertwined with the agency's NEPA duties. Under NEPA, BLM must identify impacts a proposed action will have to the environment;

---

[31/] Although BCA asserts that greater drilling costs might be offset by lesser well pad construction costs, EnCana points out that operator costs did "not appear to have been a factor in the BLM's decision not to require all directional drilling." (Opposition (IBLA 2006-157) at 20.)

married to this obligation are the duties imposed by FLPMA to identify the thresholds of acceptable impact and then determine whether the impacts are unnecessary or undue. * * *

BLM has violated NEPA by failing to engage in the analysis needed to ensure that unnecessary actions are not undertaken, by failing to establish thresholds for acceptable levels of impact beyond which degradation is undue, and by failing to demonstrate the methodologies used to prevent UUD are reliable and verified.

* * * * * * *

* * * At no point * * * in the EIS process does BLM attempt to determine a threshold level at which the project would constitute unnecessary or undue degradation, nor does the agency make any effort whatsoever to analyze whether such a threshold has been crossed. [[32/]]

Id. at 20-23. BCA concludes that, "[w]hile impacts are disclosed by the NEPA analysis in the FEIS, BLM has not assessed the impacts through the lens of its FLPMA 'unnecessary or undue degradation' duties," and has thereby failed in its affirmative obligation to prevent impacts that cause such degradation. Id. at 49, emphasis added.

BCA has failed to show a likelihood of success on its argument that BLM has a procedural obligation under NEPA to demonstrate compliance with section 302(b) of FLPMA by considering a threshold level at which the project would constitute unnecessary or undue degradation of the public lands. BLM's obligation under

---

[32/] BCA also argues that BLM must determine whether the Project will unnecessarily or unduly degrade the public lands when approving the drilling project, rather than later at the time of APD approval, since,"under 43 CFR 3101.1-2, once the operators have applied for permits to drill (APD), they acquire surface use rights which may preclude BLM from taking all necessary action, including denial of an APD, to prevent unnecessary or undue degradation of non-mineral resources." [Emphasis added.] (Petition at 37.) Essentially, it asserts that following Project approval BLM loses its right to restrict drilling activity at the time of APD approval, even if unnecessary or undue degradation were to occur. That is clearly not the case. The rights attendant to an oil and gas lease are limited by lease stipulations, the requirements of nondiscretionary statutes, and reasonable measures to minimize adverse impacts to public lands and resources. 43 CFR 3101.1-2; Wyoming Outdoor Council v. Bosworth, 284 F. Supp. 2d 81, 91 (D.D.C. 2003).

section 102(2)(C) of NEPA is to consider the likely significant impacts of approving the Project, not to establish some specific threshold beyond which any impacts will be considered unnecessary or undue.

We note that prior Departmental regulations provided that, during the environmental review process, BLM would assess whether the approval of a mining plan of operations for hard-rock minerals complied with the FLPMA obligation to prevent unnecessary or undue degradation. See Kendall's Concerned Area Residents, 129 IBLA 130, 137-38, 140-41 (1994) (citing 43 CFR 3809.2-1(b) (1989)). That regulation, however, has since been deleted. Moreover, no comparable regulation exists relating to BLM's approval of oil and gas development. [33/] See EnCana Opposition (IBLA 2006-157) at 13.

BLM does have a substantive obligation under FLPMA to prevent unnecessary or undue degradation of the public lands, and BLM is required to ensure that approved activities will not unnecessarily or unduly degrade public lands. BLM was cognizant of that obligation and found that the Project was not likely to cause unnecessary or undue degradation. See FEIS at 1-4 ("[Lessees have a] statutory right * * * to develop [F]ederal mineral resources * * * as long as unnecessary and undue environmental degradation is not incurred"); Public Comment Analysis Report at 185-87.

Although BCA complains that "tighter well spacing" by itself constitutes undue degradation under FLPMA (Petition at 32), BLM obtained State approval for 10-acre surface spacing, which the State considered necessary to fully develop the Jonah Field. See EnCana Opposition (IBLA 2006-157) at 22. In addition, BLM determined that "[a]t least 3,100 additional wells would be required to fully develop the field and

---

[33/] The Department has offered no regulatory definition of what constitutes "unnecessary or undue degradation" in the context of onshore oil and gas operations. In the absence of a definition, the Secretary may, in the exercise of discretion, address the matter on a case-by-case basis. See Mineral Policy Center v. Norton, 292 F. Supp.2d 30, 44-45 (D.D.C. 2003). Nevertheless, in Colorado Environmental Coalition, 165 IBLA 221, 229 (2005), a case involving a challenge to a decision denying a protest of the approval of applications for permit to drill for oil and gas, the Board suggested that an appellant seeking to show that an action results in undue or unnecessary degradation would have to establish, at a minimum, that operations would be "conducted in a manner that does not comply with applicable law or regulations, prudent management and practice, or reasonably available technology, such that the lessee could not undertake that action pursuant to a valid existing right."

anything less would result in stranded resources that would most likely never be recovered." (ROD at 15; FEIS at 2-7.)

BCA also charges that the Project activities will result in undue degradation of sensitive wildlife species, cultural resources, and paleontological resources. See, e.g., Petition at 32-33, 39. BCA charges at pages 32-33 of its petition that "[b]ecause two-thirds of the project area would undergo surface disturbance under the approved project, it can be inferred that two-thirds of the archaeological and historical sites will be impacted." However, BCA does not provide any evidence that any historic property considered eligible or potentially eligible for inclusion in the National Register of Historic Places and entitled to protection under section 106 of the National Historic Preservation Act, as amended, 16 U.S.C. § 470f (2000), is likely to suffer an adverse effect which cannot be avoided or mitigated, as required by the statute and its implementing regulations (36 CFR Part 800). Likewise, it offers no evidence that, given mitigation measures, paleontological resources will be unnecessarily or unduly degraded.

In addition, BCA fails to provide any evidence that the Project is likely to contribute to the need to list any of the sensitive wildlife species as threatened or endangered under the Endangered Species Act of 1973 (ESA), as amended, 16 U.S.C. §§ 1531-1543 (2000). See Petition at 43, 44-45, 47-48, 55. BLM determined that, even with infill drilling, the Project and existing and reasonably foreseeable future development will impact only a small portion of the overall habitat area used by the affected wildlife, including sensitive species: "[F]ull development in the Jonah Field will modify only up to 1.7% [of the] pronghorn [antelope] cumulative impact area, [12.7%] of the small mammal cumulative impact area, [11.5% of the raptor cumulative impact area,] and 4.8% of the cumulative impact area for [greater] sage-grouse and other game birds." (EnCana Opposition (IBLA 2006-157) at 29 (citing FEIS at 4-68 to 4-72); see FEIS at 4-74 ("Impacts to BWS [BLM Wyoming Sensitive] animal species generally would be similar to those described for wildlife"), 4-77.). BCA argues that wildlife will be displaced from the Project area onto areas which are already leased for oil and gas, since most of the public lands subject to the jurisdiction of BLM's Pinedale Field Office are already leased. However, there is no indication that development is likely to occur on all those lands at the same time or that displaced wildlife will not be able to relocate to suitable habitat, given the anticipated ongoing reclamation. E.g., FEIS at 4-56.

BLM considered the likely significant adverse impacts of the Project and concluded that the Project would not contribute to the need to list any of the sensitive wildlife species as threatened or endangered under the ESA, unnecessarily or unduly damage or destroy any cultural or paleontological resource, or otherwise result in unnecessary or undue degradation of the public lands. See, e.g., ROD at 4-

6; FEIS at 3-28 to 3-29, 3-66 to 3-68, 3-71 to 3-85, 4-30 to 4-32, 4-55 to 4-77, 4-79 to 4-84.

BCA has not shown a likelihood of success on its arguments that the Project activities will result in undue degradation of sensitive wildlife species, cultural resources, and/or paleontological resources.

We, therefore, conclude that appellants have failed to demonstrate that they are likely to succeed on the merits of their appeals. For that reason, they have not satisfied their burden of demonstrating sufficient justification for the requested limited stays.

Accordingly, pursuant to the authority delegated to the Board of Land Appeals by the Secretary of the Interior, 43 CFR 4.1, the petitions for stay filed by WOC and BCA are denied.

Bruce R. Harris
Deputy Chief Administrative Judge

APPEARANCES:

Attorneys for Wyoming Outdoor Council, et al.

Timothy J. Preso, Esq.
Abigail M. Dillen, Esq.
Earthjustice
209 South Willson Avenue
Bozeman, MT 59715-4759
**FAX: 406-586-9695**

Robert E. Yuhnke, Esq.
Robert E. Yuhnke & Associates
2910-B County Road 67
Boulder, CO 80303
**FAX: 303-499-4454**

Lisa D. McGee, Esq.
Wyoming Outdoor Council
262 Lincoln Street
Lander, WY 82520
**FAX: 307-332-6899**

Attorney for Biodiversity Conservation Alliance & Center for Native Ecosystems

Suzanne H. Lewis, Esq. **FAX: 307-742-7989**
Biodiversity Conservation Alliance
P.O. Box 1512
Laramie, WY 82073

Attorneys for the Bureau of Land Management

S. Amanda Koehler, Esq. **FAX: 303-231-5363**
Arthur R. Kleven, Esq.
Office of the Regional Solicitor
U.S. Department of the Interior
755 Parfet Street, Suite 151
Lakewood, CO 80215

Attorneys for EnCana Oil & Gas (USA) Inc.

Laura Lindley, Esq. **FAX: 303-892-1401**
Robert C. Mathes, Esq.
Bjork Lindley Little PC
1600 Stout Street, Suite 1400
Denver, CO 80202

Dennis L. Arfmann, Esq. **FAX: 720-406-5301**
Jennifer L. Morris, Esq.
Hogan & Hartson L.L.P.
1470 Walnut Street, Suite 200
Boulder, CO 80302

Mary A. Viviano, Esq. **FAX: 720-876-3655**
Erika Z. Enger, Esq.
EnCana Oil & Gas (USA) Inc.
370 17th Street, Suite 1700
Denver, CO 80202

Attorneys for BP America Production Co.

John F. Shepherd, Esq., P.C.
Holland & Hart LLP
555 Seventeenth Street, Suite 3200
P.O. Box 8749
Denver, CO 80201-8749
FAX: 303-713-6296

Jack D. Palma, Esq., P.C.
Jenifer E. Scoggin, Esq.
Holland & Hart LLP
2515 Warren Avenue, Suite 450
P.O. Box 1347
Cheyenne, WY 82003-1347
FAX: 307-778-8175

Jeffrey C. Conrad, Esq.
BP America Production Co.
501 Westlake Park Boulevard
Houston, TX 77079

Attorneys for the State of Wyoming

Patrick J. Crank, Esq.
Vicci M. Colgan, Esq.
Nancy E. Vehr, Esq.
Office of the Attorney General
Water and Natural Resources Division
123 State Capitol
Cheyenne, WY 82002
FAX: 307-777-3542

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

THEODORE ROOSEVELT CONSERVATION PARTNERSHIP
555 Eleventh St. N.W., 6th Floor
Washington, DC 20004,

Plaintiff,

v.

DIRK KEMPTHORNE, in his official capacity as the Secretary of the United States Department of the Interior
1849 C Street, N.W.
Washington, DC 20240,

and

UNITED STATES BUREAU OF LAND MANAGEMENT
1849 C Street, N.W., Room 406-LS
Washington, DC 20240,

Defendants.

ANADARKO PETROLEUM CORPORATION,
P.O. Box 1330
Houston, TX 77251-1330,

WARREN RESOURCES, INC.,
489 Fifth Avenue, 32nd Floor
New York, NY 10017,

DOUBLE EAGLE PETROLEUM CO.,
777 Overland Trail, Suite 208
P.O. Box 766
Casper, WY 82602-0766,

Defendant-Intervenors.

CASE NO. 1:07-cv-01486-RJL

STATE OF WYOMING )
123 Capitol Building )
Cheyenne, WY 82002 )

Defendant-Intervenor. )

## [PROPOSED] ORDER

This matter having come before the Court on the parties' motions and cross-motions for summary judgment and upon oral argument,

It is hereby ORDERED that

1) Plaintiff's Motion for Summary Judgment is denied;

2) Defendant-Intervenors' Cross-Motion for Summary Judgment is granted;

3) Plaintiff's First Amended and Supplemented Complaint, which was filed on April 7, 2008, is dismissed with prejudice;

4) each party shall bear its own costs.

It is SO ORDERED.

________________ ______________________________

Date

Richard J. Leon
United States District Judge

A/72561911.1