IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

THEODORE ROOSEVELT                         )
CONSERVATION PARTNERSHIP                    )
555 Eleventh St. N.W., 6th Floor            )
Washington, DC 20004,                       )
                                            )
       Plaintiff,                  )
                                            )
    v.                              )          CASE NO. 1:07-cv-01486-RJL
                                            )
DIRK KEMPTHORNE, in his official            )
capacity as the Secretary of the United States )
Department of the Interior                  )
1849 C Street, N.W.                         )
Washington, DC 20240,                       )
                                            )
   and                             )
                                            )
UNITED STATES BUREAU OF LAND                )
MANAGEMENT                                  )
1849 C Street, N.W., Room 406-LS            )
Washington, DC 20240,                       )
                                            )
    Defendants.                 )
_____)
                                            )
ANADARKO PETROLEUM CORPORATION,             )
P.O. Box 1330                               )
Houston, TX 77251-1330,                     )
                                            )
WARREN RESOURCES, INC.,                     )
489 Fifth Avenue, 32nd Floor                )
New York, NY 10017,                         )
                                            )
DOUBLE EAGLE PETROLEUM CO.,                 )
777 Overland Trail, Suite 208               )
P.O. Box 766                                )
Casper, WY 82602-0766,                      )
                                            )
    Defendant-Intervenors.      )
_____)

|                              | )  |
|------------------------------|----|
| STATE OF WYOMING             | )  |
| 123 Capitol Building         | )  |
| Cheyenne, WY 82002           | )  |
|                              | )  |
|          Defendant-Intervenor. | )  |
|                              | )  |

**ANADARKO PETROLEUM CORPORATION, WARREN RESOURCES, INC., AND DOUBLE EAGLE PETROLEUM CO.'S REPLY IN SUPPORT OF THEIR <u>MOTION TO STRIKE</u>**

In its opposition to defendants' motions to strike, Plaintiff Theodore Roosevelt Conservation Partnership ("TRCP") essentially seeks to circumvent its obligation to bring information to the agency's attention during the relevant administrative proceedings. Throughout BLM's six-year decision-making process, TRCP had numerous opportunities to provide the evidence to BLM that it now, for the first time, submits to this Court. TRCP failed to "meaningful[ly]" comment, if at all, on the issues it now claims "ought to be" considered and, "after failing to do more to bring the matter to the agency's attention, seek[s] to have the agency determination vacated on the ground that the agency failed to consider matters 'forcefully presented.'" *Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 553 (1978). This is the exact gamesmanship the Supreme Court has admonished against in *Vermont Yankee*. TRCP's actions, if allowed, would undermine the principles behind the record review rule and frustrate the administrative process.

Moreover, BLM did not ignore or omit from its review the issues raised by TRCP. It identified those issues and addressed them in the environmental impact statement ("EIS") and record of decision ("ROD") for the Atlantic Rim Project. TRCP does not explain that the record is inadequate, requiring the Court to look to extra-record evidence, but complains that BLM's

consideration of these issues was inadequate.  As such, TRCP's attempts to use the limited

exceptions to the record rule are futile and, in essence, would eviscerate the record rule and the

limits to judicial review of agency actions.  TRCP's attempts should not be condoned, and the

extra-record evidence and the arguments relying thereon should be stricken.

## I.    TRCP FAILED TO SUBMIT THE EXTRA-RECORD EVIDENCE TO BLM AND CANNOT NOW SUBMIT IT FOR THE FIRST TIME TO THIS COURT.

TRCP contends that "[i]t was not incumbent on TRCP to anticipate BLM's

misapplication of, or failure to consider, *relevant information before the agency*."  TRCP Opp'n

at 20 (emphasis added).  TRCP goes so far as to say that *Vermont Yankee* is not applicable in this

case.  TRCP, however, has submitted evidence to the Court that was *not* before the agency in

contravention of the record rule in cases under the Administrative Procedure Act ("APA").  It

makes no showing why it could not have provided these documents during the numerous

opportunities for public comment.  Instead, it waited over one year *after* the ROD was issued to

present the information.

TRCP's claim that *Vermont Yankee* is inapplicable to this case ignores the fact that it is a

Supreme Court case governing challenges brought under the National Environmental Policy Act

("NEPA").  The Supreme Court in *Vermont Yankee* found, in a NEPA case, that *the challenger*

has the burden to sufficiently raise the issue before the agency:

> [W]hile it is true that NEPA places upon an agency the obligation
> to consider every significant aspect of the environmental impact of
> a proposed action, *it is still* incumbent upon intervenors who wish
> to participate to structure their participation so that it is
> meaningful, so that it alerts the agency to the intervenors' position
> and contentions.  "[C]omments must be significant enough to step
> over a threshold requirement of materiality before any lack of
> agency response or consideration becomes of concern.  The
> comment cannot merely state that a particular mistake was made
> . . . ; *it must show why the mistake was of possible significance in
> the results . . . .*"

435 U.S. at 553 (quoting *Portland Cement Ass'n v. Ruckelshaus*, 486 F.2d 375, 394 (1973)) (emphasis added). The Supreme Court further noted that challengers should not treat administrative proceedings as "a game or a forum to engage in unjustified obstructionism." *Id.* at 553-54.

The Supreme Court reiterated this obligation on "[p]ersons challenging an agency's compliance with NEPA" in *Department of Transportation v. Public Citizen*, 541 U.S. 752, 764 (2004). In that case, the Supreme Court, recognizing the agency's primary responsibility to ensure compliance with NEPA, found that, because the parties "did not raise these particular objections" regarding failure to consider possible alternatives, the parties "forfeited any objection to the EA [(environmental assessment)] on the ground that it failed adequately to discuss potential alternatives to the proposed action." *Id.* at 764-65. Contrary to TRCP's suggestion, this is not mere criticism of the "lack of precision" of TRCP's comments, but of TRCP's failure to provide any of the evidence it places before this Court to the agency during the decision-making process. TRCP Opp'n at 20. If the Court allowed TRCP to submit this evidence in its challenge to BLM's decision, it would create incentives for every project opponent to sit back during the administrative process and then, after the agency's review, complain to the Court that such review was inadequate, resulting in potential delays of agency action and a waste of resources. This is precisely the gamesmanship the Supreme Court found improper.[1]

---

[1] Rather than explain its failure to present this evidence to the agency or even to formally seek to add this evidence to the record, TRCP argues that it is defendants that have misunderstood the distinction between record supplementation and extra-record review, claiming that TRCP had not waived its ability to offer extra-record evidence. TRCP Opp'n at 18-19 (citing *Pac. Shores Subdivision, Cal. Water Dist. v. U.S. Army Corps of Eng'rs*, 448 F. Supp. 2d 1 (D.D.C. 2006)). TRCP, however, bears the burden of establishing that the extra-record evidence is permissible. As noted by Magistrate Judge Facciola of this Court in *Pacific Shores Subdivision, California Water District v. U.S. Army Corps of Engineers* in declining to review extra-record evidence, "[w]hile a motion for the Court to consider the fourteen documents at issue as extra-record evidence may be appropriate in this case, such a motion is not presently before me." 448 F. Supp. 2d at 6. Instead of so moving, TRCP merely attached and cited to such evidence with no justification to this Court until defendants' filed their motions to strike. Moreover, TRCP did not request discovery or indicate to defendants that it would seek to submit expert testimony.

## II.    TRCP CANNOT RELY ON THE LIMITED EXCEPTIONS TO THE RECORD RULE.

TRCP attempts to excuse its failure to present the extra-record information to the agency prior to judicial review by asserting that "*the issues presented* in this matter by TRCP were placed before the agency."  TRCP Opp'n at 20 (emphasis added).  But, this is precisely the point. BLM considered the matters of which TRCP complains.  TRCP simply disagrees with BLM's final decision and attempts to undermine that decision by submitting evidence to this Court that it did not submit to BLM during the administrative proceeding.  As such, TRCP's attempts to rely on exceptions to the record rule based on *Esch v. Yeutter*, 876 F.2d 976 (D.C. Cir. 1989), are misplaced.  In any event, such exceptions are inapplicable here.

### A.    TRCP Has Failed To Show That The Record In This Case Is Inadequate For An Exception To Apply.

TRCP's reliance on *Esch v. Yeutter* is misplaced.  In that case, the D.C. Circuit noted:

> It is well settled that an agency is legally bound to respect its own regulations, and commits procedural error if it fails to abide them. The Department has adopted regulations specifying the procedures to be followed on administrative appeals, and appellees insist that in several respects they have been ignored.  The Department, on the other hand, invokes the familiar rule that judicial review of agency action is normally to be confined to the administrative record.  That principle exerts its maximum force when the substantive soundness of the agency's decision is under scrutiny; in the present case, the procedural validity of the Department's action also remains in serious question.  Particularly in the latter context, it may sometimes be appropriate to resort to extra-record information to enable judicial review to become effective.

876 F.2d at 991.  In its summary judgment papers, TRCP has not asserted procedures that BLM has not followed, but that the EIS is substantively inadequate.

In any event, TRCP must do more than merely claim an exception to the record rule. "Before invoking an exception, . . . the plaintiff must demonstrate bad faith or improper behavior on the part of the agency, or that, 'the record is so bare that it prevents effective judicial

review.'"  *Fund for Animals v. Williams*, 391 F. Supp. 2d 191, 198 (D.D.C. 2005) (citations

omitted).  *See also Stainback v. Sec'y of the Navy*, 520 F. Supp. 2d 181, 187 n.4 (D.D.C. 2007)

("Consideration of extra-record evidence is appropriate when simply reviewing the

administrative record is not enough to resolve the case.") (quoting *Pac. Shores Subdivision Cal.

Water Dist.*, 448 F. Supp. 2d at 6).  TRCP has not attempted to make any such showing in this

case, and thus the exceptions simply do not apply.

The EIS in this case alone is over 2700 pages, and the record consists of thousands of

pages.  Moreover, BLM considered the issues TRCP raises.  Even if some documents may create

a fuller record, none of the documents submitted or cited by TRCP "address issues not already

there."  *Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1451 (9th Cir.

1996) (quoting *Friends of the Earth v. Hintz*, 800 F.2d 822, 829 (9th Cir. 1986) (holding that the

district court properly limited review to the administrative record)).  For example, the extra-

record evidence submitted by TRCP regarding wind energy does not identify an issue not

considered by BLM.  BLM conducted an extensive analysis of cumulative impacts.  AR2482-

AR2508 (FEIS, Ch. 5).  In particular, BLM identified the potential impacts of wind energy, but

found no projects were proposed in the Atlantic Rim Project Area ("ARPA").  AR2483.  The

documents related to wind energy that TRCP seeks to submit do not identify any projects within

the ARPA, and thus do not contradict BLM's finding that, at the time the ROD was finalized,

there were no wind energy projects proposed that would require consideration.  *See* Defendant-

Intervenors Mem. in Opp'n to Plaintiff's Mot. and in Support of Cross-Mot. for Summ. J. at 22-

23 (Doc. No. 52).

In addition, BLM identified potential impacts to wildlife and potential mitigation to address those impacts, including adaptive management.[2]  For example, TRCP admits that BLM considered the issues presented in the Braun Declaration and that there is information regarding those issues in the administrative record.  *See, e.g.,* TRCP Opp'n at 20 (asserting that "much of the information relied on by Dr. Braun . . . was, in fact, before BLM at the time of its decision")[3], at 17 (listing work authored and co-authored by Braun "referenced . . . throughout the Administrative Record produced in this case").  TRCP has simply failed to show that the record is inadequate for the Court to determine whether BLM adequately considered the environmental impacts of the project.  Despite TRCP's contentions, the only reason to submit these documents is to question BLM's findings and decisions, not to ensure effective judicial review.  Again, this Court should not allow TRCP to undermine the principles behind administrative review cases.

B.    None Of The Exceptions To The Record Rule Are Applicable In This Case.

Even though TRCP has not shown that this Court need find an exception to the record rule in light of the substantial administrative record in this case, *Esch* does not create broad exceptions to the record rule as proposed by TRCP.  The exceptions to the record rule are "extremely limited."  *Custer County Action Ass'n v. Garvey*, 256 F.3d 1024, 1027 n.1 (10th Cir. 2001) (citation omitted).  *See also Fund for Animals*, 391 F. Supp. 2d at 197 ("Courts grant motions to supplement the administrative record only in exceptional cases.") (citations omitted).[4]

---

[2]  *See, e.g.,* AR2145-AR2146 (listing issues regarding wildlife identified during scoping process), AR2248-AR2279 (describing affected environment for wildlife and endangered and threatened species), AR2387-AR2417 (describing potential impacts and mitigation measures for wildlife and endangered and threatened species for each alternative), AR2496-AR2501 (describing potential cumulative impacts related to wildlife), AR2618- AR2632 (outlining wildlife monitoring and protection plan).

[3]  TRCP also admits that "a small portion" of the information post-dates BLM's actions.  TRCP Opp'n at 8 n.5.

[4]  The so-called *Esch* exceptions have also been referred to as non-binding dicta.  *See Peterson Farms I v. Espy*, 15 F.3d 1160, 1994 WL 26331, at *3 (D.C. Cir. Jan. 25, 1994); *Oceana, Inc. v. Evans*, 384 F. Supp. 2d 203, 217 n.17 (D.D.C. 2005).

Nonetheless, TRCP attempts to rely on three asserted exceptions to the record rule to bring in "expert" testimony through the Sparrowe and Braun Declarations. TRCP asserts there are broad exceptions for such evidence (1) to determine whether BLM considered all relevant factors or (2) to explain complex issues and (3) for such evidence in NEPA cases. However, none of these exceptions allow the type of expert testimony submitted by TRCP.[5]

Even if the experts were qualified by this Court based on the information submitted by TRCP,[6] such expert testimony is improper where it seeks to dispute the agency's findings. *See* Defendant-Intervenors' Mem. in Support of Mot. to Strike at 9-10 (Doc. No. 54). The cases cited by TRCP agree with this holding. For example, in *Spiller v. Walker*, the Court recognized that "plaintiffs cannot attempt to supplement the record for the sole purpose of competing in a battle of experts with an agency, because the Court must defer to the agency's selection of experts." No. A-98-CA-255-SS, 2002 WL 1609722, at *7 (W.D. Tex. July 19, 2002), *aff'd*, *Spiller v. White*, 352 F.3d 235 (5th Cir. 2003) (citing *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 378 (1989)).[7] In *Lee v. U.S. Air Force*, the U.S. Court of Appeals for the Tenth Circuit

---

[5] TRCP asserts that it is not "supplementing" the record, because BLM did not consider these extra-record documents. TRCP Opp'n at 18. BLM did not consider them, however, because TRCP did not submit them to the agency. Thus, this is not the case where the agency had the information, reviewed the information, and declined to include it in the record and is different from several of the cases relied on by TRCP. *Envtl. Def. Fund, Inc. v. Blum*, 458 F. Supp. 650, 661 (D.D.C. 1978) (involving "the anomalous situation . . . that highly relevant submissions in the agency's files are not considered by EPA to be part of the record as not relied upon in reaching its final order"); *Fund for Animals*, 391 F. Supp. 2d at 199 (finding plaintiff established that agency excluded evidence that were known to agency at time of its decision, that was directly related to the decision, and that was adverse to the agency's decision).

[6] Defendant-Intervenors do not contend that the experts providing the declarations are not qualified, but that they have not been qualified, as TRCP provided no indication that such affidavits would be submitted to the other parties or to this Court.

[7] In that case, the court struck portions of expert affidavits, finding "any legal conclusions and post-FONSI evidence within the declarations and argumentation offered simply to contest the agencies' experts are not admissible." *Spiller*, 2002 WL 1609722, at *8. The Braun Declaration includes post-decision information and clearly contests the agencies' experts with respect to proper mitigation measures for the sage grouse. While the expert affidavits were allowed in that case for the limited purpose of showing relevant factors that the agency did not consider when it conducted its EA, this case involves a detailed EIS, with an extensive administrative record that TRCP has failed to show is inadequate.

affirmed the district court's order to strike an expert affidavit as extra-record evidence because "neither the record nor an initial review of [the] affidavit convinces us that there are gaps or inadequacies in the EIS that would make admission of extra-record evidence appropriate. . . . In essence, [the affidavit] simply presents an expert opinion conflicting with the [agency's] conclusion . . .." 354 F.3d 1229, 1242 (10th Cir. 2004). The only "gaps" identified in the record are the disagreements these experts have with BLM's choice of mitigation measures. The Braun Declaration is intended to question BLM's findings with respect to adequate mitigation for the protection of the sage grouse.[8] Similarly, the Sparrowe Declaration is intended to question BLM's application of adaptive management.[9] This is improper use of expert declarations in a record review case.

TRCP claims that the Braun Declaration "should be permitted under the exception allowing consideration of extra-record material to help explain complex subjects." TRCP Opp'n at 7. Although TRCP asserts that it is Defendants that are confusing supplementation with reliance on extra-record evidence, TRCP attempts to rely on cases where the Court allowed supplementation of the record with extra-record evidence that "more fully explicates an agency's decision" to support its use of this exception. *Carlton v. Babbitt*, 26 F. Supp. 2d 102, 106-107

---

[8] Even assuming TRCP has not waived its arguments based on this evidence in failing to raise them to BLM during the administrative proceeding, this evidence is irrelevant to this case. NEPA does not require a showing that the mitigation measures are effective. *See, e.g., Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 353 (1989). Moreover, the Pinedale project addressed in the Sparrowe Declaration involved a different BLM office, different activities, different measures, and a different management process.

[9] This is unlike the case relied on by TRCP to support submission of the extra-record Sparrowe Declaration as expert testimony, *Inland Empire Public Lands Council v. U.S. Forest Service*, 88 F.3d 754 (9th Cir. 1996). Despite TRCP's statements to the contrary, in that case, the plaintiff submitted expert testimony to identify errors with the agency's analysis *in violation of the National Forest Management Act*, which "imposes substantive duties on the Forest Service, one of which is the duty to 'provide for diversity of plant and animal communities,'" not to determine whether the EIS was adequate under NEPA. *Id.* at 759. The court subsequently upheld the agency's determination. *See also United States v. Akzo Coatings, Inc.*, 949 F.2d 1409 (6th Cir. 1991) (finding district court should have considered, in challenge to efficacy of proposed consent decree under Comprehensive Environmental Response, Compensation and Liability Act, whether affidavit presented significant information to require EPA to reconsider consent decree).

(D.D.C. 1998) (citations omitted), cited in TRCP Opp'n at 7. While Defendant-Intervenors' note

that, in some cases, courts have found that it needed extra-record evidence to explain technical

issues in the record, the Braun Declaration goes above and beyond this limited exception. *Cf.*

*Pettiford v. Secretary of Navy*, No. 05-2082(ESH), 2008 WL 724017 (D.D.C. Mar. 17, 2008)

(declining to strike an affidavit from government defendants because it provided background

information helpful in understanding the rationalization agency gave); *Kunaknana v. Clark*, 742

F.2d 1145, 1149 (9th Cir. 1984) (allowing agency document that was explanatory in nature and

required for court to determine if actions were within scope of agency's authority).[10]  The Braun

Declaration does not merely explain a scientific concept, it purports to explain the best science

and the best mitigation measures for the sage grouse.  There is no indication that this Court is not

capable of reviewing the numerous documents *in the record* to reach a decision in this case.

Indeed, the Court demonstrated it was capable of reviewing such material and addressing these

issues in the parallel case challenging the Atlantic Rim Project, *NRDC v. Kempthorne*, 525 F.

Supp. 2d 115, 121-23 (D.D.C. 2007).

TRCP's reliance on *Holy Cross v. U.S. Army Corps of Engineers*, 455 F. Supp. 2d 532

(E.D. La. 2006), to support this claimed exception is inapposite.  In that case, the plaintiff sought

to submit extra-record evidence in support of its argument that the agency failed to supplement

an EIS that was conducted over 9 years earlier.  There, the fact and aftermath of Hurricane

Katrina had called into question the Corps' findings in the 9-year old EIS regarding a proposed

canal project. *Id.* at 538-39.  Here, on the other hand, the Braun Declaration does not identify

"facts" ignored by the agency, but constitutes "expert" opinion.  TRCP Opp'n at 10.  Moreover,

---

[10]  In other cases cited by TRCP, the court allowed *both* parties to expand on technical issues to explain the agency's actions.  *See, e.g., Bunker Hill Co. v. EPA*, 572 F.2d 1286, 1291-92 (9th Cir. 1977); *Sierra Club v. Babbitt*, 69 F. Supp. 2d 1202, 1209 (E.D. Cal. 1999); *Sierra Club v. U.S. Forest Serv.*, 535 F. Supp. 2d 1268, 1291-93 (N.D. Ga. 2008).

BLM did not "ignore reality." It conducted a review of the literature available at the time of its decision. AR4405. The EIS contains a long list of references with numerous references to studies related to the sage grouse. AR2516-AR2544. In addition, the recommendation of the Wyoming Game and Fish Department ("WGFD") on oil and gas development, based on its review of the literature, affirms BLM's chosen mitigation measures. AR6542, AR6544, AR6564. BLM is entitled to rely on its expert determination, which is substantially supported by the record.

Finally, contrary to TRCP's claims, there is no general exception to the extra-record rule for NEPA cases. As even the cases cited by TRCP recognize, TRCP must still show that the record is inadequate or bad faith on the part of the agency to resort to extra-record evidence. *See, e.g., Nat'l Audubon Soc'y v. Hoffman*, 132 F.3d 7, 14 (2d Cir. 1997) (citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971)). *See also Citizens for Alternatives to Radioactive Dumping v. U.S. Dep't of Energy*, 485 F.3d 1091, 1096 (10th Cir. 2007) (rejecting use of extra-record affidavits in NEPA case because plaintiff failed to show bad faith or improper conduct on the part of the agency). These cases, while noting that extra-record evidence is more frequently allowed in NEPA cases, also confirm that such exceptions are limited, even in NEPA cases:

> [D]eviation from the record rule, even in the review of NEPA decisions, is limited. While we allow the consideration of extra-record evidence, review of an agency's action is not *de novo*. Courts may conduct plenary review, *and consider additional information obtained from the parties through affidavits or testimony, only when the administrative record is so inadequate as to prevent the reviewing court from effectively determining whether the agency considered all environmental consequences of its proposed action.* . . . We realize that the record compiled by the agency will often contain sufficient information to permit the court to make this judgment, thereby obviating the need for considering extra-record evidence.

10

*Nat'l Audubon Soc'y,* 132 F.3d at 15 (emphasis added) (citations omitted). *See also Pac. Shores Subdivision Cal. Water Dist.*, 448 F. Supp. 2d at 5 ("Limiting review of the administrative record to only what the agency decisionmakers directly or indirectly considered is important."). As noted above, the record in this case is extensive, and each of the issues raised by TRCP were identified by BLM. The record, therefore, is not inadequate so as to require extra-record evidence.

Moreover, allowing the extra-record evidence, including the Sparrowe and Braun Declarations,[11] to be part of the record for review would allow this Court to impermissibly substitute its judgment for that of the agency. This prohibition applies with equal force in NEPA cases. As explained in a case cited by TRCP:

> [I]t is important to define the role of the district court in reviewing this aspect of an EIS for the purpose of determining whether there has been compliance with NEPA. The district court does not sit as a super-agency empowered to substitute its scientific expertise or testimony presented to it de novo for the evidence received and considered by the agency which prepared the EIS. . . . The court's task is merely "to determine whether the EIS was compiled in objective good faith and whether the resulting statement would permit a decisionmaker to fully consider and balance the environmental factors." . . . "The court is not empowered to substitute its judgment for that of the agency." . . . This is particularly true when it comes to evaluating the factual conclusions of the EIS. If the agency's conclusions have a "substantial basis in fact," . . . and if the EIS has set forth responsible opposing scientific views, . . . it is not for the district court to resolve conflicting scientific options. Evidence-weighing must be left to the agency making the policy decision. . . . Were the court to invade that province, the judiciary rather than the agency would become the policy-maker. Any agency decision

---

[11] Although cases cited by TRCP note that courts may deviate more from the record rule in NEPA cases, the explanation provided was that the "omission of technical scientific information is often not obvious from the record itself, and a court may therefore need a plaintiff's aid in calling such omissions to its attention." *Sierra Club v. Peterson*, 185 F.3d 349, 370 (5th Cir. 1999) (quoting *Nat'l Audubon Soc'y*, 132 F.3d at 14-15). Such is not the case here. Moreover, many of those cases involve an agency's finding that an EIS was not necessary, as opposed to the instant case where a detailed EIS was prepared and the plaintiff asserts that the EIS conducted was inadequate. *See, e.g., Webb v. Gorsuch*, 699 F.2d 157 (4th Cir. 1983).

> with which the court disagreed on the merits could then be
> nullified as "arbitrary" merely because the court, upon receiving
> additional evidence, chose to rely upon it or to give it greater
> weight than that considered by the Executive Branch.

*County of Suffolk v. Sec'y of Interior*, 562 F.2d 1368, 1383 (2d Cir. 1977). Asking this Court to

overturn agency action based on extra-record evidence is precisely what TRCP would have this

Court do through the Braun and Sparrowe Declarations, which could have been, but were not,

brought to the agency's attention.

**III.    TRCP PROVIDES NO JUSTIFICATION FOR THE USE OF JUDICIAL NOTICE
TO ALLOW TRCP TO AVOID ITS OBLIGATIONS TO BRING INFORMATION
TO THE AGENCY'S ATTENTION DURING THE ADMINISTRATIVE
PROCESS OR TO CIRCUMVENT THE RECORD RULE.**

As a last resort, TRCP attempts to rely on judicial notice to support its submission of and

reliance on extra-record evidence that it failed to bring to the agency's attention during the

decision-making process. Judicial notice should not be allowed to circumvent the record rule

and undermine the administrative process. *See Murakami v. United States*, 46 Fed. Cl. 731, 739

(Fed. Cl. 2000).

TRCP, in its opposition papers to the motions to strike, asserts that the Court may take

judicial notice of certain "facts" in documents it submitted related to wind energy and a 2008

memorandum by the WGFD. TRCP Opp'n at 14-15. The statements TRCP identifies, however,

are not "facts" that are properly the subject of judicial notice and, in fact, are disputed. *See, e.g.,*

*Cactus Corner, LLC v. U.S. Dep't of Agric.*, 346 F. Supp. 2d 1075, 1098 (E.D. Cal. 2004), *aff'd*,

450 F.3d 428 (9th Cir. 2006) (noting matters are not properly subject to judicial notice if they

involve a central and disputed issue) (citation omitted). For example, the wind energy EIS does

not mention the ARPA, much less state that the "wind resource level" in the ARPA was "among

the highest in the Rawlins planning area."  Moreover, potential impacts identified in an EIS are often the subject of dispute, as in this case.[12]

In addition, the WGFD memorandum is not the type of undisputed information from government agencies that were the subject of judicial notice in the cases cited by TRCP.[13]  *Cf. Seifert v. Winter*, __ F. Supp. 2d ___, 2008 WL 879029, at *6 n.5 (D.D.C. Apr. 3, 2008) (taking judicial notice of a manual of court martial); *Coleman v. Dretke*, 409 F.3d 665, 667 (5th Cir. 2005) (taking judicial notice of agency policy); *Dulaney v. United States*, 472 F. Supp. 2d 1085, 1086 (S.D. Ill. 2006) (taking judicial notice of location of veteran's hospital for purposes of determining venue).[14]  Indeed, the memorandum does not represent the findings of WGFD.  The first page of the memorandum notes that it is the "recommendation" of the authors of the memorandum that the WGFD acknowledge the document as "the correct interpretation" of recent sage grouse studies.  TRCP Ex. N to Mot. for Summ. J. at 1 (Doc. No. 43-21).  As previously noted, WGFD recommended the measures imposed by BLM here.  AR6564.  Thus, these documents do not even purport to be what TRCP claims, and the "facts" TRCP asks this Court to judicially notice are disputed.

---

[12]  TRCP claims that Anadarko "agreed the cumulative impact of wind development should be evaluated in connection with other impacts on the ARPA," but that Anadarko requests the Court to ignore this fact.  TRCP Opp'n at 6.  Contrary to TRCP's assertion, Defendant-Intervenors do, in fact, dispute that Anadarko made these comments.  Defendant-Intervenors Mem. in Opp'n to Plaintiff's Mot. and in Support of Cross-Mot. for Summ. J. at 23-24 (Doc. No. 52).  In any event, Defendant-Intervenors do not ask the Court to ignore the fact, but reiterate that such information is not relevant to these proceedings.

[13]  This memorandum was not prepared until January of 2008, over one year since the final EIS was completed.  In declining to allow an extra-record letter by a government official in an APA case, the U.S. Court of Appeals for the Ninth Circuit found the letter "constitutes post-decision information, which may not be advanced as a new rationalization either for sustaining or attacking an agency's decision."  *Sw. Ctr. for Biological Diversity*, 100 F.3d at 1450 (citations omitted).

[14]  *See also Murakami*, 46 Fed. Cl. at 739 ("The information here at issue does not reach this safe harbor.  This is not a situation in which plaintiff seeks judicial notice of a simple bookkeeping entry in a generally available government record or of the mere existence of a formal government report, but rather asks this court to take judicial notice of a wide range of factual statements, some of which undoubtedly are reasonably contestable and all of which ordinarily would be subject to more rigorous evidentiary requirements and verification.").

TRCP also notes that its reference to scientific publications that were not before BLM should be permitted, asserting that Defendant-Intervenors do not identify the conclusions they dispute within these documents. TRCP Opp'n at 13 n.7. Setting aside the fact that TRCP has only requested that this Court take judicial notice of "government publications," it is TRCP's duty to explain why these documents were not submitted to BLM during the decision-making process and, in failing to do so, why TRCP should be allowed to rely on these documents now. Instead, TRCP asks this Court to treat these materials as "reference texts." *Id.* TRCP, not Defendant-Intervenors, must show that the statements in these documents are facts "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Moreover, none of the cases cited by TRCP support such a request. *Complaint of Compagnie Generale Transatlantique*, 392 F. Supp. 973 (D. Puerto Rico 1975) (taking judicial notice of a navigation reference text that was a government publication issued pursuant to Congress in a negligence case); *Owens-Ill. Glass Co. v. Am. Coastal Lines, Inc.*, 222 F. Supp. 923, 927 (S.D.N.Y. 1963) (taking judicial notice of a standard financial reference text regarding occurrence of corporate transaction).

The failure of TRCP, or any member of the public, to submit these documents to the BLM during the administrative process belies TRCP's claim that they are standard "reference" texts. The mere fact that, with some effort, these documents may be obtained from the public domain, does not diminish TRCP's obligation to meaningfully and forcefully present its concerns to the agency during the administrative process. In any event, TRCP does not explain why the numerous studies in the record are insufficient for the Court's review on these issues. As such, TRCP's attempts to rely on judicial notice should be denied.

## CONCLUSION

For the foregoing reasons and for the reasons set forth in its initial memorandum, Defendant-Intervenors Anadarko, Warren and Double Eagle respectfully move this Court to strike the extra-record evidence relied upon by TRCP in support of its motion for summary judgment, and arguments relying thereon, and to prohibit TRCP from citing to or otherwise using such references in its motion papers.

Respectfully submitted,


_____/s/ Michael B. Wigmore_____
Michael B. Wigmore (DC Bar # 436114)
Bingham McCutchen LLP
2020 K Street, N.W.
Washington, D.C.  20006
(202) 373-6000
(202) 373-6001 (facsimile)

*Counsel for Anadarko Petroleum Corporation,*
*Warren Resources, Inc. and Double Eagle*
*Petroleum Co.*


Robert C. Mathes (DC Bar # 484255)
Bjork Lindley Little PC
1600 Stout Street, Suite 1400
Denver, CO 80202
(303) 892-1400
(303) 892-1401 (facsimile)

*Counsel for Double Eagle Petroleum Co.*


Dated:  July 1, 2008

## CERTIFICATE OF SERVICE

I hereby certify that on this 1st day of July, 2008, the foregoing Reply in Support of

Defendant-Intervenor Anadarko Petroleum Corporation, Warren Resources, Inc., and Double

Eagle Petroleum Co.'s Motion to Strike was electronically filed through the CM/ECF system,

which caused the following to be served by electronic means, as more fully reflected on the

Notice of Electronic Filing:

> Donald G. Blankenau
> Thomas R. Wilmoth
> Steven Michael Kupka
> Husch Blackwell Sanders LLP
> 206 South 13th Street
> Suite 1400
> Lincoln, NE 68508
> don.blankenau@huschblackwell.com,
> tom.wilmoth@huschblackwell.com,
> sharon.marburger@huschblackwell.com,
> nancilee.holland@huschblackwell.com
>
> Lori Caramanian
> U.S. Department of Justice
> 1961 Stout Street, 8th Floor
> Denver, CO 80294
> lori.caramanian@usdoj.gov
>
> Jay A. Jerde
> David James Willms
> John S. Burbridge
> Deputy Attorney General
> Wyoming Attorney General's Office
> 123 Capitol Building
> Cheyenne, WY 82002
> jjerde@state.wy.us
> dwillm@state.wy.us
> jburb1@state.wy.us

                                 /s/ Michael B. Wigmore
                                 Michael B. Wigmore

A/72583749.1

**UNREPORTED CASES**

*Westlaw.*

15 F.3d 1160 (Table)                                                                                        Page 1
15 F.3d 1160 (Table), 1994 WL 26331 (D.C.Cir.), 304 U.S.App.D.C. 429
**Unpublished Disposition**
**(Cite as: 15 F.3d 1160, 1994 WL 26331 (D.C.Cir.), 304 U.S.App.D.C. 429)**

**H**NOTICE: THIS IS AN UNPUBLISHED
OPINION.

(The Court's decision is referenced in a "Table of
Decisions Without Reported Opinions" appearing in
the Federal Reporter. Use FI CTADC Rule 28 and FI
CTADC Rule 36 for rules regarding the publication
and citation of unpublished opinions.)

United States Court of Appeals, District of Columbia
Circuit.
PETERSON FARMS I, California Partnership, et al.,
Appellants
v.
Mike ESPY, Secretary of the United States
Department of Agriculture
**No. 92-5243.**

Jan. 25, 1994.

Appeal from the United States District Court for the
District of Columbia, No. 91cv2340; Joyce Hens
Green, J.

D.D.C.

AFFIRMED.

Before: SILBERMAN, SENTELLE, and
HENDERSON, Circuit Judges.

JUDGMENT

PER CURIAM.

**\*\*1** This cause came to be heard on the record on
appeal from the United States District Court for the
District of Columbia, and was briefed and argued by
counsel. While the issues presented occasion no
need for a published opinion, they have been
accorded full consideration by the Court.
SeeD.C.Cir.R. 36(b) (January 1, 1994). On
consideration thereof, it is

ORDERED and ADJUDGED, by this Court, that the
judgment of the District Court appealed from in this

cause is hereby affirmed for the reasons set forth in
the accompanying memorandum. It is

FURTHER ORDERED, by this Court, *sua sponte,*
that the Clerk shall withhold issuance of the mandate
herein until seven days after disposition of any timely
petition for rehearing. SeeD.C.Cir.R. 41(a)(1)
(January 1, 1994). This instruction to the Clerk is
without prejudice to the right of any party at any time
to move for expedited issuance of the mandate for
good cause shown.

MEMORANDUM
Appellants challenged the agency's determination
that they were not 12 separate "persons" each eligible
for agricultural subsidy payments. The district court
granted summary judgment for the agency and we
affirm.

I.
The Department of Agriculture administers price
support and production adjustment programs
established by the Agricultural Act of 1949, 7 U.S.C.
§ 1281et seq. These programs seek to reduce the
total national acreage devoted to producing certain
crops by paying farmers to grow less of these crops
than they otherwise would. The programs are
administered at three levels--county committees, state
committees, and the federal Deputy Administrator--
each reviewing determinations made by the previous
level.

Program payments to farming operations are limited
to a maximum of $50,000 per year to each "person"
recognized by the agency. 7 U.S.C. § 1308. Agency
regulations provide that in order to be considered a
separate person for the purpose of payment
limitation, a legal entity must, *inter alia:*
  (a) Have a separate and distinct interest in the land
  or the crop involved,
  (b) Exercise separate responsibility for such
  interest, and
  (c) Be responsible for the cost of farming related to
  such interest from a fund or account separate from
  that of any other individual or entity.
7 C.F.R. § 795.3.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

15 F.3d 1160 (Table), 1994 WL 26331 (D.C.Cir.), 304 U.S.App.D.C. 429
**Unpublished Disposition**
**(Cite as: 15 F.3d 1160, 1994 WL 26331 (D.C.Cir.), 304 U.S.App.D.C. 429)**

Appellants are four partnerships representing the interests of four individuals, a trust and seven corporations. The partnerships filed a 1987 operating plan with the county committee proposing that Peterson Farms, a partnership determined to be five persons in 1986, be reorganized into four partnerships in 1987. Appellants represented that each partner of Peterson Farms I would contribute $50,000 in capital, and partners in Peterson Farms II, III, and IV would contribute $1,000 each. The plan also proposed a 20% reduction in farm operations by decreasing the operating acreage of Paterson Farms I from its 1986 levels.

Based on these representations, the county committee determined that appellants were 12 persons eligible for program benefits in 1987, and appellants began farming. After a random audit in 1989, however, the state committee determined that the operation of the partnerships did not conform to the 1987 plan and that the capital contributions and financing of the partnerships violated program regulations. The partners did not contribute any new capital, but merely shifted around the assets of the old Peterson Farms. And the financing and accounting of the new partnerships were so intermingled that the partners' interests were not separate and distinct. 7 C.F.R. §§ 795.3(a), (c). These violations rendered appellants to be eligible as only one person for 1987. Appellants appealed to the federal Deputy Director to no avail and then filed suit.

**\*\*2** Appellants served interrogatories on the agency to establish that they had relied in good faith on the county committee's initial 12-person determination and that the Secretary had, on occasion and in his discretion, granted an exception for such good faith reliance. Wisely not wishing to get into discovery disputes, the government answered the interrogatories but argued to the district court that the administrative record could not be supplemented. The court agreed and ruled that the interrogatories were inadmissible, and ordered summary judgment for the government.

II.

Appellants are somewhat confused about the applicable standard of review, arguing in the brief that the district court committed errors of fact. But the factual bases for the agency's "person"

determination are final and conclusive, see 7 U.S.C. § 1385, and judicial review of the agency's determination is limited to whether it is arbitrary and capricious given those facts. See, e.g., Simons v. United States, 25 Cl.Ct. 685, 698 (1992); Esch v. Lyng, 665 F.Supp. 6, 12 (D.D.C.1987). The district court held that the record amply supports the agency's determination that appellants committed five violations of the applicable regulations, any one of which suffices to justify the agency's action, see 7 C.F.R. § 795.6, and appellants did not present any credible arguments to the contrary.

We likewise need not linger on appellants' argument that the provisions of the Program Handbook which explain the "financing rule" of 7 C.F.R. § 795.3 are substantive regulations subject to notice and comment under the APA. The agency did not rely on the Handbook, but rather stated explicitly that its determinations were based on appellants' violations of the regulations [J.A. at 31], properly promulgated through notice and comment procedures. See 43 Fed.Reg. 9,784 (1978). Counsel suggested during oral argument that appellants lacked notice of the program requirements since they, as farmers, cannot be expected to keep apprised of the regulations. Given that appellants operate in a pervasively regulated industry where--according to counsel--97% participate in subsidy programs, that the program is administered in part by farmers who serve on the state and county committees, and that the expected program benefits in this case exceed half a million dollars, we find the suggestion preposterous.

Finally, appellants argued that the district court erred by not permitting them to supplement the administrative record with evidence of their good faith reliance. We note that the district court held that appellants' argument is unavailing even if their proffered evidence were admitted, since the grant of an exception lies in the Secretary's discretion. But, in any event, the district court correctly decided that the administrative record could not be augmented.

The literal language of the authorizing statute suggests no judicial review of agency decisions concerning price support programs. See 7 U.S.C. § 1385 ("The facts constituting the basis for any payment [under the Agricultural Act of 1949] when officially determined in conformity with the applicable regulations ... shall be final and conclusive

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

15 F.3d 1160 (Table)                                                                      Page 3
15 F.3d 1160 (Table), 1994 WL 26331 (D.C.Cir.), 304 U.S.App.D.C. 429
**Unpublished Disposition**
**(Cite as: 15 F.3d 1160, 1994 WL 26331 (D.C.Cir.), 304 U.S.App.D.C. 429)**

and shall not be reviewable by any other officer or agency of the Government."); 7 U.S.C. § 1429 ("Determinations made by the Secretary ... shall be final and conclusive...."). Although the APA's presumption of reviewability has led courts to bend the literal language of section 1429, permitting review of agency determinations under the arbitrary and capricious standard, *see Esch v. Yuetter, 876 F.2d 976, 991 (D.C.Cir.1989); Carruth v. United States, 224 Ct.Cl. 422, 436-37 (1980),* section 1385 still precludes judicial review of factual bases underlying the agency's determinations. *See Esch v. Yuetter, 876 F.2d at 991;Simons, 25 Cl.Ct. at 697.* Section 1385 thus limits judicial review under section 1429 to whether the Secretary's determinations were arbitrary and capricious given the unreviewable factual findings. *See Simons, 25 Cl.Ct. at 698.* It follows, therefore, that our review of the agency's determinations concerns only the findings in the administrative record, not extraneous facts that the Secretary did not have an opportunity to consider.

**\*\*3***Esch v. Yuetter* is not to the contrary. There, we faced allegations of procedural irregularities, which are appropriate for judicial review since section 1385 on its face applies only to factual findings "officially determined in conformity with the applicable regulations." 7 U.S.C. §1385. No such allegations exist here. As the district court noted, appellants had ample opportunity to present evidence of good faith reliance to the Secretary to seek discretionary relief. Having not availed themselves of these opportunities, appellants cannot now seek to introduce new facts and then argue that the agency acted capriciously in not considering them. It is true that *Esch v. Yuetter* did not limit its holding to cases of procedural violations but expounded generally on eight factors that may warrant consideration of evidence not in the administrative record. *See*876 F.2d at 991. We note only that the probative value of such dicta is limited, since the opinion--while addressing section 1385's effect on reviewability--failed to consider that section's restrictions on supplementing the administrative record. *See id.*

* * *

Accordingly, the judgment of the district court is affirmed.

15 F.3d 1160 (Table), 1994 WL 26331 (D.C.Cir.), 304 U.S.App.D.C. 429 Unpublished Disposition

END OF DOCUMENT



Slip Copy                                                                                      Page 1
Slip Copy, 2008 WL 724017 (D.D.C.)
**(Cite as: 2008 WL 724017 (D.D.C.))**

Only the Westlaw citation is currently available.

United States District Court,
District of Columbia.
Maurice B. PETTIFORD, Plaintiff,
v.
SECRETARY OF the NAVY, Defendant.
**Civil Action No. 05-2082(ESH).**

March 17, 2008.

Eugene R. Fidell, Feldesman Tucker Leifer & Fidell,
LLP, Washington, DC, for Plaintiff.

Brian Christopher Baldrate, U.S. Attorney's Office
for the District of Columbia, Washington, DC, for
Defendant.

***MEMORANDUM OPINION AND ORDER***

ELLEN SEGAL HUVELLE, District Judge.

**\*1** Plaintiff has filed a motion to strike Exhibit 4 to
defendant's motion to dismiss or, in the alternative,
for summary judgment, because the exhibit was not
part of the administrative record. (Pl.'s Stmt. in
Support of Mot. to Strike at 1.) Exhibit 4 is the
declaration of Major Ryan W. Reilly, head of the
Enlisted Promotions Section for the United States
Marine Corps. It includes a summary of the selection
rate statistics of the CY 1999 First Sergeant regular
promotion board and the CY 1999 Master Sergeant
regular selection board for plaintiff's military
occupational specialty by Performance Index (PI)
rating. The declaration also explains that the selection
boards considered both the PI rating and the Official
Military Performance File (OMPF) of each individual
Marine candidate and details the contents of the
OMPF.

Plaintiff is correct that when reviewing a final
administrative action, the Court's review is generally
limited to the administrative record. *See Camp v.
Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d
106 (1973); *Marinangelli v. Lehman,* 32 F.Supp.2d 1,
5 (D.D.C.1998). "[S]upplementation of the
administrative record is the exception, not the norm."
*Nat'l Wilderness Inst. v. U.S. Army Corps of
Engineers,* 2005 WL 691775, at \*9 (D.D.C. March
23, 2005). However, "it may sometimes be
appropriate to resort to extra-record information to
enable judicial review to become effective...." *Esch v.
Yeutter,* 876 F.2d 976, 991 (D.C.Cir.1989). "Where
this court 'needs more evidence to enable it to
understand the issues clearly' ... [it] has discretion to
supplement an administrative record." *Beach
Communications Inc. v. F.C.C.,* 959 F.2d 975, 987
(D.C.Cir.1992) (quoting *Esch,* 876 F.2d at
987).These "new materials should be merely
explanatory of the original record and should contain
no new rationalizations" for the agency decision.
*Envtl. Defense Fund v. Costle,* 657 F.2d 275, 285
(D.C.Cir.1981).

Plaintiff's complaint alleges that the Board of
Corrections of Naval Record's (BSNR) decision to
sustain the 1999 Enlisted Remedial Selection Board's
non-promotion of plaintiff was arbitrary and
capricious because plaintiff's PI score was 8.95 and
numerous Marines with PIs as low as 8.80 were
selected. (Amend. Compl. at ¶ 45(a)(ii)). Plaintiff
maintains that "it would be amazing if every one of
the 199 Marines who was selected by the 1999
regular selection board with a PI between 8.80 and
9.00 ranked above" plaintiff. (Amend.Compl.¶
42(a)). The BCNR rejected this argument explaining
that the PI is used in conjunction with the OMPF to
select candidates for promotion.

After reviewing the challenged exhibit, the Court
concludes that it provides context for the BCNR's
decision by showing that there were over 1,000
applicants with scores between 8.80 and 9.00, of
whom only 179 were selected, and by explaining to
the Court the other factors in addition to the PI that
are considered by the Selection Board as part of the
OMPF. It does not add any new "rationalization" to
support the BSNR's decision, but rather provides
background information helpful in understanding the
rationalization the BSNR gave. It is therefore an
appropriate supplement to the administrative record
and plaintiff's motion to strike [Dkt. 25]will be
**DENIED.**

**SO ORDERED.**
Slip Copy, 2008 WL 724017 (D.D.C.)

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                                                   Page 2
Slip Copy, 2008 WL 724017 (D.D.C.)
**(Cite as: 2008 WL 724017 (D.D.C.))**


END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                                                    Page 1
Not Reported in F.Supp.2d, 2002 WL 1609722 (W.D.Tex.)
**(Cite as: 2002 WL 1609722 (W.D.Tex.))**

**H**Only the Westlaw citation is currently available.

United States District Court, W.D. Texas, Austin
Division.
Ethel SPILLER, [FN1] Marian Collins, Barton
Springs-Edwards Aquifer
Conservation District, David Robertson, Plaintiffs,

FN1. Although Ethel Spiller has withdrawn
as the plaintiff in this case, her name is listed
in the caption to avoid confusion.

CITY OF AUSTIN, Plaintiff-Intervenor
v.
Robert M. WALKER, in his official capacity as
Acting Secretary of the
Department of the Army, et al., Rodney Slater, in
his official capacity as
Secretary of Transportation, Carol A. Browner, in
her official capacity as
Administrator of the Environmental Protection
Agency, United States of
America, and Longhorn Partners Pipeline, L.P.,
Defendants
**No. A-98-CA-255-SS.**

July 19, 2002.

 Property owners brought action against federal
government and owner of petroleum pipeline,
alleging National Environmental Policy Act (NEPA)
claim that decision to produce finding of no
significant impact (FONSI), rather than
environmental impact statement (EIS), was arbitrary
and capricious. City intervened as plaintiff. Cross
motions for summary judgment were filed. The
District Court, Sparks, J., held that: (1) District Court
was not required to defer to federal agencies'
expertise in FONSI decision; (2) agencies' decision to
rely on mitigation measures in FONSI was not
arbitrary and capricious; (3) agencies considered
risks associated with pump stations; (4) agencies
gave in-depth consideration to potential impacts on
surface and ground water sources and potential for
drinking water contamination; (5) agencies
considered cumulative impacts; (6) environmental
assessment (EA) identified and discussed

alternatives; and (7) EA adequately considered
environmental justice issues.

 Defendant's motion granted.

West Headnotes

**[1] Environmental Law** 🔑689
149Ek689Most Cited Cases
Nonprivileged drafts or communications of agencies
involved in decision to issue finding of no significant
impact (FONSI), rather than environmental impact
statement (EIS), for petroleum pipeline project, were
part of administrative record, and thus reviewable, on
private landowners' NEPA claims against
government and pipeline owner. National
Environmental Policy Act of 1969, § 2 et seq., 42
U.S.C.A. § 4321 et seq.

**[2] Environmental Law** 🔑689
149Ek689Most Cited Cases
Document representing negotiations between owner
of petroleum pipeline and Fish and Wildlife Service
(FWS), prior to government's decision to issue
finding of no significant impact (FONSI), rather than
environmental impact statement (EIS), would be
considered on private land owners' NEPA claims
against government and pipeline owner, although
other documents not likely relied upon by the agency
would not be considered; negotiations between
pipeline owner and FWS were crucial to
governments' issuance of FONSI and government
likely considered pipeline owners' concessions in
issuing FONSI. National Environmental Policy Act
of 1969, § 2 et seq., 42 U.S.C.A. § 4321 et seq.

**[3] Environmental Law** 🔑613
149Ek613Most Cited Cases
Expert declarations, submitted on behalf of private
land owners and city in their NEPA action against
federal government and petroleum pipeline owner,
were admissible to extent they highlighted relevant
factors that the government agencies did not consider
in issuing a finding of no significant impact (FONSI)
related to pipeline, rather than environmental impact
statement (EIS); any legal conclusions and post-
FONSI evidence within the declarations and

Not Reported in F.Supp.2d                                                                Page 2
Not Reported in F.Supp.2d, 2002 WL 1609722 (W.D.Tex.)
**(Cite as: 2002 WL 1609722 (W.D.Tex.))**

argumentation offered to contest agency experts would not be admissible. National Environmental Policy Act of 1969, § 2 et seq., 42 U.S.C.A. § 4321 et seq.

**[4]** Environmental Law ☞701
149Ek701Most Cited Cases
Declaration relied upon by petroleum pipeline owner in its opposition to motion for preliminary injunction, in NEPA action by private land owners and city against pipeline owner and federal government, would be stricken; pipeline owner did not assert declarant's reliability and plaintiffs had not had opportunity to depose declarant. National Environmental Policy Act of 1969, § 2 et seq., 42 U.S.C.A. § 4321 et seq.

**[5]** Environmental Law ☞689
149Ek689Most Cited Cases
District court, in reviewing government's decision to issue finding of no significant impact (FONSI), rather than environmental impact statement (EIS), for petroleum pipeline project proposed by petroleum pipeline owner, was not required to defer to federal agencies' expertise in FONSI decision, but could peer into the environmental assessment (EA); participation in decision-making process by White House Council on Environmental Quality (CEQ) inserted policy goals into NEPA process potentially denying NEPA rights of property owners and city that brought action. National Environmental Policy Act of 1969, § 2 et seq., 42 U.S.C.A. § 4321 et seq.

**[6]** Environmental Law ☞595(5)
149Ek595(5)Most Cited Cases
Federal agencies' decision to rely on petroleum pipeline owner's mitigation plan in issuing finding of no significant impact (FONSI) for pipeline, rather than environmental impact statement (EIS), was not arbitrary and capricious, on NEPA claim; agencies' risk assessment model indicated measures in mitigation plan would reduce risk below a level of significance, pipeline owner committed to the mitigation measures unless authorized to modify them by the Department of Transportation (DOT), and pipeline owner was required to submit quarterly progress reports for mitigation plan, which would be available to public. National Environmental Policy Act of 1969, § 2 et seq., 42 U.S.C.A. § 4321 et seq.

**[7]** Environmental Law ☞595(5)

149Ek595(5)Most Cited Cases
Federal agencies' reliance on pipeline risk assessment model in assessing pre-and post-mitigation risks for pipeline project was not arbitrary and capricious, in violation of NEPA, although the model may not have been absolutely certain; model relied upon was most widely adopted at time of environmental assessment (EA), agencies chose to omit consequences factor in favor of a tiering approach for analysis of impacts, and EA discussed historic spill data from prior owner of pipeline. National Environmental Policy Act of 1969, § 2 et seq., 42 U.S.C.A. § 4321 et seq.

**[8]** Environmental Law ☞595(5)
149Ek595(5)Most Cited Cases
Agencies which issued finding of no significant impact (FONSI) for petroleum pipeline project considered the age of the electrical resistance welding (ERW) pipe, in making FONSI decision, in compliance with NEPA; environmental assessment (EA) highlighted hazards of old pipe and addressed ways to mitigate the danger. National Environmental Policy Act of 1969, § 2 et seq., 42 U.S.C.A. § 4321 et seq.

**[9]** Environmental Law ☞595(5)
149Ek595(5)Most Cited Cases
Agencies considered risks associated with pump stations for petroleum pipeline, in compliance with NEPA, prior to issuing finding of no significant impact (FONSI) for pipeline project, rather than environmental impact statement (EIS), although pump stations were not included in risk assessment analysis; pump stations had different risk considerations than rest of pipeline, predictive power of historic data was limited due to refurbishment of pump stations, and pipeline owner had committed to mitigation measures for pump stations. National Environmental Policy Act of 1969, § 2 et seq., 42 U.S.C.A. § 4321 et seq.

**[10]** Environmental Law ☞689
149Ek689Most Cited Cases
Agencies' decision not to classify petroleum pipeline as sensitive or hypersensitive, in risk analysis performed for environmental assessment (EA) that preceded agencies' finding of no significant impact (FONSI), was entitled to deference, on NEPA claims by private land owners and city; agencies discussed relevant features of aquifer and reached conclusions about its vulnerability to leaks and spills. National

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                  Page 3
Not Reported in F.Supp.2d, 2002 WL 1609722 (W.D.Tex.)
**(Cite as: 2002 WL 1609722 (W.D.Tex.))**

Environmental Policy Act of 1969, § 2 et seq., 42 U.S.C.A. § 4321 et seq.

**[11]** Environmental Law ☞595(5)
149Ek595(5)Most Cited Cases
NEPA did not mandate that federal agencies perform an in-depth ground water modeling study of aquifer before issuing finding of no significant impact (FONSI) for petroleum pipeline project. National Environmental Policy Act of 1969, § 2 et seq., 42 U.S.C.A. § 4321 et seq.

**[12]** Environmental Law ☞595(5)
149Ek595(5)Most Cited Cases
Federal agencies gave in-depth consideration to petroleum pipeline's potential impacts on surface and ground water sources and potential for drinking water contamination, in making finding of no significant impact (FONSI), complying with NEPA requirements; although agencies did not consider private wells in determination of sensitive and hypersensitive areas, pipeline owner provided separate mitigation plan for domestic water wells. National Environmental Policy Act of 1969, § 2 et seq., 42 U.S.C.A. § 4321 et seq.

**[13]** Environmental Law ☞583
149Ek583Most Cited Cases

**[13]** Environmental Law ☞595(5)
149Ek595(5)Most Cited Cases
Federal agencies' reliance, in environmental assessment (EA) upon which finding of no significant impact (FONSI) was based, upon estimated five-minute shutdown time for petroleum pipeline was not arbitrary and capricious as would violate NEPA; pipeline's leak detection systems were part of pipeline's mitigation plan, and smaller leaks that took longer to detect would result in approximately same volume of discharge. National Environmental Policy Act of 1969, § 2 et seq., 42 U.S.C.A. § 4321 et seq.

**[14]** Environmental Law ☞595(5)
149Ek595(5)Most Cited Cases
Federal agencies considered cumulative impacts of oil pipeline project with other pipelines in shared corridor, as required for determination of finding of no significant impact (FONSI) to comply with NEPA; agencies noted potential benefits of multiple pipelines, pipelines did not come within 19 feet of

each other, agencies concluded that likelihood of a combined incident was low, and so did not include potential for chain reaction in formal risk assessment analysis. National Environmental Policy Act of 1969, § 2 et seq., 42 U.S.C.A. § 4321 et seq.; 40 C.F.R. § 1508.27.

**[15]** Environmental Law ☞595(5)
149Ek595(5)Most Cited Cases
Agencies that issued finding of no significant impact (FONSI) for petroleum pipeline considered third-party damage and sabotage as relevant factors in environmental assessment (EA) analysis, in compliance with NEPA; although prior spills from pipeline were primarily caused by sabotage, EA considered vulnerability of using exposed pipe, included third-party damage as a risk factor in probability analysis, and mitigation measures were required of pipeline owner. National Environmental Policy Act of 1969, § 2 et seq., 42 U.S.C.A. § 4321 et seq.

**[16]** Environmental Law ☞583
149Ek583Most Cited Cases
Identification and discussion of alternatives in environmental assessment (EA) prepared by federal agencies complied with NEPA, and thus fulfilled terms of
settlement agreement which required preparation of EA completed for petroleum pipeline; EA was required to contain only brief discussions of alternatives to proposed action by pipeline owner, and EA showed that agencies considered alternatives of re-routing pipeline and aquifer avoidance, and concluded that alternatives would cause greater environmental harm or were not feasible. National Environmental Policy Act of 1969, § 2 et seq., 42 U.S.C.A. § 4321 et seq.

**[17]** Environmental Law ☞583
149Ek583Most Cited Cases
Environmental assessment (EA) for petroleum pipeline project adequately considered environmental justice issues, and thus complied with settlement agreement in which government agreed to perform NEPA analysis for project; EA devoted a full chapter to environmental justice concerns, agencies reviewed potential impacts on minority and low-income populations, and found that mitigation measures undertaken as concession to Fish and Wildlife Service (FWS) would also serve to provide an

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                Page 4
Not Reported in F.Supp.2d, 2002 WL 1609722 (W.D.Tex.)
**(Cite as: 2002 WL 1609722 (W.D.Tex.))**

acceptable level of protection to minority and low-income populations. National Environmental Policy Act of 1969, § 2 et seq., 42 U.S.C.A. § 4321 et seq.

**[18]** Environmental Law ⛛596
149Ek596Most Cited Cases
Invitation by petroleum pipeline owner to city fire department complied with agreement by pipeline owner and land owners to involve fire department as cooperating agency in NEPA analysis regarding project, although fire marshal rejected invitation to participate in emergency response drills. National Environmental Policy Act of 1969, § 2 et seq., 42 U.S.C.A. § 4321 et seq.

**[19]** Environmental Law ⛛723
149Ek723Most Cited Cases
    (Formerly 149Ek710)
Costs of NEPA action, brought by land owners and city, against federal government and pipeline owner, seeking investigation of pipeline, would be taxed to government and pipeline owner; although plaintiffs did not succeed in stopping the use of the pipeline, they prevailed in obtaining the legal relief they could seek under NEPA, an investigation of the pipeline regarding environmental impacts. National Environmental Policy Act of 1969, § 2 et seq., 42 U.S.C.A. § 4321 et seq.

*ORDER*

SPARKS, J.

**\*1** BE IT REMEMBERED on the 12th day of July 2002 the Court called the above-styled cause for hearing on all pending matters, and the parties appeared by attorney of record. Before the Court are the Plaintiffs' Motion for Summary Judgment [# 295] and supplements thereto [# 307; 339], City of Austin's Motion for Summary Judgment [# 299], Defendant Longhorn Partners Pipeline, L.P.'s Motion for Summary Judgment [# 300], and Federal Defendants' Motion for Summary Judgment [# 297]; Plaintiffs' response [# 325], City of Austin's response [# 317], Longhorn Partners Pipeline, L.P.'s response [# 319], and Federal Defendants' response [# 314]. Also before the Court are the Plaintiffs' Request for Preliminary Injunction [# 323], City of Austin's Request for Preliminary Injunctive Relief [# 308], Longhorn Partners Pipeline, L.P.'s memoranda in opposition thereto [# 321, 335], Federal Defendants'

opposition thereto [# 340], and Plaintiffs' reply [# 337]. Finally, the Court considers the Defendants' motions to strike declarations filed by the Plaintiffs and the City of Austin in their summary judgment motions [# 311, 312, 315] and the Plaintiffs' and City of Austin's response thereto [# 331, 333]; as well as Longhorn Partners Pipeline, L.P.'s motion to strike documents filed by the City of Austin [# 320] and exhibits filed by the Plaintiffs in their response to the summary judgment motions [# 334]. Having considered the voluminous motions and responses, the case file as a whole, the four-volume Environmental Assessment, and the applicable law, the Court enters the following opinion and orders.

Factual and Procedural Background
 This case concerns a pipeline that runs across the state of Texas, cutting a jagged path through the 731 miles of cities, towns, farms and ranches between Houston and El Paso, crossing rivers, streams and wetlands in ten major river basins, and lying atop several aquifers and aquifer recharge zones. Exxon Pipeline Company ("Exxon") constructed the 18-to 20-inch diameter pipeline in 1949 and 1950 and transported crude oil through it from Crane to Houston until around 1995. During that time, the pipeline experienced approximately 173 spills and leaks. In 1997, Exxon sold the pipeline to Longhorn Partners Pipeline, L.P. ("Longhorn"), a Delaware limited liability partnership headquartered in Dallas. Longhorn purchased the pipeline in order to transport gasoline and other petroleum products from Gulf Coast refineries to El Paso and on to Arizona, New Mexico and California. The pipeline will eventually move 225,000 barrels per day of gasoline from Houston to El Paso and Odessa.

 On April 22, 1998, the Plaintiffs filed a challenge to the proposed Longhorn Pipeline Project ("the Pipeline") in this Court under the National Environmental Policy Act of 1969 ("NEPA"), 42 U .S.C. §§ 4321-4370d. Plaintiffs Marian Collins and David Robertson own land along the Pipeline in Kimble County and Hays County. Plaintiff Barton Springs--Edwards Aquifer Conservation District is a political subdivision of the state of Texas that conserves and protects groundwater within Travis, Hays, Caldwell and Bastrop counties. In their original complaint, the Plaintiffs sought injunctive relief requiring the federal government to perform a full-fledged review under NEPA of the environmental

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

consequences of the Pipeline. The plaintiffs sued Longhorn, the United States, the United States Department of Transportation ("DOT"), the Department of the Army ("Army"), and the Environmental Protection Agency ("EPA"). [FN2] The Court allowed the City of Austin ("City") and Lower Colorado River Authority ("LCRA") to intervene as plaintiffs because the Pipeline runs through the City and the LCRA manages a large portion of the water supply over which the Pipeline travels. [FN3]

> FN2. The plaintiffs also originally named the Federal Energy Regulatory Commission ("FERC") as a defendant, but the Court dismissed FERC because it was only involved in ratemaking.

> FN3. The Court dismissed the LCRA with prejudice pursuant to Rule 41 of the Federal Rules of Civil Procedure on March 5, 2002 after the LCRA entered into a settlement with the EPA, DOT, United States, and the Army (collectively, the "Federal Defendants") in May 2001.

*2 NEPA requires federal agencies to analyze, "to the fullest extent possible," the potential environmental impact of "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). When this case was young, Longhorn and the Federal Defendants argued the Pipeline is not a "major federal action" under NEPA because the Pipeline is privately owned and operated. Five federal agencies--FERC, DOT, EPA, the Army, and the Army Corps of Engineers--therefore refused to assume responsibility for conducting an environmental review under NEPA of the Pipeline. The parties clung to this position despite Longhorn's plans to use the Pipeline to transport petroleum products to other states and perhaps Mexico; despite Longhorn's need to obtain an easement over Army-owned Fort Bliss in El Paso County to complete the Pipeline; despite the Army Corps of Engineers' authority over pipeline construction and modification affecting navigable waterways; and despite the location of the Office of Pipeline Safety ("OPS"), which is charged with administering DOT regulations to ensure pipeline safety, within the DOT. Needless to say, this Court found the federal agencies' conclusion that the Pipeline did not constitute a

"major federal action" under NEPA not only arbitrary and capricious, but ridiculous, and on August 25, 1998, ordered the DOT and/or the EPA to conduct an environmental impact statement concerning the Pipeline in accordance with NEPA. See Order of Aug. 25, 1998, at 33-34. The Court also enjoined Longhorn from placing petroleum products into the Pipeline until this Court, the Fifth Circuit, or the United States Supreme Court orders otherwise. See id., at 32.

On March 1, 1999, the parties entered into a Settlement Stipulation, under which the EPA and DOT agreed to prepare an environmental assessment ("EA") of the Pipeline. The EA would culminate in a Finding of No Significant Impact ("FONSI") or a notice of intent to prepare an Environmental Impact Statement ("EIS"). On March 5, 1999, the Court signed an Agreed Order vacating its previous injunction and enjoining Longhorn from placing petroleum products in the Pipeline until thirty (30) days after the agencies issued an EA decision, but not prior to Longhorn's implementation of mitigation measures upon which a FONSI might be conditioned and that are required to be implemented prior to or upon startup and the lead federal agency's approval of those measures. See Agreed Order of Mar. 5, 1999. The Agreed Order stated if the agencies issued a FONSI, the Plaintiffs could apply to the Court within 30 days to extend the injunction on the basis that the FONSI is arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. See id.

In accordance with the Settlement Stipulation, the EPA and DOT prepared an EA along with their third-party contractor URS Corporation (formerly Radian International) ("Radian"). On October 29, 1999, the agencies released the draft EA and preliminary FONSI for public review and comment. See 64 Fed.Reg. 58404. The agencies held public hearings on the draft EA and FONSI in Austin, Houston, Fredericksburg, Bastrop and El Paso, and distributed hundreds of copies of the EA and FONSI in counties along the pipeline. Id. In addition to oral comments at the hearing, the agencies received over 6,000 written comments, which they responded to as described in Volume 4 of the final EA. On July 17, 2000, the agencies wrote a letter to George T. Frampton, Jr., the Acting Chair of the White House Council on

Not Reported in F.Supp.2d                                                      Page 6
Not Reported in F.Supp.2d, 2002 WL 1609722 (W.D.Tex.)
**(Cite as: 2002 WL 1609722 (W.D.Tex.))**

Environmental Quality ("CEQ") [FN4] informing Frampton they "have reached an impasse on how to conclude the NEPA process" due to a "difference of view" and asking for the CEQ's recommendation on whether to complete an EIS or issue a FONSI. Plaintiffs' Motion for Summary Judgment, Ex. 10 ("Joint Letter"), at 1, 2. In the letter, the agencies disclosed the "Department of Justice has advised us that, on the present state of the record, it could defend either a FONSI or an EIS, and that the choice is a policy choice for our two agencies." *Id.* at 2. The record strongly supports the inference that the EPA supported preparation of an EIS, while the DOT preferred to issue a FONSI.

> FN4. The CEQ promulgates regulations under NEPA that "tell federal agencies what they must do to comply with the procedures and achieve the goals of [NEPA]." 40 C.F.R. § 1500.1. The regulations are binding on federal agencies.

**\*3** On September 7, 2000, the CEQ handed down a response to the agencies' request, recommending the agencies "now promptly finalize the EA and prepare a Finding of No Significant Impact." Plaintiffs' Motion for Summary Judgment, Ex. 14 ("Frampton Letter"), at 1. The CEQ concluded "virtually nothing could be gained in terms of useful environmental information or analysis by 'redoing' this extensive document as an EIS, other than sheer delay." *Id* at 3. On November 3, 2000, the EPA and DOT issued a FONSI along with the final EA. *See* Federal Defendants' Notice of Filing Finding of No Significant Impact and Final Environmental Assessment [# 159], Att. A ("FONSI").

On February 5, 2001, the Court entered an Order allowing Plaintiffs to amend their complaints and setting deadlines for Plaintiffs to file objections to Defendants' privilege logs and to file motions to include additional documents in the administrative record. *See* Order of Feb. 5, 2001. In their second amended complaint, Plaintiffs contend (1) the Federal Defendants's decision to issue a FONSI instead of preparing an EIS was contrary to NEPA and its corresponding regulations and was arbitrary and capricious in violation of the APA; and (2) the Defendants breached the Settlement Agreement. *See* Second Amended Complaint [# 201], at ¶¶ 51-53. The City and LCRA also filed amended complaints.

On March 25, 2002, after conducting an *in camera* review of nine volumes of documents the Federal Defendants withheld as privileged, the Court ordered the Federal Defendants to produce certain non-privileged documents to the Plaintiffs and ordered the parties to file summary judgment motions. All parties filed summary judgment motions on June 10, 2002. The Plaintiffs and City argue the agencies' decision to issue a FONSI instead of prepare an EIS was arbitrary and capricious and urge the Court to vacate the FONSI, require the EPA and DOT to prepare an EIS and issue a Record of Decision concerning the Pipeline, and enjoin Longhorn from placing refined petroleum products into the Pipeline until thirty days after the issuance of the Record of Decision or until further order of this Court, the Fifth Circuit, or the United States Supreme Court. Additionally, the Plaintiffs and City seek summary judgment on their claim that the Defendants breached the Settlement Agreement. The Federal Defendants and Longhorn contend the decision to issue a FONSI was not arbitrary and capricious, the agencies followed the NEPA process, and the Defendants complied with the Settlement Agreement. Over four years after the Plaintiffs originally filed their NEPA challenge to the Pipeline, the process has finally come to a conclusion.

Analysis
I. Standard of Review under NEPA

The Plaintiffs and City contend the agencies should have prepared an EIS discussing the significant environmental impacts of the Pipeline. Under NEPA, agencies must prepare a detailed EIS for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). Preparation of an EIS "ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision." *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 349, 109 S.Ct. 1835, 1845, 104 L.Ed.2d 351 (1989). Agencies are not required to prepare an EIS "for a non-major action or a major action which does not have a significant impact on the environment." *Sierra*

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1609722 (W.D.Tex.)
(Cite as: 2002 WL 1609722 (W.D.Tex.))

*Club v. Hassell,* 636 F.2d 1095, 1097 (5th Cir. Unit B 1981). Agencies may first prepare an EA to determine whether a project's potential impacts on the environment are significant. 40 C.F.R. § 1508.9 (EA serves to "provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact."). After preparing an EA, an agency may issue a FONSI "if the agency determines on the basis of the environmental assessment not to prepare [an EIS]." 40 C.F.R. § 1501.4(e).

**\*4** All parties agree NEPA provides a process only; it does not guarantee a result. *Robertson,* 490 U.S. at 350, 109 S.Ct. at 1846 (1989) (NEPA "does not mandate particular results, but simply prescribes the necessary process). Because NEPA offers only procedural requirements, not substantive environmental requirements, it "only prohibits uninformed--rather than unwise--agency action." *Robertson,* 490 U.S. at 351, 109 S.Ct. at 1846. Given the absence of substantive rights within the statute, the "only role for a court is to insure that the agency has taken a 'hard look' at environmental consequences; it cannot 'interject itself within the area of discretion of the executive as to the choice of the action to be taken." ' *Kleppe v. Sierra Club,* 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 2730, 49 L.Ed.2d 576 (1976) (citations omitted).

 Because NEPA provides no independent right of action, plaintiffs must challenge agencies' NEPA decisions under the APA. Under the APA, courts must uphold agency decisions unless the decision is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Therefore, the prohibitively narrow question before this Court is whether the agencies' finding that the Pipeline would have no significant environmental impacts was arbitrary and capricious. The Court's role is not to decide whether the undersigned believes the Pipeline will have a significant impact or even whether the agency's finding of no significance is unreasonable. *Marsh v. Oregon Natural Res. Council,* 490 U.S. 360, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989) (agency's decision not to prepare an EIS is reviewable under arbitrary and capricious standard); *Sabine River Auth. v. U.S. Dep't of Interior,* 951 F.2d 669, 677 (5th Cir.), *cert. denied,* 506 U.S. 823 (1992) (abandoning "reasonableness" standard in response to Supreme

Court's holding in *Marsh* ). The Fifth Circuit has warned "[u]nder this highly deferential standard of review, a reviewing court has the 'least latitude in finding grounds for reversal' ' of an agency decision and "may not substitute its judgment for that of the agency." *Sabine River,* 951 F.2d at 678 (citation omitted).

 In determining whether the agencies' decision to issue a FONSI rather than prepare an EIS was arbitrary or capricious, the Court "must studiously review the record to ensure that the agency has arrived at a reasoned judgment based on a consideration and application of the relevant factors." *Sabine River,* 951 F.2d at 678. The relevant factors are found in the CEQ regulation defining "significantly" for NEPA purposes. To determine the significance of environmental impacts, agencies must consider the "context" of the project and the "intensity" of the impacts. 40 C.F.R. § 1508.7. The regulation identifies ten areas agencies should consider in evaluating "intensity":

 (1) Impacts that may be both beneficial and adverse.

 (2) The degree to which the proposed action affects public health or safety.

 **\*5** (3) Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.

 (4) The degree to which the effects on the quality of the human environment are likely to be highly controversial.

 (5) The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks.

 (6) The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration.

 (7) Whether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                    Page 8
Not Reported in F.Supp.2d, 2002 WL 1609722 (W.D.Tex.)
**(Cite as: 2002 WL 1609722 (W.D.Tex.))**

impact on the environment.

(8) The degree to which the action may adversely affect districts, sites, highways, structures or objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources.

(9) The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973.

(10) Whether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment.

40 C.F.R. § 1508.27. The agencies must consider the above factors when determining whether a project may have a significant impact on the environment. A court may set a FONSI aside if the agency fails to consider the above factors or if the record shows the project may have a significant impact on the environment or the agency's review process was so flawed the court cannot determine whether the project may have a significant impact. *Fritiofson v. Alexander,* 772 F.2d 1125, 1238 (5th Cir.1985), *overruled on other grounds by Sabine River,* 951 F.2d at 677. The agencies need not demonstrate the project will have absolutely no adverse effects on the environment. *E.g., Friends of Endangered Species, Inc. v. Jantzen,* 760 F.2d 976, 987 (9th Cir.1985) ("[S]o long as significant measures are undertaken to 'mitigate the project's effects,' they need not *completely compensate* for adverse environmental impacts." (citation omitted)).

II. Summary Judgment Standard

All parties move for summary judgment in this case. A court may grant summary judgment if the moving party shows there is no genuine issue of material fact, and it is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c). In deciding whether to grant summary judgment, the Court construes all facts and inferences in the light most favorable to the nonmoving party. *Hart v. O'Brien,* 127 F.3d 424, 435 (5th Cir.1997), *cert. denied,* 525 U.S. 1103, 119 S.Ct. 868, 142 L.Ed.2d 770 (1999). The standard for determining whether to grant summary judgment "is not merely whether there is a sufficient factual

dispute to permit the case to go forward, but whether a rational trier of fact could find for the nonmoving party based upon the record evidence before the court." *James v. Sadler,* 909 F.2d 834, 837 (5th Cir.1990).

**\*6** Both parties bear burdens of producing evidence in the summary judgment process. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party must first show "if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the nonmoving party to carry its burden of proof." *Hart,* 127 F.3d at 435. The nonmoving party must then provide "specific facts showing that there is a genuine issue for trial," and "[n]either 'conclusory allegations' nor 'unsubstantiated assertions' will satisfy the non-movant's burden." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 588, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Wallace v. Texas Tech Univ.,* 80 F.3d 1042, 1047 (5th Cir.1996).

In a case like this one, where the Court is reviewing an agency decision under the APA, summary judgment is the appropriate means for resolving claims because the Court is reviewing the legality of the agency action, not acting as the initial factfinder. In an APA case, the Court addresses the legal question of whether the agency action was arbitrary and capricious, so "the district court's review pursuant to a summary judgment motion cannot turn on credibility determinations or conflicting factual inferences." *Sabine River,* 951 F.2d at 679. Therefore, the Court finds summary judgment appropriate in this case.

III. The Record before the Court

Defendants move to strike documents and declarations submitted by the Plaintiffs and City, arguing the Court's review of the agencies' decision must be confined to the administrative record. When reviewing an agency's NEPA action under the arbitrary and capricious standard, "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973). The administrative record, which is designated by the agencies, consist of " 'the full administrative record that was before the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1609722 (W.D.Tex.)
(Cite as: 2002 WL 1609722 (W.D.Tex.))

[administrative officer] ... at the time he made his decision." ' *Milena Ship Mgmt. Co. v. Newcomb,* 995 F.2d 620, 624 (5th Cir.1993), *cert. denied,*510 U.S. 1071, 114 S.Ct. 877, 127 L.Ed.2d 74 (1994) (quoting *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 415-16, 91 S.Ct. 814, 823-24, 28 L.Ed.2d 136 (1971). The Court cannot conduct its own analysis of the potential environmental impacts of the Pipeline based on unlimited evidence produced by both sides. *Florida Power & Light Co. v. Lorion,* 470 U.S. 729, 744, 105 S.Ct. 1598, 1607, 84 L.Ed.2d 643 (1985) ( "The reviewing court is not generally empowered to conduct a *de novo* inquiry into the matter being reviewed and to reach its own conclusions based on such an inquiry.").

The Court can look outside the administrative record under some limited circumstances, however. *Sabine River,* 951 F.2d at 678 ("A reviewing court is to review the administrative record *as well as other evidence* to determine whether the agencies adequately considered the values set forth in NEPA and the potential environmental effects of the project before reaching a decision on whether an environmental impact statement was necessary." (emphasis added) (quoting *Hassell,* 636 F.2d at 1097)). The Court may complete the administrative record with documents the agencies "directly or indirectly considered" when making their decision but did not include in the administrative record. *Bar MK Ranches v. Yuetter,* 994 F.2d 735, 739 (10th Cir.1993). If a draft document is not protected by the deliberative process privilege, it should be included in the administrative record. *E.g., Public Citizen v. Heckler,* 653 F.Supp. 1229, 1237 (D.D.C.1987).

*7[1] The Plaintiffs move to complete the administrative record with its exhibits 13, 15, 16, 18, 21, 25, 27, 29, 35, 37, 38 and 41. The Defendants have not opposed this motion. Having reviewed the exhibits, the Court finds they contain non-privileged drafts and/or communications the agencies directly or indirectly considered in arriving at the FONSI decision. Accordingly, the Court considers these exhibits as part of the administrative record. In an apparent oversight, Longhorn did move to strike Exhibits 3, 4, 7 and 8 to Plaintiffs' Response to the summary judgment motions. However, the Court confirms these exhibits are part of the administrative record the agencies designated, and that motion is denied.

[2] The City also submitted extra-record documents as exhibits to its summary judgment motion. Longhorn moves to strike four of these documents. The first, stamped USF & W/6 & 7 01101, is a handwritten document titled "F & W Position" and signed by Longhorn's president, Carter Montgomery. Longhorn contends there is no evidence the agencies relied on this document. However, the document represents negotiations between Longhorn and the Fish & Wildlife Service, which were crucial to the agencies' issuance of the FONSI. *See* Frampton Letter, at 1. Therefore, the agencies likely considered Longhorn's concessions to the Fish & Wildlife Service, and the motion to strike is denied. The second and fourth documents, a letter dated August 1, 2001 and a fax cover sheet dated November 29, 2001, came into being after the FONSI decision and are therefore stricken. The City provides no evidence the third document, entitled "Peak Streamflow for Texas," was considered by the agencies. Accordingly, Longhorn's Motion to Strike [# 320] is granted in part and denied in part.

Under more limited circumstances, the Court can supplement the record with evidence not considered by the agencies in making their decision. Because one question before the Court is whether the agencies considered all relevant factors, the Court can consider extra-record evidence relating to the Plaintiffs' allegations that the agencies failed to consider all the relevant factors. *E.g., Friends of the Payette v. Horseshoe Bend Hydroelectric Co.,* 988 F.2d 989, 997 (9th Cir.1993) ("The extra-record inquiry is limited to determining whether the agency has considered all relevant factors and has explained its decision."). Otherwise, the Court would have no way of discerning what relevant factors were missing from the analysis. *Nat'l Audubon Soc'y v. Hoffman,* 132 F.3d 7, 14 (2d Cir.1997). Additionally, the Court can supplement the record when "necessary to explain technical terms or complex subject matter." *Horseshoe Bend,* 988 F.2d at 997. However, plaintiffs cannot attempt to supplement the record for the sole purpose of competing in a battle of experts with an agency, because the Court must defer to the agency's selection of experts. *Marsh,* 490 U.S. at 378, 109 S.Ct. at 1861 ("When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                    Page 10
Not Reported in F.Supp.2d, 2002 WL 1609722 (W.D.Tex.)
(Cite as: 2002 WL 1609722 (W.D.Tex.))

find contrary views persuasive."); *Sierra Club v. Froehlke, 816 F.2d 205, 214* (5th Cir.1987) (scientific disagreements among experts "are not the type that the federal courts are in business to resolve.").

**\*8**[3] Both the Plaintiffs and the City submitted expert declarations along with their summary judgment motions, and the Defendants have moved to strike them because they are not part of the administrative record. The Defendants also argue the declarations are inadmissible under Rule 702 of the Federal Rules of Evidence because the experts have no expertise dealing particularly with pipelines. However, the experts have other relevant areas of expertise, including hydrology, environmental engineering, statistics and environmental science. Additionally, the Defendants contend some experts rely on information obtained after the FONSI was issued. *Citizen Advocates for Responsible Expansion, Inc. (I-Care) v. Dole, 770 F.2d 423, 233* (5th Cir.1985) (the reviewing court "must assess the reasonableness of the agency's determination on the basis of information before the agency at the time the decision not to prepare an EIS was made."). Finally, the Defendants contend the experts offer inadmissible legal opinions. *C.P. Interests, Inc. v. California Pools, Inc.,* 238 F.2d 690, 697 (5th Cir.2001).

 Because this Court's task is to determine whether the agencies took a "hard look" at the relevant factors in evaluating the Pipeline's significance, the declarations the Plaintiffs and City submitted are admissible to the extent they highlight relevant factors the agencies did not consider. However, any legal conclusions and post-FONSI evidence within the declarations and argumentation offered simply to contest the agencies' experts are not admissible. The Defendants' motions to strike are granted in part and denied in part accordingly.

[4] Finally, the Plaintiffs move to strike the declaration of J.P. Sullivan, Jr., which Longhorn relies upon in its opposition to Plaintiffs' motion for preliminary injunction. Longhorn incorporated the declaration by reference, and it was filed in conjunction with civil action A-02-CA-001-SS, which has been consolidated with this case. The Plaintiffs contend they have not had an opportunity to depose Sullivan. Because Longhorn has not asserted the reliability of Sullivan, the declaration is stricken.

## IV. Plaintiffs' and City's NEPA Claims

 The agencies' decision to issue the FONSI was dependent upon Longhorn's agreement to implement many mitigation measures to reduce the environmental impacts of the Pipeline below the threshold of significance. In preparing the draft EA, the agencies employed a risk assessment model developed by W. Kent Muhlbauer to assess the physical integrity and risk of failure for approximately 8,000 segments of the Pipeline ("the Muhlbauer Model"). *See* FONSI, at 3. Taking into account approximately 75 variables, the Muhlbauer Model produced numerical index sum scores, which are intended to correlate with probability of failure. *Id.;* EA Vol. 1, at ES-12. Not surprisingly, the Pipeline scored poorly in this initial evaluation, which indicated the Pipeline had a higher probability of failure than the average pipeline. FONSI, at 3. Longhorn would have to mitigate the risk to avoid a significance finding. The agencies evaluated factors such as population density, proximity to surface and ground water, and protected species habitat along the Pipeline and designated segments of the Pipeline "normal" (Tier 1), "sensitive" (Tier 2), and "hypersensitive" (Tier 3) based on the potential dangers to the environment. *Id.,* EA Vol. 1, at 16. The agencies set target index sum scores for each tier and directed Longhorn to develop a mitigation plan that would reduce the risk in each tier to the target score. FONSI, at 3-4. After Longhorn submitted its final mitigation plan with 40 specific mitigation measures, the agencies found the index sum scores had been reduced such that the residual risk of environmental harm is not significant. FONSI, at 10. In fact, the agencies found the mitigation measures "should render Longhorn's pipeline among the safest in the nation and dramatically safer than the minimum regulatory threshold established by OPS regulations." FONSI, at 10. The issue before this Court is whether this finding of insignificance, and subsequent issuance of the "mitigated FONSI," was arbitrary and capricious. FONSI, at 15.

### A. Political Influences

**\*9**[5] As an overarching concern, the Plaintiffs and City contend the agencies predetermined the mitigated FONSI from the beginning as a policy decision, and the agencies simply tailored the EA to

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1609722 (W.D.Tex.)
(Cite as: 2002 WL 1609722 (W.D.Tex.))

support that decision instead of taking a true "hard look" at the environmental consequences of the Pipeline. By inserting policy goals into the NEPA process, the Plaintiffs argue, the agencies denied their procedural NEPA rights. The Plaintiffs rely on the joint letter from EPA and DOT seeking the CEQ's recommendation on how to conclude the EA process, which states "the choice is a policy choice for our two agencies." Joint Letter, at 2. Additionally, the Plaintiffs point to a deposition of Edward Ray Clark, a CEQ employee at the time of the FONSI, who testified about the "Clinton policy" of integrating and coordinating environmental and economic interests. *See* Plaintiffs' Motion for Summary Judgment, Ex. 1, at 148; 150. Clark also discussed the abundance of lobbyists representing both sides of the case. *Id.* at 62-63, 103-04. Clark specifically testified, however, the White House did not use its influence to affect the outcome of the EA. *Id.* at 74.

The Court has no doubt the White House's policy goals affected the ultimate decision to issue a FONSI, and Longhorn's expensive lobbyists may have been worth their hourly rate. However, the agencies did not request the CEQ's assistance until July 2000, long after they released the draft EA and preliminary FONSI in late October 1999. In other words, the agencies gathered the information, prepared the draft EA and received public commentary--in short, took a "hard look"--before turning to the CEQ for guidance. This Court's task is to ensure the agencies took a hard look at the relevant factors and to decide if their decision was arbitrary and capricious. Reasonable disagreement between two agencies based on a "difference of view" does not render the FONSI decision arbitrary and capricious, and an ultimate blessing by a political entity does not erase the careful study and designation of mitigation measures reflected in the EA. Joint Letter, at 2.

While the existence of White House influence does not spoil the EA does add a certain stench to the FONSI. The major relevant impact of that stench is on the level of deference with which the Court views the decision. Courts must generally defer to agencies' factual determinations that are based on agency expertise. *Marsh, 490 U.S. at 377, 109 S.Ct. at 1861* ("Because analysis of the relevant documents 'requires a high level of agency expertise,' we must defer to 'the informed discretion of the responsible federal agencies." ' (quoting *Kleppe, 427 U.S. at 412,*

*96 S.Ct. at 2731)*). Although certain analysis within the EA involves factual determinations, the CEQ's participation in the decision-making process inserts political policy goals into the final FONSI decision. Thus, the Court need not defer to the agencies' expertise in the FONSI decision itself, but may peer behind it into the EA. However, the Court's review of the FONSI decision is still limited to the highly deferential arbitrary and capricious standard.

B. Enforcement of the Longhorn Mitigation Plan

**\*10** Another major concern of the Plaintiffs and City is the agencies' reliance on the Longhorn Mitigation Plan ("LMP") in issuing the FONSI without a guarantee the plan will be strictly enforced. The agencies acknowledge the Pipeline, without mitigation, would have significant impacts on the environment. *See* EA Vol. 1, at 9-1 ("The Lead Agencies have determined that mitigation measures are necessary to reduce the potential impacts of the proposed project to a level of insignificance."). With mitigation, the agencies predict the Pipeline will result in three or fewer leaks in the next fifty years, twenty times less than it would before mitigation. *Id.* at 9-32-33.

The CEQ supports the issuance of FONSI decisions that are dependent upon mitigation ("mitigated FONSIs") because a mitigated FONSI avoids the expense and delay of an EIS, giving the project applicant an incentive to volunteer mitigation measures beyond what agencies could force it to adopt. *See* FONSI, at 15. In this case, the agencies believe Longhorn's voluntary mitigation measures as part of the FONSI are more comprehensive than they would be following an EIS. *Id.* at 16 ("[T]he Longhorn EA has resulted in greater mitigation than would likely result from the EIS process.").

The Fifth Circuit has acknowledged courts should consider mitigation measures when evaluating an agency's decision not to prepare an EIS. *Louisiana v. Lee, 758 F.2d 1081, 1083* (5th Cir.1985) ("[T]he only realistic course of action is to consider the conditions in reviewing the [agency's] decision not to file the impact statement."). Other circuits have upheld mitigated FONSIs under the arbitrary and capricious standard. *E.g., Greenpeace Action v. Franklin, 14 F.3d 1324, 1335* (9th Cir.1993); *Audubon Soc'y of Central Arkansas v. Dailey, 977 F.2d 428, 435-36*

(8th Cir.1992); *Roanoke River Basin Ass'n v. Houston, 940 F.2d 58, 62* (4th Cir.1991); *C.A.R.E. Now, Inc. v. FAA, 844 F.2d 1569, 1574* (11th Cir.1988); *Cabinet Mountains Wilderness v. Peterson, 685 F.2d 678, 682 (D.C.Cir.1982).*

[6] The Plaintiffs and City do not contend the mitigated FONSI is improper; instead, they express concern about whether the LMP will be enforced. Enforceability of mitigation measures is an important factor for the Court to consider. *Lee, 758 F.2d at 1083* ("This is not an instance where the proposed mitigating conditions consist of vague statements of good intentions by third parties not within the control of the agency.... Rather, here the conditions are legally enforceable by the [agency]."). The City takes issue with Longhorn's freedom to choose the mitigation measures in negotiation with Radian, implying Longhorn weaseled out of some mitigation requirements by taking control of the process. *See* City's Motion for Summary Judgment, Ex. J at URS 022550, 000035. However, it is important to recall Longhorn is the project applicant and as such is responsible for mitigating the Pipeline's risk below a level of significance, so is logically more involved in designing mitigation measures than the agencies. Additionally, many of Longhorn's mitigation promises go beyond what the agencies could require under law. EA Vol. 1, at 9-1 ("These mitigation measures, in many cases, go substantially beyond the legal requirements that apply to U.S. hazardous liquid pipelines.").

*11 While the agencies could not have required such mitigation measures, the LMP enables the agencies to monitor and enforce them. First, Longhorn committed to the mitigation measures unless authorized to modify them by the DOT. EA Vol. 1, at 9-55; Vol. 2, App. 9C, at 51. As the EA notes, "This restriction on their operating control is not placed on any other pipeline in the country ." EA Vol. 1, at 9-55. Additionally, under DOT regulations, pipeline companies must adhere to the procedures in their own operation and maintenance manual. *49 C.F.R. § 195.401(a).* Longhorn has incorporated the LMP into its operation and maintenance manual. EA Vol. 4, at 9-29. The DOT will monitor Longhorn through progress reports on the mitigation plan Longhorn must submit quarterly the first two years and annually thereafter. EA Vol. 1, at ES-23; 9-13. Longhorn will make these progress reports available

to the public via its web site. *Id.;* EA Vol. 2, App. 9C, at 50.

The City contends even if the DOT has the authority to enforce the LMP, it will likely not do so because of the OPS's pathetic enforcement record. *See* City's Motion for Summary Judgment, Ex. A at DOT 005850; DOT 005150; OR/DOT 005490. However, if courts were to make decisions based on federal agencies' potential to be ineffectual, the words "arbitrary and capricious" would lose their meaning. Additionally, unlike most other pipeline companies, Longhorn has committed to enact the measures and file progress reports without waiting for the OPS to come sniffing around the Pipeline.

Having reviewed the LMP and the record as a whole, the Court finds the agencies' decision to rely on the LMP in issuing the FONSI was not arbitrary and capricious. Among other things, the LMP requires Longhorn to replace the segment of pipe that runs through the Edwards Aquifer recharge and contributing zones with thick-walled pipe covered in concrete; perform an in-line inspection of the pipeline at least every three years; patrol the sensitive and hypersensitive areas every two and a half days, and the remaining areas weekly; enhance public education programs to increase awareness; and refrain from transporting products containing methyl tertiary butyl ether ("MTBE") or similar additives through the Pipeline. EA Vol. 2, App. 9C, at 5; 14; 18-19; 29; 39; 42 & 49. Longhorn must hire a third-party contractor, approved by the DOT, to conduct an operational reliability assessment ("ORA") of the Pipeline at least annually, and will implement recommendations from the ORA as approved by the DOT. EA Vol. 1, at 9-12-13. The LMP even requires Longhorn to build a refugium for the Barton Springs salamander, the City's favorite bottom-dwelling reptilian. EA Vol. 2, App. 9C, at 46-48. While these measures do not and cannot confirm with absolute certainty the Pipeline will be safe, the agencies' risk assessment model indicates the measures reduce the risk below a level of significance.

C. Uncertainty of Muhlbauer Model

*12[7] The agencies' quantitative assessment of pre- and post-mitigation risk relies upon the Mulhbauer Model. The Plaintiffs and City contend this model is untested and the results from it are necessarily

Not Reported in F.Supp.2d                                                                 Page 13
Not Reported in F.Supp.2d, 2002 WL 1609722 (W.D.Tex.)
**(Cite as: 2002 WL 1609722 (W.D.Tex.))**

uncertain. Uncertainty is a factor for courts to consider under the CEQ's definition of "significance." 40 C.F.R. § 1508.27. The EA acknowledges the index sum values, which the Mulhbauer Model uses to measure probability of failure, "generally correlate" but do not definitively correlate with failure probability. EA Vol. 1, at 9-8. Additionally, the "leak frequency estimates have a high degree of uncertainty, primarily due to the limited amount of data available." *Id.* at 9-35.

While the Muhlbauer risk assessment may not be absolutely certain, the record indicates the Muhlbauer Model is the most widely accepted pipeline risk assessment model available. EA Vol. 4, at 6-27 (the Muhlbauer Model "appears to be the most widely adopted pipeline risk model currently available."). And as the Defendants point out, the Plaintiffs do not suggest an alternative model. Moreover, the agencies' selection of the Mulhbauer Model involves precisely the type of scientific expertise to which courts must defer. The agencies selected the Muhlbauer model over contrary public commentary (as well as internal debate), finding "[i]t is well suited to the EA application in terms of comprehensiveness and its ability to indicate improvement opportunities (mitigations)." *Id.;* Plaintiffs' Motion for Summary Judgment, Ex. 19 at EPA 017009-11. The agencies acknowledged the uncertainty of the predictions and ultimately decided the model was the best available. EA Vol. 1, at 6-58 ("As with other estimates, this approach has considerable uncertainty but is felt to be the most realistic appraisal of post-mitigation leak rates."). Most importantly, the Plaintiffs' quibble with agencies' use of the Muhlbauer Model does not detract from the more relevant fact that the agencies engaged in the NEPA process and underwent an in-depth risk analysis of the Pipeline.

The Plaintiffs and City also argue the agencies altered the Muhlbauer Model by removing the consequences portion of the analysis to support their FONSI decision. The EA explains the agencies chose to omit the consequences factor in favor of the tiering approach for analyzing impacts. EA Vol.1, at 6-16; FONSI, at 3 n. 3. This alteration does not mean the agencies did not analyze the impacts at all; it merely means the agencies made a choice about which method would best suit this particular project--a choice that merits deference.

Finally, the Plaintiffs contend the agencies illogically relied on spill data from the DOT/OPS database instead of the historic spill data from the Exxon pipeline itself, despite the inaccuracies within the DOT/OPS database. *See* Plaintiffs' Motion for Summary Judgment, Ex. 21-23. The EA discusses the Exxon historical spill data and its limitations. EA Vol. 1, at 5-78; 6-58-59. Additionally, contrary to the Plaintiffs' assertion, the agencies contend the spill frequency estimates do utilize the historic spill data. *Id.* at 5-78- 79. The EA clearly does not ignore the historic spill data from the Exxon pipeline, but discusses it at length. *Id* . at 5-69-76. Therefore, this contention does not demonstrate the agencies' reliance on the Muhlbauer Model was arbitrary and capricious.

D. Old Pipe

*13[8] The Plaintiffs and City contend the agencies did not adequately consider the dangers associated with the approximately 450 miles of the Pipeline constructed in 1950. EA Vol. 1, at 3-2. They point specifically to electric resistance welding ("ERW") pipe, which makes up over fifty percent of the Pipeline and has a "higher susceptibility to certain failure mechanisms" than newer pipe. *Id* . at 5-7. ERW pipe has a longitudinal weld seam that renders the pipe more vulnerable to corrosion and fatigue. *Id.* The EA estimates ERW pipe was responsible for one major spill and possibly six smaller spills during the Exxon pipeline's operation. *Id.* at 5-82. While ERW pipe is not illegal, government agencies have issued advisories about its use. *Id.* at 5-8.

Understandably, the age of the Pipeline concerned the agencies, and the EA acknowledges and confronts those concerns. To counter the effects of age, the agencies required mitigation measures. Based on hydrostatic (water-pressure) testing and in-line ("smart pig") testing of the Pipeline in 1995, Longhorn has repaired and replaced some pipe. *Id.* at 5-11-15. In the LMP, Longhorn committed to further hydrostatic and in-line testing during the operation of the Pipeline. EA Vol. 2, App. 9C, at 28-29. [FN5]

> FN5. The Plaintiffs and City contend the in-line inspection data from 1995 is no longer reliable, since the results are only valid for a finite period. EA Vol. 1, at 5-13. However, the EA also notes "the opportunity for

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

operational-related anomaly growth was limited or non-existent because the pipeline was not in operation since the 1995 inspection." *Id.* at 5-15. Additionally, Longhorn has committed to perform further in-line testing within three months of startup. FONSI, at 9.

The EA demonstrates the agencies acknowledged the ERW pipe's risks as a relevant factor in its significance determination. The EA does not conceal the hazards of the old pipe, but highlights them and addresses ways to mitigate the danger. Ultimately, the agencies decided Longhorn's mitigation measures would adequately resolve those dangers and reduce the project's impact below the level of significance. Congress has only authorized federal courts to ensure the agencies considered all the relevant factors and has not permitted this Court to decide whether the Court would let Longhorn shoot gasoline through 52-year-old pipe for 731 miles where failure would be disastrous for thousands of people and for years to come. Unfortunately, on this record, the Court cannot say the agencies did not consider the Pipeline's age as a relevant factor in its significance determination.

E. Pump Stations

[9] The Plaintiffs and City protest that the agencies ignored the environmental impacts of the nineteen pump stations along the Pipeline, even though the pump stations are clearly relevant to the probability of failure due to their historic failure rate on the Exxon pipeline. Longhorn plans to construct new pump stations and refurbish existing stations, and at the time of the EA the agencies did not know where all the future pump stations would be. EA Vol. 1, at 3-6-3-7; 3-1 n. 1; EA Vol. 2, App. 3D. The Exxon spill data shows four times more major spills occurred at pump stations than along the pipeline: 147 leaks in 29 years. *Id.* at 5-117; 6-18.

The agencies did exclude the pump stations from the risk assessment analysis and probability of failure estimates. EA Vol. 2, App. 9B at 9B-A-1 ("Pump stations are excluded from this [probability of failure] analysis, but could be dealt with separately in a similar manner."). As the EA explains, the agencies decided not to include the pump stations in the risk assessment analysis because pump stations have different risk considerations than the rest of the

Pipeline. EA Vol. 1, at 6-18. Additionally, the predictive power of the historic leak data for the Exxon pump stations is limited because Longhorn has completely refurbished the old stations and has constructed (or will construct) at least a handful of brand-new stations. *Id.* Instead of applying the risk assessment analysis to the pump stations, Longhorn analyzed and will analyze each pump station using Hazard and Operability Studies ("HAZOPS"), a risk assessment technique that "relies on a structured and comprehensive question-answer approach and expert participants to identify and remedy potential safety and operability issues." EA Vol. 1, at 9-25; Vol. 4 at 6-3; 6-33. The EA addresses a January 1999 HAZOPS analysis of the existing pump stations, concluding "[r]esults of these studies revealed some safety and operability issues that did not appear to be critical." EA Vol. 1, at 6-19. The agencies determined the HAZOPS analysis is the appropriate risk assessment method for the Pipeline's pump stations.

*14 Additionally, Longhorn has committed to important mitigation measures concerning its pump stations. Because new pump stations may be located over karst aquifers, Longhorn must prepare site-specific environmental studies for each new pump station at least 180 days before construction begins. EA Vol. 1, at 7-92; Vol. 2, App. 9C at 49. Additionally, the above-ground storage tanks within the pump stations will be surrounded by secondary containment systems. EA Vol. 2, App. 9C at 42. While only five percent of the volume of pump stations spills from the Exxon pipeline occurred after 1982, most of those spills were attributed to tank problems. EA Vol. 1, Figs. 5-17, 5-18; Plaintiffs' Motion for Summary Judgment, Ex. 34. Pump stations are fenced and locked, although unmanned, and will be under video surveillance. EA Vol. 1, at 6-18; Vol. 2, App. 9C at 40. Each pump station will be remotely controlled and operated by the centralized Supervisory Control and Data Acquisition ("SCADA") system in Tulsa, Oklahoma. EA Vol. 1, at 5-22. Additionally, the stations can be locally controlled by emergency shutdown devices and alarms located at each station, and low suction pressure will cause the pump to shut down automatically. *Id.* at 5-23. Longhorn has also committed to pump station inspections every two and a half days in sensitive and hypersensitive areas. EA Vol. 2, App. 9C at 39.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                          Page 15
Not Reported in F.Supp.2d, 2002 WL 1609722 (W.D.Tex.)
**(Cite as: 2002 WL 1609722 (W.D.Tex.))**

   The EA demonstrates the agencies did consider the risks associated with pump stations, even though they did not include pump stations in the risk assessment analysis. Based on the causes of Exxon pump station spills and Longhorn's mitigation commitments addressing those causes, the agencies found the minor leaks that could occur at pump stations would be "generally small, confined to the facility site, quickly discovered, and soon remedied." FONSI, at 11 n. 9. In other words, the agencies considered the pump stations as a relevant factor and determined their risk to be insignificant.

   F. Impacts on Water Supply

[10] Chapter 7 of the EA devotes a section to impacts on ground water and a section to impacts on surface water. Nevertheless, Plaintiffs contend the EA fails to analyze the Pipeline's impacts on private wells and the Edwards-Trinity Aquifer. The City attacks the EA's water modeling studies concerning surface water. The Court will not critique the agencies' chosen water modeling methodology, because the choice of methodology deserves deference. The Court will, however, address the Plaintiffs' claims that the agencies did not consider the relevant factors concerning the Edwards-Trinity Aquifer or private wells.

[11] The EA defines the location of the Edwards-Trinity Aquifer, which is one of the largest aquifers in Texas, and describes it as "highly vulnerable to contamination." EA Vol. 1, at 4-20-21. The EA discusses the potential for karst features and the associated increase in vulnerability of ground water resources. *Id.* at 4-24-25; 7-27. Although the EA acknowledges not much study has been done on the Edwards-Trinity Aquifer and the agencies did not perform a ground water modeling study on it, [FN6] the EA describes the characteristics of the aquifer and estimates "any spill of 500 bbl or greater has a 50 percent probability of occurring at a place where it is more likely to impact ground water supplies." *Id.* at 7-25; 7-28. The EA classifies this estimate as "conservative." *Id.* at 7-28. Thus, contrary to Plaintiffs' assertions, the agencies discussed the relevant features of the Edwards-Trinity Aquifer and reached a conclusion about its vulnerability to leaks and spills. Additionally, one of the appendices to the EA is a technical memorandum prepared for Radian regarding groundwater modeling for certain aquifers;

this document discusses the Edwards-Trinity Aquifer for ten pages. After studying the aquifer, the agencies' decision not to classify the Pipeline located atop the Edwards-Trinity Aquifer as sensitive or hypersensitive is entitled to deference.

> FN6. The Plaintiffs seem to argue the agencies should have commissioned an in-depth study of the Edwards-Trinity Aquifer before reaching the FONSI decision. However, such in-depth study is not required by NEPA, and the agencies would not have been obligated to perform such a study even as part of an EIS. *E.g., Utah Shared Access Alliance v. United States Forest Serv.,* 288 F.3d 1205, 1211 (10th Cir.2002) ("The Forest Service concedes it did not undertake a comprehensive watershed study on the magnitude of the one described in the [Guide to Predicting Sediment Yields], but correctly points out that NEPA did not mandate such a massive study as a prerequisite to action.") (citing *Sierra Club v.Lynn,* 502 F.2d 43, 61 (5th Cir.1974)).

**\*15**[12] The Plaintiffs and City contend the agencies did not take private wells into account in determining the Pipeline's potential impacts on the water supply. It is true the agencies did not consider private wells in their determination of sensitive and hypersensitive areas. EA Vol. 2, App. 7A, at 2; Vol. 1, at 7-32. However, the agencies did consider the impact on private wells as "a criterion for requiring additional mitigation measures for the entire pipeline, and for requiring mitigation directed at addressing the needs of well owners." EA Vol. 1, at 7-32. While the draft EA apparently assumed the private well owners could seek remedies through litigation, the comments convinced the agencies a solution that did not depend on at least a year's delay and legal fees would be preferable. EA Vol. 4, at 9-37-38. Thus, Longhorn provided a separate mitigation plan for domestic water wells, whereby it will identify private wells along the Pipeline, provide early warning to owners in the event of a spill, monitor private wells for contamination should a spill occur and provide mitigation measures in the case of contamination. EA Vol. 2, App. 9F; App. 9C at 45. The Plaintiffs argue the mitigation plan only applies to wells within 2.5 miles on each side of the Pipeline. While this may be

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1609722 (W.D.Tex.)
(Cite as: 2002 WL 1609722 (W.D.Tex.))

a valid complaint, it is a far cry from contending the EA does not consider the relevant factor of the Pipeline's impacts on private wells. On the contrary, the Court finds the agencies adequately considered this factor and concluded it was insignificant given Longhorn's mitigation plan addressing the potential impacts. As a whole, the agencies gave in-depth consideration to the Pipeline's potential impacts on surface and ground water sources and the potential for drinking water contamination.

G. Five-Minute Shutdown

[13] The Plaintiffs and City contend the EA relies on a five-minute shutdown estimate that is unrealistic and thereby underestimates the impact of a spill. They contend the Pipeline can only shut down in five minutes in the best-case scenario. The Plaintiffs point to reservations agency and Radian personnel expressed about the feasibility of the Pipeline being able to shut down within five minutes of detection of a spill. Plaintiffs' Motion for Summary Judgment, Ex. 37; 40.

The Pipeline's leak detection systems are part of Longhorn's mitigation plan. The five-minute shutdown estimate is based on a worst-case scenario, a full breach of the Pipeline and the accompanying large volume spill. The SCADA system discussed above will detect a large-volume spill and set off alarms in the remote monitoring center in Tulsa, prompting personnel to shut down the remote-controlled pumps and valves along the Pipeline. EA Vol. 4, at 6-19; Vol. 2, App. 9C, at 31. The pumps can also shut down automatically in response to low suction pressure, which would result from a large leak. EA Vol. 4, at 6-19; Plaintiffs' Motion for Summary Judgment, Ex. 37. While the five-minute shutdown is only realistic for large leaks, smaller leaks that take longer to detect will result in approximately the same amount of volume discharged. EA Vol. 2, App. 6B, Table 1. Longhorn has also committed to install, prior to startup, a hydrocarbon sensing leak detection cable system in the Edwards Aquifer Recharge Zone and the Slaughter Creek watershed of the Edwards Aquifer Contributing Zone, which will detect a leak of .0030467 barrels per hour in twelve to 120 minutes. EA Vol. 2, App. 9C, at 32.

*16 The record demonstrates the agencies considered the same concerns the Plaintiffs and City raise and required Longhorn to clarify and justify the five-minute response time. Plaintiffs' Motion for Summary Judgment, Ex. 40. The agencies did not blindly rely on the estimate or fail to explain or discuss it in the EA. While the Plaintiffs and City may be skeptical the leak detection system will actually work, this skepticism is not grounds for finding the agencies' decision arbitrary and capricious.

H. Cumulative Impact of Other Pipelines

[14] The Plaintiffs and City allege the agencies failed to consider the potential cumulative impacts of the Pipeline from its shared corridor with other pipelines. The CEQ's regulatory definition of "significance" requires agencies to consider "[w]hether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment." 40 C.F.R. § 1508.27. The United States Court of Appeals for the District of Columbia Circuit recently held the Federal Aviation Administration should have considered the cumulative impact of construction of a new airport on noise pollution in a nearby national park. *Grand Canyon Trust v. Fed. Aviation Admin.,* 290 F.3d 339, 347 (D.C.Cir.2002). In analyzing cumulative impacts, agencies should consider: "(1) the area in which effects of the proposed project will be felt; (2) the impacts that are expected in that area from the proposed project; (3) other actions--past, proposed, and reasonably foreseeable--that have had or are expected to have impacts in the same area; (4) the impacts or expected impacts from these other actions; and (5) the overall impact that can be expected if the individual impacts are allowed to accumulate." *Fritiofson,* 772 F.2d at 1245.

Chapter 7 of the EA discusses cumulative impacts of the Pipeline and concludes there are no cumulative impacts from construction or normal operation of the Pipeline. EA Vol. 1, at 7-86-87. The EA also addresses the potential cumulative impacts from the other pipelines located along the same corridor as the Pipeline. EA Vol. 1, at 7-87; Vol. 4, at 6-44. Longhorn shares a corridor with several other pipelines and runs parallel to two of them for approximately 265 miles, one of which transports crude oil and the other natural gas. EA Vol. 1, at 7-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

88. The EA details the proximity of the parallel pipelines and the potential safety risks such as exposed pipe. *Id.* at 7-89-90. Because "[t]he potential influence of one pipeline on another would depend on the separation distances between pipelines," the agencies examined the distance between the pipelines, especially in Harris and Travis Counties. *Id.* at 7-89. The pipelines do not come within 19 feet of each other. *Id.* at Table 7-11. The agencies noted "[m]ultiple pipelines result in a higher absolute risk to a receptor than a single pipeline(s) in the same vicinity. Assuming pipelines pose the same risk, the combined risk would be three times the risk of one pipeline." *Id.* at 7-90. Despite the greater combined risk, the agencies "concluded that the likelihood of such an accident is low," because the DOT knew of only one accident in ten years where a pipeline explosion has caused damage to an adjoining pipeline. *Id.* Based on this conclusion, the agencies did not include the potential for a chain reaction in the formal risk assessment analysis. *Id.* at 6-26. The agencies also noted the potential benefits of multiple pipelines such as increased surveillance and public awareness. *Id.* at 7-91. While the Plaintiffs critique the EA's analysis of cumulative impacts, they cannot show the agencies failed to consider them. On the contrary, the EA analyzes the general cumulative impacts of the Pipeline and the specific issue of proximity of other pipelines.

I. Third-Party Damage and Sabotage

**\*17**[15] The Plaintiffs and City contend the agencies did not adequately consider the impacts of third-party damage, particularly sabotage, when third-party damage was the primary cause of spills on the Exxon pipeline. EA Vol. 1, at 5-82 ("The primary cause of pipeline spills of 50 bbl or greater in size has been outside force."). The potential for third-party damage is exacerbated by exposed and shallowly buried pipe. *Id.* at 5-81 (discussing shallowly buried pipe). The EA addresses the vulnerability of exposed pipe and shallowly buried pipe. *Id.* at 5-19 ("Exposed pipe, while reducing the chance of accidental damage from excavation strikes, might be a concern because of the increased vulnerability to outside force damage other than excavation (e.g.vandalism) and because of the potential for coating deterioration and atmospheric corrosion. It is not clear whether an exposed pipe has more risk of third-party damage than buried pipe. It is often assumed that shallow burial, less than six

inches, for example, is worse than a full exposure since the cover is inadequate to provide much protection, but does conceal the presence of the pipeline."). Longhorn surveyed the exposed pipe and the EA identifies the exposed areas. *Id.; see also* Figure 5-10; Table 7-8. The EA also considers the vulnerability of exposed pipe at stream and ditch crossings. *Id.* at 5- 21 ("[S]maller stream and ditch crossings in the Houston area, where there is potential vulnerability to vandalism, show evidence of use as foot bridges, graffiti painting, and tampering with the protective coatings.").

In addition to describing the potential vulnerability of the Pipeline to third-party damage, the EA includes third-party damage as one of the four factors contributing to probability of failure in the risk assessment analysis. *Id.* at 6-24-25. The Plaintiffs attack the agencies' decision not to include the risk of sabotage in the formal risk assessment. The EA explains the agencies' decision as follows: "The risk of sabotage is difficult to fully assess since such risks are so situation-specific and subject to rapid change over time. The assessment would be subject to a great deal of uncertainty, and recommendations would be problematic. This type of assessment is not thought to add significant value to the EA." *Id* . at 6-25. While the Plaintiffs may not support this choice, the agencies considered the risk of sabotage and made a reasoned decision not to include it in the risk assessment. However, Longhorn committed to mitigation measures to address the risk of sabotage and other third-party damage, including clear and bountiful pipeline markers, frequent aerial and ground surveillance, excavator education and public education. EA Vol. 2, App. 9C at 89-92; App. 9B, at 9B-B-1. [FN7] Accordingly, the Court finds the agencies considered third-party damage and sabotage as relevant factors in the EA analysis.

> FN7. The Plaintiffs take issue with Longhorn's decision not to include warnings to deer hunters in its educational materials. However, the EA addresses why Longhorn does not include such warnings. EA Vol. 4, at 5- 16 ("Depending on the terms of specific easement agreements along the [right of way], Longhorn would usually not have any control over activities such as hunting. The control of hunting activities would therefore be the responsibility of the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                    Page 18
Not Reported in F.Supp.2d, 2002 WL 1609722 (W.D.Tex.)
**(Cite as: 2002 WL 1609722 (W.D.Tex.))**

respective landowners along the ROW. At the current time, Longhorn does not plan to include comments regarding hunting in its educational material."). The Federal Defendants' assumption that hunting along the right of way is a "remote or speculative" possibility, however, reminds the Court that the Department of Justice is in fact located in Washington, D.C. Federal Defendants' Reply, at 38 n. 13.

V. Breach of Settlement Stipulation

**\*18** While many of the above NEPA arguments relate to the Plaintiffs' and City's claim of breach of the Settlement Stipulation, some contentions relate more directly to their contract claims. Under the Settlement Stipulation of March 1, 1999, the agencies agreed to prepare an EA on the Pipeline that (a) identifies surface and ground water resources, land resources and uses, and flora and fauna in the vicinity of the Pipeline; (b) discusses the environmental consequences of the Pipeline, including a discussion of pipeline integrity and a risk assessment analysis; and (c) identifies and analyzes alternatives. EA Vol. 2, App. 1A. The Court finds the Defendants did not breach the Settlement Stipulation in any of the areas discussed above. The Court discusses the remaining breach arguments below and concludes the Defendants complied with the Settlement Stipulation.

A. Consideration of Alternatives

[16] The Plaintiffs and City contend the EA does not contain a sufficient analysis of alternatives to the proposed project. This argument fails under NEPA, because the law only requires the EA to contain "brief discussions" of the alternatives to the proposed action. *Fritiofson,* 772 F.2d at 1236. The Settlement Stipulation requires the agencies to identify a range of alternatives, including re-routing alternatives that would avoid Austin and various aquifers, consider the alternatives, and explain why the alternatives are selected or eliminated from detailed study. EA Vol. 2, App. 1A, at 27-29. Additionally, the agencies agreed to "evaluate in detail those alternatives that are determined to be reasonable means of mitigating significant environmental impacts." *Id.* at 29.

The Plaintiffs and City argue the agencies did not truly consider the Austin re-route alternative but

allowed Longhorn to designate an alternative route that doomed it to fail. The Settlement Stipulation does not prohibit Longhorn from identifying the alternative routes. Longhorn identified a 21-mile alternative route to replace a 12-mile segment of the Pipeline located in highly populated south Austin. EA Vol. 1, at 4-13; Fig. 3-1. The alternative would avoid approximately 2,893 south Austin dwellings, and "potential impacts to human health and safety residing near the Austin Re-Route are much lower than for the proposed pipeline, based on this difference in population density." *Id.* at 7-16.

Despite the current lower population density of the alternative route, the EA notes "much of the areas of south Travis County and northern Hays County near and west of the I-35 corridor are currently subject to heavy development pressures." *Id.* at 7-16, 7-83. Additionally, the alternative would pass over 8.2 miles of hypersensitive karst aquifer, compared to the 3.0 miles of the existing Pipeline. *Id.* at 7-35. The agencies recognized the difficulty of re-routing the Pipeline further south due to the sensitivity of the Edwards Aquifer and the potential impacts on the San Marcos water supply and the endangered Barton Springs salamander. *Id.* at 7-35, 7-42; *see also* 7-50, 7-69. There would be additional environmental impacts from the 22 days it would take to construct the Pipeline. *Id.* at 7-76. These impacts render the Austin re-route alternative less environmentally sound than the current route. *Id.* at 9-50-51. The EA demonstrates the agencies complied with the Settlement Stipulation by identifying an alternative, considering the positive and negative impacts of the alternative, and abandoning the idea because of greater environmental harm.

**\*19** The agencies also afforded sufficient analysis to the aquifer avoidance alternative. This alternative would veer to the north, just south of Waco, and require construction of 370 miles of new pipe. EA Vol. 1, at 7-8. The alternative pipeline would have less affected population residing along the route than the current Pipeline. *Id.* at 7-17. Only approximately 80 miles of the alternative route would pass over karst aquifers, as opposed to 175 miles of the existing Pipeline. *Id.* at 7-35. The EA describes the protected species and water supplies along the alternative route. *Id.* at 7-43-44, 7-50-52, 7-69. Construction of the new segment would last approximately 12 to 18 months, and up to 13 new pump stations would also

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1609722 (W.D.Tex.)
**(Cite as: 2002 WL 1609722 (W.D.Tex.))**

need to be built. *Id.* at 7-77.

After considering and analyzing the aquifer avoidance alternative, the agencies rejected the alternative. Although the alternative would avoid Austin and the sensitive aquifers in this region, the construction would cause short-term impacts on the environment and, unlike the current Pipeline route that is shared with other pipelines, would expose a new population to pipeline risks. *Id.* at 9-48-49. Additionally, the agencies determined "it is unlikely the [alternative] would serve the proposed project's purpose, i.e. allowing Longhorn a means to transport refined petroleum products to the markets in which it hopes to compete. The additional costs of constructing 370 miles of new pipeline, estimated at $300 million, would likely eliminate Longhorn's potential ability to compete in those markets." *Id.* at 3-17. Therefore, the agencies concluded the aquifer avoidance alternative was not "a feasible means of accomplishing fundamental project purposes." *Id.* This conclusion and the analysis leading up to it complied with the Settlement Stipulation.

B. Environmental Justice Concerns

[17] The Settlement Stipulation requires the agencies to consider any environmental justice issues associated with the operation of the Pipeline, including the location of pipe in certain residential areas. EA Vol. 2, App. 1A, at 27. An environmental justice analysis determines whether there are any disproportionately high adverse human health or environmental effects on minority or low-income populations. EA Vol. 1, at 8-1. The Plaintiffs and City contend the agencies did not adequately consider environmental justice concerns.

The EA devotes an entire chapter to environmental justice concerns. The agencies reviewed the potential impacts of the project, the potential impacts on minority and low-income populations, the potential disproportionately adverse impacts, and the impacts of mitigation measures. *Id.* at 8-3. The agencies concluded "the proposed project would not have any disproportionately high and adverse effects on minority and low-income populations during normal pipeline operation scenarios. Furthermore, there is no evidence of disproportionately high and adverse effects along a majority of the pipeline in the event of a pipeline failure." *Id.* at 8-1. The City contends the

agencies did not consider the effects of Longhorn's replacement of nineteen miles of pipe in southwest Austin, an apparent concession to the Fish and Wildlife Service in exchange for a Letter of Concurrence regarding the Pipeline's effects on the Barton Springs salamander, with no attendant provision of new pipe in southeast Austin. However, the agencies did consider the environmental justice impacts of this new pipe and concluded "mitigation measures proposed in the LMP for Travis County provide an acceptable level of protection to minority and low-income populations." *Id.* at 8-27-30. The Court finds the EA's lengthy discussion and analysis of environmental justice concerns satisfies the Settlement Stipulation.

C. Involvement of Austin Fire Department

*20[18] The Settlement Stipulation requires the agencies to invite the Austin Fire Department to be a cooperating agency, and the City contends the agencies failed to do so. Therefore, the City argues, any emergency response plan of Longhorn's must be inadequate. However, the record indicates the agencies did invite the Austin Fire Department to participate in the EA process as a cooperating agency on March 26, 1999. Longhorn's Response to Summary Judgment Motions, Ex. 1. Additionally, in May 2002 the Fire Marshal rejected an invitation by Longhorn to participate in emergency response drills. *Id.,* Ex. 2. The Court finds the agencies' invitation to the Austin Fire Department complied with the Settlement Stipulation.

Conclusion

Having reviewed the record, the Court finds the FONSI complies with NEPA because "the agency decision is founded on a reasoned evaluation of the relevant factors." *Utah Shared Access,* 288 F.3d at 1213 (citing *Marsh, 490 U.S. at 373-74, 109 S.Ct. 1851, 104 L.Ed.2d 377).* While the agency could have discussed some factors more carefully, the Plaintiffs and City cannot say the EA fully fails to discuss any relevant factor. *Utah Shared Access,* 288 F.3d at 1213 ("It is true here, as it is in every case, that the agency could have discussed the relevant environmental impacts in greater detail."). The EA in this case was quite lengthy and detailed, and goes far beyond NEPA's requirements for an EA. *Sabine River,* 951 F.2d at 677 ("[T]he EA is a 'concise' document that 'briefly' discusses the relevant issues")

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1609722 (W.D.Tex.)
(Cite as: 2002 WL 1609722 (W.D.Tex.))

(quoting CEQ regulations concerning NEPA). An EIS might result in more "excellent paperwork," but the Court agrees with the agencies that an EIS would provide essentially nothing more to ease the fears of the Plaintiffs and Austin residents. 40 C.F.R. § 1500.1 ("NEPA's purpose is not to generate paperworkeven excellent paperwork--but to foster excellent action."). The leftover uncertainties result from the unavailability of data and the simple fact that predictions based on mitigation measures that have not yet been done are necessarily uncertain. What the Plaintiffs and City really want--no gasoline flowing through the Pipeline, certainly not through 52-year-old pipe, through our backyards and over our aquifers--would not be accomplished through an EIS.

While this case is about the Pipeline, it is more essentially about following a process that Congress guaranteed to Americans. As described above, the Court finds the agencies made good on Congress's promise and followed the process. This Court is part of the process too, for the balance of power that is the basic and fundamental principle keeping the federal government afloat requires federal courts to defer to Congress's statutory restriction of courts' role in the NEPA process and delegation of authority to administrative agencies. The undersigned personally is extremely concerned Longhorn will begin pushing high-grade gasoline through the Pipeline in less than a month, which it has assured the Court it intends to do. The Court finds no consolation whatsoever in the fact that Longhorn is a limited partnership with limited liability and has only $15 million of liability insurance. Had the Court been granted more discretion, at a very minimum the undersigned would find it reasonable to order Longhorn to replace the 52-year-old pipe in all populated areas and in areas that affect people's drinking water supply. However, the Court has no such discretion and recognizes the importance of staying within the sharp boundaries of judicial review. And while the Plaintiffs and the City are undoubtedly far from excited about the Pipeline's imminent startup, the Court hopes they find some reassurance in Longhorn's "unprecedented" mitigation measures for the Pipeline, which likely would not have come about but for their fervent and articulate NEPA challenge. The mitigation measures are a product of the effective process. Time will only tell if the mitigation measures will be sufficient to contain the dangers inherent in this decrepit Pipeline, and the people and critters in its threatening shadow can only hope and pray that they will.

*21 [19] And finally, the Court turns to the costs of suit. The Plaintiffs filed this lawsuit seeking the only legal relief available, and that was an investigation of this Pipeline with regard to environmental impacts under NEPA. The Federal Defendants disclaimed any responsibility, and all Defendants contended this Court could not have jurisdiction and there were no lawful procedures available to the Plaintiffs to obtain a NEPA investigation. The Plaintiffs won relief in several ways. First, the government finally admitted its responsibility and selected the DOT's Office of Pipeline Safety as the responsible agency. Plaintiffs then obtained an in-depth investigation of the Pipeline and resulting EA, which took over a year and a half. Plaintiffs also in the process received significant mitigation concessions from Longhorn along with a commitment that the OPS will ensure the completion of those mitigation features and closely monitor this Pipeline that puts in jeopardy thousands of people who live above it and many more thousands of people who depend upon the water it runs through. [FN8] Of course, the Plaintiffs did not get what they really wanted, which was to stop the Pipeline, but that simply wasn't in the cards dealt by the United States Congress. Therefore, all costs will be taxed to the Defendants, as this Court determines the Plaintiffs and City were the prevailing parties, notwithstanding a take nothing judgment.

FN8. The undersigned hears frequently of his many weak personality traits, but memory is not among them. Regardless of the OPS's claim to fame of having only nine employees to monitor all pipelines in the southwest United States, the undersigned will not forget OPS's commitment to enforce Longhorn's mitigation measures and monitor *this* Pipeline.

In accordance with the foregoing:

IT IS ORDERED that the Plaintiffs' Motion for Summary Judgment [# 295] is DENIED;

IT IS FURTHER ORDERED that the City of Austin's Motion for Summary Judgment [# 299] is DENIED;

IT IS FURTHER ORDERED that Defendant Longhorn Pipeline Partners, L.P.'s Motion for

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1609722 (W.D.Tex.)
**(Cite as: 2002 WL 1609722 (W.D.Tex.))**

Page 21

Summary Judgment [# 300] is GRANTED;

 IT IS FURTHER ORDERED that the Federal Defendants' Motion for Summary Judgment [# 297] is GRANTED;

 IT IS FURTHER ORDERED that the Plaintiffs' Motion to Extend the Injunction [# 201] and Request for Preliminary Injunction [# 323] are DENIED;

 IT IS FURTHER ORDERED that the City of Austin's Motion to Extend the Injunction [# 203] and Request for Preliminary Injunctive Relief [# 308] are DENIED;

 IT IS FURTHER ORDERED that Longhorn's Motion to Strike declarations filed by the City of Austin [# 311] is GRANTED in part and DENIED in part, as discussed in Part III above;

 IT IS FURTHER ORDERED that Longhorn's Motion to Strike declarations filed by Plaintiffs [# 312] is GRANTED in part and DENIED in part, as discussed in Part III above;

 IT IS FURTHER ORDERED that the Federal Defendants' Motion to Strike Plaintiffs' declarations [# 315] is GRANTED in part and DENIED in part, as discussed in Part III above;

 IT IS FURTHER ORDERED that Longhorn's Motion to Strike documents filed by City of Austin [# 320] is GRANTED in part and DENIED in part, as discussed in Part III above;

 IT IS FURTHER ORDERED that Longhorn's Motion to Strike exhibits filed by Plaintiffs in support of their summary judgment response [# 334] is DENIED;

 **\*22** IT IS FINALLY ORDERED that Plaintiffs' Motion to Strike Declarations of J.P. Sullivan, Jr. [# 337] is GRANTED.

 Not Reported in F.Supp.2d, 2002 WL 1609722 (W.D.Tex.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.