# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

THEODORE ROOSEVELT )
CONSERVATION PARTNERSHIP )
555 Eleventh St. N.W., 6th Floor )          CASE NO. 1:07-cv-01486-RJL
Washington, DC 20004 )
(202) 654-4600, )
)
     Plaintiff, )
)
     v. )
)
DIRK KEMPTHORNE, in his official )
capacity as the Secretary of the United States )
Department of the Interior )
1849 C Street, N.W. )
Washington, DC 20240 )
)
(202) 208-3100, )
)
     and )
)
UNITED STATES BUREAU OF LAND )
MANAGEMENT )
1849 C Street, Room 406-LS )
Washington, DC 20240 )
(202) 452-5125, )
)
     Defendants. )
)
———————————————— )
)
ANADARKO PETROLEUM )
CORPORATION, WARREN RESOURCES, )
INC., DOUBLE EAGLE PETROLEUM )
CO., )
)
and )
)
STATE OF WYOMING, )
)
     Defendant-Intervenors. )
)

## CONSOLIDATED RESPONSE TO CROSS-MOTIONS FOR SUMMARY JUDGMENT
## AND REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................1

ARGUMENT .......................................................................................................................3

I.  TRCP'S STATEMENT OF MATERIAL FACTS SHOULD BE ACCEPTED
    AS IF ADMITTED BY THE FEDERAL DEFENDANTS. .................................3

II. BLM VIOLATED FLPMA. ...............................................................................4

    A.  TRCP's "Multiple Use" and "Sustained Yield" Claims are Justiciable. ....................4

    B.  The ROD will Not Protect Hunting and Recreational Opportunities in the
        ARPA, thus Violating FLPMA's Multiple Use and Sustained Yield
        Mandates. ................................................................................7

        (1)  Sage Grouse in the ARPA Cannot Withstand the Effects of the
             Project. .........................................................................8

        (2)  BLM May Not Dedicate the ARPA to CBM Development Without
             Violating FLPMA. .............................................................12

    C.  The ROD is not Consistent with the Great Divide RMP. ...........................13

        (1)  Exceedence of the RFD Scenario by at least 25% is Inconsistent with
             the Great Divide RMP. .......................................................13

        (2)  The Conclusions in the ROD are directly Contrary to the RMP's
             Objectives. ...................................................................16

        (3)  Ultimately, the "Consistency" determination was Arbitrary and
             Capricious *Per se*. ..........................................................20

III. BLM VIOLATED NEPA. ..................................................................................21

    A.  TRCP Has Not Waived its NEPA Claims. .................................................21

    B.  BLM Unreasonably Rejected the PDA Prior to Completion of the NEPA
        Process. .......................................................................................24

    C.  BLM's Adaptive Management Program is Unlawfully Vague, Ignores the
        Obvious Failure of Similar Programs, and is Already Failing. ....................30

    D.  BLM Was Required to Await Completion of the Mule Deer Study. ..............36

    E.  BLM Unlawfully Committed the ARPA's Resources Before it Finalized
        the Rawlins RMP. ..........................................................................38

    F.  BLM's Analysis of Cumulative Impacts is Deficient. ................................40

IV. THE POD DECISIONS WERE UNLAWFUL. .................................................42

CONCLUSION ...................................................................................................................44

CERTIFICATE OF SERVICE ...........................................................................................44

Plaintiff Theodore Roosevelt Conservation Partnership ("TRCP") files its consolidated response to the various cross-motions for summary judgment filed by Defendants (Dkt. Nos. 45, 47, 48, 50, 52, and 53) and reply in support of TRCP's motion for summary judgment (Dkt. No. 43).

## INTRODUCTION

This case stems from the Bureau of Land Management's ("BLM") failure to balance the competing resources of the quarter-million acre Atlantic Rim Project Area ("ARPA").   In *Mineral Policy Center v. Norton*, 292 F. Supp. 2d 30, 33 (D.D.C. 2003), this court explained the fundamental goal of the Federal Land Policy and Management Act ("FLPMA"):

> FLPMA thus attempts to balance two vital-but often competing-interests.  On one hand, FLPMA recognizes the "need for domestic sources of minerals, food, timber, and fiber from the public lands," 43 U.S.C. § 1701(a)(12), and, on the other hand, FLPMA attempts to mitigate the devastating environmental consequences of [mineral development], to "protect the quality of scientific, scenic, historical, ecological, environmental, air, and atmospheric, water resource, and archeological values," *id*. § 1701(a)(8).  Put another way, FLPMA "represents an attempt by Congress to balance the use of the public lands by interests as diverse as the lands themselves."

(Citations omitted).  Accordingly, FLPMA requires BLM to manage for "multiple use" and "sustained yield" on the public lands, 43 U.S.C. § 1732(a), to "take any action necessary to prevent unnecessary or undue degradation of the lands[,]" 43 U.S.C. § 1732(b), and to pursue the "harmonious and coordinated management of the various resources without permanent impairment of the productivity of the land and the quality of the environment," 43 U.S.C. § 1702(c).[1]

---

[1] One issue that does not factor into FLPMA's multiple use management regime is the amount of money Defendant-Intervenors stand to make from coal bed methane ("CBM") development at the ARPA.

1

Contrary to Defendants' characterization, TRCP does not simply "prefer that BLM favor hunting and recreation over oil and gas development." Fed. Dfs. Memo. at 8. This case is based on FLPMA's fundamental premise that BLM may *not* manage the ARPA for a single use, whether for energy or non-energy purposes. However, by approving the Atlantic Rim Natural Gas Field Development Project (the "Project"), BLM has done just that, committing the ARPA to CBM development in a manner that will foreclose other uses recognized in FLPMA: outdoor recreation (e.g. hunting) and wildlife.

The record clearly demonstrates: (1) The Project will drive Greater sage grouse (whose status is so precarious that the bird is being considered for listing under the Endangered Species Act) from the ARPA; (2) the Project will not protect crucial habitats needed to support populations of big game, including mule deer, elk and pronghorn antelope; and (3) the Project will "industrialize" the ARPA, thereby destroying the hunting and recreational experiences it has always afforded. Such a result violates both FLPMA's "multiple use, sustained yield" mandates and the requirements of the Great Divide Resource Management Plan ("RMP").

The record also reflects that BLM unreasonably discarded an otherwise viable alternative developed pursuant to the National Environmental Policy Act ("NEPA"), which would not have violated FLPMA's substantive provisions. The so-called "Phased Development" alternative ("PDA"), designed by BLM staff closest to the Project, was specifically developed to protect the ARPA's non-energy resources and to complement the "Adaptive Management" program incorporated into the Record of Decision ("ROD") approving the Project. The PDA, however, was rejected prior to completion of the NEPA process based on bald assertions by the Operators that the PDA was "infeasible."

2

In the end, BLM approved the Project, requiring monitoring and mitigation as a condition of its approval, but defining those requirements so ambiguously as to render them meaningless. Erroneously labeling this "Adaptive Management" and ignoring the concurrent failure of that process in comparable energy fields, BLM shirked its duties under both NEPA and FLPMA. The ROD provides no assurance that the ARPA's wildlife (particularly the highly imperiled sage grouse) and related resources will be protected as BLM promises. Indeed, BLM already has failed to implement the Adaptive Management process promised by the ROD.

For the foregoing reasons, as further discussed in TRCP's motion for summary judgment and as elaborated herein, TRCP is entitled to judgment in its favor and the relief sought by its motion. Defendants' cross-motions should be denied.

## **ARGUMENT**

## I.    **TRCP'S STATEMENT OF MATERIAL FACTS SHOULD BE ACCEPTED AS IF ADMITTED BY THE FEDERAL DEFENDANTS.**

This Court strictly adheres to the text of LRCvP 56.1, which is identical to LRCvP 7(h). *Isse v. American University*, 540 F. Supp. 2d 9, 13 (D.D.C. 2008). Federal Defendants failed to comply with these rules by refusing to file a response to TRCP's Statement of Material Facts in Support of Motion for Summary Judgment or to file their own statement as required by the local rules.[2] Accordingly, pursuant to those rules, TRCP's statements of material fact should be treated as if admitted by Federal Defendants. Moreover, Federal Defendants' cross-motion for

---

[2] Defendants criticize TRCP for selectively quoting and even "cherry-picking" the Administrative Record to support its claims. To the extent Defendants suggest TRCP has acted improperly, TRCP submits that – unlike Federal Defendants – it is simply complying with the requirements of LRCvP 7(h) and 56.1 in an effort to winnow down the salient facts from an extensive Administrative Record to facilitate the Court's review. *See Jackson v. Finnegan, Henderson, Farabow, Garret & Dunner*, 101 F.3d 145, 150 (D.C. Cir. 1996). At any rate, TRCP has herein cited directly to the Administrative Record ("AR") in an effort to minimize additional complaints.

summary judgment should be disregarded as non-compliant. *Smith Property Holdings, 4411 Connecticut L.L.C. v. United States*, 311 F. Supp. 2d 69 (D.D.C. 2004); *Robertson v. American Airlines, Inc.*, 239 F. Supp. 2d 5 (D.D.C. 2002).

## II.    BLM VIOLATED FLPMA.

The Project cannot be squared with FLPMA's mandates. BLM has authorized a singular use for the ARPA, which will displace for multiple generations, if not permanently, the current primary uses of those lands (wildlife, hunting and recreation). BLM has not struck a "balance" among CBM development and other uses of the ARPA as required by 43 U.S.C. § 1702(c). *See also Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 58 (2004). Nor has BLM "ensure[d] a high level" of wildlife and recreational hunting in the future. *Mount Royal Joint Venture v. Kempthorne*, 477 F.3d 745, 757 (D.C. Cir. 2007); *see also* G. C. Coggins and Robert L. Glicksman, Public Natural Resources Law § 30:4 (2nd ed. 2007) ("Coggins and Glicksman") (under sustained yield principles, "management of renewable resources should be aimed at achieving a long-term equilibrium in which each of the resources will be a prominent part or contributor.").

### A.    TRCP's "Multiple Use" and "Sustained Yield" Claims are Justiciable.

"FLPMA's principal management requirement" is multiple use and sustained yield management. *Natural Resources Defense Council, Inc. v. Hodel*, 618 F. Supp. 848, 858 (D. Cal. 1985). *See also* 43 U.S.C. § 1732(a). Federal Defendants, however, contend TRCP may not challenge directly BLM's actions in this case as violating FLPMA's "multiple use" and "sustained yield" requirements. Federal Defendants assert the only thing TRCP could contest is whether the Project complies with the Great Divide RMP. Federal Defendants' Memorandum of Points and Authorities in Support of Combined Cross Motion for Summary Judgment and

Response to Plaintiff's Motion for Summary Judgment ("Fed. Dfs. Memo") at 36-38. If adopted by this Court, Federal Defendants' position would insulate virtually all BLM's site-specific management activities from judicial review for compliance with FLPMA's two most fundamental mandates. Federal Defendants' position, however, makes no sense and should be dismissed for the reasons set forth below.

Contrary to Federal Defendants' premise, the Supreme Court has not said RMPs are the *only* mechanism by which BLM implements FLPMA's mandates. Rather, land planning documents (*e.g.*, RMPs) are "the main tool" available to BLM for that purpose. *Norton*, 542 U.S. at 59-60 citing 43 CFR § 1601.0-5(k). This Circuit and other courts have entertained myriad claims concerning "multiple use" mandates in contexts other than RMP challenges. *See, e.g., Mount Royal*, *supra* (challenging, among other actions, Public Land Order 7254, in which Secretary withdrew from mineral location and entry 19,685 acres of land in Montana's Sweet Grass Hills). *Compare Headwaters, Inc. v. Bureau of Land Management, Medford Dist.*, 893 F.2d 1012 (9th Cir. 1989) (multiple use challenge to site-specific timber sales); *Williams v. Bankert*, 2007 WL 3053293 (D. Utah Oct. 18, 2007) (multiple use challenge to BLM's approval of the San Rafael Route Designation Plan, adopted to implement decisions made in the 1991 San Rafael RMP regarding the management of off-highway vehicle use). FLPMA specifically recognizes that site-specific actions like the ROD implement FLPMA's statutory mandates. *See* 43 U.S.C. § 1702(k)(1) (defining allotment management plan as a document that "prescribes the manner in, and extent to, which livestock operations will be conducted in order to meet the multiple-use, sustained-yield, economic and other needs and objectives as determined for the lands by the Secretary concerned.").

Nevertheless, Federal Defendants argue "in order to prevail, Plaintiff must show that the Atlantic Rim ROD and the decisions to approve the Sun Dog and Catalina PODs violate FLPMA because they do not comport with specific management requirements contained in the RMP." Fed. Dfs. Memo at 38.   Paradoxically, Federal Defendants simultaneously assert RMPs "are generally unreviewable" and "it is only specific actions implementing the [RMPs] that are subject to judicial scrutiny."  Fed. Dfs. Memo at 37.

An illustration of the Federal Defendants' position is the following:  The hypothetical "Development RMP" requires all land within its planning reach to be devoted to a single use (e.g., CBM extraction), to be developed as quickly as possible until all CBM in the planning area is exhausted (i.e., without regard to sustained yield).   Under Federal Defendants' theory, this Court could not review a claim that the Development RMP violates FLPMA's multiple use and sustained yield requirements because such a claim would not be justiciable.  Fed. Dfs. Memo at 37.   Rather, Federal Defendants would require plaintiffs to await a site specific action (e.g., the "CBM Project") before initiating legal action.  Yet, once the CBM Project was approved, Federal Defendants would limit the court's inquiry to whether the CBM Project was consistent with the Development RMP.  While the project strictly would meet the RMP's requirements, no court could *ever* reach the ultimate question posed by FLPMA – whether BLM is managing the public lands pursuant to the multiple use and sustained yield mandates.  Obviously, in this hypothetical, BLM would be violating FLPMA.  If Federal Defendants are correct, however, neither TRCP (nor any other plaintiff) could *ever* mount a challenge against BLM's management decision on the basis that it violates the multiple use and sustained yield mandates of FLPMA.   Federal Defendants' position should be rejected.

**B.    The ROD will Not Protect Hunting and Recreational Opportunities in the ARPA, thus Violating FLPMA's Multiple Use and Sustained Yield Mandates.**

Despite Defendants' various attempts to minimize the non-energy value of the ARPA and the impact of the Project on wildlife, the record reflects the ARPA's unique qualities and its support of extraordinary hunting opportunities.  The vast majority of lands in the ARPA are within 2 miles of an active sage grouse lek, and 92% of the area is sage grouse nesting habitat. AR 8831. "Greater sage-grouse are abundant within the ARPA, due to the high amount and diversity of suitable habitat, lack of habitat fragmentation, and the close proximity of upland and riparian habitats."  AR 2394.  The ARPA supports the Baggs Mule Deer Herd Unit, which for nearly 30 years has maintained "one of Wyoming's largest deer herds and provided exceptional recreational opportunities to both resident and nonresident sportsmen."  AR 7445.  Mule deer in the ARPA are hunted, with a 54% success rate, by 2,784 hunters (40% of which are non-residents) each year.  These hunters are supported by at least 18 local outfitters.  AR 2280.  Elk in the ARPA are hunted, with a 45% success rate, by 3,532 hunters (11% of which are non-residents) each year.  These hunters are supported by at least 15 local outfitters.  AR 2280. Pronghorn in the ARPA are hunted, with a 99% success rate, by 2,784 hunters (21% of which are non-residents) each year.  These hunters are supported by at least 13 local outfitters.  AR 2280.

Defendants contend the Project's impacts are minimal based purely on the number of acres directly destroyed.  Yet they ignore the Project's combined direct *and indirect* effects on wildlife.  As the Atlantic Rim Natural Gas Field Development Project Final Environmental Impact Statement ("FEIS") states:   "Direct habitat loss from construction would equal approximately 6 percent of the project area.  In addition, dust would directly and indirectly impact 15-30 percent more acreage (section 4.5.3.1).  These impacts would include habitat

avoidance." AR 2389. As the Wyoming Game & Fish Department ("WGFD") explained: "The impact of over 74 mi$^2$ of lost mule deer habitat, 19 mi$^2$ of pronghorn habitat, and 11 mi$^2$ of elk habitat is [a] significant impact." AR 9793. Ironically, the most imperiled species, the sage grouse, will suffer the greatest impact.

(1)    Sage Grouse in the ARPA Cannot Withstand the Effects of the Project.

Due to multiple threats to its dwindling habitat, the sage grouse is currently being considered for listing under the Endangered Species Act ("ESA"), and BLM has designated the sage grouse a "Sensitive Species." *See Western Watersheds Project v. U.S. Forest Service*, 535 F. Supp. 2d 1173 (D. Idaho 2007); *Notice of 90-day Petition Finding and Initiation of Status Review*, 73 Fed. Reg. 23,170 (April 29, 2008); AR 4405. Sage grouse is listed as a "Status 2 Species of Special Concern" in Wyoming, which means "[p]opulations are declining" and experiencing "[o]n-going significant loss of habitat." http://gf.state.wy.us/wildlife/nongame/SpeciesofSpecialConcern/index.asp.

Federal Defendants correctly note that TRCP "does not contend BLM failed to take a hard look at the potential impacts of the [Project] on sage grouse." Fed. Dfs. Memo at 26. TRCP contends that notwithstanding that hard look, BLM ignored the best available science and made a decision that will lead to the eradication of sage grouse throughout the ARPA. BLM's conclusions "run[] counter to the evidence before the agency" and violate FLPMA. *Motor Vehicles Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

Federal Defendants contend the ROD does not violate FLPMA because its provisions "protect" sage grouse in a manner consistent with the RMP. Fed. Dfs. Memo at 38. The science demonstrates, however, that BLM's mitigation measures will not adequately protect sage grouse

in the ARPA.[3]  Federal Defendants attempt vainly to minimize the Fish and Wildlife Service's

("FWS") concerns about the Project's impacts on sage grouse, incredibly stating "FWS did not

identify any flaws in BLM's analysis [with respect to sage grouse]." Fed. Dfs. Memo at 39.  This

is simply untrue.  To the contrary, FWS repeatedly and strenuously objected to BLM's sage

grouse management strategy.

Early on, FWS stated:  "Sage grouse are declining throughout their range, … .

[A]necdotal information, from several sources in Wyoming, suggests that sage grouse

populations are negatively affected by the activities associated with oil and gas development,

even when mitigative measures are implemented."  AR 7813.  FWS "encourage[d] the Bureau to

take all necessary measures allowable to protect the sage grouse … in the project area to ensure

this project does not exacerbate factors contributing to these species' declines and thus give

support to a listing petition."  *Id.*

FWS later criticized the ¼ mile no-surface-occupancy ("NSO") buffer employed by BLM

to protect sage grouse in the ARPA.  FWS's conclusions were based on studies available to BLM

at the time it signed the ROD.  FWS explained:  "Project impacts to greater sage-grouse and

other sagebrush obligate species may be significant and *possibly irreversible*, … ."  AR 10134–

35 (emphasis supplied); *compare* 40 C.F.R. § 1500.1 (noting "expert agency comments … are

essential to implementing NEPA.").  FWS implored BLM to impose stronger sage grouse

protections for the Project and noted scientific research demonstrating "stipulations placed on oil

---

[3] BLM apparently recognized this when it authorized so-called "interim drilling" preceding the ROD.  BLM's interim drilling policy prohibited drilling or disturbance in "critical winter habitat for sage grouse" and in "overlapping crucial winter ranges" of big game ungulates.  AR 7661; *see also* AR 7936.  Sensitive protected areas included crucial big game winter range, big game migration corridors, and a two-mile buffer around sage grouse leks.  AR 7663; *see also* AR 7936.

and gas development in the Pinedale Anticline, *which are identical to those proposed for the Atlantic Rim* development, were insufficient to maintain sage-grouse breeding populations in natural gas fields."[4]  AR 3256 (emphasis supplied).  In sum, the Nation's primary wildlife management agency – the agency currently considering whether that species must now be listed as an endangered species – clearly concluded that BLM's "standard stipulations" would not maintain sage grouse populations.[5]  BLM ignored these "essential" conclusions.  40 C.F.R. § 1500.1.

Federal Defendants argue BLM's ¼ mile NSO buffers are supported by the Wyoming Game and Fish Department (WGFD").  However, WGFD recommended construction sites not disturb "suitable nest cover or brood-rearing habitats within 2 mi. of an occupied lek, or within identified nesting and brood-rearing habitat outside the 2-mile perimeter." AR 6565. BLM ignored this recommendation and WGFD's repeated demand that grouse inventories needed to be conducted every year (rather than every 5 years).  AR 9794.  Thus, as late as October 2006, WGFD explained:

> In general, we are very disappointed to see so few alterations made to this document, after considerable consultation and recommendations from our biologists.  ...  Of particular concern is the wildlife monitoring plan.  For example,

---

[4] Defendants' attempts to dismiss observations from the Pinedale Anticline, accordingly, lack merit.  In addition, BLM specifically acknowledged the relevance of the Pinedale wildlife studies.  *See* AR 4563 ("Where standard procedures are not expected to work or results are uncertain for some reason, the BLM adapts procedures and monitors results to ensure unacceptable effects on the environment are avoided. For example, wildlife mitigation and monitoring studies are being conducted in several oil and gas fields such as CD/WII *and the Pinedale Anticline* to further improve our knowledge regarding how oil and gas may impact wildlife species and better determine the effectiveness of our currently prescribed protection measures.") (emphasis supplied).

[5] This was affirmed by the Western Association of Fish and Wildlife Agencies.  When such stipulations have been employed in other developed fields, they have resulted in up to a *95% lek abandonment rate*.  *See* Exhibit N to TRCP's motion for summary judgment.  *See also* Exhibit A to TRCP's motion (Declaration of Clait Braun, Ph.D.).

we have repeatedly requested that sage grouse surveys be conducted annually, in accordance with our sampling protocol to allow trend analysis. Also, our big game flights are not collecting trend data, as is referenced in the DFEIS. Please respond to these comments as the wildlife monitoring plan is a critical component of the overall EIS, and as currently written, provides little in the way of assurances that the resources we are charged to protect, will be retained.

AR 9757. WGFD later explained:

Neither the Proposed Action nor the BLM Preferred Alternative has any proposed mitigation measures beyond the standard protections. *This is inadequate* as there will always be unavoidable impacts associated with natural gas development, and in this plan, significant impacts are acknowledged in the FEIS. Some specific mitigation measures are foreseeable and are listed, and these should be disclosed in the ROD as first measures to be considered. Additional measures may be needed, as noted, if monitoring indicates that impacts have become more severe.

AR 10325 (emphasis supplied).

Ultimately, Federal Defendants ask the Court to throw up its hands and defer to the "expertise" of BLM concerning sage grouse science. Federal Defendants implore the Court to eschew a "battle of the experts" offered by the parties, asserting BLM's ROD is fully supported by science in the record. However, this is not a case of selecting BLM's science over TRCP's science. This is a case of selecting *the* science over *no* science. BLM's ¼ mile lek buffer is not based on science. *Wyoming Audubon et al.,* 151 IBLA 42, 49 (Oct. 22, 1999) (explaining unknown origin of ¼ mile buffer); *contrast*, 40 C.F.R. § 1502.24 (requiring BLM to "insure`" the scientific integrity of its EIS). The true experts (FWS) have made clear that BLM has not protected the ARPA's sage grouse.

Most telling is the fact that Defendants offer no substantive response to the scientific evidence presented by TRCP both within the Administrative Record and as offered as a proper supplement thereto. *See*, e.g. TRCP's motion for summary judgment Exhibits A and N. Rather, Federal Defendants exclaim that adoption of a 2-mile (or greater) buffer would "shut down" development in the ARPA. Fed. Dfs. Memo at 45. Federal Defendants protest too much. TRCP

has not sought in this proceeding to compel implementation of a specific mitigation measure. Rather, TRCP's case is simple: Existing science demonstrates BLM's sage grouse management measures are not effective, and FLPMA compels BLM to address that problem.[6]

> (2)    BLM May Not Dedicate the ARPA to CBM Development Without Violating FLPMA.

Defendants advance the axiomatic argument that BLM need not permit all resource uses on a single "parcel" of land. Fed. Dfs. Memo at 36 citing *Rocky Mountain Oil and Gas Ass'n v. Watt*, 696 F.2d 734, 738 (10th Cir. 1982). *See also* Defendant-Intervenor State of Wyoming's Memorandum of Points and Authorities in Support of Its Cross-Motion for Summary Judgment ("Wyo. Memo") at 29-31. This logic might be appealing were this case about a single 40, 160 or even 640 acre "parcel," but this case involves the management of nearly *one-quarter million acres* of, among other things, prime sage grouse habitat. AR 2258, AR 2394.

Defendants imply without citation to authority the relevant geographic area for purposes of "multiple use analysis" is either the entire land base within BLM's jurisdiction (approximately one quarter *billion* acres) or the four million acres within the Great Divide planning area. Under this theory, BLM could dedicate the *entire* ARPA to a single use and, yet, still be in compliance with FLPMA. In providing FLPMA's directive to employ multiple use and sustained yield principles, however, Congress cannot possibly have contemplated an area seven times larger than the District of Columbia could be dedicated to a single use like CBM development.

---

[6] Indeed, one way those issues could have been addressed was by adoption of the PDA. While the Operators did not care for the PDA, one court has explained: "FLPMA itself does not authorize the [agency's] consideration of the interests of private facility owners as weighed against environmental interests such as protection of fish and wildlife habitat. ... The Act simply does not allow [the agency] to ignore options that would minimize environmental degradation because of the costs to private parties and difficulty in implementation." *Trout Unlimited v. U.S. Dept. of Agriculture*, 320 F. Supp. 2d 1090, 1108 (D. Colo. 2004). As explained in Section III.B below, BLM's rejection of the PDA was arbitrary and capricious.

Among the foremost scholars on the matter, Coggins and Glicksman observe "the overriding reason why multiple use, sustained yield management has so little legal content at present is the disinclination of the judicial branch to take a 'hard look' at the conformance of multiple use resource allocations to the statutory words and purposes." Coggins and Glicksman, § 30:6. TRCP respectfully requests this Court do just that. A hard look reveals BLM has not managed the ARPA as FLPMA requires, but rather has sacrificed the sage grouse in the name of CBM development.

### C.    The ROD is not Consistent with the Great Divide RMP.

(1)    Exceedence of the RFD Scenario by at least 25% is Inconsistent with the Great Divide RMP.

FLPMA prohibits BLM from taking actions inconsistent with the provisions of RMPs. *See Norton*, 542 U.S. at 69, 43 U.S.C. § 1732(a) ("The Secretary shall manage the public lands ... in accordance with the land use plans developed by him ... ."); 43 C.F.R. § 1610.5-3 ("All future resource management authorizations and actions ... shall conform to the approved plan."). When needed, however, these plans may be amended. 43 C.F.R. § 1610.5-5; 43 C.F.R. § 1610.2.

The Great Divide RMP projected 1,440 wells being drilled between about 1987 and 2007 (the Reasonable Foeseeable Development "RFD" scenario). AR 4666. Since that time, BLM's RFO has approved *at least* the following: the 2,000-well Atlantic Rim project, the 385-well Desolation Flats project, the 750-well Greater Wamsutter Area II project, the 3,000-well Continental Divide/Wamsutter II project, the 275-well Creston/Blue Gap project, and various other projects all identified in the FEIS. AR 2485.

For many years preceding issuance of the ROD, BLM staff consistently recognized the Project would result in development well beyond the level anticipated in the Great Divide RMP. For example, in its initial scoping notice, BLM stated:

> The document that directs management of BLM-administered lands within the analysis area is the Great Divide Resource Management Plan (RMP, November 8, 1990). … Since the levels of oil and gas development under this proposal will likely exceed the levels of development analyzed in the RMP, it is anticipated that an RMP review will be conducted concurrently with the preparation of the Atlantic Rim CBM EIS.

AR 7635.  In April 2001, BLM informed Congress as follows:

> Concurrently with the preparation of the Atlantic Rim Coalbed Methane EIS, it is likely a land use plan review will be conducted.  The plan review will examine the need to increase the amount of oil and gas well development allowed from that shown under the Reasonable Foreseeable Development (RFD) scenario documented in the Great Divide Resource Area Resource Management Plan EIS.

AR 7923.

An internal BLM email from 2002, elaborated on the need to update the Great Divide

RMP and BLM's plan to do so:

> The current RMP - RFD will only accommodate the exploratory drilling proposed under the Interim Drilling Plan (i.e., 200 wells in the Atlantic Rim project area), and a few other projects (one of them being Desolation Flats).  Any large development after that (i.e., full field development in the Atlantic Rim area) would have to wait until the planning document is completed, currently slated for completion in late 2004.

AR 9220.  Defendant-Intervenor Double Eagle then knew the RFD limitation contained in the

Great Divide RMP presented a problem and informed BLM as much.  AR 8137.

> BLM later explained:

> Since the levels of oil and gas development under this proposal will likely exceed the levels of development analyzed in the RMP, it is anticipated that an RMP review will be conducted concurrently with the preparation of the Atlantic Rim CBM EIS.  BLM will not authorize oil and gas development actions such as APDs and ROWs that exceed current RFD disturbance estimates prior to the plan review and possible amendment.

AR 8022.  BLM staff recognized that the "[n]ew RMP needs to be signed first" before the

Project ROD could be finalized.  AR 8186.  In short, BLM knew the RMP would need to be

14

amended in order to accommodate the Project, and that the ROD could not lawfully precede the RMP amendment.

Defendants contend the mere fact that the ROD exceeded the RFD scenario means nothing because the RFD scenario is not a hard "cap" on the number of oil and gas wells that can be drilled. This argument misapprehends TRCP's claim. TRCP does not assert the RFD scenario employed with regard to the Great Divide RMP is a hard cap on oil and gas development in the Great Divide planning area. To some extent, TRCP and Defendants agree: Had the RFD scenario been exceeded by a single well, TRCP would have no claim. TRCP acknowledges, consistent with BLM's interpretation of RFD scenarios,[7] that RFD scenarios represent a planning tool.

In this case, TRCP argues simply that the RFD scenario used by BLM to develop its Great Divide RMP has been *so far exceeded* as to render the Project inconsistent with the Great Divide RMP. Because the Project exceeded the RFD scenario by 25% (and in conjunction with other development, by well over 100%), the Project simply cannot be found to be consistent with the RMP. *Cf. Southeastern Federal Power Customers, Inc. v. Geren*, 514 F.3d 1316, 1324 (D.C. Cir. 2008) ("In other circumstances it is conceivable that the difference between a minor and a major operational change might be an ambiguous matter of degree, where the Court would consider whether an agency's authoritative interpretation should be accorded deference … . But

---

[7] *See* Wyo. Memo at 33 citing AR 5311 ("It is possible that exceeding the number of wells in the selected alternative may not result in exceeding the predicted level of environmental effects."). Thus, as BLM's own policy recognizes, it is also possible that exceeding the number of wells in an RFD scenario will, in fact, exceed predicted environmental effects addressed in an RMP and its supporting materials, thereby rendering BLM's "planning tool" obsolete. If the RFD scenario is obsolete, then by definition, the RMP's fundamental assumptions about the level of development have been rendered obsolete. Development under the ROD cannot be deemed consistent with an RMP whose basic development assumptions have been outpaced to the point of obsolescence.

the Agreement's reallocation of over twenty-two percent (22%) of Lake Lanier's storage space does not present that situation. It is large enough to unambiguously constitute the type of major operational change ... [that] requires prior Congressional approval.").

(2)    The Conclusions in the ROD are directly Contrary to the RMP's Objectives.

Boiled down, the RMP's wildlife management objectives are:  To "support a natural diversity of wildlife and fisheries, including … species of special management interest in Wyoming [e.g., sage grouse]" and to "maintain or improve" vegetation conditions and overall ecological quality.  AR 690.  The Great Divide RMP states:  "Surface-disturbing activities will be restricted and intensively managed to maintain important resource values in the … Baggs Elk Crucial Winter Range, and in overlapping crucial winter ranges for the various big game species."  AR 679.  The RMP also provides:  "Crucial winter ranges for all big game species will be protected."  AR 694.

Federal Defendants suggest BLM complied with the RMP because the ROD employs seasonal restrictions on development in crucial winter range.  Fed. Dfs. Memo at 41-42.  This argument ignores the fact that seasonal stipulations fall short of protecting this key habitat area. WGFD, for example, concluded:  "Seasonal stipulations do not mitigate lost habitat, i.e., crucial winter range; they only temporarily mitigate (reduce) animal disturbance during initial field development."  AR 9646.  Even BLM recognizes:

> Prohibiting construction, drilling, and other activities potentially disruptive to wildlife during sensitive time periods (i.e., winter, brood-rearing) would minimize the probability of displacement, nest abandonment, or reproductive failure during these critical times of the year.  …  However, *habitat loss would still occur* outside of this time period, as development would be allowed.  In addition, it does not address the displacement of animals/loss of critical habitat due to the presence and operation of wells, facilities, and roads after construction is complete.

AR 2388 (emphasis supplied).

16

Federal Defendants also overstate the extent to which wildlife will acclimate over the long-term to the presence of oil and gas wells and related production activities. WGFD rejected BLM's assumption that pronghorn will "likely habituate to activities along roads and continue using habitats in those areas." AR 9646. BLM admits in the ROD that "[t]hose animals that potentially acclimate seem to do so only in smaller herd sizes." AR 2392. BLM also recognized that "the Sublette Mule Deer Study ... found no evidence of acclimation behavior." AR 2393. In turn, "[t]his suggests that within the ARPA, indirect impacts such as displacement from activities, dust from roads, and competition for forage within the already poor condition crucial winter range habitat may lead to reduced mule deer numbers and die-offs from animals going onto crucial winter range in poorer health with reduced body reserves." AR 2393-94. BLM similarly acknowledged "elk rarely adjust to continued human presence required during the production phase of the project (Thomas and Toweill 1982). With the increase in roads and potential recreational access to the area, displacement of elk is extremely likely during all phases of development." AR 2394. As a result, "there would be an 'extreme' impact to elk based on the actual number of pads (eight pads per section) (WGFD 2004c)." AR 2398.

BLM's ROD will not even protect the sage grouse, despite its status as a BLM-designated sensitive species and a candidate for listing under the ESA. The Great Divide RMP states: "Sage grouse ... strutting / dancing grounds and nesting habitat will be protected." AR964. FWS, however, concluded: "regardless of the limits to disturbance in the Project area, habitat fragmentation will occur, which may have widespread and long-term effects on species present." AR 10135. BLM explains: "In the long-term, recovery of shrubs to pre-disturbance levels would not occur during the life of the project. Therefore, there would be a long-term loss of nesting habitat." AR 2395. "Of greater concern is the indirect loss of habitat resulting from

bird displacement and fragmentation of nesting and early brood-rearing habitat."  AR 2402.

BLM finds:

> The application of avoidance and mitigation measures would help reduce the loss of habitat and stress to greater sage-grouse in proximity to leks on public lands. Based on research conducted in Wyoming, *only 45 percent of nests would be afforded seasonal protection* as they are within the 2-mile buffer of leks.  Of the suitable nesting habitat, *21 percent* is outside the 2-mile buffer and *would be afforded no seasonal protection.  Habitat loss would continue outside the quarter-mile-protected buffer around leks.*

*Id.* (emphasis supplied).

Citing TRCP's proffered declarant Clait Braun, and Naugle, BLM acknowledges documented dramatic declines in sage grouse populations within energy fields.  AR 2395.  With respect to its seasonal restrictions, BLM notes "[a]ctivities would be allowed outside this timing period and habitat could be removed.  This would result in habitat loss as well as potential displacement of wintering birds."  AR 2396.  BLM explains, in other words:  "The application of the winter timing stipulation would only protect grouse during this critical time period.  This does not prevent the direct loss of wintering areas for grouse outside of this time period."  AR 2404.

The foregoing findings cannot be reconciled with the Great Divide RMP's directives to support, maintain and improve the status of key species and their habitats.  To the extent there was any lingering doubt about the Project's impacts, BLM clarified them succinctly when it stated that all big game in the ARPA will suffer a "substantial disruption or irreplaceable loss of vital and high value habitats[,]" AR 2388 and AR 2398, and that sage grouse will suffer a "[s]ubstantial loss of habitat function or disruption of life history requirements … that would

preclude improvement of their status." AR 2388. This latter finding is directly contrary to BLM's Manual concerning special status species such as sage grouse.[8]

Nor is the ROD consistent with the RMP's other objectives. The RMP's recreation management objective is "[to] ensure the continued availability of outdoor recreational opportunities, to meet legal requirements for the health and safety of visitors and to mitigate conflicts with other resource uses." AR 682. The RMP's oil and gas management objective is: "[t]o provide for leasing, exploration and development of oil and gas while protecting other resource values." AR 679.

As explained by BLM, however, big game hunting opportunities will be lost "because of habitat loss and wildlife displacement." AR 2418-19. "The impact would be borne primarily by local and regional hunters, especially local hunters for whom the benefits of the ARPA would be diminished as a convenient and economical place to hunt." AR 2419. "The duration of the effects would be for the life of the project—which may affect more than one generation of recreation user." AR 2420. The FEIS ultimately concludes:

> [T]he impacts to the predominant recreation activities in the ARPA—hunting, pleasure driving, and wildlife viewing—would be significant. The Proposed Action would diminish the wildlife presence, degrade scenery, and introduce

_____

[8] Federal Defendants argue the fact that BLM is violating its own Manual with regard to special status species is irrelevant because that manual is non-binding "policy." This position cannot be reconciled with Defendants' repeated reliance on BLM internal "policy" concerning RFDs. Nevertheless, regardless of whether BLM's performance in this case is dictated by the Manual, that performance certainly may be judged in light of the Manual when this Court determines the reasonableness of the agency's actions. *See, e.g.*, BLM Manual § 6840.12 ("Actions authorized by BLM *shall further the conservation of* federally listed species and other *special status species* and shall not contribute to the need to list any special status species under provisions of the ESA, or designate additional sensitive species under provisions of this policy.") (emphasis supplied). *See also* AR 4529 ("[t]he sage-grouse is a BLM sensitive species, listed as such on 04/09/2001. Because of this status no actions that might lead to listing of the species or the future existence or viability of this species may occur.").

traffic and noise. *The natural setting would be converted to an industrialized setting* by development of the Proposed Action.

*Id.* (emphasis supplied). "The impacts to hunting and to the recreation setting are similar under both the Proposed Action and the [Project] … ."  AR 2423.  "Industrialization" of the ARPA is not consistent with the recreational or even the oil and gas objectives in the Great Divide RMP. The Project's inconsistency with the RMP violates FLPMA.

(3)     Ultimately, the "Consistency" determination was Arbitrary and Capricious  *Per se.*

Defendants argue TRCP's NEPA claims concerning the specificity of the ROD's monitoring and mitigation measures are misplaced.  TRCP responds to this assertion in Section III.C below.  Even assuming *arguendo* that BLM was under no NEPA-based obligation to articulate more fully its mitigation plan before the ROD was signed, FLPMA still required BLM to determine that the ROD was consistent with the RMP.

The Adaptive Management program in this case was the centerpiece of the Project's mitigation effort.  However, development of the monitoring and mitigation components did not even commence until after the ROD was adopted.  AR 4815.  Therefore, BLM could not have ensured consistency between its planning document and its proposed action. *Western Watersheds Project v. U.S. Forest Service*, 2006 WL 292010 (D. Idaho Feb. 7, 2006) ("a full explanation of the [adaptive management] strategy and its protocols is crucial to determining whether the NSEIS is consistent with the [Land and Resource Management] Plan, as required by NFMA.").

Defendants argue *Western Watersheds Project* is not on point because BLM did not rely on Adaptive Management to ensure compliance with the RMP.  Fed. Dfs. Memo at 44; Industry Defendant-Intervenors' Memorandum in Opposition to Plaintiff's Motion for Summary Judgment and in Support of Cross-Motion for Summary Judgment ("Ind. Dfs. Memo") at 43-44. This assertion fails the straight-face test in light of BLM's clear statement that the "monitoring,

20

reporting, and adaptive management processes made part of this decision [the ROD] *are its key components*." AR 4815 (emphasis supplied). Indeed, "[t]he purpose of monitoring is to assess the status of the Performance Goals, measure and detect trends, or detect any other undesired effects. Monitoring will also be used to assess the effectiveness of reclamation efforts and any approved mitigation measures." *Id.* Defendants cannot expect the Court to believe that the "key components" of the ROD were not developed precisely to comply with the RMP's resource management objectives. *Compare* Fed. Dfs. Memo at 38-42 (explaining how mitigation and monitoring elements ensure consistency with RMP requirements).

## III.    **BLM VIOLATED NEPA.**

As explained below, BLM also violated its NEPA obligations by, among other things, arbitrarily rejecting the PDA and imposing meaninglessly vague mitigation and monitoring requirements as a condition of approving development in the ARPA. Before proceeding to the merits of these claims, TRCP responds to Defendants' misplaced waiver argument.

### A.    **TRCP Has Not Waived its NEPA Claims.**

Defendants assert TRCP waived various of its NEPA claims by failing to raise them to BLM in a timely fashion. *See also* Ind. Dfs Memo at 21-22. This argument, based primarily on *Dep't of Transportation v. Public Citizen*, 541 U.S. 752, 764-65 (2004) is misplaced. In *Dep't of Transportation*, the Supreme Court explained that a party may not challenge a NEPA document (in that case an environmental assessment) for failing to include a specific alternative that the plaintiff failed to present to the agency. *Id.* Those facts are not in play here, and there is simply no support for Defendants' attempt to convert *Dep't of Transportation* into a categorical rule that a plaintiff in a NEPA case must present in excruciating detail every possible legal claim it might bring in subsequent litigation.

As an initial matter, TRCP submitted comments on the FEIS.  AR 10262.  Though acting *pro se* at the time,  TRCP highlighted, among other things, the following concerns with the FEIS: 1) that the Atlantic Rim Project would foreclose alternatives under consideration in the RMP update process; 2) that the Project was not in keeping with FLPMA's mandates; 3) that wildlife impacts had not been properly documented and mitigation requirements were insufficient; and 4) that cumulative impacts had not been analyzed sufficiently.  *Id.*  A plaintiff need only notify an agency of its objections in a manner that allows the agency to "'give the issue meaningful consideration.'"  *Southern Utah Wilderness Alliance v. Bankert*, 2007 WL 2873788, *7 (D. Utah Oct. 3, 2007) *quoting Dep't of Transportation*, 541 U.S. at 764. *See also Navajo Nation v. U.S. Forest Service*, 479 F.3d 1024, 1050 (9th Cir. 2007) ("The Forest Service was aware, from the outset of the NEPA process, of concerns about possible health risks from human ingestion of artificial snow made from treated sewage effluent, and Appellants were among those who gave the Service reason to address the issue."); *Cf. Oceana, Inc. v. Evans*, 2005 WL 555416, *27 (D.D.C. March 9, 2005) (noting sufficiency of general comments); *Great Basin Mine Watch v. Hankins*, 456 F.3d 955, 965 (9th Cir. 2006).

In *'Ilio'ulaokalani Coalition v. Rumsfeld*, 464 F.3d 1083, 1091-92 (9th Cir. 2006), the court rejected "'a broad rule which would require participation in agency proceedings as a condition precedent to seeking judicial review of an agency decision.'" *Id. quoting Kunaknana v. Clark*, 742 F.2d 1145, 1148 (9th Cir. 1984).  The court continued:

> The Supreme Court in *Public Citizen* reminds us of the rule that the primary responsibility for NEPA compliance is with the agency: "the agency bears the primary responsibility to ensure that it complies with NEPA, and an EA's or EIS' flaws might be so obvious that there is no need for a commentator to point them out specifically in order to preserve its ability to challenge a proposed action." 541 U.S. at 765, 124 S.Ct. 2204 (internal citation omitted).  Our court's holding in *Friends of Clearwater v. Dombeck*, 222 F.3d 552 (9th Cir. 2000), sheds light on how to interpret this "so obvious" standard.  In that case, we held that an EIS was

inadequate where the agency had independent knowledge of the issues that concerned Plaintiffs.  *Id.* at 558-59.  The record in this case is replete with evidence that the Army recognized the specific shortfall of the PEIS raised by Plaintiffs here: …. The Army had independent knowledge of the very issue that concerns Plaintiffs in this case, such that "there is no need for a commentator to point them out specifically in order to preserve its ability to challenge a proposed action." *Public Citizen*, 541 U.S. at 765, 124 S.Ct. 2204. Plaintiffs have not waived their right to challenge the sufficiency of the Army's consideration of reasonable alternatives.

Moreover, "judicial review may be had if an issue was raised at the administrative level by a party other than the petitioner[.]"  *Nevada v. Department of Energy*, 457 F.3d 78, 88 (D.C. Cir. 2006) citing *Cellnet Commc'n, Inc.* v. FCC, 965 F.2d 1106, 1109 (D.C. Cir. 1992) ("Consideration of the issue by the agency at the behest of another party is enough to preserve it."), *Ne. Md. Waste Disposal Auth. v. EPA*, 358 F.3d 936, 948 (D.C. Cir. 2004) (per curiam) and *Reytblatt v. U.S. Nuclear Regulatory Comm'n*, 105 F.3d 715, 721 (D.C. Cir. 1997).   As explained in *Wyoming Lodging and Restaurant Ass'n. v. U.S. Dept. of Interior*, 398 F. Supp. 2d 1197, 1210 (D. Wyo. 2005): "The purpose of the rule [of participation in administrative proceedings] is not to create a jurisdictional requirement for suits challenging agency action. Thus, so long as the agency is informed of a particular position and has a chance to address that particular position, any party may challenge the action based upon such position whether or not they actually submitted a comment asserting that position." *Id.*

In proper context, Defendants' waiver argument overreaches.  For example, Federal Defendants assert TRCP cannot advance a claim that BLM improperly dismissed the PDA.  Fed. Dfs. Memo. at 14-15.  Yet, Federal Defendants were fully aware of the significance of phased development as a concept.  Indeed, BLM staff crafted the PDA.  TRCP was not required to try in vain to convince BLM to reinsert the PDA into the FEIS.  Similarly, BLM had long ago identified or was otherwise put on notice of the key issues of relevance in this case. *See, e.g.,* AR 7454 (noting "[p]otential impacts to wildlife habitats within the analysis area, including big

game, sage grouse, and raptors"); AR 7567 (U.S. Forest Service's call for an extensive cumulative effects analysis); AR 7617 (Comments of The Wildlife Management Institute, filed by TRCP's Dr. Rollin Sparrowe); AR 7686 (WGFD comments); AR 8056 (NEPA Interdisciplinary Team's issue list); AR 10134 (FWS comments on sage grouse and wildlife needs); AR 10322 (WGFD concerns about Adaptive Management).

Perhaps most distressing is Federal Defendants' argument the Court may not entertain TRCP's claims concerning the Sun Dog or Catalina PODs because TRCP "submitted no comments on" those actions.[9]  Fed. Dfs. Memo at 17.  Federal Defendants are fully aware that TRCP sought to exercise the administrative review provisions to which it is entitled under BLM regulation and that BLM steadfastly refused to acknowledge TRCP's right to State Director Review; a decision subsequently upheld by the Interior Board of Land Appeals.  Far from failing to participate in the administrative process, TRCP, in fact, submitted comments on the Sun Dog POD to the State Director raising all of the issues presented here.  *See* TRCP's Unopposed Motion for Leave to File First Amended and Supplemented Complaint (Dkt. No. 32).[10]  That TRCP was denied its procedural rights below cannot form the basis to dismiss TRCP's claims before this Court.

### B.    BLM Unreasonably Rejected the PDA Prior to Completion of the NEPA Process.

The alternatives analysis is "the heart of the environmental impact statement," 40 C.F.R. § 1502.14.  "The selection of alternatives is thus governed by a rule of reason." *Rivers Unlimited*

---

[9] In contrast, Industry Defendant-Intervenors do acknowledge that TRCP attempted to exercise the administrative options available to it before filing suit over the POD Decisions.  Ind. Dfs. Memo at 9.

[10] Having been stonewalled on the Sun Dog decision, there is little reason to expect TRCP would have received better treatment had it challenged the Catalina decision before the agency.

*v. U.S. Dept. of Transp*. 533 F. Supp. 2d 1, 3 (D.D.C. 2008). Moreover, only those "options that meet the purpose and need of the project within the reasonable judgment of the agency need be considered." *Id. citing City of Alexandria v. Slater*, 198 F.3d 862, 867 (D.C. Cir. 2000), *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 196 (D.C. Cir. 1991) and 40 C.F.R. 1502.13-14. In reliance on these points, Federal Defendants assert BLM had no obligation to analyze the PDA beyond the draft EIS stage because the PDA was infeasible. Contrary to Defendants' implications, TRCP does not suggest that an infeasible alternative must be carried forward in the NEPA process. NEPA, however, requires BLM to analyze all feasible alternatives through completion of that process. The question presented in this case is whether BLM's decision to drop the PDA as "infeasible," *see* Fed. Dfs. Memo at 3, prior to completing the NEPA process was reasonable or was arbitrary and capricious.

There is little question BLM believed the PDA would protect non-energy resources, while still allowing the efficient extraction of oil and gas. AR 8395 ("Alternatives B [the PDA] and C attempt to balance surface resource conflicts with impacts from oil and gas development."). In July 2005, BLM elaborated on the PDA, explaining it would "focus and concentrate activities in certain areas[,]" and would "create[] [a] safe haven for wildlife[.]" AR 8241. BLM described the PDA as "A temporal alternative that preserves less developed areas for a portion of the project life to allow wildlife and recreation use." AR 8198. Ancillary benefits included allowing vegetation time to establish itself for reclamation purposes. *Id*. BLM staff specifically recognized the relationship between "Adaptive Management" and the PDA by explaining the latter: "Ties into adaptive management … if we're not happy w/ phase 1, [we] can go back and reevaluate for phase 2." AR 8242. As BLM noted, "Through monitoring of one third of the project area adjustments may be made over the other two thirds of the project area to

improve ways of doing business, (adaptive management)."  AR 8255-56.  It also would allow "for better vegetation, soil erosion and weed monitoring on a third of the project area, allowing for modifications if needed on the other two phases."  *Id.*  BLM made clear that the purpose of the PDA was "not to exclude drilling, but the [*sic*] reveal impacts in an area," *id.* and that the Project area would "still have production activity."  *Id.*

Despite the clear benefits of the PDA, its consistency with the purpose and need of oil and gas extraction, and its direct relationship to the Adaptive Management elements in the ROD, BLM dismissed the PDA prior to completing its NEPA process.[11]  To support that decision, Federal Defendants now argue the PDA did not accord with the purpose and need of the Project and was not consistent with Congressional policy to optimize domestic energy production. However, BLM's decision to drop the PDA was unlawful because the PDA was well within any *reasonable* reading of the "Purpose and Need" statement[12] contained in the FEIS and was consistent with Congressional intent.

"Congress has directed federal agencies 'to the fullest extent possible' to 'study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources.'" *Southern Utah*

---

[11] The elimination of these alternatives resulted in the remaining alternatives being substantially similar.  All action alternatives analyzed in the FEIS assume the construction of up to 2,000 wells, AR 2341, and the disturbance level and mineral resource recovery is essentially the same for the Proposed Action and for Alternatives C and D.  AR 4800.  Their similarity is further demonstrated by a review of Chapter 4 of the FEIS, in which the BLM, among other things, sets forth its analysis of the environmental consequences of each alternative.  The FEIS continually refers to the similarity of impacts and outcomes across the alternatives and, even when it does distinguish between alternatives, the distinguishing features are not subtle and of little substance worth. AR 2320 - 481.  *See also* AR 8836.

[12] *See* TRCP's motion for summary judgment at 13.  TRCP believes the PDA was well within the scope of the ROD's Purpose and Need Statement, and to the extent the ROD or Defendants contend otherwise, such construction represents an unlawfully narrow view that fails to recognize the competing interests of FLPMA.  *Id.*

*Wilderness Alliance v. Norton*, 237 F. Supp. 2d 48, 53-54 (D.D.C. 2002) citing 42 U.S.C. § 4332(E). As this court explained:

> Agency compliance *vel non* with the requirement to consider alternatives is evaluated under the "rule of reason," meaning that "the concept of alternatives must be bounded by some notion of feasibility," and that agencies are required to deal with circumstances "as they exist and are likely to exist," but are not required to consider alternatives that are "remote and speculative." *Natural Resources Defense Council, Inc. v. Hodel*, 865 F.2d 288, 294-95 (D.C. Cir.1988) (internal citations omitted). However, in examining alternatives to the proposed action, an agency's consideration of environmental concerns must be more than a pro forma ritual. Considering environmental costs means seriously considering alternative actions to avoid them. *Calvert Cliffs' Coordinating Comm., Inc. v. U.S. Atomic Energy Comm.*, 449 F.2d 1109, 1128 (D.C. Cir.1971).

*Southern Utah Wilderness Alliance*, 237 F. Supp. 2d at 52.

An alternative, thus, may be discarded prior to completion of the NEPA process if it does not meet the purpose and need of a project or if it is remote, speculative, impractical or ineffective. The only evidence Federal Defendants can cite in support of BLM's decision to drop the PDA is the ROD itself. *See* Fed. Dfs. Memo at 16 ("BLM concluded that such long delays made the phased development alterntive infeasible. ROD at 14."); *compare* Ind. Dfs. Memo at 17 (citing same provision). The ROD, in turn, cites only objections presented by the Operators, who naturally disliked the PDA because it deferred profits and comments about an obtuse "implication" that BLM would not approve certain rights of way. However, aside from a bald assertion in the ROD, TRCP could locate no discussion of this latter issue elsewhere in the Administrative Record, and Defendants have pointed to no evidence in the record aside from the ROD's unsupported conclusion.

Defendants main contention is that BLM had to give "substantial weight" to the Operators' desires. *See also* Ind. Dfs. Memo at 14-15. "An agency is obligated to take the needs and goals of the project applicant in mind when considering alternatives, *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 196 (D.C. Cir.1991), but that obligation does not limit

the scope of the agency's analysis to what the applicant says it needs." *Southern Utah Wilderness Alliance*, 237 at 53. *See also Environmental Law and Policy Center v. U.S. Nuclear Regulatory Com'n ,* 470 F.3d 676, 683 (7th Cir. 2006) ("NEPA requires an agency to 'exercise a degree of skepticism in dealing with self-serving statements from a prime beneficiary of the project" and to look at the general goal of the project rather than only those alternatives by which a particular applicant can reach its own specific goals.'" *citing Simmons v. U.S. Army Corps of Eng'rs*, 120 F.3d 664, 666 (7th Cir.1997)). *Compare Citizens Against Burlington, Inc.*, 938 F.2d at 196 ("Deference, however, does not mean dormancy, and the rule of reason does not give agencies license to fulfill their own prophecies, whatever the parochial impulses that drive them.").

Wyoming correctly points out that the Operators implored BLM about the infeasibility of the PDA. Wyo. Memo at 13. TRCP does not debate that the Operators were vociferous opponents of the PDA. [13] The problem is that when the Operators said the PDA was infeasible, BLM did nothing to verify that claim; there is nothing in the Administrative Record demonstrating BLM's analysis of the technological or economical feasibility of PDA. In contrast, BLM's Resource Management Group prepared an extraordinarily detailed analysis concerning well spacing in the ARPA, which supported BLM's rejection of Alternative "C" in the draft EIS. *See also* Ind. Dfs. Memo at 18-19 (describing same and citing AR 8204 and 8525).

The Project, more importantly, arises first and foremost from BLM's management of the public lands – not the Operators' desire to produce oil and gas. As the Court of Appeals has

---

[13] Wyoming crystallizes the full extent of Warren's interest, for example: "In 1999, Warren acquired a majority of the acreage covering the ARPA and was one of the original proponents of drilling and developing in the ARPA. Wyo. Memo at 13 (citing AR 8397).

explained, BLM's analysis of another's proposal is "shaped by the application at issue and by the function that the agency plays in the decisional process." *Citizens Against Burlington, Inc.*, 938 F.2d at 199.  This case does not involve an applicant for a permit to construct a bridge or to build a shopping mall not otherwise subject to the permitting agency's jurisdiction.  Rather, this case involves BLM's mandates concerning the proper management of public resource extraction and the protection of non-energy resources.  In such circumstances, while BLM must indeed consider the Operators' "wants," it cannot ignore its competing duties under FLPMA.  As recognized by the NEPA Interdisciplinary Team, but ultimately ignored by BLM, this may simply have been a "situation where [the Operators] can't recover the full public resource" because it is located in "the finest sage grouse habitat in the world."  AR 8247.

TRCP agrees with Federal Defendants that the reasonableness of alternatives is driven also by congressional intent.  *See Young v. General Services Admin*., 99 F. Supp. 2d 59, 69 (D.D.C. 2000) ("In attempting to reconcile NEPA and [Competition in Contracting Act, 41 U.S.C. §§ 253 et seq.], the Court is mindful of the Council on Environmental Quality ("CEQ") advisement that the consideration of alternatives is at the heart of an EIS.")  *National Resources Defense Council, Inc. v. Pena*, 972 F. Supp. 9, 18 (D.D.C. 1997) ("This Circuit has held that an agency's evaluation of its objectives is heavily influenced by the agency's consideration of 'the views of Congress, expressed, to the extent that the agency can determine them, in the agency's statutory authorization to act, as well as in other congressional directives.'" *citing Citizens Against Burlington, Inc.*, 938 F.2d at 196).  The problem is that BLM fixated on a single policy statement (that contained in the 2005 Energy Policy Act) and forgot the competing directives in

NEPA and FLPMA.[14]  Contrary to Wyoming's implication, Wyo. Memo at 13 n. 3, the "Energy Policy Acts of 2001 and 2005" did not amend or in any way repeal the substantive and procedural environmental mandates of NEPA and FLPMA.

In sum, "[w]hile an agency may decline to give rigorous consideration to proposals that fall far short of the project's Need and Purpose," *City of Alexandria v. Slater*, 46 F. Supp. 2d 35, 42 (D.D.C. 1999) reversed on other grounds by 198 F.3d 862 (D.C. Cir. 1999), BLM's assessment that the PDA "fell short" and corresponding dismissal of the PDA before completing its NEPA analysis were arbitrary and capricious.

### C.    BLM's Adaptive Management Program is Unlawfully Vague, Ignores the Obvious Failure of Similar Programs, and is Already Failing.

Citing this Court's decision in *NRDC v. Kempthorne*, 525 F. Supp. 2d 115 (D.D.C. 2007), Federal Defendants argue NEPA imposes no obligation on BLM to adopt mitigation measures or to specify such measures with any certainty. Fed. Dfs. Memo at 20; *see also* Wyo. Memo at 16-19.  This argument, however, sidesteps the real issue presented in this case.  The question here is not whether NEPA independently requires the imposition of mitigation measures to alleviate the adverse effects of oil and gas development.  The question presented is whether mitigation measures must be clearly delineated when BLM affirmatively adopts a mitigation plan under NEPA expressly for the purpose of mitigating the adverse impacts of oil and gas development on

---

[14] FLPMA mandates that the public lands "shall be managed in a manner that will protect the quality of … ecological, [and] environmental, … values" and that "will provide food and habitat for fish and wildlife and domestic animals; [and] that will provide for outdoor recreation and human occupancy and use ... ." 43 C.F.R. § 1701(a)(8).  *See also* NEPA § 2, 42 U.S.C. § 4321 ("The purposes of [NEPA] are: To declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; [and] to enrich the understanding of the ecological systems and natural resources important to the Nation... .").

the public lands.  Contrary to Federal Defendants' assertions, cases such as *Citizens Against Burlington, Inc.* and *Methow Valley* do not address the issue this case presents.  Rather, in cases where the agency has imposed mitigation requirements as a condition of project approval, courts will look to the clarity of those measures and hold the agency to commitments made.  *See, e.g., C.A.R.E. Now, Inc. v. F.A.A.*, 844 F.2d 1569, (11th Cir. 1988) ("This court must consider these mitigation measures because they were imposed as conditions of the agency action.") and *Louisiana v. Lee*, 758 F.2d 1081, 1083 (5th Cir. 1985).[15]

Defendants argue the Adaptive Management program is sufficiently concrete to justify reliance on it as Project mitigation.  However, a closer look identifies the following amorphous "Performance Goals:"

- "maintain functional migration routes through or around development areas"
- "provide an adequate amount of suitable undisturbed crucial winter range for big game animals"
- "provide well-dispersed sage-grouse breeding, nesting, brood rearing and winter habitat"

AR 4814.  Concepts such as "functionality" and "adequacy" are not meaningfully enforceable standards.  Moreover, the ROD does not even commit BLM to achieving these goals.  Rather, the ROD explains "BLM will *attempt* to achieve" the performance goals.  *Id.* (emphasis supplied). Nor does the ROD explain what will be done if the Performance Goals are not met.

In similar vague fashion, with regard to wildlife, Appendix B explains: "The Review Team … or BLM will identify the level of effort required for performance-based monitoring and develop wildlife monitoring and protection plan … for development in the ARPA."  AR 4847. With regard to inventory and monitoring requirements, ROD Appendix B explains: "Inventory

---

[15] While these cases involve adherence to mitigation needed to avoid preparing an EIS, there is no basis for concluding the same standard should not apply once the EIS is in place.

and monitoring for wildlife and plant species within the ARPA will be conducted at frequency dependent upon the level of development activity with increased frequency generally associated with increased levels of development." AR 4848. Appendix B also explains "wildlife protection measures" may be included, eliminated, or modified "in any given year as allowable and deemed appropriate by BLM in consultation with other agencies, Operators and interested parties [but not the public]." AR 4849. Such statements do nothing to ensure the other values FLPMA recognizes are protected.

"Performance-based monitoring assumes setting performance standards in NEPA standards." AR 8444. The concept of meaningfully enforceable standards was well understood by the NEPA Interdisciplinary Team, but did not translate to the ROD, as the following exchange demonstrates:

> BLM (Clare Miller)  What if you can't achieve standard?  For example, what if the sage grouse are annihilated?  Then what?
>
> STATE (Vern S. - WY Game Fish)  With performance-based monitoring there is a level of impact that everyone agrees to and this is set by the ability to mitigate impact.  You wouldn't reach that level [annihilation] because the limit on impact would stop you before that happens, such as a set acreage or distribution of sage grouse for a population.
>
> …
>
> STATE (Vern S. - WY Game Fish)  We would need to establish an outside number of impacts and flexibility for level of development because we have a threshold limit to establish.  Development would go forth based on limitations of any given resource.

AR 8444.  The ROD simply does not contain any such population thresholds  or any other resource–based performance standards that would prevent "annihilation" of the ARPA's sage grouse population.

The real problem presented by BLM's Adaptive Management model is that it simply does not work. Notably, none of the Defendants contests the fact that adaptive management has failed miserably at the Pinedale Anticline. Fed. Dfs. Memo at 21 n. 9; Ind. Dfs. Memo at 31-32. Rather, they assert such failure should be ignored as "extra-record." However, it is precisely because BLM ignored its concurrent failure at Pinedale that this Court hold unlawful BLM's adoption of Adaptive Management in the ARPA. "A determination that an agency made a decision without considering a relevant factor leads to condemning the decision as 'arbitrary and capricious.'" *Federal Election Com'n v. Rose*, 806 F.2d 1081, 1088 (D.C. Cir. 1986) *citing Motor Vehicles Manufacturers Association*, 463 at 46-57. *Compare Baltimore Gas & Elec. Co. v. Natural Resources Defense Council*, 462 U.S. 87, 105 (1983) (question is whether agency "considered the relevant factors and articulated a rational connection between the facts found and the choice made.").

Pinedale is not the only example in which BLM has failed to implement monitoring and mitigation as promised. In a report included in the Administrative Record, the General Accounting Office explained succinctly that this "dramatic increase in oil and gas development on federal lands over the past 6 years has lessened BLM's ability to meet its environmental protection responsibilities." AR 6799. For example, the field offices visited by GAO investigators reported meeting annual environmental monitoring requirements "only about half of the time" during the 6 year period. AR 6816. BLM's neglect to even mention this obvious failing in ROD is inexplicable. BLM's refusal to adapt to it is inexcusable.

Federal Defendants suggest TRCP's concerns about BLM's willingness and ability to carry out the mitigation commitments made in the ROD are misplaced, and that BLM is entitled to a presumption that it will, in fact, do as the ROD states. Fed. Dfs. Memo at 24. Federal

Defendants argue TRCP's claims that the "adaptive management" process lacks true substance are premature. They claim that the program "will be transparent[]" and that the Operators "will submit annual operating plans" which will be reviewed and be followed by "site-specific monitoring and mitigation processes … ." They further explain "monitoring data will be evaluated at least annually to determine if mitigation is effective and meeting performance goals." On that basis, mitigation measures may be modified, and additional protections placed on site-specific development. Fed. Dfs. Memo at 4.

In sum, Federal Defendants ask the Parties to trust BLM.[16] The presumption that agency officials will discharge their duties correctly, lawfully and in good faith, however, may be rebutted by "cogent and clearly convincing evidence" to the contrary. *Epstein v. Geren*, 539 F. Supp. 2d 267, 275 (D.D.C. 2008) citing *Frizelle v. Slater*, 111 F.3d 172, 177 (D.C. Cir. 1997), *Wronke v. Marsh*, 787 F.2d 1569, 1576 (Fed. Cir. 1986), *McDougall v. Widnall*, 20 F. Supp. 2d 78, 82 (D.D.C. 1998) and *Walker v. Shannon*, 848 F. Supp. 250, 254 (D.D.C. 1994).

The ROD indicates that by April 1 of each successive year (beginning in 2008), "[t]he Operators will provide the BLM RFO annual operating plans for the following year that include" the previous year's activities and a plan of development for the coming year, AR 4838-39, "along with conceptual, multi-year development plans to include planned number of wells to be

---

[16] This request would seem misplaced based solely on BLM's candid acknowledgment in response to comments on the draft EIS: "There are areas within the ARPA interim drilling where BMPs, COAs and lease stipulations have failed to protect resources, particularly with reclamation of disturbed sites. BLM doesn't track or monitor, for the most part, each and every activity performed in response to BMPs and COAs, so it is unable to describe or analyze why those activities failed. … ." AR 4447. Indeed, the record is clear that Industry Defendant-Intervenor Anadarko failed to comply with protective stipulations imposed during the so-called "interim drilling" stage. AR 9238; 9283.

drilled and an estimate of new surface disturbance and reclamation activity." AR 4839. In addition, with regard to wildlife management, the ROD provides:

> 1) In part to meet their responsibility to demonstrate achievement of Performance Goals, Operators will compile all resource data collected under the wildlife monitoring and protection plan (FEIS appendix E) and submit this data to the Review Team by October 15 of each calendar year.
>
> 2) Operators will complete draft annual reports for submittal to the Review Team by November 15 of each year. Annual reports will summarize annual wildlife inventory and monitoring results, note any trends across years, identify and assess protection measures implemented during past years, specify monitoring and protection measures proposed for the upcoming year, recommend modifications to the existing wildlife, monitoring /protection plan based on the successes and/or failures of past years, and identify additional species/categories to be monitored.
>
> 3) Operators will issue a final annual report to all potentially affected individuals and groups by early February of each year.
>
> 4) A one day meeting will be organized by the Review Team and held in December (or as determined by the Review Team) of each year to discuss and modify, as necessary, proposed wildlife inventory, monitoring, and protection protocol for the subsequent year.

AR 4847-48.

In this case, BLM already has failed to abide by the obligations imposed by the ROD. *See* Exhibit 1 attached hereto. In responding to TRCP's request for information related to BLM's implementation of the monitoring and mitigation elements contained in the ROD, BLM explained on May 13, 2008: "[T]o date, the process whereby the lease holders begin compliance with NEPA requirements for the Atlantic Rim Project Area has not gotten underway. We have only recently started scheduling public and operator's meetings." Exhibit 1. Thus, *BLM has admitted that it has not met any of the commitments imposed by the ROD for NEPA compliance*.

Such admission constitutes clear and convincing evidence sufficient to rebut the presumption Federal Defendants advance.[17]

### D.        BLM Was Required to Await Completion of the Mule Deer Study.

Contrary to Wyoming's argument, TRCP does not assert BLM must root out every possible "quantum of information" concerning the relevant environmental baseline. Wyo. Memo at 23 citing *Alaska v. Andrus*, 580 F.2d 465, 473 (D.C. Cir. 1978).[18]  Rather, TRCP submits simply that when an agency realizes the importance of specific baseline data (in this case the location of mule deer migration routes), and goes so far as to compel a study of those routes as part of the draft EIS analysis, that it is arbitrary and capricious for the agency to refuse to await that data.  This is particularly true when that data, once finalized, demonstrates that the original data on which the agency relied was wrong.

As the Supreme Court has said, the fundamental objective of NEPA is to ensure that an "agency will not act on incomplete information only to regret its decision after it is too late to correct." *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 371 (1990); *see also Foundation for North American Wild Sheep v. U.S.D.A.*, 681 F.2d 1172, 1181 (9th Cir. 1982)

---

[17] Defendants will undoubtedly challenge TRCP's Exhibit 1 as outside the record on review. However, extra-record evidence may be considered "in cases where evidence arising after the agency action shows whether the decision was correct or not[.]" *Esch v. Yeutter*, 876 F.2d 976, 991 (D.C. Cir. 1989) citing *American Mining Congress v. Thomas*, 772 F.2d 617, 626-627 (10th Cir.1985), cert. denied, 476 U.S. 1158 (1986) (recognizing exception for "evidence coming into existence after the agency acted demonstrates that the actions were right or wrong"); *see also American Petroleum Institute v. EPA*, 540 F.2d 1023, 1034 (10th Cir.1976), cert. denied, 430 U.S. 922, (1977) ("events indicating the truth or falsity of agency predictions should not be ignored.") Frankly, to the extend Federal Defendants maintain Adaptive Management is progressing as planned, such representation smacks of bad faith, providing additional grounds for review. *Stainback v. Secretary of Navy*, 520 F. Supp. 2d 181, 188 (D.D.C. 2007).

[18] This *post-hoc* rationalization is contrary to the urgings of WGFD to develop as much baseline data as possible before proceeding.  AR 7496 ("If data gaps exist, baseline information should be collected to support the necessary analyses, and significant wildlife or habitat losses should be addressed through mitigation.").

("[A]n agency decision to act now and deal with environmental consequences later ... is plainly inconsistent with the broad mandate of NEPA."); *Environmental Defense*, 515 F. Supp. 2d at 84-85 (agency assurances that it will "implement, monitor, and adjust mitigation techniques" cannot "paper over the flaws in the [agency's] mitigation analysis", and noting that such an approach "would effectively gut the environmental safeguards that Congress enacted in . . . NEPA"). A promise to do something at the back-end after problems occur does not excuse the failure to adequately analyze potential impacts at the front-end. *See* 40 C.F.R. § 1500.1(b) ("NEPA procedures must insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken.").

Federal Defendants argue BLM was under no obligation to await completion of the Mule Deer Study. Fed. Dfs. Memo at 28-31. Yet, when developing its alternatives to the Project, BLM noted it was important to "[d]efine corridors for migration of animals up and down [the] corridor." AR 8243. The NEPA Interdisciplinary Team explained "we have to know where they [migration corridors] are, especially pinch points." AR 8267. WGFD also urge BLM "to incorporate current data from the Baggs Mule Deer project into the ROD to protect or mitigate important habitats and migration corridors." AR 9810. The completed study itself recognizes that it "provides the baseline data necessary to accurately identify seasonal ranges and migration routes, both of which will be key components for successful mule deer management and mitigation as energy resources are developed in the ARPA." AR 7445. As explained in *Half Moon Bay Fishermans' Marketing Ass'n v. Carlucci*, 857 F.2d 505, 510 (9th Cir. 1988), without establishing baseline conditions, there is no way to determine what effect the proposed action will have on the environment and, consequently, no way to comply with NEPA. Because BLM did not wait for the study's conclusion, BLM's EIS and ROD do not correctly identify mule deer

migration routes as depicted in the Mule Deer Study (April 2007), and the baseline data in the ROD is erroneous. *Compare* TRCP's motion, Exhibit F with Exhibit J.

NEPA also requires an EIS to contain high quality information and accurate scientific analysis, 40 C.F.R. § 1500.1(b), and mandates agencies "*shall insure* the professional integrity, including scientific integrity, of the discussions and analyses in environmental impact statements." 40 C.F.R. § 1502.24. *See also Environmental Defense v. U.S. Army Corps of Engineers*, 515 F. Supp. 2d 69, 78 (D.D.C. 2007); Relying on insufficient data or methodology is grounds for setting aside an EIS. *Seattle Audubon Soc. v. Espy*, 998 F.2d 699, 704 (9th Cir. 1993) ("stale scientific evidence", incomplete discussion of environmental effects, and false assumptions are grounds to set aside the EIS). *Cf. Blanco v. Burton*, 2006 WL 2366046 *9 (E.D. La. August 14, 2006) (when baseline analysis is erroneous, pre-existing NEPA analysis cannot stand); *Friends of the Earth v. U.S. Army Corps of Engineers*, 109 F. Supp. 2d. 30, 38-42 (D.D.C. 2000) (Corps' failure to address certain issues raised in comments of sister agencies and "lack of analysis" of others did not satisfy NEPA's "hard look" requirement). In this case, the ROD was scientifically deficient when issued. Because BLM is not implementing its Adaptive Management program, the updated information is being ignored. BLM is violating NEPA's requirements for scientific rigor and integrity.

   E.    **BLM Unlawfully Committed the ARPA's Resources Before it Finalized the Rawlins RMP.**

Council on Environmental Quality regulation 40 C.F.R. § 1506.1 (Limitations on actions during NEPA process) in part provides: "(a) Until an agency issues a record of decision …, no action concerning the proposal shall be taken which would: … (2) Limit the choice of reasonable alternatives." *Compare* 40 C.F.R. § 1502.2(f) (Agencies may not "commit resources prejudicing the selection of alternatives before making a final decision."); *see also* 42 U.S.C.

§ 4332(2)(C)(v); *Scientists' Institute for Public Information v. AEC*, 481 F.2d 1079 (D.C. Cir. 1973). By approving the ROD before the Rawlins RMP was finalized, Federal Defendants violated NEPA's prohibition on prematurely committing the ARPA's resources to CBM development. Federal Defendants base their entire response to this argument on the sole fact that "in 2004, BLM issued a new policy that better defined how BLM should take the RFD into account." Fed. Dfs. Memo at 33.[19]

Federal Defendants concede the "relevant consideration is whether the proposed action will substantially exceed the predicted impacts analyzed in the original [RMP]." Fed. Dfs. Memo at 33. As discussed in Section II.C.1 *supra*, BLM staff for years believed the answer to that question was yes. *See* AR 9220 ("it is not that the impacts from cbm development are so different from 'conventional' gas development - but rather it is the *magnitude of the development makes the impact discussions in the land use plans inadequate … .*") (emphasis supplied). Industry Defendant-Intervenors would have this Court ignore these "preliminary" conclusions. Ind. Dfs. Memo at 11. However, a newfound interpretation that is inconsistent with the agency's earlier interpretation "is entitled to considerably less deference" than would otherwise be afforded. *Cf. Watt v. Alaska*, 451 U.S. 259, 273 (1981); *see also INS v. Cardoza-Fonseca*, 480 U.S. 421, 447, n.30 (1987); *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 515 (1994); *Pauley v. BethEnergy Mines, Inc.*, 501 U.S. 680, 698 (1991) ("the case for judicial deference is less compelling with respect to agency positions that are inconsistent with previously held views."); *Louisiana Pub. Serv. Comm'n v. FERC*, 184 F.3d 892, 897 (D.C. Cir.1999) ("For the agency to

---

[19] Wyoming's refutation of TRCP's claim fails to acknowledge the express language of 40 C.F.R. 40 C.F.R. § 1506.1 and should be disregarded.

reverse its position in the face of a precedent it has not persuasively distinguished is quintessentially arbitrary and capricious.").

Finally, Federal Defendants' cursory suggestion TRCP may not bring this claim because the leases that are now being developed under the ROD irreversibly committed the ARPA's resources is unsupportable.  That position ignores BLM's retained legal authority over the manner in which public lands are developed, as well as the fact that there remains significant ongoing federal involvement in the development of oil and gas leases, various points during which additional NEPA analyses are required.  *Cf. Mineral Policy Center*, 292 at 42.  ("FLPMA, by its plain terms, vests the Secretary of the Interior with the authority-and indeed the obligation-to disapprove of an otherwise permissible mining operation because the operation, though necessary for mining, would unduly harm or degrade the public land.").

### F.     BLM's Analysis of Cumulative Impacts is Deficient.

Cumulative impacts result "from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." 40 C.F.R. § 1508.7.  "An impact is 'reasonably foreseeable' if it is 'sufficiently likely to occur that a person of ordinary prudence would take it into account in reaching a decision.' " *City of Shoreacres v. Waterworth*, 420 F.3d 440, 453 (5th Cir. 2005) *quoting Sierra Club v. Marsh*, 976 F.2d 763, 767 (1st Cir. 1992).  An action is "not too speculative" merely because it is proposed, particularly when the agency issues a press release or otherwise indicates its intent to proceed.  *See Tenakee Springs v. Clough*, 915 F.2d 1308, 1313 (9th Cir. 1990); *Muckleshoot Indian Tribe*, 177 F.3d at 812; *National Audubon Society v. Department of Navy*, 422 F.3d 174, 196 (4th Cir. 2005).

Federal Defendants incredibly assert "[t]here are no past, present or reasonably foreseeable wind projects in the [P]roject area." Fed. Dfs. Memo at 27; see also Wyo. Memo at 21 and Ind. Dfs. Memo at 23-24.20  However: "It is the BLM general policy, consistent with the National Energy Policy of 2001 and the Energy Policy Act of 2005, to encourage  development of wind energy in acceptable areas."  BLM, Instruction Memorandum 2006-216, Wind Energy Development Policy (Aug. 24, 2006) (http://windeis.anl.gov/documents/docs/WindEnergy Development_Instruction_Memo.pdf).  Instruction Memorandum 2006-216 further provides:

> The Department of Energy's National Renewable Energy Laboratory (NREL) assisted the BLM in the preparation of the Programmatic [Wind Energy] EIS and provided an inventory assessment of wind energy resources on public lands in the Western States. The objective of this collaborative effort was to support the BLM land use planning efforts. Appendix B of the Programmatic EIS includes a set of wind resource potential maps for each BLM Field Office in each of the Western States. … Field Offices are encouraged to use this information as the inventory base for addressing wind energy resource development opportunities and to assess the effects of other resource uses on wind energy resources.

Thus, BLM policy specifically encourages assessment of wind energy potential in conjunction with other land uses.  It also provides:

> The United States has significant potential for wind energy development, especially on Federal lands in the West. The Federal wind energy production tax credit, State level tax credits and other incentives, including renewable energy portfolio standards in several states, have generated a strong interest in commercial wind energy projects on BLM-administered public lands. Project proposals on public land will create a workload that demands a commitment of resources and a priority to the timely and consistent processing of right-of-way applications for wind energy site testing and monitoring activities and for commercial wind energy development.

---

[20] Ironically, despite attacking TRCP's offering of similar materials, Industry Defendant-Intervenors support their arguments with voluminous extra-record documents concerning the Wind Energy EIS.  TRCP has no objection to this material, which TRCP asserts is properly considered by the Court under *Esch*.

Given the obvious importance of wind energy development in the Federal energy scheme, the intensity of interest in developing wind energy, and BLM's identification of the Atlantic Rim as containing a major wind corridor, wind energy development in the Atlantic Rim is "reasonably foreseeable" for NEPA purposes.

## IV.   **THE POD DECISIONS WERE UNLAWFUL.**

Federal Defendants assert it is permissible for BLM to consider just two alternatives (development or "no action") when preparing environmental assessments ("EA") analyzing plans of development ("POD") in the ARPA.  Regardless of whether NEPA's mandates are carried out in an EIS or an EA, the fundamental question before a reviewing court remains whether the agency considered a reasonable range of alternatives under the circumstances.  *See, e.g., Sierra Club v. Watkins*, 808 F. Supp. 852, 872 (D.D.C. 1991) (even in the case of an EA, "the agency must consider a range of alternatives that covers the full spectrum of possibilities."); *see also id*. ("The Department need not select the port with the least risk, but it needs to consider ports across the full spectrum of possibilities and to explain the reasons for the choice made.").  The cases cited by Defendants do not indicate otherwise.

In this case, voluminous information before BLM demonstrating *at least* the potential inadequacy of sage grouse protections warranted the agency's investigation of an option involving less intense development or more aggressive sage grouse protections.  *Compare Blue Mountains Biodiversity Project v. U.S. Forest Service*, 229 F. Supp. 2d 1140, 1147 (D. Or. 2002) ("defendants here failed … to articulate a reason for disregarding an obviously reasonable alternative that addressed preventative measures, and did not conduct a rigorous exploration and objective evaluation of all reasonable alternatives in the EA."); *Oregon Natural Desert Ass'n v. Singleton*, 47 F. Supp. 2d 1182, 1195 (D. Or. 1998); *Curry v. U.S. Forest Service*, 988 F. Supp.

541, 553-54 (W.D. Pa.1997) ("Although the LRMP for the Allegheny National Forest indicates that even-aged management will be the "featured" silvicultural system … , this provision does not …negate the obligation of the Forest Service … to consider a 'broad range of reasonable alternatives' for the Mortality II Project, some of which involve more extensive uneven-aged management techniques.").

Federal Defendants argue BLM implicitly (and without public review or knowledge) created a *de facto* "alternative" to the Operators' design for the Sun Dog and Catalina PODs. Nevertheless, the Decision Notices for these PODs implement sage grouse mitigation identified in the ROD (i.e., the ¼ mile NSO buffer around sage grouse leks).  *See* AR 74065 and 73496. Thus, for all practical purposes, the controversial issues surrounding sage grouse have been ignored.  While Federal Defendants argue there will be no significant impact on sage grouse, this court has explained that an EA has a "larger purpose" than simply demonstrating a proposed action will have minimal impact.  *Sierra Club*, 808 F. Supp. at 870.  The EA "is intended to aid decisionmaking and fulfill the purposes of an EIS, albeit to a lesser degree."  *Id*.  Simply put:

> NEPA's focus is on disclosure of information, both to the governmental decisionmakers and to the public.  The EA should set out relevant information to help the decisionmaker choose a policy option (and to help others evaluate that choice), and not simply to provide a justification as to why a choice is permissible (i.e. why there is no significant impact).  Thus an EA is more than simply the agency's *post hoc* rationalizations of its decision.

*Id*.  By refusing to allow the public to examine possible alternatives more protective of non-energy resources, and by refusing to evaluate real changes in sage grouse management, BLM failed to meet NEPA's demands.

**CONCLUSION**

For the foregoing reasons, and as further discussed in TRCP's motion for summary judgment, TRCP is entitled to judgment in its favor and the relief sought by its motion. Defendants' cross-motions should be denied.

Respectfully submitted this 10th day of July, 2008.

/s/ *Donald G. Blankenau*

D.C. Bar No. ND0003
Thomas R. Wilmoth
Nebraska Bar No. 22518
HUSCH BLACKWELL SANDERS LLP
206 South 13th Street, Suite 1400
Lincoln, NE  68508-2019
T: (402) 458-1500
F: (402) 458-1510
don.blankenau@huschblackwell.com
tom.wilmoth@huschblackwell.com

*Counsel for Theodore Roosevelt
Conservation Partnership*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 10, 2008, I caused to be electronically filed the foregoing CONSOLIDATED RESPONSE TO CROSS-MOTIONS FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

**Donald G. Blankenau**
don.blankenau@huschblackwell.com; sharon.marburger@huschblackwell.com

**John Scudder Burbridge**
jburb1@state.wy.us

**Lori Caramanian**
lori.caramanian@usdoj.gov; susan.middagh@usdoj.gov; efile_nrs.enrd@usdoj.gov;
lori.montano@usdoj.gov

**Jay A. Jerde**
jjerde@state.wy.us

**Steven Michael Kupka**
nancilee.holland@huschblackwell.com

**Robert Charles Mathes**
rmathes@bjorklindley.com; lvanderveer@bjorklindley.com; kfuller@bjorklindley.com

**Michael B. Wigmore**
michael.wigmore@bingham.com; s.franco@bingham.com

**David James Willms**
dwillm@state.wy.us; cjohns1@state.wy.us; kmcmul@state.wy.us

**Thomas R. Wilmoth**
tom.wilmoth@huschblackwell.com; sharon.marburger@huschblackwell.com

/s/ *Donald G. Blankenau*

D.C. Bar No. ND0003
Thomas R. Wilmoth
Nebraska Bar No. 22518
HUSCH BLACKWELL SANDERS LLP
206 South 13th Street, Suite 1400
Lincoln, NE 68508-2019
T: (402) 458-1500
F: (402) 458-1510
don.blankenau@huschblackwell.com
tom.wilmoth@huschblackwell.com

*Counsel for Theodore Roosevelt*
*Conservation Partnership*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| THEODORE ROOSEVELT<br>CONSERVATION PARTNERSHIP<br>555 Eleventh St. N.W., 6th Floor<br>Washington, DC 20004<br>(202) 654-4600, | )<br>)<br>)<br>)<br>)<br>) | |
| Plaintiff, | )<br>) | CASE NO. 1:07-cv-01486-RJL |
| v. | )<br>) | |
| DIRK KEMPTHORNE, in his official<br>capacity as the Secretary of the United<br>States Department of the Interior<br>1849 C Street, N.W.<br>Washington, DC 20240<br>(202) 208-3100, | )<br>)<br>)<br>)<br>)<br>)<br>) | |
| and | )<br>) | |
| UNITED STATES BUREAU OF LAND<br>MANAGEMENT<br>1849 C Street, Room 406-LS<br>Washington, DC 20240<br>(202) 452-5125, | )<br>)<br>)<br>)<br>)<br>) | |
| Defendants. | )<br>)<br>) | |
| ANADARKO PETROLEUM<br>CORPORATION, WARREN<br>RESOURCES, INC., DOUBLE EAGLE<br>PETROLEUM CO., | )<br>)<br>)<br>)<br>) | |
| and | )<br>) | |
| STATE OF WYOMING | )<br>) | |
| Defendant-Intervenors | )<br>) | |

## DECLARATION OF THOMAS R. WILMOTH

I, Thomas R. Wilmoth, state and declare as follows:

1.    I am a resident of Lincoln, Nebraska, over eighteen years of age, with personal knowledge of the facts set forth herein.

2.    On April 7, 2008, I sent on behalf of the Theodore Roosevelt Conservation Partnership a Freedom of Information Act ("FOIA") request to the Bureau of Land Management's Wyoming State Office.  A true and correct copy is attached hereto as Exhibit A.

3.    A response to the FOIA request, dated May 13, 2008, was received in my office.  A true and correct copy of that response is attached as Exhibit B.

I declare under penalty of perjury that the foregoing is true and correct.

_____July 7, 2008_____
Date

_____
Thomas R. Wilmoth

LIN-4207-1

Exhibit A

HUSCH
BLACKWELL
SANDERS
LLP

**Thomas R. Wilmoth, Partner**
DIRECT 402.458.1502 · FAX 402.458.1510 · tom.wilmoth@huschblackwell.com
206 SOUTH 13TH STREET, SUITE 1400 · LINCOLN, NE 68508-2019
www.huschblackwell.com

April 7, 2008

**VIA FACSIMILE (307-775-6058) AND U.S. MAIL**

Mark P. Archer
State FOIA/PA Officer
5353 Yellowstone Rd.
Cheyenne, WY 82009
WY_FOIA@blm.gov

Re:    **Freedom of Information Act Request Pursuant to 5 U.S.C. § 552; Request for Information Concerning Performance Under the ATLANTIC RIM NATURAL GAS FIELD DEVELOPMENT PROJECT RECORD OF DECISION.**

Dear Mr. Archer:

On behalf of the Theodore Roosevelt Conservation Partnership ("TRCP"), and pursuant to the Freedom of Information Act, 5 U.S.C. § 552 and FOIA and Departmental regulations at 43 C.F.R. Part 2, we respectfully request the information identified below concerning performance by the Bureau of Land Management ("BLM") and the Operators under the ATLANTIC RIM NATURAL GAS FIELD DEVELOPMENT PROJECT RECORD OF DECISION (MARCH 2007) ("ROD"). TRCP is a coalition of leading hunting, fishing and conservation organizations, labor unions and individual grassroots partners working together to preserve the traditions of hunting and fishing, including within the Atlantic Rim Project Area ("ARPA"). TRCP has challenged the ROD and the ATLANTIC RIM NATURAL GAS FIELD DEVELOPMENT PROJECT FINAL ENVIRONMENTAL IMPACT STATEMENT (Dec. 2006). *See TRCP v. Kempthorne et. al*, Case No. 07-cv-1486 (RJL) (D.D.C.). However, this request does not implicate those decisions. Rather, this request is directed to subsequent actions presumably taken to ensure compliance with the ROD.

**REQUEST NO. 1**

The ROD indicates that by April 1 of each successive year (beginning in 2008), "[t]he Operators will provide the BLM RFO annual operating plans for the following year that include" the previous year's activities and a plan of development for the coming year "along with conceptual, multi-year development plans to include planned number of wells to be drilled and an estimate of new surface disturbance and reclamation activity. ROD at 16.

*TRCP hereby requests each and every "annual operating plan" provided to BLM by the Operators in the Atlantic Rim on or before April 1, 2008 in compliance with the foregoing requirement.*

HUSCH
BLACKWELL
SANDERS
LLP

Mark P. Archer
April 7, 2008
Page 2

### REQUEST NO. 2

In addition, with regard to wildlife management, the ROD provides:

> 1) In part to meet their responsibility to demonstrate achievement of Performance Goals, Operators will compile all resource data collected under the wildlife monitoring and protection plan (FEIS appendix E) and submit this data to the Review Team by October 15 of each calendar year.

> 2) Operators will complete draft annual reports for submittal to the Review Team by November 15 of each year. Annual reports will summarize annual wildlife inventory and monitoring results, note any trends across years, identify and assess protection measures implemented during past years, specify monitoring and protection measures proposed for the upcoming year, recommend modifications to the existing wildlife, monitoring /protection plan based on the successes and/or failures of past years, and identify additional species/categories to be monitored.

> 3) Operators will issue a final annual report to all potentially affected individuals and groups by early February of each year.

> 4) A one day meeting will be organized by the Review Team and held in December (or as determined by the Review Team) of each year to discuss and modify, as necessary, proposed wildlife inventory, monitoring, and protection protocol for the subsequent year.

ROD, Appendix B at B-13 – B14.

*TRCP hereby requests: 1) each and every data set collected and submitted by the Operators on or before October 15, 2007 pursuant to foregoing paragraph No. 1; 2) each and every "draft annual report" submitted by the Operators on or before November 15, 2007 pursuant to foregoing paragraph No. 2; 3) each and every "final annual report" submitted by the Operators on or before "early February" 2008 pursuant to foregoing paragraph No. 3; and 4) any written materials, including attendance lists, agendas and notes from each and every meeting held to date pursuant to foregoing paragraph No. 4.*

### REQUEST FOR FEE WAIVER

TRCP seeks the foregoing information to determine, on behalf of its members and the interested public, whether the obligations identified in the ROD are being met. Indeed, paragraph number 3, quoted above, specifically entitles "affected individuals and groups" to the information discussed therein. TRCP does not intend to utilize the information disclosed for any other purpose, including any activity that might result directly or indirectly in pecuniary gain by

HUSCH
BLACKWELL
SANDERS
LLP

Mark P. Archer
April 7, 2008
Page 3

TRCP. In short, disclosure of the requested information is in the public interest because it: (a) Is likely to contribute significantly to public understanding of the operations or activities being conducted in the ARPA; and (b) is not primarily in the commercial interest of TRCP. Accordingly, TRCP hereby requests a fee waiver pursuant to 5 U.S.C. § 552(a)(4)(A)(iii).

Should you have any questions or concerns regarding the scope of this request, please contact me immediately.

Very truly yours,

Thomas R. Wilmoth

TRW
cc:    Robert Bennet, State Director
        Lori Caramanian, Department of Justice

LIN-3982-1

Exhibit B



# United States Department of the Interior

BUREAU OF LAND MANAGEMENT
Wyoming State Office
P.O. Box 1828
Cheyenne, Wyoming 82009-1828



IN REPLY REFER TO:
1278(957)
WY-2008-041

Thomas R Wilmoth,
Husch, Blackwell, Sanders LLC
206 South 13th Street
Suit 1400
Lincoln, NE  68508

MAY 1 3 2008

Dear Mr. Wilmoth:

We are writing this letter in response to your Freedom of Information Act (FOIA) request dated April 7, 2008 and received in this office on April 7, 2008.  In your letter, HUSCH, BLACKWELL, SANDERS, LLP, you ask for the following documentation:

1. TRCP hereby requests each and every "annual operating plan" provided to BLM by the operators in the Atlantic Rim on or before April 1, 2008 in compliance with the requirement as spelled out in the Record of Decision for Atlantic Rim.

2. TRCP hereby requests: 1) each and every data set collected and submitted by the operators on or before October 15, 2007 pursuant to the ROD, Appendix B at B-13 -B14;  2) each and every draft "annual report" submitted by the operators on or before November 15, 2007 pursuant to the afore mentioned Appendix;  3) each and every "final- annual report" submitted by the Operators on or before "early February" 2008 pursuant to the afore mentioned Appendix;  and 4) any written materials including attendance lists, agendas and notes from each and every meeting held to date pursuant to the afore mentioned Appendix.

We have searched our files and have found 8 records, 48 pages that are responsive to your request.  For your convenience, we have included an index that lists the documents by date.  The enclosed records are in response to item 2.4.  We are releasing these documents in their entirety with no exemptions cited.  As for item 1 and the rest of item 2, to date, the process whereby the lease holders begin compliance with NEPA requirements for the Atlantic Rim Project Area has not gotten underway.  We have only recently started scheduling public and operator's meetings.  Applications for Permit to Drill (APD) have not been filed and there are no Plans of Development as yet.  Therefore, we must deny this portion of your request because there are no records.

To the extent that you believe that this partial denial of your FOIA request is not correct you have the right to file an appeal by writing to:

> The Freedom of Information Act Appeals Officer,
> U.S. Department of the Interior,
> 1849 C Street, N. W.,
> MS~5312, MIB,
> Washington, D.C. 20240.

Your appeal must be received no later than 30 workdays after the date of this letter. Both the envelope and the letter should be marked "FREEDOM OF INFORMATION APPEAL." A copy of your original request and this letter should accompany your appeal, along with any information you have which leads you to believe the records do exist, including where they might be found, if the location is known to you. To ensure the timely receipt of your appeal, we recommend that you fax a copy of your notice of appeal to the FOIA Appeals Officer at (202) 208-6677.

There is no fee for responding to your request, as the cost is less than the $30 threshold established by the Department of the Interior for fee collection under the FOIA regulations at 43 CFR § 2.18(a).

If you have any questions please do not hesitate to contact Mark P. Archer, State FOIA Officer, (307) 775-6180.

Sincerely,

Robert A. Bennett
State Director

**FOIA WY-2008-041**

# Document Index

Disposition: Release All = R/A
Withhold All = W/A
Partial Release = P/R

| Doc # | From: | Doc. Addressed To: | Subject | Date | # of pages | Disposition | Exemption |
|---|---|---|---|---|---|---|---|
| 1 | File | | Atlantic Rim Yearly Planning Meeting Agenda | 11/28/2007 | 1 | | |
| 2 | File | | Atlantic Rim Natural Gas Development Project Final Agenda | 11/28/2007 | 1 | | |
| 3 | File | | Atlantic Rim Working Annual Planning Meeting Presentation | 11/28/2007 | 31 | | |
| 4 | File | | Atlantic Rim working Group agenda | 12/11/2007 | 3 | | |
| 5 | File | | Atlantic Rim Working Group Meeting Notes | 12/17/2007 | 2 | | |
| 6 | File | | From the Atlantic Rim ROD Decesion paper | 12/18/2007 | 5 | | |
| 7 | File | | Schedule for Atlantic rim Working Group meeting | 3/7/2008 | 2 | | |
| 8 | File | | Atlantic Rim Reclamation Working group Meeting Notes | 3/7/2008 | 3 | | |
| | | | **Total Pages** | | 48 | | |

ATLANTIC RIM YEARLY PLANNING MEETING
11.28.07
PROGRAMMATIC AGREEMENT OUTLINE

I. Background

    A. Work on it began late April or May, 2007
    B. Last Signature obtained 8.2.07
    C. Involved groups
        1. Industry (4 total)
          a. Anadarko
          b. Redwine Resources
          c. Double Eagle
          d. Warren Resources
        2. Landowners - Asked but opted not to participate
        3. Special Interest Groups
          a. Oregon-California Trails Assoc.
          b. Alliance for Historic Wyoming
        1. Agencies
          a. BLM
          b. Wyoming SHPO
          c. Advisory Council on Historic Preservation

II. Purpose of the document is to provide mechanism for agency compliance with its responsibilities under Section 106 of the NHPA

    A. Consult with SHPO on a programmatic basis instead of one project at a time.
    B. Define ways to minimize or mitigate anticipated adverse effects as identified in the Atlantic Rim EIS.

III. Stipulation requirements
    A. Industry is to plan the best it can
    B. No surface disturbance within .25 miles of contributing segments or sites
       If surface disturbance is required in order for a lease to be developed, standard Wy Protocol procedures are followed.
    C. All projects beyond two miles of the historic trails and sites are considered to have no effect.
    D. Transportation corridors established for crossing the trails
    E. All projects that are visible within 2 miles of trails and sites are considered to have an adverse effect.
    F. Mitigation Committee formed as stipulated in the PA to deal with unavoidable adverse effects.
        1. Committee members consist of Representative of Industry, OCTA, AHW, BLM, SHPO and the ACHP.
        2. Work has begun on mitigation of adverse effects (aside from on-the-ground best management practices

# Atlantic Rim Natural Gas Development Project

November 28th, 2007
Rawlins Field Office
Rawlins, Wyoming

## FINAL AGENDA

| Time | Item | Whom |
|------|------|------|
| 09:45 | Arrive, Find Seat | All |
| 10:00 | Introductions | Patrick Madigan |
| 10:15 | Annual Meeting Overview | David Simons |
| 10:30 | 2007 Program of Work review | Travis Bargsten |
| 10:45 | Anadarko Annual Plans | Anadarko Crew |
| 11:45 | No Host Lunch | |
| 1:00 | Double Eagle Annual Plans | Steve Degenfelder |
| 1:45 | Litigation Update | Simons |
| 2:00 | Review Team Update | Debbie Johnson |
| 2:15 | Industry Participation in Collaborative Monitoring | Dave Applegate |
| 2:45 | Working Group Updates<br>  Disturbance Tracking<br>  Wildlife Monitoring<br>  Reclamation<br>  Programmatic Agreement<br>  Transportation Planning | <br>Travis Bargsten<br>Paula GG<br>Skip Stonesipher<br>Nina Trapp<br>Andy Warren |
| 3:45 | Future Meetings / Planning | Simons / Collins |



# Forward Looking Statement

◆ This presentation contains forward-looking statements within the meaning of Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934. Anadarko believes that its expectations are based on reasonable assumptions. No assurance, however, can be given that such expectations will prove to have been correct. A number of factors could cause actual results to differ materially from the projections, anticipated results or other expectations expressed in this presentation. Anadarko cannot guarantee that it will successfully execute on its drilling and development plans, meet its revised production guidance, meet its debt reduction goals, or successfully create and market an initial public offering of a midstream Master Limited Partnership. See "Risk Factors" in the company's 2006 Annual Report on Form 10-K and other public filings and press releases. Anadarko undertakes no obligation to publicly update or revise any forward-looking statements.

◆ Cautionary Note to U.S. Investors — The United States Securities and Exchange Commission permits oil and gas companies, in their filings with the SEC, to disclose only proved reserves that a company has demonstrated by actual production or conclusive formation tests to be economically and legally producible under existing economic and operating conditions. We use certain terms in this presentation, such as "net unbooked, captured resources", "net risked captured resources" or "unbooked resource potential", that the SEC's guidelines strictly prohibit us from including in filings with the SEC. U.S. Investors are urged to consider closely the disclosure in our Form 10-K for the year ended December 31, 2006, File No. 001-08968, available from us at www.anadarko.com or by writing us at: Anadarko Petroleum Corporation, 1201 Lake Robbins Drive, The Woodlands, Texas 77380 Attn: Investor Relations. You can also obtain this form from the SEC by calling 1-800-SEC-0330.



Anadarko
Petroleum Corporation

# Introduction – Presentation Agenda

- **Introductions**
- **Atlantic Rim History**
- **2007 Status Update and End of Year Plans**
- **2008 Development Plans**
- **2009 Forecast**
- **2007-2008 Infrastructure Update and Plans**
- **Midstream 2008 construction projects**
- **Monitoring, Mitigation Actions and Studies**
  - *Historic Trails*
  - *Air Monitoring*
  - *Groundwater Monitoring*
  - *Performance Monitoring and Goals*
  - *Surface Disturbance and Reclamation*



Anadarko
Petroleum Corporation

# Atlantic Rim Recent History

- **2004**
  - Doty Mountain – Drill 24 well pilot
  - Red Rim – Drill 16 well pilot
- **2005**
  - Jolly Roger – Drill 16 well pilot
  - Blue Sky – Drill 12 producers
  - Brown Cow – Drill 2 producers
- **2006**
  - Doty Mountain – Drill 24 producers and 2 injectors
  - Brown Cow – Drill 11 producers
- **2007**
  - Sun Dog – Plan to drill 38 producers and 3 injectors (add to existing 14 wells pilot drilled in 2002)



Anadarko
Petroleum Corporation

# 2007 Status Update and 2008 Plans

- **2007 Sun Dog Drilling**
  - *Have drilled 18 of 41 wells this year (Sept. 15th – Nov. 28th)*
  - *3 rigs working + 1 preset rig*
  - *Built 82 pad locations*

- **2008 Plans**
  - *Drill 150-175 development wells and 15-20 injection wells*

- **POD Priority for 2008 activity (all but Doty D submitted by year end)**
  - *Doty Mountain B & C*
  - *Sun Dog F*
  - *Doty Mountain D*
  - *Jack Sparrow (Blue Sky)*



Anadarko
Petroleum Corporation

# 2007 – 2008 Development Plan



# POD Submittal Timeline

| PODs for Submittal | Submittal Date | Anticipated Drilling |
|---|---|---|
| Doty Mtn. B | November 30, 2007 | Summer - 2008 |
| Doty Mtn. C | December 14, 2007 | Summer – 2008 |
| Sun Dog F | December 31, 2007 | Summer – 2008 - 2009 |
| Doty Mtn. D | May 1, 2008 | Fall – 2008 |
| Blue Sky/Jack Sparrow | December 31, 2007 | Fall 2008 – 2009 |
| Doty Mountain A | July, 2008 | 2009 |

**Anadarko**
Petroleum Corporation

# 2009 Development Plans

- Drilling – Anticipate drilling 150-200 wells
- Continue to focus development of Sun Dog, Doty Mountain, and Jack Sparrow Federal Units
- Limited drilling required in other units to meet Unit obligations



Anadarko
Petroleum Corporation

# 2007 Infrastructure Update and 2008 Plans

- **Infrastructure 2007 Update (pipelines, electrical, roads, etc. )**
  - *Pipelines: 280,000' YTD of 482,000', 58% complete*
  - *Electric Line: 186,000' YTD of 286,000', 65% complete*
  - *Roads: 60% of roads complete w/ gravel*

- **Infrastructure 2008 Plans (pipeline, electrical, roads, etc.)**
  - *Plan to build out for 2008 activity and ½ 2009*
  - *Limited Activity in Muddy Creek / Alamosa Gulch Sub Basin*

- **Infrastructure – install for 2009 wells and ½ 2010 well program**



Anadarko
Petroleum Corporation

# Midstream 2008 construction projects

## ◆ 2008

– Complete 8 Inch Discharge Pipeline from Blue Sky to Brown Cow Compressor Stations "CS", Construction Start Date 8/1/2008

– Install additional Compression at Sun Dog, Blue Sky & Brown Cow CS(s)

– Install / upgrade Field Dehydration Units at Red Rim, Sun Dog, Blue Sky & Brown Cow CS(s)

– Permit 20 Inch Pipeline Loop from Red Rim W/C Interconnect to Brown Cow CS, Permit submitted by 8/1/2008

– 2008 Contingent Project, Extend 8 Inch Loop from Brown Cow CS to Redwine Rockies LLC, Morgan Run CBM Unit



Anadarko
Petroleum Corporation

# ROD Requirements for Monitoring and Mitigation

- **Historic Trails**
- **Air Monitoring**
- **Groundwater Monitoring**
- **Performance Goals**
  - Sage Grouse
  - Mule Deer
  - Muddy Creek
- **Surface Disturbance and Reclamation Tracking**

Anadarko
Petroleum Corporation

# ROD Requirements: Historic Trails

◆ Record of Decision requirements:

– "As prescribed in the Wyoming State Protocol between the Wyoming BLM and the SHPO, Memorandum of Agreements (MOAs) are required between SHPO, BLM, the proponent, and interested parties as part of the Section 106 of the National Historic Preservation Act (NHPA) consultation process when there are anticipated adverse effects to historic properties.  Given the number of site-specific projects needed to implement Alternative D, handling the Section 106 consultation process through one programmatic agreement (PA) is preferable to multiple, individual MOAs when adverse effect situations are anticipated…  (AR ROD, p. 10)

– "…mitigation measures will be incorporated into an agreement or agreements to be established under the Wyoming state cultural resources protocol between the BLM, the State Historic Preservation Office (SHPO), project proponents, and interested parties to address site-specific impacts and mitigation measures for all sites where setting contributes to National Register of Historic Places (NRHP) eligibility." (AR ROD, p. B-19)


Anadarko
Petroleum Corporation

# ROD Implementation: Historic Trails

♦ What's happened so far:

– Negotiations on a Programmatic Agreement for Adverse Impacts to the trails "setting" started in February of 2007

– Agreement was signed by all parties on July 31, 2007 including BLM, Anadarko, Double Eagle, Redwine, Warren Resources, SHPO, Advisory Council on Historic Preservation, Wyoming Attorney General

– Agreement Established:
  • Area of Potential Effect defined as area within 2 miles of historic trails
  • Mitigations include defined transportation corridors across contributing segments of trails, NSO within ¼ miles either side of contributing segments, and the need for a compensatory mitigation project.

– Compensatory Mitigation committee status
  • August 12, 2007: Meeting for brainstorming of project ideas
  • October 23, 2207: Narrowing of project options and work assignments
  • November 27, 2007: Discussion of two project proposals - interpretive signs and Wyoming public television show



Anadarko
Petroleum Corporation

# ROD Requirements: Air Monitoring

- Record of Decision requirements:

  - "WDEQ established an air quality monitoring station near Wamsutter, Wyoming in March 2006 to monitor concentrations of $NO_X$, $O_3$, $PM_{10}$, and $SO_2$. In cooperation with WDEQ, the Operators will finance and operate additional air quality concentration monitoring, including $O_3$ monitoring, in the Rawlins Field Office (RFO) management area. The BLM will work cooperatively with WDEQ, USEPA, and the Operators to maintain and enhance concentration monitoring in the RFO management area, including monitoring required to represent impacts due to emissions from the Atlantic Rim field." (AR ROD, p. 7)


Anadarko
Petroleum Corporation

# ROD Implementation: Air Monitoring

◆ What's happened so far:

– Discussions were held between Anadarko and WDEQ Air Quality Division to define the design criteria for a monitoring station in the AR field

– Anadarko installed an 80-foot meteorological tower and air quality monitoring shelter in the fall of 2007 at a production well approximately one mile southeast of the Jolly Roger Compressor station near the Continental Divide

– The station is instrumented to continuously monitor $O_3$, $NO_X$ and dispersion meteorology including winds, turbulence, temperature, solar radiation, barometric pressure, and atmospheric stability

– The system is fully operational

– October of 2007 was the first full month of monitoring. The data indicate that area constituent concentrations during this period were well below applicable standards



Anadarko
Petroleum Corporation

ROD Requirements and Implementation: Groundwater Monitoring

## Record of Decision requirements:

– " The operator shall be responsible for drilling, completing, and equipping one set of three shallow groundwater-monitoring wells . . . . ." (AR ROD, p. B-10)

## What's happened so far:

– Selected locations for monitoring wells in August – T16N R91W, Section 12.

– Permits submitted, subsequently revised for rig change, awaiting approval to drill.

– Additional work: APC Sponsored Methane Seep Field Study – Initiated Fall 2007
  - *Reservoir Management*
  - *Resource Conservation*
  - *Safety*



Anadarko
Petroleum Corporation

# ROD Requirements: Performance Monitoring

- ### Record of Decision requirements:

  - "The BLM will use a performance-based management approach as part of the adaptive management process..." (AR ROD, p. 19)

  - "...Performance Goals: describes the conditions that BLM and Operators will attempt to achieve..." (AR ROD, p. 19)

  - "Operators are responsible for demonstrating successful achievement of Performance Goals." (AR ROD, p. 20 and again on p. 21)

  - "As part of the annual planning process, a monitoring and mitigation process is required, and its development will begin within 30 days of the effective date of the ROD" (AR ROD, p.20)

  - "Funding for wildlife and habitat monitoring may be obtained from BLM appropriations, in collaboration from cooperating or interested agencies, from the voluntary participation of the Operators, or from outside sources..." (AR ROD, p. 20)

  - Early efforts are to be made to collect or consolidate resource data to form a baseline against which future monitoring efforts would be compared to indicate trends. In the absence of sufficient data illustrating Operator achievement of Performance goals, the BLM will use a conservative approach when considering additional approvals." (AR ROD, p. 3)



# ROD Implementation: Performance Goals

- ♦ What's happened so far:

  - June 1 Meeting: Between Rawlins Field Officer Manager and Anadarko to discuss ROD and specifically Performance Goals – Both parties agreed that this meeting met the 30-day ROD requirement to initiate the monitoring and mitigation process (AR ROD p. 20 - see June 15 letter to Mark Storzer from Anadarko)

  - October 4 Meeting: Attendees included operators, BLM, and state cooperators to discuss Review Team composition, Performance Goals, and immediate monitoring needs in AR.

  - November 6 letter from the Office of the Governor to the Rawlins BLM office: Four Review Team members have been recommended by the Governor to the BLM.



Anadarko
Petroleum Corporation

# ROD Implementation: Performance Goals

## ◆ Performance Goal for Sage Grouse:

- "provide well-dispersed sage-grouse breeding, nesting, brood rearing, and winter habitat" (AR ROD p. 19)

## ◆ What's happened so far:

- Work Group Meetings to discuss monitoring approach: 12/8/06, 5/8/07, 7/18/07, 8/29/07, 9/18/07, 10/24/07, 11/9/07, 11/15/07

- Anadarko/Warren committed $75,000 in 2007 to collar birds. Monthly flights to track the birds has taken place in 2007.

- Anadarko/Warren has committed $150,000 in 2008 for continuation of the study.



Anadarko
Petroleum Corporation

# ROD Implementation:  Performance Goals

- ## Performance Goals for Mule Deer:

  - "maintain functional migration routes through or around development areas" (AR ROD p. 19)

  - "provide an adequate amount of suitable, undisturbed crucial winter range for big game animals"

- ## What's happened so far:

  - EIS Companies funded a baseline Mule Deer Study for $200,000 during 2005 and 2006 that collared deer to "identify seasonal ranges, document migration routes, and estimate survival rates prior to development..."

  - Anadarko/Warren have recently committed $150,000 for an extension of the study during 2008 and 2009. WGF is funding $31,700 of the extended study. BLM is seeking $75,000 of internal monies to expand the scope of the study.



Anadarko
Petroleum Corporation

# ROD Implementation: Performance Goals

◆ Performance Goals for Muddy Creek Sensitive Fish:

– "maintain adequate water quality, water quantity, species distribution, and aquatic habitat components" (AR ROD p. 19)

◆ What's happened so far:

– Initial meetings to discuss monitoring occurred on 08/16/07 and 09/12/07

– Agreement has been reached that Muddy Creek monitoring program needs to be defined this winter for initiation of spring baseline sampling.

– Definition of this monitoring program is time-sensitive

– Anadarko/Warren is talking with a national environmental firm and will bring to the next work group meeting a draft proposal for Muddy Creek monitoring over the next five years.



Anadarko
Petroleum Corporation

# ROD Requirements: Surface Disturbance

♦ Record of Decision requirements:

– "Alternative D involves drilling of approximately 2,000 gas wells within the ARPA to recover energy resources, while limiting total new surface disturbance from the drilling program across the ARPA (federal, state and fee mineral) to a maximum of 7,600 acres, at any given time, and a 6.5 acre/well site short-term (less that 6 years) disturbance goal." (AR ROD, p.1)

– "Operators are required to provide BLM, within 30 days of approval of this ROD, a map of existing disturbance associated with activities authorized during the period of time when the interim drilling policy was in effect. (AR ROD, 3)

– "When evaluating development applications for affected federal minerals and lands, the BLM will consider impacts and surface disturbance that occur on private and/or state lands relative to an operators disturbance cap allocation" (AR ROD, p. 5,6)

– "The 7600-acre disturbance cap will be allocated to Operators on a prorated, mineral leasehold basis. Existing surface disturbance from activities approved under the IDP will count against each Operator's disturbance cap allocation. Past oil and gas development surface disturbance with the ARPA will not count against the cap. (AR ROD, p. 18)



Anadarko
Petroleum Corporation

# ROD Implementation: Surface Disturbance

## ◆ What's happened so far:

- Several meetings between BLM and AR operators were held to discuss surface disturbance cap allocation.

- Anadarko and Double Eagle submitted baseline disturbance estimates on June 20, 2007, thereby meeting the 30-day ROD requirement.

- BLM has developed a "draft" allocation protocol that allocates surface disturbance based on Federal Unit operators. The "draft" protocol:
  - Saves some surface disturbance for potential conventional gas development
  - Allows for periodic re-calculation of the allocation
  - Accounts for expansion or contraction of unit boundaries

- Note: Limited number of AR operators made the surface disturbance allocation relatively pain free



Anadarko
Petroleum Corporation

# Surface Disturbance Overview

♦ Methodology to determine Surface Disturbance: A GPS survey was completed within Anadarko's AR development areas by ground truth of full disturbance polygons for GIS mapping purposes (see exhibits):

- Disturbance from the beginning of the Interim Drilling Program (IDP) on Jan. 14, 2002 to present the baseline surface disturbance

- 89 built locations will be constructed by the end of 2007.

  - *8 injection wells to co-exist with a gas producing well-shared pad location*
  - *Sun Dog acres disturbed present year is 314.6 acres*

♦ Anadarko's full surface disturbance is projected to be approximately 1,612 acres at the end of 2007.



**Anadarko**
Petroleum Corporation

# Surface Disturbance: Reducing Footprint

◆ Anadarko is making efforts to reduce our footprint:

– 80-ft. wide permitted easements for transmission and transportation lease entrance corridors were constructed this fall at a reduction to 58 feet.

– Disturbance reduction of 27.5% for 40 miles of projected activity areas resulting in 106.7 fewer surface disturbed acres for 2007 Sun Dog Construction

– Section 11 in Doty Mountain resulted in 38.3 acres total vs. EIS 52 acres target (>25% reduction in surface disturbance)

  • *Project completed in 2006*


Anadarko
Petroleum Corporation

# ROD Requirements: Reclamation

◆ Record of Decision requirements:

– "Adaptive management techniques will be used to correct any deficiencies and modify reclamation criteria as is necessary (Reclamation Plan, Appendix A)" (AR ROD, p. 3)

– When a site attains the interim reclamation vegetation cover and soil stability standards detailed in "Criteria for Reclamation Success" in the Reclamation Plan (appendix a), the reclaimed acreage will be deducted from an operator's disturbance cap allocation..." (AR ROD, p. 3)

– "One of the most important principles for successful restoration is to limit initial disturbance through the use of planning, construction control, and adaptive management." (AR ROD, p. A-3)

– "The operators will provide the BLM with an annual report before December 1st for all sites disturbed..." (AR ROD p. A-5) (Note: Date has since been modified to March 1")

– "Reclamation will be considered successful if the following Interim Reclamation criteria are met:
  - 80 percent of predisturbance ground cover
  - 90 percent dominant species
  - No noxious weeds present in the seeding, and
  - Erosion features equal to or less than the surrounding area" (AR ROD, p. A-6)


Anadarko
Petroleum Corporation

# ROD Implementation: Reclamation

◆ What's happened so far:

— Several meetings between BLM and AR operators have been held to discuss reclamation tracking and annual/periodic vegetative monitoring.

— Anadarko and Double Eagle have both completed some preliminary transect monitoring using subcontractors.

— Anadarko has hired a recognized consulting company (Ecosystem Research Group out of Missoula, Montana) to help us explore an alternate "trajectory-based criteria" for reclamation success

— Field level pilots are being conducted/planned to enhance reclamation success



**Anadarko**
Petroleum Corporation

# Anadarko's Reclamation Activity

## ◆ Reclamation for Atlantic Rim areas:

– 700 acres of seed mix is scheduled for application in 2007 (including straw mulch) – weather and wildlife stipulation dependent

– Pilot project: 35 acre plot utilizing Mycorrhizal Inoculant in dry sandy area of Doty Mountain

  • two to three year study, fungi aids in sterile soil environments, possibly branch out to clay/loamy and alkaline/salinity soil areas?

– Applying erosion control points: waddles, silt fencing, mulching, gravel bars on culvert entrance/exits, wing ditches

  • Geared towards soil stability and as an aid to re-vegetation – required in many cases by Storm Water Pollution Prevention measures

– Planting shrub and forbs seed mix as soon as applicable in the first growing season

  • Weed control is focusing on mechanical means (mowing) and spot spraying of chemicals to avoid impacts to desired vegetation planted

– Geodatabase program for disturbance and reclamation success monitoring will be submitted by March 1, 2008



**Anadarko**
Petroleum Corporation

# Reclamation: State-Wide Activity

◆ Anadarko is participating in the following agency and cooperative groups:

– *South Central Wyoming Restoration Council*
  • PAW/BP industry/agency with the three sub work groups: Construction, Weeds and Seeds, Data Entry Management

– *University of Wyoming extension group; Reclamation and Restoration*
  • APC target interest is soil fertility, cooperate with NRCS and appropriate conservation districts-potential student intern project
    – Seed vs. soil compatibility, top soil management, soil amendments and appropriate fertilizer application links

– *Atlantic Rim Reclamation Working Group*
  • Reclamation Standards
    – Appropriate monitoring techniques of soil and vegetation monitoring
    – database and reporting measures
    – Roll over criteria for release purposes, ESD and trajectory tracking proposals

– *Game and Fish Department, private/fee sector of landowners, state lands and Wyoming Livestock Growers Association*
  • restoring western ranges and wild lands with multiple users

– *Wyoming Landscape Conservation Initiative*
  • Science based planning for co-existence of wildlife resources and prudent energy development



**Anadarko**
Petroleum Corporation

# Reclamation Initiatives

- ### Reclamation – Undergoing new developmental stages:

  – *Wyoming BLM Statewide Reclamation Policy- revision to be completed in the next year- early 2009 tentative schedule to update?*

  – *Geo Spatial revisions or implementations proposed by BLM tied Onshore Order #1- awaiting public review and comment period*

**Anadarko**
Petroleum Corporation

Atlantic Rim working Group December 11, 2007
Rawlins, Wyoming
Agenda

1. There is an issue with the current reclamation success criteria. I am proposing a new set of criteria based on ecological site descriptions (ESD). This process is based on soils and precipitation, similar to the current Rawlins proposed seed mix list. It would include the use of a simple monitoring scheme to track trajectory and would include a reclamation "team" to review sites proposed for disturbance cap (interim) or bond release (final).

2. Determine at what state of development a site is released or determined successful at reclamation. For example: specific root depths, x # of years of seed production, species diversity and frequency, etc.

3. Determine what percent forbs, shrubs, grass, bare ground is sufficient for reclamation release based on a system of ESD trajectory or trend.

4. Should fencing be required on all sites?

5. Soil sampling is vital to determining correct ecological site descriptions, should we standardize a simple soil identifying scheme?

Atlantic Rim working Group December 11, 2007
Rawlins, Wyoming
Agenda

6.  How to identify, use and report the ESD used on a site.

7.  Monitoring data base and reporting up date.

8.  Should this group break into sub groups or have one group for all problems
    encountered?



# Ecological Site Descriptions
### as a managment tool

## Understanding and improving applications for wildlife habitat management in sagebrush ecosystems

## October 23 - 25, 2007

Following the workshop, there were many requests for opportunities to view the high quality presentations provided at the workshop. As a result, speaker presentations are now available on-line. Just click on the titles below to review the presentation. We thank the speakers for their efforts at the workshop and their willingness to share their informative presentations.

**Sponsors:** Society for Range Management, Western Governor's Association, Western Association of Fish and Wildlife Agencies, The Wildlife Society

**Background and Purpose:** Widespread loss, alteration and degradation of sagebrush ecosystems have created complex challenges for managers seeking to conserve sagebrush-dependent wildlife species. A half century of research has created a diverse and extensive base of information upon which to plan and implement land management decisions. However, this mass of highly variable technical information has exposed a critical need to develop and use transparent tools for organization and communication of this information in conservation decision-making. Ecological Site Descriptions are one such management tool that potentially could improve our ability to describe and manage sagebrush ecosystems.

The purposes of this workshop are to:

1. Introduce habitat managers, planners and policy makers to the use and development of Ecological Site Descriptions.
2. Encourage interdisciplinary improvement of wildlife interpretations in Ecological Site Descriptions and enhance the utility of this tool for managing sagebrush ecosystems.
3. Identify information gaps and define priorities for research and development.

**Audience:** Western North American land and wildlife/habitat managers, biologists, range ecologists and soil scientists, technical assistance professionals, local sage-grouse working group members, consultants, and petroleum industry land managers.

http://www.rangelands.org/whatsnew.shtml

# From the Atlantic Rim RoD

Areas where "annual" is described.

# DECISION

Page 3

Disturbance acreage will be monitored using geospatial tracking methods. As detailed in appendix B, Operators are required to provide the BLM, within 30 days of approval of this ROD, a map of existing disturbance associated with activities authorized during the period of time when the interim drilling policy was in effect. In addition, "as-built" disturbance will be measured and reported and subsequent reclamation efforts will be monitored, documented, and provided **annually** to the BLM RFO Authorized Officer (AO).

Drilling development and reclamation activities in the ARPA will be managed through a performance-based, adaptive management process as described in appendix B. The process includes a requirement for Operators to submit an **annual operating plan** to the BLM RFO AO. The overall purpose of this process is to meet resource management objectives and ensure Performance Goals are achieved to the greatest extent possible. A monitoring and mitigation process will be required, and its development will begin within 30 days of the effective date of the ROD. This process will be developed by the Review Team (BLM, cooperating and interested agencies, and Operators) and will provide quantifiable criteria to identify trends associated with the Performance Goals. The process will include the types of mitigation responses that will be considered in the event that monitoring data indicate a downward trend relative to the Performance Goals. Throughout the life of the project, monitoring data will be reviewed to determine if mitigation measures are effective and leading to the achievement of reclamation and Performance Goals. The monitoring data will be evaluated on a regular basis (at least **annually**) and best management practices (BMPs), conditions of approval (COAs), protective measures, reclamation criteria, and mitigation measures may be modified, as appropriate, based on the monitoring results. Target dates for **annual plans** and reclamation reporting may vary as needed and approved by the RFO AO.

This decision is not the final review or approval for actions associated with ARNG development. The AO will review and consider each component of the project that involves federal lands or minerals on a site-specific basis. Other reviews or decision points include, but are not limited to, the review of **annual** or multi-year development plans (including transportation plans), Applications for Permit to Drill (APD), right-of-way (ROW) grants, Sundry Notices, or applications for Special Use Permits. To avoid duplicative installations, the transportation plan is required to include the location and size of power lines.

## Wildlife

Page 8

To restore habitat function as soon as possible, this decision implements a performance-based management approach that provides an incentive for rapid on-site interim and final reclamation while simultaneously allowing maximum flexibility in field development. As detailed in the Reclamation Plan (appendix A), the Operators will monitor and evaluate reclamation effectiveness and provide **annual** adaptive management recommendations as appropriate to the BLM for consideration.

## Rangeland and Grazing

Page 10

DRAFT

The Operators must coordinate **annually,** or more often as necessary, with affected livestock operators to discuss: (1) problems encountered during the past grazing season, (2) agreed-upon corrective actions, and (3) planned energy development and operations during the next grazing season. The BLM and Wyoming Department of Agriculture will participate as appropriate.

## Alternative D: Natural Gas Development with Disturbance Limitations (Agency Preferred Alternative)

Page 12

The goal of this alternative is to minimize surface disturbance while optimizing natural gas recovery. **Annual** planning between the Operators and the BLM would be a key component of this alternative. The **annual** planning would require the Operators to submit to the BLM their proposed plan of operation for the forthcoming year. The BLM would then work with the Operators at a site-specific level to minimize surface disturbance by applying the appropriate lease stipulations, conditions of approval, BMPs, and any other measures deemed necessary to minimize surface disturbance and still allow for the recovery of natural gas.

# PLAN, REVIEW, AND APPROVAL PROCESS

Page 16

The planning, review, and approval process for project implementation is described below. This process will typically be initiated by the Operators through an **annual** planning meeting with the Rawlins Field Office Manager, where they will outline detailed development plans for the upcoming year and a conceptual multi-year plan. The BLM (including interdisciplinary team members), cooperating and interested agencies, and the Operators will make up a Review Team to evaluate **annual** and site-specific development proposals and monitoring reports. The review and approval process will include a site-specific visit by the Review Team, applicable environmental review and establishing required BMPs, conditions of approval, or other protective measures to mitigate potential environmental impacts. The review and approval process is illustrated on figure 3.

## The Annual Planning Process

The April 1st date, as proposed by the Operators is open to modification based on results observed and problems encountered. Changes to the date may be proposed by any party, reviewed and commented upon by the companies and cooperators, and approved by the AO. Any date changes will not be effective until approved in writing by the AO. While described as an "**annual**" planning process, this concept is adaptive and open for modification and improvement, including more frequent planning meetings if necessary. The intent of the process is to have future, site-specific development plans for Atlantic Rim be submitted to the BLM for review in a manner that will allow the BLM to capture economies of scale in planning, processing, approving, and involving other cooperating agencies. By receiving development proposals in groups, the Review Team will be able to develop a more holistic view of future development and reclamation progress and success, and more effectively apply mitigations and BMPs to reduce development effects. Proposals should span several years or stages of development and must include the entire proposal including well sites, compressor stations, utility and pipeline corridors, roads, status and success of reclamation efforts for a specific area, and any other disturbances planned and their timing.

Page 18

This decision includes an unreclaimed disturbance cap of 7,600 acres at any time. All Operators must submit to the BLM within 30 days of the effective date of this decision a summary of their

DRAFT

lease holdings and associated mineral acreage. The 7,600-acre disturbance cap will be allocated to Operators on a prorated, mineral leasehold basis. Existing surface disturbance from activities approved under the IDP will count against each Operator's disturbance cap allocation. Past oil and gas development surface disturbance within the ARPA will not count against the disturbance cap. Only new disturbance proposed by the ARPA lease holders or disturbance under the IDP would be eligible for disturbance cap allocation. Only successfully reclaimed acreage (See ROD appendix A, Criteria for Reclamation Success) that was disturbed during the implementation of activities associated with this decision or the IDP will be allocated back to the Operator based on their prorated disturbance cap. Regardless of the number of Operators within the ARPA, the total of all prorated disturbance cap allocations may not exceed 7,600 acres.

## Cooperating Agencies and Interested Stakeholders

Page 18

The Review Team members will be invited to participate in the **annual** planning process and site-specific review process based on their interest, time, and availability. Review Team member participation would be in addition to their separate and independent permitting and approval responsibilities under any other authorities. The BLM is the final decision authority and will set the schedule for meetings, site visits, review periods, etc. When appropriate, Memoranda of Understanding (MOUs) or other applicable inter-agency agreements may be prepared and utilized between the parties to document the extent of participation in the **annual** planning and site-specific review processes.

## Monitoring, Reporting, and Adaptive Management

Page 20

The monitoring, reporting, and adaptive management processes made part of this decision are its key components. As part of the **annual** planning process, a monitoring and mitigation process will be required, and its development will begin within 30 days of the effective date of the ROD. This information should be reviewed at least **annual**ly with development plans modified based on those plans. The purpose of monitoring is to assess the status of the Performance Goals, measure and detect trends, or detect any other undesired effects. Monitoring will also be used to assess the effectiveness of reclamation efforts and any approved mitigation measures.

# Reclamation

Page A-1

- **Annual** monitoring and control of invasive and noxious weeds beginning the first season of disturbance;

Page A-2

- Monitoring and management of reclamation sites to evaluate weed populations, reclamation success, and to plan and report on the program **annually**; and

## 1.3 Reclamation Standards and Principles

Page A-3

One of the most important principles for successful restoration is to limit initial disturbance through the use of planning, construction control, and adaptive management. Restoration planning should start before disturbance and be an integral part of the operational plan. Consideration of the processes necessary for successful reclamation is important. Predisturbance surveys, site stabilization, weed control, and maintenance of healthy soils are important considerations. Revegetation that considers vegetative succession to pre-disturbance vegetative conditions, with **annual** monitoring and reporting, will allow tracking of success and

DRAFT

adaptive management of problem areas. **Annual** monitoring and reporting, will allow tracking of success and adaptive management of problem areas.

Page A-5

If the treatment area is found to be successfully reclaimed, the site will be checked for reclamation success at least **annually** for at least five seasons. The site will also be checked for additional management needs including weed infestations and control needs.

## 1.4 Monitoring and Reporting Disturbed Sites

Page A-5

The operator will provide the BLM with an **annual** report before December 1st for all sites disturbed. The report will include:
• Copies of the completed individual site review forms or a BLM-approved electronic report.
• A summary of monitoring data and results that include:
o Identification of monitoring by year;
o Individual site reclamation monitoring reporting data (table A-1);
o Identification of sites successfully reclaimed by reclamation years (starting with the first growing season);
o Identification of sites needing additional work/more reclamation activities;
o Sites proposed for the end of monitoring, i.e., sites that were successfully reclaimed.
• A BLM-useable shapefile(s) or Geographic Information System (GIS) layer(s) that details location, name, type, and extent of:
o New disturbances,
o Unreclaimed disturbances,
o New reclamation,
o Failed or unsuccessful reclamation,
o Locations of noxious/invasive weed infestation, and
o Further vegetation treatments planned (e.g., mulching, matting, and weed control).
o  On these shapefiles or GIS layers, *location* shall be given as the legal location and geo-referenced
o  location of the site; *name,* as the BLM Application for Permit to Drill (APD), lease, or
o  other BLM file name for the site; and *extent,* as the amount of area and location of the item.

# 2 Criteria for Reclamation Success

Page A-6

Reclamation will be considered successful if the following Interim Reclamation criteria are met.
• 80 percent of predisturbance ground cover,
• 90 percent dominant species*,
• No noxious weeds present in the seeding, and
• Erosion features equal to or less than the surrounding area.
*The vegetation will consist of species included in the seed mix and/or occurring in the surrounding natural vegetation or as deemed desirable by the BLM in review and approval of the reclamation plan. The goal is no single species will account for more than 30 percent total vegetative composition. Vegetation canopy cover production and species diversity shall approximate the surrounding undisturbed area.
Section 1.3.1 of this appendix indicates that reclamation success will be tracked by each discrete site for which an individual reclamation plan was prepared. A site can be nominated for successful reclamation status by the Operators or the BLM any time it meets the criteria for reclamation success as outlined above. A site will be considered reclaimed and the Atlantic Rim

DRAFT

disturbance acreage count reduced by the extent of the reclaimed acreage when a BLM authorized officer accepts the written nomination. Partially reclaimed discrete sites will not have any reclaimed acreage subtracted from the disturbance acreage count. The Atlantic Rim disturbance cap is 7,600 acres at any one time.

The BLM RFO will maintain a running count of the extent of surface disturbance acres based on the "as built" geo-spatial monitoring data submitted by the companies **annually** for the preceding year in December after construction. An **annual** summary report of the disturbance acreage count will be available to the companies and the public upon written request. For a project-wide-type reclamation plan (per section 1.3.1 of this appendix), each individual site disturbance included in the plan will be managed as a discrete site and disturbance acreage will be tracked as detailed above.

## Land Use/Surface Disturbance

Page B-4

4. Operators will track surface disturbance acreage (including total disturbance and successful interim reclamation) and provide BLM with Federal Geographic Data Committee (FGDC)-compliant metadata and geographic information system/global positioning system (GIS)/(GPS) showing the "as-built" location data for all newly developed facilities and reclaimed areas **annually** no later than December of each year based upon successful reclamation (appendix A, Reclamation Plan).

5. Within 30 days of approval of this ROD, Operators will provide BLM with a map of the existing disturbance associated with activities authorized as part of the interim drilling policy. This map will serve as the baseline level of disturbance and will be updated **annually**.

6. By April 1 of each year, Operators will provide the BLM RFO **annual** operating plans for the following year that include the following information:

Page B-5

a. All previous year activity to include number of wells drilled; total new surface disturbance by well pads, roads, and pipelines; and current status of all reclamation activity and
b. Plan of Development for the upcoming year, along with conceptual, multi-year development plans to include planned number of wells to be drilled and an estimate of new surface disturbance and reclamation activity.

**Schedule for Atlantic rim Working Group meeting 03-07-2008**

**Rawlins BLM Office 1300 N. Third Street Rawlins, Wyoming**

**10:00-4:00**

**Reclamation Working Group Discussion**

1. Brief overview of last meeting (Stonesifer)
2. Acceptable weed limits/types (noxious, invasive, common) (Stonesifer, group discussion)
3. Soil survey parameters, several simple soil testing techniques, and the number of samples that would be appropriate for guiding reclamation. (Williams, Foley)
4. Discuss interim, final and abandonment reclamation needs, goals, objectives. How long should monitoring continue to insure weeds are controlled and short term release is actually contributing to ecologically successful reclamation?
5. Assigning % shrubs, forbs, grasses, bare ground and what might constitute vegetation establishment. How long should monitoring continue to insure weeds are controlled and short term release is actually contributing to ecologically successful reclamation? (group discussion)
6. What conditions make a plant viable? What are the short term indicators of long term reclamation success and what constitutes stability of a site (group discussion)
7. Monitoring and reporting (standard protocol, timing, duration, intensity, frequency) .
8. Fencing types, criteria, wildlife issues when used for reclamation (WDGF, group discussion)
9. Mining reclamation (lessons learned, reclamation requirements)
10. Veg-Spec
11. Present new BLM Wyoming State Reclamation Policy to group if ready (Tom Lahti Wyoming State office)
12. Open discussion (group discussion)

**Based on numerous studies on a variety of plant communities around the western United States, we know that hydrologic cover must be at least 70 percent to reduce runoff from rainfall and to protect soils from erosion.   Landscape Stability Indicators for Sagebrush Steppe Ecosystems (Savory Cr. Wyoming)**

*by Bruce P. Van Haveren, Ph.D., Senior Scientist, National Science and Technology Center*

Hydrologic cover1 provides a good index of site stability. It is inversely related to runoff potential, in that a high hydrologic cover value would indicate low runoff potential. According to Packer (1951), reduced cover (vegetation and litter) and large bare openings are indicative of low site stability and high erosion potential. Hydrologic cover was quite stable over the 14 years of observations, ranging from 58 to 62 percent, and exhibiting a coefficient of variation of 34 percent. By comparison, bare ground ranged from 21 to 28 percent(79-72% ground cover), with a coefficient of variation of 43 percent. A strong inverse relationship (r = -0.82) existed between bare ground and hydrologic cover.  Ground cover at Stratton was remarkably stable over the 14-year measurement period, in spite of a significant drought event during 1976 77. Hydrologic cover exhibited a low variability during the measurement period and should be evaluated further as a potential indicator of landscape stability and ecological condition.

### Ground Cover Dynamics in a Sagebrush Steppe Community

*by Bruce P. Van Haveren, Ph.D., Senior Scientist*
*BLM, National Science and Technology Center*

Atlantic Rim Working Group

Meeting Notes from December 11, 2007

Rawlins, Wyoming

This was the first meeting of the Atlantic Rim Working Group. Many topics were discussed with no decisions made. However, assignments were made to collect additional information for the next meeting in early March. We also need to identify and include land owners in this area and possibly others. An agenda was passed out and loosely followed. A copy of all hand outs, agendas and meeting notes will be compiled and stored at BLM, Rawlins field office by group lead Skip Stonesifer. The processes and procedures this group will use for making decision, suggestions and advancing concerns to the review team and BLM is an iterative process based on adaptive management and still in the process of development.

1) Explained that current reclamation criteria as it appears in the Atlantic Rim Record of Decision (ARROD) may not be the best approach. The BLM and other state and federal agencies are moving forward with the use of NRCS Ecological Site Descriptions (ESD) as a basis for all ecological data collection, analysis and resource management planning. The process in Wyoming is not as complete as some states but should be further developed over the next couple years.

   a) Handed out copies of a local ESD. Also gave website for recent conference on ESD development, http://www.rangelands.org/whatsnew.shtml   scroll down to the portion on ESD's. BLM,s plan in this context is to use ESD's as a basis for reclamation. ESD's are determined by ecological factors, think of them in the form of a pyramid with parent material and soil making the base and as we rise up the pyramid plants and animals, climate and topography come into play. "An ecological site is an area of land with specific physical characteristics that differs from other kinds of land in its ability to produce a distinctive kind and amount of vegetation and to respond to management" (Fee Busby, USU). Plant selection for reclamation would be based on the Rawlins proposed seed mix. This seed mix was developed based on soil and precipitation zones and selecting seed species that are commercially available and fit the appropriate ESD. No decision was made to adopt this methodology; however, it seems the only logical alternative, based on site specific conditions and known site potential.

1) We went over a number of issues with no definitive answers agreed upon. For example; what percent of bare ground, % forbs, shrubs, and grasses are sufficient for reclamation success? What state of development is sufficient for reclamation success? These questions were not answered and we as a group need to scour existing literature, to come up with the best answer for these questions, than test them in the field.

2) A question was asked about how BLM can use adaptive management to make changes to the ROD. An answer was given that we should work as a group to improve the ROD and make

group decisions that are well documented. In addition, on page three of the ROD the second paragraph reads "Adaptive management techniques will be used to correct any deficiencies and modify reclamation criteria as necessary" and p.18, Par.3 "The BLM is the final decision authority and will set the schedule for meetings, site reviews, review periods etc.."

3) We had a discussion on the importance of weed control, how chemical reactions can differ with different soil types and herbicides, it is vital to plant into weed free seed beds and to closely control seeding depths. We discussed the issue of acceptable weed limits with no determinations made.

4) We also discussed wildlife stipulations. Exceptions are made for reclamation based on site specific situations. Exceptions are not to be used in place of proper planning. A question was raised about arranging timing stipulations to include room for exceptions when for example, a window of opportunity presents itself for late fall or winter planting that may be more beneficial for the development of some vegetative species. With proper planning and close coordination this is a possibility if everything lines up.

5) What conditions make a plant viable? What are the short term indicators of long term reclamation success and what constitutes stability of a site? Suggested setting up a pilot project to answer some of these questions and to determine scientifically based standards.

6) Industry noted some positive advancements used this past year to reduce the disturbance footprint by burying pipe and power lines in the road prism, reclaiming pits in the same season as drilling, not blading flatter pad locations, blading only portions of pads and being on site for only five days.


Assignments:

- Steve Williams U.W., Susan Foley BLM tasked with identifying soil survey parameters, several simple soil testing techniques, and the number of samples that would be appropriate for guiding reclamation.
- Jeff Beck U.W., Tim Woolley WG&F, Skip Stonesifer BLM, Ben Toole BLM are tasked with searching literature etc. to find a good basis for assigning % shrubs, forbs, grasses, bare ground and what might constitute vegetation establishment.
- Tim Woolley, fencing types, criteria, wildlife issues etc.
- Skip Stonesifer - Present new BLM Wyoming State Reclamation Policy to group
- Next meeting first week of March 2008 – need best dates from group. March 3, 4, 5, 6, 7? Respond to Skip.

Atlantic Rim Reclamation Working group

Meeting Notes; March 7,2008

Attendance: Skip Stonesifer, Corey Loveland, Steve Williams, Susan Foley, Larry justensen, j Shehan, Chris Herold, Jeff, Schweighart, Marcell Astel, Melanie Gilbert, Ben Toole, Tom Lahti, Laura Gianakos

Reviewed minutes from last meeting; 12/17/07.

Reviewed topic on weeds. Spoke mostly about invasive weeds since noxious weeds are well covered and must be promptly treated. A point was raised that BLM can request that a species be added to the county lists. Another question/concern was raised about entering areas that already have a heavy and preexisting invasive weed problem (Dad sheep grounds). This preexisting condition makes reclamation to standards difficult due to weed treatments while trying to grow forbs and shrubs.

Tom Lahti brought up the point that BLM and Industry are partners in this endeavor and when Industry wants to enter this type area it is presumed it will be reclaimed, this is part of industries responsibility. There was discussion that perhaps these areas, once identified as low reclamation potential, and the site potential identified, could have a lower standard, for example, no weeds – only grasses planted – this would control weeds and the site is essentially in better condition than when disturbed. Shrubs and forbs could be added at a later date once weeds are controlled. This strategy would allow industry release from disturbance cap worries in the short time but still lead to full reclamation over time.

We also spoke of the need for standardized monitoring protocols to track reclamation trajectory over time. Trajectories would track percentage of bare ground, weeds, forbs, grass, shrubs, litter etc. and can be graphed to track progress over time. Standardization and annual reporting would show due diligence by Industry and allow comparison of reclamation between areas and across landscapes.

We also discussed methods for using ESD's to identify site potential, then by using the appropriate seed mix (Rawlins approved seed mix) to closely mimic the potential vegetation from the ESD. Reclaim with seed from the Rawlins mix and use the percentages from the ESD as a reclamation goal for that site. For example, use the ESD to identify the site potential as: of the available vegetation composition should include, 65% grass – 15 % forbs and 20% shrubs, use available species from the Rawlins mix in the appropriate proportions and diversity to reclaim site. For example, we could require (x) number of grass species as part of the 65% grass requirement etc.

Tom Lahti (BLM State Office) presented Draft State reclamation policy.

Steve Williams (University of Wyoming) presented soils information and demonstrated a simple field soil kit that can be used to identify soil characteristics that will be required for the March 2009 reclamation reporting cycle.

A suggestion was made that time be set aside during the week of the summer Government/industry meeting to have a training and possibly have kits available for purchase. Also during same week, offer reclamation monitoring training.

Laura Gianakos briefly mentioned an upcoming, cross training effort within BLM and to include industry. The idea is to share views across disciplines on potential problems, searching for compliance and common solutions (more on this to come).

A question was asked on the possibility of offering levels of reclamation success. The ROD state sites will be tracked as discrete sites and released as such partial reclamation will not have reclamation acres removed from the cap. It was also mentioned that sites can be put back on disturbance cap if they fail to continue meeting success criteria.

Reclamation goals are intentional activities that initiate or accelerate the recovery of an ecosystem with respect to its health, integrity and sustainability including quickly stabilizing disturbed areas to protect both disturbed and adjacent undisturbed areas from unnecessary degradation.

The goal of the Atlantic Rim Working Group is to develop a scientifically defensible, economically feasible, monitoring and reporting protocol that supports and documents the activities leading to successful and sustainable reclamation.

The time line for achieving this goal is to have a plan in place for the spring of 2008. It will than take several years of testing to insure that the reclamation monitoring protocols are achieving the desired goal.

Benefit The data will enable the operators to know, prior to site disturbance, what vegetation characteristics are necessary to achieve reclamation success and bond release, and which management treatments will have the greatest probability of achieving success, along with the expected time to success

Objectives

1. Quantify the ecological characteristics that constitute 'equal or better' habitat quality for the different Ecological Site Descriptions (ESD) found in the study area.
2. Determine site-specific (by ESD) management treatments, that will expedite the re-vegetation of the disturbed sites to productivity levels and wildlife values that are equal to or better than before disturbance.
3. Develop robust and repeatable methods to monitor reclamation progress and to detect when the long-term stability of the disturbed sites is achieved.

<u>Consequences of poor or inadequate reclamation</u>, could include added conditions of approval to Applications for Permits to Drill (APDs), Increased wildlife stipulations, higher costs to industry for weed treatment and re-seeding efforts, inability to meet disturbance caps, erosion and water quality issues, reduction of forage for livestock, wildlife habitat reduction, additional ESA listings, poor public perceptions.

Comments and suggestions from the material presented during this meeting due March 17th.