UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| THEODORE ROOSEVELT CONSERVATION PARTNERSHIP, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil No. 1:07-cv-01486-RJL |
| DIRK KEMPTHORNE, in his official capacity as the Secretary of the United States Department of the Interior, and UNITED STATES BUREAU OF LAND MANAGEMENT, | ) ) ) ) ) | |
| Defendants. | ) ) | |
| ANADARKO PETROLEUM CORPORATION, WARREN RESOURCES, INC., and DOUBLE EAGLE PETROLEUM CO., and STATE OF WYOMING, | ) ) ) ) ) ) | |
| Defendant-Intervenors. Defendants. | ) ) | |

**FEDERAL DEFENDANTS' REPLY IN SUPPORT OF MOTION
FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    A.      BLM Complied With NEPA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

          1.      BLM Considered a Range of Reasonable Alternatives . . . . . . . . . . . . . . 1

          2.      BLM Adequately Examined Alternatives in the Eas . . . . . . . . . . . . . . . . 5

          3.      The FEIS Contains a Reasonably Complete Discussion
                 of Mitigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

          4.      BLM Is Not Required to Consider Hypothetical Wind
                 Development Projects . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

          5.      BLM Adequately Discussed Baseline Information
                 for Mule Deer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

          6.      BLM Did Not Violate NEPA by Irretrievably Committing
                 Resources Prior to Finalizing the Rawlins RMP . . . . . . . . . . . . . . . . . . . 14

    B.      BLM Complied With FLPMA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

          1.      The Protections for Sage-Grouse Imposed by the Atlantic
                 Rim Project ROD are Consistent with the Great Divide RMP . . . . . . . . 21

          2.      BLM Did Not Violate Plan Requirements for Big Game . . . . . . . . . . . . 23

          3.      Plaintiff's Claim that the Action Violates RMP Objectives
                 Is Non-Justiciable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

## TABLE OF AUTHORITIES

### CASES

Biodiversity Conservation Alliance v. BLM, 404 F. Supp. 2d 212
(D.D.C. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 6

Cabinet Mountains Wilderness/Scotchman's Peak Grizzly Bears v. Peterson,
685 F.2d 678 (D.C. Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Chevron, U.S.A., Inc. v. Natural Res. Def. Council, 467 U.S. 837 (1984) . . . . . . . . . . . . . . . . 18

Citizens Against Burlington, Inc. v. Busey, 938 F.2d 190 (D.C. Cir. 1991) . . . . . . . . . . . . . . 2, 3

City of Alexandria v. Slater, 198 F.3d 862 (D.C. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Davis v. Latschar, 202 F.3d 359 (D.C. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Doe v. Rumsfeld, 297 F. Supp. 2d 119 (D.D.C. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Environmental Law and Policy Center v. U.S. Nuclear Regulatory Comm'n,
470 F.3d 676 (7th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Friends of Mt. Hood v. U.S. Forest Serv., 2000 WL 1844731 (D. Or. Dec. 15, 2000) . . . . . . . . 13

Friends of Yosemite Valley v. Norton, 348 F.3d 789 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . 13

Gaule v. Meade, 402 F.Supp.2d 1078 (D. Alaska 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Hammond v. Norton, 370 F. Supp. 2d 226 (D.D.C. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Headwaters, Inc v. BLM, 893 F.2d 1012 (9th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Marsh v. Or. Natural Res. Council, 490 U.S. 360 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Mount Royal Joint Venture v. Kempthorne, 477 F.3d 745 (D.C. Cir. 2007) . . . . . . . . . . . . . . 19

Natural Fuel Gas Supply Corp. v. FERC, 468 F.3d 831 (D.C. Cir. 2006) . . . . . . . . . . . . . . . . 16

Northern Cheyenne Tribe v. Norton, 503 F.3d 836 (9th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . 20

Northern Plains Resource Council, Inc. v. BLM, 298 F. Supp. 2d 1017
(D. Mont. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Norton v. Southern Utah Wilderness Alliance, 542 U.S. 55 (2004) . . . . . . . . . . . . . . . . . . passim

NRDC v. Kempthorne, 525 F. Supp. 2d 115 (D.D.C. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . passim

Ocean Conservancy v. Gutierrez, 394 F. Supp.2d 157 (D.C. Cir. 2005) . . . . . . . . . . . . . . . . . . 23

ONRC Action v. BLM, 150 F.3d 1132 (9th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Public Citizen, Inc. v. U.S. Nuclear Regulatory Comm'n, 940 F.2d 679
(D.C. Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Robertson v. Methow Valley Citizens Council, 490 U.S. 350 (1989) . . . . . . . . . . . . . . . . . . . . . 5

Rocky Mountain Oil and Gas Ass'n v. Watt, 696 F.2d 734 (10th Cir. 1982) . . . . . . . . . . . 19, 20

Sierra Club v. Peterson, 717 F.2d 1409 (D.C. Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Southern Utah Wilderness Alliance v. Norton, 237 F. Supp. 2d 48
(D.D.C. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4, 8

Van Abbema v. Fornell, 807 F.2d 633 (7th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Western Watersheds Project v. BLM, 552 F. Supp. 2d 1113 (D. Nev. 2008) . . . . . . . . . . . . . . 13

## STATUTES

43 U.S.C. § 1702 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

43 U.S.C. § 1732 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

## REGULATIONS

40 C.F.R. § 1506.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

43 C.F.R. § 1610.2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

43 C.F.R. § 1610.5-2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

iii

The record shows that BLM's decision to authorize the Atlantic Rim project and the Sun Dog and Catalina Plans of Development (POD) is supported by the Final Environmental Impact Statement (FEIS), supporting documentation in the extensive administrative record, and two environmental assessments. What is at stake here is development of clean burning natural gas that will help reduce our Nation's dependence on foreign energy sources. While there are costs associated with such development, including impacts on wildlife to which Plaintiff objects, BLM chose an alternative that reduces the operational footprint in order to minimize surface disturbance and therefore impacts on wildlife. ROD at 4-5 (AR 4799-80). It took a hard look at the impacts of that decision, as the National Environmental Policy Act (NEPA) requires. And, while Plaintiff would plainly prefer that BLM had chosen an alternative that favors its interests, BLM's decision complies with the Federal Land Policy and Management Act (FLPMA), which charges BLM with the complicated task of balancing conflicting multiple uses. BLM is entitled to summary judgment.[1]

## ARGUMENT

### A.     BLM Complied With NEPA
#### 1.     BLM Considered a Range of Reasonable Alternatives

Plaintiff argues at length in its reply that BLM unreasonably rejected a phased development alternative, but completely fails to address the dispositive point discussed in our opening brief: BLM fully evaluated phased development in the draft EIS. The purpose of an analysis of

---

[1] Plaintiff argues that the Court should not find that it waived several arguments by failing to raise them in its comments on the FEIS, including discussions of a variety of cases from other Circuits. Plf's Reply at 21-24. But, the Court need only consider the cases we cited in our brief, Biodiversity Conservation Alliance v. BLM (BCA) 404 F. Supp. 2d 212, 219 n.6 (D.D.C. 2005), citing DOT v. Pub. Citizen, 541 U.S. 752, 764 (2004) ("party 'forfeited any objection to the EA on the ground that [the agency] failed to adequately discuss potential alternatives' where the alternative was not identified in the party's public comment.") Id. Plaintiff's generic complaints, AR 10262-63, were not enough to alert the agency that Plaintiff had specific concerns relating to the issues it challenges here. Plaintiff argues that the Court should consider the arguments because they were raised by other parties, but the documents they cite do not support their contention. Plf's Reply at 23-24.

alternatives is to ensure that the agency is informed about the consequences of its decision to move forward with a particular course of action. Hammond v. Norton, 370 F. Supp. 2d 226, 241 (D.D.C. 2005) ("All that NEPA requires is that the agency weigh all reasonable alternatives and come to a fully-informed decision."). It is entirely undisputed that the direct, indirect and cumulative impacts of phased development were analyzed in detail in the draft EIS. See BLM SJ Br. at 15. Plaintiff also ignores Davis v. Latschar, 202 F.3d 359, 368 (D.C. Cir. 2000), likely because the case compels dismissal of its claim, but in Latschar, the D.C. Circuit upheld the agency's evaluation of alternatives based on its "review of both the draft EIS and the final EIS." It found that review of the reasonable alternatives in the two EISs resulted in a "fully-informed decision. This is all that NEPA requires." Id. BLM is therefore entitled to summary judgment on this issue.[2/]

Plaintiff's argument that BLM failed to consider an appropriate range of alternatives is founded entirely on the notion that BLM gave too much weight to the objectives of the project applicants in making the decision not to carry forward the phased development alternative in the FEIS. Plaintiff parenthetically quotes a Seventh Circuit decision, Environmental Law and Policy Center v. U.S. Nuclear Regulatory Com'n, 470 F.3d 676, 683 (7th Cir. 2006), for the proposition that an agency must "look at the general goal of the project rather than only those alternatives by which a particular applicant can reach its own specific goals." Plfs. SJ Br. at 28. But, that interpretation of NEPA was specifically rejected by the D.C. Circuit in Citizens Against Burlington, Inc. v. Busey,

---

[2/]Plaintiff essentially abandons its argument that BLM did not consider a reasonable range of alternatives, relegating it to a single footnote that simply re-argues what it said in its opening brief. We explained in detail that BLM thoroughly evaluated five alternatives in the draft and final EISs, each of which had a different purpose and different impacts. Plaintiff's cursory repetition of the claim that the alternatives are "substantially similar," Plf's Reply at 26 n.11, is demonstrably false, and BLM is entitled to summary judgment. Compare, e.g., FEIS at 2-8, ROD at 12 (AR 2156, 4807) (showing alternative D reduces disturbance to 7,600 acres and imposes additional mitigation and special protections for wildlife populations) and operator's proposed action (total surface disturbance at any one time to 15,800 acres). FEIS at 2-14-2-15 (AR 2162-63); see also FEIS at 2-10--2-11 (AR 2158-59) (comparing alternative C to proposed action and alternative D).

938 F.2d 190 (D.C. Cir. 1991).[3]  In this Circuit, NEPA requires an agency "to consider an applicant's wants" when it defines the goals of the proposed action.  Id.  Plaintiff attempts to distinguish Citizens Against Burlington by arguing that the project "arises first and foremost from BLM's management of the public lands -- not the Operators' desire to produce oil and gas." Plf's Reply at 28-29.  This argument would swallow the distinction because at bottom, every action an agency takes arises out of its management of whatever it has the statutory responsibility to manage; in Citizens Against Burlington, it was the FAA's management of airports, here it is BLM's management of the public lands.  Unsurprisingly, Plaintiff fails to support its claim.  Contrary to their argument, the FEIS makes clear that the proposal stems from oil and gas operators' interests in developing their leases.  FEIS at 1-7 (AR 2134).

Plaintiff also relies heavily on Southern Utah Wilderness Alliance v. Norton, 237 F. Supp. 2d 48, 53 (D.D.C. 2002), as support for its claim that BLM gave undue weight to the operators' objectives, but the case is inapposite.  Plf's Reply at 27-28.  In Southern Utah, there was no record support for the agency's claim that it was not required to consider a particular alternative, and the court considered the argument to be a post hoc rationale that relied on the "admittedly self-serving statements of the project applicants."  237 F. Supp. 2d at 53.  Further, the court held that the record "gives no indication" whether a different alternative "might at least have minimized the damage."  Id.  In contrast, here, the phased development alternative was addressed in detail in the draft EIS.  Thus, because "the record reflected careful consideration of the alternatives by BLM and a reasoned

---

[3] The plaintiff in Citizens Against Burlington also relied on a Seventh Circuit decision, Van Abbema v. Fornell, 807 F.2d 633 (7th Cir. 1986), to make the same argument Plaintiff makes here: that "'the evaluation of "alternatives" mandated by NEPA is to be an evaluation of alternative means to accomplish the general goal of an action; it is not an evaluation of the alternative means by which a particular applicant can reach his goals.'" 938 F.2d at 198, quoting Van Abbema, 807 F.2d at 638.  The D.C. Circuit held that the Van Abbema contained "two critical flaws," because it misconstrued NEPA and improperly interjected the courts in the process of defining alternatives.  938 F.2d at 199.

rejection" for an infeasible alternative, "no judicial intervention [is] warranted." Id.

Plaintiff wrongly argues that BLM blindly deferred to the oil and gas companies' interests, and that "the only evidence Federal Defendants can cite in support of BLM's decision to drop [the phased development alternative] is in the ROD itself." Plf's Reply at 27, 28. The fact that BLM discussed in the ROD its reasons for eliminating the phased development alternative by itself distinguishes this case from Southern Utah. Further, contrary to Plaintiff's argument, the record shows that BLM did independently evaluate in the FEIS whether the oil and gas companies' contentions that phased development would unduly constrain oil and gas development were correct. Plaintiff does not dispute that, as we explained in our opening brief, nearly half the project area falls into a "checkerboard ownership pattern" where federal and private/state lands alternate. FEIS at 2-13, ROD at 14 (AR 2161, 4809). The phased development alternative would have restricted development activities to one of three zones, and put the other two off limits for 7 or 14 years, resulting in extended development delays. FEIS at 2-12--2-13 (AR 2160-61). "Phased development was considered but eliminated from detailed consideration due to the legal and economic conflicts that arise from a phased approach. . ." FEIS at O-8 (AR 4404). Plaintiff also repeats the same argument it made in its opening brief that the phased development alternative is consistent with the purpose and need because in internal discussions during preparation of the draft EIS BLM staffers identified its various benefits. Plf's Reply at 25-26. But, it continues to disregard that, notwithstanding any benefits, BLM had a reasonable basis for eliminating it from the FEIS. Plaintiff also ignores that BLM carried over Alternative B's emphases on adaptive management and reclamation into Alternative D. BLM SJ Br. at 16 n.5. The "preferred alternative is a combination of Alternatives B and C." FEIS at O-383 (AR 4778).

It is unclear what else Plaintiff expected BLM to do to verify the operators' claims that the

phased development alternative would hinder development.[4] It is undisputed that putting two zones off limits to development would result in lengthy delays. In addition, as explained in the draft EIS, oil and gas operators own leases on state and private lands, and BLM has no control over development on those lands. AR 1774. While impacts from federal development might be limited to one zone, as a practical matter impacts would still occur from non-federal development going on in other zones, which could also result in drainage of federal resources and loss of royalties. Id. BLM properly concluded that Alternative B would cause "long delays," and was also contrary to its policy of allowing reasonable access to mineral development on state and private lands. ROD at 14 (AR 4809). While BLM properly took into account the oil and gas operators' goals, it also it factored in the need to impose protections for wildlife and other resources. Likewise it properly considered Congress' expressed intent as to the importance of developing CBNG, and the need to expedite development in order to meet rapidly growing demand. FEIS at 1-9 (AR 2136).

## 2.    BLM Adequately Examined Alternatives in the EAs

Plaintiff argued in its opening brief that BLM violated NEPA when it approved the Sun Dog and Catalina PODs because it considered only the applicants' proposal and the no action alternative.[5] Plfs. Br. at 16. We showed that consideration of only two alternatives in an EA is acceptable, and the cases that Plaintiff cited were inapposite. BLM SJ Br. at 17-18. Plaintiff does not dispute the point. Instead, it simply re-states its conclusory assertion that BLM's analysis of

---

[4] Plaintiff mixes NEPA and FLPMA concepts with its argument that BLM violated NEPA because its ignored competing duties under FLPMA. Plf's Reply at 26, n.12; 29-30. NEPA does not mandate particular results or impose substantive environmental obligations upon federal agencies. See Robertson v. Methow Valley Citizens Council, 490 U.S. at 350-51 (1989); Marsh v. Or. Natural Res. Council, 490 U.S. 360, 371 (1989).

[5] Plaintiff also argued in its opening brief that BLM violated FLPMA because it failed to implement stricter protections in its POD decisions. Plfs. SJ Br. at 40-41. It abandons that argument in its reply and BLM is therefore entitled to summary judgment.

alternatives was inadequate because it did not examine some unknown alternative "involving less intense development or more aggressive sage grouse protections."  Plf's Reply at 42.  And, it now charges that BLM violated NEPA because it modified the alternative proposed by the operators to include mitigation making the development more protective of wildlife, although Plaintiff again does not support the assertion.  Id. at 43.

The Court should not penalize BLM for requiring the operator to modify its original proposal.  There are only a limited number of feasible ways for oil and gas development on a particular lease to be carried out.  Cf. Biodiversity Conservation Alliance v. BLM, 404 F. Supp. 2d 212, 218 (D.D.C. 2005).  If Plaintiff believed that there was another feasible alternative that BLM should have considered, it had the obligation to raise that issue during the public participation process, and it did not.[9]  Id. at 219 n.6.  Contrary to Plaintiff's assertion that "the controversial issues surrounding sage grouse have been ignored," Plf's Reply at 43, we explained in our opening brief that BLM conducted on-site examinations of the proposed development and modified the footprints for the approved PODs in order to resolve resource conflicts.  BLM SJ Br. at 18-19.  Project facilities were moved to minimize sage grouse conflicts, to resolve prairie dog conflicts and to protect other resources.  BLM added conditions of approval to the Sun Dog A and B POD, including seasonal restrictions on development to protect wildlife (AR 74082-83), cultural/archaeological monitors during construction (AR 74084-85), the addition of culverts and drainage control structures

---

[9] Plaintiff attempts to excuse its failure to submit comments on the Sun Dog A and B and Catalina POD decisions by arguing that it requested State Director review for the former and reasonably expected that it would be "stonewalled" if it had attempted to submit comments for the latter.  Plf's Reply. at 24.  But, what the record actually shows is that TRCP sat on its rights and submitted no comments on the Sun Dog A and B EA, and then challenged the decision by requesting State Director Review after the NEPA process was complete.  See Plfs. SOF at ¶ 228 (petition filed September 14, 2007); AR 74073 (decision made August 16, 2007).  Contrary to Plaintiff's assertion that BLM would stonewall their efforts, the record shows that when it did participate in the NEPA process, BLM considered and responded to its comments.  AR 75187.

(AR 74085-86) and the modification of engineering designs. AR 74086. Plaintiff's argument that

BLM failed to consider a reasonable range of alternatives should be rejected.[7]

### 3.    The FEIS Contains a Reasonably Complete Discussion of Mitigation

Next, Plaintiff argues that BLM's adaptive management plan violates NEPA. According to

Plaintiff, "[t]he question presented is whether mitigation measures must be clearly delineated when

BLM affirmatively adopts a mitigation plan under NEPA expressly for the purpose of mitigating the

adverse impacts of oil and gas development on the public lands." Plf's Reply at 30-31. In its

opening brief, Plaintiff relied on Ninth Circuit caselaw to argue that BLM's adaptive management

plan violated NEPA. In its reply, Plaintiff inexplicably continues to ignore controlling precedent

from this Circuit and instead cites irrelevant cases from the Eleventh and Fifth Circuits. Id. at 31.

The Court should summarily reject these arguments.[8] First, Plaintiff continues to disregard that this

Court has already explained the appropriate standard pursuant to which courts in this Circuit should

address mitigation. In NRDC v. Kempthorne (NRDC I), 525 F. Supp. 2d 115, 121 (D.D.C. 2007),

the Court stated that "NEPA . . . does not require agencies to discuss any particular mitigation plans

---

[7] Plaintiff argued in its opening brief that BLM violated NEPA because the Sun Dog and Catalina EAs tier to an inadequate EIS, allegedly because BLM failed to consider the cumulative impact of granting waivers and exemptions from wildlife proscriptions. Plfs. Br. at 29. We explained in our response that the argument was without merit. BLM SJ Br. at 34-35. Plaintiff fails to respond to our explanation, and the Court should therefore conclude its argument was without merit.

[8] Plaintiff parenthetically cites C.A.R.E. Now, Inc. v. FAA, 844 F.2d 1569 (11th Cir 1988) and Louisiana v. Lee, 758 F.2d 1081 (5th Cir. 1985). Plf's Reply at 31. It asserts (though it fails to support the assertion) that "there is no basis for concluding the same standard should not apply" to an EIS. Id. at 31 n.15. But, Plaintiff ignores the fact that in the case of a mitigated finding of no significant impact (FONSI), the agency relies on mitigation to make preparation of an EIS unnecessary, and the courts therefore apply different standards to their evaluation of a mitigated FONSI. Further, Plaintiff again ignores controlling law from this Circuit. In Cabinet Mountains Wilderness/Scotchman's Peak Grizzly Bears v. Peterson, 685 F.2d 678, 682 (D.C. Cir. 1982) (upon which C.A.R.E. Now, Inc relied), the court set forth a four part test for evaluating an agency's decision not to prepare an EIS. 685 F.2d 681-82. The fourth prong considers mitigation imposed on the proposal. Id. at 682. The test is inapplicable where an EIS has been prepared.

that they may put in place" nor does it "require agencies--or third parties--to effect any." Citing

Citizens Against Burlington, 938 F.2d at 206; Southern Utah, 237 F. Supp. 2d  54.  As the D.C.

Circuit observed in evaluating mitigation strategies in City of Alexandria v. Slater, 198 F.3d 862,

870 (D.C. Cir. 1999), while the appellees might prefer a "comprehensive plan" setting forth

mitigation measures, "that is not mandated by NEPA." This Court should reject Plaintiff's argument

that the Adaptive Management plan violates NEPA because it relies on "Performance Goals," and

supposedly does not include "meaningfully enforceable standards."  Plf's Reply at 31-32.

Second, as we explained in our opening brief, Plaintiff's argument cherry-picks out of the

record the discussion of performance goals, and ignores that the plan also includes performance

requirements. The ROD includes "[s]pecific performance-based monitoring requirements" and best

management practices.  ROD at B-4 (AR 4830).  Also contrary to their assertion, the ROD does

explain what will be done if the performance goals are not met, "[t]hroughout the life to the project,

monitoring data will be reviewed to determine if mitigation is leading to the achievement of

reclamation and performance goals.  The adaptive management process will use this data to enable

the development of management changes."  ROD at B-3 (AR 4837).  Plaintiff cites a discussion of

performance standards in the Administrative Record for the proposition that BLM supposedly

ignored advice from its interdisciplinary team that the ROD include enforceable standards, but

Plaintiff again mis-states the record.  The meeting notes are from a discussion between BLM and

the Wyoming Game and Fish Department (WGFD) about performance-based monitoring.  AR 8443-

46.  This argument simply re-hashes Plaintiff's argument in its opening brief that BLM ignored

comments from WGFD about its adaptive management plan.  Plfs. SJ Br. at 18-19.  But, Plaintiff

does not dispute that, as explained in our opening brief, BLM worked with WGFD to address its

concerns.  BLM SJ Br. at 22-23. Further compounding its selective reading of the record, Plaintiff

8

implies that Appendix B focuses only on wildlife and "do[es] nothing to ensure the other values FLPMA recognizes are protected." Plf's Reply at 32. The ROD refutes these claims, addressing monitoring and best management practices for land use, paleontological values, air quality, soils, water, range management, and cultural resources. ROD Appx. B at B-4--B-20 (AR 4838-54).

Next, Plaintiff claims that BLM's Adaptive Management model "does not work," and argues that "none of the Defendants contests the fact that adaptive management has failed miserably at the Pinedale Anticline." Plfs. Br. at 33. BLM made no such concession. Plaintiff has challenged BLM's management of the Pinedale Anticline Project Area in a separate lawsuit pending before this Court. TRCP v. Kempthorne, 08-1047-RJL (filed June 18, 2008). However, the Court should not assume BLM's management in the Pinedale area is flawed merely because Plaintiff says so, because that record is not before the Court here. Plaintiff likewise argues that because the ROD does not take into account a 2005 GAO report the decision is flawed. Id. But, the Department of the Interior's Assistant Secretary for Land and Minerals Management (which oversees BLM) contested GAO's findings, stating that "[t]he report does not support its conclusions that BLM policy changes have had a negative impacts on mitigation activities." AR 6857. The Assistant Secretary also observed that GAO's used the term "environmental mitigation activities" too narrowly, and that in addition to monitoring and enforcement, mitigation also includes best management practices and conditions of approval on APDs. Id. Plaintiff has not overcome the presumption of regularity that attaches to agency decisionmaking. NRDC I, 525 F. Supp. 2d at 120, quoting Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 415–16 (1971).

Relying on a May 13, 2008 response from BLM to a TRCP FOIA request, Plaintiff argues that BLM has not lived up to the commitments made in the ROD, and even goes so far as to suggest that BLM's representation that it is implementing an adaptive management program "smacks of bad

faith." Plfs. Br. at 35-36 n.17. While the Court should not consider this information, as we explain in our separate motion to strike, Plaintiff's argument that BLM has admitted that it has not met the commitments imposed in the ROD is wrong. Id. at 34-35. Plaintiff submitted a narrow FOIA request seeking data sets submitted by the operators on or before October 15, 2007, annual reports submitted on or before November 15, 2007 and final reports submitted by early February. Plfs. Ex. A at 2. Contrary to their assertion, the records supplied in BLM's FOIA response show that BLM is carrying out its commitments.[9] See Plfs SJ Reply Ex. B at 1 (index of documents showing BLM held planning meetings and assembled working groups); Ex. B at 9 (Anadarko update). Further, because the ROD provides BLM with flexibility in varying the dates for submitting these documents, records responsive to Plaintiff's narrow FOIA request do not reflect the entirety of actions and reporting taken in compliance with the ROD. ROD at 3 (AR 4798). The project is in its early stages and additional records demonstrating BLM compliance with the ROD will be generated, and indeed have been prepared since Plaintiff's April 2008 FOIA request. If the Court considers Plaintiff's extra-record documents (which it should not), it should also consider BLM's supplemental FOIA response, which shows the BLM is complying with the requirements set forth in the ROD, (attached hereto as Exhibit 1 with selected documents). For example, in accordance

---

[9] Counsel for the government were unaware of the May 13, 2008 FOIA response, which contains some mistakes that might have prompted TRCP to avail itself of the FOIA officer's invitation to call with questions. Plf's Reply Ex. B at 2. The portion of the response upon which Plaintiff chiefly relies states that "to date, the process whereby the lease holders begin compliance with NEPA requirements for the Atlantic Rim Project Area has not gotten underway. We have only recently started scheduling public and operator meetings." Plf's Reply at 34; Plfs. Ex. B at 1. Notwithstanding that statement, which is incorrect, the May 13 response includes documents showing that such meetings had already been conducted. See, e.g., meeting agenda of November 28, 2007 and 2008 Atlantic Rim Annual Planning Meeting presentation, provided in the May 13, 2008 FOIA response. Plfs. Ex. B. In addition, the letter also erroneously states that "Applications for Permit to Drill (APD) have not been filed and there are no Plans of Development as yet." Ex. B at 1. Obviously, as evidenced by the claims presented in Plaintiff's Amended Complaint, APDs and PODs have been approved within the Atlantic Rim Project Area prior to Plaintiff's FOIA request.

with the ROD, but not initially provided with the May 2008 response, BLM has received extensive wildlife data and reports (see, e.g, "Identifying Mule Deer Migration Routes in the Atlantic Rim Project Area" and "Anadarko Petroleum Corporation Atlantic Rim Wildlife Survey June 2007"). Id.

### 4. BLM Is Not Required to Consider Hypothetical Wind Development Projects

Plaintiff does not dispute that it did not raise the argument that BLM failed to consider the cumulative impacts of wind energy in its comments or in its complaint.  It therefore it waived the argument.  Plaintiff asserts that BLM's statement that there are no past, present, or reasonably foreseeable wind projects in the action  is "incredibl[e]," Plf's Reply at 41, but it never identifies any past, present or proposed future project before the decisionmaker at the time the ROD was signed. Rather, Plaintiff's entire argument is based on the fact that BLM has a policy of encouraging wind development.  Id.  NRDC I is dispositive of Plaintiff's argument.  The Court held that "absent some evidence that the ultimate extent of these projects, as well as their ultimate approval, was reasonably foreseeable, this Court will not overturn the BLM's decision to exclude them from its cumulative impact analysis."  525 F. Supp. 2d at 123.  Here, it is undisputed there were no proposals in existence to develop wind energy, and BLM therefore had no duty to analyze the impacts of non-existent projects.  Cf. Public Citizen, Inc. v. U.S. Nuclear Regulatory Comm'n, 940 F.2d 679, 684 (D.C. Cir. 1991) (court agreed with the agency that a "policy is not mature enough to constitute a 'proposal' for 'action'" pursuant to NEPA because the policy would have no effect until the agency took "further, unknown decisions," and therefore declined to order preparation of an EIS).

### 5. BLM Adequately Discussed Baseline Information for Mule Deer

Plaintiff continues to claim that BLM violated NEPA because it did not wait for the Mule Deer Study to be finalized prior to the decision.  Plf's Reply at 36-38.  But, by its failure to address

11

the arguments made in our opening brief, Plaintiff concedes several key points.  First, Plaintiff does not dispute that the section of the NEPA regulations applicable to background information make clear that the agency need only "succinctly describe" the affected environment.  BLM SJ Br. at 28. Second, Plaintiff does not dispute that BLM relied on the first phase of the study and incorporated the information about migration routes in its analysis.  Id. at 31, citing FEIS at 5-17 (AR 2499) (showing BLM included information from study's first phase).  Third, Plaintiff continues to rely on Half Moon Bay Fisherman's Mktg. Ass'n v. Carlucci, 857 F.2d 505 (9th Cir. 1988), but fails to address the fact that in Half Moon Bay, even though there was no background information at all in the EIS (which is not the case here), the Ninth Circuit upheld the decision based on the agency's adoption of monitoring.  Plaintiff also does not dispute that the FEIS does include background location for mule deer, including population numbers, an identification of its range, and crucial winter habitat.  BLM SJ Br. at 28-29, citing FEIS at 3-86, 3-89, 3-90 (AR 2250, 2253-54).

There is not a plethora of case law addressing the question of how much information an agency should provide in its description of the affected environment, but the decisions that have addressed the issue make it clear that, as the regulations state, the discussion of the background environment need only succinctly discuss the potentially affected resources.[10]  In Gaule v. Meade, 402 F. Supp. 2d 1078 (D. Alaska 2005), the court addressed an argument that the FEIS was deficient because it failed to adequately describe baseline data for several species of wildlife.  Even though the court agreed that there was "no baseline data" for several species, and that the actual populations were unknown, the discussion did not violate NEPA because the agency "provided mitigation measures to lessen the impact, including monitoring the affected wildlife, if spotted, and ongoing

---

[10]  Plaintiff "string cites" several cases in support of its argument that BLM failed to adequately address baseline conditions, Plf's Reply at 38, but only one of the cases addresses the issue, albeit obliquely, and is plainly inapplicable here.  Blanco v. Burton, 2006 WL 2366046 *9 (E.D. La. Aug. 14, 2006) (agency failed to account for "material changes" resulting from hurricanes).

studies." Id. at 1089. It also concluded that the plaintiffs' reliance on Half Moon Bay was misplaced, in part because the statement addressing the necessity for baseline conditions was *dicta*. Id. See also Western Watersheds Project v. BLM, 552 F.Supp.2d 1113, 1127 (D. Nev. 2008) (BLM adequately set forth background information by succinctly describing the affected environment as encompassing "70 species of mammals, 273 species of birds, and 28 species of reptiles and amphibians" and setting forth the number of miles designated as wild and scenic for two rivers in the area); Friends of Mt. Hood v. U.S. Forest Serv., 2000 WL 1844731, *13 (D. Or. Dec. 15, 2000), (rejecting argument that affected environment description was inadequate because it did not describe how the affected ecosystems functioned, the court stated that § 1502.15 "mentions several times that the description should be succinct, no longer than is necessary, and avoid useless bulk and verbosity."). BLM adequately described baseline information for mule deer.

Thus, while Plaintiff focuses on record evidence that discusses the importance of identifying migration routes, and cites a WGFD comment urging BLM to incorporate data from the Mule Deer study into FEIS as evidence that BLM failed to set forth background information, Plf's Reply at 37, the record the shows that BLM did exactly that. It recognized that "[s]everal mule deer migration routes transverse" the Project. FEIS at 4-74; FEIS at 3-89 (showing migration routes) (AR 2393, 2253). It included information from the draft study in the FEIS. FEIS at 5-17 (AR 2499). When "information is available from this research additional mitigation would be placed on development for the protection of mule deer migration corridors" in site-specific decision making. FEIS at 4-74 (AR 2393). Information from the final study will be considered in site-specific analyses. A programmatic EIS need only provide "'sufficient detail to foster informed decision-making,' but 'site-specific impacts need not be fully evaluated until a critical decision has been made to act on site development.'" Friends of Yosemite Valley v. Norton, 348 F.3d 789, 800 (9th Cir. 2003).

**6.    BLM Did Not Violate NEPA by Irretrievably Committing Resources Prior to Finalizing the Rawlins RMP**

Plaintiff's argument that BLM unlawfully committed resources in the project area prior to completing its analysis fails to address the facts and the lengthy discussion of dispositive and instructive case law cited in our brief. BLM SJ Br. at 31-34. Instead, Plaintiff wrongly argues that BLM "base[s] its entire response" on the fact that it issued a new policy defining how it take into account the reasonably foreseeable development (RFD) scenario set forth in the existing RMP. Plf's Reply at 39. What is at issue here is tiered decisionmaking and the level of analysis appropriate at each stage of decisionmaking. Here, BLM initially issued leases pursuant to the Great Divide RMP, which was accompanied by a pre-leasing EIS. Next, when the oil and gas operators proposed large-scale development of those leases, it prepared a programmatic EIS to assess the impacts of that development. The third stage of decisionmaking occurs when BLM undertakes analysis in a site-specific EA. See Northern Plains Resource Council, Inc. v. BLM, 298 F. Supp. 2d 1017, 1021 (D. Mont. 2003), aff'd, 107 Fed. Appx. 166 (9th Cir. 2004) (BLM was not required to halt lease sale while it was preparing a programmatic EIS to assess CBNG development).

We explained in our opening brief that, pursuant to Sierra Club v. Peterson, 717 F.2d 1409, 1415 (D.C. Cir. 1983) BLM makes an irretrievable commitment of resources pursuant to NEPA when it issues leases. Plaintiff does not address Sierra Club, but instead argues that because BLM retains "legal authority over the manner in which public lands are developed," the ROD at issue results in the irretrievable commitment of resources contemplated by NEPA. Plf's Reply at 40. But, Sierra Club addressed that issue, stating that the "'critical time,' insofar as lands leased without a [no surface occupancy] Stipulation are concerned, occurred at the point of leasing. . . ." 717 F.2d 1414-15. Since BLM did not impose no surface occupancy stipulations on the leases when they were issued, for NEPA purposes, the leasing decision was the initial point where resources were

14

irretrievably committed for NEPA purposes.  Plaintiff also does not dispute that BLM decided in

the Great Divide RMP to lease resources in the planning area or that in compliance with Sierra Club,

it prepared an EIS to support that decision.  In addition, Plaintiff also does not dispute that BLM has

already leased all the federal minerals within the project area.  FEIS at 1-8 (AR 2135).  Thus, as we

explained previously, BLM's leasing decisions comport with 40 C.F.R. § 1506.1(c) because they

are covered by an existing EIS.  We also explained that the Ninth Circuit's decision in ONRC

Action v. BLM, 150 F.3d 1132 (9th Cir. 1998) squarely addresses this issue, but Plaintiffs entirely

disregard it.  Even an "outdated" RMP, may serve as the existing analysis under NEPA.  Id. at 1140.

While we did briefly discuss Plaintiff's contention that BLM erred because the level of

development could exceed the RFD scenario in the Great Divide RMP, our main point was that

issuance of the leases was the point of irretrievable commitment of resources and Plaintiff has not

challenged those decisions here.  Further, as Plaintiff agrees, the important question was whether

the impacts were consistent with impacts as analyzed in the Great Divide RMP.  We explained that

they were and that BLM properly concluded that exploration and development of CBNG was in

conformance with the Great Divide RMP.  ROD at 4  (AR 4799); see also AR 8104-8118; AR 8103,

8118.  Plaintiff's argument that it was BLM's consistent position that the impacts would exceed

what was analyzed in the EIS for the Great Divide RMP is based on language it excerpts from AR

9220.  But, it omits the portion of the quoted language that makes it clear that the reference does not

refer to the Atlantic Rim project.[1]  In addition, the other documents Plaintiff cites identify a BLM

concern that approving the Atlantic Rim project would exceed the RFD scenario, not that it would

---

[1] In full, the quoted language states "[i]n the PRB it appears to me it is not that the impacts from
cbm development are so different from conventional gas development but rather it is the magnitude
of the development makes the impact discussions in the land use plans inadequate."  AR 9220.  The
"PRB" is BLM shorthand for Powder River Basin, a different resource management area.

exceed the analysis of impacts in the Great Divide RMP EIS.[12]

Plaintiff argues that BLM has changed its position with regard to how the RFD should be considered, and that its interpretation is inconsistent with its previously held views and therefore is not entitled to deference. Plf's Reply at 39. Plaintiff's argument is based on informal emails and documents discussing this particular project, which do not establish agency policy. Doe v. Rumsfeld, 297 F. Supp. 2d 119, 132 (D.D.C. 2003) (personal opinions of agency officials not entitled to deference). Here, BLM developed the 2004 guidance to "[c]larify and update" its policy and to "[p]rovide for basic level of consistency in the preparation and reporting of the RFD scenario." AR 5309. The 2004 policy clarification is consistent with previous BLM policy explaining that the RFD scenario is a mechanism to analyze impacts of various alternatives. Compare AR 5311 (2004 Policy) with AR 5087 (BLM Handbook describing that RFD scenario used to help analyze impacts). The later policy simply clarifies that the RFD scenario is not a planning decision and the fact the total number of wells in an area may exceed the total number of projected wells in the RFD scenario does not automatically require a plan amendment. Id. at 5312. National Fuel Gas Supply Corp. v. F.E.R.C., 468 F.3d 831 (D.C. Cir. 2006) (An agency's "'policy decisions are entitled to deference so long as they are reasonably explained.'"), quoting Covad Commc'ns Co. v. FCC, 450 F.3d 528, 539 n.6 (D.C. Cir. 2006). In sum, BLM's decision is supported by two Environmental Impact Statements, the Great Divide RMP/EIS and the FEIS challenged here. BLM did not irretrievably commit resources in advance of a decision.

## B.     BLM Complied With FLPMA

---

[12] Plaintiff also cites BLM's scoping document and a report to Congress, Plf's Reply at 14, but neither document establishes an agency policy as to the RFD scenario. They simply denote the possibility that a land use plan review will be conducted concurrently with preparation of the Atlantic Rim EIS. AR 7635; AR 7932. As explained herein, BLM conducted that review and determined the Atlantic Rim project is consistent with the existing RMP.

Plaintiff argues that "Federal Defendants' position would insulate virtually all BLM's site-specific management activities from judicial review" for compliance with FLPMA's multiple use and sustained yield principles, Plf's Reply at 5, but it misconstrues our position. Nor did Federal Defendants argue that the Supreme Court has said "RMPs are the *only* mechanism by which BLM implements FLPMA's mandates." Id. Our position is that Plaintiff's challenge can be maintained only as a claim that the Project violates the Resource Management Plan (RMP) because the balancing of resources that FLPMA requires is embodied in the Plan. The plain language of FLPMA states that "the Secretary shall manage the public lands under principles of multiple use and sustained yield, *in accordance with the land use plans developed*" by the Secretary. 43 U.S.C. § 1732(a) (emphasis added). In other words, as the Supreme Court observed in <u>Norton v. Southern Utah Wilderness Alliance</u> (SUWA), 542 U.S. 55, 59 (2004), land use plans are "the main tool" BLM uses to "balance wilderness protection against other uses." "Under FLPMA, '[t]he Secretary shall manage the public lands under principles of multiple use and sustained yield, in accordance with the land use plans . . . when they are available.'" <u>Id.</u>, quoting 43 U.S.C. § 1732(a). Thus, land use plans are the mechanism pursuant to which the Secretary conducts the balancing exercise, and the Court should not permit Plaintiff to maintain a stand-alone FLPMA challenge because BLM completed that exercise in the Great Divide RMP.

Plaintiff does not dispute that Interior Board of Land Appeals (IBLA) has interpreted FLPMA the same way, explaining in <u>Southern Utah Wilderness Alliance</u>, 122 IBLA 165, 172–73 (1992), "[m]ultiple use is generally considered in the context of BLM's land-use planning. . . . In fact, alternate uses of the land were considered when adopting the [RMP at issue]. They need not be considered anew each time BLM decides to lease the land or grant leave to undertake an activity." <u>Id.</u> This only makes sense. To adopt Plaintiff's view would mean that BLM would be

required to conduct a planning exercise to balance multiple uses every time it makes a site-specific decision, a result that would negate the value of having a plan in the first instance. The Court should defer to BLM's reasonable interpretation of FLPMA. Chevron, U.S.A., Inc. v. Natural Res. Def. Council, 467 U.S. 837, 843-44 (1984).

Here, as we explained in our opening brief, in the existing Great Divide RMP, BLM planned its management actions to "provide for sustained multiple use management of the public lands and resources." AR 652. In that plan, BLM determined that the entire planning area would be open to oil and gas development. AR 679. The RMP also designated areas of critical environmental concern and wilderness study areas and described management objectives and actions for other resources, including identifying wildlife habitat management areas. Id. at 650, 660, 690-94. Plaintiff's argument invites the Court to entangle itself in BLM's planning decisions, and to evaluate anew whether a particular decision complies with the multiple use principles, an outcome the Supreme Court has cautioned against. SUWA, 542 U.S. 66-67 ("Section 1782(c) is mandatory as to the object to be achieved, but it leaves BLM a great deal of discretion in deciding how to achieve it."). BLM exercised its discretion by adopting a land use plan that incorporates multiple use principles.[13] Therefore, because the decision is consistent with the Great Divide RMP, it is necessarily consistent with FLPMA's multiple use and sustained yield principles.[14]

---

[13] Contrary to Plaintiff's assertion, that does not mean that it is BLM's position that a plaintiff may never challenge the plan itself. Rather, our position is that Plaintiff has not argued, nor did it allege in its complaint, that the Great Divide RMP violates FLPMA. FLPMA's implementing regulations provide for extensive public involvement in the formulation of BLM land use plans. See 43 C.F.R. § 1610.2. After the plan is approved, "[a]ny person who participated in the planning process and has an interest which is or may be adversely affected by the approval or amendment of a resource management plan may protest such approval or amendment." Id. § 1610.5-2(a).

[14] It is telling that Plaintiff does not discuss the authorities cited in our opening brief. Instead, it asserts, incorrectly, that "[t]his Circuit and other courts have entertained myriad claims concerning 'multiple use' mandates." Plf's Reply at 5. In support of this proposition, it cites three cases, one from the D.C. Circuit, one from the Ninth Circuit and an unreported case from Utah. Plaintiff's

As an adjunct to this argument, which further illustrates its speciousness, Plaintiff asserts that BLM's multiple use management principles should not be applied to an area as large as the Atlantic Rim project area, but instead would apply if the case were "about a single 40, 160 or even 640 acre 'parcel.'" Plf's Reply at 12. BLM is responsible for managing some 258 million acres throughout the Nation. It is only in the broad application of the principle, as embodied in land use planning, that BLM can implement multiple use management. It would make no sense for BLM to apply the principle to a 40, 160 or 640 acre parcel in isolation. Plaintiff wrongly accuses BLM of failing to support its argument and yet itself cites no authority for its claim. Indeed, undercutting its assertion, Plaintiff references our citation to Rocky Mountain Oil and Gas Ass'n v. Watt, 696 F.2d 734 (10th Cir. 1982). Plf's Reply at 12. In Rocky Mountain Oil and Gas Ass'n, the Court plainly addressed this precise question, and we quoted the relevant language in our opening brief: "It is only by looking at the overall use of the public lands that one can accurately assess whether or not BLM is carrying out the broad purposes of the statute." Id. at 738-39, n.4, quoting Utah v. Andrus, 486 F. Supp. 995, 1003 (D. Utah 1979). The plain language of FLPMA further supports BLM's interpretation, defining "multiple use" as "the management of the public lands and their various resource values so that they are utilized in the combination that will best meet the present and future

---

reliance is misplaced. In Mount Royal Joint Venture v. Kempthorne, 477 F.3d 745 (D.C. Cir. 2007), while the court did not directly address the issue, and the facts of the case are complicated, its ruling tends to support BLM's position rather than Plaintiff's. The court stated that it was plaintiff's argument that "the Secretary did not utilize 'multiple use' management principles" in issuing his decision. Id. at 757. But, further characterizing the plaintiff's argument, the court explained that it was their position that "proposing a withdrawal that did not conform to the West HiLine Plan," violated FLPMA. Id. The court observed further that BLM had drafted its RMP amendment in accordance with multiple use principles, and approved a preferred alternative recommending withdrawal of certain lands from minerals management in its plan amendment. Id. Consistent with the RMP recommendation, the Secretary withdrew the lands, and the court simply concluded that Interior followed "FLPMA's land management guidelines" in making its decision. Id. at 757-58. In Headwaters, Inc v. BLM, 893 F.2d 1012 (9th Cir. 1989) it was again plaintiff's argument that BLM violated FLPMA's multiple use mandate, but the court did not address the argument. Id. at 1015. Instead, it dismissed plaintiff's claims on grounds of mootness. Id. at 1016.

needs of the American people; making the most judicious use of the land for some or all of these resources or related services over areas large enough to provide sufficient latitude for periodic adjustments in use to conform to changing needs and conditions . . ."  43 U.S.C. § 1702(c).

Thus, "FLPMA contains comprehensive inventorying and land use planning provisions to ensure that the 'proper multiple use mix of retained public lands' be achieved."  Rocky Mountain Oil and Gas Ass'n, 696 F.2d at 739, citing H.R. Rep. No. 94-1163 at 2 (1976); see also SUWA, 542 U.S. at 70 ("The San Rafael plan provides an apt illustration of the immense scope of projected activity that a land use plan can embrace. . . . [I]t presents a comprehensive management framework for 1.5 million acres of BLM-administered land."); Northern Cheyenne Tribe v. Norton, 503 F.3d 836, 840 (9th Cir. 2007) (resource area covers 8 million acres; 4 million of which are leased for oil and gas development).  This Court also briefly addressed the issue in NRDC I, 525 F. Supp. 2d at 117 n.2, noting that the project "falls within the Great Divide Resource Area, which comprises 4 million acres of public land surface and 5 million acres of federal mineral estate. . . . In November 1990, BLM issued the Great Divide Resource Management Plan . . ., which called for the 'sustained multiple use management' of the entire area."  BLM properly applied multiple use management principles in its planning decision, the Great Divide RMP.

Finally, Plaintiff's premise is wrong.  BLM is not managing the project area for a single use that forecloses other uses.  Plf's Reply at 2.  As we explained in our opening brief, and as further addressed herein, Plaintiff's exaggerated assertions that the Project will drive sage grouse to extinction and will destroy hunting and recreation in the project area, id., are contradicted by the administrative record.  The ROD does not authorize only a single use; rather, it provides protections that will encourage sustained yield and multiple uses in the project area, including recreation/visual resources ( ROD at B-18--B-19, AR 4852-4853), wildlife production (ROD at 9, B-15--B-18, AR

4804, 4849-4852), livestock grazing (ROD at 9-10, B-12--B-13, AR 4804-4805, 4846-4847), and

preservation of cultural values.  ROD at 10, B-19-20 (AR 4805, 4853-4854).  BLM complied with

FLPMA by selecting an alternative that will maximize natural gas recovery while also providing

appropriate resource protection and long-term reclamation and re-establishment of vegetation and

wildlife.  ROD at 10 (AR 4805).

### 1.    The Protections for Sage-Grouse Imposed by the Atlantic Rim Project ROD are Consistent with the Great Divide RMP

In its reply, Plaintiff does not dispute that the relevant direction contained in the Great Divide

RMP states that "[s]age grouse and sharp-tailed grouse strutting/dancing grounds and nesting habitat

will be protected."[15]  AR 694.  It admits that BLM took a hard look at the impacts on sage grouse.

Plf's Reply at 8.  Therefore, the only dispute is over BLM's conclusions about those impacts.

Plaintiff continues to rely primarily on comments from the FWS, arguing that BLM's position that

FWS did not identify any flaws in BLM's analysis of the impacts is "incredib[e].  Id. at 9.  But, the

point we were making was the same point that Plaintiff admits; namely, that like Plaintiff, FWS did

not disagree with BLM's "hard look" analysis.  Plaintiff quotes the same language from the FWS'

comments on the FEIS that it quoted in its opening brief, but its repetition of the argument does not

change the outcome.  BLM does not dispute that the FWS voiced concerns over its decision to

authorize the project, including the potential that impacts could possibly lead to listing under the

Endangered Species Act.  AR 10135.  But, Plaintiff does not deny that, as we showed in our opening

brief, the FWS emphasized the importance of reclamation and stated that it believed that "the

---

[15] Plaintiff argues that the project will not protect sage grouse because the FEIS discloses impacts
to nests and to nesting habitat outside the 2-mile buffer.  Plf's Reply at 18, citing FEIS at 4-83 (AR
2402).  But, the RMP establishes that the mechanism for protecting nesting habitat is through
seasonal use restrictions, and it is undisputed that such restrictions are part of the Project.  See AR
697; ROD at B-16 (AR 4850).  Consistent with the general direction of the RMP, the majority of
nesting habitat within the project area will be protected under the ROD.  ROD at B-16.

reclamation criteria in Appendix B form a reasonable basis for measuring reclamation success." Id. It further recommended that BLM implement measures to reduce habitat fragmentation, and requested continuing involvement during the implementation process.  Id.  In the ROD, BLM committed to the performance goal of providing for well-dispersed sage grouse habitat, which will seek to achieve "in collaboration with state and other federal agencies," e.g., the FWS.  (AR 4814).

There is no dispute that impacts on sage grouse are a key issue; they were identified as such from the outset.  AR 7454.  In response to the comments of the FWS and others on the draft EIS, BLM developed alternative D as its preferred alternative in the FEIS.  FEIS at 1-20 (AR 2147); see also ROD at 4 (AR 4799).  The ROD explains that the intent of Alternative D is to reduce the operational footprint, which thereby reduces the overall disturbance.  Alternative D also accelerates reclamation to help restore vegetation in the shortest time possible.  "The disturbance management philosophy of limiting the number of roads by transportation planning, smaller operational footprints, and accelerated reclamation efforts also benefits wildlife by limiting habitat fragmentation, reducing habitat loss, and returning habitat function in the shortest possible time." ROD at 5 (AR 4800).  BLM recognized its obligation to protect the sage grouse as a sensitive species, stating that "no actions that might jeopardize the future existence or viability of this species may occur."  AR 4405.  BLM recognized the potential for a "long-term decline in the population of this species," FEIS at 4-76 (AR 2395), but it did not find there would be a "[s]ubstantial loss of habitat function or disruption of life history requirements" that would make the sage grouse eligible for listing under the ESA.[19]  Id. at 4-69 (AR 2388).  Rather, the agency found that the impacts were significant under criteria 4, FEIS at 4-83 (AR 2042), which states that substantial loss of habitat

---

[19] Providing no citation to Federal Defendants' brief, Plaintiff assets that BLM has argued that "the fact that BLM is violating its own Manual with regard to special species is irrelevant."  Plfs. Br. at 19, n.8.  We made no such argument.  We simply stated that because the Manual is a statement of policy, it is not judicially enforceable, a point unrefuted by Plaintiff.  BLM SJ Br. at 40 n.14.

function "would preclude improvement of their status." FEIS at 4-69 (AR 2388). The Court should defer to its decision. Ocean Conservancy v. Gutierrez, 394 F. Supp. 2d 147, 157 (D.D.C. 2005).[17]

Contrary to Plaintiff's suggestion, BLM does not contend that its mitigation will fully protect sage grouse. However, its conclusion that the proposed action will not lead to listing of sage grouse as threatened or endangered finds support in the record. Sage grouse nesting habitat covers 92% of the project area. FEIS at 4-76 (AR 2395); see also FEIS at O-69 (AR 4465) (explaining scientific support). The buffer around leks covers 8,440 acres or 3.1 percent of the project area, and the buffer around nests covers 17,846 acres or 6.6 percent of the project area, and most of these areas "would remain undisturbed for the life of the project." FEIS at 4-71 (AR 2390). Habitat loss "would equate to a maximum direct loss of 10 percent of the available nesting habitat. . ." FEIS at 4-79 (AR 2398). Further, BLM explained that leks on the boundaries of CBNG development are much more likely to be active than leks within the development. FEIS at 4-76 (AR 2395). It concluded that sage grouse may re-populate an area following development, even though they may not attain the same population levels that existed prior to development. Id. Thus, while Plaintiff may disagree with the 1/4 mile buffer around leks, and seasonal restrictions of two miles during strutting season, these measures are consistent with the Great Divide RMP.

## 2.    BLM Did Not Violate Plan Requirements for Big Game

We showed in our opening brief that Plaintiff's claims that BLM violated FLPMA because the project will impact hunting were without merit because BLM's actions conformed to the RMP. BLM SJ Br. at 41-42. Plaintiff simply repeats its argument that the analysis included in the FEIS

---

[17] Plaintiff also cites comments in a January 5, 2007 letter from WGFD that identified issues that "need to be addressed in the ROD," including assurances for protection of sage grouse. AR 10323, 10325. This is yet another re-hash of the argument that BLM's conclusions with regard to sage grouse are flawed because WGFD objected, which we have already explained is false. Plfs. SJ Br. at 6, 19; see also BLM SJ Br. at 23, citing AR 8847-48.

shows there will be impacts on big game, although it offers nothing to support its conclusion that those impacts violate the RMP or FLPMA. Plf's Reply at , 16-17. Plaintiff does not dispute that big game animals in the project area are generally at or above optimal populations levels. FEIS at 3-90 (AR 2254) (19,500 antelope, 21,000 mule deer, and 11,500 elk in the area). In addition, the FEIS explains that impacts to recreation in Category A areas, which contain the main hunting grounds, will be less because of the "reduced surface disturbance and more careful mitigations." FEIS at 4-104 (AR 2423).[18] See also ROD at 12 (Category A areas have a disturbance goal of less than 6.5 acres per well pad); ROD at 13 (map depicting Category A areas) and FEIS at 4-103 (map showing locations of successful hunts) (AR 4809, 4808, 2422). Plaintiff also ignores that the 270,080 acre project area, ROD at 1 (AR 4796), is a small fraction of the 4 million acre area managed by BLM under the Great Divide RMP. AR 652. While wildlife (and therefore hunters) may be displaced to other areas, FEIS at 4-104 (AR 2323), and the recreational experience may be diminished due to noise and degradation of scenery, FEIS at 4-100-101 (AR 2419-20), as the FEIS notes, there will still be opportunities for hunting and wildlife viewing in areas farther away (although these may themselves be under increasing pressure for development). FEIS at 4-101. While the duration of effects will last over the life of the project, the intensity will be lower once drilling and construction ends. Id. Plaintiff excerpts various discussions from the FEIS as to the impacts on big game, but these arguments do not change the outcome. Plf's Reply at 7-8. The FEIS complies with the RMP's requirement that it protect important big game winter habitat by imposing seasonal restrictions. See AR 697, FEIS at 4-72 (AR 2391). BLM's decision to permit CBNG

---

[18] In our opening brief, we mistakenly quoted language relevant to the analysis of impacts under Alternative C, stating that the project includes protection measures for the most heavily hunted areas that will "help retain the quality of hunting, wildlife viewing, and recreation experiences" in the project area. FEIS at 4-104 (AR 2423). BLM SJ Br. at 44. While the ROD gives BLM the flexibility to include additional protective measures described in Alternative C, it does not require them. ROD at 1 (AR 4796). Federal Defendants apologize for the mistaken citation.

development, in compliance with the RMP, does not violate FLPMA.

### 3.    Plaintiff's Claim that the Action Violates RMP Objectives Is Non-Justiciable

Plaintiff continues to argue that Project violates FLPMA because it is inconsistent with the RFD scenario set forth in the Plan because the Great Divide RMP predicted 1,440 wells being drilled and BLM has approved wells in several other projects.  Plf's Reply at 13.  It also argues that the action is inconsistent with other plan objectives including supporting a diversity of species.  Id. at 16.  It does not reconcile its claims with the Supreme Court's holding that general statements in a plan, such as "'will do' projections of agency action . . . are not a legal binding commitment. . ." SUWA, 542 U.S. at 71. The Court should therefore dismiss these arguments because they are non-justiciable.  With regard to the claim that BLM violated FLPMA because it did not amend the plan to adjust the RFD scenario, Plaintiff also fails to address the IBLA's decision in  Biodiversity Conservation Alliance, 174 IBLA 1 (2008), finding that exceeding an RFD scenario does not constitute a violation of FLPMA.  Id. at *11.  IBLA determined that the RFD scenario was not enforceable under FLPMA.  Id. at *12.  IBLA's interpretation of FLPMA is entitled to deference, and the Court therefore should not consider this claim.[19]

### CONCLUSION

For the foregoing reasons, the Court should grant summary judgment in favor of Federal Defendants.

---

[19] Finally, Plaintiff continues to insist that Western Watersheds Project v. U.S. Forest Serv., 2006 WL 292010 (D. Idaho 2006) is applicable, although it plainly is not.  In Western Watersheds, the Court found that the agency was relying "heavily on the strategy to comply with Plan standards and objectives," but that it had failed to explain the strategy, violating the National Forest Management Act. Id. at *10.  Plaintiff seeks to penalize BLM for emphasizing the importance of its adaptive management strategy, Plfs. Br. at 21, but as we have explained herein, its analysis in the FEIS, independent of the adaptive management plan, shows that it complied with the RMP objectives. Moreover, even assuming, arguendo, that Plaintiff is correct in its assertions that BLM is relying on the adaptive management strategy to meet RMP objectives, BLM explained its strategy here.

Respectfully submitted this 31st day of July, 2008.


RONALD J. TENPAS
Assistant Attorney General
United States Department of Justice
Environment & Natural Resources Division


    s/ Lori Caramanian
Lori Caramanian
United States Department of Justice
Environment and Natural Resources Division
Environment & Natural Resources Division
1961 Stout Street, 8th Floor
Denver, CO 80294
Phone: (303) 844-1499
Fax: (303) 844-1350

Attorneys for Federal Defendants

Arthur R. Kleven
Attorney-Advisor
U.S. Department of the Interior
Office of the Solicitor, Rocky Mtn. Region



# United States Department of the Interior

BUREAU OF LAND MANAGEMENT
Wyoming State Office
P.O. Box 1828
Cheyenne, Wyoming 82009-1828



IN REPLY REFER TO:

1278(957)
WY-2008-041

July 30, 2008

Thomas R Wilmoth
Husch, Blackwell, Sanders LLC
206 South 13th Street
Suit 1400
Lincoln, NE  68508

Dear Mr. Wilmoth:

On May 13, 2008, the Wyoming State Office sent you a response to your Freedom of Information Act (FOIA) request dated April 7, 2008.  In our response, we included 8 records that we believed responsive to your request.

As you are aware, the subject matter of your request pertains to on-going litigation in the U.S. District Court for the District of Columbia (Case No. 1:07-CV-01486-RJL).  This lawsuit has challenged decisions made by the BLM regarding the Atlantic Rim Natural Gas Development Project Environmental Impact Statement (EIS) and Record of Decision (ROD).  In a recent brief that you submitted in that lawsuit ("Consolidated Response to Cross-Motions for Summary Judgment and Reply In Support of Plaintiff's Motion for Summary Judgment"), you have referenced our FOIA response and we believe that you have made inaccurate conclusions based on the records you received from us.

The ROD necessarily provides the BLM with some flexibility in administering the dates that certain reports are due and upon which meetings take place.  For example, the ROD provides that:

> "Target dates for annual plans and reclamation reporting may vary as needed and approved by the RFO AO." (ROD at Page 3), and

> "While described as an 'annual' planning process, this concept is adaptive and open for modification and improvement…" (ROD at Page E-1)

**Exhibit 1 - page 1 of 35**

In accordance with the ROD, the BLM has ensured that certain data have been reported to the BLM. For example, and as evidenced by some of the records that you received, the BLM conducted a meeting on November 28, 2007 to receive information from operators about their planned operations for the year 2008 (see ROD at Page 16, stating in part "…an annual planning meeting [will be held] where [the operators] will outline detailed development plans for the upcoming year and a conceptual multi-year plan."). Compare this with records that you have received, such as the Anadarko Petroleum Corporation presentation entitled "2008 Atlantic Rim Annual Planning Meeting" and the BLM agenda dated November 28, 2007. Similarly, we have received wildlife data and reports (see the records included in this response, such as the reports entitled "Identifying Mule Deer Migration Routes in the Atlantic Rim Project Area" and "Anadarko Petroleum Corporation Atlantic Rim Wildlife Survey June 2007") that provide information required under the ROD.

Due, in part, to the narrow focus of your FOIA request, we believe that your conclusions are based upon a limited set of records. In addition, there are a number of records that pertain to this matter but which were not specifically requested by you, or records that were generated after your FOIA request. In fact, additional records demonstrating BLM compliance with the ROD are generated frequently and recurrently. As a courtesy and in interest of keeping BLM activities open to public review, we are enclosing some additional records regarding this matter. The records are contained on a CD-ROM enclosed with this letter, and represent additional information about meetings conducted and data collected for the purpose of meeting requirements under the ROD, prior to your request.

Lastly, upon further review of our response letter dated May 13, 2008, we have found three erroneous statements. On the first page, the letter states:

> "…to date, the process whereby the lease holders begin compliance with NEPA requirements for the Atlantic Rim Project Area has not gotten underway. We have only recently started scheduling public and operator's meetings. Applications for Permit to Drill (APD) have not been filed and there are no Plans of Development as yet."

We apologize for these inaccurate statements. As evidenced by the information provided in our FOIA response, in this letter, and in the lawsuit administrative record, these statements are clearly in error. The requirements of the ROD , including the scheduling and conduct of operator meetings, are being complied with, as can be demonstrated by reviewing the records we have provided to you (i.e., please see the meeting agenda and presentations provided to you in your May 13, 2008 FOIA response). In addition, as you are aware, operators have submitted APDs and Plans of Development (PODs) within the Atlantic Rim Project Area (such as the four PODs and associated APDs submitted to the BLM as far back as the year 2005, and that TRCP is challenging approval of in the on-going litigation).

**Exhibit 1 - page 2 of 35**

There is no fee for responding to your request, as the cost is less than the $30 threshold established by the Department of the Interior for fee collection under the FOIA regulations at 43 CFR § 2.18(a).

If you have any questions please do not hesitate to contact me at (307) 775-6180.

Sincerely,

Mark P. Archer
State FOIA Officer

**Exhibit 1 - page 3 of 35**

# Identifying Mule Deer Migration Routes
# in the Atlantic Rim Project Area



**Prepared for:** The Wildlife Heritage Foundation of Wyoming

**Prepared by:**  Hall Sawyer and Matthew Kauffman
Wyoming Cooperative Wildlife Research Unit
University of Wyoming
1000 E. University Ave,
Laramie, WY 82071

April 1, 2008

Exhibit 1 - page 4 of 35

**Overview**

Given that 95% of the mule deer that winter in the Atlantic Rim Project Area (ARPA) are migratory (Sawyer 2007), sustaining current mule deer populations will require functional migration routes remain intact. Prior to 2000, conserving migration routes had not been a top management concern for agencies because there had been no large-scale habitat alterations in the ARPA or Baggs Herd Unit, (e.g., Bureau of Land Management [BLM] 2000*a*, BLM 2000*b*) and the landscape had remained relatively unchanged. However, the recent approval to develop 2,000 gas wells at a spacing of 8 per section and improve or construct approximately 1,000 miles of road and pipeline (BLM 2006) will result in large-scale habitat changes that could potentially impact mule deer migration routes in the ARPA. While disturbances associated with gas development may alter habitat selection and distribution patterns of wintering mule deer (Sawyer et al. 2006), it is unclear at what level of gas development migration routes are affected. Nonetheless, accurate delineation of migration routes prior to gas development and identification of high-use migratory segments would allow managers to develop proactive, rather than reactive, management prescriptions. Absent specific knowledge of migration routes, it is difficult for agencies or industry to develop gas resources in ways that minimize potential impacts to mule deer migration. Additionally, detailed information on migration routes can be used to identify habitat characteristics of migration routes and study the potential effects of proposed development on migration.

Ungulate migration routes are typically depicted by simply connecting the dots between locations of marked animals (e.g., Sawyer et al. 2005, Berger et al. 2006, White et al. 2007). However, because a line has no area associated with it (i.e., is it 10 feet or 1 mile wide?), the conservation and management value of this approach can be limited and difficult to incorporate into planning documents or on-the-ground prescriptions. Further, without specific knowledge of the relative amounts of use (e.g., high, medium, low-use) migration routes receive, it is difficult to prioritize specific segments for conservation or enhancement. Having the ability to estimate the width and relative amounts of use migration routes receive may assist agencies, industry, and non-government organizations (NGOs) with incorporating them

**Exhibit 1 - page 5 of 35**

into land-use planning and/or identify specific segments for management or habitat improvement.

The purpose of this project was to use existing GPS data collected from mule deer in the ARPA (Sawyer 2007) to estimate the utilization distributions (UD) of population-level migration routes originating from 2 distinct winter ranges: the Dad Winter Range and Wild Horse Winter Range. A population-level route depicts the migration routes of individual animals radio-marked in their respective winter ranges (Dad or Wild Horse). The UDs provide information on both the width of population-level migration route and relative amounts of use across the route. This work was intended to provide agencies, industry, and NGO's with a science-based tool that allows mule deer migration routes to be considered in development plans and actively managed. Additionally, the methods developed for this project may be used with other GPS data sets across the state to identify migration routes of other species.

**Study Area and Background Information**

The Atlantic Rim Project Area (ARPA) is located in southern Carbon County (Figure 1) and encompasses 422 mi$^2$ south of I-80, east of WY 789, and north of WY 70. The ARPA extends approximately 48 miles between Rawlins and Baggs, and contains 64% (271 mi$^2$) federal, 5% (22 mi$^2$) state, and 31% (129 mi$^2$) private lands (BLM 2006). The ARPA is located in the eastern portion of the Baggs Herd Unit which includes 3 hunt areas (82, 84, 100; Figure 1). The Wyoming Game and Fish Department (WGFD) manages the Baggs Herd Unit for a post-hunting season population of 18,700 deer, but the estimated herd size has ranged from 20,200 in 2001 to 22,300 in 2005 (WGFD 2005). The ARPA supports a variety of vegetation types, but is generally characterized by rolling topography, prominent ridges, and dry canyons dominated by sagebrush (*Artemisia sp.),* black greasewood (*Sacrobatus vermiculatus*), Utah juniper (*Juniperus osteosperma*), and other mixed-shrub (*Purshia tridentata, Prunus virginiana, Amelanchier alnifolia, Chrysothamnus sp., Cercocarpus sp.*). Elevations range from 6,300 to 8,300 feet.

**Exhibit 1 - page 6 of 35**

*Wildlife Heritage Foundation of Wyoming*                    *Mule Deer Migration*



Figure 1. Location of Atlantic Rim Project Area (ARPA) in Carbon County, Wyoming.

The Baggs Herd Unit has traditionally supported one of the largest mule deer populations in the state and provided sportsmen with excellent recreational opportunities (WGFD 2005). Beginning in 2007 the BLM approved the development of >2,000 gas wells in the ARPA (BLM 2006), which is situated in the middle of the Baggs Herd Unit and includes key winter and transitional ranges. In an effort to better understand the seasonal ranges and migration routes of this deer herd prior to gas development, the WGFD in cooperation with the BLM, Anadarko Petroleum Company, Warren Resources, and Western Ecosystems Technology, Inc. (WEST) implemented the Atlantic Rim Deer Study in February 2005. This study collected >115,000 locations from 47 GPS-collared deer and successfully identified seasonal ranges and general location of migration routes (Figure 2). Two major wintering complexes were identified

3

**Exhibit 1 - page 7 of 35**

in the ARPA, including the Dad and Wild Horse Winter Ranges (Figure 2). Mule deer from these

winter ranges migrate an average of 26.5 miles east-northeast to their respective summer

ranges (Sawyer 2007). This project focuses on identifying migration routes used by mule deer

that winter in the Dad and Wild Horse Winter Ranges.



Figure 2. Movement routes of 47-GPS collared deer relative to major winter ranges and Plans of Development (POD) in the Atlantic Rim Project Area (ARPA) in south-central Wyoming, February 10, 2005 – November 15, 2006.

**Exhibit 1 - page 8 of 35**

*Wildlife Heritage Foundation of Wyoming*                                          *Mule Deer Migration*

**Methods**

We used existing GPS data collected from 47 mule deer between February 2005 and November 2006 to estimate the utilization distributions (UD) of migration routes originating from the Dad and Wild Horse Winter Ranges. The UD refers to the relative frequency or probability of an animal's location over time (Worton 1987). In the case of migration routes, the UD provides a probabilistic measure of where mule deer migrations occurred. Three mule deer did not migrate and were excluded from our analysis. A portion of our GPS-collars were deployed for 1 year, while others were functioning for a full 2 years.  Depending on how long the GPS-collar was deployed, an individual deer collected data for one or more spring and fall migrations (Table 1). We documented 61 migrations for the 32 mule deer in Wild Horse Winter Range and 19 migrations for the 12 mule deer in Dad Winter Range (Table 1).

We used a Brownian Bridge Motion Model (BBMM; Horne et al. 2008) to estimate UDs for migration routes of individual deer (n=44), using the sequence of GPS locations that occurred between an individual's winter and summer range during a particular migration (spring or fall; Figure 3). The BBMM uses the time elapsed between locations and the rate of movement to estimate the probability of occurrence between successive locations (Horne et al. 2008). All of our mule deer locations were collected at 2.5-hr intervals, but depending on the rate of movement, the predicted width of the migration route varied (Figure 3). Probabilities were calculated for every 50 x 50m cell in the study area. Because mule deer demonstrated a high fidelity to their migration routes across seasons (Figure 3) and years, we combined individual UDs to generate a population-level UD for both the Dad and Wild Horse migration routes (Figures 4 and 5). We color-coded the probability values into 25% quartiles and classified the top 25% as high use and the lowest 25% were as low use. The width of the UD corresponded to a 99% contour interval. Population-level UDs for migration routes in the Dad and Wild Horse Winter Ranges were generated as grid themes in ArcView.

**Exhibit 1 - page 9 of 35**

*Wildlife Heritage Foundation of Wyoming*                    *Mule Deer Migration*



Figure 3. Illustration of individual spring (green) and fall (orange) utilization distributions (UD) estimated for migration routes of a GPS-marked mule deer. The UD estimates the width and probability of use for each migration route. Note that areas with more deer locations (low movement rate) correspond with high-use areas. Mule deer showed high fidelity to their migration routes and tended to use the same route across seasons (spring and fall) and years.

**Exhibit 1 - page 10 of 35**

Table 1. Utilization distributions (UD) were estimated for migratory data collected from 32 GPS-collared mule deer from the Wild Horse Winter Range and 12 from the Dad Winter Range, during 2005 and 2006.  The number of migrations collected for each GPS-collared deer ranged from 1 to 4.

| | Wild Horse Winter Range | | | | | Dad Winter Range | | | |
|---|---|---|---|---|---|---|---|---|---|
| Deer ID | Spring 2005 | Fall 2005 | Spring 2006 | Fall 2006 | Deer ID | Spring 2005 | Fall 2005 | Spring 2006 | Fall 2006 |
| GPS_1 | X | | | | GPS_3 | X | | | |
| GPS_6 | X | | | | GPS_4 | X | | | |
| GPS_7 | X | | | | GPS_5 | X | | | |
| GPS_8 | X | | | | GPS_16 | X | X | X | |
| GPS_9 | X | | | | GPS_17 | X | X | X | |
| GPS_10 | X | | | | GPS_18 | X | | | |
| GPS_11 | X | | | | GPS_19 | X | X | X | |
| GPS_12 | X | | | | GPS_46 | | | X | |
| GPS_14 | X | X | | | GPS_53 | | | X | X |
| GPS_15 | X | | | | GPS_57 | | | X | |
| GPS_20 | X | X | X | X | GPS_58 | | | X | |
| GPS_21 | X | X | X | | GPS_59 | | | X | |
| GPS_22 | X | X | X | | | | | | |
| GPS_23 | X | X | X | | | | | | |
| GPS_24 | X | | | | | | | | |
| GPS_25 | X | X | X | X | | | | | |
| GPS_26 | X | X | X | | | | | | |
| GPS_27 | X | X | X | | | | | | |
| GPS_28 | X | | | | | | | | |
| GPS_30 | X | X | X | X | | | | | |
| GPS_31 | X | X | X | X | | | | | |
| GPS_48 | | | X | | | | | | |
| GPS_49 | | | X | X | | | | | |
| GPS_51 | | | X | | | | | | |
| GPS_52 | | | X | X | | | | | |
| GPS_54 | | | X | | | | | | |
| GPS_55 | | | X | | | | | | |
| GPS_56 | | | X | | | | | | |
| GPS_60 | | | X | X | | | | | |
| GPS_61 | | | X | X | | | | | |
| GPS_62 | | | X | X | | | | | |
| GPS_63 | | | X | X | | | | | |
| TOTALS | 21 | 10 | 20 | 10 | TOTALS | 7 | 3 | 8 | 1 |

**Exhibit 1 - page 11 of 35**

**Results**

We calculated UDs for population-level migration routes of mule deer that wintered in the Dad (Figure 4) and Wild Horse (Figure 5) Winter Ranges. The Dad UD included 19 migrations from the 12 GPS-collared mule deer, while the Wild Horse UD included 61 migrations from 32 mule deer (Table 1). The UDs represent a probabilistic measure of where both spring and fall migrations occurred during 2005 and 2006, although the fall migrations (n=24) were not represented as well as the spring (n=56). In Figures 4 and 5, the red and orange coloring represent areas with the highest probability of use, while yellow and brown represent areas with lowest probability of use. Importantly, higher-use areas (red and orange) corresponded to areas where rates of movement were slow, whereas lower-use areas (yellow and brown) corresponded to areas with high rates of movement (Figures 4 and 5). Most high-use areas within 2-4 miles of the ARPA were connected by medium-high (orange) or medium-low (yellow) areas. As mule deer moved further from winter ranges (east-northeast), common migration routes splintered into multiple, less distinct routes, where high-use areas became smaller and less abundant.

Among the PODs, high-use migration routes occurred in Doty Mountain, Brown Cow, and Muddy Mountain. While mule deer appeared to move quickly through most regions of the Doty Mountain POD, mule deer tended to spend more time in the Brown Cow and Muddy Mountain PODs.

**Exhibit 1 - page 12 of 35**

*Wildlife Heritage Foundation of Wyoming*                                        *Mule Deer Migration*



Figure 4. Estimated utilization distribution (UD) of population-level migration route in the Dad Winter Range, based on of 12 GPS-collared mule deer, including 4 fall and 15 spring migrations between 2005 and 2006.

**Exhibit 1 - page 13 of 35**

*Wildlife Heritage Foundation of Wyoming*                              *Mule Deer Migration*



Figure 5. Estimated utilization distribution (UD) of population-level migration route for the Wild Horse Winter Range, based on 32 GPS-collared mule deer, including 20 fall and 41 spring migrations between 2005 and 2006.


**Discussion and Management Implications**

   The UDs estimated for the Dad and Wild Horse Winter Ranges provide an objective, empirically-based, delineation of population-level migration routes in the ARPA. When relative amounts of use are mapped, as in Figures 4 and 5, the natural tendency is to interpret high-use areas as the most biologically important and low-use areas as the least important. While this interpretation is generally correct, it is important to recognize that high-use areas reflect habitats where deer moved slowly (e.g., foraging, resting) and low-use areas reflect habitats

**Exhibit 1 - page 14 of 35**

where deer moved quickly. Thus, we assume that high-use areas provide key foraging and resting habitat, while lower-use areas provide movement corridors and connectivity between high-use areas. Of course, functional migration routes require that connectivity be maintained between high-use areas, such that deer have the ability to move between seasonal ranges. High-use areas within 2 miles of the ARPA were typically connected by medium-high (orange) and medium-low (yellow) use areas (e.g., Brown Cow to Sand Hills, or Doty Mountain to Sand Hills).

From a management perspective, distinguishing between high and low use areas across a population-level migration route may be useful for planning, mitigating, and prioritizing land-use decisions. For example, given that high-use areas provide foraging and resting habitat along the migration route, management strategies may be modified to minimize human disturbance (e.g., road construction) and habitat loss (e.g., infrastructure) in high-use areas. In contrast, low-use areas appear to function as simple movement corridors, rather than major foraging or resting areas. Accordingly, human disturbances and habitat loss occurring in low-use areas would be less likely to disturb mule deer or affect them physiologically, provided that the disturbance(s) did not include anthropogenic features (e.g., fences) that restricted mule deer movement. Because we currently do not know the threshold level(s) of development (e.g.., road density, well density, traffic levels, etc.) that will impede mule deer migration through low-use areas, a cautious or incremental development approach may be warranted.

Another important management consideration is that mule deer migration routes tend to become less distinct as distance from winter range increases (Thomas and Irby 1990). Our data suggest that common and intensively-used migration routes splintered into multiple, less distinct routes, as mule deer moved east-northeast of the ARPA. A useful analogy for this pattern is to think of the population-level migration routes as a road system, where the heavily-used routes close to winter range are analogous to interstates. As distance from winter range increases, those interstates turn into highways that receive less deer use (traffic) and eventually county roads with even lower levels of use.  Accordingly, the potential for disrupting mule deer migration is greater along the interstates (close to winter range) than the county roads (far

**Exhibit 1 - page 15 of 35**

from winter range) because those are the regions that receive the highest levels of use from the most number of deer.

We recommend that managers consider both the distance of migration routes from winter range and intensity of use that the route receives. In general, the potential to disrupt mule deer migration is greater in areas that receive higher levels of use and are close to winter range (Figure 6).  Conversely, the potential to disrupt mule deer migration is lower in low-use areas or for routes further from winter range (i.e., close to summer range). We encourage agencies and industry to consider this information, in conjunction with the raw migration data (Figure 2), in development plans and management strategies associated with the ARPA. Additionally, we recommend future research efforts determine the habitat characteristics of high-use and low-use areas, such that migration routes can be targeted for habitat improvement projects.



Figure 6. Predicted relationship between the potential impacts to mule deer migration and distance to winter range and levels of deer use.  Potential impacts are expected to be greater in areas close to winter range and for routes receiving high levels of use.

**Exhibit 1 - page 16 of 35**

*Wildlife Heritage Foundation of Wyoming*                                    *Mule Deer Migration*

## Literature Cited

Bureau of Land Management [BLM]. 2000*a*. Record of Decision: Environmental Impact Statement Continental Divide/Wamsutter II Natural Gas Project. Rawlins and Rock Springs Field Offices, Rawlins, Wyoming.

Bureau of Land Management [BLM]. 2000*b*. Record of Decision: Environmental Impact Statement South Baggs Area Natural Gas Development Project. Rawlins Field Office, Rawlins, Wyoming.

Bureau of Land Management [BLM]. 2005. Oil and gas activity on public lands in the United States and Wyoming. USDI-BLM, Wyoming State Office, Cheyenne, USA.

Bureau of Land Management [BLM]. 2006. Final Environmental Impact Statement Atlantic Rim Natural Gas Field Development Project. Rawlins Field Office, Rawlins, Wyoming.

Berger, J., S. L. Cain, and K. M. Berger. 2006. Connecting the dots: an invariant migration corridor links the Holocene to the present. Biology Letters doi:10.1098/rsbl.2006.0508.

Horne, J. S., E. O. Garton, S. M. Krone, and J. S. Lewis. 2007. Analyzing animal movements using Brownian Bridges. Ecology 88:2354-2363.

Porter, M. A.  1999.  Spatial relationships between sympatric mule deer and elk in south-central Wyoming.  M. S. Thesis, University of Wyoming, Laramie, Wyoming.

Sawyer, H., F. Lindzey, and D. McWhirter. 2005. Mule deer and pronghorn migration in western Wyoming. Wildlife Society Bulletin 33:1266-1273.

Sawyer, H., R. Nielson, F. Lindzey, and L. McDonald. 2006. Winter habitat selection of mule deer before and during development of a natural gas field. Journal of Wildlife Management 70:396–403.

Sawyer, H. 2007. Final Report for the Atlantic Rim Mule Deer Study. Western Ecosystems Technology, Inc. Cheyenne, Wyoming.

Thomas, T., and L. Irby. 1990. Habitat use and movement patterns by migrating mule deer in southeast Idaho. Northwest Science 64:19-27.

White, P. J., T. L. Davis, K. K. Barnowe-Meyer, R. L. Crabtree, and R. A. Garrott. 2007. Partial migration and philopatry of Yellowstone pronghorn. Biological Conservation 135:502-510.

Worton, B. J. 1987. A review of models of home range for animal movement. Ecological Modeling 38:277-298.

Wyoming Game and Fish Department [WGFD]. 2005. 2005 Job Completion Report for the Green River Region. Wyoming Game and Fish Department, Cheyenne, Wyoming.

**Exhibit 1 - page 17 of 35**

# Anadarko Petroleum Corporation
# Atlantic Rim Wildlife Survey

## June 2007

Prepared for:


Anadarko Petroleum Corporation
1201 Lake Robbins Drive
The Woodlands, Texas 77380

And


Bureau of Land Management
Rawlins Field Office
1300 North Third
Rawlins, WY  82301


Prepared by:


Grasslands Consulting, Inc.
8811 E. Hampden Ave., Suite 200
Denver, CO  80231

RECEIVED

JUL  0 3 2007

Bureau of Land Management
Rawlins Field Office

**Exhibit 1 - page 18 of 35**



# Grasslands Consulting, Inc.

8811 E. Hampden Ave., Suite 200, Denver, CO 80231
303 745-1607 Phone 303 745-1676 Fax

**Atlantic Rim Wildlife Survey**

## Introduction

Anadarko Petroleum Corporation (Anadarko) plans to develop portions of the Atlantic Rim Natural Gas Project, which is located in Carbon County, Wyoming. This project will involve drilling coal bed natural gas and conventional natural gas wells, water reinjection wells, constructing pipelines and electrical infrastructure, and developing roads. Project activities will be conducted on private lands and on lands administered by the Bureau of Land Management Rawlins Field Office (BLM). Implementation of this project is planned for late 2007 through 2008. In support of this project, Anadarko contracted Grasslands Consulting, Inc. (Grasslands) to conduct biological field surveys as required in the Wildlife Protection and Monitoring Plan in the Atlantic Rim FEIS.

## Methods

*Greater Sage Grouse Survey*

Breeding greater sage grouse (lek) surveys were conducted within the Atlantic Rim Project Area between March 1st and April 27th. All previously identified leks within 2-miles of proposed 2007 and 2008 wells were observed. All observations were made between one hour before sunrise and one hour following sunrise. The lek observation locations were accessed by vehicle. Observations were made by listening for booming grouse and visually observing sage grouse lek locations for individuals. Occupied locations were observed to count individual males and females. Following the early morning lek surveys, lek locations were visually observed for sage grouse sign including fecal pellets and feathers. Table I includes specific lek locations, observations made, dates, and names of the biologists who conducted the surveys.

*Nesting Raptor Survey*

Prior to conducting the field survey, Grasslands biologists obtained known nesting raptor locations within the project area. These locations were provided by the BLM and include observations that were made by BLM biologists and the Wyoming Game and Fish Department. All known raptor nest locations and suitable raptor nesting habitats within 1-mile of a proposed 2007 and 2008 developments were observed.

**Exhibit 1 - page 19 of 35**

Grasslands biologists Nick Hall and Grant Leadem conducted raptor surveys on June 5-6 and June 19-21, between the hours of 1000 and 1730. Observations of historic nesting locations and new locations were conducted from ATVs and on foot in areas that are inaccessible by vehicle. Coordinates of each nest location were recorded using hand-held GPS. To maintain a non-invasive, low stress presence, observations of active nests were made following approved raptor survey methods from an appropriate distance using 10X50-power binoculars (call 1978). All survey observations were recorded in field books and active nests were documented with digital photos and raptor data sheets.

*Mountain Plover Survey*

Three mountain plover surveys were conducted within the Atlantic Rim Project Area between May 15th and June 20th. Grasslands biologists Daniel Soucy, Nick Hall, and Luke Moussa conducted the first mountain plover survey on May 15th and 16th, the second survey was conducted by Nick Hall and Grant Leadem on June 5th and 6th, and the third survey was conducted by Nick Hall and Grant Leadem on June 19th and 20th. Surveys were conducted from sunrise to 1000 and from 1730 to sunset, focusing on areas characterized by level terrain, prairie dog colonies, short vegetation, grazing, widely spaced plants, and other areas as indicated by the mountain plover protocol. These habitats were identified using BLM models of potentially suitable habitat. Observations were made using 10X50-power binoculars from a vehicle or ATV within previously identified mountain plover habitat. The vehicle was stopped frequently and turned off to listen for vocalizations and to scan open terrain. All survey observations were recorded using hand-held GPS units, digital photographs, and field notebooks.

**Results**

*Greater Sage Grouse Survey*

Breeding greater sage grouse (lek) surveys conducted in March and April of this year identified 4 active leks out of the 27 leks within 2-miles of proposed 2007 and 2008 well locations. On March 1st, seven males were observed from approximately ¼-mile, displaying on the Dry Cow 4 lek. This area was revisited on the afternoon of March 2nd to map the perimeter of the lek. On March 1st and 2nd, six and ten males were observed respectively in the vicinity of the Pipeline lek. On April 25th, approximately 110 grouse were observed ¼-mile southwest of the Wild Horse Basin 2 lek. This area was revisited on April 27th to map the perimeter of the lek. On April 27th, seventy grouse were observed on the Filmore Ranch lek. The East Dry Cow and Willows 2 leks contained indicators of recent activity (scat, and feathers), although though no birds were observed. No grouse or other signs of recent activity were observed on the other leks. Table I includes the activity status and survey dates of all leks.

*Nesting Raptor Survey*

83 nests were observed within 1 mile of proposed 2007 and 2008 well locations. Six nests were identified as active; 3 were occupied by golden eagles, 1 by ferruginous hawks, and 2 by red-tailed hawks. Recently active nests were identified based on the presences of fresh white-wash, downy, and mature feathers and recorded in the notes (Table II).

**Exhibit 1 - page 20 of 35**

*Mountain Plover*

No mountain plover were observed during the three surveys. Habitat conditions within the Atlantic Rim Project Area are typically not ideal for mountain plover. A large percentage of the habitat included in the BLM modeling includes habitats that are not suitable for the species.

## Conclusion

As a result of this wildlife survey 4 greater sage grouse leks have been identified as active. These leks include the Dry Cow 4 lek, the Pipeline lek, the Wild Horse Basin 2 lek, and the Fillmore Ranch lek.

Six raptor nest were identified as being active including nests 04 RT A, 34 GE A, 38 FH A, 71 GE A, 74 GE A, and 82 RT A. All other previously identified nests and nest identified during this survey were observed as inactive.

Three mountain plover surveys were conducted within the modeled habitat. No mountain plover were observed in the Atlantic Rim Project Area. Habitat conditions within these areas do not constitute good mountain plover habitats. Mountain plover habitat mapping should be conducted prior to surveys in 2008.

## References

Bureau of Land Management. 2007. Digital Mapping Files of Raptor Nest Locations, Sage Grouse Lek Locations, and Mountain Plover Habitat. Provided by BLM Rawlins Field Office.

Call, Mayo W. 1978. Nesting Habitats and Surveying Techniques for Common Western Raptors. USBLM Technical Note TN-316. USBLM Denver Service Center; May 1978. 115pp.

**Exhibit 1 - page 21 of 35**

APPENDIX A
Results Tables

Table I Sage Grouse Lek Information

| BLM Lek Name | Lek Location | Date Surveyed | Name of Surveyor(s) | Birds Present | Comments | Mapped as Polygon |
|---|---|---|---|---|---|---|
| Dry Cow 4 | SESE Sec. 31, T17N R91W | March 1st | Chris Gayer, Dan Soucy | Yes | Approximately 7 males were observed from location approx. ¼ mile away. The location was observed later in the day. Presence of fecal pellets and feathers. Lek area was mapped as a polygon. | Yes. Shapefile name: Dry Cow 4.shp |
| Dry Cow 3 | SENE Sec. 28, T17N R91W | March 1st | Chris Gayer, Dan Soucy | No | Mapped on a pipeline corridor. No sign was observed. | No |
| Dry Cow 2 | SWSW Sec. 21, T17N R91W | March 1st | Chris Gayer, Dan Soucy | No | Mapped on a slope with low-density sagebrush surrounding. No sign was observed. | No |
| Doty Mountain | SWSW Sec. 10, T17N R91W | April 25th | Dan Soucy, Nick Hall | No | Mapped on steep hillside. | No |
| Willows 1 | SWSW Sec. 18, T17N R90W | March 2nd | Chris Gayer | No | Not much sagebrush in area, very open. No sign was observed. | No |
| Sand Dunes 1 | NWNW Sec. 25, T17N R91W | March 2nd | Chris Gayer | No | Low sagebrush in area, no sign was observed. | No |
| Willows 3 | SWSE Sec. 25, T17N R91W | March 2nd | Chris Gayer | No | Clearings are present, mid- to low sagebrush, no sign was observed. | No |
| East Dry Cow | SESE Sec. 35, T17N R91W | March 2nd | Chris Gayer | No | fecal pellets were observed, although no birds were observed. | No |
| Willows 2 | SWSW Sec. 36, T17N R91W | March 2nd | Chris Gayer | No | fecal pellets were observed, although no birds were observed. | No |
| West J.O. | NWNW Sec. 11, T16N R91W | March 2nd | Dan Soucy, Nick Hall | No | Mapped adjacent to Willows Rd, no sign was observed. | No |
| Sandhills Rd. | SWSW Sec. 10, T16N R91W | March 2nd | Dan Soucy, Nick Hall | No | Mapped along a drainage below stock pond, poor habitat, no sign observed. | No |
| Dad Basin 1 | SWSW Sec. 15, T16N R91W | March 2nd | Dan Soucy, Nick Hall | No | No sign was observed. | No |

Exhibit 1 - page 22 of 35

| | | | | | | |
|---|---|---|---|---|---|---|
| Pipeline | NESE Sec. 29, T16N R91W | March 1st & 2nd | Chris Gayer, Dan Soucy | Yes | Observed 6 males approx. 1000 feet from the mapped location on March 1st. Observed 10 males west of mapped location on Willows Road on March 2nd. | No |
| East Dad Rd | SESE Sec. 24, T16N R92W | March 1st | Chris Gayer, Dan Soucy | No | Mapped near road, poor habitat, no sign was observed. | No |
| Wild Cow | NENE Sec. 20, T15N R91W | March 3rd | Dan Soucy, Nick Hall | No | Not a large sagebrush component, no sign was observed. | No |
| Upper Wild Cow Creek | NENE Sec. 11, T15N R91W | March 3rd | Dan Soucy, Nick Hall | No | Scattered low sagebrush, no sign was observed. | No |
| Cherokee Creek 3 | Center Sec. 36, T15N R91W | March 3rd | Dan Soucy, Nick Hall | No | Low and scattered sagebrush, no sign was observed. | No |
| Wild Horse Basin 2 | SENW Sec. 7, T14N R90W | April 25th | Chris Gayer, Luke Moussa | Yes | Approx. 110 male birds were observed approximately 1/4 southwest of mapped location. Birds were in large open area near fence and two-track. Lek was revisited and mapped April 27th. | Yes. Shapefile name: Lek Area.shp |
| Wild Horse Mtn. | SENW Sec. 12, T14N R91W | April 25th | Chris Gayer, Luke Moussa | No | Birds were observed approx. 3/4 miles to the east of this location. These birds were closer to the Wild Horse Basin 2 lek. | No |
| Olson Draw | Center Sec. 34, T18N R91W | April 25th | Dan Soucy, Nick Hall | No | Decent sagebrush component, no sign was observed. | No |
| Olson Divide | NWSW Sec. 13 T18N R91W | April 27th | Dan Soucy | No | Mapped near hilltop, good sagebrush component, no sign was observed. | No |
| Fillmore Ranch | NWNE Sec. 12, T18N R91W | April 27th | Dan Soucy | Yes | Approx. 70 birds were observed. 50 birds were observed on the mapped lek location, and roughly 20 were observed on a satellite lek 200 yards north. | No |
| Fillmore Cabins | Center Sec. 8, T18N R90W | March 7th | Dan Soucy | No | No sign observed, well located within NSO. | No |
| Fillmore Turnoff | SESE Sec. 4, T18N R90W | March 7th | Dan Soucy | No | Decent sagebrush in area, no sign was observed. | No |
| Fillmore Hilltop | NENW Sec. 31, T19N R90W | April 27th | Nick Hall | No | No sign was observed, good sagebrush present. | No |
| North Fillmore | NESW Sec. 30, | April 27th | Nick Hall | No | No sign was observed, good sagebrush | No |

**Exhibit 1 - page 23 of 35**

| | T19N R90W | | | | present. | |
|---|---|---|---|---|---|---|
| Separation Creek | NENE Sec. 27, T19N R90W | March 7th | Dan Soucy | No | Decent sagebrush in area, no sign was observed. | No |

**Exhibit 1 - page 24 of 35**

## Table II Raptor Nest Information

| Name | Species | Condition | Latitude | Longitude | Notes |
|------|---------|-----------|----------|-----------|-------|
| 01 RT | Red-tailed | Poor | 41.159842 | -107.589288 | Old nest in juniper, 10' high, east facing |
| 02 RT | Red-tailed | Poor | 41.188273 | -107.614630 | Nest observed, old inactive in juniper, no birds obs aerial view, no activity |
| 03 UR | Unknown Raptor | None | 41.176907 | -107.585070 | No nest observed at previously mapped location. 04UR observed nearby. |
| 04 RT A | Red-Tailed | Active | 41.180071 | -107.590195 | 2 Nests observed, ravens observed nearby, north facing, in same tree in different deep crotches, approximately 24" in diameter and 20" deep, downy observed in nest, new whitewash feathers observed and kept. |
| 05 UR | Unknown Raptor | Poor | 41.279197 | -107.598354 | Old nest in rock face, halfway up large drainage wall, remnant, SE facing |
| 06 UR | Unknown Raptor | Moderate | 41.193303 | -107.620273 | Large nest in juniper, inactive, good shape, potentially recently active |
| 07 UR | Unknown Raptor | None | 41.208320 | -107.596211 | No nest observed at previously mapped location, Active ferruginous hawk nest observed nearby, possibly mapped incorrectly |
| 08 RT | Red-tailed | Poor | 41.473070 | -107.655454 | Old inactive nest on rocky outcrop, wind blown |
| 09 UR | Unknown Raptor | Poor | 41.278164 | -107.603460 | Old nest in rock face, halfway up large drainage wall, remnant, south facing |
| 10 UR | Unknown Raptor | Poor | 41.192867 | -107.622106 | Old tree top nest, wind blown, medium sized, inactive |
| 11 UR | Unknown Raptor | Poor | 41.192820 | -107.623185 | Old tree top nest, wind blown, medium sized, inactive |
| 12 UR | Unknown Raptor | Poor | 41.187035 | -107.615716 | Old tree top nest, not active, poor condition. |
| 13 UR | Unknown Raptor | Moderate | 41.187090 | -107.602776 | Very large nest in juniper, 3' diameter 6' depth, Small unidentified raptor flushed from location. Potentially a Merlin or Kestrel. Used as hunting perch. |
| 14 UR | Unknown Raptor | Good | 41.156594 | -107.599364 | Inactive nest in treetop, good shape, west facing, 10' high, juniper |
| 15 UR | Unknown Raptor | Poor | 41.461486 | -107.659275 | Two cavity nest in cliff face, unoccupied, could be raven nests |
| 16 UR | Unknown Raptor | Good | 41.472721 | -107.645514 | Nest in cliff face, not active, good shape, south facing |
| 17 UR | Unknown Raptor | Poor | 41.475520 | -107.653022 | 2 Nests in close proximity, old and flattened on cliff face |
| 18 UR | Unknown Raptor | Good | 41.473134 | -107.657714 | Nest on cliff face, good shape, south facing, whitewash near, no bird observed, potentially recently active |
| 19 UR | Unknown Raptor | Poor | 41.196462 | -107.608957 | Inactive tree nest, poor condition west facing |
| 20 UR | Unknown Raptor | Poor | 41.195761 | -107.607605 | Inactive tree nest, poor condition west facing |
| 21 UR | Unknown Raptor | Poor/ Moderate | 41.186711 | -107.609829 | 5 nests observed within approx 500 ft. 2 remnant 3 with moderate shape (could be reused), no new sign or activity observed, all nests in juniper |
| 22 UR | Unknown Raptor | Poor | 41.197241 | -107.613272 | Inactive, old, windblown nest in base of large tree, large nest, close proximity to active golden nest. |
| 23 FH | Ferruginous Hawk | Poor | 41.304933 | -107.667919 | 2 old remnant FEHA nests in rock face near road |
| 24 FH | Ferruginous Hawk | Poor | 41.361603 | -107.681781 | Appears to be good nesting habitat, nest is blown, feathers and downy present, hawk pellet, no recently added nesting material. |
| 25 FH | Ferruginous | Poor | 41.362461 | -107.681299 | Abandoned, collapsed, inactive |

**Exhibit 1 - page 25 of 35**

| | Hawk | | | | |
|---|---|---|---|---|---|
| 26 FH | Ferruginous Hawk | Good | 41.365214 | -107.692553 | Nest intact, feathers and downy present, 6-10" deep, 4' tall, on high point, rocky base, varying degree of bleaching on sage substrate, may have been active this year. |
| 27 FH | Ferruginous Hawk | Poor | 41.364705 | -107.693921 | Old and remnant |
| 28 FH | Ferruginous Hawk | Poor | 41.575863 | -107.557153 | Ferrug nest, collapsed, NE exposure, sage brush sticks, 9' off ground, on cliff face, inactive |
| 29 FH | Ferruginous Hawk | Poor | 41.391777 | -107.676673 | Large south facing nest on small butte, 3' diameter, flattened |
| 30 FH | Ferruginous Hawk | Good | 41.380319 | -107.684355 | 6-10" deep, new and old sage substrate, 2-4' tall, on tall rocky base, may have been active or nesting attempted this year |
| 31 FH | Ferruginous Hawk | Poor | 41.380995 | -107.689789 | Abandoned, collapsed, |
| 32 FH | Ferruginous Hawk | Poor | 41.388651 | -107.664315 | Remnant, very little remaining |
| 33 FH | Ferruginous Hawk | Poor | 41.476319 | -107.641197 | 3 old rock face nests, all inactive, all weathered, within 100' of each other |
| 34 GE A | Golden Eagle | Active | 41.243955 | -107.636635 | 2 chicks on nest, located in juniper, Large, 3' diameter 5' depth, SE facing, GOEA obs nearby |
| 35 FH | Ferruginous Hawk | Moderate | 41.203360 | -107.583468 | Artificial Nesting Platform, moderate condition, overlooking sage grouse lek, inactive, near road |
| 36 BO | Burrowing Owl | Washed | 41.331955 | -107.681031 | Inactive site, old broken down pellets in area, washed out white-wash, no new activity |
| 37 FH | Ferruginous Hawk | None | 41.179910 | -107.569676 | No nest observed at previously mapped location. Nest mapped on top of knoll. Potential old FEHA nest on ground. Thoroughly scouted, no nest observed. |
| 38 FH A | Ferruginous Hawk | Active | 41.205419 | -107.597404 | Active nest in juniper. East facing exposure halfway up slope, stick substrate, nest height 6' off ground nest depth 2' nest diameter 3'. 2 angry FEHA obs. Nearby.1- 2 chicks in nest and 2 eggs. |
| 39 FH | Ferruginous Hawk | None | 41.242071 | -107.643195 | No nest observed, possibly mapped wrong, pellets and wash near point, no nest observed |
| 40 FH | Ferruginous Hawk | Moderate | 41.241175 | -107.643013 | Juniper nest on steep slope, 3' diameter 2' depth, 10' height, inactive |
| 41 FH | Ferruginous Hawk | Poor | 41.243449 | -107.635634 | Remnant nest on rock outcrop, south facing, no activity |
| 42 FH | Ferruginous Hawk | Poor | 41.244344 | -107.635634 | Old nest in juniper, wind blown, |
| 43 FH | Ferruginous Hawk | Poor | 41.271486 | -107.677198 | Old remnant nest on rock outcrop, inactive |
| 44 FH | Ferruginous Hawk | Poor | 41.270453 | -107.670362 | Old remnant nest, no activity |
| 45 FH | Ferruginous Hawk | Poor | 41.268938 | -107.665532 | Old remnant nest, no activity |
| 46 FH | Ferruginous Hawk | Poor | 41.265977 | -107.659061 | Old cliff face nest, remnant, no activity |
| 47 FH | Ferruginous Hawk | Poor | 41.336405 | -107.682528 | Constructed on rock mound, 8' off ground, sage substrate, inactive nest, active perch site (white-wash) |
| 48 FH | Ferruginous Hawk | Poor | 41.386838 | -107.667730 | Remnant, very little remaining |
| 49 FH | Ferruginous Hawk | Poor | 41.389091 | -107.656524 | Old, remnant, cow dung mixed with sage substrate |

**Exhibit 1 - page 26 of 35**

| 50 FH | Ferruginous Hawk | Poor | 41.386069 | -107.659701 | Remnant, blown, old, |
|---|---|---|---|---|---|
| 51 FH | Ferruginous Hawk | None | 41.174979 | -107.594441 | No nest observed at previously mapped location. Potential old FEHA nest on ground. Area thoroughly checked |
| 52 FH | Ferruginous Hawk | None | 41.211284 | -107.591205 | No nest observed, located on existing road, potentially old ground nest. Unobserved |
| 53 FH | Ferruginous Hawk | None | 41.288397 | -107.645422 | Mapped in wrong place |
| 54 FH | Ferruginous Hawk | Moderate | 41.288233 | -107.649920 | Old, inactive FEHA nest on rock face. Large. 3' diameter 2' depth |
| 55 FH | Ferruginous Hawk | Poor | 41.299382 | -107.685084 | Remnant old nest on rock face |
| 56 FH | Ferruginous Hawk | Poor | 41.298747 | -107.684638 | Remnant old nest on rock face |
| 57 FH | Ferruginous Hawk | Moderate | 41.300885 | -107.693257 | Old Nest on cliff face, poor shape, whitewash and bones present, not active |
| 58 FH | Ferruginous Hawk | None | 41.305371 | -107.660651 | Unobserved nest. Point is located on existing well pad, area checked thoroughly, no nest observed |
| 59 FH | Unknown Raptor | Poor | 41.389538 | -107.675466 | Artificial Nesting Platform, poor condition, no nest shape only debris and rabbit remains, used as a hunting perch |
| 60 FH | Ferruginous Hawk | Poor | 41.391056 | -107.672230 | Nest on east edge of rocky outcrop in drainage, old inactive nest |
| 61 FH | Ferruginous Hawk | Poor | 41.391422 | -107.671952 | Nest on east edge of rocky outcrop in drainage, old inactive nest |
| 62 FH | Ferruginous Hawk | Poor | 41.393748 | -107.670012 | 2 Nests located on west edge of rocky outcrop, old, poor shape, both inactive |
| 63 FH | Ferruginous Hawk | Poor | 41.476870 | -107.629085 | Remnant cliff face nest, south facing |
| 64 FH | Ferruginous Hawk | Poor | 41.337823 | -107.681808 | Located on high point, heavily bleached sage substrate |
| 65 FH | Ferruginous Hawk | Good | 41.341688 | -107.677430 | Appears to have been active recently, feathers and downy present, southern exposure, no birds on nest, 6' off ground on rocky mound, sage substrate, 3' tall (* nest on north side of this mound that is abandoned, old and remnant, appears to have cacti mixed in w/ sage substrate) |
| 66 FH | Ferruginous Hawk | Moderate | 41.340618 | -107.677902 | Feathers and downy present, possibly active - more likely a perch |
| 67 FH | Ferruginous Hawk | Poor | 41.339614 | -107.676569 | Remnant, very little remaining |
| 68 FH | Ferruginous Hawk | Poor/Moderate | 41.361662 | -107.683296 | 3 old collapsed nests, no activity apparent at location – RETA observed in area |
| 69 FH | Ferruginous Hawk | None | 41.529926 | -107.562677 | No nest observed at previously mapped location, FEHA nest mapped, location mapped is located on the west face of a small knoll where no trees or cliff face are exposed, potentially an old ground nest |
| 70 FH | Ferruginous Hawk | Moderate/Good | 41.528232 | -107.541722 | Four nests observed along this ridgeline, 2 kestrels flew off nests, none observed as active raptors |
| 71 GE A | Golden Eagle | Active | 41.196249 | -107.608964 | Golden Eagle nest, active, 2 chicks in nest. Eagle flushed from nest. Nest in large tree (20') pinion-juniper 6' diameter 5' depth height 8', located in middle of tree near crotch, west exposure |

**Exhibit 1 - page 27 of 35**

| | | | | | |
|---|---|---|---|---|---|
| 72 GE | Golden Eagle | Poor | 41.324468 | -107.671937 | 2 old GOEA nests, remnant, on rock face, near road, GOEA observed nearby. Using area as a hunting perch, no other nests near |
| 73 GE | Golden Eagle | Poor | 41.095724 | -107.541213 | Located in stand of cottonwood trees, occupied by BBMP (8-counted) |
| 74 GE A | Golden Eagle | Active | 41.466127 | -107.670618 | Active, Good condition, on cliff face, fresh white-wash, pellets, several frequented perches, bird observed, nest constructed of sage and woody debris |
| 75 GE | Golden Eagle | Poor | 41.303718 | -107.668581 | Inactive GOEA nest on rock face. Remnant. Near Road |
| 76 GE | Golden Eagle | Poor | 41.467271 | -107.669128 | Old cliff face nest, unknown falcon, inactive, close proximity to active golden |
| 77 UR | Unknown Raptor | Poor | 41.475688 | -107.650609 | Old flattened cliff face nest, not active |
| 78 PF | Prairie Falcon | Poor | 41.480509 | -107.642382 | 3 Nests observed on same cliff face, all south facing, none active |
| 79 UR | Multiple | Poor | 41.158533 | -107.589652 | 5 total nests observed. All inactive. All poor shape |
| 80 UR | Red-tailed | Poor | 41.242139 | -107.631304 | Old nest in tree top, poor shape/ partially remnant, south facing |
| 81 RT | Red-tailed | Poor/NA | 41.470521 | -107.662492 | No trees in area, there is an old cavity nest in face that is in poor condition, could be a raven nest |
| 82 RT A | Red-tailed | Active | 41.441328 | -107.574578 | Observed active RETA nest, 1-2 chicks, mature bird observed on nest. |
| 83 FH | Ferruginous Hawk | Moderate | 41.398289 | -107.642152 | Nest in fair condition with white-wash and feathers present, located on a small outcrop of rocks. |

**Exhibit 1 - page 28 of 35**

## APPENDIX B
### Raptor Nest Inventory Forms

**Exhibit 1 - page 29 of 35**

*close to SHI4912401*
*L) Ravens 07 in June*

*SH in trees*
*defensive*
*SHH912401*

## Raptor Inventory Data Sheet

**Raptor Nest ID*:**   04 RT A          **Date First Observed*:**   6-5-2007

**Species:**   RETA          **Observed By:** Nick Hall and Grant Leadem

**Location:** Township 14 N, Range 91 W   **Ownership:**  P  S  FS  **BLM**  LU  Other_____

**Section**   13,  SW ¼, SW ¼          **Nest Substrate*:**  CTL

**UTM Zone:** 13          **Height of Substrate (ft.):** 2

**Geo. Datum (circle one):**   NAD 27   **NAD 83**   **Nest Height On/In Substrate (ft.):**  6'

**Northing:** 41.180071 **Easting:** -107.590195          **Nest Exposure:** N

**Vegetation Type*:** Juniper Woodland

**USGS Quad Name:** Smiley Draw

**County:** Carbon, WY

**Nest Status*:** ACTI

**Nest Condition*:** EXCELLENT

**Number of Eggs:** 0          **Young:**  0

**Remarks/Comments:  Physical Relationship to Other Nests, Proximity to Potential Disturbances, Etc.:**

2 Nests observed, ravens observed nearby, north facing, in same tree in different deep crotches, approximately 24" in diameter and 20" deep, downy observed in nest, new whitewash feathers observed and kept. 2 pictures taken

*L>from what?*

### Map/Photo

*this photo cannot be "04RTA" — marked on A.R. grasslands consult map.*

*Mark for "04RTA" is an isolated juniper w/ nest but doesn't seem active*



*pic looks like their 03 UR of our SH14912401*

*Ravens earlier but SH defensive today!?*

**Exhibit 1 - page 30 of 35**

Raptor Inventory Data Sheet

Raptor Nest ID*:    34 GE A              Date First Observed*: 6-20-2007

Species:            GOEA                Observed By: Nick Hall and Grant Leadem

Location: Township 15 N, Range 91 W    Ownership:  P  S  FS  **BLM**  LU  Other____

Section    28,  SW ¼, NE ¼            Nest Substrate*:   JUN

UTM Zone: 13                          Height of Substrate (ft.): 5

Geo. Datum (circle one):    NAD 27    **NAD 83**  Nest Height On/In Substrate (ft.):  10

Northing: 41.243955 Easting: -107.636635       Nest Exposure:  SE

Vegetation Type*: Juniper Woodland

USGS Quad Name: Peach Orchard Flat

County: Carbon, WY

Nest Status*: ACTI

Nest Condition*: EXCELLENT

Number of Eggs: N/A          Young:    2

Remarks/Comments:  Physical  Relationship  to  Other  Nests,  Proximity  to  Potential
Disturbances, Etc.:

2 chicks on nest, located in juniper, Large, 3' diameter 5' depth, SE facing, GOEA obs. nearby

**Map/Photo**



**Exhibit 1 - page 31 of 35**

Raptor Inventory Data Sheet

**Raptor Nest ID\*:**   38 FH A          **Date First Observed\*:**   6-5-2007

**Species:**          FEHA          **Observed By:** Nick Hall and Grant Leadem

**Location:** Township 14 N, Range 91 W   **Ownership:**   P   S   FS   **BLM**   LU   Other_____

**Section**    11,  NW ¼, NE ¼          **Nest Substrate\*:**   JUN

**UTM Zone:** 13                **Height of Substrate (ft.):** 2

**Geo. Datum (circle one):**   NAD 27    **NAD 83**  **Nest Height On/In Substrate (ft.):**  6'

**Northing:** 41.205419 **Easting:** -107.597404    **Nest Exposure:** E

**Vegetation Type\*:** Juniper Woodland

**USGS Quad Name:** Smiley Draw

**County:** Carbon, WY

**Nest Status\*:** ACTI

**Nest Condition\*:** EXCELLENT

**Number of Eggs:** 2        **Young:**   1-2

**Remarks/Comments: Physical Relationship to Other Nests, Proximity to Potential Disturbances, Etc.:**

Active nest in juniper, halfway up slope. East facing exposure, stick substrate, nest height 6' off ground nest depth 2' nest diameter 3'. 2 ferrugs obs. Nearby. 1- 2 chicks in nest and 2 eggs.

**Map/Photo**

seems accurate - 7/23
t walk to the nest
created 3 FH
elling, circling
est area far
bove

roads in area
wrong on map
-gas activity-



**Exhibit 1 - page 32 of 35**

Raptor Inventory Data Sheet

**Raptor Nest ID\*:**   71 GE A          **Date First Observed\*:**  6-5-2007

**Species:**        GOEA          **Observed By:** Nick Hall and Grant Leadem

**Location:** Township 14 N, Range 91 W   **Ownership:** P  S  FS  **BLM**  LU  Other____

**Section**     11,  NW ¼, SW ¼      **Nest Substrate\*:**  JUN

**UTM Zone:** 13              **Height of Substrate (ft.):** 5

**Geo. Datum (circle one):**  NAD 27   **NAD 83**  **Nest Height On/In Substrate (ft.):**  6'

**Northing:** 41.196249 **Easting:** -107.608964    **Nest Exposure:** SW

**Vegetation Type\*:**Juniper Woodland

**USGS Quad Name:** Smiley Draw

**County:** Carbon, WY

**Nest Status\*:** ACTI

**Nest Condition\*:** EXCELLENT

**Number of Eggs:** N/A      **Young:**    2

**Remarks/Comments:  Physical Relationship to Other Nests, Proximity to Potential Disturbances, Etc.:**

Golden Eagle nest, active, 2 chicks in nest. Eagle flushed from nest. Nest in large tree (20') pinion-juniper 6' diameter 5' depth height 8', located in middle of tree near crotch, west exposure.

**Map/Photo**



several UR nests in area

I'm sure I found this tree —

at NO 6E or other raptors showed themselves nearby {raining}

Seems accurate but seems small for 6E?

Glassed only

X saw 1 Adult 6E while driving out (south)

**Exhibit 1 - page 33 of 35**

Raptor Inventory Data Sheet

**Raptor Nest ID*:**  82 RT A          **Date First Observed*:**  6-20-2007

**Species:**          RETA          **Observed By:** Nick Hall and Grant Leadem

**Location:** Township 18 N, Range 90 W    **Ownership:**  P  S  FS  **BLM**  LU  Other____

**Section**    19,  NW ¼, NE ¼          **Nest Substrate*:**  CTL

**UTM Zone:** 13                 **Height of Substrate (ft.):** 1.5

**Geo. Datum (circle one):**    NAD 27    **NAD 83**  **Nest Height On/In Substrate (ft.):**  20

**Northing:** 41.441328 **Easting:** -107.574578    **Nest Exposure:**  W

**Vegetation Type*:**Sagebrush/ Grassland

**USGS Quad Name:** Sulphur Springs

**County:** Carbon, WY

**Nest Status*:** ACTI

**Nest Condition*:** EXCELLENT

**Number of Eggs:** N/A      **Young:**    2

**Remarks/Comments:  Physical  Relationship  to  Other  Nests,  Proximity  to  Potential Disturbances, Etc.:**

Observed active Red-tailed nest, 1-2 chicks, mature bird observed on nest.

**Exhibit 1 - page 34 of 35**

## APPENDIX C
### Additional Project Photos



Nest 70 FH – An example of Poor or Remnant condition



Nest 21 UR- An example of Moderate condition



Nest 70 FH- An example of a nest in Good condition

**Exhibit 1 - page 35 of 35**