IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| THEODORE ROOSEVELT<br>CONSERVATION PARTNERSHIP<br>555 Eleventh St. N.W., 6th Floor<br>Washington, DC 20004,<br><br>Plaintiff,<br><br>v.<br><br>DIRK KEMPTHORNE, in his official<br>capacity as the Secretary of the United States<br>Department of the Interior<br>1849 C Street, N.W.<br>Washington, DC 20240,<br><br>and<br><br>UNITED STATES BUREAU OF LAND<br>MANAGEMENT<br>1849 C Street, N.W., Room 406-LS<br>Washington, DC 20240,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CASE NO. 1:07-cv-01486-RJL |
| ANADARKO PETROLEUM CORPORATION,<br>P.O. Box 1330<br>Houston, TX 77251-1330,<br><br>WARREN RESOURCES, INC.,<br>489 Fifth Avenue, 32nd Floor<br>New York, NY 10017,<br><br>DOUBLE EAGLE PETROLEUM CO.,<br>777 Overland Trail, Suite 208<br>P.O. Box 766<br>Casper, WY 82602-0766,<br><br>Defendant-Intervenors. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | |

STATE OF WYOMING )
123 Capitol Building )
Cheyenne, WY 82002 )
)
     Defendant-Intervenor. )
)

**REPLY IN SUPPORT OF DEFENDANT-INTERVENOR ANADARKO PETROLEUM CORPORATION, WARREN RESOURCES, INC., AND DOUBLE EAGLE PETROLEUM CO.'S CROSS-MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................ ii

GLOSSARY OF ACRONYMS AND ABBREVIATIONS............................................ vi

I.   CERTAIN OF TRCP'S CLAIMS HAVE BEEN WAIVED.................................2

II.  BLM IS ENTITLED TO DEFERENCE ON TRCP'S NEPA CLAIMS.................3

     A.   BLM's Alternatives Analysis is Entitled to Deference..............................3

          1.   The record supports BLM's decision not to carry
               Alternative B forward in the final EIS ...............................3

          2.   TRCP's claim that BLM should have considered
               alternatives with reduced impacts on the sage grouse in
               the EAs is without merit ...................................................8

     B.   BLM's Cumulative Impact Analysis is Entitled to Deference ...................9

     C.   BLM Reasonably Determined that the Draft Mule Deer Study
          was Sufficient for Purposes of NEPA Review ..........................................10

     D.   BLM's Adaptive Management Program Complies with NEPA...............12

     E.   BLM's Decision to Complete the Atlantic Rim EIS Prior to the
          Rawlins Resource Management Plan Complies with NEPA....................16

III. BLM'S EXPERT DETERMINATIONS UNDER FLPMA ARE
     ENTITLED TO DEFERENCE.............................................................18

     A.   BLM Did Not Authorize a "Singular Use" for the ARPA, but
          Properly Balanced its Management Goals..................................18

     B.   BLM Imposed Mitigation Measures to Reduce Potential Impacts
          of Oil and Gas Development for the Protection of Other
          Resources, Consistent with the RMP.......................................20

     C.   TRCP's Disputes Over the Appropriate "Science" are
          Insufficient to Render BLM's Decision Arbitrary......................22

     D.   Alleged Exceedances of the RFD Scenario do not Violate
          FLPMA ................................................................24

IV.  CONCLUSION.......................................................................25

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Am. Wildlands v. Kempthorne*, --- F.3d ----, 2008 WL 2561091 (D.C. Cir. July 8, 2008)..................................................................................................3

*\*Baltimore Gas & Electric Co. v. NRDC*, 462 U.S. 87 (1983) .....................................1, 22

*Biodiversity Conservation Alliance v. BLM*, 404 F. Supp. 2d 212 (D.D.C. 2005)..............7

*Blue Mountains Biodiversity Project v. U.S. Forest Serv.*, 229 F. Supp. 2d 1140 (D. Or. 2002).........................................................................................................8

*Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190 (D.C. Cir. 1991) .......................7

*Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402 (1971)...................................18

*\*Department of Transportation v. Public Citizen*, 541 U.S. 752 (2004)............................3

*Earthlink, Inc. v. FCC*, 462 F.3d 1 (D.C. Cir. 2006) .........................................................22

*Environmental Defense v. U.S. Army Corps of Eng'rs*, 515 F. Supp. 2d 69 (D.D.C. 2007) ...................................................................................................12

*Environmental Law & Policy Ctr. v. U.S. Nuclear Regulatory Commission*, 470 F.3d 676 (7th Cir. 2006) ..........................................................................7

*Epstein v. Geren*, 539 F. Supp. 2d 267 (D.D.C. 2008) ....................................................15

*Exxon Corp. v. Lujan*, 970 F.2d 757 (10th Cir. 1992) ......................................................18

*Foundation for N. America Wild Sheep v. USDA*, 681 F.2d 1172 (9th Cir. 1982)............10

*Friends of the Earth, Inc. v. U.S. Army Corps of Eng'rs*, 109 F. Supp. 2d 30 (D.D.C. 2000) ........................................................................................................10

*Great Basin Mine Watch v. Hankins*, 456 F.3d 955 (9th Cir. 2006) ..................................3

*Gulf Restoration Network v. U.S. Department of Transportation*, 452 F.3d 362 (5th Cir. 2006)...................................................................................................9

*Half Moon Bay Fisherman's Marketing Association v. Carlucci*, 857 F.2d 505 (9th Cir. 1988)..................................................................................................10

*INS v. Cardoza-Fonesca*, 480 U.S. 421 (1987) ...............................................................18

*Kleppe v. Sierra Club*, 427 U.S. 390 (1976).......................................................9

*Lands Council v. McNair*, --- F.3d ----, 2008 WL 2640001 (9th Cir. July 2, 2008)..........22

*Louisiana Public Serv. Commission v. FERC*, 184 F.3d 892 (D.C. Cir. 1999)................18

*Marsh v. Or. Natural Resources Council*, 490 U.S. 360 (1989)................1, 12, 18, 22, 24

*Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29 (1983) ..............................................................3

*NRDC v. EPA*, 529 F.3d 1077 (D.C. Cir. 2008) ............................................10

*NRDC v. Kempthorne*, 525 F. Supp. 2d 115 (D.D.C. 2007)................................8

*National Association of Home Builders v. Defenders of Wildlife*, 127 S. Ct. 2518 (2007)....................................................................................4, 17

*National Committee for the New River, Inc. v. FERC*, 373 F.3d 1323 (D.C. Cir. 2004) ..............................................................................12

*National Wildlife Federation v. FERC*, 912 F.2d 1471 (D.C. Cir. 1990)........................9

*Navajo Nation v. U.S. Forest Serv.*, 479 F.3d 1024 (9th Cir. 2007)...................................3

*Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55 (2004)............................................20

*Or. Natural Desert Association v. Singleton*, 47 F. Supp. 2d 1182 (D. Or. 1998) .............8

*Pauley v. BethEnergy Mines, Inc.*, 501 U.S. 680 (1991) ....................................18

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332 (1989)........................7, 13

*S. Utah Wilderness Alliance v. Norton*, 237 F. Supp. 2d 48 (D.D.C. 2002)...................6, 7

*S. Utah Wilderness Alliance v. Norton*, 326 F. Supp. 2d 102 (D.D.C. 2004)...................18

*Se. Federal Power Customers, Inc. v. Geren*, 514 F.3d 1316 (D.C. Cir. 2008) ...............25

*Seattle Audubon Society v. Espy*, 998 F.2d 699 (9th Cir. 1993) .......................................12

*St. John's United Church of Christ v. City of Chicago*, 502 F.3d 616 (7th Cir. 2007)..............................................................................16

*Thomas Jefferson University v. Shalala*, 512 U.S. 504 (1994).........................................18

*Utah v. Andrus*, 486 F. Supp. 995 (D. Utah 1979) ............................................................20

*\*Vt. Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519 (1978)....................................2

*Watt v. Alaska*, 451 U.S. 259 (1981)...............................................................................18

## DOCKETED CASES

*Blanco v. Burton,* No. Civ. A 06-3813, 2006 WL 2366046 (E.D. La.
   Aug. 14, 2006) ............................................................................................................12

*Oceana, Inc. v. Evans,* No. Civ.A.04-0811 (ESH), 2005 WL 555416 (D.D.C.
   Mar. 9, 2005)................................................................................................................3

*S. Utah Wilderness Alliance v. Bankert*, No. 2:07-CV-292-TC, 2007 WL 2873788
   (D. Utah Oct. 3, 2007) ......................................................................................3, 19, 20

*Williams v. Bankert*, No. 2:05CV503DAK, 2007 WL 3053293 (D. Utah
   Oct. 18, 2007) ............................................................................................................19

## FEDERAL STATUTES

42 U.S.C. § 4332(2) ..........................................................................................................16

*43 U.S.C. § 1701(a)(12)......................................................................................................7

*43 U.S.C. § 1702(k)(1) ................................................................................................19, 20

43 U.S.C. § 1732(a) ..........................................................................................................19

43 U.S.C. § 1752................................................................................................................19

## ADMINISTRATIVE MATERIALS

40 C.F.R. § 1502.22 ..........................................................................................................10

40 C.F.R. § 1502.24 ..........................................................................................................12

40 C.F.R. § 1502.9(c)(1)....................................................................................................12

40 C.F.R. § 1506.1 ............................................................................................................16

40 C.F.R. § 1508.9 ............................................................................................................13

40 C.F.R. § 1508.13 ..........................................................................................................13

43 C.F.R. § 1610.5-2 ..........................................................................................................19

43 C.F.R. § 3162.3-1(c) ......................................................................................................17

*Biodiversity Conservation Alliance*, 174 IBLA 1 (Mar. 3, 2008) .....................................24

*Wyoming Audubon*, 151 IBLA 42, 49 (Oct. 22, 1999) ......................................................24

## MISCELLANEOUS

D.D.C. Civ. R. 7(h) ..............................................................................................................1

Authorities chiefly relied upon are indicated by an asterisk (*).

# GLOSSARY OF
# ACRONYMS AND ABBREVIATIONS

| | |
|---|---|
| APA | Administrative Procedure Act |
| APD | Applications for a Permit to Drill |
| AR | Administrative Record |
| ARPA | Atlantic Rim Project Area |
| Atlantic Rim Project or Project | Atlantic Rim Natural Gas Field Development Project |
| BLM | Bureau of Land Management |
| CEQ | Council on Environmental Quality |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| FLPMA | Federal Land Policy and Management Act |
| FWS | U.S. Fish and Wildlife Service |
| GDRA | Great Divide Resource Area |
| Great Divide RMP | Record of Decision and Approved Resource Management Plan for the Great Divide Resource Area |
| IBLA | Interior Board of Land Appeals |
| IM | Instruction Memorandum |
| NEPA | National Environmental Policy Act |
| NSO | No Surface Occupancy |
| PAPA | Pinedale Anticline Project Area |
| POD | Plan of Development |

| | |
|---|---|
| RFD | Reasonably Foreseeable Development |
| RMG | BLM Wyoming State Office Reservoir Management Group |
| RMP | Resource Management Plan |
| ROD | Record of Decision |
| SOF | Statement of Fact |
| TRCP | Theodore Roosevelt Conservation Partnership |
| WGFD | Wyoming Game and Fish Department |

Throughout its response, TRCP concedes that it is challenging BLM's substantive determinations, which are entitled to deference. *See, e.g., Baltimore Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 103 (1983); *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989). TRCP seeks to rely heavily on selective quotes from the record and extra-record evidence,[1] as a result of TRCP's having failed to comment meaningfully on the environmental impact statement ("EIS") for the Atlantic Rim Project. The Court should not condone such an attack.

In any event, even with this information, TRCP provides no factual or legal support for its claims. The record as a whole shows that BLM considered the potential environmental impacts of the proposed project as required by the National Environmental Policy Act ("NEPA") and that development of the Atlantic Rim Project Area ("ARPA") is consistent with the Federal Land Policy and Management Act ("FLPMA"). Neither NEPA nor FLPMA requires that BLM avoid impacts altogether or ignore the nation's energy policies. Moreover, BLM imposed numerous measures to mitigate the project's potential impacts, including surface disturbance limits, ongoing monitoring, and adaptive management. Thus, BLM complied with both the procedural requirements of NEPA and the substantive mandates in FLPMA. TRCP's disagreements with BLM's choices do not render them arbitrary and capricious.[2]

---

[1] Both Defendants and Defendant-Intervenors have filed motions to strike extra-record evidence relied on by TRCP.

[2] TRCP attempts to claim that its statement of facts were not disputed. Defendant-Intervenors spent 66 pages refuting TRCP's proffered statement of facts ("SOF") (and Wyoming, 124 pages). Defendant-Intervenors objected, in whole or in part, to at least 19 statements due to reliance on extra-record evidence, at least 33 statements as being opinion or characterizations, and at least 28 as being irrelevant. Defendant-Intervenors also disputed the statements as omitting key portions that in some cases rendered the statement misleading (*e.g.*, Resp. to SOF ¶¶ 36, 55, 190) or as being unsupported by the cited documents or the record. (*e.g.*, Resp. to SOF ¶¶ 3, 5, 6, 7, 9, 38, 45, 48, 54, 60, 64, 65, 70, 71, 72, 74, 83, 84, 90, 109, 115, 125, 163, 205, 206, 209, 213, 217). In fact, Defendant-Intervenors admitted, without qualification or clarification, only 12 out of 236 paragraphs in TRCP's statement. On the other hand, TRCP failed to controvert any of the statements of fact submitted by Defendant-Intervenors. As a result, all of Defendant-Intervenors statements of fact have been admitted. D.D.C. Civ. R. 7(h).

## I.    CERTAIN OF TRCP'S CLAIMS HAVE BEEN WAIVED.

It is incumbent upon challengers of agency action under NEPA "to structure their participation so that it is *meaningful*, so that it alerts the agency to the intervenors' position and contentions." *Vt. Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 553 (1978) (emphasis added).  Contrary to TRCP's contentions, Defendant-Intervenors do not seek a "categorical rule" that comments provide "excruciating detail" of all possible legal claims.  Consolidated Resp. to Cross-Mots. for Summ. J. and Reply in Supp. of Pl.'s Mot. for Summ. J. ("TRCP Reply") at 21. Rather, TRCP waived its arguments because it wholly failed to raise to BLM the issues and information it now presents to this Court.  TRCP cites no record evidence that it, or any member of the public, raised the same concerns outlined in the extra-record Sparrowe Declaration regarding the Pinedale Anticline Project Area ("PAPA") adaptive management process or the need to consider the potential for wind energy in the ARPA.  *Id.* at 21-24.  Thus, TRCP cannot contend that these issues were raised "meaningfully."  *Id.* at 22.

TRCP references only general statements in its comments *on the final EIS* to claim that it sufficiently raised the issues now before this Court.  TRCP Reply at 22 (citing 10262).  TRCP's comments, however, did not reference the PAPA or wind energy and did not identify any specific projects that were either "existing, proposed or foreseeable" that BLM had not already identified in the EIS.  Now, well after the record of decision ("ROD"), TRCP claims that BLM's analysis was inadequate because it did not take these issues into account, submitting extra-record evidence it failed to present to BLM.  Thus, *Department of Transportation v. Public Citizen*, where the plaintiff failed to raise before the agency the issue it challenged in court, is directly on

point.  541 U.S. 752, 764-65 (2004).[3]  Because TRCP failed to comment at all on the draft EIS,

and failed to comment meaningfully on the final EIS, TRCP has waived its claims.[4]

## II.     BLM IS ENTITLED TO DEFERENCE ON TRCP'S NEPA CLAIMS.

A plaintiff challenging agency action has the burden to demonstrate that BLM:

> relied on factors which Congress has not intended it to consider,
> entirely failed to consider an important aspect of the problem,
> offered an explanation for its decision that runs counter to the
> evidence before the agency, or is so implausible that it could not be
> ascribed to a difference in view or the product of agency expertise.

*Am. Wildlands v. Kempthorne*, -- F.3d ----, 2008 WL 2651091, at *5 (D.C. Cir. July 8, 2008)

(quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

None is the case here.  Rather, TRCP simply disagrees with BLM's decision.

### A.     BLM's Alternatives Analysis is Entitled to Deference.

1.     The record supports BLM's decision not to carry Alternative B forward in the final EIS.

In its initial memorandum, TRCP claimed that BLM "eliminated from study" Alternative

B -- the "phased" or "temporal" alternative -- and Alternative C -- the "spatial" alternative.

TRCP Mem. at 14 (Doc. No. 43); AR1654.  On reply, TRCP now concedes that Alternative C

was not in fact eliminated from study in the final EIS, and admits that BLM's decision not to

choose Alternative C was supported by BLM's Reservoir Management Group's ("RMG")

"extraordinarily detailed analysis."  TRCP Reply at 28.  Apparently recognizing its initial

---

[3]  Compare the cases TRCP seeks to rely on, where the courts found that the agency was "on notice" of the plaintiff's claims.  *See S. Utah Wilderness Alliance v. Bankert*, No. 2:07-CV-292-TC, 2007 WL 2873788, at *7-8 (D. Utah Oct. 3, 2007); *Navajo Nation v. U.S. Forest Serv.*, 479 F.3d 1024, 1049-50 (9th Cir. 2007); *Great Basin Mine Watch v. Hankins*, 456 F.3d 955, 965 (9th Cir. 2006).  The general statements in TRCP's comments here in no way put BLM on notice of the issues TRCP now raises.  TRCP also cites to *Oceana, Inc. v. Evans*, No. Civ.A.04-0811 (ESH), 2005 WL 555416 (D.D.C. Mar. 9, 2005).  There, the agency "never gave notice" that it was deviating from its authority in the challenged regulations, which gave rise to the plaintiff's claim.  *Id.* at *27.  Here, BLM gave TRCP numerous opportunities to comment on the EIS, and TRCP has not provided any explanation as to why it failed to do so.
[4]  While Defendant-Intervenors acknowledge that TRCP sought an administrative appeal, this is of no import.  TRCP still had a duty to present its concerns to BLM during the NEPA process.

arguments were flawed, TRCP instead now claims that the "question presented in this case is whether BLM's decision to drop the [phased development alternative (Alternative B)] as 'infeasible,' . . . prior to completing the NEPA process was reasonable or was arbitrary and capricious."  *Id.* at 25.  Thus, TRCP now disputes BLM's decision that Alternative B was not appropriate to meet the needs of the project, despite failing to provide any comments during the NEPA process to the contrary.  This it may not do.  Regardless, BLM's decision is supported by the record and is entitled to deference.

TRCP contends that BLM's decision not to retain Alternative B in the final EIS was arbitrary, because Alternative B "was well within any *reasonable* reading of the 'Purpose and Need' statement contained in the FEIS and was consistent with Congressional intent."  TRCP Reply at 26.  Neither of these rationales has merit.  First, BLM explained why Alternative B was not consistent with the "Purpose and Need" statement.  BLM noted the importance of private oil and gas development on public lands, as "an integral part of the BLM's oil and gas leasing program" under numerous statutory authorities, including FLPMA.  AR2135.  BLM then identified the purpose of and need of the project to "develop, produce, and market natural gas products."  AR2136.  BLM concluded that Alternative B was not consistent with BLM policies, because it would result in delay in developing some of the oil and gas leases already issued throughout the ARPA, and it would restrict rights-of-way through public lands in those areas closed to development.  AR2160-AR2161; AR4809.

TRCP does not point to any record evidence to dispute these findings.  Instead, it now argues that BLM relied only on unsupported objections of the Operators.[5]  TRCP Reply at 27.

---

[5]  TRCP again selectively cites to statements in the record in an effort to show that BLM believed that Alternative B met the purpose and need of the proposed action.  TRCP Reply at 25-26.  These are statements from preliminary documentation of BLM staff, some of which are by unknown authors.  AR8395 (briefing paper); AR8241 (meeting notes); AR8198 (draft description of potential alternatives); AR8242 (meeting notes); AR8255 (unnamed notes).  As

This argument is patently specious.  BLM had already identified in the draft EIS that Alternative

B could result in a delay in revenues and could impact leaseholders.  AR1507, AR1774-AR1775.

For example, BLM found:  leaseholders could experience economic impacts under the phased

alternative; no revenues would occur during suspension of the leases in inactive areas; and,

depending on the ownership of the minerals, drainage in inactive areas could result in a loss of

revenues and would affect federal, fee, and state mineral estates.  AR1774.

　　　　In addition, various operators, landowners and leaseholders submitted comments on the

draft EIS to BLM, noting that Alternative B was economically infeasible because it would place

undue limits on leaseholdings that had already been issued and would impair the ability to

develop those mineral rights.  *See, e.g.,* AR3290-AR3291, AR3295, AR3313, AR3327-AR3328,

AR3453, AR3461-AR3462, AR3465, AR3502, AR4229, AR4264, AR4280, AR4291-AR4293,

AR4321-AR4322.[6]  For example, because the interim drilling showed contiguous coal deposits,

comments explained that requiring phased development would result in an "unworkable pattern"

of development that would not optimize recovery of natural gas.  AR3465; AR4229; AR4292.

Imposing geographic restrictions through phased development unduly restricted the operators'

flexibility to take various factors into account in order to develop those resources at the optimal

level.  *See, e.g.,* AR4364.  Public comments also disputed BLM's initial statements in the draft

EIS regarding reasonable access through federal lands to state and fee lands under this

alternative.  AR1774; AR4809.  The Wyoming Department of Agriculture (AR3508, AR4373-

---

noted in Defendant-Intervenors initial memorandum (at 2-3, 11), the Supreme Court recently reaffirmed that mining the record for inconsistent preliminary statements by agency staff is insufficient to render an agency's decision arbitrary.  *See Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 127 S. Ct. 2518, 2530 (2007).  Moreover, engaging in TRCP's game would also result in finding other statements by BLM staff that identified problems with the temporal (or phased) alternative (Alternative B in the EIS), including potential impacts on leaseholders.  *See, e.g.,* AR8242.  In one meeting, for example, a member of BLM's staff asked, with respect to this alternative, "[w]hy carry an unrealistic alternative forward."  AR8244.

[6]  Other members of the public submitted similar comments, including trade associations.  AR3292, AR3467, AR3507, AR4214, AR4259, AR4270-AR4271, AR4364.

AR4374), the Office of State Lands and Investment (AR3504-AR3505), and the Wyoming

Governor's office (AR3514) raised similar concerns with Alternative B.  AR8448-AR8449.

TRCP cites to nothing in the record to dispute these comments.  Thus, the record amply supports

BLM's decision that Alternative B did not require further detailed study in the final EIS.

TRCP attempts to excuse its failure to comment on the draft EIS on this point by making

the unsupported argument that it was not required to argue "in vain" to retain an alternative in

the final EIS.  TRCP Reply at 23.  As an initial matter, TRCP provides no support for why such

comments would have been in vain, nor could it.  The purpose of the public comment period is to

solicit input from interested parties, and numerous interested parties commented on the

infeasibility of Alternative B.  If TRCP believed otherwise, it had the opportunity to submit

comments to that effect, but failed to do so.  Its excuse that doing so would be "in vain" can

hardly be taken seriously.  In fact, had TRCP submitted such comments and BLM ignored them,

TRCP would have a colorable claim.  Instead, TRCP seeks to have this Court adopt a new

exception to the well-settled obligation to participate in the NEPA process meaningfully.

In any event, even had BLM solely relied on statements of operators as TRCP contends,

which it did not, TRCP argues that BLM's alleged failure to conduct an independent analysis of

these comments violates NEPA.  TRCP Reply at 28.  There is, however, no prohibition on

BLM's reliance on comments simply because they come from the project proponents, among

others, and TRCP provides no support for this argument.  The cases cited by TRCP to support

this argument are inapposite.  In *S. Utah Wilderness Alliance v. Norton*, the court found, with

respect to an environmental assessment ("EA") for a proposed seismic oil and gas exploratory

project, that BLM failed to adequately analyze alternatives based on "BLM's unquestioning

acceptance of the statements of . . . the project applicants, . . . *in the face of public comments*

*questioning the accuracy of those statements*."  237 F. Supp. 2d 48, 52-53 (D.D.C. 2002)

(emphasis added).  Here, TRCP submitted no comments on this point.  And, unlike that case,

where "BLM failed to adequately study, develop, and describe appropriate alternatives to

recommended courses of action," *id.* at 54, BLM analyzed Alternative B in the draft EIS.[7]  In

addition, TRCP cites to no record evidence refuting BLM's economic analysis or the public

comments raising economic feasibility as an issue.  Moreover, it is self evident that restricting

development to one-third of the ARPA would delay and, therefore, impair the lease rights

already issued for the other two-thirds.  Finally, BLM did not choose the operators' preferred

alternative -- the Proposed Action-- but instead developed Alternative D to balance development

needs with the protection of the environment.

> TRCP then asserts that BLM's consideration of the alternatives is inconsistent with

Congressional policy.  TRCP Reply at 29.  TRCP claims that BLM "fixated on a single policy

statement (that contained in the 2005 Energy Policy Act) and forgot the competing directives in

NEPA and FLPMA."  *Id.* at 29-30.  TRCP, however, ignores the long list of statutory authority

requiring BLM to promote development of oil and gas resources, including those on public

lands.  AR2135.  Among that statutory authority is FLPMA, which identifies mineral exploration

and production as a "principal or major use[]" of the federal public lands.  43 U.S.C

§§ 1701(a)(12), 1702(l).  NEPA, on the other hand, is a procedural statute and does not require

an agency to choose environmental concerns over other policy choices.  *Robertson v. Methow*

*Valley Citizens Council*, 490 U.S. 332, 350 (1989); *Biodiversity Conservation Alliance v. BLM*,

404 F. Supp. 2d 212, 216 (D.D.C. 2005); *S. Utah Wilderness Alliance*, 237 F. Supp. 2d at 52.

---

[7]  Other cases TRCP cites support BLM's decision.  *See Envtl. Law & Policy Ctr. v. U.S. Nuclear Regulatory Comm'n*, 470 F.3d 676, 682-84 (7th Cir. 2006) (upholding statement of purpose and need against challenge to agency's reliance on project applicant's statement); *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 198 (D.C. Cir. 1991) (upholding agency's decision to "eliminat[e] from detailed discussion" alternatives that would not accomplish goal of "helping to launch a new cargo hub in Toledo and thereby helping to fuel the Toledo economy").

BLM considered the potential environmental impacts of Alternative B in the draft EIS and subsequently determined, based on the record, that Alternative B did not meet the purpose and need of the project. BLM's determination is entitled to deference.[8]

> 2. TRCP's claim that BLM should have considered alternatives with reduced impacts on the sage grouse in the EAs is without merit.

In its reply, TRCP claims that BLM should have investigated in the EAs for individual plans of development ("PODs") "an option involving less intense development or more aggressive sage grouse protections." TRCP Reply at 42. This claim is easily dismissed.

Aside from providing no specific details as to this alleged "reasonable" alternative, TRCP ignores that the EAs in this case are tiered to the Atlantic Rim EIS. AR73492; AR74063. The EIS considered less intense development and more stringent mitigation for sage grouse in its Alternative C, which included spacing requirements as protection measures for the sage grouse. *See, e.g.,* AR1491-AR1493; AR2151-AR2155, AR3152. As TRCP admits, BLM's RMG conducted an extensive analysis to support BLM's decision not to choose Alternative C. TRCP Reply at 28. Further, this Court found, in a companion case, that the EIS adequately considered various mitigation alternatives for the sage grouse. *NRDC v. Kempthorne*, 525 F. Supp. 2d 115, 121-22 (D.D.C. 2007). In sum, BLM was not required to undergo anew in each subsequent EA the analysis it conducted in the EIS.[9]

---

[8] TRCP, in a footnote, implies that BLM's elimination of Alternative B resulted in the remaining alternatives being similar. TRCP Reply at 26 n.11. Alternatives C and D, however, substantially reduced potential environmental impacts. *See, e.g.,* AR2089-AR2090, AR2151-AR2157. Moreover, TRCP does not dispute that the potential environmental impacts associated with Alternative B were largely the same as the Proposed Action. Mem. in Opp'n to Pls.' Mot. for Summ. J. and in Support of Def.-Intervenor Anadarko Petroleum Corp., Warren Resources, Inc. and Double Eagle Petroleum Co.'s Cross-Mot. for Summ. J. (Doc. No. 53) ("Def.-Intervenors' Summ. J. Mem.") at 7 n.6, 18; Def.-Intervenors' Statement of Material Facts, ¶¶ 29, 32.

[9] Again, TRCP relies on cases that are inapposite, because those cases did not involve a proposed alternative that was already deemed infeasible by the agency. *Cf. Blue Mountains Biodiversity Project v. U.S. Forest Serv.*, 229 F. Supp. 2d 1140, 1147 (D. Or. 2002) (finding alternatives for weed eradication improperly ignored alternatives addressing preventative measures, also noted as a purpose of proposed project); *Or. Natural Desert Ass'n v. Singleton*, 47 F. Supp. 2d 1182, 1195 (D. Or. 1998) (finding alternatives for continued grazing despite knowledge that current grazing impacted a wild river improperly ignored alternative to end grazing).

B.    BLM's Cumulative Impact Analysis is Entitled to Deference.

As explained above, TRCP waived its argument regarding consideration of wind projects

in its cumulative impacts analysis by failing to raise the issue before BLM.  Regardless, this

argument lacks merit.  TRCP contends that an action is "'not too speculative' merely because *it*

*is proposed*, particularly when the agency issues a press release or otherwise indicates its intent

to proceed."  TRCP Reply at 40 (citations omitted) (emphasis added).  TRCP, however, has

identified no *proposed* wind projects in the ARPA.  Instead, it cites to a general BLM policy

(which is not part of the record) that analyzes wind energy potential.  Even under TRCP's own

standard, there were no foreseeable wind projects in the ARPA that required analysis, because

the BLM policy identifies no "proposed" wind projects in the ARPA.[10]  AR2483.  The Supreme

Court and the D.C. Circuit have made clear that the mere possibility of a project is insufficient to

require NEPA analysis.[11]  *Nat'l Wildlife Fed'n v. FERC*, 912 F.2d 1471, 1478 (D.C. Cir. 1990)

(noting *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n. 20 (1976), "clearly establishes that an EIS

need not delve into the possible effects of a hypothetical project, but need only focus on the

impact of the particular proposal at issue and other pending or recently approved proposals that

might be connected to or act cumulatively with the proposal at issue").  Thus, TRCP cites to no

evidence to dispute BLM's determination that, when the ROD issued, there were no reasonably

foreseeable wind projects requiring analysis in the Atlantic Rim EIS.

---

[10]  After a proposal, an agency makes a determination whether an EIS is required.  Here, there is no proposal for wind development in the ARPA.  Courts have found that even proposals need not be considered in a cumulative impact analysis, if no draft EIS analyzing the potential impacts has been issued.  *See Gulf Restoration Network v. U.S. Dep't of Transp.*, 452 F.3d 362, 368-70, 371 n.15 (5th Cir. 2006).

[11]  TRCP notes that Defendant-Intervenors "support their arguments with voluminous extra-record documents concerning the Wind Energy EIS."  TRCP Reply at 41 n.20.  Reference was made to this extra-record evidence to refute TRCP's mischaracterizations regarding the status of wind energy development in the ARPA, which itself was based on extra-record evidence, in the event this Court denies the Motions to Strike.

C.     BLM Reasonably Determined that the Draft Mule Deer Study was Sufficient for Purposes of NEPA Review.

TRCP does not dispute that BLM undertook extensive analysis of baseline information related to the mule deer, including migration corridors, as explained in Defendant-Intervenors' initial memorandum (at 24-25).  *See* AR2250, AR2254 (population); AR2253 (migration routes); AR2252, AR2255 (crucial winter range).  Instead, TRCP asserts that *NEPA required* BLM to await completion of an ongoing mule deer study.  TRCP Reply at 36.[12]  Contrary to TRCP's assertions, however, Council on Environmental Quality ("CEQ") regulations expressly allow decisions to continue in light of incomplete information.  40 C.F.R. § 1502.22.  The D.C. Circuit recently affirmed an agency's discretion to act based on incomplete information:

> [An agency] "typically has wide latitude in determining the extent of data-gathering necessary to solve a problem.  We generally defer to an agency's decision to proceed on the basis of imperfect scientific information, rather than to invest the resources to conduct the perfect study."  . . .  In other words, the sole question before us is whether [the agency] has acted reasonably, not whether it has acted flawlessly.

*NRDC v. EPA*, 529 F.3d 1077, 1086 (D.C. Cir. 2008) (citation omitted).  As Defendant-Intervenors noted in their initial memorandum (at 25-26), which TRCP does not even attempt to address, TRCP cannot show that the final study was essential nor that the public was not aware of the limitations of the existing data.  In fact, BLM was aware of the ongoing mule deer study and incorporated available data from the study into the Atlantic Rim EIS.  AR2499.  BLM also properly disclosed that the final report was not yet available, as required by 40 C.F.R. § 1502.22,

---

[12]  Although TRCP cites to several cases presumably to support this claim, not one is on point.  In those cases, the agency failed to conduct the extensive review BLM conducted here.  *See, e.g., Found. for N. Am. Wild Sheep v. USDA*, 681 F.2d 1172 (9th Cir. 1982) (agency prepared only an EA); *Half Moon Bay Fisherman's Mktg. Ass'n v. Carlucci*, 857 F.2d 505 (9th Cir. 1988) (agency failed to provide *any* baseline information); *Friends of the Earth, Inc. v. U.S. Army Corps of Eng'rs*, 109 F. Supp. 2d 30, 41-42 (D.D.C. 2000) (agency responded only with conclusory statements to issue identified by sister agency).

and that information from the mule deer study will be evaluated and incorporated into wildlife

monitoring and mitigation process.  AR2393, AR2499; AR4870.  NEPA requires no more.

Instead, TRCP selectively quotes statements in the record to imply some wrongdoing on

BLM's part.  TRCP Reply at 37 (citing AR8243, AR8267, AR9810, AR7445).  A careful review

of those record citations, however, shows that TRCP is again taking statements out of context

and that the documents themselves actually support BLM's decision in this case.  The first

statement (AR8243) is from notes of an interdisciplinary team meeting in July of 2005, AR8240,

in which BLM considered moving forward and incorporating the results of the mule deer study

as part of its mitigation plan.  AR8245.  The second statement (AR8267) is from draft notes of

another meeting from August of 2005.  AR8263.  In this document, BLM notes that it would

incorporate the results of the mule deer study "as it is developed."  AR8267.  Thus, these

documents reflect that BLM was aware of the ongoing study, but determined it was not

necessary to wait for the final report to conduct its review of the project's potential impacts.[13]

TRCP also references a map from the final Mule Deer Study showing "movement routes"

to support its bald assertion that "the baseline data in the ROD is erroneous."  TRCP Reply at 38

(citing TRCP Ex. F (EIS, Map M-23) and Ex. J (Figure 7, final Mule Deer Study, AR7437)).

TRCP offers no explanation as to why this map shows that the ROD was based on erroneous

information, nor can it.  Comparing Figure 9 in the final Mule Deer Study -- common migration

routes (AR7439) -- and Figure 10 -- common migration routes with 0.25 mile buffer (AR7440) --

with the migration routes noted in Map M-23 in the EIS (AR2253) shows similar migration

---

[13]  TRCP also claims that the Wyoming Game and Fish Department ("WGFD") "urge[d]" BLM to incorporate current data into the ROD.  TRCP Reply at 37 (citing AR9810).  The cited document, however, is a summary of comments on the final EIS that, in fact, referenced the wildlife monitoring plan.  AR9810.  BLM responded to those comments, stating that the study's results would be incorporated into the adaptive management process.  AR4870.

patterns, even if not with the same exact detail.  The maps in the final Mule Deer Study also show that the movement routes are not blocked by the current development.  AR7437-AR7440.[14]

In any event, the EIS explained the potential impacts of the project on the mule deer and recognized that the "project could alter or block mule deer movements along existing migration routes."[15]  AR2393-AR2394.  BLM further found, for Alternative D, that the "acreage disturbance and the actual number of pads per section would fall under a high impact post-reclamation classification," exceeding the significance criteria.  AR2402.  Finally, BLM imposed mitigation to reduce those impacts, and adaptive management to consider additional mitigation that may be needed.  AR2404-AR2405.  TRCP does not explain how the final Mule Deer Study would change this analysis.  In fact, the final Mule Deer Study notes that "it is unclear how or if gas development affects migration routes and migratory behavior," and it encourages monitoring plans and site-specific development.  AR7447.  Thus, it cannot be said that BLM failed to adequately consider the impacts to the mule deer.[16]

D.    BLM's Adaptive Management Program Complies with NEPA.

In another attempt to revise its arguments in response to Defendant's and Defendant-Intervenors' papers, TRCP admits that NEPA does not require mitigation, but now asserts that

_____

[14]  TRCP also claims that 40 C.F.R. § 1502.24 requires that BLM ensure an EIS contain high quality information.  TRCP Reply at 38.  However, the cases relied on by TRCP are inapposite.  *See, e.g., Envtl. Def. v. U.S. Army Corps of Eng'rs*, 515 F. Supp. 2d 69, 78, 81 (D.D.C. 2007) (finding Army Corps used faulty assumptions to manipulate required cost-benefit analysis to support decision that Clean Water Act mitigation requirements would be met); *Seattle Audubon Soc'y v. Espy*, 998 F.2d 699, 704-05 (9th Cir. 1993) (finding agency ignored new study criticizing study relied on in EIS and that EIS rested on "false assumptions *regarding the cooperation of other agencies and application of relevant law*") (emphasis added).

[15]  One study in the record on the effects of natural gas projects on mule deer found that, "[w]hile results from our resource selection analyses suggest natural gas development in the [Pinedale Anticline Project Area] has affected mule deer habitat use, no statistically significant changes in survival or reproduction have been detected." AR6531.

[16]  Because the final Mule Deer Study was issued after the ROD was signed, TRCP's dispute that the study shows the ROD was based on erroneous information is really a question as to whether BLM should have supplemented the EIS.  Indeed, cases that TRCP cites address whether an agency must supplement its NEPA document based on post-decision information.  *See Marsh*, 490 U.S. at 370-71; *Blanco v. Burton*, No. Civ. A 06-3813, 2006 WL 2366046 (E.D. La. Aug. 14, 2006).  CEQ regulations outline when a supplement may be required.  40 C.F.R. § 1502.9(c)(1).  *See Nat'l Comm. for the New River, Inc. v. FERC*, 373 F.3d 1323, 1330 (D.C. Cir. 2004) ("[A] 'supplemental EIS is only required where new information 'provides a *seriously* different picture of the environmental landscape.'") (emphasis in text) (citations omitted).  TRCP has not raised this argument, nor made any such showing here.

NEPA requires that mitigation measures be "clearly delineated" when BLM "affirmatively adopts a mitigation plan." TRCP Reply at 30. In support of this claim, TRCP attempts to rely on cases involving EAs where mitigation was used to support a finding of no significant impact, so that no EIS was required. TRCP recognizes this distinction, but claims the same analysis should apply to EISs. TRCP Reply at 31 n.15. The failure of TRCP to cite to even a single case supporting this argument, however, is not an accident -- there is no support for this proposition. In one instance, the agency is relying on mitigation to conclude that a project will not have significant impacts so that no EIS is required. In such cases, the agency must briefly present "sufficient evidence and analysis for determining whether to prepare an [EIS] or a finding of no significant impact," which, in turn, must briefly explain the reasons why an action will not have a significant effect. 40 C.F.R. §§ 1508.9, 1508.13. In this case, however, BLM prepared an EIS. In such cases, the Supreme Court has made clear NEPA does not require agencies to mitigate adverse effects and does not require a detailed explanation of the mitigation measures that will actually be employed. *Robertson*, 490 U.S. at 353.[17] Consequently, TRCP's new formulation of its arguments is fatally flawed as well. Because NEPA does not require *any* mitigation be imposed, TRCP's arguments in this case that such "mitigation measures must be clearly delineated," TRCP Reply at 30, and that the mitigation here allegedly lacks "meaningfully enforceable standards," *id.* at 31-32, are futile.

In any event, the EIS described the elements of the adaptive management plan, including, but not limited to, providing a wildlife monitoring and protection plan to serve as the basis for

---

[17] TRCP asserts that arguments that NEPA does not require BLM to adopt mitigation measures or to specify such measures with any certainty "sidesteps the real issue in this case." TRCP Reply at 30. This is, however, what TRCP argued in its initial moving papers, *i.e.,* that the adaptive management plan was "so amorphous and ill-defined" that it violated NEPA's requirements. TRCP Mem. at 18 (Doc. No. 43).

such plan (Appendix E to EIS), AR2618-AR2632.[18]  Appendix E outlines a "preliminary wildlife inventory, monitoring, and protection protocol."  AR2620.  *See also* AR4871 ("The initial monitoring plan will be based on the Wildlife Monitoring and Protection Plan (FEIS appendix E) but may be modified annually, as necessary, based on monitoring results.").  The ROD also notes that other conditional requirements may also be imposed by the BLM pending site-specific review and may include requirements found in various appendices in the FEIS.  AR4835.[19]  Despite TRCP's contentions, the ROD also outlines specific inventory and monitoring requirements and specific protection measures for various species, again referencing Appendix E of the FEIS.  AR4848-AR4852.  Thus, the public was not excluded from this process, and any additional mitigation would be outlined in subsequent EAs, which are available to the public.

TRCP then argues that the "real problem presented by BLM's Adaptive Management model is that it simply does not work."  TRCP Reply at 33.  This challenge to BLM's conclusion is unsupported by the record and, in any event, conflicts with *Robertson.*[20]  Now, TRCP submits even more extra-record evidence to claim that BLM cannot be trusted, referencing the various

---

[18]  Indeed, TRCP selectively quotes from the record and ignores the ROD's reference to Appendix E in the quoted sentence in its discussion of adaptive management.  TRCP Reply at 31 (quoting AR4847).  TRCP also selectively quotes from notes of a Cooperator Status Meeting.  TRCP Reply at 32 (citing AR8444).  A review of those notes shows that, taken in context, the statements are describing use of surface disturbance limitations and reclamation standards with "ongoing" monitoring.  AR8443-AR8446.  This is what BLM did in this case.  It imposed surface disturbance limits, established reclamation standards, imposed monitoring, and provided for adaptive management.

[19]  The ROD lists:  Appendix B, Reclamation Plan; Appendix C, Hazardous Materials Management Plan; Appendix E, Wildlife Monitoring and Protection Plan; Appendix H, Best Management Practices; Appendix I, Cultural Resources Management; Appendix J, Best Management Practices for Reducing Non-Point Source Pollution; Appendix K, section K.1 .3.7 - Applicant Voluntarily Committed Measures.  AR4835.  It also references the measures outlined in Appendix L (Resource Concerns and Associated Protection Measures Proposed Under Alternative C), as potential mitigation.  AR4835.

[20]  TRCP also references extra-record evidence concerning the alleged failures of the adaptive management program in the PAPA to support this claim, which Defendants and Defendant-Intervenors have moved to strike.  TRCP Reply at 33.  Contrary to TRCP's characterization, our arguments on this point are not limited to asking this Court to "ignore" such evidence because it is extra-record.  As noted above, TRCP has waived this argument.  Moreover, Defendant-Intervenors noted that the adaptive management process in the PAPA is irrelevant given that it is a different process, involving a different project, with a different design, and different mitigation measures.  TRCP does not address these points.

14

reporting requirements outlined in the ROD.[21]  TRCP Reply at 34-36.  Again, TRCP mischaracterizes what is required.  First, nowhere in the ROD does it indicate that the annual planning begins "in 2008."  TRCP Reply at 34.  In fact, the ROD notes that the April 1 date may change.  AR4811.  Second, the reporting requirements related to wildlife management have not been triggered.  The monitoring reports are part of the monitoring plan, which, while the required elements have been outlined, is still in development.  The ROD requires only that the *process be initiated* within 30 days of the date of the ROD.  AR4798.

In any event, the documents in Exhibit 1 to TRCP's Reply show that BLM and the Operators are taking the required actions.  An agenda reflects that the annual meeting for 2007 was held on November 28, 2007 and that, at the meeting, Anadarko and Double Eagle outlined their annual plans.  An Anadarko presentation illustrates that activities for 2007 and plans for the rest of 2007, 2008 and 2009 were outlined, as provided under the ROD.  AR4838-AR4839.  The presentation also notes that the adaptive management process began with a June 1, 2007 meeting, which the parties found met the ROD's requirements.  The presentation further outlines all the meetings and monitoring that had been done or that were planned at the time.[22]  Thus, TRCP's mischaracterizations of its incomplete Exhibit notwithstanding, these documents demonstrate that BLM and the Operators are complying with the ROD's adaptive management requirements.  TRCP's claims to the contrary are easily dismissed.[23]

---

[21]  None of the cases TRCP cites to in support of this argument are NEPA cases.  TRCP Reply at 34 (listing cases).  In any event, these cases are describing the standard of review under the Administrative Procedure Act ("APA"), *i.e.*, the arbitrary and capricious standard.  *See, e.g., Epstein v. Geren*, 539 F. Supp. 2d 267, 275 (D.D.C. 2008).

[22]  Among the actions that have been taken in compliance with the ROD noted in this presentation are:  conducting numerous working group meetings; developing, and starting as applicable, a cultural resources agreement, a mule deer study, a sage grouse study, a methane seeps study, a study of Muddy Creek, and a reclamation monitoring protocol; and conducting groundwater and air quality monitoring.

[23]  As a stark example of TRCP's approach to this litigation, TRCP again falsely asserts "the record is clear" that Anadarko has failed to comply with stipulations imposed during interim drilling.  TRCP Reply at 34 n.16.  Defendant-Intervenors refuted TRCP's mischaracterizations, showing that Anadarko was, in fact, attempting to go beyond the legal requirements and satisfy the stipulations even when they were not applicable.  Def.-Intervenors'

E.    BLM's Decision to Complete the Atlantic Rim EIS Prior to the Rawlins Resource Management Plan Complies with NEPA.

TRCP continues to rely on selective statements of BLM staff to argue that BLM was required to revise the Resource Management Plan ("RMP") for the Great Divide Resource Area ("GDRA") prior to issuing the Atlantic Rim ROD. TRCP Reply at 39-40. TRCP's arguments fail on several counts.

First, 40 C.F.R. § 1506.1, cited by TRCP, does not require BLM to wait for issuance of the ROD for the Rawlins RMP prior to taking any action with respect to the Atlantic Rim Project. The plain reading of this regulation reflects simply that BLM cannot take any action with respect to the Atlantic Rim Project -- the "proposal" here -- prior to issuance of the ROD for the Atlantic Rim Project. *See St. John's United Church of Christ v. City of Chicago*, 502 F.3d 616, 629-30 (7th Cir. 2007). Here, BLM engaged in a six-year environmental review process of the Atlantic Rim Project and issued the Atlantic Rim ROD prior to authorizing any activity pursuant to the ROD in the ARPA. That is all that NEPA requires. *See* 42 U.S.C. § 4332(2)(C)(v) (prohibiting "any irreversible and irretrievable commitments of resources which would be involved in *the proposed action*" prior to conducting environmental review) (emphasis added). Under TRCP's argument, BLM would be foreclosed from issuing RODs with respect to any management decisions any time it undertakes a revision of an RMP, until the ROD for the RMP is issued. This absurd result would essentially preclude management activities during the periodic multi-year process of reviewing an RMP.

Finally, TRCP asks this Court to ignore that BLM has already issued leases for oil and gas development throughout the ARPA prior to issuing the Atlantic Rim ROD, because, it asserts, BLM retains authority to manage public lands. TRCP Reply at 40. TRCP again misses

---

Summ. J. Mem. at 40 n.27; Def.-Intervenors' Resp. to Pl.'s SOF, ¶¶64, 65. Notwithstanding, TRCP makes the same false claims in its reply, without even addressing the record evidence demonstrating its falsity.

the point.  BLM issued leases throughout the ARPA consistent with the Great Divide RMP.

AR2135, AR2174.  BLM also found the Atlantic Rim Project was consistent with the Great

Divide RMP.  AR2136.  The Rawlins RMP seeks to update the Great Divide RMP, but actions

authorized under the current RMP remain valid.  AR5390.  To the extent the Rawlins RMP

revises any of BLM's management decisions in the ARPA, any subsequent approvals must

comply with any such revisions.

        In any event, preliminary statements by agency staff are not accorded greater weight than

BLM's final decision supported by national statements of policy.  *Nat'l Ass'n of Home Builders*,

127 S. Ct. at 2530.  As explained in Defendant-Intervenors' initial memorandum (at 42), a 2004

Instruction Memorandum ("IM") issued by BLM clarified that the Reasonably Foreseeable

Development ("RFD") scenario analyzed as part of an RMP does not restrict subsequent

development.  AR5311-AR5319.  To refute the IM, TRCP cites to a statement in an e-mail by

BLM staff from September 2002 on the initial 3,880-well proposal.  AR9220, cited in TRCP

Reply at 39.[24]  Even assuming the e-mail supports TRCP's claim that the Atlantic Rim Project

exceeded the RFD scenario in the RMP, which it does not,[25] TRCP asks this Court to give

greater weight to this e-mail than an official BLM policy statement (and to findings in the EIS).

TRCP argues that BLM's "newfound interpretation that is inconsistent with the agency's earlier

---

[24]  The only document TRCP cites regarding the RFD (TRCP Reply at 14) that post-dates the BLM's Instruction Memorandum is a presentation by an unknown author.  AR8183, AR8186.

[25]  TRCP focuses on public comments on the EIS noting that the RFD in the Great Divide RMP projected 1,440 wells "being drilled between about 1987 and 2007."  TRCP Reply at 13.  However, BLM statements make clear that the RFD is based on *disturbance estimates*, not the number of wells.  *See, e.g.*, AR8141 (draft briefing paper); AR9283 (Simons e-mail).  TRCP nonetheless lists several projects within the Rawlins Field Office, alleging the number of wells that have been *approved*, not drilled, during this time period exceeds the RFD, citing to the Atlantic Rim EIS (AR2485).  TRCP Reply at 13.  TRCP also grossly misstates the number of wells that have been *approved* during this time frame.  First and foremost, BLM has not approved drilling of 2,000 wells in the ARPA, as drilling is only approved through applications for permits to drill ("APDs").  43 C.F.R. § 3162.3-1(c).  In addition, the EIS notes that: (a) BLM *analyzed* 385 wells for the Desolation Flats project; (b) the 750 wells analyzed in the Greater Wamsutter Area II project EIS, which TRCP treats as a separate approval, was included in the Continental Divide/Wamsutter II project; and (c) BLM approved development of up to 2,130 wells, not 3,000 wells, in the Continental Divide/Wamsutter II project ROD in 1999 to be developed over a 20-year period.  AR2484-AR2485.  This again is an illustration of TRCP's misrepresentations of the record.

interpretation 'is entitled to considerably less deference.'" TRCP Reply at 39. But the cases it

cites are inapposite, as they involved an official interpretation of a statute or regulation or agency

precedent, not merely a statement by agency staff made early on in the decision-making

process.[26] Moreover, the IM makes clear that BLM was only clarifying its position.[27] AR5310.

## III.    BLM'S EXPERT DETERMINATIONS UNDER FLPMA ARE ENTITLED TO DEFERENCE.

TRCP raises substantive challenges to BLM's management decisions for the ARPA

under FLPMA. Review of claims under FLPMA is conducted pursuant to the APA, and "the

standard of review is also a highly deferential one; the agency's actions are 'entitled to a

presumption of regularity,' and the court cannot 'substitute its judgment for that of the agency.'"

*S. Utah Wilderness Alliance v. Norton*, 326 F. Supp. 2d 102, 107-08 (D.D.C. 2004) (quoting

*Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415-16 (1971)). "When specialists

express conflicting views, an agency must have discretion to rely on the reasonable opinions of

its own qualified experts even if, as an original matter, a court might find contrary views more

persuasive." *Marsh*, 490 U.S. at 378. None of TRCP's arguments warrants deviating from

BLM's reasoned decisions in this case.

### A.    BLM Did Not Authorize a "Singular Use" for the ARPA, but Properly Balanced its Management Goals.

TRCP erroneously claims that "BLM has authorized a singular use for the ARPA."

TRCP Reply at 4. The Great Divide RMP provides for the "sustained multiple use management"

---

[26] *See Watt v. Alaska*, 451 U.S. 259, 272-73 (1981) (involving change in statutory interpretation agency had applied for 10 years); *INS v. Cardoza-Fonseca*, 480 U.S. 421, 447 n.30 (1987) (involving at least three different agency interpretations of relevant statutory terms in different cases, extending over several years); *Louisiana Pub. Serv. Comm'n v. FERC*, 184 F.3d 892, 897 (D.C. Cir. 1999) (involving reversal of position from prior FERC order). *Cf. Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 515 (1994) (deferring to agency's interpretation of regulations where plaintiff failed to show agency's interpretation was inconsistent); *Pauley v. BethEnergy Mines, Inc.*, 501 U.S. 680, 699 (1991) (deferring to agency's statutory interpretation advanced "since the regulations were promulgated").
[27] TRCP also ignores that this IM is from BLM's Director and that other BLM policy, as well as decisions of the Interior Board of Land Appeals ("IBLA"), confirm this position. Def.-Intervenors' Summ. J. Mem. at 41-43. Courts have given greater weight to statements of *national* policy. *See, e.g., Exxon Corp. v. Lujan*, 970 F.2d 757, 762 (10th Cir. 1992) (deferring to declaration of national policy over prior decision by regional office of BLM).

of approximately 4 million acres of public land surface and 5 million acres of federal mineral estate administered by BLM.  AR652.  The ARPA comprises approximately 270,080 acres of federal, state and privately owned lands.  AR4796.  The 173,672 acres of federal surface estate in the ARPA is approximately 4.3% of the federal lands in the GDRA.  AR4796.  Further, total surface disturbances authorized at any one time under the Atlantic Rim ROD -- 7,600 acres -- is 2.8% of the ARPA and 0.19% of the GDRA.  AR4796.  Allowing 2.8% of the ARPA to be used at any one time for oil and gas development can hardly be considered a "singular use."

TRCP asks this Court to ignore BLM's prior decisions allowing oil and gas leasing throughout the ARPA, arguing that dismissing TRCP's claim would make BLM's decisions on multiple use and sustained yield not subject to judicial review.[28]  TRCP Reply at 6.  Again, TRCP misses the point.  The RMP outlines BLM's management decisions for the entire GDRA based on FLPMA's multiple use and sustained yield requirements.  BLM is not required to undergo a new multiple use assessment for every management decision implementing the RMP.  Rather, BLM is required to ensure that its subsequent decisions conform to the plan, which it did in this case.  43 U.S.C. § 1732(a).[29]

In any event, TRCP merely disputes BLM's balancing.  In *Williams v. Bankert*, cited by TRCP, the court easily rejected a claim that "BLM's weighing of the resource values was unreasonable and the balance that BLM chose violates FLPMA's multiple-use mandate."  2007 WL 3053293, at *10.  That court found, as Defendant-Intervenors argued in their initial memorandum, that FLPMA does not require all uses on all areas of public lands:

---

[28]  In so doing, TRCP contends that courts have "entertained myriad claims concerning 'multiple use' mandates in contexts other than RMP challenges."  TRCP Reply at 5 (listing cases).  None of these cases, however, requires BLM to reassess balancing decisions already conducted in an RMP.  *Cf. Williams v. Bankert*, No. 2:05CV503DAK, 2007 WL 3053293, at *2 (D. Utah Oct. 18, 2007).  Moreover, there are opportunities for the public to dispute the decisions in an RMP.  *See, e.g.,* 43 C.F.R. § 1610.5-2 (providing for protest procedures).

[29]  TRCP's citation to 43 U.S.C. § 1702(k)(1) is unavailing.  That provision defines an "allotment management plan," which is governed by a separate section of FLPMA related to grazing leases and permits.  43 U.S.C. § 1752.

> FLPMA's multiple-use mandate does not require that all uses be
> allowed on all areas of the public lands.  That would preclude any
> kind of balance.  The purpose of the mandate is to require the BLM
> to evaluate and choose an appropriate balance of resource uses,
> which involves tradeoffs between competing uses.
>
> . . . The IBLA correctly concluded that "[Plaintiffs'] simple
> disagreement with the balance BLM chose does not establish that
> [BLM's decision] violated FLPMA's multiple use mandate."

*Id.* at 10-11 (first alteration in original).  *See also Norton v. S. Utah Wilderness Alliance*, 542

U.S. 55, 58 (2004) (citing 43 U.S.C. § 1702(c)); *Utah v. Andrus*, 486 F. Supp. 995, 1003 (D.

Utah 1979). Similar to that case, BLM here evaluated several alternatives and ultimately chose

Alternative D, which it found to be the best balance between oil and gas development and

protection of resources throughout the ARPA.[30]  While TRCP may prefer recreational uses,

FLPMA also promotes mineral exploration and production as principal uses of the federal public

lands.  43 U.S.C § 1702(l).  BLM's decision is entitled to deference.

B.    BLM Imposed Mitigation Measures to Reduce Potential Impacts of Oil and Gas
      Development for the Protection of Other Resources, Consistent with the RMP.

TRCP apparently claims the mere fact that habitat will be disturbed indicates that the

Atlantic Rim ROD is inconsistent with the wildlife and recreation management objectives in the

RMP.  TRCP Reply at 7.  This contention cannot hold, as it would restrict any uses that might

harm wildlife, including hunting.[31]  TRCP notes the total estimated disturbance (direct and

---

[30]  TRCP essentially admits that Alternative B, the phased alternative, could address the issues of which it now
complains. TRCP Reply at 12 n.6. Contrary to TRCP's assertions, BLM found Alternative B to have similar
impacts as the Proposed Action.  *See supra* note 8. Alternative D, on the other hand, substantially reduced those
impacts, illustrating that TRCP's claims are empty and merely dispute BLM's final decision.

[31]  TRCP cites to alleged impacts asserted by WGFD. TRCP Reply at 8.  These numbers, however, are taken from
Table 5-2 of a draft Final EIS (AR9793), which estimates *cumulative* surface disturbance throughout seasonal
ranges for big game, and are not limited to disturbances in the ARPA.  AR2498.  Table 5-2 shows that estimated
cumulative surface disturbances under Alternative D would be:  (a) for pronghorn seasonal ranges, 1.3% of the total
area studied (11,547 acres/890,743 acres), 57% of which would occur even under the no action alternative (6,547
acres); (b) for mule deer seasonal ranges, 2.5% of the total area studied (46,287 acres/1,843,543 acres), 89% of
which would occur even under the no action alternative (41,287 acres); and (c) for elk seasonal ranges, 0.4% of the
total area studied (5,883 acres/1,525,644 acres), 15% of which would occur even under the no action alternative

20

indirect) throughout the life of the project was estimated to be approximately 7.8% of the ARPA.[32]  AR2389, cited in TRCP Reply at 7-8.  BLM, however, has limited surface disturbance to 7,600 acres, or approximately 2.8% of the ARPA.  Moreover, BLM imposed numerous measures to mitigate the potential impacts to other resources, including monitoring and adaptive management.  AR4807, A4816, AR4835-AR4855, AR4859-AR4863.  The ROD also included a Reclamation Plan with criteria for reclamation of disturbed areas.  AR4822-AR4833.  This complies with the RMP's objectives.

TRCP erroneously claims that the ROD is "directly" contrary to the RMP's objectives, and that reliance on the adaptive management plan constitutes a violation *per se* of the RMP.  TRCP Reply at 16, 20-21.  The Great Divide RMP identified oil and gas leasing and development as one of BLM's management objectives, and opened the entire planning area for this purpose.  AR679-AR681.  The RMP states that, for oil and gas activities, surface disturbing activities in specific areas will be restricted and intensively managed to maintain important resource values.  AR679.  The RMP further notes that where stipulated restrictions or requirements are later found to be insufficient, "the needed restrictions or requirements may be included in approving subsequent exploration and development activities."[33]  AR679.  As described above, these actions were taken in this case.

TRCP also ignores specific listed "management actions" in the RMP that the ROD includes.  For example, BLM imposed the seasonal restrictions from the RMP with respect to big game winter habitat (AR692-AR694, AR697), noting that they are expected to reduce the

---

(883 acres).  AR2498.  Based on the table, Alternative D is estimated to result in 10%, 3% and 17% less cumulative surface disturbance than the Proposed Action.

[32]  Direct impacts are estimated at 6% of the project area (270,080 acres), or 16,205 acres.  Indirect impacts are estimated at 15-30% more acreage.  Using the higher end (30%), this is estimated to be an additional 4,861 acres.  This is a total of 21,066 acres, which is 7.8% of 270,080 acres.

[33]  Thus, contrary to TRCP's claims, the adaptive management process is not inconsistent with the RMP, but was expressly contemplated.

displacement and disturbance of big game.  AR2391.  Similarly, activities will be restricted from

February to July 31 within certain areas to protect important raptor and/or grouse nesting habitat

(AR2632), also as outlined in the RMP, AR697.  The RMP includes mitigation guidelines and

requires that, when considering additional mitigation, BLM must take action to protect big game

crucial winter habitat (including mitigation of surface disturbance to restore or replace habitat)

and sage grouse strutting/dancing and nesting grounds.  AR694.  BLM found the project was

consistent with the RMP, including the wildlife guidelines.  *See* AR2136, AR4405, AR4465.

The Atlantic Rim ROD also includes mitigation related to fugitive dust, visual resources,

transportation, noise, in addition to the surface disturbance limitations and mitigation for

wildlife, to address potential impacts to recreational opportunities.  AR4839-AR4840; AR4852-

AR4854.  The RMP's general comments regarding protection of wildlife and recreation do not

conflict with the approval of the Atlantic Rim Project, which contained appropriate mitigation

for these resources.  Again, the mere fact that an authorized use may adversely impact other

resources does not constitute a violation of FLMPA, but reflects BLM's balancing of multiple

uses on public lands.

C.    TRCP's Disputes Over the Appropriate "Science" are Insufficient to Render
      BLM's Decision Arbitrary.

TRCP admits that its dispute with respect to the sage grouse mitigation is over the

"science."  TRCP Reply at 8.  Contrary to TRCP's arguments, however, this is precisely the type

of challenge that entitles the agency to substantial deference.  *Marsh*, 490 U.S. at 378; *Baltimore*

*Gas & Elec. Co.*, 462 U.S. at 103; *Lands Council v. McNair*, --- F.3d ----, 2008 WL 2640001, at

*9 (9th Cir. July 2, 2008); *Earthlink, Inc. v. FCC*, 462 F.3d 1, 12 (D.C. Cir. 2006).  TRCP's

disputes over BLM's choice of specific mitigation does not constitute a violation of FLPMA.

In support of its claim that BLM ignored the science, TRCP references concerns raised by the U.S. Fish & Wildlife Service ("FWS") to assert that the mitigation BLM imposed for the sage grouse are insufficient.[34]  While FWS recommended the minimum measures in the Connelly guidelines in commenting on the *draft* EIS, those guidelines also noted that the recommendations be imposed "*whenever possible*."  Def.-Intervenors' Resp. to Pl.'s SOF, ¶31. In any event, BLM responded to FWS concerns by creating Alternative D, which sought to minimize surface disturbance to address, among other things, potential impacts to wildlife.[35] AR2089, AR2147, AR2401.  In particular, Alternative D provides for more intense management in "Category A" areas, which include sensitive wildlife habitat.  AR4807; AR2156, AR2401. FWS also commended BLM for including reclamation that "may reduce some of the impacts that will occur."  AR10135.  TRCP did not dispute the record evidence showing that reclamation will reduce the impacts to the sage grouse, or that sage grouse adapt to changes and return to areas disturbed by energy development.  AR5972; AR6240-AR6241; AR2395.

While FWS expressed "concerns" over potential impacts to the sage grouse in comments on the final EIS, it merely encouraged BLM to "incorporate as many of the protective measures outlined in Appendix L [of the EIS] as *are practical* into the final action."  AR10135 (emphasis added).  The measures for the sage grouse in Appendix L were reviewed as part of Alternative C, which BLM found to be infeasible because it would effectively limit well-spacing.  AR4442,

---

[34]  Although TRCP admits that BLM adequately considered the project's potential impacts on the sage grouse, TRCP Reply at 8, thus complying with NEPA requirements, TRCP attempts to rely on NEPA regulations to allege violations of FLPMA.  TRCP also attempts to rely on FWS comments during scoping of the EIS, asking BLM to consider the impacts on the sage grouse.  AR7808; AR7813, cited in TRCP Reply at 9.

[35]  BLM responded to FWS concerns regarding BLM's choice of a 1/4-mile no surface occupancy ("NSO"). AR4405.  BLM also explained that the 1/4-mile NSO was consistent with the RMP and with the Wyoming Greater Sage-Grouse Conservation Plan, which is prepared by the WGFD.  AR4678.  TRCP disputes, however, BLM's reliance on WGFD recommendations that specifically reference the 1/4-mile NSO because BLM did not include all of the possible mitigation identified.  TRCP Reply at 10.  However, that BLM chose different additional mitigation measures is irrelevant.  BLM noted it is working with the WGFD toward the protection of the sage grouse, but that it would not impose WGFD recommendations that were not feasible.  AR4674; AR4719.  Hence, TRCP again simply challenges BLM's decision on the appropriate mitigation to be imposed.

AR4800, AR4811.  In any event, BLM has not precluded these measures, but contemplated that additional measures, including those in Appendix L (as well as those recommended by WGFD), may be imposed as part of its adaptive management program.  AR4835; AR4870-AR4871. Thus, BLM has taken measures to address sage grouse, including steps to address subsequent determinations that current measures are "not effective."  TRCP Reply at 12.

The FWS's reference to the experience in the PAPA is also irrelevant.  Contrary to TRCP's claims, the measures imposed in the PAPA for the protection of sage grouse are not "identical" to those in the ARPA.  TRCP Reply at 10 (quoting AR3256).  *See* Def.-Intervenors' Resp. to Pl.'s SOF, ¶ 105.  Most significantly, the surface disturbance and well-spacing limitations for the ARPA are more restrictive -- 8 well sites per 640 acres (80-acre spacing) -- than for the PAPA.  AR4805.  TRCP cites FWS's comments on the *DRAFT* EIS, which were submitted prior to BLM imposing surface disturbance limitations.  FWS's comments on the *FINAL* EIS did not make the same recommendation.[36]  AR10134-AR10135.  Thus, TRCP is asking this Court to choose the "true experts" in this case, TRCP Reply at 11, which the Court may not do.  *Marsh*, 490 U.S. at 378.

D.      Alleged Exceedances of the RFD Scenario do not Violate FLMPA.

TRCP attempts now to craft a new argument that exceeding the RFD scenario is inconsistent with the RMP, and does so by jumbling arguments relating to consistency with the RMP and analysis of potential impacts of the project.  TRCP Reply at 13.  As an initial matter, as noted above, TRCP's starting premise that the scenario has been exceeded by the ROD is incorrect.  The life of the Atlantic Rim Project is expected to be 30-50 years, and the ROD itself

---

[36]  TRCP also relies on an IBLA decision to claim that the 1/4-mile NSO is based on "no science."  TRCP Reply at 11 (citing *Wyoming Audubon*, 151 IBLA 42, 49 (Oct. 22, 1999)).  As noted in Defendant-Intervenors' initial memorandum (at 39 n.25), the IBLA upheld the use of the 1/4-mile NSO.  The IBLA subsequently upheld BLM's explanation of its use of the 1/4-mile NSO.  *Biodiversity Conservation Alliance*, 174 IBLA 1, 8 (Mar. 3, 2008).

24

does not authorize actual drilling of wells, which must be approved through APDs.  AR4798.  In

any event, TRCP now *admits* that exceeding the RFD is not itself inconsistent with the RMP,

TRCP Reply at 15, so that argument fails.  Instead, TRCP now argues inconsistency based on the

RMP not considering the impacts of the proposed project.  TRCP Reply at 15 n.7.  But that was

the purpose of the six-year NEPA process for the Atlantic Rim Project, which was tiered to the

EIS for the RMP.  Again, TRCP sets up an argument that is fatally flawed.

   The only case that TRCP cites to in support of this flawed argument is clearly inapposite,

and involved an agency's interpretation of an express *statutory* limitation on agency authority.

*Se. Fed. Power Customers, Inc. v. Geren*, 514 F.3d 1316, 1323 (D.C. Cir. 2008) ("Section 301 of

the WSA plainly states that a major operational change to a project falling within its scope

requires prior Congressional approval.").  TRCP's claim that the project is not consistent with

the RMP because it exceeds the RFD Scenario is easily dismissed.

## IV.   CONCLUSION

   For the foregoing reasons and for the reasons set forth in Defendant-Intervenors' initial

memorandum, this Court should deny Plaintiff's Motion for Summary Judgment and grant

summary judgment in favor of defendants.

                              Respectfully submitted,

                               /s/ Michael B. Wigmore
                              _____
                              Michael B. Wigmore (DC Bar # 436114)
                              Bingham McCutchen LLP
                              2020 K St., NW
                              Washington, DC 20006-1806
                              202.373.6000
                              202.373.6001 (facsimile)

                              *Counsel for Anadarko Petroleum*
                              *Corporation, Warren Resources, Inc., and*
                              *Double Eagle Petroleum Co.*

Robert C. Mathes (DC Bar # 484255)
Bjork Lindley Little PC
1600 Stout Street, Suite 1400
Denver, CO 80202
303.892.1400
303.892.1401 (facsimile)

*Counsel for Double Eagle Petroleum Co.*

Dated:  July 31, 2008

## CERTIFICATE OF SERVICE

I hereby certify that on this 31st day of July, 2008, the foregoing Reply In Support Of

Defendant-Intervenor Anadarko Petroleum Corporation, Warren Resources, Inc., And Double

Eagle Petroleum Co.'s Cross-Motion For Summary Judgment was electronically filed through

the CM/ECF system, which caused the following to be served by electronic means, as more fully

reflected on the Notice of Electronic Filing:

> Donald G. Blankenau
> Thomas R. Wilmoth
> Steven Michael Kupka
> Husch Blackwell Sanders LLP
> 206 South 13th Street
> Suite 1400
> Lincoln, NE 68508
> don.blankenau@huschblackwell.com,
> tom.wilmoth@huschblackwell.com,
> sharon.marburger@huschblackwell.com,
> nancilee.holland@huschblackwell.com
>
> Lori Caramanian
> U.S. Department of Justice
> 1961 Stout Street, 8th Floor
> Denver, CO 80294
> lori.caramanian@usdoj.gov
>
> Jay A. Jerde
> David James Willms
> John S. Burbridge
> Deputy Attorney General
> Wyoming Attorney General's Office
> 123 Capitol Building
> Cheyenne, WY 82002
> jjerde@state.wy.us
> dwillm@state.wy.us
> jburb1@state.wy.us

                        /s/ Michael B. Wigmore
                         Michael B. Wigmore

A/72609987.2

27

# Unreported Cases

1.    *Blanco v. Burton*, 2006 WL 2366046 (E.D. La. Aug. 14, 2006).

2.    *Oceana, Inc. v. Evans*, No. Civ.A.04-0811(ESH), 2005 WL 555416 (D.D.C. Mar. 9, 2005).

3.    *S. Utah Wilderness Alliance v. Bankert*, No. 2:07-CV-292-TC, 2007 WL 2873788 (D. Utah Oct. 3, 2007).

4.    *Williams v. Bankert*, No. 2:05CV503DAK, 2007 WL 3053293 (D. Utah Oct. 18, 2007).

## ADMINISTRATIVE DECISIONS

5.    *Biodiversity Conservation Alliance*, 174 IBLA 1 (2008).

6.    *Wyoming Audubon*, 151 IBLA 42 (1999).

Not Reported in F.Supp.2d                                                    Page 1
Not Reported in F.Supp.2d, 2006 WL 2366046 (E.D.La.)
**(Cite as: 2006 WL 2366046 (E.D.La.))**

C

Only the Westlaw citation is currently available.

United States District Court,
E.D. Louisiana.
Kathleen Babineaux BLANCO, in her official capa-
city as Governor, State of
Louisiana; and State of Louisiana, by and through
Attorney General Charles C.
Foti, Jr.
v.
Rejane "Johnnie" BURTON, in her official capacity
as Director, Minerals
Management Service; Minerals Management Ser-
vice; Dirk Kempthorne, in his
official capacity as Secretary, United States Depart-
ment of the Interior;
United States Department of the Interior; and
American Petroleum Institute
(Intervenor)
No. Civ.A. 06-3813.

Aug. 14, 2006.

Sam Kalen, Jonathan Simon, Katherine Henry,
Jonathan Simon, Van Ness Feldman, Washington,
DC, James G. Wilkins, Megan K. Terrell, Ryan Mi-
chael Seidemann, Department of Justice, Baton
Rouge, LA, for Kathleen Babineaux Blanco, in her
official capacity as Governor, State of Louisiana;
and State of Louisiana, by and through Attorney
General Charles C. Foti, Jr.

Lauren Fischer, Brian McLachlan, Luke Hajek,
U.S. Department of Justice, Milo Mason, U.S. De-
partment of the Interior Office of the Solicitor,
Steven J. Rosenbaum, Theodore L. Garrett, Coving-
ton & Burling LLC, Washington, DC, Sharon Den-
ise Smith, U.S. Attorney's Office, Judy Y. Barrasso,
John W. Joyce, Barrasso Usdin Kupperman Free-
man & Sarver, LLC, New Orleans, LA, for Rejane
"Johnnie" Burton, in her official capacity as Direct-
or, Minerals Management Service; Minerals Man-
agement Service; Dirk Kempthorne, in his official
capacity as Secretary, United States Department of

the Interior; United States Department of the Interi-
or; and American Petroleum Institute (Intervenor).

*ORDER AND REASONS*

ENGELHARDT, J.

**\*1** Before the Court is the Motion for Preliminary
Injunction filed in the above-captioned matter by
Plaintiffs, Kathleen Babineaux Blanco, in her offi-
cial capacity as Governor, State of Louisiana
(individually referred to as "Governor"); and State
of Louisiana, by and through Attorney General
Charles C. Foti, Jr. (together with the Governor re-
ferred to as "Plaintiffs" or "State"). Memoranda in
opposition have been filed by Defendants, Rejane
"Johnnie" Burton, in her official capacity as Direct-
or, Minerals Management Service; Minerals Man-
agement Service; Dirk Kempthorne, in his
official capacity as Secretary, United States Department of
the Interior, United States Department of the Interi-
or (together referred to as "Defendants", separately
"MMS" and "DOI" respectively); and by Interven-
or, American Petroleum Institute ("API"). The
Court is also in receipt of a memorandum in reply
filed by Plaintiffs. Oral argument was heard on
Plaintiffs' motion on August 8, 2006, after which
the Court took the matter under submission.

I. *SUMMARY OF DISPOSITION*

The issue posed to the Court is simply whether pre-
liminary injunctive relief should be issued during
the pendency of this action, which calls into ques-
tion compliance by MMS and DOI with various
Congressionally-mandated environmental require-
ments in connection with Lease Sale 200. On the
showings made by the parties, and considering the
applicable law, the arguments set forth in briefs and
at oral argument, as well as the exhibits provided,
the Court this day rules as follows:

(1) Because there has not been a sufficient show-
ing of irreparable harm which could occur during
the interim between the time of this ruling and
the upcoming trial date, the Plaintiffs' Motion for

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Preliminary Injunction is DENIED;

(2) Counsel for all parties are to confer (with the assistance of the assigned magistrate judge, if necessary) no later than Monday, August 29, 2006, to determine what, if any, discovery will be necessary to prepare this matter for trial, and schedule whatever discovery is desired.

(3) A pre-trial conference will be held in this matter on Friday, November 3, 2006, at 9:30 a.m.; the final pre-trial order shall be due in chambers by 4:30 p.m. on Tuesday, October 31, 2006;

(4) The parties are to confer with the magistrate judge to discuss a possible resolution of this matter no later than Friday, October 28, 2006; and

(5) Trial in this matter, including the Plaintiffs' request for permanent injunctive relief, is fixed for Monday, November 13, 2006, at 8:30 a.m.

Critical to the Court's ruling today is the fact that this matter can be fixed for trial in short order. Balancing the risk of irreparable harm by any act committed by Defendants against the relatively short period of time necessary to prepare and try this matter on the declaratory and permanent [FN1] injunctive relief, the Court finds the entry of a preliminary injunction, particularly one as broad as suggested by Plaintiffs, to be unwarranted. Plaintiffs specifically claim irreparable harm as a result of indirect and cumulative impact of Lease Sale 200, particularly the impact on resources, onshore infrastructure and coastal residents. *See* Pls' Memo. at 65. Because any actions taken pursuant to Lease Sale 200 between now and the upcoming trial date will have no such impact, the Court declines issuance of pre-trial injunctive relief.

> FN1. This injunctive relief, if granted, would be "permanent" until there is compliance by Defendants with any federal laws deemed applicable and unsatisfied after trial on the merits.

**\*2** However, finding that Plaintiffs have a substantial likelihood of success on the merits for at least some of the claims asserted, this ruling does not

prejudice Plaintiffs' right to seek (or this Court's authority to issue) permanent injunctive relief as a result of the November 13, 2006 trial, including the enjoining of any and all activities conducted pursuant to any leases awarded between now and the trial date, until Defendants are in compliance with the applicable Congressionally-mandated requirements. The Court expects that the parties will confer in good faith to prepare this matter for trial, and, more importantly, to attempt to achieve a resolution of the perceived inadequacies of the Defendants' attempts to comply with the relevant statutory authorities that form the basis of this action, as set forth more specifically herein.

## II. *FACTUAL AND LEGAL BACKGROUND*
### A. The Outer Continental Shelf Lands Act

The Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. § 1331 *et seq.,* established federal jurisdiction over the subsoil and seabed of the outer Continental Shelf ("OCS") [FN2] and attachments thereto. *See* 43 U.S.C. §§ 1332(1), 1333(a)(1). As stated in the OCSLA, it is the policy of the United States that "the outer Continental Shelf is a vital national resource reserve held by the Federal Government for the public, which should be made available for expeditious and orderly development, subject to environmental safeguards, in a manner which is consistent with the maintenance of competition and other national needs." 43 U.S.C. § 1332(3). In accordance with such policy, Congress entrusted the Secretary of the Interior ("the Secretary") with the duty of overseeing and promulgating regulations concerning leasing of the OCS. *See* 43 U.S.C. § 1334(a). In carrying out his duties, the Secretary is required to consider and balance the potential for environmental harm, the potential for adverse impact to the coastal zone, and the potential for the discovery of resources, while also ensuring the public a fair and equitable return on the resources of the OCS. *See* 43 U.S.C. §§ 1334(a)(1), 1344(a)(3), 1344(a)(4). The OCSLA specifically authorizes the Secretary to grant oil and gas leases to the highest, qualified, and responsible bidder or

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                          Page 3
Not Reported in F.Supp.2d, 2006 WL 2366046 (E.D.La.)
**(Cite as: 2006 WL 2366046 (E.D.La.))**

bidders on the basis of sealed competitive bids. *See* 43 U.S.C. § 1337(a)(1). The Secretary has designated MMS, a bureau within the DOI, as the administrative agency responsible for the mineral leasing of submerged OCS lands and for the supervision of offshore operations after lease issuance.

> FN2. The OCSLA defines the outer Continental Shelf as "all submerged lands lying seaward and outside of the area of lands beneath navigable waters as defined in section 1301 of this title, and of which the subsoil and seabed appertain to the United States and are subject to its jurisdiction and control." *See* 43 U.S.C. § 1331(a). Essentially, the outer continental shelf is the area of the continental shelf beyond the territory of the coastal states (for the most part beyond 3 miles from coast land, but in some areas beyond 9 miles from coast land). *See* 43 U.S.C. §§ 1312, 1313 (defining and describing the seaward boundaries of the coastal states).

B. Lease Sale 200

1. 2002-2007 Program

Section 18 of the OCSLA calls for the preparation of an oil and gas leasing program indicating a 5-year schedule of lease sales designed to best meet the Nation's energy needs. *See* 43 U.S.C. § 1344. In accordance with Section 18, in 2002, the MMS issued its "Proposed Final Outer Continental Shelf Oil & Gas Leasing Program" for years 2002 to 2007 ("2002-2007 Program"). Under the 2002-2007 Program, the areas of the OCS available for mineral development and production are divided into various planning areas. Included in those planning areas is the Western Gulf of Mexico planning area ("WPA"), a plot located south of Texas and Louisiana. The 2002-2007 Program proposes one lease sale each year from 2002 until 2006 in the WPA. Lease Sale 200 is the final lease sale proposed in the 2002-2007 Program for the WPA. Under Lease Sale 200, MMS plans to offer for lease

all available, unleased blocks within the WPA for oil and natural gas operations. [FN3] Currently, as noted in its "Final Notice of Sale (FNOS) 200," MMS intends to open and publicly announce bids received for blocks offered in Lease Sale 200 on August 16, 2006.

> FN3. Under Lease Sale 200, 3,865 blocks of approximately 20.87 acres in the WPA would be leased to successful bidders. *See* Def's Exh. 1. The blocks are located from three to about 210 miles offshore in water depths of eight to more than 9,843 feet.

2. Preparation for Proposed Lease Sale 200

**\*3** In preparing for Lease Sale 200, MMS issued several statements and determinations aimed at complying with various federal statutory requirements addressing environmental concerns. Additionally, much correspondence regarding such documents and regarding compliance with federal law passed between MMS and the State of Louisiana in the months prior to the proposed sale date. In November of 2002, MMS published a "Final Environmental Impact Statement" ("multi-sale EIS"), which purports to address the environmental impacts of most of the lease sales proposed in the 2002-2007 Program for the Central and Western Gulf of Mexico planning areas, including proposed sales 185, 190, 194, 198, 187, 192, 196 and 200. [FN4] MMS prepared a single Environmental Impact Statement ("EIS") for these nine Central and Western Gulf sales because, according to MMS, "each lease sale proposal and projected activities [were] very similar each year for each planning area." Pls' Exh. 2 at 1-3. In the multi-sale EIS, MMS noted that a National Environmental Policy Act ("NEPA") review would be conducted prior to each of sales 190, 194, 198, 192, 196 and 200. Consequently, in March of 2006, MMS published its "Environmental Assessment" ("EA") with respect to proposed Lease Sale 200. [FN5]

> FN4. The public process for the multi-sale EIS began on September 12, 2001, when

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

MMS published in the Federal Register a Call for Information and Notice of Intent to Prepare the EIS. *See* 66 Fed.Reg. 47499-02, 47,500 (2001). The public process ended when MMS announced a notice of availability of the final multi-sale EIS on Nov. 12, 2002. *See* 67 Fed.Reg. 68684 (2002).

FN5. MMS announced its intent to prepare an EA for proposed Lease Sale 200 on November 22, 2005. *See* 70 Fed.Reg. 70633 (2005). Interested parties were provided with a 30-day public comment opportunity. *Id.* at 70634. The State of Louisiana, through its agencies, was the only party to submit comments. On April 4, 2006, MMS issued a notice of availability of the EA. *See* 71 Fed.Reg. 16825 (2006). Again, a 30-day public comment period was provided. *Id.* MMS sent a copy of the EA directly to the Louisiana Governor's office on April 12, 2006, in which MMS requested comments from the state by the close of the public comment period. *See* Pls' Exh. 9.

As stated by MMS, "the EA [was] prepared to aid in the determination of whether or not new available information indicates that the proposed lease sale [200] would result in new significant impacts not addressed in the multisale EIS." Pls' Exh. 7 at 1. The EA, therefore, incorporates by reference and tiers off of all relevant material contained in the multi-sale EIS. It also incorporates by reference all relevant material contained in EAs produced for Lease Sales 196 and 192. In Section 1 of the EA, entitled "Objectives of the Environmental Assessment," MMS indicates that, in preparing for and composing the EA, it reexamined all potential environmental effects of the proposed action, i.e. Lease Sale 200, and the alternatives of such action based on "any new information regarding potential impacts and issues not available at the time MMS prepared the multisale EIS in November 2002." *Id.*

MMS further states that, in developing the EA, it placed particular emphasis on changes that have occurred as a result of Hurricanes Katrina and Rita. *Id.* According to MMS, upon considering such information, it concluded that "[n]o new information was discovered that would require the full reevaluation of any resource nor alter the conclusions of the multisale EIS." *Id.* Accordingly, along with the Lease Sale 200 EA, MMS issued a "Finding of No New Significant Impact" ("FONNSI"). In its FONNSI, MMS acknowledges that new information was incorporated into the EA that was not considered in the multi-sale EIS. However, MMS asserts that such information merely supports or elaborates upon analysis or information contained in the multi-sale EIS--it does not *change* any analysis or conclusions contained therein. In light of this, MMS concludes that "no new significant impacts were identified for Proposed Lease Sale 200 that were not already assessed in the multisale EIS" and that the composition and issuance of a supplemental EIS is not necessary. Pls' Exh. 7, FONNSI.

**\*4** On May 17, 2006, the State of Louisiana submitted a letter to MMS with comments regarding the EA and FONNSI. *See* Pls' Exh. 12. In the letter, the State expressed disapproval of the measures taken by MMS in preparation for Lease Sale 200. Specifically, the State asserted that "[t]he EA and FONNSI ... are simply insufficient to reasonably address the shortcomings in coastal protection laid bare by the storms" and that "MMS has failed, perhaps in the simple rush to stay on the schedule identified in the Multisale 2002 ... EIS, to take the necessary steps with which it is charged under [federal law] to ensure for the protection of Louisiana's coastal zone and the infrastructure." *Id.* According to the State, the analysis in the EA of the damage caused by Hurricanes Katrina and Rita, which hit the Gulf Coast in August and September of 2005, respectively, to OCS facilities and the corresponding environment is cursory at best due to the fact that it is based upon and tiers off of "now outdated NEPA documents." *Id.* In response, MMS indicated that it uses the best information available

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2366046 (E.D.La.)
**(Cite as: 2006 WL 2366046 (E.D.La.))**

at the time to prepare its NEPA documents and that, as new information evolves, baseline discussions and impacts and analysis can be enhanced over time accordingly. *See* Pls' Exh. 14. MMS further noted that, in its opinion, the impacts of a single lease sale are minor and that the "incremental contribution of an individual lease sale to cumulative impacts is insignificant." *Id.*

In preparing for Lease Sale 200, MMS also issued a Consistency Determination ("CD"), entitled "Determination of Whether Proposed Western Gulf of Mexico Lease Sale 200 Is Consistent With the Louisiana Coastal Resources Program," which was received by Louisiana's Secretary of Natural Resources in March of 2006. MMS issued the CD in accordance with Section 307(c)(1) of the Coastal Zone Management Act ("CZMA"), as amended, which requires that all federal agency activity affecting any land, water use or natural resource of the coastal zone be carried out "in a manner which is consistent to the maximum extent practicable with the enforceable policies of approved State management programs." *See* 16 U.S.C. § 1456(c)(1)(A). Like the EA prepared for Lease Sale 200, the CD incorporates and tiers off of a previous documentation-- specifically, the CD for Lease Sale 187, which was held in August of 2003. [FN6] Additionally, according to MMS, the CD focuses on "the updated information from the Sale 200 and 196 EA's that was not available for the preparation of the Sale 187 EA." Pls' Exh. 5. In the CD, MMS ultimately concludes that nothing in the conduct, terms and conditions, location or configuration of the proposed Lease Sale would preclude or otherwise prevent exploration, development and production activities from being conducted in a manner consistent with the Louisiana Coastal Resources Program ("LCRP") and that Lease Sale 200 will be consistent, as much as possible, with the policies of the LCRP identified by Louisiana as enforceable.

> FN6. In its Lease Sale 200 CD, MMS states that it incorporates the Lease Sale 187 CD "[t]o aid [its] efforts to streamline

Coastal Zone Management consistency processes and reduce unnecessary paperwork." Pls' Exh. 5.

**\*5** On June 14, 2006, the State submitted comments to MMS objecting to the CD. [FN7] *See* Pls. Exh. 15. As in its letter to MMS regarding the EA, in its letter regarding the CD, the State criticized MMS for allegedly failing to fully address the devastation of Hurricanes Rita and Katrina in its assessments. *Id.* The State urged that "MMS *must* provide a more up-to-date environmental evaluation, to support its CD, that fully takes into account the new information resulting from the storms and the new circumstances facing the State in the wake of the devastation that occurred last year." *Id.* The Regional Director of MMS responded to the State's comments with a three-paragraph letter indicating that, while MMS takes the position that Lease Sale 200 is consistent with the enforceable policies of the LCRP, MMS personnel would be willing to meet with relevant State personnel to discuss the States' concerns. *See* Pls' Exh. 16. Notably, a meeting between the parties never took place.

> FN7. Before this, by letter dated April 13, 2006, LDNR notified MMS that the information presented in MMS's CD was inadequate to allow review of the proposed Lease Sale and that the State deemed the 60-day review period to be postponed until pertinent information and documents were received by the State. *See* Pls' Exh. 8. In its letter, LDNR stated that the CD "ignores the incredible damages wrought by the hurricanes of 2005, and the need to evaluate all coastal activities with a new appreciation to the potential for severe storm impacts." *Id.* LDNR further explained that adequate information to evaluate certain specific LDNR guidelines is yet to be compiled and distributed. *Id.* Without such information, LDNR concludes that review of certain LDNR guidelines cannot be com-

Not Reported in F.Supp.2d                                                                    Page 6
Not Reported in F.Supp.2d, 2006 WL 2366046 (E.D.La.)
**(Cite as: 2006 WL 2366046 (E.D.La.))**

pleted. *Id.* In response, the Director of MMS stated it was the understanding of MMS that, based on the State's responses to the CD's for previous lease sales held in the WPA, that the tiered approach to CDs was adequate and appropriate. Pls' Exh. 11. The Director further asserted that "hurricane-related impacts occur independently of impacts related to OCS lease sales." *Id.* According to MMS, the CD for Lease Sale 200 is complete. *Id.*

In addition to the above-reference correspondence between the State and MMS regarding proposed Lease Sale 200, on May 30, 2006, the State submitted a letter to MMS regarding the timing of the proposed Lease Sale 200, pursuant to Section 19 of the OCSLA. *See* Pls' Exh. 13. In the letter, the Governor recommended that Lease Sale 200 be postponed and included in the 2007-2012 program currently being prepared by MMS. *Id.* In support of her recommendation, Governor Blanco stated that postponement of Lease Sale 200 would allow MMS the opportunity to meaningfully assess the impact of OCS activities in light of the devastation wreaked on the Gulf Coast as a result of the 2005 hurricanes. *Id.* The Governor further urged that a delay of the Lease Sale would provide the State and its local communities with a greater opportunity to participate in the future development of OCS resources in the aftermath of the hurricanes, as well as the ability to prepare for the impact of future OCS activities. *Id.*

In a letter dated July 11, 2006, MMS responded to the concerns voiced by Governor Blanco. *See* Pls' Exh. 21. In the letter, MMS indicated its rejection of the State's recommendation to postpone the Lease Sale and confirmed that it would move forward with Lease Sale 200 as planned. *Id.* Among the reasons stated by MMS in support of this position were the potential that uncertainty in the MMS lease sale process would cause companies to invest elsewhere; the impact that delay or cancellation of the sale may have on the State of Texas; the impact

on new natural gas supplies being delivered that a delay in the sale would cause; and the potentially hundreds of millions of dollars that the U.S. Treasury could lose as a result of delay. *Id.* In light of these reasons, MMS determined that Governor Blanco's recommendation to postpone Lease Sale 200 did not "provide for a reasonable balance between the national interest and the well-being of the citizens of the State of Louisiana." *Id* . Accordingly, on July 17, 2006, MMS published its Final Notice of Lease Sale 200, advising the public that the sale would begin in exactly 30-days. *See* 71 Fed.Reg. 40538 (2006).

**C. Action for Declaratory and Injunctive Relief By State**

**\*6** Soon after, on July 20, 2006, Governor Blanco and the State of Louisiana filed a Complaint for Declaratory and Injunctive Relief in this Court against Defendants, Rejane "Johnnie" Burton; Director of MMS; MMS; the DOI; and Dirk Kempthorne, Secretary of the DOI. [FN8] On August 4, 2006, the Court granted the unopposed motion of API for leave to intervene as a Defendant in this matter. API's motion was generally based on its assertions that the grant of any of the forms of relief sought by Plaintiffs would cause substantial loss to API and its members and that APIs interest in this matter could not be adequately represented by the Defendants.

> FN8. Governor Blanco filed the suit in her official capacity as Governor of Louisiana; Ms. Burton and Mr. Kempthorne were sued in their respective official capacities as Director of MMS and Secretary of the DOI.

Plaintiffs' four-count Complaint alleges violations by Defendants of the Administrative Procedure Act ("APA"), the National Environmental Protection Act ("NEPA"), the CZMA, and the OCSLA. In their "Request for Relief," Plaintiffs ask the Court to declare that Defendants have violated and continue to violate said statutes and their implementing

Not Reported in F.Supp.2d                                                                                      Page 7
Not Reported in F.Supp.2d, 2006 WL 2366046 (E.D.La.)
**(Cite as: 2006 WL 2366046 (E.D.La.))**

regulations; to enjoin Defendants from opening any bids submitted in response to the Notice of Sale on Lease Sale 200, or awarding any lease pursuant to the Sale; to issue a writ of mandamus preventing Defendants from acting in the allegedly unlawful manner described in the Complaint and requiring Defendants to act in the manner requested by Plaintiffs during the pendency of this action; and to grant other relief deemed just, proper and equitable.

On July 27, 2006, Plaintiffs filed the Motion for Preliminary Injunction presently before the Court. In their memorandum in support of their motion, Plaintiffs urge that "[t]he extraordinary remedy of a preliminary injunction is necessary to avoid the potentially irreparable harm occasioned by allowing the MMS to proceed, arbitrarily and capriciously, with Lease Sale 200 without first complying with the requirements of NEPA, the CZMA and the OCSLA." Plaintiffs specifically request that the Court enjoin Defendants from opening any bids or awarding any leases in connection with Lease Sale 200 until a final ruling has been issued on the merits of the claims raised by Plaintiffs in their Complaint. [FN9]

> FN9. In their proposed preliminary injunction order, Plaintiffs would have this Court broadly enjoin Defendants as follows:
> Plaintiffs' Motion for Preliminary Injunction is HEREBY GRANTED;
> IT IS FURTHER ORDERED that Defendants, REJANE "JOHNNIE" BURTON, in her official capacity as Director, Minerals Management Service; MINERALS MANAGEMENT SERVICE; DIRK KEMPTHORNE, in his official capacity as Secretary, United States Department of the Interior; and UNITED STATES DEPARTMENT OF THE INTERIOR; and their officers, employees, and representatives, are hereby ENJOINED from holding Lease Sale 200 and opening any bids or awarding any leases in connection with such Lease Sale, until resolution of this action or fur-

ther order of this Court.

Moreover, the State highlights two MMS-initiated studies relative to the impact of Hurricanes Katrina and Rita on existing OCS-related onshore infrastructure, suggesting that Lease Sale 200 be delayed until these reports are prepared. *See* Complaint, ¶ 64 & 65; Pls' Memo. at 39. These studies are expected to take 18 and 24 months to complete, respectively. Although the Complaint suggests that these studies must be part of MMS's environmental assessment, counsel for Plaintiffs confirmed at oral argument that the duration of the injunctive relief sought was not tethered to the completion of these studies. Regardless, it is the undersigned's belief that, even if injunctive relief were warranted to protect against the irreparable harm Plaintiffs claim, such relief could and should be more narrowly tailored than as suggested here by Plaintiffs.

### III. *STATEMENT OF THE ISSUE PRESENTED FOR DISPOSITION*

In resolving the motion before it, the Court must determine, as any court must in considering a motion for a preliminary injunction, whether (1) Plaintiffs have a substantial likelihood of prevailing on the merits of the claims that they have asserted in their Complaint; (2) Plaintiffs face a substantial threat of irreparable harm if the preliminary injunction sought is not granted; (3) the threatened injury to Plaintiffs outweighs any potential harm that an injunction may cause to Defendants; and (4) the injunction will not adversely effect the public interest. *See PCI Transp. Inc. v. Fort Worth & W. R.R. Co.,* 418 F.3d 535, 545 (5th Cir.2005); *Black Fire Fighters Ass'n of Dallas v. City of Dallas,* 905 F.2d 63, 65 (5th Cir.1990). In considering Plaintiffs' motion, the Court notes that a preliminary injunction " 'is an extraordinary and drastic remedy, not to be granted routinely, but only when the movant, by a clear showing, carries a burden of persuasion'." *See Black Fire Fighters Ass'n of Dal-*

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2366046 (E.D.La.)
**(Cite as: 2006 WL 2366046 (E.D.La.))**

*las,* 905 F.2d at 65 (quoting *Holland Am. Ins. Co. v. Succession of Roy,* 777 F.2d 992, 997 (5th Cir.1985)). *See also, Louisiana v. Lujan,* 777 F.Supp. 486, 487 (E.D.La.1991).

### IV. *LAW AND ANALYSIS*

A. *Plaintiffs' Likelihood of Success on the Merits*

1. Overview of Plaintiffs' Substantive Claims

**\*7** Plaintiffs state claims under the NEPA, 42 U.S.C. § 4321 *et seq.;* the CZMA, 16 U.S.C. §§ 1451-1466; and the OCSLA, 43 U.S.C. § 1331 *et seq.*

Under the NEPA, Plaintiffs claim that MMS's FONNSI with respect to Lease Sale 200 was arbitrary and capricious because it did not (1) identify and assess the existing environmental baseline and (2) failed to adequately analyze the direct, indirect, and cumulative impacts of the proposed action. Pls' Memo. at 22. Plaintiffs point to language in the previous multi-sale EIS indicating that future lease sales would warrant preparation of a Supplemental EIS ("SEIS") if, in the meantime, significant environmental issues had arisen or if the previous EIS was deemed inadequate. *Id.* The Gulf hurricanes of 2005 are precisely the sort of changed circumstances that warrant a fresh look at the baseline and impact assessments, the State argues.

Under the CZMA, Plaintiffs claim that MMS acted arbitrarily and capriciously by (1) failing to support its CD with comprehensive information and data and (2) failing to address the bulk of the State's Coastal Use Guidelines in making its CD. *Id.* at 35-37. Plaintiffs argue that by incorporating its analysis from earlier CDs without considering those Guidelines in the light of the destruction the 2005 hurricanes wreaked on coastal wetlands and barrier islands, MMS has failed to demonstrate that Lease Sale 200 is fully consistent with Louisiana's coastal use regulations. *Id.* at 45.

Finally, under the OCSLA, Plaintiffs claim that MMS acted arbitrarily and capriciously by failing

to accept the Governor's recommendation that Lease Sale 200 be postponed until the 2007-2012 leasing cycle. *Id.* at 54. Plaintiffs claim that the plain language of the OCSLA requires that the Governor's recommendation as to timing is owed considerable deference and must be accepted if it provides for a reasonable balance between the national interest in a particular activity and the well-being of an affected community. *Id.* at 57.

2. APA Legal Standard of Review for Plaintiffs' Substantive Claims

Because Plaintiffs are not afforded, nor do they contend that they are afforded, a private right of action for their substantive claims under the NEPA, [FN10] the CZMA [FN11] or the OCSLA, [FN12] the Court will review such claims pursuant to the APA. The APA allows "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute" to seek judicial review of such action. [FN13] *See* 5 U.S.C. §§ 702, 704; *Norton v. So. Utah Wilderness Alliance,* 542 U.S. 55, 61, 124 S.Ct. 2373, 159 L.Ed.2d 137 (2004). Agency actions subject to review under the APA are those that are made reviewable by statute, as well as those that constitute "final agency action[s] for which there is no other adequate remedy in a court." *See* 5 U.S.C. § 704.

> FN10. *See generally,* 42 U.S.C. § 4321 *et seq; Noe v. Metro. Atlanta Rapid Transit Auth.,* 644 F.2d 434 (5th Cir.1981) (finding that the claimant did not demonstrate that an implied private right of action was provided under the NEPA). *See also Spiller v. White,* 352 F.3d 235, 240 (5th Cir.2004) (finding that a party objecting to an agency decision not to conduct an EIS under the NEPA may challenge such a decision only under the APA).

> FN11. *See generally,* 16 U.S.C. § 1451-1466. *See also, Akiak Native Community v. United States Postal Serv.,* 213

Not Reported in F.Supp.2d                                                                    Page 9
Not Reported in F.Supp.2d, 2006 WL 2366046 (E.D.La.)
**(Cite as: 2006 WL 2366046 (E.D.La.))**

F.3d 1140, 1144 (9th Cir.2000) (stating that "[j]udicial review of actions under CZMA ... ordinarily is governed by the APA").

FN12. *See generally,* 43 U.S.C. § 1331 *et seq; OXY USA, Inc. v. Babbitt,* 122 F.3d 251, 259 (5th Cir.1997) (finding that Congress did not intend for the "citizen suit" provision of the OCSLA, 43 U .S.C. § 1349(a)(1), "to operate ... as a means of obtaining 'umbrella' review for a series of agency decisions that were or will be otherwise subject to judicial review under the APA").

FN13. Under the statute, as amended, a claimant may name the United States as a defendant if it/he so chooses. *See* 5 U.S.C. § 702.

Under the APA, a court may "compel agency action unlawfully withheld or unreasonably delayed." *See* 5 U.S.C. § 706. It may also "hold unlawful and set aside agency action, findings and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." [FN14] *Id.* The Fifth Circuit has noted that this "arbitrary and capricious" standard is a highly deferential standard of review. *See Sabine River Auth. v. U.S. Dept. of the Interior,* 951 F.2d 669, 678 (5th Cir.1992). Consequently, although the inquiry of the reviewing court must be "searching and careful," the standard of review, ultimately, is a narrow one. *Marsh v. Oregon Nat. Resources Counsel,* 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989). A court reviewing agency actions under the APA "arbitrary and capricious" standard may not substitute its own judgment for that of the agency-rather, it must cautiously review the administrative record to ensure that the agency has derived a reasoned judgment from the consideration and application of all pertinent factors. *Id; Sabine River Authority,* 951 F.2d at 679. In other words, the court must consider whether the agency made a "clear error of judgment" with respect to its

allegedly wrongful action. *Marsh,* 490 U.S. at 378. An agency action may be held to be arbitrary and capricious under the following specifically identified circumstances: "[T]he agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [its decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Louisiana Envtl. Action Network v. United States Envtl. Protection Agency,* 382 F.3d 575, 582 (5th Cir.2004) (quoting *Texas Oil & Gas Ass'n v. United States Envtl. Protection Agency,* 161 F.3d 923, 934 (5th Cir.1998)).

FN14. Under the APA, a Court may also hold unlawful and set aside agency action, findings, and conclusions found to be "contrary to constitutional right, power, privilege, or immunity;" "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;" "without observance of procedure required by law;" "unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute;" or "unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court." *See* 5 U.S.C. § 706(2). Plaintiffs do not contend, nor does the Court find, that such provisions are applicable to Plaintiffs' claims in the instant action. *See Marsh v. Oregon Nat. Resources Council,* 490 U.S. 360, 376, 109 S.Ct. 1851, 104 L.Ed.2d 377 (holding that where the issue before a Court is whether a supplemental EIS should be filed by an agency under the NEPA, the proper standard of review under the APA is the "arbitrary and capricious" standard).

### 3. The State's NEPA Claim

**\*8** Congress enacted the NEPA with the goals of

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2366046 (E.D.La.)
**(Cite as: 2006 WL 2366046 (E.D.La.))**

"declar[ing] a national policy which will encourage productive and enjoyable harmony between man and his environment" and "promot[ing] efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man." 42 U.S.C. § 4321. An essentially procedural Act, the NEPA requires each federal agency to consider all significant aspects of the potential environmental impact of an action proposed by such agency. *Baltimore Gas and Elec. Co. v. Natural Resources Defense Council, Inc.,* 462 U.S. 87, 97, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983). In other words, under the NEPA, agencies must take a "hard look" at the potential environmental consequences of a major action prior to taking the action. *Id.* (citing *Kleppe v. Sierra Club,* 427 U.S. 390, 410, n. 21, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976)). That being said, the statute does not command an agency to choose an environmentally preferable course of action. *Sabine River Auth.,* 951 F.2d at 676. As stated by the Fifth Circuit, the "NEPA merely prohibits uninformed-rather than unwise-agency action'." *See id.* (quoting *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989)). Its demand is that the decision of an agency to proceed with a federal project that will significantly affect the environment be an environmentally conscious decision. *Id.*

To ensure action, compliance and public awareness, the NEPA directs all federal agencies to incorporate an EIS into reports or recommendations on proposals for major federal actions that may significantly affect the environment. An EIS is a statement detailing, among other things, "the environmental impact of the proposed action;" "any adverse environmental effects which cannot be avoided should the proposal be implemented;" and "alternatives to the proposed action." *See* 42 U.S.C. § 4332(2)(c); 40 C.F.R. § 1508.11 (defining EIS); 40 C.F.R. § 1501.4 (describing instances in which an EIS should be prepared by an agency). *See also, Baltimore Gas and Elec. Co.,* 462 U.S. at 97 (stating that one of the purposes of the NEPA is to ensure

that the public will be informed as to whether an agency has considered environmental concerns in its decision-making process).

To determine whether to prepare an EIS, in other words, whether an action is one that may significantly affect the environment, an agency should prepare an EA. *See* 40 C.F.R. §§ 1508.9, 1501.3, 1501.4. After preparing an EA, if an agency determines that an EIS is unnecessary, it may issue a "Finding of No Significant Impact" ("FONSI"), a document in which it describes why a proposed action will not have a significant effect on the human environment. 40 C.F.R. § 1508.13. If an agency determines that an EIS is warranted, it is required to prepare a supplemental EIS if significant new circumstances or information develop that are relevant o environmental concerns and bear upon the proposed action itself or its potential impacts. 40 C.F.R. § 1502.9.

**\*9** As stated above, Plaintiffs contend that Defendants acted arbitrarily and capriciously in determining that an SEIS was not warranted under the NEPA with respect to Lease Sale 200. The premise of the Defendants' contention that it has complied with the NEPA is simply that "no new significant impacts were identified for proposed Lease Sale 200 that were not already assessed in the multi-sale EIS." However, in considering whether "there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts", 40 C.F.R. § 1502.9(c)(1), the EA fails to recognize certain fundamental changes in the devastated coastline of Louisiana. Clearly, the earlier multi-sale EIS was rendered inadequate in some respects, irrelevant in others, by the well-documented catastrophic effects of the 2005 hurricanes.

The Court notes that in the EA, MMS provided discussion of the damage caused by the 2005 hurricanes to OCS facilities; the overall impact of the hurricanes to the wetlands and barrier islands; the effects of the hurricanes on water quality and on the health of species contained therein; the destruction

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2366046 (E.D.La.)
**(Cite as: 2006 WL 2366046 (E.D.La.))**

caused to refineries and impact on oil production caused by the storms; and other similar information. However, with little or no analysis as to why, MMS concludes virtually every discussion of changes caused by the hurricanes with a generalized statement that its prior conclusions as to the impacts of OCS activities in connection with Lease Sale 200 remain unchanged. Abbreviated summaries and unsupported conclusions do not suffice for insightful and well-reasoned analysis of potential significant impacts as the result of changed circumstances *See Natural Resources Defense Council, Inc. v. Hodel,* 865 F.2d 288, 299 (D.C.Cir.1988). The Court agrees with the State's submission that the direct, indirect and cumulative impacts of the proposed activity are likely to be significantly different; and that the EA provides no real analysis or insight of why those impacts are not now different.

Moreover, the multi-sale EIS baseline demographic projections include assumptions based upon continuity of existing social, economic, and technical trends, however, those assumptions were, for the most part, blown away in the winds and waters of Hurricanes Katrina and Rita. Given the substantial evidence [FN15] before this Court that material changes have occurred since the Fall of 2002 with respect to the affected baseline environment, [FN16] as well as the tendentious conclusions set forth in MMS's EA, the Plaintiffs' likelihood of success on the merits is strong.

> FN15. *See,* e.g., the affidavits of Mr. Robert G. Bea, Mr. Mark S. Davis and several others attached to Plaintiffs' Memorandum.

> FN16. *See,* e.g., factors discussed by the Fifth Circuit in *Gulf Restoration Network v. U.S. Department of Transportation,* No. 05-60321, 2006 U.S.App. LEXIS 14172 (5th Cir.2006).

Earlier, in the multi-sale EIS compiled in 2002, MMS recognized the precarious vulnerability and existing deterioration of areas such as Lafourche

Parish, and specifically Port Fourchon. [FN17] Defs' Exh. 4 at 3-74 through 3-75. It further noted that deterioration of highways "grows worse every day." *Id.* at 3-75. This assessment was made almost four years ago, without considering the impacts of Hurricanes Katrina and Rita, both of which passed close to this area of coastal Louisiana, and various other lesser noted storms since 2002 that may have impacted this area sufficiently to warrant a supplemental EIS. [FN18] At the hearing, counsel for Defendants conceded that additional activities conducted pursuant to Lease Sale 200 might further deteriorate the area, including Louisiana Highway 1, "a little", but assured: "It won't be significant." Thus, the quotidian damages will be undeniably greater nonetheless. The problem in making such an assessment of insignificant future damage is that it is relative: "insignificant" as compared to the 2003 status, or insignificant compared to the 2006 situation? And to what extent are they truly different?

> FN17. The original EIS, prepared in 2002, notes that, in that locality, "citizens' quality of life has decreased. The most significant negative impacts include (1) increased OCS activity is straining the local infrastructure; (2) the area is suffering with a substandard highway that will not be able to handle the truck traffic increase anticipated from OCS activities; (3) severe coastal erosion is eating away the State's hurricane protection, endangering the infrastructure and industry; and (4) salt water intrusion from coastal erosion is impacting the drinking water supply." Defs' Exh. 2 at 3-74.

> FN18. The U.S. Supreme Court has held, with regard to the need to supplement an EIS:
> "... [I]n the context of reviewing a decision not to supplement an EIS, courts should not automatically defer to the agency's express reliance on an interest in finality without carefully reviewing the record and

satisfying themselves that the agency has made a reasoned decision based on its evaluation of the significance-or lack of significance-of the new information. A contrary approach would not simply render judicial review generally meaningless, but would be contrary to the demand that courts ensure that agency decisions are founded on a reasoned evaluation "of the relevant factors."

*Marsh,* 490 U.S. at 378.

**\*10** The Court is guided by the U.S. Supreme Court's opinion in *Marsh v. Oregon Natural Resources Council* as to when an agency must supplement its NEPA analysis:

If there remains "major Federal actio[n]" to occur, and if the new information is sufficient to show that the remaining action will "affec[t] the quality of the human environment" in a significant manner or to a significant extent not already considered, a supplemental EIS must be prepared. *Id.* at 374; *see also Sierra Club v. Froehlke,* 816 F.2d 205, 209-210 (5th Cir.1987). The Court notes that the Fifth Circuit has also provided instruction as to the necessity of providing an SEIS. The Court of Appeals has stated, "The principal factor an agency should consider in exercising its discretion whether to supplement an existing EIS because of new information presents a picture of the likely environmental consequences associated with the proposed action not envisioned by the original EIS'." *Louisiana Wildlife Fed'n, Inc. v. York,* 761 F.2d 1044, 1051 (5th Cir.1985) (quoting *Wisconsin v. Weinberger,* 745 F.2d 412, 418 (7th Cir.1984). Thus, in considering whether an SEIS was required in the instant case, the Court must consider whether information regarding changes to the environment as a result of the 2005 hurricanes raises " 'raises new concerns of sufficient gravity such that another, formal in-depth look at the environmental consequences of [proposed Lease Sale 200] is necessary'." *Id.*

In this case, Plaintiffs have demonstrated that there

indeed is new information, perhaps in abundance, pertaining to the significant impacts Hurricanes Katrina and Rita had on the entire coastal area of Louisiana, with regard to damaged infrastructure, displacement of population, extensive damage to offshore facilities, and damage to wildlife and fisheries (particularly as a result of the intrusion of salt water into previously fresh water areas), among other altered factors. While it is true that the previous EIS discussed many facets as they existed some four years ago, it is equally undeniable that the Louisiana coast has suffered significant damage, and threats to the State are enhanced by increased industrial activities off the Louisiana coast.

In their Reply Memorandum, Plaintiffs also argue that there are direct conflicts within MMS's missives to the State. The Court notes that the March 2006 EA recognizes in conclusory fashion that:

Hurricanes Katrina and Rita damaged much of the shore-based infrastructure in the Gulf of Mexico. In addition, many of the demographic and economic factors (employment, income and wealth, etc.) for individual counties and economic areas (LA 1, LA2, etc.) have changed as a result of the 2005 hurricane season. It will be some time before the full extent of these changes is known.

Pls' Exh. 7 at 12. Then, in its letter of June 14, 2006, MMS, through Regional Director Chris Oynes, asserts that "the infrastructure and employment are already in place, and any activities with Lease Sale 200 will basically maintain the status quo." [FN19] *See* Pls' Exh. 14 at 2, which is also quoted in Defs' Memo at 41. While there might well be a logical rationale that reconciles these statements, the issue highlights the notion that, rather than a well-researched analytical approach to post-Katrina/Rita Louisiana, MMS and DOI have instead hastily provided expedient language designed to facilitate its preexisting decision.

FN19. One is given to wonder whether the "status quo" referenced by Mr. Oynes is

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d    Page 13
Not Reported in F.Supp.2d, 2006 WL 2366046 (E.D.La.)
**(Cite as: 2006 WL 2366046 (E.D.La.))**

that of the 2002 multi-sale EIS or the post-Katrina status supposedly considered in the March 2006 EA.

 **\*11** Based on the law and the submission of the parties, it is difficult to say that Plaintiffs are not likely to prevail on their NEPA claim. Plaintiffs have called into question whether the *Marsh* standard, requiring Defendants to take a "hard look" at the new circumstances posed by the 2005 hurricanes, has been met by MMS/DOI.

4. The State's CZMA Claim

In enacting the CZMA, 16 U.S.C. § 1451-1466, Congress declared a national policy to protect the coastal zone; [FN20] to promote the development of coastal zone management programs by the states and participation in such programs; and to encourage interaction and cooperation between federal and state agencies involved in programs affecting the coastal zone. *See* 16 U.S.C. § 1452; *Secretary of the Interior v. W. Oil and Gas Ass'n,* 464 U.S. 312, 316, 104 S.Ct. 656, 78 L.Ed.2d 496 (1984). Once a state coastal zone management program has been approved by the Secretary of Commerce, [FN21] Section 307(c) of the CZMA requires that "[e]ach Federal agency activity within or outside the coastal zone that affects any land or water use or natural resource of the coastal zone shall be carried out in a manner which is consistent to the maximum extent practicable with the enforceable policies of [such program]." [FN22] 16 U.S.C. § 1456(c)(1)(A). Accordingly, a federal agency carrying out an activity affecting any coastal use or resource must provide a "consistency determination" to the relevant state agency prior to commencing such activity. [FN23] 16 U.S.C. § 1456(c)(1)(C); 15 C.F.R. § 930.34(a)(1). If the state objects, a federal agency may proceed with its proposed activity only if it has concluded that consistency with the enforceable policies of the state's management program is prohibited by existing law applicable to the federal agency, and has described to the state, in writing, the legal impediments to full consistency with the state's policies; or if it determines that its

activity is fully consistent with the state's enforceable policies. [FN24] 15 C.F.R. § 930.43(d).

> FN20. The "coastal zone" includes the "coastal waters ... and the adjacent shorelands ..., strongly influenced by each other and in proximity to the shorelines of the several coastal states." 16 U.S.C. § 1453.

> FN21. 16 U.S.C. § 1454 requires a coastal state that has developed a coastal zone management program to submit its program to the Secretary of Commerce for review and approval. *See* 16 U.S.C. § 1454.

> FN22. Federal agencies are encouraged to obtain the views and assistance of pertinent State agencies to determine whether a proposed activity of the Federal agency will be conducted in a manner consistent to the maximum extent practicable with the enforceable policies of the State's coastal zone management program. 15 C.F.R. § 930.34(d). The term "consistent to the maximum extent practicable" means "fully consistent with the enforceable policies of management programs unless full consistency is prohibited by existing law applicable to the Federal agency." 15 C.F.R. § 930.32(a)(1).

> FN23. The CD should be provided to the State agency at the earliest practicable time, but it must be provided no later than 90 days prior to final approval of the Federal activity, unless the Federal and State agencies mutually agree to a different schedule. 16 U.S.C. § 1456(c)(1)(C). In order to facilitate review of the CD by a State agency, a Federal agency should coordinate with the State agency prior to providing the State agency with the CD. 15 C.F.R. § 930.34(a)(1).

> FN24. Regulations require a State agency to inform the Federal agency from which it

Not Reported in F.Supp.2d                                                        Page 14
Not Reported in F.Supp.2d, 2006 WL 2366046 (E.D.La.)
**(Cite as: 2006 WL 2366046 (E.D.La.))**

has received a CD of its concurrence with or objection to the CD as soon as possible, but if the State agency's response is not received by the Federal agency within 60 days of receipt by the State of the CD, then the Federal agency may presume concurrence on behalf of the State agency. *See* 15 C.F.R. § 940.41(a). A Federal agency must approve at least one request by a requesting State agency for an extension period of 15 days or less to respond. 15 C.F.R. § 930.41(b). The Federal agency may approve longer extensions depending upon the magnitude and complexity of the CD. *Id.* Should a State agency object to a CD, the Federal and State agencies are encouraged to attempt to resolve their difference, to consider using dispute resolution mechanisms provided for by regulation and statute, and to consider postponing final federal action until the problems identified have been resolved. 15 C.F.R. § 930.43(d).

The Court has considered whether the CD for Lease Sale 200 is in violation of § 307(c) of the CZMA and 15 C.F.R. § 930.39. [FN25] Void of anything more than a perfunctory passing mention of such, the MMS has failed to include new, pertinent information that reflects significantly-changed circumstances after Hurricanes Katrina and Rita. Accordingly, the CD does not take into account the increased environmental and economic risks to Louisiana's OCS supporting infrastructure and sensitive coastal resources. [FN26]

> FN25. 15 C.F.R. § 930.39 provides that "[t]he consistency determination shall include a brief statement indicating whether the proposed activity will be undertaken in a manner consistent to the maximum extent practicable with the enforceable policies of the management program." *See* 15 C.F.R. § 930.39(a). Section 930.39 also provides that "[t]he statement must be based upon an evaluation of the relevant

enforceable policies of the management program." *Id.* Additionally, section 930.30 directs as follows:
> The consistency determination shall also include a detailed description of the activity, its associated facilities, and their coastal effects, and comprehensive data and information sufficient to support the Federal agency's consistency statement. The amount of detail in the evaluation of the enforceable policies, activity description and supporting information shall be commensurate with the expected coastal effects of the activity.
> *Id.*

> FN26. Defendants argue that the State did not object to the Lease Sale 187 CD, which contains pertinent incorporated information. This argument, however, begs the question, failing to appreciate or further examine changed circumstances. If Defendants believe the circumstances have *not* changed, their new CD offers little or no insight as to the basis for such belief.

In particular, as evidenced by the questioning at the hearing, MMS's treatment of the Coastal Use Guidelines set forth in the LCRP is so inadequate as to suggest that proceeding with Lease Sale 200 was a *fait accompli* even before the CD was compiled. MMS has failed to demonstrate, as it must, that the action and its direct, indirect and cumulative impacts are consistent with those of Louisiana's 94 Coastal Use Guidelines that would apply herein. [FN27] Thus, because the CD does not adequately evaluate all of the "relevant enforceable policies" of the LCRP pursuant to 15 C.F.R. § 930.39(a), it would appear to have been compiled in an arbitrary and capricious manner such that the result, i.e. the occurring of the Lease Sale, was fore-ordained.

> FN27. At the hearing, counsel for the DOI and MMS could not identify which of the guidelines are relevant, and where a reasoned analytical discussion of them

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

could be found in the CD. Counsel for the State agreed that not all 94 Guidelines are relevant, but except for those discussed hereafter, did not claim others had not been adequately treated by Defendants.

 *12 For instance, according to MMS, the 2006 CD for Lease Sale 200 tiered off of the CD prepared by MMS for 2003 for Lease Sale 187, i.e., the previous CD is incorporated by reference. The summary of new information incorporated into the subject CD is set forth in three sections: (1) "New or Revised Mitigation and Regulations for OCS Operations"; (2) "Updates on OCS-Related Analyses and Studies"; and (3) "New Data on the Affected Environment." Despite these promising titles, nowhere does the record provide for mitigation of impacts on Louisiana's coastal resources. In fact, the CD identifies very few areas of new data pertinent to the affected environment: MMS states new population estimates for cetaceans in the northern Gulf of Mexico, a revised marine mammal impact analysis, an updated sea turtle impact analysis, and also recognizes that a total of approximately 118 square miles of land was transformed into new water areas just in the area from the Chandeleur Islands to the Atchafalya River. [FN28] Although MMS claims to have "incorporated the information and analysis from prior lease sale CDs" (Defs' Memo. at 56), in response to comments and recommendations that the State of Louisiana provided to MMS on December 22, 2005, the Court finds such a summarily conclusive statement to be palliative in nature.

> FN28. The report also notes the significant fact that, from 2004-05, the change from land to water in just the area of coastal Louisiana east of the Mississippi River was 72.9 square miles; as compared with the previous projection of only 60 miles of land loss for this area for the entire half-century of 2000-2050. Pls' Exh. 5 at 6-7 (*citing* USGS Reports latest land-water changes for southeastern Louisiana, USGS (February 2006)). The summary goes on to

recognize that, as a result of Hurricane Katrina alone, the Chandeleur Islands have been reduced by one-half of their pre-storm land area. It has further been estimated by a USGS survey that some 225 square miles of land and marsh have been transformed into open water just by the passing of Hurricanes Katrina and Rita.

Under 15 C.F.R. § 930.39(b), federal agencies must ensure that the effects on any coastal use or resource, or associated facilities "[are] consistent to the maximum extent practicable with the enforcement policies of the [State's] management program." *See* 15 C.F.R. § 930.39(b). In this instance, however, very few of Louisiana's requirements under its federally-approved coastal management program are even mentioned in the Lease Sale 200 CD. In fact, out of the 94 Coastal Use Guidelines in the LCRP, the CD analysis addresses only four: (a) possible impacts to natural biologically valuable areas; (b) possible impacts to long-term biological productivity; (c) disposal of wastes; and (d) environmental and emergency response plans. The CD then incorporates previous discussions, assumptions and conclusions made in connection with Sale 187, compiled in 2003. The Court finds that the failure of the CD to address the current status under Guidelines 1.6, [FN29] 1.7, [FN30] 6.1, [FN31] 10.5, [FN32] 10.9, [FN33] 10.10, [FN34] and 10.11, [FN35] among others, surely creates a flawed analysis, and one based upon stale information which does not account for the severe impact and resulting changed circumstances left after Hurricanes Katrina and Rita. Aside from the resulting and obvious land loss previously mentioned, no consideration is given to resulting changes in access routes utilized for mineral exploration, production and refining sights, storage facilities, significant infrastructure damage to roads, bridges, and other means of transportation of not only product, but also workers, emergency or contingency plans to be developed under these new circumstances in connection with all mineral operations, and general effective environmental and coast line protection in

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2366046 (E.D.La.)
**(Cite as: 2006 WL 2366046 (E.D.La.))**

light of the dramatically different circumstances evidenced in Plaintiffs' submissions.

> FN29. Guideline 1.6 requires consideration of, *inter alia,* thirteen categories, including the existence of necessary infrastructure to support the use and public cost resulting from the use; the extent of impacts on existing and traditional uses of the area and on future uses for which the area is suited; the extent of impacts on navigation, fishing, public access, and recreational opportunities; the flood and storm hazard characteristics of the site; and the extent of long-term benefits or adverse effects.

> FN30. Guideline 1.7 requires avoidance of certain adverse impacts, including impacts on the locality of the use and affected governmental bodies; destruction or adverse alterations of streams, wetlands, tidal passes, inshore waters and water bottoms, beaches, dunes, barrier islands and other natural biologically-valuable areas or protective coastal features; adverse land loss, erosion and subsidence; and increases in the potential for flood, hurricane or other storm damage, or increases in the likelihood that damage will occur from such hazards.

> FN31. Guideline 6.1 requires that industrial activities, such as those which are reasonably foreseeable as resulting from the Lease Sale, take place, to the maximum extent practicable, only where flood and storm hazards are minimal or where protection from these hazards can be reasonably well achieved, and where public safety would not be unreasonably endangered.

> FN32. Guideline 10.5 requires that access routes to mineral exploration, production and refining sites be designed and aligned so as to avoid adverse impacts on critical wildlife and vegetation areas to the maximum extent practicable.

> FN33. Guideline 10.9 requires that all drilling and production equipment, structures, and storage facilities be designed and constructed utilizing best practical techniques to withstand all expectable adverse conditions without releasing pollutants.

> FN34. Guideline 10.10 requires that mineral exploration, production and refining facilities be designed and constructed using best practical techniques to minimize adverse environmental impacts.

> FN35. Guideline 10.11 requires that effective environmental protection and emergency or contingency plans shall be developed and complied with for all mineral operations.

**\*13** Plaintiffs further maintain that Article IX, § 1 of the Louisiana Constitution is also an enforceable policy of the LCRP. That Article provides, in part: "The natural resources of the state, including air and water, and the healthful, scenic, historic, and esthetic quality of the environment shall be protected, conserved, and replenished insofar as possible and consistent with the health, safety and welfare of the people." *See* La. Const. art. IX, § 1. Despite Plaintiffs' assertion, however, the Court believes that the LCRA, if fully complied with in the CD, would establish compliance with Article IX. In other words, though Article IX, § 1 could indeed be read as a separate requirement which the CD must satisfy, it is clearly more general than the LCRP provisions and guidelines, and satisfaction of those provisions would, in the opinion of the undersigned, indicate compliance with Article IX, § 1.

Recognizing that the CZMA requires that each consistency determination should be made on a case-by-case basis, pursuant to 16 U.S.C. § 1456(c), the Court finds, on the showing made here, MMS's

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2366046 (E.D.La.)
**(Cite as: 2006 WL 2366046 (E.D.La.))**

treatment of these issues in this instance to be rather perfunctory. [FN36] It is apparent that the cavalier approach adopted to these critical issues rendered a seemingly inadequate result, and one that might fall below the "arbitrary and capricious" standard, indicating Plaintiffs' substantial likelihood of success on the merits of the CZMA claim.

> FN36. Plaintiffs also contend that, in the event of a disagreement, the CZMA conflict resolution procedures contained in the Defendants' Departmental Manual should have been employed. While it is not clear why these procedures designed to resolve many of the State's objections were not utilized herein by MMS, the failure to do so is surely not helpful to the Defendants' position that its conduct was not arbitrary and capricious. In fact, such failure to comply with the procedures set forth in 15 C.F.R. § 930.11 is further suggestive that the end result, i.e. the opening of bids and awarding leases under Lease Sale 200, was a foregone conclusion which did not warrant further consideration, even under the outlined procedures set forth in the CZMA.

5. The State's Claim Under Section 19 of the OCSLA

The stated purpose of the Outer Continental Shelf Lands Act Amendments of 1978 is to expedite the exploration and development of the outer continental shelf, while assuring the protection of marine and coastal environments. *See* 43 U.S.C. § 1802. To accomplish these goals, the Act prescribes a complicated series of consultations, permits, plans, and licenses covering the leasing and development process and involving governmental and regulatory bodies at the federal, state, and local levels. *See* 43 U.S.C. §§ 1331-56.

The Act segments the process of developing oil and gas leases into four phases: preparation of a leasing plan, leasing, exploration, and development and production. *See* 43 U.S.C. § 1344(a)(3); *Secretary of the Interior v. California,* 464 U.S. 312, 337-340, 104 S.Ct. 656, 78 L.Ed.2d 496 (1984) (describing the four-stage structure of the OCSLA). In the leasing phase, the phase at issue here, the Secretary grants oil and gas leases on the submerged lands of the outer continental shelf under a competitive bidding system. *See* 43 U.S .C. § 1337(a)(1) (granting the Secretary to grant leases to the highest responsible qualified bidder(s)). The lease entitles the lessee to explore, develop, and produce oil and gas contained within the boundaries of his lease, conditioned upon due diligence and "the approval of the development and production plan required by this Act." 43 U.S.C. § 1337(b)(4).

The Act imposes a specific duty to balance oil and gas production and environmental health in only two instances. First, in the preparation phase, the Secretary prepares a five year plan for leasing specific tracts on the outer continental shelf thought to contain oil and gas. 43 U.S.C. § 1344(a). As noted above, in preparing the plan he is required to

> **\*14** select the timing and location of leasing, to the maximum extent practicable, so as to obtain a proper balance between the potential for environmental damage, the potential for the discovery of oil and gas, and the potential for adverse impact on the coastal zone.

43 U.S.C. § 1344(a)(3). Challenges under this section, however, fall within the sole jurisdiction of the United States Court of Appeals for the District of Columbia. 43 U.S.C. § 1349(c)(1).

A duty to proceed in a balanced manner is also imposed by 43 U.S.C. § 1345(c). The governor of any state affected by the proposed development may, within sixty days after receiving notice of a proposed lease sale, submit recommendations to the Secretary "regarding the size, timing, or location of any proposed lease sale." 43 U.S.C. § 1345(a). The Secretary is required to accept the governor's recommendations if he determines, after providing an opportunity for consultation, that "they provide for a reasonable balance between the national interest and the well-being of the citizens of the affected

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Page 18
Not Reported in F.Supp.2d, 2006 WL 2366046 (E.D.La.)
**(Cite as: 2006 WL 2366046 (E.D.La.))**

State." 43 U.S.C. § 1345(c). The Secretary's decision either way must be communicated to the governor in writing and cannot be set aside unless it is arbitrary or capricious. 43 U.S.C. § 1345(c), (d).

The Act does not describe the process by which the Secretary is to determine whether the recommendations of a governor "provide for a reasonable balance," and there is no guidance in the case law of this Circuit. [FN37] The legislative history is also unclear as to precisely how much deference a governor's recommendation is owed. [FN38]

> FN37. Two district court cases in the First Circuit have considered this issue, both concluding that the Secretary's failure to accept a governor's recommendation was arbitrary and capricious. *See Commonwealth of Massachusetts v. Clark,* 594 F.Supp. 1373, 1387 (D.Mass.1984); *Conservation Law Found. v. Watt,* 560 F.Supp. 561, 579 (D.Mass.1983), *aff'd* 716 F.2d 946 (1st Cir.1983). A district court in Alaska came to the opposite conclusion in another case, but that case concerned objections raised by non-governmental bodies under the OCSLA and other statutes who likely did not have standing to bring recommendations to the Secretary in the first place. *Village of False Pass v. Watt,* 565 F.Supp. 1123, 1138 (D.Alaska 1983), *aff'd* 733 F.2d 605 (9th Cir.1984).

> FN38. "The committee did not believe that any state should have a veto power over OCS oil and gas activities. The committee fully expects, however, that the advice of the governor be given full and careful consideration, and be incorporated into the ultimate decision of the Secretary, insofar as they are not inconsistent with the balanced approach to OCS leasing set out in this act." H.R. Rep. 95-590, at 153.

In this case, the Governor of Louisiana submitted recommendations pursuant to § 1345(a). The Sec-

retary did not accept these recommendations, but rather provided a cryptic response dated July 11, 2006. That letter, however, contains a rather casual dismissal of the Governor's recommendations by simply claiming that "delay in leasing for even one sale will cause a discernable impact on new natural gas supplies being delivered." Pls' Exh. 21. Because the reasons stated in this letter existed *prior* to the Governor's recommendations of May 30, 2006, [FN39] and are unimpacted by any consideration of the recommendation from the Governor, whether valid or inconsequential, the distinct impression created is that, no matter what recommendations the Governor submitted, they would be disregarded in favor of maintaining the Lease Sale schedule. In other words, the response letter could be used to override virtually any recommendation of any governor at any time, in order to proceed as the DOI Secretary desires. It is apparent that such response, without more, falls well short of the "reasonable balance" required. *See* 43 U.S.C. § 1345(c) and 30 C.F.R. § 256.31(c).

> FN39. *See* Pls' Exh. 13, wherein the Governor recommends postponement of proposed Lease Sale 200 to "ensure that MMS has the opportunity to engage in a meaningful assessment of OCS activities in light of the circumstances confronting Louisiana's coastal areas, as a consequence of the devastation from the hurricanes of 2005." Thus, the recommendation is two-fold: delaying the Lease Sale 200, and proper and appropriate compliance with the OCSLA regulations. *See* 43 U.S.C. § 1802(2) & (7).

While the Court cannot discern, on the face of these letters, that a substantial likelihood of success on the merits of the § 19 claim under the OCSLA exists, the State has made a *prima facie* case that the offhanded dismissal of the Governor's recommendations with only a general response was not a serious consideration nor a reasoned determination to accept or reject these recommendations, in favor of

Not Reported in F.Supp.2d                                                                                    Page 19
Not Reported in F.Supp.2d, 2006 WL 2366046 (E.D.La.)
**(Cite as: 2006 WL 2366046 (E.D.La.))**

a deliberate and forced effort to meet a preexisting scheduled lease sale date. Accordingly, on the showings made at this juncture of these proceedings, since the record indicates a *prima facie* case, if not an outright substantial likelihood of success on the merits, in favor of Plaintiffs pursuant to 43 U.S.C. § 1345(c) and 30 C.F.R. § 256.31(c), the Court cannot say that the Defendants' conduct clearly satisfies even the "arbitrary and capricious standard" which it must meet.

B. *Irreparable Harm*

 **\*15** Perhaps the single most important factor supporting the issuance of preliminary injunctive relief is a finding of irreparable harm which the Plaintiffs would suffer during the pendency of these proceedings, if such relief were not granted at this time. Plaintiffs have the burden of demonstrating this. Thus, the undersigned has focused on precisely what will happen in the next ninety-one (91) days that must be prevented in order to prevent the suspected harms to Plaintiffs.

1. Statutory violations do not necessarily mandate preliminary injunctive relief.

Though the Court believes that Plaintiffs have established at least a *prima facie* showing of statutory violations on the part of the Defendants, such statutory violations do not, in and of themselves, constitute irreparable harm for purposes of injunctive relief on a preliminary basis. *See Amoco Prod. Co. v. Village of Gambrell, AK,* 480 U.S. 531, 544, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987); *Weinberger v. Romero-Barcelo,* 456 U.S. 305, 313, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982); *U.S. v. Marine Shale Processors,* 81 F.3d 1329, 1349 (5 th Cir.1996). Again, the Court is focused on what immediate and near-term effect such statutory violations, even assuming a substantial likelihood of success in proving them, would be between the present date and the upcoming trial date. There is no apparent indirect or cumulative impact which Plaintiffs would suffer as a result of these statutory violations, as a judgment on the merits completely in favor of

Plaintiffs would mandate the Defendants' compliance with the relevant provisions of the NEPA, the CZMA, and the OCSLA, and possibly injunctive relief until such time as Defendants comply with such mandate.

2. Threatened environmental harm is not so immediate and imminent to warrant pre-trial injunctive relief.

Though injunctive relief is appropriate where threatened environmental harm can be demonstrated, a plaintiff must show some concrete injury or environmental harm resulting from defendant's actions, and, in order to be considered "irreparable", the injury must be permanent or of long duration, not subject to re-dress by either equitable or legal remedy following trial. *See Amoco Prod. Co.,* 480 U.S. at 544; *Canal Auth. v. Calloway,* 489 F.2d 567 (5th Cir.1971); *Fund for Animals v. Clark,* 27 F.Supp.2d 8 (D.D.C.1998); *George Washington Homeowners Ass'n v. Widnal,* 863 F.Supp. 1423 (D.Colo.1994). Cognizant "that the State's concern is primarily with the indirect (secondary) and cumulative effects related to Lease Sale 200, which pose a threat to the State and its communities, resources, and infrastructure" (Pls' Memo. at 65), the Court can find no specific and imminent action which would create such harm between now and the trial date. At oral argument, counsel for the State did not identify any specific action of the Defendants (or their prospective lessees), but rather argued that a "holistic picture" of these actions provides an appreciation for the harm which may *eventually* occur as triggered by the opening of Lease Sale 200 bids on August 16, 2006. Though the State may be correct that, over time, significant injury to the State and its communities, resources and infrastructure might occur as a result of Lease Sale 200 operations (on top of all previously granted leases and currently occurring mineral exploration and development), such future indirect and cumulative effects do not demonstrate the irreparable harm necessary for preliminary injunctive relief at this juncture.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d    Page 20
Not Reported in F.Supp.2d, 2006 WL 2366046 (E.D.La.)
**(Cite as: 2006 WL 2366046 (E.D.La.))**

**\*16** Although Plaintiffs complain that tangible physical operations from Lease Sale 200, even if we assume they are to commence immediately (which they do not) cause irreparable harm to the coastline and the State's infrastructure, it is undisputed that operations currently are being conducted pursuant to previous federal lease sales (including those issued in connection with the present five year plan) as well as mineral resource exploration, recovery and refinement conducted pursuant to State authority. Counsel for the Plaintiffs indicated that such activities are subject to various regulations controlled by the State, including regulations that ensure no net loss of land mass, however, wear and tear on roads and bridges, refinery capacities, population, air and water quality, and other societal impacts are nonetheless felt, even if slightly. In other words, existing operations are already causing most of the present harm about which Plaintiffs are concerned herein; and the opening of Lease Sale 200 bids on August 16, 2006 and awarding such successful bids between now and November will not have such an immediate impact as to warrant preliminary injunctive relief to prevent such harms occurring due to causes unrelated to Lease Sale 200.

3. Pre-trial activities of Defendants (and their Lessees) are limited to those allowed by Federal Regulation.

Upon questioning at oral argument, counsel for MMS and DOI stated that, following the opening of bids, evaluation of such bids for legal compliance, and the awarding of such bids, the only possible activities anticipated would involve sonar examination and bottom testing/sampling. These "ancillary activities" are limited by law. *See* 30 C.F.R. § 250.105; 43 U.S.C. 1340(c). In fact, any such activities that could cause "undue or serious harm or damage to the human, marine, or coastal environment" are not permitted under 30 C .F.R. § 250.209 and 30 C.F.R. § 250.202. [FN40] *See also Secretary of the Interior v. California,* 464 U.S. 312, 339, 104 S.Ct. 656, 78 L.Ed.2d 496 (1984). Defendants

assert that the opening, review, and acceptance/rejection of bids may take up to ninety days. [FN41] (Defs' Memo. at 20-21) Though the State expresses valid and compelling concerns regarding its coastline as well as onshore infrastructure, these "ancillary" activities, if conducted between now and the trial date, do not demonstrate the type of irreparable harm necessary for the issuance of a preliminary injunction. Thus, the generally-stated harm cited by the Governor and State are real and demonstrable, but will not be enhanced by the opening of lease bids on August 16, 2006 and the subsequent awarding of such bids between now and the trial date. In fact, any injunctive relief provided by this Court following the trial in November will be just as effective as the preliminary injunction sought at this point in time.

> FN40. To the extent any activities other than these "ancillary activities" occur or are set to occur prior to the November 13, 2006 trial date, Defendants and Intervenors are hereby ordered to provide ten (10) days' prior written notice to this Court and Plaintiffs.

> FN41. Thus it is no coincidence that the Court has chosen the November 13, 2006 trial date.

4. Injunctive relief based on Plaintiffs' claims is still available to ensure the NEPA, the CZMA, and the OCSLA compliance at trial.

**\*17** On the other hand, in an attempt to downplay the significance of the NEPA, the CZMA and the OCSLA compliance at this stage of the offshore lease program, Defendants and Intervenors describe later junctures wherein additional "exploration plans" and "development operations coordination" documents must be filed in order to pass the NEPA and the CZMA consistency reviews. *See* Defs' Memo. at 3-6; Intervenor's Memo. at 5-8. In so arguing, Defendants and Intervenors fail to address the shortcomings of the environmental review materials required at *this* stage of the leasing process.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

This argument, moreover, suggests the unfounded notion that the NEPA, the CZMA and the OCSLA compliance at the outset of the Lease Sale 200 process is merely a "speed bump" on the road to a pre-determined destination. The black letter law of Congress, however, is quite to the contrary. The assurance of Intervenors that "further regulatory approvals are required at later stages" (Intervenor's Memo. at 2) hardly diverts this Court's attention from these threshold requirements of federal law, and the Defendants' apparently inadequate attempts to comply with them. Because the State has timely raised these claims now, the trial will not consider what Defendants (or lessees, or any other parties, for that matter) will do in the future.

5. The failure of the State to avoid irreparable harm by timely meeting with MMS and DOI as offered displays lack of urgency.

In both the Complaint and the Motion for Preliminary Injunction, the Governor complains that, despite attempts to schedule a meeting in July 2006 between authorities with MMS, DOI, and the Governor to discuss the claims made herein, no such meeting occurred. Counsel for the Governor states: "The meeting (which was set for June 29, 2006) subsequently was cancelled, due to scheduling conflicts involving critical state personnel in light of MMS's effort to schedule the meeting around the Fourth of July holiday and the federal agencies' apparent unwillingness to have any later meeting than that, because of the timing, might affect the schedule for the Final Notice of Sale." Pls' Memo. at 17. At oral argument, the Court also inquired as to why such meeting did not occur and was told much the same by Plaintiffs' counsel. [FN42]

> FN42. Counsel for Defendants stated at oral argument that representatives of MMS were always prepared to meet with Plaintiffs' representatives, but such meeting did not occur due to problems on the Plaintiffs' end. Given the notification schedule they were legally obligated to follow, Defendants appropriately offered a specific window of time to meet with the Governor and DNR personnel.

On June 21, 2006, MMS Regional Director Chris Oynes notified Governor Blanco, in response to the State's June 14, 2006 objection to MMS's CD for Lease Sale 200, that, although MMS believed that the proposed Lease Sale was consistent with the policies of LCRP, MMS would be willing to meet with her or LDNR staff to review it in order to address the State's concerns. The exhibits submitted indicate that the State *declined* a meeting with MMS as late as July 7, 2006, ostensibly on its belief that "MMS has not provided any indication that it is open to altering its Consistency Determination or revisiting its Environmental Assessment and Finding of No New Significant Impact." Pls' Exh. 17.

 **\*18** The failure of the Governor and/or State authorities to meet with representatives from MMS in a timely fashion, whether due to "scheduling conflicts" involving the Fourth of July holiday or because of doubts (no matter how reasonable) regarding the productivity of such a meeting, undercuts the State's irreparable harm argument: sounding frantic alarms of such immediate and drastic injury without traveling every avenue to resolve the purported crisis makes the State's position appear less compelling. Indeed, if imminent irreparable danger to the Louisiana coastline were to occur on the very day of August 16, 2006 (or shortly thereafter), it would seem that a meeting offered by the purported wrongdoers to discuss such irreparably harmful action would be quite welcome, even if it ultimately proved to be unfruitful. It is incumbent on one who fears irreparable harm to take such reasonable actions to avoid such harm before marching into Court. Instead, whether due to tenuous excuses such as "scheduling conflicts", the Fourth of July holiday, or their own pessimism, State authorities eschewed the opportunity to meet and be heard.

6. Cases cited by Plaintiffs to support a finding of "irreparable harm" are distinguishable.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                    Page 22
Not Reported in F.Supp.2d, 2006 WL 2366046 (E.D.La.)
**(Cite as: 2006 WL 2366046 (E.D.La.))**

Plaintiffs cite four cases--none in this circuit--in support of their contention that the irreparable harm stemming from the Lease Sale 200 mandates a preliminary injunction. Those cases, however, can be distinguished. In *Conner v. Burford,* 848 F.2d 1441 (9th Cir.1988), the appeals court affirmed in part and reversed in part a district court's decision (on summary judgment, not on a preliminary injunction request) enjoining oil drilling in the Flathead National Forest. The central issue in that case was whether particular lease sales would cause immediate disruption of environmentally sensitive lands. The appeals court made a distinction between two types of leases--"no-surface occupancy" ("NSO") leases that prohibited disruption of the land, and non-NSO leases that would have allowed lessees to immediately begin building roads and other infrastructure related to drilling. *Id.* at 1445. The district court injunction was affirmed only in respect to the latter leases, which lends support to the proposition that the important issue in considering injunctive relief is whether the harm is irreparable. In that case, the sale of non-NSO leases truly did represent a "go/no-go point of commitment." *Id.* at 1448. As explained above, that is not the case here.

Similarly, plaintiffs cite two First Circuit cases, *Massachusetts v. Watt,* 716 F.2d 946 (1st Cir.1983) and *Sierra Club v. Marsh,* 872 F.2d 497 (1st Cir.1989). In the first case, the appeals court upheld a district court order issuing a preliminary injunction stopping lease sales off the New England coast. In affirming the district court's finding of imminent harm, the appeals court held that

> NEPA is not designed to prevent all possible harm to the environment; it foresees that decisionmakers may choose to inflict such harm, for perfectly good reasons. Rather, NEPA is designed to influence the *decisionmaking process;* its aim is to make government officials notice environmental considerations and take them into account. Thus, when a decision to which NEPA obligations attach is made without the informed environmental consideration that NEPA requires, the harm that NEPA intends to prevent has been

suffered.

**\*19** *Id.* at 952 (emphasis added). Four years later, however, the Supreme Court held in *Amoco Prod. Co.,* 480 U.S. 531, 107 S.Ct. 1396, 94 L.Ed.2d 542, that the Ninth Circuit was in error when it focused on harms to the *procedural process,* rather than harms to the environment, in holding that violation of a NEPA-like statute in a lease sale created a presumption of irreparable injury that supported injunctive relief. The next year, the First Circuit returned to the issue in *Marsh.* The appeals court held that *Amoco Production* did not overrule its decision in *Watt,* but did "add one further note of explanation." *Marsh,* 872 F.2d at 500. "In *Watt* we simply held that the district court should take account of the potentially irreparable nature of this decision-making risk to the environment when considering a request for a preliminary injunction." *Id.* at 501. With this limited view of the First Circuit's holding in *Watt,* this Court is in agreement, and hence is why the motion for a preliminary injunction is denied--because this Court has determined that the irreparable risk to the environment is low in light of the activities that the Lease Sale 200 will allow before trial, the decision to hold a trial on the merits 91 days from issuing this order, and the finding that plaintiffs are substantially likely to prevail on the merits of at least one of their claims at that trial. Read in this light, *Watt* and *Marsh* confirm this Court's view that injunctive relief is inappropriate at this time.

Finally, plaintiffs cite *Natural Resources Defense Council v. Morton,* 458 F.2d 827 (D.C.Cir.1972). In that case, the D.C. Circuit upheld a preliminary injunction when the Environmental Impact Statement regarding the sale of oil and gas leases off the coast of Louisiana did not adequately consider alternatives that would mitigate the impact to sensitive marine areas. The Court simply disagrees that the factual circumstances in this case warrant the same result. Moreover, the appeals court in *Morton* did not have the guidance of the Supreme Court's decision in *Amoco Production* regarding procedural versus environmental harms in weighing whether to

issue a preliminary injunction. Indeed, the D.C. Circuit itself has expressed "doubt [about] the continuing vitality of the rather expansive view of NEPA we expressed in *Morton,* since subsequent Supreme Court cases have directly criticized us for overreading that statute's mandate." *City of Alexandria v. Slater,* 198 F.3d 862, 869 n. 4 (D.C.Cir.1999).

For all of these reasons, the Court finds that Plaintiffs have not made sufficient showing of such immediate irreparable harm to warrant injunctive relief on a preliminary basis. Of course, this does not prevent Plaintiffs from seeking, or this Court from granting, injunctive relief in order to ensure compliance with the previously-cited statutory and regulatory guidelines, if Plaintiffs prevail on the merits, which, again, seems likely.

C. *Adverse Effect on the Public Interest*

 **\*20** The Court has also considered, as it must on applications for preliminary injunctive relief, whether the entry of injunctive relief would have any adverse effect on the public interest. In this consideration, the Court recognizes the competing interests of the citizens of coastal Louisiana as well as the citizens of the country in general. Of critical interest to the citizens of coastal Louisiana are environmental protections, the prevention of coastal erosion, the provision and maintenance of infrastructure, and, of course, continued opportunities for employment in the field of development of natural resources. On a national level, the continued production of energy resources is an obvious factor. Thus, with these competing interests, the Court finds that injunctive relief issued on a preliminary basis is not warranted, given the imminent trial of the State's claims on a permanent injunctive basis in the near future. Overall, the undersigned cannot find, at this juncture, that the August 16, 2006 opening of bids on Lease Sale 200 would have an adverse effect on the public interest, and whatever effects, if any, that would be experienced by the opening and awarding of such bids between now and the trial date of November 13, 2006, are min-

imal. Accordingly, consideration of this factor weighs against the issuance of a preliminary injunction at this time.

D. *Favorable Balance of Hardships/Potential Harm*

Plaintiffs contend that the simple postponement of the Lease Sale until DOI and MMS have complied with their legal obligations under the NEPA, the CZMA, and the OCSLA would create no hardship on the Defendants and/or Intervenors. Plaintiffs argue that forcing the Defendants to comply with federal law cannot possibly be considered a "hardship." Although the Court agrees that forcing the Defendants to meet their federal obligations by providing reasonable responses and by properly evaluating the potential impacts of operations conducted pursuant to the Lease Sale would not be a hardship, and will so order if warranted after trial, the Court also recognizes that economic hardships might be incurred by others impacted by preliminarily-issued injunctive relief. This would include not only Intervenors, but also individuals who reside in coastal Louisiana and who are employed in the oil and gas industry. Preliminary injunctive relief foreclosing Lease Sale 200 bidding and "ancillary activities" at this time, before the November trial, when such activities will undoubtedly be necessary in the future (after statutory compliance is ensured), serves little purpose but may create hardships for non-parties. Thus, considering the hardships of residents and businesses in coastal Louisiana, such a factor would seem to weigh against the issuance of a preliminary injunction sought by the State herein.

The Court is mindful that Intervenors and others interested in the successful bidding on Lease Sale 200 will be greatly inconvenienced by the notion that injunctive relief after the November trial might indeed be necessary. [FN43] Intervenors are concerned that a "delay in the receipt of revenues" from the Lease Sale would be costly (Intervenor's Memo. at 11); and that API members "have spent millions of dollars preparing to bid on Lease Sale 200" (*Id.* at 10). In his affidavit (Defs' Exh. A),

Not Reported in F.Supp.2d                                                                     Page 24
Not Reported in F.Supp.2d, 2006 WL 2366046 (E.D.La.)
**(Cite as: 2006 WL 2366046 (E.D.La.))**

MMS Deputy Regional Director Charles Schoennagel, Jr. makes dire predictions [FN44] that, if injunctive relief is granted herein, bidders may not bid, or withdraw or reduce their bids due to "uncertainty"; in that "revenues to the U.S. Treasury may be reduced ..." Indeed, compliance with federal law can be a costly and bothersome proposition. This Court's responsibility, however, despite these adumbrations, is ensuring compliance with the statutory expressions of the United States Congress.

> FN43. At oral argument, counsel for Defendants states that the failure of the Lease Sale to go forward as scheduled on August 16, 2006 could create a "climate of uncertainty in the oil and gas industry about development of natural resources off the Louisiana coast." The real "climate of uncertainty," however, hovers over south Louisiana as its resources are harvested by way of miles of pipelines and navigation channels, its infrastructure is taxed to the near breaking point, its natural buffer against hurricanes is carved and shredded as a result of ongoing and future offshore activities, and its coastline vanishes into the Gulf.

> FN44. Compare those characterizations with Defendants' assertions in arguing the NEPA compliance: "MMS's conclusions are reasonable based on the fact that, in general, a lease sale in the Western Planning Area of the Gulf of Mexico, such as Lease Sale 200, represents *only* approximately *2.6 to 3.3 percent* of the OCS activity in that planning, and *only* about *1 percent* of the Gulfwide OCS program. Multi-sale EIS at 4-4." (underline as quoted; italics added.)

**\*21** Nonetheless, those who bid on Lease Sale 200 do so now with such knowledge that, in the opinion of the undersigned, Defendants' compliance with the NEPA, the CZMA, and the OCSLA is questionable at best, and that Plaintiffs have a substantial likelihood of prevailing on the merits of one or more of these claims at the November trial. Injunctive relief to ensure compliance may well be in order. Thus, Intervenors and others similarly interested in participating in the Lease Sale 200 process may guide their conduct accordingly, and factor in the risks associated with the apparent failure of MMS and/or DOI to satisfy their obligations on one or more of these federally-mandated requirements. Through this Court's candid assessment of Plaintiffs' likelihood of prevailing on the merits, these parties may employ the doctrine of *caveat emptor* on August 16, 2006.

## V. *CONCLUSION*

In conclusion, despite a showing of substantial (if not imminent) likelihood of prevailing on the merits on at least one of the statutory grounds of the State's Complaint, the Court finds it unnecessary and unwarranted to issue preliminary injunctive relief given the November 13, 2006 trial date, due to the lack of specific irreparable harm threatened between now and then. The Court further notes that, during the pendency of these proceedings, much can be done by the parties to resolve many of their differences, with or without the guidance of the Court. In lieu of such resolution, the Court orders as follows on the showings made:

(1) Plaintiffs' Motion for Preliminary Injunction be and is hereby DENIED;

(2) Counsel for all parties are to confer (with the assistance of the assigned magistrate judge, if necessary), no later than Monday, August 29, 2006, to determine what, if any, discovery will be necessary to prepare this matter for trial;

(3) A pre-trial conference will be held in this matter on Friday, November 3, 2006, at 9:30 a.m.; the final pre-trial order shall be due by 4:30 p.m. on Tuesday, October 31, 2006;

(4) The parties are to confer with the magistrate judge to discuss a possible resolution of this matter no later than Friday, October 28, 2006; and

(5) Trial in this matter, including the Plaintiffs' request for permanent injunctive relief, is fixed for Monday, November 13, 2006, at 8:30 a.m.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2366046 (E.D.La.)
**(Cite as: 2006 WL 2366046 (E.D.La.))**

Not Reported in F.Supp.2d, 2006 WL 2366046
(E.D.La.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                         Page 1
Not Reported in F.Supp.2d, 2005 WL 555416 (D.D.C.)
**(Cite as: 2005 WL 555416 (D.D.C.))**

Only the Westlaw citation is currently available.

United States District Court, District of Columbia.
OCEANA, INC, et al., Plaintiffs,
v.
Donald L. EVANS, et al., Defendants.
**No. Civ.A.04-0811(ESH).**

March 9, 2005.

Eric A. Bilsky, Stephen Elston Roady, David Earl
Frulla, Shaun Michael Gehan, Collier Shannon
Scott, PLLC, Washington, DC, Roger Fleming,
Brunswick, ME, for Plaintiffs.

Adam D. Issenberg, Mary Melissa Whittle, Coby
Howell, U.S. Department of Justice, Washington,
DC, for Defendants.

Mark A. Randlett, Office of the Attorney General,
Augusta, ME, John Winston Butler, Sher & Black-
well, Washington, DC, for Movants.

*MEMORANDUM OPINION*

HUVELLE, J.

*1 Plaintiffs allege that the Secretary acted im-
properly in approving Amendment 13 to the North-
east Multispecies Fishery Management Plan
("FMP"), which governs groundfish fishing in the
waters off New England. This most recent amend-
ment purports to establish a detailed plan for halt-
ing overfishing of several stocks and rebuilding
them to healthy, sustainable levels. Amendment 13
is being attacked from all sides, with the Trawlers
Survival Fund ("TSF"), which represents several
groups of fishermen, challenging the Secretary for
failing to authorize enough fishing, and Conserva-
tion Law Foundation and the Natural Resources
Defense Council (collectively "CLF"), challenging
the Secretary for not limiting fishing enough. Simil-
arly, plaintiff Oceana contends that Amendment 13
does not go far enough in protecting groundfish es-
sential fish habitat ("EFH"), such as ocean bottoms

vital to juvenile cod development. All of the
plaintiffs also challenge various procedural aspects
of the Secretary's decision-making process. These
claims are based on the Magnuson-Stevens Act
("MSA"), the Administrative Procedure
Act ("APA"), the National Environmental Policy Act
("NEPA"), and the Regulatory Flexibility Act
("RFA"). The Secretary is joined as defendant by
intervenors TSF, the City of Portland, Maine, and
the Associated Fisheries of Maine; and the Cape
Cod Commercial Hook Fishermen's Association
and hook fisherman Paul M. Parker, all of whom
seek to uphold Amendment 13. The States of Maine
and Rhode Island and the Commonwealth of Mas-
sachusetts have submitted a brief as *amici curiae.*

On the basis of the parties' pleadings, the hearing
held on February 25, 2005, and a voluminous ad-
ministrative record, the Court grants in part and
denies in part plaintiffs' motions for summary judg-
ment, and with exception of the issue of the bycatch
reporting methodology and TSF's Count Seven,
judgment is entered on behalf of the defendants.

BACKGROUND
I. The Magnuson-Stevens Act ("MSA")

A. Amendment 13

The statutorily-created New England Fishery Man-
agement Council ("Council"), *see* 16 U.S.C. §
1852(a)(1)(A), which had primary responsibility for
creating Amendment 13, spent five years designing
an FMP that prioritizes protecting New England
groundfish [FN1] while attempting to minimize
economic hardship on fishing communities that are
invariably affected by fishery management actions.
(A.R. 166 (Amendment 13) at C76.) Of the twenty
stocks of fish (comprising twelve species, some of
which are managed separately based upon geo-
graphy) in the fishery (*id.* at C5), most were over-
fished. [FN2] (*Id.* at 74) The Council projected that
if measures were not taken to rehabilitate stocks
and end overfishing, the industry could lose up to

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 555416 (D.D.C.)
**(Cite as: 2005 WL 555416 (D.D.C.))**

$200 million over the next two decades as fish stocks dwindled to even more dangerously low levels. (*Id.*) The Council acted, therefore, in order to protect the environment, the future of the fish stocks, and the well-being of commercial and recreational fisheries. (*Id.* at 74-75.)

> FN1. Groundfish are species that spend most of their lives on or near the ocean floor, and include, *inter alia,* cod, haddock, and yellowtail flounder. (A.R. 166 at C5.) *See also NRDC v. NMFS,* 280 F.Supp.2d 1007, 1009 (N.D.Cal.2003) (discussing Pacific groundfish).

> FN2. Overfishing and overfished mean "a rate or level of fishing mortality that jeopardizes the capacity of a fishery to produce the maximum sustainable yield on a continuing basis." 16 U.S.C. § 1802(29).

**\*2** The Council developed Amendment 13 pursuant to its authority under the Magnuson-Stevens Act of 1976, which was established to conserve and manage fishery resources, in large part through the creation of FMPs and amendments thereto. [FN3] *See* 16 U.S.C. § 1801(b)(1); *id.* § 1853(a). Although the MSA gives the Secretary [FN4] ultimate authority to approve, disapprove, or partially approve FMPs, *see id.* § 1854(a)(3), councils are the primary bodies charged with developing FMPs in the first instance, a process that generally involves years of research, the weighing of various alternatives, and numerous public hearings and opportunities for participation by interested parties. *See, e.g., id.* § 1852(i)(2). Only under exceptional circumstances, such as emergencies or where a council fails to act, may the Secretary bypass the council process and devise management measures on his own. *See id.* §§ 1854(c), 1855(c).

> FN3. Throughout this Memorandum Opinion, the term "FMP" also includes FMP amendments, such as Amendment 13. The original FMP and its subsequent incarnations are governed by the same standards.

*See, e.g.,* 16 U.S.C. § 1854(a).

> FN4. In practice, the Secretary has delegated his authority to the National Marine Fisheries Service ("NMFS"). *See C & W Fish Co., Inc. v. Fox,* 931 F.2d 1556, 1558 & n. 1 (D.C.Cir.1991). However, this Memorandum Opinion refers to the Secretary because he is the official charged by statute with adopting (or rejecting) council-proposed FMPs, based on an analysis of whether they "conform[ ] ... to the requirements of applicable law." *See* 16 U.S.C. § 1854(a)(3). In other words, the Secretary has the final word on each FMP, and a plan does not become effective until he signs off (unless he fails to act within thirty days of receiving the FMP from the council, in which case the plan automatically takes effect). *Id.* Therefore, it is Amendment 13 as adopted by the Secretary that is presently before the Court, not any earlier unofficial draft that the Council may have considered. Amendment 13 was published in the Federal Register as a final rule on April 27, 2004. 69 Fed.Reg. at 22,906.

The MSA requires a council to produce FMPs that are "consistent with" ten "National Standards." *Id.* § 1851(a). Four of these are particularly relevant to the instant case. National Standard One requires that "Conservation and management measures shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery for the United States fishing industry." *Id.* § 1851(a)(1). National Standard Two establishes that FMPs must be based on "the best scientific information available." *Id* . § 1851(a)(2). National Standard Eight provides that, "consistent with the conservation requirements of this [Act] (including the prevention of overfishing and rebuilding of overfished stocks), [FMPs shall] take into account the importance of fishery resources to fishing communities in order to (A) provide for the sustained participation

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 555416 (D.D.C.)
**(Cite as: 2005 WL 555416 (D.D.C.))**

of such communities, and (B) to the extent practicable, minimize adverse economic impacts on such communities." *Id.* § 1851(a)(8). Finally, National Standard Nine requires that FMPs, "to the extent practicable, (A) minimize bycatch [FN5] and (B) to the extent bycatch cannot be avoided, minimize the mortality of such bycatch." *Id.* § 1851(a)(9).

> FN5. Bycatch is "fish which are harvested in a fishery, but which are not sold or kept for personal use." 16 U.S.C. § 1802(2). In other words, bycatch refers to fish caught incidentally while fishers are targeting a different species. "In simple terms, bycatch kills fish that would otherwise contribute toward the well-being of the fishery or the nation's seafood consumption needs." *CLF v. Evans,* 209 F.Supp. 1, 12 (D.D.C.2001) (footnote omitted).

Recognizing that "major changes were needed" to the MSA, in 1996 Congress enacted the Sustainable Fisheries Act ("SFA") in order to address "the current crisis in ... groundfish stocks, a crisis for the conservation of both fish stocks and fishing families ." *See* 142 Cong. Rec. H11418, 11440 (1996) (statement of Rep. Studds). The MSA was thereby amended to include further provisions designed to protect essential fish habitat, expedite planning for ending overfishing, minimize bycatch, and maintain viable fishing communities. *See* 16 U.S.C. §§ 1853(a)(7)(EFH), 1854(e)(3) (one-year deadline for FMPs to end overfishing), 1853(a)(11) (bycatch), 1854(e)(4)(A)(i) (considering needs of fishing communities in ending overfishing and rebuilding stocks); *see also A.M.L. Int'l, Inc. v. Daley,* 107 F.Supp.2d 90, 94 & n. 5 (D.Mass.2000) (discussing SFA's creation, in response to "the perceived inability of fishery councils to quickly enact needed conservation measures").

B. Relevant Past Litigation

**\*3** Before the parties' arguments can be considered, it is necessary to discuss the prior lawsuits that have attacked earlier amendments and frame-

works [FN6] involving the New England fishery and have thereby helped to shape Amendment 13. In *CLF v. Evans,* two plaintiffs in the instant action--CLF and Oceana--challenged the framework governing the Atlantic sea scallop fishery on the grounds that it did not close certain areas that purportedly would have protected EFH and minimized bycatch. 360 F.3d 21, 27- 28 (1st Cir.2004). The First Circuit rejected plaintiffs' claim, holding, *inter alia,* that adverse effects on EFH and bycatch need only be minimized to the extent "practicable." *Id.* (quoting 16 U.S.C. §§ 1851(a)(9), 1853(a)(7), 1853(a)(11)). It also observed that that term "allow[s] for the application of agency expertise and discretion in determining how best to manage fishery resources," and under that standard, the Secretary's plan was not irrational. *Id.* at 28.

> FN6. Frameworks are adjustments to FMPs and FMP Amendments that involve abbreviated procedures for revising FMP overfishing definitions, resetting fishing mortality targets, and for other "action[s][ ] necessary to meet or be consistent with the goals and objectives of the Northeast Multispecies FMP." 50 C.F.R. § 648.90(b). They may be undertaken "at any time," *id.,* but in practice they were initiated when recalibrating rebuilding goals on an annual basis.

Further, Oceana challenged the Secretary's approval of a sea scallop framework on the grounds that it failed to adequately protect endangered sea turtles. But because the framework had been superseded by Amendment 10, [FN7] the lawsuit was dismissed as moot. *See Oceana, Inc. v. Evans,* 2004 U.S. Dist. LEXIS 14895, at \*2, \*11 (D.Mass. July 30, 2004). Similarly, a MSA challenge to the Secretary's procedures in adopting Amendment 13 was dismissed as moot in light of a superseding interim rule that corrected the purported flaws identified by plaintiff. *See Associated Fisheries of Me., Inc. v. Evans,* 350 F.Supp.2d 247, 249, 256-57 (D.Me.2004).

> FN7. Currently pending before this Court

Not Reported in F.Supp.2d                                                            Page 4
Not Reported in F.Supp.2d, 2005 WL 555416 (D.D.C.)
**(Cite as: 2005 WL 555416 (D.D.C.))**

is a related case that challenges Amendment 10 to the Atlantic Sea Scallop FMP. *See Oceana, Inc. v. Evans,* No. 04-810 (D.D.C.).

In *American Oceans Campaign v. Daley,* AOC--as Oceana was then known-- successfully challenged the sufficiency of the Secretary's assessment of alternatives in promulgating FMP measures designed to protect EFH. 183 F.Supp.2d 1, 5 (D.D.C.2000) (*"AOC"* ). Although the Honorable Gladys Kessler rejected plaintiff's substantive MSA challenge, the Court agreed with AOC that the Secretary had violated NEPA, 42 U.S.C. § 4321 *et seq.,* by preparing Environmental Assessments ("EAs") that "fail[ed] to consider all relevant and feasible alternatives, and fail[ed] to fully explain the environmental impact of the proposed action and alternatives." 183 F.Supp.2d at 20. Accordingly, the Court permanently enjoined the relevant FMP amendments until the Secretary "perform[ed] a new, thorough, and legally adequate EA or [Environmental Impact Statement ("EIS") ] for each EFH Amendment." *Id.* at 21.

Finally, Judge Kessler also ruled against the Secretary in a challenge to Amendment 13's predecessors brought by CLF, NRDC and others. Plaintiffs contended that the Secretary had breached the MSA by failing to prevent overfishing and to minimize bycatch in New England waters. *CLF v. Evans,* 209 F.Supp.2d 1, 5 (D.D.C.2001) (*"CLF I"* ). Given defendants' concession that they had not come into compliance with the SFA's overfishing and rebuilding provisions, the Court ruled that defendants had arbitrarily and capriciously breached their duties under the SFA and APA. *Id.* at 9, 10. The Court further rejected defendants' argument that immediate relief was inappropriate because of the upcoming approval of Amendment 13, which at that time was expected in 2003. *Id.* Finally, the Court ruled that the Secretary had breached the SFA and APA by failing to implement any new measures to report and to minimize bycatch and bycatch mortality. *Id.* at 13-15.

*4 Subsequently, Judge Kessler entered a Remedial Order on May 23, 2002 that, by its own terms, expired upon promulgation of Amendment 13. *CLF v. Evans,* 211 F.Supp.2d 55, 57 (D.D.C.2002) (*"CLF II"* ). The Order, which incorporated a settlement agreement reached by the parties, required the Secretary to adopt regulations complying with the SFA's overfishing, stock rebuilding, and bycatch provisions. The Order further required the Secretary to "provide 5% observer coverage, or higher, if necessary to provide statistically reliable data," in order to measure bycatch. *Id.* at 58. The Court ordered that observer coverage be expanded to 10% as of May 1, 2003, "unless [the Secretary] can establish by the most reliable and current scientific information available that such increase is not necessary." *Id.* On the date the 10% coverage level was to take effect, the Secretary filed a notice with the Court indicating that defendants had concluded, based on a scientific study, that a 5% level was sufficient. Federal Defendants' Notice of Administrative Action, Ex. 1 at 3, *CLF v. Evans,* No. 00-1134 (D.D.C. May 1, 2003). Plaintiffs objected on the grounds that the Secretary's scientific justification was insufficient because it failed to address whether the level of coverage would produce accurate estimates. Plaintiffs' Response to Federal Defendants' Notice of Administrative Action at 1-2, *CLF v. Evans,* No. 00- 1134 (D.D.C. June 4, 2003).

The parties also entered into a Joint Stipulation in December 2001 to resolve several issues relating to the Court's ruling in *AOC.* Most significantly, the Secretary agreed that any future EIS would consider a "range of reasonable alternatives" for protecting EFH. (A.R. 1331 at D-01-3105-06 ¶ 6.) Among those alternatives were to be " 'no action' or status quo alternatives and alternatives setting forth specific fishery management actions that can be taken by NMFS...." (*Id.*) The parties agreed that the Court would retain jurisdiction over the case in order to enforce and interpret the Joint Stipulation. (*Id.* at D-01-3114 ¶ 24.)

In order to comply with the Secretary's statutory

duties, as well as the commitments incorportated in the Remedial Order and the Joint Stipulation, Amendment 13 includes a host of measures aimed at "rebuilding overfished stocks, ending overfishing, ... reducing bycatch, and minimizing the impact of the fishery on fish habitat and protected species." (A.R. 166 at C5.) The Council established formal rebuilding programs that gradually reduce fishing effort in order to rebuild most overfished stocks by 2014. (*Id.* at C6.) The Council also designed special access programs ("SAPs") that allow restricted fishing in certain areas that might otherwise be off-limits. (*Id.* at C7.) Amendment 13 incorporated the informal United States / Canada Resource Sharing Understanding ("US/Canada Understanding") into the New England groundfish FMP, such that certain quotas for species in the eastern Georges Bank would be set in the future by representatives of both nations. (*Id.*) The Council closed several areas to various types of fishing gear in order to protect EFH. (*Id.* at C10.) Amendment 13 also suggested a desired level of observer coverage aboard fishing vessels in order to monitor bycatch so that it could be more accurately reported. (*Id.* at 8.) The Council created a system for allocating a share of the total allowable catch (a "TAC" or quota) [FN8] for certain species to "sectors" of the industry that voluntarily organize and subject themselves to supplemental regulations. (*Id.*) The Amendment restructured fishers' permitted days-at-sea ("DAS") in order to enable the Secretary to more effectively control fishing effort. (*Id.* at C8-9.) In designing Amendment 13, the Council also included an EIS that evaluated a host of alternatives to the measures it ultimately proposed. All in all, the Council concluded that Amendment 13 would achieve its conservation goals, including the rebuilding of overfished species, while also providing substantial economic benefits in the long term to fishing communities, even if sacrifices would be required for the short term. (*Id.* at C12, 14.)

> FN8. A target TAC was established for each managed stock of groundfish. *See* 69 Fed.Reg. at 22,915. These targets are "soft TACs," meaning that they are merely goals; the fishery is never closed under the soft TAC system. (A.R. 166 at C548.) By contrast, a hard TAC shuts down the entire fishery for that species when the quota is reached. (*Id.*) Amendment 13 did not implement hard TACs on a fishery-wide basis, although they are used in a few subsections of the New England waters.

C. Plaintiffs' Claims in the Instant Lawsuit

**\*5** Amendment 13 as approved by the Secretary has invited a new round of litigation. First, CLF attacks Amendment 13 for violating the MSA and the APA by failing to end overfishing immediately for those stocks that have been depleted the most severely from overfishing. Plaintiffs contend that the plain language of the MSA obliges the Secretary to take immediate action to rebuild stocks and to terminate fishing in excess of optimum yield ("OY"). (CLF Mot. at 19-25.) They further attack the Secretary's rebuilding plans as having an unacceptably low probability of success, especially given the past history of failures, in violation of this Circuit's requirement that FMPs must have at least a fifty percent probability of achieving their targets. *See NRDC v. Daley,* 209 F.3d 747, 754 (D.C.Cir.2000). (CLF Mot. at 27-33.) Additionally, CLF lodges a NEPA challenge to Amendment 13's EIS for its alleged failure to analyze fully the environmental impact of the proposed measures and to consider a suitably broad range of alternatives. (*Id.* at 36-44.)

Second, TSF makes essentially the opposite point from CLF. Identifying several purported procedural deficiencies in the Amendment 13 approval process, this plaintiff contends that the FMP authorizes too little fishing by implementing a plan that differs from that authorized by the Council in violation of the MSA. TSF attacks various measures that have been implemented, arguing that they contravene decisions of the Council. (TSF Mot. at 2-3.) TSF also claims that the version of Amendment 13 approved by the Secretary violates MSA National Standard

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 555416 (D.D.C.)
(Cite as: 2005 WL 555416 (D.D.C.))

Eight and the Regulatory Flexibility Act, because the implemented version has more severe economic impacts on fishing communities and is different from the version that the Council used in assessing the financial and social impacts of the proposed measures. (TSF Mot. at 13-14, 42.) TSF further challenges the validity of a regulation promulgated by the Secretary, 50 C.F.R. § 648.85(a)(2)(i)(D), on the grounds that it violates the MSA by allowing the NMFS Regional Administrator to overrule the Council in setting certain fishing quotas. (TSF Mot. at 39-41.)

Third, Oceana contends that the Amendment violates the MSA, the APA and NEPA by failing to adequately consider alternatives for protecting EFH. Plaintiff focuses on the limited range of area closure options the Council considered, arguing that Amendment 13 is deficient because the most protective alternative that was considered was no more protective of EFH than the status quo option that was in place at the time of the *AOC* decision. (Oceana Mot. at 28-33.) Oceana further faults the Amendment for its failure to consider designating Habitat Areas of Particular Concern ("HAPCs"), which are a subset of EFH. *See* 50 C.F.R. § 600.815(a)(8). (Oceana Mot. at 34-36.)

Fourth, both CLF and Oceana argue that, as Judge Kessler previously ruled in *CLF I,* defendants continue to ignore their MSA duty to create an FMP that adequately monitors and minimizes bycatch. Oceana focuses in particular on the Secretary's statement that he "intends" to only implement a 5% observer coverage level, notwithstanding *CLF II's* Remedial Order incorporating a ten percent level from May 1, 2003 forward, and an Oceana-commissioned scientific study which recommends 20% coverage as the minimum adequate level. (Oceana Mot. at 36-40; Oceana Reply at 26-32.) Oceana further attacks Amendment 13's EIS for failing to consider a sufficient range of alternatives in terms of observer coverage. (Oceana Mot. at 40-41; Oceana Reply at 32-34.) CLF challenges Amendment 13 on a more general level for its fail-

ure to adopt a coherent, standardized program for reporting bycatch. CLF contends that a few "scattered" and "isolated" references to various methods do not satisfy the MSA's bycatch reporting requirements. (CLF Mot. at 33-36; CLF Reply at 28-30.)

D. Defendant-Intervenors and *Amici Curiae*

**\*6** Given the consequences for the New England groundfish fishery, a host of other interested parties have intervened as defendants or have submitted a brief as *amici.* In addition to the federal defendants, intervenors TSF, Associated Fisheries of Maine, and the City of Portland, Maine defend the Council's interpretation of the MSA's overfishing and rebuilding provisions. (TSF Opp'n at 4-12.) They also basically defend the Council's choice of fishery management measures (even as plaintiff TSF disputes several alleged modifications made by the Secretary to the Council's proposals). (*Id.* at 13-20.) Their fundamental premise is that the Council successfully struck a delicate balance with respect to a complex, interdependent ecosystem with numerous species of groundfish, and this balance reasonably prevents overfishing and provides for stock rebuilding while protecting, to the extent consistent with attaining these goals, the livelihood of fishing communities. (*Id.* at 12, 20-22.) They also submit that the range of management measures considered by the Council was reasonable and lawful under NEPA and the MSA. (*Id.* at 23-29.) [FN9]

> FN9. The Cape Cod Commercial Hook Fishermen's Association and Paul W. Parker (collectively "CCCHFA") have also intervened as defendants. They describe Amendment 13's sector program, which establishes different management measures for groups that voluntarily organize and subject themselves to special regulations. As part of the program, defendant-intervenors are allocated a hard quota of Georges Bank cod as a subset of the overall TAC for that fishery. (CCCHFA Opp'n at 3, 4-5.) The sector program is "in addi-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

tion to and independent of the principal management option chosen for Amendment 13." (A.R. 166 at C143.) CCCHFA argues that none of CLF's or Oceana's arguments applies to its fishing activities or its share of the Georges Bank cod fishery. (CCCHFA Opp'n at 7-10.) It also contends that most of plaintiff TSF's arguments are inapplicable to the CCCHFA's activities and the regulations to which it is subject, although it does not object to TSF's arguments so long as they are consistent with preventing overfishing. (*Id.* at 11.) No party challenges CCCHFA's contentions or objects to the Amendment 13 sector program. Nor has the Court identified any legal deficiency involving the sector program. Therefore, nothing in this Memorandum Opinion shall be construed to restrict CCCHFA's activities pursuant to the sector program.

The States of Maine and Rhode Island and the Commonwealth of Massachusetts (collectively "the States") have submitted a joint brief as *amici curiae* that details the adverse economic effects the jurisdictions are expected to suffer as a result of the management techniques instituted by Amendment 13. (States' Br. at 5-6 .) They warn that further modifications to the Amendment that could result from granting the relief sought by the conservation plaintiffs would have dire consequences for their local fishing communities. (*Id.* at 5.) They argue that Amendment 13's plans to end overfishing and to rebuild stocks constitute a "delicate balance" of conservation goals, the minimization of economic harm to the fishing industry, and concerns for the safety of fishers. (*Id.* at 9.) They strenuously resist what they perceive as plaintiffs' efforts to tip this balance by prioritizing conservation goals over the other valid interests recognized by the National Standards. (*Id.* at 9-10.) The States also argue that the Amendment 13 EIS satisfies NEPA by considering practicable alternatives more protective than the status quo. (*Id.* at 13- 14.) They further submit

that vacatur of Amendment 13 would be an inappropriate remedy, because it is part of "an evolving administrative response to complex and interrelated issues" that should not be rejected wholesale. (*Id.* at 16.)

## II. Other Relevant Statutes

### A. The National Environmental Policy Act ("NEPA")

In addition to the MSA, as amended by the SFA, several other statutes are implicated by plaintiffs' claims. Chief among these is NEPA, which requires all federal agencies proposing "major Federal actions significantly affecting the quality of the human environment" to examine their environmental effects and inform the public of the environmental considerations involved in agency decisionmaking. 42 U.S.C. § 4332(2)(C). These disclosures normally take the form of an EIS. *See id.* Essentially a procedural statute, NEPA does not require an agency to reach a given decision in light of the information it collects and weighs. *See Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 350-51, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989). Rather, the statute's purposes are to ensure that the agency considers the environmental effects of its actions and to "guarantee[ ] that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision." *Id.* at 349.

*7 The heart of an EIS is its analysis of a reasonable range of alternatives to the agency's proposed action. These alternatives should be presented so as to "sharply defin[e] the issues and provid[e] a clear basis for choice." 40 C.F.R. § 1502.14. The range of options considered by the agency is "bounded by some notion of feasibility," and a " 'detailed statement of alternatives' cannot be found wanting simply because the agency failed to include every alternative device and thought conceivable by the mind of man." *Vermont Yankee Nuclear Power Corp. v. NRDC,* 435 U.S. 519, 551, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978). Thus, courts apply a "rule

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 555416 (D.D.C.)
**(Cite as: 2005 WL 555416 (D.D.C.))**

of reason" in assessing whether an agency considered a sufficient range of alternatives. *See Tongass Conservation Soc'y v. Cheney,* 924 F.2d 1137, 1140 (D.C.Cir.1991) (internal quotation marks and citation omitted). Moreover, "[t]he goals of an action delimit the universe of the action's reasonable alternatives." *City of Alexandria v. Slater,* 198 F.3d 862, 867 (D.C.Cir.1999) (quoting *Citizens Against Burlington, Inc. v. Busey,* 938 F.2d 190, 195 (D.C.Cir.1991)) (internal quotation marks omitted). Thus, an agency need not consider options inconsistent with the action's purpose. *Id.* Courts accord "considerable deference to the agency's expertise and policy-making role" that defined the scope of the action in the first place. *Id.* In addition to setting forth alternatives, an EIS must also analyze an action's direct, indirect and cumulative impacts, detail the action's purpose and need, and describe the affected environment. *See* 40 C.F.R. § 1502.1 *et seq.* A court's role in evaluating a NEPA challenge is "not [to] substitute its own policy judgment for those of the agency," *Tongass,* 924 F.2d at 1140, but to "ensure that the agency took account of [the relevant] factors and that its decision was not arbitrary and capricious." *Humane Soc'y of the U.S. v. Hodel,* 840 F.2d 45, 62 (D.C.Cir.1988).

**B. The Regulatory Flexibility Act ("RFA")**

While the plaintiff conservation groups invoke NEPA to support their argument, TSF looks to the RFA, which is also a procedural statute that requires, *inter alia,* that an agency analyze a rulemaking's effects on small entities. *See* 5 U.S.C. §§ 603, 604. The purpose of such an analysis, which must be made available for comment, is to ensure that agencies consider the effects of federal actions on small businesses and that agencies evaluate significant alternatives that might minimize adverse economic impacts on such businesses. *Id.* § 604(b). *See Associated Fisheries of Me., Inc. v. Daley,* 127 F.3d 104, 114-17 (1st Cir.1997) ("[RFA] section 604 does not require that a [Final Regulatory Flexibility Analysis] address every alternative, but only that it address significant ones .").

**C. Administrative Procedure Act ("APA")**

The Court reviews the Secretary's actions pursuant to the judicial review provisions of the APA. The Court may set aside an administrative action only where it is arbitrary, capricious or otherwise unlawful. *See* 5 U.S.C. § 706(2)(A)-(D). *See Marsh v. Oregon Natural Res. Council,* 490 U.S. 360, 375, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989). Administrative actions are presumed valid and are accorded great deference; thus, the inquiry is only whether the Secretary's decisions were unreasonable, and "this court will not second guess an agency decision or question whether the decision made was the best one." *C & W Fish Co.,* 931 F.2d at 1565. This is particularly the case when the Court is evaluating the Secretary's scientific determinations, as opposed to simple findings of fact. *See Baltimore Gas & Elec. Co. v. NRDC,* 462 U.S. 87, 103, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983). Moreover, the Court will not lightly depart from regulations promulgated by an agency in order to achieve a statute's goals. *See Continental Air Lines, Inc. v. Dep't of Transp.,* 843 F.2d 1444, 1451-52 (D.C.Cir.1988). Thus, it is "especially appropriate for the Court to defer to the expertise and experience of those individuals and entities--the Secretary, the Councils, and their advisors--whom the [Mangunon-Stevens] Act charges with making difficult policy judgments and choosing appropriate conservation and management measures based on their evaluations of the relevant quantitative and qualitative factors." *National Fisheries Institute v. Mosbacher,* 732 F.Supp. 210, 223 (D.D.C.1990).

**\*8** In sum, although this Court undertakes a "searching and careful," *March,* 490 U.S. at 378, examination to determine whether there is a "rational connection between the facts found and the choice made," *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962), and it will not accept a record based on "bare conclusory allegations of fact," *Taylor v. FDIC,* 132 F.3d 753, 762 (D.C.Cir.1997), the Court will likewise not substitute its judgment

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                    Page 9
Not Reported in F.Supp.2d, 2005 WL 555416 (D.D.C.)
**(Cite as: 2005 WL 555416 (D.D.C.))**

for that of the Secretary. *See Marsh,* 490 U.S. at 378.

### LEGAL ANALYSIS

In addressing the plaintiffs' arguments, the Court has considered the administrative record, which consists of over eighty volumes of documents, including Amendment 13, which alone comprises three of these volumes and some eighteen hundred pages, as well as some four hundred pages of pleadings and the arguments of counsel. It has also, consistent with the requirements of the MSA, 16 U.S.C. § 1855(f)(4), attempted to expedite this matter so as to rule before the fishing season begins on May 1, 2005. This having been said, the Court will now turn its attention to the parties' legal arguments. First, in Section I(B), the Court will focus on CLF's claim that Amendment 13 violates the law by not properly addressing the problem of overfishing in the New England groundfish fishery. In Section I(C), TSF's procedural attacks on Amendment 13's fishery management program will be considered. In Section II, the Court will address Oceana's NEPA challenge to the range of alternatives considered by the defendants when designing measures to protect EFH. Finally, CLF's and Oceana's arguments regarding the adequacy of Amendment 13's methodology for reporting and minimizing bycatch and bycatch mortality will be discussed in Section III.

### I. Overfishing

### A. Background

The gravamen of CLF's claims relates to the ongoing overfishing that is occurring, especially with respect to certain species (*e.g .,* the Georges Bank cod) and the lack of a meaningful program for rebuilding the fishery.

As is clear under the MSA, as amended by the SFA, the chief purpose of the statute is to prevent overfishing and to achieve optimum yield on a continuing basis. 16 U.S.C. § 1851(a)(1). To accomplish this goal, the statute requires a council to prepare an FMP to "end overfishing in the fishery and to rebuild affected stocks of fish" within one year after the Secretary determines that a fishery is overfished. 16 U.S.C. § 1854(e)(3)(A). Such a plan must end overfishing as quickly as possible, "taking into account the status and biology of any overfished stocks of fish, the needs of fishing communities, recommendations by international organizations in which the United States participates, and the interaction of the overfished stock of fish within the marine ecosystem." *Id.* § 1854(e)(4)(A)(i).

As with all FMPs, plans to end overfishing must be consistent with the ten National Standards. CLF stresses two of these. National Standard One requires that fishery management measures prevent overfishing while providing OY on a continuing basis from each fishery. *Id.* § 1851(a)(1). National Standard Eight states that "Conservation and management measures shall, consistent with the conservation requirements of this chapter (including the prevention of overfishing and rebuilding of overfished stocks), take into account the importance of fishery resources to fishing communities in order to (A) provide for the sustained participation of such communities, and (B) to the extent practicable, minimize adverse economic impacts on such communities." *Id.* § 1851(a)(8). Although conservation interests must predominate, where two plans achieve similar conservation results, the alternative that minimizes hardship on fishing communities is preferred. *NRDC v. Daley,* 209 F.3d at 753 (quoting 50 C.F.R. § 600.345(b)(1)).

**\*9** Three years ago plaintiffs challenged Amendment 13's predecessor. The Secretary conceded that the FMP he was implementing did not contain an adequate rebuilding program, and in view of this concession, Judge Kessler found that defendants had violated the MSA and the APA. *CLF I,* 209 F.Supp.2d at 7-9. Defendants further acknowledged that the FMP relied on measures that were likely to fail--for some species, there was only a 1 chance of success--and the Court therefore rejected the plan as falling below the required 50% probability of

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

success standard. *Id.* at 10 (citing *NRDC v. Daley,* 209 F.3d at 754). The Council also admitted that it did not want to comply with NEPA by compiling an EIS that adequately analyzed alternative management measures for preventing overfishing, and this motivated the administrative decision to adopt a plan that violated the MSA. *Id.* The Court therefore entered a Remedial Order requiring defendants to produce an FMP that established a plan for rebuilding overfished stocks. *CLF II,* 211 F.Supp.2d at 58. In the *AOC* Joint Stipulation, defendants further committed themselves to producing a proper EIS (A.R. 1331 at D-01-3105) and a lawful FMP according to an agreed-upon timetable. (*Id.* at D-01-3110.)

Amendment 13 is the product of those commitments. The Council and Secretary have now adopted a plan that includes a lengthy EIS and establishes a detailed rebuilding program that purports to have at least a 50% chance of success for each of the twelve overfished species. When developing this plan, the Council evaluated three basic approaches for returning the species to a sustainable level; each approach is pegged to an annual, species-specific fishing mortality rate, which is referred to as "F" (*i.e.,* the rate at which fish may be harvested by humans, whether the fish are kept or discarded). *See North Carolina Fisheries Ass'n, Inc. v. Evans,* 152 F.Supp.2d 870, 872 n. 1 (E.D.Va.2001). (A.R. 166 at C117.) In the first approach, the F rate is kept constant throughout the rebuilding period, resulting in a steep drop in the level of fishing for that species in the first year the plan is in effect. (*Id.* at C103.) This dramatic upfront decrease was expected to have severe economic consequences for fishing communities, leaving many fishers out of work. *See* 69 Fed.Reg. at 22,920. (*See also* A.R. 166 at C14.)

The second and third approaches are similar in that they both reduce F rates during the course of the rebuilding effort. In the "adaptive rebuilding strategy," the rate is initially dropped to the rate that would produce the maximum sustainable yield

("Fmsy"). (*Id.* at C107.) In 2009, once more date has been gathered about the species' rebuilding potential, the rate is dropped further to a rate estimated to allow the species to recover from an overfished state during the plan's remaining years. (*Id.*) The third approach phases in F reductions throughout the duration of the plan. Initially, fishing effort remains at a level in excess of Fmsy, but within two to five years, each species' F target reaches Fmsy, and in later years, the "phased" rate falls even further than it would under the adaptive approach in order to allow for rebuilding targets to be met according to the established timetable. Thus, the phased approach delays instituting extreme decreases in F until a later point in the rebuilding program. (*Id.* at C104-05, C117.) But both approaches avoid the steep initial decline in fishing that accompanies the constant F approach, thereby enabling more fisherman to remain in business while stocks rebuild. (*Id.* at C14.) These approaches are designed to better account for "[t]he complexity of the fishery and the co-occurrence of stocks of concern and stocks that are not overfished," because even lower F rates for overfished stocks, such as those produced by the constant approach, would also reduce fishers' ability to target abundant stocks in the same geographic area due to the need to avoid bycatch of the overfished stocks. 69 Fed.Reg. at 22,920. Ultimately, the Secretary adopted the phased approach for five species and the adaptive approach for seven; he did not implement the constant F model. (*Id.* at C105, C110.)

**\*10** In order to achieve the F targets for each year, Amendment 13 also implements a variety of direct and indirect management tools. [FN10] These include creating per-day and per-trip limits on fish by weight; instituting rolling closures of fishing areas and closing others year-round; instituting minimum fish sizes; limiting vessels' days-at-sea; creating special access programs; establishing quotas or TACs; and modifying fishing gear, such as by increasing mesh size and restricting the use of gillnets. (*Id.* at C9.)

Not Reported in F.Supp.2d                                                                          Page 11
Not Reported in F.Supp.2d, 2005 WL 555416 (D.D.C.)
**(Cite as: 2005 WL 555416 (D.D.C.))**

FN10. Direct management tools are those that directly limit fishing, such as fixed quotas. Indirect tools are those that seek to control fishing mortality by regulating how fishing is carried out, based on the premise that the greater the restrictions (such as increased mesh size), the fewer fish will be caught. (CLF Mot. at 9-10.)

## B. CLF's Claims

CLF raises several challenges pertaining to ongoing overfishing in the New England groundfish fishery. First, it faults Amendment 13 for allowing continued overfishing in violation of the MSA. Second, it contends that Amendment 13 must be rejected because the "management measures ... are unlikely to limit fishing mortality to the target level." (CLF Mot. at 2.) Third, it argues that the Secretary failed to adequately assess the problem of overfishing and consider alternative solutions to the problem. (*Id.* at 36.) These flaws, it insists, are violations of the MSA, the APA, and NEPA. These arguments will be considered *seriatim.*

## 1. Is It Lawful for the F Rate to Exceed Fmsy?

Plaintiffs argue that the Secretary acted unlawfully by authorizing the phased program, which temporarily allows continued overfishing for five species. They submit that the MSA requires overfishing to be ended immediately, not a few years into a rebuilding program. (CLF Mot. at 20.) In particular, plaintiffs argue that Amendment 13 violates the MSA by unlawfully authorizing fishing mortality (F) to exceed Fmsy for five groundfish stocks (*i .e.,* American plaice, Southern New England/ Mid-Atlantic yellowtail flounder, Georges Bank cod, Cape Cod/Gulf of Maine yellowtail flounder, and white hake). 69 Fed.Reg. at 22,920-21.

## a. Applicable law and technical concepts

The parties' arguments rely on a variety of technical concepts that must be explicated. Some are defined by statute, others by regulation, and others are ex-

plained in Amendment 13. The concepts can generally be divided into two distinct, but related, groups: those that prescribe *rates* and those that prescribe *amounts* of fish that may be harvested (as measured by weight).

The only relevant terms defined by statute or regulation involve caps on the *amount* of fish that may be caught. As provided by National Standard One, "Conservation and management measures shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery for the United States fishing industry." 16 U.S.C. § 1851(a)(1). The MSA defines overfishing as "a rate or level of fishing mortality [F] that jeopardizes the capacity of a fishery to produce the maximum sustainable yield on a continuing basis." 16 U.S.C. § 1802(29). "Maximum sustainable yield" ("MSY") is a "theoretical concept," 50 C.F.R. § 600.310(c)(2)(i), meaning the amount that is "the largest long-term average catch or yield that can be taken from a stock or stock complex under prevailing ecological and environmental conditions." *Id.* § 600.310(c)(1)(i). MSY is the absolute limit on how much fish, as defined in terms of weight, may be harvested. *See A.M.L. Int'l,* 107 F.Supp.2d at 94 n. 6, 99; 50 C.F.R. §§ 600.310(c), 600 .310(f)(4)(ii). (*See also* TSF Opp'n at 7-8 & n.6.)

**\*11** Optimum yield, as used in National Standard One, is the amount of fish that:

(A) will provide the greatest overall benefit to the Nation, particularly with respect to food production and recreational opportunities, and taking into account the protection of marine ecosystems;

(B) is prescribed as such on the basis of the maximum sustainable yield from the fishery, as reduced by any relevant economic, social, or ecological factor; and

(C) in the case of an overfished fishery, provides for rebuilding to a level consistent with producing the maximum sustainable yield in such fishery.

*Id.* § 1802(28). Because OY need only produce MSY "on a continuing basis," *id.* § 1802(29), it "is

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 555416 (D.D.C.)
**(Cite as: 2005 WL 555416 (D.D.C.))**

a standard that should be achieved over the long-run, not necessarily a standard that must be achieved with precision each year." *Blue Water Fisherman's Ass'n v. Mineta,* 122 F.Supp.2d 150, 161 (D.D.C.2000); *accord NRDC v. NMFS,* 280 F.Supp.2d at 1016. In other words, the maximum OY possible equals MSY, but in many cases it will be set lower on account of social, economic or ecological factors. *See C & W Fish Co.,* 931 F.2d at 1563; 50 C.F.R. § 600.310(f)(4)(ii). And assuming OY is set below MSY, if a plan provides for the amount of fish caught to exceed OY, there is no problem, so long as over time OY is obtained on average and MSY is never exceeded. 50 C.F.R. § 600.310(f)(1)(ii).

The remaining concepts deal with rates (as opposed to amounts of fish) and are defined not by statute, but in the context of Amendment 13. "Fmsy" is the rate of fishing mortality associated with actively building stocks to levels of abundance that the Secretary determines will produce MSY catch amounts over the long run. (*See* A.R. 166 at C1162 (defining Fmsy as the "fishing mortality rate that would produce MSY when the stock biomass is sufficient for producing MSY on a continuing basis [*i.e.,* no longer overfished]").)

The Spawning Stock Biomass rate ("SSBmsy"), also called the biomass rebuilding trajectory, constitutes the rebuilding target for an overfished species. Spawning stock biomass is the "total weight of fish in a stock that sexually mature, *i.e.,* are old enough to reproduce." (A.R. 166 at C1167.) SS-Bmsy is that portion of spawning stock biomass "that would produce MSY when fished at a fishing mortality rate equal to Fmsy." (*Id.* at C1159.) In practice, the Secretary has moved to using biomass targets in lieu of F targets for rebuilding purposes. *See North Carolina Fisheries,* 152 F.Supp.2d at 874; *A.M.L.,* 107 F.Supp.2d at 98. "[A] 'biomass' target is achieved by estimating the total mass of a fishery, and arriving at a suitable harvest level that allows the fishery to maintain its maximum sustainable yield.... The ideal biomass ... is considered to

be the biomass that provides maximum sustainable yield, or MSY, from the stock." *North Carolina Fisheries,* 152 F.Supp.2d at 873 n. 2. Similarly, Bmsy is the F target rate for when the stock has been rebuilt to its long-term biomass target.

**\*12** As should be clear from this discussion, the MSA and its implementing regulations establish the central importance and relative roles of the different weight caps when designing measures to address overfishing, but Congress has left the critical task of defining fishing *rates* to the Secretary and the Council. CLF nonetheless challenges defendants' rebuilding program by contending that defendants have violated the law by permitting the fishing mortality rate (F) to exceed Fmsy with respect to five stocks in the early years of the rebuilding trajectory.

b. Statutory construction

Plaintiffs' argument that the Secretary has violated the MSA by allowing overfishing to continue for a limited number of years on the front end for the five species managed under the "phased" approach rests on a misconstruction of the statute. CLF confuses the statutory bar on exceeding the MSY *amount* with a nonexistent prohibition on exceeding the Fmsy *rate* during a rebuilding program. In fact, the plain language of the statute makes clear that overfishing need not be ended instantaneously, and given this statutory framework, the Court cannot conclude that a phased approach that permits overfishing in the early years contravenes the MSA. Rather, so long as OY is achieved over time and rebuilding targets can be met within the statutory period, the Secretary enjoys significant latitude in designing a rebuilding program and in ending overfishing.

Where Congress has "directly spoken to the precise question at issue," the Court "must give effect to the unambiguously expressed intent of Congress." *Chevron U.S.A., Inc. v. NRDC,* 467 U.S. 837, 842-43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Here, the statute clearly states that any rebuilding

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 555416 (D.D.C.)

**(Cite as: 2005 WL 555416 (D.D.C.))**

plan shall "specify a time period for ending over-fishing ." 16 U.S.C. § 1854(e)(4)(A). This language would be superfluous if plaintiffs' instantaneity argument that F may never exceed Fmsy during the rebuilding plan were correct. "It is, of course, a 'cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." ' See United States ex rel. Totten v. Bombardier Corp., 380 F.3d 488, 499 (D.C.Cir.2004) (citations omitted). Applying *Chevron's* Step One analysis, it is clear that Congress provided that overfishing could continue for a time, and thus, the phase-in approach is not statutorily barred.

Furthermore, it was permissible for the Secretary to take into account "the needs of fishing communities" in establishing the rebuilding framework and in setting the timetable for ending overfishing. *See 16 U.S.C. § 1854(e)(4)(A)(1).* National Standard One, which prioritizes conservation measures, *see 16 U.S.C. § 1851(a)(1),* must be read *in pari materia* with the rebuilding requirements of § 1854(e)(4), which dictate that these economic considerations be considered when establishing plans for ending overfishing. [FN11] Moreover, insofar as various plans achieve similar conservation results, the approach least economically disadvantageous for fishing communities is the preferable alternative. 50 C.F.R. § 600.345(b)(1). Congress' explicit requirement that the Secretary consider the welfare of fishing communities when prescribing measures to end overfishing is consistent with this principle.

> FN11. This holds true for rebuilding plans of ten years or less, as well as for those that run longer. The provision dictating that fishing communities' needs be considered requires only that overfishing be ended in as short a time as possible. *See 16 U.S.C. § 1854(e)(4)(A).* The Secretary has interpreted the statute to allow for such economic considerations to extend the rebuilding period only up to ten years, unless

one of the three exceptions in § 1854(e)(4)(B) applies, in which case fishers' needs may be considered and may warrant extending the rebuilding time period up to "the rebuilding period calculated in the absence of fishing mortality plus one mean generation time or equivalent period based on the species' life-history characteristics." 50 C.F.R. § 600.310(e)(4)(B); *see NRDC v. NMFS,* 280 F.Supp.2d at 1014; *Nat'l Audubon Soc'y v. Evans,* No. 99-1707, 2003 WL 23147552, at *7 (D.D.C. July 3, 2003).

**\*13** In the alternative, even assuming that Congress did not speak clearly on this question, the result does not differ under *Chevron's* Step Two analysis. Where a "statute is silent or ambiguous with respect to the specific issue," the Court must determine whether the Secretary's construction of the statute is permissible. *Chevron,* 467 U.S. at 843. Here, "any ensuing regulation is binding in the courts unless procedurally defective, arbitrary or capricious in substance, or manifestly contrary to the statute." *United States v. Mead Corp.,* 533 U.S. 218, 226, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001) (citing *United States v. Morton,* 467 U.S. 822, 834, 104 S.Ct. 2769, 81 L.Ed.2d 680 (1984); 5 U.S .C. §§ 706(2)(A), (D)).

The Secretary's interpretation is both reasonable and entitled to deference because it is "consistent with the statutory scheme and legislative history." *City of Cleveland v. U.S. Nuclear Regulatory Comm'n,* 68 F.3d 1361, 1367 (D.C.Cir.1995). Congress clearly intended to protect endangered fisheries while simultaneously minimizing economic harm to fishing communities. The overfishing measures were to preserve "the long-term sustainability of both the resource and the fishers harvesting the resource." 142 Cong. Rec. S10794, 10816 (1996) (statement of Sen. Murray); *see also id.* at 10825 (statement of Sen. Snowe) ("Given the state of many of our fisheries, we cannot avoid conservation measures. But in the course of developing

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d    Page 14
Not Reported in F.Supp.2d, 2005 WL 555416 (D.D.C.)
(Cite as: 2005 WL 555416 (D.D.C.))

these measures, it is also equally important that the Federal Government consider the economic costs of fisheries conservation."). The Secretary's construction of the statute, *i.e.,* "the ending of overfishing can be achieved at any time during the prescribed rebuilding schedule, as long as the ability to rebuild is not jeopardized," is thus reasonable, particularly in light of the need to avoid "severe economic consequences." *See* 69 Fed.Reg. at 22,920. [FN12]

> FN12. In this regard, it is significant that the Council found that by ending the rebuilding period for certain species at 2014, instead of 2009, the economic benefits to the fishermen and their communities increased by $40 million. (A.R. 166 at C102.)

Plaintiffs nonetheless argue that F can never exceed Fmsy during a rebuilding program for an overfished stock, including at the beginning of the rebuilding period in the phased approach. (CLF Mot. at 20.) For this proposition, they rely principally on Judge Kessler's decision in *CLF I,* where she stated in a footnote that "[f]or stocks at Bmsy or above, the fishing mortality rate may not exceed the fishing mortality rate which produces the maximum sustainable yield (Fmsy). *See* [16 U.S.C. § 1802(28)(B) ]. For stocks below Bmsy, the fishing mortality rate will be lower than Fmsy so that the stock may rebuild within a specified time frame, typically five or ten years." 209 F.Supp.2d at 8 n. 9. (CLF Mot. at 21.) As acknowledged by plaintiffs (*see* Hearing Transcript at 9), this statement is merely *dicta,* and it is not binding here. In *CLF I,* there was no rebuilding plan to implement, and therefore, that case did not assess whether such a plan complied with the MSA. In short, the Court's footnote was not germane to the issues before it.

Moreover, it appears that *CLF I* read into the MSA a requirement for a rebuilding plan to achieve Fmsy in year one, whereas in the statutory provision cited in the footnote, there is no reference to fishing mortality rates. Rather, the Act refers only to terms measuring amounts by weight, *i.e.,* OY and MSY.

*See* 16 U.S.C. § 1802(28)(B). As already established, Fmsy and MSY are distinct concepts, and the statute refers only to the latter. And Amendment 13, in point of fact, does not permit any harvesting in excess of MSY. (*Compare* A.R. 166 at C94 *with* 69 Fed.Reg. at 22,915.)

**\*14** The unsupported conflating of the statutory MSY cap on harvesting by weight with a non-existent prohibition on fishing in excess of the Fmsy rate appears to underlie the flaw in plaintiffs' argument. (*See* CLF Mot. at 19-26; *see also* TSF Opp'n at 6-11.) Plaintiffs attack the Secretary's interpretation of the statute, contending that MSY itself, as defined in the Code of Federal Regulations, is calculated subject to a rate, and therefore that underlying rate is incorporated into the MSA. (*See* CLF Reply at 17 ("A Fmsy 'rate' is simply the amount of fish that can be harvested per unit of time. In prohibiting fish harvests in excess of maximum sustainable yield, Congress plainly intended to limit harvests over some period of time.").) Insofar as CLF argues that the statute itself contains no definition of MSY, and that the Secretary's regulations define MSY relative to an "MSY control rule," *see* 50 C.F.R. § 600.310(c)(2)(i) (*see also* CLF Reply at 17-18), this regulatory definition does not change the fact that MSY, as that term is used in the MSA, is an amount and *not* a rate. *See* 16 U.S.C. § 1802(28) (using the term "yield" to refer to "the amount of fish"). While it is true that some formula is used to generate MSY, the cited regulatory language does not and could not render the formula itself a part of the statutory definition of OY in the overfishing context. *See id.*

Moreover, plaintiffs' argument hinges on the notion that an F rate for a given year can never exceed Fmsy, but as plaintiffs' own definition of that latter rate acknowledges, Fmsy is computed based upon a "unit of time." This ambiguous phrasing implicitly recognizes that in the case of Fmsy for a rebuilding program, that unit of time may be many years, whereas F rates apply only to one fishing year. There is no necessary inconsistency with having an

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d    Page 15
Not Reported in F.Supp.2d, 2005 WL 555416 (D.D.C.)
**(Cite as: 2005 WL 555416 (D.D.C.))**

F rate for any given year exceed an Fmsy rate that aims to achieve a given result over the rebuilding trajectory, which may last many years. In short, Fmsy is not, contrary to CLF's argument, a statutory baseline; rather, the MSY harvest amount is the cap established by statute.

And the Council has substantial discretion in estimating the MSY cap and OY target for any given stock. *See* 50 C.F.R. § 600.310(c)(2)(ii) ("Councils have a reasonable degree of latitude in determining which estimates to use and how the estimates are to be expressed."). Since the legality of the actual MSY figures by weight that were adopted by Amendment 13 is not at issue, [FN13] plaintiffs' challenge to the Amendment 13 timetable for ending overfishing must fail, because their challenge relies on the faulty premise that the MSA applies to the Fmsy rate, when in fact it applies only to the MSY amounts.

> FN13. For instance, CLF provides as examples, but does not challenge, the Fmsy rates adopted by Amendment 13 for various stocks. (CLF Mot. at 20 n.13.) Although these examples reflect CLF's confusion as to what figures are legally relevant for purposes of the MSA in that they are rates rather than amounts by weight, they nonetheless demonstrate that CLF is mounting a legal challenge to the Secretary's construction of the statute, rather than contesting the actual figures adopted by Amendment 13.

Other courts have come to the same conclusion that the MSA applies to rebuilding targets and harvest levels set by weight, not to fishing mortality rates. For instance, in *NRDC v. NMFS,* the court held that allowing *increased* harvest levels (rising from 130 metric tons ("mt") to 168 mt) for darkblotched rockfish as a result of a scientific finding that the stock was *more overfished* than originally thought, while seemingly counterintuitive, was a reasonable construction of the SFA. 280 F.Supp.2d at 1013-14. [FN14] Similarly, in *North Carolina Fisheries As-*

*sociation, Inc. v. Evans,* the court endorsed the Secretary's use of rebuilding targets established by weight, as opposed to F rates. 152 F.Supp.2d at 873-74 & n. 2, 880 ("The Court is in no way criticizing the NMFS for adopting the biomass target--this approach appears far less confusing and thus much more approachable than the older F standard.")

> FN14. As explained by the court:
> Plaintiffs contend that NMFS violated the MSA by increasing the annual harvest limit for the darkblotched rockfish in the face of evidence that the rockfish was scarcer than originally thought. While this decision may appear at first blush to be irreconcilable with the agency's duty to prevent overfishing and rebuild overfished stocks, the explanation for the increased limit lies in the effect of the population correction on the length of the rockfish rebuilding plan.
> Faced with a choice between an interpretation of the SFA that requires a moratorium on harvesting of fish species that take more than ten years to regenerate naturally, and an interpretation that permits limited harvesting over the course of a longer rebuilding period, NMFS selected--after public notice and comment--the latter interpretation. In light of MSA's dual conservationist and commercial objectives, an interpretation that accommodates both objectives, rather than selecting one to the exclusion of the other, is permissible.
> *Id.*

*15 Courts have also rejected challenges to FMPs on the basis that they did not immediately achieve Fmsy. For instance, in *National Audubon Society v. Evans,* the Secretary had established a twenty-year rebuilding period for Atlantic bluefin tuna that included an annual TAC of 2,500 mt. 2003 WL 23147552, at *2. In the FMP's early years, the fishery's F rate would be relatively high, but would

Not Reported in F.Supp.2d                                                              Page 16
Not Reported in F.Supp.2d, 2005 WL 555416 (D.D.C.)
(Cite as: 2005 WL 555416 (D.D.C.))

drop in later years; the Secretary chose this approach, which used a constant TAC amount by weight rather than a constant F rate, because he determined it would be easier and less expensive to administer than the alternative approaches while nonetheless achieving maximum sustainable yield biomass target within the rebuilding time period. *Id.* at *8. The Court upheld the Secretary's plan under the MSA and APA. *Id.* at *9. Plaintiff had also argued that the plan violated National Standard One, 16 U.S.C. § 1851(a)(1), because the fishery's F rate exceeded Fmsy, but the Court rejected this challenge, finding that the plaintiff had failed to present any substantial evidence to support this claim. *Id.* at 8 n. 10.

The Secretary may therefore allow overfishing for a time in order to take account of fishing communities' needs, so long as, *inter alia,* the MSA's conservation goals are achieved and the MSY amount by weight is never exceeded and OY is achieved on average. It necessarily follows that the phased approach adopted by Amendment 13, which puts off for several years the greatest economic impact on fishing communities, is a proper means of achieving the conservation goal of ending overfishing and rebuilding stocks while simultaneously minimizing economic harm to fishermen and harvesting OY from other stocks. As explained in Amendment 13, "[g]iven the multispecies nature of the fishery, further reductions [beyond those adopted under the phased and adaptive approaches] for stocks such as [Georges Bank] cod or [Gulf of Maine] cod would result in further reducing catches for stocks that do not need reductions (e.g. [Georges Bank] haddock, [Gulf of Maine] haddock, [Georges Bank] yellowtail flounder). Given that the goal of the [Magnuson-Stevens] Act remains achieving OY, the Council believes its selection of rebuilding trajectories is more consistent with this goal." (A.R. 166 at C104.)

In other words, further cutbacks in the phased F rate--such as an immediate reduction to the Fmsy rate--would mean in the case of Georges Bank cod,

for instance, that haddock fishing in Georges Bank would also have to be cut back in order to avoid cod bycatch, even though haddock are relatively abundant there. Thus, a cod cutback would significantly hurt fishermen by reducing their ability to fish for another species that can withstand a heavier degree of fishing. Moreover, conservation objectives are not compromised under the phased approach, for the F rate for cod will indeed fall later to a level lower than it otherwise would have been set at under the constant F approach, thereby allowing the rebuilding goals to be achieved on the same timetable they otherwise would have been.

**\*16** This example of the interplay between Georges Bank cod and haddock fishing also highlights the delicate and nuanced balance the Council had to strike in Amendment 13 between its duties to maximize OY among all managed species while rebuilding overfished stocks and to concurrently minimize harm to fishing communities. (*See* States' Br. at 9.) It was clearly within the Secretary's discretion to choose the plan that achieves the same conservation result while keeping fishers in business, even if that approach temporarily leaves F set in excess of Fmsy.

The Court therefore concludes that it must defer to the Secretary's decision that the phased alternative is reasonable and that overfishing need not be immediately terminated. *See Mead,* 533 U.S. at 226.

2. Does Amendment 13 Have a 50% Probability of Achieving Target Mortality Rates?

CLF next argues that the rebuilding plan for overfished stocks must be rejected because defendants have not established that it has at least a 50% chance of success. (CLF Mot. at 27.) In *NRDC v. Daley,* this Circuit held that the Secretary unlawfully adopted a fishery measure he conceded had only an 18% chance of success, even though he considered alternatives that had a greater chance of success. *See* 209 F.3d at 754. The Circuit held that a lawful FMP must have at least a 50% chance of success. *Id.*

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

CLF challenges a number of specific aspects of Amendment 13 in order to show that its various components are not at least 50% likely to succeed. As a preliminary matter, defendants contend that all of Amendment 13 meets this threshold. *See, e.g.,* 69 Fed.Reg. at 22,934. Although an "agency may not rely on mere conclusory statements to explain its decision," *CLF I,* 209 F.Supp.2d at 8, as the following discussion elucidates, the Secretary had a rational basis for making these assertions based on the available scientific evidence.

Plaintiffs first attack the Closed Area Model ("CAM") used by the Council to assess the effectiveness of the management measures adopted in Amendment 13 for achieving the target fishing mortality rates. They argue that, because there is no established degree of certainty associated with the CAM, none of the measures its findings support can be assured of at least a 50% probability of success. (CLF Mot. at 27-28.) To support this argument, plaintiffs seize upon the Secretary's own admissions in Amendment 13 that the model was not completely infallible. *See* 69 Fed.Reg. at 22,926. (*See also* A.R. 166 at C294.)

However, the fact that a given model has some imperfections does not prevent it from constituting the "best scientific information available." 16 U.S.C. § 1851(a)(2). CLF, by failing to offer an alternative for evaluating the management measures, cannot show that CAM was not the best scientific evidence available. "When examining this kind of scientific determination, as opposed to [an agency's] simple findings of fact, a reviewing court must generally be at its most deferential." *Baltimore Gas,* 462 U.S. at 103. *Accord AOC,* 183 F.Supp.2d at 11-12. The focus here is on what evidence is *available;* the Secretary cannot fail to design measures to meet his MSA obligations simply because the underlying science is not yet sufficiently sophisticated. *See* NRDC v. Evans, 254 F.Supp.2d 434, 440 (S.D.N.Y.2003). Rather, when the only available methodology is less than perfect, deference to an agency's expertise is warranted. *See CLF v. Mineta,*

131 F.Supp.2d 19, 28 n. 20 (D.D.C.2001) ( "It is simply not the Court's role to interject itself into this extremely technical scientific debate; indeed, this is precisely the type of issue in which the Court should properly defer to Defendants' expertise.") Thus, where there is only an imperfect model to rely upon, the Secretary can reasonably use it as the best available scientific means for evaluating the proposed solutions.

**\*17** Moreover, the Court will only reject the Secretary's choice of model "when the model bears no rational relationship to the characteristics of the data to which it was applied." *National Wildlife Fed'n v. EPA,* 286 F.3d 554, 565 (D.C.Cir.2002) (citations and internal quotation marks omitted). Here, the CAM was intended to measure only three of the various management measures that were adopted in Amendment 13: area closures, DAS restrictions, and trip limits (*i.e.,* quotas on the amount of fish a vessel may catch per trip). (A.R. 166 at C293-94.) And indeed, the CAM--within the parameters the Secretary set for it-- fulfilled its purpose, predicting that the combination of these three tools would achieve the desired F rates for all but one species in the FMP's first year of implementation (*i.e.,* 2004). 69 Fed.Reg. at 22,927. Moreover, it predicted that the remaining species--witch flounder--would achieve its target F rate by 2006. *Id.*

Indeed, there are various assumptions implicit in the CAM that may lead it to *underestimate* the effectiveness of the three studied tools: for example, some of its projections assume that ninety-five percent of DAS will be used (*see* A.R. 166 at C398 (discussing Gulf of Maine cod)), when in fact in the 2004 fishing year vessels are on track to use less than 40% of their DAS. *See* NMFS-Fishery Statistics Office, Cumulative DAS Usage by Month for Multispecies Limited Access Vesels, *available at* http://www.nero . noaa.gov/ro/fso/muldas04b.pdf (last visited Mar. 6, 2005). Similarly, with respect to the fishing mortality rate (Fmsy) for Gulf of Maine cod, the CAM did not account for the mesh

size increases required by Amendment 13. (A.R. 166 at C398.) Thus, the model's admitted imperfections could lead to the opposite result from that predicted by plaintiffs: the measures adopted based upon the CAM may prove *more* effective than predicted by the model.

Notwithstanding the CAM's usefulness as the best available science for studying the effects of the three tools it modeled, the Council acknowledged that the CAM could not analyze other management tools, and as a result, the Council expanded its analyses to account for this limitation. (*Id.* at C293.) For instance, with respect to planned mesh size restrictions, the Council relied on various published scientific studies. (*Id.* at C315, C383-85.) Defendants similarly assessed the effects of various gear restrictions. (*Id.* at C393-98.) Furthermore, in order to gauge whether fishing mortality rates and management measures would achieve the rebuilding targets, the Council employed age-based and index-based models in designing rebuilding trajectories. (*Id.* at 296-307.) Given the Secretary's reliance on additional qualitative and quantitative models and analyses to compensate for the CAM's weaknesses, his choice of the CAM as one of a number of tools for determining whether the adopted measures would have a 50% probability of success must be accepted as a reasonable exercise of discretion.

 *18 CLF next argues that Amendment 13's measures cannot reasonably be expected to have a 50% probability of success, because the new measures simply recycle old ones that have failed before. (CLF Mot. at 30-32.) There are two problems with plaintiffs' argument: first, their claim that past management efforts have been unsuccessful focuses too narrowly on a limited number of species to the exclusion of the significant improvements that have been accomplished in the fishery as a whole. Second, the past techniques that led to disappointing results have been substantially redesigned, and therefore, it cannot be assumed that the past failures will be repeated.

As for the first claim, the record shows that, al-though not all species benefited, recent years have seen an overall decrease in fishing mortality rates and an increase in the biomass of the fishery. For instance, while CLF focuses on the Georges Bank cod, whose biomass decreased from 29,170 mt in 2001 to 26,560 mt in 2002 and whose fishing mortality rate increased from 0.38 to 0.43, the majority of other species have experienced increases in their biomasses and decreases in the F rates. (A.R. 167 at C1201.) As an example, witch flounder's biomass increased from 12,300 mt to 18,300 mt, and its F rate fell from 0.76 to 0.41. (*Id.*) Of course, while these statistics may not necessarily validate the effectiveness of the management measures that have been employed, since natural forces impact a stock's health and rebuilding speed, they do provide a more balanced picture than CLF has presented. [FN15] (*See* TSF Opp'n at 14 n.9.)

> FN15. And, with respect to the Georges Bank cod, while admittedly this stock's biomass has decreased, the Secretary has taken affirmative measures to significantly accelerate the rebuilding of that stock. For instance, Amendment 13 reduces the stock's F rate by more than half, dropping it to 0.21 in 2004 from an estimated 0.43 in 2002/2003. (A.R. 166 at C117; *see also* Defs.' Opp'n at 59.) Moreover, much of the problem with rebuilding cod is beyond the Secretary's control, in that recruitment--*i.e.,* the amount of juvenile cod that grow enough to become vulnerable to fishing gear (A.R. 167 at C1166)--has been below average for the past fifteen years. (*See* A.R. Supp. 43 at 12.)

As for the second claim that defendants' track record is the best predictor of the future, plaintiffs' argument fails to account for the significant revisions in these tools. It also ignores the fact that the probability of success of an FMP cannot be measured by evaluating its individual management tools in isolation, for the overall mix of tools must be considered, and as argued by defendants, Amendment

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 555416 (D.D.C.)
**(Cite as: 2005 WL 555416 (D.D.C.))**

13's unique combination of effort reduction measures are not the same as those that were used in the past. (Defs .' Opp'n at 55-58.)

For instance, plaintiffs attack the Secretary's failure to effectively decrease the total number of DAS available to vessels. (CLF Mot. at 31-32; CLF Reply at 20.) But as a threshold matter, the DAS program revisions are not intended, as a stand-alone measure, to impact fishing mortality; rather, they set the stage for reducing allocations of DAS over time as needed. (A.R. 166 at C380.) To do this, Amendment 13 is designed to make future DAS reductions an effective vehicle for limiting fishing effort by setting DAS based on actual usage (as opposed to allocation numbers as they exist on permits, whether used or not), thereby eliminating latent capacity and making the caps more effective. (*See* A.R. 166 at C381; *see also* Defs.' Opp'n at 20 & n.5 (citing A.R. 167 at C1416).)

But even if the revisions in DAS are not designed to affect F rates in the current fishing year, the number of DAS used has nonetheless dropped significantly. DAS usage under Amendment 13 for the first nine months of the current fishing year (24,229 DAS used) has dropped 26% relative to the same period last year (30,507). *See supra* Cumulative DAS Usage by Month for Multispecies Limited Access Vessels. Plaintiffs also fail to acknowledge the significant change in how DAS are used under Amendment 13 as compared to its predecessors. Thus, although the total theoretical number of DAS available has increased under Amendment 13, the number available for fishing overfished stocks has been significantly curbed. For the first time, Amendment 13 divides DAS into two categories: unrestricted "A" which may be used to target any groundfish stock, subject to the general limitations contained in Amendment 13, and limited "B" DAS. *See* 69 Fed Reg. at 22,909. In the past, only unrestricted DAS existed, but under the new measures, these have been reduced to just 60% of the total DAS available. *Id* (discussing A DAS). The remaining 40%--the B DAS--may only be used under

certain conditions, such as in highly-regulated SAPs. The result nine months into the first fishing year following Amendment 13's promulgation is that, even as A DAS usage is at less than 50% of the total allocated for the full year, B DAS usage is even lower: only about 5% of the full year's allocation. [FN16] *See* NMFS-Fishery Statistics Office, Cumulative DAS Usage by Month and DAS Category for Multispecies Limited Access Vessels, *available at* http://www.nero.noaa.gov/ro/fso/muldas04c.pdf (last visited Mar. 7, 2005). Thus, as compared to previous FMPs, Amendment 13 strives to implement a real reduction in the number of available DAS, which in turn may enable DAS reductions to finally become a viable tool for achieving the FMP's conservation goals. [FN17] As such, the Court must reject CLF's contention that Amendment 13's treatment of DAS indicates that the current plan to end overfishing is doomed because earlier efforts involving limits on DAS produced disappointing results.

> FN16. This figure of 5% may not accurately reflect usage because there were limited opportunities to use B DAS until Framework 40-A became effective on December 28, 2004, at which time SAPs were created. *See* 69 Fed.Reg. at 67,780, 67,803 (Nov. 19, 2004). Since that time, statistics show that regular B DAS usage has expanded from a monthly rate of less than sixty DAS before Framework 40-A to nearly 400 per month since. *See supra* Cumulative DAS Usage by Month and DAS Category for Multispecies Limited Access Vessels. However, even at this accelerated rate, by January 2005, only 1,144 regular B DAS had been used, and it appears impossible that this subcategory's cap of 26,286 DAS will be reached by April 30, 2005, when the 2004 fishing year ends. *See id.*

> FN17. The more sophisticated DAS struc-

ture created by Amendment 13 also allows for more targeted effort reduction techniques. For instance, if by 2006 certain rebuilding targets are not expected to be achieved, "default measures" will automatically go into effect. These include, *inter alia*, using "differential DAS counting" to charge a premium to vessels fishing in certain areas (counting 1.5 DAS used for every day spent in the restricted zone) as a further disincentive to fishing in places where effort needs to be reduced in order for stocks to meet their rebuilding targets. *See* 69 Fed.Reg. at 22,910. The default measures will also reduce A DAS by an additional 5%. *See id.*

**\*19** CLF also cites the Secretary's past inaccurate and overly "optimistic estimations of mortality reductions." (CLF Mot. at 31.) Defendants contest the accuracy of these accusations. (*See* Defs.' Opp'n at 59-60.) But leaving the details of this debate aside, plaintiffs' premise must be rejected for a more fundamental reason. Amendment 13 contains a far broader range of measures than was previously the case. In addition to those already discussed, Amendment 13 provides for trip limits, closed areas, TACs, and gear restrictions, such as increased mesh size. *See, e.g.,* 69 Fed.Reg. at 22910-16. The limited evidence so far--such as decreased landing rates [FN18] and lower DAS usage--suggests that, in contradistinction to past problems, this FMP's measures have a more realistic probability of success.

> FN18. For instance, the latest statistics show that cod landings-- *i.e.,* the "portion of the catch that is harvested for personal use or sold" (A.R. 166 at C1163)--for the first five months of fishing year 2004, when Amendment 13 took effect, are 65% of the level a year earlier (considering all areas, including the Gulf of Maine and Georges Bank). *See* NMFS-Fishery Statistics Office, Preliminary Cod Landings by

Stock Area, Table 1.A, *available at* http://www.nero.noaa.gov/ro/fso/tac0105.pdf (last visited Mar. 7, 2005). Although clearly other factors in addition to Amendment 13, such as resource scarcity, can affect cod landings, when the declining catch figures are combined with the decreasing DAS, it is not unreasonable to infer that Amendment 13's measures are achieving some degree of success in reducing, as planned, the F rate for Georges Bank cod by half and the F rate for Gulf of Maine cod by one third. (*See* A.R. 166 at C117.)

Moreover, there is still much that is unknown about fisheries management. In such a situation, a court should be especially deferential since the agency is "making predictions, within its area of special expertise, at the frontiers of science." Baltimore Gas, 462 U.S. at 103. The failures of past management efforts do not dictate the conclusion that the Secretary's current plans must be rejected; rather, earlier errors may be attributable to fisheries science's ongoing but understandable imprecision. (*See, e.g.,* A.R. 166 at C296 ("These tables should be viewed with caution. As noted by [a scientific paper], 'Projections are based on linear rates of increase and as such they should not be used to project population trends beyond a few years.' This approach, however, is the only one available to indicate likely trends in biomass for index-based stocks.").) Relying on the "best scientific information available," 16 U.S.C. § 1851(a)(2), does not mean that that scientific data will always turn out to be right, but that is all the Secretary can reasonably do when devising an FMP for the long term. *See* NRDC v. Evans, 254 F.Supp.2d at 440.

Given the uncertainties involved in making predictions, Amendment 13 also requires periodic assessments to evaluate whether the rebuilding measures are proving successful, and if targets are not being met, various default measures will be instituted automatically to reduce mortality rates even further in 2006 and again in 2009. (A .R. 166 at C116-17;

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 555416 (D.D.C.)
(Cite as: 2005 WL 555416 (D.D.C.))

69 Fed.Reg. at 22,910.) This is yet another measure that enhances the rebuilding program's probability of success, for if the data shows it to be necessary, even more restrictive measures than planned will go into effect. *See also supra* note 17.

Plaintiffs also challenge the Secretary's selection of rebuilding goals that purportedly set the bar too low by seeking only to achieve Fmsy, rather than OY target rates, which are set at 75% of Fmsy. (A.R. 166 at C89, C94.) (CLF Mot. at 33.) But as already explained, the MSA only requires that, in the case of overfishing, OY "provide[ ] for rebuilding to a level consistent with producing the maximum sustainable yield in such fishery." 16 U.S.C. § 1802(28)(C). In other words, within a rebuilding period, there is no statutory requirement to provide a strict timetable for achieving OY. However, once stocks are rebuilt, control rules are instituted, *see, e.g.,* 50 C.F.R. § 600.310(c)(1)(ii), which may lead to further adjustments to catch levels and the attainment of OY. (*See* A.R. 166 at C96.) But at this stage, until the stocks recover, the target OY that plaintiffs fault the Secretary for failing to achieve is simply inapplicable.

*20 In sum, the Secretary relied on the best scientific information available in determining that Amendment 13's measures have at least a 50% probability of success. As such, they comply with the Circuit's holding in *NRDC v. Daley,* 209 F.3d at 754, and they are reasonable and lawful under the MSA and the APA. *See* 5 U.S.C. § 706(2)(A).

3. Does Amendment 13's EIS Comply With NEPA?

CLF also argues that defendants violated NEPA and the Secretary's own NEPA-implementing regulation by failing to consider sufficient alternative measures and for failing to adequately inform the public of significant environmental impacts of a major federal action. As explained above, NEPA requires that alternatives to proposed federal actions must be evaluated, the affected environment be described, and the proposed action's impacts, purpose and need laid out. *See* 42 U.S.C. § 4332(2)(C); *see also* 40 C.F.R. §§ 1502 *et seq.,* 1508.7, 1508.8; National Oceanic and Atmospheric Administration Administrative Order 216-6 (requiring that "[a]n EIS must provide a full and fair discussion of significant environmental impacts"). (CLF Mot. at 36-37.)

CLF quotes various criticisms by NMFS scientists that Amendment 13's EIS does not provide a "simple overview" of the proposals and background, and it "provides little perspective." (CLF Mot. at 38 (quoting A.R. 3141 at D-03-4555- 56).) Admittedly, the EIS is not a model of draftsmanship (*see* CLF Reply at 28- 29), but it is legally sufficient. *See CLF v. Mineta,* 131 F.Supp.2d at 26 n. 16 (deeming the Secretary's NEPA analysis legally sufficient but strongly recommending that future analyses be better organized and more clearly written). Particularly in light of the enormous regulatory undertaking that resulted in Amendment 13, it would have been nearly impossible to produce a "simple" overview. *See Oregon Environmental Council v. Kunzman,* 817 F.2d 484, 493-94 (9th Cir.1987) (acknowledging that "readability" must be viewed pragmatically). The purpose of an EIS is to "disclose information in terms intelligible to interested members of the public, public servants, and legislators." *Tongass,* 924 F.2d at 1142 (citations and internal quotation marks omitted). Despite its complexity and the reality that some discussions are scattered throughout an eighteen-hundred page document, as one reviewer put it, "for diligent and well-organized readers and decision-makers, the DSEIS provides enough data to make informed choices on preferred alternatives." (A.R. 3738 at D-04-394.) Accordingly, the Court will not "fly speck" the EIS. *See Colorado Envtl. Coalition v. Dombeck,* 185 F.3d 1162, 1172 (10th Cir.1999). Rather, the Court assesses "whether there is a reasonable, good faith, objective presentation of the topics." *Id.* (citations and internal quotation marks omitted).

In the instant case, the Secretary has met that standard. The EIS discusses repeatedly throughout the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                     Page 22
Not Reported in F.Supp.2d, 2005 WL 555416 (D.D.C.)
**(Cite as: 2005 WL 555416 (D.D.C.))**

document the effects of overfishing, ranging from the implications of allowing it to continue on a short-term basis to its impact on the rebuilding trajectories, and it analyzes the impacts of alternative approaches, including the use of a constant fishing mortality rate. (A.R. 166 at C85-86, C103-117, C119, C265, C296-338, C645.) The document also acknowledges that certain stocks, such as the yellowtail flounder and the Georges Bank cod, have only shown gradual improvement and thus warrant further action, including the adjustment of F rates and the creation of management tools designed to achieve the designated rates. (*See* A.R. 167 at C1196-1201.) In short, the Secretary took the required "hard look" at the environmental consequences of his choices. *See NRDC v. Hodel,* 865 F.2d at 294.

**\*21** As for the claim regarding the sufficiency of alternatives, *see* 42 U.S.C. § 4332(2)(c)(iii), plaintiffs cite to the Secretary's purported failure to consider "alternatives" with a greater than 50% probability of success. (CLF Mot. at 40-41.) But this argument fails both as a matter of law and fact. First, this Circuit's 50% probability requirement is not itself a "Federal action" for which alternatives are required. *See NRDC v. Daley,* 209 F.3d at 754. Second, the Secretary *did* consider numerous options that were at least fifty percent likely to succeed, such as the constant fishing mortality rate options and options that would have achieved rebuilding with a 50% probability of success five years earlier (2009) than adopted by Amendment 13. (A.R. 166 at C182, C651-55.)

In sum, the Secretary adequately set forth the environmental impacts of the proposed action. Furthermore, within the range of alternatives that met the action's purposes, the Secretary considered an adequate array of options. He therefore complied both with NEPA and with its NOAA-specific implementing regulations. As such, plaintiffs' NEPA claim must be rejected.

C. TSF's Claims

Plaintiff TSF raises four claims. [FN19] Count One alleges that the final regulations implementing Amendment 13 violate the APA and the MSA, because the Secretary so materially changed the regulations from those approved by the Council that they were not subject to proper review procedures. In particular, plaintiff singles out three changes that allegedly contravene the regulations as approved by the Council: 1) the Secretary's deletion of SAPs that enabled fishers to make effective use of restricted B DAS, which were instituted as a stop-gap measure to compensate in part for Amendment 13's reduction in unrestricted DAS; [FN20] 2) the Secretary's management of the Georges Bank yellowtail flounder fishery by use of a hard TAC of 6,000 mt instead of the 11,713 mt approved by the Council (*compare* 69 Fed.Reg. at 22,912 *with id.* at 22,915); and 3) the Secretary's acceleration of the reduction in F rates, rather than the Council-approved gradual phase-in, which would have provided for a greater period of economic adjustment for fishers. (TSF Compl. at 20-22; TSF Mot. at 2-3.)

> FN19. Pursuant to TSF's and defendants' joint motion, this Court stayed TSF's Counts II and IV-VI on December 9, 2004.

> FN20. As TSF concedes, its substantive objection to the deletion of these SAPs has been satisfied by implementation of Framework 40-A, which became final on December 28, 2004. *See* 69 Fed.Reg. at 67,780, 67,787-90 (creating equivalent of the disallowed Haddock SAP). (TSF Reply at 13-14; *see* Defs.' Surreply at 2 n.2, 6.) However, TSF submits that it has still suffered a procedural injury. (TSF Reply at 14.) This contention is the subject of the mootness discussion herein.

Count Three alleges that the Secretary violated the APA and the MSA by failing to include certain measures in Amendment 13 that, in accordance with MSA National Standard Eight, would have "minimize[d] adverse economic impacts on [fishery] communities." 16 U.S.C. § 1851(a)(8).

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                                      Page 23
Not Reported in F.Supp.2d, 2005 WL 555416 (D.D.C.)
**(Cite as: 2005 WL 555416 (D.D.C.))**

The rejected measures include the SAPs necessary for effective use of B DAS, a phase-in for F reductions, the higher yellowtail flounder TAC, and a "mixed area trips" regulation that purportedly would have increased efficiency by allowing vessels to fish in more than one designated area on a single outing, which in turn would aid fishers by allowing them to move to another area if the first area proved unsuccessful. (TSF Compl. at 23; TSF Mot. at 13-14.)

 *22 Count Seven alleges that the Secretary acted *ultra vires* by issuing a regulation, 50 C.F.R. § 648.85(a)(2)(i)(D), that allows his designee, the Northeast Region Regional Administrator, to accept and implement TACs recommended by a body other than the Council, which alone is given that power by MSA, *see* 16 U.S.C. §§ 1852-1853, and whose decisions the Secretary is limited to accepting, rejecting, or accepting in part. *See* 16 U.S.C. § 1854. (TSF Compl. at 25-26.) Pursuant to the United States/Canada Resource Sharing Understanding, the Regional Administrator enforced the Trans-Boundary Management Guidance Committee's ("TMGC") hard TAC of 6,000 mt for Georges Bank yellowtail flounder, rather than the 11,713 mt TAC initially recommended by the Council in Amendment 13. (TSF Mot. at 11-12 (citing 69 Fed.Reg. at 22,912, 22,915, 59,815).)

Finally, Count Eight alleges that Amendment 13's final regulatory flexibility analysis ("FRFA") does not comply with the requirements of the Regulatory Flexibility Act ("RFA"), 5 U.S.C. § 604, because it "rejects economically ameliorative alternatives without rational bases and it predicates its economic and social impact assumptions, analyses and comparisons on fishing effort" that Amendment 13, as implemented by the Secretary, inhibits. (TSF Compl. at 26.)

The Court first addresses whether several of plaintiff's contentions are moot. It then turns to the Secretary's purported illegal deviations from the Council's Amendment 13 recommendations. Finally, the Court reaches the legality of the challenged NMFS regulation authorizing defendants' Regional Administrator to implement certain quotas recommended by the TMGC, as opposed to those recommended by the Council.

1. Are Plaintiffs' Claims in Counts One, Three and Eight Moot?

Defendants contend that Counts Three and Eight are moot because Framework 40-A implements the specific measures that plaintiff claims were improperly excluded from Amendment 13, and plaintiff therefore cannot demonstrate a substantive injury sufficient to invoke this Court's jurisdiction. (Defs.' Opp'n at 72-76 & n.30; Defs.' Surreply at 2-6.) Similarly, defendants argue that TSF's Count One is moot insofar as it relates to the failure to create a Closed Area II Haddock SAP because Framework 40-A has now created this SAP. (Def.'s Opp'n at 75 n.29.)

The Court has an "an affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority." *Grand Lodge of Fraternal Order of Police v. Ashcroft,* 185 F.Supp.2d 9, 13 (D.D.C.2001). For this Court to rule on an issue raised in plaintiff's complaint, it must present a live case or controversy. *Lewis v. Continental Bank Corp.,* 494 U.S. 472, 477-79, 110 S.Ct. 1249, 108 L.Ed.2d 400 (1990). "Even where litigation poses a live controversy when filed, the [mootness] doctrine requires a federal court to refrain from deciding it if 'events have so transpired that the decision will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future.' " *Clarke v. United States,* 915 F.2d 699, 701 (D.C.Cir.1990) (quoting *Transwestern Pipeline Co. v. FERC,* 897 F.2d 570, 575 (D.C.Cir.1990)). Where intervening events preclude the Court from granting plaintiff any effective relief, even if it were to prevail on its underlying claims, the Court must dismiss a claim as moot for want of subject matter jurisdiction. *Church of Scientology of Cal. v. United States,* 506 U.S. 9, 12-13, 113 S.Ct. 447, 121 L.Ed.2d 313 (1992). *See, e.g., Murphy v. Hunt,* 455 U.S. 478, 481-82, 102 S.Ct.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                                    Page 24
Not Reported in F.Supp.2d, 2005 WL 555416 (D.D.C.)
**(Cite as: 2005 WL 555416 (D.D.C.))**

1181, 71 L.Ed.2d 353 (1982); *Burlington N. R.R. Co. v. Surface Transp. Bd.,* 75 F.3d 685, 688 (D.C.Cir.1996).

   *\*23* Where a regulation has been superseded, a challenge to the earlier rule is moot. *See Gulf of Maine Fisherman's Alliance v. Daley,* 292 F.3d 84, 88 (1st Cir.2002) (holding that the promulgation of a new framework governing a fishery is an intervening event that moots challenges to "either procedural failures or substantive deficiencies associated with a [defunct] regulation") (citing *Save Our Cumberland Mountains, Inc. v. Clark,* 725 F.2d 1422, 1432 n. 27 (D.C.Cir.1984) and *NRDC v. United States Nuclear Regulatory Comm'n,* 680 F.2d 810, 813-15 (D.C.Cir.1982)); *see also Associated Fisheries of Me. v. Evans,* 350 F.Supp.2d at 255. Because plaintiff concedes that the substantive relief it seeks in these counts has been provided by Framework 40-A, these counts have been reduced to procedural rights claims. (*See* TSF Reply at 15 & n.13.) In such a situation, the mootness analysis "bears close affinity" to the question of whether a party has standing to raise a claim, *see Warth v. Seldin,* 422 U.S. 490, 499 n. 10, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975), and as this Circuit has held, a plaintiff seeking to vindicate procedural rights must " 'show[ ] not only that the defendant's acts omitted some procedural requirement, but also that it is substantially probable that the procedural breach will cause the essential injury to the plaintiff's own interest." ' *Ctr. for Law & Educ. v. Dep't of Educ.,* 396 F.3d 1152, 1159 (D.C.Cir.2005) (quoting *Fla. Audubon Soc'y v. Bentsen,* 94 F.3d 658, 664-65 (D.C.Cir.1996) (en banc)). In other words, a plaintiff "must show *both* (1) that [its] procedural right has been violated, *and* (2) that the violation of that right has resulted in an invasion of [its] concrete and particularized interest." *Id* . (emphasis in original). A "mere procedural misstep *per se*" is an insufficient injury to proceed with a procedural rights case. *Id.* at 1160.

Here, Framework 40-A has eliminated the economic injury plaintiff relies on in Counts Three, Eight,

and One (insofar as it relates to the failure to create SAPs), and, therefore, these claims must be dismissed as moot. *See* 69 Fed.Reg. at 67,780 ff. (creating SAPs, implementing the "B" DAS pilot program, and permitting mixed area trips). The Court cannot afford plaintiff any effective relief, for an intervening event--namely, Framework 40-A--has adopted the desired provisions which the Secretary had previously disallowed pursuant to 16 U.S.C. § 1854(a)(3). "In effect, [the earlier fishery management plan's] deficiencies have been eliminated by the promulgation of [a] new Framework[ ]." *Gulf of Maine Fisherman's Alliance,* 292 F.3d at 88.

Further, plaintiff's contention that, had the Council had the opportunity to consider the implications of the FMP as approved by the Secretary, it might have reached different conclusions regarding the mix of alternatives to recommend is simply too speculative to pass muster. *See Florida Audubon Soc'y,* 94 F.3d at 670 (rejecting a "protracted chain of causation") ("The greater number of uncertain links in a causal chain, the less likely it is that the entire chain will hold true."). (*See also* Defs.' Surreply at 7-8.) This is the case here since Framework 40-A admittedly ameliorates plaintiff's economic injury (*see* TSF Reply at 15 n.13) by adopting the very proposals plaintiff has advocated. (*See, e.g.,* TSF Reply at 3-7.) In short, because plaintiff has no current injury that can be remedied, TSF's claims under the MSA, APA and RFA are moot, and Counts Three, Eight, and One as it relates to SAPs are dismissed with prejudice.

**2. Did Defendants Follow the Council's Recommendations in Amendment 13 (Count One)?**

   *\*24* In the surviving portions of Count One, TSF contends that the Secretary illegally deviated from the policies proposed by the Council in Amendment 13. The purported deviations consist of phasing in F rate reductions faster than proposed by the Council and of applying the TMGC's hard TAC for Georges Bank yellowtail flounder, rather than the quota previously adopted by the Council. (TSF Mot. at

Not Reported in F.Supp.2d    Page 25
Not Reported in F.Supp.2d, 2005 WL 555416 (D.D.C.)
**(Cite as: 2005 WL 555416 (D.D.C.))**

21-23, 27-28.) In TSF's view, the Council's recommendations became final at its November 6, 2003 meeting and could not be changed thereafter.

Plaintiff relies on the legal principle that the Secretary has only limited powers in reviewing a Council's recommendations: he may only approve, disapprove, or partially approve an Amendment, and any disapproval or partial approval must be based on an identified inconsistency with governing law, including the ten National Standards. *See* 16 U.S.C. § 1854(a)(3); 50 C.F.R. § 600.305(a)(2). TSF further contends that the Secretary must defer to the judgment of the Council and apply what is akin to a clear error or abuse of discretion standard of review, not a *de novo* standard (TSF Mot. at 17 n.15 (quoting *J.H. Miles & Co., Inc. v. Brown,* 910 F.Supp. 1138, 1159 (E.D.Va.1995)), and under that standard, the Secretary has illegally substituted his own judgment for that of the Council.

These arguments lack factual support. The record plainly shows that the Secretary adopted the very recommendations made by the Council. That several of these decisions were taken at a subsequent meeting of the Council or were contained in the Council's final version of Amendment 13 as submitted to the Secretary does not change the fact that defendants adopted the Council's recommendations without modification. Therefore, the Secretary did not and could not inform the Council of "the nature of [the] inconsistencies" with governing law, *see* 16 U.S.C. § 1854(a)(3)(B), because the Secretary did not identify any such problems pertaining to the policies singled out by the plaintiff. Instead, the Secretary implemented the Council's recommendations.

Plaintiff's confusion about the speed of the F phase-in is traceable to TSF's focus on the transcript of the Council's November 6, 2003 meeting, which leads plaintiff to ignore the fact that the Council's *actual* proposal to the Secretary came in the form of Amendment 13 itself, which was submitted on December 1, 2003 and which contained the precise specifications later adopted by the Secretary. (*See*

A.R. 166 at C1.) At the November meeting, a Council member referred to specific phase-in targets that were presented in draft form to the Council on that date and which were less restrictive than those the Council ultimately proposed in Amendment 13. (*See* A.R. 26 at A5111-12.) However, this mere reference to preliminary numbers during an hours-long discussion does not demonstrate that the Council adopted those numbers. Moreover, this understanding is validated by subsequent correspondence that indicates that "[t]he Council did not vote on any motion that adopted [those] fishing mortality rates." (A.R. 3553 at D-03-6863.) Further, the Council clearly demonstrated its intent to leave the computation of various final figures to its Plan Development Team ("PDT"). (*See* A.R. 26 at A5118.) In fact, a suggestion by the chairman to limit the PDT's role to simply computing DAS reductions based on the specific F targets already before the Council was rejected, and the Council instead directed its PDT to flesh out the specifics during the following three weeks (before the final Amendment 13 was submitted on December 1). (*See id.* at A5112; *see also id.* at A5116.)

**\*25** In the end, the F targets being phased in by the Secretary are precisely those adopted by the Council in its final version of the Amendment as submitted to defendants. *See* 68 Fed.Reg. at 74,939. In Amendment 13, the Council was explicit: "the Council is not following the trajectories shown in [the table before the Council at the November 6 meeting]." (A.R. 166 at C105.) Rather, the Council formally proposed an accelerated phase-in, which the Secretary implemented in Amendment 13. (*See id.* at C115-18.) Thus, no reasonable reading of the record supports plaintiff's contention that the Secretary illegally deviated from the fishing mortality rates submitted by the Council. Rather than supplementing his own expertise or judgment for the Council's, he followed its recommendations, pursuant to 16 U.S.C. § 1854(a)(3).

Similarly, plaintiff's objection to the Secretary's implementation of a 6000 mt hard TAC for yellowtail

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

flounder must be rejected, because the Council adopted that very TAC on January 28, 2004. (A.R. 27 at 5149.) The Secretary reasonably incorporated this revision into the version of Amendment 13 published for public notice and comment in the Federal Register the following day. 69 Fed.Reg. at 4370. Although printing lead times required by the Office of the Federal Register meant that the Secretary had already submitted the Amendment for publication prior to the Council's final action, the Secretary was merely effectuating the Council's prior decision to incorporate TMGC's quotas into Amendment 13. The Council had already stated in its final Amendment 13, as submitted to the Secretary, that the Council had voted at its public July 2002 meeting to incorporate the US/Canada Understanding into the Amendment, and that American vessels would not exceed the allocations set under the Understanding. (A.R. 166 at C123.) Although the TMGC did not formally endorse the 2004 quotas until mid-December 2003, the TACs were "expected," and Council approval of them was virtually assured by its prior decision to incorporate the Understanding into Amendment 13. 69 Fed.Reg. at 4370. Moreover, the Federal Register notice made clear that if the Council unexpectedly did not ratify the quotas from the Understanding, whatever other decision was taken would be subject to another round of notice and comment. *Id.* As it turned out, the Council adopted the TACs, which were incorporated into the proposed Amendment 13 and were the subject of notice and comment. Therefore, Count One is dismissed with prejudice.

3. Is the Regulation Authorizing the Regional Administrator to Implement TMGC's Hard TACs Invalid (Count Seven)?

In Count Seven, TSF alleges that the Secretary acted illegally in promulgating 50 C.F.R. § 648.85(a)(2)(i)(D), which authorizes the NMFS Regional Administrator to implement the TMGC's recommended hard TACs in the event that they differ from those recommended by the Council. TSF argues that this measure was not a part of Amend-

ment 13, and its promulgation was therefore not authorized by the MSA and thus *ultra vires* because the power it purports to confer "eschew[s] legally-mandated processes for approving or disapproving Council regulations." (TSF Mot. at 40; *see also* TSF Reply at 20-23.)

**\*26** TSF's objection is well taken. Although the Council generally adopted the US/Canada Understanding as a part of Amendment 13, including its formula for calculating the hard TACs for the Georges Bank (A.R. 166 at C123), and although the Council specifically recommended implementation of the 2004 TMGC quotas (A.R. 27 at 5149), Amendment 13 also made clear that the Council had to approve the TMGC's annual recommendations before they could be implemented. (A.R. 166 at C124 ("Note that for the U.S. fishery, all harvest levels and any measures must be approved and submitted by the Council before implementation. This provides opportunity for public comment. If the Council or [the Gulf of Maine Advisory Committee] disagree with TMGC recommendations, they will be referred back to the TMGC for further refinement.").)

In effect, the challenged regulation allows the Secretary to do an end run around the Council. It provides that "[i]f the recommendation of the Council is not consistent with the recommendation of the TMGC, the Regional Administrator may select either the recommendation of the TMGC, or the Council." 50 C.F.R. § 648.85(a)(2)(i)(D). The plain language of the regulation is clearly inconsistent with Amendment 13.

In response, defendants argue that the Secretary has broad authority to promulgate regulations in order to effectuate a FMP, and that the challenged regulation is required to give effect to Amendment 13's endorsement of the broad outlines of the US/Canada Understanding. [FN21] (Defs.' Opp'n at 76-79.) Although it is indisputable that the Secretary has "general responsibility to carry out" Amendment 13 and that he may "promulgate such regulations, in accordance with [the APA], as may be ne-

cessary to discharge such responsibility," 16 U.S.C. § 1855(d), his powers are limited. "The Magnuson-Stevens Act is clear that when the Secretary is presented with proposed amendments and regulations, he does not have the independent authority to, *sua sponte,* add a regulation that is inconsistent with the proposal from the Council." *Connecticut v. Daley,* 53 F.Supp.2d 147, 160-161 (D.Conn.1999) (citing *Midwater Trawlers Coop. v. Mosbacher,* 727 F.Supp. 12, 16 (D.D.C.1989)); *see also Associated Fisheries of Me. v. Evans,* 350 F.Supp.2d at 253, 255. In particular, although the Secretary has broad authority to implement a FMP, he may not deviate from a council's recommendation except as provided by statute. He may only "approve, disapprove, or partially approve a plan or amendment," 16 U.S.C. § 1854(a)(3), and where he takes any action other than to fully approve a plan or amendment, he must give the council written notice of his action, as well as state the legal flaw in the council's proposal and recommend corrective action to the council. *Id.* In short, the more specific terms of § 1854 serve as a limit on the Secretary's broad regulatory powers described in § 1855. *See Gozlon-Peretz v. United States,* 498 U.S. 395, 407, 111 S.Ct. 840, 112 L.Ed.2d 919 (1991) ("A specific provision controls one of more general application.").

> FN21. The United States/Canada Resource Sharing Understanding is not a treaty, formal international agreement, or memorandum of understanding. Rather, it is an "informal agreement" between the two nations. (A.R. 166 at C122.)

**\*27** In this case, the Secretary never gave notice that he was deviating from Amendment 13's recommendation that the Council must assent to TMGC's annual TAC proposals before they could be implemented by the Secretary. [FN22] Nonetheless, defendants cannot plead ignorance, for they were informed weeks before publication of the proposed regulation in the Federal Register that granting the Regional Administrator power to override the Council in this manner conflicted with the Amend-

ment and had not been authorized. (A.R. 3717 at D-04-297.) *See Public Citizen,* 124 S.Ct. at 2214 (a regulatory document's "flaws might be so obvious that there is no need for a commentator to point them out specifically in order to preserve its ability to challenge the proposed action" and "the agency bears the primary responsibility to ensure that it complies with" governing law).

> FN22. This failure to provide any notice, either to the Council or in the version of Amendment 13 published for public notice and comment, that the Secretary was deviating from the Council's recommendation disarms defendants' complaint that TSF failed to comment on the proposed regulation "in order to allow the agency to give the issue meaningful consideration." (*See* Defs.' Opp'n at 79 (quoting *Dep't of Transp. v. Public Citizen,* 541 U.S. 752, 124 S.Ct. 2204, 2213, 159 L.Ed.2d 60 (2004) (discussing NEPA)).) Moreover, in the context of the MSA, courts have entertained objections to the Secretary's actions even where plaintiffs did not comment on the proposed regulation. *See, e.g., Stinson Canning Co., Inc. v. Mosbacher,* 731 F.Supp. 32, 34 (D.Me.1990). In any event, TSF did submit general comments noting that the ultimate Amendment adopted by the Secretary should conform to the Council's intent, which is the ultimate legal issue here. (A.R. 3752 at D-04-592.)

In light of the Secretary's improper substitution of his own recommendation in place of the Council's, the Court is constrained to hold that the third sentence of 50 C.F.R. § 648.85(a)(2)(i)(D) was adopted in violation of the MSA and therefore cannot be enforced.

Defendants nevertheless submit that TSF's argument fails to credit the remainder of the challenged provision's language, which specifically provides for notice and comment prior to implementing a TAC at odds with the Council's recommendation.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

*See* 50 C.F.R. § 648.85(a)(2)(i)(D) ("NMFS shall review the Council's recommendations and shall publish in the Federal Register the proposed TACs and provide a 30-day public comment period. NMFS shall make a final determination concerning the TACs and will publish notification of the approved TACs and responses to public comments in the Federal Register."). It may well be that the Secretary *does* possess the legal powers he claims in the challenged regulation, so long as he complies with the requirements of the MSA, the APA and other governing law. *See, e.g.,* 16 U.S.C. § 1855(c) (discussing emergency and interim measures, which the Secretary may implement without Council approval for up to 360 days); 16 U.S.C. § 1854(c) (discussing Secretarial measures that may be taken where, for instance, a council fails to act within a reasonable time). "However, the Secretary's authority to promulgate interim measures to reduce overfishing is legally and historically distinct from his power to issue rules to implement [fishery management plans] and amendments." *Associated Fisheries of Me. v. Evans,* 350 F.Supp.2d at 255. Thus, regardless of whether the Secretary might legally be able to either unilaterally impose TMGC's proposed TACs or promulgate, outside of a rulemaking proceeding implementing a FMP, a regulation identical to the one rejected here, he could not promulgate the challenged regulation as part and parcel of the Amendment 13 approval process, because it is directly at odds with the Amendment as submitted by the Council.

Given the Council's broad endorsement of the US/Canada Understanding, as well as the Council's demonstrated track record of adopting the TMGC's proposed TACs, it may be true that the Regional Administrator would not have cause to overrule the Council in the manner envisioned by the disallowed provision of 50 C.F.R. § 648.85(a)(2)(i)(D). This improbability, however, does not cure the problem. [FN23] Therefore, the Court grants summary judgment in favor of TSF on Count Seven.

    FN23. At the February 25, 2005 hearing,

the Secretary argued for the first time that plaintiff's challenge to this regulation is not yet ripe, because the Regional Administrator has not yet overridden the Council's recommendations in adopting the TMGC's TACs, and plaintiff has therefore not been "adversely aggrieved." (Hearing Transcript at 73.) However, plaintiff raises a facial challenge to the regulation, and as such, TSF need not wait for the Regional Administrator to invoke her powers under it. *See* Hudson v. FAA, 192 F.3d 1031, 1035 n. 3 (D.C.Cir.1999) (citing *JEM Broadcasting Co., Inc. v. FCC,* 22 F.3d 320, 325-26 (D.C.Cir.1994)) ("A rule of agency procedure, by contrast, will typically be ripe on a facial challenge."); *see also* Better Government Ass'n v. Dep't of State, 780 F.2d 86, 95-96 (D.C.Cir.1986) (holding that, where a challenge to an agency regulation involves "purely legal issues," a facial claim concerning the regulation's inconsistency with governing law is ripe for review).

**II. Essential Fish Habitat**

**A. Background**

 **\*28** The 1996 SFA made protection of EFH a priority. It defines EFH as "those waters and substrate necessary to fish for spawning, breeding, feeding or growth to maturity." 16 U.S.C. § 1802(10). Without protective measures, groundfish EFH can be harmed by certain types of fishing gear and methods, like scallop dredges and bottom trawls. (A.R. 1438 at D-02-679.) Such devices disturb the ocean bottom, particularly gravel and sand substrate that is an important environment for juvenile groundfish, such as cod. (A.R. 54 at B1743.) These areas provide protective cover from predators and may have a substantial effect on recruitment and on cod survival beyond the juvenile stage. (A.R. 49 at B1327; A.R. 69 at B2762.)

Thus, in order to preserve such vital habitat, the

Not Reported in F.Supp.2d                                                                    Page 29
Not Reported in F.Supp.2d, 2005 WL 555416 (D.D.C.)
**(Cite as: 2005 WL 555416 (D.D.C.))**

MSA now requires that FMPs "describe and identify [EFH] for the fishery ..., minimize to the extent practicable adverse effects on such habitat caused by fishing, and identify other actions to encourage the conservation and enhancement of such habitat." 16 U.S.C. § 1853(a)(7). The Secretary subsequently promulgated a regulation that, in addition to the provisions included in the MSA itself, further allows for the designation of a subset of EFH as a Habitat Area of Special Concern ("HAPC"). *See* 50 C.F.R. § 600.815(a)(8).

The designation of EFH protective measures is a federal action that must comply with NEPA, which, as explained above, is essentially a procedural statute, *see Robertson,* 490 U.S. at 350-51, that requires an agency to consider the environmental effects of its actions, as well as a reasonable range of alternatives to its proposed actions. 42 U.S.C. § 4332(2)(C). This evaluation takes the form of a "detailed statement," *see id.,* called an Environmental Impact Statement ("EIS"). While an EIS should "[r]igorously explore and objectively evaluate all reasonable alternatives," 40 C.F.R. § 1502.14, and an agency may not limit itself to only one end of the spectrum of possibilities, *see, e.g., Sierra Club v. Watkins,* 808 F.Supp. 852, 872 (D.D.C.1991), the decisionmaker need not evaluate all conceivable options. *Vermont Yankee,* 435 U.S. at 551. Rather, the adequacy of an EIS is evaluated according to a "rule of reason" standard. *Tongass,* 924 F.2d at 1140.

In *AOC,* Judge Kessler considered a variety of Environmental Assessments ("EAs") that had been produced by five regional councils, including the New England Council. According to the Court's findings, the EA relating to the New England fishery contained only one section on environmental impacts of the proposed measures that was one paragraph long and essentially discussed currently existing management measures. Moreover, the EA considered only three options: the status quo, the EFH Amendment proposed by the Council, and a total closure of the habitat area of particular con-

cern to all fishing gear. It lacked any discussion of the long-term impacts of any of these options. 183 F.Supp.2d at 7.

**\*29** Despite this lack of detailed analysis, the Court rejected plaintiffs' MSA and APA challenges to the Council's EFH Amendment. *Id.* at 14. The Court found that the Secretary approved the Amendment after considering whether it complied with the MSA given the best available scientific evidence, and it was reasonable to conclude that additional protective measures were not needed, given those already in place and the lack of available scientific evidence on the adverse effects of fishing gear. *Id.* at 14-15.

The *AOC* Court did, however, find that defendants had violated NEPA and the governing regulations. *Id.* at 20. The Court found that all of the EAs prepared by the five councils failed to properly consider whether a more comprehensive EIS was required, [FN24] and most importantly, they failed to consider all relevant and feasible alternatives and to fully explain the environmental impact of the proposed action and alternatives. *Id.* at 20-21. Finding that defendants' EAs violated NEPA, the Court ordered defendants "to perform a new and thorough EA or EIS as to each EFH Amendment, in compliance with the requirements of NEPA." *Id.* at 21. Following this decision, the parties entered into a Joint Stipulation, which, in pertinent part, provided that:

> FN24. An EA is essentially an abbreviated EIS. In some circumstances, an agency may choose to prepare an EA, which is a "concise public document ... that serves to (1) Briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact ["FONSI"]." 40 C.F.R. § 1508.9(a). An EA must also briefly discuss alternatives to the proposed action. *Id.* § 1508.9(b). If the agency, after completing an EA, determines that a full EIS is not necessary, it pre-

pares a FONSI that sets forth the reasons why the action has no significant impact on the environment. *Id.* § 1501.4, 1508.13. *See AOC,* 183 F.Supp.2d at 17- 18.

Each EIS (or, where appropriate, the portions thereof relating to EFH) prepared pursuant to this Joint Stipulation and Order will consider a range of reasonable alternatives for minimizing the adverse effects (as defined by the EFH regulations at 50 C.F.R. § 600.810) of fishing on EFH, including potential adverse effects. This range of alternatives will include "no action" or status quo alternatives and alternatives setting forth specific fishery management actions that can be taken by NMFS under the Magnuson-Stevens Act. The alternatives may include a suite of fishery management measures, and the same fishery management measures may appear in more than one alternative.

(A.R. 1331 at D-01-3105-06 ¶ 6.)

Consistent with the requirements of the Joint Stipulation, the Secretary has now prepared a full EIS, not merely an EA. The Secretary considered nearly two dozen different options for protecting EFH, many of which had several subparts. These analyses span forty pages. (A.R. 166 at C160-166, C250-263, C272-92.) Among the options considered were closing various essential fish habitats to fishing, expanding the list of gears prohibited in closed areas, requiring better monitoring systems on vessels, and reducing fishing effort such as by allowing fishers fewer DAS. (*Id.*) The Secretary also considered preserving the status quo, *i.e.,* taking no action "specifically intended to protect essential fish habitat or reduce impacts associated with fishing." (*Id.* at C250.) Amendment 13 does not designate any new HAPCs, but it does incorporate a preexisting one that protects juvenile cod. 69 Fed.Reg. at 22,923. (*See also* A.R. 166 at C162.)

B. Oceana's Claims

**\*30** Plaintiff Oceana nevertheless contends that the Secretary violated the MSA, NEPA, and the APA

by not adequately evaluating sufficiently large geographic areas for closure to fishing in order to protect EFH and by failing to consider the designation of additional HAPCs. Both NEPA and the Secretary's implementing regulations under the MSA require consideration of a range of alternative measures that could be taken to address adverse effects on EFH, *see* 42 U.S.C. § 4332(2)(C)(iii); 50 C.F.R. § 600.815(a)(2)(ii), and according to Oceana, defendants did not consider an adequate range of alternatives in determining how to protect EFH, but, in violation of the SFA, they only considered options less protective of EFH than the status quo in existence at the time of *AOC. See* 16 U.S.C. § 1853(a)(7). (Oceana Mot. at 28, 31.) Oceana does not, however, contend that the alternative adopted by the Amendment to address adverse impacts to EFH is unreasonable. (*See* Defs.' Opp'n at 80 n.32.)

1. Does the EIS Consider An Adequate Range of Alternatives for Protecting EFH in Compliance With NEPA?

As argued by Oceana at the hearing on this matter, the question of whether the Secretary considered an adequate range of alternatives breaks down into two subparts: (1) whether Oceana is correct to focus on habitat closures as an important means to protect EFH, such as for the depleted stocks of juvenile cod; and (2) if closing areas is indeed the appropriate focus of EFH protection measures, then was the range of alternatives considered by the Secretary reasonable? (Hearing Transcript at 81.)

As to the first question, the record establishes that closing areas is indeed an effective means of protecting EFH, but it cannot be read to support the conclusion that such measures must be the primary focus of such efforts. [FN25] While it is true, as argued by Oceana (*id.*), that a report of a NMFS-sponsored conference found that spatial closures are "an important tool to minimize gear impacts on habitat" in order "[t]o protect critical and/or vulnerable habitat areas," (A.R. 1438 (Gear Effects Workshop Report) at D-02- 682), the report also recognized that other methods are likewise important, in-

cluding effort reduction (such as cutting fishers' DAS) and gear modification (*e.g.,* making otter trawls lighter and lowering the turbulence associated with them). (*Id.* at D-02-664.)

> FN25. In this regard, it is significant to note that neither the MSA nor the Joint Stipulation mentions closures, and as is clear from NMFS regulations, there are numerous options for managing adverse effects from fishing which may include, but are not limited to:
>
> (A) *Fishing equipment restrictions.* These options may include, but are not limited to: seasonal and area restrictions on the use of specified equipment, equipment modifications to allow escapement of particular species or particular life stages (*e.g.,* juveniles), prohibitions on the use of explosives and chemicals, prohibitions on anchoring or setting equipment in sensitive areas, and prohibitions on fishing activities that cause significant damage to EFH.
>
> (B) *Time/area closures.* These actions may include, but are not limited to: closing areas to all fishing or specific equipment types during spawning, migration, foraging, and nursery activities and designating zones for use as marine protected areas to limit adverse effects of fishing practices on certain vulnerable or rare areas/species/life stages, such as those areas designated as habitat areas of particular concern.
>
> (C) *Harvest limits.* These actions may include, but are not limited to, limits on the take of species that provide structural habitat for other species assemblages or communities and limits on the take of prey species.
>
> 50 C.F.R. § 600.815(a)(2)(iv)(A)-(C).

Other sources cited by plaintiff in support of the argument that area closures are a superior alternative actually acknowledge the necessity of limiting this alternative's use in order to account for other pur-

poses required by the MSA. (*See, e.g.,* A.R. 54 at B1746-47 (discussing an area rotation system that leaves most areas open to fishing); A.R. 2404 at D-02-4631 (recognizing that certain areas, such as Georges Bank gravel habitat, have a high priority for protection, whereas other areas are less vulnerable and warrant lower priority, particularly in southern New England, where such areas are "dominant"); A.R. 2265 at D-02-4103 (noting that while complex hard bottoms are very important to certain groundfish, "it can be argued that closing [sand] areas in the [Mid-Atlantic Bight] are not needed to protect [Northeastern] species," even though a number of such closure alternatives were considered).)

**\*31** Furthermore, plaintiff's contention that area closures must be the focal point of EFH protection measures is contradicted by the findings of the National Research Council ("NRC"), which concluded that effort reduction, *not* area closures, is the "cornerstone" for mitigating the adverse effects of trawls and dredges on seafloor habitat. 69 Fed.Reg. at 22,922. More importantly, the NRC acknowledged that area closures, in addition to other measures, are an important component of a plan for protecting EFH, and therefore, it recommended a mix of measures--consisting of effort reduction, gear modifications, and area closures--as the most effective means of protecting EFH, rather than focusing on one approach to the exclusion of the others. *Id.* Thus, the NRC report does not buttress Oceana's singular focus on area closures.

In short, although the record establishes that area closures are an important EFH protective measure that must be analyzed, area closures are an alternative that must be considered *in conjunction* with other EFH measures. Therefore, the Court cannot conclude that the range of alternatives should be limited to a spectrum of closures.

Given this answer to Oceana's first question, its second inquiry must be modified to ask whether, in light of habitat closure's role as one of several methodologies for protecting EFH, the Secretary considered adequate alternatives that included area

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

closures as a constituent part of a comprehensive solution for protecting EFH? In addressing this question, the Court finds the First Circuit's treatment of this very issue in *CLF v. Evans* to be instructive. There, the court rejected the argument of Oceana and CLF that the Secretary had acted unlawfully in failing to close four areas to scallop harvesting in order to protect EFH, finding that plaintiffs' contentions were "flawed to the extent that they consider the closure alternative in isolation, discounting numerous other restrictions on scallop fishing imposed by [the] Framework." 360 F.3d at 28. Those other measures included "restrictions on days at sea, catch and mesh sizes, and seasonal access to sensitive areas." *Id.* Similarly, the range of alternatives that the Secretary should have considered here is not defined solely in terms of the percentage of EFH areas that are closed, but rather must include a variety of forms of closures in combination with other EFH protection methodologies, as well. Of course, the range of alternatives warranting consideration is also defined in terms of the regulatory action's purpose, *see City of Alexandria, 198 F.3d at 867,* and therefore options that are inconsistent with the MSA need not be considered.

In stark contrast to the three options considered in *AOC* (*see 183 F.Supp.2d at 7),* defendants in this case evaluated twenty-three separate EFH protection alternatives, many with numerous sub-options. (A.R. 166 at C160-166, C250-263, C272-92.) Among these were ten different closure alternatives, each designed according to a different set of criteria and evaluated in terms of their EFH protectiveness. (*Id.*) Thus, Amendment 13's EIS is quantitatively far more expansive that the deficient EAs that Judge Kessler rejected in *AOC,* and for that reason, the analogy between this case and *AOC* does not work. (Oceana Mot. at 30.) [FN26]

> FN26. In fact, the instant case is factually more akin to Judge Kessler's ruling in *CLF v. Mineta.* There, the Court found that defendants' EFH analysis concerning New England area closures satisfied NEPA

where the EA was "almost nine pages in length, [and] cited at least six scientific studies which addressed various EFH-related issues, most notably the interaction between fishing and ocean bottom habitat." 131 F.Supp.2d at 29.

**\*32** Despite the Secretary's consideration of a far greater number of alternatives, Oceana argues that defendants did not consider a broad enough spectrum of closures, and in particular, that the range of alternatives considered was no more protective of EFH than the no action alternative (or status quo) that was before the Court in *AOC.* In making this argument, Oceana misstates the record regarding the Council's position on the no action alternative, [FN27] and unjustifiably focuses solely on the relative percentage of geographic area "closed" to certain kinds of groundfish fishing under the plan in effect prior to *AOC,* as compared to the percentage of closures considered as part of Amendment 13's EIS. (*See* Oceana's Mot. at 17- 18.) As was the case in the First Circuit, its argument is thus "flawed to the extent that it considers the closure alternative in isolation, discounting numerous other restrictions," *CLF v. Evans,* 360 F.3d at 28, and to the extent that it ignores the significant qualitative difference between a groundfish closure and an EFH closure.

> FN27. Oceana also mischaracterizes defendants' legal position and accuses them of misreading the law. (Oceana Reply at 8-9.) Defendants do *not* argue, as stated by Oceana, that "regardless of [NMFS'] statutory mandate, it is free to restrict the range of alternatives considered to alternatives no more protective of essential fish habitat than No Action." (*Id.*) Rather, it is the the Secretary's position that the no action alternative offered the *least* habitat protection of all the EFH alternatives evaluated (Defs.' Opp'n at 90-91), and that he considered "an expansive range of management measures for providing direct and indirect protection to a wide variety of

EFH for a wide variety of fish species" (*id.* at 87) in compliance with his statutory duty and regulatory commitment to undertake measures to protect EFH. (*Id.* at 79 (citing 16 U.S.C. §§ 1853(a)(7), 1855(b)(1)(A)), 83 (citing 50 C.F.R. § 600.815(a)(2)).)

In fact, Amendment 13's EIS made clear that the no action alternative "was not selected because it does not address the [Magnuson-Stevens] Act requirements to minimize, to the extent practicable, the adverse effects of fishing on EFH." (A.R. 166 at C250.) The Council deemed other alternatives to be more protective than the status quo option, and rejected the no action plan because of its EFH inadequacies. (*Id.*) Thus, rather than admitting that he subverted his commitment to consider options more protective of EFH than the no action alternative, the Secretary has consistently maintained that the non-status quo alternatives that were evaluated were bona fide measures designed to offer new protections for EFH.

Moreover, the range of alternatives evaluated by the Secretary consisted of measures that, as recommended by the NRC, applied a variety of different tools to minimize harm to EFH. Thus, some tools reduced fishing effort and controlled fishing capacity (A.R. 166 at C161), others banned or restricted to varying degrees gear types believed harmful to EFH, including considering which areas would benefit the most from these restrictions (*id.* at C160, C261-62), others considered improved monitoring systems in order to better understand fishing effort as a technique for protecting EFH (*id.* at C262), and others focused on a variety of closure options designed to protect EFH in ways not addressed by the prior groundfish closures at issue in *AOC.* (*Id.* at C161- 166, C250-263, C272-92.)

For instance, among the closure options, some were designed in particular to protect hard-bottom habitats (*id.* at C250), some sought to balance fishery productivity while protecting EFH (*id.* at C277), and some took account of closures designed for

other regulatory purposes, such as stock rebuilding or as part of the Atlantic Sea Scallop FMP. [FN28] (*Id.* at 251, 255.) The Secretary went so far as to consider closing the entire fishery to bottom-tending mobile fishing gear, including otter trawls. [FN29] (*Id.* at C288.) Also, in the scallop FMP amendment process, an alternative was addressed based on Oceana's comments. (*See* A.R. 2437 at D-02-4739.) These alternatives, as well as others, were evaluated in conjunction with other types of management tools to determine what mix of measures would best protect EFH.

> FN28. It is difficult to close areas to scallop gear without displacing the entire fishery, because unlike the harvesting of other species, in most environments scallops can only be fished using techniques that cause some degree of damage to the EFH of juvenile groundfish. (A.R. 54 at B1747.)

> FN29. This option did not warrant full consideration in the EIS because it was "unnecessary in the extreme, as some bottom-tending mobile fishing gears are not considered to have significant adverse effects on some habitat types." (A.R. 166 at C288-289.) Moreover, closing so much area, as Oceana advocates, could actually cause greater damage to the fishery as fishermen would be forced to concentrate their fishing in the smaller areas that remained available to them. Such effort displacement could lead to numerous unanticipated consequences. *See* 59 Fed.Reg. at 63,928. (*See also* A.R. 166 at C958.) *See also* CLF v. Evans, 360 F.3d at 28 (noting that the Secretary's scallop FMP EIS in fact considered the closure alternative advocated by plaintiff, but rejected it because it "would provide only limited, short-term benefits," since, *inter alia,* other non-scallop fishing would continue in the closed area).

**\*33** The Secretary also evaluated the no action plan, which closed the largest geographic area of all

the closure options, but which did so in a qualitatively different manner from the closures designed for EFH protection. That is, although the preexisting closures--such as those designed for stock rebuilding purposes or for minimizing bycatch--provided some incidental benefits to EFH (*see* A.R. 166 at C272), habitat closures created for purposes other than EFH protection do not necessarily maximize benefits to EFH. *See* 59 Fed.Reg. at 63,928 (implementing emergency groundfish closures in order to reduce fishing mortality). (*See also, e.g.,* A.R. 1438 at D-02-682.) In contrast to the closure area alternatives actually designed to protect EFH, some of the groundfish closures were only seasonal and did not bar bottom-tending gear. 69 Fed.Reg. at 22,923. (*See also* A.R. 166 at C616.) Moreover, the EFH closures were designed to last indefinitely, whereas the existing closures in the no action plan could be lifted at any time if the depleted groundfish stocks for which the areas were designed are rebuilt. (*Id.*)

For these reasons, it is overly simplistic, if not misleading, to compare the ten EFH closures and their various permutations to the no action alternative. Although the EIS does juxtapose the no action alternative with the other options with respect to the percentage of square nautical miles covered by each option (A.R. 166 at 561), fixating on closures as defined in terms of mileage or a percentage of EFH ignores the substantial differences among the options with respect to the degree of protection offered to EFH. Moreover, as explained by the Secretary, he included the no action alternative in various tables comparing the closed area alternatives only as a "point of reference.... [I]t is not directly comparable because of the type of closure it represents." 69 Fed.Reg. at 22,923.

Based on this record, the Court must conclude that the Secretary considered adequate alternatives that included area closures as a constituent part of a comprehensive solution for protecting EFH. The Secretary did not commit the same error of looking, as in *AOC,* at too narrow a range of alternatives. Fi-

nally, Oceana's assault on the details of the alternatives evaluated is misplaced, because it focuses on numbers rather than the quality of protection each of the alternatives affords, and it considers the closure alternatives in isolation. Thus, Oceana's argument that the Secretary did not properly consider an adequate range of EFH alternatives must be rejected.

But Oceana also challenges the scope of the EFH alternatives as a matter of law, arguing that defendants breached NEPA and related regulations by considering too narrow a range of options. As explained, that range must be defined consistent with the purpose of the regulatory action, and in evaluating the range's breadth, the Court grants "considerable deference to the agency's expertise and policy-making role." *City of Alexandria,* 198 F.3d at 867. Thus, plaintiff shoulders a heavy burden to demonstrate that the suite of options considered by defendants was not reasonable.

**\*34** In evaluating a NEPA challenge, the Court makes two inquiries: "[1] whether an agency's objectives are reasonable, and [2] whether a particular alternative is reasonable in light of these objectives." *Id.* In the instant case, the goal of protecting EFH to the extent practicable is set forth by statute, 16 U.S.C. § 1853(a)(7), and is clearly reasonable. Oceana's challenge focuses on the second inquiry.

In arguing that the range considered was deficient, plaintiff principally relies on a 1981 Council on Environmental Quality ("CEQ") guidance document, "Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations" ("FAQ"). (Oceana Mot. at 30.) It explains that:

For some proposals there may exist a very large or even infinite number of possible reasonable alternatives. For example, a proposal to designate wilderness areas within a National Forest could be said to involve a number of alternatives from 0 to 100 percent of the forest. When there are potentially a very large number of alternatives, only a reasonable number of examples, covering the *full spectrum* of alternatives, must be analyzed

and compared in the EIS. An appropriate series of alternatives might include dedicating 0, 10, 30, 50, 70, 90, or 100 percent of the Forest to wilderness. *What constitutes a reasonable range of alternatives depends on the nature of the proposal and the facts in each case.*

46 Fed.Reg. at 18,027 (emphasis in last sentence added). This document is merely an informal statement, however, and it does not create any additional obligations beyond those included in the NEPA regulations themselves. *See Cabinet Mountain Wilderness/Scotchman's Peak Grizzly Bears v. Peterson,* 685 F.2d 678, 682 (D.C.Cir.1982). Moreover, it must, of course, be construed consistent with the well-established body of law concerning the nature and scope of NEPA analyses. By its own terms, and consistent with *City of Alexandria's* rule that the range of alternatives is defined by the goals of an action, 198 F.3d at 867, the FAQ acknowledges that what is a reasonable range will vary depending on the facts of each case and the nature of the proposal. Thus, the FAQ, standing alone, does not advance Oceana's argument. Its example of various percentages that would reasonably be evaluated in designating forest wilderness area is inapposite, for here, as explained above, the range cannot be defined solely by looking to mere percentages of EFH closed. Rather, the inquiry is whether a range of alternatives as defined in terms of EFH protectiveness--encompassing much more than the simple percentage of closed areas--was adequately evaluated.

Oceana next points to *California v. Block,* 690 F.2d 753 (9th Cir.1982), as support for its focus on geographic percentages for defining the proper range of alternatives. There, in line with the FAQ example cited above, the court rejected an EIS that evaluated alternatives at only one end of the spectrum of possibilities in considering what portion of a national forest to designate as wilderness. The agency had only considered alternatives that protected no more than one-third of the forest. *Id.* at 768-69. But *Block* is inapposite, for here the focus was not on the relatively straightforward goal of protecting various

percentages of a forest from development, *see id.* at 767, but rather was on the more complex goal of "minimiz[ing] to the extent practicable adverse effects on [EFH] caused by fishing, and identify[ing] other actions to encourage the conservation and enhancement of such habitat." 16 U.S.C. § 1853(a)(7). This goal had to be evaluated not merely in terms of mileage closed, but also in terms of affirmative actions taken to regulate vessels' activities in the closed areas; restorative measures, such as seeding, that might be implemented to rejuvenate EFH (*see* A.R. 166 at C290); and the specific sections and types of EFH that would be closed. Thus, the goal of the action in *Block* was amenable to a numbers-based approach, whereas the purpose of Amendment 13, as it relates to EFH, is not conducive to such an approach, both because of the complexity inherent in weighing alternatives based on different tools, and because protecting EFH is not the only goal of the MSA.

**\*35** Rather, EFH must be protected to the extent *practicable,* 16 U .S.C. § 1853(a)(7), and in a manner consistent with MSA's overriding principle that conservation measures should achieve OY from the fishery on a continuing basis, 16 U.S.C. § 1851(a)(1), which may become more and more difficult the greater the closures. *See supra* note 29. In the SFA, Congress did not define "practicable" in the context of what constitutes an appropriate means of minimizing adverse effects on EFH. *See* 16 U.S.C. § 1853(a)(7). Because Congress did not speak clearly on the issue, the Secretary's interpretation of the statute warrants deference, *Chevron,* 467 U .S. at 843-44, so long as it is "reasonable and consistent with the statutory purpose." *Troy Corp. v. Browner,* 120 F.3d 277, 285 (D.C.Cir.1997). To carry out his duties, the Secretary enacted a regulation to explain the scope of an FMP's practicability analysis. "In determining whether it is practicable to minimize an adverse effect from fishing, Councils should consider the nature and extent of the adverse effect on EFH and the long and short-term costs and benefits of potential management measures to EFH, associated fish-

eries, and the nation, consistent with national standard 7 [which states that '[c]onservation and management measures shall, where practicable, minimize costs and avoid unnecessary duplication.']" 50 C.F.R. § 600.815(a)(2)(iii). Amendment 13's definition of "practicability" is consistent with this regulation: "reasonable and capable of being done in light of available technology and economic considerations." (A.R. 166 at C605.)

By contrast, Oceana's singular focus on alternatives that close fishing grounds in order to protect EFH ignores these statutory mandates and effectively reads "practicable" out of the MSA. Indeed, the First Circuit has already rejected this reading of the SFA.

> [P]laintiffs [Oceana and CLF] essentially call for an interpretation of the statute that equates "practicability" with "possibility," requiring NMFS to implement virtually any measure that addresses EFH and bycatch concerns so long as it is feasible.... The closer one gets to the plaintiffs' interpretation, the less weighing and balancing is permitted. We think by using the term 'practicable' Congress intended ... to allow for the application of agency expertise and discretion in determining how best to manage fishery resources.

*CLF v. Evans,* 360 F.3d at 28. Thus, the court construed the SFA in a manner that gives the term "practicable" real force by affording the Secretary substantial discretion in determining what EFH protection measures are realistic, and thereby defining the alternatives to be evaluated in conformity with that practicability assessment. [FN30]

> FN30. Oceana contends, however, that the Secretary's construction is inconsistent with the SFA's legislative history, because Congress intended to make EFH protection "a *required* element of fishery management plans." (Oceana Reply at 7.) *See City of Cleveland v. U.S. Nuclear Regulatory Comm'n,* 68 F.3d 1361, 1367 (D.C.Cir.1995) (agency construction of statute must be consistent with statutory

purpose and legislative history). But Oceana's point is irrelevant, for the fact that EFH protection became a mandatory provision rather than a "discretionary provision" does not mean that the Secretary lacks discretion to balance numerous factors when considering EFH protection alternatives. Rather, as even the sponsor of this latter measure conceded, "My amendment does one simple thing. It simply requires the regional councils to include measures to minimize, *to the extent practicable,* fishing impact on fish habitat." 141 Cong. Rec. H10,224 (1995) (statement of Rep. Farr) (emphasis added). *See also* H.R.Rep. No. 104-171, at 24 (1995) (incorporating practicability standard into SFA's EFH provisions).

This Court is persuaded by the First Circuit's reasoning, and therefore holds that the Secretary's interpretation of "practicable" is consistent with the statutory purpose of protecting EFH while simultaneously giving the Secretary discretion to manage fishery resources. *See* 16 U.S.C. § 1802(28)(A) (defining a fishery's OY as the amount of fish that "will provide the greatest overall benefit to the Nation, particularly with respect to food production and recreational opportunities, and taking into account the protection of marine ecosystems"). The identification of what particular combination of alternatives protects EFH and therefore warrants detailed consideration lies within the Secretary's "area of special expertise" and is entitled to deference. *Nat'l Fisheries Inst. v. Mosbacher,* 732 F.Supp. at 223. Particularly in light of the Secretary's reliance on the scientific findings of the NRC and the international experts who participated in the Northeast U.S. Fishing Gear Effects Workshop, *see* 69 Fed.Reg. at 22,922 (*see also* A.R. 1438), the Court cannot fault the Secretary's choice of options for consideration, and will not presume to substitute its own judgment for the Secretary's considerable expertise in this area. *See AOC,* 183 F.Supp.2d at 11-12 ("Where the agency decision turns on issues

Not Reported in F.Supp.2d, 2005 WL 555416 (D.D.C.)
**(Cite as: 2005 WL 555416 (D.D.C.))**

requiring the exercise of technical or scientific judgment, it is essential for judges to 'look at the decision not as the chemist, biologist, or statistician that we are qualified neither by training nor experience to be, but as a reviewing court exercising our narrowly defined duty of holding agencies to certain minimal standards of rationality." ') (quoting *Ethyl Corp. v. EPA,* 541 F.2d 1, 36 (D.C.Cir.1976) (en banc)).

 **\*36** Moreover, in constructing a regulatory action governing fishing for 23 species in an area covering hundreds of thousands of square nautical miles, virtually limitless alternatives could theoretically be evaluated, but such an undertaking is not demanded by the rule of reason. *See Tongass,* 924 F.2d at 1140. The Secretary properly identified the regulatory purpose, and considered the impacts of his decision, including giving a "hard look" at a reasonable range of practicable alternatives in light of that purpose. This is all that NEPA demands. *See NRDC v. Hodel,* 865 F.2d 288, 294 (D.C.Cir.1988). [FN31]

> FN31. Oceana contends that the Secretary acted arbitrarily by deviating from his own regulation regarding EFH protection measures. (Oceana Mot. at 32-34.) Oceana reads the regulation as requiring three separate stages of analysis, with the purported first stage--identification of a range of potential new actions that may be taken--being distinct from the supposed second stage, when the practicability of such actions is weighed. (Oceana Reply at 7-8.) But the formalism Oceana ascribes to the regulation exists only when the relevant sentence is taken out of context. *See* 50 C.F.R. § 600.815(a)(2)(ii) (FMP "should identify a range of potential new actions that could be taken to address adverse effects on EFH, include an analysis of the practicability of potential new actions, and adopt any new measures that are necessary and practicable"). Read correctly, the

measure does not establish three distinct steps, but rather sets out a broad task that consists of evaluating and ultimately adopting a reasonable range of alternatives that are practicable. Moreover, as with many aspects of the regulations governing the Council's production of an FMP, the section Oceana cites uses the term "should" and therefore merely amounts to the Secretary's "strong[ ] recommend[ation]," which is not binding. *See* 50 C.F.R. § 600.305(c)(3) (defining should); *see also id.* § 600.810(b).

B. Did Amendment 13 have to Designate New HAPCs?

Oceana also argues that Amendment 13 unlawfully failed to create any additional HAPCs. (Oceana Mot. at 34-36.) But HAPCs are not even addressed by the SFA; rather, they are a creature of the Secretary's regulations. Functionally, HAPCs are a subset of EFH, and are identified based on one or more of the following factors:

(i) The importance of the ecological function provided by the habitat.
(ii) The extent to which the habitat is sensitive to human-induced environmental degradation.
(iii) Whether, and to what extent, development activities are, or will be, stressing the habitat type.
(iv) The rarity of the habitat type.
50 C.F.R. § 600.815(a)(8).

The Secretary did not act arbitrarily in failing to designate HAPCs in Amendment 13, because such designations are discretionary, not obligatory. The HAPC regulation states that they "should" be identified in FMPs, *id.,* but this term, as defined by the regulations, means that HAPC designation was only "strongly recommended." 50 C.F.R. § 600.305(c)(3); *see also id.* § 600.810(b). By contrast, numerous other components of FMPs "must" be included. *See, e.g.,* 50 C.F.R. § 600.815(a)(1)(i) (FMPs must identify EFH); *id.* § 600.815(a)(1)(v) (FMPs must include maps of EFH); *id.* §

600.815(a)(1)(iv)(E) (where FMP groups species in designating EFH, the plan must include a justification and scientific rationale). Amendment 13 did designate EFH, but did not establish new HAPCs, as permitted by the regulation. In short, the Secretary (and the Council) did not act unlawfully by failing to consider additional HAPCs, because such consideration was not required by the MSA and was optional under the regulations. [FN32]

> FN32. Although Amendment 13 did not establish any new HAPCs, one that had already been established to protect juvenile cod remains in a closed area under the new FMP, and it acquired new protections, including the banning of bottom-tending mobile gear. *See* 69 Fed.Reg. at 22,923. (*See also* A.R. 166 at C161-62.)

Moreover, the Court rejects Oceana's contention that HAPCs were required by the *AOC* Joint Stipulation. (Oceana Mot. at 34.) The Joint Stipulation is silent on the question of HAPCs. It only required "consider[ation of] a range of reasonable alternatives for minimizing the adverse effects [on EFH]." (A.R. 1331 at D-01-3105-06 ¶ 6.) That the Director of the Fisheries Service in January 2001 recommended that HAPCs be considered in FMPs in order to comply with the *AOC* order does not mean that failure to consider them years later in Amendment 13 was arbitrary. Indeed, as with the regulation described above, the Director stated only that HAPC alternatives "should" be discussed, whereas he made clear that other factors, such as "a reasonable range of alternatives for developing the mandatory EFH provisions of the affected FMPs," "must" be evaluated. (A.R. 689 at D-01-215.) Thus, while the Joint Stipulation required consideration of EFH options, HAPCs were not specified as a necessary option, and it was not required that defendants include them in Amendment 13.

**\*37** Moreover, the Secretary has not abandoned his discretionary efforts to establish HAPCs. Rather, he has reasonably deferred them until after he is able to assess the results of Amendment 13 and its At-

lantic sea scallop counterpart, Amendment 10. Amendment 13 provides that the forthcoming Essential Fish Habitat Omnibus Amendment 2, which will address numerous FMPs covering species in Northeastern waters, will identify HAPCs, and the Council has established a process for doing so. *See* 69 Fed.Reg. at 22,923. (*See also* A.R. 166 at C81-82.)

III. Bycatch Reporting Methodology

A. Background

Both Oceana and CLF challenge Amendment 13's provisions for monitoring bycatch. They allege that the Amendment fails to comply with the MSA, as modified by the SFA, and that it violates NEPA by failing to consider an adequate range of bycatch reporting methodology alternatives.

The SFA added several new provisions to the MSA, including the requirement that FMPs must:

> establish a standardized reporting methodology to assess the amount and type of bycatch occurring in the fishery, and include conservation and management measures that, to the extent practicable and in the following priority--
> (A) minimize bycatch; and
> (B) minimize the mortality of bycatch which cannot be avoided.

16 U.S.C. § 1853(a)(11). Commercial fishers routinely discard as bycatch fish caught that were "untargeted" or that would exceed the fishers' quota. *See* 142 Cong. Rec. S10,810 (1996) (statement of Sen. Stevens). *See also* NRDC v. Evans, 168 F.Supp.2d 1149, 1152 (N.D.Cal.2001) (discussing bycatch mortality rates); *CLF I,* 209 F.Supp.2d at 12 n. 23 (recounting legislative history supporting bycatch minimization, which Rep. Don Young called "one of the most crucial challenges facing fishery managers today").

In a ruling on Framework 33 and Amendment 9 (Amendment 13's FMP predecessors), Judge Kessler found that defendants had breached the SFA's bycatch provisions by failing to provide a

Not Reported in F.Supp.2d, 2005 WL 555416 (D.D.C.)
**(Cite as: 2005 WL 555416 (D.D.C.))**

reasoned basis for not adopting new measures, such as a dedicated observer program, to report and assess bycatch, as well as to minimize bycatch and bycatch mortality in the groundfish fishery. *CLF I,* 209 F.Supp.2d at 13, 15. Because the Secretary had plainly failed to respond to evidence of significant deficiencies in the existing reporting scheme and had been unreasonably dismissive of the alternative of an expanded observer program, the Court concluded that defendants had acted arbitrarily, capriciously and contrary to law in violation of the SFA and APA. *Id.* at 13.

The bycatch reporting methodology preexisting at the time of *CLF I* consisted primarily of fishing boats' logbooks, also known as Vessel Trip Reports ("VTRs"), but as all appear to agree, they are notoriously inaccurate. *Id.* at 13 & n. 24-25. The other measures--a very limited observer program that canvassed less than one percent of the fishing effort and a "cooperative statistics program" that, three years after the deadline for its implementation, had yet to collect any bycatch data--were also found to be inadequate. *Id.* at 13 n. 25. Thus, the Court held that the Secretary had violated the SFA and his own regulations, which expressly require a "review" or "improvement" of bycatch reporting methodology. *Id.* at 13 (citing 50 C.F.R. § 600.350(d)(1) and 16 U.S.C. § 1853(a)(11)).

 **\*38** To address these issues, the Court entered a Remedial Order, pursuant to a settlement agreement reached by the parties, requiring defendants to "provide 5% observer coverage, or higher, if necessary to provide statistically reliable data. Effective May 1, 2003, NMFS shall provide 10% observer coverage for all gear sectors, unless it can establish by the most reliable and current scientific information available that such increase is not necessary." *CLF II,* 211 F.Supp.2d at 58. This Order, by its own terms, expired upon enactment of Amendment 13. *Id.* at 57.

On the date the ten percent coverage level was to take effect, the Secretary filed a notice with the Court indicating that defendants had scientifically concluded that a five percent level was sufficient. Federal Defendants' Notice of Administrative Action, Ex. 1 at 3, *CLF v. Evans,* No. 00-1134 (D.D.C. May 1, 2003). Plaintiffs objected that the Secretary's scientific justification was insufficient, because although it addressed the issue of the coverage level required to achieve precise estimates of bycatch discards, it said nothing about whether those estimates would actually be accurate. Plaintiffs' Response to Federal Defendants' Notice of Administrative Action at 1-2, *CLF v. Evans,* No. 00-1134 (D.D.C. June 4, 2003).

Notwithstanding the Secretary's notice to the Court, the Council in Amendment 13 endorsed a ten percent level of observer coverage. The Amendment provides: "The Council desires 10 percent observer coverage for all gear sectors." (A.R. 166 at C140; *see also* A.R. 166 at C197 (Council establishing 10% observer coverage level, but giving Secretary power to deviate from this level if he establishes that such a level is not necessary).) In the final rule as promulgated, the Secretary did not specify a particular bycatch reporting methodology in any of the twenty-three items labeled as "approved measures." *See* 69 Fed.Reg. at 22908-16. Without explicitly mentioning bycatch, however, item fifteen--"Reporting Requirements"--does require dealers to report daily "all fish purchases; the disposition of the landings; and a trip identifier," and it requires vessels, once an electronic system is developed, to report all the information currently included in VTR reports, as well as a "password, a trip identifier, and landings information by statistical area for each trip." *Id.* at 22913-14. Later, in responding to public comments that bycatch reporting should be set at at least 10%, the Secretary stated that "NMFS intends to maintain its observer coverage in the groundfish fishery at a minimum level of 5 percent." *Id.* at 22932. The Secretary noted that for fiscal year 2004, a 10% level was implemented in response to a Congressional mandate, but a "5 percent level of observer coverage will resume in FY 05 and beyond, absent a similar appropriation requiring a greater level of observer coverage." *Id* . In

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

response to another comment contending that Amendment 13 lacked a standardized bycatch reporting methodology, the Secretary again stated that "NMFS intends to maintain its observer coverage in the groundfish fishery at no less than 5 percent." *Id.*

B. CLF's and Oceana's Claims

 **\*39** CLF contends that Amendment 13 does not establish a bycatch reporting methodology, because it contains no mandatory provisions. (CLF Mot. at 33-36 & n.21; CLF Reply at 28-30.) CLF notes in particular that earlier reporting measures were wholly inadequate. For instance, a Council staffer reported that, according to fishermen's logbook data (VTRs), one of the chief bycatch reporting methods, the New England groundfish fishery ranged from "Africa to Alaska, with heavy fishing in the Vancouver and Chicago areas." (A.R. 21 at A3799; *see also* A.R. 166 at C605.) The Council also had previously concluded that "both VTRs and the limited observer program are insufficient to estimate annual bycatch levels, because commercial fishers unlawfully underreport bycatch in VTRs." *CLF I,* 209 F.Supp.2d at 13 n. 25.

Oceana's complaint is more particularized, arguing that Amendment 13 violates the SFA because it does not establish a mandatory level of observer coverage, but rather merely expresses an intention to implement certain coverage levels. (*See* Oceana Mot. at 39.) In plaintiff's view, the language of both Amendment 13 and the Secretary's responses to public comments makes clear that defendants do not consider themselves bound to provide any particular level of observer coverage. Oceana submits that this approach violates both the mandatory language of the SFA, 16 U.S.C. § 1853(a) (providing that an FMP *"shall ...* establish a standardized reporting methodology" to assess bycatch (emphasis added)), as well as the Secretary's own regulations, which provide that, as part of National Standard Nine, a review of data collection methods "must" be completed for each fishery as part of an FMP. *See* 50 C.F.R. § 600.350(d)(1); *see also* 63

Fed.Reg. at 24,213 (explaining defendants' change of word "should" to "must" "in order to reflect the required provisions of a fishery management plan").

C. Do Amendment 13's Bycatch Measures Comport With the MSA?

As already noted, Amendment 13 contains among its "approved measures" no specific mention of bycatch reporting. And in responding to comments, the Secretary stated that he merely "intends" to maintain a 5% coverage level. While he did state that a 5% level "will resume in FY 05 and beyond," in the context of the Secretary's overall response to criticisms of Amendment 13's bycatch reporting, it is clear that this figure is not mandatory and may be subject to change if the Secretary deems it proper. *See* 69 Fed.Reg. at 22,932 (discussing the Secretary's statistical findings in support of a lower level of coverage than had been endorsed by the Council, and stating that the Secretary only "intends" to maintain a 5 coverage level). The Council's language in Amendment 13 is similarly ambiguous. (*See* A.R. 166 at C140 (stating only the Council's "desire" for 10% coverage); *id.* at C197 (granting the Secretary authority to deviate from the 10% level if he finds, based upon a scientific analysis, that such a level is "not necessary").) These citations make clear that Amendment 13 does not contain a mandatory level of observer coverage, and more generally, it does not contain any new bycatch reporting methodology. *Cf. NRDC v. Daley,* 209 F.3d at 755 (rejecting a voluntary FMP provision where, to achieve the results the Secretary predicted, a mandatory one was required).

 **\*40** Defendants nonetheless argue that Amendment 13 sets forth a variety of measures, such as a limited observer program and ships' logbooks, that already are used to monitor bycatch. (*See* A.R. 167 at C1472; *see also* Defs.' Opp'n at 102, 105-108.) However, a description of past practices already found deficient by a court does not constitute the "establish[ment]" of a bycatch reporting methodology. *See* 16 U.S.C. § 1853(a)(11).

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 555416 (D.D.C.)
**(Cite as: 2005 WL 555416 (D.D.C.))**

Indeed, there is no dispute that, given the inadequacy of other reporting methods, live observers are an essential component of an adequate bycatch reporting methodology. Defendants have concluded that "[n]on-biased observer data collection in the majority of instances is the most effective way to monitor bycatch," and that "[o]bservers provide the most reliable source of high quality, objective, fishery-dependent data." 68 Fed.Reg. at 11,505, 11,509. Therefore, "[f]or fisheries where observer coverage is needed to monitor bycatch ... a level of coverage should be deployed that provides statistically reliable bycatch estimates." *Id.* at 11,504. [FN33] In light of defendants' own findings, as well as the Court's reasoning in *CLF I,* it was clear that a "methodology" that simply retained the status quo was unacceptable. Thus, insofar as Amendment 13's language indicates only an "intent" to implement an adequate program, it fails to comply with governing law, because defendants' intent could change at any time. "Because the observer program is optional under Amendment 13, NMFS in theory could decide not to implement an observer program for the ground fishery, and nothing in Amendment 13 would prohibit the agency from making that decision." *Pac. Marine Conservation Council, Inc. v. Evans,* 200 F.Supp.2d 1194, 1200 (N.D.Cal.2002) (deeming unlawful an FMP that failed to mandate in the FMP itself a bycatch assessment methodology); *accord CLF I,* 209 F.Supp.2d at 13. By its very terms, an FMP that merely suggests a hoped-for result, as opposed to "establish[ing]" a particular standardized methodology, does not measure up to the statute's requirements. *See* 16 U.S.C. § 1853(a)(11).

> FN33. In the New England groundfish fishery in 2003, it cost $1150 for a trained bycatch observer to monitor a single vessel for a single day. (A.R. 3528 at D-03-6800.)

In response, defendants contend that Amendment 13 need not include a mandatory level of observer coverage as part of a bycatch monitoring program, because the Council, which authored the Amendment, does not manage the observer program (*see* 69 Fed.Reg. at 22,932) and because the Secretary can implement such measures administratively through regulations. (*Id.;* Defs.' Opp'n at 107.) While it is true that the Secretary has the power and responsibility to promulgate regulations to implement the terms of FMPs, *see* 16 U.S.C. § 1853(c); *id.* § 1855(d), defendants' argument that a *mandatory* provision of an FMP may be created by the Secretary acting alone outside the context of the Amendment process defies the plain language of the MSA. The statute makes perfectly clear that the "establish[ment] of a standardized [bycatch] reporting methodology" is a "required provision" of "any fishery management *plan* which is prepared by any Council." *Id.* § 1853(a) (emphasis added). In short, bycatch reporting methodology is discussed in the subsection describing mandatory plan contents, not in the separate subsection discussing Secretarial regulations implementing such plans. *Compare id.* § 1853(c) (describing proposed regulations).

**\*41** Moreover, the Secretary's contention that Amendment 13's lack of a specified level of observer coverage is explained by the fact that the Council does not manage the observer program is likewise groundless. 69 Fed.Reg. at 22,932. (*See also* Defs.' Opp'n at 107.) The MSA requires that Amendment 13 establish the reporting methodology. *See* 16 U.S.C. § 1853(a)(11). There is no reason why the Council cannot fulfill its statutory duty to establish the reporting methodology for a monitoring program, even if it is not responsible for managing this program.

Defendants also contend that the Secretary complied with the Council's directive by, in lieu of implementing a 10% coverage level, establishing "by the most reliable and current scientific information that [a 10% coverage level] is not necessary to achieve an acceptable level of precision and accuracy." (A.R. 166 at C197.) NMFS scientists conducted a study that determined that 5% coverage was sufficient. (*See* A.R. 2760 at D-03-1451.) However, this conclusion was based only on the goal of

Not Reported in F.Supp.2d                                                    Page 42
Not Reported in F.Supp.2d, 2005 WL 555416 (D.D.C.)
**(Cite as: 2005 WL 555416 (D.D.C.))**

achieving a precise estimate of bycatch, rather than one that is both precise *and* accurate. (*See id.* at D-03-1453.) As one of the study's co-authors admitted, "The accuracy issue must be avoided. We can't address that with the data we have and I'm not aware of anyone who has done this. Drawing attention to the accuracy issue would only cloud the question of sample size needs in my view." (A.R. SPP 34 at 1.) [FN34]

> FN34. There are two sources of error in discard estimates generated by observer programs: "accuracy, which measures how close the expected value of the estimate is to the actual value, and precision, which measures how close a series of independent estimates are to each other." (A.R. 3752 at D-04-628.) Ideally, a sampling program should produce estimates that are *both* accurate and precise.

In light of the NMFS Regional Administrator's contention that "the accuracy of the [bycatch] estimates may be impossible to assess" (A.R. 3098 at D-03-4388), Oceana commissioned its own study (referred to as the "Babcock Study"). It explained the problem of bias, which affects the accuracy of the observers' estimates, because their bycatch figures--while precise--often fail to account for "changes in fishermen's behavior in the presence of observers" and for selection bias, in that many observers travel on vessels that *volunteer* to carry them. (A.R. 3752 at D-04-626.) In other words, "[t]he accuracy of an estimate depends on these three measurements [necessary for achieving a precise estimate: the size of the sample, the size of the fishery, and the variability of the bycatch]," *plus* one additional consideration: "whether the sampled part of the fishery is representative of the entire fishery." (*Id.* at D-04-629.) The scientists hired by Oceana purported to do what defendants claimed could not be done: design a program that would be *both* precise and accurate. They determined that for rare bycatch species, coverage should be set at a 50% level, and for common bycatch species, 20%

would suffice. (*Id.* at D-04-643.) Oceana submitted this study to the Secretary in conjunction with the notice and comment process for Amendment 13, contending that the Amendment must be revised in light of this evidence. (*Id.* at D-04-619-20.)

Defendants responded to Oceana's comment by arguing that their earlier study provided an adequate basis for determining that 5% coverage was sufficient to achieve a "precis[e]" discard estimate. 69 Fed.Reg. at 22,932. They did not, however, respond to plaintiff's argument that the Secretary's analysis focused on precision to the exclusion of accuracy, notwithstanding Oceana's contention that the Babcock Study constituted the "best available science" and considered both factors. (*Id.* at D-04-619-20.)

**\*42** In light of the Secretary's failure to adequately respond to Oceana's study, notwithstanding his duty to formulate FMPs, including a required bycatch reporting methodology, according to the "best scientific information avaiable," 16 U.S.C. § 1851(a)(2), the Secretary's "inten[tion]" to adopt a 5% observer coverage is arbitrary and capricious in violation of the MSA and APA. 16 U.S.C. § 1853(a)(11); *see* 5 U.S.C. § 706(2)(A). *See also NRDC v. Daley,* 209 F.3d at 755-56 (quoting *Motor Vehicle Mfrs. Ass'n, Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 48, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) and *A.L. Pharma, Inc. v. Shalala,* 62 F.3d 1484, 1491 (D.C.Cir.1995)) (holding that agency scientific determinations are not entitled to deference where they fail to "cogently explain" how the resultant recommendations satisfy the MSA's requirements).

As to CLF's more general contention that Amendment 13 fails to spell out a standardized bycatch reporting methodology, plaintiffs' point is well taken. They argue that, in addition to evaluating an adequate observer program, an FMP must include "an analysis, effectively sector by sector throughout the fishery by different gear types and different species, of what the combination of methods should be in order to effectively put in place a standardized bycatch reporting methodology." (Hearing Tran-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                Page 43

Not Reported in F.Supp.2d, 2005 WL 555416 (D.D.C.)

**(Cite as: 2005 WL 555416 (D.D.C.))**

script at 113; *see also* CLF Mot. at 36.) As an example, plaintiffs point to the bycatch reporting methodology used in the Pacific highly migratory species ("HMS") fishery, which evaluates various kinds of reporting for different types of fishing gear and vessels. (*See* CLF Mot. Ex. 2 (HMS FMP, August 2003) at Ch. 5, pp. 34-36.) The government argues that Amendment 13 in fact includes many of the same analyses used in the Pacific FMP (Defs.' Opp'n at 102), but plaintiffs reply that these "isolated snippets" (CLF Reply at 30) found throughout Amendment 13's nearly eighteen hundred pages do not constitute a reporting program, nor has the Secretary suggested as much prior to the instant litigation.

The Court agrees with this latter point, and rejects what appears to be a *post hoc* rationalization. An agency must "give clear indication that it has exercised the discretion with which Congress has empowered it," and "[t]he courts may not accept ... counsel's *post hoc* rationalizations for agency action." *Burlington Truck Lines,* 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962) (internal citations and quotation marks omitted). The record does not show that the Secretary deemed these measures to be part of a standardized bycatch reporting methodology, and therefore, the Court must reject the Secretary's attempt at this late date to characterize them as such.

Moreover, without more thorough analyses and coherent justifications, the program components now cited by the Secretary do not meet the MSA's requirement that he review the bycatch reporting methodologies and, if necessary, adopt new ones, *see* 16 U.S.C. § 1853(a)(11); *id.* § 1851(a)(9), especially in light of Judge Kessler's prior finding that such measures, including often inaccurate VTRs, a non-mandatory observer program, and NMFS' limited data processing capacity, are seriously flawed. *See CLF I,* 209 F.Supp.2d at 13 & n. 24-27. (*See also* Defs.' Opp'n at 102 (citing "program" components previously found wanting by the court, without providing record evidence to substantiate how these methods pass muster now when, as the government conceded in *CLF I,* they were deficient three years ago).)

**\*43** In sum, Amendment 13 does not meet the SFA's requirements because it fails to fully evaluate reporting methodologies to assess bycatch, *id.* § 1853(a)(11); it does not mandate a "standardized reporting methodology," *id.* § 1853(a)(11), and it fails to respond to potentially important scientific evidence. *Id.* § 1851(a)(2). Accordingly, the Court concludes that the bycatch monitoring provisions of Amendment 13 do not satisfy the SFA, and plaintiffs' motions for summary judgment with respect to this claim are granted. [FN35] *See* 5 U.S.C. § 706(2)(A).

> FN35. Given this resolution of plaintiffs' claims under the MSA and the APA, the Court need not reach their NEPA claims, *see NRDC v. Daley,* 209 F.3d at 753, which raise the novel question of whether the establishment of a bycatch reporting methodology is a "proposed action," 42 U.S.C. § 4322(2)(C)(iii), that warrants a full NEPA analysis of alternatives.

CONCLUSION

Amendment 13 reflects the Council's and the Secretary's painstaking efforts to achieve a delicate balance that rebuilds stocks and ends overfishing while allowing fishermen to continue fishing those stocks that are healthy. Given the complexity of this task, the Court must conclude that Amendment 13 is, with limited exception, reasonable and in accordance with law. Accordingly, summary judgment is granted in favor of defendants, except as to Amendment 13's bycatch monitoring provisions and 50 C.F.R. § 648.85(a)(2)(i)(D). With respect to this latter regulation, the Court grants Count Seven of TSF's Complaint and vacates the third sentence of 50 C.F.R. § 648.85(a)(2)(i)(D). With respect to plaintiffs CLF's and Oceana's bycatch claims, the Court finds that Amendment 13 violates the bycatch provisions of the SFA, and therefore, this aspect of Amendment 13 is remanded to the Secret-

Case 1:07-cv-01486-RJL     Document 67-2     Filed 07/31/2008     Page 70 of 127

ary for further action consistent with this Memorandum Opinion. [FN36]

> FN36. The only part of Amendment 13 remanded to the Secretary concerns the bycatch reporting methodology. Since this provision is severable from the balance of the Amendment, no purpose would be served by vacating other parts of the FMP, and such an approach would be unnecessarily disruptive. *A.L. Pharma, Inc. v. Shalala,* 62 F.3d 1482, 1492 (D.C.Cir.1995).

\* \* \*

Not Reported in F.Supp.2d, 2005 WL 555416 (D.D.C.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                    Page 1
Not Reported in F.Supp.2d, 2007 WL 2873788 (D.Utah)
**(Cite as: 2007 WL 2873788 (D.Utah))**

H

Only the Westlaw citation is currently available.

United States District Court,
D. Utah.
SOUTHERN UTAH WILDERNESS ALLIANCE,
Plaintiff,
v.
ROGER BANKERT, in his official capacity as
Field Office Manager for the Price
Field Office, Bureau of Land Management, et al.,
Defendants.
**No. 2:07-CV-292-TC.**

Oct. 3, 2007.

Stephen H. Bloch, Southern Utah Wilderness Alliance, Salt Lake City, UT, for Plaintiff.

Jeffrey E. Nelson, US Attorney's Office, Salt Lake City, UT, for Defendant.

Bret A. Sumner, L. Poe Leggette, Fulbright & Jaworski, Washington, DC, Shawn T. Welch, Matthew L. Crockett, Pruitt Gushee, Salt Lake City, UT, for Intervenor Defendant.

ORDER AND MEMORANDUM DECISION

CAMPBELL, Chief J.

**\*1** This matter comes before the court on Plaintiff Southern Utah Wilderness Alliance's (SUWA) appeal of Defendant Bureau of Land Management's (BLM) decision approving a geophysical oil and gas exploration project in the San Rafael Desert. SUWA brings its appeal under the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321-4370f, and the Administrative Procedure Act (APA), 5 U.S.C. Chapter 7 (governing judicial review of agency decisions).

SUWA seeks reversal and remand of BLM's decision, contending that BLM did not satisfy NEPA's procedural requirements. Specifically, SUWA contends that (1) BLM blindly relied on an unverified

statement from the project proponent about seismic data quality; (2) BLM engaged in a flawed analysis of alternatives; and (3) BLM did not properly consider impacts to biological soils. Because the court finds that BLM provided the requisite "brief" discussion of alternatives, that BLM did provide independent evidence of the superiority of vibroseis data, and that BLM took a hard look at the potential impacts to biological soils, the court upholds BLM's decision and denies SUWA's request for reversal and remand.

BACKGROUND
*The Proposed Project and the Proposed Project
Area*

On July 7, 2006, Dawson Geophysical Company ("Dawson") filed a Notice of Intent to Conduct Oil and Gas Exploration Operations ("Notice of Intent") with BLM on behalf of its client, Samson Resources Company ("Samson"). The proposed project, called the San Rafael Saddle 3-D Geophysical Project ("the proposed Project"), is intended to map subsurface geology using seismic waves to identify possible oil and gas deposits.

The San Rafael Desert, where the proposed Project would occur, is located east of the scenic San Rafael Swell and west of the Labyrinth Canyon section of the Green River and the Maze District of Canyonlands National Park. The proposed Project area (which measures approximately 61.1 square miles, or 39,120 acres) consists primarily of sandy soils and is dominated by grass-like vegetation. Much of the San Rafael Desert contains fragile biological soil crusts (these occur to an unknown extent throughout the proposed Project area), which prevent erosion and help fix nitrogen levels in the soil. Under BLM's land use plan for the area, the land is open to mineral exploration and development, livestock grazing, recreation, and unrestricted Off Highway Vehicle (OHV) use (with some discrete areas closed to OHV travel to protect sensitive soils).

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 2873788 (D.Utah)
**(Cite as: 2007 WL 2873788 (D.Utah))**

The stated purpose of the proposed Project is to provide high quality geophysical information for Samson to evaluate geologic structures for untapped oil and natural gas resources. Specifically, BLM explained that the proposed Project is:

> necessary to provide high definition imaging of the subsurface geology in the proposed project area to aid in locating target zones for recovery of oil and natural gas reserves. Such knowledge of subsurface geology is likely to reduce the need for exploratory wells by increasing the likelihood that wells that are drilled will produce commercial quantities of oil and natural gas. This would result in less surface disturbance because fewer unproductive wells ("dry holes") would be drilled, as well as in reduced development costs.

**\*2** (Apr.2007 Environmental Assessment to Analyze Dawson Geophysical Company's Proposed San Rafael Saddle 3-D Geophysical Exploration Project (EA) at p. 1-3, AR0048.)

Dawson proposes to use a three-dimensional (3-D) seismograph data collection system, which employs "vibroseis" technology. Vibroseis trucks (euphemistically called "buggies") weigh 64,000 pounds, measure 34 feet in length by 8.5 feet in width, and are equipped with 3-foot-wide "balloon" tires. They will create vibrations using 4-by-8 foot steel plates lowered to the ground at predetermined points in the 39,000 acre proposed Project area, thereby generating subsurface waves (which will be detected by geophones) to map geologic formations.

According to BLM, approximately 95% of the surface soils of the proposed Project area would not be affected by the proposed vibroseis exploration, and the remaining 5% of the surface soils would be subject to potential temporary and negligible disturbance. The 5% surface disturbance is not all in one location; rather, it is spread throughout the proposed Project area over narrow corridors of land along the routes that will be traversed by the vibroseis buggies. That is, approximately 2,000 acres will be affected by the vibroseis buggy tracks, and,

of that area, about 34 acres will be affected by the steel plates during the data-collection process.

*BLM's NEPA Process*

Before BLM could grant or deny permission to conduct the proposed exploration, it needed to follow NEPA procedures, including conducting an environmental assessment to analyze the potential environmental impacts of the proposed Project and a reasonable range of alternatives. As allowed by BLM's rules, Dawson hired a private third-party environmental consulting company, TRC Mariah Associates, Inc. ("TRC Mariah"), to take the lead in preparing the environmental assessment.

In November 2006, BLM released the draft EA for a 30-day public review and comment period. SUWA submitted timely comments which expressed concern with potential impacts of the proposed action and suggested changes to the analysis, including a request that BLM fully analyze two alternatives to the proposed action. Those two alternatives are (1) to use buggy shotholes, or (2) to use a combination of vibroseis, buggy shotholes, and heliportable shotholes, as described in the expert comments (incorporated into SUWA's comments) of Mr. Ken Kreckel, an individual with expertise in geophysics.

BLM modified the draft EA in part in response to SUWA's comments, and issued its final decision on April 9, 2007. (*See* Decision Record (DR), AR0001-AR0005.) At the same time, BLM issued its final Environmental Assessment (EA) and Finding of No Significant Impact (FONSI), both of which were generated based on NEPA's procedural requirements. Although the EA was originally drafted by TRC Mariah, BLM reviewed the draft and participated in the process before issuing the draft and final EA's as its own documents.

 **\*3** The EA fully discussed the Project as proposed by Dawson/Samson and the "no-action alternative." But all other proposed alternatives (including those suggested by SUWA) were rejected with little dis-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

cussion in the document. BLM rejected SUWA's proposed alternatives primarily because, although they were technically feasible, they were similar to the proposed Project and the proposed Project would cost less and produce superior seismic data.

Ultimately, BLM found that the proposed Project would not have a significant impact on the environment. Accordingly, it did not have to issue an Environmental Impact Statement. Instead, BLM issued its decision approving the proposed Project as modified in the EA. For example, BLM's approval of the proposed Project requires Dawson to implement mitigation measures designed to protect various resources, including biological soils.

*SUWA's challenges*

SUWA appealed BLM's decision. The proposed Project has not yet begun, but it was tentatively scheduled to begin October 1, 2007, depending on the outcome of SUWA's appeal. In its appeal, now before the court, SUWA raises three different challenges under NEPA.

First, SUWA contends that BLM failed to independently evaluate TRC Mariah's rejection of alternatives, and Dawson/Samson's "self-serving" statement that the proposed Project would produce superior data as compared to the proposed alternatives. SUWA asserts that BLM blindly accepted the applicant's assessment of the alternatives, pointing to BLM's blanket statement of acceptance in the EA and lack of record evidence showing that BLM independently validated the information that prompted rejection of the alternatives. This, says SUWA, is a violation of BLM's duty under 40 C.F.R. § 1506.5 to independently evaluate applicant-produced information, and is grounds for reversal and remand.

Second, SUWA maintains that BLM failed to fully analyze a reasonable range of technically feasible alternatives. SUWA does not suggest that BLM's decision to fully analyze only the proposed action and the no-action alternative was a *per se* NEPA vi-

olation. Instead, SUWA argues that BLM should have more fully analyzed SUWA's suggested alternatives of completing the exploration using shothole technology instead of vibroseis, or a combination of shothole and vibroseis technologies. According to SUWA, BLM arbitrarily and capriciously rejected those alternatives.

SUWA's final contention is that BLM failed to take a "hard look" at how the proposed Project would affect biological soil crusts. [FN1] According to SUWA, "[t]hese crusts are vital to the environmental integrity of arid lands in Utah and throughout the Colorado Plateau, preventing erosion and helping fix nitrogen levels in the soil. They are extremely fragile; 'vehicular traffic can rapidly destroy biological soil crusts,' with recovery taking '50-100 years.' ' (Pl.'s Opening Br. at 21 (citations to administrative record omitted).) SUWA says BLM did not map or survey the extent of biological soil crusts in the area and did not explain why it could not do so. Further, according to SUWA, because BLM relied on data from earlier seismic exploration projects conducted in "geographically distinct areas," BLM erroneously compared apples to oranges to conclude that there would be no significant impact to biological soils.

FN1. SUWA also originally challenged BLM's failure to consider effects on sand dunes in the area. SUWA has since conceded that it waived that challenge because it did not raise the issue in its comments on the draft EA, so the issue of sand dunes is no longer before the court.

*ANALYSIS*

*A. Standard of Review*

**\*4** SUWA seeks judicial review of BLM's decision pursuant to the Administrative Procedure Act (APA), 5 U.S.C. §§ 701 et seq. Under the APA, the court must determine whether BLM's decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An agency decision is "arbitrary and ca-

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 2873788 (D.Utah)
**(Cite as: 2007 WL 2873788 (D.Utah))**

pricious" if

the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983).

When applying the "arbitrary and capricious" standard, the court must determine whether BLM's "decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). [FN2] Although this inquiry must be thorough, the standard of review is highly deferential; the agency's decision is entitled to a presumption of regularity, and the court cannot substitute its judgment for that of the agency. *Id.* at 415-16. Judicial deference to the agency's "informed discretion" is especially appropriate when the analysis "requires a high level of technical expertise." *Marsh v. Oregon Natural Res. Council, Inc.,* 490 U.S. 360, 377, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989) (quoting *Kleppe v. Sierra Club,* 427 U.S. 390, 412, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976)).

> FN2. *Overruled on unrelated grounds by Califano v. Sanders,* 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977).

*B. NEPA Framework*

NEPA is a procedural statute promulgated to ensure that an agency makes a fully informed and well-considered decision. *Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.,* 435 U.S. 519, 558, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978). NEPA requires that an agency take a "hard look" at the environmental consequences of a pro-

posed action. *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 350, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989). In essence, the statute "prohibits an uninformed--rather than an unwise--agency action." *Custer County Action Ass'n v. Garvey,* 256 F.3d 1024, 1034 (10th Cir.2001) (quoting *Robertson,* 490 U.S. at 351). "NEPA does not mandate any particular substantive outcome. As [the Tenth Circuit] observed, '[NEPA] does not require agencies to elevate environmental concerns over other appropriate considerations ... [I]t requires only that the agency take a 'hard look' at the environmental consequences before taking a major action." ' *Citizens' Comm. to Save Our Canyons v. U.S. Forest Serv.,* 297 F.3d 1012, 1022 (10th Cir.2002) (internal citations omitted).

Nevertheless, § 102(2)(c) of NEPA requires BLM to determine whether a proposed federal action will "significantly affect[ ] the quality of the human environment." 42 U.S.C. § 4332(2)(C). If it will, BLM must prepare an environmental impact statement (EIS). 42 U .S.C. § 4332(2)(C); 40 C.F.R. § 1501.4. To determine whether an EIS is required, federal agencies may first prepare an environmental assessment, as BLM did here. *See* 40 C.F.R. § 1501.4. An EA must "include brief discussions of the need for the proposal, of alternatives ..., of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted." 40 C.F.R. § 1508.9(b).

**\*5** If, through preparation of the EA, the agency finds no significant impact from the proposed project, it issues a Finding of No Significant Impact (FONSI) justifying its decision not to prepare an EIS. 40 C.F.R. § 1508.13. Here, BLM found no significant impacts and so it issued its FONSI. A FONSI determination is analyzed under a two-prong test: (1) " ' whether the [agency's] decision was based on a consideration of the relevant factors," ' and (2) " ' whether there has been a clear error of judgment." ' *Committee to Preserve Boomer Lake Park v. Dep't of Transp.,* 4 F.3d 1543, 1549, 1555 (10th Cir.1993) (quoting *Overton Park,*

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                                                                                       Page 5
Not Reported in F.Supp.2d, 2007 WL 2873788 (D.Utah)
**(Cite as: 2007 WL 2873788 (D.Utah))**

401 U.S. at 416).

*C. Issues Raised on Appeal*

1. BLM Independently Evaluated the Project Proponent's Information.

Here, an independent third-party (TRC Mariah) hired by the Project proponent (Samson/Dawson) took the reins to prepare the EA. This is allowed, but when that occurs, the agency must "independently evaluate" the information provided by the applicant. 40 C.F.R. § 1506.5(a)-(b).

SUWA claims that BLM relied exclusively on an unverified statement from geophysicist Stuart Wright (an employee of the applicant) that data from use of vibroseis technology is superior to other seismic exploration methods proposed by SUWA. But BLM points to a portion of the record, generated by BLM, that says vibroseis technology is the most precise method for gathering data.

In a January 4, 2006 document, BLM analyzed the results of a BLM "data call" for information from NEPA records for 244 geophysical exploration projects (like the one proposed by Dawson/Samson) that were conducted between October 1, 2000, and September 30, 2005. In that "data call" document, BLM states that the vibroseis process "is the most precise process because it uses controlled vibrations that are spread over a period of time, as opposed to the explosion vibration that is a single burst of energy." (Jan. 4, 2006 Analysis Report by BLM at 6, AR0519.) BLM also notes that it has significant experience and internal expertise regarding seismic exploration, as the "data call" document evidences.

Further, in the EA BLM discusses the rationale underlying Mr. Wright's statement that vibroseis data is superior:

Vibroseis is a frequency, phase and amplitude controlled source that produces zero-phase data after correlation with the pilot sweep. Zero-phase data is recognized by the seismic industry as the optimum reflection pulse for detailed stratigraph-

ic interpretation of the earth's surface. Dynamite produces a minimum-phase pulse. There is also a difference in the length of time over which the compressional waves are excited in the earth. Vibroseis energy is imparted gradually--typically over a period of 40 to 120 seconds. Dynamite, on the other hand, is essentially instantaneous. This abrupt release of energy can produce brittle failure in indurate rocks, or grain-shifting in unconsolidated sands. Both situations produce suboptimal compressional-wave seismic reflections. Finally, dynamite data is much more susceptible to random environmental noise such as wind, animals and traffic. With any single impulsive source, data acquisition can only take place under the quietest of conditions. For vibroseis data, the ratio of signal to random noise can be improved by increasing the number of sweeps, the length of the sweeps, the number of vibrator trucks, the fundamental ground force, or the sweep bandwidth. Varying these parameters provides flexibility to changing field conditions that are common in most settings.

*6 (EA at 2-14 to 2-15, AR0067-AR0068.) (*See also* EA List of Preparers, Tbl. 5-2, at p. 5-10, AR0083-42 (listing members of BLM's interdisciplinary team, including Neil Simmons, Geologist/ GIS, whose area of responsibility was GIS (geographic information system) data) .)

Given the foregoing, the court finds that BLM fulfilled its duty under 40 C.F.R. § 1506.5(a)-(b).

2. BLM Adequately Considered Technically Feasible Alternatives.

NEPA requires federal agencies to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(E). *See also Davis v. Mineta,* 302 F.3d 1104, 1120 (10th Cir.2002) ("A properly-drafted EA must include a discussion of appropriate alternatives to the proposed project."). BLM's NEPA regulations require BLM to provide a "brief discus-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 2873788 (D.Utah)
**(Cite as: 2007 WL 2873788 (D.Utah))**

sion" of alternatives in an EA. *See* 40 C.F.R. § 1508.9(b). When reviewing the adequacy of an EA's evaluation of alternatives, courts must apply a "rule of reason" standard (essentially, an "abuse of discretion" standard). *Citizens for Alternatives to Radioactive Dumping v. U.S. Dep't of Energy,* 485 F.3d 1091, 1098 (10th Cir.2007); *All Indian Pueblo Council v. United States,* 975 F.2d 1437, 1445 (10th Cir.1992).

SUWA claims that BLM violated NEPA by only fully analyzing the proposed action and the no-action alternative. Clearly, BLM considered other alternatives (albeit briefly), so the range of alternatives is not an issue. Instead, SUWA asserts that BLM did not sufficiently analyze the alternatives (i.e., the discussion in the EA was unsupported and too brief to be meaningful).

BLM contends that, because the proposed Project (if mitigated as outlined in the EA), would not have a significant impact on the environment, [FN3] there was little need to extensively analyze alternatives that were similar in nature, would produce less accurate seismic data, [FN4] and would cost more. [FN5] The court agrees.

> FN3. At the time the EA was being prepared, BLM was considering creating a categorical exclusion (CX) for certain types of geophysical exploration projects, including the type proposed here. For categorical exclusions, no NEPA analysis is needed (absent exceptional circumstances) for projects such as this because BLM has found that such projects do not have a significant impact on the environment. *See* 40 C.F.R. §§ 1508.4, 1507.3. BLM's proposed CX was the force behind preparation of the 2006 data call document. On August 14, 2007 (after Dawson submitted its Notice of Intent and BLM issued the Project EA), BLM adopted the categorical exclusion for geophysical exploration projects when no temporary or new road construction is proposed. *See* 72 Fed.Reg. 45504 (Aug. 14,

2007). The new CX does not factor into the court's analysis, although the data call document demonstrates that BLM has significant experience and expertise in this area.

> FN4. Mr. Kreckel, SUWA's expert, opined that data collected through the proposed alternative exploration technologies would provide "the same or higher quality data than the proposed action" would provide. (AR0209.) He cites no support for that proposition. The other statement he makes ("Data quality was good" (*id.*) for the combined technologies alternative), although supported by citation to an article, does not trump BLM's conclusion that vibroseis technology is the most precise of existing seismic exploration technologies. *See, e.g., Marsh,* 490 U.S. at 378 ("When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts...."). *See also Citizens' Comm. to Save Our Canyons v. U.S. Forest Serv.,* 297 F.3d 1012, 1030 (10th Cir.2002) ("Where the action subject to NEPA review is triggered by a proposal or application from a private party, it is appropriate for the agency to give substantial weight to the goals and objectives of that private actor.").

> FN5. BLM also notes that "superior data increases the likelihood that an exploratory well will encounter commercial quantities of hydrocarbons, and thus potentially decreases the number of unsuccessful wells that may need to be drilled and the surface disturbance associated with the drilling of unproductive wells." (Fed. Defs.' Response Br. at 10.)

The two alternatives proposed by SUWA were use of the shot hole method (either by buggy or helicopter) or a combination of methods, such as using

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 2873788 (D.Utah)
**(Cite as: 2007 WL 2873788 (D.Utah))**

vibroseis on roads, buggy shot hole on cross-country portions, and heli-portable shot hole on OHV restricted areas. BLM only briefly discussed these alternatives.

First, BLM stated that "[t]he quality of data recorded from the reflection of energy signals generated by surface shots is inferior to the quality of data using vibroseis buggies or sholeholes." (EA at p. 2-14, AR0067.) Then it rejected the use of helicopters to drill shot holes because "much of the project area is suitable for vibroseis buggies, and because the cost of heliportable drilling is much higher. Also, based on recent studies (BLM 2006), the generally low impacts of seismic exploration [regardless of method used] do not justify such additional costs." (*Id.*) BLM then explained why vibroseis data is of higher quality. Later, BLM stated that "[b]uggy drills could be used to drill shotholes to provide the source points for the seismic survey. Surface disturbance would be less using this method than with vibroseis; however, shotholes would not provide the quality of data to satisfy the purpose and need of the project...." (*Id.* at p. 2-15, AR0068.) As for the proposed combination of methods, BLM cited the same reasons for rejecting that proposed alternative. (*Id.* at p. 2-16, AR0069.)

 **\*7** The court finds that BLM's analysis of alternatives was reasonable. First, as noted above, the regulations require only a "brief discussion" of proposed alternatives. Second, there was little difference between the alternatives (although surface disturbance would be less, nothing requires BLM to focus on the more environmentally friendly alternative). *See, e.g., Headwaters, Inc. v. BLM,* 914 F.2d 1174, 1181 (9th Cir.1990)* ("NEPA does not require a separate analysis of alternatives which are not significantly distinguishable from alternatives actually considered, or which have substantially similar consequences."). Third, BLM determined that the proposed Project, with mitigation measures imposed by BLM, would not have a significant impact on the environment. *See, e.g., Park County Res. Council, Inc. v. U.S. Dep't of Agric.,* 817 F.2d 609,

621-22 (10th Cir.1987)* [FN6] (noting that agency and courts may take into account mitigation measures imposed by agency to justify issuance of FONSI). Fourth, the standard the court must impose is the "rule of reason" standard, characterized by the Tenth Circuit as an "abuse of discretion" standard. Given these factors, the court concludes that BLM's analysis of alternatives in the EA did not violate the rule of reason and was not arbitrary or capricious. *See, e.g., Utah Envtl. Congress v. Bosworth,* 439 F.3d 1184, 1195 (10th Cir.2006) (holding that agency did not act arbitrarily when it considered only proposed action and no action alternative in EA); *Biodiversity Conservation Alliance v. U.S. BLM,* 404 F.Supp.2d 212, 218-19 (D.D.C.2005) (upholding EA discussing oil and gas exploration project using vibroseis method, and finding that BLM's consideration and rejection of shot-hole alternatives that were not technically, physically, and/or economically feasible was not arbitrary and capricious).

> FN6. *Overruled on other grounds by Village of Los Ranchos De Albuquerque v. Marsh,* 956 F.2d 970 (10th Cir.1992).

3. BLM Took a "Hard Look" at the Proposed Project's Potential Impact to Biological Soils.

a. *Defendants' Waiver Argument*

As a threshold argument, BLM and Defendant-Intervenor Samson Resource Company contend that SUWA waived its "hard look" argument regarding biological soils. According to the Defendants, SUWA did not raise the issue in its comments on the draft EA so it may not raise the issue now in court. If the challenging party did not raise the issue in the administrative forum, that party forfeits its ability to raise the objection on appeal. *Silverton Snowmobile Club v. U.S. Forest Serv.,* 433 F.3d 772, 783 (10th Cir.2006).

Based on a review of SUWA's comments, the court finds that SUWA did not waive the issue regarding impact to biological soils. To preserve the argument

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2873788 (D.Utah)
**(Cite as: 2007 WL 2873788 (D.Utah))**

for appeal, SUWA needed to notify BLM about its objections in a manner that allowed BLM "to give the issue meaningful consideration." *Department of Transp. v. Pub. Citizen,* 541 U.S. 752, 764, 124 S.Ct. 2204, 159 L.Ed.2d 60 (2004). SUWA did so.

In its comments, SUWA stated that BLM failed to take a hard look at the potential impacts on "soils and vegetation." (AR0194.)

> **\*8** Soils and vegetation are likely to be more severely impacted than what the EA presently estimates.... The EA erroneously concludes that impacts to soil and vegetation will be short and insignificant.... BLM appears to understate recovery rates because it relies upon an environmental assessment from a seismic project in Uintah County to judge impacts to soils and vegetation.... It is improper to use these areas to determine vegetation and soil recovery in the San Rafael Desert. The EA itself states that recovery of soils and vegetation is dependent on precipitation levels. *See* EA at 4-7. It is difficult to understand how BLM can claim that soil impacts will not be significant when the EA states that recovery of soil surface integrity and *soil flora* can take from 50 to 100 years--in the best case scenario, having crushed material left in place. EA at 4-7. This large amount of time required for recovery appears indicative of a significant impact.

(Dec. 14, 2006 Comments by SUWA at 10-11, AR0201-AR0202 (emphasis added).) "Soil flora" is a reference to biological soils. (*See* EA at p. 4-8, AR0083- 20 (quoting Jayne Belnap study on biological soils, in which biological soils are referred to as "soil flora").)

In the above-quoted comment, SUWA clearly objected to BLM's use of other seismic exploration impact studies that, according to SUWA, were not proper comparables for evaluating the impacts to biological soils. SUWA also attached to its comments a scientific article by Dr. Jayne Belnap (in draft form) discussing the impacts of geophysical exploration on biological soils and vegetation.

Although SUWA's comments do not express the

concern articulated in its appellate brief that BLM did not map out the location of biological soils, its comments sufficiently raised the issue of whether BLM took a hard look at the proposed Project's potential impacts on biological soils. Accordingly, the court will consider the merits of SUWA's argument.

b. *Merits of SUWA's Argument*

SUWA contends that BLM did not take a "hard look" at the proposed Project's potential impact on biological soils. One of its complaints is that BLM did not map out the locations of biological soils within the proposed Project area. Because SUWA did not raise this particular complaint in its comments, the court will not address it. But the court will review BLM's overall information concerning biological soils to determine whether BLM took the requisite hard look at the issue.

In the EA, BLM cites to numerous sources relating to the recovery rates of biological soil crusts. (*See, e.g.,* EA Pt. 6.1 (listing literature cited).) "Biological soil crust" (also known as "cryptobiotic soil") is "a complex community of bacteria, algae, lichens, mosses, and fungi that often populate the soil surface, especially on arid lands." (EA at pp. 6-4 to 6-3, AR0083- 46 to AR0083-47.) The EA does not define "critical soils" in its glossary, but it does describe them in § 3.3.4, and the description shows that the two types of soil have very different characteristics. Although the EA maps "critical soils" (*see* EA Fig. 3.6, AR0083-6), BLM does not identify locations of "biological soils" in the proposed Project area. BLM just states that "[n]umerous areas of biological soil crusts occur in the project area." (*Id.* at p. 3-9, AR0083-5.)

**\*9** Although it is not absolutely clear from the EA, it appears that BLM considered "biological soils" to be different than "critical soils." Indeed, SUWA convincingly asserts that the two types of "soil" are mutually exclusive, and BLM does not argue otherwise. (*See, e.g., id.* at pp. 3-7 to 3-9, AR0083- 3 to AR0083-5 (describing critical soils and noting that such soils, which are highly susceptible to water

and wind erosion, are "made more susceptible when the vegetation or *biological soil crust* is removed") (emphasis added).) For that reason, the court treats them as different resources.

BLM notes that an evaluation of potential impacts on biological soils is very difficult to do because so many factors (including the weather at the time of the disturbance) affect the analysis. "The impact of a given surface disturbance [to biological soil crusts] depends upon [the disturbance's] severity, frequency, timing, and type, as well as climatic conditions during and after the disturbance (BLM 2001a)." (EA at p. 4-7, AR0083-19.) The EA does not discuss the biological soils in the proposed Project area itself. Instead, BLM notes that a relatively small percentage of the proposed Project area will be disturbed and BLM assumes that biological soils appear throughout the area that will be disturbed. BLM also emphasizes mitigation measures that focus specifically on reducing any impact the proposed Project might have on biological soils. (*See, e.g., id.* at pp. 2-10 to 2-11, AR0063-AR0064 (listing soil resource protection requirements, including raking disturbed biological soil crusts back into the tracks from the sides).) Given BLM's experience with the damage to and recovery of biological soils in other areas subjected to vibroseis exploration projects, BLM deduces that biological soils will not be significantly impacted in the proposed Project area.

SUWA complains about BLM's reliance on results of other seismic exploration projects. SUWA asserts that when BLM refers to the Western Geco Horse Point 3D seismic exploration project (BLM 20031) and the Veritas DGC Land Inc. 2D seismic exploration project (BLM 2001b, BLM 2003a-2003k), BLM is comparing apples to oranges because the geographic locations are so different (they get more annual precipitation than the proposed Project area). According to SUWA, comparing recovery rates of biological soils in wetter parts of the state to soils in a drier part of the state results in an uninformed decision. But BLM makes clear

that recovery rates vary depending on many factors, not just annual precipitation.

Furthermore, BLM had information from sources other than the Horse Point and Veritas projects regarding the recovery rates of biological soils. SUWA does not suggest that the information cited by BLM is incorrect. That information included studies about biological soil recovery rates.

The information presented in those studies was not uniform. According to BLM, "studies estimating recovery times for biological soil crusts vary considerably." (EA at p. 4-8, AR0083-20.) BLM cited to specific studies as examples of this variation. One study predicted recovery within 45-110 years (actual recovery was between 14 and 34 years). At another site, recovery was predicted to occur more than 400 years later (an early estimate) and, upon later review, predicted to recover in 42 years. And another study estimated that a site would recover after 85 years, but then decreased the estimate to 50 years after re-examination of the soil 14 years later. The Dr. Jayne Belnap study (upon which SUWA relies heavily) was only one of many that BLM cited. Her estimate ranged from 50-100 years. After showing the variation in estimates, BLM reported that "[t]hese and other estimates of recovery time indicate that such estimates are difficult to make and depend on numerous factors that are difficult to assess." (*Id.*)

**\*10** Under the hard look requirement, the agency must include definitive information about effect and risk, or provide an explanation why that may not be given, so that a reviewing court can evaluate agency action. *See Silverton Snowmobile Club,* 433 F.3d at 781-82 (holding that Forest Service's assumption that lynx species was present in project area containing potential lynx habitat did not violate "hard look" requirement). Here, BLM had a fair amount of information about biological soils but did not have definitive information because even the experts seemed to disagree about the recovery rates. BLM took that information, along with information it had gathered from its experience with

Not Reported in F.Supp.2d, 2007 WL 2873788 (D.Utah)
**(Cite as: 2007 WL 2873788 (D.Utah))**

recovery of biological soils after disturbance from other seismic exploration projects, added the mitigation measures (which it imposed based on experience from other projects), considered the relatively small area that potentially could be disturbed, [FN7] and made its decision.

> FN7. According to BLM, the proposed Project would disturb approximately 2,000 acres (5.1% of the proposed Project area) and that approximately 200 acres of "critical soils" would be disturbed (0.5% of the proposed Project area). (EA at p. 406, AR0083-18.)

BLM was sufficiently informed when it made its decision. The information in the record, and BLM's discussion, is sufficient to satisfy the hard look requirement of NEPA.

### ORDER

Given the deference due BLM under the case law, and given the reasons set forth above, the court finds that there was no clear error of judgment on BLM's part. Accordingly, BLM's decision was not arbitrary and capricious, and SUWA's request for reversal and remand is DENIED.

Not Reported in F.Supp.2d, 2007 WL 2873788 (D.Utah)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                      Page 1
Not Reported in F.Supp.2d, 2007 WL 3053293 (D.Utah), 35 NDLR P 226
**(Cite as: 2007 WL 3053293 (D.Utah))**

United States District Court,
D. Utah,
Central Division.
Mark H. WILLIAMS, et al., Plaintiffs,
v.
Roger BANKERT, et al., Defendants.
Southern Utah Wilderness Alliance, et al., Intervenors-Defendants.
No. 2:05CV503DAK.

Oct. 18, 2007.

**MEMORANDUM DECISION AND ORDER**

DALE A. KIMBALL, United States District Judge.

**\*1** This matter is before the court on Plaintiff Mark H. Williams, Don Keele, Bonnie Keele, Glenys Sittrud, Victor Johnson, Southeastern Utah OHV Club, Robert J. Telepak, Robert L. Norton, and Rainer Huck's appeal of a decision of the Interior Board of Land Appeals ("IBLA") which affirmed the Bureau of Land Management's ("BLM") implementation of the San Rafael Route Designation Plan ("Travel Plan"). [FN1] The court held a hearing on Plaintiff's appeal on July 18, 2007. Plaintiffs were represented by Curtis G. Kimble, Defendants were represented by Jeffrey E. Nelson, and Intervenors were represented by Stephen H.M. Bloch. The Intervenors were allowed to intervene during the appeal to the IBLA and have intervened in this case as well. Their arguments are aligned with the Defendants. Having fully considered the motion and memoranda submitted by the parties, the administrative record, and the facts and law relevant to this appeal, the court enters the following Memorandum Decision and Order.

FN1. During the litigation, Roger Bankert succeeded Patrick Gubbins as BLM's Price Field Office Manager, Selma Sierra succeeded Sally Wisely as BLM's Utah State Director, and Dirk Kempthorne succeeded Gale Norton as Secretary of the Department of the Interior. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, these public officers are substituted as defendants for the previously named parties.

**BACKGROUND**

This is an appeal of the Interior Board of Land Appeals' ("IBLA") decision in *Rainer Huck, et al.,* 168 IBLA 365 (April 18, 2006), upholding the BLM's approval of the San Rafael Route Designation Plan ("Travel Plan"). The Travel Plan was adopted in order to implement decisions made in the 1991 San Rafael Resource Management Plan ("RMP") regarding the management of off-highway vehicle use. Plaintiffs allege that the BLM's Travel Plan arbitrarily and capriciously violates the directions of the RMP and unlawfully amends the RMP to close open access and roads without utilizing legally-required procedures, public participation, and environmental analysis. Plaintiffs' action is brought under the Federal Land Policy and Management Act ("FLPMA") 43 U.S.C. § 1701; the National Environmental Policy Act ("NEPA") 42 U.S.C. § 4321 *et. seq.;* the Administrative Procedure Act ("APA") 5 U.S.C. § 701 *et. seq.;* and the Declaratory Judgment Act, 28 U.S.C. § 2201.

FLPMA requires the BLM to manage public lands "under principles of multiple use and sustained yield" and "in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archaeological values." *Id.* § 1732(a), § 1701(a)(8). FLPMA also requires the BLM to "develop, maintain, and, when appropriate, revise land use plans" to govern its management of the public lands. 43 U.S.C. § 1712(a). Accordingly, the BLM is charged with implementing planning decisions that balance various interests and uses.

" 'Multiple use management' is a deceptively simple term that describes the enormously complicated

Not Reported in F.Supp.2d                                                                Page 2
Not Reported in F.Supp.2d, 2007 WL 3053293 (D.Utah), 35 NDLR P 226
**(Cite as: 2007 WL 3053293 (D.Utah))**

task of striking a balance among the many competing uses to which land can be put." *Norton v. Southern Utah Wilderness Alliance,* 542 U.S. 55, 58 (2004). "Sustained yield" refers to the BLM's duty "to control depleting uses over time, so as to ensure a high level of valuable uses in the future." *Id.*

**\*2** OHV activity is one of the many multiple uses that must be considered in the land use planning process. Therefore, in each land use plan it prepares, the BLM designates all public lands covered by the plan as either open, limited, or closed to OHV use. 43 C.F.R. Subpart 8340, 8342.

The land within the San Rafael Swell was host to prolific mineral searches throughout the 1900s, culminating with the Uranium Boom in the 1950s. Consequently, the land contains many routes and trails. While the land is not in pristine condition, it is scenic and beautiful. The land is under the management of the BLM. In 1991, the BLM adopted the San Rafael RMP. The RMP governs land use on approximately 1.5 million acres of BLM-managed public land in the San Rafael Resource Area. This area includes the San Rafael Swell and surrounding areas in Emery County, Utah.

The RMP designated four OHV categories: (1) open to unrestricted cross-country travel; (2) closed to travel; (3) open with seasonal restrictions for deer and elk crucial winter ranges and pronghorn crucial fawning habitat; and (4) limited to designated roads and trails.

The RMP directed that OHV use on approximately 1 million acres of the San Rafael Resource Area be limited to designated roads and trails in order to protect critical soils, scenic resources, crucial wildlife habitat, and to provide recreational opportunities and special management for certain vegetation, cultural, and historic mining resources. The RMP specified that the route-designation process should apply only to dirt roads and trails across public lands. The designation would not apply to state or private lands, BLM system roads, county maintained roads, state or federal highway system roads,

or other roads for which existing rights-of-way had been established, all of which remain open to motorized travel.

The RMP also made tentative classifications of eligibility for protection under the Wild and Scenic Rivers Act, 16 U.S.C. §§ 1271 *et seq.,* for certain segments of the Green River, San Rafael River, and Muddy Creek in the San Rafael Resource Area. The RMP directed that the BLM take certain measures, including the limitation of OHV use to designated roads and trails, to afford adequate protection of these river segments until Congress acts to accept or reject the classifications.

Although the RMP required the designation of OHV routes on these lands, it did not make specific designations of roads and trails. Instead, the RMP directed that "ORV use designations developed in the RMP will be made following completion of an ORV implementation plan." The BLM complied with that requirement by adopting the Travel Plan at issue in this appeal.

In 1992, the BLM began soliciting and obtaining public input in the process of developing the Travel Plan. The BLM held eighteen meetings with diverse stakeholders including county commissioners, OHV clubs, environmental groups, mountain biking clubs, hiking groups, and other public land users. The BLM received more than 1,000 written comments. Based on these meetings and written comments, the BLM prepared the preliminary Route Designation Map, which was released for public review and comment on October 6, 1997.

**\*3** After the release of the preliminary Route Designation Map, the BLM briefed the Utah congressional delegation on the proposal and held public meetings in Utah and Colorado to discuss the proposal. BLM received more than 1,500 additional written comments following its public meeting on the proposed route designations.

The BLM also prepared an Environmental Assessment ("EA") on the Travel Plan. The EA considered

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 3053293 (D.Utah), 35 NDLR P 226
**(Cite as: 2007 WL 3053293 (D.Utah))**

various alternatives and selected the following for detailed analysis: (1) Alternative One would have designated 1045 miles of routes as open to all motorized vehicles; (2) Alternative Two would have designated 819 miles of routes as open to all motorized vehicles; (3) Alternative Three would have designated 557 miles of routes as open to all motorized vehicles and 23 miles open only to motorcycles; (4) Alternative Four would have designated 640 miles of routes as open to all motorized vehicles and 23 miles open only to motorcycles.

The EA was released for public review and comment on February 7, 2002. During the comment period, which extended through April 22, 2002, the BLM received approximately 1,200 substantive comments. The BLM prepared 23 pages of written responses to comments by subject matter, with detailed explanations of actions taken in response to those comments. In a number of cases, these public comments resulted in corrections to the proposed map in the EA.

On February 3, 2003, the BLM issued its Decision Record/Finding of No Significant Impact ("DR/FONSI") for the Travel Plan. The BLM selected a minor modification of Alternative Four. The BLM designated 677 miles of routes as open and 468 miles of routes as closed to OHV use. In addition, the BLM limited OHV use in certain areas during specified periods to protect pronghorn antelope fawning habitat and deer and elk winter ranges. The BLM explained why it had not selected the other alternatives studied in the EA. The DR does not apply to the approximately 1300 miles of federal, state, and county roads that are the primary means of travel by visitors to the San Rafael area.

The BLM's DR explained that the BLM was closing 468 miles of routes because the routes were (1) duplicate routes to destination points; (2) dead-end routes; (3) routes causing resource damage by inviting "route proliferation"; (4) routes that were naturally revegetating; (5) routes with conflicts between motorized and non-motorized users; (6) routes through riparian areas; (7) routes through critical

soils susceptible to damage; (8) routes having the most potential to affect threatened or endangered species; (9) routes that could affect cultural resources; and (10) routes that could affect the tentative classification of eligible wild and scenic river segments made in the San Rafael RMP. The BLM made available to the public the documentation that contained the detailed explanations of the designation decisions.

Plaintiffs and other parties objected to the route closures in an appeal to the IBLA. Those appeals were consolidated, and the Southern Utah Wilderness Alliance ("SUWA") was permitted to intervene in the appeal. The IBLA issued a decision upholding the BLM's decision. The IBLA held that (1) the BLM appropriately acted to preserve the characteristics of river segments that are potentially eligible for designation as "wild" or "scenic"; (2) the administrative record amply supported the BLM's designation of routes; (3) the BLM was not required to determine the validity of RS 2477 claims as a prerequisite to making its route designation decision; (4) the Travel Plan is consistent with FLPMA's multiple-use mandate; (5) the BLM complied with NEPA in adopting the Travel Plan; (6) the BLM solicited and considered public input in the process of developing and approving the Travel Plan; (7) the Travel Plan does not violate the Americans with Disabilities Act; and (8) the record does not contain evidence of impermissible bias on the part of BLM employees.

### STANDARD OF REVIEW

**\*4** Under Section 704 of the APA, this court has jurisdiction to review "final agency action." 5 U.S.C. § 704. The final agency action at issue in this case is the IBLA's decision upholding the BLM's adoption of the Travel Plan. Under Section 706 of the APA, this court must determine whether the IBLA's decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see also Utah Environmental Congress v. Zeiroth,* 190 F.Supp.2d 1265, 1267-68 (D.Utah 2002). In applying the ar-

Not Reported in F.Supp.2d                                                              Page 4
Not Reported in F.Supp.2d, 2007 WL 3053293 (D.Utah), 35 NDLR P 226
**(Cite as: 2007 WL 3053293 (D.Utah))**

bitrary and capricious standard, this court must de-
termine whether the "decision was based on a con-
sideration of the relevant factors and whether there
has been a clear error of judgment." *Citizens to Pre-*
*serve Overton Park v. Volpe,* 401 U.S. 402, 416
(1971). An "agency's decision is entitled to a pre-
sumption of regularity." *Olenhouse v. Commodity*
*Credit Corp.,* 42 F.3d 1560, 1574 (10th Cir.1994).

## DISCUSSION

Plaintiffs challenge the Travel Plan on various
grounds. They contend that the Travel Plan violates
FLPMA because it is inconsistent with the RMP,
ignores FLPMA's multiple-use mandate, is based
on an incomplete inventory of travel routes, and
was adopted without adequate consideration of
Plaintiffs' comments and suggestions. Plaintiffs also
argue that the Travel Plan violates NEPA because
the BLM did not evaluate appropriate alternatives
to the proposed course of action. Plaintiffs further
claim that certain BLM personnel involved in the
preparation of the Travel Plan were biased against
OHV use. Finally, Plaintiffs contend that the Travel
Plan violates the Rehabilitation Act of 1973 be-
cause it does not permit persons with disabilities to
access areas within the San Rafael Resource Area
that are accessible by non-disabled persons.

Plaintiffs allege that they have been unlawfully ex-
cluded from using motorized vehicles on certain
designated existing routes. Plaintiffs are complying
with the BLM's allegedly unlawful restrictions be-
cause they fear criminal sanctions should they viol-
ate the Travel Plan. See 43 C.F.R. § 8360.0-7
("Violations of any regulations in this part by a
member of the public, except for the provisions of §
8365.1.7, are punishable by a fine not to exceed
$1,000 and/or imprisonment not to exceed 12
months.") Plaintiffs ask the court to reverse the
BLM's decision and enjoin the BLM from again at-
tempting to violate its land management plan.

### 1. Bias

Plaintiffs claim that the preparers of the Travel Plan
were personally biased against OHVs and that the

EA is biased on its face. A claim of bias must be
supported by evidence of a personal interest on the
part of the allegedly biased government official.
*Converse v. Udall,* 262 F.Supp. 583, 590
(D.Or.1966).

Plaintiffs contend that the following observation by
Plaintiff Rainer Huck details the personal bias of
the Lead Preparer of the EA:

> Lead Preparer Jaynee R. Levy has a hatred of
> motorized recreation and access on public lands.
> She believes that wilderness is the highest and
> best use for the area studied in the EA. She thus
> has no place in any function related to designat-
> ing motorized travel routes. Her bias is so great
> she has no place within the BLM or any other
> public land agency. Others on the Staff, such as
> Tom Gnojek are similarly biased. This bias
> renders the entire EA a useless and meaningless
> document.

**\*5** Plaintiffs allege that Jaynee Levy illustrated her
predisposition in an email to co-workers, dated
September 16, 2002, "I know you would not want
to write the DR with what I think should be the fi-
nal decision although I would be very pleased to
have that ultimate power!" Plaintiffs assert that
while Levy did not have the ultimate power, she
had substantial power and influence as to what
routes did and did not get closed.

Plaintiffs rely on an isolated sentence from a
lengthy memorandum prepared by Jaynee Levy,
BLM's Price Field Office Outdoor Recreation Spe-
cialist. The quote, however, shows no bias. The en-
tire memorandum demonstrates Levy's dedication
to reviewing thousands of public comments about
the Travel Plan, her research into the concerns ex-
pressed in the comments, and the information from
the comments that she provided to the ultimate de-
cision-maker, Price Field Office Manager Patrick
Gubbins. Huck's unsupported allegation of Levy's
"hatred of motorized recreation" does not prove bi-
as.

Plaintiffs also rely on statements made by Kathleen

Not Reported in F.Supp.2d                                                        Page 5
Not Reported in F.Supp.2d, 2007 WL 3053293 (D.Utah), 35 NDLR P 226
**(Cite as: 2007 WL 3053293 (D.Utah))**

Clarke, the former BLM Director, in a policy speech reported in the Salt Lake Tribune on October 23, 2003. Clarke criticized freelancing bureaucrats within the BLM who pursued "personal interests" and agendas. She further stated: "I'm dealing with an agency that I think lost some discipline, lost some accountability, did a lot of freelancing. Individual priorities were pursued. Individual agendas maybe were allowed to take hold and personal interpretation of how things should be done became an issue. I am discovering there is great disparity between the offices in terms of how they are applying rules and regulations ... and we are working to reinstitute some management discipline."

However, this vague reference made by former BLM Director Kathleen Clarke regarding the operation of field offices statewide does not demonstrate bias on the part of any specific individuals. Therefore, it provides no grounds for finding bias.

With respect to bias evidenced in the EA itself, Plaintiffs contend that the EA lacks any actual rational and factual basis. Plaintiffs claim that nowhere in the text of the document is there a single reference to the positive and important aspects of Vehicle Assisted Access and Recreation. Each discussion is concerned with perceived, possible, or imaginable negative impacts. Thus, Plaintiffs claim that the EA demonstrates on its face that the author(s) had a hatred of vehicle assisted recreation because it fails to recognize and accommodate the significant and vital activities of such activities. Plaintiffs assert that an appropriate plan regulating OHV travel can only be developed by someone with at least some understanding of this activity and someone who is not an avowed opponent.

Plaintiffs have failed to demonstrate any personal bias in the preparation of the Travel Plan, and their allegations do not meet the threshold of a "substantial showing of bias." *Converse,* 262 F.Supp. at 590. Plaintiffs' claim that the Travel Plan is biased on its face is nothing more than a repetition of their argument that the plan lacks a rational and factual

basis. The Travel Plan is either rationally and factually supported or its not. In either event, there is no demonstration of bias. Accordingly, the court concludes that the IBLA correctly held that Plaintiffs failed to support their claim of bias.

**2. R.S. 2477 Claims**

**\*6** Plaintiffs argue that the BLM and the IBLA's decisions are arbitrary and capricious because they failed to consider the issue of valid R.S. 2477 claims. Agency action is arbitrary and capricious when the agency "completely fails to consider an important aspect of the issue." *Sierra Club v. Hodel,* 737 F.Supp. 629, 634 (1990). In this case, Plaintiffs assert that Emery County asserted hundreds of valid R.S. 2477 claims. In the EA, however, the BLM states that "it is beyond the scope of the EA to recognize or reject R.S. 2477 assertions, and this issue is not addressed further."

Plaintiffs take issue with whether it is beyond the scope of the EA to recognize valid R.S. 2477 roads. For example, in the Burr Trail EA, the BLM relied on its recognition of an R.S. 2477 right-of-way as rationale behind its finding that any impacts were not expected to be significant. The court in *SUWA v. National Park Service,* 387 F.Supp.2d 1178 (2005), held that the National Park Service "fully considered whether there was an R.S. 2477 right of way ... prior to completing the EA" and "did not fail to consider an important aspect of the problem." *Id.* at 1198.

But the BLM was not required to determine the validity of the R.S. 2477 claims prior to adopting the Travel Plan. One of the alternatives that BLM eliminated from detailed analysis would have designated all asserted R.S. 2477 rights-of-way as "open" to motorized travel. The BLM explained, however, why it decided not to study this alternative further:

> No regulations to either assert or recognize R.S. 2477 rights-of-way currently exist. Courts may ultimately determine the validity of R.S. 2477 assertions. While thousands of R.S. 2477 claims

Not Reported in F.Supp.2d, 2007 WL 3053293 (D.Utah), 35 NDLR P 226
**(Cite as: 2007 WL 3053293 (D.Utah))**

have been asserted by Emery County, it is beyond the scope of this EA to recognize or reject R.S. 2477 assertions, and this issue is not addressed further. Nothing in this EA is intended to provide evidence bearing on or addressing the validity of any R.S. 2477 assertions. At such time as a decision is made on R.S. 2477 assertions, BLM will adjust its travel routes accordingly, if necessary.

Neither FLPMA nor any other statute imposes a duty on the BLM to determine the validity of R.S. 2477 right-of-way claims as part of the process of preparing the Travel Plan.

In *SUWA v. BLM,* 425 F.3d 735 (10th Cir.2005), the Tenth Circuit explained that, in determining whether a valid R.S. 2477 right-of-way has been created, "the presumption is in favor of the property owner; and the burden of establishing public use for the required period of time is on those claiming it." *Id.* at 768. Thus, in developing the Travel Plan, the BLM was entitled to rely on this presumption and only recognize those R.S. 2477 rights-of-way for which claimants had previously carried their evidentiary burden. The EA provides that the Travel Plan will be adjusted to reflect any R.S. 2477 routes that may be proved in judicial proceedings.

Plaintiffs seek to require the BLM to engage in wholly discretionary, non-binding, internal administrative review of the claimed R.S. 2477 rights-of-way. Although the Tenth Circuit recognized in *SUWA* that an agency can make such determinations for its own administrative purposes, nothing in that decision suggests that third parties may judicially compel an agency to initiate such internal decision-making. In fact, such a holding would violate the principle that an agency's failure to engage in discretionary, internal decision-making is not "discrete agency action" subject to judicial review under the APA. *See Center for Biological Diversity v. Veneman,* 394 F.3d 1108, 1113 (9th Cir.2005).

**\*7** In *Kane County v. Kempthore,* Case No. 2:05cv941BSJ (D. Utah June 29, 2007), a recent

case from this court, the plaintiffs challenged the BLM's management plan with respect to the Grand Staircase-Escalante National Monument on the ground that the BLM had not made determinations of the validity of the counties' R.S. 2477 claims as part of its development of the restrictions on OHV travel. The court rejected the argument and ruled that "the final, binding determination of the counties' R.S. 2477 right-of-way claims is a matter for the courts, not the BLM." The court further ruled that since the counties' claims of infringement on their rights arose from alleged property rights, the appropriate method for asserting those rights would be by means of an action under the Quiet Title Act, not a challenge to the BLM's management plan.

The court concludes that the IBLA properly rejected Plaintiffs' R .S. 2477 claim. The BLM was not obligated to resolve R.S. 2477 issues as a part of the Travel Plan. The Travel Plan has not precluded a finding on these rights-of-way, and Defendants acknowledge that the Travel Plan can be amended if the rights-of-way are demonstrated. To mandate that an agency make a determination on thousands of R.S. 2477 claims during the decision making on the rest of the Travel Plan could paralyze an agency.

**3. FLPMA/WSR Designations**

In addition, Plaintiffs argue that the BLM violated FLPMA when it adopted route closures that conflicted with the RMP's directions for wild and scenic rivers. FLPMA Section 302(a) mandates: "The Secretary shall manage the public lands ... in accordance with the land use plans developed by him under section 202 of this Act." 43 U.S.C. § 1732(a). The Wild and Scenic Rivers Act institutes a national wild and scenic rivers system, designates the initial component of that system, and prescribes "the methods by which, and standards according to which, additional components may be added to the system from time to time." 16 U.S.C. § 1272.

The RMP identifies three river segments as having

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 3053293 (D.Utah), 35 NDLR P 226
**(Cite as: 2007 WL 3053293 (D.Utah))**

potential for wild and scenic river designation un-
der the Wild and Scenic River Act. The RMP states
that "[a]dditional planning will be needed to evalu-
ate other rivers for eligibility under the Wild and
Scenic Rivers Act. Suitability for designation as a
wild and scenic river will be determined in a future
plan amendment for the three original rivers and
any additional rivers or streams determined to be
eligible."

Plaintiffs argue that the RMP standard did not au-
thorize or require the closure of any routes to OHV
use or the restriction of dispersed camping. No fu-
ture plan amendment was undertaken within the
RMP to determine eligibility of the river segments
for wild and scenic river designation. The RMP's
1991 management standard for the river segments
remained in effect and were controlling. The BLM,
however, closed or restricted routes, areas, and dis-
persed camping in the Travel Plan stating, "Manage-
ment activities are not allowed to damage the exist-
ing classification" and "Continuation of OHV use
could jeopardize the tentative [wild or scenic] clas-
sification." Plaintiffs claim that this justification is
erroneous because there was no existing wild and
scenic river classification under the RMP, tentative
or otherwise. Therefore, Plaintiffs assert that the
BLM has failed to show a rational basis for the
WSR rationale applied and has failed to support the
rationale by technical analysis.

**\*8** The RMP, however, directed that OHV use
should be limited to designated roads and trails in
order to protect resources, including the tentative
classifications of certain river segments under the
WSR Act. The Travel Plan closed some routes to
protect the RMP's tentative classification of certain
river segments as "wild" or "scenic" under the WSR
Act. The Travel Plan did not alter or supersede the
RMP, nor did it modify the tentative river classific-
ations in the RMP. Rather, the Travel Plan com-
plied with the RMP's direction to protect the eligib-
ility of those river segments under the statute. Thus,
the BLM's decision to close certain routes to protect
tentative classifications under the Wild and Scenic

Rivers Act is consistent with the RMP.

Plaintiff's argument that the BLM's action violated
FLPMA because it is the equivalent of designating
these river segments as wild and scenic rivers, and
that such designation can be done only through a
plan amendment, ignores the purpose of the Travel
Plan. If the Travel Plan had not addressed these
areas then it would have interfered with the RMP's
tentative classification of the river segments. There-
fore, the court concludes that the IBLA correctly
held that the BLM's actions were an appropriate im-
plementation of the RMP's requirements.

**4. NEPA/WSR Designations**

Plaintiffs further argue that the BLM violated
NEPA Section 102(2)(E) when it closed routes
based on WSR considerations and did not study,
develop, or describe appropriate alternatives to the
action. Section 102(2)(E) requires environmental
analysis prior to action on a proposal and mandates
that all agencies shall "study, develop, and describe
appropriate alternatives to recommended courses of
action in any proposal which involves unresolved
conflicts concerning alternative uses of available
resources." 42 U .S.C. § 4332(2)(E) (2006).

Plaintiffs assert that the BLM also violated 40
C.F.R. § 1506.1(c), which provides that

[w]hile work on a required program environment-
al impact statement is in progress and the action
is not covered by an existing program statement,
agencies shall not undertake in the interim any
major federal action covered by the program
which may significantly affect the quality of the
human environment unless such action: (1) Is jus-
tified independently of the program; (2) Is itself
accompanied by an adequate environmental im-
pact statement; and (3) Will not prejudice the ul-
timate decision on the program when it tends to
determine subsequent development or limit al-
ternatives.

Defendants argue that Plaintiffs' entire NEPA-based
argument consists of a citation to a NEPA statute

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                      Page 8
Not Reported in F.Supp.2d, 2007 WL 3053293 (D.Utah), 35 NDLR P 226
**(Cite as: 2007 WL 3053293 (D.Utah))**

and a reference to a regulation issued by the Council on Environmental Quality and fails to give any factual or legal analysis. Plaintiffs' analysis of this argument is so thin that the court would be justified in declining to address it for that reason alone. *Utah Shared Access Alliance v. Carpenter,* 463 F.3d 1125, 1137 n. 4 (10th Cir.2006). In any event, Plaintiffs did not present these NEPA issues to the IBLA and thus waived their right to present them here. *Wilson v. Hodel,* 758 F.2d 1369, 1372 (10th Cir.1985).

**\*9** Addressing the merits of Plaintiffs' contentions, however, the court turns to the statute that requires agencies to consider alternatives to proposed courses of action, 42 U.S.C. § 4332(2)(E). In developing the Travel Plan, the BLM considered numerous alternatives from which four were selected for detailed analysis. The Travel Plan is based on Alternative Four with modifications that were prompted in part by public input. Thus, the BLM followed the statutory requirement to consider alternatives.

The regulation that Plaintiffs cite imposes certain requirements "[w]hile work on a required program environmental impact statement is in progress and the action is not covered by an existing program statement." 40 C.F.R. § 1506.1(c). The Travel Plan, however, was covered by an existing program statement, the RMP. Therefore, the cited regulation has no application to the Travel Plan. Accordingly, the court find no basis for finding a violation of NEPA or 40 C.F.R. § 1506.1(c) even if the court considers the merits of Plaintiffs' argument.

### 5. FLPMA/Inventory of Routes & Consideration of Comments

Plaintiffs contend that the BLM violated FLPMA Section 201 by failing to maintain a factually accurate inventory of motorized routes and areas and their use patterns. FLPMA Section 201 mandates that the BLM "shall prepare and maintain on a constant basis an inventory of all public lands and their resources and other values (including, but not limited to, outdoor recreation and scenic values) ...

This inventory shall be kept current." 43 U.S.C. § 1711. Plaintiffs claim that the Travel Plan, however, closes constructed motorized routes and restricted or eliminated dispersed camping based upon its inaccurate inventory.

Victor Johnson, one of the Plaintiffs, went to great lengths to provide the BLM with accurate detailed maps and inventories of motorized routes. While working with various BLM field and office personnel, Johnson claims that they would "marvel at the detail of his maps" and give him a dumbfounded look when he told them that he had sent the same maps to the head office more than once and they should have already seen them.

Johnson's individual experience with the Price Field Office, however, does not demonstrate a violation of FLPMA. The BLM conducted field examinations of the routes challenged by Mr. Johnson and in many cases added routes to its inventory map. The BLM's decision was based on an extensive inventory database of motorized routes compiled in the ten years following the adoption of the 1991 RMP. Rather than dispute the route inventory that the BLM compiled, Plaintiffs appear to challenge the fact that the BLM did not modify the inventory to coincide with Plaintiffs' opinions. The question for the IBLA was not whether the BLM's decision was consistent with the opinion of any particular party, but instead whether the decision was based on substantial evidence in the record. The BLM relied on extensive route information that was compiled not only from BM's existing data base, but also from information supplied by various parties, and BLM field work during the time it was preparing the Travel Plan. The IBLA, therefore, correctly concluded that the BLM's decision was amply supported by the record.

**\*10** Plaintiffs further claim that the BLM violated FLPMA section 202 by refusing to receive, to acknowledge, and/or to reasonably consider their comments regarding routes that were subsequently closed to motorized uses in the Travel Plan. Section 202 states that the "Secretary shall allow an oppor-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

tunity for public involvement" by establishing procedures that allow notice and an opportunity to comment on the plans relating to the management of public land. 43 U .S.C. § 1712(f).

Plaintiffs erroneously allege that the BLM was amending the RMP when it adopted the Travel Plan. The Travel Plan did not amend the RMP but rather implemented its directions. FLPMA's provisions regarding public participation in the land-use planning process are inapplicable, and the IBLA correctly noted that the applicable public participation requirements are not found in FLPMA but in the regulations implementing NEPA, such as 40 C.F.R. § 1500.2(d) and Part 1503.

Nonetheless, the record belies Plaintiffs' allegation that the public was not adequately involved in the process. The BLM held numerous meetings with various interest groups and received thousands of written comments in the process of developing both the preliminary Route Designation Map and the EA on the Travel Plan. After the release of the EA, the BLM received approximately 1200 additional substantive comments and prepared over 125 specific responses to these comments. The BLM's responses to comments on specific routes demonstrates that the BLM fully considered and responded to the public comments. The BLM also decided to leave open certain routes that it had originally proposed closing.

Therefore, the record adequately demonstrates that the ultimate decision was reached based on the BLM's responses to public comments. The record does not support Plaintiffs' allegation that the BLM violated Section 202 of FLPMA by failing to provide for adequate public participation during the preparation of the Travel Plan.

### 6. FLPMA/Multiple-Use Mandate

Plaintiffs also contend that the Travel Plan violates FLPMA's multiple-use mandate because it does not utilize the combination of resource values that will best meet the present and future needs of the Amer-

ican people. FLPMA directs the BLM to manage public lands under the principle of multiple use, which is defined in part as "the management of public lands and their various resource values so that they are utilized in the combination that will best meet the present and future needs of the American people." 43 U.S.C. § 1702(c).

Plaintiffs argue that BLM's weighing of the resource values was unreasonable and the balance that BLM chose violates FLPMA's multiple-use mandate. However, FLPMA's multiple-use mandate does not require that all uses be allowed on all areas of the public lands. That would preclude any kind of balance. The purpose of the mandate is to require the BLM to evaluate and choose an appropriate balance of resource uses, which involves tradeoffs between competing uses.

*11 The Plaintiffs' burden is to show that the balance of uses that the BLM chose reflects a "clear error of judgment." *Citizens to Preserve Overton Park,* 401 U.S. at 416. The BLM evaluated several alternatives, solicited public input, and designated routes in a manner that would provide for a variety of uses of the lands while protecting the resources of the area. The IBLA correctly concluded that "[Plaintiffs'] simple disagreement with the balance BLM chose does not establish that the closure of various OHV routes violated FLPMA's multiple use mandate."

### 7. Vocational Rehabilitation Act

Plaintiffs argue that the Travel Plan violates the Vocational Rehabilitation Act. The Vocational Rehabilitation Act prohibits discrimination on the basis of disability by the federal government. Section 504 states:

> No otherwise qualified individual with a disability in the United States, as defined in section 705 of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any pro-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 3053293 (D.Utah), 35 NDLR P 226
**(Cite as: 2007 WL 3053293 (D.Utah))**

gram or activity conducted by an Executive agency or by the United States Postal Service. 29 U.S.C. § 794.

Plaintiffs assert that the Travel Plan denies Plaintiffs motorized vehicle access to areas to which non-disabled individuals have access. Plaintiffs contend that the central purpose of the Rehabilitation Act is to assure "evenhanded treatment between the disabled and the able-bodied." *See Doe v. Pfrommer,* 148 F.3d 73, 82 (2d Cir.1998). However, by excluding the disabled from equitable access to these areas, Plaintiffs claim that the BLM denies them the benefits of public lands.

Plaintiff Robert Norton provided a Statement of Reasons for Appeal that states that using a motorized vehicle is a requirement for him to travel long distances in our public back country because his Rheumatoid Arthritis prevents him from hiking. He also states that his elderly mother and father can no longer hike into areas of outstanding beauty such as Seger's Hole because of various ailments and conditions.

It is not, however, a violation of the Rehabilitation Act that able-bodied persons can explore off-trail areas on foot or mountain bike while disabled persons cannot. Section 504 of the Rehabilitation Act does not require absolute equality of access between the disabled and the able bodied but, rather, requires a balance between the need for reasonable accommodation of the handicapped and the manageable bonds of the federal program. *Alexander v. Choate,* 469 U.S. 287, 297-99 (1985).

In the 1991 RMP, the BLM decided that the distinctive character of the San Rafael Resource Area could only be preserved by limiting OHV access to designated routes. The BLM did not unreasonably limit motorized access, however. Motorized access is available on more than 1300 miles of primary access roads within the area that are not subject to the Travel Plan, and another 677 miles of open routes that are designated by the Travel Plan.

*12 The Travel Plan provides meaningful access to the Area while fulfilling the BLM's statutory duty to protect those lands and resources. Allowing unlimited cross-country motorized access for all handicapped persons would fundamentally alter the balance the BLM has struck among the multiple uses in both the RMP and the Travel Plan. Therefore, the Travel Plan does not run afoul of the Rehabilitation Act. Rather, the Travel Plan meets the requirements of the Rehabilitation Act because it provides handicapped persons meaningful motorized access to the San Rafael Resource Area.

Furthermore, there are procedural deficiencies with respect to Plaintiffs' Rehabilitation Act claim. The BLM's decision to limit OHV travel to designated routes occurred in the 1991 RMP. This case is the first time Plaintiffs have challenged that determination. In addition, the Rehabilitation Act has its own procedural requirements. Written complaints of noncompliance must be filed with the Director of the Office for Equal Opportunity of the Department of the Interior within 180 days of the alleged discrimination. The agency then investigates the complaint and responds. If the complainant is dissatisfied with the agency's response, he or she can appeal the decision. Plaintiffs, in this case, have not exhausted their administrative remedies on such a claim, which is necessary before seeking judicial relief. *McKart v. United States,* 395 U.S. 185, 193 (1969).

Moreover, Plaintiffs did not raise this issue in their appeal to the IBLA. The claim was first asserted in Plaintiffs' Complaint filed in this case. Although Plaintiff Huck asserted a claim under the Americans with Disabilities Act, the IBLA summarily dismissed that argument based on Huck's failure to present any evidence that he met the ADA's disability requirements. The Rehabilitation Act was never raised before the IBLA. That failure prevents Plaintiffs from raising the issue for the first time before this court. Accordingly, Plaintiffs have waived their Rehabilitation Act claim. *Nevada v. Dept. of Energy,* 457 F.3d 78, 88-89

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 3053293 (D.Utah), 35 NDLR P 226
**(Cite as: 2007 WL 3053293 (D.Utah))**

Page 11

; *Wilson v. Hodell,* 758 F.2d 1369,1372-73 (10th Cir.1985).

Therefore, the court concludes that this claim is not properly before the court. Plaintiffs have failed to exhaust the appropriate administrative remedies for such a claim and failed to assert the claim before the IBLA. Even if the claim was properly before the court, it fails because there is no requirement that a disabled person have access to every trail that an able bodied person can access. There are numerous routes accessible to motorized vehicles in the Travel Plan. Therefore, the Travel Plan provides meaningful access under the requirements of the Rehabilitation Act.

## CONCLUSION

Based on the above reasoning, the court concludes that there is no basis for overturning the decision of the IBLA affirming the BLM's adoption of the Travel Plan. Therefore, the court affirms Defendants' adoption of the Travel Plan and dismisses Plaintiffs' appeal.

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.




BIODIVERSITY CONSERVATION ALLIANCE, *ET AL.*

174 IBLA 1                              Decided March 3, 2008



# United States Department of the Interior

## Office of Hearings and Appeals

Interior Board of Land Appeals
801 N. Quincy St., Suite 300
Arlington, VA 22203


BIODIVERSITY CONSERVATION ALLIANCE, *ET AL.*


IBLA 2004-316, 2005-3                    Decided March 3, 2008

     Appeals from a Record of Decision of the Wyoming State Director, Bureau of Land Management, authorizing the Desolation Flats Natural Gas Field Development Project.  BLM/WY/PL-04/029+1310.

     Affirmed in part; affirmed as modified in part.

1.     Federal Land Policy and Management Act of 1976: Generally--Oil and Gas Leases: Generally--Oil and Gas Leases: Stipulations

     When BLM issues a Record of Decision to approve an oil and gas development project, BLM's decision will not be found to constitute unnecessary or undue degradation of the public lands if its conclusions have a rational basis in the record, even if it does not (1) adopt appellants' proffered alternative to make specific decisions regarding directional drilling or co-locating wells; (2) delay drilling until after consideration of citizens' proposals to change the designation of land open to oil and gas leasing to wilderness or areas of critical environmental concern; or (3) adopt appellants' positions regarding mitigation to protect sage grouse leks and big game winter range,.

2.     Federal Land Policy and Management Act of 1976: Generally-- Federal Land Policy and Management Act of 1976: Land Use

     Where BLM establishes a reasonably foreseeable development scenario for purposes of land use planning and environmental review, that scenario is not a land use decision establishing a binding maximum to which BLM must conform.  A subsequent decision to exceed such a scenario does not violate the land use plan, FLPMA, or the rules at 43 C.F.R. Subpart 1610.

3.      Environmental Policy Act--Environmental Quality:
        Environmental Statements--National Environmental
        Policy Act of 1969: Generally

        BLM may prepare a programmatic or project-level
        environmental impact statement for exploration and
        development of an oil and gas field, deferring site-specific
        environmental analysis of individual well sites until
        applications for permits to drill wells are submitted.

APPEARANCES:  Mike Chiropolos, Esq., Boulder, Colorado, for Biodiversity
Conservation Alliance, *et al.*; Johanna H. Wald, Esq., San Francisco, California, for
Natural Resources Defense Council; Michael Saul, Esq., Boulder, Colorado, for
National and Wyoming Wildlife Federations; Terri L. Debin, Esq., Office of the
Regional Solicitor, U.S. Department of the Interior, Lakewood, Colorado, for the
Bureau of Land Management; and Laura Lindley, Esq., and Robert C. Mathes, Esq.,
Denver, Colorado, for Cabot Oil & Gas Corp., EOG Resources, Inc., and Sampson
Resources Company.

OPINION BY ADMINISTRATIVE JUDGE HEMMER

On July 27, 2004, the Wyoming State Director, Bureau of Land Management
(BLM), issued a Record of Decision (ROD) authorizing the "Desolation Flats Natural
Gas Field Development Project" (Project) on leased Federal lands in Ts. 13-16 N.,
Rs. 93-96 W., Sixth Principal Meridian, Sweetwater and Carbon Counties, Wyoming
(Project Area).  Two groups of environmental associations appealed the decision,
arguing that it violates sections 202 and 302 of the Federal Land Policy and
Management Act of 1976 (FLPMA), 43 U.S.C. §§ 1712 and 1732 (2000), and
section 102(2)(C) and (E) of the National Environmental Policy Act of 1969 (NEPA),
42 U.S.C. § 4332(2)(C) and (E) (2000).

Biodiversity Conservation Alliance, Wyoming Outdoor Council, Center for
Native Ecosystems, The Wilderness Society, and Wyoming Wilderness Association
(collectively, BCA) appealed and petitioned for a stay of the decision in an appeal
docketed as IBLA 2004-316, alleging numerous violations of FLPMA and NEPA.  We
denied BCA's petition for a stay by order dated October 26, 2004.  In that order, and
in an order dated September 20, 2004, we granted requests to intervene filed by
Cabot Oil & Gas Corporation (Cabot), EOG Resources, Inc. (EOG), proponents of the
Project, and Samson Resources Company (Samson), a successor-in-interest to a
proponent of the Project (collectively, Intervenors).

Natural Resources Defense Council, National Wildlife Federation, and
Wyoming Wildlife Federation (collectively, NRDC) filed an appeal, IBLA 2005-3, in

which they allege similar violations of NEPA and FLPMA.  By order dated November 22, 2004, we granted requests from Intervenors to intervene in this appeal as well.  We consolidate the appeals to consider the merits.

*Background – The Desolation Flats Project*

In 1999, several operators, including Cabot, EOG, and Sampson's predecessor-in-interest, submitted to BLM a proposal for an exploratory drilling and development project involving 592 gas wells to be drilled over a 20-year period on leased Federal lands in the Desolation Flats area of Wyoming.  ROD at 1.  Over 93% of this area is subject to Federal oil and gas leases.  BLM Response to Petition for Stay, IBLA 2004-316, at 4; BCA Reply at 1.  The operators later modified the proposal to reduce to 385 the number of potential gas wells to concentrate exploration and development in the most economically and technically feasible parts of the Project Area.  *Id.*  The area encompasses approximately 233,542 acres, 224,434 of which are Federally-owned.  Final Environmental Impact Statement for the Desolation Flats Natural Gas Field Development Project, May 2004 (FEIS) at 1-1.  Approximately 94% of the Project Area is within the administrative jurisdiction of BLM's Rawlins Field Office, governed by the November 1990 Great Divide Resource Management Plan (RMP)[1]; the remainder (6%) is managed by BLM's Rock Springs Field Office under the August 1997 Green River RMP.  ROD at 1.

On May 18, 2000, BLM published a notice of intent to prepare an EIS for the Project.  ROD at 4.  It completed the Draft EIS (DEIS) in April 2003, analyzing three alternatives in detail:  the Proposed Action, described below; Alternative A, which involved expanding the project to 592 wells in the event the economic environment changed to make drilling in additional locations feasible; and the No-Action Alternative.  In this case, because the subject land is generally subject to oil and gas leases which give lessees the right to exploit oil and gas, the no-action alternative was not a "no development" alternative.  Rather, taking "no action" (that is, *not* undertaking to consider development of the Project under a single EIS) would reject the operators' proposal but would nonetheless result in consideration of individual Applications for Permits to Drill (APDs) submitted by lessees or operators on a case-by-case basis.  DEIS at S-2 and S-3.

The Proposed Action included 385 wells to be drilled at 361 locations.  FEIS at 1-2.  Assuming a forecasted success rate of 65%, the project would encompass 250 producing wells at 235 well sites, supplementing 89 wells already existing in the Project Area.  *Id.*  (Of the wells predicted to be successful, 237 would be located in the Rawlins Resource Area; 13 would be in the area managed by the Rock Springs

_____
[1]  The Great Divide RMP is currently being revised and updated, and also renamed the Rawlins RMP.

Field Office.)  Development was scheduled to begin in 2004 and continue for 20 years.  The total projected life of the Project was 30 to 50 years.  *Id.*  BLM estimated that the new, short-term surface disturbance caused by the Project would be 4,923 acres:  1,444 acres for wells, 2,624 acres for new road construction or road upgrades, 758 acres for new pipelines, and 97 acres for ancillary facilities (4 compressor stations, one gas processing plant, three water evaporation ponds, two disposal wells, and ten water wells).  *Id.*  In total, approximately 2.1% of the Project Area would be disturbed in the short term.  *Id.*  BLM forecasted that total long-term surface disturbance, after rehabilitation, would be reduced to 2,139 acres, or 0.92% of the Project Area:  336 acres for wells (235 well sites with an average of 1.43 acres of long-term disturbance per site); 1,706 acres for roads (assuming reclamation of roads leading to unsuccessful well sites); and 97 acres for ancillary facilities.  *Id.*

The DEIS describes two alternatives considered but rejected from detailed study:  the Expanded Wilderness Alternative and the Directional Drilling Alternative, both proposed by BCA.  DEIS at 2-42 to 2-43; ROD at 6.  After receiving and considering public comment, BLM issued the FEIS in May 2004.  Both the FEIS and the DEIS were tiered to the EISs prepared in connection with BLM's land use planning documents governing the Project Area; these are the November 1990 Great Divide RMP for the Rawlins Field Office and the August 1997 Green River RMP for the Rock Springs Field Office.  DEIS at S-1; FEIS at 1-1.  The applicable NEPA documents for the Great Divide RMP are the April 1987 Medicine Bow-Divide (Great Divide Resource Area) Draft Environmental Impact Statement (1987 Great Divide DEIS) and a 1990 Final EIS (together the Great Divide RMP/EIS).

On July 27, 2004, the Wyoming State Director issued an ROD adopting the Proposed Action, thereby authorizing up to 385 gas wells to be drilled on up to 361 drill sites, and construction or improvement of 542 miles of roads, 361 miles of natural gas pipelines, four compressor stations, and one natural gas processing plant over 20 years.  ROD at 5.  The ROD did not approve specific sites for the 385 wells, or provide site-specific analysis of potential well sites.  BLM deferred that level of detailed analysis to NEPA documentation to be prepared in association with APDs submitted by the project proponents.  ROD at 2 ("Prior to issuing any permit or authorization to implement these activities on the BLM-administered lands, the BLM must analyze each component of the Proposed Action on a site-specific basis and subject to NEPA."); FEIS at 3-4, 5-38 to 5-41; DEIS at 2-4, 2-6 to 2-7.

*Analysis*

I.  *FLPMA.*

Appellants' allegations that the ROD violates FLPMA fall into two general categories.  They argue that the ROD (i) fails to avoid unnecessary or undue

degradation to the environment, and (ii) impermissibly authorizes development in excess of the Reasonably Foreseeable Development scenario (RFD) established in the Great Divide RMP/EIS.

### A. Unnecessary or Undue Degradation

Section 302(b) of FLPMA, 43 U.S.C. § 1732(b) (2000), extends protection to the administration of the public lands: "In managing the public lands the Secretary shall, by regulation or otherwise, take any action necessary to prevent unnecessary or undue degradation of the lands." The Department has issued no regulation defining what might constitute "unnecessary or undue degradation" in the context of onshore oil and gas development, an activity where some level of environmental degradation is to be expected. As we recently explained:

> As the Board has noted, "[n]either FLPMA nor implementing regulations defines the term 'undue or unnecessary degradation.'" *Colorado Environmental Coalition*, 165 IBLA 221, 229 (2005); *see* 43 U.S.C. § 1702 (2000). In other contexts, BLM has promulgated regulations defining the term. *See, e.g.,* . . . 43 C.F.R. § 3809.5 (surface management). No similar definition appears in the onshore oil and gas regulations. *Compare* 43 C.F.R. § 3100.0-5 (definitions for Onshore Oil and Gas Leasing: General) and 3160.0-5 (definitions for Onshore Oil and Gas Operations). However, those [latter] regulations provide that the right of a lessee to
>
>> explore for, drill for, mine, extract, remove and dispose of all the leased resource in a leasehold [is] subject to: Stipulations attached to the lease, restrictions deriving from specific, nondiscretionary statutes, and such reasonable measures as may be required by the authorized officer to minimize adverse impacts to other resource values, land uses or users not addressed in the lease stipulations at the time operations are proposed.

*Wyoming Outdoor Council*, 171 IBLA 108, 121 (2007), *quoting* 43 C.F.R. § 3101.1-2.

Nonetheless, FLPMA coexists with mineral leasing statutes and recognizes the need for multiple use management, which includes taking into account the nation's need for nonrenewable resources such as minerals, 43 U.S.C. § 1702(c) (2000), and "domestic sources of minerals . . . from the public lands," 43 U.S.C. § 1701(a)(12) (2000). Congress thus recognized that the mere act of approving oil and gas development does not constitute unnecessary or undue degradation under FLPMA, and that something more than the usual effects anticipated from such development,

subject to appropriate mitigation, must occur for degradation to be "unnecessary or undue." *See also* BCA Ex. CC, Instruction Memorandum No. (IM) 92-67 at 2 (Dec. 3, 1991) (standard "implies that there is also *necessary and due degradation*").

BCA argues that BLM has failed to meet its duty to avoid unnecessary or undue degradation on public lands because BLM did not adopt BCA's suggestions of "specific ways to avoid altogether or lessen the environmental impacts associated with additional development of the [Project Area], such as employing directional drilling, locating multiple wells per pad, . . . and implementing more stringent and scientifically supportable protections for sage grouse leks and winter-range." BCA Petition for Stay (BCA PS) at 32. We disagree with BCA that BLM's choice not to adopt BCA's mitigation recommendations constitutes, by law or rule, unnecessary or undue degradation.

[1]  The question remaining is whether BLM's decision was, as BCA argues, without rational foundation because BLM failed to minimize adverse impacts where possible, and, if so, whether that failure logically would constitute unnecessary or undue degradation. *See* BCA PS at 32.[2] BLM responded to BCA's comment letter with 59 pages of explanation, addressing each suggestion and explaining why BLM chose not to adopt it. *See* FEIS at 5-43, 5-53 (directional drilling, multiple wells per pad); 5-43 to 5-44, 5-61 (sage grouse); 5-51 to 5-52, 5-55 to 5-58 (winter range). With respect to BCA's specific allegations of failures amounting to unnecessary or undue degradation, the record shows as follows:

1.  *BCA's complaints that BLM did not adopt BCA's suggestions for employing directional drilling or locating multiple wells per pad.* BCA suggested that BLM consider an alternative of "directional drilling only." DEIS at 2-43. BLM responded in considerable detail, (a) explaining that BLM anticipated that such drilling methods *would be considered* at the APD phase; (b) describing problems encountered by Union Pacific Resources Company in attempting to drill 17 diagonal wells at the nearby Wamsutter Field, which showed that a hard and fast rule was not technically feasible; and (c) discussing the economic and mechanical limits associated with standard drilling equipment that make diagonal drilling impossible at some sites. *Id.* at 2-43 to 2-44. BLM noted this answer in responding to BCA's comments. FEIS at 5-43. We find no error in BLM's explanation, let alone a lack of rational basis that could compel

_____

[2]  BCA argues that BLM's decisions were "arbitrary, capricious, and an abuse of discretion." BCA PS at 32. This standard derives from the Administrative Procedure Act (APA) which provides that Federal courts must set aside actions of an agency found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (2000). As an administrative tribunal, we review a BLM decision to determine whether it is supportable on a rational basis. *Southern Utah Wilderness Alliance,* 160 IBLA 225, 233 (2003).

a finding of unnecessary or undue degradation.  BCA's position is, ultimately, that "BLM failed to recognize that protecting other resources might sometimes *require* conditioning drilling approvals on such technologies."  BCA Reply at 8 (emphasis BCA's).  Nothing BLM has done precludes such a requirement at the stage when BLM considers an APD, and BLM has reasonably explained why it will not adopt such requirements at the stage of preparing the FEIS for the development project.

2.  *BCA's complaints that BLM did not adopt BCA's proposals to delay drilling to protect wilderness character or proposed ACECs to be addressed in the revision of the Great Divide RMP.*  At the time of the ROD, at most, BLM had stated its intention to update the Great Divide RMP; the Rawlins Draft RMP had not been completed at that time.  BCA proposed that various portions of the Desolation Flats Project Area be designated as wilderness in a 2001 Citizen's Wilderness Proposal.  DEIS at 2-42.  BCA also proposed that some portions be designated as ACECs.  BLM considered the possibility of an Expanded Wilderness Alternative, but rejected it.  *Id.*  BLM explained that it would consider relevant citizens' proposals through appropriate NEPA documentation, and that, to the extent "proposed development activities were found to impair wilderness values, [an APD] would be denied until completion of the Great Divide RMP revision."  *Id.* at 2-43.  We find BLM's conclusion to be founded in logic.

Further, BLM has already issued oil and gas leases for the vast majority of the Project Area.  We have refused to reverse BLM land use decisions on grounds that appellants have asked BLM to change prior land use commitments.  In *Biodiversity Conservation Alliance*, 171 IBLA 313, 318 (2007), we stated:

> We have repeatedly rejected the notion that BLM must manage the public lands in light of proposals by the public to designate lands as wilderness.  *Colorado Environmental Coalition*, 162 IBLA 293, 301-02 (2004), *Colorado Environmental Coalition*, 161 IBLA 386, 393-94 (2004); *Colorado Environmental Coalition*, 149 IBLA 154, 156 (1999); *Colorado Environmental Coalition*, 142 IBLA 49, 53-54 (1997); *see also Southern Utah Wilderness Alliance*, 163 IBLA 14, 25-27 (2004).  We have applied similar principals in the context of ACECs.  *E.g., Southern Utah Wilderness Alliance*, 141 IBLA 85, 90 (1997).

*See also Colorado Environmental Coalition,* 171 IBLA 256, 268 (2007); *Southern Utah Wilderness Alliance*, 160 IBLA 225, 230-32 (2003), and cases cited.  Given this precedent, we are unable to find BLM's decision to go forward with the Desolation Flats Project an action that causes unnecessary or undue degradation.

3.  *BCA's complaints that BLM did not adopt BCA's proposals to implement "more stringent and scientifically supportable protections for sage grouse leks and winter-range."*  BCA PS at 32.  In comments, BCA challenged BLM for setting a ¼-mile buffer

around sage grouse leks.  In response, BLM acknowledged that scientific literature shows that no-surface-disturbance requirements for the sage grouse "generally run in the .25 to 2 mile range"; that therefore the ROD had established ¼ mile as a minimum distance; and that BLM reserved the right to increase the no-surface-disturbance buffer.  FEIS at 5-44.[3]  BLM also responded in considerable detail to BCA's complaints that BLM's protections of the winter range for various species were inadequate.  In particular, BLM explained the difference between stipulations attached to leases that had already been issued, as opposed to conditions of approval (COAs) attaching to APD decisions, and detailed situations in which exceptions could be granted on site-specific bases, noting that exception requests result in interdisciplinary review and consultation with the Wyoming Game and Fish Department.  FEIS at 5-52.  BLM explained, in response to BCA's complaints that waivers are "almost always approved on request," that the reason for this is that operators generally discuss such requests informally to determine if such a waiver is possible, and do not submit formal requests if BLM advises that a waiver cannot be approved.  *Id.* at 5-51 to 5-52; *see also id.* at 5-53, 5-54.  We find that BLM's conclusions have a rational basis, and do not violate FLPMA's unnecessary or undue degradation standard.  *Cf. Wyoming Outdoor Council*, 171 IBLA at 121-22 (failure to incorporate Wyoming Fish and Game policy for winter range not unnecessary or undue degradation under FLPMA).

We reject BCA's FLPMA argument.  We will not disturb BLM's discretion to balance the competing uses mandated by FLPMA where BLM has provided a reasoned explanation for its decision.

### B.  Development Beyond the RFD Scenario

BCA and NRDC argue that the BLM has exceeded the RFD scenario for the Great Divide Resource Area, both in number of wells drilled and in number of acres disturbed.  BCA PS at 32-36; NRDC SOR at 5-20.  They base this conclusion on the Great Divide RMP/EIS and DEIS, which considered an RFD scenario for oil and gas in the 20-year planning period projecting 1,440 wells.  Great Divide RMP/DEIS at 220.

BLM points out that the Great Divide RFD scenario envisioned that the anticipated 1,440 wells would disturb "approximately 34,355 acres" in the 20-year planning period, at the end of which an estimated 18,263 acres would be reclaimed, leaving a total estimated long-term disturbance of 16,092 acres.  Great Divide RMP/DEIS at 220.  BLM explains that the 40 acres of disturbance anticipated per well in 1987 exceeds subsequent gains in drilling efficiency.  BLM analyzed 26 wells drilled under an interim drilling program at Desolation Flats, and concluded that the

---

[3]  As explained in addressing NEPA below, we affirm the ROD as modified to incorporate the sage grouse policy set forth in IM 2004-057 (Aug. 16, 2004).

"long-term disturbance has averaged 6.3 acres/well."  FEIS at 2-2.  BLM concluded that, at the time of the ROD, existing long-term disturbance in the Rawlins Resource Area amounted to 10,767 acres for existing or authorized wells.  At a 65% success rate for the 385 wells in the Proposed Alternative, and accounting for wells in the Rawlins Resource Area (totaling 237 out of 250 successful wells), BLM projected long-term impacts of approved and successful wells (237 x 6.5 (rounding up)) at 1,541 acres, a total falling reasonably within the RFD disturbance scenario in the Great Divide RMP/EIS (10,767 + 1,541 < 16,092).  *See* FEIS at 2-2 through 2-4.

Appellants object to this approach and argue that BLM may permit no more than the number of wells projected for the RFD scenario in 1987.  They claim that BLM's experience with 26 wells in the Desolation Flats interim program, leading to disturbance of 6.3 acres/well, is unworthy of consideration, and that BLM should be compelled to follow the previous projection of 9 acres of disturbance per well employed in the 2000 EIS for the Continental Divide/Wamsutter II Natural Gas Project.  NRDC SOR at 16-17 and n.6.  They dispute BLM's calculation based on a 65% well success rate, stating that "[n]o data is provided to support this assumption."  *Id.* at 19 n.11.[4]  They dispute the calculated disturbance of 10,767 acres for existing or authorized wells; they argue that BLM should have increased projections of disturbed acreage per future wells and that BLM improperly discounted the number of wells authorized for other projects.  They complain that, whether counted in numbers of wells or acres to be disturbed, by approving the ROD, BLM has authorized wells in the Rawlins Resource Area vastly in excess of the RFD scenario considered in the Great Divide RMP/EIS.

[2]  We have already rejected these arguments in other appeals involving appellants represented in the cases before us, including a case involving the Great Divide RFD scenario.  We find no reason to reconsider outcomes already reached.

In *Wyoming Outdoor Council*, 164 IBLA 84, 96-97 (2004), appellants contended that BLM had violated FLPMA by approving development of wells in excess of the number of wells anticipated in the RFD scenario for the Pinedale RMP.[5]  BLM conceded in that case that the RFD scenario had been exceeded.  Nonetheless, we rejected appellants' characterization of the RFD as a "point past which further exploration and development is prohibited."  *Id.* at 99.  We adopted the characterization of the RFD found in BLM's IM No. 2004-89 (Jan. 16, 2004), as merely a "tool prepared by an interdisciplinary group of technical and scientific

_____

[4]  In fact, the Great Divide RMP discusses the history of oil and gas wells in the Rawlins Resource Area.  Between 1911 and 1985, 3,671 wells were drilled; 1,896 (more than 50%) were dry and abandoned.  Great Divide RMP/DEIS at 220.

[5]  Wyoming Outdoor Council, Wyoming Wildlife Federation, The Wilderness Society, and NRDC, all appellants in the cases before us, participated in the case.

specialists," which "serves as an analytical baseline for identifying and quantifying direct, indirect, and cumulative impacts, which provide the premise for formulating alternatives to a proposed action and strategies for mitigating adverse impacts." *Id.*

Subsequently, in *National Wildlife Federation*, 170 IBLA 240 (2006), BLM argued that the RFD for the Great Divide RMP had not been exceeded because, despite the number of wells anticipated in the RFD scenario, the number of acres of long-term disturbance envisioned in the RFD had not been exceeded.[6]  We explained:

> On the question of whether the RFD scenario has been exceeded, NWF takes a different tack than that argued in *WOC*, 164 IBLA 84.  In *WOC*, appellants argued that the number of authorized and drilled wells was greater than that projected in the RFD and, therefore, that BLM was required to amend or revise the RMP before further leasing occurred. *Id.* at 101-102.  Here, NWF objects to BLM's method of determining the status of the RFD scenario, specifically the fact that BLM has altered its calculation method.

*National Wildlife Federation*, 170 IBLA at 249.  We rejected the argument that BLM's method for calculating the status of the RFD scenario was flawed:

> [W]e perceive no fault in a calculus that presumes that the number of wells that can be drilled in an RFD scenario is properly a function of reduced surface disturbance resulting from achievements in increased efficiencies, better management practices and techniques, technological advances, reclamation, and so on . . . .  [A]lthough it plainly objects to the impact on the RFD scenario to the extent it leads to more development . . . , NWF challenges the propriety of revising the method at all.  We find nothing in FLPMA or NEPA, or implementing regulations, that plausibly requires us to hold that BLM cannot revise its method of calculating the number of wells remaining to be drilled under an RFD scenario based upon, among other things, the degree of short- and long-term surface disturbance resulting from oil and gas activities.  Even if we believed that there was a different or better approach to quantifying the degree of development remaining under an RFD scenario, however, as an appellate tribunal, the Board of Land Appeals does not exercise supervisory authority over BLM, outside the context of deciding an appeal over which the Board has jurisdiction.

170 IBLA at 250-51 (footnotes and citations omitted).

_____
[6]  The four appellants in *National Wildlife Federation*, National Wildlife Federation, BCA, Wyoming Outdoor Council, and Wyoming Wildlife Federation, appear here.

Appellants here similarly fail to make the showing that was absent in *National Wildlife Federation*.  Although they plainly disagree with BLM, the many claims appellants (in particular, NRDC) make with respect to the types of wells BLM should or should not have included in its consideration, or the types of acres of disturbance properly or improperly considered, these arguments are not probative of appellants' contention that BLM has exceeded *its* discretion with respect to assessing and interpreting the RFD scenario it previously established.[7]  The many permutations raised by appellants as options for calculating the RFD scenario and determining whether it has been exceeded only verify that there are different ways to consider the degree and impact of surface disturbance attributable to oil and gas development in the Rawlins Resource Area; they do not compel us to reject BLM's approach and choose one of appellants' options for calculating wells or acreage.  BLM established the RFD scenario in the first place; we will defer to BLM in interpreting its meaning.

But even if we were to parse through NRDC's averments regarding the wells and acreage BLM properly should have considered in calculating whether the 1987 Great Divide RFD scenario has been exceeded, we still would not find a violation of FLMPA.  We thus address, at NRDC's invitation, the issue we declined to reach definitively in *Wyoming Outdoor Council* – whether the RFD "can or should be deemed to constitute a land use plan decision within the meaning of" BLM's regulations at 43 C.F.R. Subpart 1610.  NRDC Reply at 6-7, *quoting Wyoming Outdoor Council*, 164 IBLA at 102.  To the extent NRDC's query is whether an RFD scenario is a land use decision constituting a binding maximum to which BLM must "conform," we find that it is not.

BLM has the delegated authority of the Secretary under section 202(a) of FLPMA, 43 U.S.C. § 1712(a) (2000), to establish land use plans.  Under 43 C.F.R. § 1610.5-3(a), all subsequent decisions "shall conform to the approved plan."  *See Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 69 (2004).  While an important tool in the land use planning process, RFD scenarios do not constitute fixed or maximum limits on development in RMPs under FLPMA such that exceeding them constitutes a violation of that statute.  Rather, they spring from the NEPA review process, deriving from the Council on Environmental Quality (CEQ) regulations requiring analysis of reasonably foreseeable events, and permit NEPA analysis of impacts of projected development.  As we explained in *Wyoming Outdoor Council*, 164 IBLA at 91 n.11:

---

[7]  Though appellants argue various conclusions regarding the number of wells authorized, depending on whether the wells are productive, dry holes, or reclaimed, NRDC settles on 2,227 as the number of wells BLM will have authorized in the Rawlins Resource Area with the Desolation Flats Project.  NRDC SOR at 12.  Without agreement on parameters, a precise number is evidently not possible to verify.

The phrase appears in CEQ regulations at 40 C.F.R. §§ 1501.2, 1502.16, and 1502.22, and in the CEQ's definitions of *cumulative impact*, 40 C.F.R. § 1508.7; *effects*, 40 C.F.R. § 1508.8(b); *scope*, 40 C.F.R. § 1508.25(a)(3); and *significantly*, 40 C.F.R. § 1508.27(b)(7). The concept of projecting reasonably foreseeable future actions or impacts, or, as it is more popularly termed, "reasonably foreseeable development," originates in two regulations. The CEQ defines the scope of an EIS as consisting of the "range of actions, alternatives, and impacts to be considered," 40 C.F.R. § 1508.25, and these include direct, indirect, and cumulative effects, 40 C.F.R. § 1508.25(c).

Thus, the RFD scenario is a tool used to define and consider the significant impacts on the environment as required by NEPA, when undertaking to establish an RMP, which by law and rule requires accompanying NEPA review. BLM's goals for operating within the confines of an RFD scenario in an EIS for an RMP derive from NEPA's strictures.

The Great Divide RMP explicitly opened the entire planning area to oil and gas leasing with appropriate restrictions to protect listed resources; it states with respect to oil and gas that "[a]ll lands open to oil and gas leasing" are open to exploration and development. Great Divide RMP at 17. Even assuming that it has been exceeded, we do not find that use of the RFD scenario for analysis in the underlying EIS led to a violation of the RMP, FLPMA, or the rules at 43 C.F.R. Subpart 1610.

We find confirmation of our view in Supreme Court analysis of FLPMA RMPs:

Quite unlike a specific statutory command requiring an agency to promulgate regulations by a certain date, a land use plan is generally a statement of priorities; it guides and constrains actions, but does not (at least in the usual case) prescribe them. It would be unreasonable to think that either Congress or the agency intended otherwise . . . .

Of course, an action called for in a plan may be compelled when the plan merely reiterates duties the agency is already obligated to perform, or perhaps when language in the plan itself creates a commitment binding on the agency. But allowing general enforcement of plan terms would lead to pervasive interference with BLM's own ordering of priorities.

*Norton v. Southern Utah Wilderness Alliance*, 542 U.S. at 71.

We find no evidence in the RMP of "language in the plan [which] creates a commitment binding on the agency" limiting the number of oil and gas wells to

1,440, or long-term disturbance due to oil and gas development to 16,092 acres in the 20-year planning period, let alone in the subsequent decades covered by the Desolation Flats Project. BLM established an RFD scenario for purposes of considering effects on the environment of its projected planning under NEPA.

The parties present a wealth of information regarding the planning process in making their arguments, including the *BLM Manual*, Planning for Fluid Mineral Resources, H-1624-1, May 7, 1990; BLM reports to Congress; and IM 2004-89 (Jan. 16, 2004), which set a "Policy for [RFD] Scenario for Oil and Gas." BLM undoubtedly employs RFD scenarios as a planning tool incorporated into the BLM land use planning handbook, which merges FLPMA and NEPA obligations. "The baseline RFD scenario provides the mechanism to analyze the effects that discretionary management decisions have on oil and gas activity. The RFD also provides basic information that is analyzed in the [NEPA] document under various alternatives." Intervenors' Ex 9, IM 2004-89, Attachment 1-1. That BLM has coordinated its planning and evaluation responsibilities for multiple use management is both laudable and obligatory. But it also understands that the RFD is not "a planning decision." *Id.* However BLM has intertwined the RFD scenario in accomplishing its statutory goals, on review we do not see it as a maximum limitation on development for purposes of considering conformance with the RMP under 43 C.F.R. § 1610.5-3(a). Were we to find that BLM authorized development in excess of the RFD scenario, this would constitute an issue of compliance with NEPA, not FLPMA.[8] And so, we turn to NEPA.

*II. NEPA*

NEPA is a procedural statute designed to "insure a fully informed and well-considered decision." *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 558 (1978). NEPA does not bar actions which affect the environment, even adversely. Rather, the process assures that

---

[8] This view is consistent with materials attached as Document 6 to NRDC's SOR. BLM, *Budget Justifications and Annual Performance Plan, Fiscal Year 2001*, "Report to the Congress: Land Use Planning for Sustainable Resource Decisions – Oil and Gas." In that report, BLM explained that many of its RMPs were insufficient to meet today's needs, and were "in varying stages of decline and will continue to degenerate in usability as they continue to age." *Id.* at last page, Strategy to Address Identified Planning and NEPA Deficiencies. With respect to oil and gas, BLM explained that demand exceeded many RFD scenarios, and thus that environmental analysis may be out-of-date. "This means that [land use plans] in many areas of high industry interest for leasing and development no longer *adequately analyze the full effects of such projected activities on the environment and socio-economic conditions." Id.* at III-99, Justification of 2001 Program Changes (emphasis added).

decisionmakers are fully apprised of likely effects of alternative courses of action so that selection of an action represents a fully informed decision. *In re Bryant Eagle Timber Sale*, 133 IBLA 25, 29 (1995). When BLM has satisfied the procedural requirements of section 102(2)(C) of NEPA, it will be deemed to have complied with NEPA, regardless of whether a different substantive outcome would be reached by appellants, this Board, or a reviewing court. *National Wildlife Federation*, 169 IBLA 146, 155 (2006).

An EIS is judged by whether it constitutes a "detailed statement" that takes a "hard look" at the potentially significant environmental consequences of the proposed Federal action and reasonable alternatives thereto, considering all relevant matters of environmental concern. *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976); *Western Exploration Inc.*, 169 IBLA 388, 399 (2006); *Southwest Center for Biological Diversity*, 154 IBLA 231, 236 (2001); *see* 40 C.F.R. § 1502.2(a). We are guided by a "rule of reason." *IMC Chemical, Inc.*, 155 IBLA 173, 195 (2001). The EIS must contain a "reasonably thorough discussion of the significant aspects of the probable environmental consequences" of the proposed action and alternatives. *California v. Block*, 690 F.2d 753, 761 (9th Cir. 1982), *quoting Trout Unlimited, Inc. v. Morton*, 509 F.2d 1276, 1283 (9th Cir. 1974). Significant impacts are expected when an agency prepares an EIS. *Western Exploration Inc.*, 169 IBLA at 399, *citing* 40 C.F.R. § 1502.16 (EIS must include discussion of "adverse environmental effects which cannot be avoided"); 42 U.S.C. § 4332(2)(C) (2000) (EIS required when significant impacts are found).[9]

Excluding their arguments that fall into the category of challenging a FONSI, appellants' attacks on the sufficiency of the EIS supporting the ROD generally fall into four categories. They allege that the FEIS (i) does not constitute the requisite hard look, because BLM did not choose locations of potential wells and therefore did not consider site-specific impacts; (ii) fails adequately to consider the cumulative impacts of the Project combined with other oil and gas development in the region; (iii) does not address the many opposing views set forth in appellants' comments regarding

---

[9] Appellants claim that BLM erred for failing to acknowledge that impacts of the project would be significant or to reduce such impacts to insignificance with mitigation. *E.g.*, BCA Statement of Reasons (BCA SOR) at 3; NRDC SOR at 2. These are challenges to a finding of no significant impact (FONSI) based on an environmental assessment (EA). An EA allows an agency, *inter alia*, to determine whether impacts of a proposed action warrant a FONSI or instead are significant enough that an EIS is required. *Wilderness Watch*, 168 IBLA 16, 35 (2006). A FONSI is upheld on the basis of an EA if the record justifies such a finding or a conclusion that required mitigation measures will reduce effects to insignificance. Appellants' claims that the Project will cause impacts that are significant or that BLM's mitigation will be ineffective to permit what is in effect a FONSI are not redressible here.

habitat fragmentation or the efficacy of proposed mitigation; and (iv) does not adequately consider alternatives.

### 1. *The FEIS's Failure To Undertake Site-Specific Analysis*

[3]  BCA argues that BLM failed to take the "hard look" mandated by NEPA because BLM did not undertake site-specific analysis of each potential well location. BCA SOR at 2-3; BCA PS at 14-16.  BCA thus challenges the scope of the EIS as insufficient.  BLM and Intervenors contend that the specificity demanded by BCA not only is unnecessary at this point, but also would be counterproductive and result in overstating environmental impacts by projecting events unlikely to occur.  They explain that, like all oil and gas developers, the project proponents reasonably should be permitted to employ geological and natural gas reservoir knowledge gained from early wells to more strategically site future wells.  Intervenors Answer to SOR, IBLA 2004-316, at 7-11; BLM Answer to SOR, IBLA 2004-316, at 2-5.

In the ROD, BLM explained that it chose to defer well-site selection and the accompanying analysis as follows:

> At this time the location of all future well sites and other disturbance cannot be determined with 100% accuracy by any process the proponents or BLM are aware of.  "Setting in stone" well locations in the EIS would require predicting well locations with information in hand, and ignoring the fact that each well provides additional information that is utilized to help determine future actions, including the number of wells and well site locations.  Currently, generalized areas of interest are being explored through the interim drilling process to further develop our knowledge of the geology and potential of the [Project Area].  Adaptive management of oil and gas resource development is very much a reality in that utilization of new information from drilling produces more effective drilling programs with correspondingly reduced effects upon the environment.  The number of wells, well locations, timing of drilling, and construction is controlled in part by the location of gas and oil resources as they are found and developed . . . .

ROD at Errata 1, BLM Response to Comments from Ken Kreckle.

We disagree with BCA that, by choosing to consider in an EIS impacts of the oil and gas development project proposed here, BLM bore the obligation to expand the scope of the Project to include final decisions on site location, particularly when such decisions would be predictably inaccurate.  Such specificity is not compelled by the requirement that BLM properly identify the scope of the project, lest we define

"scope" in a way that requires agencies to conduct environmental analysis they know will not be relevant.  While it is true that when "an agency has an obligation to prepare an EIS, the scope of its analysis of environmental consequences in that EIS must be appropriate to the action in question," *Kern v. BLM*, 284 F.3d 1062, 1072 (9th Cir. 2002), it is also true that scope cannot be expanded so as to defeat the meaningfulness of review altogether.  The Supreme Court described this problem in *New York v. Kleppe*:  "EIS is required to furnish only such information as appears to be reasonably necessary under the circumstances for evaluation of the project rather than to be so all-encompassing in scope that the task of preparing it would become either fruitless or well nigh impossible."  429 U.S. 1307, 1311 (1976), *quoting Natural Resources Defense Council v. Callaway*, 524 F.2d 79, 88 (2d Cir. 1975).

Moreover, BCA errs in presuming that an EIS supporting a large-scale action must be as site-specific as an EIS or an EA to support the site-specific action.  The Ninth Circuit has stated with regard to a programmatic EIS that the issue is not *whether* but *when* site-specific analysis is required:

> The critical inquiry in considering the adequacy of an EIS prepared for a large scale, multi-step project is not whether the project's site-specific impact should be evaluated in detail, but when such detailed evaluation should occur.  NEPA requires that the evaluation of a project's environmental consequences take place at an early stage in the project's planning process.  This requirement is . . . *tempered by the preference to defer detailed analysis until a concrete development proposal crystallizes the dimensions of a project's probable environmental consequences.  When a programmatic EIS has already been prepared, we have held that site-specific impacts need not be fully evaluated until a "critical decision" has been made to act on site development.*

*'Ilio'ulaokalani Coalition v. Rumsfeld*, 464 F.3d 1083, 1095-96 (2006), *quoting California v. Block*, 690 F.2d 753 (9th Cir. 1982) (emphasis added); *see also Friends of Yosemite Valley v. Norton*, 348 F.3d 789, 800 (9th Cir. 2003); *Northern Alaska Environmental Center v. Lujan*, 961 F.2d 886, 890-91 (9th Cir. 1992).

Similarly, this Board has approved NEPA documents for reviewing large-scale projects the implementation of which will be subject to further critical decisionmaking.  *See Fred E. Payne*, 159 IBLA 69, 81 (2003) ("exact position of the [353] wells and related facilities will be determined by BLM, only upon submission by the lessee/operator of an APD and further decisionmaking by BLM, following site-specific environmental review"); *William E. Love*, 151 IBLA 309, 320 (2000) ("further analysis will fix the exact location of [601 coal-bed methane] wells, compressors, pipelines, powerlines, and other facilities in the project area").

Although the Project Area lands are for the most part already leased, and thereby committed to oil and gas development, the particular location of each well has not been decided.  Thus, the threshold at which site-specific analysis is required has not been reached.  Well locations will be decided at the time BLM considers APDs for wells.  *See* IM 2003-152 (comprehensive drilling planning).  We will not reverse BLM for preparing an EIS at this point in the process, as a matter of pure practicality.  The consequence of agreement with BCA's position with respect to this EIS would be that BLM would be obligated to choose the "no action" alternative and conduct environmental review on a case-by-case basis as APDs are submitted.  This could subject BLM to the claim of improper segmentation antithetical to NEPA.  *See Stewart Park & Reserve Coalition v. Slater*, 352 F.3d 545, 559 (2d Cir. 2003).

Finally, federal regulations and our case law establish that BLM may "tier" subsequent, site-specific NEPA analysis to earlier, broad, programmatic NEPA analysis.  40 C.F.R. § 1502.20; *see, e.g.*, *Klamath Siskiyou Wildlands Center*, 157 IBLA 322, 331 (2002); *Blue Mountains Biodiversity Project*, 139 IBLA 258, 266 (1997).  BLM explains its expectation that necessary NEPA review of specific APDs will be tiered to the Desolation Flats FEIS.  Tiering is a permissible method of conducting NEPA review and we will not reverse BLM for announcing its intention to employ it.

Having established that BLM may defer site-specific analysis at the broad project or programmatic level, we find that it did so appropriately in this case.  BLM's explanation fully justifies the conclusion that later location of well sites is in order.

This conclusion, even if undermined, is not ultimately undone by BLM's subsequent approvals of APDs in the Desolation Flats Project Area pursuant to the ROD.  In its SOR and in its later submitted Supplemental Information, BCA submits EAs and Statements of Categorical Exclusion prepared for those APDs.[10]  BCA SOR Exs. R-W; Supplemental Information Exs. C1-C10.  BLM and the Intervenors object to these submissions on grounds that they impermissibly expand the scope appeal.  Intervenors' Answer, IBLA 2004-316, at 11-13; BLM Answer, IBLA 2004-316, at 5-10.  But BCA clarifies its position:

> *Appellants are not asking this Board to invalidate the APDs, as suggested by BLM*.  Rather, Appellants submitted the APDs are relevant probative evidence to support Appellants' contention that the [Project] would be used to violate NEPA by excluding the public from site-specific decision-making—notwithstanding the empty assurances in the FEIS that BLM

---

[10]  For three of the APDs cited by BCA, BLM relied on statutory categorical exclusions created by section 390 of the Energy Policy Act of 2005, Pub. L. No. 109-58, 119 Stat. 594, foregoing further NEPA analysis before approving the APDs.  42 U.S.C. § 15942 (West Supp. 2007).

> would meet its legal obligation to allow public comment on such
> decisions.  This Board should consider the APDs to establish BLM's
> course of conduct as it proceeds with the site-specific stage of the
> [Project]—exposing a fundamental legal deficiency of the FEIS.

BCA Reply to BLM and Operators' Responses to SOR at 8 (emphasis added).

We acknowledge BCA's concern that BLM could avoid site-specific analysis
altogether if it refuses to address drill sites in the FEIS, defers consideration until the
APD phase, and then refuses to conduct appropriate review at that time on the basis
of the recent categorical exclusions authorized by the 2005 Energy Policy Act enacted
after the ROD.  We agree that subsequent BLM actions could be problematic or rise to
the level of legal error.  But the deficiency, if one exists, is not with the FEIS.  To the
extent BCA's information is probative, it relates to BLM action subsequent to the
ROD, which is neither before us in this appeal nor does it constitute evidence of BLM
expectations when it prepared the ROD.

In any event, BCA's critique that BLM's assurances that it would allow public
comment when approving the APDs have proven to be "empty" is based on its claim
that there has been no opportunity for comment prior to approval of the APDs.  BCA's
Exhibits C2, C3, and C4 (to its Supplemental Information), however, include EAs
with responses to BCA's comments on the proposed APDs.  BLM denies a lack of
opportunity with respect to other EAs cited by BCA, noting that notice of all APDs it
considers is posted in BLM field offices 30 days before approval.  30 U.S.C. § 226(f)
(2000); 43 C.F.R. § 3162.3-1(g) (2005).  BCA does not allege that BLM violated this
statutory responsibility when it approved the APDs for which BCA provided
documentation.  Regardless of whether BCA had an opportunity to comment on any
particular APD, however, if there is a violation to be found, it arises from BLM's
actions with respect to a particular APD, not the FEIS.

BCA does not seek reversal of any decision to grant a particular APD.
Whatever BCA's strategy may be with respect to the FEIS, we nonetheless note that
we may not resolve *sua sponte* alleged deficiencies in BLM's NEPA procedures for
approving an APD because this appeal from the ROD and FEIS is not the appropriate
forum for doing so.  Any party adversely affected by BLM's decision to grant an APD
may request State Director Review of that decision and ultimately appeal to this
Board pursuant to 43 C.F.R. §§ 3165.3 and 3165.4.  *Southern Utah Wilderness
Alliance,* 144 IBLA 70, 81 (1998); *Wyoming Wildlife Federation*, 123 IBLA 392, 393
(1992).[11]  BCA did not avail itself of such administrative relief.

_____

[11]  In any event, we find deficiencies in BCA's particular allegations.  BCA complains
that BLM conducted site-specific analysis supporting particular EAs before BLM

(continued...)

2. *Cumulative Impacts*

NRDC argues that BLM's cumulative impacts analysis is flawed because the baseline environmental information used to prepare it was incorrectly calculated. NRDC argues that BLM incorrectly calculated the number of existing wells and the number of acres already disturbed. This flawed baseline, NRDC argues, undermines BLM's entire cumulative impacts analysis and will prevent BLM from accurately monitoring ongoing impacts. NRDC SOR at 21-26. As NRDC states: "Both of these flaws flow directly from BLM's machinations regarding the RFD." *Id.* at 23.

As we concluded above, if an agency exceeds the RFD scenario, a NEPA issue is presented and the question is whether the agency has authorized a Proposed Action without fully considering its effects in violation of NEPA section 102(2)(C). The remedy for that violation is to direct the agency to prepare or supplement an EIS considering those impacts. BLM prepared an EIS here. Therefore, the question for us is ultimately whether NRDC has shown that BLM failed properly to consider the baseline RFD scenario, and thus failed adequately to address cumulative impacts as required by NEPA.

As described above, NRDC has presented a number of options for interpreting the baseline that it believes BLM should have considered in terms of wells drilled and acreage disturbed, the effects of which were analyzed in the Great Divide RMP/EIS. While NRDC contends that these various options show that BLM's baseline was in error, in fact, they demonstrate to us NRDC's failure to meet its burden of showing error. Faced with a few sentences in the 1987 Great Divide DEIS, at page 220, projecting development at 1,440 wells, presuming 40 acres disturbance/well, NRDC contends that the meaning of this language decades later is such that we must find BLM's analysis of that baseline in the Desolation Flats FEIS to lack rational foundation. The certainty that NRDC demands of us, however, is undermined by its own arguments acknowledging that by 2000 the Wamsutter EIS recognized that

---

[11] (...continued)
approved the ROD. We do not see the violation of NEPA BCA finds in this allegation. BCA argues that BLM failed to prepare site surveys of BLM sensitive species before approving particular APDs. But BLM responded to BCA's comments to EAs on this point explaining what surveys had been conducted for several species. *See, e.g.*, Supplemental Information, Exs. C2, C3, C4, "Determination of Need for T&E Conference/Consultation and Biological Evaluation on Other Wildlife Species," prepared for each EA (including information on endangered, threatened, and sensitive species). Finally, BCA argues that the EAs do not contain site-specific additions to the mitigation and cumulative impacts addressed in the FEIS. BCA fails, however, to show that any site has a unique character that would prevent BLM from tiering to the FEIS for its analysis of these issues.

updated information from drilling showed disturbance per well to be reduced by more than 75%, to 9 acres/well. Elsewhere, NRDC acknowledges that "[a]t best, BLM's new projection of 6.5 acres per well can be applied only to forecast the disturbance resulting from the 385 wells authorized in this EIS." NRDC SOR at 18. NRDC's NEPA/RFD argument does nothing more than criticize BLM for the same lack of certainty seemingly recognized by NRDC. NRDC SOR at 25, *see also* at 24. While NRDC presents statistical options to substitute for BLM's, we will not undertake the supervisory role of deciding the RFD's meaning in 1987, when it is obviously ephemeral on today's data.

We therefore turn to BCA's cumulative impacts arguments. BLM is required by NEPA section 102(2)(C) to consider potential cumulative impacts of a proposed action, together with any other past, present, and reasonably foreseeable future actions. 40 C.F.R. § 1508.7; *see Park County Resource Council, Inc. v. United States Department of Agriculture*, 817 F.2d 609, 623 (10th Cir. 1987); *Forest Guardians*, 170 IBLA 80, 97 (2006); *Howard B. Keck, Jr.*, 124 IBLA 44, 53 (1992), *aff'd, Keck v. Hastey*, No. Civ. S-92-1670-WBS-PAN (E.D. Cal. Oct. 4, 1993); Forty Most Asked Questions Concerning CEQ's NEPA Regulations, 46 Fed. Reg. 18026 (Mar. 23, 1981). BCA bears the burden of showing that BLM's cumulative impacts analysis, tiered to analysis performed for RMPs governing the Project Area, does not constitute "a reasonably thorough discussion of . . . significant aspects of the probable environmental consequences" of the proposed action. *Trout Unlimited v. Morton*, 509 F.2d 1276, 1283 (9th Cir. 1974); *Biodiversity Conservation Alliance*, 169 IBLA 321, 333 (2006).

BCA challenges BLM's cumulative impacts analysis because the FEIS allegedly did not consider impacts on wildlife resources, all of the potential development BCA believes should have been addressed, or cumulative impacts within the region. Such arguments are unsubstantiated. In a fairly extensive cumulative impacts analysis in the FEIS and DEIS, BLM conducted a thorough review, weighing impacts of the Project with those from other projects over four "Cumulative Impact Areas" (CIAs), the Project Area, the watersheds that contain the Project Area, southeastern Sweetwater County and southwestern Carbon County, and southwest Wyoming and northwest Colorado. The CIAs studied, and thus the sources of impacts, vary, as appropriate, by the resources affected, including, *inter alia*, air quality, water quality, and wildlife. Not surprisingly, the projects potentially impacting a watershed were different from those potentially affecting an air region, or habitat, and so on. In considering these CIAs, BLM analyzed impacts from two preexisting oil and gas projects within the Project Area and seven adjacent projects for which NEPA analysis was available. Moreover, the NEPA documents were tiered to EISs prepared for the Great Divide RMP and the Green River RMP, which analyzed overall impacts of oil and gas leasing in the jurisdictions of the Rawlins and Rock Springs Field Offices before opening the regions to oil and gas development.

BCA's argument that BLM did not consider cumulative impacts on wildlife in the FEIS is unwarranted. The DEIS contains extensive analysis in Chapter 5 of cumulative impacts on range resources; wildlife; big game (including pronghorn, mule deer, and elk); wild horses; greater sage grouse; raptors (broken down by nesting and foraging habitats); and special status plant, wildlife, and fish species (including threatened, endangered, and sensitive species of plants and animals). DEIS at 5-15 to 5-25. BCA's complaint appears to be that this extensive analysis was not duplicated in the FEIS document, an argument we will not consider further.

BCA presents a list of projects BLM allegedly should have considered in its cumulative impacts analysis. BCA PS at 29-30; *see also* BCA Ex. P (map). BCA's complaint is that BLM did not consider four of seven projects raised by BCA. One of these, the Bitter Creek coalbed methane project, was proposed for scoping several months after the challenged ROD. BLM noted in the FEIS that several projects, including two of the projects raised by BCA that were not included in the analysis, had been proposed but not yet analyzed, and thus could not be included in the numerical well count. FEIS 2-69. It is unclear whether BCA's argument is that BLM was compelled by 40 C.F.R. § 1508.7 to halt consideration of development, and ultimate approval of the activity, until plans for other development had coalesced into numerical quantification. We do not read the rule this way. BLM acknowledged the cumulative impacts from accelerated development occurring in the region as a result of world events and national demand and recognized that new projects will be developed in the future; BLM acknowledged that cumulative impacts of this Project with others could be significant. FEIS at 1-16 to 1-17.[12] Ultimately, it is not a failure of consideration that BCA sustains, but rather a result BCA objects to. We do not grant relief for that.

   3. *Opposing Views*

BCA argues that BLM failed adequately to respond to opposing scientific views. BCA SOR at 5-10. In *Biodiversity Conservation Alliance*, we held that, "[t]he fact that BCA cites experts who agree with its position is not dispositive." 169 IBLA at 343, citing *Colorado Environmental Coalition v. Dombeck*, 185 F.3d 1162, 1176 (10th Cir. 1999). In making its argument, BCA has provided a bibliography of scientific studies it claims oppose BLM's position, and, based on this list, BCA demands that BLM respond to each study. BCA SOR at 8-9. We do not believe the burden placed on BLM to respond to opposing views is so broad. Nor do we believe it is our burden or

---

[12] BLM estimated that the potential cumulative impacts of these future projects to "visibility and atmospheric deposition may exceed significance criteria, although violations of Wyoming or federal pollutant concentrations standards are unlikely." FEIS at 2-69 to 2-70.

within our authority to oversee BLM's function by absorbing the substance of material represented by that bibliography and deciding ourselves what science is "right." To be successful on its arguments, BCA must establish that BLM committed a "clear error of law or demonstrable error of fact, or that the analysis failed to consider a substantial environmental question of material significance to the proposed action." *Missouri Coalition for the Environment,* 172 IBLA 226, 239 (2007); *see also Southern Utah Wilderness Alliance*, 164 IBLA 33, 36 (2004). BLM responded to the two issues BCA raises as examples of BLM's failure to respond to opposing views: protections for the sage grouse and big game. We thus examine the record to determine whether BLM committed a "demonstrable error of fact" or failed to consider a substantial environmental question of material significance in reaching its conclusions.

*Sage grouse.* The record shows both that BCA and NRDC are correct to say that the scientific community is moving in a different direction on the issue of sage grouse protections and also that BLM has recognized this in a new policy with respect to sage grouse in IM 2004-057. Thus, as explained below we affirm BLM's decision in the ROD and FEIS, as modified by that policy.

BCA and NRDC both recommended that BLM adopt a 3-mile buffer of no-surface activity around active sage grouse leks, on the advice of Dr. Clait Braun. BCA SOR at 6-7; NRDC SOR at 29-30; *see* NRDC Ex. 10 (Braun report). NRDC argues that BLM has not presented a scientific study to establish the efficacy of the ¼-mile buffer. NRDC SOR at 29-32; NRDC Reply at 13-15. As noted above, BLM responded, FEIS at 5-44 and 5-61, that the ¼-mile buffer it established for the Project "is generally a minimum distance," and acknowledged that BLM may be compelled to increase the buffer in areas of "quality nesting habitat." FEIS at 5-44, 5-62. BLM anticipated using site-specific review and targeted COAs at the APD stage to review the status of the leks identified in the Project Area in the FEIS and DEIS. *Id.* at 4-65. BCA and NRDC correctly noted that BLM's sister agency, U.S. Fish and Wildlife Service (FWS), expressed concern about the drifting state of science about sage grouse protection and questioned BLM's adherence to the notion of a ¼-mile buffer. FEIS at 4-96.

After completing the FEIS, however, BLM issued IM 2004-057, "Statement of Policy Regarding Sage-Grouse Management Definitions, and Use of Protective Stipulations and Conditions of Approval (COAs)" (Aug. 16, 2004). BLM Response, IBLA 2004-316, Att. 2. This IM catalogs the history of scientific thought regarding protections for sage grouse habitat, leks, and nesting areas from the 1970s to the present. It acknowledges a severe decline in population, public calls for listing the species under the Endangered Species Act, and the possibility that 1970s-era protections and mitigation measures might not serve intended purposes. The IM requires BLM to coordinate with the State of Wyoming to map existing sage grouse leks and to undertake analysis to determine which populations are migratory, a factor that may make areal radiuses around leks either obsolete or inaccurate on a case-by-

case basis.  The IM pursues a site-specific policy for sage grouse management which maintains minimum requirements for buffers, a 2-mile radius as a "flagging device" for stipulations and COAs, diurnal timing limitations, and seasonal restrictions.  *Id.* at 5.  But, it also imposes a policy of case-by-case mapping of sage grouse habitat, including nesting habitat, to better protect nests that are beyond a 2 mile radius "regardless of distance from leks" while allowing disturbance in areas within such a radius that do not provide suitable habitat.  *Id.* at 5.

NEPA requires BLM to "consider and respond to the comments . . . , not to agree with them."  *Utahns for Better Transportation v. U.S. Department of Transportation*, 305 F.3d 1152, 1174-75 (10th Cir. 2002).  Nonetheless, the record shows a general agreement in the relevant community of experts that sage grouse science is changing and in need of development and supplementation.  BLM must and is evidently attempting to adapt to available data and derive new data.  This is not inconsistent with Dr. Braun's contentions regarding data "too limited to conclusively demonstrate the health of the sage-grouse population(s) and trends" in the Great Divide Resource Area, and the need for long-term monitoring efforts and research studies.  NRDC Ex. 10, "Sage-Grouse Scoping Issues for Revision of the BLM's Great Divide [RMP]," Clait E. Braun, at 4-5.  The IM which BLM has committed to adopt for the Desolation Flats Project reflects BLM's acceptance that its data was outdated, and we therefore affirm as modified to incorporate the IM into the ROD.  NRDC objects to the IM as "exactly the same inadequate protection that experts have criticized in the Desolation Flats Project."  NRDC Reply at 14. Nonetheless, as we have described above, we see it as a sufficient departure that both moots the argument that BLM did not respond to comments on sage grouse and also prohibits us from finding that BLM is not attempting to protect the grouse.  NRDC is free to challenge specific decisions if it perceives that decisions made on APDs are devoid of the kind of site-specific consideration envisioned in the policy.

*Big game winter range.*  BCA and NRDC complain that BLM did not accurately consider their comments about big game winter range within the Desolation Flats Project Area.[13]  We have examined the material in the record on this topic, one which has proven in a number of cases before us to be scientifically controversial within the State of Wyoming.  *E.g., Biodiversity Conservation Alliance*, 171 IBLA 218 (2007); *Wyoming Outdoor Council*, 171 IBLA 108; *National Wildlife Federation*, 169 IBLA 146 (2006).  These cases generally address the sufficiency of mitigation measures BLM has imposed on oil and gas leasing or development to protect the winter range.

_____

[13]  NRDC contends that BLM did not adequately consider the impacts of habitat fragmentation on the sage grouse and other wildlife, citing the FWS comment letter to the DEIS which critiqued BLM's analysis of indirect impacts on the sage grouse. NRDC SOR at 28-29, citing FEIS at 4-96.  As we have responded regarding the sage grouse by modifying the ROD, we address this argument no further.

In this case, however, the import of BCA's argument is that BLM erred by incorporating various mitigation techniques for development on the big game winter range at all, *see* DEIS at 4-59 to 4-64, because "winter range areas should be withdrawn from the surface disturbance associated with oil and gas development." BCA comment letter at 28 (FEIS at 4-116). We have not overstated BCA's comments; in its SOR BCA explains that seasonal timing restrictions would be insufficient, and that "disturbance on winter ranges should be avoided at all costs," and "oil and gas production facilities and access roads must never be sited on crucial winter ranges." BCA SOR at 12. As explanation for this contention, BCA reiterates in its SOR the contention repeated in its comments that BLM has not sufficiently analyzed the effectiveness of its mitigation measures. *Id.* at 13. We presume BCA's view is that the Board's alternatives are to (a) set aside and direct BLM to complete analyses of mitigation measures to BCA's satisfaction before the ROD is issued; or (b) reverse and direct BLM to establish that no oil and gas activity can occur on winter range.

BLM acknowledged that allowing development during non-winter months and limited traffic and recreation year-round would have impacts on big game, but concluded that such impacts would not be significant. FEIS at 5-55. BLM analyzed the impacts development would have on pronghorn antelope, deer, and elk. DEIS at Chapter 4. BLM concluded that the pronghorns and deer would adapt to some disruption, and anticipated that elk would adapt less easily, but, with appropriate mitigation, would not be significantly affected. *Id.*; *see also* at 4-72 (additional mitigation measures). BLM responded to BCA's comments regarding winter range, habitat fragmentation, and particular species. FEIS at 5-50 through 5-58.

The record shows that the majority of the Desolation Flats Project Area is classified as winter/yearlong range for big game species. *See* DEIS at 4-60 (219,930 acres of "DFPA" in pronghorn winter/yearlong range); *id.* at 4-58 (Figure 4-7). We have examined the DEIS, FEIS, BCA's comments, and BLM's analysis and response, as well as our recent precedent on this topic. We find that the BCA's arguments are premised on its position that BLM has not sufficiently analyzed the impacts of oil and gas development on winter range for particular species and must do so before proceeding. We do not find such arguments sufficient to demonstrate error in BLM's failure to acquiesce in BCA's contention, effectively, that BLM "withdraw" the Desolation Flats area from oil and gas development.

### 4. Alternatives

BCA claims that BLM failed to consider adequate alternatives to the proposed action because BLM did not consider BCA's suggested "directional drilling, multiple wells per pad and closed loop drilling alternatives," as alluded to above. BCA PS at 21. BCA argues that BLM's failure to address such alternatives constitutes a violation of NEPA section 102(2)(E), 42 U.S.C. § 4332(2)(E) (2000), and CEQ regulations at

40 C.F.R. § 1502.14.  BLM is obligated to consider reasonable alternatives which accomplish the intended purpose of a proposed action, are technically and economically feasible, and have a lesser impact.  40 C.F.R. § 1500.2(e); *Headwaters, Inc. v. BLM*, 914 F.2d 1174, 1180-81 (9th Cir. 1990); *Western Exploration Inc.*, 169 IBLA at 406; *see also* 43 C.F.R. §§ 1501.2, 1502.14, 1508.9.  To show a failure to consider sufficient alternatives, an appellant must posit an alternative that would meet the test described above.  *Great Basin Mine Watch*, 159 IBLA 324, 354 (2003).

BCA has not met its burden.  As described above in addressing FLPMA, BLM has explained that it is not possible to make the particular decisions BCA would demand of it in adopting an alternative that addresses some method of co-locating wells.  BLM explained why:  certain locations present technical, feasibility, and economic problems which would make such options impossible, and certainly impossible to choose at this time; and the technical and geophysical data gathered with early wells will necessarily define subsequent well placement decisions.  Thus, while BLM concedes the value of the kind of drilling options BCA demands, it did not choose to consider them as an alternative because it was technically not feasible to do so for the overall Project, and because optimal well configurations will be determined as Project action progresses.  BCA has appended IM 2003-152 (Apr. 14, 2003), by which the BLM Director established a policy for BLM field offices to work with oil and gas operators to engage in comprehensive drilling planning.  BCA Ex. BB.  This IM, however, establishes this policy for "APD process improvements."  We do not find that BLM has impeded its ability to follow that policy by failing to consider a directional drilling alternative in the FEIS.  BCA has failed to show error in that conclusion, or to proffer a sensible proffered alternative that is technologically feasible or environmentally preferable to BLM's decision to defer siting until the APD phase, implemented in a manner consistent with IM 2003-152.

Therefore, pursuant to the authority delegated to the Board of Land Appeals by the Secretary of the Interior, 43 C.F.R. § 4.1, the decision appealed from is affirmed in part, and affirmed and modified in part as identified herein.

_____/s/_____
Lisa Hemmer
Administrative Judge

I concur:

_____/s/_____
James F. Roberts
Administrative Judge



GFS(O&G) 2(2000), 151 IBLA 42

**(Cite as: 151 IBLA 42)**


United States Department of the Interior
Office of Hearings and Appeals
Interior Board of Land Appeals

WYOMING AUDUBON ET AL.

IBLA 98-337

Decided October 22, 1999

INDEX CODES:

    40 CFR 1500.1(b) & (c)

    40 CFR 1502.24

    **\*42** Appeal from a decision of the Wyoming State Director, Bureau of Land
Management, approving a Record of Decision and Final Environmental Impact
Statement for the Jonah II Natural Gas Development Project. WY 1793 (930).

    Affirmed; stay request denied as moot.

    1. Environmental Policy Act--Environmental Quality: Environmental
Statements--National Environmental Policy Act of 1969: Environmental Statements

    BLM did not err in not adopting a 2 mile buffer zone for sage grouse leks or
strutting grounds in the ROD/FEIS where authorities relied on in support of a 2
mile buffer zone and addressed widespread sagebrush eradication rather than the
more limited impacts associated with oil and gas operations, and no scientific
evidence was offered showing that a 2 mile buffer zone was necessary to protect
sage grouse leks or strutting grounds.

    2. Environmental Policy Act--Environmental Quality: Environmental
Statements--National Environmental Policy Act of 1969: Environmental Statements

    BLM did not violate seasonal sage grouse restrictions identified in the RMP
where the RMP also provided for modification of the restrictions if necessary
based upon environmental analysis of specific proposal and site specific
mitigation, and BLM prepared an environmental impact statement modifying the
seasonal restriction based on post-RMP research more clearly defining sage grouse
breeding and nesting activity and required site-specific mitigation which protects
nests and chicks identified through required surveys.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

GFS(O&G) 2(2000)                                                              Page 2

GFS(O&G) 2(2000), 151 IBLA 42

**(Cite as: 151 IBLA 42)**

     3. Environmental Policy Act--Environmental Quality: Environmental
Statements--National Environmental Policy Act of 1969: Environmental Statements

     Where the scientific data relied on by BLM and appellants indicate that a 1/2
mile buffer zone **43** is preferable but not essential to protect sage grouse leks,
and there is no scientific evidence or studies indicating a 1/4 mile buffer zone
with appropriate mitigation measures is insufficient to protect sage grouse leks,
BLM's conclusion that a 1/4 mile buffer zone with additional mitigation is
sufficient to lessen the impact on sage grouse due to oil and gas development will
be affirmed.

APPEARANCES: Barb Gorges, President, Wyoming Audubon, for appellant Wyoming
Audubon; Linda B. Rawlins, pro se; Andrea S.V. Gelfuso, Esq., U.S. Department of
the Interior, Office of the Regional Solicitor, Rocky Mountain Region, Denver,
Colorado, for the Bureau of Land Management; John F. Shepherd, Esq., Denver,
Colorado, for Intervenors McMurry Oil Company and Amoco Production Company.

                    OPINION BY ADMINISTRATIVE JUDGE FRAZIER

  Wyoming Audubon and Linda B. Rawlins have appealed and requested a stay of an
April 27, 1998, decision of the Wyoming State Director, Bureau of Land Management
(BLM or the Bureau), approving a Record of Decision and Final Environmental Impact
Statement (ROD/FEIS) for the Jonah II Natural Gas Development Project. On June 25,
1998, the Board granted the Bureau an extension of time within which to file an
answer to appellants' Statement of Reasons (SOR) and took appellants' request for
a stay under advisement. On September 3, 1998, we granted McMurry Oil Company and
Amoco Production Company's joint Motion to Intervene and granted Intervenors'
request for an extension to and including September 28, 1998, within which to file
an answer to appellants' SOR and to respond to appellants' request for a stay.
Appellants were granted 30 days from receipt of BLM's Answer to file a response
and to respond to the answer filed by McMurry and Amoco. Appellants seek a "stay
that affects only those [natural gas] wells that are to be drilled within two
miles of an identified sage grouse lek." (SOR and Request for Stay at 13.) Because
we reach the merits of this appeal and affirm BLM, appellants' stay request is
denied as moot. [FN1]

  The EIS for the project analyzes the Proposed Action; Alternative A, a sensitive
resource protection alternative development strategy; Alternative B, a maximum
density alternative development strategy; and a No Action. Alternative. Other
alternatives requiring higher or lower well densities were considered or rejected
for environmental, economic and/or legal reasons. BLM's preferred alternative for
the project is the Proposed Action with selected mitigation measures, as described
in the Draft Environmental **44** Impact Statement (DEIS) and FEIS, which would
further reduce environmental impacts. (FEIS, Executive Summary at v.) On appeal,
appellants challenge the adequacy of two mitigation measures contained in the
ROD/EIS: the 0.25 mile buffer zone around sage grouse leks or strutting grounds
that will remain free from surface disturbance and the March 1 to June 30 seasonal
restriction on construction designed to avoid displacing sage grouse from nesting

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

GFS(O&G) 2(2000), 151 IBLA 42

**(Cite as: 151 IBLA 42)**

habitat.

 The ROD states with respect to sage grouse:

  The sage grouse is the predominant and most important game bird in the analysis
area. Data from the WGFD [Wyoming Game Fish Department] indicate that State-wide
numbers of sage grouse declined between 1987 and 1992.

  The entire analyses area is generally considered year-round habitat for sage
grouse. Important areas for these birds are strutting grounds (leks),
brood-rearing areas, and wintering areas.

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

  Lek Protection--to avoid displacing sage grouse from strutting, surface
disturbance within 0.25 miles of a sage grouse lek (strutting ground) will be
avoided. Also to avoid enhancing raptor predation on strutting sage grouse,
permanent, high profile structures such as buildings, storage tanks overhead power
lines, etc., will not be allowed within 0.25 miles of lek (the area may be
enlarged, if justified on a case by case basis).

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

  Nesting Protection--To avoid displacing sage grouse from nesting habitat,
construction activities within a two-mile radius of active leks will be avoided
from March 1 through June 30, or as designated by the BLM AO. [Bureau of Land
Management Authorized Officer].

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

  Wintering Areas--Tall sage brush *** will be avoided except to cross the
drainages at right angles. This will be done to minimize disturbance of tall sage
brush which is important sage grouse wintering habitat.
(ROD at 21-22.)

 **\*45** With respect to the 0.25 mile buffer zone provided for lek protection,
appellants contend BLM erred in not requiring a 2 mile, or alternatively, a 0.5
mile buffer zone as provided in Alternative A to provide "additional protection of
sage grouse leks." (FEIS Executive Summary at viii.)

 Regarding nesting protection, appellants argue that, "without reasonable
explanation, BLM Resource Management Plan-approved seasonal restrictions have been
shortened by two months in the [ROD]." (SOR at 2.) They argue that "[s] easonal
restrictions to protect sage grouse nesting and brood-rearing areas in the
Pinedale Resource Area RMP are set from Feb. 1-July 31 (USDI BLM, RMP FEIS, 1987,
4; RMP ROD, 1988, 59)," while the ROD at page 22 provides for a March 1 to June 30
seasonal restriction. (SOR at 4.) Appellants conclude that there is no "basis to
change a legally-binding decision made in an existing BLM [RMP] EIS." Id. at 6.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

GFS(O&G) 2(2000)                                                    Page 4

GFS(O&G) 2(2000), 151 IBLA 42

**(Cite as: 151 IBLA 42)**

While appellants acknowledge that the Jonah II FEIS appears to comply with the
guidelines of the RMP with respect requiring field evaluations for sage grouse
leks between February 1 and March 15, and for sage grouse nesting between April 1
and July 1, they complain that the seasonal restriction directly contradicts the
(Pinedale) RMP guidelines. Id. at 7.

 In response, the Bureau states that appellants rely on a Table contained in the
RMP, but "ignore language elsewhere" in the RMP which allows for modification of
the dates of sage grouse seasonal restrictions. (BLM Answer to Request for Stay
and SOR (BLM Answer) at 2.) The RMP at 8 states that "use restrictions (e.g.,
dates, distances) may be made more or less stringent depending upon the need of
specific situations," and at 59, provides that "[m] odifications to this
limitation in any year may be approved in writing by the Authorized Officer."
(Intervenors' Answer and Response to Stay Request, Exhibit (Ex.) A.) BLM maintains
that modifications were authorized by the subject ROD/FEIS based on scientific
research more clearly defining sage grouse breeding and nesting activity. The
WGFD, an agency cited by appellants as having expertise in this area, BLM notes,
"concurred with the BLM's seasonal restrictions in their comments on the FEIS."
(BLM Answer at 4.)

 Richard Wallestad in a BLM article entitled "Life History and Habitat
Requirements of Sage Grouse in Central Montana" (1975), observed that "the
strutting display of sage grouse has been described in detail [citations omitted].
Cocks establish territories on traditional strutting grounds in early March,
assembling on grounds an hour or so before dawn and strutting until approximately
one hour after sunrise." (BLM Answer, Ex. C, Breeding Activities, at 1.)

 Thus, BLM denies that there is a need to restrict activities around a sage grouse
lek in February when the males do not use the leks until March:

  Breeding then occurs in early April, but some hens may return to the lek into
May to breed. See Agency Exhibit D, Environmental Assessment for the Big Piney
LaBarge Coordinated Activity Plan, USDI-BLM 1990, p. 37. Nesting occurs from
mid-April **46** through mid-June. See Agency Exhibit E, BLM Technical Note "Habitat
Requirements and Management Recommendations for Sage Grouse" pp. 15- 16. Chicks
hatch approximately 37 days after breeding.
(BLM Answer at 3.) BLM reasons that "if a hen returned to the lek for breeding for
the last time on May 10, which is considered late in the breeding cycle, the eggs
should hatch 37 days later, i.e., June 23. Id. Thus, BLM concludes that "even
late-hatching chicks would have a week to leave the nest area before any activity
would begin." Id. at 3. BLM denies that there is any reason to restrict use in
order to protect nest sites when the young have left the nests, which normally
peaks by mid-June. See BLM Answer, Ex. M at 8, "Draft Pinedale/Jackson Region Sage
Grouse Job Completion Report 1990-1996" prepared by Doug McWhirter, Wildlife
Biologist, WGFD, Pinedale, Wyoming. The ROD, BLM submits, ensures that any sage
grouse that did use the area in February and July would be protected because the
ROD requires that "field evaluations for sage grouse leks will be conducted by a
qualified biologist prior to the start of the activities in sage grouse habitat."

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

GFS(O&G) 2(2000)                                                          Page 5

GFS(O&G) 2(2000), 151 IBLA 42

**(Cite as: 151 IBLA 42)**

(BLM Answer at 3-4.) BLM insists that it preserved its ability to provide
protection to active nesting sites in the ROD (Appendix C, at 14) by delaying
actions until nesting is completed. Thus, BLM states that "[i]f an occupied nest
is found in July, activity would not be allowed to proceed until the chicks have
left the nest, regardless of the date." (BLM Answer at 4.)

 Next, appellants contend that "BLM has not provided sufficient scientific
evidence to support quarter-mile (0.25 mile) buffer zones around sage grouse leks
or strutting grounds that will remain free from surface disturbance." (SOR at 2.)
Appellants acknowledge, however, that the ROD protects leks by stipulating that
"surface disturbance within 0.25 miles of a sage grouse lek (strutting ground)
will be avoided." (SOR at 4.) They nonetheless criticize BLM for failing to
consult with, or obtain recommendations from, the U.S. Fish and Wildlife Service
(USFWS) on the buffer zones. (SOR at 5.)

 Also, appellants allege that "WGFD found the BLM's lek buffer zones to be
inadequate in size, as stated in response to the Jonah II [DEIS] (BLM Jonah II
FEIS, 1998, 7-107)." They note that WGFD's views regarding the inadequacy of BLM's
lek buffer zone were contained in a completion report dated December 1997,
captioned "Sage Grouse Productivity, Survival and Seasonal Habitat Use Near
Farson, Wyoming, July 1 1993 to December 30 1996," which recommends "no vegetation
control within 3 km [2.2 miles] of leks (WGFD, 1997, 50)." (SOR at 5; Ex. 4.)
BLM's own experts, appellants contend, concurred in WGFD's assessment, citing a
1979 BLM Technical Note, Management Recommendations (BLM, 1979, 29). (SOR at 6 and
Ex. 5.) Referencing Exhibit 6 to its SOR, "Guidelines for Maintenance of Sage
Grouse Habitats," by Clait E. Braun, Colorado Division of Wildlife, Wildlife
Research Center, Tom Britt, WGFD, and Richard O. Wallenstad, Montana Fish and Game
Department, appellants state that the Colorado Division of Wildlife (CDW), another
agency with expertise, has also specified a 3 km buffer **47** zone around leks. Id.
at 6. While appellants concede that BLM included a list of citations to justify
its decision to limit the size of lek buffer zones to 0.25 mile, they deny that
the cited scientific studies support BLM's decision. Indeed, appellants claim that
"many of these studies directly contradict BLM's conclusions." (SOR at 10.) The
Bureau's conclusions, appellants maintain, are a "plain violation of BLM's
responsibility under 40 C.F.R. § 1502.24 'to insure the professional integrity,
including scientific integrity, of the discussions and the analyses in
environmental impact statements'." (SOR at 10.)

 Appellants further contend that BLM ignored the special expertise of WGFD, CDW,
and its own experts. (SOR at 10.) They maintain that WGFD recommended the "0.5
mile surface disturbance buffer surrounding sage grouse leks as defined in
Alternative A. This would provide additional protection from predation, as high
profile structures would not be constructed within this buffer zone." In its
Answer, BLM makes the statement that it believes that "impacts to sage grouse
using the 1/4 mile buffer are insignificant," but acknowledges that "there are
potential impacts including noise impacts, that may reduce breeding success." (BLM
Answer at 11.) In addressing BLM's statement, appellants point to WGFD's comments
on the DEIS where it observed that "[t]his impact does not appear to be

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

GFS(O&G) 2(2000)                                                    Page 6

GFS(O&G) 2(2000), 151 IBLA 42

**(Cite as: 151 IBLA 42)**

insignificant and seems to provide more support for increased protection of areas
surrounding grouse leks. We disagree that the proposed development will have
insignificant impacts to sage grouse." (SOR at 10-11, citing BLM Jonah II FEIS,
1998, 7-107, 108.) Appellants agree. (SOR at 9-11.) In response to WGFD's
observation, BLM stated that it may require a 0.5 mile seasonal avoidance buffer
from May 1 through May 30 to further protect leks from noise disturbance as an
additional potential mitigation measure to be added to the ROD. (FEIS Comment
Response 9 at 7-110; FEIS 4.2.2.5 at 42.) This mitigation measure was not selected
for implementation. (ROD at 15.) Instead, BLM required that engines and compressor
exhaust stacks are to be properly muffled according to manufactures'
specifications to reduce noise. (ROD at 9.)

 Citing a 1998 WGFD document not submitted for the record, appellants assert that
WGFD has determined that "chick survival has been the predominant factor
contributing to sage grouse population decline." (SOR at 10.) Appellants reason
that sage grouse populations can be expected to decline "if chicks are not
afforded seasonal adequate protection during the first weeks of life, total sage
grouse population can be expected to decline." Id.

 BLM, while not specifically disputing the importance of chick survival, disputes
the implication that oil and gas operations are responsible for increases in sage
grouse chick mortality. To the contrary, BLM points out that in the 1997
Completion Report relied on by appellants, WGFD specifically stated that it did
not know why the chicks died. BLM argues that WGFD reached a similar conclusion in
a second Draft Report captioned the **48** "Pinedale/Jackson Region Sage Grouse
Completion Report 1990-1996," not mentioned by appellants, which specifically
analyzed sage grouse population in the Jonah II Field. Id.; BLM Answer, Ex. M. The
Pinedale/Jackson Report states:

 Factors responsible for recent declines continue to be debated. Suspected and
proven causative agents include sagebrush eradication, overgrazing, drought,
pesticides, off[-]road vehicle use, and noise from oil & gas operations. There is
also a continuing debate on whether or not sage grouse experience cyclic
population variations. Regardless of the reason, sage grouse are currently
experiencing a region[-]wide population decline.
Id. at 1.

 The 0.25-mile buffer, BLM relates, resulted from BLM's attempt to protect the
integrity of leks during the era of radical sagebrush treatment projects based on
guidelines established by biologists in the 1960's. Noting that appellants
advocate a buffer zone of 3 km or 2 miles, BLM denies that appellants can point to
any specific scientific basis supporting their contention. (Answer at 5.)

 Moreover, to the extent that appellants imply that had BLM consulted USFWS, a 2
mile buffer zone would have been adopted, BLM denies that USFWS requires a 2 mile
buffer zone. Specifically, BLM explains that consultation with USFWS was not
required because consultation is only required for Federally listed threatened and
endangered species. Further, BLM notes that, although USFWS was involved in the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

GFS(O&G) 2(2000)                                                          Page 7

GFS(O&G) 2(2000), 151 IBLA 42

**(Cite as: 151 IBLA 42)**

preparation of the Wildlife Monitoring/Protection Plan which considered "Wyoming
Species of Concern," including sage grouse, USFWS did not comment on the proposed
0.25 buffer zone. BLM also notes that WGFD did not state that a 2 mile buffer zone
"was required" in comments submitted on the draft or final EIS. Id.

 BLM argues that appellants' reliance on "Guidelines for Maintenance of Sage
Grouse Habitats" by Clait E. Braun (Ex. 6 to SOR) and the BLM article "Habitat
Requirements and Management Recommendations for Sage Grouse," by Mayo W. Call,
Avian Biologist, Denver Service Center (Ex. 5 to SOR), is misplaced because
neither provides a scientific basis for a 2 mile buffer zone. BLM asserts that the
limited disturbance associated with oil and gas operations cannot be compared with
sagebrush eradication over thousands of acres, and to illustrate the point, cites
to the former article's description of sagebrush eradication: "over the past 35
years an estimated 2 to 2.5 million acres of sagebrush range have been treated by
burning, spraying, plowing, disking, chaining, cutting and beating in attempts to
convert these ranges to grasslands" for livestock grazing. (SOR, Ex. 6 at 99.)

 In contrast, BLM adds, the surface disturbance associated with oil and gas
operations is small areas. The Jonah II project encompasses about 60,000 acres,
and the maximum limit of sagebrush to be treated at any one **49 time within a
2-mile radius of a lek is 20 percent. BLM urges that the Jonah II project provides
for 450 wells resulting in 3,250 acres of surface disturbance at most, or 7.2
acres of disturbance per well. At eight wells per section, 7.2 acres of
disturbance per well would result in a total of 57.6 acres of disturbance per
section (which contains 160 acres), scattered throughout the section. (BLM Answer
at 7.) The WGFD 1997 Completion Report cited by appellants in support of the 2
mile buffer zone (SOR at 9), BLM states, involved widespread sagebrush eradication
as well.

 BLM urges that its adoption of the 1/4 mile buffer zone was based on consultation
between wildlife biologists based on scientifically sound considerations, and that
appellants have cited no scientific studies to the contrary. In his affidavit, BLM
Biologist David A. Roberts admits that he has no personal knowledge of the basis
for establishing the 1/4-mile buffer, and that he was able to locate only one
draft edition of sagebrush management guidelines from about 1965 which contained
the 1/4-mile limit. The limit was omitted from the final guidelines, however. His
consultations with biologists in neighboring states revealed nothing further
regarding the 1/4-mile limit. (BLM Answer at 9; BLM Answer, Ex. N at 2.) Roberts
surmises that the 1/4-mile standard evolved initially because in the 1959's and
1960's BLM and the Forest Service were engaged in sagebrush eradication as a form
of range impoundment, a practice of recognized as "quite detrimental" to sage
grouse. See BLM Answer at 10 and Ex. N at 2. Addressing more recent studies
however, Roberts states:

    While there is very little or no empirical, scientific data out there to either
support or refute the 1/4 mile no surface disturbance standard, there does seem to
be an increasingly large "pile" of anecdotal data accumulating to suggest a 1/4
mile may not be adequate. Some more recent (within the last 5-8 years) studies and

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

GFS(O&G) 2(2000)                                                              Page 8

GFS(O&G) 2(2000), 151 IBLA 42

**(Cite as: 151 IBLA 42)**

anecdotal observations would suggest that a greater distance (possibly 1/2 mile)
would be a more appropriate protective offer around sage grouse leks. Even these
more recent studies, however, have not really been designed to empirically
ascertain an appropriate setback distance.
(BLM Answer at 10, Ex. N at 3.) BLM in the ROD considered whether current
knowledge required that the buffer be changed and concluded:

   BLM has only somewhat recently been requiring the 1/4 mile buffer. While there
are some with concerns that the current 1/4 mile buffer is not enough, there is no
evidence that the 1/4 mile buffer is not sufficient, nor are there any studies to
support the need for a .05 mile buffer.
(ROD at 28.) The 1/4 mile buffer zone, BLM and Intervenors note, was included in
several recent environmental documents, including the Green River Resource Area
Plan approved in 1997 (Agency Ex. 0), and the Fontenelle and Stagecoach Draw
Natural Gas Project approved in 1995 and **50** 1996 (BLM Answer, Exs. P & Q).
Acknowledging that "there may exist a legitimate difference of opinion among
biologists as to what is an appropriate buffer zone for sage grouse protection,"
the National Environmental Policy Act of 1969 (NEPA), BLM insists, "does not
require a court to resolve disagreements between scientific methodologies." (BLM
Answer at 10-11.)

   [1] Recently, in National Wildlife Federation, 145 IBLA 348, 378  (1998) [FNa] ,
we recognized that

   NEPA is primarily a procedural statute designed "to insure a fully informed and
well-considered decision." Vermont Yankee Nuclear Power Corp. v. Natural Resources
Defense Council, Inc., 435 U.S. 519, 558 (1978). It requires that an agency take a
"hard look" at the environmental effects of any major Federal action. Kleppe v.
Sierra Club, 427 U.S. 390, 410 n. 21 (1976).

   In Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 350-51  (1989),
the Court stated:

   [I]t is now well settled that NEPA does not mandate particular results, but
simply prescribes the necessary process. *** If the adverse environmental effects
of the proposed action are adequately identified and evaluated, the agency is not
constrained by NEPA from deciding that other values outweigh the environmental
costs. *** Other statutes may impose substantive environmental obligations on
federal agencies, but NEPA merely prohibits uninformed--rather than unwise--agency
action.

   An EIS must fulfill the primary mission of NEPA, which is to ensure that a
Federal agency, in exercising the substantive discretion afforded it to approve or
disapprove a project, is fully informed regarding the environmental consequences
of such action. See 40 C.F.R. § 1500.1(b) and (c); Natural Resources Defense
Council v. Hodel, 819 F.2d 927, 929 (9th Cir.1987).

   Considering the foregoing, appellants' arguments, BLM's and the Intervenors'

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

GFS(O&G) 2(2000), 151 IBLA 42

**(Cite as: 151 IBLA 42)**

responses, and the record, we decline to find that BLM erred in failing to adopt a 2 mile buffer zone in the ROD\FEIS. The authorities relied on by appellants pertain to the effects of widespread sagebrush eradication, rather than the more limited impacts associated with oil and gas operations. Moreover, BLM recognizes the importance of tall sagebrush to the quality of sage grouse habitat and intends to limit disturbance of tall sagebrush in critical areas. (ROD/FEIS at 22.)

 **\*51** [2] Appellants have also not shown that the seasonal restriction identified in the ROD/FEIS violated the Pinedale RMP. Appendix A-1 of the 1988 Pinedale Resource Area RMP at 59 identifies the February 1 to July 31 seasonal restriction and states that modification of this limitation in any year may be approved in writing by the Authorized Officer. More importantly here, Appendix A-1 provides at that same page that "modification of requirements, developed from this guidance must be based upon environmental analysis of proposals (e.g., plans of development, plans of operation, Applications for Permit to Drill) and, if necessary, must allow for other mitigation to be applied on a site specific basis." (Pinedale ROD/RMP, Appendix A-1 at 59, Ex. A to Intervenors' Answer and Response to Stay Request.) BLM prepared an EIS in this case modifying the seasonal restriction based on post-RMP research which more clearly defines sage grouse breeding and nesting activity. It included other mitigation to be applied on a site specific basis, including restrictions in the ROD/FEIS insuring that sage grouse nests identified through required surveys would be protected, regardless of when chicks left the nest, thus providing in some cases a broader seasonal restriction than that identified in the Pinedale RMP relied on by appellants. See BLM Answer at 3-4.

 [3] We further find that BLM has provided sufficient rationale for adopting a 1/4-mile surface avoidance area. The record shows that there is no concrete scientific evidence in the record which proves or disproves the adequacy of a 0.25 mile buffer zone. At best, the record suggests that a 0.50 mile buffer zone as urged by appellants may be preferable. In the absence of more definitive scientific evidence or conclusions, however, we find that the annual surveys of leks and triennial monitoring to determine lek attendance, and the resulting collection of data, coupled with BLM's representations that additional mitigation measures may be required as necessary before any surface-disturbing activity is permitted, demonstrates that BLM took the requisite hard look at the environmental consequences of the proposed action and that the decision reflects a reasoned analysis. King's Meadow Ranches, 126 IBLA 339, 342 (1993) [FNb].

 Moreover, as BLM and Intervenors point out, NEPA does not require the courts or this Board to decide whether an EIS or environmental assessment is based on the best scientific methodology available or require us to resolve disagreements among various scientists as to methodology. See Greenpeace Action v. Franklin, 14 F.3d 1324, 1333 (9th Cir.1992); Friends of Endangered Species, Inc. v. Jantzen, 760 F.2d 976, 986 (9th Cir.1985). Nor does NEPA compel a particular result or course of action, mandating only a fully informed decision and well considered decision. 40 C.F.R. § 1500.1(b); National Wildlife Federation, 145 IBLA at 359. Although the need for additional research to better ascertain appropriate sage grouse setbacks

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

GFS(O&G) 2(2000)                                                    Page 10

GFS(O&G) 2(2000), 151 IBLA 42

**(Cite as: 151 IBLA 42)**

in the specific case of oil gas operations cannot be gainsaid, BLM's analysis of
the available data was reasonable and provides an adequate basis for its decision.

 **\*52** Therefore, pursuant to the authority delegated to the Board of Land Appeals
by Secretary of the Interior, 43 C.F.R. § 4.1, BLM's decision approving the
ROD/FEIS is affirmed and appellants' request for a stay is denied as moot.

Gail M. Frazier

Administrative Judge

I concur:
T. Britt Price
Administrative Judge

FN1 On Apr. 12, 1999, Intervenors filed a "Motion to Allow BLM to Process an
Application For In-Fill Drilling while Appeal is Pending or, In The Alternative
for Expedited Consideration." Considering our disposition of this appeal, this
motion is also denied as moot.

FNa) GFS(MIN) 105(1998)

FNb) GFS(MISC) 47(1993)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.