# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| THEODORE ROOSEVELT CONSERVATION PARTNERSHIP | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) | Civ. Action No. 07-01486 (RJL) |
| KEN SALAZAR, UNITED STATES BUREAU OF LAND MANAGEMENT, | ) ) ) ) ) | |
| Defendants | ) ) | |
| v. | ) ) | |
| ANADARKO PETROLEUM CORPORATION, WARREN RESOURCES, INC., DOUBLE EAGLE PETROLUEM, CO., and STATE OF WYOMING, | ) ) ) ) ) ) | |
| Intervenor Defendants. | ) | |
| AND | | |
| NATURAL RESOURCES DEFENSE COUNCIL, BIODIVERSITY CONSERVATION ALLIANCE, WYOMING OUTDOOR COUNCIL, WESTERN WATERSHEDS PROJECT, WYOMING WILDERNESS ASSOCIATION, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civ. Action No. 07-1709 (RJL) |

KEN SALAZAR, U.S. DEPARTMENT )
OF THE INTERIOR, U.S. BUREAU )
OF LAND MANAGEMENT, )
                      )
         Defendants. )
                      )
         v. )
                      )
STATE OF WYOMING, ANADARKO )
PETROLEUM CORPORATION, )
WARREN RESOURCES, INC., )
DOUBLE EAGLE PETROLEUM CO., )
                      )
     Intervenor Defendants. )

## MEMORANDUM OPINION
(March **31**, 2009)
[#43, #47, #50, #53 (07-cv-01486); #50, #59, #60, #64 (07-cv-1709)]

These two cases involve challenges to the government's decision to grant drilling

permits in the Atlantic Rim area of Wyoming.  The Theodore Roosevelt Conservation

Partnership (TRCP) brought one of these actions in 2007 against the Secretary of the

Interior,[1] the Department of the Interior, and the Bureau of Land Management (BLM),

challenging the granting of drilling permits as "arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law" under the Administrative Procedure

Act, 5 U.S.C. § 706(2)(A), and thus in violation of the Federal Land Policy Management

Act (FLPMA), 43 U.S.C. §§ 1702 *et seq.*, and the National Environmental Policy Act

---

[1]Pursuant to Federal Rule of Civil Procedure 25(d), if a public officer named as a
party to an action in his official capacity ceases to hold office, the court will automatically
substitute that officer's successor.  Accordingly, the Court substitutes Ken Salazar for
Dirk Kempthorne.

2

(NEPA), 42 U.S.C. §§ 4321 *et seq.* Five additional plaintiffs—Natural Resources

Defense Council, Biodiversity Conservation Alliance, Wyoming Outdoor Council,

Western Watershed Project, and Wyoming Wilderness Association (NRDC

plaintiffs)—brought a separate lawsuit later in 2007, alleging that the government

violated NEPA when it granted these drilling permits.[2] The three operator companies

who received the permits—Andarko Petroleum Corporation, Warren Resources, Inc., and

Double Eagle Petroleum Co.—and the State of Wyoming intervened in both cases in

support of the BLM decision. Each of the parties has filed a summary judgment motion.

After considering the parties' submissions, caselaw, and the record, the Court DENIES

the plaintiffs' summary judgment motions and GRANTS the summary judgment motions

filed by the federal defendants, the operator-intervenors, and the State of Wyoming.

## BACKGROUND[3]

BLM issued drilling permits after approving a Record of Decision (ROD) for the

Atlantic Rim Natural Gas Field Development Project. This project manages more than

270,000 acres of publicly and privately owned land in south-central Wyoming, which is

the home to many species of big game and a dense population of sage grouse. This area

is also rich in oil and natural gas deposits and has been under development since the

---

[2]Although this Court denied a motion to consolidate the two above-captioned cases, the Court
has decided to issue one opinion for both cases in light of their common factual issues. *See* Fed.
R. Civ. P. 42.

[3]For additional background, see this Court's earlier decision denying NRDC plaintiff's motion
for a preliminary injunction: *NRDC v. Kempthorne*, 525 F. Supp. 2d 115, 117–19 (D.D.C. 2007).

1950s.[4]  Indeed, the land now provides more than 5% of Wyoming's total gas production.

*NRDC v. Kempthorne*, 525 F. Supp. 2d 115, 117 (D.D.C. 2007) (ruling on a preliminary

injunction).

BLM's evaluation and approval of the Atlantic Rim project was the culmination of

seven years of study.  In May 2001, oil and gas companies, which ultimately included

Anadarko Petroleum, Warren Resources, and Double Eagle Petroleum, notified BLM that

they wanted to explore and potentially develop more than 3,880 natural gas wells in the

Atlantic Rim area.  *Id.*  BLM released a draft environmental impact statement in

December 2005,[5] in which it analyzed in detail the environmental effects of three

alternative proposals.  (*See* Draft Environmental Impact Statement for the Atlantic Rim

Natural Gas Field Development Project, Carbon County, Wyoming (DEIS), Dec. 2005

(AR 1436).)  Under Alternative A, existing wells would have continued to operate but

additional drilling would be rejected.  (FEIS at ES-2 (AR 2089).)  Under Alternative B,

BLM would have accepted the companies' proposals for additional drilling, but the

project would have been developed in three phases over the course of twenty years, with

the first developed over a six-to-seven-year period.  (DEIS at 2-2 (AR 1489); DEIS at 5-3

---

[4]In 2001, before the disputed BLM action, 116 natural gas wells were in the area. (Final
Environmental Impact Statement for the Atlantic Rim Natural Gas Field Development Project,
Carbon County, Wyoming (FEIS), Nov. 2006 at ES-1 (AR 2088).)

[5]NEPA requires all federal agencies to prepare and circulate for public review and comment an
"Environmental Impact Statement" for federal action that will "significantly affect[] the quality
of the human environment." 42 U.S.C. § 4332(C).

(AR 1445).)  Under Alternative C, BLM would have accepted the companies' proposals

for additional drilling, but would have employed special protection measures to limit

surface disturbance, such as reducing road density and allowing fewer areas of

disturbance. (FEIS at ES-2 (AR 2089).)

After the initial comment period, BLM released a final environmental impact

statement in December 2006, in which BLM selected a fourth alternative, Alternative D.

Under this alternative, approximately 2,000 new wells would be drilled, but the amount of

surface disturbance at any given time would be limited to less than 7,600 acres, which is

2.8% of the total project area. (*See* FEIS at ES-1 to ES-3 (AR 2088–90).)  Indeed,

Alternative D's "objective . . . is to minimize surface disturbance while optimizing natural

gas recovery." (*Id.* at 2-7 (AR 2155).)  The final impact statement deferred evaluation of

environmental impacts for site-specific drilling projects until the specific proposals were

received. *NRDC*, 525 F. Supp. 2d at 117 n.4.

BLM received comments on the final environmental impact statement and

responded to them in the ROD, which was published in March 2007.[6]  (Record of

Decision, Environmental Impact Statement for the Atlantic Rim Natural Gas Field

Development Project (ROD), Carbon County, Wyoming, Mar. 2007 (AR 4791).)

---

[6]The plaintiffs appealed BLM's Rule of Decision and Final Environmental Impact Statement to
the Interior Board of Land Appeals. *NRDC*, 525 F. Supp. 2d at 118.  The Interior Board of Land
Appeals denied that appeal on September 5, 2007.  *Id.*  NRDC plaintiffs lost the appeal before
the BIA and lost their Motion for a Preliminary Injunction to halt further development before this
Court in November 2007. *See id.* at 117.

According to the ROD, the final project is expected to produce 1,350 billion cubic feet of natural gas over its 30-50 year life span, which is enough gas to heat 19.3 million homes for one year. (ROD at 11 (AR 4806).) Indeed, BLM itself acknowledged the development it was authorizing would "adversely impact certain resource values and limit opportunities for other uses in the short-term," but noted "the long-term goal is to return these lands to a condition approximate to that which existed before developments." (*Id.* at 4 (AR 4799).)

In the summer of 2007, BLM approved Double Eagle's drilling permits in the Catalina area of the ARPA and Andarko's applications to drill in the Sun Dog area of the ARPA. *See NRDC*, 525 F. Supp. 2d at 118; (Environmental Assessment, Catalina A & B PODs, June 18, 2007 (AR 73492); Environmental Assessment, Sun Dog A & B PODs, Aug. 13, 2007 (AR 74063).) BLM conducted site-specific environmental assessments (EAs) and concluded that "the [environmental] impacts [were] not expected to be significant." *NRDC*, 525 F. Supp. 2d at 119. Accordingly, BLM did not prepare environmental impact statements for the Catalina area or Sun Dog projects. *Id.*

### ANALYSIS

All of the parties have filed motions for summary judgment, which are especially appropriate in cases such as this because the Court's review is based entirely on the administrative record. *See Mineral Policy Ctr. v. Norton*, 292 F. Supp. 2d 30, 36 (D.D.C. 2003). Of course, the Court will only grant summary judgment when there are "no

genuine issues of material fact" and the party is entitled to judgment as a matter of law. *Id.* Because plaintiffs are challenging action by an administrative agency, the plaintiffs have the burden of establishing that the agency acted arbitrarily, capriciously, or otherwise not in accordance with the law. 5 U.S.C. § 706(2)(A); *Am. Bird Conservancy, Inc. v. FCC*, 516 F.3d 1027, 1031 (D.C. Cir. 2008). For the following reasons, the Court concludes that BLM's decisions were not arbitrary, capricious, or otherwise unlawful and thus did not violate either NEPA or FLPMA.

## I.   BLM did not violate NEPA.

NEPA is the "basic national charter" for environmental protection. 40 C.F.R. § 1500.1(a). It requires federal agencies to analyze the environmental impact of their proposed actions by preparing environmental impact statements for actions "significantly" affecting the environment. 42 U.S.C. § 4332(c); *see also Biodiversity Conservation Alliance v. BLM*, 404 F. Supp. 2d 212, 216 (D.D.C. 2005). NEPA does not mandate particular outcomes, but requires only that agencies take "a hard look" at the environmental consequences of their proposed courses of action, *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 374 (1989), and "consider every significant aspect of the environmental impact of a proposed action," *Baltimore Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 97 (1983) (quotation omitted). In determining whether BLM violated NEPA, "the Court must 'consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error in judgment.'" *Biodiversity*

7

*Conservation Alliance*, 404 F. Supp. 2d at 216 (quoting *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415–16 (1971)). The Court must not substitute its judgment for that of the agency's, as "NEPA merely prohibits uninformed—rather than unwise—agency action." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 351 (1989).

NEPA requires agencies to first conduct an "environmental assessment" to determine whether a proposed action will have a significant effect on the environment. 40 C.F.R. §§ 1508.9(a), 1508.13; *Winter v. NRDC*, 129 S. Ct. 365, 372 (2008). If, after conducting an environmental assessment, the agency determines that the environmental impacts will not be significant, the agency must issue a "finding of no significant impact," 40 C.F.R. § 1501.4(e), explaining why the agency action will not significantly affect the environment, 40 C.F.R. § 1508.13. If the agency determines in the environmental assessment that the proposed action will have significant environmental effects, the agency analyzes these effects in an "environmental impact statement" (EIS). An EIS is a document detailing a "range of alternatives" the agency considered and how the agency's ultimate decision will comply with environmental laws and policies. 40 C.F.R. § 1502.2. An agency cannot make a decision or commit resources favoring an alternative before conducting the environmental assessment. 40 C.F.R. § 1502.2(f).

In this case, BLM issued an EIS for the Atlantic Rim Project as a whole and issued only environmental assessments and findings of no significant impact for site-specific

drilling projects referencing the broader project: the Catalina and Sun Dog projects. *See NRDC*, 525 F. Supp. 2d at 118–19. The plaintiffs allege BLM violated NEPA when it did this because it: (a) did not take the requisite hard look at environmental effects; (b) did not evaluate a reasonable range of alternatives; (c) failed to address the effects of the project in conjunction with other development; (d) violated NEPA's public-participation requirements; (e) unlawfully relied on adaptive management for mitigation; (f) prematurely committed resources to development; (g) failed to identify an environmental baseline from which to calculate the project's effects on wildlife; and (h) allowed for consideration of exemptions and waivers in the EAs when such was not contemplated in the EIS. For the following reasons, the Court disagrees and finds the plaintiffs have not established that BLM acted either arbitrarily or capriciously.

### A.     BLM took the requisite hard look at environmental effects before approving drilling permits.

The plaintiffs first argue that BLM failed to take a hard look at the environmental consequences of drilling. (NRDC Pl.'s Mot. for Summ. J. at 5.) Specifically, the NRDC plaintiffs argue BLM failed to take a hard look at: (1) the project's impacts on air quality; (2) the potential for methane leaks; and (3) the project's effects on a large bird, the greater sage grouse. For the following reasons, I disagree.

### i.   BLM took a hard look at the project's impacts on air quality.

The NRDC plaintiffs argue BLM failed to take a hard look at the effects of the project on air quality because BLM used a discredited method to analyze the ozone air quality and because BLM used an allegedly wrong baseline figure to identify the level of ozone in the area prior to the project's development.  Not so.

Although BLM predicted the project's effects on ozone levels using a method that is no longer the best available, BLM did not violate NEPA's standards for scientific integrity.  *Cf. Envtl. Def. v. U.S. Army Corps of Eng'rs*, 515 F. Supp. 2d 69, 80–81 (D.D.C. 2007) (citing 40 C.F.R. § 1502.24 and finding the agency's "fail[ed] to incorporate known" factors into its calculation )).  Indeed, BLM used a method that "was considered by the inter-agency air quality team to be a reasonable tool and an acceptable ozone estimation method at the time the air quality analysis was conducted."  (ROD at 7 (AR 4802).)  Although BLM selected this method (ie. the Scheffe Method) at a time when it was the best method available, the plaintiffs argue BLM had time to update and correct the ozone analysis before issuing its final impact statement.  (NRDC Pl.s' Combined Reply and Opp'n to Cross Mot. for Summ. J. at 3–4.)  However, given that the ozone analysis for this project was already complete, BLM carefully considered that very issue, (*see* Info. Memorandum for State Director, Aug. 31, 2006 (AR 8666); *see also* BLM to EPA - Notes: Ozone: What's Next?, Sept. 8, 2006 (AR 8667)), and decided to continue operating under the "agreed upon timeline."  (Info. Memorandum for State

Director, Aug. 31, 2006 (AR 8666).)  While that decision might not be ideal from the

NRDC plaintiff's perspective, it was carefully considered, based on reason, and therefore

neither arbitrary nor capricious.  *See Bensenville v. FAA*, 457 F.3d 52, 71 (D.C. Cir.

2006).  As our Circuit Court found in deciding a similar issue, while it is "desirable . . .

for agencies to use the most current and comprehensive data available when making

decisions," an agency's reliance on outdated data is not arbitrary or capricious,

"particularly given the many months required to conduct full [analysis] with the new

data."  *Id.*; *see also W. Coal Traffic League v. ICC*, 735 F.2d 1408, 1411 (D.C. Cir. 1984)

(noting, in a case involving a different regulation, that "[w]hile the legislature did require

the [agency] to revisit the standards periodically with a view to revision, it did not

command the [agency] to behave like Penelope, unravelling each day's work to start the

web again the next day"); *Winthrop v. FAA*, 535 F.3d 1, 10 (1st Cir. 2008) (noting that the

agency "adequately considered the continuing validity of the [then-outdated] data

underlying the FEIS" and that "its determination that the data were still adequate,

accurate, current, and valid was not arbitrary and capricious").

     In addition to disputing the method BLM used, the NRDC plaintiffs allege that the

BLM failed to take the requisite hard look at the air-quality effects because BLM used an

allegedly wrong figure to calculate the project's effect on ozone levels.  (NRDC Pl.'s

Mot. for Summ. J. at 17.)  I disagree.  BLM calculated the project's effect on ozone levels

by modeling background ozone levels and evaluating potential impacts against that

background level. (Fed. Def.'s Mot. for Summ. J. at 20.)  In using this approach, BLM

used a figure representing the *hourly* average of ozone-concentration levels when,

plaintiffs argue, it should have used a figure representing the level averaged over *eight*

*hours*. (*See* FEIS at 4-13 (AR 2332).)  NRDC plaintiffs contend that BLM thus failed to

use "the same averaging time periods," as it stated it would do earlier in the EIS. (*See*

FEIS at 3-19 (AR 2183).)  However, the record indicates the plaintiffs' preferred

approach "results in an *overestimate* of the potential [ozone] concentrations" given that

"[ozone] formation is a complex atmospheric chemistry process that varies greatly due to

meteorological conditions and the presence of ambient atmospheric concentrations of

many chemical species." (FEIS App. F at 60, Air Quality Technical Support Document,

July 2006 (AR 2704) (emphasis added).)  As BLM explains, "[o]zone, unlike other

pollutants analyzed in the FEIS, is not directly emitted from a point source." (Fed. Def.'s

Mot. for Summ. J. at 20.)  Instead, ozone "is formed in the atmosphere as a result of

photochemical reactions involving ambient concentrations of $NO_2$ and VOC." (FEIS

App. F at 42, Air Quality Technical Support Document, July 2006 (AR 2686).)  As a

result of this complication, BLM reasonably chose to use a figure representing the hourly

average instead of the eight-hour average.  Choosing a more accurate method of analysis

is precisely the type of decision best left to agency expertise. *See Ocean Conservancy v.*

*Gutierrez*, 394 F. Supp. 2d 147, 157 (D.D.C. 2005) ("Courts defer to [agency] decisions

that are supported in the record and reflect reasoned decision making, especially where, as

here, the dispute involves technical issues that implicate substantial agency expertise.").
Because BLM's decision was reasoned and based in fact, it was neither arbitrary nor
capricious, and this Court will "not substitute [its] judgment" for the agency's or "attempt
to resolve conflicting scientific opinions." *Izaak Walton League of Am. v. Marsh*, 655
F.2d 346, 372 (D.C. Cir. 1981).

### ii.   BLM considered the potential for methane leaks.

The NRDC plaintiffs next assert that BLM knew the project could trigger the
release of methane gas, but did not adequately disclose this in the EIS. The plaintiffs
specifically cite a report by a BLM scientist, Jon N. Dull (Dull Report). (Dull, Jon N.,
Documentation and Appraisal of Known Gas Seeps Within the Atlantic Rim Coal Bed
Natural Gas Development Area, Carbon County, Wyoming, Feb. 6, 2007 (AR 8799).)
While the Dull Report does discuss potential problems from methane gas seeps, the report
itself, which was only in draft form when BLM published the final EIS, recognizes the
uncertainties involved. According to the Dull Report, "[a]t this point in time there is no
scientific data available to prove or disprove that . . . development within the ARPA has
caused or will cause increased gas flux from the known gas seeps." (*Id.* at 7 (AR 8805).)
BLM also recognized the uncertainties, noting that "[t]he number or location of these
seeps is impossible to predict." (FEIS at 4-32 (AR 2351).) In light of the lack of
information on methane gas seeps, BLM determined that "monitoring would be
established to evaluate [their] impact." (FEIS at 4-32 (AR 2351); *see also* FEIS at 4-49

(AR 2368).)  As this Court previously found, "the project *could* increase the risk of methane seeps" but "NEPA requires consideration of only the 'reasonably foreseeable environmental effects of the action,' rather than every conceivable possibility." *NRDC*, 525 F. Supp. 2d at 122 (emphasis added) (quoting *Hammond v. Norton*, 370 F. Supp. 2d 226, 245–46 (D.D.C. 2005)).  Given the state of the methane-seep evidence, BLM did not need to address methane seeps in any greater detail.  *Id.*; *see Pub. Utils. Comm'n of Cal. v. FERC*, 900 F.2d 269, 282–83 (D.C. Cir. 1990) (finding NEPA does not require agencies to consider environmental effects of actions that are not reasonably foreseeable, especially in light of the agency's discussion of how it would mitigate any effects that may occur in the future); *cf. NRDC v. Hodel*, 865 F.2d 288, 298–99 (D.C. Cir. 1988) (finding a "few sentences" in the FEIS insufficient to address the effects of "reasonably foreseeable" actions).

### iii.  BLM took a hard look at the project's impacts on sage grouse.

The greater sage grouse is a large North American bird located in the Atlantic Rim Project Area with a declining population.  (BLM Nat'l Sage-Grouse Habitat Conservation Strategy, Nov. 2004 at 6 (AR 5505).)  The plaintiffs argue that, despite evidence indicating the project's effects on sage grouse warranted a serious look,[7] BLM did not fully analyze the effects on sage grouse or address mitigation measures.  I disagree.

---

[7] In commenting on the alternatives, the U.S. Fish and Wildlife Service expressed concern that the project's effects on sage grouse habitats "may be irreversible and no amount of mitigation can restore or replace what is lost."  (FEIS at O-8 (AR 4404).)

14

NEPA does not require a "flawless" examination of mitigation, only one that is "reasonably complete." *Citizens Against Burlington Inc. v. Busey*, 938 F.2d 190, 206 (D.C. Cir. 1991). As this Court stated in its earlier decision relating to the NRDC plaintiffs' preliminary injunction motion, "the record reflects that BLM considered several alternatives which offered varying degrees of protection to the sage-grouse population . . . ." *NRDC*, 525 F. Supp. 2d at 121. Additionally, I found that the plan BLM ultimately adopted includes numerous mitigation measures.[8] *Id.* at 121–22. Thus, "although the plaintiffs are dissatisfied with the level of protection provided under the current mitigation plan, the record clearly reflects that BLM analyzed and considered various alternatives and put in place measures far more stringent than those included in the original proposal." *Id.* at 122. Accordingly, this basis for the plaintiffs' motion must also fail.

---

[8] Specifically, this Court found that "[i]n addition to limiting the total amount of surface disturbance to 2.8% of the total area at any one time, BLM has: (1) prohibited surface disturbance or occupancy within one-quarter mile of the perimeter of occupied leks (sage-grouse breeding grounds) and within two miles of occupied leks between March 1 and July 15; (2) barred all human activity within one-quarter mile of the leks between 6:00 p.m. and 9:00 a.m. from March 1 to May 20; (3) limited construction of permanent, high-profile structures within one-quarter to one mile of leks; (4) prohibited surface disturbances between November 15 and March 14 in delineated winter concentration areas; and (5) required muffling of generator noise in order to minimize disturbance of dancing and strutting grouse (apparently an integral component of the sage-grouse mating ritual)." *NRDC*, 525 F. Supp. 2d at 121–22. Contrary to the NRDC plaintiffs' assertion, BLM's determinations of the project's effects on sage grouse and mitigation measures was reasoned and supported by the evidence. (*See* FEIS at 3-96 (AR 2260) (discussing sage grouse studies), FEIS at 5-17 to 5-18 (AR 2499–500) (discussing sage grouse and citing studies).)

The plaintiffs further argue the Fish and Wildlife Service's comment that losses of sage grouse habitats "may be irreversible," (US Fish and Wildlife Service Memorandum, Jan. 26, 2006 at 2 (AR 3255)), imposed a duty on BLM to determine whether the plan would cause sage grouse to be listed as a threatened or endangered species. However, the plaintiffs do not cite any statute or case law supporting the imposition of this duty. Additionally, the evidence demonstrates that BLM analyzed the effects of the project on sage grouse and adopted mitigation measures in response. BLM acknowledged that the project would "lead to lower productivity and long-term decline in the population of [greater sage-grouse.]" (FEIS at 4-79 (AR 2395).) BLM acknowledged in the final EIS that regardless of which alternative it chose, "[i]mpacts to greater sage-grouse and Columbian sharp-tailed grouse would be significant," (FEIS at ES-5 (AR 2092)), as "there is no way to fully develop the oil and gas resources within the project area without these effects," (FEIS at O-8 (AR 4044).) BLM, however, ultimately balanced the interests and reached the reasoned determination to develop the oil and gas resources. This record clearly indicates that BLM took seriously the concerns of the Fish and Wildlife Service and responded in a manner designed to minimize the project's effects on sage grouse. *See U.S. Satellite Broad. Co. v. FCC*, 740 F.2d 1177, 1188 (D.C. Cir. 1984) ("In notice and comment rulemaking, an agency need not respond to every comment so long as it responds in a reasoned manner to significant comments received."). "Although an agency should consider the comments of other agencies, it does not necessarily have to

defer to them when it disagrees." *Hughes River Watershed Conservancy v. Johnson*, 165

F.3d 283, 289 (4th Cir. 1999). Thus, this contention is equally to no avail.

## B. BLM Did Evaluate a Reasonable Range of Alternatives.

NEPA requires agencies to "[r]igorously explore and objectively evaluate all

reasonable alternatives" in environmental impact statements and "briefly discuss the

reasons" for eliminating alternatives from consideration. 40 C.F.R. § 1502.14(a). TRCP

next argues that the BLM failed to evaluate a reasonable range of alternatives. In

particular, TRCP alleges BLM failed to do this in eliminating Alternative B from the final

environmental impact statement. (TRCP Pl.'s Mot. for Summ. J. at 12.) This alternative

"proposed that natural gas development activities would be restricted to one of three

zones within the ARPA boundary at any one time." (FEIS at 2-12 (AR 2160).) For the

following reasons, I disagree with TRCP's contention.

BLM did consider Alternative B in detail in the draft EIS. Specifically, BLM

considered aspects of Alternative B such as economic effects, (DEIS at S-6 (AR 1448)),

geological effects, (DEIS 2-10 (AR 1497)), and effects on land, water, vegetation,

wildlife, and recreation, (DEIS at 2-10 to 2-16 (AR 1497–1503).) After considering the

alternative in the draft EIS, BLM was only required to "briefly discuss the reasons" for its

elimination in the final EIS. 40 C.F.R. § 1502.14(a); *Tongass Conservation Soc. v.*

*Cheney*, 924 F.2d 1137, 1141 (D.C. Cir. 1991) (noting the regulations require an agency

to "only 'briefly discuss the reasons' why rejected possibilities were not 'reasonable

17

alternatives'" (quoting 40 C.F.R. § 1502.14(a))); *see also Robertson*, 490 U.S. at 350–51

(1989) (noting NEPA only mandates processes; it does not dictate outcomes).  Indeed,

BLM eliminated the alternative in the final environmental impact statement due to the

prolonging effect it would have on leaseholders and mineral rights development and

would, as a result, contravene BLM's policy to allow reasonable access across federal

lands for mineral development on both private and state lands.  (FEIS at 2-12 to 2-13 (AR

2160–61); ROD at 14 (AR 4809)); *see Hells Canyon Alliance v. U.S. Forest Serv.*, 227

F.3d 1170, 1181 (9th Cir. 2000) (noting an agency did not violate NEPA by excluding an

alternative that "would have been unrealistic in light of the statutorily mandated

objectives" "of striking an appropriate balance between recreational and ecological

values").[9]  Such reasoning is neither arbitrary nor capricious.

Finally, TRCP also argues, based only on BLM's inclusion of two alternatives,

BLM did not consider a reasonable range of alternatives in the environmental assessments

---

[9]TRCP cites a Ninth Circuit case to support its argument that BLM's dismissal of Alternative B resulted in the final environmental impact statement containing three alternatives that were "virtually identical," in violation of NEPA.  (TRCP Pl.'s Mot. for Summ. J. at 15 (citing *Friends of Yosemite Valley v. Kempthorne*, 520 F.3d 1024, 1038 (9th Cir. 2008).)  The plaintiff argues the three alternatives are virtually identical because they allow drilling of approximately the same number of wells and have the same overall environmental effect.  The evidence, however, does not bear this out. While Alternatives C and D provide for the same number of drilling sites, Alternative D limits the surface disturbance at any time to less than 2.8% of the total project area. (FEIS, ES-2 to ES-3 (AR 2089–90).)  Furthermore, Alternative A would have allowed for no additional drilling or development and thus differs significantly from Alternatives C and D.  The Court finds the alternatives were not virtually identical and BLM's elimination of Alternative B was not arbitrary or capricious. *See Citizens Against Burlington, Inc.*, 938 F.2d at 193 (finding an agency's consideration of only two alternatives was not arbitrary or capricious).

for the site-specific Sun Dog and Catalina plans.  The defendants, however, note that the

EAs were "tiered" to the earlier EIS, in which BLM considered a reasonable range of

alternatives.  (Environmental Assessment, Catalina A & B PODs, June 18, 2007, "Tiered

EA, FONSI and DR Form" (AR 73492); Environmental Assessment, Sun Dog A & B

PODs, Aug. 13, 2007, "Tiered EA, FONSI and DR Form" (AR 74063).)  "Tiering" is a

term describing BLM's practice of covering general matters in broad environmental

impact statements and later incorporating the EISs in site-specific analyses.  40 C.F.R. §

1508.28.  The pertinent regulations here encourage tiering so repetitive discussions of the

same issues are eliminated and agencies can focus on actual issues ripe for decision.  40

C.F.R. § 1502.20.  Thus, as a preliminary matter, because BLM tiered the environmental

assessments to the environmental impact statements, the environmental assessments do

not need to include as thorough of an analysis.  40 C.F.R. § 1508.28; *Nevada v. Dep't of*

*Energy*, 457 F.3d 78, 91–92 (D.C. Cir. 2006) (finding an agency took a hard look at

environmental impacts when the site-specific EIS was tiered to another EIS).

In making its argument, TRCP merely relies on the fact that BLM included only

two alternatives in the site-specific EAs: a proposal allegedly provided by the operators

and an alternative that would not allow any action.  (TRCP Pl.'s Mot. for Summ. J. at 16.)

However, the evidence indicates that BLM *did* modify the operators' proposal.  In fact,

BLM conducted site-specific review to consider environmental effects, and "[a]s a result .

. . several project components were moved to reduce potential impacts to soils, water,

resources, vegetation, and wildlife resources." (Catalina EA at 5 (AR 73496); Sun Dog

EA at 4 (AR 74066).) Specifically, after BLM's on-site inspections, well sites were

relocated, (Double Eagle Letter, Mar. 21, 2006 (AR 78560)), project facilities were

moved to minimize sage grouse conflicts, (Degenfelder email, Apr. 7, 2006 (AR 78564)),

and prairie dog conflicts, (Storzer Letter, Apr. 24, 2006 (AR 78576)), a site was moved to

avoid potential hydrological impacts, (Bargsten email, May 9, 2007 (AR 78787)), and a

road was moved to conform to the recommendations of an archeological study,

(Degenfelder email, May 29, 2007 (AR 78619).) Thus, the evidence clearly indicates

BLM did consider and adopt more protective measures after conducting its own review.

In light of the EAs' incorporation of the broader EIS and the BLM analyzing and

modifying the operator's proposal, BLM's inclusion of only two alternatives in the site-

specific EAs does not evince a failure to adequately consider environmental impacts. *See*

*Citizens Against Burlington, Inc.*, 938 F.2d at 193 (finding an agency's consideration of

only two alternatives was not arbitrary or capricious).

     C.     **BLM did not violate NEPA in failing to address the project's effects in conjunction with other developments.**

NEPA requires agencies to consider environmental effects of the plan in

conjunction with "other past, present, and reasonably foreseeable future actions." 40

C.F.R. §§ 1508.7 & 1508.25. Agencies need not consider actions that are not reasonably

foreseeable. The NRDC plaintiffs next assert that BLM failed to identify the cumulative

effects of additional developments: the Continental Divide-Creston Project and the

Hiawatha Project.[10]  BLM explains that while it did consider other natural-gas developments,[11] it did not consider these two because they were not reasonably foreseeable.  I agree.

In ruling on the preliminary injunction in *NRDC*, this Court found the Continental Divide-Creston and Hiawatha Projects "had only begun to work their way through the NEPA approval process when the FEIS was compiled." *NRDC*, 525 F. Supp. 2d at 123. The *draft* environmental statements for these projects were still being prepared.  The Atlantic Rim final environmental impact statement was released to the public in December 2006, *see* 71 Fed. Reg. 69582–83 (AR 9564–65), and the ROD was released in May 2007, *see* 72 Fed. Reg. 28518–19 (AR 9574–75).  BLM issued a notice of intent to prepare EISs for the Continental Divide-Creston Project in March 2006, *see* 71 Fed. Reg. 10,989 (Mar. 3, 2006), and for the Hiawatha Project in September 2006, 71 Fed. Reg. 52,571 (Sept. 6, 2006).  Therefore, as this Court found, "absent some evidence that the ultimate extent of these projects, as well as their ultimate approval, was reasonably foreseeable, this Court [would] not overturn BLM's decision to exclude them from its cumulative impact analysis." *NRDC*, 525 F. Supp. 2d at 123.

---

[10]TRCP argues BLM failed to analyze the project's effects in conjunction with allegedly foreseeable wind energy development.  In making this argument, however, TRCP relies on exhibits the Court has excluded.  (*See* TRCP Pl.'s Mot. for Summ. J. at 22–24 (relying on Exhibits K–M); *see also* Order granting #54 Motion to Strike (03/09/09).)

[11]BLM did conduct a cumulative-impact analysis that included seven natural-gas developments that had final environmental impact statements or environmental assessments.  (FEIS at 5-2 to 5-3 (AR 2484–85).)

In an attempt to show the Continental Divide/Creston project's approval was reasonably foreseeable, the plaintiffs point to a BLM map dated June 9, 2006, (before the ROD was published in March 2007), which includes the Continental Divide/Creston project. (Rawlins Field Office—Minerals and Land Projects (AR 86298).)  This map, however provides no indication of when, *if ever*, the project would be approved.  (*Id.*) The map thus provides no more evidence of the project's ultimate approval than the draft environmental impact statements.  *See NRDC*, 525 F. Supp. 2d at 123; *Airport Impact Relief, Inc. v. Wykle*, 192 F.3d 197, 206 (1st Cir. 1999) (finding expansion of an airport was not reasonably foreseeable, despite a memorandum of understanding discussing the airport's expansion, because the expansion was "contingent on several events that may or may not occur over an eight-year span").  Thus, the plaintiffs have failed to provide this Court any "evidence that the ultimate extent of the projects, as well as their ultimate approval, was reasonably foreseeable."  *NRDC*, 525 F. Supp. 2d at 123.  Having already determined the two projects were not reasonably foreseeable, and in the absence of evidence to the contrary, the Court holds that BLM did not act arbitrarily or capriciously in failing to incorporate them in its cumulative-impacts analysis.  *See Public Util. Comm'n of Cal.*, 900 F.2d at 283 (holding "there was no need to consider the cumulative impacts" of actions that were "not reasonably foreseeable").

**D.    BLM did not violate NEPA's public-participation requirements.**

The plaintiffs next contend that BLM did not provide the public an opportunity to comment on the site-specific analysis of drilling permits in the Catalina and Sun Dog projects.  Plaintiffs take this position notwithstanding this Court's earlier decision on the preliminary injunction sought in this case that the public did have an opportunity to comment on the EAs for the projects, given that the public was informed that BLM was preparing EAs for these projects and that the permit applications were posted in a BLM public reading room.  *NRDC*, 525 F. Supp. 2d at 120.  The plaintiffs base their argument on evidence that the permit applications themselves were not posted for the public, only the notices of the pending determinations were posted.  The plaintiffs thus argue that such notice is not satisfactory because the regulations provide for public involvement "to the extent practicable."  40 C.F.R. § 1501.4(b).  I disagree.

BLM, in fact, published notices of the EAs, *NRDC*, 525 F. Supp. 2d at 120, and NEPA regulations only require that that information be available for public review "[i]n certain limited circumstances," 40 C.F.R § 1501.4(e)(2), which plaintiffs, in effect, concede do not apply in this case.  As a result, the Court must defer to BLM's decision regarding public participation with respect to the environmental assessments, because, as our Circuit pointed out in *TOMAC v. Norton*, 433 F.3d 852, 861 (D.C. Cir. 2006), "the

agency has significant discretion in determining when public comment is required with respect to EAs."[12]

### E.   BLM's reliance on adaptive management for mitigation was not arbitrary or capricious.

The plaintiff further argues that BLM's adaptive-management-mitigation plan is "so amorphous and ill-defined" that the agency was unable to determine the environmental consequences of the project and thus unable to take the requisite "hard look" at the project's effect on the environment.[13] (TRCP Pl.'s Mot. for Summ. J. at 17–18.) Once again, I disagree. As this Court has already determined, the project incorporated numerous specific mitigation techniques, such as limiting the total amount of surface disturbance to 2.8% of the total area at any one time, prohibiting surface disturbance or occupancy near sage-grouse breeding grounds, imposing greater protections during sage-grouse-breeding times, and limiting construction and noise around the breeding grounds. *NRDC*, 525 F. Supp. at 121–22 (denying a preliminary injunction and citing FEIS, at 2-8, E-7). Such planning is neither arbitrary nor capricious.

[12]The NRDC plaintiffs also argue that the failure to provide public participation poses problems, because in the EIS, BLM explicitly delayed the required analysis until the site-specific evaluations. Given that the public was only able to comment on the EIS and not the site-specific assessments and that much of the required analysis under the final impact statement was delayed until the site-specific assessments, plaintiffs argue, the public was precluded from participating in much of the analysis. This Court, however, has already rejected this argument in its decision on the preliminary injunction. *NRDC*, 525 F. Supp.2d at 121.

[13]NEPA does not require agencies to implement mitigation measures, only to *discuss* possible mitigation measures in the EIS. 40 C.F.R. § 1502.16(h); *see also Robertson*, 490 U.S. at 351–52; *NRDC*, 525 F. Supp. 2d at 121–22.

TRCP also attempts to characterize BLM's commitment to continually monitoring the project's environmental effects and to making adjustments "based upon how the environment responds to future development and performance requirements," (ROD at B-3 (AR 4837)), as equivalent to a decision to "act now and deal with environmental consequences later," which is "plainly inconsistent with the broad mandate of NEPA." (*See* TRCP Pl.'s Mot. for Summ. J. at 20–21 (citing *Found. for N. Am. Wild Sheep v. USDA*, 681 F.2d 1172, 1181 (9th Cir. 1982))).)   In short, TRCP asserts that in seeking to ensure the plan's mitigation measures are effective, BLM failed to comply with environmental regulations.  Not so!  NEPA does not prevent agencies from adopting mitigation techniques and acknowledging they may be adjusted later depending on their effectiveness.  (*See* ROD at B-3 (AR 4837) (noting the Council on Environmental Quality NEPA regulations require continual monitoring).)  Thus, this contention is also to no avail.

F.      **BLM did not prematurely commit agency resources.**

NEPA regulations prohibit agencies from committing resources to a plan before issuing an ROD.  40 C.F.R. § 1502.2(f).  An agency cannot act to further a specific proposal before analyzing the environmental effects of that proposal.  In short, agencies cannot adopt a policy of "destruction before decision."  *See St. John's United Church of Christ v. Chicago*, 502 F.3d 616, 630 (7th Cir. 2007).  TRCP next argues that in issuing the ROD for the Atlantic Rim Project, BLM unlawfully committed resources before it

completed an ROD for the Rawlins Plan, which would update the Great Divide Resource

Management Plan (RMP), the broad land use plan under which the Atlantic Rim Project

is governed. (TRCP Pl.'s Mot. for Summ. J. at 25.) As a consequence, TRCP argues,

overlapping issues were resolved in the ROD for the Atlantic Rim Project instead of the

ROD for the overarching Rawlins plan. I disagree.

In making its argument, TRCP ignores that BLM determined that a ROD for the

Rawlins Plan was *unnecessary* because the initial projections for development, or

"reasonably foreseeable development scenario" (RFD), serve as a tool to evaluate existing

management, and not a planning decision. (BLM Instruction Memorandum No. 2004-

089, Attachment 1-1 to 1-3 (AR 5311–13).) A 2004 internal memorandum defined how

BLM should interpret the existing Great Divide RMP. "The fact that the total number of

wells in an area may exceed the total number of wells projected in the selected alternative

does not automatically mean that a[n] . . . amendment to the RMP is necessary." (FEIS at

O-259 (AR 4654).) Accordingly, the RMP did not need to be revised or amended,

because, as explained below, BLM determined the Atlantic Rim Project's ROD was

consistent with the broad predictions of the RFD. (*See id.*)

Furthermore, even if BLM had not issued the memorandum, BLM does not have a

duty to halt development while revising the RMP. *ONRC Action v. BLM*, 150 F.3d 1132,

1139 (9th Cir. 1998) (defining as "unfounded" an argument that outdated RMPs cannot

be existing program plans under NEPA and finding no "clear duty of when to revise the

plans, [or] to cease actions during such revisions"). "It may be that a thorough examination of the current RMPs would reveal that revision of some of the land use plans is warranted under the language of the regulations"; however, the BLM is not required to cease actions during the revision process. *Id.* at 1140. Thus, BLM did not prematurely commit resources in completing the EIS without completing the Rawlins Plan RMP.

### G.   BLM's analysis of the project's effects on mule deer was not arbitrary and capricious.

TRCP next argues BLM failed to take the requisite "hard look" at the project's effects on mule deer because it completed the final EIS and ROD before determining baseline data regarding seasonal ranges and migration routes of mule deer.[14] (TRCP Pl.'s Mot. for Summ. J. at 27 (citing *Half Moon Bay Fishermans' Mktg. Ass'n v. Carlucci*, 857 F.2d 505, 510 (9th Cir. 1988) and referencing Final Report for the Atlantic Rim Mule Deer Study, Apr. 2007 (AR 7421).) Again, I disagree.

BLM did, in fact, consider the project's effects on mule deer. It specifically discussed the effects of the project on mule deer populations, relying for its analysis on other previously conducted studies concerning mule deer.[15] As our Circuit Court has stated: "Baseline or no baseline, the question is whether the [federal agency] has fully

---

[14]Although a study to identify the mule deer baseline data was in progress, it was not completed until April 2007, four months after the EIS was finished in December 2006, and one month after the ROD was signed in March 2007. (*Compare* Final Report for the Atlantic Rim Mule Deer Study, Apr. 2007 (AR 7421) *with* FEIS (AR 2080) and ROD (AR 4791).)

[15]*See* FEIS at R-1 to R-29 (listing references cited).

examined options calling for greater or lesser environmental protection." *Conservation Law Found. v. FERC*, 216 F.3d 41, 46 (D.C. Cir. 2000). In this case, the agency's selection of a particular baseline did not prevent it from complying with NEPA because BLM analyzed the environmental and economic costs of the action. *See id.* Thus the Court cannot say BLM violated NEPA by failing to wait for a mule deer study funded by members of the industry and prepared by a third party. *See id.*[16]

## II.     BLM did not violate the Federal Land Policy and Management Act

The Federal Land Policy and Management Act requires agencies to manage public lands to allow for multiple uses. Agencies must both protect the environment,[17] 43 U.S.C. § 1701(a)(8), and manage the land in such a way as to provide for domestic

---

[16]TRCP briefly argues that even assuming the EIS is lawful, the Catalina and Sun Dog projects are unlawful because they allow the operators to request exemptions and waivers, when the possibility of exemptions and waivers was not considered in the EIS. Thus, BLM never analyzed the environmental effects of exemptions and waivers. This cursory, unsupported argument fails. The Catalina and Sun Dog EAs merely note that "[i]n some instances, the proponent may request consideration of a temporary exception to wildlife seasonal restrictions. Such an exception may not be granted if a determination is made that the wildlife resource will not be adversely impacted." (Sun Dog EA at 9 (AR 74071); Catalina EA at 9 (AR 73500).) The plaintiffs assert BLM should have analyzed the environmental effects of granting an exemption or waiver request despite not knowing what, if any, exemptions or waivers might be requested. As such, the plaintiffs are demanding exactly the sort of "crystal ball" inquiry NEPA clearly does not require. *Vt. Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 534 (1978) ("NEPA does not require a 'crystal ball' inquiry." (internal quotation omitted)).

[17]Specifically, FLPMA provides public lands shall be managed "in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values; that, where appropriate, will preserve and protect certain public lands in their natural condition; that will provide food and habitat for fish and wildlife and domestic animals; and that will provide for outdoor recreation and human occupancy and use." 43 U.S.C. § 1701(a)(8).

sources of "minerals, food, timber, and fiber."[18]  43 U.S.C. § 1701(a)(12).  FLPMA also

requires agencies to develop land use plans, 43 U.S.C. § 1712(a), and to "manage the

public lands . . . in accordance with [them]," 43 U.S.C. § 1732(a).  The land use plan in

this case is the Great Divide Resource Management Plan.  TRCP contends that BLM

violated FLPMA by acting inconsistently with FLPMA's multiple-use and sustained-yield

principles.  For the following reasons, I disagree.

A.    **The project's effects on sage grouse do not indicate a violation of
      multiple-use management.**

TRCP first alleges BLM violated FLPMA's goals of multiple use and sustained

yield because the project will result in "possibly irreversible" effects on sage grouse,

(TRCP Pl.'s Summ. J. Mot. at 33 (citing U.S. Fish and Wildlife Serv. Memorandum, Jan.

5, 2002 (AR 10134)), and a reduction in big game, (*Id.* at 7.)  The Court first notes the

goals of multiple use and sustained yield are "guidelines."  43 U.S.C. §§ 1701(a)(7);

1712(a), 1712(c)(1); *see also Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 58

(2004) (noting "FLPMA establishes a dual regime of inventory and planning" to

effectuate its broad management goals).  Furthermore, these guidelines are used in

developing broad land use plans, not in developing more specific RODs.  43 U.S.C. §

1732(a).  As the Interior Board of Land Appeals held, "[m]ultiple use is generally

considered in the context of BLM's land-use planning"; therefore, "[alternate uses] need

_____

[18]Specifically, FLPMA provides land shall be managed in a manner that "recognizes the Nation's
need for domestic sources of minerals, food, timber, and fiber from the public lands."  43 U.S.C.
§ 1701(a)(12).

not be considered anew each time BLM decides to lease the land or grant leave to

undertake an activity." *S. Utah Wilderness Alliance Utah Chapter, Sierra Club*, 122

IBLA 165, 172 (Interior Bd. of Land App. Feb. 7, 1992).  Thus, TRCP's argument that

the ROD is inconsistent with FLPMA is misplaced.  *Id.*  While land use plans are

governed by FLPMA's broad principles, each individual project and parcel of land need

not, and cannot, reflect all FLPMA's purposes.  *See Rocky Mountain Oil and Gas Ass'n v.

Watt*, 696 F.2d 734, 738 (10th Cir. 1982) (noting FLPMA requires BLM to "recognize

competing values" and that all values cannot be effectuated on a particular piece of land).

Despite this, even if the Court assumes, as TRCP argues, that BLM must manage

the Atlantic Rim Project Area in accordance with multiple-use and sustained-yield

principles because of its large size, (TRCP Pl.'s Consolidated Response to Cross-Mot. for

Summ. J. and Reply in Support of Pl's Mot. for Summ. J. at 12), TRCP has not

demonstrated that the ROD itself was inconsistent with multiple-use and sustained-yield

principles.  BLM clearly sought to balance the competing objectives of "recover[ing]

natural gas resources" and "protecting other resource values."  (ROD at 10 (AR 4805).)

In selecting Alternative D, BLM believed that the alternative would "provide[] a good

balance between oil and gas recovery and resource protection and provide[] for long-term

reclamation and re-establishment of native vegetation and wildlife communities."  (*Id.*)

The ROD also provides for mitigation measures that will "reduce direct and indirect

disturbance to wildlife" and "facilitat[e] the long-term return of habitat function."  (ROD

at 9 (AR 4804).) These measures include "limiting allowable surface disturbance, accelerated reclamation by the Operators, remote monitoring (telemetry), [and] timing stipulations." (*Id.*) As such, BLM's actions, although not protective enough for TRCP's taste, were not "inconsistent" with FLPMA's multiple-use and sustained-yield objectives. And, as such, this argument is also to no avail.

> **B.     The ROD is not inconsistent with the Great Divide Resource Management Plan.**

FLPMA requires BLM to "manage the public lands . . . in accordance with . . . land use plans . . . when they are available." 43 U.S.C. § 1732(a). Thus, "[a]ll future resource management authorizations and actions . . . shall conform to the approved plan." 43 C.F.R. § 1610.5-3(a); *see also S. Utah Wilderness Alliance*, 542 U.S. at 67. TRCP next argues that the ROD is inconsistent with the RMP itself for three reasons: (1) because the amount of drilling for the Atlantic Rim Project vastly exceeds the Great Divide RMP's projections, (2) because the project is inconsistent with the RMP's objectives to maintain vegetation and ecological quality, and (3) because BLM failed to define mitigation and monitoring efforts in the ROD. I disagree.

The plaintiff first asserts that the amount of drilling for the Atlantic Rim Project so exceeded the Great Divide RMP's projections that the project was not being managed "in accordance with . . . land use plans." 43 U.S.C. § 1732(a). To that end, TRCP points out that the Great Divide RMP projected that 1,440 wells would be drilled, and while there are a number of projects within the Great Divide RMP area, drilling for the Atlantic Rim

Project alone exceeds the projection by more than 25%. (TRCP Pl.'s Mot. for Summ. J. at 42.) TRCP argues that exceeding the projection "by 25% with a single project (and by as much as 1000% when projects are viewed cumulatively), is so far beyond the . . . projection as to render BLM in violation of FLPMA's basic requirement that all project level actions remain consistent with the governing RMP." (*Id.*) How so?

While TRCP is correct that drilling for the Atlantic Rim project vastly exceeds the RMP's projections, the RMP itself concluded that "[t]he entire planning area is open to oil and gas leasing." (Great Divide Resource Area Record of Decision and Approved Resource Management Plan, Nov. 1990 (RMP) at 30 (AR 679).) Furthermore, it is important to note that BLM had determined previously that the RMP projection is not a hard cap on drilling. As explained above, in the 2004 internal memorandum, BLM noted the Great Divide RMP's projection of reasonably foreseeable development "is not a management prescription" and does *not* "establish a limit on the number of oil and gas wells that can be drilled in a resource area." (FEIS at O-259 (AR 4654); FEIS at O-271 (AR 4666)); *see also S. Utah Wilderness Alliance*, 542 U.S. at 69 (emphasizing that "FLPMA describes land use plans as tools by which 'present and future use is *projected*'" (quoting 43 U.S.C. § 1701(a)(2))). Having stated that the entire area was open to drilling, the RMP's projection estimates do not limit the number of wells that can be drilled. The Court is thus not persuaded by TRCP's argument that BLM acted arbitrarily and capriciously in allowing the drilling of more wells than the RMP initially projected.

Second, TRCP argues the project is inconsistent with the Great Divide RMP's objectives to maintain vegetation and ecological quality and to ensure the continued availability of outdoor recreational opportunities because the project will have adverse effects on big game and sage grouse and will displace hunting and recreation activities. (TRCP Pl.'s Mot. for Summ. J. at 41–42.) However, BLM adopted a wildlife resource management plan, which includes limiting surface disturbance to less than three miles in grouse brood rearing or nesting habitat and big game crucial winter range, (FEIS at G-4 (AR 3057)), directional drilling, drilling multiple wells from a single pad, seasonally restricting public vehicular access, monitoring wells remotely, implementing techniques and designs to reduce noise, burying power lines to avoid poles and other tall structures, and numerous other activities, (FEIS at H-13 (AR 3093).) The FEIS also mandates that "[n]o surface disturbance would be allowed in severe winter relief habitats for greater sage-grouse." (FEIS at G-4 (AR 3057).). BLM thus took numerous actions in furtherance of the Great Divide RMP's objectives to maintain vegetation and ecological quality and to ensure the continued availability of outdoor recreational opportunities.

While the project will have some adverse effects on the environment and recreational opportunities, the RMP, like FLPMA itself, has the additional objective to provide for development. Indeed, the RMP establishes as an objective "[t]o provide opportunity for leasing, exploration, and development of oil and gas while protecting other resource values," (FEIS at 1-9 (AR 2136)), and, as discussed above, provides that

"[t]he entire planning area is open to oil and gas leasing." (RMP at 30 (AR 679).)

Because BLM balanced the RMP's competing management objectives, and took steps to

ensure environmental protection, the ROD is not inconsistent with the RMP as a whole.

Finally, the plaintiff argues that BLM failed to define mitigation and monitoring

efforts in the ROD, and that, as a result, the ROD is *per se* inconsistent with the Great

Divide RMP. I disagree. The plaintiff makes this argument citing only a single,

unpublished case. The district court in that case, however, was not evaluating an

environmental impact statement in relation to the FLPMA. *See W. Watersheds Project v.*

*U.S. Forest Serv.*, 2006 WL 292010 (D. Idaho 2006). In *Western Watersheds Project*, the

court found that because the agency did not explain the mitigation strategy, "the Court

[could not] tell from the administrative record whether or not the [agency] complied with

the Plan standards." *Id.* at 10 (quotation and alteration omitted). Here, however, BLM

described in detail the monitoring and mitigation plan in the ROD and the FEIS. (*See*

ROD at 20 (AR 4815) (discussing monitoring, reporting, and adaptive management);

FEIS at App. E (AR 4868–4881) (providing for the preliminary wildlife inventory,

monitoring, and protection protocol).) Additionally, as discussed above, BLM included

numerous mitigation measures to minimize the project's effect on wildlife. *NRDC*, 525

F. Supp. 2d at 121–22. Although, as TRCP points out, the ROD noted that BLM would

begin developing the specific details of the monitoring and mitigation process *after*

issuing the ROD, (ROD at 20 (AR 4815)), BLM nevertheless fully explained the overall

strategy and protocols sufficient to enable the Court to determine that the ROD is in

compliance with plan standards.  *Cf. W. Watersheds Project*,  2006 WL 292010 (D. Idaho

2006).  Therefore, the project is not inconsistent with the Great Divide RMP based on an

alleged failure of mitigation measures.

## CONCLUSION

Thus, for all of the foregoing reasons, this Court DENIES the plaintiffs' summary

judgment motions and GRANTS the defendants' summary judgment motions.  An Order

consistent with this opinion is attached.

RICHARD J. LEON
United States District Judge